Retained Loans consist of Loans granted by GDB to several public corporations and instrumentalities with an aggregate principal balance as of the Cutoff Date of approximately $1,131.8 million, of which the Additional Recovery Authority Loans comprise approximately $144.6 million. The "Additional Recovery Authority Loans" are Loans to CRIM, Economic Development Bank for Puerto Rico ("EDB"), and University Medical Services, Inc. ("SMU"), further described below.

Pursuant to the GDB Restructuring Act and the Qualifying Modification, GDB will be required to transfer the proceeds of the GDB Retained Loans to the Issuer as soon as practicable but in no event later than 15 days after receipt thereof. Other than the Additional Recovery Authority Loans (upon the transfer thereof to GDB as provided below) and the Beneficial Interest in the GDB Retained Loans, the GDB Retained Loans will not be part of the Transferred Property.

As explained above under "—*Management of the Restructuring Property*," pursuant to the Qualifying Modification, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on the GDB Retained Loans, *provided* that it will not be required to bring any action seeking to obtain a judgment against a public entity that is an obligor on a GDB Retained Loan or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material information relating to any modification, restructuring or similar transaction in respect of such Loans.

The Additional Recovery Authority Loans will be transferred to GDB as Transferred Property on the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (b) 18 months after the Closing Date. Upon the required transfer of the Additional Recovery Authority Loans to the Issuer and upon the transfer of any other GDB Retained Loan to the Issuer at the discretion of GDB, the Issuer will be subject to the limitations on its exercise of rights and remedies in respect of such Loan to the same extent as with respect to the Public Corporation Loan Assets. For additional information on such duties and limitations, see "—*Management of the Restructuring Property*" above.

All GDB Retained Loans (other than the Additional Recovery Authority Loans) are classified by GDB as non-performing. All Additional Recovery Authority Loans were classified by GDB as performing as of the Cutoff Date, *provided that*, as further discussed below, a portion of the 2001 CRIM Loan (as defined herein) with a principal balance of $26.9 million, had been placed by GDB in non-accrual status as of the Cutoff Date.

The following table provides an overview of certain additional information regarding the GDB Retained Loans as of the Cutoff Date (but considering any payments received by GDB on July 2, 2018 by virtue of rollover to the next business day from the Cutoff Date), and a brief description of each Additional Recovery Authority Loan follows.

**GDB Retained Loan Rights[1]**

| Obligor | Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date[2] | % of Total Outstanding Principal Balance of GDB Retained Loans |
|---|---|---|---|---|---|---|
| ASEM[3] | $282,447,692 | $64,161,740 | 1 | 6.25% | 11/30/2022 | 25% |
| Special Communities[4] | 240,708,020 | 92,889,979 | 1 | 7.00% | 6/30/2040 | 21% |
| ASES[5] | 182,196,066 | 41,817,876 | 1 | 6.25% | 10/31/2022 | 16% |
| CRIM | 129,083,721 | 19,350,623 | 2 | 4.11% | 7/1/2032 | 11% |
| Cancer Center[6] | 120,482,398 | 20,509,820 | 2 | 6.55% | 12/31/2043 | 11% |
| TDF[7] | 44,925,998 | - | 3 | - | - | 4% |
| EDB Loan[8] | 6,556,583 | 0 | 1 | 6.00% | 6/1/2026 | 1% |
| EDB Deposit[9] | 35,122,200 | 0 | 1 | N/A | N/A | 3% |
| Cantera Peninsula[10] | 37,791,088 | 10,007,699 | 2 | 7.00% | 6/30/2040 | 3% |
| PRIFA | 37,361,150 | 8,897,649 | 1 | 6.25% | 6/30/2017 | 3% |
| SMU[8] | 8,988,973 | - | 1 | 6.25% | 6/30/2025 | 1% |
| PPP[11] | 6,159,177 | 949,295 | 1 | 6.25% | 1/31/2016 | 1% |
| Total | $1,131,823,066 | $258,584,482 | 17 | - | - | 100% |

(1) Additional Recovery Authority Loans are identified in bold.

(2) Does not account for the impact of Closing Date Adjustments.

(3) Puerto Rico Medical Services Administration.

(4) Special Communities Perpetual Trust.

(5) Puerto Rico Health Insurance Administration.

(6) Puerto Rico Comprehensive Cancer Center.

(7) Puerto Rico Tourism Development Fund.

(8) As defined herein.

(9) Non-performing overnight deposit of GDB at EDB.

(10) Cantera Peninsula Integral Development Company.

(11) Puerto Rico Public-Private Partnerships Authority.

Source: GDB

AAFAF_CONF_0001101

*CRIM Loans.* CRIM is a municipal entity of the Commonwealth that is primarily responsible for assessing and collecting real and personal property taxes for the benefit of the municipalities. Loans to CRIM comprising Additional Recovery Authority Loans consist of two Loans made by GDB to CRIM in 2001 (the "2001 CRIM Loan") and 2002 (the "2002 CRIM Loan") that have an aggregate outstanding principal balance as of the Cutoff Date of approximately $129.1 million.

*2001 CRIM Loan.* The 2001 CRIM Loan was made by GDB to CRIM pursuant to Act No. 42-2000 to cover CRIM's operational deficit resulting from excess remittances made by CRIM to municipalities based on estimates of annual property tax collections that later resulted to be greater than the actual tax collections. Municipalities are indebted to CRIM for the amount of the excess remittances received, and CRIM withholds funds from the municipalities' remittances for the payment of the 2001 CRIM Loan. As of the Cutoff Date, the 2001 CRIM Loan has an outstanding principal balance of approximately $101.7 million and accrued and unpaid interest of approximately $19.1 million. The 2001 CRIM Loan is payable on January 1 and July 1 of each year, bears interest at a variable rate equal to LIBOR, plus 125 basis points, and matures on July 1, 2032. The 2001 CRIM Loan is unsecured and, pursuant to the loan agreement, is payable from Commonwealth appropriations related to an increase in Commonwealth subsidies to municipalities authorized pursuant to Act 42-2000. As of the Cutoff Date, CRIM has made all payments due on the 2001 CRIM Loan in full with funds withheld by CRIM from municipalities as repayment of excess remittances received by such municipalities. As a result, the 2001 CRIM Loan was classified by GDB as performing as of the Cutoff Date. However, certain municipalities have objected to CRIM withholding remittances for this purpose, which may result in CRIM not being able to continue making all debt service payments due under the 2001 CRIM Loan. As a result, GDB has placed the portion of the 2001 CRIM Loan corresponding to such municipalities (approximately $26.9 million) in non-accrual status as of the Cutoff Date. Moreover, GDB and CRIM are currently negotiating a possible moratorium on payments of principal on the 2001 CRIM Loan. As a result, the Collections Schedule included herein assumes a two-year moratorium on payments of principal on the 2001 CRIM Loan. Any such modification would need to be approved by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement), if it occurs prior to the Closing Date, and by the Servicer in accordance with the Servicing Agreement, if it occurs after the Closing Date.

*2002 CRIM Loan.* The proceeds of the 2002 CRIM Loan were used by CRIM to cancel a debt issued by it in connection with a transaction for the sale of delinquent tax debts. As of the Cutoff Date, the 2002 CRIM Loan has an outstanding principal balance of approximately $27.3 million and accrued and unpaid interest of approximately $222 thousand. Interest on the 2002 CRIM Loan is payable on March 31 and September 30 of each year, and principal is payable on March 31 of each year. The 2002 CRIM Loan bears interest at a variable rate equal to LIBOR, plus 125 basis points. The 2002 CRIM Loan is unsecured and, pursuant to the loan agreement, was expected to be payable from Commonwealth appropriations to municipalities. As of the Cutoff Date, the 2002 CRIM Loan was classified by GDB as performing. However, GDB and CRIM are currently negotiating a possible moratorium on payments of principal on the 2002 CRIM Loan. As a result, the Collections Schedule included herein assumes a two-year moratorium on payments of principal on the 2002 CRIM Loan. Any such modification would need to be approved by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement), if it occurs prior to the Closing Date, and by the Servicer in accordance with the Servicing Agreement, if it occurs after the Closing Date.

*EDB Loan.* EDB is a public bank that is an instrumentality of the Commonwealth and provides Loans to individuals and private entities to promote economic development, primarily in the manufacturing, agriculture and tourism industries. GDB made a Loan to EDB (the "EDB Loan") in 1998 for the acquisition and improvement of the building in San Juan, Puerto Rico, in which EDB currently has its offices (the "EDB Property"). As of the Cutoff Date, the EDB Loan had an outstanding principal balance of approximately $6.6 million. Interest on the EDB Loan is payable semi-annually on June 1 and December 1 of each year, and principal is payable on June 1 of each year. The EDB Loan bears interest at a fixed rate of 6% per year. The Loan is secured by a mortgage in the principal amount of approximately $14.2 million over the EDB Property. The most recent appraisal of the EDB Property prepared at the request of GDB (dated August 2016) reflects an appraisal value of $7.7 million. As of the Cutoff Date, the EDB Loan was classified by GDB as current.

*SMU Loan.* SMU is a not-for-profit corporation created by the UPR, the Commonwealth's public university system, to administer certain of the university's medical facilities. GDB made a Loan to SMU (the "SMU Loan") to finance operating expenses and make certain improvements to the medical facilities. As of the Cutoff Date, the SMU Loan had an outstanding principal balance of approximately $9.0 million. The SMU Loan is payable monthly and bears interest at a variable rate equal to the Prime Rate plus 150 basis points. The Loan is unsecured and benefits from a payment guarantee from the UPR. As of the Cutoff Date, the SMU Loan was classified by GDB as current.

### Real Property Assets

The Real Property Assets comprise real properties that were transferred to GDB by the Commonwealth and certain public corporations of the Commonwealth in full or partial payment of certain Loans of such entities with GDB. The majority of the real properties comprising the Real Property Assets were acquired by GDB from the Commonwealth (through the Puerto Rico Lands Administration) in 2008 pursuant to a Deed of Assignment, Transfer and Conveyance in Partial Payment of Loan. All of the Real Property Assets are located in the Commonwealth. GDB will transfer the Real Property Assets to the Issuer on an "as is, where is" basis.

AAFAF_CONF_0001102

As a result, the Issuer will receive the Real Property Assets with any and all defects and restrictions on transfer such assets had when held by GDB.

Certain of the Real Property Assets have been offered for sale by GDB since 2009 and, more actively, during the last year. GDB has conducted request for proposal processes to sell certain of the Real Property Assets and has issued several notices of award following such processes.

Certain of the Real Property Assets are subject to, or have in the past been subject to, litigation or other claims from other government entities or third parties, including, without limitation, claims challenging GDB's title to such assets. Further, certain of the Real Property Assets (i) have been determined to contain hazardous materials or be subject to other adverse environmental conditions, (ii) are occupied by third parties (squatters), (iii) are subject to zoning and building restrictions that limit their potential uses, (iv) are located in zones designated as flood zones by the Federal Emergency Management Agency, (v) are subject to various types of liens, encumbrances and other restrictions, including leases, covenants and laws restricting their sale or use or requiring that they be dedicated to public uses, and/or (vi) have not yet been recorded in the name of GDB in the Registry of the Property. The estimated value of the Real Property Assets has been significantly reduced in recent years primarily as a result of general economic and real estate market conditions in the Commonwealth. The various issues discussed in this paragraph, as well as other conditions, including conditions that are unknown at this time, may significantly affect the realizable value of the Real Property Assets. For additional discussion regarding the risks related to the foregoing matter, see "*Risk Factors—Risks Related to the Restructuring Property—Risks Related to the Restructuring Property Assets—The Real Property Assets may have title defects or restrictions on transfer that could affect the Issuer's ability to realize value from such assets.*"

The following table contains a summary of certain characteristics of the Real Property Assets and, following the table is a more detailed description of each of the Real Property Assets that have an estimated appraisal value of more than $10,000,000.

**Real Property Assets**

| Real Property Asset | Location | Approximate Surface Area (sq.mt) [1] | Date of Last Appraisal | Appraisal Value | Purchase Offers [2] |
|---|---|---|---|---|---|
| Parcel B | Santurce Ward, San Juan | 20,809.03 | Oct-16 | $13,525,000 | $3,000,000-$3,250,000 |
| Río Bayamón Norte Community Lot | Juan Sánchez Ward, Bayamón and Pueblo Viejo Ward, Guaynabo | 729,590.93 | Jul-17 | 12,000,000 | $10,000,000-$12,000,000 |
| National Guard | Puerta de Tierra Ward, San Juan | 14,972.50 | Oct-17 | 7,000,000 | None |
| Former Leprosarium | Las Cuevas Ward, Trujillo Alto | 100,269.62 | Jan-16 | 6,020,000 | None |
| Josefa Farm Rural Property (Parcel A) | Quebrada Vueltas, Fajardo | 168,190.67 | Nov-14 | 3,825,000 | None |
| Josefa Farm Rural Property (Parcel C-4) | Quebrada Vueltas, Fajardo | 270,265.79 | Nov-14 | 1,500,000 | None |
| Property adjacent to San Lucas Hospital | Machuelos Ward, Ponce | 307,872.07 | Dec-15 | 5,090,000 | $5,090,000 |
| Former Ruiz Soler Hospital Complex | Juan Sánchez Ward, Bayamón | 3,662.18 | Jan-16 | 2,470,000 | $750,000-$900,000 |
| Property Adjacent to Former AcuaExpreso Terminal | San Juan | 6,396.33 | Oct-13 | 2,400,000 | None |
| Former Luchetti School | Tanamá Ward, Arecibo | 31,958.49 | Jan-16 | 1,360,000 | None |
| Parklane | Pueblos and Santa Rosa Ward, Guaynabo | 3,677.19 | May-15 | 700,000 | $625,000 [3] |
| Guayanés | Barrio Guayanés, Yabucoa | 221,910.14 | Dec-15 | 260,000 | None |
| Former Mini-Golf Range | Las Cuevas Ward, Trujillo Alto | 14,221.71 | Oct-13 | 185,000 | None |
| Total | | - | - | $56,335,000 | - |

(1) Surface area is based on legal description of the properties.

(2) Purchase offers received by GDB, if any, for each Real Property Asset from January 2017 to the Cutoff Date.

(3) After conducting a request for proposals process, GDB issued a notice of award to sell this property for this price.

Source: GDB

*Parcel B.* The Real Property Asset known as "Parcel B" is a vacant lot with an area of approximately 20,809.03 sq.mt. located across the street southwest of Sagrado Corazón Urban Train Station, Martín Peña Sector, Santurce Sur Ward, San Juan, Puerto Rico ("Parcel B"). GDB acquired Parcel B from the Commonwealth in 2007 pursuant to a Deed of Subdivision, Consolidation and Exchange. The most recent appraisal of Parcel B prepared at the request of GDB is dated October 2016 and assigned the property a market value of approximately $13.525 million. However, after conducting a request for proposals process and marketing the property for over a year, the offers received by GDB for the purchase of this property are significantly lower than its appraisal value.

*Río Bayamón Norte Community.* The Real Property Asset known as the "Río Bayamón Norte Community" property has a surface area of approximately 729,590.93 sq.mt. and comprises various parcels of land located in the Juan Sanchez Ward of Bayamón and the Pueblo Viejo Ward of Guaynabo (the "Río Bayamón Property"). GDB acquired the Río Bayamón Property from the Puerto Rico Urban Renewal and Housing Corporation, a Commonwealth public corporation that later was merged into the Puerto Rico Housing Finance Authority, pursuant to a Deed of Assignment in Lieu of Debt Payment in 1997.

AAFAF_CONF_0001103

The parcels comprising the Río Bayamón Property were expected to be developed into multi-family residential projects and mixed residential/commercial use projects pursuant to a master development plan. While the construction of the common infrastructure for such projects was substantially completed in 2015, the projects have not been developed. Moreover, the contractor of the property's common infrastructure commenced litigation against GDB in 2017 seeking the payment of approximately $21 million on account of final withholding, extended overhead and other charges in connection with such development. At the request of GDB, the court entered judgment on January 2018 dismissing the claim for lack of jurisdiction due to the construction contract including a mandatory arbitration clause. The parties are currently in the process of appointing an arbitrator.

The most recent appraisal of the Río Bayamón Property prepared at the request of GDB is dated June 2017 and assigned the property a market value of approximately $12.0 million. The same appraiser had estimated the market value of the property to be approximately $19.6 million in October 2016.

*Other Loan Assets*

*Repurchase Agreement.* The Transferred Property will also include a Repurchase Agreement between HFA and GDB, pursuant to which HFA owes GDB approximately $19.6 million as of the Cutoff Date (the "Repurchase Agreement"). The obligations of HFA under the Repurchase Agreement are secured by a security interest in certain mortgage Loans with an outstanding principal balance of approximately $8.8 million as of the Cutoff Date granted by HFA to public and private housing developers for the development of rental housing for low and moderate-income families. The Repurchase Agreement is classified by GDB as non-performing.

*Private Loans.* The Transferred Property will also include the Private Loans, which consist of approximately 70 Loans to various private entities and individuals with an aggregate outstanding balance as of the Cutoff Date of approximately $471,866, with the principal balances of the individual Private Loans ranging from $6 to $89,532. The Private Loans include the Mortgage Loans, which have an aggregate principal balance of approximately $131,918 as of the Cutoff Date, and are classified by GDB as performing. As of the Cutoff Date, all of the other Private Loans are classified by GDB as non-performing. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Private Loans are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

AAFAF_CONF_0001104

### THE KEEPWELL AGREEMENT

**General**

On the Closing Date, concurrently with the consummation of the Qualifying Modification, GDB will enter into a keepwell agreement (the "Keepwell Agreement") with the Issuer. The Keepwell Agreement will provide, in limited circumstances, to the Issuer, the Indenture Trustee and the Bondholders, as applicable, certain claims against GDB in the event that the Restructuring Property is returned to GDB or the restructuring under the Qualifying Modification is impaired, except as described below.

The Keepwell Agreement is not, and nothing done pursuant to the Keepwell Agreement by GDB will be deemed to constitute, a guarantee by GDB of any of the New Bonds or other obligation, indebtedness or liability of any kind or character of the Issuer whatsoever. The Keepwell Agreement is governed by the laws of the State of New York.

**The Keepwell Agreement is different than other similarly named instruments. Following the consummation of the Qualifying Modification, GDB will have little to no assets remaining, but will be required, under the Keepwell Agreement, to provide certain covenants and indemnifications to Bondholders, as described below. Furthermore, GDB will not be subject to covenants requiring the maintenance of any financial ratios. As such, the Keepwell Agreement is not expected to provide an additional source of recovery to Bondholders other than in limited circumstances.**

The Keepwell Agreement will provide that if any Restructuring Property is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such Restructuring Property to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Transaction Documents (or if such retransfer or reconveyance violates any law or court order, to take such other actions as may be necessary such that the Bondholders receive the economic equivalent thereof), until payment in full of the New Bonds with any remaining balance delivered to the Issuer.

The Keepwell Agreement will further provide that GDB will indemnify and hold the Bondholders (collectively, the "Indemnified Parties") harmless from and against all damages and losses suffered or incurred by the Indemnified Parties as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms (the "Covered Losses"); *provided*, that an impairment resulting from an immaterial diminution in value of the Restructuring Property will not independently give rise to a claim for indemnification; *provided further* that an Indemnified Party will not be entitled to indemnification for Covered Losses to the extent the circumstances giving rise to such Covered Losses result from the actions of such Indemnified Party. For the avoidance of doubt, it is the intention of the parties that such indemnification and hold harmless provision will give rise to claims in favor of the Indemnified Parties against GDB in an amount such that, after giving effect to such claims and any distributions thereon, including in any bankruptcy, insolvency, receivership or similar proceedings in respect of GDB, the Indemnified Parties will be fully compensated for the Covered Losses, subject to the proviso in the foregoing sentence.

**Third-Party Beneficiaries**

Under the terms of the Keepwell Agreement, the Bondholders and the Indenture Trustee, for the benefit of the Bondholders, will be express third-party beneficiaries of the Keepwell Agreement and will be entitled to the rights and benefits thereunder and may enforce the provisions thereof, as if they were parties thereto, notwithstanding (i) any waiver or other action by the Issuer or (ii) any legislative action or determination by a court resulting, in the case of (ii), in the rescission, avoidance or other unenforceability of the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds.

AAFAF_CONF_0001105

**DESCRIPTION OF THE NEW BONDS AND THE BOND INDENTURE**

**General**

The New Bonds will be issued pursuant to the terms and conditions of the Bond Indenture, to be agreed upon by the Indenture Trustee and the Issuer, subject to approval by the Requisite Bondholders (as defined in the Restructuring Support Agreement). The following summary describes certain expected terms and conditions of the New Bonds and the Bond Indenture. This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the New Bonds and the Bond Indenture.

**Payment Dates**

Payments on the New Bonds will be made on the Special First Payment Date (as defined herein) and, thereafter, each February 20 and August 20 (each such date, a "Payment Date"), *provided* that if any such Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay.

On the Closing Date or as soon thereafter as reasonably practicable (the "Special First Payment Date"), the Issuer will apply all Cash Assets received from GDB on the Closing Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments*," to make payments on the New Bonds after the payment or retention, as applicable, of the other amounts required pursuant to such payment priority.

**Payments of Interest**

Interest on the outstanding principal amounts (including, for the avoidance of doubt, previously accrued PIK Amounts) of the New Bonds will accrue at a rate per annum of 7.500%, payable to the Bondholders on each Payment Date.

Interest due on each Payment Date will be that which has accrued during the period from and including the immediately preceding Payment Date on which interest has been paid (in cash or in kind) (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid (each such period, an "Interest Period"). Interest on the New Bonds will be calculated on an actual/360 basis. This means that the interest due on the New Bonds on each Payment Date will be the product of: (i) the principal amount of the New Bonds outstanding on that Payment Date (including, for the avoidance of doubt, previously accrued PIK Amounts (as defined herein)), before giving effect to the payment of principal on that date, (ii) the interest rate and (iii) the number of days from and including the immediately preceding Payment Date (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid divided by 360.

To the extent there is insufficient Available Cash on any Payment Date to pay in full in cash all interest accrued during the Interest Period preceding such Payment Date on the New Bonds, such accrued interest on the New Bonds will be paid in cash pro rata to the extent of and from Available Cash, and principal of the New Bonds will accrue an amount equal to the amount of any Available Cash shortfall (each such amount of shortfall, a "PIK Amount"). Following an increase in the principal amount of the New Bonds as a result of the accrual of a PIK Amount, the New Bonds will bear interest on the then-outstanding principal, which will include such accrued PIK Amount. For additional information, see "*Payments to Bondholders*" in this Offering Memorandum.

In addition, to the extent there is insufficient Available Cash on any Payment Date to pay at least $1.00 of interest for every $1,000 of outstanding principal amount of New Bonds, there will be no distribution to Bondholders on such Payment Date and any Available Cash will remain in the Collection Account until the following Payment Date.

**Payments of Principal**

The principal amount of the New Bonds will be due on August 20, 2040 (such date, or thereafter as such date may be delayed by vote of the Bondholders pursuant to the procedure described under "*Termination of the Bond Indenture*" below, the "Final Scheduled Payment Date"). Principal payments on the New Bonds will be made from Available Cash on each Payment Date to the extent available after all accrued interest with respect to such Payment Date has been paid in full in cash, thereby reducing the outstanding principal balance of the New Bonds by such amount. For additional information, see "*Payments to Bondholders*" in this Offering Memorandum.

**Allocation of Losses**

Losses on the Restructuring Property will not be allocated to write down the principal amount of the New Bonds. Instead, losses will reduce the amount of Available Cash available to make payments on the New Bonds on the Payment Dates that follow.

AAFAF_CONF_0001106

**Additional Bonds**

After the Closing Date, in addition to the New Bonds offered pursuant to this Offering Memorandum, the Issuer may be required, pursuant to the terms of the Qualifying Modification and consistent with the terms of the Bond Indenture, to authorize from time to time the issuance of Additional Bonds under the Bond Indenture in respect of certain contingent claims against GDB that are described in Appendix G. For a description of the contingent claims, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" and "*Appendix G: Contingent and Unliquidated Claims*" attached to this Offering Memorandum.

From time to time after the Closing Date, solely upon receipt of instructions from GDB or AAFAF, the Issuer will authorize such Additional Bonds in the amount(s) specified by GDB or AAFAF, as applicable, and will execute and deliver such Additional Bonds in accordance with such instructions from GDB or AAFAF.

The Additional Bonds will be identical in all respects to the previously issued New Bonds (including with respect to the exchange ratio to be used to calculate the principal amount thereof to be issued) except as to issue date and first interest payment date; however, if the Additional Bonds are not fungible with the previously issued New Bonds for U.S. federal income tax purposes, such Additional Bonds will be issued with a different CUSIP number from the previously issued New Bonds.

**No Setoff Rights**

By accepting delivery of the New Bonds, Bondholders will be deemed to have waived any right to setoff (except for any Closing Date Adjustment), or receive credit for, amounts that the Bondholders may owe to the Issuer or GDB as obligors on the Restructuring Property, if any, against amounts payable by the Issuer to such Bondholders on the New Bonds.

**Bond Indenture**

*Modification of the Bond Indenture.* Subject to the limitations described below, the Issuer and the Indenture Trustee may, with the consent of Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding, execute supplemental indentures to add provisions to, change in any manner or eliminate any provisions of, the Bond Indenture, or modify in any manner the rights of the Bondholders. For purposes of determining whether Bondholders representing the requisite percentage of outstanding principal amount of the New Bonds have given any request, demand, authorization, direction, notice, consent or waiver under the Bond Indenture, New Bonds held beneficially or owned by the Issuer or its affiliates will be disregarded and deemed not to be "outstanding," except that, in determining whether the Indenture Trustee will be protected in relying upon any such request, demand, authorization, direction, notice, consent, or waiver, only New Bonds that a Trust Officer (as defined in the Bond Indenture) of the Indenture Trustee actually knows to be so owned will be so disregarded.

The Issuer and the Indenture Trustee may enter into supplemental indentures without obtaining the consent of the Bondholders, for the purpose of, (i) curing any ambiguity, omission, defect, or inconsistency in the Bond Indenture or in the New Bonds, (ii) conforming the provisions in the Bond Indenture to the descriptions thereof contained in this Offering Memorandum, (iii) evidencing the assumption of the Issuer's obligations under the Bond Indenture or the New Bonds by a permitted successor to the Issuer, (iv) providing for the issuance of Additional Bonds in accordance with the limitations set forth in the Bond Indenture, (v) adding additional property to the description of the Restructuring Property, (vi) adding additional covenants of the Issuer for the benefit of the Bondholders, (vii) conveying, or otherwise transferring or pledging, property to the Indenture Trustee, (viii) adding or changing any of the provisions of the Bond Indenture as necessary and permitted to facilitate the administration by more than one indenture trustee, (ix) making any change that would provide additional rights or benefits to the Bondholders or (x) evidencing and providing for the appointment of a successor indenture trustee; *provided* that such supplemental indenture will not adversely affect the interests of any Bondholder (other than in the case of the issuance of Additional Bonds made in accordance with the terms of the Bond Indenture), as determined by the Collateral Monitor (or, if the Collateral Monitor is unable to make such determination, another financial advisor unaffiliated with the Issuer) and external legal counsel of recognized national standing.

Notwithstanding the foregoing, without the consent of the holder of each outstanding New Bond affected thereby, no supplemental indenture will: (i) change the due date of any principal of or interest on any such New Bond or reduce the principal amount of any such New Bond, the interest rate specified thereon or change any place of payment where, or the coin or currency in which, any such New Bond or any interest thereon is payable; (ii) impair the right to bring suit for the enforcement of provisions of the Bond Indenture regarding payment; (iii) reduce the percentage of the aggregate amount of outstanding New Bonds, the consent of the holders of which is required to amend the Bond Indenture or certain other related agreements or the consent of the holders of which is required for any waiver of compliance with certain provisions of the Bond Indenture or certain defaults under the Bond Indenture and their consequences as provided for in the Bond Indenture; (iv) modify or alter the provisions of the Bond Indenture regarding the voting of New Bonds held by the Issuer, any other obligor on such New Bonds or an affiliate of any of them; (v) reduce the percentage of the aggregate amount of outstanding New Bonds, the consent of the holders of which is required to direct the Indenture Trustee to sell or

AAFAF_CONF_0001107

liquidate the Restructuring Property after a Bond Indenture Event of Default if the proceeds of such sale would be insufficient to pay the principal amount and accrued but unpaid interest on the outstanding New Bonds; or (vi) permit the creation of any lien or security interest ranking senior to or on a parity with the lien of the Bond Indenture with respect to any of the Restructuring Property or, except as otherwise permitted or contemplated in such Bond Indenture, terminate the lien of such Bond Indenture with respect to any such Restructuring Property or deprive the holder of any such Bond of the security afforded by the lien of such Bond Indenture.

*Bond Indenture Events of Default; Rights Upon a Bond Indenture Event of Default.* With respect to the New Bonds, each of the following is an event of default under the Bond Indenture (each, a "Bond Indenture Event of Default"):

i.     a failure by the Issuer to accrue any PIK Amount as required or to make any required payment from Available Cash in respect of any of the New Bonds on the date on which the same is due;

ii.     a failure by the Issuer to observe or perform any covenant or agreement (other than a covenant or agreement referred to in clause (i) above) contained in the Bond Indenture, and such failure continues or is not cured for a period of 60 days after written notice by the Indenture Trustee or Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding;

iii.     the Issuer, pursuant to or within the meaning of any U.S. federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation PROMESA (collectively, "Bankruptcy Laws"):

     A.     commences proceedings to be adjudicated bankrupt or insolvent;

     B.     consents to the institution of bankruptcy or insolvency proceedings against it;

     C.     files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

     D.     consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property; *provided*, for the avoidance of doubt, that any such official appointed in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (iii)(D);

     E.     makes a general assignment for the benefit of its creditors;

     F.     is deemed to be a covered territorial instrumentality under PROMESA or is otherwise determined to be subject to oversight under applicable Bankruptcy Law; or

     G.     takes any corporate or similar action in furtherance of any of the foregoing;

iv.     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

     A.     is for relief against the Issuer in a proceeding in which the Issuer is to be adjudicated bankrupt or insolvent;

     B.     approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer under any Bankruptcy Law;

     C.     appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer for all or any substantial part of the property of the Issuer; *provided*, for the avoidance of doubt, that any such order or decree entered in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (iv)(C); or

     D.     orders the liquidation, dissolution or winding up of the Issuer and the order or decree remains unstayed and in effect for 60 consecutive days;

v.     any legislation is enacted, governmental action is taken (including any action by the Government, the Commonwealth instrumentalities or any Government-controlled or managed entities, including entities with directors or management controlled or appointed by the Government and any failure by the Government or any Commonwealth instrumentality to observe or perform the non-impairment covenant set forth in Article 407 of the GDB Restructuring Act (as in effect as of the Closing Date)) or any party (other than an obligor on the Restructuring Property) is determined by a final, non-appealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affect (i) the receipt of current or future Collections on the Restructuring Property to which the Issuer is entitled (other than by reason of (A) a failure, delay or default of the obligor under such Restructuring Property, (B) an obligor being subject

AAFAF_CONF_0001108

to a proceeding under PROMESA or to any provision thereof or (C) changes in taxation or restrictions on the enforcement of rights or remedies, so long as such changes or restrictions are not directed solely at the Issuer, the Restructuring Property, the New Bonds or the Bondholders relative to any other entity, asset, security or security holder) in respect of assets having an aggregate value on the Closing Date of $25 million or more (as determined by the face amount of any such asset, in the case of Loans, or the book value of any such asset, in the case of other assets) or (ii) the binding effect or enforcement of, in accordance with their respective terms, the GDB Restructuring Act (as in effect as of the Closing Date), the Qualifying Modification, the Public Entity Trust, the Bond Indenture, the New Bonds or the liens on the Restructuring Property;

vi.   any entry of a judgment against the Issuer in the amount of $10 million or more;

vii.   the occurrence of an event of default by GDB under the Transfer Agreement; and

viii.   the Issuer permits the validity or effectiveness of the Transaction Documents to be impaired, and such impairment affects the enforceability of or payments on the New Bonds, or any person to be released from any covenants or obligations with respect to the New Bonds.

Notwithstanding any other provision of the Bond Indenture, no default under the Disclosure Agreement will be deemed a Bond Indenture Event of Default, and the sole remedy under the Disclosure Agreement in the event of any failure of the Issuer or the Dissemination Agent to comply with the Disclosure Agreement will be an action to compel performance.

*Remedies.* If a Bond Indenture Event of Default occurs and is continuing, the Indenture Trustee may, or upon direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will, declare the principal of such New Bonds and accrued but unpaid interest and any other amounts owed thereon to be immediately due and payable, in the order of priority specified for payments. Such declaration may be rescinded and annulled by Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding, if:

i.   the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

A.   all payments of principal of and interest on the New Bonds and all other amounts that would then be due on such New Bonds or in accordance with the terms of such New Bonds if the Bond Indenture Event of Default giving rise to such acceleration had not occurred; and

B.   all sums paid by the Indenture Trustee under the Bond Indenture and the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel; or

ii.   all Bond Indenture Events of Default, other than the nonpayment of the principal or interest of the New Bonds that has become due solely by such acceleration, have been cured or waived.

Following the occurrence of a Bond Indenture Event of Default and acceleration of the maturity of the New Bonds, the Indenture Trustee is not required to sell the Restructuring Property and may sell the Restructuring Property as described below only after meeting requirements specified in the Bond Indenture and described below.

Following a Bond Indenture Event of Default, the Indenture Trustee may exercise any remedies available as described hereunder and otherwise available under applicable law (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*," in this Offering Memorandum), but may exercise remedies only if (i) Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, consent to such exercise or (ii) the proceeds of such exercise are sufficient to pay in full the principal of and the accrued interest and any other amounts owed on the outstanding New Bonds at the date of such exercise. In addition, the Indenture Trustee must institute proceedings to collect amounts due and exercise such remedies if Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, direct the Indenture Trustee to do so. If the Bondholders do not direct the Indenture Trustee, and the Indenture Trustee does not elect, to exercise such remedies, the Issuer will maintain possession of the Restructuring Property and the Servicer will continue to manage the Restructuring Property, and the Collections thereon will be distributed in accordance with the payment priority set forth in "*Payments to Bondholders—Priority of Payments*." The proceeds from a liquidation of the Restructuring Property conducted by the Indenture Trustee will constitute Collections on the Restructuring Property and, as such, will be deposited in the Collection Account and distributed in accordance with the payment priority set forth in "*Payments to Bondholders—Priority of Payments*." Upon the liquidation of all remaining Restructuring Property and distribution of all remaining Collections in accordance with the requisite payment priority, the Bondholders will have no further claims against the Issuer in respect of the New Bonds.

In the event of a sale of any of the Restructuring Property following a Bond Indenture Event of Default, the Indenture Trustee will provide public notice of the sale of such assets and the Indenture Trustee and/or Bondholders may, by following the procedures outlined in such notice, submit a bid in respect of such sale.

AAFAF_CONF_0001109

If a Bond Indenture Event of Default occurs and is continuing for a period of 30 days, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage and control the Restructuring Property for the benefit of the Bondholders and will exercise all the rights and powers of the Issuer with respect to such Restructuring Property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby. The Servicing Agreement will remain in effect notwithstanding the appointment of a receiver, subject to removal of the Servicer in accordance with the terms described in "*Servicing Agreement—Removal of the Servicer.*"

If a Bond Indenture Event of Default occurs and is continuing and the Indenture Trustee has actual knowledge of such Bond Indenture Event of Default, the Indenture Trustee will be obligated to notify each Bondholder of the Bond Indenture Event of Default within twenty days of the Indenture Trustee's discovery thereof; *provided, however*, that the Indenture Trustee may withhold notice to the Bondholders if and so long as a committee of its officers in good faith determines that withholding such notice is in the best interests of the Bondholders.

Subject to the provisions of the Bond Indenture relating to the duties of the Indenture Trustee, if a Bond Indenture Event of Default occurs and is continuing, the Indenture Trustee will be under no obligation to exercise any of the rights or powers under the Bond Indenture at the request or direction of any of the Bondholders if the Indenture Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities that might be incurred by it in complying with such request. Subject to the provisions for indemnification and certain limitations contained in the Bond Indenture, Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will have the right to direct the time, method and place for conducting any proceeding for any remedy available to the Indenture Trustee or exercising any trust or power conferred on the Indenture Trustee, and Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding may, in certain cases, waive any default under the Bond Indenture except a default resulting from, or in respect of, (i) a failure by the Issuer to accrue any PIK Amount as required or to make any required payment from Available Cash in respect of any of the New Bonds, on the applicable Payment Date on which the same is due, (ii) any insolvency, bankruptcy, reorganization, restructuring, receivership or any other form of debtor relief sought by or against the Issuer, whether under federal or Commonwealth law or (iii) a failure by the Issuer to observe or perform any covenant or provision of the Bond Indenture that cannot be modified without the waiver or consent of each affected Bondholder.

Any New Bonds owned by the Issuer, the Servicer, the Collateral Monitor or any affiliate of the foregoing will be entitled to equal and proportionate benefits under the Bond Indenture, except that such New Bonds, while owned by the Issuer or any of its affiliates, will not be considered to be outstanding for the purpose of determining whether the requisite percentage of Bondholders have given any request, demand, authorization, direction, notice, consent or other action under the Bond Indenture.

No Bondholder will have the right to institute any proceeding with respect to the Bond Indenture, unless (i) such holder previously has given to the Indenture Trustee written notice of a continuing Bond Indenture Event of Default, (ii) Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding have made written request to the Indenture Trustee to institute such proceeding in its own name, (iii) such holder or Bondholders have offered the Indenture Trustee security or indemnity reasonably satisfactory to it, (iv) the Indenture Trustee has for 30 days failed to institute such proceeding and (v) no direction inconsistent with such written request has been given to the Indenture Trustee during such 30-day period by Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding.

Notwithstanding the foregoing, the right of any Bondholder to receive payment or delivery, as the case may be, of cash interest or principal, on or after the respective dates on which the same are due and payable from Available Cash, or to bring suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Issuer, may not be impaired or affected without the consent of such Bondholder.

With respect to the Issuer, neither the Indenture Trustee in its individual capacity nor any of its owners, beneficiaries, agents, officers, directors, employees, affiliates, successors or assigns will, in the absence of an express agreement to the contrary, be personally liable for the payment of any amount on the New Bonds or for the agreements of the Issuer contained in the Bond Indenture.

*Final Scheduled Payment Date.* On the Final Scheduled Payment Date, all outstanding amounts on the New Bonds will be due and payable.

If the Issuer fails to pay all outstanding amounts on the New Bonds on or prior to the Final Scheduled Payment Date, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer pursuant to the terms of the Transaction Documents. Such receiver so appointed will have, hold, use, operate, manage, and control the Restructuring Property for the benefit of the Bondholders and will exercise all the rights and powers of the

AAFAF_CONF_0001110

Issuer with respect to such Restructuring Property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby.

*Certain Covenants of the Issuer.*

The Bond Indenture will provide that the Issuer will, among other things:

i.    promptly report to the Indenture Trustee any Bond Indenture Event of Default or the occurrence of any default that, with notice and/or the passage of time, would become a Bond Indenture Event of Default;

ii.    delegate to, and confer upon, the Servicer all authority to manage and service the Restructuring Property in accordance with the terms of the Bond Indenture;

iii.    deposit, or cause to be deposited, any Collections into the Collection Account to be held in trust for the benefit of the Bondholders in accordance with the terms of the Bond Indenture;

iv.    designate and authorize the Indenture Trustee or other Independent Person to act as paying agent with respect to all amounts to be paid from the Collection Account in accordance with the terms of the Bond Indenture;

v.    maintain in the Borough of Manhattan, in the City of New York, an office or agency where New Bonds may be presented or surrendered for payment, where the New Bonds may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Issuer in respect of the New Bonds and the Bond Indenture may be served and give prompt written notice to the Indenture Trustee of the location and of any change in the location of such office or agency;

vi.    file IRS Form 8281 reporting the New Bonds as contingent payment debt instruments as defined in U.S. Treasury Regulations Section 1.1275-4 and reflecting a "comparable yield" equal to the applicable Federal rate based on the presumption based on the applicable Federal rate as set forth in subsection (b)(4)(i)(B) thereof;

vii.    timely file a protective election under U.S. Treasury Regulations Section 301.7701-3 to elect to be classified as a partnership for U.S. tax purposes in the event that holders of New Bonds are treated as holding equity interests in the Issuer;

viii.    in the event that the U.S. Internal Revenue Service asserts that the New Bonds are characterized as equity interests of the Issuer for U.S. federal income tax purposes, use commercially reasonable efforts to provide, or cause to be provided, such information as is reasonably requested by Bondholders to enable them to comply with their U.S. federal income tax reporting obligations, and to use commercially reasonable efforts to retain or cause the Servicer to retain possession of records and information relevant to the foregoing;

ix.    require the Servicer or any subsequent servicer, pursuant to the Servicing Agreement or any subsequent servicing agreement, as applicable, to provide to the Indenture Trustee for provision to the Bondholders the reports of the Servicer described under "*Service Providers—Reports to Bondholders*" in this Offering Memorandum; and

x.    take commercially reasonable efforts to cooperate with the Servicer and the Collateral Monitor to facilitate the execution of each of their respective duties, including by providing information available to the Issuer reasonably requested by the Servicer or Collateral Monitor.

Unless expressly permitted by the Bond Indenture, the Issuer will not, among other things:

i.    sell, transfer, encumber, exchange, otherwise dispose of, or waive any rights with respect to any of the assets of the Issuer, including any of the Restructuring Property, other than as directed by the Servicer;

ii.    claim any credit on or make any deduction from the principal and interest payable in respect of the New Bonds other than amounts that, in accordance with written advice from outside counsel of national standing or a recognized firm of reputable standing within the Commonwealth, are required to be withheld from such payments or assert any claim against any present or former holder of the New Bonds because of the payment of taxes levied or assessed upon the Issuer;

iii.    consolidate with or merge into any other entity;

iv.    dissolve or liquidate in whole or in part;

AAFAF_CONF_0001111

v.  at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of the Bond Indenture; and the Issuer (to the extent that it may lawfully do so) will expressly waive all benefit or advantage of any such law, and covenant that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted;

vi.  permit the validity or effectiveness of the Transaction Documents to be impaired, fail to enforce the obligations of counterparties under the Transaction Documents, or permit any person to be released from any covenants or obligations with respect to the New Bonds under the Transaction Documents;

vii.  fail to observe or perform under any covenant or agreement contained in the Transaction Documents, provided that the sole remedy for a default by the Issuer under the Disclosure Agreement will be an action to compel performance;

viii.  unless otherwise consented to by the Collateral Monitor, which consent may not be unreasonably withheld, incur Issuer Operating Expenses after the Closing Date in any year exceeding the Issuer Operating Expenses Cap.

ix.  permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance to be created on or extended to or otherwise arise upon or burden the assets of the Issuer or any part thereof, or any interest in the assets of the Issuer or the proceeds thereof other than the liens on the Restructuring Property securing the Bond Indenture and the obligations of the Issuer under the New Bonds, the Bond Indenture and any related documents or instruments;

x.  incur, assume or guarantee any indebtedness other than indebtedness incurred under the New Bonds and pursuant to the Bond Indenture;

xi.  fail to at all times, to the extent permitted by law, defend, preserve and protect, or cause to be defended, preserved and protected, the pledge of the Restructuring Property and all the rights of the Indenture Trustee and the Bondholders under the Bond Indenture against all claims and demands of all persons whomsoever;

xii.  fail to execute, acknowledge where appropriate, and deliver, and use its best efforts to cause others to execute, acknowledge where appropriate, and deliver, from time to time promptly at the request of the Indenture Trustee or the Servicer, all such instruments and documents as in the reasonable opinion of the Indenture Trustee or the Servicer, as applicable, are necessary or advisable to carry out the intent and purpose of the Bond Indenture or the Servicing Agreement, as applicable, and to take such other action as may be reasonably necessary to carry out the transactions contemplated hereby and thereby;

xiii.  engage in any activity other than as specified in this Offering Memorandum and the GDB Restructuring Act (as in effect as of the Closing Date);

xiv.  subject to the applicable contractual and legal limitations, take any action that is inconsistent with the maximization of the recoverable value of the Restructuring Property and the Collections thereon or payment of amounts owing on the New Bonds; or

xv.  fail to at all times, to the extent permitted by law and to the extent not delegated to the Servicer, defend against all claims and demands brought against the Issuer or the Board of Trustees that would adversely affect maximization of the recoverable value of the Restructuring Property and Collections thereon or the performance of the Issuer's obligations under the Transaction Documents.

*Satisfaction and Discharge of the Bond Indenture.* The Bond Indenture will be discharged with respect to the Restructuring Property securing the New Bonds upon the delivery to the Indenture Trustee for cancellation of all such New Bonds or, with certain limitations, upon deposit with the Indenture Trustee of funds sufficient for the payment in full of all New Bonds, including interest thereon, and the payment in full of any fees, expenses and indemnification amounts due and payable pursuant to the Bond Indenture.

*Termination of the Bond Indenture.* With respect to the New Bonds, the obligations of the Indenture Trustee will terminate upon the surrender or redemption (as applicable) and cancellation of all New Bonds and the payment of all principal, interest and other amounts required to be paid to Bondholders pursuant to the Bond Indenture, which will occur upon the earlier of (i) the surrender for payment in full of all principal, interest and any other amounts owing on the New Bonds, (ii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture after termination (in accordance with the terms of the applicable Loan documents) of all Restructuring Property and (iii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture, after liquidation of all remaining Restructuring Property or, if no such liquidation occurs, a pro rata distribution of all remaining Available Cash, if any, in each case, in accordance with the terms of the Bond Indenture.

E-144

The Indenture Trustee will give ten days' written notice of termination of the Bond Indenture to each Bondholder of record. The final distribution to any Bondholder will be made only upon cancellation of that holder's New Bond after delivery at any office or agency of the Indenture Trustee specified in the notice of termination. Any funds of the Issuer remaining, after the Indenture Trustee has taken measures to locate Bondholders as described in the Bond Indenture and those measures have failed, will be distributed, subject to applicable law, as provided in the Bond Indenture.

On or prior to the date that is six months prior to the Final Scheduled Payment Date, the Servicer will prepare and provide to the Indenture Trustee, the Board of Trustees and the Collateral Monitor statements to be delivered or made available to the Bondholders that will include the aggregate principal amount outstanding on the New Bonds, a description of the amount of any Restructuring Property remaining, the Servicer's good faith projections of the expected Collections to be generated in respect of such Restructuring Property on or prior to the Final Scheduled Payment Date and thereafter and the Servicer's good faith estimate of the cost to continue to manage such Restructuring Property after the Final Scheduled Payment Date.

Subject to the limitations as described in "*The Restructuring Property—Management of the Restructuring Property*" herein the Servicer will be required to use commercially reasonable efforts to liquidate all remaining Restructuring Property, if any, as soon as reasonably practicable after, and in no event later than the end of the month of the date that is four months following (or such other date thereafter as reasonably agreed to by the Issuer, the Servicer and the Collateral Monitor) the Final Scheduled Payment Date, unless either (i) all principal, interest and any other amounts owing on the New Bonds have been paid or (ii) following a solicitation of veto conducted by the Issuer prior to the then-current Final Scheduled Payment Date, Bondholders holding not less than 25% in principal amount of the New Bonds for which votes are submitted vote against such liquidation and to delay the Final Scheduled Payment Date by a one-year period; *provided* that if the Board of Trustees, in consultation with the Collateral Monitor, determines in good faith that the expected Collections to be generated in respect of the Restructuring Property after the Final Scheduled Payment Date are unreasonably small in comparison to the expected cost to continue to manage such Restructuring Property, no such solicitation of veto will occur and the Servicer will liquidate the remaining Restructuring Property. The proceeds from such liquidation will constitute Collections on the Restructuring Property and, as such, will be deposited in the Collection Account and distributed in accordance with the Bond Indenture based on the payment priority set forth in "*Payments to Bondholders—Priority of Payments*" on the date that is six months after the Final Scheduled Payment Date (or such other date thereafter as reasonably determined by the Issuer, the Servicer and the Collateral Monitor), including as the Final Scheduled Payment Date may be extended (such distribution date, the "Liquidation Payment Date"). The process described above will apply to the initial Final Scheduled Payment Date and each subsequent Final Scheduled Payment Date resulting from a delay of the then applicable Final Scheduled Payment Date.

Upon the liquidation of all remaining Restructuring Property and distribution of all remaining Collections in accordance with the requisite payment priority, the Bondholders will have no further claims against the Issuer in respect of the New Bonds.

## Remaining Interest

Following the termination of the Bond Indenture, the remaining assets of the Issuer, if any, will be distributed to the Public Entity Trust on account of a residual interest it will have in the Issuer. For additional information on the termination of the Bond Indenture and the Public Entity Trust's residual interest in the Issuer, see "*—Termination of the Bond Indenture*" and "*The GDB Restructuring Act*" in this Offering Memorandum.

## Notices

Except as may be provided otherwise in this Offering Memorandum or in the Bond Indenture, Bondholders of record will be notified in writing by the Indenture Trustee of any Bond Indenture Event of Default or removal and replacement of the Servicer promptly upon a Trust Officer (as defined in the Bond Indenture) obtaining actual knowledge thereof. While New Bonds are held in book-entry form, these notices will be delivered by the Indenture Trustee to DTC. If New Bonds are issued in definitive form, these notices will be mailed to the addresses provided to the Indenture Trustee by the Bondholders of record as of the relevant Payment Record Date. Such notices will be deemed to have been given as of the date of delivery to DTC or mailing.

## Governing Law

The Bond Indenture and the New Bonds are governed by and will be construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction.

## Venue

Any legal action, suit, or proceeding arising out of or relating to the New Bonds, brought by any party or its successors or assigns must be brought in any federal district court sitting in the Commonwealth and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereof.

AAFAF_CONF_0001113

**Minimum Denominations**

The New Bonds will be issued in U.S. Dollars in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof.

**Book-Entry Registration**

*General.* The New Bonds are anticipated to be represented by one or more New Bonds registered in the name of Cede & Co., as the nominee of DTC, the clearing agency (together with any successor depositary, the "Depositary"). Accordingly, such nominee is expected to be the holder of record of the New Bonds. Unless and until definitive bonds are issued under the limited circumstances described in this Offering Memorandum, no Bondholder will be entitled to receive a physical certificate representing a New Bond. All references in this Offering Memorandum to actions by Bondholders refer to actions taken by the Depositary upon instructions from its participating organizations (the "Depositary Participants") and all references in this Offering Memorandum to payments, notices, reports and statements to Bondholders refer to payments, notices, reports and statements to the Depositary or its nominee, as the registered holder of the New Bonds, for distribution to Bondholders in accordance with the Depositary's procedures with respect thereto. Beneficial interests in the New Bonds may be held through DTC, Clearstream Banking or Euroclear as operator of the Euroclear System, directly as a participant or indirectly through organizations that are participants in such system. DTC, Clearstream Banking and Euroclear are collectively referred to herein as the "Clearing Systems." Clearstream Banking and Euroclear will hold through a DTC participant. None of Euroclear, Clearstream Banking or DTC is under any obligation to perform or continue to perform the procedures referred to below, and such procedures may be discontinued at any time.

Neither the Issuer nor any of its agents will have any responsibility for the performance by Euroclear, Clearstream Banking or DTC or their respective direct or indirect participants or account holders of their respective obligations under the rules and procedures governing their operations or the arrangements referred to below.

**The information in this Offering Memorandum concerning the Clearing Systems has been obtained from sources that the Dealer Managers and the Issuer believe to be reliable, but the Dealer Managers and the Issuer take no responsibility for the accuracy thereof.**

*DTC Book-Entry-Only System.* DTC will act as securities depository for the New Bonds in the United States. The New Bonds will be issued as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully registered bond certificate will be issued for the New Bonds, in the aggregate principal amount of such New Bonds, and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.6 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company of DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others, such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has an S&P Global Ratings rating of AA+. The DTC rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of the New Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the New Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the New Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their beneficial ownership interests in the New Bonds, except in the event that use of the book-entry system for the New Bonds is discontinued.

AAFAF_CONF_0001114

To facilitate subsequent transfers, all New Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the New Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not affect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the New Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such New Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of the New Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the New Bonds, such as redemptions, tenders, defaults, and proposed amendments to the bond documents. For example, Beneficial Owners of the New Bonds may wish to ascertain that the nominee holding the New Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Indenture Trustee and request that copies of notices be provided directly to them.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the New Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts such New Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payments of principal of and interest on the New Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Issuer or the Indenture Trustee, on the payment date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC nor its nominee, the Indenture Trustee or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Indenture Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the New Bonds at any time by giving reasonable notice to the Issuer or the Indenture Trustee. Under such circumstances, in the event that a successor depository is not appointed, bond certificates are required to be printed and delivered.

The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, bond certificates will be printed and delivered.

NONE OF THE DEALER MANAGERS, THE ISSUER, THE INDENTURE TRUSTEE OR THE COMMONWEALTH WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DTC PARTICIPANTS, INDIRECT PARTICIPANTS OR BENEFICIAL OWNERS WITH RESPECT TO THE PAYMENTS OR THE PROVIDING OF NOTICE TO DTC PARTICIPANTS, INDIRECT PARTICIPANTS OR BENEFICIAL OWNERS.

None of the Dealer Managers, the Issuer, the Indenture Trustee or the Commonwealth can give any assurances that DTC, DTC Participants, Indirect Participants or others will distribute payments of principal and interest on the New Bonds paid to DTC or its nominee, as the registered Owner, or any notice, to the Beneficial Owners or that they will do so on a timely basis or that DTC will serve and act in a manner described in this Offering Memorandum.

*Euroclear and Clearstream Banking.* Euroclear and Clearstream Banking have advised the Issuer as follows:

Euroclear and Clearstream Banking each hold securities for their customers and facilitate the clearance and settlement of securities transactions by electronic book-entry transfer between their respective account holders. Euroclear and Clearstream Banking provide various services including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Euroclear and Clearstream Banking also deal with domestic securities markets in several countries through established depositary and custodial relationships. Euroclear and Clearstream Banking have established an electronic bridge between their two systems across which their respective participants may settle trades with each other.

AAFAF_CONF_0001115

Euroclear and Clearstream Banking customers are worldwide financial institutions, including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to Euroclear and Clearstream Banking is available to other institutions that clear through or maintain a custodial relationship with an account holder of either system, either directly or indirectly.

*Clearing and Settlement Procedures.* New Bonds sold in offshore transactions will be initially issued to investors through the book-entry facilities of DTC, or Clearstream Banking and Euroclear in Europe if the investors are participants in those systems, or indirectly through organizations that are participants in the systems. For any of such New Bonds, the record holder will be DTC's nominee. Clearstream Banking and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream Banking's and Euroclear's names on the books of their respective depositories.

The depositories, in turn, will hold positions in customers' securities accounts in the names of their respective DTC participants through which they hold such securities on the books of DTC. Because of time zone differences, the securities account of a Clearstream Banking or Euroclear participant as a result of a transaction with a participant, other than a depository holding on behalf of Clearstream Banking or Euroclear, will be credited during the securities settlement processing day, which must be a business day for Clearstream Banking or Euroclear, as the case may be, immediately following the DTC settlement date. These credits or any transactions in the securities settled during the processing will be reported to the relevant Euroclear participant or Clearstream Banking participant on that business day. Cash received in Clearstream Banking or Euroclear as a result of sales of securities by or through a Clearstream Banking participant or Euroclear participant to a DTC Participant, other than the depository for Clearstream Banking or Euroclear, will be received with value on the DTC settlement date but will be available in the relevant Clearstream Banking or Euroclear cash account only as of the business day following settlement in DTC.

Transfers between participants will occur in accordance with DTC rules. Transfers between Clearstream Banking participants or Euroclear participants will occur in accordance with their respective rules and operating procedures. Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream Banking participants or Euroclear participants, on the other, will be affected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositories, however, cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in the system in accordance with its rules and procedures and within its established deadlines in European time. The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its depository to take action to affect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream Banking participants or Euroclear participants may not deliver instructions directly to the depositories.

The Issuer will not impose any fees in respect of holding the New Bonds; however, holders of book-entry interests in the New Bonds may incur fees normally payable in respect of the maintenance and operation of accounts in the Clearing Systems.

*Initial Settlement.* Interests in the New Bonds will be in uncertified book-entry form. Purchasers electing to hold book-entry interests in the New Bonds through Euroclear and Clearstream Banking accounts will follow the settlement procedures applicable to conventional New Bonds. Book-entry interests in the New Bonds will be credited to Euroclear and Clearstream Banking participants' securities clearance accounts on the business day following the date of delivery of the New Bonds against payment (value as on the date of delivery of the New Bonds). Direct Participants acting on behalf of purchasers electing to hold book-entry interests in the New Bonds through DTC will follow the delivery practices applicable to securities eligible for DTC's Same Day Funds Settlement system. Direct Participants' securities accounts will be credited with book-entry interests in the New Bonds on the date of delivery of the New Bonds.

*Secondary Market-Trading.* Secondary market trades in the New Bonds will be settled by transfer of title to book-entry interests in the Clearing Systems. Title to such book-entry interests will pass by registration of the transfer within the records of Euroclear, Clearstream Banking or DTC, as the case may be, in accordance with their respective procedures. Book-entry interests in the New Bonds may be transferred within Euroclear and within Clearstream Banking and between Euroclear and Clearstream Banking in accordance with procedures established for these purposes by Euroclear and Clearstream Banking. Book-entry interests in the New Bonds may be transferred within DTC in accordance with procedures established for this purpose by DTC. Transfer of book-entry interests in the New Bonds between Euroclear or Clearstream Banking and DTC may be affected in accordance with procedures established for this purpose by Euroclear, Clearstream Banking and DTC.

## Accounts with DTC, Clearstream Banking or Euroclear Participants

Since the New Bonds are anticipated to be issued in book-entry form and will only be issued after the Closing Date as definitive bonds in limited circumstances described under "—*Definitive Bonds*" below, each Bondholder must obtain prior to the Closing Date, and maintain as long as it holds New Bonds, an account with a participant in the DTC, Clearstream Banking or Euroclear systems, through which such Bondholder will hold its New Bonds.

AAFAF_CONF_0001116

**Definitive Bonds**

The New Bonds will be issued in fully registered, definitive form to owners of beneficial interests or their nominees rather than to the Depositary or its nominee, only if:

(a)  the Issuer advises the Indenture Trustee in writing that the Depositary is no longer willing or able to discharge properly its responsibilities as depositary with respect to the New Bonds, and the Issuer is unable to locate a qualified successor; or

(b)  after a Bond Indenture Event of Default or a Servicer Replacement Event, beneficial owners representing not less than a majority in principal amount of the New Bonds then outstanding, advise the Indenture Trustee and the Depositary in writing that the continuation of a book-entry system through the Depositary (or a successor) is no longer in the best interests of the Bondholders.

Upon the occurrence of any of the events described in the immediately preceding paragraph, the Indenture Trustee through the Depositary and its participating members will be required to notify all owners of beneficial interests in a global bond of the occurrence of such event and of the availability through the Depositary of New Bonds in definitive registered form. Upon surrender by the Depositary of the book-entry global bonds representing the New Bonds and instructions for re-registration, the Indenture Trustee will reissue the New Bonds in definitive registered form, and thereafter the Indenture Trustee will recognize the holders of the definitive registered bonds as Bondholders.

Payments or distributions of principal of and interest on the New Bonds will be made by a paying agent directly to Bondholders in definitive registered form in accordance with the procedures set forth in the Bond Indenture. Payments or distributions on each Payment Date (including the Final Scheduled Payment Date and the Liquidation Payment Date, if any) will be made to holders in whose names the Definitive Bonds were registered at the close of business on the Payment Record Date. Payments or distributions will be made by check mailed to the address of each Bondholder as it appears on the register maintained by the Indenture Trustee. The final payment or distribution on any New Bond, whether New Bonds in definitive registered form or New Bonds registered in the name of Cede & Co., however, will be made only upon presentation and surrender of the New Bonds at the office or agency specified in the notice of final payment or distribution to Bondholders.

New Bonds in definitive registered form will be transferable and exchangeable at the offices of the Indenture Trustee, or at the offices of a transfer agent or registrar named in a notice delivered to Bondholders in definitive registered form. No service charge will be imposed for any registration of transfer or exchange, but the Indenture Trustee, transfer agent or registrar may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith.

**List of Bondholders**

Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding may, by written request to the Indenture Trustee, obtain access to the list of all Bondholders maintained by the Indenture Trustee for the purpose of communicating directly with other Bondholders with respect to their rights under the Bond Indenture or under the New Bonds. The Indenture Trustee may elect not to afford the requesting Bondholders access to the list of Bondholders if it agrees to mail the desired communication or proxy, on behalf of and at the expense of the requesting Bondholders, to all Bondholders contained within such list.

The Bond Indenture will not provide for the holding of annual or other meetings of Bondholders.

AAFAF_CONF_0001117

**COLLECTIONS ON THE RESTRUCTURING PROPERTY AND CALCULATION OF AVAILABLE CASH**

**Collections on the Restructuring Property**

The Restructuring Property consists of a non-homogeneous pool of assets. In addition, the Collections on the Restructuring Property are, and will be, subject to complex financial arrangements including, in certain instances, Collections passing through intermediary entities that are governmental instrumentalities of the Commonwealth. For detailed descriptions of the anticipated cash flows from the various classes of assets making up the Restructuring Property, see "*The Restructuring Property—Detailed Description of the Restructuring Property*" in this Offering Memorandum.

**The Collection Account**

On or prior to the Closing Date, the Servicer will establish a trust account in the name of the Indenture Trustee for the benefit of the Bondholders (such account, the "Collection Account"), into which all Collections generated in respect of the Restructuring Property will be deposited, together with any net income received on the investment of funds on deposit in the Collection Account. The Servicer will have full authority to make deposits into and payments from the Collection Account unless revoked in writing by the Indenture Trustee.

The Servicer will, to the extent practicable, cause Collections collected during each Collection Period to be deposited directly into the Collection Account or, to the extent not practicable to do so, to be subsequently deposited into the Collection Account as promptly as practicable after receipt. The Servicer may invest amounts (other than amounts corresponding to the Fees and Expenses Reserve) held in the Collection Account in Eligible Investments from the time deposited into the Collection Account until the Business Day before the next Payment Date. As promptly after receipt of any Collections that are not cash as is consistent with the Servicer's duty to maximize the value of the Restructuring Property, the Servicer will sell such Collections for cash in an arm's length transaction to a person or entity that is not an affiliate of the Issuer or GDB and deposit the proceeds thereof into the Collection Account.

From time to time after each Payment Date and prior to the following Determination Date, the Servicer may withdraw funds from the Collection Account (i) to pay Reimbursable Servicer Expenses or to reimburse the Servicer for any Reimbursable Servicer Expenses advanced by the Servicer, in the aggregate, up to the amount of the Fees and Expense Reserve corresponding to budgeted Reimbursable Servicer Expenses, (ii) upon the request of the Issuer, to pay the Issuer Expenses budgeted under the Fees and Expenses Reserve, and (iii) upon the reasonable request of the Issuer, to pay Issuer Expenses not otherwise budgeted under the Fees and Expenses Reserve, *provided that* if a withdrawal as described in the foregoing clause (ii) or (iii) would result in the Issuer Operating Expenses exceeding the Issuer Operating Expenses Cap, as described below, or if such withdrawal would result in the reasonable likelihood of the Issuer Operating Expenses exceeding the Issuer Operating Expenses Cap, the Servicer will not withdraw any such funds without the consent of the Collateral Monitor, which consent will not be unreasonably withheld. All other withdrawals from the Collection Account will be made on each Payment Date in accordance with the priority of payments set forth in the Bond Indenture and any other applicable terms set forth therein. Following the Collateral Monitor's notice of a possible Servicer Replacement Event until the replacement of the Servicer or waiver by the Bondholders of such possible Servicer Replacement Event, all Servicer decisions in respect of the Collection Account will be subject to the approval of the Collateral Monitor, which will be exercised promptly and in such a manner as to allow for servicing in accordance with the servicing standards set forth in the Servicing Agreement.

Unless otherwise consented to by the Collateral Monitor, which consent may not be unreasonably withheld, the Issuer may not incur Issuer Operating Expenses (as defined herein) after the Closing Date exceeding, in the aggregate, (i) $650,000 per year through the first Payment Date following the first Annual Filing Date (prorated for any partial years) and (ii) an amount to be determined by the Board of Trustees for each year thereafter, which amount shall not exceed $650,000 and shall be subject to the consent of the Collateral Monitor, which consent may not be unreasonably withheld (it being understood that such amounts are expected to decrease after the first Payment Date following the first Annual Filing Date) (the "Issuer Operating Expenses Cap").

"Issuer Operating Expenses" means all expenses, liabilities or other obligations other than Excluded Expenses.

"Excluded Expenses" means (a) amounts owed in respect of the New Bonds, (b) amounts to be paid for any transaction costs of the Qualifying Modification, including the professional fees and expenses of GDB, AAFAF, the Issuer and the professionals required to be paid pursuant to the Restructuring Support Agreement, (c) amounts owed to the Servicer, the Indenture Trustee or the Collateral Monitor (including, in each case, in respect of reimbursable expenses) and (d) expenses arising from (i) Bondholder solicitations required under the terms of the Bond Indenture, (ii) litigation brought against or reasonably brought by the Issuer or the Board of Trustees (including any related legal fees and indemnification costs), (iii) expenses arising from the creation and distribution of information for U.S. tax reporting purposes, (iv) directors and officers insurance or (v) auditing fees.

"Issuer Expenses" means Issuer Operating Expenses and Excluded Expenses.

E-150

The Servicer will not be required to, and is not expected to, make advances of interest or principal payments on the Restructuring Property.

## Fees and Expenses Reserve

The Servicer will prepare, and on the Business Day prior to each Payment Date (each, a "Determination Date") deliver to the Issuer, the Collateral Monitor and the Indenture Trustee, the Payment Date Report, which will include, among other things, the Semiannual Budget, which will set forth the reasonably expected Issuer Expenses (other than amounts owed in respect of the New Bonds and amounts due to the Servicer and the Collateral Monitor calculated on the basis of cash Collections) through the next Determination Date based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees, which approval will not be unreasonably withheld. The amount of cash needed to satisfy the amounts set forth in the Semiannual Budget (such amount, the "Fees and Expenses Reserve") will be reserved in the Collection Account on the related Payment Date. From time to time after each Payment Date and prior to the following Determination Date, the Servicer may withdraw funds corresponding to the Fees and Expenses Reserve as described in "—*The Collection Account*" above.

## Calculation of Available Cash

The Payment Date Report will also include a statement setting forth the amount of funds available for payment to the Bondholders on the relevant Payment Date (such amount, the "Available Cash"), and the calculation thereof, which will be calculated as follows:

(i) the sum of all amounts in the Collection Account as of the applicable Determination Date (whether arising from the Collections or otherwise), *less*

(ii) the sum of (x) the Fees and Expenses Reserve and (y) the sum of amounts due to the Servicer, the Indenture Trustee and the Collateral Monitor.

## Collection Schedule and Yield Considerations

The Issuer's ability to pay interest on the New Bonds in cash as it comes due and make principal payments on the New Bonds depends on the rate of Collections on the Restructuring Property, which will be influenced by a variety of economic, social and other factors. There can be no assurance as to the amount of cash interest or principal payments, if any, to be made on the New Bonds on each Payment Date, since the amount will depend on the amount collected on the Restructuring Property during the applicable Collection Period.

The Collection schedule for the Municipal Loan Assets, the Additional Restructuring Authority Assets and the Real Property Assets is attached hereto as Appendix E (the "Collection Schedule"). There can be no assurance that Collections on, including proceeds from sales of, any of the Restructuring Property, including the Municipal Loan Assets, will be generated in the amounts and according to the schedules set forth herein or at all.

If Collections occur earlier than, or in greater amounts than, projected, payments of principal on the New Bonds could occur significantly earlier than anticipated. If this occurs, Bondholders will bear the risk of not being able to reinvest such amounts at yields equal at least to the yield on their respective New Bonds. Such reinvestment risk includes the risk that interest rates may be lower at the time such Bondholders receive payments from the Issuer than interest rates would otherwise be had such payments not been made or had such payments been made at a later time.

Additionally, to the extent that obligors on Restructuring Property that have Loans with higher interest rates are able to prepay or refinance their Loans at lower interest rates, such repayment may result in the Issuer holding Restructuring Property that will generate Collections in amounts less than those set forth on the Collection Schedule, which will result in less Available Cash from which to make interest or principal payments on the New Bonds.

Likewise, delayed principal payments on the Restructuring Property could result in an actual yield that is less than the anticipated yield, and expedited principal payments on the Restructuring Property could result in an actual yield that is less than the anticipated yield.

## Eligible Investments of Funds in the Collection Account

Funds in the Collection Account may be invested, at the written direction of the Servicer, in Eligible Investments.

AAFAF_CONF_0001119

"Eligible Investments" means certain highly rated obligations and securities, including, in the case of any obligation or security issued by a U.S. party, only (a) obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency thereof, provided such obligations are backed by the full faith, credit and taxing power of the United States and (b) certificates of deposit issued by any bank, trust company, savings bank or other savings institution that is an Eligible Institution and is fully insured by the Federal Deposit Insurance Corporation (the "FDIC"), in either case with a total duration of no more than 183 days from the date of original issue and a remaining duration consistent with the payment of Available Cash due on the following Payment Date.

The Collection Account will be maintained as either (a) a segregated account with an Eligible Institution or (b) an Eligible Deposit Account. "Eligible Deposit Account" means a segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States of America or any one of the states thereof, the District of Columbia or the Commonwealth (or any domestic branch of a foreign bank), having corporate trust powers and acting as trustee for funds deposited in such account, so long as the short term securities of such depositary institution are rated A-1 by S&P, P-1 by Moody's and F1+ by Fitch or the long term securities of such depositary institution are rated at least BB by S&P, Baa by Moody's and BB by Fitch. "Eligible Institution" means a depositary institution or trust company (including the Indenture Trustee or any of its affiliates) so long as the short term securities of such depositary institution are rated A-1 by S&P, P-1 by Moody's and F1+ by Fitch or the long term securities of such depositary institution are rated at least BB by S&P, Baa by Moody's, and BB by Fitch and whose deposits are insured by the FDIC. The Collection Account will be initially held at the Indenture Trustee, and the Servicer will have full authority to make deposits to and payments therefrom unless revoked in writing by the Indenture Trustee. In the event the Indenture Trustee no longer qualifies as an Eligible Institution, the Servicer will, with the Indenture Trustee's assistance as necessary, use reasonable efforts to cause the Collection Account to be moved to an Eligible Institution within 30 days from the date on which the Indenture Trustee fails to be an Eligible Institution.

AAFAF_CONF_0001120

### PAYMENTS TO BONDHOLDERS

On each Determination Date, the Servicer will inform the Issuer, the Indenture Trustee and the Collateral Monitor of, among other things, the amount of Available Cash to be distributed to the Bondholders as described in more detail in "*Collections on the Restructuring Property and Calculation of Available Cash—Calculation of Available Cash*," in this Offering Memorandum.

The Indenture Trustee will make payments to the Bondholders out of the Available Cash. The Available Cash to be distributed to the Bondholders will be allocated in the manner described below.

### Priority of Payments

*Priority of Payments*. The Indenture Trustee will make payments from amounts in the Collection Account or will retain amounts in the Collection Account, as applicable, in the following order of priority:

1.  *Holdback for Fees and Expenses Reserve* — On each Payment Date, an amount equal to the amount of cash reasonably expected to be required to pay all Issuer Expenses that are capable of estimation (which will not include, for the avoidance of doubt, amounts owed in respect of the New Bonds and Servicing Fee and Collateral Monitor Fee determined on the basis of cash Collections) through the next Determination Date based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees (such amount, the "Fees and Expenses Reserve") will be retained in the Collection Account;

2.  *Third-Party Fees and Expenses* — On each Payment Date or otherwise as such amounts become due, make payments to each of the Servicer, the Indenture Trustee and the Collateral Monitor, of the respective amount of any fees, expenses and indemnification amounts due to it, and to the Issuer or other applicable third party, the amount of any other due and payable Issuer Expenses, including Reimbursable Servicer Expenses, subject, as applicable, to the Issuer Operating Expenses Cap and other applicable restrictions on Issuer Expenses described herein; *provided*, for the avoidance of doubt, that the payment of all Issuer Expenses validly incurred and payable from the Collection Account pursuant to the terms of the Transaction Documents as described herein will be paid prior to the calculation of Available Cash, notwithstanding any shortfall in the Fees and Expenses Reserve for the applicable semi-annual period;

3.  *Current Interest on the New Bonds* — On each Payment Date, make payments to the Bondholders of accrued and unpaid interest on the New Bonds relating to such Payment Date; and

4.  *New Bond Principal* — On each Payment Date, make payments to the Bondholders until the principal amount of the New Bonds is reduced to zero.

### Hypothetical Amortization of the New Bonds

As discussed above, the cash payments to the Bondholders on each Payment Date, if any, are dependent upon Collections on the Restructuring Property in the corresponding Collection Period and the amount of Available Cash that the Issuer holds. Such Collections are highly dependent upon a number of factors, including many that are outside of the Issuer's control.

In connection with the transfer of the Transferred Property from GDB to the Issuer, GDB has prepared a Collection Schedule for the Restructuring Property, which includes scheduled payments on the Restructuring Property Loans classified as performing as of the Cutoff Date (*i.e.*, the performing Municipal Loan Assets and Additional Recovery Authority Loans), projected sales of Real Property Assets and distributable Cash Assets, and which is attached hereto as Appendix E. However, there can be no assurance that the actual Collections on the Restructuring Property will not materially deviate, both in relation to the timing and amount of any such Collections, from the contractually scheduled payments. In particular, as a result of Hurricanes Irma and María, the tax revenues on which the Municipal Loan Assets rely may be materially reduced for an unknown period. In addition, such schedule and the scenario analysis assume zero Collections on any of the Restructuring Property other than the Municipal Loan Assets, the Additional Recovery Authority Loans and the Real Property Assets. Any recoveries on other portions of the Restructuring Property, which are uncertain and speculative as to timing and amount, may materially change the hypothetical scenario analysis presented below.

Subject to the qualifications and assumptions described above and on Appendix F, a hypothetical scenario analysis regarding the hypothetical amortization of the New Bonds can be found on "*Appendix F: Hypothetical Amortization of the New Bonds*," attached to this Offering Memorandum.

AAFAF_CONF_0001121

## TRANSFER AGREEMENT

The following summary describes certain terms and conditions of the transfer agreement, entered into by and between the Issuer and GDB (the "Transfer Agreement"). The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, all the provisions of the Transfer Agreement.

**Transfer and Assignment of Restructuring Property**

On the Closing Date, pursuant to the GDB Restructuring Act and the Qualifying Modification, the Transfer Agreement will require GDB to irrevocably assign and transfer without recourse to the Issuer, in consideration for cancellation of certain of GDB's existing bond obligations and other indebtedness pursuant to the Qualifying Modification, all of GDB's legal and equitable right, title and interest in, to and under, and claims and causes of action to enforce, all of the Transferred Property (other than the GDB Retained Loans) and any security interests related to the Transferred Property. Furthermore, upon (i) the discovery of any Unknown Assets, (ii) the receipt of any proceeds of the GDB Retained Loans or (iii) the identification of any Cash Assets, including the Vendor Claim Reserve Residual and the Residual GDB Cash Assets, GDB will also be required to take all necessary steps to complete the transfer thereof (in each case, net of the expenses associated with obtaining such Unknown Assets, proceeds or Cash Assets, as applicable) to the Issuer within fifteen days, pending which such assets will be held in trust for the Issuer. In addition, the Transfer Agreement will require that all retained rights, title and interests in and to, and claims and causes of action to enforce, the Additional Recovery Authority Loans (i.e., other than the Beneficial Interests therein transferred on the Closing Date) be transferred to the Issuer, and will provide that each such Additional Recovery Authority Loan will constitute Transferred Property, no later than the date that is the earlier of (A) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (B) 18 months after the Closing Date. The Transfer Agreement will also permit GDB to transfer, at its option (except as described in the preceding sentence), all rights, title and interest in, to and under, and claims and causes of action to enforce, any of the GDB Retained Loans at any time, at which time, such GDB Retained Loans will be deemed Transferred Property. The Transfer Agreement will also provide that GDB will retain all proceeds of Causes of Action and will be authorized to use such proceeds (net of any expenses associated with realization of such proceeds) solely to satisfy or resolve any contingent and unliquidated claims against GDB arising on or before the Closing Date (other than those resolved pursuant to the Qualifying Modification or the GDB Restructuring Act) and, upon its sole determination that all such contingent and unliquidated claims have been satisfied or resolved, shall transfer to the Issuer the remaining proceeds, if any, of the Causes of Action, and thereafter from time to time shall transfer the proceeds of any Causes of Action subsequently resolved.

The Transfer Agreement will require that such transfers, effectuated pursuant to the GDB Restructuring Act and the Qualifying Modification, be documented under the Transfer Agreement, and that each item of the Transferred Property be identified in a written transfer notice delivered to the Issuer and the Servicer in accordance therewith; *provided* that such identification may be made in general terms. Pursuant to the Transfer Agreement, each transfer thereunder will be irrevocable, non-voidable and an absolute transfer of all of GDB's title and interest (as a true sale) and not a pledge or other financing, in accordance with the GDB Restructuring Act.

An initial budget providing the projected sources and uses of GDB's cash through the remainder of GDB's operations will be included in the Transfer Agreement, and the Transfer Agreement will provide that GDB will prepare and deliver to the Issuer an updated budget in form and substance satisfactory to the Collateral Monitor at the end of each fiscal quarter until all Transferred Property has been transferred to the Issuer, each GDB Retained Loan has been transferred to the Issuer or terminated according to its terms and each Cause of Action has been resolved, released or otherwise extinguished. Upon GDB's determination that all obligations required to be paid with such cash have been provided for, GDB will transfer to the Issuer any surplus cash and cash equivalents as Residual GDB Cash Assets.

In accordance with the Transfer Agreement, GDB will be required to provide notice to each obligor and relevant payment intermediary in respect of the Loans constituting Transferred Property and all other relevant parties of such transfers notifying such parties of the transfer of the Transferred Property and directing such parties to send all future payments in respect of such Transferred Property directly to the Collection Account. GDB will use reasonable best efforts and cooperate with the Servicer to ensure the relevant payors make all future payments in respect of the Transferred Property directly to the Collection Account or otherwise to the Servicer. In the event that, after the Closing Date, any Collections in respect of the Transferred Property are not remitted directly to the Servicer or the Collection Account or are received by GDB in any manner, GDB will remit or cause to be remitted such Collections to the Servicer.

In addition, the Transfer Agreement will require GDB, in connection with any transfer of Transferred Property, at its own expense, on or prior to the date of such transfer, to deliver the books, records and other documents (whether in physical or electronic form) relating to such Transferred Property to a designated document custodian, which will thereafter hold such documents for the benefit of the Issuer, and that the respective accounting records and computer files of GDB and the Issuer will reflect such transfer and assignment. For additional information, see, among other things, *"Risk Factors—Although the New Bonds will be automatically secured by a statutory lien on the Transferred Property and all Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders, pursuant to the GDB Restructuring Act, such rights of the Bondholders may be adversely affected by issues generally*

E-154

AAFAF_CONF_0001122

*associated with the realization of liens on collateral"* and *"Risk Factors—The Restructuring Property securing the New Bonds includes certain Loan proceeds that will not be transferred to the Issuer until received by GDB after the Closing Date. Although the New Bonds will be secured by a lien on the Beneficial Interest in such Loans, the lien on such proceeds received by GDB after a future GDB Title III filing, if any, could be subject to challenge."*

Furthermore, under the Transfer Agreement, GDB will agree to use commercially reasonable efforts, in cooperation with the Servicer and the Issuer, to perform the actions of GDB required to transfer the servicing of the Restructuring Property from GDB to the Servicer.

The Transfer Agreement will require the Issuer to assume on the Closing Date, in connection with the transfer of the Transferred Property to the Issuer, liability for the payment of any transaction costs of the Qualifying Modification, including professional fees and expenses of GDB, AAFAF, and the professionals to be paid pursuant to the Restructuring Support Agreement, to the extent not paid in full by GDB prior to or on the Closing Date (notwithstanding the foregoing, GDB intends and expects to pay all such expenses in full on the Closing Date, as required by the Restructuring Support Agreement).

Pursuant to the Transfer Agreement, GDB will covenant, among other things, to use commercially reasonable best efforts to maximize the return on the GDB Retained Loans, provided that it shall not be required to bring any action seeking to obtain a judgment against a public entity obligor on such Loan or seeking to foreclose upon any of such public entity's assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans. In addition, GDB will covenant to provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of the GDB Retained Loans. Upon the occurrence of an event of default under the Transfer Agreement, including, but not limited to, the failure by GDB to transfer any Transferred Property as contemplated by the Transfer Agreement, the failure to disclose to the Issuer the existence of any asset that is required to be transferred to the Issuer but not yet transferred or to comply with any other covenant contained in the Transfer Agreement in any material respect, the Servicer, on behalf of the Issuer, shall be authorized and empowered to take certain actions to effectuate the terms of the Transfer Agreement, including to effectuate the transfer of any such property, including by way of specific performance in addition to any other remedy to which they are entitled at law or in equity.

**No GDB Repurchase Obligation**

The Transfer Agreement will provide that GDB will have no obligation to repurchase any of the Transferred Property.

**Amendment**

The Transfer Agreement will provide that the Transfer Agreement may be amended by the parties thereto, without the consent of the Bondholders or the Indenture Trustee, to cure any ambiguity, to correct or supplement any provisions in the Transfer Agreement or for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Transfer Agreement or of modifying in any manner the rights of the Bondholders; *provided* that an officer's certificate will have been delivered by the Servicer to the Indenture Trustee certifying that such officer reasonably believes that such amendment will not adversely affect the interests of any Bondholder.

The Transfer Agreement will provide that it may also be amended by the parties thereto with the written consent of the Indenture Trustee for any other purpose (i) if the Indenture Trustee concludes that such amendment will not adversely affect the interests of the Bondholders or (ii) for any other purpose, so long as the Indenture Trustee has obtained the consent of Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding.

The Transfer Agreement will also provide, however, that no amendment to the Transfer Agreement may reduce the percentage of the aggregate principal amount of outstanding New Bonds required to consent to amendments pursuant to (i) and (ii) in the preceding paragraph without the consent of each Bondholder.

**Third-Party Beneficiaries**

The Transfer Agreement will provide that the Indenture Trustee, on behalf of the Bondholders, and the Servicer will be express third-party beneficiaries of the Transfer Agreement.

AAFAF_CONF_0001123

## SERVICING AGREEMENT

The following summary describes certain terms and conditions that are to be included in the Servicing Agreement entered into by the Issuer and the Servicer.

### Servicing Procedures

The Servicer, for the benefit of the Issuer and the Bondholders, will manage, service, administer and make Collections on the Restructuring Property in accordance with the terms of the Servicing Agreement, which will provide, among other things, that the Servicer will act (a) in accordance with applicable laws and regulations and the terms of the provisions of such Restructuring Property, (b) consistent with the Servicer's standard servicing procedures, if applicable, (c) in accordance with the other express terms of the Servicing Agreement, which for the avoidance of doubt, will include the limitations described in "*The Restructuring Property—Management of the Restructuring Property,*" and (d) with reasonable care, using the same degree of skill and attention that a prudent lender or asset manager would exercise with respect to comparable assets that it services for itself or others (i) with a view to the timely collection of all periodic payments due on the Loans that make up the Restructuring Property and a duty to maximize the realizable value (in present value terms) of the Restructuring Property and (ii) without regard to any relationship that the Servicer may have with the related obligor or any other creditor of such obligor (collectively, the "Accepted Servicing Practices").

The Servicer's duties will include performance of the following services, in each case, in accordance with the Accepted Servicing Practices (the "Services"):

(a) using commercially reasonable efforts to maximize the realizable present value of the Restructuring Property, including, as appropriate, through the collection of all payments called for under the terms of each Loan as and when the same become due, the sale, settlement or other disposition of the Restructuring Property or the enforcement of all rights and remedies of the Issuer in respect of the Restructuring Property through the commencement of legal proceedings or other enforcement actions;

(b) using commercially reasonable efforts to enforce the Issuer's rights under the Transfer Agreement, including by: (i) collecting all proceeds in respect of the GDB Retained Loans and the Causes of Action and receiving, on behalf of the Issuer, the Additional Recovery Authority Loans, and enforcing the Issuer's rights to each of the foregoing in accordance with the Transfer Agreement; (ii) enforcing GDB's covenant under the Transfer Agreement and the Qualifying Modification to use commercially reasonable best efforts to maximize the return on the GDB Retained Loans; and (iii) reviewing any proposed modification by GDB of any Additional Recovery Authority Loan and providing approval of such modification only if, after consultation with and non-objection by the Collateral Monitor, the Servicer determines in good faith that such modification is commercially reasonable;

(c) with respect to obligors on the Restructuring Property: (i) using commercially reasonable efforts to respond to inquiries of such obligors; (ii) using commercially reasonable efforts to investigate and manage delinquencies, defaults and potential defaults on the Restructuring Property, including by using commercially reasonable efforts to contact and interview any obligor to determine the financial condition of such obligor, the economic viability of the related Restructuring Property and such obligor's intentions with respect to making payments in respect of the Restructuring Property; and (iii) sending payment coupons and reporting tax information to such obligors;

(d) establishing and maintaining the Collection Account and managing all deposits therein and withdrawals therefrom (for additional information on the Services relating to the Collection Account, see "*Collections on the Restructuring Property and Calculation of Available Cash—Collections on the Restructuring Property*" in this Offering Memorandum);

(e) preparing, or causing to be prepared, and delivering (i) the Annual Report and certain other disclosures required pursuant to the Disclosure Agreement (including unaudited annual financial information necessary for the Issuer to file unaudited financial information in the event that the Issuer's audited financial statements are not available by the date the Annual Report is required to be filed under the Disclosure Agreement), (ii) the Payment Date Report, including the Semiannual Budget, and the Quarterly Budget Report, (iii) the information required by the Collateral Monitor to conduct the Compliance Test and prepare the Semiannual Bondholder Report and (iv) the information required by the auditor of the Issuer to prepare the Issuer's annual audited financial statements, including the management's discussion and analysis;

(f) entering servicing information on a current basis into the servicing report system utilized by the Servicer in accordance with the Accepted Servicing Practices, including by crediting Collections against the Restructuring Property only once actually received by the Servicer, and maintaining and ensuring the safe custody of, as property of the Issuer, a complete, accurate and separate set of books and records pertaining to the Servicer's performance of the Services,

AAFAF_CONF_0001124

including (i) all Collections received by the Servicer or otherwise deposited in the Collection Account in respect of the Restructuring Property, the GDB Retained Loans or the Causes of Action, (ii) all expenses to be paid by the Issuer relating to the Restructuring Property and (iii) relevant copies of notes, correspondence and documentation of all servicing efforts and activities, including all material meetings and telephone calls with obligors or made in connection with obligors or the Restructuring Property;

(g)   maintaining an effective system of audits and controls adequate to ensure that the Servicer's agents, representatives, employees and other staff perform their respective obligations and comply with the Accepted Servicing Practices;

(h)   taking all steps necessary, on behalf of the Issuer, to continuously maintain the Issuer's ownership interest in the Restructuring Property and all Collections thereon and perfected security interests in or liens on any collateral securing any Loan constituting Restructuring Property and the Vendor Claim Reserve and any proceeds thereof, including by, as necessary, (i) obtaining the execution of all necessary documentation by the applicable obligor or GDB, (ii) recording, registering, filing, re-recording, re-filing and re-registering all applicable security agreements, financing statements and continuation statements, (iii) amending the title documents of such property and (iv) using all commercially reasonable efforts to defeat any adverse claims to the Restructuring Property or the Vendor Claim Reserve Residual, including to the sources of repayment of the Issuer, and to preserve the Restructuring Property and the enforceability of the Issuer's rights thereto;

(i)   responding to inquiries of federal, state or local government authorities with respect to the Restructuring Property, using commercially reasonable efforts to generate information for U.S. federal tax reporting purposes, as is available to the Servicer, for the Issuer and, in the event that the U.S. Internal Revenue Service asserts that the New Bonds are characterized as equity interests of the Issuer for U.S. federal income tax purposes, using commercially reasonable efforts to provide, or cause to be provided, such information as is reasonably requested by Bondholders to enable them to comply with their U.S. federal income tax reporting obligations and to retain possession of records and information relevant to the foregoing; and

(j)   performing the other duties, including administrative functions, as specified in the Servicing Agreement.

Subject to the Accepted Servicing Practices, including the limitations described in "*The Restructuring Property—Management of the Restructuring Property*," the Servicer will be authorized and empowered to:

(a)   act as agent for the Issuer to perform the Services and all other actions required by the Servicer under the Servicing Agreement, and to do any and all things in connection therewith that it may deem necessary or desirable; for the avoidance of doubt, the Servicer will be authorized and empowered to act as agent for the Issuer to prepare, or cause to be prepared, the Annual Report and certain other notifications required under the Disclosure Agreement;

(b)   exercise all available rights and seek all available remedies in respect of the Restructuring Property, including, without limitation (i) commencing, in its own name or in the name of the Issuer, a legal proceeding to enforce rights and seek remedies under the Restructuring Property or any lien or similar interest or claim relating thereto, (ii) commencing or participating in any legal proceeding (including, without limitation, a proceeding under Title III or Title VI of PROMESA or similar proceeding) relating to or involving the Restructuring Property, including defaults on the Restructuring Property and (iii) executing and delivering, in the Servicer's name or in the name of the Issuer, any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such proceeding described in the foregoing clause (i) or (ii); for the avoidance of doubt, the Issuer will appoint the Servicer as its attorney in fact and agent of the Issuer to exercise all available rights and seek all available remedies in respect of the Restructuring Property, or waiving, modifying or varying any term of, or selling, any Loan constituting Restructuring Property;

(c)   waive, modify or vary any term of, or sell or settle, any Loan constituting Restructuring Property if, in the Servicer's reasonable and prudent determination, such waiver, modification, postponement or indulgence will maximize the amounts (in present value terms) to be received by the Bondholders in respect of such Loan;

(d)   execute and deliver, on behalf of itself or the Issuer, any and all agreements necessary to effectuate any transaction allowed under the Servicing Agreement and any and all instruments of satisfaction, cancellation, partial or full release or discharge and all other comparable instruments with respect to the Restructuring Property; *provided* that the Servicer will not, except pursuant to an order from a court of competent jurisdiction, or as part of a legitimate restructuring transaction of such Restructuring Property (which transaction has been approved by the Collateral Monitor as commercially reasonable), release an obligor from payment of any unpaid amount under any Restructuring Property or waive the right to collect the unpaid balance of any Restructuring Property from any obligor, except that the Servicer may forego collection efforts if the amount subject to collection is *de minimis* or such release or waiver is otherwise consistent with the Accepted Servicing Practices; and

AAFAF_CONF_0001125

(e)     subject to the reimbursement limitations described in "*Servicing Compensation and Payment of Expenses*" below, engage third-party vendors, legal counsel, brokers, property managers and other sub-contractors in connection with the servicing, collection, resolution, restructuring, enforcement, litigation, settlement, sale or other disposition of the Restructuring Property.

The Servicer will have the exclusive right to the extent permitted by law to vote, to give consents, ratifications and waivers and to take any other action with respect to the Restructuring Property with the same force and effect as if the Servicer were the absolute and sole owner thereof, in each case, in accordance with the Accepted Servicing Practices, and the Issuer will take all such action as the Servicer may reasonably request from time to time to give effect to such right. Under the Servicing Agreement, in order to authorize and empower the Servicer to carry out the Services, the Issuer will grant the Servicer powers of attorney to the fullest extent permitted by law to enable the Servicer to carry out its servicing and administrative duties under the Servicing Agreement, and the Issuer will furnish any additional documents the Servicer deems necessary or appropriate in connection therewith.

In addition, if the Servicer commences or participates in a legal proceeding in respect of the Restructuring Property in its own name, the Issuer will be deemed to have automatically assigned the applicable Restructuring Property (subject to the lien in favor of the Indenture Trustee for the benefit of the Bondholders) and any other related property of the Issuer with respect to such Restructuring Property to the Servicer for purposes of commencing or participating in any such proceeding as a party or claimant. If in any enforcement suit or legal proceeding, it will be held that the Servicer may not enforce rights under the Restructuring Property on the grounds that it will not be a real party in interest or a holder entitled to enforce such rights under the Restructuring Property, the Issuer will, at the Servicer's written direction, take such steps as the Servicer may direct to enforce such rights under the Restructuring Property, including bringing suit in its name. For the avoidance of doubt, the Servicer will not acquire any right or title to, or interest in, the Restructuring Property, other than the servicing rights conveyed by the Servicing Agreement.

The Servicing Agreement will not create any fiduciary duties of Servicer to the Bondholders, and such duties will only exist to the extent arising under applicable law.

**Oversight by the Collateral Monitor**

The Servicing Agreement and the Collateral Monitor Agreement will provide that the activities of the Servicer will be subject to the ongoing oversight and review of the Collateral Monitor and require the Servicer and the Collateral Monitor to meet and confer regularly and in good faith in fulfillment of their respective duties under such agreements. The Servicing Agreement will require the Servicer to cooperate with the Collateral Monitor by, among other things, providing, and responding to reasonable requests of the Collateral Monitor for, (i) access to the Servicer, (ii) access to or copies of documents relating to the Restructuring Property or any other reasonably available papers or information regarding the activities of the Issuer and the Servicer, including, without limitation, all information relating to any potential material transaction in respect of the Restructuring Property and (iii) temporary on-site access and work space for the Collateral Monitor and the Issuer at the Servicer's facilities from which it is primarily performing the Services, in each case, as reasonably necessary to permit the Collateral Monitor and the Issuer to carry out such entities' duties in respect of oversight of the Servicer. Such agreements will provide further that, unless waived by the Collateral Monitor in its sole discretion, the Servicer and the Collateral Monitor will meet at least once each month for the first 24 months after the Closing Date and once each fiscal quarter thereafter, if such reduced schedule is agreed to by the Collateral Monitor, to discuss, among other things, the Servicer's performance, the Collections on the Restructuring Property, delinquencies on the Restructuring Property and strategy and expected timing for returning any non-performing assets to performing status, and preparation of the reports and budgets required under the Servicing Agreement. Pursuant to the Servicing Agreement, the Issuer will have a right to, but will not be required to, attend such meetings or to receive an update from the Collateral Monitor as to the results of any such meeting.

In addition, the Servicing Agreement will provide that if the Servicer engages in any negotiations relating to, or consideration of, or if the Servicer is approached regarding, any potential material transaction in respect of any Restructuring Property or any Additional Recovery Authority Loan held by GDB, including any potential waiver, modification, amendment, consent, other accommodation, sale or other disposition, the Servicer will notify the Collateral Monitor and provide, on an ongoing basis throughout the course of such negotiations and consideration, the Collateral Monitor with all information necessary for the Collateral Monitor to make a determination as to the commercial reasonableness of such transaction. The Servicing Agreement and the Collateral Monitor Agreement will require the Servicer and the Collateral Monitor to collaborate in good faith to ensure the completeness and timely delivery of the information provided to the Collateral Monitor, and, in all events, the Servicer will be required to provide all such information to the Collateral Monitor no later than 10 business days prior to the date the Servicer proposes to enter into any such transaction. In accordance with the restrictions described in "*The Restructuring Property—Management of the Restructuring Property*," the Servicing Agreement will not permit the Servicer to enter into or consent to any such transaction if the Collateral Monitor has objected to such transaction. The Collateral Monitor Agreement will require the Collateral Monitor, on the last day of each Collection Period (each, a "Test Date"), to conduct a test (the "Compliance Test") to determine if the cumulative shortfall of the actual cash Collections received in respect of the Municipal Loan Assets identified on the Municipal Loans Collection Schedule as compared to the scheduled interest and amortization payments identified therein from July 1, 2018, through such Test Date is 10% or more, which will be a Servicer Default under the Servicing Agreement (described below in "*—Removal of Servicer*").

E-158

AAFAF_CONF_0001126

**Servicing Compensation and Payment of Expenses**

The Servicing Agreement will provide that, on the Closing Date, the Servicer will be paid a fee of $225 for each Loan transferred to the Issuer on the Closing Date for management by the Servicer under the Servicing Agreement (the "Initial Portfolio Transfer Fee").

The Servicing Agreement will also provide that, on each Payment Date, the Issuer will pay the Servicer a fee (the "Servicing Fee") calculated, with respect to each Collection Period, as the sum of (i) $225 per Loan transferred to the Issuer subsequent to the Closing Date during such Collection Period, (ii) 0.120% of the aggregate principal amount of the performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iii) 0.025% of the aggregate principal amount of the non-performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iv) 3.000% of Net Collections generated during such Collection Period upon the sale or settlement of any Loan constituting Restructuring Property and (v) 3.000% of Net Collections generated upon the sale of any Real Property Asset during such Collection Period, subject to certain limitations. The Servicing Agreement will also entitle the Servicer to reimbursement or payment by the Issuer for certain expenses and indemnification amounts incurred in connection with the performance of its duties under the Servicing Agreement, as described below. (The Servicing Fee and such expenses and indemnification may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds, in each case, subject to the terms and conditions contained in the Servicing Agreement.)

For purposes of calculating the Servicing Fee under the Servicing Agreement, (a) the term "Net Collections" will mean cash Collections in respect of the Restructuring Property net of any documented Reimbursable Servicer Expenses related to realizing such Collections and (b) "settlement" will mean, with respect to any Loan, a disposition, other than a sale, resulting in cash Collections. The Servicing Agreement will provide, for the avoidance of doubt, that if a non-performing Loan is restructured, all amounts due thereon will be considered to have been paid for purposes of its classification so long as all amounts due under the Loan's restructured terms have been paid.

The Servicer will be entitled to be paid the Servicing Fee pursuant to the Servicing Agreement solely to the extent of monies on deposit in the Collection Account and in accordance with the priority of payments described in "*Payments to Bondholders—Priority of Payments*" in this Offering Memorandum.

The Servicing Fee will compensate the Servicer for performing the Services under the Servicing Agreement. In addition, the Servicer will be entitled to reimbursement pursuant to the Servicing Agreement for the reasonable and necessary documented "out of pocket" costs and expenses incurred in the performance of the Servicer's obligations including expenses arising from (i) the establishment or maintenance of the Collection Account, (ii) legal and other fees and expenses in connection with the enforcement of rights and remedies under the Restructuring Property or in connection with an allowed transaction in respect of any Restructuring Property, (iii) the maintenance of any security interest securing any Restructuring Property, (iv) insurance, to the extent required, for any Restructuring Property, and (v) outside accounting fees in connection with the preparation of any of the reports and budgets required under the Servicing Agreement (collectively, "Reimbursable Servicer Expenses"). The Servicing Agreement will also provide that, to the extent the Servicer incurs Reimbursable Servicer Expenses exceeding the amount in the Fees and Expenses Reserve corresponding to Reimbursable Servicer Expenses, such expenses so incurred will be treated as advances by the Servicer ("Servicer Advances") and will be repaid, in addition to interest thereon from the date of the advance at the rate of 1.0% per month compounded monthly, on the succeeding Payment Date prior to any other amounts due to the Servicer.

The Servicing Agreement will provide that, notwithstanding the foregoing, the Servicer may receive reimbursement for a third-party expense only if the Servicer has obtained the prior written consent of the Collateral Monitor to engage such third party, which consent may not be unreasonably withheld if the Collateral Monitor determines that such engagement is commercially reasonable; provided that the Collateral Monitor will have the opportunity to review all invoices of such third party and may terminate such engagement upon finding that it is no longer commercially reasonable. The Servicing Agreement will further provide that, if the Collateral Monitor has provided such written consent for the Servicer's engagement of a third party in connection with the performance of the Services, it will give notice of such consent to the Issuer and include notice of such engagement to the Bondholders in its next Semiannual Bondholder Report and, in addition, include a requirement that information regarding all Reimbursable Servicer Expenses, whether paid from the Fees and Expenses Reserve or as Servicer Advances, be documented in reasonable detail, including information regarding amounts paid to each third party and the services provided by such third parties, and provided to the Bondholders in the next Quarterly Budget Report or Payment Date Report following incurrence of such amounts.

The Servicing Agreement will not permit the Servicer to collect and retain as additional servicing compensation any investment earnings or interest earned from the investment of monies on deposit in the Collection Account. For additional information, see

AAFAF_CONF_0001127

"*Collections on the Restructuring Property and Calculation of Available Cash—Collections on the Restructuring Property*" in this Offering Memorandum.

### Resignation of Servicer Permitted Under Limited Circumstances

The Servicing Agreement will provide that the Servicer may not resign from its obligations and duties unless (i) as a result of a change in law, the Servicer's duties under the Servicing Agreement are no longer permissible under applicable law or the Servicer receives a written notice from a relevant governmental or regulatory authority to the effect that the Servicer's duties under the Servicing Agreement are not permissible under applicable law, (ii) through no fault of the Servicer's, material, non-disputed amounts due to the Servicer in respect of the Servicing Fee or Servicer Advances or otherwise are not paid from monies on deposit in the Collection Account on the applicable Payment Date, which nonpayment is not remedied within 30 days following such Payment Date, (iii) (A) the Servicer has proposed a Qualified Successor Servicer to the Issuer and the Collateral Monitor in writing and such proposed Qualified Successor Servicer is acceptable to the Issuer and the Collateral Monitor and (B) such proposed Qualified Successor Servicer has agreed in writing to assume the obligations of Servicer under the Servicing Agreement or a substantially similar servicing agreement acceptable to the Collateral Monitor or (iv) the Servicing Agreement is otherwise terminated in accordance with its terms after the Servicer has provided at least three-months' notice of its intention to resign to the Issuer and the Collateral Monitor. The Servicing Agreement will further provide that, subject to applicable law or the direction of an applicable governmental or regulatory authority, resignation pursuant to the foregoing clause (iii) or (iv) above will become effective at the earlier of (a) the date a successor Servicer is able to provide the Services and enters into a servicing agreement with the Issuer, which successor Servicer's identity and Servicing Agreement are acceptable to the Collateral Monitor and (b) 24 months following the date of the Servicer's resignation, and the Transaction Documents will provide that any such successor Servicer will be subject to the same preliminary 60-day period for objection by the New Bond Requisite Holders (described below in "*—Removal of Servicer*").

### Removal of Servicer

The Servicing Agreement will provide that, subject to the procedures set forth therein (as described below), the Servicer may be removed and replaced by the Bondholders upon the occurrence of a Servicer Default (as defined herein) that is material to the interests of the Bondholders (a "Servicer Replacement Event"). Pursuant to the Collateral Monitor Agreement, the Collateral Monitor will be required to notify the Indenture Trustee and the Issuer when (a) the Collateral Monitor believes, in good faith, that a Servicer Default has occurred and is continuing and (b) the Collateral Monitor believes, in its sole discretion, that such Servicer Default is material to the interests of the Bondholders and that such notice from the Collateral Monitor will provide a detailed narrative and explanation of (i) the facts supporting the evaluation of the Collateral Monitor, (ii) the possible effects on the interests of the Bondholders and (iii) the recommendation of the Collateral Monitor regarding the possible Servicer Replacement Event. Pursuant to the Servicing Agreement, the Servicer will have the opportunity to provide a written explanation of such Servicer Default to the Collateral Monitor and the Issuer; *provided* that notwithstanding any such explanation, the Collateral Monitor's decision to give notice of a possible Servicer Replacement Event pursuant to the Collateral Monitor Agreement, and such notice actually given, will not be subject to challenge by the Servicer or any other person or entity. Pursuant to the Bond Indenture and the Collateral Monitor Agreement, the Indenture Trustee will be required to make available to the Bondholders the Collateral Monitor's notice along with the recommendation, if any, of the Issuer regarding the possible Servicer Replacement Event.

The Bond Indenture will require, promptly upon the Collateral Monitor's notice of a possible Servicer Replacement Event, but in no event later than 30 days thereafter, the Indenture Trustee to issue a posting on the EMMA website or other similar public posting and to solicit a Bondholder vote regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced. The Servicing Agreement will provide that, if the New Bond Requisite Holders do not deliver affirmative votes in respect of the solicitation, which will have a period of not less than 30 days and not more than 60 days, the Servicer Default and possible Servicer Replacement Event will be deemed waived. The Servicing Agreement will also provide that, if the New Bond Requisite Holders deliver affirmative votes in respect of the solicitation, a Servicer Replacement Event will have occurred and, upon the Servicer's receipt of notice by the Indenture Trustee of the results of the Bondholder vote, the Servicer's appointment under the Servicing Agreement will be terminated pending the appointment of a successor Servicer. Under such circumstances, the Transaction Documents will require the Issuer to initiate a competitive process, reasonably satisfactory to the Collateral Monitor, for the identification of a possible successor Servicer, who must be "qualified" and "independent" (as such terms are defined in the Transaction Documents), of recognized national standing and with the requisite expertise and Spanish speaking capability. The Transaction Documents will provide further that the Issuer (or, if the Issuer fails to act within 45 days of such vote, the Collateral Monitor) will be required to designate a successor Servicer acceptable to the Collateral Monitor for a preliminary 60-day period on terms of engagement acceptable to the Collateral Monitor and that any approval of the successor Servicer or terms of its engagement required from the Collateral Monitor may not be unreasonably withheld. The Collateral Monitor will be required to give notice to the Indenture Trustee under the Collateral Monitor Agreement, and the Indenture Trustee will be required to make such notice available to the Bondholders under the Bond Indenture, of (i) the successor Servicer, (ii) the terms of the successor Servicer's engagement, (iii) the terms of the preliminary 60-day engagement period and opportunity for Bondholder objection, (iv) any additional information the Collateral Monitor would like to provide and (vi) any additional information the Issuer would like to provide. The Transaction Documents will provide that, if the New

AAFAF_CONF_0001128

Bond Requisite Holders do not object to the identity or terms of the successor Servicer's engagement within 60 days after the Bondholders receipt of such notice, the successor Servicer's engagement will become final, subject to the terms and conditions of such Servicer's Servicing Agreement and that, if a successor Servicer is not appointed within six months after the delivery of affirmative votes of the New Bond Requisite Holders in respect of the solicitation, the Servicer Replacement Event and underlying Servicer Default will be deemed waived and the Servicer will remain in place.

Each of the following events will constitute a "Servicer Default" under the Servicing Agreement:

(a)     The failure by the Servicer, if within the Servicer's power to do so, to deposit or deliver to the Indenture Trustee for deposit in the Collection Account any required payment or to make any required payment or distribution therefrom, which failure continues unremedied for a period of five Business Days after discovery of the failure by an officer of the Servicer or written notice of such failure is provided to the Servicer by the Issuer or the Collateral Monitor;

(b)     The Compliance Test carried out by the Collateral Monitor shows a cumulative shortfall of 10% or more as of any applicable Test Date, *provided* that any Servicer Default occurring as the result of such a cumulative shortfall will be deemed waived and voided if notification of a possible Servicer Replacement Event is not made by the Collateral Monitor in respect of such Servicer Default within 30 days of the results of the Compliance Test being published in the Semiannual Bondholder Report;

(c)     Information necessary to verify compliance with the Compliance Test as of any Test Date or any of the other information necessary for the Collateral Monitor's Semiannual Bondholder Report is not delivered to the Collateral Monitor on a timely basis;

(d)     The Servicer fails to use commercially reasonable efforts to maximize the realizable present value of the Restructuring Property (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum), as detailed in writing to the Servicer and not remedied within 30 days of the Servicer being notified thereof;

(e)     The Servicer enters into modifications, extensions or accommodations in respect of the Restructuring Property that are, individually or in the aggregate, not commercially reasonable (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum); *provided* that if the Collateral Monitor fails to object to a modification, extension or accommodation during the ten-day period described in such limitations, such modification, extension or accommodation will be presumed to be commercially reasonable and will not, individually, be the basis for a Servicer Default;

(f)     The Servicer fails to maintain its existence in good standing as an entity under the laws of its jurisdiction of incorporation or organization or to obtain and preserve its Qualification or Independence;

(g)     There occurs an Insolvency Event with respect to the Servicer;

(h)     A violation by the Servicer of any provision of applicable law or any judgment of any court or governmental authority applicable to the Servicer that would materially adversely affect its ability to perform its obligations under the Servicing Agreement in any material respect;

(i)     The Servicer engages in fraudulent or criminal activities that would (i) adversely affect its ability to perform its obligations under the Servicing Agreement in any material respect or (ii) present an unacceptable level of risk or damage to (A) the reputation of the Issuer or (B) the ability to make payments to Bondholders;

(j)     Any representation, warranty or statement of the Servicer made in the Servicing Agreement or any certificate, report or other writing delivered pursuant to the Servicing Agreement proves to be incorrect in any material respect as of the time made (and, if such representation, warranty or statement is reasonably capable of cure, continues unremedied for a period of 30 days after the date on which written notice of such failure has been given to the Servicer by the Issuer or the Collateral Monitor);

(k)     There occurs any material adverse change in the Servicer's financial position that has a material adverse effect on the Servicer's ability to perform its obligations under the Servicing Agreement;

(l)     Failure on the part of the Servicer to observe or perform any covenant or agreement set forth in the Servicing Agreement other than those set forth above that, to the extent capable of remedy, continues unremedied for a period of up to 30 days after the date on which written notice of such failure has been given to the Servicer by the Issuer or the Collateral Monitor, as set forth in the Servicing Agreement; *provided, however,* that for a breach capable of being remedied but of the nature that it cannot be reasonably expected to be remedied within such 30-day period and the

E-161

Collateral Monitor determines that the Servicer is using its good faith efforts to cure such breach, the 30-day period will be extended for up to an additional 90 days so long as the Servicer continues to use good faith efforts to cure the breach; and

(m)   Other customary events of default.

For purposes of the Servicing Agreement:

"Affiliate" will mean, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through ownership of shares, equity in registered capital or other voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing. The Servicing Agreement will state that, for the avoidance of doubt, the Commonwealth of Puerto Rico, and its municipalities, public corporations and instrumentalities are Affiliates of GDB and of the Issuer.

"Independent" will mean, with respect to any Person, a Person that (a) is not an Affiliate of GDB, (b) is not a manager, director, officer or employee of GDB or its Affiliates (not including the Person's provision of services to GDB or its Affiliates in the ordinary course of business, subject to the following clause (c)) and (c) does not receive more than 20% of its annual revenue from, collectively, GDB and its Affiliates.

"Insolvency Event" will mean, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Servicer or any substantial part of its property in an involuntary case under any applicable federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect (including, where applicable, PROMESA), or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or for any substantial part of its property, or ordering the winding-up or liquidation of the Servicer's affairs, and such decree or order remains unstayed and in effect for a period of 30 consecutive days; or (b) the commencement by the Servicer of a voluntary case under any applicable federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Servicer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Servicer to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or for any substantial part of its property, or the making by the Servicer of any general assignment for the benefit of creditors, or the failure by the Servicer generally to pay its debts as such debts become due, or the taking of action by the Servicer in furtherance of any of the foregoing.

"New Bond Requisite Holders" will mean Bondholders holding not less than one-third in principal amount of the New Bonds then outstanding (or, if a Bond Indenture Event of Default under the New Bonds has occurred and is continuing, Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding).

"Person" will mean an individual, a corporation, a limited liability company, a company, a partnership, a joint venture, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Qualification" will mean those material licenses and material approvals required to qualify as a manager of the Restructuring Property on behalf of the Issuer pursuant to applicable law.

"Qualified Successor Servicer" will mean any Person that, at the time of determination (a) is organized and doing business pursuant to the laws of the United States of America or any of its states or territories, (b) is duly authorized to perform the duties of the Servicer on the terms set forth in the Servicing Agreement on behalf of the Issuer, (c) is not restricted or prohibited from contracting with the Issuer, (d) has obtained Qualification, (e) is Independent, (f) is of recognized national standing and (g) is equipped with the requisite expertise and Spanish speaking capability to perform the Services.

**Transition Periods**

If the Servicer resigns or is removed in accordance with the terms of the Servicing Agreement, the outgoing Servicer will be obligated under the Servicing Agreement to (i) use commercially reasonable efforts to cooperate with the successor Servicer in effecting the termination of the responsibilities and rights of the Servicer under the Servicing Agreement, (ii) allow the successor Servicer to examine all the books or accounts, records, reports, agreements, Loan documents and other papers of the outgoing Servicer relating to the Restructuring Property, and (iii) cooperate with the Issuer and the Collateral Monitor to effect such transition and to provide the successor Servicer with such documents and any monies in its possession and held in its capacity as the Servicer under the Servicing Agreement. The Servicing Agreement will provide that, in addition to (and without duplication of) any rights and remedies of the Issuer under applicable law, all reasonable transition and conversion costs and expenses borne or incurred by the Issuer (including, without limitation, the reasonable costs and expenses of counsel to the Issuer) associated with engaging, and transferring the servicing of the Restructuring Property to, the successor Servicer as a result of the resignation or removal of the outgoing Servicer in accordance with the

AAFAF_CONF_0001130

Servicing Agreement will be borne by the outgoing Servicer; *provided* that such transition or conversion costs and expenses borne by the outgoing Servicer may be capped. (Any such costs and expenses not paid by the outgoing Servicer within 90 days will be paid solely in accordance with the priority of payments described in "*Payments to Bondholders—Priority of Payments*" in this Offering Memorandum. The Bond Indenture will require the Indenture Trustee to provide prompt written notice of any resignation or termination of the Servicer to the Bondholders, which requirement will apply to any transition from one Servicer to a successor Servicer.) The Servicing Agreement will provide that the successor Servicer will hold all the rights of the outgoing Servicer under the Servicing Agreement and will be entitled to receive the Servicing Fee from the date on which the replacement of the outgoing Servicer becomes effective.

## Reporting to Indenture Trustee, Collateral Monitor and Issuer

The Servicing Agreement will require the Servicer to act as agent for the Issuer in respect of certain of the Issuer's obligations under the Disclosure Agreement, including preparing or causing to be prepared the Annual Report required thereunder, subject to review and approval of each such Annual Report by the Issuer and the Collateral Monitor. See "*Continuing Disclosure*."

In addition, the Servicing Agreement will require the Servicer to provide the Collateral Monitor with the information needed by the Collateral Monitor to conduct the Compliance Test and to prepare the Semiannual Bondholder Report described in "*Service Providers—Reports to Bondholders*," and any and all other information, including asset lists, reasonably requested by the Collateral Monitor. Further, the Servicing Agreement will require the Servicer to prepare and provide to the Issuer, the Collateral Monitor and the Indenture Trustee, for dissemination to the Bondholders, the Payment Date Report and the Quarterly Budget Report, on the dates and with the information described in "*Service Providers—Reports to Bondholders*."

## Certain Matters Regarding the Servicer; Servicer Liability; Indemnity

The Servicing Agreement will provide that any Person into which the Servicer may be merged or consolidated, or any Person resulting from any merger or consolidation to which the Servicer is a party, or any Person succeeding to all or substantially all of the servicing business of the Servicer will be the successor of the Servicer under the Servicing Agreement, unless (i) such merger, consolidation, amalgamation, or transfer is reasonably determined by the Collateral Monitor to materially and adversely affect the Servicer's ability to perform its obligations, in which case, such transaction may be deemed to be a Servicer Default, in accordance with the terms of the Servicing Agreement, and may result in the Servicer's removal in accordance with the procedures described above in "*—Removal of Servicer*" or (ii) such Person cannot meet the requirements of a Qualified Successor Servicer.

The Servicing Agreement will further provide that neither the Servicer nor any of its directors, officers, employees or agents will have any liability to the Issuer or the Bondholders for taking any action or for refraining from taking any action in good faith pursuant to the Servicing Agreement or for errors in judgment, except that neither the Servicer nor any such Person will be protected against any breach of representations or warranties made by it therein or liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of the Servicer's duties under the Servicing Agreement or by reason of reckless disregard of its obligations and duties under the Servicing Agreement. In addition, the Servicing Agreement will provide that, subject to certain restrictions, the Servicer may rely in good faith upon the advice of a Qualified Advisor (as to be defined in the Servicing Agreement, but which will include the Collateral Monitor) in connection with the exercise of any of the Servicer's duties or obligations under the Servicing Agreement to the extent such advice is of a type for such advisor has expertise.

The Servicing Agreement will require the Issuer to indemnify and hold the Servicer harmless from and against certain losses, liabilities and expenses (including reasonable fees and expenses of counsel) incurred in connection with its performance under the Servicing Agreement. In addition, the Servicing Agreement will provide that the Servicer is under no obligation to appear in, prosecute or defend any legal action that is not incidental to the Servicer's servicing responsibilities under the Servicing Agreement and that, in its opinion, may cause it to incur any expense or liability for which it is not indemnified.

## Amendment

The Servicing Agreement will provide that the provisions thereof may be amended, modified or waived by the parties thereto, with the consent of the Collateral Monitor and without the consent of the Bondholders, *provided* that the Collateral Monitor determines, in its sole discretion, that such amendment will not materially and adversely affect the interest of any Bondholder.

The parties to the Servicing Agreement will also be permitted to otherwise amend, modify or waive any of the provisions of the Servicing Agreement with the consent of Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding.

AAFAF_CONF_0001131

**Termination**

The Servicing Agreement will terminate upon the earlier of (a) the resignation or removal of the Servicer in accordance with the Servicing Agreement and (b) the termination of the Bond Indenture. For additional information regarding the termination of the Bond Indenture and liquidation of the assets of the Issuer, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Termination of the Bond Indenture*" in this Offering Memorandum.

**Third-Party Beneficiaries**

Each of the Bondholders, the Indenture Trustee, for the benefit of the Bondholders, and the Collateral Monitor will be third-party beneficiaries of the Servicing Agreement. The Servicing Agreement provides that each of the Collateral Monitor and the Indenture Trustee will be authorized and empowered to enforce all provisions of the Servicing Agreement, *provided* that the Bondholders may not enforce the Servicing Agreement unless the New Bond Requisite Holders instruct the Indenture Trustee to enforce the Servicing Agreement and the Indenture Trustee, after the New Bond Requisite Holders have complied with the terms of the Bond Indenture, fails to do so, in which case any other single representative of the New Bond Requisite Holders may do so. The Servicing Agreement also states that the Servicing Agreement does not create any fiduciary duties of the Servicer to the Bondholders, and such duties only exist to the extent they exist under applicable law.

**Servicer Challenges**

Any challenge brought by the Servicer against the Collateral Monitor with respect to any decision or other action by the Collateral Monitor in respect of the Servicer's duties under the Servicing Agreement will be subject to mandatory binding arbitration. In addition, the Servicing Agreement will provide that any objection by the Collateral Monitor to any material transaction or the Collateral Monitor's refusal of consent in respect of the Servicer's engagement of any third party or any other decision or action of the Collateral Monitor that, in any such case, is based upon the Collateral Monitor receiving inadequate information will be deemed reasonable. Finally, the Servicing Agreement will provide that, notwithstanding the foregoing, the Collateral Monitor's decision to give notice of a possible Replacement Event, and such notice actually given, will be in the Collateral Monitor's sole discretion and will not be subject to challenge by the Servicer, the Issuer or any other Person.

AAFAF_CONF_0001132

## CERTAIN PUERTO RICO TAX CONSIDERATIONS

The following discussion summarizes the Puerto Rico tax treatment of the Issuer and certain Puerto Rico tax consequences to the holders of Participating Bond Claims (the "Claims") of the exchange of Claims for New Bonds and the ownership and disposition of the New Bonds. This summary is based on the Puerto Rico Internal Revenue Code of 2011, as amended (the "P.R. Tax Code"), the regulations promulgated thereunder, the GDB Restructuring Act, judicial decisions and published administrative rules and pronouncements of the Puerto Rico Treasury Department (the "P.R. Treasury"), all as in effect on the date hereof (collectively, "Applicable P.R. Tax Law"). Changes in or new interpretations of Applicable P.R. Tax Law may have retroactive effect and could significantly affect the Puerto Rico income tax consequences described below. Neither GDB nor the Issuer has requested, nor will they request, any ruling or determination from the P.R. Treasury or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the P.R. Treasury or the courts. No assurance can be given that the P.R. Treasury would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically noted otherwise, this summary does not address U.S. federal, state, local or foreign tax consequences of the exchange, nor does it purport to address all aspects of Puerto Rico taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as broker-dealers, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, corporations or individuals, persons who hold Claims or who will hold the New Bonds as part of a straddle, hedge, conversion transaction, or other integrated investment, or subsequent purchasers of New Bonds). Furthermore, this summary assumes that a holder holds a Claim only as a "capital asset" (within the meaning of Section 1034.01(a)(1) of the P.R. Tax Code).

As used herein, and except as provided below, the term "P.R. Investor" means a beneficial owner of Claims or New Bonds that is (i) a resident of Puerto Rico for Puerto Rico income tax purposes, (ii) a corporation (including an entity treated as a corporation for Puerto Rico income tax purposes) created or organized in or under the laws of Puerto Rico, (iii) an estate, the income of which is subject to Puerto Rico income taxation regardless of its source or (iv) a trust (other than a business trust), all of the beneficiaries of which are residents of Puerto Rico for Puerto Rico income tax purposes. As used herein, the term "Non-P.R. Investor" means a beneficial owner of Claims or New Bonds (other than a partnership or other entity treated as a partnership for Puerto Rico income tax purposes) that is not a P.R. Investor.

If a partnership (including for this purpose any other entity treated as a partnership for Puerto Rico income tax purposes) holds Claims or New Bonds, the tax treatment of a partner (including for this purpose any other owner treated as a partner for Puerto Rico income tax purposes) in the partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner of a partnership holding Claims or New Bonds, you should consult your tax advisor regarding the tax consequences of the exchange and the ownership and disposition of the New Bonds.

**THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE PUERTO RICO INCOME TAX LAWS, AS WELL AS THE APPLICATION OF NON-INCOME TAX LAWS AND THE LAWS OF NON-PUERTO RICO TAXING JURISDICTIONS, TO YOUR PARTICULAR SITUATION.**

### Tax Treatment of Issuer

The Issuer is fully exempt from all taxes imposed by the Government and any of its municipalities, instrumentalities and taxing authorities.

### Tax Consequences to P.R. Investors

#### *Exchange of Claims for New Bonds*

The exchange of Claims for New Bonds will constitute a taxable exchange of the Claims for Puerto Rico income tax purposes. Therefore, a P.R. Investor will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Investor's adjusted tax basis in the Claims on the date of the exchange. The amount realized on the exchange of a Claim will equal the fair market value of each New Bond received in exchange for such Claim, which includes any cash payment received by the P.R. Investor on the date of the exchange.

Gain or loss on the exchange of Claims for New Bonds will generally be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Investor's holding period for the Claim is longer than one year. Long-term capital gains recognized by P.R. Investors are subject to a reduced Puerto Rico income tax rate of a maximum of 15% (or up to a maximum of 24% if the alternate basic tax is applicable), in the case of non-corporate P.R. Investors, and 20% in the case of corporate P.R. Investors.

AAFAF_CONF_0001133

P.R. Investors may deduct capital losses realized in the exchange of the Claims for New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Investors may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

*Ownership of New Bonds*

The New Bonds will be considered debt for Puerto Rico tax purposes.

*Interest.* Interest paid or accrued to P.R. Investors on the New Bonds will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

The excess of the principal amount of the New Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

Ownership of the New Bonds may result in a portion of the interest paid or accrued by a P.R. Investor and other expenses incurred by the P.R. Investor attributable to interest on the New Bond being disallowed as deductions for Puerto Rico income tax purposes.

*Sale, Exchange or Retirement of the New Bonds.* The gain realized by a P.R. Investor upon a sale, exchange or retirement of a New Bond will be exempt from Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

P.R. Investors may deduct capital losses realized in the exchange of the Claims for New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Investors may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

*Property Taxes.* The New Bonds will be exempt from Puerto Rico property taxes.

*Estate and Gift Taxes.* The transfer of the New Bonds by gift or upon the death of a P.R. Investor will not be subject to Puerto Rico estate or gifts taxes, as the case may be.

**Tax Consequences to Non-P.R. Investors**

*Exchange of Claims for New Bonds*

Non-P.R. Investors who are individuals nonresident of Puerto Rico for Puerto Rico income tax purposes, corporations (or entities treated as corporations under the P.R. Tax Code) organized under the laws other than of Puerto Rico that are not engaged in trade or business in Puerto Rico, and trusts and estates will not be subject to Puerto Rico income tax on the gain, if any, recognized by any such Non-P.R. Investor on the exchange of the Claims for New Bonds. On the other hand, Non-P.R. Investors that are corporations (or treated as corporations under the P.R. Tax Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if the gain is effectively connected with their Puerto Rico trade or business.

*Ownership of New Bonds*

*Payments of Interest.* Interest paid or accrued on the New Bonds to a Non-P.R. Investor will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

The excess of the principal amount of the New Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

Ownership of the New Bonds may result in a portion of the interest paid or accrued by a Non-P.R. Investor subject to Puerto Rico income tax and other expenses incurred by such Non-P.R. Investor attributable to interest on the New Bonds being disallowed as deductions for Puerto Rico income tax purposes.

*Sale, Exchange or Retirement of New Bonds.* Gain recognized on the sale or exchange of the New Bonds by a Non-P.R. Investor will not be subject to Puerto Rico income tax, by way of withholding or otherwise, or municipal license tax.

*Property Taxes.* The New Bonds will be exempt from Puerto Rico property taxes.

E-166

AAFAF_CONF_0001134

***Estate and Gift Taxes.*** The transfer of the New Bonds by gift or upon the death of a Non-P.R. Investor will not be subject to Puerto Rico gift or estate taxes, as the case may be.

E-167

AAFAF_CONF_0001135

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain United States ("U.S.") federal income tax consequences to the holders of Participating Bond Claims of the exchange of Participating Bond Claims for New Bonds and the ownership and disposition of the New Bonds. This summary is based on the Internal Revenue Code of 1986, as amended (the "U.S. Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law"). Changes in or new interpretations of such Applicable U.S. Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Neither GDB nor the Issuer has requested, nor will they request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically noted otherwise, this summary does not address U.S. state, local or non-U.S. tax consequences of the exchange, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as certain former citizens and long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Participating Bond Claims or who will hold the New Bonds as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, holders deemed to sell the Participating Bond Claims or the New Bonds under the constructive sale provisions of the U.S. Tax Code, or subsequent purchasers of New Bonds). Furthermore, this summary assumes that a holder holds a Participating Bond Claim only as a "capital asset" (within the meaning of Section 1221 of the U.S. Tax Code). This summary also assumes that the Issuer will not hold assets that generate income subject to withholding under the U.S. Tax Code.

As used herein, and except as provided below, the term "U.S. Holder" means a beneficial owner of Participating Bond Claims or New Bonds that is for U.S. federal income tax purposes (i) a citizen or resident of the United States, (ii) a corporation (including an entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (b) the trust was in existence on August 20, 1996, and properly elected to continue to be treated as a United States person. The term "U.S. Holder" does not include a Puerto Rico Individual (as defined herein) or a Puerto Rico Corporation (as defined herein). As used herein, the term "Non-U.S. Holder" means a beneficial owner of Participating Bond Claims or New Bonds (other than a partnership or other entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder, a Puerto Rico Individual or a Puerto Rico Corporation.

As used herein, the term "Puerto Rico Individual" means a beneficial owner of a Participating Bond Claim or New Bond that is an individual and a bona fide resident of the Commonwealth within the meaning of Section 937 of the U.S. Tax Code and the Regulations for the entire taxable year, including the taxable year in which the exchange occurs or the New Bond is acquired. As used herein, the term "Puerto Rico Corporation" means a beneficial owner of a Participating Bond Claim or New Bond that is a corporation organized under the laws of the Commonwealth.

If a partnership (including for this purpose any other entity treated as a partnership for U.S. federal income tax purposes) holds Participating Bond Claims or New Bonds, the tax treatment of a partner (including for this purpose any other owner treated as a partner for U.S. federal income tax purposes) in the partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner of a partnership holding Participating Bond Claims or New Bonds, you should consult your tax advisor regarding the tax consequences of the exchange and the ownership and disposition of the New Bonds.

**THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS, AS WELL AS THE APPLICATION OF NON-INCOME TAX LAWS AND THE LAWS OF ANY U.S. STATE, LOCAL OR NON-U.S. TAXING JURISDICTION, TO YOUR PARTICULAR SITUATION.**

### Characterization of the New Bonds as Debt of the Issuer

The Issuer intends to report on IRS Form 8281 the New Bonds as debt of the Issuer for U.S. federal income tax purposes. Whether an instrument is characterized as debt rather than equity or another form of interest for U.S. federal income tax purposes depends upon the facts and circumstances surrounding the issuer and the terms and operation of the particular instrument. The courts and the IRS have identified many factors to be considered in making a debt/equity determination. Among these factors are the following: (i) the intent of the parties; (ii) the form of the instrument; (iii) a reasonable expectation of repayment and the source of repayment; (iv) security for repayment; (v) the presence of a maturity date; (vi) subordination of the instrument; (vii) payment of interest;

E-168

AAFAF_CONF_0001136

(viii) creditor rights; (ix) adequacy of capitalization; (x) the order of payments; (xi) the treatment of the instrument as debt or equity for non-tax purposes, including regulatory, rating agency and financial accounting purposes; (xii) the relationship between the debtor and the creditors and (xiii) participation in management or voting rights. No single factor is relevant in every case, and the significance of any particular factor depends on the facts and circumstances.

Notwithstanding the Issuer's intended reporting treatment of the New Bonds as debt, holders should recognize that the appropriate classification of the New Bonds for U.S. federal income tax purposes is uncertain. A number of factors, such as the intent of the parties, form of the instrument, the status of the Issuer as a governmental instrumentality of the Commonwealth, treatment of the New Bonds for non-tax purposes, certain creditor rights and the context in which the exchange is occurring (*i.e.*, a workout of distressed debt between unrelated parties intended to maximize recovery on the Participating Bond Claims and enhance the holders' positions as creditors) tend to support debt treatment. On the other hand, certain aspects of the New Bonds may be indicative of non-debt classification, including the considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including PIK Amounts). **Accordingly, there is no assurance that the IRS or a court will agree with the Issuer's intended tax treatment of the New Bonds as debt for U.S. federal income tax purposes.**

If the New Bonds were to be characterized as an interest other than debt for U.S. federal income tax purposes, the tax consequences to a holder of the New Bonds could differ materially from the consequences to such holder of debt treatment. See the discussion under "*—Tax Consequences if the New Bonds are Not Treated as Debt for U.S. Federal Income Tax Purposes—Tax Consequences to U.S. Holders.*"

Except where specifically noted below, the following discussion assumes that the New Bonds are properly characterized as debt for U.S. federal income tax purposes.

### Tax Consequences to U.S. Holders

#### *Exchange of Participating Bond Claims for New Bonds*

The exchange of Participating Bond Claims for New Bonds will constitute a taxable exchange of the Participating Bond Claims for U.S. federal income tax purposes. Therefore, a U.S. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange (except to the extent attributable to accrued and unpaid interest, as discussed below) and the U.S. Holder's adjusted tax basis in the Participating Bond Claims on the date of the exchange (except to the extent any recognized loss may be deferred under the "wash sale" rules of the U.S. Tax Code). The amount realized on the exchange of a Participating Bond Claim will equal the "issue price" of the New Bonds received in exchange for such Participating Bond Claim, plus the value of any cash payment to be received on the Special First Payment Date to the extent the value of such cash payment is not reflected in the issue price of such New Bonds (described below under "*—Issue Price of New Bonds*"). The New Bonds will have an initial tax basis equal to their respective issue prices and will have a new holding period commencing on the day after the exchange. Subject to the discussions under "*—Market Discount*" and "*—Accrued Interest*" below, gain or loss on the exchange will generally be capital gain or loss and may be long-term capital gain or loss if the U.S. Holder's holding period for the Participating Bond Claim is longer than one year. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

*Issue Price of New Bonds.* The New Bonds are expected to be "publicly traded" as defined by the Regulations, in which case the "issue price" of the New Bonds will be equal to their fair market value on the date of the exchange. The New Bonds will be considered to be "publicly traded" if, within the meaning of the Regulations, at any time during the 31-day period ending fifteen days after the exchange, (i) there is a "sales price" for an executed purchase or sale of the New Bonds appearing in a medium available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments, (ii) there are one or more "firm quotes" for the New Bonds available from at least one broker, dealer or pricing service and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the New Bonds or (iii) there are one or more "indicative quotes" available from at least one broker, dealer or pricing service for the New Bonds. The fair market value of the New Bonds on the date of the exchange will generally be presumed to be equal to such sales price or quoted price. The treatment of any cash payment received by such U.S. Holder on the Special First Payment Date will depend on whether the value of the payment is reflected in the issue price of such New Bonds, as described above. If the value of the cash payment is reflected in the issue price of the New Bonds, the payment will be included in the projected payment schedule (as described below) for the New Bonds and will not be treated as an amount separately received in exchange for a Participating Bond Claim. Alternatively, if the value of the payment is not reflected in the issue price of the New Bonds, the payment will be treated as an amount received in exchange for the Participating Bond Claim in addition to the issue price of the New Bonds, subject to the discussion of amounts attributable to accrued but unpaid interest in "*—Exchange of Participating Bond Claims for New Bonds*" above and "*—Accrued Interest*" below. Based on the Regulations and the anticipated trading prices of the New Bonds at the time of issuance, the Issuer anticipates that the "issue price" of the New Bonds will be less than their stated principal amounts. See "*—Ownership of New Bonds—Treatment of the New Bonds as Contingent Payment Debt Instruments*" below.

AAFAF_CONF_0001137

*Market Discount.* If a U.S. Holder acquired Participating Bond Claims with market discount, any gain recognized on the exchange of such Participating Bond Claims for New Bonds should be treated as ordinary income to the extent of the accrued market discount, unless such holder previously elected to include market discount in income as it accrued for U.S. federal income tax purposes. For these purposes, market discount is generally the excess, if any, of the stated principal amount of the Participating Bond Claim over such holder's initial tax basis in the Participating Bond Claim, if such excess exceeds a de minimis amount.

*Accrued Interest.* To the extent that any consideration (i.e. New Bonds (or portions thereof) received in exchange for a Participating Bond Claim plus the value of any cash payment to be received on the Special First Payment Date to the extent the value of such cash payment is not reflected in the issue price of such New Bonds) received by a U.S. Holder pursuant to the exchange is attributable to accrued and unpaid stated interest on the Participating Bond Claim, that amount of consideration generally will be includible in gross income as ordinary interest income if such accrued interest has not been included previously in gross income for U.S. federal income tax purposes. Holders of tax-exempt Participating Bond Claims should consult their advisors regarding the extent to which any amounts received in the exchange should be treated as tax-exempt interest.

The New Bonds (or portions thereof) received by the U.S. Holder in respect of such interest will have an issue price determined in the same manner as described above under "—*Issue Price of New Bonds*," a tax basis equal to their issue price and a holding period commencing on the day after the New Bonds are received. In the event a U.S. Holder previously included in gross income any accrued and unpaid interest on the Participating Bond Claims in an amount higher than the aggregate consideration such U.S. Holder will receive in respect of such interest, the difference may be deductible by such U.S. Holder. The extent to which the amount of aggregate consideration will be attributable to accrued interest is unclear. Under the terms and conditions of the exchange, the aggregate consideration to be received by holders of Participating Bond Claims will be allocated first to the principal amount of the Participating Bond Claims, with any excess allocated to unpaid interest that accrued on such Participating Bond Claims, if any. By way of analogy, certain legislative history indicates that an allocation of consideration as between principal and interest provided in certain reorganizations under the United States Bankruptcy Code is binding for U.S. federal income tax purposes, while certain Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the terms and conditions of the exchange. Holders of Participating Bond Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them pursuant to the exchange.

*Ownership of New Bonds*

*NO U.S. FEDERAL TAX EXEMPTION.* **INTEREST ON THE NEW BONDS WILL NOT BE EXCLUDED FROM GROSS INCOME FOR U.S. FEDERAL INCOME TAX PURPOSES.**

*U.S. State and Local Tax Exemption.* Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, the New Bonds and interest thereon will be exempt from U.S. state and local income taxation. However, see "—*Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes—Tax Consequences to U.S. Holders—State and Local Income Taxation*" below.

*Treatment of the New Bonds as Contingent Payment Debt Instruments.* The Issuer intends to treat the New Bonds as indebtedness subject to the Regulations governing contingent payment debt instruments (the "contingent payment debt regulations") and to report information on IRS Form 8281 consistent with this treatment. However, there is no statutory or judicial authority that directly addresses all aspects of the treatment of the New Bonds for U.S. federal income tax purposes, and the application of the contingent payment debt regulations to the New Bonds is unclear. Therefore, no assurance can be given that the IRS will not assert that the New Bonds should be treated under a different method for accruing interest and original issue discount. For instance, the IRS could assert that interest accruals should be determined under the methodology described in Section 1272(a)(6) of the U.S. Tax Code by asserting that principal payments on the New Bonds could be considered to be accelerated due to excess Available Cash arising from prepayments on the Restructuring Property. Based on the terms of the Restructuring Property and the historical experience of GDB and other factors, the Issuer believes that the likelihood of prepayments on the Restructuring Property is remote. However, the IRS may disagree with this conclusion or otherwise assert that the methodology described in Section 1272(a)(6) should nonetheless apply. Application of different rules for accruing interest on the New Bonds upon a successful challenge by the IRS or a change in law could significantly affect the amount, timing and character of income, gain or loss to a U.S. Holder of the New Bonds. For example, a U.S. Holder might be required to accrue interest at a higher or lower rate, and might recognize capital gain rather than ordinary income upon a taxable disposition of the New Bonds. Accordingly, U.S. Holders should consult their tax advisers regarding the accrual of interest on the New Bonds and the consequences of the application of different accrual rules.

The remainder of this discussion assumes that the New Bonds will be treated as indebtedness subject to the contingent payment debt regulations as discussed above.

*Interest Accruals and Adjustments to Accruals on the New Bonds.* No stated interest on the New Bonds will be "qualified stated interest" under the U.S. Tax Code. Under the contingent payment debt regulations, a U.S. Holder, regardless of its method of

AAFAF_CONF_0001138

accounting for U.S. federal income tax purposes, will be required to accrue interest income on the New Bonds on a constant yield basis at an assumed yield (the "comparable yield") that will be determined by the Issuer of the New Bonds at the time of issuance, adjusted upward or downward to reflect any difference between the actual and projected amounts of the contingent payments on the New Bonds during the year (as described below). There may be differences between the timing of accrual of interest income under these rules and the timing of adjustments for actual payments. Because of potential differences between the method by which interest income is computed for U.S. federal income tax purposes and amounts paid as payments of interest on the New Bonds, a U.S. Holder may be required to include interest income in some years in excess of the interest actually received in that year.

The term "comparable yield" as used in the contingent payment debt regulations generally means the greater of (i) the annual yield an issuer of a contingent payment debt instrument would pay, as of the issue date, on a fixed-rate debt instrument with no contingent payments, but with terms and conditions otherwise comparable to those of the contingent payment debt instrument, including the level of subordination, term, timing of payments and general market conditions, but excluding any adjustments for the riskiness of the contingencies or the liquidity of the instrument, and (ii) the applicable federal rate (which is published monthly by the IRS). However, the Regulations also provide that if the debt instrument provides for one or more contingent payments not based on market information and is part of an issue that is marketed or sold in substantial part to persons for whom the inclusion of interest is not expected to have a substantial effect on their U.S. tax liability, the instrument's comparable yield is presumed to be the applicable federal rate (the "AFR Presumption") (which, for the month of August 2018, is 2.93% for debt instruments with a term exceeding nine years with interest that compounds semi-annually). The Issuer intends to take the position that the AFR Presumption applies to the New Bonds. However, there is no guidance under Applicable U.S. Tax Law as to the precise circumstances in which the AFR Presumption will be deemed to apply to a debt instrument or the manner in which the AFR Presumption applies to instruments in which stated payments under the instruments result in a yield that exceeds the applicable federal rate. Accordingly, there is no assurance that the IRS will not successfully challenge the application of the AFR Presumption to the New Bonds.

**Solely for purposes of determining the amount of interest income that a U.S. Holder is required to accrue, the Issuer is required to construct a "projected payment schedule" in respect of the New Bonds representing a series of payments the amount and timing of which produce a yield to maturity equal to the comparable yield. A U.S. Holder will generally be bound by the comparable yield and the projected payment schedule determined by the Issuer, unless the U.S. Holder determines its own comparable yield and projected payment schedule and explicitly discloses such schedule to the IRS, and explains to the IRS the reason for preparing its own schedule.**

Income accrued on the basis of the comparable yield is adjusted upward or downward to reflect the difference between projected and actual payments made during the taxable year. In addition to the interest accrual discussed above, a U.S. Holder will be required to recognize interest income equal to the amount of any excess of actual payments over projected payments (a "positive adjustment") in respect of a New Bond for a taxable year. On the other hand, if, in a taxable year, a U.S. Holder receives actual payments that, in aggregate, are less than the projected payments in respect of a New Bond for such taxable year, the U.S. Holder will incur a "net negative adjustment" equal to the amount of such difference. This net negative adjustment will (i) first reduce the amount of interest in respect of the New Bond that a U.S. Holder would otherwise be required to include in income in that taxable year and (ii) to the extent of any excess, give rise to an ordinary loss equal to that portion of such excess that does not exceed the excess of (A) the amount of all previous interest inclusions on the New Bond over (B) the total amount of the U.S. Holder's net negative adjustments treated as ordinary loss on the New Bond in prior taxable years. Any negative adjustment in excess of the amounts described in (i) and (ii) will be carried forward to offset future interest income in respect of the New Bond or, if there is a negative adjustment carryforward on the New Bond in a taxable year in which the New Bond is sold, exchanged, redeemed or retired, to reduce the amount realized on a sale, exchange or retirement of the New Bond. A net negative adjustment is not subject to the limitation imposed on miscellaneous deductions under Section 67 of the U.S. Tax Code.

**The comparable yield and projected payment schedule are not determined for any purpose other than the determination of a U.S. Holder's interest accruals and adjustments thereof in respect of the New Bonds for U.S. federal income tax purposes and do not constitute a projection or representation by GDB, the Issuer or any third party regarding the actual amount that will be paid on the New Bonds.**

The precise manner of determining the comparable yield and projected payment schedule in the case of the New Bonds is uncertain. The IRS could challenge the Issuer's determination of the comparable yield and projected payment schedule. The yield, if re-determined as a result of such a challenge, could be greater or less than the comparable yield provided by the Issuer, and the projected payment schedule could differ materially from the projected payment schedule constructed by the Issuer. In such case, the taxable income of a holder arising from the ownership and disposition of a New Bond could be increased or decreased.

Based on the comparable yield and the issue price of the New Bonds (determined as described above under "—*Exchange of Participating Bond Claims for New Bonds—Issue Price of New Bonds*"), a U.S. Holder (regardless of its accounting method) will be required to accrue interest income equal to the sum of the daily portions of interest on a New Bond for each day in the taxable year on which the U.S. Holder holds the New Bond, adjusted upward or downward to reflect the difference, if any, between the actual and projected amount of any payments on the New Bonds (as described above). The daily portions of interest in respect of a New Bond are

AAFAF_CONF_0001139

determined by allocating to each day in an accrual period the ratable portion of interest on the New Bond that accrues in the accrual period. The amount of interest on a New Bond that accrues in an accrual period is the product of the comparable yield on the New Bond (adjusted to reflect the length of the accrual period) and the adjusted issue price of the New Bond as of the beginning of the accrual period. The "adjusted issue price" of a New Bond at the beginning of any accrual period is (x) the sum of the issue price of the New Bond and any interest previously accrued thereon (disregarding any positive or negative adjustments described above) minus (y) the projected amount of any payments (in accordance with the projected payment schedule described above) previously made with respect to the New Bond. Interest income accrued on the New Bonds will be foreign source income for U.S. federal income tax purposes.

Legislation enacted in 2017 modified the rules regarding the timing of income to be recognized by accrual method taxpayers. Under these modifications, if a U.S. Holder is an accrual method taxpayer and has an applicable financial statement, notwithstanding any discussion above, the U.S. Holder may be required to include stated interest, original issue discount, and other income on a note no later than when the relevant item is taken into account as revenue in an applicable financial statement, if any. These new rules will generally apply to stated interest and other income for taxable years beginning after December 31, 2017, but will not apply to original issue discount until taxable years beginning after December 31, 2018. U.S. Holders should consult their own tax advisor concerning the application of these rules in their particular situation.

*Sale, Exchange or Retirement of the New Bonds.* Upon a sale, exchange or retirement of a New Bond, a U.S. Holder will generally recognize taxable gain or loss in an amount equal to the difference between (i) the amount of cash and the fair market value of any property received, reduced by any net negative adjustment carried forward, and (ii) such U.S. Holder's adjusted tax basis in the New Bond. A U.S. Holder's adjusted tax basis in a New Bond will generally be equal to the U.S. Holder's initial tax basis for the New Bond (which will be equal to the issue price of the New Bonds for U.S. Holders receiving New Bonds in exchange for Participating Bond Claims), increased by any interest income previously accrued by the U.S. Holder (determined without regard to any positive or negative adjustments to interest accruals described above) and decreased by the projected amounts of any payments scheduled to have been previously made on the New Bonds to the U.S. Holder (without regard to actual amounts paid). A U.S. Holder generally will treat any gain as ordinary interest income, and any loss as ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and the balance as capital loss. The deductibility of capital losses is subject to limitations. A U.S. Holder that sells the New Bonds at a loss that meets certain thresholds may be required to file a disclosure statement with the IRS.

For the purposes of the contingent payment debt instrument rules, payments of principal made prior to the maturity date of the New Bonds that are not made pursuant to the New Bonds' payment schedule will be treated as "pro rata prepayments" on the New Bonds. In determining gain or loss attributable to such prepayments of principal, a pro rata prepayment is treated as a repurchase by the Issuer from a U.S. Holder of a pro rata portion of the principal amount of a New Bond for the amount paid by the Issuer to such U.S. Holder. Resulting gain or loss would be calculated by assuming that each New Bond consists of two instruments, one that is retired and one that remains outstanding. The adjusted issue price, the U.S. Holder's adjusted basis, and accrued but unpaid original issue discount in respect of the original New Bond determined immediately before the pro rata prepayment are allocated between these two instruments based on the portion of the New Bond that is treated as retired by the prepayment of principal. The application of these rules to the New Bonds is complex and U.S. Holders should consult their tax advisors regarding the treatment of payments of principal made prior to the maturity date of the New Bonds if the New Bonds are properly characterized as contingent payment debt instruments.

*Additional Tax on Passive Income*

Under current law, certain individuals, estates and trusts whose income exceeds certain thresholds will be required to pay a 3.8% tax on "net investment income" including, among other things, interest and net gain from disposition of property (other than property held in certain trades or businesses). U.S. Holders are encouraged to consult their own tax advisors regarding the effect, if any, of this tax on their ownership and disposition of the New Bonds.

## Tax Consequences to Puerto Rico Individuals & Puerto Rico Corporations

*Exchange of Participating Bond Claims for New Bonds*

In general, pursuant to the provisions of Section 1.937-2 of the Regulations, the source of the income from the disposition of personal property by a Puerto Rico Individual is determined under the rules of Section 865 of the U.S. Tax Code. Accordingly, a gain on the exchange of Participating Bond Claims for New Bonds that is recognized by a Puerto Rico Individual will constitute Puerto Rico-source income and, therefore, will qualify for the income exclusion under Section 933(1) of the U.S. Tax Code. A Puerto Rico Corporation generally will not be subject to income or withholding tax under the U.S. Tax Code on gain recognized on the sale or exchange of the Participating Bond Claims, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and certain other requirements are satisfied.

AAFAF_CONF_0001140

*Ownership of New Bonds*

*Payments of Interest.* Interest paid or accrued on the New Bonds to a Puerto Rico Individual will constitute gross income from sources within Puerto Rico and, therefore, will not be included in gross income and will be exempt from U.S. federal income taxation pursuant to Section 933(1) of the U.S. Tax Code. In addition, for U.S. federal income tax purposes, no deduction or credit will be allowed that is allocable to or chargeable against amounts so excluded from the Puerto Rico Individual's gross income. Interest paid or accrued on the New Bonds to a Puerto Rico Corporation will not be subject to income taxation under the U.S. Tax Code, *provided* that such interest is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such Puerto Rico Corporation.

*Sale, Exchange or Retirement of New Bonds.* In general, pursuant to the provisions of Section 1.937-2 of the Regulations, the source of the income from the disposition of personal property by a Puerto Rico Individual will be determined under the rules of Section 865 of the U.S. Tax Code. Accordingly, gain on the sale or exchange of the New Bonds that is recognized by a Puerto Rico Individual will constitute Puerto Rico-source income and, therefore, qualify for the income exclusion under Section 933(1) of the U.S. Tax Code. A Puerto Rico Corporation generally will not be subject to income or withholding tax under the U.S. Tax Code on gain recognized on the sale or exchange of the New Bonds, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and certain other requirements are satisfied.

## Tax Consequences to Non-U.S. Holders

*Exchange of Participating Bond Claims for New Bonds*

Gain recognized by a Non-U.S. Holder on the exchange of Participating Bond Claims for New Bonds will generally not be subject to U.S. federal income tax unless the gain is effectively connected with its conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment that such Non-U.S. Holder is treated as maintaining in the United States), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described below under "—*Ownership of New Bonds*"; or such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange and such gain is derived from sources within the United States. Certain other exceptions may be applicable, and a Non-U.S. Holder should consult its tax advisor in this regard. Any New Bonds received by a Non-U.S. Holder that are attributable to accrued and unpaid interest on a Participating Bond Claim generally will be taxable in the same manner as described below under "—*Ownership of New Bonds*."

*Ownership of New Bonds*

Subject to the discussion below concerning backup withholding, payments of interest on a New Bond (including original issue discount) to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, and gain recognized upon a sale, exchange or retirement of a New Bond by a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax if the Non-U.S. Holder is not deemed to conduct a trade or business in the United States. If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including original issue discount and gain recognized upon the sale, exchange or retirement of New Bonds, which generally will be treated as interest under the contingent payment debt regulations, as discussed above under "—*Tax Consequences to U.S. Holders—Ownership of New Bonds—Sale, Exchange or Retirement of the New Bonds*") on the New Bonds is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including original issue discount and gain recognized upon a sale, exchange or retirement of New Bonds) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income at a rate of 30% unless an applicable income tax treaty applies to reduce such rate.

## Backup Withholding and Information Reporting

*U.S. Holders, Puerto Rico Individuals and Puerto Rico Corporations*

In general, information-reporting requirements may apply to the exchange of Participating Bond Claims for New Bonds, and such requirements will apply to certain payments of interest (and accruals of original issue discount) on, or proceeds from a disposition (including a retirement or redemption) of, New Bonds unless, in each case, the holder is an exempt recipient such as a corporation. Backup withholding may apply to the exchange of Participating Bond Claims for New Bonds and payments of interest on or proceeds from disposition (including a retirement or redemption) of New Bonds if a U.S. Holder, Puerto Rico Individual or Puerto Rico Corporation fails to provide its correct taxpayer identification number, fails to certify that it is not subject to backup withholding, or otherwise fails to establish an exemption. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

AAFAF_CONF_0001141

Certain U.S. Holders who are individuals (and certain entities closely held by individuals) may be required to report information relating to their ownership of the New Bonds, subject to certain exceptions (including an exception for New Bonds held in accounts maintained by U.S. financial institutions). U.S. Holders should consult their tax advisors regarding their reporting obligations with respect to the New Bonds.

*Non-U.S. Holders*

In general, a Non-U.S. Holder will not be subject to backup withholding with respect to the exchange of Participating Bond Claims for New Bonds or interest (including original issue discount) paid to it on the Participating Bond Claims or New Bonds, *provided* that the payor does not have actual knowledge or reason to know that such Non-U.S. Holder is a U.S. person as defined under the U.S. Tax Code, and the Non-U.S. Holder has provided a validly completed IRS Form W-8BEN or W-8BEN-E (or other applicable form) establishing that it is not a U.S. person (or it satisfies certain documentary evidence requirements for establishing that it is not a U.S. person). Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition of Participating Bond Claims or New Bonds made within the United States or conducted through certain United States-related financial intermediaries, unless the Non-U.S. Holder certifies to the payor under penalties of perjury that it is not a United States person (and the payor does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person), or otherwise establishes an exemption. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes**

As discussed above, the IRS could seek to treat the New Bonds as interests other than debt for U.S. federal income tax purposes on the basis that the value of the Restructuring Property and expectations of repayment are not sufficiently supportive of debt characterization. In that event, if the New Bonds were treated as equity interests in the Issuer, they could be treated as equity interests in either a corporation or a partnership if the Issuer is considered to be a "business entity" under Applicable U.S. Tax Law, or as beneficial interests in a trust if the Issuer is not considered to be a "business entity." Although the issue is not free from doubt, the Issuer intends to take the position that it should be classified as business entity and will file a "check the box" election under applicable Regulations in order to be classified as a partnership rather than a corporation if the New Bonds are treated as equity for U.S. federal income tax purposes. If, instead, the Issuer were to be classified as a trust rather than a business entity, the tax treatment of the holders of the New Bonds would be similar in many respects to their tax treatment if the New Bonds were treated as partnership interests as described below. However, because the Issuer would be classified as a foreign trust, U.S. Holders would be exposed to certain onerous reporting requirements and possibly penalties for non-compliance.

Alternatively, it is possible that the New Bonds could be characterized as contractual rights to payments from a governmental entity that are neither debt nor equity for U.S. federal income tax purposes. Although the tax treatment of such contractual rights is unclear, the timing of income earned with respect to such rights could potentially be accounted for under "open transaction" principles.

Holders of Participating Bond Claims should consult their own tax advisors regarding the characterization of the New Bonds as debt of the Issuer, the classification of the Issuer as a business entity, and the consequences if the Issuer's intended positions are successfully challenged.

The following paragraphs describe some of the material U.S. federal income tax consequences to a holder of Participating Bond Claims if the New Bonds are treated as partnership interests rather than debt for tax purposes.

*Tax Consequences to U.S. Holders*

*Exchange of Participating Bond Claims for New Bonds that are Treated as Partnership Interests.* A U.S. Holder of New Bonds that are treated as partnership interests would recognize gain or loss equal to the difference between (i) the fair market value of the New Bonds received in exchange for the Participating Bond Claim plus the value of any cash payment to be received on the Special First Payment Date to the extent the value of such cash payment is not otherwise taken into account in determining the fair market value of such New Bonds and (ii) the U.S. Holder's adjusted tax basis in the Participating Bond Claims on the date of the exchange (except to the extent any recognized loss may be deferred under the "wash sale" rules of the U.S. Tax Code). The New Bonds would have a new holding period commencing on the day after the exchange. Subject to the discussions of accrued interest principles under "—*Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Accrued Interest*" above and market discount principles under "—*Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Market Discount*" above, gain or loss on the exchange would generally be capital gain or loss and may be long-term capital gain or loss depending on the holding period in the Participating Bond Claim of the U.S. Holder. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

E-174

AAFAF_CONF_0001142

*Ownership of New Bonds that are Treated as Partnership Interests.* Each U.S. Holder of a New Bond that is treated as a partnership interest would be required to take into account its allocable share of items of income, gain, loss, and deduction of the Issuer (as computed for U.S. federal income tax purposes) in computing its U.S. federal income tax liability, regardless of whether or not cash distributions are made by the Issuer.

In addition, as a result of the exchange each of the underlying debt obligations and other assets that comprise the Restructuring Property would likely be treated as having a new initial tax basis in the hands of the Issuer equal to its deemed fair market value on the date of the exchange. To the extent such new tax basis is less than the amount due on a particular debt obligation, the difference would be "market discount" that could result in gain (taxable as ordinary income) being recognized as principal payments are made on the repayment of the obligation. See discussion of market discount principles under "—*Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Market Discount*" **above**.

Distributions that are not in partial or full redemption of the New Bonds held by a U.S. Holder would generally be governed by Section 731 of the U.S. Tax Code. Section 731(a)(1) generally provides that a partner will not recognize taxable gain in connection with a partnership distribution except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution. Section 731(a)(2) generally provides that a partner will not recognize loss upon a non-liquidating distribution.

*Sale, Exchange or Retirement of New Bonds that are Treated as Partnership Interests.* U.S. Holders generally would recognize gain or loss upon the sale or other taxable disposition of a New Bond that is treated as a partnership interest equal to the difference between (a) the sum of the cash or fair market value of other property received in exchange for such New Bond plus the share of the Issuer's liabilities allocated to such holder under partnership tax principles, if any, and (b) such U.S. Holder's adjusted tax basis in the New Bond. A U.S. Holder's adjusted tax basis in the New Bond would generally be equal to (1) the fair market value of the New Bond on the date of the exchange of Participating Bond Claims for the New Bond; plus (2) the Issuer's liabilities allocated to such holder under partnership tax principles, if any; plus (3) the Issuer's income and gain previously allocated to such holder; minus (4) the Issuer's losses previously allocated to, distributions to, and the share of nondeductible, noncapitalized expenses allocated to, such holder (which decrease such holder's tax basis, but not below zero).

Gain or loss recognized by a U.S. Holder in a sale or other taxable disposition of New Bonds that are treated as partnership interests should generally be taxable as capital gain or loss. However, a portion of this gain or loss, which could be substantial, would be separately computed and taxed as ordinary income or loss under Section 751 of the U.S. Tax Code to the extent attributable to "unrealized receivables" or to "inventory items" of the Issuer. Notably, the term "unrealized receivables" would include any market discount on the debt obligations held by the Issuer to the extent of the amount that would be treated as ordinary income if such obligations were to be sold by the Issuer at the time of the sale or other disposition of the New Bonds.

Distributions by the Issuer in redemption or liquidation of any New Bonds that are treated as partnership interests should be subject to Sections 731 and 751(b) of the U.S. Tax Code. Section 731(a)(1) generally provides that a partner will not recognize taxable gain in connection with a partnership distribution except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution. Section 731(a)(2) generally provides that a partner will not recognize taxable loss unless (a) a distribution is in liquidation of a partner's interest in the partnership and (b) only money, unrealized receivables (as defined in Section 751(c) of the U.S. Tax Code) and inventory (as defined in Section 751(d) of the U.S. Tax Code) are distributed, in which case loss will be recognized to the extent of the excess of the adjusted basis of the partner's interest in the partnership over the sum of the property distributed.

The calculation of gain or loss in connection with the application of Section 751 is complex, and holders of New Bonds should consult with their own tax advisors with respect to such calculations in the event such New Bonds are characterized as partnership interests.

*Certain Reporting Requirements.* For U.S. federal income tax purposes, partnerships organized in Puerto Rico are considered foreign entities. The U.S. Tax Code and the Regulations require certain U.S. persons that own certain interests in a foreign partnership or transfer property to a foreign partnership in exchange for a partnership interest to file a properly completed Form 8865 with the IRS. If required to be filed, Form 8865 must be filed with a U.S. person's annual tax return for the applicable year. Failure to file a required Form 8865 can result in significant penalties. U.S. Holders are urged to consult their tax advisors as to the advisability of filing a protective Form 8865 for their taxable year that includes the exchange and for later taxable years because of the possibility that the IRS may successfully assert that their New Bonds are properly treated as equity interests in a foreign partnership rather than debt.

Certain U.S. Holders who are individuals (and certain entities closely held by individuals) may be required to report information relating to their ownership of the New Bonds, subject to certain exceptions (including an exception for New Bonds held in accounts maintained by U.S. financial institutions). U.S. Holders should consult their tax advisors regarding their reporting obligations with respect to the New Bonds.

E-175

AAFAF_CONF_0001143

*State and Local Income Taxation.* Although the Applicable U.S. Tax Law provides that bonds issued by Puerto Rico are generally exempt from U.S. state and local income taxation, whether that exemption would apply to the New Bonds if they are characterized as equity of the Issuer rather than debt for tax purposes is uncertain. Bondholders should consult their own tax advisors as to the U.S. state and local tax implications of acquiring and holding the New Bonds if they are treated as equity interests of the Issuer for tax purposes.

### *Tax Consequences to Puerto Rico Individuals & Puerto Rico Corporations*

Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, the treatment of the New Bonds as partnership interests rather than debt for U.S. federal income tax purposes should not alter the U.S. federal income tax consequences of the exchange or the ownership or disposition of the New Bonds to Puerto Rico Individuals and Puerto Rico Corporations. Accordingly, a Puerto Rico Individual or a Puerto Rico Corporation should not be subject to U.S. federal income taxation on any income or gain arising from the exchange of Participating Bond Claims for New Bonds that are treated as partnership interests or as a result of owning or disposing of New Bonds unless, in the case of a Puerto Rico Corporation, such income or gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and certain other requirements are satisfied.

### *Tax Consequences to Non-U.S. Holders*

*Exchange of Participating Bond Claims for New Bonds that are Treated as Partnership Interests.* Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, the treatment of the New Bonds as partnership interests rather than debt for U.S. federal income tax purposes should not materially alter the U.S. federal income tax consequences of the exchange of Participating Bond Claims for the New Bonds by Non-U.S. Holders. See "*—Tax Consequences to Non-U.S. Holders—Exchange of Participating Bond Claims for New Bonds*" above.

*Ownership of New Bonds that are Treated as Partnership Interests.* Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, the treatment of the New Bonds as partnership interests rather than debt for U.S. federal income tax purposes should not materially alter the U.S. federal income tax consequences to Non-U.S. Holders. Accordingly, subject to the discussion concerning backup withholding above, a Non-U.S. Holder generally should not be subject to U.S. federal income taxation on its allocable share of the income of the Issuer attributable to such New Bonds provided such income is not effectively connected with the conduct of a trade or business in the United States. A Non-U.S. Holder whose income with respect to the New Bonds is effectively connected to the conduct of a U.S. trade or business will generally be taxed as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income at a rate of 30% unless an income tax treaty applies to reduce such rate. See "*—Tax Consequences to Non-U.S. Holders—Ownership of New Bonds*" above.

*Sale, Exchange or Retirement of New Bonds that are Treated as Partnership Interests.* Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, any gain realized by a Non-U.S. Holder upon the sale, exchange or retirement of a New Bond that is treated as a partnership interest rather than debt for U.S. federal income tax purposes generally will not be subject to U.S. federal income tax unless the gain is treated as effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment that such Non-U.S. Holder is treated as maintaining in the United States), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described above under "*—Tax Consequences to Non-U.S. Holders—Ownership of New Bonds*"; or such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange, and such gain is derived from sources within the United States. Certain other exceptions may be applicable, and a Non-U.S. Holder should consult its tax advisor in this regard.

AAFAF_CONF_0001144

**ERISA CONSIDERATIONS**

Participating Bond Claims are in some instances held by pension, profit sharing or other employee benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including an entity such as a collective investment fund and separate accounts whose underlying assets include the assets of such plans, subject to ERISA (a "Plan"). Each fiduciary of a Plan holding Participating Bond Claims should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before determining whether to consent to the Qualifying Modification. Accordingly, among other factors, the fiduciary should consider the description of "Risk Factors" in the Solicitation Statement and this Offering Memorandum when considering the Plan's vote on the Qualifying Modification.

In addition, each fiduciary of a Plan that is considering an investment in the New Bonds should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before authorizing an investment in the New Bonds. For example, the only sources of payment on the New Bonds are payments, Collections received on the Restructuring Property and interest thereon, and the New Bonds will not be insured or guaranteed by the Commonwealth or any other person. For those and other reasons, an investment in the New Bonds may not be appropriate for some Plans.

In addition, Section 406 of ERISA and Section 4975(c) of the U.S. Tax Code generally prohibit transactions between a Plan (including for this purpose many individual retirement accounts and plans established by self-employed individuals or Keogh plans (each, also a "Plan")) and a "party in interest" within the meaning of Section 3(14) of ERISA ("Party In Interest"), or a "disqualified person" within the meaning of Section 4975(e)(2) of the U.S. Tax Code. If a non-exempt prohibited transaction does occur, it could result in the transaction being voided or rescinded, as well as excise tax or other monetary penalties and liabilities under ERISA and/or Section 4975 of the U.S. Tax Code. Governmental, church and foreign plans to which ERISA does not apply may be subject to similar rules under federal, state, local or foreign law. Under ERISA and various prohibited transaction class exemptions ("PTCEs") issued by the U.S. Department of Labor, exemptive relief may be available for a potential direct or indirect prohibited transaction that may occur from a purchase, holding or disposition of New Bonds. Those exemptions include PTCE 96-23 (for certain transactions determined by in house asset managers), PTCE 95-60 (for certain transactions involving insurance company general accounts), PTCE 91-38 (for certain transactions involving bank collective investment funds), PTCE 90-1 (for certain transactions involving insurance company separate accounts), PTCE 84-14 (for certain transactions determined by independent qualified asset managers), and the exemption under Section 408(b)(17) of ERISA and Section 4975(d)(20) of the U.S. Tax Code, for certain arm's-length transactions with a person that is a Party In Interest solely by reason of providing services to Plans or being an affiliate of such a service provider.

Any purchaser, including any fiduciary purchasing on behalf of a Plan, transferee or holder of the New Bonds will be deemed to have represented, in its corporate and its fiduciary capacity, by its purchase of the New Bonds, that either (a) it is not a Plan or an entity whose underlying assets include plan assets by reason of any Plan's investment in the entity, and is not purchasing the New Bonds on behalf of or with plan assets of any Plan or with any assets of a governmental, church or foreign plan that is subject to any federal, state, local or foreign law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the U.S. Tax Code or (b) its purchase is eligible for exemptive relief or such purchase is not prohibited by ERISA or Section 4975 of the U.S. Tax Code (or in the case of a governmental, church or foreign plan, any substantially similar federal, state, local or foreign law).

Under ERISA, assets of a Plan may include assets held in the general account of an insurance company that has issued an insurance policy to such plan or assets of an entity in which the Plan has invested. Accordingly, insurance company general accounts that include assets of a Plan must ensure that one of the foregoing exemptions is available.

Due to the complexity of the prohibited transaction rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries of Plans or other persons considering purchasing the New Bonds on behalf of or with "plan assets" of any Plan consult with their counsel regarding the prohibited transaction rules.

Purchasers of the New Bonds have exclusive responsibility for ensuring that their purchase does not violate the prohibited transaction rules of ERISA or the U.S. Tax Code or any similar regulations applicable to governmental, church or foreign plans, as described above.

In addition, Section 3(42) of ERISA and the U.S. Department of Labor regulation located at 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") describe what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA and the Code, including the fiduciary responsibility provisions of Title I of ERISA and Section 4975 of the Code. Under Section 3(42) of ERISA and the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or that, immediately after the most recent acquisition of any equity interest in the entity, Plans hold less than 25% of the total value of each class of "equity interest" in the entity. Under the Plan Asset Regulation, an "equity interest" means

E-177

AAFAF_CONF_0001145

any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and that has no substantial equity features.

The New Bonds will not constitute "publicly-offered securities" for purposes of the Plan Asset Regulation. In addition, the Issuer will not be registered under the Investment Company Act, and it is not likely that the Issuer will qualify as an "operating company" for purposes of the Plan Asset Regulation. Therefore, if the New Bonds are deemed to constitute equity interests for purposes of the Plan Asset Regulation, and Plans hold 25% or more of the New Bonds, the Restructuring Property could be considered to be the assets of any Plans that hold New Bonds. If for any reason the Restructuring Property are deemed to be "plan assets," certain transactions involving the Restructuring Property might constitute non-exempt "prohibited transactions" under Section 406 of ERISA or Section 4975 of the Code and might have to be rescinded at significant cost to the Issuer. In addition, the Issuer and/or the Servicer might be deemed fiduciaries of the investing Plans and could be subject to other significant penalties and liabilities. In such circumstances, in addition to considering the applicability of ERISA and Section 4975 of the Code to the New Bonds, a fiduciary considering an investment in the New Bonds should consider, among other things, the applicability of ERISA and Section 4975 of the Code to transactions involving the Restructuring Property, including whether such transactions might constitute a direct or indirect prohibited transaction under ERISA or Section 4975 of the Code or otherwise may result in a breach of fiduciary duty under ERISA.

Although there is little guidance on the subject, assuming the New Bonds constitute debt for local law purposes, the Issuer believes that, at the time of their issuance, the New Bonds should not be treated as equity interests in the Issuer for purposes of the Plan Asset Regulation. This determination is based in part upon the traditional debt features of the New Bonds, including the absence of equity conversion rights, warrants and other typical equity features.

Neither the Issuer, the Servicer, nor any of their respective affiliates, agents or employees will act as a fiduciary to any Plan with respect to the Plan's decision to invest in the New Bonds. Each fiduciary or other person with investment responsibilities over the assets of a Plan considering an investment in the New Bonds must carefully consider the above factors before making an investment. Fiduciaries of Plans considering the purchase of the New Bonds should consult their legal advisors regarding whether the Restructuring Property would be considered "plan assets," the possibility of exemptive relief from the prohibited transaction rules and other issues and their potential consequences.

AAFAF_CONF_0001146

INFORMATION CONCERNING OFFERING RESTRICTIONS IN CERTAIN JURISDICTIONS OUTSIDE THE UNITED STATES

**MINIMUM UNIT SALES**

THE NEW BONDS WILL TRADE AND SETTLE ON A UNIT BASIS (ONE UNIT EQUALING ONE BOND OF $1.00 PRINCIPAL AMOUNT). FOR ANY SALES MADE OUTSIDE THE UNITED STATES, THE MINIMUM PURCHASE AND TRADING AMOUNT IS 1 UNIT (BEING 1 NEW BOND IN AN AGGREGATE PRINCIPAL AMOUNT OF $1.00).

**NOTICE TO INVESTORS IN CANADA**

THE NEW BONDS MAY BE SOLD IN CANADA ONLY TO PURCHASERS PURCHASING, OR DEEMED TO BE PURCHASING, AS PRINCIPAL THAT ARE ACCREDITED INVESTORS, AS DEFINED IN NATIONAL INSTRUMENT 45-106 PROSPECTUS EXEMPTIONS OR SUBSECTION 73.3(1) OF THE SECURITIES ACT (ONTARIO), AND ARE PERMITTED CLIENTS, AS DEFINED IN NATIONAL INSTRUMENT 31-103 REGISTRATION REQUIREMENTS, EXEMPTIONS AND ONGOING REGISTRANT OBLIGATIONS. ANY RESALE OF THE NEW BONDS MUST BE MADE IN ACCORDANCE WITH AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE PROSPECTUS REQUIREMENTS OF APPLICABLE SECURITIES LAWS.

SECURITIES LEGISLATION IN CERTAIN PROVINCES OR TERRITORIES OF CANADA MAY PROVIDE A PURCHASER WITH REMEDIES FOR RESCISSION OR DAMAGES IF THIS OFFERING MEMORANDUM (INCLUDING ANY AMENDMENT THERETO) CONTAINS A MISREPRESENTATION, *PROVIDED* THAT THE REMEDIES FOR RESCISSION OR DAMAGES ARE EXERCISED BY THE PURCHASER WITHIN THE TIME LIMIT PRESCRIBED BY THE SECURITIES LEGISLATION OF THE PURCHASER'S PROVINCE OR TERRITORY. THE PURCHASER SHOULD REFER TO ANY APPLICABLE PROVISIONS OF THE SECURITIES LEGISLATION OF THE PURCHASER'S PROVINCE OR TERRITORY FOR PARTICULARS OF THESE RIGHTS OR CONSULT WITH A LEGAL ADVISOR.

PURSUANT TO SECTION 3A.3 OF NATIONAL INSTRUMENT 33-105 UNDERWRITING CONFLICTS (NI 33-105), THE UNDERWRITERS ARE NOT REQUIRED TO COMPLY WITH THE DISCLOSURE REQUIREMENTS OF NI 33-105 REGARDING UNDERWRITER CONFLICTS OF INTEREST IN CONNECTION WITH THIS OFFERING.

**NOTICE TO INVESTORS IN THE EUROPEAN ECONOMIC AREA**

THIS OFFERING MEMORANDUM IS NOT A PROSPECTUS FOR THE PURPOSES OF EUROPEAN COMMISSION DIRECTIVE 2003/71/EC (AS AMENDED) (THE "PROSPECTUS DIRECTIVE") AS IMPLEMENTED IN EACH MEMBER STATE OF THE EUROPEAN ECONOMIC AREA. IT HAS BEEN PREPARED ON THE BASIS THAT ALL OFFERS OF THE NEW BONDS WILL BE MADE PURSUANT TO AN EXEMPTION UNDER ARTICLE 3 OF THE PROSPECTUS DIRECTIVE, AS IMPLEMENTED IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA, FROM THE REQUIREMENT TO PRODUCE A PROSPECTUS FOR SUCH OFFERS. THIS OFFERING MEMORANDUM IS ONLY ADDRESSED TO AND DIRECTED AT PERSONS IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA WHO ARE "QUALIFIED INVESTORS" WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE AND ANY RELEVANT IMPLEMENTING MEASURE IN EACH MEMBER STATE OF THE EUROPEAN ECONOMIC AREA ("QUALIFIED INVESTORS"). THIS OFFERING MEMORANDUM MUST NOT BE READ, ACTED ON OR RELIED ON IN ANY SUCH MEMBER STATE OF THE EUROPEAN ECONOMIC AREA BY PERSONS WHO ARE NOT QUALIFIED INVESTORS. ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH THIS OFFERING MEMORANDUM RELATES IS AVAILABLE ONLY TO QUALIFIED INVESTORS IN ANY MEMBER STATE OF THE EUROPEAN ECONOMIC AREA AND WILL NOT BE ENGAGED IN WITH ANY OTHER PERSONS. EACH PERSON WHO INITIALLY ACQUIRES ANY NEW BONDS OR TO WHOM ANY OFFER OF NEW BONDS MAY BE MADE WILL BE DEEMED TO HAVE REPRESENTED, ACKNOWLEDGED AND AGREED THAT IT IS A "QUALIFIED INVESTOR" WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE.

**NOTICE TO INVESTORS IN SWITZERLAND**

THIS OFFERING MEMORANDUM IS NOT INTENDED TO CONSTITUTE AN OFFER OR SOLICITATION TO PURCHASE OR INVEST IN THE NEW BONDS DESCRIBED HEREIN. THE NEW BONDS MAY NOT BE PUBLICLY OFFERED, SOLD OR ADVERTISED, DIRECTLY OR INDIRECTLY, IN, INTO OR FROM SWITZERLAND AND WILL NOT BE LISTED ON THE SIX SWISS EXCHANGE LTD. OR ON ANY OTHER EXCHANGE OR REGULATED TRADING FACILITY IN SWITZERLAND. NEITHER THIS OFFERING MEMORANDUM NOR ANY OTHER OFFERING OR MARKETING MATERIAL RELATING TO THE NEW BONDS CONSTITUTES A PROSPECTUS AS SUCH TERM IS UNDERSTOOD PURSUANT TO ARTICLE 652A OR ARTICLE 1156 OF THE *SWISS CODE OF OBLIGATIONS* OR A LISTING PROSPECTUS WITHIN THE MEANING OF THE LISTING RULES OF THE SIX SWISS EXCHANGE LTD. OR ANY OTHER REGULATED TRADING

AAFAF_CONF_0001147

FACILITY IN SWITZERLAND. ACCORDINGLY, THIS OFFERING MEMORANDUM IS COMMUNICATED IN OR FROM SWITZERLAND TO A LIMITED NUMBER OF SELECTED INVESTORS ONLY, AND NEITHER THIS OFFERING MEMORANDUM NOR ANY OTHER OFFERING OR MARKETING MATERIAL RELATING TO THE NEW BONDS MAY BE PUBLICLY DISTRIBUTED OR OTHERWISE MADE PUBLICLY AVAILABLE IN OR FROM SWITZERLAND.

AAFAF_CONF_0001148

**PENDING AND THREATENED LITIGATION THAT MAY IMPACT THE QUALIFYING MODIFICATION**

As of the date hereof, numerous lawsuits have been filed that challenge PROMESA and the actions of the Oversight Board, the Solicitation, the Qualifying Modification and the treatment of various creditors of GDB. In addition, various parties whose claims against GDB may be affected by the Qualifying Modification have threatened the commencement of litigation, and it is possible that such parties and others (including parties that are not creditors of GDB but could be indirectly affected by the Qualifying Modification, as described below) will file new legal challenges against the Solicitation and the Qualifying Modification. Given the novelty of PROMESA, the Qualifying Modification (which is the first proposed restructuring being undertaken by a covered territorial instrumentality under PROMESA) and the GDB Restructuring Act, no assurances can be given as to the outcome of any litigation relating to or impacting them or the impact on the validity or enforceability of the Transaction Documents, including the New Bonds. Any litigation may be costly and time-consuming, delay the Solicitation and consummation of the Qualifying Modification and ultimately result, even before the resolution of such litigation, in the termination of the Restructuring Support Agreement (as a result of the failure to satisfy milestones or otherwise) and in the Oversight Board commencing a case under Title III of PROMESA with respect to GDB. Even if the Qualifying Modification is consummated, a subsequent unfavorable decision in some of these lawsuits could, among other things, affect the validity or enforceability of the Transaction Documents, including the New Bonds, or otherwise materially adversely affect the rights and remedies of holders of the New Bonds and the payment of principal of and interest on the New Bonds.

**Litigation Challenging the Constitutionality of PROMESA and/or the Actions of the Oversight Board**

As of the date hereof, there are at least two lawsuits challenging the constitutionality of PROMESA and/or the actions of the Oversight Board.

*In re: The Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, et al.* (Case No. 17 BK 3283). On August 7, 2017, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, "Aurelius"), as creditors of the Commonwealth, submitted in the District Court an Objection and Motion to Dismiss the petition filed by the Oversight Board under Title III of PROMESA in respect of the Commonwealth for, among other matters, lack of authority to initiate the proceedings. In its motion, Aurelius challenges the constitutionality of PROMESA on the grounds that the appointment of the members of the Oversight Board violates the Appointments Clause and separation of powers principles of the U.S. Constitution, inasmuch as such members were not appointed by the President with the advice and consent of the Senate. Aurelius argues that because of this constitutional defect, the actions taken by the Oversight Board are therefore void. In a separate PROMESA Title III proceeding, *In re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Electric Power Authority, et al.* (Case No. 17 BK 4780), the Union de Trabajadores de la Industria Eléctrica y Riego ("UTIER"), a labor union of the Puerto Rico Electric Power Authority ("PREPA"), filed an adversary proceeding making the same constitutional challenges as Aurelius and seeks to have all acts of the Oversight Board declared invalid and to enjoin the defendants from pursuing any Title III cases. *See Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority, et al.,* No. 17-00228-LTS (D.P.R. Aug. 7, 2017). UTIER filed an amended complaint on November 10, 2017.

AAFAF and the Oversight Board have filed briefs in opposition to Aurelius' motion to dismiss the Commonwealth Title III proceeding and have filed motions to dismiss UTIER's amended adversary complaint. Certain other creditor groups have also opposed Aurelius' objection and motion to dismiss. On December 6, 2017, the United States, which has a statutory right to intervene in any federal court action in which the constitutionality of an Act of Congress is drawn into question, also filed a brief in support of the constitutionality of PROMESA, arguing that PROMESA's appointments scheme is not subject to the Appointments Clause and does not violate separation of powers. The United States filed the same statement in support of PROMESA in the UTIER adversary proceeding. Oral arguments on Aurelius's motion to dismiss the Commonwealth Title III and Defendants' motion to dismiss the UTIER adversary proceeding were held on January 10, 2018. On July 13, 2018, the court issued an order and opinion denying Aurelius' Motion to Dismiss, noting that an opinion on the motion to dismiss UTIER's adversary complaint would be issued separately. On July 17, 2018, Aurelius appealed the order denying its motion to dismiss to the United States Court of Appeals for the First Circuit. On July 24, 2018, Aurelius requested expedited treatment of its appeal. On August 1, 2018, the First Circuit denied the motion and ordered Aurelius to file an application for permission to appeal on or before August 9, 2018. On July 30, 2018, the District Court entered an order certifying its July 13, 2018 opinion and order for immediate appeal to the United States Court of Appeals for the First Circuit.

Separately, on July 23, 2018, Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured") filed a separate adversary complaint in a third Title III proceeding, *In re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority,* against the Oversight Board and its members asserting the same Appointments Clause challenge brought by Aurelius and UTIER, and asking the court to dismiss HTA's Title III proceeding. *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, et al.,* (Case No. 18-00087). On August 3, 2018, the District Court entered a stipulated judgment in the Oversight Board's favor. Assured filed a notice of appeal to the First Circuit the same day.

AAFAF_CONF_0001149

On July 25, 2018, certain leaders of the Popular Democratic Party filed a separate lawsuit asserting a similar Appointments Clause challenge in the Commonwealth's Title III proceeding against the Oversight Board. *Hernández-Montañez v. The Financial Oversight and Management Board for Puerto Rico* (Case No. 18-00090). The adversary complaint seeks a declaratory judgment that the appointment of the Oversight Board's members violated the Appointments Clause or, in the alternative, a declaratory judgment that the Oversight Board violates the separation of powers doctrine. Plaintiffs also seek to enjoin the Oversight Board from exercising authority pursuant to PROMESA. On July 30, 2018, the District Court certified the constitutional challenge to the Attorney General.

While these challenges to PROMESA are brought in the Commonwealth's, PREPA's, and HTA's Title III proceedings and thus are not directly related to GDB, a decision holding that the members of the Oversight Board were not validly appointed could in turn result in the voidance of any decisions by the Oversight Board, including, but not limited to, the certification by the Oversight Board of the Restructuring Support Agreement as a Voluntary Agreement and a Qualifying Modification under PROMESA, and in the reconstitution of the Oversight Board. Such an outcome could result in significant delays in consummating, or the inability to consummate, the Qualifying Modification as there can be no assurance that a reconstituted Board would ratify or reaffirm the decisions in favor of the Solicitation and the Qualifying Modification. If occurring after consummation of the Qualifying Modification, the voidance of all actions taken by the Oversight Board in furtherance of the Solicitation and the Qualifying Modification could result in reverting the legal standing of GDB's creditors, including the holders of Participating Bond Claims, to the legal standing that existed prior to the Qualifying Modification.

### Litigation Challenging the Solicitation and the Qualifying Modification

As of the date hereof, municipalities have filed various lawsuits in the District Court directly challenging the Solicitation and the Qualifying Modification. GDB believes it has meritorious defenses to the claims asserted in these lawsuits and intends to vigorously defend itself and the Qualifying Modification. One of these lawsuits has been dismissed. But, because the pending lawsuit challenges the Solicitation and the Qualifying Modification, the District Court could determine that certain of the claims may have to be resolved prior to consummating the Qualifying Modification. An adverse decision or ruling in the pending case could delay the consummation of the Qualifying Modification and, if GDB and its creditors were still to pursue a financial restructuring pursuant to Title VI of PROMESA, it may require amending the Qualifying Modification to provide for alternative treatment of claims and interests, which may result in holders of Participating Bond Claims receiving significantly less for their claims and interests. If any modifications to the Qualifying Modification are material, it may be necessary to re-solicit votes from holders of Participating Bond Claims.

*Municipality of San Juan v. Government Development Bank et al.* (Case No. 17-02009). This complaint for declaratory judgment and injunctive relief was filed on July 26, 2017, in the District Court against the Oversight Board, GDB and AAFAF. In its original complaint, the plaintiff sought, among other things, a declaratory judgment that the Restructuring Support Agreement is invalid for failure to comply with PROMESA's voting pool requirements and that the treatment in the Restructuring Support Agreement of certain purported trust funds (designated as Participating Bond Claims in the Qualifying Modification) violates PROMESA, and a permanent injunction against the Oversight Board from certifying a Restructuring Support Agreement that does not provide a separate voting pool for municipal depositors with set-off rights or contemplates use of purported trust funds for the benefit of non-municipal creditors. On August 25, 2017, the plaintiff filed a motion for a preliminary injunction to enjoin GDB and AAFAF from initiating the Solicitation in connection with the Qualifying Modification and requesting an expedited briefing schedule. On September 11, 2017, the District Court denied the plaintiff's request for a preliminary injunction. On October 27, 2017, the District Court granted motions from seven other municipalities – specifically, the municipalities of **Juana Díaz, Cabo Rojo, Hormigueros, San Germán, Luquillo, San Lorenzo** and **Mayagüez** – to intervene in this action. These other municipalities filed intervenor complaints alleging the same causes of action San Juan asserted in its original complaint and seeking the same relief sought by San Juan. On December 1, 2017, the Municipality of San Juan filed an amended complaint for declaratory judgment, damages and injunctive relief. As a whole, San Juan's core allegations and legal theories largely mirror those in the original complaint, but also include allegations that the provisions of the GDB Restructuring Act limiting the ability of government entities to challenge the Restructuring Support Agreement are preempted by PROMESA, that GDB's refusal to disburse certain monies to the municipality for the provision of essential services is unlawful, that GDB has breached fiduciary duties and contractual provisions of a deed of trust with respect to certain municipal funds, and that the court should impose a constructive trust in favor of the municipality with respect to approximately $83.3 million of funds held in accounts at GDB. On January 8, 2018, GDB and AAFAF, and the Oversight Board filed motions to dismiss the case, arguing, among other things, lack of standing, ripeness and that the municipality's causes of action (including all of the intervening municipalities' claims) fail under applicable law. On January 25, 2018, in response to San Juan's consent motion for an extension of time to respond to the defendants' motions to dismiss, the court ordered a briefing schedule, setting a March 2, 2018, deadline for any response to the motions to dismiss, and a March 30, 2018, deadline for any replies in support of the motions to dismiss. On April 9, 2018, the Municipality of San Juan filed a motion requesting that the pending motions to dismiss be held in abeyance pending its review of the Fourth Amendment to the Restructuring Support Agreement to determine the amendment's impact on San Juan's claims. On April 17, 2018, GDB, AAFAF and the Oversight Board jointly filed a response requesting that the court stay the entire proceeding and stating that either party could thereafter move to lift the stay if it deems a lifting of the stay to be appropriate. On April 18, 2018, the District Court stayed the action in its entirety.

AAFAF_CONF_0001150

*Municipality of Caguas v. Government Development Bank et al.* (Case No. 17-01973). This complaint for declaratory, equitable and injunctive relief was filed on July 17, 2017, in the District Court against GDB, AAFAF, the Municipal Revenue Collection Center and certain officers thereof. The plaintiff sought declaratory judgment and injunctive relief to prohibit GDB and AAFAF from continuing with the Qualifying Modification on the grounds that it is in violation of PROMESA, contrary to other applicable law and/or unconstitutional. In particular, the plaintiff alleged, among other matters, that certain municipal deposits designated as Participating Bond Claims in the Qualifying Modification are not "Bonds" under PROMESA and thus may not be altered under Title VI of PROMESA. GDB moved to dismiss the case, arguing, among other things, that the municipality lacks standing to sue pursuant to Article 703 of the GDB Restructuring Act, which provides that no Puerto Rico government entity will have authority or standing to challenge the Qualifying Modification or the related restructuring transactions. GDB also argued in its motion to dismiss that the municipality's claims are not ripe because they depend on uncertain and contingent events and are thus not ripe. On October 30, 2017, the Municipality of Caguas filed a Notice of Voluntary Dismissal without prejudice of its claim. The court entered judgment dismissing the complaint without prejudice on October 31, 2017.

## Litigation Challenging the Treatment of Certain GDB Creditors

As of the date hereof, municipalities have also filed various lawsuits in Puerto Rico courts seeking the payment of municipal funds deposited with GDB and/or alleging that certain municipal funds are trust funds that are not the property of GDB, and seeking damages. While these lawsuits do not expressly challenge the Qualifying Modification, the claimants seek a treatment of certain municipal claims with respect to funds deposited with GDB that is inconsistent with the treatment of such claims under the Qualifying Modification. If claimants were to prevail, the Qualifying Modification may have to be amended to provide for a different treatment of certain claims, which could result in holders of Participating Bond Claims receiving significantly less for their claims and interests. An adverse decision could also delay the consummation of the Qualifying Modification and/or result in the termination of the Restructuring Support Agreement and the failure to consummate the Qualifying Modification.

*Municipality of San Germán v. Banco Gubernamental de Fomento para Puerto Rico et al.* (Case No. SJ2016CV00351). This complaint for preliminary and permanent injunctions, mandamus and declaratory judgment was filed on December 29, 2016, before the Puerto Rico Court of First Instance, San Juan Part, against GDB and the Commonwealth of Puerto Rico. The plaintiff seeks the payment of Excess CAE funds deposited with GDB in the amount of $1.275,000 as of November 2016 and challenges certain laws and executive orders that control the way in which such funds are paid. The case was stayed pursuant to the PROMESA automatic stay upon enactment. Although this stay is no longer in effect, the plaintiff has not sought to prosecute the case. It sought to intervene in the Municipality of San Juan v. GDB lawsuits before the District Court (described above) and the Puerto Rico Court of First Instance (described below). There are no scheduled court hearings or filing deadlines at this time.

*Municipality of Añasco v. Banco Gubernamental de Fomento para Puerto Rico et al.* (Case No. SJ2017CV00444). This complaint for preliminary and permanent injunctions, mandamus and declaratory judgment was filed on June 15, 2017, before the Puerto Rico Court of First Instance, San Juan Part, against GDB and the Commonwealth of Puerto Rico. The plaintiff seeks payment of all funds currently held at GDB and constituting funds deposited by, on behalf of, or for the municipality, including alleged Excess CAE funds in the amount of $1,375,073; municipal loan proceeds in the amount of $2,755,000; and other funds in the amount of $522,957. The case was stayed pursuant to the PROMESA automatic stay upon commencement of the Commonwealth's Title III proceeding. The plaintiff requested reconsideration, which was denied by the court. There are no scheduled court hearings or filing deadlines at this time.

*Municipality of San Juan v. Banco Gubernamental de Fomento para Puerto Rico et al.* (Case No. SJ2017CV00501). This complaint for preliminary and permanent injunctions, mandamus and declaratory judgment was filed on June 26, 2017, before the Puerto Rico Court of First Instance, San Juan Part, against GDB and its President. The plaintiff seeks, among other things, payment of, and a declaration that it has proprietary interest over, certain Excess CAE funds held at GDB. An amended complaint was filed on July 31, 2017, which withdrew the requests for the issuance of a preliminary injunction and mandamus. The Municipalities of **Arroyo, Cabo Rojo, Comerío, Hormigueros, Isabela, Juana Díaz, Luquillo, Patillas, Salinas, San Germán, San Lorenzo,** and **Yabucoa** have sought to intervene as the plaintiffs in the case raising the same allegations as the Municipality of San Juan. On August 28, 2017, the defendants filed a motion to dismiss the Municipality of San Juan's complaint and the proposed intervenor complaints and in opposition to the intervenors complaints. GDB argued that, pursuant to the GDB Restructuring Act, the Municipality of San Juan lacked standing to bring suit questioning the Restructuring Support Agreement and that the District Court, not the Puerto Rico Court of First Instance, has exclusive jurisdiction to entertain any claims over deposits held at GDB. On September 15, 2017, the Municipality of San Juan moved for an extension of time of fifteen days to oppose the motion to dismiss. GDB moved the court to grant it a term of twenty days from the date the Municipality of San Juan filed its response to the motion to dismiss to file a reply. On February 1, 2018, the court granted GDB's request. The Municipality of San Juan filed a belated motion for an additional extension, which was granted by the court, and finally filed its opposition on March 5, 2018. In its opposition, the Municipality of San Juan argued that its complaint does not question the Restructuring Support Agreement and, therefore, that the GDB Restructuring Act does not foreclose its suit. The Municipality also argued that Title VI of PROMESA does not stay based on Puerto Rico law. GDB asked for a further extension until April 16, 2018, to file its reply. On the same day, GDB filed a motion to stay proceedings citing to the Municipality of San Juan's motion seeking the same

E-183

relief in *Municipality of San Juan v. Government Development Bank et al.* (Case No. 17-02009). A status conference was held on June 18, 2018 and the stay was extended until October 3, 2018, when a further status conference will be held.

*Travelers Casualty & Surety Company v. Municipality of San Juan* (Case No. 17-01290). This complaint for breach of contract and collection of monies was filed on February 28, 2017, in the District Court by Travelers Casualty and Surety Company against the Municipality of San Juan. The plaintiff seeks payment of $338,656 allegedly owed by the Municipality of San Juan to a contractor with respect to two construction projects. The Municipality of San Juan admitted essential facts but filed a third-party complaint against GDB on July 12, 2017, claiming that the amounts due should be paid by GDB, as the funds for paying such contracts are allegedly deposited with, and under the control of, GDB. GDB filed a motion to dismiss the third-party complaint, arguing, among other things, that the municipality lacks standing to sue pursuant to Article 703 of the GDB Restructuring Act, which provides that no Puerto Rico government entity will have authority or standing to challenge or question the validity of GDB's restructuring process, which GDB argued would be the consequence of allowing the third-party complaint to go forward. On November 20, 2017, the Municipality of San Juan filed a notice of voluntary dismissal without prejudice of the third-party complaint against GDB. The court entered judgment dismissing the third-party complaint on November 30, 2017.

*Wilma Figueroa Alvarez v. Newport Bonding v. Municipality of San Juan v. GDB et al.* (Case No. KCD2015-1141 (602)). This complaint for collection of monies and damages was filed on May 28, 2015, before the Puerto Rico Court of First Instance by Figueroa Alvarez against the Municipality of San Juan. The plaintiff is seeking payment of approximately $48,000 for work performed under a construction contract with the municipality and $500,000 as compensation for damages allegedly suffered by the plaintiff due to the municipality's failure to pay. The Municipality of San Juan filed a third-party complaint against GDB and its president on May 8, 2017, which was served on December 1, 2017. In the third-party complaint, the municipality alleges that it has been unable to make payments under the construction contract because such payments were to be made by the municipality from the proceeds of a loan made to it by GDB, which proceeds are allegedly under the control of GDB. The municipality alleges that, as a result, GDB is directly responsible to the plaintiff for the outstanding payments. GDB filed a motion to dismiss on February 12, 2018. In it, GDB contends that: (i) pursuant to PROMESA, the District Court, and not the Puerto Rico Court of First Instance, has original and exclusive jurisdiction to entertain the case, (ii) pursuant to the GDB Restructuring Act, the Municipality of San Juan lacks standing and authority to bring suit against GDB challenging the Restructuring Support Agreement, (iii) several executive orders issued under Act 21-2016, as amended, and Act 5-2017, as amended, restrict the withdrawal of deposits with GDB, and (iii) GDB is not an indispensable party as it is not privy to the contractual relationship between the parties to the case. On March 19, 2018, the Municipality of San Juan filed an opposition to GDB's motion to dismiss. In its opposition, the Municipality of San Juan argued that GDB is an indispensable party as depository of the monies claimed by Newport Bonding. However, it did not address the balance of the arguments raised by GDB in its motion to dismiss. On April 12, 2018, GDB filed a reply to the Municipality of San Juan's opposition. On May 9, 2018, entered and notified on May 10, 2018, the Court of First Instance issued a partial judgment granting GDB's Motion to Dismiss and dismissing San Juan's claims against GDB. The municipality filed a timely appeal of that dismissal judgment on July 9, 2018, insisting that GDB is an indispensable party to the litigation and that the case should not proceed without it. GDB's opposition brief is due August 8, 2018. In the meantime, the case before the Court of First Instance has been stayed pending insolvency proceedings of defendant (and claimant against the municipality) Newport Bonding & Surety Co.

*Siemens Transportation Partnership Puerto Rico, S.E. v. Puerto Rico Highways and Transportation Authority et al.*, **Adversary Proceeding 18-ap-030 (LTS)** (Case No. 17-03567 (LTS)). On March 26, 2018, Siemens Transportation Partnership Puerto Rico, S.E. ("Siemens"), filed an adversary proceeding against HTA, the Oversight Board, AAFAF, and GDB in the District Court. The complaint seeks to collect monies and asserts a breach of contract claim in connection with a settlement agreement whereby Siemens was to receive the sum of $52 million from HTA related to the construction of the Tren Urbano project. Specifically, Siemens requests the disbursement of the last completion payment of $13 million, which, according to Siemens, was to be deposited in an escrow account at GDB. Accordingly, Siemens brings suit against, among others, HTA and GDB to collect on such monies, seeking a determination that the completion payment has become due, that the monies in question are deposited in escrow at GDB, an injunction against the defendants prohibiting the dissipating of the funds allegedly held in escrow, and an order to release the monies to Siemens. On March 28, 2018, Judge Swain referred the case to Magistrate Judge Dein for pretrial management. On May 2, 2018, Siemens filed a motion to preserve funds and request for discovery in aid of any hearing deemed necessary by the judge. GDB, AAFAF and the Oversight Board filed separate responses to this motion on May 16, 2018, requesting that the motion be denied. On May 29, 2018, Magistrate Judge Dein heard arguments on the motion to preserve funds. On June 8, 2018, the court denied Siemens' motion to preserve funds without prejudice. On May 29, 2018, GDB, AAFAF and the Oversight Board filed motions to dismiss. GDB generally argued that (1) in the absence of a written agreement with GDB for the creation of an escrow account requiring GDB to segregate the funds from its liquidity, as a matter of Puerto Rico law, the funds are held in GDB deposits and not on escrow, and (2) the case should be considered as part of GDB's Title VI proceedings given that Siemens' claim is with respect to a GDB deposit subject to the Qualifying Modification. The court set a status conference on this matter as part of the omnibus hearing set for June 6, 2018, to discuss whether the Siemens' claim should be considered as part of the Title VI proceedings. During that conference, the court ordered the parties to propose a working schedule for the Title VI court to consider the claims, including discovery and resolution.

E-184

On June 18, 2018, and within the context of the Title III adversary proceeding, Siemens filed an omnibus opposition to the motions to dismiss. GDB, AAFAF, and the Oversight Board filed replies in support of their respective motions to dismiss on June 25, 2018, and Siemens sur-replied on July 5, 2018.

The court set a status conference on this matter as part of the omnibus hearing on July 25, 2018. After the hearing, the court entered an order ruling as follows: (1) the controversies posed in the adversary proceeding will be resolved in connection with GDB's Title VI proceeding, (2) the adversary proceeding is stayed without prejudice, (3) assuming GDB files its Title VI petition by the middle of August, the court will hold a hearing on GDB's Title VI relief on November 7, 2018 and GDB will inform Siemens of any delays in the filing of the Title VI proceeding, (4) the Title VI schedule is to include a full schedule for discovery and briefing on Siemens' claims and all briefing is to conclude by October 31, 2018, and (5) GDB will hold the monies in dispute, $13 million dollars, until a determination is made on a qualifying modification in the Title VI proceeding, without prejudice for an extension of that hold. Further, the parties agreed to continue discovery regarding Siemens' claim –substantial discovery took place in the context of a Rule 2004 motion by Siemens in HTA's Title III proceeding– while the Title VI process was commenced.

*Cooperativa de Ahorro y Crédito Abraham Rosa et al v. Commonwealth of Puerto Rico* (Case No. 17 BK 4780 LTS). This complaint was filed on March 22, 2018, in the District Court, by several state-chartered credit unions against GDB, the Public Corporation for the Supervision and Insurance of Cooperatives ("COSSEC"), the Issuer, AAFAF, the Oversight Board, the Commonwealth, the public corporations that are in Title III proceedings, and other defendants. The plaintiffs allege that the defendants maliciously and under false pretenses offered and sold to the plaintiffs unsound bonds issued by the Commonwealth and its instrumentalities, including GDB. They allege that this resulted in an undue concentration of bonds in the cooperative's portfolios and created a systemic risk for the plaintiffs. Additionally, they allege that GDB, as fiscal agent to the Commonwealth, exerted significant influence on COSSEC, the public corporation in charge of regulating the Commonwealth's credit unions, which resulted in the bonds being offered and sold to the plaintiffs in violation of statutory, fiduciary and regulatory duties, causing them material losses. The plaintiffs request a determination that the plaintiffs' claims against all debtors in Title III proceedings are exempted from discharge in such proceedings, the imposition of monetary damages and compensation for losses suffered for breach of contract, violations to securities laws, negligence, breach of fiduciary duties, fraud, misrepresentations, and unjust enrichment. The Issuer and its Trustees, in their official capacity, waived service of process on July 31, 2018, agreeing to answer the complaint or otherwise plead on or before October 1, 2018. GDB filed a motion to dismiss this complaint on August 6, 2018.

*Fundación Biblioteca Rafael Hernández Colón v. Commonwealth of Puerto Rico et al.* (Case No. JAC 17-0401). This complaint was filed on March 20, 2018, before the Puerto Rico Court of First Instance, by Fundación Biblioteca Rafael Hernández Colón against the Commonwealth, GDB and other defendants. The plaintiff alleges that Act 290-2000 established a special fund, to be capitalized with the proceeds of certain cigarette excise taxes, for the benefit of foundations established by former governors and first ladies, including the plaintiff. The plaintiff also alleges that GDB acts as trustee of such fund, which is held on deposit at GDB, and that moneys in such fund cannot be comingled with other funds deposited with GDB. The plaintiff further alleges that it obtained two Loans with an aggregate outstanding principal balance of approximately $1.4 million, which are secured by an assignment of the funds received by the plaintiff pursuant to Act 290-2000. The complaint seeks that the court order: (1) the Secretary of Treasury to transfer the percentage of the proceeds of cigarette excise taxes corresponding to the Act 290-2000 special fund, for the years 2013-2014 to the present, to an account with the court, (2) GDB to disburse to the plaintiff its pro rata share of the funds in the special fund corresponding to the years 2013-2014 to the present, (3) that the plaintiff's pro rata share of the funds in the special fund corresponding to the years 2013-2014 to the present be used to satisfy certain Loans of the plaintiff payable from such funds, and (4) the Secretary of Treasury and GDB to comply with their obligations under Act 290-2000.

On May 8, 2018, the Department of Justice (on behalf of the Secretary of Treasury) filed a notice of stay of this action pursuant to Title III of PROMESA. On May 22, 2018, GDB filed a request for stay and motion to dismiss alleging that (1) the case should be stayed in its entirety because the Secretary of Treasury is an indispensable party, and, alternatively, (2) the case should be dismissed for lack of jurisdiction and because the plaintiff has failed to satisfy the requirements for a petition for *mandamus* and GDB is prohibited from disbursing funds in deposit. On May 25, 2018, the plaintiff filed a sworn amended complaint. The only change is that of the sworn statement filed in support of the allegations in the complaint. On July 23, 2018, the plaintiff filed a consolidated opposition to the notice of stay filed by the Department of Justice and to the request for stay and motion to dismiss the case as to GDB. GDB sought an extension until August 23, 2018 to reply.

*Fundación Sila M. Calderón, Inc. v. Estado Libre Asociado de Puerto Rico, Inc.* (Civil No. SJ2018CV02952). This complaint was filed on May 7, 2018, before the Puerto Rico Court of First Instance, by Fundación Sila M. Calderón, Inc., against the Commonwealth, GDB and other defendants. The plaintiff's allegations and requests for relief are substantially similar to those made by the plaintiff in *Fundación Biblioteca Rafael Hernández Colón v. Commonwealth of Puerto Rico et al.*, discussed above. The Secretary of Justice also filed a notice of stay of this action pursuant to Title III of PROMESA on May 13, 2018, and GDB filed a request for stay and motion to dismiss based on the same arguments put forth in *Fundación Biblioteca Rafael Hernández Colón v. Commonwealth of Puerto Rico et al.* However, on May 16, 2018, the plaintiff filed an amended complaint where it made the following amendments to its requests for relief: (1) as to the first count, that the order to the Secretary of Treasury to transfer the percentage of the proceeds of cigarette excise

AAFAF_CONF_0001153

taxes corresponding to the Act 290-2000 special fund in an account with the court be for the period of May 3, 2007, to the present, and (2) as to the second count, that GDB disburse to the plaintiff its pro rata share of the funds in the special fund corresponding to the years 2015-2017 and any other amounts that it may receive pursuant to Act 290-2000 in the future. After several extensions requested by the plaintiff to oppose GDB's request for stay and motion to dismiss, the court ordered the plaintiff to show cause why the case should not be stayed. The plaintiff consented to the stay. On July 20, 2018, the court entered Judgment staying the case and retaining jurisdiction to reopen upon request by the plaintiff.

*Municipality of Hormigueros and Municipality of San German v. Municipal Revenue Collection Center and Government Development Bank for Puerto Rico* (Case No. ISCI201800246 (307)). This complaint was filed on April 2, 2018, before the Puerto Rico Court of First Instance, by the Municipalities of Hormigueros and San Germán against CRIM and GDB. The plaintiffs allege that they have not received the Excess CAE for fiscal years 2015 through 2017 and that GDB has failed to disburse the full amount of the municipal Loans granted to the municipalities despite requiring that the municipalities pay for the service of municipal debt with GDB on the basis of the entire amount loaned to the municipalities. The municipalities request declaratory and injunctive relief for (1) CRIM to distribute the Excess CAE for fiscal year 2018 directly to the municipalities and that such excess be calculated based on loaned amounts actually disbursed by GDB, and (2) an order against GDB (a) so that it may only collect from the municipalities the amounts owed in principal and interests based on the actual loaned amounts disbursed to the municipalities and not on the total amount of the Loans, and (b) for the reimbursement of any amounts paid by the municipalities on account of the repayment of portions of the Loans that have not been disbursed by GDB.

On May 21, 2018, CRIM filed a motion to dismiss. On June 6, 2018, GDB filed a motion to dismiss, alleging that (1) the court lacks jurisdiction to entertain the municipalities' claims because the municipal Loans (and funds on deposit with GDB) are subject to the terms of the Qualifying Modification, (2) the municipalities lack standing to challenge the Qualifying Modification, (3) as a matter of law, GDB is authorized to collect the re-payment of all municipal Loans on a yearly basis even if part of the Loan proceeds are held on deposit with GDB, and (4) the municipalities failed to plead with any specificity their claims against GDB. A scheduling hearing was held on June 7, 2018. On July 12, 2018, the municipalities filed an opposition to GDB's motion and, on July 16, 2018, an opposition to CRIM's motion. GDB sought an extension until August 10, 2018 to reply.

**Threatened Litigation**

In addition to the litigation described above, various parties have communicated with the Oversight Board, the Commonwealth and GDB expressing concerns about the Solicitation, the Qualifying Modification and alleged disparate treatment of certain claims against GDB, including claims with respect to funds held by, and/or deposit liabilities of, GDB. These parties include not only direct creditors of GDB, but creditors of other governmental instrumentalities that do not hold Participating Bond Claims (such as PREPA and the Puerto Rico Highways and Transportation Authority) but have other financial claims against GDB the treatment of which is alleged to be impermissibly disparate to and substantially worse than that given to the holders of the Participating Bond Claims. While some parties have only requested information informally at this stage to evaluate the treatment of their potential claims against GDB, others are seeking discovery, have demanded that the Oversight Board, AAFAF and certain public entity depositors oppose the Qualifying Modification and have threatened the commencement of litigation to challenge the Qualifying Modification and the treatment of certain claims thereunder. Furthermore, based on statements made to the court, the Unsecured Creditors Committee appointed in the Commonwealth's Title III proceeding under PROMESA has anticipated that it may raise objections to the Qualifying Modification.

AAFAF_CONF_0001154

**CONTINUING DISCLOSURE**

The following is a summary of the Issuer's obligations under the Disclosure Agreement (as defined herein). For information regarding additional periodic reporting requirements to Bondholders under the Transaction Documents, see "*Service Providers—Reports to Bondholders*."

Consistent with the requirements of Rule 15c2-12 of the United States Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time (the "Rule"), the Issuer will covenant in a Continuing Disclosure Agreement (the "Disclosure Agreement"), dated as of the Closing Date, among the Issuer, AAFAF, as dissemination agent (the "Dissemination Agent"), and the Indenture Trustee, to provide certain ongoing continuing disclosure with respect to the New Bonds, for the benefit of the Bondholders and the Beneficial Owners of the New Bonds (as defined herein and, generally, the tax owners of the New Bonds) and the Dealer Managers.

The Issuer has not previously entered into any continuing disclosure undertakings pursuant to the Rule or otherwise.

**Provision of Annual Reports**

Pursuant to the Disclosure Agreement, the Issuer will covenant and agree as follows:

(a)    to prepare, or to cause to be prepared, and provide to the Dissemination Agent, not later than 210 days after the end of the Issuer's fiscal year (the "Annual Filing Date") (which fiscal year as of the date hereof ends June 30), commencing with the fiscal year ending June 30, 2019, an annual report (the "Annual Report"), containing or including by reference (i) the audited financial statements of the Issuer for the prior fiscal year, prepared in accordance with generally accepted accounting principles applicable to the Issuer; provided, however, if such audited financial statements are not available by the time the annual report is required to be filed, the annual report will contain unaudited financial statements in a format that complies with current generally accepted accounting principles and the audited financial statements will be filed in the same manner as the annual report when such financial statements become available, (ii) an update of the information similar to that contained under the following headings in this Offering Memorandum, to the extent not included in the financial statements (including notes thereto) described in the immediately preceding clause (i): (1) "*Summary of Collections on the Restructuring Property*," (2) "*Summary of Distributions of Cash from the Collection Account*," and (3) "*Collections on the Restructuring Property and Calculation of Available Cash*" and (iii) an update of the information contained in Appendix D and Appendix E attached hereto solely to the extent such information is not included in the financial statements (including notes thereto) described in the preceding clause (i); and

(b)    to file or cause to be filed with MSRB through the EMMA website (http://emma.msrb.org) established by the MSRB each Annual Report no later than the Annual Filing Date.

Any or all of the items listed above may be included by specific reference to other documents that have been filed with the MSRB (or any other entity designated or authorized by the SEC to receive reports pursuant to the Rule) or the SEC. The Issuer will clearly identify, or will cause to be clearly identified, each such other document so included by reference.

**Reporting of Significant Events**

Pursuant to the Disclosure Agreement, the Issuer will also covenant and agree to file, or cause to be filed, with the MSRB through EMMA, notice of failure of the Issuer to comply with the Annual Report requirements described above and notice of the occurrence of any of the following events with respect to the New Bonds, in each case in a timely manner but in no event later than 10 business days after the occurrence of the event:

1.    principal and interest payment delinquencies;

2.    non-payment related defaults, if material;

3.    unscheduled draws on debt service reserves reflecting financial difficulties;

4.    unscheduled draws on credit enhancement reflecting financial difficulties;

AAFAF_CONF_0001155

5.   substitution of credit or liquidity providers, or their failure to perform;

6.   adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the New Bonds, or other material events affecting the tax status of the New Bonds;

7.   modifications to rights of the holders (including Beneficial Owners) of the New Bonds, if material;

8.   bond calls, if material, and tender offers;

9.   defeasances;

10.  release, substitution or sale of property securing repayment of the New Bonds, if material;

11.  rating changes;

12.  bankruptcy, insolvency, receivership, or similar event of the Issuer;

13.  the consummation of a merger, consolidation or acquisition involving the Issuer or the sale of all or substantially all of the assets of the Issuer, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

14.  the appointment of a successor or additional trustee, or the change in the name of a trustee, if material.

For purposes of the event identified in (12), the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Issuer, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Issuer.

In addition to the events listed above, the Issuer will give, or will cause to be given, notice in a timely manner but in no event later than 10 business days after the occurrence of (i) the appointment of a successor or additional Servicer or Collateral Monitor, or the change of name of a Servicer or Collateral Monitor, if material, or (ii) the Issuer becoming aware of the failure (A) to receive Collections on Restructuring Property in the Collection Account or (B) to make required disbursements therefrom.

**Termination of Reporting Obligations**

The parties' obligations under the Disclosure Agreement will terminate upon the termination of the Bond Indenture.

**Dissemination Agent**

The Issuer may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under the Disclosure Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent. The Disclosure Agreement provides that the Dissemination Agent will not be responsible in any manner for the content of any notice or report provided by the Issuer pursuant to the Disclosure Agreement. The Dissemination Agent (if other than the Indenture Trustee) may resign by providing thirty (30) days written notice to the Issuer. The Disclosure Agreement also provides that (i) the Dissemination Agent will have no duty to prepare any information report nor will the Dissemination Agent be responsible for filing any report not provided to it by the Issuer in a timely manner and in a form suitable for filing and (ii) if at any time there is not any other designated Dissemination Agent, the Indenture Trustee will be the Dissemination Agent. The initial Dissemination Agent will be AAFAF.

**Amendment; Waiver**

The Issuer, the Dissemination Agent and the Indenture Trustee may amend the Disclosure Agreement (and each of the Dissemination Agent and the Indenture Trustee will be required to agree to any amendment so requested by the Issuer which does not impose any greater duties, nor greater risk of liability, on such party) and any provision of the Disclosure Agreement may be waived, provided that the following conditions are satisfied:

E-188

AAFAF_CONF_0001156

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Issuer, or type of business conducted;

(b)     the Disclosure Agreement, as amended, would, as determined by outside legal counsel of recognized national standing, have been consistent with the requirements of the Rule at the time of the issuance of the New Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and

(c)     the amendment either (i) is approved by the Bondholders in the same manner as provided in the Bond Indenture for amendments to the Bond Indenture with the consent of the Bondholders or (ii) does not impair the interests of Bondholders or Beneficial Owners of the New Bonds, as determined by outside legal counsel of recognized national standing.

In the event of any amendment or waiver of a provision of the Disclosure Agreement, the Disclosure Agreement requires the Issuer to describe such amendment in the next Annual Report. In addition, if the amendment relates to the accounting principles to be followed in preparing financial statements, the Issuer is required to file, or cause to be filed, notice of such change in the same manner as for the events listed under (1) through (14) above. Notwithstanding the conditions set forth in (a)-(c) above, the Disclosure Agreement may be amended in accordance with subsequent guidance from the Securities and Exchange Commission regarding amendments to continuing disclosure agreements under the Rule.

**Additional Information**

Nothing in the Disclosure Agreement will be deemed to prevent the Issuer from disseminating, or causing to be disseminated, any other information, using the means of dissemination set forth in the Disclosure Agreement or any other means of communication, or including any other information in any Annual Report or notice of occurrence of an event, in addition to that which is required by the Disclosure Agreement.  If the Issuer chooses to include, or cause to be included, any information in any Annual Report or notice of occurrence of an event, in addition to that which is specifically required by the Disclosure Agreement, the Issuer will have no obligation under the Disclosure Agreement to update such information or include it in any future Annual Report or notice of occurrence of an event pursuant to the Disclosure Agreement.

**Default**

In the event of a failure of the Issuer or the Dissemination Agent to comply with any provision of the Disclosure Agreement, the Disclosure Agreement provides that the Indenture Trustee may and, at the request of Bondholders holding at least twenty-five percent (25%) in aggregate principal amount of the New Bonds then outstanding, will (but only to the extent it has been indemnified to its satisfaction from any loss, liability, or expense, including without limitation, reasonable fees and out-of-pocket expenses of its attorneys), and any Bondholder or Beneficial Owner of the outstanding New Bonds may, take such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Issuer or the Dissemination Agent, as the case may be, to comply with its respective obligations under the Disclosure Agreement.

A default under the Disclosure Agreement will not be deemed a Bond Indenture Event of Default and the sole remedy under the Disclosure Agreement in the event of any failure of the Issuer or the Dissemination Agent to comply with the Disclosure Agreement will be an action to compel performance.

E-189

## DEALER MANAGERS

Bank of America Merrill Lynch and Barclays Capital Inc. (collectively, the "Dealer Managers") have agreed to manage the exchange of the New Bonds for the Participating Bond Claims. The obligations of the Dealer Managers are subject to certain conditions precedent, but either of the Dealer Managers may in good faith, pursuant to such agreement, determine it to be inadvisable to continue to render services pursuant to such agreement. Notwithstanding such determination, the Dealer Managers' continued involvement is not a condition precedent to the consummation of the Qualifying Modification.

GDB will pay the Dealer Managers customary fees for their services and reimburse the Dealer Managers for their reasonable out-of-pocket expenses in connection therewith. GDB and the Issuer have agreed to indemnify the Dealer Managers for certain liabilities.

The Dealer Managers and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. The Dealer Managers and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Dealer Managers and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank Loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

## LEGAL MATTERS

Certain legal matters will be passed upon for the Issuer by its U.S. counsel, King & Spalding LLP, and its Puerto Rico counsel, Cancio Covas & Santiago, LLP; for the Issuer and GDB by the Secretary of Justice of Puerto Rico; for GDB by its General Counsel; for GDB and AAFAF by their U.S. counsel, O'Melveny & Myers LLP, and their Puerto Rico counsel, Pietrantoni Méndez & Alvarez LLC; and for the Dealer Managers by their counsel, Squire Patton Boggs (US) LLP. However, due solely to litigation, it is not expected that a legal opinion with respect to the validity or enforceability of the New Bonds will be delivered. See "*Risk Factors—Risks Related to the New Bonds and the Keepwell Agreement—Certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from closing conditions and closing deliverables that are typically required in municipal debt offering transactions.*"

AAFAF_CONF_0001158

## MISCELLANEOUS

The foregoing summaries of or references to the GDB Restructuring Act, the New Bonds, the Transaction Documents and the other agreements and matters referred to herein, are made subject to all the detailed provisions thereof to which reference is hereby made and do not purport to be complete statements of any or all of such provisions.

The agreements with the Bondholders are fully set forth in the Transaction Documents. This Offering Memorandum is not to be construed as a contract with the Bondholders or of any other obligations of the Issuer.

The execution and delivery of this Offering Memorandum has been duly authorized by the Issuer.

**GDB DEBT RECOVERY AUTHORITY**

By:_____
      Chairperson

E-191

AAFAF_CONF_0001159

### APPENDIX A: INDEX OF DEFINED TERMS IN THIS OFFERING MEMORANDUM

Below is an index of defined terms used in this Offering Memorandum.

| Term | Page(s) |
|---|---|
| 1996 CCDA Loan | E-132 |
| 2001 CRIM Loan | E-134 |
| 2002 CRIM Loan | E-134 |
| 2006 PBA Loan | E-131 |
| 2008 Ports Authority Loan | E-130 |
| 2013 CCDA Loan | E-132 |
| 2014 Ports Authority Loan | E-130 |
| 2015-17 Excess CAE | E-72, E-110 |
| 2015-17 Excess CAE Settlement Amount | E-110 |
| 68 Resolution | E-128 |
| 68 Resolution Revenues | E-128 |
| 98 Resolution | E-127 |
| AAFAF | E-2, E-59 |
| AAFAF-EAI | E-63 |
| Accepted Servicing Practices | E-75, E-156 |
| Act 30-31 Revenues | E-128 |
| Act 106 | E-40 |
| Act 80 | E-65 |
| Additional Bonds | E-14 |
| Additional Recovery Authority Loans | E-133 |
| adjusted issue price | E-172 |
| Affiliate | E-162 |
| AFR Presumption | E-171 |
| Agrelot Coliseum | E-131 |
| Agricultural Development Fund | E-132 |
| Aguadilla Airport | E-130 |
| Annual Filing Date | E-187 |
| Annual Report | E-187 |
| Applicable P.R. Tax Law | E-165 |
| Applicable U.S. Tax Law | E-168 |
| Approved Purchaser | E-21, E-102 |
| APRs | E-44 |
| Assured | E-181 |
| Aurelius | E-181 |
| Autonomous Municipalities Act | E-39 |
| automatic stay | E-36 |
| Available Cash | E-151 |
| Balloon Payment | E-109 |
| Bankruptcy Laws | E-28, E-140 |
| Bar Date | E-67 |
| Basic Tax | E-89 |
| Beneficial Interest | E-17, E-100 |
| Beneficial Owner | E-146 |
| Board | E-56 |
| Board of Trustees | E-56 |
| Bond Indenture | E-2, E-14, E-75 |
| Bond Indenture Event of Default | E-140 |
| Bondholders | E-2 |
| BPPR | E-106 |
| Business Day | E-15 |
| CAE | E-89 |
| Cantor-Katz | E-13, E-76 |
| Cash Adjustments | E-17, E-100 |

AAFAF_CONF_0001160

| Term | Page(s) |
|---|---|
| Cash Assets | E-17 |
| CCDA | E-61 |
| CCDA Loans | E-132 |
| Causes of Action | E-17 |
| Causes of Action Rights | E-17 |
| CDL Loans | E-42 |
| Clearing Systems | E-146 |
| Clearstream Banking | E-16 |
| Closing Date | E-7, E-15 |
| Closing Date Adjustments | E-98 |
| COFIM | E-92 |
| COFINA | E-61 |
| Collateral Monitor | E-13, E-76 |
| Collateral Monitor Agreement | E-76 |
| Collateral Monitor Fee | E-24, E-80 |
| Collateral Monitor Fee Letter | E-14, E-76 |
| Collection Account | E-150 |
| Collection Period | E-15 |
| Collection Schedule | E-151 |
| Collections | E-7 |
| Commonwealth | E-2 |
| Commonwealth Constitution | E-41 |
| Commonwealth Contributions | E-93 |
| Commonwealth Fiscal Plan | E-65 |
| Commonwealth Guaranteed Loan Asset | E-16, E-99 |
| Commonwealth Loan Assets | E-16, E-99 |
| Commonwealth SUT | E-115 |
| Commonwealth Title III Case | E-67 |
| comparable yield | E-171 |
| Compliance Test | E-77, E-158 |
| contingent payment debt regulations | E-170 |
| COSSEC | E-65, E-185 |
| Covered Losses | E-22, E-137 |
| covered territorial instrumentalities | E-37, E-51, E-81 |
| CPPR | E-96 |
| Credit Event | E-80 |
| CRIM | E-46 |
| CRIM Act | E-40 |
| CRIM Board | E-93 |
| Crude Oil Revenues | E-128 |
| Cutoff Date | E-15 |
| Dealer Managers | E-190 |
| Depositary | E-146 |
| Depositary Participants | E-146 |
| Designated Basic Tax | E-94 |
| Designated Commonwealth Contributions | E-93 |
| Designated Depositors | E-71 |
| Designated Trustee | E-110 |
| Determination Date | E-15, E-151 |
| Development Fund | E-116 |
| Direct Participants | E-146 |
| Disclosure Agreement | E-187 |
| Dissemination Agent | E-187 |
| DTC | E-16 |
| DTCC | E-146 |
| EDB | E-133 |
| EDB Loan | E-134 |

AAFAF_CONF_0001161

| Term | Page(s) |
|------|---------|
| EDB Property | E-134 |
| Eligible Deposit Account | E-152 |
| Eligible Institution | E-152 |
| Eligible Investments | E-152 |
| EMMA | E-5 |
| Equalization Monies | E-94 |
| equity interest | E-177 |
| ERISA | E-177 |
| ERS | E-40 |
| Euroclear | E-16 |
| Excess CAE | E-89, E-109 |
| Excluded Expenses | E-26, E-150 |
| Excluded GDB Assets | E-19, E-101 |
| FAM | E-47 |
| FAM Act | E-48 |
| FAM Redemption Fund | E-116 |
| FDIC | E-152 |
| February 2017 GDB Fiscal Plan | E-59 |
| FEMA | E-42 |
| Fees and Expenses Reserve | E-12, E-25, E-151, E-153 |
| Final Scheduled Payment Date | E-15, E-138 |
| Fiscal Responsibility Act | E-124 |
| Fiscal Year 2019 Certified Budget | E-65 |
| forward-looking statements | E-5 |
| GDB | E-2, E-13 |
| GDB Enabling Act | E-104 |
| GDB Fiscal Plan | E-60 |
| GDB Letter of Credit | E-129 |
| GDB Restructuring Act | E-14 |
| GDB Retained Loans | E-17 |
| GDB Retained Loan Rights | E-17, E-100 |
| GNP | E-62 |
| GO Available Legal Margin | E-114 |
| GO Legal Margin | E-114 |
| GO Payment Capacity | E-114 |
| GO Redemption Fund | E-106 |
| Government | E-59, E-68 |
| Government Development Bank for Puerto Rico Debt Restructuring Act | E-14 |
| Governor | E-59 |
| HFA | E-16, E-100 |
| Household Survey | E-64 |
| HTA | E-37 |
| HTA Bonds | E-127 |
| HTA Debt | E-127 |
| HTA Loans | E-127 |
| Improvement Fund | E-116 |
| Indemnified Parties | E-22, E-137 |
| Indenture Trustee | E-2, E-13, E-75 |
| Indenture Trustee Fee | E-24, E-80 |
| Independent | E-162 |
| Indirect Participants | E-146 |
| Initial Portfolio Transfer Fee | E-23, E-79, E-159 |
| Initial Restructuring Support Agreement | E-59 |
| Insolvency Event | E-162 |
| Interest Period | E-24, E-138 |
| Interim Receipts | E-107 |

AAFAF_CONF_0001162

| Term | Page(s) |
|------|---------|
| Investment Company Act | E-30 |
| IRS | E-54 |
| issue price | E-169 |
| Issuer | E-2, E-13 |
| Issuer Expenses | E-26, E-150 |
| Issuer Operating Expenses | E-26, E-150 |
| Issuer Operating Expenses Cap | E-26, E-150 |
| JRS | E-64 |
| June 2017 GDB Fiscal Plan | E-60 |
| Kobre | E-43 |
| Krueger Report | E-62 |
| Lehman | E-57 |
| Legislative Assembly | E-2, E-59 |
| LIBOR | E-19, E-105 |
| Liquidation Payment Date | E-26, E-145 |
| Loan and Trust Agreement | E-129 |
| Loan | E-98 |
| LTPR | E-130 |
| LTPR Lease | E-130 |
| market discount | E-175 |
| Matching Fund | E-94 |
| MFA | E-45, E-104 |
| Moratorium Act | E-59, E-124 |
| Municipal Financing Act | E-47 |
| Municipal License Tax Act | E-92 |
| Municipal Lines of Credit | E-106 |
| Municipal Loan Assets | E-16, E-98 |
| Municipal Tax Act | E-89 |
| Net Collections | E-79, E-159 |
| net negative adjustment | E-171 |
| New Bond Requisite Holders | E-162 |
| New Bonds | E-2 |
| Non-P.R. Investor | E-165 |
| Non-U.S. Holder | E-168 |
| Offering Memorandum | E-7 |
| Open or Disputed Vendor Claims | E-20, E-102 |
| Operational Loans | E-106 |
| Other Loan Assets | E-17, E-100 |
| Oversight Board | E-2, E-59 |
| P.R. Investor | E-165 |
| P.R. Tax Code | E-165 |
| P.R. Treasury | E-165 |
| PAA | E-16, E-99 |
| PAA Bond | E-125 |
| Parcel B | E-135 |
| Parcel C | E-132 |
| Party In Interest | E-177 |
| Payment Date | E-2, E-15, E-138 |
| Payment Date Report | E-78 |
| Payment Record Date | E-16 |
| PBA | E-61 |
| PBA Loans | E-131 |
| Person | E-162 |
| PFC | E-61 |
| phantom income | E-55 |
| PIK Amount | E-2, E-25, E-138 |
| Plan | E-177 |

AAFAF_CONF_0001163

| Term | Page(s) |
|------|---------|
| Plan Asset Regulation | E-177 |
| Planning Board | E-62 |
| Ports Authority | E-129 |
| Ports Authority Loans | E-129 |
| Ports Authority Reimbursement Obligations | E-129 |
| positive adjustment | E-171 |
| PR Code | E-116 |
| PRASA | E-65 |
| PREPA | E-42, E-181 |
| PRIDCO | E-130 |
| PRIDCO Mortgaged Properties | E-130 |
| PRIFA | E-61 |
| PRIFA Bonds | E-129 |
| Prime Rate | E-19, E-105 |
| Private Loans | E-16, E-100 |
| Private Sub-Fund | E-110 |
| PROMESA | E-2 |
| Property Tax Exemptions | E-89 |
| Prospectus Directive | E-179 |
| PTCEs | E-177 |
| Public Corporation Loan Assets | E-16, E-99 |
| Public Entity Deed of Trust | E-71 |
| Public Entity Trust | E-68 |
| Public Entity Trust Assets | E-20, E-71, E-102 |
| Puerto Rico Corporation | E-168 |
| Puerto Rico Individual | E-168 |
| Qualification | E-162 |
| Qualified Investors | E-179 |
| Qualified Successor Servicer | E-162 |
| Qualifying Modification | E-2, E-31 |
| Real Property Assets | E-17, E-100 |
| Regulations | E-168 |
| Reimbursable Servicer Expenses | E-159 |
| Reimbursement Agreement | E-129 |
| Report | E-96 |
| Repurchase Agreement | E-16, E-100, E-136 |
| Residual GDB Cash Assets | E-20, E-102 |
| Restructuring Property | E-7 |
| Restructuring Support Agreement | E-59 |
| Retirement Systems | E-64 |
| Revenue Loans | E-106 |
| Revised Commonwealth Fiscal Plan | E-65 |
| Río Bayamón Norte Community | E-135 |
| Río Bayamón Property | E-135 |
| Rule | E-187 |
| Sales Tax Obligations | E-106 |
| San Juan Waterfront Parcel | E-130 |
| San Juan Waterfront Project | E-130 |
| Secured Deposit Account | E-20, E-102 |
| Securities Act | E-30 |
| Semiannual Bondholder Report | E-78 |
| Semiannual Bondholder Report Date | E-78 |
| Semiannual Budget | E-78 |
| Servicer | E-13, E-75 |
| Servicer Advances | E-159 |
| Servicer Default | E-161 |
| Servicer Replacement Event | E-27, E-160 |

AAFAF_CONF_0001164

| Term | Page(s) |
|---|---|
| Services | E-156 |
| Servicing Agreement | E-14 |
| Servicing Fee | E-23, E-79, E-159 |
| Siemens | E-184 |
| SMU | E-133 |
| SMU Loan | E-134 |
| SO Available Legal Margin | E-122 |
| SO Payment Capacity | E-122 |
| Special Additional Tax | E-89 |
| Special First Payment Date | E-2, E-15, E-138 |
| Specified Cash Assets | E-20, E-102 |
| Stafford Act | E-42 |
| Step-Up Fee Period | E-80 |
| territorial instrumentalities | E-37, E-81 |
| Test Date | E-77, E-158 |
| Title III Cases | E-67 |
| Toll Revenues | E-128 |
| Transaction Documents | E-15 |
| Transfer Agreement | E-14, E-154 |
| Transferred Property | E-7 |
| TRS | E-64 |
| Type A Asset | E-80 |
| Type B Asset | E-80 |
| Type C Asset | E-80 |
| U.S. | E-168 |
| U.S. Holder | E-168 |
| U.S. Tax Code | E-168 |
| undersecured claims | E-32 |
| Unknown Assets | E-17 |
| unrealized receivables | E-175 |
| UPR | E-61 |
| UTIER | E-181 |
| Vendor Claim Reserve | E-20, E-102 |
| Vendor Claim Reserve Residual | E-20, E-102 |

AAFAF_CONF_0001165

## APPENDIX B: THE TRANSFERRED PROPERTY

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30000131000100203 | Municipal General Obligations | Adjuntas | $254,613.32 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30000131000100201 | Municipal General Obligations | Adjuntas | $765,000.00 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000231000100216 | Municipal General Obligations | Aguada | $120,119.52 | 7/1/2020 | VARIABLE | P+1.5 | 7.00 |
| 30000231000100205 | Municipal General Obligations | Aguada | $890,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100216 | Municipal General Obligations | Aguadilla | $502,769.95 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100207 | Municipal General Obligations | Aguadilla | $1,754,923.70 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100204 | Municipal General Obligations | Aguadilla | $1,908,495.09 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100213 | Municipal General Obligations | Aguadilla | $2,490,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100219 | Municipal General Obligations | Aguadilla | $2,423,157.26 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100208 | Municipal General Obligations | Aguadilla | $3,056,030.45 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100218 | Municipal General Obligations | Aguadilla | $5,798,208.48 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000431000100202 | Municipal General Obligations | Aguas Buenas | $749,130.01 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30000531000100206 | Municipal General Obligations | Aibonito | $72,896.62 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30000531000100208 | Municipal General Obligations | Aibonito | $418,817.74 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30000631000100207 | Municipal General Obligations | Anasco | $29,285.06 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30000631000100204 | Municipal General Obligations | Anasco | $1,126,428.48 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100209 | Municipal General Obligations | Arecibo | $287,983.72 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100212 | Municipal General Obligations | Arecibo | $581,321.36 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100206 | Municipal General Obligations | Arecibo | $831,482.44 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100217 | Municipal General Obligations | Arecibo | $1,823,226.28 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100210 | Municipal General Obligations | Arecibo | $3,155,576.73 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100216 | Municipal General Obligations | Arecibo | $3,383,204.67 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100204 | Municipal General Obligations | Arroyo | $117,473.87 | 7/1/2021 | VARIABLE | N+1 | 2.34 |
| 30000831000100205 | Municipal General Obligations | Arroyo | $689,055.27 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100202 | Municipal General Obligations | Arroyo | $884,098.67 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100212 | Municipal General Obligations | Barceloneta | $109,806.63 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100210 | Municipal General Obligations | Barceloneta | $700,000.00 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100211 | Municipal General Obligations | Barceloneta | $920,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100215 | Municipal General Obligations | Barceloneta | $1,229,256.82 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100207 | Municipal General Obligations | Barceloneta | $1,440,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100216 | Municipal General Obligations | Barceloneta | $1,497,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100224 | Municipal General Obligations | Barceloneta | $3,755,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100208 | Municipal General Obligations | Barceloneta | $4,035,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30001231000100209 | Municipal General Obligations | Cabo Rojo | $805,618.72 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30001231000100211 | Municipal General Obligations | Cabo Rojo | $5,462,023.06 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30001231000100206 | Municipal General Obligations | Cabo Rojo | $7,704,648.61 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100210 | Municipal General Obligations | Caguas | $903,042.21 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100238 | Municipal General Obligations | Caguas | $8,589,999.78 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30001431000100211 | Municipal General Obligations | Camuy | $374,981.34 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |

[1] As of the Cutoff Date, after giving effect to the Closing Date Adjustments and adjusted for payments received on July 2, 2018 (by virtue of rollover to the next business day).

[2] Maturity dates adjusted to give effect to the Closing Date Adjustments.

[3] "N" means 3-month London Interbank Offered Rate ("LIBOR"). "P" means the U.S. Prime Rate (the "Prime Rate").

E-198

AAFAF_CONF_0001166

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30001431000100204 | Municipal General Obligations | Camuy | $900,000.00 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30001531000100210 | Municipal General Obligations | Canovanas | $303,229.67 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100211 | Municipal General Obligations | Canovanas | $404,986.05 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100206 | Municipal General Obligations | Canovanas | $1,104,640.01 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100208 | Municipal General Obligations | Canovanas | $2,029,354.71 | 7/1/2021 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100207 | Municipal General Obligations | Canovanas | $3,716,065.57 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100205 | Municipal General Obligations | Canovanas | $3,894,903.08 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100226 | Municipal General Obligations | Cayey | $697,187.26 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100217 | Municipal General Obligations | Cayey | $1,530,972.77 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100216 | Municipal General Obligations | Cayey | $2,270,590.11 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100215 | Municipal General Obligations | Cayey | $2,752,145.74 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100204 | Municipal General Obligations | Cayey | $3,822,570.35 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30001931000100209 | Municipal General Obligations | Ceiba | $285,404.69 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100206 | Municipal General Obligations | Ciales | $77,743.05 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100208 | Municipal General Obligations | Ciales | $963,428.69 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100205 | Municipal General Obligations | Ciales | $958,894.51 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30002131000100210 | Municipal General Obligations | Cidra | $1,250,110.97 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002131000100206 | Municipal General Obligations | Cidra | $3,620,559.59 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100211 | Municipal General Obligations | Coamo | $820,018.33 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100209 | Municipal General Obligations | Coamo | $1,048,186.29 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100205 | Municipal General Obligations | Coamo | $1,081,566.40 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100204 | Municipal General Obligations | Comerio | $44,634.88 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30002331000100202 | Municipal General Obligations | Comerio | $589,949.93 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100205 | Municipal General Obligations | Corozal | $1,800,136.22 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100239 | Municipal General Obligations | Dorado | $531,325.21 | 7/1/2027 | VARIABLE | P+1.5 | 7.00 |
| 30002631000100230 | Municipal General Obligations | Dorado | $753,011.96 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100223 | Municipal General Obligations | Dorado | $800,346.98 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100220 | Municipal General Obligations | Dorado | $1,200,031.32 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100225 | Municipal General Obligations | Dorado | $1,563,689.25 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100227 | Municipal General Obligations | Dorado | $1,532,402.84 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100219 | Municipal General Obligations | Dorado | $1,507,297.85 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100229 | Municipal General Obligations | Dorado | $1,647,256.14 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100216 | Municipal General Obligations | Dorado | $1,886,067.75 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100236 | Municipal General Obligations | Dorado | $2,091,477.33 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100226 | Municipal General Obligations | Dorado | $2,429,717.71 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100211 | Municipal General Obligations | Dorado | $2,623,687.04 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100237 | Municipal General Obligations | Dorado | $2,589,903.99 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100228 | Municipal General Obligations | Dorado | $8,925,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002831000100205 | Municipal General Obligations | Florida | $228,379.79 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30002931000100207 | Municipal General Obligations | Guanica | $93,793.15 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30002931000100210 | Municipal General Obligations | Guanica | $2,368,411.07 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30003031000100207 | Municipal General Obligations | Guayama | $4,420,075.68 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30003031000100204 | Municipal General Obligations | Guayama | $5,453,314.58 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100203 | Municipal General Obligations | Guayanilla | $85,884.75 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003131000100201 | Municipal General Obligations | Guayanilla | $220,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |

AAFAF_CONF_0001167

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30003131000100205 | Municipal General Obligations | Guayanilla | $350,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30003131000100212 | Municipal General Obligations | Guayanilla | $504,435.14 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100206 | Municipal General Obligations | Guayanilla | $635,000.00 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30003131000100211 | Municipal General Obligations | Guayanilla | $1,886,680.59 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100211 | Municipal General Obligations | Guaynabo | $2,186,816.05 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30003231000100215 | Municipal General Obligations | Guaynabo | $4,639,782.39 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30003231000100218 | Municipal General Obligations | Guaynabo | $4,959,889.07 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100222 | Municipal General Obligations | Guaynabo | $7,267,479.20 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100229 | Municipal General Obligations | Guaynabo | $7,430,401.69 | 7/1/2033 | VARIABLE | P+1.5 | 7.00 |
| 30003231000100219 | Municipal General Obligations | Guaynabo | $9,759,261.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100224 | Municipal General Obligations | Guaynabo | $17,174,359.78 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100220 | Municipal General Obligations | Guaynabo | $17,113,747.65 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30003331000100216 | Municipal General Obligations | Gurabo | $178,946.31 | 7/1/2020 | VARIABLE | P+1.5 | 7.00 |
| 30003331000100208 | Municipal General Obligations | Gurabo | $906,712.36 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100213 | Municipal General Obligations | Gurabo | $4,806,257.89 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003331000100207 | Municipal General Obligations | Gurabo | $4,941,063.13 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100203 | Municipal General Obligations | Gurabo | $5,505,418.42 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003531000100202 | Municipal General Obligations | Hormigueros | $87,658.89 | 7/1/2021 | VARIABLE | N+1.25 | 2.59 |
| 30003731000100207 | Municipal General Obligations | Isabela | $261,367.62 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30003731000100206 | Municipal General Obligations | Isabela | $1,279,221.89 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30003731000100201 | Municipal General Obligations | Isabela | $1,815,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30003831000100202 | Municipal General Obligations | Jayuya | $89,193.63 | 7/1/2023 | VARIABLE | N+1 | 2.34 |
| 30003831000100203 | Municipal General Obligations | Jayuya | $344,145.50 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100209 | Municipal General Obligations | Juana Diaz | $235,475.48 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100206 | Municipal General Obligations | Juana Diaz | $1,389,341.79 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100205 | Municipal General Obligations | Juana Diaz | $1,593,356.81 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100208 | Municipal General Obligations | Juana Diaz | $2,071,562.22 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100207 | Municipal General Obligations | Juncos | $406,596.25 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004031000100212 | Municipal General Obligations | Juncos | $2,073,420.87 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100215 | Municipal General Obligations | Juncos | $4,493,812.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100209 | Municipal General Obligations | Juncos | $5,616,253.97 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004031000100214 | Municipal General Obligations | Juncos | $6,367,099.66 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004131000100206 | Municipal General Obligations | Lajas | $841,151.77 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004131000100205 | Municipal General Obligations | Lajas | $2,897,332.46 | 7/1/2039 | VARIABLE | P+1.5 | 6.00 |
| 30004431000100205 | Municipal General Obligations | Las Piedras | $126,918.49 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30004431000100210 | Municipal General Obligations | Las Piedras | $1,862,560.88 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30004431000100211 | Municipal General Obligations | Las Piedras | $8,363,680.97 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004531000100204 | Municipal General Obligations | Loiza | $299,142.72 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30004531000100206 | Municipal General Obligations | Loiza | $375,000.00 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30004531000100202 | Municipal General Obligations | Loiza | $628,770.27 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004531000100212 | Municipal General Obligations | Loiza | $643,853.25 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30004531000100213 | Municipal General Obligations | Loiza | $1,359,882.21 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30004531000100214 | Municipal General Obligations | Loiza | $1,475,118.71 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30004631000100205 | Municipal General Obligations | Luquillo | $411,631.58 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30004631000100206 | Municipal General Obligations | Luquillo | $1,008,708.66 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |

AAFAF_CONF_0001168

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30004631000100203 | Municipal General Obligations | Luquillo | $2,019,929.55 | 7/1/2032 | FIXED | 2.59 | n.a |
| 30004731000100209 | Municipal General Obligations | Manati | $26,903.72 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100205 | Municipal General Obligations | Manati | $725,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100215 | Municipal General Obligations | Manati | $1,223,167.83 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100219 | Municipal General Obligations | Manati | $1,417,290.40 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100212 | Municipal General Obligations | Manati | $2,280,873.37 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100220 | Municipal General Obligations | Manati | $2,457,730.73 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100217 | Municipal General Obligations | Manati | $2,590,000.00 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100218 | Municipal General Obligations | Manati | $4,704,279.71 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004831000100206 | Municipal General Obligations | Maricao | $27,774.06 | 7/1/2019 | VARIABLE | P+1.5 | 7.00 |
| 30004831000100203 | Municipal General Obligations | Maricao | $370,000.00 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30004931000100206 | Municipal General Obligations | Maunabo | $214,700.87 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100204 | Municipal General Obligations | Maunabo | $585,732.81 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100203 | Municipal General Obligations | Maunabo | $831,183.95 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100201 | Municipal General Obligations | Maunabo | $837,329.96 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005031000100211 | Municipal General Obligations | Mayaguez | $1,997,456.96 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30005031000100210 | Municipal General Obligations | Mayaguez | $6,748,334.21 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100201 | Municipal General Obligations | Moca | $128,529.33 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30005131000100210 | Municipal General Obligations | Moca | $460,974.30 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100213 | Municipal General Obligations | Moca | $549,598.20 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100206 | Municipal General Obligations | Moca | $696,113.05 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005131000100214 | Municipal General Obligations | Moca | $1,811,605.21 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30005231000100215 | Municipal General Obligations | Morovis | $574,115.06 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30005331000100209 | Municipal General Obligations | Naguabo | $1,194,908.79 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100201 | Municipal General Obligations | Naranjito | $1,688,151.06 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30005431000100202 | Municipal General Obligations | Naranjito | $2,943,809.97 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100205 | Municipal General Obligations | Orocovis | $246,598.58 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30005531000100201 | Municipal General Obligations | Orocovis | $495,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100204 | Municipal General Obligations | Patillas | $557.28 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100205 | Municipal General Obligations | Patillas | $299,155.75 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100209 | Municipal General Obligations | Patillas | $2,728,151.24 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100210 | Municipal General Obligations | Penuelas | $236,751.34 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100206 | Municipal General Obligations | Penuelas | $933,637.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100204 | Municipal General Obligations | Penuelas | $1,090,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100209 | Municipal General Obligations | Penuelas | $1,204,075.79 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005831000100216 | Municipal General Obligations | Ponce | $1,312,312.88 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100210 | Municipal General Obligations | Ponce | $3,832,425.82 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100222 | Municipal General Obligations | Ponce | $9,094,274.94 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100223 | Municipal General Obligations | Ponce | $9,796,862.96 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100212 | Municipal General Obligations | Ponce | $11,049,072.53 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100215 | Municipal General Obligations | Ponce | $11,368,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100204 | Municipal General Obligations | Ponce | $13,010,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30005931000100203 | Municipal General Obligations | Quebradillas | $355,944.24 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100202 | Municipal General Obligations | Quebradillas | $875,000.00 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100209 | Municipal General Obligations | Quebradillas | $965,744.13 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |

E-201

AAFAF_CONF_0001169

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30006131000100212 | Municipal General Obligations | Rio Grande | $1,561,695.82 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100213 | Municipal General Obligations | Rio Grande | $2,285,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100201 | Municipal General Obligations | Rio Grande | $2,590,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30006131000100205 | Municipal General Obligations | Rio Grande | $2,750,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30006131000100208 | Municipal General Obligations | Rio Grande | $5,016,030.88 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006231000100212 | Municipal General Obligations | Sabana Grande | $205,495.55 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30006231000100205 | Municipal General Obligations | Sabana Grande | $428,909.54 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30006231000100208 | Municipal General Obligations | Sabana Grande | $887,360.00 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100203 | Municipal General Obligations | Salinas | $594,145.74 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30006331000100211 | Municipal General Obligations | Salinas | $1,076,919.14 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100215 | Municipal General Obligations | Salinas | $1,230,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100214 | Municipal General Obligations | Salinas | $2,969,431.37 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100211 | Municipal General Obligations | San German | $408,250.16 | 7/1/2025 | VARIABLE | P+1.5 | 7.00 |
| 30006531000100208 | Municipal General Obligations | San Juan | $13,847,472.33 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30006531000100203 | Municipal General Obligations | San Juan | $16,196,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006531000100218 | Municipal General Obligations | San Juan | $22,404,558.07 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006531000100213 | Municipal General Obligations | San Juan | $23,182,647.50 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006531000100221 | Municipal General Obligations | San Juan | $45,958,514.27 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30006531000100219 | Municipal General Obligations | San Juan | $64,319,226.75 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100212 | Municipal General Obligations | San Lorenzo | $200,781.34 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100206 | Municipal General Obligations | San Lorenzo | $1,089,173.75 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30006631000100213 | Municipal General Obligations | San Lorenzo | $1,590,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100211 | Municipal General Obligations | San Lorenzo | $1,660,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100208 | Municipal General Obligations | San Lorenzo | $1,695,143.28 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100205 | Municipal General Obligations | San Lorenzo | $2,166,012.35 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30006731000100210 | Municipal General Obligations | San Sebastian | $103,175.67 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100208 | Municipal General Obligations | San Sebastian | $809,765.33 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100203 | Municipal General Obligations | San Sebastian | $825,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006731000100209 | Municipal General Obligations | San Sebastian | $1,228,970.38 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100214 | Municipal General Obligations | San Sebastian | $1,453,326.88 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100212 | Municipal General Obligations | San Sebastian | $1,717,105.06 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100215 | Municipal General Obligations | San Sebastian | $1,767,355.78 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100212 | Municipal General Obligations | Santa Isabel | $584,483.95 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100207 | Municipal General Obligations | Santa Isabel | $670,000.00 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100216 | Municipal General Obligations | Santa Isabel | $1,053,659.79 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100208 | Municipal General Obligations | Santa Isabel | $1,960,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100213 | Municipal General Obligations | Santa Isabel | $5,914,949.83 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100203 | Municipal General Obligations | Toa Alta | $1,141,500.98 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30006931000100211 | Municipal General Obligations | Toa Alta | $1,643,744.08 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100210 | Municipal General Obligations | Toa Alta | $1,484,294.01 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100209 | Municipal General Obligations | Toa Alta | $2,581,526.97 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100212 | Municipal General Obligations | Toa Alta | $4,023,786.77 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100211 | Municipal General Obligations | Toa Baja | $536,153.31 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007031000100216 | Municipal General Obligations | Toa Baja | $1,439,402.12 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100214 | Municipal General Obligations | Toa Baja | $1,310,000.00 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |

E-202

AAFAF_CONF_0001170

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30007031000100212 | Municipal General Obligations | Toa Baja | $3,112,085.13 | 7/1/2032 | FIXED | 2.59 | n.a |
| 30007031000100219 | Municipal General Obligations | Toa Baja | $3,585,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100220 | Municipal General Obligations | Toa Baja | $25,195,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100217 | Municipal General Obligations | Toa Baja | $28,031,616.80 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100211 | Municipal General Obligations | Trujillo Alto | $392,480.08 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100212 | Municipal General Obligations | Trujillo Alto | $1,954,374.13 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100201 | Municipal General Obligations | Trujillo Alto | $1,950,804.98 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007131000100207 | Municipal General Obligations | Trujillo Alto | $4,169,634.89 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100208 | Municipal General Obligations | Trujillo Alto | $5,337,454.76 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100210 | Municipal General Obligations | Trujillo Alto | $5,370,525.49 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007231000100203 | Municipal General Obligations | Utuado | $84,284.40 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30007331000100228 | Municipal General Obligations | Vega Alta | $247,897.78 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30007331000100225 | Municipal General Obligations | Vega Alta | $2,094,999.99 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100210 | Municipal General Obligations | Vega Baja | $374,914.51 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100209 | Municipal General Obligations | Vega Baja | $1,027,586.35 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007431000100223 | Municipal General Obligations | Vega Baja | $1,014,708.08 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100211 | Municipal General Obligations | Vega Baja | $1,100,952.30 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100216 | Municipal General Obligations | Vega Baja | $1,118,009.09 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100220 | Municipal General Obligations | Vega Baja | $1,357,799.36 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100219 | Municipal General Obligations | Vega Baja | $1,736,076.76 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100217 | Municipal General Obligations | Vega Baja | $1,945,966.38 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100204 | Municipal General Obligations | Vega Baja | $2,310,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30007431000100215 | Municipal General Obligations | Vega Baja | $2,365,777.05 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30007531000100210 | Municipal General Obligations | Vieques | $309,946.06 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30007531000100201 | Municipal General Obligations | Vieques | $636,253.51 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30007531000100208 | Municipal General Obligations | Vieques | $765,113.48 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007531000100209 | Municipal General Obligations | Vieques | $1,073,838.86 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007631000100206 | Municipal General Obligations | Villalba | $169,269.72 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100212 | Municipal General Obligations | Villalba | $387,032.55 | 7/1/2023 | VARIABLE | P+1.5 | 7.00 |
| 30007731000100207 | Municipal General Obligations | Yabucoa | $792,229.31 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100211 | Municipal General Obligations | Yabucoa | $1,276,629.64 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100212 | Municipal General Obligations | Yabucoa | $1,675,742.66 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100202 | Municipal General Obligations | Yabucoa | $1,730,000.00 | 7/1/2027 | VARIABLE | N+1 | 2.34 |
| 30007731000100213 | Municipal General Obligations | Yabucoa | $1,735,633.35 | 7/1/2030 | VARIABLE | P+1.5 | 7.00 |
| 30007831000100205 | Municipal General Obligations | Yauco | $33,569.68 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100227 | Municipal General Obligations | Yauco | $125,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100215 | Municipal General Obligations | Yauco | $185,000.00 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100223 | Municipal General Obligations | Yauco | $200,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100212 | Municipal General Obligations | Yauco | $245,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100224 | Municipal General Obligations | Yauco | $271,495.50 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100226 | Municipal General Obligations | Yauco | $425,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100228 | Municipal General Obligations | Yauco | $445,854.73 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100211 | Municipal General Obligations | Yauco | $370,210.92 | 7/1/2021 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100222 | Municipal General Obligations | Yauco | $474,095.03 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100219 | Municipal General Obligations | Yauco | $560,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |

E-203

AAFAF_CONF_0001171

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30007831000100225 | Municipal General Obligations | Yauco | $790,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100216 | Municipal General Obligations | Yauco | $1,560,036.71 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100217 | Municipal General Obligations | Yauco | $2,450,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100220 | Municipal General Obligations | Yauco | $2,708,848.73 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100221 | Municipal General Obligations | Yauco | $5,573,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30000131000100701 | Sales Tax Obligations | Adjuntas | $2,293,835.50 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000131000100702 | Sales Tax Obligations | Adjuntas | $3,137,899.04 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100701 | Sales Tax Obligations | Aguadilla | $222,368.46 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100702 | Sales Tax Obligations | Aguadilla | $4,980,167.99 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000431000100701 | Sales Tax Obligations | Aguas Buenas | $2,923,136.55 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000531000100701 | Sales Tax Obligations | Aibonito | $1,683,090.33 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30000531000100703 | Sales Tax Obligations | Aibonito | $1,974,133.50 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000631000100703 | Sales Tax Obligations | Anasco | $377,079.80 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000631000100704 | Sales Tax Obligations | Anasco | $752,017.58 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100701 | Sales Tax Obligations | Arecibo | $1,446,925.26 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100703 | Sales Tax Obligations | Arecibo | $1,461,345.24 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100702 | Sales Tax Obligations | Arecibo | $1,776,830.01 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100705 | Sales Tax Obligations | Arecibo | $1,798,820.59 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100702 | Sales Tax Obligations | Arroyo | $896,703.06 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100701 | Sales Tax Obligations | Arroyo | $3,288,124.19 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100707 | Sales Tax Obligations | Barceloneta | $126,385.91 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100703 | Sales Tax Obligations | Barceloneta | $900,480.40 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100702 | Sales Tax Obligations | Barceloneta | $934,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100701 | Sales Tax Obligations | Barceloneta | $2,754,358.77 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30001031000100701 | Sales Tax Obligations | Barranquitas | $1,341,653.56 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30001131000100701 | Sales Tax Obligations | Bayamon | $2,598,347.13 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30001131000100705 | Sales Tax Obligations | Bayamon | $8,163,012.44 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30001131000100703 | Sales Tax Obligations | Bayamon | $12,046,637.35 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30001231000100702 | Sales Tax Obligations | Cabo Rojo | $1,631,970.27 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30001231000100701 | Sales Tax Obligations | Cabo Rojo | $3,574,300.91 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100703 | Sales Tax Obligations | Caguas | $5,904.77 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30001331000100706 | Sales Tax Obligations | Caguas | $286,689.83 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100704 | Sales Tax Obligations | Caguas | $3,834,081.23 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100707 | Sales Tax Obligations | Caguas | $5,176,359.30 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100702 | Sales Tax Obligations | Caguas | $6,518,521.00 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30001431000100703 | Sales Tax Obligations | Camuy | $597,682.15 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30001431000100701 | Sales Tax Obligations | Camuy | $2,449,347.85 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30001731000100702 | Sales Tax Obligations | Catano | $1,966,170.01 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100701 | Sales Tax Obligations | Cayey | $2,155,024.20 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30001931000100702 | Sales Tax Obligations | Ceiba | $39,924.58 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30001931000100703 | Sales Tax Obligations | Ceiba | $1,502,854.03 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100705 | Sales Tax Obligations | Ciales | $143,399.92 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100702 | Sales Tax Obligations | Ciales | $457,158.27 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30002031000100704 | Sales Tax Obligations | Ciales | $3,010,000.00 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002131000100702 | Sales Tax Obligations | Cidra | $721,489.69 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |

E-204

AAFAF_CONF_0001172

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30002131000100701 | Sales Tax Obligations | Cidra | $2,070,168.64 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100705 | Sales Tax Obligations | Coamo | $29,005.75 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100701 | Sales Tax Obligations | Coamo | $138,209.34 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100706 | Sales Tax Obligations | Coamo | $218,143.81 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100704 | Sales Tax Obligations | Coamo | $579,021.97 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100703 | Sales Tax Obligations | Coamo | $602,019.24 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100702 | Sales Tax Obligations | Coamo | $1,018,351.59 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100708 | Sales Tax Obligations | Coamo | $1,363,781.98 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30002331000100701 | Sales Tax Obligations | Comerio | $2,128,745.39 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30002431000100702 | Sales Tax Obligations | Corozal | $396,870.34 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100701 | Sales Tax Obligations | Corozal | $1,578,546.30 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100703 | Sales Tax Obligations | Corozal | $1,667,595.30 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002531000100701 | Sales Tax Obligations | Culebra | $419,857.02 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100703 | Sales Tax Obligations | Dorado | $306,029.42 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100701 | Sales Tax Obligations | Dorado | $2,643,461.01 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002831000100702 | Sales Tax Obligations | Florida | $2,654,665.86 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002931000100702 | Sales Tax Obligations | Guanica | $610,326.75 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002931000100701 | Sales Tax Obligations | Guanica | $944,965.67 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002931000100705 | Sales Tax Obligations | Guanica | $927,556.75 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100704 | Sales Tax Obligations | Guayanilla | $371,573.61 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100703 | Sales Tax Obligations | Guayanilla | $2,165,608.54 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100702 | Sales Tax Obligations | Guayanilla | $2,241,237.78 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30003231000100701 | Sales Tax Obligations | Guaynabo | $21,547,494.24 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100704 | Sales Tax Obligations | Gurabo | $12,739.23 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30003531000100703 | Sales Tax Obligations | Hormigueros | $344,094.46 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30003531000100705 | Sales Tax Obligations | Hormigueros | $770,894.92 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30003731000100701 | Sales Tax Obligations | Isabela | $1,507,651.34 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30003831000100704 | Sales Tax Obligations | Jayuya | $845,793.64 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003831000100702 | Sales Tax Obligations | Jayuya | $2,057,613.54 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003831000100701 | Sales Tax Obligations | Jayuya | $2,613,349.45 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100706 | Sales Tax Obligations | Juana Diaz | $379,481.96 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100703 | Sales Tax Obligations | Juana Diaz | $701,895.63 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100704 | Sales Tax Obligations | Juana Diaz | $749,740.22 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100701 | Sales Tax Obligations | Juana Diaz | $2,972,833.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30004031000100707 | Sales Tax Obligations | Juncos | $180,469.56 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100702 | Sales Tax Obligations | Juncos | $238,312.38 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100701 | Sales Tax Obligations | Juncos | $512,404.53 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100703 | Sales Tax Obligations | Juncos | $664,225.35 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100705 | Sales Tax Obligations | Juncos | $1,097,462.31 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30004131000100704 | Sales Tax Obligations | Lajas | $1,287,195.58 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004131000100702 | Sales Tax Obligations | Lajas | $1,704,951.72 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100703 | Sales Tax Obligations | Las Marias | $392,455.18 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100706 | Sales Tax Obligations | Las Marias | $430,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30004331000100704 | Sales Tax Obligations | Las Marias | $660,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100701 | Sales Tax Obligations | Las Marias | $2,040,999.61 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |

E-205

AAFAF_CONF_0001173

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[2] | Maturity Date[3] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30004431000100704 | Sales Tax Obligations | Las Piedras | $722,698.23 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30004431000100703 | Sales Tax Obligations | Las Piedras | $1,430,241.45 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30004431000100702 | Sales Tax Obligations | Las Piedras | $1,418,041.67 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30004631000100702 | Sales Tax Obligations | Loiza | $315,980.27 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30004631000100701 | Sales Tax Obligations | Luquillo | $1,186,758.14 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100702 | Sales Tax Obligations | Manati | $378,738.94 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100703 | Sales Tax Obligations | Manati | $1,479,104.90 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100701 | Sales Tax Obligations | Manati | $4,628,282.23 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004831000100704 | Sales Tax Obligations | Maricao | $240,175.82 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30004831000100701 | Sales Tax Obligations | Maricao | $1,472,671.08 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30004831000100706 | Sales Tax Obligations | Maricao | $3,150,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100706 | Sales Tax Obligations | Maunabo | $135,016.63 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100705 | Sales Tax Obligations | Maunabo | $225,554.06 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100704 | Sales Tax Obligations | Maunabo | $474,948.49 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100702 | Sales Tax Obligations | Maunabo | $1,754,317.24 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100701 | Sales Tax Obligations | Maunabo | $3,808,987.11 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005131000100704 | Sales Tax Obligations | Moca | $379,194.68 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100702 | Sales Tax Obligations | Moca | $1,404,297.07 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100703 | Sales Tax Obligations | Moca | $1,993,793.15 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30005231000100701 | Sales Tax Obligations | Morovis | $397,410.01 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100702 | Sales Tax Obligations | Morovis | $2,115,671.89 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100703 | Sales Tax Obligations | Morovis | $3,299,472.83 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005331000100703 | Sales Tax Obligations | Naguabo | $1,525,293.89 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100706 | Sales Tax Obligations | Naranjito | $1,146,028.08 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100705 | Sales Tax Obligations | Naranjito | $1,264,745.76 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100702 | Sales Tax Obligations | Naranjito | $1,968,346.53 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005531000100705 | Sales Tax Obligations | Orocovis | $14,545.72 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100704 | Sales Tax Obligations | Orocovis | $140,000.00 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100702 | Sales Tax Obligations | Orocovis | $1,465,000.00 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30005631000100703 | Sales Tax Obligations | Patillas | $161,481.72 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30005631000100701 | Sales Tax Obligations | Patillas | $2,022,286.52 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100702 | Sales Tax Obligations | Patillas | $2,900,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100702 | Sales Tax Obligations | Penuelas | $1,209,915.41 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100701 | Sales Tax Obligations | Penuelas | $1,566,163.41 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100703 | Sales Tax Obligations | Penuelas | $1,778,532.04 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100701 | Sales Tax Obligations | Ponce | $11,490,615.51 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100701 | Sales Tax Obligations | Quebradillas | $1,403,857.13 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100702 | Sales Tax Obligations | Rio Grande | $520,286.05 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100701 | Sales Tax Obligations | Rio Grande | $3,080,000.00 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30006231000100702 | Sales Tax Obligations | Sabana Grande | $38,652.48 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100705 | Sales Tax Obligations | Salinas | $267,061.48 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100704 | Sales Tax Obligations | Salinas | $784,805.17 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100702 | Sales Tax Obligations | Salinas | $3,184,740.94 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100701 | Sales Tax Obligations | San German | $668,064.28 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006531000100703 | Sales Tax Obligations | San Juan | $8,813,001.71 | 7/1/2021 | VARIABLE | P+1.5 | 6.00 |

E-206

AAFAF_CONF_0001174

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30006531000100702 | Sales Tax Obligations | San Juan | $26,017,372.33 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30006631000100701 | Sales Tax Obligations | San Lorenzo | $667,638.25 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30006631000100708 | Sales Tax Obligations | San Lorenzo | $1,045,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100705 | Sales Tax Obligations | San Lorenzo | $2,400,153.14 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100702 | Sales Tax Obligations | San Sebastian | $970,464.59 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100703 | Sales Tax Obligations | San Sebastian | $1,910,588.48 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100701 | Sales Tax Obligations | San Sebastian | $2,690,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100702 | Sales Tax Obligations | Santa Isabel | $1,793,078.48 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100701 | Sales Tax Obligations | Santa Isabel | $3,572,384.90 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006931000100703 | Sales Tax Obligations | Toa Alta | $808,064.14 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100701 | Sales Tax Obligations | Toa Baja | $2,837,598.69 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100703 | Sales Tax Obligations | Trujillo Alto | $500,322.35 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100701 | Sales Tax Obligations | Trujillo Alto | $2,902,315.65 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007231000100701 | Sales Tax Obligations | Utuado | $1,716,616.64 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30007331000100701 | Sales Tax Obligations | Vega Alta | $135,743.55 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100704 | Sales Tax Obligations | Vega Baja | $110,333.51 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100703 | Sales Tax Obligations | Vega Baja | $1,155,437.21 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100701 | Sales Tax Obligations | Vega Baja | $3,303,954.26 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30006531000100702 | Sales Tax Obligations | Vieques | $2,403,656.70 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100707 | Sales Tax Obligations | Villalba | $36,480.81 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30007631000100704 | Sales Tax Obligations | Villalba | $348,704.78 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100709 | Sales Tax Obligations | Villalba | $310,000.00 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30007631000100703 | Sales Tax Obligations | Villalba | $484,095.02 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100702 | Sales Tax Obligations | Villalba | $502,909.98 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100701 | Sales Tax Obligations | Villalba | $1,175,467.60 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100702 | Sales Tax Obligations | Yabucoa | $27,177.44 | 7/1/2023 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100703 | Sales Tax Obligations | Yabucoa | $2,266,378.91 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100701 | Sales Tax Obligations | Yabucoa | $2,250,569.49 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100706 | Sales Tax Obligations | Yauco | $1,926,075.55 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100704 | Sales Tax Obligations | Yauco | $2,844,935.85 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100705 | Sales Tax Obligations | Yauco | $3,941,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000331500100208 | Municipal Lines of Credit | Aguadilla | $16,092,092.94 | 12/13/2024 | VARIABLE | P+1 | 6.25 |
| 30000731500100201 | Municipal Lines of Credit | Arecibo | $2,529,739.18 | 4/24/2010 | VARIABLE | N+1.25 | 2.59 |
| 30001831500100200 | Municipal Lines of Credit | Cayey | $4,214,440.74 | 7/6/2015 | FIXED | 4.63 | n.a |
| 30002231500100201 | Municipal Lines of Credit | Coamo | $113,709.47 | 2/15/2014 | VARIABLE | P+1.5 | 6.00 |
| 30002931500100301 | Municipal Lines of Credit | Guanica | $343,494.50 | 6/30/2024 | FIXED | 0 | n.a |
| 30002931500100302 | Municipal Lines of Credit | Guanica | $3,658.05 | 6/30/2024 | FIXED | 0 | n.a |
| 30003831500100201 | Municipal Lines of Credit | Jayuya | $998,100.15 | 10/30/2014 | FIXED | 5.5 | n.a |
| 30004031500100202 | Municipal Lines of Credit | Juncos | $8,870,921.14 | 12/31/2017 | FIXED | 6.62 | n.a |
| 30004331500100202 | Municipal Lines of Credit | Las Marias | $92,992.10 | 6/30/2015 | FIXED | 6 | n.a |
| 30006731500100201 | Municipal Lines of Credit | San Sebastian | $2,214,405.56 | 6/30/2007 | VARIABLE | N+1.25 | 5.00 |
| 30000131000100207 | Operational Loans | Adjuntas | $6,463,266.59 | 7/1/2036 | FIXED | 5.3 | n.a |
| 30000331000100201 | Operational Loans | Aguadilla | $1,923,295.95 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30000631000100202 | Operational Loans | Anasco | $168,132.52 | 7/1/2021 | VARIABLE | N+1 | 2.34 |

E-207

AAFAF_CONF_0001175

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30000631000100201 | Operational Loans | Anasco | $1,479,735.22 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100202 | Operational Loans | Arecibo | $2,428,497.30 | 7/1/2028 | FIXED | 6 | n.a |
| 30000731000100201 | Operational Loans | Arecibo | $5,680,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30000931000100219 | Operational Loans | Barceloneta | $13,471.91 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100227 | Operational Loans | Barceloneta | $5,890,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100205 | Operational Loans | Caguas | $2,564,329.95 | 7/1/2023 | VARIABLE | N+1.25 | 2.59 |
| 30001331000100208 | Operational Loans | Caguas | $5,383,999.89 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30001431000100201 | Operational Loans | Camuy | $1,663,388.69 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30002031000100201 | Operational Loans | Ciales | $13,145.15 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30002131000100204 | Operational Loans | Cidra | $890,564.52 | 7/1/2023 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100201 | Operational Loans | Coamo | $4,666,619.99 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100204 | Operational Loans | Corozal | $318,787.33 | 7/1/2032 | FIXED | 4.88 | n.a |
| 30002931000100205 | Operational Loans | Guanica | $629,966.53 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30003131000100207 | Operational Loans | Guayanilla | $464,063.79 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100201 | Operational Loans | Gurabo | $1,471,751.22 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30003831000100209 | Operational Loans | Jayuya | $252,835.39 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30003831000100210 | Operational Loans | Jayuya | $284,751.66 | 7/1/2023 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100211 | Operational Loans | Juana Diaz | $346,142.38 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100208 | Operational Loans | Juncos | $1,509,285.82 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100208 | Operational Loans | Las Marias | $12,991.42 | 7/1/2019 | VARIABLE | N+1 | 2.34 |
| 30004331000100203 | Operational Loans | Las Marias | $350,000.00 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100201 | Operational Loans | Las Marias | $455,000.00 | 7/1/2028 | FIXED | 6 | n.a |
| 30004531000100205 | Operational Loans | Loiza | $254,719.77 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100203 | Operational Loans | Manati | $992,932.89 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30004831000100202 | Operational Loans | Maricao | $416,953.73 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30004931000100207 | Operational Loans | Maunabo | $2,138,676.45 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100203 | Operational Loans | Moca | $161,308.13 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100201 | Operational Loans | Morovis | $86,745.38 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100211 | Operational Loans | Morovis | $442,820.75 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30005231000100207 | Operational Loans | Morovis | $1,255,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100208 | Operational Loans | Morovis | $1,360,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005431000100203 | Operational Loans | Naranjito | $34,708.38 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100205 | Operational Loans | Naranjito | $842,810.69 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100206 | Operational Loans | Orocovis | $40,409.58 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100207 | Operational Loans | Penuelas | $480,515.08 | 7/1/2024 | VARIABLE | N+1 | 2.34 |
| 30005731000100201 | Operational Loans | Penuelas | $1,065,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30005731000100205 | Operational Loans | Penuelas | $2,451,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100207 | Operational Loans | Quebradillas | $300,120.64 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100205 | Operational Loans | Quebradillas | $1,085,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30006231000100203 | Operational Loans | Sabana Grande | $83,316.04 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30006231000100201 | Operational Loans | Sabana Grande | $355,670.33 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30006231000100204 | Operational Loans | Sabana Grande | $860,000.00 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30006331000100201 | Operational Loans | Salinas | $201,881.19 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30006331000100202 | Operational Loans | Salinas | $464,966.49 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30006431000100210 | Operational Loans | San German | $9,757,788.25 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |

E-208

AAFAF_CONF_0001176

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30006631000100202 | Operational Loans | San Lorenzo | $206,180.10 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100202 | Operational Loans | Santa Isabel | $195,693.82 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100203 | Operational Loans | Santa Isabel | $1,009,622.11 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007331000100218 | Operational Loans | Vega Alta | $188,183.24 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30007531000100204 | Operational Loans | Vieques | $182,744.47 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007531000100203 | Operational Loans | Vieques | $450,700.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30007531000100202 | Operational Loans | Vieques | $1,390,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100209 | Operational Loans | Villalba | $1,583,961.27 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100208 | Operational Loans | Yabucoa | $148,765.67 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100201 | Operational Loans | Yabucoa | $325,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30007831000100206 | Operational Loans | Yauco | $35,540.73 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100214 | Operational Loans | Yauco | $370,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100203 | Operational Loans | Yauco | $569,555.87 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100202 | Revenue Loans | Aguadilla | $5,843,328.29 | 7/1/2028 | VARIABLE | N+1.25 | 5.00 |
| 30000331000100220 | Revenue Loans | Aguadilla | $8,005,298.46 | 7/1/2037 | VARIABLE | P+1.5 | 7.00 |
| 30000931000100220 | Revenue Loans | Barceloneta | $1,300,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100204 | Revenue Loans | Barceloneta | $3,150,000.00 | 7/1/2028 | VARIABLE | N+1.25 | 5.00 |
| 30001131000100216 | Revenue Loans | Bayamon | $7,200,000.00 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100221 | Revenue Loans | Manati | $5,885,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100213 | Revenue Loans | Manati | $6,991,584.21 | 7/1/2033 | FIXED | 6 | n.a |
| 30005231000100216 | Revenue Loans | Morovis | $1,318,207.00 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100205 | Revenue Loans | San German | $47,800.00 | 1/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100204 | Revenue Loans | San German | $2,792,483.44 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100206 | Revenue Loans | Santa Isabel | $43,500.00 | 7/1/2019 | FIXED | 6 | n.a |
| 30007131000100205 | Revenue Loans | Trujillo Alto | $3,809,657.17 | 7/1/2033 | FIXED | 7 | n.a |
| 30007331000100212 | Revenue Loans | Vega Alta | $840,000.00 | 7/1/2021 | FIXED | 0 | n.a |
| 30007331000100214 | Revenue Loans | Vega Alta | $263,000.00 | 6/1/2019 | FIXED | 7.63 | n.a |
| 30007331000100215 | Revenue Loans | Vega Alta | $283,000.00 | 6/1/2020 | FIXED | 7.75 | n.a |
| 30007331000100216 | Revenue Loans | Vega Alta | $50,000.00 | 8/1/2020 | FIXED | 7.75 | n.a |
| 30007631000100211 | Revenue Loans | Villalba | $362,974.69 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100213 | Revenue Loans | Villalba | $1,506,541.83 | 7/1/2040 | FIXED | 7 | n.a |

E-209

| Loan ID | Entity/Category | Outstanding Principal Amount[4] | Maturity Date[5] | Interest Rate Type | Interest Rate[6] | Floor Rate (%) |
|---|---|---|---|---|---|---|
| 200079215142 | Puerto Rico Highways and Transportation Authority Loans | $133,812,005.07 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215143 | Puerto Rico Highways and Transportation Authority Loans | $121,538,951.31 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215147 | Puerto Rico Highways and Transportation Authority Loans | $397,970,996.83 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215148 | Puerto Rico Highways and Transportation Authority Loans | $110,436,951.62 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215149 | Puerto Rico Highways and Transportation Authority Loans | $16,338,850.34 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151410 | Puerto Rico Highways and Transportation Authority Loans | $37,707,751.95 | 1/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 200079215411 | Puerto Rico Highways and Transportation Authority Loans | $2,673,220.95 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151412 | Puerto Rico Highways and Transportation Authority Loans | $61,712,626.03 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151413 | Puerto Rico Highways and Transportation Authority Loans | $114,855,315.10 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151414 | Puerto Rico Highways and Transportation Authority Loans | $196,841,591.22 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151415 | Puerto Rico Highways and Transportation Authority Loans | $40,334,226.08 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151416 | Puerto Rico Highways and Transportation Authority Loans | $86,732,402.55 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151417 | Puerto Rico Highways and Transportation Authority Loans | $4,747,401.62 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151418 | Puerto Rico Highways and Transportation Authority Loans | $16,170,048.12 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151419 | Puerto Rico Highways and Transportation Authority Loans | $26,518,876.00 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151420 | Puerto Rico Highways and Transportation Authority Loans | $21,680,708.74 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151422 | Puerto Rico Highways and Transportation Authority Loans | $166,200,871.57 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151423 | Puerto Rico Highways and Transportation Authority Loans | $4,533,490.73 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151424 | Puerto Rico Highways and Transportation Authority Loans | $49,074,798.55 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151426 | Puerto Rico Highways and Transportation Authority Loans | $9,819,542.36 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151427 | Puerto Rico Highways and Transportation Authority Loans | $32,447,432.79 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151428 | Puerto Rico Highways and Transportation Authority Loans | $58,748,983.31 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151429 | Puerto Rico Highways and Transportation Authority Loans | $14,006,262.04 | 6/30/2015 | VARIABLE | P+1.5 | 6.00 |
| HTA Bonds | Puerto Rico Highways and Transportation Authority Bonds | $200,000,000.00 | 7/1/2028 | FIXED | 12 | n.a |
| 200055210141 | Ports Authority Reimbursement Obligations | $69,405,014.78 | 12/1/2018 | VARIABLE | P+1.5 | 6.00 |
| 200055210142 | Ports Authority Reimbursement Obligations | $90,058,013.81 | 2/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 200055210143 | Ports Authority Reimbursement Obligations | $36,847,624.60 | 3/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 200055215134 | 2008 Ports Authority Loan | $40,941,805.11 | 6/30/2023 | VARIABLE | P+1.5 | 6.00 |
| 2000552151412 | 2014 Ports Authority Loan | $29,322,720.42 | 12/5/2044 | VARIABLE | P+1.5 | 7.00 |
| 200561215141 | PAA (Loan) | $1,700,000.00 | 10/31/2014 | FIXED | 8 | N/A |
| Port of America Bonds | Commonwealth Guaranteed Loan Asset | $225,533,700.45 | 1/1/2045 | FIXED | 9.52 | N/A |
| Treasury GO2151347 | Commonwealth Loan Assets | $21,095,309.51 | 6/30/2041 | VARIABLE | P+1.5 | 6.00 |
| Treasury GO2151348 | Commonwealth Loan Assets | $63,135,000.00 | 6/30/2042 | VARIABLE | P+1.5 | 6.00 |
| Treasury GO2151353 | Commonwealth Loan Assets | $50,419,093.00 | 6/30/2043 | VARIABLE | P+1.5 | 6.00 |
| Treasury GO2151356 | Commonwealth Loan Assets | $34,788,635.25 | 6/30/2043 | VARIABLE | P+1.5 | 6.00 |
| 200057215141 | 1996 CCDA Loans | $81,401,212.08 | 6/30/2027 | FIXED | 7 | N/A |
| 200057215142 | 1996 CCDA Loans | $57,022,447.09 | 6/30/2027 | FIXED | 7 | N/A |
| 200057215144 | 2013 CCDA Loans | $4,414,379.81 | 9/30/2014 | FIXED | 6 | N/A |
| 200082215142 | 2006 PBA Loan | $49,995,336.92 | 6/30/2018 | FIXED | 7 | N/A |
| 200082215144 | Other PBA Loans | $12,110,751.59 | 6/30/2044 | VARIABLE | P+1.5 | 6.00 |
| 200082215145 | Other PBA Loans | $39,204,590.16 | 6/30/2044 | VARIABLE | P+1.5 | 6.00 |

[4] As of the Cutoff Date, after giving effect to the Closing Date Adjustments and adjusted for payments received on July 2, 2018 (by virtue of rollover to the next business day).

[5] Maturity date sourced from original contractual maturity, not adjusted for Closing Date Adjustments.

[6] "N" means LIBOR and "P" means the Prime Rate.

AAFAF_CONF_0001178

| Loan ID | Entity/Category | Outstanding Principal Amount[4] | Maturity Date[5] | Interest Rate Type | Interest Rate[6] | Floor Rate (%) |
|---|---|---|---|---|---|---|
| 2000822151410 | Other PBA Loans | $39,408,148.90 | 6/30/2044 | VARIABLE | P+1.5 | 6.00 |
| 200011210141 | Puerto Rico Aqueduct and Sewer Authority | $53,607,940.17 | 3/31/2019 | VARIABLE | P+1.5 | 6.00 |
| 200108210141 | Puerto Rico Industrial Development Company | $24,668,614.07 | 11/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 200108215141 | Puerto Rico Industrial Development Company | $7,130,989.31 | 6/30/2040 | FIXED | 7 | N/A |
| 200108215142 | Puerto Rico Industrial Development Company | $8,208,135.24 | 6/30/2040 | FIXED | 7 | N/A |
| 200108215143 | Puerto Rico Industrial Development Company | $13,108,811.09 | 6/30/2040 | FIXED | 7 | N/A |
| 200080215141 | Puerto Rico Solid Waste Management Authority | $4,955,409.20 | 6/30/2040 | FIXED | 7 | N/A |
| 200080215142 | Puerto Rico Solid Waste Management Authority | $14,341,884.49 | 6/30/2018 | FIXED | 7 | N/A |
| 200080215143 | Puerto Rico Solid Waste Management Authority | $5,208,369.98 | 6/30/2018 | FIXED | 7 | N/A |
| 200080215144 | Puerto Rico Solid Waste Management Authority | $25,786,980.93 | 6/30/2040 | FIXED | 7 | N/A |
| 200566215141 | Port Authority of Ponce | $20,762,619.12 | 6/30/2044 | FIXED | 1/7/1900 | N/A |
| AFV Rev | Repurchase Agreement | $19,611,048.73 | 1/13/2017 | FIXED | 3 | N/A |
| 200271215131 | Fund for the Agricultural Development of Puerto Rico | $15,287,457.81 | 3/1/2027 | VARIABLE | N+1.25 | 5.00 |
| 200556215141 | Interagency Committee | $995,449.28 | 3/14/2013 | VARIABLE | P+2 | 6.50 |
| Private | Other Private Loans | $339,948.37 | N/A | N/A | N/A | N/A |
| Mortgage | Mortgage Loans | $131,917.96 | N/A | N/A | N/A | N/A |

---

[1] "N" means the London Interbank Offered Rate ("LIBOR"). "P" means the U.S. Prime Rate ("Prime").

AAFAF_CONF_0001179

## APPENDIX C: GDB RETAINED LOANS

| Loan ID | Entity | Outstanding Balance[7] | Maturity Date | Interest Rate Type[1] | Interest Rate | Floor Rate (%) |
|---|---|---|---|---|---|---|
| 200003215131 | Puerto Rico Medical Services Administration | $282,447,691.65 | 11/30/2022 | VARIABLE | P+1.5 | 6.00 |
| 200277215141 | Special Communities Perpetual Trust | $240,708,020.23 | 6/30/2040 | FIXED | 7 | N/A |
| 200006215131 | Puerto Rico Health Insurance Administration | $182,196,066.45 | 10/31/2022 | VARIABLE | P+1.5 | 6.00 |
| 200543215141 | Puerto Rico Comprehensive Cancer Center | $31,932,463.76 | 10/31/2021 | FIXED | 6 | N/A |
| 200543215142 | Puerto Rico Comprehensive Cancer Center | $88,549,933.86 | 12/31/2043 | VARIABLE | P+2 | 6.50 |
| 200243215141 | 2002 CRIM Loan | $27,345,225.14 | 7/1/2032 | VARIABLE | N+1.25 | N/A |
| 200243215141P | 2001 CRIM Loan | $74,878,370.07 | 7/1/2032 | VARIABLE | N+1.25 | N/A |
| TDF St. Regis | Puerto Rico Tourism Development Fund | $16,742,815.96 | N/A | N/A | N/A | N/A |
| TDF Rio Mar | Puerto Rico Tourism Development Fund | $17,900,928.01 | N/A | N/A | N/A | N/A |
| TDF Condado Duo | Puerto Rico Tourism Development Fund | $10,282,254.21 | N/A | N/A | N/A | N/A |
| 200061215141 | Economic Development Bank Loan | $6,556,582.87 | 6/1/2026 | FIXED | 6 | N/A |
| 200061Overnight | Economic Development Bank Deposit | $35,122,199.76 | N/A | N/A | N/A | N/A |
| 200002215141 | Cantera Peninsula Integral Development Company | $8,797,013.77 | 6/30/2040 | FIXED | 7 | N/A |
| 200022215142 | Cantera Peninsula Integral Development Company | $28,994,073.76 | 6/30/2040 | FIXED | 7 | N/A |
| 2000592215420 | Puerto Rico Infrastructure Financing Authority (PRIFA) | $37,361,150.22 | 6/30/2017 | VARIABLE | P+1.5 | 6.00 |
| 200549215142 | 2001 CRIM Loan | $26,860,125.74 | 7/1/2032 | FIXED | 5.83 | N/A |
| 200272215133 | SMU Loan | $8,988,973.42 | 6/30/2025 | VARIABLE | P+1.5 | 6.00 |
| 200551215131 | Puerto Rico Public-Private Partnerships Authority | $6,159,176.94 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |

---

[7] As of the Cutoff Date, after giving effect to the Closing Date Adjustments and adjusted for any payments received on July 2, 2018 (by virtue of rollover to the next business day after the Cutoff Date).

AAFAF_CONF_0001180

### APPENDIX D: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS
### ($ IN MILLIONS)

The Municipal Loan Assets comprise five types of Loans issued by GDB to municipalities, characterized by their source of repayment. This Municipal Loans Collection Schedule is prepared based upon the aggregate amortization and interest schedules for the Municipal Loan Assets classified as performing as of the Cutoff Date (excludes the Municipal Lines of Credit, all of which are non-performing as of the Cutoff Date), determined by the terms of the individual loan agreements, including the contractual interest rates applicable to the individual Loans, and assuming compliance with such schedules. A forward interest rate curve is applied to all Loans with variable interest rates. The forward interest curve is based on the annual forward rates for 3-month LIBOR and Prime rates, respectively, based on annual update from Bloomberg shown on the following page.

| Payment Date | Municipal Loans Assets (Principal and Interest) | | | | Scheduled Total Collections |
| --- | --- | --- | --- | --- | --- |
| | Municipal General Obligations | Sales Tax Obligations | Operational Loans | Revenue Loans | |
| Jan-19 | 25.5 | 9.1 | 2.0 | 5.3 | 41.9 |
| Jul-19 | 62.4 | 28.2 | 8.1 | 3.7 | 102.3 |
| Jan-20 | 24.3 | 8.1 | 1.9 | 1.5 | 35.8 |
| Jul-20 | 62.8 | 28.7 | 8.0 | 3.7 | 103.2 |
| Jan-21 | 22.9 | 7.5 | 1.7 | 1.4 | 33.5 |
| Jul-21 | 63.1 | 28.6 | 7.9 | 3.5 | 103.1 |
| Jan-22 | 21.6 | 6.9 | 1.6 | 1.3 | 31.4 |
| Jul-22 | 63.6 | 26.7 | 8.1 | 3.5 | 101.9 |
| Jan-23 | 20.2 | 6.4 | 1.4 | 1.3 | 29.2 |
| Jul-23 | 65.3 | 27.0 | 7.7 | 3.6 | 103.7 |
| Jan-24 | 18.8 | 5.8 | 1.3 | 1.2 | 27.1 |
| Jul-24 | 66.6 | 27.2 | 7.5 | 4.2 | 105.5 |
| Jan-25 | 17.2 | 5.3 | 1.1 | 1.1 | 24.6 |
| Jul-25 | 66.2 | 27.1 | 7.4 | 3.6 | 104.3 |
| Jan-26 | 15.6 | 4.7 | 1.0 | 1.0 | 22.4 |
| Jul-26 | 63.4 | 27.7 | 7.0 | 3.7 | 101.8 |
| Jan-27 | 14.2 | 4.1 | 0.8 | 0.9 | 20.1 |
| Jul-27 | 61.5 | 28.0 | 5.4 | 3.8 | 98.7 |
| Jan-28 | 12.8 | 3.5 | 0.7 | 0.9 | 17.9 |
| Jul-28 | 61.6 | 26.4 | 4.1 | 9.3 | 101.3 |
| Jan-29 | 11.0 | 2.9 | 0.6 | 0.6 | 15.1 |
| Jul-29 | 61.8 | 23.5 | 3.2 | 2.4 | 90.9 |
| Jan-30 | 9.4 | 2.3 | 0.5 | 0.5 | 12.8 |
| Jul-30 | 59.7 | 23.0 | 2.9 | 2.5 | 88.0 |
| Jan-31 | 7.8 | 1.8 | 0.5 | 0.4 | 10.5 |
| Jul-31 | 57.8 | 21.0 | 2.7 | 2.6 | 84.1 |
| Jan-32 | 6.1 | 1.2 | 0.4 | 0.4 | 8.2 |
| Jul-32 | 51.1 | 16.1 | 2.7 | 2.6 | 72.6 |
| Jan-33 | 4.6 | 0.8 | 0.3 | 0.3 | 6.0 |
| Jul-33 | 41.5 | 10.2 | 2.6 | 2.6 | 56.9 |
| Jan-34 | 3.3 | 0.5 | 0.3 | 0.2 | 4.2 |
| Jul-34 | 36.2 | 8.1 | 2.1 | 1.7 | 48.0 |
| Jan-35 | 2.1 | 0.2 | 0.2 | 0.2 | 2.7 |
| Jul-35 | 25.4 | 5.2 | 2.2 | 1.6 | 34.4 |
| Jan-36 | 1.3 | 0.1 | 0.1 | 0.1 | 1.6 |
| Jul-36 | 19.5 | 1.1 | 1.8 | 1.6 | 24.0 |
| Jan-37 | 0.6 | 0.0 | 0.1 | 0.1 | 0.8 |
| Jul-37 | 10.2 | 0.4 | 1.6 | 1.0 | 13.2 |
| Jan-38 | 0.3 | 0.0 | 0.0 | 0.0 | 0.3 |
| Jul-38 | 8.0 | 0.1 | 0.9 | 0.6 | 9.6 |
| Jan-39 | 0.0 | – | – | 0.0 | 0.0 |
| Jul-39 | 0.3 | – | – | 0.1 | 0.4 |
| Jan-40 | – | – | – | 0.0 | 0.0 |
| Jul-40 | – | – | – | 0.1 | 0.1 |
| Total | $1,247.3 | $455.6 | $110.5 | $80.7 | $1,894.1 |

AAFAF_CONF_0001181

| Forward Interest Curve | | |
|---|---|---|
| Date | Prime | 3 Month Libor |
| | Basis Adj Fwd (%) | Forward Rate (%) |
| 6/19/2018 | 5.03 | 2.33 |
| 6/19/2019 | 5.68 | 2.92 |
| 6/21/2021 | 5.61 | 2.94 |
| 6/20/2022 | 5.62 | 2.92 |
| 6/19/2023 | 5.59 | 2.92 |
| 6/19/2024 | 5.61 | 2.94 |
| 6/19/2025 | 5.56 | 2.98 |
| 6/19/2026 | 5.59 | 3.01 |
| 6/21/2027 | 5.61 | 3.03 |
| 6/19/2028 | 5.69 | 3.11 |
| 6/19/2029 | 5.61 | 3.03 |
| 6/19/2030 | 5.62 | 3.03 |
| 6/19/2031 | 5.62 | 3.03 |
| 6/21/2032 | 5.61 | 3.03 |
| 6/20/2033 | 5.58 | 3.00 |
| 6/19/2034 | 5.57 | 2.99 |
| 6/19/2035 | 5.56 | 2.98 |
| 6/19/2036 | 5.55 | 2.96 |
| 6/19/2037 | 5.53 | 2.95 |
| 6/21/2038 | 5.48 | 2.90 |
| 6/20/2039 | 5.47 | 2.88 |
| 6/19/2040 | 5.45 | 2.86 |
| 6/19/2041 | 5.43 | 2.84 |
| 6/19/2042 | 5.40 | 2.82 |

| Bloomberg Assumptions | | |
|---|---|---|
| | Prime | Libor |
| Screen | IVCS 86 | IVCS 23 |
| Interval | 1 yr | 1 yr |
| Up to | 25 yrs | 25 yrs |

E-214

AAFAF_CONF_0001182

# APPENDIX E: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS, THE ADDITIONAL RECOVERY AUTHORITY LOANS AND PROCEEDS FROM THE SALE OF REAL PROPERTY ASSETS ($ IN MILLIONS)

Collections on the Restructuring Property included in the following Collection Schedule are limited to scheduled payments on the Loans classified as performing as of the Cutoff Date (*i.e.*, performing Municipal Loan Assets and Additional Recovery Authority Loans), projected sales of the Real Property Assets and the distributable Cash Assets received from GDB on the Closing Date. Collections from non-performing Restructuring Property Loans and non-performing GDB Retained Loans have not been included in the Collection Schedule. The scheduled Collections are not guarantees of future performance. While evaluating the Collection Schedule, Bondholders should carefully consider "*Cautionary Statement Concerning Forward-Looking Statements and Hypothetical Scenarios*" in this Offering Memorandum.

| Payment Date | Scheduled Collection from Municipal Loans Assets (Principal and Interest) | Additional Recovery Authority Loans[1] | Proceeds from Sale of Real Property Assets[2] | Cash Assets | Scheduled Total Collections[3] |
|---|---|---|---|---|---|
| Dec-18 | – | – | | $492.7 | $492.7 |
| Jan-19 | 41.9 | 0.4 | 13.4 | – | 55.7 |
| Jul-19 | 102.3 | 4.6 | 20.4 | – | 127.3 |
| Jan-20 | 35.8 | 3.9 | – | – | 39.7 |
| Jul-20 | 103.2 | 6.5 | – | – | 109.7 |
| Jan-21 | 33.5 | 5.7 | – | – | 39.2 |
| Jul-21 | 103.1 | 8.4 | – | – | 111.4 |
| Jan-22 | 31.4 | 5.6 | – | – | 37.0 |
| Jul-22 | 101.9 | 8.4 | – | – | 110.3 |
| Jan-23 | 29.2 | 5.6 | – | – | 34.8 |
| Jul-23 | 103.7 | 8.4 | – | – | 112.0 |
| Jan-24 | 27.1 | 4.5 | – | – | 31.6 |
| Jul-24 | 105.5 | 7.3 | – | – | 112.8 |
| Jan-25 | 24.6 | 4.4 | – | – | 29.1 |
| Jul-25 | 104.3 | 7.3 | – | – | 111.6 |
| Jan-26 | 22.4 | 4.4 | – | – | 26.7 |
| Jul-26 | 101.8 | 7.3 | – | – | 109.1 |
| Jan-27 | 20.1 | 4.3 | – | – | 24.4 |
| Jul-27 | 98.7 | 6.3 | – | – | 105.0 |
| Jan-28 | 17.9 | 4.3 | – | – | 22.2 |
| Jul-28 | 101.3 | 6.2 | – | – | 107.6 |
| Jan-29 | 15.1 | 4.3 | – | – | 19.4 |
| Jul-29 | 90.9 | 6.2 | – | – | 97.1 |
| Jan-30 | 12.8 | 4.2 | – | – | 17.0 |
| Jul-30 | 88.0 | 6.2 | – | – | 94.2 |
| Jan-31 | 10.5 | 4.2 | – | – | 14.7 |
| Jul-31 | 84.1 | 6.2 | – | – | 90.3 |
| Jan-32 | 8.2 | 4.2 | – | – | 12.3 |
| Jul-32 | 72.6 | 8.1 | – | – | 80.7 |
| Jan-33 | 6.0 | 11.5 | – | – | 17.5 |
| Jul-33 | 56.9 | – | – | – | 56.9 |
| Jan-34 | 4.2 | – | – | – | 4.2 |
| Jul-34 | 48.0 | – | – | – | 48.0 |
| Jan-35 | 2.7 | – | – | – | 2.7 |
| Jul-35 | 34.4 | – | – | – | 34.4 |
| Jan-36 | 1.6 | – | – | – | 1.6 |
| Jul-36 | 24.0 | – | – | – | 24.0 |
| Jan-37 | 0.8 | – | – | – | 0.8 |
| Jul-37 | 13.2 | – | – | – | 13.2 |
| Jan-38 | 0.3 | – | – | – | 0.3 |
| Jul-38 | 9.6 | – | – | – | 9.6 |
| Jan-39 | 0.0 | – | – | – | 0.0 |
| Jul-39 | 0.4 | – | – | – | 0.4 |
| Jan-40 | 0.0 | – | – | – | 0.0 |
| Jul-40 | 0.1 | – | – | – | 0.1 |
| Total | $1,894.1 | $168.7 | $33.8 | $492.7 | $2,589.2 |

[1] Assumes collections on the Additional Recovery Authority Loans in accordance with their contracted amortization schedules, provided that no Collections are assumed with respect to the portion of the 2001 CRIM Loan that had been placed by GDB on non-accrual status as of the Cutoff Date, consisting of approximately $26.9 million, and provided further that the scheduled Collections assume an application of a two year principal moratorium on the 2001 CRIM Loan and the 2002 CRIM Loan.

As with the Municipal Loans Collection Schedule, the scheduled Collections for performing Additional Recovery Authority Loans on this Collection Schedule are prepared based upon the aggregate amortization and interest schedules for such Loans, determined by the individual loan agreements, including the contractual interest rates applicable to the individual Loans, assuming compliance with such schedules, as described in further detail in "The Restructuring Property—Summary Characteristics of the Restructuring Property—GDB Retained Loan Rights."

[2] Scheduled Collections on the Real Property Assets have been included with consideration for the impact of Hurricanes Irma and Maria and have been valued with the assistance of commercial real estate servicers assuming liquidation of the Real Property Assets by June 2020.

[3] Includes interest on cash balance in the Collection Account at a rate of 0.25%. The distribution of cash on the Special First Payment Date does not include any accrued interest.

AAFAF_CONF_0001183

## APPENDIX F: HYPOTHETICAL AMORTIZATION OF THE NEW BONDS

The following examples illustrate how the payments on the New Bonds could be applied for each New Bond until the Final Scheduled Payment Date. The payments provided for in the tables below reflect the Collections on the Municipal Loan Assets, the Additional Recovery Authority Loans, proceeds from the sale of Real Property Assets, and distribution of Cash Assets in accordance with Appendix E hereto. The tables below assume that no amounts will be collected on any of the other Restructuring Property. If Collections are generated in respect of such other Restructuring Property or if the currently performing assets become non-performing, then the tables below could materially change.

The tables below are for illustrative purposes only and are not guarantees of future performance. While evaluating the table below, Bondholders should carefully consider "*Cautionary Statement Concerning Forward-Looking Statements and Hypothetical Scenarios*" in this Offering Memorandum.

**Certain Important Assumptions**

The tables below assume that all Collections on the Municipal Loan Assets, the Additional Recovery Authority Loans and the Real Property Assets will follow the Collection Schedule as detailed in Appendix E hereto. However, if the timing or amount of Collections deviate from such Collection Schedule, or any of the other assumptions described herein change, such deviations or changes could have a material adverse effect on expected payments on the New Bonds.

In addition, the tables below assume:

- *Closing Date:* December 1, 2018.

- *Issuer Expenses*: The Issuer will incur expenses for its Board of Trustees as laid out in the GDB Fiscal Plan, as adjusted for the negotiated compensation arrangements described herein. Fee arrangements are forecasted through 2027, at which time expenses are shown herein as declining linearly to $100,000 on a semi-annual basis by fiscal year 2040.

- *Size of the Closing Date Distribution:* $490.3 million, paid on the Special First Payment Date.

- *2015-17 Excess CAE Settlement Amount:* $21.6 million, paid on or prior to the Closing Date.

- *Interest on Cash Balances:* 0.25%, as described in the GDB Fiscal Plan.

- *Additional Bonds.* The Issuer does not issue any Additional Bonds after the Closing Date.

Numbers in the tables below have been rounded for ease of analysis. These examples do not take into account any tax consequences from holding the New Bonds. All dates included below are subject to the business day convention.

AAFAF_CONF_0001184

*Hypothetical Aggregate Collections and Payments on the New Bonds.* The table below presents the hypothetical aggregate Collections on the Restructuring Property, hypothetical Issuer Expenses withheld in reserve, hypothetical Available Cash for distribution to the Bondholders and the hypothetical amount of cash to be distributed to the Bondholders as a whole on all of the New Bonds, subject to the assumptions described above. Furthermore, the following table assumes that New Bonds are issued in the aggregate principal amount of approximately $2,580.5 million. This scenario reflects that the hypothetical Collections will not be sufficient to pay interest and principal on the New Bonds in full and that, as a result of PIK Amounts, the aggregate outstanding principal amount of the New Bonds on their maturity date would be higher than their initial principal amount.

If any of the assumptions described above were to change, such change could have a material impact on the table below. Numbers below are in millions.

| Payment Date | Hypothetical Collections | Issuer Expense Reserve Withheld | Available Cash | New Bonds | | | |
|---|---|---|---|---|---|---|---|
| | | | | Interest Paid in Cash | Principal Paid in Cash | PIK Accrued Per Period | Total Ending Principal |
| Dec-18 | $492.7 | ($2.4) | $490.3 | – | $490.3 | – | $2,090.2 |
| Feb-19 | 55.7 | (4.7) | 51.1 | $39.2 | 11.9 | – | 2,078.3 |
| Aug-19 | 127.3 | (4.2) | 123.1 | 77.9 | 45.1 | – | 2,033.2 |
| Feb-20 | 39.7 | (3.8) | 35.9 | 35.9 | – | $40.4 | 2,073.6 |
| Aug-20 | 109.7 | (4.2) | 105.5 | 77.8 | 27.8 | – | 2,045.8 |
| Feb-21 | 39.2 | (3.7) | 35.4 | 35.4 | – | 41.3 | 2,087.1 |
| Aug-21 | 111.4 | (4.1) | 107.3 | 78.3 | 29.1 | – | 2,058.0 |
| Feb-22 | 37.0 | (3.7) | 33.3 | 33.3 | – | 43.8 | 2,101.9 |
| Aug-22 | 110.3 | (4.0) | 106.2 | 78.8 | 27.4 | – | 2,074.4 |
| Feb-23 | 34.8 | (3.6) | 31.2 | 31.2 | – | 46.6 | 2,121.0 |
| Aug-23 | 112.0 | (3.9) | 108.1 | 79.5 | 28.5 | – | 2,092.5 |
| Feb-24 | 31.6 | (3.5) | 28.1 | 28.1 | – | 50.4 | 2,142.9 |
| Aug-24 | 112.8 | (3.9) | 108.9 | 80.4 | 28.5 | – | 2,114.3 |
| Feb-25 | 29.1 | (3.4) | 25.7 | 25.7 | – | 53.6 | 2,167.9 |
| Aug-25 | 111.6 | (3.8) | 107.9 | 81.3 | 26.6 | – | 2,141.4 |
| Feb-26 | 26.7 | (3.3) | 23.4 | 23.4 | – | 56.9 | 2,198.2 |
| Aug-26 | 109.1 | (3.7) | 105.4 | 82.4 | 23.0 | – | 2,175.3 |
| Feb-27 | 24.4 | (3.2) | 21.2 | 21.2 | – | 60.4 | 2,235.7 |
| Aug-27 | 105.0 | (3.1) | 101.9 | 83.8 | 18.1 | – | 2,217.6 |
| Feb-28 | 22.2 | (2.9) | 19.3 | 19.3 | – | 63.9 | 2,281.4 |
| Aug-28 | 107.6 | (2.8) | 104.8 | 85.6 | 19.2 | – | 2,262.2 |
| Feb-29 | 19.4 | (2.6) | 16.8 | 16.8 | – | 68.1 | 2,330.3 |
| Aug-29 | 97.1 | (2.5) | 94.7 | 87.4 | 7.3 | – | 2,323.0 |
| Feb-30 | 17.0 | (2.3) | 14.7 | 14.7 | – | 72.4 | 2,395.4 |
| Aug-30 | 94.2 | (2.2) | 92.1 | 89.8 | 2.2 | – | 2,393.2 |
| Feb-31 | 14.7 | (2.0) | 12.7 | 12.7 | – | 77.1 | 2,470.2 |
| Aug-31 | 90.3 | (1.9) | 88.4 | 88.4 | – | 4.2 | 2,474.5 |
| Feb-32 | 12.3 | (1.7) | 10.6 | 10.6 | – | 82.2 | 2,556.6 |
| Aug-32 | 80.7 | (1.6) | 79.2 | 79.2 | – | 16.7 | 2,573.3 |
| Feb-33 | 17.5 | (1.4) | 16.1 | 16.1 | – | 80.4 | 2,653.8 |
| Aug-33 | 56.9 | (1.3) | 55.6 | 55.6 | – | 43.9 | 2,697.6 |
| Feb-34 | 4.2 | (1.1) | 3.1 | 3.1 | – | 98.0 | 2,795.7 |
| Aug-34 | 48.0 | (1.0) | 47.0 | 47.0 | – | 57.8 | 2,853.5 |
| Feb-35 | 2.7 | (0.8) | 1.9 | 1.9 | – | 105.1 | 2,958.6 |
| Aug-35 | 34.4 | (0.7) | 33.7 | 33.7 | – | 77.2 | 3,035.8 |
| Feb-36 | 1.6 | (0.5) | 1.1 | 1.1 | – | 112.8 | 3,148.6 |
| Aug-36 | 24.0 | (0.4) | 23.6 | 23.6 | – | 94.5 | 3,243.1 |
| Feb-37 | 0.8 | (0.4) | 0.4 | 0.4 | – | 121.2 | 3,364.2 |
| Aug-37 | 13.2 | (0.4) | 12.9 | 12.9 | – | 113.3 | 3,477.5 |
| Feb-38 | 0.3 | (0.4) | – | – | – | 130.4 | 3,607.9 |
| Aug-38 | 9.6 | (0.4) | 9.2 | 9.2 | – | 126.1 | 3,734.0 |
| Feb-39 | 0.0 | (0.4) | – | – | – | 140.0 | 3,874.0 |
| Aug-39 | 0.4 | (0.4) | – | – | – | 145.3 | 4,019.3 |
| Feb-40 | 0.0 | (0.4) | – | – | – | 150.7 | 4,170.0 |
| Aug-40 | 0.1 | – | – | – | – | 156.4 | 4,326.4 |
| Total | $2,589.2 | ($102.1) | $2,487.8 | $1,702.8 | $785.0 | $2,530.9 | N/A |

AAFAF_CONF_0001185

*Hypothetical Aggregate Collections and Payments on $1,000 of New Bonds.* The table below presents the hypothetical aggregate Collections on the Restructuring Property, hypothetical Issuer Expenses withheld in reserve, hypothetical Available Cash for distribution to the Bondholders and the hypothetical amount of cash to be received by a Bondholder holding $1,000 in New Bonds as of the Closing Date, subject to the assumptions described above. Furthermore, the following table assumes that New Bonds are issued in the aggregate principal amount of approximately $2,580.5 million. This scenario reflects that a Bondholder holding $1,000 in New Bonds on the Closing Date would receive approximately $661.50 in cash interest and approximately $298.90 in cash principal payments through the Final Scheduled Payment Date, as the hypothetical Collections would not be sufficient to pay interest and principal on the New Bonds in full and that, as a result of PIK Amounts, the aggregate outstanding principal amount of the New Bonds on the Final Scheduled Payment Date would be approximately $1,676.60 (higher than the initial principal amount of $1,000).

If any of the assumptions described above were to change, such change could have a material impact on the table below. Only the numbers below under "Hypothetical Collections," "Issuer Expense Reserve Withheld" and "Available Cash" are in millions.

| Payment Date | Hypothetical Collections | Issuer Expense Reserve Withheld | Available Cash | Per $1,000 in New Bonds | | | |
|---|---|---|---|---|---|---|---|
| | | | | Interest Paid in Cash | Principal Paid in Cash | PIK Accrued Per Period | Total Ending Principal |
| Dec-18 | $492.7 | ($2.4) | $490.3 | – | $190.0 | – | $810.0 |
| Feb-19 | 55.7 | (4.7) | 51.1 | $15.2 | 4.6 | – | 805.4 |
| Aug-19 | 127.3 | (4.2) | 123.1 | 30.2 | 17.5 | – | 787.9 |
| Feb-20 | 39.7 | (3.8) | 35.9 | 13.9 | – | $15.6 | 803.6 |
| Aug-20 | 109.7 | (4.2) | 105.5 | 30.1 | 10.8 | – | 792.8 |
| Feb-21 | 39.2 | (3.7) | 35.4 | 13.7 | – | 16.0 | 808.8 |
| Aug-21 | 111.4 | (4.1) | 107.3 | 30.3 | 11.3 | – | 797.5 |
| Feb-22 | 37.0 | (3.7) | 33.3 | 12.9 | – | 17.0 | 814.5 |
| Aug-22 | 110.3 | (4.0) | 106.2 | 30.5 | 10.6 | – | 803.9 |
| Feb-23 | 34.8 | (3.6) | 31.2 | 12.1 | – | 18.1 | 821.9 |
| Aug-23 | 112.0 | (3.9) | 108.1 | 30.8 | 11.1 | – | 810.9 |
| Feb-24 | 31.6 | (3.5) | 28.1 | 10.9 | – | 19.5 | 830.4 |
| Aug-24 | 112.8 | (3.9) | 108.9 | 31.1 | 11.1 | – | 819.4 |
| Feb-25 | 29.1 | (3.4) | 25.7 | 10.0 | – | 20.8 | 840.1 |
| Aug-25 | 111.6 | (3.8) | 107.9 | 31.5 | 10.3 | – | 829.8 |
| Feb-26 | 26.7 | (3.3) | 23.4 | 9.1 | – | 22.0 | 851.9 |
| Aug-26 | 109.1 | (3.7) | 105.4 | 31.9 | 8.9 | – | 843.0 |
| Feb-27 | 24.4 | (3.2) | 21.2 | 8.2 | – | 23.4 | 866.4 |
| Aug-27 | 105.0 | (3.1) | 101.9 | 32.5 | 7.0 | – | 859.4 |
| Feb-28 | 22.2 | (2.9) | 19.3 | 7.5 | – | 24.8 | 884.1 |
| Aug-28 | 107.6 | (2.8) | 104.8 | 33.2 | 7.5 | – | 876.7 |
| Feb-29 | 19.4 | (2.6) | 16.8 | 6.5 | – | 26.4 | 903.0 |
| Aug-29 | 97.1 | (2.5) | 94.7 | 33.9 | 2.8 | – | 900.2 |
| Feb-30 | 17.0 | (2.3) | 14.7 | 5.7 | – | 28.1 | 928.3 |
| Aug-30 | 94.2 | (2.2) | 92.1 | 34.8 | 0.9 | – | 927.4 |
| Feb-31 | 14.7 | (2.0) | 12.7 | 4.9 | – | 29.9 | 957.3 |
| Aug-31 | 90.3 | (1.9) | 88.4 | 34.3 | – | 1.6 | 958.9 |
| Feb-32 | 12.3 | (1.7) | 10.6 | 4.1 | – | 31.8 | 990.8 |
| Aug-32 | 80.7 | (1.6) | 79.2 | 30.7 | – | 6.5 | 997.2 |
| Feb-33 | 17.5 | (1.4) | 16.1 | 6.2 | – | 31.2 | 1,028.4 |
| Aug-33 | 56.9 | (1.3) | 55.6 | 21.6 | – | 17.0 | 1,045.4 |
| Feb-34 | 4.2 | (1.1) | 3.1 | 1.2 | – | 38.0 | 1,083.4 |
| Aug-34 | 48.0 | (1.0) | 47.0 | 18.2 | – | 22.4 | 1,105.8 |
| Feb-35 | 2.7 | (0.8) | 1.9 | 0.7 | – | 40.7 | 1,146.5 |
| Aug-35 | 34.4 | (0.7) | 33.7 | 13.1 | – | 29.9 | 1,176.5 |
| Feb-36 | 1.6 | (0.5) | 1.1 | 0.4 | – | 43.7 | 1,220.2 |
| Aug-36 | 24.0 | (0.4) | 23.6 | 9.2 | – | 36.6 | 1,256.8 |
| Feb-37 | 0.8 | (0.4) | 0.4 | 0.2 | – | 47.0 | 1,303.7 |
| Aug-37 | 13.2 | (0.4) | 12.9 | 5.0 | – | 43.9 | 1,347.6 |
| Feb-38 | 0.3 | (0.4) | – | – | – | 50.5 | 1,398.2 |
| Aug-38 | 9.6 | (0.4) | 9.2 | 3.6 | – | 48.9 | 1,447.0 |
| Feb-39 | 0.0 | (0.4) | – | – | – | 54.3 | 1,501.3 |
| Aug-39 | 0.4 | (0.4) | – | – | – | 56.3 | 1,557.6 |
| Feb-40 | 0.0 | (0.4) | – | – | – | 58.4 | 1,616.0 |
| Aug-40 | 0.1 | (0.4) | – | – | – | 60.6 | 1,676.6 |
| **Total** | **$2,589.2** | **($102.1)** | **$2,487.8** | **$659.9** | **$304.2** | **$980.8** | **N/A** |

AAFAF_CONF_0001186

*Hypothetical Aggregate Collections and Payments on $1,000 of Participating Bond Claims.* The table below presents the hypothetical aggregate Collections on the Restructuring Property, hypothetical Issuer Expenses withheld in reserve, hypothetical Available Cash for distribution to the Bondholders and the hypothetical amount of cash to be received by any Bondholder who had $1,000 in Participating Bond Claims (calculated to include principal plus unpaid interest accrued up to but not including the Closing Date in respect of the GDB Bonds and the Guaranteed Bonds (each as defined in the Solicitation Statement)), subject to the assumptions described above. A Bondholder who has $1,000 in Participating Bond Claims on the Closing Date would receive $550 in New Bonds. Furthermore, the following table assumes that New Bonds are issued in the aggregate principal amount of approximately $2,580.5 million. This scenario reflects that a Bondholder holding $1,000 in Participating Bond Claims ($550 in New Bonds) on the Closing Date would receive approximately $363.80 in cash interest and $164.40 in cash principal payments through the Final Scheduled Payment Date, as the hypothetical Collections would not be sufficient to pay interest and principal on the New Bonds in full and that, as a result of PIK Amounts, the aggregate outstanding principal amount of the New Bonds on the Final Scheduled Payment Date would be $922.10 (higher than the initial principal amount of $550).

If any of the assumptions described above were to change, such change could have a material impact on the table below. Only the numbers below under "Hypothetical Collections," "Issuer Expense Reserve Withheld" and "Available Cash" are in millions.

| Payment Date | Hypothetical Collections | Issuer Expense Reserve Withheld | Available Cash | Per $550 in New Bonds | | | |
|---|---|---|---|---|---|---|---|
| | | | | Interest Paid in Cash | Principal Paid in Cash | PIK Accrued Per Period | Total Ending Principal |
| Dec-18 | $492.7 | ($2.4) | $490.3 | -- | $104.5 | -- | $445.5 |
| Feb-19 | 55.7 | (4.7) | 51.1 | $8.4 | 2.5 | -- | 443.0 |
| Aug-19 | 127.3 | (4.2) | 123.1 | 16.6 | 9.6 | -- | 433.4 |
| Feb-20 | 39.7 | (3.8) | 35.9 | 7.7 | -- | $8.6 | 442.0 |
| Aug-20 | 109.7 | (4.2) | 105.5 | 16.6 | 5.9 | -- | 436.0 |
| Feb-21 | 39.2 | (3.7) | 35.4 | 7.5 | -- | 8.8 | 444.8 |
| Aug-21 | 111.4 | (4.1) | 107.3 | 16.7 | 6.2 | -- | 438.6 |
| Feb-22 | 37.0 | (3.7) | 33.3 | 7.1 | -- | 9.3 | 448.0 |
| Aug-22 | 110.3 | (4.0) | 106.2 | 16.8 | 5.8 | -- | 442.1 |
| Feb-23 | 34.8 | (3.6) | 31.2 | 6.7 | -- | 9.9 | 452.1 |
| Aug-23 | 112.0 | (3.9) | 108.1 | 17.0 | 6.1 | -- | 446.0 |
| Feb-24 | 31.6 | (3.5) | 28.1 | 6.0 | -- | 10.7 | 456.7 |
| Aug-24 | 112.8 | (3.9) | 108.9 | 17.1 | 6.1 | -- | 450.6 |
| Feb-25 | 29.1 | (3.4) | 25.7 | 5.5 | -- | 11.4 | 462.1 |
| Aug-25 | 111.6 | (3.8) | 107.9 | 17.3 | 5.7 | -- | 456.4 |
| Feb-26 | 26.7 | (3.3) | 23.4 | 5.0 | -- | 12.1 | 468.5 |
| Aug-26 | 109.1 | (3.7) | 105.4 | 17.6 | 4.9 | -- | 463.6 |
| Feb-27 | 24.4 | (3.2) | 21.2 | 4.5 | -- | 12.9 | 476.5 |
| Aug-27 | 105.0 | (3.1) | 101.9 | 17.9 | 3.9 | -- | 472.7 |
| Feb-28 | 22.2 | (2.9) | 19.3 | 4.1 | -- | 13.6 | 486.3 |
| Aug-28 | 107.6 | (2.8) | 104.8 | 18.2 | 4.1 | -- | 482.2 |
| Feb-29 | 19.4 | (2.6) | 16.8 | 3.6 | -- | 14.5 | 496.7 |
| Aug-29 | 97.1 | (2.5) | 94.7 | 18.6 | 1.6 | -- | 495.1 |
| Feb-30 | 17.0 | (2.3) | 14.7 | 3.1 | -- | 15.4 | 510.6 |
| Aug-30 | 94.2 | (2.2) | 92.1 | 19.1 | 0.5 | -- | 510.1 |
| Feb-31 | 14.7 | (2.0) | 12.7 | 2.7 | -- | 16.4 | 526.5 |
| Aug-31 | 90.3 | (1.9) | 88.4 | 18.8 | -- | 0.9 | 527.4 |
| Feb-32 | 12.3 | (1.7) | 10.6 | 2.3 | -- | 17.5 | 544.9 |
| Aug-32 | 80.7 | (1.6) | 79.2 | 16.9 | -- | 3.6 | 548.5 |
| Feb-33 | 17.5 | (1.4) | 16.1 | 3.4 | -- | 17.1 | 565.6 |
| Aug-33 | 56.9 | (1.3) | 55.6 | 11.9 | -- | 9.4 | 575.0 |
| Feb-34 | 4.2 | (1.1) | 3.1 | 0.7 | -- | 20.9 | 595.9 |
| Aug-34 | 48.0 | (1.0) | 47.0 | 10.0 | -- | 12.3 | 608.2 |
| Feb-35 | 2.7 | (0.8) | 1.9 | 0.4 | -- | 22.4 | 630.6 |
| Aug-35 | 34.4 | (0.7) | 33.7 | 7.2 | -- | 16.5 | 647.1 |
| Feb-36 | 1.6 | (0.5) | 1.1 | 0.2 | -- | 24.0 | 671.1 |
| Aug-36 | 24.0 | (0.4) | 23.6 | 5.0 | -- | 20.1 | 691.2 |
| Feb-37 | 0.8 | (0.4) | 0.4 | 0.1 | -- | 25.8 | 717.1 |
| Aug-37 | 13.2 | (0.4) | 12.9 | 2.7 | -- | 24.1 | 741.2 |
| Feb-38 | 0.3 | (0.4) | -- | -- | -- | 27.8 | 769.0 |
| Aug-38 | 9.6 | (0.4) | 9.2 | 2.0 | -- | 26.9 | 795.9 |
| Feb-39 | 0.0 | (0.4) | -- | -- | -- | 29.8 | 825.7 |
| Aug-39 | 0.4 | (0.4) | -- | -- | -- | 31.0 | 856.7 |
| Feb-40 | 0.0 | (0.4) | -- | -- | -- | 32.1 | 888.8 |
| Aug-40 | 0.1 | -- | -- | -- | -- | 33.3 | 922.1 |
| Total | $2,589.2 | ($102.1) | $2,487.8 | $362.9 | $167.3 | $539.4 | N/A |

E-219

AAFAF_CONF_0001187

## APPENDIX G: CONTINGENT AND UNLIQUIDATED CLAIMS

| **Contingent and Unliquidated Claims** | |
|---|---|
| PR Public Finance Corporation Stand-By Letter of Credit[1] | $ 86,710,112[2] |
| Lehman Brothers Special Financing, Inc. - Debt Service Deposit Agreement[3] | $26,000,000[4] |

**Notes**

(1) Represents a stand-by letter of credit (the "Stand-by LOC") for the benefit of Puerto Rico Public Finance Corporation 2011 Series A and B Bonds and 2012 Series A Bonds (the "PFC Bonds").The trustee for the Bonds may only draw from the Stand-by LOC when the following conditions exist: (i) a budget for a new fiscal year is not approved and adopted, and (ii) a legislative appropriation for the then-current fiscal year exists and is lower than the debt service payment due on the PFC Bonds for the next fiscal year for which a new budget is not adopted. In such an instance, the Stand-by LOC may be drawn in the amount that the debt service on the PFC Bonds for the upcoming fiscal year is higher than the appropriated amount for debt service on the PFC Bonds during the then-current fiscal year, if any. The Stand-by LOC is not intended to and does not cover the risk that no appropriation is made by the Legislature of Puerto Rico for any particular fiscal year, or that an appropriation is made in an amount lower than the amount of debt service on the PFC Bonds due with respect to any fiscal year. If the budget for any fiscal year is adopted but no appropriation for the payment of the PFC Bonds is included in such budget, or an appropriation is made in an amount lower than the amount of debt service on the PFC Bonds, the trustee may not make a drawing under the Stand-by LOC. No appropriations have been approved by the Legislative Assembly for the payment of the PFC Bonds since fiscal year 2016.

(2) Represents the estimated potential amount of the contingent and unliquidated claim against GDB (discounted to reflect the likelihood thereof) with respect to the Stand-by LOC for which Additional Bonds may be issued (at a 55% exchange ratio) under the Bond Indenture. Amount is based on the debt service for the PFC Bonds during fiscal year 2018.

(3) The Commonwealth, GDB and Lehman Brothers Special Financing, Inc. ("Lehman") are parties to a Debt Service Deposit Agreement (the "DSDA"). Under the DSDA, the Commonwealth made deposits to a "Redemption Fund" in an amount sufficient to make debt service payments on the Commonwealth's General Obligation Bonds. If the DSDA is breached, the Commonwealth and GDB are jointly liable to Lehman for a termination amount (the "Termination Amount") calculated pursuant to the terms of the DSDA as the amount required for Lehman to preserve the economic equivalent of its rights under the DSDA. However, the DSDA provides that Lehman must first pursue remedies against the Commonwealth prior to pursuing remedies against GDB and that GDB will not be required to make a payment under the DSDA unless the Commonwealth has, among other things, repudiated the DSDA or raised a defense of immunity.

(4) Represents the estimated potential amount of the contingent and unliquidated claim against GDB with respect to the DSDA for which Additional Bonds may be issued (at a 55% exchange ratio) under the Bond Indenture. Amount is based on the projected Termination Amount as of June 1, 2018.

AAFAF_CONF_0001188

**EXHIBIT F: GDB FISCAL PLAN**

AAFAF_CONF_0001189



GOVERNMENT OF PUERTO RICO
Government Development Bank for
Puerto Rico



# Government Development Bank for Puerto Rico New Fiscal Plan

**As Certified by the Financial Oversight and Management Board for Puerto Rico**

San Juan, Puerto Rico
April 20, 2018

AAFAF_CONF_0001190

# Disclaimer

*The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government Development Bank for Puerto Rico ("GDB"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government, the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.*

*The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.*

*This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.*

*Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.*

*By accepting this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.*

*This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.*

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001191

# Table of Contents

I.   Background and Context

II.  Title VI Transaction Overview

III. New Fiscal Plan

IV.  Current Balance Sheet Information (unaudited)



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001192





# I. Background and Context

AAFAF_CONF_0001193

# Background and Context

## Overview

- GDB was originally created to aid the Government in the performance of its fiscal duties and to more effectively carry out its responsibility to develop the economy of Puerto Rico.

- Over time, GDB evolved and its role expanded to include, among other services, acting as a financing backstop for fiscal losses of the Government, its Agencies, Municipalities, and Public Corporations.

- GDB was also called upon to provide financial support during periods of financial distress, leveraging its strong credit rating, reputation, access to the capital markets and its constructive relationship with the investment community to provide financial support to troubled public entities and assist them in regaining financial stability.

- Due to the expansion of services over time and a confluence of other decisions and actions, in recent years GDB found itself immersed in a fiscal and viability crisis.

- The loss of its investment grade rating in 2014, the resulting loss of market access, and the decision by the Government to default on appropriation debt in 2015, left GDB with significant non-performing assets, limited available liquidity, and the inability to repay its debts as they came due.

- With the fiscal challenges affecting GDB, AAFAF was created to assume the roles of fiscal agent, financial advisor, and disclosure agent of the Government.

- Given the reduced services that GDB was providing since 2016, an important question was asked and answered – Could GDB be restructured, become a viable going concern, and reinstate its past activities? A careful review of information and circumstances in early 2017, and the exclusion of appropriations to GDB in the Government's fiscal plan, made it clear there was no clear path to achieve long term viability for GDB.[1]

- Early in 2017, GDB's leadership concluded that an <u>orderly wind-down</u> of its operations and consensual negotiations with its creditors would be the optimal path to mitigate the impact to its stakeholders (municipalities, depositors, and other creditors, etc.).

(1) Analysis and assessment based on unaudited financial information.

**GDB**   GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001194

# Background and Context

## Overview

- GDB's operational wind-down was completed on March 23, 2018, with all fundamental operations having ceased or transferred to other entities (i.e. AAFAF, EDB, etc.) and workforce restructuring completed with minimal "at will" staffing needed to conclude legal and operational matters through FY2019.

- GDB, as a legally responsible entity is anticipated to resolve (i) outstanding legal matters and claims that exist or may be asserted against GDB and (ii) certain public entity loans that will remain at GDB for which GDB shall have a contractual duty to the Recovery Authority to use commercially reasonable best efforts to maximize proceeds and transfer such proceeds, if any, to the Recovery Authority.

- The Restructuring Support Agreement ("RSA"), as amended, between AAFAF, GDB and a significant portion of GDB's financial creditors was originally announced on May 15, 2017 and amended on April 6, 2018, consists of:

  - *The RSA contemplates that GDB's assets will be assigned to two separate entities: GDB Recovery Authority for the benefit of GDB's financial creditors consisting of bondholders, municipal depositors, and non-government entity depositors (the "Recovery Authority") and a Public Entity Trust ("PET") for the benefit of other depositors that are net creditors of GDB ("Government Entity Depositors").*

  - *GDB will continue to exist as a legal entity with operational activity limited to resolving certain outstanding legal matters and managing the resolution strategy of certain public entity loans the proceeds of which, if any, will be assigned to the Recovery Authority, pursuant to the terms of the RSA.*

  - *The RSA (as the same is expected to be amended as herein after discussed) is expected to be consummated pursuant to a consensual restructuring of GDB's long-term obligations through a Title VI Qualifying Modification.*

  - *Once approved by the requisite financial creditors of GDB, the FOMB and the US District Court (Puerto Rico), the Restructuring (as defined in the RSA) will provide GDB's stakeholders a recovery based on the performance of the underlying assets.*

- AAFAF, GDB and a significant portion of GDB's financial creditors agreed to amend the RSA to reflect a simplified structure with one security offered to Participating Bond Claims (as defined in the RSA) and applying all municipal deposits against corresponding municipal loans, where applicable.

- GDB's New Fiscal Plan ("Plan") incorporates the RSA terms and legislative framework established pursuant to the GDB Restructuring Act No. 109-2017, as the same is to be amended to reflect the transaction as described herein (the "GDB Restructuring Act"), resolving the mechanism by which projected cash flow will be allocated to the Recovery Authority, and pre-determined cash amounts will be allocated at closing to cover certain expenses associated with the management of the PET and remaining matters of GDB.



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001195

# Background and Context

## Accomplishments Since January 2017

Since the beginning of 2017, GDB's management, under the leadership of Governor Ricardo Rosselló Nevares, has achieved considerable progress in the measures set out in the restructuring and wind-down process of GDB.

<u>Summary of Accomplishments</u>

GDB GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

# Background and Context

## GDB Snapshot[1]

**Balance Sheet: Key Assets**

| ($000s) | 12/31/2017 |
|---|---|
| **Unrestricted Cash[a]** | **307,858** |
| Loans | |
| *Municipal [b]* | *2,417,877* |
| *Public Sector* | *6,252,187* |
| *Private/Other* | *803* |
| *Adjustments [c]* | *(2,504,721)* |
| **Total Loan Portfolio** | **6,166,146** |
| **REO Assets** | **62,517** |
| **Key Assets** | **6,536,522** |

**Balance Sheet: Key Liabilities**

| ($000s) | 12/31/2017 |
|---|---|
| Outstanding Balances | |
| *Deposits* | *3,548,994* |
| *Accrued Interest* | *8,204* |
| **Total Deposit Balance** | **3,557,198** |
| *GDB Notes* | *3,764,944* |
| *Accrued Interest [c]* | *252,039* |
| **Total GDB Note Balance** | **4,016,983** |
| **Key Liabilities** | **7,574,182** |

> 204 Total Employees (1/31/17)
> 110 Union – 73 General – 21 Appointed

> 96 Total Employees (12/31/17)
> 50 Union – 38 General – 8 Appointed

> 6 Total Employees (3/31/18)
> 6 Appointed

(a) Unrestricted Cash excludes $22mm in GDB's obligations to former GDB employees that retired pursuant to various pre-retirement and voluntary separation programs. Balance sourced from GDB's unaudited 12/31/2017 financial statements. Book values may be impacted by ACH and intercompany suspense accounts.
(b) Municipal loan balance accounts for COFIM and FAM Advances of $326mm and $168mm, respectively, prior to reconciliation.
(c) GDB 12/31/2017 unaudited financial statements.

### Current Objective / Services Provided

- All fundamental operating activities have ceased as of March 23, 2018.
- Service existing loan portfolio pursuant to the terms of the RSA through consummation of the Title VI Qualifying Modification.
- Continues to exist as a legal entity with operational activity limited to resolving outstanding legal matters and managing the resolution strategy of certain public entity loans, the proceeds of which, if any, will be transferred to the Recovery Authority, pursuant to the terms of the RSA.
- Continue a transparent and orderly sale of real estate assets through the consummation of the Title VI Qualifying Modification.

(1) Unaudited
Source: GDB



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001197



GOVERNMENT OF PUERTO RICO

Government Development Bank for
Puerto Rico



# II.   Title VI Transaction Overview

AAFAF_CONF_0001198

# Title VI Transaction Overview

## Transaction Timeline

| | |
|---|---|
| **May 15, 2017** | AAFAF and GDB executed the RSA with a significant portion of GDB's financial creditors, which became effective pursuant to its terms on May 17, 2017. |
| **June 19, 2017** | AAFAF and GDB announced that parties representing over 50% of GDB's Participating Bond Claims (as defined in the RSA) had signed the RSA. |
| **July 14, 2017** | FOMB authorized GDB to restructure its debts under Title VI of PROMESA. |
| **August 24, 2017** | Act 109-2017 (GDB Restructuring Act) enacted, establishing the legislative framework for the restructuring of GDB's obligations under a Title VI Qualifying Modification. |
| **September 2017** | Hurricanes Irma and María impacted Puerto Rico causing catastrophic damage to the island, with estimated $94bn* in damages. |
| | Due to the effects of the hurricanes, loss of communication, impairment to municipal revenues and liquidity, and the impact to GDB real estate owned assets, AAFAF, GDB and the RSA Requisite Bondholders agreed on revising certain RSA milestones. |
| **October 20, 2017** | The first milestone for completion of solicitation process was delayed, providing a 60 day extension through December 20, 2017. |
| **December 20, 2017** | The extended first milestone for completion of the solicitation process was further delayed an additional 90 days through March 20, 2018. |
| **April 6, 2018** | AAFAF, GDB, and a significant portion of GDB's financial creditors agreed on certain amendments to the RSA structure resulting in: |

- Simplified structure (one security offered to Participating Bond Claims).
- All municipal deposits will be applied against corresponding municipal loans to provide cash flow relief to municipalities to mitigate near-term impact of hurricanes.

*External damage estimates; subject to revision*

GDB   GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001199

# Title VI Transaction Overview

### RSA Summary (including the proposed amendments)

- RSA is consistent with the previously certified GDB Fiscal Plan, as it contemplates the conclusion of the orderly wind-down of GDB and a Title VI Qualifying Modification for the restructuring of GDB's Participating Bond Claims.

- RSA contemplates dividing GDB's assets into (i) the Recovery Authority for the benefit of bondholders, municipal depositors, and non-government entity depositors, and (ii) the PET for the benefit of other Government Entity Depositors.

- GDB will continue to exist as a legal entity for the purpose of resolving (i) outstanding legal matters and claims that exist or may be asserted by or against GDB and (ii) certain public entity loans that will remain at GDB and for which GDB shall have a contractual duty to the Recovery Authority to use commercially reasonable best efforts to maximize proceeds and transfer such proceeds, if any, to the Recovery Authority (pursuant to the terms of the RSA and the GDB Restructuring Act).

- GDB and the PET will be pre-funded at the time of closing of the Restructuring (as defined in the RSA) and will not require further financial assistance from the Recovery Authority, the PET or the Government.

- Prior to the closing of the Restructuring, GDB will (i) adjust loan balances by undisbursed deposits consisting of municipal loan proceeds applied against corresponding loans, (ii) adjust municipal loan balances by all remaining municipal deposits applied against corresponding loan types, and (iii) provide accelerated application of public entity deposits to non-performing loans where applicable and pursuant to the GDB Restructuring Act.

- At closing, all holders of Participating Bond Claims (as defined in the RSA) will exchange their claims for New Bonds (as defined in the RSA).

### Management and Trust Structure Summary

- On or prior to the closing of the transaction, pursuant to the terms of the RSA and the GDB Restructuring Act, each as amended, available cash will be distributed as follows: Approximately (i) $21mm for payment to certain municipalities of the Excess CAE Settlement (in accordance with the RSA and GDB Restructuring Act); (ii) $27.2mm for estimated operating cash and contingency requirements of GDB; (iii) transaction costs (including legal and professional fees and contemplated settlements); (iv) $1.5mm for estimated operating cash requirements of the PET; and (v) distributable cash to the Recovery Authority (~$324mm). All amounts are subject to change.

- Upon closing of the Restructuring, GDB will transfer the servicing of the Recovery Authority assets (or the New Bond Collateral, as defined in the RSA) to a third party servicer approved by GDB.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001200

# Title VI Transaction Overview

Pre-Transaction    Pro-Forma Allocation Pre-Transaction

## Asset Summary

**Pre Transaction - Key Assets**
Post Setoff

| ($000s) | 6/30/2018 |
|---|---|
| Unrestricted Cash | $ 433,565 |
| Loans | |
| Municipal | 1,349,561 |
| Public Sector | 4,264,127 |
| Appropriations | 905,492 |
| Private Loans | 803 |
| Loan Portfolio | 6,519,983 |
| REO Assets | 43,636 |
| **Key Assets** | **$ 6,997,184** |

= 

**GDB - Key Assets**
Post Setoff

| ($000s) | 6/30/2018 |
|---|---|
| Unrestricted Cash[1] | $ 107,765 |
| Public Sector Loans[2] | 1,141,012 |
| Loan Portfolio | 1,141,012 |
| REO Assets | - |
| **Key Assets** | **$ 1,248,777** |

+

**Recovery Authority - Key Assets**
Post Setoff

| ($000s) | 6/30/2018 |
|---|---|
| Unrestricted Cash | $ 324,258 |
| Loans | |
| Municipal | 1,349,561 |
| Public Sector | 3,123,115 |
| Private | 803 |
| Loan Portfolio | 4,473,479 |
| REO Assets | 43,636 |
| **Key Assets** | **$ 4,841,374** |

+

**PET - Key Assets**
Post Setoff

| ($000s) | 6/30/2018 |
|---|---|
| Unrestricted Cash | $ 1,542 |
| Loans | |
| Appropriations | 905,492 |
| Loan Portfolio | 905,492 |
| **Key Assets** | **$ 907,034** |

(1) Includes estimated transaction and settlement related costs (actual costs will vary).
(2) Public Sector Loans that will remain at GDB with proceeds, if any, assigned to the Recovery Authority.

## Liability Summary

**Pre Transaction - Key Liabilities**
Post Setoff

| ($000s) | 6/30/2018 |
|---|---|
| Outstanding Balances | |
| Muni Deposits | $ 79,839 |
| Other Deposits | 376,522 |
| Public Entity Deposits | 507,065 |
| Total Deposit Balance | 963,426 |
| GDB Notes | 3,765,922 |
| Total GDB Note Balance | 3,765,922 |
| **Key Liabilities** | **$ 4,729,348** |

= 

**GDB - Key Liabilities***
Post Setoff

GDB will retain the rights to control loans of 13 Public Entities totaling $1.141bn in outstanding principal balances. The net proceeds generated from these loans, if any, are assigned to the Recovery Authority.

+

**Recovery Authority - Key Liabilities***
Post Setoff Pre-Transaction

| ($000s) | 6/30/2018 |
|---|---|
| Outstanding Balances | |
| Muni Deposits | $ 79,839 |
| Other Deposits | 376,522 |
| Total Deposit Balance | 456,361 ** |
| GDB Notes | 3,765,922 |
| Total GDB Note Balance | 3,765,922 |
| **Key Liabilities** | **$ 4,222,283** |

+

**PET - Key Liabilities***
Post Setoff

| ($000s) | 6/30/2018 |
|---|---|
| Outstanding Balances | |
| Public Entity Deposits | $ 507,065 |
| Total Deposit Balance | 507,065 |
| **Key Liabilities** | **$ 507,065** |

*To show allocation of the Key Assets and Key Liabilities, before giving effect to any modification of such assets or liabilities pursuant to the restructuring, as between the Recovery Authority, GDB, and the PET.

**Excludes accrued interest on the GDB notes, which are part of the Recovery Authority liabilities.

Source: GDB
Note: All financial data is unaudited and subject to change.
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
GDB

AAFAF_CONF_0001201



GOVERNMENT OF PUERTO RICO

Government Development Bank for
Puerto Rico



# III.  New Fiscal Plan

AAFAF_CONF_0001202

# New Fiscal Plan

## Approach and Assumptions

- The Plan is based on the projected performance of GDB's <u>existing loan asset portfolio</u>, based on recent historical results.

- Based on the assessment of GDB's loan portfolio[1] and the information available post-Hurricanes Irma and María, the Plan assumes currently performing municipal loans (after the corresponding application of municipal deposits against municipal loans), certain public sector loans, and the sale of real estate owned assets are the only sources of revenue going forward.

- To the extent a loan asset is "non-performing", the Plan assumes such loan remains "non-performing" and therefore would not be a source of future inflows, although GDB, or any successor entity, reserves the right to pursue collection efforts, subject to the limitations imposed by the GDB Restructuring Act.

- The Plan assumes the continued orderly sale or other legally available disposition of real estate owned assets, until such assets are transferred to the Recovery Authority per the terms of the RSA.

- As of March 23, 2018, GDB's management expects to have completed the wind-down of GDB's fundamental operations, with substantially all employees separating or transferring from GDB. The Plan reflects ongoing activity at GDB limited to servicing and pursuing resolution strategies of certain public entity loans with any proceeds assigned to the Recovery Authority and resolving outstanding legal matters.

- The Plan assumes GDB and the PET are funded at the closing of the Restructuring with sufficient funds to complete their respective responsibilities without further financial assistance from the Recovery Authority, the PET or the Government.

- As permitted by the RSA, GDB has segregated approximately $22mm in cash, corresponding to GDB's obligations to former GDB employees that retired pursuant to various pre-retirement and voluntary separation programs. Promptly after the certification of the Plan, GDB shall transfer such funds to a new trust to be constituted by GDB for the benefit of said retired employees, releasing GDB from such obligations.

- The Plan is consistent with the Government's fiscal plan and other covered entity fiscal plans (all pending FOMB certification).

(1) As of December 31, 2017 - Unaudited

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001203

# New Fiscal Plan

## Financial Projections – Combined Recovery Authority, PET and GDB

**Government Development Bank**
**Fiscal Plan - Fund Flows**

Projections assume Title VI Transaction Close on June 30, 2018.

| ($000s) | Fiscal 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 | Total |
|---|---|---|---|---|---|---|---|
| Recovery Authority Inflows | 1,053 | 195,169 | 141,194 | 149,438 | 154,267 | 155,664 | 796,785 |
| PET Inflows | 0 | 3 | 1 | 0 | 0 | 0 | 4 |
| GDB Inflows | 220,451 | 17 | 4 | 1 | 0 | 0 | 220,473 |
| **Total Cash Inflows** | 221,504 | 195,189 | 141,199 | 149,439 | 154,267 | 155,664 | 1,017,262 |
| Recovery Authority Outflows | 1,103 | 9,925 | 9,693 | 8,782 | 8,608 | 8,447 | 46,559 |
| PET Outflows | 260 | 500 | 520 | 526 | - | - | 1,806 |
| GDB Outflows | 32,133 | 24,725 | 1,810 | 681 | - | - | 59,348 |
| **Total Cash Outflows** | 33,496 | 35,150 | 12,023 | 9,990 | 8,608 | 8,447 | 107,714 |
| **Net Cash Flows** | 188,008 | 160,039 | 129,176 | 139,450 | 145,659 | 147,217 | 909,548 |
| **Beginning Cash Balance** | 244,371 | 352,995 | 29,383 | 5,253 | 4,044 | 4,042 | 244,371 |
| Net Cash Flows | 188,008 | 160,039 | 129,176 | 139,450 | 145,659 | 147,217 | 909,548 |
| Transaction Costs | (80,571) | - | - | - | - | - | (80,571) |
| Cash Funding (Disbursements) | 1,187 | (483,651) | (153,305) | (140,659) | (145,661) | (147,324) | (1,069,412) |
| **Ending Cash Balance** | 352,995 | 29,383 | 5,253 | 4,044 | 4,042 | 3,936 | 3,936 |

Source: GDB. Financial projections are based on unaudited financial data provided by GDB.

Notes:
FY2018 beginning cash balance and transaction costs are estimates and are subject to change. Title VI Transaction closing assumed on or about June 30, 2018.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001204

# New Fiscal Plan

## GDB Financial Projections

**Government Development Bank**
Fiscal Plan - Fund Flows - GDB

Projections assume Title VI Transaction Close on June 30, 2018.

| ($000s) | Fiscal 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Total |
|---|---|---|---|---|---|
| Loan Asset Portfolio Receipts | 217,664 | - | - | - | 217,664 |
| REO Asset Sales | 1,801 | - | - | - | 1,801 |
| Interest on Cash | 987 | 17 | 4 | 1 | 1,008 |
| GDB Inflows | 220,451 | 17 | 4 | 1 | 220,473 |
| Personnel Related Expenses | 13,369 | 1,031 | - | - | 14,399 |
| Other Operating Expenses | 18,764 | 23,694 | 1,810 | 681 | 44,949 |
| Total Operating Outflows | 32,133 | 24,725 | 1,810 | 681 | 59,348 |
| **Net Cash Flows** | **188,319** | **(24,708)** | **(1,806)** | **(680)** | **161,124** |
| Beginning Cash Balance | 244,371 | 27,194 | 2,486 | 680 | 244,371 |
| *Net Cash Flows* | *188,319* | *(24,708)* | *(1,806)* | *(680)* | *161,124* |
| *Transaction Costs* | *(80,571)* | *-* | *-* | *-* | *(80,571)* |
| Proceeds of Public Sector Loans for Benefit of Recovery Authority | 1,019 | 8,568 | 10,522 | 14,007 | 34,116 |
| *Cash Funding (Disbursements)* | *(325,943)* | *(8,568)* | *(10,522)* | *(14,007)* | *(359,040)* |
| **Ending Cash Balance** | **27,194** | **2,486** | **680** | **-** | **-** |

Note: Unused cash held by GDB, if any, will be disbursed to the Recovery Authority after a period to be determined in the definitive documents of the Title VI Qualifying Modification.

| GDB - Key Assets | | |
|---|---|---|
| *Post Setoff* | | |
| ($000s) | | 6/30/2018 |
| Unrestricted Cash | $ | 27,194 |
| *Public Sector Loans [1]* | | *1,141,012* |
| Loan Portfolio | | 1,141,012 |
| REO Assets | | - |
| **Key Assets** | **$** | **1,168,206** |

**GDB - Key Liabilities**

*Post Setoff*

GDB will retain the rights to control loans of 13 Public Entities totaling $1.141bn in outstanding principal balances. The net proceeds generated from these loans, if any, are assigned to the Recovery Authority.

Source: GDB; unaudited financial data is subject to change.
Note: Differs from assets on unaudited balance sheet.
[1]   Public Sector Loans that will remain at GDB with proceeds, if any, assigned to the Recovery Authority.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001205

# New Fiscal Plan

## Recovery Authority Financial Projections

Government Development Bank

Fiscal Plan - Fund Flows - Recovery Authority

Projections assume Title VI Transaction Close on June 30, 2018.

| ($000s) | June 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 | Total |
|---|---|---|---|---|---|---|---|
| Municipal Loans | - | 142,808 | 130,630 | 135,394 | 140,271 | 141,823 | 690,925 |
| REO Asset Sales | - | 43,636 | - | - | - | - | 43,636 |
| Interest on Cash | 34 | 157 | 43 | 37 | 38 | 39 | 348 |
| Proceeds of Public Sector Loans | 1,019 | 8,568 | 10,522 | 14,007 | 13,958 | 13,803 | 61,876 |
| Recovery Authority Inflows | 1,053 | 195,169 | 141,194 | 149,438 | 154,287 | 155,664 | 796,785 |
| Personnel Related Expenses | 82 | 992 | 1,002 | 1,013 | 1,026 | 1,042 | 5,158 |
| Other Operating Expenses | 70 | 778 | 709 | 717 | 726 | 737 | 3,737 |
| Trust Servicing Fee | 636 | 5,521 | 5,354 | 4,431 | 4,249 | 4,064 | 24,256 |
| Tax Reporting Consultant | 100 | 202 | 204 | 206 | 209 | 212 | 1,133 |
| Indenture Trustee Fees | 3 | 10 | 10 | 10 | - | - | 33 |
| Collateral Monitor | 112 | 1,322 | 1,302 | 1,281 | 1,260 | 1,237 | 6,515 |
| Other Professional & Legal Fees | 100 | 1,100 | 1,111 | 1,123 | 1,138 | 1,155 | 5,727 |
| Total Operating Outflows | 1,103 | 9,925 | 9,693 | 8,782 | 8,608 | 8,447 | 46,559 |
| Net Cash Flows | (51) | 185,244 | 131,501 | 140,656 | 145,659 | 147,217 | 750,226 |
| Beginning Cash Balance | - | 324,258 | 25,852 | 4,047 | 4,044 | 4,042 | - |
| Net Cash Flows | (51) | 185,244 | 131,501 | 140,656 | 145,659 | 147,217 | 750,226 |
| Cash Funding (Disbursements) | 324,309 | (483,651) | (153,305) | (140,659) | (145,661) | (147,324) | (746,290) |
| Ending Cash Balance | 324,258 | 25,852 | 4,047 | 4,044 | 4,042 | 3,936 | 3,936 |

| Recovery Authority - Key Assets | | | Recovery Authority - Key Liabilities | | | Recovery Authority - Key Liabilities | | |
|---|---|---|---|---|---|---|---|---|
| Post Setoff | | | Post Setoff Pre-Transaction | | | Post Setoff Post-Transaction | | |
| ($000s) | | 6/30/2018 | ($000s) | | 6/30/2018 | ($000s) | | 6/30/2018 |
| Unrestricted Cash | $ | 324,258 | Outstanding Balances | | | Outstanding Balances | | |
| Loans | | | Muni Deposits | $ | 79,839 | Muni Deposits | $ | 43,912 |
| Municipal | | 1,349,561 | Other Deposits | | 376,522 | Other Deposits | | 207,087 |
| Public Sector | | 3,123,115 | Total Deposit Balance | | 456,361 | Total Deposit Balance | | 250,998 |
| Private | | 803 | GDB Notes [1] | | 3,765,922 | GDB Notes [1] | | 2,071,257 |
| Loan Portfolio | | 4,473,479 | Total GDB Note Balance | | 3,765,922 | Total GDB Note Balance | | 2,071,257 |
| REO Assets | | 43,636 | | | | | | |
| Key Assets | $ | 4,841,374 | Key Liabilities | $ | 4,222,283 | Key Liabilities | $ | 2,322,256 |

Source: GDB; unaudited financial data is subject to change.
Note: Differs from assets on unaudited balance sheet.
(1) Does not include accrued interest.

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

GDB

AAFAF_CONF_0001206

# New Fiscal Plan

## PET Financial Projections

**Government Development Bank**

**Fiscal Plan - Fund Flows - PET**

Projections assume Title VI Transaction Close on June 30, 2018.

| ($000s) | June 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Total |
|---|---|---|---|---|---|
| Public Entity Trust Collections | - | - | - | - | - |
| Interest on Cash | 0 | 3 | 1 | - | 4 |
| **Total Operating Inflows** | 0 | 3 | 1 | - | 4 |
| Indenture Trustee Fees | 10 | - | 10 | 10 | 31 |
| Contingent Legal Fees | - | 500 | 255 | 258 | 1,013 |
| Servicing Fees | 250 | - | 255 | 258 | 763 |
| **Total Operating Outflows** | 260 | 500 | 520 | 526 | 1,806 |
| **Net Cash Flows** | (260) | (497) | (519) | (526) | (1,802) |
| **Beginning Cash Balance** | - | 1,542 | 1,045 | 526 | - |
| *Net Cash Flows* | (260) | (497) | (519) | (526) | (1,802) |
| *Transaction Flows* | - | - | - | - | - |
| *Cash Funding (Disbursements)* | 1,802 | - | - | - | 1,802 |
| **Ending Cash Balance** | 1,542 | 1,045 | 526 | - | - |

Note: Unused cash balance held at PET will be disbursed to Recovery Authority after a period to be determined in definitive documents of the Title VI Qualifying Modification. Trust is set up at transaction closing (assumed 6/30/18) and all prior cash flows are distributed at closing.

**PET - Key Assets**

*Post Setoff*

| ($000s) | 6/30/2018 |
|---|---|
| **Unrestricted Cash** | $ 1,542 |
| Loans | |
| Appropriations | 905,492 |
| Loan Portfolio | 905,492 |
| **Key Assets** | $ 907,034 |

**PET - Key Liabilities**

*Post Setoff*

| ($000s) | 6/30/2018 |
|---|---|
| **Outstanding Balances** | |
| *Public Entity Deposits* | $ 507,065 |
| **Total Deposit Balance** | 507,065 |
| **Key Liabilities** | $ 507,065 |

Source: Government Development Bank; unaudited financial data is subject to change.
Note: Differs from Assets on unaudited balance sheet.

 **GDB** GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001207

# New Fiscal Plan

## Inflows Approach and Assumptions – Combined Recovery Authority, PET and GDB

**The Plan assumes projected inflows from assets including (a) cash and cash equivalents, (b) loan portfolio assets, and (c) sale of real estate assets based on GDB's unaudited balance sheet as of December 31, 2017.**

| Item | Assumption |
|---|---|
| Cash on Hand[1] | Assumes all cash on hand post transaction closing costs will revert to the Recovery Authority with pre-funded balances for both GDB and the PET. GDB and PET will not require further funding from the Recovery Authority or any other government agency or instrumentality after closing. |
| **Loan Assets:** | |
| Municipality Loans | Assumes the municipalities will pay their currently performing loans as contracted, with balances adjusted downward through an application of all available municipal deposits against corresponding loans (by loan type). |
| | There have been instances when municipalities have made late payments on their revenue and/or operational loans, or may have other delinquent statutory debts with other Government entities. All late payment events have been cured prior to the disbursement of any excess CAE funds. |
| | Based on the repayment structure, safeguards of municipal obligations, historical performance, and the overall reduction in debt service and outstanding loan balances due to the application of all municipal deposits, where applicable, no impairments on future cash flows have been assumed. |
| Public Sector Loans | Assumes debt service payments on four loans[2] will continue based on a review of historical performance and collateral and adjustments to loan terms, where applicable. For all other remaining loans, Plan assumes no debt service will be collected, although rights to pursue collection efforts are reserved, subject to the limitations imposed by the GDB Restructuring Act. |
| Private Loans | Assumes no debt service on private loans will be collected, although rights to pursue collection efforts are reserved, subject to the limitations imposed by the GDB Restructuring Act. |
| **Other Assets:** | |
| Real Estate Owned (REO) Assets | Assumes real estate assets are sold through a public Request for Proposals ("RFP") process. |

**GDB** GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
(1) Cash on hand is subject to revision.
(2) Includes two loans with CRIM ($106mm) , one loan with Economic Development Bank ($7mm), and one loan with Servicios Medicos Universitarios ($10mm).

AAFAF_CONF_0001208

# New Fiscal Plan

## Summary of Inflows (FY2018 - FY2023) – Combined Recovery Authority, PET and GDB

**The Plan projects $1.0bn of Total Cash Inflows to be collected during the projection period primarily comprised of loan portfolio collections.**

- Appropriation Loans: Generate no cash flow pursuant to Government's certified fiscal plan of March 13, 2017, as amended.
- Municipal Loans: Generate $895.5mm of cash flow over the Plan's projection period. Cash flows are based on contracted interest and amortization schedules for currently performing municipal loans.
- Public Sector Loans: Generate $75.0mm of cash flow over the Plan's projection period. Cash flows are based on four loans that are projected to perform based on historical trends and loan terms, as may be adjusted.



**Composition of Inflows**

**Government Development Bank**
**Summary of Cash Inflows**

| ($000s) | Fiscal 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 | Total |
|---|---|---|---|---|---|---|---|
| **Inflows from Loan Portfolio** | | | | | | | |
| Total Appropriation Loans | - | - | - | - | - | - | - |
| Total Municipal Loans | 204,578 | 142,808 | 130,630 | 135,394 | 140,271 | 141,823 | 895,503 |
| Total Public Sector Loans | 14,104 | 8,568 | 10,522 | 14,007 | 13,958 | 13,803 | 74,962 |
| **Total Loan Inflows** | **218,682** | **151,376** | **141,151** | **149,401** | **154,228** | **155,626** | **970,465** |
| **Other Inflows** | | | | | | | |
| Interest on Cash | 1,021 | 176 | 48 | 38 | 38 | 39 | 1,360 |
| REO Asset Sales | 1,801 | 43,636 | - | - | - | - | 45,437 |
| **Total Cash Inflows** | **221,504** | **195,189** | **141,199** | **149,439** | **154,267** | **155,664** | **1,017,262** |

Source: GDB; unaudited financial data is subject to change.



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

**GDB**

AAFAF_CONF_0001209

# New Fiscal Plan

## Detail of Loan Portfolio Inflows (FY2018 - FY2023) – Combined Recovery Authority, PET and GDB

**Government Development Bank for Puerto Rico**
Fiscal Plan - Cash Inflows from Loan Portfolio
*Post Setoff*

| ($000s) | Fiscal 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 | Total |
|---|---|---|---|---|---|---|---|
| ***Municipal Portfolio Cash Flows*** | | | | | | | |
| *CAE* | *135,333* | *91,070* | *82,524* | *85,688* | *88,504* | *91,179* | *574,298* |
| *IVU* | *46,234* | *35,963* | *34,335* | *35,704* | *37,555* | *36,204* | *225,996* |
| *Operational* | *17,868* | *11,132* | *9,419* | *9,619* | *9,750* | *9,897* | *67,685* |
| *Revenue* | *5,142* | *4,642* | *4,352* | *4,384* | *4,461* | *4,543* | *27,524* |
| **Municipal Portfolio** | **204,578** | **142,808** | **130,630** | **135,394** | **140,271** | **141,823** | **895,503** |
| **Appropriation** | - | - | - | - | - | - | - |
| **Public Sector Loans** | **14,104** | **8,568** | **10,522** | **14,007** | **13,958** | **13,803** | **74,962** |
| **Cash Flow From Loan Portfolio** | **218,682** | **151,376** | **141,151** | **149,401** | **154,228** | **155,626** | **970,465** |





Source: GDB; unaudited financial data is subject to change.

**GDB**   GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

F-22

AAFAF_CONF_0001210

# New Fiscal Plan

## Real Estate Owned (REO) Assets

- GDB owns a portfolio of real estate assets, the majority of which were transferred to GDB in exchange for a $150mm loan on December 30, 2008 used by the central government to cover a portion of the FY2008-2009 deficit. The source of repayment for the $150mm loan was expected to come from the sale proceeds of the properties; however, previous sales efforts have been inconsistent and have yielded unsatisfactory results.

- GDB REO Management and Disposition Working Group Committee has operated with the objective of managing and selling REO properties through an open, transparent, and orderly process since calendar year 2017.

- GDB engaged a commercial real estate broker to assist in the property preservation and sales efforts.

- Since August 2017, substantially all of GDB's real estate owned portfolio has been marketed for sale through several sales channels, including a dedicated website, property signage and RFPs.

- Sales and marketing efforts were interrupted by Hurricanes Irma and María, but have recently restarted, with the successful sale of one property in December and several others currently being subject of bids through recent RFP processes.

- The overall sales strategy and disposition values have been adjusted to reflect the projected impact of the Hurricanes Irma and María, and assumes and orderly sale or transfer to the Recovery Authority of all such assets by the end of fiscal year 2019.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001211

# New Fiscal Plan

## Outflows Approach and Assumptions – Combined Recovery Authority, GDB, and PET

The Plan assumes projected outflows consisting of operational expenses deemed necessary to complete the operational wind-down of GDB, adjusted for inflation per the Government's draft fiscal plan.

| Item | Assumption |
|---|---|
| Payroll and Benefits | Workforce restructuring will be completed on March 23, 2018 with a reduction of 97% in the number of employees when compared to January 2017. |
| GDB Board Legal/Admin Expenses | Assumes reasonable legal, administrative, and D&O insurance expenses for GDB Board of Directors through FY2021. |
| Facilities and Servicing (MOUs) | Assumes rent and utilities, servicing and back office fees will be paid through FY2021, as necessary under Memorandum of Understandings ("MOU") with pertinent agencies (AAFAF/EDB). Unspent cash will be disbursed to the Recovery Authority pursuant to the RSA. |
| Other Operating Outflows | Assumes only critical operating expenses (audit; operating reserves) to be reduced throughout the projection period. |
| Professional and Legal Fees | Assumes legal and financial professionals necessary to complete the wind-down and restructuring transaction. Unspent cash will be disbursed to the Recovery Authority pursuant to the RSA. |
| Legal and Operating Contingency | Assumes estimates of contingency to account for claims asserted by or against GDB. |
| Recovery Authority Servicing Fee | Portfolio servicing fee assumed to be 20bps of the Recovery Authority AUM (performing loans) paid semiannually from cash flows produced by the Recovery Authority Bond Collateral (as defined in the RSA). Subject to change. |

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001212

# New Fiscal Plan

## Summary of Outflows (FY2018 - FY2023) – Combined Recovery Authority, GDB, and PET

**The Plan projects $1.2bn of Total Cash Outflows during the projection period.**

- <u>Distributions:</u> Distributable cash flow is projected to be $1.1bn through the projection period and will be allocated among GDB's creditors pursuant to the terms of the RSA.

Government Development Bank
Summary of Cash Outflows

Note: Operating outflows are subject to further adjustments arising from the restructuring.

| ($000s) | Fiscal 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 | Total |
|---|---|---|---|---|---|---|---|
| **Government Development Bank** | | | | | | | |
| Payroll and Benefits | 13,369 | 1,031 | - | - | - | - | 14,399 |
| GDB Board Legal and Administrative Expenses | - | 300 | 50 | 51 | - | - | 401 |
| D&O Insurance | 435 | 727 | 500 | 506 | - | - | 2,168 |
| Servicing and Backoffice Support MOU (EDB) | - | 80 | - | - | - | - | 80 |
| Facilities and Services MOU | 5,617 | 87 | - | - | - | - | 5,704 |
| Legal Fees | 7,033 | 2,000 | 1,010 | - | - | - | 10,043 |
| Professional Services | 4,116 | 1,500 | - | - | - | - | 5,616 |
| Legal and Operating Contingency | 125 | 17,800 | - | - | - | - | 17,925 |
| Other Operating Outflows | 1,437 | 1,200 | 250 | 125 | - | - | 3,012 |
| **Total Operating Outflows** | 32,133 | 24,725 | 1,810 | 681 | - | - | 59,348 |
| **Recovery Authority** | | | | | | | |
| Personnel Expenses | 82 | 992 | 1,002 | 1,013 | 1,026 | 1,042 | 5,158 |
| D&O Insurance | 54 | 657 | 663 | 670 | 679 | 689 | 3,412 |
| Facilities | 4 | 45 | 46 | 46 | 47 | 48 | 236 |
| Other Operating Expenses | 13 | 76 | - | - | - | - | 88 |
| Legal Fees | - | 1,000 | 1,010 | 1,021 | 1,034 | 1,050 | 5,115 |
| External Auditor | 100 | 100 | 101 | 102 | 103 | 105 | 612 |
| Servicing Fees | 851 | 7,055 | 6,871 | 5,929 | 5,717 | 5,513 | 31,937 |
| **Total Operating Outflows** | 1,103 | 9,925 | 9,693 | 8,782 | 8,608 | 8,447 | 46,559 |
| **Public Entity Trust** | | | | | | | |
| Indenture Trustee | 10 | - | 10 | 10 | - | - | 31 |
| Contingent Legal Fees | - | 500 | 255 | 258 | - | - | 1,013 |
| Servicing Fees | 250 | - | 255 | 258 | - | - | 763 |
| **Total Operating Outflows** | 260 | 500 | 520 | 526 | - | - | 1,806 |
| Distributions | (1,187) | 483,651 | 153,305 | 140,659 | 145,661 | 147,324 | 1,069,412 |
| **Total Outflows** | 32,309 | 518,800 | 165,329 | 150,648 | 154,269 | 155,771 | 1,177,126 |



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001213

# New Fiscal Plan

## Debt Sustainability Analysis

The Plan contemplates a restructuring of GDB's obligations pursuant to a Title VI Qualifying Modification.

**Government Development Bank**
**Senior Unsecured Notes - Summary of Pre-Restructuring Obligations**

| ($ millions) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| GDB Available Cash Flow | (1) | 484 | 153 | 141 | 146 | 147 |
| *Contractual Debt Service* | | | | | | |
| *Principal* | *277* | *848* | *432* | *434* | *143* | *47* |
| *Interest* | *140* | *123* | *79* | *55* | *46* | *43* |
| **Total Contractual Debt Service** | **417** | **971** | **512** | **488** | **189** | **91** |

Upon the completion of the restructuring through a Title VI Qualifying Modification GDB will no longer have any bonds outstanding.

Source: Government Development Bank; unaudited financial data is subject to change.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001214

# New Fiscal Plan

## Subsidiaries, Guarantees and Letters of Credit

### GDB Subsidiaries

GDB is authorized under Article 2 of its enabling act, Act 17 of 1948, to create subsidiaries by resolution of the Board of Directors. The GDB Charter provides that GDB Subsidiaries shall constitute government instrumentalities, <u>independent of and separate from GDB</u>.[1]

### Separation of GDB from Subsidiaries and Affiliates

Since the beginning of 2017, GDB's management has worked and completed the operational separation of GDB from its subsidiaries and affiliates. Legislation is being drafted to legally separate GDB from its subsidiaries and affiliates, and is expected to be filed during the current legislative session.

### Puerto Rico Housing Finance Authority (HFA)

Subsidiary of GDB and a government instrumentality, created in 1977 for the purpose of financing the construction, reconstruction, improvement, alteration and repair of decent, safe and sanitary dwellings for persons of limited income under state and federally subsidized homeownership programs.

- HFA owes approximately $73.7mm to GDB and has $136.4mm in non-federal deposits at GDB. Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between non-municipal government entities and GDB shall be automatically determined by applying outstanding loan balances against corresponding deposits. Therefore, HFA will have a claim of approximately $62.7mm against the PET.

---

(1) Section Fourth (J)(1) of the GDB Charter, 7 L.P.R.A § 552



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001215

# New Fiscal Plan

## Subsidiaries, Guarantees and Letters of Credit

### Puerto Rico Development Fund (PRDF)

Established in 1977 to provide an alternate source of financing to private enterprises, including to provide guarantees and invest in equity securities of such enterprises.

The Plan assumes no collections from PRDF. Under the terms of the RSA, PRDF has a Participating Bond Claim in the amount of approximately $11mm against GDB pursuant to the terms of the PRDF Loan Guaranty Program under which GDB entered into a commitment to fund any deficiencies if and when asserted against the PRDF.

### Puerto Rico Tourism Development Fund (TDF)

Created in 1993 to promote the hotel and tourism industry by making capital investments in, or by providing financing directly or indirectly (through the use of letters of credits and guarantees) to, entities that can contribute to the development of the industry.

- TDF has experienced significant losses and has an accumulated net deficits due to decreased economic activity in the hotel and tourism industries in recent years.
- Although TDF has covered its deficits through contributions from the Government, as permitted by legislation, and from financial support provided by GDB, no additional contributions or support are expected.
- No recourse to GDB: GDB has confirmed, through an analysis by outside legal counsel, that the resolution that created TDF "specifically provides that GDB shall not be liable for the payment of any of TDF's debts of any nature, unless expressly guaranteed by GDB."
- TDF owes approximately $207.5mm to GDB and has approximately $160.6mm in non-federal deposits at GDB. Pursuant to Article 302 of the GDB Restructuring Act, the balance of liabilities owed between non-municipal government entities and GDB shall be automatically determined by applying outstanding loan balances against corresponding deposits. Therefore, TDF will owe approximately $46.9mm to GDB.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001216

# New Fiscal Plan

## Subsidiaries, Guarantees and Letters of Credit

#### Other Guarantees and/or Letters of Credit

- **GDB Stand-by Letter of Credit ("Stand-by LOC")** for the benefit of Puerto Rico Public Finance Corporation 2011 Series A and B Bonds and 2012 Series A Bonds (the "Bonds"). The Stand-by LOC does not impact GDB's Fiscal Plan. The Trustee may only draw from the Stand-by LOC when a budget for a new fiscal year is not approved and adopted, a legislative appropriation for the current fiscal year exists and is lower than the debt service payment due on the Bonds for the next fiscal year for which a new budget is not adopted. In such an instance, the Stand-by LOC may be drawn in the amount that the debt service on the Bonds for the upcoming fiscal year is higher than the appropriated amount for debt service on the Bonds during the current fiscal year, if any.

  - The Stand-by LOC is not intended to and does not cover the risk that no appropriation is made by the Legislature of Puerto Rico for any particular fiscal year, or that an appropriation is made in an amount lower than the amount of debt service on the Bonds due with respect to any fiscal year. If the budget for any fiscal year is adopted but no appropriation for the payment of the Bonds is included in such budget, or an appropriation is made in an amount lower than the amount of debt services on the Bonds, the Trustee may not make a drawing under the Stand-by LOC.

#### Lehman Brothers Special Financing, Inc. – Debt Service Deposit Agreement

- The Commonwealth, GDB, and Lehman Brothers Special Financing, Inc. ("Lehman") are parties to a Debt Service Deposit Agreement (the "DSDA"). Under the DSDA, the Commonwealth made deposits to a "Redemption Fund" in an amount sufficient to make debt service payments on the Commonwealth's General Obligation Bonds. If the DSDA is breached, the Commonwealth and GDB are jointly liable to Lehman for a termination amount, calculated pursuant to the terms of the DSDA. However, the DSDA provides that Lehman must first pursue remedies against the Commonwealth prior to pursuing remedies against GDB and that GDB shall not be required to make a payment under the DSDA unless the Commonwealth has, among other things, repudiated the DSDA or raised a defense of immunity.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001217

# New Fiscal Plan

## Subsidiaries, Guarantees and Letters of Credit

### Public Private Partnerships and Respective Payment Guarantees

PR-22 and PR-5 Toll Roads[1]

* GDB payment guarantee in favor of Metropistas (toll road operator) for any "Termination Damages" due and payable in cash by the Puerto Rico Highways and Transportation (HTA in turn agreed to reimburse GDB).

Luis Muñoz Marín International Airport[2]

* GDB payment guarantee in favor of Aerostar (airport operator) for any "Termination Damages" due and payable in cash by the Puerto Rico Ports Authority, which would be reimbursable to GDB by the Ports Authority.

On February 23, 2017, GDB and AAFAF received a letter from the Puerto Rico Public Private Partnership Association where it indicated that a "restructuring (rather than a liquidation) of the GDB is clearly the preferred and most beneficial approach."

**The Plan assumes the payment guarantees remain outstanding and unasserted during the existence of GDB as a legal entity.**

Source:
(1) Concession Agreement between Metropisas and HTA and Reimbursement Agreement between HTA and GDB.
(2) Lease Agreement between Aerostar and Ports Authority and Reimbursement Agreement between Ports Authority and GDB.

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001218

# New Fiscal Plan

## Repayment Structure of CAE Loans (64% of Municipal Loan Portfolio)

- The principal source of payment for CAE Loans is a special additional property tax ("CAE" for its Spanish acronym), which, as provided by Act No. 83 of August 30, 1991, as amended ("Municipal Tax Act"), may be imposed by a municipality without limitation as to rate or amount on all taxable real and personal property within a municipality.

- Under Act 64 of 1996 (the "Municipal Financing Act"), each municipality is required to levy the CAE in such amounts as will be required for the payment of all its outstanding CAE Loans. *Ad valorem* taxes on real and personal property, including the CAE, are generally collected on behalf of the municipalities by the Municipal Revenues Collection Center, an independent municipal entity ("CRIM" for its Spanish acronym).

- CAE collections are required by law to be deposited in the Municipal Public Debt Redemption Fund (the "CAE Redemption Fund") and used for the payment of CAE Loans. To the extent that a municipality's funds in the CAE Redemption Fund exceed the amount necessary to cover twelve months' debt service on such municipality's then outstanding CAE Loans, as determined by AAFAF, and such municipality's statutory debts, the Municipal Financing Act (as amended pursuant to the GDB Restructuring Act) requires the disbursement of such excess to the municipality, at its request, once during each fiscal year. Such excess is generally referred to as "Excess CAE."

- In November 2015, CRIM and GDB executed a deed of trust with respect to the CAE Redemption Fund, pursuant to which the CAE Redemption Fund was divided into two separate sub-funds, one of which would be invested in deposits at GDB and used for the payment of CAE Loans held by GDB, and the other one would be invested in certain qualified instruments and used for the payment of CAE Loans held by private banks and MFA (known as the "Private Sub-Fund"). The Private Sub-Fund was, and continues to be, invested in deposits at Banco Popular de Puerto Rico ("BPPR").

 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001219

# New Fiscal Plan

## Repayment Structure of CAE Loans (64% of Municipal Loan Portfolio)

- In April 2016, upon the imposition of restrictions on the withdrawal of funds on deposit at GDB, no additional CAE revenues were transferred to GDB. Thereafter, all CAE revenues have been deposited by CRIM at BPPR and have been kept in two accounts as follows: (i) in the Private Sub-Fund, an amount based on the debt service payable on the CAE Loans held by private banks and MFA and (ii) in a separate account at BPPR, an amount based on the debt service payable on CAE Loans held by GDB.

- *Security*. The Municipal Financing Act provides for a lien in respect of CAE Loans as follows: (i) CAE is collected and transferred to the CAE Redemption Fund at BPPR, (ii) to the extent that a municipality's funds in the CAE Redemption Fund are insufficient to satisfy the payment in full of such municipality's CAE Loans, as determined by the Designated Trustee, CRIM will deposit in the CAE Redemption Fund other revenues subject to the lien to cover such insufficiency, and (iii) the Designated Trustee will use the funds in the CAE Redemption Fund to pay, on behalf of the municipality, the principal and interest on such municipality's CAE Loans. The Municipal Financing Act provides that the CAE and other amounts deposited in the CAE Redemption Fund are to be utilized first for the payment of the principal of and premium, if any, and interest on each municipality's CAE Loans.



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001220

# New Fiscal Plan

**Repayment Structure of CAE Loans (64% of Municipal Loan Portfolio)**





GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001221

# New Fiscal Plan

## Repayment Structure of IVU Loans (25% of Municipal Loan Portfolio)

- Act No. 18-2014, as amended (the "FAM Act"), requires the Government to deposit in the Municipal Administration Fund ("FAM") an amount equal to the product of the State IVU collected during a fiscal year multiplied by a fraction whose numerator will be 0.5% and whose denominator will be 6%. The FAM is currently held on deposit at BPPR and, pursuant to the FAM Act, is administered by the Puerto Rico Municipal Financing Corporation ("COFIM").
- Amounts received by FAM are divided into three separate funds as follows:
    - *40% of the State IVU deposited in the FAM (i.e., product of the State IVU collected during a fiscal year multiplied by a fraction whose numerator is 0.2% and whose denominator is the rate of the State IVU deposited in the FAM) is transferred to the FAM's Redemption Fund (the "FAM Redemption Fund"),*
    - *40% of the State IVU deposited in the FAM (i.e., the product of the State IVU collected during a fiscal year multiplied by a fraction whose numerator is 0.2% and whose denominator is the rate of the State IVU deposited in the FAM) is transferred to the Municipal Development Fund (the "Development Fund"), and*
    - *20% the State IVU deposited in the FAM (i.e., the product of the State IVU collected during a fiscal year multiplied by a fraction whose numerator is 0.1% and whose denominator is the rate of the State IVU deposited in the FAM) is transferred to the Municipal Improvement Fund (the "Improvement Fund").*
- FAM Redemption Fund is distributed among municipalities pursuant to a predetermined formula provided by the FAM Act, which is based on the amounts collected in each municipality during the prior fiscal year. However, pursuant to the FAM Act, funds in the FAM should be used first for the payment of any outstanding municipal advances made by GDB to a municipality, prior to the distribution of funds to such municipality's FAM Redemption Fund, Development Fund and Improvement Fund.
- IVU Loans are payable from sales and use tax revenues required by law to be deposited in the FAM Redemption Fund. In addition, Section 4050.08 of the PR Internal Revenue Code, as amended, authorizes municipalities to elect to transfer all or a portion of funds in such municipality's Development Fund to the FAM Redemption Fund to increase their borrowing capacity. Funds so transferred from the Development Fund to the FAM Redemption Fund are available for the payment of IVU Loans.
- The funds in the FAM Redemption Fund are required by law to be applied for the payment of IVU Loans. IVU Loans that are part of the Restructuring Property, however, may be effectively subordinated to the payment of other IVU Loans secured by a security interest in municipal sales and use taxes granted to municipalities by private financial institutions to secure such loans.



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001222

# New Fiscal Plan

**Repayment Structure of IVU Loans (25% of Municipal Loan Portfolio)**



 GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001223



GOVERNMENT OF PUERTO RICO
Government Development Bank for
Puerto Rico



# IV.  Current Balance Sheet Information (unaudited)

AAFAF_CONF_0001224

# Current Balance Sheet Information (unaudited)

## Current Balance Sheet

- GDB's balance sheet includes a significant number of "non-performing" assets.

- Historically, GDB accounted for its inherent losses in its public sector loan portfolio following applicable financial reporting and accounting pronouncements and experiences on recoveries on its loan portfolio over several decades.

- Events between 2014 and 2016 resulted in loss of investment grade rating and market access that resulted in a significant increase in allowance for loan losses, totaling $2.5bn in the FY2014 Audited Financial Statements.

- The retention of certain revenues, conditionally transferred to public corporations by the Government, permanently impaired a large portion of GDB public corporation loans.

| ($ in millions) | 12/31/2017 |
|---|---|
| **Assets:** | |
| Cash & Cash Equivalents[a] | $307.9 |
| Loans: | |
| Public Entity Loans | 6,252.2 |
| Municipal Loans[b] | 2,417.9 |
| Private Sector Loans | 0.8 |
| Other Loans | 0.0 |
| Allowance for Loan Losses | (2,504.7) |
| **Total Loans, net** | **$6,166.1** |
| Accrued Interest Recievable: | |
| Investments | 0.0 |
| Public Entity Loans | 190.4 |
| Municipal Loans | 55.5 |
| Private Sector Loans | 0.0 |
| **Total Accrued Interest Receivable** | **$245.9** |
| Real Estate Owned | 62.5 |
| Other Assets | 17.9 |
| **Total Assets** | **$6,800.3** |

| **Liabilities:** | |
|---|---|
| Total Deposits | $3,549.0 |
| Allowance For Losses on Guarantees and LOCs | 52.6 |
| Accrued Interest Payable | 28.5 |
| Accounts Payable | 1,205.2 |
| Notes Payable | 2,818.3 |
| **Total Liabilities** | **$7,653.6** |
| Net Position | (853.4) |
| **Total Liabilities and Net Position** | **$6,800.3** |

Note:
1) Balance Sheet Information is unaudited.
2) Accounts Payable includes $947mm of GDB notes that have matured.
3) Allowance for Loan Losses is from GDB FY2014 Audited Financial Statements.
4) COFIM and FAM advances totaling $326.2mm and $168.1mm, respectively, are being reconciled against deposits received from municipal IVU from each entity. FAM advances will be netted out completely where COFIM would still owe $43.4mm to GDB.

Note:
(a) Unrestricted Cash excludes $22mm in GDB's obligations to former GDB employees that retired pursuant to various pre-retirement and voluntary separation programs. Balance sourced from GDB's unaudited 12/31/2017 financial statements. Book values may be impacted by ACH and intercompany suspense accounts.
(b) Municipal Loan balance accounts for COFIM and FAM Advances of $326mm and $168mm, respectively, prior to reconciliation.

Source: GDB



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001225

# Current Balance Sheet Information (unaudited)

## Loans

| GDB Loan Portfolio ($ in millions) | |
|---|---|
| **Public Corporation:** | |
| PR Highways and Transportation Authority (HTA) | $1,933.7 |
| Special Communities Perpetual Trust (SCPT) | 345.8 |
| PR Ports Authority (PRPA) | 286.5 |
| PR Administration of Medical Services | 282.4 |
| Port of the Americas | 227.2 |
| Other Public Corporation Loans | (113.0) |
| **Total Public Corporation Portfolio** | **$2,962.7** |
| **Public Agency:** | |
| PR Treasury Department (Hacienda) | $715.1 |
| Office of Management and Budget | 265.5 |
| Department of Treasury (General Obligation) | 169.4 |
| PR Comprehensive Cancer Center | 120.5 |
| Department of Education | 106.3 |
| Other Public Agency Loans | 1,443.3 |
| **Total Public Agency Portfolio** | **$2,820.2** |
| **Municipal:** | |
| San Juan | $391.9 |
| Guaynabo | 137.5 |
| Ponce | 93.1 |
| Toa Baja | 73.1 |
| Aguadilla | 70.1 |
| Other Municipal Loans | 1,157.9 |
| **Total Municipal Portfolio** | **$1,923.6** |
| **Private:** | |
| **Total Private Portfolio** | **$0.8** |
| **Total Portfolio** | **$7,707.2** |

| GDB Total Loan Portfolio ($ in millions) | |
|---|---|
| Public Corporation and Agency Loans | $5,782.9 |
| Municipal Loans | 1,923.6 |
| Municipal FAM Advances | 168.1 |
| Municipal COFIM Advances | 326.2 |
| Other Public Loans | 448.2 |
| Private Sector Loans | 0.8 |
| AFV Reverse Repo | 21.1 |
| **Gross Loans** | **$8,670.9** |
| Adjustments | (2,504.7) |
| **Net Loans** | **$6,166.1** |

Note: Differs from Assets on unaudited balance sheet:
- As of 12/31/17; Unaudited
- Public Loans excludes investment assets.
- COFIM and FAM advances totaling $326.2mm and $168.1mm, respectively, are being reconciled against deposits received from municipal IVU from each entity. FAM advances will be netted out completely where COFIM would still owe $43.4mm to GDB.
- All amounts shown are prior to application of deposits against corresponding loans.



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001226

# Current Balance Sheet Information (unaudited)

## Deposits

- As of December 31, 2017, GDB held approximately $3.5bn[1], net of COFIM and FAM, in deposits for various government agencies, corporations, municipalities and other entities.
- All depositors have transitioned their operating accounts away from GDB and have been transacting via commercial banks since April 2016.

| Top 20 GDB Depositors (12/31/17) | | | |
|---|---|---|---|
| ($ in millions) | | | |
| **Depositor** | **Balance** | **Depositor** | **Balance** |
| PR Treasury Department (Hacienda) | $ 568 | University of Puerto Rico (UPR) | $ 93 |
| Municipal Finance Corporation (COFIM) | 283 | Department of Labor and Human Resources | 82 |
| PR Infrastructure Financing Authority (PRIFA) | 232 | Municipality of Carolina | 60 |
| Municipal Administration Fund (FAM) | 190 | Puerto Rico State Insurance Fund (SIF) | 43 |
| PR Tourism Development Fund (TDF) | 161 | PR Public Buildings Authority (PBA) | 41 |
| PR Electric Power Authority (PREPA) | 152 | Land Administration | 39 |
| Municipality of San Juan | 149 | Municipality of Mayaguez | 35 |
| PR Housing Finance Authority (PRHFA) | 132 | PR Tourism Company (PRTC) | 35 |
| Special Communities Perpetual Trust (SCPT) | 103 | Government Employees Retirement System | 33 |
| PR Science and Technology Trust [2] | 96 | Other | 1,023 |
| **Total Deposits** | | | **$3,549**[3] |

Source: GDB
(1)  Balance of deposits includes $282mm and $190mm of COFIM and FAM deposits, respectively, that are the repayment of advances made by GDB to municipalities before July 1st, 2016 through COFIM and FAM. GDB is currently reconciling its books with net effect being an advance payable from COFIM to GDB of $43.4mm. All amounts are unaudited.
(2)  Indicates funds deposited by Science and Technology Trust are from a private non-profit entity.
(3)  All amounts are prior to application of deposits against corresponding loans.



GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

AAFAF_CONF_0001227

## SOLICITATION STATEMENT



## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

Any questions or requests for assistance or for additional copies of this Solicitation Statement or related documents may be directed to the Information Agent at its telephone numbers and e-mail address set forth below. You may also contact your Nominee for assistance concerning this Solicitation.

*The Calculation Agent and the Information Agent for this Solicitation is:*

**Epiq Corporate Restructuring**
**777 Third Avenue, 12th Floor**
**New York, New York 10017**
**Attn: GDB Ballot Processing**
**Telephone: (503) 520-4490**
**U.S. Toll Free: (877) 552-1788**

**Questions – but NOT Ballots or Master Ballots – may be sent by e-mail to:**
**tabulation@epiqglobal.com (please reference "GDB" in the subject line)**

Delivery of a Ballot or a Master Ballot to an address other than as set forth above may not constitute a valid delivery. *Beneficial Owners of Participating Bond Claims should follow the directions of their Nominee with respect to the return of their Ballot, which may be to the Nominee.*

Eligible Voters may also contact the Solicitation Agents at the telephone numbers set forth below for assistance concerning this Solicitation.

*The Solicitation Agents for this Solicitation are:*

**BofA Merrill Lynch**
Lead Solicitation Agent

**Barclays**
Co-Solicitation Agent

One Bryant Park
New York, New York 10036
Attn: Debt Advisory
Collect: (646) 855-8988
U.S. Toll Free: (800) 292-0070

745 7th Ave
New York, New York 10019
Attn: Municipal Sales
(212) 528-1115
U.S. Toll Free: (866) 744-4575

AAFAF_CONF_0001228