# COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2014

At June 30, 2014, the Primary Government's bonds and notes outstanding amounted to approximately $40.3 billion, the discretely presented component units' bonds and notes outstanding amounted to approximately $27.6 billion, and the fiduciary funds' bonds outstanding amounted to approximately $3.1 billion.

General obligation bonds are backed by the full faith, credit, and taxing power of the Commonwealth. The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth shall not be issued if the amounts of the principal of and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter internal revenue) in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee as long as the Commonwealth is in compliance with the 15% limitation at the time of issuance of such guaranteed debt. Internal revenue consists principally of income taxes, sales and use tax, property taxes, and excise taxes. Certain revenue, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Puerto Rico Highways Transportation Authority (PRHTA), a discrete component unit, are not included as revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of sales and use tax allocated to COFINA is not included as internal revenues consistent with the legislation creating COFINA, which transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" under the constitutional provisions relating to the payment of debt service.

Act No. 97 of July 1, 2015 established the Puerto Rico Commission for the Comprehensive Audit of the Public Credit (the Commission) to provide transparency and citizen participation in the review of the Commonwealth's and its public corporations' aggregate debt. In June 2016, the Commission rendered a pre-audit survey report. Due to timing and funding constraints, the report was limited to a review of documentation produced by GDB associated with the two most recent debt issuances by the Commonwealth (the 2014 $3.5 billion general obligation bond offering and the 2015 tax and revenue anticipations notes). The report was preliminary but raise concerns about whether the Commonwealth complied with the following requirements: the Puerto Rico Constitution's balanced budget requirement by using debt to finance deficits; the Puerto Rico Constitution's debt limit; the Puerto Rico Constitution's prohibition against issuing notes lasting more than 30 years; among other requirements; and whether the Commonwealth and/or its advisors and underwriters complied with the applicable U.S. Securities and Exchange Commission (SEC) laws concerning disclosures. The report states that it does not purport to render a legal opinion of any sort but, rather, provide an overview of some of the laws against which the Commission should determine compliance.

The Commonwealth has stated that although it encourages an open and transparent process to review the Commonwealth's aggregate debt load, it has no reason to believe that any of the Commonwealth's debt was issued in violation of the Puerto Rico Constitution or any other applicable laws. The Commonwealth will monitor further activities of the Commission.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2014

Debt of certain discretely presented component units (other than bond anticipation notes) such as the Puerto Rico Electric Power Authority (PREPA) and PRASA, is supported by the revenue of such component units from rates charged for services or products. However, the debt of certain blended component units and discretely presented component units is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

The Commonwealth's assigned general obligation bond ratings as of June 30, 2014 were as follows: "BB+" by Standard & Poor's Investor Services (S&P), "Ba2" by Moody's Investor Service, Inc. (Moody's), and "BB" Fitch Investor Service (Fitch). From July 2014 to the date that the financial statements were available to be issued, the Commonwealth's general obligations bonds credit rating has been lowered to "CC" by S&P, "Caa3" by Moody's, and "C" by Fitch.

Additional information on the Commonwealth's long-term debt can be found in note 12 to the basic financial statements that accompany this report.

### The Krueger Report

On February 5, 2015, former economists who have previously occupied senior executive positions at the International Monetary Fund (IMF) (the Former IMF economists), were engaged at GDB's request by its counsel, to analyze the Commonwealth's economic and financial stability and growth prospects. The Former IMF economist delivered their report (the Krueger Report) on June 28, 2015. The Krueger Report was subsequently updated as of July 13, 2015 and was accompanied by a note indicating that such update did not include final fiscal numbers for fiscal year 2015, which could materially change the estimated financing gaps mentioned in the report.

The Krueger Report was divided into two sections: (i) an assessment of the probable future performance of the Commonwealth's economy and public finances based on current policies, past experience and market conditions, and the risks inherent in the Commonwealth's outlook based on current conditions and (ii) options to strengthen the Commonwealth's outlook with a particular emphasis on policies to improve economic growth and reduce debt-servicing difficulties. The analysis included a public sector debt sustainability analysis similar to those typically performed by the IMF. Based on historical and projected fiscal and financial information provided by the Commonwealth, the analysis prepared by the Former IMF economists looked at a broader concept of the central government and its fiscal balance rather than just the General Fund, in line with IMF practices. The analysis examined the extent of the potential fiscal financing gaps (i.e., the extent to which total projected expenditures exceed total projected revenue) over the next five years based on current government policies, as well as taking into account potential contingencies, such as the loss of certain federal funds, and the implementation of additional revenue and expenditure reform measures. The Krueger Report states that Puerto Rico faces an acute crisis in the face of faltering economic activity, fiscal solvency and debt sustainability, and institutional credibility. Some of the report's principal conclusions are as follows:

- The economic problems of Puerto Rico are structural, not cyclical, and are not going away without structural reforms. The report reviews the various shocks to Puerto Rico's economy in the last decade (including the decline in manufacturing activity and the housing market, the banking crisis and the 2007–2009 U.S. economic recession), and concludes that, even more significantly than those factors, other forces on the supply side have affected economic growth. These supply side forces include low labor participation (40% versus 63% in the United States) and high labor costs, outmigration and population loss (according to the Puerto Rico Planning Board, population may continue to fall through 2020), high energy costs, high transportation costs and barriers to competition and business activity. The report states that the economy is

26   (Continued)

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2014

in a cycle where unsustainable public finances are feeding into uncertainty and low growth, which in turn is raising the fiscal deficit and the debt ratio. The Former IMF economists believe that the economy will continue to contract at a rate of at least 1% per annum, likely more in fiscal year 2015.

- Fiscal deficits are much larger than assumed and are set to deteriorate. The report points to a number of factors that contribute to the persistent deficits: overly optimistic revenue projections and budget formulation; lack of expenditure control and buildup of payables; negotiated discounts on anticipated tax obligations; extensive tax expenditures in the form of credits and exemptions; and lack of timely and reliable monitoring of fiscal trends. The report concludes that the standard measure of the fiscal balance in Puerto Rico, using the General Fund, greatly understates the true deficit and the challenge ahead. The report discusses the conceptual problems with viewing the deficit from the standpoint of the General Fund in isolation, including that the General Fund (i) being on a cash basis, does not reflect previously incurred expenses until the fiscal year in which they are recorded for payment, (ii) excludes numerous agencies and public corporations that operate like arms of the government and also run deficits, and (iii) excludes capital expenditures. As a result, the report states that an analysis of fiscal and debt sustainability cannot be conducted on the basis of the General Fund measure alone.

  Using standard IMF metrics to view the deficit from a broader standpoint than the General Fund, the Krueger Report indicates that the overall deficit is larger than recognized. The Former IMF economists construct a measure of the overall deficit that incorporates cash and noncash spending and uses a wider definition of the central government that includes, for example, governmental units receiving formula-based budgetary transfers. Under this methodology, the report identifies a deficit of approximately $2.0 billion for fiscal year 2015 that has been funded through a decline in cash balances and a further buildup of payables at the central government and at various others entities that receive funding from the General Fund. A similar narrative of large deficits is seen at the three largest public enterprises (PREPA, PRASA, and PRHTA) and the principal retirement systems. These deficits have worsened the prospect for debt sustainability.

  The report concludes that the actions taken by the Commonwealth to date to address the fiscal deficits are insufficient, and, thus, the fiscal deficits too are not going away and have to be closed through wide-ranging policy action.

- The central government deficits (as measured in the Krueger Report) over the coming years imply an unsustainable trajectory of large financing gaps. The report constructs a projection model using the above-described metrics and certain assumptions, including negative 1% real growth (the report states that this assumption is probably too optimistic in light of the looming crisis) and 2% inflation. The projection assumes the following: (i) budgetary support for the ERS starting in fiscal year 2017, for the JRS starting in fiscal year 2019 and for TRS starting in fiscal year 2020; (ii) principal payments of debt; (iii) the gradual pay down of arrears to suppliers and taxpayers ($450 million per year); and (iv) additional downside risks from a potential loss of federal funding for the Affordable Care Act and from a decline in Act No 154 of 2010 excise tax receipts (due to modified source income accounting rules for firms operating in multiple tax jurisdictions). Based on current policies, the model reflects overall deficits of between $3 billion and $5 billion per year over the next five years, and continuing to grow thereafter. After factoring the additional downside risks described in clause (iv) above, the report identifies that annual deficits could range from $3.7 billion in fiscal year 2016 to $8.2 billion in fiscal year 2025.

- Puerto Rico's public debt cannot be made sustainable without growth, nor can growth occur in the face of structural obstacles and doubts about debt sustainability. To restore growth and confidence, Puerto Rico

(Continued)

### COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2014

needs to implement ambitious measures as an integrated package in three principal areas: (1) structural reforms directed at restoring competitiveness, (2) fiscal reform and restructuring of public debt, and (3) institutional credibility.

First, with respect to structural reforms, the Krueger Report discusses needed supply side measures, some of which can be implemented by the Commonwealth by amending local laws (such as labor laws that result in a disincentive for employment) but others that would require federal legislative action. The impact on growth of supply side reforms, however, takes time. Implementing structural reforms alone would leave large fiscal deficits.

Second, with respect to fiscal adjustment and public debt, the Krueger Report states that fiscal reforms should focus more on broadening the tax base than on raising tax rates, and on targeted expenditure reductions. The report concludes that there is scope to increase savings to over $2 billion per year by fiscal year 2020 and $2.5 billion per year by fiscal year 2025, although total expenditures would still rise in dollar terms and relative to GNP as it is assumed that the government makes up for any cash shortfalls of the retirement systems. The report states that, while a reduction of fiscal imbalances should improve long-term economic prospects, the adjustment should be designed to be as growth oriented as possible. Too much fiscal tightening could depress demand and would do nothing to address the supply side problems at the root of the Commonwealth's growth problems. The report also states that there is scope to raise receipts around $3 billion annually by fiscal year 2020 and $4 billion annually by fiscal year 2025. The report acknowledges that their quantitative estimates are subject to great uncertainty and do not reflect the full menu of policy options.

The Krueger Report concludes that, even after factoring in a substantial fiscal effort, a large residual financing gap persists into the next decade, implying a need for debt relief. Based on the assumptions used in the projection model and incorporating the effects of proposed fiscal reforms, the residual financing gap disappears by fiscal year 2025, but to close the gap in prior years significant debt service relief is required. To close the financing gap, the government would need to seek relief from a significant but progressively declining proportion of principal and interest falling due during fiscal years 2016–2024. The report acknowledges that any debt restructuring would be challenging as there is no precedent of this scale and scope, but concludes that, from an economic perspective, the fact remains that the central government faces large financing gaps even with substantial adjustment efforts (as there are limits to how much expenditures can be cut or taxes raised). The report notes: "difficult or not, the projections are clear that the issue can no longer be avoided."

Finally, with respect to institutional credibility, the Krueger Report states that the legacy of budgetary laxity, nontransparency, and unreliable and dated statistics must be overcome for the reform program to work and command credibility. The recommendations in this area include, among others, legislative approval of a long-term fiscal plan, rules to limit changes to the plan, the establishment of an independent fiscal oversight board to advice on the budget and control its implementation, and the strengthening of statistics on the wider economy.

The Krueger Report acknowledges that the recommendations contained therein consist of a daunting agenda from a political, legal, and organizational standpoint, but the Former IMF economists believe that addressing these issues is urgent and that delays can intensify the crisis.

The projections included in the Krueger Report include estimates and assumptions about economic growth and other variables that are inherently subject to significant political, economic, and other uncertainties. Actual results may vary materially from such estimates and projections.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2014

**Going Concern, Insolvency of the Pension Systems and Liquidity Risk**

*Going Concern*

The Commonwealth and several of its component units face significant risks and uncertainties, including liquidity risk, which is the risk of not having sufficient liquid financial resources to meet obligations when they come due, as further described in note 2 to the basic financial statements. Governmental Accounting Standards Board Statement No. 56, *Codification of Accounting and Financial Reporting Guidance Contained in the AICPA Statements on Auditing Standards* (GASB Statement No. 56) requires management to evaluate whether there is substantial doubt about a government's ability to continue as a going concern. Information that may indicate substantial doubt as to a government's ability to continue as a going concern includes a government's inability to continue to meet its obligations as they become due without substantial disposition of assets outside the ordinary course of governmental operations, restructuring of debt, submission to the oversight of a separate financial assistance authority or financial review board, or similar actions. The risks and uncertainties facing the Commonwealth, together with other factors described in the basic financial statements, have led management to conclude that there is substantial doubt as to the ability of the Primary Government (including the Governmental Activities carried out by various blended component units), and of various discretely presented component units, to continue as a going concern in accordance with GASB Statement No. 56. In addition, in the opinion of management, the retirement systems comprising the pension trust funds (PRERS, PRJRS and PRTRS), included as part of the fiduciary funds, carry a substantial risk of insolvency, if measures are not taken to significantly increase contributions to them.

The Commonwealth currently faces a severe fiscal, economic and liquidity crisis, the culmination of many years of significant governmental deficits, a prolonged economic recession (which commenced in 2006), high unemployment, population decline, and high levels of debt and pension obligations. The Commonwealth's largest revenue streams are especially vulnerable during times of major economic downturns and have been affected by these same factors. Further stressing the Commonwealth's liquidity are large healthcare, pension and debt service costs. As the Commonwealth's tax base has shrunk and its revenues affected by prevailing economic conditions, healthcare, pension, and debt service costs have become an increasing portion of the General Fund budget, which has resulted in reduced funding available for other essential services. The Commonwealth's very high level of debt and unfunded pension liabilities and the resulting required allocation of revenue to service debt and pension obligations have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has financed, further increasing the amount of its debt. More recently, the Commonwealth's continued economic recession, high level of debt and pension obligations, and structural budget deficits, among other factors, have adversely affected its credit ratings and its ability to obtain financing at reasonable interest rates, if at all. As a result, the Commonwealth has relied more heavily on short-term financings and interim loans from GDB, and other component units of the Commonwealth, which reliance has constrained the liquidity of the Commonwealth in general and GDB in particular, and increased near-term refinancing risk. These factors have also resulted in delays in the repayment by the Commonwealth and its component units of outstanding GDB lines of credit, which delays have limited GDB's ability to continue providing liquidity to the Commonwealth and have caused GDB to fail to make a principal payment on its debt obligations. These factors are reflected in the deterioration of the Commonwealth's credit ratings. Since June 30, 2014, the principal rating agencies have continued to lower their rating on the general obligation bonds of the Commonwealth, which had already been placed within noninvestment grade ratings since February 2014. They also lowered their ratings on the bonds of PBA and COFINA, and on other bonds of various component units, including GDB, all of which were lowered multiple notches in the grading levels.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2014

The causes of these challenges have been analyzed in the Krueger Report, as previously described. At the time of the release of the Krueger Report, the Governor announced that the Commonwealth had no choice but to seek to restructure its debt with the goal of achieving a more sustainable debt service, and that if it was unable to do so the Commonwealth could default on its debt. In addition, the Governor created the Working Group for the Fiscal and Economic Recovery of Puerto Rico pursuant to Executive Order No. 2015-022, which prepared a Fiscal and Economic Growth Plan (the FEGP) that was released on September 9, 2015 and updated on January 18, 2016. The FEGP, among other things, projects significant financing gaps for the next ten fiscal years, identifies measures that could be implemented to reduce such gaps, and concludes that there is a need for a significant restructuring of the debt of the Commonwealth and various component units that have issued tax-supported debt. In making such projections, the FEGP adopted the Krueger Report's methodology (with certain modifications described therein), and do not directly correspond to the basis of reporting results in these basic financial statements. The conclusions drawn by both the Krueger Report and the FEGP indicate significant risks for holders of bonds and other obligations of the Commonwealth and its component units.

Following the release of the FEGP, the Commonwealth has proposed to seek a consensual restructuring of its outstanding debt and other tax-supported debt issued by certain component units. In January 2016, Commonwealth officials and advisors met with the advisors to the Commonwealth's creditors to present the Commonwealth's restructuring proposal, which was subsequently made public. In March and June 2016, the Commonwealth made public new proposals to the Commonwealth's creditors. The Krueger Report, the FEGP, and a summary of the Commonwealth's restructuring proposal are available in GDB's website at www.gdbpr.com. Negotiations with creditors remain ongoing.

There can be no assurance, however, that the Commonwealth will be able to successfully consummate its latest proposal or any other debt restructuring, particularly in absence of an orderly restructuring regime that binds holdout creditors. Certain of the Commonwealth's component units have already defaulted on debt service payments during fiscal year 2016. Others, like PREPA, a major component unit of the Commonwealth that does not issue tax-supported debt, have reached preliminary agreements with holders of a significant portion of its debt to restructure the terms of such obligations and achieve self-sufficiency from the Commonwealth. Such agreement, however, is subject to substantial political, legal and implementation risk. Management expects that the Commonwealth and various additional component units will be unable to comply with certain of their scheduled debt obligations, including general obligation debt service due on July 1, 2016. As a result, the Governor has issued several executive orders declaring emergency periods and suspending certain transfers and payments with respect to the Commonwealth and several of its component units, as further discussed in note 22 to the basic financial statements. Management expects that the Commonwealth and its component units will need to seek further relief under existing or potential future laws regarding receivership, insolvency, reorganization, moratorium, and/or similar laws affecting creditors' rights, to the extent available.

One such law, Act No. 71-2014, known as the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the Recovery Act), enacted by the Commonwealth to provide the aforementioned protection to certain component units, was challenged by certain private investors in Federal court and was declared unconstitutional by the United States District Court for the District of Puerto Rico on February 6, 2015. The District Court's decision was upheld by the United States Court of Appeals for the First Circuit and subsequently upheld by the U.S. Supreme Court.

In addition, although neither the Commonwealth nor its component units are eligible to seek relief under Chapter 9 of the United States Bankruptcy Code, on June 30, 2016, the U.S. President signed the Puerto Rico Oversight,

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2014

Management, and Economic Stability Act (PROMESA), which grants the Commonwealth and its component units access to an orderly mechanism to restructure their debts in exchange for significant federal oversight over the Commonwealth's finances. In broad strokes, PROMESA seeks to provide Puerto Rico with fiscal and economic discipline through the creation of a control board, relief from creditor lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt.

First, to ensure fiscal and economic discipline, PROMESA creates a federally appointed oversight board that has plenary authority over Puerto Rico's finances. The board's primary function is to provide fiscal oversight through the development and approval of fiscal plans and budgets, and to enforce compliance with those plans and budgets through broad-based powers such as reducing non-debt expenditures and instituting certain hiring freezes. The board also has oversight over legislative processes because PROMESA requires the board to review new laws and deny their enforcement if they are inconsistent with the approved fiscal plans and budgets. The board also has authority to review contracts to ensure compliance with the fiscal plan, and to prevent the execution or enforcement of a contract, rule, executive order or regulation to the extent that it is inconsistent with the approved fiscal plan.

Second, the enactment of PROMESA also operates as a broad-based stay on litigation, applicable to all entities, with respect to claims related Puerto Rico's financial debt, as well as on enforcement of provisions in contracts that allow for termination and the exercise of remedies based on non-payment of financial obligations, among other conditions.

Finally, PROMESA contains two methods to adjust Puerto Rico's debts. The first method is a streamlined process to achieve modifications of financial indebtedness with the consent of a supermajority of affected financial creditors. This method has benefits such as potential speed relative to a traditional restructuring through a formal in-court process. The second method is a court-supervised debt-adjustment process, which is modeled on Chapter 9 of the U.S. Bankruptcy Code. This process includes the so-called "cram-down" power, which may provide Puerto Rico with flexibility in debt adjustment, but it also gives the oversight board total control over the adjustment process and includes certain provisions designed to protect creditor interests.

The Commonwealth expects that its ability to finance future budget deficits will be severely limited even if it achieves a comprehensive debt restructuring, and, therefore, that it will be required to, among other measures, reduce the amount of resources that fund important governmental programs and services in order to balance its budget. There is no assurance, however, that budgetary balance will be achieved and, if achieved, that such budgetary balance will be based on recurring revenue or expense reductions or that the revenue or expense measures undertaken to balance the budget will be sustainable on a long term basis. Moreover, the measures to achieve budgetary balance through austerity may adversely affect the performance of the Commonwealth's economy, which, in turn, may adversely affect governmental revenues. While the FEGP and the proposed comprehensive debt restructuring seeks to address these recurring budgetary imbalances and to make debt service payments sustainable, it is at present uncertain that such a restructuring will be consummated or that it will achieve the goals of recurring budgetary balance and debt sustainability. Furthermore, the restructuring proposals presented by the Commonwealth depend on one hundred percent participation, which can only be achieved practically through a mechanism to bind holdout creditors. While PROMESA provides the Commonwealth tools to bind such holdouts and adjust its debts in an orderly manner, PROMESA gives the oversight board total control over such adjustment process and includes certain provisions designed to protect creditor interests, which are untested. There is thus no assurance that the federally appointed oversight board of PROMESA will be successful in achieving budgetary and fiscal balance through a debt restructuring or otherwise.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2014

Due in part to its significant liquidity constraints and the absence of an orderly restructuring regime to complete a restructuring of the Commonwealth's tax-supported debt obligations, the Commonwealth has already been forced to take emergency measures that affect the rights of bondholders and other creditors. First, the Commonwealth implemented administrative measures pursuant to Article VI Section 8 of the Constitution of the Commonwealth to redirect certain assigned revenues towards the payment of public debt.

In April 2016, the Governor of Puerto Rico signed into law Act 21-2016, known as the "Puerto Rico Emergency Moratorium and Financial Rehabilitation Act", as amended pursuant to Act 40-2016, (Act 21). Act 21 allows the Governor to prioritize essential government services over the financial obligations of the Commonwealth and its instrumentalities by imposing a moratorium on debt service payments, including debt service on general obligation bonds, and staying related creditor remedies for a temporary period. In respect of GDB, Act No. 21 also allows the Governor to take any and all actions that are reasonable and necessary to allow GDB to continue carrying out its operations. The temporary period set forth in Act 21 lasts until January 31, 2017, with a possible two-month extension at the Governor's discretion. The moratorium and stay provisions in Act 21 require executive action of the Governor to become effective. The Governor has issued several executive orders under Act 21 with respect to the Commonwealth and several of its component units, as discussed in note 22 to the basic financial statements. Additional measures could be undertaken, through Act 21 or through other state or federal legislation, such as PROMESA, in order to ensure the provision of essential government services.

GDB has historically served as the principal source of short-term liquidity for the Commonwealth and its component units and its functions are very important to the operations of the Commonwealth, its public corporations and municipalities. GDB announced that, at present, it is not able to continue to provide such assistance. Act 21 included amendments to the GDB's Enabling Act to enhance the statutory tools necessary if a resolution, reorganization or restructuring of GDB becomes necessary in the future. Specifically, these amendments modernize the receivership provision in the GDB's Enabling Act and authorize the creation of a temporary "bridge bank" to carry out GDB's functions and honor deposits.

GDB faces significant risks and uncertainties and it currently does not have sufficient liquid financial resources to meet obligations when they come due, including deposit withdrawals. Pursuant to Act 21, the Governor has ordered the suspension of loan disbursements by GDB, imposed restrictions on the withdrawal and transfer of deposits from GDB, and imposed a moratorium on debt obligations of GDB, among other measures. In conjunction with these measures, the Commonwealth and certain of its instrumentalities that used GDB as its main depositary institution have opened accounts in private banks and have ceased depositing at GDB.

As a result of GDB financing being unavailable, the Commonwealth and its component units are required to seek other sources of funding, including budgetary appropriations, in order to meet their obligations. There is no assurance that the Commonwealth or its component units will be able to access other sources of funding sufficient at any one time to meet their obligations as they come due. If such other funding sources are not available, the financial condition of the Commonwealth and its component units could deteriorate further and their ability to repay their loans to GDB may be further adversely affected.

Management expects that the Commonwealth will not be able to honor all of its obligations as they come due while at the same time providing essential government services. Also, there are certain Commonwealth component units that offer basic and essential services to the population of Puerto Rico. To the extent that any of these component units is unable to continue to provide such essential services, the Commonwealth may be required to divert

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2014

Commonwealth resources to ensure that such services continue to be provided. Such action would exacerbate the Commonwealth's insufficiency of revenue to honor its obligations as they become due.

Even though the Commonwealth's management believes that there is substantial doubt as to the Primary Government's ability to continue as a going concern in accordance with GASB Statement No. 56, the financial information contained herein has been presented assuming that it will continue as a going concern. In reaching the determination as to substantial doubt about the Primary Government's ability to continue as a going concern in accordance with GASB Statement No. 56, the Commonwealth's management has considered that these entities and activities show all the indicators to support such a conclusion: (i) negative trends for an extended period of time as evidenced by their significant deficits; (ii) other indicators of financial difficulties (such as the events of nonpayment of Public Finance Corporation bonds, the nonappropriation of funds for the payment of loans to GDB, the activation of the claw-back provisions of the Constitution and the enactment of Act 21); (iii) internal matters such as the Primary Government's significant dependency on federal grants and on the tax revenue (Act No. 154) from a few corporate sources carrying uncertain continuity and permanence as well as the frequent failure of the Commonwealth to meet its revenue projections; and (iv) external factors such as a contracting economy, contracting population, liquidity sources, and debt restructuring alternatives that are currently dependent on U.S. congressional legislation.

The Commonwealth has taken various emergency measures that have affected the rights of creditors and is actively considering additional emergency measures that may be implemented in the near future. In order to implement certain emergency measures, the Commonwealth needs to seek relief under existing or potential future laws regarding insolvency, reorganization, moratorium and/or similar laws affecting the creditor's rights, such as Act 21 of 2016 or PROMESA. The Commonwealth's emergency measures have included moratoriums on the payments of debt obligations, including General Obligation Bonds. Approximately $1.1 billion in General Obligations Bonds of the Commonwealth are due and payable on July 1, 2016. The Commonwealth lacks sufficient funds to honor such payment in full, among other debts due in July 2016.

For similar reasons, several discretely presented component units carry substantial doubt about their ability to continue as a going concern in accordance with GASB Statement No. 56, such as GDB, PRHTA, PREPA, PRASA, University of Puerto Rico (UPR), Puerto Rico Health Insurance Administration (PRHIA), Puerto Rico Ports Authority (PRPA), and Puerto Rico Metropolitan Bus Authority (PRMBA), Puerto Rico Industrial Development Company, among others.

*Insolvency of the Pension Systems*

The Pension Trust Funds carry a substantial risk of insolvency. The Pension Trust Funds' net pension liability (under the newly adopted GASB Statement No. 67) and the funded ratio as of June 30, 2014, are approximately $43.7 billion and 4.0%, respectively. Based on statutory funding requirements, the annual benefit payments and administrative expenses paid by the PRERS, the PRTRS and the PRJRS (the Retirement Systems) were significantly larger than the employee and employer contributions received by the Retirement Systems. In the opinion of management and based on information prepared by consulting actuaries, if measures are not taken to significantly increase contributions to ERS, JRS and TRS, these retirement systems will become insolvent by fiscal years 2018, 2018 and 2019, respectively. Further depletion of the Pension Trust Funds' assets could result in the inability to pay benefits and bonds.

## COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2014

The estimate of when each of the pension trust funds will become insolvent and when their assets will be exhausted is based on significant assumptions, including the rate of return on investments, the amount and timing of collections from the Commonwealth for the member and employer contributions, as well as the estimated participant benefits and the pension trust funds' administrative expenses to be paid each year.

If each of the systems comprising the pension trust funds becomes insolvent, each system would be operating solely on a "pay as you go" basis, which means that each system would be unable to pay benefits that exceed the actual employer and employee contributions received (net of administrative and other expenses), unless the Commonwealth and other participating employers provide the funding required to meet the "pay as you go" required benefits.

*Liquidity Risk*

As disclosed in Note 1(f) and 5 to the basic financial statements, the Commonwealth follows the practice of pooling cash. The Commonwealth has an operational bank account (known as the Treasury Single Account (TSA)) in which deposits all receipts from all governmental funds, except for the blended component units (such as COFINA, PBA, PRIFA, others). The TSA also includes some amounts deposited in custody from the fiduciary funds. The following figure represents the flows of receipts and disbursements of the TSA:



The TSA is the main operational bank account of the Commonwealth. Receipts in the TSA include tax collections (including pledged revenues for debt service payments), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), short and long term debt issuances, and other receipts. Disbursements from the TSA include payroll and related costs, pension funds benefits, suppliers and operational disbursements (including those reimbursed by Federal assistance grants and non general budgetary funds), capital outlays, debt service payments, required formulas and appropriations payments, pass through of pledged revenues to certain component units, tax refunds, and others disbursements. In April 2016, the TSA receipts started to be

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2014

deposited in a commercial bank rather than in GDB. Cash balances in the TSA held at GDB are subject to the limitations on withdrawals of funds from GDB.

The Primary Government cash bank balance shows a net decrease of $188 million in fiscal year 2014, when compared to fiscal year 2013. The Commonwealth has implemented significant measures to improve its liquidity in recent years, but even after the implementation of these measures, the Commonwealth confronts a severe liquidity risk in the last quarter of fiscal year 2016 and it expects to confront a severe liquidity risk in fiscal year 2017. The Commonwealth's liquidity position has been further affected by limitations imposed on withdrawals of funds from GDB. The Commonwealth projects that its resources will be insufficient to meet all of its financial obligations due in July 2016.

**Requests for Information**

This financial report is designed to provide a general overview of the Commonwealth's finances for all of the Commonwealth's residents, taxpayers, customers, investors, and creditors. This financial report seeks to demonstrate the Commonwealth's accountability for the money it receives. Questions concerning any of the information provided in this report or requests for additional information should be addressed to: Department of the Treasury of the Commonwealth of Puerto Rico, Área de Contabilidad Central, P.O. Box 9024140, San Juan, PR 00902.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position

June 30, 2014

(In thousands)

| | | Primary government | | | |
|---|---:|---:|---:|---:|---:|
| Assets: | | Governmental activities | Business-type activities | Totals primary government | Component units |
| Cash and cash equivalents in commercial banks | $ | 152,065 | 56,380 | 208,445 | 1,756,820 |
| Cash and cash equivalents in governmental banks | | 420,925 | 115,646 | 536,571 | 278,974 |
| Cash equivalents in Puerto Rico Government Investment Trust | | | | | |
| Fund (PRGITF) | | 2,072 | — | 2,072 | 7,019 |
| Investments | | 26,176 | — | 26,176 | 4,259,122 |
| Collateral from securities lending transactions | | — | — | — | 158,834 |
| Receivables – net: | | | | | |
| Income and excise taxes | | 1,483,305 | | 1,483,305 | — |
| Unemployment and other insurance premiums | | — | 4,169 | 4,169 | 53,486 |
| Intergovernmental | | 553,665 | 4,998 | 558,663 | 363,655 |
| Accounts | | 31,632 | 33,599 | 65,231 | 1,191,093 |
| Loans | | 39 | — | 39 | 4,641,505 |
| Accrued interest | | 41,607 | 49 | 41,656 | 200,106 |
| Other | | 144,106 | 339 | 144,445 | 77,209 |
| Due from net of allowance for uncollectibles: | | | | | |
| Primary government | | — | | — | 249,446 |
| Component units | | 73,708 | — | 73,708 | 2,223,259 |
| Other governmental entities | | 13,121 | 7,305 | 20,426 | 741,074 |
| Internal balances | | 11,041 | (11,041) | — | — |
| Inventories | | 10,733 | — | 10,733 | 443,527 |
| Prepaid expenses | | 35,716 | — | 35,716 | 29,959 |
| Other assets | | 15,797 | 4,542 | 20,339 | 149,385 |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | | 486,726 | 7,142 | 493,868 | 1,159,470 |
| Cash and cash equivalents in governmental banks | | 1,409,600 | 181,228 | 1,590,828 | 224,256 |
| Cash equivalents in PRGITF | | 80,725 | — | 80,725 | — |
| Cash and cash equivalents under the custody of U.S. Treasury | | — | 415,032 | 415,032 | — |
| Sales and use tax receivable | | 113,706 | — | 113,706 | — |
| Unemployment and other insurance premiums receivable | | — | 59,528 | 59,528 | — |
| Intergovernmental receivable | | 56,277 | — | 56,287 | — |
| Receivables | | — | 160 | 160 | — |
| Accrued interest | | — | 5,968 | 5,968 | — |
| Loans receivable from component units | | — | 490,916 | 490,916 | — |
| Investments | | 519,705 | 38,735 | 558,440 | 3,603,069 |
| Other | | 1,099 | 25,978 | 27,077 | 65,208 |
| Real estate held for sale or future development | | 44,667 | | 44,667 | 243,979 |
| Capital assets: | | | | | |
| Land and other nondepreciable assets | | 1,864,742 | 6,872 | 1,871,614 | 5,838,886 |
| Other capital assets – net of depreciation or amortization | | 6,275,220 | 58,558 | 6,333,778 | 24,294,353 |
| Total assets | | 13,868,175 | 1,506,113 | 15,374,288 | 52,253,694 |
| Deferred Outflows of Resources: | | | | | |
| Accumulated decrease in fair value of hedging derivatives | | 56,529 | — | 56,529 | 48,864 |
| Loss on bonds refunding | | 481,007 | — | 481,007 | 272,462 |
| Total deferred outflows of resources | | 537,536 | — | 537,536 | 321,326 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position

June 30, 2014

(In thousands)

|  | Primary government | | | |
|  | Governmental activities | Business-type activities | Totals primary government | Component units |
|---|---|---|---|---|
| Liabilities: | | | | |
| Accounts payable and accrued liabilities | 1,983,577 | 60,981 | 2,044,558 | 2,599,770 |
| Deposits and escrow liabilities | — | — | — | 5,986,088 |
| Tax refunds payable | 804,925 | — | 804,925 | — |
| Due to: | | | | |
| Primary government | — | — | — | 611,821 |
| Component units | 275,195 | 30,922 | 306,117 | 3,703,205 |
| Other governmental entities | 202,432 | 3,866 | 206,298 | 168,181 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | 198,797 |
| Interest payable | 745,029 | 16,671 | 761,700 | 760,078 |
| Grant advances | 8,960 | — | 8,960 | — |
| Unearned revenue | 56,549 | 20,755 | 77,304 | 109,233 |
| Notes payable to GDB | 313,136 | — | 313,136 | — |
| Bond anticipation notes | 8,391 | — | 8,391 | — |
| Liability for automobile accident insurance, workmen compensation, and medical claims | — | — | — | 1,187,689 |
| Hedging derivatives instruments - interest rate swaps | 56,529 | — | 56,529 | 48,864 |
| Liabilities payable within one year: | | | | |
| General obligations and revenue bonds | 522,400 | — | 522,400 | 1,028,116 |
| Notes payable to component units | 5,000 | — | 5,000 | 1,424,158 |
| Liability under guaranteed obligation | 949 | — | 949 | — |
| Capital leases | 5,224 | — | 5,224 | 964 |
| Compensated absences | 833,235 | 2,199 | 835,434 | 206,526 |
| Obligation for unpaid lottery prizes | — | 55,343 | 55,343 | — |
| Voluntary termination benefits | 98,352 | 732 | 99,084 | 25,920 |
| Insurance benefits payable | — | 63,661 | 63,661 | — |
| Other long-term liabilities | 138,871 | 25,859 | 164,730 | 155,079 |
| Liabilities payable after one year: | | | | |
| Commonwealth appropriation bonds | 571,236 | — | 571,236 | 529,169 |
| General obligations and revenue bonds | 36,831,805 | — | 36,831,805 | 18,976,981 |
| Notes payable to GDB | 2,044,120 | 278,292 | 2,322,412 | 5,600,433 |
| Liability under guaranteed obligation | 554,794 | — | 554,794 | — |
| Capital leases | 166,594 | — | 166,594 | 28,758 |
| Net pension obligation | 14,591,482 | — | 14,591,482 | — |
| Other postemployment benefit obligation | 268,834 | 1,834 | 270,668 | — |
| Compensated absences | 585,531 | 15,900 | 601,431 | 346,910 |
| Obligation for unpaid lottery prizes | — | 131,214 | 131,214 | — |
| Voluntary termination benefits | 979,834 | 5,144 | 984,978 | 197,043 |
| Other long-term liabilities | 2,088,284 | 6,891 | 2,095,175 | 873,696 |
| Total liabilities | 64,741,268 | 720,264 | 65,461,532 | 44,767,479 |
| Deferred Inflows of Resources: | | | | |
| Service concession arrangements | — | — | — | 1,744,617 |
| Gain on bonds refunding | 103,446 | — | 103,446 | — |
| Total deferred inflows of resources | 103,446 | — | 103,446 | 1,744,617 |
| Net Position: | | | | |
| Net investment in capital assets | 3,587,555 | 65,229 | 3,652,784 | 7,613,932 |
| Restricted for: | | | | |
| Capital projects | 142,010 | — | 142,010 | 335,331 |
| Debt service | 247,676 | — | 247,676 | 778,592 |
| Emergency services | — | 10,173 | 10,173 | — |
| Lending activities | — | 644,180 | 644,180 | — |
| Payment of insurance benefits | — | 435,668 | 435,668 | — |
| Public housing and welfare | 115,873 | — | 115,873 | 106,490 |
| Student loans and other educational purposes | — | — | — | 107,916 |
| Other | 1,280 | — | 1,280 | 209,970 |
| Unrestricted (deficit) | (54,533,397) | (369,401) | (54,902,798) | (3,089,307) |
| Total net position (deficit) | $ (50,439,003) | 785,849 | (49,653,154) | 6,062,924 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Activities

Year ended June 30, 2014

(In thousands)

| Functions | Expenses | Program revenue | | | Net (expense) revenue and changes in net position | | | Component units |
| | | Charges for services | Operating grants and contributions | Capital grants and contributions | Primary government | | | |
| | | | | | Governmental activities | Business-type activities | Total | |
| Primary Government: | | | | | | | | |
| Governmental activities: | | | | | | | | |
| General government | $ 2,894,304 | 310,148 | 330,229 | — | (2,253,927) | — | (2,253,927) | — |
| Public safety | 2,236,392 | 52,727 | 84,056 | — | (2,099,609) | — | (2,099,609) | — |
| Health | 3,139,595 | 165,865 | 1,693,632 | — | (1,280,098) | — | (1,280,098) | — |
| Public housing and welfare | 3,735,594 | 3,878 | 2,681,972 | 83,172 | (966,572) | — | (966,572) | — |
| Education | 4,570,665 | 1,251 | 1,466,992 | — | (3,102,422) | — | (3,102,422) | — |
| Economic development | 1,417,068 | 122,743 | 118,803 | — | (1,175,522) | — | (1,175,522) | — |
| Intergovernmental | 371,719 | — | — | — | (371,719) | — | (371,719) | — |
| Interest and other | 2,429,405 | — | — | — | (2,429,405) | — | (2,429,405) | — |
| Total governmental activities | 20,794,742 | 656,612 | 6,375,684 | 83,172 | (13,679,274) | — | (13,679,274) | — |
| Business-type activities: | | | | | | | | |
| Unemployment insurance | 271,749 | 246,171 | 91,807 | — | — | 66,229 | 66,229 | — |
| Lotteries | 714,199 | 923,233 | — | — | — | 209,034 | 209,034 | — |
| Puerto Rico Medical Services Administration | 204,688 | 123,143 | — | — | — | (81,545) | (81,545) | — |
| Puerto Rico Water Pollution Control Revolving Fund | 1,183 | 6,482 | 26,917 | — | — | 32,216 | 32,216 | — |
| Nonmajor proprietary funds | 28,920 | 40,410 | 9,084 | — | — | 20,574 | 20,574 | — |
| Total business-type activities | 1,220,739 | 1,339,439 | 127,808 | — | — | 246,508 | 246,508 | — |
| Total primary government | $ 22,015,481 | 1,996,051 | 6,503,492 | 83,172 | (13,679,274) | 246,508 | (13,432,766) | — |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Statement of Activities

Year ended June 30, 2014

(In thousands)

| Functions | Expenses | Charges for services | Operating grants and contributions | Capital grants and contributions | Governmental activities | Business-type activities | Total | Component units |
|---|---|---|---|---|---|---|---|---|
| | | | | | **Net (expense) revenue and changes in net position** | | | |
| | | **Program revenue** | | | **Primary government** | | | |
| Component Units: | | | | | | | | |
| Government Development Bank for Puerto Rico | $  3,261,768 | 410,583 | 163,522 | — | — | — | — | (2,687,663) |
| Puerto Rico Highways and Transportation Authority | 1,200,978 | 304,630 | — | 228,398 | — | — | — | (667,950) |
| Puerto Rico Electric Power Authority | 4,954,848 | 4,468,922 | — | 44,959 | — | — | — | (440,967) |
| Puerto Rico Aqueduct and Sewer Authority | 1,208,777 | 1,127,422 | — | 25,906 | — | — | — | (55,449) |
| University of Puerto Rico | 1,406,004 | 182,203 | 125,335 | 5,091 | — | — | — | (1,093,375) |
| State Insurance Fund Corporation | 585,005 | 614,693 | — | — | — | — | — | 29,688 |
| Puerto Rico Health Insurance Administration | 2,570,182 | 1,575,705 | — | — | — | — | — | (994,477) |
| Nonmajor component units | 1,486,339 | 778,827 | 47,027 | 65,015 | — | — | — | (595,470) |
| Total component units | $  16,673,901 | 9,462,985 | 335,884 | 369,369 | — | — | — | (6,505,663) |
| General Revenue: | | | | | | | | |
| Income taxes | | | | | $  5,400,423 | — | 5,400,423 | — |
| Sales and use tax | | | | | 1,294,445 | — | 1,294,445 | — |
| Excise taxes | | | | | 3,363,611 | — | 3,363,611 | 69,999 |
| Other taxes | | | | | 168,078 | — | 168,078 | — |
| Revenue from global tobacco settlement agreement | | | | | 72,012 | — | 72,012 | — |
| Revenue from State Insurance Fund Corporation | | | | | 107,904 | — | 107,904 | — |
| Revenue from Puerto Rico Tourism Company | | | | | 21,516 | — | 21,516 | — |
| Revenue from Automobile Accidents Compensation Administration | | | | | 1,713 | — | 1,713 | — |
| Grants and contributions not restricted to specific programs | | | | | 126,255 | — | 126,255 | 168,070 |
| Revenue from primary government | | | | | — | — | — | 2,444,808 |
| Unrestricted investment (losses) earnings – net | | | | | 11,624 | 14,257 | 25,881 | 317,087 |
| Other | | | | | 141,139 | — | 141,139 | 34,401 |
| Transfers | | | | | 266,956 | (266,956) | — | — |
| Total general revenue and transfers | | | | | 10,975,676 | (252,699) | 10,722,977 | 3,034,365 |
| Change in net position | | | | | (2,703,598) | (6,191) | (2,709,789) | (3,471,298) |
| Net position | | | | | | | | |
| At beginning of year, as previously reported | | | | | (47,212,999) | 792,268 | (46,420,731) | 9,826,618 |
| Correction of errors and adoption of new accounting pronouncements (note 3) | | | | | (522,406) | (228) | (522,634) | (292,396) |
| Net position (deficit) – beginning of year, as adjusted and restated | | | | | (47,735,405) | 792,040 | (46,943,365) | 9,534,222 |
| Net position (deficit) – end of year | | | | | $  (50,439,003) | 785,849 | (49,653,154) | 6,062,924 |

See accompanying notes to basic financial statements.

39

**COMMONWEALTH OF PUERTO RICO**

Balance Sheet – Governmental Funds

June 30, 2014

(In thousands)

| | General | Debt service | COFINA special revenue | COFINA debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 114,068 | — | — | — | 37,997 | 152,065 |
| Cash and cash equivalents in governmental banks | 289,127 | — | 9,600 | — | 122,198 | 420,925 |
| Cash equivalents in PRGITF | — | — | — | — | 2,072 | 2,072 |
| Investments | 10,600 | — | 170 | — | 15,406 | 26,176 |
| Receivables – net: | | | | | | |
| Income and excise taxes | 1,483,305 | — | — | — | — | 1,483,305 |
| Intergovernmental | 541,422 | — | — | — | 12,243 | 553,665 |
| Accounts | 28,350 | — | — | — | 3,282 | 31,632 |
| Loans | — | — | — | — | 39 | 39 |
| Accrued interest | 41,531 | — | — | — | 76 | 41,607 |
| Other | 97,364 | — | — | — | 46,742 | 144,106 |
| Due from: | | | | | | |
| Other funds, net | 51,974 | — | — | — | 4,959 | 56,933 |
| Component units, net | 56,010 | — | — | — | 17,698 | 73,708 |
| Other governmental entities | — | — | — | — | 13,121 | 13,121 |
| Other assets | 13,642 | — | — | — | 2,155 | 15,797 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 51,123 | 137 | — | 4 | 435,462 | 486,726 |
| Cash and cash equivalents in governmental banks | 16,648 | 1,133,933 | — | 18,788 | 240,231 | 1,409,600 |
| Cash equivalents in PRGITF | — | — | — | — | 80,725 | 80,725 |
| Sales and use tax receivable | — | — | — | 113,706 | — | 113,706 |
| Intergovernmental receivable | — | 56,277 | — | — | — | 56,277 |
| Investments | — | — | — | 407,371 | 112,334 | 519,705 |
| Due from other funds | — | — | — | 204,224 | — | 204,224 |
| Other assets | — | — | — | 657 | 442 | 1,099 |
| Real estate held for sale or future development | — | — | — | — | 2,052 | 2,052 |
| Total assets | $ 2,795,164 | 1,190,347 | 9,770 | 540,526 | 1,353,458 | 5,889,265 |
| **Liabilities, Deferred Inflow of Resources, and Fund Balances (Deficit):** | | | | | | |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | $ 1,826,709 | — | 4,329 | 92 | 143,548 | 1,974,678 |
| Tax refunds payable | 804,925 | — | — | — | — | 804,925 |
| Due to: | | | | | | |
| Other funds | 44,759 | — | — | 203,654 | 1,703 | 250,116 |
| Component units | 273,421 | — | — | — | 1,774 | 275,195 |
| Other governmental entities | 172,015 | — | — | — | 30,417 | 202,432 |
| Interest payable | 7,130 | 324,122 | — | — | 121,288 | 452,540 |
| Grant advances | 8,960 | — | — | — | — | 8,960 |
| Unearned revenue | 46,718 | — | — | — | 9,831 | 56,549 |
| Notes payable to GDB | 313,136 | — | — | — | — | 313,136 |
| Bond anticipation notes payable | — | — | — | — | 8,391 | 8,391 |
| General obligation and revenue bonds | — | 397,285 | — | — | 76,760 | 474,045 |
| Voluntary termination benefits payable | 746 | — | — | — | — | 746 |
| Total liabilities | 3,498,519 | 721,407 | 4,329 | 203,746 | 393,712 | 4,821,713 |
| **Deferred Inflows of Resources:** | | | | | | |
| Unavailable income taxes | 1,012,801 | — | — | — | — | 1,012,801 |
| Intergovernmental grants and contributions | 63,333 | 35,807 | — | — | — | 99,140 |
| Developer fees | 84,396 | — | — | — | — | 84,396 |
| Global tobacco settlement agreement | — | — | — | — | 42,193 | 42,193 |
| Total deferred inflows of resources | 1,160,530 | 35,807 | — | — | 42,193 | 1,238,530 |
| **Fund Balances:** | | | | | | |
| Spendable: | | | | | | |
| Restricted | 67,771 | 433,133 | — | 336,780 | 737,973 | 1,575,657 |
| Committed | 1,742 | — | — | — | 26,420 | 28,162 |
| Assigned | — | — | 5,441 | — | 153,160 | 158,601 |
| Unassigned | (1,933,398) | — | — | — | — | (1,933,398) |
| Total fund balances (deficit) | (1,863,885) | 433,133 | 5,441 | 336,780 | 917,553 | (170,978) |
| Total liabilities, deferred inflow of resources, and fund balances (deficit) | $ 2,795,164 | 1,190,347 | 9,770 | 540,526 | 1,353,458 | 5,889,265 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Reconciliation of the Balance Sheet of Governmental Funds
to the Statement of Net Position

June 30, 2014

(In thousands)

| | | |
|---|---|---:|
| Total fund balances (deficit) of governmental funds | $ | (170,978) |
| Amounts reported for governmental activities in the statement of net position are different than the amounts reported in the governmental funds because: | | |
| Inventories and prepaid expenses that are not reported in governmental funds and are reported in the statement of net position | | 46,449 |
| Deferred outflows of resources - Accumulated decrease in fair value of hedging derivatives | | 56,529 |
| Deferred outflows of resources - Loss on bond refunding | | 481,007 |
| Capital assets used in governmental activities are not financial resources and, therefore, are not reported in funds | | 8,139,962 |
| Real estate held for sale or future development are not current financial resources and, therefore, are not reported in the governmental funds | | 42,615 |
| Unearned revenue and deferred inflows of resources reported in the governmental funds are recognized as revenue in the governmental activities | | 1,238,530 |
| Deferred inflows of resources - Gain on bonds refunding | | (103,446) |
| Long-term liabilities are not due and payable in the current period and, therefore, are not reported in the funds: | | |
| Liabilities for terminated swap agreements and others | | (8,899) |
| Interest payable | | (292,489) |
| Hedging derivative instrument - interest rate swaps | | (56,529) |
| Commonwealth appropriation bonds | | (571,236) |
| General obligation and revenue bonds | | (36,880,160) |
| Notes payable to component units | | (2,049,120) |
| Liability under guaranteed obligation | | (555,743) |
| Capital leases | | (171,818) |
| Net pension obligation | | (14,591,482) |
| Other postemployment benefit obligation | | (268,834) |
| Compensated absences | | (1,418,766) |
| Voluntary termination benefits | | (1,077,440) |
| Other long-term liabilities | | (2,227,155) |
| Total net position (deficit) of governmental activities | $ | (50,439,003) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenditures, and Changes in Fund Balances – Governmental Funds

Year ended June 30, 2014

(In thousands)

| | General | Debt service | COFINA special revenue | COFINA debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Taxes: | | | | | | |
| Income taxes | $ 5,108,866 | — | — | — | — | 5,108,866 |
| Sales and use tax | 648,494 | — | — | 645,951 | — | 1,294,445 |
| Excise taxes | 3,363,611 | — | — | — | — | 3,363,611 |
| Property taxes | 55,838 | — | — | — | — | 55,838 |
| Other taxes | 112,240 | — | — | — | — | 112,240 |
| Charges for services | 694,507 | — | — | — | — | 694,507 |
| Revenue from global tobacco settlement agreement | 72,130 | — | — | — | — | 72,130 |
| Revenue from component units | 131,133 | — | — | — | — | 131,133 |
| Intergovernmental | 6,413,100 | 119,289 | — | — | 35,883 | 6,568,272 |
| Interest and investment earnings (losses) | 4,158 | 11,144 | 9 | 243 | 5,772 | 21,326 |
| Other | 133,385 | — | — | — | 7,891 | 141,276 |
| Total revenue | 16,737,462 | 130,433 | 9 | 646,194 | 49,546 | 17,563,644 |
| Expenditures: | | | | | | |
| Current: | | | | | | |
| General government | 1,166,672 | — | 181 | — | 154,241 | 1,321,094 |
| Public safety | 2,159,009 | — | — | — | 723 | 2,159,732 |
| Health | 3,037,927 | — | — | — | 3,948 | 3,041,875 |
| Public housing and welfare | 3,413,529 | — | — | — | 17,124 | 3,430,653 |
| Education | 4,595,314 | — | — | — | 1,856 | 4,597,170 |
| Economic development | 1,236,617 | — | — | — | 40,132 | 1,276,749 |
| Intergovernmental | 366,900 | — | — | — | 4,658 | 371,558 |
| Capital outlays | 95,736 | — | — | — | 102,615 | 198,351 |
| Debt service: | | | | | | |
| Principal | 1,962,638 | 397,285 | 333,300 | — | 330,954 | 3,024,177 |
| Interest and other | 237,832 | 617,098 | — | 652,795 | 402,059 | 1,909,784 |
| Other – debt issuance costs | — | 36,821 | — | — | — | 36,821 |
| Total expenditures | 18,272,174 | 1,051,204 | 333,481 | 652,795 | 1,058,310 | 21,367,964 |
| Deficiency of revenue under expenditures | (1,534,712) | (920,771) | (333,472) | (6,601) | (1,008,764) | (3,804,320) |
| Other financing sources (uses): | | | | | | |
| Transfers in | 1,846,666 | 737,639 | 374,941 | 9,066 | 1,080,567 | 4,048,879 |
| Transfers out | (1,402,254) | (2,238,438) | (84,880) | (55,395) | (956) | (3,781,923) |
| Proceeds from long term debt issued | 1,008,826 | — | — | — | 47,678 | 1,056,504 |
| Issuance of refunding bond | — | 3,500,000 | — | — | — | 3,500,000 |
| Payments to refunded bond escrow agent | — | (466,574) | — | — | — | (466,574) |
| Sale of capital assets | 1,016 | — | — | — | — | 1,016 |
| Discount on bonds issued | — | (245,000) | — | — | — | (245,000) |
| Termination payments on swap agreements | — | (90,417) | — | — | — | (90,417) |
| Total other financing sources (uses) | 1,454,254 | 1,197,210 | 290,061 | (46,329) | 1,127,289 | 4,022,485 |
| Net change in fund balances | (80,458) | 276,439 | (43,411) | (52,930) | 118,525 | 218,165 |
| Fund balances (deficit) – beginning of year, as restated (note 3) | (1,783,427) | 156,694 | 48,852 | 389,710 | 799,028 | (389,143) |
| Fund balances (deficit) – end of year | $ (1,863,885) | 433,133 | 5,441 | 336,780 | 917,553 | (170,978) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Reconciliation of the Statement of Revenue, Expenditures, and Changes in
Fund Balances of Governmental Funds to the Statement of Activities

Year ended June 30, 2014

(In thousands)

| | | |
|---|---:|---:|
| Net change in fund balances – total governmental funds | $ | 218,165 |
| Amounts reported for governmental activities in the statement of activities are different because: | | |
| Governmental funds report capital outlays as expenditures. However, in the statement of activities, the cost of those assets is allocated over their estimated useful lives and reported as depreciation and amortization expense. In the current period, these amounts are: | | |
| Capital outlays | $ 198,351 | |
| Less depreciation and amortization expense | (299,293) | |
| Subtotal | | (100,942) |
| The issuance of long-term debt (e.g., bonds and notes) provides current financial resources to governmental funds, while the repayment of the principal of long-term debt consumes the current financial resources of governmental funds. Neither transaction, however, has any effect on net position. Also, governmental funds report the effect of premiums, discounts, and similar items when debt is first issued, whereas these amounts are deferred and amortized in the statement of activities. This amount is the net effect of these differences in the treatment of long-term debt and related items: | | |
| Principal payments of long-term debt | 3,024,177 | |
| Proceed from long-term debt issued | (1,056,504) | |
| Proceeds from issuance of refunding bonds | (3,500,000) | |
| Payment to refunded bond escrow agent | 466,574 | |
| Termination payment on swap agreements | 90,417 | |
| Discount on bonds issuance | 245,000 | |
| Subtotal | | (730,336) |
| Some revenues in the statement of activities do not provide current financial resources, and, therefore, are deferred in governmental funds. Also, revenue related to prior periods that became available during the current period is reported in governmental funds but are eliminated in the statement of activities. This amount is the net adjustment. | | 260,544 |
| Some expenses reported in the statement of activities do not require the use of current financial resources and, therefore, are not reported as expenditures in governmental funds. | | (2,376,688) |
| Generally, inventory and prepayments are recorded as expenditures in the governmental funds when purchased rather than capitalized as an asset. However, these assets are capitalized in the statement of net position. This amount is the net decrease in total inventories and prepaid expenses. | | 25,659 |
| Change in net position of governmental activities | $ | (2,703,598) |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position – Proprietary Funds

June 30, 2014

(In thousands)

| | Business-Type Activities – Enterprise Funds | | | | | |
|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents in commercial banks | $          — | 55,106 | 1,098 | — | 176 | 56,380 |
| Cash and cash equivalents in governmental banks | — | 53,940 | — | — | 61,706 | 115,646 |
| Insurance premiums receivables – net | — | — | — | — | 4,169 | 4,169 |
| Intergovernmental receivable | — | — | 4,998 | — | — | 4,998 |
| Accounts | — | 13,049 | 18,418 | — | 2,132 | 33,599 |
| Accrued interest receivable | — | — | — | — | 49 | 49 |
| Other receivables | — | — | 66 | — | 273 | 339 |
| Due from other funds | — | — | 22,036 | — | 2,999 | 25,035 |
| Due from other governmental entities | — | — | 7,305 | — | — | 7,305 |
| Other assets | — | — | 4,321 | — | 221 | 4,542 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 5,650 | — | — | — | 535 | 6,185 |
| Cash and cash equivalents in governmental banks | — | — | — | 116,544 | 64,684 | 181,228 |
| Cash and cash equivalents under the custody the U.S. Treasury | 415,032 | — | — | — | — | 415,032 |
| Insurance premiums receivables – net | 59,528 | — | — | — | — | 59,528 |
| Intergovernmental receivable | 10 | — | — | — | — | 10 |
| Receivables | 35 | — | — | 125 | — | 160 |
| Accrued interest receivable | 1,161 | — | — | 3,255 | 1,552 | 5,968 |
| Loans receivable from component unit | — | — | — | 19,309 | 7,258 | 26,567 |
| Total current assets | 481,416 | 122,095 | 58,242 | 139,233 | 145,754 | 946,740 |
| Noncurrent assets: | | | | | | |
| Cash and cash equivalents in commercial banks - restricted | — | — | 957 | — | — | 957 |
| Loans receivable from component unit – restricted | — | — | — | 312,623 | 151,726 | 464,349 |
| Due from other funds | — | — | — | — | 16,589 | 16,589 |
| Restricted investments | — | — | — | — | 38,735 | 38,735 |
| Other restricted assets | — | 25,096 | — | 882 | — | 25,978 |
| Capital assets: | | | | | | |
| Land and other nondepreciable assets | — | — | 6,872 | — | — | 6,872 |
| Depreciable assets | — | 1,348 | 52,994 | — | 4,216 | 58,558 |
| Total assets | 481,416 | 148,539 | 119,065 | 452,738 | 357,020 | 1,558,778 |
| **Liabilities and net position:** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable and accrued liabilities | — | 9,010 | 46,707 | 2,124 | 3,140 | 60,981 |
| Due to other funds | 10,832 | 34,158 | 2,394 | — | 5,281 | 52,665 |
| Due to component units | — | — | 30,922 | — | — | 30,922 |
| Due to other governmental entities | — | — | — | — | 3,866 | 3,866 |
| Interest payable | — | — | 16,671 | — | — | 16,671 |
| Unearned revenue | 10,670 | 7,368 | — | — | 2,717 | 20,755 |
| Compensated absences | — | 569 | 313 | — | 1,317 | 2,199 |
| Obligation for unpaid lottery prizes | — | 55,343 | — | — | — | 55,343 |
| Voluntary termination benefits payable | — | 552 | — | — | 180 | 732 |
| Insurance benefits payable | 62,915 | — | — | — | 746 | 63,661 |
| Other long-term liabilities | — | — | 25,859 | — | — | 25,859 |
| Total current liabilities | 84,417 | 107,000 | 122,866 | 2,124 | 17,247 | 333,654 |
| Noncurrent liabilities: | | | | | | |
| Notes payable to GDB | — | — | 278,292 | — | — | 278,292 |
| Net postemployment benefit obligation | — | — | 1,834 | — | — | 1,834 |
| Compensated absences | — | 2,361 | 11,508 | — | 2,031 | 15,900 |
| Obligation for unpaid lottery prizes | — | 131,214 | — | — | — | 131,214 |
| Voluntary termination benefits payable | — | 4,587 | — | — | 557 | 5,144 |
| Other long-term liabilities | — | — | 6,891 | — | — | 6,891 |
| Total liabilities | 84,417 | 245,162 | 421,391 | 2,124 | 19,835 | 772,929 |
| Net position: | | | | | | |
| Net investment in capital assets | — | 1,348 | 59,865 | — | 4,016 | 65,229 |
| Restricted for emergency services | — | — | — | — | 10,173 | 10,173 |
| Restricted for lending activities | — | — | — | 450,614 | 193,566 | 644,180 |
| Restricted for payment of insurance benefits | 396,999 | — | — | — | 38,669 | 435,668 |
| Unrestricted (deficit) | — | (97,971) | (362,191) | — | 90,761 | (369,401) |
| Total net position (deficit) | $   396,999 | (96,623) | (302,326) | 450,614 | 337,185 | 785,849 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenses, and Changes in Fund Net Position – Proprietary Funds

Year ended June 30, 2014

(In thousands)

| | | | **Business-Type Activities – Enterprise Funds** | | | |
| | Unemployment Insurance | Lotteries | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
|---|---|---|---|---|---|---|
| Operating revenue: | | | | | | |
| Insurance premiums | $ 246,171 | — | — | — | 16,450 | 262,621 |
| Lottery ticket sales | — | 923,182 | — | — | — | 923,182 |
| Patient service, net of provision for bad debts | — | — | 123,143 | — | — | 123,143 |
| Interest | — | — | — | 6,482 | 3,122 | 9,604 |
| Emergency telephone service charges | — | — | — | — | 20,838 | 20,838 |
| Other | — | 51 | — | — | — | 51 |
| Total operating revenue | 246,171 | 923,233 | 123,143 | 6,482 | 40,410 | 1,339,439 |
| Operating expenses: | | | | | | |
| Insurance benefits | 271,749 | — | — | — | 2,853 | 274,602 |
| Lottery prizes | — | 632,706 | — | — | — | 632,706 |
| Patient services | — | — | 166,613 | — | — | 166,613 |
| General, administrative, and other operating expenses | — | 81,493 | 21,657 | 892 | 22,487 | 126,529 |
| Total operating expenses | 271,749 | 714,199 | 188,270 | 892 | 25,340 | 1,200,450 |
| Operating income (loss) | (25,578) | 209,034 | (65,127) | 5,590 | 15,070 | 138,989 |
| Nonoperating revenue (expenses): | | | | | | |
| U.S. government grants | 91,807 | — | — | 26,917 | 9,084 | 127,808 |
| Contributions to component unit | — | — | — | (291) | (3,580) | (3,871) |
| Interest and investment earnings | 9,213 | 458 | — | — | 4,586 | 14,257 |
| Interest expense | — | — | (17,234) | — | — | (17,234) |
| Other | — | — | 816 | — | — | 816 |
| Total nonoperating revenue (expenses) | 101,020 | 458 | (16,418) | 26,626 | 10,090 | 121,776 |
| Income (loss) before transfers | 75,442 | 209,492 | (81,545) | 32,216 | 25,160 | 260,765 |
| Transfers from other funds | — | — | 50,534 | 106 | 1,801 | 52,441 |
| Transfers to other funds | (41,719) | (259,325) | (2,250) | — | (16,103) | (319,397) |
| Net change in net position | 33,723 | (49,833) | (33,261) | 32,322 | 10,858 | (6,191) |
| Net position (deficit)– beginning of year, as adjusted (note 3) | 363,276 | (46,790) | (269,065) | 418,292 | 326,327 | 792,040 |
| Net position (deficit)– end of year | $ 396,999 | (96,623) | (302,326) | 450,614 | 337,185 | 785,849 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Cash Flows – Proprietary Funds

Year ended June 30, 2014

(In thousands)

| | | | Business-Type Activities – Enterprise Funds | | | |
|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| Cash flows from operating activities: | | | | | | |
| Receipts from customers and users | $ 243,419 | 918,068 | 128,547 | — | 36,954 | 1,326,988 |
| Other receipts | — | 50 | — | — | — | 50 |
| Payments to suppliers and employees | — | (82,259) | (158,022) | (688) | (19,716) | (260,685) |
| Payments of lottery prizes | — | (622,341) | — | — | — | (622,341) |
| Payments of insurance benefits | (277,399) | — | — | — | (2,928) | (280,327) |
| Net cash provided by (used in) operating activities | (33,980) | 213,518 | (29,475) | (688) | 14,310 | 163,685 |
| Cash flows from noncapital financing activities: | | | | | | |
| Intergovernmental grants and contributions | 92,214 | — | — | 26,917 | 9,084 | 128,215 |
| Contributions to component unit | — | — | — | (291) | (3,580) | (3,871) |
| Interest paid | — | — | (563) | — | — | (563) |
| Transfers from other funds | — | 736 | 38,035 | 106 | 1,801 | 40,678 |
| Transfers to other funds | (44,937) | (220,574) | 144 | — | (17,490) | (282,857) |
| Net cash provided by (used in) noncapital and related financing activities | 47,277 | (219,838) | 37,616 | 26,732 | (10,185) | (118,398) |
| Cash flows from capital and related financing activities: | | | | | | |
| Transfers from other funds | — | — | 1,100 | — | — | 1,100 |
| Capital expenditures | — | (105) | (11,892) | — | (356) | (12,353) |
| Net cash used in capital and related financing activities | — | (105) | (10,792) | — | (356) | (11,253) |
| Cash flows from investing activities: | | | | | | |
| Interest collected on deposits, investments, and loans | 9,213 | 458 | 816 | 6,192 | 5,696 | 22,375 |
| Loans originated | — | — | — | (31,212) | (10,317) | (41,529) |
| Principal collected on loans | — | — | — | 14,738 | 10,743 | 25,481 |
| Proceeds from sales and maturities of investments | — | — | — | — | 21,814 | 21,814 |
| Purchases of investments | — | — | — | — | (11,741) | (11,741) |
| Net cash provided by (used in) investing activities | 9,213 | 458 | 816 | (10,282) | 16,195 | 16,400 |
| Net change in cash and cash equivalents | 22,510 | (5,967) | (1,835) | 15,762 | 19,964 | 50,434 |
| Cash and cash equivalents at beginning of year | 398,172 | 115,013 | 3,890 | 100,782 | 107,137 | 724,994 |
| Cash and cash equivalents at end of year | $ 420,682 | 109,046 | 2,055 | 116,544 | 127,101 | 775,428 |

**COMMONWEALTH OF PUERTO RICO**

Statement of Cash Flows – Proprietary Funds

Year ended June 30, 2014

(In thousands)

| | | Business-Type Activities – Enterprise Funds | | | | |
|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| Reconciliation of operating income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Operating income (loss) | $ (25,578) | 209,034 | (65,127) | 5,590 | 15,070 | 138,989 |
| Adjustments to reconcile operating income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Interests earned on deposits, loans, and investments | — | — | — | (6,482) | (3,123) | (9,605) |
| Depreciation | — | 258 | 4,588 | — | 1,012 | 5,858 |
| Provision for bad debts | — | — | 13,530 | — | — | 13,530 |
| Loss on disposition of capital assets | — | — | 74 | — | 195 | 269 |
| Changes in operating assets and liabilities: | | | | | | |
| Decrease (increase) in accounts and loans receivable | 1,984 | (3,809) | (23,771) | — | (524) | (26,120) |
| Decrease in due from component units | — | — | 11,863 | — | — | 11,863 |
| Decrease in due from other governmental entities | — | — | 3,336 | — | — | 3,336 |
| Decrease (increase) in other assets | — | (676) | 446 | — | (183) | (413) |
| Increase (decrease) in accounts payable and accrued liabilities | — | (648) | 33,502 | 204 | (109) | 32,949 |
| Decrease in due to component units | — | — | (8,229) | — | — | (8,229) |
| Increase in due to other governmental entities | — | — | — | — | 2,039 | 2,039 |
| Increase (decrease) in unearned revenue | (4,737) | (629) | — | — | 373 | (4,993) |
| Increase (decrease) in compensated absences | — | (22) | 313 | — | (190) | 101 |
| Increase in obligation for unpaid lottery prizes | — | 10,365 | — | — | — | 10,365 |
| Decrease in voluntary termination benefits payable | — | (355) | — | — | (175) | (530) |
| Decrease in liability for insurance benefits payable | (5,649) | — | — | — | (75) | (5,724) |
| Total adjustments | (8,402) | 4,484 | 35,652 | (6,278) | 760 | 24,696 |
| Net cash provided by (used in) operating activities | $ (33,980) | 213,518 | (29,475) | (688) | 14,310 | 163,685 |
| Non-cash capital and financing activities: | | | | | | |
| Retirement of capital assets | $ — | — | 1,341 | — | — | 1,341 |
| Due from other funds write-off | $ — | 53,175 | — | — | — | 53,175 |
| Intergovernmental contribution for the payment of interest expenses | $ — | — | 16,671 | — | — | 16,671 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Fiduciary Net Position – Fiduciary Funds

June 30, 2014

(In thousands)

| | Pension (and other employee benefit) trust | Agency |
|---|---:|---:|
| Assets: | | |
| Cash and cash equivalents in commercial banks: | | |
|     Unrestricted | $ 81,574 | 577,386 |
|     Restricted | 129,690 | — |
| Cash and cash equivalents in governmental banks: | | |
|     Unrestricted | 60,123 | 293,167 |
|     Restricted | 21,299 | |
| Receivables – net: | | |
|     Employers – net | 196,086 | — |
|     Accrued interest and dividends | 15,821 | — |
|     Investments sold | 15,287 | — |
|     Other | 35,549 | — |
| Collateral from securities lending transactions | 142,627 | — |
| Investments at fair value: | | |
|     Bonds and notes | 2,006,298 | — |
|     Nonexchange commingled trust funds | 1,293,997 | — |
|     Stocks | 93,002 | — |
|     Investments in limited partnerships | 65,316 | — |
| Member loans and interest receivable – net | 1,040,465 | — |
| Capital assets – net | 28,536 | — |
| Other assets | 6,541 | — |
|         Total assets | 5,232,211 | 870,553 |
| Liabilities: | | |
|     Accounts payable and accrued liabilities | 33,366 | 870,553 |
|     Interest payable | 13,876 | — |
|     Payable for investment securities purchased | 23,641 | — |
|     Securities lending obligations | 142,627 | — |
|     Due to Commonwealth of Puerto Rico | 37,082 | — |
|     Other liabilities | 73,520 | — |
|     Bonds payable | 3,077,587 | — |
|         Total liabilities | 3,401,699 | 870,553 |
|     Net position: | | |
|         Restricted for pensions to be provided by ERS | 80,666 | — |
|         Restricted for pensions to be provided by TRS | 1,703,779 | — |
|         Restricted for pensions to be provided by JRS | 46,067 | — |
|     Total net position | $ 1,830,512 | — |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds

Year ended June 30, 2014

(In thousands)

| | | |
|---|---:|---:|
| Additions: | | |
| Contributions: | | |
| Employer contributions: | | |
| Basic benefits, net of provision to allowance of $82,848 | $ | 635,329 |
| Special benefits | | 418,122 |
| Member contributions | | 483,258 |
| Total contributions | | 1,536,709 |
| Investment income and investment expense: | | |
| Net appreciation in fair value of investments | | 260,571 |
| Interest | | 167,858 |
| Dividends | | 2,223 |
| Investment expense, other than from security lending | | (6,408) |
| Net income from investing, other than from security lending | | 424,244 |
| Securities lending income | | 664 |
| Securities lending expenses | | (167) |
| Net income from security lending | | 497 |
| Net investment income | | 424,741 |
| Other income | | 32,223 |
| Total additions | | 1,993,673 |
| Deductions: | | |
| Benefits paid to participants | | 2,382,130 |
| Refunds of contributions | | 177,272 |
| Interest on bonds payable | | 192,947 |
| General and administrative | | 76,495 |
| Other expenses | | 1,572 |
| Total deductions | | 2,830,416 |
| Net decrease in net position | | (836,743) |
| Net position restricted for pensions: | | |
| Beginning of year, as previously reported | | 2,697,236 |
| Effect of adoption of GASB Statement No. 65 (note 3) | | (29,981) |
| Beginning of year, as restated | | 2,667,255 |
| End of year | $ | 1,830,512 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Major Component Units

June 30, 2014

(In thousands)

| | | | Major component units | | | | | Major component units totals | Nonmajor component units totals | All component units totals |
|---|---|---|---|---|---|---|---|---|---|---|
| | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | State Insurance Fund Corporation | Puerto Rico Health Insurance Administration | | | |
| Assets: | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | $ 1,338,415 | 11,754 | 147,236 | 67,982 | 15,091 | 53,583 | 10,318 | 1,644,379 | 112,441 | 1,756,820 |
| Cash and cash equivalents in governmental banks | — | 35,751 | — | — | 79,919 | 26,144 | 19,267 | 161,081 | 117,893 | 278,974 |
| Cash equivalents in PRGITF | — | 179 | — | 6,840 | — | — | — | 7,019 | — | 7,019 |
| Investments | 1,846,615 | — | — | — | — | 1,246,203 | — | 3,092,818 | 1,166,304 | 4,259,122 |
| Collateral from securities lending transactions | — | — | — | — | — | 103,107 | — | 103,107 | 55,727 | 158,834 |
| Receivables – net: | | | | | | | | | | |
| Insurance premiums | — | — | — | — | — | 52,399 | — | 52,399 | 1,087 | 53,486 |
| Intergovernmental | — | 26,824 | — | 23,288 | 21,411 | — | 289,785 | 361,308 | 2,347 | 363,655 |
| Accounts | — | 10,357 | 818,889 | 166,040 | 29,536 | — | 69,344 | 1,094,166 | 96,927 | 1,191,093 |
| Loans and advances | 4,321,096 | — | — | — | 4,062 | — | — | 4,325,158 | 316,347 | 4,641,505 |
| Accrued interest | 177,858 | 576 | — | — | — | 5,336 | — | 183,770 | 16,336 | 200,106 |
| Other governmental entities | — | — | 641,783 | 5,306 | 71,685 | — | — | 718,774 | 22,300 | 741,074 |
| Other | 31,319 | — | — | — | — | 39,324 | — | 70,643 | 6,566 | 77,209 |
| Due from – net: | | | | | | | | | | |
| Primary government | — | 34,641 | 64,149 | 51,480 | 17,468 | 1,882 | 30,020 | 199,640 | 49,806 | 249,446 |
| Component units | 2,061,272 | 95,769 | 18,200 | 10,063 | 2,458 | — | — | 2,187,762 | 35,497 | 2,223,259 |
| Inventories | — | — | 390,960 | 30,215 | 3,806 | 3,277 | — | 428,258 | 15,269 | 443,527 |
| Prepaid expenses | — | 4,800 | 463 | 5,483 | 1,141 | 291 | 2,254 | 14,432 | 15,527 | 29,959 |
| Other assets | 630 | 2,311 | 16,803 | — | 93,840 | — | — | 113,584 | 35,801 | 149,385 |
| Restricted assets: | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | 84,939 | 1,298 | 634,225 | 359,809 | 8,290 | — | 1,100 | 1,089,661 | 69,809 | 1,159,470 |
| Cash and cash equivalents in governmental banks | — | 69,475 | — | 28,314 | 18,033 | — | — | 115,822 | 108,434 | 224,256 |
| Investments | 369,580 | 669,571 | 694,626 | — | 280,886 | 293,627 | — | 2,308,290 | 1,294,779 | 3,603,069 |
| Other restricted assets | 12,276 | — | — | — | — | — | — | 12,276 | 52,932 | 65,208 |
| Real estate held for sale or future development | 82,546 | — | — | — | — | — | — | 82,546 | 161,433 | 243,979 |
| Capital assets, not being depreciated | 16,945 | 2,246,264 | 1,108,149 | 722,007 | 92,291 | 21,315 | — | 4,206,971 | 1,631,915 | 5,838,886 |
| Capital assets, depreciable – net | 3,780 | 8,663,595 | 5,739,307 | 6,747,751 | 860,373 | 80,290 | 654 | 22,095,750 | 2,198,603 | 24,294,353 |
| Total assets | 10,347,271 | 11,777,396 | 10,352,359 | 8,232,715 | 1,607,895 | 1,929,236 | 422,742 | 44,669,614 | 7,584,080 | 52,253,694 |
| Deferred Outflows of Resources: | | | | | | | | | | |
| Accumulated decrease in fair value of hedging derivatives | — | — | 48,864 | — | — | — | — | 48,864 | — | 48,864 |
| Loss on bonds refunding | 2,872 | 132,042 | 77,948 | 35,598 | 2,818 | — | — | 251,278 | 21,184 | 272,462 |
| Total deferred outflows of resources | 2,872 | 132,042 | 126,812 | 35,598 | 2,818 | — | — | 300,142 | 21,184 | 321,326 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Major Component Units

June 30, 2014

(In thousands)

| | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | State Insurance Fund Corporation | Puerto Rico Health Insurance Administration | Major component units totals | Nonmajor component units totals | All component units totals |
|---|---|---|---|---|---|---|---|---|---|---|
| Liabilities: | | | | | | | | | | |
| Accounts payable and accrued liabilities | 91,706 | 147,852 | 1,481,236 | 264,975 | 39,314 | 155,267 | 74,550 | 2,254,900 | 344,870 | 2,599,770 |
| Deposits and escrow liabilities | 5,214,539 | — | 184,581 | 83,154 | — | — | — | 5,482,274 | 503,814 | 5,986,088 |
| Due to: | | | | | | | | | | |
| Primary government | — | 9,484 | — | 490,916 | — | — | 7,239 | 507,639 | 104,182 | 611,821 |
| Component units | — | 2,050,266 | 43,620 | 101,794 | 119,952 | — | 183,251 | 2,498,883 | 1,204,322 | 3,703,205 |
| Other governmental entities | — | 3,321 | — | 9,162 | 66,567 | — | — | 79,050 | 89,131 | 168,181 |
| Securities lending obligations and reverse repurchase agreements | 50,000 | — | — | — | — | 103,107 | — | 153,107 | 45,690 | 198,797 |
| Interest payable | 42,069 | 297,722 | 218,839 | 105,947 | 4,313 | 919 | 11,105 | 680,914 | 79,164 | 760,078 |
| Unearned revenue | — | — | — | 18,583 | — | 21,193 | — | 39,776 | 69,457 | 109,233 |
| Liability for automobile accident insurance, workmen compensation, and medical claims | — | — | — | — | — | 811,996 | 281,714 | 1,093,710 | 93,979 | 1,187,689 |
| Liabilities payable within one year: | | | | | | | | | | |
| Notes payable | 209,575 | 150,000 | 698,029 | 200,000 | 514 | 21,426 | 82,999 | 1,362,543 | 61,615 | 1,424,158 |
| Bonds payable | 305,941 | 107,600 | 432,281 | 48,744 | 21,090 | — | — | 915,656 | 112,460 | 1,028,116 |
| Accrued compensated absences | 3,273 | 10,362 | 97,413 | 12,918 | 37,880 | 12,949 | 731 | 175,526 | 31,000 | 206,526 |
| Voluntary termination benefits payable | 3,062 | 9,960 | — | — | — | — | 537 | 13,559 | 12,361 | 25,920 |
| Capital leases | — | — | — | — | — | 765 | — | 765 | 199 | 964 |
| Other long-term liabilities | 15,067 | 11,397 | 60,614 | 7,092 | 2,258 | 49,523 | — | 145,951 | 9,128 | 155,079 |
| Liabilities payable after one year: | | | | | | | | | | |
| Notes payable | 4,317,616 | 250,000 | 10,862 | — | 908 | 232,261 | — | 4,811,647 | 788,786 | 5,600,433 |
| Commonwealth appropriation bonds | 3,434 | — | — | 416,798 | — | — | — | 420,232 | 108,937 | 529,169 |
| Bonds payable | 144,379 | 4,458,668 | 8,236,144 | 4,075,242 | 541,929 | — | — | 17,456,362 | 1,520,619 | 18,976,981 |
| Accrued compensated absences | 1,334 | 10,806 | 114,518 | 28,771 | 140,397 | 26,254 | 467 | 322,547 | 24,363 | 346,910 |
| Voluntary termination benefits payable | 13,638 | 70,543 | — | — | — | — | 3,952 | 88,133 | 108,910 | 197,043 |
| Capital leases | — | — | — | — | — | 28,515 | — | 28,515 | 243 | 28,758 |
| Hedging derivative instruments – interest rate swaps | — | — | 48,864 | — | — | — | — | 48,864 | — | 48,864 |
| Other long-term liabilities | 250,484 | 204,774 | 119,175 | 25,238 | 118,967 | 62,458 | 5,992 | 787,088 | 86,608 | 873,696 |
| Total liabilities | 10,666,117 | 7,792,755 | 11,746,176 | 5,889,334 | 1,094,089 | 1,526,633 | 652,537 | 39,367,641 | 5,399,838 | 44,767,479 |
| Deferred inflows of resources: | | | | | | | | | | |
| Service concession arrangements | — | 1,139,213 | — | — | — | — | — | 1,139,213 | 605,404 | 1,744,617 |
| Total deferred inflows of resources | — | 1,139,213 | — | — | — | — | — | 1,139,213 | 605,404 | 1,744,617 |
| Net position: | | | | | | | | | | |
| Net investment in capital assets | 9,354 | 2,815,240 | (253,448) | 2,525,360 | 398,041 | 44,504 | 654 | 5,539,705 | 2,074,227 | 7,613,932 |
| Restricted for: | | | | | | | | | | |
| Capital projects | — | 26,824 | — | — | 9,300 | — | — | 36,124 | 299,207 | 335,331 |
| Debt service | 43,132 | 443,377 | — | — | 57,081 | 67,760 | — | 611,350 | 167,242 | 778,592 |
| Affordable housing and related loan insurance programs | 106,490 | — | — | — | — | — | — | 106,490 | — | 106,490 |
| Student loans and other educational purposes | — | — | — | — | 99,166 | — | — | 99,166 | 8,750 | 107,916 |
| Other specified purposes | — | — | — | 27,050 | 13,139 | — | — | 40,189 | 169,781 | 209,970 |
| Unrestricted (deficit) | (474,950) | (307,971) | (1,013,557) | (173,431) | (60,103) | 290,339 | (230,449) | (1,970,122) | (1,119,185) | (3,089,307) |
| Total net position (deficit) | $ (315,974) | 2,977,470 | (1,267,005) | 2,378,979 | 516,624 | 402,603 | (229,795) | 4,462,902 | 1,600,022 | 6,062,924 |

See accompanying notes to basic financial statements.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Activities – Major Component Units

Year ended June 30, 2014

(In thousands)

| | Expenses | Charges for services | Operating grants and contributions | Capital grants and contributions | Net revenue (expenses) and changes in net position | Payments from (to) primary government | Payments from (to) other component units | Grants and contributions not restricted to specific programs | Interest and investment earnings | Excise taxes and others | Change in net position | Net position – beginning of year, as adjusted and restated | Correction of errors and adoption of new pronouncements (note 3) | Net position – beginning of year, as adjusted and restated | Net position end of year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | | | | | | | | | |
| Government Development Bank for Puerto Rico | $ 3,261,768 | 410,583 | 163,522 | — | (2,687,663) | — | — | — | — | — | (2,687,663) | 2,379,306 | (7,617) | 2,371,689 | (315,974) |
| Puerto Rico Highways and Transportation Authority | 1,200,978 | 304,630 | — | 228,398 | (667,950) | 440,725 | — | — | 36,758 | 249 | (190,218) | 3,245,395 | (77,707) | 3,167,688 | 2,977,470 |
| Puerto Rico Electric Power Authority | 4,954,848 | 4,468,922 | — | 44,959 | (440,967) | — | — | — | 21,157 | — | (419,810) | (791,385) | (55,810) | (847,195) | (1,267,005) |
| Puerto Rico Aqueduct and Sewer Authority | 1,208,777 | 1,127,422 | — | 25,906 | (55,449) | 5,856 | — | — | 4,467 | 4,080 | (41,046) | 2,539,475 | (119,450) | 2,420,025 | 2,378,979 |
| University of Puerto Rico | 1,406,004 | 182,203 | 125,335 | 5,091 | (1,093,375) | 873,570 | 64,547 | 162,035 | 9,892 | 11,230 | 27,899 | 483,544 | 5,181 | 488,725 | 516,624 |
| State Insurance Fund Corporation | 585,005 | 614,693 | — | — | 29,688 | (107,903) | — | — | 143,717 | — | 65,502 | 337,101 | — | 337,101 | 402,603 |
| Puerto Rico Health Insurance Administration | 2,570,182 | 1,575,705 | — | — | (994,477) | 894,657 | (64,547) | 6,035 | 40,727 | 88,841 | (59,093) | (170,702) | — | (170,702) | (229,795) |
| Nonmajor component units | 1,486,339 | 778,827 | 47,027 | 65,015 | (595,470) | 337,903 | — | — | 60,569 | — | (166,869) | 1,803,884 | (36,993) | 1,766,891 | 1,600,022 |
| | $ 16,673,901 | 9,462,985 | 335,884 | 369,369 | (6,505,663) | 2,444,808 | — | 168,070 | 317,087 | 104,400 | (3,471,298) | 9,826,618 | (292,396) | 9,534,222 | 6,062,924 |

See accompanying notes to basic financial statements.

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

**(1) Summary of Significant Accounting Policies**

The Commonwealth of Puerto Rico (the Commonwealth) was constituted on July 25, 1952, under the provisions of the Commonwealth's Constitution (the Constitution) as approved by the people of Puerto Rico and the U.S. Congress. The Constitution provides for the separation of powers of the executive, legislative, and judicial branches of the government. The Commonwealth assumes responsibility for general government, public safety, health, public housing and welfare, education, and economic development.

The accompanying basic financial statements of the Commonwealth are presented in conformity with U.S. Generally Accepted Accounting Principles (U.S. GAAP) for governments as prescribed by the Governmental Accounting Standards Board (GASB).

The accompanying basic financial statements present the financial position of the Commonwealth and its various funds and component units, the results of operations of the Commonwealth and its various funds and component units, and the cash flows of the proprietary funds. The basic financial statements are presented as of June 30, 2014 and for the year then ended.

(a) *Financial Reporting Entity*

The financial reporting entity of the Commonwealth includes all departments, agencies, funds, functions, and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's financial reporting entity. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. The GASB has set forth criteria to be considered in determining financial accountability. These criteria include when the Commonwealth appoints a voting majority of an organization's governing body and it has (i) the ability to impose its will on that organization or (ii) the potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth. In situations where the Commonwealth has not appointed the voting majority of an organization's governing body, the GASB has then provided as criteria for financial accountability the fiscal dependency of such organizations on the Commonwealth when there is a potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth.

As required by U.S. GAAP, the financial reporting entity of the Commonwealth includes the Commonwealth and its component units.

(b) *Component Units*

The financial statements of the component units discussed below have been included in the financial reporting entity either as blended component units or as discretely presented component units in accordance with GASB Statement No. 14, *The Financial Reporting Entity*, as amended by GASB Statements No. 39 and No. 61.

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

**Blended Component Units**

The following entities, while legally separate from the Commonwealth, meet the blending criteria to be reported as part of the Primary Government as follows:

*Public Buildings Authority (PBA)* – PBA is governed by a seven-member board comprised of the Secretary of the Department of Transportation and Public Works (DTPW), the Secretary of the Department of Education of the Commonwealth, the President of the Government Development Bank for Puerto Rico (GDB), and four members appointed by the Governor of Puerto Rico with the advice and consent of the Senate. It is a legally separate entity, whose activities are blended within the Primary Government because it exists to construct, purchase, or lease office, school, health, correctional, social welfare, and other facilities for lease to the Commonwealth's departments, component units, and instrumentalities. Bonds issued by the PBA to finance such facilities are payable from lease collections, which are largely derived from Commonwealth appropriations and are further secured by the Commonwealth's guaranty. Therefore, the financial statements of the PBA are blended in the Commonwealth's fund financial statements as a special revenue, debt service, and capital project fund.

*Puerto Rico Infrastructure Financing Authority (PRIFA)* – PRIFA is governed by a seven-member board comprised of five members appointed by the board of the directors of the GDB, the Secretary of the Treasury of the Commonwealth and one member appointed by the Governor. The members of PRIFA's board of directors are executives in trustworthy positions, named and supervised by the Governor. The President is appointed by the Governor from among its members. PRIFA is a financing authority whose responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternate means for financing them. PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt is payable from federal excise taxes levied on the rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the US Treasury and returned to the Commonwealth. PRIFA's remaining debt, other than the Special Tax Revenue Bonds, is payable from Commonwealth legislative appropriations. Therefore, PRIFA's financial statements are blended in the Commonwealth's fund financial statements as a special revenue, debt service and capital project fund.

*Puerto Rico Maritime Shipping Authority (PRMSA)* – PRMSA is governed by the President of the GDB. The operations of PRMSA have been limited to processing the remaining legal requirements resulting from the sale of certain maritime operations formerly owned and operated by PRMSA. Such legal requirements consist solely of servicing the long-term debt that remained in PRMSA after the sale. The Commonwealth should appropriate annually funds in its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding. Therefore, PRMSA's financial statements are blended in the Commonwealth's fund financial statements as a debt service fund.

*Puerto Rico Medical Services Administration (PRMeSA)* – PRMeSA is governed by a ten member board comprising the Secretary of the Department of Health of the Commonwealth, who is the Chairman, the Dean of the Medical Sciences Faculty of the University of Puerto Rico (UPR), the President of the board of directors of the Puerto Rican League Against Cancer, the Mayor of the

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Municipality of San Juan, the Administrator of the State Insurance Fund Corporation, the Administrator of the Administration of Mental Health and Addiction Services, the President of the Medical Policy and Administration Committee, the Secretary of the Department of Family, and two members appointed by the Secretary of the Department of Health of the Commonwealth. Its purpose is to plan, organize, operate, and administer the centralized health services, provided in support of the hospital and other functions, offered by the member institutions and users of the medical complex known as the Puerto Rico Medical Center. The Commonwealth should annually appropriate funds from its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding of PRMeSA. Therefore, PRMeSA's financial statements are blended in the Commonwealth's fund financial statements as an enterprise fund.

*Puerto Rico Sales Tax Financing Corporation (Known as COFINA, its Spanish Acronym)* – COFINA was created under Act No. 91 approved on May 13, 2006, as amended by the Legislative Assembly of the Commonwealth. COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain debt obligations of the Commonwealth outstanding at June 30, 2006 (the 2006 Appropriation Debt). During 2009, the Commonwealth's Legislative Assembly expanded the purposes of COFINA to assist in funding operational expenses of the Commonwealth for 2009 through 2011 and for 2012, to the extent included in the annual budget of the Commonwealth. The members of the board of directors of COFINA are the same as the ones of the GDB. Since COFINA's total outstanding debt of Sales Tax Revenue Bonds is being repaid and pledged with Commonwealth's sales and use taxes as described in note 12, its financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

*Special Communities Perpetual Trust (SCPT)* – SCPT is governed by a board of directors composed of eleven members: the Secretary of the Department of Housing of the Commonwealth, the Secretary of the DTPW of the Commonwealth, the Coordinator for the Social and Economic Financing of the Special Communities, one mayor of a municipality of Puerto Rico, one community leader resident in one special community, four private citizens representing the public interest, and two public employees. All members of the board of directors are appointed by the Governor. SCPT's principal purpose is to fund development projects that address the infrastructure and housing needs of the underprivileged communities. Over the years since its inception, SCPT has seen its revenue sources diminished as its principal assets, mortgage loans, are being fully reserved. SCPT has accumulated debt with the GDB, which is payable from Commonwealth Legislative appropriations. Therefore, SCPT's financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

*The Children's Trust* – The Children's Trust is governed by a seven-member board comprised of the Governor, who designates the president of the board, the President of the GDB, the Director of the Office of Management and Budget of the Commonwealth (Commonwealth OMB), the Secretary of Justice of the Commonwealth, and three private citizens appointed by the Governor with the advice and consent of the Senate. The Children's Trust's sole operation consists of providing financial assistance principally to the Commonwealth's departments to carry out projects aimed at promoting the well-being of families, children, and youth of Puerto Rico, especially in the areas of education, recreation, and health. The operation of the Children's Trust is financed with the moneys being received by the Commonwealth from a global settlement agreement (GSA) dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

States of America, including the Commonwealth. The GSA calls for annual payments through the year 2025, which will vary due to inflationary and volume adjustments. After 2025, the tobacco companies shall continue making contributions in perpetuity. As The Children's Trust provides financial assistance entirely or almost entirely to the Commonwealth's departments and its total debt outstanding is being repaid and pledged with the GSA resources received by the Commonwealth, its financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

The COFINA debt service fund and the COFINA special revenue fund are presented as major governmental funds, while PRMeSA is presented as a major enterprise fund. All the other blended component units are reported in the nonmajor governmental funds column. Complete financial statements of the blended component units can be obtained directly by contacting their respective administrative offices at:

Public Buildings Authority
P.O. Box 41029 – Minillas Station
San Juan, PR 00940-1029

Puerto Rico Infrastructure Financing Authority
P.O. Box 41207 Minillas Station
San Juan, PR 00940

Puerto Rico Maritime Shipping Authority
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Medical Services Administration
P.O. Box 2129
San Juan, PR 00922-2129

Puerto Rico Sales Tax Financing
   Corporation
P.O. Box 42001
San Juan, PR 00940-2001

Special Communities Perpetual Trust
P.O. Box 42001
San Juan, PR 00940-2001

The Children's Trust
P.O. Box 42001
San Juan, PR 00940-2001

**Discretely Presented Component Units**

The component units described below, all legally separate entities, consistent with GASB Statement No. 14, as amended by GASB Statements No. 39 and 61, are discretely presented in the basic financial statements principally because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because the component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth (with the exception of Culebra Conservation and Development Authority, which does not meet all these criteria, but the Commonwealth has determined it would be misleading to exclude it from the Commonwealth's financial reporting entity). These component units are not blended with the Primary Government because they do not provide services entirely, or almost entirely to the Primary Government, their governing board is not substantively the same as that of the Primary Government, the Primary Government does not have any operational responsibilities over them, and they do not have total debt outstanding being repaid entirely or almost entirely with resources of the Primary Government. These have been classified by management between major and nonmajor component units. A major discretely presented component unit is determined by the Commonwealth

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

based on the nature and significance of its relationship to the Primary Government. This determination is based on the evaluation of the following factors: a) the services provided by the component unit to the citizenry are such that separate reporting as a major component unit is considered to be essential to financial statement users, b) there are significant transactions with the Primary Government, or c) there is a significant financial benefit or burden relationship with the Primary Government. If a component unit is expected to meet some of these considerations for inclusion as major component unit in a future year, the Commonwealth may elect to report it as a major component unit.

**Major Component Units**

*Government Development Bank for Puerto Rico (GDB)* – GDB is governed by a seven-member board appointed by the Governor. GDB's boards of directors' members are executives in a trustworthy position, named and supervised by the Governor. GDB acts as fiscal agent, depository of funds, disbursing agent, investor and financial advisor for the Commonwealth, its public corporations, and municipalities in connection with the issuance of bonds and notes; and it also issues warranties to third parties, makes loans, and advances funds predominantly to the Commonwealth's departments, component units, and municipalities.

Act No. 21-2016, known as the "Puerto Rico Emergency Moratorium and Financial Rehabilitation Act", created a new fiscal agency and financial advisory authority to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities, and municipalities.

*Puerto Rico Highways and Transportation Authority (PRHTA)* – PRHTA is governed by a seven-member board comprising the Secretary of Department of Transportation and Public Works (DTPW) (serving as the President of the board), the President of the Planning Board, the Secretary of the Treasury, the President of GDB, and three other members from the private sector appointed by the Governor with the advice and consent of the Senate. The PRHTA has broad powers to carry out its responsibilities in accordance with DTPW's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities constructed, owned, or operated by the PRHTA, the ability to set tolls for the use of the highway facilities, and the power to issue bonds, notes, or other obligations. The PRHTA plans and manages the construction of all major projects relating to the Commonwealth's toll highway system, undertakes major repairs, and maintains the toll ways. The Commonwealth has the ability to significantly influence the toll rates charged by the PRHTA.

*Puerto Rico Electric Power Authority (PREPA)* – PREPA is governed by a nine-member board comprising the Secretary of the DTPW, the Secretary of Economic Development and Commerce, four members appointed by the Governor with the advice and consent of the Senate, and two members representing the consumers' interest and one member representing the commercial and industrial interest elected in a referendum carried out by the Puerto Rico Consumer Affairs Department. Board members are appointed or elected for a period of four years. PREPA is responsible for conserving, developing, and utilizing the power resources in order to promote the general welfare of Puerto Rico and owns and operates the Commonwealth's electrical power generation, transmission, and distribution system. The Commonwealth is entitled to receive contributions in lieu of taxes from PREPA. On May 27, 2014, the Commonwealth approved Act No. 57, which creates and authorizes

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

the Puerto Rico Energy Commission (PREC) to approve electric rates proposed by PREPA among other matters. At June 30, 2014, PREC has had not active operations and its board had not been constituted.

*Puerto Rico Aqueduct and Sewer Authority (PRASA)* – PRASA is governed by a nine-member board comprising six members appointed by the Governor with the advice and consent of the Senate (including the President of the Puerto Rico Planning Board), the Executive President of PREPA, the Executive Director of Mayors' Federation, and the Executive Director of Mayors' Association. PRASA owns and operates the Commonwealth's system of public water supply and sanitary sewer facilities. PRASA is authorized, among other things, to borrow money and issue revenue bonds for any of its corporate purposes. The Commonwealth guarantees the principal and interest payments of certain outstanding bonds and of all future bonds issued to refinance those outstanding bonds at the date of refinancing. Act No. 45 of July 28, 1994 was later amended to include other loans under the State Revolving Fund Program (SRFP). The Commonwealth generally provides financial support to PRASA through legislative appropriations, mostly to cover the debt service of its PFC notes.

*University of Puerto Rico (UPR)* – The UPR is governed by a thirteen-member Governing Board, nine of which are appointed by the Governor of Puerto Rico and confirmed by the Senate of Puerto Rico. The remaining members of the Governing Board consist of two tenured professors and two full-time students. The Secretary of the Department of Education of the Commonwealth becomes ex-officio member of the governing board. The Commonwealth provides financial support to the UPR through legislative appropriations.

*State Insurance Fund Corporation (SIFC)* – SIFC is governed by a seven-member board appointed by the Governor with the advice and consent of the Senate. The board comprises the Commissioner of Insurance of Puerto Rico, an officer from the Department of Labor and Human Resources of the Commonwealth, an officer from the Department of Health of the Commonwealth, a representative of the employers' interest, a representative of the employees' interest, and two members without any of these interests. One of these members is appointed by the Governor as president of the board for a period of six years. The three public officials are appointed for a period of five years, and the rest of the members for four, three, two, and one year, respectively. SIFC provides workers' compensation and disability insurance to public and private employees. The Commonwealth has access to SIFC's resources.

*Puerto Rico Health Insurance Administration (PRHIA)* – PRHIA is governed by a board of directors, which, by law, is composed of eleven members (six compulsory members and five discretionary members). The compulsory members are the Secretary of Health of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the Director of the Commonwealth OMB, the President of the GDB, the Insurance Commissioner of Puerto Rico, and the Administrator of the Administration of Services of Mental Health and Addiction. The five discretionary members are appointed by the Governor, with the advice and consent of the Senate. The board of directors' president is designated by the Governor and all discretionary board members are executives in a trustworthy position. PRHIA was created for implementing, administering, and negotiating a health insurance system through contracts with insurance underwriters to provide quality medical and hospital care to low income individuals, employees of the Commonwealth and policemen who voluntarily subscribe to the Puerto

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Rico health insurance medical plan. The Commonwealth provides financial support to PRHIA through legislative appropriations.

**Nonmajor Component Units**

*Agricultural Enterprises Development Administration (AEDA)* – AEDA is governed by the Secretary of Agriculture of the Commonwealth. The purpose of AEDA is to provide a wide variety of services and incentives to the agricultural sector. The Commonwealth has the ability to impose its will on AEDA. The Commonwealth provides financial support to AEDA through legislative appropriations.

*Automobile Accidents Compensation Administration (AACA)* – AACA is governed by a Cabinet Member, and a four-member board appointed by the Governor with the advice and consent of the Senate. The AACA operates a system of compulsory insurance coverage for all registered motor vehicles and compensates citizens for injuries arising from motor vehicle accidents. The Commonwealth has the ability to significantly influence rates charged by the AACA. The Commonwealth has access to AACA's resources.

*Cardiovascular Center Corporation of Puerto Rico and the Caribbean (CCCPRC)* – CCCPRC is governed by a seven member board comprising the Secretary of Health of the Commonwealth, the Director of the Medical Sciences Campus of the UPR, the Executive Director of the PRMeSA, and four additional members appointed by the Governor with the advice and consent of the Senate, one of which should be from the Cardiology Society of Puerto Rico and another a member of a cardiology foundation properly registered in the Department of State of the Commonwealth. The purpose of the CCCPRC is to provide special treatment to patients suffering from cardiovascular diseases. The Commonwealth provides financial support to the CCCPRC through legislative appropriations.

*Company for the Integral Development of the "Península de Cantera" (CIDPC)* – CIDPC is governed by an eleven-member board, of which six members are appointed by the Governor and five members appointed by the Mayor of the Municipality of San Juan. The CIDPC was created to establish and implement a comprehensive development plan for the Península de Cantera area. Its main function is to supervise and coordinate governmental efforts and also promote and manage private sector initiatives for the improvements and rehabilitation of the aforementioned area. The Commonwealth generally provides financial support to the CIDPC.

*Corporation for the "Caño Martín Peña" ENLACE Project (CPECMP)* – CPECMP was created for the purpose of coordinating the public policy related to the rehabilitation of the Caño Martín Peña area. The CPECMP is governed by a board of directors of thirteen members of which seven members are appointed by the Governor and six members appointed by the Mayor of the Municipality of San Juan. The Commonwealth generally provides financial support to the CPECMP through legislative appropriations.

*Corporation for the Development of the Arts, Science, and Film Industry of Puerto Rico (CDASFIPR)* – CDASFIPR was created for the development of the arts and the film industry in Puerto Rico and is governed by a seven member board comprising the Secretary of Economic Development and Commerce, who is the president, the President of the Puerto Rico Public Broadcasting Corporation, the Secretary of Treasury, the Executive Director the Puerto Rico Institute of Culture, and three additional members appointed by the Governor with the advice and consent of the Senate. The

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Commonwealth generally provides financial support to the CDASFIPR through legislative appropriations.

*Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico (CIBMRIP)* – CIBMRIP is governed by the Secretary of the Family of the Commonwealth, who is also the President of the CIBMRIP. The purpose of the Corporation is to establish and organize workshops in Puerto Rico, which will provide training, employment, and other services that is deemed appropriate or necessary for the rehabilitation of blind people, mentally retarded or other delayed mental or other handicaps, which constitute obstacles to their occupational capacity, residing in Puerto Rico. The Commonwealth provides financial support to the CIBMRIP through Commonwealth appropriations.

*Culebra Conservation and Development Authority (CCDA)* – CCDA was created to formulate and administer the program and plan for the conservation, use, and development of natural resources of the Municipality of Culebra. The CCDA is administered through a board of directors composed of five members, including the Mayor of the Municipality of Culebra and four additional members appointed by the Mayor of the Municipality of Culebra and confirmed by the municipal legislature. The administration and operations of the CCDA are conducted by an executive director elected by the board of directors. The Commonwealth provides financial support to the CCDA through legislative appropriations. Although CCDA's board of directors is not appointed by the Commonwealth and it is not fiscally dependent on the Commonwealth, the Commonwealth believes it would be misleading to exclude it from its reporting entity, given the financial support provided by the Commonwealth.

*Economic Development Bank for Puerto Rico (EDB)* – EDB is governed by a nine member board comprising the President of the GDB, who is the Chairman, the Secretary of Agriculture of the Commonwealth, the Secretary of the Department of Economic Development and Commerce of the Commonwealth, the Executive Director of the Puerto Rico Industrial Development Company (PRIDCO), the Executive Director of the PRTC (Puerto Rico Tourism Company), and four members representing the private sector and appointed by the Governor with the advice and consent of the Senate. Private sector members are appointed for a maximum period of three years. The EDB is responsible for the promotion and development of the private sector economy of the Commonwealth. This purpose is to be met by granting direct loans, loan guarantees, loan participation, and/or direct investments to any person or business organization devoted to manufacturing, agriculture, trade, tourism, or other service enterprises with preference, but not limited, to economic activities that may have the effect of substituting imports. The Commonwealth has the ability to impose its will on the EDB.

*Employment and Training Enterprises Corporation (ETEC)* – ETEC is governed by an eleven-member consulting board, which includes two private citizens appointed by the Governor with the consent of the Senate. The purpose of ETEC is to provide training for management, business development, and employment for inmates of the correctional institutions of the Commonwealth. The Commonwealth generally provides financial support to ETEC through legislative appropriations and has the ability to impose its will on ETEC.

*Farm Insurance Corporation of Puerto Rico (FICPR)* – FICPR is governed by a five-member board consisting of the Secretary of Agriculture of the Commonwealth, the Dean of the Agricultural Sciences

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Faculty of the UPR Mayaguez Campus, a representative of the GDB, and two bona fide farmers appointed by the Governor with the advice and consent of the Senate. The purpose of the FICPR is to provide insurance to farmers against losses in their farms caused by natural disasters. The Commonwealth has the ability to impose its will on the FICPR.

*Fine Arts Center Corporation (FACC)* – FACC is governed by a nine-member board comprising the President of the MAC and eight members named by the Governor. FACC was created with the purpose of administering the Fine Arts Center. The Commonwealth provides financial support to FACC through legislative appropriations.

*Institute of Puerto Rican Culture (IPRC)* – IPRC is governed by a nine-member board comprising the President of MAC and eight members appointed by the Governor with the advice and consent of the Senate. The IPRC is responsible for implementing the public policy related to the development of Puerto Rican arts, humanities, and culture. The Commonwealth provides financial support to the IPRC through legislative appropriations.

*Institutional Trust of the National Guard of Puerto Rico (ITNGPR)* – ITNGPR is governed by a seven-member board comprising the Adjutant General of the Puerto Rico National Guard, the President of the GDB, the Secretary of Justice of the Commonwealth, three militaries from the Puerto Rico National Guard, and one representative from the community appointed by the Governor. ITNGPR's purpose is to provide life insurance, retirement benefits, and economic assistance to the active members of the Puerto Rico National Guard and their families. The Commonwealth generally provides financial support to the ITNGPR through legislative appropriations and has the ability to impose its will on the ITNGPR.

*Land Authority of Puerto Rico (LAPR)* – LAPR is governed by a five-member board consisting of the Secretary of Agriculture of the Commonwealth and four members appointed by the Governor. LAPR was created to carry out the provisions of the Land Law of Puerto Rico, principally geared to the agricultural development of Puerto Rico. LAPR maintains debt that is payable from Commonwealth's appropriations and funds generated by LAPR operations.

*Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads (LRA)* – LRA is governed by a nine member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, two members appointed by the Mayor of the Municipality of Ceiba, one member appointed by the Mayor of the Municipality of Naguabo, one member appointed by the President of the Senate, one member appointed by the Speaker of the House of Representatives and three additional members appointed by the Governor, all to possess known interest and expertise in the areas of planning; commercial, tourism, residential, and institutional development; real estate; tourism and recreational facilities administration; and infrastructure projects' management. The LRA is responsible for the implementation of the reuse and redevelopment plan for the former Navy Station of Roosevelt Roads located in Ceiba, Puerto Rico. Some of the activities involved in these redevelopment plans include the direction, supervision, regulation, and maintenance of the economic development on the land and facilities formerly occupied by the U.S. Navy. The Commonwealth generally provides financial support to the LRA through legislative appropriations.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Musical Arts Corporation (MAC)* – MAC is governed by a seven-member board appointed by the Governor with the advice and consent of the Senate. MAC was created to promote the development of the arts and cultural programs of the Commonwealth. The Commonwealth provides financial support to MAC through legislative appropriations.

*National Parks Company of Puerto Rico (NPCPR)* – NPCPR is governed by a nine member board comprising the Secretary of Recreation and Sports Department of the Commonwealth (the Secretary), who is the chairman, the Secretary of the Department of Education of the Commonwealth, the Executive Director of the PRTC, the Secretary of the Department of Natural and Environmental Resources of the Commonwealth, and five members appointed by the Governor with the recommendation from the Secretary and with known interest in the development and preservation of parks in the private sector. The NPCPR is responsible for the operation of all national parks and the protection, conservation, maintenance and use of parks, beaches, forests, and natural and historical monuments for the optimum enjoyment of present and future generations. The Commonwealth provides financial support to the NPCPR through legislative appropriations.

*Ponce Ports Authority (PPA)* – On December 12, 2011, Act No. 240 was approved creating the PPA, another component unit of the Commonwealth, with a seven-member board required to be comprised of the Secretary of Economic Development and Commerce, the director of the Ponce port, three members to be appointed by the Governor with the consent of the Senate and two members to be appointed by the Mayor of Ponce with the consent of the Ponce legislative assembly. PPA was created to continue the development of the container terminal being undertaken now by PAA and handle such facilities' future operations. As of June 30, 2014, the board of PPA had not been formed and operations had not started. All of the assets, rights and duties of PAA would be transferred to PPA. However, as of June 30, 2014, no such transfer has taken place.

*Port of the Americas Authority (PAA)* – PAA is governed by an eleven-member board comprising the Secretary of DTPW, the Secretary of Economic Development and Commerce, the Executive Director of PRIDCO, the Mayors of the Municipalities of Ponce, Peñuelas and Guayanilla and five private citizens appointed by the Governor with the consent of the Senate. The main purpose of the PAA is the planning, development and construction of a large scale container terminal in the city of Ponce, Puerto Rico. The Commonwealth generally provides financial support to the PAA through legislative appropriations.

*Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives (PCSDIPRC)* – PCSDIPRC is governed by a nine member board comprising the Administrator of the Cooperative Development Administration, the Commissioner of Financial Institutions of Puerto Rico, the Secretary of the Treasury of the Commonwealth, the Inspector of Cooperatives, three citizens representing the cooperative movement, one representative of the Puerto Rico Cooperatives League, and one private citizen representing the public interest. PCSDIPRC has the responsibility of providing to all the cooperatives and the Federation of Cooperatives of Puerto Rico insurance coverage over the stocks and deposits, and for monitoring the financial condition of the insured cooperatives, and the uninsured cooperatives when requested by the Inspector of Cooperatives. The Commonwealth has the ability to impose its will on PCSDIPRC.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Puerto Rico Conservatory of Music Corporation (PRCMC)* – PRCMC is governed by a seven-member board appointed by the Governor, with the advice and consent of the Senate. The PRCMC is responsible for providing the Puerto Rican community and especially its youths with the required facilities to educate and perfect their musical skills, including secondary education programs for developing musical arts. It prepares the artistic element that nourishes the Puerto Rico Symphony Orchestra and other musical organizations, and coordinates the governmental efforts to interested industries, private enterprises, and particular citizens. The Commonwealth occasionally provides financial support to the PRCMC through legislative appropriations.

*Puerto Rico Convention Center District Authority (PRCCDA)* – PRCCDA is governed by a nine-member board of directors comprising of three members from the public sector and six members from the private sector. The public sector members comprise the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Executive Director of the PRTC, and the president of the GDB. The private sector members are individuals having experience in the areas of hotel operations, tourism, real estate, convention centers, and at least one with financial expertise who are appointed by the Governor with the advice and consent of the Senate. PRCCDA was created to be responsible, for improving, developing, managing, and operating the property and improvements within the Puerto Rico Convention Center District (the District) geographical area. PRCDDA has the power to finance all of the improvements to be developed through the issuance of bonds and the imposition of assessments against the owners or lessees of land within the District who benefit from the Convention Center and other improvements. Also, PRCCDA promotes the development, construction, expansion and improvement of the Puerto Rico Convention Center (Convention Center), Bahía Urbana, and the Jose Miguel Agrelot Coliseum (the Coliseum). The administration, operation and management of the Convention Center, the Coliseum, and Bahía Urbana is carried out by a third party private entity, under PRCDDA's responsibility. The Commonwealth provides financial support to the PRCCDA through legislative appropriations.

*Puerto Rico Council on Education (PRCE)* – PRCE is governed by a board comprising nine members appointed by the Governor with the consent of the Senate. Its purpose is to develop higher education, to administer the licensing and certification of institutions of higher education, and to administer scholarship funds. The Commonwealth provides financial support to the PRCE through legislative appropriations.

*Puerto Rico Government Investment Trust Fund (PRGITF)* – PRGITF is governed by the Secretary of the Treasury of the Commonwealth. The GDB is its trustee, custodian, and administrator. PRGITF's main objective is to provide investment opportunities in a professionally managed money market portfolio by investing in high quality securities with minimal credit risk. Qualified investors include the Commonwealth's central government, its public corporations, instrumentalities and agencies, and the municipalities of Puerto Rico. In conformity with GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investments Pools*, the financial statements of the PRGITF are not included in the accompanying basic financial statements because the Primary Government and each component unit investor is already presenting as cash or investment their corresponding share of the assets of the PRGITF.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Puerto Rico Industrial Development Company (PRIDCO)* – PRIDCO is governed by a seven-member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Secretary of the Treasury of the Commonwealth, the President of the GDB, the President of the Planning Board of Puerto Rico, and three members from the private sector appointed by the Governor with the advice and consent of the Senate. The private sector members are appointed for a period of four years. PRIDCO administers the Commonwealth sponsored economic development program by providing facilities, general assistance, and special incentive grants to manufacturing companies operating in Puerto Rico. PRIDCO has issued interim notes and revenue bonds to finance manufacturing plants and other facilities. Rentals derived from the leasing of specified facilities of PRIDCO are pledged for the payment of PRIDCO's revenue bonds. PRIDCO maintains debt that is payable from Commonwealth's appropriations. The Commonwealth generally provides financial support to PRIDCO through legislative appropriations and has the ability to impose its will on PRIDCO.

*Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (known as AFICA, its Spanish acronym)* – AFICA is governed by a seven-member board comprising the Executive Director of PRIDCO, the President of the GDB, the Executive Director of PRIFA, the Executive Director of the PRTC, the President of the Environmental Quality Board, and two private citizens appointed by the Governor. AFICA is authorized to issue revenue bonds to finance industrial, tourist, environmental control, medical, and educational facilities in Puerto Rico and the United States of America for use by private companies, nonprofit entities, or governmental agencies. The bonds are payable solely from collections from such private companies, nonprofit entities, or governmental agencies, and do not constitute debt of the Commonwealth or any of its other component units. The Commonwealth has the ability to impose its will on AFICA.

*Puerto Rico Land Administration (PRLA)* – PRLA is governed by an eleven member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who serves as President, the President of the Planning Board of Puerto Rico, who serves as Vice-President, the Secretary of the Treasury of the Commonwealth, the Secretary of Agriculture of the Commonwealth, the Secretary of DTPW of the Commonwealth, the Secretary of Housing of the Commonwealth, the Executive Director of PRIDCO, and four members appointed by the Governor with the advice and consent of the Senate. The PRLA acquires parcels of land on behalf of government instrumentalities through negotiation or expropriation for future development or for reserve. The Commonwealth provides financial support to the PRLA through legislative appropriations.

*Puerto Rico and Municipal Islands Maritime Transport Authority (PRMIMTA)* – PRMIMTA is governed by a five-member board comprising the Secretary of DTPW, who serves as President, the Executive Director of the Puerto Rico Ports Authority, the Mayors of Vieques and Culebra, and one additional member appointed by the Governor. The operations of PRMIMTA consist of administering and operating the maritime transportation services between San Juan, Fajardo, Vieques, and Culebra. The Commonwealth generally provides financial support to PRMIMTA through legislative appropriations.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Puerto Rico Metropolitan Bus Authority (PRMBA)* – PRMBA is governed by the Secretary of DTPW of the Commonwealth. The PRMBA provides bus transportation to passengers within the San Juan Metropolitan Area. The Commonwealth provides financial support to the PRMBA through the transfer of certain gasoline and diesel excise taxes collected by the Commonwealth.

*Puerto Rico Municipal Finance Agency (PRMFA)* – PRMFA is governed by a five-member board comprising the President of the GDB, who is the Chairman, the Commissioner of Municipal Affairs, and three additional members appointed by the Governor, one of whom shall be either the mayor or chief financial officer of a municipality. The PRMFA was organized to create a capital market to assist the municipalities of Puerto Rico in financing their public improvement programs. The Commonwealth is required to cover any potential deficiency that may exist on the MFA reserve accounts established for debt service.

*Puerto Rico Municipal Finance Corporation (Known as COFIM, for its Spanish Acronym)* – COFIM is governed by a seven member board comprising three members of the Board of Directors of GDB, three mayors from municipalities in Puerto Rico (two of them from the political party controlling the majority of municipalities and the remaining major elected by the rest of the municipalities) and one member representing the public interest recommended by all the mayors of the municipalities and ratified by the Governor. COFIM was created by Act No. 19 of January 24, 2014 to issue bonds and use other financing mechanisms to pay or refinance, directly or indirectly, all or a portion of the municipalities' debt obligations payable from the municipal sales and use tax. The Commonwealth is required to cover any potential deficiency that may exist on the COFIM reserve accounts established for debt service. At June 30, 2014, COFIM has had no active operations and its board of directors had not been constituted; therefore, it has not been included within the components units' financial information presented herein.

*Puerto Rico Ports Authority (PRPA)* – PRPA is governed by a five-member board consisting of the Secretary of DTPW of the Commonwealth, who is the Chairman, the Secretary of Economic Development and Commerce of the Commonwealth, the Executive Director of the PRTC, the Executive Director of Puerto Rico Industrial Development Company and one private citizen appointed by the Governor with the consent of the Senate. The purpose of the PRPA is to administer all owned ports and aviation transportation facilities of the Commonwealth and to render other related services, including the supervision and monitoring over the service concession arrangement of the LMMIA, further described in note 16. The Commonwealth generally provides financial support to the PRPA through legislative appropriations.

*Puerto Rico Public Broadcasting Corporation (PRPBC)* – PRPBC is governed by an eleven-member board of directors comprising the Secretary of the Department of Education of the Commonwealth, the President of the UPR, the Executive Director of the IPRC, and eight private citizens appointed by the Governor with the advice and consent of the Senate. At least three of these private citizens must have proven interest, knowledge, and experience in education, culture, art, science, or radio and television. The PRPBC was created for the purpose of integrating, developing, and operating the radio, television, and electronic communication facilities that belong to the Commonwealth. The Commonwealth provides financial support to the PRPBC through legislative appropriations.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Puerto Rico Public Private Partnerships Authority (PPPA)* – PPPA is governed by a five-member board of directors comprising the President of the GDB, the Secretary of the Treasury of the Commonwealth, the President of the Planning Board, and two members appointed by the Governor, one member selected by the President of the Senate of Puerto Rico and another member, by the Speaker of the Puerto Rico House of Representatives. The PPPA is the only government entity authorized and responsible for implementing public policy on public private partnerships established by Act No. 29 of June 8, 2009 and to determine the functions, services, or facilities for which such Partnerships will be established. The Commonwealth has the ability to impose its will on the PPPA.

*Puerto Rico School of Plastic Arts (PRSPA)* – PRSPA is governed by a seven-member board. Four members are appointed by the board of directors of the IPRC, representing the public educational and cultural interests. Board members may not be employees of the PRSPA. The remaining three members are elected from among the members of the board of directors of the IPRC, one of whom will serve as president. The PRSPA was created to develop, promote, plan, and coordinate programs of study in higher education oriented to the plastic arts, teaching, artistic techniques, and to help students to develop humanistic values. The Commonwealth generally provides financial support to the PRSPA through legislative appropriations.

*Puerto Rico Telephone Authority (PRTA)* – PRTA is governed by a five-member board comprising the President of the GDB and four members that are appointed by the board of directors of the GDB from among the GDB board members, all of which are appointed by the Governor. PRTA is the legal entity responsible to account for the equity interest in Telecommunications de Puerto Rico, Inc. The Commonwealth has the ability to impose its will on the PRTA. PRTA is currently inactive and wait for a legislative process to arrange its liquidation.

*Puerto Rico Tourism Company (PRTC)* – PRTC is governed by a seven-member board comprising of representatives of different tourist related sectors appointed by the Governor with the consent of the Senate. At least one member must represent internal tourism and two must not be residents of the metropolitan area. Its purpose is to promote the tourism industry of Puerto Rico. The Commonwealth generally provides financial support to the PRTC through legislative appropriations.

*Puerto Rico Trade and Export Company (PRTEC)* – PRTEC is governed by a nine-member board comprising the Secretary of the Department of Economic Development and Commerce, who is the Chairman, the Executive Director of the PRPA, the Secretary of the Department of Agriculture, the President of the EDB, the Executive Director of PRIDCO, the Legal Division Director of the PRTEC, and three private citizens. The PRTEC has the responsibility to promote the highest efficiency in the services provided to the commercial sector, with emphasis on small and medium sized enterprises while promoting the export of products and services from Puerto Rico to other countries. The Commonwealth has the ability to impose its will on the PRTEC.

*Solid Waste Authority (SWA)* – SWA is governed by a board appointed by the Secretary of the Department of Natural Resources, whereby, the Secretary and the Executive Director of SWA periodically meet. SWA provides alternatives for processing of solid waste and encourages recycling, reuse, and recovery of resources from waste. The Commonwealth provides financial support to SWA through legislative appropriations.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*University of Puerto Rico Comprehensive Cancer Center (UPRCCC)* – UPRCCC is governed by a nine-member board comprising of four ex-officio members: the President of the University of Puerto Rico (the UPR), the Chancellor of Medical Sciences Campus of the UPR, the Secretary of the Department of Health of the Commonwealth, and the Dean of the UPR School of Medicine. The remaining five (5) members, who shall be appointed by the Governor with the approval of the Commonwealth Senate, are citizens of Puerto Rico who have shown commitment to the fight against cancer are as follows: two members from the investigative studies or cancer treatment community; one member with experience in management, finance, or business administration, or with previous experience managing hospitals or medical investigation clinics; one member who is a cancer patient; and one member of which will be a member of the "Liga Puertorriqueña Contra el Cancer." The Commonwealth provides financial support to UPRCCC through legislative appropriations.

Complete financial statements of the discretely presented component units can be obtained directly by contacting their administrative offices:

Agricultural Enterprises Development
Administration
P.O. Box 9200
Santurce, PR 00908-0200

Automobile Accidents Compensation
Administration
P.O. Box 364847
San Juan, PR 00936-4847

Cardiovascular Center Corporation of
Puerto Rico and the Caribbean
P.O. Box 366528
San Juan, PR 00936-6528

Company for the Integral Development of the
"Península de Cantera"
P.O. Box 7187
Santurce, PR 00916-7187

Corporation for the "Caño Martín Peña"
ENLACE Project
P.O. Box 41308
San Juan, PR 00940-1308

Corporation for the Development of the Arts,
Science and Film Industry of Puerto Rico
P.O. Box 362350
San Juan, PR 00936-2350

Corporation of Industries for the Blind and
Mentally Retarded and Incapacitated Persons
of Puerto Rico
P.O. Box 13382
San Juan, PR 00908

Culebra Conservation and Development
Authority
P.O. Box 217
Culebra, PR 00775-0217

Economic Development Bank for Puerto Rico
P.O. Box 2134
San Juan, PR 00922-2134

Employment and Training Enterprises Corporation
P.O. Box 366505
San Juan, PR 00936-6505

Farm Insurance Corporation of Puerto Rico
P.O. Box 9200
Santurce, PR 00908

Fine Arts Center Corporation
P.O. Box 41287 – Minillas Station
San Juan, PR 00940-1287

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Institute of Puerto Rican Culture
P.O. Box 9024184
San Juan, PR 00902-4184

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Institutional Trust of the National Guard of
Puerto Rico
P.O. Box 9023786
San Juan, PR, 00902-3786

Land Authority of Puerto Rico
P.O. Box 9745
Santurce, PR 00908-9745

National Parks Company of Puerto Rico
P.O. Box 9022089
San Juan, PR 00902-2089

Public Corporation for the Supervision and
Deposit Insurance of Puerto Rico Cooperatives
P.O. Box 195449
San Juan, PR 00919-5449

Puerto Rico Conservatory of Music Corporation
951 Ponce de León Ave.
San Juan, PR 00907-3373

Puerto Rico Convention Center District Authority
P.O. Box 19269,
San Juan, Puerto Rico, 00910-1269

Puerto Rico Government Investment Trust Fund
P.O. Box 42001, Millas Station
San Juan, Puerto Rico 00940-2001

Puerto Rico Highways and Transportation Authority
P.O. Box 42007
San Juan, PR 00940-2007

Puerto Rico Land Administration
P.O. Box 363767
San Juan, PR 00936-3767

Puerto Rico and Municipal Islands Maritime
Transport Authority
P.O. Box 4305
Puerto Real, PR 00740

Puerto Rico Municipal Finance Agency
P.O. Box 42001
San Juan, PR 00940-2001

Ponce Ports Authority
P.O. Box 7051
Ponce, PR 00752

Local Redevelopment Authority of the Lands
and Facilities of Naval Station Roosevelt Roads
400 Calaf Street, PMB 456
San Juan, PR 00918-1314

Musical Arts Corporation
P.O. Box 41227
San Juan, PR 00940-1227

Port of the Americas Authority
P.O. Box 195534
San Juan, PR 00919-5534

Puerto Rico Aqueduct and Sewer Authority
P.O. Box 7066
San Juan, PR 00916-7066

Puerto Rico Council on Education
P.O. Box 19900
San Juan, PR 00910-1900

Puerto Rico Electric Power Authority
P.O. Box 364267
San Juan, PR 00936-4267

Puerto Rico Health Insurance Administration
P.O. Box 195661
San Juan, PR 00919-5661

Puerto Rico Industrial Development Company
P.O. Box 362350
San Juan, PR 00936-2350

Puerto Rico Metropolitan Bus Authority
P.O. Box 195349
San Juan, PR 00919-5349

Puerto Rico Industrial, Tourist, Educational,
Medical, and Environmental Control
Facilities Financing Authority
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Municipal Finance Corporation
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Ports Authority
P.O. Box 362829
San Juan, PR 00936-2829

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

| | |
|---|---|
| Puerto Rico Public Broadcasting Corporation<br>P.O. Box 190909<br>San Juan, PR 00919-0909 | Puerto Rico Public Private Partnerships Authority<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Puerto Rico School of Plastic Arts<br>P.O. Box 9021112<br>San Juan, PR 00902-1112 | Puerto Rico Telephone Authority<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Puerto Rico Tourism Company<br>Tanca Street #500, Ochoa Building, 3rd Floor<br>Old San Juan, PR 00902-3960 | Puerto Rico Trade and Export Company<br>P.O. Box 195009<br>San Juan, PR 00919-5009 |
| Solid Waste Authority<br>P.O. Box 40285<br>San Juan, PR 00940-0285 | State Insurance Fund Corporation<br>P.O. Box 365028<br>San Juan, PR 00936-5028 |
| University of Puerto Rico<br>Jardín Botánico Sur<br>1187 Street Flamboyán<br>San Juan, PR 00916-1117 | University of Puerto Rico Comprehensive<br>Cancer Center<br>PMB 711, 89 De Diego Ave., Suite 105<br>San Juan, PR 00927-6346 |

The financial statements of the discretely presented component units have a year-end of June 30, 2014, except for the Puerto Rico Telephone Authority, which has a year-end of December 31, 2013.

**Pension Trust Funds**

The three employee retirement systems described in the following paragraphs (the Retirement Systems) administer the pension funds and other postemployment healthcare benefits for the Commonwealth and its political subdivisions. These Retirement Systems are subject to legislative and executive controls, and their administrative expenses are subject to legislative budget controls. They meet the component units' criteria and blend into fiduciary funds of the Commonwealth. They have been omitted from the government wide financial statements, as their resources are not available to fund operations of the Commonwealth. The Retirement Systems, as governmental retirement plans, are excluded from the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

*Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)* – ERS is governed by an eleven-member board of trustees, which is composed of the Secretary of the Treasury of the Commonwealth, who is the President, the President of the GDB, the Commissioner of Municipal Affairs, the Director of the Office of Human Resources of the Commonwealth, three employees, and two retirees, who are appointed by the Governor. The other two members are the President of the Federation of Mayors and the President of the Association of Mayors. The ERS is a cost-sharing, multiple-employer defined-benefit pension plan, which covers all regular employees of the Commonwealth and its instrumentalities and of certain municipalities and component units not covered by their own retirement systems. The ERS is administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration) that also administers the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). The ERS MIC is an unfunded,

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

cost-sharing, multi-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

*Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)* – JRS is governed by the same board of trustees as the ERS. The JRS is a single employer defined-benefit plan that covers all active judges or retired judges of the judiciary branch of the Commonwealth. The JRS is administered by the ERS and JRS Administration that also administers the Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC), an unfunded, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired judges of the Judiciary Branch of the Commonwealth.

*Puerto Rico System of Annuities and Pensions for Teachers (TRS)* – TRS is governed by a nine member board comprising three ex-officio members, which are the Secretary of the Department of Education of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the President of the GDB, and one member who is a representative of a teachers' organization designated by the Governor; three teachers appointed by the Governor, one of which represents currently certified teachers in active service, and two who represent retired teachers; one member who is a representative of the entity that represents the proper unit under Act No. 45 of February 25, 1998, as amended; and one additional member, as representative of the public interest, with knowledge of and experience in the administration and operation of financial systems, appointed by the Governor. The Commonwealth reports the TRS as a single-employer pension plan. The TRS provides retirement benefits to all teachers of the Department of Education of the Commonwealth, all pensioned teachers, all teachers transferred to an administrative position in the Department of Education of the Commonwealth, and those who practice in private institutions accredited by the Department of Education of the Commonwealth who elect to become members. The TRS provides retirement, death, and disability benefits. The TRS is administered by the Teachers Retirement System (the TRS Administration) that also administers the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC), an unfunded, cost-sharing, multi-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of the TRS Administration.

Complete financial statements of these component units can be obtained directly by contacting their respective administrative offices at:

Employees' Retirement System of the
Government of the Commonwealth of Puerto Rico
P.O. Box 42003 – Minillas Station
San Juan, PR 00940-2203

Retirement System for the Judiciary of the
Commonwealth of Puerto Rico
P.O. Box 42003 – Minillas Station
San Juan, PR 00940-2203

Puerto Rico System of Annuities and Pensions for
Teachers
P.O. Box 191879
San Juan, PR 00919-1879

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(c) *Component Units Audited Separately*

The basic financial statements of the Commonwealth include the financial statements of the following component units that were audited by other auditors:

**Blended Component Units**

Public Buildings Authority
Puerto Rico Infrastructure Financing Authority
Puerto Rico Maritime Shipping Authority
Puerto Rico Medical Services Administration
Special Communities Perpetual Trust
The Children's Trust

**Discretely Presented Component Units**

Agricultural Enterprises Development Administration
Automobile Accidents Compensation Administration
Cardiovascular Center Corporation of Puerto Rico and the Caribbean
Company for the Integral Development of the "Península de Cantera"
Corporation for the "Caño Martín Peña" ENLACE Project
Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico
Corporation of Industries for the Blind and Mentally Retarded, and Incapacitated Persons of Puerto Rico
Culebra Conservation and Development Authority
Employment and Training Enterprises Corporation
Farm Insurance Corporation of Puerto Rico
Fine Arts Center Corporation
Institute of Puerto Rican Culture
Institutional Trust of the National Guard of Puerto Rico
Land Authority of Puerto Rico
Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads
Musical Arts Corporation
National Parks Company of Puerto Rico
Port of the Americas Authority
Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives
Puerto Rico Aqueduct and Sewer Authority
Puerto Rico Conservatory of Music Corporation
Puerto Rico Convention Center District Authority
Puerto Rico Council on Education
Puerto Rico Electric Power Authority
Puerto Rico Health Insurance Administration
Puerto Rico Highways and Transportation Authority
Puerto Rico Industrial Development Company
Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities
    Financing Authority
Puerto Rico Land Administration

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Puerto Rico and Municipal Islands Maritime Transport Authority
Puerto Rico Metropolitan Bus Authority
Puerto Rico Municipal Finance Agency
Puerto Rico Ports Authority
Puerto Rico Public Broadcasting Corporation
Puerto Rico Public Private Partnerships Authority
Puerto Rico School of Plastic Arts
Puerto Rico Telephone Authority
Puerto Rico Tourism Company
Puerto Rico Trade and Export Company
Solid Waste Authority
State Insurance Fund Corporation
University of Puerto Rico
University of Puerto Rico Comprehensive Cancer Center

(d)   ***Basis of Presentation***

**Government-Wide Financial Statements**

The government-wide financial statements (the statement of net position and the statement of activities) report information of all of the nonfiduciary activities of the Commonwealth and its component units. For the most part, the effect of interfund activity has been removed from these government-wide financial statements. Governmental Activities, which normally are supported by taxes and intergovernmental revenue, are reported separately from Business-Type Activities, which rely to a significant extent on fees and charges for services. Likewise, the Primary Government is reported separately from the legally separate discretely presented component units for which the Primary Government is financially accountable. The statement of net position presents the reporting entities' nonfiduciary assets, deferred outflows of resources, liabilities, and deferred inflows of resources, with the residual measure reported as net position. Net position is reported in three categories:

- *Net Investment in Capital Assets* – This component of net position consists of capital assets net of accumulated depreciation and reduced by the outstanding balance of any bonds, mortgages, notes, or other borrowings that are directly attributable to the acquisition, construction, or improvement of those assets. Deferred outflows of resources and deferred inflows of resources that are attributable to the acquisition, construction, or improvement of those assets or related debt also should be included in this component of net position. If there are significant unspent related debt proceeds or deferred inflows of resources at year-end, the portion of the debt or deferred inflows of resources attributable to the unspent amount is not included in the calculation of this component of net position. Rather, that portion of the debt or deferred inflows of resources is included in the same net position component (restricted or unrestricted) as the unspent amount.

- *Restricted Net Position* – This component of net position consists of restricted assets and deferred outflows of resources reduced by related liabilities and deferred inflows of resources. Generally, a liability relates to restricted assets if the asset results from a resource flow that also results in the recognition of a liability or if the liability will be liquidated with the restricted

72                                                                                    (Continued)

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

assets reported. Restricted assets result when constraints placed on those assets use are either, externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

- *Unrestricted Net Position* – This component of net position is the net amount of the assets, deferred outflows of resources, liabilities, and deferred inflows of resources that are not included in the determination of net investment in capital assets or the restricted component of net position.

When both restricted and unrestricted resources are available for use, generally, it is the Commonwealth's policy to use restricted resources first, then the unrestricted resources as they are needed.

The statement of activities demonstrates the degree to which the direct expenses of a given function, segment, or component unit are offset by program revenue. Direct expenses are those that are clearly identifiable with a specific function, segment, or component unit. The Commonwealth does not allocate general government (indirect) expenses to other functions. Program revenue includes charges to customers who purchase, use, or directly benefit from goods or services provided by a given function, segment, or component unit. Program revenue also includes grants and contributions that are restricted to meeting the operational or capital requirements of a particular function, segment, or component unit. Revenue that is not classified as program revenue, including all taxes, is presented as general revenue. Resources that are dedicated internally are reported as general revenue rather than as program revenue.

### Fund Financial Statements

The Commonwealth reports its financial position and results of operations in funds, which are considered separate accounting entities, including those component units, which are required to be blended. The operations of each fund are accounted for within a set of self-balancing accounts. Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with legal, financial, and contractual provisions. Major funds are determined using a predefined percentage of the assets, deferred outflows of resources, liabilities, deferred inflows of resources, revenue, or expenditures/expenses of either the fund category or the governmental and proprietary funds combined. The nonmajor funds are combined in a single column in the fund financial statements.

#### *Governmental Funds*

Governmental funds focus on the sources and uses of funds and provide information on near-term inflows, outflows, and balances of available resources. The Commonwealth reports the following governmental funds:

- *General Fund* – The General Fund is the primary operating fund of the Commonwealth. It is used to account for and report all financial resources received and used for those services traditionally provided by a government, except those required to be accounted for and reported in another fund. The General Fund includes transactions for services such as general government, public safety, health, public housing and welfare, education, and economic

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

development. The financial resources received and used in the General Fund mostly include: budgeted resources (such as taxes and charges for services), as approved by the Commonwealth Legislature and as adjusted for timing and basis of accounting differences, and other financial resources outside the General Fund budget such as: federal funds, pledged funds, other special revenue and general-type funds, and agencies with independent treasuries.

- *Debt Service Fund* – The debt service fund accounts for and reports financial resources that are restricted, committed or assigned to expenditure for general long-term bonds' principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and component units, either blended or discretely presented. Long-term debt and interest due on July 1 of the following fiscal year are accounted for as a fund liability if resources are available as of June 30 for its payment.

- *COFINA Special Revenue Fund* – The special revenue fund of the Puerto Rico Sales Tax Financing Corporation (COFINA) is used to account for and report all financial resources of COFINA, except those required to be accounted for and reported in the COFINA Debt Service fund.

- *COFINA Debt Service Fund* – The debt service fund of COFINA is used to account for the Commonwealth sales tax revenue being deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations.

- *Nonmajor Governmental Funds* – The Commonwealth reports the following blended component units within the nonmajor governmental funds: PBA, The Children's Trust, PRIFA, SCPT, and the PRMSA.

If a component unit is blended, it should be blended with those of the Primary Government by including them in the appropriate fund category of the Primary Government. Although the Primary Government's General Fund is usually the main operating fund of the reporting entity, the General Fund of a blended component unit should be reported as a special revenue fund. Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

The capital projects funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditures for capital outlays, including the acquisition or construction of capital facilities and other capital assets. These capital expenditures may be for the Primary Government directly or for discretely presented component units and outside organizations and governments such as the municipalities of the Commonwealth and other applicable entities. Capital projects funds exclude those types of capital-related outflows financed by proprietary funds or for assets that will be held in trust for individuals, private organizations, or other governments.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

In accordance with GASB Statement No. 54, *Fund Balance Reporting and Governmental Fund Type Definitions*, the classification of fund balance is based on the extent to which the Commonwealth is bound to observe constraints imposed upon the use of resources in the governmental funds. The classifications are as follows:

- *Nonspendable* – Amounts that are not in a spendable form or are legally or contractually required to be maintained intact.

- *Restricted* – Amounts that are legally restricted by outside parties, constitutional provisions, or enabling legislation for a specific purpose.

- *Committed* – Amounts that are constrained for specific purposes that are internally imposed by the government's formal action at the highest level of decision-making authority and do not lapse at year-end. The highest level of decision authority for the Commonwealth is the Legislature and the Governor, and the formal action is the passage of a law specifying the purposes for which amounts can be used.

- *Assigned* – includes fund balance amounts that are constrained by the Commonwealth and are intended to be used for specific purposes that are neither considered restricted or committed. The Director of the Commonwealth OMB is authorized to assign an amount for a specific purpose through the approval of budget certificates as required by statute.

- *Unassigned* – is the residual classification for the General Fund. In a governmental fund other than the General Fund, a negative amount indicates that the expenditures incurred for a specific purpose exceeded the amounts in the fund that are restricted, committed, and assigned to that purpose.

The Commonwealth uses restricted amounts first when both restricted and unrestricted fund balances are available, unless there are legal documents/contracts that prohibit doing this, such as a grant agreement requiring dollar for dollar spending. Additionally, unless required by law or agreement, the Commonwealth would first use committed, then assigned, and lastly unassigned amounts of unrestricted fund balance when expenditures are made.

The Commonwealth does not have a formal minimum fund balance policy.

### Proprietary Funds

These funds account for those activities, which are financed and operated in a manner similar to private business enterprises. Management intends to recover, primarily through user charges, the cost of providing goods or services to the general public.

The Commonwealth reports the following major proprietary funds:

- *Unemployment Insurance Fund* – This fund accounts for amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

- *Lotteries Fund* – This fund accounts for the assets and operations of two lottery systems administered by the Commonwealth.

- *Puerto Rico Medical Services Administration* – This fund, a blended component unit, accounts for the operations of the centralized health services, provided in support of hospitals and other functions offered by the member institutions and consumers of the complex known as Puerto Rico Medical Center.

- *Puerto Rico Water Pollution Control Revolving Fund* – This fund, administered by the Puerto Rico Environmental Quality Board (EQB), is authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), mostly for water infrastructure projects, under a joint cooperation agreement between the EQB, PRIFA, PRASA, and the GDB, where each entity has agreed to assume their corresponding responsibilities.

The Commonwealth reports the following nonmajor proprietary funds: Disability Insurance, Drivers' Insurance, the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, and the Governing Board of 9-1-1 Services.

### Fiduciary Funds

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity, or as an agent for individuals, private organizations, and other governmental units. The following are the Commonwealth's fiduciary funds:

- *Pension (and Other Employee Benefit) Trust Funds* – These are used to account for the assets, liabilities, and net position held in trust for pension benefits and postemployment healthcare benefits held in trust for the public employees' retirement systems.

- *Agency Funds* – These are custodial in nature (assets equal liabilities) and do not involve measurement of the results of operations.

(e) **Measurement Focus and Basis of Accounting**

*Government-Wide Financial Statements* – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Revenue from property tax is recognized in the fiscal year for which the taxes are levied. Grants and similar items are recognized as revenue as soon as all eligibility requirements have been met.

*Governmental Fund Financial Statements* – The governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available, and net of estimated overpayments (as applicable) and amounts considered not collectible. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

the current period (see note 1(j) for further description about the period of availability for the principal sources of revenue in the Governmental Activities).

Principal revenue sources considered susceptible to accrual include personal and corporate income taxes (recognized as taxpayers earn income), sales and uses taxes (recognized as sales are made), excise taxes (as the underlying import or related activity take place), property taxes (imposed on real estate property values, as defined), intergovernmental revenue (typically, when related expenditures are incurred), and other taxes and charges for services (typically, as cash is received).

Expenditures are generally recorded when a liability is incurred, as under accrual accounting. Modifications to the accrual basis of accounting include the following:

- Employees' vested annual vacation and sick leave are recorded as expenditures when matured. The unmatured amount of accumulated annual vacation and sick leave unpaid at June 30, 2014 is reported only in the government wide financial statements.

- Interest and principal on general long-term obligations and interest on interest rate swap agreements are recorded when due, except for interest and principal due on July 1 of the following fiscal year, if resources are available for its payment as of June 30.

- Debt service expenditures, federal funds' cost disallowances, other long-term obligations, and amounts subject to judgments under litigation are recorded in the governmental funds only when payment is due; and in the case of judgments under litigation, when a settlement has been made and awaiting payment. Until these criteria are met, these liabilities have been recorded only in the government-wide financial statements.

A summary reconciliation of the difference between total fund balances (deficit) as reflected in the governmental funds balance sheet and net position of Governmental Activities as shown on the government-wide statement of net position is presented in an accompanying reconciliation of the balance sheet of governmental funds to the statement of net position.

A summary reconciliation of the difference between net change in fund balances (deficit) as reflected in the governmental funds statement of revenue, expenditure, and changes in fund balances (deficit) and change in net position in the statement of activities of the government-wide financial statements is presented in the accompanying reconciliation of revenue, expenditures, and changes in fund balances (deficit) of governmental funds to the statement of activities.

*Proprietary Funds, Fiduciary Funds, and Discretely Presented Component Units Financial Statements* – The financial statements of the proprietary funds, fiduciary funds, and discretely presented component units are reported using the economic resources measurement focus and the accrual basis of accounting, similar to the government-wide financial statements described above.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations. Revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses. The major operating revenue of the Commonwealth's major proprietary funds is as follows:

- *Unemployment Insurance Fund* – Amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

- *Lotteries Fund* – Amounts collected from the sale of traditional lottery tickets and electronic lotto games.

- *Puerto Rico Medical Services Administration* – Amounts charged and collected from private citizens, member institutions and municipalities for patient services provided.

- *Puerto Rico Water Pollution Control Revolving Fund* – Interest income from the granting of infrastructure and construction loans.

(f)   ***Cash and Short Term Investments***

The Commonwealth follows the practice of pooling cash. Cash balances of funds held in the Commonwealth Treasury are commingled in a general checking account and several zero balance bank accounts for special purposes. The available cash balance in the general checking account beyond immediate need is now pooled in an interest bearing account with a commercial bank (with the Government Development Bank for Puerto Rico (GDB) and with the Puerto Rico Government Investment Trust Fund (PRGITF) as of June 30, 2014).

Cash and cash equivalents include investments with original maturities of 90 days or less from the date of acquisition. Short-term investments are recorded at cost.

The Puerto Rico Commissioner of Financial Institutions requires that Puerto Rico private financial institutions deposit collateral securities to secure the deposits of the Commonwealth and all other governmental entities in each of these institutions. The amount of collateral securities to be pledged for the security of public deposits shall be established by the rules and regulations promulgated by the Commissioner of Financial Institutions.

The Puerto Rico Unemployment Insurance Trust Fund is maintained to account for the collection of unemployment insurance contributions from employers and the payment of unemployment benefits to eligible claimants. As required by federal law, all resources not necessary for current benefit payments are placed on deposit with the U.S. Treasury. Interest earned over such deposit is retained in the fund.

Cash and short term investments and cash equivalents of the component units and certain funds of the Primary Government are maintained in separate bank accounts, from those of the rest of the Primary Government, in their own names. A significant portion of these cash instruments are invested in GDB deposits.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(g) *Securities Purchased/Sold under Agreements to Resell/Repurchase*

Certain component units of the Commonwealth enter into purchases of securities with simultaneous agreements to resell the same securities (resale agreements) and into sales of securities under agreements to repurchase (repurchase agreements). The amounts advanced or received under these agreements generally represent short-term loans and are reflected as an asset in the case of resale agreements and as a liability in the case of repurchase agreements. The securities underlying these agreements mainly consist of U.S. government obligations, mortgage-backed securities, and interest bearing deposits with other banks. Resale and repurchase agreements are authorized transactions under their respective enabling legislation and/or authorized by the Commonwealth fiscal agent.

(h) *Securities Lending Transactions*

Certain component units and pension trust funds of the Commonwealth enter into securities lending transactions in which governmental entities (lenders) transfer their securities to broker dealers and other entities (borrowers) for collateral with a simultaneous agreement to return the collateral for the same securities in the future. Cash received as collateral on securities lending transactions and investments made with that cash are reflected as investments. Securities received as collateral are reported as investments if the component unit has the ability to pledge or sell them without a borrower default. Liabilities resulting from these securities lending transactions also are reported in the statement of net position. Securities lending transactions collateralized by letters of credit or by securities that the component unit does not have the ability to pledge or sell unless the borrower defaults are not reported as assets and liabilities in the statement of net position.

(i) *Investments*

Investments mainly include U.S. government and agencies' obligations, mortgage-backed securities, repurchase agreements, commercial paper, local government obligations, investment contracts, and corporate debt and equity obligations. Investments and investment contracts are carried at fair value, except for money market investments and participating investment contracts with a remaining maturity at the time of purchase of one year or less and nonparticipating investment contracts (guaranteed investment contracts), which are carried at cost; and investment positions in 2a7-like external investment pools, which are carried at the pool's share price. Fair value is determined based on quoted market prices and quotations received from independent broker/dealers or pricing service organizations. Investment income, including changes in the fair value of investments, is presented as investment earnings in the statement of activities, the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds, and the statement of revenue, expenses, and changes in net position – proprietary funds. Realized gains and losses from the sale of investments and unrealized changes in the fair value of outstanding investments are included in the change in the fair value of investments.

The PRGITF is considered a 2a7-like external investment pool and, as such, reports its investments at amortized cost.

(j) *Accounts Receivable, Loans, and General Revenue*

Income taxes receivables, in both the General Fund and statement of net position, include predominantly an estimate of amounts owed by taxpayers for individual and corporate income taxes,

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

net of estimated uncollectible amounts. Income taxes receivables in the General Fund are recognized as revenue when they become measurable and available based on actual collections during the 120 days following the fiscal year-end related to taxable years of prior periods. Income taxes receivable also include amounts owed by taxpayers on income earned prior to June 30, 2014, estimated to be collectible but not currently available, and thus are reported as deferred inflows of resources in the General Fund; such deferred inflows are considered revenue in the statement of activities as the availability criteria is not applicable on the government-wide financial statements for revenue recognition.

The sales and use tax receivable is recognized as revenue in the statement of revenue, expenses, and changes in fund balance-governmental funds when it becomes measurable and available based on actual collections during the 30 days following the fiscal year-end related to sales and use transactions due on or before year-end. The same treatment is given in the government-wide financial statements given its short period of availability.

Excise tax receivable is recognized as revenue when it becomes measurable and available based on actual collections during the 30 days following the fiscal year-end related to transactions that occurred before year-end. The same treatment is given in the government-wide financial statements given its short period of availability. Act No. 154 of October 25, 2010 imposed a temporary excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico by nonresident alien individuals, foreign corporations, and foreign partnerships. Act No. 154 applies to income realized and acquisitions occurring after December 31, 2010. Act No. 154 provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico and taxable in Puerto Rico with respect to a portion of taxpayer's income where the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of seventy-five million dollars or more in any of the last three years and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, but will instead be subject to the excise tax in lieu of any income tax. The excise tax will apply until the year 2017. The excise tax is based on the value of the personal property or the services acquired, and was 4% for calendar year 2011, 3.75% in 2012 and 2.75% for portions of 2013 until February 28, 2013. On February 28, 2013, Act No. 2 was enacted raising the then prevailing excise tax rate of 2.75% to 4%, effective immediately, and maintaining such rate fixed at 4% until the year 2017.

Real property tax payments, under Act No. 7 described below, for the fiscal year ended June 30, 2014 were due September 1, 2012 and March 1, 2013. For purposes of the governmental fund financial statements, property tax revenue represents payments received during the year and payments received (against the current fiscal year and prior years' levies) within the first 90 days of the following fiscal year reduced by tax refunds, if any. Additionally, the government wide financial statements recognize real property tax revenue (net of refunds), which is not available to the governmental funds in the fiscal year for which the taxes are levied. Act No. 7 of March 9, 2009, as amended, imposed a real property tax, in addition to the one already established for the municipalities of the Commonwealth through the Municipal Revenue Collection Center (CRIM), on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax was applicable during fiscal years

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

2010 through 2012 and amounted to 0.591% of such properties' appraised value as determined by the CRIM. Act No. 1 of January 31, 2011 eliminated this additional real property tax commencing with the quarter ended June 30, 2011. Collections on this tax were still being received during fiscal year 2014, as a result of delinquent taxpayers bringing their accounts current or taking advantages of amnesty programs offered by the Department of the Treasury. The Commonwealth applies a 90-day availability period, rather than the traditional 60-day period after year-end, in order to cover a period in which most tax extension payments are made. This has been applied consistently over the years.

Intergovernmental receivables are stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions. Intergovernmental receivables primarily represent amounts owed to the Commonwealth for reimbursement of expenditures incurred pursuant to federally funded programs. This intergovernmental receivable is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during one year following the fiscal year-end related to transactions that occurred before year-end. Those intergovernmental receivables not expected to be collected within the aforementioned one-year period are recorded as deferred inflows of resources. In applying the susceptible to accrual concept to federal grants, revenue is recognized when all applicable eligibility requirements are met (typically, when related expenditures are incurred) and the resources are available. Resources received before eligibility requirements, other than timing, are met are considered unearned revenue. Resources received before timing requirements are met are considered deferred inflows of resources.

Intergovernmental receivables also include taxes that the CRIM, is required to remit to the Commonwealth to be used by the Commonwealth's debt service fund for payment of debt service on general obligations of the Commonwealth. The amount to be remitted is based on the special tax of 1.03% of the assessed value of all real and personal property not exonerated from taxation, which is levied by the CRIM, pursuant to Act No. 83 of 1991. This receivable from CRIM is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during 180 days following the fiscal year-end related to transactions that occurred before year-end. The amounts from CRIM not expected to be collected within the aforementioned 180 days-period are recorded as deferred inflows of resources.

Unemployment, disability, driver's insurance, and other services receivables recognized in the proprietary funds are stated net of estimated allowances for uncollectible accounts.

The accounts receivable from nongovernmental customers of the component units are net of estimated uncollectible amounts. These receivables arise primarily from service charges to users. Accounts receivable from the Primary Government and other component units that arise from service charges, are evaluated for collectibility.

Loans of the General Fund are net of estimated uncollectible amounts. These receivables arise from amounts owed by public corporations and municipalities for public insurance and rent paid by the General Fund on their behalf.

The loans of the pension trust funds are presented net of estimated allowances for adjustments and losses in realization. However, most of the loans are secured by mortgage deeds, plan members'

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

contributions, and any unrestricted amounts remaining in escrow. Loans of the component units consist predominantly of loans to the Primary Government, other component units, and municipalities, and are presented net of allowances for uncollectible accounts. The remaining loans of the component units are to small and medium businesses, agricultural, and low income housing loans from nongovernmental customers, and are presented net of estimated losses on such portfolios.

(k) *Inventories*

Generally, inventories are valued at cost and predominantly on the first-in, first-out basis. Governmental fund inventories are recorded as expenditures when purchased rather than capitalized as an asset. Only significant amounts of inventory at the end of the year are capitalized in the governmental funds. However, inventories are always capitalized in the statement of net position of Governmental Activities.

(l) *Restricted Assets*

Funds set aside for the payment and guarantee of notes and interest payable and for other specified purposes are classified as restricted assets since their use is limited for this purpose by applicable agreements or required by law. Restricted assets in the proprietary funds mainly include amounts set aside for the payment of insurance benefits and lending activities.

(m) *Real Estate Held for Sale or Future Development*

Real estate held for sale or future development is carried at the lower of fair value or cost, which is established by a third-party professional assessment or based upon an appraisal, minus estimated costs to sell. Subsequent declines in the value of real estate available for sale are charged to expenditure/expense.

(n) *Capital Assets*

Capital assets include land, buildings, building improvements, equipment (including software), vehicles, construction in process, and infrastructure assets, and are reported in the applicable Governmental Activities, Business-Type Activities, and component unit columns in the government-wide financial statements and in the proprietary fund financial statements. The Commonwealth's Primary Government defines capital assets as assets that (i) have an initial, individual cost of $25,000 or more at the date of acquisition and (ii) have a useful life of more than one year. Capital assets are recorded at historical cost or at estimated historical cost, if actual historical cost is not available.

Capital assets donated by third parties are recorded at fair value at the time of donation. Those capital assets donated by related parties are recorded at the carrying value existing at the transferor's records. Major outlays for capital assets and improvements are capitalized as projects are constructed. Interest costs are capitalized during the construction period only for business-type activities and most component units. The costs of normal maintenance and repairs that do not add value to the assets or materially extend asset lives are not capitalized.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Capital assets utilized in the governmental funds are recorded as expenditures in the governmental fund financial statements. Depreciation expense is recorded in the government-wide financial statements, as well as the proprietary funds and component units' financial statements.

Capital assets of the Primary Government are depreciated on the straight-line method over the assets' estimated useful life. There is no depreciation recorded for land and construction in progress. The estimated useful life of capital assets is as follows:

|  | Years |
|---|---|
| Buildings and building improvements | 20–50 |
| Equipment, furniture, fixtures, vehicles, and software | 5–15 |
| Infrastructure | 50 |

The capital assets of the component units are recorded in accordance with the applicable standards of the component units and under their own individual capitalization thresholds, which includes capitalization of interest. Depreciation has been recorded when required by these standards based on the types of assets, use, and estimated useful lives of the respective assets, and on the nature of each of the component unit's operations.

The estimated useful lives of capital assets reported by the component units are as follows:

|  | Years |
|---|---|
| Buildings and building improvements | 3–50 |
| Equipment, furniture, fixtures, vehicles, and software | 3–20 |
| Intangibles, other than software | 3–5 |
| Infrastructure | 10–50 |

In the case of capital assets under service concession arrangements pursuant to GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements* (mostly attributed to Puerto Rico Ports Authority and Puerto Rico Highways and Transportation Authority), these are maintained on their books and also stated at cost or at estimated historical cost. Construction in progress made by the third-party operators under these service concession arrangements is not recorded by the aforementioned component units while such construction is still in progress and not ready for use and operation; at which time such constructed assets and improvements will be recognized at their corresponding fair value. These capital assets are not being depreciated since the closing date of their respective service concession arrangements because such agreements require the third-party operators to return the related facilities to these component units in its original or enhanced condition. Such capital assets continue to apply existing capital asset guidance, including depreciation through the closing date of the respective service concession arrangements. Under these service concession arrangements, the aforementioned component units have received from the third-party operator either an upfront compensation fee or capital assets (or the commitment to construct them under the agreement) or both. These resources, net of any contractual obligation from the component units, are considered a deferred inflow of resources, which is recognized into revenue under the straight-line method over the term of the respective agreements.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The Commonwealth follows the provisions of GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*, and amendment to GASB No. 34. This statement establishes guidance for accounting and reporting for the impairment of capital assets and for insurance recoveries. In accordance with these provisions, governments are required to evaluate prominent events or changes in circumstances affecting capital assets to determine whether impairment of a capital asset has occurred. Such events or changes in circumstances that may be indicative of impairment include evidence of physical damage, enactment or approval of laws or regulations or other changes in environmental factors, technological changes or evidence of obsolescence, changes in the manner or duration of use of a capital asset, and construction stoppage among others. The Commonwealth and its components units evaluated its capital assets as required by GASB No. 42 and an impairment of approximately $59.3 million and $110.6 million was identified at the Primary Government and Component Unit level, respectively. The $59.3 million impairments at the Primary Government level consisted of approximately $26.1 million of certain dwelling units identified for demolition by the Public Housing Administration (PHA), approximately $22.0 million of public schools identified for closure and $11.2 million of stoppage of construction projects. At the Component Unit level, the impairment of approximately $110.6 million was identified in the construction in progress account for PRHTA.

(o)  *Income Tax Refunds Payable*

During the calendar year, the Commonwealth collects individual income taxes through withholdings and payments from taxpayers. At June 30, the Commonwealth estimates the amount owed to taxpayers for overpayments of income taxes during the first half of the calendar year. These estimated amounts and the actual individual income tax refunds claimed for prior years but not paid at year-end are recorded as income tax refunds payable and as a reduction of tax revenue in both the Governmental Funds and the Governmental Activities. Corporate income tax refunds claimed are recognized on a pay-as-you go basis.

(p)  *Deferred Outflows/Inflows of Resources*

In addition to assets, the statement of net position will sometimes report a separate section for *deferred outflows of resources*. This separate financial statement element, deferred outflows of resources, represents a consumption of net position that applies to a future period(s) and so will *not* be recognized as an outflow of resources (expense/expenditure) until then. The Primary Government and the component units have two major items that qualify for reporting in this category: (i) the unamortized balance of losses on bond refunding and (ii) the accumulated decrease in the fair value of hedging derivatives, both reported in the government-wide statement of net position. A loss on a bond refunding results from the difference in the carrying value of refunded debt and its reacquisition price. This amount is capitalized and amortized over the shorter of the life of the refunded or refunding debt. Further information about the balances of unamortized deferred refunding losses reclassified out of debt into deferred outflow of resources as a result of the adoption of GASB Statement No. 65, can be found in note 12. With respect to hedging derivatives, the accumulated losses on their fair values are also deferred and amortized as the underlying hedged instrument (in this case, debt) is being repaid or refunded and/or as the hedging derivative is terminated. Further information on the derivative instruments of the Primary Government can be found in note 20. There were no deferred outflows of resources at the governmental funds level.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

In addition to liabilities, the statement of net position and the governmental funds' balance sheet will sometimes report a separate section for deferred inflows of resources. This separate financial statement element, *deferred inflows of resources*, represents an acquisition of net position and resources that applies to a future period(s) and so will not be recognized as an inflow of resources (revenue) until that time. The Primary Government has only one type of item arising under the modified accrual basis of accounting that qualify for reporting in this category, and that is *unavailable revenue*. Deferred inflows of resources at the governmental fund level arise when potential revenue does not meet the "available" criteria for revenue recognition in the current period under the modified accrual basis of accounting. In subsequent periods, when the applicable resources become available, the deferred inflow of resources is removed from the balance sheet, and the revenue is recognized. The Primary Government and the component units also have one item that qualifies for reporting in this category in the government wide statement of net position and that one is the unamortized balance of gains on bond refunding. A gain on a bond refunding results when the carrying value of refunded debt is greater than its reacquisition price. This amount is capitalized and amortized over the shorter of the life of the refunded or refunding debt. Further information about the balances of unamortized deferred refunding gains reclassified out of debt into deferred inflow of resources as a result of the adoption of GASB Statement No. 65 can be found in note 12. The component units also have one additional item that qualifies for reporting in this category in the government wide statement of net position, which is the unamortized balances of the upfront amounts received and related adjustments pertaining to the Service Concession Arrangements of PRPA and PRHTA, further described in note 16.

(q) *Long-Term Debt*

The liabilities reported in the government wide financial statements include Commonwealth's general obligation bonds and long-term notes, liabilities under guaranteed obligations, obligations under lease/purchase agreements, obligations for voluntary termination benefits, and long-term liabilities including vacation, sick leave, long-term liabilities to other governmental entities, net pension obligation, legal claims, and noncurrent federal fund cost disallowances related to expenditures of federal grants. Long-term obligations financed by proprietary fund types and component units are recorded as liabilities in those funds and in the discretely presented component units' column.

In the government wide financial statements, premiums and discounts on long-term debt and other long-term obligations are presented in the columns for governmental and business-type activities. The same is presented in the proprietary fund financial statements. Bond and note premiums and discounts are deferred and amortized over the life of the debt under a method that approximate the effective interest method. Bonds and notes payable are reported net of the applicable bond premium or discount. Bond issuance costs, other than prepaid insurance, are reported as expenses. In the governmental fund financial statements, governmental funds recognize bond premiums and discounts, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums received on debt issuance are reported as other financing sources while discounts are reported as other financing uses. Issuance costs, whether or not withheld from the actual debt proceeds received, are reported as expenditures.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(r)   *Derivative Instruments*

The Commonwealth accounts for derivative instruments in accordance with GASB Statement No. 53, *Accounting and Financial Reporting for Derivative Instruments*. Derivative instruments such as interest rate and commodity swaps, interest rate locks, options (caps, floors, and collars), swaptions, forward contracts, and futures contracts are entered into by governments as investments; as hedges of identified financial risks associated with assets or liabilities, or expected transactions (i.e., hedge-able items); to lower the costs of borrowings; to effectively fix cash flows or synthetically fix prices; or to offset the changes in fair value of hedgeable items. Certain derivative instruments, with the exception of synthetic guaranteed investment contracts that are fully benefit-responsive, are reported at fair value in the government-wide financial statements. The changes in fair value of effective hedging derivative instruments are reported as deferred inflows or deferred outflows of resources. The changes in fair value of investment derivative instruments (which include ineffective hedging derivative instruments) are reported as part of investment revenue in the current reporting period. Effectiveness is determined by considering whether the changes in cash flows or fair values of the potential hedging derivative instrument substantially offset the changes in cash flows or fair values of the hedge-able item. See note 20 for disclosure information relating to hedging and investment derivative instruments.

(s)   *Accounting for Pension Costs*

The Commonwealth accounts for pension costs under the provisions of GASB Statement No. 27, A*ccounting for Pensions by State and Local Governmental Employers, as amended* by GASB Statement No. 50. Under GASB Statement No. 27, annual pension cost measured on the accrual basis of accounting is equal to the employer's annual required contributions (ARC) to the plan, calculated in accordance with certain parameters, unless the employer has a net pension obligation for past under or over contributions. A pension liability or asset is reported equal to the cumulative difference between annual required contributions and the statutorily required contributions.

For the purpose of applying the requirements of GASB Statement No. 27, as amended by GASB Statement No. 50, *Pension Disclosures*, the Commonwealth's financial reporting entity is considered to be a sponsor of three defined-benefit pension plans: JRS, TRS, and ERS. This is because substantially all the participants in the three pension trust funds are part of the financial reporting entity of the Commonwealth. For the purpose of the basic financial statements, and as disclosed in note 17, the Commonwealth's annual pension cost, measured on the accrual basis of accounting, for the year ended June 30, 2014 amounted to approximately $2.4 billion. However, the statutory contributions made by the sponsors of the three defined-benefit plans amounted to approximately $861.4 million. The excess of the annual required contribution over the statutorily required contributions of approximately $1.6 billion increased the net pension obligation at June 30, 2014 to approximately $14.6 billion. This amount is presented in the statement of net position of the Governmental Activities as of June 30, 2014, analogous to the accounting of a single-employer retirement plan.

For purposes of the stand-alone financial statements of each of the blended and discretely presented component units, the entities accounted for pension costs from the standpoint of a participant in a multiple employer cost sharing plan. Accordingly, pension costs recognized are equal to the statutorily or contractually required contributions, with a liability recorded for any unpaid required contributions. The basis of accounting used by the component units was either modified accrual basis or accrual

86                                                                                                              (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

basis, depending upon individual fund structure and type of entity. Most component units did not have pension related assets or liabilities because they have contributed the statutorily required contributions.

(t) *Other Postemployment Benefits*

In addition to the pension benefits described in note 17, the Commonwealth provides other retirement benefits, such as summer and Christmas bonus, and postemployment healthcare benefits (OPEB) for its retired employees in accordance with local law. Substantially, all of the employees may become eligible for these benefits if they reach normal retirement age while working for the Commonwealth. The Commonwealth accounts for OPEB under the provisions of GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. This statement requires a systematic, accrual-basis measurement and recognition of OPEB cost (expense) over a period that approximates employees' years of service and provides information about actuarial accrued liabilities associated with OPEB and whether and to what extent progress is being made in funding the plan. Annual postemployment benefits cost should equal the annual required contribution to the plans, calculated in accordance with certain parameters. For more information, refer to note 18.

The Christmas bonus and the summer bonus benefits are provided by Commonwealth statutes. The Christmas bonus and the summer bonus paid by the Commonwealth to the retired employees during the year ended June 30, 2014 was $600 per retiree, except for those retirees of the ERS, which had their summer bonus eliminated and the Christmas bonus reduced from $600 per retiree to $200 per retiree pursuant to Act No. 3 of April 4, 2013, which reformed the ERS. The total amount of Christmas and summer bonus paid during fiscal year 2014 was approximately $46.3 million. These benefits are recorded as expenditures when paid in the General Fund.

Postemployment healthcare benefits are provided through insurance companies whose premiums are paid by the retiree with the Commonwealth providing a matching share of not more than $100 per month for each retiree. The total amount of postemployment healthcare benefits paid during fiscal year 2014 was approximately $15.4 million. These benefits are recorded as expenditures when paid in the General Fund.

(u) *Compensated Absences*

The vacation policy of the Commonwealth generally provides for the accumulation of 2.5 days per month, except for the teachers who accrue 4 days per month, up to an annual maximum of 40 days. Vacation time accumulated is fully vested by the employees from the first day of work up to a maximum of 60 days. Employees accumulate sick leave generally at a rate of 1.5 days per month up to an annual maximum of 18 annual days and an accumulated maximum of 90 days. Upon retirement, an employee receives compensation for all accumulated unpaid vacation leave at the current rate regardless of years of service; and for all accumulated unpaid sick if the employee has at least 10 years of service with the Commonwealth. The liability for compensated absences reported in the government-wide and proprietary fund financial statements has been calculated using the vesting method (except for Police department employees), in which leave amounts for both, employees who currently are eligible to receive termination payments and other employees who are expected to become eligible in the future to receive such payments upon termination, are included. The liability has been calculated based on the employees' current salary level and includes salary-related costs (e.g., social security and Medicare tax). The liability for compensated absences of Police department

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

employees is estimated based on actual termination payments made and projected statistically, a method, which is a hybrid between the vesting and termination methods. The governmental fund financial statements record expenditures when employees are paid for leave or the balance due is accrued upon the employee's separation from employment. Compensated absence accumulation policies for the blended component units and discretely presented component units vary from entity to entity based on negotiated agreements and other factors agreed upon between the management of these entities and their employees.

The Public Service Personnel Law requires certain component units and the Primary Government of the Commonwealth to annually pay the employees the accumulated vacation and sick leave earned in excess of the limits mentioned above. As a result of Act No. 66 of June 17, 2014, some of these excess accumulations are no longer going to be payable to the employers (see note 2 for further discussion).

(v) *Termination Benefits*

The Commonwealth accounts for termination benefits in accordance with GASB Statement No. 47, *Accounting for Termination Benefits*. Pursuant to the provisions of GASB Statement No. 47, in financial statements prepared on the accrual basis of accounting, employers should recognize a liability and expense for voluntary termination benefits (for example, early retirement incentives) when the offer is accepted and the amount can be estimated. A liability and expense for involuntary termination benefits (for example, severance benefits) should be recognized in the government-wide financial statements when a plan of termination has been approved by those with the authority to commit the government to the plan, the plan has been communicated to the employees, and the amount can be estimated. In financial statements prepared on the modified accrual basis of accounting, liabilities and expenditures for termination benefits should be recognized to the extent the liabilities are normally expected to be liquidated with expendable available financial resources.

(w) *Encumbrances*

Encumbrance accounting, under which purchase orders, contracts, and other commitments for expenditures are recorded to reflect the use of the applicable spending appropriations, is used by the General Fund during the fiscal year to control expenditures. The unencumbered balance of any appropriation of the General Fund at the end of the fiscal year lapses immediately. Appropriations, other than in the General Fund, are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending.

(x) *Interfund Activities and Intraentity Transactions*

The Commonwealth had the following interfund activities and intraentity transactions:

*Interfund Transfer* – Legally required transfers are reported when incurred as transfer-in by the recipient fund and as transfer-out by the disbursing fund, with receivables and payables presented as amounts due to and due from other funds. Advances between funds are also presented as amounts due to and due from other funds. However, these advances, transfers, and related amounts receivable and payable are considered internal balances and activities that have been eliminated in the government-wide financial statements. Interfund receivables are stated net of estimated allowances for

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

uncollectible accounts, which are determined, based upon past collection experience and current economic conditions.

*Intraentity Transactions* – There are two types of intraentity transactions: First, the flow of resources between the Primary Government and its component units, and among the component units. This flow of resources and the related outstanding balances are reported as if they were external transactions. However, flow of resources between the Primary Government and blended component units are classified as interfund activity, as described above. Second, the intraentity balances between the Primary Government and discretely presented component units that are tantamount to long-term debt financing. The Primary Government's liability is reported in the statement of net position, the proceeds in the Primary Government's statement of revenue, expenditures and changes in fund balance-governmental funds, and the asset in the discretely presented component units' statement of net position. Due from component units is stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions.

(y) **Lottery Revenue and Prizes**

The revenue, expenses, and prizes awarded by the Lottery of Puerto Rico and the Additional Lottery System, reported within the lotteries enterprise fund, are recognized as drawings are held. Moneys collected prior to June 30 for tickets related to drawings to be conducted subsequent to June 30 are reported as unearned revenue. Unpaid prizes awarded as of June 30 are reported as a fund liability. Unclaimed prizes expire after six months and are transferred to the General Fund.

(z) **Risk Management**

The Commonwealth purchases commercial insurance covering casualty, theft, tort claims, and other losses for the Primary Government, most component units, and the municipalities. The Commonwealth is reimbursed for premium payments made on behalf of the component units and the municipalities. The current insurance policies have not been canceled or terminated. For workers' compensation, the Commonwealth has a discretely presented component unit, the SIFC, which provides workers' compensation to both public and private employees. The Commonwealth's blended component units are responsible for assuring that its property is properly insured. Annually, these blended component units compile the information of all property owned and its respective replacement value and purchases its property and casualty insurance policies. Insurance coverage for fiscal year 2014 remained similar to those of prior years. In the last three years, the Commonwealth's or the component units' insurance settlements have not exceeded the amount of coverage.

Certain discrete and blended component units combine commercial insurance with internal self-insurance funds covering specific risks related to their specialized operations. The most significant self-insurance funds reside at the discrete component unit's level, and are described in detail in note 15.

(aa) **Tobacco Settlement**

The Commonwealth follows GASB Technical Bulletin No. 2004-1, *Tobacco Settlement Recognition and Financial Reporting Entity Issue*, as amended by GASB Statement No. 48, *Sales and Pledges of Receivables and Future Revenues and Intra-Entity Transfers of Assets and Future Revenues*, (the TB),

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

which provides accounting guidance for entities created to obtain the rights to all or a portion of future tobacco settlement resources and for the governments that create such entities.

The TB indicates that the entity created to obtain the rights (in the Commonwealth's case, it is the Children's Trust), which is called the Tobacco Settlement Authority, should be considered a component unit of the government that created it and the component unit should be blended. The TB also states that the government receiving the payments from the tobacco companies under the agreement, which are called settling governments, should recognize a receivable and revenue for tobacco settlement resources when an event occurs. The event that results in the recognition of an asset and revenue by the settling government is the domestic shipment of cigarettes. The TB indicates that accruals should be made by the settling government and tobacco settlement authorities for estimated shipments from January 1 to their respective fiscal year ends, since the annual payments are based on a calendar year. However, under the modified accrual basis of accounting at the fund level, revenue should be recognized only to the extent that resources are available.

(bb)  *Use of Estimates*

The preparation of the basic financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the basic financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

(cc)  *New Accounting Standards Adopted*

The following new accounting standards were adopted by the Commonwealth effective July 1, 2013:

- GASB Statement No. 65, *Items Previously Reported as Assets and Liabilities*. This Statement established accounting and financial reporting standards that reclassified, as deferred outflows of resources or deferred inflows of resources, certain items that were previously reported as assets and liabilities and recognized as outflows of resources or inflows of resources, certain items that were previously reported as assets and liabilities, or vice versa. This Statement also provided other financial reporting guidance related to the impact of the financial statement elements of deferred outflows of resources and deferred inflows of resources, such as changes in the determination of the major fund calculations and limiting the use of the term deferred in financial statement presentations.

At adoption, the impact of Statement No. 65 at the Commonwealth was applicable to the following categories:

**Debt Issuance Costs** – The Commonwealth eliminated its existing unamortized debt issuance costs, other than prepaid insurance, against its beginning net position. Refer to note 3 for details of such impact at both the Primary Government and the discretely presented component units.

**Refunding of Bonds** – The unamortized deferred loss and/or gain on refunding bonds are now required to be presented as a deferred outflow and/or inflow of resources. The Commonwealth reclassified the beginning unamortized balance of such deferred loss and/or gain on refunding

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

bonds as a deferred outflow and/or inflows of resources, which had previously been reported as a deduction of debt. Refer to note 12 for details of such reclassifications restatements made to the applicable debt at both the Primary Government and discretely presented component units.

**Unavailable Revenue** – The Commonwealth reclassified in its governmental funds' balance sheet during fiscal year 2014, as deferred inflows of resources, those potential revenue items not meeting the *available* criteria for revenue recognition under the modified accrual basis of accounting, and which were previously classified as traditional liabilities (deferred or unearned revenue).

- GASB Statement No. 66, *Technical Corrections-2012*. The objective of this Statement was to improve accounting and financial reporting for a governmental financial reporting entity by resolving conflicting guidance that resulted from the issuance of two pronouncements, Statements No. 54, *Reporting and Governmental Fund Type Definitions*, and No. 62, *Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements*. This Statement amended Statement No. 10, *Accounting and Financial Reporting for Risk Financing and Related Insurance Issues*, by removing the provision that limits fund-based reporting of an entity's risk financing activities to the General Fund and the internal service fund type. As a result, governments should base their decisions about fund type classification on the nature of the activity to be reported, as required in Statement 54 and Statement No. 34, *Basic Financial Statements – and Management's Discussion and Analysis – for State and Local Governments*. This Statement also amended Statement No. 62 by modifying the specific guidance on accounting for (1) operating lease payments that vary from a straight line basis, (2) the difference between the initial investment (purchase price) and the principal amount of a purchased loan or group of loans, and (3) servicing fees related to mortgage loans that are sold when the stated service fee rate differs significantly from a current (normal) servicing fee rate. These changes clarified how to apply Statement No. 13, *Accounting for Operating Leases with Scheduled Rent Increases*, and resulted in guidance that is consistent with the requirements in Statement No. 48, *Sales and Pledges of Receivables and Future Revenues and Intra-Entity Transfers of Assets and Future Revenues*, respectively. The adoption of this Statement on the Commonwealth had no significant impact.

- GASB Statement No. 67, *Financial Reporting for Pension Plans – an amendment of GASB Statement No. 25*. The defined-benefit pension plans reported in the Pension Trust Funds have implemented this Statement in their standalone basis for the fiscal year ending June 30, 2014. This Statement replaced the requirements of Statements No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*, and No. 50, *Pension Disclosures*. The major fundamental change, among others related to the application and determination of certain measurement assumptions in valuing pension plans, was switching from the then existing "funding-based" accounting model, where the Annual Required Contribution (ARC) was compared to the actual payments made and that difference determined the net pension obligation; to an "accrual basis" model, where the total pension obligation (actuarially determined) is compared to the plan net position and the difference represents the net pension liability. The effects of this Statement have been presented also in the financial statements of the pension trust funds and disclosed in note 17.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

- GASB Statement No. 70, *Accounting and Financial Reporting for Nonexchange Financial Guarantees*. This Statement requires a governmental entity guarantor that offers a nonexchange financial guarantee to another organization or government to recognize a liability on its financial statements when it is more likely than not that the guarantor will be required to make a payment to the obligation holders under the agreement. Certain qualitative factors are considered when evaluating the likelihood of a guaranty payment, such as: initiation of a bankruptcy process, breach of a debt contract in relation to the guaranteed obligation and indications of significant financial difficulty such as failure to pay agents or trustees. Upon adoption of this Statement, the Commonwealth recognized against its beginning net position a liability on certain guaranteed obligations issued by PAA and PRASA. Refer to note 3 and note 12 for details of such impact on the Commonwealth's Governmental Activities and to note 13(a) for additional disclosures required by this Statement to cover all the Commonwealth guaranteed debt, regardless of whether or not it is required to make payments to the guaranteed obligation holders.

(dd) ***Accounting Pronouncements Issued But Not Yet Effective***

The following new accounting standards has been issued but not yet effective:

- GASB Statement No. 68, *Accounting and Financial Reporting for Pensions – an amendment of GASB Statement No. 27*. This Statement improves accounting and financial reporting by state and local governments for pensions. It also improves information provided by state and local governmental employers about financial support for pensions that is provided by other entities. This Statement replaces the requirements of Statement No. 27, *Accounting for Pensions by State and Local Governmental Employers*, as well as the requirements of Statement No. 50, *Pension Disclosures*, as they relate to pensions that are provided through pension plans administered as trusts or equivalent arrangements (hereafter jointly referred to as trusts) that meet certain criteria. The requirements of Statements 27 and 50 remain applicable for pensions that are not covered by the scope of this Statement. This Statement will bring the effect of Statement 67 summarized in the previous note 1.cc, into the accounting records of the individual agencies, component units and municipalities, whose employees participate in the Retirement Systems.

  The Primary Government of the Commonwealth, as well as its component units and the municipalities, are considered "cost-sharing" employers of the Retirement Systems; therefore, they would report its allocated share of the Retirement System's resulting Net Pension Liability from Statement 67 as follows:

  – Based on their respective individual proportion to the collective net pension liability of all the governments participating

  – The proportion should be consistent with the method used to assess contributions (percentage of payroll). The use of their respective long term expected contribution effort to Retirement Systems divided by those of all governments in the plan, is encouraged.

  This Statement is not effective until fiscal year 2015. The Commonwealth and the Retirement Systems are in the process of evaluating the impact of this Statement on its agencies and component units and also on the municipalities of the Commonwealth. The information to adopt

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

this Statement will be based on the new actuarial reports to be prepared under Statement No. 67 described on the previous note 1(cc).

- GASB Statement No. 69, *Government Combinations and Disposals of Government Operations*. This Statement establishes accounting and financial reporting standards related to government combinations and disposals of government operations. As used in this Statement, the term *government combinations* include a variety of transactions referred to as mergers, acquisitions, and transfers of operations.

  The distinction between a government merger and a government acquisition is based upon whether an exchange of significant consideration is present within the combination transaction. Government mergers include combinations of legally separate entities without the exchange of significant consideration. This Statement requires the use of carrying values to measure the assets and liabilities in a government merger. Conversely, government acquisitions are transactions in which a government acquires another entity, or its operations, in exchange for significant consideration. This Statement requires measurements of assets acquired and liabilities assumed generally to be based upon their acquisition values. This Statement also provides guidance for transfers of operations that do not constitute entire legally separate entities and in which no significant consideration is exchanged. This Statement defines the term *operations* for purposes of determining the applicability of this Statement and requires the use of carrying values to measure the assets and liabilities in a transfer of operations.

  A disposal of a government's operations results in the removal of specific activities of a government. This Statement provides accounting and financial reporting guidance for disposals of government operations that have been transferred or sold. The requirements of this Statement are effective for government combinations and disposals of government operations occurring in financial reporting periods beginning after December 15, 2013, and should be applied on a prospective basis.

- GASB Statement No. 71, *Pension Transition for Contributions Made Subsequent to the Measurement Date*. This Statement amends paragraph 137 of Statement No. 68 to require that, at transition, a government recognize a beginning deferred outflow of resources for its pension contributions, if any, made subsequent to the measurement date of the beginning net pension liability. Statement No. 68, as amended, continues to require that beginning balances for other deferred outflows of resources and deferred inflow of resources related to pensions be reported at transition only if it is practical to determine all such amounts. The provisions of this Statement should be applied simultaneously with the provisions of Statement No. 68.

- GASB Statement No. 72, *Fair Value Measurement and Application*. This Statement requires a government to use valuation techniques that are appropriate under the circumstances and for which sufficient data are available to measure fair value. The techniques should be consistent with one or more of the following approaches; the market approach, the cost approach, or the income approach. This Statement also establishes a hierarchy of inputs to valuation techniques used to measure fair value. That hierarchy has three levels. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities. Level 2 inputs are inputs, other than quoted prices, included within Level 1 that are observable for the assets or liability, either

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

directly or indirectly. Finally, Level 3 inputs are unobservable inputs, such as management's assumptions of the default rate among underlying mortgages of a mortgage-backed security. The provisions of this Statement are effective for financial statements for periods beginning after June 15, 2015.

- GASB Statement No. 73, *Accounting and Financial Reporting for Pensions and Related Assets That Are Not within the Scope of GASB Statement 68, and Amendments to Certain Provisions of GASB Statements 67 and 68*. This Statement establishes requirements for defined-benefit pensions that are not within the scope of Statement No. 68, *Accounting and Financial Reporting for Pensions, as well as for the assets accumulated for purposes* of providing those pensions. In addition, it establishes requirements for defined contribution pensions that are not within the scope of Statement 68. It also amends certain provisions of Statement No. 67, *Financial Reporting for Pension Plans*, and Statement 68 for pension plans and pensions that are within their respective scopes. The provisions of this Statement that address accounting and financial reporting by employers and governmental nonemployer contributing entities for pensions that are not within the scope of Statement 68 are effective for financial statements for fiscal years beginning after June 15, 2016, and the provisions of this Statement that address financial reporting for assets accumulated for purposes of providing those pensions are effective for fiscal years beginning after June 15, 2015. The provisions of this Statement for pension plans that are within the scope of Statement 67 or for pensions that are within the scope of Statement 68 are effective for fiscal years beginning after June 15, 2015.

- GASB Statement No. 74, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*. This Statement replaces Statements No. 43, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*, as amended, and No. 57, *OPEB Measurements by Agent Employers and Agent Multiple-Employer Plans*. It also includes requirements for defined-contribution OPEB plans that replace the requirements for those OPEB plans in Statement No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*, as amended, Statement 43, and Statement No. 50, *Pension Disclosures*. The scope of this Statement includes OPEB plans-defined benefit and defined contribution-administered through trusts that meet the following criteria:

  – Contributions from employers and nonemployer contributing entities to the OPEB plan and earnings on those contributions are irrevocable.

  – OPEB plan assets are dedicated to providing OPEB to plan members in accordance with the benefit terms.

  – OPEB plan assets are legally protected from the creditors of employers, nonemployer contributing entities, and the OPEB plan administrator. If the plan is a defined benefit OPEB plan, plan assets also are legally protected from creditors of the plan members.

This Statement also includes requirements to address financial reporting for assets accumulated for purposes of providing defined-benefit OPEB through OPEB plans that are not administered

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

through trusts that meet the specified criteria. The provisions of this statement are effective for fiscal years beginning after June 15, 2016.

- GASB Statement No. 75, *Accounting and Financial Reporting for Postemployment Benefits Other Than Pensions*. This Statement replaces the requirements of Statements No. 45, Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions, as amended, and No. 57, OPEB Measurements by Agent Employers and Agent Multiple-Employer Plans, for OPEB. Statement No. 74, Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans, establishes new accounting and financial reporting requirements for OPEB plans. The scope of this Statement addresses accounting and financial reporting for OPEB that is provided to the employees of state and local governmental employers. This Statement establishes standards for recognizing and measuring liabilities, deferred outflows of resources, deferred inflows of resources, and expense/expenditures. For defined benefit OPEB, this Statement identifies the methods and assumptions that are required to be used to project benefit payments, discount projected benefit payments to their actuarial present value, and attribute that present value to periods of employee service. Note disclosure and required supplementary information requirements about defined benefit OPEB also are addressed. In addition, this Statement details the recognition and disclosure requirements for employers with payables to defined-benefit OPEB plans that are administered through trusts that meet the specified criteria and for employers whose employees are provided with defined contribution OPEB. This Statement also addresses certain circumstances in which a nonemployer entity provides financial support for OPEB of employees of another entity. The provisions of this statement are effective for fiscal years beginning after June 15, 2017.

- GASB Statement No. 76, *The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments*. This Statement identifies in the context of the current governmental financial reporting environment the hierarchy of generally accepted accounting principles (GAAP). The "GAAP hierarchy" consists of the sources of accounting principles used to prepare financial statements of state and local governmental entities in conformity with GAAP and the framework for selecting those principles. This Statement reduces the GAAP hierarchy to two categories of authoritative GAAP and addresses the use of authoritative and nonauthoritative literature in the event that the accounting treatment for a transaction or other event is not specified within a source of authoritative GAAP. This Statement supersedes Statement No. 55, The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments. The provisions of this Statement are effective for financial statements for periods beginning after June 15, 2015.

- GASB Statement No. 77, *Tax Abatement Disclosures*. This Statement establishes financial reporting standards for tax abatement agreements entered into by state and local governments. The disclosures required by this Statement encompass tax abatements resulting from both (a) agreements that are entered into by the reporting government and (b) agreements that are entered into by other governments and that reduce the reporting government's tax revenue. The provisions of this Statement should be applied to all state and local governments subject to such tax abatement agreements. For financial reporting purposes, a tax abatement is defined as a reduction in tax revenue that results from an agreement between one or more governments and

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

an individual or entity in which (a) one or more governments promise to forgo tax revenue to which they are otherwise entitled and (b) the individual or entity promises to take a specific action after the agreement has been entered into that contributes to economic development or otherwise benefits the governments or the citizens of those governments. A transaction's substance, not its form or title, is a key factor in determining whether the transaction meets the definition of a tax abatement for the purpose of this Statement. The provisions of this Statement are effective for financial statements for periods beginning after December 15, 2015.

- GASB Statement No. 78, *Pensions Provided Through Certain Multiple-Employer Defined Benefit Plans*. This Statement addresses a practice issue regarding the scope and applicability of Statement No. 68, Accounting and Financial Reporting for Pensions. This issue is associated with pensions provided through certain multiple-employer defined-benefit pension plans and to state or local governmental employers whose employees are provided with such pensions. Prior to the issuance of this Statement, the requirements of Statement 68 applied to the financial statements of all state and local governmental employers whose employees are provided with pensions through pension plans that are administered through trusts that meet the criteria in paragraph 4 of that Statement. This Statement amends the scope and applicability of Statement 68 to exclude pensions provided to employees of state or local governmental employers through a cost-sharing multiple-employer defined benefit pension plan that (1) is not a state or local governmental pension plan, (2) is used to provide defined-benefit pensions both to employees of state or local governmental employers and to employees of employers that are not state or local governmental employers, and (3) has no predominant state or local governmental employer (either individually or collectively with other state or local governmental employers that provide pensions through the pension plan). This Statement establishes requirements for recognition and measurement of pension expense, expenditures, and liabilities; note disclosures; and required supplementary information for pensions that have the characteristics described above. This Statement is not effective until fiscal year 2016.

- GASB Statement No. 79, *Certain External Investment Pools and Pool Participants*. This Statement addresses accounting and financial reporting for certain external investment pools and pool participants. Specifically, it establishes criteria for an external investment pool to qualify for making the election to measure all of its investments at amortized cost for financial reporting purposes. An external investment pool qualifies for that reporting if it meets all of the applicable criteria established in this Statement. The specific criteria address (1) how the external investment pool transacts with participants; (2) requirements for portfolio maturity, quality, diversification, and liquidity; and (3) calculation and requirements of a shadow price. Significant noncompliance prevents the external investment pool from measuring all of its investments at amortized cost for financial reporting purposes. Professional judgment is required to determine if instances of noncompliance with the criteria established by this Statement during the reporting period, individually or in the aggregate, were significant. If an external investment pool does not meet the criteria established by this Statement, that pool should apply the provisions in paragraph 16 of Statement No. 31, Accounting and Financial Reporting for Certain Investments and for External Investment Pools, as amended. If an external investment pool meets the criteria in this Statement and measures all of its investments at amortized cost, the pool's participants also should measure their investments in that external investment pool at amortized cost for

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

financial reporting purposes. If an external investment pool does not meet the criteria in this Statement, the pool's participants should measure their investments in that pool at fair value, as provided in paragraph 11 of Statement 31, as amended. This Statement establishes additional note disclosure requirements for qualifying external investment pools that measure all of their investments at amortized cost for financial reporting purposes and for governments that participate in those pools. Those disclosures for both the qualifying external investment pools and their participants include information about any limitations or restrictions on participant withdrawals. This Statement is not effective until fiscal year 2016, except for certain provisions on portfolio quality, custodial credit risk, and shadow pricing. Those provisions are not effective until fiscal year 2017.

- GASB Statement No. 80, *Blending Requirements for Certain Component Units*. This Statement improves financial reporting by clarifying the financial statement presentation requirements for certain component units. This Statement amends the blending requirements established in paragraph 53 of Statement No. 14, The Financial Reporting Entity, as amended. This Statement amends the blending requirements for the financial statement presentation of component units of all state and local governments. The additional criterion requires blending of a component unit incorporated as a not-for-profit corporation in which the is the sole corporate member. The additional criterion does not apply to component units included in the financial reporting entity pursuant to the provisions of Statement No. 39, Determining Whether Certain Organizations Are Component Units. This Statement is not effective until fiscal year 2017.

- GASB Statement No. 81, *Irrevocable Split-Interest Agreements*. This Statement improves accounting and financial reporting for irrevocable split-interest agreements by providing recognition and measurement guidance for situations in which a government is a beneficiary of the agreement. Split-interest agreements are a type of giving agreement used by donors to provide resources to two or more beneficiaries, including governments. Split-interest agreements can be created through trusts, or other legally enforceable agreements with characteristics that are equivalent to split-interest agreements, in which a donor transfers resources to an intermediary to hold and administer for the benefit of a government and at least one other beneficiary. Examples of these types of agreements include charitable lead trusts, charitable remainder trusts, and life-interests in real estate. This Statement requires that a government that receives resources pursuant to an irrevocable split-interest agreement recognize assets, liabilities, and deferred inflows of resources at the inception of the agreement. Furthermore, this Statement requires that a government recognize assets representing its beneficial interests in irrevocable split-interest agreements that are administered by a third party, if the government controls the present service capacity of the beneficial interests. This Statement requires that a government recognize revenue when the resources become applicable to the reporting period. This Statement is not effective until fiscal year 2018.

- GASB Statement No. 82, *Pension Issues- an Amendment of GASB Statements No 67, No. 68 and No. 73*. This Statement addresses certain issues that have been raised with respect to GASB Statements No. 67, No. 68, and No. 73. The Statement is designed to improve consistency in the application of the pension standards by clarifying or amending related areas of existing guidance. Specifically, this Statement addresses issues regarding (1) the presentation of payroll-related measures in required supplementary information, (2) the selection of assumptions and the

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

treatment of deviations from the guidance in an Actuarial Standard of Practice for financial reporting purposes, and (3) the classification of payments made by employers to satisfy employee (plan member) contribution requirements. Prior to the issuance of this Statement, GASB Statements No. 67 and No. 68 required presentation of covered-employee payroll, which is the payroll of employees that are provided with pensions through the pension plan, and ratios that use that measure, in schedules of required supplementary information. This Statement amends GASB Statements No. 67 and No. 68 to instead require the presentation of covered payroll, defined as the payroll on which contributions to a pension plan are based, and ratios that use that measure. This Statement clarifies that a deviation, as the term is used in Actuarial Standards of Practice issued by the Actuarial Standards Board, from the guidance in an Actuarial Standard of Practice is not considered to be in conformity with the requirements of GASB Statement No. 67, GASB Statement No. 68, or GASB Statement No. 73 for the selection of assumptions used in determining the total pension liability and related measures. This Statement clarifies that payments that are made by an employer to satisfy contribution requirements that are identified by the pension plan terms as plan member contribution requirements should be classified as plan member contributions for purposes of GASB Statement No. 67 and as employee contributions for purposes of GASB Statement No. 68. It also requires that an employer's expense and expenditures for those amounts be recognized in the period for which the contribution is assessed and classified in the same manner as the employer classifies similar compensation other than pensions (for example, as salaries and wages or as fringe benefits). This Statement is not effective until fiscal year 2017, except for the requirements of this Statement for the selection of assumptions in a circumstance in which an employer's pension liability is measured as of a date other than the employer's most recent fiscal year-end. In that circumstance, the requirements for the selection of assumptions are effective for that employer in the first reporting period in which the measurement date of the pension liability is on or after June 15, 2017.

Management is evaluating the impact that these Statement will have on the Commonwealth's basic financial statements.

**(2)   Going Concern, Uncertainties and Liquidity Risk**

(a)   ***Going Concern – Primary Government***

The Commonwealth currently faces a severe fiscal, economic and liquidity crisis, the culmination of many years of significant governmental deficits, a prolonged economic recession (which commenced in 2006), high unemployment, population decline, and high levels of debt and pension obligations. Further stressing the Commonwealth's liquidity is the vulnerability of revenue streams during times of major economic downturns and large health care, pension and debt service costs. As the Commonwealth's tax base has shrunk and its revenues affected by prevailing economic conditions, health care, pension and debt service costs have become an increasing portion of the General Fund budget, which has resulted in reduced funding available for other essential services. The Commonwealth's very high level of debt and unfunded pension liabilities and the resulting required allocation of revenues to service debt and pension obligations have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has financed, further increasing the amount of its debt. More recently, these matters and the Commonwealth's liquidity

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

constraints, among other factors, have adversely affected its credit ratings and its ability to obtain financing at reasonable interest rates, if at all. As a result, the Commonwealth has relied more heavily on short-term financings and interim loans from GDB, and other instrumentalities of the Commonwealth, which reliance has constrained the liquidity of the Commonwealth in general and GDB in particular, and increased near-term refinancing risk. These factors have also resulted in delays in the repayment by the Commonwealth and its instrumentalities of outstanding GDB lines of credit, which delays have limited GDB's ability to continue providing liquidity to the Commonwealth and have caused GDB to fail to make a principal payment on its debt obligations. These factors are reflected in the deterioration of the Commonwealth's credit ratings. Since June 30, 2014, the principal rating agencies have continued to lower their rating on the general obligation bonds of the Commonwealth, which had already been placed within non-investment grade ratings in February 2014. They also lowered their ratings on the bonds of the PBA and COFINA, and on other bonds of various instrumentalities, including GDB, all of which were lowered multiple notches in the grading levels.

The following activities, funds, and blended component units reflect a net position deficit/fund balance deficit as of June 30, 2014 (expressed in thousands):

|  |  | Deficit balance |
|---|---|---|
| Primary Government: |  |  |
| Governmental activities | $ | 50,439,003 |
| General fund |  | 1,863,885 |
| Lotteries |  | 96,623 |
| PRMeSA |  | 302,326 |

The Commonwealth's Governmental Activities show a net position deficit of approximately $50.4 billion as of June 30, 2014. The net deficit is attributable to the accumulated effect of over a decade of operating expenses exceeding program and general revenues, an increase in the cost of funding the Retirement Systems, and a decrease in estimated revenues, among other factors.

The Commonwealth's General Fund shows a fund balance deficit of approximately $1.9 billion. The fund balance deficit is attributable to operating expenses exceeding revenues.

Another aspect of the Commonwealth's operations contributing to the aforementioned deficits and liquidity constraints relates to the Commonwealth's education costs, representing a very high percentage of its budgetary expenditures, and the Commonwealth's challenges in controlling such costs. The budget appropriation for the Commonwealth's Department of Education has historically represented a significant portion of the total General Fund budget.

The liquidity constraints and historic budgetary deficits have caused the Commonwealth to recurrently amend the terms and the minimum debt service requirements of the lines of credit owed to GDB by the Commonwealth and other instrumentalities which are payable solely from annual legislative appropriations from the General Fund. On June, 27, 2014, the Governor signed executive order no. OE 2014-029 to modify the 2014 approved legislative appropriations based on the Article VI, Section 8 of the Puerto Rico Constitution and Act No. 147 of the OMB of the Commonwealth. Through such executive order the Governor eliminated from the budget approximately $247 million of debt service requirement payments for the lines of credit of GDB, approximately $84.3 million of appropriations

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

intended to improve the liquidity of the retirements systems of the Commonwealth and approximately $47.1 million of rent expense that are payable to PBA, a blended component unit of the Commonwealth.

Additionally, for the fiscal year ended June 30, 2016, the Legislature of Puerto Rico did not appropriate approximately $94 million for the payments of the PFC bonds which are obligations of certain component units of the Commonwealth that are payable solely from such appropriations. As a consequence, a partial interest payment in the amount of $628,000 was made (out of approximately $58 million payment due on August 1, 2015) from funds remaining in PFC accounts corresponding to excess legislatives appropriations from prior periods. Such appropriations are the sole source of payment of principal and interest on PFC bonds. As of February 1, 2016, PFC had missed payments of debt service on its bonds in the aggregate amount of approximately $86.5 million.

On December 1, 2015, the Governor signed Executive Order No. 46 ("Executive Order No. 46"), which orders the Secretary of Treasury to retain certain revenues in light of revised revenue estimates for fiscal year 2016 and the Commonwealth's deteriorating liquidity situation. Pursuant to Executive Order No. 46, certain available resources of the Commonwealth assigned to PRHTA, PRIFA, PRCCDA and PRMBA to pay debt service on their obligations were, and continue to be, retained by the Commonwealth (commonly referred to as the "clawback"), pursuant to Article VI, Section 8 of the Constitution of the Commonwealth and the statutory provisions pursuant to which such revenues were assigned to the applicable public corporations. As a result of the clawback of revenues mentioned above, PRIFA and PRMBA were not able to meet their debt service obligations due on January 1, 2016 in full and PRHTA and PRCCDA did so using moneys previously held by the bond indenture trustees in reserves or other accounts.

On January 4, 2016, the Commonwealth made the approximately $330 million payment of general obligation debt due on that date. The Commonwealth used approximately $164 million of revenues retained from PRIFA, PRHTA, PRCCDA and the PRMBA pursuant to Executive Order No. 46 to make this payment.

The following table illustrates the revenues that were retained by the Commonwealth pursuant to Executive Order No. 46 as of December 31, 2015 and used to make the required payment on its general obligation bonds on January 4, 2016 (expressed in thousands):

|  |  | Amount |
|---|---|---|
| PRIFA | $ | 113,000 |
| PRHTA |  | 47,600 |
| PRCCDA |  | 3,000 |
| PRMBA |  | 300 |
| Total | $ | 163,900 |

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The following table presents the revenues that were retained by the Commonwealth pursuant to Executive Order No. 46 from January to June 2016 (expressed in thousands):

|  |  | Amount |
|---|---|---|
| PRIFA | $ | 12,826 |
| PRHTA |  | 262,601 |
| PRCCDA |  | 9,100 |
| PRMBA |  | 4,674 |
| Total | $ | 289,201 |

The revenues that were retained by the Commonwealth pursuant to Executive Order No. 46 from January to June 2016 are deposited as follows: approximately $143.2 million are deposited in GDB, which funds are subject to the limitations imposed on withdrawals of funds from GDB by Executive Order No. 2016-014, as explained below under section "*Going Concern- Discretely Presented Component Units- GDB*", and approximately $146.0 million are deposited in a commercial bank. Even with the additional resources provided by the implementation of the clawback, the Commonwealth lacks sufficient resources to meet the entire debt service obligation on the Commonwealth's general obligations bonds due on July 1, 2016 (approximately $1.1 billion).

The Commonwealth's ability to reduce its General Fund deficit and to achieve a balanced budget in future fiscal years depends on a number of factors, some of which are not wholly within its control, including the performance of the Commonwealth's economy, that actual collections of taxes meet the Treasury Department's projections, and the government's ability to reduce and control governmental expenditures, particularly in areas such as education, public safety and healthcare, which represents a significant portion of the budget appropriations of the Commonwealth.

The Commonwealth will not be able to honor all of its obligations as they come due while at the same time providing essential government services. These factors create an uncertainty about the Primary Government's ability to continue as a going concern.

*Remediation Plan – Primary Government*

In response to the risks and uncertainties referred to above, Governor García Padilla issued an Executive Order to create the Puerto Rico Fiscal and Economic Recovery Working Group (the "Working Group"). The Working Group was created to consider the measures necessary, including the measures recommended by Anne O. Krueger, economist and author on the report named "Puerto Rico a Way Forward" (Krueger Report), to address the economic and fiscal crisis of the Commonwealth. The Working Group was tasked with the responsibility for developing and recommending to the Governor of Puerto Rico the Puerto Rico Fiscal and Economic Growth Plan (the "FEGP"). The FEGP had to contain the plans and the administrative and legislative measures necessary to address the short, medium and long-term fiscal and economic challenges facing Puerto Rico, including measures to: (i) address the financing gaps and the debt load on the public sector, (ii) achieve the execution of its budgets, (iii) achieve greater transparency with respect to statistics and the

101 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

government's financial information, and (iv) carry out the structural reforms necessary to promote the economic growth and competitiveness of the Commonwealth.

The remediation plan encompasses the following aspects: (i) implement the fiscal and economic growth plan, (ii) restructure the Commonwealth's debt obligations, (iii) stabilize the Commonwealth's liquidity, (iv) strengthen central government finances, (v) make the Commonwealth's component units self-sufficient, and (vi) promote economic growth.

(i)   Implement the Fiscal and Economic Growth Plan

The FEGP contemplates that the projected financing gap could be reduced through a combination of revenue increases (including the recent increase in sales and use taxes, which is already in effect), expense reductions and economic growth measures, but that the remaining financing gap will need to be addressed by debt restructuring. The FEGP also concludes that, absent certain emergency measures implemented by the Commonwealth, the Commonwealth Treasury Department's single cash Concentration Account (referred to as the "Treasury Single Account" or "TSA") would have exhausted its liquidity in July 2016. The implementation of the FEGP would require executive action by the Commonwealth and the United States governments and, as to certain matters, the approval of legislation by the Commonwealth's Legislative Assembly and U.S. Congress.

(ii)   Restructure the Commonwealth Debt Obligations

The Commonwealth has proposed to seek a debt restructuring of its outstanding debt and other tax-supported debt issued by certain component units. During 2016, Commonwealth's officials and its advisors have met with creditors or creditor's advisors to present and negotiate the Commonwealth's restructuring proposal. Some of these proposals and communications have been made public. The proposal seeks an orderly restructuring of the Commonwealth's tax-supported debt, amounting to approximately $49.2 billion, in order to provide the Commonwealth with the necessary debt relief to enable it to confront the significant shortfalls projected by the FEGP.

Following the release of the FEGP, the Commonwealth has proposed to seek a restructuring of its outstanding debt and other tax-supported debt issued by certain component units. In January 2016, Commonwealth officials and advisors met with the advisors to the Commonwealth's creditors to present the Commonwealth's restructuring proposal, which was subsequently made public. In March and June 2016, the Commonwealth made public new proposals to the Commonwealth's creditors. Negotiations with creditors remain ongoing.

(iii)   Stabilize the Commonwealth's Liquidity

In March 2014, as further described in note 12(c), the Commonwealth issued $3.5 billion of general obligation bonds, which allowed the Commonwealth and PBA to repay approximately $1.9 billion of outstanding GDB lines of credit. The Commonwealth also used the proceeds from this issuance to redeem or refund approximately $807 million in short-term obligations, cover approximately $47.7 million in interest rate swap terminations that could have caused a further deterioration of the Commonwealth's and GDB's liquidity position and provide for a portion of

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

the payment of interest on these bonds through July 1, 2016, which funds are held by the trustee. Then, on October 10, 2014, GDB issued short-term notes to fund the purchase of up to $900 million Commonwealth's tax and revenue anticipation notes for fiscal year 2015.

During fiscal years 2015 and 2016, the Commonwealth has sought additional liquidity through potential bond issues or private financings. Due to its deteriorated financial condition, however, the Commonwealth has been unable to complete these transactions and, as described above, is now pursuing a comprehensive debt restructuring that seeks to improve its liquidity position as a result of near-term debt service relief. While the Commonwealth pursues this strategy, it has taken a number of emergency measures to stabilize its liquidity condition that are unsustainable over the long-term run. These include, among others, requiring advance payments from the government retirement systems for payments of retirement benefits to participants, suspending for fiscal year 2016 the Commonwealth set-asides for the payment of its general obligation debt, delaying the payments to suppliers and amounts due to component units, financing tax and revenue anticipation notes for fiscal year 2016 through certain intra-governmental transactions, deferring the disbursement of certain budgetary assignments, and delaying the payment of income tax refunds. Some of these measures are described in more detail in note 22.

(iv)     Strengthen Central Government Finances

One of the main goals of the Commonwealth is to achieve a balance between recurring revenues and expenditures without resorting to deficit financing and in a manner that is sustainable over the long-term. The FEGP and the restructuring proposal described above seek to achieve such structural balance between revenues and expenditures and establish a sustainable level of debt service for the Commonwealth's tax-supported debt over the long-term.

The proposals included in the FEGP build upon a series of actions taken by the Commonwealth in recent years to reduce budgetary deficits by increasing the Commonwealth's revenues and reducing its expenses. For example, the Commonwealth enacted legislation to expand and increase its revenue base. On June 30, 2013, the Commonwealth enacted Acts No. 40 through No. 48 of 2013. These acts were designed to achieve, among other things, an expansion of the revenue base of the General Fund of the Commonwealth in order to increase tax revenue and help address the structural deficit of the Commonwealth. The aforementioned amendments involved, among other changes, increases in the excise taxes on cigarette imports (Act No. 41); the establishment of a new national "volume of business" tax (also known as "patente nacional") ranging between 0.2% to a maximum of 0.85% (1% for financial institutions) on the gross sales/revenue to businesses with a volume of sales/revenue exceeding $1 million (Act No. 40) (this tax was later eliminated pursuant to Act 288-2014); the imposition of the sales and use taxes to certain business to business transactions and other procedural changes (Act No. 40 and 42); additional limitations on certain deductions and credits that were formerly available on the tax returns of individuals (Act No. 40); increase in the corporate tax rates from 30% to 39% coupled with a reduction in the surtax exemption base from $750,000 to $25,000 (Act No. 40); increases in the escalating tax rates applicable for the alternative minimum tax determination on individuals and corporations (Act No. 40); a new surtax of 2% applicable to self-employed individuals with over $200,000 in gross income as defined (Act No. 40); a special contribution of 1.5% imposed on payments made for professional and consulting services rendered to a

103     (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

governmental entity (Act No. 48); and increases in the share of slot machines in casinos and the restructuring of the manner in which their profits are distributed (Act No. 48). Some of these Acts also assigned funds for the enhancing and strengthening of the sales and use tax collection process (Act No. 46) and created the 2013–2014 Budgetary Support Fund that was nourished with appropriately $96.5 million provided from transfers of excess cash from other funds, mostly coming from the Department of Education and the State Insurance Fund Corporation (Act No. 43). A number of other additional measure were implemented to increase the General Fund revenues.

(v)   Make the Commonwealth's Component Units Self-Sufficient

One of the most significant legacy fiscal challenges faced by the Commonwealth consists of the explicit and implicit subsidies provided by the Commonwealth and GDB to certain component units. These subsidies have historically consisted primarily of budgetary appropriations from the General Fund and loans and other forms of financial assistance provided by GDB, which reduces funds available to provide other essential services. The Commonwealth has adopted various measures to turn the Commonwealth's component units into self-sufficient enterprises and address structural problems that threaten the Commonwealth's long-term fiscal stability. These measures are described in more detail on the remediation plans' sections below for specific component units. In addition to the specific measures that may have been adopted by the individual component units to reduce their reliance on operating and financial subsidies, the Commonwealth's enactment of the Fiscal Operation and Sustainability Act (Act No. 66) sought to grant component units with tools to reduce their operating expenditures.

(vi)   Promote Economic Growth

In addition to the economic development measures being proposed as part of the FEGP, the Commonwealth has been implementing a number of initiatives to promote economic growth, diversify Puerto Rico's economic base, pursue niche strategies and leverage its human capital and fiscal autonomy to attract new investment opportunities. The Commonwealth has also implemented several initiatives to foster the growth of the small and medium enterprises sector.

In addition, although neither the Commonwealth nor its component units are eligible to seek relief under Chapter 9 of the United States Bankruptcy Code, on June 30, 2016, the U.S. President signed the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), which grants the Commonwealth and its component units access to an orderly mechanism to restructure their debts in exchange for significant federal oversight over the Commonwealth's finances.

There is no certainty that the remediation plan will be fully implemented or if implemented will ultimately provide the intended results. As a result of such uncertainty, the Commonwealth's financial position, results of operations, and liquidity, may still be affected to the extent that it may require the Commonwealth to choose between reducing the amounts of resources that are used to fund essential governmental programs and services and honoring its debt obligations.

The Commonwealth is currently considering a number of emergency measures that could affect the rights of creditors. The Commonwealth needs to seek further relief under existing or potential future laws regarding insolvency, reorganization, moratorium and/or similar laws affecting the creditors

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

rights, to the extent available, and may resort to other emergency measures including non-payment of debt obligations. On July 1, 2016 the Commonwealth has a required debt services payment of approximately $1.1 billion on General Obligations Bonds, among other debts. The Commonwealth lacks the resources to comply with the required debt service while continuing to provide essential services.

(b) ***Going Concern – Discretely Presented Component Units***

The following major discretely presented component units have been identified as having substantial doubt about their ability to continue as a going concern. Each major discretely presented component units circumstances and remediation plan are described below.

### *GDB*

GDB has traditionally served as interim lender to the Commonwealth and its public corporations (also referred to herein as instrumentalities) and municipalities in anticipation of the issuance of long-term bonds and notes by such entities in the municipal bond market. GDB has also provided financing to the Commonwealth and its instrumentalities to finance their respective budget deficits, collateral requirements under swap agreements and to meet mandatory payments of obligations. As a result of this lending function, GDB traditionally served as the principal source of short-term liquidity for the Commonwealth, its public corporations and municipalities.

Loans to the Commonwealth and its instrumentalities constitute a significant portion of GDB's assets. As a result, GDB's liquidity and financial condition depends to a large extent on the repayment of loans made to the Commonwealth and its instrumentalities, which face significant fiscal and financial challenges. Conditions that adversely affect the ability of the Commonwealth and its instrumentalities to raise cash (including limited access to capital markets) and repay their interim and other loans to GDB have an adverse effect on GDB's liquidity and financial condition. Similarly, conditions that adversely affect the ability of GDB to raise cash (including limited access to capital markets) or otherwise finance its loan portfolio also have an adverse effect on the Commonwealth and its instrumentalities, as GDB's ability to continue providing interim financing to the Commonwealth and its instrumentalities is reduced.

GDB faces significant risks and uncertainties and it currently does not have sufficient liquid financial resources to meet obligations when they come due, as further described below. As discussed below, pursuant to recently enacted legislation, the Governor has ordered the suspension of loan disbursements by GDB, imposed restrictions on the withdrawal and transfer of deposits from GDB, and imposed a moratorium on debt obligations of GDB, among other measures.

The discussion in the following paragraphs regarding the liquidity risks, uncertainties and remediation plans of GDB provides the necessary background and support for management's evaluation as to whether there is substantial doubt about GDB's ability to continue as a going concern for 12 months beyond the date of the financial statements or for an extended period if there is currently known information that may raise substantial doubt shortly thereafter. As discussed below, the risks and uncertainties facing GDB, and, more broadly, the Commonwealth and its other instrumentalities, together with other factors described in the basic financial statements, have led management to conclude that there is substantial doubt as to the ability of GDB to continue as a going concern.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

During the fiscal year ended June 30, 2014, and subsequent to the end of such fiscal year, GDB's liquidity position has been adversely affected by the Commonwealth and its instrumentalities' continued operational deficits and lack of capital markets access. These factors have resulted in delays in the repayment by the Commonwealth and its instrumentalities of outstanding loans with GDB, which delays, in turn, have limited GDB's ability to continue providing liquidity to the Commonwealth and its instrumentalities. The Commonwealth's General Fund budget for fiscal year 2014 included approximately $291.3 million of appropriations to GDB, including approximately $270 million of appropriations to repay principal and interest on public sector loans from. These appropriations were based on payment schedules proposed by GDB, which are mostly based on a period of amortization of 30 years, at contractual interest rates. During fiscal year 2014, in order to address a significant revenue shortfall, Executive Order No. 2014-029 was signed by the Governor, which modified the budgetary appropriation originally approved by the Legislative Assembly of the Commonwealth and thus modified the principal and/or interest payments actually received by GDB. The amount of the appropriation was reduced from approximately $291.3 million to $30.1 million. This reduction was compensated with the funds obtained from the $3.5 billion General Obligation Bonds issuance of March 2014. For fiscal year 2015, the Commonwealth and GDB renegotiated the terms of such loans and the Commonwealth appropriated and paid the renegotiated debt service on the public sector loan portfolio of GDB.

The budget proposed by the Governor to the Legislative Assembly for fiscal year 2016 included an appropriation for the payment of debt owed by the Commonwealth and certain of its instrumentalities to GDB of $261.1 million, but was amended by the Legislative Assembly to reduce said appropriation to approximately $18 million, all of which had been received. Given the Commonwealth's deteriorating financial condition and ongoing fiscal crisis, there can be no assurance that the Commonwealth will be in a position to make any future appropriations for the payment of debt owed by the Commonwealth and its instrumentalities to GDB.

As a result of the reductions in liquidity experienced subsequent to June 30, 2014, GDB took a number of liquidity enhancing and conservation measures, and explored the sale of assets and other alternatives to address its liquidity needs. For example, GDB's subsidiaries sold approximately $90 million of mortgage loans to third party investors, the proceeds of which were used to repay several outstanding lines of credit with GDB.  In light of GDB's significant debt service obligations during fiscal year 2016, these measures, however, are not expected to be sufficient to maintain GDB's operations in the ordinary course absent the completion of a capital market transaction, a restructuring of GDB's debt, and the payment by the Commonwealth of debt service on GDB's public sector loans payable from annual appropriations. As a result of the non-payment by the Commonwealth of the appropriation to GDB and GDB's inability to restructure its debt in light of the broader fiscal crisis faced by the Commonwealth, GDB was not in a position to pay principal on its debt obligations due on May 1, 2016 and continue operations in the ordinary course. In April 2016 the Governor imposed on GDB emergency operational restrictions and debt moratorium described below. GDB has continued to pay interest on its debt obligations.

Due to the conditions and events described above, management believes substantial doubt exists as to GDB's ability to continue as a going concern.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Remediation Plans – GDB*

On April 6, 2016, the Governor signed into law Act 21-2016, known as the "Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" (as amended pursuant to Act 40-2016, "Act 21"). Act 21 allows the Governor to declare a moratorium on debt service payments and to stay related creditor remedies for a temporary period for the Commonwealth and certain government instrumentalities, including GDB. In respect of GDB, Act 21 also allows the Governor to take any and all actions that are reasonable and necessary to allow GDB to continue carrying out its operations. The temporary period set forth in Act 21 lasts until January 31, 2017, with a possible two-month extension at the Governor's discretion. The moratorium and stay provisions with respect to any obligations owed by GDB require executive action of the Governor to become effective.

On April 8, 2016, the Governor signed Executive Order No. 2016-010 ("EO No. 23016-010"), declaring GDB to be in a state of emergency pursuant to Act 21. In accordance with the emergency powers provided for in Act 21, EO No. 2016-010 implemented a regulatory framework governing GDB's operations and liquidity, including prohibiting loan disbursements by GDB and establishing a procedure with respect to governmental withdrawals, payments, and transfer requests with respect to funds held on deposit at GDB. To that effect, EO No. 2016-010 restricts the withdrawal, payment and transfer of funds held on deposit at GDB to those reasonable and necessary to ensure the provision of essential services and authorizes GDB to establish weekly limits on the aggregate amount of such disbursements. Moreover, EO No. 2016-010 prohibits GDB depositors from printing or writing checks creditable against their accounts at GDB, unless they obtain a temporary waiver from GDB. Finally, pursuant to Act 21, EO No. 2016-010 suspends Article 6 of Act No. 17 of September 23, 1948, as amended (the "GDB's Enabling Act"), which required GDB to maintain a reserve of not less than 20% of its liabilities on accounts of deposits on demand.

Further, on April 30, 2016, the Governor signed Executive Order No. 2016-014 ("EO No. 2016-014"), which, among other things, (a) designates deposits and letters of credit of GDB as "enumerated obligations" of GDB, thereby making them "covered obligations" of GDB and, therefore, subject to the stay provisions of Act 21, (b) declares a moratorium with respect to the financial obligations of GDB (other than deposits and interest obligations that may be paid in kind), (c) provides that interest payments in respect of GDB's financial obligations may be made to the extent authorized by the Governor, and (d) declares an emergency period with respect to certain obligations of PRIFA that are secured by a letter of credit issued by GDB. Pursuant to EO No. 2016-014, on May 1, 2016, GDB failed to make a principal payment of approximately $367 million in respect of its notes.

Act 21 also included amendments to GDB's Enabling Act to include certain statutory options and tools useful for any resolution, reorganization or restructuring that GDB may undertake in the future. Specifically, these amendments modernize the receivership provision in the GDB's Enabling Act and authorize the creation of a temporary "bridge bank" to carry out GDB's functions and honor deposits.

Finally, Act 21 also created a new fiscal agency and financial advisory authority to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities, and municipalities.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Management has determined that, even under the framework of EO No.2016-010 and EO No. 2016-014, GDB will require additional sources of liquidity, in particular, through appropriations for the payment of debt service by the Commonwealth in fiscal year 2017 on GDB's appropriation loans or some other appropriation to GDB and the consummation of a comprehensive restructuring of its debt obligations for GDB to continue operating in fiscal year 2017 and beyond.

GDB requested that the Office of Management and Budget include an appropriation for the payment of the Commonwealth's appropriation loans with GDB in the amount of $375 in the budget that would be submitted by the Governor to the Legislative Assembly for fiscal year 2017. The budget for fiscal year 2017 submitted by the Governor to the Legislative Assembly included several appropriations to GDB amounting to a total of $375 million, which were approved by the House of Representatives. The Senate, however, amended the budget bill approved by the House of Representatives. As amended by the Senate, the budget bill includes appropriations to GDB totaling $147.5 million.  The use by GDB of such appropriations is restricted in the budget approved by the Senate as follows: (a) $100 million to fund disbursements for federal funds matching from PRIFA, PRASA, PRHTA and the Housing Finance Authority deposit accounts at GDB, (b) $25 million to fund disbursements from the AEDA deposit accounts at GDB and (c) $22.5 million to cover payroll and other operating expenses of GDB.  The proposed budget provides that all appropriations to GDB shall be applied as a reduction in the Commonwealth's debts with GDB. The House of Representatives is not expected to concur with the amendments made by the Senate and, accordingly, the bill is expected to go to conference committee for reconciliation.  There can be no assurance that appropriations to GDB will be included in the final approved budget for fiscal year 2017.

GDB announced on May 1, 2016 that it had negotiated a framework of indicative terms for a restructuring of GDB's notes with a group of noteholders (known as the "Ad Hoc Group") holding approximately $900 million of GDB's outstanding notes (the "Old Notes"). The framework included an understanding with the Ad Hoc Group regarding key terms for a restructuring of the portion of GDB's Old Notes held by the group and a path forward to a broader restructuring of all of GDB's Old Notes. The agreement on key terms was intended to provide a framework for GDB and the Ad Hoc Group to continue negotiations with a view toward entering into an agreement in principle that would memorialize in full the terms and conditions of the proposed restructuring.

The agreed key terms contemplate a two-step restructuring of GDB's obligations, in which all holders of the Old Notes (including the Ad Hoc Group) would first exchange (an "Interim Exchange") their current holdings for new notes at GDB (the "Interim Notes"), to be followed by an exchange of such Interim Notes as part of a future global restructuring of the debt of the Commonwealth and its instrumentalities, including that of GDB (the "Global Restructuring"). As part of the agreed key economic terms, creditors would agree to haircut of 43.75% of the face amount of their Old Notes in the first-step exchange. In addition, as part of the transaction, bondholders would agree to the proposed treatment for their notes, in a second step exchange as part of a Global Restructuring, that would result in an agreed haircut of 53% of the face amount of their Old Notes. Many important terms of the transaction are currently being discussed as the parties continue to negotiate further details of the transaction, including several key open economic terms.  In addition, the transaction would be subject to several conditions, which would need to be met over the coming months before the deal could proceed.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Importantly, the proposed terms of the Interim Exchange require 100% participation by all bondholders, including, in addition to the Ad Hoc Group, the state-chartered credit unions in Puerto Rico (or "cooperativas") and other large institutional groups on the Commonwealth. As a result, the proposed transaction is being designed to take into account the varied interests of all its creditors, and, as further details of the transaction are negotiated with the Ad Hoc Group, GDB and the Commonwealth plan on continuing discussions with such other creditor groups to ensure that any agreement in principle reflects their concerns in a debt restructuring. Similarly, as a comprehensive deal for all of GDB's stakeholders, the transaction contemplates providing a path forward to depositors, including by providing collateral for their deposits, as GDB works through its challenges.

Without federal restructuring legislation, including the tools to bind non-consenting creditors, the transaction would be highly unlikely to reach the required participation levels. In the absence of federal legislation, GDB would not be able to complete the deal as proposed, and the Commonwealth as a whole would not be able to move towards a comprehensive restructuring of the debt of the Commonwealth and its instrumentalities.

If GDB does not obtain adequate funding from the Commonwealth for fiscal year 2017 and is not able to consummate a comprehensive debt restructuring, or to otherwise obtain additional funding or other arrangements with its creditors, GDB may not be able to continue as a going concern and may need to pursue the resolution processes provided for by the GDB's Enabling Act, as amended pursuant to Act 21. Act 21 amended the receivership provisions of the GDB's Enabling Act to establish a set of rules better suited to confront the challenges that would be faced by GDB if it were to go into receivership at some point in the future. It modified the process for the appointment of a receiver, including that the Governor (rather than a court) may appoint the receiver based on recommendations made by GDB's Board of Directors or the Secretary of Treasury of the Commonwealth. As amended, the GDB's Enabling Act establishes that the receiver shall have, among other, the following powers: (i) to place GDB into resolution, (ii) to evaluate and adjudicate claims against GDB, (iii) to petition for the creation of a bridge bank, and (iv) to create subsidiaries to take over certain of GDB's functions. If GDB were to be placed into receivership at some point in the future, the Secretary of the Treasury would have the power to, if so requested by GDB's receiver, organize a bridge bank. The new bridge bank could assume certain of GDB's liabilities and purchase certain of its assets. If a bridge bank is created, creditor claims that are not assumed by the bridge bank would remain at GDB, but all creditors shall be entitled to receive at least the amount such creditors would have received if GDB were liquidated without a bridge bank on the date the receiver was appointed.

*PRHTA*

PRHTA has experienced significant recurring losses from operations and faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the fact that PRHTA has not increased revenues to cover the effects of its rising costs. Its principal challenges, some of which are interrelated, are: (i) optimization of federal grants; (ii) revenue deficiency; (iii) high operating costs; and (iv) liquidity.

PRHTA does not currently have sufficient funds available to fully repay its various obligations as they come due or that are currently in default, and is working on extending the due date of the obligations or obtaining new financing to provide relief and/or funds to repay the existing amounts of principal

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

and interest or bring the outstanding balances current at the various due dates as well as to continue operate and to finance capital improvement projects. Additionally, significant support and funding for obligations of PRHTA has previously been provided by the Commonwealth and its component units, including GDB. The Commonwealth and such entities are experiencing significant financial difficulties and are unable to continue to extend, refinance or otherwise provide the necessary liquidity to PRHTA as and when needed. As such, current defaults may not be cured and future defaults on PRHTA's obligations may not be avoided.

There can be no assurance that the Commonwealth will continue to provide adequate support, or to continue to allow PRHTA to operate as a separate entity or that affiliated and unaffiliated lenders will be able to refinance or modify the terms of PRHTA's obligations. Therefore, PRHTA does not currently have sufficient funds available to fully repay its various obligations as they come due or that are currently in default. The financial difficulties experienced by PRHTA, including the uncertainty as to its ability to fully satisfy its obligations when come due, raises substantial doubt about its ability to continue as a going concern.

*Remediation Plan – PRHTA*

On June 25, 2013, the Legislature of the Commonwealth enacted Act No. 30 and Act No. 31 to raise additional annual revenues for PRHTA to repay its outstanding loans with GDB. The additional annual revenues consist of (i) the transfer to PRHTA of vehicle license fee revenues currently received by the Commonwealth's Department of the Treasury, which amount to approximately $32.6 million; (ii) an increase in the petroleum products tax assigned to PRHTA from $3.00 per barrel to $9.25 per barrel (to be adjusted for inflation, every four years beginning in 2017, based on the accumulated compounded yearly increase in the USA CPI Index plus a margin of 1.5%), which are estimated to generate approximately $189 million; (iii) the transfer to PRHTA of the first $20 million in annual cigarette tax revenues currently collected by the Commonwealth's Department of the Treasury. All these measures would generate a total of approximately $270 million in additional annual revenues. Also, approved legislation changed the governance structure of PRHTA by establishing a board of directors.

In August of 2014, Act No. 123 was adopted which created the Puerto Rico Integrated Transit Authority ("PRITA"). Under this legislation, the operations of the Urban Train (currently under PRHTA), the Puerto Rico Maritime Transportation Authority and the Metropolitan Bus Authority would be consolidated under the newly created PRITA. The consolidation of such operations requires federal approval. The transfer of the Urban Train to PRITA would relieve PRHTA from further operating losses related to the Urban Train. There can be no assurance, however, that the required federal approvals will be obtained since, among other requirements, the combined operations of PRITA would have to be financially self-sufficient.

In January 2015, the Commonwealth approved Act No. 1 of 2015, assigning a new petroleum tax of $6.25 per barrel to PRIFA to refinance PRTHA's debt with GDB and certain parties. Pursuant to Act No. 1, PRIFA refinanced approximately $246 million on bond anticipation notes issued by PRHTA. A subsequent proposed issuance of long-term bonds was subsequently abandoned.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

These remediation plans were intended to address PRHTA's liquidity situation and to maintain the continuity of its services. However, as described above, commencing in December 2015, certain of the revenues assigned by the Commonwealth to PRHTA were returned by the Commonwealth pursuant to Article VI, Section 8 of the Puerto Rico Constitution, thus increasing PRHTA's liquidity constraints.

### PREPA

PREPA does not currently have sufficient funds available to fully repay its various obligations as they come due, but has reached agreement with creditors holding approximately 70% of its outstanding financial indebtedness on principle terms of a recovery plan, including an exchange offer that would reduce the principal amount of some of PREPA's debts and an extension of certain debt maturities on terms more favorable to PREPA. The Commonwealth and its instrumentalities are also experiencing significant financial difficulties and may be unable to continue to repay amounts due to PREPA or to extend, refinance or otherwise provide the necessary liquidity to PREPA as and when needed. PREPA has receivables at June 30, 2014 of over $804 million from the Commonwealth and related entities and is subject to significant uncertainty with regard to its ability to collect on such receivables. As a consequence, PREPA may not be able to avoid future defaults on its obligations. PREPA's insufficiency of funds available to fully repay its various obligations as they come due raises substantial doubt about its ability to continue as going concern.

*Remediation Plan - PREPA*

On May 27, 2014, the Commonwealth of Puerto Rico enacted Act No. 57 (Act No. 57), also known as the Transformation and Energy Relief Act of Puerto Rico (the Energy Relief Act). The Act provides for, among other things, the creation of the PREC with regulatory oversight over P R E P A ' s operations, as well as over any other company providing electric energy services in Puerto Rico. PREC has since been formed, and given supervisory power over P R E P A , and many transactions that affect the electrical system and the electric infrastructure of Puerto Rico, including but not limited to, rate setting approval powers. Act No. 57 also provides for P R E P A to set aside two percent (2%) out of the eleven percent (11%) from the fuel and purchase power adjustment clause revenues for deposit to a s e p a r a t e a c c o u n t with the purpose of stabilizing the price of energy in Puerto Rico.

On September 4, 2014, PREPA appointed a chief restructuring officer whose mandate includes providing overall leadership to PREPA's restructuring process, developing a business plan, implementing revenue improvement and cost reduction plans, overseeing and implementing cash and liquidity management activities, improving PREPA's ability to analyze, track and collect accounts receivable, improving PREPA's capital expenditure plan, and developing plans to improve PREPA's generation, transmission, distribution and other operations.

In addition, as discussed in note 22, PREPA is in the process of restructuring its indebtedness through a consensual process with its creditors.

### PRASA

PRASA reflects a series of liquidity risks and obstacles in meeting its debt service payments as they become due, as further described below.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2014, PRASA had an unrestricted net deficit of approximately $173 million and long-term debt outstanding of $5,312 million (which included revenue bonds payable of $4,541 million, notes payable of $763 million and lines of credit of $8 million). PRASA had a working capital deficiency of $369 million as of June 30, 2014. Subsequent to June 30, 2014, PRASA's revenue bonds have been downgraded several times by rating agencies. PRASA's bonds are currently rated "Caa3" by Moody's and "CCC-" by S&P.

PRASA owes approximately $399 million in PFC Notes, for which its August 2015 debt service requirements were not covered as a result of the Legislature not making the necessary appropriations which in turn would have allowed the payment of the PFC Bonds. These notes were being paid with Commonwealth's appropriations, which are not expected to recur for these purposes at the moment.

On February 16, 2016, PRASA's Governing Board approved Resolution No. 2970 (Resolution No. 2970), which includes an Action Plan designed and recommended by PRASA's management as part of their assessment of the possible financial scenarios and alternatives in light of current market conditions. PRASA's Governing Board approved with resolution No. 2970, among other actions, the setting aside of certain funds that were previously used to fund escrow accounts used for purpose of making payments to its contractors. As a result, it has not made the full deposits of the monthly interest and principal accruals required by debt and the loan agreements on certain Commonwealth Guaranteed Indebtedness (consisting of the Water Pollution Control and Safe Drinking Water Treatment Revolving Fund loans and the Rural Development Bonds), and the Commonwealth Supported Indebtedness (consisting of a note held by PFC which is payable solely from Commonwealth budgetary appropriations) and a note payable to GDB.

On March 4, 2016, PRASA announced that as a result of recent setbacks in its attempts to access to the bond market for the issuance of revenue bonds to cover a portion of the costs of its Capital Improvement Program (CIP), it had been unable to pay certain outstanding contractor obligations and had to suspend or cancel its ongoing CIP projects. PRASA's management and its Governing Board began evaluating various alternatives that would potentially allow it to fulfill its obligations to contractors, as well as resuming the CIP projects. As of March 31, 2016, unpaid CIP contractor obligations was approximately $150 million, excluding interest and penalties.

Among the alternatives evaluated by PRASA's management, is the enactment by the Legislature of the Commonwealth of a legislation which would create a new special purpose entity and governmental instrumentality that would be permitted to issue bonds payable from special charges imposed by such entity, the proceeds of which would be provided to PRASA to pay for approved expenses, including CIP costs. No assurance can be given, however, that such legislation will be passed or that such entity will be able to access the bond market, if in fact such legislation were to become in law.

In the past, the PRASA's CIP has been funded with external financings. Now, PRASA has limited access to external financing market and its actual operating cash flows from the new service rate structure are not sufficient to cover its CIP without jeopardizing the debt service of its Commonwealth Guaranteed Indebtedness, Commonwealth Supported Obligations, and the term note payable to GDB.

In addition, PRASA has not paid the quarterly interest and principal payments of the note payable to GDB since December 2015.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

In June 2016, PRASA started formal negotiations with the creditors of its Water Pollution Control and Safe Drinking Water Treatment Revolving loans and the Rural Development Bonds to obtain a Forbearance Agreement on the debt service, and provides a period conducts negotiations in order to seek a restructuring of such debt. Such negotiations remain ongoing.

PRASA has significant cash flows difficulties, resulting in its inability to pay its CIP contractor obligations and its term note payable to GDB. PRASA is expected an insufficiency of funds available to honor the interest and principal payments on the above mentioned long-term debt obligations. PRASA's insufficiency of funds available to repay all obligations as they become due raises substantial doubt about its ability to continue as going concern.

*Remediation Plan – PRASA*

In July 2013, PRASA implemented a 60% rate increase, on average, that has provided additional revenues to cover operational expenses and improve debt service coverage. Subsequently, on December 18, 2013, PRASA amended the rate structure for non-residential customers, which included increases of the base and volume charges and incorporated a new monthly charge for environmental compliance and regulatory costs, which varies by customer class, consumption or meter size. Also, there is an additional $2 monthly charge for special projects, such as the protection and remediation of watersheds and improvements to systems not connected to PRASA.

As included in the Action Plan approved by PRASA's Governing Board on February 16, 2016, as amended on May 17, 2016, if House Bill 2786 is not approved or a financing option is not in place on or before June 30, 2016, PRASA may implement an increase in its service rates. In addition, PRASA is looking for a consensual agreement with its Water Pollution Control and Safe Drinking Water Treatment Revolving loans a Rural Development Bonds creditors to obtain a forbearance agreement for the required debt service payment due on July 1, 2016, and to provide a period to conducts negotiations in order to seek a restructuration of such debt.

PRASA continues to work on alternatives to achieve a long-term financing. If PRASA is not able to achieve such a financing, however, PRASA will be forced to re-evaluate the financing structure for its capital improvement program and may be required under its debt agreement to implement reductions in its operating expenses and/or additional increases in its service rates.

**UPR**

UPR had an unrestricted deficit position of approximately $60 million as of June 30, 2014. The UPR has had operating losses (without considering depreciation and interest expense and nonoperating revenues, such as Commonwealth appropriations and Federal Pell Grant program) during fiscal years 2014, 2013 and 2012 of $1 billion, $966 million and $898 million, respectively. Balances payable to governmental entities increased from approximately $112 million as of June 30, 2012 to approximately $124 million as of June 30, 2014, $102 million of which represent lines of credit payable to GDB as of June 30, 2014.

Approximately 70% of the operating revenues and non-operating revenues of the UPR for the year ended June 30, 2014 are Commonwealth appropriations, grants and contracts. The amount of the annual appropriation is based on a statutory formula, and equals 9.60% of the Commonwealth's

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year. However, Act No. 66 froze the UPR's appropriations at their fiscal year 2014 level for three years. The UPR's budgeted General Fund appropriations for fiscal years 2016, 2015, 2014 and 2013 were $873 million, $881 million, $888 million and $825 million respectively. The UPR derives additional revenues from other sources like tuition, student fees, auxiliary enterprises, interest income, federal grants (in particular, the Federal Pell Grant Program), and other sources. In the last three-year period ended June 30, 2014, the UPR's capital improvements have been partially financed with a line of credit with GDB which expired in January 2016. Its operating revenues for fiscal years 2014, 2013 and 2012 were $308 million, $353 million and $417 million, respectively. However, the UPR has limited ability to raise operating revenues due to the economic and political challenges of maintaining enrollment and increasing tuition.

During fiscal year 2016, the Commonwealth, due to its liquidity constraints expressed above, paid late to the UPR the formula-based contribution between October and December 2015. In spite of financial constraints, the Commonwealth revenues assigned to the UPR have not ceased and the actual "backlog' was reduced to more than one month. Furthermore, the FEGP contemplates, as part of the expense reduction measures, that the Commonwealth will reduce appropriations made to the UPR by $200 million during a four-year period, commencing in fiscal year 2017. As of the date of these financial statements, no legislative measure has been presented in the Legislative Assembly to implement this reduction.

The UPR has relied on GDB for liquidity and financial management support. GDB also serves as depositary of some of the UPR's funds. GDB's financial condition and liquidity has significantly deteriorated during fiscal years 2015 and 2016 as a result of some of the same factors that have affected the Commonwealth, including lack of market access and the inability of the Commonwealth and its instrumentalities to repay their loans to GDB. GDB's deteriorated financial condition and potential inability to comply with all of its legal and financial obligations could further adversely affect the UPR's financial condition and liquidity.

Despite the UPR having a positive net position as of June 30, 2015, its ability to continue receiving similar operational funding from the Commonwealth is uncertain, which raises substantial doubt about its ability to continue as going concern.

*Remediation Plan – UPR*

In response to the delays of appropriation payments by the Commonwealth and the lack of available financing, the UPR developed various cash flow scenarios to ensure payment of key disbursements and established additional controls over cash management and budget monitoring. In addition, the Board of Governors of the UPR, recognizing both the importance of the current and projected financial difficulties facing Puerto Rico and the UPR, commissioned a study to address the following areas: (1) increase the cost effectiveness of the UPR's Central Administration; (2) reduce duplication of functions and services; (3) improve measurable financial and educational outcomes; (4) improve working and reporting relationships; (5) better align the goals of the UPR, work of the Central Administration, and missions of the eleven campuses and affiliated auxiliary organizations; (6)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

enhance capacity for the Central Administration to provide system-wide strategic leadership; and (7) establish a more strategic relationship between the Central Administration and the Board of Governors.

The report provides recommendations over comprehensive change in governance; expectations of leaders; the structure of the system, including the roles of the Central Administration; as well as ideas for further cost reduction and growth opportunities. Management and the Board of Governors are analyzing the recommendations included in the report in order to determine possible courses of actions.

*PRHIA*

PRHIA has had significant recurring operating losses, working capital deficiencies, deficits and fiscally depends on the Commonwealth, resulting in heightened liquidity and market access risk. As of June 30, 2014, PRHIA had a net deficit of $230 million and a working capital deficiency (excluding lines of credit with GDB of approximately $183 million maturing between 2015 and 2023) of approximately $26 million. Further, PRHIA received Commonwealth appropriations representing approximately 36.2% of its operating revenue. These Commonwealth appropriations represent approximately 10% of the Commonwealth annual budget expenditures.

PRHIA's transition from a third party administrator model to a managed care organization model for its Government Public Health Insurance Plan (GHP) has exacerbated PRHIA's liquidity needs because, in the latter model, it is customary to pay related premiums during the first days of each month. This requirement, coupled with the need to fund legacy claims under the Third Party Administrator model, results in a financing need of approximately $150 million. In addition, the unpaid premiums of the current managed care model were approximately $220 million at the close of September 2015. If PRHIA is unable to secure funding or financing for this financing gap and/or if the Commonwealth's financial situation precludes it from continuing supporting the Commonwealth health insurance plan, PRHIA might be unable to fulfill its financial and contractual obligations.

The Commonwealth, through PRHIA provides health insurance coverage to approximately 1.6 million qualifying (generally low-income) residents of Puerto Rico. The cost of this health insurance program is very significant, totaling $2.5 billion for the year ended June 30, 2014. A substantial portion of this cost is currently paid by the federal government and funded principally by non-recurring funding provided pursuant to the federal Patient Protection and Affordable Care Act (the "Affordable Care Act" or "ACA"), as well as recurring Medicaid and Children's Health Insurance Program ("CHIP") funds, which in the case of the Commonwealth are capped at a level lower than that applicable to the states (which are not capped). Upon exhaustion of the non-recurring ACA funds, currently estimated to occur in March 2018, and absent Congressional action to renew this non-recurring funding, the amount of federal funds available for this health insurance program will revert to the recurring capped Commonwealth Medicaid and CHIP allocations, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility or both are reduced significantly. Although the Commonwealth can take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures. If the availability of ACA funds is not renewed through Congressional action and if no changes to benefits, co-pays or eligibility are made, the annual deficit of the health insurance program (which the General Fund may be required to fund) could rise to as much as approximately $2.0 billion by fiscal year 2019, from approximately $59 million on fiscal year

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

2014. The fiscal stability of the Commonwealth's health insurance program is one of the most significant budgetary challenges facing the Commonwealth, especially if the availability of ACA funds is not renewed or Medicaid funds are not significantly increased. In addition, and on a much shorter term, reductions in Medicare Advantage funding for Puerto Rico will take place beginning in January 2016, as recently confirmed by the Centers for Medicaid and Medicare Services. Further information on these developments can be found in note 22.

On March 14, 2011, PRHIA entered into a credit agreement with GDB in order to pay its obligations to healthcare insurers incurred prior to fiscal year 2010. The aggregate principal amount of this non-revolving line of credit was $186.0 million and will be payable in nine annual principal payments of approximately $20.7 million, plus interest, on March 14 of the years 2015 through 2023. This credit agreement is payable from Commonwealth legislative appropriations pursuant to Act No. 173. PRHIA did not pay the March 2015 principal payment since the Commonwealth Legislature did not appropriate any funds to pay such amounts of this credit agreement. During fiscal year 2015, the Commonwealth's General Fund paid interest amounting to approximately $2.4 million on behalf of PRHIA. No payments were made by Commonwealth's General Fund in fiscal year 2014.

The Centers for Medicare and Medicaid Services announced that there will be a reduction for Medicare advantage programs payments rates in Puerto Rico in 2016. PRHIA is not aware of any alternate sources of capital to meet such demands, if made.

PRHIA's ability to obtain refinancing is uncertain and its ability to continue receiving similar operational funding from the Commonwealth that is also facing severe liquidity and fiscal challenges is also uncertain. Also, PRHIA has significant cash flow difficulties, which has caused problems to pay third party obligations as they become due. These matters raise substantial doubts about the PRHIA's ability to continue as a going concern.

*Remediation Plan – PRHIA*

PRHIA's management adopted a fiscal stabilization plan that includes the following measures: (i) maximization of discounts or rebates with respect to prescription drugs dispensed to beneficiaries; (ii) implementation of a monitoring program with all insurance companies through audits and imposition of penalties and fines for noncompliance; (iii) maximization of process of petitions of federal funds through more efficient segregation of Commonwealth and Federal beneficiaries; and (iv) improvement and implementation of an effective accounts receivable collection process. Also, in order to ensure continuity of services, PRHIA reached a preliminary agreement with the five private insurance providers, whereby PRHIA will be paying throughout the month the premiums owed to the insurers (as opposed to paying the entire amount during the first days of the month).

### Other Nonmajor Component Units

There are other non-major component units that have accumulated deficits and others that even without deficits, carry significant debt payable to GDB or debt subject to the aforementioned clawback provisions (like PRPA, PRMBA, PRIDCO and PRCCDA). The reasons similar to the ones presented above for the Primary Government and discretely presented major component units and the uncertainty as to their ability to satisfy their obligations when they become due and raises substantial doubt about their ability to continue as a going concern.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Additionally, there are other non-major discretely presented component units that although do not have a deficit position, or loans outstanding with GDB as of June 30, 2014, and have not been impacted by the clawback provisions, are mainly funded by non-operating revenues primarily from Commonwealth appropriations, and are highly reliant on the Commonwealth and on GDB for liquidity and financial management support. These appropriations are contingent on the availability of funds from the Commonwealth and their legislative approval. A reduction in the amount of these appropriation could result in financial difficulties for these entities, including the uncertainty as to their ability to fully satisfy their obligations when due, which raises substantial doubts about their ability to continue as a going concern.

(c)   ***Other Uncertainties and Liquidity Risk Matters***

*Insolvency of the Retirement Systems*

The Retirement Systems are mature systems with a significant retiree population. The pension Trust Funds' net pension liability (under the newly adopted GASB Statement No. 67) and the funded ratio as of June 30, 2014, are approximately $43.7 billion and 4%, respectively. Based on statutory funding requirements, the annual benefit payments and administrative expenses paid by the ERS, the TRS and the JRS (the Retirement Systems) were significantly larger than the employee and employer contributions received by the Retirement Systems. As a result, investments income and assets were used to cover negative cash flows and the Retirement Systems assets are expected to decline until exhaustion.

In the opinion of management and based on information prepared by consulting actuaries, if measures are not taken to significantly increase contributions to the ERS, the JRS and the TRS, these retirement systems will become insolvent as follows: the ERS and the JRS by fiscal year 2018 and the TRS by fiscal year 2019, respectively, depending on the timing of receipt of contributions and the Retirement Systems' ability to dispose of illiquid assets.

The estimate of when each of the Pension Trust Funds will become insolvent and when their assets will be exhausted is based on significant assumptions, including the rate of return on investments, the amount and timing of collections from the Commonwealth for the member and employer contributions, as well as the estimated participant benefits and the Pension Trust Funds' administrative expenses to be paid each year.

If each of the systems comprising the Pension Trust Funds becomes insolvent, each system would be operating solely on a "pay as you go" basis, which means that each system would be unable to pay benefits that exceed the actual employer and employee contributions received (net of administrative and other expenses), unless the Commonwealth and other participating employers provide the funding required to meet the "pay as you go" required benefits. The ERS has been in a deficit position since fiscal year 2015. As described in note 12, future employers' contributions of the ERS are pledged for the payment of debt service on the ERS bonds. Further depletion of the ERS' assets could result in the inability to pay benefits and bonds.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Remediation Plan – Retirement Systems*

To improve the liquidity and solvency of the ERS, on July 6, 2011, the Commonwealth enacted Act No. 116, increasing the employers' contribution rate from 9.275% to 10.275% of employee compensation for the 2011-2012 fiscal year, an additional 1% annually for each of the next four years, and 1.25% annually for each of the five years thereafter, reaching an aggregate contribution rate of 20.525% effective July 1, 2020.

On April 4, 2013, the Governor of Puerto Rico signed into law Act No. 3-2013 ("Act No. 3"), which adopted a comprehensive reform of the ERS, the largest of the three Commonwealth retirement systems that are funded primarily with budget appropriations from the Commonwealth's General Fund. Act No. 3, among other measures, reduced benefits, increased employee contributions and, in the case of active employees who were entitled to the defined benefit program, replaced most of the defined benefit elements of the system with a hybrid program similar to a defined contribution system. Special laws benefits were reduced for current retirees and eliminated for future retirees. The "Merit Annuity" available to participants who joined the ERS prior to April, 1, 1990 was eliminated. Act No. 3 froze all retirement benefits accrued through June 30, 2013 under the defined benefit program. Ceasing future defined benefit accruals and converting to a member-funded hybrid plan will result in lower benefit payments as these tiers wind down, and will make all future employer contributions available to pay benefits and bonds payable debt service.

Based on the statutory funding requirements prior to the reform, the annual benefit payments and administrative expenses of the ERS were significantly larger than the employee and employer contributions. The reform was intended to address the Commonwealth's future cash flow needs and "pay-as-you-go" requirements, while recognizing that the ERS would continue to have a large unfunded actuarial accrued liability and a low funded ratio. As such, the reform was intended to provide enough cash flow for the ERS to be able to pay benefits (as amended through the reform) and debt service on the pension obligation bonds, while maintaining the projected ERS gross assets at no less than $1 billion at all times.

In order to achieve this goal, the Commonwealth enacted Act No. 32-2013, as amended, which provided for incremental annual contributions (the "Additional Uniform Contribution") from the General Fund, public corporations and municipalities, beginning in fiscal year 2014 and up to the fiscal year 2033. The initial Additional Uniform Contributions determined for the fiscal years 2014, 2015 and 2016 was defined at $120 million and subsequent annual amounts will be determined annually based on actuarial studies to be performed by the ERS' actuaries as necessary for the ERS' gross assets to remain above $1 billion. An appropriation for such additional uniform contribution of approximately $98 million was included in the Commonwealth's budget for the fiscal year 2014. However, as a result of the Commonwealth's General Fund revenue shortfall, compared to budget, the Commonwealth made certain adjustments to the fiscal year 2014 budgetary appropriations following the "priority norms" for the disbursement of public funds that apply during any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year. These adjustments included the reduction in full of the portion of the Act No. 32 Additional Uniform Contribution by Executive Order 29-2014.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

For fiscal year 2015 and 2016, the certification of the Additional Uniform Contribution was not available at least 120 days before the commencement of the applicable fiscal year. Act No. 32, as amended, provides that, in this situation, the Additional Uniform Contribution for the fiscal year will be the additional uniform applicable for the preceding year. Thus, the Additional Uniform Contribution determined for fiscal years 2015 and 2016 was $120 million.

Timely payment of the Additional Uniform Contribution is a critical component of the reform in order for the System to be able to make payments as they come due without depleting all of its assets first. However, as a result of continued budget deficits in fiscal years 2014 and 2015, the Commonwealth and other participating employers have been unable to make the Additional Uniform Contribution required in full for these fiscal years (other than $35.4 million paid by municipalities and public corporations for fiscal year 2014 and $22.7 million paid by the Commonwealth and $37.1 million paid by public corporations and municipalities for fiscal year 2015). In February 2016, the System's actuaries recalculated the Additional Uniform Contribution for fiscal year 2017 and subsequent years. Based on certain assumptions (which do not account for any fiscal adjustment that the Commonwealth may undertake to address its fiscal challenges), the projected Additional Uniform Contribution for fiscal year 2017 and subsequent years was approximately $596 million (of which approximately $370 million corresponds to the Commonwealth, to be funded from its General Fund, and the remaining portion corresponds to the participating public corporations and municipalities).

During the first half of fiscal year 2014, the Commonwealth enacted legislation to reform the two other retirement systems of the Commonwealth, the TRS and the JRS, by among other measures, reducing benefits, increasing employee contributions and replacing most of the defined benefit elements of the system with a defined contribution system. The TRS and the JRS are mature systems with significant retiree populations.

The more significant of these two retirement systems is the TRS. Based on statutory funding requirements, the annual benefit payments and administrative expenses paid by the TRS are significantly higher than the member and employer contributions made to the TRS. As a result, investment income and the TRS's assets are being used to cover the negative cash flow, and the TRS's assets are expected to continually decline until exhaustion. To improve the liquidity and solvency of the TRS, on July 5, 2011, the Commonwealth approved Act No. 114, which provides for an increase in employer's contributions to the TRS of 1% of covered payroll in each of the five fiscal years following enactment and by 1.25% of covered payroll in each of the following five fiscal years thereafter.

The TRS is being reformed through the passage of Act No. 160 of December 24, 2013 (Act No. 160-2013). The constitutionality of Act No. 160-2013 was challenged in court, and on April 11, 2014, the Supreme Court declared certain sections unconstitutional while maintaining the constitutionality of the following: (i) all changes made to the benefit structure apply to future participants that are hired after July 31, 2014; (ii) elimination of special laws benefits for participants that retire on or after August 1, 2014; and (iii) reduction of special laws benefits to current retirees as of July 31, 2014. The legislation provides for two classes of additional contributions by the Commonwealth's General Fund to the TRS: (i) a Teacher's Justice Uniform Contribution (the Uniform Contribution) of $30 million in each of fiscal years 2017 and 2018 and $60 million thereafter until fiscal year 2042, and (ii) an Annual Additional Contribution commencing on fiscal year 2019 and continuing until fiscal year 2042

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(the Annual Additional Contribution) equal to the amount determined by the actuaries as necessary to prevent the projected value of the TRS's gross assets from falling below $300 million during any subsequent fiscal year. In April 2015, the TRS's actuaries prepared an actuarial study to determine an estimate of the Annual Additional Contribution measured as of June 30, 2014 and, based on various assumptions, projected that the Annual Additional Contribution for fiscal year 2019 and each fiscal year thereafter would be approximately $450 million. The actuarial study notes that if the Annual Additional Contribution is not paid in full during the intended fiscal years, the amount would increase in the following years. The actuaries also noted that if the TRS was unable to sell certain illiquid assets (consisting primarily of loans to members), currently amounting to approximately $450 million, the TRS may face liquidity issues since its assets are projected to fall below the $450 million level during fiscal year 2018, one year before the first payment of the Annual Additional Contribution.

To help address the JRS's funded status situation, on December 24, 2013, the Governor of Puerto Rico signed into law Act No. 162 of 2013 (Act No. 162-2013). Act No. 162-2013 included various changes applicable to all participants and retirees, as modified by the February 21, 2014 decision of the Puerto Rico Supreme Court which limited the effect of the reform as follows: (i) members hired prior to December 24, 2013 maintain the existing benefits; (ii) members hired from December 24, 2013 to June 30, 2014 will accrue a maximum pension of 60% of salary and will contribute 10% of salary; (iii) and members hired on or after July 1, 2014 will be covered by a contributory, hybrid program with defined benefit and defined contribution components. In addition, the Christmas bonus, summer bonus and medication bonus were eliminated. Section 17 of Act No. 162-2013 enacted an additional employer contribution. Beginning with fiscal year 2015, the JRS will receive an additional contribution as necessary to avoid having the projected gross assets of the JRS, during any subsequent fiscal year, to fall below $20 million. The JRS shall commissioned an actuarial evaluation to determine an annual additional contribution. The first annual additional contribution which corresponds to fiscal year 2015 was determined at $11.6 million and due by June 30, 2015. The budgets of the Commonwealth's General Fund for fiscal years 2015 and 2016, do not include an appropriation for such additional contribution. Timely payment of the additional contribution is a critical component of the reform in order for the JRS to be able to make payments as they come due without depleting all of its assets first.

The success of these measures cannot be assured, as it is dependent upon future events and circumstances whose outcome cannot be anticipated.

**(3)   Correction of Errors and Adoption of New Accounting Pronouncements**

During 2014, the Commonwealth identified various errors related to prior year financial statements. In addition, the Commonwealth adopted GASB Statement No. 65, *Items Previously Reported as Assets and Liabilities*, and GASB Statement No. 70, *Accounting and Financial Reporting for Nonexchange Financial Guarantees*, which resulted in restatements of the beginning net position/fund balance of the

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Commonwealth's government-wide and fund financial statements. The impact of correcting these errors and the effect of the adoption of GASB pronouncements are as follows:

**Primary Government**

*Governmental and Business-Type Activities*

The following table summarizes the changes to net position at the beginning of the year as previously reported for the Governmental and Business-Type Activities in the government-wide financial statements (expressed in thousands):

|  | | Governmental Activities | Business-Type Activities |
|---|---|---|---|
| Net position (deficit) – July 1, 2013, as previously reported | $ | (47,212,999) | 792,268 |
| Impact of GASB No. 65 implementation: | | (329,513) | — |
| Impact of GASB No. 70 implementation | | (438,751) | — |
| Correction of immaterial errors | | 245,858 | (228) |
| Net position (deficit)– July 1, 2013, as restated | $ | (47,735,405) | 792,040 |

*Adoption of New Accounting Pronouncements*

The impact of adopting GASB Statement No. 65 consisted of charging-off the existing unamortized debt issuance costs, other than prepaid insurance, against beginning net position. The impact of adopting GASB Statement No. 70 consisted of recognizing liabilities in the Governmental Activities for the guaranteed obligations of PAA and PRASA, as further described in note 13 (a).

*Correction of Immaterial Errors*

The correction of $245.9 million, net, in the Governmental Activities includes a combination of (a) an understatement of receivable from the federal government of approximately $71.1 million; (b) an overstatement of PRIFA's investments in bonds issued by COFINA for $35.2 million representing the unrealized gain accumulated by PRIFA on such bonds in previous years up to June 30, 2013, which should have been eliminated for financial reporting purposes as both PRIFA and COFINA are component units blended as governmental funds; (c) a miscalculation of the deferred portion of federal funds received, which resulted in an overstatement of deferred revenue of approximately $247.7 million; (d) an understatement of a liability to the Rums of Puerto Rico program of approximately $52.1 million; (e) an understatement of amounts receivable from the U.S. Internal Revenue Service (IRS) of rum federal excise taxes in the amount of approximately $12 million; and (f) and understatement of accounts receivable in the amount of approximately $2.2 million.

The correction in Business-Type Activities resulted from (a) an overstatement of accounts receivable in the amount of approximately $214 thousand; and (b) an understatement of termination benefits payable in the amount of $14 thousand.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

## *Governmental Funds*

The following table summarizes the changes to fund balances (deficit) at the beginning of the year as previously reported for the governmental funds (expressed in thousands):

|  | | General Fund | COFINA Debt Service Fund | Nonmajor Governmental Funds |
|---|---|---|---|---|
| Fund Balances (deficit) – July 1, 2013, as previously reported | $ | (2,011,026) | 579,610 | 834,228 |
| Correction of material error | | — | (189,900) | — |
| Correction of immaterial errors | | 227,599 | — | (35,200) |
| Fund balances (deficit) – July 1, 2013, as restated | $ | (1,783,427) | 389,710 | 799,028 |

### *Correction of Material Error*

PRIFA reported an investment in bonds issued by COFINA, which should have been adjusted for financial reporting purposes as PRIFA and COFINA are component units blended within governmental funds. PRIFA recorded an asset in the nonmajor governmental funds, but the COFINA Debt Service Fund did not recognize the related liability. The correction of $189.9 million in the COFINA Debt Service Fund has the effect of recording such liability.

### *Correction of Immaterial Errors*

The net correction of $227.6 million in the general fund includes to combination of (a) an understatement of receivable from the Federal government of approximately $71.1 million; (b) a miscalculation of the deferred portion of Federal funds received, which resulted in an overstatement of deferred revenue of approximately $194.3 million; (c) an understatement of a liability to the Rums of Puerto Rico program of approximately $52 million; (d) an understatement of amounts receivable from the IRS of rum federal excise taxes in the amount of approximately $12 million; and (e) an understatement of accounts receivable in the amount of approximately $2.2 million.

The correction of $35.2 million in nonmajor governmental funds decreasing net position represents the unrealized gain recorded by PRIFA in previous years on its investment in COFINA bonds, which gain should have been eliminated at the governmental fund level.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Proprietary Funds*

The following table summarizes the changes to net position at the beginning of the year as previously reported for the proprietary funds (expressed in thousands):

|  |  | Nonmajor Proprietary Funds |
|---|---|---|
| Net position – July 1, 2013, as previously reported | $ | 326,555 |
| Correction of immaterial errors |  | (228) |
| Net position – July 1, 2013, as adjusted | $ | 326,327 |

The correction of errors within the non-major Proprietary Funds resulted from an overstatement of accounts receivable in the amount of approximately $214 thousand and an understatement of termination benefits payable in the amount of approximately $14 thousand.

**Fiduciary Funds**

The following table summarizes the change to net position held in trust for pension benefits at the beginning of the year as previously reported for the fiduciary funds (expressed in thousands):

|  |  | Total Pension Trust Funds |
|---|---|---|
| Net position – July 1, 2013, as previously reported | $ | 2,697,236 |
| Impact of GASB No. 65 implementation |  | (29,981) |
| Net position – July 1, 2013, as restated | $ | 2,667,255 |

The impact of adopting GASB Statement No. 65 consisted of eliminating the applicable unamortized debt issuance costs, other than prepaid insurance, against beginning net position.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

**Discretely Presented Component Units**

The following table summarizes the changes to net position at the beginning of the year as previously reported for certain discretely presented component units (expressed in thousands):

*Major Discretely Presented Component Units*

|  | | GDB | PRHTA | PREPA | PRASA | UPR |
|---|---|---|---|---|---|---|
| Net position (deficit)– July 1, 2013, as previously reported | $ | 2,379,306 | 3,245,395 | (791,385) | 2,539,475 | 483,544 |
| Impact of GASB No. 65 implementation: | | (7,617) | (77,707) | (55,810) | (63,335) | (4,819) |
| Correction of immaterial errors  (a) | | — | — | — | (56,115) | 10,000 |
| Net position (deficit)– July 1, 2013, as restated | $ | 2,371,689 | 3,167,688 | (847,195) | 2,420,025 | 488,725 |

*Nonmajor Discretely Presented Component Units*

| | | |
|---|---|---|
| Net position – July 1, 2013, as previously reported | $ | 1,803,884 |
| Impact of GASB No. 65 implementation: | | |
| PRPA | | (2,794) |
| PRMFA | | (3,688) |
| PRCCDA | | (3,120) |
| PRIDCO | | (1,594) |
| PRTC | | (414) |
| | | (11,610) |
| Correction of immaterial errors: | | |
| PRMBA (b) | | (18,444) |
| PRPA (c) | | (15,319) |
| PRMIMTA (e) | | 7,032 |
| AEDA (f) | | 3,227 |
| PRTC (g) | | (1,950) |
| PRSPA (h) | | 587 |
| PRPBC (i) | | (467) |
| ITNGPR (j) | | (422) |
| NPCPR (k) | | 373 |
| | | (25,383) |
| Net position – July 1, 2013, as restated | $ | 1,766,891 |

The impact of adopting GASB Statement No. 65 consisted of eliminating the applicable component unit's existing unamortized debt issuance costs, other than prepaid insurance, and GDB's unamortized loan origination and commitment fees against its beginning net position.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The correction of errors resulted from the following:

***Major Discretely Presented Component Units***

(a)  PRASA had an understatement of accumulated depreciation, hence an overstatement of net capital assets, of approximately $56.1 million.

(b)  UPR had an understatement of prepaid assets of approximately $10 million.

***Nonmajor Discretely Presented Component Units***

(c)  PRMBA had an understatement of interests, fines, penalties and surcharges payable over income taxes withheld due to the Department of the Treasury of approximately $12.9 million; an understatement of insurance liabilities of approximately $1.8 million; an understatement of legal reserves of approximately $4.1 million; an overstatement of capital assets of approximately $364 thousand; an overstatement of unearned income from transportation services of approximately $100 thousand; and, an overstatement of voluntary termination benefits payable of approximately $786 thousand.

(d)  PRPA had an understatement of liabilities of approximately $15.3 million of voluntary termination benefits payable.

(e)  PRMIMTA had an overstatement of deferred revenue and an understatement of revenue of approximately $7 million.

(f)  AEDA had an overstatement of liabilities of approximately $2.3 million and an understatement of net capital assets of approximately $887 thousand.

(g)  PRTC had an understatement of accrued expenditures of approximately $1.7 million and an overstatement of capital assets of approximately $226 thousand.

(h)  PRSPA restated its beginning net position to correct various accounts in the aggregated amount of approximately $587 thousand.

(i)  PRPBC had an understatement of liabilities of approximately $564 thousand and an understatement of accounts receivables of approximately $97 thousand.

(j)  ITNGPR had an overstatement of assets of approximately $422 thousand.

(k)  NPCPR had an overstatement of liabilities of approximately $373 thousand.

**(4)  Puerto Rico Government Investment Trust Fund (PRGITF)**

PRGITF was created by Act No. 176, of August 11, 1995, and began operations on December 4, 1995. The PRGITF is a no load diversified collective investment trust administered, among other functions, by GDB that was created for the purpose of providing eligible governmental investors of Puerto Rico with a convenient and economical way to invest in a professionally managed money market portfolio. The PRGITF is not an investment company or a mutual fund and is not subject to regulation or registration under the investment company Act of 1940. Units issued by the PRGITF are not subject to regulation or registration under the Securities and Exchange Act of 1933, as amended, because the units are issued by a government

125                                                                                    (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

entity. The deposits on hand and the investments purchased are not collateralized, secured, or guaranteed by the Commonwealth or any of its agencies, instrumentalities, or political subdivisions.

PRGITF is considered a 2a7-like external investment pool, and as such, reports its investment at amortized cost, which approximates fair value. In addition, the Puerto Rico Government Investment Trust Fund follows GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investments Pools*; however, as stated in note (1)(b), such financial statements are not included in the accompanying basic financial statements because the Primary Government and each component unit already present their corresponding share of the assets of the PRGITF as cash equivalents or investments.

The investment securities on hand at June 30, 2014, consisted of certificates of deposit and time deposits, money market funds, securities purchased under agreements to resell, corporate obligations, commercial paper, and U.S. government and sponsored agencies obligations, all of which may be considered highly liquid. However, the participants' investments are subject to the ability of the PRGITF to receive payment from the securities' issuer when due. The liquidity of certain investments and changes in interest rates may affect PRGITF's yield and the fair value of its investments.

The Commonwealth classified approximately $82.8 million of investments presented in the PRGITF (see note 5) as cash and cash equivalents. Investments in the PRGITF with original maturity of 90 days or less from the date of acquisition are considered to be cash equivalents.

The dollar amount of the investments at June 30, 2014 at $1.00 per unit of participation was reported in the individual financial statements of each of the participants, and combined in the basic financial statements as follows (expressed in thousands):

| | | Outstanding balance | Percentage of total |
|---|---|---|---|
| Primary government: | | | |
| Commonwealth | $ | 80,725 | 45.23% |
| The Children's Trust (1) | | 15,406 | 8.63 |
| PRIFA | | 2,072 | 1.16 |
| COFINA (1) | | 553 | 0.31 |
| Total for primary government | | 98,756 | 55.33 |
| Discretely presented component units: | | | |
| GDB (1) | | 71,665 | 40.15 |
| PRASA | | 6,840 | 3.83 |
| SIFC (1) | | 1,039 | 0.58 |
| PRHTA | | 179 | 0.10 |
| PREPA (1) | | 9 | 0.01 |
| Total for discretely presented component units | | 79,732 | 44.67 |
| Total for all participants | $ | 178,488 | 100.00% |

(1) Reported as investments in the accompanying statement of net position.

126                                                                                (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The deposits at June 30, 2014 were invested in securities with a cost that approximates fair value, plus accrued interest, for approximately $178.5 million. The external portion of the PRGITF was not considered significant for separate reporting in the accompanying basic financial statements.

As June 30, 2014, the PRGITF's investments were rated "A1" or "AAA" by Standard & Poor's. U.S. government securities carry the explicit guarantee of the U.S. government.

Following is a table of the investments held by the PRGITF at June 30, 2014, presented at amortized cost (expressed in thousands):

| | | |
|---|---|---:|
| Securities purchased under agreements to resell | $ | 25,000 |
| Commercial paper | | 80,579 |
| U.S. government and sponsored agencies obligations | | 50,227 |
| Certificates of deposit and time deposits | | 6,000 |
| Money market | | 9,932 |
| Corporate obligations | | 6,750 |
| Total | $ | 178,488 |

## (5)   Deposits and Investments

### *Primary Government*

The Primary Government may invest in different types of securities, including domestic, international, and fixed income securities, among others.

The Primary Government maintains a cash and investment pool that is available for use by all funds, including some of the fiduciary funds. Each fund's portion of this pool is reported on the statement of net position as cash and cash equivalents. The fiduciary funds' investments are held and managed separately from those of other Primary Government funds.

### *Deposits*

Custodial credit risk for deposits is the risk that in the event of bank failure, the Commonwealth's deposit might not be recovered. The Commonwealth requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by banks in the Commonwealth's name. There is no formal policy for custodial credit risk for cash accounts opened with commercial banks outside of Puerto Rico.

Deposits in governmental banks represent the balance of interest and noninterest-bearing accounts in GDB and EDB. The deposit liability at the GDB and the EDB is substantially related to deposits from other component units and of the Commonwealth.

Deposits maintained in GDB, EDB, and non-Puerto Rico commercial banks are exempt from the collateral requirement established by the Commonwealth and thus represent a custodial credit risk, because in the event that these financial institutions fail, the Commonwealth may not be able to recover these deposits.

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Cash and cash equivalents consist of demand deposits, interest-bearing accounts, certificates of deposit, and bank investment contracts.

The carrying amount of deposits of the Primary Government at June 30, 2014 consists of the following (expressed in thousands):

| | | Carrying amount | | | Bank |
| | | Unrestricted | Restricted | Total | balance |
|---|---|---|---|---|---|
| Governmental activities: | | | | | |
| Commercial banks | $ | 152,065 | 486,726 | 638,791 | 655,944 |
| Governmental banks | | 422,997 | 1,490,325 | 1,913,322 | 2,214,857 |
| Total | $ | 575,062 | 1,977,051 | 2,552,113 | 2,870,801 |

| | | Carrying amount | | | Bank |
| | | Unrestricted | Restricted | Total | balance |
|---|---|---|---|---|---|
| Business-type activities: | | | | | |
| Commercial banks | $ | 56,380 | 7,142 | 63,522 | 69,672 |
| Governmental banks | | 115,646 | 181,228 | 296,874 | 208,226 |
| Under the Custody of the U.S. Treasury | | — | 415,032 | 415,032 | 415,003 |
| Total | $ | 172,026 | 603,402 | 775,428 | 692,901 |

At year-end, the Primary Government's bank balance of deposits in commercial banks amounting to approximately $726 million was covered by federal depository insurance and by collateral held by the Commonwealth's agent in the Commonwealth's name. Deposits of approximately $415 million with the U.S. Treasury represent unemployment insurance taxes collected from employers that are transferred to the federal Unemployment Insurance Trust Fund in the U.S. Treasury. These deposits are uninsured and uncollateralized. The Primary Government's bank balance of deposits in governmental banks, which as of June 30, 2014 amounted to approximately $2.4 billion, is also uninsured and uncollateralized.

The Primary Government classified approximately $82.8 million of investments in the PRGITF as cash equivalents.

### Investments

*Custodial Credit Risk* – Custodial credit risk for investments is the risk that, in the event of the failure of the counterparty to the transaction, the Commonwealth may not be able to recover the value of the investment or collateral securities that are in the possession of an outside party.

128                                                                  (Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Credit Risk* – This is the risk of loss of principal or loss of a financial reward stemming from a borrower's failure to repay a loan or otherwise meet a contractual obligation. Investors are compensated for assuming credit risk by way of interest payments from the borrower or issuer of a debt obligation.

Credit risk is closely tied to the potential return of an investment, the most notable being that the yields on bonds correlate strongly to their perceived credit risk.

The Commonwealth's general investment policy is to apply the "prudent investor" rule, that states investments shall be made with judgment and care under circumstances then prevailing, which persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not for speculation, but for investment considering the probable safety of their capital as well as the probable income to be derived. The prudent investor rule should be applied in the context of managing an overall portfolio.

Short-term funds of the agencies, including operating funds, may be invested in U.S. Treasury bills; U.S. Treasury notes or bonds with short term maturities; short-term obligations of U.S. government agencies and instrumentalities classified within the highest rating category of Standard & Poor's Rating Services (S&P) and Moody's Investors Service (Moody's); fully insured or collateralized certificates of deposit of eligible financial institutions designated by the Commissioner of Financial Institutions and the Secretary of the Treasury of the Commonwealth; Prime commercial paper rated A1/P1 by S&P and Moody's or secured by an irrevocable line of credit of an institution rated within the highest rating category of S&P and Moody's or collateralized by government securities; bankers' acceptances (as alternatives to CDs) of eligible financial institutions doing business in Puerto Rico provided adequate collateral has been pledged; the PRGITF; obligations of the Commonwealth and its instrumentalities with an expected rate of return similar to other securities with the same risk profile.

Longer-term funds may also be invested in U.S. government and agency securities rated in the highest rating category of S&P and Moody's. Taxable Municipal Bonds of state and local governments in the United States classified within the three (3) highest categories of at least two of the principal rating services; taxable municipal obligations of the Primary Government and its component units; Structured Investments (notes and other types of on-balance sheet securities issued by a U.S. Government Agency or another financial institutions that are classified in the highest rating category of at least two of the principal rating services); any mortgage-backed instrument issued by a U.S. Government Agency rated in the highest rating category of S&P and Moody's.

*Concentration of Credit Risk* – This is the risk of loss attributed to the magnitude of a government's investment in a single issuer. The Commonwealth policy on larger portfolios with positions in securities having potential default risk is to limit the investments in size so that in case of default, the portfolio's annual investment income will exceed a loss on a single issuer's securities.

*Interest Rate Risk* – It is the Commonwealth policy that a minimum 10% of the total portfolio be held in highly marketable U.S. Treasury bills or overnight investment instruments. Larger portfolios should not hold more than 30% of the portfolio in marketable instruments with maturities beyond one month. This policy should be followed as long as it doesn't reduce investment yields.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Governmental Activities*

The Governmental Activities had approximately $87.4 million in nonparticipating investment contracts (guaranteed investment contract) that were exposed to custodial risk as uninsured, unregistered, and held by the counterparties or by their trust departments or agents, but not in the Primary Government's name.

The following table summarizes the type and maturities of investments held by the Governmental Activities at June 30, 2014 (expressed in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| | Maturity (in years) | | |
| Investment type | Within one year | After ten years | Total |
|---|---|---|---|
| U.S. government securities | $ 28,124 | — | 28,124 |
| U.S. corporate bonds and notes | 22,906 | — | 22,906 |
| Money market funds | 10,600 | — | 10,600 |
| PRGITF | 15,959 | — | 15,959 |
| External investment pools – fixed-income securities: | | | |
| Dreyfus Government Cash Management | 355,958 | — | 355,958 |
| Deutsche Bank | — | 24,884 | 24,884 |
| Nonparticipating investment contracts: | | | |
| Bayerische Hypo-und Vereinsbank AG | — | 83,684 | 83,684 |
| Calyon | — | 3,766 | 3,766 |
| Total debt securities and fixed-income investment contracts | $ 433,547 | 112,334 | 545,881 |
| Reconciliation to the government-wide statement of net position: | | | |
| Unrestricted investments | | $ | 26,176 |
| Restricted investments | | | 519,705 |
| Total | | $ | 545,881 |

130                                                        (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The credit quality ratings (S&P) and fair value by investment type for the investments reported by the governmental activities at June 30, 2014 consist of the following (expressed in thousands):

| Investment type | | AAA | BBB+ to B- | Not rated | Total |
|---|---|---|---|---|---|
| | | | **Rating** | | |
| U.S. corporate bonds and notes | $ | 22,906 | — | — | 22,906 |
| Money market funds | | — | — | 10,600 | 10,600 |
| PRGITF | | 15,959 | — | — | 15,959 |
| External investment pools – fixed-income securities: | | | | | |
| Dreyfus Government Cash Management | | 355,958 | — | — | 355,958 |
| Deutsche Bank | | 24,884 | — | — | 24,884 |
| Nonparticipating investment contracts: | | | | | |
| Bayerische Hypo-undVereinsbank AG | | — | 83,684 | — | 83,684 |
| Calyon | | 3,766 | — | — | 3,766 |
| Total debt securities and fixed-income investment contracts | $ | 423,473 | 83,684 | 10,600 | 517,757 |

Approximately $28.1 million of the total governmental activities' investments consist of U.S. government securities, which carry no credit risk, therefore, are not included within the table above.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Business-Type Activities*

The following table summarizes the type and maturities of investments held by the business-type activities at June 30, 2014 (expressed in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|
| U.S. government and agency securities | $ — | 363 | 3,158 | 1,226 | 4,747 |
| Mortgage and asset-backed securities: | | | | | |
|   Government National Mortgage Association (GNMA) | — | — | 159 | 414 | 573 |
|   FNMA | — | — | — | 2,489 | 2,489 |
|   Federal Home Loan Mortgage Corporation (FHLMC) | — | — | — | 4,659 | 4,659 |
|   Commercial mortgages | — | — | — | 1,712 | 1,712 |
|   Asset-backed securities | — | 849 | — | — | 849 |
| U.S. corporate bonds and notes | — | 5,073 | 2,531 | 1,918 | 9,522 |
| Foreign corporate and government bonds and notes | — | 1,253 | 256 | — | 1,509 |
| U.S. municipal notes | — | — | 56 | 835 | 891 |
|     Total debt securities | $ — | 7,538 | 6,160 | 13,253 | 26,951 |

| | | | | | Total |
|---|---|---|---|---|---|
| External investment pools – equity securities: | | | | | |
|   SPDR S&P 500 ETF Trust | | | | | 9,820 |
|   MFC ISHARES TR Russell 2000 Index Fund | | | | | 986 |
|   MFC Vanguard FTSE Emergency MKTS ETF | | | | | 875 |
|   MFC Vanguard FTSE Development Markets | | | | | 103 |
|     Total | | | | $ | 38,735 |
| Reconciliation to the government-wide statement of net position: | | | | | |
|   Unrestricted investments | | | | $ | — |
|   Restricted investments | | | | | 38,735 |
|     Total | | | | $ | 38,735 |

132 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The credit quality ratings (S&P) and fair value by investment type for the investments reported by the business-type activities at June 30, 2014 consist of the following (expressed in thousands):

| Investment type | | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ to BB- | Not rated | Total |
|---|---|---|---|---|---|---|---|---|
| Mortgage and asset-backed securities: | | | | | | | | |
| FNMA | $ | — | 2,489 | — | — | — | — | 2,489 |
| FHLMC | | — | 4,659 | — | — | — | — | 4,659 |
| Commercial mortgages | | 1,173 | — | — | — | — | 539 | 1,712 |
| Asset-backed securities | | 486 | — | — | — | — | 363 | 849 |
| U.S. corporate bonds and notes | | 128 | 1,034 | 4,573 | 3,423 | 364 | — | 9,522 |
| Foreign corporate and government bonds and notes | | — | 229 | 991 | 197 | 92 | — | 1,509 |
| U.S. municipal notes | | 447 | 388 | 56 | — | — | — | 891 |
| Total debt securities | $ | 2,234 | 8,799 | 5,620 | 3,620 | 456 | 902 | 21,631 |

Approximately $5.3 million of the total business-type activities' investments consist of U.S. government securities and mortgage- and asset-backed securities (GNMA), which carry no credit risk, therefore, are not included within the table above.

**Fiduciary Funds**

*Deposits and short-term investments*

Cash and cash equivalents of the fiduciary funds at June 30, 2014 consist of the following (expressed in thousands):

| | | Carrying amount | | | Bank balance |
|---|---|---|---|---|---|
| | | Unrestricted | Restricted | Total | |
| Commercial banks | $ | 658,960 | 129,690 | 788,650 | 594,057 |
| Governmental banks | | 353,290 | 21,299 | 374,589 | 488,539 |
| Total | $ | 1,012,250 | 150,989 | 1,163,239 | 1,082,596 |

Cash and cash equivalents consist of deposits with commercial banks, deposits with the GDB and short-term investments. Short-term investments include money market funds and other cash equivalents of approximately $196.0 million at June 30, 2014. Restricted cash deposited with the GDB consists of escrow servicing accounts for mortgage loans administrated by the mortgage servicers and expired checks not claimed by the plan members, restricted for repayments.

Collateral received for securities lending transactions of the pension trust funds at June 30, 2014 amounting to approximately $142.6 million were invested in short-term investment funds sponsored by the pension trust funds' custodian bank. (note 6).

*Custodial Credit Risk* – As of June 30, 2014, the fiduciary funds had approximately $632 million of cash and cash equivalents and collateral from securities lending transactions, which were exposed to custodial credit risk as uninsured and uncollateralized. Cash collateral received from securities lending transactions

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

invested in short-term investment funds sponsored by the pension trust funds' custodian bank are also exempt from compliance with the collateralization requirement.

### Investments

The following table summarizes the type and maturities of investments held by the pension trust funds at June 30, 2014 (expressed in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|
| U.S. government securities: | | | | | |
| U.S. Treasury notes | $ 1,013 | 25,122 | 29,037 | — | 55,172 |
| U.S. Treasury note strips | — | — | 75,081 | — | 75,081 |
| U.S. Treasury bonds | — | — | — | 659 | 659 |
| U.S. Treasury Inflation-Protected Securities (TIPS) | — | 500 | 1,766 | — | 2,266 |
| U.S. government sponsored agencies notes: | | | | | |
| Federal Home Loan Bank (FHLB) | 6,214 | 2,256 | 6,473 | — | 14,943 |
| FNMA | — | 4,942 | 3,377 | — | 8,319 |
| FHLMC | — | 9,756 | 3,486 | — | 13,242 |
| Federal Farm Credit Bank (FFCB) | — | 4,153 | 1,641 | — | 5,794 |
| Mortgage and asset–backed securities: | | | | | |
| GNMA | — | 44 | — | 11,066 | 11,110 |
| FNMA | 616 | 176 | 720 | 5,668 | 7,180 |
| FHLMC | — | 38 | 278 | 4,638 | 4,954 |
| Collateralized mortgage obligations (CMO) | — | — | — | 322 | 322 |
| Commercial mortgages | — | — | — | 22,663 | 22,663 |
| Asset–backed securities | — | 69 | — | — | 69 |
| U.S. corporate bonds and notes | 118,199 | 683,048 | 514,799 | 44,055 | 1,360,101 |
| Non-U.S. corporate bonds and notes | 22,460 | 129,135 | 118,697 | 3,181 | 273,473 |
| U.S. municipal bonds and notes | — | 3,403 | 5,325 | 3,104 | 11,832 |
| Commonwealth bonds | 995 | — | — | — | 995 |
| COFINA bonds | — | — | — | 138,123 | 138,123 |
| Total bonds and notes | 149,497 | 862,642 | 760,680 | 233,479 | 2,006,298 |
| Nonexchange commingled trust funds: | | | | | |
| Fixed income fund – SSgA Intermediate Fund: | | | | | |
| U.S. | — | 141,878 | — | — | 141,878 |
| Non-U.S. | — | 75,325 | — | — | 75,325 |
| Total bonds and notes and nonexchange commingled fixed-income trust funds | $ 149,497 | 1,079,845 | 760,680 | 233,479 | 2,223,501 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

| | Maturity (In years) | | | | |
|---|---|---|---|---|---|
| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
| Stocks and equity and other nonexchange commingled trust funds: | | | | | |
| U.S. corporate stock | | | | | 3,061 |
| Non-U.S. corporate stock | | | | | 89,941 |
| Nonexchange commingled trust funds: | | | | | |
| Equity and other funds: | | | | | |
| U.S. – SSgA Russell 3000 Fund | | | | | 840,649 |
| U.S. – SSgA S&P 500 Fund | | | | | 25,962 |
| Non-U.S.–SSgA MSCI | | | | | |
| ACWI Ex USA Fund | | | | | 210,183 |
| Total stocks and equity and other nonexchange commingled trust funds | | | | | 1,169,796 |
| Investments in limited partnerships | | | | | 65,316 |
| Total | | | | | $ 3,458,613 |

The pension trust fund's investments are exposed to custodial credit risk, credit risk, concentration of credit risk, foreign currency risk, and interest rate risk. Following is a description of these risks as of June 30, 2014:

*Custodial Credit Risk* – At June 30, 2014, securities investments were registered in the name of the pension trust fund and were held in the possession of the pension trust fund's custodian banks, State Street Bank and Trust and Bank of New York Mellon, except for securities lent. Securities lent are not exposed to custodial credit risk (see note 6).

*Credit Risk* – All fixed-income securities at the time of purchase must be of investment grade quality. All issuances shall be rated investment grade by at least two of the nationally recognized rating agencies. The portfolio is expected to maintain a minimum weighted average credit quality of either "A" or better using either S&P or Moody's credit ratings. TRS's investment guidelines prohibit the investments in securities with expected maturity dates beyond 30 years. Positions that drift below investment grade should be reported to a management representative of the TRS and monitored carefully. The TRS portfolio is not expected to have more than 5% invested in securities that have drifted after purchase below investment-grade quality. The JRS investment policy limits the investment in corporate debt securities to the top ratings issued by nationally recognized statistical rating organizations.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The credit quality ratings for investments held by the pension trust funds at June 30, 2014 are as follows (expressed in thousands):

| Investment type | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ to BB- | Not Rated | Total |
|---|---|---|---|---|---|---|---|
| | | | Rating (1) | | | | |
| Bonds and notes: | | | | | | | |
| U.S. government agencies obligations: | | | | | | | |
| FHLB | $ — | 14,943 | — | — | — | — | 14,943 |
| FNMA | — | 8,319 | — | — | — | — | 8,319 |
| FHLMC | — | 13,242 | — | — | — | — | 13,242 |
| FFCB | — | 5,794 | — | — | — | — | 5,794 |
| Mortgage and asset- backed securities: | | | | | | | |
| FNMA | — | 7,180 | — | — | — | — | 7,180 |
| FHLMC | — | 4,954 | — | — | — | — | 4,954 |
| Collateralized mortgage obligations | 36 | — | — | — | — | 286 | 322 |
| Commercial mortgages | 22,663 | — | — | — | — | — | 22,663 |
| Asset-backed securities | — | 69 | — | — | — | — | 69 |
| U.S. corporate bonds and notes | 20,810 | 153,523 | 641,085 | 493,070 | 39,775 | 11,838 | 1,360,101 |
| Non U.S. corporate bonds and notes | — | 40,172 | 118,005 | 98,467 | 4,364 | 12,465 | 273,473 |
| U.S. municipal bonds and notes | 3,712 | 4,864 | 3,256 | — | — | — | 11,832 |
| Commonwealth bonds | — | — | — | — | 995 | — | 995 |
| COFINA bonds | — | — | 138,123 | — | — | — | 138,123 |
| Total bonds and notes | 47,221 | 253,060 | 900,469 | 591,537 | 45,134 | 24,589 | 1,862,010 |
| Nonexchange commingled trust funds: | | | | | | | |
| Fixed Income fund – SSgA Intermediate Fund | 25,391 | 27,975 | 81,104 | 82,733 | — | — | 217,203 |
| Total debt securities and fixed-income nonexchange commingled trust funds | $ 72,612 | 281,035 | 981,573 | 674,270 | 45,134 | 24,589 | 2,079,213 |

(1) Rating obtained from Standard and Poor's or equivalent rating by Moody's Investor Service or Fitch Ratings.

Approximately $144.3 million of the total fiduciary funds' investments at June 30, 2014 consist of U.S. government securities and mortgage-backed securities (GNMAs), which carry no risk, therefore, are not included within the table above.

*Concentration of Credit Risk* – None of the ERS and the JRS investment in marketable securities in any organization represents 5% or more of ERS and JRS net assets held in trust for pension benefits. There are no TRS investments in any one issuer that represent 5% or more of total investments as of June 30, 2014. The TRS investment guidelines specify that no more than 5% of a manager's assets at market shall be invested in the securities of any single issuer.

*Interest Rate Risk* – In accordance with their investment policy, the ERS and the JRS manage their exposure to declines in fair values by structuring the investment portfolio so that securities mature to meet cash requirements for benefit payments, thereby avoiding the need to sell securities on the open market prior to maturity. The Pension Trust Fund is expected to achieve capital preservation and income generation by investing in a diversified portfolio of marketable investment-grade core fixed-income securities. The TRS investment guidelines specify that the duration of the portfolio is expected to vary no more than between 75% and 125% of the duration of the respective benchmark.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2014, investment maturities as a percentage of total debt securities and fixed-income nonexchange traded mutual funds are as follows:

| Maturity | Maximum maturity |
|---|---|
| Within one year | 7% |
| After one year to five years | 49 |
| After five years to ten years | 34 |
| After ten years | 10 |
| Total | 100% |

*Foreign Currency Risk* – This is the risk that changes in exchange rates will adversely affect the fair value of an investment or a deposit. The ERS and the JRS have no investments with exposure to foreign currency risk. The TRS international portfolio is expected to achieve long-term and aggressive capital appreciation by investing in Core EAFE (Europe Australasia and the Far East) securities. The portfolio is expected to be broadly diversified with respect to exposures to countries, economic sectors, industries, and individual stock. No single issue is expected to exceed 5% (at market) of the portfolio.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The TRS's investments and deposits exposed to foreign currency risk as of June 30, 2014, are as follows:

| Investment type | Local currency | Fair value |
|---|---|---|
| | | (In thousands) |
| Cash and cash equivalents | Australian Dollar | $       12 |
| Cash and cash equivalents | Euro | 831 |
| Cash and cash equivalents | Hong Kong Dollar | 13 |
| Cash and cash equivalents | Japanese Yen | 12 |
| Total cash and cash equivalents | | 868 |
| Non-U.S. corporate stock | Australian Dollar | 6,951 |
| Non-U.S. corporate stock | British Sterling Pound | 20,211 |
| Non-U.S. corporate stock | Danish Krone | 5,565 |
| Non-U.S. corporate stock | Euro | 11,617 |
| Non-U.S. corporate stock | Hong Kong Dollar | 3,465 |
| Non-U.S. corporate stock | Japanese Yen | 12,662 |
| Non-U.S. corporate stock | New Turkish Lira | 677 |
| Non-U.S. corporate stock | New Zealand Dollar | 943 |
| Non-U.S. corporate stock | South Africa Rand | 1,781 |
| Non-U.S. corporate stock | Singapore Dollar | 1,795 |
| Non-U.S. corporate stock | Swedish Krona | 8,434 |
| Non-U.S. corporate stock | Swiss Franc | 8,472 |
| Total common stock | | 82,573 |
| Nonexchange commingled trust funds – Ssga MCSI ACWI Ex USA | | 210,183 |
| Total cash and cash equivalents and securities exposed to foreign currency risk | | $     293,624 |

### Nonexchange Commingled Trust Funds

The pension trust funds invest in shares of the following State Street Global Advisor equity funds: SsgA S&P 500 Flagship Securities Lending Fund (the SsgA S&P 500 Fund), the SsgA Russell 3000 Index Non-Lending Fund (the SsgA Russell 3000 Fund), and the SsgA MSCI ACWI Ex USA Non-Lending Fund (the SsgA MSCI ACWI Ex USA Fund). The investment objectives of the SsgA S&P 500 Fund, the SsgA Russell 3000 Fund, and the SsgA MSCI ACWI Ex USA Fund are to match the return of the Standard & Poor's 500 Index, the Russell 3000 Index, and the MSCI ACWI Ex USA Index, respectively, over the long-term. Shares of the SsgA S&P 500 Fund and of the SsgA Russell 3000 Fund can be redeemed on a daily basis at net asset value (NAV) and have no redemption restrictions. Shares of the SsgA MSCI ACWI Ex USA Fund can be redeemed semimonthly at NAV and have no redemption restrictions. The pension trust funds' investment in these funds is included as part of nonexchange commingled trust funds.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2014, the investments underlying the SsgA S&P 500 Fund, the SsgA Russell 3000 Fund and the SsgA MSCI ACWI Ex USA Fund had the following sector allocations:

| Sector | SSgA S&P 500 Fund | SSgA Russell 3000 Fund | SSgA MSCI ACWI Ex USA Fund |
|---|---|---|---|
| Information technology | 19% | 18% | 7% |
| Financials | 16 | 17 | 26 |
| Healthcare | 13 | 13 | 8 |
| Consumer discretionary | 12 | 13 | 11 |
| Industrials | 11 | 12 | 11 |
| Energy | 11 | 10 | 10 |
| Consumer staples | 10 | 8 | 10 |
| Materials | 3 | 4 | 8 |
| Utilities | 3 | 3 | 4 |
| Telecommunication services | 2 | 2 | 5 |
| Total | 100% | 100% | 100% |

In addition, the pension trust funds invest in shares of the State Street Global Advisor Intermediate Credit Index Non-Lending Fund (the SsgA Intermediate Fund). The investment objective of the SsgA Intermediate Fund is to replicate the Barclays U.S. Intermediate Credit Bond Index over a long-term by investing exclusively in fixed-income securities. Shares of the SsgA Intermediate Fund can be redeemed on a daily basis at their NAV and have no redemption restrictions. The pension trust funds' investment in the SsgA Intermediate Fund is included as part of nonexchange commingled trust funds.

As of June 30, 2014, the investments underlying the SsgA Intermediate Fund had the following sector allocations:

| Sector | Percentage |
|---|---|
| Corporate – Industrial | 45% |
| Corporate – Finance | 30 |
| Noncorporates | 21 |
| Corporate – Utility | 4 |
| Total | 100% |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2014, the composition of the underlying investments in the SsgA MSCI ACWI Ex USA Fund and in the SsgA Intermediate Fund by country was as follows:

| Country | SSgA MSCI ACWI Ex USA Fund | SSgA Intermediate Fund |
|---|---|---|
| United Kingdom | 15% | 3% |
| Japan | 14 | 2 |
| Canada | 8 | 5 |
| France | 7 | 1 |
| Germany | 7 | 4 |
| Australia | 6 | 2 |
| Switzerland | 6 | — |
| China | 4 | — |
| Korea | 3 | — |
| Spain | 3 | — |
| Taiwan | 3 | — |
| Brazil | 2 | 2 |
| Hong Kong | 2 | — |
| Italy | 2 | — |
| Netherlands | 2 | — |
| South Africa | 2 | — |
| Sweden | 2 | — |
| U.S. | — | 65 |
| Other | 12 | 16 |
| Total | 100% | 100% |

*Investments in Limited Partnerships*

Pursuant to the Commonwealth's General Investment Policy, the pension trust funds invested approximately $1.4 million in limited partnerships during the year ended June 30, 2014.

The fair value of investments in limited partnerships at June 30, 2014 amounted to approximately $65.3 million. The allocations of net gains and losses to limited partners are based on certain percentages, as established in the limited partnership agreements. Investments in limited partnerships are not rated by a nationally recognized statistical rating organization. The related credit risk is measured through credit analysis, periodic reviews of results of operations, and meetings of subject companies' management.

As of June 30, 2014, the pension trust funds had capital commitments with limited partnerships and related contributions as follows (expressed in thousands):

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

| | Public sector commitments | Fiscal year contributions | Cumulative contributions | Fair value |
|---|---|---|---|---|
| Guayacán Fund of Funds, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | $    25,000 | — | 23,820 | 52 |
| Puerto Rico System of Annuities and Pensions for Teachers | 20,000 | — | 19,056 | 42 |
| Subtotal | 45,000 | — | 42,876 | 94 |
| Guayacán Fund of Funds II, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 25,000 | — | 23,681 | 2,907 |
| Puerto Rico System of Annuities and Pensions for Teachers | 25,000 | — | 23,681 | 2,907 |
| Subtotal | 50,000 | — | 47,362 | 5,814 |
| Guayacán Private Equity Fund, L.P. | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 5,000 | — | 4,645 | 3,516 |
| Puerto Rico System of Annuities and Pensions for Teachers | 5,000 | — | 4,645 | 3,516 |
| Subtotal | 10,000 | — | 9,290 | 7,032 |
| Guayacán Private Equity Fund II, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 25,000 | 892 | 19,922 | 20,343 |
| Subtotal | 25,000 | 892 | 19,922 | 20,343 |
| Other Funds: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 47,596 | 255 | 47,382 | 27,328 |
| Puerto Rico System of Annuities and Pensions for Teachers | 28,714 | — | 26,498 | 4,705 |
| Subtotal | 76,310 | 255 | 73,880 | 32,033 |
| Total | $    206,310 | 1,147 | 193,330 | 65,316 |

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

**Discretely Presented Component Units**

*Deposits*

Cash and cash equivalents consist of demand deposits, interest-bearing accounts, certificates of deposit, and bank investment contracts. Cash and cash equivalents of the component units at June 30, 2014 consist of (expressed in thousands):

*Major Component Units*

| | | Carrying amount | | | |
|---|---|---|---|---|---|
| | | Unrestricted | Restricted | Total | Bank balance |
| Commercial banks | $ | 1,644,379 | 1,089,661 | 2,734,040 | 2,768,698 |
| Governmental banks | | 168,100 | 115,822 | 283,922 | 319,689 |
| Total | $ | 1,812,479 | 1,205,483 | 3,017,962 | 3,088,387 |

As of June 30, 2014, the component units had approximately $320 million of cash and cash equivalents that were exposed to custodial credit risk as uninsured and uncollateralized.

*Nonmajor Component Units*

| | | Carrying amount | | | |
|---|---|---|---|---|---|
| | | Unrestricted | Restricted | Total | Bank balance |
| Commercial banks | $ | 112,441 | 69,809 | 182,250 | 200,574 |
| Governmental banks | | 117,893 | 108,434 | 226,327 | 232,884 |
| Total | $ | 230,334 | 178,243 | 408,577 | 433,458 |

As of June 30, 2014, the component units had approximately $335 million of cash and cash equivalents that were exposed to custodial credit risk as uninsured and uncollateralized.

*Investments*

*Credit Risk* – In addition to the investments permitted for the Primary Government, the component units' investment policies allow management to invest in: certificates of deposit or Euro notes issued by financial institutions in the U.S. in which the issuer is classified in the highest rating category for short term obligations and in the two highest rating category for long term obligations as classified by S&P and Moody's: corporate notes and bonds classified in the highest categories of at least two of the principal rating services; taxable corporate debt issued through AFICA and CARIFA within the two (2) highest rating categories of at least two of the principal rating services; trust certificates (Subject to prior written consultation with the GDB), Mortgage and Asset Backed Securities rated AAA by S&P or Aaa by Moody's that shall not exceed 5% of the underlying Trust at any time.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The component units' investment policies establish limitations and other guidelines on amounts to be invested in the aforementioned investment categories and by issuer/counterparty and on exposure by country. In addition, such policies provide guidelines on the institutions with which investment transactions can be entered into.

The component units' investment policies provide that investments transactions shall be entered into with counterparties that are rated BBB+/A-1 or better by the S&P's or equivalent rating by Fitch Ratings or Moody's, depending on the type and maturity of the investment and the counterparty to the transaction.

*Concentration of credit risk* – In addition, the investment policy specifies that no more than 5% of a manager's assets at fair value shall be invested in the securities of any single issuer. The following table summarizes the type and maturities of investments held by the component units at June 30, 2014 (expressed in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

### *Major Component Units*

| Investment type | | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|---|
| U.S. government securities | $ | 159,419 | 236,146 | 33,026 | 3,239 | 431,830 |
| U.S. government sponsored agencies notes: | | | | | | |
| FHLB | | 328,531 | 276,917 | 36,680 | — | 642,128 |
| FNMA | | 105,605 | 127,567 | 27,661 | 1,453 | 262,286 |
| FHLMC | | 112,266 | 204,063 | 79,439 | 275 | 396,043 |
| FFCB | | 529 | 55,363 | 1,787 | — | 57,679 |
| Other | | — | 2,292 | — | — | 2,292 |
| Mortgage and asset-backed securities: | | | | | | |
| GNMA | | 523 | 252 | 3,571 | 127,468 | 131,814 |
| FNMA | | 10,063 | 32,048 | 3,426 | 206,078 | 251,615 |
| FHLMC | | 44,337 | 36,579 | 26,903 | 49,713 | 157,532 |
| Commercial mortgages | | — | — | — | 3,257 | 3,257 |
| Asset-backed securities | | — | 5,636 | 2,168 | — | 7,804 |
| Other | | — | 159 | 20,016 | 65,623 | 85,798 |
| U.S. corporate bonds and notes | | 406,647 | 267,438 | 152,939 | 39,253 | 866,277 |
| Foreign government bonds and notes | | — | 2,788 | 1,671 | — | 4,459 |
| U.S. municipal notes | | 14,184 | 8,608 | 8,189 | 2,137 | 33,118 |
| Commonwealth agency bonds and notes | | 6,351 | 108,291 | — | — | 114,642 |
| Money market funds | | 47,127 | — | — | — | 47,127 |
| Negotiable certificates of deposit | | 318,565 | — | — | — | 318,565 |
| PRGITF | | 1,039 | 71,665 | — | — | 72,704 |
| External investment pools – fixed-income securities | | 126,556 | 430 | — | 6,403 | 133,389 |
| Nonparticipating investment contracts | | 13,442 | 44,140 | — | 229,142 | 286,724 |
| Others | | 254,147 | 43,682 | — | — | 297,829 |
| Total debt securities and fixed-income investment contracts | $ | 1,949,331 | 1,524,064 | 397,476 | 734,041 | 4,604,912 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

| Investment type | Total |
|---|---|
| Equity securities: | |
| U.S. corporate stocks | 381,901 |
| Non-U.S. corporate stocks | 42,517 |
| External investment pools – equity securities | 324,656 |
| Limited partnership/private equity | 47,122 |
| Total | 5,401,108 |
| Reconciliation to the government-wide statement of net position: | |
| Unrestricted investments | 3,092,818 |
| Restricted investments | 2,308,290 |
| Total | $ 5,401,108 |

### *Nonmajor Components Units*

| Investment type | | Maturity (in years) | | | |
|---|---|---|---|---|---|
| | Within one year | After one to five years | After five to ten years | After ten years | Total |
| U.S. government securities | $ 12,431 | 29,533 | 13,010 | 6,900 | 61,874 |
| U.S. government sponsored agencies notes: | | | | | |
| FHLB | 251 | 4,065 | 4,216 | 1,262 | 9,794 |
| FNMA | — | 6,239 | 1,968 | 2,402 | 10,609 |
| FHLMC | 3,219 | 3,358 | — | 1,027 | 7,604 |
| FFCB | — | 1,976 | 9,319 | 739 | 12,034 |
| Other | — | — | 1,818 | 1,529 | 3,347 |
| Mortgage and asset-backed securities: | | | | | |
| GNMA | — | 181 | — | 24,534 | 24,715 |
| FNMA | 15,233 | 24,367 | 2,997 | 161,255 | 203,852 |
| FHLMC | 3,780 | 22,292 | 2,118 | 16,224 | 44,414 |
| Commercial mortgages | — | 11,197 | — | 4,938 | 16,135 |
| Asset-backed securities | 37 | 7,425 | 2,134 | 4,396 | 13,992 |
| Other | 1,637 | — | 1,296 | — | 2,933 |
| U.S. corporate bonds and notes | 30,117 | 43,860 | 29,538 | 4,561 | 108,076 |
| U.S. municipal notes | 155 | 8,535 | 59,332 | 467,096 | 535,118 |
| Commonwealth agency bonds and notes | 215,404 | 353,439 | 236,367 | 157,305 | 962,515 |
| Money market funds | 88,464 | 33,365 | — | — | 121,829 |
| Negotiable certificates of deposit | 58,447 | 11,800 | — | — | 70,247 |
| External investment pools – fixed-income securities | 51,438 | — | — | — | 51,438 |
| Nonparticipating investment contracts | — | — | 15,863 | 20,845 | 36,708 |
| Others | 26,034 | 8,417 | 1,196 | 252 | 35,899 |
| Total debt securities and fixed-income investment contracts | $ 506,647 | 570,049 | 381,172 | 875,265 | 2,333,133 |

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

| Investment type | Total |
|---|---|
| Equity securities: | |
| U.S. corporate stocks | 62,934 |
| Non-U.S. corporate stocks | 2,120 |
| External investment pools – equity securities | 40,280 |
| Limited partnership/private equity | 22,616 |
| Total | 2,461,083 |
| Reconciliation to the government-wide statement of net position: | |
| Unrestricted investments | 1,166,304 |
| Restricted investments | 1,294,779 |
| Total | $ 2,461,083 |

PRASA and PRHTA (major component units) classified approximately $6.8 million and $179 thousand, respectively, of investments presented in the PRGITF as cash equivalents.

*Custodial Credit Risk* – The component units had approximately $264 million (approximately $7 million and $257 million at major and nonmajor component units, respectively) in various types of U.S. government and agency securities, mortgage-backed securities, and other investments that were exposed to custodial credit risk as uninsured, unregistered, and held by the counterparties or by their trust departments or agents, but not in the component units' name.

*Foreign Currency Risk* – SIFC (a major component unit) limits its exposure to foreign currency risk by limiting the total amount invested to 5% of the portfolio. As of June 30, 2014, the SIFC had the following investments denominated in foreign currency (expressed in thousands):

| Description | Currency | Fair value |
|---|---|---|
| Preferred stock and other equities | Euro | $ 12,526 |
| | Japanese Yen | 8,546 |
| | British Pound | 8,045 |
| | Swiss Franc | 4,020 |
| | Singapore Dollar | 2,202 |
| | Australian Dollar | 1,159 |
| | Swedish Krona | 943 |
| | Norwegian Krone | 900 |
| | Hong Kong Dollar | 875 |
| | South African Rand | 431 |
| | Indonesian Rupiah | 373 |
| | Euro | 2,499 |
| Government and foreign corporate bonds | Mexican Peso | 949 |
| | Brazilian Real | 385 |
| | Colombian Peso | 383 |
| Total | | $ 44,236 |

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

### *Subsequent Downgrades in Credit Ratings of Commonwealth's Bonds*

As explained in note 22, during fiscal years 2015 and 2014, several bonds of the Commonwealth and its instrumentalities were downgraded several times and several notches by the principal credit rating agencies in the United States. However, most of the existing investments in the tables above were not affected, as in general terms, the investment policies of the Commonwealth require its agencies and instrumentalities to maintain their investment portfolios of debt securities with investment grade ratings. With over 85% and 75% of the investments at the Primary Government and component unit level, respectively, with credit ratings no lower than "A-" or without risks at June 30, 2014, overall average credit ratings on the entire investment portfolio have remained within the Commonwealth's required investment policies, even after the several 2015 downgrades. The remaining percentage of investments is either rated throughout the B spectrum or not rated.

**(6)   Securities Lending and Repurchase Agreement Transactions**

During the year, the pension trust funds included within the fiduciary funds, the GDB, the EDB, and the SIFC, discretely presented component units, entered into securities lending and securities sold with agreements to repurchase transactions. These transactions are explained below:

### *Pension Trust Funds*

The Retirement System participates in a securities lending program, whereby investment securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, government securities, and/or irrevocable bank letters of credit equal to approximately 102% of the fair value of the domestic securities on loan and 105% of the fair value of the international securities on loan, with a simultaneous agreement to return the collateral for the same securities in the future. Collateral is marked to market daily, and the agent places a request for additional collateral from brokers, if needed. The custodian bank is the agent for the securities lending program.

At year-end, the Retirement System has no credit risk exposure to borrowers because the amounts the Retirement System owes the borrowers (the collateral) exceeded the amounts the borrowers owe the Retirement System. At June 30, 2014, the collateral received represented 102% of the fair value of the domestic securities lent. The securities on loan for which collateral was received as of June 30, 2014, consisted of the following (expressed in thousands):

| Description | Fair value of underlying securities |
|---|---:|
| U.S. government securities: | |
|     U.S. Treasury bill | $    2,000 |
|     U.S. Treasury notes | 24,363 |
|     U.S. Treasury note strips | 12,492 |
|     U.S. Treasury bonds | 242 |
|     U.S. Treasury Inflaction-Protected Securities (TIPS) | 568 |
| U.S. government sponsored agencies notes: | |
|     FNMA | 1,474 |
|     FHLMC | 4,134 |
| U.S. corporate bonds and notes | 92,415 |
| U.S. corporate stock | 280 |
| Non-U.S. corporate stock | 1,250 |
|     Total | $    139,218 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The underlying collateral for these securities had a fair value of approximately $142.6 million as of June 30, 2014. The collateral received was invested in a short-term investment fund sponsored by the custodian bank and is presented as collateral from securities lending transactions in the accompanying statement of fiduciary net position.

As of June 30, 2014, the distribution of the short-term investment fund by investment type is as follows (expressed in thousands):

| Investment type | | Fair value of underlying securities |
|---|---|---|
| Securities bought under agreements to resell | $ | 141,800 |
| Commercial paper | | 247 |
| Certificates of deposit | | 580 |
| Total | $ | 142,627 |

Under the terms of the securities lending agreement, the Retirement System is fully indemnified against failure of the borrowers to return the loaned securities (to the extent the collateral is inadequate to replace the loaned securities) or failure to pay the Retirement System for income distributions by the securities' issuers while the securities are on loan. In addition, the Retirement System is indemnified against loss should the lending agent fail to demand adequate and appropriate collateral on a timely basis.

***Discretely Presented Component Units***

*GDB* – The following is selected information concerning securities sold under agreements to repurchase (expressed in thousands):

| | | |
|---|---|---|
| Carrying amount at June 30, 2014 | $ | 50,000 |
| Maximum amount outstanding at any month-end | | 1,236,413 |
| Average amount outstanding during the year | | 572,737 |
| Weighted average interest rate for the year | | 0.18% |
| Weighted average interest rate at year-end | | 0.03 |

The following summarizes the activity of securities sold under agreements to repurchase for the year ended June 30, 2014 (expressed in thousands):

| | Beginning balance | Issuances | Maturities | Ending balance | Within one year |
|---|---|---|---|---|---|
| GDB Operating Fund | $ 634,301 | 9,942,712 | (10,527,013) | 50,000 | 50,000 |

All sales of investments under agreements to repurchase are for fixed terms. In investing the proceeds of securities sold under agreements to repurchase, GDB's policy is for the term to maturity of investments to be on or before the maturity of the related repurchase agreements. As of June 30, 2014, the total amount of securities sold under agreements to repurchase mature within one year.

147 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*SIFC* – The Commonwealth statutes and the SIFC's board of directors' policies permit the SIFC to use its investments to enter into securities lending transactions, whereby securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, securities, and/or irrevocable bank letter of credit. The SIFC's securities custodian, JP Morgan Chase Bank, N.A., as agent of the SIFC, manages the securities lending program and receives cash collateral, securities, or irrevocable bank letters of credit as collateral. The collateral securities cannot be pledged or sold by the SIFC unless the borrower defaults. The collateral requirement is equal to 102% for securities issued in the United States of America and 105% for securities issued outside of the United States of America, of the fair value of the securities lent. Additional collateral has to be provided by the next business day if its fair value falls to less than 100% of the fair value of the securities lent. All security loans can be terminated on demand by either the SIFC or the borrower. In lending securities, the term to maturity of the securities loans is matched with the term to maturity of the investment of the cash collateral. Such matching existed at year-end. At year-end, the SIFC has no credit risk exposure to borrowers because the amounts the SIFC owes the borrowers exceed the amounts the borrowers owe SIFC. Contracts with the lending agents require them to indemnify the SIFC if the borrowers fail to return the securities (and if the collateral is inadequate to replace the securities lent) or fail to pay the SIFC for income distributions by the securities' issuers while the securities are on loan.

Securities lent as of June 30, 2014 had a fair value of $109.6 million and were secured with collateral received with a fair value of $112.1 million. Securities lent for which cash was received as collateral as of June 30, 2014 consist of the following (expressed in thousands):

| Description | | Fair value of underlying securities |
|---|---|---|
| Corporate bonds and notes | $ | 6,233 |
| Equity securities | | 76,366 |
| U.S. sponsored agencies bonds and notes | | 15,627 |
| U.S. Treasury notes and bonds | | 2,597 |
| | $ | 100,823 |

Cash collateral received as of June 30, 2014 amounted to $103.1 million and was invested as follows (expressed in thousands):

| Description | | Fair value of underlying securities |
|---|---|---|
| Resell agreements | $ | 49,605 |
| Commercial paper | | 2,999 |
| Certificates of deposit with other banks | | 50,503 |
| | $ | 103,107 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

In addition, the SIFC had the following lending obligations as of June 30, 2014 for which securities were received as collateral (expressed in thousands):

| Description | | Securities lent | Investment collateral received |
|---|---|---|---|
| | | **Fair value** | |
| U.S. Treasury bonds and notes | $ | 3,938 | 4,032 |
| Corporate bonds and notes | | 778 | 795 |
| U.S. sponsored agencies bonds and notes | | 4,052 | 4,169 |
| | $ | 8,768 | 8,996 |

*EDB* – EDB's investment policies, as authorized by Act number 22 of July 24, 1985, Article 3, allow management to sell securities under agreements to repurchase. The following table summarizes certain information on securities sold under agreements to repurchase (expressed in thousands):

| | | |
|---|---|---|
| Carrying amount at June 30, 2014 | $ | 45,690 |
| Average amount outstanding during the year | | 59,824 |
| Maximum amount outstanding at any month-end | | 75,750 |
| Weighted average interest rate for the year | | 1.07% |
| Weighted average interest rate at year-end | | 0.35 |

As of June 30, 2014, securities sold under agreements to repurchase were collateralized with mortgage-backed securities, other government agencies securities, and other investments with a fair market value of approximately $50 million.

The activity for securities sold under agreements to repurchase during 2014 was as follows (expressed in thousands):

| | | Beginning balance | Issuances | Maturities | Ending balance | Within one year |
|---|---|---|---|---|---|---|
| Securities sold under agreements to repurchase | $ | 76,200 | 248,690 | (279,200) | 45,690 | 45,690 |

**(7)   Receivables and Payables**

*Governmental and Proprietary Funds*

Receivables in the governmental funds include approximately $1.6 billion of accrued income, excise, and sales and use taxes. Intergovernmental receivables include approximately $541.4 million from the federal government and $56.3 million from CRIM. In addition, the proprietary funds include $63.7 million of unemployment, disability, and drivers' insurance premium receivables; and approximately $18.4 million receivable from private citizens, member institutions, and municipalities for patient services provided by the

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

PRMeSA. Payables in the governmental funds include approximately $1.3 billion of trade accounts due to suppliers for purchase of merchandise and services rendered, approximately $486 million of salary-related benefits owed to eligible police agents for annual salary increases, awards, and other monetary benefits granted to them through several laws dating back to 1954, and approximately $805 million of tax refunds payable.

In accordance with GASB Technical Bulletin No. 2004-1, *Tobacco Settlement Recognition and Financial Reporting Entity Issue*, as amended (the TB), a receivable of $42.2 million was recorded as other receivable in the government-wide financial statements and in the nonmajor governmental funds for estimated shipments from January 1 to June 30, 2014, which will be applied to debt service upon collection. Additionally, the TB indicated that the trust designated as the Tobacco Settlement Authority (the Children's Trust in the case of the Commonwealth) should recognize a liability for the bonds payable and an expense (and liability if unpaid) in the same period in its stand-alone financial statements. The expense (and liability if unpaid) recognizes the contractual obligation to remit the proceeds of the bond sold to the settling government (the Commonwealth). Since the Children's Trust is reported as a blended component unit, the TB indicates these remittances should be reported as transfers into the fund receiving the proceeds and transfers out in the fund that accounts for the activities of the Tobacco Settlement Authority. Since the Children's Trust has no contractual obligation, under its enabling legislation or elsewhere, to remit all bond proceeds or assets related to the Tobacco Settlement Authority to the settling government (the Commonwealth), the Children's Trust has not recognized an expense and liability for unpaid proceeds from the bonds since it records the expense as amounts are disbursed as grants to its settling government (including its instrumentalities) or third parties.

### *Pension Trust Funds*

Loans receivable from plan members are guaranteed by the contributions of plan members and by other sources, including mortgage deeds and any unrestricted amount remaining in the escrow funds. In addition, collections on loans receivable are received through payroll withholdings. For the year ended June 30, 2014, the maximum amount of loans to plan members for mortgage loans was $100,000, and $5,000 for personal and cultural trip loans. During the year ended June 30, 2014, personal loans with principal balances amounting to approximately $100 million, were sold to two financial institutions. As per servicing agreement, the ERS will be in charge of the servicing, administration and collection of loans and outstanding principal balances at the end of the closing date for a servicing fee of 2%.

The allowance for adjustments and losses in realization is considered a general allowance for all categories of loans and interest receivable, except mortgage loans, and also a specific allowance for the special collection project loans balances.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2014, the composition of loans and interest receivable from plan members is summarized as follows (expressed in thousands):

| | | |
|---|---|---:|
| Loans receivable from plan members: | | |
| Personal | $ | 634,630 |
| Mortgage | | 323,408 |
| Cultural trips | | 46,737 |
| Total loans to plan members | | 1,004,775 |
| Accrued interest receivable | | 40,060 |
| Total loans and interest receivable from plan members | | 1,044,835 |
| Less allowance for adjustments and losses in realization | | (4,370) |
| Total loans and interest receivable from plan members – net | $ | 1,040,465 |

As of June 30, 2014, accounts receivable from employers, included within accounts receivable in the accompanying statement of fiduciary net position, consisted of the following (expressed in thousands):

| | | |
|---|---|---:|
| Early retirement programs | $ | 3,790 |
| Employer contributions under special laws | | 104,572 |
| Employer and employee contributions | | 154,578 |
| Interest on late payments | | 15,994 |
| Total accounts receivable from employers | | 278,934 |
| Less allowance for doubtful accounts receivable | | (82,848) |
| Accounts receivable from employers – net | $ | 196,086 |

According to Act No. 447-1991, each employer must pay, on a monthly basis, the amounts corresponding to contributions and loan repayments, on or before the fifteenth day of the following month. After that date, interest is charged as established by the Pension Trust Fund.

The Commonwealth and many of its instrumentalities and municipalities, which are the employers as it relates to the ERS, have been facing significant fiscal and economic challenges. Further, in recent months, the rating downgrade and widening of credit spreads for Puerto Rico's public sector debt, including public corporations, has put further strain on liquidity and sources of funding of the employers. Consequently, most of the receivables from employers are delinquent past established payment dates and/or installment plan due dates. In other instances, amounts past due have continued to be renegotiated to later dates.

As of June 30, 2014, the ERS recorded an allowance of $82.8 million for adjustments and losses in realization related to the additional uniform contribution due from the Commonwealth because its collectibility is uncertain.

Although certain measures have been taken to improve the collection of such receivables, the timing of collections from employers affects the liquidity needs of the ERS. Management is of the opinion that, except for the additional uniform contribution of the Commonwealth of $82.8 million, other amounts due from

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

employers are collectible; however, this situation could ultimately affect the payment of benefits to members or repayment of the ERS's bonds payable, should any such amounts become uncollectible in the future.

As of June 30, 2014, accounts receivable from employers include amounts due from PRMeSA of approximately $30 million (recorded within the ERS), as follow (expressed in thousands):

| | | |
|---|---|---|
| Employer and employee contributions | $ | 14,087 |
| Interest | | 15,863 |
| Total accounts receivable from PRMeSA | $ | 29,950 |

On November 1, 2011, the PRMeSA and the ERS entered into a payment plan agreement (the Agreement) for the repayment of a debt amounting to approximately $15.3 million, at such date, corresponding to fiscal year 2010-2011. Beginning on November 15, 2011, the agreement calls for sixty (60) monthly installments of $255,677 bearing no interest. Default payments of less than one year in default will bear interest at 9% and 12% for those in excess of one year.

Future minimum payments for the next three fiscal years are approximately as follows: 2015- $3,068,000; 2016- $3,068,000; and 2017- $1,023,000.

***Discretely Presented Component Units – GDB***

At June 30, 2014, loans from GDB to public corporations and agencies of the Commonwealth (excluding municipalities) amounting to $6.2 billion are repayable from the following sources (expressed in thousands):

| | | **Amount** |
|---|---|---|
| Repayment source: | | |
| Proceeds from future bond issuances | $ | 2,276,522 |
| General fund and/or legislative appropriations | | 3,629,077 |
| Operating revenues | | 331,087 |
| Other | | 12,741 |
| Total | $ | 6,249,427 |

Since one of GDB's principal functions is to provide financing to the Commonwealth and its instrumentalities, GDB's loan portfolio includes loans to various departments and agencies of the Commonwealth, to various public corporations, and to municipalities, which represent a significant portion of GDB's assets. Loans to the Commonwealth and its departments and agencies typically include working capital lines of credit payable from short-term tax and revenue anticipation notes issued by the Commonwealth, interim financing of capital improvements payable from Commonwealth's general obligation bonds or revenue bonds issued by the corresponding agency and, in recent years, loans to finance the Commonwealth's budget deficit payable from COFINA, uncollected taxes and annual appropriations made by the Legislature of Puerto Rico.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

For the year ended June 30, 2014, disbursements and collections of principal of public sector loans with future bond issuances as the source of repayment amounted to approximately $1.7 billion and $2.5 billion, respectively. Public sector loans with Commonwealth's General fund and/or appropriations as source of repayment had disbursements and collections of principal amounting to approximately $65.9 million and $291.3 million, respectively during the year ended June 30, 2014. Public sector loans with operating revenue and other as source of repayment had disbursements and collections of principal amounting to approximately $280.4 million and $270.1 million, respectively during the year ended June 30, 2014.

At June 30, 2014, approximately $3.5 billion of the public sector loans are payable from legislative appropriations from, or future tax revenue of, the Commonwealth. Accordingly, the payment of these loans may be affected by budgetary constraints, the fiscal situation impacting Puerto Rico.

The Commonwealth's General Fund budget for fiscal year 2014 included $291.3 million of appropriations to repay principal and interest on public sector loans whose repayment source was either from future issuance of Commonwealth's general obligations or COFINA bonds and other legislative appropriations. GDB annually submits to the Office of Management and Budget (OMB), to be included in the Commonwealth's budget for legislative approval in each subsequent fiscal year, an amount established in the payment schedules, which are mostly based on a period of amortization of 30 years each, at contractual interest rates. During the 2014 fiscal year, Executive Order No. 2014-029 (the "EO") was signed by the Governor, issued and implemented.  The EO modified the debt service appropriation originally approved by the Legislature and thus modified the principal and/or interest payments actually received by GDB.  GDB received $30.1 million of appropriations of the initially approved $291.3 million.

As of June 30, 2014, the PRHTA had an authorized maximum of $2,015.9 million in financing with GDB with an outstanding balance of $2,014.1 million in principal. Historically, these facilities have been repaid from proceeds of bond issuances. All of these facilities have been extended repeatedly and have not been paid as scheduled. On December 1, 2015, the Commonwealth announced its intention to retain Commonwealth's taxes and revenues pledged to certain public corporations and agencies, including the Authority, pursuant to Article VI, Section 8 of the Puerto Rico Constitution. As such, there can be no assurance that the PRHTA management's current plans to repay or refinance the obligations or extend their terms will be achieved or that services will not have to be terminated, curtailed or modified.

PRHTA does not currently have sufficient funds available to fully repay its various obligations, including those owed to GDB, as they come due or that are currently in default, and is working on extending the due date of the obligations or obtaining new financing to provide relief and/or funds to repay the existing amounts of principal and interest or bring the outstanding balances current at the various due dates as well as to continue to operate and to finance capital improvement projects. Additionally, significant support and funding for obligations of the PRHTA has previously been provided by sources from the Commonwealth and other entities that are part of the Commonwealth, such as GDB. The Commonwealth and such entities are experiencing significant financial difficulties and are unable to continue to extend, refinance or otherwise provide the necessary liquidity to the PRHTA as and when needed. As such, current defaults may not be cured and future defaults on the obligations of this entity may not be avoided. The management of the PRHTA has plans to address its liquidity situation and continue its services and believes it will be able to repay or refinance its obligations and also continue to operate as a separate governmental entity. However, there can be no assurance that the Commonwealth will continue to provide adequate support, will continue

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

to allow the PRHTA to operate as a separate entity or that the affiliated or unaffiliated lenders will be able and willing to refinance or modify the terms of the entity's obligations.

As of June 30, 2014, all loans to public corporations and agencies totaling $6.1 billion were classified as non-accrual. Interest income that would have been recorded if such non-accrual loans had been accruing in accordance with their original terms was approximately $382.2 million in fiscal year 2014. Interest collected during fiscal year 2014 on these loans amounted to $272 million.

GDB considers the public sector loan portfolio as impaired based on current information and events, including the significant delays in the receipt of the scheduled debt service payment mentioned above. In management's opinion, it is highly probable that GDB will be unable to collect all amounts due according to the loan's original contractual terms. GDB's management used the results of the FEGP, specifically the set of cash flows and assumptions related to the forecast of the financing gaps for the next ten fiscal years for those entities within the FEGP, including the measures that could be implemented to reduce such gaps, to estimate the potential future debt service payments on its public sector loan portfolio including those payable from appropriations from the Legislature to establish an allowance for loans losses. Specifically, GDB established a general allowance for losses on these impaired loans based on management's estimate of the present value of expected debt service payments discounted at the loan's effective interest rate. GDB determined that as the ultimate source of repayment on this portfolio is the same, the general fund and/or appropriations from the Legislature, the allowance for loan losses was determined for the related loans on a collective basis instead of a loan by loan basis. To the extent the FEGP did not include specific entities, GDB then individually evaluated for impairment the outstanding loans corresponding to those entities.

The FEGP contains the plans and the administrative and legislative measures necessary to address the short, medium and long-term fiscal and economic challenges facing the Commonwealth and GDB, including measures to: (i) address the financing gaps and the debt load on the public sector, (ii) achieve the execution of its budgets, (iii) achieve greater transparency with respect to statistics and the government's financial information, and (iv) carry out the structural reforms necessary to promote the economic growth and competitiveness of the Commonwealth.

GDB's management used the results of the FEGP, specifically the set of cash flows and assumptions related to the forecast of the financing gaps for the next ten fiscal years for those entities within the FEGP, including the measures that could be implemented to reduce such gaps, to estimate the potential future debt service payments on its public sector loan portfolio including those payable from appropriations from the Legislature to establish an allowance for loans losses. GDB developed several possible cash flow scenarios, by stressing certain key assumptions within the FEGP, to determine the amounts available for future debt service payments to GDB.  For each of the scenarios, GDB determined the present value of the future debt service payments, discounted at the public sector portfolio's composite effective interest rate. Then, various probabilities were assigned to each of the scenarios to determine a range of possible loan losses to GDB. The allowance for loan losses was estimated by averaging these probabilities. GDB determined that as the ultimate source of repayment on this portfolio is the same, the general fund and/or appropriations from the Legislature, it treated the loans as homogenous to estimate the allowance for loan losses. To the extent the FEGP did not include specific entities, GDB then individually evaluated for impairment the outstanding loans corresponding to those entities. The impairment losses recognized for these specific loans were based on the same loss percentages allowance determined for the homogeneous loan portfolio as previously explained.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

During fiscal year 2014, GDB recognized a provision for loan losses of approximately $2.5 billion for inherent credit losses in its public sector loan portfolio.

Loans to municipalities amounted to approximately $2.2 billion at June 30, 2014. For the year ended June 30, 2014, municipal sector loan disbursements and collections amounted to approximately $165 million and $170 million, respectively. These loans include approximately $1.37 billion at June 30, 2014, which are collateralized by a pledge of a portion of property tax assessments of each municipality. Loans pledged with property tax assessments include bonds and notes issued by Puerto Rico municipalities which are originated by GDB as bridge financing until such financings can be completed. Loans to municipalities include approximately $581 million at June 30, 2014, which are collateralized by a pledge of a portion of the municipal sales tax, which is deposited in special accounts with GDB for the purpose of granting such loans to municipalities. The funds available in such accounts increase the borrowing capacity of the corresponding municipality. Loans to municipalities include approximately $260 million at June 30, 2014, which were provided mainly as interim loans to finance capital expenditures that are payable from revenues to be generated from a specific revenue generating project associated with the loan or to cover operating losses. Once operating loans are approved and if the municipality is not servicing the debt with its own funds, GDB informs the Municipal Revenue Collection Center (CRIM for its Spanish acronym) in order to withhold property taxes revenues and remit them directly to GDB before they are distributed to the municipalities. These loans include approximately $7 million which were previously payable from future issuances of the Commonwealth's general obligations and are currently payable from legislative appropriations. Municipality loans amounting to approximately $1.5 million as of June 30, 2014, were identified as delinquent. No interest was collected on these loans during the year ended June 30, 2014.

Loans to the private sector include the outstanding principal balance of credit facilities granted by GDB and its different subsidiaries to private enterprises in Puerto Rico, the activities of which are deemed to further the economic and tourism development of Puerto Rico. Loans to the private sector also include the outstanding principal balance of mortgage loans granted to low and moderate-income families for the acquisition of single-family housing units and to developers of low and moderate-income multifamily housing units in Puerto Rico. These credit facilities, net of allowance for loan losses, amounted to approximately $422 million at June 30, 2014, of which approximately $307 million are mortgage loans for low and moderate-income housing units, approximately $88 million are for tourism projects and approximately $27 million are manufacturing loans. Private sector loans classified as nonaccrual amounted to approximately $281 million at June 30, 2014. Interest income that would have been recorded if these loans had been performing in accordance with their original terms was approximately $15.8 million in 2014.

**(8)  Pledges of Receivables and Future Revenue**

**(a)  *COFINA Revenue***

Act 91-2006, as amended, establishes the Dedicated Sales Tax Fund, a special revenue fund held by COFINA. The Act requires that the greater of the following amounts be deposited in the Dedicated Sales Tax Fund each fiscal year for the payment of COFINA bonds: (i) a minimum fixed amount, referred to as the "Base Amount" and (ii) the revenue generated by up to 2.75% of the Commonwealth's sales and use tax. The Base Amount in fiscal year ended June 30, 2014 amounted to approximately $643.7 million. For fiscal year 2014, debt service paid by COFINA amounted approximately to $652.8 million.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(b)  *PRIFA Assigned Revenue*

The following revenue (collectively, the PRIFA Assigned Revenue) has been assigned by the Commonwealth to PRIFA and are pledged for the payment of certain of PRIFA's bonds and notes, subject to the provisions of Article VI, Section 8 of the Puerto Rico Constitution. As further discussed in notes 2 and 22, the PRIFA Assigned Revenues are currently being retained by the Commonwealth and redirected to the payment of the Commonwealth's general obligation bonds pursuant to Executive Order No. 46.

### Federal Excise Taxes

Rum manufactured in Puerto Rico is subject to federal excise taxes once exported to the United States.; however, the revenue generated by such excise taxes is returned by the IRS to the Commonwealth. Act No. 44 of June 21, 1988, as amended (the RIFA Act), requires that the first $117 million of certain federal excise taxes received by the Commonwealth be transferred to PRIFA, a blended component unit of the Commonwealth, each fiscal year. Such taxes consist of the federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States. PRIFA has pledged these taxes for the repayment of PRIFA's Special Tax Revenue Bonds. Receipt of the federal excise taxes securing the bonds is subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. The amount of federal excise taxes to be received by the Commonwealth is currently expected to decrease, although the exact amount cannot be determined. If the federal excise taxes received by the Commonwealth in any fiscal year are less than $117 million, the PRIFA Act requires that PRIFA request and the Director of the Commonwealth OMB include in the budget of the Commonwealth for the corresponding fiscal year, an appropriation sufficient to cover such deficiency. The Commonwealth's Legislative Assembly, however, is not required to make such appropriation. For the year ended June 30, 2014, of the total of $117 million received by PRIFA from the Commonwealth, a total of $113 million was pledged for the debt service of the Special Tax Revenue Bonds. For fiscal year 2014, debt service paid on Special Tax Revenue Bonds by PRIFA amounted to $115.4 million.

### Petroleum Products Tax

Recently, the PRIFA Act and the Puerto Rico Internal Revenue Code of 2011, as amended (the Puerto Rico Code) were amended by Act 1-2015, as amended, in order to impose a new petroleum products tax on nondiesel products ($6.25 initially) and to assign the revenue therefrom to PRIFA to secure the payment of certain of its bonds and notes.

(c)  *PRHTA Assigned Revenue*

The following revenues (collectively, the PRHTA Assigned Revenues) has been assigned by the Commonwealth to PRHTA, subject to the provisions of Article VI, Section 8 of the Puerto Rico Constitution. As further discussed in notes 2 and 22, the PRHTA Assigned Revenues are currently being retained by the Commonwealth pursuant to Article VI, Section 8 of the Puerto Rico Constitution.

### Gasoline and Gas Oil Taxes

The Puerto Rico Code currently imposes a $0.16 per gallon tax on gasoline and a $0.04 per gallon tax on gas oil and diesel oil. By law, the Commonwealth has assigned the entire $0.16 tax on gasoline and

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

$0.04 tax on gas oil and diesel oil to PRHTA as a source of revenue and has authorized PRHTA to pledge such amounts to the payment of the principal of and interest on its bonds.

### License Fees

Under Act 22-2000, as amended, known as the "Vehicle and Traffic Law," the Commonwealth imposes annual license fees on various classes of motor vehicles. Fifteen dollars ($15) of each such annual license fees were originally assigned to PRHTA to be used as a source of revenue. Act No. 30 of 2013 further assigned the remaining twenty-five dollars ($25) of each such annual license fees to PRHTA, and PRHTA has been authorized to pledge such revenue as security for the payment of debt service on obligations of PRHTA or any other legal purpose of PRHTA.

### Petroleum Products Tax

The Puerto Rico Code also allocates to PRHTA $9.50 per barrel or fraction thereof of petroleum products exercise tax (which include crude oil, unfinished oil, and derivative products) and authorizes PRHTA to pledge such amounts to the payment of principal and interest on its bonds. The tax is imposed on any petroleum product introduced, consumed, sold, or transferred in the Commonwealth.

### Cigarette Tax

A portion of the proceeds of the cigarette tax imposed by Section 3020.05 of the Puerto Rico Code (approximately $20 million) has been assigned to PRHTA and pledged for the payment of PRHTA outstanding loans with GDB.

(d) **_CCDA Assigned Revenue_**

Article 24 of Act No. 272-2003, as amended, imposes a hotel occupancy tax on all hotels and motel accommodations on the island (the Hotel Occupancy Tax). A portion of the proceeds of the Hotel Occupancy Tax (the CCDA Assigned Revenue) has been assigned to CCDA and pledged for the payment of CCDA's bonds, subject to the provisions of Article VI, Section 8 of the Puerto Rico Constitution. As further discussed in notes 2 and 22, the CCDA Assigned Revenues are currently being retained by the Commonwealth and redirected to the payment of the Commonwealth's general obligation bonds pursuant to Executive Order No. 46.

(e) **_PRMBA Assigned Revenue_**

A portion of the proceeds of the cigarette tax imposed by Section 3020.05 of the Puerto Rico Code (the PRMBA Assigned Revenue) has been assigned to PRMBA and pledged for the payment of certain PRMBA debt obligations, subject to the provisions of Article VI, Section 8 of the Puerto Rico Constitution. As further discussed in notes 2 and 22, the PRMBA Assigned Revenues are currently being retained by the Commonwealth and redirected to the payment of the Commonwealth's general obligation bonds pursuant to Executive Order No. 46.

(f) **_The Children's Trust Revenue_**

The Children's Trust is a public trust ascribed to GDB, created pursuant to Act No. 173-1999 (Act 173). Through Act 173, the Commonwealth assigned and transferred to the Children's Trust all of its rights, title, and interest in a settlement agreement entered into by and among the Commonwealth, 46

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

states and several cigarette manufacturers (the Tobacco Settlement Agreement), including the Commonwealth's right to receive certain annual payments from such cigarette manufacturers (the Pledged TSRs). The Pledged TSRs, otherwise deliverable to the General Fund, were assigned to the Children's Trust in consideration of the issuance of bonds by the Children's Trust and the application of the proceeds thereof to fund certain social programs.

**(9)   Interfund and Intraentity Activity**

Interfund receivables and payables at June 30, 2014 are summarized as follows (expressed in thousands):

| Receivable Fund | Payable Fund | | |
|---|---|---|---|
| Nonmajor governmental | COFINA debt service | $ | 203,654 |
| General | Lotteries | | 34,158 |
| Puerto Rico Medical Service Administration | General | | 22,036 |
| Nonmajor proprietary | General | | 19,588 |
| General | Unemployment insurance | | 10,832 |
| General | Other proprietary | | 5,281 |
| Nonmajor governmental | General | | 3,135 |
| Nonmajor governmental | Puerto Rico Medical Service Administration | | 2,394 |
| General | Nonmajor governmental | | 1,703 |
| | | $ | 302,781 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Transfers from (to) other funds for the year ended June 30, 2014 are summarized as follows (expressed in thousands):

| Transferee Fund | Transferor Fund | |
|---|---|---|
| General (a) | Debt service | $ 1,441,433 |
| Debt service (b) | General | 737,639 |
| Nonmajor governmental ( c ) | General | 612,174 |
| Nonmajor governmental (d) | Debt service | 454,639 |
| COFINA Special Revenue (e) | Debt service | 333,300 |
| General (f ) | Lotteries | 259,325 |
| General (g) | COFINA Special Revenue | 84,880 |
| Puerto Rico Medical Services Administration (h) | General | 50,534 |
| General (i) | Unemployment Insurance | 41,719 |
| COFINA Special Revenue (j) | COFINA debt service | 41,641 |
| General (k) | Nonmajor proprietary | 16,103 |
| Nonmajor governmental (l) | COFINA debt service | 13,754 |
| COFINA Debt Service (m) | Debt service | 9,066 |
| General (n) | Puerto Rico Medical Services Administration | 2,250 |
| Nonmajor proprietary (o) | General | 1,801 |
| General (p) | Nonmajor governmental | 956 |
| Puerto Rico Water Pollution Control Revolving Loan Fund (q) | General | 106 |
| | | $ 4,101,320 |

The principal purposes of the interfund transfers are to (expressed in thousands):

a.  Transfer of $1,441,433 from the debt service fund to the General Fund for the payment of principal and interests on notes payable.

b.  Transfer of $737,639 from the General Fund to the debt service fund to make funds available for debt service payments on general obligation bonds.

c.  Recognizes transfers of $416,701 for the rental payments made by the Commonwealth's agencies on properties leased by the PBA, a blended component unit of the Commonwealth; $72,130 related to the revenue received from the Tobacco Settlement Agreement managed by The Children's Trust, a blended component unit of the Commonwealth; $164 related to the SCPT for its operations; $123,044 to PRIFA for the payment of debt and capital projects and $135 to PRMSA for the payment of interests on appropriation debts.

d.  Transfer from the debt service fund to the Commonwealth capital project fund $(228,848); to PBA, a blended component unit of the Commonwealth $(193,079) and to SCPT $(32,712) for the payment of principal and interests on short-term bond anticipation notes (at the Commonwealth capital project fund) and notes payable (at PBA and SCPT).

e.  Transfer of $333,300 from the debt service fund to COFINA Special Revenue Fund for the repayment of principal on bond anticipation notes.

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

f.   Transfer of $259,325 from the Lotteries to the General Fund to distribute the increase in net assets of the Lotteries for the use of the General Fund, as required by the Lotteries enabling legislation.

g.   Transfer of $84,880 from the COFINA Special Revenue Fund to the General Fund to finance the General Fund's operational expenditures.

h.   Transfer of $50,534 from the General Fund to Puerto Rico Medical Service Administration, a major proprietary fund, to make funds available for debt service payments, capital projects, and operating expenses.

i.   Transfer of $41,719 from the Unemployment Insurance Fund related to the distribution of surplus cash corresponding to the General Fund for the payment of administrative expenses.

j.   Transfer of $41,641 from the COFINA Debt Service Fund to make funds available to the COFINA Special Revenue Fund for ultimate financing of certain General Fund's operational expenditures.

k.   Transfer from Disability Insurance Funds related to the distribution of surplus cash to the General Fund $(4,488) and from 9-1-1 Services $(11,615) to reimburse the General Fund for expenses assistance provided on emergency calls services.

l.   Transfer of $13,754 from the debt service fund to COFINA Debt Service Fund for the repayment of interests on bond anticipation notes.

m.   Recognize as transfers of $9,066, the interest income earned by PRIFA, a blended component unit, on its investment on bonds issued by COFINA, another blended component unit, where an interest expense is incurred by the same amount.

n.   Transfer of $2,250 from the PReMSA to the General Fund to make funds available for operating expenses.

o.   Transfer of $1,801 to provide local matching funds from the General Fund to the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, a nonmajor enterprise fund of the Commonwealth.

p.   Transfer of $956 from the Commonwealth's capital projects fund to the General Fund for public improvements in municipalities and corporations.

q.   Transfer of $106 to provide local matching funds from the General Fund to the Puerto Rico Water Pollution Control Revolving Fund, a major enterprise fund of the Commonwealth.

Interfund receivables and payables represent the pending settlements of the aforementioned transfers or transactions from current and prior years.

(Continued)

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Due to the Primary Government from component units are as follows (expressed in thousands):

| Payable entity | General fund | Nonmajor governmental Public Building Authority | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total due from component units |
|---|---|---|---|---|---|
| | | | Receivable entity | | |
| Major component units: | | | | | |
| Puerto Rico Aqueduct and Sewer Authority | $ — | — | 331,932 | 158,984 | 490,916 |
| Puerto Rico Health Insurance Administration | 7,239 | — | — | — | 7,239 |
| Puerto Rico Highway and Transportation Authority | 9,484 | — | — | — | 9,484 |
| Nonmajor component units: | | | | | |
| Cardiovascular Center Corporation of Puerto Rico and the Caribbean | — | 17,698 | — | | 17,698 |
| National Parks Company Puerto Rico | 13,322 | — | — | | 13,322 |
| Puerto Rico Land Administration | 1,151 | — | — | — | 1,151 |
| Puerto Rico and Municipal Island Maritime Transport Authority | 1,471 | — | — | — | 1,471 |
| Puerto Rico Metropolitan Bus Authority | 30,474 | — | — | | 30,474 |
| Puerto Rico Ports Authority | 37,483 | — | — | — | 37,483 |
| Puerto Rico Tourism Company | 2,583 | — | — | — | 2,583 |
| Subtotal due from component units | 103,207 | 17,698 | 331,932 | 158,984 | 611,821 |
| Allowance for uncollectible balances | (47,197) | — | — | — | (47,197) |
| | $ 56,010 | 17,698 | 331,932 | 158,984 | 564,624 |

The amount owed by PRASA of approximately $491 million represents construction loans granted by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, nonmajor proprietary funds, to finance the construction of capital assets for PRASA. PRASA has not made the required deposits under the debt agreement related to this debt (see note 2).

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Due to component units from the Primary Government are as follows (expressed in thousands):

| Receivable entity | General fund | Nonmajor governmental<br>Public Building Authority | Puerto Rico Medical Services Administration | Total due to component units | Allowance for uncollectible balance | Total due to component units |
|---|---|---|---|---|---|---|
| Major component units: | | | | | | |
| Puerto Rico Electric Power Authority | $   57,718 | 1,774 | 18,627 | 78,119 | (13,970) | 64,149 |
| Puerto Rico Aqueduct and Sewer Authority | 50,850 | — | 4,005 | 54,855 | (3,375) | 51,480 |
| University of Puerto Rico | 11,060 | — | 6,408 | 17,468 | — | 17,468 |
| Puerto Rico Highway and Transportation Authority | 34,641 | — | — | 34,641 | — | 34,641 |
| State Insurance Fund Corporation | — | — | 1,882 | 1,882 | — | 1,882 |
| Puerto Rico Health Insurance Administration | 30,020 | — | — | 30,020 | — | 30,020 |
| Nonmajor component units: | | | | | | |
| Agricultural Enterprises Development Administration | 46,061 | — | — | 46,061 | (24,576) | 21,485 |
| Solid Waste Authority | 1,130 | — | — | 1,130 | — | 1,130 |
| Land Authority of Puerto Rico | 11,603 | — | — | 11,603 | — | 11,603 |
| National Parks Company of Puerto Rico | 8,805 | — | — | 8,805 | — | 8,805 |
| Puerto Rico Metropolitan Bus Authority | 1,600 | — | — | 1,600 | — | 1,600 |
| Puerto Rico Ports Authority | 14,750 | — | — | 14,750 | (14,750) | — |
| Puerto Rico Council on Education | 5,183 | — | — | 5,183 | — | 5,183 |
| Total due to | $   273,421 | 1,774 | 30,922 | 306,117 | (56,671) | 249,446 |

The amount presented by the Primary Government as due to the University of Puerto Rico excludes approximately $5 million, which was recorded and presented by the Commonwealth as notes payable in the accompanying statement of net position of the Governmental Activities.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Due from (to) component units are as follows (expressed in thousands):

| | Major component units | | | | | | Nonmajor component units | | | | | | |
| Payable entity | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | State Insurance Fund Corporation | Farm Insurance Corporation of Puerto Rico | Land Authority of Puerto Rico | Puerto Rico Convention Center District Authority | Puerto Rico Land Administration | Puerto Rico Metropolitan Bus Authority | Puerto Rico Ports Authority | Total due to component units |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Major component units:** | | | | | | | | | | | | | |
| Puerto Rico Electric Power Authority | $ 40,406 | — | | 3,214 | — | — | — | — | — | — | — | — | 43,620 |
| University of Puerto Rico | 101,628 | — | 15,868 | 2,456 | — | — | — | — | — | — | — | — | 119,952 |
| Puerto Rico Aqueduct and Sewer Authority | 81,083 | — | 20,711 | | — | — | — | — | — | — | — | — | 101,794 |
| Puerto Rico Health Insurance Adm. | 183,251 | — | | | — | — | — | — | — | — | — | — | 183,251 |
| Puerto Rico Highways and Transportation Authority | 2,013,902 | — | 26,338 | — | — | — | — | — | — | — | 3,938 | 6,088 | 2,050,266 |
| **Nonmajor component units:** | | | | | | | | | | | | | |
| Puerto Rico Trade and Export Company | — | — | 1,442 | — | — | — | — | — | — | — | — | — | 1,442 |
| Puerto Rico Conservatory of Music Corporation | 1,114 | — | | — | — | — | — | — | — | — | — | — | 1,114 |
| Institute of Puerto Rican Culture | 3,291 | — | | | — | — | — | — | — | — | — | — | 3,291 |
| Farm Insurance Corporation of Puerto Rico | — | — | | — | — | — | 4,992 | — | — | — | — | — | 4,992 |
| Puerto Rico Metropolitan Bus Authority | — | — | 5,703 | — | — | 1,341 | — | — | — | — | — | — | 7,044 |
| Economic Development Bank for Puerto Rico | 8,923 | — | — | — | — | — | — | — | — | — | — | — | 8,923 |
| Puerto Rico Tourism Company | — | — | — | — | 5,219 | — | — | — | 4,471 | — | — | 1,515 | 11,205 |
| National Parks Company of Puerto Rico | 10,095 | — | 3,105 | — | — | — | — | — | — | — | — | — | 13,200 |
| Cardiovascular Center Corporation of Puerto Rico and the Caribbean | — | — | 17,279 | — | — | — | — | — | — | — | — | — | 17,279 |
| Company for the Integral Development of the "Peninsula de Cantera" | 34,875 | — | — | — | — | — | — | — | — | — | — | — | 34,875 |
| University of Puerto Rico Comprehensive Cancer Center | 28,185 | — | — | — | 4,844 | — | — | — | — | — | — | — | 33,029 |
| Puerto Rico and Municipal Islands Maritime Transport Authority | — | 31,621 | 1,661 | 1,654 | — | — | — | — | — | — | — | 38,545 | 73,481 |
| Land Authority of Puerto Rico | 34,409 | — | — | — | — | — | — | — | — | — | — | — | 34,409 |
| Solid Waste Authority | 71,012 | — | 5,629 | — | — | — | — | — | — | — | — | — | 76,641 |
| Puerto Rico Industrial Development Company | 87,325 | — | — | — | — | — | — | — | — | 1,306 | — | — | 88,631 |
| Agricultural Enterprises Development Administration | 100,968 | — | — | — | — | — | 8,065 | 8,229 | — | — | — | — | 117,262 |
| Puerto Rico Convention Center District Authority | 145,448 | — | 1,940 | — | — | — | — | — | — | — | — | — | 147,388 |
| Port of the Americas Authority | 226,564 | — | — | — | — | — | — | — | — | — | — | — | 226,564 |
| Puerto Rico Ports Authority | 262,974 | 1,833 | 24,760 | 12,868 | — | 1,117 | — | — | — | — | — | — | 303,552 |
| Subtotal due from component units | 3,435,453 | 33,454 | 124,436 | 20,192 | 10,063 | 2,458 | 8,065 | 13,221 | 4,471 | 1,306 | 3,938 | 46,148 | 3,703,205 |
| Allowance for uncollectible balances | (1,374,181) | (33,454) | (28,667) | (1,992) | — | — | (3,107) | — | — | — | — | (38,545) | (1,479,946) |
| Total due from component units | $ 2,061,272 | — | 95,769 | 18,200 | 10,063 | 2,458 | 4,958 | 13,221 | 4,471 | 1,306 | 3,938 | 7,603 | 2,223,259 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The amount due from component units presented by GDB of approximately $2.4 billion represents loan balances owed to GDB by other Commonwealth's component units. The rest of the loans receivable reported by the GDB consists of the following (expressed in thousands):

| | |
|---|---:|
| Primary government – governmental activities | $ 2,365,647 |
| Primary government – business-type activities | 278,292 |
| Other governmental entities and municipalities | 2,384,917 |
| Private sector, net of allowance for loan losses | 422,059 |
| Total loans receivable reported by GDB | 5,450,915 |
| Less allowance for public sector loans | (1,129,819) |
| | $ 4,321,096 |

The loans to the Primary Government are presented by the Commonwealth within notes payable in the statement of net position.

Expenses of the Primary Government include approximately $2.6 billion in capital and operational contributions made by the Primary Government to the component units as follows (expressed in thousands):

| | |
|---|---:|
| Puerto Rico Health Insurance Administration | $ 894,657 |
| University of Puerto Rico | 873,570 |
| Puerto Rico Highways and Transportation Authority | 440,725 |
| Puerto Rico Aqueduct and Sewer Authority | 5,856 |
| Nonmajor components units | 337,903 |
| Total contributions made by primary government to component units | $ 2,552,711 |

164

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

**(10)   Capital Assets**

Capital assets activity for the year ended June 30, 2014 is as follows (expressed in thousands):

*Primary Government*

|  | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Governmental activities: |  |  |  |  |
| Capital assets, not being depreciated: |  |  |  |  |
| Land | $ 909,748 | 1,803 | 253 | 911,298 |
| Construction in progress | 1,157,593 | 170,929 | 375,078 | 953,444 |
| Total capital assets, not being depreciated | 2,067,341 | 172,732 | 375,331 | 1,864,742 |
| Buildings and building improvements | 9,056,017 | 370,565 | 52,019 | 9,374,563 |
| Equipment, furniture, fixtures, vehicles, and software | 610,733 | 18,901 | 3,266 | 626,368 |
| Infrastructure | 605,846 | — | — | 605,846 |
| Total capital assets, being depreciated and amortized | 10,272,596 | 389,466 | 55,285 | 10,606,777 |
| Less accumulated depreciation and amortization for: |  |  |  |  |
| Buildings and building improvements | 3,472,600 | 249,657 | 24,770 | 3,697,487 |
| Equipment, furniture, fixtures, vehicles, and software | 429,214 | 37,097 | 1,200 | 465,111 |
| Infrastructure | 156,420 | 12,539 | — | 168,959 |
| Total accumulated depreciation and amortization | 4,058,234 | 299,293 | 25,970 | 4,331,557 |
| Total capital assets, being depreciated and amortized, net | 6,214,362 | 90,173 | 29,315 | 6,275,220 |
| Governmental activities capital assets, net | $ 8,281,703 | 262,905 | 404,646 | 8,139,962 |

165

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

| | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Business-type activities: | | | | |
| Capital assets, not being depreciated: | | | | |
| Land | $    6,872 | — | — | 6,872 |
| Building and building improvements | 97,022 | 7,948 | — | 104,970 |
| Equipment | 89,090 | 4,407 | 2,248 | 91,249 |
| Total capital assets being depreciated | 186,112 | 12,355 | 2,248 | 196,219 |
| Less accumulated depreciation and amortization for: | | | | |
| Building and building improvements | 62,858 | 1,735 | — | 64,593 |
| Equipment | 70,921 | 4,123 | 1,976 | 73,068 |
| Total accumulated depreciation and amortization | 133,779 | 5,858 | 1,976 | 137,661 |
| Total business-type activities capital assets, being depreciated, net | 52,333 | 6,497 | 272 | 58,558 |
| Total business-type activities capital assets, net | $    59,205 | 6,497 | 272 | 65,430 |

Depreciation and amortization expense was charged to functions/programs of the Primary Government for the year ended June 30, 2014 as follows (expressed in thousands):

| | | |
|---|---|---|
| Governmental activities: | | |
| General government | $ | 102,042 |
| Public safety | | 28,622 |
| Health | | 7,846 |
| Public housing and welfare | | 114,301 |
| Education | | 29,485 |
| Economic development | | 16,997 |
| Total depreciation and amortization expense – governmental activities | $ | 299,293 |

The Commonwealth annually performs an impairment analysis of its capital assets in accordance with the provisions of GASB Statement No. 42. The current year's analysis identified approximately $59.3 million

166                                                                    (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

of impairments, including $11.2 million of stoppage of construction projects, recognized in the statement of governmental activities for the year ended June 30, 2014.

General infrastructure assets include $427 million representing costs of assets transferred to the Department of Natural and Environmental Resources (DNER) of the Commonwealth (at cost) in 1997 upon completion of the Cerrillos Dam and Reservoir and the Portugues-River and Bucana-River Projects (the Cerrillos Dam and Reservoir Project) by the United States (U.S.) Army Corps of Engineers. These infrastructure assets are reported within Governmental Activities and include dams, intake facilities, and similar items built for flood control, water supply, and recreational purposes. The depreciation is computed using the straight-line method over an estimated useful life of 50 years from the transfer date of the property. Late in April 2011, the Commonwealth received a final debt agreement from the U.S. Army Corps of Engineers establishing a repayment schedule for its allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project, excluding those costs for items built for recreational purposes, amounting to $214 million. On March 21, 2014, the debt agreement with the U.S. Army Corps of Engineers was modified to reduce the interest rate and the annual payment for the remaining term of the debt. The Commonwealth's unpaid allocated share of these construction costs associated with the Cerrillos Dam and Reservoir Project amounted to $214 million at June 30, 2014. The Commonwealth also recorded a payable to the U.S. Army Corp of Engineers, amounting to approximately $15 million, for its estimated allocated share of the construction costs associated with the recreational part of the Cerrillos Dam and Reservoir Project, including accrued interest of approximately $5 million (see note 12(n)).

On February 24, 2012, PRIFA, a blended component unit, entered into an Assistance Agreement with the Puerto Rico Department of Justice (PRDOJ) and GDB to acquire, refurbish, and operate a property to be used for the relocation of the PRDOJ's main offices. In connection with the Assistance Agreement, GDB provided a $35 million credit facility to PRIFA to undertake the acquisition and administration of this property and manage the initial phase of the rehabilitation and refurbishment of the property. On March 8, 2012, PRIFA acquired the property for approximately $27 million. The credit facility is payable solely from, and secured by the assignment of the PRDOJ lease agreement and any other existing and future lease agreement and by a mortgage lien on the property acquired.

PRIFA has also issued certain bonds and notes to finance the construction of certain capital projects for the benefit of PRASA, municipalities and other agencies and instrumentalities of the Commonwealth. The capital projects include the construction of infrastructure and buildings to be used in the operations of, and managed by, PRASA, the municipalities and other agencies in their respective operations. The capital projects, including the land acquired, are included as part of PRIFA's capital assets until construction is completed and the conditions for transfers to the ultimate beneficiaries are met. During the year ended June 30, 2014, PRIFA incurred approximately $6.3 million in construction costs for the benefit of other instrumentalities of the Commonwealth.

In October 2010, PRIFA entered into a memorandum of understanding with PPPA, PBA, Puerto Rico Department of Education, Puerto Rico Department of Transportation and Public Works (DTPW), and GDB for the administration of the Schools for the 21st Century Program (the 21st Century Program). Construction in process at June 30, 2014 includes $97.2 million related to this program. The program consists of remodeling over 100 schools throughout Puerto Rico. To finance the program, the PBA issued government facilities revenue bonds in the amount of $878 million during the fiscal year ended June 30, 2012 of which $148 million are deposited in construction funds, within PBA's capital project fund, at June 30, 2014.

(Continued)

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

**Discretely Presented Component Units**

Capital assets activity for discretely presented component units for the year ended June 30, 2014 is as follows (expressed in thousands):

| Major component units | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Capital assets not being depreciated/ amortized: | | | | |
| Land | $ 2,245,782 | 28,816 | 82,581 | 2,192,017 |
| Construction in progress | 2,360,256 | 997,147 | 1,342,449 | 2,014,954 |
| Total capital assets not being depreciated/ amortized | 4,606,038 | 1,025,963 | 1,425,030 | 4,206,971 |
| Capital assets being depreciated/ amortized: | | | | |
| Buildings and building improvements | 2,506,568 | 400,094 | 26,679 | 2,879,983 |
| Equipment, furniture, fixtures, vehicles, and software | 10,690,430 | 128,117 | 20,359 | 10,798,188 |
| Infrastructure | 28,738,005 | 832,103 | 77,888 | 29,492,220 |
| Intangibles, other than software | 4,969 | — | — | 4,969 |
| Total capital assets, being depreciated/amortized | 41,939,972 | 1,360,314 | 124,926 | 43,175,360 |
| Less accumulated depreciation/ amortization for: | | | | |
| Buildings and building improvements | 1,317,895 | 378,450 | 20,725 | 1,675,620 |
| Equipment, furniture, fixtures, vehicles, and software | 2,333,985 | 75,336 | 13,500 | 2,395,821 |
| Infrastructure | 16,363,264 | 652,486 | 7,581 | 17,008,169 |
| Total accumulated depreciation/ amortization | 20,015,144 | 1,106,272 | 41,806 | 21,079,610 |
| Total capital assets, being depreciated/ amortized (net) | 21,924,828 | 254,042 | 83,120 | 22,095,750 |
| Capital assets (net) | $ 26,530,866 | 1,280,005 | 1,508,150 | 26,302,721 |

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

| Nonmajor component units | | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|---|
| Capital assets not being depreciated/ amortized: | | | | | |
| Land | $ | 1,074,816 | 10,010 | 17,383 | 1,067,443 |
| Art works | | 3,155 | — | — | 3,155 |
| Construction in progress | | 544,305 | 104,796 | 87,784 | 561,317 |
| Total capital assets not being depreciated/ amortized | | 1,622,276 | 114,806 | 105,167 | 1,631,915 |
| Capital assets being depreciated/ amortized: | | | | | |
| Buildings and building improvements | | 2,976,058 | 74,565 | 26,311 | 3,024,312 |
| Equipment, furniture, fixtures, vehicles, and software | | 630,603 | 7,248 | 10,524 | 627,327 |
| Infrastructure | | 598,962 | 13,345 | 3,228 | 609,079 |
| Intangibles, other than software | | 2,293 | — | — | 2,293 |
| Total capital assets, being depreciated/amortized | | 4,207,916 | 95,158 | 40,063 | 4,263,011 |
| Less accumulated depreciation/ amortization for: | | | | | |
| Buildings and building improvements | | 1,134,973 | 70,727 | 2,968 | 1,202,732 |
| Equipment, furniture, fixtures, vehicles, and software | | 469,758 | 25,169 | 6,339 | 488,588 |
| Infrastructure | | 359,879 | 12,172 | — | 372,051 |
| Intangibles, other than software | | 980 | 57 | — | 1,037 |
| Total accumulated depreciation/ amortization | | 1,965,590 | 108,125 | 9,307 | 2,064,408 |
| Total capital assets, being depreciated/ amortized (net) | | 2,242,326 | (12,967) | 30,756 | 2,198,603 |
| Capital assets (net) | $ | 3,864,602 | 101,839 | 135,923 | 3,830,518 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

**(11)   Short-Term Obligations**

Short-term obligations at June 30, 2014 and changes for the year then ended are as follows (expressed in thousands):

| | Balance at June 30, 2013 | Debt issued | Debt paid | Other increases | Other (decreases) | Balance at June 30, 2014 | Due within one year |
|---|---|---|---|---|---|---|---|
| Governmental activities: | | | | | | | |
| Notes payable to GDB | $ 186,710 | 1,367,455 | (1,269,819) | 28,790 | — | 313,136 | 313,136 |
| Tax revenue anticipation notes | — | 900,000 | (900,000) | — | — | — | — |
| Bond anticipation notes | 204,866 | 642,614 | (839,089) | — | — | 8,391 | 8,391 |
| | $ 391,576 | 2,910,069 | (3,008,908) | 28,790 | — | 321,527 | 321,527 |

(a)   *Notes Payable to GDB*

The Commonwealth has entered into various short-term line-of-credit agreements with GDB (all within Governmental Activities) consisting of the following at June 30, 2014 (expressed in thousands):

| Agency | Purpose | Interest rate | Line of credit | Outstanding balance |
|---|---|---|---|---|
| Department of the Treasury | To cover temporary cash deficiencies | 150 bp over prime rate | $ 300,000 | 200,000 |
| Department of the Treasury | To pay several central government agencies' debt | 125 bp over three months LIBOR | 100,000 | 69,342 |
| Department of the Treasury | To cover operational needs of catastrophic disaster funds | 125 bp over three months LIBOR | 37,388 | 27,737 |
| Department of the Treasury | To fund information technology project | 125 bp over GDB's commercial paper rate | 44,868 | 13,601 |
| Department of the Treasury | Purchase of mobile X-ray machines | 125 bp over three months LIBOR | 12,000 | 2,456 |
| | | | $ 494,256 | 313,136 |

Other increases include an increase of approximately $28.8 million in notes payable to GDB-short term, which were classified as long term at June 30, 2013, but which matured during fiscal year 2014 and became due and payable at June 30, 2014 and, consequently, is reported as a new short-term debt matured and payable in the balance sheet – governmental funds. At the same time, upon such debt becoming matured and payable, a principal payment recognition was recorded for the same amount in the statement of revenue, expenditures and changes in fund balances (deficit) - governmental funds and presented within the debt paid column in the previous table reducing the long-term note payable to the GDB.

(b)   *Tax Revenue Anticipation Notes*

Act No. 1 of the Legislature of the Commonwealth, approved on June 26, 1987 (Act No. 1), authorizes the Secretary of the Department of the Treasury to issue, from time to time, notes in anticipation of taxes and revenue (Tax Revenue Anticipation Notes or TRANS) so that the Secretary, in the cash flow management program designed to maximize the use of moneys in the General Fund, will have an alternate means of providing a liquidity mechanism to cover any temporary cash shortages projected for a fiscal year. Act No. 139, approved on November 9, 2005, amended Section 2(g) of Act No. 1 to

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

provide that the total principal amount of notes issued under the provisions of Act No. 1 and outstanding at any time for any fiscal year may not exceed the lesser of eighteen percent (18%) of the net revenue of the General Fund for the fiscal year preceding the fiscal year in which the notes are issued or one billion five hundred million dollars ($1.5 billion).

TRANS issued during fiscal year 2014 amounted to $900 million at interest rates ranging from 1.50% to 6.25%. TRANS proceeds were used to cover temporary cash deficiencies resulting from the timing differences between tax collections and the payments of current expenditures. TRANS were refinanced during the year in order to take advantage of interest rates. The maximum amount of TRANS outstanding at any time during the year was $900 million. As of June 30, 2014, the outstanding balance of TRANS was paid in full.

(c)   *Bond Anticipation Notes*

During fiscal year 2012, the Commonwealth was authorized to issue bond anticipation notes in an aggregate principal amount, not to exceed $290 million, in order to complete certain public improvement projects, acquire certain properties and equipment on behalf of some component units, and cover the cost and interest of the bonds expected to be issued, as described below. These notes were issued in anticipation of the issuance of public improvement bonds expected to be issued during fiscal year 2014 or thereafter. Although legal steps have been taken to refinance the anticipation notes with the bonds, since such bonds have not been issued as of the date of these basic financial statements, the related notes have been recognized as a short-term fund liability in the capital project fund. As of June 30, 2014, $8.4 million of bond anticipation notes were outstanding, all payable to GDB.

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

## (12) Long-Term Obligations

### (a) *Primary Government*

Long-term obligations at June 30, 2014 and changes for the year then ended are as follows (expressed in thousands):

| | Balance at June 30, 2013 (as restated) | Debt issued | Debt paid | Original issue discount | Debt refunded | Other increases | Other (decreases) | Balance at June 30, 2014 | Due within one year |
|---|---|---|---|---|---|---|---|---|---|
| **Governmental activities:** | | | | | | | | | |
| General obligation and revenue bonds | $ 35,433,304 | 3,500,000 | (1,169,925) | (245,000) | (460,840) | 353,732 | (57,066) | 37,354,205 | 522,400 |
| Commonwealth appropriation bonds | 571,945 | — | — | — | — | — | (709) | 571,236 | — |
| Notes payable to component units: | | | | | | | | | |
| GDB | 2,812,214 | 1,056,504 | (1,824,598) | — | — | — | — | 2,044,120 | — |
| Other | 11,920 | — | (6,920) | — | — | — | — | 5,000 | 5,000 |
| Liability under guaranteed obligation | 438,751 | — | — | — | — | 118,911 | (1,919) | 555,743 | 949 |
| Capital leases | 177,342 | — | (5,524) | — | — | — | — | 171,818 | 5,224 |
| Total bonds, notes, and capital leases payable | 39,445,476 | 4,556,504 | (3,006,967) | (245,000) | (460,840) | 472,643 | (59,694) | 40,702,122 | 533,573 |
| Net pension obligation | 13,072,665 | — | — | — | — | 2,433,989 | (915,172) | 14,591,482 | — |
| Other postemployment benefit obligation | 278,372 | — | — | — | — | 128,741 | (138,279) | 268,834 | — |
| Compensated absences | 1,530,318 | — | — | — | — | 663,212 | (774,764) | 1,418,766 | 833,235 |
| Voluntary termination benefits payable | 1,094,441 | — | — | — | — | 76,665 | (92,920) | 1,078,186 | 98,352 |
| Other long-term liabilities | 2,096,672 | — | — | — | — | 362,982 | (232,499) | 2,227,155 | 138,871 |
| Total governmental activities | 57,517,944 | 4,556,504 | (3,006,967) | (245,000) | (460,840) | 4,138,232 | (2,213,328) | 60,286,545 | 1,604,031 |
| **Business-type activities:** | | | | | | | | | |
| Notes payable to GDB | 273,344 | 4,948 | — | — | — | — | — | 278,292 | — |
| Other postemployment benefit obligation | 1,572 | — | — | — | — | 262 | — | 1,834 | — |
| Compensated absences | 17,997 | — | — | — | — | 102 | — | 18,099 | 2,199 |
| Obligation for unpaid lottery prizes | 176,192 | — | — | — | — | 590,525 | (580,160) | 186,557 | 55,343 |
| Voluntary termination benefits | 6,392 | — | — | — | — | 222 | (738) | 5,876 | 732 |
| Claims liability for insurance benefits | 69,386 | — | — | — | — | 274,602 | (280,327) | 63,661 | 63,661 |
| Other long-term liabilities | 21,483 | — | — | — | — | 15,016 | (3,749) | 32,750 | 25,859 |
| Total business-type activities | 566,366 | 4,948 | — | — | — | 880,729 | (864,974) | 587,069 | 147,794 |
| Total primary government | $ 58,084,310 | 4,561,452 | (3,006,967) | (245,000) | (460,840) | 5,018,961 | (3,078,302) | 60,873,614 | 1,751,825 |

As discussed in note 3, one of the restatements in the governmental activities was related to an investment of PRIFA in bonds issued by COFINA, which should have been eliminated for financial reporting as both PRIFA and COFINA are component units blended as governmental funds. Therefore, $189.9 million representing the principal balance at July 1, 2013 of the COFINA bonds issued to PRIFA was eliminated in order to effect such restatement.

As discussed in note 1(cc), the beginning balance of general obligation and revenue bonds and Commonwealth appropriation bonds was also restated due to the impact of the adoption of GASB Statement No. 65; where the beginning unamortized deferred refunding loss and/or gain on certain of such bonds, which had previously been reported as a deduction of debt, were reclassified as

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

a deferred outflow and/or inflows of resources. The amount of such reclassification amounted to approximately $372 million and $33.4 million increasing the beginning balance of general obligation bonds/revenue bonds and Commonwealth appropriation bonds, respectively. The composition of such unamortized deferred bond refunding losses and gains reclassified out of debt into the new deferred outflows/inflows of resources category at the beginning of the year and its corresponding balances at June 30, 2014 were as follows (expressed in thousands):

| Primary government entity/agency | | Deferred outflows (inflows) | |
|---|---|---|---|
| | | Beginning balance June 30, 2013 | Ending balance June 30, 2014 |
| General obligation and revenue bonds: | | | |
| Department of the Treasury | $ | 220,863 | 212,234 |
| PBA | | 125,151 | 116,376 |
| PRIFA | | 54,477 | 50,874 |
| COFINA | | 50,003 | 46,642 |
| The Children's Trust | | 27,491 | 24,527 |
| Total deferred outflows | | 477,985 | 450,653 |
| Department of the Treasury | | (968) | (829) |
| COFINA | | (104,997) | (102,617) |
| Total deferred inflows | | (105,965) | (103,446) |
| Net impact on general obligation and revenue bonds | $ | 372,020 | 347,207 |
| Commonwealth appropriation bonds: | | | |
| Department of the Treasury-Act 164 | $ | 19,846 | 17,880 |
| PRMSA | | 13,526 | 12,474 |
| Total deferred outflows | $ | 33,372 | 30,354 |
| Presentation in statement of net position at June 30, 2014: | | | |
| Deferred outflows of resources-deferred loss on bonds refunding | $ | — | 481,007 |
| Deferred inflows of resources-deferred gain on bonds refunding | | — | (103,446) |

Also as discussed in note 1(cc), the liability under guaranteed obligation was recorded upon adoption of GASB Statement No. 70 in relation to the Commonwealth's guaranty of certain PAA bonds and PRASA's USDA Rural Development Program Serial Bonds, which required the recording of a beginning balance in the amount of $438.8 million (see further information on these guarantees in note 13 (a)).

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The principal balance of general obligation and revenue bonds paid reported as expenditures in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds do not agree with amounts reported as debt paid in the table above because it includes principal paid on July 1, 2013 on general obligation and revenue bonds amounting to approximately $456.8 million, which was accrued at June 30, 2013 as a fund liability. Also, during fiscal year 2014 the amount of approximately $474 million of debt principal paid on July 1, 2014 was accrued as a fund liability at June 30, 2014, but not included as payments in the table above. The net effect of approximately $17.2 million is the difference between the principal paid on bonds, notes and capital leases payable included in the previous table and the principal shown as expenditures in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds.

The other decrease of $1.9 million in the liability under guaranteed obligation represents the payment by the Commonwealth under the PAA guaranty the aforementioned guaranty of the required debt service of certain PAA bonds for fiscal year 2014. Such payment is reflected as an economic development expenditure of the General Fund in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds. The remaining balance of the other increases (decreases) in bonds, notes, and capital leases payable consists of capitalization of interest on capital appreciation bonds (increases); additional bond financing by PAA and PRASA under the Commonwealth's guaranty (increases); and amortization of premiums (decreases) and accretion of discounts (increases) on bonds. These adjustments did not require any source or use of cash.

Compensated absences, net pension obligation, other postemployment benefit obligation, voluntary termination benefits, other long-term liabilities, obligation for unpaid lottery prizes, and claims liability for insurance benefits reflect other increases resulting from accrual adjustments for fiscal year 2014 to agree these obligations to their new estimated balances at June 30, 2014, and other decreases resulting from payments on these obligations made during fiscal year 2014. These payments, as pertaining to the Governmental Activities, are not included as principal payments in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds, but presented as expenses within their corresponding functions.

(b) **_Debt Limitation_**

The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth shall not be issued if the amounts of the principal of and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter internal revenue) in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee as long as the Commonwealth is in compliance with the 15% limitation at the time of issuance of such guaranteed debt. Internal revenue consists principally of income taxes, sales and use tax, property taxes, and excise taxes. Certain revenue, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

products and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the PRHTA, a discrete component unit, are not included as revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of sales and use tax allocated to COFINA is not included as internal revenues consistent with the legislation creating COFINA, which transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" under the constitutional provisions relating to the payment of debt service.

Act No. 97 of July 1, 2015 established the Puerto Rico Commission for the Comprehensive Audit of the Public Credit (the Commission) to provide transparency and citizen participation in the review of the Commonwealth's and its public corporations' aggregate debt. In June 2016, the Commission rendered a pre-audit survey report. Due to timing and funding constraints, the report was limited to a review of documentation produced by GDB associated with the two most recent debt issuances by the Commonwealth (the 2014 $3.5 billion general obligation bond offering and the 2015 tax and revenue anticipations notes). The report was preliminary but raise concerns about whether the Commonwealth complied with the following requirements: the Puerto Rico Constitution's balanced budget requirement by using debt to finance deficits; the Puerto Rico Constitution's debt limit; the Puerto Rico Constitution's prohibition against issuing notes lasting more than 30 years; among other requirements; and whether the Commonwealth and/or its advisors and underwriters complied with the applicable U.S. Securities and Exchange Commission (SEC) laws concerning disclosures. The report states that it does not purport to render a legal opinion of any sort but, rather, provide an overview of some of the laws against which the Commission should determine compliance.

The Commonwealth has stated that although it encourages an open and transparent process to review the Commonwealth's aggregate debt load, it has no reason to believe that any of the Commonwealth's debt was issued in violation of the Puerto Rico Constitution or any other applicable laws. The Commonwealth will monitor further activities of the Commission.

(c) **Bonds Payable**

The Constitution of the Commonwealth provides that public debt will constitute a first claim on the available revenue of the Commonwealth. Public debt includes general obligation bonds and debt guaranteed by the Commonwealth. The full faith, credit, and taxing power of the Commonwealth is irrevocably pledged for the prompt payment of the principal and interest of the general obligation bonds. On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Rehabilitation Act ("Act No. 21"). Among other objectives, Act No. 21 allows the Governor to declare a moratorium on debt service payments and to stay related creditor remedies for a temporary period for the Commonwealth and its component units. Refer to note 22.

Act No. 83 of August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exonerated from taxation. The levy is made by Municipal Revenue Collection Center (known as CRIM, its Spanish acronym), a municipal corporation, not a component unit of the Commonwealth. CRIM is required to remit the 1.03% of property tax collected to the Commonwealth to be used by the Commonwealth's debt service fund for payment of debt service on general obligation bonds. During the year ended June 30, 2014, the total

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

revenue and receivable reported by the Commonwealth amounted to approximately $119.3 million and $56.3 million, respectively, which are included in the debt service fund.

For financial reporting purposes, the outstanding amount of bonds represents the total principal amount outstanding, plus unamortized premiums and interest accreted on capital appreciation bonds, less unaccreted discount. Bonds payable outstanding at June 30, 2014, including accreted interest on capital appreciation bonds, are as follows (expressed in thousands):

| | General obligation bonds | Revenue bonds | Total |
|---|---|---|---|
| Term bonds payable through 2042; interest payable monthly or semiannually at rates varying from 0.13% to 6.50% | $ 8,269,588 | 8,218,820 | 16,488,408 |
| Serial bonds payable through 2042; interest payable monthly or semiannually at rates varying from 0.13% to 6.75% | 4,901,985 | 1,808,687 | 6,710,672 |
| Fixed rate bonds payable through 2057; interest payable at rates varying from 3.38% to 6.50% | — | 5,541,646 | 5,541,646 |
| Capital appreciation bonds payable through 2056; no interest rate, yield ranging from 3.75% to 7.48%. (1) | 183,395 | 5,192,620 | 5,376,015 |
| Special Tax Revenue Bonds payable through 2045; interest payable or accreted semiannually at rates varying from 4.00% to 5.50% | — | 1,822,032 | 1,822,032 |
| Mental Health Infrastructure Revenue Bonds payable through 2038; interest payable semiannually at rates varying from 5.60% to 6.50% | — | 37,100 | 37,100 |
| The Children's Trust Fund Tobacco Settlement asset-backed bonds payable through 2057; interest payable or accreted semiannually at rates varying from 4.25% to 8.38% | — | 1,409,087 | 1,409,087 |
| Capital Fund Program Bonds, maturing in various dates payable through 2025; interest payable semiannually at rates varying from 2.00% to 5.00% | — | 151,085 | 151,085 |
| LIBOR-Based Adjustable Rate Bonds due on August 1, 2057; interest payable quarterly (1.11% at June 30, 2014) | — | 136,000 | 136,000 |
| Total | 13,354,968 | 24,317,077 | 37,672,045 |
| Unamortized premium | 103,752 | 219,961 | 323,713 |
| Unamortized discount | (276,724) | (161,175) | (437,899) |
| Subtotal bonds payable | 13,181,996 | 24,375,863 | 37,557,859 |
| Elimination entry COFINA bonds issued to PRIFA | — | (203,654) | (203,654) |
| Total bonds payable | $ 13,181,996 | 24,172,209 | 37,354,205 |

(1)   Revenue bonds include $969 million capital appreciation bonds convertible to fixed rate interest bonds on August 1, 2031; August 1, 2032; and August 1, 2033.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2014, debt service requirements for general obligation and revenue bonds outstanding, including accreted interest of capital appreciation bonds are as follows (expressed in thousands):

| Year ending June 30 | Principal | Interest | Interest subsidy (1) | Total |
|---|---|---|---|---|
| 2015 | $ 522,400 | 1,701,968 | 3,835 | 2,228,203 |
| 2016 | 573,035 | 1,731,731 | 3,835 | 2,308,601 |
| 2017 | 626,390 | 1,703,801 | 3,835 | 2,334,026 |
| 2018 | 560,770 | 1,720,135 | 3,835 | 2,284,740 |
| 2019 | 524,885 | 1,727,260 | 3,835 | 2,255,980 |
| 2020–2024 | 3,463,801 | 8,311,698 | 19,173 | 11,794,672 |
| 2025–2029 | 6,099,745 | 7,584,478 | 19,173 | 13,703,396 |
| 2030–2034 | 7,740,303 | 5,483,731 | 19,173 | 13,243,207 |
| 2035–2039 | 9,265,900 | 3,453,384 | 19,173 | 12,738,457 |
| 2040–2044 | 10,538,095 | 1,286,800 | 12,462 | 11,837,357 |
| 2045–2049 | 6,865,065 | 341,818 | — | 7,206,883 |
| 2050–2054 | 5,525,061 | 313,365 | — | 5,838,426 |
| 2055–2059 | 13,087,730 | 211,862 | — | 13,299,592 |
| Total | 65,393,180 | $ 35,572,031 | 108,329 | 101,073,540 |
| Less unaccreted interest | (27,721,135) | | | |
| Plus unamortized premium, net | 323,713 | | | |
| Less unamortized discount | (437,899) | | | |
| Subtotal | 37,557,859 | | | |
| Elimination of COFINA bonds issued to PRIFA | (203,654) | | | |
| Total | $ 37,354,205 | | | |

(1)   Sales Tax Revenue Bonds, First Subordinate Series 2010D and 2010E were issued as Build America Bonds. COFINA will receive a subsidy payment from the federal government equal to 35% and 45%, respectively, of the amount of each interest payment. On June 24, 2013, the IRS sent notice that 8.7% of the subsidy payment on the Build America Bonds will be sequestered due to adjustments of the federal government budget.

On March 17, 2014, the Commonwealth sold $3.5 billion aggregate principal amount of its Series 2014 bonds. The proceeds of the Series 2014 bonds, net of issuance expenses of $36.8 million and original issue discount of $245 million, were used principally for the repayment of approximately $1.9 billion of outstanding GDB lines of credit to the Commonwealth and PBA and approximately $342 million of COFINA bond anticipation notes. The Commonwealth also used the proceeds from this issuance to advance refund approximately $461 million in general obligation bonds, pay for termination amounts under certain interest rate exchange agreements (approximately $90.4 million in interest rate swap termination payments) and to provide for a portion of the payment of interest on this issuance through July 1, 2016 (approximately $423 million). As a result of this issuance and the related advance refunding and interest rate swap termination, a refunding loss of approximately $10.8 million was recognized as a deferred outflow of resources in the statement of net position. Also, due to the

177                                                                              (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

advance refunding, the Commonwealth increased its total debt service requirements by $478 million, which resulted in an economic loss (difference between the present value of the debt service payments on the old and new debt) of $94.7 million.

The table that follows presents Governmental Activities debt service payments on certain revenue variable-rate bonds and the net payments on associated hedging derivative instruments (see note 20) as of June 30, 2014 (all pertaining to COFINA). Although interest rates on variable rate debt and the current reference rates of hedging derivative instruments change over time, the calculations included in the table below are based on the assumption that the variable rate and the current reference rates of hedging derivative instruments at June 30, 2014 will remain the same for their term.

| | Variable-rate bonds | | Hedging derivative instruments, net | Total |
| | Principal | Interest | | |
|---|---|---|---|---|
| | | (In thousands) | | |
| Year ending June 30: | | | | |
| 2015 | $              — | 1,481 | 5,210 | 6,691 |
| 2016 | — | 1,470 | 5,221 | 6,691 |
| 2017 | — | 1,470 | 5,221 | 6,691 |
| 2018 | — | 1,470 | 5,221 | 6,691 |
| 2019 | — | 1,470 | 5,221 | 6,691 |
| 2020–2024 | — | 7,350 | 26,106 | 33,456 |
| 2025–2029 | — | 7,350 | 26,106 | 33,456 |
| 2030–2034 | — | 7,350 | 26,106 | 33,456 |
| 2035–2039 | — | 7,350 | 26,106 | 33,456 |
| 2040–2044 | — | 7,350 | 26,106 | 33,456 |
| 2045–2049 | — | 7,350 | 26,106 | 33,456 |
| 2050–2054 | — | 7,350 | 26,106 | 33,456 |
| 2055–2058 | 136,000 | 6,616 | 23,495 | 166,111 |
| Total | $    136,000 | 65,427 | 232,331 | 433,758 |

COFINA's outstanding bonds are payable from amounts deposited in the Dedicated Sales Tax Fund in each fiscal year. The minimum amount to be deposited is the Pledged Sales Tax Base Amount, which for the fiscal year ended June 30, 2014, was approximately $643.7 million. The Pledged Sales Tax Base Amount increases each fiscal year thereafter at a statutory rate of 4% up to $1,850 million.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

At June 30, 2014, the Pledged Sales Tax Base Amount, by year, is as follows (expressed in thousands):

|  | | Amount |
|---|---|---|
| Year ending June 30: | | |
| 2015 | $ | 669,480 |
| 2016 | | 696,260 |
| 2017 | | 724,110 |
| 2018 | | 753,074 |
| 2019 | | 783,197 |
| 2020–2024 | | 4,411,731 |
| 2025–2029 | | 5,367,545 |
| 2030–2034 | | 6,530,439 |
| 2035–2039 | | 7,945,278 |
| 2040–2044 | | 9,184,725 |
| 2045–2049 | | 9,250,000 |
| 2050–2054 | | 9,250,000 |
| 2055–2059 | | 7,400,000 |
| Total | $ | 62,965,839 |

The Commonwealth's bonds payable are subject to arbitrage regulations issued by the Internal Revenue Service of the United States of America, that require rebate to the federal government of excess investments earnings on tax-exempt debt proceeds if the yield on those earnings exceeds the effective yield on the related tax-exempt debt issued. Excess earnings must be rebated every five years or upon maturity of the debt, whichever is earlier. Arbitrage calculations resulted in no liability as of June 30, 2014.

*Commonwealth's Department of Housing Partnership Agreement*

Vivienda Modernization 1, LLC (the LLC) is a limited liability company created under the laws of the Commonwealth whose sole member is Vivienda Modernization Holdings 1, S.E. (the Partnership), a civil partnership created under the laws of the Commonwealth and pursuant to a related Partnership Agreement. The Partnership was created on August 1, 2008 by the Department of Housing of the Commonwealth of Puerto Rico (DOH), in its capacity as the general partner (the General Partner) and Hudson SLP XL LLC, a Delaware limited liability company (the Special Limited Partner) and Hudson Housing Tax Credit Fund XL LP, a Delaware limited partnership (the Investment Partnership); (collectively the Limited Partners). The Partnership has been organized to acquire, develop, rehabilitate, own, maintain, and operate thirty-three residential rental housing developments intended for low and moderate income tenants. Profits, losses, and tax credits are allocated in accordance with the Partnership Agreement. Profits and losses from operations and low-income housing tax credits in any year shall be allocated 99.98% to the Investment Partnership, 0.01% to the Special Limited Partner, and 0.01% to the General Partner. As defined in the Partnership Agreement, certain transactions and occurrences warrant special allocations of profits and losses. All other losses shall be allocated to the extent allowable under Section 704(b) of the U.S. IRC.

Pursuant to the Partnership Agreement, the Limited Partners are required to provide capital contributions totaling approximately $235 million to the Partnership (Initial Projected Equity), subject

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

to potential adjustment based on the amount of low-income housing credits ultimately allocated to the developments in addition to other potential occurrences as more fully explained in the Partnership Agreement. As of June 30, 2014, the Limited Partners have provided capital contributions totaling approximately $126.6 million.

Pursuant to the Partnership Agreement, the General Partner is required to provide capital contributions totaling approximately $10 million to the Partnership. Should the Partnership have no sufficient funds available to pay the outstanding balance of the developer fee thereof, as defined, the General Partner shall be required to provide additional capital contributions to the Partnership in an amount sufficient for the Partnership to pay such balance in full. The General Partner shall have no right or obligation to make any other capital contributions. As of June 30, 2014, the General Partner had provided no capital contributions. In addition, the DOH as general partner shall establish the Assurance Reserve Fund at initial closing in the amount of the initial capital contribution less approximately $4 million (plus any initial capital contribution with respect to the apartment complexes). Amounts in the Assurance Reserve Fund shall be used, (i) upon the request of the General Partner, subject to the consent of the Special Limited Partner or (ii) upon the direction to the Special Limited Partner, to meet financial obligations of the General Partner, other than for excess development costs, as provided in the Partnership Agreement. As of June 30, 2014, such reserve was maintained in the Partnership.

On August 7, 2008, the LLC entered into a Master Developer Agreement with the DOH to perform services in connection with the development, rehabilitation, and modernization of certain housing projects (the Master Developer Agreement). Pursuant to the Master Developer Agreement, the DOH will earn a developer's fee in the amount of approximately $75.1 million for such services. Payment of the developer's fee shall be subject to the terms and conditions of Section 6(a) (i-iv) of the Master Developer Agreement. As of June 30, 2014, approximately $74.8 million were recorded within other accounts receivable in the General Fund related to the Master Development Agreement (including approximately $16.6 million related to the Assurance Reserve Fund).

Additionally, on August 7, 2008, the LLC and the DOH entered into a Purchase and Sales Agreement through which the LLC acquired the surface rights of a property (the Property) and the improvement erected on such property consisting of buildings and construction in progress with a net book value and cost of approximately $45.9 million and $110 million, respectively, from the DOH under those certain deeds of Constitution of Surface Rights and Transfer of Improvements dated August 7, 2008, which require the LLC to rehabilitate or construct on the Property four thousand one hundred thirty-two (4,132) residential rental units (the Units or collectively the Development) all of which will receive the benefit of an operating subsidy and benefit of low income housing tax credit under Section 42 of the Internal Revenue Code of 1986, as amended. Eighty-four (84) of the units, all of which will be located at the Brisas de Cayey II site, are to be newly constructed. The remaining units will be modernized.

Also, on August 7, 2008, the DOH entered into a loan agreement with the LLC in the amount of approximately $102.9 million for the acquisition of the 33 residential rental properties (the deferred purchase price note). The LLC shall make payments equal to the amount of net available capital contributions, as defined, for the preceding calendar quarter.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The following are the terms of the deferred purchase price note: commitment-$102,889,957; interest rate- 3.55%; and maturity date- later of (i) funding of the last installment of the capital contribution or (ii) August 7, 2013. The note shall be a full recourse liability of the LLC; however, none of the LLC's members has personal liability. As of June 30, 2014, the principal balance outstanding on the deferred purchase price note was approximately $8.8 million and accrued interest was approximately $883 thousand and were recorded within loans in the General Fund.

PHA has entered into an Interagency Agreement dated August 7, 2008 with the DOH, in DOH's capacity as general partner of the Partnership, to delegate management and operational duties related to the Development to PHA as set forth in the Interagency Agreement. The LLC and PHA also intend that the units be developed, operated, and managed so as to assure receipt by the LLC of the aforementioned economic and tax benefits to the full extent available to the LLC.

(d)   ***Commonwealth Appropriation Bonds***

Over the years, GDB, as fiscal agent and a bank for the Commonwealth, had extended lines of credit, advances, and loans to several agencies and component units of the Commonwealth in order to finance their capital improvement projects and to cover their operational deficits at the time. At different points in time, these loans were refunded through the issuance of Commonwealth appropriation bonds issued by the Puerto Rico Public Finance Corporation (PFC), a blended component unit of GDB, which serves only as a conduit for the issuance of the bonds. The Commonwealth has recognized a mirror effect of these refundings by PFC over the years in its own debt in proportion to the portion of the Commonwealth's notes included in such PFC refundings. Also, during more recent years, COFINA, through the issuance of bonds, has been used to repay certain other loans and existing appropriation bonds. COFINA is a blended component unit of the Commonwealth created in 2007 with the capacity to issue bonds to repay or refund advances from GDB, the appropriation bonds referred to above, and other debt obligations, collectively referred as the extra constitutional debt. There were no new activities of Commonwealth appropriation bonds during fiscal year 2014, other than the annual amortization of corresponding premiums and their related deferred inflows and outflows of resources in the form of deferred refunding gains and losses.

At June 30, 2014, the outstanding balance of the Commonwealth appropriation bonds pertaining to the Primary Government (i.e., excluding the balance pertaining to discretely presented component units), consists of the following obligations (expressed in thousands):

| | | |
|---|---|---|
| Act. No. 164 restructuring | $ | 439,542 |
| Puerto Rico Maritime Shipping Authority (PRMSA) | | 131,694 |
| Total Commonwealth appropriation bonds | $ | 571,236 |

**Act No. 164 Restructuring** – On December 17, 2001, Act No. 164 was approved, which authorized certain government agencies and discretely presented component units to refund approximately $2.4 billion of their outstanding obligations with GDB, for which no repayment source existed, over a period not exceeding 30 years, and to be repaid with annual Commonwealth appropriations not to exceed $225 million. This refunding was originally executed with Commonwealth appropriation bonds through several Series issued by PFC during the period between December 2001 and June 2002.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Subsequently, additional refundings (current and advance) and/or redemptions of Act No. 164 restructuring have been executed through PFC and COFINA bond issuances.

Approximately $439.5 million of the Commonwealth Appropriation bonds outstanding at June 30, 2014, belong to the Primary Government under Act No. 164, consisting of the Department of Health of the Commonwealth (health reform financing and other costs), the Department of the Treasury of the Commonwealth (originally the fiscal year 2001 deficit financing and the obligation assumed for defective tax liens), and the one attributed to PRIFA, a blended component unit of the Commonwealth. The outstanding balance of Commonwealth Appropriation bonds related to Act No. 164 bears interest at rates ranging from 3.10% to 6.50%. Debt service requirements in future years are as follows (expressed in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2015 | $ — | 22,443 | 22,443 |
| 2016 | 25,684 | 21,779 | 47,463 |
| 2017 | 20,836 | 21,048 | 41,884 |
| 2018 | 21,554 | 20,254 | 41,808 |
| 2019 | 22,361 | 19,374 | 41,735 |
| 2020–2024 | 107,035 | 81,529 | 188,564 |
| 2025–2029 | 181,258 | 55,830 | 237,088 |
| 2030–2034 | 57,507 | 3,206 | 60,713 |
| Total | 436,235 | $ 245,463 | 681,698 |
| Plus unamortized premium | 3,307 |  |  |
| Total | $ 439,542 |  |  |

**Puerto Rico Maritime Shipping Authority (PRMSA)** – A promissory note payable owed by PRMSA to GDB was assumed by the Commonwealth in connection with the sale of the maritime operations of PRMSA. Commonwealth appropriation bonds, 2003 Series B and 2004 Series B were issued to refund this liability, which were refunded most recently in June 2012 with the issuance of PFC 2012 Series A bonds. The bond balance bears interest at a variable rate ranging from 3.10% to 5.35%. Debt service requirements in future years are as follows (expressed in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2015 | $ — | 6,837 | 6,837 |
| 2016 | — | 6,837 | 6,837 |
| 2017 | — | 6,837 | 6,837 |
| 2018 | — | 6,837 | 6,837 |
| 2019 | — | 6,837 | 6,837 |
| 2020–2024 | 27,999 | 32,996 | 60,995 |
| 2025–2029 | 55,385 | 16,462 | 71,847 |
| 2030–2032 | 48,310 | 5,600 | 53,910 |
| Total | $ 131,694 | 89,243 | 220,937 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(e)   *Advance Refunding, Defeasance and Refunding of Commonwealth Bonds*

In prior years, the Commonwealth defeased certain general obligation and other bonds by placing the proceeds of the bonds in an irrevocable trust to provide for all future debt service payments on the refunded bonds. Accordingly, the trust's account assets and liabilities for the defeased bonds are not included in the basic financial statements. At June 30, 2014, approximately $455.2 million of bonds outstanding from prior years' advance refunding are considered defeased.

PBA, a blended component unit, has defeased certain revenue bonds in prior years by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payments on the old debts. Accordingly, the trust's account assets and liabilities for the defeased bonds are not included in the statement of net position. As of June 30, 2014, approximately $608.3 million of PBA's bonds are considered defeased.

During prior years, COFINA, a blended component unit, issued certain refunding bonds, the proceeds of which were placed in an irrevocable trust to provide for all future debt service payments on the refunded COFINA Series 2009A and 2009B bonds. The outstanding balance of the advance refunded bonds was $91.3 million at June 30, 2014.

(f)   *Notes Payable to GDB and Other Component Units*

*Governmental Activities*

The Commonwealth financed certain long-term liabilities through GDB and other component units, mostly within Governmental Activities. The outstanding balance at June 30, 2014 on the financing provided by GDB and other component units presented within notes payable in the statement of net position – Governmental Activities, comprises the following (expressed in thousands):

| | | |
|---|---|---:|
| GDB: | | |
| Department of the Treasury | $ | 722,178 |
| Special Communities Perpetual Trust | | 345,841 |
| Office of Management and Budget | | 229,529 |
| Public Buildings Authority | | 175,453 |
| Department of Education | | 106,308 |
| Department of Transportation and Public Works | | 81,080 |
| Correction Administration | | 72,575 |
| Department of Agriculture | | 65,079 |
| Department of Justice | | 49,846 |
| Department of Health | | 44,005 |
| Puerto Rico Infrastructure Financing Authority | | 48,948 |
| Police Department | | 31,679 |
| Department of Housing | | 26,007 |
| Office of the Superintendent of the Capitol | | 23,634 |
| Puerto Rico Court Administration Office | | 12,398 |
| Department of Recreation and Sports | | 9,268 |
| Office of Veterans' Affairs | | 292 |
| Notes payable to GDB | $ | 2,044,120 |
| Other components units: | | |
| Health facilities agreement payable to the UPR's Medical Sciences Campus | $ | 5,000 |
| Notes payable to other component units | $ | 5,000 |

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2014, the Department of the Treasury of the Commonwealth has entered into various lines of credit agreements with GDB amounting to approximately $3.3 billion for different purposes as presented in the following table. The purpose, interest rate, maturity date, and amount outstanding under each individual agreement at June 30, 2014 consist of the following (expressed in thousands):

| Purpose | Interest rate | Maturity | Lines of credit | Outstanding balance |
|---|---|---|---|---|
| To finance payroll and operational expenditures of the Commonwealth for fiscal year 2006 | 5.50% | June 30, 2036 | $ 741,000 | 170,515 |
| To pay lawsuits against the Commonwealth and to assign $15.3 million to Labor Development Administration for operational expenses | 6.00% | June 30, 2018 | 160,000 | 145,504 |
| Resources to meet appropriations in annual budget of the Commonwealth (fiscal year 2004) and federal programs expenditures | 125 bp over 3 month LIBOR | June 30, 2018 | 640,000 | 111,205 |
| To finance capital improvements projects of agencies and municipalities | 150 bp over GDB's commercial paper rate | June 30, 2019 | 130,000 | 83,548 |
| To finance capital improvements of several governmental agencies | 7.00% | June 30, 2018 | 105,000 | 68,834 |
| To fund monthly principal and interest deposits required for the 2013 debt service of the outstanding public improvement bonds and public improvement refunding bonds | 150 bp over PRIME, but not less than 6% | June 30, 2042 | 600,433 | 63,135 |
| To fund monthly principal and interest deposits required for the 2014 debt service of the outstanding public improvement bonds and public improvement refunding bonds | 6.00% | June 30, 2043 | 738,320 | 50,419 |
| Resources to cover the operational needs of the catastrophic disasters fund (fiscal year 2004) of the Puerto Rico Health Insurance Administration and the Department of the Family | 125 bp over 3 month LIBOR | September 30, 2015 | 42,542 | 14,806 |
| Acquisition of Salinas Correctional Facilities | 125 bp over 3 month LIBOR | June 30, 2018 | 15,000 | 7,141 |
| To pay invoices presented to the Treasury Department related to Act No.171 "Ley de Manejo de Neumátuicos" | 6.00% | June 30, 2019 | 22,100 | 5,083 |
| To finance certain capital improvement projects | 150 bp over PRIME, but not less than 6% | June 30, 2018 | 100,000 | 1,988 |
| Total | | | $ 3,294,395 | 722,178 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The outstanding balance of approximately $722.2 million is reported in the Governmental Activities within notes payable to GDB after one year. On February 27, 2014 and November 13, 2013, the Department of the Treasury entered into loan agreements with GDB for up to a maximum of $418.7 million and $92.5 million, respectively, as amended, for operational and public improvement bonds refinancing purposes. These loans, maturing on June 30, 2043 and bearing a 6%. interest rate with no balance outstanding at June 30, 2014, were fully drawn and repaid during fiscal year 2014.

On November 21, 2002, Resolution No. 1028 from the Legislature of the Commonwealth authorized GDB to provide a line-of-credit financing for $500 million to the Special Communities Perpetual Trust for the construction and rehabilitation of housing; construction and improvements of electric, water and sewage systems; repair and improvements of streets and sidewalks; construction and improvement of recreational facilities; and to encourage the attempts to develop initiatives for economic-auto-sufficiency for the residents of a selected group of displaced and economically disadvantaged communities, all encompassed within the Special Communities Program initiated with the creation of the Special Communities Perpetual Trust by Act No. 271 of November 21, 2002. This nonrevolving line of credit, originally for a ten-year term, was extended on June 30, 2012 to a maturity date of June 30, 2040. Effective October 2009, the interest rate on this line was set at 7%. Annual payments on the line are determined using a 30-year amortization table based on the principal and interest balance as of December 31 of each year, and a 4% interest penalty is carried on late payments. Legislative Resolution No. 1762 of September 18, 2004 established that the principal plus accrued interest of this line would be repaid from Commonwealth's appropriations as established by the Commonwealth OMB. The outstanding balance of this line at June 30, 2014 amounted to approximately $345.8 million.

On May 23, 2012, the Commonwealth OMB entered into a $100 million line-of-credit agreement with GDB to cover costs of the implementation of the third phase of Act No. 70 of 2010. Borrowings under this line of credit bear interest at prime rate plus 1.50% with a floor of 6%. The line of credit matures on July 31, 2027. As of June 30, 2014, approximately $81.1 million was outstanding. On June 5, 2006, the Commonwealth OMB entered into a $150 million line-of-credit agreement with GDB to provide economic assistance for disasters and emergencies. Borrowings under this line-of-credit agreement bear interest at variable rates based on 125 basis points over three month LIBOR and were payable upon the original maturity of the line-of-credit on September 30, 2011. On July 22, 2011, OMB and GDB amended the $150 million line-of-credit agreement to extend its maturity date to July 30, 2022. In addition, the agreement was converted to a revolving line of credit bearing interest at 150 basis points over prime rate, but in no event shall such rate be less than 6% per annum. As of June 30, 2014, approximately $148.4 million were outstanding.

On August 18, 2010, GDB provided to PBA with a nonrevolving credit facility in the maximum principal amount of approximately $93.6 million bearing interest at a fluctuating annual rate equal to Prime plus 1.50%, provided that such interest shall not be less than 6%, or at such other rate determined by GDB. The proceeds of the facility were used for construction projects development. The line is due on June 30, 2044 and payable from the proceeds of future revenue refunding bond issuance of PBA. As of June 30, 2014, approximately $48.2 million was outstanding. PBA also maintains a $75 million line-of-credit agreement with GDB for payment of operational expenses. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 7%, and are payable upon maturity on June 30, 2018. As of June 30, 2014, approximately $64.7 million was outstanding. In addition, on May 2, 2008, PBA

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

executed two Loan Agreements with GDB for the interim financing of its Capital Improvement Program in an amount not to exceed approximately $226 million, bearing interest at 6%. The loans and the accrued interest are due on June 30, 2044 and are payable from the proceeds of the future revenue refunding bond issuance of PBA. The loans are divided into approximately $209 million on a tax-exempt basis and approximately $16.9 million on a taxable basis. As of June 30, 2014, approximately $62.5 million remains outstanding.

On February 6, 2003, the Department of Education of the Commonwealth entered into a $25 million line-of-credit agreement with GDB for the purchase of equipment and for school improvements. Borrowings under this line-of-credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR, and are payable upon the maturity of the line-of-credit on June 30, 2018. As of June 30, 2014, approximately $4.6 million was outstanding. On August 4, 2002, the Department of Education of the Commonwealth entered into an additional $140 million line-of-credit agreement with GDB in order to reimburse the Department of the Treasury of the Commonwealth for payments made on their behalf for state funds used to fund federal program expenditures. Borrowings under this line-of-credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2014, approximately $101.7 million still remains outstanding related to this line of credit agreement. The line-of-credit is expected to be repaid upon collection of the federal grants.

The Department of Transportation and Public Works of the Commonwealth entered into five line-of-credit agreements with GDB amounting to $104 million for improvement and maintenance of roads around the island. Borrowings under these lines of credit bear interest at a 7% rate and are payable upon maturity of the line of credit on June 30, 2018. As of June 30, 2014, approximately $81.1 million was outstanding.

On May 12, 2004, the Correction Administration of the Commonwealth entered into a $60 million line-of-credit agreement with GDB for improvements to certain correctional facilities. Borrowings under this line-of-credit agreement bear interest at a fixed 7% rate and are payable upon the maturity of the line-of-credit on June 30, 2018. As of June 30, 2014, approximately $15.1 million was outstanding. In addition, on November 24, 2010, the Correction Administration of the Commonwealth entered into an $80 million line of credit agreement with GDB for the construction of a new correctional medical center. Borrowings under this line-of-credit agreement bear interest at a rate per annum equal to Prime Rate, plus 150 basis points, but in no event shall such rate be less than 6% per annum nor greater than 12% per annum and were payable originally upon the maturity of the line of credit on June 30, 2040. As of June 30, 2014, approximately $57.5 million was outstanding.

On August 9, 1999, the Department of Agriculture of the Commonwealth entered into a $125 million nonrevolving line-of-credit agreement with GDB to provide economic assistance to the agricultural sector, which sustained severe damages caused by Hurricane Georges in 1998. As of February 24, 2004, the line of credit increased by $50 million resulting in a total amount of $175 million. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2014, approximately $65.1 million were outstanding.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

On October 2, 2002, the Department of Justice of the Commonwealth entered into a $90 million line-of-credit agreement with GDB for the financing of 12 public improvement projects for the Municipality of Ponce pursuant to a court order. Borrowings under this line-of-credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on June 30, 2018. On August 8, 2005, the Department of Justice of the Commonwealth entered into an amended agreement to increase the aforementioned line of credit from $90 million to $110 million to cover various additional projects in Ponce, pursuant to the same court order. Borrowings under the new amended line of credit agreement bear interest at a 7% rate and are payable upon the maturity of the line of credit on June 30, 2018. As of June 30, 2014, the aggregated balance outstanding under this amended line-of-credit agreement amounted to $49.8 million.

In August 2003, the Department of Health of the Commonwealth entered into a $30 million line-of-credit agreement with GDB in order to repay certain outstanding debts that the PRMeSA had with other agencies and suppliers. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 7% and are payable upon maturity of the line of credit on June 30, 2040. As of June 30, 2014, approximately $21.3 million related to this line-of-credit agreement was outstanding. On November 8, 2004, the Department of Health entered into an additional $58.5 million line-of-credit agreement with GDB for the financing of a project of the Department of Health and PRMeSA. Borrowings under this line-of-credit agreement bear interest at variable rates based on 150 basis points over GDB's commercial paper rate and are payable upon the maturity of the line-of-credit on June 30, 2040. As of June 30, 2014, the outstanding balance of this line of credit agreement amounted to approximately $19.4 million. On February 14, 2008, the Department of Health also entered into an additional $8 million line-of-credit agreement with GDB to cover costs of treatment, diagnosis, and supplementary expenses during fiscal year 2008 in conformity with Act 150-1996. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and are payable upon maturity of the line-of-credit on June 30, 2040. As of June 30, 2014, the outstanding balance of this line of credit agreement amounted to approximately $3.3 million.

On February 18, 2005, PRIFA entered into a $40 million credit agreement with GDB for the construction of an auditorium for the Luis A. Ferré Fine Arts Center. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 7% and are payable upon maturity of the loan agreement on June 30, 2040. Principal and interest payments are being paid from Commonwealth's appropriations. As of June 30, 2014, approximately $4.7 million related to this credit agreement were outstanding. On June 1, 2009, PRIFA entered into an additional revolving line-of-credit agreement with GDB to provide financing for costs incurred by PRIFA under certain American Recovery and Reinvestment Act Programs (the ARRA programs). Borrowings under this line-of-credit agreement bear interest at variable rates based on 150 basis points over the prime rate and are payable upon the maturity of the line of credit on January 31, 2016. This line is being repaid from the cost reimbursements received from the federal government under the ARRA programs and Commonwealth's appropriations. As of June 30, 2014, the outstanding balance of this line of credit agreement amounted to approximately $6.8 million. On March 8, 2012, PRIFA also entered into an additional $35 million line-of-credit agreement with GDB for the acquisition, refurbishments, and maintenance of certain real estate property that will be subsequently leased to the Commonwealth's Department of Justice. This credit facility is secured by a mortgage lien on the property and is payable from future Commonwealth appropriations. Currently, the property is under refurbishment and has not

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

been occupied by the intended tenant. This line of credit matures on June 30, 2017 and bears interest at 150 basis points over the prime rate, with a minimum interest rate of 6%. As of June 30, 2014, the outstanding balance of this line-of-credit agreement amounted to approximately $37.4 million.

On July 29, 2004, the Police Department of the Commonwealth entered into a $48 million line-of-credit agreement with GDB for the acquisition of vehicles and high technology equipment. Borrowings under this line-of-credit agreement bear interest based on the All Inclusive Total Interest Cost of the Medium Term Notes, Series B, plus a markup of 1.25% and are payable upon the maturity of the line of credit on September 30, 2014. The outstanding balance of this line-of-credit agreement amounted to approximately $31.7 million at June 30, 2014.

On March 8, 2007, the Department of Housing of the Commonwealth entered into a $19 million line-of-credit agreement with GDB, to reimburse the Puerto Rico Housing Financing Authority, a blended component unit of GDB, for certain advances made for the Santurce Revitalization Project. Borrowings under this line-of-credit agreement bear interest at a variable rate of three-month LIBOR plus 1.25%, not to exceed 5% and are payable upon maturity of the line-of-credit on June 30, 2040. As of June 30, 2014, the line of credit has an outstanding balance of approximately $8.1 million. On December 3, 2007, the Department of Housing entered into an additional $30 million line-of-credit agreement with GDB for the purchase of Juan C. Cordero Dávila building. Borrowings under this line of credit agreement bear interest based on 75 basis points over three month LIBOR and are payable upon maturity of the line of credit on February 28, 2038. As of June 30, 2014, approximately $17.9 million related to this line-of-credit agreement was outstanding.

On February 15, 2002, the Office of the Superintendent of the Capitol entered into a $35 million line-of-credit agreement with GDB for the Office of the Superintendent of the Capitol parking's construction. Borrowings under this line-of-credit agreement bear interest at a fixed rate of 7% and are payable upon the maturity of the line-of-credit on June 30, 2040. As of June 30, 2014, approximately $15.5 million remained outstanding from the line of credit agreement. On February 9, 2012, the Office of the Superintendent of the Capitol entered into an additional $15 million line-of-credit agreement with GDB for permanent improvements of existing buildings. Borrowings under this line-of-credit agreement bear interest at 150 basis points over Prime Rate and shall not be less than 6% nor greater than 12% per annum and are payable upon maturity of the line of credit on June 30, 2018. As of June 30, 2014, approximately $8.1 million was outstanding.

On May 7, 2001, the Puerto Rico Court Administration Office (the Office) entered into a $49.4 million nonrevolving line-of-credit agreement with GDB for operating purposes. Borrowings under this line-of-credit agreement bear interest at a variable rate of three-month LIBOR plus 1%, not to exceed 8%. The Office must deposit $6 million a year, from the total fees collected on the filing of civil cases, in a special fund created by the Department of the Treasury of the Commonwealth, which is pledged for repayment until July 31, 2015. As of June 30, 2014, approximately $10.2 million remains outstanding. On February 27, 2014, the Office entered into an additional $50 million line-of-credit agreement with GDB for the development of several priority projects pursuant to its strategic plan and to fund additional operational commitments. Borrowings under this line-of-credit agreement bear interest at 150 basis points over Prime Rate and shall not be less than 6% nor greater than 12% per annum and are payable upon maturity of the line of credit on July 31, 2027. As of June 30, 2014, approximately $2.2 million was outstanding.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

On January 18, 2005, the Department of Recreation and Sports of the Commonwealth (DRS) entered into a $17.2 million line-of-credit agreement with GDB for the development of a series of recreational projects at different municipalities. Borrowings under this line-of-credit agreement bear interest based on 150 basis points over GDB's commercial paper rate and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2014, approximately $0.5 million was outstanding. Also, on February 9, 2004, DRS entered into a $16 million line-of-credit agreement with GDB for the development and improvement of recreational facilities. Borrowings under this line-of-credit agreement bear interest on the unpaid principal amount of each advance at a fixed rate of 7% and are payable upon the maturity of the line-of-credit on June 30, 2018. As of June 30, 2014, approximately $0.5 million was outstanding. An additional line of credit agreement was entered into between GDB and DRS in the maximum principal amount of $17.6 million bearing interest on the unpaid principal amount of each advance at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2018. The proceeds of the line of credit were used for development and improvement of recreational facilities. As of June 30, 2014, approximately $8.2 million was outstanding.

On February 14, 2012, the Office of Veterans' Affairs entered into a $7.5 million line-of-credit agreement with GDB for betterments to the Veterans' House in Juana Diaz and for phase I of the Veterans' Graveyard Construction. Borrowings under this line-of-credit agreement bear interest at a rate that will not be less than 6% nor greater than 12% per annum and are payable upon maturity of the line of credit on March 31, 2015. As of June 30, 2014, approximately $292 thousand was outstanding.

As of July 1, 1999, debts of approximately $102 million payable to UPR, a discretely presented component unit, in relation to outstanding noninterest bearing debt accumulated in prior years by Health Facility and Services Administration (HFSA) were transferred to the Commonwealth. On September 7, 2004, additional debts of approximately $71.2 million were also restructured and combined with the previous financing arrangement. The outstanding balance of approximately $1.9 million existing at June 30, 2013 under this arrangement was fully repaid during fiscal year 2014. The Commonwealth has also agreed to pay UPR $20 million related to Commonwealth legislative scholarships for fiscal years 2008 and 2009, which are payable in annual installments of $5 million. As of June 30, 2014, one last installment of $5 million remains outstanding and is presented within notes payable within governmental activities in the statement of net position.

*Business-Type Activities*

The Commonwealth has also financed a long-term liability through GDB within its Business-Type Activities, with a line-of-credit agreement to PRMeSA, a component unit that became blended effective July 1, 2012. On November 23, 2010, the Legislature of the Commonwealth approved a new article 9A to Act No. 66 of June 22, 1978, by which it authorized PRMeSA to incur on an obligation of up to $285 million to be deposited in a special GDB account and to be used for payment of debts to suppliers, agencies and a reserve fund for self-insurance of PRMeSA, and to provide operational liquidity to ease PRMeSA's fiscal situation. GDB was named fiscal agent to administer and monitor the use of these funds. The Commonwealth will honor the payment of this obligation with appropriations to be made every year until fiscal year 2023–2024. Borrowings under this line of credit agreement bear interest at variable rates based on 150 basis points over the prime rate. As of June 30, 2014, approximately $278.3 million was outstanding.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

With the exception of a few lines of credit having a defined source of repayment, the remaining lines of credit described above used Commonwealth appropriations as the source of repayment until June 30, 2007. Beginning in fiscal year 2008, these lines of credit were repaid or refunded with a combination of Commonwealth appropriations and COFINA under the restructuring mechanism provided by Act No. 164 as described in note 12(d).

(g) ***Obligations under Capital Lease Arrangements***

The Commonwealth is obligated under capital leases with third parties that expire through 2039 for land, buildings, and equipment.

The present value of future minimum capital lease payments at June 30, 2014 reported in the accompanying government-wide statement of net position is as follows (expressed in thousands):

| Year ending June 30: | | |
|---|---|---|
| 2015 | $ | 19,255 |
| 2016 | | 19,202 |
| 2017 | | 19,115 |
| 2018 | | 18,106 |
| 2019 | | 17,141 |
| 2020–2024 | | 85,707 |
| 2025–2029 | | 85,707 |
| 2030–2034 | | 53,959 |
| 2035–2039 | | 11,509 |
| Total future minimum lease payments | | 329,701 |
| Less amount representing interest costs | | (157,883) |
| Present value of minimum lease payments | $ | 171,818 |

Leased land, buildings, and equipment under capital leases included in capital assets at June 30, 2014, include the following (expressed in thousands):

| Land | $ | 7,960 |
|---|---|---|
| Buildings | | 254,886 |
| Equipment | | 4,215 |
| Subtotal | | 267,061 |
| Less accumulated amortization | | (70,195) |
| Total | $ | 196,866 |

Amortization applicable to capital leases and included within depreciation expense of capital assets amounted to approximately $6.3 million in 2014.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(h)   *Net Pension Obligation*

The amount reported as net pension obligation in the Governmental Activities of approximately $14.6 billion at June 30, 2014, represents the cumulative amount owed by the Commonwealth for the unfunded prior years' actuarially required pension contributions to the ERS, JRS, and TRS (collectively known as the pension plans) (see note 17).

(i)   *Other Postemployment Benefit Obligation*

The amount reported as other postemployment benefit obligation in the Governmental Activities and business-type activities of approximately $268.8 million and $1.8 million, respectively, at June 30, 2014 represents the cumulative amount owed by the Commonwealth for the unfunded prior years' actuarially required other postemployment benefit contributions to the ERS MIPC, JRS MIPC, and TRS MIPC (see note 18) in the case of Governmental Activities, and to other postemployment plans in the case of business-type activities.

(j)   *Compensated Absences*

Long-term liabilities include approximately $1.4 billion and $18.1 million of accrued compensated absences recorded as Governmental and Business-Type Activities, respectively, at June 30, 2014.

(k)   *Obligation for Unpaid Lottery Prizes*

The amount reported as unpaid lottery prizes represents the lottery prizes payable of the Lottery of Puerto Rico (commonly known as Traditional Lottery) and the Additional Lottery System (commonly known as Lotto) jointly known as the Lottery Systems at June 30, 2014. The minimum annual payments related to unpaid awards of both lotteries are as follows (expressed in thousands):

| | | Principal | Interest | Total |
|---|---|---|---|---|
| Year ending June 30: | | | | |
| 2015 | $ | 55,343 | 10,013 | 65,356 |
| 2016 | | 19,173 | 10,158 | 29,331 |
| 2017 | | 17,075 | 10,111 | 27,186 |
| 2018 | | 14,905 | 9,698 | 24,603 |
| 2019 | | 12,728 | 8,935 | 21,663 |
| 2020–2024 | | 42,051 | 34,361 | 76,412 |
| 2025–2029 | | 19,132 | 15,693 | 34,825 |
| 2030–2032 | | 6,150 | 5,168 | 11,318 |
| Total | $ | 186,557 | 104,137 | 290,694 |

The minimum annual payments related to unpaid awards of Lotto include an unclaimed prizes liability (not lapsed) of approximately $5.7 million at June 30, 2014, which is reported as prizes payable – current portion.

The liability for unpaid lottery prizes is reported in the accompanying statement of net position – business-type activities of the proprietary funds.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(l)   *Voluntary Termination Benefits Payable*

On July 2, 2010, the Commonwealth enacted Act No. 70 to establish a program that provides early retirement benefits or economic incentives for voluntary employment termination to eligible employees, as defined. Act No. 70 applies to agencies and component units whose budgets are funded in whole or in part by the General Fund.

Act No. 70 established that early retirement benefits (early retirement program) will be provided to eligible employees that have completed between 15 to 29 years of credited services in the Retirement System and will consist of biweekly benefits ranging from 37.5% to 50% of each employee's salary, as defined. Pursuant to Act No. 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Retirement System, as well as covering the annuity payments to the employees opting for the early retirement, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments.

Economic incentives are available to eligible employees who have less than 15 years of credited service in the Retirement System (incentivized resignation program) or who have at least 30 years of credited service in the Retirement System and the age for retirement or who have the age for retirement (incentivized retirement program). Economic incentives will consist of a lump-sum payment ranging from one month to six months' salary based on employment years.

Additionally, eligible employees that choose to participate in the early retirement program or in the incentivized resignation program are eligible to receive health plan coverage for up to 12 months in a health plan selected by management of the Commonwealth.

In addition, Act No. 70 allows certain component units of the Commonwealth that operate with their own resources to implement a similar program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. The benefits and the requirements are the same as provided by Act No. 70, except as follows: in the early retirement benefit program, the component unit will make the employee and the employer contributions to the Retirement System and pay the corresponding pension until the employee complies with the requirements of age and 30 years of credited service in the Retirement System; and in the incentivized retirement program, the component unit will make the employee and the employer contributions to the Retirement System for a five-year period.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The following table summarizes the financial impact resulting from the benefits granted to participants of Act No. 70 and similar programs in the government wide financial statements as of and for the year ended June 30, 2014 (expressed in thousands):

| | | Primary government | | |
|---|---|---|---|---|
| Accrued voluntary termination | Governmental activities | Business-type activities | Totals primary government | Component units |
| Benefits as of June 30, 2014: | | | | |
| Current liabilities | $ 98,352 | 732 | 99,084 | 25,920 |
| Noncurrent liabilities | 979,834 | 5,144 | 984,978 | 197,043 |
| Total | $ 1,078,186 | 5,876 | 1,084,062 | 222,963 |
| Expenses for the year ended June 30, 2014 | $ 76,665 | 223 | 76,888 | 35,035 |

At June 30, 2014, unpaid long-term benefits granted in Act No. 70 were discounted at interest rates that ranged from 0.63% to 2.77% at the Primary Government level and from 0.90% to 3.00% at the component units level.

As required by Act No. 70, the General Fund of the Commonwealth must appropriate on an annual basis funds necessary to cover the annual payments of Act No. 70 of certain components units. Discounted termination benefits payable of these component units amounted to approximately $85.5 million as of June 30, 2014.

(m) *Claims Liability for Insurance Benefits*

The Commonwealth provides unemployment compensation, occupational disability, and drivers' insurance coverage to public and private employees through various insurance programs administered by the Department of Labor and Human Resources of the Commonwealth. These insurance programs cover workers against unemployment, temporary disability, or death because of work or employment related accidents or because of illness suffered as consequence of their employment.

| | | Unemployment insurance | | Other nonmajor proprietary funds | | Totals | |
|---|---|---|---|---|---|---|---|
| | | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
| | | | | (In thousands) | | | |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ | 68,565 | 72,161 | 821 | 833 | 69,386 | 72,994 |
| Total incurred benefits | | 271,749 | 387,336 | 2,853 | 3,229 | 274,602 | 390,565 |
| Total benefit payments | | (277,399) | (390,932) | (2,928) | (3,241) | (280,327) | (394,173) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ | 62,915 | 68,565 | 746 | 821 | 63,661 | 69,386 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The Commonwealth establishes liabilities for incurred but unpaid benefits and benefit adjustment expenses based on the ultimate cost of settling the benefits. Insurance benefit claim liabilities are reevaluated periodically to take into consideration recently settled claims, the frequency of claims, and other economic and social factors. The liability for insurance benefits claims is reported as insurance benefits payable in the Business-Type Activities of the accompanying statement of net position – proprietary funds. The liability as of June 30, 2014, amounts to approximately $63.7 million.

(n)   ***Other Long-Term Liabilities***

The remaining long-term liabilities of Governmental Activities at June 30, 2014 include (expressed in thousands):

| | | |
|---|---|---:|
| Liability for legal claims and judgments (note 16) | $ | 1,826,727 |
| Liability to U.S. Army Corps of Engineers (note 10) | | 193,986 |
| Accrued Employees' Christmas bonus | | 94,652 |
| Liability for federal cost disallowances (note 16) | | 69,683 |
| Liability to the Puerto Rico System of Annuities and Pensions for Teachers | | 10,764 |
| Other | | 31,343 |
| Total | $ | 2,227,155 |

As described in note 10, the Commonwealth has a debt obligation with the U.S. Army Corps of Engineers in relation to its estimated allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project. Late in April 2011, the Commonwealth received a final debt agreement from the U.S. Army Corps of Engineers establishing a repayment schedule for its allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project, amounting to $214 million, excluding those costs for items built for recreational purposes. On October 10, 2012, the U.S. Army Corps of Engineers placed such debt into the U.S. Treasury Department Offset Program (the Offset Program). Upon placing this debt under the Offset Program, the U.S. Treasury Department withheld federal funding, otherwise directed to certain Commonwealth's agencies and instrumentalities recipients, in order to repay the aforementioned amount due on behalf of the U.S. Army Corps of Engineers. During the seven months' period ended in May 2013 (month in which the Offset Program was stopped), the Offset Program impacted certain federal programs by approximately $158 million. On March 21, 2014, the U.S. Army Corps of Engineers granted certain concessions on this obligation of the Commonwealth by forgiving the balance already due and payable in the amount of $35.4 million and approving a new payment plan proposed by the Secretary of the Treasury for the remaining debt obligation. This new payment plan reduced the interest rate from 6.063% to 1.50% and waived all cumulative penalty interest and fees, which reduced the annual payment from approximately $12.9 million to approximately $7.1 million for the remaining term of the debt. The new payment plan consists of 33 annual payments of $7,076,760, including interests, from June 7, 2014 until June 7, 2046. These concessions qualified as a troubled debt restructuring, where the total future cash payments specified by the new terms exceeded the carrying value of the old debt, including the accrued balance matured and payable of $35.4 million. Under such circumstances, the effects of the new terms are accounted for prospectively without modifying the carrying amount of the debt in the statement of net position. On the other hand, the balance forgiven that had been accrued as due and payable in the General Fund, was eliminated against other revenue,

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

to reflect the conversion of such matured debt into a long-term liability payable now under aforementioned new terms.

The unpaid allocated share of the construction costs associated with the Cerrillos Project amounted to approximately $179 million at June 30, 2014. Debt service requirements on this debt obligation at June 30, 2014 were as follows (expressed in thousands):

| Year(s) ending June 30: | | Principal | Interest | Total |
|---|---|---|---|---|
| 2015 | $ | 4,395 | 2,682 | 7,077 |
| 2016 | | 4,461 | 2,616 | 7,077 |
| 2017 | | 4,527 | 2,550 | 7,077 |
| 2018 | | 4,595 | 2,482 | 7,077 |
| 2019 | | 4,664 | 2,413 | 7,077 |
| 2020–2024 | | 24,392 | 10,992 | 35,384 |
| 2025–2029 | | 26,277 | 9,107 | 35,384 |
| 2030–2034 | | 28,308 | 7,076 | 35,384 |
| 2035–2039 | | 30,496 | 4,888 | 35,384 |
| 2040–2044 | | 32,853 | 2,531 | 35,384 |
| 2045–2049 | | 13,841 | 310 | 14,151 |
| Total | $ | 178,809 | 47,647 | 226,456 |

In addition, the Commonwealth has a debt obligation of approximately $15.2 million with the U.S. Army Corps of Engineers in relation to its estimated allocated share of the construction costs associated with the recreational part of the Cerrillos Dam and Reservoir Project, including accrued interest of approximately $5 million, at June 30, 2014. The final debt agreement with the U.S. Army Corps of Engineers for the recreational part of the Cerrillos Dam and Reservoir Project has not been finalized, and therefore, terms and conditions could differ from those estimated. The related debt is expected to be payable in annual installment payments over a 35-year period. However, the debt has been presented as a long-term payable after one year in the accompanying statement of net position since the commencement date of repayment has not yet been determined.

The remaining other long-term liabilities within business-type activities at June 30, 2014 are composed primarily of accrued pension costs and legal claims for approximately $30 million and $2.8 million, respectively, all corresponding to PRMeSA.

(o)   ***Fiduciary Funds***

On February 27, 2007, the ERS's administration and GDB, acting as the ERS's fiscal agent (the Fiscal Agent), presented to the board of trustees, a financial transaction for the issuance of pension funding bonds in order to reduce the ERS's unfunded actuarial accrued liability. The ERS authorized the issuance of one or more series of bonds (the ERS Bonds) in order to increase the funds available to pay pension benefits to certain of its beneficiaries and reduce its unfunded accrued actuarial pension liability. The ERS Bonds are limited, nonrecourse obligations of the ERS, payable solely from and secured solely by a pledge of employer contributions made after the date of issuance of the first series of the ERS Bonds, and from funds held on deposit with the Bank of New York Mellon (the Fiscal

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Agent). The ERS Bonds are not payable from contributions made to the ERS by participating employees, or from the assets acquired with the proceeds of the ERS Bonds, or from employer contributions released by the Fiscal Agent to the ERS after funding of required reserves, or from any other asset of the ERS. The ERS invested the proceeds of the ERS Bonds and used these investments and the earnings thereon to provide pension benefits to its beneficiaries.

On January 31, 2008, the ERS issued the first series of the ERS Bonds, which consisted of approximately $1,589 million aggregate principal amount of Senior Pension Funding Bonds, Series A (the Series A Bonds). On June 2, 2008, the ERS issued the second of such series of the ERS Bonds, which consisted of approximately $1,059 million aggregate principal amount of Senior Pension Funding Bonds, Series B (the Series B Bonds). Finally, on June 30, 2008, the ERS issued the third and final of such series of the ERS Bonds, which consisted of approximately $300 million aggregate principal amount of Senior Pension Funding Bonds, Series C (the Series C Bonds).

As of June 30, 2014, the outstanding principal balance of the ERS Bonds is as follows (expressed in thousands):

| Description | | |
| --- | --- | --- |
| Series A Bonds: | | |
| Capital Appreciation Bonds, maturing in 2028, bearing interest at 6.20% | $ | 66,657 |
| Term Bonds, maturing in 2023, bearing interest at 5.85% | | 200,000 |
| Term Bonds, maturing from 2031 through 2038, bearing interest at 6.15% | | 679,000 |
| Term Bonds, maturing from 2039 through 2042, bearing interest at 6.20% | | 332,770 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.45% | | 332,000 |
| Total Series A Bonds outstanding | | 1,610,427 |
| Series B Bonds: | | |
| Capital Appreciation Bonds, maturing from 2028 through 2030, bearing interest at 6.40% | | 207,034 |
| Capital Appreciation Bonds, maturing from 2031 through 2034, bearing interest at 6.45% | | 149,353 |
| Term Bonds, maturing in 2031, bearing interest at 6.25% | | 117,100 |
| Term Bonds, maturing from 2036 through 2039, bearing interest at 6.30% | | 270,000 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.55% | | 429,000 |
| Total Series B Bonds outstanding | | 1,172,487 |
| Series C Bonds: | | |
| Capital Appreciation Bonds, maturing in 2030, bearing interest at 6.50% | | 3,235 |
| Term Bonds, maturing in 2028, bearing interest at 6.15% | | 110,000 |
| Term Bonds, maturing in 2038, bearing interest at 6.25% | | 45,000 |
| Term Bonds, maturing in 2043, bearing interest at 6.30% | | 143,000 |
| Total Series C Bonds outstanding | | 301,235 |
| Total bonds outstanding | | 3,084,149 |
| Less bonds discount | | (6,562) |
| Bonds payable – net | $ | 3,077,587 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

**Series A Bonds** – The aggregate principal amount of the Series A Bonds issued amounted to approximately $1,589 million of which $1,544 million were issued as term bonds (the Series A Term Bonds) and $45 million were issued as capital appreciation bonds (the Series A Capital Appreciation Bonds). Interest on the Series A Term Bonds is payable monthly on the first day of each month. Interest on the Series A Capital Appreciation Bonds is not payable on a current basis, but is added to the principal of the Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The Series A Bonds are subject to redemption at the option of the ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series A Capital Appreciation Bonds, the accreted amount) of the Series A Bonds, plus accrued interest to the redemption date, and without premium.

In addition, the following Series A Term Bonds are subject to mandatory redemption in part commencing on July 1, 2021 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (expressed in thousands):

| Redemption period | Subject bonds | Amount |
|---|---|---|
| July 1, 2021 | Term bonds maturing July 1, 2023 | $      50,000 |
| July 1, 2022 | Term bonds maturing July 1, 2023 | 70,000 |
| July 1, 2023 | Term bonds maturing July 1, 2023 | 80,000 |
| Subtotal | | 200,000 |
| July 1, 2034 | Term bonds maturing July 1, 2038 | 133,500 |
| July 1, 2035 | Term bonds maturing July 1, 2038 | 133,500 |
| July 1, 2036 | Term bonds maturing July 1, 2038 | 133,500 |
| July 1, 2037 | Term bonds maturing July 1, 2038 | 133,500 |
| July 1, 2038 | Term bonds maturing July 1, 2038 | 133,500 |
| Subtotal | | 667,500 |
| Total | | $     867,500 |

**Series B Bonds** – The aggregate principal amount of the Series B Bonds amounted to approximately $1,059 million of which $816 million were issued as term bonds (the Series B Term Bonds) and $243 million were issued as capital appreciation bonds (the Series B Capital Appreciation Bonds). Interest on the Series B Term Bonds is payable monthly on the first day of each month. Interest on the Series B Capital Appreciation Bonds is not payable on a current basis, but is added to the principal of the Series B Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The Series B Bonds are subject to redemption at the option of the ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series B Capital Appreciation Bonds, the accreted amount) of the Series B Bonds, plus accrued interest to the redemption date, and without premium.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

**Series C Bonds** – The aggregate principal amount of the Series C Bonds amounted to approximately $300 million of which $298 million were issued as term bonds (the Series C Term Bonds) and $2 million were issued as capital appreciation bonds (the Series C Capital Appreciation Bonds). Interest on the Series C Term Bonds is payable monthly on the first day of each month. Interest on the Series C Capital Appreciation Bonds is not payable on a current basis, but are added to the principal of the Series C Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The Series C Bonds are subject to redemption at the option of the ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series C Capital Appreciation Bonds, the accreted amount) of the Series C Bonds, plus accrued interest to the redemption date, and without premium.

In addition, the following Series C Term Bonds are subject to mandatory redemption in part commencing on July 1, 2024 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (expressed in thousands):

| Redemption period | Subject bonds | Amount |
|---|---|---|
| July 1, 2024 | Term bonds maturing July 1, 2028 | $ 18,700 |
| July 1, 2025 | Term bonds maturing July 1, 2028 | 22,000 |
| July 1, 2026 | Term bonds maturing July 1, 2028 | 29,150 |
| July 1, 2027 | Term bonds maturing July 1, 2028 | 36,300 |
| July 1, 2028 | Term bonds maturing July 1, 2028 | 3,850 |
| | Subtotal | 110,000 |
| July 1, 2029 | Term bonds maturing July 1, 2038 | 100 |
| July 1, 2030 | Term bonds maturing July 1, 2038 | 540 |
| July 1, 2031 | Term bonds maturing July 1, 2038 | 100 |
| July 1, 2032 | Term bonds maturing July 1, 2038 | 3,420 |
| July 1, 2033 | Term bonds maturing July 1, 2038 | 4,320 |
| July 1, 2034 | Term bonds maturing July 1, 2038 | 100 |
| July 1, 2035 | Term bonds maturing July 1, 2038 | 11,940 |
| July 1, 2036 | Term bonds maturing July 1, 2038 | 2,160 |
| July 1, 2037 | Term bonds maturing July 1, 2038 | 7,920 |
| July 1, 2038 | Term bonds maturing July 1, 2038 | 14,400 |
| | Subtotal | 45,000 |
| July 1, 2039 | Term bonds maturing July 1, 2043 | 28,600 |
| July 1, 2040 | Term bonds maturing July 1, 2043 | 28,600 |
| July 1, 2041 | Term bonds maturing July 1, 2043 | 28,600 |
| July 1, 2042 | Term bonds maturing July 1, 2043 | 28,600 |
| July 1, 2043 | Term bonds maturing July 1, 2043 | 28,600 |
| | Subtotal | 143,000 |
| | Total | $ 298,000 |

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The ERS complied with the sinking fund requirements at June 30, 2014. Debt service requirements in future years on the ERS bonds as of June 30, 2014 are as follows (expressed in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year(s) ending June 30: | | | |
| 2015 | $          — | 166,519 | 166,519 |
| 2016 | — | 166,519 | 166,519 |
| 2017 | — | 166,519 | 166,519 |
| 2018 | — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2020–2024 | 200,000 | 811,924 | 1,011,924 |
| 2025–2029 | 387,250 | 753,416 | 1,140,666 |
| 2030–2034 | 904,490 | 716,791 | 1,621,281 |
| 2035–2039 | 1,045,100 | 548,184 | 1,593,284 |
| 2040–2044 | 543,270 | 285,615 | 828,885 |
| 2045–2049 | — | 247,568 | 247,568 |
| 2050–2054 | — | 247,568 | 247,568 |
| 2055–2059 | 761,000 | 131,562 | 892,562 |
| | 3,841,110 | $   4,575,223 | 8,416,333 |
| Less unaccreted interest | (756,961) | | |
| Less unamortized discount | (6,562) | | |
| Total | $   3,077,587 | | |

**Pledge of Employer Contributions Pursuant to Security Agreement** – The ERS entered into a Security Agreement with the Fiscal Agent for the benefit of the bondholders, pursuant to which the ERS pledged to the Fiscal Agent, and granted the Fiscal Agent a security interest in employer contributions made after January 31, 2008, which was the date of issuance of the first series of bonds, and the funds on deposit with the Fiscal Agent under the various accounts established under the Pension Funding Bond Resolution (the Resolution).

The Resolution and the Security Agreement constitute a contract between the ERS and the Fiscal Agent, on behalf of owners of the bonds. The pledge, covenants, and agreements of the ERS set forth in the Resolution and the Security Agreement shall be for the equal benefit, protection, and security of the owners of the bonds, regardless of time or times of their issuance or maturity, and shall be of equal rank, without preference, priority, or distinction of any of the bonds over any other bond, except as expressly provided in or permitted by the Resolution. Annual employer contributions that are made after January 31, 2008, which was the date of issuance of the first Series of bonds, in accordance with the Act and amounts on deposit in the different accounts created pursuant to the Resolution for the benefits of the owners of the bonds, are pledged for annual debt service requirements as established. The pledge is irrevocable so long as any bonds are outstanding under the terms of the Resolution.

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(p)  *Discretely Presented Component Units*

Notes, bonds, and appropriation bonds payable are those liabilities that are paid out of the component units' own resources. These obligations do not constitute a liability or debt of the Primary Government.

The outstanding balance of notes payable at June 30, 2014 is as follows (expressed in thousands):

| Component unit | Interest rates | Maturity through | Balance at June 30, 2013 (as restated) | Additions | Reductions | Balance at June 30, 2014 | Due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Government Development | | | | | | | |
| Bank for Puerto Rico | 3.375%–8.00% | 2042 | $ 4,840,739 | 110,000 | 423,548 | 4,527,191 | 209,575 |
| Puerto Rico Highways and | | | | | | | |
| Transportation Authority | 8.75% | 2016 | — | 400,000 | — | 400,000 | 150,000 |
| Puerto Rico Electric Power | | | | | | | |
| Authority | 3.25%–7.25% | 2018 | 762,216 | 701,597 | 754,922 | 708,891 | 698,029 |
| Puerto Rico Aqueduct and | | | | | | | |
| Sewer Authority | 6.98% | 2015 | — | 200,000 | — | 200,000 | 200,000 |
| University of Puerto Rico | 4.00% | 2017 | 2,273 | — | 851 | 1,422 | 514 |
| State Insurance Fund | | | | | | | |
| Corporation | Variable | 2028 | 275,162 | — | 21,475 | 253,687 | 21,426 |
| Puerto Rico Health Insurance | | | | | | | |
| Administration | 3.00% | 2015 | — | 82,999 | — | 82,999 | 82,999 |
| Nonmajor component units: | | | | | | | |
| Economic Development | | | | | | | |
| Bank for Puerto Rico | 1.83%–5.81% | 2032 | 703,048 | — | 261,833 | 441,215 | — |
| Puerto Rico Ports Authority | Variable | 2027 | 18,573 | 1,571 | 6,789 | 13,355 | 2,923 |
| Puerto Rico Trade and | | | | | | | |
| Export Company | 4.60%–6.48% | 2038 | 371,412 | — | 105,360 | 266,052 | 541 |
| Puerto Rico Industrial | | | | | | | |
| Development Company | 5.26%–8.45% | 2025 | 86,158 | 7,636 | 14,612 | 79,182 | 7,554 |
| Puerto Rico Tourism | | | | | | | |
| Company | Variable | 2014 | 16,114 | — | 16,114 | — | — |
| Puerto Rico Metropolitan | | | | | | | |
| Bus Authority | 2.62% | 2015 | 34,545 | — | 2,503 | 32,042 | 32,042 |
| Agricultural Enterprises and | | | | | | | |
| Development Administration | 4.50% | 2015 | 19,399 | 53,228 | 54,072 | 18,555 | 18,555 |
| | | | $ 7,129,639 | 1,557,031 | 1,662,079 | 7,024,591 | 1,424,158 |

(Continued)

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Debt service requirements on component units' notes payable with fixed maturities at June 30, 2014 were as follows (expressed in thousands):

| Year(s) ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2015 | $ 1,424,158 | 269,327 | 1,693,485 |
| 2016 | 1,194,214 | 230,467 | 1,424,681 |
| 2017 | 301,931 | 206,408 | 508,339 |
| 2018 | 320,406 | 184,886 | 505,292 |
| 2019 | 874,297 | 167,031 | 1,041,328 |
| 2020–2024 | 2,040,268 | 426,561 | 2,466,829 |
| 2025–2029 | 492,351 | 122,928 | 615,279 |
| 2030–2034 | 331,696 | 48,353 | 380,049 |
| 2035–2039 | 31,433 | 10,399 | 41,832 |
| 2040–2044 | 13,837 | 1,260 | 15,097 |
| Total | $ 7,024,591 | 1,667,620 | 8,692,211 |

Commonwealth appropriation bonds payable outstanding at June 30, 2014 are as follows (expressed in thousands):

| Component unit | Interest rates | Maturity through | Balance at June 30, 2013 (as restated) | Additions | Reductions | Balance at June 30, 2014 | Amounts due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Puerto Rico Aqueduct and Sewer Authority | 3.10% – 6.15% | 2032 | $ 417,016 | — | 218 | 416,798 | — |
| Government Development Bank for Puerto Rico | 3.10% – 6.50% | 2032 | 3,431 | 3 | — | 3,434 | — |
| Nonmajor component units: | | | | | | | |
| Puerto Rico Tourism Company | 3.10% – 6.15% | 2032 | 45,356 | — | 58 | 45,298 | — |
| Land Authority of Puerto Rico | 3.10% – 6.50% | 2032 | 56,771 | — | 953 | 55,818 | — |
| Solid Waste Authority | 3.10% – 6.50% | 2032 | 7,880 | — | 59 | 7,821 | — |
| Total Commonwealth appropriation bonds – component units | | | $ 530,454 | 3 | 1,288 | 529,169 | — |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Debt service requirements on the Commonwealth's appropriation bonds payable with fixed maturities at June 30, 2014 were as follows (expressed in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year(s) ending June 30: | | | |
| 2015 | $ — | 29,123 | 29,123 |
| 2016 | 10,600 | 28,925 | 39,525 |
| 2017 | 8,600 | 28,615 | 37,215 |
| 2018 | 8,895 | 31,748 | 40,643 |
| 2019 | 15,573 | 36,694 | 52,267 |
| 2020–2024 | 56,970 | 129,512 | 186,482 |
| 2025–2029 | 268,979 | 99,688 | 368,667 |
| 2030–2034 | 153,192 | 13,969 | 167,161 |
| Premium | 6,426 | — | 6,426 |
| Discount | (66) | — | (66) |
| Total | $ 529,169 | 398,274 | 927,443 |

Bonds payable outstanding at June 30, 2014 are as follows (expressed in thousands):

| Component Unit | Interest rates | Maturity through | Balance at June 30, 2013 (as restated) | Additions | Reductions | Balance at June 30, 2014 | Amount due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Government Development Bank for Puerto Rico | 2.96%–6.56% | 2040 | $ 473,725 | — | 23,405 | 450,320 | 305,941 |
| Puerto Rico Highways and Transportation Authority | 2.25%–6.50% | 2046 | 4,879,730 | 6,392 | 319,854 | 4,566,268 | 107,600 |
| Puerto Rico Electric Power Authority | 2.50%–7.25% | 2043 | 8,218,912 | 658,340 | 208,827 | 8,668,425 | 432,281 |
| Puerto Rico Aqueduct and Sewer Authority | 2.0%–6.15% | 2050 | 4,145,053 | 170 | 21,237 | 4,123,986 | 48,744 |
| University of Puerto Rico | 5.00%–5.75% | 2036 | 584,933 | — | 21,914 | 563,019 | 21,090 |
| Nonmajor component units: | | | | | | | |
| Puerto Rico Municipal Finance Agency | 3.90%–6.00% | 2031 | 915,100 | — | 97,456 | 817,644 | 91,615 |
| Puerto Rico Ports Authority | 2.75%–6.00% | 2026 | 240,889 | — | 40,147 | 200,742 | 550 |
| Puerto Rico Industrial Development Company | 5.10%–6.75% | 2029 | 197,169 | 482 | 8,292 | 189,359 | 10,020 |
| Puerto Rico Convention Center District Authority | 4.00%–5.00% | 2036 | 436,082 | — | 10,748 | 425,334 | 10,275 |
| Total bonds payable - component units | | | $ 20,091,593 | 665,384 | 751,880 | 20,005,097 | 1,028,116 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Debt service requirements on component units' bonds payable with fixed maturities at June 30, 2014 were as follows (expressed in thousands):

| Year(s) ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2015 | $ 1,028,116 | 1,014,247 | 2,042,363 |
| 2016 | 546,187 | 990,654 | 1,536,841 |
| 2017 | 570,350 | 958,993 | 1,529,343 |
| 2018 | 565,682 | 935,923 | 1,501,605 |
| 2019 | 594,290 | 896,541 | 1,490,831 |
| 2020–2024 | 3,242,424 | 4,005,437 | 7,247,861 |
| 2025–2029 | 3,903,582 | 3,134,733 | 7,038,315 |
| 2030–2034 | 3,345,019 | 2,180,938 | 5,525,957 |
| 2035–2039 | 3,172,998 | 1,277,958 | 4,450,956 |
| 2040–2044 | 2,047,922 | 468,876 | 2,516,798 |
| 2045–2049 | 567,194 | 69,684 | 636,878 |
| 2050–2054 | 15,183 | 941 | 16,124 |
| Premium | 489,179 | — | 489,179 |
| Discount | (83,029) | — | (83,029) |
| Total | $ 20,005,097 | 15,934,925 | 35,940,022 |

As discussed in notes 1(cc) and 3, the beginning balance of the discretely presented component units' bonds and Commonwealth appropriation bonds was restated due to the impact of the adoption of GASB Statement No. 65, where the beginning unamortized deferred refunding loss and/or gain on certain of such bonds, which had previously been reported as a deduction of debt, was reclassified as a deferred outflow and/or inflows of resources. The amount of such reclassification amounted to approximately $298.9 million and $21 million increasing the beginning balance of bonds and Commonwealth appropriation bonds, respectively. The composition of such unamortized deferred bond refunding losses and gains reclassified out of debt into the new deferred outflows/inflows of

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

resources category at the beginning of the year and its corresponding balances at June 30, 2014 were as follows (expressed in thousands):

| | | Deferred outflows (inflows) | |
| | | Beginning balance | Ending balance |
| Discretely presented component unit | | June 30, 2013 | June 30, 2014 |
|---|---|---|---|
| Bonds: | | | |
| GDB | $ | 3,161 | 2,872 |
| UPR | | 3,125 | 2,818 |
| MFA | | 6,568 | 4,884 |
| PRPA | | 25,997 | 14,623 |
| PRASA | | 20,874 | 35,598 |
| PREPA | | 92,279 | 77,948 |
| PRHTA | | 146,904 | 132,042 |
| Net impact on bonds | $ | 298,908 | n/a |
| Commonwealth appropriation bonds: | | | |
| PRASA | $ | 18,469 | n/a |
| PRTC | | 1,794 | 1,677 |
| LAPR | | 495 | n/a |
| SWA | | 51 | n/a |
| Total deferred outflows | $ | 20,809 | |
| Presentation in statement of net position at June 30, 2014: | | | |
| Deferred outflows of resources-deferred loss on bonds refunding | | $ | 272,462 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The table that follows presents debt service payments on PREPA's variable-rate bonds and the net payments on associated hedging derivative instrument as of June 30, 2014 (expressed in thousands). Such variable-rate bonds are included within bonds payable in the discretely presented component units column. Although interest rates on variable rate debt and the current reference rate of hedging derivative instrument change over time, the calculations included in the table below are based on the assumption that the variable rate and the current reference rate of the hedging derivative instrument on June 30, 2014 will remain the same for their term (expressed in thousands).

| | Variable-Rate Bonds | | Hedging derivative instruments, net | Total |
| | Principal | Interest | | |
|---|---|---|---|---|
| Year(s) ending June 30: | | | | |
| 2015 | $        — | 2,108 | 8,209 | 10,317 |
| 2016 | — | 2,108 | 8,209 | 10,317 |
| 2017 | — | 2,108 | 8,209 | 10,317 |
| 2018 | — | 2,108 | 8,209 | 10,317 |
| 2019 | — | 2,108 | 8,209 | 10,317 |
| 2020–2024 | — | 2,108 | 8,209 | 10,317 |
| 2025–2029 | — | 2,108 | 8,209 | 10,317 |
| 2030–2034 | 252,875 | 16,865 | 65,674 | 335,414 |
| Total | $  252,875 | 31,621 | 123,137 | 407,633 |

Several component units have defeased certain revenue bonds by placing the proceeds of new bonds in irrevocable trusts to provide for all future debt service payments on the old debts. Accordingly, the trust accounts' assets and liabilities for the defeased bonds are not included in the statement of net position. As of June 30, 2014, the following bonds are considered defeased (expressed in millions):

| | Amount outstanding |
|---|---|
| Puerto Rico Electric Power Authority | $   3,700 |
| Puerto Rico Highways and Transportation Authority | 1,530 |
| Puerto Rico Municipal Finance Agency | 257 |
| Total | $   5,487 |

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

**(13)  Guaranteed and Appropriation Debt**

(a)  *Guaranteed Debt*

The Commonwealth may provide guarantees for the repayment of certain borrowings of component units to carry out designated projects. At June 30, 2014, the following component unit debts are guaranteed by the Commonwealth (expressed in thousands):

|  | | Maximum guarantee | Outstanding balance |
|---|---|---|---|
| Blended component unit – Public Buildings Authority | $ | 4,721,000 | 4,246,144 |
| Discretely presented component units: | | | |
|     Government Development Bank for Puerto Rico | | 2,000,000 | 377,000 |
|     Puerto Rico Aqueduct and Sewer Authority | | 1,177,320 | 1,177,320 |
|     Port of the Americas Authority | | 250,000 | 224,864 |
|         Total | $ | 8,148,320 | 6,025,328 |

The Commonwealth has guaranteed the payments of rentals of its departments, agencies, and component units to the PBA, a blended component unit, under various lease agreements executed pursuant to the enabling Act that created the PBA (Act No. 56 of June 19, 1958, as amended). Such rental payments are pledged for the payment of principal and interest on the guaranteed debt of PBA. Act No. 56 also provides that the Department of the Treasury of the Commonwealth will further secure the payment of principal and interest of the guaranteed debt of PBA by making advances to PBA for any unpaid portion of rent payable to PBA by any agency or instrumentality of the Commonwealth that has entered into lease agreements with PBA. Such advances are recorded as reductions of rent receivable since the responsibility of reimbursement belongs to the corresponding agency or instrumentality according to the enabling Act. The enabling Act is silent as to whether there are arrangements established for recovering payments from PBA if the guaranty were to be claimed; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments.

Rental income of the PBA funds amounted to approximately $413 million during the year ended June 30, 2014, of which $272.6 million was used to cover debt service obligations.

**Government Development Bank for Puerto Rico Remarketed Refunding Bonds**

On February 13, 2014, the Commonwealth enacted Act No. 24 that, among other provisions, increased from $500 million to $2 billion, the amount of GDB's obligations that can be guaranteed by the full faith and credit of the Commonwealth.

The Commonwealth guarantees the Remarketed Refunding Bonds, Series 1985, issued by GDB, a discretely presented component unit. The outstanding balance of these bonds amounted to $267 million at June 30, 2014. On August 1, 2008, GDB repurchased the $267 million outstanding of its adjustable refunding bonds as a result of significant increases in the interest rate of these auction rate bonds. On December 30, 2009, GDB remarketed and reissued these bonds at a fixed rate of 4.75%,

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

maturing on December 1, 2015. As disclosed in note 22, these bonds were fully repaid upon its maturity on December 1, 2015.

On December 13, 2013, GDB issued Senior Guaranteed Notes 2013 Series B (guaranteed by the Commonwealth). The 2013 Series B Notes consist of term notes maturing on various dates from December 1, 2017 to December 1, 2019, and carrying an interest rate of 8.00%, payable monthly on the first day of each month. The outstanding balance of these notes amounted to $110 million at June 30, 2014.

Based on the liquidity and uncertainty risks more fully disclosed in note 2, GDB has shown all the indicators for concluding that there is substantial doubt as to its ability to continue as a going concern. Furthermore, on April 6, 2016, the Governor signed Act No. 21, *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, which allows the Governor to declare a moratorium on debt service payments and to stay related creditor remedies for a temporary period for the Commonwealth and GDB, among other government instrumentalities. Such moratorium was declared on April 30, 2016 on the financial debt obligations of GDB. (refer to note 22 under Component Units) These risks and events impacting GDB has caused management to recognize at June 30, 2014, upon adoption of GASB Statement No. 70 (GASB No. 70), *Accounting and Financial Reporting for Nonexchange Financial Guarantees*, a liability on this guaranteed obligation in the amount of approximately $95 million. This measurement was based on the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee. Act No. 24, referred to above, is silent as to whether there are arrangements established for recovering payments from GDB for guaranty payments made; however, there is no intention from the Commonwealth to request a recovery of any such payments. As of the date of these basic financial statements, no payments have been made yet honoring the aforementioned guaranty.

**Puerto Rico Aqueduct and Sewer Authority (PRASA)** – Act No. 45 of July 28, 1994 states that the Commonwealth guarantees the payment of principal and interest of all outstanding bonds at the date the law was enacted and of all future bond issues to refinance those outstanding bonds of PRASA, a discretely presented component unit. Act No. 140 of August 3, 2000 amended Act No. 45 to extend the Commonwealth guarantee to include the principal and interest payments of the Rural Development Serial Bonds and the loans under the State Revolving Fund Program (SRFP) outstanding at the effective date of Act No. 140, and of all future bonds and SRFP loans that may be issued through June 30, 2005. Act No. 386 of September 21, 2004 extended the Commonwealth guarantee to June 30, 2010. Act. No. 75 of July 12, 2010 amended Section 1 of Act No. 45 of July 28, 1994 to extend the Commonwealth guarantee over the Rural Development and SRFP's borrowings to June 30, 2015. Pursuant to Act No. 96 of June 30, 2015, the Commonwealth guaranty on the payment of principal and interest on most of the outstanding Revolving Fund loans granted to PRASA was extended to cover such loans issued through June 30, 2020. All these Acts, as amended, are silent as to whether there are arrangements established for recovering payments from PRASA if the guaranty were to be claimed; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments.

(Continued)

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The United States Department of Agriculture (USDA) Rural Development Program assists PRASA in the financing and construction of aqueduct and sewer facilities in rural areas by purchasing revenue bonds from PRASA, the proceeds of which are used by PRASA to finance such projects. GDB provides interim financing for these projects through short-term lines of credit. On June 12, 2013, PRASA issued approximately $45.5 million of Series II of USDA Rural Development Program Bonds, at a maximum interest of 3.50%, payable semiannually and maturing in semiannually installments through July 1, 2053. The funds raised by this issuance were used to partially repay the outstanding balance of USDA Rural Development Program lines of credit for construction projects from GDB. As of June 30, 2014, the USDA Rural Development Program Bonds consisted of twenty-six (26) separate series, issued from 1983 through 2013, bearing interest from 2% to 5% due in semiannual installments through 2053. The outstanding balance of the USDA Rural Development Program Serial Bonds as of June 30, 2014 was approximately $402 million. The USDA Rural Development Program Serial Bonds are guaranteed by the Commonwealth, pursuant to Act No. 140 of 2000 as amended and PRASA's net revenue is pledged toward the payment of debt service on the USDA Rural Development Program Bonds. The USDA Rural Development Program Bonds are subordinate to all senior and senior subordinated debt.

The Puerto Rico Water Pollution Control Revolving Fund and Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (the Revolving Funds) were created by Act No. 44 of June 21, 1988 and Act No. 32 of July 7, 1997, respectively, of the Commonwealth. The Puerto Rico Water Pollution Control Revolving Fund is administered, pursuant to Act No. 44 and Act No. 9 of June 21, 1988 and June 18, 1970, respectively, as amended, by Puerto Rico Environmental Quality Board (EQB). The Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund is administered, pursuant to Act No. 5 of July 21, 1977, as amended, by Puerto Rico Department of Health (DOH). Pursuant to these laws, the EQB and the DOH, on behalf of the Commonwealth, are authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA). Puerto Rico Infrastructure Financing Authority (PRIFA), a component unit of the Commonwealth, PRASA, and GDB entered into a memorandum of understanding under which each party has agreed to assume specific responsibilities in connection with the operations of the Revolving Funds.

PRASA has entered into revolving loan agreements to finance certain capital improvements. As of June 30, 2014, PRASA had outstanding of approximately $490.9 million under these loan agreements.

The loan agreements are evidenced by promissory notes, which bear interest at a 2% annual rate payable semiannually. Construction loans are required to be paid in full within 20 years of the project completion date. PRASA has pledged its net revenue on a basis subordinate in all respects to PRASA's bonds outstanding. If PRASA's pledged revenue is not sufficient for the payment of principal and interest, the payments are guaranteed by the Commonwealth under Act No. 45 of July 28, 1994, as amended, which obligates the Commonwealth to pay principal and interest on the notes.

On March 18, 2008, PRASA issued approximately $284.8 million of Revenue Refunding Bonds, Series A and B (the 2008 Revenue Refunding Bonds), (guaranteed by the Commonwealth) to refund PRASA's outstanding Revenue Refunding Bonds, Series 1995 (guaranteed by the Commonwealth) in the amount of approximately $262.8 million. The 2008 Revenue Refunding Bonds bear interest at rates from 5.80% to 6.10% per annum with maturity dates ranging from July 1, 2021 to July 1, 2034. The

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

outstanding balance of the 2008 Revenue Refunding Bonds at June 30, 2014 amounted to $284.8 million.

As a result of the voluntary disclosure statement issued by PRASA on March 4, 2016 regarding the expectation, due to the certain funds' set asides more fully disclosed in note 22, that it might not have sufficient funds to fully fund the debt service on certain of its Commonwealth guaranteed debt, management concluded that it would be more likely than not that the Commonwealth will be required to make a payment only on the USDA Rural Development Program Serial Bonds guaranty, as required by GASB No. 70. The 2008 Revenue Refunding Bonds and the SRFP loans were excluded from this conclusion because: a) the 2008 Revenue Refunding Bonds are considered senior subordinated debt and will not be affected by the aforementioned set asides and b) the SRFP funds are proprietary funds within the Commonwealth and not a separate legal entity, which would exclude them from the scope of GASB No. 70.

Upon the adoption of GASB No. 70 for the USDA Rural Development Program Serial Bonds, the Commonwealth recognized against its beginning net position a liability on this guaranteed obligation in the amount of approximately $218.4 million. This measurement was based on the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee. Similarly, the liability under guaranteed obligation at June 30, 2014 approximated $235.8 million. As of the date of these basic financial statements, no payments have been made yet honoring the aforementioned guaranty.

**Port of the Americas Authority (PAA)** – At various times during fiscal years ended 2005 and 2006, the PAA, a component unit of the Commonwealth, entered into bond purchase agreements with GDB, whereby GDB agreed to disburse to the PAA from time to time certain bond principal advances up to a maximum aggregate principal amount of $70 million (Port of the Americas Authority 2005 Series A Bond), $40 million (Port of the Americas Authority 2005 Series B Bond), and $140 million (Port of the Americas Authority 2005 Series C Bond). These bonds are guaranteed by the Commonwealth by Act No. 409 of September 22, 2004, which authorized the issuance of these financing arrangements. The proceeds of the bonds were used to finance the cost of development and construction of the PAA. At June 30, 2014, the aggregate unpaid principal balance of all outstanding bond principal advances was set to be payable on January 1, 2015 and January 15, 2015, carrying an interest rate determined annually by GDB based on a spread ranging between 150 and 175 basis points over the interest rate of underlying commercial paper issued by GDB in connection with these facilities. Just before the maturity of the bond advances, these were refinanced for a period of 30 years, with the first payment of principal and interest to commence on August 1, 2015, with interest rates based on the rates borne by the general obligation of the Commonwealth. These rates shall be revised on a quarterly basis. The principal amount may be paid with any of the following: (i) a long-term bond issuance once the projects are completed; (ii) other revenue of the PAA; (iii) or legislative appropriations as established in Act No. 409 of September 22, 2004 (Act No. 409), honoring the guaranty agreement referred to above. The Commonwealth paid during fiscal year 2014 the debt service on these bonds, under its guaranty. Therefore, upon adoption of GASB Statement No. 70, *Accounting and Financial Reporting for Nonexchange Financial Guarantees*, the Commonwealth recognized against its beginning net position a liability on this guaranteed obligation in the amount of $220.4 million. This measurement was based on the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee. As these bond advances carry a variable market interest rate, the

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Commonwealth estimated that such discounted present value at adoption date approximated the carrying amount outstanding of these bonds at June 30, 2013. Similarly, the liability under guaranteed obligation at June 30, 2014 also approximated the carrying amount of these bonds at the same date. Act No. 409, as amended, is silent as to whether there are arrangements established for recovering payments from PAA for guaranty payments made; however, there is no intention from the Commonwealth to request a recovery of any such payments.

Upon the refinancing referred to above, accrued interest through the date of the refinancing amounting to approximately $8.8 million was capitalized into the principal balance then outstanding for a refinanced amount of approximately $233.6 million.

(b)  ***Debt Supported by Commonwealth Appropriations***

At June 30, 2014, the outstanding principal balances of debt payable by Commonwealth appropriations and sales and use taxes (PFC bonds and notes payable, as described in note 12(d), and notes payable to GDB and others, as described in note 12(f)), which are included in the individual financial statements of the following discretely presented component units, are as follows (expressed in thousands):

| | PFC bonds and notes | Notes payable to GDB and others | Total |
|---|---|---|---|
| Puerto Rico Aqueduct and Sewer Authority | $ 416,798 | — | 416,798 |
| Puerto Rico Health Insurance Administration | — | 183,251 | 183,251 |
| Puerto Rico Convention Center District Authority | — | 140,951 | 140,951 |
| University of Puerto Rico | — | 63,208 | 63,208 |
| Solid Waste Authority | 7,821 | 74,027 | 81,848 |
| Agricultural Enterprises Development Administration | — | 105,371 | 105,371 |
| Land Authority of Puerto Rico | 55,818 | — | 55,818 |
| Puerto Rico Tourism Company | 45,298 | — | 45,298 |
| Puerto Rico Industrial Development Company | — | 41,653 | 41,653 |
| Company for the Integral Development of the "Península de Cantera" | — | 36,278 | 36,278 |
| University of Puerto Rico Comprehensive Cancer Center | — | 28,184 | 28,184 |
| Government Development Bank | 3,434 | 13,340 | 16,774 |
| National Parks Company of Puerto Rico | — | 5,605 | 5,605 |
| Institute of Puerto Rican Culture | — | 3,291 | 3,291 |
| Puerto Rico Electric Power Authority | — | 713 | 713 |
| Total | $ 529,169 | 695,872 | 1,225,041 |

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Notes payable to GDB are reported in the statement of net position as "due from (to) component units."

(c) *Other Guarantees*

Mortgage Loan Insurance – The Puerto Rico Housing Finance Authority (the Authority), a component unit of GDB, provides mortgage credit insurance to low and moderate income families through its mortgage loan insurance program. The Commonwealth guarantees up to $75 million of the principal insured by the mortgage loan insurance program. As of June 30, 2014, the mortgage loan insurance program covered loans aggregating to approximately $546 million. Currently, the Commonwealth has not been called to make any direct payments pursuant to these guarantees.

**(14) Conduit Debt Obligations and No Commitment Debt**

From time to time, certain of the Commonwealth's component units issue revenue bonds to provide financial assistance to private sector entities for the acquisition and construction of transportation, environmental, industrial, tourism, educational, and commercial facilities, deemed to be in the public interest and that are expected to provide benefits to Puerto Rico. These bonds are secured by the property financed and are payable solely from payments received on the underlying mortgage loans. Upon repayment of the bonds, ownership of the acquired facilities is retained by the private sector entity served by the bond issuance. Neither the Commonwealth nor any political subdivision or component unit thereof is obligated in any manner for the repayment of the bonds. Accordingly, the bonds are not reported as liabilities in the basic financial statements of the issuing entities. As of June 30, 2014, conduit debt obligations consisted of the following bonds issued by component units (expressed in thousands):

| Issuing entity | | Issued since inception to date | Amount outstanding |
|---|---|---|---|
| Discretely presented component units: | | | |
| Puerto Rico Ports Authority | $ | 155,410 | 155,410 |
| Puerto Rico Highways and Transportation Authority | | 270,000 | 155,100 |
| Government Development Bank for Puerto Rico | | 1,147,475 | 458,900 |
| Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority | | 6,353,000 | 982,742 |
| Total | $ | 7,925,885 | 1,752,152 |

(a) *Puerto Rico Ports Authority (PRPA)*

PRPA has issued $39,810,000 in Special Facility Revenue Bonds under the provisions of a trust agreement dated June 1, 1993, and $115,600,000 in Special Facility Revenue Bonds, under the provisions of a trust agreement dated May 1, 1996, between the PRPA and a private bank. The proceeds from the sale of the bonds were used to finance the construction, acquisition of equipment, and improvement of certain facilities at the Luis Munoz Marin International Airport for the benefit of a major private airline. The property is owned by the PRPA and leased to the private company. These bonds are limited obligations of the PRPA, and are payable solely from and secured by a pledge of certain payments made under the Special Facilities Agreement with the private company and certain other moneys. Neither the credit of the Commonwealth nor that of any of its political subdivisions is

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

pledged for the repayment of these bonds. In addition, the bonds are unconditionally guaranteed by the private company's parent company. Pursuant to the agreements between the PRPA and the private company, the private company has agreed to pay amounts sufficient to cover the principal of, and premium, if any, and interest on the bonds. The bonds are not collateralized by any property, but are payable solely from certain pledged payments by the private company under the agreement or by the private company's parent company under its unconditional guarantee. The outstanding balance of these bonds amounted to $155.4 million at June 30, 2014.

(b)   *Puerto Rico Highways and Transportation Authority (PRHTA)*

In March 1992, the PRHTA issued Special Facility Revenue Bonds, 1992 Series A, B, and C for approximately $117 million for the construction of a toll bridge. The proceeds from the sale of these bonds were transferred by the PRHTA to a private entity, Autopistas de Puerto Rico & Compañía, S.E. (Autopistas), pursuant to a signed concession agreement for the design, construction, operation, and maintenance of the bridge. On October 30, 2003, the PRHTA issued Special Facility Revenue Refunding Bonds, 2004 Series A, amounting to approximately $153 million for the purpose of refunding PRHTA's Special Facility Revenue Bonds, 1992 Series A, B, and C, which were issued to fund the construction of the bridge, and to pay the cost of issuance of the bonds. The proceeds from the sale of the bonds were transferred by the PRHTA to Autopistas pursuant to a new loan agreement by and between Autopistas and the PRHTA. The bonds shall be paid from the proceeds received by Autopistas from the operation of the bridge.

Under certain circumstances, the concession agreement may be terminated and the PRHTA is then obligated to assume Autopista's entire obligation to pay principal of, and interest on, the bonds outstanding, which pursuant to the signed agreement, will be paid from the net revenue of the use and operation of the bridge. The PRHTA does not currently expect the concession agreement to terminate. The outstanding bonds (including accrued interest) at June 30, 2014 amounted to approximately $155.1 million.

(c)   *Government Development Bank for Puerto Rico (GDB)*

In December 2003, GDB, through its Housing Finance Authority, issued approximately $663 million in Capital Fund Program Bonds Series 2003 to lend the proceeds thereof to the Public Housing Administration, an agency of the Commonwealth, in its financing of improvements to various public low and moderate income housing projects. The Capital Fund Program Bonds Series 2003 are limited obligations of the Housing Finance Authority, which will be paid solely from an annual allocation of public housing capital funds when received from the U.S. Department of Housing and Urban Development (U.S. HUD) and other funds available under the bond indenture. Accordingly, these bonds are considered conduit debt and are excluded, along with the related assets held in trust, from the accompanying basic financial statements. The outstanding balance of these bonds amounted to approximately $151.1 million at June 30, 2014.

On August 1, 2008, the Housing Finance Authority issued the Capital Fund Modernization Program Subordinate Bonds amounting to approximately $384.5 million. The proceeds from the issuance were mainly used to finance a loan to a limited liability company and pay the costs of issuance. The $384.5 million bonds are limited obligations of the Housing Finance Authority, payable primarily by a pledge and assignment of federal housing assistance payments made available by the U.S. HUD,

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

with an outstanding balance of approximately $307.8 million at June 30, 2014. Payment of principal of the Housing Revenue Bonds was also secured by an irrevocable standby letter of credit issued by GDB.

(d) ***Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (AFICA)***

AFICA's revenue bonds are special and limited obligations of AFICA and, except to the extent payable from bond proceeds and investments thereof, will be payable solely from and secured by a pledge and assignment of the amounts payable under the loan agreements between AFICA and the borrowers. Furthermore, payment of principal and interest on the revenue bonds is unconditionally guaranteed by the borrowers, their parent companies, or letters of credit generally issued by major U.S. banks or U.S. branches of international banks.

The revenue bonds are considered conduit debt and do not constitute a debt or a pledge of the full faith and credit of AFICA or the Commonwealth or any political subdivision thereof.

In connection with the issuance of revenue bonds, AFICA enters into trust agreements, whereby AFICA assigns and pledges to the trustees, for the benefit of the holders of the revenue bonds (1) all amounts receivable by AFICA in repayment of the amounts due under the loan agreements; (2) any rights, title, and interest of AFICA in the proceeds derived from the issuance of the revenue bonds and of any securities in which moneys in any fund or account created by the trust agreements or loan agreements are invested and the proceeds derived therefrom; and (3) AFICA's rights, title, and interest in and to the loan agreements, subject to AFICA's retention of certain rights, including the right to collect moneys payable to AFICA, which are not received with respect to repayment of the loans.

Since inception and up to June 30, 2014, AFICA has issued revenue bonds aggregating to $6,353 million, approximately $983 million of which was outstanding as of June 30, 2014. Of the revenue bonds outstanding at June 30, 2014, approximately $409 million represent industrial and commercial revenue bonds; approximately $97 million, tourism-related revenue bonds; approximately $163 million, hospital revenue bonds; and approximately $312 million, educational revenue bonds. Pursuant to the loan agreements covering the issuance of these bonds, corporations and partnerships operating in Puerto Rico borrowed the proceeds from the bond issuances by AFICA.

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

**(15)  Risk Management**

*Primary Government*

The risk management policies of the Primary Government of the Commonwealth are addressed on note 1(z).

*Discretely Presented Component Units*

The following describes the risk management programs separately administered by certain discretely presented component units, including all the major component units and certain nonmajor component units carrying self-funded risk reserves:

(a)  **GDB**

To minimize the risk of loss, GDB purchases insurance coverage for public liability, hazard, automobile, crime, and bonding, as well as workmen's compensation insurance for employees. The selection of the insurer has to be approved by the Public Insurance Office of the Department of the Treasury. Insurance coverage is updated annually to account for changes in operating risk. For the last three years, insurance settlements have not exceeded the amount of coverage. Other risk management policies of GDB involve its mortgage and loans servicing and insurance activities. Certain loan portfolios of the Housing Finance Authority, a blended component unit of GDB, are administered by private servicers who are required to maintain an errors and omissions insurance policy. The Housing Finance Authority has a program to manage the risk of loss on its mortgage loan lending and insurance activities.

(b)  **PRHTA**

PRHTA carries commercial insurance to cover casualty, theft, claims, and other losses. The PRHTA has not settled any claims in excess of its insurance coverage for any of the past three years.

(c)  **PREPA**

PREPA purchases commercial insurance covering casualty, theft, tort claims, natural disaster and other claims covering all risk property (excluding transmission and distribution lines), boiler and machinery, and public liability. In addition, PREPA has a self-insured fund to pay the cost of repairing, replacing, or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of a cause.

PREPA has a cost plus health insurance program covering substantially all employees. PREPA contracted an administrator for the processing, approval, and payment of claims plus an administrative fee. The accrual for employees' health plan includes the liability for claims processed and an estimate for claims incurred but not reported.

214                                                                                                          (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Changes in the balances of the health insurance program and other self-insurance risks during fiscal years 2014 and 2013 were as follows (expressed in thousands):

|  |  | **2014** | **2013** |
|---|---|---|---|
| Claims payable – July 1 | $ | 5,270 | 7,188 |
| Incurred claims | | 89,332 | 100,889 |
| Claim payments | | (88,870) | (102,807) |
| Claims payable – June 30 | $ | 5,732 | 5,270 |

These claims payable are presented as a component of accounts payable and accrued liabilities in the accompanying statement of net position - major component units.

(d)   *PRASA*

PRASA has acquired commercial insurance to mitigate its exposure to certain losses involving real and personal property (including windstorm, flood, and earthquake damages) and comprehensive general and automobile claims. PRASA also has an Owner Controlled Insurance Program (OCIP) under which commercial general liability, excess general liability, builder's risk, and contractors' pollution liability coverage are procured or provided on a project "wrap-up" basis for contractors and subcontractors of any tier, who have been properly enrolled, while performing operations at the applicable project site. Each commercial insurance policy maintained by PRASA contains specific policy limits and deductibles. Settled claims resulting from these risks have not exceeded commercial insurance coverage in any of the past three fiscal years.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(e)  *UPR*

UPR is exposed to various risks of loss related to torts; theft of, damage to, and destruction of assets; errors and omissions; injuries to employees; and natural disasters. Through January 1993, the UPR was insured under claims-made insurance policies with respect to medical malpractice risks for $250,000 per occurrence up to an annual aggregate of $500,000. Subsequent to such date, the UPR was unable to obtain insurance at a cost it considered to be economically justifiable; consequently, the UPR is now self-insured for such risks. Under Act No. 98 of August 24, 1994, the responsibility of the UPR is limited to a maximum amount of $75,000 per person, or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Self-insured risk liabilities are reported when it is probable that a loss has occurred and the amount of the loss can be reasonably estimated. Liabilities include an amount for claims that have been incurred but not reported. The process used in computing claims liabilities does not necessarily result in an exact amount because actual claims liabilities depend upon such complex factors as inflation, changes in legal doctrines, and damage awards. Claims liabilities are reevaluated periodically to take into consideration recently settled claims, the frequency of claims, and other economic and social factors.

Changes in the claims liability amount for medical malpractice in fiscal years 2014 and 2013 were as follows (expressed in thousands):

| | 2014 | 2013 |
|---|---|---|
| Claims payable – July 1 | $ 9,572 | 11,956 |
| Incurred claims and changes in estimates | 1,091 | (1,084) |
| Payments for claims and adjustments expenses | (2,786) | (1,300) |
| Claims payable – June 30 | $ 7,877 | 9,572 |

In addition, the UPR is a defendant in several lawsuits other than medical malpractice arising out of the normal course of business. Management has recorded an accrual of $9.6 million as of June 30, 2014 to cover claims and lawsuits that may be assessed against the UPR. The UPR continues to carry commercial insurance for these risks of loss.

These claims payable are presented as a component of accounts payable and accrued liabilities in the accompanying statement of net position - major component units. The UPR continues to carry commercial insurance for all other risks of loss.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(f)  *SIFC*

SIFC provides workers' compensation insurance to public and private employees. This insurance covers workers against injuries, disability, or death caused by work or employment related accidents, or by illness suffered as a consequence of their employment. SIFC establishes liabilities for incurred but unpaid benefits and benefit adjustment expenses based on the ultimate cost of settling the benefits. The liability includes estimates for cases reported that have not been adjudged and cases incurred but not reported. The following table provides a reconciliation of the beginning and ending liability for incurred but unpaid benefits and benefit adjustment expenses for the two most recent fiscal years (expressed in thousands):

|  |  | 2014 | 2013 |
|---|---|---|---|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ | 820,934 | 820,012 |
| Total incurred benefits |  | 447,909 | 481,743 |
| Total benefit payments |  | (456,847) | (480,821) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ | 811,996 | 820,934 |

The liability for incurred but unpaid benefits and benefit adjustment expenses is reported as liability for automobile accident insurance, workmen's compensation and medical claims in the accompanying statement of net position - major component units.

The liability for incurred but unpaid benefits and benefit adjustment expenses is based on historical claims experience data, assumptions and projections as to future events, including claims frequency, severity, persistency, and inflationary trends determined by an independent actuarial study. This liability has been discounted at 3.83% in 2014. SIFC's management believes that discounting such liability results in a better matching of costs and revenue since compensation benefits have a long payment cycle. The assumptions used in estimating and establishing the liability are reviewed annually based on current circumstances and trends.

SIFC's management believes that the liability for incurred but unpaid benefits and benefit adjustment expenses, actuarially determined at June 30, 2014, is a reasonable estimate of the ultimate net cost of settling benefits and benefit expenses incurred. Because actual benefit costs depend upon such factors as duration of worker disability, medical cost trends, occupational disease, inflation, and other social and economic factors, the process used in computing the ultimate cost of settling benefits and expenses for administering benefits is necessarily based on estimates. The amount ultimately paid may be above or below such estimates. Adjustments resulting from changes in estimates of these liabilities are charged or credited to operations in the period in which they occur.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(g) *PRHIA*

PRHIA is responsible for implementing, administering, and negotiating a health insurance system, through contracts with insurance underwriters, to provide quality medical and hospital care to the Commonwealth residents regardless of their financial condition and capacity to pay. PRHIA pays a monthly premium to such insurance underwriters based on a contracted premium and the number of members subscribed in the health plan. Funds to pay for such premiums are requested from the Commonwealth, net of funds available for such purposes from all other sources.

Under the provisions of Act No. 105 of July 19, 2002, which amends Act No. 72 of 1993, PRHIA was authorized to negotiate directly with health providers under a pilot program. PRHIA has, since then, entered into different direct contracts to cover the insured population of different regions and municipalities. Since November 1, 2006 through September 1, 2010, PRHIA directly contracted providers that served approximately 190,000 lives from the metro-north region. At June 30, 2011, PRHIA has direct contracting projects with the municipalities of Vieques and Guaynabo, and effective October 1, 2011, the projects were expanded to cover the west, the metro north, the north, San Juan, the northeast, and the virtual regions under a new arrangement with a new insurance underwriter as third-party administrator. In addition, PRHIA implemented certain cost containment strategies to control costs, such as establishing a copayment that applies for the unjustified use of emergency rooms, detection and control of prescription drug overuse, implementation of a disease management program for respiratory conditions, modification of provider fees, and better coordination of benefits for the population having other medical insurance.

PRHIA establishes a liability to cover for the estimated amount to be paid to providers based on experience and accumulated statistical data under one of the direct contracting pilot projects. The estimates of medical claims incurred but not reported and other medical expense payments is developed using actuarial methods and assumptions based upon payment patterns, inflation of medical costs, historical developments, and other relevant factors. The following table provides a reconciliation of the beginning and ending liability for incurred but unpaid medical and benefit adjustment expenses for the two most recent fiscal years (expressed in thousands):

| | 2014 | 2013 |
|---|---|---|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ 150,005 | 213,173 |
| Total incurred benefits | 1,949,344 | 1,262,982 |
| Total benefit payments | (1,817,635) | (1,326,150) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ 281,714 | 150,005 |

The liability for incurred but unpaid benefits and benefit adjustment expenses is reported as liability for automobile accident insurance, workmen's compensation, and medical claims in the accompanying statement of net position - major component units.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(h)  *AACA*

AACA operates a system of compulsory insurance for vehicles licensed to be used on public roads and highways in Puerto Rico. This insurance covers bodily injuries and compensation for beneficiaries (and their dependents) caused by automobile accidents. The annual premium is $35 per motor vehicle.

The following table provides a reconciliation of the beginning and ending liability for the future benefits for the two most recent fiscal years, presented based on an undiscounted method (expressed in thousands):

|  | | 2014 | 2013 |
|---|---|---|---|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at beginning of year | $ | 104,912 | 97,111 |
| Total incurred benefits | | 42,852 | 41,165 |
| Total benefit payments | | (53,785) | (33,364) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at end of year | $ | 93,979 | 104,912 |

The liability for future benefits is reported as liability for automobile accident insurance, workmen's compensation, and medical claims in the nonmajor component unit column of the accompanying statement of net position - major component units. The liability covers the estimated cost of all future benefits related to claims incurred but not reported during the year. Future benefits include death and funeral, disability and accident, and health benefits. The AACA has recorded this liability, including administrative expenses for claim processing, based on the results of an actuarial report prepared by an independent actuary.

Changes in the ultimate liabilities for benefit payments may be required as information develops, which varies from experience, provides additional data, or, in some cases, augments data, which previously were not considered sufficient for use in determining the claim liabilities.

(i)  *PCSDIPRC*

PCSDIPRC has the responsibility of providing to all the cooperatives and the Federation of Cooperatives of Puerto Rico insurance coverage over the stocks and deposits, and for monitoring the financial condition of the insured cooperatives, and the uninsured cooperatives when requested by the Inspector of Cooperatives. PCSDIPRC contracted independent actuaries for the preparation of actuarial estimates of the reserves for estimated losses on stocks and deposits.

(Continued)

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The following table provides the activity during fiscal years 2014 and 2013 in the estimated reserves (expressed in thousands):

|  |  | **2014** | **2013** |
|---|---|---|---|
| Liability for estimated losses on insured stocks and deposits at beginning of year | $ | 27,881 | 26,975 |
| Provision for losses |  | — | 825 |
| Payment of claims |  | — | (2) |
| Recoveries |  | 62 | 83 |
| Liability for estimated losses on insured stocks and deposits at end of year | $ | 27,943 | 27,881 |

These estimated reserves are presented as a component of accounts payable and accrued liabilities in the accompanying statement of net position (deficit).

**(16) Commitments and Contingencies**

*Primary Government*

*Legal Contingencies*

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 29, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions set forth in said Act to a maximum amount of $75,000 or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the payment of such judgments.

With respect to pending and threatened litigation involving the Commonwealth's Governmental Activities, excluding the litigation mentioned in the ensuing paragraphs, the Commonwealth reported approximately $321 million as an amount to cover for awarded and anticipated unfavorable judgments at June 30, 2014. This amount was included as other long-term liabilities in the accompanying statement of net position, and represents the amount estimated as a probable liability or a liability with a fixed or expected due date that will require future available financial resources for this payment. The amounts claimed exceed $8 billion; however, the ultimate liability cannot be presently determined. It is the opinion of management that the claims are excessive and exaggerated. Management believes that the ultimate liability in excess of amounts provided, if any, would not be significant.

The Commonwealth is a defendant in two parallel lawsuits regarding an alleged inappropriate withholding of Medicaid funds, one filed in the state court and the other at the federal court. The plaintiffs are various primary healthcare centers seeking to recover from the Commonwealth approximately $500 million of Medicaid funds retained by the Department of Health of the Commonwealth since 1997. In February 2005, the United States Court of Appeals for the First Circuit determined that the Commonwealth must return the funds withheld because of noncompliance with a federal law. The Commonwealth is still contesting several

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

provisions of this determination, and amounts to be returned are still in the process of estimation. As of June 30, 2014, the Commonwealth accrued $500 million for this legal contingency.

The Commonwealth is a defendant in a class action presented by parents of special education students in the areas of education and healthcare. In October 2006, the State Court of Appeals decided in favor of the parents' request to include damage claims pursuant to the same class action case although not as a remedy in the class action per se. The court now may award damages to the members of the class action and to do so it may look at the claims by dividing them into groups or consider each case individually. This will require that the parents prove the damages suffered on an individual basis. The Commonwealth plans to defend vigorously each individual case. As of June 30, 2014, the Commonwealth accrued $650 million for this legal contingency.

The Commonwealth is a defendant in two lawsuits instituted in 2007 and 2009 by a large group of employees from the Department of Family, the Administration of Vocational Rehabilitation, and the Administration of Juvenile Institutions claiming that wages in an aggregate amount of $215 million are owed to them. The plaintiffs claim for loss of earnings due to the failure of compliance by the applicable agencies of the equal payment for equal work under different laws. The plaintiffs claim that they have been adversely affected by reason of the agencies failure to revise the scales of remuneration each time the federal minimum wage changed. All parties have filed petitions for summary judgment, which are pending. As of June 30, 2014, this legal contingency has an estimated exposure of $215 million plus an undetermined amount for interest. The Commonwealth has accrued $215 million to cover for this contingency.

Under the lawsuit *Vaquería Tres Monjitas, Inc. et al v. Ramírez et al*., certain plaintiffs alleged that the price rates set by the Administrator of the Office for the Regulation of the Dairy Industry (ORIL, as its Spanish acronym) did not afford local dairy processors Suiza Dairy and Vaquería Tres Monjitas the opportunity to make the reasonable profit to which they were constitutionally entitled. The parties reached a settlement agreement on October 29, 2013. Among other things, the Commonwealth, through certain of its instrumentalities, agreed to contribute the following amounts to certain regulatory accrual payments to be made pursuant to the settlement agreement: $50 million by December 31, 2014, $15 million by December 31, 2015, $15 million by December 31, 2016, and $15 million by December 31, 2017. After numerous motions, hearings and appeals, the settlement agreement took effect on November 6, 2013. The case is now closed although the court will retain jurisdiction in order to tend to any matter of compliance or breach of compliance regarding the settlement agreement. As of June 30, 2014, the Commonwealth accrued $95 million for this legal contingency.

On December 2, 2014 and on January 16, 2015, the United States Securities and Exchange Commission ("SEC") requested information about certain bond issuances of the Commonwealth and its component units. The Commonwealth is cooperating in the inquiry, including by providing the SEC with documents and information. The SEC has advised that the information requests should not be construed as an indication that any violation of the federal securities laws has occurred. This matter is ongoing and the Commonwealth cannot predict when it will be concluded or its outcome.

PBA, a blended component unit, is defendant or codefendant in various lawsuits for alleged damages and breach of contracts in cases related to construction projects. In addition, PBA is defendant or codefendant in other cases related to public liability and labor-related matters. PBA, based on legal advice, has recorded an accrual approximating $20.2 million to cover probable losses on these claims. In the opinion of legal counsel,

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

any liability in excess of the insurance coverage and/or the recorded accrual that may arise from such claims would not be significant to affect PBA's financial position or results of operations.

The SCPT, a blended component unit, is a defendant and a party in numerous legal proceedings and extrajudicial claims pertaining to matters incidental to the performance of its normal operations. SCPT has recognized approximately $8.7 million to cover for awarded and anticipated unfavorable judgments at June 30, 2014.

PRIFA, a component unit blended as a governmental activity, is a defendant in various legal proceedings arising from its normal operations. Management, based on the advice of legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings and legal actions in the aggregate will not have a material effect on PRIFA's financial statements. However, management is of the opinion that they will reach settlements in certain cases. A liability to cover these potential settlements in the amount of approximately $7.6 million has been established at June 30, 2014.

PHA is a defendant and a party in numerous legal proceedings and extrajudicial claims pertaining to matters incidental to the performance of its normal operations, including cases arising out of alleged torts, alleged breach of contracts, alleged violation of law, discrimination against employees, unlawful discharge, and condemnation proceedings, among others. PHA has recognized $6.0 million to cover for awarded and anticipated unfavorable judgments at June 30, 2014.

In connection with the termination of an interest rate exchange agreement (swap) with a notional amount of $218 million by COFINA relating to its Sales Tax Revenue Bonds, Series 2007A, COFINA made a termination payment to the counterparty in November 2008. The counterparty has asserted that it was entitled to a termination payment in excess of that paid by COFINA in November 2008, plus interest at a default rate, amounting to approximately $64 million. The counterparty alleges that the date of the termination notice used by COFINA for purposes of calculating the termination payment was not in accordance with the agreement. In addition, the counterparty alleges that the termination payment should have been based on the value of replacement swaps entered into by COFINA, which actually have different credit terms than those contained in the terminated swap. COFINA has accrued $3.4 million in connection with this matter at June 30, 2014. The amount claimed in excess of that accrued at June 30, 2014 is approximately $60.6 million. While the counterparty may assert continued default interest since the claim date, an amount of possible loss in excess of the $3.4 million accrued, if any, cannot be reasonably estimated. COFINA intends to contest this matter vigorously. Among other things, it is the opinion of COFINA that, even assuming that the counterparty's allegations regarding improper termination are correct, the amounts claimed by the counterparty are not correct. Accordingly, management does not expect that the ultimate costs to resolve this matter will have a material adverse effect on COFINA's financial position or results of operations.

On May 7, 2013, a group of governmental employees that worked in the PBA's central offices in Minillas from 1984 through May 2012 filed a lawsuit claiming damages suffered during the years working at such offices, caused by the existence of asbestos in the building. The employees are claiming a total of $300 million of which $100 million would be used to create a medical program to monitor health conditions on all of these employees and $200 million to be paid to them for damages. This case is in its initial stages; therefore, no provision for any liability that may result upon adjudication of this lawsuit has been recorded by the Commonwealth.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

PRMeSA, a component unit blended as a business-type activity, is a party in certain legal actions and claims related to medical malpractice arising in the ordinary conduct of its business. Although PRMeSA appears as a defendant in the claims, many of them involve medical personnel of the member institutions, and in effect, these claims are against said institutions. As a result of the deficiency as of June 30, 2014 of funds available in the Self-Insurance Fund, any unfavorable outcome may have a significant effect on the financial condition of PRMeSA. Based on a review of current facts and circumstances, PRMeSA's management has provided for what is believed to be a reasonable estimate of the exposure to loss associated to litigation. PRMeSA has established an accrual for claim losses in the amount of $2.8 million at June 30, 2014 under business-type activities in the statement of net position and in the statement of net position - proprietary funds.

On December 21, 2012, the federal government, through the U.S. Department of Justice (USDOJ), filed a lawsuit in order to demand from the Commonwealth and its Police Department, compliance with the action and remediation plan submitted on September 8, 2011 by the Civil Rights Division of the USDOJ pursuant to an investigation which revealed a pattern of civil rights violations by the Police Department. According to this investigation and resulting report, the pattern or practice of illegal activity is the product of an ongoing failure by the Commonwealth and its Police Department to provide officers with the necessary guidance, training, and tools to engage in constitutional and effective law enforcement. The federal government was seeking declaratory and equitable relief to eliminate this unlawful pattern by asking the Commonwealth and its Police Department to adopt and implement policies and procedures in the areas of recruitment, hiring, promotions, policies, training, supervision, investigation, discipline, and prevent the police officers of depriving persons of rights, privileges, or immunities secured and protected by the Constitution or laws of the United States. Although the claim does not include damages, the action and remediation plan proposed would require an investment of approximately $600 million, which is expected to be incurred over a period of 10 years, starting with fiscal year 2014. During fiscal year 2016, the Commonwealth appropriated $20 million pursuant Act No. 105 of July 2, 2015. The Secretary of Justice of the Commonwealth is still negotiating the final determinations of the measures to be implemented by the Police Department in terms of final costs and timeframe. On July 17, 2013, a final definitive agreement was reached between the USDOJ and the Commonwealth, which was filed with the Court. Under the settlement agreement, the court dismissed the claim, but retained jurisdiction to ensure compliance with the agreement, through the appointment of a Technical Compliance Advisor. No provision for any liability is required at this time under this remediation plan. Expenditures and related liabilities will be recognized as costs during the execution of the remediation plan are incurred beginning in fiscal year 2015.

On June 16, 2014, the USDOJ, acting on behalf of the United States Environmental Protection Agency (EPA), has filed a complaint alleging unauthorized discharges of pollutants from the storm sewer systems owned and/or operated by the Municipality of San Juan (MSJ), the Department of Transportation and Public Works (DTPW), and the Puerto Rico Highways and Transportation Authority (PRHTA) through certain flood control pump stations owned and operated by the Department of Natural and Environmental Resources (DNER), into the waters of the United States, in violation of the Federal Clean Water Act. The complaint seeks the assessment of civil penalties against MSJ, DTPW/PRHTA, DNER and the Commonwealth of Puerto Rico (collectively, the Puerto Rico Defendants) for past and present violations of up to $32,500 per day per violation, for those violations that occurred between February 5, 2007 and January 12, 2009; and $37,500 per day per violation, for those violations that occurred from January 13, 2009 to the present. The complaint further seeks injunctive relief to bring the defendants into compliance with the Municipal Separate Storm Sewer Systems Permit. MSJ, DNER, and DTPW/PRHTA individually resolved the complaint by

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

entering into three separate consent decrees with USDOJ/EPA. Pursuant to the settlement negotiations, and taking into considerations the economic impact of a civil penalty and the Puerto Rico Defendants' documented inability to pay a penalty, USDOJ/EPA agreed to waive the monetary civil penalty associated with the provisions alleged in the complaint. Thus, the three consent decrees focus on injunctive relief to enable the Puerto Rico Defendants to attain compliance with applicable statutory and regulatory provisions. The MSJ consent decree was lodged with the U.S. District Court for the District of Puerto Rico (District Court) on October 26, 2015. The DNER and the DTPW/PRHTA consent decrees were both lodged with the District Court on December 23, 2015. At this time, USDOJ has not yet filed a motion with the District Court for entry of the consent decrees, as USDOJ/EPA is evaluating public comments received during the mandatory public period pursuant to 28 C.F.R.£50.7.

As has been the case with each comprehensive pension reform measure enacted in the United States, certain public employees have brought lawsuits challenging the constitutionality of pension reform in Puerto Rico. Certain teachers and members of the Judiciary Branch of the Commonwealth have brought suits challenging the constitutionality of Act 160 and Act 162 of December 24, 2013, which reformed the Puerto Rico Teachers Retirement System and the Judiciary Retirement System, respectively. On January 8, 2014, a teachers' association filed a lawsuit challenging the constitutionality of Act 160 as applied to them. On April 11, 2014, the Supreme Court declared certain sections of Act 160-2013 unconstitutional while maintaining the constitutionality of the following: (i) all changes made to the benefit structure apply to future participants that are hired after July 31, 2014; (ii) elimination of special laws benefits for participants that retire on or after August 1, 2014; and (iii) reduction of special laws benefits to current retirees as of July 31, 2014. Currently, the Supreme Court's decision is under the Government's evaluation and analysis in order to determine the course of action to undertake.

On December 30, 2013, a judges' association filed a complaint in the Commonwealth's Court of First Instance, San Juan Part, alleging that Act 162 was unconstitutional because it allegedly violated the principle on judicial independence and retroactively makes changes to the Judiciary Retirement System. On February 21, 2014, the Puerto Rico Supreme Court upheld the constitutionality of Act No. 162, but ordered the application of its provisions prospectively rather than retroactively.

In May 2014, the Secretary of the Treasury of the Commonwealth (the Secretary) declared null a closing agreement entered into in a prior year in which a taxpayer and the former Secretary agreed to recognize the value of an unamortized tax asset not recovered by the taxpayer of approximately $230 million as of January 1, 2011, as a tax overpayment. The Commonwealth had recorded the $230 million upon execution of the closing agreement and it remained recorded through June 30, 2013. In June 2014, the taxpayer filed a lawsuit before the Court of First Instance (the trial court) against the Commonwealth requesting a declaratory judgment to enforce the validity of the closing agreement. On October 10, 2014, the trial court ruled in favor of the taxpayer, holding that the closing agreement was valid. The Commonwealth appealed this judgment, and on February 25, 2015, the Appellate Court ruled in favor of the Commonwealth by declaring null and void the final agreement subscribed on March 26, 2012 between the Department of the Treasury and the taxpayer. The taxpayer immediately filed a certiorari petition and an urgent motion for relief before the Puerto Rico Supreme Court, which was denied by said court on February 27, 2015, finally closing the case in favor of the Commonwealth. As a result of this favorable judgment, the Commonwealth reversed from its books at June 30, 2014 the $230 million income tax refund accrual that it had previously recorded upon execution of the original closing agreement.

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

On June 28, 2014, certain holders of bonds issued by PREPA filed a lawsuit in the United States District Court for the District of Puerto Rico *(Franklin California Tax Free Fund v. Commonwealth of Puerto Rico)* seeking a declaratory judgment that the Recovery Act violates several provisions of the United States Constitution. The complaint alleges that the Recovery Act is a law dealing with "bankruptcy matters" and that the Commonwealth is precluded by the United States Constitution from enacting this law since only the United States Congress can do so under the "bankruptcy clause" of the United States Constitution. The complaint further alleges that certain provisions of the Recovery Act, if enforced, would violate several provisions of the United States Constitution because they would constitute an unconstitutional impairment of the contract between PREPA and its bondholders or a "taking" of the bondholders' property without just compensation. On July 22, 2014, an investment manager, on behalf of investment funds that purportedly hold bonds issued by PREPA, filed another lawsuit in the United States District Court for the District of Puerto Rico *(Bluemountain Capital Management, LLC v. Alejandro Garcia Padilla, et. al.)* seeking a declaratory judgment that the Recovery Act violates the bankruptcy clause of the United States Constitution and other provisions of the United States and Commonwealth Constitutions, asserting similar arguments as the *Franklin California Tax Free Fund* complaint. On August 20, 2014, the District Court issued an order consolidating both actions. The Commonwealth, PREPA, and GDB have filed motions to dismiss both lawsuits for failure to state a claim. The motions to dismiss assert, among other things, that since the Recovery Act has never been invoked, the lawsuits are not ripe, and that there is no preemption by federal law, because there is no federal law applicable to the enforcement of the debts of Puerto Rico public corporations. On February 6, 2015, the United States District Court for the District of Puerto Rico issued a declaratory judgment and permanent injunction holding that the Recovery Act is unconstitutional because it is preempted by the United States Bankruptcy Code. The District Court's decision was upheld by the United States Court of Appeals for the First Circuit and subsequently upheld by the U.S. Supreme Court.

The Commonwealth receives financial assistance from the federal government in the form of grants and entitlements. Receipt of grants is generally conditioned upon compliance with terms and conditions of the grant agreements and applicable federal laws and regulations, including the expenditure of resources for eligible purposes. Substantially, all grants are subject to audit under Circular A-133 of the Office of Management and Budget of the United States of America (OMB Circular A-133), all of which are performed at the individual department or agency level. Disallowance as a result of these audits may become liabilities of the Commonwealth. At June 30, 2014, based on an evaluation of pending federal disallowances, the Commonwealth has recorded approximately $69.7 million as other long-term liabilities in the accompanying statement of net position. Expenditures that are still subject to audit could be disallowed but management believes any such future disallowances would not be material to the basic financial statements.

*Commitments*

PRIFA is a subgrantee of the Office of the Governor of the Commonwealth under the State Fiscal Stabilization Fund Program, which was authorized under Title XIV of Division A of the American Recovery and Reinvestment Act of 2009 (the ARRA Act). PRIFA was awarded a $20 million grant for ARRA Act implementation costs and a $55 million grant for school renovations. Under the ARRA programs, PRIFA is responsible to oversee the administration of all resources awarded to the Commonwealth under the ARRA Act. PRIFA will also act as coordinator of efforts and tasks to ascertain ARRA Act funds are properly managed. Additionally, PRIFA is responsible for contracting, managing, and providing oversight to the school renovations or improvement projects. Pursuant to the provisions of the ARRA Act, PRIFA also entered into a subgrantee agreement with the Puerto Rico Energy Affairs Administration (EAA) to

225 (Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

administer approximately $62 million of a grant to be received from the U.S. Department of Energy (DOE) under the Weatherization Assistance Program (WAP). WAP was established to provide assistance to the elderly, families with children, persons with disabilities and those with a high-energy burden in their household. In addition, pursuant to the provisions of the ARRA Act, PRIFA entered into a subgrant agreement with the EAA to assist in the administration of approximately $27 million of a grant to be received from the DOE under the State Energy Program (SEP). SEP was established to advance energy efficiency and renewable energy technologies throughout Puerto Rico with various initiatives for government, commercial, and residential sectors. The ARRA programs concluded during fiscal year ended June 30, 2012; however, extensions were provided to grantees for fiscal years ended June 30, 2013 and 2014, in order to complete the projects by which grants were provided. The remaining activity of the ARRA programs is related to the conclusion of pending and administrative matters related to such program.

On November 23, 1998, a global settlement agreement (the Global Agreement) was entered into by and between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The Global Agreement calls for annual payments through the year 2025, which will vary due to inflationary and volume adjustments. Estimated payments to be received under the Global Agreement through the year ending June 30, 2025 amount to approximately $1.1 billion. After 2025, the tobacco companies shall continue making contributions in perpetuity. Pursuant to Act No. 173 of July 30, 1999, which created the Trust (a blended component unit), the Commonwealth assigned and transferred to the Children's Trust the contributions that the Commonwealth is entitled to receive under the Global Agreement. Payments received under the Global Agreement and recognized as revenue during the year ended June 30, 2014, amounted to approximately $72.1 million. All of the revenue to be received under the Global Agreement and investment earnings on certain accounts under bond indentures is pledged as collateral for the Tobacco Settlement Asset-Backed Bonds, Series 2002, 2005, and 2008. At June 30, 2014, the approximate amount of the pledge is $2.5 billion, representing the approximate remaining principal and interest of the aforementioned bond issuances, which are committed through May 15, 2057. Accordingly, until May 15, 2057, such revenue is not available for other purposes.

On November 23, 2010, the Legislature of the Commonwealth approved a new article 9A to Act No. 66 of June 22, 1978 (the Article), authorizing PRMeSA, a blended component unit, to incur obligations up to $285 million, under such terms and conditions approved by the Board of Member Institutions of PRMeSA and GDB, as fiscal agent of the Commonwealth and its instrumentalities. These additional funds shall be deposited in a special account at GDB and may only be used for the following purposes:

a.  payment of debts to suppliers, agencies, institutions, and reserve fund for the self-insurance (professional responsibility and interfund debt) of PRMeSA; and

b.  to provide operational liquidity to ease PRMeSA's fiscal situation, as determined by the agreement with GDB.

From savings generated as a result of the debt renegotiations with the agencies and institutions, PRMeSA will create a fund to cover operating expenses related to maintenance, overhaul, and reconditioning of the physical plant. GDB, in its role as fiscal agent, shall possess the administrative mechanisms as it deems necessary to ensure that these funds will be used solely and exclusively for the purposes set forth in the Article. The special bank account and the funds deposited therein shall not be seized, syndicated, frozen, encumbered, or otherwise affected by decisions, judgments, orders, or rulings issued by courts of Justice of

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

the Commonwealth or its agencies or public corporations during any adjudicative proceeding of administrative or judicial nature, regardless of whether they were initiated by private individuals or public institutions. PRMeSA was required to develop and implement within one hundred eighty (180) days from the approval of the Article, an aggressive collection plan for the recovery of its accounts receivable. The Directors shall report periodically to GDB on the implementation of that plan, and report annually to the Board of Member Institutions and GDB the collection proceeds arising from the execution of the plan. GDB was authorized as fiscal agent to undertake any necessary measures in order to, within a reasonable period of time, help PRMeSA to become and operate as an independent fiscal instrumentality. However, once the collection plan is working as expected and providing PRMeSA the resources required, and becomes a financially independent institution as determined by GDB, PRMeSA will be required to assume the remaining established obligations.

The healthcare industry, under which PRMeSA operates, is subject to numerous laws and regulations, which include, among other things, matters such as government healthcare participation requirements, various licenses and accreditations, reimbursements for patient services, and Medicare and Medicaid fraud and abuse. Government action has increased with respect to investigations and/or allegations concerning possible violations of fraud and abuse and false claims statutes and/or regulations by healthcare providers. Providers that are found to have violated these laws and regulations may be subjected to fines or penalties. While management of PRMeSA believes its policies, procedures, and practices comply with governmental regulations, no assurance can be given that the Administration will not be subject to governmental inquires or actions.

The Health Insurance Portability and Accountability Act (HIPAA) was enacted in August 1996 to assure health insurance portability, reduce healthcare fraud and abuse, guarantee security and privacy of health information, and enforce standards for health information. Organizations are required to be in compliance with HIPAA provisions. Organizations are subject to significant fines and penalties if found not to be compliant with the provisions outlined in the regulations. PRMeSA's management believes that they are in compliance.

The Health Information Technology for Economic and Clinical Health Act set meaningful use of interoperable Electronic Health Record (EHR) adoption in the health system as a critical national goal and incentivized the EHR adoption. Its goal is not adoption alone but meaningful use of EHRs, that is, their use by providers to achieve significant improvements in care. Meaningful use compliance is required before the Federal Fiscal Year 2016 or otherwise the hospital will incur penalties for noncompliance that may reduce future Medicare payments and potentially Medicare Advantage program payments. The Centers for Medicare and Medicaid Services (CMS) manages and has implemented an incentive program for those hospitals that implement EHR and that also, comply with certain specific requirements. CMS' EHR Incentive Programs provide incentive payments to eligible hospitals as they adopt, implement, upgrade, or demonstrate meaningful use, as defined by CMS, of certified EHR technology. As of June 30, 2014, PRMeSA is under the implementation of its EHR system.

The Special Communities Perpetual Trust (the Trust) has financial assistance agreements with several municipalities of the Commonwealth to provide funding for the construction, improvement, and rehabilitation of certain projects of the Special Communities. At June 30, 2014, the Trust's accumulated budgeted balances on these agreements amounted to approximately $1,006 million, from which a total of approximately $963.7 million had been disbursed.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Construction commitments at June 30, 2014, entered into by the PBA, amounted to approximately $5.1 million. In addition, PBA's construction commitments to honor the cost of the uncompleted public schools under the 21st Century Program amounted to approximately $81.8 million at June 30, 2014. PRIFA has active construction projects at June 30, 2014, representing construction commitments amounting to $36.6 million. At June 30, 2014, the Children's Trust had approved commitments to provide assistance to several entities through 24 contracts with balances amounting to approximately $16 million.

The Commonwealth is also committed under numerous noncancelable long-term operating lease agreements, which expire through 2033, covering land, office facilities, and equipment. Rental expenditure within the governmental funds for the year ended June 30, 2014 under such operating leases was approximately $185 million.

The future minimum lease payments for these leases are as follows (expressed in thousands):

| Year(s) ending June 30: | | |
|---|---|---|
| 2015 | $ | 87,671 |
| 2016 | | 66,368 |
| 2017 | | 46,995 |
| 2018 | | 32,589 |
| 2019 | | 21,976 |
| 2020–2024 | | 61,939 |
| 2025–2029 | | 24,586 |
| 2030–2034 | | 4,891 |
| Total future minimum lease payments | $ | 347,015 |

*Environmental Commitments and Contingencies*

The Commonwealth accounts for pollution remediation obligations in accordance with GASB Statement No. 49, *Accounting and Financial Reporting for Pollution Remediation Obligations*. This Statement addresses accounting and financial reporting standards for pollution (including contamination) remediation obligations, which are obligations to address the current or potential detrimental effects of existing pollution by participating in pollution remediation activities such as site assessments and cleanups. The scope excludes pollution prevention or control obligations with respect to current operations, and future pollution remediation activities that are required upon retirement of an asset, such as landfill closure and postclosure care.

Once any of five specified obligating events occurs, a government is required to estimate the components of expected pollution remediation outlays and determine whether outlays for those components should be accrued as a liability or, if appropriate, capitalized when goods and services are acquired. Obligating events include the following:

- The government is compelled to take pollution remediation action because of an imminent endangerment.

- The government violates a pollution prevention - related permit or license.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

- The government is named, or evidence indicates that it will be named, by a regulator as a responsible party or potentially responsible party (PRP) for remediation, or as a government responsible for sharing costs.

- The government is named, or evidence indicates that it will be named, in a lawsuit to compel participation in pollution remediation.

- The government commences or legally obligates itself to commence pollution remediation.

During 2012, the PBA identified asbestos in its central offices building in Minillas. Asbestos removal cost was estimated based on environmental engineers' consultant survey and as a result of this study, the PBA recorded a liability of $2 million at June 30, 2012. During the year ended June 30, 2013 most of the asbestos removal process was completed at a total cost very similar to the total provision recorded in 2012. The PBA has contracted environmental engineers to determine if asbestos exists at any other of the PBA's properties. At June 30, 2014, no other property has been identified; therefore, no additional reserve for any future potential liability has been recorded.

### *Fiduciary Funds*

ERS is a defendant in a lawsuit challenging the constitutionality of Act No. 3 of 2013 and in another lawsuit challenging the constitutionality Act No. 3 and Act No. 32 of 2013. In the first lawsuit, the plaintiffs requested the ERS to honor the participants of an employer of the ERS, the benefits available to them under Act No. 447 which were affected by Act No. 3 of 2013, with the economic consequences that this would entail. On February 13, 2015, the Puerto Rico Supreme Court denied the plaintiff's recourse. On March 6, 2014, the plaintiffs file an amended complaint, including the Board of Trustees of the ERS as a defendant and including a torts claim against the ERS's Administration and its Board of Trustees. In the second lawsuit, the plaintiffs requested the annulment of the provisions of law imposing economic obligations to municipalities in favor of the ERS. Act No. 3 of 2013 imposed a $2,000 contribution to all municipalities and public corporations for every retiree as of June 30, 2013 and Act No. 32 of 2013 imposed an additional uniform contribution according to the corresponding proportion of the employer's contributions. On May 5, 2015, the Puerto Rico First Court of Instance issued a judgment dismissing the case. On July 27, 2015, the plaintiffs filed an appeal at the Puerto Rico Court of Appeals. On January 5, 2015, the Puerto Rico Court of Appeals upheld the decision regarding the dismissal of the case. On April 5, 2016, the plaintiffs filed a Certiorari before the Puerto Rico Supreme Court. The Puerto Rico Supreme Court has yet to issue a ruling regarding this. Although an economic compensation was not requested in this second case, if a ruling declaring invalidity of the questioned articles is made by the Puerto Rico Supreme Court, the ERS will not receive the payments imposed by Act No. 3 and Act No. 32 of 2013 to the municipality and the ERS will probably have to refund payments already made under those law provisions. With respect to these lawsuits, the ERS, in consultation with legal counsel, has advised that at this stage of the proceedings they cannot offer an opinion as to the probable outcome. Accordingly, management does not consider necessary making any provision in its books for these cases and intends to contest them vigorously.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

ERS is also a defendant in a lawsuit brought by pensioners of the ERS. They filed the claim on behalf of the ERS against the underwriters of certain ERS pension bonds and some of the former members of the Board of Trustees of the ERS. The complaint requested $800 million in damages resulting from the $3 billion bond issuance in 2008 that according to the plaintiffs compromised the solvency of the ERS. This case is in its initial stages; therefore, no provision for any liability that may result upon adjudication of this lawsuit has been recorded by the ERS in its fiduciary funds.

TRS is a defendant in one lawsuit filed by several groups representing the teachers alleging that, since the Puerto Rico Supreme Court declared unconstitutional the subsection in Act No. 160 of 2013 that established the interest rate to be paid by a member for the accreditation of services rendered but not credited, the TRS is unable to charge 9.5% interest on account of service credit. Prior to the adoption of Act No. 160 of 2013, the interest rate applicable in respect of such accreditation stood at 2% as per Board Resolution. The TRS believes that the claimant's allegations are not legally sustainable and the 9.5% interest rate is valid given that the percentage interest is not a contractual right of the active members; as it was not established in Act 91 of 2004, previous law of the TRS. It is the TRS's opinion, in consultation with legal counsel, that what the Puerto Rico Supreme Court ruled as unconstitutional is that active participants could only pay for unaccredited services up to July 31, 2014. With the Puerto Rico Supreme Court's ruling, active participants can continue to pay for unaccredited services and the interest to be charged is defined in Article 1, which was not declared unconstitutional. The Board of Trustees of the TRS addressed the issue administratively by unanimously approving a resolution, retroactive to December 24, 2013, by which it determined that the interest rate to be paid by a member for the accreditation of services rendered but not credited will be 9.5%. Should the courts not agree with the TRS's position, the TRS is exposed to reimburse the amounts already collected in excess of 2%, honor the 2% for all cases pending and new applications submitted, the actuarial impact of granting such accreditation, and to the sanctions and/or fees the court may impose. The Board of Trustees of the TRS, in consultation with legal counsel, is unable to assess the likelihood of an adverse resolution of the case. At this time, it is not possible to determine the financial impact of said outcome.

In addition, each of the Retirement Systems is a defendant or co-defendant in various lawsuits resulting from the ordinary conduct of its operations. Based on the advice of legal counsel and considering insurance coverages, management is of the opinion that the ultimate liability, if any, will not have a significant effect on the financial status of each of the Retirement Systems.

### *Discretely Presented Component Units*

In the normal course of their operations, various Component Units are subject to guarantees, actions brought by third parties seeking damages or entering into commitments. Such actions are disclosed in the separately issued reports of the major component units, included below. With respect to commitments related to guarantees, certain nonmajor component units engaged in the financial services industry were also included for informative purposes. These commitments and guarantees are summarized below:

(a) *GDB*

At June 30, 2014, GDB has financial guarantees for the private sector of approximately $592 million. In addition, at June 30, 2014, standby letters of credit to the public sector were approximately $1.3 billion. Commitments to extend credit to the public sector were approximately $1.4 billion, while there were no commitments to extend credit to the private sector.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

On July 24, 2013, Aerostar Airport Holdings, LLC (Aerostar) and the PRPA entered into a lease agreement of Luis Muñoz Marín International Airport (LMMIA), for a term of 40 years. In connection with the lease of LMMIA, GDB executed a payment guarantee in favor of Aerostar for any Termination Damages due and payable in cash by the PRPA under the lease agreement. In accordance with GDB's guarantee, Aerostar has the right to terminate the lease agreement mainly under three different noncompliance scenarios on the part of the PRPA. The amount of Termination Damages mainly consists, among other components, of the LMMIA Facility Leasehold Value and Leasehold Compensation as defined in the agreement.

On September 22, 2011, Autopistas Metropolitanas de Puerto Rico, LLC (Metropistas) and PRHTA entered into a concession agreement (the Concession Agreement) for the administration of the toll roads PR-22 and PR-5, for which the PRHTA received in exchange a lump-sum payment of $1.1 billion and a commitment to make immediate improvements to the toll roads amounting to $56 million and to comply with world-class operating standards, which may require investing more than $600 million over the life of the concession. In connection with the closing of the Concession Agreement, GDB executed a payment guarantee in favor of Metropistas pursuant to which GDB acts as guarantor of any Termination Damages, as defined in the Concession Agreement, due and payable in cash by the PRHTA under the Concession Agreement. The amount of Termination Damages consists, among other components, of the fair market value of Metropistas' interest in the toll roads. At the same time, in connection with the payment guarantee, GDB and PRHTA also entered into a Reimbursement Agreement whereby the PRHTA agreed to reimburse GDB for any amounts paid under the guarantee.

On August 18, 2002, the Legislature approved Act No. 198, which creates the Cooperative Development Investment Fund. The purpose of this fund is to promote the development of cooperative entities. This fund will be capitalized through contributions to be provided by GDB up to $25 million to be matched by cooperative entities. As of June 30, 2014, GDB has contributed $20.4 million to the Cooperative Development Investment Fund, $1.1 million of which were contributed during the year ended June 30, 2014.

GDB's Development Fund has entered into an agreement with the Economic Development Bank for Puerto Rico (EDB) whereby the Development Fund would guarantee a portion of loans granted by the EDB under a government program named "The Key for Your Business" (the Program). Under the agreement, the Development Fund would assign $15 million of its capital for the Program. The Development Fund guarantees one-third of the outstanding principal balance of each loan plus accrued interest and certain other charges. The Development Fund charges one percent of the loan amount as guarantee fee and no loan can exceed $50,000. In addition, GDB, the Development Fund, and certain participating banks enter into guarantee, commitment, and funding agreements in which the Development Fund guarantees eligible loans made by such banks to eligible businesses up to a maximum of 30% of the principal amount of the loans. The guarantee Program started on April 3, 2012 and ended on April 3, 2013. As of June 30, 2014, guarantees amounted to approximately $15 million. At June 30, 2014, the outstanding balance of loans guaranteed by the Development Fund amounted to approximately $4.5 million, and the allowance for losses on guarantees amounted to approximately $243 thousand.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The Housing Finance Authority, a blended component unit of GDB, acts as servicer for a number of mortgage loans owned by other investors. The servicing is generally subcontracted to a third party. As of June 30, 2014, the principal balance of the mortgage loans serviced for others is approximately as follows (expressed in thousands):

| | | |
|---|---|---|
| Puerto Rico Community Development Fund I | $ | 40,099 |
| R-G Mortgage, Inc. or its successor | | 1,256 |
| Office for the Administration of the Assets of the Urban Renovation and Housing Corporation or its successor without guaranteed mortgage loan payments | | 24 |
| | $ | 41,379 |

The U.S. Office of Inspector General (OIG) has performed various examinations of the HOME Program covering fiscal years ended prior to July 1, 2010. These examinations covered periods in which the HOME Program was under the administration of the Department of Housing. These examinations identified instances of noncompliance with terms and conditions of the grant agreements, applicable federal law, and the HOME Program's regulations, including but not limited to the expenditure of resources for ineligible purposes. OIG identified in its examinations disallowed costs amounting to approximately $18.3 million. The Housing Finance Authority, a blended component unit of GDB, recorded a contingency for such disallowed costs, and additional amounts identified internally as potential disallowances, amounting to approximately $20.4 million. On May 2013, the Housing Finance Authority entered into a three-year repayment plan, starting on August 1, 2013, with HUD to return HOME funds amounting to approximately $1.8 million that were determined to be disallowed costs within the $18.3 million discussed above. On July 31, 2014, the Governor of the Commonwealth signed the HOME Voluntary Repayment Settlement Agreement (The Voluntary Settlement Agreement) with HUD. The Voluntary Settlement Agreement establishes the reimbursement to the HOME program of $14.2 million, from nonfederal funds, for disallowed expenditures in connection with HUD-funded projects, as defined and described in the Voluntary Settlement Agreement, in two installments of $10 million and $4.2 million due on October 1, 2014 and October 1, 2015, respectively. During the year ended June 30, 2014, the Affordable Housing Subsidy Program paid $624,403 to the Home Program to cover the installment payments due under the $1.8 million repayment plan. At June 30, 2014, the total liability amounted to approximately $16 million and is included in accounts payable and accrued liabilities in the statement of net position - major component units.

Other federal programs are also subject to audits. Such audits could result in claims against the resources of the Housing Finance Authority. No provision has been made for any liabilities that may arise from such amounts since the amount, if any, cannot be determined at this date.

GDB and certain of its component units are defendants in several lawsuits arising out of the normal course of business. Management, based on advice of legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings will not have a material adverse effect on the financial position and results of operations of GDB or its component units.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(b)   *PRHTA*

PRHTA is a defendant or codefendant in various lawsuits for alleged damages in cases principally related to construction projects. These are generally either fully or partially covered by insurance. The contactors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless the PRHTA from lawsuits brought on account of damages relating to the construction of the projects. As of June 30, 2014, the PRHTA, based on legal advice, has recorded a liability of approximately $216 million for probable losses on those claims not fully covered by insurance. In the opinion of legal counsel, any liability in excess of the recorded liability that may arise for such claims will not be significant to the PRHTA's financial position or results of operations.

PRHTA entered into a System and Test Track Turnkey Contract (STTT Contract) with Siemens Transportation Partnership Puerto Rico, S.E. (Siemens) and other contractors for the purpose of operating and maintaining the Urban Train. During 2005, the STTT Contract became effective upon execution of the contract for an initial term of five years with an option by the PRHTA to extend the term for an additional five years. The compensation is based on a schedule included in the master agreement, which approximates $4.0 million on a monthly basis. The total annual operation and maintenance cost, including cost of issuance and electricity, for fiscal year 2014 was approximately $91.2 million.

(c)   *PREPA*

PREPA is a defendant or codefendant in several lawsuits incidental to its business, some involving substantial amounts. In those instances, that management and legal counsel believe that the outcome of the litigation will be unfavorable to PREPA, a provision has been made to cover the estimated liability. PREPA's management, based on discussions with legal counsel, believes that the additional liability, if any, resulting from the ultimate resolution of these matters will not have a material effect on PREPA's financial position or results of operations.

On May 18, 2000, Abengoa, Puerto Rico, S.E. (Abengoa), PREPA's contractor for the repowering of San Juan steam plant units 5 and 6, unilaterally declared a termination of the contract with PREPA and filed a complaint for breach of contract. This litigation was bifurcated into a liability and damages phase. Trial on the first phase to determine breach of contract commenced on January 22, 2015 and was concluded during the course of that same year. Trial on the second phase to determine damages and economic terms is scheduled to commence in 2016. PREPA believes that the actions by the contractor will not materially affect the ability of PREPA to provide service nor there will be a material difference in the quality of service provided by PREPA. PREPA understands that it has significant probabilities of prevailing on the merits of its counterclaim for wrongful termination against Abengoa and its surety.

In 2009, a large fire at a tank farm owned by CAPECO caused major damage to surrounding areas. PREPA stored some of its fuel at this facility. In the aftermath of the fire, numerous claims were filed against CAPECO. Some of the plaintiffs included PREPA as a defendant in these suits, alleging that PREPA failed in its duty (as the owner of fuel stored at the site) to properly monitor CAPECO's operations in the tank farm. All cases are in the initial stages and PREPA intends to vigorously defend

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

against these claims. On August 12, 2010, CAPECO filed for bankruptcy. As a result, thereof all proceedings against CAPECO have been stayed. The proceedings against PREPA continue.

In 2011, separate lawsuits were filed against PREPA by various consumers claiming damages allegedly caused by incorrect and unlawful billing and invoicing practices. The lawsuits have been consolidated and certified as complex litigation, as requested by PREPA. The consumers are claiming damages in excess of $100 million and requested that the case be certified as a class action. PREPA filed its reply in opposition to the class certification request. Discovery proceedings have begun.

In 2011, a federal class action lawsuit was filed claiming that PREPA's rate schedules, including subsidies granted to various groups, violate federal antitrust law, specifically the Robinson-Patman Act, and the religious freedom clause of the First Amendment to the United States Constitution by discriminating against certain customers who are not entitled to subsidies and requiring certain customers to associate with persons of different religious or political views by subsidizing those views through PREPA's lower electric rates to such persons. PREPA believes the claims are without merit because several elements of the Robinson-Patman Act that the plaintiffs must prove do not exist in PREPA's case, including that it does not sell electricity in interstate commerce and because PREPA's subsidies are mandated by Commonwealth legislation rather than independent PREPA actions. PREPA moved for full dismissal; however, the court partially granted the request. The pending issues in the case are under discovery proceedings.

In 2011, a civil lawsuit was filed against PREPA and its directors in federal court in Puerto Rico, by eight private individuals and one local private corporation, claiming violations of the Racketeer Influenced and Corrupt Organizations Act (the RICO Act), including unlawful use of an enterprise to launder money generated by a pattern of racketeering activity, unlawful manipulation of an enterprise for purposes of engaging in, concealing, or benefiting from a pattern of racketeering activity, unlawful conspiracy to violate the RICO Act, and conspiracy to advance a money-laundering scheme. Neither the United States federal government nor the Commonwealth government is a party in this civil lawsuit. The amount claimed is unspecified. Plaintiffs have also asked the federal court to allow them to be the representatives of a class consisting of all consumers of the electricity sold by PREPA from 2007 to the present. PREPA opposed to the certification of class action, and was denied by the court. On September 25, 2012, the federal court dismissed all of the above claims except those claims regarding conspiracy to advance a money-laundering scheme and conspiracy for acquiring an interest in an enterprise. PREPA believes that the undismissed RICO Act claims are without merit because the plaintiffs will be unable to prove the necessary elements of those claims, in particular those that require showing that PREPA conspired through its employees to violate the RICO Act, or that its directors or Board members obtained any interest in PREPA (other than their Board position).

In 2009, PREPA filed a lawsuit in Commonwealth court against Vitol, Inc. and certain of its affiliates and subsidiaries seeking a declaratory judgment as to the nullity of a $2 billion fuel supply agreement due to Vitol's failure to disclose certain corruption cases for which it accepted responsibility. Vitol removed this lawsuit to federal court and presented a counterclaim alleging that PREPA owed it approximately $45 million for delivered fuel and related excise taxes. On November 28, 2012, PREPA filed a second complaint against Vitol in the Commonwealth Court of First Instance seeking essentially the same remedies sought in the first action but as to four other contracts, after discovery revealed the date in which Vitol learned of the investigations in the corruption cases. Vitol also removed this action

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

to the U.S. District Court for the District of Puerto Rico. PREPA claims approximately $3.5 billion in the aggregate. Vitol has resolved the claim for the $17 million in excise taxes and has stated that it will amend its counterclaim to dismiss that claim. Discovery in the case is closed. The parties have submitted motions for summary judgment against each other and are in the process of filing their respective oppositions thereto. The motions are pending adjudication by the court.

Fifty-four plaintiffs, former and current PREPA employees, claim that they have health problems due to PREPA's intentional failure to comply with federal and local laws regarding asbestos materials. In particular, plaintiffs claim that, during a certain time-frame, in which PREPA had the obligation to take measures regarding asbestos materials in its facilities, PREPA failed to comply with its duty to protect the plaintiffs from asbestos exposure. Plaintiffs claim approximately $321 million in damages. PREPA alleged employer's immunity under the Workers' Compensation Law. An evidentiary hearing on the issue took place. After trial, the Court entered judgment dismissing the claims in their entirety. The plaintiffs filed an appeal before the Puerto Rico Appeals Court. PREPA filed a motion to dismiss the appeal. The Appeals Court denied PREPA's motion to dismiss and PREPA filed its appellate brief. The case is pending adjudication by the Appeals Court.

On November 21, 2013, Tropical Solar Farms, LLC; New Horizon Solar, LLC; Jonas Solar Energy, LLC; and Roberto Torres (collectively, the Plaintiffs) filed a 58-page suit in the Commonwealth of P.R. Court of First Instance, Ponce Section, against 29 defendants and several John Does. The complaint contains a plethora of claims against multiple defendants arising from an alleged multiplicity of sources of obligations: contractual, in tort, and in breach of fiduciary duties and the law. It encompasses private entities, a public corporation, PREPA and former public officers, among others. The complaint claims monetary compensation in excess of $705 million. The complaint alleges that the defendants negotiated several Renewable Power Purchase Agreements to provide up to 40 megawatts to PREPA, all of which were assigned by the plaintiffs to various other defendants. The Plaintiffs allege that the defendants never intended to comply with their obligations under the agreements, and were only buying time to advance their other renewable energy projects with PREPA.

PREPA filed its answer to the complaint on January 7, 2014. As of this date, not all the defendants have answered the complaint, and the discovery proceedings are in a very early stage. Although it is anticipated that the litigation may become a protracted one as a result of the plethora of allegations and defendants, it is our professional evaluation at this early stage of the proceedings that PREPA should not be held liable to plaintiffs.

In addition to these cases, PREPA is involved in typical litigation for an electric power utility, but management estimates the amounts of such claims are not material and will not affect adversely PREPA's operations.

(d)   ***PRASA***

PRASA is the defendant in a lawsuit presented by customers alleging that PRASA has over billed them due to the methodology used to estimate consumption. There is one case in which plaintiffs requested a certification of the suit as a class action and seek recovery damages and an injunction enjoining PRASA from continuing to bill using the current methodology. The class certification hearing took place in June 2011, a certification to a class action was issued. PRASA appealed the class action certification and is expecting the Court decision on the request. PRASA's potential exposure

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

from these lawsuits is unlikely and, as such, no liability is being reported on the accompanying basic financial statements.

PRASA is the defendant or codefendant in various other lawsuits. The ultimate outcome of the lawsuits cannot presently be determined. However, PRASA's management, based on the advice of legal counsels, is of the opinion that these lawsuits will not have a material impact on the basic financial statements.

(e)   *UPR*

UPR participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of the OMB Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, or to compliance audits by grantor agencies. The amount, if any, of expenditures that may be disallowed by the granting agencies cannot be determined at this time. Management believes the impact will not be material to the UPR's financial statements.

Medical malpractice claims have been asserted against the UPR hospital and are currently at various stages of litigations. It is the opinion of the UPR hospital's legal counsel and management that recorded accruals are adequate to provide for potential losses resulting from pending or threatened litigation, as well as claims from unknown incidents that may be asserted arising from services provided to patients.

In September 2013, the Federal Center for Disease Control and Prevention (CDC) issued a preliminary report, which indicated that bacteria affected several patients in the UPR hospital's intensive care unit during a period of time. The UPR hospital may be subject to penalties or sanctions as a result of this situation. Also, as of June 30, 2014, there are known judicial and extra-judicial claims related to this matter. As permitted by Act No. 98 of August 24, 1994, maximum claims loss against the UPR hospital is limited to $75,000 per person, or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. It is the opinion of the UPR hospital's management and its legal counsel that the outcome of these claims would not have a material effect on the UPR or the hospital's operations.

(f)   *PRHIA*

PRHIA has been requested to repay the Commonwealth's Department of the Treasury approximately $103 million representing excess transfers of money from the central government during the fiscal years 2001–2003. After consultation with external legal counsel, PRHIA is of the opinion that the money does not have to be repaid and believes that the likelihood of an unfavorable outcome is remote. Therefore, no reserve for such request has been recognized in PRHIA's financial statements.

PRHIA is a defendant and codefendant in legal proceedings pertaining to matters incidental to the performance of its operations. With respect to the pending and threatened litigation, PRHIA, in consultation with legal counsel, has advised that at this stage of the proceedings they cannot offer an opinion as to the probable outcome. Accordingly, management does not consider necessary making any provision in its books for these cases and intends to contest them vigorously.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(g)  **PCSDIPRC**

PCSDIPRC provides insurance coverage over the stocks and deposits of all cooperatives in Puerto Rico. The deposit base of the cooperatives approximates $7.3 billion at June 30, 2014.

*Environmental Commitments and Contingencies*

The following discretely presented component units' operations are the ones carrying and involved in specific activities that are subject to state and federal environmental regulations:

(a)  **PREPA**

Facilities and operations of PREPA are subject to regulation under numerous federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, Oil Pollution Act (OPA), Resource Conservation Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and Underground Storage Tanks, among others.

In February 1992, the Environmental Protection Agency (EPA) conducted a multimedia inspection of PREPA's facilities and identified several alleged instances of noncompliance related to PREPA's air, water, and oil spill prevention control and countermeasures compliance programs. PREPA and the EPA negotiated to resolve the issues regarding the deficiencies observed during the inspection and to ensure future compliance with all applicable laws and regulations. As a result of the negotiations, PREPA and the EPA reached an agreement that resulted in a consent decree (the Consent Decree) approved by the United States federal court in March 1999. Under the terms and conditions of the Consent Decree, PREPA paid a civil penalty of $1.5 million, and implemented additional compliance measures amounting to $4.5 million. In addition, the Consent Decree requires that PREPA improve and implement compliance programs and operations in order to assure compliance with environmental laws and regulations.

In 2004, the United States federal court approved a modification to the Consent Decree agreed to by PREPA and the EPA under which PREPA reduced, in two steps, the sulfur content in the No. 6 fuel oil used in certain generating units of its Costa Sur and Aguirre power plants (to 0.75% or less by March 1, 2005 and to 0.5% or less by March 1, 2007), and used No. 6 fuel oil with sulfur content of not more than 0.5% through July 18, 2009 at its Palo Seco and San Juan power plants. Additionally, PREPA has completed a nitrogen oxide emissions reduction program and modified the optimal operating ranges for all its units under the Consent Decree. PREPA also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs under the Consent Decree.

PREPA has been audited several times for compliance with the Consent Decree programs, and understands that a considerable number of them can be closed since their requirements have been completed. On July 22, 2014, representatives from PREPA, EPA, and USDOJ met to begin the discussion towards the termination of some of the programs. As a result, the EPA and the USDOJ requested PREPA to submit information regarding PREPA's compliance with the Programs for their review and evaluation. On September 25, 2014, PREPA met again with EPA and USDOJ representatives and submitted the information requested, along with a letter where PREPA formally requested the EPA to review and approve the termination of those programs provisions of the Consent

237                                                      (Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

Decree and its Modification of 2004 presented, as well as begin the process toward jointly filing in the Court a stipulation for Partial Termination of such programs. To accomplish this goal, PREPA suggested to appoint a task force composed of EPA and PREPA representatives to schedule and meet to address the details which EPA agreed to. On May 27 and 28, 2015, PREPA, EPA, and USDOJ legal representatives met to begin discussions about PREPA's termination claims, as well as define any additional documentation requested to support and demonstrate PREPA's determination of compliance with the different programs obligations. EPA, PREPA, and USDOJ representatives continue with a thorough evaluation and discussion process about this matter.

Since September 2004, there has been no legal action in the United States federal court or any administrative proceeding against PREPA regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of noncompliance. Noncompliance events must be disclosed to EPA in the corresponding report. Ordinarily, when a covered noncompliance event occurs, PREPA pays the stipulated penalty in advance in order to benefit from a 50% discount of the applicable stipulated penalty.

In 2002, PREPA received a "Special Notice Concerning Remedial Investigation/Feasibility Study for Soil" at the Vega Baja Solid Waste Disposal Superfund Site. The EPA has identified PREPA and six other entities as "potentially responsible parties," as defined in the CERCLA. In 2003, PREPA agreed to join the other potentially responsible parties in an Administrative Order on Consent (AOC) for a Remedial Investigation/Feasibility Study (RI/FS), with the understanding that such agreement did not constitute an acceptance or responsibility. Under the AOC, PREPA committed up to $250,000 as its contribution to partially fund the RI/FS. At this time, RI/FS has been completed. The work proceeded in accordance with the schedule established by PREPA and the other designated (PRPs). In July 2010, a proposed plan was issued identifying the Preferred Alternative to address soil contamination at the Vega Baja Solid Waste Disposal Site. EPA held a public hearing on August 3, 2010 to discuss the alternatives to address soil contamination.

The Record of Decision (ROD) was published as scheduled by EPA on September 30, 2011. Alternative No. 2, Removal with On-Site Consolidation and Cover in the Non-Residential Area, was selected. From this point on, EPA resumed negotiations with the PRP's, both private and public, toward signing a Consent Decree through which the PRP's would contribute enough funds to cover the costs of the remedial action and the maintenance of the site. PREPA has already approved a contribution of $1.0 million through Resolution 3804, April 1, 2011. Notwithstanding, through further negotiations an additional contribution of $300,000 was required by EPA. This additional contribution was approved by PREPA's Governing Board.

On December 4, 2012, the Federal Department of Justice lodged with the Court the Consent Decree Civil Action No. 3:12-cv-01988, which requires that PREPA shall pay to EPA for the past response costs of the agency the amounts of $300,000 within 30 days of the effective date; $300,000 no later than August 15, 2013 and $300,000 no later than August 15, 2014. On April 10, 2013, an Environmental Escrow Account was entered into by GDB, as the escrow agent, PRLA, the Puerto Rico Housing Department and PREPA; and the United States of America on behalf of the Environmental Protection Agency. On June 24, 2013, PREPA deposited $400,000 into the escrow as provided in the Consent Decree.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

PREPA continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

(b) **PRASA**

On July 1, 2003, PRASA entered into an agreement (Civil Action No. 01-1709) with EPA to attain compliance with the Clean Water Act in relation to PRASA's wastewater pump stations (WWPSs) in response to a significant number of sanitary sewer bypasses from these locations. The Clean Water Act prohibits discharges of sewage from any point in the collection and treatment system other than the authorized point at the treatment facility. PRASA completed all improvement projects required by EPA for these WWPSs on or before the established completion dates in the agreement. This agreement also required PRASA to invest $1 million in the development and implementation of a Supplemental Environmental Project (SEP). This project consisted of the connection of three non-PRASA communities to the PRASA's drinking water system. The connection has been completed and is awaiting completion of adjacent systems to fully integrate these systems to PRASA's service. The agreement also required the implementation of the Preventive Maintenance Program (PMP) for all of PRASA's WWPSs. This was fully completed in December 2010, and is still in place. As part of the agreement, PRASA pays stipulated penalties for pump station bypass events on a quarterly basis. The penalty calculations are based on the pumping capacity of the pump station and the time taken to correct the deficiency causing the bypass event. The amount paid during fiscal year 2014 was approximately $300,000.

On June 22, 2006, PRASA entered into a consent decree (Civil Action No. 06-1624) with EPA that requires PRASA to implement systemwide remedial measures at all of the wastewater treatment plants operated by PRASA. The decree establishes deadlines for the compliance with the conditions set forth in the agreement and stipulates penalties for violation of any of those deadlines. PRASA was assessed a stipulated civil penalty of $1 million, which was paid during fiscal year 2008. This penalty was assessed by the Court as payment for the discharge permit violations of several treatment facilities to the Clear Water Act. The agreement also required PRASA to deposit in an escrow account with GDB an additional civil penalty of $3 million. These funds are to be used for providing sewer service to a community that has not been connected to PRASA's sanitary sewer system. PRASA and the EPA decided to select the Lago La Plata community for this project. As part of the agreement, PRASA pays stipulated penalties on a yearly basis for exceedances to each of PRASA's facilities to their individual discharge permits. The penalty calculations are based on frequency of the exceedances as well as the percentage of the exceedances with its respective limit. The amount paid during fiscal year 2014 was approximately $600,000. These penalty payments are deposited into an escrow account from which a fraction of the deposited amount can be reimbursed to PRASA based on completion of specific projects and initiatives.

On May 25, 2006, PRASA entered into a plea agreement with the U.S. Department of Justice related to violations of the Clean Water Act, as amended, Title 33, USC, Sections 1131(a) and 1319(c)(2)(A). As part of the agreement (Criminal Case No. 06-CR-00202-001), PRASA paid a $9 million fine. This penalty was assessed by the Court as payment for the discharge permit violations of several treatment facilities to the Clean Water Act. PRASA was placed on probation for a period of five years. As part of the probation, PRASA has to comply with several special conditions, such as: (i) upgrade the

239 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

collection and wastewater treatment system in the Ponce de León Avenue area of San Juan for a cost of not less than $10 million to prevent direct discharges to the Martín Peña Channel; (ii) upgrade nine wastewater treatment plants for a cost of not less than $109 million; and (iii) comply with the consent decree signed by PREPA with the U.S. government on June 22, 2006. The plea agreement also established stipulated penalties for violation of any of the deadlines of performance standards set forth in the agreement. Currently, PRASA is in compliance with the deadlines and requirements of this consent order and no penalties have been paid.

On December 15, 2006, an agreement (Civil Case No. KPE 2006-0858 was signed between PRASA and the Department of Health of the Commonwealth related to violations of the Safe Drinking Water Act (SDWA), as amended. The agreement was preliminarily approved by the supervising court on March 15, 2007 and it was amended and finally approved by that court on June 20, 2008. PRASA agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the SDWA. This Act requires the compliance with parameters of water quality and treatment techniques in PRASA's water systems. As part of the agreement, PRASA paid a civil penalty of $1 million during fiscal year ended June 30, 2007. The civil penalty was stipulated by the court for alleged noncompliance issues to the SDWA attended in this decree. In this Consent Decree, PRASA shall pay stipulated penalties for failing to comply with remedial measures deadlines, failure to submit deliverables, or exceedances to maximum contaminant levels. During fiscal year ended June 30, 2008 and based on the amendment and final approval of the agreement, PRASA accrued approximately $2.7 million for penalties for noncompliance as stipulated by the final agreement, which were paid during fiscal year 2009. Also, as part of the penalties for noncompliance with the remedial measures of the agreement with the Department of Health during fiscal year 2009, $1.3 million was deposited in a GDB escrow account to be used for a SEP. This SEP included three projects: (1) a chemical monitoring of 67 non-PRASA systems, (2) the installation of a disinfection system in six non-PRASA systems, and (3) the connection of schools that have their own deficient water systems to PRASA's water system. During fiscal year ended June 30, 2014, the penalties amounted to approximately $100,000. PRASA deposited $100,000 in an escrow account for parameters exceedances that will be used for compliance projects with the approval of the Department of Health.

In November 2007, PRASA entered into negotiation of a consent decree (Civil Action No. 10 1365) with EPA that requires PRASA to implement system wide remedial measures at all of the sludge treatment systems at the water treatment plants owned and operated by PRASA. The consent decree was lodged on May 3, 2010 and its entry date was August 24, 2010. This consent order supersedes previous consent orders known as PRASA II (Civil Action No. 92 1511) and PRASA III (Civil Action No. 00-2554). This consent order establishes deadlines for compliance with the conditions set forth in the proposed agreement and stipulates penalties for violation of any of those deadlines.

PRASA was assessed a civil penalty of approximately $3.2 million of which $1 million was paid to the Treasurer of the United States of America as a civil penalty, and $2.2 million was deposited in an escrow account with GDB for the design and construction of a SEP. This SEP consisted of the installation of an aeration system in the Toa Vaca Lake. The aeration system was finished and placed into operation in November 2012. The total amount of penalties paid under this agreement during the fiscal year 2014 was approximately $200,000. Stipulated penalties must be paid by PRASA for failing

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

to comply with remedial measures deadlines, permitting limit exceedances or failure to submit deliverables or Discharge Monitoring Reports.

PRASA is in the process of renegotiation of all the consent decrees and commitments mentioned above. The objective of this renegotiation is to establish a prioritization system that will smooth out the economic impact of the capital improvement projects on a yearly basis.

(c)   *SWA*

SWA initiated in years prior to the year ended June 30, 2014, the implementation and development of the Strategic Plan for Recycling and Disposal of Solid Waste in Puerto Rico at an estimated cost of approximately $112 million. The first stage consists of the construction of thirty-nine (39) projects to be financed through an interim financing agreement with the Government Development Bank for Puerto Rico. The lines-of-credit under the agreement were paid by the Department of the Treasury of the Commonwealth through joint resolutions approved by the Legislature of Puerto Rico. SWA has continued with the planning and construction of the projects.

During May 2008, SWA approved the "Dynamic Itinerary for Infrastructure Projects of Solid Waste in Puerto Rico." This itinerary defines the strategies for safe and efficient handling of solid waste in Puerto Rico for the next twenty-five (25) years in compliance with all applicable regulations. SWA proposes this itinerary for the purpose of adopting this plan as the official instrument to guide public policy for the development of infrastructure projects for handling and final disposition of solid waste in Puerto Rico. The projects proposed in the itinerary include programs to develop facilities for the recovery of recyclable materials, facilities (RMF's) for the deposit of acceptable sludge, facilities to convert solid waste to energy, transshipment facilities, and lateral expansion to sanitary stuffing systems (SSS). The development of these projects takes into consideration the closing of various SSS. The construction investment is estimated at approximately $1.9 billion. SWA projects that financing for these projects will come from both the public and private sectors.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Construction Commitments*

As of June 30, 2014, the following discretely presented component units are the ones maintaining various unspent construction agreements as follows (expressed in thousands):

| | | |
|---|---|---:|
| Puerto Rico Highways and Transportation Authority | $ | 163,300 |
| Puerto Rico Aqueduct and Sewer Authority | | 124,200 |
| University of Puerto Rico Comprehensive Cancer Center | | 184,987 |
| Puerto Rico Electric Power Authority | | 47,000 |
| University of Puerto Rico | | 34,900 |
| Solid Waste Authority | | 30,369 |
| Company for the Integral Development of the Peninsula de Cantera | | 8,909 |
| Puerto Rico Ports Authority | | 7,900 |
| Puerto Rico Land Administration | | 7,000 |
| Puerto Rico and Municipal Islands Maritime Transport Authority | | 2,200 |
| Port of the Americas Authority | | 1,466 |
| Institute of Puerto Rican Culture | | 861 |
| Total | $ | 613,092 |

*Service Concession Arrangements (SCA)*

(a)  **PRHTA**

On September 22, 2011, the PRHTA entered into a toll road concession agreement with Autopistas Metropolitanas Puerto Rico, LLC (the Concessionaire), in which the PRHTA granted to the Concessionaire the right to operate PR-5 and PR-22 highways (the Toll Roads) for a period of 40 years. During the 40-year term, the Concessionaire will have the right to charge and collect tolls imposed on the Toll Roads. The PRHTA received an upfront concession fee payment of $1,136 million, from which approximately $873 million was used to redeem or defease certain bonds issued and outstanding associated with the Toll Roads. Pursuant to the provisions of GASB Statement No. 60, Accounting and Financial Reporting for Service Concession Arrangements, the PRHTA recognized a deferred inflow of resources of $1,136 million, which will be amortized and recognized as revenue over the 40-year term of the agreement. The PRHTA will recognize approximately $28.4 million annually through fiscal year 2052 as a result of the amortization of the recognized deferred inflow of resources. The Toll Roads will continue to be presented as an asset of the PRHTA, which at June 30, 2014 amounted to approximately $90.7 million, but are not being depreciated since September 22, 2011 until the end of the agreement in 2052, as the concession agreement required the Concessionaire to return the Toll Roads to the PRHTA in its original or enhanced condition.

On December 20, 1992, the PRHTA and Autopistas de Puerto Rico y Compañía S.E. (Autopistas) entered into a concession agreement, amended in 2004 and in 2009, for the design, construction, operation, and maintenance of the Teodoro Moscoso Bridge (the Bridge), a toll bridge that traverses the San Jose Lagoon between the municipalities of San Juan and Carolina. The initial term of this agreement was 35 years, expiring on April 3, 2027, but has been subsequently amended on September 9, 2009 to extend the term to 50 years until 2044. Also, pursuant to the provisions of GASB No. 60, as of June 30, 2013, the PRHTA recognized the Bridge at its estimated fair value of

242 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

$109.5 million, amortized over an estimated useful life of 50 years, and a deferred inflow of resources, also of $109.5 million that will be amortized and recognized as revenue over the remaining term of the agreement.

The highways and bridge under concession agreement, net at June 30, 2014 consisted of (expressed in thousands):

|  |  |  |
|---|---|---|
| Toll roads concession | $ | 90,740 |
| Toll roads concession improvements | | 16,175 |
| Bridge concession | | 66,193 |
| Total | $ | 173,108 |

The deferred inflows of resources at June 30, 2014 consisted of (expressed in thousands):

|  |  |  |
|---|---|---|
| Toll roads concession | $ | 1,073,513 |
| Bridge concession | | 65,700 |
| Total | $ | 1,139,213 |

(b) *PRPA*

On February 27, 2013, the Federal Aviation Administration (FAA) approved the closing of the Lease and Use Agreements (the APP Agreements) entered into on July 27, 2012 between the PRPA and Aerostar Airport Holdings, LLC (Aerostar) with respect to the Luis Munoz Marin International Airport Project (LMMIA Project). The APP Agreements awarded Aerostar the right to operate, manage, maintain, develop, and rehabilitate the LMMIA during a term of 40 years, subject to extension conditions as defined, in exchange for an upfront payment of a leasehold fee of $615 million to the PRPA. In addition, upon the closing of the APP Agreements, the PRPA will receive from Aerostar annual rental payments for the first five full reporting years of $2.5 million; then from the sixth full reporting year through and including the 30th reporting year, the PRPA will receive annual rental payments equal to 5% of the gross airport revenue earned by Aerostar in such years; and finally from the 31st reporting year and each succeeding year, the PRPA will receive annual rental payments equal to 10% of the gross airport revenue earned by Aerostar in such years.

Under the APP Agreements, the PRPA is responsible for certain capital improvements pursuant to the Airline Capital Improvement Program. The present value of these capital improvements was estimated at $3.068 million at the transaction date. Pursuant to the provisions of GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements*, the PRPA recognized at February 27, 2013, the date of the closing of the APP Agreements, a resulting deferred inflow of resources amounting to $622.5 million and a liability of $3,068 million for the present value of the capital improvement commitments of the PRPA; in exchange for the receipt of the $615 million upfront leasehold fee and the receivable of the annual payments of $2.5 million to be received from Aerostar for the first five years after the closing, with a present value estimate of $10.5 million. Since the closing date through June 30, 2014, approximately $20.7 million of the deferred inflow of resources have been amortized into revenue, $15.6 million of which belonged to fiscal year 2014, and

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

approximately $15.6 million will be amortized annually until the term of the agreement. As of June 30, 2014, the PRPA has satisfied approximately $2.8 million of its capital improvement commitments.

The right awarded to Aerostar to operate, manage, and rehabilitate the LMMIA (following certain Operating Standards established by the FAA and the Authority) is accompanied with the assignment of all the revenue from the LMMIA facilities through the different lease agreements with airport concessionaries, including food and beverage providers, retailers, ground transportation providers, and other airport users, formerly belonging to the Authority. Aerostar will also be able to charge a maximum level of fees to the airlines at LMMIA, as established in the APP Agreements. The APP Agreements also provide for a series of capital improvement expenditures on the LMMIA from Aerostar over the term of the APP Agreements, with certain required initial projects and general accelerated upgrades, as defined, in several phases, all aggregating an estimated investment ranging from $246 million to $290 million. At June 30, 2014, approximately $42.4 million have been invested in capital expenditures by Aerostar, $1.6 million of which have been completed and placed in operations. The PRPA, on the other hand, is required to provide police and fire services to the LMMIA in exchange for an annual compensation of $2.8 million, to be adjusted thereafter based on inflation. The APP Agreements also establishes certain compensation events, the occurrence of which from either party would trigger a compensation amount or activity from the defaulting party to the affected party, as defined. Finally, the PRPA will be responsible to Aerostar, at the term of the APP Agreements, for any capital-related improvements not fully reimbursed to Aerostar from the Passenger Facility Charge (PFC) program or other airline charges.

PRPA used $525 of the $615 million upfront leasehold fee received to repay debt obligations to lenders and suppliers, to cover certain related transaction costs and to set up reserve funds to cover early retirement of employees, improvements to regional airports, and cover obligations of the PRPA in case of losses sustained on the APP Agreements. The LMMIA assets under this concession agreement amounted to $476.2 million at June 30, 2014, while the deferred inflows of resources at June 30, 2014 amounted to $605.4 million.

## (17) Retirement Systems

The Retirement Systems issue financial reports, which are publicly available and include the basic financial statements, the required trend information, and any other required supplementary information. Each system is independent; thus, their assets or liabilities may not be transferred from one system to another or used for any purpose other than to benefit the participants of each system.

### (a) ERS

*Plan Description* – The ERS is a cost-sharing, multi-employer defined-benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration). It is a trust created by Act No. 447 on May 15, 1951 (Act No. 447), as amended, to provide pension and other benefits to retired employees of the Commonwealth, its public corporations, and municipalities of Puerto Rico. The ERS began operations on January 1, 1952, at which date, contributions by employers and participating employees commenced. The ERS is a pension trust fund of the Commonwealth.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The ERS administers different benefit structures pursuant to Act No. 447, as amended, including a cost-sharing, multi-employer defined-benefit program, a defined-contribution program (System 2000 program) and a contributory hybrid program. Benefit provisions vary depending on member's date of hire. Substantially all full-time employees of the Commonwealth and its instrumentalities (73 Commonwealth agencies, 78 municipalities, and 55 public corporations, including the ERS) are covered by the ERS. Membership is mandatory for all regular, appointed, and temporary employees of the Commonwealth at the date of employment. Membership is optional for the Governor of the Commonwealth, Commonwealth secretaries, head of public agencies, and instrumentalities, among others.

The benefits provided to members of the ERS are established by Commonwealth law and may be amended only by the Legislature with the Governor's approval. Act No. 3 of April 4, 2013 (Act No. 3 of 2013), in conjunction with other recent funding and design changes, provided for a comprehensive reform of the ERS. This summary details the provisions under Act No. 3 of 2013.

Certain provisions are different for the three groups of members who entered the ERS prior to July 1, 2013 as described below:

- Members of Act No. 447 are generally those members hired before April 1, 1990 (contributory, defined-benefit program).

- Members of Act No. 1 of February 16, 1990 (Act No. 1) are generally those members hired on or after April 1, 1990 and on or before December 31, 1999 (contributory, defined-benefit program).

- Members of Act No. 305 of September 24, 1999 (Act No. 305 or System 2000) are generally those members hired on or after January 1, 2000 and on or before June 30, 2013 (defined-contribution program).

All regular employees hired for the first time on or after July 1, 2013, and former employees who participated in the defined-benefit program and the System 2000 program, and were rehired on or after July 1, 2013, become members of the Contributory Hybrid Program as a condition to their employment. In addition, employees who at June 30, 2013, were participants of previous programs became part of the Contributory Hybrid Program on July 1, 2013.

Each member has a nonforfeitable right to the value of his/her account. Members have three options to invest their contributions. Investment income is credited to the member's account semiannually. The Commonwealth does not guarantee benefits at retirement age.

The assets of the defined-benefit program, the defined-contribution program and the Contributory Hybrid Program are pooled and invested by the ERS. Future benefit payments will be paid from the same pool of assets. In addition, employers' contributions for members hired on or after January 1, 2000 will be used by the ERS to reduce the unfunded status of the Defined Benefit Program.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

This summary of plan provisions is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts shall be determined in strict accordance with the plan document itself.

*Service Retirements*

(a)   *Eligibility for Act No. 447 Members:* Act No. 447 members who were eligible to retire as of June 30, 2013 would continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 447 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 58 with 10 years of credited service, (3) any age with 30 years of credited service, (4) for Public Officers in High Risk Positions (the Commonwealth Police and Firefighter Corps, the Municipal Police and Firefighter Corps and the Custody Office Corps), attainment of age 50 with 25 years of credited service, and (5) for Mayors of municipalities, attainment of age 50 with 8 years of credited service as a Mayor. In addition, Act No. 447 members who would attain 30 years of credited service by December 31, 2013 would be eligible to retire at any time.

Act No. 447 members who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire upon attainment of the retirement eligibility age shown in the table below with 10 years of credited service.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 61 |
| July 1, 1956 to June 30, 1957 | 56 | 60 |
| Before July 1, 1956 | 57 and up | 59 |

In addition to the requirements in the table above, Act No. 447 Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(b)   *Eligibility for Act No. 1 Members:* Act No. 1 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 1 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 65 with 10 years of credited service, (3) for Public Officers in High Risk Positions, any age with 30 years of credited service, and (4) for Mayors, attainment of age 50 with 8 years of credited service as a Mayor.

Act No. 1 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 65 with 10 years of credited service. In addition, Act No. 1 Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(c)   *Eligibility for System 2000 Members:* System 2000 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, System 2000 members could retire upon attainment of age 55 for Public Officers in High Risk Positions and attainment of age 60 otherwise.

System 2000 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 55 for Public Officers in High Risk Positions and upon attainment of the retirement eligibility age shown in the table below otherwise.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 65 |
| July 1, 1956 to June 30, 1957 | 56 | 64 |
| July 1, 1955 to June 30, 1956 | 57 | 63 |
| July 1, 1954 to June 30, 1955 | 58 | 62 |
| Before July 1, 1954 | 59 and up | 61 |

(d)   *Eligibility for Members Hired after June 30, 2013:* Attainment of age 58 if a Public Officer in a High Risk Position and attainment of age 67 otherwise.

*Service Retirement Annuity Benefits:*

An annuity payable for the lifetime of the member equal to the annuitized value of the balance in the hybrid contribution account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013. If the balance in the hybrid contribution account is $10,000 or less, it shall be paid as a lump sum instead of as an annuity.

(a)   *Accrued Benefit as of June 30, 2013 for Act No. 447 Members:* The accrued benefit as of June 30, 2013 shall be determined based on the average compensation, as defined, for Act No. 447 members, the years of credited service, and the attained age of the member all as of June 30, 2013. For Act No. 447 Mayors, the highest compensation, as defined, as a Mayor is determined as of June 30, 2013.

If the Act No. 447 member had at least 30 years of credited service as of June 30, 2013, the accrued benefit equals 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting the Coordination Plan, the benefit is recalculated at the Social Security Retirement Age (SSRA), as defined, as 1.5% of average compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 65% (75% if member was at least age 55 as of June 30, 2013) of average compensation in excess of $6,600.

If the Act No. 447 member had less than 30 years of credited service as of June 30, 2013, and attains 30 years of credited service by December 31, 2013, the accrued benefit equals 55% of average compensation if the member was under age 55 as of June 30, 2013 or 60% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting the Coordination Plan, the benefit is recalculated at SSRA as 1.5% of average compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 55% (60% if member was

247                                                                                        (Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

at least age 55 as of June 30, 2013) of average compensation in excess of $6,600. Member contributions received from Act No. 447 members eligible for this transitory benefit during the period beginning July 1, 2013 and ending upon the attainment of 30 years of credited service are considered pre-July 1, 2013 contributions; the contributions to the hybrid contribution account begin after the member attains 30 years of credited service.

If the Act No. 447 member had less than 30 years of credited service as of December 31, 2013, the accrued benefit equals 1.5% of average compensation multiplied by years of credited service up to 20 years, plus 2% of average compensation multiplied by years of credited service in excess of 20 years. Maximum benefit is 75% of average compensation. Except for Commonwealth Police and Commonwealth Firefighters, the benefit is actuarially reduced for each year payment commences prior to age 58. For participants selecting the Coordination Plan, the basic benefit is recalculated at SSRA as 1% of average compensation up to $6,600 multiplied by years of credited service up to 20 years, plus 1.5% of average compensation up to $6,600 multiplied by years of credited service in excess of 20 years, plus 1.5% of average compensation in excess of $6,600 multiplied by years of credited service up to 20 years, plus 2.0% of average compensation in excess of $6,600 multiplied by years of credited service in excess of 20 years. Except for Police and Firefighters, the benefit is actuarially reduced for each year payment commences prior to age 58.

For Act No. 447, Mayors with at least 8 years of credited service as a mayor, the accrued benefit will not be less than 5% of highest compensation, as defined, as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for each year of non-Mayoral credited service in excess of 20 years. Non-Mayoral credited service includes service earned as a Mayor in excess of 10 years. Maximum benefit is 90% of highest compensation as a Mayor.

(b)   *Accrued Benefit as of June 30, 2013 for Act No. 1 Members:* The accrued benefit as of June 30, 2013 shall be determined based on the average compensation for Act No. 1 members, the years of credited service, and the attained age of the member all as of June 30, 2013. For Act No. 1 Mayors, the highest compensation as a Mayor is determined as of June 30, 2013.

If the Act No. 1 is a police officer or firefighter had at least 30 years of credited service as of June 30, 2013, the accrued benefit equals 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013.

For all other Act No. 1 members, the accrued benefit equals 1.5% of average compensation multiplied by years of credited service. The benefit is actuarially reduced for each year payment commences prior to age 65.

For Act No. 1 Mayors with at least 8 years of credited service as a mayor, the accrued benefit will not be less than 5% of highest compensation as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for each year of non-Mayoral credited service in excess of 20 years. Non-Mayoral credited service

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

includes service earned as a Mayor in excess of 10 years. Maximum benefit is 90% of highest compensation as a Mayor.

*Compulsory Retirement*

All Act No. 447 and Act No. 1 Public Officers in High Risk Positions must retire upon attainment of age 58 and 30 years of credited service. A two-year extension may be requested by the member from the Superintendent of the Puerto Rico Police, the Chief of the Firefighter Corps, or supervising authority as applicable.

*Termination Benefits*

(a)  *Lump-Sum Withdrawal*

Eligibility: A Member is eligible upon termination of service prior to 5 years of service or if the balance in the hybrid contribution account is $10,000 or less.

Benefit: The benefit equals a lump-sum payment of the balance in the hybrid contribution account as of the date of the permanent separation of service.

(b)  *Deferred Retirement*

Eligibility: A Member is eligible upon termination of service with 5 or more years of service (10 years of credited service for Act No. 447 and Act No. 1 members) prior to the applicable retirement eligibility, provided the member has not taken a lump-sum withdrawal of the accumulated contributions and the hybrid contribution account.

Benefit: An annuity payable for the lifetime of the member commencing at the applicable retirement eligibility age equal to the annuitized value of the balance in the hybrid contribution account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013.

*Death Benefits*

(a)  *Pre-retirement Death Benefit*

Eligibility: Any current nonretired member is eligible.

Benefit: A refund of the hybrid contribution account, plus the accumulated contributions for Act No. 447 and Act No. 1 members.

(b)  *High-Risk Death Benefit under Act No. 127*

Eligibility: Police, firefighters, and other employees in specified high-risk positions who die in the line of work due to reasons specified in Act No. 127 of 1958, as amended.

Spouse's Benefit: 50% of the participant's compensation at date of death, payable as an annuity until death or remarriage.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Children's Benefit*: 50% of the participant's compensation at date of death, payable as an annuity, and allocated pro-rata among eligible children. The annuity is payable for life for a disabled child, until age 18 for a nondisabled child not pursuing studies, and until age 25 for a nondisabled child who is pursuing studies.

*Benefit if No Spouse or Children*: The parents of the member shall each receive 50% of the participant's compensation at date of death, payable as an annuity for life.

*Postdeath Increases*: Effective July 1, 1996 and subsequently every three years, the above death benefits are increased by 3% provided that the beneficiary(ies) had been receiving payments for at least three years.

The cost of these benefits is paid by the Commonwealth's General Fund.

(c)   *Postretirement Death Benefit for Members Who Retired prior to July 1, 2013*

*Eligibility*: Any retiree or disabled member receiving a monthly benefit who has not elected a reversionary annuity and whose benefits commenced prior to July 1, 2013.

*Benefit*: The benefit is as follows (Law No. 105, as amended by Law No. 4):

(i)   For those married or with dependent children at the time of death, the annual income to a widow, or widower or dependent children is equal to 60% (50% if in the Coordination Plan – 30%, prior to January 1, 2004) of the retirement benefit payable for life for a surviving spouse and/or disabled children and payable until age 18 (age 25 if pursuing studies) for nondisabled children. If in the Coordination Plan, the benefit to the surviving spouse does not begin until the spouse's attainment of age 60 and the surviving spouse must have been married to the member for at least 10 years to be eligible for this benefit. The increase in the percentage from 30% to 50% if in the Coordination Plan is paid by the Commonwealth's General Fund for former government employees or by the public enterprise or municipality for their former employees.

(ii)   The benefit, when there is no relation as stated above, is equal to the remaining balance of accumulated contributions at the time of retirement after the deduction of lifetime annual income paid and is payable to a beneficiary or to the Member's estate. In no case shall the benefit be less than $1,000. Either the Commonwealth's General Fund for former government employees or the public enterprise or municipality for their former employees pays the difference, up to $250, between (1) the accumulated contributions less the lifetime annual income paid and (2) $1,000. The ERS pays for the rest.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(d)   *Postretirement Death Benefit for Members Who Retired after June 30, 2013*

   *Eligibility:* Any retiree or disabled member who began receiving a monthly benefit after June 30, 2013.

   *Benefit:* If the member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent optional form of payment, the applicable survivor benefit.

   For all members, the excess, if any, of the hybrid contribution account, plus the accumulated contributions for Act No. 447 and Act No. 1 members, at the time of retirement over the total annuity payments paid to the member and any beneficiary per the terms of the optional form of payment shall be payable to a beneficiary or the member's estate.

(e)   *Beneficiaries receiving occupational death benefits as of June 30, 2013 continue to be eligible to receive such benefits.*

*Disability Benefits*

(a)   *Disability*

   *Eligibility*: All members are eligible upon the occurrence of disability.

   *Benefit*: The balance of the hybrid contribution account payable as lump-sum distribution, an immediate annuity, or a deferred annuity at the election of the participant. Act No. 447 and Act No. 1 members remain eligible to receive the accrued benefit as of June 30, 2013 commencing at the applicable retirement eligibility age.

(b)   *High Risk Disability under Act No. 127*

   *Eligibility*: Police, firefighters, and other employees in specified high-risk positions who are disabled in the line of work due to reasons specified in Act No. 127 of 1958 (as amended).

   *Benefit*: 80% (100% for Act No. 447 members) of compensation as of date of disability, payable as an annuity. If the member dies while still disabled, this annuity benefit continues to his beneficiaries. Beneficiaries include the surviving spouse and/or disabled children (for life), nondisabled children until age 18 (age 25 if pursuing studies), and the parents if no other beneficiaries. Effective July 1, 1996 and subsequently every three years, the disability benefit is increased by 3% provided that the member (or beneficiary) had been receiving payments for at least three years (Act No. 127 of 1958, as amended). The cost of these benefits is paid by the Commonwealth's General Fund.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

    (c)    Members who qualified for occupational or nonoccupational disability benefits as of June 30, 2013 continue to be eligible to receive such benefits

*Special Benefits*

(a)    *Minimum Benefits*

    (i)    Past Ad hoc Increases: The Legislature, from time to time, increases pensions for certain retirees as described in Act No. 124 approved on June 8, 1973 and Act No. 23 approved on September 23, 1983. The benefits are paid 50% by the Commonwealth's General Fund and 50% by the ERS.

    (ii)    Minimum Benefit for Members Who Retired before July 1, 2013 (Act No. 156 of 2003, Act No. 35 of 2007, and Act No. 3 of 2013): The minimum monthly lifetime income for members who retired or become disabled before July 1, 2013 is $500 per month effective July 1, 2013 ($400 per month effective July 1, 2007 and $300 per month up to June 30, 2007). The increase in the minimum monthly benefit from $200 per month to $300 per month is paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees. The increase in the minimum monthly benefit from $300 per month to $400 per month is to be paid by the ERS for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

    (iii)    Coordination Plan Minimum Benefit: A minimum monthly benefit is payable upon attainment of SSRA such that the benefit, when added to the Social Security Benefit, is not less than the benefit payable prior to SSRA.

(b)    *Cost-of-Living Adjustments (COLA) to Pension Benefits:* The Legislature, from time to time, increases pensions by 3% for retired and disabled members. Beneficiaries are not entitled to COLAs granted after the retiree's death. The first increase was granted by Act No. 10 of 1992. Subsequent 3% increases have been granted every third year since 1992, with the latest 3% increase established on April 24, 2007 and effective July 1, 2007 (retroactive to January 1, 2007) for retired and disabled members that were receiving a monthly benefit on or before January 1, 2004 (Act No. 35). In addition, effective July 1, 2008, any retired or disabled member that was receiving a monthly annuity on or before January 1, 2004 less than $1,250 per month received an increase of up to 3% without exceeding the limit of $1,250 per month (Act No. 35). The COLAs granted in 1992 to all retirees and in 1998 to retirees who are former government or municipal employees shall be paid by the ERS. All other COLAs granted in 1995 and later shall be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(c)   *Special "Bonus" Benefits*

(i)   *Christmas Bonus (Act No. 144, as Amended by Act No. 3 of 2013):* An annual bonus of $200 for each retiree, beneficiary, and disabled member paid in December provided the member retired prior to July 1, 2013. This benefit is paid from the supplemental contributions received from the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(ii)   *Medication Bonus (Act No. 155, as Amended by Act No. 3 of 2013):* An annual bonus of $100 for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the member retired prior to July 1, 2013. Evidence of coverage is not required. The amount is prorated if there are multiple beneficiaries. This benefit is paid from the Supplemental Contributions received from the Commonweath's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

The special benefits contributions of approximately $229 million in 2014 mainly represent contributions from the Commonwealth's General Fund, public corporations and municipalities for the special benefits identified above granted by special laws. The funding of the special benefits is provided to the ERS through legislative appropriations each July 1 by the Commonwealth's General Fund for former government and certain public corporations without own treasuries employees and by certain public corporations with own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by the ERS for the special benefits. Deficiencies in legislative appropriations are covered by the ERS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits.

*Contributions*

The contribution requirement to the ERS is established by law and is not actuarially determined.

(a)   *Member Contributions:* Effective July 1, 2013, contributions by members are 10% of compensation. However, for Act No. 447 members who selected the Coordination Plan, the member contributions are 7% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2013-2014 fiscal year and 8.5% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2014-2015 fiscal year. Members may voluntarily make additional contributions to their hybrid contribution account.

Prior to July 1, 2013, contributions by Act No. 447 members selecting the Coordination Plan were 5.775% of compensation up to $6,600 plus 8.275% of compensation in excess of $6,600. Contributions by all other members were 8.275% of compensation. System 2000 members may also have made voluntary contributions of up to 1.725% of compensation prior to July 1, 2013.

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(b)  *Employer Contributions (Article 2-116, as Amended by Law No. 116 of 2010 and Act No. 3 of 2013):* Prior to July 1, 2011, employer contributions were 9.275% of compensation. Effective July 1, 2011, employer contributions are 10.275% of compensation. For the next four fiscal years effective July 1, 2012, employer contributions will increase annually by 1% of compensation. For the next five fiscal years, employer contributions will increase annually by 1.25% of compensation, reaching an employer contribution rate of 20.525% of compensation effective July 1, 2020.

(c)  *Supplemental Contributions from the Commonwealth's General Fund, Certain Public Corporations, and Municipalities (Act No. 3 of 2013):* Effective July 1, 2013, the ERS will receive a supplemental contribution of $2,000 each year for each pensioner (including beneficiaries receiving survivor benefits) that was previously benefitting as an Act No. 447 or Act No. 1 member while an active employee. This supplemental contribution will be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(d)  *Additional Uniform Contribution (Act No. 32 of 2013, as Amended):* The additional uniform contribution will be certified by the external actuary of the ERS each fiscal year from fiscal year 2015 through 2033 as necessary to avoid having the projected gross assets of the ERS, during any subsequent fiscal year, to fall below $1 billion. The Additional Uniform Contribution is to be paid by the Commonwealth's General Fund, public corporations with their own treasuries, and municipalities. The additional uniform contribution determined for fiscal years 2014, 2015, and 2016 was $120 million. The additional uniform contribution determined for fiscal year 2017 is $596 million, payable at the end of the fiscal year.

*Early Retirement Programs*

The Puerto Rico Environmental Quality Board (EQB) implemented an early retirement program for its employees under the Law 224 Act No. 7 dated August 9, 2008. EQB has already made the initial payment and would reimburse the remaining balance on annuities and other benefits paid by the ERS in four installments on each July 31 starting in 2009 through 2012. The EQB was at default on the retirement plan payment, so they requested a new payment plan. The ERS Board of Trustees approved a payment plan for the debt balance due of the retirement program for 24 months starting in March 2014.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

On July 2, 2010, the Commonwealth enacted Act No. 70 establishing a program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. Act No. 70 also established that early retirement benefits will be provided to eligible employees that have completed between 15 and 29 years of creditable services and will consist of monthly benefits ranging from 37.5% to 50.0% of each employees' monthly salary. Benefits under this program will be paid by the General Fund of the Commonwealth (the General Fund) and by the public corporations, covering their respective employees until the plan member reaches the later of age 55 for members under Act No. 447 or age 65 for members under Act No. 1, or the date the plan member would have completed 30 years of service had the member continued employment. In addition, the public corporations will also be required to continue making the required employee and employer contributions to the ERS. The General Fund will be required to continue making its required employer contributions. The ERS will be responsible for benefit payments afterward.

(b) *JRS*

*Plan Description* – The JRS is a single-employer defined-benefit pension plan administered by the ERS and JRS Administration. It is a trust created by Act No. 12 on October 19, 1954 (Act No. 12 of 1954), as amended, to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth, through the Office of the Administration of Court Facilities (the Employer). The JRS is a pension trust fund of the Commonwealth and is not an employer.

The ERS and JRS Administration allocated 1.57% of its general and administrative expenses to the JRS during the year ended June 30, 2014. The methodology used to determine the allocation of the ERS and JRS Administration's expenses is based on total employer and participating employees' contributions to the JRS, divided by the aggregate total of employers' and participants' contributions to the ERS and the JRS, combined.

The JRS consists of two benefit structures pursuant to Act No. 12 of 1954, as amended by Act No. 162 of 2013. Benefit provisions vary depending on member's date of hire as follows:

- Judges hired on or before June 30, 2014 with certain distinctions for judges hired December 24, 2013 to June 30, 2014 (contributory, defined-benefit program).

- Judges hired July 1, 2014 or later (contributory, hybrid program).

All judges of the Judiciary Branch of the Commonwealth are members of the JRS. Members include all persons holding a position as Judge of the Puerto Rico Supreme Court, Judge of the Court of Appeals, Superior Judges of the Court of First Instance, and Municipal Judges of the Court of First Instance in the Commonwealth.

The benefits provided to members of the JRS are established by Commonwealth law and may be amended only by the Legislature with the Governor's approval.

This summary of plan provisions is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts shall be determined in strict accordance with the plan document itself.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

***Pension Plan Provisions Applicable to Judges Hired on or before June 30, 2014 (Pre-Act No. 162 Members)***

*Service Retirement Annuity Benefits*

An annuity payable for the lifetime of the member equal to the applicable benefit detailed below.

(a)   *Normal Retirement*

*Basic Eligibility:* Age 60 with 10 years of credited service.

*Basic Benefit:* 25% of highest salary, as defined, plus 5% of highest salary, as defined, for each year of credited service in excess of 10 years, subject to a maximum of 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014.

*Eligibility for Judges who serve without a Fixed Tenure:* 10 years of credited service. This enhanced eligibility is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Benefit for Judges who serve without a Fixed Tenure:* 25% of the salary corresponding to the office during the retirement period, plus 5% of such salary for each year of credited service in excess of 10 years, subject to a maximum of 100% of such salary. If the judge has served in a position without a fixed tenure for a total of at least 8 years, the 25% increases to 50% in the preceding formula. This enhanced benefit is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Optional Eligibility:* Age and credited service as shown in the table below, provided at least 8 years of credited service were earned in office as a judge.

| Age | Years of credited services |
|---|---|
| Less than 60 | 30 |
| 62 | 20 |
| 61 | 21 |
| 60 | 22 |
| 59 | 23 |
| 58 | 24 |
| 57 | 25 |
| 56 | 26 |
| 55 | 27 |

*Optional Benefit:* 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Enhanced Eligibility:* Any judge who has served without a fixed tenure for at least 3 years and has at least 25 years of credited service. This enhanced benefit is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Enhanced Benefit:* 75% of the salary earned at the time of retirement.

*Compulsory Retirement:* All judges must retire by age 70. If the judge has less than 10 years of credited service, the judge can elect a refund of accumulated contributions or a proportional part of the basic benefit based on completed years and months of credited service.

(b)   *Early Retirement*

*Basic Eligibility:* 20 years of credited service before age 60.

*Basic Benefit:* The basic benefit payable under Normal Retirement, reduced on an actuarial equivalent basis for each month that early retirement date precedes age 60. However, no actuarial reduction is applied for judges who serve without a fixed tenure.

*Optional Eligibility:* 20 years of credited service, provided at least 8 years of credited service were earned in office as a judge.

*Optional Benefit:* 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014, reduced on an actuarial equivalent basis for each month that early retirement date precedes the age specified in the table under Optional Eligibility under Normal Retirement for the applicable years of credited service.

*Termination Benefits*

(a)   *Lump-Sum Withdrawal*

*Eligibility:* A member is eligible upon termination of service.

*Benefit:* The benefit equals a refund of accumulated contributions.

(b)   *Deferred Retirement*

*Eligibility:* A member is eligible upon termination of service prior to age 60 and after 10 years of credited service, provided the member has not taken a lump-sum withdrawal.

*Benefit:* The benefit, commencing at age 60, is equal to the benefit payable upon Normal Retirement.

*Death Benefits*

(a)   *Occupational Death Benefit*

*Eligibility:* The beneficiaries of any active participant who dies from an employment-related cause under the Workmen's Accident Compensation Act.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Spouse's Benefit:* 50% of the participant's salary at date of death, payable as an annuity until death or remarriage.

*Children's Benefit:* $10 ($20 if full orphan) for each child payable monthly until child's age 18 or completion of studies, if later. The maximum family benefit is 75% of the participant's salary at date of death.

*Benefit if No Spouse or Children:* Refund of accumulated contributions, plus an amount equal to one year of compensation, as defined, in effect at the time of death.

(b)   *Preretirement Death Benefit*

*Eligibility:* Any current nonretired member is eligible, provided not eligible for the Occupational Death Benefit.

*Benefit:*

(i)    While in active service, the benefit equals a refund of accumulated contributions; plus, an amount equal to one year of compensation in effect at the time of death.

(ii)   While not in active service, the benefit equals a refund of accumulated contributions.

(c)   *Special Preretirement Death Benefit*

*Eligibility:* An active participant who was eligible to retire at the date of death with a surviving spouse or dependent children.

*Benefit:* The postretirement death benefits described below assuming the active participant retired the day before the date of death.

(d)   *Postretirement Death Benefit*

*Eligibility:* Any retiree or disabled member receiving a monthly benefit.

*Benefit:*

(i)    For those married or with dependent children at the time of death, an annual income equal to 60% of the retirement benefit at time of death, payable for life for a surviving spouse and/or disabled children, and payable until age 18 or completion of studies, if later, for nondisabled children.

(ii)   The benefit, when there is no relation as stated above, is equal to the remaining balance of accumulated contributions at the time of retirement after the deduction of lifetime annual income paid and is payable to a beneficiary or to the Member's estate. In no case shall the benefit be less than $1,000. The Commonwealth's General Fund pays the difference, up to $500, between (1) the accumulated fees, as defined, with interest less the lifetime annual income paid and (2) $1,000. The JRS pays for the rest.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Disability Benefits*

(a)   *Nonoccupational Disability*

*Eligibility:* All members are eligible for nonoccupational disability upon 10 years of credited service and the occurrence of disability.

*Benefit:* 30% of average compensation, plus 1% of average compensation for each year of credited service in excess of 10 years, payable as an annuity; subject to a maximum of 50% of average compensation.

(b)   *Occupational Disability*

*Eligibility:* All members disabled while in the course and as a consequence of their work, as certified by two physicians appointed by the Plan Administrator, and provided the member is receiving compensation from the Workmen's Accident Compensation Act.

*Benefit:* 50% of Salary at date of disability, payable as an annuity, reduced by any payments received from the State Insurance Fund Corporation under the Workmen's Accident Compensation Act.

*Special Benefits*

(a)   *Cost-of-Living Adjustments (COLA) to Pension Benefits:* Effective January 1, 2001, commencing January 1, 2002 and subsequently every three years thereafter, the annual benefit is increased by 3% for retirees and disabled members provided that the member had been receiving payments for at least three years.

These COLAs are paid by the Commonwealth's General Fund. In addition, an ad-hoc 3% COLA was granted effective January 1, 1999 and is paid by the JRS.

(b)   *Special "Bonus" Benefits*

(i)   *Christmas Bonus (Act No. 144)*: An annual bonus of $600 for each retiree, beneficiary, and disabled member paid in December provided the judge was hired before December 24, 2013. The JRS pays $150 per retiree, beneficiary, and disabled member and the balance is paid by the Commonwealth's General Fund.

(ii)   *Summer Bonus (Act No. 37)*: An annual bonus of $100 for each retiree, beneficiary, and disabled member paid in July provided the judge was hired before December 24, 2013. The amount is prorated if there are multiple beneficiaries. This benefit is paid by the Commonwealth's General Fund.

(iii)   *Medication Bonus (Act No. 155)*: An annual bonus of $100 for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the judge was hired before December 24, 2013. Evidence of coverage is not required. The amount is prorated if there are multiple beneficiaries. This benefit is paid by the Commonwealth's General Fund.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Judges hired on December 24, 2013 and thereafter are not eligible for these special "bonus" benefits.

The special benefits contributions of approximately $1.2 million in 2014 represent contributions from the Commonwealth's General Fund for the special benefits identified above granted by special laws. The funding of the special benefits is provided to the JRS through legislative appropriations each July 1. The legislative appropriations are considered estimates of the payments to be made by the JRS for the special benefits. Deficiencies in legislative appropriations are covered by the JRS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits.

*Contributions*

The contribution requirement to the JRS is established by law and is not actuarially determined.

(a)   *Member Contributions:* Contributions by members are 8.0% of compensation if hired before December 24, 2013 and 10.0% of compensation if hired between December 24, 2013 and June 30, 2014.

(b)   *Employer Contributions:*

- *Payroll-based Employer Contributions*: Contributions by the Commonwealth are 30.34% of compensation. Prior to July 1, 2008, the employer contribution rate was 20.0% of compensation.

- *Additional Uniform Contribution (Act No. 162 of 2013)*: Beginning with the fiscal year 2015, the JRS will receive an additional uniform contribution as necessary to avoid having the projected gross assets of the JRS, during any subsequent fiscal year, to fall below $20 million.

**Pension Plan Provisions Applicable to Judges Hired on or after July 1, 2014 (Act No. 162 Members)**

Members hired on or after July 1, 2014 will be covered by a contributory, hybrid plan with defined-benefit and defined-contribution components as follows:

(a)   Defined Benefit (DB) provisions:

- DB accrued benefit of 1.5% of the last 5-year final average earnings for each year of service.

- Only judicial service counts toward service; prior government service is not included and cannot be transferred.

- Normal retirement age of 65 with 12 years of service.

- Early retirement age of 55 with 12 years of service, with an actuarial reduction of the DB accrued benefit if benefits commence early.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

- Deferred vested benefit after 12 years of service with benefits commencing at normal retirement age, provided member has not taken a lump-sum withdrawal of DC component. Benefits may begin at early retirement age but would be reduced as specified above.

- The monthly DB component benefit will be paid as a single life annuity.

(b) Defined Contributions (DC) provisions:

- Member contributions of 12% of pay.

- The member contributions are credited to a notional account each year.

- Normal retirement age of 65 with 12 years of service.

- Early retirement age of 55 with 12 years of service.

- Members who separate from employment with less than 12 years of service would receive their notional account as a lump sum.

- Members who separate from employment with 12 or more years of service would receive their benefit in the form of a mandatory annuity.

- Members who separate at or after early or normal retirement age would receive an immediate annuity.

- Members who separate prior to early retirement age for reasons other than disability would receive a deferred annuity commencing at early or normal retirement age, with interest credits continuing to accrue to the account during the deferral period.

- The mandatory annuity would be in the form of a "modified cash refund" of the member's notional account balance – which means that if the accumulated annuity payments at the time of post-retirement death are less than the account balance at the time of retirement, then the beneficiary would receive the remainder of the account balance.

(c) The death and disability benefits for these members are as follows:

- Beneficiaries of members who die while actively employed would receive a lump-sum payment of the members' accumulated account balance at the time of death. No monthly benefit would be payable.

- Upon disability after 5 years of service and before age 65, the disability benefit, payable immediately, equals the smaller of (1) 33% of the last 5-year final average compensation or (2) the sum of the DB accrued benefit (without reduction for early commencement) and the annuity derived from an immediate annuitization of the DC notional account.

(c) *TRS*

*Plan Description* – The Puerto Rico System of Annuities and Pensions for Teachers (TRS) is a single-employer defined-benefit pension plan administered by the Puerto Rico Teachers Retirement System. It is a trust created by Act No. 218 of May 6, 1951, as superseded by Act No. 91 of March 29, 2004, to provide pension and other benefits mainly to retired teachers of the Puerto Rico Department of Education (Department of Education), an agency of the Commonwealth, and the employees of the

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

TRS. The TRS is considered an integral part of the Commonwealth's financial reporting entity and is included in the Commonwealth's basic financial statements as a pension trust fund.

The TRS administers two benefit structures pursuant to Act No. 160 of December 24, 2013 (Act No. 160-2013), as modified by the April 11, 2014 decision of the Puerto Rico Supreme Court. Benefit provisions vary depending on member's date of hire as follows:

- Members hired on or before July 31, 2014 with certain distinctions for members who retire August 1, 2014 or later (contributory, defined-benefit program).

- Members hired August 1, 2014 or later (contributory, hybrid program).

All active teachers of the Department of Education and the employees of the TRS become plan members of the TRS at their date of employment. Licensed teachers working in private schools or other educational organizations have the option to become members of the TRS so long as the required employer and employee contributions are satisfied.

The benefits provided to members of the TRS are established by Commonwealth of Puerto Rico law and may be amended only by the Legislature with the Governor's approval.

This summary of plan description is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts shall be determined in strict accordance with the plan document itself.

As part of the plan description information, the most important aspects of Act No. 160-2013, as modified by the April 11, 2014 decision of the Puerto Rico Supreme Court, are as follows: (i) active participants as of July 31, 2014 will continue to participate in the defined-benefit pension program; (ii) starting August 1, 2014, the defined-benefit pension program will be closed for future participants and they will contribute to a contributory hybrid program; (iii) the retirement age for employees hired on or after August 1, 2014 will increase to age 62; (iv) the employee contribution for employees hired on or after August 1, 2014 will increase to 10% from August 1, 2014 to June 30, 2017, 13.12% from July 1, 2017 to June 30, 2020, and 14.02% from July 1, 2020 and thereafter; (v) special benefits payable to active participants that retire on or before July 31, 2014 will be reduced, and (vi) special benefits and postemployment healthcare benefits will be eliminated for future retirees.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

### *Defined-Benefit Pension Program*

The members of the TRS hired on or before July 31, 2014 are eligible for the benefits described below:

#### *Retirement Annuity*

Members are eligible for monthly benefit payments determined by the application of stipulated benefit ratios to the member's average compensation. Average compensation is computed based on the highest 36 months of compensation recognized by the TRS. The monthly annuity for which a member is eligible is limited to a minimum of $400 per month and a maximum of 75% of the average compensation.

Members are eligible for retirement annuity benefits upon complying with the following:

| Age | Years of creditable services | Retirement annuity compensation |
|---|---|---|
| 55 | 30 or more | 75% of average compensation |
| 50 | 30 or more | 75% of average compensation (1) |
| Under 50 | 30 or more | 65% of average compensation |
| 50 | At least 25, but less than 30 | 1.8% of average compensation times years of service |
| 47, but less than 50 | At least 25, but less than 30 | 95% of 1.8% of average compensation times years of service |
| 60 or more | At least 10, but less than 25 | 1.8% of average compensation times years of service |

(1) Refer to subsection (7) under Defined-Benefit Pension Program.

#### *Deferred Retirement Annuity*

A participating employee who terminates service before age 60, after having accumulated a minimum of 10 years of creditable services, qualifies for a deferred retirement annuity payable beginning at age 60. A participating employee who has completed 25 or more years of creditable services and is under the age of 47 at termination qualifies for a deferred retirement annuity payable beginning at age 47. The vested rights described above are provided if his or her contributions to the TRS are left within the TRS until the attainment of the respective retirement age.

#### *Occupational Disability Annuity*

A participating employee, who as a direct result of the performance of his or her occupation becomes disabled, is eligible for an annuity of 1.8% of average compensation based on the highest 60 months or the number of months of creditable services, if less than 5 years, recognized by the TRS, times years of creditable services, but not less than $400 per month.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Death Benefits*

Preretirement – The beneficiaries receive the contributions made plus 2% interest accumulated as of the date of death (after discounting debts with the TRS). Additionally, for active participants that die on or before July 31, 2014, their beneficiaries will receive an amount equal to the annual compensation of the member at the time of death.

Postretirement – For members who retire on or before July 31, 2014: The surviving spouse receives 50% of the retiree's pension and if there are children under 22 years of age or disabled (until disability ceases), they receive the other 50% of the pension. If there is no surviving spouse or children who qualify, the beneficiaries receive the excess, if any, of the accumulated contributions at the time of retirement over the total annuity benefits received before death. Full pension for the month in which the pensioner died plus an additional fifteen-day pay period payable to the member's eligible beneficiaries, but in no case shall the benefit be less than $1,000 per month (prior to discounting any debts with the TRS).

Postretirement – For members who retire August 1, 2014 or later: If the member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent option form of payment, the applicable survivor benefit will be granted. Otherwise, the excess, if any, of the accumulated contributions at the time of retirement over the total annuity benefits received before death is payable to the beneficiaries or to the member's estate.

*Refunds*

A participating employee who ceases his or her employment with the Commonwealth on or before July 31, 2014 without the right to a retirement annuity has the right to a refund of the employee contributions paid to the TRS, plus any interest earned thereon. Refer to subsection (e) under Contributory Hybrid Program with respect to a participating employee who ceases his or her employment on or after August 1, 2014.

*Early Retirement Program*

On January 27, 2000, Act No. 44 was approved, which provided that effective March 9, 2000, members were eligible for early retirement upon attaining the age of 50 and 28 years of service in the first year of implementation and age 50 and 25 years of service in subsequent years. Those who selected early retirement under these conditions receive monthly benefits equal to 75% of their average compensation, which is computed based on the highest 36 months of compensation recognized by the TRS. Effective July 31, 2001, the option for early retirement was closed. On January 27, 2001, Act No. 45 was approved, which established 50 years as the minimum age requirement to obtain a pension benefit equal to 75% of average compensation with 30 years of service. In these cases, the retiree will pay the participating employee contribution until attaining 55 years of age. Act No. 160-2013 imposes the same obligation to the employer.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Contributory Hybrid Program*

A hybrid plan, such as a cash balance plan, determines the benefit amount based on a formula using contributions and earning credits, has notional individual accounts for members, and provides lifetime annuity benefits. Each member has a defined-contribution account that is credited with member contributions and investment yield. Upon retirement, the balance in the account is paid as a lifetime annuity. The program is defined as hybrid given that it has some features that are commonly found in defined-benefit (DB) plans and other features that are commonly found in defined-contribution (DC) plans, as follows:

- The members contribute a fixed percent of payroll to their account. In DB plans, the percent is usually fixed. In DC plans, the percent is usually elected by the member.

- The defined-contribution account is credited each semester with the TRS's investment portfolio's net rate of return. The return is determined by the Board and will not be less than 80% of the TRS's investment portfolio net rate of return. Account growth via the application of investment earnings is a common feature of DC plans.

- Assets are invested by the TRS. This feature is more commonly found in DB plans. DC plans most commonly allow for the members to elect their investments on an individual basis and the member contributions are then actually invested in the options selected by the member.

- Upon retirement, the balance in the account is paid to the member in the form of a lifetime annuity with optional survivor benefits, with the TRS responsible for investment and longevity risk during retirement. The annuity feature is common to DB plans.

Members of the TRS hired on or after August 1, 2014 are eligible for the benefits described below:

*Retirement Annuity*

Members with five or more years of service and $10,000 or more in contributions at the age of 62 will qualify for an annuity of the percentage acquired by contributions based on actuarial formula.

The pension of each participant shall be computed upon retirement as follows: (i) the accumulated balance of his/her contributions to the defined contribution account on the date of retirement, divided by (ii) a factor, established by the Board in consultation with its actuaries and to be determined on the basis of the actuarial life expectancy of the participant and a specific interest rate.

*Deferred Retirement Annuity*

Members with five or more years of service and $10,000 or more in contributions will qualify for an annuity calculated based on the balance of the defined-contribution account. If separated from service with the requirements but with less than 62 years of age, the annuity will be deferred until reaching 62 years of age.

*Disability Annuity*

Any participant who enrolled in the TRS after August 1, 2014, and after five years in the public service suffers a disability, whether work related or not, he/she shall be granted a disability pension by the

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

TRS computed on the basis of his/her individual contributions, as determined by the TRS through regulations.

*Death Benefits*

New members starting August 1, 2014 that eventually retire and die, their beneficiaries have two options: (i) continue to receive the monthly annuity payments until the balance, if any, of the contributions to the defined-contribution account is exhausted or (ii) request reimbursement in one global payment of the balance, if any.

*Refunds*

A participant with less than five years of service or less than $10,000 in contributions qualifies for a reimbursement. Specifically, a refund of contributions and earnings in his/her defined-contribution account.

**Special Benefits**

Act No. 160-2013 contemplates a reduction in the special laws for pensioners as of July 31, 2014 and the elimination of special laws for future pensioners who retire starting August 1, 2014. Special benefits include the following:

*Christmas Bonus*

An annual bonus of $600 for each retiree and disabled member paid each December. The TRS pays $150 per retiree and disabled member and the remaining bonus is paid by the Commonwealth's General Fund. After August 1, 2014, for active participants that retire on or before July 31, 2014, the bonus will be $200 and funded by the Commonwealth's General Fund.

*Medication Bonus*

An annual bonus of $100 for each retiree, beneficiary, and disabled member paid each July to cover health costs. Evidence of coverage is not required. This benefit is funded by the Commonwealth's General Fund. Act No. 160-2013 kept this benefit for active participants that retire on or before July 31, 2014.

*Summer Bonus*

An annual bonus of $100 for each retiree, beneficiary, and disabled member paid each July. This benefit is prorated if there are multiple beneficiaries and is funded by the Commonwealth's General Fund. Act No. 160-2013 eliminated this benefit for all retirees.

Cost-of-Living Adjustments

Act No. 62 of September 4, 1992 provided, subject to the approval of the Legislature of the Commonwealth (the Legislature), for increases of 3% every three years in pensions to those members with three or more years of retirement. In years 1995, 1998, 2001, 2004, and 2007, the Legislature

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

replicated the benefit granted per Act No. 62 of September 4, 1992. This benefit is funded by the Commonwealth's General Fund. Act No. 160-2013 did not alter this benefit.

*Other Pension Increase Acts*

Act No. 128 of June 10, 1967, and Act No. 124 of June 8, 1973, provided a pension increase (from 2% to 10%) based on the monthly pension, and Act No. 47 of June 1, 1984, provided a pension increase based on credited service worked. This increase is funded by the Commonwealth's General Fund. Act No. 160-2013 did not alter this benefit.

*Cultural Loans*

Act No. 22 of June 14, 1965, provides a 50% repayment of the interest that would be paid by the active teachers and retirees. This benefit is funded by the Commonwealth's General Fund. Act No. 160-2013 did not alter this benefit.

*Death Benefit*

Act No. 272 of March 29, 2004, increases the death benefit of $500 to $1,000. This $500 increase is funded by the Commonwealth. As per Act No. 160-2013, this benefit will only apply to pensioners as of July 31, 2014 that eventually die.

The special benefits contributions of approximately $49.9 million in 2014 represent contributions from the General Fund of the Commonwealth for the special benefits granted by special laws. The funding of the special benefits is provided to the TRS through legislative appropriations each January 1 and July 1. The legislative appropriations are considered estimates of the payments to be made by the TRS for the special benefits. Deficiencies in legislative appropriations are covered by the TRS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits.

***Contributions***

The contribution requirement to the TRS is established by law and is not actuarially determined.

*Member Contributions*

*(a)*   Contributions by members hired on or before July 31, 2014 are 9% of compensation.

*(b)*   Contributions by members hired on or after August 1, 2014 are as follows: 10% of compensation for fiscal years 2015 through 2017, 13.12% of compensation for fiscal years 2018 through 2020, and 14.02% of compensation for fiscal year 2021 and each year thereafter.

*Employer Contributions*

*(a)*   *Payroll-based Employer Contributions:* Contributions by the Commonwealth and the TRS, as applicable, are 9.5% of compensation for the fiscal year beginning July 1, 2011. For the next four fiscal years effective July 1, employer contributions will increase annually by 1%. For the

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

next five fiscal years, employer contributions will increase annually by 1.25%, reaching an employer contribution rate of 19.75% effective July 1, 2020. Effective July 1, 2021 and later fiscal years, the employer contribution rate will be 20.525%.

*(b)* *Supplemental Contributions:* From fiscal year 2015 and each subsequent fiscal year, the TRS will receive from the General Fund of the Commonwealth a contribution of $1,675 per pensioner, regardless if the pensioner retired before or after August 1, 2014, to pay for special benefits (i.e., Christmas and medication bonuses) and medical insurance plan contribution, and, therefore, contribute to the solvency of the TRS.

*(c)* *Teacher's Justice Uniform Contribution:* The annual contribution to be made to the TRS equal to $30 million in fiscal year 2017, $30 million in fiscal year 2018, and $60 million in fiscal year 2019, and subsequent years, until fiscal year 2042. The Teacher's Justice Uniform Contribution is to be funded by the Commonwealth's General Fund.

*(d)* *Annual Additional Contribution:* The annual contribution certified by the external actuary of the TRS as necessary to prevent the value of the projected gross assets of the TRS from falling below $300 million during any subsequent fiscal year. The Annual Additional Contribution is to be funded by the Commonwealth's General Fund from fiscal year 2019 through fiscal year 2042.

Other relevant information on the Commonwealth's Retirement Systems is presented below:

(d) ***Membership as of June 30, 2013***

|  | | ERS | JRS | TRS | Total |
|---|---|---|---|---|---|
| Retirees, beneficiaries and disabled members currently receiving benefits | $ | 124,497 | 430 | 38,367 | 163,294 |
| Current participating employees | | 125,671 | 364 | 41,553 | 167,588 |
| Terminated vested participants not yet receiving benefits | | — | 59 | 698 | 757 |
| Total | $ | 250,168 | 853 | 80,618 | 331,639 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(e) *Annual Pension Cost and Net Pension Obligation*

The Commonwealth's annual pension cost and net pension obligation of the three pension plans as of and for the year ended June 30, 2014 were as follows (expressed in thousands):

|  | ERS | JRS | TRS | Total |
|---|---|---|---|---|
| Annual required contributions | $ 1,822,675 | 40,758 | 748,569 | 2,612,002 |
| Interest on net pension obligation | 636,543 | 6,286 | 189,181 | 832,010 |
| Adjustment to annual required sponsors' contributions | (822,014) | (9,791) | (178,218) | (1,010,023) |
| Annual pension cost | 1,637,204 | 37,253 | 759,532 | 2,433,989 |
| Statutory sponsors' contributions made | (713,813) | (11,992) | (189,367) | (915,172) |
| Increase in net pension obligation | 923,391 | 25,261 | 570,165 | 1,518,817 |
| Net pension obligation at beginning of year | 9,945,982 | 99,788 | 3,026,895 | 13,072,665 |
| Net pension obligation at end of year | $ 10,869,373 | 125,049 | 3,597,060 | 14,591,482 |

The net pension obligation at June 30, 2014 for ERS, JRS, and TRS of approximately $14.6 billion, is recorded in the Governmental Activities of the accompanying statement of net position.

The annual pension cost for the year ended June 30, 2014 was determined by an actuarial valuation with beginning-of-year census data as of July 1, 2013 that was updated to roll forward the pension cost for the year ended June 30, 2014 and assumed no liability gains or losses. Prior year actuarial valuations were made using end-of-year census data.

The following tables show the most significant actuarial methods and assumptions used to estimate the net pension obligation:

|  | ERS | JRS | TRS |
|---|---|---|---|
| Actuarial-cost method | Projected unit credit cost method with straight proration based on service to decrement | Projected unit credit cost method with straight proration based on service to decrement | Entry age normal |
| Amortization method | 30 years closed, level dollar | 30 years closed, level percentage of payroll | 30 years closed, level percentage of payroll |
| Remaining amortization period | 23 years | 12 years | 23 years |

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The annual required contribution for the year ended June 30, 2014, was determined by actuarial valuations for each of the pension plans as described below:

| | ERS | JRS | TRS |
|---|---|---|---|
| Asset-valuation method | Market value of assets | Market value of assets | Market value of assets |
| Actuarial assumptions: | | | |
| Inflation | 2.5% | 2.5% | 2.5% |
| Investment rate of return | 6.4 | 6.3 | 6.3 |
| Projected payroll growth | 2.5 | — | |
| Projected salary increases per annum | 3.0 | 3.0 | 3.5% (general wage inflation, plus service-based merit increase) |
| Cost-of-living adjustments | 0.99% annually to approximate 3.0% triennial increases | 0.99% annually to approximate 3.0% triennial increases | None assumed. |
| Mortality | Pre-retirement Mortality: For general employees and Mayors, RP-2000 Employee Mortality Rates for males and females projected on a generational basis using Scale AA. For members covered under Act 127, RP-2000 Employee Mortality Rates with blue collar adjustments for males and females, projected on a generational basis using Scale AA. As generational tables, they reflect mortality improvements both before and after the measurement date. | Pre-retirement Mortality: RP-2000 Employee Mortality Rates with white collar adjustments for males and females, projected on a generational basis using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date. | Pre-retirement Mortality: RP-2000 Employee Mortality Rates for males and females, projected on a generational basis using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date. |
| | Post-retirement Healthy Mortality: 100% of deaths while in active service are assumed to be occupational for members covered under Act 127. For other members, 25% of deaths while in active service are assumed to be occupational and 75% are assumed to be nonoccupational. | Post-retirement Healthy Mortality: Among deaths while in active service, 50% are assumed to be occupational, 50% are assumed to be nonoccupational. | Post-retirement Healthy Mortality: Rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of plan's experience from 2007 to 2012 equal to 92% of the rates from the UP-1994 Mortality Table for Males and 87% of the rates from the UP-1994 Mortality Table for females. |

270 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

| ERS | JRS | TRS |
|---|---|---|
| Postretirement Healthy Mortality: Rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of plan's experience from 2007 to 2012 equal to 92% of the rates from the UP-1994 Mortality Table for Males and 95% of the rates from the UP-1994 Mortality Table for females. The rates are projected on a generational basis starting in 1994 using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date. | Postretirement Healthy Mortality: RP-2000 Healthy Annuitant Mortality Rates with white collar adjustments for males and females, projected on a generational basis using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date. | Postretirement Healthy Mortality: The rates are projected on a generational basis starting in 1994 using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date. |
| Post-retirement Disabled Mortality: Rates which vary by gender are assumed for disabled retirees based on a study of plan's experience from 2007 to 2012 equal to 105% of the rates from the UP-1994 Mortality Table for Males and 115% of the rates from the UP-1994 Mortality table for females. No provision was made for future mortality improvement for disabled retirees. | Post-retirement Disabled Mortality: RP-2000 Disabled Annuitant Mortality Rates, without projection. No provision was made for future mortality improvement for disabled retirees. | Post-retirement Disabled Mortality: Rates which vary by gender are assumed for disabled retirees based on a study of plan's experience from 2007 to 2012 equal to the rates in the UP-1994 Mortality Table for males and females. No provision was made for future mortality improvement for disabled retirees. |

The ERS, JRS, and TRS statutory contribution as a percentage of the required contribution for the current year and each of the two preceding years is as follows:

| | ERS | JRS | TRS |
|---|---|---|---|
| Year ended June 30, 2014 | 39.2% | 29.4% | 25.3% |
| Year ended June 30, 2013 | 29.1 | 29.6 | 25.5 |
| Year ended June 30, 2012 | 29.2 | 34.2 | 26.8 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(f) *Three-Year Trend Information*

The three-year trend information is as follows (dollars expressed in thousands):

|  | | ERS | JRS | TRS |
|---|---|---|---|---|
| Annual pension cost (APC): | | | | |
| Year ended June 30, 2014 | $ | 1,637,204 | 37,253 | 759,532 |
| Year ended June 30, 2013 | | 1,962,083 | 36,096 | 752,107 |
| Year ended June 30, 2012 | | 1,903,046 | 32,274 | 673,891 |
| Percentage of APC contributed: | | | | |
| Year ended June 30, 2014 | | 43.6% | 32.2% | 24.9% |
| Year ended June 30, 2013 | | 32.5 | 31.6 | 24.9 |
| Year ended June 30, 2012 | | 31.0 | 35.5 | 25.9 |
| Net pension obligation: | | | | |
| At June 30, 2014 | $ | 10,869,373 | 125,049 | 3,597,060 |
| At June 30, 2013 | | 9,945,982 | 99,788 | 3,026,895 |
| At June 30, 2012 | | 8,621,475 | 75,094 | 2,462,232 |

(g) *Funded Status*

Funded status of the pension plans as of June 30, 2013, the most recent actuarial valuation date, is as follows (dollars expressed in thousands):

|  | | ERS | JRS | TRS | Total |
|---|---|---|---|---|---|
| Actuarial accrued liability | $ | (23,712,081) | (416,734) | (12,251,995) | (36,380,810) |
| Actuarial value of assets | | 715,057 | 45,316 | 1,906,882 | 2,667,255 |
| Unfunded actuarial accrued liability | $ | (22,997,024) | (371,418) | (10,345,113) | (33,713,555) |
| Funded ratio | | 3.0% | 10.9% | 15.6% | 7.3% |
| Covered payroll | $ | 3,489,096 | 32,138 | 1,248,674 | 4,769,908 |
| Unfunded actuarial accrued liability as a percentage of covered payroll | | 659.1% | 1,155.7% | 828.5% | 706.8% |

The schedule of funding progress presented as required supplementary information following the notes to the basic financial statements, presents multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

The projections of benefits for financial reporting purposes do not explicitly incorporate the potential effects of legal or contractual funding limitations.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

**(18)   Other Postemployment Benefits**

A s further described in note 1(b), the Commonwealth provides postemployment healthcare benefits through defined-benefit plans that are administered by the ERS and JRS Administration or by the TRS Administration:

- Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC)

- Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC)

- Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC)

(a)   *Plans Descriptions*

ERS MIPC is an unfunded cost-sharing, multiple-employer defined-benefit other postemployment (OPEB) plan sponsored by the Commonwealth. JRS MIPC and TRS MIPC are unfunded, single-employer defined-benefit OPEB plans sponsored by the Commonwealth. These OPEB plans were created under Act No. 95 approved on June 29, 1963. Healthcare benefits are provided through insurance companies whose premiums are paid by the retiree with the Commonwealth providing a matching share. ERS MIPC covers substantially all full time employees of (1) the Commonwealth's Primary Government and (2) certain municipalities of Puerto Rico and certain component units of the Commonwealth not having their own postemployment benefit plan. JRS MIPC covers all judges of Judiciary Branch of the Commonwealth. The TRS MIPC covers all active teachers of the Department of Education of the Commonwealth and employees of the TRS Administration.

For ERS MIPC and TRS MIPC, Commonwealth employees became plan members upon their date of employment. Plan members were eligible for benefits upon reaching the pension benefits retirement ages. Act No. 3 of 2013 eliminated this healthcare benefit to ERS MIPC members retired after June 30, 2013. Act No. 160-2013 eliminated this healthcare benefit to TRS MIPC members retired after July 31, 2014.

For JRS MIPC, judges of the Judiciary Branch of the Commonwealth become plan members upon their date of employment. Plan members are eligible for benefits upon reaching the age of 60 with 10 years of service.

*Funding Policy* – The contribution requirement of ERS MIPC, JRS MIPC, and TRS MIPC are established by Act No. 95 approved on June 29, 1963. Its benefit consists of a maximum of $100 per month per retiree or disabled member. All these OPEB plans are financed by the Commonwealth and its public corporations and municipalities on a pay-as-you-go basis. The funding of the OPEB benefits are provided to the ERS MIPC, the JRS MIPC and TRS MIPC through legislative appropriations each July 1 by the Commonwealth's General Fund for former government and certain public corporations without own treasuries employees and by certain public corporations with own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by the ERS MIPC, the JRS MIPC and TRS MIPC for the healthcare benefits throughout the year. There is no contribution requirement for plan members during active employment.

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Retirees contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution.

(b) *Membership as of July 1, 2013*

The table below presents membership as of July 1, 2013, adjusted by changes in ERS MIPC participants established by Act No. 3 of 2013 and by changes in TRS MIPC participants established by Act No. 160-2013 and for its outsized retirement activity (2,234 retirees).

|  | ERS | JRS | TRS | Total |
|---|---|---|---|---|
| Retirees, disabled members and beneficiaries currently receiving benefits | $ 111,044 | 489 | 38,202 | 149,735 |
| Current participating employees | — | 364 | 1,391 | 1,755 |
| Total | $ 111,044 | 853 | 39,593 | 151,490 |

(c) *Annual OPEB costs and Net OPEB obligation*

The annual OPEB cost and the annual required contribution (ARC) were computed as part of an actuarial valuation in accordance with parameters of GASB Statement No. 45 based on beginning-of-year census (demographic) data as of July 1, 2013, as adjusted. Prior year actuarial valuations were made using end-of-year census data.

The Commonwealth's annual OPEB cost and the net OPEB obligation for the postemployment healthcare benefits plans as of and for the year ended June 30, 2014 were as follows (expressed in thousands):

|  | ERS MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|
| Annual OPEB cost: |  |  |  |  |
| ARC | $ 88,508 | 684 | 46,403 | 135,595 |
| Interest on net OPEB obligation | 7,258 | 45 | 1,744 | 9,047 |
| Adjustment to annual required contribution | (13,544) | (112) | (2,245) | (15,901) |
| Annual OPEB cost | 82,222 | 617 | 45,902 | 128,741 |
| Statutory sponsor's contributions made | (102,085) | (302) | (35,892) | (138,279) |
| Increase (decrease) in net OPEB obligation | (19,863) | 315 | 10,010 | (9,538) |
| Net OPEB obligation at beginning of year | 223,317 | 1,387 | 53,668 | 278,372 |
| Net OPEB obligation at year-end | $ 203,454 | 1,702 | 63,678 | 268,834 |

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The net OPEB obligation at June 30, 2014 for ERS MIPC, JRS MIPC, and TRS MIPC totaling $268.8 million is recorded in the governmental activities in the accompanying statement of net position.

(d) *Actuarial Methods and Assumptions*

The OPEB funded status as of June 30, 2014 was determined by the actuarial valuation with beginning-of-year census data as of July 1, 2013, as adjusted by Act No. 3 of 2013 for ERS MIPC (eliminating the medical insurance plan contributions for members retired after June 30, 2013) and by Act No. 160-2013 for TRS MIPC (eliminating the medical insurance plan contributions for members retired after July 31, 2014), that was updated to roll forward the funded status to June 30, 2014 and assumed no liability gains or losses. In addition, for TRS MIPC, the census data as of July 1, 2013 was updated to reflect its outsized retirement activity during the year ended June 30, 2014 (2,234 retirees).

For ERS MIPC and JRS MIPC, the actuarial cost method was revised in fiscal year 2014 from the projected unit credit method (used in the actuarial valuations for fiscal year 2013 and before) to the entry age normal method to conform to the requirements of the pension benefits. For ERS MIPC, the amortization period for GASB No. 45 has been reduced to the expected future lifetime of current in pay members.

For TRS MIPC, the actuarial cost method was changed from the level dollar variation of the entry age normal method to the level percentage of payroll variation of the entry age normal method.

As a result of the elimination of the medical insurance plan contributions for ERS MIPC members retired after June 30, 2013 and for TRS MIPC members retired after July 31, 2014, the amortization period of GASB Statement No. 45 was reduced from 30 years to 18 years for ERS MIPC and 20 years for TRS MIPC.

The following are the most significant actuarial methods and assumptions used to estimate the net OPEB obligation at June 30, 2014 and the OPEB required annual contribution for the year ended June 30, 2014:

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Actuarial-cost method | Entry age normal | Entry age normal | Entry age normal |
| Amortization method | 18 years closed (beginning July 1, 2014), level dollar | 30 years closed, level percentage of payroll | 20 years closed (beginning July 1, 2014), level dollar |
| Remaining amortization period | 18 years | 12 years | 20 years |
| Discount rate | 3.10% | 3.10% | 3.10% |
| Projected payroll growth | N/A | 0% until June 30, 2017; 3% thereafter | N/A |
| Projected salary increases | N/A | N/A | N/A |
| Inflation | N/A | N/A | N/A |

275

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The ERS MIPC, JRS MIPC, and TRS MIPC statutory contributions as a percentage of the annual required contribution for the current year and each of the two preceding years are as follows:

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Year ended June 30, 2014 | 115.3% | 44.1% | 77.3% |
| Year ended June 30, 2013 | 59.2 | 45.3 | 75.0 |
| Year ended June 30, 2012 | 70.8 | 53.1 | 83.9 |

Actuarial valuations of an ongoing plan involve estimates of the net value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment and mortality. Amounts determined regarding the funded status of the plan and the ARC of the employer are subject to continuous revision as actual results are compared with past expectations and new estimates are made about the future.

Calculations are based on the types of benefits provided under the terms of the substantive plan at the time of each valuation and on the pattern of sharing of costs between the employer and plan members to that point. The projections of benefits for financial reporting purposes does not explicitly incorporate the potential effects of legal or contractual funding limitations on the pattern of cost sharing between the employer and plan members in the future.

The actuarial calculations reflect a long-term perspective. Consistent with that perspective, actuarial methods and assumptions used include techniques that are designed to reduce short-term volatility in actuarial accrued liabilities and actuarial value of assets.

(e)  *Three-Year Trend Information*

The three-year trend information is as follows (dollars expressed in thousands):

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Annual OPEB cost: |  |  |  |
| Year ended June 30, 2014 | $ 82,222 | 617 | 45,902 |
| Year ended June 30, 2013 | 148,383 | 731 | 40,367 |
| Year ended June 30, 2012 | 130,704 | 530 | 40,962 |
| Percentage of annual OPEB cost contributed: |  |  |  |
| Year ended June 30, 2014 | 124.2% | 48.9% | 78.2% |
| Year ended June 30, 2013 | 61.9 | 39.8 | 84.8 |
| Year ended June 30, 2012 | 72.4 | 58.9 | 90.0 |
| Net OPEB obligation: |  |  |  |
| At June 30, 2014 | $ 203,454 | 1,702 | 63,678 |
| At June 30, 2013 | 223,317 | 1,387 | 53,668 |
| At June 30, 2012 | 166,757 | 947 | 47,540 |

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(f)   *Funded Status*

Funded status of the postemployment healthcare benefit plans as of June 30, 2014, the most recent actuarial valuation date, is as follows (dollars expressed in thousands):

| | | ERS MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|---|
| Actuarial accrued liability (AAL) | $ | 1,438,475 | 6,540 | 543,205 | 1,988,220 |
| Actuarial value of assets | | — | — | — | — |
| Unfunded actuarial accrued liability | $ | 1,438,475 | 6,540 | 543,205 | 1,988,220 |
| Funded ratio | | —% | —% | —% | —% |
| Covered payroll | $ | 3,489,096 | 31,707 | 1,171,154 | 4,691,957 |
| Unfunded actuarial accrued liability as a percentage of covered payroll | | 41.2% | 20.6% | 46.4% | 42.4% |

The schedule of funding progress presented as required supplementary information following the notes to the basic financial statements, present multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

**(19)   Debt Service Deposit Agreements**

On May 26, 2005 (but effective on July 1, 2005), the Commonwealth, PFC, and GDB (together the Commonwealth) and Lehman Brothers Special Financing Inc. (Lehman) entered into Debt Service Deposit Agreements (DSD Agreements), the objective of which was for the Commonwealth to secure an upfront payment in exchange for granting Lehman the rights to earnings generated from eight of its debt service funds. On September 25, 2008, as a result of Lehman commencing a case in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of the United States Code, Lehman selected Hexagon Securities LLC to act as the Qualified Dealer under the DSD Agreements and delivered Qualified Securities as permitted under the DSD Agreement. Seven of the funds are associated with the Commonwealth's PFC bonds, presented in the accompanying basic financial statements as Commonwealth appropriation bonds, and one fund is associated with the Commonwealth's general obligation bonds. The upfront payment, which amounted to $82.7 million, was received on May 26, 2005 and equaled the present value of the projected earnings income adjusted for credit timing risks as well as an appropriate amount of compensation for Lehman.

With the upfront payment made as explained above, the Commonwealth delivered to Lehman the required and scheduled debt service deposits and Lehman delivered qualified government debentures, which will mature before the next debt service payment date at an amount approximating such next debt service payment. Lehman will attempt to earn sufficient funds on the debt service deposit amounts, less its cost for the qualified government debentures, to make back the $82.7 million over time. At the same time, the

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

Commonwealth will be managing its borrowings and investments by increasing the predictability of its cash flows from earnings on its investments and not for purpose of speculation. The Commonwealth acknowledges that, in exchange for the upfront payment received, it is foregoing its right to receive investment earnings on the deposit amounts referred to above in the future and that, by accepting the upfront payment, the Commonwealth has minimized the risks resulting from fluctuations in interest rates during the term of the DSD Agreements but also has foregone the possibility of receiving greater returns on such amounts from such fluctuations.

Under the DSD Agreements, the Commonwealth will be exposed to the payment to Lehman of a Termination Amount, as defined in the agreement, principally upon the occurrence of redemption or a defeasance of the related bonds on or prior to the last scheduled deposit date. The amount of the Termination Amount will vary depending on various market conditions, as defined in the DSD Agreements. Under certain market conditions, the Termination Amount owed to Lehman by the Commonwealth may exceed the amount of the original upfront payment received.

The $82.7 million upfront payment received by the Commonwealth was recognized as other revenue for budgetary purposes in 2005; however, under U.S. GAAP, such upfront payment was deferred and is being recognized proportionally over the future periods the Commonwealth would have otherwise earned such interest earnings. The unamortized balance amounted to approximately $22.1 million and is a component of unearned revenue at June 30, 2014. During fiscal year 2014, approximately $3.4 million was amortized into other revenue in the governmental activities of the accompanying statement of activities. For additional information regarding potential claims with respect to the debt service deposit agreements, refer to note 22.

**(20) Derivative Instruments**

*Hedging Derivative Instruments*

The sole hedging derivative instrument at the Primary Government at June 30, 2014 resides at COFINA, which has entered into an interest rate exchange agreement (swap) with a counterparty in connection with the issuance of $136,000,000 LIBOR-based adjustable rate bonds within the Sales Tax Revenue Bonds Series 2007A (the Adjustable Rate Bonds) maturing August 1, 2057. The Adjustable Rate Bonds expose COFINA to variability in interest payments due to changes in interest rates. Management believes that it is prudent to limit the variability of interest payments on the Adjustable Rate Bonds. To meet this objective, management entered into a $136,000,000 interest rate swap agreement to manage fluctuations in cash flows resulting from interest rate risk. This swap effectively changes the variable rate cash flow exposure on the Adjustable Rate Bonds to fixed cash flows. Under the terms of the interest rate swap, COFINA receives variable interest rate payments equal to the interest payment on the Adjustable Rate Bonds, and makes fixed interest rate payments at 4.92% through August 1, 2057, thereby creating the equivalent of a fixed rate debt.

278                                                                                                          (Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

The fair value and notional amount of the derivative instrument (pay-fixed interest rate swap) outstanding at June 30, 2014, designated as cash flow hedge, was as follows (dollars expressed in thousands):

| Notional amount | Fair value (1) | Change in fair value from June 30, 2013 (2) | Effective date | Floating rate indicator | Maturity date | Receives | | Pays | | Counterparty credit rating Moody's/S&P |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Type | Rate | Type | Rate | |
| $ 136,000 | (56,529) | (3,354) | 7/31/2007 | 67% 3M LIBOR +0.93% | 8/1/2057 | Variable | 1.09% | Fixed | 4.92% | A2/A |

The fair value of the interest rate swap was estimated using the zero-coupon method. This method calculates the future net settlement payments required by the swap, assuming that the current forward rate implied by the yield curve correctly anticipate future spot interest rates. These payments are then discounted using the spot rates implied by the current yield curve for hypothetical zero-coupon bonds due on the date of each future net settlement of the swaps.

Accrued interest payable on swaps are presented separately from the fair values of the swaps in the Commonwealth's government-wide statement of net position and in the governmental funds – balance sheet and amounted to $2.5 million at June 30, 2014.

The COFINA swap does not have significant embedded options.

During the year ended June 30, 2014, the Commonwealth terminated all its hedging derivative instruments. The Commonwealth terminated various hedging derivative instruments with notional amount of $263.5 million and recorded a deferred refunding loss of $34.6 million, which approximates the fair value of the swaps at the refunding date. It was deferred due to it being associated with a debt refunding. In addition, the Commonwealth terminated various hedging derivative instruments with a notional amount of $126.7 million and recorded an investment loss of $8.9 million during the year ended June 30, 2014.

### Risks on Hedging Derivative Instruments

By using derivative financial instrument to hedge the exposure to changes in interest rates, COFINA exposes itself to interest rate risk, credit risk, and termination risk.

*Credit or Counterparty Risk –* Credit risk is the failure of the counterparty (or its guarantor) to perform under the terms of the derivative contract. When the fair value of a derivative contract is positive, the counterparty owes COFINA, which creates credit risk for COFINA. When the fair value of a derivative contract is negative, COFINA owes the counterparty and, therefore, does not possess credit risk. COFINA minimizes the credit risk in derivative instruments by entering into transactions with counterparties whose credit rating is acceptable under the investment policies of COFINA. At June 30, 2014, there is no credit risk since the fair value of the derivative instrument is negative.

*Interest Rate Risk –* Interest rate risk is the adverse effect on the value of a financial instrument that results from a change in interest rates. COFINA is exposed to interest rate risk on its pay-fixed, receive-variable swap; as LIBOR decreases, COFINA's net payment on the swap increases. At the same time, interest payments on the hedged adjustable rate bonds decrease. The interest rate risk associated with interest rate swap contracts is managed by establishing and monitoring parameters that limit the types and degree of interest rate risk that may be undertaken.

279                                                                  (Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Termination Risk* – Termination risk is the possibility that a hedging derivative instrument's unscheduled end will affect COFINA's liability strategy or will present COFINA with potentially significant unscheduled termination payments to the counterparty. COFINA or its counterparty may terminate a derivative instrument if the other party fails to perform under the terms of the contract. COFINA is at risk that the counterparty will terminate a swap at a time when COFINA owes it a termination payment. COFINA has mitigated this risk by specifying that the counterparty has the right to terminate only as a result of certain events, including a payment default by COFINA; insolvency of COFINA (or similar events); or a downgrade of COFINA's credit rating below BBB+ or Baa1. If at the time of termination, an investment derivative instrument is in a liability position, COFINA would be liable to the counterparty for a payment equal to the liability, subject to netting arrangements.

### Investment Derivative Instruments

During the year ended June 30, 2014, the Commonwealth terminated all of its investment derivative instruments with notional amount of $1.5 billion for $58.0 million, and recorded an investment loss of $1 million. One of the counterparties to these terminated swaps waived its right to receive the entire termination payment on July 3, 2014 provided that the Commonwealth pays to it as follows: $4 million on July 3, 2014; $1 million on October 1, 2014; $1 million on January 7, 2015; and $1 million on April 1, 2015. The Commonwealth made these payments as agreed.

*Collateral Posting Requirements and Contingencies* – At June 30, 2014, no collateral posting requirement applied to COFINA's derivative instrument.

In connection with the COFINA swap agreement, Moody's issued a downgrade on its LIBOR 2007 A Bonds to a rating of Ba3. On September 24, 2014, rather than terminate the swap agreement, COFINA and the counterparty entered into a new credit support annex, as well as an amendment to the ISDA Master Agreement, to permit COFINA to collateralize its obligations under the swap agreement and to amend the termination events thereunder. The impact of the new swap agreement was for COFINA to post $12 million in collateral to the counterparty, as well as set up a restricted account in which a portion of the collateral be deposited for the benefit of the counterparty. See further subsequent events disclosures on note 22.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

### (21)  Fund Balance (Deficit)

Below is the detail included in the fund balance (deficit) classifications for the governmental funds at June 30, 2014 (expressed in thousands):

| | General | Debt service | COFINA Special revenue | COFINA Debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| Spendable: | | | | | | |
| Restricted for: | | | | | | |
| General government | $  67,771 | — | — | — | — | 67,771 |
| Public housing and welfare | — | — | — | — | 83,570 | 83,570 |
| Capital projects | — | — | — | — | 456,738 | 456,738 |
| Debt service | — | 433,133 | — | 336,780 | 197,665 | 967,578 |
| Subtotal | 67,771 | 433,133 | — | 336,780 | 737,973 | 1,575,657 |
| Committed to: | | | | | | |
| General government | 1,742 | — | — | — | — | 1,742 |
| Public housing and welfare | — | — | — | — | 26,420 | 26,420 |
| Subtotal | 1,742 | — | — | — | 26,420 | 28,162 |
| Assigned to: | | | | | | |
| General government | — | — | 5,441 | — | — | 5,441 |
| Public housing and welfare | — | — | — | — | 6,867 | 6,867 |
| Capital projects | — | — | — | — | 144,796 | 144,796 |
| Debt service | — | — | — | — | 1,497 | 1,497 |
| Subtotal | — | — | 5,441 | — | 153,160 | 158,601 |
| Unassigned | (1,933,398) | — | — | — | — | (1,933,398) |
| Total fund balance (deficit) | $  (1,863,885) | 433,133 | 5,441 | 336,780 | 917,553 | (170,978) |

### (22)  Subsequent Events

Subsequent events were evaluated through June 30, 2016 to determine if any such events should either be recognized or disclosed in the 2014 basic financial statements. The subsequent events disclosed below are principally those related to debt activities, including credit rating downgrade events, and other revenue and/or budget related matters that management believes are of public interest for disclosure.

***Primary Government***

*Tax Revenue Anticipation Notes and Other Notes and Bonds Issued after Year-End*

(a)   *2015 Tax and Revenue Anticipation Notes*

On October 10, 2014, GDB entered into a Note Purchase, Revolving Credit, and Term Loan Agreement providing for the issuance of up to $900 million aggregate principal amount of 2015 Series B Senior Notes guaranteed by the Commonwealth (the GDB Notes). The proceeds of the GDB Notes were used to make a loan to the Commonwealth evidenced by $900 million aggregate principal amount of Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series B (2015)

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

(the 2015 Series B TRANs). GDB also purchased an additional $300 million aggregate principal amount of Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series C (2015) (the 2015 Series C TRANs and, collectively with the 2015 Series B TRANs, the 2015 TRANs). The 2015 TRANS and the underlying GDB Notes have subsequently been paid in full.

(b)   *2016 Tax and Revenue Anticipation Notes (2016 TRANs)*

On July 2, 2015, the Legislative Assembly approved Act No. 102-2015, which required SIFC, ACAA, and the Disability Insurance Fund to purchase in the aggregate $400 million in TRANs from the Commonwealth. On August 17, 2015, the Commonwealth issued $400 million in TRANs (the 2016 TRANs) to SIF, ACAA, and the Disability Insurance Funds. The 2016 TRANs bore interest at a rate of 6%. At present, the Commonwealth has paid the full amount of principal and interest of the 2016 TRANs.

(c)   *PRIFA Bond Anticipation Notes*

On March 17, 2015, PRIFA issued $245,955,000 of bond anticipation notes payable from the increase in the petroleum products tax imposed by Act 1-2015 (the PRIFA BANs), the proceeds of which were used to refinance certain outstanding PRHTA bond anticipation notes and pay related expenses. The PRIFA BANs were originally expected to be refinanced through a long-term bond issuance by PRIFA. However, this proposed transaction has been abandoned. As of June 28, 2016, approximately $90.8 million of these bond anticipation notes remain outstanding.

On June 24, 2016, the Governor signed an executive order, EO-2016-027, which suspended all obligations to transfer money to PRIFA in respect to PRIFA BANs.

*Budgetary Events and Related Legislation*

The Legislative Assembly of the Commonwealth approved a $9.8 billion budget for fiscal year 2016. As part of the 2016 budget legislation, the Legislative Assembly created the Economic Development and Obligations Payment Fund (the Payment Fund) and appropriated $275 million to such fund. The Payment Fund may only be used to fund economic development initiatives and for the payment of the Commonwealth's debt obligations, if authorized by Joint Resolution of the Legislative Assembly. The approved budget did not include an appropriation for the payment of PFC bonds. The budgetary appropriation for the payment of debts of the Commonwealth and its instrumentalities with GDB was reduced from approximately $261.6 million, the amount included in the budget submitted by the Commonwealth OMB to the Legislative Assembly, to approximately $17.5 million.

On July 24, 2015, the Secretary of the Treasury announced that the total revenue of the Commonwealth's General Fund (budgetary basis) for fiscal year 2015 was $8.961 billion, which were $76 million less than the revenue for fiscal year 2014 and approximately $604 million below the original revenue estimate.

In October 2015, the Treasury Department reduced its fiscal year 2016 General Fund revenue estimate to $9.4 billion, approximately $354 million lower than originally projected. The Treasury Department revised its fiscal year 2016 General Fund revenue estimates again in January 2016. As revised, total estimated revenue for fiscal year 2016 is $9.3 billion, which is approximately $508 million lower than originally projected.

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

In order to address its liquidity constraints and the decrease in estimated revenue, the Commonwealth has implemented, among others, the following measures: (a) requiring advance payment to the Treasury Department from the two largest government retirement systems of funds required for the payment of retirement benefits to participants (instead of the usual reimbursements made by the retirement systems to the Treasury Department for pension benefits payments made by the Treasury Department on behalf of the retirement systems), (b) suspending during fiscal year 2016 Commonwealth set-asides required by Act No. 39 of May 13, 1976, as amended, for the payment of its general obligation debt, (c) delaying the payment of third-party payables or amounts due to public corporations, (d) deferring the disbursement of certain budgetary assignments, (e) delaying the payment of income tax refunds, and (f) retaining certain tax revenue assigned by the Commonwealth to PRHTA, PRIFA, CCDA and PRMBA and redirecting them to the payment of the Commonwealth's general obligation debt. The Commonwealth also has not paid debt service on PFC bonds, since these amounts were not appropriated in the fiscal year 2016 budget as a result of continuing liquidity constraints.

The Commonwealth OMB has implemented reductions to budgetary appropriations through the elimination of certain contingency accounts, reductions in nonpriority program appropriations, and a decrease in the operating budgets of various agencies funded by the General Fund, including government's operational programs in health, security, social well-being, and additional cuts in the special additional contributions to the Retirement Systems. The aggregate reductions to budget appropriations, added to the $275 million for the Payment Fund, require legislative action in order to be used, approximates the total amount of the gap of $500 million.

On May 23, 2016, the Governor proposed a $9.1 billion budget for fiscal year 2017. The proposed budget includes approximately $203 million for debt service, which amount is less than the required debt service for fiscal year 2017, and did not include appropriations for the payment of PFC bonds.

*Significant Legislation and Other Events after Year-End*

(a)   *Implementation of New Petroleum Products Tax*

Act 1-2015, as amended, amended PRIFA's enabling act to impose a new petroleum products tax and assign the revenue therefrom, subject to clawback, to PRIFA to secure the payment of bonds and notes issued by PRIFA.

(b)   *Transition to Value Added Tax*

On May 29, 2015, the Commonwealth enacted Act 72-2015 (Act 72), which, among other things, increased the sales and use tax (SUT) by 4.5%, in addition to the then-applicable 7% SUT, and provided for a transition to a value added tax (VAT), subject to certain conditions.

Since July 1, 2015, transactions subject to the 7% SUT are now subject to an aggregate 11.5% SUT (10.5%, of which 0.5% goes to a special fund for the benefit of the municipalities, and 1% separately collected by the municipalities). The transition from the SUT to the VAT was scheduled for March 31, 2016; however, as permitted by Act 72 the Secretary of Treasury extended the implementation date for up to 60 days.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

In addition, since October 1, 2015 and until May 31, 2016, taxable business to business transactions are subject to an aggregate 11.5% SUT and certain business to business services and designated professional services that were previously exempt from SUT are subject to a Commonwealth SUT of 4% (with no municipal SUT applying to these services).

After the extended implementation date for the VAT, all transactions subject to the SUT will be subject to a new aggregate VAT of 10.5% plus a 1% municipal SUT. The new VAT will also apply to the introduction into Puerto Rico of taxable articles and on taxable transactions that relate to the sale in Puerto Rico of goods and services by a merchant, the rendering of a service by a nonresident to a person in Puerto Rico, and combined transactions.

Act No. 72 exempted the following services, among other exemptions, from the business-to-business SUT: (i) services offered by the Commonwealth government and instrumentalities, (ii) education, (iii) interest and other financing charges, (iv) insurance, (v) health and hospital services, and (vi) services offered by merchants with a volume of business not exceeding $50,000.

On September 30, 2015, the Governor signed into law Act 159-2015, which expanded the services exempt from the 4% SUT to include certain legal services, advertising services, services rendered to a person engaged exclusively in the storage or handling of fuel in a foreign trade zone, services rendered to bona fide farmers, designated professional services rendered to labor unions, and ocean, air, and ground transportation of goods, among other services.

During the first week of May 2016, the Legislature passed a bill repealing the business to business SUT hike to 10.5% and the transition to the VAT. Although the Governor vetoed such bill a week later, the Legislature approved on May 26, 2016 to override the Governor's veto.

(c)  *Act 80-2015*

Act No. 80-2015 was approved with the objective of addressing the Commonwealth's projected cash flow deficiencies for fiscal year 2015. This Act, among other provisions, specifically authorized the SIFC, PRTC, AACA, EDB, PRIDCO and the Department of Economic Development and Commerce to grant a loan and/or a special contribution to the Department of the Treasury, in the aggregate, in the amount of $125 million. On June 5 and 9, 2015, SIFC and AACA granted loans to the Department of the Treasury under the provisions of this Act in the amounts of $100 million and $2 million, respectively. These loans bear interest at a rate of 1%, and will be payable on an annual basis, effective July 31, 2017. The loan granted by ACAA matures on July 31, 2022 and that granted by SIFC matures on July 31, 2032.

(d)  *Nonpayment of PFC Bonds*

On July 15, 2015, PFC filed a notice with Electronic Municipal Market Access (EMMA) indicating that the Legislative Assembly had not included in the approved budget for fiscal year 2016 the funds necessary to pay principal and interest on all outstanding PFC bonds. Such appropriation is the sole source of payment of principal and interest on PFC bonds. The first payment of debt service on PFC bonds for fiscal year 2016 came due on August 3, 2015, on which date PFC made a partial payment of interest in the amount of $628,000 (of the approximately $58 million payment due on that date) from funds held by PFC representing funds remaining from prior legislative appropriations. As of

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

February 1, 2016, PFC had missed payments of debt service on its bonds in the aggregate amount of approximately $86.5 million.

(e) *Creation of the Bureau of Internal Revenue*

On September 18, 2015, the Commonwealth enacted Act No. 156-2015 to create the Bureau of Internal Revenue, an autonomous entity ascribed to the Treasury Department, with the mission of reducing tax evasion and avoidance, increasing collections, enhancing the professional development of its staff, improving systems technology, and improving the quality of services to taxpayers. The Secretary of Treasury is currently working on developing a structural and organizational plan for the implementation of the Bureau of Internal Revenue and cannot provide at this time an estimate of when the Bureau of Internal Revenue will be in full operation.

(f) *The Commonwealth's Fiscal and Economic Growth Plan*

In reaction to the Krueger Report, on June 29, 2015, the Governor of Puerto Rico created the Puerto Rico Fiscal and Economic Recovery Working Group (the Working Group) to evaluate the measures necessary to address the fiscal crisis of the Commonwealth, including the measures recommended in the Krueger Report. The Working Group was responsible for developing and recommending to the Governor of Puerto Rico the Puerto Rico Fiscal and Economic Growth Plan (the FEGP). The FEPG was released on September 8, 2015 and updated on January 18, 2016.

The FEGP proposes the implementation of the following measures, among others:

*Labor Reform*

- Extend the probation period for an employee from three months to one year.

- Limit the compensation to an employee in case of lay-off to a maximum of six months' salary.

- Base compensation rules for overtime on the excess of 40 hours worked per week, rather than the existing excess of 8 hours worked per day.

- Make employee productivity and performance a basis for personnel reduction.

- Simplify process to exempt an employer from the payment of the Christmas bonus.

- Pursue efforts to prevent the application of the increases in federal minimum wage to employees under 25 years old.

*Energy Rates Stabilization*

- Completion of PREPA's restructuring plan

- Facilitate private investment to upgrade PREPA's existing generation plants and construct new and modern installations.

- Remove political influence from PREPA's structures.

- Invest over $2 billion in infrastructure.

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Corporate Taxes Fostering Growth*

- Establish simpler corporate tax system for new and existing enterprises.

- Extend past the year 2017, its current expiration date, the existing temporary excise tax of 4% of Act No. 154-2010 on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico by nonresident alien individuals, foreign corporations, and foreign partnerships; replace excise tax over time with new corporate tax system.

- Eliminate tax credits determined to be ineffective and unproductive; reduce or eliminate the Alternative Minimum Tax.

- Request U.S. Congress to provide Puerto Rico with tax treatment that encourages U.S. investment on the island.

*Reduction of the Cost of Doing Business in Puerto Rico*

- Simplify the permits granting process.

- Require municipalities to adopt uniform permit guidelines.

- Upgrade property registry.

- Request U.S. Congress to exempt Puerto Rico from Jones Act.

- Revise regulations governing ground transportation.

*Investment in Infrastructure*

- Invest approximately $3.3 billion over a five-year span for infrastructure improvements.

- Extend PR-10, extend Northwest Highway Corridor; improve various piers in San Juan and Aguadilla airport; resume development of the Port of Americas and Roosevelt Roads; construct Science District; invest in other strategic sectors.

*Transition to the Value Added Tax System*

- Expand, effective October 1, 2015, the sales and use tax system to transactions between businesses at the rate of 4%.

- Complete the transition to VAT, including between businesses to business transactions.

*Improving Supervision and Monitoring of Taxpayers*

- Revamp information systems and training to improve the Department of the Treasury's tax collections.

- Restrict use of tax amnesties and other special tax deals to improve the certainty of the Commonwealth's tax projections.

- Address the issue of the proliferation of illegal video-lottery machines by implementing and enforcing a tax on, and regulation of, video lottery games.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

*Reduction in Governmental Operational Costs*

- Extend until 2021 the provisions of Act No. 66.

- Reduce the government's labor costs by targeting a 2% annual reduction in head count, mostly through the use of early retirement windows, among other initiatives.

*Reduction of Government Subsidies*

- Beginning in fiscal year 2018, initiate a gradual phase out of government subsidies to the Municipalities while providing them the legal, administrative, and operational tools necessary for them to offset these reductions.

- Implement reductions in General Fund subsidies to the UPR, which may be compensated with a more cost-effective operation, means-testing tuition, operational efficiencies, and maximization of federal funds.

*Downsizing of the Public Education System*

- Consolidate public schools.

- Reduction of the Department of Education's payroll by 2% a year through attrition.

- Consider the sale of government assets, including real estate, in order to finance early retirement of teachers and capitalize the existing financing deficit at the Puerto Rico Teachers' Retirement System.

*Cost Control of the Commonwealth's Health Program*

- Implement provider payment scale based on performance.

- Implement functional public-private partnership arrangements (invoicing, maintenance and food supply), among other service support initiatives at state hospitals in order to bring best practices, centralization of duties, and processes efficiencies.

- Standardize health protocols and health service rates.

*Promotion of Public-Private Partnerships*

- Consolidate PBA and the Office for the Improvement of Public Schools.

- Consider transfer of the operations of the PRMBA to municipalities.

- Consider establishment of a service concession arrangement for a minimum of five years for the operation and maintenance of the public maritime transportation system.

*Installation of New Accounting Systems*

- Implement new financial, accounting, and payroll systems to unify the current segmented public platforms, which hamper the Commonwealth's capacity to adequately supervise and monitor its fiscal condition.

- Contract information technology supplier that would develop and install this new system.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Centralization of the Department of the Treasury's Functions*

- Establish a centralized treasury function for state agencies and public corporations in order to improve and maximize cash flow.

- Construct the infrastructure necessary for cash flows projection and monitoring.

*Betterment of the Fiscal and Economic Decision Making Systems*

- Implement five-year plan by the Statistics Institute and the Planning Board to strengthen, upgrade, and modernize the system of economic statistics and its analyses.

- Consolidate the nonbanking functions of the Department of the Treasury, OMB, and GDB into a new department.

*Enactment of New Budgetary Rules and Creation of a Fiscal Oversight Board*

- Require five-year projection of revenue and expenditures.

- Require that Commonwealth annual projection of revenue be validated by a third and/or independent party.

- Involve OMB in the supervision of all purchase orders and contracts.

- Create a special fund that can only be utilized for the payment of past-due accounts, including tax refunds.

- The creation, through legislation, of a fiscal oversight board to ensure budget compliance and to oversee the implementation of the FEGP.

On January 18, 2016, the Working Group released an update to the FEGP. The update: (i) revised projections from fiscal year 2016 to fiscal year 2020 to account for year-to-date actual results and (ii) at the request of creditors, extended the updated FEGP projections by another five years to fiscal year 2025.

(g) *Organic Act of the Fiscal Oversight and Economic Recovery Board*

Act 208-2015, approved on December 8, 2015, creates a five-member fiscal and economic oversight board, to be known as the "Puerto Rico Fiscal Oversight and Economic Recovery Board" (the Board). The Board will have fiscal oversight authority over each public entity of the Commonwealth, other than the Judicial Branch, the Legislative Assembly and its dependencies, municipalities, the Office of the Comptroller, the Office of Government Ethics, the Office of the Special Independent Prosecutor's Panel, the Puerto Rico Electric Power Authority, and PRASA.

The Board will be charged with (a) reviewing and approving the FEGP, (b) reviewing the annual budgets of the public entities subject to its fiscal oversight authority, and (c) monitoring compliance with such budgets. The Board shall issue warnings to such public entities that approve budgets that are not in compliance with the Fiscal Adjustment Plan or that fail to adhere to their approved budgets. The effectiveness of the provisions of the Act pertaining to the review and approval of annual budgets and the monitoring of compliance with such budgets is suspended until the FEGP is submitted to and approved by the Board. The Act provides that the Governor shall submit the FEGP to the Board for

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

approval after all of the members of the Board shall have taken office. As of the date of these financial statements, no Board members have been appointed.

The Act requires that an amount equal to 2.5% of the operating expenses and special appropriations included in the Commonwealth's budget be transferred to an account to be administered by the Commonwealth OMB. The Director of the Commonwealth OMB would only be allowed to authorize the expenditure of specified percentages of such funds at the end of each fiscal quarter if the Board concludes that the Commonwealth has adhered to its budget during such fiscal quarter. Finally, the legislation also provides for automatic across-the-board reductions in appropriations in an amount sufficient to reduce projected budget deficits.

(h) *Restructuring Process and Principles*

On September 24, 2015, the Working Group released a document titled "Restructuring Process and Principles," which outlines the Working Group's plan of engagement with creditors to seek financial relief in the near term. The restructuring principles that will guide the Working Group's efforts include the following:

- Achieve the needed debt relief in a timely manner in order to avoid a default on the Commonwealth's debt;

- Ensure that the Commonwealth can continue to make payments on its restructured debt while providing essential services to residents;

- Reflect, and seek to respect, the Constitutional priorities for payment of the Commonwealth's public debt;

- Create a long-term financing solution to the patchwork complex of issuers and indebtedness;

- Design a structure that is attractive to existing creditors; and

- Restore market access on sustainable terms.

(i) *Commonwealth's Restructuring Proposal*

Since fall 2015, the Commonwealth and its advisors have been designing and discussing with creditors and their advisors a potential transaction involving a comprehensive voluntary exchange of the Commonwealth's general obligation debt and other tax-supported debt issued by certain component units. On January 29, 2016, the Commonwealth presented an initial voluntary debt restructuring proposal to legal and financial advisors to holders of all of the principal bond issuers. Such proposal was subsequently released publicly. Following the release of the January 29, 2016 proposal, certain bondholder groups made various public proposals regarding potential debt restructurings involving the bonds held by the respective group. In addition, Commonwealth officials and advisors convened several meetings, in person and on the telephone, with legal and financial advisors to creditors of the Commonwealth and other governmental entities, in order to discuss a potential consensual transaction. Further, the Commonwealth presented a revised debt restructuring proposal to advisors to creditors, which was released publicly on April 11, 2016. This revised proposal was developed in part based on the feedback received from creditors since the release of the original proposal.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

On June 14, 2016, the Commonwealth and its advisors met again with members of the Commonwealth's senior creditor groups and their advisors to present and discuss a further revised proposal. The presentation of this further revised proposal was followed by discussions between Commonwealth officials and advisors and the senior creditors and their advisors. Certain holders of general obligation bonds (GO) and senior COFINA bonds then presented separate counterproposals regarding their own credits. On June 17, 2016, the Commonwealth made a counterproposal responding to the counterproposal presented by the general obligation creditors. A summary of the most recent terms of the proposals and counterproposals made to senior creditors is as follows:

- Total incremental debt service offered to GO and COFINA creditor groups of approximately $15 billion.

- GO holders would receive an 83.5% recovery of their principal in the form of a mandatorily payable bond ("Base Bond"), as well as some portion above their 83.5% recovery in the form of a contingent obligation bond, whose required payments will vary based on terms to be determined.

- COFINA creditors would consent to the release of the Sales and Use Tax Fund during the first half of the fiscal year, on terms to be agreed upon.

- Senior COFINA holders would receive an 80% recovery of their principal in the form of a Base Bond.

- Subordinated COFINA holders would receive a 60% recovery of their principal in the form of a Base Bond.

- The base bond given to COFINA and GO holders in a potential exchange would receive a 5% interest coupon to be paid as a combination of cash and in kind, with variations depending on the credit and with the cash portion increasing incrementally over a five-year period until paid entirely in cash.

On June 21, 2016, the various confidentiality agreements between the Commonwealth and the negotiating senior creditors expired without the parties having reached an agreement on the terms of a voluntary exchange transaction. In compliance with the terms of these confidentiality agreements, the Commonwealth publicly released the further revised proposals and counterproposals, as well as the most recent counterproposals received from the general obligation and senior COFINA creditor groups. At the time of this report, the Commonwealth is not negotiating with its senior creditors on a private or public basis to reach a voluntary exchange agreement. However, as stated on numerous public occasions, the Commonwealth's intention is to seek significant debt relief through voluntary arrangements with its creditors. As a result, the status of negotiations with creditors may change at any time.

(j)     *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*

On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Rehabilitation Act ("Act No. 21"). Among other objectives, Act No. 21 allows the Governor to declare a moratorium on debt service payments and to stay related creditor remedies for a temporary period for the Commonwealth and its component units. The temporary period set forth in Act No. 21 lasts until January 31, 2017, with a possible two-month extension at the Governor's discretion. The

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

moratorium and stay provisions of Act No. 21 require executive action of the Governor to become effective.

Act No. 21 also included amendments to GDB's organic act to include certain statutory options and tools useful for any resolution, reorganization or restructuring that GDB may undertake in the future. Specifically, these amendments modernize the receivership provision in the GDB's organic act and authorize the creation of a temporary "bridge bank" to carry out the GDB's functions and honor deposits.

Act No. 21 also created a new fiscal agency and financial advisory authority to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities, and municipalities.

Pursuant to Act No. 21, on April 8, 2016, the Governor signed an executive order, EO-2016-010 ("EO 10"), declaring GDB to be in a state of emergency. In accordance with the emergency powers provided in Act No. 21, EO 10 implemented a regulatory framework governing GDB's operations and liquidity, including prohibiting loan disbursements by GDB and establishing a procedure with respect to governmental withdrawals, payments, and transfer requests in respect of funds held on deposit at GDB. To that effect, EO 10 restricts the withdrawal, payment and transfer of funds held on deposit at GDB to those reasonable and necessary to ensure the provision of essential services and authorizes GDB to establish weekly limits on the aggregate amount of such disbursements.

The procedures implemented by EO 10 result in restrictions on the ability of the Commonwealth and its component units to withdraw funds held on deposit at GDB. On April 1, 2016, the Commonwealth began depositing its revenues in accounts outside of GDB. However, the Puerto Rico Treasury Department still has funds deposited at GDB, subject to the limitations on withdrawals of funds from GDB.

On April 30, 2016, the Governor signed an executive order, EO-2016-014 ("EO 14"), which declared a payment moratorium with respect to certain obligations of GDB (see related disclosure on the executive action taken imposing a moratorium on GDB's obligations further below under the *Component Units* section of this note). EO 14 also declared an emergency period with respect to certain obligations of PRIFA that are secured by a letter of credit issued by GDB. Pursuant to EO 14, on May 1, 2016, GDB failed to make a principal payment of approximately $367 million in respect of its notes.

On May 17, 2016, the Governor signed an executive order, EO-2016-018 ("EO 18"), which, among other things, declares an emergency period with respect to the PRHTA and suspend PRHTA's obligation to transfer certain revenues to the trustee.

On June 24, 2016, the Governor signed an executive order, EO-2016-027, which declared PRIFA's Tax Fund Revenue Bond Anticipation Notes Series 2015A (the PRIFA BANs), which are guaranteed by the Commonwealth, covered obligations of PRIFA and suspended all obligations to transfer money to PRIFA in respect of the PRIFA BANs.

On June 30, 2016, the Governor signed an executive order, EO-2016-030 (EO 30), declaring the Commonwealth to be in a state of emergency and declaring a moratorium on the Commonwealth's obligation to make payments on bonds and notes issued or guaranteed by the Commonwealth. EO 30

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

also declares an emergency period with respect to PRMBA and PBA, and suspends certain obligations of the Commonwealth to transfer moneys to such entities. EO 30 also suspends any obligation of the Office of Management and Budget of the Commonwealth to include an appropriation in the proposed budget submitted to the Legislative Assembly for the payments of bonds issued by PFC. Finally, EO suspends the payment of certain bonds and notes issued by PRIFA, PRHTA, and PBA.

On the same date, the Governor signed an executive order, EO-2016-031 (EO 31), which among other things, declares an emergency period with respect to CCDA, the ERS, PRIDCO, UPR and PFC.  Also, EO 31 suspends certain obligations to transfer money to and from such entities and from PRTC to GDB. Finally, EO 31 also suspends certain transfers of funds to and from PRHTA.

(k)    *Actions of the U.S. Government and Congress*

On June 30, 2016, the U.S. President signed the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), which grants the Commonwealth and its component units access to an orderly mechanism to restructure their debts in exchange for significant federal oversight over the Commonwealth's finances. In broad strokes, PROMESA seeks to provide Puerto Rico with fiscal and economic discipline through the creation of a control board, relief from creditor lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt.

First, to ensure fiscal and economic discipline, PROMESA creates a federally appointed oversight board that has plenary authority over Puerto Rico's finances. The board's primary function is to provide fiscal oversight through the development and approval of fiscal plans and budgets, and to enforce compliance with those plans and budgets through broad-based powers such as reducing non-debt expenditures and instituting certain hiring freezes. The board also has oversight over legislative processes because PROMESA requires the board to review new laws and deny their enforcement if they are inconsistent with the approved fiscal plans and budgets. The board also has authority to review contracts to ensure compliance with the fiscal plan, and to prevent the execution or enforcement of a contract, rule, executive order or regulation to the extent that it is inconsistent with the approved fiscal plan.

Second, the enactment of PROMESA also operates as a broad-based stay on litigation, applicable to all entities, with respect to claims related Puerto Rico's financial debt, as well as on enforcement of provisions in contracts that allow for termination and the exercise of remedies based on non-payment of financial obligations, among other conditions.

Finally, PROMESA contains two methods to adjust Puerto Rico's debts. The first method is a streamlined process to achieve modifications of financial indebtedness with the consent of a supermajority of affected financial creditors. This method has benefits such as potential speed relative to a traditional restructuring through a formal in-court process. The second method is a court-supervised debt-adjustment process, which is modeled on Chapter 9 of the U.S. Bankruptcy Code. This process includes the so-called "cram-down" power, which may provide Puerto Rico with flexibility in debt adjustment, but it also gives the oversight board total control over the adjustment process and includes certain provisions designed to protect creditor interests.

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(l)     *Retention by the Commonwealth of Tax Revenue Assigned to Certain Public Corporations and Priority of Payment Provisions*

On November 30, 2015, the Governor signed Executive Order No. OE-2015-46 (the Executive Order No. 46), which orders the Secretary of Treasury to retain certain revenue in light of recently revised revenue estimates and the Commonwealth's deteriorating liquidity situation. Pursuant to Executive Order No. 46, certain available resources of the Commonwealth assigned to PRHTA, PRIFA, CCDA, and PRMBA to pay debt service on their obligations were, and continue to be, retained by the Commonwealth (commonly referred to as the clawback), pursuant to Article VI, Section 8 of the Constitution of the Commonwealth and the statutory provisions pursuant to which such revenue was assigned to the applicable public corporations. As a result of the clawback of revenue mentioned above, PRIFA and PRMBA were not able to meet their debt service obligations due on January 1, 2016 in full and PRHTA and CCDA did so using moneys previously held by the bond indenture trustees in reserves or other accounts.

On December 8, 2015, the Governor signed Executive Order No. OE-2015-49 (Executive Order No. 49) to delegate to the Director of the OMB the power to implement the priority norms established in the enabling act of the OMB, Act No. 147 of June 18, 1980, as amended, for the disbursement of the Commonwealth's available revenue.

On January 8, 2016, the clawback of revenue referred to above was challenged in the Puerto Rico Federal District Court by the insurance companies of the PRIFA' bonds impacted by the clawback, claiming such action violates certain clauses of the U.S. Constitution. The Commonwealth intends to contest this case vigorously.

(m)     *Voluntary Preretirement Program*

On December 8, 2015, Act No. 211-2015 was approved to create a Voluntary Preretirement Program. This Act, among other provisions, establishes that employees who started contributing to the ERS before April 1, 1990 with at least 20 years of service may be eligible to participate in the program. Those who participate in the program would be paid 50% of their average salary (except police officers, which would be paid 60%). These payments will be made until the employee becomes eligible to receive payments from the ERS. Other benefits would include the payment of the participant's healthcare plan during the first two years of the program.

(n)     *Civil Action Filed by Walmart Puerto Rico, Inc. Against the Commonwealth*

On December 4, 2015, Walmart Puerto Rico, Inc. filed a civil action lawsuit against the Commonwealth challenging the legality of certain new Puerto Rico tax laws, particularly Act No. 72-2015, claiming it violates the Commerce Clause, the Equal Protection Clause, and the Bill of Attainder Clause of the U.S. Constitution, as well as the Federal Relations Act. Act No. 72-2015 imposed a 6.5% tax rate (an increase from the then-existing 2%) on purchases made by P.R. businesses (including Walmart) to their subsidiaries in the United States. A trial was held and ended on February 5, 2016. On March 28, 2016, the court ruled in favor of Walmart declaring unconstitutional the aforementioned tax on purchases made to subsidiaries in the United States. The Commonwealth immediately appealed this decision to the U.S. Court of Appeals for the First Circuit.

### COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

(o)   *Civil Actions Filed by General Obligation Creditors Against the Commonwealth*

On May 23, 2016, a group of bond creditors filed a lawsuit in the U.S. District Court for the District of Puerto Rico seeking to invalidate Act 21, *The Puerto Rico Emergency Moratorium and Financial Rehabilitation Act* (Act 21) enacted into law during April 2016.

On June 15, 2016, the monoline insurers filed a lawsuit in the U.S. District Court for the District of Puerto Rico, that the Act 21 and executive orders undertaken pursuant to the Act 21 violated the United States Constitution and the Puerto Rico Constitution. On June 22, 2016, monoline insurers filed a motion for partial summary judgment.

On June 21, 2016, a group of four hedge funds, holders of Commonwealth's general obligation bonds, filed a lawsuit in New York seeking to invalidate Act 21, enacted into law during April 2016; and at the same time questioned the COFINA's debt structure as it prevents the use of COFINA's sales and use tax resources from being available to pay general obligation bonds which should enjoy constitutional priority. The lawsuit has been assigned to the southern District Court of New York.

*Bonds Credit Rating Downgrades*

After a series of credit downgrades during July 2014 and February 2015, a further downgrade was announced by Standard & Poor's Ratings Services (S&P) on April 24, 2015, when it lowered its rating on the general obligation bonds of the Commonwealth from "B" to "CCC+", maintaining a negative credit watch, and noted that further downgrades were possible. Similarly, on May 21, 2015, Moody's Investors Service (Moody's) also lowered its rating on the general obligation bonds of the Commonwealth one more notch, from "Caa1" to "Caa2," and maintained a "negative" outlook on all these bonds. On March 26, 2015, Fitch Ratings (Fitch) lowered its rating on the general obligation bonds of the Commonwealth by two notches from "BB-" to "B," and placed them on "negative credit watch" outlook. During these same dates, S&P downgraded the COFINA's senior and junior-lien bonds to "CCC+" from "B" and maintained a "negative" outlook. Moody's also downgraded COFINA's senior lien bonds on May 21, 2015 to "Caa2" from "B3" and its junior-lien bonds to "Caa3" from "Caa1". During these same dates, S&P, Moody's and Fitch, also downgraded PBA's bonds to a rating of "CCC+", "Caa2", and "B", respectively, while S&P and Moody's have lowered the credit ratings of PRIFA's Special Tax Revenue Bonds various notches since February 2014 from "Ba2" (at both rating agencies) to "CCC+" and "Ca", respectively, during April and May 2015. Since PBA's main activity consists of the rental of buildings to agencies and public corporations of the Commonwealth and PRIFA's principal source of pledged revenue for its bonds' debt service is the federal excise taxes on distilled spirits, their financial stability depends directly on the financial well-being of the Commonwealth and the continuity of the referenced federal excise taxes, respectively.

On June 29 and July 1, 2015, all three credit rating agencies further downgraded the Puerto Rico bonds given the likelihood of a default or a distressed exchange. Fitch downgraded from "B" to "CC" the general obligation bonds of the Commonwealth, COFINA's senior and junior-lien bonds and PBA's bonds. S&P downgraded from "CCC+" to "CCC-" the general obligation bonds of the Commonwealth, COFINA's senior and junior-lien bonds and PRIFA's Special Tax Revenue Bonds and placed them in "negative" outlook. Finally, Moody's downgraded the general obligation bonds of the Commonwealth from "Caa2" to "Caa3". Then on September 10, 2015, S&P lowered again its ratings on the general obligation bonds of the Commonwealth, on COFINA's senior and junior-lien bonds and on PRIFA's Special Tax Revenue Bonds to "CC" from "CCC-" and removed the ratings from CreditWatch, where they had been placed with negative

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

implications July 20, 2015. The outlook is still negative. PBA's bonds have also been downgraded to "CC" by S&P. These recent rating actions by S&P follow the September 9, 2015 release by the Working Group of the FEGP, recommending restructuring all tax-backed debt, including general obligation bonds and COFINA bonds.

On June 24, 2016, Fitch downgraded from "CC" to "C" the general obligation bonds of the Commonwealth, COFINA's senior and junior-lien bonds, PBA's bonds and the ERS bonds and placed them on "negative" outlook since default of some kind is inevitable. Fitch cited "the breakdown of negotiations between the government and major bondholders, the recent ruling by the U.S. Supreme Court on the Commonwealth's bankruptcy legislation, and the slow process of federal legislation in support of the Commonwealth" as indicators that a debt restructuring, deferral or default has become inevitable. Fitch also indicated that recently released proposals and counterproposals between the Commonwealth and bondholders indicate a distressed debt exchange of some kind is inevitable. Moreover, Fitch expressed that with sizeable debt service payments due on July 1, 2016, the probability of default on the general obligation debt is high.

## *Component Units*

On June 28, 2014, the Commonwealth enacted Act 71-2014, known as the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (Recovery Act). The Recovery Act was intended to fill the void that currently exists with respect to an orderly legal process governing the enforcement and restructuring of the debts and other obligations of a public corporation, due to the general inapplicability of Chapters 9 and 11 of the United States Bankruptcy Code to public corporations that are governmental instrumentalities of the Commonwealth. The purpose of the Recovery Act was to create a legal framework that: (1) allows public corporations to adjust their debts in a manner that protects the interests of all affected creditors; (2) provides procedures for the orderly enforcement and restructuring of a public corporation's debt in a manner that is consistent with the United States and Commonwealth Constitution; and (3) maximizes the return to the public corporation's stakeholders.

The Recovery Act did not apply to the Commonwealth. It applied solely to public corporations, other than the following: the Children's Trust; the ERS; GDB and its subsidiaries, affiliates, and any entities ascribed to GDB; the JRS; the MFA; the Municipal Finance Corporation; the PFC; the PRIDCO, AFICA; PRIFA; COFINA; the TRS; and the UPR.

On February 6, 2015, the United States District Court for the District of Puerto Rico issued an opinion and order declaring the Recovery Act unconstitutional and stating that it was preempted by the United States Bankruptcy Code. The District Court's decision was upheld by the United States Court of Appeals for the First Circuit and subsequently upheld by the U.S. Supreme Court.

Further specific subsequent events for major discretely presented component units follow:

(a)  *GDB*

On December 1, 2015, GDB met its scheduled principal and interest debt service payments on its notes, including the payment of $267 million of principal on outstanding GDB notes guaranteed by the Commonwealth.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

As of June 30, 2015, Puerto Rico municipalities maintained approximately $515 million on deposit at GDB in special debt service deposit accounts, which are funded primarily from the proceeds of a special property tax (Special Additional Tax). As of July 31, 2015, after the July debt service payment, the aggregate balance of debt service deposits related to the Special Additional Tax was $266 million. These funds are collected by the CRIM and used for debt service payments of general obligations bonds issued by the municipalities and, by law, have to be deposited in trust at GDB. On June 29, 2015, the CRIM filed suit requesting that GDB execute a deed of trust pursuant to Puerto Rico law. The CRIM also stopped transferring collected revenue to GDB until the deed of trust was executed. GDB opposed the CRIM's suit asserting that the law already provided a statutory trust and, hence, there was no need for a deed of trust as requested by the CRIM. On October 23, 2015, the parties announced that a settlement had been reached, that a deed of trust would be executed and that new investment guidelines for the municipalities' funds would be approved and applied thereon. On November 2, 2015, the parties executed the deed of trust and on November 4, 2015, a judgment was entered by the Court ending the litigation. The execution of the deed of trust and the new investment guidelines are not expected to have a material adverse effect on GDB's current liquidity or financial position.

The Commonwealth has also recently reformed and amended GDB's lending practices, financing capacity and oversight powers of public funds through Act No. 24-2014 and Act No. 97-2015. Act No. 24-2014 prohibits GDB, subject to certain limited exceptions, from making loans to public corporations' payable from future increases in rates, taxes or other charges. In essence, each public corporation seeking financing from GDB must demonstrate sufficient approved revenue streams to cover debt service on any GDB loan. Act No. 24 is intended to impose fiscal discipline on the public corporations, while preserving GDB's net position. In addition, Act No. 24 also (i) increases from $550 million to $2 billion the amount of GDB obligations that can be guaranteed by the full faith and credit of the Commonwealth to provide GDB with greater flexibility in its role of granting interim financing to public corporations and agencies; (ii) grants GDB the ability to exercise additional oversight over certain public funds deposited at private financial institutions and grants GDB the legal authority, subject to an entity's ability to request waivers under certain specified circumstances, to require such public funds (other than funds of the Legislative Branch, the Judicial Branch, the University of Puerto Rico, governmental pension plans, municipalities, and certain other independent agencies) to be deposited at GDB, which is expected to result in a more efficient management of public resources; and (iii) provides a process through which the OMB may assume, on behalf of the Commonwealth, the repayment from budgetary appropriations (commencing fiscal year 2017) of certain obligations owed by governmental agencies or public corporations to GDB, up to a maximum amount of $500 million.

Furthermore, on July 1, 2015, the Commonwealth enacted Act 97-2015, which prohibits GDB from lending to government entities (1) that are in default on any payment to GDB or (2) in the case of entities other than the Commonwealth, if the principal outstanding on all loans of that governmental entity with GDB exceed 5% of GDB's total loan portfolio. Furthermore, the Act provides that the use of proceeds of new GDB loans are limited to funding capital expenditures or working capital needs (in such case, with a maturity of one year or less), unless expressly authorized by law. In addition, the Act requires GDB to meet certain capital to assets, loan to deposit and other ratios in order to continue granting loans and clarifies the standard for personal liability of directors, officers, and employees.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

The Act also creates the Puerto Rico Commission for the Comprehensive Audit of the Public Credit, which is charged with providing transparency and citizen participation in the review of the Commonwealth and public corporations' aggregate debt.

Refer to note 2 section *Going Concern- Discretely Presented Component Units- GDB* for additional subsequent events related to:

- EO No. 2016-010 signed by the Governor on April 8, 2016, declaring GDB to be in a state of emergency pursuant to Act 21.

- EO No. 2016-014 signed by the Governor on April 30, 2016, which, among other things, (a) declares a moratorium with respect to the financial obligations of GDB (other than deposits and interest obligations that may be paid in kind and (b) declares an emergency period with respect to certain obligations of PRIFA that are secured by a letter of credit issued by GDB. Pursuant to EO No. 2016-014, on May 1, 2016, GDB failed to make a principal payment of approximately $367 million in respect of its notes.

- Negotiations related to the restructuring of GDB's notes payable.

(b)  **PRHTA**

On August 3, 2014, the Governor of the Commonwealth signed Act No. 123-2014 to create the Integrated Transportation Authority of Puerto Rico (ATI), to establish their purposes, duties, powers, and authorities and to authorize the PRHTA to transfer the Urban Train System during the fiscal year 2016. According to this Act, ATI will be in charge of the PRMBA and the PRHTA of the PRMIMTA. As of the date of these financial statements, the transfers contemplated by Act No. 123-2014 have not been executed and there is no timetable for their completion.

All the lines of credit with GDB expiring on August 31, 2014 and January 31, 2015, were extended for one year as approved by GDB's Board of Directors. No further extensions have been made on these lines of credit as of the date of these financial statements.

On January 15, 2015, Act No. 1-2015 was enacted by the Commonwealth to increase the petroleum products tax rate from $9.25 to $15.50 per petroleum products barrel, starting on March 15, 2015. The new tax rate of the petroleum products tax was distributed as follows: $6.00 per barrel to the PRHTA and $9.25 per barrel to PRIFA. The $9.25 per barrel to be received by PRIFA was originally to serve as the source of repayment of bonds to be issued by PRIFA, which would have refinanced twenty-four lines of credit with GDB, the $200 million in PRHTA Variable Rate Bonds held by GDB and certain Bond Anticipation Notes issued by PRHTA.

On March 16, 2015, PRIFA issued certain Bond Anticipation Notes (the PRIFA BANs) secured by the petroleum products tax assigned to PRIFA to refinance the outstanding balance of $227.6 million of the Bonds Anticipation Notes issued by PRHTA, along with associated costs.

On June 5, 2015, PRHTA extended the contract for the operation and maintenance of the Urban Train for one (1) additional year ending on June 6, 2016.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

On April 24, 2015, S&P lowered various ratings on the PRHTA's bonds to CCC+ from B. On May 21, 2015, Moody's downgraded the PRHTA's bonds from Caa2 to Ca, based on expectations of continued stagnation or decline in the Commonwealth economy. On September 2, 2015, S&P downgraded furthermore the rating on the PRHTA's bonds to CC from CCC+. The rating changes were driven by the downgrade of the Commonwealth's general obligation bonds effected at the same date. The ratings reflect only the opinions of such rating agency and an explanation of the significance of such ratings may be obtained only from the relevant rating agency. These credit rating downgrades could result in the acceleration of certain PRHTA obligations or the termination of certain credit and liquidity facilities that support certain PRHTA obligations. In addition, the interest rates on certain bonds and notes will increase as a result of the credit downgrades, to rates ranging from 10%–12%.

The Governor has issued several executive orders with respect PRHTA under Act 21, which, among other things, suspend the payment of PRHTA bonds and the transfer of certain funds to and from PRHTA.

(c)   ***PREPA***

*Forbearance Agreements*

On August 14, 2014, PREPA entered into Forbearance Agreements with certain insurers (the monoline bond insurers) and beneficiary owners of Power Revenue Bonds (the Ad Hoc Group of Bondholders), banks that provide fuel lines of credit (the Forbearing Lenders), and the GDB (the Forbearing Creditors). As provided in the Forbearance Agreements, the Forbearing Creditors agreed not to exercise certain rights and remedies under their financing agreements. PREPA also agreed to prepare a new business plan, 13-week cash flows and a recovery plan that would be acceptable to the Forbearing Creditors.

PREPA did not make monthly cash deposits to the 1974 Sinking Fund Principal and Interest during the six months ending on December 31, 2014 and a specified fractional amount of interest on Power Revenue Bonds due on October 1, 2014 and January 1, 2015 was transferred from the 1974 Reserve Account in the Sinking Fund to a separate account. The Forbearance Agreements were scheduled to terminate originally on or before March 31, 2015, but were extended on numerous occasions, most recently through November 5, 2015. The Forbearance Agreements expired on November 5, 2015, but the agreement of the Forbearing Creditors to refrain from exercising certain rights and remedies was extended under the Restructuring Support Agreement (RSA as defined below).

On July 1, 2015, PREPA paid, as required by the Forbearance Agreement, $415.8 million to satisfy the principal and interest payments on the bonds due on that date. This payment was funded with moneys in the 1974 Sinking Fund, including reserves, and a $153.0 million transfer from PREPA's General Fund.

On July 31, 2015, pursuant to the Trust Agreement and as agreed with Forbearing Creditors, PREPA issued Power Revenue Bonds Series 2015 A, in a par amount of $130.7 million, to be used as working capital. The Series 2015 A was bought in its entirety by current bond insurers, and the maturity date of this issue was January 1, 2016.

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

In accordance with the terms of the Series 2015A bonds, PREPA made several mandatory redemption payments prior to maturity. On December 15, 2015, PREPA deposited $103.5 million in escrow to satisfy the remaining principal and interest requirements on the Series 2015 A Bonds, which deposit was funded by $100.9 million from PREPA's self-insurance fund and $2.6 million from PREPA's General Fund. These amounts were paid to holders of the 2015 A Bonds on January 4, 2016 in accordance with their terms.

*Agreements in Principle with Certain Creditors*

On September 2, 2015, PREPA announced an agreement in principle regarding the economic terms of a restructuring with the Ad Hoc Group of Bondholders that were Forbearing Bondholders (the Ad Hoc Group Agreement) and which group held, at that time, approximately 35% in principal amount of the outstanding Bonds. Under that agreement, the Ad Hoc Group will have the option to receive securitization bonds that will pay cash interest at a per annum rate of 4.0%–4.75% (depending on the rating obtained) (Option A Bonds) or convertible capital appreciation securitization bonds that will accrete interest at a per annum rate of 4.5%–5.5% for the first five years and pay current interest in cash thereafter at those per annum rates (Option B Bonds). Option A Bonds will not pay principal for the first five years (interest only) and Option B Bonds will accrete interest but not receive any cash interest or principal during the first five years. All of PREPA's uninsured bondholders will have an opportunity to participate in the exchange. Both Option A and Option B Bonds would be issued at an exchange ratio of 85% (i.e., with a 15% reduction in principal amount of current holdings of outstanding Bonds). Under the extension to the Forbearance Agreement with the Ad Hoc Group executed on September 1, 2015, PREPA agreed to work collaboratively and in full faith with the Ad Hoc Group to reach agreement on a recovery plan incorporating these terms. The Ad Hoc Group Agreement was included in the Restructuring Support Agreement (RSA) described below.

On September 22, 2015, PREPA announced an agreement in principle regarding economic terms with its Forbearing Lenders (the Fuel Line Agreement).

Under the Fuel Line Agreement, the Forbearing Lenders, which hold all of the approximately $696 million of matured debt (Notes Payable), will have the option to either (1) convert their existing credit agreements into term loans, with a fixed interest rate of 5.75% per annum, to be repaid over six years in accordance with an agreed amortization schedule or (2) exchange all or part of principal due under their existing credit agreements for new securitization bonds to be issued on the same terms as the Ad Hoc Group.

Under the extensions to the Forbearance Agreements with the Forbearing Lenders executed on September 22, 2015, PREPA agreed to work collaboratively and in good faith with the Forbearing Lenders to reach agreement on a recovery plan incorporating these terms. The Fuel Line Agreement was included in the RSA.

*Restructuring Support Agreement*

On November 5, 2015, PREPA announced its entry into a restructuring support agreement (the Initial RSA) with both the Ad Hoc Group (representing at that time approximately 40% in principal amount of the outstanding Bonds) and the Forbearing Lenders setting forth the agreed-upon terms of PREPA's recovery plan, which terms were amended to extend the milestone dates therein on numerous

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

occasions. The economic terms set forth in the Initial RSA are consistent with the Ad Hoc Group Agreement and the Fuel Line Agreement. In addition, pursuant to the Initial RSA, GDB was entitled to receive substantially the same treatment on $35.9 million owed by PREPA to GDB as the Forbearing Lenders. The monoline bond insurers were not party to the Initial RSA.

On December 23, 2015, certain of the monoline bond insurers along with the Ad Hoc Group (representing together at that time approximately 66% in principal amount of the outstanding Bonds), the Forbearing Lenders and GDB (the Supporting Creditors), all signed an amended and restated restructuring support agreement (the A&R RSA and together with the Initial RSA and the Revised RSA (as defined below), are referred to as the "RSA," with terms and conditions substantially similar to those in the Initial RSA outlined above (including the agreement to exchange Bonds held by the Ad Hoc Group for new securitization bonds at an 85% exchange ratio with a 5-year principal holiday and fixed interest rates).

On January 23, 2016, the RSA terminated when the PREPA Revitalization Act was not enacted into law and the Ad Hoc Group did not agree to PREPA's request to extend the related RSA milestone. PREPA continued to engage in discussions with the Ad Hoc Group and the other Supporting Creditors regarding a potential extension of the RSA and the transactions contemplated therein and described below.

Under the RSA, certain of the Supporting Creditors agreed to purchase approximately $115 million in Bonds to refund a portion of the interest payments on the Bonds made on January 4, 2016, subject to certain conditions including enactment of the PREPA Revitalization Act in acceptable form. This agreement was formalized in a Bond Purchase Agreement (the Initial 2016AB Bond Purchase Agreement) executed on December 29, 2015. The Initial 2016AB Bond Purchase Agreement also terminated on January 23, 2016 when the A&R RSA terminated. PREPA continued to engage in discussions with the Supporting Creditors regarding the transactions contemplated by the Initial Bond Purchase Agreement.

On January 23, 2016, certain of the Forbearing Lenders agreed to enter into a short form forbearance agreement by which they agreed to forbear from exercising enforcement rights against PREPA under the applicable fuel line agreements through February 12, 2016.

On January 27, 2016, PREPA and the Supporting Creditors executed a revised RSA (Revised RSA) and a revised Bond Purchase Agreement (the Revised 2016AB Bond Purchase Agreement). The Revised RSA is substantially the same as the A&R RSA, with minor adjustments to address delays in legislative consideration of the PREPA Revitalization Act. The milestone date for legislative approval of the PREPA Revitalization Act was extended to February 16, 2016, and other related milestones were also adjusted accordingly. The Revised 2016AB Bond Purchase Agreement was substantially the same as the Initial 2016AB Bond Purchase Agreement, except that it reduced the amount of Bonds to be sold from $115 million to $111 million and made certain changes to the timing, conditions and total amount of the contemplated Bond purchase. Under the Revised 2016AB Bond Purchase Agreement, 50% of the total purchased Bonds (the Series 2016A bonds) were required to be purchased upon a determination by the applicable Supporting Creditors that the PREPA Revitalization Act satisfied the standards set forth in the RSA and 50% of the total purchased Bonds (the Series 2016B Bonds) were required to be purchased upon the filing of a petition with the Energy Commission seeking approval

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

of a securitization charge that satisfies the standards under the RSA. Following several amendments to the Revised 2016AB Bond Purchase Agreement in light of various delays and subsequent developments including the enactment of Act No. 21, the closing of the Series 2016A Bonds occurred on May 19, 2016 and the closing of the Series 2016B Bonds occurred on June 22, 2016.

On June 29, 2016, PREPA and the Supporting Creditors executed the First Supplement to the RSA (the First RSA Supplement) extending the termination date of the RSA from June 30, 2016 to December 15, 2016 and revising certain other terms of the RSA. Additionally, as part of the First RSA Supplement, PREPA reached agreement with Syncora Guarantee Inc., one of its monolines insurers, with respect to the restructuring of debt insured by Syncora. Under the terms of the agreement with Syncora, PREPA will refinance certain Syncora-insured debt, PREPARC will conduct a tender offer for certain Syncora-insured debt, and Syncora will exchange certain of the Syncora-insured debt owned by Syncora on the same terms as the Ad Hoc Group of Bondholders.

In connection with the First RSA Supplement and PREPA's payment of $415 million in principal and interest due under the Bonds on July 1, 2016, PREPA and certain of the Supporting Creditors executed a Bond Purchase Agreement (the 2016CDE Bond Purchase Agreement) providing for the sale of approximately $264 million of Bonds in three different series (the Series 2016 CDE Bonds), with varying maturity dates ranging from four to six years, to the monoline insurers and members of the Ad Hoc Group. The sale of the Series 2016 CDE Bonds closed on June 30, 2016.

Under the RSA, the Ad Hoc Group has agreed to exchange 100% of its uninsured Bonds for securitization bonds at an 85% exchange ratio. The monoline bond insurers agreed to provide up to $462 million of reserve surety bonds at the time the transaction closes and forward commitments for additional surety capacity to be provided at a later time during the term of the transaction, as credit support for the securitization bonds, that would be available to be drawn upon in the event certain cash reserves and transition payments from PREPA's customers are insufficient to pay current debt service on the securitization bonds. In return for this, (1) the SPV (defined below – see PREPA Revitalization Act) would issue $2.1 billion additional securitization bonds, which amount is subject to adjustment in accordance with the RSA, as credit support for outstanding PREPA insured Bonds to be held in escrow for the benefit of holders of PREPA's insured Bonds and (2) PREPA and the SPV would attempt to refinance certain outstanding Bonds insured by such insurers with securitization bonds during a 6-month period starting 3 years after the date the above exchange closes. The surety bonds provided by the monoline bond insurers would be replaced by SPV cash (derived from transition payments) beginning in FY 2019 over a period of nine years, subject to earlier replacement in accordance with certain conditions set forth in the RSA. Among the primary purposes for this transaction are to refinance at a lower cost a portion of PREPA's outstanding Bonds and to improve PREPA's liquidity position during the first five years after issuance. There can be no assurance, however, that the transactions contemplated by the RSA will be consummated.

Significant uncertainty remains as to the potential consummation of the transactions set forth in the RSA, which is subject to a number of material conditions, including without limitation, (1) receipt of an investment grade rating on the new securitization bonds from any credit rating agency that will rate the securitization bonds; (2) obtaining an agreed-upon level of participation from holders of PREPA's uninsured Bonds in the exchange offer described above such that no more than $700 million in principal amount of uninsured Bonds shall remain outstanding following the exchange offer, or such

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

higher amount determined by PREPA after consulting with its advisors; (3) amending the PREPA Trust Agreement to increase to at least a majority the percentage of Bondholders required to direct the Trustee to take certain actions under the Trust Agreement, including upon a default by PREPA and continue the waiver of PREPA's obligation to make monthly Sinking Fund deposits, among other things; (4) successful completion of litigation relating to the validation of the PREPA Revitalization Act and the issuance of the new securitization bonds, and (5) obtaining approval and reaching agreement with all Supporting Creditors, including the Forbearing Lenders, regarding the definitive documentation of the various restructuring transactions.

The RSA contains a number of termination or withdrawal events in favor of the Supporting Creditors, including if there is a material amendment to certain terms of the recovery plan, if PREPA commences any proceeding under bankruptcy or insolvency law (except to implement the recovery plan in accordance with the RSA), as well as the failure to achieve certain milestones by specific dates, which would result in termination of the RSA or withdrawal from the RSA by individual Supporting Creditors.

*PREPA Revitalization Act*

On November 4, 2015, the Governor submitted the PREPA Revitalization Act to the Legislative Assembly to facilitate PREPA's ongoing transformation and recovery plan. The PREPA Revitalization Act sets forth a framework for PREPA to execute on the agreements with creditors reached to that date. Among other things, the PREPA Revitalization Act would (1) enhance PREPA's governance processes; (2) adjust PREPA's practices for hiring and managing personnel; (3) change PREPA's processes for collecting outstanding bills from public and private entities; (4) improve the transparency of PREPA's billing practices; (5) implement a competitive bidding process for soliciting third-party investment in PREPA's infrastructure; (6) allow for the refinancing of existing PREPA bonds through a securitization that would reduce PREPA's indebtedness and cost of borrowing; and (7) set forth a process for the Energy Commission to address PREPA's proposal for a new rate structure that is consistent with its recovery plan. The PREPA Revitalization Act was approved by the Senate of Puerto Rico on February 10, 2016 and by the House of Representatives, with amendments, on February 15, 2016. The Senate concurred with these amendments, and the Governor signed the bill, Act No. 4-2016 into law on February 16, 2016.

*New Securitization Bonds*

The PREPA Revitalization Act authorizes the Puerto Rico Electric Power Authority Revitalization Corporation (PREPARC) to issue securitization bonds and impose a transition charge on PREPA customers, with an automatic adjustment mechanism, for the purpose of allowing PREPA to restructure certain of its financial indebtedness as contemplated by the RSA.  On April 7, 2016, PREPARC filed a petition before the Energy Commission seeking approval of the calculation methodology for the transition charge and the related adjustment mechanism.  As approved, the initial transition charge will be approximately 3.1 cents per kWh for residential and commercial customers. On June 21, 2016, the Energy Commission approved PREPARC's petition, and on June 28, 2016, PREPARC approved a resolution authorizing the issuance of the new securitization bonds, subject to certain terms and conditions.  The issuance of such securitization bonds remains subject to numerous contingencies, including the successful completing of validation proceedings before a Commonwealth court in accordance with the PREPA Revitalization Act.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

*Provisional Rate*

On May 27, 2016, PREPA filed a petition before the Energy Commission seeking approval of an adjustment to the rates charged to PREPA's customers. The petition sought approval of the proposed rate adjustment on a temporary basis pending Energy Commission's consideration of the requested rate adjustment. On June 24, 2016, the Energy Commission issued an order authorizing PREPA to increase its rates, on a temporary basis, by approximately 1.3 cents per kWh, effective as of thirty days after issuance of the order, subject to certain conditions. The rate adjustment is estimated to generate additional revenues in the amount of approximately $220 million annually.

*Bond Ratings Downgrade*

Since June of 2014, the credit ratings of PREPA's Power Revenue Bonds, already within noninvestment grade, have been lowered (more than once in most cases) by Moody's and S&P. The latest downgrade made by Moody's was on September 17, 2014, when PREPA's bond rating was lowered from Caa2 to Caa3. On July 2, 2015, S&P lowered PREPA's bonds from CCC- to CC. Fitch has maintained its rating on PREPA's bonds at CC since June of 2014. These downgrades consider the uncertainty that persists regarding the details of the expected restructuring plan by PREPA, the implementation risk that continues regarding PREPA's ability to execute on its multiyear fuel conversion plan as well the rating agencies' belief that any such debt restructuring will involve some degree of impairment for bondholders. The downgrades also reflect the concerns raised by: the repeated draws on the debt reserve fund and uncertainty regarding any future draws that could result in its depletion; the structural imbalance between revenue and expenses without a pathway to meeting debt service obligations if and when the debt service reserve is depleted; and the inability of PREPA to access the capital markets.

(d)  *PRASA*

On March 3, 2015, PRASA executed an amendment of a Credit Agreement originally executed on October 24, 2013, by and among PRASA and two other banks, whereby the banks agreed to extend the maturity date on $200 million of loans incurred under the Credit Agreement through May 29, 2015. Concurrently with the execution of the amendment, PRASA paid the banks $40 million of the principal due and agreed to make two additional principal payments of $5 million each on April 1 and May 1, 2015, which were made. These loans constituted senior indebtedness under PRASA's Master Agreement of Trust, ranking on parity with PRASA's senior bonds and collateralized with a gross pledge of PRASA's revenue.

On May 29, 2015, PRASA entered into a Credit Agreement with a depository institution pursuant to which PRASA borrowed $90 million on a short-term basis. These funds were used, together with other funds from PRASA's operations, to repay in full the existing loans due to other banks, which were due on that date. To secure the new loan, PRASA used $90 million from the Rate Stabilization Account under its Master Trust Agreement and pledged such funds to the depository institution under an Escrow Deposit Agreement. The new loan was issued as "Senior Indebtedness" under the Master Trust Agreement, on parity with the senior bonds issued thereunder. The loan was due on September 15, 2015.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

On September 15, 2015, PRASA issued $75 million of its Series 2015A Bonds under the Master Trust Agreement, as supplemented by a Fifth Supplemental Agreement of Trust. The proceeds of the purchase of the Series 2015A Senior Bonds were used to repay a portion of the outstanding balance of the $90 million term loan extended under the Credit Agreement referred above. The Series 2015A Bonds were due on November 30, 2015. Also on September 15, 2015, the Credit Agreement was amended to reflect the reduction of its outstanding balance and extend the maturity date of the remaining $15 million term loan through November 30, 2015. In August 2015, PRASA commenced an offering of $750 million of revenue bonds, the proceeds of which would have been used, in part, to repay the amounts due under the Credit Agreement and refund the 2015A Bonds, thereby releasing the $90 million presently securing such facilities and permitting their deposit to the Rate Stabilization Account of the Surplus Fund used to fund the escrow accounts relating thereto. The bond issuance was also intended to finance a portion of PRASA's capital improvement program and reimburse itself for certain capital costs incurred. PRASA was unable to complete the transaction.

On October 8, 2015, PRASA issued Series JJ under the Rural Development Bonds for $10.6 million. The proceeds of the issuance were used to repay the outstanding balance of $7.4 million on the revolving line of credit with GDB, and to finance a fleet acquisition under its capital improvement projects.

On November 30, 2015, PRASA extended through February 29, 2016 the maturity date of its Series 2015A Bonds. On that date, PRASA also extended the maturity date of the remaining $15 million term loan to February 29, 2016, provided PRASA made a $5 million principal payment on January 31, 2016, which was made. On maturity date, PRASA made principal payments on both financings and cancelled the amounts outstanding in full.

As a result of recent obstacles faced by PRASA in gaining access to the bond market for the issuance of its revenue bonds to cover the cost of construction projects included in its Capital Improvement Program (CIP), it has been unable to pay certain outstanding contractor receivables in an amount of approximately $150 million and has had to suspend its ongoing CIP projects. In this respect, PRASA and its governing board (the Governing Board) are in the process of evaluating a number of alternatives that would potentially allow it to fulfill its obligations to contractor, as well as continue its CIP. Among these possible alternatives is the enactment by the Legislature of the Commonwealth of legislation which would create a new special purpose governmental entity that would be permitted to issue bonds payable from special charges imposed by such entity, the proceeds of which would be provided to PRASA to pay for approved expenses, including CIP costs. Despite the approval of this legislation, there is no assurance that a bond issuance will materialize. In addition to the aforementioned legislation, PRASA's governing Board approved on February 16, 2016 an action plan which included the set asides of certain funds within the Master Agreement of Trust (MAT) for the purpose of making payments to its contractors in the event that an external source of funding or financing for these costs is not achieved by June 30, 2016. As a result of the approval of this action plan, PRASA, on March 4, 2016, issued to EMMA and the Municipal Securities Market Access System a voluntary disclosure statement presenting the different alternatives being considered and indicating that in the event that PRASA utilizes the aforementioned set asides, it would be expected that PRASA will not have sufficient funds to fully fund its Commonwealth Payment Fund and similarly, no excess moneys will be available to make payments on the debt payable from its Surplus Fund. These funds are the ones used provide for the debt service of most of its Commonwealth guaranteed obligations.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

PRASA continues to work on alternatives to achieve a long-term financing. If PRASA is not able to achieve such a financing; however, PRASA will be forced to re-evaluate the financing structure for its capital improvement program and may be required under its Master Agreement of Trust to implement additional increases in its service rates.

On September 15, 2015 the USDOJ, acting at the request of the Administrator of EPA, filed a complaint (the Complaint) against PRASA and the Commonwealth, as a required party under the Clean Water Act (defined below), in the United States District Court for the District of Puerto Rico (the District Court). The Complaint seeks injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the Federal Water Pollution Control Act enacted in 1956, as amended by the federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, and the Water Quality Act of 1987, as amended (the Clean Water Act). Concurrently with the filing of the Complaint, USDOJ also filed a consent decree (the 2015 EPA Consent Decree) executed among EPA, PRASA, and the Commonwealth settling the matters addressed in the Complaint, under the terms agreed upon by PRASA and EPA. The 2015 EPA Consent Decree is the result of an extensive negotiation process aimed, among other things, at resolving the claims addressed in the Complaint and the requirements of PRASA IV, the 2006 EPA Consent Decree and the 2010 EPA Consent Decree (collectively the EPA Consent Decrees) related to the allegations included in the Complaint. EPA and PRASA acknowledged in the 2015 EPA Consent Decree the work to be undertaken thereunder will enable PRASA to better understand its sewer systems, but will not resolve all of PRASA's Clean Water Act obligations with respect to such systems. The Commonwealth will incur a liability under the 2015 EPA Consent Decree only to the extent that the laws of the Commonwealth prevent PRASA from raising revenue needed to comply with the 2015 EPA Consent Decree. In this connection, the Commonwealth has represented under the 2015 EPA Consent Decree that its present laws do not prevent PRASA from raising the revenue needed to comply with the obligations it has incurred thereunder.

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by PRASA in order to mitigate the high construction in progress (CIP) costs mandated by the Existing Consent Decrees, representing 60% of CIP and an approximate cost of $1.4 billion during fiscal years 2006–2014. Another $1.7 billion of mandatory compliance projects would be required under the Existing Consent Decrees, in their current form, through fiscal year 2025. Despite being in material compliance with the capital improvement project requirements of the Existing Consent Decrees, PRASA began discussions with the USDOJ, on behalf of EPA, EPA and Department of Health (DOH) seeking to amend the Existing Consent Decrees, in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in PRASA's CIP not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance, and capital improvement program requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows. The resulting 2015 EPA Consent Decree is expected to realign the cost of these projects and activities with PRASA's current financial condition and economic prospects. The 2015 EPA Consent Decree will be subject to the approval of the Federal District Court after the thirty (30) day public comment period which commenced on October 8, 2015 with the publication of the corresponding notice in the Federal Register. Once final approval is granted, the 2015 EPA Consent Decree will consolidate and supersede the EPA Consent Decrees. As of the date of these financial statements, such approval has not occurred.

(Continued)

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2014

PRASA also expects that after final approval of the 2015 EPA Consent Decree, it will be able to finalize the amendment to the DWSA (the Proposed DWSA Amendment) under terms substantially similar to those currently being negotiated with DOH. Although the Proposed DWSA Amendment remains to be finalized, on May 22, 2015, the Superior Court of Puerto Rico approved a joint motion submitted by PRASA and DOH on May 12, 2015 to amend the 2006 Drinking Water Settlement Agreement to incorporate certain regulatory projects that were not originally included under its provisions. The final approval by the District Court of the 2015 EPA Consent Decree and the culmination of the negotiations of the Proposed DWSA Amendment will permit PRASA to significantly reduce annual capital expenditure levels for mandated projects under the Existing Consent Decrees, based on a new comprehensive and holistic prioritization system (the Prioritization System) for the scheduling and management of CIP projects, which would be applied to capital improvement project requirements under the 2015 EPA Consent Decree and the Proposed DWSA Amendment, as well as other CIP projects that may arise in the future under the Clean Water Act and the Safe Drinking Water Act. The 2015 EPA Consent Decree and the Proposed DWSA Amendment are expected to extend the compliance date of certain capital improvement projects through 2034 at a cost of approximately $1.7 billion. No assurance, however, can be given that the 2015 EPA Consent Decree will be approved by the District Court in the form filed on September 15, 2015 and that the Proposed DWSA Amendment will be concluded under terms substantially similar to those currently being negotiated with DOH. If the 2015 EPA Consent Decree is not approved under terms substantially similar to those filed on September 15, 2015 or the Proposed DWSA Amendment is not approved as anticipated, PRASA would have to significantly increase its Five-Year CIP expenditures from currently projected levels or, if the 2015 EPA Consent Decree and the Proposed DWSA Amendment are approved but PRASA fails to comply with such decrees, PRASA's financial and operating condition may be significantly adversely affected.

On April 24, 2015, S&P lowered its rating on the bonds of PRASA two notches to CCC+ and kept this rating on credit watch with negative implications. On May 21, 2015, Moody's lowered the ratings on the bonds of PRASA from Caa1 to Caa2. On June 29, 2015, Fitch lowered its rating on the bonds of PRASA from B to CC, given its perception of a likelihood of default or distressed exchange. On July 1, 2015, Moody's lowered again its rating on PRASA bonds to Caa3 from Caa2. On July 2, 2015, S&P downgraded again its rating on PRASA bonds two notches to CCC- from CCC+, and removed it from CreditWatch with negative implications. The outlook is still negative. The ratings reflect only the opinions of such rating agency and an explanation of the significance of such ratings may be obtained only from the relevant rating agency.

On June 30, 2016, PRASA executed a Forbearance Agreement (the "Forbearance Agreement") with the Department of Housing of the Commonwealth (DOH), administrator of the Drinking Water State Revolving Fund (DW-SRF), the Puerto Rico Environmental Quality Board (EQB), administrator of the Clean Water State Revolving Fund (CW-SRF), and PRIFA, as operating agent for the for the SRFs, authorized to assist DOH and EQB in the administration, financial and accounting activities of the SRFs. Under the Forbearance Agreement the payments due on July 1, 2016 under the SRF Loans are deferred and the parties thereto agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to each under the SRF Loans.

PRIFA, DOH and EQB, with the acknowledgment and support of the United States Environmental Protection Agency ("EPA"), granted such forbearance, subject to the terms and conditions set forth in

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

the Forbearance Agreement, for a period of six (6) months, which may be extended for an additional six (6) months if conditions are met. During such forbearance period, the Commonwealth Guaranty will not be enforced either. PRIFA, EQB and DOH, with the support of EPA, contemplate that during the forbearance period the parties will negotiate new terms and conditions to the SRF Loans under a restructuring of such loans and a revision of underlying agreements between PRASA, PRIFA, EQB, DOH and, where applicable, EPA.

Regarding the Rural Development Bonds (RD Bonds), PRASA has also requested that USDA Rural Development Program to temporarily forbear from exercising its rights and remedies, including the enforcement of the Commonwealth Guaranty, under the RD Bond documents. To this effect, PRASA and USDA Rural Development Program are presently engaged in the process of negotiating a forbearance document.

(e) **UPR**

On July 1, 2014, Moody's downgraded the UPR's revenue bonds from Ba3 to Caa1 and the Desarrollos Universitarios, Inc. (DUI), AFICA bonds from B1- to Caa2. On July 14, 2014, S&P downgraded the UPR's revenue bonds and the DUI's AFICA bonds from BB+ to BB. On February 13, 2015, S&P downgraded again the UPR's revenue bonds and the DUI's AFICA bonds from BB to B, while on March 12, 2015, Moody's downgraded the UPR's revenue bonds from Caa1 to Caa2 and the Desarrollos Universitarios, Inc. (DUI), AFICA bonds from Caa2 to Caa3. On April 24, 2015, S&P downgraded furthermore the UPR's revenue bonds and the DUI's AFICA bonds from B to CCC+; while on May 21, 2015, Moody's downgraded furthermore the UPR's revenue bonds from Caa2 to Caa3 and the Desarrollos Universitarios, Inc. (DUI) AFICA bonds from Caa3 to Ca. On June 30, 2015, S&P downgraded again the UPR's revenue bonds from CCC+ to CCC- and later on September 11, 2015 they were further lowered to a rating of CC. Moody's lowered furthermore on July 1, 2015 the ratings on the UPR's revenue bonds from Caa3 to Ca. These rating downgrades have followed each downgrade being made on the Commonwealth's general obligation bonds and certain other public corporations' bonds, which they have generally mirrored given the UPR's significant dependence on Commonwealth's appropriations, plus its constrained ability and willingness to raise tuition and other auxiliary revenue sufficient to mitigate cuts. The UPR is highly reliant on the Commonwealth for operating revenue, coupled with reliance on GDB for liquidity and financial management support.

(f) **PRHIA**

On October 14, 2014, the Board of Directors of PRHIA awarded new contracts for the Government Health Plan (GHP), which replaced the former "Mi Salud" plan, to five private insurance providers pursuant to a bidding process. The new contracts became effective on April 1, 2015. Under the new contracts, the Commonwealth public health model changed from a third-party administrator model (TPA), in which the Commonwealth was ultimately responsible for the cost of the health services provided, to a managed care organization model (MCO), in which PRHIA will pay the insurers a fixed premium for each insured beneficiary and the insurers will be responsible for the cost of such services.

PRHIA owes approximately $186 million in recorded and unpaid claims under the previous third-party administrator model. Furthermore, as of June 30, 2014, the actuarially determined incurred but not reported liability for claims not yet received is approximately $192 million. In addition, the unpaid premiums under the current MCO model were approximately $220 million as of September 2015. On

307                                                                                    (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2014

October 8, 2015, Act No. 172 was approved, which seeks to amend PRHIA's enabling act in order to authorize PRHIA to incur into additional indebtedness, including the issuance of bonds, for an amount up to $400 million. The objective of this Act is to use the proceeds from this potential new indebtedness to substantially repay the amounts mentioned above. However, there are no assurances that even with the enactment of this legislation that PRHIA will be able to obtain such financing.

On January 1, 2016, PRHIA's contracted insurers under the GHP's MCO model will be subject to an annual fee under section 9010 of the Affordable Care Act (ACA). For each contracted MCO model, the annual fee will be allocated based on the ratio of the amount of the entity's net premiums written during the preceding calendar year to the amount of health insurance for any U.S. health risk that is written during the preceding calendar year. Once this fee is paid as required by ACA, the PRHIA will reimburse such fee to each contracted MCO.

On June 8, 2015, the Centers for Medicaid and Medicare services confirmed that, as had been previously reported, the Medicare Advantage funding for Puerto Rico in 2016 will be reduced by approximately 11%. Such reductions to the Medicare Advantage rates would impact the ability of the Medicare Advantage plans to assume the costs of covering the higher-need dual eligible population (approximately 250,000 beneficiaries) covered through PRHIA's "Platino" program. Medicare Advantage subsidizes the costs of the "Platino" program from the rates paid through Medicare. If the Medicare Advantage plans cannot subsidize the costs of covering the "Platino" program, PRHIA's costs for calendar year 2016 for this population would increase from the current $20 to $30 million per year to $120 to $150 million per year unless benefit reductions are made.

As of April 29, 2016, PRHIA had paid the private health insurance providers in Puerto Rico the first three weekly installments due for the month of April 2016, under the GHP. However, in April 29, 2016, the PRHIA notified such insurance providers that it would be unable at this time to make the fourth and final 25% installment payment of the capitation amount due for April 2016, or approximately $15 million. Such payment was made in May 2016, including the weekly capitation installments for the month of May 2016.

(Continued)

**REQUIRED SUPPLEMENTARY INFORMATION**

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of Funding Progress – Defined Benefit Pension Plans

Year ended June 30, 2014

The Schedule of Funding Progress presents the following information for the past six years for each of the Commonwealth's defined benefit pension plans. All actuarially determined information has been calculated in accordance with actuarial assumptions and methods reflected in the actuarial valuations as of the indicated actuarial valuation date.

**Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS) (amounts in thousands, except for percentages):**

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2013 | $ 715,057 | 23,712,081 | 22,997,024 | 3 % $ | 3,489,096 | 659 % |
| June 30, 2012 | 1,218,645 | 27,645,786 | 26,427,141 | 4 | 3,570,339 | 740 |
| June 30, 2011 | 1,723,811 | 25,457,354 | 23,733,543 | 7 | 3,666,402 | 647 |
| June 30, 2010 | 1,667,358 | 21,370,006 | 19,702,648 | 8 | 3,818,332 | 516 |
| June 30, 2009 | 1,851,223 | 18,943,586 | 17,092,363 | 10 | 4,292,552 | 398 |
| June 30, 2008 | 2,607,086 | N/D | N/D | N/D | N/D | N/D |

**Puerto Rico System of Annuities and Pensions for Teachers (TRS) (amounts in thousands, except for percentages):**

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2013 | $ 1,906,882 | 12,251,995 | 10,345,113 | 16 % $ | 1,248,674 | 829 % |
| June 30, 2012 | 2,099,216 | 12,350,836 | 10,251,620 | 17 | 1,292,975 | 793 |
| June 30, 2011 | 2,385,863 | 11,448,609 | 9,062,746 | 21 | 1,320,400 | 686 |
| June 30, 2010 | 2,221,977 | 9,279,776 | 7,057,799 | 21 | 1,370,344 | 515 |
| June 30, 2009 | 2,157,593 | 8,721,515 | 6,563,922 | 25 | 1,418,304 | 463 |
| June 30, 2008 | N/D | N/D | N/D | N/D | N/D | N/D |

**Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS) (amounts in thousands, except for percentages):**

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2013 | $ 45,316 | 416,734 | 371,418 | 11 % $ | 32,138 | 1,156 % |
| June 30, 2012 | 46,399 | 416,340 | 369,941 | 11 | 33,066 | 1,119 |
| June 30, 2011 | 63,975 | 382,776 | 318,801 | 17 | 31,811 | 1,002 |
| June 30, 2010 | 55,410 | 338,195 | 282,785 | 16 | 32,061 | 882 |
| June 30, 2009 | 50,566 | 323,928 | 273,362 | 16 | 30,587 | 894 |
| June 30, 2008 | 69,311 | N/D | N/D | N/D | N/D | N/D |

N/D = Not determined.

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

Schedule of Funding Progress – Postemployment Healthcare Plans

Year ended June 30, 2014

The Schedule of Funding Progress presents the following information for the past seven years for each of the Commonwealth's defined benefit postemployment healthcare plans. All actuarially determined information has been calculated in accordance with actuarial assumptions and methods reflected in the actuarial valuations as of the indicated actuarial valuation date.

**ERS (amounts in thousands, except for percentages):**

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2014 [1] | $ — | 1,438,475 | 1,438,475 | — % $ | 3,489,096 | 41 % |
| June 30, 2013 | — | 1,482,879 | 1,482,879 | — | 3,489,096 | 43 |
| June 30, 2012 | — | 2,120,970 | 2,120,970 | — | 3,570,339 | 59 |
| June 30, 2011 | — | 1,758,389 | 1,758,389 | — | 3,666,402 | 48 |
| June 30, 2010 | — | 1,699,373 | 1,699,373 | — | 3,818,332 | 45 |
| June 30, 2009 | — | 1,633,159 | 1,633,159 | — | 4,292,552 | 38 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

**TRS (amounts in thousands, except for percentages):**

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2014 [2] | $ — | 543,205 | 543,205 | — % $ | 1,171,154 | 46 % |
| June 30, 2013 | — | 792,875 | 792,875 | — | 1,248,674 | 64 |
| June 30, 2012 | — | 797,332 | 797,332 | — | 1,292,975 | 62 |
| June 30, 2011 | — | 706,069 | 706,069 | — | 1,320,400 | 54 |
| June 30, 2010 | — | 694,230 | 694,230 | — | 1,370,344 | 51 |
| June 30, 2009 | — | 750,382 | 750,382 | — | 1,418,304 | 53 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

**JRS (amounts in thousands, except for percentages):**

| Actuarial Valuation Date | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2014 [1] | $ — | 6,540 | 6,540 | — % $ | 31,707 | 21 % |
| June 30, 2013 | — | 6,705 | 6,705 | — | 32,138 | 21 |
| June 30, 2012 | — | 6,592 | 6,592 | — | 33,066 | 20 |
| June 30, 2011 | — | 5,810 | 5,810 | — | 31,811 | 18 |
| June 30, 2010 | — | 5,808 | 5,808 | — | 32,061 | 18 |
| June 30, 2009 | — | 5,643 | 5,643 | — | 30,587 | 19 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

N/D= Not determined.

[1]  The System's OPEB funded status as of June 30, 2014 was determined by the actuarial valuation as of June 30, 2013 that was updated to roll forward the funded status to June 30, 2014 and assuming no liability gains or losses.

[2]  The System's OPEB funded status as of June 30, 2014 was determined by the actuarial valuation as of June 30, 2013 that was updated to roll forward the funded status to June 30, 2014 and assumed no liability gains or losses. However, due to the large number of retirements during fiscal year 2014 (about 2,234 retirees), census data for new retired members was updated as of June 30, 2014. In addition, the System's OPEB funded status as of June 30, 2014 reflects an estimate of the changes required  by Act No. 160, specifically, the elimination of the medical insurance plan contributions for members retiring on or after August 1, 2014.

See accompanying notes to required supplementary information and independent auditors' report.

## COMMONWEALTH OF PUERTO RICO

Required Supplementary Information (Unaudited)

Schedule of Employers' Contributions

Year ended June 30, 2014

The following table shows the Commonwealth's annual required contribution (ARC) and percent of the ARC funded for the pension benefits and for the post employment healthcare benefits.

(Amounts in thousands, except for percentages)

**Pension Benefits**

| Fiscal Year Ended | ERS Annual Required Contribution | ERS Percentage Contributed | TRS Annual Required Contribution | TRS Percentage Contributed | JRS Annual Required Contribution | JRS Percentage Contributed |
|---|---|---|---|---|---|---|
| June 30, 2014 | $ 1,822,675 | 39 | 748,569 | 25 | $ 40,758 | 29 |
| June 30, 2013 | 2,192,821 | 29 | 736,591 | 26 | 38,501 | 30 |
| June 30, 2012 | 2,019,467 | 29 | 659,334 | 27 | 33,544 | 34 |
| June 30, 2011 | 1,734,979 | 40 | 528,170 | 30 | 29,684 | 37 |
| June 30, 2010 | 1,459,774 | 36 | 477,213 | 35 | 28,127 | 39 |
| June 30, 2009 | 1,258,695 | 47 | 393,871 | 44 | 22,195 | 50 |
| June 30, 2008 | 1,191,275 | 56 | 341,495 | 46 | 19,803 | 37 |

**Post Employment Healthcare Benefits**

| Fiscal Year Ended | ERS Annual Required Contribution | ERS Percentage Contributed | TRS Annual Required Contribution | TRS Percentage Contributed | JRS Annual Required Contribution | JRS Percentage Contributed |
|---|---|---|---|---|---|---|
| June 30, 2014 | $ 88,508 | 115 | 46,403 | 77 | $ 684 | 44 |
| June 30, 2013 | 154,999 | 59 | 45,669 | 75 | 643 | 45 |
| June 30, 2012 | 133,654 | 71 | 41,069 | 84 | 554 | 53 |
| June 30, 2011 | 129,395 | 73 | 39,925 | 84 | 529 | 48 |
| June 30, 2010 | 128,294 | 69 | 42,487 | 71 | 488 | 52 |
| June 30, 2009 | 111,683 | 77 | 38,015 | 77 | 425 | 55 |
| June 30, 2008 | 110,650 | 72 | 36,836 | 77 | 408 | 55 |

See accompanying notes to required supplementary information and independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**
Required Supplementary Information - Unaudited

Schedule of Revenue and Expenditures – Budget and Actual –
Budgetary Basis – General Fund

Year ended June 30, 2014

(In thousands)

|  | | Original budget | Amended budget | Actual |
|---|---|---|---|---|
| Revenue: | | | | |
| Income taxes | $ | 5,079,000 | 5,392,000 | 4,700,678 |
| Sales and use taxes | | 865,000 | 614,000 | 645,254 |
| Excise taxes | | 2,959,000 | 2,900,000 | 2,815,029 |
| Property taxes | | — | 16,000 | 58,535 |
| Other taxes | | 17,000 | 30,000 | 20,506 |
| Charges for services | | 100,000 | 102,000 | 108,579 |
| Revenue from component units | | 39,000 | 31,000 | 23,673 |
| Intergovernmental | | 222,000 | 220,000 | 237,159 |
| Other | | 124,000 | 134,000 | 116,581 |
| Total revenue | | 9,405,000 | 9,439,000 | 8,725,994 |
| Expenditures – current: | | | | |
| General government | | 1,414,249 | 1,327,064 | 1,281,494 |
| Public safety | | 2,041,943 | 1,997,347 | 1,979,809 |
| Health | | 1,367,775 | 1,361,762 | 1,319,724 |
| Public housing and welfare | | 454,164 | 448,796 | 430,407 |
| Education | | 3,422,122 | 3,479,584 | 3,382,133 |
| Economic development | | 425,353 | 450,533 | 407,220 |
| Intergovernmental | | 482,157 | 390,177 | 364,763 |
| Total expenditures | | 9,607,763 | 9,455,263 | 9,165,550 |
| Deficiency of revenue under expenditures | | (202,763) | (16,263) | (439,556) |
| Other financing sources (uses): | | | | |
| Notes payable issued for debt service | | 245,000 | 92,500 | 667,902 |
| Transfer in from Lotteries Fund | | 120,000 | 99,000 | 220,574 |
| Transfer out and other payments for debt service | | (162,237) | (162,237) | (737,639) |
| Total other financing sources | | 202,763 | 29,263 | 150,837 |
| Deficiency of revenue and other financing sources under expenditures and other financing uses | $ | — | 13,000 | (288,719) |

See accompanying notes to required supplementary information and independent auditors' report.

COMMONWEALTH OF PUERTO RICO

Notes to Required Supplementary Information (Unaudited)

June 30, 2014

**(1)    Schedule of Funding Progress**

The schedule of funding progress provides information about the funded status of the Retirement Systems and the progress being made in accumulating sufficient assets to pay benefits when due. The information was obtained from the last actuarial report as of June 30, 2014.

**(2)    Schedule of Employers' Contributions**

The schedule of employers' contributions provides information about the annual required contributions (ARC) and the extent to which contributions were made cover the ARC. The ARC is the annual required contribution for the year calculated in accordance with certain parameters, which include actuarial methods and assumptions.

The Retirement Systems' schedule of employers' contributions includes both Commonwealth's and participating employees' contributions as the Commonwealth's contributions, ultimately, should cover any deficiency between the participating employees' contributions, pension benefits, and the Retirement Systems' administration costs.

The information was obtained from the last actuarial report as of June 30, 2014.

**(3)    Budgetary Control**

The Governor is constitutionally required to submit to the Legislature an annual balanced budget of the Commonwealth for the ensuing fiscal year. The annual budget is prepared by the Commonwealth's Office of Management and Budget (Commonwealth OMB) and takes into consideration the advice provided by the Puerto Rico Planning Board (annual economic growth forecasts and four year capital improvements plan), the Department of the Treasury of the Commonwealth (revenue estimates, accounting records, and the comprehensive annual financial report), GDB (the fiscal agent), and other governmental offices and agencies. Section 7 of Article VI of the Constitution of Puerto Rico provides that "The appropriations made for any fiscal year shall not exceed the total revenue, including available surplus, estimated for the said fiscal year, unless the imposition of taxes sufficient to cover the said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenue and other resources for the ensuing fiscal year under: (i) laws existing at the time the budget is submitted and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four year capital improvements plan adopted by the Puerto Rico Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying other sources of revenue to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor who may decrease or eliminate any line item but may not increase or insert any new line item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the fiscal year, the annual budget for the preceding fiscal year, as approved by the Legislature and the Governor, is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments for its operating and other

## COMMONWEALTH OF PUERTO RICO

Notes to Required Supplementary Information (Unaudited)

June 30, 2014

expenses until the new budget is approved. The appropriated annual budget for fiscal year 2014 (including other financing uses) amounted to approximately $9.6 billion, including several special budget appropriations to the General Fund made by the Legislature throughout the year which amounted to approximately $4.2 billion.

The Commonwealth OMB has authority to amend the budget within a department, agency, or government unit without legislative approval.

For budgetary purposes, encumbrance accounting is used. The encumbrances (that is, purchase orders and contracts) are considered expenditures when a commitment is made. For U.S. GAAP reporting purposes, encumbrances outstanding at year-end are reported within the restricted, committed, assigned, and unassigned fund balance classifications and do not constitute expenditures or liabilities on a U.S. GAAP basis because the commitments will be honored during the subsequent year. The unencumbered balance of any appropriation of the General Fund at the end of the fiscal year lapses immediately. Appropriations, other than in the General Fund, are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending. In addition, for budgetary purposes, revenue is recorded when cash is received.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: (i) the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); (ii) the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit, and full faith of the Commonwealth; (iii) current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and (iv) all other purposes.

In addition, the Legislature may direct that certain revenue be retained and made available for spending within a specific appropriation account. Generally, expenditures may not exceed the level of spending authorized for an individual department. However, the Commonwealth is statutorily required to pay debt service, regardless of whether such amounts are appropriated. Appropriations are enacted for certain departments, agencies, and government units included in the General Fund.

For these funds, a schedule of revenue and expenditures – budget and actual budgetary basis – General Fund is included. Appropriations for capital projects are made for each bond issue and the authorization continues for the expected construction period.

The Commonwealth OMB has the responsibility to ensure that budgetary spending control is maintained on an individual department basis. The OMB may transfer part or all of any unencumbered balance within a department to another department subject to legislative approval. Budgetary control is exercised through the Puerto Rico Integrated Financial Accounting System (PRIFAS). PRIFAS ensures that encumbrances or expenditures are not processed if they exceed the department's total available spending authorization, which

(Continued)

COMMONWEALTH OF PUERTO RICO

Notes to Required Supplementary Information (Unaudited)

June 30, 2014

is considered its budget. The legal level of budgetary control is at the individual department level for General Fund expenditures, principal and interest due for the year for the debt service fund, and by bond authorization for capital expenditures.

**(4)   Statutory (Budgetary) Accounting**

The Commonwealth's budget is adopted in accordance with a statutory basis of accounting, which is not in accordance with U.S. GAAP. Revenue is generally recognized when cash is received. Income tax revenues are reduced for the amount of income tax refunds paid during the year and claimed but unpaid at year end. Short-term and long-term borrowings may be used to finance budgetary excess of expenditures over revenue. Expenditures are generally recorded when the related expenditure is incurred or encumbered. Encumbrances generally lapse the year following the end of the fiscal year when the encumbrance was established, as established by Act No. 123 of August 17, 2001. Unencumbered appropriations lapse at year-end. Amounts required for settling claims and judgments against the Commonwealth and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment.

Under the statutory basis of accounting, the Commonwealth uses encumbrance accounting to record the full amount of purchase orders, contracts, and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure. In the governmental funds, encumbrance accounting is a significant aspect of budgetary control.

The schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund only presents the information for the General Fund for which there is a legally adopted budget, as required by U.S. GAAP. See note 6 for a reconciliation of the statement of revenue and expenditures – budget and actual – budgetary basis – General Fund with the statement of revenue, expenditures, and changes in fund balances (deficit) for the General Fund. The special revenue funds do not have a legally mandated budget.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2014

**(5)   Budget/U.S. GAAP Reconciliation**

The following schedule presents comparisons of the legally adopted budget with actual data on a budgetary basis. Because accounting principles applied for purposes of developing data on a budgetary basis differ significantly from those used to present financial statements in conformity with U.S. GAAP, a reconciliation of entity, timing, and basis differences in the excess (deficiency) of revenue and other financing sources over expenditures and other financing uses for the year ended June 30, 2014 is presented below for the General Fund (expressed in thousands):

| | | |
|---|---|---:|
| Deficiency of revenue and other financing sources under expenditures and other financing uses – budgetary basis | $ | (288,719) |
| Entity differences–excess of revenues and other financing sources over expenditures and other financing uses for: | | |
|     Nonbudgeted funds | | 784,779 |
|     Inclusion of agencies with independent treasuries | | (299,269) |
| Timing differences: | | |
|     Adjustment for encumbrances | | 190,263 |
|     Current year expenditures against prior year encumbrances | | (150,687) |
| Basis of accounting differences: | | |
|     Revenue accrual adjustment | | 141,499 |
|     Expenditures accrual adjustments | | (458,324) |
| Deficiency of revenue and other financing sources under expenditures and other financing uses – U.S. GAAP basis | $ | (80,458) |

See accompanying independent auditors' report.

**COMBINING AND INDIVIDUAL FUND
FINANCIAL STATEMENTS AND SCHEDULES**

**COMMONWEALTH OF PUERTO RICO**

General Fund

Year ended June 30, 2014

The General Fund is the primary operating fund of the Commonwealth. The General Fund is used to account for and report all financial resources received and used for those services traditionally provided by a government, which are not required legally or by sound financial management to be accounted for in another fund. Included are transactions for services such as general government, public safety, health, public housing and welfare, education, and economic development. Following is the supplemental schedule of expenditures – budget and actual – General Fund (budgetary basis).

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2014

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---|---|---|
| Expenditures - Current: | | | |
| General government: | | | |
| Senate of Puerto Rico | $    44,499 | 44,499 | 44,499 |
| House of Representatives of Puerto Rico | 52,875 | 52,875 | 52,875 |
| Comptroller's Office | 43,000 | 43,000 | 43,000 |
| Governor's Office | 19,351 | 21,005 | 20,505 |
| Office of Management and Budget (1) | 34,700 | 73,277 | 49,583 |
| Planning Board | 12,298 | 10,924 | 11,242 |
| Department of State | 5,863 | 5,457 | 4,773 |
| Department of the Treasury (1) | 479,473 | 413,646 | 426,430 |
| Central Office of Personnel Administration | 4,007 | 3,859 | 3,861 |
| Commonwealth Elections Commission | 41,245 | 35,514 | 52,305 |
| Federal Affairs Administration | 4,838 | 4,685 | 4,194 |
| General Services Administration | 200 | 200 | 268 |
| Municipal Complaints Hearing Commission | 4,945 | 4,854 | 5,693 |
| Civil Rights Commission | 1,193 | 1,157 | 1,003 |
| Office of the Citizen's Ombudsman | 5,408 | 5,443 | 4,580 |
| Government Ethics Board | 10,290 | 10,290 | 10,290 |
| Legislative Affairs Office | 200 | 200 | 150 |
| Office of the Superintendent of the Capitol | 19,105 | 15,855 | 15,855 |
| Legislative Affairs Office | 18,172 | 17,972 | 18,022 |
| Comptroller's Special Reports Joint Commission | 691 | 691 | 644 |
| Legislative Donation Commission | 22,707 | 1,107 | 1,298 |
| Coordination Office for Special Communities of Puerto Rico | 4,163 | 3,960 | 3,818 |
| Corporation "Enlace" Caño Martín Peña | 1,388 | 1,346 | 1,346 |
| Puerto Rico Statistics Institute | 1,861 | 1,831 | 1,831 |
| Office for the Governmental's Integrity and Efficiency | 5,425 | 1,236 | 907 |
| Permits Management Office | 5,115 | 4,729 | 4,804 |
| Permits Inspector General Office | 5,178 | 4,729 | 4,283 |
| Board for the Review of Permits and Use of Lands | 1,201 | 1,301 | 1,278 |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 391,773 | 391,773 | 334,650 |
| Puerto Rico System of Annuities and Pensions for Teachers | 126,692 | 126,692 | 132,864 |
| Contributions to Political Parties | 1,200 | 1,200 | 1,200 |
| Public Buildings Authority | 6,000 | 6,000 | 6,000 |
| Procurement Administration Offices | 1,724 | 843 | 618 |
| Office of Elections Comptroller | 4,179 | 4,179 | 4,262 |
| Labor Development Administration | 4,095 | 4,095 | 6,351 |
| Telecommunication Board | 2,000 | 2,000 | 2,000 |
| Information and Technology Communication Office | 23,183 | 731 | 530 |
| Appellative Board of the Personnel System Administration | 4,012 | 3,839 | 3,682 |
| Total general government | 1,414,249 | 1,327,064 | 1,281,494 |
| Public safety: | | | |
| Puerto Rico General Court of Justice | 348,798 | 348,798 | 351,341 |
| Civil Defense | 7,444 | 19,344 | 6,979 |
| Commission of Investigation, Processing and Appeals Board | 523 | 507 | 481 |
| Department of Justice | 140,120 | 123,117 | 121,278 |
| Puerto Rico Police Department | 829,857 | 807,094 | 817,075 |
| Puerto Rico Firefighters Corps | 69,918 | 66,058 | 66,639 |
| Puerto Rico National Guard | 22,406 | 19,491 | 18,481 |
| Public Service Commission | 6,069 | 5,873 | 5,749 |
| Consumer Affairs Department | 9,884 | 9,672 | 9,622 |
| Natural Resources Administration | 35,032 | 34,377 | 34,783 |
| Department of Correction and Rehabilitation | 443,877 | 431,612 | 430,383 |
| Parole Board | 2,551 | 2,480 | 2,521 |
| Forensic Sciences Institute | 16,678 | 16,194 | 16,281 |
| Special Prosecutor Panel | 2,859 | 2,859 | 2,815 |
| Pre-Trial Services Office | 7,491 | 7,435 | 7,290 |
| Correctional Health | 70,973 | 74,486 | 59,360 |
| Medical Emergencies Service | 24,821 | 25,382 | 26,295 |
| Criminal Justice College | 2,642 | 2,568 | 2,436 |
| Total public safety | 2,041,943 | 1,997,347 | 1,979,809 |

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2014

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---|---|---|
| **Health:** | | | |
| Environmental Quality Board | 7,121 | 6,916 | 12,121 |
| Department of Health | 300,241 | 294,378 | 281,038 |
| Mental Health and Drug Addiction Services Administration | 102,935 | 103,627 | 104,591 |
| Puerto Rico Solid Waste Authority | 7,696 | 6,827 | 6,717 |
| Puerto Rico Health Insurance Administration | 906,130 | 905,960 | 894,553 |
| Medical Services Administration | 38,078 | 38,480 | 20,704 |
| University of Puerto Rico Comprehensive Cancer Center | 5,574 | 5,574 | — |
| Total health | 1,367,775 | 1,361,762 | 1,319,724 |
| **Public housing and welfare:** | | | |
| Office of Youth Affairs | 9,654 | 7,723 | 7,219 |
| Department of Labor and Human Resources | 16,584 | 21,602 | 13,912 |
| Labor Relations Board | 832 | 793 | 793 |
| Department of Housing | 18,294 | 17,574 | 17,389 |
| Department of Recreation and Sports | 37,038 | 39,512 | 39,709 |
| Administration for the Horse Racing Sport and Industry | 2,517 | 2,414 | 2,426 |
| Women's Affairs Commission | 4,564 | 4,475 | 3,880 |
| Public Housing Administration | 1,500 | 1,300 | 1,298 |
| Office of the Veteran's Ombudsman | 3,552 | 3,508 | 3,396 |
| Department of Family | 35,746 | 38,563 | 38,680 |
| Family and Children Administration | 175,922 | 174,725 | 170,656 |
| Minors Support Administration | 16,383 | 14,776 | 11,921 |
| Vocational Rehabilitation Administration | 17,902 | 17,583 | 17,755 |
| Social Economic Development Administration | 87,712 | 79,673 | 77,105 |
| Office of the Disabled Persons Ombudsman | 1,618 | 1,454 | 1,466 |
| Office for Elderly Affairs | 3,394 | 3,543 | 3,663 |
| Company for the Integral Development of the Península de Cantera | 574 | 564 | 564 |
| Industries for the Blind, Mentally Retarded, and Other Disabled Persons of Puerto Rico | 500 | 485 | 485 |
| Patient Ombudsman | 3,485 | 2,851 | 2,633 |
| Administration for the Care and Development of the Childhood | 16,393 | 15,678 | 15,457 |
| Total public housing and welfare | 454,164 | 448,796 | 430,407 |
| **Education:** | | | |
| Department of Education | 2,445,326 | 2,497,818 | 2,402,256 |
| Institute of Puerto Rican Culture | 27,044 | 29,345 | 29,899 |
| Puerto Rico School of Plastics Arts | 2,651 | 2,516 | 2,533 |
| State Office for Historic Preservation | 1,827 | 1,788 | 1,765 |
| University of Puerto Rico | 887,727 | 887,727 | 888,328 |
| Musical Arts Corporation | 8,204 | 7,987 | 8,004 |
| Fine Arts Center Corporation | 4,299 | 4,170 | 4,240 |
| Puerto Rico Public Broadcasting Corporation | 13,176 | 16,496 | 13,527 |
| Athenaeum of Puerto Rico | 1,200 | 1,200 | 1,200 |
| Puerto Rico Conservatory of Music Corporation | 7,672 | 7,472 | 7,472 |
| Puerto Rico Council on Education | 22,996 | 23,065 | 22,909 |
| Total education | 3,422,122 | 3,479,584 | 3,382,133 |

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2014

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---|---|---|
| Economic development: | | | |
| Department of Transportation and Public Works | 52,506 | 60,544 | 57,916 |
| Department of Natural and Environmental Resources | 6,787 | 6,922 | 6,001 |
| Department of Agriculture | 31,450 | 51,380 | 19,364 |
| Cooperative Enterprises Development Administration | 3,063 | 3,233 | 3,234 |
| Department of Economic Development and Commerce | 2,000 | 2,000 | 1,901 |
| Agricultural Enterprises Development Administration | 93,190 | 91,860 | 82,797 |
| Energy Affairs Administration | 1,157 | 1,095 | 1,107 |
| Puerto Rico Infrastructure Financing Authority | 117,000 | 117,000 | 117,000 |
| Puerto Rico Ports Authority | 5,500 | 1,750 | 1,750 |
| Puerto Rico Metropolitan Bus Authority | 42,197 | 42,197 | 41,398 |
| Puerto Rico Tourism Company | — | 3,790 | 3,790 |
| Culebra Conservation and Development Authority | 324 | 324 | 313 |
| National Parks Company of Puerto Rico | 22,219 | 21,603 | 21,717 |
| Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico | 535 | 510 | 430 |
| Ports of Americas Authority | 19,258 | 17,258 | 17,258 |
| Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | 910 | 1,810 | 900 |
| Puerto Rico Maritime Transportation Authority | 27,257 | 27,257 | 30,344 |
| Total economic development | 425,353 | 450,533 | 407,220 |
| Intergovernmental – Municipal Services Administration | 482,157 | 390,177 | 364,763 |
| Total expenditures | $ 9,607,763 | 9,455,263 | 9,165,550 |
| Operating Transfer-out to Other Funds: | | | |
| Department of the Treasury – transfer to Debt Service Fund and other funds | $ 162,237 | 162,237 | 737,639 |

(1)    As a department and a fiscal agent.

See accompanying independent auditors' report.

# COMMONWEALTH OF PUERTO RICO

Nonmajor Governmental Funds

Year ended June 30, 2014

## Special Revenue Funds

Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects. Other resources (investment earnings and transfers from other funds, for example) also may be reported in the fund if those resources are restricted, committed, or assigned to the specified purpose of the fund.

*Public Buildings Authority Special Revenue Fund* – The operating fund of the Public Buildings Authority, a blended component unit, used to account for the operation, maintenance, equipment replacement, and other extraordinary operation and maintenance costs of the buildings and facilities that, when constructed, are leased to the Commonwealth's Primary Government agencies.

*The Children's Trust Special Revenue Fund* – The special revenue fund of the Children's Trust, a blended component unit, is used to account for the money received by the Commonwealth from a global settlement agreement dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United State of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

*Puerto Rico Infrastructure Financing Authority's Special Revenue Fund* – The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth. Under Act No. 44 of June 21, 1988, as amended, the Commonwealth transfers to this fund the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds. This special revenue fund also receives ARRA funds for the weatherization program aimed at converting certain government buildings into eco-friendly locations.

*Special Communities Perpetual Trust's Special Revenue Fund* – The special revenue fund of the Special Communities Perpetual Trust, a blended component unit, is used to account for the moneys received from the Governmental Development Bank, through a line of credit financing and cash contributions, upon inception of the Special Communities Perpetual Trust. The financial resources received by this fund are used to carry out development projects that address the infrastructure and housing needs of certain under privileged communities.

## Debt Service Funds

The debt service funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for principal and interest, and related costs other than bonds payable from operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following year are accounted for as a fund liability if resources are available as of June 30 for its payment.

*The Children's Trust Debt Service Fund* – The debt service fund of The Children's Trust accounts for the financial resources that are restricted, committed, or assigned to expenditure for the payment of interest and principal on long-term obligations financed with moneys to be received by the Commonwealth from the global settlement agreement signed by certain tobacco companies.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Nonmajor Governmental Funds

Year ended June 30, 2014

***Public Buildings Authority Debt Service Fund*** – A blended component unit engaged in the construction and/or acquisition of building facilities for lease mainly to the Commonwealth's Primary Government agencies. Its debt service fund is used to account for the financial resources that are restricted, committed, or assigned to expenditure for the payment of revenue bonds and other liabilities incurred to finance the construction of the buildings and facilities.

***Puerto Rico Maritime Shipping Authority Debt Service Fund*** – This is the remainder of a former shipping company owned by the Commonwealth. Its debt service fund is used to account for the financial resources that are restricted for the payment of the long-term liability that resulted from the sale of its marine operations. This fund is mainly subsidized from appropriations and operating transfers from the General Fund

***Puerto Rico Infrastructure Financing Authority's Debt Service Fund*** – The debt service fund of the Puerto Rico Infrastructure Financing Authority accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its special tax revenue bonds. These resources are received from operating transfers from the Puerto Rico Infrastructure Financing Authority Special Revenue Fund.

***Special Communities Perpetual Trust's Debt Service Fund*** – The debt service fund of the Special Communities Perpetual Trust accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its line of credit with the GDB, financed with moneys to be received by the Commonwealth from general legislative appropriations.

## Capital Projects Funds

Capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not being financed by the Public Buildings Authority's Capital Projects Fund, the Puerto Rico Infrastructure Financing Authority's Capital Project Fund, proprietary fund types, pension trust funds, and discretely presented component units.

***Commonwealth Public Improvements Funds and Other Funds*** – These funds present the activities of the capital improvements program of the Commonwealth, financed with the proceeds of the general obligation bonds.

***Public Buildings Authority's Capital Projects Fund*** – The Public Buildings Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not financed by proprietary fund types, pension trust funds, and discretely presented component units.

***Puerto Rico Infrastructure Financing Authority's Capital Projects Fund*** – The Puerto Rico Infrastructure Financing Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned for the acquisition or construction of capital assets and capital improvements, not financed by proprietary fund types, pension trust funds, and discretely presented component units.

**COMMONWEALTH OF PUERTO RICO**

Combining Balance Sheet – Nonmajor Governmental Funds

June 30, 2014

(In thousands)

| | Special Revenue | | | | Debt Service | | | | | Capital Projects | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Special Communities Perpetual Trust | The Children's Trust | The Children's Trust | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Special Communities Perpetual Trust | Puerto Rico Maritime Shipping Authority | Commonwealth of Puerto Rico | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Eliminations | Total Nonmajor Governmental Funds |
| **Assets:** | | | | | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | $ 22,850 | — | — | 67 | — | 15,080 | — | — | — | — | — | — | — | 37,997 |
| Cash and cash equivalents in governmental banks | 97,128 | 5,085 | — | 18,383 | — | — | — | — | 1,602 | — | — | — | — | 122,198 |
| Cash equivalents in PRGITF | — | — | — | — | — | — | — | — | — | — | — | 2,072 | — | 2,072 |
| Investments | — | — | 15,406 | — | — | — | — | — | — | — | — | — | — | 15,406 |
| Receivables – net of allowance for uncollectibles: | | | | | | | | | | | | | | |
| Intergovernmental | 8,713 | — | — | — | — | — | — | — | — | — | — | 3,530 | — | 12,243 |
| Accounts | — | 576 | — | — | — | — | — | — | — | 671 | 2,035 | — | — | 3,282 |
| Loans | — | — | — | — | — | — | — | — | — | 39 | — | — | — | 39 |
| Accrued interest | — | — | 73 | 1 | — | — | 2 | — | — | — | — | — | — | 76 |
| Other | 4,549 | — | — | — | 42,193 | — | — | — | — | — | — | — | — | 46,742 |
| Due from: | | | | | | | | | | | | | | |
| Other funds | — | 3,638 | 641 | — | — | — | 22 | — | — | — | — | 27,296 | (26,638) | 4,959 |
| Component units | 17,698 | — | — | — | — | — | — | — | — | — | — | — | — | 17,698 |
| Other governmental entities | 13,072 | 49 | — | — | — | — | — | — | — | — | — | — | — | 13,121 |
| Other assets | 2,155 | — | — | — | — | — | — | — | — | — | — | — | — | 2,155 |
| Restricted assets: | | | | | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | — | — | — | — | 192,285 | 75,606 | — | — | — | — | 134,374 | 33,197 | — | 435,462 |
| Cash and cash equivalents in governmental banks | — | 14,453 | 107,148 | — | — | — | — | — | 37 | 71,052 | 15,140 | 32,401 | — | 240,231 |
| Cash equivalents in PRGITF | — | — | — | — | — | — | — | — | — | 80,725 | — | — | — | 80,725 |
| Investments | — | — | — | — | 108,568 | — | 3,138 | — | — | — | — | 628 | — | 112,334 |
| Due from other funds | — | 203,654 | — | — | — | — | — | — | 570 | — | — | — | — | 204,224 |
| Other | — | — | — | — | 442 | — | — | — | — | — | — | — | — | 442 |
| Real estate held for sale or future development | 198 | — | — | — | — | — | — | — | — | 1,854 | — | — | — | 2,052 |
| **Total assets** | $ 166,363 | 227,455 | 107,862 | 33,857 | 151,203 | 207,365 | 78,768 | — | 2,209 | 154,341 | 149,514 | 101,159 | (26,638) | 1,353,458 |
| **Liabilities, Deferred Outflow of Resources, and Fund Balances:** | | | | | | | | | | | | | | |
| **Liabilities:** | | | | | | | | | | | | | | |
| Accounts payable and accrued liabilities | $ 11,042 | 15,543 | 22,908 | 570 | — | — | — | — | 142 | 36,026 | 23,032 | 34,285 | — | 143,548 |
| Due to: | | | | | | | | | | | | | | |
| Other funds | 1,703 | — | 1,384 | — | — | — | — | — | — | — | 22,374 | 2,880 | (26,638) | 1,703 |
| Other governmental entities | 5,475 | — | — | — | — | — | — | — | — | — | — | 24,942 | — | 30,417 |
| Component units | 1,774 | — | — | — | — | — | — | — | — | — | — | — | — | 1,774 |
| Bond anticipation notes payable | — | — | — | — | — | — | — | — | — | 8,391 | — | — | — | 8,391 |
| Bonds payable | — | — | — | — | — | 76,760 | — | — | — | — | — | — | — | 76,760 |
| Interest payable | — | — | — | — | — | 120,718 | — | — | 570 | — | — | — | — | 121,288 |
| Unearned revenue | 9,831 | — | — | — | — | — | — | — | — | — | — | — | — | 9,831 |
| **Total liabilities** | 29,825 | 15,543 | 24,292 | 570 | — | 197,478 | — | — | 712 | 44,417 | 45,406 | 62,107 | (26,638) | 393,712 |
| Deferred inflow of Resources: | | | | | | | | | | | | | | |
| Global tobacco settlement agreement | — | — | — | — | 42,193 | — | — | — | — | — | — | — | — | 42,193 |
| **Total deferred inflow of resources** | — | — | — | — | 42,193 | — | — | — | — | — | — | — | — | 42,193 |
| Fund balances: | | | | | | | | | | | | | | |
| Restricted for: | | | | | | | | | | | | | | |
| Public housing and welfare | — | — | 83,570 | — | — | — | — | — | — | — | — | — | — | 83,570 |
| Debt service | — | — | — | — | 109,010 | 9,887 | 78,768 | — | — | — | — | — | — | 197,665 |
| Capital projects | — | 203,654 | — | — | — | — | — | — | — | 109,924 | 104,108 | 39,052 | — | 456,738 |
| Committed to: | | | | | | | | | | | | | | |
| Public housing and welfare | — | — | — | 26,420 | — | — | — | — | — | — | — | — | — | 26,420 |
| Assigned to: | | | | | | | | | | | | | | |
| Public housing and welfare | — | — | — | 6,867 | — | — | — | — | — | — | — | — | — | 6,867 |
| Capital projects | 136,538 | 8,258 | — | — | — | — | — | — | — | — | — | — | — | 144,796 |
| Debt service | — | — | — | — | — | — | — | — | 1,497 | — | — | — | — | 1,497 |
| **Total fund balances** | 136,538 | 211,912 | 83,570 | 33,287 | 109,010 | 9,887 | 78,768 | — | 1,497 | 109,924 | 104,108 | 39,052 | — | 917,553 |
| **Total liabilities, deferred inflow of resources, and fund balances** | $ 166,363 | 227,455 | 107,862 | 33,857 | 151,203 | 207,365 | 78,768 | — | 2,209 | 154,341 | 149,514 | 101,159 | (26,638) | 1,353,458 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Revenue, Expenditures, and Changes in Fund Balances – Nonmajor Governmental Funds

Year ended June 30, 2014

(In thousands)

| | Special Revenue | | | | Debt Service | | | | | Capital Projects | | | | |
| | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Special Communities Perpetual Trust | The Children's Trust | The Children's Trust | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Special Communities Perpetual Trust | Puerto Rico Maritime Shipping Authority | Commonwealth of Puerto Rico | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Eliminations | Total Nonmajor Governmental Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue: | | | | | | | | | | | | | | |
| Interest and investment earnings | $ 1,652 | 5 | 421 | 23 | 3,384 | — | 168 | — | 2 | — | — | 117 | — | 5,772 |
| Intergovernmental | — | — | — | — | — | 35,883 | — | — | — | — | — | — | — | 35,883 |
| Other | 1,292 | 2,406 | 1,113 | — | — | — | 2,946 | — | — | — | — | 134 | — | 7,891 |
| Total revenue | 2,944 | 2,411 | 1,534 | 23 | 3,384 | 35,883 | 3,114 | — | 2 | — | — | 251 | — | 49,546 |
| Expenditures: | | | | | | | | | | | | | | |
| Current: | | | | | | | | | | | | | | |
| General government | 138,420 | 7,077 | — | 301 | — | — | — | — | — | 8,443 | — | — | — | 154,241 |
| Public safety | — | — | — | — | — | — | — | — | — | 723 | — | — | — | 723 |
| Health | — | — | 303 | — | — | — | — | — | — | 3,645 | — | — | — | 3,948 |
| Public housing and welfare | — | — | 11,587 | 2,179 | — | — | — | — | — | 3,358 | — | — | — | 17,124 |
| Education | — | — | — | 10 | — | — | — | — | — | 227 | — | 1,619 | — | 1,856 |
| Economic development | — | — | — | — | — | — | — | — | 98 | 35,320 | — | 4,714 | — | 40,132 |
| Intergovernmental | — | — | — | 147 | — | — | — | — | — | 4,511 | — | — | — | 4,658 |
| Capital outlays | — | 41 | — | — | — | — | — | — | — | 21,474 | 76,127 | 4,973 | — | 102,615 |
| Debt service: | | | | | | | | | | | | | | |
| Principal | 177,257 | — | — | — | 26,480 | 76,760 | 35,895 | 14,562 | — | — | — | — | — | 330,954 |
| Interest and other | 15,858 | 2,361 | — | — | 50,569 | 228,796 | 79,489 | 18,150 | 6,836 | — | — | — | — | 402,059 |
| Total expenditures | 331,535 | 9,479 | 11,587 | 2,940 | 77,049 | 305,556 | 115,384 | 32,712 | 6,934 | 77,701 | 76,127 | 11,306 | — | 1,058,310 |
| Deficiency of revenue under expenditures | (328,591) | (7,068) | (10,053) | (2,917) | (73,665) | (269,673) | (112,270) | (32,712) | (6,932) | (77,701) | (76,127) | (11,055) | — | (1,008,764) |
| Other financing sources (uses): | | | | | | | | | | | | | | |
| Transfers in | 630,670 | 131,803 | 164 | 4 | 72,130 | 259,565 | 113,293 | 32,712 | 135 | 228,848 | — | 4,795 | (393,552) | 1,080,567 |
| Transfers out | (259,565) | (112,960) | — | — | (4) | — | — | — | — | (956) | (20,890) | (133) | 393,552 | (956) |
| Proceeds from long term debt issued | — | 5,512 | — | — | — | — | — | — | — | 25,383 | 16,566 | 217 | — | 47,678 |
| Total other financing sources | 371,105 | 24,355 | 164 | 4 | 72,126 | 259,565 | 113,293 | 32,712 | 135 | 253,275 | (4,324) | 4,879 | — | 1,127,289 |
| Net change in fund balances | 42,514 | 17,287 | (9,889) | (2,913) | (1,539) | (10,108) | 1,023 | — | (6,797) | 175,574 | (80,451) | (6,176) | — | 118,525 |
| Fund balances (deficit) – beginning of year (as restated)(note 3 to financial statements) | 94,024 | 194,625 | 93,459 | 36,200 | 110,549 | 19,995 | 77,745 | — | 8,294 | (65,650) | 184,559 | 45,228 | — | 799,028 |
| Fund balances – end of year | $ 136,538 | 211,912 | 83,570 | 33,287 | 109,010 | 9,887 | 78,768 | — | 1,497 | 109,924 | 104,108 | 39,052 | — | 917,553 |

See accompanying independent auditors' report.

# COMMONWEALTH OF PUERTO RICO

Nonmajor Proprietary Funds

Year ended June 30, 2014

**Nonmajor Proprietary Funds**

Proprietary funds are used to account for operations that are financed and operated in a manner similar to private business enterprises where the intent of the government is that the costs of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges.

***9-1-1 Services Governing Board (9-1-1 Service)*** – This fund was created by Act No. 144 on December 22, 1994. The 9-1-1 Service is responsible for providing an efficient service of fast response to emergency calls through the 9-1-1 number, and transferring these to the appropriate response agencies.

***Disability Insurance*** – This fund was created by Act No. 139 on June 26, 1968. It is used to account for disability benefits to remedy temporarily the loss of income as a result of disability caused by sickness or accident unrelated to the employment.

***Drivers' Insurance*** – This fund was created by Act No. 428 on May 15, 1950. It is used to account for contributions made by the drivers and their employers to provide a social security plan for the benefit of the drivers in Puerto Rico. The plan also includes payment of benefits for health and life insurance.

***Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund*** – This fund was created by Act No. 32 on July 7, 1997. It is administered, pursuant to Act No. 9 of June 18, 1970, as amended, by the Puerto Rico Department of Health (DOH). Pursuant to such act, the DOH, on behalf of the Commonwealth, is authorized to enter into operating and capitalization grant agreements with the EPA for lending activities.

327

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Nonmajor Proprietary Funds

June 30, 2014

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | |
|---|---|---|---|---|---|
| | 9-1-1 Service Governing Board | Disability Insurance | Drivers' Insurance | Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total |
| Assets: | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents in commercial banks | $ — | — | 176 | — | 176 |
| Cash and cash equivalents in governmental banks | — | 51,811 | 9,895 | — | 61,706 |
| Insurance premiums receivables, net | — | 3,005 | 1,164 | — | 4,169 |
| Accrued interest receivable | — | 49 | — | — | 49 |
| Accounts receivable | 2,132 | — | — | — | 2,132 |
| Other receivables | 27 | 246 | — | — | 273 |
| Due from other funds | — | — | 2,999 | — | 2,999 |
| Other assets | 221 | — | — | — | 221 |
| Investments | — | — | — | — | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | 535 | — | — | 535 |
| Cash and cash equivalents in governmental banks | 31,464 | — | — | 33,220 | 64,684 |
| Receivables | — | — | — | — | — |
| Accrued interest receivable | — | — | — | 1,552 | 1,552 |
| Loans receivable from component unit | — | — | — | 7,258 | 7,258 |
| Total current assets | 33,844 | 55,646 | 14,234 | 42,030 | 145,754 |
| Noncurrent assets: | | | | | |
| Loans receivable from component unit – restricted | — | — | — | 151,726 | 151,726 |
| Due from other funds | — | — | 16,589 | — | 16,589 |
| Restricted investments | — | 38,735 | — | — | 38,735 |
| Depreciable assets | 4,060 | 156 | — | — | 4,216 |
| Total assets | 37,904 | 94,537 | 30,823 | 193,756 | 357,020 |
| Liabilities and Net Position: | | | | | |
| Current liabilities: | | | | | |
| Accounts payable and accrued liabilities | 2,158 | 609 | 183 | 190 | 3,140 |
| Due to other funds | 4,478 | 803 | — | — | 5,281 |
| Due to other governmental entities | 3,862 | — | 4 | — | 3,866 |
| Unearned revenue | — | 2,699 | 18 | — | 2,717 |
| Compensated absences | 624 | 438 | 255 | — | 1,317 |
| Voluntary termination benefits payable | 180 | — | — | — | 180 |
| Insurance benefits payable | — | 600 | 146 | — | 746 |
| Total current liabilities | 11,302 | 5,149 | 606 | 190 | 17,247 |
| Noncurrent liabilities: | | | | | |
| Compensated absences | 990 | 658 | 383 | — | 2,031 |
| Voluntary termination benefits payable | 557 | — | — | — | 557 |
| Total liabilities | 12,849 | 5,807 | 989 | 190 | 19,835 |
| Net position: | | | | | |
| Net investment in capital assets | 3,860 | 156 | — | — | 4,016 |
| Restricted for lending activities | — | — | — | 193,566 | 193,566 |
| Restricted for payment of insurance benefits | — | 38,669 | — | — | 38,669 |
| Restricted for emergency services | 10,173 | — | — | — | 10,173 |
| Unrestricted | 11,022 | 49,905 | 29,834 | — | 90,761 |
| Total net position | $ 25,055 | 88,730 | 29,834 | 193,566 | 337,185 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Revenue, Expenses, and Changes in Fund Net Position - Nonmajor Proprietary Funds

Year ended June 30, 2014

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | |
|---|---|---|---|---|---|
| | **9-1-1 Service Governing Board** | **Disability Insurance** | **Drivers' Insurance** | **Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund** | **Total** |
| Operating revenue: | | | | | |
| Emergency telephone service charges | $ 20,838 | — | — | — | 20,838 |
| Insurance premiums | — | 11,787 | 4,663 | — | 16,450 |
| Interest | — | — | — | 3,122 | 3,122 |
| Total operating revenue | 20,838 | 11,787 | 4,663 | 3,122 | 40,410 |
| Operating expenses: | | | | | |
| Insurance benefits | — | 1,968 | 885 | — | 2,853 |
| General, administrative, and other operating expenses | 12,031 | 6,029 | 3,584 | 843 | 22,487 |
| Total operating expenses | 12,031 | 7,997 | 4,469 | 843 | 25,340 |
| Operating income | 8,807 | 3,790 | 194 | 2,279 | 15,070 |
| Nonoperating revenue (expenses): | | | | | |
| Contributions from U.S. government | — | — | — | 9,084 | 9,084 |
| Contributions to component unit | — | — | — | (3,580) | (3,580) |
| Interest and investment earnings | 386 | 3,716 | 484 | — | 4,586 |
| Total nonoperating revenue | 386 | 3,716 | 484 | 5,504 | 10,090 |
| Income before transfers | 9,193 | 7,506 | 678 | 7,783 | 25,160 |
| Transfers from other funds | — | — | — | 1,801 | 1,801 |
| Transfers to other funds | (11,615) | (4,488) | — | — | (16,103) |
| Net change in net position | (2,422) | 3,018 | 678 | 9,584 | 10,858 |
| Net position – beginning of year, as adjusted (see note 3 to the financial statement) | 27,477 | 85,712 | 29,156 | 183,982 | 326,327 |
| Net position – end of year | $ 25,055 | 88,730 | 29,834 | 193,566 | 337,185 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Cash Flows – Nonmajor Proprietary Funds

Year ended June 30, 2014

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | |
|---|---|---|---|---|---|
| | **9-1-1 Service Governing Board** | **Disability Insurance** | **Drivers' Insurance** | **Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund** | **Total** |
| Cash flows from operating activities: | | | | | |
| Receipts from customers and users | $ 20,532 | 11,832 | 4,590 | — | 36,954 |
| Payments to suppliers and employees | (8,937) | (6,135) | (3,721) | (923) | (19,716) |
| Payments of insurance benefits | — | (2,026) | (902) | — | (2,928) |
| Net cash provided by (used in) operating activities | 11,595 | 3,671 | (33) | (923) | 14,310 |
| Cash flows from noncapital financing activities: | | | | | |
| Intergovernmental grants and contributions | — | — | — | 9,084 | 9,084 |
| Contributions to component unit | — | — | — | (3,580) | (3,580) |
| Transfers from other funds | — | — | — | 1,801 | 1,801 |
| Transfers to other funds | (13,002) | (4,488) | — | — | (17,490) |
| Net cash provided by (used in) noncapital financing activities | (13,002) | (4,488) | — | 7,305 | (10,185) |
| Cash flows from capital and related financing activities – capital expenditures | (306) | (50) | — | — | (356) |
| Cash flows from investing activities: | | | | | |
| Interest collected on deposits, investments, and loans | 386 | 2,239 | 9 | 3,062 | 5,696 |
| Loans originated | — | — | — | (10,317) | (10,317) |
| Principal collected on loans | — | — | 5,000 | 5,743 | 10,743 |
| Proceeds from sales and maturities of investments | 12,180 | 9,634 | — | — | 21,814 |
| Purchases of investments | — | (11,741) | — | — | (11,741) |
| Net cash provided by (used in) investing activities | 12,566 | 132 | 5,009 | (1,512) | 16,195 |
| Net increase (decrease) in cash and cash equivalents | 10,853 | (735) | 4,976 | 4,870 | 19,964 |
| Cash and cash equivalents – beginning of year | 20,611 | 53,081 | 5,095 | 28,350 | 107,137 |
| Cash and cash equivalents – end of year | $ 31,464 | 52,346 | 10,071 | 33,220 | 127,101 |
| Reconciliation of operating income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Operating income | $ 8,807 | 3,790 | 194 | 2,279 | 15,070 |
| Adjustments to reconcile operating income (loss) to net cash provided by (used in) operating activities: | | | | | |
| Interests earned on deposits, loans, and investments | — | — | — | (3,123) | (3,123) |
| Depreciation | 967 | 45 | — | — | 1,012 |
| Loss on disposition of capital assets | 195 | — | — | — | 195 |
| Changes in operating assets and liabilities: | | | | | |
| Increase in accounts receivable | (123) | (330) | (71) | — | (524) |
| Increase in other assets | (183) | — | — | — | (183) |
| Increase (decrease) in accounts payable and accrued liabilities | 43 | (72) | (1) | (79) | (109) |
| Increase (decrease) in due to other governmental entities | 2,123 | (38) | (46) | — | 2,039 |
| Increase in deferred revenue | — | 375 | (2) | — | 373 |
| Decrease in compensated absences | (59) | (41) | (90) | — | (190) |
| Decrease in termination benefits payable | (175) | — | — | — | (175) |
| Decrease in liability for insurance benefits payable | — | (58) | (17) | — | (75) |
| Total adjustments | 2,788 | (119) | (227) | (3,202) | (760) |
| Net cash provided by (used in) operating activities | $ 11,595 | 3,671 | (33) | (923) | 14,310 |

See accompanying independent auditors' report.

## COMMONWEALTH OF PUERTO RICO

Fiduciary Funds

Year ended June 30, 2014

Fiduciary funds are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units. Following are the Commonwealth's fiduciary funds:

**Pension Trust Funds**

The pension trust funds are used to account for the assets, liabilities, and net assets available for pension benefits held in trust for the public employees of the Commonwealth.

***Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)*** – ERS is a cost-sharing multiple-employer defined-benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 447 on May 15, 1951. The ERS is sponsored by the Commonwealth, public corporations, and municipalities of Puerto Rico. Substantially all full-time employees of the Commonwealth and its instrumentalities are covered by the ERS. All regular appointed and temporary employees of the Commonwealth become plan members at the date of employment. The ERS is administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration) that also administers the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). The ERS MIPC is an unfunded, cost-sharing, multi-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

***Puerto Rico System of Annuities and Pensions for Teachers (TRS)*** – TRS is a cost-sharing multiple-employer defined benefit pension plan administered by the Puerto Rico Teachers Retirement System and was created by Act No. 91 of March 29, 2004, that superseded Act No. 218 of May 6, 1951. The TRS is sponsored by the Commonwealth. All active teachers of the Commonwealth's Department of Education are covered by the TRS. Licensed teachers working in private schools or other educational organizations have the option to become members of TRS at their own choice as long as the required employer and employee contributions are satisfied. The employees of the TRS are also plan members. The TRS is administered by the Puerto Rico Teachers Retirement System (the TRS Administration) that also administers the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC), an unfunded, cost-sharing, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of the TRS Administration.

***Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)*** – JRS is a single-employer defined-benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 12 on October 19, 1954. The JRS is sponsored by the Commonwealth. All judges of the judiciary branch of the Commonwealth are plan members. The JRS provides retirement benefits to the employees of the judiciary branch of the Commonwealth, through the office of the Administration of Court Facilities. The JRS is administered by the ERS and JRS Administration that also administers the Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC), an unfunded, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired judges of the Judiciary Branch of the Commonwealth.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Fiduciary Funds

Year ended June 30, 2014

**Agency Fund**

Agency fund is used to account for assets held by the Commonwealth as an agent for individuals, private organizations, and other governments. This fund is custodial in nature (assets equal liabilities) and does not involve measurement of the results of operations.

**Special Deposits** – This fund acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections, and agency accounts for which the Commonwealth act in an agent's capacity.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Fiduciary Net Position – Pension Trust Funds

June 30, 2014

(In thousands)

| | Pension Trust Funds | | | | | | |
|---|---|---|---|---|---|---|---|
| | (ERS) | | (TRS) | | (JRS) | | |
| | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Total |
| Assets: | | | | | | | |
| Cash and cash equivalents in commercial banks: | | | | | | | |
| Unrestricted | $ 64,824 | — | 14,205 | — | 2,545 | — | 81,574 |
| Restricted | 129,690 | — | — | — | — | — | 129,690 |
| Cash and cash equivalents in governmental banks: | | | | | | | |
| Unrestricted | 56,980 | — | — | — | 3,143 | — | 60,123 |
| Restricted | 17,998 | — | 3,301 | — | — | — | 21,299 |
| Receivables – net: | | | | | | | |
| Employers – net | 195,803 | — | — | — | 283 | — | 196,086 |
| Accrued interest and dividends | 9,500 | — | 6,146 | — | 175 | — | 15,821 |
| Investments sold | 10,976 | — | 4,311 | — | — | — | 15,287 |
| Other | 20,819 | — | 14,704 | — | 26 | — | 35,549 |
| Due from JRS (Due to ERS) | 19,122 | — | — | — | (19,122) | — | — |
| Collateral from securities lending transactions | 126,648 | — | 15,152 | — | 827 | — | 142,627 |
| Investments at fair value: | | | | | | | |
| Bonds and notes | 1,337,292 | — | 649,774 | — | 19,232 | — | 2,006,298 |
| Nonexchange commingled trust funds | 750,482 | — | 503,619 | — | 39,896 | — | 1,293,997 |
| Stocks | 102 | — | 92,900 | — | — | — | 93,002 |
| Investments in limited partnerships | 54,146 | — | 11,170 | — | — | — | 65,316 |
| Member loans and interest receivable– net | 619,379 | — | 420,544 | — | 542 | — | 1,040,465 |
| Capital assets – net | 11,211 | — | 17,325 | — | — | — | 28,536 |
| Other assets | 5,695 | — | 846 | — | — | — | 6,541 |
| Total assets | 3,430,667 | — | 1,753,997 | — | 47,547 | — | 5,232,211 |
| Liabilities: | | | | | | | |
| Accounts payable and accrued liabilities | 12,236 | — | 21,130 | — | — | — | 33,366 |
| Interest payable | 13,876 | — | — | — | — | — | 13,876 |
| Payable for investment securities purchased | 19,009 | — | 4,442 | — | 190 | — | 23,641 |
| Securities lending obligations | 126,648 | — | 15,152 | — | 827 | — | 142,627 |
| Due to Commonwealth of Puerto Rico | 37,082 | — | — | — | — | — | 37,082 |
| Other liabilities | 63,563 | — | 9,494 | — | 463 | — | 73,520 |
| Bonds payable | 3,077,587 | — | — | — | — | — | 3,077,587 |
| Total liabilities | 3,350,001 | — | 50,218 | — | 1,480 | — | 3,401,699 |
| Net position restricted for pensions | $ 80,666 | — | 1,703,779 | — | 46,067 | — | 1,830,512 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds

Year ended June 30, 2014

(In thousands)

| | Pension Trust Funds | | | | | | |
|---|---|---|---|---|---|---|---|
| | (ERS) | | (TRS) | | (JRS) | | |
| | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Total |
| **Additions:** | | | | | | | |
| Contributions: | | | | | | | |
| Employer contributions: | | | | | | | |
| Basic contributions, net of provision | | | | | | | |
| to allowance of $82,848 | $ 485,114 | — | 139,453 | — | 10,762 | — | 635,329 |
| Special benefits | 228,699 | 102,085 | 49,914 | 35,892 | 1,230 | 302 | 418,122 |
| Member contributions | 359,862 | — | 119,592 | — | 3,804 | — | 483,258 |
| Total contributions | 1,073,675 | 102,085 | 308,959 | 35,892 | 15,796 | 302 | 1,536,709 |
| Investment income and investment expense: | | | | | | | |
| Net appreciation in fair value of investments | 124,907 | — | 126,796 | — | 8,868 | — | 260,571 |
| Interest | 103,005 | — | 64,011 | — | 842 | — | 167,858 |
| Dividends | 75 | — | 2,148 | — | — | — | 2,223 |
| Investment expense, other than | | | | | | | |
| from security lending | (3,280) | — | (3,128) | — | — | — | (6,408) |
| Net income from investing, other than from security lending | 224,707 | — | 189,827 | — | 9,710 | — | 424,244 |
| Securities lending income | 399 | — | 261 | — | 4 | — | 664 |
| Securities lending expenses | (101) | — | (65) | — | (1) | — | (167) |
| Net income from security lending | 298 | — | 196 | — | 3 | — | 497 |
| Net investment income | 225,005 | — | 190,023 | — | 9,713 | — | 424,741 |
| Other income | 30,748 | — | 1,416 | — | 59 | — | 32,223 |
| Total additions | 1,329,428 | 102,085 | 500,398 | 35,892 | 25,568 | 302 | 1,993,673 |
| **Deductions:** | | | | | | | |
| Benefits paid to participants | 1,548,423 | 102,085 | 672,991 | 35,892 | 22,437 | 302 | 2,382,130 |
| Refunds of contributions | 166,335 | — | 10,707 | — | 230 | — | 177,272 |
| Interest on bonds payable | 192,947 | — | — | — | — | — | 192,947 |
| General and administrative | 56,114 | — | 19,803 | — | 578 | — | 76,495 |
| Other expenses | — | — | — | — | 1,572 | — | 1,572 |
| Total deductions | 1,963,819 | 102,085 | 703,501 | 35,892 | 24,817 | 302 | 2,830,416 |
| Net change in net position | (634,391) | 102,085 | (203,103) | 35,892 | 751 | 302 | (836,743) |
| **Net position restricted for pensions:** | | | | | | | |
| Beginning of year, as previously reported | 731,342 | — | 1,906,882 | — | 59,012 | — | 2,697,236 |
| Adjustments of beginning of year net position: | | | | | | | |
| Effect of adoption of GASB Statement No. 65 | (29,981) | — | — | — | — | — | (29,981) |
| Correction of immaterial errors | 13,696 | — | — | — | (13,696) | — | — |
| Beginning of year, as adjusted and restated | 715,057 | — | 1,906,882 | — | 45,316 | — | 2,667,255 |
| End of year | $ 80,666 | — | 1,703,779 | — | 46,067 | — | 1,830,512 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Changes in Assets and Liabilities – Agency Funds

Year ended June 30, 2014

(In thousands)

| Assets | | Balance at June 30, 2013 | Additions | Deletions | Balance at June 30, 2014 |
|---|---|---|---|---|---|
| Cash and cash equivalents in commercial banks | $ | 666,244 | 1,234,150 | 1,323,008 | 577,386 |
| Cash and cash equivalents in governmental banks | | 433,944 | 14,247,030 | 14,387,807 | 293,167 |
| Total assets | $ | 1,100,188 | 15,481,180 | 15,710,815 | 870,553 |
| **Liabilities** | | | | | |
| Accounts payable and accrued liabilities | $ | 1,100,188 | 15,481,180 | 15,710,815 | 870,553 |
| Total liabilities | $ | 1,100,188 | 15,481,180 | 15,710,815 | 870,553 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Year ended June 30, 2014

These entities, all legally separate entities, consistent with GASB Statement No. 14, as amended by GASB Statement Nos. 39 and 61, are discretely presented in a separate column of the basic financial statements of the Primary Government principally because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because these component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth (with the exception of Culebra Conservation and Development Authority, which does not meet all these criteria, but the Commonwealth has determined it would be misleading to exclude it from the Commonwealth's financial reporting entity). These entities have been classified as nonmajor component units because management believes they do not meet the following factors for inclusion as major: a) the services provided by the component unit to the citizenry are such that separate reporting as a major component unit is considered to be essential to financial statement users, b) there are significant transactions with the Primary Government, or c) there is a significant financial benefit or burden relationship with the Primary Government. The accounting principles followed by each of the component units included herein may vary depending on the type of industries they are involved in (that is, banking, construction, public utilities, and so forth). The detailed information for each of these entities may be obtained directly from the administrative offices of the corresponding entities, as described in note 1 to the basic financial statements included in the financial section of this report.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2014

(In thousands)

| | Agricultural Enterprises Development Administration | Automobile Accidents Compensation Administration | Cardiovascular Center Corporation of Puerto Rico and the Caribbean | Company for the Integral Development of the "Península de Cantera" | Corporation for the "Caño Martín Peña" ENLACE Project | Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico |
|---|---|---|---|---|---|---|
| Assets: | | | | | | |
| Cash and cash equivalents in commercial banks | $ — | 15,890 | 10,163 | 1,706 | 498 | 46 |
| Cash and cash equivalents in governmental banks | — | — | — | — | — | 972 |
| Investments | — | 155,265 | — | — | — | 528 |
| Collateral from securities lending transactions | — | — | — | — | — | — |
| Receivables – net: | | | | | | |
| Insurance premiums | — | 1,087 | — | — | — | — |
| Intergovernmental | — | — | — | — | — | — |
| Accounts | 2,142 | — | 2,507 | — | — | 733 |
| Loans and advances | — | — | — | 5,676 | — | — |
| Accrued interest | — | 654 | — | — | — | — |
| Other governmental entities | 68 | 639 | 1,681 | 687 | 573 | 553 |
| Other | 62 | 1,631 | 974 | 23 | — | — |
| Due from – net: | | | | | | |
| Primary government | 21,485 | — | — | — | — | — |
| Component units | — | — | — | — | — | — |
| Inventories | 6,706 | — | 2,396 | — | — | — |
| Prepaid expenses | 962 | — | 427 | 34 | — | 75 |
| Other assets | — | 248 | — | — | — | — |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 24,454 | 515 | — | — | 86 | 1,338 |
| Cash and cash equivalents in governmental banks | 16,900 | — | — | — | — | 11,742 |
| Investments | — | — | — | 497 | — | — |
| Other restricted assets | — | — | — | 847 | — | — |
| Real estate held for sale or future development | — | — | — | — | — | — |
| Capital assets, not being depreciated | 3,739 | 1,026 | 103 | 80 | 1,073 | — |
| Capital assets, depreciable – net | 23,503 | 5,002 | 17,064 | 44 | 1,424 | 51 |
| Total assets | 100,021 | 181,957 | 35,315 | 9,594 | 3,654 | 16,038 |
| Deferred outflows of resources: | | | | | | |
| Loss on bonds refunding | — | — | — | — | — | — |
| Total assets and deferred outflows of resources | 100,021 | 181,957 | 35,315 | 9,594 | 3,654 | 16,038 |
| Liabilities: | | | | | | |
| Accounts payable and accrued liabilities | 39,769 | 5,799 | 27,394 | 2,245 | 400 | 144 |
| Deposits and escrow liabilities | — | — | — | — | — | — |
| Due to: | | | | | | |
| Primary government | — | — | 17,698 | — | — | — |
| Component units | 117,262 | — | 17,279 | 34,875 | — | — |
| Other governmental entities | 1,296 | 317 | 1,382 | 1,402 | — | 302 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — | — |
| Interest payable | — | — | — | 2,364 | — | — |
| Unearned revenue | 854 | 37,840 | — | — | — | — |
| Liability for automobile accident insurance, workmen's compensation, and medical claims | — | 93,979 | — | — | — | — |
| Liabilities payable within one year: | | | | | | |
| Notes payable | 18,555 | — | — | — | — | — |
| Bonds payable | — | — | — | — | — | — |
| Accrued compensated absences | 2,555 | 3,327 | 3,492 | 72 | 97 | 81 |
| Voluntary termination benefits payable | 2,650 | — | — | — | — | — |
| Capital leases | — | — | — | — | — | — |
| Other long-term liabilities | 744 | — | 2,847 | — | — | — |
| Liabilities payable after one year: | | | | | | |
| Notes payable | — | — | — | — | — | — |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Bonds payable | — | — | — | — | — | — |
| Accrued compensated absences | 2,805 | — | — | — | 54 | — |
| Voluntary termination benefits payable | 22,286 | — | — | — | — | — |
| Capital leases | — | — | — | — | — | — |
| Other long-term liabilities | — | 5,311 | 5,038 | — | — | — |
| Total liabilities | 208,776 | 146,573 | 75,130 | 40,958 | 551 | 527 |
| Deferred inflows of resources: | | | | | | |
| Service concession arrangements | — | — | — | — | — | — |
| Total liabilities and deferred inflows of resources | 208,776 | 146,573 | 75,130 | 40,958 | 551 | 527 |
| Net Position: | | | | | | |
| Net Investment in capital assets | 27,242 | 6,028 | 17,167 | 124 | 2,498 | — |
| Restricted for: | | | | | | |
| Trust – nonexpendable | — | — | — | — | — | — |
| Capital projects | 191,660 | — | — | — | — | — |
| Debt service | — | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — | — |
| Other specified purposes | — | — | — | 497 | 85 | 16,551 |
| Unrestricted (deficit) | (327,657) | 29,356 | (56,982) | (31,985) | 520 | (1,040) |
| Total net position (deficit) | $ (108,755) | 35,384 | (39,815) | (31,364) | 3,103 | 15,511 |

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2014

(In thousands)

| | Corporation of Industries for the Blind Mentally Retarded Incapacitated Persons of Puerto Rico | Culebra Conservation and Development Authority | Economic Development Bank for Puerto Rico | Employment and Training Enterprises Corporation | Farm Insurance Corporation of Puerto Rico | Fine Arts Center Corporation |
|---|---|---|---|---|---|---|
| Assets: | | | | | | |
| Cash and cash equivalents in commercial banks | $ 34 | 75 | 3,715 | 1 | 7,027 | 3,235 |
| Cash and cash equivalents in governmental banks | 578 | — | 1,517 | 232 | — | — |
| Investments | — | — | 691,309 | — | — | — |
| Collateral from securities lending transactions | — | — | 55,727 | — | — | — |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | — |
| Intergovernmental | — | — | — | — | — | — |
| Accounts | 20 | 1 | — | — | — | 111 |
| Loans and advances | — | — | 304,053 | — | — | — |
| Accrued interest | — | — | 9,310 | — | — | — |
| Other governmental entities | 96 | — | 776 | 166 | 3,095 | 110 |
| Other | — | — | — | — | 64 | — |
| Due from – net: | | | | | | |
| Primary government | — | — | — | — | — | — |
| Component units | — | — | — | — | 4,958 | — |
| Inventories | 198 | — | — | 86 | — | — |
| Prepaid expenses | — | — | — | — | 18 | 107 |
| Other assets | — | — | 7,568 | — | — | — |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | — | 24 | 924 | — | 213 | — |
| Cash and cash equivalents in governmental banks | 117 | — | — | — | — | — |
| Investments | — | — | — | — | — | — |
| Other restricted assets | — | — | 6,534 | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — | — |
| Capital assets, not being depreciated | — | 640 | 2,735 | — | — | 3,179 |
| Capital assets, depreciable – net | 247 | 249 | 6,078 | 43 | 146 | 14,355 |
| Total assets | 1,290 | 989 | 1,090,246 | 528 | 15,521 | 21,097 |
| Deferred outflows of resources: | | | | | | |
| Loss on bonds refunding | — | — | — | — | — | — |
| Total assets and deferred outflows of resources | 1,290 | 989 | 1,090,246 | 528 | 15,521 | 21,097 |
| Liabilities: | | | | | | |
| Accounts payable and accrued liabilities | 199 | 68 | 2,855 | 707 | 321 | 536 |
| Deposits and escrow liabilities | — | — | 411,684 | — | — | 140 |
| Due to: | | | | | | |
| Primary government | — | — | — | — | — | — |
| Component units | — | — | 8,923 | — | 4,992 | — |
| Other governmental entities | — | — | — | — | 1,974 | — |
| Securities lending obligations and reverse repurchase agreements | — | — | 45,690 | — | — | — |
| Interest payable | — | — | 7,541 | — | — | — |
| Unearned revenue | 364 | — | — | 87 | 3,668 | — |
| Liability for automobile accident insurance, workmen's compensation, and medical claims | — | — | — | — | — | — |
| Liabilities payable within one year: | | | | | | |
| Notes payable | — | — | — | — | — | — |
| Bonds payable | — | — | — | — | — | — |
| Accrued compensated absences | 120 | 62 | — | 217 | 508 | 233 |
| Voluntary termination benefits payable | — | 12 | — | — | — | 254 |
| Capital leases | — | 2 | — | — | — | — |
| Other long-term liabilities | — | — | — | 2,018 | — | — |
| Liabilities payable after one year: | | | | | | |
| Notes payable | — | — | 441,215 | — | — | — |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Bonds payable | — | — | — | — | — | — |
| Accrued compensated absences | — | — | 2,050 | — | — | 300 |
| Voluntary termination benefits payable | — | 125 | — | — | — | 2,418 |
| Capital leases | — | 1 | — | — | — | — |
| Other long-term liabilities | — | — | 4,291 | — | — | — |
| Total liabilities | 683 | 270 | 924,249 | 3,029 | 11,463 | 3,881 |
| Deferred inflows of resources: | | | | | | |
| Service concession arrangements | — | — | — | — | — | — |
| Total liabilities and deferred inflows of resources | 683 | 270 | 924,249 | 3,029 | 11,463 | 3,881 |
| Net Position: | | | | | | |
| Net Investment in capital assets | 247 | 889 | (110) | 42 | 146 | 16,963 |
| Restricted for: | | | | | | |
| Trust – nonexpendable | — | — | — | — | — | — |
| Capital projects | — | — | — | — | — | — |
| Debt service | — | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — | — |
| Other specified purposes | — | 18 | 18,077 | — | — | — |
| Unrestricted (deficit) | 360 | (188) | 148,030 | (2,543) | 3,912 | 253 |
| Total net position (deficit) | $ 607 | 719 | 165,997 | (2,501) | 4,058 | 17,216 |

338

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2014

(In thousands)

| | Institute of Puerto Rican Culture | Institutional Trust of the National Guard of Puerto Rico | Land Authority of Puerto Rico | Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | Musical Arts Corporation | National Parks Company of Puerto Rico | Port of the Americas Authority |
|---|---|---|---|---|---|---|---|
| Assets: | | | | | | | |
| Cash and cash equivalents in commercial banks | $ 4,224 | 654 | 948 | — | 2,824 | 620 | — |
| Cash and cash equivalents in governmental banks | — | 1,121 | 27,873 | 219 | 485 | 642 | 56 |
| Investments | — | — | — | — | — | — | — |
| Collateral from securities lending transactions | — | — | — | — | — | — | — |
| Receivables – net: | | | | | | | |
| Insurance premiums | — | — | — | — | — | — | — |
| Intergovernmental | 482 | — | — | — | — | — | — |
| Accounts | 223 | 1,118 | 17,608 | 89 | 43 | 182 | 1 |
| Loans and advances | — | — | — | — | — | — | — |
| Accrued interest | — | 628 | — | — | — | — | — |
| Other governmental entities | — | — | 1,081 | 480 | 118 | 22 | — |
| Other | — | 158 | 339 | — | — | — | — |
| Due from – net: | | | | | | | |
| Primary government | — | — | 11,603 | — | — | 8,805 | — |
| Component units | — | — | 13,221 | — | — | — | — |
| Inventories | 1,948 | — | — | — | — | — | — |
| Prepaid expenses | — | 55 | 17 | 402 | — | 54 | — |
| Other assets | — | — | 7,673 | — | — | — | — |
| Restricted assets: | | | | | | | |
| Cash and cash equivalents in commercial banks | 7,812 | — | — | 27 | 114 | 46 | — |
| Cash and cash equivalents in governmental banks | 1,974 | 37,177 | — | — | 576 | 11,092 | 500 |
| Investments | — | — | — | — | — | — | — |
| Other restricted assets | — | — | — | — | — | — | — |
| Real estate held for sale or future development | 916 | 7,887 | 88,330 | 16,545 | 568 | 18,558 | 356,844 |
| Capital assets, not being depreciated | 55,233 | 12,770 | 8,512 | 4 | 136 | 138,779 | — |
| Capital assets, depreciable – net | | | | | | | |
| Total assets | 72,812 | 61,568 | 177,205 | 17,766 | 4,864 | 178,800 | 357,401 |
| Deferred outflows of resources: | | | | | | | |
| Loss on bonds refunding | — | — | — | — | — | — | — |
| Total assets and deferred outflows of resources | 72,812 | 61,568 | 177,205 | 17,766 | 4,864 | 178,800 | 357,401 |
| Liabilities: | | | | | | | |
| Accounts payable and accrued liabilities | 953 | 1,599 | 4,539 | 907 | 359 | 1,560 | 5,681 |
| Deposits and escrow liabilities | — | — | 2,252 | 650 | — | — | — |
| Due to: | | | | | | | |
| Primary government | — | — | — | — | — | 13,322 | — |
| Component units | 3,291 | — | 34,409 | — | — | 13,200 | 226,564 |
| Other governmental entities | — | — | 16,700 | 16,345 | 486 | 581 | 84 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — | — | — |
| Interest payable | 66 | — | 1,719 | — | — | 323 | 14,475 |
| Unearned revenue | 75 | — | 3,948 | — | 579 | 210 | — |
| Liability for automobile accident insurance, workmen's compensation, and medical claims | — | — | — | — | — | — | — |
| Liabilities payable within one year: | | | | | | | |
| Notes payable | — | — | — | — | — | — | — |
| Bonds payable | — | — | — | — | — | — | — |
| Accrued compensated absences | 73 | 25 | 965 | 104 | 584 | 247 | 8 |
| Voluntary termination benefits payable | 609 | — | — | — | 62 | 1,396 | — |
| Capital leases | — | — | — | — | — | — | — |
| Other long-term liabilities | — | — | 2,817 | — | — | — | — |
| Liabilities payable after one year: | | | | | | | |
| Notes payable | — | — | — | — | — | — | — |
| Commonwealth appropriation bonds | — | — | 55,818 | — | — | — | — |
| Bonds payable | — | — | — | — | — | — | — |
| Accrued compensated absences | 1,480 | — | 1,110 | — | 216 | 4,693 | — |
| Voluntary termination benefits payable | 4,709 | — | — | — | 782 | 10,291 | — |
| Capital leases | — | — | — | — | — | — | — |
| Other long-term liabilities | — | — | 37,950 | — | 6,602 | 2,621 | — |
| Total liabilities | 11,256 | 1,624 | 162,227 | 18,006 | 9,670 | 48,444 | 246,812 |
| Deferred inflows of resources: | | | | | | | |
| Service concession arrangements | — | — | — | — | — | — | — |
| Total liabilities and deferred inflows of resources | 11,256 | 1,624 | 162,227 | 18,006 | 9,670 | 48,444 | 246,812 |
| Net Position: | | | | | | | |
| Net Investment in capital assets | 52,858 | 20,657 | 96,842 | 203 | 704 | 151,731 | 110,602 |
| Restricted for: | | | | | | | |
| Trust – nonexpendable | — | — | — | — | — | — | — |
| Capital projects | 4,333 | — | — | — | — | 9,417 | — |
| Debt service | — | — | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — | — | — |
| Other specified purposes | 5,058 | 32,465 | — | 270 | 690 | — | — |
| Unrestricted (deficit) | (693) | 6,822 | (81,864) | (713) | (6,200) | (30,792) | (13) |
| Total net position (deficit) | $ 61,556 | 59,944 | 14,978 | (240) | (4,806) | 130,356 | 110,589 |

339

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2014

(In thousands)

| | Public Corporation for the Supervision and Deposit Insurance of P.R. Cooperatives | Puerto Rico Conservatory of Music Corporation | Puerto Rico Convention Center District Authority | Puerto Rico Council on Education | Puerto Rico Industrial Development Company | Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities Financing Authority |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 2,932 | 166 | 8,127 | 106 | 16,440 | — |
| Cash and cash equivalents in governmental banks | 582 | — | 5,121 | 1,646 | 26,766 | — |
| Investments | 229,617 | — | — | — | 4,093 | — |
| Collateral from securities lending transactions | | | | | | |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | — |
| Intergovernmental | — | — | — | — | 897 | — |
| Accounts | — | — | 12,288 | — | 14,802 | — |
| Loans and advances | 3,300 | — | 1,356 | — | 29 | — |
| Accrued interest | 2,328 | — | — | — | — | 1 |
| Other governmental entities | 40 | 37 | 767 | — | 6,612 | — |
| Other | 281 | 906 | — | 764 | — | — |
| Due from – net: | | | | | | |
| Primary government | — | — | — | 5,183 | — | — |
| Component units | — | — | 4,471 | — | — | — |
| Inventories | — | — | — | — | — | — |
| Prepaid expenses | — | 6 | 1,345 | — | 2,169 | — |
| Other assets | — | — | 9,827 | — | — | — |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | — | 2,676 | 161 | — | — | — |
| Cash and cash equivalents in governmental banks | — | — | 476 | 4,930 | — | 9,541 |
| Investments | — | — | 57,548 | — | 31,718 | — |
| Other restricted assets | — | — | — | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — | — |
| Capital assets, not being depreciated | — | 5,157 | 289,710 | — | 250,235 | — |
| Capital assets, depreciable – net | 2,694 | 78,223 | 405,623 | 178 | 409,656 | — |
| Total assets | 241,774 | 87,171 | 796,820 | 12,807 | 763,417 | 9,542 |
| Deferred outflows of resources: | | | | | | |
| Loss on bonds refunding | — | — | — | — | — | — |
| Total assets and deferred outflows of resources | 241,774 | 87,171 | 796,820 | 12,807 | 763,417 | 9,542 |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | 29,703 | 2,042 | 7,787 | 462 | 43,694 | 75 |
| Deposits and escrow liabilities | — | — | 2,131 | — | 7,073 | — |
| Due to: | | | | | | |
| Primary government | — | — | — | — | — | — |
| Component units | — | 1,114 | 147,388 | — | 88,631 | — |
| Other governmental entities | — | 45 | — | — | — | — |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — | — |
| Interest payable | — | 11 | 13,203 | — | 3,405 | — |
| Unearned revenue | — | 850 | 6,766 | — | — | — |
| Liability for automobile accident insurance, workmen's compensation, and medical claims | — | — | — | — | — | — |
| Liabilities payable within one year: | | | | | | |
| Notes payable | — | — | — | — | 7,554 | — |
| Bonds payable | — | — | 10,275 | — | 10,020 | — |
| Accrued compensated absences | 1,907 | 309 | 172 | 116 | 5,634 | — |
| Voluntary termination benefits payable | — | 20 | — | 117 | 939 | — |
| Capital leases | — | — | — | — | 76 | — |
| Other long-term liabilities | — | 702 | — | — | — | — |
| Liabilities payable after one year: | | | | | | |
| Notes payable | — | — | — | — | 71,628 | — |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Bonds payable | — | — | 415,059 | — | 179,339 | — |
| Accrued compensated absences | — | 555 | — | 560 | — | — |
| Voluntary termination benefits payable | 651 | 94 | — | 1,423 | 8,015 | — |
| Capital leases | — | — | — | — | 146 | — |
| Other long-term liabilities | — | — | — | — | — | — |
| Total liabilities | 32,261 | 5,742 | 602,781 | 2,678 | 426,154 | 75 |
| Deferred inflows of resources: | | | | | | |
| Service concession arrangements | — | — | — | — | — | — |
| Total liabilities and deferred inflows of resources | 32,261 | 5,742 | 602,781 | 2,678 | 426,154 | 75 |
| **Net Position:** | | | | | | |
| Net Investment in capital assets | 2,694 | 83,423 | 111,358 | 178 | 393,732 | — |
| Restricted for: | | | | | | |
| Trust – nonexpendable | — | — | — | — | — | — |
| Capital projects | — | 1,085 | 4,352 | — | — | — |
| Debt service | — | — | 53,832 | — | 19,577 | — |
| Student loans and other educational purpose | — | 1,023 | — | 5,320 | — | — |
| Other specified purposes | 85,532 | — | — | — | — | — |
| Unrestricted (deficit) | 121,287 | (4,102) | 24,497 | 4,631 | (76,046) | 9,467 |
| Total net position (deficit) | $ 209,513 | 81,429 | 194,039 | 10,129 | 337,263 | 9,467 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2014

(In thousands)

| | Puerto Rico Land Administration | Puerto Rico and Municipal Islands Maritime Transport Authority | Puerto Rico Metropolitan Bus Authority | Puerto Rico Municipal Finance Agency | Puerto Rico Ports Authority | Puerto Rico Public Broadcasting Corporation |
|---|---:|---:|---:|---:|---:|---:|
| Assets: | | | | | | |
| Cash and cash equivalents in commercial banks | $ 791 | 1,373 | 2,756 | — | 2,569 | $ 1,950 |
| Cash and cash equivalents in governmental banks | 22,782 | — | 4,188 | 3,333 | 2,042 | — |
| Investments | 26,654 | — | — | — | — | — |
| Collateral from securities lending transactions | | | | | | |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | — |
| Intergovernmental | — | 17 | — | — | — | 97 |
| Accounts | 343 | 51 | 2,442 | — | 31,014 | 267 |
| Loans and advances | — | — | — | — | — | — |
| Accrued interest | — | — | — | — | — | — |
| Other governmental entities | 815 | 288 | — | — | — | 179 |
| Other | — | — | 11 | — | 271 | 29 |
| Due from – net: | | | | | | |
| Primary government | — | — | 1,600 | — | — | — |
| Component units | 1,306 | — | 3,938 | — | 7,603 | — |
| Inventories | — | 59 | 3,876 | — | — | — |
| Prepaid expenses | 817 | 2,285 | 1,355 | 43 | 5,008 | — |
| Other assets | — | — | 542 | 5,186 | 4,078 | 83 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | — | — | — | 16,520 | 5,965 | 1,486 |
| Cash and cash equivalents in governmental banks | 399 | — | — | — | 26,579 | — |
| Investments | — | — | — | 884,481 | 30,022 | — |
| Other restricted assets | — | — | — | 20,550 | 25,351 | — |
| Real estate held for sale or future development | 160,586 | — | — | — | — | — |
| Capital assets, not being depreciated | 30,312 | 1,069 | 2,500 | — | 427,483 | 83 |
| Capital assets, depreciable – net | 8,180 | 66,245 | 34,844 | — | 704,017 | 8,485 |
| Total assets | 252,985 | 71,387 | 58,052 | 930,113 | 1,272,002 | 12,659 |
| Deferred outflows of resources: | | | | | | |
| Loss on bonds refunding | — | — | — | 4,884 | 14,623 | — |
| Total assets and deferred outflows of resources | 252,985 | 71,387 | 58,052 | 934,997 | 1,286,625 | 12,659 |
| Liabilities: | | | | | | |
| Accounts payable and accrued liabilities | 1,069 | 10,116 | 12,538 | 569 | 77,381 | 2,979 |
| Deposits and escrow liabilities | 33,945 | — | — | 44,558 | 1,381 | — |
| Due to: | | | | | | |
| Primary government | 1,151 | 1,471 | 30,474 | — | 37,483 | — |
| Component units | — | 73,481 | 7,044 | — | 303,552 | — |
| Other governmental entities | 1,333 | 10,295 | 16,808 | 5,981 | 3,949 | — |
| Securities lending obligations and reverse repurchase agreements | | | | | | |
| Interest payable | — | — | — | 17,164 | 9,447 | — |
| Unearned revenue | 4,922 | — | — | — | 1,790 | — |
| Liability for automobile accident insurance, workmen's compensation, and medical claims | | | | | | |
| Liabilities payable within one year: | | | | | | |
| Notes payable | — | — | 32,042 | — | 2,923 | — |
| Bonds payable | — | — | — | 91,615 | 550 | — |
| Accrued compensated absences | 720 | 1,209 | 3,684 | — | — | 855 |
| Voluntary termination benefits payable | 403 | 347 | 1,016 | — | 2,522 | 431 |
| Capital leases | — | — | — | — | — | — |
| Other long-term liabilities | — | — | — | — | — | — |
| Liabilities payable after one year: | | | | | | |
| Notes payable | — | — | — | — | 10,432 | — |
| Commonwealth appropriation bonds | | | | | | |
| Bonds payable | — | — | — | 726,029 | 200,192 | — |
| Accrued compensated absences | — | 1,057 | 1,186 | — | — | 1,357 |
| Voluntary termination benefits payable | 3,038 | 3,596 | 7,268 | — | 26,534 | 4,119 |
| Capital leases | | | | | | |
| Other long-term liabilities | — | 212 | 10,490 | — | 2,696 | — |
| Total liabilities | 46,581 | 101,784 | 122,550 | 885,916 | 680,832 | 9,741 |
| Deferred inflows of resources: | | | | | | |
| Service concession arrangements | — | — | — | — | 605,404 | — |
| Total liabilities and deferred inflows of resources | 46,581 | 101,784 | 122,550 | 885,916 | 1,286,236 | 9,741 |
| Net Position: | | | | | | |
| Net Investment in capital assets | 8,181 | 67,314 | 37,344 | — | 653,548 | 8,568 |
| Restricted for: | | | | | | |
| Trust – nonexpendable | | | | | | |
| Capital projects | — | — | — | — | 87,917 | — |
| Debt service | — | — | — | 90,833 | — | — |
| Student loans and other educational purpose | | | | | | |
| Other specified purposes | 399 | — | — | — | — | 1,485 |
| Unrestricted (deficit) | 197,824 | (97,711) | (101,842) | (41,752) | (741,076) | (7,135) |
| Total net position (deficit) | $ 206,404 | (30,397) | (64,498) | 49,081 | 389 | 2,918 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2014

(In thousands)

| | Puerto Rico Public Private Partnerships Authority | Puerto Rico School of Plastic Arts | Puerto Rico Telephone Authority | Puerto Rico Tourism Company | Puerto Rico Trade and Export Company | Solid Waste Authority |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ — | 16 | — | 9,756 | 2,907 | — |
| Cash and cash equivalents in governmental banks | 584 | 14 | 5,161 | 40,255 | 7,214 | 3,991 |
| Investments | — | — | — | 40,255 | — | 18,583 |
| Collateral from securities lending transactions | — | — | — | — | — | — |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | — |
| Intergovernmental | — | — | — | — | — | 159 |
| Accounts | — | 132 | — | 9,794 | 1,749 | — |
| Loans and advances | — | — | — | 1,200 | — | — |
| Accrued interest | — | — | 1 | — | 3,414 | — |
| Other governmental entities | — | — | — | 877 | 433 | 1,334 |
| Other | — | — | — | 525 | — | 528 |
| Due from – net: | | | | | | |
| Primary government | — | — | — | — | — | 1,130 |
| Component units | — | — | — | — | — | — |
| Inventories | — | — | — | — | — | — |
| Prepaid expenses | — | — | — | 127 | 93 | — |
| Other assets | 40 | — | — | — | — | 556 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | — | 3 | — | — | 7,398 | — |
| Cash and cash equivalents in governmental banks | — | 597 | 11,979 | — | 1,276 | 9,361 |
| Investments | — | 2,407 | — | — | 251,426 | — |
| Other restricted assets | — | — | — | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — | — |
| Capital assets, not being depreciated | — | — | — | 12,542 | 60,275 | 21,797 |
| Capital assets, depreciable – net | 17 | 7,598 | — | 18,742 | 51,752 | 98,047 |
| Total assets | 641 | 10,767 | 11,980 | 98,979 | 387,937 | 155,486 |
| **Deferred outflows of resources:** | | | | | | |
| Loss on bonds refunding | — | — | — | 1,677 | — | — |
| Total assets and deferred outflows of resources | 641 | 10,767 | 11,980 | 100,656 | 387,937 | 155,486 |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | 2,637 | 958 | 14 | 35,918 | 3,713 | 3,911 |
| Deposits and escrow liabilities | — | — | — | — | — | — |
| Due to: | | | | | | |
| Primary government | — | — | — | 2,583 | — | — |
| Component units | — | — | — | 11,205 | 1,442 | 76,641 |
| Other governmental entities | 1,722 | — | — | — | — | 8,129 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — | — |
| Interest payable | — | — | — | 1,032 | 3,173 | 5,241 |
| Unearned revenue | — | — | — | 7,504 | — | — |
| Liability for automobile accident insurance, workmen's compensation, and medical claims | — | — | — | — | — | — |
| Liabilities payable within one year: | | | | | | |
| Notes payable | — | — | — | — | 541 | — |
| Bonds payable | — | — | — | — | — | — |
| Accrued compensated absences | 52 | 167 | — | 2,253 | 559 | 295 |
| Voluntary termination benefits payable | — | 120 | — | 646 | 353 | 464 |
| Capital leases | — | — | — | 68 | 53 | — |
| Other long-term liabilities | — | — | — | — | — | — |
| Liabilities payable after one year: | | | | | | |
| Notes payable | — | — | — | — | 265,511 | — |
| Commonwealth appropriation bonds | — | — | — | 45,298 | — | 7,821 |
| Bonds payable | — | — | — | — | — | — |
| Accrued compensated absences | — | 285 | — | 4,818 | 1,409 | 340 |
| Voluntary termination benefits payable | — | 202 | — | 6,144 | 2,005 | 5,210 |
| Capital leases | — | — | — | — | 96 | — |
| Other long-term liabilities | — | — | 6,754 | 50 | 4,593 | — |
| Total liabilities | 4,411 | 1,732 | 6,768 | 117,519 | 283,448 | 108,052 |
| **Deferred inflows of resources:** | | | | | | |
| Service concession arrangements | — | — | — | — | — | — |
| Total liabilities and deferred inflows of resources | 4,411 | 1,732 | 6,768 | 117,519 | 283,448 | 108,052 |
| **Net Position:** | | | | | | |
| Net Investment in capital assets | 17 | 7,598 | — | 31,216 | 97,401 | 45,817 |
| Restricted for: | | | | | | |
| Trust – nonexpendable | — | — | — | — | — | — |
| Capital projects | — | — | — | — | — | — |
| Debt service | — | — | — | 3,000 | — | — |
| Student loans and other educational purpose | — | 2,407 | — | — | — | — |
| Other specified purposes | — | — | — | — | 7,297 | 1,357 |
| Unrestricted (deficit) | (3,787) | (970) | 5,212 | (51,079) | (209) | 260 |
| Total net position (deficit) | $ (3,770) | 9,035 | 5,212 | (16,863) | 104,489 | 47,434 |

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2014

(In thousands)

| | University of Puerto Rico Comprehensive Cancer Center | Nonmajor Component Units Total |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents in commercial banks | $ 10,892 | 112,441 |
| Cash and cash equivalents in governmental banks | 774 | 117,893 |
| Investments | — | 1,166,304 |
| Collateral from securities lending transactions | — | 55,727 |
| Receivables – net: | | |
| Insurance premiums | — | 1,087 |
| Intergovernmental | 695 | 2,347 |
| Accounts | — | 96,927 |
| Loans and advances | — | 316,347 |
| Accrued interest | — | 16,336 |
| Other governmental entities | 773 | 22,300 |
| Other | — | 6,566 |
| Due from – net: | | |
| Primary government | — | 49,806 |
| Component units | — | 35,497 |
| Inventories | — | 15,269 |
| Prepaid expenses | 128 | 15,527 |
| Other assets | — | 35,801 |
| Restricted assets: | | |
| Cash and cash equivalents in commercial banks | 47 | 69,809 |
| Cash and cash equivalents in governmental banks | 395 | 108,434 |
| Investments | — | 1,294,779 |
| Other restricted assets | — | 52,932 |
| Real estate held for sale or future development | — | 161,433 |
| Capital assets, not being depreciated | 28,529 | 1,631,915 |
| Capital assets, depreciable – net | 20,662 | 2,198,603 |
| Total assets | 62,895 | 7,584,080 |
| **Deferred outflows of resources:** | | |
| Loss on bonds refunding | — | 21,184 |
| Total assets and deferred outflows of resources | 62,895 | 7,605,264 |
| **Liabilities:** | | |
| Accounts payable and accrued liabilities | 13,269 | 344,870 |
| Deposits and escrow liabilities | — | 503,814 |
| Due to: | | |
| Primary government | — | 104,182 |
| Component units | 33,029 | 1,204,322 |
| Other governmental entities | — | 89,131 |
| Securities lending obligations and reverse repurchase agreements | — | 45,690 |
| Interest payable | — | 79,164 |
| Deferred revenue | — | 69,457 |
| Liability for automobile accident insurance, workmen's compensation, and medical claims | — | 93,979 |
| Unearned revenue | | |
| Notes payable | — | 61,615 |
| Bonds payable | — | 112,460 |
| Accrued compensated absences | 298 | 31,000 |
| Voluntary termination benefits payable | — | 12,361 |
| Capital leases | — | 199 |
| Other long-term liabilities | — | 9,128 |
| Liabilities payable after one year: | | |
| Notes payable | — | 788,786 |
| Commonwealth appropriation bonds | — | 108,937 |
| Bonds payable | — | 1,520,619 |
| Accrued compensated absences | 88 | 24,363 |
| Voluntary termination benefits payable | — | 108,910 |
| Capital leases | — | 243 |
| Other long-term liabilities | — | 86,608 |
| Total liabilities | 46,684 | 5,399,838 |
| **Deferred inflows of resources:** | | |
| Service concession arrangements | — | 605,404 |
| Total liabilities and deferred inflows of resources | 46,684 | 6,005,242 |
| **Net Position:** | | |
| Net Investment in capital assets | 21,005 | 2,074,227 |
| Restricted for: | | |
| Trust – nonexpendable | — | — |
| Capital projects | 443 | 299,207 |
| Debt service | — | 167,242 |
| Student loans and other educational purpose | — | 8,750 |
| Other specified purposes | — | 169,781 |
| Unrestricted (deficit) | (5,237) | (1,119,185) |
| Total net position (deficit) | $ 16,211 | 1,600,022 |

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Activities

Year ended June 30, 2014

(In thousands)

| | Expenses | Program revenue: Charges for services | Program revenue: Operating grants and contributions | Program revenue: Capital grants and contributions | Net revenues (expenses) and changes in net position | Payments from (to) primary government | Payments from (to) other component units | Grants and contributions not restricted to specific programs | Interest and investment earnings | Excise taxes and others | Change in net position | Net position beginning of year | Correction of errors and adoption of new accounting pronouncements (note 3 to financial statements) | Net position (deficit)—beginning of year, as adjusted or restated | Net position (deficit) end of year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agricultural Enterprises Development Administration | $ 212,485 | 109,734 | — | 2,022 | (100,729) | 84,472 | — | 45 | 1,247 | — | (14,965) | (97,017) | 3,227 | (93,790) | (108,755) |
| Automobile Accidents Compensation Administration | 84,319 | 84,559 | — | 240 | 240 | (1,713) | — | — | 16,765 | — | 15,292 | 20,092 | — | 20,092 | 35,384 |
| Cardiovascular Center Corporation of Puerto Rico and the Caribbean | 89,139 | 82,648 | — | — | (6,491) | — | — | 70 | 2,879 | — | (3,542) | (36,273) | — | (36,273) | (39,815) |
| Company for the Integral Development of the "Península de Cantera" | 48,980 | — | 492 | — | (48,488) | 10,233 | — | 2 | 60 | — | (38,193) | 6,829 | — | 6,829 | (31,364) |
| Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico | 1,130 | 652 | — | — | (478) | 485 | — | — | — | — | 7 | 600 | — | 600 | 607 |
| Corporation for the "Caño Martín Peña" Enlace Project | 7,201 | — | 231 | — | (6,970) | 4,088 | — | — | 2 | — | (2,877) | 5,980 | — | 5,980 | 3,103 |
| Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico | 2,206 | 512 | — | — | (1,694) | 3,689 | — | — | — | 61 | 2,056 | 13,455 | — | 13,455 | 15,511 |
| Culebra Conservation and Development Authority | 561 | 258 | — | — | (303) | 313 | — | — | — | — | 10 | 709 | — | 709 | 719 |
| Economic Development Bank for Puerto Rico | 52,944 | 51,125 | — | 4,816 | 2,997 | — | — | — | 2,481 | 437 | 5,915 | 160,082 | — | 160,082 | 165,997 |
| Employment and Training Enterprises Corporation | 1,760 | 1,147 | — | — | (613) | — | — | — | — | 17 | (596) | (1,905) | — | (1,905) | (2,501) |
| Farm Insurance Corporation of Puerto Rico | 6,232 | 1,947 | 1,107 | — | (3,178) | — | — | — | 50 | — | (3,128) | 7,186 | — | 7,186 | 4,058 |
| Fine Arts Center Corporation | 7,333 | 2,303 | — | — | (5,030) | 4,423 | — | — | 9 | — | (598) | 17,814 | — | 17,814 | 17,216 |
| Institute of Puerto Rican Culture | 20,035 | — | 658 | 1,373 | (18,004) | 16,180 | — | — | — | — | (1,824) | 63,380 | — | 63,380 | 61,556 |
| Institutional Trust of the National Guard of Puerto Rico | 28,723 | 4,170 | — | — | (24,553) | — | — | — | — | — | (24,553) | 84,919 | (422) | 84,497 | 59,944 |
| Land Authority of Puerto Rico | 24,561 | 9,317 | — | — | (15,244) | 14,146 | — | — | 406 | 737 | (356) | 14,933 | — | 14,933 | 14,978 |
| Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | 2,896 | 464 | 1,130 | — | (1,302) | 900 | — | — | — | 123 | (279) | 39 | — | 39 | (240) |
| Musical Arts Corporation | 8,882 | 451 | — | — | (8,431) | 7,939 | — | — | 95 | 312 | (85) | (4,721) | — | (4,721) | (4,806) |
| National Parks Company of Puerto Rico | 40,036 | 8,967 | — | 955 | (30,114) | 24,213 | — | — | 90 | 105 | (5,706) | 135,689 | 373 | 136,062 | 130,356 |
| Port of the Americas Authority | 761 | — | — | — | (761) | 17,670 | — | — | — | — | 16,909 | 93,680 | — | 93,680 | 110,589 |
| Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives | 11,779 | 23,097 | 1,589 | — | 12,907 | — | — | — | (534) | — | 12,373 | 197,140 | — | 197,140 | 209,513 |
| Puerto Rico and Municipal Islands Transport Authority | 52,017 | 5,200 | 231 | 11,414 | (35,172) | 26,227 | — | — | — | — | (8,945) | (28,484) | 7,032 | (21,452) | (30,397) |
| Puerto Rico Conservatory of Music Corporation | 13,184 | 3,045 | — | 25 | (10,114) | 12,436 | — | 926 | 3 | 75 | 3,346 | 78,083 | — | 78,083 | 81,429 |
| Puerto Rico Convention Center District Authority | 77,922 | 26,194 | — | — | (51,728) | 13,767 | 34,809 | — | 303 | 1,281 | (1,568) | 198,727 | (3,120) | 195,607 | 194,039 |
| Puerto Rico Council on Education | 28,634 | 1,260 | 2,426 | — | (24,948) | 27,955 | — | — | 47 | 94 | 3,148 | 6,981 | — | 6,981 | 10,129 |
| Puerto Rico Industrial Development Company | 85,582 | 61,717 | — | 44,405 | 20,540 | — | — | — | 1,282 | 1,662 | 23,484 | 315,373 | (1,994) | 313,779 | 337,263 |
| Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority | 26 | — | — | — | (26) | — | — | — | 10 | — | (16) | 9,483 | — | 9,483 | 9,467 |
| Puerto Rico Land Administration | 9,754 | 11,796 | — | — | 2,042 | — | — | — | 335 | — | 2,377 | 204,027 | — | 204,027 | 206,404 |
| Puerto Rico Metropolitan Bus Authority | 75,702 | 4,862 | 14,858 | — | (55,982) | 51,902 | — | — | — | — | (4,080) | (41,974) | (18,444) | (60,418) | (64,498) |
| Puerto Rico Municipal Finance Agency | 39,778 | — | — | — | (39,778) | — | — | — | 20,965 | 1,525 | (17,288) | 70,057 | (3,688) | 66,369 | 49,081 |
| Puerto Rico Ports Authority | 236,527 | 101,091 | 17,018 | — | (118,418) | 2,726 | — | — | 63 | 815 | (114,814) | 133,316 | (18,113) | 115,203 | 389 |
| Puerto Rico Public Broadcasting Corporation | 24,080 | 3,004 | — | — | (21,076) | 14,002 | — | 2,252 | 5 | 415 | (4,402) | 7,787 | (467) | 7,320 | 2,918 |
| Puerto Rico Public Private Partnerships Authority | 7,260 | — | — | — | (7,260) | 102 | — | — | 3 | — | (7,155) | 3,385 | — | 3,385 | (3,770) |
| Puerto Rico School of Plastic Arts | 6,572 | 900 | 2,522 | — | (3,150) | 2,431 | — | — | 257 | — | (462) | 8,910 | 587 | 9,497 | 9,035 |
| Puerto Rico Telephone Authority | 90 | — | — | — | (90) | — | — | — | 12 | — | (78) | 5,290 | — | 5,290 | 5,212 |
| Puerto Rico Tourism Company | 106,040 | 158,368 | — | — | 52,328 | (14,919) | (99,356) | — | 397 | 76,387 (1) | 14,837 | (29,336) | (2,364) | (31,700) | (16,863) |
| Puerto Rico Trade and Export Company | 41,315 | 17,025 | 3,000 | — | (21,290) | 9,216 | — | 2,855 | 16,867 | 666 | (902) | 105,391 | — | 105,391 | 104,489 |
| Solid Waste Authority | 23,296 | 3,014 | — | — | (20,282) | 9,216 | — | — | 281 | — | (10,785) | 58,219 | — | 58,219 | 47,434 |
| State Insurance Fund Corporation | | | | | | | | | | | | | | | |
| University of Puerto Rico Comprehensive Cancer Center | 6,597 | — | 1,765 | 5 | (4,827) | 5,000 | — | — | — | — | 173 | 16,038 | — | 16,038 | 16,211 |
| Total nonmajor component units | $ 1,486,339 | 778,827 | 47,027 | 65,015 | (595,470) | 337,903 | (64,547) | 6,035 | 60,369 | 88,841 | (166,869) | 1,803,884 | (36,993) | 1,766,891 | 1,600,022 |

(1)  Amount includes $69,999 of excise taxes.

See accompanying independent auditors' report.

**COMMONWEALTH OF PUERTO RICO**

Basic Financial Statements
and Required Supplementary Information

June 30, 2015

(With Independent Auditors' Report Thereon)

CONFIDENTIAL

CW_STAY0009784

# BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION

### Fiscal Year Ended June 30, 2015



### Commonwealth of Puerto Rico

### Honorable Ricardo Rosselló Nevares
### Governor

*Prepared by:*

### Puerto Rico Department of the Treasury

### Raúl Maldonado Gautier, CPA, ESQ.
*Secretary of the Treasury*

### Omar E. Rodríguez Pérez, CPA
*Undersecretary of Central Accounting*

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

| | Page(s) |
|---|---|
| Independent Auditors' Report | 1–13 |
| Management's Discussion and Analysis (Unaudited) | 14–38 |
| Basic Financial Statements: | |
|     Government-Wide Financial Statements: | |
|         Statement of Net Position | 39–40 |
|         Statement of Activities | 41–42 |
|     Fund Financial Statements: | |
|     Governmental Funds: | |
|         Balance Sheet | 43 |
|         Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Position | 44 |
|         Statement of Revenue, Expenditures, and Changes in Fund Balances | 45 |
|         Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances – Governmental Funds to the Statement of Activities | 46 |
|     Proprietary Funds: | |
|         Statement of Net Position | 47 |
|         Statement of Revenues, Expenses, and Changes in Fund Net Position | 48 |
|         Statement of Cash Flows | 49–50 |
|     Fiduciary Funds: | |
|         Statement of Fiduciary Net Position | 51 |
|         Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds | 52 |
|     Discretely Presented Component Units: | |
|         Combining Statement of Net Position | 53–54 |

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

|  | Page(s) |
|---|---|
| Combining Statement of Activities | 55 |
| Notes to Basic Financial Statements | 56–340 |
| Required Supplementary Information: | |
| Schedule of Changes in the Commonwealth's Net Pension Liability for Single-Employer Pension Plans | 342 |
| Schedule of the Commonwealth's Proportionate Share of the Net Pension Liability of the Cost-Sharing Multiple-Employer Pension Plan | 342 |
| Schedule of Employers' Contributions - All Pension Plans | 343 |
| Schedule of Actuarial Methods and Assumptions - All Pension Plans | 344 |
| Schedule of Funding Progress for the Postemployment Healthcare Plans | 345 |
| Schedule of Employers' Contributions for the Postemployment Healthcare Plans | 346 |
| Schedule of Revenue and Expenditures – Budget and Actual – Budgetary Basis – General Fund | 347 |
| Notes to Required Supplementary Information | 348–351 |
| Combining and Individual Fund financial Statements and Schedules | |
| General Fund: | |
| General Fund | 353 |
| Schedule of Expenditures by Agency – Budget and Actual – Budgetary Basis – General Fund | 354–356 |
| Nonmajor Governmental Funds: | |
| Nonmajor Governmental Funds | 357–359 |
| Combining Balance Sheet | 360 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Balances | 361 |
| Nonmajor Proprietary Funds: | |
| Nonmajor Proprietary Funds | 362 |

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

|  | Page(s) |
|---|---|
| Combining Statement of Net Position | 363 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Net Position | 364 |
| Combining Statement of Cash Flows | 365 |
| Fiduciary Funds: | |
| Fiduciary Funds | 366–367 |
| Combining Statement of Fiduciary Net Position – Pension Trust Funds | 368 |
| Combining Statement of Changes in Fiduciary Net Position – (and Other Employee Benefit) Trust Funds | 369 |
| Combining Statement of Changes in Assets and Liabilities – Agency Funds | 370 |
| Nonmajor Discretely Presented Component Units: | |
| Nonmajor Discretely Presented Component Units | 371 |
| Combining Statement of Net Position | 372–378 |
| Combining Statement of Activities | 379 |

CONFIDENTIAL



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

**Independent Auditors' Report**

The Honorable Governor and Legislature
  Commonwealth of Puerto Rico
  San Juan, Puerto Rico

We have audited the accompanying financial statements of the Governmental Activities, Aggregate Discretely Presented Component Units, General Fund, Debt Service Fund, COFINA Special Revenue Fund, COFINA Debt Service Fund, Unemployment Insurance Fund, Lotteries Fund, Puerto Rico Medical Services Administration Fund, and the Puerto Rico Health Insurance Administration Fund of the Commonwealth of Puerto Rico (the Commonwealth) as of and for the year ended June 30, 2015, and the related notes to the basic financial statements. We were also engaged to audit the accompanying financial statements of the Business-Type Activities, the Puerto Rico Water Pollution Control Revolving Fund, and the Aggregate Remaining Fund Information of the Commonwealth as of and for the year ended June 30, 2015, and the related notes to the basic financial statements. The financial statements described in this paragraph collectively comprise the Commonwealth's basic financial statements as listed in the Table of Contents.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of the following entities and funds:

* *Governmental Activities*

    - Corporation for the Development of the Arts, Science, and Film Industry of Puerto Rico, which represents 0.43% and 0.00% of the total assets and revenues, respectively, of the General Fund.

    - Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico, which represents 0.04% and 0.00% of the total assets and revenues, respectively, of the General Fund.

    - Labor Development Administration, which represents 0.24% and 0.30% of the total assets and revenues, respectively, of the General Fund.

    - Office of Legislative Services, which represents 0.44% and 0.00% of the total assets and revenues, respectively, of the General Fund.

    - Superintendency of the Capitol Building, which represents 0.74% and 0.01% of the total assets and revenues, respectively, of the General Fund.

    - Puerto Rico House of Representatives, which represents 0.43% and 0.00% of the total assets and revenues, respectively, of the General Fund.

KPMG LLP is a Delaware limited liability partnership and the U.S. member
firm of the KPMG network of independent member firms affiliated with
KPMG International Cooperative ("KPMG International"), a Swiss entity.



- Puerto Rico Senate, which represents 0.57% and 0.00% of the total assets and revenues, respectively, of the General Fund.
- National Parks Company of Puerto Rico, which represents 0.36% and 0.05% of the total assets and revenues, respectively, of the General Fund.
- Puerto Rico Public Housing Administration, which represents 15.20% and 2.12% of the total assets and revenues, respectively, of the General Fund.
- Puerto Rico Maritime Shipping Authority, which is a non-major governmental fund that represents 0.01% and 0.00% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.
- Special Communities Perpetual Trust special revenue and debt service funds, which are a non-major governmental funds that collectively represent 0.11% and 0.07% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.
- Public Buildings Authority, which is a non-major governmental fund that represents 4.84% and 2.17% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.
- University of Puerto Rico Comprehensive Cancer Center, which is a non-major governmental fund that represents 0.21% and 0.10% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

These entities and funds collectively represent 51.63% and 5.21% of the total assets and revenues, respectively, of the Governmental Activities.

* *Other Entities and Funds*

- Unemployment Insurance Fund, which is a major enterprise fund.
- The Additional Lottery System, which represents 55.72% and 54.99% of the total assets and revenues, respectively, of the Lotteries Fund, which is a major enterprise fund.
- Puerto Rico Health Insurance Administration, which is a major enterprise fund.
- Puerto Rico Medical Services Administration, which is a major enterprise fund.
- The Governing Board of 9-1-1 Services, which is a non-major enterprise fund that represents 0.35% and 1.27% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.
- The Puerto Rico System of Annuities and Pensions for Teachers, which represents 21.59% and 23.55% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

* *Discretely Presented Component Units*

- The discretely presented component units listed in note 1(c), except for those considered unaudited as discussed under "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities and Aggregate Discretely Presented Component Units".

These entities collectively represent 79.66% and 66.10% of the total assets and revenues, respectively, of the Aggregate Discretely Presented Component Units.

Those financial statements were audited by other auditors, whose reports thereon have been furnished to us, and our opinions, insofar as they relate to the amounts included for the entities and funds indicated above, are based solely on the reports of the other auditors.

2



We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement. Because of the matter described in the "Basis for Disclaimer of Opinions on Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information – Basis for Disclaimer – Unaudited Entities and Funds" paragraphs, however, we were not able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion on the Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

Except for the matter described in the "Basis for Disclaimer of Opinions on Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information – Basis for Disclaimer – Unaudited Entities and Funds" paragraphs, we believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our modified and unmodified audit opinions.

**Summary of Opinions**

| Opinion Unit | Type of Opinion |
|---|---|
| Governmental Activities | Qualified |
| Business-Type Activities | Disclaimer |
| Aggregate Discretely Presented Component Units | Qualified |
| General Fund | Unmodified |
| Debt Service Fund | Unmodified |
| COFINA Special Revenue Fund | Unmodified |
| COFINA Debt Service Fund | Unmodified |
| Unemployment Insurance Fund | Unmodified |
| Lotteries Fund | Unmodified |
| Puerto Rico Medical Services Administration Fund | Adverse |
| Puerto Rico Water Pollution Control Revolving Fund | Disclaimer |

3

CONFIDENTIAL

CW_STAY0009791



| Opinion Unit | Type of Opinion |
|---|---|
| Puerto Rico Health Insurance Administration Fund | Qualified |
| Aggregate Remaining Fund Information | Disclaimer |

**Basis for Disclaimer of Opinions on Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information**

*Basis for Disclaimer – Unaudited Entities and Funds*

As discussed in note 5 to the basic financial statements, the Commonwealth determined that a custodial credit loss of deposits held at the Government Development Bank for Puerto Rico (GDB) should have been recognized as of June 30, 2015. The following entities and funds, which were audited by other auditors, did not evaluate the potential for custodial credit loss of deposits at the GDB in their respective separately issued financial statements. Because such loss could have been material to those financial statements, we were not able to rely on the other auditors' reports. Accordingly, we considered the financial statement amounts for the following entities and funds included in the financial statements of the Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information of the Commonwealth to be unaudited.

∗ *Business-Type Activities and Puerto Rico Water Pollution Control Revolving Fund*

 – Puerto Rico Water Pollution Control Revolving Fund

 This fund represents 100% of the total assets and revenues of the Puerto Rico Water Pollution Control Revolving Fund, which is reported as a major enterprise fund.

 This fund represents 25.58% and 2.28% of the total assets and revenues, respectively, of the Business-Type Activities.

∗ *Aggregate Remaining Fund Information*

 – Puerto Rico Infrastructure Financing Authority

 – The Children's Trust

 – The Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund

 – The Disability Insurance Fund

 – The Drivers' Insurance Fund

 These entities and funds collectively represent 15.17% and 3.68% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

*Departures from U.S. Generally Accepted Accounting Principles Identified for Entities and Funds Subject to Disclaimer*

As discussed in note 17 to the basic financial statements, the following entities and funds, which were audited by other auditors, did not adopt the provisions of GASB Statement No. 68, *Accounting and Financial Reporting for Pensions* (GASB Statement No. 68), in their respective separately issued financial statements. In accordance with GASB Statement No. 68, these entities and funds should have recorded their proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the

4



Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, the amounts included in the financial statements of the Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information of the Commonwealth do not include the pension amounts for the following entities and funds as required by GASB Statement No. 68. Management's unaudited estimate of the unrecorded net pension liability for each opinion unit is disclosed in notes 17(g) and 17(h) to the basic financial statements.

* *Business-Type Activities*

    - Puerto Rico Medical Services Administration

    - Puerto Rico Health Insurance Administration

    - The Additional Lottery System

    - The Governing Board of 9-1-1 Services

* *Aggregate Remaining Fund Information*

    - Public Buildings Authority

    - Puerto Rico Infrastructure Financing Authority

The Puerto Rico Infrastructure Financing Authority, a blended component unit reported within non-major governmental funds, owns COFINA bonds as an investment. As a result of the blended presentation of the Puerto Rico Infrastructure Financing Authority, the investment in COFINA bonds are presented as an interfund loan due from the COFINA Debt Service Fund. The Commonwealth evaluated its ability to repay the COFINA bonds (interfund loan) due to the non-major governmental funds. However, we believe the Commonwealth's analysis did not adequately consider all relevant factors that could adversely affect the collectability of the interfund receivable balance of $218.4 million as of June 30, 2015, including the Commonwealth's recurring deficits, negative financial position, deterioration of economic conditions, and limited ability to access credit markets. As a result, we believe that such interfund loan is overstated and is not reported at its net realizable value as of June 30, 2015, as required by U.S. generally accepted accounting principles. The amount by which this overstatement would affect the assets, fund balances, and revenues of the Aggregate Remaining Fund Information has not been determined.

**Disclaimer of Opinions**

Because of the significance of the matters described in the "Basis for Disclaimer of Opinions on Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information" paragraphs above, we have not been able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion on the financial statements of the Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information of the Commonwealth.

**Basis for Adverse Opinion for Puerto Rico Medical Services Administration Fund**

*Basis for Adverse Opinion – Unrecorded Pension Amounts*

As discussed in note 17 to the basic financial statements, the Puerto Rico Medical Services Administration, which was audited by other auditors, did not adopt the provisions of GASB Statement No. 68 in its separately issued financial statements. In accordance with GASB Statement No. 68, the Puerto Rico Medical Services Administration should have recorded its proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, the amounts included in the financial statements of the Puerto Rico Medical Services Administration Fund of the Commonwealth do not include the pension amounts as required by GASB Statement No. 68. Management's

5



unaudited estimate of the unrecorded net pension liability for each opinion unit is disclosed in note 17(g) to the basic financial statements.

**Adverse Opinion**

In our opinion, based on the audit procedures we performed and the report of other auditors, because of the significance of the matter discussed in the "Basis for Adverse Opinion for Puerto Rico Medical Services Administration Fund" paragraph, the financial statements referred to above do not present fairly the financial position of the Puerto Rico Medical Services Administration Fund as of June 30, 2015, or the changes in financial position and cash flows thereof for the year then ended in accordance with U.S. generally accepted accounting principles.

**Basis for Qualified Opinions (Scope Limitation) for Governmental Activities and Aggregate Discretely Presented Component Units**

*Basis for Qualified Opinions – Unaudited Entities and Funds*

As discussed in note 5 to the basic financial statements, the Commonwealth determined that a custodial credit loss of deposits at the GDB should have been recognized as of June 30, 2015. The following entities and funds, which were audited by other auditors, did not evaluate the potential for custodial credit loss of deposits at the GDB in their respective separately issued financial statements. Because such loss could have been material to those financial statements, we were not able to rely on the other auditors' reports. Accordingly, we considered the financial statement amounts for the following entities and funds included in the financial statements of the Governmental Activities and Aggregate Discretely Presented Component Units of the Commonwealth to be unaudited.

\* *Governmental Activities*

- Office of the Improvement of Public Schools
- Puerto Rico Housing Finance Department – Sales and Acquisition Fund
- Puerto Rico Infrastructure Financing Authority
- The Children's Trust

These entities and funds collectively represent 4.27% and 0.49% of the total assets and revenues, respectively, of the Governmental Activities.

\* *Aggregate Discretely Presented Component Units*

- State Insurance Fund Corporation
- Agricultural Enterprises Development Administration
- Farm Insurance Corporation of Puerto Rico
- Institute of Puerto Rican Culture
- Land Authority of Puerto Rico
- Musical Arts Corporation
- Puerto Rico and Municipal Islands Maritime Transportation Authority
- Puerto Rico Council of Education
- Puerto Rico Energy Commission
- Puerto Rico Industrial Development Corporation

6



- Puerto Rico Integrated Transit Authority

- Puerto Rico Land Administration

- Puerto Rico Science, Technology and Research Trust

- Puerto Rico Telephone Authority

- Puerto Rico Tourism Company

- Puerto Rico Trade and Export Company

- Solid Waste Authority

These entities and funds collectively represent 9.09% and 11.31% of the total assets and revenues, respectively, of the Aggregate Discretely Presented Component Units.

*Basis for Qualified Opinions – Unaudited Pension Amounts*

The funds listed below, which were audited by other auditors, did not adopt the provisions of GASB Statement No. 68 in their respective separately issued financial statements. In accordance with GASB Statement No. 68, these funds should have recorded their proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. However, upon adoption of the provisions of GASB Statement No. 68, the Commonwealth recorded within Governmental Activities such proportionate share of the collective pension amounts, which were not subject to our audit procedures, or the audit procedures of the other auditors. Accordingly, we were not able to obtain sufficient appropriate audit evidence about the pension amounts included in the financial statements for the following funds which are included in the financial statements of the Governmental Activities of the Commonwealth.

\* *Governmental Activities*

- Corporation for the Development of the Arts, Science, and Film Industry of Puerto Rico,

- Office of Legislative Services

- Superintendency of the Capitol Building

- Puerto Rico House of Representatives

- Puerto Rico Senate

- Puerto Rico Public Housing Administration

- National Parks Company of Puerto Rico

The net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense included for these funds in the financial statements of the Governmental Activities of the Commonwealth were $194.8 million, $11.2 million, $73.9 million, and $485.8 thousand, respectively.

The entities listed below, which were audited by other auditors, adopted the provisions of GASB Statement No. 68 in their respective separately issued financial statements. However, based on the lack of availability of audited pension amounts from the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico at the time of the respective issuance of their financial statements, the other auditors qualified their opinions due to the lack of sufficient appropriate audit evidence on the pension amounts, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, we were not able to obtain sufficient appropriate audit evidence about the pension amounts included in the

7



financial statements for the following entities which are included in the financial statements of the Aggregate Discretely Presented Component Units of the Commonwealth.

∗  *Aggregate Discretely Presented Component Units*

- State Insurance Fund Corporation
- Agricultural Enterprises Development Administration
- Automobile Accidents Compensation Administration
- Culebra Conservation and Development Authority
- Land Authority of Puerto Rico

The net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense included for these entities in the financial statements of the Aggregate Discretely Presented Component Units of the Commonwealth were $1,815.7 million, $100.9 million, $14.3 million, and $103.9 million, respectively.

**Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units, and Puerto Rico Health Insurance Administration Fund**

*Basis for Qualified Opinions – Unrecorded Pension Amounts*

As discussed in note 17 to the basic financial statements, the entities and funds listed below, which were audited by other auditors, did not adopt the provisions of GASB Statement No. 68 in their respective separately issued financial statements. In accordance with GASB Statement No. 68, the following entities and funds should have recorded their proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, the amounts included in the financial statements of the Governmental Activities, Aggregate Discretely Presented Component Units, and the Puerto Rico Health Insurance Administration Fund of the Commonwealth do not include the pension amounts for the following entities and funds as required by GASB Statement No. 68. Management's unaudited estimate of the unrecorded net pension liability for each opinion unit is disclosed in notes 17(g) and 17(h) to the basic financial statements.

∗  *Governmental Activities*

- Public Buildings Authority
- Puerto Rico Infrastructure Financing Authority
- Puerto Rico Maritime Shipping Authority

∗  *Aggregate Discretely Presented Component Units*

- Government Development Bank for Puerto Rico
- Puerto Rico Aqueducts and Sewer Authority
- Puerto Rico Highways and Transportation Authority
- Agricultural Insurance Corporation
- Cardiovascular Center Corporation of Puerto Rico and the Caribbean
- Company for the Integral Development of the "Península de Cantera"

8



- Corporation for the "Caño Martin Peña" Enlace Project
- Corporation for the Cooperatives Supervision and Insurance
- Economic Development Bank for Puerto Rico
- Fine Arts Center Corporation
- Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority
- Institutional Trust of the National Guard of Puerto Rico
- Institute of Puerto Rican Culture
- Puerto Rico Land Administration
- Metropolitan Bus Authority
- Musical Arts Corporation
- Puerto Rico Conservatory of Music Corporation
- Puerto Rico Industrial Development Corporation
- Puerto Rico Ports Authority
- Puerto Rico Public Broadcasting Corporation
- Puerto Rico Public Private Partnerships Authority
- Puerto Rico School of Plastic Arts
- Puerto Rico Tourism Company
- Puerto Rico Trade and Export Company
- Solid Waste Authority
- Tourism Development Fund
- Counsel of Higher Education
- Maritime Transportation Authority

\* *Puerto Rico Health Insurance Administration Fund*

- Puerto Rico Health Insurance Administration

*Basis for Qualified Opinion – Inappropriate Discount Rate Used in Measurement of Net Pension Liability*

The financial statements of the Puerto Rico Electric Power Authority (PREPA), a discretely presented component unit of the Commonwealth, as of June 30, 2015 and for the year then ended were audited by other auditors, whose report thereon, dated April 20, 2018, included a "Basis for Qualification" paragraph stating that as part of the GASB Statement No. 68 implementation, PREPA incorrectly used actual instead of projected investment returns for certain periods subsequent to the measurement date in the calculation of its discount rate assumption used to estimate the net pension liability. Such error resulted in an overstatement of PREPA's net pension liability as of June 30, 2015 by an estimated amount ranging from approximately $76 million to $194 million, depending on the discount rate assumption ultimately used.

9



**Qualified Opinions**

In our opinion, based on our audit and the reports of other auditors, except for the possible effects of the matters described in the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities and Aggregate Discretely Presented Component Units" paragraphs and except for the effects of the matters described in the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units, and Puerto Rico Health Insurance Administration Fund" paragraphs, the financial statements referred to above present fairly, in all material respects, the financial position of the Governmental Activities, Aggregate Discretely Presented Component Units, and Puerto Rico Health Insurance Administration Fund as of June 30, 2015, and the respective changes in financial position and, where applicable, cash flows thereof for the year then ended in accordance with U.S. generally accepted accounting principles.

**Unmodified Opinions**

In our opinion, based on our audit and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the General Fund, Debt Service Fund, COFINA Special Revenue Fund, COFINA Debt Service Fund, Unemployment Insurance Fund, and Lotteries Fund as of June 30, 2015, and the respective changes in financial position and, where applicable, cash flows thereof for the year then ended in accordance with U.S. generally accepted accounting principles.

**Emphasis of Matters**

*Uncertainty about Ability to Continue as a Going Concern – Primary Government*

The accompanying basic financial statements have been prepared assuming that the Commonwealth will continue as a going concern. As discussed in note 2(a) to the basic financial statements, the Commonwealth has incurred recurring deficits, has a negative financial position, has experienced further deterioration of its economic condition, has not been able to access the credit markets, and has stated that substantial doubt exists about the Commonwealth's ability to continue as a going concern. Additionally, the Commonwealth is currently restructuring its obligations in an orderly fashion under Title III of the U.S. Congress Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). Management's evaluation of the events and conditions and management's plans regarding these matters are also described in note 2(a). The basic financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our disclaimer of opinions, modified opinions, and unmodified opinions, respectively, on the basic financial statements are not modified with respect to this matter.

*Uncertainty about Ability to Continue as a Going Concern – Retirement Systems*

The accompanying basic financial statements have been prepared assuming that the retirement systems of Commonwealth will continue as a going concern. As discussed in note 2(c) to the basic financial statements, the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, and the Puerto Rico System of Annuities and Pensions for Teachers are severely underfunded. In fiscal year 2018, each of the retirement systems sold most of their investments and started operating on a pay-as-you-go basis. Also, on May 3, 2017 and May 22, 2017, the Financial Oversight Board commenced cases for the Commonwealth and the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, respectively, by filing petitions for relief under Title III of PROMESA. Accordingly, the Commonwealth has stated in note 2(c) that substantial doubt exists about each of the retirement system's ability to continue as a going concern. The basic financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our disclaimer of opinions, modified opinions, and unmodified opinions, respectively, on the basic financial statements are not modified with respect to these matters.

CONFIDENTIAL

CW_STAY0009798



*Uncertainty about Ability to Continue as a Going Concern – Major Discretely Presented Component Units*

The accompanying basic financial statements have been prepared assuming that the major discretely presented financial component of the Commonwealth will continue as a going concern. As discussed in note 2(b) to the basic financial statements, the Commonwealth has stated that substantial doubt exists for the following major discretely presented component units to continue as a going concern. Management's evaluation of the events and conditions and management's plans in regard to these matters are described in note 2(b). The basic financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our disclaimer of opinions, modified opinions, and unmodified opinions, respectively, on the basic financial statements are not modified with respect to these matters.

* *Government Development Bank for Puerto Rico (GDB)*

   The Commonwealth and its component units have not been able to repay their loans from the GDB, which has significantly affected the GDB's liquidity and ability to repay its obligations. Also, on March 23, 2018, the GDB ceased its operations and is currently winding down in an orderly fashion under Title VI of PROMESA. These matters raise substantial doubt about the GDB's (including its blended component units) ability to continue as a going concern.

* *Puerto Rico Highways and Transportation Authority (PRHTA)*

   The financial statements of PRHTA as of June 30, 2015 and for the year then ended were audited by other auditors, whose report thereon, dated August 4, 2017, included an emphasis of matter paragraph related to PRHTA's ability to continue as a going concern. As stated in PRHTA's independent auditors' report, PRHTA has had significant recurring losses from operations and does not have sufficient funds available to fully repay its various obligations as they come due. Also, PRHTA filed on May 21, 2017 a form of bankruptcy petition under Title III of PROMESA.

* *Puerto Rico Electric Power Authority (PREPA)*

   The financial statements of PREPA as of June 30, 2015 and for the year then ended were audited by other auditors, whose report thereon, dated April 20, 2018, included an emphasis of matter paragraph related to PREPA's ability to continue as a going concern. As stated in PREPA's independent auditors' report, PREPA does not have sufficient funds available to fully repay its various obligations as they come due and has entered into a process to restructure its long-term debt. Also, on July 2, 2017, the Financial Oversight and Management Board for Puerto Rico created under the Puerto Rico Oversight, Management, and Economic Stability Act of June 30, 2016, at the request of PREPA, filed a petition under Title III of PROMESA in the United States District Court for the District of Puerto Rico.

* *Puerto Rico Aqueduct and Sewer Authority (PRASA)*

   The financial statements of PRASA as of June 30, 2015 and for the year then ended were audited by other auditors, whose report thereon, dated July 22, 2016, included an emphasis of matter paragraph related to PRASA's ability to continue as a going concern. As stated in PRASA's independent auditors' report, PRASA has had significant recurring operating losses, working capital deficiencies, credit downgrades, large non-discretionary capital expenditure requirements, and has not been able to access credit markets.

* *University of Puerto Rico (UPR)*

   The financial statements of UPR as of June 30, 2015 and for the year then ended were audited by other auditors, whose report thereon, dated September 7, 2016, included an emphasis of matter paragraph related to UPR's ability to continue as a going concern. As stated in UPR's independent auditors' report, UPR is highly dependent on the Commonwealth's appropriations to finance its operations.

CONFIDENTIAL

CW_STAY0009799



*Adoption of GASB Statement No. 68, Accounting and Financial Reporting for Pensions and GASB Statement No. 71, Pension Transition for Contributions Made Subsequent to the Measurement Date*

As discussed in notes 1(cc) and 17 to the basic financial statements, except as discussed in the "Basis for Disclaimer of Opinions on Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information" paragraphs, the "Basis for Adverse Opinion for Puerto Rico Medical Services Administration Fund" paragraphs, the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities and Aggregate Discretely Presented Component Units" paragraphs, and the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units, and Puerto Rico Health Insurance Administration Fund" paragraphs, the Commonwealth adopted the provisions of GASB Statement No. 68 and GASB Statement No. 71 as of July 1, 2014. Our opinions are not modified with respect to these matters.

**Other Matters**

*Required Supplementary Information*

U.S. generally accepted accounting principles require that the management's discussion and analysis on pages 14 through 38; the schedule of changes in the Commonwealth's net pension liability for single-employer pension plans and schedule of the Commonwealth's proportionate share of the net pension liability of the cost-sharing multiple-employer pension plan on page 342; the schedule of employers' contributions for all pension plans on page 343; the schedule of actuarial methods and assumptions for all pension plans on page 344; the schedules of funding progress for the postemployment healthcare plans on page 345; the schedule of employers' contributions for the postemployment healthcare plans on page 346; and the schedule of revenue and expenditures – budget and actual–budgetary basis – General Fund on page 347, be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context.

We were unable to apply certain limited procedures to the management's discussion and analysis in accordance with auditing standards generally accepted in the United States of America, due to the matters described in the "Basis for Disclaimer of Opinions on Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information" and the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities and Discretely Presented Component Units" paragraphs. Additionally, although our disclaimer of opinions, modified opinions, and unmodified opinions, respectively, on the basic financial statements are not affected, the financial statements amounts included in the management's discussion and analysis contain material departures from U.S. generally accepted accounting principles because they do not include pension amounts for certain entities and funds that did not adopt the provisions of GASB Statement No. 68. We do not express an opinion or provide any assurance on the information.

We have applied certain limited procedures to the schedule of changes in the Commonwealth's net pension liability for single-employer pension plans, the schedule of the Commonwealth's proportionte share of the net pension liability of the cost-sharing multiple-employer pension plan, the schedule of employers' contributions for all pension plans, the schedule of actuarial methods and assumptions for all pension plans, the schedules of funding progress for the postemployment healthcare plans, the schedule of employers' contributions for the postemployment healthcare plans, and the schedule of revenue and expenditures – budget and actual– budgetary basis – General Fund, in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. Although our disclaimer of opinions, modified opinions, and unmodified opinions, respectively, on the basic financial statements are not affected, the amounts included in the schedule of the Commonwealth's proportionate share

12

CW_STAY0009800



of the net pension liability of the cost-sharing multiple-employer pension plan and the schedule of employer's contributions and covered-employee payroll contain material departures from U.S. generally accepted accounting principles because they do not include the pension amounts for certain entities and funds that did not adopt the provisions of GASB Statement No. 68. We do not express an opinion or provide any assurance on the information.

*Supplementary Information*

We were engaged for the purpose of forming opinions on the financial statements that collectively comprise the Commonwealth's basic financial statements. The combining and individual fund financial statements and schedules listed in the accompanying table of contents are presented for the purpose of additional analysis and are not a required part of the basic financial statements. Because of the significance of the matters described above in the "Basis for Disclaimer of Opinions on Business-Type Activities, Puerto Rico Water Pollution Control Revolving Fund, and Aggregate Remaining Fund Information" paragraphs, the "Basis for Adverse Opinion for Puerto Rico Medical Services Administration Fund" paragraph, the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities and Aggregate Discretely Presented Component Units" paragraphs, and the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units, and Puerto Rico Health Insurance Administration Fund" paragraphs, it is inappropriate to and we do not express an opinion on the supplementary information referred to above.

*KPMG LLP*

June 29, 2018

Stamp No. E325027 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

13

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

**Management's Discussion and Analysis**

This management's discussion and analysis section (MD&A) provides a narrative overview and analysis of the financial activities of the Commonwealth of Puerto Rico (the Commonwealth) for the fiscal year ended June 30, 2015. The MD&A is intended to serve as an introduction to the Commonwealth basic financial statements, which have the following components: (1) government-wide financial statements, (2) fund financial statements, and (3) notes to the basic financial statements. The MD&A is designed to (a) assist the reader in focusing on significant matters, (b) provide an overview of the Commonwealth's financial activities, (c) present an overview of results for the General Fund on a budgetary basis, and (d) highlight individual fund matters. The following presentation is by necessity highly summarized, and therefore, in order to gain a thorough understanding of the Commonwealth's financial condition, the financial statements, notes, and required supplementary information should be reviewed in their entirety.

**Financial Highlights**

* The Commonwealth's Primary Government, which encompasses the Commonwealth's Governmental and Business-Type Activities, reported, in the government-wide financial statements, a net position (deficit) of approximately $67 billion at June 30, 2015, which was comprised of approximately $16.1 billion in total assets and approximately $2.3 billion in deferred outflows of resources, less approximately $84.4 billion in total liabilities and approximately $1 billion in deferred inflows of resources.

* The net position (deficit) of the Commonwealth's Primary Government increased by approximately $1 billion during fiscal year 2015. The net position (deficit) for Governmental Activities increased by approximately $1.1 billion and the net position for Business-Type Activities increased by $122.2 million during the fiscal year 2015.

* The Commonwealth's Governmental Activities had total revenue of approximately $17.2 billion for fiscal year 2015, which was lower than total expenses of approximately $177 billion. However, decrease of approximately $2.2 billion in total expenses is noted when compared to fiscal year 2014. The Commonwealth's Business-Type Activities had total revenue of approximately $3.3 billion for fiscal year 2015, which represented an increase of approximately $222 million when compared to fiscal year 2014.

* The Commonwealth's Primary Government had total expenses of approximately $21.5 billion in fiscal year 2015, which included expenses of approximately $3.8 billion incurred by Business-Type Activities, which represented a decrease of approximately $2.2 billion when compared to total expenses incurred during fiscal year 2014 (as restated).

* For fiscal year 2015, the total deficiency of revenue under expenditures and general obligation debt service payments in the General Fund (budgetary basis) for fiscal year 2015 was approximately $735 million. It consisted of the difference between total actual revenue of approximately $8.8 billion (excluding other financing sources), less the sum of total actual expenditures of approximately $8.7 billion and general obligation debt service payments of approximately $861 million (excluding other financing uses). The variance between the U.S. generally accepted accounting principles (U.S. GAAP) and budgetary basis deficits results from differences of accounting, entity, and perspective differences between budgetary reporting versus those established by U.S. GAAP and followed in these financial statements.

14

CW_STAY0009802

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

The Commonwealth's management believes that there is substantial doubt as to the ability of the Primary Government to continue as a going concern in accordance with Governmental Accounting Standards Board (GASB) Statement No. 56, *Codification of Accounting and Financial Reporting Guidance Contained in the AICPA Statements on Auditing Standards*. In addition, the Commonwealth's management believes that the pension trust funds, included as part of the fiduciary funds, carry a substantial risk of insolvency, if measures are not taken to significantly increase contributions to such funds. As a result of the fiscal difficulties faced by the Commonwealth, on May 3, 2017 the Financial Oversight and Management Board for Puerto Rico (Oversight Board), at the request of the Commonwealth, filed a petition for relief under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA). For additional information regarding going concern, uncertainties and liquidity risk, refer to Note 2.

**Reporting the Commonwealth as a Whole**

The Commonwealth, as a whole, consists of all departments, agencies, funds, functions, and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's financial reporting entity. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth is such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. As noted above, the Commonwealth's basic financial statements consist of four components: (i) government-wide financial statements, (ii) fund financial statements, (iii) component unit's financial statements, and (iv) notes to the basic financial statements. The fund financial statements include governmental, proprietary, and fiduciary types of funds that will be described later in this MD&A. The notes to the basic financial statements provide explanations and/or additional detail for all of the above types of financial statements and are considered an integral part of the financial statements.

15

CW_STAY0009803

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

The following table summarizes the major features of the basic financial statements.

| | Government-Wide Financial Statements | Fund Financial Statements | | |
|---|---|---|---|---|
| | | Governmental Funds | Proprietary Funds | Fiduciary Funds |
| Scope | Governmental activities, business type activities and discretely presented component units. | The activities of the Commonwealth that are not proprietary or fiduciary, including education, health, public safety services, among others. | Activities of the Commonwealth that operate similar to private businesses, including Lotteries. | Instances in which the Commonwealth is the trustee or agent for someone else's resources, such as the retirement plans for public employees. |
| Required financial statements | Statement of net position and statement of activities. | Balance sheet and statement of revenue, expenditures, and changes in fund balances. | Statement of net position; statement of revenue, expenses and changes in fund net position; and statement of cash flows. | Statement of fiduciary net position and statement of changes in fiduciary net position. |
| Accounting basis and measurement focus | Accrual basis and economic resources measurement focus. | Modified accrual basis and current financial resources measurement focus. | Accrual basis and economic resources measurement focus. | Accrual basis and economic resources measurement focus. |
| Type of asset/liability information | All assets and liabilities, both financial and capital, and both short-term and long-term. | Only assets expected to be used up and liabilities that come due during the year or soon thereafter; no capital assets or long-term obligations are included. | All assets and liabilities, both financial and capital, and both short-term and long-term. | All assets and liabilities, both financial and capital, and both short-term and long-term. |
| Type of inflow/outflow information | All revenue and expenses during the year, regardless of when cash is received or paid. | Revenue for which cash is received during the year or soon after the end of the year; expenditures when goods or services have been received and payment is due during the year or soon thereafter. | All revenue and expenses during the year, regardless of when cash is received or paid. | All revenue and expenses during the year, regardless of when cash is received or paid. |

16

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

**Government-Wide Financial Statements**

The government-wide financial statements provide readers a broad view of the Commonwealth's operations in a manner similar to a private-sector business. The statements provide both short and long-term information about the Commonwealth's financial position, which assists in assessing the Commonwealth's economic condition at the end of the fiscal year. These are prepared using the economic resources measurement focus and the full accrual basis of accounting. This means they follow methods that are similar to those used by most private businesses. They take into account all revenue and expenses connected with the fiscal year even if cash involved has not been received or paid.

The government-wide financial statements include two statements:

* *Statement of Net Position* – This statement presents all of the government's assets, liabilities, and deferred outflows and inflows of resources. Net position is the difference between (a) assets and deferred outflows of resources and (b) liabilities and deferred inflows of resources. Over time, increases or decreases in the Commonwealth's net position may serve as a useful indicator of whether the financial position of the Commonwealth is improving or deteriorating.

*Statement of Activities* – This statement presents information showing how the Primary Government's and its component units' net position changed during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenue and expenses are reported in this statement for some items that will not result in cash flows until future fiscal periods (such as uncollected taxes and earned but unused vacation leave). This statement also presents a comparison between direct expenses and program revenue for each function of the Commonwealth.

Although one can think of the Commonwealth's net position as one way to measure whether the Commonwealth's financial health is improving or deteriorating, one may also need to consider other nonfinancial factors, such as changes in the Commonwealth tax structure, population, employment, debt levels, fiscal conditions, economic factors, availability to external markets and the condition of the Commonwealth's roads, bridges and buildings, in order to assess the overall health of the Commonwealth.

In the statement of net position and the statement of activities, the operations of the Commonwealth are divided into the following activities:

* *Governmental Activities* – Most of the Commonwealth's basic services are reported here, including education, health, public housing and welfare, public safety, economic development, general government and interest on long-term debt. Federal grants (intergovernmental), personal and corporate income taxes, consumption and use taxes, business and other taxes, transfers from lottery revenues, and bond or loan proceeds finance most of these activities. Also included in Governmental Activities are nine blended component units, which are entities that, while legally separate from the Commonwealth, meet the blending criteria under GASB to be reported as part of the Primary Government.

* *Business-Type Activities* – These activities are normally intended to recover all or a significant portion of their costs through user fees and charges to external users of goods and services. These Business-Type Activities of the Commonwealth include the operations of the following major funds: the Unemployment Insurance Trust Fund, the Lotteries Fund, the Puerto Rico Health Insurance Administration (PRHIA) the Puerto Rico Medical Services Administration (PRMeSA) and the Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF).

17

CW_STAY0009805

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

***Discretely Presented Component Units*** – Although legally separate from the Commonwealth, these discretely presented component units are important to the Commonwealth because the Commonwealth is financially accountable for them or the nature and significance of their relationship with the Commonwealth are such that their exclusion would cause the Commonwealth's financial statements to be misleading or incomplete. Discretely presented component units, presented in a separate column in these basic financial statements, are discretely presented principally because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because such component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth. The Commonwealth classifies 43 separate legal entities as discretely presented component units, as disclosed in Note 1 to the basic financial statements.

The government-wide financial statements can be found immediately following this MD&A.

**Governmental and Proprietary Fund Financial Statements**

Financial statements prepared at the fund level provide additional details about the Commonwealth's financial position and activities. A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. The Commonwealth uses fund accounting to help ensure and demonstrate compliance with finance-related legal requirements. The fund financial statements focus on individual parts of the Commonwealth government, reporting the Commonwealth's operations in more detail than the government-wide financial statements. Information presented in the fund financial statements differs from the information presented in the government-wide financial statements because the perspective and basis of accounting used to prepare the fund financial statements are different from the perspective and basis of accounting used to prepare the government-wide financial statements. The Commonwealth's governmental and proprietary funds types use different perspectives and accounting basis. The funds presented in the fund financial statements are categorized as either major or nonmajor funds as required by U.S. GAAP. All of the funds of the Commonwealth can be divided into the following categories:

\* ***Governmental Funds*** – Most of the basic services provided by the Commonwealth are financed through governmental funds. Governmental funds are used to account for essentially the same functions reported as Governmental Activities in the government-wide financial statements. However, unlike the government-wide financial statements that use the full accrual basis of accounting, the governmental funds financial statements use a modified accrual basis of accounting (also known as the current financial resources measurement focus), which focuses on near-term inflows and outflows of expendable resources. This information may be useful in evaluating the government's near-term financing requirements. These statements provide a detailed short-term view of the Commonwealth's finances and assist in determining whether there will be adequate financial resources available to meet the current needs of the Commonwealth. Since the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for the Governmental Activities in the government-wide financial statements. By comparing the governmental funds financial statements to the Governmental Activities in the government-wide financial statements, readers may better understand the long-term impact of the government's near-term financing decisions. Both the governmental funds balance sheet and the governmental fund statement of revenue, expenditures, and changes in fund balances provide a reconciliation to facilitate this comparison between governmental funds and the Governmental Activities. These reconciliations are presented on page immediately following each governmental fund financial statement.

18

CW_STAY0009806

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

The Commonwealth has four major governmental funds. That is, each major fund is presented in a separate column in the governmental funds balance sheet and in the governmental funds statement of revenue, expenditures, and changes in fund balances. The Commonwealth's four major governmental funds are:

* General Fund [1]
* Debt Service Fund
* COFINA Special Revenue Fund

    COFINA Debt Service Fund

The remaining nonmajor governmental funds, which consist of funds from the blending of the Port of the Americas Authority (PAA), Public Buildings Authority (PBA), Puerto Rico Infrastructure Financing Authority (PRIFA), Puerto Rico Maritime Shipping Authority (PRMSA), Special Communities Perpetual Trust (SCPT), The Children's Trust, University of Puerto Rico Comprehensive Cancer Center (UPRCCC), and the Commonwealth's capital project funds, are grouped and presented in a single column in the governmental funds financial statements. The basic governmental funds financial statements can be found immediately following the government-wide financial statements.

***Proprietary Funds*** – These funds are used to show activities that operate more like those of commercial enterprises. Because these funds charge fees for services provided to outside customers, including local governments, they are also known as enterprise funds. Proprietary funds provide the same type of information as the Business-Type Activities in the government-wide financial statements, but in more detail. As with government-wide financial statements, proprietary funds financial statements use the full accrual basis of accounting. There is no reconciliation needed between the government-wide financial statements for Business-Type Activities and the proprietary funds financial statements. The Commonwealth has five major proprietary funds: (i) the Unemployment Insurance Fund; (ii) the Lotteries Fund, which includes the Lottery of Puerto Rico and the Additional Lottery System; (iii) Puerto Rico Health Insurance Administration (PRHIA); (iv) Puerto Rico Medical Service Administration (PRMeSA); and (v) and Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF). Other nonmajor proprietary funds consist of the Disability Insurance Fund, Drivers' Insurance Fund, Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (PRSDWRLF), Ponce Ports Authority (PPA), and the 9-1-1 Services Governing Board, which are grouped and presented in a separate column in the proprietary funds financial statements. The basic proprietary funds financial statements can be found immediately following the governmental funds financial statements.

---

[1] The General Fund is the primary operating fund of the Commonwealth. The financial resources received and used in the General Fund mostly includes: the General Fund budgeted resources, as approved by the Legislative Assembly of Puerto Rico (the Legislature ) and as adjusted for timing and basis of accounting differences, and other financial resources outside the General Fund budget such a s: federal funds, pledged funds, resources that otherwise would be accounted for in special revenue funds, and agencies wit h independent treasuries.

19

CW_STAY0009807

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

**Fiduciary Funds**

The Commonwealth is a trustee, or fiduciary, for its employees' pension plans. It is also responsible for other assets that, because of a trust arrangement, can be used only for the trust beneficiaries. All the Commonwealth fiduciary activities are reported in a separate statement of fiduciary net position and of changes in fiduciary net position. The Commonwealth excluded these activities from the Commonwealth government-wide financial statements because the Commonwealth cannot use these assets to finance its operations. The Commonwealth is responsible for ensuring that the assets reported in these funds are used for their intended purposes.

**Notes to Basic Financial Statements**

The notes provide additional information that is essential to a full understanding of the data provided in the government-wide and the fund financial statements. The notes to the basic financial statements can be found immediately following the major component units' combining financial statements.

**Required Supplementary Information/Supplementary and Other Information (Unaudited)**

The basic financial statements include a section of required supplementary information and other information immediately following its notes. This section includes information of funding progress and employer contributions for the Commonwealth's three separate retirement systems, including postemployment healthcare benefits, schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund, supplemental schedule of expenditures by agency – budget and actual – budgetary basis – General Fund, and combining schedules for nonmajor governmental funds, nonmajor proprietary funds, fiduciary funds, and nonmajor discretely presented component units.

**Overall Financial Position and Results of Operations (Government-Wide)**

The following is an analysis of the financial position and changes in the financial position of theCommonwealth's Governmental Activities and Business-Type Activities for fiscal year 2015.

20

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

### Net Position

Condensed financial information from the statement of net position as of June 30, 2015 and 2014 is as follows (in thousands):

| | Governmental Activities | | Business-Type Activities | | Primary Government | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 (As restated) | 2015 | 2014 (As restated) | 2015 | 2014 (As restated) |
| Assets: | | | | | | |
| Non-capital assets: | | | | | | |
| Cash and investments | $ 2,686,669 | 3,204,035 | 906,601 | 846,169 | 3,593,270 | 4,050,204 |
| Receivables, net | 2,433,357 | 2,473,348 | 983,500 | 880,108 | 3,416,857 | 3,353,456 |
| Other | 106,797 | 206,150 | 53,493 | 137,814 | 160,290 | 343,964 |
| Total non-capital assets | 5,226,823 | 5,883,533 | 1,943,594 | 1,864,091 | 7,170,417 | 7,747,624 |
| Capital assets | 8,823,439 | 8,690,037 | 84,620 | 66,084 | 8,908,059 | 8,756,121 |
| Total assets | 14,050,262 | 14,573,570 | 2,028,214 | 1,930,175 | 16,078,476 | 16,503,745 |
| Deferred outflows of resources | 2,252,947 | 1,154,828 | 5,066 | 631 | 2,258,013 | 1,155,459 |
| Liabilities: | | | | | | |
| Long-term liabilities | 78,282,969 | 77,628,832 | 1,117,600 | 817,471 | 79,400,569 | 78,446,303 |
| Other liabilities | 4,769,552 | 4,564,712 | 260,925 | 580,965 | 5,030,477 | 5,145,677 |
| Total liabilities | 83,052,521 | 82,193,544 | 1,378,525 | 1,398,436 | 84,431,046 | 83,591,980 |
| Deferred inflows of resources | 943,173 | 103,446 | 192 | — | 943,365 | 103,446 |
| Net position: | | | | | | |
| Net investment in capital assets | 3,444,760 | 3,823,841 | 68,310 | 65,883 | 3,513,070 | 3,889,724 |
| Restricted | 509,458 | 539,581 | 1,209,359 | 1,090,021 | 1,718,817 | 1,629,602 |
| Unrestricted (deficit) | (71,646,703) | (70,932,014) | (623,106) | (623,534) | (72,269,809) | (71,555,548) |
| Total net position (deficit) | $ (67,692,485) | (66,568,592) | 654,563 | 532,370 | (67,037,922) | (66,036,222) |

Governmental entities are required by U.S. GAAP to report on their net position. The statement of net position presents the value of all of the Commonwealth's assets and deferred outflows of resources, and liabilities and deferred inflows of resources, with the difference between them reported as net position.

Net position may serve over time as a useful indicator of a government's financial position. Total assets plus deferred outflows of resources and total liabilities plus deferred inflows of resources of the Primary Government as of June 30, 2015 amounted to approximately $18.3 billion and $85.4 billion, respectively, for a net deficit of approximately $67 billion as of June 30, 2015, compared to a net deficit of approximately $66 billion as of June 30, 2014 (as restated).

Net position (deficit) for Governmental Activities increased by approximately $1.1 billion for fiscal year 2015, increasing to approximately $67.7 billion at June 30, 2015 from approximately $66.6 billion at June 30, 2014 (as

21

CONFIDENTIAL

CW_STAY0009809

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

restated). The unrestricted deficit for Governmental Activities – that part of net position that can be used to finance day-to-day governmental operations without constraints established by debt covenants, enabling legislation, or other legal requirements – had a deficit of approximately $71.6 billion as of June 30, 2015. The unrestricted deficit in Governmental Activities, which increased by approximately $715 million, exists primarily because of excessive operating expenses in disparity with actual revenues. This deficit can be expected to continue for as long as the Commonwealth continues to have obligations outstanding for purposes other than the acquisition of governmental capital assets. The statement of net position in Governmental Activities reflects outstanding bonds and notes amounting to approximately $40.3 billion and net pension liability amounting to approximately $33 billion as of June 30, 2015, as compared to outstanding bonds and notes amounting to approximately $40.3 billion and net pension liability amounting to approximately $32 billion as of June 30, 2014.

A portion of the Commonwealth's net position reflects its investment in capital assets such as land, buildings, and equipment, less any related debt used to acquire those assets. The Commonwealth uses these capital assets to provide services to its residents; consequently, these assets are not available for future spending, and with the exception of Business-Type assets, do not generate direct revenue for the Commonwealth. They do represent, however, an obligation on the part of the Commonwealth to maintain these assets into the future. Although the Commonwealth investment in its capital assets is reported net of related debt, it should be noted that the resources needed to repay this debt must be provided from other sources, since most of the capital assets themselves cannot be used to liquidate these liabilities.

During fiscal year 2015, the Commonwealth adopted the provisions of GASB Statement No. 68, *Accounting and Financial Reporting for Pensions*. The impact of adopting GASB Statement No. 68 consisted of recognizing the net effects of the Primary Government's proportionate share of ERS' beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date, as well as recognizing the net effect of the Puerto Rico System of Annuities and Pension for Teachers (TRS) and Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS) beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date and the elimination of the beginning net pension obligation under GASB Statement No. 27, against beginning net position. The audited Schedule of Employer Allocations and Schedules of Pension Amounts by Employer was issued and available on May 11, 2018. For further information on the adoption of GASB Statement No. 68, refer to Note 3 and Note 17.

The provisions of GASB 68 were not implemented by certain blended component units and discretely presented component units of the Commonwealth. The non-implementation resulted in a modification on the independent auditor's report.

The net position in Business-Type Activities increased by approximately $122 million in fiscal year 2015 when compared to fiscal year 2014, from approximately $532 million at June 30, 2014 to approximately $655 million at June 30, 2015.

22

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

### Statements of Activities and Results of Operations

Condensed financial information of the statements of activities for the years ended June 30, 2015 and 2014 is as follows (in thousands):

| | Governmental Activities | | Business-Type Activities | | Primary Government | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 (As restated) | 2015 | 2014 (As restated) | 2015 | 2014 (As restated) |
| **Revenue:** | | | | | | |
| Program revenue: | | | | | | |
| Charges for services | $ 852,708 | 667,890 | 3,189,952 | 2,901,070 | 4,042,660 | 3,568,960 |
| Operating grants and contributions | 6,355,255 | 6,377,449 | 89,586 | 127,808 | 6,444,841 | 6,505,257 |
| Capital grants and contributions | 80,753 | 84,132 | — | — | 80,753 | 84,132 |
| | 7,288,716 | 7,129,471 | 3,279,538 | 3,028,878 | 10,568,254 | 10,158,349 |
| General revenue: | | | | | | |
| Taxes | 9,334,215 | 10,226,557 | — | — | 9,334,215 | 10,226,557 |
| Revenue from global tobacco settlement agreement | 66,192 | 72,012 | — | — | 66,192 | 72,012 |
| Revenue from component units | 152,635 | 131,133 | — | — | 152,635 | 131,133 |
| Other, including loss on investments | 355,184 | 280,290 | 26,457 | 54,984 | 381,641 | 335,274 |
| | 9,908,226 | 10,709,992 | 26,457 | 54,984 | 9,934,683 | 10,764,976 |
| Total revenue | 17,196,942 | 17,839,463 | 3,305,995 | 3,083,862 | 20,502,937 | 20,923,325 |
| **Expenses:** | | | | | | |
| General government | 2,251,979 | 2,878,210 | — | — | 2,251,979 | 2,878,210 |
| Public safety | 1,828,596 | 2,236,392 | — | — | 1,828,596 | 2,236,392 |
| Health | 2,327,012 | 2,246,535 | — | — | 2,327,012 | 2,246,535 |
| Public housing and welfare | 3,279,564 | 3,737,999 | — | — | 3,279,564 | 3,737,999 |
| Education | 3,599,979 | 4,570,665 | — | — | 3,599,979 | 4,570,665 |
| Economic development | 1,525,337 | 1,414,501 | — | — | 1,525,337 | 1,414,501 |
| Intergovernmental | 344,594 | 371,719 | — | — | 344,594 | 371,719 |
| Interest and other | 2,499,411 | 2,445,113 | — | — | 2,499,411 | 2,445,113 |
| Unemployment insurance | — | — | 161,312 | 271,749 | 161,312 | 271,749 |
| Lotteries | — | — | 634,336 | 714,199 | 634,336 | 714,199 |
| Health Insurance Administration | — | — | 2,805,897 | 2,556,108 | 2,805,897 | 2,556,108 |
| Medical Services Administration | — | — | 199,032 | 204,688 | 199,032 | 204,688 |
| Water Pollution Control Revolving Fund | — | — | 8,225 | 1,183 | 8,225 | 1,183 |
| Nonmajor proprietary funds | — | — | 39,363 | 28,920 | 39,363 | 28,920 |
| Total expenses | 17,656,472 | 19,901,134 | 3,848,165 | 3,776,847 | 21,504,637 | 23,677,981 |
| Increase (decrease) in net position before transfers | (459,530) | (2,061,671) | (542,170) | (692,985) | (1,001,700) | (2,754,656) |
| Transfers | (664,363) | (627,701) | 664,363 | 627,701 | — | — |
| Change in net position | (1,123,893) | (2,689,372) | 122,193 | (65,284) | (1,001,700) | (2,754,656) |
| Net position (deficit), beginning of year, as adjusted and restated (note 3) | (66,568,592) | (63,879,220) | 532,370 | 597,654 | (66,036,222) | (63,281,566) |
| Net position (deficit), end of year | $ (67,692,485) | (66,568,592) | 654,563 | 532,370 | (67,037,922) | (66,036,222) |

23

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

As described above, the Governmental Activities net deficit position increased from approximately $66.6 billion at June 30, 2014 (as restated) to approximately $67.7 billion at June 30, 2015, an increase of approximately $1.1 billion. The increase in total net deficit position is mainly due to a decrease in taxes revenues amounting to $892 million. Approximately 54.28% of the Governmental Activities' revenue came from taxes, while approximately 37.43% resulted from grants and contributions (primarily federal financial assistance). Charges for services represented approximately 4.96% of total revenue. The Governmental Activities' expenses cover a range of governmental services. The largest expenses were for general government 12.3% of total expenses, education 19.6% of total expenses, public housing and welfare 17.9% of total expenses, health 12.7% of total expenses, and public safety 10% of total expenses. In fiscal year 2015, Governmental Activities' expenses, which amounted to approximately $17.7 billion, were funded by approximately $9.9 billion in general revenue, and approximately $7.3 billion in program revenue (comprised primarily of federal financial assistance). Also, the implementation of Act No. 66 of 2014 "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act "contributed to a reduction in expenses in areas such as:

* Payroll and related expenses.

* Freeze contributions, based on formulas, to the University of Puerto Rico, the Commonwealth's Judicial Branch and the Municipalities.

* Reduction in the Commonwealth's Department of Education expenses, such as, a reduction in school transportation services, payroll savings on account of teacher's retirement system and no contracting to fill vacancies.

* Reduction of special appropriations.

Elimination of certain subsidies to programs or operations of component units.

Total revenue from Governmental Activities for fiscal year 2015 decreased by approximately $642.5million compared to fiscal year 2014. The Commonwealth suffers from a profound fiscal, economic and liquidity crisis, a prolonged economic recession (which commenced in 2006), high unemployment, population decline, and high levels of debt and pension obligations.

24

CW_STAY0009812

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

**Revenues – Governmental Activities**



**Expenses – Governmental Activities**



25

CONFIDENTIAL

CW_STAY0009813

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

Business-Type Activities' total net position increased by approximately $122 million from the total net position at June 30, 2014. Approximately 96% of the Business-Type Activities total revenue came from charges for services, while approximately 3% resulted from grants and contributions (primarily federal financial assistance). Business-Type Activities expenses cover a range of services. The largest expenses were for lotteries and Health Insurance Administration. In fiscal year 2015, Business-Type Activities' total revenues exceeded expenses by approximately $122 million. The excess of revenues over expenses in fiscal year 2015 was increased by net transfers from other funds, mainly the Governmental Activities, amounted to approximately $664 million.

**Governmental Funds**

The governmental funds financial statements provides information on near-term inflows, outflows, and balances of expendable resources. Such information is useful in assessing the Commonwealth's financing requirements. In particular, unassigned fund balance may serve as a useful measure of a government's net resources available for spending at the end of the fiscal year. As of June 30, 2015, the Commonwealth's governmental funds, which include the General Fund, the Debt Service Fund, the COFINA Special Revenue Fund, the COFINA Debt Service Fund, and certain nonmajor governmental funds (i.e., PBA, PRIFA, and the Children's Trust), reported a combined ending deficit of approximately $1 billion. In fiscal year 2015, expenditures in these governmental funds exceeded revenues by approximately $1.1 billion. However, this deficit was offset by other financing sources totaling approximately $262 million in the governmental funds. For fiscal year 2015, the excess of expenditures over revenues decreased by approximately $2.7 billion when compared with the prior year, primarily as a result of a decrease of principal payments on long-term debt amounted by $2.1 billion and a decrease in education expenses of $880 million in comparison with prior year figures. Other financing sources decreased by approximately $3.8 billion compared with the prior year. Such decrease is attributable primarily to the issuance of $3.5 billion of general obligation bonds in fiscal year 2014 while in 2015 there was no issuance of general obligation bonds.

The General Fund (as described in footnote 1 above) is the chief operating fund of the Commonwealth. At the end of fiscal year 2015, the General Fund, which encompasses other financial resources outside the General Fund budget such as federal funds, pledged funds, special revenue funds, and agencies with independent treasuries, had a total fund deficit of approximately $2.1 billion. The fund deficit of the Commonwealth's General Fund increased by approximately $317 million as a result of the fiscal year's change in financial position. The deficit also shows significantly higher operating expenses than projected and actual revenue necessary to provide essential services to the citizens.

The debt service fund is the fund in which the Commonwealth accumulates the resources for the payment of the long-term general obligations debt. The net change in fund balance of the debt service fund decreased by approximately $213 million in fiscal year 2015, and the fund balance at the end of year decreased to approximately $221 million at June 30, 2015, as a result of an increase in debt service payments of $194 million. Bonds and interest payable during fiscal year 2015 increased by approximately $83 million when compared with fiscal year 2014.

26

CW_STAY0009814

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

The COFINA Special Revenue Fund is used to account for and report all financial resources of the Puerto Rico Sales Tax Financing Corporation (COFINA). The fund balance of the COFINA special revenue fund decreased by approximately $287 thousand in fiscal year 2015, decreasing to approximately $5 million at June 30, 2015. The COFINA Debt Service Fund is used to account for the Commonwealth sales tax revenue being deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations of COFINA. The fund balance of the COFINA debt service fund decreased by approximately $347 thousand during fiscal year 2015, to approximately $336 million at June 30, 2015.

**General Fund Budgetary Highlights**

The Commonwealth Constitution requires the Governor to submit a balanced budget that contains a plan of expenditures for the ensuing fiscal year and identifies the anticipated revenues and other resources sufficient to meet the proposed expenditures. The Commonwealth adopts an annual appropriations budget for its General Fund. A budgetary comparison schedule has been provided on page 347 as required supplementary information for the General Fund to demonstrate compliance with this budget. The schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund presents only the information for the General Fund for which there is a legally adopted budget, as required by U.S. GAAP.

Total General Fund actual revenue on a budgetary basis for fiscal year 2015 was approximately $8.8 billion (excluding other financing sources), representing a decrease of approximately $651 million, or 7%, from original budgeted revenue and an increase of approximately $53 million or 1% from actual revenue of approximately $8.7 billion for fiscal year 2014.

Total General Fund actual expenditures on a budgetary basis for fiscal year 2015 were approximately $8.7 billion, representing a decrease of $169 million or 2% from original budgeted expenses and a decrease of approximately $513 million or 6% from actual expenditures of approximately $9.1 billion for fiscal year 2014.

For fiscal year 2015, the budgeted excess of revenue over expenditures (budgetary basis) was approximately $126 million, consisting of the difference between total actual revenue of approximately $8.8 billion and total actual expenditures of approximately $8.7 billion. For fiscal year 2014, the deficiency of revenue under expenditures (budgetary basis) was approximately $440 million, consisting of the difference between total actual revenue of approximately $8.7 billion and total actual expenditures of approximately $9.1 billion. The budgeted excess of revenue over expenditures (budgetary basis) for fiscal year 2015 increased by approximately $566 million when compared to the deficiency of fiscal year 2014.

27

CW_STAY0009815

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

For fiscal year 2015, the total deficiency of revenue under expenditures and general obligation debt service payments in the General Fund (budgetary basis) was approximately $735 million. It consisted of the difference between actual revenue of approximately $8.8 billion (excluding other financing sources), less the sum of total expenditures of approximately $8.7 billion and general obligation debt service payments of approximately $861 million (excluding other financing uses). This deficiency of approximately $735 million in the General Fund (budgetary basis) differs from the excess of revenue over expenditures in the General Fund on a modified accrual basis (U.S. GAAP) of approximately $1.5 billion, which was offset by approximately $1.8 billion in other financing sources, principally consisting of proceeds from issuances of long-term debt, for a resulting net decrease in fund balances of approximately $317 million for the fiscal year 2015. The variance between the U.S. GAAP and budgetary basis deficiency results from differences in the basis of accounting, and perspective differences between budgetary reporting versus those established by U.S. GAAP and followed in these financial statements. Examples of such differences include: (i) recognition of proceeds of long-term debt issued as other financing sources, (ii) recognition of receivables (revenue) for reimbursements of expenses allocated to federal funds, (iii) the recognition of revenue and expenditures of entities with independent treasuries, (iv) expenditures incurred in nonbudgetary funds (special revenue funds, internal revenue funds, and other funds), which were not included in the General Fund Budget, and (v) timing differences in basis of accounting such as (a) the recognition of receivables on income and corporate taxes and (b) recognition of expenditure accruals. A reconciliation is presented on page 351 in the notes to required supplementary information section. The Commonwealth's ability to continue reducing the deficit will depend in part on its ability to continue increasing revenue and reducing expenditures in the face of rising debt service and pension obligations, which in turn depends on a number of factors, including improvements in general economic conditions.

The following information is presented to assist the reader in comparing the final amended budget and the actual results.

**Actual Revenue – General Fund**
Budgetary Basis
Year ended June 30, 2015
(in thousands)



CW_STAY0009816

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

**Actual Expenditures – General Fund**
Budgetary Basis
Year ended June 30, 2015
(in thousands)



For more than a decade, the Commonwealth had significant deficiencies of revenues under expenditures (including debt services) that were mainly funded through issuances of bonds and lines of credits.

### Capital Assets and Debt Administration

#### *Capital Assets*

The following is a summary schedule of the Primary Government's capital assets (in thousands):

**Commonwealth's Capital Assets – Primary Government**

June 30, 2015 and 2014

(Net of depreciation expressed in thousands)

| | Governmental activities | | Business-type activities | | Total Primary Government | |
|---|---|---|---|---|---|---|
| | **2015** | **2014 (As restated)** | **2015** | **2014 (As restated)** | **2015** | **2014 (As restated)** |
| Land | $ 937,125 | 933,984 | 23,555 | 6,872 | 960,680 | 940,856 |
| Construction in progress | 1,350,108 | 1,256,696 | 3,282 | — | 1,353,390 | 1,256,696 |
| Buildings and building improvements, net | 5,923,393 | 5,855,597 | 40,523 | 40,098 | 5,963,916 | 5,895,695 |
| Equipment, furniture, fixtures, vehicles and software, net | 192,946 | 211,663 | 17,260 | 19,114 | 210,206 | 230,777 |
| Infrastructure, net | 419,867 | 432,098 | — | — | 419,867 | 432,097 |
| Total capital assets | $ 8,823,439 | 8,690,038 | 84,620 | 66,084 | 8,908,059 | 8,756,121 |

29

CW_STAY0009817

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

The Commonwealth's investment in capital assets for its Governmental Activities and Business-Type Activities as of June 30, 2015 amounted to approximately $13.8 billion, less accumulated depreciation and amortization of approximately $4.9 billion, resulting in a book value of approximately $8.9 billion. Capital assets include land, constructions in progress, buildings, building improvements, equipment, and infrastructure. Capital assets included in the Governmental Activities column are principally owned by blended component units (e.g., Public Buildings Authority and Puerto Rico Infrastructure Financing Authority) and are primarily of value only to the Commonwealth, such as public schools, roads, and buildings used for governmental services. Depreciation and amortization expense for its Governmental Activities and Business-Type Activities amounted to approximately $328 million for the year ended June 30, 2015.

Other infrastructure assets, such as highways, bridges, toll road facilities, water and sewer systems, electricity production, transmission and distribution systems, and similar assets, are owned by discretely presented component units.

Additional information on the Commonwealth's capital assets can be found in Note 10 to the basic financial statements that accompany this report.

### Debt Administration – Primary Government

The Commonwealth has incurred long-term debt financing and other obligations, including lease/purchases and contractual obligations where the Commonwealth's legal obligation to make payments is typically subject to and paid from annual appropriations made by the Legislative Assembly of Puerto Rico (the Legislature) of the Commonwealth. For example, the debts reported by most blended component units, by Business-Type Activities and certain discretely presented component units are supported, directly or indirectly, by payments from resources from the Commonwealth's Governmental Activities.

At June 30, 2015, the Primary Government's bonds and notes outstanding amounted to approximately $40.3 billion, the discretely presented component units' bonds and notes outstanding amounted to approximately $25.9 billion, and the fiduciary funds' bonds outstanding amounted to approximately $3.1 billion.

General obligation bonds are backed by the full faith, credit, and taxing power of the Commonwealth. The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith, credit, and taxing power of the Commonwealth should not be issued if the amounts of the principal of and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter internal revenue) in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution of the Commonwealth does not limit the amount of debt that the Commonwealth may guarantee as long as the Commonwealth is in compliance with the 15% limitation at the time of issuance of such guaranteed debt. Internal revenue consists principally of income taxes, sales and use tax, property taxes, and excise taxes. Certain revenue, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States government and returned to the Commonwealth, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are conditionally allocated to the Puerto Rico Highways Transportation Authority (PRHTA), a discretely presented component unit,

30

CW_STAY0009818

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

are not included as revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. Certain of these revenues are subject to ongoing litigation. For additional information on the current status of this litigation, refer to Note 16. In addition, the portion of sales and use tax conditionally allocated to COFINA is not included as internal revenues consistent with the legislation creating COFINA, which transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" under the constitutional provisions relating to the payment of debt service. This historical practice is the subject of ongoing litigation. For additional information on the status of this litigation, refer to Note 16.

On September 13, 2017 the Oversight Board announced that a Special Committee of the Board has retained an independent investigator to carry out a review of the Commonwealth's debt and its connection to the current financial crisis. The Special Committee considers this investigation an integral part of the Oversight Board's mission to restore fiscal balance and economic opportunity and to promote the Commonwealth's reentry to the capital markets. The independent investigator's work is ongoing, and at the conclusion of the investigation, the Oversight Board will publish the independent investigator's final report, which will include an analysis of the historical and more recent macroeconomic and political factors contributing directly and indirectly to the Commonwealth crisis, the Commonwealth's municipal bond issuance process, and the legislative efforts to restructure the debt, in addition to its investigative findings, policy recommendations, and identification of potential claims and matters for regulatory attention.

The Commonwealth has stated that although it encourages an open and transparent process to review the Commonwealth's aggregate debt load, it has no reason to believe that any of the Commonwealth's debt was issued in violation of the Puerto Rico Constitution or any other applicable laws. The Commonwealth will monitor further activities of the Commission.

Debt of certain discretely presented component units (other than bond anticipation notes) such as the Puerto Rico Electric Power Authority (PREPA) and Puerto Rico Aqueduct and Sewer Authority (PRASA) is supported by the revenue of such component units from rates charged for services or products. However, the debt of certain blended component units and discretely presented component units is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Additional information on the Commonwealth's long-term debt can be found in Note 12 to the basic financial statements that accompany this report.

**Going Concern, Liquidity Risk and Fiscal Plan**

*Going Concern and Liquidity Risk*

The Commonwealth and most of its public corporations are in the midst of a profound fiscal, economic and liquidity crisis, the culmination of many years of significant governmental deficits, a prolonged economic recession (which commenced in 2006), high unemployment, population decline, and high levels of debt and pension obligations. As the Commonwealth's tax base has shrunk and its revenues affected by prevailing economic conditions, health care, pension and debt service costs have become an increasing portion of the General Fund budget, which has resulted in reduced funding available for other essential services. The Commonwealth's very high level of debt and unfunded pension liabilities and the resulting required allocation of revenues to service debt and pension obligations have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has financed, further increasing the amount of its debt. These matters and the Commonwealth's liquidity constraints, among other factors, have adversely affected its credit ratings and its

31

CW_STAY0009819

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

ability to obtain financing at reasonable interest rates. As a result, the Commonwealth had relied more heavily on short-term financings and interim loans from the Government Development Bank for Puerto Rico (GDB), and other instrumentalities of the Commonwealth, which reliance has constrained the liquidity of the Commonwealth in general and GDB and increased near-term refinancing risk. During fiscal year 2015 and thereafter, the principal rating agencies lowered their rating on the general obligation bonds of the Commonwealth to a default rating of D. They also lowered similarly to a default grade their ratings on the bonds of the PBA and GDB, while the ratings on the bonds of COFINA have been lowered multiple notches to a current noninvestment grade level of CC and D, depending on the rating agency.

Liquidity measures undertaken include the issuance of short-term notes with GDB on October 10, 2014 to fund the purchase of up to $900 million of Commonwealth's tax and revenue anticipation notes for fiscal year 2015. In June 2015, State Insurance Fund Corporation (SIFC) and Automobile Accidents Compensation Administration (AACA) granted loans to the Treasury Department of the Commonwealth (Treasury Department) in the amounts of $100 million and $2 million, respectively, under the provisions of Act No. 80 of 2015, which was enacted with the objective of addressing the Commonwealth's projected cash flow deficiencies for fiscal year 2015. During fiscal year 2016, liquidity measures included: (i) requiring the two largest Commonwealth's retirement systems to pre-fund the payment of current retirement benefits to participants (in prior fiscal years such amounts were first paid in full by the Treasury Department's single cash Concentration Account, referred to as the "Treasury Single Account" or "TSA", and only later reimbursed to the TSA by the retirement systems), (ii) suspending Commonwealth set-asides required by Act No. 39 of May 13, 1976, as amended, (iii) delaying the payment of third-party payables or amounts due to public corporations, (iv) deferring the disbursement of certain budgetary assignments and (v) delaying the payment of income tax refunds. For decades, the TSA receipts had been deposited primarily at GDB. In April 2016, as a result of GDB's deteriorated liquidity situation, the Commonwealth started to deposit TSA receipts in a commercial bank. Remaining cash balances in the TSA held at GDB are subject to the limitations on withdrawals of funds imposed by the Moratorium Act.

During 2015, the Commonwealth, as a result of the GDB's liquidity situation, evaluated the availability and recoverability of funds held at GDB at June 30, 2015 and determined that a custodial credit loss existed as of this date. Consequently, a custodial credit risk loss of approximately $295 million was recorded in the Governmental Activities. However, most agencies with independent treasuries and accounting, blended and discretely presented component units issued their 2015 stand-alone audited financial statements without recording a custodial credit loss which resulted in a modification of the independent's auditor report.

Other liquidity measures had also been bolstered by placing an emergency "intra-governmental" Tax Revenue Anticipation Note (TRANs) in the aggregate principal amount of $400 million with State Insurance Fund (SIFC), Automobile Accident Compensation Administration (AACA) and the Labor Departments disability fund. During fiscal year 2016, the Commonwealth also received extraordinary distributions from SIFC and AACA totaling approximately $105 million.

Additionally, for the fiscal year ended June 30, 2016, the Legislature did not appropriate approximately $94 million for the payment of the Public Finance Corporation (PFC) bonds which are obligations of certain component units of the Commonwealth that are payable solely from such appropriations. PFC did not make payments of debt service on its bonds in the aggregate amount of approximately $86.5 million and $78 million for fiscal years 2016 and 2017, respectively.

On December 1, 2015, Executive Order No. 46 was signed, which ordered the Secretary of Treasury to retain certain revenues in light of revised revenue estimates for fiscal year 2016 and the Commonwealth's deteriorating

32

CW_STAY0009820

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

liquidity situation. Pursuant to Executive Order No. 46, certain available resources of the Commonwealth were conditionally allocated to Puerto Rico Highway and Transportation Authority (PRHTA), Puerto Rico Infrastructure Financing Authority (PRIFA), Puerto Rico Convention Center District Authority (PRCCDA) and Puerto Rico Metropolitan Bus Authority (PRMBA) to pay debt service on their obligations were, and continue to be, retained by the Commonwealth (commonly referred to as the "clawback"), pursuant to Article VI, Section 8 of the Constitution of the Commonwealth and the statutory provisions pursuant to which such revenues were assigned to the applicable public corporations.

Even with the additional resources provided by the implementation of the aforementioned clawback, on April 6, 2016, the Commonwealth Enacted Act No. 21, known as the Puerto Rico Emergency Moratorium and Rehabilitation Act (the Moratorium Act). Based on the provisions of the Moratorium Act, the Commonwealth and certain of its instrumentalities suspended the payment of debt service on their respective debts. In particular, the Commonwealth suspended the payment of $779 million in debt service on general obligation bonds due July 1, 2016 (net of $352 million of capitalized interest fund and escrow accounts) because it did not have sufficient funds in its TSA to make such payment. For additional information on the Moratorium Act, refer to Note 22.

The Commonwealth was also faced with the challenge to replace the revenue produced by the special temporary excise tax imposed by Act No. 154 of October 25, 2010 (described in Note 1(j)) if its effective period is not extended (originally set to expire on December 31, 2017) or if the U.S. Internal Revenue Service eliminates its credit against an entity's federal income tax liability. Act No. 154 currently accounts for approximately 20% of General Fund budgeted revenues and approximately 10 companies account for approximately 90% of such Act No. 154 revenues. Although Act No. 154 imposes a modified source of income rule upon the expiration of the temporary excise tax, the Commonwealth currently estimates that revenues from the modified source of income rule would be materially lower than revenues collected from the temporary excise tax. To the extent the Commonwealth is unable to replace the revenue generated by the temporary excise tax, the Commonwealth's funding gap will materially increase and the Commonwealth's ability to continue funding its current operations and provide essential services will be compromised. On January 23, 2017, the Fiscal Crisis Management Act bill was eventually approved into Act No. 3, which among several provisions, established the extension for 10 years to the Act No. 154 excise tax on acquisitions by foreign corporations, thus eliminating for the moment the fiscal cliff related to the Act 154 excise tax.

On January 29, 2017 Act No. 5 was signed into law, known as the Puerto Rico Fiscal Responsibility and Financial Emergency Act (as amended, Act No. 5), which repealed certain provisions of the Moratorium Act and authorized additional emergency measures. Pursuant to Act No. 5, however, the executive orders issued under the Moratorium Act would continue in effect until amended, rescinded or superseded. The emergency period under Act No. 5 will expire June 30, 2018, unless extended by the Governor. Some additional powers provided to the Governor through Act No. 5 include: authority to exercise receivership powers to rectify the financial emergency, exercise general supervisory control over the functions and activities of all government entities within the Executive Branch, and issue executive orders to implement and enforce compliance with Act No. 5. On April 30, 2017, the Governor of the Commonwealth issued executive order OE-2017-031, which extended to Act No. 5 emergency period to August 1, 2017. On July 19, 2017, the Legislature enacted Act No. 46 (Act No. 46), which further extended the Act No. 5 emergency period through December 31, 2017. Act No. 46 allowed the Governor to sign executive orders to extend the emergency period for successive periods of six months as long as the Oversight Board remains established for Puerto Rico under PROMESA.

33

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

The Commonwealth has not included appropriations for the payment of debt service in its general fund budget since fiscal year 2017, as the payment of such obligations has been suspended pursuant to the Moratorium Act and Act No. 5.

On June 30, 2016, President Barack Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act (codified under 48 U.S.C. §§ 2101-2241) (PROMESA). In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through, among other things: (i) the establishment of the Oversight Board, whose responsibilities include the certification of fiscal plans and budgets for the Commonwealth and its related entities; (ii) a temporary stay of all creditor lawsuits; and (iii) two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a bankruptcy-type proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of the U.S. Bankruptcy Code (11 U.S.C. §§ 101, et seq.). For more information on the key elements of PROMESA and the Title III cases, refer to Note 22. For more information on the civil actions related to the Title III cases and other litigation contingencies, refer to Note 16.

*Fiscal Plan*

Pursuant to PROMESA and the requirements imposed by the Oversight Board, on April 19, 2018 (recertified on May 30, 2018), the Oversight Board certified the Board Fiscal Plan (defined below) for the Commonwealth. The Board Fiscal Plan commits to fiscal responsibility and implements specific revenue enhancements and targeted expenditure reductions to return Puerto Rico to fiscal stability and economic growth. On June 29, 2018, the Oversight Board informed the Commonwealth its intention of certifying a revised version of the Board Fiscal Plan (recertified on May 30, 2018). For additional information regarding the Board Fiscal Plan, refer to Note 2.

**Currently Known Facts**

The following is a summary description of currently known facts, decisions, and conditions that have had, or are expected to have, a significant effect on the Commonwealth's financial position and results of operations. For additional information and further detail, refer to Note 22.

*Tax Revenue Anticipation Notes and Other Notes and Bonds Issued after Year-End*

    (a)  2016 Tax and Revenue Anticipation Notes

On August 17, 2015, the Commonwealth issued $400 million in TRANs (the 2016 TRANs) to SIFC, ACAA, and the Disability Insurance Funds. The 2016 TRANs bore interest at a rate of 6%. As of the date hereof, the Commonwealth has paid the full amount of principal and interest of the 2016 TRANs.

On September 6, 2016, the Commonwealth renewed the emergency "intra-governmental" TRANs for fiscal year 2017, in the aggregate principal amount of $400 million with the SIFC, ACAA, and the Disability Insurance Bonds, also at the interest rate of 6%. On April 28, 2017, the Commonwealth acknowledged that it would be unable to pay the principal and interest payments on the TRANs notes as they become due and entered into a forbearance agreement with SIFC, ACAA, and SINOT. The forbearance period will expire on June 30, 2018.

    (b)  PRIFA Bond Anticipation Notes

34

CW_STAY0009822

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

On June 24, 2016, the Governor signed an executive order, EO-2016-027, which suspended all obligations to transfer money to PRIFA in respect to PRIFA BANs, as described in Note 12(c).

*Significant Legislation and Other Events after Year-End*

(a) Sales and Use Tax

On May 29, 2015, the Commonwealth enacted Act No. 72 (Act No. 72), which, among other things, increased the sales and use tax (SUT) by 4.5%, in addition to the then-applicable 7% SUT. Since July 1, 2015, transactions subject to the 7% SUT are now subject to an aggregate 11.5% SUT (10.5%, of which 0.5% goes to a special fund for the benefit of the municipalities, and 1% separately collected by the municipalities).

In addition, since October 1, 2015, and until May 31, 2016, taxable business-to-business transactions are subject to an aggregate 11.5% SUT, and certain business-to-business services and designated professional services that were previously exempt from SUT are subject to a Commonwealth SUT of 4% (with no municipal SUT applying to these services).

Act No.72 exempted the following services, among other exemptions, from the business-to-business SUT: (i) services offered by the Commonwealth government and instrumentalities, (ii) education, (iii) interest and other financing charges, (iv) insurance, (v) health and hospital services, and (vi) services offered by merchants with a volume of business not exceeding $50,000.

On September 30, 2015, the Governor signed into law Act No. 159, which expanded the services exempt from the 4% SUT to include certain legal services, advertising services, services rendered to a person engaged exclusively in the storage or handling of fuel in a foreign trade zone, services rendered to bona fide farmers, designated professional services rendered to labor unions, and ocean, air, and ground transportation of goods, among other services.

On November 8, 2017, the Governor issued executive order OE-2017-068, which established a 10% reimbursement for the certain small and mid-sized businesses on their SUT filings from August 2017 through November 2017. Due to the sweeping power outages in the wake of Hurricane Maria that left many people without access to refrigeration or ovens, the Governor temporarily waived SUT collections on prepared foods through December 2017 to enable relief organizations and families to maximize their resources.

(b) Bonds in Non-Payment

*PFC Bonds*

On July 15, 2015, PFC filed a notice with Electronic Municipal Market Access (EMMA) indicating that the Legislature had not included in the approved budget for fiscal year 2016 the funds necessary to pay principal and interest on all outstanding PFC bonds. Such appropriation is the sole source of payment of a principal and interest on PFC bonds. The first payment of debt service on PFC bonds for fiscal year 2016 came due on August 3, 2015, on which date PFC made a partial payment of interest in the amount of $628,000 (of the approximately $58 million payment due on that date) from funds held by PFC representing funds remaining from prior legislative appropriations. From August 3, 2015 through May 15,

35

CW_STAY0009823

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

2018, PFC had missed additional debt payments on its bonds in the aggregate amount of approximately $262.6 million.

*General Obligation (GO) Bonds*

On July 1, 2016, approximately $1.1 billion of principal and interest payments were due on the Commonwealth's GO bonds. Of this amount, the Commonwealth paid approximately $351.9 million (leaving approximately $778.8 million unpaid). The $351.9 million payment consisted of funds held in escrow accounts ($314.4 million in principal amounts plus $37.5 million from existing capitalized interest thereon). From July 1, 2016 through May 15, 2018, the Commonwealth missed additional debt payments on its GO bonds in the aggregate amount of approximately $1.5 billion.

*PBA Bonds*

On July 1, 2016, of the approximately $186.9 million debt service ($86.1 million in principal and $100.9 million in interest) due on the PBA outstanding bonds, all was paid except principal of $25.2 million. Of the outstanding bonds debt service requirements due from July 1, 2016 through May 15, 2018, PBA missed outstanding debt services of approximately $373.9 million, except principal of $3.5 million and interest of $56.6 million which were paid.

*PRIFA Bonds*

On January 1, 2016, of the approximately $35.9 million debt service (all interest) due on the PRIFA bonds, almost all remained unpaid except $14.4 thousands. Since January 1, 2016, PRIFA has missed all of outstanding debt services due of approximately $324.5 million, except principal of $100 thousand and interest of $1.1 million.

*Port of the Americas (PAA) Bond Purchase Agreement with GDB*

On August 1, 2016, of the approximately $28.7 million debt service ($7.8 million in principal and $20.9 million in interest) due on the PAA Bond Purchase Agreement with GDB, all remained unpaid. On August 1, 2017, of the approximately $29.3 million debt service ($7.8 million in principal and $21.5 million in interest) due on the PAA Bond Purchase Agreement with GDB, all remained unpaid.

*Voluntary Preretirement Program*

On December 8, 2015, Act No. 211 of 2015 (Act No. 211) was approved to create a Voluntary Preretirement Program. Act No. 211 established that employees who started contributing to ERS before April 1, 1990, with at least 20 years of service, may be eligible to participate in the program. Those who participate in the program would be paid 50% of their average salary (except police officers, who would be paid 60%). These payments will be made until the employee becomes eligible to receive payments from ERS. Other benefits would include the payment of the participant's healthcare plan during the first two years of the program.

*New Plan for Defined Contributions for Public Servants*

On August 23, 2017, Act No. 106 (Act No. 106) was signed into law to guarantee the payment to pensioners and establish a new plan for defined contributions for public servants, reformed the Commonwealth's pensions by replacing the governing boards of the Retirement Systems with a single Retirement Board of the Commonwealth of Puerto Rico (Retirement Board) and established a separate

36

CW_STAY0009824

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

"account for the payment of accrued pensions" to implement a "pay-as-you-go" (PayGo) method for the Retirement Systems. Act No. 106 created the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system.

*Bonds Credit Rating Downgrades*

After a series of credit downgrades during fiscal year 2015, on June 29 and July 1, 2015, all three credit rating agencies further downgraded the Puerto Rico bonds, given the likelihood of a default or a distressed exchange. Fitch downgraded from "B" to "CC" the general obligation bonds of the Commonwealth, COFINA's senior- and junior-lien bonds, and PBA's bonds. S&P downgraded from "CCC+" to "CCC-"the general obligation bonds of the Commonwealth, COFINA's senior- and junior-lien bonds, and PRIFA's Special Tax Revenue Bonds, and placed them in "negative" outlook. Finally, Moody's downgraded the general obligation bonds of the Commonwealth from "Caa2" to "Caa3." Then, on September 10, 2015, S&P lowered again its ratings on the general obligation bonds of the Commonwealth, on COFINA's senior- and junior-lien bonds, and on PRIFA's Special Tax Revenue Bonds to "CC" from "CCC-" and removed the ratings from CreditWatch, where they had been placed with negative implications since July 20, 2015. The outlook is still negative. PBA's bonds have also been downgraded to "CC" by S&P.

On June 24, 2016, Fitch downgraded from "CC" to "C" the general obligation bonds of the Commonwealth, COFINA's senior- and junior-lien bonds, PBA's bonds, and the ERS bonds and placed them on "negative" outlook because default of some kind was deemed inevitable. Fitch cited "the breakdown of negotiations between the Commonwealth and major bondholders, the recent ruling by the U.S. Supreme Court on the Commonwealth's bankruptcy legislation, and the slow process of federal legislation in support of the Commonwealth" as indicators that a debt restructuring, deferral, or default has become inevitable. Fitch also indicated that recently released proposals and counterproposals between the Commonwealth and bondholders indicate that a distressed debt exchange of some kind was inevitable. Moreover, Fitch expressed that, with sizeable debt service payments due on July 1, 2016, the probability of default on the general obligation debt was high.

Soon after the missed payments of July 1, 2016, imposed by the Moratorium Act and related executive orders, S&P downgraded to the lowest level of "D" the general obligation bonds of the Commonwealth, PRIFA's Special Tax Revenue Bonds, and the PBA bonds, while Fitch did the same with the general obligation bonds of the Commonwealth and the PBA bonds. On April 6, 2017, Moody's downgraded PRIFA's Special Tax Revenue Bonds and ERS bonds to a level C rating from its previous ratings of

Ca and Ca, respectively. On that same date, Moody's reaffirmed the Caa3 rating on the Commonwealth's GO bonds. On June 7, 2017, S&P downgraded COFINA's senior- and junior-lien bonds to the default rating of D, in response to the Title III Judge Swain order to not make the COFINA's scheduled debt service for June 1, July 1, and August 1, 2017, but to maintain such funds in a trust account until the judge decides on the case.

37

CW_STAY0009825

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2015

**Requests for Information**

This financial report is designed to provide a general overview of the Commonwealth's finances for all of the Commonwealth's residents, taxpayers, customers, investors, and creditors. This financial report seeks to demonstrate the Commonwealth's accountability for the money it receives. Questions concerning any of the information provided in this report or requests for additional information should be addressed to: Department of the Treasury of the Commonwealth of Puerto Rico, Área de Contabilidad Central, P.O. Box 9024140, San Juan, PR 00902.

38

CW_STAY0009826

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position

June 30, 2015

(In thousands)

| | Primary government | | | |
| | Governmental activities | Business-type activities | Totals primary government | Component units |
|---|---:|---:|---:|---:|
| **Assets:** | | | | |
| Cash and cash equivalents in commercial banks | $ 251,436 | 36,959 | 288,395 | 1,045,899 |
| Cash and cash equivalents in governmental banks | 302,249 | 178,667 | 480,916 | 308,111 |
| Cash equivalents in Puerto Rico Government Investment Trust Fund (PRGITF) | — | — | — | 3,039 |
| Investments | 15,335 | 6,512 | 21,847 | 2,763,869 |
| Collateral from securities lending transactions | — | — | — | 99,429 |
| Receivables – net: | | | | |
| Income and excise taxes | 1,474,386 | — | 1,474,386 | — |
| Insurance premium | — | 4,267 | 4,267 | 34,288 |
| Intergovernmental | 462,707 | 175,509 | 638,216 | 765,438 |
| Accounts | 20,787 | 117,850 | 138,637 | 852,655 |
| Loans | 39 | — | 39 | 3,531,227 |
| Accrued interest | 3,301 | 50 | 3,351 | 107,608 |
| Other | 142,596 | 40,892 | 183,488 | 82,298 |
| Due from – net : | | | | |
| Primary government | — | — | — | 235,780 |
| Component units | 64,694 | — | 64,694 | 365,769 |
| Other governmental entities | 84,176 | 2,245 | 86,421 | 795,257 |
| Internal balances | (27,780) | 27,780 | — | — |
| Inventories | 11,247 | — | 11,247 | 355,855 |
| Prepaid expenses | 35,237 | — | 35,237 | 29,288 |
| Other assets | 14,803 | 25,614 | 40,417 | 61,372 |
| Restricted assets: | | | | |
| Cash and cash equivalents in commercial banks | 1,222,037 | 7,451 | 1,229,488 | 437,493 |
| Cash and cash equivalents in governmental banks | 230,599 | 184,769 | 415,368 | 284,366 |
| Cash equivalents in PRGITF | 69,674 | — | 69,674 | — |
| Cash and cash equivalents under the custody of U.S. Treasury | — | 454,125 | 454,125 | — |
| Sales and use tax receivable | 130,343 | — | 130,343 | — |
| Insurance premium – net | — | 54,121 | 54,121 | — |
| Intergovernmental receivable | 78,108 | — | 78,108 | — |
| Receivables | — | 171 | 171 | — |
| Accrued interest | — | 5,226 | 5,226 | — |
| Loans receivable from component units | 555,389 | — | 555,389 | — |
| Investments | 595,339 | 38,118 | 633,457 | 2,960,741 |
| Other | 1,101 | 27,879 | 28,980 | 62,922 |
| Real estate held for sale or future development | 44,409 | — | 44,409 | 249,125 |
| Capital assets: | | | | |
| Land and other nondepreciable | 2,287,233 | 26,837 | 2,314,070 | 5,375,229 |
| Depreciable, net | 6,536,206 | 57,783 | 6,593,989 | 23,873,095 |
| Total assets | 14,050,262 | 2,028,214 | 16,078,476 | 44,680,153 |
| **Deferred outflows of resources:** | | | | |
| Accumulated decrease in fair value of hedging derivatives | 53,200 | — | 53,200 | 51,195 |
| Loss on bonds refunding | 440,910 | — | 440,910 | 238,694 |
| Pension related | 1,758,837 | 5,066 | 1,763,903 | 1,741,680 |
| Total deferred outflows of resources | $ 2,252,947 | 5,066 | 2,258,013 | 2,031,569 |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009827

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position

June 30, 2015

(In thousands)

| | Primary government | | | |
| | Governmental activities | Business-type activities | Totals primary government | Component units |
|---|---:|---:|---:|---:|
| **Liabilities:** | | | | |
| Accounts payable and accrued liabilities | $ 1,483,799 | 179,383 | 1,663,182 | 3,087,088 |
| Cash overdraft | 530,715 | — | 530,715 | — |
| Deposits and escrow liabilities | — | — | — | 4,406,799 |
| Tax refunds payable | 763,145 | — | 763,145 | — |
| Due to: | | | | |
| Primary government | — | — | — | 697,848 |
| Component units | 283,866 | 34,516 | 318,382 | 3,395,115 |
| Other governmental entities | 202,663 | 431 | 203,094 | 109,833 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | 395,392 |
| Interest payable | 875,945 | 22,794 | 898,739 | 812,983 |
| Grant advances | 7,949 | — | 7,949 | — |
| Unearned revenue | 206,342 | 23,801 | 230,143 | 114,378 |
| Notes payable to GDB | 415,128 | — | 415,128 | — |
| Liabilities payable within one year: | | | | |
| Commonwealth appropriation bonds | 25,684 | — | 25,684 | 10,599 |
| General obligations and revenue bonds | 702,095 | — | 702,095 | 1,045,911 |
| Bond purchase agreement with GDB | 7,788 | — | 7,788 | — |
| Notes payable to component units | 21,903 | 41,333 | 63,236 | 1,701,191 |
| Note payable to financial institution | 4,753 | — | 4,753 | — |
| Capital leases | 7,884 | — | 7,884 | 1,060 |
| Compensated absences | 585,159 | 10,036 | 595,195 | 183,605 |
| Obligation for unpaid lottery prizes | — | 102,859 | 102,859 | — |
| Voluntary termination benefits | 97,607 | 1,329 | 98,936 | 19,977 |
| Net pension liability | 77,039 | — | 77,039 | — |
| Liability for automobile accident insurance and workmen compensation | — | — | — | 834,857 |
| Liability for unemployment, disability and health insurance | — | 298,487 | 298,487 | — |
| Other long-term liabilities | 242,111 | 48,030 | 290,141 | 226,071 |
| Liabilities payable after one year: | | | | |
| Commonwealth appropriation bonds | 544,970 | — | 544,970 | 518,273 |
| General obligations and revenue bonds | 36,671,572 | — | 36,671,572 | 18,417,823 |
| Bond purchase agreement with GDB | 225,482 | — | 225,482 | — |
| Notes payable to component units | 2,289,258 | 443,463 | 2,732,721 | 4,209,669 |
| Notes payable to financial institutions | 23,764 | — | 23,764 | — |
| Liability under guaranteed obligation | 337,257 | — | 337,257 | — |
| Capital leases | 342,470 | — | 342,470 | 27,998 |
| Net pension obligation | — | — | — | 18,394 |
| Net pension liability | 32,967,637 | 30,353 | 32,997,990 | 7,478,653 |
| Hedging derivatives instruments – interest rate swaps | 53,200 | — | 53,200 | 51,195 |
| Other postemployment benefit obligation | 263,335 | 1,834 | 265,169 | — |
| Compensated absences | 756,650 | 9,578 | 766,228 | 331,347 |
| Obligation for unpaid lottery prizes | — | 118,635 | 118,635 | — |
| Voluntary termination benefits | 638,167 | 8,196 | 646,363 | 156,599 |
| Other long-term liabilities | 1,397,184 | 3,467 | 1,400,651 | 637,598 |
| Total liabilities | 83,052,521 | 1,378,525 | 84,431,046 | 48,890,256 |
| **Deferred inflows of resources:** | | | | |
| Service concession arrangements | — | — | — | 1,793,952 |
| Gain on bonds refunding | 100,928 | — | 100,928 | — |
| Pension related | 842,245 | 192 | 842,437 | 179,147 |
| Total deferred inflows of resources | 943,173 | 192 | 943,365 | 1,973,099 |
| **Net position:** | | | | |
| Net investment in capital assets | 3,444,760 | 68,310 | 3,513,070 | 6,889,041 |
| Restricted for: | | | | |
| Capital projects | 123,529 | — | 123,529 | 317,345 |
| Debt service | 306,552 | — | 306,552 | 498,660 |
| Emergency services | — | 6,984 | 6,984 | — |
| Lending activities | — | 731,489 | 731,489 | — |
| Payment of insurance benefits | — | 470,886 | 470,886 | — |
| Public housing and welfare | 4,094 | — | 4,094 | 146,008 |
| Student loans and other educational purposes | — | — | — | 108,103 |
| Other | 75,283 | — | 75,283 | 210,101 |
| Unrestricted (deficit) | (71,646,703) | (623,106) | (72,269,809) | (12,320,891) |
| Total net position (deficit) | $ (67,692,485) | 654,563 | (67,037,922) | (4,151,633) |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009828

COMMONWEALTH OF PUERTO RICO

Statement of Activities

Year ended June 30, 2015

(In thousands)

| Functions | Expenses | Program revenue | | | Net (expense) revenue and changes in net position | | | Component units |
| | | Charges for services | Operating grants and contributions | Capital grants and contributions | Primary government | | | |
| | | | | | Governmental activities | Business-type activities | Total | |
| Primary government: | | | | | | | | |
| Governmental activities: | | | | | | | | |
| General government | $ 2,251,979 | 364,401 | 111,252 | — | (1,776,326) | — | (1,776,326) | — |
| Public safety | 1,828,596 | 131,390 | 63,535 | — | (1,633,671) | — | (1,633,671) | — |
| Health | 2,327,012 | 188,154 | 2,265,557 | — | 126,699 | — | 126,699 | — |
| Public housing and welfare | 3,279,564 | 19,167 | 2,723,493 | 80,753 | (456,151) | — | (456,151) | — |
| Education | 3,599,979 | 1,305 | 1,188,719 | — | (2,409,955) | — | (2,409,955) | — |
| Economic development | 1,525,337 | 148,291 | 2,699 | — | (1,374,347) | — | (1,374,347) | — |
| Intergovernmental | 344,594 | — | — | — | (344,594) | — | (344,594) | — |
| Interest and other | 2,499,411 | — | — | — | (2,499,411) | — | (2,499,411) | — |
| Total governmental activities | 17,656,472 | 852,708 | 6,355,255 | 80,753 | (10,367,756) | — | (10,367,756) | — |
| Business-type activities: | | | | | | | | |
| Unemployment insurance | 161,312 | 229,144 | 3,018 | — | — | 70,850 | 70,850 | — |
| Lotteries | 634,336 | 846,403 | — | — | — | 212,067 | 212,067 | — |
| Puerto Rico Health Insurance Administration | 2,805,897 | 330,251 | 1,592,485 | — | — | (883,161) | (883,161) | — |
| Puerto Rico Medical Services Administration | 199,032 | 136,230 | — | — | — | (62,802) | (62,802) | — |
| Puerto Rico Water Pollution Control Revolving Fund | 8,225 | 7,090 | 68,167 | — | — | 67,032 | 67,032 | — |
| Nonmajor proprietary funds | 39,363 | 48,349 | 18,401 | — | — | 27,387 | 27,387 | — |
| Total business-type activities | 3,848,165 | 1,597,467 | 1,682,071 | — | — | (568,627) | (568,627) | — |
| Total primary government | $ 21,504,637 | 2,450,175 | 8,037,326 | 80,753 | (10,367,756) | (568,627) | (10,936,383) | — |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009829

**COMMONWEALTH OF PUERTO RICO**

Statement of Activities

Year ended June 30, 2015

(In thousands)

| Functions | Expenses | Charges for services | Operating grants and contributions | Capital grants and contributions | Governmental activities | Business-type activities | Total | Component units |
|---|---|---|---|---|---|---|---|---|
| | | Program revenue | | | Net (expense) revenue and changes in net position | | | |
| | | | | | Primary government | | | |
| Component units: | | | | | | | | |
| Government Development Bank for Puerto Rico | $ 4,136,064 | 395,477 | 167,801 | — | — | — | — | (3,572,786) |
| Puerto Rico Highways and Transportation Authority | 1,109,782 | 322,405 | — | 135,985 | — | — | — | (651,392) |
| Puerto Rico Electric Power Authority | 5,069,855 | 3,865,458 | — | 21,404 | — | — | — | (1,182,993) |
| Puerto Rico Aqueduct and Sewer Authority | 1,183,957 | 1,054,488 | — | 26,054 | — | — | — | (103,415) |
| University of Puerto Rico | 1,363,147 | 189,492 | 290,155 | 2,266 | — | — | — | (881,234) |
| State Insurance Fund Corporation | 546,042 | 589,638 | — | — | — | — | — | 43,596 |
| Nonmajor component units | 1,339,766 | 753,511 | 156,902 | 31,132 | — | — | — | (398,221) |
| Total component units | $ 14,748,613 | 7,170,469 | 614,858 | 216,841 | — | — | — | (6,746,445) |
| General revenue: | | | | | | | | |
| Income taxes | | | | | $ 4,682,575 | — | 4,682,575 | — |
| Sales and use tax | | | | | 1,315,075 | — | 1,315,075 | — |
| Excise taxes | | | | | 3,201,776 | — | 3,201,776 | 168,390 |
| Other taxes | | | | | 134,789 | — | 134,789 | — |
| Revenue from global tobacco settlement agreement | | | | | 66,192 | — | 66,192 | — |
| Revenue from State Insurance Fund Corporation | | | | | 106,756 | — | 106,756 | — |
| Revenue from Puerto Rico Tourism Company | | | | | 21,175 | — | 21,175 | — |
| Revenue from Automobile Accidents Compensation Administration | | | | | 18,671 | — | 18,671 | — |
| Revenue from Puerto Rico Department of Transportation and Highway Authority | | | | | 6,033 | — | 6,033 | — |
| Grants and contributions not restricted to specific programs | | | | | 84,369 | — | 84,369 | 4,015 |
| Revenue from primary government | | | | | — | — | — | 1,668,952 |
| Unrestricted investment (losses) earnings – net | | | | | 24,144 | 25,819 | 49,963 | 143,613 |
| Other | | | | | 246,671 | 638 | 247,309 | — |
| Transfers | | | | | (664,363) | 664,363 | — | — |
| Total general revenue and transfers | | | | | 9,243,883 | 690,820 | 9,934,683 | 1,984,970 |
| Change in net position | | | | | (1,123,893) | 122,193 | (1,001,700) | (4,761,475) |
| Net position: | | | | | | | | |
| At beginning of year, as previously reported | | | | | (50,439,003) | 785,849 | (49,653,154) | 6,021,944 |
| Correction of errors and adoption of new accounting pronouncements (note 3) | | | | | (16,129,589) | (253,479) | (16,383,068) | (5,412,102) |
| Net position (deficit) – beginning of year, as adjusted and restated | | | | | (66,568,592) | 532,370 | (66,036,222) | 609,842 |
| Net position (deficit) – end of year | | | | | $ (67,692,485) | 654,563 | (67,037,922) | (4,151,633) |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009830

**COMMONWEALTH OF PUERTO RICO**

Balance Sheet – Governmental Funds

June 30, 2015

(In thousands)

| | General | Debt service | COFINA special revenue | COFINA debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 226,076 | — | — | — | 25,360 | 251,436 |
| Cash and cash equivalents in governmental banks | 248,740 | — | 5,168 | — | 48,341 | 302,249 |
| Investments | 243 | — | 165 | — | 14,927 | 15,335 |
| Receivables – net: | | | | | | |
| Income and excise taxes | 1,474,386 | — | — | — | — | 1,474,386 |
| Intergovernmental | 452,111 | — | — | — | 10,596 | 462,707 |
| Accounts | 18,837 | — | — | — | 1,950 | 20,787 |
| Loans | — | — | — | — | 39 | 39 |
| Accrued interest | 3,258 | — | — | — | 43 | 3,301 |
| Other | 103,582 | — | — | — | 39,014 | 142,596 |
| Due from – net: | | | | | | |
| Other funds | 11,044 | — | — | — | 18,979 | 30,023 |
| Component units | 64,650 | — | — | — | 44 | 64,694 |
| Other governmental entities | 76,613 | — | — | — | 7,563 | 84,176 |
| Other assets | 13,350 | — | — | — | 1,453 | 14,803 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 29,526 | 780,902 | — | 27,004 | 384,605 | 1,222,037 |
| Cash and cash equivalents in governmental banks | 53,579 | 91,364 | — | 360 | 85,296 | 230,599 |
| Cash equivalents in PRGITF | — | — | — | — | 69,674 | 69,674 |
| Sales and use tax receivable | — | — | — | 130,343 | — | 130,343 |
| Intergovernmental receivable | — | 78,108 | — | — | — | 78,108 |
| Investments | 11,140 | 75,108 | — | 397,096 | 111,995 | 595,339 |
| Due from other funds | — | — | — | — | 218,975 | 218,975 |
| Other assets | — | — | — | 659 | 442 | 1,101 |
| Real estate held for sale or future development | — | — | — | — | 2,052 | 2,052 |
| Total assets | $ 2,787,135 | 1,025,482 | 5,333 | 555,462 | 1,041,348 | 5,414,760 |
| **Liabilities, deferred inflow of resources, and fund balances (deficit):** | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable and accrued liabilities | $ 1,289,926 | — | 179 | 624 | 193,070 | 1,483,799 |
| Cash overdraft | 530,715 | — | — | — | — | 530,715 |
| Tax refunds payable | 763,145 | — | — | — | — | 763,145 |
| Due to: | | | | | | |
| Other funds | 53,193 | — | — | 218,405 | 5,180 | 276,778 |
| Component units | 275,113 | — | — | — | 8,753 | 283,866 |
| Other governmental entities | 196,725 | — | — | — | 5,938 | 202,663 |
| Interest payable | 21,794 | 376,076 | — | — | 103,790 | 501,660 |
| Grant advances | 7,949 | — | — | — | — | 7,949 |
| Unearned revenue | 201,247 | — | — | — | 5,095 | 206,342 |
| Notes payable to GDB | 413,428 | — | — | — | 1,700 | 415,128 |
| General obligation and revenue bonds | — | 428,865 | — | — | 82,000 | 510,865 |
| Voluntary termination benefits payable | 725 | — | — | — | — | 725 |
| Net pension liability | 77,039 | — | — | — | — | 77,039 |
| Other liabilities | 34,000 | — | — | — | — | 34,000 |
| Total liabilities | 3,864,999 | 804,941 | 179 | 219,029 | 405,526 | 5,294,674 |
| Deferred inflows of resources: | | | | | | |
| Unavailable income taxes | 928,702 | — | — | — | — | 928,702 |
| Intergovernmental grants and contributions | 28,140 | — | — | — | — | 28,140 |
| Developer fees | 80,618 | — | — | — | — | 80,618 |
| Global tobacco settlement agreement | — | — | — | — | 36,871 | 36,871 |
| Total deferred inflows of resources | 1,037,460 | — | — | — | 36,871 | 1,074,331 |
| Fund Balances: | | | | | | |
| Nonspendable | 988 | — | — | — | 7 | 995 |
| Spendable: | | | | | | |
| Restricted | 61,430 | 220,541 | — | 336,433 | 579,296 | 1,197,700 |
| Committed | — | — | — | — | 25,487 | 25,487 |
| Assigned | 28,277 | — | 5,154 | — | 33,984 | 67,415 |
| Unassigned (deficit) | (2,206,019) | — | — | — | (39,823) | (2,245,842) |
| Total fund balances (deficit) | (2,115,324) | 220,541 | 5,154 | 336,433 | 598,951 | (954,245) |
| Total liabilities, deferred inflow of resources, and fund balances (deficit) | $ 2,787,135 | 1,025,482 | 5,333 | 555,462 | 1,041,348 | 5,414,760 |

See accompanying notes to basic financial statements.

43

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Reconciliation of the Balance Sheet of Governmental Funds
to the Statement of Net Position

June 30, 2015

(In thousands)

| | | |
|---|---|---:|
| Total fund balances (deficit) of governmental funds | $ | (954,245) |
| Amounts reported for governmental activities in the statement of net position are different than the amounts reported in the governmental funds because: | | |
| Inventories and prepaid expenses that are not reported in governmental funds and are reported in the statement of net position | | 46,484 |
| Deferred outflows of resources – Accumulated decrease in fair value of hedging derivatives | | 53,200 |
| Deferred outflows of resources – Loss on bond refunding | | 440,910 |
| Deferred outflows of resources – Pension related | | 1,758,837 |
| Capital assets used in governmental activities are not financial resources and, therefore, are not reported in funds | | 8,823,439 |
| Real estate held for sale or future development are not current financial resources and, therefore, are not reported in the governmental funds | | 42,357 |
| Deferred inflows of resources reported in the governmental funds are recognized as revenue in the governmental activities | | 1,074,331 |
| Deferred inflows of resources – Gain on bonds refunding | | (100,928) |
| Deferred inflows of resources – Pension related | | (842,245) |
| Long-term liabilities are not due and payable in the current period and, therefore, are not reported in the funds: | | |
| Interest payable | | (374,285) |
| Commonwealth appropriation bonds | | (570,654) |
| General obligation and revenue bonds | | (36,862,802) |
| Bond purchase agreement with GDB | | (233,270) |
| Guaranteed obligation | | (337,257) |
| Notes payable to component units | | (2,311,161) |
| Notes payable to financial institution | | (28,517) |
| Capital leases | | (350,354) |
| Net pension liability | | (32,967,637) |
| Hedging derivative instrument – interest rate swaps | | (53,200) |
| Other postemployment benefit obligation | | (263,335) |
| Compensated absences | | (1,341,809) |
| Voluntary termination benefits | | (735,049) |
| Other long-term liabilities | | (1,605,295) |
| Total net position (deficit) of governmental activities | $ | (67,692,485) |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009832

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenditures, and Changes in Fund Balances – Governmental Funds

Year ended June 30, 2015

(In thousands)

| | General | Debt service | COFINA special revenue | COFINA debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Taxes: | | | | | | |
| Income taxes | $ 4,766,674 | — | — | — | — | 4,766,674 |
| Sales and use tax | 628,958 | — | — | 686,117 | — | 1,315,075 |
| Excise taxes | 3,201,776 | — | — | — | — | 3,201,776 |
| Property taxes | 21,260 | — | — | — | — | 21,260 |
| Other taxes | 113,529 | — | — | — | — | 113,529 |
| Charges for services | 852,708 | — | — | — | — | 852,708 |
| Revenue from global tobacco settlement agreement | 71,514 | — | — | — | — | 71,514 |
| Revenue from component units | 146,602 | — | — | — | 6,033 | 152,635 |
| Intergovernmental | 6,433,892 | 120,176 | — | — | 37,309 | 6,591,377 |
| Interest and investment earnings | 4,265 | 14,612 | — | 402 | 4,865 | 24,144 |
| Other | 239,263 | — | 30 | — | 7,378 | 246,671 |
| Total revenue | 16,480,441 | 134,788 | 30 | 686,519 | 55,585 | 17,357,363 |
| Expenditures: | | | | | | |
| Current: | | | | | | |
| General government | 1,408,557 | — | 19,826 | 6,476 | 299,046 | 1,733,905 |
| Public safety | 1,907,953 | — | — | — | 360 | 1,908,313 |
| Health | 2,603,591 | — | — | — | 9,938 | 2,613,529 |
| Public housing and welfare | 3,341,160 | — | — | — | 7,811 | 3,348,971 |
| Education | 3,714,891 | — | — | — | 2,418 | 3,717,309 |
| Economic development | 1,128,305 | — | — | — | 263,274 | 1,391,579 |
| Intergovernmental | 328,365 | — | — | — | 16,314 | 344,679 |
| Capital outlays | 289,265 | — | — | — | 189,306 | 478,571 |
| Debt service: | | | | | | |
| Principal | 64,730 | 428,865 | — | — | 377,736 | 871,331 |
| Interest and other | 239,419 | 779,813 | — | 643,668 | 387,040 | 2,049,940 |
| Other – debt issuance costs | — | — | — | — | 1,067 | 1,067 |
| Total expenditures | 15,026,236 | 1,208,678 | 19,826 | 650,144 | 1,554,310 | 18,459,194 |
| Excess (deficiency) of revenue over (under) expenditures | 1,454,205 | (1,073,890) | (19,796) | 36,375 | (1,498,725) | (1,101,831) |
| Other financing sources (uses): | | | | | | |
| Transfers in | 268,085 | 861,298 | 19,509 | — | 629,316 | 1,778,208 |
| Transfers out | (2,405,849) | — | — | (36,722) | — | (2,442,571) |
| Proceeds from long term debt issued | 366,313 | — | — | — | 343,397 | 709,710 |
| Issuance of refunding bonds | — | — | — | — | 232,872 | 232,872 |
| Proceeds from sale of capital assets | 669 | — | — | — | — | 669 |
| Discount on bonds issued | — | — | — | — | (17,217) | (17,217) |
| Total other financing sources (uses) | (1,770,782) | 861,298 | 19,509 | (36,722) | 1,188,368 | 261,671 |
| Net change in fund balances | (316,577) | (212,592) | (287) | (347) | (310,357) | (840,160) |
| Fund balances (deficit) – beginning of year, as restated (note 3) | (1,798,747) | 433,133 | 5,441 | 336,780 | 909,308 | (114,085) |
| Fund balances (deficit) – end of year | $ (2,115,324) | 220,541 | 5,154 | 336,433 | 598,951 | (954,245) |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009833

**COMMONWEALTH OF PUERTO RICO**

Reconciliation of the Statement of Revenue, Expenditures, and Changes in
Fund Balances of Governmental Funds to the Statement of Activities

Year ended June 30, 2015

(In thousands)

| | | |
|---|---:|---:|
| Net change in fund balances – total governmental funds | $ | (840,160) |
| Amounts reported for governmental activities in the statement of activities are different because: | | |
| Governmental funds report capital outlays as expenditures. However, in the statement of activities, the cost of those assets is allocated over their estimated useful lives and reported as depreciation and amortization expense. In the current period, these amounts are: | | |
| Capital outlays | $    478,571 | |
| Less depreciation and amortization expense | (321,186) | |
| Loss on disposal of assets | (23,985) | |
| Subtotal | | 133,400 |
| The issuance of long-term debt (e.g., bonds and notes) provides current financial resources to governmental funds, while the repayment of the principal of long-term debt consumes the current financial resources of governmental funds. Neither transaction, however, has any effect on net position. Also, governmental funds report the effect of premiums, discounts, and similar items when debt is first issued, whereas these amounts are deferred and amortized in the statement of activities. This amount is the net effect of these differences in the treatment of long-term debt and related items: | | |
| Principal payments of long-term debt | 871,331 | |
| Proceed from long-term debt issued | (709,710) | |
| Proceeds from issuance of refunding bonds | (232,872) | |
| Discount on bonds issuance | 17,217 | |
| Subtotal | | (54,034) |
| Some revenues in the statement of activities do not provide current financial resources, and, therefore, are deferred in governmental funds. Also, revenue related to prior periods that became available during the current period is reported in governmental funds but are eliminated in the statement of activities. This amount is the net adjustment. | | (160,421) |
| Some expenses reported in the statement of activities do not require the use of current financial resources and, therefore, are not reported as expenditures in governmental funds. | | (202,713) |
| Generally, inventory and prepayments are recorded as expenditures in the governmental funds when purchased rather than capitalized as an asset. However, these assets are capitalized in the statement of net position. This amount is the net decrease in total inventories and prepaid expenses. | | 35 |
| Change in net position of governmental activities | $ | (1,123,893) |

See accompanying notes to basic financial statements.

46

(Continued)

CW_STAY0009834

**COMMONWEALTH OF PUERTO RICO**

Statement of Net Position – Proprietary Funds

June 30, 2015

(In thousands)

| | | | Business-Type Activities – Enterprise Funds | | | | |
|---|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| Assets: | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents in commercial banks | $ — | 21,315 | 13,890 | 1,754 | — | — | 36,959 |
| Cash and cash equivalents in governmental banks | — | 109,661 | 2,142 | — | — | 66,864 | 178,667 |
| Investments | — | — | 6,512 | — | — | — | 6,512 |
| Receivables – net: | | | | | | | |
| Insurance premiums | — | — | — | — | — | 4,267 | 4,267 |
| Intergovernmental | — | — | 170,737 | 4,772 | — | — | 175,509 |
| Accounts | — | 3,980 | 93,065 | 18,593 | — | 2,212 | 117,850 |
| Accrued interest receivable | — | — | — | — | — | 50 | 50 |
| Other | — | — | — | 48 | — | 305 | 353 |
| Due from other funds | — | 3,876 | — | 15,337 | — | 6,182 | 25,395 |
| Due from other governmental entities | — | — | — | 2,245 | — | — | 2,245 |
| Other assets | — | — | 21,520 | 4,046 | — | 48 | 25,614 |
| Restricted assets: | | | | | | | |
| Cash and cash equivalents in commercial banks | 2,752 | — | 1,321 | — | — | 1,112 | 5,185 |
| Cash and cash equivalents in governmental banks | 657 | — | — | — | 129,525 | 54,387 | 184,769 |
| Cash and cash equivalents under the custody of the | | | | | | | |
| U.S. Treasury | 454,125 | — | — | — | — | — | 454,125 |
| Insurance premiums | 54,121 | — | — | — | — | — | 54,121 |
| Other | 43 | — | — | — | — | 128 | 171 |
| Accrued interest | — | — | — | — | 3,614 | 1,612 | 5,226 |
| Loans from component units | — | — | — | — | 17,572 | 8,032 | 25,604 |
| Total current assets | 511,898 | 138,832 | 309,187 | 46,795 | 150,839 | 145,071 | 1,302,622 |
| Noncurrent assets: | | | | | | | |
| Cash and cash equivalents in commercial banks – restricted | — | — | 1,100 | 1,166 | — | — | 2,266 |
| Receivables – net: | | | | | | | |
| Loans from component units – restricted | — | — | — | — | 367,307 | 162,478 | 529,785 |
| Due from component units | — | — | — | — | — | 10,879 | 10,879 |
| Other | — | — | 40,539 | — | — | — | 40,539 |
| Restricted investments | — | — | — | — | — | 38,118 | 38,118 |
| Other restricted assets | — | 27,126 | — | — | 753 | — | 27,879 |
| Land and other nondepreciable | — | — | — | 6,872 | — | 19,965 | 26,837 |
| Depreciable, net | — | 1,095 | 702 | 52,541 | — | 3,445 | 57,783 |
| Total assets | 511,898 | 167,053 | 351,528 | 107,374 | 518,899 | 379,956 | 2,036,708 |
| Deferred outflows of resources: | | | | | | | |
| Pension related | — | 5,066 | — | — | — | — | 5,066 |
| Current liabilities: | | | | | | | |
| Accounts payable and accrued liabilities | — | 9,056 | 121,912 | 42,135 | 820 | 5,460 | 179,383 |
| Due to other funds | 8,494 | — | — | — | — | — | 8,494 |
| Due to component units | — | — | — | 34,516 | — | — | 34,516 |
| Due to other governmental entities | — | — | — | 322 | — | 109 | 431 |
| Interest payable | — | — | 8,718 | 13,145 | — | 931 | 22,794 |
| Unearned revenue | 12,454 | 8,587 | — | — | — | 2,760 | 23,801 |
| Notes payable to component units | — | — | 41,333 | — | — | — | 41,333 |
| Compensated absences | — | 628 | 502 | 7,426 | — | 1,478 | 10,036 |
| Obligation for unpaid lottery prizes | — | 102,859 | — | — | — | — | 102,859 |
| Voluntary termination benefits payable | — | 542 | 616 | — | — | 171 | 1,329 |
| Liability for unemployment, disability and health insurance | 57,683 | — | 240,153 | — | — | 651 | 298,487 |
| Other long-term liabilities | — | — | — | 48,030 | — | — | 48,030 |
| Total current liabilities | 78,631 | 121,672 | 413,234 | 145,576 | 820 | 11,560 | 771,493 |
| Noncurrent liabilities: | | | | | | | |
| Notes payable to component units | — | — | 141,918 | 282,445 | — | 19,100 | 443,463 |
| Net pension liability | — | 30,353 | — | — | — | — | 30,353 |
| Other postemployment benefit obligation | — | — | — | 1,834 | — | — | 1,834 |
| Compensated absences | — | 2,503 | 321 | 5,078 | — | 1,676 | 9,578 |
| Obligation for unpaid lottery prizes | — | 118,635 | — | — | — | — | 118,635 |
| Voluntary termination benefits payable | — | 4,239 | 3,560 | — | — | 397 | 8,196 |
| Other long-term liabilities | — | — | — | 3,467 | — | — | 3,467 |
| Total liabilities | 78,631 | 277,402 | 559,033 | 438,400 | 820 | 32,733 | 1,387,019 |
| Deferred inflows of resources: | | | | | | | |
| Pension related | — | 192 | — | — | — | — | 192 |
| Net position: | | | | | | | |
| Net investment in capital assets | — | 1,095 | 702 | 59,413 | — | 7,100 | 68,310 |
| Restricted for emergency services | — | — | — | — | — | 6,984 | 6,984 |
| Restricted for lending activities | — | — | — | — | 518,079 | 213,410 | 731,489 |
| Restricted for payment of insurance benefits | 433,267 | — | — | — | — | 37,619 | 470,886 |
| Unrestricted (deficit) | — | (106,570) | (208,207) | (390,439) | — | 82,110 | (623,106) |
| Total net position (deficit) | $ 433,267 | (105,475) | (207,505) | (331,026) | 518,079 | 347,223 | 654,563 |

See accompanying notes to basic financial statements.

47

(Continued)

CW_STAY0009835

**COMMONWEALTH OF PUERTO RICO**

Statement of Revenue, Expenses, and Changes in Fund Net Position – Proprietary Funds

Year ended June 30, 2015

(In thousands)

| | Business-Type Activities – Enterprise Funds | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Unemployment Insurance | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| Operating revenue: | | | | | | | |
| Health insurance administration | $ — | — | 330,251 | — | — | 23,582 | 353,833 |
| Insurance premiums | 229,144 | — | — | — | — | — | 229,144 |
| Lottery ticket sales | — | 846,352 | — | — | — | — | 846,352 |
| Patient service, net of provision for bad debts | — | — | — | 136,230 | — | — | 136,230 |
| Interest | — | — | — | — | 7,090 | 3,228 | 10,318 |
| Emergency telephone service charges | — | — | — | — | — | 21,226 | 21,226 |
| Other | — | 51 | — | — | — | 313 | 364 |
| Total operating revenue | 229,144 | 846,403 | 330,251 | 136,230 | 7,090 | 48,349 | 1,597,467 |
| Operating expenses: | | | | | | | |
| Insurance benefits | 161,312 | — | — | — | — | 2,513 | 163,825 |
| Medical premiums and claims | — | — | 2,765,772 | — | — | — | 2,765,772 |
| Lottery prizes | — | 551,561 | — | — | — | — | 551,561 |
| Patient services | — | — | — | 158,722 | — | — | 158,722 |
| General, administrative, and other operating expenses | — | 82,775 | 26,197 | 20,315 | 1,723 | 30,895 | 161,905 |
| Total operating expenses | 161,312 | 634,336 | 2,791,969 | 179,037 | 1,723 | 33,408 | 3,801,785 |
| Operating income (loss) | 67,832 | 212,067 | (2,461,718) | (42,807) | 5,367 | 14,941 | (2,204,318) |
| Nonoperating revenue (expenses): | | | | | | | |
| U.S. government grants | 3,018 | — | 1,592,485 | — | 68,167 | 18,401 | 1,682,071 |
| Contributions to component units | — | — | — | — | (6,502) | (5,024) | (11,526) |
| Interest and investment earnings | 9,813 | 832 | 13,192 | — | — | 1,982 | 25,819 |
| Interest expense | — | — | (13,928) | (19,995) | — | (931) | (34,854) |
| Other | — | — | — | 638 | — | — | 638 |
| Total nonoperating revenue (expenses) | 12,831 | 832 | 1,591,749 | (19,357) | 61,665 | 14,428 | 1,662,148 |
| Income (loss) before transfers | 80,663 | 212,899 | (869,969) | (62,164) | 67,032 | 29,369 | (542,170) |
| Transfers from other funds | — | — | 892,259 | 33,464 | 433 | 3,830 | 929,986 |
| Transfers to other funds | (44,395) | (198,067) | — | — | — | (23,161) | (265,623) |
| Net change in net position | 36,268 | 14,832 | 22,290 | (28,700) | 67,465 | 10,038 | 122,193 |
| Net position (deficit)– beginning of year, as adjusted (note 3) | 396,999 | (120,307) | (229,795) | (302,326) | 450,614 | 337,185 | 532,370 |
| Net position (deficit)– end of year | $ 433,267 | (105,475) | (207,505) | (331,026) | 518,079 | 347,223 | 654,563 |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009836

COMMONWEALTH OF PUERTO RICO

Statement of Cash Flows – Proprietary Funds

Year ended June 30, 2015

(In thousands)

| | Business-Type Activities – Enterprise Funds | | | | | | |
|---|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| **Cash flows from operating activities:** | | | | | | | |
| Receipts from customers and users | $ 237,489 | 854,610 | 302,750 | 124,647 | — | 45,142 | 1,564,638 |
| Other receipts | — | 51 | 122,828 | — | — | — | 122,879 |
| Payments to healthcare organizations and third party administrators | — | — | (2,756,772) | — | — | — | (2,756,772) |
| Payments to suppliers and employees | — | (80,831) | (63,685) | (136,478) | (3,027) | (31,686) | (315,707) |
| Payments of lottery prizes | — | (516,624) | — | — | — | — | (516,624) |
| Payments of insurance benefits | (166,544) | — | — | — | — | (2,609) | (169,153) |
| Net cash provided by (used in) operating activities | 70,945 | 257,206 | (2,394,879) | (11,831) | (3,027) | 10,847 | (2,070,739) |
| **Cash flows from noncapital financing activities:** | | | | | | | |
| U.S. government grants | 3,028 | — | 1,592,485 | — | 68,167 | 15,771 | 1,679,451 |
| Contributions to component units | — | — | — | — | (6,502) | (5,024) | (11,526) |
| Payments of lines of credit | — | — | (83,000) | — | — | — | (83,000) |
| Interest paid | — | — | (16,314) | (23,521) | — | — | (39,835) |
| Transfers from other funds | — | — | 874,481 | 40,163 | 433 | 9,540 | 924,617 |
| Transfers to other funds | (46,734) | (236,101) | — | — | — | (28,442) | (311,277) |
| Net cash provided by (used in) noncapital and related financing activities | (43,706) | (236,101) | 2,367,652 | 16,642 | 62,098 | (8,155) | 2,158,430 |
| **Cash flows from capital and related financing activities:** | | | | | | | |
| Transfers from other funds | — | — | 7,259 | — | — | — | 7,259 |
| Capital expenditures | — | (7) | (285) | (4,584) | — | (20,205) | (25,081) |
| Net cash provided (used) by capital and related financing activities | — | (7) | 6,974 | (4,584) | — | (20,205) | (17,822) |
| **Cash flows from investing activities:** | | | | | | | |
| Interest collected on deposits, investments, and loans | 9,813 | 832 | 13,192 | 638 | 6,732 | 4,693 | 35,900 |
| Loans originated | — | — | — | — | (72,257) | 110 | (72,147) |
| Principal collected on loans | — | — | — | — | 19,435 | 7,464 | 26,899 |
| Proceeds from sales and maturities of investments | — | — | — | — | — | 8,475 | 8,475 |
| Purchases of investments | — | — | — | — | — | (7,967) | (7,967) |
| Net cash provided by (used in) investing activities | 9,813 | 832 | 13,192 | 638 | (46,090) | 12,775 | (8,840) |
| Net change in cash and cash equivalents | 37,052 | 21,930 | (7,061) | 865 | 12,981 | (4,738) | 61,029 |
| Cash and cash equivalents at beginning of year | 420,682 | 109,046 | 25,514 | 2,055 | 116,544 | 127,101 | 800,942 |
| Cash and cash equivalents at end of year | $ 457,734 | 130,976 | 18,453 | 2,920 | 129,525 | 122,363 | 861,971 |

See accompanying notes to basic financial statements.

49

(Continued)

CW_STAY0009837

COMMONWEALTH OF PUERTO RICO

Statement of Cash Flows – Proprietary Funds

Year ended June 30, 2015

(In thousands)

| | | | Business-Type Activities – Enterprise Funds | | | | |
|---|---|---|---|---|---|---|---|
| | Unemployment Insurance | Lotteries | Puerto Rico Health Insurance Administration | Puerto Rico Medical Services Administration | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary | Total proprietary |
| Reconciliation of operating income (loss) to net cash provided by (used in) operating activities: | | | | | | | |
| Operating income (loss) | $ 67,832 | 212,067 | (2,461,718) | (42,807) | 5,367 | 14,941 | (2,204,318) |
| Adjustments to reconcile operating income (loss) to net cash provided by (used in) operating activities: | | | | | | | |
| Interests earned on deposits, loans, and investments | — | — | — | — | (7,090) | (3,228) | (10,318) |
| Depreciation | — | 260 | 237 | 5,012 | — | 880 | 6,389 |
| Provision for bad debts | — | — | — | 16,987 | — | — | 16,987 |
| Loss on disposition of capital assets | — | — | — | 25 | — | 131 | 156 |
| Changes in operating assets and liabilities: | | | | | | | |
| Decrease (increase) in accounts and loans receivable | 6,560 | 9,069 | 95,327 | (16,918) | — | (197) | 93,841 |
| Increase in due from component units | — | — | — | (1,446) | — | — | (1,446) |
| Decrease in due from other governmental entities | — | — | — | 6,506 | — | — | 6,506 |
| Decrease (increase) in other assets | — | (2,030) | (19,286) | 275 | — | 173 | (20,868) |
| Increase in deferred outflow of resources | — | (4,435) | — | — | — | — | (4,435) |
| Increase (decrease) in accounts payable and accrued liabilities | — | 46 | (1,512) | 15,934 | (1,304) | 2,320 | 15,484 |
| Increase in due to component units | — | — | — | 3,484 | — | — | 3,484 |
| Increase (decrease) in due to other governmental entities | — | — | (7,239) | 432 | — | (3,757) | (10,564) |
| Increase in unearned revenue | 1,784 | 1,219 | — | — | — | 43 | 3,046 |
| Increase (decrease) in compensated absences | — | 201 | (375) | 685 | — | (194) | 317 |
| Increase in deferred inflow of resources | — | 192 | — | — | — | — | 192 |
| Increase in net pension liability | — | 6,038 | — | — | — | — | 6,038 |
| Increase in obligation for unpaid lottery prizes | — | 34,937 | — | — | — | — | 34,937 |
| Decrease in voluntary termination benefits payable | — | (358) | (313) | — | — | (169) | (840) |
| Decrease in liability for unemployment, disability and health insurance | (5,231) | — | — | — | — | (96) | (5,327) |
| Total adjustments | 3,113 | 45,139 | 66,839 | 30,976 | (8,394) | (4,094) | 133,579 |
| Net cash provided by (used in) operating activities | $ 70,945 | 257,206 | (2,394,879) | (11,831) | (3,027) | 10,847 | (2,070,739) |
| Noncash capital and financing activities: | | | | | | | |
| Retirement of capital assets | $ — | — | — | 671 | — | — | 671 |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009838

**COMMONWEALTH OF PUERTO RICO**

Statement of Fiduciary Net Position – Fiduciary Funds

June 30, 2015

(In thousands)

| | Pension (and other employee benefit) trust | Agency |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents in commercial banks: | | |
| Unrestricted | $ 157,211 | 598,848 |
| Restricted | 126,613 | — |
| Cash and cash equivalents with governmental banks: | | |
| Unrestricted | 109,768 | 192,477 |
| Restricted | 37,990 | |
| Receivables – net: | | |
| Employers – net | 183,359 | — |
| Accrued interest and dividends | 8,875 | — |
| Investments sold | 156,469 | — |
| Other | 23,792 | — |
| Collateral from securities lending transactions | 107,424 | — |
| Investments at fair value: | | |
| Bonds and notes | 1,185,866 | — |
| Nonexchange commingled trust funds | 826,862 | — |
| Stocks | 66,358 | — |
| Investments in limited partnerships | 61,526 | — |
| Member loans and interest receivable – net | 1,024,040 | — |
| Capital assets – net | 27,091 | — |
| Other assets | 1,850 | — |
| Total assets | 4,105,094 | 791,325 |
| **Liabilities:** | | |
| Accounts payable and accrued liabilities | 28,928 | 791,325 |
| Interest payable | 13,876 | — |
| Payable for investment securities purchased | 10,272 | — |
| Securities lending obligations | 107,424 | — |
| Due to Commonwealth of Puerto Rico | 76,613 | — |
| Other liabilities | 79,552 | — |
| Bonds payable | 3,105,448 | — |
| Total liabilities | 3,422,113 | 791,325 |
| **Net position:** | | |
| Restricted for pensions to be provided by ERS | (668,272) | — |
| Restricted for pensions to be provided by TRS | 1,311,081 | — |
| Restricted for pensions to be provided by JRS | 40,172 | — |
| Total net position | $ 682,981 | — |

See accompanying notes to basic financial statements.

51                                                                 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds

Year ended June 30, 2015

(In thousands)

| | | |
|---|---|---:|
| Additions: | | |
| Contributions: | | |
| Employer contributions: | | |
| Basic benefits, net of provision for allowance of $233,615 | $ | 636,262 |
| Special benefits | | 372,120 |
| Member contributions | | 450,791 |
| Total contributions | | 1,459,173 |
| Investment income and investment expense: | | |
| Net depreciation in fair value of investments | | (40,365) |
| Interest | | 136,806 |
| Dividends | | 1,511 |
| Investment expense, other than from security lending | | (4,793) |
| Net income from investing, other than from security lending | | 93,159 |
| Securities lending income | | 344 |
| Securities lending expenses | | (83) |
| Net income from security lending | | 261 |
| Net investment income | | 93,420 |
| Other income | | 30,429 |
| Total additions | | 1,583,022 |
| Deductions: | | |
| Benefits paid to participants | | 2,416,804 |
| Refunds of contributions | | 50,762 |
| Interest on bonds payable | | 194,400 |
| General and administrative | | 53,491 |
| Other expenses | | 15,096 |
| Total deductions | | 2,730,553 |
| Net decrease in net position | | (1,147,531) |
| Net position: | | |
| Beginning of year | | 1,830,512 |
| End of year | $ | 682,981 |

See accompanying notes to basic financial statements.

52

(Continued)

CW_STAY0009840

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Discretely Presented Component Units

June 30, 2015

(In thousands)

| | Major component units | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | State Insurance Fund Corporation | Major component units totals | Nonmajor component units totals | All component units totals |
| Assets: | | | | | | | | | |
| Cash and cash equivalents in commercial banks | $ 429,891 | 13,196 | 252,093 | 32,818 | 57,294 | 48,994 | 834,286 | 211,613 | 1,045,899 |
| Cash and cash equivalents with governmental banks | 36,695 | 14,726 | 12,560 | — | 57,154 | 44,034 | 165,169 | 142,942 | 308,111 |
| Cash equivalents in PRGITF | — | 171 | — | 2,868 | — | — | 3,039 | — | 3,039 |
| Investments | 672,821 | — | — | — | 2,774 | 1,055,839 | 1,731,434 | 1,032,435 | 2,763,869 |
| Collateral from securities lending transactions | — | — | — | — | — | 99,429 | 99,429 | — | 99,429 |
| Receivables – net: | | | | | | | | | |
| Insurance premiums | — | — | — | — | — | 33,260 | 33,260 | 1,028 | 34,288 |
| Intergovernmental | — | 27,553 | 668,947 | 22,767 | 40,384 | — | 759,651 | 5,787 | 765,438 |
| Accounts | — | 10,962 | 531,795 | 178,164 | 28,630 | — | 749,551 | 103,104 | 852,655 |
| Loans and advances | 3,113,202 | — | — | — | 5,663 | 100,000 | 3,218,865 | 312,362 | 3,531,227 |
| Accrued interest | 85,033 | 597 | 2,643 | — | 502 | 4,870 | 93,645 | 13,963 | 107,608 |
| Other | 25,065 | — | 24,622 | — | — | 28,176 | 77,863 | 4,435 | 82,298 |
| Due from – net: | | | | | | | | | |
| Primary government | — | 59,798 | 78,831 | 18,959 | 30,992 | — | 188,580 | 47,200 | 235,780 |
| Component units | 211,560 | — | 95,806 | 5,499 | 5,435 | 12,771 | 331,071 | 34,698 | 365,769 |
| Other governmental entities | — | — | 702,620 | 3,337 | 45,061 | 2,522 | 753,540 | 41,717 | 795,257 |
| Inventories | — | 4,684 | 299,218 | 28,733 | 3,229 | 4,390 | 335,570 | 20,285 | 355,855 |
| Prepaid expenses | — | — | 3,928 | 4,909 | 2,083 | 207 | 15,811 | 13,477 | 29,288 |
| Other assets | 1,286 | 1,179 | 28,579 | — | — | — | 31,044 | 30,328 | 61,372 |
| Restricted assets: | | | | | | | | | |
| Cash and cash equivalents in commercial banks | 22,258 | 840 | 9,305 | 345,654 | 6,797 | — | 384,854 | 52,639 | 437,493 |
| Cash and cash equivalents with governmental banks | 71,558 | 3,015 | 126,590 | 32,075 | — | — | 233,238 | 51,128 | 284,366 |
| Investments | 247,254 | 573,250 | 411,107 | — | 279,259 | 272,653 | 1,783,523 | 1,177,218 | 2,960,741 |
| Other restricted assets | 10,362 | — | — | — | — | — | 10,362 | 52,560 | 62,922 |
| Real estate held for sale or future development | 79,369 | — | — | — | — | — | 79,369 | 169,756 | 249,125 |
| Capital assets: | | | | | | | | | |
| Land and other nondepreciable | 16,945 | 2,264,874 | 790,958 | 869,471 | 90,455 | 30,641 | 4,063,344 | 1,311,885 | 5,375,229 |
| Depreciable – net | 2,895 | 8,337,339 | 5,906,387 | 6,632,877 | 842,963 | 76,849 | 21,803,310 | 2,069,785 | 23,873,095 |
| Total assets | 5,026,194 | 11,312,184 | 9,947,989 | 8,178,131 | 1,498,675 | 1,816,635 | 37,779,808 | 6,900,345 | 44,680,153 |
| Deferred outflows of resources: | | | | | | | | | |
| Accumulated decrease in fair value of hedging derivatives | — | — | 51,195 | — | — | — | 51,195 | — | 51,195 |
| Loss on bonds refunding | 2,568 | 116,947 | 66,354 | 31,638 | 2,517 | — | 220,024 | 18,670 | 238,694 |
| Pension related | — | — | 1,552,516 | — | 88,251 | 79,028 | 1,719,795 | 21,885 | 1,741,680 |
| Total deferred outflows of resources | 2,568 | 116,947 | 1,670,065 | 31,638 | 90,768 | 79,028 | 1,991,014 | 40,555 | 2,031,569 |

See accompanying notes to basic financial statements.

53

(Continued)

CONFIDENTIAL

CW_STAY0009841

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Discretely Presented Component Units

June 30, 2015

(In thousands)

| | Major component units | | | | | | Major component units totals | Nonmajor component units totals | All component units totals |
|---|---|---|---|---|---|---|---|---|---|
| | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | State Insurance Fund Corporation | | | |
| **Liabilities:** | | | | | | | | | |
| Accounts payable and accrued liabilities | $ 109,351 | 110,304 | 2,053,908 | 371,017 | 39,317 | 103,818 | 2,787,715 | 299,373 | 3,087,088 |
| Deposits and escrow liabilities | 3,824,206 | — | 185,927 | 84,823 | — | — | 4,094,956 | 311,843 | 4,406,799 |
| Due to: | | | | | | | | | |
| Primary government | — | 16,515 | — | 555,389 | — | 17,000 | 588,904 | 108,944 | 697,848 |
| Component units | — | 2,066,079 | 39,314 | 112,619 | 113,308 | 1,268 | 2,334,588 | 1,060,527 | 3,395,115 |
| Other governmental entities | — | — | — | 9,569 | 30,866 | 4,634 | 45,069 | 64,764 | 109,833 |
| Securities lending obligations and reverse repurchase agreements | 267,207 | — | — | — | — | 99,429 | 366,636 | 28,756 | 395,392 |
| Interest payable | 35,900 | 376,542 | 211,193 | 103,164 | 4,101 | 850 | 731,750 | 81,233 | 812,983 |
| Unearned revenue | 3,180 | — | — | 19,427 | — | 21,247 | 43,854 | 70,524 | 114,378 |
| Liabilities payable within one year: | | | | | | | | | |
| Commonwealth appropriation bonds | 103 | — | — | 7,316 | — | — | 7,419 | 3,180 | 10,599 |
| Bonds payable | 287,450 | 113,355 | 459,628 | 50,853 | 22,160 | — | 933,446 | 112,465 | 1,045,911 |
| Notes payable | 609,040 | — | 698,006 | 92,405 | 607 | 215,969 | 1,616,027 | 85,164 | 1,701,191 |
| Capital leases | — | — | — | — | 847 | — | 847 | 213 | 1,060 |
| Compensated absences | — | 9,894 | 83,590 | 12,105 | 38,205 | 10,120 | 153,714 | 29,891 | 183,605 |
| Voluntary termination benefits | — | 9,241 | — | — | — | — | 9,241 | 10,736 | 19,977 |
| Liability for automobile accident insurance and workmen compensation | — | — | — | — | — | 760,149 | 760,149 | 74,708 | 834,857 |
| Other long-term liabilities | 80,438 | 28,846 | 37,701 | 7,091 | 3,851 | 44,322 | 202,249 | 23,822 | 226,071 |
| Liabilities payable after one year: | | | | | | | | | |
| Commonwealth appropriation bonds | 3,331 | — | — | 409,250 | — | — | 412,581 | 105,692 | 518,273 |
| Bonds payable | 136,730 | 4,344,797 | 7,989,298 | 4,019,781 | 517,952 | — | 17,008,558 | 1,409,265 | 18,417,823 |
| Notes payable | 3,440,947 | — | 20,470 | 4,148 | — | 16,292 | 3,482,569 | 727,100 | 4,209,669 |
| Compensated absences | — | 12,145 | 114,372 | 28,419 | 129,186 | 27,828 | 311,950 | 19,397 | 331,347 |
| Capital leases | — | — | — | — | — | 27,668 | 27,668 | 330 | 27,998 |
| Net pension obligation | — | — | — | — | — | — | — | 18,394 | 18,394 |
| Net pension liability | — | — | 3,558,872 | — | 2,104,040 | 1,417,963 | 7,080,875 | 397,778 | 7,478,653 |
| Hedging derivative instruments – interest rate swaps | — | — | 51,195 | — | — | — | 51,195 | — | 51,195 |
| Voluntary termination benefits | — | 65,944 | — | — | — | — | 65,944 | 90,655 | 156,599 |
| Other long-term liabilities | 119,639 | 133,300 | 111,817 | 29,489 | 127,112 | 45,331 | 566,688 | 70,910 | 637,598 |
| Total liabilities | 8,917,522 | 7,288,762 | 15,615,291 | 5,916,865 | 3,131,417 | 2,814,735 | 43,684,592 | 5,205,664 | 48,890,256 |
| **Deferred inflows of resources:** | | | | | | | | | |
| Service concession arrangements | — | 1,113,929 | — | — | — | — | 1,113,929 | 680,023 | 1,793,952 |
| Pension related | — | — | 57,703 | — | 107,138 | 11,347 | 176,188 | 2,959 | 179,147 |
| Total deferred inflows of resources | — | 1,113,929 | 57,703 | — | 107,138 | 11,347 | 1,290,117 | 682,982 | 1,973,099 |
| **Net position:** | | | | | | | | | |
| Net investment in capital assets | 11,313 | 3,019,516 | (1,017,787) | 2,638,506 | 397,454 | 58,448 | 5,107,450 | 1,781,591 | 6,889,041 |
| Restricted for: | | | | | | | | | |
| Capital projects | — | 28,817 | — | — | 11,053 | — | 39,870 | 277,475 | 317,345 |
| Debt service | 29,829 | 199,895 | — | — | 55,964 | 62,920 | 348,608 | 150,052 | 498,660 |
| Affordable housing and related loan insurance programs | 146,008 | — | — | — | — | — | 146,008 | — | 146,008 |
| Student loans and other educational purposes | — | — | — | — | 102,012 | — | 102,012 | 6,091 | 108,103 |
| Other | — | — | — | 27,777 | 13,129 | — | 40,906 | 169,195 | 210,101 |
| Unrestricted (deficit) | (4,075,910) | (221,788) | (3,037,153) | (373,379) | (2,228,724) | (1,051,787) | (10,988,741) | (1,332,150) | (12,320,891) |
| Total net position (deficit) | $ (3,888,760) | 3,026,440 | (4,054,940) | 2,292,904 | (1,649,112) | (930,419) | (5,203,887) | 1,052,254 | (4,151,633) |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL

CW_STAY0009842

COMMONWEALTH OF PUERTO RICO

Combining Statement of Activities – Discretely Presented Component Units

Year ended June 30, 2015

(In thousands)

| | Expenses | Charges for services | Program revenue Operating grants and contributions | Capital grants and contributions | Net revenue (expenses) and changes in net position | General revenue and transfers Payments from (to) primary government | Payments from (to) other component units | Grants and contributions not restricted to specific programs | Interest and investment earnings | Excise taxes and others | Change in net position | Net position (deficit) – beginning of year, as previously reported | Correction of errors and adoption of new pronouncements (note 3) | Net position (deficit) – beginning of year, as adjusted and restated | Net position (deficit) end of year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Major component units | | | | | | | | | | | | | | | |
| Government Development Bank for Puerto Rico | $ 4,136,064 | 395,477 | 167,801 | — | (3,572,786) | — | — | — | — | — | (3,572,786) | (315,974) | — | (315,974) | (3,888,760) |
| Puerto Rico Highways and Transportation Authority | 1,109,782 | 322,405 | — | 135,985 | (651,392) | 646,972 | — | — | 13,037 | 40,353 | 48,970 | 2,977,470 | — | 2,977,470 | 3,026,440 |
| Puerto Rico Electric Power Authority | 5,069,855 | 3,865,458 | — | 21,404 | (1,182,993) | — | (5,229) | — | 44,263 | — | (1,143,959) | (1,267,006) | (1,643,985) | (2,910,990) | (4,054,940) |
| Puerto Rico Aqueduct and Sewer Authority | 1,183,957 | 1,054,488 | — | 26,054 | (103,415) | 9,867 | — | — | 4,435 | 3,038 | (86,075) | 2,378,979 | — | 2,378,979 | 2,292,904 |
| University of Puerto Rico | 1,363,147 | 189,492 | 290,155 | 2,266 | (881,234) | 873,833 | 63,524 | — | 3,552 | 11,950 | 71,625 | 516,624 | (2,237,361) | (1,720,737) | (1,649,112) |
| State Insurance Fund Corporation | 546,042 | 589,638 | — | — | 43,596 | (106,756) | — | — | 29,731 | — | (33,429) | 402,600 | (1,299,593) | (896,990) | (930,419) |
| Nonmajor component units | 1,339,766 | 753,511 | 156,900 | 31,132 | (398,221) | 245,036 | (58,304) | 4,015 | 48,595 | 113,049 | (45,830) | 1,329,247 | (231,163) | 1,098,084 | 1,052,254 |
| | $ 14,748,613 | 7,170,469 | 814,856 | 216,841 | (6,746,445) | 1,668,952 | — | 4,015 | 143,613 | 168,390 | (4,761,475) | 6,021,944 | (5,412,102) | 609,842 | (4,151,633) |

See accompanying notes to basic financial statements.

(Continued)

CONFIDENTIAL
CW_STAY0009843

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

## (1) Summary of Significant Accounting Policies

The Commonwealth of Puerto Rico (the Commonwealth) was constituted on July 25, 1952, under the provisions of the Commonwealth's Constitution (the Constitution) as approved by the people of Puerto Rico and the U.S. Congress. The Constitution provides for the separation of powers of the executive, legislative, and judicial branches of the government. The Commonwealth assumes responsibility for general government, public safety, health, public housing and welfare, education, and economic development. Recently, however, as a result of the current fiscal crisis that affects the Commonwealth (as further described below in Note 2 and Note 22), the U.S. Congress enacted a law establishing a Oversight Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs, and review and approval over certain governmental responsibilities. This law is known as the "Puerto Rico Oversight, Management and Economic Stability Act" (PROMESA).

The accompanying basic financial statements of the Commonwealth are presented in conformity with U.S. Generally Accepted Accounting Principles (U.S. GAAP) for governments as prescribed by the Governmental Accounting Standards Board (GASB).

The accompanying basic financial statements present the financial position of the Commonwealth and its various funds and component units, the results of operations of the Commonwealth and its various funds and component units, and the cash flows of the proprietary funds.

### (a) Financial Reporting Entity

The financial reporting entity of the Commonwealth includes all departments, agencies, funds, functions, and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's financial reporting entity. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. The GASB has set forth criteria to be considered in determining financial accountability. These criteria include when the Commonwealth appoints a voting majority of an organization's governing body and it has (i) the ability to impose its will on that organization or (ii) the potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth. In situations where the Commonwealth has not appointed the voting majority of an organization's governing body, the GASB has then provided as criteria for financial accountability the fiscal dependency of such organizations on the Commonwealth and when there is a potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth.

As required by U.S. GAAP, the financial reporting entity of the Commonwealth includes the Commonwealth and its component units.

56

CW_STAY0009844

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

**(b)  Component Units**

The financial statements of the component units discussed below have been included in the financial reporting entity either as blended component units or as discretely presented component units in accordance with GASB Statement No. 14, *The Financial Reporting Entity*, as amended by GASB Statements No. 39 and No. 61.

*(i)  Blended Component Units*

The following entities, while legally separate from the Commonwealth, meet the blending criteria to be reported as part of the Primary Government as follows:

*Ponce Ports Authority (PPA)* – On December 12, 2011, Act No. 240 (Act No. 240) was approved creating the PPA, a component unit of the Commonwealth, with a seven-member board required to be comprised of the Secretary of Economic Development and Commerce, the director of the Ponce port, three members to be appointed by the Governor with the consent of the Senate and two members to be appointed by the Mayor of Ponce with the consent of the Ponce legislative assembly. PPA was created to continue the development of the container terminal formerly undertaken by Port of the Americas Authority (PAA) and handle such facilities' future operations; therefore, all of the assets, rights and duties of PAA (with the exception of its existing debt) would be transferred to PPA. Effective fiscal year 2015, the board of PPA was formed and operations started; although the assets of PAA have not been transferred at June 30, 2015. On December 19, 2013, Act No. 156 was approved amending Act No. 240 by, among other things, authorizing PPA to request a line of credit of up to $60 million from the Government Development Bank (GDB) to start funding the operations for which it was created and to establish that effective fiscal year 2015 the debt service of such debt be satisfied with annual Commonwealth's legislative appropriations. As the total debt outstanding of PPA at June 30, 2015 is payable from Commonwealth's legislative appropriations, PPA's financial statements became blended in the Commonwealth's fund financial statements as an enterprise fund effective July 1, 2015.

*Port of the Americas Authority (PAA)* – PAA is governed by an eleven-member board comprising the Secretary of the Department of Transportation and Public Works (DTPW), the Secretary of Economic Development and Commerce, the Executive Director of PRIDCO, the Mayors of the Municipalities of Ponce, Peñuelas, and Guayanilla and five private citizens appointed by the Governor with the consent of the Senate. The main purpose of the PAA was the planning, development and construction of a large-scale container terminal in the city of Ponce, Puerto Rico. The Commonwealth generally provided financial support to the PAA through legislative appropriations and its current existing debt is guaranteed by the Commonwealth pursuant the provisions of Act No. 409 of September 22, 2004. With the commencement of the operations of PPA in fiscal year 2015, as described in the previous paragraph above, the operations of PAA have been limited to processing the remaining legal requirements resulting after the transfer of all rights and duties to PPA. Such legal requirements consist principally of servicing the long-term debt that remained in PAA. The Commonwealth should appropriate annually funds in its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding. Therefore, PAA's

57

CW_STAY0009845

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

financial statements became blended in the Commonwealth's fund financial statements as a special revenue fund and a debt service fund effective July 1, 2015.

*Public Buildings Authority (PBA)* – PBA is governed by a seven-member board comprised of the Secretary of the DTPW, the Secretary of the Department of Education of the Commonwealth, the President of the GDB, and four members appointed by the Governor of Puerto Rico with the advice and consent of the Senate. It is a legally separate entity, whose activities are blended within the Primary Government because it exists to construct, purchase, or lease office, school, health, correctional, social welfare, and other facilities for lease to the Commonwealth's departments, component units, and instrumentalities. Bonds issued by the PBA to finance such facilities are payable from the payments of rentals of certain government facilities leased by PBA and are further supported by a guarantee of the Commonwealth. Therefore, the financial statements of the PBA are blended in the Commonwealth's fund financial statements as a special revenue, debt service, and capital project fund.

*Puerto Rico Health Insurance Administration (PRHIA)* – PRHIA is governed by a board of directors, which, by law, is composed of eleven members (six compulsory members and five discretionary members). The compulsory members are the Secretary of Health of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the Director of the Office of Management and Budget of the Commonwealth (OMB), the President of the GDB, the Insurance Commissioner of Puerto Rico, and the Administrator of the Administration of Services of Mental Health and Addiction. The five discretionary members are appointed by the Governor, with the advice and consent of the Senate. The board of directors' president is designated by the Governor and all discretionary board members are executives in a trustworthy position. PRHIA was created for implementing, administering, and negotiating a health insurance system through contracts with insurance underwriters to provide quality medical and hospital care tolow income individuals (via the Medicaid program administered and funded by the Centers for Medicare and Medicaid Services through a memorandum of understanding with the Department of Health); and also to employees of the Commonwealth, Municipalities and policemen who voluntarily subscribe to the Puerto Rico health insurance medical plan in exchange for a fee paid by them through payroll deductions. PRHIA also recovers its operating costs through charges made to Municipalities and a rebate program with pharmacies where PRHIA retains 100% of the income derived from this program. Since 2015, the Commonwealth should annually appropriate funds from its general operating budget to provide for the payment of principal and interest on the PRHIA line of credit obligation, which is the total debt outstanding of PRHIA. Therefore, PRHIA's financial statements are blended in the Commonwealth's fund financial statements as an enterprise fund effective July 1, 2015.

*Puerto Rico Infrastructure Financing Authority (PRIFA)* – PRIFA is governed by a seven-member board comprised of five members appointed by the board of the directors of the GDB, the Secretary of the Treasury of the Commonwealth and one member appointed by the Governor. The members of PRIFA's board of directors are executives in trustworthy positions, named and supervised by the Governor. The President is appointed by the Governor from among its members. PRIFA is a financing authority whose responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternate means for financing them. PRIFA's total debt outstanding, mostly Special Tax

58

CONFIDENTIAL

CW_STAY0009846

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Revenue Bonds comprising over 95% of its total debt is payable from federal excise taxes levied on the rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the US Treasury and returned to the Commonwealth. PRIFA's remaining debt, other than the Special Tax Revenue Bonds, is payable from Commonwealth legislative appropriations. Therefore, PRIFA's financial statements are blended in the Commonwealth's fund financial statements as a special revenue, debt service and capital project fund.

*Puerto Rico Maritime Shipping Authority (PRMSA)* – PRMSA is governed by the President of the GDB. The operations of PRMSA have been limited to processing the remaining legal requirements resulting from the sale of certain maritime operations formerly owned and operated by PRMSA. Such legal requirements consist solely of servicing the long-term debt that remained in PRMSA after the sale. The Commonwealth should appropriate annually funds in its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding. Therefore, PRMSA's financial statements are blended in the Commonwealth's fund financial statements as a debt service fund.

*Puerto Rico Medical Services Administration (PRMeSA)* – PRMeSA is governed by a ten member board comprising the Secretary of the Department of Health of the Commonwealth, who is the Chairman, the Dean of the Medical Sciences Faculty of the University of Puerto Rico (UPR), the President of the board of directors of the Puerto Rican League Against Cancer, the Mayor of the Municipality of San Juan, the Administrator of the State Insurance Fund Corporation, the Administrator of the Administration of Mental Health and Addiction Services, the President of the Medical Policy and Administration Committee, the Secretary of the Department of Family, and two members appointed by the Secretary of the Department of Health of the Commonwealth. Its purpose is to plan, organize, operate, and administer the centralized health services, provided in support of the hospital and other functions, offered by the member institutions and users of the medical complex known as the Puerto Rico Medical Center. The Commonwealth should annually appropriate funds from its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding of PRMeSA. Therefore, PRMeSA's financial statements are blended in the Commonwealth's fund financial statements as an enterprise fund.

*Puerto Rico Sales Tax Financing Corporation (Known as COFINA, its Spanish Acronym)* – COFINA was created under Act No. 91 approved on May 13, 2006, as amended by the Legislature. COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain debt obligations of the Commonwealth outstanding at June 30, 2006 (the 2006 Appropriation Debt). During 2009, the Legislature expanded the purposes of COFINA to assist in funding operational expenses of the Commonwealth for 2009 through 2011 and for 2012, to the extent included in the annual budget of the Commonwealth. The board of directors of COFINA is comprised of the same members as the GDB board. Because COFINA's Sales Tax Revenue Bond obligations have historically been repaid with the Commonwealth's sales and use taxes as described in Note 12, its financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

*Special Communities Perpetual Trust (SCPT)* – SCPT is governed by a board of directors composed of eleven members: the Secretary of the Department of Housing of the Commonwealth, the Secretary of the DTPW of the Commonwealth, the Coordinator for the Social and Economic Financing of the

59

CW_STAY0009847

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Special Communities, one Mayor of a municipality of Puerto Rico, one community leader resident in one special community, four private citizens representing the public interest, and two public employees. All members of the board of directors are appointed by the Governor. SCPT's principal purpose is to fund development projects that address the infrastructure and housing needs of the underprivileged communities. Over the years since its inception, SCPT has seen its revenue sources diminished as its principal assets, mortgage loans, are being fully reserved. SCPT has accumulated debt with the GDB, which is payable from Commonwealth Legislative appropriations. Therefore, SCPT's financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

*The Children's Trust* – The Children's Trust is governed by a seven-member board comprised of the Governor, who designates the president of the board, the President of the GDB, the Director of the OMB, the Secretary of Justice of the Commonwealth, and three private citizens appointed by the Governor with the advice and consent of the Senate. The Children's Trust's sole operation consists of providing financial assistance principally to the Commonwealth's departments to carry out projects aimed at promoting the well being of families, children, and youth of Puerto Rico, especially in the areas of education, recreation, and health. The operation of the Children's Trust is financed with the moneys being received by the Commonwealth from a global settlement agreement (GSA) dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The GSA calls for annual payments through the year 2025, which will vary due to inflationary and volume adjustments. After 2025, the tobacco companies should continue making contributions in perpetuity. As the Children's Trust provides financial assistance entirely or almost entirely to the Commonwealth's departments and its total debt outstanding is being repaid with the GSA resources received by the Commonwealth, its financial statements are blended in the Commonwealth's fund financial statements as a special revenue and debt service fund.

*University of Puerto Rico Comprehensive Cancer Center (UPRCCC)* – UPRCCC is governed by a nine-member board comprising of four ex officio members: the President of the UPR, the Chancellor of Medical Sciences Campus of the UPR, the Secretary of the Department of Health of the Commonwealth, and the Dean of the UPR School of Medicine. The remaining five (5) members must be citizens of Puerto Rico who have shown commitment to the fight against cancer, and are appointed by the Governor with the approval of the Commonwealth Senate with the following criteria: two members from the investigative studies or cancer treatment community; one member with experience in management, finance, or business administration, or with previous experience managing hospitals or medical investigation clinics; one member who is a cancer patient; and one member of which will be a member of the "Liga Puertorriqueña Contra el Cancer." The Commonwealth provides financial support to UPRCCC through legislative appropriations. The UPRCCC was created by Act No. 230 of August 26, 2004 (Act No. 230), to be the governmental entity principally responsible to execute public policy related to the prevention, orientation, investigation and treatment of cancer in Puerto Rico. On October 31, 2013, Act No. 128 (Act No. 128) was approved amending Act No. 230 in order to specifically establish that beginning with fiscal year 2015, annual Commonwealth's legislative appropriations of $15 million could be made available to cover the debt service of the obligations incurred by the UPRCCC in its capital related projects, particularly the construction of its medical and hospital facilities. Prior to Act No. 128, Act No. 230 was not conclusive as to the revenue source from which to repay the aforementioned debt service. As

60

CW_STAY0009848

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

the total debt outstanding of UPRCCC at June 30, 2015 is payable from Commonwealth's legislative appropriations, UPRCCC's financial statements became blended in the Commonwealth's fund financial statements as a special revenue fund effective July 1, 2015; inasmuch as the medical and hospital operations has not commenced.

The COFINA debt service fund and the COFINA special revenue fund are presented as major governmental funds, while PRMeSA and PRHIA are presented as major enterprise funds. All the other blended component units are reported in the nonmajor governmental funds column, except for PPA, which is reported in the nonmajor enterprise funds column. Complete financial statements of the blended component units can be obtained directly by contacting their respective administrative offices at:

| | |
|---|---|
| Ponce Ports Authority<br>P.O. Box 7051<br>Ponce, PR 00752 | Port of the Americas Authority<br>P.O. Box 195534<br>San Juan, PR 00919-5534 |
| Public Buildings Authority<br>P.O. Box 41029 – Minillas Station<br>San Juan, PR 00940-1029 | Puerto Rico Health Insurance Administration<br>P.O. Box 195661<br>San Juan, PR 00919-5661 |
| Puerto Rico Infrastructure Financing Authority<br>P.O. Box 41207 Minillas Station<br>San Juan, PR 00940 | Puerto Rico Maritime Shipping Authority<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Puerto Rico Medical Services Administration<br>P.O. Box 2129<br>San Juan, PR 00922-2129 | Puerto Rico Sales Tax Financing Corporation<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| Special Communities Perpetual Trust<br>P.O. Box 42001<br>San Juan, PR 00940-2001 | The Children's Trust<br>P.O. Box 42001<br>San Juan, PR 00940-2001 |
| University of Puerto Rico Comprehensive<br>   Cancer Center<br>PMB 711, 89 De Diego Ave., Suite 105<br>San Juan, PR 00927-6346 | |

(ii)   *Discretely Presented Component Units*

The component units described below, all legally separate entities, consistent with GASB Statement No. 14, as amended by GASB Statements No. 39 and 61, are discretely presented in the basic financial statements principally because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because the component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth (with the exception of Culebra Conservation and Development Authority and the Puerto Rico Science, Technology and Research Trust, which do not meet all these criteria, but the Commonwealth has determined it would be misleading to exclude

61

CW_STAY0009849

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

them from the Commonwealth's financial reporting entity). These component units are not blended with the Primary Government because they do not provide services entirely, or almost entirely to the Primary Government, their governing board is not substantively the same as that of the Primary Government, the Primary Government does not have any operational responsibilities over them, and they do not have total debt outstanding being repaid entirely or almost entirely with resources of the Primary Government. These have been classified by management between major and nonmajor component units. A major discretely presented component unit is determined by the Commonwealth based on the nature and significance of its relationship to the Primary Government. This determination is based on the evaluation of the following factors: a) the services provided by the component unit to the citizenry are such that separate reporting as a major component unit is considered to be essential to financial statement users, b) there are significant transactions with the Primary Government, or c) there is a significant financial benefit or burden relationship with the Primary Government. If a component unit is expected to meet some of these considerations for inclusion as major component unit in a future year, the Commonwealth may elect to report it as a major component unit.

*(iii)*    *Major Component Units*

*Government Development Bank for Puerto Rico (GDB)* – GDB is governed by a seven-member board appointed by the Governor. GDB's boards of directors' members are executives in a trustworthy position, named and supervised by the Governor. GDB acts as fiscal agent, depository of funds, disbursing agent, investor and financial advisor for the Commonwealth, its public corporations, and municipalities in connection with the issuance of bonds and notes; and it also issues warranties to third parties, makes loans, and advances funds predominantly to the Commonwealth's departments, component units, and municipalities.

Act No. 21 2016, known as the "Puerto Rico Emergency Moratorium and Financial Rehabilitation Act", created the Fiscal Agency and Financial Advisory Authority (FAFAA) to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities, and municipalities. This new fiscal agency and advisory authority commenced its functions as described above immediately upon approval of Act No. 21 on April 6, 2016 (the Moratorium Act). The Moratorium Act did not have an impact on the designation of GDB as a major discretely presented component unit for fiscal year 2015. The scope of FAFAA's powers were substantially expanded under Act No. 2, as discussed in Note 22.

*Puerto Rico Highways and Transportation Authority (PRHTA)* – PRHTA is governed by a seven-member board comprising the Secretary of Department of Transportation and Public Works (DTPW) (serving as the President of the board), the President of the Planning Board, the Secretary of the Treasury, the President of GDB, and three other members from the private sector appointed by the Governor with the advice and consent of the Senate. The PRHTA has broad powers to carry out its responsibilities in accordance with DTPW's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway facilities constructed, owned, or operated by the PRHTA, the ability to set tolls for the use of the highway facilities, and the power to issue bonds, notes, or other obligations. The PRHTA plans and manages the construction of all major projects relating to the Commonwealth's toll highway system, undertakes major repairs,

62

    CW_STAY0009850

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

and maintains the toll ways. The Commonwealth has the ability to significantly influence the toll rates charged by the PRHTA.

*Puerto Rico Electric Power Authority (PREPA)* – PREPA is governed by a nine-member board comprising the Secretary of the DTPW, the Secretary of Economic Development and Commerce, four members appointed by the Governor with the advice and consent of the Senate, and two members representing the consumers' interest and one member representing the commercial and industrial interest elected in a referendum carried out by the Puerto Rico Consumer Affairs Department. Board members are appointed or elected for a period of four years. PREPA is responsible for conserving, developing, and utilizing the power resources in order to promote the general welfare of Puerto Rico and owns and operates the Commonwealth's electrical power generation, transmission, and distribution system. The Commonwealth is entitled to receive contributions in lieu of taxes from PREPA.

*Puerto Rico Aqueduct and Sewer Authority (PRASA)* – PRASA is governed by a nine-member board comprising six members appointed by the Governor with the advice and consent of the Senate (including the President of the Puerto Rico Planning Board), the Executive President of PREPA, the Executive Director of Mayors' Federation, and the Executive Director of Mayors' Association. PRASA owns and operates the Commonwealth's system of public water supply and sanitary sewer facilities. PRASA is authorized, among other things, to borrow money and issue revenue bonds for any of its corporate purposes. The Commonwealth guarantees the principal and interest payments of certain outstanding bonds and of all future bonds issued to refinance those outstanding bonds at the date of refinancing. Act No. 45 of July 28, 1994 was later amended to include other loans under the State Revolving Fund Program (SRFP). The Commonwealth generally provides financial support to PRASA through legislative appropriations, mostly to cover the debt service of its PFC notes.

*University of Puerto Rico (UPR)* – The UPR is governed by a thirteen-member Governing Board, nine of which are appointed by the Governor of Puerto Rico and confirmed by the Senate of Puerto Rico. The remaining members of the Governing Board consist of two tenured professors and two full time students. The Secretary of the Department of Education of the Commonwealth becomes ex officio member of the governing board. The Commonwealth provides financial support to the UPR through legislative appropriations.

*State Insurance Fund Corporation (SIFC)* – SIFC is governed by a seven-member board appointed by the Governor with the advice and consent of the Senate. The board comprises the Commissioner of Insurance of Puerto Rico, an officer from the Department of Labor and Human Resources of the Commonwealth, an officer from the Department of Health of the Commonwealth, a representative of the employers' interest, a representative of the employees' interest, and two members without any of these interests. One of these members is appointed by the Governor as president of the board for a period of six years. The three public officials are appointed for a period of five years, and the rest of the members for four, three, two, and one year, respectively. SIFC provides workers' compensation and disability insurance to public and private employees. The Commonwealth has access to SIFC's resources.

63

CW_STAY0009851

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*(iv)   Nonmajor Component Units*

*Agricultural Enterprises Development Administration (AEDA)* – AEDA is governed by the Secretary of Agriculture of the Commonwealth. The purpose of AEDA is to provide a wide variety of services and incentives to the agricultural sector. The Commonwealth has the ability to impose its will on AEDA. The Commonwealth provides financial support to AEDA through legislative appropriations.

*Automobile Accidents Compensation Administration (AACA)* – AACA is governed by a Cabinet Member, and a four-member board appointed by the Governor with the advice and consent of the Senate. The AACA operates a system of compulsory insurance coverage for all registered motor vehicles and compensates citizens for injuries arising from motor vehicle accidents. The Commonwealth has the ability to significantly influence rates charged by the AACA. The Commonwealth has access to AACA's resources.

*Cardiovascular Center Corporation of Puerto Rico and the Caribbean (CCCPRC)* – CCCPRC is governed by a seven member board comprising the Secretary of Health of the Commonwealth, the Director of the Medical Sciences Campus of the UPR, the Executive Director of the PRMeSA, and four additional members appointed by the Governor with the advice and consent of the Senate, one of which should be from the Cardiology Society of Puerto Rico and another a member of a cardiology foundation properly registered in the Department of State of the Commonwealth. The purpose of the CCCPRC is to provide special treatment to patients suffering from cardiovascular diseases. The Commonwealth provides financial support to the CCCPRC through legislative appropriations.

*Company for the Integral Development of the "Península de Cantera" (CIDPC)* – CIDPC is governed by an eleven-member board, of which six members are appointed by the Governor and five members appointed by the Mayor of the Municipality of San Juan. The CIDPC was created to establish and implement a comprehensive development plan for the Península de Cantera area. Its main function is to supervise and coordinate governmental efforts and also promote and manage private sector initiatives for the improvements and rehabilitation of the aforementioned area. The Commonwealth generally provides financial support to the CIDPC.

*Corporation for the "Caño Martín Peña" ENLACE Project (CPECMP)* – CPECMP was created for the purpose of coordinating the public policy related to the rehabilitation of the Caño Martín Peña area. The CPECMP is governed by a board of directors of thirteen members of which seven members are appointed by the Governor and six members appointed by the Mayor of the Municipality of San Juan. The Commonwealth generally provides financial support to the CPECMP through legislative appropriations.

*Culebra Conservation and Development Authority (CCDA)* – CCDA was created to formulate and administer the program and plan for the conservation, use, and development of natural resources of the Municipality of Culebra. The CCDA is administered through a board of directors composed of five members, including the Mayor of the Municipality of Culebra and four additional members appointed by the Mayor of the Municipality of Culebra and confirmed by the municipal legislature. The administration and operations of the CCDA are conducted by an executive director elected by the board of directors. The Commonwealth provides financial support to the CCDA through legislative appropriations. Although CCDA's board of directors is not appointed by the Commonwealth and it is

64

CONFIDENTIAL

CW_STAY0009852

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

not fiscally dependent on the Commonwealth, the Commonwealth believes it would be misleading to exclude it from its reporting entity, given the financial support provided by the Commonwealth.

*Economic Development Bank for Puerto Rico (EDB)* – EDB is governed by a nine member board comprising the President of the GDB, who is the Chairman, the Secretary of Agriculture of the Commonwealth, the Secretary of the Department of Economic Development and Commerce of the Commonwealth, the Executive Director of the Puerto Rico Industrial Development Company (PRIDCO), the Executive Director of the PRTC (Puerto Rico Tourism Company), and four members representing the private sector and appointed by the Governor with the advice and consent of the Senate. Private sector members are appointed for a maximum period of three years. The EDB is responsible for the promotion and development of the private sector economy of the Commonwealth. This purpose is to be met by granting direct loans, loan guarantees, loan participation, and/or direct investments to any person or business organization devoted to manufacturing, agriculture, trade, tourism, or other service enterprises with preference, but not limited, to economic activities that may have the effect of substituting imports. The Commonwealth has the ability to impose its will on the EDB.

*Farm Insurance Corporation of Puerto Rico (FICPR)* – FICPR is governed by a five-member board consisting of the Secretary of Agriculture of the Commonwealth, the Dean of the Agricultural Sciences Faculty of the UPR Mayaguez Campus, a representative of the GDB, and two bona fide farmers appointed by the Governor with the advice and consent of the Senate. The purpose of the FICPR is to provide insurance to farmers against losses in their farms caused by natural disasters. The Commonwealth has the ability to impose its will on the FICPR.

*Fine Arts Center Corporation (FACC)* – FACC is governed by a nine-member board comprising the President of the Musical Arts Corporation (MAC) and eight members named by the Governor. FACC was created with the purpose of administering the Fine Arts Center. The Commonwealth provides financial support to FACC through legislative appropriations.

*Institute of Puerto Rican Culture (IPRC)* – IPRC is governed by a nine-member board comprising the President of MAC and eight members appointed by the Governor with the advice and consent of the Senate. The IPRC is responsible for implementing the public policy related to the development of Puerto Rican arts, humanities, and culture. The Commonwealth provides financial support to the IPRC through legislative appropriations.

*Institutional Trust of the National Guard of Puerto Rico (ITNGPR)* – ITNGPR is governed by a seven-member board comprising the Adjutant General of the Puerto Rico National Guard, the President of the GDB, the Secretary of Justice of the Commonwealth, three militaries from the Puerto Rico National Guard, and one representative from the community appointed by the Governor. ITNGPR's purpose is to provide life insurance, retirement benefits, and economic assistance to the active members of the Puerto Rico National Guard and their families. The Commonwealth generally provides financial support to the ITNGPR through legislative appropriations and has the ability to impose its will on the ITNGPR.

*Land Authority of Puerto Rico (LAPR)* – LAPR is governed by a five-member board consisting of the Secretary of Agriculture of the Commonwealth and four members appointed by the Governor. LAPR

65

CW_STAY0009853

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

was created to carry out the provisions of the Land Law of Puerto Rico, principally geared to the agricultural development of Puerto Rico. LAPR maintains debt that is payable from Commonwealth's appropriations and funds generated by LAPR operations.

*Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads (LRA)* – LRA is governed by a nine member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, two members appointed by the Mayor of the Municipality of Ceiba, one member appointed by the Mayor of the Municipality of Naguabo, one member appointed by the President of the Senate, one member appointed by the Speaker of the House of Representatives and three additional members appointed by the Governor, all to possess known interest and expertise in the areas of planning; commercial, tourism, residential, and institutional development; real estate; tourism and recreational facilities administration; and infrastructure projects' management. The LRA is responsible for the implementation of the reuse and redevelopment plan for the former Navy Station of Roosevelt Roads located in Ceiba, Puerto Rico. Some of the activities involved in these redevelopment plans include the direction, supervision, regulation, and maintenance of the economic development on the land and facilities formerly occupied by the U.S. Navy. The Commonwealth generally provides financial support to the LRA through legislative appropriations.

*Musical Arts Corporation (MAC)* – MAC is governed by a seven-member board appointed by the Governor with the advice and consent of the Senate. MAC was created to promote the development of the arts and cultural programs of the Commonwealth. The Commonwealth provides financial support to MAC through legislative appropriations.

*Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives (PCSDIPRC)* – PCSDIPRC is governed by a nine member board comprising the Administrator of the Cooperative Development Administration, the Commissioner of Financial Institutions of Puerto Rico, the Secretary of the Treasury of the Commonwealth, the Inspector of Cooperatives, three citizens representing the cooperative movement, one representative of the Puerto Rico Cooperatives League, and one private citizen representing the public interest. PCSDIPRC has the responsibility of providing to all the cooperatives and the Federation of Cooperatives of Puerto Rico insurance coverage over the stocks and deposits, and for monitoring the financial condition of the insured cooperatives, and the uninsured cooperatives when requested by the Inspector of Cooperatives. The Commonwealth has the ability to impose its will on PCSDIPRC.

*Puerto Rico Conservatory of Music Corporation (PRCMC)* – PRCMC is governed by a seven-member board appointed by the Governor, with the advice and consent of the Senate. The PRCMC is responsible for providing the Puerto Rican community and especially its youths with the required facilities to educate and perfect their musical skills, including secondary education programs for developing musical arts. It prepares the artistic element that nourishes the Puerto Rico Symphony Orchestra and other musical organizations, and coordinates the governmental efforts to interested industries, private enterprises, and particular citizens. The Commonwealth occasionally provides financial support to the PRCMC through legislative appropriations.

*Puerto Rico Convention Center District Authority (PRCCDA)* – PRCCDA is governed by a nine-member board of directors comprising of three members from the public-sector and six members

66

CW_STAY0009854

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

from the private sector. The public-sector members comprise the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Executive Director of the PRTC, and the president of the GDB. The private sector members are individuals having experience in the areas of hotel operations, tourism, real estate, convention centers, and at least one with financial expertise who are appointed by the Governor with the advice and consent of the Senate. PRCCDA was created to be responsible, for improving, developing, managing, and operating the property and improvements within the Puerto Rico Convention Center District (the District) geographical area. PRCDDA has the power to finance all of the improvements to be developed through the issuance of bonds and the imposition of assessments against the owners or lessees of land within the District who benefit from the Convention Center and other improvements. Also, PRCCDA promotes the development, construction, expansion and improvement of the Puerto Rico Convention Center (Convention Center), Bahía Urbana, and the Jose Miguel Agrelot Coliseum (the Coliseum). The administration, operation and management of the Convention Center and the Coliseum are carried out by a third party private entity, under PRCDDA's responsibility. Bahía Urbana is administered by PRCCDA's management. The Commonwealth provides financial support to the PRCCDA through legislative appropriations.

*Puerto Rico Council on Education (PRCE)* – PRCE is governed by a board comprising nine members appointed by the Governor with the consent of the Senate. Its purpose is to develop higher education, to administer the licensing and certification of institutions of higher education, and to administer scholarship funds. The Commonwealth provides financial support to the PRCE through legislative appropriations.

*Puerto Rico Energy Commission (PREC)* – PREC is governed by a board of directors composed by a commissioner President and two associate commissioners, all appointed by the Governor with the advice and consent of the Senate. The first commissioner President and two associate commissioners appointed will occupy their positions for six years, four years and two years, respectively, with succeeding commissioners to be appointed for a term of six years. PREC was created on May 27, 2014 pursuant Act No. 57, also known as the Puerto Rico Energy Transformation and Relief Act. Under the provisions of Act No. 57, PREC functions as an independent government entity in charge of regulating, overseeing and ensuring compliance with the public policy on energy of the Commonwealth and with the authority to approve electric rates proposed by PREPA, among other responsibilities. Act No. 57 requires PREPA to appropriate annually $5.8 million for PREC's operations, to be remitted to the PREC through special accounts established at the Commonwealth's Treasury Department. The Commonwealth also has the ability to impose its will on PREC.

*Puerto Rico Government Investment Trust Fund (PRGITF)* – PRGITF is governed by the Secretary of the Treasury of the Commonwealth. The GDB is its trustee, custodian, and administrator. PRGITF's main objective is to provide investment opportunities in a professionally managed money market portfolio by investing in high quality securities with minimal credit risk. Qualified investors include the Commonwealth's central government, its public corporations, instrumentalities and agencies, and the municipalities of Puerto Rico. In conformity with GASB Statement No. 31, Accounting and Financial Reporting for Certain Investments and for External Investments Pools, the financial statements of the PRGITF are not included in the accompanying basic financial statements because the Primary Government and each component unit investor is already presenting as cash or investment their corresponding share of the assets of the PRGITF.

67

CW_STAY0009855

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Puerto Rico Industrial Development Company (PRIDCO)* – PRIDCO is governed by a seven-member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who is the Chairman, the Secretary of the Treasury of the Commonwealth, the President of the GDB, the President of the Planning Board of Puerto Rico, and three members from the private sector appointed by the Governor with the advice and consent of the Senate. The private sector members are appointed for a period of four years. PRIDCO administers the Commonwealth sponsored economic development program by providing facilities, general assistance, and special incentive grants to manufacturing companies operating in Puerto Rico. PRIDCO has issued interim notes and revenue bonds to finance manufacturing plants and other facilities. Rentals derived from the leasing of specified facilities of PRIDCO are used for the payment of PRIDCO's revenue bonds. PRIDCO maintains debt that is payable from Commonwealth's appropriations. The Commonwealth generally provides financial support to PRIDCO through legislative appropriations and has the ability to impose its will on PRIDCO.

*Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (known as AFICA, its Spanish acronym)* – AFICA is governed by a seven-member board comprising the Executive Director of PRIDCO, the President of the GDB, the Executive Director of PRIFA, the Executive Director of the PRTC, the President of the Environmental Quality Board, and two private citizens appointed by the Governor. AFICA is authorized to issue revenue bonds to finance industrial, tourist, environmental control, medical, and educational facilities in Puerto Rico and the United States of America for use by private companies, nonprofit entities, or governmental agencies. The bonds are payable solely from collections from such private companies, nonprofit entities, or governmental agencies, and do not constitute debt of the Commonwealth or any of its component units. The Commonwealth has the ability to impose its will on AFICA.

*Puerto Rico Integrated Transit Authority (PRITA)* – PRITA is governed by a nine member board comprising the Secretary of DTPW, who serves as Chairman, the Executive Director of the PRHTA, the President of the Puerto Rico Planning Board, the Director of OMB, the President of GDB, two additional members from the private sector appointed by the Governor with the advice and consent of the Senate and two other members representing entities within the Metropolitan Planning Organization, who are selected through the vote from its own Board of Directors. PRITA was created by Act No. 123 of August 3, 2014 for the purpose of implementing a uniform public policy on collective, road and maritime transportation, and with it the integration of the operations, assets, rights, obligations and funds of PRHTA's urban train, the Puerto Rico Metropolitan Bus Authority (PRMBA) and the Puerto Rico and Municipal Islands Maritime Transport Authority (PRMIMTA). As of June 30, 2015, PRITA's operations consisted only of performing the initial organization process in order to achieve the purposes of Act No. 123, as it was still in the process of obtaining the required approvals from local and federal authorities to integrate and officialize the merger of the urban train, PRMBA and PRMIMTA into PRITA. The Commonwealth generally provides financial support to PRITA through legislative appropriations.

*Puerto Rico Land Administration (PRLA)* – PRLA is governed by an eleven member board comprising the Secretary of Economic Development and Commerce of the Commonwealth, who serves as President, the President of the Planning Board of Puerto Rico, who serves as Vice President, the Secretary of the Treasury of the Commonwealth, the Secretary of Agriculture of the Commonwealth, the Secretary of DTPW of the Commonwealth, the Secretary of Housing of the

68

CW_STAY0009856

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Commonwealth, the Executive Director of PRIDCO, and four members appointed by the Governor with the advice and consent of the Senate. The PRLA acquires parcels of land on behalf of government instrumentalities through negotiation or expropriation for future development or for reserve. The Commonwealth provides financial support to the PRLA through legislative appropriations.

*Puerto Rico and Municipal Islands Maritime Transport Authority (PRMIMTA)* – PRMIMTA is governed by a five-member board comprising the Secretary of DTPW, who serves as President, the Executive Director of the Puerto Rico Ports Authority, the Mayors of Vieques and Culebra, and one additional member appointed by the Governor. The operations of PRMIMTA consist of administering and operating the maritime transportation services between San Juan, Fajardo, Vieques, and Culebra. The Commonwealth generally provides financial support to PRMIMTA through legislative appropriations. Act No. 123 of August 3, 2014, which created PRITA, provided for the integration into PRITA of PRMIMTA's operations; however, as of June 30, 2015, PRMIMTA's operations, assets, rights, obligations and funds had not been transferred.

*Puerto Rico Metropolitan Bus Authority (PRMBA)* – PRMBA is governed by the Secretary of DTPW of the Commonwealth. The PRMBA provides bus transportation to passengers within the San Juan Metropolitan Area. The Commonwealth provides financial support to the PRMBA through the transfer of certain gasoline and diesel excise taxes collected by the Commonwealth. Act No. 123 of August 3, 2014, which created PRITA, provided for the integration into PRITA of PRMBA's operations; however, as of June 30, 2015, PRMBA's operations, assets, rights, obligations and funds had not been transferred.

*Puerto Rico Municipal Finance Agency (PRMFA)* – PRMFA is governed by a five-member board comprising the President of the GDB, who is the Chairman, the Commissioner of Municipal Affairs, and three additional members appointed by the Governor, one of whom must be either the Mayor or chief financial officer of a municipality. The PRMFA was organized to create a capital market to assist the municipalities of Puerto Rico in financing their public improvement programs. The Commonwealth is required to cover any potential deficiency that may exist on the MFA reserve accounts established for debt service.

*Puerto Rico Municipal Finance Corporation (Known as COFIM, for its Spanish Acronym)* – COFIM is governed by a seven member board comprising three members of the Board of Directors of GDB, three Mayors from municipalities in Puerto Rico (two of them from the political party controlling the majority of municipalities and the remaining major elected by the rest of the municipalities) and one member representing the public interest recommended by all the Mayors of the municipalities and ratified by the Governor. COFIM was created by Act No. 19 of January 24, 2014 to issue bonds and use other financing mechanisms to pay or refinance, directly or indirectly, all or a portion of the municipalities' debt obligations payable from the municipal sales and use tax. The Commonwealth is required to cover any potential deficiency that may exist on the COFIM reserve accounts established for debt service. COFIM commenced operations during fiscal year 2015.

*Puerto Rico Ports Authority (PRPA)* – PRPA is governed by a five-member board consisting of the Secretary of DTPW of the Commonwealth, who is the Chairman, the Secretary of Economic Development and Commerce of the Commonwealth, the Executive Director of the PRTC, the

69

                                                              CW_STAY0009857

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Executive Director of Puerto Rico Industrial Development Company and one private citizen appointed by the Governor with the consent of the Senate. The purpose of the PRPA is to administer all owned ports and aviation transportation facilities of the Commonwealth and to render other related services, including the supervision and monitoring over the service concession arrangement of the Luis Muñoz Marin International Airport, as further described in Note 16. The Commonwealth generally provides financial support to the PRPA through legislative appropriations.

*Puerto Rico Public Broadcasting Corporation (PRPBC)* – PRPBC is governed by an eleven-member board of directors comprising the Secretary of the Department of Education of the Commonwealth, the President of the UPR, the Executive Director of the IPRC, and eight private citizens appointed by the Governor with the advice and consent of the Senate. At least three of these private citizens must have proven interest, knowledge, and experience in education, culture, art, science, or radio and television. The PRPBC was created for the purpose of integrating, developing, and operating the radio, television, and electronic communication facilities that belong to the Commonwealth. The Commonwealth provides financial support to the PRPBC through legislative appropriations.

*Puerto Rico Public Private Partnerships Authority (PPPA)* – PPPA is governed by a five-member board of directors comprising the President of the GDB, the Secretary of the Treasury of the Commonwealth, the President of the Planning Board, and two members appointed by the Governor, one member selected by the President of the Senate of Puerto Rico and another member, by the Speaker of the Puerto Rico House of Representatives. The PPPA is the only government entity authorized and responsible for implementing public policy on public private partnerships established by Act No. 29 of June 8, 2009, as amended, and to determine the functions, services, or facilities for which such Partnerships will be established.

*Puerto Rico School of Plastic Arts (PRSPA)* – PRSPA is governed by a seven-member board. Four members are appointed by the board of directors of the IPRC, representing the public educational and cultural interests. Board members may not be employees of the PRSPA. The remaining three members are elected from among the members of the board of directors of the IPRC, one of whom serves as president. The PRSPA was created to develop, promote, plan, and coordinate programs of study in higher education oriented to the plastic arts, teaching, artistic techniques, and to help students to develop humanistic values. The Commonwealth generally provides financial support to the PRSPA through legislative appropriations.

*Puerto Rico Science, Technology and Research Trust (PRSTRT)* – PRSTRT is governed by an eleven-member board of trustees comprising five members ex officio representing certain Primary Government agencies and public corporations: the Secretary of the Department of Economic Development and Commerce, the President of the UPR, the Director of OMB, the President of the GDB and the Executive Director of PRIDCO; and six additional trustees appointed by the board of trustees. The PRSTRT was created by Act No, 214 of August 18, 2004, as amended, to foster and fund research, development and infrastructure projects related to science and technology to promote the economic, social or educational development of the Commonwealth and to operate exclusively for charitable, educational and scientific purposes.

The PRSTRT was initially financially supported through various sources including moneys from certain UPR's funds, private donations and legislative appropriations which have not recurred during

70

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

the past several years. But recently, most of the funds come indirectly from the Commonwealth's contributions into several funds that are managed and administered by PRIDCO, which in turn makes such funds available to PRSTRT. The PRSTRT's board of trustees is not appointed by the Commonwealth. The Commonwealth believes it would be misleading to exclude it from its reporting entity, given the substantial indirect financial support provided by the Commonwealth and the fact that PRSTRT was created by law to implement and execute the Commonwealth's scientific research mission and can be eliminated by actions of the Commonwealth.

*Puerto Rico Telephone Authority (PRTA)* – PRTA is governed by a five-member board comprising the President of the GDB and four members that are appointed by the board of directors of the GDB from among the GDB board members, all of which are appointed by the Governor. PRTA is the legal entity responsible to account for the equity interest in Telecommunications de Puerto Rico, Inc. The Commonwealth has the ability to impose its will on the PRTA. PRTA is currently inactive and awaiting for a legislative process to arrange its liquidation.

*Puerto Rico Tourism Company (PRTC)* – PRTC is governed by a seven-member board comprising of representatives of different tourist related sectors appointed by the Governor with the consent of the Senate. At least one member must represent internal tourism and two must not be residents of the metropolitan area. Its purpose is to promote the tourism industry of Puerto Rico. The Commonwealth generally provides financial support to the PRTC through legislative appropriations.

*Puerto Rico Trade and Export Company (PRTEC)* – PRTEC is governed by a nine-member board comprising the Secretary of the Department of Economic Development and Commerce, who is the Chairman, the Executive Director of the PRPA, the Secretary of the Department of Agriculture, the President of the EDB, the Executive Director of PRIDCO, the Legal Division Director of the PRTEC, and three private citizens. The PRTEC has the responsibility to promote the highest efficiency in the services provided to the commercial sector, with emphasis on small and medium sized enterprises while promoting the export of products and services from Puerto Rico to other countries. The Commonwealth has the ability to impose its will on the PRTEC.

*Solid Waste Authority (SWA)* – SWA is governed by a board appointed by the Secretary of the Department of Natural Resources, whereby, the Secretary and the Executive Director of SWA periodically meet. SWA provides alternatives for processing of solid waste and encourages recycling, reuse, and recovery of resources from waste. The Commonwealth provides financial support to SWA through legislative appropriations.

71

CONFIDENTIAL

CW_STAY0009859

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Complete financial statements of the discretely presented component units can be obtained directly by contacting their administrative offices:

Agricultural Enterprises Development
Administration
P.O. Box 9200
Santurce, PR 00908-0200

Automobile Accidents Compensation
Administration
P.O. Box 364847
San Juan, PR 00936-4847

Cardiovascular Center Corporation of
Puerto Rico and the Caribbean
P.O. Box 366528
San Juan, PR 00936-6528

Company for the Integral Development of the
"Península de Cantera"
P.O. Box 7187
Santurce, PR 00916-7187

Corporation for the "Caño Martín Peña"
ENLACE Project
P.O. Box 41308
San Juan, PR 00940-1308

Culebra Conservation and Development
Authority
P.O. Box 217
Culebra, PR 00775-0217

Economic Development Bank for Puerto Rico
P.O. Box 2134
San Juan, PR 00922-2134

Farm Insurance Corporation of Puerto Rico
P.O. Box 9200
Santurce, PR 00908

Fine Arts Center Corporation
P.O. Box 41287 – Minillas Station
San Juan, PR 00940-1287

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Institute of Puerto Rican Culture
P.O. Box 9024184
San Juan, PR 00902-4184

Institutional Trust of the National Guard of
Puerto Rico
P.O. Box 9023786
San Juan, PR, 00902-3786

Land Authority of Puerto Rico
P.O. Box 9745
Santurce, PR 00908-9745

Local Redevelopment Authority of the Lands
and Facilities of Naval Station Roosevelt Roads
400 Calaf Street, PMB 456
San Juan, PR 00918-1314

Musical Arts Corporation
P.O. Box 41227
San Juan, PR 00940-1227

Public Corporation for the Supervision and
Deposit Insurance of Puerto Rico Cooperatives
P.O. Box 195449
San Juan, PR 00919-5449

72

CW_STAY0009860

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Puerto Rico Aqueduct and Sewer Authority
P.O. Box 7066
San Juan, PR 00916-7066

Puerto Rico Conservatory of Music Corporation
951 Ponce de León Ave.
San Juan, PR 00907-3373

Puerto Rico Convention Center District Authority
P.O. Box 19269,
San Juan, Puerto Rico, 00910-1269

Puerto Rico Council on Education
P.O. Box 19900
San Juan, PR 00910-1900

Puerto Rico Energy Commission
268 Munoz Rivera Avenue
San Juan, PR 00918

Puerto Rico Electric Power Authority
P.O. Box 364267
San Juan, PR 00936-4267

Puerto Rico Government Investment Trust Fund
P.O. Box 42001, Millas Station
San Juan, Puerto Rico 00940-2001

Puerto Rico Highways and Transportation Authority
P.O. Box 42007
San Juan, PR 00940-2007

Puerto Rico Industrial Development Company
P.O. Box 362350
San Juan, PR 00936-2350

Puerto Rico Industrial, Tourist, Educational,
Medical, and Environmental Control
Facilities Financing Authority
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Integrated Transit Authority
P.O. Box 41267
San Juan, PR 00940

Puerto Rico Land Administration
P.O. Box 363767
San Juan, PR 00936-3767

Puerto Rico and Municipal Islands Maritime
Transport Authority
P.O. Box 4305
Puerto Real, PR 00740

Puerto Rico Metropolitan Bus Authority
P.O. Box 195349
San Juan, PR 00919-5349

Puerto Rico Municipal Finance Agency
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Municipal Finance Corporation
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico Ports Authority
P.O. Box 362829
San Juan, PR 00936-2829

Puerto Rico Public Broadcasting Corporation
P.O. Box 190909
San Juan, PR 00919-0909

Puerto Rico Public Private Partnerships Authority
P.O. Box 42001
San Juan, PR 00940-2001

Puerto Rico School of Plastic Arts
P.O. Box 9021112
San Juan, PR 00902-1112

Puerto Rico Science, Technology and Research Trust
P.O.Box 363475
San Juan, PR 00936-3475

Puerto Rico Telephone Authority
P.O. Box 42001
San Juan, PR 00940-2001

73

CW_STAY0009861

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

| | |
|---|---|
| Puerto Rico Tourism Company | Puerto Rico Trade and Export Company |
| Tanca Street #500, Ochoa Building, 3rd Floor | P.O. Box 195009 |
| Old San Juan, PR 00902-3960 | San Juan, PR 00919-5009 |
| | |
| Solid Waste Authority | State Insurance Fund Corporation |
| P.O. Box 40285 | P.O. Box 365028 |
| San Juan, PR 00940-0285 | San Juan, PR 00936-5028 |
| | |
| University of Puerto Rico | |
| Jardín Botánico Sur | |
| 1187 Street Flamboyán | |
| San Juan, PR 00916-1117 | |

The financial statements of the discretely presented component units have a year end of June 30, 2015, except for the PRTA, which has a year end of December 31, 2014.

*(v)   Pension Trust Funds*

The three employee retirement systems described in the following paragraphs (the Retirement Systems) administered the pension funds and other postemployment healthcare benefits for the Commonwealth and its political subdivisions until the enactment of the Act for Guaranteeing the Payment to Retirees and Establishing a New Defined Contributions Plan for the Public Servicers (Act No. 106) on August 23, 2017. These Retirement Systems are subject to legislative and executive controls, and their administrative expenses are subject to legislative budget controls. They meet the component units' criteria and blend into fiduciary funds of the Commonwealth. They have been omitted from the government-wide financial statements, as their resources prior to August 23, 2017 were not available to fund operations of the Commonwealth. The Retirement Systems, as governmental retirement plans, are excluded from the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

*Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)* – ERS is a cost sharing, multiple employer defined benefit pension plan, which covers all regular employees of the Commonwealth and its instrumentalities and of certain municipalities and component units not covered by their own retirement systems. Prior to August 23, 2017, ERS was governed by an eleven-member board of trustees, composed of the Secretary of the Treasury of the Commonwealth (who serves as ERS' President), the President of the GDB, the Commissioner of Municipal Affairs, the Director of the Office of Human Resources of the Commonwealth, three employees, and two retirees, who were appointed by the Governor. The other two members were the President of the Federation of Mayors and the President of the Association of Mayors. Prior to August 23, 2017, ERS was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (ERS and JRS Administration) which also administered the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). ERS MIPC is an unfunded, cost sharing, multi employer defined benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

74

CW_STAY0009862

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)* – JRS is a single employer defined benefit plan that covers all active judges or retired judges of the judiciary branch of the Commonwealth. Prior to August 23, 2017, JRS was governed by the same board of trustees as ERS and was administered by the ERS and JRS.

*Puerto Rico System of Annuities and Pensions for Teachers (TRS)* – TRS provides retirement benefits to all teachers of the Department of Education of the Commonwealth, all pensioned teachers, all teachers transferred to an administrative position in the Department of Education of the Commonwealth, and those who practice in private institutions accredited by the Department of Education of the Commonwealth who elect to become members. TRS provides retirement, death, and disability benefits. Prior to August 23, 2017, TRS was governed by a nine member board comprising three *ex officio* members, comprised of the Secretary of the Department of Education of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the President of the GDB, and one member who was a representative of a teachers' organization designated by the Governor; three teachers appointed by the Governor, one of which represented certified teachers in active service, and two who represented retired teachers; one member who was a representative of the entity that represented the proper unit under Act No. 45 of February 25, 1998, as amended; and one additional member, as representative of the public interest, with knowledge of and experience in the administration and operation of financial systems, appointed by the Governor. The Commonwealth reports TRS as a single employer pension plan. TRS was administered by the Teachers Retirement System ( TRS Administration) which also administered the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC). TRS MIPC is an unfunded, cost sharing, multi employer defined benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of TRS Administration.

On August 23, 2017, the Governor signed Act No.106 into law. Act No. 106 reforms  ERS, JRS and TRS by substituting the governing boards of the Retirement Systems with the Retirement Board of the Government of Puerto Rico (Retirement Board) and establishing a separate "Account for the Payment of Accrued Pensions" to implement a "pay-as-you-go" method for the Retirement Systems. For additional information on the transition to the "pay-as-you-go" method, refer to Note 22.

Complete financial statements of these component units can be obtained directly by contacting their respective administrative offices at:

Employees' Retirement System of the
Government of the Commonwealth of Puerto Rico
P.O. Box 42003 – Minillas Station
San Juan, PR 00940-2203

Retirement System for the Judiciary of the
Commonwealth of Puerto Rico
P.O. Box 42003 – Minillas Station
San Juan, PR 00940-2203

Puerto Rico System of Annuities and Pensions for
  Teachers
P.O. Box 191879
San Juan, PR 00919-1879

75

CW_STAY0009863

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

(c) *Component Units Audited Separately*

The basic financial statements of the Commonwealth include the financial statements of the following component units that were audited by other auditors:

(i)  *Blended Component Units*

Ponce Ports Authority
Port of the Americas Authority
Public Buildings Authority
Puerto Rico Health Insurance Administration
Puerto Rico Infrastructure Financing Authority
Puerto Rico Maritime Shipping Authority
Puerto Rico Medical Services Administration
Special Communities Perpetual Trust
The Children's Trust
University of Puerto Rico Comprehensive Cancer Center

(ii)  *Discretely Presented Component Units*

Agricultural Enterprises Development Administration
Automobile Accidents Compensation Administration
Cardiovascular Center Corporation of Puerto Rico and the Caribbean
Company for the Integral Development of the "Península de Cantera"
Corporation for the "Caño Martín Peña" ENLACE Project
Culebra Conservation and Development Authority
Economic Development Bank for Puerto Rico
Farm Insurance Corporation of Puerto Rico
Fine Arts Center Corporation
Institute of Puerto Rican Culture
Institutional Trust of the National Guard of Puerto Rico
Land Authority of Puerto Rico
Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads
Musical Arts Corporation
Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives
Puerto Rico Aqueduct and Sewer Authority
Puerto Rico Conservatory of Music Corporation
Puerto Rico Convention Center District Authority
Puerto Rico Council on Education
Puerto Rico Electric Power Authority
Puerto Rico Energy Commission
Puerto Rico Government Investment Trust Fund
Puerto Rico Highways and Transportation Authority
Puerto Rico Industrial Development Company
Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities Financing Authority
Puerto Rico Integrated Transit Authority

76

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

> Puerto Rico Land Administration
> Puerto Rico and Municipal Islands Maritime Transport Authority
> Puerto Rico Metropolitan Bus Authority
> Puerto Rico Municipal Finance Agency
> Puerto Rico Municipal Finance Corporation
> Puerto Rico Ports Authority
> Puerto Rico Public Broadcasting Corporation
> Puerto Rico Public Private Partnerships Authority
> Puerto Rico School of Plastic Arts
> Puerto Rico Science, Technology and Research Trust
> Puerto Rico Telephone Authority
> Puerto Rico Tourism Company
> Puerto Rico Trade and Export Company
> Solid Waste Authority
> State Insurance Fund Corporation
> University of Puerto Rico

   (iii)   *Pension Trust Funds*

> Puerto Rico System of Annuities and Pensions for Teachers

**(d)  *Basis of Presentation***

   (i)   *Government-Wide Financial Statements*

The government-wide financial statements (the statement of net position and the statement of activities) report information of all the nonfiduciary activities of the Commonwealth and its component units. For the most part, the effect of interfund activity has been removed from these government-wide financial statements. Governmental Activities, which normally are supported by taxes and intergovernmental revenue, are reported separately from Business-Type Activities, which rely to a significant extent on fees and charges for services or which are financed and operated in a manner similar to private business enterprises. Likewise, the Primary Government is reported separately from the legally separate discretely presented component units for which the Primary Government is financially accountable. The statement of net position presents the reporting entities' nonfiduciary assets, deferred outflows of resources, liabilities, and deferred inflows of resources, with the residual measure reported as net position. Net position is reported in three categories:

   *   Net Investment in Capital Assets* – This component of net position consists of capital assets net of accumulated depreciation and reduced by the outstanding balance of any bonds, mortgages, notes, or other borrowings that are directly attributable to the acquisition, construction, or improvement of those assets. Deferred outflows of resources and deferred inflows of resources that are attributable to the acquisition, construction, or improvement of those assets or related debt also should be included in this component of net position. If there are significant unspent related debt proceeds or deferred inflows of resources at year end, the portion of the debt or deferred inflows of resources attributable to the unspent amount is not included in the calculation of this component of net position. Rather, that portion of the debt or deferred inflows of resources is included in the same net position component (restricted or unrestricted) as the unspent amount.

77

CW_STAY0009865

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

* *Restricted Net Position* – This component of net position consists of restricted assets and deferred outflows of resources reduced by related liabilities and deferred inflows of resources. Generally, a liability relates to restricted assets if the asset results from a resource flow that also results in the recognition of a liability or if the liability will be liquidated with the restricted assets reported. Restricted assets result when constraints placed on those assets use are either, externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

  *Unrestricted Net Position* – This component of net position is the net amount of the assets, deferred outflows of resources, liabilities, and deferred inflows of resources that are not included in the determination of net investment in capital assets or the restricted component of net position.

  When both restricted and unrestricted resources are available for use, generally, it is the Commonwealth's policy to use restricted resources first, then the unrestricted resources as they are needed.

The statement of activities demonstrates the degree to which the direct expenses of a given function, segment, or component unit are offset by program revenue. Direct expenses are those that are clearly identifiable with a specific function, segment, or component unit. The Commonwealth does not allocate general government (indirect) expenses to other functions. Program revenue includes charges to customers who purchase, use, or directly benefit from goods or services provided by a given function, segment, or component unit. Program revenue also includes grants and contributions that are restricted to meeting the operational or capital requirements of a particular function, segment, or component unit. Revenue that is not classified as program revenue, including all taxes, is presented as general revenue. Resources that are dedicated internally are reported as general revenue rather than as program revenue.

*(ii) Fund Financial Statements*

The Commonwealth reports its financial position and results of operations in funds, which are considered separate accounting entities, including those component units, which are required to be blended. The operations of each fund are accounted for within a set of self balancing accounts. Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with legal, financial, and contractual provisions. Major funds are determined using a predefined percentage of the assets, deferred outflows of resources, liabilities, deferred inflows of resources, revenue, or expenditures/expenses of either the fund category or the governmental and proprietary funds combined. The nonmajor funds are combined in a single column in the fund financial statements.

*(iii) Governmental Funds*

Governmental funds focus on the sources and uses of funds and provide information on near term inflows, outflows, and balances of available resources. The Commonwealth reports the following governmental funds:

* *General Fund* – The General Fund is the primary operating fund of the Commonwealth. It is used to account for and report all financial resources received and used for those services traditionally

78

   CW_STAY0009866

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

provided by a government, except those required to be accounted for and reported in another fund. The General Fund includes transactions for services such as general government, public safety, health, public housing and welfare, education, and economic development. The financial resources received and used in the General Fund mostly include: budgeted resources (such as taxes and charges for services), as approved by the Legislature and as adjusted for timing and basis of accounting differences, and other financial resources outside the General Fund budget such as: federal funds, pledged funds, other special revenue and general type funds, and agencies with independent treasuries.

* *Debt Service Fund* – The debt service fund accounts for and reports financial resources that are restricted, committed or assigned to expenditure for general long-term bonds' principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and component units, either blended or discretely presented. Long-term debt and interest due on July 1 of the following fiscal year are accounted for as a fund liability if resources are available as of June 30 for its payment.

* *COFINA Special Revenue Fund* – The special revenue fund of the Puerto Rico Sales Tax Financing Corporation (COFINA) is used to account for and report all financial resources of COFINA, except those required to be accounted for and reported in the COFINA Debt Service fund.

* *COFINA Debt Service Fund* – The debt service fund of COFINA is used to account for the Commonwealth sales tax revenue being deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations.

*Nonmajor Governmental Funds* – The Commonwealth reports the following blended component units within the nonmajor governmental funds: PBA, The Children's Trust, PRIFA, PRMSA, PAA, SCPT and the UPRCCC. The nonmajor governmental funds also includes the Commonwealth's capital project fund.

If a component unit is blended, it should be blended with those funds of the Primary Government by including them in the appropriate fund category of the Primary Government. Although the Primary Government's General Fund is usually the main operating fund of the reporting entity, the General Fund of a blended component unit should be reported as a special revenue fund. Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

The capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditures for capital outlays, including the acquisition or construction of capital facilities and other capital assets. These capital expenditures may be for the Primary Government directly or for discretely presented component units and outside organizations and governments such as the municipalities of the Commonwealth and other applicable entities. Capital project funds exclude those types of capital related outflows financed by proprietary funds or for assets that will be held in trust for individuals, private organizations, or other governments.

79

CONFIDENTIAL

CW_STAY0009867

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

In accordance with GASB Statement No. 54, *Fund Balance Reporting and Governmental Fund Type Definitions*, the classification of fund balance is based on the extent to which the Commonwealth is bound to observe constraints imposed upon the use of resources in the governmental funds. The classifications are as follows:

*   *Nonspendable* – Amounts that are not in a spendable form or are legally or contractually required to be maintained intact.

*   *Restricted* – Amounts that are legally restricted by outside parties, constitutional provisions, or enabling legislation for a specific purpose.

*   *Committed* – Amounts that are constrained for specific purposes that are internally imposed by the government's formal action at the highest level of decision making authority and do not lapse at year end. The highest level of decision authority for the Commonwealth is the Legislature and the Governor, and the formal action is the passage of a law specifying the purposes for which amounts can be used.

*   *Assigned* – includes fund balance amounts that are constrained by the Commonwealth and are intended to be used for specific purposes that are neither considered restricted or committed. The Director of the Commonwealth OMB is authorized to assign an amount for a specific purpose through the approval of budget certificates as required by statute.

    *Unassigned* – is the residual classification for the General Fund. In a governmental fund other than the General Fund, a negative amount indicates that the expenditures incurred for a specific purpose exceeded the amounts in the fund that are restricted, committed, and assigned to that purpose.

The Commonwealth uses restricted amounts first when both restricted and unrestricted fund balances are available, unless there are legal documents/contracts that prohibit doing this, such as a grant agreement requiring dollar for dollar spending. Additionally, unless required by law or agreement, the Commonwealth would first use committed, then assigned, and lastly unassigned amounts of unrestricted fund balance when expenditures are made.

The Commonwealth does not have a formal minimum fund balance policy.

*(iv)* *Proprietary Funds*

These funds account for those activities, which are financed and operated in a manner similar to private business enterprises. Management intends to recover, primarily through user charges, the cost of providing goods or services to the general public.

The Commonwealth reports the following major proprietary funds:

*   *Unemployment Insurance Fund* – This fund accounts for amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

*   *Lotteries Fund* – This fund accounts for the assets and operations of two lottery systems administered by the Commonwealth.

80

CW_STAY0009868

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

∗ *Puerto Rico Health Insurance Administration* –This fund, a blended component unit, accounts for a health insurance system operated through contracts with insurance underwriters to provide quality medical and hospital care to low income individuals, employees of the Commonwealth and policemen who voluntarily subscribe to the Puerto Rico health insurance medical plan.

∗ *Puerto Rico Medical Services Administration* – This fund, a blended component unit, accounts for the operations of the centralized health services, provided in support of hospitals and other functions offered by the member institutions and consumers of the complex known as Puerto Rico Medical Center.

*Puerto Rico Water Pollution Control Revolving Fund* – This fund, administered by the Puerto Rico Environmental Quality Board (EQB), is authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), mostly for water infrastructure projects, under a joint cooperation agreement between the EQB, PRIFA, PRASA, and the GDB, where each entity has agreed to assume their corresponding responsibilities.

The Commonwealth reports the following nonmajor proprietary funds: Disability Insurance Fund, Drivers' Insurance Fund, the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, Ponce Ports Authority and the Governing Board of 9 1 1 Services.

(v) *Fiduciary Funds*

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity, or as an agent for individuals, private organizations, and other governmental units. The following are the Commonwealth's fiduciary funds:

∗ *Pension (and Other Employee Benefit) Trust Funds* – These are used to account for the assets, liabilities, and net position held in trust for pension benefits and postemployment healthcare benefits held in trust for the public employees' retirement systems.

*Agency Funds* – These are custodial in nature (assets equal liabilities) and do not involve measurement of the results of operations.

**(e) Measurement Focus and Basis of Accounting**

*Government-Wide Financial Statements* – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Revenue from property tax is recognized in the fiscal year for which the taxes are levied. Grants and similar items are recognized as revenue as soon as all eligibility requirements have been met.

*Governmental Fund Financial Statements* – The governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available, and net of estimated overpayments (as applicable) and amounts considered not collectible. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the

81

CW_STAY0009869

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

current period (see Note 1(j) for further description about the period of availability for the principal sources of revenue in the Governmental Activities).

Principal revenue sources considered susceptible to accrual include personal and corporate income taxes (recognized as taxpayers earn income), sales and uses taxes (recognized as sales are made), excise taxes (as the underlying import or related activity takes place), property taxes (imposed on real estate property values, as defined), intergovernmental revenue (typically, when related expenditures are incurred), and other taxes and charges for services (typically, as cash is received).

Expenditures are generally recorded when a liability is incurred, as under accrual accounting. Modifications to the accrual basis of accounting include the following:

\* Employees' vested annual vacation and sick leave are recorded as expenditures when matured. The unmatured amount of accumulated annual vacation and sick leave unpaid at June 30, 2015 is reported only in the government-wide financial statements.

\* Interest and principal on general long-term obligations and interest on interest rate swap agreements are recorded when due, except for interest and principal due on July 1 of the following fiscal year, if resources are available for its payment as of June 30.

Debt service expenditures, federal funds' cost disallowances, other long-term obligations, and amounts subject to judgments under litigation are recorded in the governmental funds only when payment is due; and in the case of judgments under litigation, when a settlement has been made and awaiting payment. Until these criteria are met, these liabilities have been recorded only in the government-wide financial statements.

A summary reconciliation of the difference between total fund balances (deficit) as reflected in the governmental funds balance sheet and net position of Governmental Activities as shown on the government-wide statement of net position is presented in an accompanying reconciliation of the balance sheet of governmental funds to the statement of net position.

A summary reconciliation of the difference between net change in fund balances (deficit) as reflected in the governmental funds statement of revenue, expenditures, and changes in fund balances (deficit) and change in net position in the statement of activities of the government-wide financial statements is presented in the accompanying reconciliation of revenue, expenditures, and changes in fund balances (deficit) of governmental funds to the statement of activities.

*Proprietary Funds, Fiduciary Funds, and Discretely Presented Component Units Financial Statements–* The financial statements of the proprietary funds, fiduciary funds, and discretely presented component units are reported using the economic resources measurement focus and the accrual basis of accounting, similar to the government-wide financial statements described above.

82

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Proprietary funds distinguish operating revenue and expenses from nonoperating items. Operating revenue and expenses generally result from providing services and producing and delivering goods in connection with a proprietary fund's principal ongoing operations. Revenue and expenses not meeting this definition are reported as nonoperating revenue and expenses. The major operating revenue of the Commonwealth's major proprietary funds is as follows:

* *Unemployment Insurance Fund* – Amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

* *Lotteries Fund* – Amounts collected from the sale of traditional lottery tickets and electronic lotto games.

* *Puerto Rico Health Insurance Administration* – Amounts received through the Puerto Rico Department of Health (DOH) representing payments by the Medicaid Program under Title XIX of the Social Security Act and State Plan, contributions from the Commonwealth to cover the local share to meet the Medicaid Program matching requirements and amounts charged and collected from employers and municipalities for direct health services provided to its members.

* *Puerto Rico Medical Services Administration* – Amounts charged and collected from private citizens, member institutions and municipalities for patient services provided.

  *Puerto Rico Water Pollution Control Revolving Fund* – Interest income from the granting of infrastructure and construction loans.

*(f) Cash, Cash Equivalents and Short-Term Investments*

The Commonwealth follows the practice of pooling cash. Cash balances of funds held in the Commonwealth Treasury are commingled in a general checking account and several zero balance bank accounts for special purposes. The available cash balance in the general checking account beyond immediate need is pooled in interest bearing accounts with GDB and PRGITF as of June 30, 2015. Subsequent to March 2016, new interest-bearing accounts were created with commercial banks insured with the FDIC. These new accounts are used by the Commonwealth to follow the practice of pooling of cash.

Cash and cash equivalents include investments with original maturities of 90 days or less from the date of acquisition. Short-term investments are recorded at cost.

The Puerto Rico Commissioner of Financial Institutions requires that Puerto Rico private financial institutions deposit collateral securities to secure the deposits of the Commonwealth and all other governmental entities in each of these institutions. The amount of collateral securities to be pledged for the security of public deposits must be established by the rules and regulations promulgated by the Commissioner of Financial Institutions.

The Puerto Rico Unemployment Insurance Trust Fund is maintained to account for the collection of unemployment insurance contributions from employers and the payment of unemployment benefits to eligible claimants. As required by federal law, all resources not necessary for current benefit payments are placed on deposit with the U.S. Treasury. Interest earned over such deposit is retained in the fund.

83

CW_STAY0009871

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Cash and short-term investments and cash equivalents of the component units and certain funds of the Primary Government are maintained in separate bank accounts, from those of the rest of the Primary Government, in their own names. A significant portion of these financial instruments are invested in GDB deposits. Refer to Note 5 for more information about the cash deposited at GDB.

The custodial credit risk, the availability and recoverability of cash and short-term investments is evaluated continuously by the Commonwealth. Refer to Note 5 for custodial credit loss recorded on certain cash and short-term investments. The custodial credit loss of cash and short-term investments held as of June 30, 2015 was determined on the actual subsequent utilization of such assets.

**(g) Securities Purchased/Sold under Agreements to Resell/Repurchase**

Certain component units of the Commonwealth enter into purchases of securities with simultaneous agreements to resell the same securities (resale agreements) and into sales of securities under agreements to repurchase (repurchase agreements). The amounts advanced or received under these agreements generally represent short-term loans and are reflected as an asset in the case of resale agreements and as a liability in the case of repurchase agreements. The securities underlying these agreements mainly consist of U.S. government obligations, mortgage backed securities, and interest-bearing deposits with other banks. Resale and repurchase agreements are authorized transactions under their respective enabling legislation and/or authorized by the Commonwealth fiscal agent.

**(h) Securities Lending Transactions**

Certain component units and pension trust funds of the Commonwealth enter into securities lending transactions in which governmental entities (lenders) transfer their securities to broker dealers and other entities (borrowers) for collateral with a simultaneous agreement to return the collateral for the same securities in the future. Cash received as collateral on securities lending transactions and investments made with that cash are reflected as investments. Securities received as collateral are reported as investments if the component unit has the ability to pledge or sell them without a borrower default. Liabilities resulting from these securities lending transactions also are reported in the statement of net position. Securities lending transactions collateralized by letters of credit or by securities that the component unit does not have the ability to pledge or sell unless the borrower defaults are not reported as assets and liabilities in the statement of net position.

**(i) Investments**

Investments mainly include U.S. government and agencies' obligations, mortgage backed securities, repurchase agreements, commercial paper, local government obligations, investment contracts, and corporate debt and equity obligations. Investments and investment contracts are carried at fair value, except for money market investments and participating investment contracts with a remaining maturity at the time of purchase of one year or less and nonparticipating investment contracts (guaranteed investment contracts), which are carried at cost; and investment positions in 2a7 like external investment pools, which are carried at the pool's share price. Fair value is determined based on quoted market prices and quotations received from independent broker/dealers or pricing service organizations. Investment income, including changes in the fair value of investments, is presented as investment earnings in the statement of activities, the statement of revenue, expenditures, and changes in fund balances (deficit)– governmental funds, and the statement of revenue, expenses, and changes in net position– proprietary

84

CW_STAY0009872

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

funds. Realized gains and losses from the sale of investments and unrealized changes in the fair value of outstanding investments are included within interest and investments earnings.

The PRGITF is considered a 2a7 like external investment pool and, as such, reports its investments or short-term investments at amortized cost.

**(j)** *Accounts Receivable, Loans, General Revenue and Unearned Revenue*

Income taxes receivables, in both the General Fund and statement of net position, include predominantly an estimate of amounts owed by taxpayers for individual and corporate income taxes, net of estimated uncollectible amounts. Income taxes receivables in the General Fund are recognized as revenue when they become measurable and available based on actual collections during the 120 days following the current fiscal year end that are related to taxable years of prior periods. Income taxes receivable also include amounts owed by taxpayers on income earned prior to June 30, 2015, estimated to be collectible but not currently available, and thus are reported as deferred inflows of resources in the General Fund; such deferred inflows are considered revenue in the statement of activities as the availability criteria is not applicable on the government-wide financial statements for revenue recognition. Act No. 44 of March 30, 2015 allowed citizens to prepay taxes on their individual retirements, educational savings accounts, annuities contracts and on the incremental value of property subject to capital gain. The income taxes collected in advance are recognized as unearned revenue in the balance sheet governmental funds and will be recognized as revenue when the underlying transaction occurs.

The sales and use tax receivable is recognized as revenue in the statement of revenue, expenditures, and changes in fund balance governmental funds when it becomes measurable and available based on actual collections during the 30 days following the current fiscal year end related to sales and use transactions due on or before year end. The same treatment is given in the government-wide financial statements given its short period of availability.

Excise tax receivable is recognized as revenue when it becomes measurable and available based on actual collections during the 30 days following the current fiscal year end related to transactions that occurred before year end. The same treatment is given in the government-wide financial statements given its short period of availability. Act No. 154 of October 25, 2010 imposed a temporary excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico by nonresident alien individuals, foreign corporations, and foreign partnerships. Act No. 154 applies to income realized and acquisitions occurring after December 31, 2010. Initially, the excise tax would apply until the year 2017. The excise tax is based on the value of the personal property or the services acquired, and was 4% for calendar year 2011, 3.75% in 2012 and 2.75% for portions of 2013 until February 28, 2013. On February 28, 2013, Act No. 2 was enacted raising the then prevailing excise tax rate of 2.75% to 4%, effective immediately, and maintaining such rate fixed at 4% until the year 2017. On January 23, 2017, Act No. 3 was enacted extending the fixed rate of 4% for ten additional years. Refer to Note 2 and Note 22 for more information about this Act.

For purposes of the governmental fund financial statements, property tax revenue represents payments received during the year and payments received (against the current fiscal year and prior years' levies) within the first 90 days of the following fiscal year reduced by tax refunds, if any. Additionally, the government-wide financial statements recognize real property tax revenue (net of refunds), which is not

85

CW_STAY0009873

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

available to the governmental funds in the fiscal year for which the taxes are levied. Act No. 7 of March 9, 2009, as amended, imposed a real property tax, in addition to the one already established for the municipalities of the Commonwealth through the Municipal Revenue Collection Center (CRIM), on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax was applicable during fiscal years 2010 through 2012 and amounted to 0.591% of such properties' appraised value as determined by the CRIM. Act No. 1 of January 31, 2011 eliminated this additional real property tax commencing with the quarter ended June 30, 2011. Collections on this tax, which were due September 1, 2012 and March 1, 2013, were still being received during fiscal year 2015, as a result of delinquent taxpayers bringing their accounts current or taking advantages of amnesty programs offered by the Treasury Department. The Commonwealth applies a 90-day availability period, rather than the traditional 60-day period after year end, in order to cover a period in which most tax extension payments are made. This has been applied consistently over the years.

Intergovernmental receivables are stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions. Intergovernmental receivables primarily represent amounts owed to the Commonwealth for reimbursement of expenditures incurred pursuant to federally funded programs. This intergovernmental receivable is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during one year following the fiscal year end related to transactions that occurred before year end. Those intergovernmental receivables not expected to be collected within the aforementioned one-year period are recorded as deferred inflows of resources. In applying the susceptible to accrual concept to federal grants, revenue is recognized when all applicable eligibility requirements are met (typically, when related expenditures are incurred) and the resources are available. Resources received before eligibility requirements, other than timing, are met are considered unearned revenue. Resources received before timing requirements are met are considered deferred inflows of resources.

Intergovernmental receivables also include taxes that the CRIM, is required to remit to the Commonwealth to be used by the Commonwealth's debt service fund for payment of debt service on general obligations of the Commonwealth. The amount to be remitted is based on the special tax of 1.03% of the assessed value of all real and personal property not exonerated from taxation, which is levied by the CRIM, pursuant to Act No. 83 of 1991. This receivable from CRIM is recognized as revenue in the governmental funds when it becomes measurable and available based on actual collections during 180 days following the current fiscal year end that are related to transactions that occurred before year end. The amounts from CRIM not expected to be collected within the aforementioned 180 days period are recorded as deferred inflows of resources.

Unemployment, disability, driver's insurance, and other services receivables recognized in the proprietary funds are stated net of estimated allowances for uncollectible accounts.

The accounts receivable from nongovernmental customers of the component units are net of estimated uncollectible amounts. These receivables arise primarily from service charges to users. Accounts receivable from the Primary Government and other component units that arise from service charges, are evaluated for collectability.

86

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Loans of the General Fund are net of estimated uncollectible amounts. These receivables arise from amounts owed by public corporations and municipalities for public insurance and rent paid by the General Fund on their behalf.

The loans of the pension trust funds are presented net of estimated allowances for adjustments and losses in realization. However, most of the loans are secured by mortgage deeds, plan members' contributions, and any unrestricted amounts remaining in escrow. Loans of the component units consist predominantly of loans to the Primary Government, other component units, and municipalities. The remaining loans of the component units are to small and medium businesses, agricultural, and low-income housing loans from nongovernmental customers, and are presented net of estimated losses on such portfolios.

**(k)  Inventories**

Generally, inventories are valued at cost and predominantly on the first in, first out basis. Governmental fund inventories are recorded as expenditures when purchased rather than capitalized as an asset. Only significant amounts of inventory at the end of the year are capitalized in the governmental funds. However, inventories are always capitalized in the statement of net position of Governmental Activities.

**(l)  Restricted Assets**

Funds set aside for the payment and guarantee of notes and interest payable and for other specified purposes are classified as restricted assets since their use is limited for this purpose by applicable agreements or required by law. Restricted assets in the proprietary funds mainly include amounts set aside for the payment of insurance benefits and lending activities.

**(m)  Real Estate Held for Sale or Future Development**

Real estate held for sale or future development is carried at the lower of fair value or cost, which is established by a third party professional assessment or based upon an appraisal, minus estimated costs to sell. Subsequent declines in the value of real estate available for sale are charged to expenditure/expense.

**(n)  Capital Assets**

Capital assets include land, buildings, building improvements, equipment (including software), vehicles, construction in process, and infrastructure assets, and are reported in the applicable Governmental Activities, Business-Type Activities, and component unit columns in the government-wide financial statements and in the proprietary fund financial statements. The Commonwealth's Primary Government defines capital assets as assets that (i) have an initial, individual cost of $25,000 or more at the date of acquisition and (ii) have a useful life of more than one year. Capital assets are recorded at historical cost or at estimated historical cost, if actual historical cost is not available.

Capital assets donated by third parties are recorded at fair value at the time of donation. Those capital assets donated by related parties are recorded at the carrying value existing at the transferor's records. Major outlays for capital assets and improvements are capitalized as projects are constructed. Interest costs are capitalized during the construction period only for Business-Type Activities and most component units. The costs of normal maintenance and repairs that do not add value to the assets or materially extend asset lives are not capitalized.

87

CW_STAY0009875

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Capital assets utilized in the governmental funds are recorded as expenditures in the governmental fund financial statements. Depreciation expense is recorded in the government-wide financial statements, as well as the proprietary funds and component units' financial statements.

Capital assets of the Primary Government are depreciated on the straight-line method over the assets estimated useful life. There is no depreciation recorded for land and construction in progress. The estimated useful life of capital assets is as follows:

| | Years |
|---|---|
| Buildings and building improvements | 20–50 |
| Equipment, furniture, fixtures, vehicles, and software | 5–15 |
| Infrastructure | 50 |

The capital assets of the component units are recorded in accordance with the applicable standards of the component units and under their own individual capitalization thresholds, which includes capitalization of interest. Depreciation has been recorded when required by these standards based on the types of assets, use, and estimated useful lives of the respective assets, and on the nature of each of the component unit's operations.

The estimated useful lives of capital assets reported by the component units are as follows:

| | Years |
|---|---|
| Buildings and building improvements | 3–50 |
| Equipment, furniture, fixtures, vehicles, and software | 3–20 |
| Intangibles, other than software | 3–5 |
| Infrastructure | 10–50 |

In the case of capital assets under service concession arrangements pursuant to GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements* (mostly attributed to PRPA and PRHTA), these are maintained on their books and also stated at cost or at estimated historical cost. Construction in progress made by the third-party operators under these service concession arrangements is not recorded by the aforementioned component units while such construction is still in progress and not ready for use and operation; at which time such constructed assets and improvements will be recognized at their corresponding fair value. These capital assets are not being depreciated after the closing date of their respective service concession arrangements because such agreements require the third-party operators to return the related facilities to these component units in its original or enhanced condition. Such capital assets continue to apply existing capital asset guidance, including depreciation through the closing date of the respective service concession arrangements. Under these service concession arrangements, the aforementioned component units have received from the third-party operator either an upfront compensation fee or capital assets (or the commitment to construct them under the agreement) or both. These resources, net of any contractual obligation from the component units,

88

CW_STAY0009876

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

are considered a deferred inflow of resources, which is recognized into revenue under the straight-line method over the term of the respective agreements.

The Commonwealth follows the provisions of GASB Statement No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*, an amendment to GASB Statement No. 34. This statement establishes guidance for accounting and reporting for the impairment of capital assets and for insurance recoveries. In accordance with these provisions, governments are required to evaluate prominent events or changes in circumstances affecting capital assets to determine whether impairment of a capital asset has occurred. Such events or changes in circumstances that may be indicative of impairment include evidence of physical damage, enactment or approval of laws or regulations or other changes in environmental factors, technological changes or evidence of obsolescence, changes in the manner or duration of use of a capital asset, and construction stoppage among others. The Commonwealth and its components units evaluated its capital assets as required by GASB Statement No. 42 and an impairment of approximately $900 thousand and $14.4 million was identified at the Primary Government and Component Unit level, respectively. The $900 thousand impairments at the Primary Government level related to public schools identified for closure. At the Component Unit level, the impairment of approximately $14.4 million was identified in the construction in progress account for PRHTA ($1.1 million) and land under development at GDB ($13.3 million).

*(o) Income Tax Refunds Payable*

During the calendar year, the Commonwealth collects individual and corporate income taxes through withholdings and payments from taxpayers. At June 30, the Commonwealth estimates the amount owed to taxpayers for overpayments of income taxes during the first half of the calendar year. These estimated amounts and the actual individual and corporate income tax refunds claimed for prior years but not paid at year end are recorded as income tax refunds payable and as a reduction of tax revenue in both the Governmental Funds and the Governmental Activities.

*(p) Deferred Outflows/Inflows of Resources*

In addition to assets, the statement of net position will sometimes report a separate section for deferred outflows of resources. This separate financial statement element, deferred outflows of resources, represents a consumption of net position that applies to a future period(s) and so will not be recognized as an outflow of resources (expense/expenditure) until then. The Primary Government and the component units have three major captions that qualify for reporting in this category: (i) the unamortized balance of losses on bond refunding, (ii) the accumulated decrease in the fair value of hedging derivatives and (iii) several items related to pensions, the three of them reported in the government-wide statement of net position. A loss on bond refunding results from the difference in the carrying value of refunded debt and its reacquisition price. This amount is capitalized and amortized over the shorter of the life of the refunded or refunding debt. Further information about the balances of unamortized deferred refunding losses can be found in Note 12. With respect to hedging derivatives, the accumulated losses on their fair values are also deferred and amortized as the underlying hedged instrument (in this case, debt) is being repaid or refunded and/or as the hedging derivative is terminated. Further information on the derivative instruments of the Primary Government can be found in Note 20. Of the pension related items (further disclosed in Note 2 (s) and Note 17), changes in proportional share of contributions and differences between expected and actual experience, are capitalized and recognized over a period equal to the expected remaining working lifetime of active and inactive participants. Net differences between

89

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

projected and actual earnings on pension plan investments is deferred and recognized over a five-year period. Pension contributions made subsequent to the measurement date will be recognized as a reduction of the net pension liability after the next measurement date. There were no deferred outflows of resources at the governmental funds level.

In addition to liabilities, the statement of net position and the governmental funds balance sheet will sometimes report a separate section for deferred inflows of resources. This separate financial statement element, deferred inflows of resources, represents an acquisition of net position and resources that applies to a future period(s) and so will not be recognized as an inflow of resources (revenue) until that time. The Primary Government has only one type of caption arising under the modified accrual basis of accounting that qualify for reporting in this category, and that is unavailable revenue. Deferred inflows of resources at the governmental fund level arise when potential revenue does not meet the "available" criteria for revenue recognition in the current period under the modified accrual basis of accounting. In subsequent periods, when the applicable resources become available, the deferred inflow of resources is removed from the balance sheet, and the revenue is recognized. The Primary Government and the component units also have two captions that qualify for reporting in this category in the government-wide statement of net position and those are the unamortized balance of gains on bond refunding and several items related to pensions. A gain on a bond refunding results when the carrying value of refunded debt is greater than its reacquisition price. This amount is capitalized and amortized over the shorter of the life of the refunded or refunding debt. Further information about the balances of unamortized deferred refunding gains can be found in Note 12. Of the pension related items (further disclosed in Note 2 (s) and Note 17), changes in proportional share of contributions, differences between expected and actual experience and changes in actuarial assumptions, are deferred and recognized over a period equal to the expected remaining working lifetime of active and inactive participants. Net differences between projected and actual earnings on pension plan investments is deferred and recognized over a five-year period. The component units also have one additional item that qualifies for reporting in this category in the government-wide statement of net position, which is the unamortized balances of the upfront amounts received and related adjustments pertaining to the Service Concession Arrangements of PRPA and PRHTA, further described in Note 16.

### (q) Long-Term Debt

The liabilities reported in the government-wide financial statements include the Commonwealth's general obligation and revenue bonds and long-term notes, liabilities under guaranteed obligations, obligations under lease/purchase agreements, obligations for voluntary termination benefits, and long-term liabilities including vacation, sick leave, long-term liabilities to other governmental entities, net pension liability, legal claims, and noncurrent federal fund cost disallowances related to expenditures of federal grants. Long-term obligations financed by proprietary fund types and component units are recorded as liabilities in those funds and in the discretely presented component units' column.

In the government-wide financial statements, premiums and discounts on long-term debt and other long-term obligations are presented in the columns for governmental and Business-Type Activities. The same is presented in the proprietary fund financial statements. Bond and note premiums and discounts are deferred and amortized over the life of the debt under a method that approximate the effective interest method. Bonds and notes payable are reported net of the applicable bond premium or discount. Bond issuance costs, other than prepaid insurance, are reported as expenses. In the governmental fund

90

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

financial statements, governmental funds recognize bond premiums and discounts, as well as bond issuance costs, during the current period. The face amount of debt issued is reported as other financing sources. Premiums received on debt issuance are reported as other financing sources while discounts are reported as other financing uses. Issuance costs, whether or not withheld from the actual debt proceeds received, are reported as expenditures.

**(r)  Derivative Instruments**

The Commonwealth accounts for derivative instruments in accordance with GASB Statement No. 53, *Accounting and Financial Reporting for Derivative Instruments*. Derivative instruments such as interest rate and commodity swaps, interest rate locks, options (caps, floors, and collars), swaptions, forward contracts, and futures contracts are entered into by governments as investments; as hedges of identified financial risks associated with assets or liabilities, or expected transactions (i.e., hedge able items); to lower the costs of borrowings; to effectively fix cash flows or synthetically fix prices; or to offset the changes in fair value of hedgeable items. Certain derivative instruments, with the exception of synthetic guaranteed investment contracts that are fully benefit responsive, are reported at fair value in the government-wide financial statements. The changes in fair value of effective hedging derivative instruments are reported as deferred inflows or deferred outflows of resources. The changes in fair value of investment derivative instruments (which include ineffective hedging derivative instruments) are reported as part of investment revenue in the current reporting period. Effectiveness is determined by considering whether the changes in cash flows or fair values of the potential hedging derivative instrument substantially offset the changes in cash flows or fair values of the hedge able item. For additional information regarding hedging and investment derivative instruments, refer to Note 20.

**(s)  Accounting for Pension Costs**

The Commonwealth accounts for pension costs under the provisions of GASB Statement No. 68, *Accounting and Financial Reporting for Pensions an amendment of GASB Statement No. 27*, and GASB Statement No. 71, *Pension Transitions for Contributions Made Subsequent to the Measurement Date an amendment of GASB Statement No. 68*, which were adopted by a portion of the Primary Government and partially by the Component Units effective July 1, 2014. GASB Statement No. 68 replaced GASB Statement No. 27, Accounting for Pensions by State and Local Government Employers and requires that employers report a net pension liability and related pension accounts, such as pension expense and deferred outflows/inflows of resources as determined by the Retirement Systems, as applicable, under the requirements contained in GASB Statement No. 67, *Financial Reporting for Pension Plans – an amendment of GASB Statement No. 25*. The major fundamental change brought by GASB Statement No. 67, was switching from the then existing "funding based" accounting model, where the Annual Required Contribution (ARC) was compared to the actual payments made and that difference determined the net pension obligation; to an "accrual basis" model, where the total pension obligation (actuarially determined) is compared to the plan net position and the difference represents the net pension liability. In essence, GASB Statement No. 68 brings the effect of GASB Statement No. 67 into the accounting records of the Primary Government and each of the component units and municipalities, whose employees participate in the Retirement Systems.

91

CW_STAY0009879

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The Primary Government of the Commonwealth, as well as its component units and the municipalities, are considered "cost sharing" employers of ERS; therefore, they report their allocated share of ERS's net pension liability and the related pension amounts taking in consideration the following:

* The individual proportion to the collective net pension liability of all the governments participating

* Each participating government employer's proportionate share is consistent with the manner in which contributions are determined and should reflect that participating government employer's projected long-term contribution effort relative to that of all the participating government employers. Contributions that separately finance specific liabilities of an individual participating government employer to ERS (such a local participating government employer early retirement incentives) are not included in determining the proportionate share of the overall projected long-term contribution effort.

* The contributions that reflect each participating government employer's projected long-term contribution effort are the Act No. 116 of 2011 statutory payroll based contribution, the Act No. 3 of 2013 supplemental contribution, other special contributions, and the Act No. 32 of 2013 Additional Uniform Contribution (AUC). Other contributions that do not reflect a participating government employer's projected long-term contribution effort are excluded from the proportionate share calculation.

  The AUC, requires a contribution that it is determined in the aggregate and ERS then allocates the total amount to each participating government employer based on such participating government employer's payroll. However, due to a history of non-payment of the AUC by many participating government employers and the expected continuing nonpayment of such contributions, it was determined that the collected AUC amounts would be excluded from the proportionate share determination, in order to prevent an overallocation of net pension liability amounts to those participating government employers who have paid their AUC (or are expected to do so) and an under allocation of net pension liability amounts to the participating government employers who have not paid their AUC (or are not expected to do so).

TRS is a single employer pension plan for purposes of GASB Statement No. 68 reporting, as it covers those eligible participants who are teachers within the Commonwealth public education system and are employed by the Commonwealth's Department of Education, which is a single government employer. Similarly, JRS is a single employer pension plan for purposes of GASB Statement No. 68 reporting, as it covers those eligible participants who are judges within the Commonwealth judiciary system and are employed by the Commonwealth's Court Administration Office.

Neither GASB Statements No. 68 nor No. 71 affect the way the Commonwealth may choose to fund its pension obligations. While GASB Statement No. 68 changes the amount of the pension liability that is reported on the financial statements, governments may continue to fund their plans by calculating an actuarially determined contribution and measuring their funded status as it relates to that actuarially determined contribution. GASB Statement No. 68 requires certain disclosures if an actuarially determined contribution has been calculated.

For purposes of the stand alone financial statements of each of the blended and discretely presented component units, which audit reports for fiscal year 2015 had already been issued prior to the issuance of the accompanying financial statements of the Commonwealth, ERS did not timely provide the

92

CW_STAY0009880

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

information needed to adopt GASB Statements No. 68 and No. 71. Therefore, the majority of the component units were unable to adopt these accounting pronouncements, and a small number of component units adopted them based on unaudited information. As a result, the majority of the component units have maintained the accounting for pension costs in accordance with GASB Statement No. 27, also based from the standpoint of a participant in a multiple employer cost sharing plan. Accordingly, pension costs recognized for most of the component units were principally equal to the statutorily or contractually required contributions, with a liability recorded for any unpaid required contributions. The component units did not record pension related assets or liabilities because they contributed the statutorily required contributions; except for those few who adopted GASB Statement No. 68 based on the unaudited information received from ERS.

**(t)   Other Postemployment Benefits**

In addition to the pension benefits described in Note 17, the Commonwealth provides other retirement benefits, such as summer and Christmas bonus, and postemployment healthcare benefits (OPEB) for its retired employees in accordance with local law. Substantially, all of the employees may become eligible for these benefits if they reach normal retirement age while working for the Commonwealth. The Commonwealth accounts for OPEB under the provisions of GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*. This statement requires a systematic, accrual basis measurement and recognition of OPEB cost (expense) over a period that approximates employees' years of service and provides information about actuarial accrued liabilities associated with OPEB and whether and to what extent progress is being made in funding the plan. Annual postemployment benefits cost should equal the annual required contribution to the plans, calculated in accordance with certain parameters. For more information, refer to Note 18.

The Christmas bonus and the summer bonus benefits are provided by Commonwealth statutes. The Christmas bonus and the summer bonus paid by the Commonwealth to the retired employees during the year ended June 30, 2015 was $600 per retiree, except for those retirees of the ERS, which had their summer bonus eliminated and the Christmas bonus reduced from $600 per retiree to $200 per retiree pursuant to Act No. 3 of April 4, 2013, which reformed ERS. The total amount of Christmas and summer bonus paid during fiscal year 2015 was approximately $30.2 million. These benefits are recorded as expenditures when paid in the General Fund.

Bonus for medicines is also provided to retirees by Commonwealth statutes. The total amount of this bonus paid during fiscal year 2015 was approximately $15.8 million. These benefits are recorded as expenditures when paid in the General Fund.

**(u)   Compensated Absences**

The vacation policy of the Commonwealth generally provides for the accumulation of 2.5 days per month, except for the teachers who accrue 4 days per month, up to an annual maximum of 40 days. Vacation time accumulated is fully vested by the employees from the first day of work up to a maximum of 60 days. Employees generally accumulate sick leave at a rate of 1.5 days per month up to an annual maximum of 18 days and an accumulated maximum of 90 days. Upon retirement, an employee receives compensation for all accumulated unpaid vacation leave at the current rate regardless of years of service; and for all accumulated unpaid sick leave if the employee has at least 10 years of service with the Commonwealth. The liability for compensated absences reported in the government-wide and proprietary

93

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

fund financial statements has been calculated using the vesting method (except for Police department employees), in which leave amounts for both employees who currently are eligible to receive termination payments and other employees who are expected to become eligible in the future to receive such payments upon termination, are included. The liability has been calculated based on the employees' current salary level and includes salary related costs (e.g., social security and Medicare tax). The liability for compensated absences of Police department employees is estimated based on actual termination payments made and projected statistically, which is a hybrid between the vesting and termination methods. The governmental fund financial statements record expenditures when employees are paid for leave, or when the balance due is accrued upon the employee's separation from employment. Compensated absence accumulation policies for the blended component units and discretely presented component units vary from entity to entity based on negotiated agreements and other factors agreed upon between the management of these entities and their employees.

The Public Service Personnel Law required certain component units and the Primary Government of the Commonwealth to annually pay the employees the accumulated vacation and sick leave earned in excess of the limits mentioned above. As a result of Act No. 66 of June 17, 2014, some of these excess accumulations will no longer be payable to the employers. For further information, refer to Note 2.

*(v)  Termination Benefits*

The Commonwealth accounts for termination benefits in accordance with GASB Statement No. 47, *Accounting for Termination Benefits.* Pursuant to the provisions of GASB Statement No. 47, in financial statements prepared on the accrual basis of accounting, employers should recognize a liability and expense for voluntary termination benefits (for example, early retirement incentives) when the offer is accepted and the amount can be estimated. A liability and expense for involuntary termination benefits (for example, severance benefits) should be recognized in the government-wide financial statements when: (i) a plan of termination has been approved by those with the authority to commit the government to the plan, (ii) the plan has been communicated to the employees, and (iii) the amount can be estimated. In financial statements prepared on the modified accrual basis of accounting, liabilities and expenditures for termination benefits should be recognized to the extent the liabilities are normally expected to be liquidated with expendable available financial resources.

*(w)  Encumbrances*

Encumbrance accounting, under which purchase orders, contracts, and other commitments for expenditures are recorded to reflect the use of the applicable spending appropriations, is used by the General Fund during the fiscal year to control expenditures. The unencumbered balance of any appropriation of the General Fund at the end of the fiscal year lapses immediately. Appropriations, other than in the General Fund, are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending.

*(x)  Interfund Activities and Intraentity Transactions*

The Commonwealth had the following interfund activities and intraentity transactions:

*Interfund Transfer* – Legally required transfers are reported when incurred as transfer in by the recipient fund and as transfer out by the disbursing fund, with receivables and payables presented as amounts due to and due from other funds. Advances between funds are also presented as amounts due to and

94

CW_STAY0009882

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

due from other funds. However, these advances, transfers, and related amounts receivable and payable are considered internal balances and activities that have been eliminated in the government-wide financial statements. Interfund receivables are stated net of estimated allowances for uncollectible accounts, which are determined, based upon past collection experience and current economic conditions.

*Intraentity Transactions* – There are two types of intraentity transactions: First, the flow of resources between the Primary Government and its component units, and among the component units. This flow of resources and the related outstanding balances are reported as if they were external transactions. However, flow of resources between the Primary Government and blended component units are classified as interfund activity, as described above. Second, the intraentity balances between the Primary Government and discretely presented component units are tantamount to long-term debt financing. The Primary Government's liability is reported in the statement of net position, the proceeds in the Primary Government's statement of revenue, expenditures and changes in fund balance governmental funds, and the asset in the discretely presented component units' statement of net position. Amounts due from component units are stated net of estimated allowances for uncollectible accounts, which are determined, by past collection experience and current economic conditions.

**(y) Lottery Revenue and Prizes**

The revenue, expenses, and prizes awarded by the Lottery of Puerto Rico and the Additional Lottery System, reported within the lotteries enterprise fund, are recognized as drawings are held. Moneys collected prior to June 30 for tickets related to drawings to be conducted subsequent to June 30 are reported as unearned revenue. Unpaid prizes awarded as of June 30, are reported as a fund liability. Unclaimed prizes expire after six months and are transferred to the General Fund.

**(z) Risk Management**

The Commonwealth purchases commercial insurance covering casualty, theft, tort claims, and other losses for the Primary Government, most component units, and the municipalities. The Commonwealth is reimbursed for premium payments made on behalf of the component units and the municipalities. The current insurance policies have not been canceled or terminated. For workers' compensation, the Commonwealth has a discretely presented component unit, the SIFC, which provides workers' compensation to both public and private employees. The Commonwealth's blended component units are responsible for assuring that its property is properly insured. Annually, these blended component units compile the information of all property owned and its respective replacement value and purchases its property and casualty insurance policies. Insurance coverage for fiscal year 2015 remained similar to those of prior years. In the last three years, the Commonwealth's or the component units' insurance settlements have not exceeded the amount of coverage.

Certain discretely presented and blended component units combine commercial insurance with internal self insurance funds covering specific risks related to their specialized operations. The most significant self insurance funds reside at the discretely presented component unit's level, and are described in detail in Note 15.

95

CW_STAY0009883

**COMMONWEALTH OF PUERTO RICO**
Note to the Basic Financial Statements
June 30, 2015

*(aa)* *Tobacco Settlement*

The Commonwealth follows GASB Technical Bulletin No. 2004 1, Tobacco Settlement Recognition and Financial Reporting Entity Issue, as amended by GASB Statement No. 48, *Sales and Pledges of Receivables and Future Revenues and Intra Entity Transfers of Assets and Future Revenues*, (the TB), which provides accounting guidance for entities created to obtain the rights to all or a portion of future tobacco settlement resources and for the governments that create such entities.

The TB indicates that the entity created to obtain the rights generally referred to as Tobacco Settlement Authority (in the Commonwealth's case, the Children's Trust), , should be considered a blended component unit of the government that created it. The TB also states that the government receiving the payments from the tobacco companies under the agreement, referred to as settling governments, should recognize a receivable and revenue for tobacco settlement resources when an event occurs. The event that results in the recognition of an asset and revenue by the settling government is the domestic shipment of cigarettes. The TB indicates that accruals should be made by the settling government and tobacco settlement authorities for estimated shipments from January 1 to their respective fiscal year ends, since the annual payments are based on a calendar year. However, under the modified accrual basis of accounting at the fund level, revenue should be recognized only to the extent that resources are available.

*(bb)* *Use of Estimates*

The preparation of the basic financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities disclosure of contingent assets and liabilities at the date of the basic financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*(cc)* *New Accounting Standards Adopted*

The following new accounting standards were adopted by the Commonwealth effective July 1, 2014:

* GASB Statement No. 68, *Accounting and Financial Reporting for Pensions – an amendment of GASB Statement No. 27* and GASB Statement No. 71, *Pension Transition for Contributions Made Subsequent to the Measurement Date*. GASB Statement No. 68 required that employers and nonemployer contributing entities report a net pension liability and related pension expense as determined by the plans under the requirements contained in GASB Statement No. 67. Previously, GASB Statement No. 27 required employers to report a net pension obligation as determined under the requirements of GASB Statement No. 25, *Financial Reporting for Defined Benefit Plans and Note Disclosures for Defined Contribution Plans*. The Commonwealth implemented GASB Statement No. 67 for the fiscal year ending June 30, 2014. GASB Statement No. 67 replaced the requirements of GASB Statement No. 25 and specified the required approach to measuring the pension liability of employers and nonemployer contributing entities for benefits provided through the pension plan. GASB Statement No. 67 required plans to calculate a net pension liability to be measured as the total pension liability less the amount of the pension plan's fiduciary net position. During the year ended June 30, 2015, the Commonwealth also implemented GASB Statement No. 71 requiring that upon implementation of GASB Statement No. 68, a government recognize a beginning deferred outflow of resources for its pension contributions made subsequent to the measurement date of the beginning net pension liability.

96

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Implementation of these new financial reporting standards required that the Commonwealth restate its beginning net position as of July 1, 2014, reflecting the cumulative effects of applying these statements. In addition, in accordance with the provisions of these statements, beginning balances of deferred pension outflows of resources and deferred pension inflows of resources have not been reported, except for recognizing the beginning balance for deferred outflows of resources for pension contributions made subsequent to the measurement date of the beginning pension liability but before the start of the Commonwealth's fiscal year. Disclosures required under GASB Statement No. 68 only apply to the defined benefit plans under the Retirement Systems for which the Commonwealth is required to fund the net pension liability.

Implementation of these two standards had no effect on the beginning fund balances of governmental funds. However, the beginning net positions of governmental and Business-Type Activities, certain enterprise funds and the discretely presented component units that adopted these statements have been restated. The restatement eliminated the previously reported net pension obligation or assets and recognized the newly required net pension liability and deferred outflow/inflows of resources. For additional information of such impact at both the Primary Government and the discretely presented component units, refer to Note 3.

As mentioned in Note 1(s), some blended and discretely presented component units as well as a portion of the Primary Government did not adopt GASB Statement No. 68.

* GASB Statement No. 69, *Government Combinations and Disposals of Government Operations*. This Statement established accounting and financial reporting standards related to government combinations and disposals of government operations. As used in this statement, the term government combinations include a variety of transactions referred to as mergers, acquisitions, and transfers of operations. During the fiscal year 2015, the operations of the Corporation for the Development of the Arts, Science, and Film Industry of Puerto Rico (CDASFIPR), Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico (CIBMRIP), Employment and Training Enterprises Corporation (ETEC) and National Parks Company of Puerto Rico (NPCPR) (formerly discretely presented component units of the Commonwealth) were merged into the Commonwealth's General Fund. These mergers became effective at various dates during fiscal year 2015; however, under the provisions of GASB Statement No. 69, the merger date is July 1, 2014, the beginning of the reporting period in which the combinations occurred. The initial opening balances of these merged entities' assets, liabilities and net position as of the beginning of the period, were determined based on the carrying values reported in their separate financial statements as of June 30, 2014. For further details of such impact at both the Primary Government and the discretely presented component units, refer to Note 3.

### (dd) Accounting Pronouncements Issued But Not Yet Effective

The following new accounting standards have been issued but are not yet effective:

* GASB Statement No. 72, *Fair Value Measurement and Application*. This statement requires a government to use valuation techniques that are appropriate under the circumstances and for which sufficient data are available to measure fair value. The techniques should be consistent with one or more of the following approaches; the market approach, the cost approach, or the income approach. This statement also establishes a three-level hierarchy of inputs to valuation techniques used to

97

CW_STAY0009885

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

measure fair value. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities. Level 2 inputs are inputs, other than quoted prices, included within Level 1 that are observable for the assets or liability, either directly or indirectly. Finally, Level 3 inputs are unobservable inputs, such as management's assumptions of the default rate among underlying mortgages of a mortgage backed security. The provisions of this statement are effective for financial statements for periods beginning after June 15, 2015.

* GASB Statement No. 73, *Accounting and Financial Reporting for Pensions and Related Assets That Are Not within the Scope of GASB Statement No. 68, and Amendments to Certain Provisions of GASB Statements No. 67 and No. 68.* This statement establishes requirements for defined benefit pensions that are not within the scope of GASB Statement No. 68, *Accounting and Financial Reporting for Pensions*, as well as for the assets accumulated for purposes of providing those pensions. In addition, it establishes requirements for defined contribution pensions that are not within the scope of GASB Statement No. 68. It also amends certain provisions of GASB Statement No. 67, *Financial Reporting for Pension Plans*, and GASB Statement No. 68 for pension plans and pensions that are within their respective scopes. The provisions of this statement that address accounting and financial reporting by employers and governmental nonemployer contributing entities for pensions that are not within the scope of GASB Statement No. 68 are effective for financial statements for fiscal years beginning after June 15, 2016, and the provisions of this statement that address financial reporting for assets accumulated for purposes of providing those pensions are effective for fiscal years beginning after June 15, 2015. The provisions of this statement for pension plans that are within the scope of GASB Statement No. 67 or for pensions that are within the scope of GASB Statement No. 68 are effective for fiscal years beginning after June 15, 2015.

* GASB Statement No. 74, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans.* This statement replaces GASB Statements No. 43, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*, as amended, and GASB Statement No. 57, *OPEB Measurements by Agent Employers and Agent Multiple Employer Plans.* It also includes requirements for defined contribution OPEB plans that replace the requirements for those OPEB plans in GASB Statement No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*, as amended, GASB Statement No. 43, and GASB Statement No. 50, *Pension Disclosures.* The scope of this statement includes OPEB plans defined benefit and defined contribution administered through trusts that meet the following criteria:

  – Contributions from employers and nonemployer contributing entities to the OPEB plan and earnings on those contributions are irrevocable.

  – OPEB plan assets are dedicated to providing OPEB to plan members in accordance with the benefit terms.

  – OPEB plan assets are legally protected from the creditors of employers, nonemployer contributing entities, and the OPEB plan administrator. If the plan is a defined benefit OPEB plan, plan assets also are legally protected from creditors of the plan members.

This statement also includes requirements to address financial reporting for assets accumulated for purposes of providing defined benefit OPEB through OPEB plans that are not administered through trusts that meet the specified criteria. The provisions of this statement are effective for fiscal years beginning after June 15, 2016.

98

CONFIDENTIAL

CW_STAY0009886

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

\* GASB Statement No. 75, *Accounting and Financial Reporting for Postemployment Benefits Other Than Pensions*. This Statement replaces the requirements of GASB Statements No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*, as amended, and GASB Statement No. 57, *OPEB Measurements by Agent Employers and Agent Multiple Employer Plan*, for OPEB. GASB Statement No. 74, *Financial Reporting for Postemployment Benefit Plans Other Than Pension Plans*, establishes new accounting and financial reporting requirements for OPEB plans. The scope of this statement addresses accounting and financial reporting for OPEB that is provided to the employees of state and local governmental employers. This statement establishes standards for recognizing and measuring liabilities, deferred outflows of resources, deferred inflows of resources, and expense/expenditures. For defined benefit OPEB, this statement identifies the methods and assumptions that are required to be used to project benefit payments, discount projected benefit payments to their actuarial present value, and attribute that present value to periods of employee service. Note disclosure and required supplementary information requirements about defined benefit OPEB also are addressed. In addition, this statement details the recognition and disclosure requirements for employers with payables to defined benefit OPEB plans that are administered through trusts that meet the specified criteria and for employers whose employees are provided with defined contribution OPEB. This statement also addresses certain circumstances in which a nonemployer entity provides financial support for OPEB of employees of another entity. The provisions of this statement are effective for fiscal years beginning after June 15, 2017.

\* GASB Statement No. 76, *The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments*. This statement identifies in the context of the current governmental financial reporting environment the hierarchy of generally accepted accounting principles (GAAP). The "GAAP hierarchy" consists of the sources of accounting principles used to prepare financial statements of state and local governmental entities in conformity with GAAP and the framework for selecting those principles. This statement reduces the GAAP hierarchy to two categories of authoritative GAAP and addresses the use of authoritative and nonauthoritative literature in the event that the accounting treatment for a transaction or other event is not specified within a source of authoritative GAAP. This statement supersedes GASB Statement No. 55, *The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments*. The provisions of this Statement are effective for financial statements for periods beginning after June 15, 2015.

\* GASB Statement No. 77, *Tax Abatement Disclosures*. This statement establishes financial reporting standards for tax abatement agreements entered into by state and local governments. The disclosures required by this statement encompass tax abatements resulting from both (a) agreements that are entered into by the reporting government and (b) agreements that are entered into by other governments and that reduce the reporting governments tax revenue. The provisions of this statement should be applied to all state and local governments subject to such tax abatement agreements. For financial reporting purposes, a tax abatement is defined as a reduction in tax revenue that results from an agreement between one or more governments and an individual or entity in which (a) one or more governments promise to forgo tax revenue to which they are otherwise entitled and (b) the individual or entity promises to take a specific action after the agreement has been entered into that contributes to economic development or otherwise benefits the governments or the citizens of those governments. A transaction's substance, not its form or title, is a key factor in determining whether the transaction meets the definition of a tax abatement for the

99

CONFIDENTIAL

CW_STAY0009887

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

purpose of this Statement. The provisions of this statement are effective for financial statements for periods beginning after December 15, 2015.

* GASB Statement No. 78, *Pensions Provided Through Certain Multiple Employer Defined Benefit Plans*. This Statement addresses a practice issue regarding the scope and applicability of GASB Statement No. 68. This issue is associated with pensions provided through certain multiple employer defined benefit pension plans and to state or local governmental employers whose employees are provided with such pensions. Prior to the issuance of this statement, the requirements of GASB Statement No. 68 applied to the financial statements of all state and local governmental employers whose employees are provided with pensions through pension plans that are administered through trusts that meet the criteria in paragraph 4 of that statement. This statement amends the scope and applicability of GASB Statement No. 68 to exclude pensions provided to employees of state or local governmental employers through a cost sharing multiple employer defined benefit pension plan that (1) is not a state or local governmental pension plan, (2) is used to provide defined benefit pensions both to employees of state or local governmental employers and to employees of employers that are not state or local governmental employers, and (3) has no predominant state or local governmental employer (either individually or collectively with other state or local governmental employers that provide pensions through the pension plan). This statement establishes requirements for recognition and measurement of pension expense, expenditures, and liabilities; note disclosures; and required supplementary information for pensions that have the characteristics described above. This statement is not effective until fiscal year 2016.

* GASB Statement No. 79, *Certain External Investment Pools and Pool Participants*. This statement addresses accounting and financial reporting for certain external investment pools and pool participants. Specifically, it establishes criteria for an external investment pool to qualify for making the election to measure all of its investments at amortized cost for financial reporting purposes. An external investment pool qualifies for that reporting if it meets all of the applicable criteria established in this statement. The specific criteria address (1) how the external investment pool transacts with participants; (2) requirements for portfolio maturity, quality, diversification, and liquidity; and (3) calculation and requirements of a shadow price. Significant noncompliance prevents the external investment pool from measuring all of its investments at amortized cost for financial reporting purposes. Professional judgment is required to determine if instances of noncompliance with the criteria established by this statement during the reporting period, individually or in the aggregate, were significant. If an external investment pool does not meet the criteria established by this statement, that pool should apply the provisions in paragraph 16 of GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investment Pools*, as amended. If an external investment pool meets the criteria in this statement and measures all of its investments at amortized cost, the pool's participants also should measure their investments in that external investment pool at amortized cost for financial reporting purposes. If an external investment pool does not meet the criteria in this statement, the pool's participants should measure their investments in that pool at fair value, as provided in paragraph 11 of GASB Statement No. 31, as amended. This statement establishes additional note disclosure requirements for qualifying external investment pools that measure all of their investments at amortized cost for financial reporting purposes and for governments that participate in those pools. Those disclosures for both the qualifying external investment pools and their participants include information about any limitations or restrictions on participant withdrawals. This statement is not effective until fiscal year 2016, except

100

CW_STAY0009888

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

for certain provisions on portfolio quality, custodial credit risk, and shadow pricing. Those provisions are not effective until fiscal year 2017.

* GASB Statement No. 80, *Blending Requirements for Certain Component Units.* This statement improves financial reporting by clarifying the financial statement presentation requirements for certain component units. This statement amends the blending requirements established in paragraph 53 of GASB Statement No. 14, *The Financial Reporting Entity*, as amended. The additional criterion requires blending of a component unit incorporated as a not for profit corporation in which the Primary Government is the sole corporate member. The additional criterion does not apply to component units included in the financial reporting entity pursuant to the provisions of GASB Statement No. 39, *Determining Whether Certain Organizations Are Component Units.* This statement is not effective until fiscal year 2017.

* GASB Statement No. 81, *Irrevocable Split Interest Agreements.* This statement improves accounting and financial reporting for irrevocable split interest agreements by providing recognition and measurement guidance for situations in which a government is a beneficiary of the agreement. Split interest agreements are a type of giving agreement used by donors to provide resources to two or more beneficiaries, including governments. Split interest agreements can be created through trusts, or other legally enforceable agreements with characteristics that are equivalent to split interest agreements, in which a donor transfers resources to an intermediary to hold and administer for the benefit of a government and at least one other beneficiary. Examples of these types of agreements include charitable lead trusts, charitable remainder trusts, and life interests in real estate. This statement requires that a government that receives resources pursuant to an irrevocable split interest agreement recognize assets, liabilities, and deferred inflows of resources at the inception of the agreement. Furthermore, this statement requires that a government recognize assets representing its beneficial interests in irrevocable split interest agreements that are administered by a third party, if the government controls the present service capacity of the beneficial interests. This statement requires that a government recognize revenue when the resources become applicable to the reporting period. This statement is not effective until fiscal year 2018.

* GASB Statement No. 82, *Pension Issues an Amendment of GASB Statements No. 67, No. 68 and No. 73.* This statement addresses certain issues that have been raised with respect to GASB Statements No. 67, No. 68, and No. 73. The statement is designed to improve consistency in the application of the pension standards by clarifying or amending related areas of existing guidance. Specifically, this statement addresses issues regarding (1) the presentation of payroll related measures in required supplementary information, (2) the selection of assumptions and the treatment of deviations from the guidance in an Actuarial Standard of Practice for financial reporting purposes, and (3) the classification of payments made by employers to satisfy employee (plan member) contribution requirements. Prior to the issuance of this statement, GASB Statements No. 67 and No. 68 required presentation of covered employee payroll, which is the payroll of employees that are provided with pensions through the pension plan, and ratios that use that measure, in schedules of required supplementary information. This statement amends GASB Statements No. 67 and No. 68 to instead require the presentation of covered payroll, defined as the payroll on which contributions to a pension plan are based, as well as ratios that use that measure. This statement clarifies that a deviation, as the term is used in Actuarial Standards of Practice issued by the Actuarial Standards Board, from the guidance in an Actuarial Standard of Practice is not considered to be in conformity with the requirements of GASB Statement No. 67, GASB Statement No. 68, or GASB Statement

101

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

No. 73 for the selection of assumptions used in determining the total pension liability and related measures. This statement clarifies that payments that are made by an employer to satisfy contribution requirements that are identified by the pension plan terms as plan member contribution requirements should be classified as plan member contributions for purposes of GASB Statement No. 67 and as employee contributions for purposes of GASB Statement No. 68. It also requires that an employer's expense and expenditures for those amounts be recognized in the period for which the contribution is assessed and classified in the same manner as the employer classifies similar compensation other than pensions (for example, as salaries and wages or as fringe benefits). This statement is not effective until fiscal year 2017, except for the requirements of this statement for the selection of assumptions in a circumstance in which an employer's pension liability is measured as of a date other than the employer's most recent fiscal year end. In that circumstance, the requirements for the selection of assumptions are effective for that employer in the first reporting period in which the measurement date of the pension liability is on or after June 15, 2017.

GASB Statement No. 83, *Certain Asset Retirement Obligations*. This statement addresses accounting and financial reporting for certain asset retirement obligations (AROs). An ARO is a legally enforceable liability associated with the retirement of a tangible capital asset. A government that has legal obligations to perform future asset retirement activities related to its tangible capital assets should recognize a liability based on the guidance in this statement. This statement establishes criteria for determining the timing and pattern of recognition of a liability and a corresponding deferred outflow of resources for AROs. This statement requires that recognition occur when the liability is both incurred and reasonably estimable. The determination of when the liability is incurred should be based on the occurrence of external laws, regulations, contracts, or court judgments, together with the occurrence of an internal event that obligates a government to perform asset retirement activities. Laws and regulations may require governments to take specific actions to retire certain tangible capital assets at the end of the useful lives of those capital assets, such as decommissioning nuclear reactors and dismantling and removing sewage treatment plants. Other obligations to retire tangible capital assets may arise from contracts or court judgments. Internal obligating events include the occurrence of contamination, placing into operation a tangible capital asset that is required to be retired, abandoning a tangible capital asset before it is placed into operation, or acquiring a tangible capital asset that has an existing ARO.

This statement requires the measurement of an ARO to be based on the best estimate of the current value of outlays expected to be incurred. The best estimate should include probability weighting of all potential outcomes, when such information is available or can be obtained at reasonable cost. If probability weighting is not feasible at reasonable cost, the most likely amount should be used. This statement requires that a deferred outflow of resources associated with an ARO be measured at the amount of the corresponding liability upon initial measurement.

This statement requires the current value of a government's AROs to be adjusted for the effects of general inflation or deflation at least annually. In addition, it requires a government to evaluate all relevant factors at least annually to determine whether the effects of one or more of the factors are expected to significantly change the estimated asset retirement outlays. A government should remeasure an ARO only when the result of the evaluation indicates there is a significant change in the estimated outlays. The deferred outflows of resources should be reduced and recognized as

102

CW_STAY0009890

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

outflows of resources (for example, as an expense) in a systematic and rational manner over the estimated useful life of the tangible capital asset.

The requirements of this statement are effective for reporting periods beginning after June 15, 2018.

\* GASB Statement No. 84, *Fiduciary Activities*. The objective of this statement is to improve guidance regarding the identification of fiduciary activities for accounting and financial reporting purposes and how those activities should be reported. This statement establishes criteria for identifying fiduciary activities of all state and local governments. The focus of the criteria generally is on (1) whether a government is controlling the assets of the fiduciary activity and (2) the beneficiaries with whom a fiduciary relationship exists. Separate criteria are included to identify fiduciary component units and postemployment benefit arrangements that are fiduciary activities. An activity meeting the criteria should be reported in a fiduciary fund in the basic financial statements. Governments with activities meeting the criteria should present a statement of fiduciary net position and a statement of changes in fiduciary net position. An exception to that requirement is provided for a Business-Type activity that normally expects to hold custodial assets for three months or less. This statement describes four fiduciary funds that should be reported, if applicable: (1) pension (and other employee benefit) trust funds, (2) investment trust funds, (3) private purpose trust funds, and (4) custodial funds. Custodial funds generally should report fiduciary activities that are not held in a trust or equivalent arrangement that meets specific criteria. This statement also provides for recognition of a liability to the beneficiaries in a fiduciary fund when an event has occurred that compels the government to disburse fiduciary resources.

Events that compel a government to disburse fiduciary resources occur when a demand for the resources has been made or when no further action, approval, or condition is required to be taken or met by the beneficiary to release the assets. The requirements of this statement are effective for reporting periods beginning after December 15, 2018.

\* GASB Statement No. 85, *Omnibus 2017*. The objective of this statement is to address practice issues that have been identified during implementation and application of certain GASB Statements. This statement addresses a variety of topics including issues related to blending component units, goodwill, fair value measurement and application, and postemployment benefits (pensions and other postemployment benefits [OPEB]). Specifically, this statement addresses the following topics:

– Blending a component unit in circumstances in which the Primary Government is a Business-Type activity that reports in a single column for financial statement presentation.

– Reporting amounts previously reported as goodwill and "negative" goodwill.

– Classifying real estate held by insurance entities.

– Measuring certain money market investments and participating interest earning investment contracts at amortized cost.

– Timing of the measurement of pension or OPEB liabilities and expenditures recognized in financial statements prepared using the current financial resources measurement focus.

– Recognizing on behalf payments for pensions or OPEB in employer financial statements.

103

CW_STAY0009891

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

– Presenting payroll related measures in required supplementary information for purposes of reporting by OPEB plans and employers that provide OPEB.

– Classifying employer paid member contributions for OPEB.

– Simplifying certain aspects of the alternative measurement method for OPEB.

– Accounting and financial reporting for OPEB provided through certain multiple employer defined benefit OPEB plans.

The requirements of this Statement are effective for reporting periods beginning after June 15, 2017. Earlier application is encouraged.

* GASB Statement No. 86, *Certain Debt Extinguishment* Issues. This statement improves the consistency in accounting and financial reporting for in substance defeasance of debt by providing guidance for transactions in which cash and other monetary assets acquired with only existing resources – resources other than the proceeds of refunding debt– are placed in an irrevocable trust for the sole purpose of extinguishing debt. This statement also improves accounting and financial reporting for prepaid insurance on debt that is extinguished and notes to financial statements for debt that is defeased in substance. The requirements of this statement are effective for fiscal years beginning after June 15, 2017.

* GASB Statement No. 87, *Leases.* The objective of this statement is to better meet the information needs of financial statement users by improving accounting and financial reporting for leases by governments. This statement increases the usefulness of governments' financial statements by requiring recognition of certain lease assets and liabilities for leases that previously were classified as operating leases and recognized as inflows of resources or outflows of resources based on the payment provisions of the contract. It establishes a single model for lease accounting based on the foundational principle that leases are financings of the right to use an underlying asset. Under this statement, a lessee is required to recognize a lease liability and an intangible right to use lease asset, and a lessor is required to recognize a lease receivable and a deferred inflow of resources, thereby enhancing the relevance and consistency of information about governments' leasing activities. The requirements of this statement are effective for reporting periods beginning after December 15, 2019.

* GASB Statement No. 88, *Certain Disclosures Related to Debt, Including Direct Borrowings and Direct Placements.* The primary objective of this statement is to improve the information that is disclosed in notes to government financial statements related to debt, including direct borrowings and direct placements. It also clarifies which liabilities governments should include when disclosing information related to debt. This statement defines debt for purposes of disclosure in notes to financial statements as a liability that arises from a contractual obligation to pay cash (or other assets that may be used in lieu of cash) in one or more payments to settle an amount that is fixed at the date the contractual obligation is established. This statement requires that additional essential information related to debt be disclosed in notes to financial statements, including unused lines of credit; assets pledged as collateral for the debt; and terms specified in debt agreements related to significant events of default with finance-related consequences, significant termination events with finance-related consequences, and significant subjective acceleration clauses. For notes to financial statements related to debt, this statement also requires that existing and additional information be

104

CONFIDENTIAL

CW_STAY0009892

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

provided for direct borrowings and direct placements of debt separately from other debt. The requirements of this statement are effective for reporting periods beginning after June 15, 2018.

∗   GASB Statement No. 89, *Accounting for Interest Cost Incurred Before the End of a Construction Period*. This statement establishes accounting requirements for interest cost incurred before the end of a construction period. Such interest cost includes all interest that previously was accounted for in accordance with the requirements of paragraphs 5–22 of GASB Statement No. 62, Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements, which are superseded by this statement. This statement requires that interest cost incurred before the end of a construction period be recognized as an expense in the period in which the cost is incurred for financial statements prepared using the economic resources measurement focus. As a result, interest cost incurred before the end of a construction period will not be included in the historical cost of a capital asset reported in a business-type activity or enterprise fund. This statement also reiterates that in financial statements prepared using the current financial resources measurement focus, interest cost incurred before the end of a construction period should be recognized as an expenditure on a basis consistent with governmental fund accounting principles. The requirements of this statement are effective for reporting periods beginning after December 15, 2019.

Management is evaluating the impact that these statements will have on the Commonwealth's basic financial statements.

**(2)  Going Concern, Uncertainties and Liquidity Risk**

The following discussion covers in detail the Commonwealth's liquidity risks and uncertainties, and the detailed plans set forth in order to address the complex challenges ahead.

*(a)  Going Concern – Primary Government*

Management believes that there is substantial doubt about the Commonwealth's ability to continue as a going concern because of the following:

∗   The Commonwealth is in the midst of a profound fiscal, economic and liquidity crisis, the culmination of many years of significant governmental deficits, a prolonged economic recession, high unemployment, population decline, and high levels of debt and pension obligations. Further stressing the Commonwealth's liquidity is the vulnerability of revenue streams during times of major economic downturns and large health care, pension and debt service costs. As the Commonwealth's tax base has shrunk and its revenues affected by prevailing economic conditions, health care, pension and debt service costs have become an increasing portion of the General Fund budget, which has resulted in reduced funding available for other essential services. The Commonwealth's high level of debt and unfunded pension liabilities and the resulting required allocation of revenues to service debt and pension obligations have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has financed, further increasing the amount of its debt.

These matters and the Commonwealth's liquidity constraints, among other factors, have adversely affected its credit ratings and its ability to obtain financing at reasonable interest rates, if at all. As a result, the Commonwealth had relied more heavily on short-term financings and interim loans from GDB, and other component units of the Commonwealth, which reliance has constrained the liquidity of the Commonwealth in general and GDB in particular, and increased near term refinancing risk.

105

CW_STAY0009893

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

These factors have also resulted in delays in the repayment by the Commonwealth and its component units of outstanding GDB lines of credit, which delays have limited GDBs ability to continue providing liquidity to the Commonwealth and have caused GDB to fail to make a principal payment on its debt obligations. Similarly, and pursuant to a series of legislations and executive orders during fiscal year 2016 and further explained below, the Commonwealth and certain other public corporations also delayed the debt service payments on some of its debt, including the general obligation bonds of the Commonwealth.

These factors are reflected in the deterioration of the Commonwealth's credit ratings. Since June 30, 2014, the principal rating agencies have continued to lower their rating on the general obligation bonds of the Commonwealth, which had already been placed in a default rating of "D." They also lowered similarly to a default grade their ratings on the bonds of the PBA and GDB, while the ratings on the bonds of COFINA have been lowered multiple notches to a current noninvestment grade level of CC and D, depending on the particular rating agency.

* The Primary Government reflects a net position deficit/fund balance deficit of approximately $67 billion as of June 30, 2015. The Commonwealth's General Fund shows a fund balance (deficit) of approximately $2.1 billion as of June 30, 2015.

* For the fiscal year ended June 30, 2016, the Legislature of Puerto Rico did not appropriate approximately $94 million for the payments of the PFC bonds which are obligations of certain component units of the Commonwealth that are payable solely from such appropriations.

* On April 6, 2016, the Commonwealth enacted Act No. 21, known as the Puerto Rico Emergency Moratorium and Rehabilitation Act (the Moratorium Act) under which, the Commonwealth and certain of its component units suspended their respective debt service payments. In particular, the Commonwealth suspended the payment of $779 million in debt service on general obligation bonds due July 1, 2016 (net of $352 million of capitalized interest fund and escrow accounts).

On May 1, 2017, the PROMESA Stay expired, permitting the substantial litigation brought by bondholders and other creditors against the Commonwealth and its component units to resume. As a result, on May 3, 2017, the Oversight Board filed a petition for relief under Title III of PROMESA. Title III of PROMESA incorporates the automatic stay provisions of Bankruptcy Code section 362 and 922, which are made applicable to the Title III cases pursuant to PROMESA section 301 (a).

*Remediation Plan – Primary Government*

On April 19, 2018 (recertified on May 30, 2018 and amended on June 29, 2018), the Oversight Board certified its fiscal plan for the Commonwealth including the following areas:

(i)     *Revenue Enhancements*

(ii)    *Reducing Health Care Spending*

(iii)   *Reducing Higher Education Spending*

(iv)    *Pension Reform*

(v)     *Improving Capital Efficiency*

106

CW_STAY0009894

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*(vi)   Structural Reforms*

*(vii)   Debt Restructuring Process*

There is no certainty that the Certified Commonwealth Fiscal Plan (as revised and amended) will be fully implemented, or if implemented will ultimately provide the intended results. All these plans and measures, and the Commonwealth's ability to reduce its deficit and to achieve a balanced budget in future fiscal years depends on a number of factors and risks, some of which are not wholly within its control.

**(b)   Going Concern – Discretely Presented Component Units**

The following major discretely presented component units have been identified as having substantial doubt about their ability to continue as a going concern. Each major discretely presented component units' circumstances and remediation plan are described below.

*(i)   GDB*

The stand-alone audited financial statements of GDB disclose that there is substantial doubt about GDB's ability to continue as a going concern because of the following:

\* GDB, traditionally served as interim lender to the Commonwealth, its component units, and municipalities in anticipation of the issuance of long-term bonds and notes by such entities in the municipal bond market. GDB has also provided financing to the Commonwealth and its component units to finance their respective budget deficits, collateral requirements under swap agreements, and to meet mandatory payments of obligations. As a result, GDB's liquidity and financial condition depends to a large extent on the repayment of loans made to the Commonwealth and its component units. Conditions that adversely affect the ability of the Commonwealth and its component units to raise cash (including limited access to capital markets) and repay their interim and other loans to GDB had an adverse effect on GDB's liquidity and financial condition.

\* GDB faces significant risks and uncertainties and currently does not have (and is not expected to have) sufficient liquid financial resources to meet its obligations in full. Pursuant to enacted legislation and executive orders by two separate government administrations, GDB has been ordered to suspend loan disbursements, to impose restrictions on the withdrawal and transfer of deposits from GDB, and has been imposed a moratorium on its debt obligations, among other measures. On March 23, 2018, GDB ceased its operations and it is currently winding down in an orderly fashion under Title VI of PROMESA.

Finally, the Moratorium Act also created a new Fiscal Agency and Financial Advisory Authority (FAFAA), as an independent public corporation to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its component units, and municipalities. FAFAA has also been assigned the tasks of overseeing matters related to the restructuring or adjustment of the Commonwealth's financial liabilities, coordinating liability management or other transactions with respect to such obligations, and ensuring compliance with fiscal plans and budgets approved by the Oversight Board pursuant to PROMESA.

107

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Remediation Plan – GDB*

With the establishment of FAFAA, GDB role has been reduced to act as an agent in (i) collecting on its loan portfolio and (ii) disbursing funds pursuant to strict priority guidelines. Therefore, taking into consideration the scenario described above, given the reduced services that GDB is currently providing and given that no appropriations were assigned to GDB for fiscal year 2018, GDBs management has concluded that an orderly wind down of its operations would mitigate the impact to its stakeholders (municipalities, depositors, and other creditors, etc.).

On March 13, 2017, GDB presented to the Oversight Board its fiscal plan for the ensuing ten years. On April 28, 2017, the Oversight Board approved the fiscal plan for GDB and also noted separately from the fiscal plan that FAFAA should provide a certification regarding the anticipated impact that reduced GDB's distributions to depositors and other potential exposures might have on other government entities with fiscal plans/and or budgets.

On May 15, 2017, the Governor announced that FAFAA and GDB entered into a restructuring support agreement (the "GDB RSA") with a significant portion of GDB's major stakeholders holding more than $2.45 billion in claims against GDB, including more than 300 on-island bondholders, 50 on-island credit unions, and the Ad Hoc Group of Bank's Bondholders, which holds more than $1 billion of GDB's public bonds. On May 8, 2018, the Oversight Board recertified the GDB RSA as compliant with the updated GDB fiscal plan.

Detailed information about GDB's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans is disclosed in the notes of GDB's 2015 fiscal year stand-alone audited financial statements.

*(ii)* *PRHTA*

The stand-alone audited financial statements of PRHTA disclose that there is substantial doubt about PRHTA's ability to continue as a going concern because of the following:

*   PRHTA has experienced significant recurring losses from operations and faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the fact that PRHTA has not increased revenues to cover the effects of its rising costs.

*   Additionally, significant support and funding for obligations of PRHTA has previously been provided by the Commonwealth and its component units, including GDB. The Commonwealth and such entities are experiencing significant financial difficulties and are unable to continue to extend, refinance or otherwise provide the necessary liquidity to PRHTA as and when needed. As such, current defaults may not be cured and future defaults on PRHTA's obligations may not be avoided.

*   As of the date of these financial statements, PRHTA does not have sufficient funds available to fully repay its various obligations as they come due or those that are currently in default.

On May 21, 2017, the Oversight Board, at the request of PRHTA, filed petition under Title III of PROMESA in the United States District Court for the District of Puerto Rico. PRHTA is currently operating under the protection of the Title III Court.

108

CONFIDENTIAL

CW_STAY0009896

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Remediation Plan – PRHTA*

On March 13, 2017, PRHTA presented to the Oversight Board its fiscal for the ensuing ten years. Faced with the challenges referred to above, PRHTA has developed a fiscal plan that focuses on four key areas: (i) infrastructure agenda, (ii) memorandum of understanding (MOU) with its federal grantor agencies geared at revamping PRHTA's Project and Program Delivery capabilities, (iii) fiscal initiatives and organizational transformation and (iv) debt sustainability.

On April 28, 2017, the Oversight Board approved the fiscal plan for PRHTA recommending certain amendments. After the passage of Hurricanes Irma and Maria, the Oversight Board requested PRHTA to submit a revised fiscal plan. On April 5, 2018, the Oversight Board certified its own updated PRHTA fiscal plan.

Detailed information about PRHTA's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans is disclosed in the notes of PHRTA's 2015 fiscal year stand-alone audited financial statements.

*(iii)* *PREPA*

The stand-alone audited financial statements of PREPA disclose that there is substantial doubt about PREPA's ability to continue as a going concern because of the following:

* PREPA does not currently have sufficient funds available to and is not generating sufficient revenues to maintain its system or fully repay its various obligations as they come due, including its outstanding bond debt and pension obligations.

* The Commonwealth and its component units are also experiencing significant financial difficulties and may be unable to continue to repay amounts due to PREPA or to extend, refinance or otherwise provide the necessary liquidity to PREPA as and when needed.

* As of the date of these financial statements, PREPA does not have sufficient funds available to repay fully its various obligations as they come due or those that are currently in default.

  On July 2, 2017, the Oversight Board, at the request of PREPA, filed a petition under Title III of PROMESA in the United States District Court for the District of Puerto Rico. PREPA is currently operating under the protection of the Title III Court.

*Remediation Plan – PREPA*

On March 13, 2017, PREPA presented to the Oversight Board its fiscal plan for the ensuing ten years. Faced with the challenges referred to above but capitalizing on the then existing Restructuring Support Agreement (RSA), PREPA's fiscal plan commits to fiscal responsibility and implements urgently needed infrastructure modernization, public private partnerships, targeted expenditure reductions/efficiencies (operational and other) and specific revenue enhancements to return PREPA to (i) fiscal stability, (ii) efficient and competitive energy prices, (iii) compliance with environmental and health standards, and (iv) being an agent of economic growth. In particular, the fiscal plan contemplates revised fuel prices, distributed generation trends, urgent infrastructure investments for needed efficiencies and environmental compliance, and operational transformation to benefit its customers and Puerto Rico's economy.

109

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

On April 28, 2017, the Oversight Board approved the fiscal plan for PREPA, but suggested certain amendments.

After the passage of Hurricanes Irma and Maria, the Oversight Board requested PREPA to submit a revised fiscal plan. On April 5, 2018, PREPA submitted its revised fiscal plan. On April 19, 2018, the Oversight Board certified its own updated PREPA fiscal plan.

PREPA fiscal plan as certified by the Oversight Board contemplates a transformation of the electric sector in Puerto Rico that, if completed, will result in private ownership and/or operation of the transmission and distribution system and separate ownership and/or operation of the generation assets. If completed, the transformation transaction would result in PREPA no longer functioning as a public, vertically integrated utility.

Detailed information about PREPA's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans is disclosed in the notes of PREPA's 2015 fiscal year stand-alone audited financial statements.

(iv)   *PRASA*

The stand-alone audited financial statements of PRASA disclose that there is substantial doubt about PRASA's ability to continue as a going concern because of the following:

∗   PRASA is experiencing cash flow and financing difficulties. As of June 30, 2015, PRASA had an unrestricted net deficit of approximately $373 million and long-term debt outstanding of $5,214 million (which included revenue bonds payable of $4,488 million, notes payable of $719 million and lines of credit of $7 million). PRASA's net position decreased by $86.1 million during the year ended June 30, 2015, and PRASA had a working capital deficiency of $471 million as of June 30, 2015. PRASA's restricted cash includes a portion for the payment of current debt of approximately $250.9 million as of June 30, 2015

∗   PRASA's significant cash flow difficulties have resulted in PRASA's inability to pay its CIP contractor obligations and make principal and interest payments on a term note payable to GDB. As described in more detail Note 22, PRASA and PRASA's management have taken additional actions with respect to PRASA's other indebtedness. Given PRASA's insufficiency of funds available to fully repay its various obligations as they come due and the different events and conditions described above, management has concluded that since fiscal year 2014 substantial doubt exists as to PRASA's ability to continue as a going concern.

PRASA's management plans to improve liquidity as well as PRASA's long-term plans and projections are described in more detail in Note 22.

*Remediation Plan – PRASA*

On March 13, 2017, PRASA presented to the Oversight Board a revised fiscal plan for the ensuing ten years (an initial draft fiscal plan was presented on February 21, 2017). The revised fiscal plan includes a series of ongoing initiatives that commenced since 2009, and some new initiatives suggested by the Oversight Board upon a review of PRASA's original draft submitted on February 21, 2017. The ongoing initiatives includes the revenue optimization program, non-revenue water reduction program, customer services, measuring and reporting key performance indicators,

110

CW_STAY0009898

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

headcount optimization and payroll costs reductions, electric power expense reduction and continued reduction in number of facilities. PRASA's new initiatives include: rate increases, P3 projects, charge for paper bill, adjustment policy revision, new disconnection fee, physical losses reduction, hydroelectric power generation, and other expenses reduction.

On April 28, 2017, the Oversight Board approved the fiscal plan for PRASA recommending certain amendments. After PRASA proposed certain revisions to the PRASA fiscal plan, the Oversight Board certified a revised PRASA fiscal plan on August 25, 2017.

As contemplated in the PRASA fiscal plan, PRASA increased its rates on January 1, 2018. Thereafter, annual rate increases are expected to be as follows through year 2026 (effective starting January 1, 2018 and on July 1 each year thereafter starting on July 1, 2018): (i) 2.5% for residential customers; (ii) 2.8% for commercial customers; (iii) 3.5% for industrial customers; and (iv) 4.5% for governmental customers. The PRASA fiscal plan also proposed a $1 monthly credit to those residential customers opting for the electronic billing.

After the passage of Hurricanes Irma and María, the Oversight Board requested PRASA to submit a revised fiscal plan. On April 5, 2018, PRASA submitted its revised fiscal plan. On April 19, 2018, the Oversight Board certified its own revised PRASA fiscal plan. This revised PRASA fiscal plan includes the following new initiatives, among other things: (i) rate increases; (ii) P3 Project for Commercial Services; (iii) increase in government account collections; (iv) reductions in physical water losses; (v) extension of forbearance agreements with federal creditors; and (vi) new federal funding commencing in fiscal year 2019.

Detailed information about PRASA's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans is disclosed in the notes of PRASA's 2015 fiscal year stand-alone audited financial statements.

(v)  *UPR*

The stand-alone audited financial statements of UPR disclose that there is substantial doubt about UPR's ability to continue as a going concern because of the following:

* UPR had an unrestricted deficit position of approximately $106 million as of June 30, 2015, excluding approximately $2.1 billion of net related pension liabilities and deferred outflows/inflows of resources resulting from the implementation of GASB 68. Including the GASB 68 related accounts, the unrestricted deficit position of the UPR was approximately $2.2 billion at June 30, 2015.

* The UPR has had operating losses (without considering depreciation and interest expense and nonoperating revenues, such as Commonwealth appropriations and Federal Pell Grant program) during fiscal years 2015, 2014 and 2013 of $953 million, $1 billion and $966 million, respectively. Balances payable to governmental entities amounted to approximately $144 million as of June 30, 2015, $110 million of which represent lines of credit payable to GDB.

* Approximately 77% of the operating revenues and nonoperating revenues of the UPR for the year ended June 30, 2015 are Commonwealth appropriations, grants and contracts. The amount of the annual appropriation is based on a statutory formula, and equals 9.60% of the

111

CW_STAY0009899

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Commonwealth's average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year. However, Act No. 66 froze the UPR's appropriations at their fiscal year 2014 level for three years. The UPR's budgeted General Fund appropriations for fiscal years 2016, 2015, 2014 and 2013 were $873 million, $881 million, $888 million and $825 million, respectively. The UPR derives additional revenues from other sources like tuition, student fees, auxiliary enterprises, interest income, federal grants (in particular, the Federal Pell Grant Program), and other sources. In the last three-year period ended June 30, 2015, the UPR's capital improvements had been partially financed with a line of credit with GDB which expired in January 2016. Its operating revenues for fiscal years 2015, 2014 and 2013 were $312 million, $308 million and $353 million, respectively. However, the UPR has limited ability to raise operating revenues due to the economic and political challenges of maintaining enrollment and increasing tuition.

During fiscal year 2016, the Commonwealth, due to its liquidity constraints expressed above, paid late to the UPR the formula based contribution between October and December 2015. In spite of financial constraints, the Commonwealth conditionally allocated to the UPR have not ceased and the actual "backlog" was reduced to more than one month of payments.

*Remediation Plan – UPR*

On August 1, 2017, UPR presented to the Oversight Board its fiscal plan for the ensuing ten years. The fiscal plan includes a series of expense reduction measures complemented with revenue enhancing initiatives, including tuition hikes, which in the aggregate will add up to $512 million in Commonwealth appropriations reductions by fiscal year 2026.

On August 26, 2017, the Oversight Board announced, through a letter from its Executive Director, that the UPR fiscal plan will not be certified as submitted above. The letter requests to the UPR Governing Board develop a new version of the fiscal plan correcting several deficiencies that the Oversight Board identified.

After the passage of Hurricanes Irma and María, the Oversight Board requested UPR to submit a revised fiscal plan. On April 5, 2018, UPR submitted its revised fiscal plan. On April 20, 2018, the Oversight Board certified its own UPR fiscal plan.

Detailed information about UPR's conditions and events that raise doubt about its ability to continue as a going concern and the corresponding remediation plans is disclosed in the notes of UPR's 2015 fiscal year stand-alone audited financial statements.

*(vi)   Other Nonmajor Component Units*

There are other Nonmajor component units that have accumulated deficits and others that even without deficits, carry significant debt payable to GDB or debt subject to the aforementioned clawback provisions (like PRPA, PRMBA, PRIDCO and PRCCDA). The reasons similar to the ones presented above for the Primary Government and discretely presented major component units and the uncertainty as to their ability to satisfy their obligations when they become due raises substantial doubt about their ability to continue as a going concern.

112

CW_STAY0009900

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Additionally, there are other Nonmajor discretely presented component units that although do not have a deficit position, or loans outstanding with GDB as of June 30, 2015, and have not been impacted by the clawback provisions, are mainly funded by Nonoperating revenues primarily from Commonwealth appropriations, and are highly reliant on the Commonwealth and on GDB for liquidity and financial management support. These appropriations are contingent on the availability of funds from the Commonwealth and their legislative approval. A reduction in the amount of these appropriations could result in financial difficulties for these entities, including the uncertainty as to their ability to fully satisfy their obligations when due, which raises substantial doubts about their ability to continue as a going concern.

*(c) Going Concern – Retirement Systems*

The Commonwealth has historically maintained three retirement systems: (i) the ERS; (ii) the JRS; and (iii) the TRS, collectively, the Commonwealth Retirement Systems.

The Commonwealth Retirement Systems are severely underfunded. In the case of the ERS, which is the largest of the three Retirement Systems, its funded ratio (fiduciary net position as a% of total pension liability) as of June 30, 2015, was negative 2.00%, since its fiduciary net position is negative as of such date, and its net pension liability was approximately $33.3 billion.

In the case of the TRS and the JRS, their funded ratio was 8.00% and 6.90%, respectively, and their net pension liability was approximately $15 billion and $545.1 million, respectively, in each case as of June 30, 2015. The TRS and the JRS are also very close to depleting their liquid assets (which amounted to $920 million and $51 million, respectively, as of June 30, 2015), which is projected to occur during fiscal year 2018.

On May 22, 2017, the Oversight Board, at the request of the Commonwealth, filed a petition for ERS in the United States District Court for the District of Puerto Rico, commencing a Title III case for ERS. On June 15, 2017, the United States Trustee appointed an Official Committee of Retired Employees in the Commonwealth's Title III cases.

*Remediation Plan – Retirement Systems*

On June 27, 2017, the Treasury Department issued Circular Letter No. 1300 46 17 in order to convey to the central government agencies, public corporations and municipalities the new implementation procedures to adopt, effective, July 1, 2017, the new "pay as you go" (PayGo) mechanism for all of the Commonwealth Retirement Systems. With the start of the fiscal year 2018, employers' contributions, contributions ordered by special laws, and the Additional Uniform Contribution were all eliminated and replaced by a monthly PayGo charge that will be collected from the aforementioned government entities to pay retirees. The Commonwealth Retirement Systems will determine and administer the payment amount per retiree that will be charged to each agency, public corporation and municipality. As liquid retirement funds become depleted, the PayGo charge is expected to increase.

In addition to the establishment of the PayGo mechanism, on August 23, 2017, the Governor signed into law the Act to Guarantee the Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants (Act No. 106), which reformed the Commonwealth Retirement Systems so that their active participants would deposit their individual contributions in a new Defined Contribution

113

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Plan that will be managed by a private entity. Act No. 106 creates the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system. With this system, the Commonwealth makes pension payments from the general fund, according to the money available. Act No. 106 also created a Defined Contribution Plan under which future benefits will not accumulate. However, under the PayGo system, Puerto Rico's municipalities will remain obligated on their pension obligations. The members of the JRS are not required to participate in the new defined contributions program; they will continue participating in the actual program as they did before the approval of Act No. 106 in accordance with Act No. 12, the "Judiciary Retirement Act". The members of the JRS, however, could voluntarily participate in the new defined contributions program as determined by the Retirement Board.

Detailed information about the Commonwealth Retirement System's liquidity and solvency issues and the corresponding remediation plans are disclosed in the notes of the Commonwealth Retirement System's 2015 fiscal year stand-alone audited financial statements.

**(3) Correction of Immaterial Errors, Changes in Reporting Entity and Adoption of New Accounting Pronouncement**

During 2015, the Commonwealth identified various immaterial errors related to prior year financial statements, including the blending of certain former discretely presented component units into the Primary Government effective July 1, 2014. In addition, the Primary Government of the Commonwealth and certain of its component units partially adopted GASB Statements No. 68 and No. 71, which resulted in restatements of the beginning net position of the Commonwealth's government-wide financial statements. The impact of the related adjustments to beginning net position/fund balance are as follows:

114

CW_STAY0009902

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

**Primary Government**

*Governmental and Business-Type Activities*

The following table summarizes the changes to net position at the beginning of the year as previously reported for the Governmental and Business-Type Activities in the government-wide financial statements (in thousands):

|  | Governmental Activities | Business-Type Activities |
|---|---|---|
| Net position (deficit) – July 1, 2014, as previously reported | $ (50,439,003) | 785,849 |
| Impact of GASB Statements No. 68 and No. 71 implementation: |  |  |
| Elimination of beginning net pension obligation | 14,591,482 | — |
| Recognition of beginning net pension liability | (32,195,875) | (24,315) |
| Recognition of deferred outflow of resources for pension contributions made after the measurement date (July 1, 2013) | 694,331 | 631 |
| Recognition of due to other governmental entities | (82,848) | — |
| Elimination of certain liabilities | 309,570 | — |
| Entities that were discretely presented component units in fiscal year 2014, but blended component units in fiscal year 2015 (change in reporting entity) | 404,877 | (229,795) |
| Correction of immaterial errors: |  |  |
| Various amounts (a) | 72,377 | — |
| Entities excluded in fiscal year 2014, but included in fiscal year 2015 (change in reporting entity) (b) | 76,651 | — |
| Understatement of liabilities (c) | (154) | — |
| Net position (deficit)– July 1, 2014, as restated | $ (66,568,592) | 532,370 |

*Adoption of GASB Statements No. 68 and No. 71*

The impact of adopting GASB Statements No. 68 and No. 71 in the Primary Government consisted of recognizing it's proportionate share of ERS' beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date (July 1, 2013), as well as recognizing the net effects of TRS and JRS beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date (July 1, 2013), the elimination of the beginning net pension obligation under GASB Statement No. 27, against beginning net position, and the reduction of contributions payables to the ERS that were accounted as part of the voluntary termination benefits payable. The adjustment does not include the balances of the blended component units that did not adopt GASB Statements No. 68 and No. 71, as disclosed in Note 1(s) and Note 1(cc).

115

CONFIDENTIAL

CW_STAY0009903

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Changes in Reporting Entity*

The nature of operations of certain formerly discretely presented component units changed to the extent they were either blended component units or programmatic funds of the Primary Government, thus causing a change in reporting entity. PAA and UPRCCC became blended component units within Governmental Activities, while PRHIA became a blended component unit within Business-Type Activities, as further described in Note 1(b). As a result of blending PAA, the Commonwealth eliminated a liability under guaranteed obligation recorded at June 30, 2014 related to a PAA liability.

NPCPR was restructured into a program of the Department of Recreation and Sports pursuant to Act No. 107 of July 23, 2014. ETEC was restructured into a program of the Department of Corrections and Rehabilitation, pursuant to Act No. 151 of September 6, 2014. CDASFIPR and CIBMRIP were restructured into programmatic funds of the Department of Economic Development and the Department of Labor, respectively, pursuant to Act No. 171 of October 2, 2014.

PPA, another component unit of the Commonwealth created on December 12, 2011 by Act No. 240 to undertake the development and operation of the container terminal formerly undertaken by PAA became a blended component unit effective fiscal year 2015. However, this blending did not have any impact on beginning net position as the board of PPA was not formed and its operations had not started until fiscal year 2015.

*Correction of Immaterial Errors*

(a) The accounts payables and accrued liabilities of the Primary Government were overstated by approximately $35.3 million. The amounts due from other governmental entities were understated by approximately $37.1 million.

(b) The financial information of central government instrumentalities with independent treasuries and autonomous operations, were excluded from prior year financial statements because the stand-alone audited financial statements were unavailable and not deemed material, individually or in the aggregate, to the Commonwealth's basic financial statements. During the current year audit, the management of the Commonwealth made an effort to obtain the stand-alone audited financial statements of these entities and include them in its basic financial statements.

(c) The accounts payable of a governmental instrumentality audited by another auditor (reported within the General Fund) were understated by approximately $154 thousand.

116

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

**Governmental Funds**

The following table summarizes the changes to fund balances (deficit) at the beginning of the year as previously reported for the governmental funds (in thousands):

| | | General Fund | Nonmajor Governmental Funds |
|---|---|---|---|
| Fund Balances (deficit) – July 1, 2014, as previously reported | $ | (1,863,885) | 917,553 |
| Entities that were discretely presented component units in fiscal year 2014, but blended component units in fiscal year 2015 (change in reporting entity) | | 18,394 | (8,299) |
| Correction of immaterial errors: | | | |
| Various amounts (a) | | (10,471) | — |
| Entities excluded in fiscal year 2014, but included in fiscal year 2015 (change in reporting entity) (b) | | 57,369 | 54 |
| Understatement of liabilities (c) | | (154) | — |
| Fund balances (deficit) – July 1, 2014, as restated | $ | (1,798,747) | 909,308 |

*Changes in Reporting Entity*

The nature of operations of certain formerly discretely presented component units changed to the extent they were either blended component units or programmatic funds of the Primary Government, thus causing a change in reporting entity. PAA and UPRCCC became blended component units within Governmental Activities, as further described in Note 1(b). NPCPR was restructured into a program of the

The Department of Recreation and Sports pursuant to Act No. 107 of July 23, 2014. ETEC was restructured into a program of the Department of Corrections and Rehabilitation, pursuant to Act No. 151 of September 6, 2014. CDASFIPR and CIBMRIP were restructured into programmatic funds of the Department of Economic Development and the Department of Labor, respectively, pursuant to Act No. 171 of October 2, 2014.

*Correction of Immaterial Errors*

(a) The accounts payables and accrued liabilities of the Primary Government was overstated by approximately $47.5 million. The amounts due from other governmental activities are understated by approximately $37.1 million.

(b) The information of central government instrumentalities with independent treasuries and autonomous operations were excluded from prior year financial statements because the stand-alone audited financial statements were unavailable and not deemed material, individually or in the aggregate, to the Commonwealth's basic financial statements. During the current year audit, the management of the Commonwealth made an effort to obtain the stand-alone audited financial statements and include them in its basic financial statements.

117

CW_STAY0009905

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

(c)  The accounts payable of a governmental instrumentality audited by another auditor (reported within the General Fund) were understated by approximately $154 thousand.

**Proprietary Funds**

The following table summarizes the changes to net position at the beginning of the year as previously reported for the proprietary funds (in thousands):

|  | Lotteries | Puerto Rico Health Insurance Administration |
|---|---|---|
| Net (deficit) position – July 1, 2014, as previously reported | $ (96,623) | — |
| Impact of GASB Statements No. 68 and No. 71 implementation: | | |
| Recognition of beginning net pension liability | (24,315) | — |
| Recognition of deferred outflow of resources for pension contributions made after the measurement date (July 1,2013) | 631 | — |
| Entity that was a discretely presented component unit in fiscal year 2014, but blended in 2015 (change in reporting entity) | — | (229,795) |
| Net (deficit) position – July 1, 2014, as restated | $ (120,307) | (229,795) |

*Adoption of GASB Statements No. 68 and No. 71*

The impact of adopting GASB Statements No. 68 and No. 71 consisted of recognizing the net effects of the Lotteries' proportionate share of ERS' beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date.

*Changes in Reporting Entity*

The nature of operations of PRHIA referred to in the table above changed to the extent of becoming a blended component unit of the Primary Government, thus causing a change in reporting entity. PRHIA became a blended component unit within Business-Type Activities, as further described in Note 1(b). PPA, another component unit of the Commonwealth created on December 12, 2011 by Act No. 240 to undertake the development and operations of the container terminal formerly undertaken by PAA, became a blended component unit effective fiscal year 2015. However, this blending did not have any impact on beginning net position since the board of PPA was not formed and its operations had not started until fiscal year 2015.

118

CW_STAY0009906

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The following table summarizes the changes to net position at the beginning of the year as previously reported for certain discretely presented component units (in thousands):

**Major Discretely Presented Component Units**

|  | PREPA | UPR | SIFC | PRHIA |
|---|---|---|---|---|
| Net position (deficit) – July 1, 2014, as previously reported | $ (1,267,005) | 516,624 | 402,603 | (229,795) |
| Impact of GASB Statements No. 68 and No. 71 implementation: |  |  |  |  |
| Elimination of beginning net pension obligation (asset) | 15,317 | (92,487) | — | — |
| Recognition of beginning net pension liability | (1,744,128) | (2,236,563) | (1,333,367) | — |
| Recognition of deferred outflow of resources for pension contributions made after the measurement date (July 1,2013) | 84,826 | 91,689 | 33,774 | — |
| Entity that was a discretely presented component unit in fiscal year 2014, but blended in fiscal year 2015 (change in reporting entity) | — | — | — | 229,795 |
| Net position (deficit) – July 1, 2014, as restated | $ (2,910,990) | (1,720,737) | (896,990) | — |

*Adoption of GASB Statements No. 68 and No. 71*

The impact of adopting GASB Statements No. 68 and No. 71 consisted of recognizing the net effects of PREPA's and UPR's beginning net pension liability, deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date and the elimination of the beginning net pension asset/obligation related to their separate corresponding retirement systems underGASB Statement No. 27, against beginning net position.The adoption also recognizes the net effects of SIFC's proportionate share of the Retirement Systems' beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date, against beginning net position. SIFC adopted GASB Statements No. 68 and No. 71 based on unaudited information, while the rest of the major component units did not adopt GASB Statements No. 68 and No. 71, as disclosed in Note 1(s) and Note 1(cc).

*Change in Reporting Entity*

PRHIA, a former major discretely presented component unit, became a blended component unit within Business-Type Activities, and thus cause a change in reporting entity, as further described in Note 1(b).

119

   CW_STAY0009907

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

**Nonmajor Discretely Presented Component Units**

| | | |
|---|---|---:|
| Net position – July 1, 2014, as previously reported | $ | 1,600,022 |
| Impact of GASB Statements No. 68 and No. 71 implementation: | | |
| Recognition of beginning net pension liability | | (368,813) |
| Recognition of deferred outflow of resources for pension contributions made after the measurement date (July 1, 2013) | | 4,459 |
| Entities that were discretely presented component units in fiscal year 2014, but blended component units in fiscal year 2015 (change in reporting entity) | | (180,013) |
| Correction of immaterial errors: | | |
| Entities excluded in fiscal year 2014, but included in fiscal year 2015 (change in reporting entity) (a) | | 140,483 |
| Overstatement of assets (b) | | (90,760) |
| Net overstatement or understatement of liabilities (c) | | (7,294) |
| Net position – July 1, 2014, as restated | $ | 1,098,084 |

*Adoption of GASB Statements No. 68 and No. 71*

The impact of adopting GASB Statements No. 68 and No. 71 consisted of recognizing the net effects of AEDA's, AACA's, LAPR and CCDA's proportionate share of the Retirement Systems' beginning net pension liability and deferred outflows of resources for pension contributions made after the beginning net pension liability measurement date, against beginning net position. These component units adopted GASB Statements No. 68 and No. 71 based on unaudited information, while the remaining of the nonmajor component units did not adopt Statements No. 68 and No. 71, as disclosed in Note 1(s) and Note 1(cc).

*Changes in Reporting Entity*

The nature of operations of certain formerly discretely presented component units changed to the extent they were either blended component units or programmatic funds of the Primary Government, thus causing a change in reporting entity. PAA and UPRCC became blended component units within Governmental Activities, as further described in Note 1(b). NPCPR was restructured into a program of the Department of Recreation and Sports pursuant to Act No. 107 of July 23, 2014. ETEC was restructured into a program of the Department of Corrections and Rehabilitation, pursuant to Act No. 151 of September 6, 2014. CDASFIPR and CIBMRIP were restructured into programmatic funds of the Department of Economic Development and the Department of Labor, respectively, pursuant to Act No. 171 of October 2, 2014.

*Correction of Immaterial Errors*

(a) PRSTRT was excluded in the 2014 financial statements because its financial statements were unavailable and not deemed material to Commonwealth basic financial statements. During the current year audit, the Commonwealth's management made an effort to obtain the audited financial statements of PRSTRT and include such balances into its basic financial statements.

(b) PAA's management reevaluated the accounting treatment for certain credit facilities interests that had been capitalized resulting in an overstatement of capital assets by approximately $90.8 million.

120

CW_STAY0009908

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

(c) MAC had not recognized in prior years approximately $11.4 million in net pension obligation related to its own defined benefit plan for the Symphony Orchestra of Puerto Rico. LAPR understated several liabilities by the amount of approximately $4.4 million. CIDPC understated capital assets by approximately $4.4 million as a result of certain construction and development costs that were expensed in prior years. AEDA overstated liabilities by approximately $3.4 million. CPECMP understated capital assets by approximately $743 thousand and understated unearned revenues by approximately $45 thousand.

**(4) Puerto Rico Government Investment Trust Fund (PRGITF)**

PRGITF was created by Act No. 176, of August 11, 1995, and began operations on December 4, 1995. The PRGITF is a no load diversified collective investment trust administered by GDB, and created to provide eligible governmental investors of Puerto Rico with a convenient and economical way to invest in a professionally managed money market portfolio. The PRGITF is not an investment company or a mutual fund and is not subject to regulation or registration under the Investment Company Act of 1940. Units issued by the PRGITF are not subject to regulation or registration under the Securities and Exchange Act of 1933, as amended, because the units are issued by a government entity. The deposits on hand and the investments purchased are not collateralized, secured, or guaranteed by the Commonwealth or any of its agencies, instrumentalities, or political subdivisions.

PRGITF is considered a 2a7 like external investment pool, and as such, reports its investment at amortized cost, which approximates fair value. In addition, the Puerto Rico Government Investment Trust Fund follows GASB Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investments Pools*; however, as stated in Note (1)(b), such financial statements are not included in the accompanying basic financial statements because the Primary Government and each component unit already present their corresponding share of the assets of the PRGITF as cash equivalents or investments.

The investment securities on hand at June 30, 2015, consisted of certificates of deposit and time deposits, money market funds, securities purchased under agreements to resell, corporate obligations, commercial paper, and U.S. government and sponsored agencies obligations, all of which may be considered highly liquid. However, the participants' investments are subject to the ability of the PRGITF to receive payment from the securities' issuer when due. The liquidity of certain investments and changes in interest rates may affect PRGITF's yield and the fair value of its investments.

The Commonwealth classified approximately $69.7 million of investments presented in the PRGITF (see Note 5) as cash and cash equivalents. Investments in the PRGITF with an original maturity of 90 days or less from the date of acquisition are considered to be cash equivalents.

121

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The dollar amount of the investments at June 30, 2015 at $1.00 per unit of participation was reported in the individual financial statements of each of the participants, and combined in the basic financial statements as follows (in thousands):

|  | Outstanding balance | Percentage of total |
|---|---|---|
| Primary government: | | |
| Commonwealth | $ 69,674 | 35.27% |
| The Children's Trust  (1) | 14,927 | 7.56 |
| COFINA  (1) | 536 | 0.24 |
| Total for primary government | 85,137 | 43.07 |
| Discretely presented component units: | | |
| GDB (1) | 59,113 | 29.95 |
| MFA (1) | 42,342 | 21.43 |
| SWA (1) | 6,285 | 3.18 |
| PRASA | 2,868 | 1.45 |
| SIFC (1) | 1,040 | 0.53 |
| PRHTA | 171 | 0.09 |
| Total for discretely presented component units | 111,819 | 56.63 |
| Other participants | 598 | 0.30 |
| Total for all participants | $ 197,554 | 100.00% |

(1)  Reported as investments in the accompanying statement of net position.

The deposits at June 30, 2015 were invested in securities with a cost that approximates fair value, plus accrued interest, for approximately $197.6 million. The external portion of the PRGITF was not considered significant for separate reporting in the accompanying basic financial statements.

As June 30, 2015, the PRGITF's investments were rated "A1" or "AAA" by Standard & Poor's. U.S. government securities carry the explicit guarantee of the U.S. government.

CONFIDENTIAL

CW_STAY0009910

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Following is a table of the investments held by the PRGITF at June 30, 2015, presented at amortized cost (in thousands):

| | | |
|---|---|---:|
| Commercial paper | $ | 105,906 |
| U.S. government and sponsored agencies obligations | | 41,536 |
| Certificates of deposit and time deposits | | 28,500 |
| Money market | | 21,612 |
| Total | $ | 197,554 |

**(5) Deposits and Investments**

**Primary Government**

The Primary Government may invest in different types of securities, including domestic, international, and fixed income securities, among others.

The Primary Government maintains a cash and investment pool that is available for use by all funds, including some of the fiduciary funds. Each fund's portion of this pool is reported on the statement of net position as cash and cash equivalents. The fiduciary funds' investments are held and managed separately from those of other Primary Government funds.

*Cash and cash equivalents*

Custodial credit risk for deposits is the risk that in the event of bank failure, the Commonwealth's deposit might not be recovered. The Commonwealth requires that public funds deposited in commercial banks in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by banks in the Commonwealth's name. There is no formal policy for custodial credit risk for cash accounts opened with commercial banks outside of Puerto Rico.

Deposits in governmental banks represent the balance of interest and noninterest bearing accounts in GDB and EDB. The deposit liability at the GDB and the EDB is substantially related to deposits from the Treasury Department of the Commonwealth, its component units and its municipalities.

Deposits maintained in GDB, EDB, and none Puerto Rico commercial banks are exempt from the collateral requirement established by the Commonwealth and thus represent a custodial credit risk, because in the event that these financial institutions fail, the Commonwealth may not be able to recover these deposits.

CONFIDENTIAL

CW_STAY0009911

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The carrying amount of deposits of the Primary Government at June 30, 2015 consists of the following (in thousands):

| | Carrying amount | | | Bank balance |
| | Unrestricted | Restricted | Total | |
|---|---|---|---|---|
| Governmental activities: | | | | |
| Commercial banks | $   251,436 | 1,222,037 | 1,473,473 | 1,500,378 |
| Governmental banks: | | | | |
| GDB - net | 281,401 | 222,624 | 504,025 | 894,694 |
| EDB | 20,848 | 7,975 | 28,823 | 28,512 |
| | 302,249 | 230,599 | 532,848 | 923,206 |
| Total | $   553,685 | 1,452,636 | 2,006,321 | 2,423,584 |

| | Carrying amount | | | Bank balance |
| | Unrestricted | Restricted | Total | |
|---|---|---|---|---|
| Business-type activities: | | | | |
| Commercial banks | $   36,959 | 7,451 | 44,410 | 44,558 |
| Governmental bank (all with GDB) | 178,667 | 184,769 | 363,436 | 371,768 |
| Under the Custody of the U.S. Treasury | — | 454,125 | 454,125 | 454,125 |
| | 178,667 | 638,894 | 817,561 | 825,893 |
| Total | $   215,626 | 646,345 | 861,971 | 870,451 |

At year end, the Primary Government's bank balance of deposits in commercial banks amounted approximately $1.5 billion, covered by federal depository insurance and by collateral held by the Commonwealth's agent in the Commonwealth's name. Deposits of approximately $454 million with the U.S. Treasury represent unemployment insurance taxes collected from employers that are transferred to the federal Unemployment Insurance Trust Fund in the U.S. Treasury. These deposits are uninsured and uncollateralized. The Primary Government's bank balance of deposits in governmental banks, which as of June 30, 2015, amounted approximately $1.3 billion, is also uninsured and uncollateralized.

The Primary Government classified approximately $69.7 million of investments in the PRGITF as cash equivalents, not presented in the table above; but included in a separate line item in the accompanying statement of net position.

124

CW_STAY0009912

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Custodial Credit Loss on Deposits held at GDB*

GDB is facing a critical and economic situation as described in Note 2. Therefore, deposits held at GDB were subject to strict restrictions and limitations during fiscal year 2015, and subsequent periods. GDB served as the primary depository agent of the Commonwealth, its instrumentalities and municipalities' funds; depositors' cash and cash equivalents with GDB are thus subject to custodial credit risk. Management determined that a custodial credit loss existed as of June 30, 2015 for the deposits held at GDB. Based on an evaluation of the availability and recoverability of such deposits, a custodial credit loss on these deposits has been recorded on the Primary Government's financial statements as follows (in thousands):

|  | Amount |
|---|---|
| Governmental activities: | |
| Carrying value before loss | $ 799,072 |
| Custodial credit loss | (295,047) |
| Net carrying value | $ 504,025 |

The aforementioned custodial credit loss of approximately $295 million was recognized as general government expenditures of the Governmental Activities and belong substantially to those Treasury Department accounts and those blended component units or agencies that issued their standalone financial statements considering the impact of the custodial credit loss. However, certain blended component units or agencies that are audited by another auditors issued their 2015 stand-alone financial statements without a custodial credit loss evaluation or recognition. Consequently, the cash and cash equivalents balance reported in the financial statements of such blended component units or agencies and of the Primary Government is overstated at June 30, 2015.

The Commonwealth evaluated the availability and recoverability of the deposits held at GDB for the entities that did not evaluate a custodial credit loss on their respective 2015 stand-alone financial statements, and determined that an additional custodial credit loss should have been recorded as of June 30, 2015 on the deposits of the Governmental Activities, Business-Type Activities, General Fund, Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF) and aggregate remaining fund financial information, including fiduciary funds as disclosed below, of approximately $49.3 million, $137.9 million, $11.5 million, $119.7 million and $59.2 million, respectively. These additional amounts of custodial credit loss which should have been recognized as of June 30, 2015 are considered unaudited because they relate to entities and funds, which are audited by other auditors, that did not evaluate the potential custodial credit loss of deposits at GDB in their respective separately issued financial statements.

As discussed in Note 2 (b), GDB is currently in a process directed to restructure its obligations. Such restructuring may require the offset between financial instruments assets and liabilities held by GDB. The proposed restructuring remains subject to different milestones. Upon an eventual restructuring of GDB obligations and the execution of the milestones noted in the GDB RSA, the recorded and unrecorded custodial credit loss on the cash and cash equivalents disclosed above may change.

At February 28, 2018 (last reporting period that GDB has available financial information prior to its business discontinuance effective March 23, 2018), the Primary Government holds deposits at GDB of approximately $977.3 million (unaudited) of which approximately $878.2 million (unaudited) and $99.1 million (unaudited)

125

CW_STAY0009913

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

are related to the Governmental and Business-Type Activities, respectively. The ultimate custodial credit loss related to the deposits held at GDB subsequent to June 30, 2015, if any, cannot be determined until GDB concludes its restructuring process.

*Investments*

*Custodial Credit Risk* – Custodial credit risk for investments is the risk that, in the event of the failure of the counterparty to the transaction, the Commonwealth may not be able to recover the value of the investment or collateral securities that are in the possession of an outside party.

*Credit Risk* – This is the risk of loss of principal or loss of a financial reward stemming from a borrower's failure to repay a loan or otherwise meet a contractual obligation. Investors are compensated for assuming credit risk by way of interest payments from the borrower or issuer of a debt obligation.

Credit risk is closely tied to the potential return of an investment, the most notable being that the yields on bonds correlate strongly to their perceived credit risk.

The Commonwealth's general investment policy is to apply the "prudent investor" rule, which states investments must be made with judgment and care under circumstances then prevailing, that persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not for speculation but for investment, and considering the probable safety of their capital as well as the probable income to be derived. The prudent investor rule should be applied in the context of managing an overall portfolio.

Short-term funds of the agencies, including operating funds, may be invested in U.S. Treasury bills; U.S. Treasury notes or bonds with short-term maturities; short-term obligations of U.S. government agencies and instrumentalities classified within the highest rating category of Standard & Poor's Rating Services (S&P) and Moody's Investors Service (Moody's); fully insured or collateralized certificates of deposit of eligible financial institutions designated by the Commissioner of Financial Institutions and the Secretary of the Treasury of the Commonwealth; prime commercial paper rated A1/P1 by S&P and Moody's or secured by an irrevocable line of credit of an institution rated within the highest rating category of S&P and Moody's or collateralized by government securities; bankers' acceptances (as alternatives to CDs) of eligible financial institutions doing business in Puerto Rico provided adequate collateral has been pledged; the PRGITF; obligations of the Commonwealth and its instrumentalities with an expected rate of return similar to other securities with the same risk profile.

Longer term funds may also be invested in U.S. government and agency securities in the highest rating category of S&P and Moody's. This include Taxable Municipal Bonds of state and local governments in the United States classified within the three (3) highest categories of at least two of the principal rating services; taxable municipal obligations of the Primary Government and its component units; structured investments (notes and other types of on balance sheet securities issued by a U.S. Government Agency or another financial institutions in the highest rating category of at least two of the principal rating services); and any mortgage backed instrument issued by a U.S. Government Agency in the highest rating category of S&P and Moody's.

*Concentration of Credit Risk* – This is the risk of loss attributed to the magnitude of a government's investment in a single issuer. The Commonwealth policy on larger portfolios with positions in securities having potential

126

CW_STAY0009914

**COMMONWEALTH OF PUERTO RICO**
Note to the Basic Financial Statements
June 30, 2015

default risk is to limit the investments in size so that in case of default, the portfolio's annual investment income will exceed a loss on a single issuer's securities.

*Interest Rate Risk* – It is the Commonwealth policy that a minimum 10% of the total portfolio be held in highly marketable U.S. Treasury bills or overnight investment instruments. Larger portfolios should not hold more than 30% of the portfolio in marketable instruments with maturities beyond one month. This policy should be followed as long as it does not reduce investment yields.

**Governmental Activities**

The Governmental Activities investments consisted of approximately $87.4 million in nonparticipating investment contracts (guaranteed investment contracts) that were exposed to custodial risk as uninsured, unregistered, and held by the counterparties or by their trust departments or agents, but not in the Primary Government's name.

The following table summarizes the type and maturities of investments held by the Governmental Activities at June 30, 2015 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

127

CW_STAY0009915

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The credit quality ratings (S&P) and fair value by investment type for the investments reported by the Governmental Activities at June 30, 2015 consist of the following (in thousands):

| Investment type | Maturity (in years) | | | |
| --- | --- | --- | --- | --- |
| | Within one year | After one to five years | After ten years | Total |
| U.S. government securities | $ 14,596 | — | — | 14,596 |
| U.S. corporate bonds and notes | 231,754 | — | — | 231,754 |
| Money market funds | 11,140 | 75,108 | — | 86,248 |
| PRGITF | 15,463 | — | — | 15,463 |
| Other | — | — | 243 | 243 |
| External investment pools – fixed-income securities: | | | | |
| Dreyfus Government Cash Management | 150,375 | — | — | 150,375 |
| Deutsche Bank | — | 24,544 | — | 24,544 |
| Nonparticipating investment contracts: | | | | |
| Bayerische Hypo-und Vereinsbank AG | — | 83,684 | — | 83,684 |
| Calyon | — | — | 3,767 | 3,767 |
| Total debt securities and fixed-income investment contracts | $ 423,328 | 183,336 | 4,010 | 610,674 |
| Reconciliation to the government-wide statement of net position: | | | | |
| Unrestricted investments | | | $ | 15,335 |
| Restricted investments | | | | 595,339 |
| Total | | | $ | 610,674 |

| Investment type | Rating | | | | |
| --- | --- | --- | --- | --- | --- |
| | AAA | A+ to A- | BBB+ to B- | Not rated | Total |
| U.S. corporate bonds and notes | $ 231,754 | — | — | — | 231,754 |
| Money market funds | — | — | — | 86,248 | 86,248 |
| PRGITF | 14,927 | — | — | 536 | 15,463 |
| Other | — | — | — | 243 | 243 |
| External investment pools – fixed-income securities: | | | | | |
| Dreyfus Government Cash Management | 150,375 | — | — | — | 150,375 |
| Deutsche Bank | — | 24,544 | — | — | 24,544 |
| Nonparticipating investment contracts: | | | | | |
| Bayerische Hypo-undVereinsbank AG | — | — | 83,684 | — | 83,684 |
| Calyon | — | 3,767 | — | — | 3,767 |
| Total debt securities and fixed-income investment contracts | $ 397,056 | 28,311 | 83,684 | 87,027 | 596,078 |

128

CW_STAY0009916

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Approximately $14.6 million of the total Governmental Activities' investments consist of U.S. government securities, which carry no credit risk and therefore, are not included within the table above.

**Business-Type Activities**

The following table summarizes the type and maturities of investments held by the Business-Type Activities at June 30, 2015 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| Investment type | Maturity (In years) | | | | |
|---|---|---|---|---|---|
| | Within one year | After one to five years | After five to ten years | After ten years | Total |
| U.S. government and agency securities | $ — | 1,824 | 3,141 | 1,523 | 6,488 |
| Mortgage and asset-backed securities: | | | | | |
| Government National Mortgage Association (GNMA) | — | — | — | 422 | 422 |
| FNMA | — | 15 | 29 | 1,887 | 1,931 |
| Federal Home Loan Mortgage Corporation (FHLMC) | — | — | 92 | 4,233 | 4,325 |
| Commercial mortgages | — | — | — | 646 | 646 |
| Asset-backed securities | — | 753 | — | — | 753 |
| U.S. corporate bonds and notes | — | 3,615 | 2,682 | 2,400 | 8,697 |
| Foreign corporate and government bonds and notes | — | 1,346 | 116 | — | 1,462 |
| Negotiable certificate of deposits | 6,512 | — | — | — | 6,512 |
| U.S. municipal notes | — | — | 98 | 782 | 880 |
| Total debt securities | $ 6,512 | 7,553 | 6,158 | 11,893 | 32,116 |
| External investment pools – equity securities: | | | | | |
| SPDR S&P 500 ETF Trust | | | | | 10,114 |
| MFC ISHARES TR Russell 2000 Index Fund | | | | | 936 |
| MFC Vanguard FTSE Emergency MKTS ETF | | | | | 60 |
| MFC Vanguard FTSE Development Markets | | | | | 1,404 |
| Total | | | | $ | 44,630 |
| Reconciliation to the government-wide statement of net position: | | | | | |
| Unrestricted investments | | | | $ | 6,512 |
| Restricted investments | | | | | 38,118 |
| Total | | | | $ | 44,630 |

129

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The credit quality ratings (S&P) and fair value by investment type for the investments reported by the Business-Type Activities at June 30, 2015 consist of the following (in thousands):

| Investment type | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ to BB- | Not rated | Total |
|---|---|---|---|---|---|---|---|
| Mortgage and asset-backed securities: | | | | | | | |
| FNMA | $ — | 1,931 | — | — | — | | 1,931 |
| FHLMC | — | 4,325 | — | — | — | — | 4,325 |
| Commercial mortgages | 360 | — | — | — | — | 286 | 646 |
| Asset-backed securities | 625 | — | — | — | — | 128 | 753 |
| U.S. corporate bonds and notes | 124 | 1,176 | 4,114 | 3,087 | 196 | — | 8,697 |
| Foreign corporate and government bonds and notes | — | — | 1,123 | 249 | 90 | — | 1,462 |
| Negotiable certificate of deposits | — | — | — | — | — | 6,512 | 6,512 |
| U.S. municipal notes | 446 | 380 | 54 | — | — | — | 880 |
| Total debt securities | $ 1,555 | 7,812 | 5,291 | 3,336 | 286 | 6,926 | 25,206 |

Approximately $6.9 million of the total Business-Type Activities' investments consist of U.S. Government National Mortgage Association (GNMA) securities, which carry no credit risk and therefore, are not included within the table above.

**Fiduciary Funds**

*Cash and cash equivalents*

Cash and cash equivalents of the Fiduciary Funds at June 30, 2015 consist of the following (in thousands):

| | Carrying amount | | | Bank balance |
|---|---|---|---|---|
| | Unrestricted | Restricted | Total | |
| Commercial banks | $ 756,060 | 126,613 | 882,673 | 615,334 |
| Governmental banks (all with GDB), net | 302,245 | 37,990 | 340,235 | 255,798 |
| Total | $ 1,058,305 | 164,603 | 1,222,908 | 871,132 |

Cash and cash equivalents consist of deposits with commercial banks, deposits with the GDB and short-term investments. Short-term investments include money market funds and other cash equivalents. The cash in commercial banks and governmental banks also include funds deposited in private banks (approximately $598.8 millions) and GDB (approximately $192.5 million) held by the Commonwealth's agency fund on behalf of third parties outside the Commonwealth's reporting entity.

Restricted cash and cash equivalents amounted to approximately $164.6 million as of June 30, 2015 and consisted of the following: approximately $121.7 million in funds restricted for the debt service of ERS bonds payable (of which approximately $112.5 million was deposited at the trustee in money market funds and approximately $9.2 million was deposited at GDB); approximately $42.9 million in funds restricted for

130

CW_STAY0009918

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

repayments of mortgage and personal loans, for expired checks not claimed by the plan members, and other purposes (of which approximately $28.8 million was deposited at GDB and approximately $14.1 million was deposited at Puerto Rico commercial banks).

Collateral received for securities lending transactions of the pension trust funds at June 30, 2015 that amounted approximately $107.4 million was invested in short-term investment funds sponsored by the pension trust funds' custodian bank (see Note 6).

Custodial Credit Risk – As of June 30, 2015, the fiduciary funds had approximately $245 million in cash and cash equivalents and collateral from securities lending transactions, which were exposed to custodial credit risk as uninsured and uncollateralized. Cash collateral received from securities lending transactions invested in short-term investment funds sponsored by the pension trust funds' custodian bank are also exempt from compliance with the collateralization requirement.

*Custodial Credit Loss on Deposits held at GDB*

Based on an evaluation of the availability and recoverability of deposits, a custodial credit loss has been recorded on the fiduciary funds' financial statements within other expenses as follows (in thousands):

| | Deposits Held with GDB at June 30, 2015 | | |
| --- | --- | --- | --- |
| | Carrying value custodial credit loss | Custodial credit loss | Carrying value |
| Cash and cash equivalents | $ 354,039 | (13,804) | 340,235 |

The above custodial credit loss belongs to those blended component units of the fiduciary funds opinion unit that issued their stand-alone financial statements considering the impact of the custodial credit loss. A blended component unit of the fiduciary funds opinion unit issued its stand-alone financial statements without performing a custodial credit loss evaluation. Consequently, the cash and cash equivalent amount reported by such entity and by the fiduciary funds is overstated at June 30, 2015.

The Commonwealth evaluated the availability and recoverability of the deposits held at GDB for the entity that did not evaluate custodial credit loss on its respective 2015 stand-alone financial statements, an additional custodial credit loss should have been recorded as of June 30, 2015 on the deposits of the fiduciary funds of approximately $3.3 million, included in aggregate remaining funds. These additional amounts of custodial credit loss which should have been recognized as of June 30, 2015 are considered unaudited because they relate to entities and funds, which are audited by other auditors, that did not evaluate the potential custodial credit loss of deposits at GDB in their respective separately issued financial statements.

At February 28, 2018 (last reporting period that GDB has available financial information prior to its business discontinuance effective March 23, 2018), the Fiduciary funds holds deposits with GDB of approximately $47.3 million (unaudited). The ultimate custodial credit loss related to the deposits held at GDB subsequent to June 30, 2015, if any, cannot be determined until GDB concludes its restructuring process.

131

CW_STAY0009919

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Investments*

The following table summarizes the type and maturities of investments held by the pension trust funds at June 30, 2015 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|
| U.S. government securities: | | | | | |
| U.S. Treasury notes | $ 1,016 | 10,476 | 16,115 | — | 27,607 |
| U.S. Treasury note strips | — | — | 40,665 | — | 40,665 |
| U.S. Treasury bonds | — | — | — | 2,456 | 2,456 |
| U.S. Treasury Inflation-Protected | | | | | |
| Securities (TIPS) | — | 1,080 | 1,122 | — | 2,202 |
| U.S. government sponsored agencies notes: | | | | | |
| Federal Home Loan Bank (FHLB) | — | 5,367 | — | — | 5,367 |
| FNMA | — | 4,820 | 2,301 | — | 7,121 |
| FHLMC | — | 6,901 | 1,519 | — | 8,420 |
| Federal Farm Credit Bank (FFCB) | 2,110 | 1,984 | 1,643 | — | 5,737 |
| Mortgage and asset–backed securities: | | | | | |
| GNMA | — | — | — | 6,967 | 6,967 |
| FNMA | — | 30 | 325 | 8,549 | 8,904 |
| FHLMC | — | — | — | 3,752 | 3,752 |
| Collateralized mortgage obligations (CMO) | — | — | — | 239 | 239 |
| Commercial mortgages | — | — | — | 7,933 | 7,933 |
| Asset–backed securities | — | — | 4,521 | 3,110 | 7,631 |
| U.S. corporate bonds and notes | 52,645 | 405,009 | 300,068 | 40,053 | 797,775 |
| Non-U.S. corporate bonds and notes | 6,512 | 69,024 | 76,111 | 1,861 | 153,508 |
| U.S. municipal bonds and notes | 2,782 | 611 | 7,050 | — | 10,443 |
| COFINA bonds | — | — | — | 89,139 | 89,139 |
| Total bonds and notes | 65,065 | 505,302 | 451,440 | 164,059 | 1,185,866 |
| Nonexchange commingled trust funds: | | | | | |
| Fixed income fund – SSgA Intermediate Fund: | | | | | |
| U.S. | — | 113,083 | — | — | 113,083 |
| Non-U.S. | — | 59,063 | — | — | 59,063 |
| Total bonds and notes and nonexchange commingled fixed-income trust funds | $ 65,065 | 677,448 | 451,440 | 164,059 | 1,358,012 |

132

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

| Investment type | Maturity (In years) | | | | |
|---|---|---|---|---|---|
| | Within one year | After one to five years | After five to ten years | After ten years | Total |
| Stocks and equity and other nonexchange commingled trust funds: | | | | | |
| U.S. corporate stock | | | | | $ 1,828 |
| Non U.S. corporate stock | | | | | 64,530 |
| Nonexchange commingled trust funds: | | | | | |
| Equity and other funds: | | | | | |
| U.S. – SSgA Russell 3000 Fund | | | | | 509,870 |
| U.S. – SSgA S&P 500 Fund | | | | | 7,970 |
| Non-U.S. – SSgA MSCI | | | | | |
| ACWI Ex USA Fund | | | | | 136,876 |
| Total stocks and equity and other nonexchange commingled trust funds | | | | | 721,074 |
| Investments in limited partnerships | | | | | 61,526 |
| Total | | | | | $ 2,140,612 |

The pension trust fund's investments are exposed to custodial credit risk, credit risk, concentration of credit risk, foreign currency risk, and interest rate risk. Following is a description of these risks as of June 30, 2015:

*Custodial Credit Risk* – At June 30, 2015, securities investments were registered in the name of the pension trust fund and were held in the possession of the pension trust funds custodian banks, State Street Bank and Trust and Bank of New York Mellon, except for securities lent. Securities lent are not exposed to custodial credit risk (see Note 6).

*Credit Risk* – All fixed income securities at the time of purchase must be of investment grade quality. All issuances must be rated investment grade by at least two of the nationally recognized rating agencies. The portfolio is expected to maintain a minimum weighted average credit quality of either "A" or better using either S&P or Moody's credit ratings. TRS's investment guidelines prohibit the investments in securities with expected maturity dates beyond 30 years. Positions that drift below investment grade should be reported to a management representative of TRS and monitored carefully. TRS portfolio is not expected to have more than 5% invested in securities that have drifted after purchase below investment grade quality. JRS investment policy limits the investment in corporate debt securities to the top ratings issued by nationally recognized statistical rating organizations.

133

CW_STAY0009921

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The credit quality ratings for investments held by the pension trust funds at June 30, 2015 are as follows (in thousands):

| Investment type | AAA | AA+ to AA- | A+ to A- | BBB+ to BBB- | BB+ to BB- | CCC- | Not Rated | Total |
|---|---|---|---|---|---|---|---|---|
| Bonds and notes: | | | | | | | | |
| U.S. government agencies obligations: | | | | | | | | |
| FHLB | $  — | 5,367 | — | — | — | — | — | 5,367 |
| FNMA | — | 7,121 | — | — | — | — | — | 7,121 |
| FHLMC | — | 8,420 | — | — | — | — | — | 8,420 |
| FFCB | — | 5,737 | — | — | — | — | — | 5,737 |
| Mortgage and asset – backed securities: | | | | | | | | |
| FNMA | — | 8,904 | — | — | — | — | — | 8,904 |
| FHLMC | — | 3,752 | — | — | — | — | — | 3,752 |
| CMO | 27 | — | — | — | — | — | 212 | 239 |
| Commercial mortgages | 7,933 | — | — | — | — | — | — | 7,933 |
| Asset-backed securities | — | — | — | — | — | — | 7,631 | 7,631 |
| U.S. corporate bonds and notes | 19,534 | 103,890 | 356,076 | 298,219 | 18,893 | — | 1,163 | 797,775 |
| Non U.S. corporate bonds and notes | 2,294 | 7,556 | 57,523 | 64,133 | 13,527 | — | 8,475 | 153,508 |
| U.S. municipal bonds and notes | 3,663 | 3,559 | 3,221 | — | — | — | — | 10,443 |
| COFINA bonds | — | — | — | — | — | 89,139 | — | 89,139 |
| Total bonds and notes | 33,451 | 154,306 | 416,820 | 362,352 | 32,420 | 89,139 | 17,481 | 1,105,969 |
| Nonexchange commingled trust funds: | | | | | | | | |
| Fixed Income fund – SSgA Intermediate Fund | 20,726 | 19,074 | 64,881 | 67,431 | 34 | — | — | 172,146 |
| Total debt securities and fixed-income nonexchange commingled trust fund | $  54,177 | 173,380 | 481,701 | 429,783 | 32,454 | 89,139 | 17,481 | 1,278,115 |

(1) Rating obtained from Standard and Poor's or equivalent rating by Moody's Investor Service or Fitch Ratings.

Approximately $79.9 million of the total fiduciary funds' investments at June 30, 2015 consist of GNMA securities, which carry no risk and therefore, are not included within the table above.

*Concentration of Credit Risk* – None of ERS and JRS investment in marketable securities in any organization represents 5% or more of ERS and JRS net assets held in trust for pension benefits. There are no TRS investments in any one issuer that represent 5% or more of total investments as of June 30, 2015. TRS investment guidelines specify that no more than 5% of a manager's assets at market may be invested in the securities of any single issuer.

*Interest Rate Risk* – In accordance with their investment policy, ERS and JRS manage their exposure to declines in fair values by structuring the investment portfolio so that securities mature to meet cash requirements for benefit payments, thereby avoiding the need to sell securities on the open market prior to maturity. The Pension Trust Fund is expected to achieve capital preservation and income generation by investing in a diversified portfolio of marketable investment grade core fixed income securities. TRS investment guidelines specify that the duration of the portfolio is expected to vary no more than between 75% and 125% of the duration of the respective benchmark.

134

CW_STAY0009922

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

As of June 30, 2015, investment maturities as a percentage of total debt securities and fixed income nonexchange traded mutual funds are as follows:

| Maturity | Maximum maturity |
|---|---|
| Within one year | 6% |
| After one year to five years | 49 |
| After five years to ten years | 33 |
| After ten years | 12 |
| Total | 100% |

*Foreign Currency Risk* – This is the risk that changes in exchange rates will adversely affect the fair value of an investment or a deposit. ERS and JRS have no investments with exposure to foreign currency risk. TRS international portfolio is expected to achieve long-term and aggressive capital appreciation by investing in Core EAFE (Europe Australasia and the Far East) securities. The portfolio is expected to be broadly diversified with respect to exposures to countries, economic sectors, industries, and individual stock. No single issue is expected to exceed 5% (at market) of the portfolio.

TRS's investments and deposits exposed to foreign currency risk as of June 30, 2015, are as follows:

| Investment type | Local currency | Fair value |
|---|---|---|
| | | (In thousands) |
| Cash and cash equivalents | Japanese Yen | $ 9 |
| Cash and cash equivalents | New Zealand Dollar | 61 |
| Total cash and cash equivalents | | 70 |
| Non-U.S. corporate stock | Australian Dollar | 3,376 |
| Non-U.S. corporate stock | British Sterling Pound | 16,299 |
| Non-U.S. corporate stock | Danish Krone | 4,138 |
| Non-U.S. corporate stock | Euro | 7,280 |
| Non-U.S. corporate stock | Hong Kong Dollar | 2,275 |
| Non-U.S. corporate stock | Japanese Yen | 12,716 |
| Non-U.S. corporate stock | New Turkish Lira | 401 |
| Non-U.S. corporate stock | New Zealand Dollar | 388 |
| Non-U.S. corporate stock | South African Rand | 1,095 |
| Non-U.S. corporate stock | Singapore Dollar | 1,206 |
| Non-U.S. corporate stock | South Korean Won | 497 |

135

CONFIDENTIAL

CW_STAY0009923

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

| Investment type | Local currency | | Fair value |
|---|---|---|---|
| | | | (In thousands) |
| Non-U.S. corporate stock | Swedish Krona | $ | 5,555 |
| Non-U.S. corporate stock | Swiss Franc | | 4,643 |
| Total common stock | | | 59,869 |
| Nonexchange commingled trust funds – Ssga MCSI ACWI Ex USA | | | 16,622 |
| Total cash and cash equivalents and securities exposed to foreign currency risk | | $ | 76,561 |

In July 2017, the Retirement Systems sold all of the held investments amounting to approximately $297 million and started operating on a "pay as you go" basis. For further information on the transition to a "pay as you go" structure for the Retirement Systems, refer to Note 22.

*Nonexchange Commingled Trust Funds*

The pension trust funds invest in shares of the following State Street Global Advisor equity funds: SsgA S&P 500 Flagship Securities Lending Fund (the SsgA S&P 500 Fund), the SsgA Russell 3000 Index Non-Lending Fund (the SsgA Russell 3000 Fund), and the SsgA MSCI ACWI Ex USA Non-Lending Fund (the SsgA MSCI ACWI Ex USA Fund). The investment objectives of the SsgA S&P 500 Fund, the SsgA Russell 3000 Fund, and the SsgA MSCI ACWI Ex USA Fund are to match the return of the Standard & Poor's 500 Index, the Russell 3000 Index, and the MSCI ACWI Ex USA Index, respectively, over the long-term. Shares of the SsgA S&P 500 Fund and of the SsgA Russell 3000 Fund can be redeemed on a daily basis at net asset value (NAV) and have no redemption restrictions. Shares of the SsgA MSCI ACWI Ex USA Fund can be redeemed semimonthly at NAV and have no redemption restrictions. The pension trust funds' investment in these funds is included as part of nonexchange commingled trust funds.

136

CW_STAY0009924

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

As of June 30, 2015, the investments underlying the SsgA S&P 500 Fund, the SsgA Russell 3000 Fund and the SsgA MSCI ACWI Ex USA Fund had the following sector allocations:

| Sector | SSgA S&P 500 Fund | SSgA Russell 3000 Fund | SSgA MSCI ACWI Ex USA Fund |
|---|---|---|---|
| Information technology | 20% | 19% | 8% |
| Financials | 17 | 18 | 28 |
| Healthcare | 15 | 15 | 9 |
| Consumer discretionary | 13 | 13 | 12 |
| Industrials | 10 | 11 | 11 |
| Consumer staples | 9 | 8 | 10 |
| Energy | 8 | 7 | 7 |
| Materials | 3 | 4 | 7 |
| Utilities | 3 | 3 | 3 |
| Telecommunication services | 2 | 2 | 5 |
| Total | 100% | 100% | 100% |

In addition, the pension trust funds invest in shares of the State Street Global Advisor Intermediate Credit Index Non- Lending Fund (the SsgA Intermediate Fund). The investment objective of the SsgA Intermediate Fund is to replicate the Barclays U.S. Intermediate Credit Bond Index over a long-term by investing exclusively in fixed income securities. Shares of the SsgA Intermediate Fund can be redeemed on a daily basis at their NAV and have no redemption restrictions. The pension trust funds' investment in the SsgA Intermediate Fund is included as part of nonexchange commingled trust funds.

As of June 30, 2015, the investments underlying the SsgA Intermediate Fund had the following sector allocations:

| Sector | Percentage |
|---|---|
| Corporate – Industrial | 45% |
| Corporate – Finance | 30 |
| Noncorporates | 21 |
| Corporate – Utility | 4 |
| Total | 100% |

137

CONFIDENTIAL

CW_STAY0009925

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

As of June 30, 2015, the composition of the underlying investments in the SsgA MSCI ACWI Ex USA Fund and in the SsgA Intermediate Fund by country was as follows:

| Country | SSgA MSCI ACWI Ex USA Fund | SSgA Intermediate Fund |
|---|---|---|
| Japan | 16% | 2% |
| United Kingdom | 14 | 3 |
| Canada | 7 | 5 |
| France | 7 | — |
| Switzerland | 7 | 1 |
| Germany | 6 | 4 |
| Australia | 5 | 1 |
| China | 5 | — |
| Korea | 3 | — |
| Spain | 3 | — |
| Taiwan | 3 | — |
| Brazil | 2 | 2 |
| Hong Kong | 2 | — |
| India | 2 | — |
| Italy | 2 | — |
| Netherlands | 2 | — |
| South Africa | 2 | — |
| Sweden | 2 | — |
| Denmark | 1 | — |
| Singapore | 1 | — |
| U.S. | — | 66 |
| Mexico | — | 2 |
| Other | 8 | 14 |
| Total | 100% | 100% |

**Investments in Limited Partnerships**

Pursuant to the Commonwealth's General Investment Policy, the pension trust funds invested approximately $1.4 million in limited partnerships during the year ended June 30, 2015.

The fair value of investments in limited partnerships at June 30, 2015 amounted to approximately $61.5 million. The allocations of net gains and losses to limited partners are based on certain percentages, as established in the limited partnership agreements. Investments in limited partnerships are not rated by a nationally recognized statistical rating organization. The related credit risk is measured through credit analysis, periodic reviews of results of operations, and meetings of subject companies' management.

138

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

On July 31, 2014, the Guayacán Fund of Funds L.P was dissolved by Grupo Guayacán, Inc. The final distribution of the fund was received by ERS and TRS in December 2014.

As of June 30, 2015, the pension trust funds had capital commitments with limited partnerships and related contributions as follows (in thousands):

| | Public sector commitments | Fiscal year contributions | Cumulative contributions | Fair value |
|---|---|---|---|---|
| Guayacán Fund of Funds II, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | $ 25,000 | — | 23,681 | 2,042 |
| Puerto Rico System of Annuities and Pensions for Teachers | 25,000 | — | 23,681 | 2,042 |
| Subtotal | 50,000 | — | 47,362 | 4,084 |
| Guayacán Private Equity Fund, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 5,000 | — | 4,645 | 2,214 |
| Puerto Rico System of Annuities and Pensions for Teachers | 5,000 | — | 4,645 | 2,214 |
| Subtotal | 10,000 | — | 9,290 | 4,428 |
| Guayacán Private Equity Fund II, L.P.: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 25,000 | 1,428 | 21,350 | 22,238 |
| Subtotal | 25,000 | 1,428 | 21,350 | 22,238 |
| Other Funds: | | | | |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 47,596 | — | 47,382 | 27,532 |
| Puerto Rico System of Annuities and Pensions for Teachers | 28,714 | — | 26,498 | 3,244 |
| Subtotal | 76,310 | — | 73,880 | 30,776 |
| Total | $ 161,310 | 1,428 | 151,882 | 61,526 |

139

CW_STAY0009927

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

**Discretely Presented Component Units**

*Deposits*

Cash and cash equivalents consist of demand deposits, interest bearing accounts, certificates of deposit, and bank investment contracts. Cash and cash equivalents of the component units at June 30, 2015 consist of (in thousands):

*Major Component Units*

|  |  | Carrying amount | | | Bank |
|  |  | Unrestricted | Restricted | Total | balance |
|---|---|---|---|---|---|
| Commercial banks | $ | 834,286 | 384,854 | 1,219,140 | 1,010,449 |
| Governmental banks: |  |  |  |  |  |
| GDB, net |  | 39,163 | 233,238 | 272,401 | 482,946 |
| EDB |  | 126,006 | — | 126,006 | 126,006 |
|  |  | 165,169 | 233,238 | 398,407 | 608,952 |
| Total | $ | 999,455 | 618,092 | 1,617,547 | 1,619,401 |

As of June 30, 2015, the major component units had approximately $609 million of cash and cash equivalents that were exposed to custodial credit risk as uninsured and uncollateralized.

The major component units classified approximately $3 million of investments in the PRGITF as cash equivalents, not presented in the table above; but included in a separate line item in the accompanying statement of net position.

*Nonmajor Component Units*

|  |  | Carrying amount | | | Bank |
|  |  | Unrestricted | Restricted | Total | balance |
|---|---|---|---|---|---|
| Commercial banks | $ | 211,613 | 52,639 | 264,252 | 276,723 |
| Governmental banks: |  |  |  |  |  |
| GDB, net |  | 116,576 | 51,128 | 167,704 | 181,535 |
| EDB |  | 26,366 | — | 26,366 | 26,366 |
|  |  | 142,942 | 51,128 | 194,070 | 207,901 |
| Total | $ | 354,555 | 103,767 | 458,322 | 484,624 |

As of June 30, 2015, the nonmajor component units had approximately $208 million of cash and cash equivalents that were exposed to custodial credit risk as uninsured and uncollateralized.

140

CW_STAY0009928

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Custodial Credit Loss on Deposits held at GDB*

Management determined that a custodial credit loss existed at June 30, 2015 for the deposits held at GDB. Based on an evaluation of the availability and recoverability of such deposits, a custodial credit loss on these deposits has been recorded on the component units' financial statements within general expenses as follows (in thousands):

|  | | Amount |
|---|---|---|
| Major component units: | | |
| Carrying value before custodial credit loss | $ | 463,604 |
| Custodial credit loss | | (191,203) |
| Net carrying value | $ | 272,401 |

|  | | Amount |
|---|---|---|
| Nonmajor component units: | | |
| Carrying value before custodial credit loss | $ | 177,522 |
| Custodial credit loss | | (9,818) |
| Net carrying value | $ | 167,704 |

The aforementioned custodial credit losses belongs substantially to those discretely presented component units which issued their stand-alone financial statements considering the impact of the custodial credit loss. However, certain of the discretely presented component units issued their 2015 stand-alone financial statements without performing a custodial credit loss evaluation. Consequently, the cash and cash equivalents amounts reported by such discretely presented component units is overstated as of June 30, 2015.

The Commonwealth evaluated the availability and recoverability of the deposits held at GDB for the entities that did not evaluate custodial credit loss on their respective 2015 stand-alone financial statements, and determined that an additional custodial credit loss of approximately $24.2 million and approximately $66.7 million should have been recorded as of June 30, 2015 on the cash and cash equivalents of the discretely presented major and nonmajor component units, respectively. These additional amounts of custodial credit loss which should have been recognized as of June 30, 2015 are considered unaudited because they relate to entities and funds, which are audited by other auditors, that did not evaluate the potential custodial credit loss of deposits at GDB in their respective separately issued financial statements.

As discussed in Note 2 (b), GDB is currently in a process directed to restructure its obligations. Such restructuring may require the offset between financial instruments assets and liabilities held by GDB. The proposed restructuring remains subject to different milestones. Upon an eventual restructuring of GDB obligations and the execution of the milestones noted in the GDB RSA, the recorded and unrecorded custodial credit loss on the cash and cash equivalents disclosed above may change.

141

CW_STAY0009929

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

At February 28, 2018 (last reporting period that GDB has available financial information prior to its business discontinuance effective March 23, 2018), the discretely presented componet units holds deposits at GDB of approximately $573.3 million (unaudited). The ultimatel custodial credit loss related to the deposits held at GDB subsequent to June 30, 2015, if any, cannot be determined until GDB concludes its restructuring process.

*Credit Risk* – In addition to the investments permitted for the Primary Government, the component units' investment policies allow management to invest in the following: certificates of deposit or Euro notes issued by financial institutions in the U.S. in which the issuer is classified in the highest rating category for short-term obligations and in the two highest rating category for long-term obligations as classified by S&P and Moody's: corporate notes and bonds classified in the highest categories of at least two of the principal rating services; taxable corporate debt issued through AFICA within the two (2) highest rating categories of at least two of the principal rating services; trust certificates (subject to prior written consultation with GDB);,  and Mortgage and Asset Backed Securities rated AAA by S&P or Aaa by Moody's that must not exceed 5% of the underlying Trust at any time.

The component units' investment policies establish limitations and other guidelines on amounts to be invested in the aforementioned investment categories and by issuer/counterparty and on exposure by country. In addition, such policies provide guidelines on the institutions with which investment transactions can be entered into.

The component units' investment policies provide that investments transactions must be entered into with counterparties that are rated BBB+/A 1 or better by S&P's or equivalent rating by Fitch Ratings or Moody's, depending on the type and maturity of the investment and the counterparty to the transaction.

*Concentration of credit risk* – In addition, the investment policy specifies that no more than 5% of a manager's assets at fair value must be invested in the securities of any single issuer. The following table summarizes the type and maturities of investments held by the component units at June 30, 2015 (in thousands). Investments by type in any issuer representing 5% or more of total investments have been separately disclosed. Expected maturities will differ from contractual maturities, because counterparties may have the right to call or prepay obligations with or without call or prepayment penalties.

CONFIDENTIAL

CW_STAY0009930

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

## Major Component Units

| | | Maturity (in years) | | | |
|---|---|---|---|---|---|
| Investment type | Within one year | After one to five years | After five to ten years | After ten years | Total |
| U.S. government securities | $ 79,818 | 63,732 | 31,898 | 2,909 | 178,357 |
| U.S. government sponsored agencies notes: | | | | | |
| FHLB | 77,056 | 169,370 | 26,523 | — | 272,949 |
| FNMA | 5,848 | 232,594 | 3,679 | — | 242,121 |
| FHLMC | 47,527 | 255,734 | — | — | 303,261 |
| FFCB | — | 20,381 | 7,573 | 386 | 28,340 |
| Other | — | 2,207 | 273 | — | 2,480 |
| Mortgage and asset-backed securities: | | | | | |
| GNMA | — | — | 14,619 | 114,933 | 129,552 |
| FNMA | 21,656 | 25,763 | 6,766 | 52,967 | 107,152 |
| FHLMC | — | 10 | 1,241 | 40,669 | 41,920 |
| Commercial mortgages | — | — | — | 893 | 893 |
| Asset-backed securities | — | 7,238 | — | 332 | 7,570 |
| Other | — | — | — | 185 | 185 |
| U.S. corporate bonds and notes | 10,991 | 167,083 | 143,970 | 33,369 | 355,413 |
| Foreign government bonds and notes | 278 | 1,457 | 13,678 | 938 | 16,351 |
| U.S. municipal notes | 6,266 | 3,043 | 6,257 | 1,548 | 17,114 |
| Commonwealth agency bonds and notes | — | 98,461 | — | — | 98,461 |
| Money market funds | 332,814 | — | — | — | 332,814 |
| Negotiable certificates of deposit | 52,714 | — | — | — | 52,714 |
| PRGITF | 60,153 | — | — | — | 60,153 |
| External investment pools – fixed-income securities | 35,032 | 43,960 | — | 5,172 | 84,164 |
| Nonparticipating investment contracts | 103,540 | 107,173 | — | 156,686 | 367,399 |
| Others | 98,102 | 1,106 | — | — | 99,208 |
| Total debt securities and fixed-income investment contracts | $ 931,795 | 1,199,312 | 256,477 | 410,987 | 2,798,571 |
| Equity securities: | | | | | |
| U.S. corporate stocks | | | | | 369,075 |
| Non-U.S. corporate stocks | | | | | 40,975 |
| External investment pools – equity securities | | | | | 258,315 |
| Limited partnership/private equity | | | | | 48,021 |
| Total | | | | | $ 3,514,957 |
| Reconciliation to the government-wide statement of net position: | | | | | |
| Unrestricted investments | | | | | $ 1,731,434 |
| Restricted investments | | | | | 1,783,523 |
| Total | | | | | $ 3,514,957 |

143

CONFIDENTIAL

CW_STAY0009931

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

### Nonmajor Components Units

| Investment type | | Within one year | After one to five years | After five to ten years | After ten years | Total |
|---|---|---|---|---|---|---|
| | | | | Maturity (in years) | | |
| U.S. government securities | $ | 7,571 | 23,710 | 15,641 | 6,576 | 53,498 |
| U.S. government sponsored agencies notes: | | | | | | |
| FHLB | | — | 2,477 | 6,646 | 2,024 | 11,147 |
| FNMA | | 1,751 | 240 | 125 | — | 2,116 |
| FHLMC | | 2,699 | 10,394 | 8,714 | 2,128 | 23,935 |
| FFCB | | 4,003 | 2,510 | 7,492 | 960 | 14,965 |
| Other | | — | 462 | 2,550 | 19,782 | 22,794 |
| Mortgage and asset-backed securities: | | | | | | |
| GNMA | | 98 | — | — | 22,772 | 22,870 |
| FNMA | | — | 7,908 | 1,807 | 162,234 | 171,949 |
| FHLMC | | 5,613 | 19,960 | 2,332 | 13,907 | 41,812 |
| Commercial mortgages | | — | 6,677 | — | 2,822 | 9,499 |
| Asset-backed securities | | 11,934 | 3,338 | 624 | 1,985 | 17,881 |
| U.S. corporate bonds and notes | | 44,509 | 29,431 | 41,337 | 7,666 | 122,943 |
| Foreign government bonds and notes | | 151 | | 127 | | 278 |
| U.S. municipal notes | | 2,763 | 4,406 | 306,470 | 196,997 | 510,636 |
| Commonwealth agency bonds and notes | | 106,550 | 265,857 | 208,624 | 124,291 | 705,322 |
| Money market funds | | 72,309 | 33,366 | — | — | 105,675 |
| Negotiable certificates of deposit | | 73,387 | 85,470 | — | — | 158,857 |
| PRGITF | | 42,342 | 6,285 | | | 48,627 |
| Nonparticipating investment contracts | | | | 15,863 | 20,845 | 36,708 |
| Others | | 11,729 | 1,733 | 2,139 | 266 | 15,867 |
| Total debt securities and fixed-income investment contracts | $ | 387,409 | 504,224 | 620,491 | 585,255 | 2,097,379 |
| Equity securities: | | | | | | |
| U.S. corporate stocks | | | | | | 34,712 |
| Non-U.S. corporate stocks | | | | | | 23,632 |
| External investment pools – equity securities | | | | | | 35,533 |
| Limited partnership/private equity | | | | | | 18,397 |
| Total | | | | | $ | 2,209,653 |
| Reconciliation to the government-wide statement of net position: | | | | | | |
| Unrestricted investments | | | | | $ | 1,032,435 |
| Restricted investments | | | | | | 1,177,218 |
| Total | | | | | $ | 2,209,653 |

PRASA and PRHTA (major component units) classified approximately $2.9 million and $171 thousand, respectively, of investments presented in the PRGITF as cash equivalents.

144

CW_STAY0009932

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Custodial Credit Risk* – The component units had approximately $328 million (approximately $10 million and $318 million at major and nonmajor component units, respectively) in various types of U.S. government and agency securities, mortgage backed securities, and other investments that were exposed to custodial credit risk as uninsured, unregistered, and held by the counterparties or by their trust departments or agents, but not in the component units' name.

*Foreign Currency Risk* – SIFC (a major component unit) limits its exposure to foreign currency risk by limiting the total amount invested to 10% of the portfolio. As of June 30, 2015, the SIFC had the following investments denominated in foreign currency (in thousands):

| Description | Currency | Fair Value |
|---|---|---|
| Common stock | Australian dollar | $ 896,342 |
| | Canadian Dollar | 880,220 |
| | Swiss Franc | 3,767,581 |
| | Euro | 12,511,750 |
| | British Pound | 7,638,418 |
| | Hong Kong Dollar | 892,290 |
| | Indonesian Rupiah | 420,521 |
| | Japanese Yen | 8,852,093 |
| | Mexican Peso | 305,592 |
| | Norwegian Krone | 975,706 |
| | Swedish Krona | 452,073 |
| | Singapore Dollar | 1,271,970 |
| | South African Rand | 478,522 |
| Preferred stock and other equities | Euro | 1,632,058 |
| Total | | $ 40,975,136 |

145

CW_STAY0009933

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Custodial Credit Loss on Deposits held at GDB*

Certain negotiable certificates of deposits presented in the investment tables above are deposits at GDB. As GDB serves as the depository agent of these deposits, such certificates of deposits at GDB, are subject to custodial credit risk. Management determined that a custodial credit loss existed at June 30, 2015 for the deposits held at GDB. Based on an evaluation of the availability and recoverability of such deposits, a custodial credit loss on these deposits has been recorded on the corresponding component units' financial statements as follows (in thousands):

| | | Certificates of Deposits Held with GDB at June 30, 2015 | | |
| --- | --- | --- | --- | --- |
| | | Carrying value before custodial credit loss | Custodial credit loss | Net carrying value |
| Major component units: | | | | |
| PRHTA | $ | 15,000 | (15,000) | — |
| UPR | | 31,279 | (21,688) | 9,591 |
| Subtotal | | 46,279 | (36,688) | 9,591 |
| Nonmajor component units: | | | | |
| PRSTRT | | 79,693 | — | 79,693 |
| PRLA | | 30,094 | — | 30,094 |
| PRPA | | 25,002 | — | 25,002 |
| PRTC | | 12,361 | — | 12,361 |
| SWA | | 11,707 | — | 11,707 |
| Subtotal | | 158,857 | — | 158,857 |
| Total component units | $ | 205,136 | (36,688) | 168,448 |

The aforementioned custodial credit loss is mainly related to those discretely presented component units which issued their 2015 stand-alone financial statements considering the impact of the custodial credit loss. However, certain of the discretely presented component units issued their stand-alone financial statements without performing a custodial credit loss evaluation. Consequently, the certificates of deposit amounts reported by such discretely presented component units is overstated as of June 30, 2015.

The Commonwealth evaluated the availability and recoverability of the funds held at GDB that have not been subject to custodial credit loss considerations on their respective 2015 stand-alone financial statements, an additional custodial credit loss of approximately $39 million should have been recorded as of June 30, 2015 on the certificates of deposit held at GDB of the discretely presented component units. These additional amounts of custodial credit loss which should have been recognized as of June 30, 2015 are considered unaudited because they relate to entities and funds, which are audited by other auditors, that did not evaluate

146

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

the potential custodial credit loss of deposits at GDB in their respective separately issued financial statements.

As discussed in Note 2 (b), GDB is currently in a process directed to restructure its obligations. Such restructuring may require the offset between financial instruments assets and liabilities held by GDB. The proposed restructuring remains subject to different milestones. Upon an eventual restructuring of GDB obligations and the execution of the milestones noted in the GDB RSA, the recorded and unrecorded custodial credit loss on the certificates of deposit disclosed above may change.

*Subsequent Downgrades in Credit Ratings of Commonwealth's Bonds*

As explained in Note 22, subsequent to fiscal year 2015, several bonds of the Commonwealth and its instrumentalities were downgraded on multiple ocassions and by notches by the principal credit rating agencies in the United States. However, most of the existing investments in the tables above were not affected. Generally, the investment policies of the Commonwealth require its agencies and instrumentalities to hold only investment grade ratings debt securities in their investment portfolio. With over 85% and 75% of the investments at the Primary Government and component unit level, respectively, with credit ratings no lower than "A "or without risks at June 30, 2015, overall average credit ratings on the entire investment portfolio have remained within the Commonwealth's required investment policies, even after the downgrades. The remaining percentage of investments is either rated throughout the B spectrum or not rated, except for a SIFC (major component unit) investment in GDB bonds of approximately $98 million and for nonmajor component units' investments in GDB or Primary Government Bonds of approximately $705 million, both of which were downgraded to D after June 30, 2015.

**(6)   Securities Lending and Repurchase Agreement Transactions**

During the year, the pension trust funds (included within the fiduciary funds), GDB, EDB, and SIFC (all discretely presented component units) entered into transactions involving securities lending and the selling of securities with agreements to repurchase. These transactions are explained below:

*Pension Trust Funds*

The Retirement Systems participate in a securities lending programs, whereby investment securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, government securities, and/or irrevocable bank letters of credit equal to approximately 102% of the fair value of the domestic securities on loan and 105% of the fair value of the international securities on loan, with a simultaneous agreement to return the collateral for the same securities in the future. Collateral is marked to market daily, and the agent places a request for additional collateral from brokers, if needed. The custodian bank is the agent for the securities lending program.

147

CW_STAY0009935

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

At year end, the Retirement Systems had no credit risk exposure to borrowers because the amounts the Retirement Systems owed the borrowers (the collateral) exceeded the amounts the borrowers owed the Retirement Systems. At June 30, 2015, the collateral received represented 102% of the fair value of the domestic securities lent. The securities on loan for which collateral was received as of June 30, 2015, consisted of the following (in thousands):

| Description | | Fair value of underlying securities |
|---|---|---:|
| U.S. government securities: | | |
| U.S. Treasury bills | $ | 910 |
| U.S. Treasury notes | | 20,036 |
| U.S. Treasury note strips | | 40,234 |
| U.S. Treasury bonds | | 1,095 |
| U.S. Treasury Inflection-Protected Securities (TIPS) | | 1,086 |
| U.S. government sponsored agencies notes: | | |
| FHLB | | 1,094 |
| FNMA | | 2,672 |
| FHLMC | | 1,816 |
| U.S. corporate bonds and notes | | 27,790 |
| Non-U.S. corporate bonds and notes | | 7,434 |
| U.S. corporate stock | | 8 |
| Non-U.S. corporate stock | | 925 |
| Total | $ | 105,100 |

The underlying collateral for these securities had a fair value of approximately $107.4 million as of June 30, 2015. The collateral received was invested in a short-term investment fund sponsored by the custodian bank and is presented as collateral from securities lending transactions in the accompanying statement of fiduciary net position.

148

CW_STAY0009936

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

As of June 30, 2015, the distribution of the short-term investment fund by investment type is as follows (in thousands):

| Investment type | Fair value of underlying securities |
|---|---|
| Securities bought under agreements to resell | $ 106,031 |
| Commercial paper | 1,108 |
| Certificates of deposit | 285 |
| Total | $ 107,424 |

Under the terms of the securities lending agreement, the Retirement System is fully indemnified against failure of the borrowers to return the loaned securities (to the extent the collateral is inadequate to replace the loaned securities) or failure to pay the Retirement System for income distributions by the securities' issuers while the securities are on loan. In addition, the Retirement System is indemnified against loss should the lending agent fail to demand adequate and appropriate collateral on a timely basis.

*Discretely Presented Component Units*

GDB – The following is selected information concerning securities sold under agreements to repurchase (in thousands):

| | |
|---|---|
| Carrying amount at June 30, 2015 | $ 267,207 |
| Maximum amount outstanding at any month-end | 961,348 |
| Average amount outstanding during the year | 490,855 |
| Weighted average interest rate for the year | 0.32% |
| Weighted average interest rate at year-end | 0.02 |

The following summarizes the activity of securities sold under agreements to repurchase for the year ended June 30, 2015 (in thousands):

| | Beginning balance | Issuances | Maturities | Ending balance | Due Within one year |
|---|---|---|---|---|---|
| GDB Operating Fund | $ 50,000 | 7,427,688 | 7,210,481 | 267,207 | 267,207 |

149

CW_STAY0009937

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

All sales of investments under agreements to repurchase are for fixed terms. In investing the proceeds of securities sold under agreements to repurchase, GDB's policy is for the term to maturity of investments to be on or before the maturity of the related repurchase agreements. As of June 30, 2015, the total amount of securities sold under agreements to repurchase mature within one year.

SIFC – The Commonwealth statutes and the SIFC's board of directors' policies permit the SIFC to use its investments to enter into securities lending transactions, whereby securities are transferred to an independent broker or dealer in exchange for collateral in the form of cash, securities, and/or irrevocable bank letter of credit. The SIFC's securities custodian, JP Morgan Chase Bank, N.A., as agent of the SIFC, manages the securities lending program and receives cash collateral, securities, or irrevocable bank letters of credit as collateral. The collateral securities cannot be pledged or sold by the SIFC unless the borrower defaults. The collateral requirement is equal to 102% for securities issued in the United States of America and 105% for securities issued outside of the United States of America, of the fair value of the securities lent.Collateral must be supplemented by the next business day if its fair value falls to less than 100% of the fair value of the securities lent. All security loans can be terminated on demand by either the SIFC or the borrower. In lending securities, the term to maturity of the securities loans is matched with the term to maturity of the investment of the cash collateral. Such matching existed at year end. At year end, the SIFC has no credit risk exposure to borrowers because the amounts the SIFC owes the borrowers exceed the amounts the borrowers owe SIFC. Contracts with the lending agents require them to indemnify the SIFC if the borrowers fail to return the securities (and if the collateral is inadequate to replace the securities lent) or fail to pay the SIFC for income distributions by the securities' issuers while the securities are on loan.

Securities lent as of June 30, 2015 had a fair value of approximately $104.3 million and were secured with collateral received with a fair value of approximately $106.8 million. Securities lent for which cash was received as collateral as of June 30, 2015 consist of the following (in thousands):

| Investment type | | Fair value of underlying securities |
|---|---|---|
| Equity securities | $ | 84,197 |
| Corporate bonds and notes | | 11,646 |
| U.S. Treasury notes and bonds | | 751 |
| Foreign government and corporate bonds | | 623 |
| Total | $ | 97,217 |

150

CW_STAY0009938

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Cash collateral received as of June 30, 2015 amounted to approximately $99.4 million and was invested as follows (in thousands):

| Investment type | | Fair value of underlying securities |
|---|---|---|
| Certificates of deposit with other banks | $ | 52,500 |
| Resell agreements | | 36,434 |
| Commercial paper | | 7,495 |
| U.S. agency discounted notes | | 3,000 |
| Total | $ | 99,429 |

In addition, the SIFC had the following lending obligations as of June 30, 2015 for which securities were received as collateral (in thousands):

| | | Fair value | |
|---|---|---|---|
| Description | | Securities lent | Investment collateral received |
| U.S. Treasury bonds and notes | $ | 581 | 593 |
| Corporate bonds and notes | | 1,458 | 1,488 |
| Equity securities | | 5,107 | 5,246 |
| | $ | 7,146 | 7,327 |

EDB – EDB's investment policies, as authorized by Act No. 22 of July 24, 1985, Article 3, allow management to sell securities under agreements to repurchase. The following table summarizes certain information on securities sold under agreements to repurchase (in thousands):

| | | |
|---|---|---|
| Carrying amount at June 30, 2015 | $ | 28,756 |
| Average amount outstanding during the year | | 35,330 |
| Maximum amount outstanding at any month-end | | 40,800 |
| Weighted average interest rate for the year | | 0.44% |
| Weighted average interest rate at year-end | | 0.57 |

As of June 30, 2015, securities sold under agreements to repurchase were collateralized with mortgage backed securities, other government agencies securities, and other investments with a fair market value of approximately $31 million.

151

CW_STAY0009939

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The activity for securities sold under agreements to repurchase during 2015 was as follows (in thousands):

| | | Beginning balance | Issuances | Maturities | Ending balance | Due Within one year |
|---|---|---|---|---|---|---|
| Securities sold under agreements to repurchase | $ | 45,690 | 182,241 | (199,175) | 28,756 | 28,756 |

## (7) Receivables and Payables

*Governmental and Proprietary Funds*

Receivables in the governmental funds include approximately $1.5 billion of accrued income, excise, and sales and use taxes. Intergovernmental receivables include approximately $462.7 million from the federal government and $78.1 million from CRIM. In addition, the proprietary funds include $58.4 million of unemployment, disability, and drivers' insurance premium receivables; approximately $25.6 million receivable from private citizens, member institutions, and municipalities for patient services provided by the PRMeSA; and approximately $263.8 million receivable from the U.S. Department of Health, municipalities and private citizens and pharmacies for the related health insurance coverage services provided by PRHIA's operations. Payables in the governmental funds include approximately $1,109 million of trade accounts due to suppliers for purchase of merchandise and services rendered, approximately $374.6 million of salary related benefits owed to eligible police agents for annual salary increases, awards, and other monetary benefits granted to them through several laws dating back to 1954, approximately $7631 million of tax refunds payable and approximately $530.7 million in bank overdraft.

In accordance with GASB Technical Bulletin No. 2004 1, *Tobacco Settlement Recognition and Financial Reporting Entity Issue*, as amended (the TB), a receivable of $36.8 million was recorded as other receivable in the government-wide financial statements and in the nonmajor governmental funds for estimated shipments from January 1 to June 30, 2015, which will be applied to debt service upon collection. Additionally, the TB indicated that the trust designated as the Tobacco Settlement Authority (the Children's Trust in the case of the Commonwealth) should recognize a liability for the bonds payable and an expense (and liability if unpaid) in the same period in its stand-alone financial statements. The expense (and liability if unpaid) recognizes the contractual obligation to remit the proceeds of the bond sold to the settling government (the Commonwealth). Since the Children's Trust is reported as a blended component unit, the TB indicates these remittances should be reported as transfers into the fund receiving the proceeds and transfers out of the fund that accounts for the activities of the Tobacco Settlement Authority. Since the Children's Trust has no contractual obligation, under its enabling legislation or elsewhere, to remit all bond proceeds or assets related to the Tobacco Settlement Authority to the settling government (the Commonwealth), the Children's Trust has not recognized an expense and liability for unpaid proceeds from the bonds since it records the expense as amounts are disbursed as grants to its settling government (including its instrumentalities) or third parties.

*Pension Trust Funds*

Loans receivable from plan members are guaranteed by the contributions of plan members and by other sources, including mortgage deeds and any unrestricted amount remaining in the escrow funds. In addition,

152

CW_STAY0009940

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

collections on loans receivable are received through payroll withholdings. For the year ended June 30, 2015, the maximum amount of loans to plan members for mortgage loans was $100,000 for ERS and JRS and $125,000 for TRS, and $5,000 for personal and cultural trip loans for the three systems. During the year ended June 30, 2014 and 2013, ERS personal loans with principal balances amounting to approximately $100 million and $88 million, respectively, were sold to two financial institutions. As per the servicing agreement, ERS will be in charge of the servicing, administration and collection of loans and outstanding principal balances at the end of the closing date for a servicing fee of 2%.

The allowance for adjustments and losses in realization is considered a general allowance for all categories of loans and interest receivable, except mortgage loans, that is a specific allowance for the special collection project loans balances.

As of June 30, 2015, the composition of loans and interest receivable from plan members is summarized as follows (in thousands):

| | | |
|---|---|---:|
| Loans receivable from plan members: | | |
| Personal | $ | 609,253 |
| Mortgage | | 339,038 |
| Cultural trips | | 43,302 |
| Total loans to plan members | | 991,593 |
| Accrued interest receivable | | 37,430 |
| Total loans and interest receivable from plan members | | 1,029,023 |
| Less allowance for adjustments and losses in realization | | (4,983) |
| Total loans and interest receivable from plan members – net | $ | 1,024,040 |

As of June 30, 2015, accounts receivable from employers, included within accounts receivable in the accompanying statement of fiduciary net position, consisted of the following (in thousands):

| | | |
|---|---|---:|
| Early retirement programs | $ | 3,264 |
| Employer contributions under special laws | | 59,964 |
| Employer and employee contributions | | 330,140 |
| Interest on late payments | | 23,606 |
| Total accounts receivable from employers | | 416,974 |
| Less allowance for doubtful accounts receivable | | (233,615) |
| Accounts receivable from employers – net | $ | 183,359 |

According to Act No. 447 1991, each employer must pay, on a monthly basis, the amounts corresponding to contributions and loan repayments, on or before the fifteenth day of the following month. After that date, interest is charged as established by the Pension Trust Fund.

153

CW_STAY0009941

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The Commonwealth and many of its instrumentalities and municipalities, which are employers for the purpose of ERS and JRS, have been facing significant fiscal and economic challenges. Further, in recent months, the rating downgrade and widening of credit spreads for Puerto Rico's public-sector debt, including public corporations, has put further strain on liquidity and sources of funding for the employers. Consequently, most of the receivables from employers are delinquent past established payment dates and/or installment plan due dates. In other instances, amounts past due continue to be renegotiated to later dates.

As of June 30, 2015, ERS and JRS recorded an allowance of approximately $222 million and $11.6 million respectively, for adjustments and losses in realization related to the uncertain collectability of the additional uniform contributions due from the Commonwealth.

Although certain measures have been taken to improve the collection of such receivables, the timing of collections from employers affects the liquidity needs of ERS and JRS. Management is of the opinion that, except for the additional uniform contributions of the Commonwealth of approximately $151.4 million due to ERS for the fiscal years 2014 and 2015 and approximately $11.6 million due to JRS for the fiscal year 2015, other amounts due from employers are collectible; however, this situation could ultimately affect the payment of benefits to members or repayment of ERS's bonds payable, should any such amounts become uncollectible in the future.

As of June 30, 2015, accounts receivable from employers include amounts due from PRMeSA of approximately $49 million (recorded within ERS), as follow (in thousands):

| | | |
|---|---|---:|
| Employer and employee contributions | $ | 25,197 |
| Withholdings of employees' loans | | 1,613 |
| Interest | | 22,243 |
| Total accounts receivable from PRMeSA | $ | 49,053 |

Amounts due from PRMeSA as of June 30, 2015 mainly consists of accrued pension costs corresponding to fiscal years 2013 through 2015 amounting to approximately $45 million, which have no repayment plan and those related to fiscal year 2011 under the repayment plan referred to below amounting to approximately $3 million.

On November 1, 2011, PRMeSA and ERS entered into a payment plan agreement (the Agreement) for the repayment of a debt amounting to approximately $15.3 million, at such date, corresponding to fiscal year 2011. Beginning on November 15, 2011, the agreement calls for sixty (60) monthly installments of $255,677 bearing no interest. Default payments of less than one year in default will bear interest at 9% and 12% for those in excess of one year.

Future minimum payments for the next year 2016 is approximately $1,023,000.

154

CW_STAY0009942

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

*Discretely Presented Component Units – GDB*

At June 30, 2015, loans from GDB to public corporations and agencies of the Commonwealth (excluding municipalities) amounting to $6.5 billion are repayable from the following sources (in thousands):

| | Amount |
|---|---|
| Repayment source: | |
| Proceeds from future bond issuances | $ 1,787,944 |
| General fund and/or legislative appropriations | 3,537,187 |
| Operating revenues | 1,153,118 |
| Other | 12,411 |
| Total | $ 6,490,660 |

For the year ended June 30, 2015, disbursements and collections of principal of public-sector loans payable by future bond issuances amounted to approximately $38.2 million and $6 million, respectively. Public-sector loans payable by the Commonwealth's General fund and/or appropriations had disbursements and collections of principal amounting to approximately $3,090 million and $2,858 million, respectively during the year ended June 30, 2015. Public-sector loans payable by operating revenue and other sources of repayment had disbursements and collections of principal amounting to approximately $132.9 million and $101.6 million, respectively during the year ended June 30, 2015.

At June 30, 2015, approximately $3.5 billion of the public-sector loans are payable from legislative appropriations or future tax revenue of the Commonwealth. Accordingly, the payment of these loans may be affected by budgetary constraints and the overall fiscal situation impacting Puerto Rico.

As of June 30, 2015, the PRHTA had an authorized maximum of approximately $2,015.9 million in financing with GDB, with an outstanding balance of approximately $2,012.9 million in principal. Historically, these facilities were repaid from proceeds of bond issuances. All of these facilities have been extended repeatedly and have not been paid as scheduled. On December 1, 2015, the Commonwealth announced its intention to retain certain taxes and revenues that were conditionally allocated to certain public corporations and agencies, including the PRHTA.

PRHTA is currently in a debt restructuring proceeding under Title III of PROMESA and does not currently have sufficient funds available to fully repay its various obligations, including those owed to GDB, as they come due or that are currently in default.

As of June 30, 2015, the majority of loans to public corporations and agencies totaling approximately $6.1 billion were classified as nonaccrual. Interest income that would have been recorded if under the original term of these loans amounted approximately $374.8 million in fiscal year 2015. Actual interest collected during fiscal year 2015 on these loans amounted approximately $203.5 million.

155

CW_STAY0009943

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

GDB considers the public-sector loan portfolio to be impaired based on current information and events, including the significant delays in the receipt of the scheduled debt service payment mentioned above. In Management's opinion, it is highly probable that GDB will be unable to collect all amounts due according to the loan's original contractual terms. GDB's evaluation of impaired loans consisted of identifying which public-sector loans have reliable or unreliable sources of repayment, respectively. Loans with reliable sources of repayment that were performing were evaluated collectively. Loans with unreliable sources of repayment were evaluated for impairment individually. Impaired loans are measured individually based on the present value of expected future cash flows discounted at the loan's effective interest rate, or if the loan is collateral dependent, the fair value of the collateral.

During fiscal year 2015, GDB recognized a provision for loan losses of approximately $3.5 billion for inherent credit losses in its public-sector loan portfolio. As of June 30, 2015, the public-sector loan portfolio had an allowance for loan losses in the amount of $2.9 billion. Historically, no charge-off has been recorded by GDB in its public-sector loan portfolio.

Loans to municipalities amounted to approximately $2.5 billion at June 30, 2015. For the year ended June 30, 2015, municipal sector loan disbursements and collections amounted to approximately $122 million and $155 million, respectively. These loans include approximately $1.4 billion at June 30, 2015, which are collateralized by a pledge of a portion of property tax assessments of each municipality. Loans pledged with property tax assessments include bonds and notes issued by Puerto Rico municipalities which are originated by GDB as bridge financing. Approximately $539 million in loans to municipalities at June 30, 2015, are collateralized by a pledge of a portion of municipal sales tax deposited in specially-designated accounts with GDB. The funds available in such accounts increase the borrowing capacity of the corresponding municipality. Approximately $481 million in loans to municipalities at June 30, 2015, were provided mainly as interim loans to finance capital expenditures that are payable from revenues to be generated from a specific revenue generating project associated with the loan or to cover operating losses. Once operating loans are approved and if the municipality is not servicing the debt with its own funds, GDB informs the Municipal Revenue Collection Center (CRIM for its Spanish acronym) in order to withhold property taxes revenues and remit them directly to GDB before they are distributed to the municipalities. Approximately $1.9 million in municipalitiy loans were identified as delinquent as of June 30, 2015. No interest was collected on these loans during the year ended June 30, 2015.

Loans to the private sector include the outstanding principal balance of credit facilities granted by GDB and its different subsidiaries to private enterprises in Puerto Rico, the activities of which are deemed to further the economic and tourism development of Puerto Rico. Loans to the private sector also include the outstanding principal balance of mortgage loans granted to low and moderate-income families for the acquisition of single family housing units and to developers of low and moderate income multifamily housing units in Puerto Rico. These credit facilities, net of allowance for loan losses, amounted to approximately $420 million at June 30, 2015, of which approximately $320 million are mortgage loans for low and moderate-income housing units, approximately $74 million are for tourism projects and approximately $26 million are manufacturing loans. Private sector loans classified as nonaccrual amounted to approximately $286 million at June 30, 2015, and had a corresponding allowance for loan losses of $199 million as of June 30, 2015. Interest income that would have been recorded if these loans had been performing in accordance with their original terms was approximately $9 million in 2015.

156

                                    CW_STAY0009944

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

**(8) Conditionally Allocated Receivables and Future Revenue**

*(a) COFINA Revenue*

Act No. 91 of 2006, as amended, establishes the Dedicated Sales Tax Fund, a special revenue fund held by COFINA. The Act requires that the greater of the following amounts be deposited in the Dedicated Sales Tax Fund each fiscal year for the payment of COFINA bonds: (i) a minimum fixed amount, referred to as the "Base Amount" and (ii) the revenue generated by up to 2.75% of the Commonwealth's sales and use tax. The Base Amount in fiscal year ended June 30, 2015 amounted to approximately $669.5 million. For fiscal year 2015, debt service paid by COFINA amounted approximately to $643.7 million.

*(b) PRIFA Assigned Revenue*

The following revenue (collectively, the PRIFA Allocated Revenue) has been conditionally allocated by the Commonwealth to PRIFA, subject to the provisions of Article VI, Section 8, of the Puerto Rico Constitution. As further discussed in Note 2 and Note 22, the PRIFA Allocated Revenues are currently being retained by the Commonwealth.

*(i) Federal Excise Taxes*

Rum manufactured in Puerto Rico is subject to federal excise taxes once exported to the United States; however, the revenue generated by such excise taxes is returned by the IRS to the Commonwealth. Act No. 44 of June 21, 1988, as amended (the RIFA Act), requires that the first $117 million of certain federal excise taxes received by the Commonwealth be transferred to PRIFA, a blended component unit of the Commonwealth, each fiscal year. Such taxes consist of the federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States. PRIFA applies these taxes to the repayment of PRIFA's Special Tax Revenue Bonds. Receipt of the federal excise taxes securing the bonds is subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. The amount of federal excise taxes to be received by the Commonwealth is currently expected to decrease, although the exact amount cannot be determined. If the federal excise taxes received by the Commonwealth in any fiscal year are less than $117 million, the PRIFA Act requires that PRIFA request, and the Director of the Commonwealth OMB include in the budget of the Commonwealth for the corresponding fiscal year, an appropriation sufficient to cover such deficiency. The Legislature, however, is not required to make such appropriation. For the year ended June 30, 2015, of the total of $117 million received by PRIFA from the Commonwealth, a total of $113 million was conditionally allocated for the debt service of the Special Tax Revenue Bonds. For fiscal year 2015, debt service paid on Special Tax Revenue Bonds by PRIFA amounted to $112.3 million.

157

CW_STAY0009945

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

(ii)   *Petroleum Products Tax*

Recently, the PRIFA Act and the Puerto Rico Internal Revenue Code of 2011, as amended (the Puerto Rico Code) were amended by Act No. 1 of 2015, as amended, in order to impose a new petroleum products tax on nondiesel products ($6.25 initially) and to assign the revenue therefrom to PRIFA to secure the payment of certain of its bonds and notes, in particular, the Dedicated Tax Fund Revenue Bond Anticipation Notes issued on March 16, 2015 to redeem certain PRHTA Special Revenue Bonds 2013A Bond Anticipation Notes. For fiscal year 2015, debt service paid on the Dedicated Tax Fund Revenue Bond Anticipation Notes issued by PRIFA amounted to $4 million, all representing interest.

**(c)   *PRHTA Allocated Revenue***

The following revenues (collectively, the PRHTA Allocated Revenues) have been conditionally allocated by the Commonwealth to PRHTA, subject to the provisions of Article VI, Section 8 of the Puerto Rico Constitution. As further discussed in Note 2 and Note 22, the PRHTA Allocated Revenues are currently being retained by the Commonwealth pursuant to Article VI, Section 8 of the Puerto Rico Constitution.

(i)   *Gasoline and Gas Oil Taxes*

The Puerto Rico Code currently imposes a $0.16 per gallon tax on gasoline and a $0.04 per gallon tax on gas oil and diesel oil. By law, the Commonwealth has conditionally allocated the entire $0.16 tax on gasoline and $0.04 tax on gas oil and diesel oil to PRHTA as a source of revenue.

(ii)   *License Fees*

Under Act No. 22 of 2000, as amended, known as the "Vehicle and Traffic Law," the Commonwealth imposes annual license fees on various classes of motor vehicles. Fifteen dollars ($15) of each such annual license fee were conditionally allocated to PRHTA to be used as a source of revenue. Act No. 30 of 2013 conditionally assigned the remaining twenty-five dollars ($25) of each such annual license fee to PRHTA.

(iii)   *Petroleum Products Tax*

The Puerto Rico Code also allocates to PRHTA $9.50 per barrel or fraction thereof of petroleum products exercise tax (which include crude oil, unfinished oil, and derivative products). The tax is imposed on any petroleum product introduced, consumed, sold, or transferred in the Commonwealth.

(iv)   *Cigarette Tax*

A portion of the proceeds of the cigarette tax imposed by Section 3020.05 of the Puerto Rico Code (approximately $20 million) has been conditionally allocated to PRHTA.

**(d)   *PRCCDA Allocated Revenue***

Article 24 of Act No. 272 of 2003, as amended, imposes a hotel occupancy tax on all hotels and motel accommodations on the island (the Hotel Occupancy Tax). A portion of the proceeds of the Hotel Occupancy Tax (the PRCCDA Allocated Revenue) has been conditionally allocated to PRCCDA for the payment of PRCCDA's bonds, subject to the provisions of Article VI, Section 8 of the Puerto Rico

158

CONFIDENTIAL

CW_STAY0009946

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Constitution. As further discussed in Note 2 and Note 22, the PRCCDA Allocated Revenues are currently being retained by the Commonwealth.

### (e) PRMBA Allocated Revenue

A portion of the proceeds of the cigarette tax imposed by Section 3020.05 of the Puerto Rico Code (the PRMBA Allocated Revenue) has been conditionally allocated to PRMBA for the payment of certain PRMBA debt obligations, subject to the provisions of Article VI, Section 8, of the Puerto Rico Constitution. As further discussed in Note 2 and Note 22, the PRMBA Allocated Revenues are currently being retained by the Commonwealth.

### (f) The Children's Trust Revenue

The Children's Trust is a public trust ascribed to GDB, created pursuant to Act No. 173 1999 (Act No. 173). Through Act No. 173, the Commonwealth allocated and transferred to the Children's Trust all of its rights, title, and interest in a settlement agreement entered into by and among the Commonwealth, 46 states and several cigarette manufacturers (the Tobacco Settlement Agreement), including the Commonwealth's right to receive certain annual payments from such cigarette manufacturers (the TSRs). The TSRs, otherwise deliverable to the General Fund, were allocated to the Children's Trust in consideration of the issuance of bonds by the Children's Trust and the application of the proceeds thereof to fund certain social programs.

## (9) Interfund and Intraentity Activity

Interfund receivables and payables at June 30, 2015 are summarized as follows (in thousands):

| Receivable Fund | Payable Fund | | |
|---|---|---|---|
| Nonmajor governmental | COFINA debt service | $ | 218,405 |
| Puerto Rico Medical Service Administration | General | | 15,337 |
| Nonmajor governmental | General | | 19,549 |
| Nonmajor proprietary | General | | 14,431 |
| General | Unemployment insurance | | 8,494 |
| Nonmajor proprietary | Nonmajor governmental | | 2,630 |
| General | Nonmajor governmental | | 2,550 |
| Lotteries | General | | 3,876 |
| | | $ | 285,272 |

159

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Transfers from (to) other funds for the year ended June 30, 2015 are summarized as follows (in thousands):

| Transferee Fund | Transferor Fund | |
|---|---|---:|
| Puerto Rico Health Insurance Administration (a) | General | $ 892,259 |
| Debt service (b) | General | 861,298 |
| Nonmajor governmental ( c ) | General | 614,565 |
| General (d) | Lotteries | 198,067 |
| General (e) | Unemployment Insurance | 44,395 |
| Puerto Rico Medical Services Administration (f) | General | 33,464 |
| General (g) | Nonmajor proprietary | 23,161 |
| COFINA Special Revenue (h) | COFINA debt service | 19,509 |
| Nonmajor governmental (i) | COFINA debt service | 14,751 |
| Nonmajor proprietary (j) | General | 3,830 |
| General (k) | COFINA debt service | 2,462 |
| Puerto Rico Water Pollution Control Revolving Loan Fund (l) | General | 433 |
| | | $ 2,708,194 |

The principal purposes of the interfund transfers are to (in thousands):

a. Transfer of $892,259 from the General Fund to the Puerto Rico Health Insurance Administration to provide funds to cover operational expenditures and Medicaid funds' matching.

b. Transfer of $861,298 from the General Fund to the Debt Service Fund to make funds available for debt service payments on general obligation bonds.

c. Recognizes transfers of $340,866 for the rental payments made by the Commonwealth's agencies on properties leased by the PBA, a blended component unit of the Commonwealth; $71,514 related to the revenue received from the Tobacco Settlement Agreement managed by The Children's Trust, a blended component unit of the Commonwealth; $11,077 related to the SCPT for the payment of its debt ($10,939) and its operations ($138); $175,446 to PRIFA for the payment of debt and capital projects; $6,837 to PRMSA for the payment of interests on appropriation debts; $8,500 to UPRCCC to provide funds to cover operational expenditures; and $325 to PAA for the payment of debt.

d. Transfer of $198,067 from the Lotteries to the General Fund to distribute the increase in net assets of the Lotteries for the use of the General Fund, as required by the Lotteries enabling legislation.

e. Transfer of $44,395 from the Unemployment Insurance Fund related to the distribution of surplus cash corresponding to the General Fund for the payment of administrative expenses.

160

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

f.   Transfer of $33,464 from the General Fund to Puerto Rico Medical Service Administration, a major proprietary fund, to make funds available for debt service payments, capital projects, and operating expenses.

g.   Transfer from Disability Insurance Fund related to the distribution of surplus cash to the General Fund ($5,455) and from 9 1 1 Services ($17,706) to reimburse the General Fund for expenses assistance provided on emergency calls services.

h.   Transfer of $19,509 from the COFINA Debt Service Fund to make funds available to the COFINA Special Revenue Fund for ultimate financing of certain General Fund's operational expenditures.

i.   Recognize as transfers of $14,751, the interest income earned by PRIFA, a blended component unit, on its investment on bonds issued by COFINA, another blended component unit, wherean interest expense is incurred by the same amount.

j.   Transfer of $3,830 to provide local matching funds from the General Fund to the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, a nonmajor enterprise fund of the Commonwealth.

k.   Transfer of $2,462 from the COFINA Debt Service Fund to the General Fund to finance the General Fund's operational expenditures.

l.   Transfer of $433 to provide local matching funds from the General Fund to the Puerto Rico Water Pollution Control Revolving Fund, a major enterprise fund of the Commonwealth.

Interfund receivables and payables represent the pending settlements of the aforementioned transfers or transactions from current and prior years.

CONFIDENTIAL

CW_STAY0009949

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

Due to the Primary Government from component units are as follows (in thousands):

| Payable entity | | General fund | Nonmajor governmental Public Building Authority | Puerto Rico Water Pollution Control Revolving Fund | Nonmajor proprietary Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total due from component units |
|---|---|---|---|---|---|---|
| | | | | Receivable entity | | |
| Major component units: | | | | | | |
| Puerto Rico Aqueduct and Sewer Authority | $ | — | — | 384,879 | 170,510 | 555,389 |
| Puerto Rico Highway and Transportation Authority | | 8,439 | 8,076 | — | — | 16,515 |
| State Insurance Fund | | 17,000 | — | — | — | 17,000 |
| Nonmajor component units: | | | | | | |
| Cardiovascular Center Corporation for Puerto Rico and the Caribbean | | — | 21,155 | — | — | 21,155 |
| Puerto Rico Land Administration | | 1,191 | — | — | — | 1,191 |
| Puerto Rico and Municipal Island Maritime Transport Authority | | 2,573 | — | — | — | 2,573 |
| Puerto Rico Metropolitan Bus Authority | | 40,139 | — | — | — | 40,139 |
| Puerto Rico Ports Authority | | 41,243 | — | — | — | 41,243 |
| Puerto Rico Tourism Company | | 2,643 | — | — | — | 2,643 |
| Subtotal due from component units | | 113,228 | 29,231 | 384,879 | 170,510 | 697,848 |
| Allowance for uncollectible balances | | (48,578) | (29,187) | — | — | (77,765) |
| | $ | 64,650 | 44 | 384,879 | 170,510 | 620,083 |

162

CW_STAY0009950

**COMMONWEALTH OF PUERTO RICO**

Note to the Basic Financial Statements

June 30, 2015

The amount owed by PRASA of approximately $555 million represents construction loans granted by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, nonmajor proprietary funds, to finance the construction of capital assets for PRASA. PRASA has not made the required deposits under the debt agreement related to this debt (see Note 2).

Due to component units from the Primary Government are as follows (in thousands):

| | | | | Payable entity | | | |
| | | Nonmajor governmental | | Puerto Rico | | | |
| Receivable entity | General fund | Public Building Authority | UPR Comprehensive Cancer Center | Medical Services Administration | Total due to component units | Allowance for uncollectible balance | Total due to component units |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Puerto Rico Electric Power Authority | $ 76,948 | 5,927 | — | 22,207 | 105,082 | (26,251) | 78,831 |
| Puerto Rico Aqueduct and Sewer Authority | 29,823 | 1,620 | — | 4,541 | 35,984 | (17,025) | 18,959 |
| University of Puerto Rico | 22,018 | — | 1,206 | 7,768 | 30,992 | — | 30,992 |
| Puerto Rico Highway and Transportation Authority | 59,798 | — | — | — | 59,798 | — | 59,798 |
| Nonmajor component units: | | | | | | | |
| Agricultural Enterprises Development Administration | 57,783 | — | — | — | 57,783 | (24,576) | 33,207 |
| Solid Waste Authority | 3,252 | — | — | — | 3,252 | — | 3,252 |
| Land Authority of Puerto Rico | 9,716 | — | — | — | 9,716 | — | 9,716 |
| Puerto Rico Industrial Development Company | 1,025 | — | — | — | 1,025 | — | 1,025 |
| Puerto Rico Ports Authority | 14,750 | — | — | — | 14,750 | (14,750) | — |
| Total due to | $ 275,113 | 7,547 | 1,206 | 34,516 | 318,382 | (82,602) | 235,780 |

163

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Due from (to) component units are as follows (in thousands):

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Receivable entity | | | | | | | | | | | | |
| | Major component units | | | | | | Nonmajor component units | | | | | | |
| Payable entity | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | SIFC | Farm Insurance Corporation of Puerto Rico | Land Authority of Puerto Rico | Puerto Rico Convention Center District Authority | Puerto Rico Land Administration | Puerto Rico Metropolitan Bus Authority | Puerto Rico Ports Authority | Total due to component units |
| **Major component units:** | | | | | | | | | | | | | |
| Puerto Rico Highways and Transportation Authority | $ 2,012,979 | — | 43,657 | — | — | 1,101 | — | — | — | — | 4,254 | 6,088 | 2,068,079 |
| University of Puerto Rico | 96,078 | — | 17,230 | — | — | — | — | — | — | — | — | — | 113,308 |
| Puerto Rico Aqueduct and Sewer Authority | 75,366 | — | 37,253 | — | — | — | — | — | — | — | — | — | 112,619 |
| Puerto Rico Electric Power Authority | 35,846 | — | — | 3,468 | — | — | — | — | — | — | — | — | 39,314 |
| State Insurance Fund Corporation | — | — | 1,268 | — | — | — | — | — | — | — | — | — | 1,268 |
| **Nonmajor component units:** | | | | | | | | | | | | | |
| Puerto Rico Ports Authority | 285,635 | 1,832 | 16,107 | 13,415 | — | 3,704 | — | — | — | — | — | — | 320,693 |
| Puerto Rico Convention Center District Authority | 145,285 | — | — | — | — | — | — | — | — | — | — | — | 145,285 |
| Puerto Rico Municipal Finance Corporation | 111,320 | — | — | — | — | — | — | — | — | — | — | — | 111,320 |
| Agricultural Enterprises Development Administration | 92,826 | — | — | — | — | — | 4,447 | 5,527 | — | — | — | — | 102,800 |
| Puerto Rico Industrial Development Company | 86,325 | — | — | — | — | — | — | — | — | — | — | — | 86,325 |
| Solid Waste Authority | 71,861 | — | 5,784 | — | — | — | — | — | — | — | — | — | 77,645 |
| Puerto Rico and Municipal Islands Maritime Transport Authority | — | 31,320 | 1,435 | 1,514 | — | 3,083 | — | — | — | — | — | 38,627 | 75,979 |
| Land Authority of Puerto Rico | 31,080 | — | 5,723 | — | — | — | — | — | — | 2,095 | — | — | 38,898 |
| Company for the Integral Development of the "Peninsula de Cantera" | 37,107 | 1,173 | — | — | — | — | — | — | — | — | — | — | 38,280 |
| Cardiovascular Center Corporation of Puerto Rico and the Caribbean | — | — | 15,034 | — | — | — | — | — | — | — | — | — | 15,034 |

164

CONFIDENTIAL

CW_STAY0009952

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

| | Major component units | | | | | | Nonmajor component units | | | | | | |
| Payable entity | Government Development Bank for Puerto Rico | Puerto Rico Highways and Transportation Authority | Puerto Rico Electric Power Authority | Puerto Rico Aqueduct and Sewer Authority | University of Puerto Rico | SIFC | Farm Insurance Corporation of Puerto Rico | Land Authority of Puerto Rico | Puerto Rico Convention Center District Authority | Puerto Rico Land Administration | Puerto Rico Metropolitan Bus Authority | Puerto Rico Ports Authority | Total due to component units |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nonmajor component units: | | | | | | | | | | | | | |
| Puerto Rico Tourism Company | $ — | — | — | — | 5,435 | — | — | — | 5,880 | — | — | 1,515 | 12,830 |
| Puerto Rico Metropolitan Bus Authority | — | — | 6,335 | — | — | 4,883 | — | — | — | — | — | — | 11,218 |
| Economic Development Bank for Puerto Rico | 8,394 | — | — | — | — | — | — | — | — | — | — | — | 8,394 |
| Puerto Rico Public Private Partnerships Authority | 5,101 | — | — | — | — | — | — | — | — | — | — | — | 5,101 |
| Farm Insurance Corporation of Puerto Rico | — | — | — | — | — | — | — | 4,892 | — | — | — | — | 4,892 |
| Institute of Puerto Rican Culture | 3,326 | — | — | — | — | — | — | — | — | — | — | — | 3,326 |
| Puerto Rico Trade and Export Company | — | — | 1,483 | — | — | — | — | — | — | — | — | — | 1,483 |
| Puerto Rico Conservatory of Music Corporation | — | — | 1,024 | — | — | — | — | — | — | — | — | — | 1,024 |
| Subtotal due from component units | 3,098,529 | 34,325 | 152,333 | 18,397 | 5,435 | 12,771 | 4,447 | 10,419 | 5,880 | 2,095 | 4,254 | 46,230 | 3,395,115 |
| Allowance for uncollectible balances | (2,886,969) | (34,325) | (56,527) | (12,898) | — | — | — | — | — | — | — | (38,627) | (3,029,346) |
| Total due from component units | $ 211,560 | — | 95,806 | 5,499 | 5,435 | 12,771 | 4,447 | 10,419 | 5,880 | 2,095 | 4,254 | 7,603 | 365,769 |

165

(Continued)

CONFIDENTIAL

CW_STAY0009953

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The amount due from component units presented by GDB of approximately $3 billion (before allowance for uncollectible accounts) represents loan balances owed to GDB by other Commonwealth's component units. The rest of the loans receivable reported by the GDB consists of the following (in thousands):

| | | |
|---|---|---:|
| Primary government – governmental activities | $ | 2,857,559 |
| Primary government – business-type activities | | 484,797 |
| Other governmental entities and municipalities | | 2,514,140 |
| Private sector, net of allowance for loan losses | | 419,647 |
| Total loans receivable reported by GDB | | 6,276,143 |
| Less allowance for public sector loans | | (3,162,941) |
| | $ | 3,113,202 |

The loans to the Primary Government are presented by the Commonwealth within notes payable in the statement of net position.

Expenses of the Primary Government include approximately $1.8 billion in capital and operational contributions made by the Primary Government to the component units as follows (in thousands):

| | | |
|---|---|---:|
| University of Puerto Rico | $ | 873,833 |
| Puerto Rico Highways and Transportation Authority | | 646,972 |
| Puerto Rico Aqueduct and Sewer Authority | | 9,867 |
| Nonmajor components units | | 280,615 |
| Total contributions made by primary government to component units | $ | 1,811,287 |

166

(Continued)

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(10) Capital Assets**

Capital assets activity for the year ended June 30, 2015 is as follows (in thousands):

*Primary Government*

| | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Governmental activities: | | | | |
| Land and other nondepreciable assets: | | | | |
| Land | $ 933,984 | 4,667 | 1,526 | 937,125 |
| Construction in progress | 1,256,696 | 248,797 | 155,385 | 1,350,108 |
| Total land and other nondepreciable assets | 2,190,680 | 253,464 | 156,911 | 2,287,233 |
| Buildings and building improvements | 9,642,485 | 353,913 | 26,299 | 9,970,099 |
| Equipment, furniture, fixtures, vehicles, and software | 713,073 | 20,076 | 8,340 | 724,809 |
| Infrastructure | 599,682 | — | — | 599,682 |
| Total other capital assets, being depreciated and amortized | 10,955,240 | 373,989 | 34,639 | 11,294,590 |
| Less accumulated depreciation and amortization for: | | | | |
| Buildings and building improvements | 3,786,888 | 271,622 | 11,804 | 4,046,706 |
| Equipment, furniture, fixtures, vehicles, and software | 501,410 | 37,333 | 6,880 | 531,863 |
| Infrastructure | 167,584 | 12,231 | — | 179,815 |
| Total accumulated depreciation and amortization | 4,455,882 | 321,186 | 18,684 | 4,758,384 |
| Total other capital assets, net of depreciation and amortization | 6,499,358 | 52,803 | 15,955 | 6,536,206 |
| Governmental activities capital assets, net | $ 8,690,038 | 306,267 | 172,866 | 8,823,439 |

167 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

| | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Business-type activities: | | | | |
| Land and other nondepreciable assets: | | | | |
| Land | $ 6,872 | 16,683 | — | 23,555 |
| Construction in progress | — | 3,282 | — | 3,282 |
| Total capital assets, not being depreciated | 6,872 | 19,965 | — | 26,837 |
| Building and building improvements | 105,078 | 2,763 | 108 | 107,733 |
| Equipmen | 93,396 | 2,423 | 2,186 | 93,633 |
| Total other capital assets being depreciated and amortized | 198,474 | 5,186 | 2,294 | 201,366 |
| Less accumulated depreciation and amortization for: | | | | |
| Building and building improvements | 64,980 | 2,338 | 108 | 67,210 |
| Equipment | 74,282 | 4,051 | 1,960 | 76,373 |
| Total accumulated depreciation and amortization | 139,262 | 6,389 | 2,068 | 143,583 |
| Total business-type activities other capital assets, net of depreciation and amortization | 59,212 | (1,203) | 226 | 57,783 |
| Total business-type activities capital assets, net | $ 66,084 | 18,762 | 226 | 84,620 |

168

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Depreciation and amortization expense was charged to functions/programs of the Primary Government for the year ended June 30, 2015 as follows (in thousands):

| | | |
|---|---|---:|
| Governmental activities: | | |
| General government | $ | 108,335 |
| Public safety | | 36,478 |
| Health | | 8,719 |
| Public housing and welfare | | 120,475 |
| Education | | 30,648 |
| Economic development | | 16,531 |
| Total depreciation and amortization expense – governmental activities | $ | 321,186 |

The Commonwealth annually performs an impairment analysis of its capital assets in accordance with the provisions of GASB Statement No. 42. The current year's analysis identified approximately $900 thousand of impairments, recognized by the Governmental Activities in the statement of Governmental Activities for the year ended June 30, 2015.

General infrastructure assets include $427 million representing costs of assets transferred to the Department of Natural and Environmental Resources (DNER) of the Commonwealth (at cost) in 1997 upon completion of the Cerrillos Dam and Reservoir and the Portugues River and Bucana River Projects (the Cerrillos Dam and Reservoir Project) by the United States (U.S.) Army Corps of Engineers. These infrastructure assets are reported within Governmental Activities and include dams, intake facilities, and similar items built for flood control, water supply, and recreational purposes. The depreciation is computed using the straight-line method over an estimated useful life of 50 years from the transfer date of the property. Late in April 2011, the Commonwealth received a final debt agreement from the U.S. Army Corps of Engineers establishing a repayment schedule for its allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project, excluding those costs for items built for recreational purposes, amounting to $214 million. On March 21, 2014, the debt agreement with the U.S. Army Corps of Engineers was modified to reduce the interest rate and the annual payment for the remaining term of the debt. The Commonwealth's unpaid allocated share of these construction costs associated with the Cerrillos Dam and Reservoir Project amounted to $190.2 million at June 30, 2015. The Commonwealth also recorded a payable to the U.S. Army Corp of Engineers, amounting to approximately $15.8 million, for its estimated allocated share of the construction costs associated with the recreational part of the Cerrillos Dam and Reservoir Project. (see Note 12(p)).

(Continued)

CONFIDENTIAL

CW_STAY0009957

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On February 24, 2012, PRIFA, a blended component unit, entered into an Assistance Agreement with the Puerto Rico Department of Justice (PRDOJ) and GDB to acquire, refurbish, and operate a property to be used for the relocation of the PRDOJ's main offices. In connection with the Assistance Agreement, GDB provided a $35 million credit facility to PRIFA to undertake the acquisition and administration of this property and manage the initial phase of the rehabilitation and refurbishment of the property. On March 8, 2012, PRIFA acquired the property for approximately $27 million. The relocation of the PRDOJ's main offices never materialized but PRIFA has been working with gradually securing lease agreements with other governmental entities and third parties. The credit facility is secured by a mortgage lien on the property, and is payable from future appropriations from the Commonwealth and from the assignment of current and any future lease agreement.

PRIFA has also issued certain bonds and notes to finance the construction of certain capital projects for the benefit of PRASA, municipalities and other agencies and instrumentalities of the Commonwealth. The capital projects include the construction of infrastructure and buildings to be used in the operations of, and managed by, PRASA, the municipalities and other agencies in their respective operations. The capital projects, including the land acquired, are included as part of PRIFA's capital assets until construction is completed and the conditions for transfers to the ultimate beneficiaries are met. During the year ended June 30, 2015, PRIFA incurred approximately $4.5 million in construction costs for the benefit of other instrumentalities of the Commonwealth.

In October 2010, PRIFA entered into a memorandum of understanding with PPPA, PBA, Puerto Rico Department of Education, DTPW and GDB for the administration of the Schools for the 21st Century Program (the 21st Century Program). Construction in process at June 30, 2015 includes $31.9 million related to this program. The program consists of remodeling over 100 schools throughout Puerto Rico. To finance the program, the PBA issued government facilities revenue bonds in the amount of $878 million during the fiscal year ended June 30, 2012 of which $69.5 million are deposited in construction funds, within PBA's capital project fund, at June 30, 2015.

170                                                                                           (Continued)

CONFIDENTIAL                                                                                           CW_STAY0009958

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Discretely Presented Component Units*

Capital assets activity for discretely presented component units for the year ended June 30, 2015 is as follows (in thousands):

| Major component units | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Land and other nondepreciable assets: | | | | |
| Land | $ 2,192,017 | 14,143 | 11,759 | 2,194,401 |
| Construction in progress | 2,014,954 | 714,659 | 860,670 | 1,868,943 |
| Total capital assets not being depreciated/ amortized | 4,206,971 | 728,802 | 872,429 | 4,063,344 |
| Other capital assets being depreciated/ amortized: | | | | |
| Buildings and building improvements | 2,879,861 | 567,148 | 15,207 | 3,431,802 |
| Equipment, furniture, fixtures, vehicles, and software | 10,796,055 | 107,092 | 42,800 | 10,860,347 |
| Infrastructure | 29,492,220 | 318,070 | 135,075 | 29,675,215 |
| Intangibles, other than software | 4,969 | — | — | 4,969 |
| Total other capital assets, being depreciated/ amortized | 43,173,105 | 992,310 | 193,082 | 43,972,333 |
| Less accumulated depreciation/ amortization for: | | | | |
| Buildings and building improvements | 1,675,527 | 419,992 | 17,273 | 2,078,246 |
| Equipment, furniture, fixtures, vehicles, and software | 2,394,313 | 72,987 | 22,855 | 2,444,445 |
| Infrastructure | 17,008,169 | 667,651 | 29,488 | 17,646,332 |
| Total accumulated depreciation/ amortization | 21,078,009 | 1,160,630 | 69,616 | 22,169,023 |
| Total other capital assets, net of depreciation and amortization | 22,095,096 | (168,320) | 123,466 | 21,803,310 |
| Capital assets (net) | $ 26,302,067 | 560,482 | 995,895 | 25,866,654 |

171

(Continued)

CONFIDENTIAL

CW_STAY0009959

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

| Nonmajor component units | | Beginning balance (as restated) | Increases | Decreases | Ending balance |
|---|---|---|---|---|---|
| Land and other nondepreciable assets: | | | | | |
| Land | $ | 1,068,946 | 2,993 | 7,733 | 1,064,206 |
| Art works | | 3,155 | — | — | 3,155 |
| Construction in progress | | 182,989 | 83,862 | 22,327 | 244,524 |
| Total land and other nondepreciable assets | | 1,255,090 | 86,855 | 30,060 | 1,311,885 |
| Other capital assets being depreciated/ amortized: | | | | | |
| Buildings and building improvements | | 2,677,805 | 103,693 | 4,711 | 2,776,787 |
| Equipment, furniture, fixtures, vehicles, and software | | 609,842 | 6,554 | 11,579 | 604,817 |
| Infrastructure | | 505,202 | 8,873 | 356 | 513,719 |
| Intangibles, other than software | | 2,293 | — | 428 | 1,865 |
| Total other capital assets, being depreciated/ amortized | | 3,795,142 | 119,120 | 17,074 | 3,897,188 |
| Less accumulated depreciation/ amortization for: | | | | | |
| Buildings and building improvements | | 1,019,923 | 58,864 | 4,360 | 1,074,427 |
| Equipment, furniture, fixtures, vehicles, and software | | 447,338 | 23,902 | 9,879 | 461,361 |
| Infrastructure | | 280,309 | 10,269 | — | 290,578 |
| Intangibles, other than software | | 1,037 | — | — | 1,037 |
| Total accumulated depreciation/ amortization | | 1,748,607 | 93,035 | 14,239 | 1,827,403 |
| Total other capital assets, net of depreciation and amortization | | 2,046,535 | 26,085 | 2,835 | 2,069,785 |
| Capital assets (net) | $ | 3,301,625 | 112,940 | 32,895 | 3,381,670 |

172

(Continued)

CONFIDENTIAL

CW_STAY0009960

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(11) Short-Term Obligations**

Short-term obligations at June 30, 2015 and changes for the year then ended are as follows (in thousands):

| | Balance at June 30, 2014 (as restated) | Debt issued | Debt paid | Other increases | Other (decreases) | Balance at June 30, 2015 | Due within one year |
|---|---|---|---|---|---|---|---|
| Governmental activities: | | | | | | | |
| Notes payable to GDB | $ 314,836 | 100,000 | (300,000) | 292 | — | 115,128 | 115,128 |
| Tax revenue anticipation notes | — | 1,200,000 | (900,000) | — | — | 300,000 | 300,000 |
| Bond anticipation notes | 8,391 | — | — | — | (8,391) | — | — |
| | $ 323,227 | 1,300,000 | (1,200,000) | 292 | (8,391) | 415,128 | 415,128 |

As further expanded in Note 1(b) and Note 3, the beginning balance of short-term obligations was restated due to the change in reporting entity brought about by PAA, carrying a note payable to GDB of $1.7 million, becoming a blended component unit of the Commonwealth effective July 1, 2014.

The Commonwealth has entered into various short-term line of credit agreements with GDB (all within Governmental Activities) consisting of the following at June 30, 2015 (in thousands):

| Agency | Purpose | Interest rate | Line of credit | Outstanding balance |
|---|---|---|---|---|
| Department of the Treasury | To pay several central government agencies' debt | 125 bp over three months LIBOR | $ 100,000 | 69,342 |
| Department of the Treasury | To cover operational needs of catastrophic disaster funds | 125 bp over three months LIBOR | 37,388 | 27,737 |
| Department of the Treasury | To fund information technology project | 125 bp over GDB's commercial paper rate | 44,868 | 13,601 |
| Department of the Treasury | Purchase of mobile X-ray machines | 125 bp over three months LIBOR | 12,000 | 2,456 |
| Ports of the Americas Authority | To finance terms of consent decree agreement | 150 bp over PRIME with floor of 6% and ceiling of 12% | 1,700 | 1,700 |
| Office of Veteran's Ombudsman | To fund improvements to veteran's facilities | 6% | 7,500 | 292 |
| | | | $ 203,456 | 115,128 |

Other increases consist of a short-term note payable of $292 thousand to GDB, which was classified as long-term at June 30, 2014, but which matured during fiscal year 2015 and became due and payable at June 30, 2015, consequently, the note is reported as a new short-term debt matured and payable in the balance sheet – governmental funds. At the same time, upon such debt becoming matured and payable, a principal payment recognition was recorded for the same amount in the statement of revenue, expenditures and changes in fund balances (deficit) governmental funds and presented within the debt paid column in the long- term obligations table of Note 12 (a), reducing the long-term note payable to the GDB.

173

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(a)** *Tax Revenue Anticipation Notes*

Act No. 1 of the Legislature of the Commonwealth, approved on June 26, 1987 (Act No. 1), authorizes the Secretary of the Treasury Department to issue, notes to either private or governmental institutions, in anticipation of taxes and revenue (Tax Revenue Anticipation Notes or TRANs) as an alternate means of providing liquidity to cover any temporary cash shortages projected for a fiscal year. Act No. 139, approved on November 9, 2005, amended Section 2(g) of Act No. 1 to provide that the total principal amount of notes issued under the provisions of Act No. 1 and outstanding at any time for any fiscal year may not exceed the lesser of eighteen percent (18%) of the net revenue of the General Fund for the fiscal year preceding the fiscal year in which the notes are issued or one billion five hundred million dollars ($1.5 billion).

On October 10, 2014, GDB entered into a Note Purchase, Revolving Credit, and Term Loan Agreement providing for the issuance of up to $900 million aggregate principal amount of 2015 Series B Senior Notes guaranteed by the Commonwealth (the GDB Notes). The proceeds of the GDB Notes were used to make a loan to the Commonwealth evidenced by $900 million aggregate principal amount of Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series B (2015) (the 2015 Series B TRANs). GDB also purchased an additional $300 million aggregate principal amount of Tax and Revenue Anticipation Notes of the Commonwealth of Puerto Rico, Series C (2015) (the 2015 Series C TRANs and, collectively with the 2015 Series B TRANs, the 2015 TRANs). Therefore, the 2015 TRANs issued during fiscal year 2015 amounted to $1.2 billion at interest rates ranging from prime rate plus 625 basis points (7.75% at June 30, 2015) to 8.30%. TRANs proceeds were used to cover temporary cash deficiencies resulting from the timing differences between tax collections and the payments of current expenditures. TRANs were refinanced during the year in order to take advantage of interest rates. The maximum amount of TRANs outstanding at any time during the year was $1.5 billion. As of June 30, 2015, the outstanding balance of TRANs, all payable to GDB, was $300 million pertaining to the 2015 Series C TRANs. The 2015 Series C TRANs were fully repaid during July 2015.

**(b)** *Bond Anticipation Notes*

During fiscal year 2012, the Commonwealth was authorized to issue bond anticipation notes (BAN) in an aggregate principal amount, not to exceed $290 million, in order to complete certain public improvement projects, acquire certain properties and equipment on behalf of some component units, and cover the cost and interest of the bonds expected to be issued, as described below. These notes were issued in anticipation of the issuance of public improvement bonds expected to be issued during fiscal year 2014 or thereafter. Although legal steps have been taken to refinance the anticipation notes with the bonds, since such bonds have not been issued as of the date of these basic financial statements, the related notes have been recognized as a short-term fund liability in the capital project fund. The $8.4 million BAN payable to GDB short-term, outstanding at June 30, 2014, was refinanced into a long-term line of credit with a maturity of June 30, 2041. Therefore, the other decrease of $8.4 million in the BAN on the previous table represents the reclassification from a short-term in the balance sheet governmental funds into a long-term line of credit payable to GDB. At the same time, a proceed from line of credit long-term recognition was recorded for the same amount in the statement of revenue, expenditures and changes in fund balance (deficit) governmental funds and presented within the debt issued column in the long term obligations table of Note 12(a), increasing the long-term note payable to GDB.

CONFIDENTIAL

CW_STAY0009962

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2015

## (12) Long-Term Obligations

### (a) Primary Government

Long-term obligations at June 30, 2015 and changes for the year then ended are as follows (in thousands):

| | Balance at June 30, 2014 (as restated) | Debt issued | Debt paid | Original issue discount | Debt refunded | Other increases | Other (decreases) | Balance at June 30, 2015 | Due within one year |
|---|---|---|---|---|---|---|---|---|---|
| Governmental activities: | | | | | | | | | |
| Commonwealth appropriation bonds $ | 571,236 | — | — | — | — | — | (582) | 570,654 | 25,684 |
| General obligation and revenue bonds | 37,354,205 | 245,955 | (554,065) | (17,217) | — | 369,822 | (25,033) | 37,373,667 | 702,095 |
| Bond purchase agreement with GDB | 224,864 | 235,635 | — | — | (226,280) | — | (949) | 233,270 | 7,788 |
| Notes payable to component units: | | | | | | | | | |
| GDB | 2,082,399 | 158,243 | (31,481) | — | — | — | — | 2,209,161 | 21,903 |
| Other | 5,000 | 102,000 | (5,000) | — | — | — | — | 102,000 | — |
| Note payable to financial institution | 33,270 | — | (4,753) | — | — | — | — | 28,517 | 4,753 |
| Liability under guaranteed obligation | 330,879 | — | — | — | — | 6,378 | — | 337,257 | — |
| Capital leases | 172,248 | 200,748 | (8,536) | — | — | — | (14,105) | 350,354 | 7,884 |
| Total bonds, notes, and capital leases payable | 40,774,101 | 942,581 | (603,835) | (17,217) | (226,280) | 376,200 | (40,670) | 41,204,880 | 770,107 |
| Net pension liability | 32,195,875 | — | — | — | — | 1,466,093 | (617,292) | 33,044,676 | 77,039 |
| Other postemployment benefit obligation | 268,834 | — | — | — | — | 129,958 | (135,457) | 263,335 | — |
| Compensated absences | 1,447,982 | — | — | — | — | 727,062 | (833,235) | 1,341,809 | 585,159 |
| Voluntary termination benefits payable | 780,302 | — | — | — | — | 37,839 | (82,367) | 735,774 | 97,807 |
| Other long-term liabilities | 2,232,926 | — | (4,394) | — | — | 262,643 | (851,880) | 1,639,295 | 242,111 |
| Total governmental activities | 77,700,020 | 942,581 | (608,229) | (17,217) | (226,280) | 2,999,795 | (2,560,901) | 78,229,769 | 1,772,023 |
| Business-type activities: | | | | | | | | | |
| Notes payable to GDB | 461,543 | 23,253 | — | — | — | — | — | 484,796 | 41,333 |
| Note payable to financial institution | 82,999 | — | (82,999) | — | — | — | — | — | — |
| Other postemployment benefit obligation | 1,834 | — | — | — | — | — | — | 1,834 | — |
| Compensated absences | 19,297 | — | — | — | — | 907 | (590) | 19,614 | 10,036 |
| Net pension liability | 24,315 | — | — | — | — | 6,669 | (631) | 30,353 | — |
| Obligation for unpaid lottery prizes | 186,557 | — | — | — | — | 551,561 | (516,624) | 221,494 | 102,859 |
| Voluntary termination benefits | 10,365 | — | — | — | — | 189 | (1,029) | 9,525 | 1,329 |
| Liability for unemployment, disability and health insurance | 345,375 | — | — | — | — | 1,926,473 | (1,973,361) | 298,487 | 298,487 |
| Other long-term liabilities | 32,750 | — | — | — | — | 20,126 | (1,379) | 51,497 | 48,030 |
| Total business-type activities | 1,165,035 | 23,253 | (82,999) | — | — | 2,506,925 | (2,493,614) | 1,117,600 | 502,074 |
| Total primary government $ | 78,865,055 | 965,834 | (691,228) | (17,217) | (226,280) | 5,505,720 | (5,054,515) | 79,347,369 | 2,274,097 |

As further expanded in Note 1(b) and Note 3, the beginning balance of long-term obligations under Governmental Activities was restated due to the change in reporting entity of certain former discretely presented component units, carrying long-term obligations, tha became blended component units merged into agencies of the Commonwealth effective July 1, 2014. The balance was also restated due to certain other agencies, also carrying long-term obligations, being incorrectly excluded from the Primary Government reporting entity in prior year but included during fiscal year 2015. These changes in reporting entities include the blending and/or merging into Governmental Activities of UPRCCC and NPCPR

175                                                          (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

bringing notes payable to GDB with a beginning balance aggregating approximately $38.3 million. Another component unit, PAA, carried with a bond purchase agreement with GDB covered by the Commonwealth guaranty, that became an obligation of approximately $224.9 million on the part of the Primary Government. The House of Representatives, formerly excluded from the Primary Government, recorded a capital lease obligation with a beginning balance $430 thousand.

With respect to accrued compensated absences, termination benefits payable and other long-term liabilities, the following component units, now blended or merged into government agencies' programs, and certain other agencies excluded in prior years but included in current year, brought the following corresponding beginning balances (in thousands):

| | Compensated Absences | Termination Benefits | Other Long-Term Liabilities |
|---|---|---|---|
| Component units blended or merged into the Primary Government: | | | |
| NPCPR | $ 4,940 | 11,686 | 2,621 |
| UPRCCC | 386 | — | — |
| ETEC | 246 | — | — |
| CIBMRIP | 120 | — | — |
| CDASFIPR | 81 | — | — |
| PAA | 8 | — | 3,150 |
| Agencies formerly excluded from the Primary Government: | | | |
| Office of the Comptroller of Puerto Rico | 10,564 | — | — |
| Senate of Puerto Rico | 5,109 | — | — |
| House of Representatives of Puerto Rico | 4,860 | — | — |
| Superintendence of the Capitol Building | 1,614 | — | — |
| Office of Legislative Affairs | 1,288 | — | — |
| Accrued compensated balances restatement | $ 29,216 | 11,686 | 5,771 |

With respect to pension related activities, adopting GASB Statement No. 68 (see Note 1(s), Note 1(cc) and Note (3) resulted in recognizing the Primary Government Governmental and Business-Type Activities' beginning net pension liability of approximately $33,045 million and $30.4 million, respectively (for an aggregate total of approximately $33,075 million), and the elimination of the beginning net pension obligation of approximately $14.6 billion existing prior to the adoption of GASB Statement No. 68.

Withi respect to Business-Type Activities, PRHIA blended into the Primary Government's enterprise fund as of July 1, 2014. PRHIA brought with it notes payable to GDB, notes payable to financial institutions, accrued compensated absences, termination benefits payable and claims liability for health insurance benefits for total beginning balances approximating $183.3 million, $83 million, $1.2 million, $4.5 million and $281.7 million, respectively.

(Continued)

CONFIDENTIAL

CW_STAY0009964

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The principal balance of general obligation and revenue bonds paid reported as expenditures in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds do not agree with amounts reported as debt paid in the table above. The balance paid includes principal paid on July 1, 2014 on general obligation and revenue bonds amounting to approximately $474 million, which was accrued at June 30, 2014 as a fund liability. Also, during fiscal year 2015 approximately $510.9 million of debt principal paid on July 1, 2015 was accrued as a fund liability at June 30, 2015, but not included as payments in the table above. The net effect of approximately $36.98 million is the difference between the principal paid on bonds, notes and capital leases payable included in the previous table and the principal shown as expenditures in the statement of revenue, expenditures, and changes in fund balances – governmental funds.

Please refer to Note 12 (e) and Note 13 (a) for detailed information regarding the liability under guaranteed obligation. The other decrease of $949 thousand in the Bond Purchase Agreement with GDB represents payments be the Primary Government reducing the principal balance of such bonds. The remaining balance of the other increases (decreases) in bonds and notes consists of capitalization of interest on capital appreciation bonds (increases) and amortization of premiums (decreases) and accretion of discounts (increases) on bonds. These adjustments did not require any source or use of cash.

Accrual adjustments for fiscal year 2015 were made to reconcile various obligations with the new estimated balances at June 30, 2015, and other decreases resulting from payments on these obligations made during the fiscal year. These obligations include compensated absences, net pension liabilities, other postemployment benefit obligation, voluntary termination benefits, other long-term liabilities, obligation for unpaid lottery prizes, and claims liability for insurance benefits. These payments, as pertaining to Governmental Activities, are included not as principal payments in the statement of revenue, expenditures, and changes in fund balances (deficit) – governmental funds, but as expenses within their corresponding functions.

(Continued)

CONFIDENTIAL

CW_STAY0009965

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Changes in deferred outflow of resources related to losses on the refunding of some of the general obligation and revenues bonds and appropriation bonds referred to in the table below (in thousands):

| Primary government entity/agency | Balance at June 30, 2014 | Reductions | Balance at June 30, 2015 |
|---|---|---|---|
| General obligation and revenue bonds: | | | |
| Department of the Treasury | $   212,234 | 18,347 | 193,887 |
| PBA | 116,376 | 8,774 | 107,602 |
| PRIFA | 50,874 | 3,634 | 47,240 |
| COFINA | 46,642 | 3,360 | 43,282 |
| Children's Trust | 24,527 | 2,964 | 21,563 |
| Commonwealth appropriation bonds: | | | |
| Department of the Treasury-Act 164 | 17,880 | 1,966 | 15,914 |
| PRMSA | 12,474 | 1,052 | 11,422 |
| Total deferred outflow of resources – loss on bonds refunding | $   481,007 | 40,097 | 440,910 |

Changes in deferred inflow of resources related to gains on the refunding of some of the general obligation and revenues bonds referred to in the table above follow (in thousands):

| Primary government entity/agency | Balance at June 30, 2014 | Reductions | Balance at June 30, 2015 |
|---|---|---|---|
| General obligation and revenue bonds: | | | |
| Department of the Treasury | $   829 | 138 | 691 |
| COFINA | 102,617 | 2,380 | 100,237 |
| Total deferred inflow of resources – gain on bonds refunding | $   103,446 | 2,518 | 100,928 |

### (b)  Debt Limitation

The Constitution of the Commonwealth authorizes the contracting of debts as determined by the Legislature. Nevertheless, Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes and backed by the full faith credit, and taxing power of the Commonwealth should not be issued if the amounts of the principal of and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenue raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter internal revenue) in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution of the Commonwealth does not limit the

(Continued)

CONFIDENTIAL

CW_STAY0009966

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

amount of debt that the Commonwealth may guarantee so long as the Commonwealth is in compliance with this 15% limitation at the time of issuance of such guaranteed debt. During the period ended June 30, 2015, no direct obligations were issued by the Commonwealth.

On September 13, 2017 the Oversight Board announced that a Special Committee of the Board has retained an independent investigator to carry out a review of the Commonwealth's debt and its connection to the current financial crisis. The Special Committee considers this investigation an integral part of the Oversight Board's mission to restore fiscal balance and economic opportunity and to promote the Commonwealth's reentry to the capital markets. The independent investigator's work is ongoing, and the Oversight Board will publish the independent investigator's final report. This report is expected to provide an analysis of the historical and more recent macroeconomic and political factors contributing directly and indirectly to the Commonwealth crisis, the Commonwealth's municipal bond issuance process, and legislative efforts to restructure the debt, as well as the Oversight's Board investigative findings, policy recommendations, and identification of potential claims and matters for regulatory attention.

The SEC has requested information about certain bond issuances (General Obligation bonds and PREPA bonds) of the Commonwealth and its component units, dating back to 2009. The SEC has also sent what is known as "Wells" letter notifications to the Commonwealth as well as to investment bankers, financial advisors and legal advisors who helped structure all the related bond issuances under the scope of its investigation. Wells letter notifies the recipient that it is being investigated by the SEC and presents an opportunity for all recipients of such notifications to respond to any allegations from the SEC. The Commonwealth and GDB has cooperated with all inquiries, including by providing the SEC with documents and information. The SEC has advised that the information requests should not be construed as an indication that any violation of the federal securities laws has occurred. During April 2018, the SEC communicated that they do not intend to recommend an enforcement action against the Commonwealth in relation to the matter mentioned above. The Commonwealth and the GDB continue to cooperate with the SEC regarding their investigation with respect to the PREPA bonds. This matter is ongoing and, it cannot be predicted when it will be concluded or its outcome.

The Commonwealth has stated that although it encourages an open and transparent process to review the Commonwealth's aggregate debt load, it has no reason to believe that any of the Commonwealth's debt was issued in violation of the Puerto Rico Constitution or any other applicable laws.

*(c)* *Bonds Payable*

The Constitution of the Commonwealth provides that public debt will constitute a first claim on the available revenue of the Commonwealth. Public debt includes general obligation bonds and debt guaranteed by the Commonwealth. The full faith, credit, and taxing power of the Commonwealth is irrevocably pledged for the prompt payment of the principal and interest of the general obligation bonds. On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Rehabilitation Act (the Moratorium Act). Among other objectives, the Moratorium Act allows the Governor to declare a moratorium on debt service payments and to stay related creditor remedies for a temporary period for the Commonwealth and its component units. For additional information on the Moratorium Act, refer to Note 22. For additional information on litigation contingencies related to the Moratorium Act, refer to Note 16.

(Continued)

CONFIDENTIAL                                                    CW_STAY0009967

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Act No. 83 of August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The levy is made by Municipal Revenue Collection Center (known as CRIM, its Spanish acronym), a municipal corporation, not a component unit of the Commonwealth. CRIM is required to remit the 1.03% of property tax collected by the Commonwealth to pay debt service on general obligation bonds. During the year ended June 30, 2015, the total revenue and receivable reported by the Commonwealth amounted to approximately $120.2 million and $78.1 million, respectively, which are included in the debt service fund.

For financial reporting purposes, the outstanding amount of bonds represents the total principal amount outstanding, plus unamortized premiums and interest accreted on capital appreciation bonds, less unaccreted discount. Bonds payable outstanding at June 30, 2015, including accreted interest on capital appreciation bonds, are as follows (in thousands):

| | General obligation bonds | Revenue bonds | Total |
|---|---|---|---|
| Term bonds payable through 2042; interest payable monthly or semiannually at rates varying from 0.13% to 6.50% | $ 8,291,758 | 8,211,780 | 16,503,538 |
| Serial bonds payable through 2042; interest payable monthly or semiannually at rates varying from 0.13% to 6.75% | 4,520,770 | 1,733,092 | 6,253,862 |
| Fixed rate bonds payable through 2057; interest payable at rates varying from 3.38% to 6.50% | — | 5,541,644 | 5,541,644 |
| Capital appreciation bonds payable through 2056; no interest rate, yield ranging from 3.75% to 7.48%. (1) | 152,484 | 5,508,566 | 5,661,050 |
| Special Tax Revenue Bonds payable through 2045; interest payable or accreted monthly and semiannually at rates varying from 4.00% to 8.25% | — | 2,048,144 | 2,048,144 |
| Mental Health Infrastructure Revenue Bonds payable through 2038; interest payable semiannually at rates varying from 5.60% to 6.50% | — | 36,400 | 36,400 |
| The Children's Trust Fund Tobacco Settlement asset-backed bonds payable through 2057; interest payable or accreted semiannually at rates varying from 4.25% to 8.38% | — | 1,421,983 | 1,421,983 |

(Continued)

CONFIDENTIAL

CW_STAY0009968

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

|  | General obligation bonds | Revenue bonds | Total |
|---|---|---|---|
| Capital Fund Program Bonds, maturing in various dates payable through 2025; interest payable semiannually at rates varying from 2.00% to 5.00%  $ | — | 140,485 | 140,485 |
| LIBOR-Based Adjustable Rate Bonds due on August 1, 2057; interest payable quarterly (1.11% at June 30, 2015) | — | 136,000 | 136,000 |
| Total | 12,965,012 | 24,778,094 | 37,743,106 |
| Unamortized premium | 90,713 | 188,189 | 278,902 |
| Unamortized discount | (273,900) | (156,036) | (429,936) |
| Subtotal bonds payable | 12,781,825 | 24,810,247 | 37,592,072 |
| Elimination entry COFINA bonds issued to PRIFA | — | (218,405) | (218,405) |
| Total bonds payable  $ | 12,781,825 | 24,591,842 | 37,373,667 |

(1)  Revenue bonds include $969 million capital appreciation bonds convertible to fixed rate interest bonds on August 1, 2031; August 1, 2032; and August 1, 2033.

(Continued)

CONFIDENTIAL

CW_STAY0009969

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

As of June 30, 2015, debt service requirements for general obligation and revenue bonds outstanding, including accreted interest of capital appreciation bonds are as follows (in thousands):

| Year ending June 30 | Principal | Interest | Interest subsidy (1) | Total |
|---|---|---|---|---|
| 2016 | $ 702,095 | 1,747,445 | 3,835 | 2,453,375 |
| 2017 | 743,285 | 1,732,712 | 3,835 | 2,479,832 |
| 2018 | 560,770 | 1,720,630 | 3,835 | 2,285,235 |
| 2019 | 524,885 | 1,725,066 | 3,835 | 2,253,786 |
| 2020 | 603,500 | 1,706,058 | 3,835 | 2,313,393 |
| 2021–2025 | 3,875,756 | 8,197,457 | 19,173 | 12,092,386 |
| 2026–2030 | 6,319,500 | 7,263,801 | 19,173 | 13,602,474 |
| 2031–2035 | 8,377,243 | 5,095,501 | 19,173 | 13,491,917 |
| 2036–2040 | 9,441,930 | 3,048,257 | 19,173 | 12,509,360 |
| 2041–2045 | 9,916,375 | 918,859 | 8,628 | 10,843,862 |
| 2046–2050 | 6,706,443 | 325,251 | — | 7,031,694 |
| 2051–2055 | 5,285,143 | 313,365 | — | 5,598,508 |
| 2056–2060 | 12,028,378 | 149,188 | — | 12,177,566 |
| Total | 65,085,303 | $ 33,943,590 | 104,495 | 99,133,388 |
| Less unaccreted interest | (27,342,197) | | | |
| Plus unamortized premium | 278,902 | | | |
| Less unamortized discount | (429,936) | | | |
| Subtotal | 37,592,072 | | | |
| Elimination of COFINA bonds issued to PRIFA | (218,405) | | | |
| Total | $ 37,373,667 | | | |

(1) Sales Tax Revenue Bonds, First Subordinate Series 2010D and 2010E were issued as Build America Bonds. COFINA will receive a subsidy payment from the federal government equal to 35% and 45%, respectively, of the amount of each interest payment. On June 24, 2013, the IRS sent notice that 8.7% of the subsidy payment on the Build America Bonds will be sequestered due to adjustments of the federal government budget.

On March 16, 2015, PRIFA issued $245.9 million of bond anticipation notes (disclosed as Special Tax Revenue Bonds) payable from the increase in the petroleum products tax imposed by Act No. 1 of 2015 (the PRIFA BANs), the proceeds of which were used to refinance certain outstanding PRHTA bond anticipation notes and pay-related expenses. The PRIFA BANs were originally expected to be refinanced through a long-term bond issuance by PRIFA. However, this proposed transaction has been abandoned. The PRIFA BANs had a maturity date of May 1, 2017 (which was not met), with an interest rate of 8.25% payable monthly on the first business day of each month, commencing on April 1, 2015. The aforementioned revenues that support the payment of the PRIFA BANs could instead be applied to pay

182                                                                                              (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

the Commonwealth's general obligation debt if its available resources proved insufficient to cover all approved appropriations. The PRIFA BANs are guaranteed by the good faith, credit and taxing power of the Commonwealth (Refer to Note 13(a)). On June 24, 2016, the Governor signed an executive order, EO 2016 027, which suspended all obligations to transfer money to PRIFA for the purpose of making payments on PRIFA BANs.

The table below presents Governmental Activities-debt service payments on certain revenue variable rate bonds and the net payments on associated hedging derivative instruments (see Note 20) as of June 30, 2015 (all pertaining to COFINA). Although interest rates on variable rate debt and the current reference rates of hedging derivative instruments change over time, the calculations included in the table below are based on the assumption that the variable rate and the current reference rates of hedging derivative instruments as of June 30, 2015, will remain constant.

| | Variable-rate bonds | | Hedging derivative instruments, net | Total |
|---|---|---|---|---|
| | Principal | Interest | | |
| | | (In thousands) | | |
| Year ending June 30: | | | | |
| 2016 | $ — | 1,620 | 5,071 | 6,691 |
| 2017 | — | 1,845 | 4,846 | 6,691 |
| 2018 | — | 1,845 | 4,846 | 6,691 |
| 2019 | — | 1,845 | 4,846 | 6,691 |
| 2020 | — | 1,845 | 4,846 | 6,691 |
| 2021–2025 | — | 9,224 | 24,232 | 33,456 |
| 2026–2030 | — | 9,224 | 24,232 | 33,456 |
| 2031–2035 | — | 9,224 | 24,232 | 33,456 |
| 2036–2040 | — | 9,224 | 24,232 | 33,456 |
| 2041–2045 | — | 9,224 | 24,232 | 33,456 |
| 2046–2050 | — | 9,224 | 24,232 | 33,456 |
| 2051–2055 | — | 9,224 | 24,232 | 33,456 |
| 2056–2058 | 136,000 | 6,459 | 10,270 | 152,729 |
| Total | $ 136,000 | 80,027 | 204,349 | 420,376 |

COFINA's outstanding bonds are payable from amounts deposited in the Dedicated Sales Tax Fund in each fiscal year. The minimum amount to be deposited is the Pledged Sales Tax Base Amount, which for the fiscal year ended June 30, 2015, was approximately $669.5 million. The Pledged Sales Tax Base Amount increases each fiscal year thereafter at a statutory rate of 4% up to $1,850 million.

(Continued)

CONFIDENTIAL

CW_STAY0009971

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

At June 30, 2015, the Pledged Sales Tax Base Amount, by year, is as follows (in thousands):

|  | Amount |
|---|---|
| Year ending June 30: | |
| 2016 | $ 696,260 |
| 2017 | 724,110 |
| 2018 | 753,074 |
| 2019 | 783,197 |
| 2020 | 814,525 |
| 2021–2025 | 4,588,200 |
| 2026–2030 | 5,582,247 |
| 2031–2035 | 6,791,657 |
| 2036–2040 | 8,263,089 |
| 2041–2045 | 9,250,000 |
| 2046–2050 | 9,250,000 |
| 2051–2055 | 9,250,000 |
| 2056–2058 | 5,550,000 |
| Total | $ 62,296,359 |

The Commonwealth's bonds payable are subject to arbitrage regulations issued by the Internal Revenue Service of the United States of America, requiring a rebate to the federal government of excess investments earnings on tax exempt debt proceeds if the yield on those earnings exceeds the effective yield on the related tax-exempt debt issued. Excess earnings must be rebated every five years or upon maturity of the debt, whichever is earlier. Arbitrage calculations resulted in no liability as of June 30, 2015.

(i)  *Commonwealth's Department of Housing Partnership Agreement*

Vivienda Modernization 1, LLC (the LLC) is a limited liability company created under the laws of the Commonwealth whose sole member is Vivienda Modernization Holdings 1, S.E. (the Partnership), a civil partnership created under the laws of the Commonwealth and pursuant to a related Partnership Agreement. The Partnership was created on August 1, 2008 with the Department of Housing of the Commonwealth of Puerto Rico (DOH), acting as general partner (the General Partner) and Hudson SLP XL LLC, a Delaware limited liability company (the Special Limited Partner) and Hudson Housing Tax Credit Fund XL LP, a Delaware limited partnership (the Investment Partnership); acting as limited partners (collectively the Limited Partners). The Partnership has been organized to acquire, develop, rehabilitate, own, maintain, and operate thirty-three residential rental housing developments intended for low and moderate-income tenants. Profits, losses, and tax credits are allocated in accordance with the Partnership Agreement. Profits and losses from operations and low-income housing tax credits in any year should be allocated 99.98% to the Investment Partnership, 0.01% to the Special Limited Partner, and 0.01% to the General Partner. As defined in the Partnership Agreement, certain transactions and occurrences warrant special allocations of profits and losses. All other losses should be allocated to the extent allowable under Section 704(b) of the U.S. IRC.

184 (Continued)

CW_STAY0009972

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Pursuant to the Partnership Agreement, the Limited Partners are required to provide capital contributions totaling approximately $235 million to the Partnership (the Initial Projected Equity), subject to adjustment based on the amount of low income housing credits ultimately allocated to the developments in addition to other potential occurrences as more fully explained in the Partnership Agreement. As of June 30, 2015, the Limited Partners have provided capital contributions totaling approximately $126.6 million.

Pursuant to the Partnership Agreement, the General Partner is required to provide capital contributions totaling approximately $10 million to the Partnership. Should the Partnership not have sufficient funds available to pay the outstanding balance of the developer fee thereof, as defined, the General Partner must provide additional capital contributions to the Partnership in an amount sufficient for the Partnership to pay such balance in full. The General Partner must have no right or obligation to make any other capital contributions. As of June 30, 2015, the General Partner had provided no capital contributions. In addition, the DOH as General Partner must establish the Assurance Reserve Fund at the initial closing in the amount of the initial capital contribution less approximately $4 million (plus any initial capital contribution with respect to the apartment complexes). Amounts in the Assurance Reserve Fund must be used, (i) upon the request of the General Partner, subject to the consent of the Special Limited Partner or (ii) upon the direction to the Special Limited Partner, to meet financial obligations of the General Partner, other than for excess development costs, as provided in the Partnership Agreement. As of June 30, 2015, such reserve was maintained in the Partnership.

On August 7, 2008, the LLC entered into a Master Developer Agreement with the DOH to perform services in connection with the development, rehabilitation, and modernization of certain housing projects (the Master Developer Agreement). Pursuant to the Master Developer Agreement, the DOH will earn a developer's fee in the amount of approximately $75.1 million for such services. Payment of the developer's fee must be subject to the terms and conditions of Section 6(a) (i iv) of the Master Developer Agreement. As of June 30, 2015, approximately $70.6 million was recorded within other accounts receivable in the General Fund related to the Master Development Agreement (including approximately $16.6 million related to the Assurance Reserve Fund).

Additionally, on August 7, 2008, the LLC and the DOH entered into a Purchase and Sale Agreement through which the LLC acquired the surface rights of a property (the Property) and the improvement erected on such property consisting of buildings and construction in progress with a net book value and cost of approximately $45.9 million and $110 million, respectively, from the DOH. This purchase is subject to certain deeds of Constitution of Surface Rights and Transfer of Improvements dated August 7, 2008, which require the LLC to rehabilitate or construct on the Property four thousand one hundred thirty two (4,132) residential rental units (the Units or collectively the Development), all of which will receive the benefit of an operating subsidy and Low-Income Housing Tax Credits under Section 42 of the Internal Revenue Code of 1986, as amended. Eighty-four (84) of the units, all of which will be located at the Brisas de Cayey II site, are to be newly constructed. The remaining units will be modernized.

Also, on August 7, 2008, the DOH entered into a loan agreement with the LLC in the amount of approximately $102.9 million for the acquisition of the 33 residential rental properties (the deferred purchase price note). The LLC must make payments equal to the amount of net available capital contributions, as defined, for the preceding calendar quarter.

185                                                              (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The following are the terms of the deferred purchase price note: commitment $102,889,957; interest rate 3.55%; and maturity date later of (i) funding of the last installment of the capital contribution or (ii) August 7, 2013. The note must be a full recourse liability of the LLC; however, none of the LLCs members has personal liability. As of June 30, 2015, the principal balance outstanding on the deferred purchase price note was approximately $8.8 million and accrued interest was approximately $1.2 million, and both amounts were recorded within deferred inflow of resources – developer fees in the General Fund.

PHA has entered into an Interagency Agreement dated August 7, 2008, with the DOH, in DOH's capacity as general partner of the Partnership, to delegate management and operational duties related to the Development to PHA as set forth in the Interagency Agreement. The LLC and PHA also intend that the units be developed, operated, and managed so as to assure receipt by the LLC of the aforementioned economic and tax benefits to the full extent available to the LLC.

### (d) Commonwealth Appropriation Bonds

Over the years, GDB, as fiscal agent and a bank for the Commonwealth, had extended lines of credit, advances, and loans to several agencies and component units of the Commonwealth in order to finance their capital improvement projects and to cover their operational deficits at the time. At different points in time, these loans were refunded through the issuance of Commonwealth appropriation bonds issued by the Puerto Rico Public Finance Corporation (PFC), a blended component unit of GDB, which serves only as a conduit for the issuance of the bonds. The Commonwealth has recognized a mirror effect of these refundings by PFC over the years in its own debt in proportion to the portion of the Commonwealth's notes included in such PFC refundings. Also, during more recent years, COFINA, through the issuance of bonds, has been used to repay certain other loans and existing appropriation bonds. COFINA is a blended component unit of the Commonwealth created in 2007 with the capacity to issue bonds to repay or refund advances from GDB, the appropriation bonds referred to above, and other debt obligations, collectively referred as the extra constitutional debt. There were no new activities of Commonwealth appropriation bonds during fiscal year 2015, other than the annual amortization of corresponding premiums and their related deferred inflows and outflows of resources in the form of deferred refunding gains and losses.

At June 30, 2015, the outstanding balance of the Commonwealth appropriation bonds pertaining to the Primary Government (i.e., excluding the balance pertaining to discretely presented component units), consists of the following obligations (in thousands):

| | | |
|---|---|---|
| Act. No. 164 restructuring | $ | 438,960 |
| Puerto Rico Maritime Shipping Authority (PRMSA) | | 131,694 |
| Total Commonwealth appropriation bonds | $ | 570,654 |

186

(Continued)

CW_STAY0009974

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**Act No. 164 Restructuring** – On December 17, 2001, Act No. 164 was approved, which authorized certain government agencies and discretely presented component units to refund approximately $2.4 billion of their outstanding obligations with GDB, for which no repayment source existed, over a period not exceeding 30 years, and to be repaid with annual Commonwealth appropriations not to exceed $225 million. This refunding was originally executed with Commonwealth appropriation bonds through several bond series issued by PFC during the period between December 2001 and June 2002.

Subsequently, additional refundings (current and advance) and/or redemptions of Act No. 164 restructuring have been executed through PFC and COFINA bond issuances.

Approximately $439 million of the Commonwealth Appropriation bonds outstanding at June 30, 2015, belong to the Primary Government under Act No. 164, consisting of the Department of Health of the Commonwealth (health reform financing and other costs), the Treasury Department of the Commonwealth (originally the fiscal year 2001 deficit financing and the obligation assumed for defective tax liens), and the one attributed to PRIFA, a blended component unit of the Commonwealth. The outstanding balance of Commonwealth Appropriation bonds related to Act No. 164 bears interest at rates ranging from 3.10% to 6.50%. Debt service requirements, subject to legislative appropriations, in future years are as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2016 | $        25,684 | 21,779 | 47,463 |
| 2017 | 20,836 | 21,048 | 41,884 |
| 2018 | 21,554 | 20,254 | 41,808 |
| 2019 | 22,361 | 19,374 | 41,735 |
| 2020 | 23,257 | 18,421 | 41,678 |
| 2021–2025 | 95,316 | 77,162 | 172,478 |
| 2026–2030 | 197,682 | 44,169 | 241,851 |
| 2031–2035 | 29,545 | 812,480 | 842,025 |
| Total | 436,235 | 1,034,687 | 1,470,922 |
| Plus unamortized premium | 2,725 |  |  |
| Total | $        438,960 |  |  |

187

(Continued)

CONFIDENTIAL

CW_STAY0009975

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**Puerto Rico Maritime Shipping Authority (PRMSA)** – A promissory note payable owed by PRMSA to GDB was assumed by the Commonwealth in connection with the sale of the maritime operations of PRMSA. Commonwealth appropriation bonds, 2003 Series B and 2004 Series B were issued to refund this liability, which were refunded most recently in June 2012 with the issuance of PFC 2012 Series A bonds. The bond balance bears interest at a variable rate ranging from 3.10% to 5.35%. Debt service requirements in future years are as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year ending June 30: |  |  |  |
| 2016 | $ — | 6,837 | 6,837 |
| 2017 | — | 6,837 | 6,837 |
| 2018 | — | 6,837 | 6,837 |
| 2019 | — | 6,837 | 6,837 |
| 2020 | — | 6,837 | 6,837 |
| 2021–2025 | 27,999 | 30,884 | 58,883 |
| 2026–2030 | 55,385 | 14,321 | 69,706 |
| 2031–2035 | 48,310 | 3,016 | 51,326 |
| Total | $ 131,694 | 82,406 | 214,100 |

*(e)* *Bond Purchase Agreement with GDB*

At various times during fiscal years ending in 2005 and 2006, the PAA, a blended component unit of the Commonwealth, entered into bond purchase agreements with the GDB, whereby the GDB agreed to disburse to the PAA from time to time certain bond principal advances up to a maximum aggregate principal amount of $70 million (Port of the Americas Authority 2005 Series A Bond), $40 million (Port of the Americas Authority 2005 Series B Bond), and $140 million (Port of the Americas Authority 2005 Series C Bond). These bonds are guaranteed by the Commonwealth by Act No. 409 of September 22, 2004 (Act No. 409), which authorized the issuance of these financing arrangements and accounted by the Commonwealth as a liability under guarantee obligation. The Commonwealth had been paying for debt service on these bonds under its guaranty pursuant to Act No 409. For additional detail, refer to Note 13(a).

(Continued)

CONFIDENTIAL

CW_STAY0009976

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The proceeds of the bonds were used to finance the cost of development and construction of the PAA facilities. These bonds, having an original maturity of January 2015, were refinanced on December 31, 2014 into one single bond for a period of 30 years, with the first payment of principal and interest to commence on August 1, 2015, with interest rates based on the rates borne by the general obligation of the Commonwealth. These rates should be revised on a quarterly basis provided, however, that the interest should never be less than 7% nor greater than 12%. The principal and interest on the refinanced bond continue to be covered by the guaranty of the Commonwealth. Upon the refinancing referred to above at the then outstanding balance of $224.8 million, accrued interest through the date of the refinancing amounting to approximately $8.8 million was capitalized into the principal balance then outstanding for a refinanced amount of approximately $233.3 million. The table that follows represents the future debt service payments on the refinanced amount. Although interest rates on the refinancing change over time, the calculations included in the table below are based on the assumption that the variable rate then and at the refinancing date (7.18%) will remain the same for the rest of the term.

|  | | Principal | Interest | Total |
|---|---|---|---|---|
| Year ending June 30: | | | | |
| 2016 | $ | 7,788 | 9,785 | 17,573 |
| 2017 | | 7,788 | 16,216 | 24,004 |
| 2018 | | 7,788 | 15,656 | 23,444 |
| 2019 | | 7,788 | 15,097 | 22,885 |
| 2020 | | 7,788 | 14,538 | 22,326 |
| 2021–2025 | | 38,938 | 64,303 | 103,241 |
| 2026–2030 | | 38,938 | 50,324 | 89,262 |
| 2031–2035 | | 38,938 | 36,435 | 75,373 |
| 2036–2040 | | 38,938 | 22,366 | 61,304 |
| 2041–2045 | | 38,578 | 8,387 | 46,965 |
| Total | $ | 233,270 | 253,107 | 486,377 |

The PAA debt may be paid with any of the following: (i) a long-term bond issuance, once the projects are completed or (ii) legislative appropriations, as established by Act No. 409, honoring the agreement referred to above. During the prior year, a liability under guaranteed obligation was recorded upon adoption of GASB Statement No. 70, *Accounting and Financial Reporting for Nonexchange Financial Guarantees*, with respect to this guaranty of the PAA's bond obligation given that the Commonwealth has been paying the debt service on these bonds based on the provisions of Act No. 409. Such liability was measured based on the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guaranty. During 2015, PAA became a blended component unit of the Primary Government and as a consequence of the change in reporting entity, the Commonwealth eliminated the liability under guaranteed obligation. If PAA ceases to be a blended component unit of the Commonwealth, a liability under guarantee obligation may be recorded by the Commonwealth related to PAA's guaranteed obligations.

Act No. 409, as amended, is silent as to whether there are arrangements established for recovering payments from PAA for guaranty payments made; however, there is no intention from the Commonwealth to request a recovery of any such payments.

189 (Continued)

CW_STAY0009977

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(f)  *Advance Refunding, Defeasance and Refunding of Commonwealth Bonds***

In prior years, the Commonwealth defeased certain general obligation and other bonds by placing the proceeds of the bonds in an irrevocable trust to provide for all future debt service payments on the refunded bonds. Accordingly, the trust's account assets and liabilities for the defeased bonds are not included in the basic financial statements. At June 30, 2015, approximately $318.9 million of bonds outstanding from prior years' advance refunding are considered defeased.

PBA, a blended component unit, has defeased certain revenue bonds in prior years by placing the proceeds of new bonds in an irrevocable trust to provide for all future debt service payments on the old debts. Accordingly, the trust's account assets and liabilities for the defeased bonds are not included in the statement of net position. As of June 30, 2015, approximately $668.9 million of PBA's bonds are considered defeased.

During prior years, COFINA, a blended component unit, issued certain refunding bonds, the proceeds of which were placed in an irrevocable trust to provide for all future debt service payments on the refunded COFINA Series 2009A and 2009B bonds. The outstanding balance of the advance refunded bonds was $91.3 million at June 30, 2015.

**(g)  *Notes Payable to GDB, Other Component Units and Financial Institution***

The Commonwealth financed certain long-term liabilities through GDB and other component units, within both Governmental and Business-Type Activities. The outstanding balance at June 30, 2015 on the financing provided by GDB and other component units presented within notes payable in the statement of net position, comprises the following (in thousands):

**(i)  *Governmental Activities:***

| | | |
|---|---|---:|
| Notes payable to GDB | $ | 2,209,161 |
| Other component units: | | |
| State Insurance Fund Corporation | | 100,000 |
| Automobile Accidents Compensation Administration | | 2,000 |
| Notes payable to other component units | $ | 102,000 |
| Note payable to financial institution | $ | 28,517 |

(Continued)

CONFIDENTIAL

CW_STAY0009978

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

As of June 30, 2015, the Treasury Department of the Commonwealth has entered into various lines of credit agreements with GDB amounting to approximately $3.6 billion for different purposes as presented in the following table. The purpose, interest rate, maturity date, and amount outstanding under each individual agreement at June 30, 2015 consist of the following (in thousands):

| Purpose | Interest rate | Maturity | Lines of credit | Outstanding balance |
|---|---|---|---|---|
| To finance payroll and operational expenditures of the Commonwealth for fiscal year 2006 | 7.00% | June 30, 2040 $ | 741,000 | 170,515 |
| To pay lawsuits against the Commonwealth and to assign $15.3 million to Labor Development Administration for operational expenses | 6.00% | June 30, 2018 | 160,000 | 145,270 |
| Resources to meet appropriations in annual budget of the Commonwealth (fiscal year 2004) and federal programs expenditures | 125 bp over 3 month LIBOR | June 30, 2040 | 640,000 | 111,205 |
| To finance capital improvements projects of agencies and municipalities | 150 bp over GDB's commercial paper rate | June 30, 2019 | 130,000 | 83,548 |
| To finance capital improvements of several governmental agencies | 7.00% | June 30, 2040 | 105,000 | 68,834 |
| To partially fund monthly principal and interest deposits required for 2013 debt service of General Obligation and Revenue Bonds | 150 bp over PRIME, but not less than 6% | June 30, 2042 | 516,090 | 63,135 |
| To fund monthly principal and interest deposits required for the 2014 debt service of the General Obligation and Revenue Bonds | 6.00% | June 30, 2043 | 319,645 | 50,419 |
| To finance certain capital improvement projects | 150 bp over PRIME, but not less than 6% | June 30, 2043 | 100,000 | 23,531 |
| To finance certain capital improvement projects | 150 bp over PRIME, but not less than 6% | June 30, 2041 | 290,000 | 17,778 |

191

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

| Purpose | Interest rate | Maturity | Lines of credit | Outstanding balance |
|---|---|---|---|---|
| Resources to cover the operational needs of the catastrophic disasters fund (fiscal year 2004) of the Puerto Rico Health Insurance Administration and the Department of the Family | 125 bp over 3 month LIBOR | September 30, 2015 | $  42,542 | 14,806 |
| Acquisition of Salinas Correctional Facilities | 125 bp over 3 month LIBOR | June 30, 2040 | 15,000 | 7,141 |
| To pay invoices presented to the Treasury Department related to Act No. 171 "Ley de Manejo de Neumátuicos" | 6.00% | June 30, 2019 | 22,100 | 687 |
| Total | | | $  3,081,377 | 756,869 |

On November 21, 2002, Resolution No. 1028 from the Legislature authorized GDB to provide a line of credit financing for $500 million to the Special Communities Perpetual Trust for the construction and rehabilitation of housing, construction and improvements of electric, water and sewage systems; repair and improvements of streets and sidewalks; construction and improvement of recreational facilities, and to develop initiatives for economic self-sufficiency for the residents of a selected group of displaced and economically disadvantaged communities, all encompassed within the Special Communities Program initiated with the creation of the Special Communities Perpetual Trust by Act No. 271 of November 21, 2002. This nonrevolving line of credit, originally for a ten-year term, was extended on June 30, 2012 to a maturity date of June 30, 2040. Effective October 2009, the interest rate on this line was set at 7%. Annual payments on the line are determined using a 30-year amortization table based on the principal and interest balance as of December 31 of each year, and a 4% interest penalty is carried on late payments. Legislative Resolution No. 1762 of September 18, 2004, established that the principal plus accrued interest of this line would be repaid from Commonwealth's legislative appropriations as established by the Commonwealth OMB. The outstanding balance of this line as of June 30, 2015, amounted to approximately $345.8 million.

On May 23, 2012, the Commonwealth OMB entered into a $100 million line of credit agreement (amended during fiscal year 2015 to a maximum of $178 million) with GDB to cover costs of the implementation of the third phase of Act No. 70 of 2010. Borrowings under this line of credit bear interest at prime rate plus 1.50% with a floor of 6%. The amended line of credit matures on July 31, 2037. As of June 30, 2015, approximately $112.9 million was outstanding. On June 5, 2006, the Commonwealth OMB entered into a $150 million line of credit agreement with GDB to provide economic assistance for disasters and emergencies. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and were payable upon the original maturity of the line of credit on September 30, 2011. On July 22, 2011, OMB and GDB amended the $150 million line of credit agreement to extend its maturity date to July 30, 2022. In addition, the agreement was converted to a revolving line of credit bearing interest at 150 basis points over prime rate, but in no event may such rate be less than 6% per annum. As of June 30, 2015, approximately $150 million was outstanding. Both of the outstanding lines of credit are payable from Commonwealth's legislative appropriations.

(Continued)

CONFIDENTIAL

CW_STAY0009980

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On August 18, 2010, GDB provided PBA a nonrevolving credit facility in the maximum principal amount of approximately $93.6 million bearing interest at a fluctuating annual rate equal to Prime plus 1.50%, provided that such interest cannot be less than 6%, or at such other rate determined by GDB. The proceeds of the facility were used for construction projects development. The line is due on June 30, 2044, and is payable from the proceeds of future revenue refunding bond issuance of PBA. As of June 30, 2015, approximately $49.5 million was outstanding. PBA also maintains a $75 million line of credit agreement with GDB for payment of operational expenses. Borrowings under this line of credit agreement bear interest at a fixed rate of 7%, and are payable upon maturity on June 30, 2018. As of June 30, 2015, approximately $64.7 million was outstanding. In addition, on May 2, 2008, PBA executed two Loan Agreements with GDB for the interim financing of its Capital Improvement Program in an amount not to exceed approximately $226 million, bearing interest at 6%. The loans and the accrued interest are due on June 30, 2044, and are payable from the proceeds of the future revenue refunding bond issuance of PBA. The loans are divided into approximately $209 million on a tax-exempt basis and approximately $16.9 million on a taxable basis. As of June 30, 2015, approximately $64 million remains outstanding.

On February 6, 2003, the Department of Education of the Commonwealth entered into a $25 million line of credit agreement with GDB for the purchase of equipment and for school improvements. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR, and are payable upon the maturity of the line of credit on June 30, 2018. As of June 30, 2015, approximately $4.6 million was outstanding. On August 4, 2002, the Department of Education of the Commonwealth entered into an additional $140 million line of credit agreement with GDB in order to reimburse the Treasury Department of the Commonwealth for payments made on their behalf for state funds used to fund federal program expenditures. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2015, approximately $101.7 million was outstanding, which is payable from Commonwealth's legislative appropriations.

The Department of Transportation and Public Works of the Commonwealth entered into five line of credit agreements with GDB amounting to $104 million for improvement and maintenance of roads around the island. Borrowings under these lines of credit bear interest at a 7% rate and are payable upon maturity of the line of credit on June 30, 2018. As of June 30, 2015, approximately $82.2 million was outstanding, which is payable from Commonwealth's legislative appropriations. On May 12, 2004, the Correction Administration of the Commonwealth entered into a $60 million line of credit agreement with GDB for improvements to certain correctional facilities. Borrowings under this line of credit agreement bear interest at a fixed 7% rate and are payable upon the maturity of the line of credit on June 30, 2018. As of June 30, 2015, approximately $17.7 million was outstanding, which is payable from Commonwealth's legislative appropriations. In addition, on November 24, 2010, the Correction Administration of the Commonwealth entered into an $80 million line of credit agreement with GDB for the construction of a new correctional medical center. Borrowings under this line of credit agreement bear interest at a rate per annum equal to Prime Rate, plus 150 basis points, but in no event may such rate be less than 6% per annum nor greater than 12% per annum, and were payable originally upon the maturity of the line of credit on June 30, 2040. As of June 30, 2015, approximately $61.4 million was outstanding which is payable from Commonwealth's legislative appropriations.

193

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On August 22, 2007, UPRCCC entered into an $18 million nonrevolving line of credit agreement with GDB to build the UPRCCC's administrative offices and research facilities. On May 29, 2008, the agreement was amended, mainly to increase the maximum borrowing amount to $75 million, to extend the maturity date up to October 31, 2021, and to finance the construction of the hospital and radiotherapy facilities. The balance will be repaid from future annual Commonwealth legislative appropriations commencing in fiscal year 2015. The nonrevolving line bears interest at a fixed rate of 6%. As of June 30, 2015, approximately $25.5 million was outstanding. On November 18, 2013, the UPRCCC entered into another nonrevolving line of credit facility with GDB up to an aggregate principal amount not to exceed $196 million, for the construction and development of a ninety-six beds hospital, a multi disciplinary outpatient clinic, a diagnostic imaging center and a medical oncology infusion unit in a land lot property of the UPRCCC located in San Juan. The line of credit, including interest at a fixed rate of 6.5%, is payable in 28 consecutive annual installments from future Commonwealth legislative appropriations, commencing on the last business day of December 2016. As of June 30, 2015, approximately $51 million was outstanding.

On August 9, 1999, the Department of Agriculture of the Commonwealth entered into a $125 million nonrevolving line of credit agreement with GDB to provide economic assistance to the agricultural sector, which sustained severe damages caused by Hurricane Georges in 1998. As of February 24, 2004, the line of credit increased by $50 million resulting in a total amount of $175 million. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2015, approximately $65.1 million was outstanding, which is payable from Commonwealth's legislative appropriations.

On October 2, 2002, the Department of Justice of the Commonwealth entered into a $90 million line of credit agreement with GDB for the financing of 12 public improvement projects for the Municipality of Ponce pursuant to a court order. Borrowings under this line of credit agreement bear interest at variable rates and are payable upon the maturity of the line of credit on June 30, 2018. On August 8, 2005, the Department of Justice of the Commonwealth entered into an amended agreement to increase the aforementioned line of credit from $90 million to $110 million to cover various additional projects in Ponce, pursuant to the same court order. Borrowings under the new amended line of credit agreement bear interest at a 7% rate and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2015, the aggregated balance outstanding under this amended line of credit agreement amounted to $49.8 million which, is payable from Commonwealth's legislative appropriations.

On February 18, 2005, PRIFA entered into a $40 million credit agreement with GDB for the construction of an auditorium for the Luis A. Ferré Fine Arts Center. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon maturity of the loan agreement on June 30, 2040. Principal and interest payments are being paid from Commonwealth's legislative appropriations. As of June 30, 2015, approximately $4.8 million related to this credit agreement was outstanding. On June 1, 2009, PRIFA entered into an additional revolving line of credit agreement with GDB to provide financing for costs incurred by PRIFA under certain American Recovery and Reinvestment Act Programs (the ARRA programs). Borrowings under this line of credit agreement bear interest at variable rates based on 150 basis points over the prime rate and are payable upon the maturity of the line of credit on January 31, 2016. This line is being repaid from Commonwealth's legislative appropriations. As of June 30, 2015, the outstanding balance of this line

194 (Continued)

CONFIDENTIAL

CW_STAY0009982

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

of credit agreement amounted to approximately $7.1 million. On March 8, 2012, PRIFA also entered into a $35 million line of credit agreement with GDB for the acquisition, refurbishments, and maintenance of certain real estate properties that are mostly occupied by various governmental agencies. This credit facility is secured by a mortgage lien on the property and is payable from future Commonwealth appropriations. This line of credit matures on June 30, 2017, and bears interest at 150 basis points over the prime rate, with a minimum interest rate of 6%. As of June 30, 2015, the outstanding balance of this line of credit agreement amounted to approximately $37.3 million.

In August 2003, the Department of Health of the Commonwealth entered into a $30 million line of credit agreement with GDB in order to repay certain outstanding debts that the PRMeSA had with other agencies and suppliers. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon maturity of the line of credit on June 30, 2040. As of June 30, 2015, approximately $21.3 million related to this line of credit agreement was outstanding. On November 8, 2004, the Department of Health entered into an additional $58.5 million line of credit agreement with GDB for the financing of a project of the Department of Health and PRMeSA. Borrowings under this line of credit agreement bear interest at variable rates based on 150 basis points over GDB's commercial paper rate and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2015, the outstanding balance of this line of credit agreement amounted to approximately $19.6 million, which is payable from Commonwealth's legislative appropriations. On February 14, 2008, the Department of Health also entered into an additional $8 million line of credit agreement with GDB to cover costs of treatment, diagnosis, and supplementary expenses during fiscal year 2008 in conformity with Act No. 150 of 1996. Borrowings under this line of credit agreement bear interest at variable rates based on 125 basis points over three-month LIBOR and are payable upon maturity of the line of credit on June 30, 2040. As of June 30, 2015, the outstanding balance of this line of credit agreement amounted to approximately $3.3 million, which is payable from Commonwealth's legislative appropriations.

On July 29, 2004, the Police Department of the Commonwealth entered into a $48 million line of credit agreement with GDB for the acquisition of vehicles and high technology equipment. Borrowings under this line of credit agreement bear interest based on the All Inclusive Total Interest Cost of the Medium-Term Notes, Series B, plus a markup of 1.25%, and are payable upon the maturity of the line of credit on June 30, 2040. The outstanding balance of this line of credit agreement amounted to approximately $31.7 million as of June 30, 2015, which is payable from the Commonwealth's legislative appropriations.

On February 15, 2002, the Office of the Superintendent of the Capitol entered into a $35 million line of credit agreement with GDB for the Office of the Superintendent of the Capitol parkings construction. Borrowings under this line of credit agreement bear interest at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2015, approximately $15.5 million remained outstanding from the line of credit agreement, which is payable from the Commonwealth's legislative appropriations. On February 9, 2012, the Office of the Superintendent of the Capitol entered into an additional $15 million line of credit agreement with GDB for permanent improvements of existing buildings. Borrowings under this line of credit agreement bear interest at 150 basis points over Prime Rate and may not be less than 6% nor greater than 12% per annum and are payable upon maturity of the line of credit on June 30, 2018. As of June 30, 2015, approximately $6.5 million was outstanding, which is payable from Commonwealth's legislative

(Continued)

CONFIDENTIAL                                                   CW_STAY0009983

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

appropriations. On December 17, 2014, the Office of the Superintendent of the Capitol entered into another $15 million line of credit agreement with GDB for permanent improvements to the Capitol District. Borrowings under this line of credit agreement bear interest at the fixed rate of 58% and are payable upon maturity of the line of credit on June 30, 2024. As of June 30, 2015, approximately $3 million was outstanding.

On March 8, 2007, the Department of Housing of the Commonwealth entered into a $19 million line of credit agreement with GDB, to reimburse the Puerto Rico Housing Financing Authority, a blended component unit of GDB, for certain advances made for a revitalization project. Borrowings under this line of credit agreement bear interest at a variable rate of three-month LIBOR plus 1.25%, not to exceed 5%, and are payable upon maturity of the line of credit on June 30, 2040. As of June 30, 2015, the line of credit has an outstanding balance of approximately $5.5 million, which is payable from the proceeds of the sale of properties. On December 3, 2007, the Department of Housing entered into an additional $30 million line of credit agreement with GDB for the purchase of Juan C. Cordero Dávila building. Borrowings under this line of credit agreement bear interest based on 75 basis points over three-month LIBOR and are payable upon maturity of the line of credit on February 28, 2038. As of June 30, 2015, approximately $15.6 million related to this line of credit agreement was outstanding, which is payable from future rental revenues.

On January 18, 2005, the Department of Recreation and Sports of the Commonwealth (DRS) entered into a $17.2 million line of credit agreement with GDB for the development of a series of recreational projects at different municipalities. Borrowings under this line of credit agreement bear interest based on 150 basis points over GDB's commercial paper rate and are payable upon the maturity of the line of credit on June 30, 2040. As of June 30, 2015, approximately $0.5 million was outstanding. Also, on February 9, 2004, DRS entered into a $16 million line of credit agreement with GDB for the development and improvement of recreational facilities. Borrowings under this line of credit agreement bear interest on the unpaid principal amount of each advance at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2018. As of June 30, 2015, approximately $0.6 million was outstanding, which is payable from Commonwealth's legislative appropriations. An additional line of credit agreement was entered into between GDB and DRS in the maximum principal amount of $13.028 million bearing interest on the unpaid principal amount of each advance at a fixed rate of 7% and are payable upon the maturity of the line of credit on June 30, 2040. The proceeds of the line of credit were used for development and improvement of recreational facilities. As of June 30, 2015, approximately $8.2 million was outstanding, which is payable from Commonwealth's legislative appropriations. On July 23, 2014, Act No. 107 was approved, creating the National Parks Program of the Commonwealth (NPP), which among other provisions, merged NPCPR, then a discretely presented component unit, into a program within the DRS, NPCPR then cease to exist as a separate legal entity. With this transaction, the program brought three separate line of credit agreements with GDB into DRS. On August 17, 2007, NPP entered in a $10 million line of credit in order to finance an early retirement program in response to Act No. 70 of June 30, 2007. Borrowings under this line of credit agreement bear interest based on a fixed rate of 7%, and principal and interest are payable on October 31 of each year until December 31, 2018. The source for the repayment comes from revenues collected by NPP during the first four months of the year and thereafter until 2018. As of June 30, 2015, approximately $3.5 million was outstanding. On February 6, 2003, NPP entered in a $9.3 million line of credit in order to finance the improvements of certain parks, seaside facilities and buildings of NPP. Borrowings under this line of credit

196                                                                                      (Continued)

CONFIDENTIAL                                                                  CW_STAY0009984

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

agreement bear interest based on a variable rate (7% as of June 30, 2015). Principal and interest are payable annually through June 30, 2040 and the source for the repayment comes from legislative appropriations. As of June 30, 2015, approximately $1.1 million was outstanding. During 2003, NPP entered into a $12 million line of credit in order to finance the acquisition of a certain land lot. Borrowings under this line of credit agreement bear interest based on a variable rate (7% as of June 30, 2015). Principal and interest are payable annually through June 30, 2040, and the source for the repayment comes from future Commonwealth's legislative appropriations. As of June 30, 2015, approximately $4.5 million was outstanding.

On May 7, 2001, the Puerto Rico Court Administration Office (the Office) entered into a $49.4 million nonrevolving line of credit agreement with GDB for operating purposes. Borrowings under this line of credit agreement bear interest at a variable rate of three-month LIBOR plus 1%, not to exceed 8%. The Office must deposit $6 million a year, from the total fees collected on the filing of civil cases, in a special fund created by the Treasury Department of the Commonwealth, which is pledged for repayment until July 31, 2015. During fiscal year 2015, this line of credit was fully repaid. On February 27, 2014, the Office entered into an additional $50 million line of credit agreement with GDB for the development of several priority projects pursuant to its strategic plan and to fund additional operational commitments. Borrowings under this line of credit agreement bear interest at 150 basis points over Prime Rate and may not be less than 6% nor greater than 12% per annum and are payable upon maturity of the line of credit on July 31, 2027. As of June 30, 2015, approximately $16.8 million was outstanding, which is payable from future custom duty taxes.

Act No. 80 of 2015 was approved with the objective of addressing the Commonwealth's projected cash flow deficiencies for fiscal year 2015. This Act, among other provisions, specifically authorized the SIFC, PRTC, AACA, EDB, PRIDCO and the Department of Economic Development and Commerce to grant loans and/or special contributions to the Treasury Department, in the aggregate amount of $125 million. On June 5 and 9, 2015, SIFC and AACA granted loans to the Treasury Department under the provisions of this Act in the amounts of $100 million and $2 million, respectively, which is payable from the Commonwealth's legislative appropriations. These loans bear interest at a rate of 1%, and principal and interest will be payable on an annual basis, effective July 31, 2017. The loan granted by ACAA matures on July 31, 2022, and that granted by SIFC matures on July 31, 2032.

CONFIDENTIAL                                                          CW_STAY0009985

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On December 26, 2013, the General Service Administration (GSA) entered into a $33.3 million nonrevolving line of credit agreement with a financial institution for the purchase of four helicopters to be used by the Puerto Rico Police Department, through a lease agreement between both government agencies. Such lease agreement has been assigned as the line of credit repayment source, which in turn will be sustained with annual future Commonwealth legislative appropriations in the amounts necessary to cover the required debt service of the line of credit. This obligation is payable in seven equal, annual and consecutive installments commencing on July 15, 2014, plus interest payable on July 15 and January 15 of every year beginning on July 15, 2014, at an interest rate based on the financial institution cost of funds, as defined, plus 0.25 basis points. The interest rate as of June 30, 2015, was 3.0204%. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of principal and interest on this obligation. As of June 30, 2015, approximately $28.5 million was outstanding. Debt service requirements in future years are as follows (in thousands):

|  | | Principal | Interest | Total |
|---|---|---|---|---|
| Year ending June 30: | | | | |
| 2016 | $ | 4,753 | 810 | 5,563 |
| 2017 | | 4,753 | 656 | 5,409 |
| 2018 | | 4,753 | 509 | 5,262 |
| 2019 | | 4,753 | 363 | 5,116 |
| 2020 | | 4,753 | 218 | 4,971 |
| 2021 | | 4,752 | 73 | 4,825 |
| Total | $ | 28,517 | 2,629 | 31,146 |

(ii)  *Business-Type Activities (in thousands):*

| | | |
|---|---|---|
| Puerto Rico Medical Services Administration | $ | 282,445 |
| Puerto Rico Health Insurance Administration | | 183,251 |
| Ponce Ports Authority | | 19,100 |
| Notes payable to GDB | $ | 484,796 |

On October 14, 2010, the Legislature approved a new article 9A to Act No. 66 of June 22, 1978, by which it authorized PRMeSA, a component unit blended as a Commonwealth enterprise fund, to incur on an obligation of up to $285 million to be deposited in a special GDB account and to be used for payment of debts to suppliers, agencies and a reserve fund for self insurance of PRMeSA, and to provide operational liquidity to ease PRMeSA's fiscal situation. GDB was named fiscal agent to administer and monitor the use of these funds. The Commonwealth is required to honor the payment of this obligation with future legislative appropriations to be made every year until fiscal year 2023–2024. Borrowings under this line of credit agreement bear interest at variable rates based on 150 basis points over the prime rate. No legislative appropriations were made in 2015 to cover the first scheduled principal payment of approximately $31.5 million. As of June 30, 2015, approximately $282.4 million was outstanding.

(Continued)

CONFIDENTIAL                                                      CW_STAY0009986

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On March 14, 2011, PRHIA, a blended component unit, entered into a credit agreement with GDB in order to pay its obligations to healthcare insurers incurred prior to fiscal year 2010. The aggregate principal amount of the nonrevolving line of credit was $186 million. This line is payable in nine payments of $20.7 million each due on March 14 of the years 2015 through 2023, through future Commonwealth annual legislative appropriations. Interests are accrued at a fluctuating annual rate of interest equal to the greater of 150 basis points over the prime rate and 6%. No legislative appropriations were made in 2015 to cover the first principal payment scheduled for March 14, 2015. As of June 30, 2015, the outstanding principal balance amounted to approximately $183.3 million.

On August 29, 2014, the PPA entered into an $60 million line of credit agreement with GDB to cover the operational, maintenance, equipment acquisition and permanent improvement costs of the Ports of the Americas Rafael Cordero Santiago, pursuant to the provisions of Act No. 240 of 2011, which created the PPA (assets are owned by PAA as of June 30, 2015). Borrowings under this line of credit agreement bear interest based on the rates borne by the general obligation of the Commonwealth. These rates should be revised on a quarterly basis provided, however, that the interest may never be less than 7% nor greater than 12%. Interest during fiscal year 2015 was 7.78%. The line of credit has a maturity of June 30, 2044, and its principal and interests are payable through annual legislative appropriations. As of June 30, 2015, the outstanding principal balance was approximately $19.1 million, which is payable from future Commonwealth's legislative appropriations.

*(h) Obligations under Capital Lease Arrangements*

The Commonwealth is obligated under capital leases with third parties that expire through 2044 for land, buildings, and equipment.

The present value of future minimum capital lease payments at June 30, 2015 reported in the accompanying government-wide statement of net position is as follows (in thousands):

| Year ending June 30: | | |
|---|---|---:|
| 2016 | $ | 35,658 |
| 2017 | | 35,547 |
| 2018 | | 34,524 |
| 2019 | | 33,448 |
| 2020 | | 33,349 |
| 2021–2025 | | 166,669 |
| 2026–2030 | | 165,947 |
| 2031–2035 | | 126,302 |
| 2036–2040 | | 92,715 |
| 2041–2045 | | 60,166 |
| Total future minimum lease payments | | 784,325 |
| Less amount representing interest costs | | (433,971) |
| Present value of minimum lease payments | $ | 350,354 |

CONFIDENTIAL                                                                CW_STAY0009987

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Leased land, buildings, and equipment under capital leases included in capital assets at June 30, 2015, include the following (in thousands):

| | | |
|---|---|---:|
| Land | $ | 7,960 |
| Buildings | | 438,784 |
| Equipment | | 1,696 |
| Subtotal | | 448,440 |
| Less accumulated amortization | | (78,167) |
| Total | $ | 370,273 |

Amortization applicable to capital leases and included within depreciation expense of capital assets amounted to approximately $16.5 million in 2015.

**(i) Net Pension Liability**

The amount reported as net pension liability in the government-wide financial statements of approximately $33 billion of which approximately $77 million is due within one year at June 30, 2015, represents the Primary Government's proportionate share of the ERS calculation of the measure represented by the total pension liability less the amount of the ERS fiduciary net position, plus the sum of the full TRS and JRS measure of its total pension liability less the amount of its corresponding fiduciary net positions (see Note 17).

**(j) Other Post-Employment Benefit Obligation**

The amount reported as other post-employment benefit obligation in the Governmental Activities and Business-Type Activities of approximately $2 million and $1.8 million, respectively, at June 30, 2015 represents the cumulative amount owed by the Commonwealth for the unfunded prior years' actuarially required other post-employment benefit contributions to the ERS MIPC, JRS MIPC, and TRS MIPC (see Note 18) in the case of Governmental Activities, and to other post-employment plans in the case of Business-Type Activities.

**(k) Compensated Absences**

Long-term liabilities include approximately $1.3 billion and $19.6 million of accrued compensated absences recorded as Governmental and Business-Type Activities, respectively, at June 30, 2015.

(Continued)

CONFIDENTIAL

CW_STAY0009988

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(l)   *Obligation for Unpaid Lottery Prizes***

The amount reported as unpaid lottery prizes represents the lottery prizes payable of the Lottery of Puerto Rico (commonly known as Traditional Lottery) and the Additional Lottery System (commonly known as Lotto) jointly known as the Lotteries at June 30, 2015. The minimum annual payments related to unpaid awards of both lotteries are as follows (in thousands):

|  | | Principal | Interest | Total |
|---|---|---|---|---|
| Year ending June 30: | | | | |
| 2016 | $ | 102,859 | 10,138 | 112,997 |
| 2017 | | 17,322 | 10,090 | 27,412 |
| 2018 | | 15,239 | 9,698 | 24,937 |
| 2019 | | 13,062 | 8,940 | 22,002 |
| 2020 | | 11,363 | 8,315 | 19,678 |
| 2021–2025 | | 38,015 | 30,864 | 68,879 |
| 2026–2030 | | 18,256 | 13,769 | 32,025 |
| 2031–2035 | | 5,378 | 3,873 | 9,251 |
| Total | $ | 221,494 | 95,687 | 317,181 |

The minimum annual payments related to unpaid awards of Lotto include an unclaimed prizes liability (not lapsed) of approximately $5.3 million at June 30, 2015, which is reported as prizes payable – current portion.

The liability for unpaid lottery prizes is reported in Business-Type Activities of the accompanying statement of net position and statement of net position of the proprietary funds.

**(m)  *Voluntary Termination Benefits Payable***

On July 2, 2010, the Commonwealth enacted Act No. 70 to establish a program that provides early retirement benefits or economic incentives for voluntary employment termination to eligible employees, as defined. Act No. 70 applies to agencies and component units whose budgets are funded in whole or in part by the General Fund.

Act No. 70 established that early retirement benefits (early retirement program) will be provided to eligible employees that have completed between 15 to 29 years of credited services in the Retirement System and will consist of bi-weekly benefits ranging from 37.5% to 50% of each employee's salary, as defined. Pursuant to Act No. 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Retirement System, as well as covering the annuity payments to the employees opting for the early retirement, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments.

CONFIDENTIAL                                                                                    CW_STAY0009989

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Economic incentives are available to eligible employees who have less than 15 years of credited service in the Retirement System (incentivized resignation program) or who have at least 30 years of credited service in the Retirement System and who have the age for retirement (incentivized retirement program). Economic incentives will consist of a lump sum payment ranging from one month to six months' salary based on employment years.

Additionally, eligible employees that choose to participate in the early retirement program or in the incentivized resignation program are eligible to receive health plan coverage for up to 12 months in a health plan selected by management of the Commonwealth.

In addition, Act No. 70 allows certain component units of the Commonwealth that operate with their own resources to implement a similar program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. The benefits and the requirements are the same as provided by Act No. 70, except as follows: in the early retirement benefit program, the component unit will make the employee and employer contributions to the Retirement System and pay the corresponding pension until the employee complies with the requirements of age and 30 years of credited service in the Retirement System; and in the incentivized retirement program, the component unit will make the employee and the employer contributions to the Retirement System for a five year period.

The following table summarizes the financial impact resulting from the benefits granted to participants of Act No. 70 and similar programs in the government-wide financial statements as of and for the year ended June 30, 2015 (in thousands):

| Accrued voluntary termination | | Primary government | | | |
| | | Governmental activities | Business-type activities | Totals primary government | Component units |
|---|---|---|---|---|---|
| Benefits as of June 30, 2015: | | | | | |
| Due within one year | $ | 97,607 | 1,329 | 98,936 | 19,977 |
| Due in more than one year | | 638,167 | 8,196 | 646,363 | 156,599 |
| Total | $ | 735,774 | 9,525 | 745,299 | 176,576 |
| Expenses for the year ended June 30, 2015 | $ | 37,839 | 189 | 38,028 | 35,035 |

At June 30, 2015, unpaid long-term benefits granted in Act No. 70 were discounted at interest rates that ranged from 0.46% to 3.00% at the Primary Government level and from 0.055% to 2.49% at the component units level.

As required by Act No. 70, the General Fund of the Commonwealth must appropriate on an annual basis funds necessary to cover the annual payments of Act No. 70 of certain components units. Discounted termination benefits payable of these component units amounted to approximately $66.7 million as of June 30, 2015.

(Continued)

CONFIDENTIAL

CW_STAY0009990

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(n) Claims Liability for Health Insurance Benefits**

The Commonwealth, through PRHIA (a blended component unit), is responsible for implementing, administering, and negotiating a health insurance system, through contracts with insurance underwriters, to provide quality medical and hospital care to the Commonwealth residents regardless of their financial condition and capacity to pay. PRHIA pays a monthly premium to such insurance underwriters based on a contracted premium and the number of members subscribed in the health plan. Funds to pay for such premiums are requested from the Commonwealth, net of funds available for such purposes from all other sources.

Under the provisions of Act No. 105 of July 19, 2002, which amends Act No. 72 of 1993, PRHIA was authorized to negotiate directly with health providers under a pilot program. PRHIA has, since then, entered into different direct contracts to cover the insured population of different regions and municipalities. Since November 1, 2006 through September 1, 2010, PRHIA directly contracted providers that served approximately 190,000 lives from the metro north region. At June 30, 2011, PRHIA has direct contracting projects with the municipalities of Vieques and Guaynabo, and effective October 1, 2011, the projects were expanded to cover the west, the metro north, the north, San Juan, the northeast, and the virtual regions under a new arrangement with a new insurance underwriter as third-party administrator. In addition, PRHIA implemented certain cost containment strategies to control costs, such as establishing a co-payment that applies for the unjustified use of emergency rooms, detection and control of prescription drug overuse, implementation of a disease management program for respiratory conditions, modification of provider fees, and better coordination of benefits for members of the population that have other medical insurance.

PRHIA establishes a liability to cover for the estimated amount to be paid to providers based on experience and accumulated statistical data under one of the direct contracting pilot projects. The estimates of medical claims incurred but not reported and other medical expense payments is developed using actuarial methods and assumptions based upon payment patterns, inflation of medical costs, historical developments, and other relevant factors. The following table provides a reconciliation of the beginning and ending liability for incurred but unpaid medical and benefit adjustment expenses for the period ended June 30, 2015 (in thousands):

| | | |
|---|---|---:|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ | 281,714 |
| Total incurred benefits | | 1,762,647 |
| Total benefit payments | | (1,804,208) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ | 240,153 |

The liability for health benefits claims is reported as liability for health insurance in the Business-Type Activities of the accompanying statement of net position and in the statement of net position of the proprietary funds. The liability as of June 30, 2015, amounts to approximately $240.2 million.

CONFIDENTIAL                                                                          CW_STAY0009991

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*(o) Claims Liability for Unemployment and Disability Insurance Benefits*

The Commonwealth provides unemployment compensation, occupational disability, and drivers' insurance coverage to public and private employees through various insurance programs administered by the Department of Labor and Human Resources of the Commonwealth. These insurance programs cover workers against unemployment, temporary disability, or death because of work or employment related accidents or because of illness suffered as consequence of their employment. The following table provides a reconciliation of the beginning and ending liability for incurred but unpaid benefits and benefit adjustment expenses for the year ended June 30, 2015:

| | | Unemployment insurance | Other nonmajor proprietary funds | Totals |
|---|---|---|---|---|
| | | (In thousands) | | |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ | 62,915 | 746 | 63,661 |
| Total incurred benefits | | 161,312 | 2,514 | 163,826 |
| Total benefit payments | | (166,544) | (2,609) | (169,153) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ | 57,683 | 651 | 58,334 |

The Commonwealth establishes liabilities for incurred but unpaid benefits and benefit adjustment expenses based on the ultimate cost of settling the benefits. Insurance benefit claim liabilities are reevaluated periodically to take into consideration recently settled claims, the frequency of claims, and other economic and social factors. The liability for insurance benefits claims is reported as liability for unemployment and disability insurance in the Business-Type Activities of the accompanying statement of net position and statement of net position of the proprietary funds. The liability as of June 30, 2015, amounts to approximately $58.3 million.

(Continued)

CONFIDENTIAL

CW_STAY0009992

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (p)  Other Long-Term Liabilities

The remaining long-term liabilities of Governmental Activities at June 30, 2015 include (in thousands):

| | | |
|---|---|---|
| Liability for legal claims and judgments (note 16) | $ | 1,134,410 |
| Liability to U.S. Army Corps of Engineers (note 10) | | 190,211 |
| Liability for custodial credit risk loss of State Revolving Funds | | 133,302 |
| Accrued Employees' Christmas bonus | | 77,498 |
| Liability for federal cost disallowances (note 16) | | 69,907 |
| Other | | 33,967 |
| Total | $ | 1,639,295 |

As described in Note 10, the Commonwealth has a debt obligation with the U.S. Army Corps of Engineers (USACE) in relation to its estimated allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project. Late in April 2011, the Commonwealth received a final debt agreement from the U.S. Army Corps of Engineers establishing a repayment schedule for its allocated share of the construction costs associated with the Cerrillos Dam and Reservoir Project, amounting to $214 million, excluding those costs for items built for recreational purposes. On October 10, 2012, the U.S. Army Corps of Engineers placed such debt into the U.S. Treasury Department Offset Program (the Offset Program) until May 2013 (the month in which the Offset Program was stopped). On March 21, 2014, the U.S. Army Corps of Engineers granted certain concessions on this obligation of the Commonwealth by forgiving the balance already due and payable in the amount of $35.4 million and approving a new payment plan proposed by the Secretary of the Treasury for the remaining debt obligation. This new payment plan reduced the interest rate from 6.063% to 1.50% and waived all cumulative penalty interest and fees, which reduced the annual payment from approximately $12.9 million to approximately $7.1 million for the remaining term of the debt. The new payment plan consists of 33 annual payments of $7.1 million, including interests, from June 7, 2014 until June 7, 2046. These concessions qualified as a troubled debt restructuring, where the total future cash payments specified by the new terms exceeded the carrying value of the old debt, including the accrued balance matured and payable of $35.4 million. Under such circumstances, the effects of the new terms are accounted for prospectively without modifying the carrying amount of the debt in the statement of net position.

CONFIDENTIAL                                                                 CW_STAY0009993

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The unpaid allocated share of the construction costs associated with the Cerrillos Project amounted to approximately $174 million at June 30, 2015. Debt service requirements on this debt obligation at June 30, 2015 were as follows (in thousands):

|  | Principal | Interest | Total |
|---|---|---|---|
| Year(s) ending June 30: | | | |
| 2016 | $ 4,461 | 2,616 | 7,077 |
| 2017 | 4,527 | 2,550 | 7,077 |
| 2018 | 4,595 | 2,482 | 7,077 |
| 2019 | 4,664 | 2,413 | 7,077 |
| 2020 | 4,734 | 2,342 | 7,076 |
| 2021–2025 | 24,758 | 10,626 | 35,384 |
| 2026–2030 | 26,672 | 8,712 | 35,384 |
| 2031–2035 | 28,733 | 6,651 | 35,384 |
| 2036–2040 | 30,953 | 4,430 | 35,383 |
| 2041–2045 | 33,346 | 2,038 | 35,384 |
| 2046–2050 | 6,972 | 105 | 7,077 |
| Total | $ 174,415 | 44,965 | 219,380 |

In addition, the Commonwealth has a debt obligation of approximately $15.8 million with the U.S. Army Corps of Engineers in relation to its estimated allocated share of the construction costs associated with the recreational part of the Cerrillos Dam and Reservoir Project, including accrued interest of approximately $5.6 million, at June 30, 2015. The final debt agreement with the U.S. Army Corps of Engineers for the recreational part of the Cerrillos Dam and Reservoir Project has not been finalized, and therefore, terms and conditions could differ from those estimated. The related debt is expected to be payable in annual installment payments over a 35-year period. However, the debt has been presented as a long-term payable after one year in the accompanying statement of net position since the commencement date of repayment has not yet been determined.

The remaining other long-term liabilities within Business-Type Activities at June 30, 2015 are composed primarily of accrued pension costs and legal claims for approximately $49.1 million and $2.4 million, respectively, all corresponding to PRMeSA.

*(q) Fiduciary Funds*

On January 31, 2008, ERS issued its first of three series of bonds (collectively, ERS Bonds), which consisted of approximately $1,589 million aggregate principal amount of Senior Pension Funding Bonds, Series A (the Series A Bonds). On June 2, 2008, ERS issued its second series of ERS Bonds, which consisted of approximately $1,059 million aggregate principal amount of Senior Pension Funding Bonds, Series B (the Series B Bonds). Finally, on June 30, 2008, ERS issued its third and final series of ERS Bonds, which consisted of approximately $300 million aggregate principal amount of Senior Pension Funding Bonds, Series C (the Series C Bonds).

206                                    (Continued)

CW_STAY0009994

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The ERS Bonds are limited, nonrecourse obligations of ERS, payable solely from employer contributions made after the date of issuance of the first series of the ERS Bonds, and from funds held on deposit with the Bank of New York Mellon (the Fiscal Agent). ERS Bonds are not payable from contributions made to ERS by participating employees, or from the assets acquired with the proceeds of the ERS Bonds, or from employer contributions released by the Fiscal Agent to ERS after funding of required reserves, or from any other asset of ERS. ERS invested the proceeds of ERS Bonds and used these investments and the earnings thereon to provide pension benefits to its beneficiaries.

As of June 30, 2015, the outstanding principal balance of ERS Bonds is as follows (in thousands):

| Description | |
| --- | ---: |
| Series A Bonds: | |
| Capital Appreciation Bonds, maturing in 2028, bearing interest at 6.20% | $ 70,853 |
| Term Bonds, maturing in 2023, bearing interest at 5.85% | 200,000 |
| Term Bonds, maturing from 2031 through 2038, bearing interest at 6.15% | 679,000 |
| Term Bonds, maturing from 2039 through 2042, bearing interest at 6.20% | 332,770 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.45% | 332,000 |
| Total Series A Bonds outstanding | 1,614,623 |
| Series B Bonds: | |
| Capital Appreciation Bonds, maturing from 2028 through 2030, bearing interest at 6.40% | 220,485 |
| Capital Appreciation Bonds, maturing from 2031 through 2034, bearing interest at 6.45% | 159,137 |
| Term Bonds, maturing in 2031, bearing interest at 6.25% | 117,100 |
| Term Bonds, maturing from 2036 through 2039, bearing interest at 6.30% | 270,000 |
| Term Bonds, maturing from 2055 through 2058, bearing interest at 6.55% | 429,000 |
| Total Series B Bonds outstanding | 1,195,722 |
| Series C Bonds: | |
| Capital Appreciation Bonds, maturing in 2030, bearing interest at 6.50% | 3,449 |
| Term Bonds, maturing in 2028, bearing interest at 6.15% | 110,000 |
| Term Bonds, maturing in 2038, bearing interest at 6.25% | 45,000 |
| Term Bonds, maturing in 2043, bearing interest at 6.30% | 143,000 |
| Total Series C Bonds outstanding | 301,449 |
| Total bonds outstanding | 3,111,794 |
| Less bonds discount | (6,346) |
| Bonds payable – net | $ 3,105,448 |

**Series A Bonds** – The aggregate principal amount of the Series A Bonds issued amounted to approximately $1,589 million of which $1,544 million was issued as term bonds (the Series A Term

207                                                                 (Continued)

CONFIDENTIAL

CW_STAY0009995

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Bonds) and $45 million was issued as capital appreciation bonds (the Series A Capital Appreciation Bonds). Interest on the Series A Term Bonds is payable monthly on the first day of each month. Interest on the Series A Capital Appreciation Bonds is not payable on a current basis, but is added to the principal of the Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest must be computed based on a 360-day year consisting of twelve 30-day months. The Series A Bonds are subject to redemption at the option of ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series A Capital Appreciation Bonds, the accreted amount) of the Series A Bonds, plus accrued interest to the redemption date, and without premium.

In addition, the following Series A Term Bonds are subject to mandatory redemption in part commencing on July 1, 2021 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (in thousands):

| Redemption period | Subject bonds | | Amount |
|---|---|---|---|
| July 1, 2021 | Term bonds maturing July 1, 2023 | $ | 50,000 |
| July 1, 2022 | Term bonds maturing July 1, 2023 | | 70,000 |
| July 1, 2023 | Term bonds maturing July 1, 2023 | | 80,000 |
| Subtotal | | | 200,000 |
| July 1, 2031 | Term bonds maturing July 1, 2038 | | 3,000 |
| July 1, 2032 | Term bonds maturing July 1, 2038 | | 4,500 |
| July 1, 2033 | Term bonds maturing July 1, 2038 | | 4,000 |
| July 1, 2034 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2035 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2036 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2037 | Term bonds maturing July 1, 2038 | | 133,500 |
| July 1, 2038 | Term bonds maturing July 1, 2038 | | 133,500 |
| Subtotal | | | 679,000 |
| Total | | $ | 879,000 |

**Series B Bonds** – The aggregate principal amount of the Series B Bonds amounted to approximately $1,059 million of which $816 million was issued as term bonds (the Series B Term Bonds) and $243 million was issued as capital appreciation bonds (the Series B Capital Appreciation Bonds). Interest on the Series B Term Bonds is payable monthly on the first day of each month. Interest on the Series B Capital Appreciation Bonds is not payable on a current basis, but is added to the principal of the Series B Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest must be computed based on a 360-day year consisting of twelve 30-day months. The Series B Bonds are subject to redemption at the option of ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series B Capital

208

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Appreciation Bonds, the accreted amount) of the Series B Bonds, plus accrued interest to the redemption date, and without premium.

**Series C Bonds** – The aggregate principal amount of the Series C Bonds amounted to approximately $300 million of which $298 million was issued as term bonds (the Series C Term Bonds) and $2 million was issued as capital appreciation bonds (the Series C Capital Appreciation Bonds). Interest on the Series C Term Bonds is payable monthly on the first day of each month. Interest on the Series C Capital Appreciation Bonds is not payable on a current basis, but are added to the principal of the Series C Capital Appreciation Bonds on each January 1 and July 1 (Compounding Dates), and is treated as if accruing in equal daily amounts between Compounding Dates, until paid at maturity or upon redemption. Interest must be computed based on a 360-day year consisting of twelve 30-day months. The Series C Bonds are subject to redemption at the option of ERS from any source, in whole or in part at any time on or after July 1, 2018, at a redemption price equal to the principal amount (in the case of Series C Capital Appreciation Bonds, the accreted amount) of the Series C Bonds, plus accrued interest to the redemption date, and without premium.

In addition, the following Series C Term Bonds are subject to mandatory redemption in part commencing on July 1, 2024 to the extent of the sinking fund requirement for said bonds set forth below at a redemption price equal to 100% of the principal amount thereof plus accrued interest as follows (in thousands):

| Redemption period | Subject bonds | Amount |
|---|---|---|
| July 1, 2024 | Term bonds maturing July 1, 2028 | $ 18,700 |
| July 1, 2025 | Term bonds maturing July 1, 2028 | 22,000 |
| July 1, 2026 | Term bonds maturing July 1, 2028 | 29,150 |
| July 1, 2027 | Term bonds maturing July 1, 2028 | 36,300 |
| July 1, 2028 | Term bonds maturing July 1, 2028 | 3,850 |
| | Subtotal | 110,000 |
| July 1, 2029 | Term bonds maturing July 1, 2038 | 100 |
| July 1, 2030 | Term bonds maturing July 1, 2038 | 540 |
| July 1, 2031 | Term bonds maturing July 1, 2038 | 100 |
| July 1, 2032 | Term bonds maturing July 1, 2038 | 3,420 |
| July 1, 2033 | Term bonds maturing July 1, 2038 | 4,320 |
| July 1, 2034 | Term bonds maturing July 1, 2038 | 100 |
| July 1, 2035 | Term bonds maturing July 1, 2038 | 11,940 |
| July 1, 2036 | Term bonds maturing July 1, 2038 | 2,160 |
| July 1, 2037 | Term bonds maturing July 1, 2038 | 7,920 |
| July 1, 2038 | Term bonds maturing July 1, 2038 | 14,400 |
| | Subtotal | 45,000 |

(Continued)

CONFIDENTIAL

CW_STAY0009997

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

| Redemption period | Subject bonds | Amount |
|---|---|---|
| July 1, 2039 | Term bonds maturing July 1, 2043 | $      28,600 |
| July 1, 2040 | Term bonds maturing July 1, 2043 | 28,600 |
| July 1, 2041 | Term bonds maturing July 1, 2043 | 28,600 |
| July 1, 2042 | Term bonds maturing July 1, 2043 | 28,600 |
| July 1, 2043 | Term bonds maturing July 1, 2043 | 28,600 |
| | Subtotal | 143,000 |
| | Total | $    298,000 |

ERS complied with the sinking fund requirements at June 30, 2015. Debt service requirements in future years on ERS bonds as of June 30, 2015 are as follows (in thousands):

| | Principal | Interest | Total |
|---|---|---|---|
| Year(s) ending June 30: | | | |
| 2016 | $          — | 166,519 | 166,519 |
| 2017 | — | 166,519 | 166,519 |
| 2018 | — | 166,519 | 166,519 |
| 2019 | — | 166,519 | 166,519 |
| 2020 | — | 166,519 | 166,519 |
| 2021–2025 | 218,700 | 799,171 | 1,017,871 |
| 2026–2030 | 648,055 | 747,700 | 1,395,755 |
| 2031–2035 | 897,165 | 700,709 | 1,597,874 |
| 2036–2040 | 1,036,940 | 484,531 | 1,521,471 |
| 2041–2045 | 279,250 | 266,815 | 546,065 |
| 2046–2050 | — | 247,568 | 247,568 |
| 2051–2055 | — | 247,568 | 247,568 |
| 2056–2060 | 761,000 | 82,048 | 843,048 |
| | 3,841,110 | 4,408,705 | 8,249,815 |
| Less unaccreted interest | (729,316) | | |
| Less unamortized discount | (6,346) | | |
| Total | $    3,105,448 | | |

**Use of Employer Contributions** – ERS entered into a Security Agreement with the Fiscal Agent for the benefit of the bondholders, pursuant to which ERS pledged to the Fiscal Agent, and granted the Fiscal Agent a security interest in employer contributions made after January 31, 2008, which was the date of issuance of the first series of bonds, and the funds on deposit with the Fiscal Agent under the various accounts established under the Pension Funding Bond Resolution (the Resolution).

210                                                                (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Annual employer contributions that are made after January 31, 2008, which was the date of issuance of the first Series of bonds, in accordance with the Act and amounts on deposit in the different accounts created pursuant to the Resolution for the benefits of the owners of the bonds, are used for annual debt service requirements as established.

*(r)* ***Discretely Presented Component Units***

Notes, bonds, and appropriation bonds payable are those liabilities that are paid out of the component units' own resources. These obligations do not constitute a liability or debt of the Primary Government.

The outstanding balance of notes payable at June 30, 2015 is as follows (in thousands):

| Component unit | Interest rates | Maturity through | Balance at June 30, 2014 (as restated) | Additions | Reductions | Balance at June 30, 2015 | Due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Government Development Bank for Puerto Rico | 3.375%–8.00% | 2042 | $   4,527,191 | 900,000 | 1,377,204 | 4,049,987 | 609,040 |
| Puerto Rico Highways and Transportation Authority | 8.75% | 2016 | 400,000 | — | 400,000 | — | — |
| Puerto Rico Electric Power Authority | 3.25%–7.25% | 2023 | 708,891 | 168,440 | 158,855 | 718,476 | 698,006 |
| Puerto Rico Aqueduct and Sewer Authority | 8.75% | 2017 | 200,000 | 97,496 | 200,943 | 96,553 | 92,405 |
| University of Puerto Rico | 4.00%–5.95% | 2017 | 1,422 | 410 | 513 | 1,319 | 607 |
| State Insurance Fund Corporation | Variable | 2028 | 253,687 | — | 21,426 | 232,261 | 215,969 |
| Nonmajor component units: | | | | | | | |
| Economic Development Bank for Puerto Rico | 1.83%–7.23% | 2033 | 441,215 | — | 29,217 | 411,998 | 6,677 |
| Puerto Rico Ports Authority | 6.00%–7.50% | 2024 | 13,355 | — | 2,923 | 10,432 | 1,445 |
| Puerto Rico Trade and Export Company | 4.60%–6.48% | 2038 | 266,052 | — | 3,276 | 262,776 | 14,085 |
| Puerto Rico Industrial Development Company | 4.65%–8.45% | 2025 | 79,182 | 14,862 | 15,284 | 78,760 | 14,659 |
| Puerto Rico Tourism Company | Variable | 2016 | — | 2,400 | — | 2,400 | 2,400 |
| Puerto Rico Metropolitan Bus Authorit | 2.62% | 2016 | 32,042 | — | 2,503 | 29,539 | 29,539 |
| Agricultural Enterprises and Development Administration | 4.50% | 2016 | 18,555 | 37,485 | 39,681 | 16,359 | 16,359 |
| | | | $   6,941,592 | 1,221,093 | 2,251,825 | 5,910,860 | 1,701,191 |

211

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Debt service requirements on component units' notes payable with fixed maturities at June 30, 2015 were as follows (in thousands):

| Year(s) ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2016 | $ 1,701,191 | 233,357 | 1,934,548 |
| 2017 | 304,943 | 201,404 | 506,347 |
| 2018 | 304,415 | 179,882 | 484,297 |
| 2019 | 858,328 | 162,341 | 1,020,669 |
| 2020 | 451,610 | 118,932 | 570,542 |
| 2021–2025 | 1,514,776 | 334,714 | 1,849,490 |
| 2026–2030 | 415,073 | 95,044 | 510,117 |
| 2031–2035 | 328,570 | 33,942 | 362,512 |
| 2036–2040 | 26,637 | 8,102 | 34,739 |
| 2041–2045 | 5,317 | 487 | 5,804 |
| Total | $ 5,910,860 | 1,368,205 | 7,279,065 |

Commonwealth appropriation bonds payable outstanding at June 30, 2015 are as follows (in thousands):

| Component unit | Interest rates | Maturity through | Balance at June 30, 2014 | Additions | Reductions | Balance at June 30, 2015 | Amounts due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Puerto Rico Aqueduct and Sewer Authority | 3.10%–6.50% | 2032 | $ 416,798 | — | 232 | 416,566 | 7,316 |
| Government Development Bank for Puerto Rico | 3.10%–6.50% | 2032 | 3,434 | — | — | 3,434 | 103 |
| Nonmajor component units: | | | | | | | |
| Puerto Rico Tourism Company | 3.10%–6.50% | 2032 | 45,298 | — | 58 | 45,240 | 1,309 |
| Land Authority of Puerto Rico | 3.10%–6.50% | 2032 | 55,818 | — | — | 55,818 | 1,642 |
| Solid Waste Authority | 3.10%–6.50% | 2032 | 7,821 | — | 7 | 7,814 | 229 |
| Total Commonwealth appropriation bonds – component units | | | $ 529,169 | — | 297 | 528,872 | 10,599 |

212

(Continued)

CW_STAY0010000

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Debt service requirements on the Commonwealth's appropriation bonds payable with fixed maturities at June 30, 2015 were as follows (in thousands):

| Year(s) ending June 30: | | Principal | Interest | Total |
|---|---|---|---|---|
| 2016 | $ | 10,599 | 28,925 | 39,524 |
| 2017 | | 8,600 | 28,615 | 37,215 |
| 2018 | | 8,895 | 28,295 | 37,190 |
| 2019 | | 9,229 | 27,940 | 37,169 |
| 2020 | | 9,934 | 28,230 | 38,164 |
| 2021–2025 | | 39,861 | 110,985 | 150,846 |
| 2026–2030 | | 332,626 | 109,839 | 442,465 |
| 2031–2035 | | 103,064 | 6,325 | 109,389 |
| Premium | | 6,130 | — | 6,130 |
| Discount | | (66) | — | (66) |
| Total | $ | 528,872 | 369,154 | 898,026 |

Bonds payable outstanding at June 30, 2015 are as follows (in thousands):

| Component Unit | Interest rates | Maturity through | Balance at June 30, 2014 | Additions | Reductions | Balance at June 30, 2015 | Amount due within one year |
|---|---|---|---|---|---|---|---|
| Major component units: | | | | | | | |
| Government Development Bank for Puerto Rico | 2.96%–6.56% | 2040 | $  450,320 | — | 26,140 | 424,180 | 287,450 |
| Puerto Rico Highways and Transportation Authority | 2.25%–6.50% | 2046 | 4,566,268 | 6,705 | 114,821 | 4,458,152 | 113,355 |
| Puerto Rico Electric Power Authority | 2.50%–7.25% | 2043 | 8,668,425 | — | 219,499 | 8,448,926 | 459,628 |
| Puerto Rico Aqueduct and Sewer Authority | 2.0%–6.15% | 2050 | 4,123,986 | — | 53,352 | 4,070,634 | 50,853 |
| University of Puerto Rico | 5.00%–5.63% | 2036 | 563,019 | — | 22,907 | 540,112 | 22,160 |
| Nonmajor component units: | | | | | | | |
| Puerto Rico Municipal Finance Agency | 3.90%–6.00% | 2031 | 817,644 | — | 89,623 | 728,021 | 87,160 |
| Puerto Rico Ports Authority | 2.75%–6.00% | 2026 | 200,742 | — | 1,118 | 199,624 | 1,650 |
| Puerto Rico Industrial Development Company | 5.10%–6.75% | 2029 | 189,359 | 506 | 10,006 | 179,859 | 12,865 |
| Puerto Rico Convention Center District Authority | 4.00%–5.00% | 2036 | 425,334 | — | 11,108 | 414,226 | 10,790 |
| Total bonds payable - component units | | | $ 20,005,097 | 7,211 | 548,574 | 19,463,734 | 1,045,911 |

213

(Continued)

CONFIDENTIAL

CW_STAY0010001

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Debt service requirements on component units' bonds payable with fixed maturities at June 30, 2015 were as follows (in thousands):

| | | Principal | Interest | Total |
|---|---|---|---|---|
| Years ending June 30: | | | | |
| 2016 | $ | 1,045,911 | 962,779 | 2,008,690 |
| 2017 | | 562,915 | 938,337 | 1,501,252 |
| 2018 | | 567,720 | 915,391 | 1,483,111 |
| 2019 | | 608,138 | 888,547 | 1,496,685 |
| 2020 | | 614,805 | 857,436 | 1,472,241 |
| 2021–2025 | | 3,057,456 | 3,637,769 | 6,695,225 |
| 2026–2030 | | 3,946,518 | 3,118,836 | 7,065,354 |
| 2031–2035 | | 3,366,162 | 2,004,603 | 5,370,765 |
| 2036–2040 | | 3,308,162 | 1,101,952 | 4,410,114 |
| 2041–2045 | | 1,553,295 | 347,367 | 1,900,662 |
| 2046–2050 | | 434,433 | 39,204 | 473,637 |
| 2051–2055 | | 9,629 | 462 | 10,091 |
| Premium | | 458,675 | — | 458,675 |
| Discount | | (70,085) | — | (70,085) |
| Total | $ | 19,463,734 | 14,812,683 | 34,276,417 |

Changes in deferred outflow of resources related to losses on the refunding of some of the bonds referred to in the table above follow (in thousands):

| Component unit | | Balance at June 30, 2014 | Reductions | Balance at June 30, 2015 |
|---|---|---|---|---|
| Major component units: | | | | |
| PRHTA | $ | 132,042 | 15,095 | 116,947 |
| PREPA | | 77,948 | 11,594 | 66,354 |
| PRASA | | 35,598 | 3,960 | 31,638 |
| UPR | | 2,818 | 301 | 2,517 |
| GDB | | 2,872 | 304 | 2,568 |
| Nonmajor component units: | | | | |
| PRPA | | 14,623 | 1,034 | 13,589 |
| MFA | | 4,884 | 1,364 | 3,520 |
| PRTC | | 1,677 | 116 | 1,561 |
| Total deferred outflow of resources – loss on bonds refunding | $ | 272,462 | 33,768 | 238,694 |

(Continued)

CONFIDENTIAL

CW_STAY0010002

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The table that follows presents debt service payments on PREPA's variable rate bonds and the net payments on associated hedging derivative instruments as of June 30, 2015 (in thousands). Such variable rate bonds are included within bonds payable in the discretely presented component units column. Although interest rates on variable rate debt and the current reference rate of hedging derivative instruments change over time, the calculations included in the table below are based on the assumption that the variable rate and the current reference rate of the hedging derivative instrument at June 30, 2015 will remain the same for their term (in thousands).

| | | Variable-Rate Bonds | | Hedging derivative instruments, net | Total |
|---|---|---|---|---|---|
| | | Principal | Interest | | |
| Years ending June 30: | | | | | |
| 2016 | $ | — | 2,108 | 8,209 | 10,317 |
| 2017 | | — | 2,108 | 8,209 | 10,317 |
| 2018 | | — | 2,108 | 8,209 | 10,317 |
| 2019 | | — | 2,108 | 8,209 | 10,317 |
| 2020 | | — | 2,108 | 8,209 | 10,317 |
| 2021–2025 | | — | 10,540 | 41,045 | 51,585 |
| 2026–2030 | | 252,875 | 8,433 | 32,837 | 294,145 |
| Total | $ | 252,875 | 29,513 | 114,927 | 397,315 |

Several component units have defeased certain revenue bonds by placing the proceeds of new bonds in irrevocable trusts to provide for all future debt service payments on the old debts. Accordingly, the trust accounts' assets and liabilities for the defeased bonds are not included in the statement of net position. As of June 30, 2015, the following bonds are considered defeased (in millions):

| | | Amount outstanding |
|---|---|---|
| Puerto Rico Electric Power Authority | $ | 3,538 |
| Puerto Rico Highways and Transportation Authority | | 1,515 |
| Puerto Rico Municipal Finance Agency | | 215 |
| Total | $ | 5,268 |

(Continued)

CONFIDENTIAL

CW_STAY0010003

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

## (13) Guaranteed and Appropriation Debt

### (a) Guaranteed Debt

The Commonwealth may provide guarantees for the repayment of certain borrowings of component units to carry out designated projects. The guarantees are backed by the full faith and credit of the Commonwealth. The guarantees are accounted following the guidance provided by the GASB Statement No. 70 – *Accounting and Financial Reporting for Nonexchange Financial Guarantees*. GASB Statement No. 70 requires that nonexchange financial guarantees be recorded when qualitative factors and historical data, if any, indicate that it is more likely than not that the Commonwealth will be required to make a payment on the guarantee. The amount of the liability to be recognized should be the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee.

|  | | Maximum guarantee | Outstanding balance | Recorded Commonwealth Guaranteed Obligation |
|---|---|---|---|---|
| Blended component units: | | | | |
| Public Buildings Authority | $ | 4,721,000 | 4,159,032 | N/A |
| Port of the Americas Authority | | 250,000 | 233,270 | N/A |
| Puerto Rico Infrastructure Financing Authority | | 245,955 | 245,955 | N/A |
| Discretely presented component units: | | | | |
| Government Development Bank for Puerto Rico | | 2,000,000 | 377,000 | 100,897 |
| Puerto Rico Aqueduct and Sewer Authority | | 1,228,479 | 1,228,479 | 236,360 |
| Total | $ | 8,445,434 | 6,243,736 | 337,257 |

**Public Buildings Authority (PBA)** – PBA uses the payments of rentals of certain government facilities leased by PBA, a blended component unit, to departments, agencies, instrumentalities and municipalities of the Commonwealth under various lease agreements executed pursuant to the enabling Act that created PBA (Act No. 56 of June 19, 1958, as amended) for the payment of principal and interest on the debt of PBA. Act No. 56 also provides that the Treasury Department of the Commonwealth will make advances to PBA for any unpaid portion of rent payable to PBA by any departments, agencies, instrumentalities, or municipalities of the Commonwealth under a lease agreement with PBA. Such advances are recorded as reductions of rent receivables since the responsibility of reimbursement belongs to the corresponding agency or instrumentality according to the enabling Act.

The debt of PBA is supported by a guarantee of the Commonwealth that if revenues or income of PBA are not sufficient for the payment of principal and interest when they come due, the Treasury Department of the Commonwealth will withdraw from any available funds amounts as may be necessary to cover the deficiency. The debt of PBA is further supported by a Commonwealth guarantee. Act No. 56 is silent as to whether there are arrangements established for recovering payments from PBA if the guaranty were to be claimed; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments.

(Continued)

CONFIDENTIAL

CW_STAY0010004

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Rental income of PBA funds amounted to approximately $408 million during the year ended June 30, 2015, of which $281.1 million was used to cover debt service obligations.

Beginning on July 1, 2016, a portion of PBA debt service scheduled on that date and for subsequent periods through the date of these financial statements was not paid, including interest payments. Some of the interest that was in fact paid after July 1, 2016 reflected amounts received from applicable subsidy programs.

**Port of the Americas Authority (PAA)** – Please refer to Note 12 (e) for additional information on PAA debt.

**Puerto Rico Infrastructure Financing Authority (PRIFA)** – On March 17, 2015, PRIFA, a blended component unit of the Commonwealth, issued $245.9 million of Dedicated Tax Fund Revenue Bond Anticipation Notes (the PRIFA BANs or Series 2015A BANs), the proceeds of which were used to refinance certain outstanding PRHTA bond anticipation notes and pay related expenses. The PRIFA BANs are payable from, and are supported by, a Trust Estate comprising certain assets and revenues of PRIFA, which include: (i) a $6.25/barrel Petroleum Products Tax on non-diesel products; (ii) any funds received by PRIFA pursuant to the terms of a financial assistance agreement between PRIFA and PRHTA; and (iii) any additional revenues pledged to PRIFA in accordance with the Trust Agreement. The PRIFA BANs are guaranteed by the Commonwealth. The PRIFA BANs agreement and the underlying Trust Agreement are silent as to whether there are arrangements established for recovering payments from PRIFA if the guaranty were to be claimed; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments. As of the date of these basic financial statements, no payments have been made yet honoring the aforementioned guaranty.

Of the monthly debt service due on the PRIFA BANs from August 1, 2016 through March 1, 2017, all remain unpaid.

**Government Development Bank (GDB)** – On February 13, 2014, the Commonwealth enacted Act No. 24 that, among other provisions, increased from $500 million to $2 billion the amount of GDB obligations that can be guaranteed by the full faith and credit of the Commonwealth.

The Commonwealth guaranteed the Remarketed Refunding Bonds, Series 1985, issued by GDB. The outstanding balance of these bonds amounted to $267 million at June 30, 2015. These bonds were fully repaid upon their maturity on December 1, 2015.

On December 13, 2013, GDB issued Senior Guaranteed Notes 2013 Series B (guaranteed by the Commonwealth). The 2013 Series B Notes consist of term notes maturing on various dates from December 1, 2017 to December 1, 2019, and carry an interest rate of 8.00% payable monthly on the first day of each month. At June 30, 2015, the outstanding balance of these notes amounted to $110 million. SIFC, a major component unit of the Commonwealth, is the sole holder of these bonds. Based on the liquidity and uncertainty risks discussed in Note 2, GDB has shown all indicators to conclude that there is substantial doubt as to GDB's ability to continue as a going concern. These risks and events impacting GDB caused the Commonwealth's management to recognize a liability on this guaranteed obligation in the amount of approximately $95 million based on the discounted present value of the best estimate of the future outflows expected to be incurred, at that moment, as a result of the guaranty. Act No. 24, referred to above, is silent as to whether there are arrangements established for recovering any potential

217

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

payments from GDB for guaranty payments made; however, there is no intention from the Commonwealth to request a recovery of any potential payments. As of the date of these basic financial statements, no payments have been made honoring the aforementioned guaranty. GDB made its monthly payments of interest until July 2016, but beginning on August 1, 2016, GDB started to miss such payments.

As discussed in Note 2, GDB is executing an orderly wind down of its operations and has reached a consensual agreement with its creditors, including SIFC, pursuant to Title VI of PROMESA.

The Commonwealth recognized a liability on this guaranteed obligation in the amount of approximately $100.9 million at June 30, 2015. This measurement was based on the discounted present value of the best estimate of the future outflows expected to be incurred as a result of the guarantee.

**Puerto Rico Aqueduct and Sewer Authority (PRASA)** – Act No. 45 of July 28, 1994, as amended, states that the Commonwealth guarantees the payment of principal and interest of all outstanding bonds at the date the law was enacted and of all future bond issues to refinance those outstanding bonds of PRASA, a discretely presented component unit. Act No. 140 of August 3, 2000 amended Act No. 45 to extend the Commonwealth guarantee to include the principal and interest payments of the Rural Development Serial Bonds and the loans under the State Revolving Fund Program (SRFP) outstanding at the effective date of Act No. 140, and of all future bonds and SRFP loans that may be issued through June 30, 2005. Act No. 386 of September 21, 2004 extended the Commonwealth guarantee to June 30, 2010. Act. No. 75 of July 12, 2010 amended Section 1 of Act No. 45 of July 28, 1994 to extend the Commonwealth guarantee over the Rural Development and SRFPs borrowings to June 30, 2015. Pursuant to Act No. 96 of June 30, 2015, the Commonwealth guaranty on the payment of principal and interest on most of the outstanding Revolving Fund loans granted to PRASA was extended to cover such loans issued through June 30, 2020. Each of these Acts, as amended, is silent as to whether there are arrangements established for recovering potential payments from PRASA if the guaranty were to be claimed; however, there is no intention from the Commonwealth to request a recovery of any such eventual payments.

The United States Department of Agriculture (USDA) Rural Development Program assists PRASA in the financing and construction of aqueduct and sewer facilities in rural areas by purchasing revenue bonds from PRASA, the proceeds of which are used by PRASA to finance such projects. As of June 30, 2015, the USDA Rural Development Program Bonds consisted of twenty-six (26) separate series, issued from 1983 through 2013 and bearing interest from 2% to 5% due in semiannual installments through 2053. The outstanding balance of the USDA Rural Development Program Serial Bonds as of June 30, 2015 was approximately $388.3 million. The USDA Rural Development Program Serial Bonds are guaranteed by the Commonwealth pursuant to Act No. 140 of 2000 as amended, and PRASA's net revenue is pledged toward the payment of debt service on the USDA Rural Development Program Bonds. The USDA Rural Development Program Bonds are subordinate to all senior and senior subordinated debt.

The Puerto Rico Water Pollution Control Revolving Fund and Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (the Revolving Funds) were created by Act No. 44 of June 21, 1988 and Act No. 32 of July 7, 1997, respectively, of the Commonwealth. The Puerto Rico Water Pollution Control Revolving Fund is administered, pursuant to Act No. 44 and Act No. 9 of June 21, 1988 and June 18, 1970, respectively, as amended, by Puerto Rico Environmental Quality Board (EQB). The Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund is administered, pursuant to Act No. 5 of July 21, 1977,

218                                          (Continued)

                                          CW_STAY0010006

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

as amended, by Puerto Rico Department of Health (DOH). Pursuant to these laws, the EQB and the DOH, on behalf of the Commonwealth, are authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA). PRIFA, PRASA, and GDB entered into a memorandum of understanding under which each party has agreed to assume specific responsibilities in connection with the operations of the Revolving Funds. PRASA has entered into revolving loan agreements to finance certain capital improvements. As of June 30, 2015, PRASA had outstanding approximately $555.4 million under these loan agreements, which bear interest at a 2% annual rate payable semiannually and are required to be paid in full within 20 years of the project completion date. PRASA has pledged its net revenue on a basis subordinate in all respects to PRASA's bonds outstanding. If PRASA's pledged revenue is not sufficient for the payment of principal and interest, the payments are guaranteed by the Commonwealth under Act No. 45 of July 28, 1994, as amended, which obligates the Commonwealth to pay principal and interest on the notes.

On March 18, 2008, PRASA issued approximately $284.8 million of Revenue Refunding Bonds, Series A and B (the 2008 Revenue Refunding Bonds) that were guaranteed by the Commonwealth and primarily used to refund PRASA's outstanding Revenue Refunding Bonds, Series 1995 (which were also guaranteed by the Commonwealth) in the amount of approximately $262.8 million. The 2008 Revenue Refunding Bonds bear interest at rates from 5.80% to 6.10% per annum with maturity dates ranging from July 1, 2021 to July 1, 2034. The outstanding balance of the 2008 Revenue Refunding Bonds at June 30, 2015 amounted to $284.8 million.

As a result of the voluntary disclosure statement issued by PRASA on March 4, 2016 regarding the expectation that it might not have sufficient funds to fully fund the debt service on certain of its Commonwealth guaranteed debt, management concluded that it would be more likely than not that the Commonwealth will be required to make a payment only on the USDA Rural Development Program Serial Bonds guaranty. As a result, a liability on the Rural Development Bonds guaranteed obligation in the amount of approximately $236.4 million was recognized at June 30, 2015. This measurement was based on the discounted present value of the best estimate of the future outflows expected to be incurred, at that moment, as a result of the guarantee. As of the date of these basic financial statements, no payments have been made honoring the aforementioned guaranty. The 2008 Revenue Refunding Bonds and the SRFP loans were excluded from this conclusion because: (a) the 2008 Revenue Refunding Bonds are considered senior debt and will not be affected by the aforementioned set asides; and (b) the SRFP funds are proprietary funds within the Commonwealth and not a separate legal entity, and therefore there is no separate guaranty liability.

CONFIDENTIAL                                                                          CW_STAY0010007

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(b)  Debt Supported by Commonwealth Appropriations**

At June 30, 2015, the outstanding principal balances of debt payable by Commonwealth appropriations and sales and use taxes (PFC bonds and notes payable, as described in Note12(d), and notes payable to GDB and others, as described in Note 12(f)), which are included in the individual financial statements of the following discretely presented component units, are as follows (in thousands):

| | PFC bonds and notes | Notes payable to GDB and others | Total |
|---|---:|---:|---:|
| Major Component Units: | | | |
| Puerto Rico Aqueduct and Sewer Authority | $ 416,566 | — | 416,566 |
| Government Development Bank | 3,434 | 13,340 | 16,774 |
| University of Puerto Rico | — | 54,526 | 54,526 |
| Puerto Rico Electric Power Authority | — | 713 | 713 |
| Nonmajor Component Units: | | | |
| Land Authority of Puerto Rico | 55,818 | — | 55,818 |
| Puerto Rico Tourism Company | 45,240 | — | 45,240 |
| Solid Waste Authority | 7,814 | 71,861 | 79,675 |
| Puerto Rico Convention Center District Authority | — | 140,795 | 140,795 |
| Agricultural Enterprises Development Administration | — | 92,826 | 92,826 |
| Puerto Rico Industrial Development Company | — | 41,653 | 41,653 |
| Company for the Integral Development of the "Península de Cantera" | — | 37,107 | 37,107 |
| Institute of Puerto Rican Culture | — | 3,326 | 3,326 |
| Total | $ 528,872 | 456,147 | 985,019 |

Notes payable to GDB and others are reported in the statement of net position as "due from (to) component units.

220

(Continued)

CONFIDENTIAL

CW_STAY0010008

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*(c) Other Guarantees*

Mortgage Loan Insurance – The Puerto Rico Housing Finance Authority (the Authority), a component unit of GDB, provides mortgage credit insurance to low and moderate-income families through its mortgage loan insurance program. The Commonwealth guarantees up to $75 million of the principal insured by the mortgage loan insurance program. As of June 30, 2015, the mortgage loan insurance program covered loans aggregating to approximately $552 million. Currently, the Commonwealth has not been called to make any direct payments pursuant to these guarantees and there are no triggering events indicating that it is more likely than not that it will be required to make payments on these guarantees.

**(14) Conduit Debt Obligations and No Commitment Debt**

From time to time, certain of the Commonwealth's component units issue revenue bonds to provide financial assistance to private sector entities for the acquisition and construction of transportation, environmental, industrial, tourism, educational, and commercial facilities, deemed to be in the public interest and that are expected to provide benefits to Puerto Rico. These bonds are supported by the property financed and are payable solely from payments received on the underlying mortgage loans. Upon repayment of the bonds, ownership of the acquired facilities is retained by the private sector entity served by the bond issuance. Neither the Commonwealth nor any political subdivision or component unit thereof is obligated in any manner for the repayment of the bonds. Accordingly, the bonds are not reported as liabilities in the basic financial statements of the issuing entities. As of June 30, 2015, conduit debt obligations consisted of the following bonds issued by component units (in thousands):

| Issuing entity | Issued since inception to date | Amount outstanding |
|---|---|---|
| Major component units: | | |
| Government Development Bank for Puerto Rico | $ 1,047,500 | 435,700 |
| Puerto Rico Highways and Transportation Authority | 270,000 | 150,700 |
| Nonmajor component units: | | |
| Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority | 6,353,000 | 921,879 |
| Puerto Rico Ports Authority | 155,410 | 155,410 |
| Total | $ 7,825,910 | 1,663,689 |

(Continued)

CONFIDENTIAL

CW_STAY0010009

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(a)** *Puerto Rico Ports Authority (PRPA)*

PRPA has issued $39,810,000 in Special Facility Revenue Bonds under the provisions of a trust agreement dated June 1, 1993, and $115,600,000 in Special Facility Revenue Bonds, under the provisions of a trust agreement dated May 1, 1996, between the PRPA and a private bank. The proceeds from the sale of the bonds were used to finance the construction and improvement of certain facilities and the acquisition of related equipment at the Luis Munoz Marin International Airport for the benefit of a major private airline. The property is owned by the PRPA and leased to the private company. These bonds are limited obligations of the PRPA, and are payable solely from certain payments made under the Special Facilities Agreement with the private company and certain other moneys. Neither the credit of the Commonwealth nor that of any of its political subdivisions is pledged for the repayment of these bonds. In addition, the bonds are unconditionally guaranteed by the private company's parent company. Pursuant to the agreements between the PRPA and the private company, the private company has agreed to pay amounts sufficient to cover the principal of, and premium, if any, and interest on the bonds. The bonds are not collateralized by any property, but are payable solely from certain payments by the private company under the agreement or by the private company's parent company under its unconditional guarantee. The outstanding balance of these bonds amounted to approximately $155.4 million as of June 30, 2015.

**(b)** *Puerto Rico Highways and Transportation Authority (PRHTA)*

In March 1992, the PRHTA issued Special Facility Revenue Bonds, 1992 Series A, B, and C for approximately $117 million for the construction of a toll bridge. The proceeds from the sale of these bonds were transferred by the PRHTA to a private entity, Autopistas de Puerto Rico & Compañía, S.E. (Autopistas), pursuant to a signed concession agreement for the design, construction, operation, and maintenance of the bridge. On October 30, 2003, the PRHTA issued Special Facility Revenue Refunding Bonds, 2004 Series A, amounting to approximately $153 million for the purpose of refunding PRHTA's Special Facility Revenue Bonds, 1992 Series A, B, and C, which were issued to fund the construction of the bridge, and to pay the cost of issuance of the bonds. The proceeds from the sale of the bonds were transferred by the PRHTA to Autopistas pursuant to a new loan agreement by and between Autopistas and the PRHTA. The bonds should be paid from the proceeds received by Autopistas from the operation of the bridge.

Under certain circumstances, the concession agreement may be terminated and the PRHTA is then obligated to assume Autopista's entire obligation to pay principal of, and interest on, the bonds outstanding, which pursuant to the signed agreement, will be paid from the net revenue of the use and operation of the bridge. The PRHTA does not currently expect the concession agreement to terminate. The outstanding bonds (including accrued interest) at June 30, 2015 amounted to approximately $150.7 million.

**(c)** *Government Development Bank for Puerto Rico (GDB)*

In December 2003, GDB, through its Housing Finance Authority, issued approximately $663 million in Capital Fund Program Bonds Series 2003 to lend the proceeds thereof to the Public Housing Administration, an agency of the Commonwealth, in its financing of improvements to various public low and moderate-income housing projects. The Capital Fund Program Bonds Series 2003 are limited obligations of the Housing Finance Authority, which will be paid solely from an annual allocation of public housing capital funds when received from the U.S. Department of Housing and Urban Development

222                                                                (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

(U.S. HUD) and other funds available under the bond indenture. Accordingly, these bonds are considered conduit debt and are excluded, along with the related assets held in trust, from the accompanying basic financial statements. The outstanding balance of these bonds amounted to approximately $140.5 million at June 30, 2015.

On August 1, 2008, the Housing Finance Authority issued the Capital Fund Modernization Program Subordinate Bonds amounting to approximately $384.5 million. The proceeds from the issuance were mainly used to finance a loan to a limited liability company and pay the costs of issuance. The $384.5 million bonds are limited obligations of the Housing Finance Authority, payable primarily by a pledge and assignment of federal housing assistance payments made available by the U.S. HUD, with an outstanding balance of approximately $295.2 million at June 30, 2015. Payment of principal of the Housing Revenue Bonds was also secured by an irrevocable standby letter of credit issued by GDB.

*(d)* ***Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (AFICA)***

AFICA's revenue bonds are special and limited obligations of AFICA and, except to the extent payable from bond proceeds and investments thereof, will be payable solely from the amounts payable under the loan agreements between AFICA and the borrowers. Furthermore, payment of principal and interest on the revenue bonds is unconditionally guaranteed by the borrowers, their parent companies, or letters of credit generally issued by major U.S. banks or U.S. branches of international banks. The revenue bonds are considered conduit debt and do not constitute a debt or a pledge of the full faith and credit of AFICA or the Commonwealth or any political subdivision thereof.

In connection with the issuance of revenue bonds, AFICA enters into trust agreements, whereby AFICA assigns and pledges to the trustees, for the benefit of the holders of the revenue bonds (1) all amounts receivable by AFICA in repayment of the amounts due under the loan agreements; (2) any rights, title, and interest of AFICA in the proceeds derived from the issuance of the revenue bonds and of any securities in which moneys in any fund or account created by the trust agreements or loan agreements are invested and the proceeds derived therefrom; and (3) AFICA's rights, title, and interest in and to the loan agreements, subject to AFICA's retention of certain rights, including the right to collect moneys payable to AFICA, which are not received with respect to repayment of the loans.

Since inception and up to June 30, 2015, AFICA has issued revenue bonds aggregating to $6,353 million, approximately $921 million of which was outstanding as of June 30, 2015. Of the revenue bonds outstanding at June 30, 2015, approximately $374 million represent industrial and commercial revenue bonds, approximately $94 million represent tourism related revenue bonds, approximately $158 million represent hospital revenue bonds, and approximately $295 million represent educational revenue bonds. Pursuant to the loan agreements covering the issuance of these bonds, corporations and partnerships operating in Puerto Rico borrowed the proceeds from the bond issuances by AFICA.

**(15) Risk Management**

*Primary Government*

The risk management policies of the Primary Government of the Commonwealth are addressed on Note 1(z).

223 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Discretely Presented Component Units*

The following describes the risk management programs separately administered by certain discretely presented component units, including all the major component units and certain nonmajor component units carrying self funded risk reserves:

**(a) GDB**

To minimize the risk of loss, GDB purchases insurance coverage for public liability, hazard, automobile, crime, and bonding, as well as workmen's compensation insurance for employees. The selection of the insurer has to be approved by the Public Insurance Office of the Treasury Department. Insurance coverage is updated annually to account for changes in operating risk. For the last three years, insurance settlements have not exceeded the amount of coverage. Other risk management policies of GDB involve its mortgage and loans servicing and insurance activities. Certain loan portfolios of the Housing Finance Authority, a blended component unit of GDB, are administered by private servicers who are required to maintain an errors and omissions insurance policy. The Housing Finance Authority has a program to manage the risk of loss on its mortgage loan lending and insurance activities.

**(b) PRHTA**

PRHTA carries commercial insurance to cover casualty, theft, claims, and other losses. The PRHTA has not settled any claims in excess of its insurance coverage for any of the past three years.

**(c) PREPA**

PREPA purchases commercial insurance covering casualty, theft, tort claims, natural disaster and other claims covering all risk property (excluding transmission and distribution lines), boiler and machinery, and public liability. In addition, PREPA has a self-insured fund to pay the cost of repairing, replacing, or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of a cause.

PREPA has a cost-plus health insurance program covering substantially all employees. PREPA contracted an administrator for the processing, approval, and payment of claims plus an administrative fee. The accrual for employees' health plan includes the liability for claims processed and an estimate for claims incurred but not reported.

Changes in the balances of the health insurance program and other self insurance risks during fiscal year 2015 were as follows (in thousands):

| | |
|---|---:|
| Claims payable – July 1 | $ 5,732 |
| Incurred claims | 64,330 |
| Claim payments | (64,915) |
| Claims payable – June 30 | $ 5,147 |

These claims payable are presented as a component of accounts payable and accrued liabilities in the accompanying combining statement of net position major component units.

(Continued)

CONFIDENTIAL

CW_STAY0010012

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (d) PRASA

PRASA has acquired commercial insurance to mitigate its exposure to certain losses involving real and personal property (including windstorm, flood, and earthquake damages) and comprehensive general and automobile claims. PRASA also has an Owner Controlled Insurance Program (OCIP) under which commercial general liability, excess general liability, builder's risk, and contractors' pollution liability coverage are procured or provided on a project "wrap up" basis for contractors and subcontractors of any tier, who have been properly enrolled, while performing operations at the applicable project site. Each commercial insurance policy maintained by PRASA contains specific policy limits and deductibles. Settled claims resulting from these risks have not exceeded commercial insurance coverage in any of the past three fiscal years.

### (e) UPR

UPR is exposed to various risks of loss related to torts; theft of, damage to, and destruction of assets; errors and omissions; injuries to employees; and natural disasters. Through January 1993, the UPR was insured under claims made insurance policies with respect to medical malpractice risks for $250,000 per occurrence up to an annual aggregate of $500,000. Subsequent to such date, the UPR was unable to obtain insurance at a cost it considered to be economically justifiable; consequently, the UPR is now self insured for such risks. Under Act No. 98 of August 24, 1994, the responsibility of the UPR is limited to a maximum amount of $75,000 per person, or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Self insured risk liabilities are reported when it is probable that a loss has occurred and the amount of the loss can be reasonably estimated. Liabilities include an amount for claims that have been incurred but not reported. The process used in computing claims liabilities does not necessarily resut in an exact amount because actual claims liabilities depend upon such complex factors as inflation, changes in legal doctrines, and damage awards. Claims liabilities are reevaluated periodically to take into consideration recently settled claims, the frequency of claims, and other economic and social factors.

Changes in the claims liability amount for medical malpractice in fiscal year 2015 were as follows (in thousands):

| | | |
|---|---|---:|
| Claims payable – July 1 | $ | 7,877 |
| Incurred claims and changes in estimates | | 1,922 |
| Payments for claims and adjustments expenses | | (1,234) |
| Claims payable – June 30 | $ | 8,565 |

In addition, the UPR is a defendant in several lawsuits other than medical malpractice arising out of the normal course of business. Management has recorded an accrual of $10.5 million as of June 30, 2015 to cover claims and lawsuits that may be assessed against the UPR. The UPR continues to carry commercial insurance for these risks of loss.

These claims payable are presented as a component of accounts payable and accrued liabilities in the accompanying combining statement of net position major component units. The UPR continues to carry commercial insurance for all other risks of loss.

CONFIDENTIAL                                                          CW_STAY0010013

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (f) SIFC

SIFC provides workers' compensation insurance to public and private employees. This insurance covers workers against injuries, disability, or death caused by work or employment related accidents, or by illness suffered as a consequence of their employment. SIFC establishes liabilities for incurred but unpaid benefits and benefit adjustment expenses based on the ultimate cost of settling the benefits. The liability includes estimates for cases reported that have not been adjudged and cases incurred but not reported. The following table provides a reconciliation of the beginning and ending liability for incurred but unpaid benefits and benefit adjustment expenses for the most recent fiscal year (in thousands):

| | | |
|---|---|---:|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at July 1 | $ | 811,996 |
| Total incurred benefits | | 322,952 |
| Total benefit payments | | (374,799) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at June 30 | $ | 760,149 |

The liability for incurred but unpaid benefits and benefit adjustment expenses is based on historical claims experience data, assumptions and projections as to future events, including claims frequency, severity, persistency, and inflationary trends determined by an independent actuarial study. This liability has been discounted at 3.85% in 2015. SIFC's management believes that discounting such liability results in a better matching of costs and revenue since compensation benefits have a long payment cycle. The assumptions used in estimating and establishing the liability are reviewed annually based on current circumstances and trends.

SIFC's management believes that the liability for incurred but unpaid benefits and benefit adjustment expenses, actuarially determined at June 30, 2015, is a reasonable estimate of the ultimate net cost of settling benefits and benefit expenses incurred. Because actual benefit costs depend upon such factors as duration of worker disability, medical cost trends, occupational disease, inflation, and other social and economic factors, the process used in computing the ultimate cost of settling benefits and expenses for administering benefits is necessarily based on estimates. The amount ultimately paid may be above or below such estimates. Adjustments resulting from changes in estimates of these liabilities are charged or credited to operations in the period in which they occur.

The liability for incurred but unpaid benefits and benefit adjustment expenses is reported as liability for automobile accident insurance and workmen's compensation in the accompanying combining statement of net position major component units.

### (g) AACA

AACA operates a system of compulsory insurance for vehicles licensed to be used on public roads and highways in Puerto Rico. This insurance covers bodily injuries and compensation for beneficiaries (and their dependents) caused by automobile accidents. The annual premium is $35 per motor vehicle.

(Continued)

CONFIDENTIAL

CW_STAY0010014

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The following table provides a reconciliation of the beginning and ending liability for the future benefits for the most recent fiscal year, presented based on an undiscounted method (in thousands):

| | | |
|---|---|---:|
| Liability for incurred but unpaid benefits and benefit adjustment expenses at beginning of year | $ | 93,979 |
| Total incurred benefits | | 21,355 |
| Total benefit payments | | (40,626) |
| Liability for incurred but unpaid benefits and benefit adjustment expenses at end of year | $ | 74,708 |

The liability for future benefits is reported as liability for automobile accident insurance and workmen's compensation in the nonmajor component unit column of the accompanying combining statement of net position major component units. The liability covers the estimated cost of all future benefits related to claims incurred but not reported during the year. Future benefits include death and funeral, disability and accident, and health benefits. The AACA has recorded this liability, including administrative expenses for claim processing, based on the results of an actuarial report prepared by an independent actuary.

Changes in the ultimate liabilities for benefit payments may be required as information develops, which varies from experience, provides additional data, or, in some cases, augments data, which previously were not considered sufficient for use in determining the claim liabilities.

*(h)* *PCSDIPRC*

PCSDIPRC has the responsibility of providing to all the cooperatives and the Federation of Cooperatives of Puerto Rico insurance coverage over the stocks and deposits, and for monitoring the financial condition of the insured cooperatives, and the uninsured cooperatives when requested by the Inspector of Cooperatives. PCSDIPRC contracted independent actuaries for the preparation of actuarial estimates of the reserves for estimated losses on stocks and deposits.

The following table provides the activity during fiscal year 2015 in the estimated reserve (in thousands):

| | | |
|---|---|---:|
| Liability for estimated losses on insured stocks and deposits at beginning of year | $ | 27,943 |
| Payment of claims | | (23) |
| Recoveries | | 76 |
| Liability for estimated losses on insured stocks and deposits at end of year | $ | 27,996 |

These estimated reserves are presented as a component of accounts payable and accrued liabilities in the component units column of the accompanying statement of net position.

(Continued)

CONFIDENTIAL

CW_STAY0010015

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(16) Commitments and Contingencies**

*Primary Government*

*Legal Contingencies*

**(a) *Litigation Prior to Commencement of Title III Cases Related to Governmental Operations***

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 29, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions set forth in said Act to a maximum amount of $75,000 or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the payment of such judgments.

With respect to pending and threatened litigation involving the Commonwealth's Governmental Activities, excluding the litigation mentioned in the ensuing paragraphs, the Commonwealth reported approximately $368 million as an amount to cover for awarded and anticipated unfavorable judgments at June 30, 2015. This amount was included as other long-term liabilities in the accompanying statement of net position, and represents the amount estimated as a probable liability or a liability with a fixed or expected due date that will require future available financial resources for this payment. The amounts claimed exceed $9.5 billion; however, the ultimate liability cannot be presently determined. It is the opinion of management that the claims are excessive and exaggerated. Management believes that the ultimate liability in excess of amounts provided, if any, would not be significant.

The Commonwealth is a defendant in parallel lawsuits regarding an alleged inappropriate withholding of Medicaid funds, one filed in the state court and two in federal court. The plaintiffs are various primary healthcare centers seeking to recover from the Commonwealth approximately $800 million of Medicaid funds retained by the Department of Health of the Commonwealth since 1997. In February 2005, the United States Court of Appeals for the First Circuit determined that the Commonwealth must return the funds withheld because of noncompliance with a federal law. The Commonwealth is still contesting several provisions of this determination, and amounts to be returned and payment plan methods are still in the process of estimation. As of June 30, 2015, the Commonwealth accrued $137 million for this legal contingency.

The Commonwealth is a defendant in a class action presented by parents of special education students in the areas of education and healthcare. In October 2006, the State Court of Appeals decided in favor of the parents' request to include damage claims pursuant to the same class action case although not as a remedy in the class action per se. The court now may award damages to the members of the class action and to do so it may look at the claims by dividing them into groups or consider each case individually. This will require that the parents prove the damages suffered on an individual basis. On June 26, 2016, the court ordered the publication of a public edict that would describe in detail the process to be followed to submit claims for damages suffered. Such edict was published an opened a claims period effective August 14, 2016 through October 31, 2016. The Commonwealth plans to vigorously defend each individual case. The Commonwealth has accrued $500 million for this legal contingency as of June 30, 2015.

228

(Continued)

CW_STAY0010016

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Under the lawsuit Vaquería Tres Monjitas, Inc. et al v. Ramírez et al., certain plaintiffs alleged that the price rates set by the Administrator of the Office for the Regulation of the Dairy Industry (ORIL, as its Spanish acronym) did not afford local dairy processors Suiza Dairy and Vaquería Tres Monjitas the opportunity to make the reasonable profit to which they were constitutionally entitled. The parties reached a settlement agreement on October 29, 2013. Among other things, the Commonwealth, through certain of its instrumentalities, agreed to contribute the following amounts to certain regulatory accrual payments to be made pursuant to the settlement agreement: $50 million by December 31, 2014, $15 million by December 31, 2015, $15 million by December 31, 2016, and $15 million by December 31, 2017, for a total original amount accrued by the Commonwealth during fiscal year 2014 of $95 million. The case is now closed, but the court will retain jurisdiction in order to tend to any matter of compliance or breach of compliance regarding the settlement agreement. During fiscal year 2015, the Commonwealth paid $16 million, out of the required $50 million due on December 31, 2014. As of June 30, 2015, the Commonwealth has accrued $79 million for this legal contingency, $34 million of which, pertaining to the portions not paid on December 31, 2014, are recorded as due and payable within the general fund.

On December 2, 2014 and on January 16, 2015, the United States Securities and Exchange Commission (SEC) requested information about certain bond issuances of the Commonwealth and its component units. The Commonwealth is cooperating in the inquiry, including providing the SEC with documents and information. The SEC has advised that the information requests should not be construed as an indication that any violation of the federal securities laws has occurred. During April 2018, the SEC communicated that they do not intend to recommend an enforcement action against the Commonwealth.

PBA, a blended component unit as a Governmental Activity, is a defendant or codefendant in various lawsuits for alleged damages and breaches of contracts in cases related to construction projects. In addition, PBA is a defendant or codefendant in other cases related to public liability and labor related matters. PBA, based on legal advice, has recorded an accrual approximating $17 million at June 30, 2015 to cover probable losses on these claims. In the opinion of legal counsel, any liability in excess of the insurance coverage and/or the recorded accrual that may arise from such claims would not be significant to affect PBA's financial position or results of operations.

The SCPT, a blended component unit as a Governmental Activity, is a defendant and a party in numerous legal proceedings and extrajudicial claims pertaining to matters incidental to the performance of its normal operations. SCPT has recognized approximately $13.3 million to cover for awarded and anticipated unfavorable judgments at June 30, 2015.

PRIFA, a blended component unit as a Governmental Activity, is a defendant in various legal proceedings arising from its normal operations. Management, based on the advice of legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings and legal actions in the aggregate will not have a material effect on PRIFA's financial statements. However, management is of the opinion that they will reach settlements in certain cases. A liability to cover these potential settlements in the amount of approximately $7.6 million has been established at June 30, 2015.

PHA is a defendant and a party in numerous legal proceedings and extrajudicial claims pertaining to matters incidental to the performance of its normal operations, including cases arising out of alleged torts, alleged breaches of contracts, alleged violation of law, discrimination against employees, unlawful discharge, and condemnation proceedings, among others. PHA has recognized $6.0 million to cover for awarded and anticipated unfavorable judgments at June 30, 2015.

(Continued)

CONFIDENTIAL                                                              CW_STAY0010017

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

In connection with the termination of an interest rate exchange agreement (swap) with a notional amount of $218 million by COFINA relating to its Sales Tax Revenue Bonds, Series 2007A, COFINA made a termination payment to the counterparty in November 2008. The counterparty has asserted that it was entitled to a termination payment in excess of that paid by COFINA in November 2008, plus interest at a default rate, amounting to approximately $64 million. The counterparty alleges that the date of the termination notice used by COFINA for purposes of calculating the termination payment was not in accordance with the agreement. In addition, the counterparty alleges that the termination payment should have been based on the value of replacement swaps entered into by COFINA, which actually have different credit terms than those contained in the terminated swap. COFINA has accrued $3.4 million in connection with this matter at June 30, 2014. The amount claimed in excess of that accrued at June 30, 2015 is approximately $60.6 million. While the counterparty may assert continued default interest since the claim date, an amount of possible loss in excess of the $3.4 million accrued, if any, cannot be reasonably estimated. COFINA intends to contest this matter vigorously. Among other things, it is the opinion of COFINA that, even assuming that the counterparty's allegations regarding improper termination are correct, the amounts claimed by the counterparty are not correct. Accordingly, management does not expect that the ultimate costs to resolve this matter will have a material adverse effect on COFINA's financial position or results of operations.

The National Parks program within the Sports and Recreation Department is a defendant in various lawsuits and complaints. Such program's management, after consultation with legal counsel, has made a provision of $2.6 million for losses on these litigations at June 30, 2015.

Of the total liability for legal claims and judgments recognized in the Governmental Activities, approximately $159.1 million are considered payable within one year, based on the payments made subsequent to June 30, 2015 through June 30, 2016.

PRMeSA, a blended component unit as a Business-Type Activity, is a party in certain legal actions and claims related to medical malpractice arising in the ordinary conduct of its business. Although PRMeSA appears as a defendant in the claims, many of them involve medical personnel of the member institutions, and in effect, these claims are against said institutions. As a result of the deficiency of funds available in the Self-Insurance Fund as of June 30, 2015, any unfavorable outcome may have a significant effect on the financial condition of PRMeSA. Based on a review of current facts and circumstances, PRMeSA's management has provided for what is believed to be a reasonable estimate of the exposure to loss associated to litigation. PRMeSA has established an accrual for claim losses in the amount of approximately $2.4 million at June 30, 2015 under Business-Type Activities in the statement of net position and in the statement of net position proprietary funds.

PRHIA, a blended component unit as a Business-Type Activity, has been requested to repay the Commonwealth's Treasury Department approximately $103 million representing excess transfers of money from the central government during the fiscal years 2001–2003. After consultation with external legal counsel, PRHIA is of the opinion that the money does not have to be repaid and believes that the likelihood of an unfavorable outcome is remote. Therefore, no reserve for such request has been recognized in PRHIA's financial statements. PRHIA is also a defendant and codefendant in legal proceedings pertaining to matters incidental to the performance of its operations. With respect to the pending and threatened litigation, PRHIA, in consultation with legal counsel, has advised that at this stage of the proceedings they cannot offer an opinion as to the probable outcome. Accordingly,

(Continued)

CONFIDENTIAL

CW_STAY0010018

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

management does not consider it necessary to make any provision in its books for these cases and intends to contest them vigorously.

On December 21, 2012, the federal government, through the U.S. Department of Justice (USDOJ), filed a lawsuit in order to demand from the Commonwealth and its Police Department, compliance with the action and remediation plan submitted on September 8, 2011 by the Civil Rights Division of the USDOJ pursuant to an investigation which revealed a pattern of civil rights violations by the Police Department. According to this investigation and resulting report, the pattern or practice of illegal activity is the product of an ongoing failure by the Commonwealth and its Police Department to provide officers with the necessary guidance, training, and tools to engage in constitutional and effective law enforcement. The federal government was seeking declaratory and equitable relief to eliminate this unlawful pattern by asking the Commonwealth and its Police Department to adopt and implement policies and procedures in the areas of recruitment, hiring, promotions, policies, training, supervision, investigation, discipline, and to prevent the police officers from depriving persons of rights, privileges, or immunities secured and protected by the Constitution or laws of the United States. Although the claim does not include damages, the action and remediation plan proposed would require an investment of approximately $600 million, which is expected to be incurred over a period of 10 years, starting with fiscal year 2015. The Secretary of Justice of the Commonwealth is still negotiating the final determinations of the measures to be implemented by the Police Department in terms of final costs and timeframe. On July 17, 2013, a final definitive agreement was reached between the USDOJ and the Commonwealth, which was filed with the Court. Under the settlement agreement, the court dismissed the claim, but retained jurisdiction to ensure compliance with the agreement, through the appointment of a Technical Compliance Advisor. No provision for any liability is required at this time under this remediation plan. Expenditures and related liabilities will be recognized as costs during the execution of the remediation plan are incurred beginning in fiscal year 2015.

The Commonwealth receives financial assistance from the federal government in the form of grants and entitlements. Receipt of grants is generally conditioned upon compliance with terms and conditions of the grant agreements and applicable federal laws and regulations, including the expenditure of resources for eligible purposes. Substantially, all grants are subject to audit under Circular A 133 of the Office of Management and Budget of the United States of America (OMB Circular A 133), all of which are performed at the individual department or agency level. Disallowance as a result of these audits may become liabilities of the Commonwealth. As of June 30, 2015, based on an evaluation of pending federal disallowances, the Commonwealth has recorded approximately $69.9 million as other long-term liabilities in the accompanying statement of net position. Expenditures that are still subject to audit could be disallowed, but management believes any such future disallowances would not be material to the basic financial statements.

**(b)** ***Civil Actions Filed by Several Bondholder Groups and Other Creditors Against the Commonwealth Prior to the Commencement of the Title III Cases.***

Several groups of bondholders, monoline insurers, and indenture trustees have filed claims contesting the constitutionality of the Moratorium Act. However, these lawsuits were stayed from June 30, 2016 through May 1, 2017 under the Title IV stay and re stayed upon commencement of the Title III cases.

*Assured Guar. Corp. v. Garcia Padilla*, Case No. 16 1037-FAB (D.P.R. Jan. 7, 2016)

231

(Continued)

CW_STAY0010019

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On January 7, 2016, a group of monoline insurers of bonds issued by PRHTA, PRCCDA, and PRIFA filed a complaint seeking (i) a declaration that EO 2015 46 and EO 2015 49 – which prioritized the payment of general expenditures over the payment of public debt subject to pledged revenues – violate the Contract Clause, Takings Clause, and Due Process Clause of the U.S. Constitution and Puerto Rico Constitution and are invalid, null, and void, and (ii) an injunction prohibiting defendants from taking or causing to be taken any action pursuant to the executive orders.

*Fin. Guar. Ins. Co. v. Garcia Padilla*, Case No. 16 1095-FAB (D.P.R. Jan. 19, 2016)

On January 19, 2016, a monoline insurer for bonds issued by PRHTA, PRCCDA, and PRIFA filed a complaint (similar to that of Case No. 16-1037 discussed in the prior paragraph), seeking declaratory and injunctive relief stating that the U.S. Constitution preempts Section 8 of Article VI of the Commonwealth Constitution, the OMB Act, and EO 2015 46 and EO 2015 49.

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia Padilla*, Case No. 16 1610-FAB (D.P.R. Apr. 4, 2016)

The holder of a substantial amount of bonds issued by GDB filed a complaint seeking a declaration that the Moratorium Act, and executive orders issued pursuant to the Act, violate the United States and Puerto Rico Constitutions, and alleging that the Moratorium Act (i) rewrites the contractual and legal rights and entitlements of GDB's creditors; (ii) takes, without due process or just compensation, property to which GDB's creditors are entitled for the benefit of the Commonwealth, other Puerto Rico government entities, and their respective creditors; (iii) facially discriminates against interstate commerce by providing for preferential treatment of Puerto Rico resident institutional holders of GDB bonds over nonresident holders of GDB bonds of equal rank; (iv) establishes a law on bankruptcy within the power of the United States Congress and preempted by Congress's exercise of those powers; and (v) unconstitutionally seeks to preclude creditors of GDB from suing in federal court.

*Ambac Assurance Corp. v. Puerto Rico Highways and Trans. Auth.*, Case No. 16 1893-FAB (D.P.R. May 10, 2016)

Ambac, a monoline insurer of PRHTA bonds filed a complaint alleging breach of contract and breach of fiduciary duty based on PRHTA's mismanagement and lack of transparency. The complaint seeks, among other things, (i) a preliminary injunction enjoining the Economic Development Bank for Puerto Rico from transferring the proceeds of toll revenues to any entity other than PRHTA, (ii) expedited discovery of PRHTA's financial condition, and (iii) an appointment of a provisional receiver over PRHTA.

*Nat'l Pub. Fin. Guar. Corp. v. Garcia Padilla*, Case No. 16 2101-FAB (D.P.R. Jun. 15, 2016)

On June 15, 2016, a group of monoline insurers filed a lawsuit in the U.S. District Court for the District of Puerto Rico, claiming that the Moratorium Act and its related executive orders violated the United States Constitution and the Puerto Rico Constitution and seeking various forms of declaratory relief.

*Jacana Holdings I LLC v. Puerto Rico*, Case No. 16 4702-GHW (S.D.N.Y. Jun. 21, 2016)

On June 21, 2016, a group of four hedge funds, each holding the Commonwealth's general obligation bonds, filed a lawsuit in the District Court for the Southern District of New York challenging the

(Continued)

CONFIDENTIAL                                                  CW_STAY0010020

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Moratorium Act and questioning COFINA's debt structure for rendering COFINA's sales and use tax resources unavailable to pay general obligation bonds, which plaintiffs contend should enjoy constitutional priority. Plaintiffs seek declaratory and injunctive relief.

*Trigo Gonzalez v. Garcia Padilla*, Case No. 16 2257-FAB (D.P.R. Jun. 30, 2016)

On June 30, 2016, a group of Puerto Rico residents who own bonds issued by either GDB or PFC filed a complaint challenging the Moratorium Act on constitutional grounds, alleging that it (i) usurps the powers vested by Congress to the Bankruptcy Court and contained in the Bankruptcy Code' (ii) is preempted by the Bankruptcy Code; and (iii) impairs creditors' rights without consent and gives preference to one creditor over another in violation of plaintiffs' rights under the Contract Clause; and (iv) deprives plaintiffs of their proprietary right to existing and future funding for the repayment of their bonds in violation of the Takings Clause. The complaint sought a declaratory judgment that certain sections of the Moratorium Act, and any executive or governmental action predicated on those sections, are null and void.

*Lex Claims, LLC v. Garcia Padilla*, Case No. 16 2374-FAB (D.P.R. Jul. 20, 2016)

On July 20, 2016, a group of GO bondholders filed a complaint challenging the Moratorium Act Executive Order 2016-30, which declared a moratorium on the Commonwealth's obligations to make payments on any bonds or notes issued or guaranteed by the Commonwealth, other than certain payments owed to GDB. Plaintiffs also allege. alleging that the Commonwealth violated PROMESA through the enactment of Act No. 74, which "purports to authorize the GDB to 'restructure' loans owed to GDB by Puerto Rico, independent corporations, and municipalities' by consolidating at least $2 billion in loan obligations and unpaid interest owed to GDB for which the Commonwealth was not previously responsible into a single loan that will be payable (at a 40% discount) exclusively from the Commonwealth's general fund, over a 35 year period. The plaintiffs request the court to invalidate the transfers and to (i) require the Commonwealth to segregate and preserve all retained revenues and acknowledge that those funds are for purposes of paying the GO bonds and GO-Guaranteed bonds and (ii) prohibit the Commonwealth from making certain transfers contemplated in the fiscal year 2017 budget.

*U.S. Bank Trust Nat'l Ass'n v. Garcia Padilla*, Case No. 16 2510-FAB (D.P.R. Aug. 19, 2016)

On August 19, 2016, a successor trustee to a trust agreement that authorized the UPR revenue bonds filed a complaint arguing that OE 2016 31 – which suspended the obligation of UPR to transfer the pledged revenues to U.S. Bank – was improper and seeking declaratory and injunctive relief under PROMESA to prevent the Commonwealth from diverting revenues away from UPR.

*Voya Inst'l Tr. Co. v. Univ. of Puerto Rico*, Case No. 16 2519-FAB (D.P.R. Aug. 22, 2016)

On August 22, 2016, the trustee for the UPR deferred compensation plan filed a complaint alleging that since April 2016, UPR has directed Voya to make approximately $33 million in emergency distributions to plan participants. Because of the UPR's known insolvency, Voya denied these requests and further suspended emergency withdrawals. Because of this, the UPR notified Voya that the UPR intended to remove Voya as plan trustee. In its complaint, Voya recognized that the UPR has the right to remove Voya as the trustee but asserted that compliance with the UPR's request

(Continued)

CONFIDENTIAL

CW_STAY0010021

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

may subject Voya to liability for violating PROMESA's stay and restrictions on transfer if the UPR is later found to currently be insolvent. Through the complaint, Voya sought declaratory judgments that it may transfer plan assets to a successor trustee pursuant to the UPR's instructions without incurring liability under PROMESA.

After the filing of the Commonwealth's Title III case, this case was converted to an adversary proceeding under Adv. Proc. No. 17 216 LTS in the United States District Court for the District of Puerto Rico, and is currently stayed pursuant to the parties' request.

*Scotiabank de Puerto Rico v. Garcia Padilla*, Case No. 16 2736-FAB (D.P.R. Sept. 28, 2016)

On September 28, 2016, Scotiabank de Puerto Rico (a Puerto Rico based bank) filed a complaint against the Commonwealth. In its amended complaint, Scotiabank alleged that a $37.5 million loan extended to PRMBA was secured by liens on certain cigarette sales tax revenues conditionally allocated to PRMBA and that the loan was in default since December 2015. In this action, Scotiabank sought declaratory and injunctive relief to prevent the Commonwealth from diverting and expropriating any cigarette sales tax revenues.

*Servidores Públicos Unidos v. Fin. Oversight and Mgmt. Bd. for Puerto Rico*, Case No. 17 1483-FAB (D P.R. Apr. 12, 2017)

On April 12, 2017, a Puerto Rico labor union filed a complaint against the Oversight Board and the Commonwealth, asserting that the Certified Commonwealth Fiscal Plan as approved on March 13, 2017 violated PROMESA both procedurally and substantively by requiring the Commonwealth to unconstitutionally impair the contractual rights of pensioners and improperly using the funds of employees' individual retirement savings accounts. The complaint also asserts that the Oversight Board improperly approved the Governor's proposed fiscal plan by adding amendments to it rather than approving it without amendments, which the labor union claims is the proper procedure under PROMESA. As a result, the complaint seeks related declaratory and injunctive relief to prevent implementation of the Certified Commonwealth Fiscal Plan.

*Rodríguez Perelló v. Rosselló Nevares*, Case No. 17 1566 (D.P.R. May 1, 2017)

A coalition of institutional and hedge funds that own COFINA senior bonds sued the Commonwealth in the United States District Court for the District of Puerto Rico. The plaintiffs request that the court declare invalid the Certified Commonwealth Fiscal Plan and Act No. 26 of 2017 on the grounds that it is contrary to PROMESA and impairs the rights of these bondholders. Plaintiffs also demand that the Certified Commonwealth Fiscal Plan be amended so it does not affect COFINA, and request the court to declare an event of default, the remedies for which include acceleration of COFINA's outstanding debt. They also request the court to prohibit the Commonwealth from acting in a way that affects the transfer of the pledged SUT portion that guarantees the payment of this debt. In sum, these creditors seek that the Commonwealth not include COFINA's debt, nor the SUT revenues as part of Puerto Rico's debt restructuring plan.

*Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Case No. 17 1567 (D.P.R. May 1, 2017)

234 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Ambac, a COFINA bond insurer, filed an action requesting the District Court for the District of Puerto Rico to invalidate the Certified Commonwealth Fiscal Plan and Act No. 26. Ambac claims that both are unconstitutional and in violation of PROMESA. Through this lawsuit, Ambac is attempting to prevent the Commonwealth from using SUT funds used for the payment of COFINA's debt.

*Ambac Assurance Corp. v. Commonwealth of Puerto Rico*, Case No. 17 1568 (D.P.R. May 2, 2017)

Ambac filed an action requesting the court to invalidate all moratorium legislation and related orders in effect since the end of 2015. Through the moratorium legislation and orders, Ambac alleges that the Commonwealth withholds certain revenue sources–highway tolls, license fees and taxes on tobacco products, gasoline, and hotel rooms, among others–that are used for the payment of the debt incurred by PRIFA, PRHTA and PRCCDA. Ambac claims that the related orders are also unconstitutional and contrary to PROMESA. Ambac intends to prevent the Commonwealth from using these funds for uses other than debt service.

*Ambac Assurance Corp. v. U.S. Dept. of the Treasury*, Case No. 17 0809 (D.D.C. May 2, 2017)

Ambac sued the United States Department of the Treasury in the District Court for the District of Washington, D.C., in relation to the money transferred to the Commonwealth from the federal excise tax on the sale of rum. The Commonwealth has retained this source of revenue, which is used for the payment of certain PRIFA bonds. The insurer requests that the U.S. Treasury stop transferring these funds to the Commonwealth until the dispute is resolved, or, in the alternative, that a receiver retains these funds in a separate account.

*Aurelius Investment, LLC v. Commonwealth of Puerto Rico*, Index No. 652357/2017 (N.Y. Sup. Ct. May 2, 2017)

A group of hedge funds – which includes Aurelius, Autonomy, and Monarch – sued in New York state court, demanding that the Commonwealth pay nearly $243 million in GO debt service, plus interest. The plaintiffs own approximately $1.4 billion in GO bonds issued by the Commonwealth in 2014. The lawsuit asserts that the GO bondholders have a right to all funds held by the Treasury Department to pay remaining principal and interest on the GO bonds and seeks injunctive relief and monetary damages to account for all overdue interest.

*(c)* **Key Civil Actions Filed by Several Bondholder Groups and Other Creditors Against the Commonwealth After the Commencement of the Title III Cases**

*Assured Guar. Corp. et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. No. 17-00125-LTS (D.P.R. May 11, 2017)

On May 11, 2017, certain GO bond monoline insurers filed an adversary proceeding claiming that the Certified Commonwealth Fiscal Plan is "illegal" under PROMESA because of its alleged (i) "failure to comply with lawful priorities and liens established by Puerto Rico's constitution"; (ii) "failure to differentiate between Nonessential and essential spending"; (iii) "elevation of all Nondebt spending above debt service"; and (iv) "unexplained economic assumptions." Plaintiffs challenge the legality of Act No. 26 of 2017 on the ground that it "effectuates the contract impairments and illegal expropriations of property purportedly authorized by the Illegal Fiscal Plan."

235 (Continued)

CW_STAY0010023

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

In the aftermath of Hurricane María, the plaintiffs filed a voluntary dismissal without prejudice on October 6, 2017, and the Title III court dismissed the case on October 10, 2017.

*The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation (COFINA), et al.,* Adv. Pro. No. 17-00133-LTS (D.P.R. May 16, 2017)

On May 16, 2017, Bank of New York Mellon (BNYM), as trustee, filed an interpleader complaint against COFINA and several COFINA bondholder constituencies, as an adversary proceeding within the COFINA Title III case. The interpleader seeks to resolve the parties' "competing and conflicting claims" regarding distribution of COFINA's pledged sales and use tax revenues deposited in the various accounts at BNYM (collectively, the "Project Accounts"). BNYM alleges that the defendants take conflicting positions on whether certain actions by the Commonwealth and COFINA constitute nonmonetary covenant defaults under the COFINA Resolution.

On May 30, 2017, the Title III Court entered an order granting the interpleader and ordering the interpleaded funds to be held in trust on behalf of the party or parties to whom the court ultimately determines they rightfully belong.

On November 6, 2017, several groups of creditors filed motions for summary judgment, which have been fully briefed. The Court has not yet ruled on the motions.

*ACP Master, Ltd., et al. v. Commonwealth of Puerto Rico, et al.,* Adv. Pro. No. 17-00189-LTS (D.P.R. Jun. 29, 2017)

On June 29, 2017, a group of GO bondholders filed an adversary proceeding alleging that the Oversight Board and the Commonwealth have improperly allocated retained revenues and special property tax revenues to expenditures other than payment of GO debt. The plaintiffs seek declaratory judgments that (i) these revenue streams by law cannot be used for any purpose except to satisfy the Commonwealth's payment obligations with respect to outstanding constitutional debt; (ii) plaintiffs have equitable and beneficial property interests in the revenue; (iii) the plaintiffs have a statutory lien on the revenue; (iv) the revenue is special revenue as defined in chapter 9 of the Bankruptcy Code; (v) the diversion of the revenue without just compensation is an unlawful taking under the Fifth Amendment to the U.S. Constitution; and (vi) under Puerto Rico law, the revenue must be segregated and deposited into a designated account and used for no other purpose than the repayment of constitutional debt. Plaintiffs also seek injunctive relief directing the Commonwealth to segregate and preserve the revenue for payment of the constitutional debt.

On January 30, 2018, the Court granted the defendants' motion to dismiss the complaint. On February 1, 2018, plaintiffs appealed the dismissal to the First Circuit (Case No. 18-1108). Appellants filed their opening brief with the First Circuit on May 2, 2018. Appellees' responding brief is due on July 2, 2018.

236 (Continued)

CW_STAY0010024

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Asociación de Profesoras y Profesores del Recinto Universitario de Mayagüez, Inc. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. No. 17-00197-LTS (D.P.R. July 9, 2017)

On July 9, 2017, an association of UPR professors filed an adversary proceeding claiming that UPR "is the main catalyst for sustainable economic development" and is therefore an essential service under PROMESA section 201. The complaint argues that the Certified Commonwealth Fiscal Plan fails to differentiate "between higher priority 'essential' services and lower priority 'Nonessential services'" and "artificially inflate[s] the Commonwealth's 'expenses' by including a so called 'Reconciliation Adjustment' of $585 million."

On November 6, 2017, APRUM filed an amended complaint in lieu of responding to defendants' motion to dismiss. On December 8, 2017, Judge Dein granted the parties' motion to hold this case in abeyance until revised fiscal plans are certified for the Commonwealth and UPR. APRUM filed a second amended complaint on May 11, 2018.

*Municipality of Caguas v. Government Development Bank for Puerto Rico et al.*, Case No. 17-01973-LTS (D.P.R. July 17, 2017)

On July 17, 2017, the Municipality of Caguas sued the Commonwealth, along with GDB, the Oversight Board, FAFAA, and CRIM to prohibit GDB from restructuring its debt using the GDB RSA further described in Note 22. The lawsuits contend that the GDB RSA violates PROMESA and is unconstitutional. The remedies sought by the Municipality include a court order declaring that Caguas' right as a debtor may not be the object of the GDB RSA under Title VI of PROMESA. Caguas filed a notice of voluntary dismissal without prejudice on October 30, 2017, which the Court approved the next day.

*University of Puerto Rico v. Voya Institutional Trust Co.*, Adv. Pro. No. 17-00217-LTS (D.P.R. July 26, 2017)

On July 26, 2017, the case styled *Voya Institutional Trust Co. v. University of Puerto Rico, et al.*, 17 00216 LTS (D.P.R. Aug, 22, 2016), as discussed in the pre-Title III litigation section above, was transferred to an adversary proceeding under the Title III cases. On September 18, 2017 and December 14, 2017, Judge Dein granted the parties' requests for a stay of the case.

*Asociación de Salud Primaria de Puerto Rico et al. v. Commonwealth of Puerto Rico et al.*, Adv. Pro. No. 17-00227-LTS (D.P.R. Aug. 2, 2017)

On August 2, 2017, a Puerto Rico health advocacy association filed a complaint alleging that the Commonwealth and its officials have not complied with their ministerial duties to the plaintiffs to supplement payments for services under Medicaid to indigent patients. Plaintiffs seek mandamus relief and a declaratory judgment that the Commonwealth must reimburse expenses incurred for rendering services to Medicaid beneficiaries.

The plaintiffs' mandamus action was initially filed in state court in 2002 and then as a federal action in 2003, in which they allege they were awarded prospective injunctive relief. The plaintiffs filed a notice of removal of their own 2002 mandamus action on August 1, 2017. On November 14, 2017, the Puerto Rico Department of Justice, on behalf of the Commonwealth, filed a motion for abstention

237                                                                    (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

seeking to have the case remanded to State Court. On December 11, 2017, Judge Swain filed an amended order referring the case to Magistrate Judge Dein for general pre-trial management and for a report and recommendation regarding the Commonwealth's motion for abstention. On April 2, 2018, Judge Dein recommended that Judge Swain remand the adversary proceeding to Puerto Rico state court. Plaintiffs have filed objections to Judge Dein's report and recommendations.

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as Agent of The Commonwealth of Puerto Rico v. Bettina Whyte as Agent of The Puerto Rico Sales Tax Financing Corporation (In re: The Financial Oversight and Management Board for Puerto Rico), Adv. Pro. No. 17-00257-LTS (D. P.R. Sept. 8, 2017)

On August 10, 2017, the Court issued an order to approve a protocol for resolving the disputes between the Commonwealth and COFINA (the Commonwealth-COFINA Dispute) and appointing (i) an agent for the Oversight Board as the debtor's representative for the Commonwealth (the Commonwealth Agent); and (ii) an agent for the Oversight Board as the debtor's representative for COFINA (the COFINA Agent).

On September 8, 2017, the Commonwealth Agent filed a complaint asserting that the SUT revenue pledged by COFINA to secure the COFINA bond debt is "the exclusive property of the Commonwealth." The complaint alleges that the COFINA enabling legislation "did not transfer to COFINA present ownership of future SUT revenues" and did not assign to COFINA the Commonwealth's "right to receive" such revenues. The complaint argues that the transfer to COFINA of SUT revenues was at most an unsecured promise to transfer revenues in the future. The complaint further alleges that even if the transfer of future SUT revenues to COFINA had any legal effect, such transfers are merely a grant of a security interest in acquired property governed by Article 9 of the Uniform Commercial Code. The complaint alleges that any security interest of COFINA in SUT revenues is unenforceable against the Commonwealth or, in the alternative, is unperfected and therefore avoidable and otherwise subordinate to the rights of the Oversight Board as trustee. The complaint further asserts that the Commonwealth Title III case cuts off any security interest.

The complaint also alleges that COFINA's structure is unconstitutional because it circumvents the Puerto Rico Constitution's debt limitations.

FAFAA filed a motion to dismiss certain claims of the Commonwealth Agent and counterclaims of the COFINA Agent on the ground that they exceeded the scope of their authority. Document production and discovery were completed in February 2018. On February 21, 2018, parties filed summary judgment motions. The Court heard oral arguments on April 10, 2018 and took the motions under advisement.

On February 26, 2018, the COFINA Agent filed a motion to certify five questions to the Puerto Rico Supreme Court regarding whether the COFINA enabling legislation transferred to COFINA present ownership of future SUT revenues, and whether the enabling legislation is unconstitutional because it allegedly violates various provisions of the Puerto Rico Constitution. Various COFINA bondholder groups joined in the motion in whole or in part; the Commonwealth Agent, the Oversight Board, and the Ad Hoc Group of GO Bondholders opposed the motion in whole or in part. The Court heard oral arguments on May 9, 2018, and took the motion under advisement.

238

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On May 14, 2018, certain Commonwealth creditors and certain COFINA creditors announced a purported "settlement" of the Commonwealth-COFINA Dispute. Neither FAFAA, nor the Oversight Board, nor the named parties in this adversary proceeding joined the purported settlement.

On June 5, 2018, the Commonwealth Agent and the COFINA Agent filed a joint motion requesting the Court to delay any decision on the summary judgment motions for 60 days in light of a proposed settlement in principle that they had reached (the Proposed Settlement). The Proposed Settlement was publicly disclosed on June 7, 2018. As of the date thereof, the joint motion is pending.

Under the Proposed Settlement (which is subject to definitive documentation as well as Title III Court approval), a portion of the 5.5% SUT revenue currently conditionally allocated to COFINA – which portion is referred to as Pledge Sales Tax Base Amount (PSTBA) – would be shared between COFINA and the Commonwealth. The PSTBA is the base amount of SUT revenue allocated to COFINA that COFINA must receive under Act No. 91 before that balance of the 5.5% of SUT revenue allocated to COFINA can be made available to the Commonwealth. Currently, the PSTBA is approximately $783.2 million for fiscal year 2019 and grows 4% annually until it reaches approximately $1.85 billion in fiscal year 2041. The Proposed Settlement would divide the PSTBA so that COFINA receives 53.65% of the PSTBA starting in fiscal year 2019 while the Commonwealth receives the other 46.35% for the benefit of holders claims, subject to certain restrictions and exceptions. The balance of the 5.5% SUT revenue conditionally allocated to COFINA would continue to flow to the Commonwealth. The Proposed Settlement also allocates to COFINA 100% of certain previously collected SUT revenue held at Bank of New York Mellon that is the subject of litigation. This description is a summary of the terms of the Proposed Settlement. For a full description of its terms, readers are directed to the language of the Proposed Settlement, which is a public document.

It is unclear whether the Proposed Settlement will be implemented because it remains subject to definitive documentation, objections from creditors and governmental entities, and approval by the Title III Court.

*Atlantic Medical Center, Inc. et al., v. Commonwealth of Puerto Rico*, Adv. Pro. No. 17-00278-LTS (D.P.R. Nov. 17, 2017)

On November 17, 2017, a group of domestic nonprofit corporations filed an adversary complaint alleging that the Commonwealth is obligated to pay them for services provided in furtherance of the Commonwealth's Medicaid program. Plaintiffs allege that federal law requires the Commonwealth to make certain payments to plaintiffs, and Congress gave plaintiffs an enforceable right under 42 U.S.C. § 1983 to compel the Commonwealth to make those payments.

Plaintiffs seek a declaratory judgment that their claims for all supplemental payments for Medicaid services owed by the Commonwealth for the years since 1997 – and that are the object of Adversary Proceeding 17 0227 (LTS) – are nondischargeable under PROMESA and otherwise unimpaired by the Commonwealth's filing of a Title III case. Plaintiffs rely on PROMESA section 7 (48 U.S.C. § 2016), which states that PROMESA "shall not be construed as impairing or in any manner relieving a territorial government from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory," and PROMESA section 304(h) (48

239                                                              (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

U.S.C. § 2164(h)), which precludes discharge of obligations arising under federal policy or regulatory laws, including those relating to public safety.

On February 2, 2018, the Court granted the Commonwealth's unopposed motion to consolidate this adversary proceeding with *Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerío, Corozal, Naranjito y Orocovis v. Commonwealth* (Adv. Pro. No. 17-00298-LTS), consolidating the cases under Adv. Proc. No. 17-278. On February 22, 2018, the Commonwealth filed a motion to dismiss the plaintiffs' consolidated complaints.

*Puerto Rico Energy Commission v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Adv. Pro. No. 18-00021-LTS (D. P.R. Mar. 4, 2018)

On March 4, 2018, the Puerto Rico Energy Commission (PREC), an independent regulatory entity charged with ensuring compliance with the Commonwealth's public policy on energy, filed a complaint against the Oversight Board and PREPA seeking declaratory and injunctive relief to prevent the Oversight Board from certifying a fiscal plan for PREPA before PREC has had an opportunity to review. Alongside its complaint, PREC also filed a motion for a preliminary injunction against the Oversight Board and PREPA preventing them from taking actions with respect to electricity policy which PREC claimed were subject to its jurisdiction, including certifying a fiscal plan without prior PREC approval. On March 12, 2018, Judge Swain referred the matter to Judge Dein for pre-trial management. On March 10, 2018, FAFAA filed an urgent motion to intervene on its own behalf as the sole entity authorized to act on behalf of Puerto Rico's government entities by the Enabling Act of the Fiscal Agency and Financial Advisory Authority, Act No. 2. On March 15, 2018, Judge Dein granted FAFAA limited intervention rights.

On March 16, 2018, the Oversight Board, on behalf of itself and PREPA, filed an opposition to PREC's preliminary injunction motion. FAFAA filed its own response and joined in part theOversight Board's opposition. Oral arguments on PREC's preliminary injunction motion took place on March 27, 2018. On March 28, 2018, Judge Swain entered an order denying PREC's motion. On April 10, 2018, PREC filed a notice of voluntary dismissal and Judge Swain entered an order dismissing the matter without prejudice.

*Puerto Rico Electric Power Authority, et al. v. Puerto Rico Energy Commission*, Adv. Pro. No. 18-00024-LTS (D. P.R. Mar. 13, 2018)

On March 13, 2018, the Oversight Board, on behalf of PREPA, filed a notice of removal of *Comisión de Energía de Puerto Rico v. Autoridad de Energía Eléctrica de Puerto Rico* (No. SJ2018cv01081) filed in the Commonwealth of Puerto Rico Court of First Instance, San Juan Superior Court on March 5, 2018. The removed action seeks PREPA's compliance with two orders issued by PREC and a declaration that compelling compliance with the orders does not violate PROMESA. The Oversight Board alleges that, in addition to violating Puerto Rico law, the orders directly invade the authority of the Oversight Board over fiscal and budgetary matters relating to PREPA under PROMESA Sections 201–205 and infringe upon the authority granted by ActNo. 2 to FAFAA as the exclusive representative of the Governor on behalf of the Commonweath in the creation, execution, supervision and oversight of any fiscal plan pursuant to PROMESA section 303.

(Continued)

CONFIDENTIAL                                    CW_STAY0010028

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On March 14, 2018, Judge Swain referred the case to Magistrate Judge Dein for general pre-trial management. The Oversight Board and FAFAA must respond to the complaint by June 7, 2018.

*Coopertiva de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Pro. No. 18-00028-LTS (D. P.R. Mar. 22, 2018)

On March 22, 2018, several Credit Cooperatives chartered under Puerto Rico law filed an adversary complaint against the Commonwealth, COFINA, the Oversight Board, FAFAA, GDB, PRHTA, ERS, and PREPA, seeking a declaratory judgment that their Puerto Rico debt holdings are not dischargeable and monetary damages for alleged fraud in issuing and encouraging the Cooperatives to purchase Puerto Rico debt instruments. On March 26, 2018, Judge Swain referred the case to Magistrate Judge Dein for general pre-trial management. On May 15, 2018, the official committee of unsecured creditors in the Title III cases filed a motion to intervene, which will be heard by the Court on June 6, 2018. Defendants must respond to the complaint by June 15, 2018.

*Siemens Transportation Partnership Puerto Rico, S.E. v. Puerto Rico Highways and Transportation Authority*, Adv. Pro. No. 18-00030-LTS (D. P.R. Mar. 26, 2018)

On March 26, 2018, Siemens Transportation Partnership Puerto Rico, S.E. (Siemens) filed a complaint against PRHTA, the Oversight Board, FAFAA, and GDB. Siemens alleges that PRHTA failed to pay Siemens for work done on the Tren Urbano construction project. Siemens seeks declaratory and injunctive relief (a) determining and declaring that a final installment of $13 million – to be paid from an escrow account upon the conclusion of all work contemplated by a settlement agreement between Siemens, PRHTA, and other contractors – has become due and payable to Siemens; (b) determining and declaring that the funds held in the escrow account are Siemens' property; (c) enjoining defendants from using the escrowed funds for any purpose other than releasing the funds to Siemens; and (d) determining and declaring that the escrowed funds are to be released to Siemens. On March 28, 2018, Judge Swain referred the case to Magistrate Judge Dein for general pre-trial management.

On May 2, 2018, Siemens filed a brief in support of its motion to preserve funds held in escrow and request for discovery in aid of any hearing deemed necessary by the judge. FAFAA and the Oversight Board filed separate responses to this motion on May 16, 2018, requesting the motion be denied.

*Pinto-Lugo, et al. v. United States, et al.*, Adv. Pro. No. 18-00047-LTS (D. P.R. Apr. 24, 2018)

On April 24, 2018, plaintiffs – a group of labor unions, non-profit organizations, and one individual – filed suit against the U.S. Government, the Oversight Board, and Governor Rosselló seeking injunctive and declaratory relief, including the determination that certain provisions of PROMESA, including the establishment of the Oversight Board, violate plaintiffs' fundamental rights as protected by the First, Fifth, and Fourteenth Amendments of the U.S. Constitution. Plaintiffs also seek a forensic audit of public debt, which they allege is fundamental to transparency and constitutes an essential fiduciary and statutory duty of the Oversight Board and Commonwealth. On April 25, 2018, Judge Swain referred the case to Magistrate Judge Dein for general pre-trial management. The Oversight Board must respond to the complaint by June 29, 2018. On May 17, 2018, the PR DOJ requested the same extension for Governor Rosselló to respond.

241 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*The Financial Oversight and Management Board for Puerto Rico v. Puerto Rico Electric Power Authority, et al.*, Adv. Pro. No. 18-00047 (D. P.R. Apr. 27, 2018)

On April 27, 2018, the Oversight Board filed a notice of removal of *José Ramón Rivera, et al., v. Commonwealth of Puerto Rico, et al.*, Civil No. SJ2018cv01670 filed in the Commonwealth of Puerto Rico Court of First Instance, San Juan Superior Court on March 27, 2018. The removed action seeks, among other things, declaratory and injunctive relief providing that (i) PREPA's Employees Retirement System is a trust separate and independent of PREPA and the Commonwealth, and (ii) Executive Order OE-2018-012 interferes with the independence and powers of the Retirement System and is null and void. On May 15, 2018, the Court entered an order requiring that plaintiffs file certified English translations by June 11, 2018.

*Santini-Gaudier v. Rosselló Nevares, et al.*, Adv. Pro. No. 18-00053-LTS (D. P.R. May 7, 2018)

On May 7, 2018, the Oversight Board filed a notice of removal of *Luis R. Santini Gaudier v. Hon. Ricardo Rosselló Nevares, Gobernador de Puerto Rico; Autoridad de Energia Electrica*, Case No SJ2018cv02743, filed in the Commonwealth of Puerto Rico Court of First Instance, San Juan Superior Court on May 2, 2018. The removed action seeks, among other things, declaratory and injunctive relief requiring that Luis Santini, a former PREPA Board Member removed from his position by defendant Governor Rosselló, be reinstated to the PREPA Board. On May 8, 2018, Judge Swain referred the case to Magistrate Judge Dein for general pre-trial management. On May 11, 2018, the Oversight Board filed certified English translations of key pleadings.

*PFZ Properties Inc. v. Commonwealth of Puerto Rico*, Adv. Pro. No. 18-00056-LTS (D. P.R. May 14, 2018)

On May 14, 2018, PFZ Properties, Inc. filed a complaint against the Commonwealth alleging that the Commonwealth took its beachfront property without just compensation. Plaintiff seeks, among other things, (i) declarations that the Debtor has effected a regulatory taking of the property and violated PFZ's constitutional rights and (ii) a judgment against the Commonwealth in the amount of $75,550,000 providing for just compensation for the property to the plaintiff. On May 14, 2018, PFZ Properties Inc. filed a corporate disclosure statement. Summonses were issued to the Commonwealth on May 16, 2018.

*Commitments*

On November 23, 1998, a global settlement agreement (the Global Agreement) was entered into by and between certain tobacco companies and certain states, territories, and other jurisdictions of the United States of America, including the Commonwealth. The Global Agreement calls for annual payments through the year 2025, which will vary due to inflationary and volume adjustments. Estimated payments to be received under the Global Agreement through the year ending June 30, 2025, amount to approximately $967 million. After 2025, the tobacco companies will continue making contributions in perpetuity. Pursuant to Act No. 173 of July 30, 1999, which created the Trust (a blended component unit), the Commonwealth allocated and transferred to the Children's Trust the contributions that the Commonwealth is entitled to receive under the Global Agreement. Payments received under the Global Agreement and recognized as revenue during the year ended June 30, 2015, amounted to approximately $71.5 million. All of the revenue to be received under the Global Agreement and investment earnings on certain accounts under bond indentures is pledged as collateral for the Tobacco Settlement Asset Backed Bonds, Series 2002, 2005, and 2008. As of June 30,

242 (Continued)

CW_STAY0010030

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

2015, the approximate amount of the pledge is $2.5 billion, representing the approximate remaining principal and interest of the aforementioned bond issuances, which are committed through May 15, 2057. Accordingly, until May 15, 2057, such revenue is not available for other purposes.

On November 23, 2010, the Legislature approved a new article 9A to Act No. 66 of June 22, 1978 (the Article), authorizing PRMeSA, a blended component unit, to incur obligations up to $285 million, under such terms and conditions approved by the Board of Member Institutions of PRMeSA and GDB, as fiscal agent of the Commonwealth and its instrumentalities. These additional funds must be deposited in a special account at GDB and may only be used for the following purposes:

a. payment of debts to suppliers, agencies, institutions, and reserve fund for the self insurance (professional responsibility and interfund debt) of PRMeSA; and

b. to provide operational liquidity to ease PRMeSA's fiscal situation, as determined by the agreement with GDB.

From savings generated as a result of the debt renegotiations with the agencies and institutions, PRMeSA will create a fund to cover operating expenses related to maintenance, overhaul, and the reconditioning of the physical plant. GDB, in its role as the Fiscal Agent, may possess the administrative mechanisms as it deems necessary to ensure that these funds will be used solely and exclusively for the purposes set forth in the Article. The special bank account and the funds deposited therein cannot be seized, syndicated, frozen, encumbered, or otherwise affected by decisions, judgments, orders, or rulings issued by courts of Justice of the Commonwealth or its agencies or public corporations during any adjudicative proceeding of an administrative or judicial nature, regardless of whether they were initiated by private individuals or public institutions. PRMeSA was required to develop and implement within one hundred eighty (180) days from the approval of the Article, an aggressive collection plan for the recovery of its accounts receivable. The Directors must report periodically to GDB on the implementation of that plan, and report annually to the Board of Member Institutions and GDB the collection proceeds arising from the execution of the plan. GDB was authorized as fiscal agent to undertake any necessary measures in order to, within a reasonable period of time, help PRMeSA to become and operate as an independent fiscal instrumentality. However, once the collection plan is working as expected and providing PRMeSA the resources required, and once PRMeSA becomes a financially independent institution as determined by GDB, PRMeSA will be required to assume the remaining established obligations.

The healthcare industry, under which PRMeSA operates, is subject to numerous laws and regulations, which include, among other things, matters such as government healthcare participation requirements, various licenses and accreditations, reimbursements for patient services, and Medicare and Medicaid fraud and abuse. Government action has increased with respect to investigations and/or allegations concerning possible violations of fraud and abuse and false claims statutes and/or regulations by healthcare providers. Providers that are found to have violated these laws and regulations may be subjected to fines or penalties. While management of PRMeSA believes its policies, procedures, and practices comply with governmental regulations, no assurance can be given that the Administration will not be subject to governmental inquires or actions.

The Health Insurance Portability and Accountability Act (HIPAA) was enacted in August 1996 to assure health insurance portability, reduce healthcare fraud and abuse, guarantee security and privacy of health information, and enforce standards for health information. Organizations are required to be in compliance

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

with HIPAA provisions. Organizations are subject to significant fines and penalties if found not to be compliant with the provisions outlined in the regulations. PRMeSA's management believes that they are in compliance.

The Health Information Technology for Economic and Clinical Health Act set meaningful use of interoperable Electronic Health Record (EHR) adoption in the health system as a critical national goal and incentivized the EHR adoption. Its goal is not adoption alone but meaningful use of EHRs, that is, their use by providers to achieve significant improvements in care. Meaningful use compliance is required before the Federal Fiscal Year 2016, otherwise, the hospital will incur penalties for noncompliance that may reduce future Medicare payments and potentially Medicare Advantage program payments. The Centers for Medicare and Medicaid Services (CMS) manages and has implemented an incentive program for those hospitals that implement EHR and comply with certain specific requirements. CMS' EHR Incentive Programs provide incentive payments to eligible hospitals as they adopt, implement, upgrade, or demonstrate meaningful use, as defined by CMS, of certified EHR technology. As of June 30, 2015, PRMeSA is under the implementation of its EHR system.

The Special Communities Perpetual Trust (the Trust) has financial assistance agreements with several municipalities of the Commonwealth to provide funding for the construction, improvement, and rehabilitation of certain projects of the Special Communities. At June 30, 2015, the Trust's accumulated budgeted balances on these agreements amounted to approximately $1,092 million, from which a total of approximately $1,023 million had been disbursed.

As of June 30, 2015, the following blended component units maintain various unspent construction and assistance commitments as follows (in thousands):

| | | |
|---|---|---|
| Puerto Rico Public Housing Administration | $ | 193,800 |
| University of Puerto Rico Comprehensive Cancer Center | | 79,427 |
| Public Buildings Authority | | 50,000 |
| Puerto Rico Infratructure Financing Authority | | 33,300 |
| The Children's Trust | | 17,600 |
| Total | $ | 374,127 |

The Commonwealth is also committed under numerous noncancelable long-term operating lease agreements, which expire through 2033, covering land, office facilities, and equipment. Rental expenditure within the governmental funds for the year ended June 30, 2015 under such operating leases was approximately $134 million.

244

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The future minimum lease payments for these leases are as follows (in thousands):

| Years ending June 30: | | |
|---|---|---|
| 2016 | $ | 72,004 |
| 2017 | | 54,546 |
| 2018 | | 40,384 |
| 2019 | | 29,714 |
| 2020 | | 17,626 |
| 2021–2025 | | 57,975 |
| 2026–2030 | | 22,934 |
| 2031–2035 | | 4,164 |
| Total future minimum lease payments | $ | 299,347 |

*Environmental Commitments and Contingencies*

The Commonwealth accounts for pollution remediation obligations in accordance with GASB Statement No. 49, Accounting and Financial Reporting for Pollution Remediation Obligations. This Statement addresses accounting and financial reporting standards for pollution (including contamination) remediation obligations, which are obligations to address the current or potential detrimental effects of existing pollution by participating in pollution remediation activities such as site assessments and cleanups. The scope excludes pollution prevention or control obligations with respect to current operations, and future pollution remediation activities that are required upon retirement of an asset, such as landfill closure and postclosure care.

Once any of five specified obligating events occurs, a government is required to estimate the components of expected pollution remediation outlays and determine whether outlays for those components should be accrued as a liability or, if appropriate, capitalized when goods and services are acquired. Obligating events include the following:

∗ The government is compelled to take pollution remediation action because of an imminent endangerment.

∗ The government violates a pollution prevention related permit or license.

∗ The government is named, or evidence indicates that it will be named, by a regulator as a responsible party or potentially responsible party (PRP) for remediation, or as a government responsible for sharing costs.

∗ The government is named, or evidence indicates that it will be named, in a lawsuit to compel participation in pollution remediation.

The government commences or legally obligates itself to commence pollution remediation.

On June 16, 2014, the USDOJ, acting on behalf of the United States Environmental Protection Agency (EPA), filed a complaint alleging unauthorized discharges of pollutants from the storm sewer systems owned and/or operated by the Municipality of San Juan (MSJ), the Department of Transportation and Public Works (DTPW), and the Puerto Rico Highways and Transportation Authority (PRHTA) through certain flood control pump

245 (Continued)

CONFIDENTIAL

CW_STAY0010033

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

stations owned and operated by the Department of Natural and Environmental Resources (DNER), into the waters of the United States, in violation of the Federal Clean Water Act. The complaint seeks the assessment of civil penalties against MSJ, DTPW/PRHTA, DNER and the Commonwealth of Puerto Rico (collectively, the Puerto Rico Defendants) for past and present violations of up to $32,500 per day per violation, for those violations that occurred between February 5, 2007 and January 12, 2009; and $37,500 per day per violation, for those violations that occurred from January 13, 2009 to the present. The complaint further seeks injunctive relief to bring the defendants into compliance with the Municipal Separate Storm Sewer Systems Permit. MSJ, DNER, and DTPW/PRHTA individually resolved the complaint by entering into three separate consent decrees with USDOJ/EPA. Pursuant to the settlement negotiations, and taking into considerations the economic impact of a civil penalty and the Puerto Rico Defendants' documented inability to pay a penalty, USDOJ/EPA agreed to waive the monetary civil penalty associated with the provisions alleged in the complaint. Thus, the three consent decrees focus on injunctive relief to enable the Puerto Rico Defendants to attain compliance with applicable statutory and regulatory provisions. The MSJ consent decree was lodged with the U.S. District Court for the District of Puerto Rico (District Court) on October 26, 2015. The DNER and the DTPW/PRHTA consent decrees were both lodged with the District Court on December 23, 2015. At this time, USDOJ has not yet filed a motion with the District Court for entry of the consent decrees, as USDOJ/EPA is evaluating public comments received during the mandatory public period pursuant to 28 C.F.R.£50.7.

**Fiduciary Funds**

ERS is a defendant in a lawsuit challenging the constitutionality of Act No. 3 of 2013 and in another lawsuit challenging the constitutionality of Act No. 3 and Act No. 32 of 2013. In the first lawsuit, the plaintiffs requested the ERS to honor the participants of an employer of the ERS, the benefits available to them under Act No. 447 which were affected by Act No. 3 of 2013, with the economic consequences that this would entail. On February 13, 2015, the Puerto Rico Supreme Court denied the plaintiffs recourse. On March 6, 2014, the plaintiffs file an amended complaint, including the Board of Trustees of the ERS as a defendant and including a torts claim against the ERS's Administration and its Board of Trustees. In the second lawsuit, the plaintiffs requested the annulment of the provisions of law imposing economic obligations to municipalities in favor of the ERS. Act No. 3 of 2013 imposed a $2,000 contribution to all municipalities and public corporations for every retiree as of June 30, 2013 and Act No. 32 of 2013 imposed an additional uniform contribution according to the corresponding proportion of the employer's contributions. On May 5, 2015, the Puerto Rico First Court of Instance issued a judgment dismissing the case. On July 27, 2015, the plaintiffs filed an appeal at the Puerto Rico Court of Appeals. On January 5, 2016, the Puerto Rico Court of Appeals upheld the decision regarding the dismissal of the case. On April 5, 2016, the plaintiffs filed a Certiorari before the Puerto Rico Supreme Court. The Puerto Rico Supreme Court has yet to issue a ruling regarding this. Although an economic compensation was not requested in this second case, if a ruling declaring invalidity of the questioned articles is made by the Puerto Rico Supreme Court, the ERS will not receive the payments imposed by Act No. 3 and Act No. 32 of 2013 to the municipality and the ERS will probably have to refund payments already made under those law provisions. With respect to these lawsuits, the ERS, in consultation with legal counsel, has advised that at this stage of the proceedings they cannot offer an opinion as to the probable outcome. Accordingly, management does not consider it necessary to make any provision in its books for these cases and intends to contest them vigorously.

ERS is also a defendant in a lawsuit brought by pensioners of ERS. They filed the claim on behalf of ERS against the underwriters of certain ERS pension bonds and some of the former members of the Board of Trustees of ERS. The complaint requested $800 million in damages resulting from the $3 billion bond

246 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

issuance in 2008 that according to the plaintiffs compromised the solvency of ERS. This case is in its initial stages; therefore, no provision for any liability that may result upon adjudication of this lawsuit has been recorded by ERS in its fiduciary funds.

TRS is a defendant in one lawsuit filed by several groups representing the teachers alleging that, since the Puerto Rico Supreme Court declared unconstitutional the subsection in Act No. 160 of 2013 that established the interest rate to be paid by a member for the accreditation of services rendered but not credited, TRS is unable to charge 9.5% interest on account of service credit. Prior to the adoption of Act No. 160 of 2013, the interest rate applicable in respect of such accreditation stood at 2% as per Board Resolution. TRS believes that the claimant's allegations are not legally sustainable and the 9.5% interest rate is valid given that the percentage interest is not a contractual right of the active members; as it was not established in Act 91 of 2004, previous law of TRS. It is TRS's opinion, in consultation with legal counsel, that what the Puerto Rico Supreme Court ruled as unconstitutional is that active participants could only pay for unaccredited services up to July 31, 2014. With the Puerto Rico Supreme Court's ruling, active participants can continue to pay for unaccredited services and the interest to be charged is defined in Article 1, which was not declared unconstitutional. The Board of Trustees of TRS addressed the issue administratively by unanimously approving a resolution, retroactive to December 24, 2013, by which it determined that the interest rate to be paid by a member for the accreditation of services rendered but not credited will be 9.5%.

On October 21, 2016, the Puerto Rico Supreme Court ruled against the petition for reconsideration requested by TRS regarding the retroactive application of 9.5% interest rate on not credited services as explained above. The Supreme Court resolved that the applicable interest rate for not credited services for all participants is 2% until September 2, 2015 and 9.5% thereafter, instead of applying 9.5% interest rate since December 24, 2013. Based on this determination, it is probable that TRS will be required to reimburse the amounts already collected in excess of 2% and honor the 2% for all cases pending and new applications submitted. The actual and actuarial impact of granting such accreditation has not been determined as of the date of this report. TRS is contemplating a re consideration request from the Supreme Court. The Board of Trustees of TRS, in consultation with legal counsel, is unable to assess the likelihood of an adverse resolution of the case. At this time, it is not possible to determine the financial impact of said outcome.

In addition, each of the Retirement Systems is a defendant or co defendant in various lawsuits resulting from the ordinary conduct of its operations. Based on the advice of legal counsel and considering insurance coverages, management is of the opinion that the ultimate liability, if any, will not have a significant effect on the financial status of each of the Retirement Systems.

**Discretely Presented Component Units**

On June 28, 2014, the Commonwealth enacted Act 71 2014, known as the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (Recovery Act). The Recovery Act was intended to fill the void that currently exists with respect to an orderly legal process governing the enforcement and restructuring of the debts and other obligations of a public corporation, due to the general inapplicability of Chapters 9 and 11 of the United States Bankruptcy Code to public corporations that are governmental instrumentalities of the Commonwealth. The purpose of the Recovery Act was to create a legal framework that: (1) allows public corporations to adjust their debts in a manner that protects the interests of all affected creditors; (2) provides procedures for the orderly enforcement and restructuring of a public corporation's debt in a manner that is consistent with the United States and Commonwealth Constitution; and (3) maximizes the return to the public corporation's stakeholders.

247 (Continued)

CONFIDENTIAL

CW_STAY0010035

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The Recovery Act did not apply to the Commonwealth. It applied solely to public corporations, other than the following: the Children's Trust; ERS; GDB and its subsidiaries, affiliates, and any entities ascribed to GDB; JRS; MFA; the Municipal Finance Corporation; PFC; PRIDCO, AFICA; PRIFA; COFINA; TRS; and UPR.

On February 6, 2015, the United States District Court for the District of Puerto Rico issued an opinion and order declaring the Recovery Act unconstitutional and stating that it was preempted by the United States Bankruptcy Code. The District Court's decision was upheld by the United States Court of Appeals for the First Circuit and subsequently upheld by the U.S. Supreme Court.

In the normal course of their operations, various Component Units are also subject to guarantees and other actions brought by third parties seeking damages or entering into commitments. Such actions are disclosed in the separately issued reports of the major component units, included below. With respect to commitments related to guarantees, certain nonmajor component units engaged in the financial services industry were also included for informative purposes. These commitments and guarantees are summarized below:

**(a) GDB**

At June 30, 2015, GDB has financial guarantees for the private sector of approximately $587 million. In addition, at June 30, 2015, standby letters of credit to the public-sector were approximately $1.3 billion. Commitments to extend credit to the public-sector were approximately $1.4 billion, while there were no commitments to extend credit to the private sector.

On July 24, 2013, Aerostar Airport Holdings, LLC (Aerostar) and PRPA entered into a lease agreement of Luis Muñoz Marín International Airport (LMMIA), for a term of 40 years. In connection with the lease of LMMIA, GDB executed a payment guarantee in favor of Aerostar for any Termination Damages due and payable in cash by PRPA under the lease agreement. In accordance with GDB's guarantee, Aerostar has the right to terminate the lease agreement mainly under three different noncompliance scenarios on the part of PRPA. The amount of Termination Damages mainly consists, among other components, of the LMMIA Facility Leasehold Value and Leasehold Compensation as defined in the agreement.

On September 22, 2011, Autopistas Metropolitanas de Puerto Rico, LLC (Metropistas) and PRHTA entered into a concession agreement (the Concession Agreement) for the administration of the toll roads PR 22 and PR 5, for which PRHTA received in exchange a lump sum payment of $1.1 billion and a commitment to make immediate improvements to the toll roads amounting to $56 million and to comply with world class operating standards, which may require investing more than $600 million over the life of the concession. In connection with the closing of the Concession Agreement, GDB executed a payment guarantee in favor of Metropistas pursuant to which GDB acts as guarantor of any Termination Damages, as defined in the Concession Agreement, due and payable in cash by PRHTA under the Concession Agreement. The amount of Termination Damages consists, among other components, of the fair market value of Metropistas' interest in the toll roads. At the same time, in connection with the payment guarantee, GDB and PRHTA also entered into a Reimbursement Agreement whereby PRHTA agreed to reimburse GDB for any amounts paid under the guarantee.

On August 18, 2002, the Legislature approved Act No. 198, which created the Cooperative Development Investment Fund. The purpose of this fund is to promote the development of cooperative entities. This fund will be capitalized through contributions to be provided by GDB up to $25 million to be matched by cooperative entities. As of June 30, 2015, GDB has contributed $21.9 million to the Cooperative

248 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Development Investment Fund, $1.5 million of which was contributed during the year ended June 30, 2015.

GDB's Development Fund has entered into an agreement with the Economic Development Bank for Puerto Rico (EDB) whereby the Development Fund would guarantee a portion of loans granted by EDB under a government program named "The Key for Your Business" (the Program). Under the agreement, the Development Fund would assign $15 million of its capital for the Program. The Development Fund guarantees one third of the outstanding principal balance of each loan plus accrued interest and certain other charges. The Development Fund charges one percent of the loan amount as guarantee fee and no loan can exceed $50,000. In addition, GDB, the Development Fund, and certain participating banks enter into guarantee, commitment, and funding agreements in which the Development Fund guarantees eligible loans made by such banks to eligible businesses up to a maximum of 30% of the principal amount of the loans. The guarantee Program started on April 3, 2012 and ended on April 3, 2013. As of June 30, 2015, guarantees amounted to approximately $15 million. At June 30, 2015, the outstanding balance of loans guaranteed by the Development Fund amounted to approximately $2.9 million, and the allowance for losses on guarantees amounted to approximately $131 thousand.

The Housing Finance Authority, a blended component unit of GDB, acts as servicer for a number of mortgage loans owned by other investors. The servicing is generally subcontracted to a third party. As of June 30, 2015, the principal balance of the mortgage loans serviced for others is approximately as follows (in thousands):

| | | |
|---|---|---|
| Puerto Rico Community Development Fund I | $ | 40,099 |
| Office for the Administration of the Assets of the Urban Renovation and Housing Corporation or its successor without guaranteed mortgage loan payments | | 20 |
| | $ | 40,119 |

The U.S. Office of Inspector General (OIG) has performed various examinations of the HOME Program covering fiscal years ended prior to July 1, 2010. These examinations covered periods in which the HOME Program was under the administration of the Department of Housing. These examinations identified instances of noncompliance with terms and conditions of the grant agreements, applicable federal law, and the HOME Program's regulations, including but not limited to the expenditure of resources for ineligible purposes. OIG identified in its examinations disallowed costs amounting to approximately $18.3 million. The Housing Finance Authority, a blended component unit of GDB, recorded a contingency for such disallowed costs, and additional amounts identified internally as potential disallowances, amounting to approximately $20.4 million. On October 2013, the Housing Finance Authority entered into a three-year repayment plan, starting on October 15, 2013, with HUD to return HOME funds amounting to approximately $1.8 million that were determined to be disallowed costs within the $18.3 million discussed above. In July 31, 2014, the Governor of the Commonwealth signed the HOME Voluntary Repayment Settlement Agreement (The Voluntary Settlement Agreement) with HUD. The Voluntary Settlement Agreement establishes the reimbursement to the HOME program of $14.2 million, from nonfederal funds, for disallowed expenditures in connection with HUD funded projects, as defined and described in the Voluntary Settlement Agreement, in two installments of

249

(Continued)

CW_STAY0010037

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

$10 million and $4.2 million due on October 1, 2014 and October 1, 2015, respectively. During the year ended June 30, 2014, the Affordable Housing Subsidy Program paid $703,920 to the Home Program to cover the installment payments due under the $1.8 million repayment plan. At June 30, 2015, the total liability amounted to approximately $4.8 million and is included in accounts payable and accrued liabilities in the combining statement of net position major component units.

Other federal programs are also subject to audits. Such audits could result in claims against the resources of the Housing Finance Authority. No provision has been made for any liabilities that may arise from such amounts since the amount, if any, cannot be determined at this date.

GDB and certain of its component units are defendants in several lawsuits arising out of the normal course of business. Management, based on advice of legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings will not have a material adverse effect on the financial position and results of operations of GDB or its component units.

#### (b) PRHTA

PRHTA is a defendant or codefendant in various lawsuits for alleged damages in cases principally related to construction projects. These are generally either fully or partially covered by insurance. The contactors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless PRHTA from lawsuits brought on account of damages relating to the construction of the projects. As of June 30, 2015, PRHTA, based on legal advice, has recorded a liability of approximately $162.1 million for probable losses on those claims not fully covered by insurance. In the opinion of legal counsel, any liability in excess of the recorded liability that may arise for such claims will not be significant to PRHTA's financial position or results of operations.

PRHTA entered into a System and Test Track Turnkey Contract (STTT Contract) with Siemens Transportation Partnership Puerto Rico, S.E. (Siemens) and other contractors for the purpose of operating and maintaining the Urban Train. During 2005, the STTT Contract became effective upon execution of the contract for an initial term of five years with an option by PRHTA to extend the term for an additional five years. The compensation is based on a schedule included in the master agreement, which approximates $4.0 million on a monthly basis. The total annual operation and maintenance cost, including cost of issuance and electricity, for fiscal year 2015 was approximately $87.4 million.

#### (c) PREPA

PREPA is a defendant or codefendant in several lawsuits incidental to its business, some involving substantial amounts. In those instances, that management and legal counsel believe that the outcome of the litigation will be unfavorable to PREPA, a provision has been made to cover the estimated liability. PREPA's management, based on discussions with legal counsel, believes that the additional liability, if any, resulting from the ultimate resolution of these matters will not have a material effect on PREPA's financial position or results of operations.

On May 18, 2000, Abengoa, Puerto Rico, S.E. (Abengoa), PREPA's contractor for the repowering of San Juan steam plant units 5 and 6, unilaterally declared a termination of the contract with PREPA and filed a complaint for breach of contract. This litigation was bifurcated into a liability and damages phase. Trial on the first phase to determine breach of contract commenced on January 22, 2015 and was concluded during the course of that same year. Trial on the second phase to determine damages and economic

250                                                                    (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

terms was scheduled to commence in 2016; but later postponed until January 16, 2018. Economic claims have been reserved for this second phase of the trial on damages. PREPA is prepared to prove direct damages arising from the wrongful termination by Abengoa (i.e. direct costs to complete Abengoa's scope of work, equipment refurbishment, etc.) in an amount of at least of $250 million. If recovery of indirect or consequential damages is permitted by the Court, PREPA has claimed in excess of $400 million (including claims for fuel differential costs, loss of EPA credits, etc.).

PREPA understands that it has significant probabilities of prevailing on the merits or its counterclaim for wrongful termination against Abengoa and its surety insurance company. The evidence will show that Abengoa chose to terminate the Contract with knowledge of or total disregard of the financial damage that such termination would cause.

In 2009, a large fire at a tank farm owned by Caribbean Petroleum Corporation (CAPECO) caused major damage to surrounding areas. PREPA stored some of its fuel at this facility. In the aftermath of the fire, numerous claims were filed against CAPECO. Some of the plaintiffs included PREPA as a defendant in these suits, alleging that PREPA failed in its duty (as the owner of fuel stored at the site) to properly monitor CAPECO's operations in the tank farm. All cases are in the initial stages and PREPA intends to vigorously defend against these claims. On August 12, 2010, CAPECO filed for bankruptcy. As a result, thereof all proceedings against CAPECO have been stayed. The proceedings against PREPA continue.

In 2011, separate lawsuits were filed against PREPA by various consumers claiming damages allegedly caused by incorrect and unlawful billing and invoicing practices. The lawsuits have been consolidated and certified as complex litigation, as requested by PREPA. The consumers are claiming damages in excess of $100 million and requested that the case be certified as a class action. PREPA filed its reply in opposition to the class certification request. Discovery proceedings are still being conducted in those cases that have not been dismissed yet. On December 7, 2016, a Status Conference was held and a new judge was assigned. On March 23, 2017, a conference was held and as a result thereof a hearing for class certification was scheduled on August 16, 2017. However, on July 2, 2017, PREPA filed for bankruptcy under Title III of PROMESA. PREPA filed the notice of stay before the state court on July 12, 2017 and the corresponding judgment staying the case was entered on August 11, 2017. PREPA will vigorously defend these cases and maintains that there is no cause of action against PREPA.

In 2011, a federal class action lawsuit was filed claiming that PREPA's rate schedules, including subsidies granted to various groups, violate federal antitrust law, specifically the Robinson Patman Act, and the religious freedom clause of the First Amendment to the United States Constitution by discriminating against certain customers who are not entitled to subsidies and requiring certain customers to associate with persons of different religious or political views by subsidizing those views through PREPA's lower electric rates to such persons. PREPA believes the claims are without merit because several elements of the Robinson Patman Act that the plaintiffs must prove do not exist in PREPA's case, including that it does not sell electricity in interstate commerce and because PREPA's subsidies are mandated by Commonwealth legislation rather than independent PREPA actions. PREPA moved for full dismissal; however, the court partially granted the request. Judgment for the Authority in this case has been affirmed by the federal appeals court and the case has been dismissed.

In 2011, a civil lawsuit was filed against PREPA and its directors in federal court in Puerto Rico, by eight private individuals and one local private corporation, claiming violations of the Racketeer Influenced and Corrupt Organizations Act (the RICO Act), including unlawful use of an enterprise to launder money

251

(Continued)

CW_STAY0010039

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

generated by a pattern of racketeering activity, unlawful manipulation of an enterprise for purposes of engaging in, concealing, or benefiting from a pattern of racketeering activity, unlawful conspiracy to violate the RICO Act, and conspiracy to advance a money laundering scheme. Neither the United States federal government nor the Commonwealth government is a party in this civil lawsuit. The amount claimed is unspecified. Plaintiffs have also asked the federal court to allow them to be the representatives of a class consisting of all consumers of the electricity sold by PREPA from 2007 to the present. PREPA opposed the certification of class action, and was denied by the court. On September 25, 2012, the federal court dismissed all of the above claims except those claims regarding conspiracy to advance a money laundering scheme and conspiracy for acquiring an interest in an enterprise. PREPA believes that the undismissed RICO Act claims are without merit because the plaintiffs will be unable to prove the necessary elements of those claims, in particular those that require showing that PREPA conspired through its employees to violate the RICO Act, or that its directors or Board members obtained any interest in PREPA (other than their Board position). PREPA will continue to vigorously defend this case.

In 2009, PREPA filed a lawsuit in Commonwealth court against Vitol, Inc. and certain of its affiliates and subsidiaries seeking a declaratory judgment as to the nullity of a $2 billion fuel supply agreement due to Vitol's failure to disclose certain corruption cases for which it accepted responsibility. Vitol removed this lawsuit to federal court and presented a counterclaim alleging that PREPA owed it approximately $45 million for delivered fuel and related excise taxes. On November 28, 2012, PREPA filed a second complaint against Vitol in the Commonwealth Court of First Instance seeking essentially the same remedies sought in the first action but as to four other contracts, after discovery revealed the date in which Vitol learned of the investigations in the corruption cases. Vitol also removed this action to the U.S. District Court for the District of Puerto Rico. PREPA claims approximately $3.5 billion in the aggregate. Vitol has resolved the claim for the $17 million in excise taxes and has stated that it will amend its counterclaim to dismiss that claim. Discovery in the case is closed. The parties have submitted motions for summary judgment against each other and are in the process of filing their respective oppositions thereto. The motions are pending adjudication by the court.

Fifty four plaintiffs, former and current PREPA employees, claim that they have health problems due to PREPA's intentional failure to comply with federal and local laws regarding asbestos materials. In particular, plaintiffs claim that, during a certain time frame, in which PREPA had the obligation to take measures regarding asbestos materials in its facilities, PREPA failed to comply with its duty to protect the plaintiffs from asbestos exposure. Plaintiffs claim approximately $321 million in damages. PREPA alleged employer's immunity under the Workers' Compensation Law. An evidentiary hearing on the issue took place. After trial, the Court entered judgment dismissing the claims in their entirety. The plaintiffs filed an appeal before the Puerto Rico Appeals Court. PREPA filed a motion to dismiss the appeal. The Appeals Court denied PREPA's motion to dismiss and PREPA filed its appellate brief. The case is pending adjudication by the Appeals Court.

On November 21, 2013, Tropical Solar Farms, LLC; New Horizon Solar, LLC; Jonas Solar Energy, LLC; and Roberto Torres (collectively, the Plaintiffs) filed a suit in the Commonwealth of P.R. Court of First Instance, Ponce Section, against 29 defendants and several John Does. The complaint contains a plethora of claims against multiple defendants arising from an alleged multiplicity of sources of obligations: contractual, in tort, and in breach of fiduciary duties and the law. It encompasses private entities, a public corporation, PREPA and former public officers, among others. The complaint claims monetary compensation in excess of $705 million. The complaint alleges that the defendants negotiated

(Continued)

CONFIDENTIAL                                                                              CW_STAY0010040

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

several Renewable Power Purchase Agreements to provide up to 40 megawatts to PREPA, all of which were assigned by the plaintiffs to various other defendants. The Plaintiffs allege that the defendants never intended to comply with their obligations under the agreements, and were only buying time to advance their other renewable energy projects with PREPA.

PREPA filed a motion to dismiss and on October 2, 2015, a partial judgment was entered dismissing all claims in the case against PREPA with prejudice. Tropical Solar has appealed the dismissal to the Puerto Rico Court of Appeals.

In addition to these cases, PREPA is involved in other typical litigations for an electric power utility, but management estimates the amounts of such claims are not material and will not affect adversely PREPA's operations. These other cases remain in discovery stages and PREPA will defend them vigorously.

*(d)* *PRASA*

PRASA is the defendant in a lawsuit presented by customers alleging that PRASA has over billed them due to the methodology used to estimate consumption. There is one case in which plaintiffs requested a certification of the suit as a class action and seek recovery damages and an injunction enjoining PRASA from continuing to bill using the current methodology. The class certification hearing took place in June 2011, a certification to a class action was issued. PRASA appealed the class action certification and is expecting the Court decision on the request. PRASA's potential exposure from these lawsuits is unlikely and, as such, no liability is being reported on the accompanying basic financial statements.

PRASA is the defendant or codefendant in various other lawsuits. The ultimate outcome of the lawsuits cannot presently be determined. However, PRASA's management, based on the advice of legal counsels, is of the opinion that these lawsuits will not have a material impact on the basic financial statements.

*(e)* *UPR*

UPR participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of the OMB Circular A 133, Audits of States, Local Governments, and Non-Profit Organizations, or to compliance audits by grantor agencies. The amount, if any, of expenditures that may be disallowed by the granting agencies cannot be determined at this time. Management believes the impact will not be material to UPR's financial statements.

Medical malpractice claims have been asserted against UPR hospital and are currently at various stages of litigation. It is the opinion of the UPR hospital's legal counsel and management that the recorded accruals are adequate to provide for potential losses resulting from pending or threatened litigation, as well as claims from unknown incidents that may be asserted arising from services provided to patients. Under Act No. 98 of August 24, 1994, maximum claims loss against UPR hospital is limited to $75,000 per person, or $150,000 if it involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. It is the opinion of UPR hospital's management and its legal counsel that the outcome of these claims would not have a material effect on UPR or the hospital's operations.

253

(Continued)

CW_STAY0010041

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(f)  PCSDIPRC**

PCSDIPRC provides insurance coverage over the stocks and deposits of all cooperatives in Puerto Rico. The deposit base of the cooperatives approximates $7.5 billion at June 30, 2015.

*Environmental Commitments and Contingencies*

The following discretely presented component units' operations are the ones carrying and involved in specific activities that are subject to state and federal environmental regulations:

**(a)  PREPA**

Facilities and operations of PREPA are subject to regulation under numerous federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, Oil Pollution Act (OPA), Resource Conservation Recovery Act (RCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and Underground Storage Tanks, among others.

In February 1992, the Environmental Protection Agency (EPA) conducted a multimedia inspection of PREPA's facilities and identified several alleged instances of noncompliance related to PREPA's air, water, and oil spill prevention control and countermeasures compliance programs. PREPA and the EPA negotiated to resolve the issues regarding the deficiencies observed during the inspection and to ensure future compliance with all applicable laws and regulations. As a result of the negotiations, PREPA and the EPA reached an agreement that resulted in a consent decree (the Consent Decree) approved by the United States federal court in March 1999. Under the terms and conditions of the Consent Decree, PREPA paid a civil penalty of $1.5 million, and implemented additional compliance measures amounting to $4.5 million. In addition, the Consent Decree requires that PREPA improve and implement compliance programs and operations in order to assure compliance with environmental laws and regulations.

In 2004, the United States federal court approved a modification to the Consent Decree agreed to by PREPA and the EPA under which PREPA reduced, in two steps, the sulfur content in the No. 6 fuel oil used in certain generating units of its Costa Sur and Aguirre power plants (to 0.75% or less by March 1, 2005 and to 0.5% or less by March 1, 2007), and used No. 6 fuel oil with sulfur content of not more than 0.5% through July 18, 2009 at its Palo Seco and San Juan power plants. Additionally, PREPA has completed a nitrogen oxide emissions reduction program and modified the optimal operating ranges for all its units under the Consent Decree. PREPA also paid a $300,000 civil fine and reserved $200,000 to fund certain supplemental environmental projects and programs under the Consent Decree.

PREPA has been audited several times for compliance with the Consent Decree programs, and understands that a considerable number of them can be closed since their requirements have been completed. On July 22, 2014, representatives from PREPA, EPA, and USDOJ met to begin the discussion towards the termination of some of the programs. As a result, the EPA and the USDOJ requested PREPA to submit information regarding PREPA's compliance with the Programs for their review and evaluation. On September 25, 2014, PREPA met again with EPA and USDOJ representatives and submitted the information requested, along with a letter where PREPA formally requested the EPA to review and approve the termination of those programs provisions of the Consent Decree and its Modification of 2004 presented, as well as begin the process toward jointly filing in the Court a stipulation for Partial Termination of such programs. To accomplish this goal, PREPA suggested to appoint a task force composed of EPA and PREPA representatives to schedule and meet to address the details which EPA agreed to. On May 27 and 28, 2015, PREPA, EPA, and USDOJ legal representatives met to begin

254                                                                                    (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

discussions about PREPA's termination claims, as well as define any additional documentation requested to support and demonstrate PREPA's determination of compliance with the different programs obligations. EPA, PREPA, and USDOJ representatives continue with a thorough evaluation and discussion process about this matter.

Since September 2004, there has been no legal action in the United States federal courts or any administrative proceeding against PREPA regarding the Consent Decree or its modification. The Consent Decree includes stipulated penalties for certain events of noncompliance. Noncompliance events must be disclosed to EPA in the corresponding report. Ordinarily, when a covered noncompliance event occurs, PREPA pays the stipulated penalty in advance in order to benefit from a 50% discount of the applicable stipulated penalty.

In 2002, PREPA received a "Special Notice Concerning Remedial Investigation/Feasibility Study for Soil" at the Vega Baja Solid Waste Disposal Superfund Site. The EPA has identified PREPA and six other entities as "potentially responsible parties," as defined in the CERCLA. In 2003, PREPA agreed to join the other potentially responsible parties in an Administrative Order on Consent (AOC) for a Remedial Investigation/Feasibility Study (RI/FS), with the understanding that such agreement did not constitute an acceptance or responsibility. Under the AOC, PREPA committed up to $250,000 as its contribution to partially fund the RI/FS. At this time, the RI/FS has been completed. The work proceeded in accordance with the schedule established by PREPA and the other designated (PRPs). In July 2010, a proposed plan was issued identifying the Preferred Alternative to address soil contamination at the Vega Baja Solid Waste Disposal Site. EPA held a public hearing on August 3, 2010 to discuss the alternatives to address soil contamination.

The Record of Decision (ROD) was published as scheduled by EPA on September 30, 2011. Alternative No. 2, Removal with On Site Consolidation and Cover in the Non-Residential Area, was selected. From this point on, EPA resumed negotiations with the PRPs, both private and public, toward signing a Consent Decree through which the PRP's would contribute enough funds to cover the costs of the remedial action and the maintenance of the site. PREPA has already approved a contribution of $1.0 million through Resolution 3804, April 1, 2011. Notwithstanding, through further negotiations an additional contribution of $300,000 was required by EPA. This additional contribution was approved by PREPA's Governing Board.

On December 4, 2012, the Federal Department of Justice lodged with the Court the Consent Decree Civil Action No. 3:12 cv 01988, which requires that PREPA pay EPA for the past response costs of the agency the amounts of $300,000 within 30 days of the effective date; $300,000 no later than August 15, 2013 and $300,000 no later than August 15, 2014. On April 10, 2013, an Environmental Escrow Account was entered into by GDB, as the escrow agent, PRLA, the Puerto Rico Housing Department and PREPA; and the United States of America on behalf of the Environmental Protection Agency. On June 24, 2013, PREPA deposited $400,000 into the escrow as provided in the Consent Decree.

PREPA continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

255

(Continued)

CW_STAY0010043

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (b) PRASA

On July 1, 2003, PRASA entered into an agreement (Civil Action No. 01 1709) with EPA to attain compliance with the Clean Water Act in relation to PRASA's wastewater pump stations (WWPSs) in response to a significant number of sanitary sewer bypasses from these locations. The Clean Water Act prohibits discharges of sewage from any point in the collection and treatment system other than the authorized point at the treatment facility. PRASA completed all improvement projects required by EPA for these WWPSs on or before the established completion dates in the agreement. This agreement also required PRASA to invest $1 million in the development and implementation of a Supplemental Environmental Project (SEP). This project consisted of the connection of three non PRASA communities to the PRASA's drinking water system. The connection has been completed and is awaiting completion of adjacent systems to fully integrate these systems to PRASA's service. The agreement also required the implementation of the Preventive Maintenance Program (PMP) for all of PRASA's WWPSs. This was fully completed in December 2010, and is still in place. As part of the agreement, PRASA pays stipulated penalties for pump station bypass events on a quarterly basis.

The penalty calculations are based on the pumping capacity of the pump station and the time taken to correct the deficiency causing the bypass event. The amount paid during fiscal year 2015 was approximately $600,000.

On June 22, 2006, PRASA entered into a consent decree (Civil Action No. 06 1624) with EPA that requires PRASA to implement system wide remedial measures at all of the wastewater treatment plants operated by PRASA. The decree establishes deadlines for the compliance with the conditions set forth in the agreement and stipulates penalties for violation of any of those deadlines. PRASA was assessed a stipulated civil penalty of $1 million, which was paid during fiscal year 2008. This penalty was assessed by the Court as payment for the discharge permit violations of several treatment facilities to the Clear Water Act. The agreement also required PRASA to deposit in an escrow account with GDB an additional civil penalty of $3 million. These funds are to be used for providing sewer service to a community that has not been connected to PRASA's sanitary sewer system. PRASA and the EPA decided to select the Lago La Plata community for this project. As part of the agreement, PRASA pays stipulated penalties on a yearly basis for exceedances to each of PRASA's facilities to their individual discharge permits. The penalty calculations are based on frequency of the exceedances as well as the percentage of the exceedances with its respective limit. The amount paid during fiscal year 2015 was approximately $100,000. These penalty payments are deposited into an escrow account from which a fraction of the deposited amount can be reimbursed to PRASA based on completion of specific projects and initiatives.

On May 25, 2006, PRASA entered into a plea agreement with the U.S. Department of Justice related to violations of the Clean Water Act, as amended, Title 33, USC, Sections 1131(a) and 1319(c)(2)(A). As part of the agreement (Criminal Case No. 06 CR 00202 001), PRASA paid a $9 million fine. This penalty was assessed by the Court as payment for the discharge permit violations of several treatment facilities to the Clean Water Act. PRASA was placed on probation for a period of five years. As part of the probation, PRASA has to comply with several special conditions, such as: (i) upgrade the collection and wastewater treatment system in the Ponce de León Avenue area of San Juan for a cost of not less than $10 million to prevent direct discharges to the Martín Peña Channel; (ii) upgrade nine wastewater treatment plants for a cost of not less than $109 million; and (iii) comply with the consent decree signed by PREPA with the U.S. government on June 22, 2006. The plea agreement also established stipulated penalties for violation of any of the deadlines of performance standards set forth in the agreement.

256

(Continued)

CW_STAY0010044

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Currently, PRASA is in compliance with the deadlines and requirements of this consent order and no penalties have been paid.

On December 15, 2006, an agreement (Civil Case No. KPE 2006 0858 was signed between PRASA and the Department of Health of the Commonwealth related to violations of the Safe Drinking Water Act (SDWA), as amended. The agreement was preliminarily approved by the supervising court on March 15, 2007 and it was amended and finally approved by that court on June 20, 2008. PRASA agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the SDWA. This Act requires the compliance with parameters of water quality and treatment techniques in PRASA's water systems. As part of the agreement, PRASA paid a civil penalty of $1 million during fiscal year ended June 30, 2007. The civil penalty was stipulated by the court for alleged noncompliance issues to the SDWA attended in this decree. In this Consent Decree, PRASA must pay stipulated penalties for failing to comply with remedial measures deadlines, failure to submit deliverables, or exceedances to maximum contaminant levels. During fiscal year ended June 30, 2008 and based on the amendment and final approval of the agreement, PRASA accrued approximately $2.7 million for penalties for noncompliance as stipulated by the final agreement, which were paid during fiscal year 2009. Also, as part of the penalties for noncompliance with the remedial measures of the agreement with the Department of Health during fiscal year 2009, $1.3 million was deposited in a GDB escrow account to be used for a SEP. This SEP included three projects: (1) a chemical monitoring of 67 non PRASA systems, (2) the installation of a disinfection system in six non PRASA systems, and (3) the connection of schools that have their own deficient water systems to PRASA's water system. During fiscal year ended June 30, 2015, the penalties amounted to approximately $100,000. PRASA deposited $100,000 in an escrow account for parameters exceedances that will be used for compliance projects with the approval of the Department of Health.

In November 2007, PRASA entered into negotiation of a consent decree (Civil Action No. 10 1365) with EPA that requires PRASA to implement system wide remedial measures at all of the sludge treatment systems at the water treatment plants owned and operated by PRASA. The consent decree was lodged on May 3, 2010 and its entry date was August 24, 2010. This consent order supersedes previous consent orders known as PRASA II (Civil Action No. 92 1511) and PRASA III (Civil Action No. 00 2554). This consent order establishes deadlines for compliance with the conditions set forth in the proposed agreement and stipulates penalties for violation of any of those deadlines.

PRASA was assessed a civil penalty of approximately $3.2 million of which $1 million was paid to the Treasurer of the United States of America as a civil penalty, and $2.2 million was deposited in an escrow account with GDB for the design and construction of a SEP. This SEP consisted of the installation of an aeration system in the Toa Vaca Lake. The aeration system was finished and placed into operation in November 2012. The total amount of penalties paid under this agreement during the fiscal year 2014 was approximately $200,000. Stipulated penalties must be paid by PRASA for failing to comply with remedial measures deadlines, permitting limit exceedances or failure to submit deliverables or Discharge Monitoring Reports.

PRASA is in the process of renegotiation of all the consent decrees and commitments mentioned above. The objective of this renegotiation is to establish a prioritization system that will smooth out the economic impact of the capital improvement projects on a yearly basis.

(Continued)

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On September 15, 2015, the USDOJ, acting at the request of the Administrator of EPA, filed a complaint (the Complaint) against PRASA and the Commonwealth, as a required party (pursuant to Section 309(e)) in the United States District Court for the District of Puerto Rico (the District Court). The Complaint seeks injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the Clean Water Act. Specifically, the Complaint alleges PRASA violated Section 301(a) of the Clean Water Act, by discharging pollutants, for failing to comply with the terms of the National Pollutant Discharge Elimination System (NPDES) permits issued to PRASA's facilities under Section 402 of the Clean Water Act, for failing to report unauthorized discharges required under such permits, and failing to meet operation and maintenance requirements for certain of PRASA's water treatment plants and wastewater treatment plants.

Concurrently with the filing of the Complaint, USDOJ also filed the 2015 EPA Consent Decree executed among EPA, PRASA and the Commonwealth settling the matters addressed in the Complaint, under the terms agreed upon by PRASA, USDOJ and EPA. The 2015 EPA Consent Decree is the result of an extensive negotiation process aimed, among other things, at resolving the claims addressed in the Complaint and the requirements of previous consent decrees related to the allegations included in the Complaint, specifically with the goal of implementing a system wide NPDES permit compliance plan, continue the implementation of operational and maintenance plans in all of PRASA's facilities, implementing remedial measures to address discharges and the alleged violations to the Clean Water Act occurring within the Puerto Nuevo Sewer System in the municipality of San Juan.

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by PRASA in order to mitigate the high capital improvement program (CIP) costs mandated by the existing consent decrees. Despite being in material compliance with the capital improvement project requirements of the Existing Consent Decrees, PRASA began discussions with the USDOJ, on behalf of EPA and the US Department of Health (DOH) seeking to amend the existing consent decrees in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in the PRASA's CIP not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance and capital improvement program requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows.

On May 23, 2016, the District Court entered judgment approving the 2015 EPA Consent Decree as presented on May 10,2016. The Complaint was dismissed with prejudice and civil case number 15 2283 was closed. PRASA expects that with the final approval of the 2015 EPA Consent Decree, it will be able to finalize the proposed amendment to the 2006 Drinking Water Settlement Agreement under terms substantially similar to those currently being negotiated with DOH.

*(c)* **SWA**

SWA initiated in years prior to the year ended June 30, 2015, the implementation and development of the Strategic Plan for Recycling and Disposal of Solid Waste in Puerto Rico at an estimated cost of approximately $112 million. The first stage consists of the construction of thirty-nine (39) projects to be financed through an interim financing agreement with the Government Development Bank for Puerto Rico. The lines of credit under the agreement were paid by the Treasury Department of the Commonwealth through joint resolutions approved by the Legislature. SWA has continued with the planning and construction of the projects. During June 2015, SWA updated the line of credit drawdown schedule and presented disbursements projections for infrastructure projects from July 2015 through

258

(Continued)

CW_STAY0010046

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

June 2016. Total estimated costs amounting to approximately $29.5 million were identified and assigned for the development and construction of projects related to the solid waste management.

During May 2008, SWA approved the "Dynamic Itinerary for Infrastructure Projects of Solid Waste in Puerto Rico." This itinerary defines the strategies for safe and efficient handling of solid waste in Puerto Rico for the next twenty-five (25) years in compliance with all applicable regulations. SWA propose this itinerary for the purpose of adopting this plan as the official instrument to guide public policy for the development of infrastructure projects for handling and final disposition of solid waste in Puerto Rico. The projects proposed in the itinerary include programs to develop facilities for the recovery of recyclable materials, facilities (RMF's) for the deposit of acceptable sludge, facilities to convert solid waste to energy, transshipment facilities, and lateral expansion to sanitary stuffing systems (SSS). The development of these projects takes into consideration the closing of various SSS. The construction investment is estimated at approximately $1.9 billion. SWA projects that financing for these projects will come from both the public and private sectors.

SWA's operations include activities which are subject to state and federal environmental regulations. SWA is currently involved, as previously mentioned, in the implementation and development of the Infrastructure Strategic Plan for Recycling and Disposal of Solid Waste in Puerto Rico. As of June 30, 2015, management of SWA believes that, at this time, there is no sufficient information available to determine the potential amount of related losses, if any, and no provision for losses has been made in the accompanying financial statements. Nevertheless, preventive infrastructure has been constructed to minimize any possible impact or events that occur. In addition, operational plans have been developed to incorporate good maintenance practice.

SWA administers a tract of land in the Municipality of Lajas, Puerto Rico, to deposit acceptable sludge. The Commonwealth and federal laws and regulations require certain procedures when the tract of land stops accepting waste and to perform certain maintenance and monitoring functions at the site after closure. Subsequent to June 30, 2007, SWA commenced the closing of the tract of land, estimated to cost approximately $80,000. However, as of June 30, 2015, management of SWA believes that, at this time, there is no sufficient information available to determine the potential amount of related losses, if any, and no provision for losses has been made in the accompanying financial statements. Also, no studies have been performed by outside independent sources to evaluate the amount estimated and if changes are currently needed in the costs estimated by management for the closing of the tract of land.

(Continued)

CONFIDENTIAL

CW_STAY0010047

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Construction Commitments*

As of June 30, 2015, the following discretely presented component units maintained various unspent construction agreements as follows (in thousands):

| | | |
|---|---|---|
| Puerto Rico Highways and Transportation Authority | $ | 162,500 |
| Puerto Rico Aqueduct and Sewer Authority | | 90,700 |
| Puerto Rico Electric Power Authority | | 48,000 |
| University of Puerto Rico | | 48,300 |
| Solid Waste Authority | | 29,500 |
| State Insurance Fund Corporation | | 22,900 |
| Puerto Rico Ports Authority | | 14,400 |
| Company for the Integral Development of the Peninsula de Cantera | | 6,300 |
| Puerto Rico Land Administration | | 7,000 |
| Institute of Puerto Rican Culture | | 700 |
| Total | $ | 430,300 |

*Service Concession Arrangements (SCA)*

**(a) PRHTA**

On September 22, 2011, the PRHTA entered into a toll road concession agreement with Autopistas Metropolitanas Puerto Rico, LLC (the Concessionaire), in which the PRHTA granted to the Concessionaire the right to operate PR 5 and PR 22 highways (the Toll Roads) for a period of 40 years. During the 40-year term, the Concessionaire will have the right to charge and collect tolls imposed on the Toll Roads. The PRHTA received an upfront concession fee payment of $1,136 million, from which approximately $873 million was used to redeem or defease certain bonds issued and outstanding associated with the Toll Roads. Pursuant to the provisions of GASB Statement No. 60, Accounting and Financial Reporting for Service Concession Arrangements, the PRHTA recognized a deferred inflow of resources of $1,136 million, which will be amortized and recognized as revenue over the 40-year term of the agreement. The PRHTA will recognize approximately $28.4 million annually through fiscal year 2052 as a result of the amortization of the recognized deferred inflow of resources. The Toll Roads will continue to be presented as an asset of the PRHTA, which at June 30, 2015 amounted to approximately $90.7 million, but are not being depreciated since September 22, 2011 until the end of the agreement in 2052, as the concession agreement required the Concessionaire to return the Toll Roads to the PRHTA in its original or enhanced condition. Toll Roads Concession improvements are recognized in PRHTA's records as soon as they are completed and placed in operations.

On December 20, 1992, the PRHTA and Autopistas de Puerto Rico y Compañía S.E. (Autopistas) entered into a concession agreement, amended in 2004 and in 2009, for the design, construction, operation, and maintenance of the Teodoro Moscoso Bridge (the Bridge), a toll bridge that traverses the San Jose Lagoon between the municipalities of San Juan and Carolina. The initial term of this agreement was 35 years, expiring on April 3, 2027, but has been subsequently amended on September 9, 2009 to extend the term to 50 years until 2044. Also, pursuant to the provisions of GASB No. 60, as of June 30, 2013, the PRHTA recognized the Bridge at its estimated fair value of $109.5 million, amortized over an

CONFIDENTIAL

CW_STAY0010048

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

estimated useful life of 50 years, and a deferred inflow of resources, also of $109.5 million that will be amortized and recognized as revenue over the remaining term of the agreement.

The highways and bridge under concession agreement, net at June 30, 2015 consisted of (in thousands):

| | | |
|---|---|---:|
| Toll roads concession | $ | 90,740 |
| Toll roads concession improvements | | 22,062 |
| Bridge concession | | 64,496 |
| Total | $ | 177,298 |

The deferred inflows of resources at June 30, 2015 consisted of (in thousands):

| | | |
|---|---|---:|
| Toll roads concession | $ | 1,050,419 |
| Bridge concession | | 63,510 |
| Total | $ | 1,113,929 |

*(b) PRPA*

On February 27, 2013, the Federal Aviation Administration (FAA) approved the closing of the Lease and Use Agreements (the APP Agreements) entered into on July 27, 2012 between the PRPA and Aerostar Airport Holdings, LLC (Aerostar) with respect to the Luis Munoz Marin International Airport Project (LMMIA Project). The APP Agreements awarded Aerostar the right to operate, manage, maintain, develop, and rehabilitate the LMMIA during a term of 40 years, subject to extension conditions as defined, in exchange for an upfront payment of aleasehold fee of $615 million to the PRPA. In addition, upon the closing of the APP Agreements, the PRPA will receive from Aerostar annual rental payments for the first five full reporting years of $2.5 million; then from the sixth full reporting year through and including the 30th reporting year, the PRPA will receive annual rental payments equal to 5% of the gross airport revenue earned by Aerostar in such years; and finally from the 31st reporting year and each succeeding year, the PRPA will receive annual rental payments equal to 10% of the gross airport revenue earned by Aerostar in such years.

Under the APP Agreements, the PRPA is responsible for certain capital improvements pursuant to the Airline Capital Improvement Program. The present value of these capital improvements was estimated at $3.068 million at the transaction date. Pursuant to the provisions of GASB Statement No. 60, Accounting and Financial Reporting for Service Concession Arrangements, the PRPA recognized at February 27, 2013, the date of the closing of the APP Agreements, a resulting deferred inflow of resources amounting to $622.5 million and a liability of $3,068 million for the present value of the capital improvement commitments of the PRPA; in exchange for the receipt of the $615million upfront leasehold fee and the receivable of the annual payments of $2.5 million to be received from Aerostar for the first five years after the closing, with a present value estimate of $10.5million. Since the closing date through June 30, 2015, approximately $37.1 million of the deferred inflow of resources have been amortized into revenue, $15.6 million of which belonged to fiscal year 2015. As of June 30, 2015, the PRPA has satisfied approximately $2.8 million of its capital improvement commitments.

261

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The right awarded to Aerostar to operate, manage, and rehabilitate the LMMIA (following certain Operating Standards established by the FAA and the Authority) is accompanied with the assignment of all the revenue from the LMMIA facilities through the different lease agreements with airport concessionaries, including food and beverage providers, retailers, ground transportation providers, and other airport users, formerly belonging to the Authority. Aerostar will also be able to charge a maximum level of fees to the airlines at LMMIA, as established in the APP Agreements. The APP Agreements also provide for a series of capital improvement expenditures on the LMMIA from Aerostar over the term of the APP Agreements, with certain required initial projects and general accelerated upgrades, as defined, in several phases, all aggregating an estimated investment ranging from $246 million to $290 million. At June 30, 2015, approximately $140 million has been invested in capital expenditures by Aerostar, $91.9 million of which has been completed and placed in operations. The PRPA, on the other hand, is required to provide police and fire services to the LMMIA in exchange for an annual compensation of $2.8 million, to be adjusted thereafter based on inflation. The APP Agreements also establish certain compensation events, the occurrence of which from either party would trigger a compensation amount or activity from the defaulting party to the affected party, as defined. Finally, the PRPA will be responsible to Aerostar, at the term of the APP Agreements, for any capital related improvements not fully reimbursed to Aerostar from the Passenger Facility Charge (PFC) program or other airline charges.

PRPA used $525 million of the $615 million upfront leasehold fee received to repay debt obligations to lenders and suppliers, and the rest was used to cover certain related transaction costs and to set up reserve funds to cover early retirement of employees, improvements to regional airports, and cover obligations of the PRPA in case of losses sustained on the APP Agreements. The LMMIA assets under this concession agreement amounted to approximately $566.5 million at June 30, 2015, while the deferred inflows of resources at June 30, 2015 amounted to approximately $680 million.

**(17) Retirement Systems**

The Retirement Systems issue financial reports, which are publicly available and include the basic financial statements, the required trend information, and any other required supplementary information. The Commonwealth implemented GASB Statements No. 68 and No. 71 during fiscal year 2015, and new Required Supplementary Information schedules are included. Each system is independent; thus, their assets or liabilities may not be transferred from one system to another or used for any purpose other than to benefit the participants of each system.

**(a) ERS**

*Plan Description* – ERS is a cost sharing, multi employer defined benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (ERS and JRS Administration). It is a trust created by Act No. 447 on May 15, 1951 (Act No. 447), as amended, to provide pension and other benefits to retired employees of the Commonwealth, its public corporations, and municipalities of Puerto Rico. ERS began operations on January 1, 1952, at which date, contributions by employers and participating employees commenced. ERS is a pension trust fund of the Commonwealth.

ERS administers different benefit structures pursuant to Act No. 447, as amended, including a cost sharing, multi employer defined benefit program, a defined contribution program (System 2000 program) and a contributory hybrid program. Benefit provisions vary depending on member's date of hire. Substantially all full-time employees of the Commonwealth and its instrumentalities (73 Commonwealth

262 (Continued)

                                                                                  CW_STAY0010050

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

agencies, 78 municipalities, and 55 public corporations, including ERS) are covered by ERS. Membership is mandatory for all regular, appointed, and temporary employees of the Commonwealth at the date of employment. Membership is optional for the Governor of the Commonwealth, Commonwealth secretaries, head of public agencies, and instrumentalities, among others.

The benefits provided to members of ERS are established by Commonwealth law and may be amended only by the Legislature with the Governor's approval. Act No. 3 of April 4, 2013 (Act No. 3 of 2013), in conjunction with other recent funding and design changes, provided for a comprehensive reform of ERS. This summary details the provisions under Act No. 3 of 2013.

Certain provisions are different for the three groups of members who entered ERS prior to July 1, 2013 as described below:

* Members of Act No. 447 are generally those members hired before April 1, 1990 (contributory, defined benefit program).

* Members of Act No. 1 of February 16, 1990 (Act No. 1) are generally those members hired on or after April 1, 1990 and on or before December 31, 1999 (contributory, defined benefit program).

  Members of Act No. 305 of September 24, 1999 (Act No. 305 or System 2000) are generally those members hired on or after January 1, 2000 and on or before June 30, 2013 (defined contribution program).

All regular employees hired for the first time on or after July 1, 2013, and former employees who participated in the defined benefit program and the System 2000 program, and were rehired on or after July 1, 2013, become members of the Contributory Hybrid Program as a condition to their employment.

In addition, employees who at June 30, 2013, were participants of previous programs became part of the Contributory Hybrid Program on July 1, 2013.

Each member has a nonforfeitable right to the value of his or her account. Members have three options to invest their contributions. Investment income is credited to the member's account semi-annually. The Commonwealth does not guarantee benefits at retirement age.

The assets of the defined benefit program, the defined contribution program and the Contributory Hybrid Program are pooled and invested by ERS. Future benefit payments will be paid from the same pool of assets. In addition, employers' contributions for members hired on or after January 1, 2000 will be used by ERS to reduce the unfunded status of the Defined Benefit Program.

This summary of ERS plan provisions is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts should be determined in strict accordance with the plan document itself.

*Service Retirements*

(a) *Eligibility for Act No. 447 Members:* Act No. 447 members who were eligible to retire as of June 30, 2013 would continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 447 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 58 with 10 years of credited service, (3) any age with 30 years of credited service, (4) for Public Officers in High Risk

263                                                                 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Positions (the Commonwealth Police and Firefighter Corps, the Municipal Police and Firefighter Corps and the Custody Office Corps), attainment of age 50 with 25 years of credited service, and (5) for Mayors of municipalities, attainment of age 50 with 8 years of credited service as a Mayor. In addition, Act No. 447 members who would attain 30 years of credited service by December 31, 2013 would be eligible to retire at any time.

Act No. 447 members who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire upon attainment of the retirement eligibility age shown in the table below with 10 years of credited service.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 61 |
| July 1, 1956 to June 30, 1957 | 56 | 60 |
| Before July 1, 1956 | 57 and up | 59 |

In addition to the requirements in the table above, Act No. 447 Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 and did not attain 30 years of credited service by December 31, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(b) *Eligibility for Act No. 1 Members*: Act No. 1 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, Act No. 1 members could retire upon (1) attainment of age 55 with 25 years of credited service, (2) attainment of age 65 with 10 years of credited service, (3) for Public Officers in High Risk Positions, any age with 30 years of credited service, and (4) for Mayors, attainment of age 50 with 8 years of credited service as a Mayor.

Act No. 1 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 65 with 10 years of credited service. In addition, Act No. 1 Public Officers in High Risk Positions who were not eligible to retire as of June 30, 2013 are eligible to retire directly from active service upon the attainment of age 55 with 30 years of credited service.

(c) *Eligibility for System 2000 Members*: System 2000 members who were eligible to retire as of June 30, 2013 continue to be eligible to retire at any time. Prior to July 1, 2013, System 2000 members could retire upon attainment of age 55 for Public Officers in High Risk Positions and attainment of age 60 otherwise.

264                                                            (Continued)

CONFIDENTIAL

CW_STAY0010052

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

System 2000 members who were not eligible to retire as of June 30, 2013 are eligible to retire upon attainment of age 55 for Public Officers in High Risk Positions and upon attainment of the retirement eligibility age shown in the table below otherwise.

| Date of birth | Attained age as of June 30, 2013 | Retirement eligibility age |
|---|---|---|
| July 1, 1957 or later | 55 or less | 65 |
| July 1, 1956 to June 30, 1957 | 56 | 64 |
| July 1, 1955 to June 30, 1956 | 57 | 63 |
| July 1, 1954 to June 30, 1955 | 58 | 62 |
| Before July 1, 1954 | 59 and up | 61 |

(d) *Eligibility for Members Hired after June 30, 2013*: Attainment of age 58 if a Public Officer in a High-Risk Position and attainment of age 67 otherwise.

*Service Retirement Annuity Benefits*

An annuity payable for the lifetime of the member equal to the annuitized value of the balance in the hybrid contribution account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013. If the balance in the hybrid contribution account is $10,000 or less, it should be paid as a lump sum instead of as an annuity.

(a) *Accrued Benefit as of June 30, 2013 for Act No. 447 Members*: The accrued benefit as of June 30, 2013 is determined based on the average compensation, as defined, for Act No. 447 members, the years of *credited* service, and the attained age of the member all as of June 30, 2013. For Act No. 447 Mayors, the highest compensation, as defined, as a Mayor is determined as of June 30, 2013.

If the Act No. 447 member had at least 30 years of credited service as of June 30, 2013, the accrued benefit equals 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting the Coordination Plan, the benefit is recalculated at the Social Security Retirement Age (SSRA), as defined, as 1.5% of average compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 65% (75% if member was at least age 55 as of June 30, 2013) of average compensation in excess of $6,600.

If the Act No. 447 member had less than 30 years of credited service as of June 30, 2013, and attains 30 years of credited service by December 31, 2013, the accrued benefit equals 55% of average compensation if the member was under age 55 as of June 30, 2013 or 60% of average compensation if the member was at least age 55 as of June 30, 2013. For participants selecting the Coordination Plan, the benefit is recalculated at SSRA as 1.5% of average compensation up to $6,600 multiplied by years of credited service, up to 30 years, plus 55% (60% if member was at least age 55 as of June 30, 2013) of average compensation in excess of $6,600. Member contributions received from Act No. 447 members eligible for this transitory benefit during the period beginning July 1, 2013 and ending upon the attainment

265

(Continued)

CW_STAY0010053

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

of 30 years of credited service are considered pre- July 1, 2013 contributions; the contributions to the hybrid contribution account begin after the member attains 30 years of credited service.

If the Act No. 447 member had less than 30 years of credited service as of December 31, 2013, the accrued benefit equals 1.5% of average compensation multiplied by years of credited service up to 20 years, plus 2% of average compensation multiplied by years of credited service in excess of 20 years. Maximum benefit is 75% of average compensation. Except for Commonwealth Police and Commonwealth Firefighters, the benefit is actuarially reduced for each year payment commences prior to age 58. For participants selecting the Coordination Plan, the basic benefit is recalculated at SSRA as 1% of average compensation up to $6,600 multiplied by years of credited service up to 20 years, plus 1.5% of average compensation up to $6,600 multiplied by years of credited service in excess of 20 years, plus 1.5% of average compensation in excess of $6,600 multiplied by years of credited service up to 20 years, plus 2.0% of average compensation in excess of $6,600 multiplied by years of credited service in excess of 20 years. Except for Police and Firefighters, the benefit is actuarially reduced for each year payment commences prior to age 58.

For Act No. 447, Mayors with at least 8 years of credited service as a Mayor, the accrued benefit will not be less than 5% of highest compensation, as defined, as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for each year of non-Mayoral credited service in excess of 20 years. Non- Mayoral credited service includes service earned as a Mayor in excess of 10 years. Maximum benefit is 90% of highest compensation as a Mayor.

(b) *Accrued Benefit as of June 30, 2013 for Act No. 1 Members*: The accrued benefit as of June 30, 2013 is determined based on the average compensation for Act No. 1 members, the years of credited service, and the attained age of the member all as of June 30, 2013. For Act No. 1 Mayors, the highest compensation as a Mayor is determined as of June 30, 2013.

If the Act No. 1 is a police officer or firefighter member that had at least 30 years of credited service as of June 30, 2013, the accrued benefit equals 65% of average compensation if the member was under age 55 as of June 30, 2013 or 75% of average compensation if the member was at least age 55 as of June 30, 2013.

For all other Act No. 1 members, the accrued benefit equals 1.5% of average compensation multiplied by years of credited service. The benefit is actuarially reduced for each year payment commences prior to age 65.

For Act No. 1 Mayors with at least 8 years of credited service as a Mayor, the accrued benefit will not be less than 5% of highest compensation as a Mayor for each year of credited service as a Mayor up to 10 years, plus 1.5% of highest compensation as Mayor for each year of non-Mayoral credited service up to 20 years, plus 2.0% of highest compensation as Mayor for each year of non-Mayoral credited service in excess of 20 years. Non- Mayoral credited service includes service earned as a Mayor in excess of 10 years. Maximum benefit is 90% of highest compensation as a Mayor.

*Compulsory Retirement*

All Act No. 447 and Act No. 1 Public Officers in High Risk Positions must retire upon attainment of age 58 and 30 years of credited service. A two-year extension may be requested by the member from the

266 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Superintendent of the Puerto Rico Police, the Chief of the Firefighter Corps, or supervising authority as applicable.

*Termination Benefits*

(a) *Lump Sum Withdrawal*

*Eligibility*: A Member is eligible upon termination of service prior to 5 years of service or if the balance in the hybrid contribution account is $10,000 or less.

*Benefit:* The benefit equals a lump sum payment of the balance in the hybrid contribution account as of the date of the permanent separation of service.

(b) *Deferred Retirement*

*Eligibility*: A Member is eligible upon termination of service with 5 or more years of service (10 years of credited service for Act No. 447 and Act No. 1 members) prior to the applicable retirement eligibility, provided the member has not taken a lump sum withdrawal of the accumulated contributions and the hybrid contribution account.

*Benefit*: An annuity payable for the lifetime of the member commencing at the applicable retirement eligibility age equal to the annuitized value of the balance in the hybrid contribution account at the time of retirement, plus, for Act No. 447 and Act No. 1 members, the accrued benefit determined as of June 30, 2013.

*Death Benefits*

(a) *Pre- retirement Death Benefit*

*Eligibility*: Any current nonretired member is eligible.

*Benefit*: A refund of the hybrid contribution account, plus the accumulated contributions for Act No. 447 and Act No. 1 members.

(b) *High Risk Death Benefit under Act No. 127*

*Eligibility*: Police, firefighters, and other employees in specified high risk positions who die in the line of work due to reasons specified in Act No. 127 of 1958, as amended.

*Spouse's Benefit*: 50% of the participant's compensation at date of death, payable as an annuity until death or remarriage.

*Children's Benefit*: 50% of the participant's compensation at date of death, payable as an annuity, and allocated pro rata among eligible children. The annuity is payable for life for a disabled child, until age 18 for a nondisabled child not pursuing studies, and until age 25 for a nondisabled child who is pursuing studies.

*Benefit if No Spouse or Children*: The parents of the member should each receive 50% of the participant's compensation at date of death, payable as an annuity for life.

(Continued)

CONFIDENTIAL

CW_STAY0010055

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Postdeath Increases*: Effective July 1, 1996 and subsequently every three years, the above death benefits are increased by 3% provided that the beneficiary(ies) had been receiving payments for at least three years.

The cost of these benefits is paid by the Commonwealth's General Fund.

(c) *Postretirement Death Benefit for Members Who Retired prior to July 1, 2013*

*Eligibility*: Any retiree or disabled member receiving a monthly benefit who has not elected a reversionary annuity and whose benefits commenced prior to July 1, 2013.

*Benefit*: The benefit is as follows (Law No. 105, as amended by Law No. 4):

(i) For those married or with dependent children at the time of death, the annual income to a widow, or widower or dependent children is equal to 60% (50% if in the Coordination Plan – 30%, prior to January 1, 2004) of the retirement benefit payable for life for a surviving spouse and/or disabled children and payable until age 18 (age 25 if pursuing studies) for nondisabled children. If in the Coordination Plan, the benefit to the surviving spouse does not begin until the spouse's attainment of age 60 and the surviving spouse must have been married to the member for at least 10 years to be eligible for this benefit. The increase in the percentage from 30% to 50% if in the Coordination Plan is paid by the Commonwealth's General Fund for former government employees or by the public enterprise or municipality for their former employees.

(ii) The benefit, when there is no relation as stated above, is equal to the remaining balance of accumulated contributions at the time of retirement after the deduction of lifetime annual income paid and is payable to a beneficiary or to the Member's estate. In no case may the benefit be less than $1,000. Either the Commonwealth's General Fund for former government employees or the public enterprise or municipality for their former employees pays the difference, up to $250, between (1) the accumulated contributions less the lifetime annual income paid and (2) $1,000. ERS pays for the rest.

(d) *Postretirement Death Benefit for Members Who Retired after June 30, 2013*

*Eligibility*: Any retiree or disabled member who began receiving a monthly benefit after June 30, 2013.

*Benefit*: If the member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent optional form of payment, the applicable survivor benefit.

For all members, the excess, if any, of the hybrid contribution account, plus the accumulated contributions for Act No. 447 and Act No. 1 members, at the time of retirement over the total annuity payments paid to the member and any beneficiary per the terms of the optional form of payment must be payable to a beneficiary or the member's estate.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

(e) *Beneficiaries receiving occupational death benefits as of June 30, 2013 continue to be eligible to receive such benefits*

*Disability Benefits*

(a) *Disability*

*Eligibility*: All members are eligible upon the occurrence of disability.

*Benefit*: The balance of the hybrid contribution account payable as lump sum distribution, an immediate annuity, or a deferred annuity at the electon of the participant. Act No. 447 and Act No. 1 members remain eligible to receive the accrued benefit as of June 30, 2013 commencing at the applicable retirement eligibility age.

(b) *High Risk Disability under Act No. 127*

*Eligibility*: Police, firefighters, and other employees in specified high risk positions who are disabled in the line of work due to reasons specified in Act No. 127 of 1958 (as amended).

*Benefit*: 80% (100% for Act No. 447 members) of compensation as of date of disability, payable as an annuity. If the member dies while still disabled, this annuity benefit continues to his beneficiaries. Beneficiaries include the surviving spouse and/or disabled children (for life), nondisabled children until age 18 (age 25 if pursuing studies), and the parents if no other beneficiaries. Effective July 1, 1996 and subsequently every three years, the disability benefit is increased by 3% provided that the member (or beneficiary) had been receiving payments for at least three years (Act No. 127 of 1958, as amended). The cost of these benefits is paid by the Commonwealth's General Fund.

(c) *Members who qualified for occupational or nonoccupational disability benefits as of June 30, 2013 continue to be eligible to receive such benefits*

*Special Benefits*

(a) *Minimum Benefits*

(i) Past Ad hoc Increases: The Legislature, from time to time, increases pensions for certain retirees as described in Act No. 124 approved on June 8, 1973 and Act No. 23 approved on September 23, 1983. The benefits are paid 50% by the Commonwealth's General Fund and 50% by ERS.

(ii) Minimum Benefit for Members Who Retired before July 1, 2013 (Act No. 156 of 2003, Act No. 35 of 2007, and Act No. 3 of 2013): The minimum monthly lifetime income for members who retired or become disabled before July 1, 2013 is $500 per month effective July 1, 2013 ($400 per month effective July 1, 2007 and $300 per month up to June 30, 2007). The increase in the minimum monthly benefit from $200 per month to $300 per month is paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees. The increase in the minimum monthly benefit from $300 per month to $400 per month is to be paid by ERS for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

269                                                                 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

(iii) Coordination Plan Minimum Benefit: A minimum monthly benefit is payable upon attainment of SSRA such that the benefit, when added to the Social Security Benefit, is not less than the benefit payable prior to SSRA.

(b) *Cost of Living Adjustments (COLA) to Pension Benefits*. The Legislature, from time to time, increases pensions by 3% for retired and disabled members. Beneficiaries are not entitled to COLAs granted after the retiree's death. The first increase was granted by Act No. 10 of 1992. Subsequent 3% increases have been granted every third year since 1992, with the latest 3% increase established on April 24, 2007 and effective July 1, 2007 (retroactive to January 1, 2007) for retired and disabled members that were receiving a monthly benefit on or before January 1, 2004 (Act No. 35). In addition, effective July 1, 2008, any retired or disabled member that was receiving a monthly annuity on or before January 1, 2004 less than $1,250 per month received an increase of up to 3% without exceeding the limit of $1,250 per month (Act No. 35). The COLAs granted in 1992 to all retirees and in 1998 to retirees who are former government or municipal employees are to be paid by ERS. All other COLAs granted in 1995 and later must be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries employees or by certain public corporations with their own treasuries or municipalities for their former employees.

(c) *Special "Bonus" Benefits*

(i) *Christmas Bonus (Act No. 144, as Amended by Act No. 3 of 2013)*: An annual bonus of $200 for each retiree, beneficiary, and disabled member paid in December provided the member retired prior to July 1, 2013. This benefit is paid from the supplemental contributions received from the Commonwealth's General Fund for former government and certain public corporations without their own treasuries, or by certain public corporations with their own treasuries or municipalities for their former employees.

(ii) *Medication Bonus (Act No. 155, as Amended by Act No. 3 of 2013)*: An annual bonus of $100 for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the member retired prior to July 1, 2013. Evidence of coverage is not required. The amount is prorated if there are multiple beneficiaries. This benefit is paid from the Supplemental Contributions received from the Commonwealth's General Fund for former government and certain public corporations without their own treasuries, or by certain public corporations with their own treasuries or municipalities for their former employees.

The special benefits contributions of approximately $186 million in 2015 mainly represent contributions from the Commonwealth's General Fund, public corporations and municipalities for the special benefits identified above granted by special laws. The funding of the special benefits is provided to ERS through legislative appropriations each July 1 by the Commonwealth's General Fund for former government and certain public corporations without own treasuries and by certain public corporations with their own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by ERS for the special benefits. Deficiencies in legislative appropriations are covered by ERS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits.

270                                              (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Contributions*

The contribution requirement to ERS is established by law and is not actuarially determined.

(a) *Member Contributions*: Effective July 1, 2013, contributions by members are 10% of compensation. However, for Act No. 447 members who selected the Coordination Plan, the member contributions are 7% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2013 2014 fiscal year and 8.5% of compensation up to $6,600 plus 10% of compensation in excess of $6,600 during the 2014 2015 fiscal year. Members may voluntarily make additional contributions to their hybrid contribution account.

Prior to July 1, 2013, contributions by Act No. 447 members selecting the Coordination Plan were 5.775% of compensation up to $6,600 plus 8.275% of compensation in excess of $6,600. Contributions by all other members were 8.275% of compensation. System 2000 members could also have made voluntary contributions of up to 1.725% of compensation prior to July 1, 2013.

(b) *Employer Contributions (Article 2 116, as Amended by Law No. 116 of 2010 and Act No. 3 of 2013)*: Prior to July 1, 2011, employer contributions were 9.275% of compensation. Effective July 1, 2011, employer contributions are 10.275% of compensation. For the next four fiscal years effective July 1, 2012, employer contributions will increase annually by 1% of compensation. For the next five fiscal years, employer contributions will increase annually by 1.25% of compensation, reaching an employer contribution rate of 20.525% of compensation effective July 1, 2020.

(c) *Supplemental Contributions from the Commonwealth's General Fund, Certain Public Corporations, and Municipalities (Act No. 3 of 2013)*: Effective July 1, 2013, ERS will receive a supplemental contribution of $2,000 each year for each pensioner (including beneficiaries receiving survivor benefits) that was previously benefitting an Act No. 447 or Act No. 1 member while an active employee. This supplemental contribution will be paid by the Commonwealth's General Fund for former government and certain public corporations without their own treasuries or by certain public corporations with their own treasuries or municipalities for their former employees.

(d) *Additional Uniform Contribution (Act No. 32 of 2013, as Amended)*: The additional uniform contribution will be certified by the external actuary of ERS each fiscal year from fiscal year 2015 through 2033 as necessary to avoid the projected gross assets of ERS, falling below $1 billion during any subsequent fiscal year. The Additional Uniform Contribution is to be paid by the Commonwealth's General Fund, public corporations with their own treasuries, and municipalities. The additional uniform contribution determined for fiscal years 2014, 2015, and 2016 was $120 million. The additional uniform contribution determined for fiscal year 2017 is $596 million, payable at the end of the fiscal year. For additional information on the status of these contributions, refer to Note 2.

*Early Retirement Programs*

The Puerto Rico Environmental Quality Board (EQB) implemented an early retirement program for its employees under the Law 224 Act No. 7 dated August 9, 2008. EQB has already made the initial payment and would reimburse the remaining balance on annuities and other benefits paid by ERS in four installments on each July 31 starting in 2009 through 2012. EQB was in default on the retirement plan payment, so they requested a new payment plan. ERS Board of Trustees approved a payment plan for the debt balance due of the retirement program for 24 months starting in March 2014.

271 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On July 2, 2010, the Commonwealth enacted Act No. 70 establishing a program that provides benefits for early retirement or economic incentives for voluntary employment termination to eligible employees, as defined. Act No. 70 also established that early retirement benefits will be provided to eligible employees that have completed between 15 and 29 years of creditable services and will consist of monthly benefits ranging from 37.5% to 50.0% of each employees' monthly salary. Benefits under this program will be paid by the General Fund of the Commonwealth (the General Fund) and by the public corporations, covering their respective employees until the plan member reaches the later of age 55 for members under Act No. 447 or age 65 for members under Act No. 1, or the date the plan member would have completed 30 years of service had the member continued employment. In addition, the public corporations will also be required to continue making the required employee and employer contributions to ERS. The General Fund will be required to continue making its required employer contributions. ERS will be responsible for benefit payments afterward.

**(b)  JRS**

*Plan Description* – JRS is a single employer defined benefit pension plan administered by ERS and JRS Administration. It is a trust created by Act No. 12 on October 19, 1954 (Act No. 12 of 1954), as amended, to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth, through the Office of the Administration of Court Facilities (the Employer). JRS is a pension trust fund of the Commonwealth and is not an employer.

ERS and JRS Administration allocated 1.62% and 98.38% of its general and administrative expenses during the fiscal year ended June 30, 2015 to the JRS and ERS systems, respectively. The methodology used to determine the allocation of ERS ad JRS Administration's expenses is based on total employers' and participants' contributions to ERS and JRS, combined.

JRS consists of two benefit structures pursuant to Act No. 12 of 1954, as amended by Act No. 162 of 2013. Benefit provisions vary depending on member's date of hire as follows:

∗   Judges hired on or before June 30, 2014 with certain distinctions for judges hired December 24, 2013 to June 30, 2014 (contributory, defined benefit program).

   Judges hired July 1, 2014 or later (contributory, hybrid program).

All judges of the Judiciary Branch of the Commonwealth are members of JRS. Members include all persons holding a position as Judge of the Puerto Rico Supreme Court, Judge of the Court of Appeals, Superior Judges of the Court of First Instance, and Municipal Judges of the Court of First Instance in the Commonwealth.

The benefits provided to members of JRS are established by Commonwealth law and may be amended only by the Legislature with the Governor's approval.

This summary of JRS plan provisions is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts should be determined in strict accordance with the plan document itself.

(Continued)

CONFIDENTIAL                                                    CW_STAY0010060

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**Pension Plan Provisions Applicable to Judges Hired on or before June 30, 2014 (Pre- Act No. 162 Members)**

*Service Retirement Annuity Benefits*

An annuity payable for the lifetime of the member equal to the applicable benefit detailed below.

(a) *Normal Retirement*

*Basic Eligibility*: Age 60 with 10 years of credited service.

*Basic Benefit*: 25% of highest salary, as defined, plus 5% of highest salary, as defined, for each year of credited service in excess of 10 years, subject to a maximum of 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014.

*Eligibility for Judges who serve without a Fixed Tenure*: 10 years of credited service. This enhanced eligibility is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Benefit for Judges who serve without a Fixed Tenure*: 25% of the salary corresponding to the office during the retirement period, plus 5% of such salary for each year of credited service in excess of 10 years, subject to a maximum of 100% of such salary. If the judge has served in a position without a fixed tenure for a total of at least 8 years, the 25% increases to 50% in the preceding formula. This enhanced benefit is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Optional Eligibility*: Age and credited service as shown in the table below, provided at least 8 years of credited service were earned in office as a judge.

| Age | Years of credited services |
|---|---|
| Less than 60 | 30 |
| 62 | 20 |
| 61 | 21 |
| 60 | 22 |
| 59 | 23 |
| 58 | 24 |
| 57 | 25 |
| 56 | 26 |
| 55 | 27 |

*Optional Benefit*: 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014.

273

(Continued)

CW_STAY0010061

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Enhanced Eligibility*: Any judge who has served without a fixed tenure for at least 3 years and has at least 25 years of credited service. This enhanced benefit is not available to judges who are appointed after June 28, 2007 to an unlimited term.

*Enhanced Benefit*: 75% of the salary earned at the time of retirement.

*Compulsory Retirement*: All judges must retire by age 70. If the judge has less than 10 years of credited service, the judge can elect a refund of accumulated contributions or a proportional part of the basic benefit based on completed years and months of credited service.

(b) *Early Retirement*

*Basic Eligibility*: 20 years of credited service before age 60.

*Basic Benefit*: The basic benefit payable under Normal Retirement, reduced on an actuarial equivalent basis for each month that early retirement date precedes age 60. However, no actuarial reduction is applied for judges who serve without a fixed tenure.

*Optional Eligibility*: 20 years of credited service, provided at least 8 years of credited service were earned in office as a judge.

*Optional Benefit*: 75% of highest salary if hired before December 24, 2013 and 60% of highest salary if hired between December 24, 2013 and June 30, 2014, reduced on an actuarial equivalent basis for each month that early retirement date precedes the age specified in the table under Optional Eligibility under Normal Retirement for the applicable years of credited service.

*Termination Benefits*

(a) *Lump Sum Withdrawal*

*Eligibility*: A member is eligible upon termination of service.

*Benefit*: The benefit equals a refund of accumulated contributions.

(b) *Deferred Retirement*

*Eligibility*: A member is eligible upon termination of service prior to age 60 and after 10 years of credited service, provided the member has not taken a lump sum withdrawal.

*Benefit*: The benefit, commencing at age 60, is equal to the benefit payable upon Normal Retirement.

*Death Benefits*

(a) *Occupational Death Benefit*

*Eligibility*: The beneficiaries of any active participant who dies from an employment related cause under the Workmen's Accident Compensation Act.

*Spouse's Benefit*: 50% of the participant's salary at date of death, payable as an annuity until death or remarriage.

274                                                        (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Children's Benefit:* $10 ($20 if full orphan) for each child payable monthly until child's age 18 or completion of studies, if later. The maximum family benefit is 75% of the participant's salary at date of death.

*Benefit if No Spouse or Children:* Refund of accumulated contributions, plus an amount equal to one year of compensation, as defined, in effect at the time of death.

(b) *Preretirement Death Benefit*

*Eligibility:* Any current nonretired member is eligible, provided they are not eligible for the Occupational Death Benefit.

*Benefit:*

(i) While in active service, the benefit equals a refund of accumulated contributions; plus, an amount equal to one year of compensation in effect at the time of death.

(ii) While not in active service, the benefit equals a refund of accumulated contributions.

(c) *Special Preretirement Death Benefit*

*Eligibility:* An active participant who was eligible to retire at the date of death with a surviving spouse or dependent children.

*Benefit:* The postretirement death benefits described below assuming the active participant retired the day before the date of death.

(d) *Postretirement Death Benefit*

*Eligibility:* Any retiree or disabled member receiving a monthly benefit.

*Benefit:*

(i) For those married or with dependent children at the time of death, an annual income equal to 60% of the retirement benefit at time of death, payable for life for a surviving spouse and/or disabled children, and payable until age 18 or completion of studies, if later, for nondisabled children.

(ii) The benefit, when there is no relation as stated above, is equal to the remaining balance of accumulated contributions at the time of retirement after the deduction of lifetime annual income paid and is payable to a beneficiary or to the Member's estate. In no case may the benefit be less than $1,000. The Commonwealth's General Fund pays the difference, up to $500, between (1) the accumulated fees, as defined, with interest less the lifetime annual income paid and (2) $1,000. JRS pays for the rest.

*Disability Benefits*

(a) *Nonoccupational Disability*

*Eligibility:* All members are eligible for nonoccupational disability upon 10 years of credited service and the occurrence of disability.

275

(Continued)

CW_STAY0010063

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Benefit*: 30% of average compensation, plus 1% of average compensation for each year of credited service in excess of 10 years, payable as an annuity; subject to a maximum of 50% of average compensation.

(b) *Occupational Disability*

*Eligibility*: All members disabled while in the course and as a consequence of their work, as certified by two physicians appointed by the Plan Administrator, and provided the member is receiving compensation from the Workmen's Accident Compensation Act.

*Benefit*: 50% of Salary at date of disability, payable as an annuity, reduced by any payments received from the State Insurance Fund Corporation under the Workmen's Accident Compensation Act.

*Special Benefits*

(a) *Cost of Living Adjustments (COLA) to Pension Benefits*: Effective January 1, 2001, commencing January 1, 2002 and subsequently every three years thereafter, the annual benefit is increased by 3% for retirees and disabled members provided that the member had been receiving payments for at least three years.

These COLAs are paid by the Commonwealth's General Fund. In addition, an ad hoc 3% COLA was granted effective January 1, 1999 and is paid by JRS.

(b) *Special "Bonus" Benefits*

(i) Christmas Bonus (Act No. 144): An annual bonus of $600 for each retiree, beneficiary, and disabled member paid in December provided the judge was hired before December 24, 2013. JRS pays $150 per retiree, beneficiary, and disabled member and the balance is paid by the Commonwealth's General Fund.

(ii) Summer Bonus (Act No. 37): An annual bonus of $100 for each retiree, beneficiary, and disabled member paid in July provided the judge was hired before December 24, 2013. The amount is prorated if there are multiple beneficiaries. This benefit is paid by the Commonwealth's General Fund.

(iii) Medication Bonus (Act No. 155): An annual bonus of $100 for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the judge was hired before December 24, 2013. Evidence of coverage is not required. The amount is prorated if there are multiple beneficiaries. This benefit is paid by the Commonwealth's General Fund.

Judges hired on December 24, 2013 and thereafter are not eligible for these special "bonus" benefits.

The special benefits contributions of approximately $1.8 million in 2015 represent contributions from the Commonwealth's General Fund for the special benefits identified above granted by special laws. The funding of the special benefits is provided to JRS through legislative appropriations each July 1. The legislative appropriations are considered estimates of the payments to be made by JRS for the special benefits. Deficiencies in legislative appropriations are covered by JRS's own funds until recovered through future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits.

276 (Continued)

CW_STAY0010064

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**Pension Plan Provisions Applicable to Judges Hired on or after July 1, 2014 (Act No. 162 Members)**

Members hired on or after July 1, 2014 will be covered by a contributory, hybrid plan with defined benefit and defined contribution components as follows:

*Service Retirement Annuity Benefits*

An annuity payable for the lifetime of the member equal to the applicable benefit detailed below.

    (a) *Normal Retirement*

        *Eligibility*: Age 65 with 12 years of credited service.

        *Basic Benefit*: 1.5% of average compensation, as defined, for each year of credited service, plus the annualized value of the balance in the hybrid program contribution account at the time of retirement.

        *Compulsory Retirement*: All judges must retire by age 70. If the judge has less than 12 years of credited service, the judge will receive a refund of the hybrid program contribution account.

    (b) *Early Retirement*

        *Basic Eligibility*: Age 55 with 12 years of credited service before age 65.

        *Basic Benefit*: 1.5% of average compensation, as defined, for each year of credited service, reduced by 1/180 for each for the first 60 months and by 1/360 for each next 60 months by which the early retirement date precedes age 65, plus the annualized value of the balance in the hybrid program contribution account at time of retirement.

*Termination Benefits*

    (a) *Lump Sum Withdrawal*

        *Eligibility*: A member is eligible upon termination of service with less than 12 years of credited service.

        *Benefit*: The benefit equals a refund of the hybrid program contribution account.

    (b) *Deferred Retirement*

        *Eligibility*: A member is eligible upon termination of service prior to age 65 and after 12 years of credited service, provided the member has not taken a lump sum withdrawal.

        *Benefit*: The benefit, commencing at age 65, is equal to the benefit payable upon Normal Retirement. The benefit may commence as early as age 55, subject to the reductions described under early retirement.

*Death Benefits*

    (a) *Pre- retirement Death Benefit*

        *Eligibility*: Any current Nonretired member is eligible.

        *Benefit*: The benefit equals a refund of the hybrid program contribution account.

(Continued)

CONFIDENTIAL

CW_STAY0010065

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*(b) Postretirement Death Benefit*

*Eligibility*: Any retiree or disabled member.

*Benefit*: If a member elected at the time of retirement is to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent optional form of payment, the applicable survivor benefits.

For all members, the excess, if any, of the hybrid program contribution account at the time of retirement over the total hybrid program annuity payments paid to the member and any beneficiary per the terms of the optional form of payment is payable to a beneficiary or the member's estate.

*Disability Benefits*

*Eligibility*: All members are eligible upon 5 years of credited service and the occurrence of disability prior to age 65.

*Benefit*: 1.5% of average compensation, as defined, for each year of credited service plus the annuitized value of the balance in the hybrid program contribution account at the time of disability, payable as an annuity; subject to a maximum of 33% of average compensation, as defined.

*Special Benefits*

*(a) Cost of Living Adjustments (COLA) to Pension Benefits*

Commencing January 1, 2017 and subsequently every three years thereafter, the annual benefit is increased by 3% for retirees and disabled members provided that the member had been receiving payments for at least three years.

These COLAs are paid by the Commonwealth's General Fund.

*Contributions*

The contribution requirement to JRS is established by law and is not actuarially determined.

*(a) Member Contributions*: Contributions by members are 8.0% of compensation if hired before December 24, 2013, 10.0% of compensation if hired between December 24, 2013 and June 30, 2014 and 12.0% of compensation if hired on or after July 1, 2014.

*(b) Employer Contributions:*

∗ Payroll based Employer Contributions: Contributions by the Commonwealth are 30.34% of compensation. Prior to July 1, 2008, the employer contribution rate was 20.0% of compensation.

Additional Uniform Contribution (Act No. 162 of 2013): Beginning with the fiscal year 2015, JRS will receive an additional uniform contribution as necessary to avoid having the projected gross assets of JRS, during any subsequent fiscal year, to fall below $20 million. The Annual Additional Contribution is to be funded by the Commonwealth's General Fund from fiscal year 2015 through fiscal year 2046. The additional uniform contributions determined for fiscal years 2015, 2016, and 2017 were $11.6 million, $12.1 million and $13.5 million, respectively. The additional uniform contribution is payable at the end of the corresponding fiscal year.

278 (Continued)

CW_STAY0010066

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*(c)* *TRS*

Plan Description – The Puerto Rico System of Annuities and Pensions for Teachers (TRS) is a single employer defined benefit pension plan administered by the Puerto Rico Teachers Retirement System. I is a trust created by Act No. 218 of May 6, 1951, as superseded by Act No. 91 of March 29, 2004, to provide pension and other benefits mainly to retired teachers of the Puerto Rico Department of Education (Department of Education), an agency of the Commonwealth, and the employees of TRS.

TRS administers two benefit structures pursuant to Act No. 160 of December 24, 2013 (Act No. 160 of 2013), as modified by the April 11, 2014 decision of the Puerto Rico Supreme Court. Benefit provisions vary depending on member's date of hire as follows:

\* Members hired on or before July 31, 2014 with certain distinctions for members who retire August 1, 2014 or later (contributory, defined benefit program).

Members hired August 1, 2014 or later (contributory, hybrid program).

All active teachers of the Department of Education and the employees of TRS become plan members of TRS at their date of employment. Licensed teachers working in private schools or other educational organizations have the option to become members of TRS so long as the required employer and employee contributions are satisfied.

The benefits provided to members of TRS are established by Commonwealth of Puerto Rico law and may be amended only by the Legislature with the Governor's approval.

This summary of TRS plan description is intended to describe the essential features of the plan. All eligibility requirements and benefit amounts should be determined in strict accordance with the plan document itself.

As part of the plan description information, the most important aspects of Act No. 160 of 2013, as modified by the April 11, 2014 decision of the Puerto Rico Supreme Court, are as follows: (i) active participants as of July 31, 2014 will continue to participate in the defined benefit pension program; (ii) starting August 1, 2014, the defined benefit pension program will be closed for future participants and they will contribute to a contributory hybrid program; (iii) the retirement age for employees hired on or after August 1, 2014 will increase to age 62; (iv) the employee contribution for employees hired on or after August 1, 2014 will increase to 10% from August 1, 2014 to June 30, 2017, 13.12% from July 1, 2017 to June 30, 2020, and 14.02% from July 1, 2020 and thereafter; (v) special benefits payable to active participants that retire on or before July 31, 2014 will be reduced, and (vi) special benefits and post-employment healthcare benefits will be eliminated for future retirees.

**Defined Benefit Pension Program**

The members of TRS hired on or before July 31, 2014 are eligible for the benefits described below:

*Retirement Annuity*

Members are eligible for monthly benefit payments determined by the application of stipulated benefit ratios to the member's average compensation. Average compensation is computed based on the highest 36 months of compensation recognized by TRS. The monthly annuity for which a member is eligible is limited to a minimum of $400 per month and a maximum of 75% of the average compensation.

279                                                                                              (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Members are eligible for retirement annuity benefits upon complying with the following:

| Age | Years of creditable services | Retirement annuity compensation |
|---|---|---|
| 55 | 30 or more | 75% of average compensation |
| 50 | 30 or more | 75% of average compensation |
| Under 50 | 30 or more | 65% of average compensation |
| 50 | At least 25, but less than 30 | 1.8% of average compensation times years of service |
| 47, but less than 50 | At least 25, but less than 30 | 95% of 1.8% of average compensation times years of service |
| 60 or more | At least 10, but less than 25 | 1.8% of average compensation times years of service |

*Deferred Retirement Annuity*

A participating employee who terminates service before age 60, after having accumulated a minimum of 10 years of creditable services, qualifies for a deferred retirement annuity payable beginning at age 60. A participating employee who has completed 25 or more years of creditable services and is under the age of 47 at termination qualifies for a deferred retirement annuity payable beginning at age 47. The vested rights described above are provided if his or her contributions to TRS are left within TRS until the attainment of the respective retirement age.

*Occupational Disability Annuity*

A participating employee, who as a direct result of the performance of his or her occupation becomes disabled, is eligible for an annuity of 1.8% of average compensation based on the highest 60 months or the number of months of creditable services, if less than 5 years, recognized by TRS, times years of creditable services, but not less than $400 per month.

*Death Benefits*

Preretirement – The beneficiaries receive the member contributions made plus 2% interest accumulated as of the date of death (after discounting debts with TRS). Additionally, for beneficiaries of members who died on or before July 31, 2014, will receive an amount equal to the annual compensation of the member at the time of death.

Postretirement – For members who retire on or before July 31, 2014: The surviving spouse receives 50% of the member's pension and the other 50% is shared among the members' children (if any) and only if such children are under 22 years of age or disabled (until disability ceases). If there is no surviving spouse or qualifying children, the beneficiaries receive the excess, if any, of the accumulated contributions at the time of retirement over the total annuity benefits received before death. The benefit includes the full pension for

CONFIDENTIAL                                                          CW_STAY0010068

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

the month in which the pensioner died plus an additional fifteen-day pay period payable to the member's eligible beneficiaries, but in no case, may the benefit be less than $1,000 per month (prior to discounting any debts with TRS).

Postretirement – For members who retire on or after August 1, 2014: If the member elected at the time of retirement to transfer a portion of the annuity to a beneficiary by selecting an actuarially equivalent option form of payment, the applicable survivor benefit will be granted. Otherwise, the excess, if any, of the accumulated contributions at the time of retirement over the total annuity benefits received before death is payable to the beneficiaries or to the member's estate.

*Refunds*

A participating employee who ceases his or her employment with the Commonwealth on or before July 31, 2014 without the right to a retirement annuity has the right to a refund of the employee contributions paid to TRS, plus any interest earned thereon.

*Early Retirement Program*

On January 27, 2000, Act No. 44 was approved, which provided that effective March 9, 2000, members were eligible for early retirement upon attaining the age of 50 and 28 years of service in the first year of implementation and age 50 and 25 years of service in subsequent years. Those who selected early retirement under these conditions receive monthly benefits equal to 75% of their average compensation, which is computed based on the highest 36 months of compensation recognized by TRS. Effective July 31, 2001, the option for early retirement was closed. On January 27, 2001, Act No. 45 was approved, established 50 years as the minimum age requirement to obtain a pension benefit equal to 75% of average compensation with 30 years of service. In these cases, the retiree pays the participating employee contribution until attaining 55 years of age. Act No. 160 of 2013 impose the same obligation on the employer.

**Contributory Hybrid Program**

A hybrid plan, such as a cash balance plan, (i) determines the benefit amount based on a formula using contributions and earning credits, (ii) has notional individual accounts for members, and (iii) provides lifetime annuity benefits. Each member has a defined contribution account that is credited with member contributions and investment yield. Upon retirement, the balance in the account is paid as a lifetime annuity. The program is defined as hybrid because it contains some features that are commonly found in defined benefit (DB) plans and other features that are commonly found in defined contribution (DC) plans, such as:

* The members contribute a fixed percentage of payroll to their account. In DB plans, the percentage is usually fixed. In DC plans, the percentage is usually elected by the member.

* The defined contribution account is credited each semester with TRS's investment portfolio's net rate of return. The return is determined by the Board and will not be less than 80% of TRS's investment portfolio net rate of return. Account growth via the application of investment earnings is a common feature of DC plans.

* Assets are invested by TRS. This feature is more commonly found in DB plans. Conversely, DC plans commonly allow for the members to elect their investments on an individual basis and the member contributions are then actually invested in the options selected by the member.

281

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Upon retirement, the balance in the account is paid to the member in the form of a lifetime annuity with optional survivor benefits. TRS is responsible for investment and longevity risk during retirement. This annuity feature is common in DB plans.

Members of TRS hired on or after August 1, 2014 are eligible for the benefits described below:

*Retirement Annuity*

Members with five or more years of service and $10,000 or more in contributions at the age of 62 will qualify for an annuity of the percentage acquired by contributions based on the actuarial formula.

The pension of each member is computed upon retirement as follows: (i) the accumulated balance of member contributions to the defined contribution account on the date of retirement, divided by (ii) a factor, established by TRS Board in consultation with its actuaries and to be determined on the basis of the actuarial life expectancy of the participant and a specific interest rate.

*Deferred Retirement Annuity*

Members with five or more years of service and $10,000 or more in contributions will qualify for an annuity calculated based on the balance of the defined contribution account. If separated from service with the requirements but with less than 62 years of age, the annuity will be deferred until reaching 62 years of age.

*Disability Annuity*

Any member who enrolled in TRS after August 1, 2014, and after five years in the public service suffers a disability, whether work related or not, is granted a disability pension by TRS computed on the basis of such members individual contributions, as determined by TRS through regulations.

*Death Benefits*

There are two death benefit options for beneficiaries of new members joining on or after August 1, 2014 upon such members retirement and death:

(i)   continue to receive the monthly annuity payments until the balance, if any, of the contributions to the defined contribution account is exhausted or

(ii)  request reimbursement in one global payment of the balance, if any.

*Refunds*

A member with less than five years of service or less than $10,000 in contributions qualifies for a reimbursement. Specifically, a refund of contributions and earnings in such member's defined contribution account.

**Special Benefits**

Act No. 160 of 2013 provides for a reduction in the special laws for pensioners as of July 31, 2014 and the elimination of special laws for future pensioners who retire on or after August 1, 2014. Special benefits include the following:

282

(Continued)

CW_STAY0010070

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Christmas Bonus*

An annual bonus of $600 for each retiree and disabled member paid each December. TRS pays $150 per retiree and disabled member and the remaining bonus is paid by the Commonwealth's General Fund. On or ffter August 1, 2014, for active participants that retired on or before July 31, 2014, the bonus will be $200 and paid from the Commonwealth's General Fund.

*Medication Bonus*

An annual bonus of $100 for each retiree, beneficiary, and disabled member paid each July to cover health costs. Evidence of coverage is not required. This benefit is paid from the Commonwealth's General Fund. Act No. 160 of 2013 kept this benefit for active participants that retired on or before July 31, 2014.

*Summer Bonus*

Prior to Act No. 160 of 2013 an annual bonus of $100 for each retiree, beneficiary, and disabled member was paid each July. This benefit was prorated if there were multiple beneficiaries and was paid from the Commonwealth's General Fund. Act No. 160 of 2013 eliminated this benefit for all retirees.

*Cost of Living Adjustments*

Act No. 62 of September 4, 1992 provided, subject to the Legislature's approval, for increases of 3% every three years in pensions to those members with three or more years of retirement. In years 1995, 1998, 2001, 2004, and 2007, the Legislature replicated the benefit granted per Act No. 62 of September 4, 1992. This benefit is paid from the Commonwealth's General Fund. Act No. 160 of 2013 did not alter this benefit.

*Other Pension Increase Acts*

Act No. 128 of June 10, 1967, and Act No. 124 of June 8, 1973, provided a pension increase (from 2% to 10%) based on the monthly pension. Act No. 47 of June 1, 1984, provided a pension increase based on credited service worked. These increases are paid from the Commonwealth's General Fund. Act No. 160 of 2013 did not alter this benefit.

*Cultural Loans*

Act No. 22 of June 14, 1965, provides a 50% repayment of the interest that would be paid by active teachers and retirees. This benefit is paid from the Commonwealth's General Fund. Act No. 160 of 2013 did not alter this benefit.

*Death Benefit*

Act No. 272 of March 29, 2004, increased the death benefit of $500 to $1,000. This $500 increase is paid from the Commonwealth. Under Act No. 160 of 2013, this benefit will apply only at tha death of members who joined TRS on or before July 31, 2014.

The special benefits contributions of approximately $48.8 million in 2015 represent contributions from the General Fund of the Commonwealth for the special benefits granted by special laws. The funding of the special benefits is provided to TRS through legislative appropriations each January 1 and July 1. The legislative appropriations are considered estimates of the payments to be made by TRS for the special benefits. Deficiencies in legislative appropriations are covered by TRS's own funds until recovered through

283                                                           (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

future legislative appropriations. Any surplus of legislative appropriations collected over special benefits paid is combined with the assets held in trust for the payment of other pension benefits.

**Contributions**

The contribution requirement to TRS is established by law and is not actuarially determined.

*Member Contributions*

(i) Contributions by members hired on or before July 31, 2014 are 9% of compensation.

(ii) Contributions by members hired on or after August 1, 2014 are as follows: (i) 10% of compensation for fiscal years 2015 through 2017, (ii) 13.12% of compensation for fiscal years 2018 through 2020, and (iii) 14.02% of compensation for fiscal year 2021 and each year thereafter.

*Employer Contributions*

(i) Payroll-Based Employer Contributions: Commonwealth and TRS contributions, as applicable, are 9.5% of compensation for the fiscal year beginning July 1, 2011. For the next four fiscal years (July 1, 2012 through July 1, 2015) employer contributions will increase annually by 1%. For the next five fiscal years, (July 1, 2016 through July 1, 2020) employer contributions will increase annually by 1.25%, reaching an employer contribution rate of 19.75% effective July 1, 2020. Effective July 1, 2021 and later fiscal years, the employer contribution rate will be 20.525%.

(ii) Supplemental Contributions: From fiscal year 2015 and each subsequent fiscal year thereafter, the General Fund of the Commonwealth will provide TRS with a supplemental a contribution of $1,675 per pensioner, regardless of wether the pensioner retired before or after August 1, 2014, to pay for special benefits (i.e., Christmas and medication bonuses) and medical insurance plan contribution.

(iii) Teacher's Justice Uniform Contribution: The annual contribution to be made to TRS is equal to $30 million in fiscal year 2017, $30 million in fiscal year 2018, and $60 million in each fiscal year from fiscal year 2019 through fiscal year 2042. The Teacher's Justice Uniform Contribution is paid from the Commonwealth's General Fund.

(iv) Annual Additional Contribution: The annual contribution certified by the external actuary of TRS as necessary to prevent the value of the projected gross assets of TRS from falling below $300 million during any subsequent fiscal year. The Annual Additional Contribution is paid from the Commonwealth's General Fund for each fiscal year from fiscal year 2019 through fiscal year 2042.

**(d) Membership as of July 1, 2013**

| | JRS | TRS |
|---|---|---|
| Retirees, beneficiaries and disabled members currently receiving benefits | 430 | 40,601 |
| Current participating employees | 364 | 39,343 |
| Terminated vested participants not yet receiving benefits | 59 | 689 |
| Total | 853 | 80,633 |

284

(Continued)

CW_STAY0010072

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (e) Net Pension Liability

The Commonwealth's net pension liability as of June 30, 2015 was measured as of June 30, 2014, and the total pension liability used to calculate the net pension liability was determined by an actuarial valuation with beginning of year census data as of July 1, 2013 that was updated to roll forward the total pension liability to June 30, 2014, assuming no gains or losses.

### (i) Actuarial Methods and Assumptions

The total pension liabilities in the June 30, 2014 actuarial valuations were determined using the following actuarial methods and assumptions, applied to all periods included in the measurement:

| | ERS | JRS | TRS |
|---|---|---|---|
| Actuarial cost method | Entry age normal | Entry age normal | Entry age normal |
| Asset-valuation method | Market value of assets | Market value of assets | Market value of assets |
| Actuarial assumptions: | | | |
| Inflation | 2.5% | 2.5% | 2.5% |
| Investment rate of return, net of investment expenses, including inflation | 6.8 | 5.4 | 6.7 |
| Municipal bond index | 4.3 | 4.3 | 4.3 |
| Discount rate | 4.3 | 4.3 | 4.3 |
| Projected salary increases per annum | 3.0% per annum. No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 and the current general economy. | 3.0% per annum. No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 and the current general economy. | 2.5% per annum general wage inflation plus service-based merit increases. No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 and the current general economy. |
| Cost-of-living adjustments | None assumed. | None assumed. | None assumed. |

The mortality tables used in the June 30, 2014 actuarial valuations were as follows:

* Pre-Retirement Mortality: For ERS general employees not covered under Act No. 127 and for TRS members, RP 2000 Employee Mortality Rates are assumed for males and females projected on a generational basis using Scale AA. For ERS members covered under Act No. 127 and for JRS members, RP 2000 Employee Mortality Rates are assumed with blue collar adjustments for males and females, projected on a generational basis using Scale AA. As generational tables, they reflect mortality improvements both before and after the measurement date.

  For ERS, 100% of deaths while in active service are assumed to be occupational only for members covered under Act No. 127. For JRS, among deaths while in active service, 50% are assumed to be occupational and 50% are assumed to be nonoccupational.

(Continued)

CONFIDENTIAL

CW_STAY0010073

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Post-Retirement Healthy Mortality: For ERS and TRS, rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of the plan's experience from 2007 to 2012 equal to 92% of the rates from the UP 1994 Mortality Table for Males and 95% (ERS) or 87% (TRS) of the rates from the UP 1994 Mortality Table for Females. The rates are projected on a generational basis starting in 1994 using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date.

For JRS, RP 2000 Healthy Annuitant Mortality Rates are assumed with white collar adjustments for males and females, projected on a generational basis using Scale AA. As generational tables, it reflects mortality improvements both before and after the measurement date.

Post-Retirement Disabled Mortality For ERS, rates which vary by gender are assumed for disabled retirees based on a study of the plan's experience from 2007 to 2012 equal to 105% of the rates from the UP 1994 Mortality Table for Males and 115% of the rates from the UP 1994 Mortality Table for Females. No provision was made for future mortality improvement for disabled retirees.

For TRS, rates which vary by gender are assumed for disabled retirees based on a study of the plan's experience from 2007 to 2012 equal to the rates in the UP 1994 Mortality Table for Males and Females. No provision was made for future mortality improvement for disabled retirees.

For JRS, RP 2000 Disabled Annuitant Mortality Rates are assumed without projection. No provision was made for future mortality improvement for disabled retirees.

(ii) *Long-term Rate of Return on Investments*

The long-term expected rate of return on pension benefit investments was determined in accordance with the portfolio asset allocation adopted by the corresponding boards of the Retirement Systems during December 2013 for ERS, December 2010 for TRS and October 2014 for JRS and the actuary's capital market assumptions as of June 30, 2014. The long-term expected rate of return on pension benefit investments as of June 30, 2014 and 2013 was 6.75% and 6.40% for ERS, respectively, 6.65% and 6.25% for TRS, respectively, and 5.35% and 6.30% for JRS, respectively. In the case of ERS, the long-term expected rate of return on pension benefit investments was slightly higher than the debt service of the senior pension funding bonds payable which ranged from 5.85% to 6.55% as of June 30, 2014.

(Continued)

CONFIDENTIAL

CW_STAY0010074

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The Retirement Systems' policies in regard to allocation of invested assets is established and may be amended by the corresponding Retirement System's Board. Plan assets are managed on a total return basis with a long-term objective of achieving and maintaining a positive impact on each of the Retirement Systems' financial condition for the benefits provided through the pension programs. The following are of the Retirement System Board's adopted asset allocation policies as of June 30, 2014:

| | ERS | | TRS | | JRS | |
|---|---|---|---|---|---|---|
| | Target allocation | Long-term expected rate of return | Target allocation | Long-term expected rate of return | Target allocation | Long-term expected rate of return |
| Asset class: | | | | | | |
| Domestic equity | 25% | 6.8% | 25% | 6.8% | 18% | 6.8% |
| International equity | 10 | 7.6 | 10 | 7.6 | 7 | 7.6 |
| Fixed income | 64 | 3.9 | 64 | 3.9 | 74 | 3.9 |
| Cash | 1 | 2.9 | 1 | 2.9 | 1 | 2.9 |
| Total | 100% | | 100% | | 100% | |

The long-term expected rates of return on pension benefit investments were determined using a building block method in which best estimate ranges of expected future real rates of return (expected returns, net of pension plan investment expense and inflation) were developed for each major asset class. These ranges were combined to produce the long-term expected rate of return by weighting the expected future real rates of return by the target asset allocation percentage and by adding expected inflation.

(iii)  *Discount Rate*

The asset basis for the date of depletion projection is each of the Retirement Systems' fiduciary net position (the gross assets plus deferred outflows of resources less the gross liabilities, including the senior pension funding bonds payable, plus deferred inflows of resources). On this basis, ERS's fiduciary net position was exhausted in fiscal year 2015. The fiduciary net position for each of TRS and JRS is expected to be exhausted in fiscal years 2019 and 2018, respectively. The projections assume that certain illiquid assets (consisting primarily of loans to members), of approximately $764 million, $450 million and $542 thousand as of June 30, 2014 for ERS, TRS and JRS, respectively, will be converted to cash when needed.

The discount rate used to measure the total pension liability decreased from 4.63% per annum in June 30, 2013 to 4.29% per annum in June 30, 2014, for ERS and from 6.30% per annum in June 30, 2013 for both TRS and JRS to 4.33%, and 4.30%, respectively, per annum in June 30, 2014.

The fiduciary net position of ERS was not projected to be available to make all projected future benefit payments of current active and inactive employees. The date of depletion projection in the actuarial report does not include any amounts from the additional uniform contribution required by Act No. 32 because of actual fiscal and budgetary difficulties, continued budget deficits and liquidity risks of the Commonwealth and its municipalities, and the risk that the financial condition of the Commonwealth and its municipalities do not improve in the near term. Therefore, the tax-free municipal bond index (Bond Buyer General Obligation 20 Bond Municipal Bond Index) was applied

287                                        (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

to all periods of projected benefits payments to determine the total pension liability. The discount rate for ERS was 4.29% as of June 30, 2014.

The fiduciary net positions of TRS and JRS are not expected to be available to make all projected future benefit payments of current active and inactive members. Therefore, the discount rate for calculating the total pension liability is equal to the single equivalent rate that results in the same actuarial present value as the long-term expected rate of return applied to benefit payments, to the extent that the pension plan's fiduciary net position is projected to be sufficient to make projected benefit payments, and the tax free municipal bond index rate (Bond Buyer General Obligation 20 Bond Municipal Bond Index) applied to benefit payments, to the extent that the pension plan's fiduciary net position is not projected to be sufficient. The TRS and the JRS discount rates were 4.33% and 4.30%, respectively, as of June 30, 2014.

(iv)   *Changes in Net Pension Liability of TRS and JRS*

Changes in the Commonwealth's net pension liability of TRS and JRS as of period June 30, 2014 were as follows (in thousands):

| | TRS | | | JRS | | |
|---|---|---|---|---|---|---|
| | Total pension liability | Plan fiduciary net position | Net pension liability | Total pension liability | Plan fiduciary net position | Net pension liability |
| Balance at July 1, 2013 | $ 14,792,649 | 1,906,882 | 12,885,767 | 481,715 | 45,316 | 436,399 |
| Changes for the year: | | | | | | |
| Service cost | 354,159 | — | 354,159 | 16,764 | — | 16,764 |
| Interest on total pension liability | 690,742 | — | 690,742 | 22,620 | — | 22,620 |
| Changes in benefit terms | (599,560) | — | (599,560) | — | — | — |
| Differences between expected and actual experience in measuring the total pension liability | 169,851 | — | 169,851 | (1,658) | — | (1,658) |
| Changes in assumptions | 83,560 | — | 83,560 | 7,601 | — | 7,601 |
| Contributions – employer | — | 189,367 | (189,367) | — | 11,992 | (11,992) |
| Contributions – employees | — | 115,461 | (115,461) | — | 3,804 | (3,804) |
| Contributions – transfers | — | 4,131 | (4,131) | — | — | — |
| Pension plan net investment income | — | 190,023 | (190,023) | — | 9,713 | (9,713) |
| Other income | — | 1,416 | (1,416) | — | 59 | (59) |
| Benefit payments, including refunds of contributions | (683,698) | (683,698) | — | (22,667) | (22,667) | — |
| Pension plan net administrative expenses | — | (19,803) | 19,803 | — | (2,150) | 2,150 |
| Net changes | 15,054 | (203,103) | 218,157 | 22,660 | 751 | 21,909 |
| Balance at June 30, 2014 | $ 14,807,703 | 1,703,779 | 13,103,924 | 504,375 | 46,067 | 458,308 |

The net pension liabilities for TRS and JRS of approximately $13.1 billion and $458 million, respectively, as of June 30, 2015 are included as part of the Governmental Activities of the Primary Government in the statement of net position.

288

(Continued)

CONFIDENTIAL

COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2015

Actuarial assumptions are revised periodically to more closely reflect both actual and anticipated future experience. Due to the change in the census collection date to the beginning of the fiscal year rather than the end of the fiscal year, demographic gain/loss during the year is limited to the difference between actual and expected benefit payments, which arise from differences in termination and retirement activity and mortality versus expectations.

The June 30, 2014, actuarial valuation for TRS reflect increases in the total pension liability as follows: (i) approximately $83.6 million loss as a result of the changes assumptions including the change in the discount rate as required by GASB Statement No. 67, and (ii) approximately $170 million loss as a result of the update of the census data to reflect outsized retirement activity during the fiscal year 2014, plus the difference between actual and expected benefit payments, which arise from differences in retirement activity and actual mortality versus expectations. In addition, several assumptions were revised due to the Act No. 160 of 2013 changes, including the form of payment assumption for members hired on or before July 31, 2014 who retire August 1, 2014 or later and incidence of retirement and disability, commencement of benefits for terminated vested members, and the form of payment assumptions for members hired August 1, 2014 or later. The assumptions for the defined contribution account were added due to the Act No. 160 of 2013 changes. The compensation assumption was revised to lower the general wage inflation assumption from 3.5% to 2.5% and to reflect Act No. 66 of 2014.

The June 30, 2014, actuarial valuation for JRS reflects an increase of approximately $7.6 million in the total pension liability because of changes in assumptions related to the change in the discount rate as required by GASB Statement No. 67 and a decrease of approximately $1.7 million in the total pension liability because of differences between expected and actual experience. In addition, the retirement, commencement of benefits for terminated vested members, disability, and form of payment assumptions were revised for judges hired July 1, 2014 or later due to the Act No. 162 of 2013 changes. The assumptions for the hybrid program contribution account were added due to the Act No. 162 of 2013 changes. Also, the compensation increase assumption was revised due to Act No. 66 of 2014.

The following table presents the Commonwealth's net pension liability for TRS and JRS calculated as follows (in thousands): (i) for TRS, using the discount rate of 4.33%, as well as what such rate would be if calculated using a discount rate of 1% point lower (3.33%) or 1% percentage point higher (5.33%) than the current rate; and (ii) for JRS, using the discount rate of 4.30%, as well as what such rate would be if calculated using a discount rate of 1% point lower (3.30%) or 1% percentage point higher (5.30%) than the current rate (dollars in thousands):

| | | TRS | | | JRS | | |
|---|---|---|---|---|---|---|---|
| | | 1% decrease (3.33%) | Current discount rate (4.33%) | 1% increase (5.33%) | 1% decrease (3.30%) | Current discount rate (4.30%) | 1% increase (5.30%) |
| Net pension liability | $ | 15,173,401 | 13,103,924 | 11,396,544 | 524,258 | 458,308 | 403,807 |

(Continued)

CONFIDENTIAL

CW_STAY0010077

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

(v)   *Commonwealth Proportion of Net Pension Liability of ERS*

The following table presents the Commonwealth's proportionate share of the net pension liability of ERS as of June 30, 2015, and the proportion percentage of the aggregate net pension liability of ERS allocated to the Commonwealth (in thousands):

| | Governmental activities | Business-type activities | Totals primary government | Information basis |
|---|---|---|---|---|
| Commonwealth's proportion of the net pension liability | 64.00% | 0.10% | 64.10% | Audited |
| Commonwealth's proportionate share of the net pension liability $ | 19,287,633 | 30,353 | 19,317,986 | Audited |
| Commonwealth's proportion of the net pension liability | 0.64% | — | 0.64% | Unaudited |
| Commonwealth's proportionate share of the net pension liability $ | 194,812 | — | 194,812 | Unaudited |

The Commonwealth's proportion of ERS's net pension liability was based on the actual required contributions of each of the participating employers that reflect each employer's projected long-term contribution effort. The contributions that reflect each employer's projected long-term contribution effort included in the proportionate share calculation are: (1) Act No. 116 of 2010 statutory payroll based contribution, (2) Act No. 3 of 2013 supplemental contribution, and (3) other special law contributions. Contributions to ERS of approximately $783 million were required during the period subsequent to the measurement date or during period ended June 30, 2015. Other contributions to ERS that do not reflect an employer's projected long-term contribution effort, such as contributions that separately finance specific liabilities of an individual employer to ERS (i.e. local employer early retirement incentives), were excluded from the proportionate share calculation.

In addition, Act No. 32 of 2013 Additional Uniform Contribution (AUC), which is a contribution that reflects each employer's projected long-term contribution effort, was excluded from the proportionate share calculation because its collectability from various employers, including the Commonwealth, is uncertain at this moment. This prevents an overallocation of GASB Statement No. 68 amounts to the employers who have paid their AUC (or are expected to do so) and an underallocation of GASB Statement No. 68 amounts to the employers who have not paid their AUC (or are not expected to do so).

Actuarial assumptions are revised periodically to more closely reflect both actual and anticipated future experience. Due to the change in the census collection date to the beginning of the fiscal year, rather than the end of the fiscal year, demographic gain/loss during the year is limited to the difference between actual and expected benefit payments, which arise from differences in termination and retirement activity and mortality versus expectations.

The June 30, 2014 actuarial valuation for ERS reflects an increase of approximately $1.9 billion in the total pension liability because of the changes in assumptions related to the change in the discount

290                                                                                      (Continued)

CONFIDENTIAL                                                                           CW_STAY0010078

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

rate as required by GASB Statement No. 67 and an increase of approximately $54 million in the total pension liability because of differences between expected and actual experience. With the enactment of Act No. 3 of 2013, termination, retirement and disability rates were added for new Act No. 3 members. Also, the compensation increase assumption was revised due to Act No. 66 of 2014.

The following table presents the Commonwealth's proportionate share of the net pension liability for ERS calculated using the discount rate of 4.29%, as well as what the Commonwealth's proportionate share of the net pension liability would be if it were calculated using a discount rate of 1% point lower (3.29%) or 1% percentage point higher (5.29%) than the current rate (in thousands):

|  | 1% decrease (3.29%) | Current discount rate (4.29%) | 1% increase (5.29%) | Information basis |
|---|---|---|---|---|
| Commonwealth's proportionate share of the net pension liability | $ 21,880,164 | 19,287,633 | 17,139,481 | Audited |
| Commonwealth's proportionate share of the net pension liability | $ 221,012 | 194,812 | 173,126 | Unaudited |

**(f)** ***Pension Expense and Deferred Outflows of Resources and Deferred Inflows of Resources from Pension Activities***

Pension expense recognized by the Commonwealth for the year ended June 30, 2015 related to the Retirement Systems are as follows (in thousands):

| Retirement systems | Governmental activities | Business-type activities | Totals primary government | Information basis |
|---|---|---|---|---|
| ERS | $ 956,301 | 2,287 | 958,588 | Audited |
| ERS | 485,789 | — | 485,789 | Unaudited |
| TRS | 257,835 | — | 257,835 | Audited |
| JRS | 35,201 | — | 35,201 | Audited |
| Total | $ 1,735,126 | 2,287 | 1,737,413 | |

(Continued)

CONFIDENTIAL                                   CW_STAY0010079

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Deferred outflows and deferred inflows of resources from pension activities by source reported by the Commonwealth in the statement of net position as of June 30, 2015 for each of the Retirement Systems are as follows (in thousands):

| Retirement system | Source | Governmental activities | | Business-type activities | | Information basis |
| | | Deferred outflows of resources | Deferred inflows of resources | Deferred outflows of resources | Deferred inflows of resources | |
|---|---|---|---|---|---|---|
| ERS | Differences between expected and actual experience in measuring total pension liability | $ 29,587 | — | 47 | — | Audited |
| | Changes in assumptions | 657,316 | — | 1,034 | — | Audited |
| | Net difference between projected and actual earnings on pension plan investments | — | 121,865 | — | 192 | Audited |
| | Changes in proportion and differences between actual contributions and proportionate share | 85,795 | 571,872 | 3,499 | — | Audited |
| | Employer contributions made subsequent to the measurement date | 533,555 | — | 486 | — | Audited |
| | Total ERS | 1,306,253 | 693,737 | 5,066 | 192 | |
| ERS | Differences between expected and actual experience in measuring total pension liability | 299 | — | — | — | Unaudited |
| | Changes in assumptions | 6,639 | — | — | — | Unaudited |
| | Net difference between projected and actual earnings on pension plan investments | — | 1,231 | — | — | Unaudited |
| | Changes in proportion and differences between actual contributions and proportionate share | — | 72,755 | — | — | Unaudited |
| | Employer contributions made subsequent to the measurement date | 4,258 | — | — | — | Unaudited |
| | Total ERS | 11,196 | 73,986 | — | — | |
| TRS | Differences between expected and actual experience in measuring total pension liability | 145,586 | — | — | — | Audited |
| | Changes in assumptions | 71,623 | — | — | — | Audited |
| | Net difference between projected and actual earnings on pension plan investments | — | 67,521 | — | — | Audited |
| | Changes in proportion and differences between actual contributions and proportionate share | — | — | — | — | Audited |
| | Employer contributions made subsequent to the measurement date | 194,541 | — | — | — | Audited |
| | Total TRS | 411,750 | 67,521 | — | — | |
| JRS | Differences between expected and actual experience in measuring total pension liability | — | 1,244 | — | — | Audited |
| | Changes in assumptions | 5,701 | — | — | — | Audited |
| | Net difference between projected and actual earnings on pension plan investments | — | 5,757 | — | — | Audited |
| | Changes in proportion and differences between actual contributions and proportionate share | — | — | — | — | Audited |
| | Employer contributions made subsequent to the measurement date | 23,937 | — | — | — | Audited |
| | Total JRS | 29,638 | 7,001 | — | — | |

292

(Continued)

CONFIDENTIAL

CW_STAY0010080

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

| Retirement system | Source | Governmental activities | | Business-type activities | | Information basis |
|---|---|---|---|---|---|---|
| | | Deferred outflows of resources | Deferred inflows of resources | Deferred outflows of resources | Deferred inflows of resources | |
| Total | Differences between expected and actual experience | $    175,472 | 1,244 | 47 | — | |
| | Changes in assumptions | 741,279 | — | 1,034 | — | |
| | Net difference between projected and actual earnings on pension plan investments | — | 196,374 | — | 192 | |
| | Changes in proportion and differences between actual contributions and proportionate share | 85,795 | 644,627 | 3,499 | — | |
| | Employer contributions made subsequent to the measurement date | 756,291 | — | 486 | — | |
| | Total | $    1,758,837 | 842,245 | 5,066 | 192 | |

Amounts reported as deferred outflows/inflows of resources from pension activities as of June 30, 2015 will be recognized in the pension expense as follows (in thousands):

| | ERS | TRS | JRS | Total |
|---|---|---|---|---|
| **Year ending June 30:** | | | | |
| 2016 | $    1,771 | 19,321 | 46 | 21,138 |
| 2017 | 1,771 | 19,321 | 46 | 21,138 |
| 2018 | 1,771 | 19,321 | 46 | 21,138 |
| 2019 | 1,772 | 19,321 | (1,438) | 19,655 |
| 2020 | 2,414 | 36,202 | — | 38,616 |
| Thereafter | 2,414 | 36,202 | — | 38,616 |
| Total | $    11,913 | 149,688 | (1,300) | 160,301 |

Deferred outflows of resources related to pensions resulting from the Commonwealth required contributions subsequent to the measurement date were approximately $535.7 million, $194.5 million and $23.9 million as of June 30, 2015 for the corresponding proportionate share of ERS, for TRS and for JRS, respectively, and will be recognized as a reduction of the net pension liability in the year ended June 30, 2016. This amount is not included in the table above.

(Continued)

CONFIDENTIAL

CW_STAY0010081

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(g)  Unrecorded Pension Amounts – Primary Government**

These additional amounts (in thousands) of GASB Statement No. 68 and No. 71 should have been recognized as of June 30, 2015 and are considered unaudited because they relate toblended component units of the Commonwealth, reported as part of the Primary Government, which are audited by other auditors that did not implement the requirements of GASB Statements No. 68 and No. 71 in their respective separately issued financial statements.

| FS Caption | | Governmental activities | Business-type activities | Total primary government |
|---|---|---|---|---|
| Net pension liability | $ | 421,789 | 567,089 | 988,878 |
| Pension Expense | | 26,539 | 41,641 | 68,180 |
| Deferred outflow of resources | | 41,811 | 94,809 | 136,620 |
| Deferred inflow of resources | | 2,951 | 5,026 | 7,977 |

| | | Net pension liability | Pension expense | Deferred outflow of resources | Deferred inflow of resources |
|---|---|---|---|---|---|
| Business-type activities: | | | | | |
| · PRHIA | $ | 18,840 | 1,486 | 3,441 | 119 |
| PReMSA | | 504,173 | 37,448 | 85,862 | 3,186 |
| · Additional Lottery | | 7,073 | 792 | 2,745 | 45 |
| Aggregate remaining fund financial information | | 37,003 | 1,915 | 2,761 | 1,676 |
| | $ | 567,089 | 41,641 | 94,809 | 5,026 |

**(h)  Net Pension Liability Information for Component Units**

As mentioned in Note 1(s), for purposes of the stand alone financial statements of each of the discretely presented component units, which audit reports for fiscal year 2015 had already been issued prior to the issuance of the accompanying financial statements of the Commonwealth, ERS did not timely provide the information needed to adopt GASB Statements No. 68 and No. 71. Therefore, the majority of the component units were unable to adopt these accounting pronouncements. Of the component units that adopted GASB Statements No. 68 and No. 71 in their stand-alone audited financial statements, most were based on unaudited information (except for PREPA and UPR which were able to use audited information because they each have their own separate retirement systems). As a result, the majority of the component units have maintained the accounting for pension costs in accordance with GASB Statement No. 27, also based from the standpoint of a participant in a multiple employer cost sharing plan. Accordingly, pension costs recognized for most of the component units were principally equal to the statutorily or contractually required contributions, with a liability recorded for any unpaid required contributions.

294

(Continued)

CW_STAY0010082

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**University of Puerto Rico Retirement System**

*Plan Description and Membership*

The University of Puerto Rico Retirement System (UPR Retirement System) is a single-employer, defined benefit pension plan that covers all employees of UPR with the exception of hourly, temporary, part-time, contract and substitute employees, and visiting professors. It is qualified and exempt from Puerto Rico and United States income taxes. The UPR Retirement System is not subject to the requirements of the Employees Retirement Income Security Act of 1974 (ERISA). The UPR Retirement System issues a publicly available financial report that includes financial statements and required supplementary information for the plan. That report may be obtained by writing to the University of Puerto Rico Retirement System at P.O. Box 21769, San Juan, Puerto Rico 00931-1769.

**Puerto Rico Electric Power Authority Retirement System**

*Plan Description and Membership*

The Puerto Rico Electric Power Authority Retirement System (PREPA Retirement System) is a single-employer, defined benefit pension plan that covers all permanent full-time employees of PREPA administered by Employees' Retirement System of the Puerto Rico Electric Power Authority. It is qualified and exempt from Puerto Rico and United States income taxes. The PREPA Retirement System is not subject to the requirements of the Employees Retirement Income Security Act of 1974 (ERISA). The PREPA Retirement System issues a publicly available financial report that includes financial statements and required supplementary information for the plan. That report may be obtained by writing to the Retirement System of the Puerto Rico Electric Power Authority, PO Box 13978, San Juan, Puerto Rico 00908-3978.

(Continued)

CONFIDENTIAL

CW_STAY0010083

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

For those component units that did adopt the GASB Statements No. 68 and No. 71, the following consists of the Net Pension Liability and Pension Expense recognized on the accompanying basic financial statements under the Component Units opinion unit (in thousands):

|  | | Net pension liability | Pension expense | Information basis |
|---|---|---|---|---|
| Major component units: | | | | |
| PREPA | $ | 3,558,872 | 420,900 | Audited |
| UPR | | 2,104,040 | 66,304 | Audited |
| SIFC | | 1,417,963 | 81,318 | Unaudited |
| Total major component units | | 7,080,875 | 568,522 | |
| Nonmajor component units: | | | | |
| AACA | | 133,003 | 7,393 | Unaudited |
| AEDA | | 167,598 | 9,611 | Unaudited |
| LAPR | | 95,597 | 5,483 | Unaudited |
| CCDA | | 1,580 | 90 | Unaudited |
| Total nonmajor component units | | 397,778 | 22,577 | |
| Total component units | $ | 7,478,653 | 591,099 | |

These additional amounts (in thousands) of GASB Statement No. 68 and No. 71 should have been recognized as of June 30, 2015 and are considered unaudited because they relate to discretely presented component units of the Commonwealth which are audited by other auditors that did not implement the requirements of GASB Statements No. 68 and No. 71 in their respective separately issued financial statements.

|  | | Net pension liability | Pension expense | Deferred outflow of resources | Deferred inflow of resources |
|---|---|---|---|---|---|
| Aggregate discretely presented component units | $ | 2,933,402 | 231,183 | 437,177 | 85,367 |

(Continued)

CONFIDENTIAL

CW_STAY0010084

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The following consists of the deferred outflows and deferred inflows of resources from pension activities by source reported at June 30, 2015 by those component units referred to above who adopted the provisions of GASB Statements No. 68 and No. 71 (in thousands):

| Major component unit | Source | Deferred outflows of resources | Deferred inflows of resources |
|---|---|---|---|
| PREPA (Audited) | Employer contributions made subsequent to the measurement date | $ 100,851 | — |
| | Differences between expected and actual experience in measuring the total pension liability | 37,081 | — |
| | Changes in assumptions | 1,414,584 | — |
| | Net difference between projected and actual earnings on pension plan investments | — | 57,703 |
| | Total PREPA | 1,552,516 | 57,703 |
| UPR (Audited) | Employer contributions made subsequent to the measurement date | 88,251 | — |
| | Changes in assumptions | — | 14,790 |
| | Net difference between projected and actual earnings on pension plan investments | — | 92,348 |
| | Total UPR | 88,251 | 107,138 |
| SIFC (Unaudited) | Employer contributions made subsequent to the measurement date | 30,629 | — |
| | Differences between expected and actual experience in measuring the total pension liability | — | 11,347 |
| | Changes in assumptions | 48,399 | — |
| | Total ERS | 79,028 | 11,347 |
| Total | Employer contributions made subsequent to the measurement date | 219,731 | — |
| | Differences between expected and actual experience in measuring the total pension liability | 37,081 | 11,347 |
| | Changes in assumptions | 1,462,983 | 14,790 |
| | Net difference between projected and actual earnings on pension plan investments | — | 150,051 |
| | Total | $ 1,719,795 | 176,188 |

(Continued)

CONFIDENTIAL

CW_STAY0010085

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

| Nonmajor component units (unaudited) | Source | | Deferred outflows of resources | Deferred inflows of resources |
|---|---|---|---|---|
| AACA | Employer contributions made subsequent to the measurement date | $ | 3,170 | — |
| | Differences between expected and actual experience in measuring the total pension liability | | 204 | — |
| | Changes in assumptions | | 4,564 | 840 |
| | Total ERS | | 7,938 | 840 |
| AEDA | Employer contributions made subsequent to the measurement date | | 3,725 | |
| | Net difference between projected and actual earnings on pension plan investments | | 6,152 | 1,341 |
| | Total TRS | | 9,877 | 1,341 |
| LAPR | Employer contributions made subsequent to the measurement date | | 705 | — |
| | Net difference between projected and actual earnings on pension plan investments | | 3,279 | 765 |
| | Total ERS | | 3,984 | 765 |
| CCDA | Employer contributions made subsequent to the measurement date | | 32 | — |
| | Changes in proportion and differences between actual contributions and proportionate share | | 54 | 13 |
| | Total ERS | | 86 | 13 |
| Total | Employer contributions made subsequent to the measurement date | | 7,632 | — |
| | Differences between expected and actual experience in measuring the total pension liability | | 204 | — |
| | Changes in assumptions | | 4,564 | 840 |
| | Net difference between projected and actual earnings on pension plan investments | | 9,431 | 2,106 |
| | Changes in proportion and differences between actual contributions and proportionate share | | 54 | 13 |
| | Total ERS | $ | 21,885 | 2,959 |

(Continued)

CONFIDENTIAL

CW_STAY0010086

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*(i) Payable to the Retirement Systems*

Payable to the Retirement Systems reported by the Commonwealth at June 30, 2015 related to unpaid contributions for each of the Retirement Systems were as follows (in thousands):

| Retirement systems | | Amount |
|---|---|---|
| ERS | $ | 125,207 |
| TRS | | — |
| JRS | | 11,600 |
| Total | $ | 136,807 |

As of year-end, ERS had an obligation with the Commonwealth of approximately $70 million. The accounts receivable from and accounts payable to ERS are presented in the Statement of Net Position as part of the due from and due to other governmental entities.

**(18) Other Post-Employment Benefits**

As further described in Note 1(t), the Commonwealth provides post-employment healthcare benefits through the following defined benefit plans that are administered by ERS and JRS Administration or by the TRS Administration:

* Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC)

* Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC)

Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC)

*(a) Plans Descriptions*

ERS MIPC is an unfunded cost sharing, multiple employer defined benefit other post-employment (OPEB) plan sponsored by the Commonwealth. JRS MIPC and TRS MIPC are unfunded, single employer defined benefit OPEB plans sponsored by the Commonwealth. These OPEB plans were created under Act No. 95 approved on June 29, 1963. Healthcare benefits are provided through insurance companies whose premiums are paid by the retiree with the Commonwealth providing a matching share. ERS MIPC covers substantially all full-time employees of (1) the Primary Government and (2) certain municipalities of Puerto Rico and certain component units of the Commonwealth not having their own post-employment benefit plans. JRS MIPC covers all judges of the Judiciary Branch of the Commonwealth. TRS MIPC covers all active teachers of the Department of Education of the Commonwealth and employees of the TRS Administration.

For ERS MIPC and TRS MIPC, Commonwealth employees became plan members upon their date of employment. Plan members were eligible for benefits upon reaching the applicable pension benefits retirement age. Act No. 3 of 2013 eliminated this healthcare benefit to ERS MIPC members retired after June 30, 2013. Act No. 160 of 2013 eliminated this healthcare benefit to TRS MIPC members retired after July 31, 2014.

299

(Continued)

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

For JRS MIPC, judges of the Judiciary Branch of the Commonwealth become plan members upon their date of employment. Plan members are eligible for benefits upon reaching the age of 60 with 10 years of service.

Funding Policy – The contribution requirement of ERS MIPC, JRS MIPC, and TRS MIPC are established by Act No. 95 approved on June 29, 1963. Its benefit consists of a maximum of $100 per month per retiree or disabled member. Each of these OPEB plans is financed by the Commonwealth and its public corporations and municipalities on a pay as you go basis. The funding of the OPEB benefits are provided to the ERS MIPC, the JRS MIPC and TRS MIPC through legislative appropriations each July 1 by (i) the Commonwealth's General Fund for former government and (ii) certain public corporations without their own treasuries, (iii) certain public corporations with their own treasuries and municipalities for their former employees. The legislative appropriations are considered estimates of the payments to be made by the ERS MIPC, the JRS MIPC and TRS MIPC for the healthcare benefits throughout the year. There is no contribution requirement for plan members during active employment.

Retirees contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution.

*(b) Membership as of July 1, 2014*

| | ERS | JRS | TRS | Total |
|---|---|---|---|---|
| Retirees, disabled members and currently receiving benefits | 112,876 | 372 | 38,511 | 151,759 |

*(c) Annual OPEB costs and Net OPEB obligation*

The annual OPEB cost and the annual required contribution (ARC) were computed as part of an actuarial valuation in accordance with parameters of GASB Statement No. 45 based on beginning of year census (demographic) data as of July 1, 2014, as adjusted. Prior year actuarial valuations were made using end of year census data.

300                                                                        (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The Commonwealth's annual OPEB cost and the net OPEB obligation for the post-employment healthcare benefits plans as of and for the year ended June 30, 2015 were as follows (in thousands):

| | ERS MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|
| Annual OPEB cost: | | | | |
| ARC | $ 103,878 | 847 | 36,292 | 141,017 |
| Interest on net OPEB obligation | 6,307 | 53 | 1,974 | 8,334 |
| Adjustment to annual required contribution | (14,918) | (155) | (4,320) | (19,393) |
| Annual OPEB cost | 95,267 | 745 | 33,946 | 129,958 |
| Statutory sponsor's contributions made | (97,374) | (307) | (37,776) | (135,457) |
| Increase (decrease) in net OPEB obligation | (2,107) | 438 | (3,830) | (5,499) |
| Net OPEB obligation at beginning of year | 203,454 | 1,702 | 63,678 | 268,834 |
| Net OPEB obligation at year-end | $ 201,347 | 2,140 | 59,848 | 263,335 |

The net OPEB obligation at June 30, 2015 for ERS MIPC, JRS MIPC, and TRS MIPC was approximately $263.3 million and $1.8 million recorded in the Governmental Activities and Business-Type Activities, respectively, in the accompanying statement of net position.

*(d)* *Actuarial Methods and Assumptions*

The OPEB funded status as of June 30, 2015 was determined by the actuarial valuation with beginning of year census data as of July 1, 2014, which was updated to roll forward the funded status to June 30, 2015 and assumed no liability gains or losses.

(Continued)

CONFIDENTIAL

CW_STAY0010089

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The following are the most significant actuarial methods and assumptions used to estimate the net OPEB obligation at June 30, 2015 and the OPEB required annual contribution for the year ended June 30, 2015:

| | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Actuarial-cost method | Entry age normal | Entry age normal | Entry age normal |
| Amortization method | 18 years closed (beginning July 1, 2014), level dollar | 30 years closed, level percentage of payroll | 20 years closed (beginning July 1, 2014), level dollar |
| Remaining amortization period | 17 years | 11 years | 19 years |
| Discount rate | 3.10% | 3.10% | 3.10% |
| Projected payroll growth | N/A | 0% until June 30, 2017; 3% thereafter | N/A |
| Projected salary increases | N/A | N/A | N/A |
| Inflation | N/A | N/A | N/A |

N/A = Not applicable.

The ERS MIPC, JRS MIPC, and TRS MIPC statutory contributions as a percentage of the annual required contribution for the current year and each of the two preceding years are as follows:

| | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Year ended June 30, 2015 | 93.7% | 36.3% | 104.1% |
| Year ended June 30, 2014 | 115.3 | 44.1 | 77.3 |
| Year ended June 30, 2013 | 59.2 | 45.3 | 75.0 |

Actuarial valuations of an ongoing plan involve estimates of the net value of reported amounts and assumptions about the probability of occurrence of events far into the future. Including for example, assumptions about future employment and mortality. Amounts determined regarding the funded status of the plan and the ARC of the employer are subject to continuous revision because actual results are compared with past expectations and new estimates are made about the future.

Calculations are based on the types of benefits provided under the terms of the substantive plan at the time of each valuation and the pattern of sharing of costs between the employer and plan members at the time of each valuation. The projections of benefits for financial reporting purposes does not explicitly incorporate the potential effects of legal or contractual funding limitations on the pattern of cost sharing between the employer and plan members in the future.

The actuarial calculations reflect a long-term perspective. Consistent with that perspective, the actuarial methods and assumptions used include techniques designed to reduce short-term volatility in actuarial accrued liabilities and actuarial value of assets.

(Continued)

CONFIDENTIAL

CW_STAY0010090

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (e) Three Year Trend Information

The three-year trend information is as follows (in thousands):

|  | ERS MIPC | JRS MIPC | TRS MIPC |
|---|---|---|---|
| Annual OPEB cost: | | | |
| Year ended June 30, 2015 | $ 95,267 | 745 | 33,946 |
| Year ended June 30, 2014 | 82,222 | 617 | 45,902 |
| Year ended June 30, 2013 | 148,383 | 731 | 40,367 |
| Percentage of annual OPEB cost contributed: | | | |
| Year ended June 30, 2015 | 102.2% | 41.2% | 111.3% |
| Year ended June 30, 2014 | 124.2 | 48.9 | 78.2 |
| Year ended June 30, 2013 | 61.9 | 39.8 | 84.8 |
| Net OPEB obligation: | | | |
| At June 30, 2015 | 201,347 | 2,140 | 59,848 |
| At June 30, 2014 | 203,454 | 1,702 | 63,678 |
| At June 30, 2013 | 223,317 | 1,387 | 53,668 |

### (f) Funded Status

Funded status of the post-employment healthcare benefit plans as of June 30, 2015, the most recent actuarial valuation date, is as follows (in thousands):

|  | ERS MIPC | JRS MIPC | TRS MIPC | Total |
|---|---|---|---|---|
| Actuarial accrued liability (AAL) | $ 1,428,788 | 6,917 | 548,518 | 1,984,223 |
| Actuarial value of assets | — | — | — | — |
| Unfunded actuarial accrued liability | $ 1,428,788 | 6,917 | 548,518 | 1,984,223 |
| Funded ratio | —% | —% | —% | —% |
| Covered payroll | $ 3,319,280 | 31,917 | 1,127,500 | 4,478,697 |
| Unfunded actuarial accrued liability as a percentage of covered payroll | 43.0% | 21.7% | 48.6% | 44.3% |

The schedule of funding progress presented as required supplementary information following the notes to the basic financial statements, present multiyear trend information about whether the actuarial value of plan assets is increasing or decreasing over time relative to the actuarial accrued liability for benefits.

303

(Continued)

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(19)  Debt Service Deposit Agreements**

On May 26, 2005, the Commonwealth, PFC, and GDB (together the Commonwealth Entities) and Lehman Brothers Special Financing Inc. (Lehman) entered into Debt Service Deposit Agreements (DSD Agreements) effective on July 1, 2005. The objective of the DSD Agreement was for the Commonwealth Entities to secure an upfront payment in exchange for granting Lehman the rights to earnings generated from eight of its debt service funds. On September 25, 2008, as a result of Lehman commencing a case in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of Title 11 of the United States Code, Lehman selected Hexagon Securities LLC to act as the Qualified Dealer under the DSD Agreements and delivered Qualified Securities as permitted under the DSD Agreement. Seven of the funds are associated with the Commonwealth PFC bonds, presented in the accompanying basic financial statements as Commonwealth appropriation bonds, and one fund is associated with the Commonwealth's general obligation bonds. On May 26, 2005 the Commonwealth Entities received the upfront payment of approximately $82.7 million, representing the present value of the projected earnings income adjusted for credit timing risks as well as an appropriate amount of compensation for Lehman.

With the upfront payment made as explained above, the Commonwealth Entities delivered to Lehman the required and scheduled debt service deposits and Lehman delivered qualified government debentures, which will mature before the next debt service payment date at an amount approximating such next debt service payment. Lehman will attempt to earn sufficient funds on the debt service deposit amounts, less its cost for the qualified government debentures, to make back the $82.7 million over time. At the same time, the Commonwealth Entities will be managing their borrowings and investments by increasing the predictability of its cash flows from earnings on its investments and not for purposes of speculation. The Commonwealth Entities acknowledge that, in exchange for the upfront payment received, they are foregoing their rights to receive investment earnings on the deposit amounts referred to above in the future and that, by accepting the upfront payment, the Commonwealth Entities have minimized the risks resulting from fluctuations in interest rates during the term of the DSD Agreements but also have foregone the possibility of receiving greater returns on such amounts from such fluctuations.

Under the DSD Agreements, the Commonwealth Entities will be exposed to the payment to Lehman of a Termination Amount, as defined in the agreement, principally upon the occurrence of redemption or a defeasance of the related bonds on or prior to the last scheduled deposit date. The amount of the Termination Amount will vary depending on various market conditions, as defined in the DSD Agreements. Under certain market conditions, the Termination Amount owed to Lehman by the Commonwealth may exceed the amount of the original upfront payment received.

The $82.7 million upfront payment received by the Commonwealth Entities was recognized as other revenue for budgetary purposes in 2005; however, under U.S. GAAP, such upfront payment was deferred and is being recognized proportionally over the future periods the Commonwealth Entities would have otherwise earned such interest earnings. The unamortized balance amounted to approximately $19 million and is a component of unearned revenue at June 30, 2015. During fiscal year 2015, approximately $3.2 million was amortized into other revenue in the Governmental Activities of the accompanying statement of activities. For additional information regarding potential claims with respect to the debt service deposit agreements, refer to Note 22.

CONFIDENTIAL                                                                 CW_STAY0010092

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(20) Derivative Instruments**

*Hedging Derivative Instruments*

The sole hedging derivative instrument at the Primary Government as of June 30, 2015 resided at COFINA, which has entered into an interest rate exchange agreement (swap) with a counterparty in connection with the issuance of $136 million LIBOR based adjustable rate bonds within the Sales Tax Revenue Bonds Series 2007A (the Adjustable Rate Bonds) maturing August 1, 2057. The Adjustable Rate Bonds expose COFINA to variability in interest payments due to changes in interest rates. Management believes that it is prudent to limit the variability of interest payments on the Adjustable Rate Bonds. To meet this objective, management entered into a $136 million interest rate swap agreement to manage fluctuations in cash flows resulting from interest rate risk. This swap effectively changes the variable rate cash flow exposure on the Adjustable Rate Bonds to fixed cash flows. Under the terms of the interest rate swap, COFINA receives variable interest rate payments equal to the interest payment on the Adjustable Rate Bonds, and makes fixed interest rate payments at 4.92% through August 1, 2057, thereby creating the equivalent of a fixed rate debt. At June 30, 2015, the credit rating of the counterparty to this swap agreement was A 1 by Standard & Poor's.

The fair value and notional amount of the derivative instrument (pay fixed interest rate swap) outstanding as of June 30, 2015, designated as cash flow hedge, was as follows (in thousands):

| Notional amount | Fair value (1) | Change in fair value from June 30, 2013 (2) | Effective date | Floating rate indicator | Maturity date | Receives | | Pays | | Counterparty credit rating Moody's/S&P |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Type | Rate | Type | Rate | |
| $ 136,000 | 53,200 | 3,330 | 7/31/2007 | LIBOR+0.93% | 8/1/2057 | Variable | 1.101% | Fixed | 4.92% | A2/A |

The fair value of the interest rate swap was estimated using the zero-coupon method. This method calculates the future net settlement payments required by the swap, assuming that the current forward rate implied by the yield curve correctly anticipates future spot interest rates. These payments are then discounted using the spot rates implied by the current yield curve for hypothetical zero coupon bonds due on the date of each future net settlement of the swaps.

The COFINA swap does not have embedded options.

*Risks on Hedging Derivative Instruments*

By using derivative financial instrument to hedge the exposure to changes in interest rates, COFINA exposes itself to interest rate risk, credit risk, and termination risk.

Credit or Counterparty Risk – Credit risk is the failure of the counterparty (or its guarantor) to perform under the terms of the derivative contract. When the fair value of a derivative contract is positive, the counterparty owes COFINA, which creates credit risk for COFINA. When the fair value of a derivative contract is negative, COFINA owes the counterparty and, therefore, does not possess credit risk. COFINA minimizes the credit risk in derivative instruments by entering into transactions with counterparties whose credit rating is acceptable under the investment policies of COFINA. As of June 30, 2015, there is no credit risk because the fair value of the derivative instrument was negative.

(Continued)

CONFIDENTIAL

CW_STAY0010093

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Interest Rate Risk – Interest rate risk is the adverse effect on the value of a financial instrument that results from a change in interest rates. COFINA is exposed to interest rate risk on its pay fixed, receive variable swap; as LIBOR decreases, COFINA's net payment on the swap increases. At the same time, interest payments on the hedged adjustable rate bonds decrease. The interest rate risk associated with interest rate swap contracts is managed by establishing and monitoring parameters that limit the types and degree of interest rate risk that may be undertaken.

Termination Risk – Termination risk is the possibility that a hedging derivative instruments unscheduled end will affect COFINA's liability strategy or will present COFINA with potentially significant unscheduled termination payments to the counterparty. COFINA or its counterparty may terminate a derivative instrument if the other party fails to perform under the terms of the contract. COFINA is at risk that the counterparty will terminate a swap at a time when COFINA owes it a termination payment. COFINA has mitigated this risk by specifying that the counterparty has the right to terminate only as a result of certain events, including a payment default by COFINA; insolvency of COFINA (or similar events); or a downgrade of COFINA's credit rating below BBB+ or Baa1. If at the time of termination, an investment derivative instrument is in a liability position, COFINA would be liable to the counterparty for a payment equal to the liability, subject to netting arrangements.

*Investment Derivative Instruments*

Collateral Posting Requirements and Contingencies – As of June 30, 2015, no collateral posting requirement applied to COFINA's derivative instrument.

In connection with the COFINA swap agreement, on July 1, 2014, Moody's issued a downgrade on the LIBOR 2007A Bonds to a rating of Ba3. On September 24, 2014, rather than terminate the Swap Agreement, COFINA and the counterparty entered into a new credit annex (the "2014 Credit Support Annex) as well as an Amendment to the ISDA Master Agreement (the "2014 ISDA Amendment) to permit COFINA to collateralize its obligations under the Swap Agreement and to amend the termination events thereunder. The impact of the new agreement was for COFINA to post $12 million in collateral to the counterparty, as well as set up a restricted account in which a portion of the collateral be deposited for the benefit of counterparty. In addition, COFINA has committed to post up to $15 million annually in additional collateral by March 15 of each year until fiscal year 2018. Over time, the maximum amount COFINA would have to post is $60 million. On January 28, 2015, COFINA posted the $15 million additional collateral due on March 31, 2015. As of June 30, 2015, the collateral amount held by the counterparty is $27 million. For further disclosures regarding subsequent events refer to Note 22.

306

(Continued)

CW_STAY0010094

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (21) Fund Balance (Deficit)

Below is the detail included in the fund balance (deficit) classifications for the governmental funds as of June 30, 2015 (in thousands):

| | General | Debt service | COFINA Special revenue | COFINA Debt service | Nonmajor governmental | Total governmental |
|---|---|---|---|---|---|---|
| Nonspendable: | | | | | | |
| Inventory | $ 988 | — | — | — | 7 | 995 |
| | 988 | — | — | — | 7 | 995 |
| Spendable: | | | | | | |
| Restricted for: | | | | | | |
| General government | 11,173 | — | — | — | — | 11,173 |
| Public housing and welfare | 40,641 | — | — | — | — | 40,641 |
| Education | 9,616 | — | — | — | — | 9,616 |
| Capital projects | — | — | — | — | 345,235 | 345,235 |
| Debt service | — | 220,541 | — | 336,433 | 234,061 | 791,035 |
| Subtotal | 61,430 | 220,541 | — | 336,433 | 579,296 | 1,197,700 |
| Committed to: | | | | | | |
| Public housing and welfare | — | — | — | — | 25,487 | 25,487 |
| Subtotal | — | — | — | — | 25,487 | 25,487 |
| Assigned to: | | | | | | |
| General government | 14,998 | — | 5,154 | — | — | 20,152 |
| Public housing and welfare | 1,180 | — | — | — | 6,539 | 7,719 |
| Economic development | 12,099 | — | — | — | — | 12,099 |
| Capital projects | — | — | — | — | 27,355 | 27,355 |
| Debt service | — | — | — | — | 90 | 90 |
| Subtotal | 28,277 | — | 5,154 | — | 33,984 | 67,415 |
| Unassigned | (2,206,019) | — | — | — | (39,823) | (2,245,842) |
| Total fund balance (deficit) | $ (2,115,324) | 220,541 | 5,154 | 336,433 | 598,951 | (954,245) |

307

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

**(22) Subsequent Events**

Subsequent events were evaluated through June 29, 2018 to determine if any such events should either be recognized or disclosed in the 2015 basic financial statements. The subsequent events disclosed below are principally those related to debt activities, including credit rating downgrade events, other revenue and/or budget related matters and fiscal events and related legislation, both local or federal, that management believes are of public interest for disclosure.

*Primary Government*

**Tax Revenue Anticipation Notes and Other Notes and Bonds Issued after Year End**

(a) 2016 Tax and Revenue Anticipation Notes (2016 TRANs)

On July 2, 2015, the Legislature approved Act No. 102 of 2015, which required SIFC, ACAA, and the Disability Insurance Bureau (SINOT) to purchase an aggregate amount of $400 million in TRANs from the Commonwealth. On August 17, 2015, the Commonwealth issued $400 million in TRANs (the 2016 TRANs) to SIFC, ACAA, and SINOT. The 2016 TRANs bore an annual interest rate of 6%. The Commonwealth paid the full amount of principal and interest due on the 2016 TRANs.

On September 6, 2016, the Commonwealth renewed the emergency "intra governmental" TRANs for fiscal year 2017, in the aggregate principal amount of $400 million with the SIFC, ACAA and SINOT, also at the interest rate of 6%. On April 28, 2017, the Commonwealth acknowledged that it would be unable to pay the principal and interest payments on the TRANs notes as they become due and entered into a forbearance agreement with SIFC, ACAA, and SINOT. The forbearance period will expire on June 30, 2018.

(b) PRIFA Bond Anticipation Notes

On June 24, 2016, the Governor signed an executive order, EO 2016 027, which suspended all obligations to transfer money to PRIFA that would be used to make payments on PRIFA BANs, as described in Note 12 (c).

**Budgetary Events and Related Legislation**

On June 30, 2016, the U.S. President signed the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), which (i) establishes an oversight board for Puerto Rico, (ii) grants a temporary stay of all creditor lawsuits and (iii) provides the Commonwealth and its component units' with both in-court and out-of-court mechanisms to restructure their debts. PROMESA seeks to provide Puerto Rico with fiscal and economic discipline through the creation of a control board, relief from creditor lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt.

The two mechanisms to adjust its debt are (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a quasi-bankruptcy proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of the U.S. Bankruptcy Code. The Commonwealth management took this into consideration given that it provides evidence to support that does not have the ability and intention to honor any guaranteed debt. In addition, PROMESA provides for a temporary stay for all creditor lawsuits. Such stay

308

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

limits the ability of creditors to pursue legal claims against the Commonwealth seeking to enforce any potential guarantee obligation.

Title IV of PROMESA contains several miscellaneous provisions, including a temporary stay of litigation related to "Liability Claims," relief from certain wage and hour laws, the establishment of a Congressional Task Force on Economic Growth in Puerto Rico (the Task Force), the requirement that the Comptroller General of the United States submit two reports to Congress regarding the public debt levels of the U.S. territories, and expansion of the federal government's small business HUBZone program in Puerto Rico.

**Significant Legislation and Other Events after Year End**

(a) *Puerto Rico Oversight, Management and Economic Stability Act*

On June 30, 2016, U.S. President signed PROMESA into law (as codified under 48 U.S.C. §§ 2101-2241). In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through, among other things: (i) the establishment of the Oversight Board, whose responsibilities include the certification of fiscal plans and budgets for the Commonwealth and its related entities; (ii) a temporary stay of all creditor lawsuits under Title IV of PROMESA; and (iii) two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a quasi-bankruptcy proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of Title 11 of the United States Code (U.S. Bankruptcy Code). Each of these elements are divided among PROMESA's seven titles, as discussed below.

(i) *Title I – Establishment of Oversight Board and Administrative Matters*

Upon PROMESA's enactment, the Oversight Board was established for Puerto Rico. *See* PROMESA § 101(b). As stated in PROMESA, "the purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." PROMESA § 101(a). On August 31, 2016, U.S. President announced the appointment the Oversight Board members. Each Oversight Board member is required to have "knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government." PROMESA § 101(f)(1). The Oversight Board was "created as an entity within the territorial government for which it was established" and is expressly not an entity of the federal government, see PROMESA § 101(c), but it was also established to act independently from the Commonwealth government, such that neither the Governor nor the Legislature may "(i) exercise any control, supervision, oversight, or review over the Oversight Board or its activities; or (ii) enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board." PROMESA § 108(a). Please refer to the language of PROMESA for a complete description of the Oversight Board and its powers.

(ii) *Title II – Fiscal Plan and Budget Certification Process and Compliance*

Title II sets forth the requirements for proposing and certifying fiscal plans and budgets for the Commonwealth and its instrumentalities. "Each fiscal plan serves as the cornerstone for structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards fiscal responsibility and access to capital markets." H.R. Rep. 114-602(I), 2016 WL

309                                                         (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

3124840, at *45 (2016); PROMESA § 201(b)(1). According to the legislative history, a fiscal plan should "provide for a sustainable level of debt, improve governance, provide for capital expenditures that promise economic growth, and respect the relative priorities that different classes of bondholders have vis-à-vis one another under Puerto Rico law." H.R. Rep. 114-602(I), 2016 WL 3124840, at *112 (2016). PROMESA section 201 sets forth the specific requirements for a fiscal plan and the process for fiscal plan approval.

Only after the Oversight Board has certified a fiscal plan may the Governor submit a fiscal year Commonwealth budget and fiscal year budgets for certain Commonwealth instrumentalities (as approved by the Oversight Board) to the Legislature. *See* PROMESA § 201(c)(1). PROMESA section 202 sets forth the specific procedures and requirements for approval of each fiscal year Commonwealth budget and Commonwealth instrumentality budgets.

In furtherance of the foregoing duties, PROMESA contains a provision that grants the Oversight Board powers to monitor compliance with certified fiscal plans and budgets and undertake certain actions, including spending reductions and the submission of recommended actions to the Governor that promote budgetary compliance. Please refer to the language of PROMESA for a complete description of the Oversight Board's powers related to fiscal plan and budgetary compliance.

(iii)   *Title III – In-Court Restructuring Process*

Title III of PROMESA establishes an in-court process for restructuring the debts of Puerto Rico and other United States territories that is modeled after the process under Chapter 9 of the U.S. Bankruptcy Code. In order to be a debtor under Title III, the territory and/or its instrumentalities must: (i) have an Oversight Board established for it or be designated a "covered entity"; (ii) have the Oversight Board issue a restructuring certification under PROMESA section 206(b); and (iii) "desire to effect a plan to adjust its debt." PROMESA § 302. The Oversight Board has sole authority to file a voluntary petition seeking protection under Title III of PROMESA. *See* PROMESA § 304(a). As of the date hereof, the Oversight Board has commenced Title III cases for the Commonwealth, COFINA, PRHTA, ERS, and PREPA, as discussed below.

In a Title III case, the Oversight Board acts as the debtor's representative and is authorized to take any actions necessary to prosecute the Title III case. *See* PROMESA § 315. Immediately upon filing the Title III petition, Bankruptcy Code section 362 (which is incorporated into Title III cases under PROMESA) applies to automatically stay substantially all litigation against the debtor (the Title III Stay). After the Title III case is commenced, the Chief Justice of the United States Supreme Court must designate a district court judge to sit by designation and preside over the Title III case. PROMESA also provides that the commencement of a Title III case "does not limit or impair the powers of a covered territory to control by legislation or otherwise the exercise of the political or governmental powers of the territory or territorial instrumentality." PROMESA § 303.

The core component of the Title III case is the confirmation of a plan of adjustment of the debts of the debtor. The Oversight Board has the exclusive authority to file and modify a plan of adjustment prior to confirmation. *See* PROMESA § 312. In order to be confirmed, a proposed plan of adjustment must meet the requirements set forth under PROMESA section 314.

310                                                          (Continued)

                                   CW_STAY0010098

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*(iv)    Title IV – Temporary Stay of Litigation, Government Reporting, and Other Miscellaneous Provisions*

Title IV of PROMESA contains several miscellaneous provisions, including a temporary stay of litigation related to "Liability Claims," relief from certain wage and hour laws, the establishment of a Congressional Task Force on Economic Growth in Puerto Rico (the Task Force), the requirement that the Comptroller General of the United States submit two reports to Congress regarding the public debt levels of the U.S. territories, and expansion of the federal government's small business HUBZone program in Puerto Rico.

Pursuant to PROMESA section 405, the enactment of PROMESA immediately and automatically imposed a temporary stay (the Title IV Stay) from June 30, 2016 (the date of PROMESA's enactment) through February 15, 2017 of all "Liability Claim" litigation commenced against the Commonwealth of Puerto Rico and its instrumentalities after December 18, 2015. *See* PROMESA § 405(d)(1)(A). A "Liability Claim" is defined as any right to payment or equitable remedy for breach of performance related to "a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights entitlements, or obligations arise from contract, statute, or any other source of law related [thereto]" for which the Commonwealth or one of its instrumentalities was the issuer, obligor, or guarantor and such liabilities were incurred prior to June 30, 2016. PROMESA § 405(a)-(b). The Title IV Stay was subject to a one-time 75-day extension by the Oversight Board or a one-time 60-day extension by the district court. On January 28, 2017, the Oversight Board extended the stay by 75 days to May 1, 2017, at which time the Title IV Stay expired. Any party subject to the Title IV Stay could have filed a motion in the United States District Court for the District of Puerto Rico seeking a relief from the Title IV Stay upon "cause shown." PROMESA § 405(e).

Title IV of PROMESA also required several federal government reports. First, PROMESA established within the legislative branch the Task Force. *See* PROMESA § 409(a). On or before December 31, 2016, the Task Force was required to file a report of findings regarding impediments in federal law and programs to Puerto Rico's economic growth and recommendations to "spur sustainable long-term economic growth." PROMESA § 409(g). A further discussion of this report is provided below.

Second, PROMESA required the U.S. Comptroller General, through the Government Accountability Office ("GAO"), to submit a report to the House and Senate by December 30, 2017 regarding: (i) the conditions that led to Puerto Rico's current level of debt; (ii) how government actions improved or impaired its financial condition; and (iii) recommendations on new fiscal actions or policies that the Commonwealth could adopt. *See* PROMESA § 410. The GAO published this report on October 2, 2017.

Third, PROMESA required the U.S. Comptroller General, through the GAO, to submit to Congress by June 30, 2017 a report on public debt of the U.S. territories. *See* PROMESA § 411. In addition to its initial report, the GAO must submit to Congress updated reports on the public debt at least once every two years. The GAO published this report on June 29, 2017.

*(v)    Title V – Infrastructure Revitalization*

Title V of PROMESA establishes the position of Revitalization Coordinator under the Oversight Board and provides a framework for infrastructure revitalization through an expedited permitting process

CONFIDENTIAL                                                                           CW_STAY0010099

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

for "critical projects" as identified by the Revitalization Coordinator. *See* PROMESA § 502(a). Under PROMESA section 502(b)(1), the Oversight Board is required to submit at least three nominees from which the Governor may appoint the Revitalization Coordinator. If the Governor does not select a Revitalization Coordinator within 10 days after receiving the nominations, the Oversight Board may appoint the Revitalization Coordinator by majority vote. *See* PROMESA § 502(b)(1)(C). On October 30, 2016, the Oversight Board submitted the names of three candidates to the Governor for potential designation as Revitalization Coordinator. On November 9, 2016, the Governor appointed Aaron Bielenberg as Revitalization Coordinator. On July 24, 2017, in consultation with the Oversight Board, the Governor appointed Noel Zamot to replace Mr. Bielenberg as Revitalization Coordinator.

Under PROMESA section 501(2), a "critical project" means "a project identified under the provisions of [Title V] and intimately related to addressing an emergency whose approval, consideration, permitting, and implementation shall be expedited and streamlined according to the statutory process provided by Act No. 76, or otherwise adopted." An "emergency" means "any event of grave problem of deterioration in the physical infrastructure for the rendering of essential services to the people, or that endangers the life, public health, or safety of the population or of a sensitive ecosystem. includ[ing] problems in the physical infrastructure for energy, water, sewer, solid waste, highways or roads, ports, telecommunications, and other similar infrastructure." PROMESA § 501(5). Any party proposing an infrastructure project may submit a proposed project to the Revitalization Coordinator for consideration as a "critical project," which submission must include the elements described under PROMESA section 503(a)(1).

Within 20 days after receiving the submission, each identified Commonwealth agency must submit to the Revitalization Coordinator its expedited permitting process for the proposed project. *See* PROMESA § 503(a)(3)(A). Within 60 days after receiving a submission, the Revitalization Coordinator must develop a "Critical Project Report" for each submitted project in consultation with the Governor and relevant Commonwealth agencies. *See* PROMESA § 503(b)(1). The Critical Project Report must thereafter be published to allow at least 30 days of public comments. *See* PROMESA § 503(b)(2). After responding to public comments, the Revitalization Coordinator then submits the Critical Project Report to the Oversight Board, which must either approve or disapprove the project. *See* PROMESA § 503(c).

*(vi)   Title VI – Consensual, Out-of-Court Debt Modification Process*

Title VI of PROMESA establishes an out-of-court process for modifying Puerto Rico's debts. Under PROMESA section 601(d), the Oversight Board is authorized to establish "pools" of bonds issued by each Puerto Rico government-related issuer based upon relative priorities. After establishing the pools, the government issuer or any bondholder or bondholder group may propose a modification to one or more series of the government issuer's bonds. If a voluntary agreement exists, the Oversight Board must issue a certification that: (i) the voluntary agreement conforms to the certified fiscal plan; (ii) if no fiscal plan has been certified, the voluntary agreement provides for a sustainable level of debt; or (iii) the voluntary agreement is limited to an extension of principal and interest payments on affected bonds for a period of one year. *See* PROMESA § 104(i). If a voluntary agreement exists, then the Oversight Board must certify the agreement as a "Qualifying Modification" by finding that either: (i) the issuer consulted with the holders of bonds in each pool prior to solicitation, all holders in each pool will be offered the same amount of consideration under the agreement, and the agreement is in the "best interest of the creditors and is feasible"; or (ii) the voluntary agreement has

312                                                                                          (Continued)

CONFIDENTIAL                                                                    CW_STAY0010100

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

been entered into by a majority of the bondholders, all holders in each pool will be offered the same amount of consideration under the agreement, and the voluntary agreement is consistent with any restructuring support agreement executed prior to the establishment of the Oversight Board. *See* PROMESA § 601(g). If the voluntary agreement is certified as a "Qualifying Modification," then the issuer must provide to the Calculation Agent, Information Agent, and Oversight Board additional information as required under PROMESA section 601(f).

Once the Oversight Board approves the voluntary agreement as a Qualifying Modification and the required information has been delivered, then the issuer, through the Information Agent, may solicit votes for bondholder approval of the Qualifying Modification. *See* PROMESA § 601(h). The Qualifying Modification will be deemed approved by bondholders if (x) of those who actually vote, at least two-thirds of the amount outstanding in each pool vote in favor of the Qualifying Modification, and (y) at least a majority of the aggregate principal amount of all bonds actually vote. *See* PROMESA § 601(j). After voting, in order for the Qualifying Modification to be conclusive and binding on all present and future bondholders:

∗ Each of the issuer's bond pools must accept the Qualifying Modification based on the voting requirements above;

∗ The Oversight Board certifies that the voting requirements are satisfied, the Qualifying Modification complies with PROMESA § 104(i), and any conditions to effectiveness of the Qualifying Modification have been waived; and

Rejecting, non-consenting secured lenders must retain their lien or receive value equal to the lesser of the amount of their claim or the value of the collateral securing such claim. *See* PROMESA § 601(m).

Finally, the United States District Court for the District of Puerto Rico must enter an order approving the Qualifying Modification and vesting in the issuer all property free and clear of claims in respect of any bonds. *See* PROMESA § 601(n).

The Title VI process is currently being implemented to restructure the debts of the GDB. The GDB Title VI process is discussed below under *Component Units – GDB*.

(vii) *Title VII – Sense of Congress*

Title VII of PROMESA sets forth the sense of Congress that "any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States."

(b) *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Financial Emergency and Fiscal Responsibility of Puerto Rico Act and Related Executive Orders*

On April 6, 2016, the Commonwealth enacted Act No. 21 of 2016, known as the Puerto Rico Emergency Moratorium and Rehabilitation Act (as amended, the Moratorium Act). Pursuant to the Moratorium Act, the Governor issued a series of executive orders declaring an emergency period, a moratorium and various other measures with respect to certain obligations of the Commonwealth of Puerto Rico and several of its instrumentalities. Pursuant to these executive orders, certain Commonwealth entities have

313

(Continued)

CW_STAY0010101

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

either: (i) not made debt service payments, (ii) made debt service payments with funds on deposit with the trustees of their bonds, and/or (iii) not received or transferred certain revenues. Such executive orders also placed significant restrictions on the disbursement of funds deposited at GDB and suspended the disbursement of loans by GDB.

On January 29, 2017, the Governor signed into law Act No. 5 of 2017, known as the Puerto Rico Fiscal Responsibility and Financial Emergency Act (as amended, Act No. 5), which repealed certain provisions of the Moratorium Act and authorized additional emergency measures. Pursuant to Act No. 5, however, the executive orders issued under the Moratorium Act would continue in effect until amended, rescinded or superseded. The emergency period under Act No. 5 will expire on June 30, 2018, unless extended by the Governor. Some additional powers provided to the Governor through Act No. 5 include the authority to: (i) exercise receivership powers to rectify the financial emergency, (ii) exercise general supervisory control over the functions and activities of all government entities within the Executive Branch, and (iii) issue executive orders to implement and enforce compliance with Act No. 5.

The Commonwealth has not included appropriations for the payment of debt service in its General Fund budget since fiscal year 2017, as the payment of such obligations has been suspended pursuant to the Moratorium Act and Act No. 5.

*(c)  Retention by the Government of Tax Revenues Conditionally Allocated to Certain Public Corporations and Priority of Payment Provisions*

On December 1, 2015, the Governor signed Executive Order No. 46 (Executive Order No. 46). Executive Order No. 46 ordered the Secretary of Treasury to retain certain available resources of the Commonwealth in light of revised revenue estimates for fiscal year 2016 and the Commonwealth's deteriorating liquidity situation. Pursuant to such executive order, the Secretary of Treasury retained revenues conditionally allocated to PRHTA, PRIFA, PRCCDA, and PRMBA for the payment of debt service on their bonds during fiscal year 2016 and segregated such funds for the payment of debt service on the Commonwealth's public debt. Since fiscal year 2017, such revenues are being retained by the Commonwealth pursuant to the Moratorium Act and Act No. 5 (discussed above) for the payment of essential government services.

*(d)  Sales and Use Tax*

On May 29, 2015, the Commonwealth enacted Act No. 72 of 2015, which, among other things, increased the Commonwealth's sales and use tax (SUT) by 4.5%, in addition to the then applicable 7% SUT, effective July 1, 2015 and subject to certain exceptions.

*(e)  Bonds in Non- Payment*

*PFC Bonds*

On July 15, 2015, PFC filed a notice with Electronic Municipal Market Access (EMMA) indicating that the Legislature had not included in the approved budget for fiscal year 2016 the funds necessary to pay principal and interest on all outstanding PFC bonds. Such appropriation is the sole source of payment of principal and interest on PFC bonds. The first payment of debt service on PFC bonds for fiscal year 2016 came due on August 3, 2015, on which date PFC made a partial payment of interest in the amount of $628,000 (of the approximately $58 million payment due on that date) from funds held by PFC representing funds remaining from prior legislative appropriations. From August 3, 2015 through May 15,

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

2018, PFC missed additional debt payments on its bonds in the aggregate amount of approximately $262.6 million.

*General Obligation (GO) Bonds*

On July 1, 2016, approximately $1.1 billion of principal and interest payments were due on the Commonwealth's GO bonds. Of this amount, the Commonwealth paid approximately $351.9 million (leaving approximately $778.8 million unpaid). The $351.9 million payment consisted of funds held in escrow accounts ($314.4 million in principal amounts plus $37.5 million from existing capitalized interest thereon). From August 1, 2016 through May 15, 2018, the Commonwealth missed additional debt payments on its GO bonds in the aggregate amount of approximately $1.5 billion.

*PBA Bonds*

On July 1, 2016, of the approximately $186.9 million of debt service due on the PBA outstanding bonds (consisting of approximately $86.1 million in principal and $100.9 million in interest), all was paid except principal of $25.2 million. Of the outstanding bonds debt service requirements due from August 1, 2016 through May 15, 2018, PBA missed additional outstanding debt services of approximately $373.9 million, except principal of $3.5 million and interest of $56.6 million which were paid.

*PRIFA Bonds*

On January 1, 2016, of the approximately $35.9 million debt service (all interest) due on the PRIFA bonds, almost all remained unpaid except $14.4 thousand After January 1, 2016, PRIFA has missed all additional outstanding debt services due of approximately $324.5 million, except principal of $100 thousand and interest of $1.1 million.

*Port of the Americas (PAA) Bond Purchase Agreement with GDB*

On August 1, 2016, of the approximately $28.7 million debt service due on the PAA Bond Purchase Agreement with GDB (consisting of approximately $7.8 million in principal and $20.9 million in interest), all remained unpaid. On August 1, 2017, of the approximately $29.3 million debt service due on the PAA Bond Purchase Agreement with GDB (consisting of approximately $7.8 million in principal and $21.5 million in interest), all remained unpaid.

(f) *Laws to Address Fiscal Crisis and Economic Recovery*

Act No. 2 of January 18, 2017 (Act No. 2 of 2017), the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, was enacted to expand FAFAA's powers and authority (as initially established under the Moratorium Act) so that FAFAA has the sole responsibility to negotiate, restructure, and reach agreements with creditors on all or part of the public debt or any other debt issued by any Commonwealth entity. FAFAA is also responsible for the collaboration, communication, and cooperation efforts between the Commonwealth and the Oversight Board under PROMESA. In addition, Act No. 2 of 2017 established FAFAA as the Commonwealth entity responsible for carrying out the roles inherited from the GDB along with additional duties and powers, which include, among other things: (i) oversight of the Commonwealth budget; (ii) an administrative presence on every board or committee where the GDB president is currently a member; (iii) authority to conduct audits and investigations; and (iv) authority to freeze budgetary items, appoint trustees, redistribute human resources, and change procedures.

315

(Continued)

CW_STAY0010103

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Act No. 3 of January 23, 2017 (Act No. 3 of 2017), the Fiscal Crisis Management Act, was enacted to extend most of the fiscal measures that had been adopted under Act No. 66 of 2014 through July 1, 2021, including a 10-year extension of the excise tax on acquisitions by foreign corporations under Act No. 154.

Act No. 4 of January 26, 2017 (Act No. 4 of 2017) introduced several human-capital and labor reforms to improve Puerto Rico's competitiveness and foster economic development, while relaxing legal requirements for hiring and retaining employees. Specifically, Act 4 No. of 2017 (i) established lower accrual rates for both vacation days and sick leave, (ii) approximately doubled work hours required for accrual of Christmas bonuses, (iii) placed a $600 cap on Christmas bonuses, and (iv) reduced severance pay for unjust termination, among other reforms.

Act No. 5 of January 29, 2017 (Act No. 5 of 2017), the Puerto Rico Fiscal Responsibility and Financial Emergency Act, was enacted to maintain the moratorium on debt payment existing under the Moratorium Act; however, it allowed the Commonwealth to segregate funds that would eventually be used to fund the payment of public debt. Act No. 5 of 2017 states that the Governor may pay debt service as long as the Commonwealth is able to continue to fund essential services, such as the health, safety, and well-being of the people of Puerto Rico, including providing for their education and assistance to residents. Act No. 5 of 2017 continued to declare the Commonwealth to be in a state of emergency and increased the Governor's powers to manage the Commonwealth's finances. The emergency period under Act No. 5 of 2017 was set to expire on May 1, 2017 to coincide with the expiration of the Title IV Stay (as discussed above), unless extended by an additional three months by executive order. On April 30, 2017, the Governor issued executive order OE-2017-031, which extended to the Act No. 5 of 2017 emergency period to August 1, 2017. On July 19, 2017, the Legislature enacted Act No. 46 of 2017 (Act No. 46 of 2017), which further extended the Act No. 5 of 2017 emergency period through December 31, 2017. Act No. 46 of 2017 allowed the Governor to sign executive orders to extend the emergency period for successive periods of six months as long as the Oversight Board remains established for Puerto Rico under PROMESA.

Act No. 8 of February 4, 2017 (Act No. 8 of 2017), known as the Single Employer Act, was enacted to unite public agencies to establish the government as a single employer. This legislation is designed to facilitate employee transfers between the Commonwealth's 118 agencies, which prior to the enactment of Act No. 8 of 2017 signature operated as separate employers, with different administrative divisions and wages for the same occupations.

Act No. 9 of February 8, 2017 (Act No. 9 of 2017) and Act No. 14 of February 21, 2017 (Act No. 14 of 2017) introduced a series of tax amendments to provide incentives to professionals to stay in Puerto Rico by promoting and facilitating the creation and management of retirement plans and other trusts to promote financial stability and job creation.

Act No. 26 of April 29, 2017 (Act No. 26 of 2017), known as the Fiscal Plan Compliance Act, introduced a series of changes and freezes to existing public employees' labor bargaining agreements, reductions and eliminations to previously granted public employee benefits, and other fiscal control measures geared toward compliance with the government expenditures cuts and savings.

Act No. 106 of August 23, 2017 (Act No. 106 of 2017), the Act to Guarantee the Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants, reformed the

316 (Continued)

CW_STAY0010104

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Commonwealth's pensions by replacing the governing boards of the Retirement Systems with a single Retirement Board of the Commonwealth of Puerto Rico (Retirement Board) and established a separate "Account for the Payment of Accrued Pensions" to implement a "pay-as-you-go" (PayGo) method for the Retirement Systems. Act No. 106 of 2017 created the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system.

*(g)* *Oversight Board Commencement of Title III Cases*

On May 1, 2017, the Title IV Stay expired, permitting the substantial litigation brought by bondholders and other creditors against the Commonwealth and its instrumentalities to resume. On May 3, 2017, the Oversight Board commenced a Title III case at the request of the Commonwealth by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico (the Title III Court). On May 5, 2017, the Oversight Board commenced a Title III case at the request of COFINA by filing a similar petition for relief under Title III of PROMESA. On May 11, 2017, United States Supreme Court Chief Justice John Roberts designated United States District Judge Laura Taylor Swain as the presiding judge in the Title III cases.

On May 21, 2017, the Oversight Board commenced Title III cases at the request of PRHTA and ERS by filing similar petitions for relief under Title III of PROMESA. On July 3, 2017, the Oversight Board commenced a Title III case at the request of PREPA by filing a similar petition for relief under Title III of PROMESA. All of the foregoing Title III cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 17-3283-LTS in the United States District Court for the District of Puerto Rico.

The Title III cases were commenced in part due to the May 1, 2017 expiration of the Title IV Stay. Title III of PROMESA incorporates the automatic stay provisions of Bankruptcy Code section 362 and 922, which are made applicable to the Title III cases pursuant to PROMESA section 301(a). Accordingly, upon the filing of the Title III cases, the Title III Stay immediately went into effect to stay creditor litigation.

A discussion of the events in the Title III cases is provided below. For information on the civil actions filed in connection with the Title III cases, refer to the legal contingencies discussion in Note 16.

*(h)* *Mediation in the Title III Cases*

On June 23, 2017, Title III Court appointed a team of five federal judges to facilitate settlement negotiations of any and all issues and proceedings arising in the Title III cases. Mediation of various disputes relating to the Title III cases remains ongoing.

*(i)* *Key Contested Motions in the Title III Cases*

On August 7, 2017, a group of GO bondholders led by Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, Aurelius) filed a motion to dismiss the Title III petitions. In the motion, Aurelius argues that the appointment of the Oversight Board members violated the "Appointments Clause" of the United States Constitution, which requires that "principal officers" of the United States be appointed by the President and confirmed by the Senate. Oral argument took place on January 10, 2018. The court took the matter under submission and, as of the date hereof, has yet to issue a decision.

(Continued)

CONFIDENTIAL

CW_STAY0010105

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*(j)   Federal Tax Reform*

On December 22, 2017, U.S. President signed into law the U.S. Tax Cuts and Jobs Act. The law enacts a deemed repatriation of overseas profits at a rate of 15.5% for cash and equivalents and 8% for reinvested earnings. The law introduces a territorial tax system, under which only domestic earnings are subject to tax. Companies with over $500 million in annual gross receipts are subject to the base erosion anti-abuse tax, which is designed to counteract base erosion and profit shifting. The law, also, alters the treatment of intangible property that is held abroad by imposing an additional tax on foreign earnings in excess of a standard rate of return that are below the effective tax rate for intangibles held domestically. The Commonwealth is considered a foreign territory under this law. The Commonwealth's officials opposed the approval of this law under the belief that it might have a negative impact on the island's future economic development.

**Health Insurance Administration**

On October 8, 2015, Act No. 172 was approved, which seeks to amend PRHIA's enabling act in order to authorize PRHIA to incur additional indebtedness, including the issuance of bonds, for an amount up to $400 million. The objective of this Act is to use the proceeds from the new indebtedness to substantially repay the amounts mentioned above. However, there are no assurances that even with the enactment of this legislation that PRHIA will be able to obtain such financing.

On January 1, 2016, PRHIA's contracted insurers under the Government Health Plan (GHPs) management care organization model (MCO) model will be subject to an annual fee under section 9010 of the Affordable Care Act (ACA). For each contracted MCO, the annual fee will be allocated based on the ratio of the amount of the entity's net premiums written during the preceding calendar year to the amount of health insurance for any U.S. health risk that is written during the preceding calendar year. Once this fee is paid as required by ACA, the PRHIA will reimburse such fee to each contracted MCO.

**Bonds Credit Rating Downgrades**

After a series of credit downgrades during fiscal year 2015, on June 29 and July 1, 2015, all three credit rating agencies further downgraded the Puerto Rico bonds given the likelihood of a default or a distressed exchange. Soon after July 1, 2016 S&P downgraded the Commonwealth general obligation bonds, PRIFA's Special Tax Revenue Bonds and the PBA bonds, to the lowest level D rating, while Fitch did the same with the the Commonwealth general obligation bonds and the PBA bonds. On April 6, 2017, Moody's downgraded PRIFA's Special Tax Revenue Bonds and the ERS bonds to a level C rating from its previous ratings of Ca and Ca, respectively. On that same date, Moody's reaffirmed the Caa3 rating on the Commonwealth's GO bonds. On June 7, 2017, S&P downgraded COFINA's senior and junior lien bonds to the default rating of D.

**Component Units**

On September 30, 2016, the Oversight Board designated the initial Commonwealth's component units subject to the PROMESA. These entities include, among others, GDB, PRASA, UPR, PREPA, PRHTA, and SIFC.

(Continued)

CONFIDENTIAL

CW_STAY0010106

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Further specific subsequent events for major discretely presented component units follow:

*(a)* *GDB*

On December 1, 2015, GDB met its scheduled principal and interest debt service payments on its notes, including the payment of $267 million of principal on outstanding GDB notes guaranteed by the Commonwealth.

On June 29, 2015, CRIM filed suit requesting that GDB execute a deed of trust pursuant to Puerto Rico law. CRIM also stopped transferring collected revenue to GDB until the deed of trust was executed. GDB opposed CRIM's suit asserting that the law already provided a statutory trust and, thus, there was no need for a deed of trust as requested by CRIM. On October 23, 2015, the parties announced that a settlement had been reached, that a deed of trust would be executed and that new investment guidelines for the municipalities' funds would be approved and applied thereon. On November 2, 2015, the parties executed the deed of trust and on November 4, 2015, a judgment was entered by the Court ending the litigation. However, upon the imposition of restrictions on the withdrawal of funds deposited at GDB under the Moratorium Act, CRIM stopped transferring collected revenue to GDB.

*GDB Restructuring Support Agreement and Title VI Process*

On May 15, 2017, the Governor announced that FAFAA and the GDB entered into the GDB RSA, with a significant portion of the GDB's major stakeholders holding more than $2.45 billion in claims against GDB, including more than 300 on island bondholders, 50 on island credit unions, and an ad hoc group of GDB bondholders, which holds more than $1 billion of GDB's public bonds. The GDB RSA contemplates a consensual restructuring of certain of GDB's financial indebtedness through a Title VI proceeding under PROMESA. On April 6, 2018, FAFAA, GDB and certain of GDB's financial creditors entered into a fourth amendment to the GDB RSA. The GDB RSA, as amended, is consistent with the underlying strategy of the New GDB Fiscal Plan, namely providing for a transaction resulting in an orderly wind-down of GDB's operations. The GDB RSA also sets forth the parameters for a proposed GDB Title VI Plan under which distributable cash flow would be allocated among GDB's various financial creditors and provides greater clarity as to how GDB's operations would be wound down (the GDB Title VI Plan).

The proposed GDB Title VI Plan contemplated by the GDB RSA provides for certain GDB creditors – consisting primarily of holders of GDB public bonds and deposit claims held by certain municipalities of the Commonwealth and certain municipal and nonpublic entities – to exchange their claims against GDB at a discount for new bonds (the New Bonds). If the GDB Title VI Plan is approved, such GDB creditors will receive New Bonds, and their claims, valued at full face value but without accrued interest, will be exchanged for New Bonds at an "Upfront Exchange Ratio" of 55 The New Bonds will be issued by a newly formed special purpose instrumentality created pursuant to statute (the Issuer).

(Continued)

CONFIDENTIAL

CW_STAY0010107

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Pursuant to Act No. 109 of 2017 (Act No. 109 of 2017), effective as of the closing date of the Qualifying Modification, the balance of liabilities owed between any government entity and GDB may be automatically determined by applying the outstanding balance of any deposit of such entity against the outstanding balance of any loan of such entity with GDB in a manner consistent with the Qualifying Modification. Furthermore, Act No. 109 of 2017 provides that all transactions effected pursuant thereto are valid and binding with respect to all government entities and that, other than as expressly provided therein or in the transaction documents, no government entity has any further rights or claims against GDB, the new issuer or the Public Entity Trust based, in whole or in part, on facts existing or occurring on or prior to the closing of the Qualifying Modification. Upon the closing of the Qualifying Modification, government entities are deemed to forever waive, release and discharge GDB, the new issuer and the Public Entity Trust from any and all such claims.

The assets of the Public Entity Trust consist of claims against the Commonwealth for loans with an outstanding principal balance of approximately $905 million to be asserted by the Public Entity Trust in the Commonwealth's Title III cases. The Public Entity Trust will be structured to provide priority treatment for claims arising from deposits of certain federal funds with GDB. As with the assets securing the New Bonds, certain assets to be placed in the Public Entity Trust are expressly subject to further diligence and recategorization. The GDB RSA also requires the Commonwealth's Governmental and Business-Type entities to net their debts with GDB against their deposits and investments also held by GDB.

On June 30, 2017, FAFAA and GDB submitted the GDB RSA to the Oversight Board for its preliminary approval, including a request that the GDB fiscal plan, dated April 28, 2017, be amended. On July 12, 2017, the Oversight Board authorized GDB to pursue a restructuring of its debts under Title VI of PROMESA and conditionally certified the GDB RSA as a Qualified Modification under Title VI of PROMESA. On August 1, 2017, the Oversight Board certified a revised GDB fiscal plan. On August 24, 2017, the Governor signed into law the Government Development Bank for Puerto Rico Debt Restructuring Act, which established as public policy the Commonwealth's support for the GDB RSA and enabled the GDB to execute the provisions of the GDB RSA.

On October 20, 2017, FAFAA and GDB announced that the parties agreed to a 60-day extension of the milestones under the GDB RSA.

On April 6, 2018, FAFAA, GDB and certain of GDB's financial creditors entered into the fourth amendment to the GDB RSA, to, among other things: (i) further refine and restructure the terms of the Qualifying Modification, including simplifying the overall transaction structure, (ii) provide additional relief to municipalities as they recover from Hurricanes Irma and Maria and (iii) ensure that the Issuer will receive additional assets in the restructuring.

In addition, under the amendment to the GDB RSA, FAFAA, GDB and the parties agreed to an extension of the milestones, such that the current milestones include:

* completing the solicitation of the Qualifying Modification by June 8, 2018;

* obtaining a District Court order approving the Qualifying Modification by June 28, 2018; and

    causing the Qualifying Modification to become effective by July 28, 2018.

320                                                                      (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

It is anticipated that these milestones will need to be further modified by agreement among the parties. On April 25, 2018, FAFAA and GDB resubmitted the GDB RSA, as amended by the four amendments thereto, to the Oversight Board for recertification. On May 8, 2018, the Oversight Board recertified the GDB RSA as compliant with the GDB fiscal plan dated April 20, 2018, and certified the GDB RSA as a Qualifying Modification under section 601 of PROMESA.

*Challenges to the GDB RSA*

*Municipality of San Juan v. Government Development Bank et al.*

On July 26, 2017, the Municipality of San Juan (San Juan) filed a complaint in the United States District Court for the District of Puerto Rico seeking declaratory judgment and injunctive relief against the Oversight Board, GDB, and FAFAA. In its original complaint, San Juan sought, among other things, (i) a declaratory judgment that the GDB RSA is invalid for failure to comply with PROMESA's voting pool requirements and that the treatment of certain purported trust funds in the GDBRSA violates PROMESA; and (ii) a permanent injunction against the Oversight Board from certifying a GDB RSA that does not provide a separate voting pool for municipal depositors with set-off rights or contemplates use of purported trust funds for the benefit of non-municipal creditors.

On August 25, 2017, San Juan filed a motion seeking a preliminary injunction to enjoin GDB and FAFAA from implementing the GDB RSA and requesting an expedited briefing schedule. On September 11, 2017, the District Court denied San Juan's request for a preliminary injunction. On October 27, 2017, the District Court granted motions from seven other municipalities – specifically, the municipalities of Juana Díaz, Cabo Rojo, Hormigueros, San Germán, Luquillo, San Lorenzo and Mayaguez – to intervene in this action. These other municipalities filed intervenor complaints alleging the same causes of action San Juan asserted in its original complaint and seeking the same relief sought by San Juan.

On December 1, 2017, San Juan filed an amended complaint seeking declaratory judgment, damages and injunctive relief. San Juan's core allegations and legal theories largely mirror those in the original complaint, but also include allegations that (a) the provisions of Act No. 109 of 2017 that limit the ability of government entities to challenge the GDB RSA are preempted by PROMESA, (b) GDB's refusal to disburse certain monies to the municipality for the provision of essential services is unlawful, (c) GDB has breached fiduciary duties and contractual provisions of a deed of trust with respect to certain municipal funds, and (d) the District Court should impose a constructive trust in favor of the municipality with respect to approximately $83.3 million of funds held in escrow accounts at GDB. On January 8, 2018, GDB and FAFAA, and the Oversight Board filed motions to dismiss the case, arguing, among other things, lack of standing, lack of ripeness, and that San Juan's causes of action (including all of the intervening municipalities' claims) fail under applicable law. On January 25, 2018, in response to San Juan's consent motion for an extension of time to respond to the defendants' motions to dismiss, the District Court ordered a briefing schedule, setting a March 2, 2018 deadline for any response to the motions to dismiss, and a March 30, 2018 deadline for any replies in support of the motions to dismiss. On April 9, 2018, the Municipality of San Juan filed a motion requesting that the pending motions to dismiss be held in abeyance pending its review of the fourth amendment to the GDB RSA to determine the amendment's impact on San Juan's claims. On April 17, 2018, GDB filed a response seeking to stay the action in its entirety. On April 18, 2018, the District Court stayed the action in its entirety.

321                                                        (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*Municipality of Caguas v. Government Development Bank et al.*

On July 17, 2017, the Municipality of Caguas (Caguas) filed a complaint in the United States District Court for the District of Puerto Rico seeking declaratory, equitable, and injunctive relief against GDB, FAFAA, the Municipal Revenue Collection Center, and certain officers thereof. Caguas sought declaratory judgment and injunctive relief to prohibit GDB and FAFAA from implementing the GDB RSA on the grounds that it violates PROMESA, is contrary to other applicable law, and/or is unconstitutional. In particular, Caguas alleged, among other things, that certain municipal deposits designated as "Participating Bond Claims" in the GDB RSA are not "Bonds" under PROMESA and thus may not be altered under Title VI of PROMESA. GDB moved to dismiss the case, arguing, among other things, that the municipality lacks standing to sue pursuant to Article 703 of the GDB Restructuring Act, which provides that no Puerto Rico government entity will have authority or standing to challenge the GDB debt restructuring transactions. GDB also argued in its motion to dismiss that the municipality's claims are not ripe because they depend on uncertain and contingent events. On October 30, 2017, Caguas filed a Notice of Voluntary Dismissal without prejudice of its claim. The court entered judgment dismissing the complaint without prejudice on October 31, 2017.

**(b) PRHTA**

All the lines of credit with GDB expiring on August 31, 2014 and January 31, 2015, were extended through January 31, 2016, as approved by GDB's Board of Directors. As of the date hereof, no further extensions have been made on these lines of credit, which are considered in default.

Effective July 1, 2015, the electronic toll system is administered by a new operator with a new contract for five years ending on July 1, 2019. This agreement decreased the toll operation expense by approximately $10.0 million per year.

On September 2, 2015, S&P further downgraded the rating on PRHTA's bonds to CC from CCC+. These credit rating downgrades could result in the acceleration of certain PRHTA obligations or the termination of certain credit and liquidity facilities that support certain PRHTA obligations. In addition, the interest rates on certain bonds and notes will increase as a result of the credit downgrades, to rates ranging from 10% to 12%. Currently, the ratings on these bonds have remained unaltered, except for the 1998 Resolution Subordinated Series Bonds, which were lowered to D during July 2016. PRHTA had approximately $15 million for debt service reserve held at GDB, such funds are not available to make the debt service due.

On December 1, 2015, the Governor signed executive order EO 2015 46, which provides that the Commonwealth will begin to redirect certain revenues in light of liquidity conditions. The revenue that has been used to pay debt service of PRHTA bonds will be retained by the Commonwealth.

On April 19, 2016, PRHTA entered into an amendment of its highway tolls concessionaire agreement to extend the original term to ten additional years and to create five bi-directional tolling points on PR 5 and PR 22 highways. PRHTA received an upfront concession fee payment of $100 million, from which it used to pay $18.2 million of PRHTA's current debts and $79.8 million of Commonwealth debt. Also, pursuant to this amendment, PRHTA will receive an additional $15 million on the earlier of the bi-directional tolls commencement date or June 30, 2017.

(Continued)

CONFIDENTIAL

CW_STAY0010110

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On July 1, 2016, the trustee of PRHTA's 1998 Resolution Subordinated Series Bonds notified to PRHTA that it failed to make a portion of the principal and interest payment to the trustee on July 1, 2016 and that a default under the trust agreement constitutes an event of default under the 1998 Resolution Subordinated Bonds Trust Agreement. As such, PRHTA is in default on this obligation. Similar defaults subsequently occurred on February 1, 2017 and July 1, 2017. The trustee is not seeking to collect or recover any indebtedness from, enforce any judgment against, obtain possession of, or exercise control over, any property of or from, the Commonwealth or any of its instrumentalities, including PRHTA, or to exercise any act that is stayed by PROMESA, the Moratorium Act or any executive orders related thereto.

On May 21, 2017, the Oversight Board commenced a Title III case at the request of PRHTA in the United Stated District Court for the District of Puerto Rico by filing a petition for relief for PRHTA under Title III of PROMESA.

On June 30, 2017, the Oversight Board approved and certified PRHTA's Budget for the fiscal year 2018.

On July 3, 2017, the trustee of PRHTA notified PRHTA that it failed to make payment on principal and interest amounting to approximately $107.2 million and $116.9 million, respectively, under the 1968 and 1998 Bond Resolutions. Of the total amount defaulted by PRHTA approximately $76.5 million and $66.7 million of principal and interest, respectively, was paid by the insurance company under the financial guarantee insurance policy.

During September 2017, Hurricanes Irma and Maria struck the island of Puerto Rico causing widespread damages throughout the island. At the date of the financial statements, PRHTA's management is in the process of determining the amount of damages suffered by PRHTA's roads, bridges, mass transportation system and other capital assets. PRHTA's management has been unable to determine the amount of damages at the date of the financial statements but a preliminary assessment of the physical damages to its roads and bridges amounts to approximately $437 million. PRHTA is in the process of assessing the physical damages suffered by its urban train system. In addition, Hurricane Maria caused an interruption in PRHTA's electronic toll system and train operation resulting in a loss of revenue. PRHTA has insurance policies in force at the time of both hurricanes and expects to recover part of such damages with assistance to be provided by Federal Emergency Management Agency (FEMA).

On April 20, 2018 the Oversight Board approved a new fiscal plan to provide a roadmap for transforming not only the PRHTA, but also infrastructure across Puerto Rico to catalyze economic growth. PRHTA has four objectives aligned with this goal: (a) transit security and safety projects, (b) improvement of existing transportation infrastructure, (c) completing highway systems, and (d) traffic reduction.

*(c)* *PREPA*

*Forbearance Agreements*

On August 14, 2014, PREPA entered into certain forbearance agreements (collectively, the Forbearance Agreements) with certain insurers (the Monoline Bond Insurers) and certain beneficiary owners of Power Revenue Bonds (the Ad Hoc Group of PREPA Bondholders), banks that provide fuel lines of credit (collectively, the Forbearing Lenders), and the GDB (collectively, the Forbearing Creditors). As provided in the Forbearance Agreements, the Forbearing Creditors agreed not to exercise certain rights and remedies under their financing agreements. PREPA also agreed to prepare a new business plan, 13-week cash flows and a recovery plan that would be acceptable to the Forbearing Creditors.

323                                                                      (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

The Forbearance Agreements were scheduled to terminate originally on or before March 31, 2015, but were extended on numerous occasions, most recently through November 5, 2015. The Forbearance Agreements expired on November 5, 2015, but the agreement of the Forbearing Creditors to refrain from exercising certain rights and remedies was extended under the PREPA RSA.

Under the Forbearance Agreements, as extended and continued under the PREPA RSA, PREPA's obligations to pay any and all principal and interest payments on the Power Revenue Bonds continued. The Forbearing Creaditors consented to an amendment to the Trust Agreement (the Trust Agreement Amendment) permitting PREPA not to make transfers to the Revenue Fund or the Sinking Fund pursuant to sections 506 and 507 of the Trust Agreement while the Trust Agreement Amendment, as extended and continued under the PREPA RSA, remained in effect. PREPA has not made monthly cash deposits into the Sinking Fund since July 2014 but has paid all principal and interest payments due on the Bonds since that time.

Under the Forbearance Agreements, as extended and continued under the PREPA RSA, PREPA was also permitted to delay making certain payments that became due to the Fuel Line Lenders in July and August 2014.

In order to address the PREPA's liquidity challenges, the Trust Agreement Amendment permitted PREPA to use approximately $280 million held in its construction fund for payment of current expenses in addition to capital improvements. The Amendment also provided for an increase in the thresholds required for the exercise of remedies under the Trust Agreement.

In connection with the continued implementation of the PREPA RSA, the Trust Agreement was again amended to allow for the issuance of $130.7 million in Bonds to the Monoline Bond Insurers (the 2015A Bonds) that matured on January 1, 2016. On December 15, 2015, PREPA defeased the outstanding principal and interest amounts due on the 2015A Bonds, and the 2015A Bonds were paid in full on January 4, 2016 in accordance with their terms.

On July 1, 2015, PREPA paid, as required by the Forbearance Agreement, $415.8 million to satisfy the principal and interest payments on the bonds due on that date. This payment was funded with moneys in the 1974 Sinking Fund, including reserves, and a $153 million transfer from PREPA's General Fund.

On July 31, 2015, pursuant to the Trust Agreement and as agreed with Forbearing Creditors, PREPA issued Power Revenue Bonds Series 2015 A, in a par amount of $130.7 million, to be used as working capital. The Series 2015 A was bought in its entirety by current bond insurers, and the maturity date of this issue was January 1, 2016.

In accordance with the terms of the Series 2015A bonds, PREPA made several mandatory redemption payments prior to maturity. On December 15, 2015, PREPA deposited $103.5 million in escrow to satisfy the remaining principal and interest requirements on the Series 2015 A Bonds, which deposit was funded by $100.9 million from PREPA's self insurance fund and $2.6 million from PREPA's General Fund. These amounts were paid to holders of the 2015 A Bonds on January 4, 2016 in accordance with their terms.

On January 4, 2016, PREPA paid $198 million, to satisfy the interest payments on its other outstanding Bonds due on that date. This payment was made with funds from moneys in the 1974 Sinking Fund, and a $171 million contribution from the General Fund.

(Continued)

CONFIDENTIAL                    CW_STAY0010112

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On July 1, 2016, PREPA paid $416 million to satisfy the principal and interest payments on its Bonds due on that date. This payment was made with funds from the Sinking Fund, approximately $264 million in proceeds from the sale of the 2016 CDE Bonds (referred to below) to certain Forbearing Creditors and a $146.8 million contribution from the General Fund.

On January 3, 2017, PREPA paid $197.7 million, to satisfy the interest payments on its other outstanding Bonds due on that date. This payment was made with a $194.4 million contribution from the General Fund.

PREPA did not make the principal and interest payments due on the Bonds on July 3, 2017 and January 1, 2018.

*Agreements in Principle with Certain Creditors*

On September 2, 2015, PREPA announced an agreement in principle regarding the economic terms of a restructuring with the Ad Hoc Group of Bondholders that were Forbearing Creditors (the Ad Hoc Group Agreement) and which group held, at that time, approximately 35% in principal amount of the outstanding Bonds, which agreement was incorporated into the PREPA RSA, as defined below. On September 22, 2015, PREPA announced an agreement in principle regarding economic terms with its Forbearing Lenders (the Fuel Line Agreement).

Under the extensions to the Forbearance Agreements with the Forbearing Lenders executed on September 22, 2015, PREPA agreed to work collaboratively and in good faith with the Forbearing Lenders to reach agreement on a recovery plan incorporating these terms. The Fuel Line Agreement was included in the PREPA RSA.

*Restructuring Support Agreement*

On November 5, 2015, PREPA announced its entry into a restructuring support agreement (the Initial PREPA RSA) with both the Ad Hoc Group of PREPA Bondholders (representing at that time approximately 40% in principal amount of the outstanding Bonds) and the Forbearing Lenders setting forth the agreed upon terms of PREPA's recovery plan, which terms were amended to extend the milestone dates therein on numerous occasions. On December 23, 2015, certain of the Monoline Bond Insurers along with the Ad Hoc Group of PREPA Bondholders (representing together at that time approximately 66% in principal amount of the outstanding Bonds), the Forbearing Lenders and GDB (the Supporting Creditors), all signed an amended and restated version of the Initial PREPA RSA (the A&R PREPA RSA).

On January 23, 2016, the A&R PREPA RSA terminated when the PREPA Revitalization Act was not enacted into law and the Ad Hoc Group of PREPA Bondholders did not agree to PREPA's request to extend the related milestone. PREPA continued to engage in discussions with the Ad Hoc Group of PREPA Bondholders and the other Supporting Creditors regarding a potential extension of the A&R PREPA RSA.

On January 23, 2016, certain of the Forbearing Lenders agreed to enter into a short form forbearance agreement by which they agreed to forbear from exercising enforcement rights against PREPA under the applicable fuel line agreements through February 12, 2016.

(Continued)

CONFIDENTIAL                                                        CW_STAY0010113

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On January 27, 2016, PREPA and the Supporting Creditors executed a revised restructuring support agreement (the PREPA RSA) that was substantially the same as the A&R PREPA RSA, with minor adjustments to address delays in legislative consideration of the PREPA Revitalization Act.

Starting on June 29, 2016, PREPA and the Supporting Creditors executed three supplements to the PREPA RSA that (i) extended the December 15, 2016 termination date, (ii) revised certain milestone dates, (iii) reduced forbearance fees, and (iv) added a new milestone for reaching an agreement on amendments to the PREPA RSA necessary to implement the transactions contemplated therein under a mechanism agreeable to the parties on or before January 31, 2017 (the Implementation Milestone).

On January 27, 2017, FAFAA advised PREPA that pursuant to Act No. 2 of 2017 it assumed all responsibilities for negotiations with PREPA's creditors and requested that PREPA agree to extend the Implementation Milestone to provide FAFAA additional time to review the terms and conditions of the PREPA RSA.

Thereafter, the parties to the PREPA RSA entered into 15 additional supplements that ultimately extended the termination date and Implementation Milestone to June 28, 2017.

However, the PREPA RSA was subject to the approval of the Oversight Board under PROMESA, and the Oversight Board declined to approve the RSA on June 27, 2017. As a result, the RSA terminated by its own terms on June 29, 2017.

On April 19, 2018 the Oversight Board approved a fiscal plan to provide framework for the negotiation and approval of the transformation of PREPA. The PREPA fiscal plan includes a set of aspirational rate and reliability targets that set the parameters for funding and transformation processes that can no longer be delayed, including: (i) near-term investments in restoration, generation and resiliency; (ii) the scope and focus of federal funding; and (iii) the funding and/or size of transition charge available for restructuring debt and pension liabilities.

*PREPA Revitalization Act*

On November 4, 2015, the Governor submitted the PREPA Revitalization Act to the Legislature to facilitate PREPA's ongoing transformation and recovery plan. The PREPA Revitalization Act set forth a framework for PREPA to execute on the agreements with creditors reached to that date. Among other things, the PREPA Revitalization Act would (1) enhance PREPA's governance processes; (2) adjust PREPA's practices for hiring and managing personnel; (3) change PREPA's processes for collecting outstanding bills from public and private entities; (4) improve the transparency of PREPA's billing practices; (5) implement a competitive bidding process for soliciting third party investment in PREPA's infrastructure; (6) allow for the refinancing of existing PREPA bonds through a securitization that would reduce PREPA's indebtedness and cost of borrowing; and (7) set forth a process for the Energy Commission to address PREPA's proposal for a new rate structure that is consistent with its recovery plan. The PREPA Revitalization Act was approved by the Senate of Puerto Rico on February 10, 2016 and by the House of Representatives, with amendments, on February 15, 2016. The Senate concurred with these amendments, and the Governor signed the bill, Act No. 4 2016 into law on February 16, 2016. In light of the termination of the PREPA RSA and the commencement of the Title III case for PREPA, the securitization transactions contemplated by the PREPA Revitalization Act have not occurred.

(Continued)

CONFIDENTIAL                    CW_STAY0010114

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

*New Securitization Bonds*

The PREPA Revitalization Act authorizes the Puerto Rico Electric Power Authority Revitalization Corporation (PREPARC) to issue securitization bonds and impose a transition charge on PREPA customers, with an automatic adjustment mechanism, for the purpose of allowing PREPA to restructure certain of its financial indebtedness as contemplated by the PREPA RSA. On April 7, 2016, PREPARC filed a petition before the Energy Commission seeking approval of the calculation methodology for the transition charge and the related adjustment mechanism. On June 21, 2016, the Energy Commission approved PREPARC's petition, and on June 28, 2016, PREPARC approved a resolution authorizing the issuance of the new securitization bonds, subject to certain terms and conditions. In light of the termination of the PREPA RSA and the commencement of the Title III case for PREPA, the securitization transactions contemplated by the PREPA Revitalization Act have not occurred.

On August 7, 2017, the Puerto Rico Senate introduced Senate Bill 608, which proposes to eliminate PREPARC. As of the date hereof, no action has been taken on Senate Bill 608.

*Provisional Rate*

On May 27, 2016, PREPA filed a petition before the Energy Commission seeking approval of an adjustment to the base rates charged to PREPA's customers. The petition also sought approval of the proposed base rate adjustment on a temporary basis pending the Energy Commission's consideration of the requested rate adjustment. On June 24, 2016, the Energy Commission issued an order authorizing PREPA to increase its base rates, on a temporary basis, by approximately 1.3 cents per kWh, effective as of thirty days after issuance of the order, subject to certain conditions. The base rate adjustment was estimated to generate additional revenues in the amount of approximately $220 million annually.

On January 10, 2017, the Energy Commission issued a Final Resolution and Order lowering the requested increase in PREPA's base rate revenue requirement to $177 million, which resulted in an approved average base rate increase of approximately 1.025 cents per kWh. However, on January 20, 2017, PREPA filed a motion for clarification regarding, among other things, the base rate revenue requirement calculation. On March 8, 2017, the Commission issued a Resolution that approved a revised base rate revenue requirement increase of approximately $171.8 million. On April 25, 2017 PREPA filed its Compliance Filing basing base rates on the updated revenue requirement calculation, which was approved through orders entered on May 10, 2017 and May 31, 2017 (subject to certain modifications), although the new rates did not go into effect. PREPA is required to credit customer bills based on a reconciliation of the provisional rate and the final approved rate in accordance with those orders and the requirements of Act No. 83 of 1941, as amended by Act No. 4 of 2016.

Due to Hurricane Maria, the Energy Commission temporarily suspended, effective September 19, 2017, all administrative proceedings including the provisional and final rate implementation issues. On November 1, 2017, in the rate case docket, the Energy Commission granted in part and denied in part PREPA's motion to postpone the permanent rate implementation. Specifically, the Energy Commission granted PREPA's request for temporary extension of the provisional rate and of all other deadlines under the rate order and subsequent orders regarding permanent rate implementation and the provision of information regarding reconciliations and budgetary oversight and approvals, under Section 6A of Act No. 83 of 1941 and Article 6.25 of Act No. 57 of 2014. The Energy Commission also ordered that it would issue a new timeline for compliance and filing deadlines when PREPA's operations are normalized.

(Continued)

CONFIDENTIAL

CW_STAY0010115

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

However, on May 4, 2018, the Energy Commission issued a new Resolution and Order in a new docket that limited in certain respects the effect of the rate orders in the above Rate Review and called for a new rate case. On May 11, 2018, PREPA filed a response and motion for a temporary stay to allow discussion of how best to move forward. On May 18, 2018, the Energy Commission held a technical conference on this subject. It has not yet been determined how the new rate docket will proceed, including but not limited to how the new rate docket may involve or affect the subject of a provisional rate reconciliation.

*Oversight Board Actions and Litigation*

As noted above, the PREPA RSA was subject to approval of the Oversight Board under PROMESA. After consideration of the terms of the PREPA RSA, the Oversight Board ultimately declined to approve the PREPA RSA on June 27, 2017, and the PREPA RSA expired and terminated by its terms on June 29, 2017. On July 2, 2017, the Oversight Board commenced a Title III case at the request of PREPA in the United States District Court for the District of Puerto Rico, by filing a petition relief for PREPA under Title III case of PROMESA.

The Ad Hoc Group of PREPA Creditors filed a motion on July 18, 2017 seeking to lift the automatic stay in PREPA's Title III case, to file an action in the Commonwealth court seeking the appointment of a receiver for PREPA to oversee certain operations of the utility company and to seek an increase in rates. On September 15, 2017, Title III Court denied the Ad Hoc Group of PREPA Creditors' motion seeking to lift the PROMESA's law's stay. In its determination, Title III Court concluded that the Ad Hoc Group of PREPA Creditors failed to demonstrate cause for the lifting of the automatic stay that would have allowed them to seek the appointment of a receiver for PREPA. The Title III Court also found that relief sought by the Ad Hoc Group of PREPA Creditors, which was expressly designed to facilitate an increase in electricity rates, would run counter to PROMESA's designation of the Oversight Board (on behalf of PREPA) as the sole entity empowered to develop and propose a plan of adjustment. The Ad Hoc Group of PREPA Creditors have appealed the Title III Court's determination to the United States Court of Appeals for the First Circuit, which appeal is currently pending.

On October 26, 2017, in the aftermath of Hurricane Maria, the Oversight Board filed a motion seeking entry of an order confirming the appointment and authority of a Chief Transformation Officer for PREPA, which was ultimately denied as discussed above under section (m)(iii), Key Contested Motions in the Title III Cases.

On March 4, 2018, the Puerto Rico Energy Commission (PREC) filed an adversary complaint and preliminary injunction motion against the Oversight Board and PREPA, seeking an order prohibiting the Oversight Board from mandating or authorizing "substantive electricity actions" by PREPA – including the certification of a fiscal plan – without PREC's prior permission and approval, prohibiting PREPA from taking certain actions in alleged contravention of PREC's authority. On March 28, 2018, the Title III Court denied the request for a preliminary injunction, on grounds that PREC was seeking an advisory opinion. On April 10, 2018, PREC voluntarily dismissed the adversary complaint, without prejudice.

*Superpriority Post-Petition Revolving Credit Loan Agreement*

On February 16, 2018, the Oversight Board and PREPA jointly filed an urgent application seeking approval of a proposed $300 million unsecured, superpriority loan from the Commonwealth to PREPA (the Revolving Credit Loan), which was granted by order dated February 19, 2018. As authorized by the Title III Court on February 22, 2018, PREPA (as borrower) and the Commonwealth (as lender) entered

328

(Continued)

CW_STAY0010116

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

into a Revolving Credit Loan Agreement, in which the Commonwealth agreed to make the Revolving Credit Loan consisting of a superpriority post-petition credit facility in an aggregate principal amount not to exceed $300 million available to PREPA until June 30, 2018, unless extended by necessary governmental action by the Commonwealth. The Revolving Credit Loan will bear 5% interest, provided that, in the event the Commonwealth funds or refinances the Revolving Credit Loan with the proceeds of a Commonwealth financing, the interest rate on the such funded or refinanced Revolving Credit Loan will automatically accrue interest at the rate equal to the interest rate on the Revolving Credit Loan not funded or refinanced with any Commonwealth financing. PREPA will pay the Commonwealth from time to time the amount necessary so that the unpaid balance does not exceed the revolving loan commitment then in effect.

*PREPA Governing Board*

On June 26, 2017, the Governor signed into law Act No. 37 of 2017 (Act No. 37 of 2017) in order to overhaul PREPA's existing governing board structure. After the enactment of Act No. 37 of 2017, PREPA's governing board consists of seven members. Of its seven-member board, six members are designated by the Governor (three of which require Senate approval) and one member is an elected consumer representative.

*Impact of Hurricanes Irma and Maria*

The PREPA electric system sustained significant damage as a result of Hurricanes Irma and Maria. The damages were exacerbated by the fact that PREPA's infrastructure was in disrepair prior to the hurricanes due to years of limited investment and lack of maintenance. Hurricane Maria made her landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period. Hurricane Maria crossed Puerto Rico diagonally, entering through the Southeast and exiting through the Northwestern region. The hurricane caused catastrophic destruction in Puerto Rico, including severe damage to the electric power system, and left the island completely without power. Only two weeks prior to Hurricane Maria, Hurricane Irma – one of the strongest hurricanes ever recorded in the Atlantic – passed by Puerto Rico's north coast, substantially impairing an already weak infrastructure.

After Hurricane Maria passed through the island, and when it was safe for personnel to return to the field, PREPA deployed assessment teams to conduct a preliminary damage assessment and attempted to reestablish communications with PREPA's various key components. This initial assessment confirmed that PREPA's entire grid suffered severe damage. The infrastructure was designed to withstand winds up to 140 miles per hour, but Hurricane Maria brought sustained winds of over approximately 155 miles per hour. This resulted in massive direct damage and mechanical fatigue and stress that will require significant replacement and repair. These include, for example:

* Transmission: Hundreds of major transmission structures were damaged, and hundreds of hardware, conductor, and insulator failures were also identified at that time.

* Distribution: Many thousands of individual distribution lines, poles and transformers fell or were damaged, which will require debris removal and line reconstruction and repair.

    Communications and IT: Communications and IT systems throughout much of the PREPA system were not functional in the immediate aftermath of Hurricane Maria. PREPA's data center, which houses PREPA's critical IT assets, was offline for weeks. Internet communication was nonexistent

329 (Continued)

CONFIDENTIAL

CW_STAY0010117

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

for the first two weeks and intermittent thereafter. Most of the communication antennas suffered severe damage. During the weeks after the Hurricane Maria, PREPA had to rely on several short-wave radios and satellite phones for its limited communication abilities.

Based upon the damage assessment, PREPA began implementation of its emergency communication and restoration procedures. PREPA established five key stabilization initiatives essential to the emergency response: (1) reestablishing communications and IT systems, (2) reconstructing distribution and transmission systems, (3) energizing substations, (4) procurement and liquidity, and (5) operations planning.

PREPA's initial recovery actions focused on reestablishing power to the most critical customers including: (i) hospitals and elder care facilities; (ii) airports; (iii) ports; (iv) water and sewage treatment plants; (v) agencies providing essential services; (vii) lodging facilities; (viii) industrial buildings; (ix) financial institutions; and (x) ice making plants.

*Bond Ratings Downgrade*

Since June 2014, Moody's, S&P and Fitch have all lowered the credit ratings of PREPA's Power Revenue Bonds, which were already within noninvestment grade, and in most cases, have been lowered more than once. by Moody's and S&P. On July 2, 2015, S&P lowered PREPA's bonds from CCC to CC. On July 1, 2016, S&P again lowered PREPA's bonds from CC to D. On June 27, 2016, Fitch lowered its rating on PREPA's bonds from CC to C. These downgrades consider the uncertainty that persists regarding the details of the expected restructuring plan by PREPA, anticipation of distressed debt exchanges and the implementation risk that continues regarding PREPA's ability to execute on its multiyear fuel conversion plan, and the rating agencies' belief that any such debt restructuring will involve some degree of impairment for bondholders. The downgrades also reflect the concerns raised by(i) the repeated draws on the debt reserve fund and uncertainty regarding any future draws that could result in its depletion; (ii) the structural imbalance between revenue and expenses without a pathway to meeting debt service obligations if and when the debt service reserve is depleted; and(iii) the inability of PREPA to access the capital markets.

On July 6, 2017, Moody's downgraded its rating for PREPA's bonds to Ca from Caa3, with the outlook remaining negative. This latest downgrade reflects PREPA having commenced a proceeding under Title III of PROMESA. On the same date, Fitch also downgraded its rating for PREPA's bonds to D.

*Privatization*

On January 22, 2018, the Governor announced that the Commonwealth will begin the transformation of PREPA. The purpose of the transformation is to assure that the system is modern and reliable and that energy rates are affordable for the residents of Puerto Rico. The contemplated transformation will involve (a) private ownership and operation of generation assets and (b) an operator of the transmission and distribution system through a concession model. The transformation process will likely take between 18 months to 2 years to complete.

*Superpriority Post-Petition Revolving Credit Loan Agreement*

On February 22, 2018, PREPA and the Commonwealth entered into a Revolving Credit Loan Agreement, in which the Commonwealth agreed to make a revolving loan to PREPA consisting of a superpriority

330                                                                                                      (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

post-petition credit facility in an aggregate principal amount not to exceed $300 million, available to PREPA until June 30, 2018, unless extended by necessary governmental action the Commonwealth. The Revolving Credit Loan shall bear a 5% interest, provided that, in the event that the Commonwealth funds or refinances the Revolving Credit Loan with the proceeds of a Commonwealth Financing, the interest rate on the such funded or refinanced Revolving Credit Loan shall automatically accrue interest at rate equal to the interest rate on the Revolving Credit Loan not funded or refinanced with any Commonwealth Financing. PREPA shall pay the Commonwealth from time to time the amount necessary so that the unpaid balance does not exceed the Revolving Loan Commitment then in effect.

*(d) PRASA*

*Bond Issuances, Forbearance Agreements and Related Events*

On September 15, 2015, PRASA issued $75 million of its Series 2015A Senior Bonds under the Master Trust Agreement, as supplemented by a Fifth Supplemental Agreement of Trust, dated as of September 15, 2015 setting the details of such bonds. The proceeds of the purchase of the 2015A Senior Bonds were used to repay part of the outstanding balance of a $90 million term loan granted by a syndicate of commercial banking institutions, on May 29, 2015, by and between PRASA and Banco Popular de Puerto Rico, as Administrative Agent, certain lenders parties thereto (as amended, the Banco Popular Credit Agreement). The Series 2015A Bonds were due on November 30, 2015. Also on September 15, 2015, the Banco Popular Credit Agreement was amended to reflect the reduction of its outstanding balance and extend the maturity date of the remaining $15 million term loan through November 30, 2015. On November 30, 2015 both financings were extended through February 29, 2016. On February 29, 2016 the principal and interest due under both financings were paid in full.

On October 8, 2015, PRASA issued Series JJ under the Rural Development Bonds for $10.6 million. The proceeds of the issuance were used to repay the outstanding balance of $7.4 million on the revolving line of credit with GDB, and to finance a fleet acquisition under its capital improvement projects.

On June 30, 2016, PRASA executed a forbearance agreement with the Puerto Rico Department of Health (DOH), administrator of the Drinking Water State Revolving Fund (DW SRF), the Puerto Rico Environmental Quality Board (EQB), administrator of the Clean Water State Revolving Fund (CW SRF), and PRIFA, as operating agent for the for the SRFs, authorized to assist DOH and EQB in the administration, financial and accounting activities of the SRFs. Under the Forbearance Agreement the payments due since July 1, 2016 under the SRF Loans are deferred and the parties thereto agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to each under the SRF Loans.

PRIFA, DOH and EQB, with the acknowledgment and support of the United States Environmental Protection Agency (EPA), granted such forbearance, subject to the terms and conditions set forth in the Forbearance Agreement, for a period of six months, which may be extended for an additional six months if certain conditions are met. During such forbearance period, the Commonwealth Guaranty will not be enforced either. PRIFA, EQB and DOH, with the support of EPA, contemplate that during the forbearance period the parties will negotiate new terms and conditions to the SRF loans under a restructuring of such loans and a revision of underlying agreements between PRASA, PRIFA, EQB, DOH and, where applicable, EPA. After the expiration of the initial six-month forbearance period under the Forbearance Agreement, such period was extended for an additional six months until June 30, 2017, and subsequently futher extended to June 30, 2018.

(Continued)

CONFIDENTIAL   CW_STAY0010119

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

Regarding the Rural Development Bonds (RD Bonds), PRASA has requested that USDA Rural Development Program provide a short-term forbearance period, during which it would refrain from exercising its rights and remedies, including the enforcement of the Commonwealth Guaranty, under the RD Bond documents. To this effect, PRASA and USDA Rural Development Program executed a forbearance document, effective as of June 30, 2016 (the USDA Forbearance Agreement). The USDA Rural Development Program granted PRASA a three month forbearance period, through September 30, 2016, subject to the terms and conditions set forth in the USDA Forbearance.

Agreement in order to provide for additional time to examine all options available to correct PRASA's deficiencies and restore loan repayment. Pursuant to the USDA Forbearance Agreement, the payments due since July 1, 2016 under the RD Bond documents were also deferred for the duration of the forbearance period and USDA Rural Development Program agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to it under the RD Bond documents or any grant or loan document in relation thereto. After the expiration of the initial three month forbearance period, the USDA Forbearance Agreement has been extended multiple times, with the latest forbearance expiring on June 30, 2018.

On July 12, 2016, the Governor of Puerto Rico signed into law Act No. 68 of 2016 (Act No. 68 of 2016), providing for the creation of a new public corporation to be known as the Puerto Rico Aqueduct and Sewer Authority Revitalization Corporation (the PRASARC) as a single-purpose, bankruptcy remote entity. PRASARC is authorized to fix and collect securitization charges for the purpose of issuing bonds the proceeds of which may be used by PRASA for its Capital Improvement Program (CIP), refinancing of bond anticipation notes and the cancelation, defeasance and refinancing of its Bonds, among other approved financing costs. Act No. 68 of 2016 limits the securitization charge which may be imposed by the PRASARC to an amount equivalent to 20% of PRASA's revenues and provides that PRASARC may issue up to a maximum of $900 million in bonds for the purpose of financing the development of the PRASA's CIP. The difference between the $900 million that may be used for the financing of the CIP and the maximum amount that can be financed with the 20% of PRASA's revenues may be used to retire, cancel (defease) or refinance Bonds of the PRASA subject to certain conditions.

On April 19, 2018 the Oversight Board approved a fiscal plan to allow PRASA to continue providing safe and reliable supplies of drinking water and treatment of wastewater. Also, PRASA will be able to invest in necessary infrastructure to restore the system and ensure compliance with required standards while promoting much need economic growth through the island.

*Environmental Commitments and Consent Decree*

On September 15, 2015, the USDOJ, acting at the request of the Administrator of EPA, filed a complaint against PRASA and the Commonwealth, as a required party under the Clean Water Act (defined below), in the United States District Court for the District of Puerto Rico. The Complaint seeks injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the Federal Water Pollution Control Act enacted in 1956, as amended by the federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, and the Water Quality Act of 1987, as amended (the Clean Water Act). Concurrently with the filing of the complaint, USDOJ also filed a consent decree (the 2015 EPA Consent Decree) executed among EPA, PRASA, and the Commonwealth settling the matters addressed in the complaint, under the terms agreed upon by PRASA and EPA. The 2015 EPA Consent Decree is the result of an extensive negotiation process aimed, among other things, at resolving the claims

(Continued)

CONFIDENTIAL

CW_STAY0010120

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

addressed in the complaint and the requirements of various existing consent decrees entered in 2003, 2006 and 2010 (collectively the EPA Consent Decrees) related to the allegations included in the complaint. EPA and PRASA acknowledged in the 2015 EPA Consent Decree the work to be undertaken thereunder will enable PRASA to better understand its sewer systems, but will not resolve all of PRASA's Clean Water Act obligations with respect to such systems. The Commonwealth will incur a liability under the 2015 EPA Consent Decree only to the extent that the laws of the Commonwealth prevent PRASA from raising revenue needed to comply with the 2015 EPA Consent Decree. The Commonwealth has represented under the 2015 EPA Consent Decree that its present laws do not prevent PRASA from raising the revenue needed to comply with the obligations it has incurred thereunder.

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by PRASA in order to mitigate the high construction-in-progress costs mandated by the Existing Consent Decrees, representing 60% of construction-in-progress cost and an approximate cost of $1.4 billion during fiscal years 2006–2014. Another $1.7 billion of mandatory compliance projects would be required under the Existing Consent Decrees, in their current form, through fiscal year 2025. Despite being in material compliance with the capital improvement project requirements of the Existing Consent Decrees, PRASA began discussions with the USDOJ, on behalf of EPA, the EPA and the DOH seeking to amend the Existing Consent Decrees, in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in PRASA's construction-in-progress not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance, and capital improvement program requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows. The resulting 2015 EPA Consent Decree is expected to realign the cost of these projects and activities with PRASA's current financial condition and economic prospects.

On May 23, 2016, the District Court entered judgment approving the 2015 EPA Consent Decree as presented on May 10, 2016. The complaint was dismissed with prejudice and civil case number 15-2283 was closed. PRASA expects that with the final approval of the 2015 EPA Consent Decree, it will be able to finalize the proposed amendment to the 2006 Drinking Water Settlement Agreement under terms substantially similar to those currently being negotiated with DOH. The agreement established a prioritization system to manage and comply with the required capital improvements projects based on PRASA's financing capability, without affecting the regulatory and compliance requirements.

*Bond Ratings Downgrade*

On July 1, 2015, Moody's lowered its rating on PRASA bonds to Caa3 from Caa2. On July 2, 2015, S&P downgraded its rating on PRASA bonds two notches to CCC from CCC+, and removed it from CreditWatch with negative implications. The outlook is still negative. The ratings reflect only the opinions of such rating agency and an explanation of the significance of such ratings may be obtained only from the relevant rating agency. The aforementioned credit ratings were further downgraded and PRASA's bonds are currently rated Caa3 by Moody's and CC by S&P. Fitch's rating was downgraded to C from CC on May 2, 2017.

**(e)   UPR**

On June 30, 2015, S&P downgraded UPR's revenue bonds from CCC+ to CCC ,which it further downgraded to a CC rating. On July 1, 2015, Moody's lowered its ratings on UPR's revenue bonds from Caa3 to Ca, and which it further lowered to a C rating on October 17, 2017. These rating downgrades

(Continued)

CONFIDENTIAL   CW_STAY0010121

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

have generally followed each downgrade made on the Commonwealth general obligation bonds and certain other public corporation bonds given UPR's significant dependence on Commonwealth appropriations and its constrained ability to raise tuition and other auxiliary revenue sufficient to mitigate cuts. At the time of these downgrades, UPR was highly reliant on the Commonwealth for operating revenue and on GDB for liquidity and financial management support.

On May 11, 2016, a majority of plan participants (96.9%) of UPR's Healthcare Deferred Compensation Plan of the Medical Sciences Campus recommended the termination of UPR's Healthcare Deferred Compensation Plan, which UPR's board of directors ratified . On June 30, 2016, Governing Board of the UPR ratified the termination of Voya Institutional Trust Company as Trustee of the Trust of the UPR's Healthcare Deferred Compensation Plan. The members of the Governing Board ofUPR were designated as the Successor Trustees of the Governing Board of UPR's Healthcare Deferred Compensation Plan. In addition, the Governing Board of the UPR approved the dissolution of the UPRs Healthcare Deferred Compensation Plan and the distribution of the deferred funds to its participants. On August 22, 2016, Voya filed a complaint in the United States District Court for the District of Puerto Rico against the Governor of the Commonwealth, UPR and UPR's President. The complaint seeks relief from the Court relating to its administration of the Trust in light of the financial crisis in Puerto Rico and its effect onUPR. Specifically, the complaint seeks declaratory relief for federal judicial review of the issues arising under PROMESA, the Trust Agreements, and other relevant law, in light of UPR's financial condition and its efforts to distribute all plan assets. Voya has not yet transferred the plan assets to UPR pending the resolution of the complaint. The District Court entered an order staying the case until December 14, 2017 to give the parties an opportunity to consensually resolve the dispute. By that date, the parties were ordered to file a supplemental joint status report apprising the court on the status of negotiations and proposed resolutions on all motions filed in the case (both substantive and procedural).

On June 30, 2016, the Governing Board of UPR reestablished the annual increase per incoming class (approximately 2% increase) in the tuition cost per credit for academic year 2016 2017.

On June 30, 2016, the Governor of Puerto Rico signed Executive Order No. 31 (EO 31) declaring UPR in a state of emergency pursuant to Act No. 21. In compliance with EO 31, the UPR suspended the monthly payments to the trustee of the Trust Agreement that governs UPR System Revenue Bonds and the monthly payments of the Lease Agreement with "Desarrollos Universitarios Inc" (DUI) starting in July 2016.

In July 2016, UPR filed the Deed of Confirmation and Acknowledgment of Trust of UPR Retirement System in which UPR (as the Original Settlor) and the Governing Board of UPR (as the Original Trustee) confirmed, restated and acknowledged the inception of the Pension Plan and its Trust Fund in accordance to the provisions of the laws of the Commonwealth, specifically, the provisions of Act No. 219 of 2012.

On August 5, 2016, the trustee of the DUI's AFICA Bonds notified UPR that it failed to make the basic lease payment to the trustee on July 25, 2016 and that a default under the lease agreement with DUI constitutes an event of default under the DUI's AFICA Bonds Trust Agreement. At this time, the trustee did not seek to collect or recover any indebtedness from, enforce any judgment against, or obtain possession of, or exercise control over, any property of or from, the Commonwealth or any of its instrumentalities, including DUI and UPR, or exercise any act that was stayed by PROMESA, the Moratorium Act, or any Executive Orders related thereto. On or around the time that the PROMESA Stay

334 (Continued)

CW_STAY0010122

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

expired, the trustee again notified UPR that it was in default for failure to make the outstanding lease payments. Thereafter, in May 2017, UPR made the outstanding lease payments and has continued to do so on a monthly basis since that time. As a result, the lease agreement and the DUI AFICA Bonds Trust Agreement are not in default.

On August 19, 2016, the U.S. Bank Trust National Association, in its capacity as Trustee for UPR System Revenue Bonds, filed a civil lawsuit under the United States Court, District of Puerto Rico against the Commonwealth, the Governor, UPR and UPR's President. The motion seeks relief from Title IV Stay under PROMESA for claims related to the Moratorium Act and the executive orders related thereto, and a preliminary injunction against the Commonwealth's diversion and expropriation of pledged revenues, which the trustee alleges constitute collateral supporting the UPR system revenue bonds. On May 1, 2017, Title IV Stay under PROMESA expired. However, pursuant to the Standstill Agreement (defined below), the lawsuit is not currently active.

On June 29, 2017, the Trustee for the UPR System Revenue Bonds entered into a standstill agreement (the Standstill Agreement) with UPR, pursuant to which UPR agreed to transfer to a segregated account, for the benefit of the holders of the revenue bonds, certain amounts in respect of revenue pledged on the condition that during the covered period of the Standstill Agreement the trustee would not institute, commence, or continue any legal proceeding against UPR, the Commonwealth of Puerto Rico or any other agency, instrumentality, or municipality thereof to enforce rights related to the revenue bonds. Under the initial Standstill Agreement, which expired on August 31, 2017, UPR made two payments of $20 million to the segregated account. UPR and the Trustee have agreed to extend the Standstill Agreement on several occasions, and the standstill period is currently set to expire on March 31, 2018. During the time that the Standstill Agreement remains in effect, UPR has agreed to transfer $4 million a month (the approximate amount required to cover debt service payments during such period) to a segregated account in exchange for the trustee's agreement to not commence or continue any legal proceeding related to the revenue bonds. Pledged revenues mostly include student's tuition fees.

UPR and FAFAA shall provide the Trustee with detailed plans and specifications for repairing, replacing or reconstructing its property that was damaged or destroyed by Hurricane Maria as these plans are approved. UPR shall deposit all proceeds of casualty insurance policies in a separate account and of direct federal aid (the Repair Funds) in one or more separate accounts at a commercial bank to facilitate the audit of the expenditure of such accounts. All Repair Funds in excess of $1,000,000 shall be used pursuant to a written requisition. UPR will submit the preceding month's requisitions to the Trustee on or before the fifteenth calendar day of each month. Pursuant to the extended letter agreement, the majority bondholders expanded their direction to instruct the Trustee not to call a default during the pendency of the new Compliance Period if UPR sends to the Trustee copies of the preceding month's requisitions, as set forth above. UPR and FAFAA will provide, or cause relevant agencies to provide, the Trustee with all project requests, progress or other reports provided by FEMA or to any casualty insurance company with respect to the expenditure of the Repair Funds during the preceding month.

On April 20, 2018 the Oversight Board approved a revised UPR fiscal plan. UPR plays an essential role as the Island's engine for economic and workforce development. In many ways, the future of Puerto Rico depends on a vibrant and sustainable UPR. UPR fiscal plan returns the system to a three campus "hub" model, whereby the footprint of secondary campuses is reduced, and shared services are increasingly relied upon to drive down operating expenditures. Also, UPR fiscal plan makes every effort to minimize the increase of tuition and fees that could jeopardize affordability and access to quality higher education

335 (Continued)

CW_STAY0010123

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

on the Island. It does so by first maximizing opportunities to increase revenue from non-tuition sources, such as: (i) federal grants and awards, (ii) intellectual property and patent monetization, and (iii) ancillary service fees for providing training to external institutions.

### (f) SIFC

On July 2, 2015, the Commonwealth enacted Act No. 102, requiring SIFC, ACAA and the Disability Insurance Fund to provide an alternate means of liquidity to the Commonwealth through the issuance of TRANs. Pursuant to this Act, SIFC was authorized to invest $335 million in TRANs from the Commonwealth during fiscal year 2016. For additional information, refer to related disclosure above under Primary Government subsequent events.

On July 2, 2015, the Commonwealth enacted Act No. 105 to create the "Municipal Support Fund 2015 2016" and the "Legal Responsibility Fund 2015 2016" of the Commonwealth, among others things. Act No. 105 requires a transfer of $55.4 million and $31.9 million from SIFC to the "Municipal Support Fund 2015 2016" and the "Legal Responsibility Fund 2015 2016", respectively; while another transfer of $12.6 million was made from SIFC to the "Fund of Services and Therapies for Special Education Students" of the Commonwealth created by Act No. 73 of 2014. SIFC transferred the aforementioned funds in two installments of $50 million, one made during November 2015 and the other one made during December 2015.

On August 27, 2015, the Board of Directors of SIFC approved the prepayment in full of the existing note payable with a financial institution. The SIFC board, also approved the partial sale of SIFC's investment portfolio to obtain the funds to pay off such debt. In September 2015, SIFC paid off approximately $208 million related to this note payable, which included the principal, interest and a prepayment penalty. Upon the prepayment of the loan, all pledged assets were released by the financial institution.

### (g) Commonwealth Retirement Systems

The Commonwealth has historically maintained three retirement systems: (i) ERS; (ii) JRS; and (iii) TRS (collectively, the Retirement Systems).

Faced with the eventual insolvency of ERS and the inability to reach a consensual restructuring agreement with the ERS creditors, on May 21, 2017, the Oversight Board filed a petition at the request of ERS in the United States District Court for the District of Puerto Rico, commencing a Title III case for ERS. On June 15, 2017, the United States Trustee appointed an Official Committee of Retired Employees in the consolidated Title III cases.

On June 23, 2017, the Legislature approved certain other assignments for the Fiscal Year 2017-2018 Joint Resolution, which among other things, ordered ERS, JRS and TRS to liquidate their assets and pass the net proceeds to the Treasury Department. On July 20, 2017, ERS, JRS and TRS sold investments amounting to approximately $297 million.

(Continued)

CONFIDENTIAL

CW_STAY0010124

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On June 27, 2017, the Treasury Department issued Circular Letter No. 1300 46 17 in order to convey to the Primary Government's agencies, public corporations and municipalities the new implementation procedures to adopt, effective, July 1, 2017, the new "pay as you go (PayGo)" mechanism for all of the Commonwealth's Retirement Systems. With the start of the fiscal year 2018, employers' contributions, contributions ordered by special laws and the Additional Uniform Contribution were all eliminated and replaced by a monthly PayGo charge that will be collected from the aforementioned government entities to pay retirees. The Commonwealth Retirement Systems will determine and administer the payment amount per retiree that will be charged to each agency, public corporation and municipality. The PayGo charge must be submitted to the Treasury Department before the 15th day of each month along with the individual contributions withheld from active employees. As liquid retirement funds become depleted, the PayGo charge is expected to increase.

In addition to the establishment of the PayGo mechanism, on August 23, 2017, the Governor signed into law Act No. 106 of 2017, which reformed the Retirement Systems, so that their active participants would deposit their individual contributions in a new Defined Contribution Plan that will be managed by a private entity. Act No.106 of 2017 creates the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system. Under the PayGo system, the Commonwealth makes pension payments from the General Fund, according to the extent money is available, and municipalities and public corporations will reimburse the Commonwealth for any payments made on behalf of their employees. Approximately $2 billion was allocated for these purposes in the fiscal year 2018 budget. Act No. 106 of 2017 also created a Defined Contribution Plan, similar to a 401(k) plan, which guarantees the contributions of public servants, because future benefits will not be paid by the Retirement Systems. However, under the PayGo system, Puerto Rico's municipalities will remain obligated on their pension obligations.

On July 17, 2017, the Title III Court approved an agreement between the Commonwealth and a group on ERS bondholders, whereby the Commonwealth will set aside in a Prepetition Segregated Account (i) any funds related to employer contributions made by the Commonwealth to ERS in late May 2017, and (ii) $18.5 million on each of the following dates: July 19, 2017 (two days after Title III Court's order approving the agreement); July 31, 2017; August 31, 2017; September 30, 2017; and October 31, 2017. The agreement also calls for the payment of approximately $14 million in interest due July 1, 2017 and missed by the ERS, after commencement of its Title III case. As part of the Title III cases, on July 21, 2017, the Oversight Board filed a complaint (Declaratory Relief Action) on behalf of ERS challenging the validity, priority, extent, and enforceability of bonds issued by ERS. The bondholders have filed counter-claims against ERS. The Title III Court has ordered ERS to pay subsequent monthly interest payments from the Prepetition Segregated Account until the Court renders a ruling with respect to the dispositive motions filed by the Parties in the Declaratory Relief Action.

(Continued)

CONFIDENTIAL                                                                      CW_STAY0010125

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

### (h) Aftermath of Hurricane Maria

On September 20, 2017, Puerto Rico was directly impacted by Hurricane Maria, leaving in its path the destruction of thousands of homes, knocking out power across the entire island and flooding many streets and roads. As a result of the massive impact of the hurricane, a series of actions and events have been taken. Some of these actions, events and considerations are discussed in the ensuing paragraphs.

On September 20, 2017, the same day that Hurracaine Maria made landfall in Puerto Rico, the Governor requested funds from categories A and B of FEMA's public assistance program to address the state of emergency, which were immediately approved. Shortly thereafter, the Governor requested funds from categories C through G of FEMA's public assistance program, which are the categories dealing with permanent infrastructure projects such as roads, bridges, electricity and water infrastructure, public buildings, and parks and recreation spaces.

After FEMA's processing of the categories C through G funding requests, on November 1, 2017, the U. S. President approved the use of such funds for permanent projects on November 1, 2017. By doing so, the federal share on these funds was also increased from 75% to 90%, given the major disaster caused by the Hurricane Maria in Puerto Rico.

On September 21, 2017, pursuant to its authority under PROMESA and section 3 of the fiscal year 2018 budget resolutions, the Oversight Board announced its approval for the Commonwealth to reallocate up to $1 billion of its fiscal year 2018 budget to be used for emergency funding in the aftermath of Hurricane Maria.

On October 23, 2017, the Governor issued executive order EO 2017 065, creating the Central Recovery and Reconstruction Office of Puerto Rico (CRRO) pursuant to Act No. 211 of 1999, Act No. 5 of 2017, and Act No. 20 of 2017. The CRRO is created as a division within the Public Private Partnerships Authority (P3 Authority) for the purpose of (i) identifying, procuring, and administering resources to invest in the recovery of Puerto Rico, (ii) coordinating and channeling efforts of the Commonwealth related to the recovery of Puerto Rico, (iii) financing, executing, or effecting works and infrastructure projects related to the recovery of Puerto Rico, and (iv) advising the Governor and providing technical assistance and advice to other governmental entities regarding any matter related to the recovery of Puerto Rico. On November 10, 2017, the Governor issued executive order EO 2017 069, which amended EO 2017 065.

On October 26, 2017, the U.S. President signed into law the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, which provides for $36.5 billion of disaster relief funds for Texas, Florida, Puerto Rico and the United States Virgin Islands (USVI) related to damage from Hurricanes Harvey, Irma, and Maria. The law included $4.9 billion of Disaster Assistance Direct Loans to maintain liquidity for Puerto Rico and the USVI. Puerto Rico is expected to receive a substantial majority of these loans, with the USVI expected to receive only between $200 million and $400 million.

338

(Continued)

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On November 8, 2017, the Governor issued executive order EO 2017 066 pursuant to his authority under Act No. 5 of 2017. EO 2017 066 delegates the Governor's receivership powers under Section 206(a) of Act No. 5 of 2017 to FAFAA so that it may act as receiver of PREPA's procurement division and any other division or office whose duties affect PREPA's procurement processes for goods and services in order to supervise and reform the procurement processes. EO 2017 066 also created within PREPA the Office of Contract and Procurement Compliance, which reports to FAFAA.

On November 8, 2017, the Governor also issued executive order EO 2017 068, which established a 10% reimbursement for the certain small and mid sized businesses on their sales and use tax filings from August 2017 through November 2017.

On November 27, 2017, the Governor announced a series of controls that will be imposed in the administration of federal funds for the long-term infrastructure projects required in the aftermath of Hurricanes Irma and Maria, and which the Commonwealth expects to reach the $94.4 billion the Governor requested on November 14, 2017 to the U.S. Congress. In addition to the creation of the CRRO previously discussed, another control measure would be the role that will be played by FEMA. In addition to the oversight over the use of federal money, FEMA will preauthorize each permanent work project so that prior to its start, the Commonwealth can be sure that it will receive federal funds to help pay for it. For long-term infrastructure reconstruction projects, the Commonwealth will use section 428 of the Stafford Act, which provides some flexibility in the requirements for obtaining the maximum amount of federal funds for these efforts. For example, under that section, introduced after Superstorm Sandy, the state government is not required to reconstruct exactly to the pre- disaster state, as required by FEMA's process under section 406. In essence, section 428 would allow the Commonwealth to make improvements to existing infrastructure without losing access to the maximum amount of federal funds it could obtain via reimbursement. Currently, the United States federal government will cover up to 90% of the cost of permanent work projects, while the rest must come from the local governments checkbook. Under section 428, both the Commonwealth and FEMA will analyze the damage separately and, if there is any disagreement, a third party would validate a single damage estimate. Without these evaluations, FEMA will not be able to disburse funds to pay for the respective project.

(Continued)

CONFIDENTIAL

CW_STAY0010127

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2015

On February 9, 2018, the U.S. Congress approved and the U.S. President signed an amendment of the Continuing Appropriations Act of 2018 to provide continuing fiscal year 2018 appropriations to most federal agencies through March 23, 2018. The Continuing Appropriations Act allocates additional budget appropriations of approximately $15 billion to the U.S. Corps of Engineers for necessary expenses to address emergency situation projects, and to construct, and rehabilitate and repair damages caused by natural disasters. Of the total amount of $15 billion, not less than $10.4 billion will be available for such projects within states and insular areas that were impacted by Hurricanes Harvey, Irma, and Maria and all repair, rehabilitation, study, design, and construction of the U.S. Corps of Engineers projects in Puerto Rico and the USVI will be conducted at full federal expense. Also, allocates approximately $28 billion to the Community Development Fund to cover for necessary expenses related to disaster relief, long-term recovery, restoration of infrastructure and housing, economic revitalization, and mitigation in the most impacted and distressed areas resulting from a major declared disaster that occurred in 2017; of the amounts made available under this provision, no less than $11 billion will be allocated to the States and units of local government affected by Hurricane Maria, and of such amounts allocated to such grantees affected by Hurricane Maria, $2 billion will be used to provide enhanced or improved electrical power systems. In addition, the budget appropriation include $4.8 billion in Medicaid funds for Puerto Rico, $39 million to carry out U.S. Customs and Border Protection activities in fiscal year 2018 in Puerto Rico and the USVI, $30.9 million for construction, rehabilitation and acquisition for Job Corps Centers in Puerto Rico, $64 million to repair the U.S. Immigration & Customs Enforcement Service (ICE) facilities in Puerto Rico, USVI, Texas and Florida, $1.37 billion for the Emergency Recovery Program of the Federal Highway Administration of which Puerto Rico will receive 100 percent federal contribution to repair damages from Hurricanes Irma and María, $14 million for the Special Supplemental Nutrition Program for Women, Infants, and Children (known as PAN in Spanish) for infrastructure grants to Puerto Rico and the U.S. Virgin Islands to assist in the repair and restoration of buildings, equipment, technology, and other infrastructure damaged as a consequence of Hurricanes Irma and Maria and $24 million for the Commodity Assistance Program for the emergency food assistance program to cover necessary expenses related to the consequences of Hurricanes Harvey, Irma, and Maria or due to wildfires in 2017.

340

CW_STAY0010128

**REQUIRED SUPPLEMENTARY INFORMATION**

CONFIDENTIAL

CW_STAY0010129

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

(Amounts in thousands, except for percentages)

A. Schedule of Changes in the Commonwealth's Net Pension Liability for Single-Employer Pension Plans (the Puerto Rico System of Annuities and Pensions for Teachers (TRS) and the Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS) at June 30, 2015:

|  | TRS | JRS |
|---|---|---|
| Total pension liability: |  |  |
| Service cost | $ 354,159 | 16,764 |
| Interest | 690,742 | 22,620 |
| Changes in benefit terms | (599,560) | — |
| Differences between expected and annual experience | 169,851 | (1,658) |
| Changes in assumptions | 83,560 | 7,601 |
| Benefit payments, including refunds of contributions | (683,698) | (22,667) |
| Net change in total pension liability | 15,054 | 22,660 |
| Total pension liability – beginning | 14,792,649 | 481,715 |
| Total pension liability – ending (a) | 14,807,703 | 504,375 |
| Plan fiduciary net position: |  |  |
| Contributions – employers, net of provision | 189,367 | 11,992 |
| Contributions – participating employees | 115,461 | 3,804 |
| Contributions – transfers | 4,131 | — |
| Net investment income | 190,023 | 9,713 |
| Other income | 1,416 | 59 |
| Benefit payments, including refunds of member contributions | (683,698) | (22,667) |
| Administrative expenses | (19,803) | (2,150) |
| Net change in plan fiduciary net position | (203,103) | 751 |
| Plan fiduciary net position – beginning | 1,906,882 | 45,316 |
| Plan fiduciary net position – ending (b) | 1,703,779 | 46,067 |
| Employer's net pension liability (a)-(b) | $ 13,103,924 | 458,308 |
| Plan fiduciary net position as a percentage of the total pension liability | 11.51% | 9.17% |
| Covered-employee payroll | $ 1,171,154 | 31,707 |
| Employer's net pension liability as a percentage of covered-employee payroll | 1,118.89% | 1,438.19% |

B. Schedule of the Commonwealth's Proportionate Share of the Net Pension Liability of the Cost-Sharing Multiple-Employer Pension Plan (the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS) at June 30, 2015:

|  | ERS |
|---|---|
| Commonwealth's proportion of the net pension liability | 64.74% |
| Commonwealth's proportionate share of the net pension liability | $ 19,512,797 |
| Commonwealth's covered-employee payroll | 2,257,445 |
| Commonwealth's proportionate share of the net pension liability as a percentage of its covered-employee payroll | 864.38% |
| Plans fiduciary net position as a percentage of the total pension liability | 0.27 |

Notes:

The Commonwealth's net pension liability as of June 30, 2015 was measured as of June 30, 2014, and the total pension liability used to calculate the net pension liability was determined by an actuarial valuation with beginning-of-year census data as of July 1, 2013 that was updated to roll forward the total pension liability to June 30, 2014 and assuming no gains or losses. Due to outsized retirement activity in the TRS during the 2013-2014 fiscal year, 2,234 reported retirements were reflected.

Schedules are intended to show information for ten years. Additional years will be displayed as they become available.

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010130

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

(Amounts in thousands, except for percentages)

**C. Schedule of Employers' Contributions for All Pension Plans**

| | | 2014 | 2013* | 2012* | 2011* | 2010* | 2009* | 2008* |
|---|---|---|---|---|---|---|---|---|
| **ERS** | | | | | | | | |
| Statutory required contribution | $ | 1,822,675 | 2,192,821 | 2,019,467 | 1,734,979 | 1,459,774 | 1,258,695 | 1,191,275 |
| Contributions in relation to the actuarially determined contribution (a) | | 713,813 | 637,576 | 589,767 | 701,399 | 531,136 | 595,863 | 662,275 |
| Contribution deficiency | $ | 1,108,862 | 1,555,245 | 1,429,700 | 1,033,580 | 928,638 | 662,832 | 529,000 |
| Covered-employee payroll (b) | $ | 3,489,096 | 3,489,096 | 3,570,339 | 3,666,402 | 3,818,332 | 4,292,552 | N/D |
| Contribution as a percentage of covered-employee payroll (a)/(b) | | 20.46% | 18.27% | 16.52% | 19.13% | 13.91% | 13.88% | N/D |
| **TRS** | | | | | | | | |
| Statutory required contribution | $ | 748,569 | 736,591 | 659,334 | 528,170 | 477,213 | 393,871 | 341,495 |
| Contributions in relation to the actuarially determined contribution (a) | | 189,367 | 187,444 | 176,970 | 159,754 | 164,650 | 171,331 | 156,835 |
| Contribution deficiency | $ | 559,202 | 549,147 | 482,364 | 368,416 | 312,563 | 222,540 | 184,660 |
| Covered-employee payroll (b) | $ | 1,171,154 | 1,248,674 | 1,292,975 | 1,320,400 | 1,370,344 | 1,418,304 | N/D |
| Contribution as a percentage of covered-employee payroll (a)/(b) | | 16.17% | 15.01% | 13.69% | 12.10% | 12.02% | 12.08% | N/D |
| **JRS** | | | | | | | | |
| Statutory required contribution | $ | 40,758 | 38,501 | 33,544 | 29,684 | 28,127 | 22,195 | 19,803 |
| Contributions in relation to the actuarially determined contribution (a) | | 11,992 | 11,402 | 11,466 | 11,012 | 11,045 | 1,132 | 7,262 |
| Contribution deficiency | $ | 28,766 | 27,099 | 22,078 | 18,672 | 17,082 | 21,063 | 12,541 |
| Covered-employee payroll (b) | $ | 31,707 | 32,138 | 33,066 | 31,811 | 32,061 | 30,587 | N/D |
| Contribution as a percentage of covered-employee payroll (a)/(b) | | 37.82% | 35.48% | 34.68% | 34.62% | 34.45% | 36.39% | N/D |

N/D = Not determined.

\* For the Commonwealth Fiscal Years 2008 to 2013, reported contributions and covered payroll amounts are those of each retirement system as a whole (i.e., the sum for all participating employers.) Commonwealth-only covered payroll is not readily available for years prior to 2014; and due to methodological changes during the periods 2008 through 2013, the Commonwealth-only employer contributions are not comparable over the seven year period.

Notes:

The contribution requirement to each retirement system is established by law and is not actuarially determined.

Schedule is intended to show information for ten years. Additional years will be displayed as they become available.

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010131

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

**D. Schedule of Actuarial Methods and Assumptions - Pension Plans**
The methods and assumptions used to determine the actuarially determined contributions are as follows:

| | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|---|
| Valuation Dates | June 30, 2013 | June 30, 2013 | June 30, 2012 | June 30, 2011 | June 30, 2010 | June 30, 2013 |
| Adjustments to census data | TRS – due to outsized retirement activity during fiscal year 2014, 2,234 reported retirements were reflected. | N/A | N/A | N/A | N/A | N/A |
| Actuarial cost method | Entry age normal | ERS and JRS: projected unit credit with straight proration based on service to decrement. TRS: entry age normal | ERS and JRS: projected unit credit with straight proration based on service to decrement. TRS: entry age normal | ERS and JRS: projected unit credit with straight proration based on service to decrement. TRS: entry age normal | ERS and JRS: projected unit credit with straight proration based on service to decrement. TRS: entry age normal | ERS and JRS: projected unit credit with straight proration based on service to decrement. TRS: entry age normal |
| Amortization method | N/A | ERS-30 years, closed, level dollar; TRS and JRS-30 years closed, level percentage of payroll | ERS-30 years, closed, level dollar; TRS and JRS-30 years closed, level percentage of payroll | ERS-30 years, closed, level dollar; TRS and JRS-30 years closed, level percentage of payroll | 30 years closed, level percentage of payroll | 30 years closed, level percentage of payroll |
| Remaining amortization period | N/A | ERS and JRS-23 years; TRS 12 years | ERS and JRS-20 years; TRS 15 years | ERS and JRS-27 years; TRS 16 years | ERS and JRS-37 years; TRS 16 years | ERS and JRS-26 years; TRS 17 years |
| Asset valuation method | Market value of assets | Market value of assets | Market value of assets | Market value of assets | Market value of assets | Market value of assets |
| **Actuarial assumptions:** | | | | | | |
| Inflation | 2.5% per annum | 2.5% per annum | 2.5% per annum | 2.5% per annum | 2.5% per annum | 2.5% per annum |
| Investment rate of return | ERS-6.0% per annum; TRS-6.7% per annum; and JRS-5.4% per annum, net on investment expenses, including inflation | ERS-6.4% per annum; TRS and JRS-6.3% per annum | ERS-6.4% per annum; TRS and JRS-6.0% per annum | ERS-6.4% per annum; TRS and JRS-6.0% per annum | ERS-7.5% per annum; TRS and JRS – 8.0% per annum | ERS-7.5% per annum; TRS and JRS-8.0% per annum |
| Municipal bond index | 4.3% per annum, as per Bond Buyer General Obligation 20-Bond Municipal Index | N/A | N/A | N/A | N/A | N/A |
| Discount rate | 4.3% per annum | ERS-6.4% per annum; TRS and JRS-6.3% per annum | ERS-6.4% per annum; TRS and JRS-6.0% per annum | ERS-6.4% per annum; TRS and JRS-6.0% per annum | ERS-7.5% per annum; TRS and JRS – 8.0% per annum | ERS-7.5% per annum; TRS and JRS-8.0% per annum |
| Projected salary increases | ERS and JRS-3.0% per annum; TRS – 2.5% per annum (general wage inflation, plus service-base merit increase). No compensation increases are assumed until July 1, 2017 as a result of Act No. 66 and the current general economy. | ERS and TRS-3% per annum; JRS-3.5% per annum (general wage inflation, plus service-base merit increase) | ERS and TRS-3% per annum; JRS-3.5% per annum (general wage inflation, plus service-base merit increase) | ERS and TRS-3% per annum (ERS-no increase in 2010-2011); JRS-3.5% per annum (general wage inflation, plus service-base merit increase) | ERS and TRS-3% per annum (ERS-no increase in 2009-10 and in 2010-11); JRS – 3.5% per annum (general wage inflation, plus service-base merit increase) | ERS and TRS – 3% per annum (ERS-no increase in 2009-10 and in 2010-11); JRS – 3.5% per annum (general wage inflation, plus service-base merit increase) |
| Cost-of-Living-Adjustments | None assumed. | For ERS and JRS – 0.96% per annum to approximate 3.0% triennial increases; for TRS-none assumed. | For ERS and JRS – 0.96% per annum to approximate 3.0% triennial increases; for TRS-none assumed. | For ERS and JRS – 0.96% per annum to approximate 3.0% triennial increases; for TRS-none assumed. | For ERS and JRS – 0.99% per annum to approximate 3.0% triennial increases; for TRS-none assumed. | For ERS and JRS – 0.99% per annum to approximate 3.0% triennial increases; for TRS-none assumed. |

**Mortality:**

**Pre-retirement Mortality:**

Fiscal Years 2009 to 2014: For the ERS general employees not covered under Act No. 127 and for the TRS members, RP-2000 Employee Mortality Rates for males and females projected on a generational basis using Scale AA. For the ERS members covered under Act No. 127 and for the JRS members, RP-2000 Employee Mortality Rates with blue collar adjustments for males and females, projected on a generational basis using Scale AA. As generational tables, they reflect mortality improvements both before and after the measurement date.

Fiscal Year 2014: For the ERS, 100% of deaths while in active service are assumed to be occupational only for members covered under Act No. 127. For the JRS, among deaths while in active service, 50% are assumed to be occupational and 50% are assumed to be nonoccupational.

Fiscal Years 2009 to 2013: For the ERS, 100% of deaths while in active service are assumed to be occupational; for members covered under Act No. 127. For other ERS members, 25% of deaths while in active service are assumed to be occupational and 75% are assumed to be nonoccupational. For the JRS, among deaths while in active service, 50% are assumed to be occupational and 50% are assumed to be nonoccupational.

**Post-retirement Healthy Mortality:**

Fiscal Years 2012 to 2014: For the ERS and the TRS, rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of plan's experience from 2007 to 2012 equal to 92% of the rates from the UP-1994 Mortality Table for Males and 95% (ERS) or 87% (TRS) of the rates from the UP-1994 Mortality Table for Females. The rates are projected on a generational basis starting in 1994 using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date.

Fiscal Years 2009 to 2011: For the ERS and the TRS, rates which vary by gender are assumed for healthy retirees and beneficiaries based on a study of plan's experience from 2003 to 2007 for the ERS and from 2004 to 2007 for the TRS. The rates are projected on a generational basis starting in 2005 using Scale AA. As a generational table, it reflects mortality improvements both before and after the measurement date.

Fiscal Years 2009 to 2014: For the JRS, RP-2000 Healthy Annuitant Mortality Rates with white collar adjustments for males and females, projected on a generational basis using Scale AA. As generational tables, it reflects mortality improvements both before and after the measurement date.

**Post-retirement Disabled Mortality:**

Fiscal Years 2012 to 2014: For the ERS, rates which vary by gender are assumed for disabled retirees based on a study of plan's experience from 2007 to 2012 equal to 105% of the rates from the UP-1994 Mortality Table for Males and 115% of the rates from the UP-1994 Mortality Table for Females. No provision was made for future mortality improvement for disabled retirees.

Fiscal Years 2009 to 2011: For the ERS and the JRS, RP-2000 Disabled Annuitant Mortality Rates, without projection. No provision was made for future mortality improvement for disabled retirees.

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010132

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

(Amounts in thousands, except for percentages)

**E. Schedule of Funding Progress for the Postemployment Healthcare Plans**

The Schedule of Funding Progress for the Commonwealth Postemployment Healthcare Plans presents the results of the other than pension postemployment benefits (OPEB) valuations for the past eight years. The schedule provides an eight year information trend about whether the actuarial values of plan assets are increasing or decreasing over time relative to the actuarial accrued liabilities for benefits. All actuarially determined information has been calculated in accordance with actuarial assumptions and methods reflected in the actuarial valuations as of the indicated actuarial valuation date.

**ERS:**

| Actuarial Valuation Date (1) | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2015 | $  — | 1,428,788 | 1,428,788 | —% | $ 3,319,280 | 43% |
| June 30, 2014 | — | 1,438,475 | 1,438,475 | — | 3,489,096 | 41 |
| June 30, 2013 | — | 1,482,879 | 1,482,879 | — | 3,570,339 | 43 |
| June 30, 2012 | — | 2,120,970 | 2,120,970 | — | 3,570,339 | 59 |
| June 30, 2011 | — | 1,758,389 | 1,758,389 | — | 3,666,402 | 48 |
| June 30, 2010 | — | 1,699,373 | 1,699,373 | — | 3,818,332 | 45 |
| June 30, 2009 | — | 1,633,159 | 1,633,159 | — | 4,292,552 | 38 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

**TRS:**

| Actuarial Valuation Date (1) | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2015 | $  — | 548,518 | 548,518 | —% | 1,127,500 | 49% |
| June 30, 2014 | — | 543,205 | 543,205 | — | 1,171,154 | 46 |
| June 30, 2013 | — | 792,875 | 792,875 | — | 1,248,674 | 64 |
| June 30, 2012 | — | 797,332 | 797,332 | — | 1,292,975 | 62 |
| June 30, 2011 | — | 706,069 | 706,069 | — | 1,320,400 | 54 |
| June 30, 2010 | — | 694,230 | 694,230 | — | 1,370,344 | 51 |
| June 30, 2009 | — | 750,362 | 750,362 | — | 1,418,304 | 53 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

**JRS:**

| Actuarial Valuation Date (1) | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| June 30, 2015 | $  — | 6,917 | 6,917 | —% | 31,917 | 22% |
| June 30, 2014 | — | 6,540 | 6,540 | — | 31,707 | 21 |
| June 30, 2013 | — | 6,705 | 6,705 | — | 32,138 | 21 |
| June 30, 2012 | — | 6,592 | 6,592 | — | 33,066 | 20 |
| June 30, 2011 | — | 5,810 | 5,810 | — | 31,811 | 18 |
| June 30, 2010 | — | 5,808 | 5,808 | — | 32,061 | 18 |
| June 30, 2009 | — | 5,643 | 5,643 | — | 30,587 | 19 |
| June 30, 2008 | — | N/D | N/D | — | N/D | N/D |

N/D=Not determined.

(1) The System's OPEB funded status as of June 30, 2015 and 2014 were determined by the actuarial valuation at beginning of year that was updated to roll forward the funded status to June 30, 2015 and 2014 and assuming no liability gains or losses. Prior year actuarial valuations were made using end-of-year census data.

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010133

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information (Unaudited)

(Amounts in thousands, except for percentages)

**F. Schedule of Employers' Contributions for the Postemployment Healthcare Plans**

The Schedule of Employers' Contributions for the Commonwealth Postemployment Healthcare Plans provides information about the annual required contributions (ARC) for OPEB and the extent to which contributions were made to cover the ARC for OPEB for the past eight years. The ARC is the annual required contribution for the year calculated in accordance with certain parameters, which include actuarial methods and assumptions.

| | ERS | | TRS | | JRS | |
| Fiscal Year Ended (1) | Annual Required Contribution | Percentage Contributed | Annual Required Contribution | Percentage Contributed | Annual Required Contribution | Percentage Contributed |
|---|---|---|---|---|---|---|
| June 30, 2015 | 103,878 | 94% | 36,292 | 104% | 847 | 36% |
| June 30, 2014 | 88,508 | 115 | 46,403 | 77 | 684 | 44 |
| June 30, 2013 | 154,999 | 59 | 45,669 | 75 | 643 | 45 |
| June 30, 2012 | 133,654 | 71 | 41,069 | 84 | 554 | 53 |
| June 30, 2011 | 129,395 | 73 | 39,925 | 84 | 529 | 48 |
| June 30, 2010 | 128,294 | 69 | 42,487 | 71 | 488 | 52 |
| June 30, 2009 | 111,683 | 77 | 38,015 | 77 | 425 | 55 |
| June 30, 2008 | 110,650 | 72 | 36,836 | 77 | 408 | 55 |

(1) The System's annual required contributions for the years ended June 30, 2015 and 2014 were determined by the actuarial valuation at beginning of year that was updated to roll forward the funded status to June 30, 2015 and 2014 and assuming no liability gains or losses. Prior year actuarial valuations were made using end-of-year census data.

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010134

**COMMONWEALTH OF PUERTO RICO**

Required Supplementary Information – Unaudited

Schedule of Revenue and Expenditures – Budget and Actual –

Budgetary Basis – General Fund

Year ended June 30, 2015

(In thousands)

|  | Original budget | Amended budget | Actual |
|---|---|---|---|
| Revenue: | | | |
| Income taxes | $ 5,378,000 | 5,378,000 | 4,927,910 |
| Sales and use taxes | 735,000 | 735,000 | 636,057 |
| Excise taxes | 2,818,000 | 2,818,000 | 2,736,572 |
| Property taxes | — | — | 21,619 |
| Other taxes | 28,000 | 28,000 | 23,031 |
| Charges for services | 104,000 | 104,000 | 117,106 |
| Revenue from component units | 24,000 | 24,000 | 19,274 |
| Intergovernmental | 225,000 | 225,000 | 202,309 |
| Other | 118,000 | 118,000 | 95,537 |
| Total revenue | 9,430,000 | 9,430,000 | 8,779,415 |
| Expenditures – current: | | | |
| General government | 1,197,443 | 1,278,484 | 1,065,680 |
| Public safety | 1,984,147 | 1,940,834 | 1,944,715 |
| Health | 1,342,964 | 1,341,836 | 1,361,865 |
| Public housing and welfare | 437,846 | 441,945 | 429,040 |
| Education | 3,091,028 | 3,048,818 | 3,166,000 |
| Economic development | 399,674 | 401,185 | 433,135 |
| Intergovernmental | 369,180 | 369,180 | 252,516 |
| Total expenditures | 8,822,282 | 8,822,282 | 8,652,951 |
| Surplus of revenue over expenditures | 607,718 | 607,718 | 126,464 |
| Other financing sources (uses): | | | |
| Transfer in from Lotteries Fund | 135,000 | 135,000 | 113,810 |
| Transfer out for payments for debt service | (742,718) | (742,718) | (861,298) |
| Total other financing sources | (607,718) | (607,718) | (747,488) |
| Deficiency of revenue and other financing sources under expenditures and other financing uses | $ — | — | (621,024) |

See accompanying notes to required supplementary information and independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010135

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2015

**(1) Schedule of Funding Progress**

The schedule of funding progress provides information about the funded status of the Retirement Systems and the Post-Employment Healthcare Plans and the progress being made in accumulating sufficient assets to pay benefits when due. The information was obtained from the last actuarial report as of June 30, 2015.

**(2) Schedule of Employers' Contributions**

The schedule of employers' contributions provides information about the annual required contributions (ARC) and the extent to which contributions were made cover the ARC. The ARC is the annual required contribution for the year calculated in accordance with certain parameters, which include actuarial methods and assumptions.

The Retirement Systems' and the Post-Employment Healthcare Plans' schedule of employers' contributions includes both Commonwealth and participating employees contributions because ultimately the Commonwealth's contributions should cover any deficiency between the participating employees' contributions, pension benefits, and the Retirement Systems' administration costs.

The information was obtained from the last actuarial report as of June 30, 2015.

**(3) Budgetary Control**

The Governor is constitutionally required to submit to the Legislature an annual balanced budget of the Commonwealth for the ensuing fiscal year. The annual budget is prepared by the Commonwealth's Office of Management and Budget (Commonwealth OMB) and takes into consideration the advice provided by the Puerto Rico Planning Board (annual economic growth forecasts and four-year capital improvements plan), the Treasury Department of the Commonwealth (revenue estimates, accounting records, and the comprehensive annual financial report), GDB (the fiscal agent), and other governmental offices and agencies. Section 7 of Article VI of the Constitution of Puerto Rico provides that "the appropriations made for any fiscal year shall not exceed the total revenue, including available surplus, estimated for the said fiscal year, unless the imposition of taxes sufficient to cover the said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenue and other resources for the ensuing fiscal year under: (i) laws existing at the time the budget is submitted and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year capital improvements plan adopted by the Puerto Rico Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying other sources of revenue to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor who may decrease or eliminate any line item but may not increase or insert any new line item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the fiscal year, the annual budget for the preceding fiscal year, as approved by the Legislature and the Governor, is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments for its operating and other expenses until the new budget is approved. The appropriated annual budget for fiscal year 2015 (including

348

(Continued)

CW_STAY0010136

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2015

other financing uses) amounted to approximately $9.6 billion, including several special budget appropriations to the General Fund made by the Legislature throughout the year which amounted to approximately $4.7 billion.

The Commonwealth OMB has authority to amend the budget within a department, agency, or government unit without legislative approval.

For budgetary purposes, encumbrance accounting is used. The encumbrances (that is, purchase orders and contracts) are considered expenditures when a commitment is made. For U.S. GAAP reporting purposes, encumbrances outstanding at year-end are reported within the restricted, committed, assigned, and unassigned fund balance classifications and do not constitute expenditures or liabilities on a U.S. GAAP basis because the commitments will be honored during the subsequent year. The unencumbered balance of any appropriation of the General Fund at the end of the fiscal year lapses immediately. Appropriations, other than in the General Fund, are continuing accounts for which the Legislature has authorized that an unspent balance from the prior year be carried forward and made available for current spending. In addition, for budgetary purposes, revenue is recorded when cash is received.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments must give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: (i) the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); (ii) the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit, and full faith of the Commonwealth; (iii) current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and (iv) all other purposes.

In addition, the Legislature may direct that certain revenue be retained and made available for spending within a specific appropriation account. Generally, expenditures may not exceed the level of spending authorized for an individual department. However, the Commonwealth is statutorily required to pay debt service, regardless of whether such amounts are appropriated. Appropriations are enacted for certain departments, agencies, and government units included in the General Fund.

For these funds, a schedule of revenue and expenditures – budget and actual budgetary basis – General Fund is included. Appropriations for capital projects are made for each bond issue and the authorization continues for the expected construction period.

349                                                               (Continued)

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2015

The Commonwealth OMB has the responsibility to ensure that budgetary spending control is maintained on an individual department basis. The OMB may transfer part or all of any unencumbered balance within a department to another department subject to legislative approval. Budgetary control is exercised through the Puerto Rico Integrated Financial Accounting System (PRIFAS). PRIFAS ensures that encumbrances or expenditures are not processed if they exceed the departments total available spending authorization, which is considered its budget. The legal level of budgetary control is at the individual department level for General Fund expenditures, principal and interest due for the year for the debt service fund, and by bond authorization for capital expenditures.

Notwithstanding the foregoing, the enactment of PROMESA (as discussed in Note 22) created an Oversight Board with the power to review and approve budgets for the Commonwealth and its instrumentalities. Under PROMESA, a fiscal plan for each covered entity must be certified by the Oversight Board before the Commonwealth can propose any fiscal year budgets. All budgets proposed after the enactment of PROMESA must be certified by the Oversight Board as being consistent with the applicable certified fiscal plan. For additional information on the budget certification process under PROMESA, refer to Note 22.

**(4) Statutory (Budgetary) Accounting**

The Commonwealth's budget is adopted in accordance with a statutory basis of accounting, which is not in accordance with U.S. GAAP. Revenue is generally recognized when cash is received. Income tax revenues are reduced for the amount of income tax refunds paid during the year and claimed but unpaid at year end. Short-term and long-term borrowings may be used to finance budgetary excess of expenditures over revenue. Expenditures are generally recorded when the related expenditure is incurred or encumbered. Encumbrances generally lapse the year following the end of the fiscal year when the encumbrance was established, as established by Act No. 123 of August 17, 2001. Unencumbered appropriations lapse at year-end. Amounts required for settling claims and judgments against the Commonwealth and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment.

Under the statutory basis of accounting, the Commonwealth uses encumbrance accounting to record the full amount of purchase orders, contracts, and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure. In the governmental funds, encumbrance accounting is a significant aspect of budgetary control.

The schedule of revenue and expenditures – budget and actual – budgetary basis – General Fund only presents the information for the General Fund for which there is a legally adopted budget, as required by U.S. GAAP. For a reconciliation of the statement of revenue and expenditures – budget and actual – budgetary basis – General Fund with the statement of revenue, expenditures, and changes in fund balances (deficit) for the General Fund, refer to Note 6. The special revenue funds do not have a legally mandated budget.

(Continued)

CONFIDENTIAL CW_STAY0010138

**COMMONWEALTH OF PUERTO RICO**

Notes to Required Supplementary Information (Unaudited)

June 30, 2015

**(5) Budget/U.S. GAAP Reconciliation**

The following schedule presents comparisons of the legally adopted budget with actual data on a budgetary basis. Because accounting principles applied for purposes of developing data on a budgetary basis differ significantly from those used to present financial statements in conformity with U.S. GAAP, a reconciliation of entity, timing, and basis differences in the excess (deficiency) of revenue and other financing sources over expenditures and other financing uses for the year ended June 30, 2015 is presented below for the General Fund (in thousands):

| | |
|---|---:|
| Deficiency of revenue and other financing sources under expenditures and other financing uses – budgetary basis | $ (621,024) |
| Entity differences –excess of revenues and other financing sources over expenditures and other financing uses for: | |
| Nonbudgeted funds | 132,739 |
| Inclusion of agencies with independent treasuries | 2,584 |
| Timing differences: | |
| Adjustment for encumbrances | 229,196 |
| Current year expenditures against prior year encumbrances | (190,263) |
| Basis of accounting differences: | |
| Revenue accrual adjustment | (93,248) |
| Expenditures accrual adjustments | 223,439 |
| Deficiency of revenue and other financing sources under expenditures and other financing uses – U.S. GAAP basis | $ (316,577) |

See accompanying independent auditors' report.

351

CW_STAY0010139

**COMBINING AND INDIVIDUAL FUND
FINANCIAL STATEMENTS AND SCHEDULES**

CW_STAY0010140

**COMMONWEALTH OF PUERTO RICO**

Schedule of Revenue and Expenditures – Budget and Actual –

Budgetary Basis – General Fund (Unaudited)

Year ended June 30, 2015

(In thousands)

The General Fund is the primary operating fund of the Commonwealth. The General Fund is used to account for and report all financial resources received and used for those services traditionally provided by a government, which are not required legally or by sound financial management to be accounted for in another fund. Included are transactions for services such as general government, public safety, health, public housing and welfare, education, and economic development. Following is the supplemental schedule of expenditures– budget and actual – General Fund (budgetary basis).

353

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual

Budgetary Basis – General Fund

Year ended June 30, 2015

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---:|---:|---:|
| **Expenditures – Current:** | | | |
| **General government:** | | | |
| Senate of Puerto Rico | $ 40,493 | 40,493 | 40,493 |
| House of Representatives of Puerto Rico | 48,004 | 48,026 | 48,026 |
| Comptroller's Office | 40,315 | 40,315 | 40,315 |
| Governor's Office | 19,317 | 21,074 | 20,727 |
| Office of Management and Budget (1) | 64,133 | 187,310 | 38,497 |
| Planning Board | 14,681 | 14,337 | 14,847 |
| Department of State | 5,919 | 5,289 | 5,855 |
| Department of the Treasury (1) | 328,291 | 307,417 | 248,769 |
| Central Office of Personnel Administration | 3,866 | 4,481 | 4,108 |
| Commonwealth Elections Commission | 36,145 | 36,123 | 37,099 |
| Federal Affairs Administration | 4,288 | 4,256 | 4,696 |
| General Services Administration | 160 | 160 | 160 |
| Municipal Complaints Hearing Commission | 12,008 | 11,936 | 12,542 |
| Civil Rights Commission | 1,101 | 1,101 | 1,054 |
| Office of the Citizen's Ombudsman | 5,012 | 5,012 | 5,750 |
| Government Ethics Board | 9,528 | 9,528 | 9,528 |
| Legislative Affairs Office | 17,650 | 17,404 | 17,393 |
| Office of the Superintendent of the Capitol | 20,059 | 20,194 | 18,194 |
| Comptroller's Special Reports Joint Commission | 690 | 696 | 708 |
| Legislative Donation Commission | 21,092 | 907 | 1,022 |
| Corporation "Enlace" Caño Martín Peña | 1,317 | 1,317 | 1,317 |
| Puerto Rico Statistics Institute | 1,343 | 1,320 | 1,320 |
| Office for the Governmental's Integrity and Efficiency | 123 | 123 | 216 |
| Permits Management Office | 9,067 | 7,816 | 6,986 |
| Employees' Retirement System of the Government of the Commonwealth of Puerto Rico | 334,539 | 333,566 | 326,994 |
| Puerto Rico System of Annuities and Pensions for Teachers | 141,704 | 141,704 | 141,704 |
| Contributions to Political Parties | 1,200 | 1,200 | 1,200 |
| Public Buildings Authority | 4,167 | 4,167 | 4,167 |
| Procurement Administration Offices | 6 | 6 | — |
| Office of Elections Comptroller | 3,870 | 3,870 | 4,708 |
| Labor Development Administration | 3,147 | 3,147 | 3,177 |
| Information and Technology Communication Office | 650 | 259 | 259 |
| Appellative Board of the Personnel System Administration | 3,558 | 3,782 | 3,849 |
| Total general government | 1,197,443 | 1,278,316 | 1,065,680 |
| **Public safety:** | | | |
| Puerto Rico General Court of Justice | 326,049 | 326,049 | 343,768 |
| Civil Defense | 19,122 | 19,072 | 19,679 |
| Commission of Investigation, Processing and Appeals Board | 473 | 452 | 442 |
| Department of Justice | 128,484 | 120,587 | 118,082 |
| Puerto Rico Police Department | 801,959 | 780,856 | 768,600 |
| Puerto Rico Firefighters Corps | 63,945 | 63,609 | 65,365 |
| Puerto Rico National Guard | 12,214 | 12,207 | 12,282 |
| Public Service Commission | 5,488 | 5,311 | 5,953 |
| Consumer Affairs Department | 9,108 | 8,877 | 9,363 |
| Natural Resources Administration | 35,124 | 33,928 | 33,774 |
| Office of the Model Forest | 1,000 | 500 | — |
| Department of Correction and Rehabilitation | 452,125 | 443,087 | 440,455 |
| Parole Board | 2,442 | 2,422 | 2,547 |
| Forensic Sciences Institute | 17,401 | 17,907 | 17,907 |
| Special Prosecutor Panel | 2,647 | 2,647 | 2,647 |
| Pre-Trial Services Office | 7,158 | 7,111 | 7,214 |
| Correctional Health | 73,229 | 71,553 | 71,701 |
| Medical Emergencies Service | 23,828 | 23,473 | 24,355 |
| Criminal Justice College | 2,351 | 647 | 581 |
| Total public safety | 1,984,147 | 1,940,295 | 1,944,715 |

(Continued)

CONFIDENTIAL

CW_STAY0010142

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2015

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---|---|---|
| **Health:** | | | |
| Environmental Quality Board | $ 7,302 | 9,403 | 9,862 |
| Department of Health | 276,461 | 266,228 | 285,111 |
| Puerto Rico Medical Services Administration | 48,574 | 49,355 | 49,355 |
| Mental Health and Drug Addiction Services Administration | 90,931 | 98,024 | 97,427 |
| Puerto Rico Solid Waste Authority | 6,672 | 6,672 | 6,843 |
| Puerto Rico Health Insurance Administration | 905,867 | 905,797 | 906,110 |
| University of Puerto Rico Comprehensive Cancer Center | 7,157 | 7,157 | 7,157 |
| | 1,342,964 | 1,342,636 | 1,361,865 |
| **Public housing and welfare:** | | | |
| Office of Youth Affairs | 4,324 | 4,490 | 5,057 |
| Department of Labor and Human Resources | 10,601 | 11,432 | 18,894 |
| Labor Relations Board | 841 | 831 | 832 |
| Department of Housing | 16,070 | 15,820 | 17,388 |
| Department of Recreation and Sports | 34,306 | 37,988 | 41,131 |
| Administration for the Horse Racing Sport and Industry | 1,766 | 2,016 | 2,150 |
| Women's Affairs Commission | 5,583 | 3,894 | 4,201 |
| Public Housing Administration | 1,200 | 1,141 | 1,139 |
| Office of the Veteran's Ombudsman | 3,090 | 2,976 | 2,853 |
| Department of Family | 32,169 | 36,187 | 37,097 |
| Family and Children Administration | 177,357 | 185,994 | 182,184 |
| Minors Support Administration | 13,329 | 12,986 | 13,372 |
| Vocational Rehabilitation Administration | 17,475 | 17,475 | 17,427 |
| Social Economic Development Administration | 78,029 | 69,681 | 45,628 |
| Office of the Disabled Persons Ombudsman | 1,812 | 1,620 | 1,637 |
| Office for Elderly Affairs | 3,381 | 3,263 | 3,758 |
| Company for the Integral Development of the Península de Cantera | 1,666 | 1,659 | 1,659 |
| Industries for the Blind, Mentally Retarded, and Other Disabled Persons of Puerto Rico | 467 | 467 | 467 |
| Patient Ombudsman | 3,012 | 2,657 | 2,679 |
| Administration for the Care and Development of the Childhood | 16,807 | 14,961 | 15,096 |
| Special Communities Trust | 14,561 | 14,314 | 14,391 |
| | 437,846 | 441,852 | 429,040 |
| **Education:** | | | |
| Department of Education | 2,126,863 | 2,088,781 | 2,199,006 |
| Institute of Puerto Rican Culture | 23,753 | 26,555 | 27,197 |
| Puerto Rico School of Plastics Arts | 2,521 | 2,521 | 2,521 |
| State Office for Historic Preservation | 1,802 | 1,633 | 1,741 |
| University of Puerto Rico | 881,227 | 879,572 | 879,572 |
| Musical Arts Corporation | 8,213 | 8,156 | 8,156 |
| Fine Arts Center Corporation | 3,846 | 3,792 | 3,792 |
| Puerto Rico Public Broadcasting Corporation | 12,566 | 12,482 | 13,533 |
| Athenaeum of Puerto Rico | 500 | 483 | 483 |
| Puerto Rico Conservatory of Music Corporation | 7,011 | 6,983 | 6,983 |
| Puerto Rico Council on Education | 22,726 | 17,860 | 23,016 |
| | 3,091,028 | 3,048,818 | 3,166,000 |

(Continued)

CONFIDENTIAL

CW_STAY0010143

**COMMONWEALTH OF PUERTO RICO**

Supplemental Schedule of Expenditures by Agency – Budget and Actual
Budgetary Basis – General Fund

Year ended June 30, 2015

(In thousands)

| | Original budget | Amended budget | Actual |
|---|---|---|---|
| Economic development: | | | |
| Department of Transportation and Public Works | $ 44,370 | 41,389 | 50,116 |
| Department of Natural and Environmental Resources | 5,670 | 5,726 | 8,143 |
| Department of Agriculture | 16,819 | 30,463 | 47,261 |
| Cooperative Enterprises Development Administration | 3,929 | 2,626 | 2,600 |
| Department of Economic Development and Commerce | 800 | 744 | 701 |
| Agricultural Enterprises Development Administration | 84,987 | 81,206 | 88,374 |
| Energy Affairs Administration | 1,125 | 1,093 | 1,095 |
| Puerto Rico Infrastructure Financing Authority | 118,295 | 118,295 | 118,295 |
| Puerto Rico Industrial Development Company | 4,182 | 4,182 | 4,182 |
| Puerto Rico Housing Finance Authority | 658 | 658 | 658 |
| Puerto Rico Integrated Transportation Authority | 6,841 | 6,572 | 6,572 |
| Puerto Rico Land Administration | 1,600 | — | — |
| Puerto Rico Electric Power Authority | 23 | 23 | 23 |
| Puerto Rico Metropolitan Bus Authority | 34,711 | 31,889 | 31,648 |
| Puerto Rico Tourism Company | — | 23 | 23 |
| Culebra Conservation and Development Authority | 330 | 330 | 324 |
| National Parks Company of Puerto Rico | 20,073 | 20,040 | 20,040 |
| Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico | 491 | 282 | 255 |
| Ports of Americas Authority | 17,013 | 17,001 | 17,001 |
| Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | 792 | 764 | 1,674 |
| Puerto Rico Convention Center District Authority | 4,453 | 4,453 | 4,453 |
| Puerto Rico Maritime Transportation Authority | 32,512 | 33,426 | 29,697 |
| Total economic development | 399,674 | 401,185 | 433,135 |
| Intergovernmental – Municipal Services Administration | 369,180 | 369,180 | 252,516 |
| Total expenditures | $ 8,822,282 | 8,822,282 | 8,652,951 |
| Operating Transfer-out to Other Funds: | | | |
| Department of the Treasury – transfer to Debt Service Fund and other funds | $ 742,718 | 742,718 | 861,298 |

(1)   As a department and a fiscal agent.

See accompanying independent auditors' report.

356

(Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2015

**Special Revenue Funds**

Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects. Other resources (investment earnings and transfers from other funds, for example) also may be reported in the fund if those resources are restricted, committed, or assigned to the specified purpose of the fund.

*Public Buildings Authority Special Revenue Fund*

The operating fund of the Public Buildings Authority, a blended component unit, used to account for the operation, maintenance, equipment replacement, and other extraordinary operation and maintenance costs of the buildings and facilities that, when constructed, are leased to the Commonwealth's Primary Government agencies.

**Puerto Rico Infrastructure Financing Authority's Special Revenue Fund**

The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth. Under Act No. 44 of June 21, 1988, as amended, the Commonwealth conditionally allocates to this fund the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds. This special revenue fund also receives ARRA funds for the weatherization program aimed at converting certain government buildings into eco-friendly locations.

*Port of the Americas Authority's Special Revenue Fund*

The special revenue fund of Port of the Americas Authority, a blended component unit, is used to account for its remaining legal and certain other administrative requirements resulting after the transfer of all rights and duties to PPA. The main purpose of the PAA was the planning, development and construction of a large-scale container terminal in the city of Ponce, Puerto Rico.

*Special Communities Perpetual Trust's Special Revenue Fund*

The special revenue fund of the Special Communities Perpetual Trust, a blended component unit, is used to account for the moneys received from the Governmental Development Bank, through a line of credit financing and cash contributions, upon inception of the Special Communities Perpetual Trust. The financial resources received by this fund are used to carry out development projects that address the infrastructure and housing needs of certain under privileged communities.

*The Children's Trust Special Revenue Fund*

The special revenue fund of the Children's Trust, a blended component unit, is used to account for the money received by the Commonwealth from a global settlement agreement dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United State of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

(Continued)

CONFIDENTIAL

CW_STAY0010145

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2015

*University of Puerto Rico Comprehensive Cancer Canter's Special Revenue Fund*

The special revenue fund of the UPRCCC, a blended component unit, is used to account for the moneys received from the Commonwealth and certain other grants from both the private sector and the Federal government, to execute public policy related to the prevention, orientation, investigation and treatment of cancer in Puerto Rico. The medical and hospital operations of the UPRCCC, for which fees will be charged to patients, has not commenced at June 30, 2015.

**Debt Service Funds**

The debt service funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for principal and interest, and related costs other than bonds payable from operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following year are accounted for as a fund liability if resources are available as of June 30 for its payment.

*Public Buildings Authority Debt Service Fund*

A blended component unit engaged in the construction and/or acquisition of building facilities for lease mainly to the Commonwealth's Primary Government agencies. Its debt service fund is used to account for the financial resources that are restricted, committed, or assigned to expenditure for the payment of revenue bonds and other liabilities incurred to finance the construction of the buildings and facilities.

*Puerto Rico Infrastructure Financing Authority's Debt Service Fund*

The debt service fund of the Puerto Rico Infrastructure Financing Authority accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its special tax revenue bonds. These resources are received from operating transfers from the Puerto Rico Infrastructure Financing Authority Special Revenue Fund.

*Port of the Americas Authority's Debt Service Fund*

The debt service fund of of Port of the Americas Authority is used to account for the financial resources that are restricted for the payment of the long-term debt that remained at PAA after the transfer of its operations to PPA. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

*Puerto Rico Maritime Shipping Authority Debt Service Fund*

This is the remainder of a former shipping company owned by the Commonwealth. Its debt service fund is used to account for the financial resources that are restricted for the payment of the long-term liability that resulted from the sale of its marine operations. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

(Continued)

CONFIDENTIAL

CW_STAY0010146

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2015

*Special Communities Perpetual Trust's Debt Service Fund*

The debt service fund of the Special Communities Perpetual Trust accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its line of credit with the GDB, financed with moneys to be received by the Commonwealth from general legislative appropriations.

*The Children's Trust Debt Service Fund*

The debt service fund of The Children's Trust accounts for the financial resources that are restricted, committed, or assigned to expenditure for the payment of interest and principal on long-term obligations financed with moneys to be received by the Commonwealth from the global settlement agreement signed by certain tobacco companies.

**Capital Projects Funds**

Capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not being financed by the Public Buildings Authority's Capital Projects Fund, the Puerto Rico Infrastructure Financing Authority's Capital Project Fund, proprietary fund types, pension trust funds, and discretely presented component units.

*Commonwealth of Puerto Rico Capital Project Fund*

These funds present the activities of the capital improvements program of the Commonwealth, financed with the proceeds of the general obligation bonds.

*Public Buildings Authority's Capital Projects Fund*

The Public Buildings Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not financed by proprietary fund types, pension trust funds, and discretely presented component units.

*Puerto Rico Infrastructure Financing Authority's Capital Projects Fund*

The Puerto Rico Infrastructure Financing Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned for the acquisition or construction of capital assets and capital improvements, not financed by proprietary fund types, pension trust funds, and discretely presented component units.

359

CW_STAY0010147

**COMMONWEALTH OF PUERTO RICO**

Combining Balance Sheet – Nonmajor Governmental Funds

June 30, 2015

(In thousands)

| | Special Revenue | | | | | | Debt Service | | | | | Capital Projects | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | The Children's Trust | University of Puerto Rico Comprehensive Cancer Center | The Children's Trust | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | Puerto Rico Maritime Shipping Authority | Commonwealth of Puerto Rico | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Eliminations | Total Nonmajor Governmental Funds |
| **Assets:** | | | | | | | | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | $ 21,145 | — | — | — | 67 | 3,519 | — | — | — | — | — | — | 529 | — | — | — | 25,360 |
| Cash and cash equivalents in governmental banks | 16,433 | 5,991 | 306 | 241 | 17,261 | 7,661 | — | — | — | — | — | 163 | 93 | — | — | — | 48,341 |
| Investments | — | — | — | — | 14,927 | — | — | — | — | — | — | — | — | — | — | — | 14,927 |
| Receivables – net | | | | | | | | | | | | | | | | | |
| Intergovernmental | 9,844 | — | — | — | — | 752 | — | — | — | — | — | — | — | — | — | — | 10,596 |
| Accounts | — | 1,279 | — | — | — | — | — | — | — | — | — | — | 671 | — | — | — | 1,950 |
| Loans | — | — | — | — | — | — | — | — | — | — | — | — | 39 | — | — | — | 39 |
| Accrued interest | — | — | — | 36 | 1 | — | — | — | 8 | — | — | — | — | — | — | — | 45 |
| Other | 2,082 | — | — | — | — | 61 | 36,871 | — | — | — | — | — | — | — | — | — | 39,014 |
| Due from: | | | | | | | | | | | | | | | | | |
| Other funds | — | 2,356 | — | 1,321 | — | — | — | — | 11,785 | — | — | — | — | — | 16,951 | (15,363) | 15,978 |
| Component units | 44 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 44 |
| Other governmental entities | 1,390 | 22 | — | — | — | — | — | — | — | — | — | — | — | — | 6,151 | — | 7,563 |
| Other assets | 1,440 | — | — | 6 | — | 7 | — | — | — | — | — | — | — | — | — | — | 1,453 |
| Restricted assets: | | | | | | | | | | | | | | | | | |
| Cash and cash equivalents in commercial banks | — | — | — | — | — | 263 | — | 190,607 | 104,912 | — | — | — | — | 62,704 | 26,119 | — | 384,605 |
| Cash and cash equivalents in governmental banks | — | 9,583 | — | 5,204 | — | 525 | — | — | — | — | — | 57 | 37,378 | — | 32,768 | — | 85,396 |
| Cash equivalents in PRGITF | — | — | — | — | — | — | — | — | — | — | — | — | 69,674 | — | — | — | 69,674 |
| Investments | — | — | — | — | — | — | 109,226 | — | 3,136 | — | — | — | — | — | 629 | — | 111,965 |
| Due from other funds | — | 218,405 | — | — | — | — | — | — | — | — | — | 570 | — | — | — | — | 218,975 |
| Other | — | — | — | — | — | — | 442 | — | — | — | — | — | — | — | — | — | 442 |
| Real estate held for sale or future development | 198 | — | — | — | — | — | — | — | — | — | — | — | 1,856 | — | — | — | 2,052 |
| Total assets | $ 52,576 | 237,665 | 306 | 6,710 | 32,256 | 13,088 | 145,541 | 190,607 | 119,839 | — | — | 770 | 110,026 | 62,704 | 54,619 | (15,363) | 1,041,345 |
| **Liabilities, deferred outflow of resources, and fund balances (deficit):** | | | | | | | | | | | | | | | | | |
| Accounts payable and accrued liabilities | $ 14,768 | 11,249 | 614 | 21,711 | 250 | 51,988 | — | — | — | — | — | 110 | 39,207 | 21,595 | 51,897 | — | 193,070 |
| Due to: | | | | | | | | | | | | | | | | | |
| Other funds | 2,543 | 169 | 2,635 | — | — | — | — | — | — | — | — | — | — | 12,952 | 2,243 | (15,363) | 5,160 |
| Component units | 7,547 | — | — | — | — | 1,206 | — | — | — | — | — | — | — | — | — | — | 8,753 |
| Other governmental entities | 3,110 | — | — | — | — | — | — | — | — | — | — | — | 2,826 | — | — | — | 5,936 |
| Notes payable to GDB | — | — | 1,700 | — | — | — | — | — | — | — | — | — | — | — | — | — | 1,700 |
| General obligation and revenue bonds | — | — | — | — | — | — | — | 82,000 | — | — | — | — | — | — | — | — | 82,000 |
| Interest payable | — | — | 965 | — | — | — | — | 103,055 | — | — | — | 570 | — | — | — | — | 103,790 |
| Unearned revenue | 5,095 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 5,095 |
| Total liabilities | 33,063 | 11,418 | 5,117 | 21,711 | 250 | 53,094 | — | 185,055 | — | — | — | 680 | 42,035 | 34,547 | 54,139 | (15,363) | 405,526 |
| **Deferred inflow of resources:** | | | | | | | | | | | | | | | | | |
| Global tobacco settlement agreement | — | — | — | — | — | — | 36,871 | — | — | — | — | — | — | — | — | — | 36,871 |
| Total deferred inflow of resources | — | — | — | — | — | — | 36,871 | — | — | — | — | — | — | — | — | — | 36,871 |
| **Fund balances:** | | | | | | | | | | | | | | | | | |
| Nonspendable | — | — | — | — | — | 7 | — | — | — | — | — | — | — | — | — | — | 7 |
| Restricted for: | | | | | | | | | | | | | | | | | |
| Debt service | — | — | — | — | — | — | 108,670 | 5,552 | 119,839 | — | — | — | — | — | — | — | 234,061 |
| Capital projects | — | 218,405 | — | — | — | — | — | — | — | — | — | — | 67,993 | 28,357 | 30,460 | — | 345,255 |
| Committed to: | | | | | | | | | | | | | | | | | |
| Public housing and welfare | — | — | — | 25,467 | — | — | — | — | — | — | — | — | — | — | — | — | 25,467 |
| Assigned to: | | | | | | | | | | | | | | | | | |
| Public housing and welfare | — | — | — | 6,539 | — | — | — | — | — | — | — | — | — | — | — | — | 6,539 |
| Capital projects | 19,513 | 7,842 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | 27,355 |
| Debt service | — | — | — | — | — | — | — | — | — | — | — | 90 | — | — | — | — | 90 |
| Unassigned (deficit) | — | — | (4,809) | (15,001) | 32,006 | (20,013) | — | — | — | — | — | — | — | — | — | — | (59,823) |
| Total fund balances (deficit) | 19,513 | 226,247 | (4,809) | (15,001) | 32,006 | (20,006) | 108,670 | 5,552 | 119,839 | — | — | 90 | 67,993 | 28,357 | 30,460 | — | 598,951 |
| Total liabilities, deferred inflow of resources, and fund balances (deficit) | $ 52,576 | 237,665 | 306 | 6,710 | 32,256 | 13,088 | 145,541 | 190,607 | 119,839 | — | — | 770 | 110,026 | 62,704 | 54,619 | (15,363) | 1,041,345 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010148

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Revenue, Expenditures, and Changes in Fund Balances – Nonmajor Governmental Funds

Year ended June 30, 2015

(In thousands)

| | Special Revenue | | | | | | Debt Service | | | | | | Capital Projects | | | | |
| | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | The Children's Trust | University of Puerto Rico Comprehensive Cancer Center | The Children's Trust | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Ports of the Americas Authority | Special Communities Perpetual Trust | Puerto Rico Maritime Shipping Authority | Commonwealth of Puerto Rico | Public Buildings Authority | Puerto Rico Infrastructure Financing Authority | Eliminations | Total Nonmajor Governmental Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | | | | |
| Revenue from component units | $ — | — | — | — | — | 1,339 | — | — | 6,033 | — | — | — | — | — | — | — | 6,033 |
| Intergovernmental | — | — | — | — | — | 17 | — | 36,000 | — | — | — | — | — | — | — | — | 37,309 |
| Interest and investment earnings | 665 | 9 | — | 473 | 21 | 17 | 3,384 | — | 176 | — | — | 1 | — | — | 119 | — | 4,865 |
| Other | 215 | 3,119 | — | 712 | — | 452 | — | — | 2,770 | — | — | — | — | — | 110 | — | 7,378 |
| Total revenue | 880 | 3,128 | — | 1,185 | 21 | 1,778 | 3,384 | 36,000 | 8,979 | — | — | 1 | — | — | 229 | — | 55,585 |
| **Expenditures** | | | | | | | | | | | | | | | | | |
| **Current:** | | | | | | | | | | | | | | | | | |
| General government | 162,529 | 6,930 | — | 97,035 | — | — | — | — | — | — | — | 1,309 | 20,995 | 10,248 | — | — | 299,046 |
| Public safety | — | — | — | — | 109 | — | — | — | — | — | — | — | 360 | — | — | — | 360 |
| Health | — | — | — | — | 109 | 7,356 | — | — | — | — | — | — | 2,473 | — | — | — | 9,938 |
| Public housing and welfare | — | 4 | — | 2,859 | 779 | — | — | — | — | — | — | — | 4,169 | — | — | — | 7,811 |
| Education | — | — | — | — | — | — | — | — | — | — | — | — | 1,032 | — | 1,386 | — | 2,418 |
| Economic development | — | 227,438 | 1,220 | — | — | — | — | — | — | — | — | 99 | 31,386 | — | 3,131 | — | 263,274 |
| Intergovernmental | — | 1,358 | 2,757 | — | 402 | — | — | — | — | — | — | — | 15,912 | — | — | — | 16,314 |
| Capital outlays | — | — | — | — | — | 66,727 | — | — | — | — | — | — | 8,027 | 87,158 | 22,279 | — | 189,306 |
| **Debt service:** | | | | | | | | | | | | | | | | | |
| Principal | 35 | — | — | — | — | — | 25,790 | 87,875 | 37,755 | 226,261 | — | — | — | — | — | — | 377,736 |
| Interest and other | 4,167 | 1,295 | — | — | — | — | 49,672 | 225,611 | 81,826 | 6,693 | 10,939 | 6,837 | — | — | — | — | 387,040 |
| Other – debt issuance costs | — | — | — | — | — | — | — | — | 1,067 | — | — | — | — | — | — | — | 1,067 |
| Total expenditures | 166,731 | 237,025 | 3,977 | 99,894 | 1,290 | 74,083 | 75,462 | 313,486 | 120,648 | 232,974 | 10,939 | 8,245 | 85,354 | 97,406 | 26,796 | — | 1,554,310 |
| **Deficiency of revenue under expenditures** | (165,851) | (233,897) | (3,977) | (98,709) | (1,269) | (72,305) | (72,078) | (277,486) | (111,669) | (232,974) | (10,939) | (8,244) | (85,354) | (97,406) | (26,567) | — | (1,498,725) |
| **Other financing sources (uses):** | | | | | | | | | | | | | | | | | |
| Transfers in | 340,866 | 360,958 | 223 | 138 | 8 | 8,500 | 71,746 | 273,151 | 151,672 | 102 | 10,939 | 6,837 | — | 18,889 | 18,938 | (633,561) | 629,316 |
| Transfers out | (292,040) | (112,983) | — | — | — | — | (8) | — | (227,670) | — | — | — | — | — | (850) | 633,561 | — |
| Proceeds from long term debt issued | — | 257 | 2,764 | — | — | 48,279 | — | — | 245,955 | — | — | — | 43,369 | 2,766 | 7 | — | 343,397 |
| Issuance of refunding bonds | — | — | — | — | — | — | — | — | — | 232,872 | — | — | — | — | — | — | 232,872 |
| Discount on bonds issued | — | — | — | — | — | — | — | — | (17,217) | — | — | — | — | — | — | — | (17,217) |
| Total other financing sources | 48,826 | 248,232 | 2,987 | 138 | 8 | 56,779 | 71,738 | 273,151 | 152,740 | 232,974 | 10,939 | 6,837 | 43,369 | 21,655 | 17,995 | — | 1,188,368 |
| **Net change in fund balances** | (117,025) | 14,335 | (990) | (98,571) | (1,261) | (15,526) | (340) | (4,335) | 41,071 | — | — | (1,407) | (41,985) | (75,751) | (8,572) | — | (310,357) |
| Fund balances (deficit) – beginning of year (as restated)(note 3 to financial statements) | 136,538 | 211,912 | (3,819) | 83,570 | 33,287 | (4,480) | 108,010 | 9,887 | 78,768 | — | — | 1,497 | 109,978 | 104,108 | 39,052 | — | 908,508 |
| Fund balances – end of year | $ 19,513 | 226,247 | (4,809) | (15,001) | 32,026 | (20,006) | 108,670 | 5,552 | 119,839 | — | — | 90 | 67,993 | 28,357 | 30,480 | — | 598,151 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010149

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Proprietary Funds

Year ended June 30, 2015

**Nonmajor Proprietary Funds**

Proprietary funds are used to account for operations that are financed and operated in a manner similar to private business enterprises where the intent of the government is that the costs of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges. 9-1-1 Services

**Governing Board (9-1-1 Service)**

This fund was created by Act No. 144 on December 22, 1994. The 9-1-1 Service is responsible for providing an efficient service of fast response to emergency calls through the 9-1-1 number, and transferring these to the appropriate response agencies.

**Disability Insurance**

This fund was created by Act No. 139 on June 26, 1968. It is used to account for disability benefits to remedy temporarily the loss of income as a result of disability caused by sickness or accident unrelated to the employment.

**Drivers' Insurance**

This fund was created by Act No. 428 on May 15, 1950. It is used to account for contributions made by the drivers and their employers to provide a social security plan for the benefit of the drivers in Puerto Rico. The plan also includes payment of benefits for health and life insurance.

**Ponce Ports Authority**

This fund was created by Act No. 240 on December 12, 2011. It is used to account for the development of the container terminal formerly undertaken by PAA and handle such facilities future operations.

**Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund**

This fund was created by Act No. 32 on July 7, 1997. It is administered, pursuant to Act No. 9 of June 18, 1970, as amended, by the Puerto Rico Department of Health (DOH). Pursuant to such act, the DOH, on behalf of the Commonwealth, is authorized to enter into operating and capitalization grant agreements with the EPA for lending activities.

362

CW_STAY0010150

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Net Position – Nonmajor Proprietary Funds

June 30, 2015

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 9-1-1 Service Governing Board | Disability Insurance | Drivers' Insurance | Ponce Ports Authority | Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total |
| Assets: | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents in governmental banks $ | — | 51,069 | 15,782 | 13 | — | 66,864 |
| Receivables - net: | | | | | | |
| Insurance premiums | — | 3,079 | 1,188 | — | — | 4,267 |
| Accrued interest | — | 50 | — | — | — | 50 |
| Accounts | 2,212 | — | — | — | — | 2,212 |
| Other | 45 | 260 | — | — | — | 305 |
| Due from other funds | — | — | 3,552 | 2,630 | — | 6,182 |
| Other assets | 46 | — | — | 2 | — | 48 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | — | 1,112 | — | — | — | 1,112 |
| Cash and cash equivalents in governmental banks | 12,945 | — | — | — | 41,442 | 54,387 |
| Receivables - net: | | | | | | |
| Accrued interest | — | — | — | — | 1,612 | 1,612 |
| Loans from component units | — | — | — | — | 8,032 | 8,032 |
| Total current assets | 15,248 | 55,570 | 20,522 | 2,645 | 51,086 | 145,071 |
| Noncurrent assets: | | | | | | |
| Receivables - net: | | | | | | |
| Loans from component units – restricted | — | — | — | — | 162,478 | 162,478 |
| Due from other funds | — | — | 10,879 | — | — | 10,879 |
| Restricted investments | — | 38,118 | — | — | — | 38,118 |
| Land and other nondepreciable assets | 3,772 | — | — | 16,193 | — | 19,965 |
| Depreciable assets | 3,334 | 111 | — | — | — | 3,445 |
| Total assets | 22,354 | 93,799 | 31,401 | 18,838 | 213,564 | 379,956 |
| Liabilities and net position: | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable and accrued liabilities | 4,243 | 736 | 285 | 42 | 154 | 5,460 |
| Due to other governmental entities | 101 | — | 8 | — | — | 109 |
| Interest payable | — | — | — | 931 | — | 931 |
| Unearned revenue | — | 2,745 | 15 | — | — | 2,760 |
| Compensated absences | 777 | 437 | 264 | — | — | 1,478 |
| Voluntary termination benefits payable | 171 | — | — | — | — | 171 |
| Liability for unemployment and disability benefits | — | 499 | 152 | — | — | 651 |
| Total current liabilities | 5,292 | 4,417 | 724 | 973 | 154 | 11,560 |
| Noncurrent liabilities: | | | | | | |
| Notes payable to component units | — | — | — | 19,100 | — | 19,100 |
| Compensated absences | 625 | 656 | 395 | — | — | 1,676 |
| Voluntary termination benefits payable | 397 | — | — | — | — | 397 |
| Total liabilities | 6,314 | 5,073 | 1,119 | 20,073 | 154 | 32,733 |
| Net position: | | | | | | |
| Net investment in capital assets | 6,989 | 111 | — | — | — | 7,100 |
| Restricted for lending activities | — | — | — | — | 213,410 | 213,410 |
| Restricted for payment of insurance benefits | — | 37,619 | — | — | — | 37,619 |
| Restricted for emergency services | 6,984 | — | — | — | — | 6,984 |
| Unrestricted | 2,067 | 50,996 | 30,282 | (1,235) | — | 82,110 |
| Total net position $ | 16,040 | 88,726 | 30,282 | (1,235) | 213,410 | 347,223 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010151

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Revenue, Expenses, and Changes in Fund Net Position – Nonmajor Proprietary Funds

Year ended June 30, 2015

(In thousands)

| | Business-Type Activities – Nonmajor Enterprise Funds | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 9-1-1 Service Governing Board | Disability Insurance | Drivers' Insurance | Ponce Ports Authority | Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total |
| Operating revenue: | | | | | | |
| Insurance premiums | $        — | 18,976 | 4,606 | — | — | 23,582 |
| Emergency telephone service charges | 21,226 | — | — | — | — | 21,226 |
| Interest | — | — | — | — | 3,228 | 3,228 |
| Other | — | — | — | 313 | — | 313 |
| Total operating revenue | 21,226 | 18,976 | 4,606 | 313 | 3,228 | 48,349 |
| Operating expenses: | | | | | | |
| Insurance benefits | — | 1,705 | 808 | — | — | 2,513 |
| General, administrative, and other operating expenses | 12,922 | 12,948 | 3,817 | 617 | 591 | 30,895 |
| Total operating expenses | 12,922 | 14,653 | 4,625 | 617 | 591 | 33,408 |
| Operating income (loss) | 8,304 | 4,323 | (19) | (304) | 2,637 | 14,941 |
| Nonoperating revenue (expenses): | | | | | | |
| U.S. government grants | — | — | — | — | 18,401 | 18,401 |
| Contributions to component units | — | — | — | — | (5,024) | (5,024) |
| Interest and investment earnings | 387 | 1,128 | 467 | — | — | 1,982 |
| Interest expense | — | — | — | (931) | — | (931) |
| Total nonoperating revenue | 387 | 1,128 | 467 | (931) | 13,377 | 14,428 |
| Income before transfers | 8,691 | 5,451 | 448 | (1,235) | 16,014 | 29,369 |
| Transfers from other funds | — | — | — | — | 3,830 | 3,830 |
| Transfers to other funds | (17,706) | (5,455) | — | — | — | (23,161) |
| Net change in net position | (9,015) | (4) | 448 | (1,235) | 19,844 | 10,038 |
| Net position – beginning of year, as adjusted (see note 3 to the financial statement) | 25,055 | 88,730 | 29,834 | — | 193,566 | 337,185 |
| Net position – end of year | $     16,040 | 88,726 | 30,282 | (1,235) | 213,410 | 347,223 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010152

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Cash Flows – Nonmajor Proprietary Funds

Year ended June 30, 2015

(In thousands)

| | | Business-Type Activities – Nonmajor Enterprise Funds | | | | |
|---|---|---|---|---|---|---|
| | 9-1-1 Service Governing Board | Disability Insurance | Drivers' Insurance | Ponce Ports Authority | Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund | Total |
| Cash flows from operating activities: | | | | | | |
| Receipts from customers and users | $   21,303 | 18,947 | 4,579 | 313 | — | 45,142 |
| Payments to suppliers and employees | (14,013) | (12,779) | (3,690) | (577) | (627) | (31,686) |
| Payments of insurance benefits | — | (1,807) | (802) | — | — | (2,609) |
| Net cash provided by (used in) operating activities | 7,290 | 4,361 | 87 | (264) | (627) | 10,847 |
| Cash flows from noncapital financing activities: | | | | | | |
| U.S. government grants | — | — | — | (2,630) | 18,401 | 15,771 |
| Contributions to component units | — | — | — | — | (5,024) | (5,024) |
| Transfers from other funds | — | — | 5,710 | — | 3,830 | 9,540 |
| Transfers to other funds | (22,184) | (6,258) | — | — | — | (28,442) |
| Net cash provided by (used in) noncapital financing activities | (22,184) | (6,258) | 5,710 | (2,630) | 17,207 | (8,155) |
| Cash flows from capital and related financing activities – capital expenditures | (4,012) | — | — | (16,193) | — | (20,205) |
| Cash flows from investing activities: | | | | | | |
| Interest collected on deposits, investments, and loans | 387 | 1,224 | (86) | — | 3,168 | 4,693 |
| Loans originated | — | — | — | 19,100 | (18,990) | 110 |
| Principal collected on loans | — | — | — | — | 7,464 | 7,464 |
| Proceeds from sales and maturities of investments | — | 8,475 | — | — | — | 8,475 |
| Purchases of investments | — | (7,967) | — | — | — | (7,967) |
| Net cash provided by (used in) investing activities | 387 | 1,732 | (86) | 19,100 | (8,358) | 12,775 |
| Net increase (decrease) in cash and cash equivalents | (18,519) | (165) | 5,711 | 13 | 8,222 | (4,738) |
| Cash and cash equivalents – beginning of year | 31,464 | 52,346 | 10,071 | — | 33,220 | 127,101 |
| Cash and cash equivalents – end of year | 12,945 | 52,181 | 15,782 | 13 | 41,442 | 122,363 |
| Reconciliation of operating income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Operating income | 8,304 | 4,323 | (19) | (304) | 2,637 | 14,941 |
| Adjustments to reconcile operating income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Interests earned on deposits, loans, and investments | — | — | — | — | (3,228) | (3,228) |
| Depreciation | 835 | 45 | — | — | — | 880 |
| Loss on disposition of capital assets | 131 | — | — | — | — | 131 |
| Changes in operating assets and liabilities: | | | | | | |
| Increase in accounts receivable | (98) | (75) | (24) | — | — | (197) |
| Decrease (increase) in other assets | 175 | — | — | (2) | — | 173 |
| Increase (decrease) in accounts payable and accrued liabilities | 2,085 | 127 | 102 | 42 | (36) | 2,320 |
| Increase (decrease) in due to other governmental entities | (3,761) | — | 4 | — | — | (3,757) |
| Increase (decrease) in unearned revenue | — | 46 | (3) | — | — | 43 |
| Increase (decrease) in compensated absences | (212) | (3) | 21 | — | — | (194) |
| Increase in voluntary termination benefits payable | (169) | — | — | — | — | (169) |
| Increase (decrease) in liability for unemployment and disability benefits payable | — | (102) | 6 | — | — | (96) |
| Total adjustments | (1,014) | 38 | 106 | 40 | (3,264) | (4,094) |
| Net cash provided by (used in) operating activities | $   7,290 | 4,361 | 87 | (264) | (627) | 10,847 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010153

## COMMONWEALTH OF PUERTO RICO

Fiduciary Funds

Year ended June 30, 2015

Fiduciary funds are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units. Following are the Commonwealth's fiduciary funds:

**Pension Trust Funds**

Prior to the enactment of Act No.107 of 2017 on August 23, 2017, the pension trust funds were used to account for the assets, liabilities, and net assets available for pension benefits held in trust for the public employees of the Commonwealth. After August 23, 2017, all pension benefits will be paid from the Primary Government's General Fund (as discussed in Note 22), and as of the date hereof, the pension trust funds are no longer applicable.

### *Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)*

ERS is a cost-sharing multiple-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 447 on May 15, 1951. ERS is sponsored by the Commonwealth, public corporations, and municipalities of Puerto Rico. Substantially all full-time employees of the Commonwealth and its instrumentalities are covered by the ERS. All regular appointed and temporary employees of the Commonwealth become plan members at the date of employment. Prior to August 23, 2017, ERS was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration) that also administered the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). The ERS MIPC is an unfunded, cost-sharing, multi-employer, defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

### *Puerto Rico System of Annuities and Pensions for Teachers (TRS)*

TRS is a cost-sharing multiple-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Teachers Retirement System and was created by Act No.91 of March 29, 2004, that superseded Act No. 218 of May 6, 1951. TRS is sponsored by the Commonwealth. All active teachers of the Commonwealth's Department of Education are covered by the TRS. Licensed teachers working in private schools or other educational organizations have the option to become members of TRS as long as the required employer and employee contributions are satisfied. The employees of the TRS are also plan members. Prior to August23, 2017, TRS was administered by the Puerto Rico Teachers Retirement System (the TRS Administration) that also administered the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC), an unfunded, cost-sharing, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of the TRS Administration.

### *Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)*

JRS is a single-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 12 on October 19, 1954. The JRS is sponsored by the Commonwealth. All judges of the judiciary branch of the Commonwealth are plan members. The JRS provides retirement benefits to the employees of the judiciary branch of the Commonwealth through the office of the Administration of Court Facilities. Prior to August 23, 2017, JRS was administered by the ERS and JRS Administration that also administered the Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC), an unfunded,

366

CW_STAY0010154

**COMMONWEALTH OF PUERTO RICO**

Fiduciary Funds

Year ended June 30, 2015

single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired judges of the Judiciary Branch of the Commonwealth.

**Agency Fund**

Agency fund is used to account for assets held by the Commonwealth as an agent for individuals, private organizations, and other governments. This fund is custodial in nature (assets equal liabilities) and does not involve measurement of the results of operations.

**Special Deposits**

This fund acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections, and agency accounts for which the Commonwealth act in an agent's capacity.

367

CONFIDENTIAL

CW_STAY0010155

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Fiduciary Net Position – Pension Trust Funds

June 30, 2015

(In thousands)

| | | Pension Trust Funds | | | | |
|---|---|---|---|---|---|---|
| | (ERS) | | (TRS) | | (JRS) | |
| | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Total |
| Assets: | | | | | | | |
| Cash and cash equivalents in commercial banks: | | | | | | | |
| Unrestricted | $ 96,394 | — | 59,193 | — | 1,624 | — | 157,211 |
| Restricted | 126,613 | — | — | — | — | — | 126,613 |
| Cash and cash equivalents in governmental banks: | | | | | | | |
| Unrestricted | 105,355 | — | 1,240 | — | 3,173 | — | 109,768 |
| Restricted | 34,685 | — | 3,305 | — | — | — | 37,990 |
| Receivables – net: | | | | | | | |
| Employers | 183,359 | — | — | — | — | — | 183,359 |
| Accrued interest and dividends | 5,314 | — | 3,399 | — | 162 | — | 8,875 |
| Investments sold | 108,607 | — | 46,862 | — | 1,000 | — | 156,469 |
| Other | 13,747 | — | 9,983 | — | 62 | — | 23,792 |
| Due from JRS (Due to ERS) | 7,090 | — | — | — | (7,090) | — | — |
| Collateral from securities lending transactions | 80,071 | — | 25,960 | — | 1,393 | — | 107,424 |
| Investments at fair value: | | | | | | | |
| Bonds and notes | 794,761 | — | 371,022 | — | 20,083 | — | 1,185,866 |
| Nonexchange commingled trust funds | 467,823 | — | 335,528 | — | 23,511 | — | 826,862 |
| Stocks | 1 | — | 66,357 | — | — | — | 66,358 |
| Investments in limited partnerships | 54,026 | — | 7,500 | — | — | — | 61,526 |
| Member loans and interest receivable– net | 607,617 | — | 415,946 | — | 477 | — | 1,024,040 |
| Capital assets – net | 10,521 | — | 16,570 | — | — | — | 27,091 |
| Other assets | 785 | — | 1,065 | — | — | — | 1,850 |
| Total assets | 2,696,769 | — | 1,363,930 | — | 44,395 | — | 4,105,094 |
| Liabilities: | | | | | | | |
| Accounts payable and accrued liabilities | 9,329 | — | 17,218 | — | 2,381 | — | 28,928 |
| Interest payable | 13,876 | — | — | — | — | — | 13,876 |
| Payable for investment securities purchased | 7,754 | — | 2,518 | — | — | — | 10,272 |
| Securities lending obligations | 80,071 | — | 25,960 | — | 1,393 | — | 107,424 |
| Due to Commonwealth of Puerto Rico | 76,613 | — | — | — | — | — | 76,613 |
| Other liabilities | 71,950 | — | 7,153 | — | 449 | — | 79,552 |
| Bonds payable | 3,105,448 | — | — | — | — | — | 3,105,448 |
| Total liabilities | 3,365,041 | — | 52,849 | — | 4,223 | — | 3,422,113 |
| Net position restricted for pensions | $ (668,272) | — | 1,311,081 | — | 40,172 | — | 682,981 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010156

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds

Year ended June 30, 2015

(In thousands)

| | Pension Trust Funds | | | | | | |
| | (ERS) | | (TRS) | | (JRS) | | |
| | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Pension | Postemployment healthcare benefits | Total |
|---|---|---|---|---|---|---|---|
| **Additions:** | | | | | | | |
| Contributions: | | | | | | | |
| Employer contributions: | | | | | | | |
| Basic benefits, net of provision to allowance of $222,015 for the ERS and $11,600 for the JRS | $ 479,911 | — | 145,773 | — | 10,578 | — | 636,262 |
| Special benefits | 186,136 | 97,374 | 48,768 | 37,776 | 1,759 | 307 | 372,120 |
| Member contributions | 339,650 | — | 107,465 | — | 3,676 | — | 450,791 |
| Total contributions | 1,005,697 | 97,374 | 302,006 | 37,776 | 16,013 | 307 | 1,459,173 |
| Investment income and investment expense: | | | | | | | |
| Net appreciation (depreciation) in fair value of investments | (46,453) | — | 5,950 | — | 138 | — | (40,365) |
| Interest | 81,603 | — | 54,444 | — | 759 | — | 136,806 |
| Dividends | 60 | — | 1,451 | — | — | — | 1,511 |
| Investment expense, other than from security lending | (2,775) | — | (2,018) | — | — | — | (4,793) |
| Net income from investing, other than from security lending | 32,435 | — | 59,827 | — | 897 | — | 93,159 |
| Securities lending income | 216 | — | 125 | — | 3 | — | 344 |
| Securities lending expenses | (51) | — | (31) | — | (1) | — | (83) |
| Net income from security lending | 165 | — | 94 | — | 2 | — | 261 |
| Net investment income | 32,600 | — | 59,921 | — | 899 | — | 93,420 |
| Other income | 28,499 | — | 1,057 | — | 873 | — | 30,429 |
| Total additions | 1,066,796 | 97,374 | 362,984 | 37,776 | 17,785 | 307 | 1,583,022 |
| **Deductions:** | | | | | | | |
| Benefits paid to participants | 1,541,324 | 97,374 | 716,893 | 37,776 | 23,130 | 307 | 2,416,804 |
| Refunds of contributions | 31,351 | — | 19,407 | — | 4 | — | 50,762 |
| Interest on bonds payable | 194,400 | — | — | — | — | — | 194,400 |
| General and administrative | 33,623 | — | 19,382 | — | 486 | — | 53,491 |
| Other expenses | 15,036 | — | — | — | 60 | — | 15,096 |
| Total deductions | 1,815,734 | 97,374 | 755,682 | 37,776 | 23,680 | 307 | 2,730,553 |
| Net change in net position | (748,938) | — | (392,698) | — | (5,895) | — | (1,147,531) |
| Net position restricted for pensions: | | | | | | | |
| Beginning of year, as adjusted and restated | 80,666 | — | 1,703,779 | — | 46,067 | — | 1,830,512 |
| End of year | $ (668,272) | — | 1,311,081 | — | 40,172 | — | 682,981 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010157

**COMMONWEALTH OF PUERTO RICO**

Combining Statement of Changes in Assets and Liabilities – Agency Funds

Year ended June 30, 2015

(In thousands)

| Assets | | Balance at June 30, 2014 | Additions | Deletions | Balance at June 30, 2015 |
|---|---|---|---|---|---|
| Cash and cash equivalents in commercial banks | $ | 577,386 | 49,653 | 28,191 | 598,848 |
| Cash and cash equivalents with governmental banks | | 293,167 | 5,541,883 | 5,642,573 | 192,477 |
| Total assets | $ | 870,553 | 5,591,536 | 5,670,764 | 791,325 |
| **Liabilities** | | | | | |
| Accounts payable and accrued liabilities | $ | 870,553 | 5,591,536 | 5,670,764 | 791,325 |
| Total liabilities | $ | 870,553 | 5,591,536 | 5,670,764 | 791,325 |

See accompanying independent auditors' report.

370

(Continued)

CW_STAY0010158

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Year ended June 30, 2015

These entities, all legally separate entities, consistent with GASB Statement No. 14, as amended by GASB Statement Nos. 39 and 61, are discretely presented in a separate column of the basic financial statements of the Primary Government principally because of the nature of the services they provide, the Commonwealth's ability to impose its will, principally through the appointment of their governing authorities, and because these component units provide specific financial benefits to, or impose financial burdens on, the Commonwealth (with the exception of Culebra Conservation and Development Authority and the Puerto Rico Science, Technology and Research Trust, which does not meet all these criteria, but the Commonwealth has determined it would be misleading to exclude it from the Commonwealth's financial reporting entity). These entities have been classified as nonmajor component units because management believes they do not meet the following factors for inclusion as major: a) the services provided by the component unit to the citizenry are such that separate reporting as a major component unit is considered to be essential to financial statement users, b) there are significant transactions with the Primary Government, or c) there is a significant financial benefit or burden relationship with the Primary Government. The accounting principles followed by each of the component units included herein may vary depending on the type of industries they are involved in (that is, banking, construction, public utilities, and so forth). The detailed information for each of these entities may be obtained directly from the administrative offices of the corresponding entities, as described in Note 1 to the basic financial statements included in the financial section of this report.

371

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2015

(In thousands)

| | Agricultural Enterprises Development Administration | Automobile Accidents Compensation Administration | Cardiovascular Center Corporation of Puerto Rico and the Caribbean | Company for the Integral Development of the "Península de Cantera" | Corporation for the "Caño Martín Peña" ENLACE Project |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash and cash equivalents in commercial banks | $ — | 11,674 | 7,610 | 1,717 | 388 |
| Cash and cash equivalents in governmental banks | — | — | — | — | — |
| Investments | — | 142,131 | — | — | — |
| Receivables – net: | | | | | |
| Insurance premiums | — | 1,028 | — | — | — |
| Intergovernmental | — | — | 2 | — | — |
| Accounts | 1,992 | — | 5,291 | — | — |
| Loans and advances | — | 2,000 | — | 5,693 | — |
| Accrued interest | — | 581 | — | — | — |
| Other | 60 | 882 | — | 20 | — |
| Due from – net: | | | | | |
| Primary government | 33,207 | — | — | — | — |
| Component units | — | — | — | — | — |
| Other governmental entities | 60 | 99 | 1,797 | 479 | 507 |
| Inventories | 11,726 | — | 1,968 | — | — |
| Prepaid expenses | 597 | — | 563 | 30 | — |
| Other assets | — | 267 | — | — | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | 6,630 | 279 | — | — | 64 |
| Cash and cash equivalents in governmental banks | 17,923 | — | — | — | — |
| Investments | — | — | — | — | — |
| Other restricted assets | — | — | — | 497 | — |
| Real estate held for sale or future development | — | — | — | 1,051 | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | 3,739 | 1,026 | 103 | 80 | 2,012 |
| Depreciable, net | 22,313 | 4,744 | 15,797 | 4,055 | 1,253 |
| Total assets | 98,247 | 164,711 | 33,131 | 13,642 | 4,234 |
| Deferred outflows of resources: | | | | | |
| Loss on bonds refunding | — | — | — | — | — |
| Pension related | 9,877 | 7,938 | — | — | — |
| Total deferred outflows of resources | 9,877 | 7,938 | — | — | — |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | 35,238 | 5,608 | 28,643 | 614 | 333 |
| Deposits and escrow liabilities | — | — | — | — | — |
| Due to: | | | | | |
| Primary government | — | — | 21,155 | — | — |
| Component units | 102,800 | — | 15,034 | 38,280 | — |
| Other governmental entities | 161 | 349 | 1,513 | — | — |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — |
| Interest payable | — | — | — | 2,081 | — |
| Unearned revenue | 1,391 | 39,877 | — | — | 64 |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | — | — | — | — |
| Notes payable | 16,359 | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | 2,540 | 3,252 | 3,908 | 83 | 74 |
| Voluntary termination benefits payable | 2,657 | — | — | — | — |
| Liability for automobile accident insurance, and workmen's compensation | — | 74,708 | — | — | — |
| Other long-term liabilities | 7,142 | — | 267 | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | — | — | — | — |
| Notes payable | — | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | 2,785 | — | — | — | 112 |
| Net pension obligation | — | — | — | — | — |
| Net pension liability | 167,598 | 133,003 | — | — | — |
| Voluntary termination benefits payable | 20,760 | — | — | — | — |
| Other long-term liabilities | — | 4,892 | 5,173 | — | — |
| Total liabilities | 359,431 | 261,689 | 75,693 | 41,058 | 583 |
| Deferred inflows of resources: | | | | | |
| Service concession arrangements | — | — | — | — | — |
| Pension related | 1,341 | 840 | — | — | — |
| Total deferred inflows of resources | 1,341 | 840 | — | — | — |
| **Net position:** | | | | | |
| Net investment in capital assets | 26,052 | 5,770 | 15,900 | 4,145 | 3,275 |
| Restricted for: | | | | | |
| Capital projects | 208,644 | — | — | — | — |
| Debt service | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | 497 | — |
| Other specified purposes | — | — | — | — | 415 |
| Unrestricted (deficit) | (487,344) | (95,650) | (58,462) | (32,058) | (39) |
| Total net position (deficit) | $ (252,648) | (89,880) | (42,562) | (27,416) | 3,651 |

(Continued)

CONFIDENTIAL

CW_STAY0010160

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2015

(In thousands)

| | Culebra Conservation and Development Authority | Economic Development Bank for Puerto Rico | Farm Insurance Corporation of Puerto Rico | Fine Arts Center Corporation | Institute of Puerto Rican Culture |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Cash and cash equivalents in commercial banks | $  70 | 16,484 | 1,216 | 2,258 | 5,234 |
| Cash and cash equivalents in governmental banks | — | 673 | 4,021 | — | — |
| Investments | — | 499,794 | — | — | — |
| Receivables – net: | | | | | |
| Insurance premiums | — | — | — | — | — |
| Intergovernmental | — | — | — | — | 130 |
| Accounts | — | — | — | 152 | 124 |
| Loans and advances | — | 298,053 | — | — | — |
| Accrued interest | — | 7,240 | — | — | — |
| Other | — | — | 81 | — | — |
| Due from – net: | | | | | |
| Primary government | — | — | — | — | — |
| Components | — | — | 4,447 | — | — |
| Other governmental entities | — | 84 | 2,949 | 110 | — |
| Inventories | — | — | — | — | 2,002 |
| Prepaid expenses | — | — | — | 110 | — |
| Other assets | — | 4,993 | — | — | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | 65 | 469 | — | 553 | 7,691 |
| Cash and cash equivalents in governmental banks | — | — | — | — | 2,340 |
| Investments | — | — | — | — | — |
| Other restricted assets | — | 8,387 | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | 640 | 2,735 | — | 3,179 | 753 |
| Depreciable, net | 215 | 5,967 | 100 | 13,560 | 51,711 |
| Total assets | 990 | 844,889 | 12,814 | 19,922 | 69,985 |
| Deferred outflows of resources: | | | | | |
| Loss on bonds refunding | — | — | — | — | — |
| Pension related | 86 | — | — | — | — |
| Total deferred outflows of resources | 86 | — | — | — | — |
| Liabilities: | | | | | |
| Accounts payable and accrued liabilities | 54 | 2,405 | 298 | 474 | 1,891 |
| Deposits and escrow liabilities | — | 212,138 | 201 | — | — |
| Due to: | | | | | |
| Primary government | — | — | — | — | — |
| Components | — | 8,394 | 4,892 | — | 3,326 |
| Other governmental entities | — | — | 33 | — | — |
| Securities lending obligations and reverse repurchase agreements | — | 28,756 | — | — | — |
| Interest payable | — | 6,310 | — | — | 194 |
| Unearned revenue | — | — | 3,696 | — | 80 |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | — | — | — | — |
| Notes payable | — | 6,677 | — | — | — |
| Capital leases | 1 | — | — | — | 19 |
| Compensated absences | 28 | — | 508 | 94 | — |
| Voluntary termination benefits payable | 13 | — | — | 258 | 619 |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — |
| Other long-term liabilities | — | — | 43 | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | — | — | — | — |
| Notes payable | — | 405,321 | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | 1,813 | — | 447 | 1,382 |
| Net pension obligation | — | — | — | — | — |
| Net pension liability | 1,580 | — | — | — | — |
| Voluntary termination benefits payable | 115 | — | — | 2,334 | 4,414 |
| Other long-term liabilities | — | 4,240 | — | — | — |
| Total liabilities | 1,791 | 676,054 | 9,470 | 3,808 | 11,925 |
| Deferred inflows of resources: | | | | | |
| Service concession arrangements | — | — | — | — | — |
| Pension related | 13 | — | — | — | — |
| Total deferred inflows of resources | 13 | — | — | — | — |
| Net position: | | | | | |
| Net investment in capital assets | 855 | 308 | 100 | 16,169 | 49,139 |
| Restricted for: | | | | | |
| Capital projects | — | — | — | — | 4,506 |
| Debt service | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — |
| Other specified purposes | 63 | 23,837 | — | — | 5,267 |
| Unrestricted (deficit) | (1,646) | 144,690 | 3,244 | (55) | (852) |
| Total net position (deficit) | $  (728) | 168,835 | 3,344 | 16,114 | 58,060 |

373

(Continued)

CW_STAY0010161

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2015

(In thousands)

| | Institutional Trust of the National Guard of Puerto Rico | Land Authority of Puerto Rico | Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | Musical Arts Corporation | Public Corporation for the Supervision and Deposit Insurance of P.R. Cooperatives |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash and cash equivalents in commercial banks | $ 1,927 | 1,252 | — | 3,669 | 6,372 |
| Cash and cash equivalents in governmental banks | 856 | 31,556 | 903 | 1,483 | 66 |
| Investments | — | — | — | — | 229,970 |
| Receivables – net: | | | | | |
| Insurance premiums | — | — | — | — | — |
| Intergovernmental | — | 927 | — | — | — |
| Accounts | 828 | 10,758 | 21 | 6 | — |
| Loans and advances | — | — | — | — | 3,731 |
| Accrued interest | 519 | — | — | — | 2,209 |
| Other | 115 | — | — | — | 407 |
| Due from – net: | | | | | |
| Primary government | — | 9,716 | — | — | — |
| Component units | — | 10,419 | — | — | — |
| Other governmental entities | — | 7,928 | 193 | 108 | — |
| Inventories | — | — | — | — | — |
| Prepaid expenses | 56 | — | 258 | — | — |
| Other assets | — | 6,324 | — | — | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | 984 | 47 | — | — |
| Cash and cash equivalents in governmental banks | — | 3,017 | 100 | 67 | — |
| Investments | 27,556 | — | — | — | — |
| Other restricted assets | — | — | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | 7,887 | 90,515 | 16,545 | 568 | — |
| Depreciable, net | 11,386 | 7,401 | 4 | 211 | 2,597 |
| Total assets | 51,230 | 180,897 | 18,071 | 6,112 | 245,352 |
| **Deferred outflows of resources:** | | | | | |
| Loss on bonds refunding | — | — | — | — | — |
| Pension related | — | 3,984 | — | — | — |
| Total deferred outflows of resources | — | 3,984 | — | — | — |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | 1,196 | 6,941 | 906 | 332 | 29,559 |
| Deposits and escrow liabilities | — | 2,446 | 707 | — | — |
| Due to: | | | | | |
| Primary government | — | — | — | — | — |
| Component units | — | 38,898 | — | — | — |
| Other governmental entities | — | 8,784 | 16,345 | 116 | — |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — |
| Interest payable | — | 1,316 | — | — | — |
| Unearned revenue | — | 9,885 | 1 | 486 | — |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | 1,642 | — | — | — |
| Bonds payable | — | — | — | — | — |
| Notes payable | — | — | — | — | — |
| Compensated absences | 88 | 832 | 188 | 622 | — |
| Capital leases | — | — | — | — | 1,986 |
| Voluntary termination benefits payable | — | — | — | 63 | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — |
| Other long-term liabilities | — | 2,910 | — | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | 54,176 | — | — | — |
| Bonds payable | — | — | — | — | — |
| Notes payable | — | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | 955 | — | 241 | — |
| Net pension obligation | — | — | — | 18,394 | — |
| Net pension liability | — | 95,597 | — | — | — |
| Voluntary termination benefits payable | — | — | — | 738 | 579 |
| Other long-term liabilities | — | 38,092 | — | — | 235 |
| Total liabilities | 1,284 | 262,474 | 18,147 | 20,992 | 32,359 |
| **Deferred inflows of resources:** | | | | | |
| Service concession arrangements | — | — | — | — | — |
| Pension related | — | 765 | — | — | — |
| Total deferred inflows of resources | — | 765 | — | — | — |
| **Net position:** | | | | | |
| Net investment in capital assets | 19,273 | 98,016 | 204 | 779 | 2,597 |
| Restricted for: | | | | | |
| Capital projects | — | — | — | — | — |
| Debt service | — | — | — | — | — |
| Student loans and other educational purpose | — | — | — | — | — |
| Other specified purposes | 26,702 | — | 227 | 67 | 89,218 |
| Unrestricted (deficit) | 3,971 | (176,374) | (507) | (15,726) | 121,178 |
| Total net position (deficit) | $ 49,946 | (78,358) | (76) | (14,880) | 212,993 |

(Continued)

CW_STAY0010162

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2015

(In thousands)

| | Puerto Rico Conservatory of Music Corporation | Puerto Rico Convention Center District Authority | Puerto Rico Council on Education | Puerto Rico Energy Commission | Puerto Rico Industrial Development Company | Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities Financing Authority |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ 1,676 | 18,392 | 28 | — | 13,454 | — |
| Cash and cash equivalents in governmental banks | — | 2,391 | 2,546 | 4,549 | 22,467 | — |
| Investments | — | — | — | — | 4,093 | — |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | — |
| Intergovernmental | — | — | — | — | 668 | — |
| Accounts | — | 8,894 | — | — | 14,872 | — |
| Loans and advances | — | 1,825 | — | — | — | — |
| Accrued interest | — | — | — | — | — | 1 |
| Other | 670 | — | 845 | — | — | — |
| Due from – net: | | | | | | |
| Primary government | — | — | — | — | 1,025 | — |
| Component units | — | 5,880 | — | — | — | — |
| Other governmental entities | 36 | — | — | — | 3,260 | — |
| Inventories | — | — | — | — | — | — |
| Prepaid expenses | 44 | 2,351 | — | — | 1,743 | — |
| Other assets | — | 9,362 | — | — | — | — |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | 1,590 | 1 | — | — | — | — |
| Cash and cash equivalents in governmental banks | — | 226 | 2,491 | — | 28,341 | 70 |
| Investments | — | 54,841 | — | — | — | — |
| Other restricted assets | — | — | — | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — | — |
| Capital assets: | | | | | | |
| Land and other nondepreciable | 5,157 | 290,038 | — | — | 271,784 | — |
| Depreciable, net | 75,769 | 394,929 | 63 | 156 | 389,587 | — |
| Total assets | 84,942 | 789,130 | 5,973 | 4,705 | 751,694 | 71 |
| **Deferred outflows of resources:** | | | | | | |
| Loss on bonds refunding | — | — | — | — | — | — |
| Pension related | — | — | — | — | — | — |
| Total deferred outflows of resources | $ — | — | — | — | — | — |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | $ 1,829 | 8,843 | 530 | 232 | 49,952 | 70 |
| Deposits and escrow liabilities | — | 10,568 | — | — | 7,606 | — |
| Due to: | | | | | | |
| Primary government | — | — | — | — | — | — |
| Component units | 1,024 | 145,285 | — | — | 86,325 | — |
| Other governmental entities | — | — | — | 580 | — | — |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — | — |
| Interest payable | — | 18,024 | — | — | 1,971 | — |
| Unearned revenue | 825 | 8,229 | — | — | — | — |
| Liabilities payable within one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Bonds payable | — | 10,790 | — | — | 12,865 | — |
| Notes payable | — | — | — | — | 14,559 | — |
| Capital leases | — | — | — | — | 100 | — |
| Compensated absences | 360 | 225 | 120 | 13 | 5,284 | — |
| Voluntary termination benefits payable | 20 | — | 119 | — | 917 | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — | — |
| Other long-term liabilities | — | — | — | — | — | — |
| Liabilities payable after one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — | — |
| Bonds payable | — | 403,436 | — | — | 166,994 | — |
| Notes payable | — | — | — | — | 64,101 | — |
| Capital leases | — | — | — | — | 225 | — |
| Compensated absences | 538 | — | 557 | 247 | — | — |
| Net pension obligation | — | — | — | — | — | — |
| Net pension liability | — | — | — | — | — | — |
| Voluntary termination benefits payable | 75 | — | 1,381 | — | 7,319 | — |
| Other long-term liabilities | — | — | — | — | — | — |
| Total liabilities | 4,671 | 605,400 | 2,707 | 1,072 | 418,318 | 70 |
| **Deferred inflows of resources:** | | | | | | |
| Service concession arrangements | — | — | — | — | — | — |
| Pension related | — | — | — | — | — | — |
| Total deferred inflows of resources | $ — | — | — | — | — | — |
| **Net position:** | | | | | | |
| Net investment in capital assets | $ 80,926 | 105,952 | 63 | 156 | 389,246 | — |
| Restricted for: | | | | | | |
| Capital projects | — | 1,137 | — | — | — | — |
| Debt service | — | 53,931 | — | — | 13,690 | — |
| Student loans and other educational purpose | 1,590 | — | 2,074 | — | — | — |
| Other specified purposes | — | — | — | — | — | — |
| Unrestricted (deficit) | (2,245) | 21,700 | 1,129 | 3,477 | (69,560) | 1 |
| Total net position (deficit) | $ 80,271 | 183,730 | 3,266 | 3,633 | 333,376 | 1 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010163

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2015

(In thousands)

| | Puerto Rico Integrated Transit Authority | Puerto Rico Land Administration | Puerto Rico and Municipal Islands Maritime Transport Authority | Puerto Rico Metropolitan Bus Authority | Puerto Rico Municipal Finance Agency |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash and cash equivalents in commercial banks | $       — | 2,225 | 2,016 | 2,988 | — |
| Cash and cash equivalents in governmental banks | 6,269 | 10,960 | 1,780 | 108 | 4,517 |
| Investments | — | 31,693 | — | — | — |
| Receivables – net: | | | | | |
| Insurance premiums | — | — | — | — | — |
| Intergovernmental | — | — | 128 | — | — |
| Accounts | — | 154 | 68 | 350 | — |
| Loans and advances | — | — | — | — | — |
| Accrued interest | — | — | — | 9 | — |
| Other | — | 16 | — | — | — |
| Due from – net: | | | | | |
| Primary government | — | — | — | — | — |
| Component units | — | 2,095 | — | 4,254 | — |
| Other governmental entities | — | 3 | — | 800 | — |
| Inventories | — | — | 96 | 4,493 | — |
| Prepaid expenses | — | 752 | 16 | 1,278 | 82 |
| Other assets | — | — | — | 542 | 4,141 |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | — | — | — | 14,325 |
| Cash and cash equivalents in governmental banks | — | 207 | — | — | — |
| Investments | — | — | — | — | 784,430 |
| Other restricted assets | — | — | — | — | 18,325 |
| Real estate held for sale or future development | — | 166,095 | — | — | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | — | 30,260 | 93 | 2,500 | — |
| Depreciable, net | 119 | 8,605 | 62,546 | 28,235 | — |
| Total assets | 6,388 | 253,065 | 66,743 | 45,557 | 825,820 |
| Deferred outflows of resources: | | | | | |
| Loss on bonds refunding | — | — | — | — | 3,520 |
| Pension related | — | — | — | — | — |
| Total deferred outflows of resources | — | — | — | — | 3,520 |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | 551 | 2,252 | 9,224 | 20,499 | 613 |
| Deposits and escrow liabilities | — | 34,022 | — | — | 40,152 |
| Due to: | | | | | |
| Primary government | — | 1,191 | 2,573 | 40,139 | — |
| Component units | — | — | 75,979 | 11,218 | — |
| Other governmental entities | — | 950 | 163 | 1,533 | 2,708 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — |
| Interest payable | — | — | — | — | 15,324 |
| Unearned revenue | — | 3,267 | — | — | — |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | — | — | — | 87,160 |
| Notes payable | — | — | — | 29,539 | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | 652 | 1,082 | 3,646 | — |
| Voluntary termination benefits payable | — | 426 | 341 | 971 | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — |
| Other long-term liabilities | — | — | 497 | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | — | — | — | 640,861 |
| Notes payable | — | — | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | — | 1,401 | 1,250 | — |
| Net pension obligation | — | 207 | — | — | — |
| Net pension liability | — | — | — | — | — |
| Voluntary termination benefits payable | — | 2,736 | 3,478 | 6,705 | — |
| Other long-term liabilities | — | — | 3,505 | 10,745 | — |
| Total liabilities | 551 | 45,496 | 98,233 | 126,245 | 786,818 |
| Deferred inflows of resources: | | | | | |
| Service concession arrangements | — | — | — | — | — |
| Pension related | — | — | — | — | — |
| Total deferred inflows of resources | — | — | — | — | — |
| **Net position:** | | | | | |
| Net investment in capital assets | 119 | 7,460 | 62,639 | 30,735 | — |
| Restricted for: | | | | | |
| Capital projects | — | — | — | — | — |
| Debt service | — | — | — | — | 78,689 |
| Student loans and other educational purpose | — | 207 | — | — | — |
| Other specified purposes | — | — | — | — | — |
| Unrestricted (deficit) | 5,718 | 199,902 | (94,129) | (111,423) | (36,167) |
| Total net position (deficit) | $       5,837 | 207,569 | (31,490) | (80,688) | 42,522 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010164

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2015

(In thousands)

| | Puerto Rico Municipal Finance Corporation | Puerto Rico Ports Authority | Puerto Rico Public Broadcasting Corporation | Puerto Rico Public Private Partnerships Authority | Puerto Rico School of Plastic Arts |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Cash and cash equivalents in commercial banks | $ 86,210 | 3,091 | 450 | — | 27 |
| Cash and cash equivalents in governmental banks | — | 5,553 | — | 170 | 227 |
| Investments | — | — | — | — | — |
| Receivables – net: | | | | | |
| Insurance premiums | — | — | — | — | — |
| Intergovernmental | 3,730 | — | 35 | — | — |
| Accounts | 25,435 | 21,905 | 392 | — | 64 |
| Loans and advances | — | — | — | — | — |
| Accrued interest | — | — | — | — | — |
| Other | — | — | — | — | — |
| Due from – net: | | | | | |
| Primary government | — | — | — | — | — |
| Component units | — | 7,603 | — | — | — |
| Other governmental entities | — | 1,915 | 1,861 | 6,705 | — |
| Inventories | — | — | — | — | — |
| Prepaid expenses | — | 5,146 | — | — | — |
| Other assets | — | 3,911 | 167 | 29 | — |
| Restricted assets: | | | | | |
| Cash and cash equivalents in commercial banks | — | 10,944 | 3,222 | — | 4 |
| Cash and cash equivalents in governmental banks | — | 1,891 | — | 788 | 36 |
| Investments | — | 25,002 | — | — | 2,428 |
| Other restricted assets | — | 25,351 | — | — | — |
| Real estate held for sale or future development | — | — | — | — | — |
| Capital assets: | | | | | |
| Land and other nondepreciable | — | 465,591 | 83 | — | — |
| Depreciable, net | — | 788,871 | 7,682 | 15 | 7,509 |
| Total assets | 115,375 | 1,366,774 | 13,892 | 7,707 | 10,295 |
| **Deferred outflows of resources:** | | | | | |
| Loss on bonds refunding | — | 13,589 | — | — | — |
| Pension related | — | — | — | — | — |
| Total deferred inflows of resources | $ — | 13,589 | — | — | — |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | $ — | 59,716 | 2,768 | 994 | 630 |
| Deposits and escrow liabilities | — | 1,359 | — | — | — |
| Due to: | | | | | |
| Primary government | — | 41,243 | — | — | — |
| Component units | 111,320 | 320,693 | — | 5,101 | — |
| Other governmental entities | 4,055 | 20,882 | — | 615 | — |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — |
| Interest payable | — | 23,985 | — | — | — |
| Unearned revenue | — | 1,723 | — | 1,000 | — |
| Liabilities payable within one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | 1,650 | — | — | — |
| Notes payable | — | 1,445 | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | — | 981 | — | 142 |
| Voluntary termination benefits payable | — | 2,444 | 439 | — | — |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — |
| Other long-term liabilities | — | — | — | — | — |
| Liabilities payable after one year: | | | | | |
| Commonwealth appropriation bonds | — | — | — | — | — |
| Bonds payable | — | 197,974 | — | — | — |
| Notes payable | — | 8,987 | — | — | — |
| Capital leases | — | — | — | — | — |
| Compensated absences | — | — | 1,551 | — | 283 |
| Net pension obligation | — | — | — | — | — |
| Net pension liability | — | 24,353 | 3,947 | — | — |
| Voluntary termination benefits payable | — | — | — | — | — |
| Other long-term liabilities | — | 3,028 | — | — | — |
| Total liabilities | 115,375 | 709,482 | 9,686 | 7,710 | 1,055 |
| **Deferred inflows of resources:** | | | | | |
| Service concession arrangements | — | 680,023 | — | — | — |
| Pension related | — | — | — | — | — |
| Total liabilities and deferred inflows of resources | $ 115,375 | 1,389,505 | 9,686 | 7,710 | 1,055 |
| **Net position:** | | | | | |
| Net investment in capital assets | $ — | 651,009 | 7,654 | 15 | 7,510 |
| Capital projects | — | 63,188 | — | — | — |
| Debt service | — | — | — | — | — |
| Student loans and other educational purpose | — | — | 3,163 | — | 2,427 |
| Other specified purposes | — | — | — | — | — |
| Unrestricted (deficit) | — | (723,339) | (6,611) | (18) | (697) |
| Total net position (deficit) | $ — | (9,142) | 4,206 | (3) | 9,240 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010165

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Net Position

June 30, 2015

(In thousands)

| | Puerto Rico Science, Technology and Research Trust | Puerto Rico Telephone Authority | Puerto Rico Tourism Company | Puerto Rico Trade and Export Company | Solid Waste Authority | Nonmajor Component Units Total |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Cash and cash equivalents in commercial banks | $ | — | 17,094 | 4,091 | — | 211,613 |
| Cash and cash equivalents in governmental banks | 31,340 | — | 3,429 | 3,782 | 3,297 | 142,942 |
| Investments | 73,764 | — | 32,499 | — | 18,491 | 1,032,435 |
| Receivables – net: | | | | | | |
| Insurance premiums | — | — | — | — | — | 1,028 |
| Intergovernmental | — | — | — | — | 157 | 5,787 |
| Accounts | — | — | 9,484 | 1,727 | 607 | 103,104 |
| Loans and advances | — | — | 1,050 | — | — | 312,362 |
| Accrued interest | 3 | 1 | — | 3,309 | — | 13,963 |
| Other | 889 | — | 440 | — | — | 4,435 |
| Due from – net: | | | | | | |
| Primary government | — | — | — | — | 3,252 | 47,200 |
| Component units | — | — | — | — | — | 34,698 |
| Other governmental entities | 12,578 | — | — | — | 245 | 41,717 |
| Inventories | — | — | — | — | — | 20,285 |
| Prepaid expenses | — | — | 357 | 94 | — | 13,477 |
| Other assets | 48 | — | — | — | 544 | 30,328 |
| Restricted assets: | | | | | | |
| Cash and cash equivalents in commercial banks | — | — | — | 5,771 | — | 52,639 |
| Cash and cash equivalents in governmental banks | — | 11,898 | — | 1,282 | 6,792 | 51,128 |
| Investments | 5,929 | — | — | 248,691 | — | 1,177,218 |
| Other restricted assets | — | — | — | — | — | 52,560 |
| Real estate held for sale or future development | — | — | 2,600 | — | — | 169,756 |
| Capital assets: | | | | | | |
| Land and other nondepreciable | 29,382 | — | 5,042 | 60,275 | 21,798 | 1,311,685 |
| Depreciable, net | 2,547 | — | 17,985 | 49,831 | 93,602 | 2,069,785 |
| Total assets | 156,480 | 11,899 | 89,960 | 378,853 | 150,795 | 6,900,345 |
| **Deferred outflows of resources:** | | | | | | |
| Loss on bonds refunding | — | — | 1,561 | — | — | 18,670 |
| Pension related | — | — | — | — | — | 21,885 |
| Total deferred outflows of resources | $ — | — | 1,561 | — | — | 40,555 |
| **Liabilities:** | | | | | | |
| Accounts payable and accrued liabilities | $ 3,801 | 7 | 15,272 | 4,083 | 3,015 | 299,373 |
| Deposits and escrow liabilities | — | — | — | 2,544 | — | 311,843 |
| Due to: | | | | | | |
| Primary government | — | — | 2,643 | — | — | 108,944 |
| Component units | — | — | 12,830 | 1,483 | 77,545 | 1,060,527 |
| Other governmental entities | — | — | — | 958 | 5,019 | 64,764 |
| Securities lending obligations and reverse repurchase agreements | — | — | — | — | — | 28,756 |
| Interest payable | — | — | 899 | 3,074 | 8,055 | 81,233 |
| Unearned revenue | — | — | — | — | — | 70,524 |
| Liabilities payable within one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | 1,309 | — | 229 | 3,180 |
| Bonds payable | — | — | — | — | — | 112,465 |
| Notes payable | — | — | 2,400 | 14,085 | — | 85,154 |
| Capital leases | 7 | — | 47 | 58 | — | 213 |
| Compensated absences | — | — | 2,361 | 544 | 259 | 29,891 |
| Voluntary termination benefits payable | — | — | 643 | 349 | 457 | 10,736 |
| Liability for automobile accident insurance, and workmen's compensation | — | — | — | — | — | 74,708 |
| Other long-term liabilities | — | — | 12,973 | — | — | 23,822 |
| Liabilities payable after one year: | | | | | | |
| Commonwealth appropriation bonds | — | — | 43,931 | — | 7,585 | 105,692 |
| Bonds payable | — | — | — | — | — | 1,409,265 |
| Notes payable | — | — | — | 248,691 | — | 722,100 |
| Capital leases | 7 | — | — | 98 | — | 330 |
| Compensated absences | — | — | 4,350 | 1,131 | 354 | 19,397 |
| Net pension obligation | — | — | — | — | — | 18,394 |
| Net pension liability | — | — | — | — | — | 397,778 |
| Voluntary termination benefits payable | — | — | 5,217 | 1,723 | 4,781 | 90,655 |
| Other long-term liabilities | — | — | — | 1,000 | — | 70,910 |
| Total liabilities | 3,815 | 7 | 104,875 | 279,921 | 107,399 | 5,205,564 |
| **Deferred inflows of resources:** | | | | | | |
| Service concession arrangements | — | — | — | — | — | 680,023 |
| Pension related | — | — | — | — | — | 2,959 |
| Total deferred inflows of resources | $ — | — | — | — | — | 682,982 |
| **Net position:** | | | | | | |
| Net investment in capital assets | $ 31,929 | — | 23,026 | 96,021 | 43,539 | 1,781,591 |
| Capital projects | — | — | — | — | — | 277,475 |
| Debt service | — | — | 3,742 | — | — | 150,052 |
| Student loans and other educational purpose | — | — | — | — | — | 6,091 |
| Other specified purposes | — | 11,892 | — | 6,283 | 1,357 | 169,195 |
| Unrestricted (deficit) | 120,736 | — | (40,122) | (3,372) | (1,500) | (1,332,150) |
| Total net position (deficit) | $ 152,665 | 11,892 | (13,354) | 98,932 | 43,396 | 1,052,254 |

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010166

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Discretely Presented Component Units

Combining Statement of Activities

Year ended June 30, 2015

(In thousands)

| | Expenses | Charges for services | Operating grants and contributions | Capital grants and contributions | Net revenues (expenses) and changes in net position | Payments from (to) primary government | Payments from (to) other component units | Grants and contributions not restricted to specific programs | Interest and invest-ment earnings | Excise taxes and others | Change in net position | Net position (deficit) beginning of year | Correction of errors and adoption of new accounting pronouncements (note 3) | Net position (deficit) beginning of year, adjusted and restated | Net position (deficit) end of year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agricultural Enterprises Development Administration | $ 189,075 | 103,902 | — | — | (85,273) | 90,572 | — | — | 88 | 505 | 6,392 | (108,755) | (150,185) | (258,940) | (252,548) |
| Automobile Accidents Compensation Administration | 69,700 | 81,595 | — | — | 11,895 | (18,671) | — | — | 3,194 | — | (3,582) | 35,384 | (121,662) | (86,298) | (89,880) |
| Cardiovascular Center Corporation of Puerto Rico and the Caribbean | 83,329 | 79,637 | — | — | (3,692) | 198 | — | 96 | 32 | 727 | (2,747) | (37,128) | — | (39,815) | (42,562) |
| Company for the Integral Development of the "Península de Cantera" | 6,368 | — | — | — | (6,368) | 5,778 | — | — | 55 | — | (479) | (31,354) | 4,427 | (26,937) | (27,415) |
| Corporation for the "Caño Martin Peña" Enlace Project | 3,154 | — | 128 | — | (3,026) | 2,874 | — | — | 2 | — | (150) | 3,103 | 698 | 3,801 | 3,651 |
| Culebra Conservation and Development Authority | 581 | 259 | — | — | (322) | 324 | — | — | — | — | 2 | 719 | (1,449) | (730) | (728) |
| Economic Development Bank for Puerto Rico | 46,239 | 42,700 | — | 5,432 | 1,894 | — | — | — | — | 944 | 2,838 | 165,997 | — | 165,997 | 168,835 |
| Farm Insurance Corporation of Puerto Rico | 3,116 | 1,476 | 881 | — | (761) | — | — | — | 47 | — | (714) | 4,058 | — | 4,058 | 3,344 |
| Fine Arts Center Corporation | 7,239 | 2,339 | — | — | (4,900) | 3,792 | — | — | 6 | — | (1,102) | 17,216 | — | 17,216 | 16,114 |
| Institute of Puerto Rican Culture | 18,974 | — | 667 | 1,259 | (17,048) | 13,552 | — | — | — | — | (3,496) | 61,556 | — | 61,556 | 58,060 |
| Institutional Trust of the National Guard of Puerto Rico | 14,374 | 4,376 | — | — | (9,998) | — | — | — | — | — | (9,998) | 59,944 | — | 59,944 | 49,946 |
| Land Authority of Puerto Rico | 33,063 | 9,374 | 1,539 | — | (22,150) | 16,238 | — | — | 4 | 4,620 | (1,288) | 14,976 | (92,046) | (77,070) | (78,358) |
| Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads | 3,182 | 227 | 1,285 | — | (1,670) | 1,674 | — | — | — | 160 | 164 | (240) | — | (240) | (76) |
| Musical Arts Corporation | 8,679 | 557 | — | — | (8,122) | 8,697 | — | — | 438 | 320 | 1,333 | (4,806) | (11,407) | (16,213) | (14,880) |
| Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives | 19,689 | 22,056 | 1,113 | — | 3,480 | — | — | — | — | — | 3,480 | 209,513 | — | 209,513 | 212,993 |
| Puerto Rico Conservatory of Music Corporation | 12,722 | 3,233 | — | 31 | (9,458) | 7,551 | — | 723 | 3 | 24 | (1,157) | 81,428 | — | 81,428 | 80,271 |
| Puerto Rico Convention Center District Authority | 78,318 | 26,357 | — | — | (51,961) | 4,470 | 35,101 | — | 434 | 1,647 | (10,309) | 194,039 | — | 194,039 | 183,730 |
| Puerto Rico Council of Education | 27,833 | 1,089 | 1,858 | — | (24,886) | 17,773 | — | — | 56 | 194 | (6,863) | 10,129 | — | 10,129 | 3,266 |
| Puerto Rico Energy Commission | 1,589 | — | — | — | (1,589) | — | 5,220 | — | 2 | — | 3,633 | 3,633 | — | 3,633 | 3,633 |
| Puerto Rico Industrial Development Company | 86,036 | 61,832 | — | 19,752 | (4,452) | — | — | — | 559 | 6 | (3,887) | 337,263 | — | 337,263 | 333,376 |
| Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority | 9,476 | — | — | — | (9,476) | — | — | — | 10 | — | (9,466) | 9,467 | — | 9,467 | 1 |
| Puerto Rico Interstate Transit Authority | 737 | — | — | — | (737) | 6,572 | — | — | — | 2 | 5,837 | — | — | — | 5,837 |
| Puerto Rico Land Administration | 10,967 | 11,841 | — | — | 874 | — | — | — | 291 | — | 1,165 | 206,404 | — | 206,404 | 207,569 |
| Puerto Rico and Municipal Islands Maritime Transport Authority | 40,741 | 5,377 | 3,045 | 2,642 | (29,677) | 28,584 | — | — | — | — | (1,093) | (30,397) | — | (30,397) | (31,490) |
| Puerto Rico Metropolitan Bus Authority | 64,157 | 4,236 | 2,859 | — | (57,062) | 40,867 | — | — | 5 | — | (16,190) | (64,498) | — | (64,498) | (80,688) |
| Puerto Rico Municipal Finance Agency | 35,841 | — | — | — | (35,841) | — | — | — | 29,281 | 1 | (6,559) | 49,081 | — | 49,081 | 42,522 |
| Puerto Rico Municipal Finance Corporation | 111,945 | — | 111,945 | — | — | — | — | — | — | — | — | — | — | — | — |
| Puerto Rico Ports Authority | 141,392 | 103,782 | 11,315 | — | (26,295) | 2,735 | — | — | 288 | 13,741 | (9,531) | 389 | — | 389 | (9,142) |
| Puerto Rico Public Broadcasting Corporation | 20,707 | 4,200 | — | — | (16,507) | 14,029 | — | 3,236 | 20 | — | 1,288 | 2,918 | — | 2,918 | 4,206 |
| Puerto Rico Public-Private Partnerships Authority | 3,189 | 6,955 | — | — | 3,766 | — | — | — | 1 | — | 3,767 | (3,770) | — | (3,770) | (3) |
| Puerto Rico School of Plastic Arts | 5,418 | 631 | 1,945 | — | (2,842) | 3,027 | — | — | 20 | — | 205 | 9,035 | — | 9,035 | 9,240 |
| Puerto Rico Science, Technology and Research Trust | 7,725 | — | 17,578 | 2,015 | 11,868 | — | — | — | — | 314 | 12,182 | — | 140,483 | 140,483 | 152,665 |
| Puerto Rico Telephone Authority | 86 | — | — | — | (86) | — | — | — | 12 | 6,754 | 6,680 | 5,212 | — | 5,212 | 11,892 |
| Puerto Rico Tourism Company | 121,001 | 156,902 | — | — | 35,901 | (16,938) | (98,625) | — | 961 | 82,430 | 3,500 | (16,963) | — | (16,963) | (13,354) |
| Puerto Rico Trade and Export Company | 35,577 | 16,291 | 1,044 | — | (18,242) | — | — | — | 12,426 | 260 | (5,556) | 104,488 | — | 104,488 | 98,932 |
| Solid Waste Authority | 17,755 | 2,627 | — | — | (15,128) | 10,720 | — | — | 370 | — | (4,038) | 47,434 | — | 47,434 | 43,396 |
| Total nonmajor component units | $ 1,339,766 | 753,511 | 156,902 | 31,132 | (398,221) | 245,036 | (58,304) | 4,015 | 48,595 | 113,949 | (45,830) | 1,329,247 | (231,163) | 1,098,084 | 1,052,254 |

(1) Amount includes $79,930 of excise taxes.

See accompanying independent auditors' report.

(Continued)

CONFIDENTIAL

CW_STAY0010167

COMMONWEALTH OF PUERTO RICO

Basic Financial Statements
and Required Supplementary Information

June 30, 2016

(With Independent Auditors' Report Thereon)

CONFIDENTIAL

# BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION

### Fiscal Year Ended June 30, 2016



### Commonwealth of Puerto Rico

### Honorable Ricardo Rosselló Nevares
### Governor

*Prepared by:*

### Puerto Rico Department of the Treasury

**Raúl Maldonado Gautier, CPA, Esq.**
*Secretary of the Treasury*

**Francisco Peña Montañez**
*Under Secretary of the Treasury*

**Omar E. Rodríguez Pérez**
*Assistant Secretary of Central Accounting*

CONFIDENTIAL

COMMONWEALTH OF PUERTO RICO

Table of Contents

| | Page(s) |
|---|---|
| Independent Auditors' Report | 1–10 |
| Management's Discussion and Analysis (Unaudited) | 11–33 |
| Basic Financial Statements: | |
|   Government-wide- Financial Statements: | |
|     Statement of Net Position | 34–35 |
|     Statement of Activities | 36–37 |
|   Fund Financial Statements: | |
|     Governmental Funds: | |
|       Balance Sheet | 38 |
|       Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Position | 39 |
|       Statement of Revenue, Expenditures, and Changes in Fund Balances | 40 |
|       Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances of Governmental Funds to the Statement of Activities | 41 |
|     Proprietary Funds: | |
|       Statement of Net Position | 42 |
|       Statement of Revenues, Expenses, and Changes in Fund Net Position | 43 |
|       Statement of Cash Flows | 44 |
|     Fiduciary Funds: | |
|       Statement of Fiduciary Net Position | 45 |
|       Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds | 46 |
|   Discretely Presented Component Units: | |
|     Combining Statement of Net Position | 47–48 |

CW_STAY0010170

COMMONWEALTH OF PUERTO RICO

Table of Contents

|  | Page(s) |
|---|---|
| Combining Statement of Activities | 49 |
| Notes to Basic Financial Statements | 50–330 |
| Required Supplementary Information (Unaudited): | |
| Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans - TRS | 331 |
| Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans - JRS | 332 |
| Schedule of Proportionate Share of the Net Pension Liability of a Cost-Sharing Multiple-Employer Pension Plan - ERS | 333 |
| Schedule of Employers' Contributions - All Pension Plans | 334 |
| Schedule of Funding Progress for the Postemployment Healthcare Plans | 335 |
| Schedule of Employers' Contributions for the Postemployment Healthcare Plans | 336 |
| Schedule of Revenue and Expenditures – Budget and Actual – Budgetary Basis – General Fund | 337 |
| Notes to Required Supplementary Information | 338–342 |
| Combining and Individual Fund financial Statements and Schedules | |
| General Fund: | |
| General Fund | 343 |
| Schedule of Expenditures by Agency – Budget and Actual– Budgetary Basis – General Fund | 344–346 |
| Nonmajor Governmental Funds: | |
| Nonmajor Governmental Funds | 347–349 |
| Combining Balance Sheet | 350 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Balances | 351 |
| Nonmajor Proprietary Funds: | |
| Nonmajor Proprietary Funds | 352 |

CW_STAY0010171

COMMONWEALTH OF PUERTO RICO

Table of Contents

|  | Page(s) |
|---|---|
| Combining Statement of Net Position | 353 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Net Position | 354 |
| Combining Statement of Cash Flows | 355 |
| Fiduciary Funds: | |
| Fiduciary Funds | 356–357 |
| Combining Statement of Fiduciary Net Position – Pension Trust Funds | 358 |
| Combining Statement of Changes in Fiduciary Net Position – (and Other Employee Benefit) Trust Funds | 359 |
| Combining Statement of Changes in Assets and Liabilities – Agency Funds | 360 |
| Nonmajor Discretely Presented Component Units: | |
| Nonmajor Discretely Presented Component Units | 361 |
| Combining Statement of Net Position | 362–368 |
| Combining Statement of Activities | 369 |

CW_STAY0010172



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

### Independent Auditors' Report

The Honorable Governor and Legislature
Commonwealth of Puerto Rico
San Juan, Puerto Rico

We have audited the accompanying financial statements of the Governmental Activities, the Business-Type Activities, the Aggregate Discretely Presented Component Units, each major fund, and the Aggregate Remaining Fund Information of the Commonwealth of Puerto Rico (the Commonwealth) as of and for the year ended June 30, 2016, and the related notes to the basic financial statements, which collectively comprise the Commonwealth's basic financial statements as listed in the table of contents.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express opinions on these financial statements based on our audit. We did not audit the financial statements of the following entities and funds:

x  *Governmental Activities*

  – Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico, Office of Legislative Services, Office for the Improvement of Public Schools, Superintendence of the Capitol Building, Puerto Rico House of Representatives, Puerto Rico Senate, Puerto Rico Public Housing Administration, Puerto Rico Housing Finance Department – Sales and Acquisition Fund, Puerto Rico Department of Economic Development and Commerce, which collectively represent 18.95% and 2.49% of the total assets and revenues, respectively, of the General Fund.

  – Puerto Rico Maritime Shipping Authority, Special Communities Perpetual Trust special revenue and debt service funds, Public Buildings Authority, University of Puerto Rico Comprehensive Cancer Center, Puerto Rico Infrastructure Financing Authority, The Children's Trust, Port of the Americas Authority which are non-major governmental funds that represent 12.84% and 3.04% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

  These entities and funds collectively represent 56.02% and 4.11% of the total assets and revenues, respectively, of the Governmental Activities.

x  *Business-Type Activities*

  – Unemployment Insurance Fund, which is a major enterprise fund.

  – The Additional Lottery System, which represents 68.02% and 55.17% of the total assets and revenues, respectively, of the Lotteries Fund, which is a major enterprise fund.

  – Puerto Rico Health Insurance Administration, which is a major enterprise fund.

KPMG LLP is a Delaware limited liability partnership and the U.S. member
firm of the KPMG network of independent member firms affiliated with
KPMG International Cooperative ("KPMG International"), a Swiss entity.



- Puerto Rico Medical Services Administration, which is a major enterprise fund.
- Puerto Rico Water Pollution Control Revolving Fund, which is a major enterprise fund
- The Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund, the Governing Board of 9-1-1 Services, Disability Insurance Fund, Drivers' Insurance Fund, and Ponce Ports Authority which are non-major enterprise funds that collectively represent 3.54% and 3.20% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

x *Other Entities and Funds*

The Puerto Rico System of Annuities and Pensions for Teachers, which represents 19.35% and 21.53% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

x *Aggregate Discretely Presented Component Units*

The discretely presented component units listed in note 1(c) to the basic financial statements, except for those considered unaudited as discussed under "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information".

These entities collectively represent 89.95% and 93.48% of the total assets and revenues, respectively, of the Aggregate Discretely Presented Component Units.

Those financial statements were audited by other auditors, whose reports thereon have been furnished to us, and our opinions, insofar as they relate to the amounts included for the entities and funds indicated above, are based solely on the reports of the other auditors.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the basic financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the basic financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

## Summary of Opinions

| Opinion Unit | Type of Opinion |
|---|---|
| Governmental Activities | Qualified |
| Business-Type Activities | Qualified |

2



| Opinion Unit | Type of Opinion |
|---|---|
| Aggregate Discretely Presented Component Units | Qualified |
| General Fund | Unmodified |
| Debt Service Fund | Unmodified |
| COFINA Special Revenue Fund | Unmodified |
| COFINA Debt Service Fund | Unmodified |
| Unemployment Insurance Fund | Unmodified |
| Lotteries Fund | Unmodified |
| Puerto Rico Medical Services Administration Fund | Unmodified |
| Puerto Rico Water Pollution Control Revolving Fund | Unmodified |
| Puerto Rico Health Insurance Administration Fund | Qualified |
| Aggregate Remaining Fund Information | Qualified |

**Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information**

*Basis for Qualified Opinions – Unaudited Entities and Funds*

As discussed in note 6 to the basic financial statements, the Commonwealth determined that a custodial credit loss of deposits at the Government Development Bank for Puerto Rico (GDB) should have been recognized as of June 30, 2015. The following entities and funds, which were audited by other auditors, did not evaluate the potential for custodial credit loss of deposits at the GDB in their respective separately issued 2015 financial statements and either did not recognize a custodial credit loss in 2015, or recognized a custodial credit loss in 2016 without consideration to the impact on the beginning net position/fund balance. Because such loss could have been material to those financial statements, we were not able to rely on the other auditors' reports. Accordingly, we considered the financial statement amounts for the following entities and funds included in the financial statements of the Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information of the Commonwealth to be unaudited.

x   *Governmental Activities*

–   Office for the Improvement of Public Schools
–   Puerto Rico Housing Finance Department – Sales and Acquisition Fund
–   The Children's Trust

These entities and funds collectively represent 1.62% and 0.03%% of the total assets and revenues, respectively, of the Governmental Activities.

3

CONFIDENTIAL



x   *Business-Type Activities*

- The Disability Insurance Fund
- The Drivers' Insurance Fund

These funds collectively represent 8.86% and 0.56% of the total assets and revenues, respectively, of the Business-Type Activities.

x   *Aggregate Discretely Presented Component Units*

- Farm Insurance Corporation of Puerto Rico
- Land Authority of Puerto Rico
- Puerto Rico Council of Education
- Puerto Rico Energy Commission
- Puerto Rico Housing Finance Authority
- Puerto Rico Industrial Development Company
- Puerto Rico Integrated Transit Authority
- Puerto Rico Land Administration
- Puerto Rico Municipal Finance Agency
- Puerto Rico School of Plastic Arts
- Puerto Rico Science, Technology and Research Trust
- Puerto Rico Telephone Authority
- Puerto Rico Trade and Export Company
- Solid Waste Authority

These entities collectively represent 16.41% and 9.46% of the total assets and revenues, respectively, of the Aggregate Discretely Presented Component Units.

x   *Aggregate Remaining Fund Information*

- The Children's Trust
- The Disability Insurance Fund
- The Drivers' Insurance Fund

These entities and funds collectively represent 5.73% and 1.20% of the total assets and revenues, respectively, of the Aggregate Remaining Fund Information.

*Basis for Qualified Opinions – Unaudited Pension Amounts*

The funds listed below, which were audited by other auditors, did not apply the provisions of GASB Statement No. 68 in their respective separately issued financial statements. In accordance with GASB Statement No. 68, these funds should have recorded their proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. However, the Commonwealth recorded within Governmental Activities such proportionate share of the collective pension

CONFIDENTIAL

CW_STAY0010176



amounts, which were not subject to our audit procedures, or the audit procedures of the other auditors. Accordingly, we were not able to obtain sufficient appropriate audit evidence about the pension amounts of the following funds which are included in the financial statements of the Governmental Activities of the Commonwealth.

- x   Office of Legislative Services
- x   Superintendence of the Capitol Building
- x   Puerto Rico House of Representatives
- x   Puerto Rico Senate
- x   Puerto Rico Public Housing Administration

Additionally, the Commonwealth recorded the pension amounts within Governmental Activities related to the Puerto Rico System of Annuities and Pensions for Teachers, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Such pension amounts have not been audited, nor were we engaged to audit the pension amounts as a part of our audit of the Commonwealth's basic financial statements.

The aggregate net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense related to these funds and to the Puerto Rico System of Annuities and Pensions for Teachers' that are included in the financial statements of the Governmental Activities of the Commonwealth were $15,109 million, $1,543 million, $82.5 million, and $936 million, respectively.

The entities listed below, which were audited by other auditors, applied the provisions of GASB Statement No. 68 in their respective separately issued financial statements. However, based on the lack of availability of audited pension amounts from the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico at the time of the respective issuance of their financial statements, the other auditors qualified their opinions due to the lack of sufficient appropriate audit evidence on the pension amounts, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, we were not able to obtain sufficient appropriate audit evidence about the pension amounts included in the financial statements for the following entities which are included in the financial statements of the Aggregate Discretely Presented Component Units of the Commonwealth.

- x   *Aggregate Discretely Presented Component Units*

    - State Insurance Fund Corporation
    - Agricultural Enterprises Development Administration
    - Automobile Accidents Compensation Administration
    - Culebra Conservation and Development Authority
    - Land Authority of Puerto Rico
    - Puerto Rico School of Plastic Arts

    The net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense included for these entities in the financial statements of the Aggregate Discretely Presented Component Units of the Commonwealth were $1,854.5 million, $117.9 million, $14.3 million, and $104.6 million, respectively.

CONFIDENTIAL                                                                                    CW_STAY0010177



**Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units and Puerto Rico Health Insurance Administration Fund**

*Basis for Qualified Opinions -- Unrecorded Pension Amounts*

As discussed in note 18 to the basic financial statements, the entities and funds listed below, which were audited by other auditors, did not apply the provisions of GASB Statement No. 68 in their respective separately issued financial statements. In accordance with GASB Statement No. 68, the following entities and funds should have recorded their proportionate share of the collective pension amounts related to the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, including net pension liability, deferred outflows of resources, deferred inflows of resources, and pension expense. Accordingly, the amounts included in the financial statements of the Governmental Activities, Aggregate Discretely Presented Component Units and Puerto Rico Health Insurance Administration Fund of the Commonwealth do not include the pension amounts for the following entities and funds as required by GASB Statement No. 68. Management's unaudited estimate of the unrecorded net pension liability for each opinion unit is disclosed in notes 18(g) and 18(h) to the basic financial statements.

x   *Governmental Activities*

   –  Public Buildings Authority

   –  Puerto Rico Infrastructure Financing Authority

   –  Puerto Rico Maritime Shipping Authority

x   *Aggregate Discretely Presented Component Units*

   –  Government Development Bank for Puerto Rico

   –  Puerto Rico Aqueduct and Sewer Authority

   –  Puerto Rico Highways and Transportation Authority

   –  Company for the Integral Development of the "Península de Cantera"

   –  Corporation for the "Caño Martin Peña" Enlace Project

   –  Economic Development Bank for Puerto Rico

   –  Farm Insurance Corporation of Puerto Rico

   –  Fine Arts Center Corporation

   –  Institutional Trust of the National Guard of Puerto Rico

   –  Institute of Puerto Rican Culture

   –  Musical Arts Corporation

   –  Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives

   –  Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority

   –  Puerto Rico and Municipal Islands Maritime Transportation Authority

   –  Puerto Rico Conservatory of Music Corporation

   –  Puerto Rico Council of Education

   –  Puerto Rico Industrial Development Company

CONFIDENTIAL

CW_STAY0010178



- Puerto Rico Land Administration
- Puerto Rico Metropolitan Bus Authority
- Puerto Rico Ports Authority
- Puerto Rico Public Broadcasting Corporation
- Puerto Rico Public Private Partnerships Authority
- Puerto Rico Tourism Company
- Puerto Rico Trade and Export Company
- Solid Waste Authority

x    *Puerto Rico Health Insurance Administration Fund*

### Qualified Opinions

In our opinion, based on our audit and the reports of other auditors, except for the possible effects of the matters described in the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information" paragraphs and except for the effects of the matters described in the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units and Puerto Rico Health Insurance Administration Fund" paragraphs, the financial statements referred to above present fairly, in all material respects, the financial position of the Governmental Activities, the Business-Type Activities, the Aggregate Discretely Presented Component Units, the Puerto Rico Health Insurance Administration Fund, and the Aggregate Remaining Fund Information as of June 30, 2016, and the respective changes in financial position and, where applicable, cash flows thereof for the year then ended in accordance with U.S. generally accepted accounting principles.

### Unmodified Opinions

In our opinion, based on our audit and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the respective financial position of the General Fund, Debt Service Fund, COFINA Special Revenue Fund, COFINA Debt Service Fund, Unemployment Insurance Fund, Lotteries Fund, Puerto Rico Medical Services Administration Fund, and Puerto Rico Water Pollution Control Revolving Fund as of June 30, 2016, and the respective changes in financial position and, where applicable, cash flows thereof for the year then ended in accordance with U.S. generally accepted accounting principles.

### Emphasis of Matters

*Uncertainty about Ability to Continue as a Going Concern – Primary Government*

The accompanying basic financial statements have been prepared assuming that the Commonwealth will continue as a going concern. As discussed in note 2(a) to the basic financial statements, the Commonwealth has incurred recurring deficits, has a negative financial position, has experienced further deterioration of its economic condition, has not been able to access the credit markets, and has stated that substantial doubt exists about the Commonwealth's ability to continue as a going concern. Additionally, on May 3, 2017, the Financial Oversight and Management Board (the Oversight Board) at the request of the Governor, filed a petition for relief under Title III of the U.S. Congress Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) in the United States District Court for the District of Puerto Rico. Management's evaluation of the events and conditions and management's plans regarding these matters are also described in note 2(a) to the basic financial statements. The basic financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinions on the basic financial statements are not modified with respect to this matter.

7

CONFIDENTIAL                                                                                    CW_STAY0010179



*Uncertainty about Ability to Continue as a Going Concern – Retirement Systems*

The accompanying basic financial statements have been prepared assuming that the retirement systems of the Commonwealth will continue as a going concern. As discussed in note 2(b) to the basic financial statements, the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, and the Puerto Rico System of Annuities and Pensions for Teachers are severely underfunded. In fiscal year 2018, each of the retirement systems sold most of their investments and started operating on a pay-as-you-go basis. Also, on May 3, 2017 and May 21, 2017, the Oversight Board commenced cases for the Commonwealth and the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, respectively, by filing petitions for relief under Title III of PROMESA. Accordingly, the Commonwealth has stated in note 2(b) to the basic financial statements that substantial doubt exists about each of the retirement systems' ability to continue as a going concern. The basic financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our opinions on the basic financial statements are not modified with respect to these matters.

*Uncertainty about Ability to Continue as a Going Concern – Major Discretely Presented Component Units*

The accompanying basic financial statements have been prepared assuming that the major discretely presented component units of the Commonwealth will continue as a going concern. As discussed in note 2(c) to the basic financial statements, the Commonwealth has stated that substantial doubt exists for the following major discretely presented component units to continue as a going concern. Management's evaluation of the events and conditions and management's plans in regard to these matters are described in note 2(c) to the basic financial statements. The basic financial statements do not include any adjustments that might result from the outcome of these uncertainties. Our opinions on the basic financial statements are not modified with respect to these matters.

x   *Government Development Bank for Puerto Rico (GDB)*

The Commonwealth and its component units have not been able to repay their loans from the GDB, which has significantly affected the GDB's liquidity and ability to repay its obligations. Also, on March 23, 2018, the GDB ceased its operations and is currently winding down in an orderly fashion under Title VI of PROMESA. These matters raise substantial doubt about the GDB's (including its blended component units) ability to continue as a going concern.

x   *Puerto Rico Highways and Transportation Authority (PRHTA)*

The financial statements of PRHTA as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated April 6, 2018, included an emphasis of matter paragraph related to PRHTA's ability to continue as a going concern. As stated in PRHTA's independent auditors' report, PRHTA has had significant recurring losses from operations and does not have sufficient funds available to fully repay its various obligations as they come due. Also, on May 21, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for PRHTA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico.

x   *Puerto Rico Electric Power Authority (PREPA)*

The financial statements of PREPA as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated December 12, 2018, included an emphasis of matter paragraph related to PREPA's ability to continue as a going concern. As stated in PREPA's independent auditors' report, PREPA has an accumulated deficit of $5 billion at June 30, 2016 and due to liquidity constraints, during the year ended June 30, 2016, PREPA did not make the required deposits to the Sinking Fund. Also, on July 2, 2017, the Oversight Board, at the request of the Governor, commenced a Title III case for

CONFIDENTIAL

CW_STAY0010180



PREPA by filing a petition for relief under Title III of PROMESA in the United States District Court for the District of Puerto Rico.

x   *Puerto Rico Aqueduct and Sewer Authority (PRASA)*

The financial statements of PRASA as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated March 7, 2017, included an emphasis of matter paragraph related to PRASA's ability to continue as a going concern. As stated in PRASA's independent auditors' report, PRASA has had significant recurring operating losses, working capital deficiencies, credit downgrades, large non-discretionary capital expenditure requirements, uncertainty as to fully satisfying its obligations, fiscal oversight and has not been able to access the capital markets.

x   *University of Puerto Rico (UPR)*

The financial statements of UPR as of June 30, 2016 and for the year then ended were audited by other auditors, whose report thereon, dated March 29, 2018, included an emphasis of matter paragraph related to UPR's ability to continue as a going concern. As stated in UPR's independent auditors' report, UPR is highly dependent on the Commonwealth's appropriations to finance its operations.

*Restatement of Net Position and Fund Balance*

As discussed in note 4 to the basic financial statements, the net position/fund balance of the Business-Type Activities, Aggregate Discretely Presented Component Units, CORNA Debt Service Fund, Puerto Rico Medical Services Administration Fund, and the Puerto Rico Water Pollution Control Revolving Fund have been restated as of July 1, 2015 to correct misstatements. Our opinions on the basic financial statements are not modified with respect to these matters.

**Other Matters**

*Required Supplementary Information*

U.S. generally accepted accounting principles require that the management's discussion and analysis on pages 11 through 33; the schedules of changes in the Commonwealth's net pension liability for single-employer pension plans on pages 331 and 332; the schedule of the Commonwealth's proportionate share of the net pension liability of the cost-sharing multiple-employer pension plan on page 333; the schedule of employers' contributions for all pension plans on page 334; the schedule of funding progress for the postemployment healthcare plans on page 335; the schedule of employers' contributions for the postemployment healthcare plans on page 336; and the schedule of revenue and expenditures – budget and actual–budgetary basis – General Fund on page 337, be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context.

We were unable to apply certain limited procedures to the management's discussion and analysis in accordance with auditing standards generally accepted in the United States of America, due to the matters described in the "Basis for Qualified Opinions (Scope Limitation) for Governmental Activities, Business-Type Activities, Aggregate Discretely Presented Component Units, and Aggregate Remaining Fund Information" and the "Basis for Qualified Opinions (Departure from U.S. Generally Accepted Accounting Principles) for Governmental Activities, Aggregate Discretely Presented Component Units, and Puerto Rico Health Insurance Administration Fund" paragraphs. Additionally, although our opinions on the basic financial statements are not affected, the financial statements amounts included in the management's discussion and analysis contain material departures from U.S. generally accepted accounting principles because they do not include pension amounts for certain entities and funds that did not apply the provisions of GASB Statement No. 68. We do not express an opinion or provide any assurance on the information.

9