**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO / TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO**

Fill in this information to identify the case (Select only one Debtor per claim form). /
Llene esta información para identificar el caso (seleccione solo un deudor por formulario de reclamación).

| | | | |
|---|---|---|---|
| ❑ | Commonwealth of Puerto Rico<br>El Estado Libre Asociado de Puerto Rico | Case No. 17-bk-03283 | Petition Date:<br>May 3, 2017 |
| ❑ | Puerto Rico Sales Tax Financing Corporation (COFINA)<br>La Corporación del Fondo de Interés Apremiante de Puerto Rico | Case No. 17-bk-03284 | Petition Date:<br>May 5, 2017 |
| ❑ | Puerto Rico Highways and Transportation Authority<br>La Autoridad de Carreteras y Transportación de Puerto Rico | Case No. 17-bk-03567 | Petition Date:<br>May 21, 2017 |
| ❑ | Employees Retirement System of the Government of the<br>Commonwealth of Puerto Rico<br>El Sistema de Retiro de los Empleados del Gobierno del Estado<br>Libre Asociado de Puerto Rico | Case No. 17-bk-03566 | Petition Date:<br>May 21, 2017 |
| ▣ | Puerto Rico Electric Power Authority<br>La Autoridad de Energía Eléctrica de Puerto Rico | Case No. 17-bk-04780 | Petition Date:<br>July 2, 2017 |
| ❑ | Puerto Rico Public Building Authority<br>El Autoridad de Edificios Públicos de Puerto Rico | Case No. 19-bk-05523 | Petition Date:<br>Sept 27, 2019 |

## Modified Official Form 410 / Formulario Oficial 410 Modificado

# Proof of Claim / Evidencia de reclamación

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a Title III case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy or subject to confidentiality on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

Lea las instrucciones antes de completar este formulario. Este formulario está diseñado para realizar una reclamación de pago en un caso en virtud del Título III. No utilice este formulario para solicitar el pago de un gasto administrativo que no sea una reclamación que reúna los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b) (9) del U.S.C. Ese tipo de solicitud debe realizarse de conformidad con el Título 11 § 503 del U.S.C.

Quienes presenten la documentación deben omitir o editar información que reúna los requisitos para ser tratada con privacidad o confidencialidad en este formulario o en cualquier otro documento adjunto. Adjunte copias editadas de cualquier otro documento que respalde la reclamación, tales como pagarés, órdenes de compra, facturas, balances detallados de cuentas en funcionamiento, contratos, resoluciones judiciales, hipotecas y acuerdos de garantías. No adjunte documentos originales, ya que es posible que los documentos adjuntos se destruyan luego de analizarlos. En caso de que los documentos no estén disponibles, explique los motivos en un anexo.

Fill in all the information about the claim as of the Petition Date.

Complete toda la información acerca de la reclamación a la fecha en la que se presentó el caso.

| Part 1 / Parte 1 | Identify the Claim / Identificar la reclamación |
|---|---|

1. **Who is the current creditor?**

   ¿Quién es el acreedor actual?

   Jose A. Figueroa Sierra

   Name of the current creditor (the person or entity to be paid for this claim)
   Nombre al acreedor actual (la persona o la entidad a la que se le pagará la reclamación)

   Other names the creditor used with the debtor   Jose A. Figueroa Sierra
   Otros nombres que el acreedor usó con el deudor

| 12. Is this claim subject to a right of setoff?<br><br>¿La reclamación está sujeta a un derecho de compensación? | ☐ No / No<br><br>☒ Yes. Identify the property /<br>Sí. Identifique el bien: _Sujeto a Conpensación Economica_ |
|---|---|

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?<br><br>¿La reclamación, total o parcial, cumple los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b)(9) del U.S.C.? | ☐ No / No<br><br>☒ Yes. Indicate the amount of your claim arising from the value of any goods received   $ _____<br>by the debtor within 20 days before the Petition Date in these Title III case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.<br><br>Sí. Indique el importe de la reclamación que surge del valor de cualquier bien recibido por el deudor dentro de los 20 días anteriores a la fecha de inicio en estos casos del Título III, en el que los bienes se han vendido al deudor en el transcurso normal de los negocios del deudor. Adjunte la documentación que respalda dicha reclamación. |
|---|---|

## Part 3 / Parte 3:    Sign Below / Firmar a continuación

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

La persona que complete esta evidencia de reclamación debe firmar e indicar la fecha. FRBP 9011(b).

Si presenta esta reclamación de manera electrónica, la FRBP 5005(a)(2) autoriza al tribunal a establecer normas locales para especificar qué se considera una firma.

Check the appropriate box / Marque la casilla correspondiente:

☒ I am the creditor. / Soy el acreedor.

☐ I am the creditor's attorney or authorized agent. / Soy el abogado o agente autorizado del acreedor.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. / Soy el síndico, el deudor o su agente autorizado. Norma de quiebra 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. / Soy el garante, fiador, endosante u otro codeudor. Norma de quiebra 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

Comprendo que una firma autorizada en esta *Evidencia de reclamación* se considera como un reconocimiento de que al calcular el importe de la reclamación, el acreedor le proporcionó al deudor crédito para todo pago recibido para saldar la deuda

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

He leído la información en esta *Evidencia de reclamación* y tengo motivos razonables para suponer que la información es verdadera y correcta.

I declare under penalty of perjury that the foregoing is true and correct. / Declaro bajo pena de perjurio que lo que antecede es verdadero y correcto.

Executed on date / Ejecutado el _____ (MM/DD/YYYY) / (DD/MM/AAAA)

Signature / Firma _José A. Figueroa Sierra_

Print the name of the person who is completing and signing this claim / Escriba en letra de imprenta el nombre de la persona que completa y firma esta reclamación:

Name _Jose A._   _Figueroa_   _Sierra_
First name / Primer nombre   Middle name / Segundo nombre   Last name / Apellido

Title / Cargo _Jubilado_

Company / Compañía _A.E.E._
Identify the corporate servicer as the company if the authorized agent is a servicer.
Identifique al recaudador corporativo como la compañía si el agente autorizado es un recaudador.

Address / Dirección _P.O. Box 2956_
Number / Número     Street / Calle
_Carolina_          _P.R._   _00984-2956_
City / Ciudad       State / Estado   ZIP Code / Código postal

Contact phone / Teléfono de contacto _(787)226-4555_ Email / Correo electrónico _Mtorres170610@gmail.com_

**8. How much is the claim?**

¿Cuál es el importe de la reclamación?

$ 1,500,000.00 . Does this amount include interest or other charges?
¿Este importe incluye intereses u otros cargos?

☐ No / No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).
Sí. Adjunte un balance con intereses detallados, honorarios, gastos u otros cargos exigidos por la Norma de Quiebras 3001(c)(2)(A).

**9. What is the basis of the claim?**

¿Cuál es el fundamento de la reclamación?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Por ejemplo: Venta de bienes, préstamo de dinero, arrendamiento, prestación de servicios, lesiones personales u homicidio culposo, o tarjetas de crédito. Adjunte copias editadas de cualquier documento que respalde la reclamación conforme a lo exigido por la Norma de Quiebras 3001(c). Limite la divulgación de información que reúne los requisitos para ser tratada con privacidad, tal como información sobre atención médica.

Exposición directamente al asbecto sin protección y sin ninguna notificacio del mismo previo; esto debido a demanda a la autoridad de Energía Electric a consecuencia de esto padesco de nodulo en los puinones, tiroide, asmatico, alta precion y paciente Cardiaco # de caso de demanda desestimada hbP2005-1599.

**10. Is all or part of the claim secured?**

¿La reclamación está gerantizada de manera total o parcial?

☑ No / No

☐ Yes. The claim is secured by a lien on property.
Sí. La reclamación está garantizada por un derecho de retención sobre un bien.

Nature of property / Naturaleza del bien:
☐ Motor vehicle / Vehículos

☐ Other. Describe:
Otro. Describir: _____

Basis for perfection / Fundamento de la realización de pasos adicionales: _____

_____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Adjunte copias editadas de documentos, si los hubiere, que demuestre la realización de pasos adicionales para hacer valer un derecho de garantía (por ejemplo, una hipoteca, un derecho de retención, un certificado de propiedad, una declaración de financiamiento u otro documento que demuestre que se ha presentado o registrado un derecho de retención.)

Value of property / Valor del bien: $_____

Amount of the claim that is secured /
Importe de la reclamación que está garantizado: $_____

Amount of the claim that is unsecured /
Importe de la reclamación que no está garantizado: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)
(La suma del importe garantizado y no garantizado debe coincidir con el importe de la línea 7.)

Amount necessary to cure any default as of the Petition Date /
Importe necesario para compensar toda cesación de pago a la fecha que se presentó el caso : $_____

_____

Annual Interest Rate (on the Petition Date)
Tasa de interés anual (cuando se presentó el caso)_____%
☐ Fixed / Fija
☐ Variable / Variable

**11. Is this claim based on a lease?**

¿Esta reclamación está basada en un arrendamiento?

☑ No / No

☐ Yes. Amount necessary to cure any default as of the Petition Date.
Sí. Importe necesario para compensar toda cesación de pago a partir de la que se presentó el caso$ _____

**2. Has this claim been acquired from someone else?**

¿Esta reclamación se ha adquirido de otra persona?

☒ No / No
☐ Yes. From whom?
    Sí. ¿De quién? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

¿A dónde deberían enviarse las notificaciones al acreedor?

Norma federal del procedimiento de quiebra (FRBP, por sus siglas en inglés) 2002(g

| Where should notices to the creditor be sent? ¿A dónde deberían enviarse las notificaciones al acreedor? | Where should payments to the creditor be sent? (if different) ¿A dónde deberían enviarse los pagos al acreedor? (En caso de que sea diferente) |
|---|---|
| Jose A. Figueroa Sierra<br>Name / Nombre | Jose A. Figueroa Sierra<br>Name / Nombre |
| PO Box 2956<br>Number / Número   Street / Calle | PO Box 2956<br>Number / Número   Street / Calle |
| Carolina P.R.   00984-2956<br>City / Ciudad   State / Estado   ZIP Code / Código postal | Carolina P.R.   00984-2956<br>City / Ciudad   State / Estado   ZIP Code / Código postal |
| 787-226-4555 // 787 679-3434<br>Contact phone / Teléfono de contacto | 787-226-4555 // 787 679-3434<br>Contact phone / Teléfono de contacto |
| Mtorres170610@gmail.com<br>Contact email / Correo electrónico de contacto | Mtorres170610@gmail.com<br>Contact email / Correo electrónico de contacto |

**4. Does this claim amend one already filed?**

¿Esta reclamación es una enmienda de otra presentada anteriormente?

☒ No / No
☐ Yes.  Claim number on court claims registry (if known)
    Sí.  Número de reclamación en el registro de reclamaciones judiciales (en caso de saberlo) _____
    Filed on / Presentada el _____ (MM /DD/YYYY) / (DD/MM/AAAA)

**5. Do you know if anyone else has filed a proof of claim for this claim?**

¿Sabe si alguien más presentó una evidencia de reclamación para esta reclamación?

☒ No / No
☐ Yes. Who made the earlier filing?
    Sí. ¿Quién hizo la reclamación anterior? _____

---

**Part 2 / Parte 2:**   **Give Information About the Claim as of the Petition Date**
**Complete toda la información acerca de la reclamación desde la fecha en la que se presentó el caso.**

**6. Do you have a claim against a specific agency or department of the Commonwealth of Puerto Rico?**

¿Tiene una reclamación en contra de algún organismo o departamento específico del Estado Libre Asociado de Puerto Rico?

☐ No / No
☒ Yes.  Identify the agency or department and contact name. (A list of Commonwealth of Puerto Rico agencies and departments is available at: https://cases.primeclerk.com/puertorico/.)
    Sí.  Identifique el organismo o departamento y nombre del representante. (Una lista de agencias y departamentos del Estado Libre Asociado de Puerto Rico está disponible en: https://cases.primeclerk.com/puertorico/.)

Autoridad de Energía Eléctrica # Caso 130187

**7. Do you supply goods and / or services to the government?**

¿Proporciona bienes y / o servicios al gobierno?

☒ No / No
☐ Yes. Provide the additional information set forth below / Sí. Proporcionar la información adicional establecida a continuación:

Vendor / Contract Number | Número de proveedor / contrato: _____

List any amounts due after the Petition Date (listed above) but before June 30, 2017:
Anote la cantidad que se le debe después de la fecha que se presentó el caso (mencionados anteriormente), pero antes del 30 de junio de 2017 $ _____

---

ESTADO LIBRE ASOCIADO DE PUERTO RICO
DEPARTAMENTO DE JUSTICIA

15 de mayo de 2016

Lcdo. Josía Hernández Sánchez
Edificio First Bank, Oficina 600
Ave. Ponce de León, #1519
San Juan, PR 00909

Primer Informe Conjunto sobre la Resolución de la Cámara Sacd.



PATIENT NAME : FIGUEROA SIERRA, JOSÉ

DATE OF STUDY : 1-13-2011.

REF. PHYSICIAN : DR. BENJAMIN BETANCOURT

ID NUMBER : 3154 – EVALUATE FOR POSSIBLE RETROCARDIAC MASS

## MDCT SCAN OF THE THORAX WITHOUT IV CONTRAST

### PROCEDURE:
Thin axial images of the thorax were obtained with mediastinal and lung windows.

### FINDINGS:
There are no prior studies for comparison.
Lungs windows reveal no pulmonary nodules, consolidation or pleural effusion. Calcified pleural plaques are noted from prior asbestos exposure. No masses identified at the retrocardium. No mediastinal mass is identified. There is no pericardial effusion. Cardiac chambers appear normal in size.

No mediastinal adenopathies identified. Evaluation of the hilar region is limited without IV contrast.

Images of the upper abdomen are unremarkable. The adrenal glands are symmetric.

### IMPRESSION:

1. NO EVIDENCE OF RETROCARDIAC MASS.
2. CALCIFIED PLEURAL PLAQUES ARE NOTED FROM PRIOR ASBESTOS EXPOSURE.
3. NO CONSOLIDATION OR PLEURAL EFFUSION.

JUAN E. PEREZ MONTE, MD
NUCLEAR MEDICINE PHYSICIAN
DIAGNOSTIC RADIOLOGIST
DIPLOMATE OF THE ABNM AND ABR

THANKS FOR YOUR REFERRAL

1501 Betancourt Building Fernandez Juncos Avenue, Suite 302, Santurce, PR 00738
P.M.B. 322, P.O. Box 7891, Guaynabo, PR 00970-7891
Tel. (787) 727-2738 • Fax (787) 728-2738

## ESTADO LIBRE ASOCIADO DE PUERTO RICO

15ta  Asamblea
Legislativa

7ma Sesión
Ordinaria

## CAMARA DE REPRESENTANTES

30 de junio de 2008

### Primer Informe Conjunto sobre la

### R. de la C. 5661

## A LA CÁMARA DE REPRESENTANTES

Vuestras **Comisiones de Recursos Naturales, Conservación y Medioambiente** y de **Salud de la Cámara de Representantes de Puerto Rico**, someten ante este Cuerpo Legislativo el presente **Primer Informe Conjunto** motivado por la **Resolución de la Cámara 5661**.

### ALCANCE DE LA MEDIDA

La **Resolución de la Cámara 5661** tiene el propósito de ordenar a las Comisiones de Recursos Naturales, Conservación y Medioambiente y de Salud de la Cámara de Representantes de Puerto Rico, realizar una investigación sobre la alegada utilización y contaminación de asbesto en las instalaciones de la Autoridad de Energía Eléctrica.

La **primera Vista Pública** que celebró la Comisión de Recursos Naturales Conservación y Medioambiente, fue el **20 de septiembre de 2007.** Para esta vista se citaron a la Autoridad de Energía Eléctrica (AEE) y al Departamento de Salud, los cuales se excusaron por escrito. Participaron de la vista ex empleados de la AEE, entre  los representantes del grupo se encuentran:

El **Lcdo. Jesús Hernández Sánchez** quien fue senador desde el 1969-1977 y miembro de la Comisión del Trabajo. Indica que viene a participar como ciudadano particular por que tiene un pleito con el tribunal. Nos señala que el Gobierno Federal hizo prohibición del uso del asbesto en el 1970, se continuó hasta el 1980.  El primer caso  de contaminación con este material ocurrió en el año 1999.

Asbestosis es una condición que se usa para distinguirla de cáncer.  Estos síntomas pueden aparecer lamentablemente  hasta 15 años después, según algunos diagnósticos realizados por el Fondo del Seguro del Estado o la Comisión Industrial.

Comisión de Recursos Naturales, Conservación y Medio Ambiente                    2
Primer Informe Conjunto
R. de la C. 5661

Según señala el Lcdo. Hernández Sánchez en su ponencia, el Tribunal Supremo de Puerto Rico en el caso Oriosola vs Superior 116DRR 485 del 1985, se determinó que la Ley del Fondo de Seguro, pudiera recomendar aquellos casos que haya intención si el patrono envía al empleado a un área donde hay "fumes" gases y el patrono actúa con negligencia crasa. Se podía legislar en casos donde el patrono tiene conocimiento, por que si no tiene conocimiento, no hay intención, pero si tiene se puede convertir en delito por el código penal. La inteligencia, el conocimiento se le debe dar a la gente más débil, pobre, al trabajador. El Lcdo. Hernández indica que está aquí como ciudadano para que se legisle y se proteja a los trabajadores públicos y privados. Las empresas grandes de este país se van a oponer. Ustedes tendrán un gran reto de enfrentarse a todas estas fuerzas, si ustedes lo hacen y logran la legislación ustedes van a pasar a ser unos distinguidos. En Puerto Rico no hay daños punitivos, deberían existir para proteger al débil, al trabajador. Dios quiso que quisiera seguir esa ruta de seguir defendiendo a los trabajadores por lo que tenemos este pleito en el tribunal.

El **Sr. Jorge Martínez**, ex empleado de la AEE, hizo entrega de una ponencia escrita a esta Comisión donde informa que a nombre suyo y de su familia le agradece la invitación para que declare en torno a la Resolución de la Cámara 5661 fechada 4 de octubre de 2006 y radicada por el ilustre presidente de este cuerpo legislativo Hon. Aponte Hernández. Todos los trabajadores de Puerto Rico tienen que agradecerle al Sr. Presidente su interés y preocupación por la salud de más de un millón de empleados públicos y privados que laboran día y noche en el mercado del trabajo de nuestra isla encantada.

El Sr. Jorge Martínez García, indica en su ponencia que es padre de dos niñas jóvenes una de 19 y otra de 21 que tuvo con su querida esposa Evelyn · · · López. Expone que está enfermo debido a la contaminación contraída con asbesto durante el tiempo que trabajó en la Autoridad de Energía Eléctrica. Este trabajó desde 1986 a 1996. Su función era como ayudante de generatriz trabajando en las calderas de dicha entidad pública y mientras laboraba en Palo Seco y en Puerto Nuevo trabajó en turbina. Sus funciones le requerían meterse dentro de las calderas en donde se quitaba y ponía asbesto que es un material aislador del calor. Otros compañeros también laboraban en las calderas estando expuestos a dicha contaminación. **La AEE desde el principio de la década del 80 tenía conocimiento de que el asbesto es un mineral que produce cáncer y enfermedades como asbestosis.** En la actualidad el Sr. Martínez tiene una disfunción de sus vías respiratorias y condición de asma bronquial lo cual le produce que no pueda respirar, le tienen que dar terapias de oxígeno y le afecta grandemente para poder digerir sus alimentos. La obstrucción según relata el Sr. Martínez es severa a nivel del pulmón. Todo ello relacionado con la contaminación con asbesto. Mientras trabajó estando expuesto a dicha contaminación no le proveían de equipo para protegerse del polvo del asbesto el cual les llenaba sus cuerpos, sus cabezas y su ropa. No fue hasta años mas tarde que le proveyeron de una mascarilla para taparse la nariz y nunca le dieron una máscara de medio rostro o rostro completo para protegerse. La ropa que usaba para su trabajo era la que traía de su casa y luego regresaba al hogar con dicha ropa contaminada. Nunca se le dijo ni a él ni a sus compañeros de los riesgos que existía y no fue hasta el año 1989 mas o menos que vino una señora de nombre Marta Disla a darles unas conferencias sobre el daño que hacía el asbesto si no tenían el equipo de protección. Ha sido operado de la tiroides, en la actualidad no tiene tiroides y

Comisión de Recursos Naturales, Conservación y Medio Ambiente                    3
Primer Informe Conjunto
R. de la C. 5661

no hay nadie en su familia que padezca de la tiroides. También hace seis o siete años le sacaron unos pólipos del colon.

El Sr. Martínez considera según establece en su ponencia que es un acto inhumano y hasta criminal. Si un patrono tiene conocimiento de que un trabajador se va a enfermar ¿Por qué lo envía a trabajar a un sitio contaminante sin un equipo de protección? Le corresponde a la Legislatura de Puerto Rico legislar para hacer a los patronos responsables criminal y civilmente cuando una situación como esa ocurre. El Sr. Martínez considera que en una situación como esa hay negligencia crasa de parte del patrono y también hay intención pues si tiene conocimiento previo de que el obrero se va a enfermar no debe enviarlo a trabajar en un lugar contaminante sin equipo protector.

Otros compañeros han muerto de cáncer, otros están recibiendo tratamiento debido a que tienen cáncer y contrajeron dicha enfermedad debido a la contaminación con asbesto que es una sustancia que produce cáncer, como dicen por ahí carcinógena. El cáncer puede desarrollarse a los 15, 20 o 25 años después del empleado haber estado expuesto a las fibras pequeñitas del asbesto. El Sr. Martínez dice:
**"Nosotros nos vamos pa' la tumba dejamos huérfanos a nuestros hijos y viuda a nuestra mujer y los responsables se quedan riendo. Basta ya de eso. Le corresponde a la legislatura parar situaciones como esa. Si la legislatura no actúa estaría siendo cómplice de cada tragedia, dolor y muerte que sufre un trabajador. Esta comisión debe condenar públicamente al rendir su informe".**

También informó el Sr. Martínez que cuando era empleado temporero trabajaba de 7am a 7pm. Todos los compañeros seguíamos trabajando sin ninguna protección. A veces les daban un paño, después vino la autoridad con unos bozales de cartón. **(ANEJO #1)**

La AEE en un acuerdo con la UTIER envió unas guaguas móviles para hacernos unos estudios en la misma Planta. Nos tomaban muestras de orina, placas de pecho y una prueba de los pulmones que consistía en soplar por una máquina y otra de disfunción pulmonar. Nunca la AEE informó el resultado de estas pruebas. Luego de un tiempo nuevamente la AEE y la UTIER llegan a otro acuerdo para hacernos un estudio epidemiológico y el que saliera enfermo lo enviaban al hospital Monte Sinaí.

El Sr. Martínez en una carta enviada a esta Comisión indica lo siguiente: fui incapacitado por un accidente en la Planta por discos y condición nerviosa. El Fondo del Seguro del Estado me otorgó una incapacidad total. Ahora por que razón que salí con una obstrucción en los pulmones y Asma Bronquial Severa y estando jubilado la AEE me envía a coger tratamiento al Fondo de Seguro. ¿Qué tipo de compensación recibiré si ya recibí una total?

El señor Martínez presenta a esta Comisión, carta del 28 de mayo de 2008, recibida del Departamento del Trabajo y Recursos Humanos, Administración de Seguridad y Salud Ocupacional de Puerto Rico (OSHA), donde dicha agencia contesta una serie de preguntas que el señor Martínez le refiriera sobre este particular. A continuación preguntas y respuestas contempladas en dicha carta: **(Anejo 6)**

Comisión de Recursos Naturales, Conservación y Medio Ambiente                    4
Primer Informe Conjunto
R. de la C. 5661

a) ¿Desde cuando OSHA tiene conocimiento de que el asbesto causa cáncer?

PR OSHA tiene conocimiento sobre la norma de asbesto (1910.1001) desde su fecha de adopción (1 de febrero de 1978) y ahí es que se indica que se evite respirar polvo que contenga fibras de asbesto porque puede causar daños severos a su salud. Sin embargo, desde el año 1971, OSHA (Administración de Seguridad y Salud Ocupacional federal) promulgó su primera regla sobre asbesto con relación a los efectos adversos a la salud en el trabajo. Según más información era recibida sobre la toxicidad del asbesto, OSHA actualizaba y modificaba dicha reglamentación. A partir del 1975, OSGA decide evaluar la data científica y médica que identifica el asbesto con un carcinógeno en humanos y actualiza nuevamente la reglamentación con las nuevas medidas.

b) ¿Desde cuando OSHA le notifica a la Autoridad de Energía Eléctrica que el asbesto causa cáncer a sus empleados?

La Ley Núm. 16 del 5 de agosto de 1975, conocida como la Ley de Seguridad y Salud en el Trabajo de Puerto Rico establece las bases para el desarrollo de PR OSHA. Desde la aprobación del plan estatal en el 1978, los patronos del sector privado y gubernamental tienen que cumplir con todos los reglamentos adoptados por medio de esta.

c) ¿Desde el 2007, la Autoridad de Energía Eléctrica ha sido multada por el asbesto?

A la Autoridad de Energía Eléctrica, Central de San Juan se le realizó una inspección del 17 de mayo de 2007 (inspección #307935171). En esta investigación se emitió una propuesta penalidad de $17,500.00 por aparentes violaciones a la reglamentación de asbesto.

d) ¿Si OSHA tiene conocimiento de las muertes por asbesto en las plantas de la Autoridad de Energía Eléctrica?

PR OSHA no tiene conocimiento sobre muertes de empleados por exposición al asbesto. Usted puede comunicarse con la Corporación del Fondo del Seguro del Estrado para verificar si se han reportado muertes por exposición al asbesto en la Autoridad de Energía Eléctrica.

El **Sr. Juan Sosa Fernández,** quien trabajó 27 años como soldador. Indica a esta Comisión que tiene dificultad de las vías respiratorias. Este veneno lo cargábamos a nuestras casas nuestros hijos nos abrazaban y se contaminaban. Luego de estas charlas fue que comenzaron a utilizar lo que llamaban cuartos sucios y luego cuartos limpios, pero esto fue 10 años después de trabajar. Se retiró en marzo del 2004. El proceso de trabajar con asbesto fue hasta el año 1987. El 16 de enero del 1990, a un sin número de compañeros los re-localizaron. Ahí se cortó el ciclo de trabajar con asbestos. El que no sabe es como el que no ve, nosotros sacábamos el material con las manos. El ayudante como el operario se tragaba toda esa contaminación. Sé que es un dato científico que una partícula de asbestos de una misión a una

Comisión de Recursos Naturales, Conservación y Medio Ambiente                    5
Primer Informe Conjunto
R. de la C. 5661

altura de seis pies tarda seis horas en llegar al mismo.  En un lugar sin ventilación tarda más
tiempo y uno se lo traga.

En el 2000 se hizo un estudio epidemiológico según dijo el Dr. Levin de ese Hospital de
New York el 89% todos tienen cicatrices en pulmones y problemas respiratorios.  Salimos con
eso yo tengo los papeles en mi casa no puedo estar expuesto a químicos, polvo, gases.  Tengo
caso en el fondo.  Aquí en el fondo no hay médico con expertice en esa área, los tienen que
enviar a Estados Unidos. La Dra. Perdomo secretaria de Salud estuvo en reunión con nosotros.
Ella tiene pleno conocimiento de los estudios del Dr. Levin y los resultados que arrojaron.
Dijeron que de salir algunas personas con la enfermedad ellos le iban a pagar el tratamiento.

El **Sr. Adrián Valle**, ex  supervisor de la AEE expuso en la vista pública de la Comisión
que tenía a su a cargo un grupo de empleados, supervisor de líneas, supervisor de sub-estaciones
y que trabajó 10 años. Su oficina se llama Durotex, indica que la oficina también tenía asbesto,
iba a las centrales a darle mantenimiento con su gente. Se jubiló y como 12 años de haber
jubilado sintió una pelota debajo del brazo se hizo un estudio fue un linfoma canceroso.  El Sr.
Valle expresó lo siguiente: "Fui al fondo, allí me mandaron dos doctores Dr. Masin y Dr. Franco
ambos determinan cáncer. Debido a mi trabajo mis compañeros han muerto de cáncer.  Tengo un
linfoma entre el corazón.  Me dieron quimioterapia, estoy recibiendo tratamiento en la Torre de
San Francisco todavía sigo con el cáncer.  Tenía que entrar a esas áreas de mis empleados, no
queda casi ninguno todos han muerto de cáncer.  Me han encontrado cuatro linfomas.  Estoy
pasando por ese trago.  Las caretas que nos daban es lo que se usa para pintar, no nos daban
equipo, mi último compañero tenía 37 años y yo sigo vivo aquí luchando, incluso otros
superiores que entraban a las sub-estaciones, muchos otros compañeros desconocen sus
derechos.  Ya están retirados y desconocen si tienen condiciones por esto mismo.

El **Sr. José Hernández**, ex empleado informó a esta Comisión lo siguiente: "Le pregunto
a mi cardiólogo por que me operan del corazón y tengo 4 bypass. Soy soldador me jubilé en el
1994 y todavía no habían hecho caretas.  No se puede acabar nunca los asbestos se encuentra en
el revestimiento de la varilla.  Cualquier cosa que se convierta en polvo fino es silia.  Muchos de
mis compañeros han muerto, uno de ellos fue Pellot. Tuve problemas con supervisores sino hacía
un trabajo te amenazaban que te votaban, me dan pena de mis compañeros muchos estamos
dañados.  Todos tenemos la suerte echada con el asbesto. Fui al Fondo y la Dra. creyó que lo
que estaba buscando era dinero.  Yo no fui a buscar dinero, fui a buscar salud.  Me gustaría
investigar al Dr. Franco es médico del Fondo, de la Autoridad de Acueductos y Alcantarillados y
de la  Autoridad de Energía Eléctrica., es el único toxicólogo en Puerto Rico, hay conflicto de
intereses, quien nos va a hacer justicia. Si duermo de lado siento que me hincan los pulmones.
Personas compañeros han muerto de condiciones de pulmones.".

El **Sr. José Nadal**, también expuso en la vista pública que trabajó desde 1972-1989 y me
incapacitaron. Tengo diagnosticado Obstrucción Pulmonar Crónica certificado por el Fondo del
Seguro de Estado.  Estoy recibiendo tratamiento para el asma.  En el 1972 para protección

Comisión de Recursos Naturales, Conservación y Medio Ambiente                    6
Primer Informe Conjunto
R. de la C. 5661

usábamos camisetas colocados de máscaras para trabajar rompiendo asbesto.   Era ayudante calderas, en el 1989 todavía no habían encapsulado el asbesto.

El **Sr. Víctor Morales Cedeño**, informó a esta Comisión lo siguiente "Trabajé 23 años y no había protección, muchos residentes a lo mejor también se contaminaron. A lo último comenzó la AEE a tapar con unos plásticos para que no saliera cuando vino protección ya el daño estaba hecho. Tengo problema por vía respiratoria.   La Puerto Rico Testing que hacia pruebas a mí y a un compañero mío nos mandaron al Centro Médico el Dr. Franco certificó que tenía mi condición.

El **Sr. Benito Ayala Pacheco** expuso en la vista pública lo siguiente: "Empecé en AEE en Aguirre con asbestos. Me enviaban a Guayanilla 2 años y pico y luego me enviaron a Puerto Nuevo, Palo Seco. En el Fondo decían que tenía anomalías. Fui a un doctor privado y dijeron que tenía Leucemia. La protección era un bozal de tela más nada.   Iba con esa misma ropa a mi casa. Ahora me estoy asfixiando, me sacaron placa se perdieron y tuve que sacarme otras.

El **Sr. José A. Otero** informó a esta Comisión lo siguiente: "Trabajé 28 años para la AEE, la mayor cantidad en la Planta de Puerto Nuevo, yo era mecánico.   A nosotros nos aplicaban los deberes, entendían que si íbamos a trabajar con asbestos lo teníamos que remover.   Trabajé en el área de calderas y  se sentía el olor a asbesto. En el 1988 me dio un infarto al miocardio. Me jubilé en el 2000. En el 2002 me llaman para un estudio epidemiológico. Salí con calcificaciones en los pulmones, siento el pecho comprimido. Tengo la preocupación de que tarde o temprano nos va afectar. En julio del 2003 recibimos los resultados del estudio epidemiológico a consecuencia del asbesto.

El **Sr. Carlos Benjamín Morales Ruiz,** es albañil III de la Autoridad Energía Eléctrica, entregó a esta Comisión una Declaración Jurada ante notario público Milagros Acevedo Colon, con fecha del 23 de agosto de 1989, donde declara que:

1. Que mis circunstancias personales son como queda dicho.
2. Que durante los años 1981-1982 trabajaba con la Autoridad de Energía Eléctrica como albañil y en unión a otros 15 o 20 compañeros se nos instruyo que debíamos trabajar en la Central de Palo Seco en Toa Baja, y que llevásemos un camión de plataforma.   Allí había otros empleados temporeros los cuales nos fueron asignados para realizar el trabajo durante el día.   Se nos encomendó recoger un material que estaba tirado y regado en el suelo, el cual se había tumbado de un conducto de la caldera, y debíamos mojarlo para que no volara.   El recogido se hizo usando palas y los desperdicios se echaban en unos drones de echar basura.
3. Una vez llenos, los drones descubiertos se subían al camión, a veces hasta 20 o mas drones por viaje y uno de los compañeros lo guiaba hasta un hoyo que se había hecho con un "digger" dentro de la misma planta.
4. Ese hoyo era de mas de 10 pies de profundidad, se veía el agua de mar al fondo, y como de 20 o mas pies de diámetro.   Estaba entre la turbina de gas y la Carretera #165.   El hoyo originalmente era mas pequeño, según se iba llenando se tapaba con arena y se abría otro hoyo al lado con la "digger" que estaba allí, que la manejaba un compañero al que apodamos "Morovis".

Comisión de Recursos Naturales, Conservación y Medio Ambiente 7
Primer Informe Conjunto
R. de la C. 5661

5. El dron lleno lo agarrábamos entre dos o tres compañeros y se viraba para dejar caer los desperdicios al hoyo. Una vez se vaciaba se montaban los drones en el camión y se llevaba de vuelta al lugar donde estaban los desperdicios para volverlos a llenar. Esto se hizo muchas veces, estuvimos cerca de tres o cuatro semanas trabajando allí.

6. Para nuestra conveniencia cada vez que se abría un hoyo, antes de comenzar a echar los desperdicios, colocábamos una escalera de madera y en mas de una ocasión algunos de mis compañeros o yo bajamos por la escalera al fondo para recoger un dron, una pala u otros objetos que se caían.

7. Algunas veces, si algún residuo quedaba en el camión se recogía con la misma pala y con las manos. Otras veces usábamos nuestros pañuelos para la nariz, porque cuando se secaba el asbesto se convertía en un polvorín.

8. En ningún momento fui advertido que estaría trabajando con asbesto. No conocía ni se me orientó sobre los daños que podría causar el asbesto a mi salud y a la de mi familia.

9. Utilicé la ropa usual de trabajo para laborar allí: camisa y pantalón verde olivo con botas de seguridad, guantes de cuero para mover los drones y casco de seguridad con gafas. Algunos compañeros los usaban y otros no porque no se nos advirtió nunca la necesidad de protegernos. Mientras realizábamos este trabajo, en la Central estaba llevándose a cabo el trabajo rutinario.

10. Cada día al regresar a nuestras labores observé que durante la noche habían echado arena sobre los hoyos que habíamos cubierto durante el día.

11. Al finalizar cada día de trabajo muchos de los compañeros nos duchábamos en los baños de la planta; no había un área dispuesta ni restricciones al uso de equipo personal.

12. Concluido el trabajo de sacar y enterrar el asbesto nunca fui evaluado médicamente con relación a mi participación en este trabajo, tampoco fui adiestrado sobre el manejo correcto de estos tóxicos ni equipado o protegido para trabajar.

13. El supervisor inmediato y encargado del proyecto fue el señor Elías Vega, el que firmó la hoja de trabajo fue el ingeniero Gilberto Félix Orta. El supervisor Domínguez venia de pasada y se quedaba "de lejito" observando.

Juro que lo antes declarado es la verdad y nada más que la verdad, sin que nada me conste en contrario, y suscribo esta declaración jurada para todo propósito legal pertinente.

En San Juan, Puerto Rico, a 23 de agosto de 1999.

La **Junta de Calidad Ambiental** presentó por escrito su ponencia en donde plantea que ellos regulan el manejo de materiales que contienen asbesto a través de su Reglamento para el Control de la Contaminación Atmosférica. Dispone dicho reglamento en su Regla 422 lo siguiente:

A. Ninguna persona causara o permitirá el manejo de materiales que contienen asbesto conforme se define en este Reglamento para el Control sin contar previamente con un permiso de la Junta y según lo requiere la regla 204.

Comisión de Recursos Naturales, Conservación y Medio Ambiente                 8
Primer Informe Conjunto
R. de la C. 5661

B. Normas para otorgar la aprobación a permisos para el manejo de asbesto durante las remociones, desmontes o traslado de materiales que contienen asbesto, así como las labores de encerrar, encapsular o reparar dichos materiales.

   1. Un permiso para manejar materiales que contienen asbesto durante remociones desmontes o traslado de materiales que contienen asbesto será otorgado si el solicitante demuestra a satisfacción de la Junta que:

      a. El manejo del material que contiene asbesto será capaz de cumplir con todas las reglas y/o reglamentos aplicables.

      b. Todo personal que labore en el manejo del material que contiene asbesto deberá poseer evidencia de que aprobó un curso de una escuela y/o institución debidamente certificada por la Junta y deberá evidenciar que aparece en el registro de personas certificadas para manejar asbesto de la Junta. La Junta tendrá disponible en el Programa, su biblioteca y en otros centros de distribución el listado de las escuelas y/o instituciones para certificar personal adiestrado.

      c. Previo a iniciar el manejo de material que contiene asbesto, la persona y/o personas responsables deberá someter ante la Junta un Plan de Trabajo con treinta (30) días de antelación a dar inicio las operaciones para el manejo de material que contiene asbesto deberá incluir en el plan de trabajo, el cual contendrá pero sin limitarse, la información contenida en las guías provistas por o cualquier otro requisito aplicable que establezca la Junta.

   2. Todo manejo de material que contienen asbesto durante las labores de encerrar, encapsular y/o repara dicho material deberá ser notificado a la Junta con treinta (30) días de antelación exceptuando cuando ocurra como consecuencia de una emergencia o cuando sea permitido por un permiso de la Junta y/o APA. Toda encapsulación, encerramiento y/o reparación del material deberá realizarse con personal debidamente adiestrado para trabajar con materiales que contiene asbesto. Deberá adjuntar la acreditación y evidencia de estar registrado en la Junta.

Sujeto a esta reglamentación la Autoridad de Energía Eléctrica ha solicitado múltiples permisos. La JCA detalla los permisos solicitados por la AEE en los últimos cinco años.(**ANEJO #2**)

El **Departamento del Trabajo y Recursos Humanos (DTRH)** entregó a solicitud de esta Comisión un memorial explicativo con fecha de 27 de noviembre de 2006. Estos hacen mención que en el área de trabajo, la Constitución establece y reconoce el derecho de todo trabajador a estar protegido contra riesgos para la salud y la seguridad. **El Departamento de Trabajo y Recursos Humanos, a través de Puerto Rico OSHA, es la agencia encargada de hacer cumplir las leyes protectoras del trabajo y las leyes que valen por la salud y**

seguridad en el trabajo. Según sus disposiciones, el patrono está obligado a proveer a cada persona que emplea un lugar libre de riesgos que puedan causar daño físico o la muerte al

Comisión de Recursos Naturales, Conservación y Medio Ambiente                                    9
Primer Informe Conjunto
R. de la C. 5661

**trabajador.** La Administración de Seguridad y Salud Ocupacional de Puerto Rico (PR OSHA, por sus siglas en ingles) comenzó sus operaciones en el 1978, a raíz de la creación de la Ley Num. 16 del 5 de agosto de 1975, Ley de Seguridad y Salud en el Trabajo de Puerto Rico. El propósito de esta Ley es garantizar condiciones de trabajo seguras y salubres a cada empleado en Puerto Rico autorizando al Secretario del Trabajo a prescribir y poner en vigor las normas, reglas y reglamentos de seguridad y salud desarrolladas y adoptadas; asistiendo y estimulando a patronos y empleados en sus esfuerzos por garantizar condiciones de trabajo seguras y salubres; proveyendo para la investigación científica, información, educación y adiestramiento y el desarrollo de estadísticas en el campo de la seguridad y salud ocupacional.

Entre las áreas y negociados de PR OSHA se encuentra el negociado Inspecciones. La función básica del negociado de Inspecciones es hacer cumplir el mandato de la Ley:
**"... garantizar hasta donde sea posible a cada empleado en el Estado Libre Asociado de Puerto Rico condiciones de trabajo seguras y saludables...".**

Estos tendrán la obligación de realizar inspecciones efectivas en los lugares de trabajo para determinar si los patronos están: proveyendo lugares de trabajo libres de riesgos reconocidos que estén causando o pueden causar muerte o daño físico a sus empleados, y cumpliendo con las normas, reglas y reglamentos de seguridad y salud ocupacionales aplicables a sus lugares de trabajo.

Consciente de la importancia que tiene para nuestra paz laboral y la salud de los trabajadores el DTRH respalda cualquier investigación que resulte en beneficio para la salud de todos los trabajadores.

El Departamento tiene un compromiso inquebrantable con la salud y seguridad de los trabajadores; un compromiso indeleble con la paz laboral por tal razón, entienden que esta medida pudiera ser pieza esencial en la salud de los trabajadores y en la paz laboral que esta industria de vital importancia para el pueblo de Puerto Rico. El DTRH se reitera a su disposición de para comentar cualquier medida que redunde en beneficios para la clase trabajadora.

La Comisión realizó una **segunda vista pública** el pasado **jueves 17 de enero de 2008** en donde se citaron a la Autoridad de Energía Eléctrica (AEE), el Departamento de Salud, la UTIER y la Asociación de Jubilados. De estos comparecieron la AEE y el Departamento de Salud.

El **Departamento de Salud**, representado por la Lcda. Yaidy Santiago, indica que hace su ponencia en el aspecto del Departamento de Salud, pero en su agencia la doctora realizó un estudio para la UPR. Informa en su ponencia que el asbesto es un carcinógeno ante cuya exposición repetida puede causar una enfermedad conocida como asbestosis que forma cicatrices en los pulmones y revela cambios en la radiografía del pecho. Los síntomas incluyen tos, falta de aire y dolor del pecho. La detención de la exposición es la mejor forma de detener la enfermedad. Lo relacionado al asbesto esta reglamentado por la Administración para la Salud y Seguridad Ocupacional (OSHA).

Case:17-03283-LTS Doc#:18818-1 Filed:10/26/21 Entered:10/27/21 09:30:54 Desc:
Exhibit Page 16 of 26
Comisión de Recursos Naturales, Conservación y Medio Ambiente                    10
Primer Informe Conjunto
R. de la C. 5661

La presencia de fibras de asbestos en el ambiente constituye una amenaza a la salud, debido a que estas no se evaporan en el aire, ni se disuelven en el agua. Las fibras de estos minerales pueden permanecer por largos periodos de tiempo, suspendidas en el aire y ser cargadas a largas distancias por el agua y el viento. El efecto nefasto del asbesto sobre la salud ha sido ampliamente documentado científicamente por la comunidad médica y por investigadores probos en la materia.

Conforme a la literatura, naturalmente estamos expuestos a niveles bajos de asbestos por el aire que respiramos, especialmente aquellas personas que residen en áreas urbanas y/o industriales. Si a esa exposición le agregamos la que pueda ocurrir en el lugar de trabajo, es indudable que el riesgo al que se expone el empleado es mayor. Considerando que la Resolución alude al ambiente ocupacional, recomiendan la participación del Departamento del Trabajo y Recursos Humanos en la investigación que se esta proponiendo.

Los señores **Manuel Santiago y Orville M. Disdier** también del **Departamento de Salud** explican en la vista pública lo relacionado al estudio epidemiológico. En el 1996, la escuela de salud pública desarrolló un protocolo de investigación, el estudio se pone en pie octubre 2003. El estudio consistía en exposición a mercurio e hiedrasina. El estudio es una contratación de la AEE a la Universidad. La población utilizada eran empleados que habían desempeñado labores antes de 1987. Estos empleados fueron invitados a participar del estudio.

Explica el estudio en que consistía y cada participante recibió copia de sus resultados. Entre los hallazgos de 1555 empleados, 1248 asistieron estudios clínicos y el 93% completo todos los aspectos del estudio. El Dr. Levin como parte de las conclusiones establece que hay prevalencia de anormalidades. Los trabajadores deben continuar un programa de vigilancia. Empleados con anormalidades del tórax deben someterse a más estudios. Las exposiciones deben ser eliminadas, la tasa de anormalidad prueba fusión pulmonar riesgo mayor en fumadores.

El estudio es el Primer estudio Epidemiológico realizado a trabajadores. El 11% presento presencia de mercurio, puede darse el caso que los mismos expuestos a asbestos y a mercurio. Las manifestaciones o síntomas se limitan a 15 años. El criterio se usó desde 1987.

Cuando se hace el estudio ya se habían establecido unos propósitos. El estudio surge por petición de la AEE y la unión. No hay suficiente información de condiciones que se esta estudiando el 13% lo que significa es que hay anormalidad en el pulmón, no se puede determinar en este tipo de estudio si puede ser asociado en el empleo. El estudio nos alerta pero no establece si fueron racionados por la AEE o por otros factores. El Presidente de la Comisión cuestionó en la vista pública si el 13% fue referido algún tratamiento medico lo cual indicó el deponente que la escuela no daba tratamiento porque no era el propósito del estudio. Un medico que conoce que una persona tiene ciertas condiciones tiene la obligación legal de notificar al paciente.

A nivel individual cada participante tubo sus resultados hubo actividad donde la Dra. Levin presentó sus resultados. Cada individuo recibió sus resultados. La Dra. fue enfática que este estudio fue un primer paso. Si se quiere estudiar población debe ser por muchos años.

Comisión de Recursos Naturales, Conservación y Medio Ambiente          11
Primer Informe Conjunto
R. de la C. 5661

Recomendamos darle continuidad al estudio. El tipo de estudio es descriptivo. El estudio cumple con su propósito generar hipótesis y preguntas. En el estudio 1,168 empleados completaron todas las partes, 10,786 cartas en procedimiento que hizo AEE y 2219 respondieron a primera notificación.

Esta Comisión de Recursos Naturales, Conservación y Medioambiente solicitó información adicional al Departamento de Salud referente a qué preguntas o estudios adicionales se pueden generar para seguir con la investigación.

El pasado 29 de febrero de 2008 el **Departamento de Salud** envió una comunicación escrita a esta Comisión donde indica que el Departamento tiene a bien informar lo siguiente sobre **preguntas o estudios adicionales que pudieran realizarse con el fin de ofrecerle continuidad a la investigación sobre asbesto en trabajadores de la Autoridad de Energía Eléctrica, explicamos lo siguiente:**

Como se estableció durante nuestra ponencia, el estudio realizado fue uno de tipo descriptivo. A través del mismo se pudieron obtener estimadores puntuales (frecuencia, promedios, proporciones y porcentajes) de las variables o características estudiadas. Esto permite tener un panorama o descripción del perfil sociodemográfico y clínico de la población de estudio (en este caso de los trabajadores estudiados). El estudio fue uno de gran calidad y con un excelente diseño epidemiológico. Sus resultados brindan datos nunca antes obtenidos en este tipo de población, en especial en la población puertorriqueña. Pero la riqueza principal de este, como de todo estudio descriptivo, reside en su capacidad de generar preguntas e hipótesis. Ejemplos de preguntas que surgen de la investigación son las siguientes:

1. **¿Cuál es la proporción de trabajadores que, a pesar de no evidenciar exposición laboral a asbesto, presentan anormalidades del pulmón?**
2. **¿Existe una asociación estadística entre el trabajar en las generatrices y el presentar anormalidades clínicas relacionadas a hidracina, asbesto o mercurio? De ser así...**
3. **¿Cuál es el riesgo atribuible?**
4. **¿Cómo se diferencian, en términos demográficos, clínicos y de exposición, la proporción de trabajadores que no participan del estudio? ¿Por qué no participaron?**

Estas son solo algunas de las muchas preguntas que los resultados de este estudio descriptivo logran provocar. Las opciones de los próximos pasos a seguir son variadas pero deben estar dirigidas a contestar estas y otras posibles preguntas. Quizás **lo más recomendable sea el desarrollo de un estudio de tipo inferencial con un diseño Caso Control. También podrían llevarse a cabo entrevistas cualitativas, en aquellos que evidencias problemas clínicos, con el fin de obtener mayor información sobre sus exposiciones pasadas y estilos de vida.**

La **Autoridad de Energía Eléctrica (AEE)**, representados en la vista por el Lcdo. Ramón Rosado, director asuntos laborales, el Sr. Juan F. Alicea, del área planificación ambiental y la Ing. Evelyn Parrilla, hacen lectura de una ponencia donde declaran que el Asbesto es una

Comisión de Recursos Naturales, Conservación y Medio Ambiente                    12
Primer Informe Conjunto
R. de la C. 5661

fibra mineral que, mezclado con otras sustancias, se utilizo en la construcción de edificios y estructuras, así como material aislante. Muchas diversas industrias, incluyendo la Autoridad, utilizaron el asbesto en sus instalaciones debido a sus propiedades resistentes al calor, su durabilidad y sus propiedades aislativas. En la octava década del Siglo XX, la Administración Federal de Salud y Seguridad Ocupacional (OSHA en ingles), revisó su reglamento y restringió la exposición de los empelados a las fibras de asbesto.

La Autoridad, cumpliendo con su responsabilidad de proteger a sus empleados y cumplir con los reglamentos estatales y federales, estableció un programa para eliminar de sus instalaciones todo material que contiene asbesto. Se estableció un Acuerdo Integral Permanente con la Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER) para realizar trabajos de remoción, reparación o limpieza de material aislante con contenido de asbesto. Entre los acuerdos allí firmados se encuentran los siguientes:

- La Autoridad removerá todo material aislante y cualquier otro material que contenga asbesto y lo sustituirá con material que cumpla con la legislación y reglamentación vigente.
- La Autoridad cumplirá con todos los acuerdos disponiéndose que no se podrá discriminar contra los trabajadores, ni tomar acción disciplinaria, cuando estos notifiquen situaciones que violen las normas de seguridad y salud aquí alcanzada.

Además, se prohibió la compra de material que contiene asbesto. Se determinó, a través de muestreos y pruebas de laboratorio, el contenido de asbesto en los materiales aislantes de las tuberías, calderas, turbinas y equipos electrónicos. También, se analizaron edificios, estructuras y materiales sospechosos. Se identificaron aquellas áreas que resultaron positivo asbesto.

Se estableció un plan de trabajo, según lo requiere OSHA, para la remoción del material que contiene asbesto. En este plan se especificó la metodología a seguir para realizar los trabajos con seguridad.

Al Programa que se estableció se incorporaron los empleados que podrían estar expuestos al asbesto durante los trabajos de remoción, además de otros trabajos de mantenimiento y operación en las centrales generatrices y otros directorados. A estos empleados se les adiestró en la manera segura de trabajar, los riesgos asociados a la exposición y los requisitos de las reglamentaciones aplicables. Se les proveyó todo el equipo de protección personal necesario para realizar sus tareas de forma segura, y se les incluyó en un programa anual de exámenes médicos.

También, se realizaron muestreos ambientales durante los trabajos de remoción para determinar los niveles de exposición al asbesto y evaluar la efectividad de los métodos de control, ingeniería y administrativos establecidos. Para realizar la labor de remover el asbesto en edificios, paredes o estructuras con cemento, la Autoridad contrato compañías certificadas por las agencias reguladoras.

En el 1996 se firmó una estipulación entre la Autoridad y UTIER para llevar a cabo un estudio epidemiológico sobre la posible exposición al asbesto. Este estudio abarcó a empleados activos y jubilados que trabajaron en los últimos quince años en las centrales generatrices.

Comisión de Recursos Naturales, Conservación y Medio Ambiente                                    13
Primer Informe Conjunto
R. de la C. 5661

Se notificó del estudio epidemiológico, por medio de carta certificada a 10,786 empleados jubilados que pudieron estar expuestos al asbesto. De éstos, sólo participaron 1,248 personas de forma voluntaria. El 11% reflejó anormalidades que pudieron asociarse a tareas ocupacional. Algunos de los participantes radicaron los casos en la Corporación Fondo del Seguro del Estado. La Autoridad, cumpliendo con su responsabilidad, continúa con el proceso de seguimiento a estas personas.

Actualmente, todos los empleados de la Autoridad que trabajan en las centrales generatrices y que, por sus tareas, pueden estar expuestos a algún material que quede y que pueda contener asbesto, continúan en el Programa y son sometidos anualmente a examen medico.

Por otro lado, el Artículo XLIV, Salud y Seguridad Ocupacional, del Convenio Colectivo entre la UTIER y la Autoridad establece en su sección 1:

La autoridad y la Unión tomarán las medidas de seguridad necesaria e indispensable para la prevención de accidentes del trabajo y enfermedades ocupacionales para garantizar, tanto como sea posible, la salud física y mental de todos los trabajadores cubiertos por este Convenio Colectivo.

En su artículo 2, se dispuso lo siguiente:

La Autoridad y la Unión convienen en crear un Comité Central de Salud y Seguridad Ocupacional (en lo subsiguiente Comité Central) integrado por el Secretario de Salud y Seguridad de la UTIER y un representante UTIER de cada uno de los secretos de oficina, centrales y campo.

Este Comité Central tendrá la facultad para promulgar normas y reglas sobre médicas de salud y seguridad para evitar accidentes y enfermedades ocupacionales. Estas medidas y normas serán obligatorias para ambas partes.

Indica la AEE en su ponencia que según surge de todo lo antes indicado, la Autoridad está comprometida con la salud y seguridad de sus empleados, en específico aquellos expuestos a asbesto. Por lo tanto, la Autoridad no tiene objeción a que se lleve a cabo cualquier investigación que la Cámara de Representantes estime pertinente sobre el particular.

En la vista pública explican los deponentes que anterior al 1988 existía tabla de contaminantes con restricción mínima y se hacían medidas básicas en protección, cuanto surge el cambio la AEE haría los cambios para cumplir con las restricciones establecidas por OSHA. Se usaban los asbestos en centrales generatrices y otras áreas. Básicamente áreas de calderas. Los foros están abiertos. El Sr. Juan Alicea indica que sí quedan áreas de asbestos que están

encapsuladas y las van a ir trabajando poco a poco. Informan que hay un grupo adiestrado y el equipo adecuado, ya es una rutina básica. En la vista pública se le cuestionó si actualmente reciben alguna protección los que trabajan con el material y si se someten algún examen físico.

Comisión de Recursos Naturales, Conservación y Medio Ambiente                                      14
Primer Informe Conjunto
R. de la C. 5661

La Ing. Evelyn Parrilla indica que le proveen respirador, filtro con batería que provee aire al interior de la careta, los más estrictos half face, cámara de descontaminarse, limitar el tiempo de trabajo y un examen anual. La unión prefirió contratar una persona para orientar a los empleados.

Esta Comisión de Recursos Naturales, Conservación y Medioambiente solicitó a la **Autoridad de Energía Eléctrica (AEE)** la siguiente información adicional:
- Información sobre la fecha exacta que le fue notificado a la AEE sobre la nueva reglamentación de OSHA y cuando se le dio el equipo de protección a los empleados.
- En que momento enviaron cartas de notificación de los cambios al reglamento.
- Información sobre evidencia de la compra de equipo de seguridad.
- Cuales fueron las compañías privadas que hicieron la remoción del material contaminante.
- Nombre de la persona contratada por la UTIER para orientar a los empleados.
- Se le tiempo adicional para presentar evidencia de que se le habían dado el equipo de seguridad necesario a todos los empleados antes de someterse al proceso de remoción del material.
- Se le solicito provea evidencia sobre recibos de compra de dicho equipo de seguridad.
- Además se le solicito evidencia de que se le dio adiestramiento a dichos empleados sobre los riesgos, peligros existentes al momento de trabajar con dicho material.

El pasado 6 de marzo de 2008 la **Autoridad de Energía Eléctrica (AEE)** envió una comunicación escrita a esta Comisión donde indica que en conformidad con la información provista por la División de Seguridad Laboral, le informamos que las compañías que laboraron en la remoción de Asbestos desde 1989 son las siguientes: J.R. Insullation, Central Insullation, Induchem Enviromental Services (Actualmente Indultec), PROTECO, General Products y DEMACO

Por otro lado, en torno a la solicitud sobre la fecha exacta en que fue notificada la Autoridad de la nueva reglamentación de OSHA, es preciso señalar que OSHA no notifica directamente a los patronos sobre cambios en su reglamentación. La publicación o cambios a reglamentos federales se notifican a través del Code of Federal Regulations (CFR). La Autoridad proveyó el equipo de protección personal de conformidad con esta reglamentación.

## MARCO LEGAL VIGENTE DE ESTA INVESTICACIÓN

Todo lo relacionado al asbesto esta reglamentado por la Administración para la Salud y Seguridad Ocupacional (OSHA). La Administración de Seguridad y Salud Ocupacional de Puerto Rico (PR OSHA, por sus siglas en ingles) comenzó sus operaciones en el 1978, a raíz de la creación de la Ley Num. 16 del 5 de agosto de 1975, Ley de Seguridad y Salud en el Trabajo de Puerto Rico. El propósito de esta Ley es garantizar condiciones de trabajo seguras y salubres a cada empleado en Puerto Rico autorizando al Secretario del Trabajo a prescribir y poner en vigor

las normas, reglas y reglamentos de seguridad y salud desarrolladas y adoptadas; asistiendo y estimulando a patronos y empleados en sus esfuerzos por garantizar condiciones de trabajo

Comisión de Recursos Naturales, Conservación y Medio Ambiente                                15
Primer Informe Conjunto
R. de la C. 5661

seguras y salubres; proveyendo para la investigación científica, información, educación y adiestramiento y el desarrollo de estadísticas en el campo de la seguridad y salud ocupacional.


## HALLAZGOS

Las Comisiones a las que les fue referido la **R. de la C. 5661** desarrollaron un Plan de Trabajo para cumplir con lo ordenado en esta medida investigativa. La **R. de la C. 5661** ordena en su Sesión 1 realizar una investigación sobre la alegada utilización y contaminación de asbesto en las instalaciones de la Autoridad de Energía Eléctrica.

Estas Comisiones cumpliendo con su deber llevaron a cabo dos Vistas Públicas donde participaron las agencias y grupos de interés que se mencionan en este informe.

**Entre los hallazgos encontrados luego de un estudio ponderado de esta medida podemos resaltar los siguientes:**

1. Todos los ex empleados que participaron en este proceso expresaron y sienten que lo que han cometido con ellos es un atropello.
2. Los ex empleados se cuestionan porqué si la AEE pagaba una póliza de Seguro, no los referían al Fondo del Seguro del Estado por la exposición al material contaminante de asbestos. Solo eran referidos al Fondo por accidentes.
3. Quedó establecido en las declaraciones de los ex empleados que no llevaban ningún tipo de protección para trabajar con tan peligroso material, llevando residuos de asbestos impregnados en su ropa a sus hogares.
4. Quedo establecido por los empleados que estos no tomaron ni fueron orientado sobre los peligros de la exposición con dicho material antes de comenzar los trabajos de remoción del mismo.
5. El Sr. Jorge Martínez, ex empleado de la AEE, expresó que su hija hoy día está presentando los mismos síntomas que él, que laboró por alrededor de 11 años para la AEE.
6. Se estableció una Nueva Propuesta de Integración de los Acuerdos entre la UTIER y la AEE para Realizar los Trabajos de Remoción, Encapsulación, Instalación y Limpieza de Material de Aislación en las Centrales Generatrices en el 2001. **(ANEJO #3 )**
7. El Sr. Martínez llevó su caso ante la Comisión Industrial de Puerto Rico y esta última resuelve ordenar al administrador de la Corporación del Fondo del Seguro del Estado que evalúe y emita Decisión Institucional sobre Disfunción Reactiva de la Vía Respiratoria y Síndrome de Asma Bronquial; todo esto relacionado con la exposición al asbesto, también sobre obstrucción Severa Disfuncional a Nivel del Pulmón y Asma Bronquial Severa. **(ANEJO #4)**
8. **Que la AEE no presento evidencia de que ellos cumplieron con brindarle el equipo de seguridad necesaria a todos los empleados que estaban en contacto con el material. Además esta Corporación no cumplió con presentar la evidencia sobre los**

**adiestramientos brindados a estos empleados antes de someterlos a este proceso de limpieza y remoción del asbesto en el área de trabajo.**

Comisión de Recursos Naturales, Conservación y Medio Ambiente                    16
Primer Informe Conjunto
R. de la C. 5661

## Conclusiones y Recomendaciones

Luego de este análisis de haber presentado los hallazgos antes esbozados, estas Comisiones cumpliendo con su deber ministerial establecido en la Sesión 2 de la Resolución de la Cámara 5661 tiene a bien someter a este Honroso Cuerpo las siguientes recomendaciones.

1. El Departamento de Salud  recomienda el desarrollo de un estudio de tipo inferencial con un diseño Caso Control.  También podrían llevarse a cabo entrevistas cualitativas, en aquellos que evidencias problemas clínicos, con el fin de obtener mayor información sobre sus exposiciones pasadas y estilos de vida.

2. Sea referido .copia de dicho informe al Secretario del Trabajo  y al Secretario de Justicia de Puerto Rico, para que evalúen y determinen si existe alguna violación a la Legislación Federal o Estatal Vigente y procedan a emitir cualquier pronunciamiento que en derecho proceda.

Por lo antes expuesto, vuestras **Comisiones de Recursos Naturales, Conservación y Medio ambiente y de Salud** de la **Cámara de Representantes del Estado Libre Asociado de Puerto Rico,** Recomienda la aprobación de este   **Primer Informe** con sus hallazgos, conclusiones y recomendaciones.

Respetuosamente sometido,

**Hon. José Luis Rivera Guerra**                                           **Hon Gabriel Rodríguez Aguiló**
**Presidente**                                                                        **Presidente**
**Comisión de Recursos Naturales,**                              **Comisión de Salud**
**Conservación y Medioambiente**

Comisión de Recursos Naturales, Conservación y Medio Ambiente 17
Primer Informe Conjunto
R. de la C. 5661

Comisión de Recursos Naturales, Conservación y Medio Ambiente
Primer Informe Conjunto
R. de la C. 5661

a)  ¿Desde cuando OSHA tiene conocimiento de que el asbesto causa cáncer?

PR OSHA tiene conocimiento sobre la norma de asbesto (1910.1001) desde su fecha de adopción (1 de febrero de 1978) y ahí es que se indica que se evite respirar polvo que contenga fibras de asbesto porque puede causar daños severos a su salud. Sin embargo, desde el año 1971, OSHA (Administración de Seguridad y Salud Ocupacional federal) promulgó su primera regla sobre asbesto con relación a los efectos adversos a la salud en el trabajo. Según más información era recibida sobre la toxicidad del asbesto, OSHA actualizaba y modificaba dicha reglamentación. A partir del 1975, OSGA decide evaluar la data científica y médica que identifica el asbesto con un carcinógeno en humanos y actualiza nuevamente la reglamentación con las nuevas medidas.

b)  ¿Desde cuando OSHA le notifica a la Autoridad de Energía Eléctrica  que el asbesto causa cáncer a sus empleados?

La Ley Núm. 16 del 5 de agosto de 1975, conocida como la Ley de Seguridad y Salud en el Trabajo de Puerto Rico establece las bases para el desarrollo de PR OSHA. Desde la aprobación del plan estatal en el 1978, los patronos del sector privado y gubernamental tienen que cumplir con todos los reglamentos adoptados por medio de esta.

c)  ¿Desde el 2007, la Autoridad de Energía Eléctrica ha sido multada por el asbesto?

A la Autoridad de Energía Eléctrica, Central de San Juan se le realizó una inspección del 17 de mayo de 2007 (inspección #307935171). En esta investigación se emitió una propuesta penalidad de $17,500.00 por aparentes violaciones a la reglamentación de asbesto.

d)  ¿Si OSHA tiene conocimiento de las muertes por asbesto en las plantas de la Autoridad de Energía Eléctrica?

PR OSHA no tiene conocimiento sobre muertes de empleados por exposición al asbesto. Usted puede comunicarse con la Corporación del Fondo del Seguro del Estado para verificar si se han reportado muertes por exposición al asbesto en la Autoridad de Energía Eléctrica.

El **Sr. Juan Sosa Fernández,** quien trabajó 27 años como soldador.  Indica a esta Comisión que tiene dificultad de las vías respiratorias. Este veneno lo cargábamos a nuestras casas nuestros hijos nos abrazaban y se contaminaban.  Luego de estas charlas fue que comenzaron a utilizar lo que llamaban cuartos sucios y luego cuartos limpios, pero esto fue 10 años después de trabajar.  Se retiró en marzo del 2004.  El proceso de trabajar con asbesto fue hasta el año 1987.  El 16 de enero del 1990, a un sin número de compañeros los re-localizaron. Ahí se cortó el ciclo de trabajar con asbestos.  El que no sabe es como el que no ve, nosotros sacábamos el material con las manos.  El ayudante como el operario se tragaba toda esa contaminación.  Sé que es un dato científico que una partícula de asbestos de una misión a una

Case:17-03283-LTS Doc#:18818-1 Filed:10/26/21 Entered:10/27/21 09:30:54 Desc:
Comisión de Recursos Naturales, Conservación y Medio Ambiente                    5
Primer Informe Conjunto
R. de la C. 5661

altura de seis pies tarda seis horas en llegar al mismo. En un lugar sin ventilación tarda más tiempo y uno se lo traga.

En el 2000 se hizo un estudio epidemiológico según dijo el Dr. Levin de ese Hospital de New York el 89% todos tienen cicatrices en pulmones y problemas respiratorios. Salimos con eso yo tengo los papeles en mi casa no puedo estar expuesto a químicos, polvo, gases. Tengo caso en el fondo. Aquí en el fondo no hay médico con expertice en esa área, los tienen que enviar a Estados Unidos. La Dra. Perdomo secretaria de Salud estuvo en reunión con nosotros. Ella tiene pleno conocimiento de los estudios del Dr. Levin y los resultados que arrojaron. Dijeron que de salir algunas personas con la enfermedad ellos le iban a pagar el tratamiento.

El **Sr. Adrián Valle**, ex supervisor de la AEE expuso en la vista pública de la Comisión que tenía a su a cargo un grupo de empleados, supervisor de líneas, supervisor de sub-estaciones y que trabajó 10 años. Su oficina se llama Durotex, indica que la oficina también tenía asbesto, iba a las centrales a darle mantenimiento con su gente. Se jubiló y como 12 años de haber jubilado sintió una pelota debajo del brazo se hizo un estudio fue un linfoma canceroso. El Sr. Valle expresó lo siguiente: "Fui al fondo, allí me mandaron dos doctores Dr. Masin y Dr. Franco ambos determinan cáncer. Debido a mi trabajo mis compañeros han muerto de cáncer. Tengo un linfoma entre el corazón. Me dieron quimioterapia, estoy recibiendo tratamiento en la Torre de San Francisco todavía sigo con el cáncer. Tenía que entrar a esas áreas de mis empleados, no queda casi ninguno todos han muerto de cáncer. Me han encontrado cuatro linfomas. Estoy pasando por ese trago. Las caretas que nos daban es lo que se usa para pintar, no nos daban equipo, mi último compañero tenía 37 años y yo sigo vivo aquí luchando, incluso otros superiores que entraban a las sub-estaciones, muchos otros compañeros desconocen sus derechos. Ya están retirados y desconocen si tienen condiciones por esto mismo.

El **Sr. José Hernández**, ex empleado informó a esta Comisión lo siguiente: "Le pregunto a mi cardiólogo por que me operan del corazón y tengo 4 bypass. Soy soldador me jubilé en el 1994 y todavía no habían hecho caretas. No se puede acabar nunca los asbestos se encuentra en el revestimiento de la varilla. Cualquier cosa que se convierta en polvo fino es silia. Muchos de mis compañeros han muerto, uno de ellos fue Pellot. Tuve problemas con supervisores sino hacía un trabajo te amenazaban que te votaban, me dan pena de mis compañeros muchos estamos dañados. Todos tenemos la suerte echada con el asbesto. Fui al Fondo y la Dra. creyó que lo que estaba buscando era dinero. Yo no fui a buscar dinero, fui a buscar salud. Me gustaría investigar al Dr. Franco es médico del Fondo, de la Autoridad de Acueductos y Alcantarillados y de la Autoridad de Energía Eléctrica., es el único toxicólogo en Puerto Rico, hay conflicto de intereses, quien nos va a hacer justicia. Si duermo de lado siento que me hincan los pulmones. Personas compañeros han muerto de condiciones de pulmones.".

El **Sr. José Nadal**, también expuso en la vista pública que trabajó desde 1972-1989 y me incapacitaron. Tengo diagnosticado Obstrucción Pulmonar Crónica certificado por el Fondo del Seguro de Estado. Estoy recibiendo tratamiento para el asma. En el 1972 para protección

Case:17-03283-LTS   Doc#:18818-1   Filed:10/26/21   Entered:10/27/21 09:30:54   Desc:
Comisión de Recursos Naturales, Conservación y Medio Ambiente                                6
Primer Informe Conjunto
R. de la C. 5661

usábamos camisetas colocados de máscaras para trabajar rompiendo asbesto.   Era ayudante calderas, en el 1989 todavía no habían encapsulado el asbesto.

El **Sr. Víctor Morales Cedeño,** informó a esta Comisión lo siguiente "Trabajé 23 años y no había protección, muchos residentes a lo mejor también se contaminaron. A lo último comenzó la AEE a tapar con unos plásticos para que no saliera cuando vino protección ya el daño estaba hecho.   Tengo problema por vía respiratoria.   La Puerto Rico Testing que hacia pruebas a mí y a un compañero mío nos mandaron al Centro Médico el Dr. Franco certificó que tenía mi condición.

El **Sr. Benito Ayala Pacheco** expuso en la vista pública lo siguiente: "Empecé en AEE en Aguirre con asbestos. Me enviaban a Guayanilla 2 años y pico y luego me enviaron a Puerto Nuevo, Palo Seco.  En el Fondo decían que tenía anomalías. Fui a un doctor privado y dijeron que tenía Leucemia. La protección era un bozal de tela más nada.  Iba con esa misma ropa a mi casa.  Ahora me estoy asfixiando, me sacaron placa se perdieron y tuve que sacarme otras.

El **Sr. José A. Otero** informó a esta Comisión lo siguiente: "Trabajé 28 años para la AEE, la mayor cantidad en la Planta de Puerto Nuevo, yo era mecánico.   A nosotros nos aplicaban los deberes, entendían que si íbamos a trabajar con asbestos lo teníamos que remover.   Trabajé en el área de calderas y  se sentía el olor a asbesto.  En el 1988 me dio un infarto al miocardio. Me jubilé en el 2000.  En el 2002 me llaman para un estudio epidemiológico. Salí con calcificaciones en los pulmones, siento el pecho comprimido. Tengo la preocupación de que tarde o temprano nos va afectar.   En julio del 2003 recibimos los resultados del estudio epidemiológico a consecuencia del asbesto.

El **Sr. Carlos Benjamín Morales Ruiz,** es albañil III de la Autoridad Energía Eléctrica, entregó a esta Comisión una Declaración Jurada ante notario público Milagros Acevedo Colon, con fecha del 23 de agosto de 1989, donde declara que:

1. Que mis circunstancias personales son como queda dicho.
2. Que durante los años 1981-1982 trabajaba con la Autoridad de Energía Eléctrica como albañil y en unión a otros 15 o 20 compañeros se nos instruyo que debíamos trabajar en la Central de Palo Seco en Toa Baja, y que llevásemos un camión de plataforma.   Allí había otros empleados temporeros los cuales nos fueron asignados para realizar el trabajo durante el día.   Se nos encomendó recoger un material que estaba tirado y regado en el suelo, el cual se había tumbado de un conducto de la caldera, y debíamos mojarlo para que no volara.   El recogido se hizo usando palas y los desperdicios se echaban en unos drones de echar basura.
3. Una vez llenos, los drones descubiertos se subían en el camión, a veces hasta 20 o mas drones por viaje y uno de los compañeros lo guiaba hasta un hoyo que se había hecho con un "digger" dentro de la misma planta.
4. Ese hoyo era de mas de 10 pies de profundidad, se veía el agua de mar al fondo, y como de 20 o mas pies de diámetro.   Estaba entre la turbina de gas y la Carretera #165.  El hoyo originalmente era mas pequeño, según se iba llenando se tapaba con arena y se abría otro hoyo al lado con la "digger" que estaba allí, que la manejaba un compañero al que apodamos "Morovis".