# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-03283 (LTS)<br><br>(Jointly Administered)<br><br>**Re: ECF No. 17627** |

### THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES' REPLY IN SUPPORT OF CONFIRMATION OF THE SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Retired Employees hereby files its Reply in support of confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Dkt. 17627] (the "**Plan**").

1. The Retiree Committee supports confirmation of the Plan proposed by the Oversight Board. The Retiree Committee files this Reply to provide the Court with its response to

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

certain issues that the DRA Parties and Peter Hein raise in their Objections that directly implicate the treatment of pensions under the Plan.

### A. The Plan's Treatment of Retiree Claims Is In The Best Interests Of And Fair To All Creditors.

2. Both the DRA Parties and Mr. Hein argue that the Plan improperly favors retirees over other creditors and that therefore the Plan is either not in the best interests of creditors (the DRA Parties' argument) or is unfair to bondholders (Mr. Hein's argument). [DRA Parties (*see* Dkt. 18590 at ¶ 56) and Mr. Hein (*see* Dkt. 18575 at 14-15, 30).] Both arguments are wrong. The Retiree Committee will present evidence that is unrebutted in the form of the expert testimony of Professor Simon Johnson that any preferential treatment of retirees under the Plan is justified given (among other things) the depressive effects pension cuts would have on the Puerto Rican economy as a whole, including jeopardizing Puerto Rico's access to credit markets. [Dkt. 18822-1]. For example, Professor Johnson will testify that the Oversight Board's original proposal for the treatment of retiree claims would have reduced the Commonwealth's gross national product by at least .60% and reduced employment by over 6,300 jobs. [Dkt. 18822-1 at 2.9.]

3. As Professor Johnson further notes, the current Plan's proposed pension cuts (8.5% cap with a $1,500 threshold—an agreement reached after extensive negotiations between the Retiree Committee and the Oversight Board) is on the outside edge of what Puerto Rico can sustain without causing severe economic consequences. [Dkt. 18822-1 at 2.10.] Indeed, Professor Johnson opines that any further cuts "could have much larger – and hard to reverse – negative macroeconomic consequences…." [*Id*.] In other words, any further reductions to retiree benefits poses the very real danger of pushing the Commonwealth over the economic cliff.

4. Consequently, the arguments of the DRA Parties and Mr. Hein are built upon a false premise. The treatment of retiree claims is not a case of choosing "winners and losers," as

the DRA Parties describe it. [Dkt. 18590 at ¶ 56.] Instead, and as Professor Johnson lays out in detail in his unrebutted testimony, every dollar in cuts from a pensioner has a negative and multiplied effect on the Commonwealth's economy. [Dkt. 18822-1 at 2.8-2.21.] Consequently, the Plan's treatment of retiree claims is not only fair, it actually benefits all of the Commonwealth's creditors and citizens by helping to ensure the health of Puerto Rico's economy. And this is why the Retiree Committee supports the efforts of the Oversight Board and the Legislature and Governor to finalize a proposed agreement that would see the elimination of any cuts to accrued pension benefits. While such an arrangement would be more beneficial to retirees, it also would in fact help support the Puerto Rican economy as a whole and the feasibility of the Plan and therefore benefit all creditors and Puerto Rican citizens.

### B. The Pension Reserve Trust Does Not Make the Plan Inconsistent With The Fiscal Plan.

5. The DRA Parties also argue the Plan cannot be confirmed because it is not consistent with the Fiscal Plan. [Dkt. 18590 at ¶¶ 155-158.] The DRA Parties rely, in part, on the argument that the Fiscal Plan provides for the payment of pension obligations through the "PayGo" system and not through the funding of the Pension Reserve. This is factually inaccurate. The 2021 Commonwealth Fiscal Plan does explicitly recognize the creation and funding of a Pension Reserve Trust to ensure the adequate funding of pensions as required by PROMESA. (*See* 2021 Commonwealth Fiscal Plan at 278 (Debtors Ex. 10).) Consequently, it cannot be that the inclusion of the Pension Reserve Trust in the Plan is in any way inconsistent with the Fiscal Plan. The fact that the Fiscal Plan does not yet explicitly lay out in detail the precise mechanism for how the Pension Reserve Trust is to be funded, while the Plan does, in no way makes the Plan "inconsistent" with the Fiscal Plan.

3

6. Likewise, the DRA Parties complain that while the Fiscal Plan requires a reduction in current retiree benefits paid, "the Plan increases the current payment to the pension system." [Dkt. 18589 at ¶ 157.] But this conflates two separate concepts—benefits paid to retirees and payments made into a reserve support system that pays pensions. Given the financial state of the Commonwealth's pension systems when these Title III cases were commenced (*i.e.*, catastrophic underfunding, *see* Debtors Ex. 10 at 271-72), it is not surprising that in addition to cutting pensions the Plan provides for the creation of a reserve to support the PayGo system and provide assurance that funds will be available to pay pensions in years with projected cash flow deficits. Nothing in the Fiscal Plan requires otherwise and the DRA Parties' argument therefore fails.

**C. The DRA Parties' Narrow View of Preemption Is Wrong As A Matter of Law.**

7. The DRA Parties also incorrectly argue that PROMESA's preemption powers are limited. In fact, the DRA Parties argue that PROMESA preemption is the rare exception and that "PROMESA largely harmonizes and respects Commonwealth law, and the Plan must therefore conform with Commonwealth law." [Dkt. 18590, ¶ 72.] Based upon the theory that PROMESA simply "supplement[s], rather than replace[s], local law," the DRA Parties argue that Acts 30 and 31 are not preempted by PROMESA because Acts 30 and 31 are not "inconsistent" with any PROMESA. (DRA Obj. ¶¶ 70-85.) They are doubly wrong.

8. *First*, Congress expressly indicated its intention to preempt territorial law. Section 4 of PROMESA provides that PROMESA "shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act." 48 U.S.C. § 2103. PROMESA incorporates Bankruptcy Code § 507(a)(2) and not other subsections of § 507(a) and thus limits priority for general unsecured claims to only those entitled to administrative expense priority under § 503. 48 U.S.C. § 2161. The DRA Parties maintain that by only incorporating

4

§ 507(a)(2) into PROMESA, Congress somehow intended to incorporate any and all of the Commonwealth's statutory priority schemes into PROMESA. This makes no sense. Section 507(a)(2) reads, "The following expenses and claims have priority in the following order" "administrative expenses allowed under section 503(b) of this title ...." Period, full stop. If Congress had intended to tack on preexisting Commonwealth priorities to § 507(a)(2), it would have done so in the text of PROMESA. It did not.

9. ***Second***, any priority schemes created by Acts 30 and 31 are clearly "inconsistent with" and therefore preempted by PROMESA's incorporation of a different priority scheme—11 U.S.C. § 507(a)(2)—into PROMESA. *See* 48 U.S.C. § 301(a) (incorporating 11 U.S.C. §507(a)(2); *see also* 48 U.S.C. § 2103 (PROMESA "shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act").) As Collier explains:

> Section 507, together with various other sections of the Code, contains the only priority provisions applicable in a bankruptcy case. To the extent a federal nonbankruptcy statute purports to affect priorities within a bankruptcy case, that statute is preempted by the more specific provisions in the Code. To the extent that a state statute purports to establish the priority of a claim over other claims, that statute is preempted by the Code and of no effect in the bankruptcy case.

4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 507.02 (16th ed. 2017).[2]

10. Consistent with that rule, numerous courts have held that "[c]onflicting priorities established by state law must yield upon the intervention of bankruptcy to superior federal law." *Max Sobel Wholesale Liquors v. Nolden (In re Leslie)*, 520 F.2d 761, 762 (9th Cir. 1975). "In innumerable bankruptcy cases, past and present, one finds a primary bankruptcy thesis recited. If the debtor is in bankruptcy, state law is not permitted to prefer a class of unsecured creditors. This

---

[2] Because the other priority provisions of § 507(a) are inapplicable to a governmental entity like the Commonwealth, PROMESA only incorporates § 507(a)(2). Collier's general discussion of preemption in the context of § 507(a) is nonetheless still applicable.

5


is true although the state's motives for so doing are of the highest order. If state law is contrary to the distribution provisions of federal bankruptcy law, state law must yield." *In re Allen Care Ctrs., Inc.*, 163 B.R. 180, 183 (Bankr. D. Or.), *aff'd,* 175 B.R. 397 (D. Or. 1994), *aff'd,* 96 F.3d 1328 (9th Cir. 1996)); *see also In re City of Columbia Falls, Montana, Special Improvement Dist. No. 25*, 143 B.R. 750, 759 (Bankr. D. Mont. 1992) (chapter 9 permits impairment of obligations imposed by state statute).

11. For example, in *Leslie*, a state statute required the proceeds from a sale of a liquor license and business to be placed in escrow and, after state approval of transfer, distributed to the seller and creditors in accordance with a particular priority scheme. The court held that the Bankruptcy Code's priority scheme governed, commenting that "title to the proceeds in question passed to the trustee under § 70(a)(5) of the Bankruptcy Act, 11 U.S.C. § 110(a)(5), for distribution in accordance with the priorities enumerated in § 64 of the Act, 11 U.S.C. § 104, with any remainder to be divided pro rata among the bankrupt's general creditors." 520 F.2d at 762.[3]

---

[3] *Accord Rosetta Stone Comms., Inc. v. Gordon (In re Chambers)*, 500 B.R. 221, 229 (Bankr. N.D. Ga. 2013); *Int'l Bhd. of Teamsters, AFL-CIO v. Kitty Hawk Int'l, Inc. (In re Kitty Hawk, Inc.)*, 255 B.R. 428, 439 (Bankr. N.D. Tex. 2000) ("Where a state statute would alter the priority of claims in a bankruptcy case, the state statute is pre-empted by the Code"); *In re Lull Corp.*, 162 B.R. 234, 240 (Bankr. D. Minn. 1993) ("A state statute cannot reset bankruptcy priorities"); *In re Webster*, 126 B.R. 4, 5-6 (Bankr. D. Me. 1991) ("Congress may, and has, determined the extent of the [claim's] wage priority. Having done so, its determination is exclusive, notwithstanding the content of state enactments with which it may collide" citing U.S. Const. art. I, § 8, cl. 4; art. VI, cl. 2); *In re Nat'l Bickford Foremost, Inc.*, 116 B.R. 351, 352 (Bankr. D.R.I. 1990) ("[U]nder the Supremacy Clause of the U.S. Constitution, Article VI, Clause 2 . . . this Court is required to recognize and hold that the [state-law statute creating higher priority] is preempted by Sections 507(a)(3) and (a)(4) of the Bankruptcy Code"); *Flatau v. Jackson (In re Cropper Co.)*, 63 B.R. 874, 876 (Bankr. M.D. Ga.1986) ("The Court recognizes that Georgia law governs the priority of liens in a non-bankruptcy situation. When a bankruptcy has been filed, however, the priority of liens as set forth by Congress in the Bankruptcy Code governs"); *In re Redford Roofing Co.*, 54 B.R. 254, 255 (Bankr. N.D. Ill. 1985) ("Priority of distribution in a bankruptcy case is governed exclusively by sections 507 and 726 of the Bankruptcy Code"); *In re Sw. Fabricators, Inc.*, 40 B.R. 790, 791 (Bankr. W.D. Tex. 1984) ("State law is determinative on the issue of entitlement to property rights while federal bankruptcy law is relevant on the issue of priorities of rights").

12. This rule has been applied in the governmental context. The bankruptcy court held in Detroit's chapter 9 case that "[s]tate law cannot reorder the distributional priorities of the bankruptcy code. If the state consents to a municipal bankruptcy, it consents to the application of chapter 9 of the bankruptcy code." *In re City of Detroit*, 504 B.R. 97, 161 (Bankr. E.D. Mich. 2013); *accord Mission Indep. Sch. Dist. v. Texas*, 116 F.2d 175 (5th Cir. 1940) (rejecting the state's attempt by legislation to exempt itself as a bondholder from the operation of Chapter IX), *cert. denied*, 313 U.S. 562 (1941).

13. The case for preemption is even stronger given that the Tenth Amendment does not apply. The power to supersede state law derives from the Supremacy Clause, U.S. Const. art. VI, cl. 2. By contrast, when Congress regulates territories, the Territory Clause, U.S. Const. art. IV, sec. 3, cl. 2, requires territorial laws or constitutions to yield. "U.S. territories … are not sovereigns distinct from the United States." *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1873 (2016). As a result, "the powers" that territorial governments "exercise are delegations from Congress" under the Territory Clause. *Id.* at 1873 n.5. Even a territory's constitution derives entirely from Congressional authority, as the Supreme Court recently reiterated with respect to Puerto Rico itself. *Id.* at 1875 ("Congress conferred the authority to create the Puerto Rico Constitution."). "Congress may thus enable a territory's people to make large-scale choices about their own political institutions," *id.* at 1876, and may grant to a territorial legislature "powers … nearly as extensive as those exercised by any State legislature," *Hornbuckle v. Toombs*, 85 U.S. 648, 655-56 (1873). But those powers remain "subject also … to the right of Congress to revise, alter, and revoke at its discretion." *Id.* at 655; *Clinton v. Englebrecht*, 80 U.S. 434, 441 (1871) (noting that inhabitants of territories possessed "all the powers of self-government consistent with the

7

supremacy and supervision of National authority"). These preemption cases apply with equal force under PROMESA.

14. Accordingly, for the reasons set forth above, the DRA Parties' preemption arguments should be overruled.

### D. Comment on Objection of Miriam E. Lima Colon, Betzaida Feliciano Concepcion and Angel L. Mendez Gonzalez.

15. The Retiree Committee also notes the limited objection to the Plan filed by Miriam E. Lima Colon, Betzaida Feliciano Concepcion and Angel L. Mendez Gonzalez (the "**Limited Objectors**") in which the Limited Objectors argue that they are owed corrected pension amounts and should be classified as Class 51-A retiree creditors. [Dkt. 18583] They contend that the Plan classifies them as either disputed or as general unsecured claims under Class 58.

16. The Retiree Committee has no knowledge of the underlying dispute and takes no position as to the merits of the Limited Objectors' claims. The Retiree Committee simply notes that in the event the Limited Objectors are owed pensions, their pensions should be treated as such under the Plan.

WHEREFORE, for the reasons contained in the Oversight Board's reply and for the reasons discussed herein, the objections to confirmation of the Plan should be overruled and the Plan confirmed.

Dated: October 27, 2021

| JENNER & BLOCK LLP | BENNAZAR, GARCÍA & MILIÁN, C.S.P. |
|---|---|
| By: */s/ Robert Gordon* | By: */s/ A.J. Bennazar-Zequeira* |
| Robert Gordon (admitted *pro hac vice*) <br> Richard Levin (admitted *pro hac vice*) <br> 919 Third Ave <br> New York, NY 10022-3908 <br> rgordon@jenner.com <br> rlevin@jenner.com <br> 212-891-1600 (telephone) <br> 212-891-1699 (facsimile) <br><br> Catherine Steege (admitted *pro hac vice*) <br> Melissa Root (admitted *pro hac vice*) <br> Landon Raiford (admitted *pro hac vice*) <br> 353 N. Clark Street <br> Chicago, IL 60654 <br> csteege@jenner.com <br> mroot@jenner.com <br> lraiford@jenner.com <br> 312-222-9350 (telephone) | A.J. Bennazar-Zequeira <br> Héctor M. Mayol Kauffmann <br> Francisco del Castillo Orozco <br> Edificio Union Plaza, 1701 <br> Avenida Ponce de León #416 <br> Hato Rey, San Juan <br> Puerto Rico 00918 <br> ajb@bennazar.org <br> hector.mayol@bennazar.org <br> francisco.delcastillo@bennazar.org <br> 787-754-9191 (telephone) <br> 787-764-3101 (facsimile) <br><br> *Counsel for The Official Committee of Retired Employees of Puerto Rico* |