# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **A&S LEGAL STUDIO, PSC**<br>434 Avenida Hostos<br>San Juan, PR 00918<br>Telephone. (787) 751-6764<br>Facsimile (787) 763-8260 |

*Attorneys for the Financial Oversight and Management Board*
*as Representative for the Commonwealth, ERS, and PBA in their Title III Cases*

Dated: October 27, 2021

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND AND OVERVIEW
    OF SETTLEMENTS IN THE PLAN ...............................................................4

    A.    Procedural Posture of the Debtors' Title III Cases ................................................4

    B.    The Filing of the Plan and Disclosure Statement...................................................5

    C.    The 2021 Fiscal Plan for the Commonwealth, PBA, and ERS...........................15

    D.    The Disclosure Statement Order and Confirmation Procedures Order ................16

    E.    The Solicitation and Tabulation of Votes in Favor of the Plan ...........................17

THE PLAN MEETS EACH OF THE REQUIREMENTS
    UNDER TITLE III OF PROMESA AND SHOULD BE CONFIRMED .......................18

    A.    PROMESA § 314(b)(1): The Plan Fully Complies with the Provisions of
    the Bankruptcy Code Made Applicable by PROMESA § 301 ............................18

        1.    The Plan Satisfies the Classification Requirements of Section 1122
        of the Bankruptcy Code ....................................................................19

        2.    The Plan Satisfies Section 1123(a) of the Bankruptcy Code...................35

            a.    The Plan Complies with the Requirements of 11 U.S.C. §
            1123(a)(1) By Designating Classes of Claims..............................35

            b.    The Plan Complies with the Requirements of 11 U.S.C. §
            1123(a)(2) By Specifying Unimpaired Classes ............................36

            c.    The Plan Complies with the Requirements of 11 U.S.C. §
            1123(a)(3) By Specifying the Treatment of Impaired
            Classes...........................................................................................36

            d.    The Plan Complies with the Requirements of 11 U.S.C. §
            1123(a)(4) By Providing Equal Treatment within Each
            Class of Claims ..............................................................................36

            e.    The Plan Complies with the Requirements of 11 U.S.C. §
            1123(a)(5) By Providing Adequate Means for Its
            Implementation ..............................................................................38

3.       The Plan Complies with Section 1123(b) of the Bankruptcy Code...........39

         a.       The Plan Permissibly Provides for the
                  Impairment/Unimpairment of Certain Claims.............................40

         b.       The Plan Permissibly Provides for the Assumption and
                  Rejection of Executory Contracts ...................................................40

         c.       The Plan Permissibly Provides for the Settlement or
                  Adjustment of the Debtors' Claims ...............................................41

         d.       The Plan Permissibly Provides for the Retention and
                  Enforcement of Claims ................................................................76

         e.       The Plan Permissibly Provides for the Sale of the Debtors'
                  Property...........................................................................................77

         f.       The Plan Permissibly Provides for Modification of
                  Claimholders' Rights ...................................................................78

         g.       The Plan Permissibly Includes Other Appropriate
                  Provisions......................................................................................78

4.       The Plan Complies with Section 1123(d) of the Bankruptcy Code
         By Providing for the Cure of Defaults Under the Plan.............................79

5.       Section 1129(a)(2):  The Debtors Have Complied  with the
         Applicable Provisions of the Bankruptcy Code.......................................79

         a.       The Debtors Have Complied with Section 1125 of the
                  Bankruptcy Code ..........................................................................80

         b.       The Debtors Have Obtained Acceptances of the Plan
                  Consistent with Section 1126 of the Bankruptcy Code ................82

6.       Section 1129(a)(3):  The Plan was Proposed in Good Faith and Not
         by Any Means Forbidden by Law ............................................................84

7.       Section 1129(a)(6):  The Plan Does Not Contain Any Rate
         Changes Subject to the Jurisdiction of Any Governmental
         Regulatory Commission............................................................................86

8.       Section 1129(a)(8):  The Plan Has Not Been Accepted By Each
         Impaired Class of any Debtor Under the Plan, But Nonetheless
         Can Be Confirmed By Satisfying 11 U.S.C. §§ 1129(a)(10) and (b) ........87

9.       Section 1129(a)(10):  At Least One Impaired Class of Claims
         Voted in Favor of the Plan, Without Including Claims of Insiders ...........88

10.   Section 1129(b)(1):  The Plan Satisfies the Cram-Down
Requirements with Respect to the Classes that Did Not Accept the
Plan ....................................................................................................89

a.   The Plan Does Not Unfairly Discriminate Against the
Rejecting Classes and Complies with the Requirements of
11 U.S.C. § 1129(b)(1) ...........................................................90

b.   The Plan Is Fair and Equitable with Respect to the
Rejecting Classes and Complies with the Requirements of
11 U.S.C. § 1129(b)(2)(B) ......................................................98

B.   PROMESA § 314(b)(2):  The Plan Fully Complies with Title III of
PROMESA....................................................................................................100

C.   PROMESA § 314(b)(3):  The Debtors are Not Prohibited By Law From
Taking Any Action Necessary to Carry Out the Plan.........................................101

D.   PROMESA § 314(b)(4):  The Plan Provides for Full Payment of All
Allowed Priority Claims ....................................................................................103

1.   The Support Agreement Administrative Expenses in the Plan
Should be Approved. ...........................................................................104

E.   PROMESA § 314(b)(5):  The Plan Has Obtained All Necessary
Legislative, Regulatory, and Electoral Approvals ..............................................116

F.   PROMESA § 314(b)(6):  The Plan is in the Best Interests of Creditors and
is Feasible.............................................................................................................118

1.   The Plan is in the Best Interests of Creditors of each of the
Debtors. ...............................................................................................118

2.   The Plan is Feasible for Each of the Debtors.......................................123

a.   The Plan is Feasible for the Commonwealth ..............................125

b.   The Plan is Feasible for ERS ......................................................130

c.   The Plan is Feasible for PBA ......................................................130

G.   PROMESA § 314(b)(7):  The Plan is Consistent with the Fiscal Plan for
the Debtors. ..........................................................................................................131

COMMONWEALTH LAWS INCONSISTENT WITH PROMESA ARE PREEMPTED........132

A.   Commonwealth Law Provisions Requiring Appropriations Outside of
Board-Certified Budget or Fiscal Plan Are Preempted........................................136

B.      Commonwealth Law Provisions Requiring Payment of Prepetition Debt in
        Full Are Preempted. ............................................................................................145

C.      Commonwealth Law Provisions Authorizing Issuance of New Debt
        Without Oversight Board Approval Are Preempted.............................................148

THE INJUNCTION AND RELEASE PROVISIONS EMBODIED
        IN THE PLAN ARE PERMISSIBLE AND SHOULD BE APPROVED ....................148

A.      The Debtors' Release of Claims Should Be Approved .......................................149

B.      The Consensual Releases Should Be Approved ..................................................152

C.      The Exculpation Sought In the Plan Is Appropriate ...........................................155

D.      The Injunction Sought is Necessary to Enforce the Releases and
        Exculpations Contained in the Plan ....................................................................160

CONCLUSION..........................................................................................................................161

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*,
No. 4:17-CV-01053, 2017 U.S. Dist. LEXIS 47231 (E.D. Mo. Mar. 30, 2017) ..................106

*Aetna Cas. & Sur. Co. v. Clerk, United States Bankr. Court (In re Chateaugay Corp.)*,
89 F.3d 942 (2d Cir. 1996)........................................................................................20, 30

*Airadigm Commc'n, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*,
519 F.3d 640 (7th Cir. 2008) ..................................................................................158

*AMPR v. Sist. Retiro Maestros IV*,
190 P.R. Dec. 854 (2014).........................................................................................147

*Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*,
954 F.3d 1 (1st Cir. 2020).........................................................................................21

*Antilles Cement Corp. v. Fortuño*,
670 F.3d 310 (1st Cir. 2012)......................................................................................132

*Arizona v. United States*,
567 U.S. 387 (2012)..........................................................................132, 133, 141, 142

*AT&T Mobility v. Concepcion*,
563 U.S. 333 (2011).................................................................................................133

*Barnett Bank, N.A. v. Nelson*,
517 U.S. 25 (1996).................................................................................................133

*Berliner v. Pappalardo (In re Puffer)*,
674 F.3d 78 (1st Cir. 2012).......................................................................................85

*Blixseth v. Credit Suisse*,
961 F.3d 1074 (9th Cir. 2020),
*cert. denied*, 141 S. Ct. 1394 (2021) ...................................................................158

*Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*,
622 F.2d 872 (5th Cir. 1980) ..................................................................................91

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*,
656 F.3d 82 (1st Cir. 2011) ................................................................................42

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
280 F.3d 648 (6th Cir. 2002) .............................................................................20

*Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*,
191 B.R. 1005 (Bankr. C.D. Cal. 1996)...................................................134, 140

*Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*,
709 F.2d 762 (1st Cir. 1983)...............................................................................84

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983)................................................................................42

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000)..........................................................................................142

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
416 F.3d 136 (2d Cir. 2005)..............................................................................153

*Elliot v. Bumb*,
356 F.2d 749 (9th Cir. 1966) ............................................................................140

*Faitoute Iron & Steel, Co. v. City of Asbury Park*,
316 U.S. 502 (1942)..........................................................................................120

*Fin. Oversight & Management Board for Puerto Rico v. Auerlius Invs, LLC*,
140 S. Ct. 1649 (2020)........................................................................................48

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight and Mgmt. Bd. for P.R.)*,
948 F.3d 457 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 844 (2020) ............44, 45, 48

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
85 F. Supp. 3d 577 (D.P.R. 2015),
*aff'd*, 136 S. Ct. 1938 (2016) ...........................................................................143

*Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*,
542 B.R. 261 (B.A.P. 9th Cir. 2015)...................................20, 22, 84, 117, 122

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995)..........................................................................................133

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992)..................................................................................133, 144

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund,*
    748 F.2d 42 (1st Cir. 1984).........................................................................21

*Grogan v. Garner,*
    498 U.S. 279 (1991)....................................................................................154

*Gustavsen v. Alcon Labs., Inc.,*
    272 F. Supp. 3d 241 (D. Mass. 2017) .......................................................133, 142

*Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.),*
    136 F.3d 45 (1st Cir. 1998).........................................................................41, 42

*Hill v. Burdick (In re Moorhead Corp.),*
    208 B.R. 87 (B.A.P. 1st Cir. 1997),
    *aff'd*, 201 F.3d 428 (1st Cir. 1998) .............................................................42

*Hines v. Davidowitz,*
    312 U.S. 52 (1941).....................................................................................143

*In re 203 N. LaSalle St. Ltd. P'ship,*
    190 B.R. 567 (Bankr. N.D. Ill. 1995),
    *aff'd,* 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds sub nom. Bank of*
    *Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434 (1999) ....................90

*In re Adelphia Commc'ns Corp.,*
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)...............................................................112

*In re Affordable Auto Repair, Inc.,*
    No. 6:19-bk-18367, 2020 WL 6991012 (Bankr. C.D. Cal. Sept. 2, 2020).........................111

*In re Aegean Marine Petroleum Network, Inc.,* 599 B.R. 717, 721 (Bankr.
    S.D.N.Y. 2019) .........................................................................................158

*In re Alpha Natural Res., Inc.,*
    No. 15-33896, 2016 Bankr. LEXIS 3246 (Bankr. E.D. Va. July 12, 2016) .........................89

*In re Armstrong World Indus., Inc.,*
    348 B.R. 111 (D. Del. 2006)........................................................................89

*In re Aztec Co.,*
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) .........................................................90

*In re Barnwell Cnty. Hosp.,*
    471 B.R. 849 (Bankr. D.S.C. 2012)..............................................................91, 96, 117

*In re BearingPoint, Inc.*,
   453 B.R. 486 (Bankr. S.D.N.Y. 2011) ...............................................................154

*In re C.P. del Caribe, Inc.*,
   140 B.R. 320 (Bankr. D.P.R. 1992) ....................................................................42

*In re CHC Grp. Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex.
   Mar. 3, 2017) ......................................................................................................106

*In re Charles St. African Methodist Episcopal Church of Boston*,
   499 B.R. 66 (Bankr. D. Mass. 2013) ............................................................18, 19

*In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*,
   187 B.R. 683 (Bankr. D. Colo. 1995) ...........................................................20, 88

*In re City of Detroit*,
   504 B.R. 97 (Bankr. E.D. Mich. 2013) .....................................................134, 140

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) ..................................................... *passim*

*In re City of Stockton*,
   526 B.R. 35 (Bankr. E.D. Cal. 2015) .................................................................93

*In re Connector 2000 Ass'n*,
   447 B.R. 752 (Bankr. D.S.C. 2011) .........................................................117, 118

*In re Corcoran Hosp. Dist.*,
   233 B.R. 449 (Bankr. E.D. Cal. 1999) ..............................................................22

*In re Corey*,
   892 F.2d 829 (9th Cir. 1989) .............................................................................84

*In re DBSD N. Am., Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009) .............................................................153

*In re Dow Corning Corp.*,
   244 B.R. 634 (Bankr. E.D. Mich. 1999) ............................................................23

*In re Dow Corning Corp.*,
   255 B.R. 455 (E.D. Mich. 2000) ........................................................................91

*In re Drexel Burnham Lambert Grp. Inc.*,
   138 B.R. 714 (Bankr. S.D.N.Y. 1992) .............................................................112

*In re Drexel Burnham Lambert Grp., Inc.*,
   140 B.R. 347 (S.D.N.Y.1992) ...........................................................................111

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992)................................................................160

*In re Fin. Oversight & Mgmt. Bd.*,
   361 F. Supp. 3d 203 (D.P.R. 2019)....................................................134

*In re Firstline Corp.*,
   No. 06–70145, 2007 WL 269086 (Bankr. M.D. Ga. Jan. 27, 2007)....................................159

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................90

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) ............................................89, 157

*In re Granite Broad. Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007)..................................................155

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ........................................................20

*In re Hardeman Cnty. Hosp. Dist.*,
   540 B.R. 229 (Bankr. N.D. Tex. 2015)...................................................21

*In re Heron, Burchette, Ruckert & Rothwell*,
   148 B.R. 660 (Bankr. D.D.C. 1992) .....................................................108

*In re Holywell Corp.*,
   913 F.2d 873 (11th Cir.1990) ................................................................20

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) ............................................107, 108

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987)................................................................31

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y 1986), *aff'd in part*, *rev'd in part on other
   grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-
   Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ............................18, 79, 90

*In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*,
   No. 04-10585, 2009 Bankr. LEXIS 2846 (Bankr. P.R. Mar. 31, 2009) ................................42

*In re Lull Corp.*,
   162 B.R. 234 (Bankr. D. Minn. 1993) ..................................................140

*In re MCorp Fin., Inc.*,
   137 B.R. 219 (Bankr. S.D. Tex.),
   *appeal dismissed and remanded*, 139 B.R. 820 (S.D. Tex. 1992).........................................112

*In re Midway Gold US, Inc.*,
   575 B.R. 475 (Bankr. D. Colo. 2017) ................................................................................149

*In re Montreal Me. & Atl. Ry.*,
   No. 13-10670, 2015 Bankr. LEXIS 3737 (Bankr. D. Me. Oct. 9, 2015)..............155, 158, 159

*In re Mount Carbon Metro. Dist.*,
   242 B.R. 18 (Bankr. D. Colo. 1999) ..........................................................84, 85, 120, 124, 125

*In re MPM Silicones, LLC*,
   No. 14-22503, 2014 WL 4637175 (S.D.N.Y. Sept. 17, 2014) ............................................112

*In re Nat'l Heritage Found., Inc.*,
   478 B.R. 216 (Bankr. E.D. Va. 2012)................................................................................157

*In re Nat'l Paper & Type Co. of P.R.*,
   120 B.R. 624 (D.P.R. 1990)................................................................................................20

*In re Oneida Ltd.*,
   351 B.R. 79 (Bankr. S.D.N.Y. 2006) ................................................................................155

*In re Pub. Serv. Co. of New Hampshire*,
   108 B.R. 854 (Bankr. D.N.H. 1989) .................................................................................135

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000).............................................................79, 154, 156, 157

*In re Quincy Med. Ctr., Inc.*,
   No. 11-16394-MSH, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011) ................157, 158

*In re Receivership Estate of Indian Motorcycle Mfg., Inc.*,
   299 B.R. 8 (D. Mass. 2003) ...............................................................................................42

*In re Redford Roofing Co.*,
   54 B.R. 254 (Bankr. N.D. Ill. 1985) .................................................................................140

*In re Resorts Int'l*,
   145 B.R. 412 (Bankr. D.N.J. 1990) ...................................................................................88

*In re Richmond Unified Sch. Dist.*,
   133 B.R. 221 (Bankr. N.D. Cal. 1991) ...............................................................................91

*In re Rivera Echevarria*,
   129 B.R. 11 (Bankr. D.P.R. 1991).....................................................................................90

*In re Sanitary & Improvement Dist. No. 7,*
    98 B.R. 970 (Bankr. D. Neb. 1989) ..............................................................101, 118, 123, 134

*In re Save Our Springs (S.O.S.) Alliance, Inc.,*
    388 B.R. 202 (Bankr. W.D. Tex. 2008),
    *aff'd,* 2009 U.S. Dist. Lexis 121177 (W.D. Tex. Sept. 29, 2009),
    *aff'd,* 632 F.3d 168 (5th Cir. 2011) ..........................................................................................23

*In re Simmons,*
    288 B.R. 737 (Bankr. N.D. Tex. 2003) .......................................................................................90

*In re Spansion,*
    426 B.R. 114 (Bankr. D. Del. 2010) .........................................................................................149

*In re TCI 2 Holdings, LLC,*
    428 B.R. 117 (Bankr. D.N.J. 2010) .........................................................................................106

*In re Toy & Sports Warehouse, Inc.,*
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..........................................................................................79

*In re Trahan,*
    283 F. Supp. 620 (W.D. La. 1968) ............................................................................................140

*In re U.S. Truck Co.,*
    800 F.2d 581 (6th Cir. 1986) ...............................................................................................20, 30

*In re Willowood U.S. Holdings, LLC,* No. 19-11079 KHT, 2020 Bankr. LEXIS
    3706 (Bankr. D. Colo. Feb. 14, 2020) .....................................................................................158

*In re Winn-Dixie Stores, Inc.,*
    356 B.R. 239 (Bankr. M.D. Fla. 2006) .....................................................................................155

*In re Yellowstone Mountain Club, LLC,*
    No. 08–61570–11, 2009 WL 2163528 (Bankr. D. Mont. July 16, 2009)...............................155

*In re Zenith Elecs. Corp.,*
    241 B.R. 92 (Bankr. D. Del. 1999) ....................................................................................89, 111

*Int'l Bhd. of Teamsters v. Hawk Int'l, Inc. (In re Kitty Hawk, Inc.),*
    255 B.R. 428 (Bankr. N.D. Tex. 2000) ....................................................................................139

*Int'l Shoe Co. v. Pinkus,*
    278 U.S. 261 (1929) ..................................................................................................................133

*Jeffrey v. Desmond,*
    70 F.3d 183 (1st Cir. 1995) ...............................................................................................42, 150

*Jeremiah v. Richardson*,
   148 F.3d 17 (1st Cir. 1998)........................................................................41

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993).................................................................20, 89

*Kelley v. Everglades Drainage District*,
   319 U.S. 415 (1943).......................................................................124, 125

*Lorillard v. Pons*,
   434 U.S. 575 (1978)..................................................................................100

*Marrama v. Citizens Bank of Mass.*,
   549 U.S. 365 (2007)..................................................................................154

*Mass Ass'n of Health Maint. Orgs v. Ruthhardt*,
   194 F.3d 176 (1st Cir. 1999)....................................................................132

*Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
   Mgmt. Bd. for P.R.)*,
   916 F.3d 98 (1st Cir. 2019)...............................................................133, 137

*Meritage Homes of Nev., Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge
   LLC)*,
   478 B.R. 403 (D. Nev. 2012)....................................................................157

*Mineral Techs., Inc. v. Novinda Corp. (In re Novinda Corp.)*,
   585 B.R. 145 (B.A.P. 10th Cir. 2018).......................................................21

*Murphy v. Weathers*,
   No. 7:07-CV-00027, 2008 WL 4426080 (M.D. Ga. Sept. 25, 2008) ...........155, 159

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984)....................................................................................73

*Official Comm. of Unsecured Creditors of the Commonwealth of P.R. v. Whyte (In
   re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   360 F. Supp. 3d 65 (D.P.R. 2019)..............................................................23

*Ohio v. Kovacs*,
   469 U.S. 274 (1985) ................................................................................140

*Perez v. Campbell*,
   402 U.S. 637 (1971)..................................................................................133

*Pliva v. Mensing*,
   564 U.S. 604 (2011)...........................................................................133, 143

*Reading Co. v. Brown*,
   391 U.S. 471 (1968)................................................................................47

*Resolution Trust Corp.* v. *Best Prods. Co. (In re Best Prods. Co.)*,
   177 B.R. 791 (S.D.N.Y. 1995),
   *aff'd*, 68 F.3d 26 (2d Cir. 1995).....................................................41

*Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
   *Mgmt. Bd. for P.R.)*,
   327 F. Supp. 3d 365 (D.P.R. 2018),
   *aff'd sub nom. Méndez-Núñez v. Oversight & Mgmt. Bd. for P.R. (In re Fin.*
   *Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98 (1st Cir. 2019)............................137

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
   *Mgmt. Bd. for P.R.)*,
   330 F. Supp. 3d 685 (D.P.R. 2018),
   *aff'd*, 945 F.3d 3 (1st Cir. 2019) .........................................133, 137, 145

*United States v. Savoie*,
   985 F.2d 612 (1st Cir. 1993).......................................................20

*United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.)*,
   289 B.R. 269 (B.A.P. 1st Cir. 2003)..............................................41

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
   326 B.R. 497 (S.D.N.Y. 2005)...............................................155, 160

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
   *Mgmt. Bd. for P.R.)*,
   945 F.3d 3 (1st Cir. 2019),
   *cert. denied*, 141 S. Ct. 241 (2010) ..............................................136

*W. Mining & Invs., LLC v. Bankers Trust Co.*,
   No. C.A.02-1445, 2003 WL 503403 (D. Del. Feb. 19, 2003) ..............................157

*Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76 LLC)*,
   465 B.R. 525 (B.A.P. 9th Cir. 2012),
   *aff'd*, 578 F. App'x 644 (6th Cir. 2014).........................................26

**STATUTES**

32 L.P.R.A. § 2905 .......................................................................31

11 U.S.C. § 101........................................................................96, 100

11 U.S.C. § 105.........................................................................149

11 U.S.C. § 363.........................................................................115

11 U.S.C. § 365 ................................................................................................5, 40, 59, 73

11 U.S.C. § 502 ...........................................................................................................103, 122

11 U.S.C. § 503 .........................................................................................59, 105, 107, 108

11 U.S.C. § 507 ...................................................................................................103, 139, 146

11 U.S.C. § 510 .............................................................................34, 87, 89, 97, 100

11 U.S.C. § 524 ............................................................................................................155

11 U.S.C. § 552 .............................................................................................44, 47, 48, 99

11 U.S.C. § 901 ..............................................................................................................84, 115

11 U.S.C. § 926 .................................................................................................................68

11 U.S.C. § 943 .........................................................................101, 102, 117, 118, 140

11 U.S.C. § 944 .............................................................................88, 134, 144, 145, 153

11 U.S.C. § 1122 ........................................................................................................ *passim*

11 U.S.C. § 1123 ........................................................................................................ *passim*

11 U.S.C. § 1125 .............................................................................................16, 79, 80, 86

11 U.S.C. § 1126 .............................................................................................79, 82, 83, 87,

11 U.S.C. § 1129 ........................................................................................................ *passim*

11 U.S.C. § 1141 .................................................................................................................88

11 U.S.C. § 1145 .................................................................................................................78

42 U.S.C. 1396a .........................................................................................................33, 95

48 U.S.C. §§ 2101–2241 ...........................................................................................1

48 U.S.C. § 2175 ..............................................................................................................4

PROMESA § 4 ............................................................................................132, 143, 147

PROMESA § 101 ..............................................................................................................84

PROMESA § 201 .......................................................................................................66, 136

PROMESA § 202 ..................................................................................................66, 136, 143

PROMESA § 207.....................................................................................66, 134, 135, 145, 148

PROMESA § 301.................................................................................................. *passim*

PROMESA § 305.................................................................................................149

PROMESA § 306.................................................................................................149

PROMESA § 314.................................................................................................. *passim*

PROMESA § 405.................................................................................122, 138,141, 143

## OTHER AUTHORITIES

121 Cong. Rec. H39413 (daily ed. Dec. 9, 1975) (remarks of Reps. Kindness and
    Edwards), reprinted in Norton Bankruptcy Law and Practice 2d at 915 (1998–
    99) ............................................................................................................124

H.R. Rep. 94-686, 32-33 (1975), *as reprinted in* 1976 U.S.C.C.A.N. 539 ...............................124

H.R. REP. NO. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ...............................18, 79

P.R. Const., Article II, § 7..........................................................................146

P.R. Const., Article II, § 9..........................................................................146

P.R. Const., Article II, § 12........................................................................146

U.S. Const. Article VI, cl. 2.......................................................................132

4 Collier on Bankruptcy ¶ 943.03[7] (16th ed. 2021)............................................120

7 Collier on Bankruptcy ¶ 1129.04[3] (15th ed. 2002)...........................................90

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA")[2] (the Oversight Board, in its capacity as Title III representative of the Commonwealth, ERS, and PBA, is referred to as the "Debtors"), respectfully submits this memorandum of law in support of confirmation (the "Memorandum" or the "Confirmation Brief") of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 17627][3] (as it may be amended, modified, or supplemented, the "Plan").

## PRELIMINARY STATEMENT

1.      The Oversight Board is proud to ask the Court to confirm the Plan.  It is proud because the Plan reflects concerns and input from the Government, the people, and the creditors. The Plan's pillars are negotiated settlements with holders of a vast majority of the impaired debt. But, the Plan's largest benefits go to the people of the Commonwealth.  The vast majority of Government retirees are provided their full pensions at current levels, after suffering hits to their pensions years before the Title III cases commenced.  All financial debt is materially impaired, even after receiving no interest for nearly five years while pension payments continued unabated throughout the Title III cases.  The Plan includes multiple provisions designed to create reserves for future pension payments, reserves for financial debt, debt management requirements, and

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.
[3] All ECF No. references are to Case No. 17-bk-3283-LTS, unless otherwise indicated.

careful oversight of pension reserves by independent persons.  Everyone's aspiration is that confirmation of the Plan will turbocharge economic investment and growth, as it did after Detroit's chapter 9 plan was confirmed.  The Plan, however, and the currently certified fiscal plan, do not depend on extra growth.  If it occurs, retirees and creditors can benefit from contingent upsides built into their treatments under the Plan.  The Oversight Board purposefully avoided upside assumptions because they are uncertain and there are also potential downsides. For instance, very recently, a major United States corporation generating $300 million per year in Commonwealth tax revenues exited the Commonwealth.  Therefore, the Oversight Board's planning is cautious.  But, confirmation of the Plan would eliminate a huge debt burden on the people of the Commonwealth.  It would facilitate fiscal responsibility and market access, the Oversight Board's twin statutory missions.  And, it is necessary before the Oversight Board's tenure can lead to balanced budgets and the Oversight Board's statutory termination.  All this can occur with the Commonwealth's best days yet to come, but much closer.

2.      The Plan is also a tribute to all who participated in the Title III cases.  Litigation was passionately pursued by creditors, the Government, and other parties in interest—each serving as champion for their constituencies.  Without the Court's rulings, nearly all of which were affirmed if appealed, and the judicial mediators' indefatigable guidance, the uncertainties would not have been narrowed sufficiently and the consensus in the Plan would not have emerged.  Thus, the Oversight Board requests confirmation of the Plan knowing it would not have been possible without everyone's participation.  And, let there be no illusions.  The people and the creditors have each suffered serious losses.  The Plan does not restore everything lost. But, the Plan and the fiscal plan measures preceding it and following it, can enable the Commonwealth to provide much brighter futures.

3.     After devastating hurricanes, earthquakes, and the COVID-19 pandemic, the Debtors have proposed the Plan, incorporating among other items, the terms of multiple plan support agreements.  They compromise and settle all outstanding challenges to the validity, priority, and secured status of GO Bonds and PBA Bonds.  The ERS Stipulation compromises and settles the outstanding disputes in connection with the ERS Bonds.  And the HTA/CCDA PSA and PRIFA PSA compromise and settle the issues with respect to claims against the Commonwealth for retaining Allocable Revenues (colloquially known as "clawback claims"). The Plan also incorporates agreements with the Official Committee of Retirees and the Official Committee of Unsecured Creditors with respect to the treatment of their constituencies' claims, and an agreement with AFSCME, one of the Commonwealth's major employees' unions, on the treatment of its claims and the terms of a new collective bargaining agreement moving forward.

4.     The Plan resolves a multitude of disputes surrounding the Debtors' over $135 billion of liabilities, including over $55 billion of unfunded pension liabilities for the benefit the Commonwealth's public sector employees.  Resolution of these myriad disputes ends the uncertainty surrounding them, greatly reduces the Debtors' funded indebtedness, and both reduces and provides a means to satisfy the Debtors' pension liabilities.

5.     As set forth below, the Plan satisfies the confirmation requirements of Title III of PROMESA, including the sections of the Bankruptcy Code incorporated therein by PROMESA section 301(a).  The Debtors request that the Court overrule all the objections and confirm the Plan.

**BACKGROUND AND OVERVIEW
OF SETTLEMENTS IN THE PLAN**

A. **Procedural Posture of the Debtors' Title III Cases**

6.      On June 30, 2016, the Oversight Board was established pursuant to PROMESA section 101(b).  The current members of the Oversight Board are David Skeel (Chairman), Andrew Biggs, Arthur Gonzalez, Antonio Medina, John Nixon, Justin Peterson, and Dr. Betty Rosa.

7.      Pursuant to PROMESA section 315, "[t]he Oversight Board in a case under this subchapter is the representative of the debtor" and "may take any action necessary on behalf of the debtor to prosecute the case of the debtor, including filing a petition under section [304] of [PROMESA] . . . submitting . . . a plan of adjustment . . . or otherwise generally submitting filings in relation to the case with the court."  48 U.S.C. § 2175.

8.      On May 3, 2017 (the "Commonwealth Petition Date"), the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, commencing a case under title III thereof (the "Commonwealth's Title III Case").  Pursuant to PROMESA section 315(b), the Oversight Board is the Commonwealth's Title III representative.

9.      On May 21, 2017 (the "ERS Petition Date"), the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for ERS pursuant to section 304(a) of PROMESA, commencing a case under title III thereof ("ERS's Title III Case").  Pursuant to PROMESA section 315(b), the Oversight Board is ERS's Title III.

10.     On September 27, 2019 (the "PBA Petition Date"), the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary

petition for relief for PBA pursuant to section 304(a) of PROMESA, commencing a case under title III thereof ("PBA's Title III Case" and together with the Commonwealth's Title III Case and ERS's Title III Case, the "Title III Cases").  Pursuant to PROMESA section 315(b), the Oversight Board is PBA's Title III representative.

11.    Background information regarding the Debtors and the commencement of their respective Title III Cases is contained in the *Notice of Filing of Statement of Oversight Board in Connection with PROMESA Title III Petition* [ECF No. 1], attached to the Commonwealth's Title III petition, and the *Notice of Filing of Statement of Oversight Board Regarding PBA's Title III Case* [ECF No. 2, Case No. 19-5523].

**B.   The Filing of the Plan and Disclosure Statement**

12.    In May 2019, the Oversight Board reached agreements with several major groups of claimholders on the treatments of their claims.  The *Plan Support Agreement*, dated as of May 31, 2019 (the "2019 PSA"), among the Oversight Board, and certain holders of Commonwealth general obligation bonds ("GO Bonds") and bonds issued by PBA ("PBA Bonds"), included the compromise and settlement of a key dispute concerning whether claimed leases between the Commonwealth and PBA were true leases for purposes of Bankruptcy Code section 365 or were debts of the Commonwealth.

13.    On June 7, 2019, the Oversight Board and the Retiree Committee entered into a plan support agreement providing for the Retiree Committee's support for the term of an agreed-upon restructuring of the Commonwealth's pension obligations pursuant to the Plan.  That same day, on June 7, 2019, the Oversight Board and AFSCME entered into a plan support agreement regarding, among other things, the AFSCME's support for the terms of a new collective bargaining agreement, along with the restructuring of pension obligations pursuant to the Plan.

14.     On September 27, 2019, the Oversight Board filed an initial plan of adjustment [ECF No. 8765] (the "Initial Plan"), which embodied, among other agreements, the 2019 PSA. Thereafter, the Oversight Board continued to engage stakeholders in negotiations facilitated by the Court-appointed mediation team led by Chief Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas (the "Mediation Team") to build greater support for the Initial Plan.  On February 9, 2020, the Oversight Board and certain holders of in excess of $8 billion in GO Bonds and PBA Bonds disclosed they had reached a global settlement in principle outlined in a Plan Support Agreement (the "2020 PSA"), which agreement had greater support among stakeholders than the 2019 PSA.

15.     In furtherance of the 2020 PSA, on February 28, 2020, the Oversight Board filed:

(a) the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11946] (the "2020 Plan"),

(b) the *Disclosure Statement for the Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 11947] (the "2020 Disclosure Statement"), and

(c) the *Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. 11950].

16.     On March 10, 2020, the Court entered the *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Spanish Translation of the Disclosure Statement, (III) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, and (IV) Granting Related Relief* [ECF No. 12187] establishing June 3–4, 2020 as the dates for the

hearing to consider the adequacy of the information contained in the 2020 Disclosure Statement and related deadlines.

17.     However, in response to the spread of COVID-19 throughout Puerto Rico and the rest of the world, and its effects on the people and economy of Puerto Rico, the Oversight Board sought to adjourn the hearing to consider approval of the 2020 Disclosure Statement and related deadlines, subject to further status reports to be provided to the Court [ECF No. 12485], which the Court granted by order, dated March 27, 2020 [ECF No. 12549].

18.     On October 29, 2020, the Court entered the *Order on Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* [ECF No. 14987] (the "Plan Scheduling Order"), which directed the Oversight Board to file on or before February 10, 2021 the proposed terms of a plan of adjustment and a motion for approval of a proposed timetable for filing an amended plan and proposed disclosure statement, among other things.   In accordance with the Plan Scheduling Order, and with the guidance of the Mediation Team, the Oversight Board participated in (a) group or individual informational and negotiation mediation sessions (as and when scheduled by the Mediation Team) or (b) informal sessions with the Commonwealth, the parties to the 2020 PSA, the monoline insurers, the Official Committee of Unsecured Creditors, the Retiree Committee, and various unions, all designed to establish a framework and timeline for the development for a consensual debt restructuring.

19.     On February 9, 2021, the Oversight Board announced that, as a result of discussions led by the Mediation Team, the Oversight Board and the principal parties to the 2020 PSA reached an agreement in principle regarding the terms of an amended plan of adjustment, subject to the execution of definitive documentation.   On February 16, 2021, the Court entered

the *Order Granting Urgent Motion of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of Deadlines for Submission of Plan or Adjustment or Term Sheet with Respect Thereto* [ECF No. 15849], extending the February 10, 2021 deadline set forth in the Plan Scheduling Order to March 8, 2021.

20.     On February 23, 2021, the Oversight Board announced the termination of the 2020 PSA and the execution of the Plan Support Agreement, dated as of February 22, 2021 (the "PSA"), among the Oversight Board, as representative of the Commonwealth, ERS, and PBA, certain holders of GO Bonds, certain holders of PBA Bonds, Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured"), solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, Syncora Guarantee Inc., as holder of, subrogee with respect to, or insurer of GO Bonds and PBA Bonds, and National Public Finance Guarantee Corporation ("National"), solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to GO Bonds and PBA Bonds.

21.     On March 8, 2021, the Oversight Board filed the *Disclosure Statement for the Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF Nos. 15977 and 15988] and the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 15976] (the "Second Amended Plan").

22.     On April 2, 2021, the Oversight Board entered into the *Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment* (the "ERS Stipulation") with certain groups of holders of

bonds (the "ERS Bondholders") issued by ERS (the "ERS Bonds").  The ERS Stipulation incorporates, among other things, the proposed consensual treatment for ERS Bonds.

23.     On April 4, 2021, the Debtors filed the *Debtors' Joint Motion for an Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief* [ECF No. 16332].

24.     On April 5, 2021, the parties to the ERS Stipulation filed an *Urgent Joint Motion to Stay Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [ECF No. 16321], which the Court granted by order, dated April 12, 2021 [ECF No. 16385].

25.     On April 12, 2021, the Oversight Board entered into an agreement in principle with Assured and National regarding, among other things, the treatment of claims asserted against the Commonwealth arising from its retention of funds historically conditionally appropriated and transferred to certain Commonwealth instrumentalities (the "Allocable Revenues"), which was memorialized in the HTA/CCDA PSA (as defined below).

26.     On May 4, 2021, the Court entered the *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief* [ECF No. 16681], setting July 13, 2021

as the date for the hearing to consider the adequacy of the information contained in the Disclosure Statement, among other things.

27.    On May 5, 2021, the Oversight Board, as Title III representative of the Commonwealth and the Puerto Rico Highways and Transportation Authority ("HTA"), entered into the HTA/CCDA Related Plan Support Agreement (the "HTA/CCDA PSA") with certain holders of bonds issued by HTA, certain holders of bonds issued by the Puerto Rico Convention Center District Authority ("CCDA"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to bonds issued by HTA bonds ("HTA Bonds") and bonds issued by CCDA ("CCDA Bonds"), and National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA bonds.  The HTA/CCDA PSA incorporates, among other things, the proposed treatment of claims asserted against the Commonwealth related to its retention of Allocable Revenues, the terms of a restructuring of the indebtedness of CCDA,  and certain terms to be included in a plan of adjustment for HTA.

28.    In furtherance of the PSA, ERS Stipulation, and the HTA/CCDA PSA, on May 11, 2021, the Debtors filed:

(a)  the *Third Amended Title III Joint Plan Of Adjustment Of The Commonwealth Of Puerto Rico, et al.* [ECF No. 16740] (the "Third Amended Plan") and

(b)  the *Disclosure Statement for the Third Amended Title III Joint Plan Of Adjustment Of The Commonwealth Of Puerto Rico, et al.* [ECF No. 16741].

29.    On May 13, 2021, the Debtors filed the *Amended Joint Motion of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation*

10

*Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures.* [ECF No. 16756] (the "DS Approval Motion").

30.     On May 13, 2021, the Debtors filed the *Motion of Debtors for an Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (the "Confirmation Procedures Motion") [ECF No. 16757].

31.     On July 6, 2021, the Oversight Board reached an agreement in principle, subject to final documentation, with the American Federation of Teachers, the Asociacion de Maestros de Puerto Rico ("AFT"), and the Asociacion de Maestros de Puerto Rico-Local Sindical ("AMPR") regarding, among other things, the treatment of TRS benefits pursuant to a Commonwealth plan of adjustment.  This agreement, however, was subject to ratification by simple majority vote of AMPR's members.  On or around September 28, 2021, the members of AFT and AMPR voted against ratifying this agreement.

32.     On July 12, 2021, the Oversight Board reached an agreement in principle, subject to final documentation, with the Official Committee of Unsecured Creditors, regarding, among other things, proposed recoveries for general unsecured creditors.

33.     On July 13 and 14, 2021, the Court heard oral argument on the DS Approval Motion and Confirmation Procedures Motion and made certain oral rulings and entered orders memorializing such rulings.  In accordance therewith, the Debtors filed, among other things, a revised Disclosure Statement [ECF No. 17517], revised proposed orders granting the DS

Approval Motion [ECF No. 17519-1], and the Confirmation Procedures Motion [ECF No. 17631-1].

34.     On July 27, 2021, the Oversight Board, as Title III representative of the Commonwealth, entered into that certain PRIFA plan support agreement (the "PRIFA PSA") with certain holders of bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA"), Ambac Assurance Corp., solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to bonds issued by PRIFA ("PRIFA Bonds"), and Financial Guaranty Insurance Company, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds, which resolves certain litigation among the parties, set forth the terms of securities to be issued pursuant to the plan of adjustment for the Commonwealth and a restructuring of the indebtedness of PRIFA, and sets forth the agreement of the parties to support the terms of the plan of adjustment for the Commonwealth consistent with the terms of the PRIFA PSA.  That same day the Oversight Board filed the *Sixth Amended Title III Joint Plan of Adjustment* [ECF No. 17516] (the "Sixth Amended Plan") and associated disclosure statement [ECF No. 17517] to, among other things, incorporate the settlements contained in the PRIFA PSA.

35.     On July 29, 2021, the Oversight Board reached an agreement with the Creditors' Committee on the terms of the Plan's treatment of general unsecured claims (the "Committee Agreement").  On July 30, 2021, the Oversight Board filed the Plan and Disclosure Statement [ECF Nos. 17627 and 17628], to incorporate the terms set forth in the Committee Agreement.

36.     On August 3, 2021, the Oversight Board filed the *Brief Summarizing Primary Proof that May be Offered in Support of Confirmation of Plan of Adjustment* [ECF No. 17680],

12

summarizing the Debtors' *prima facie* cases for the primary confirmation requirements for the Plan. *Id.* at 2.

37.     On September 6, 2021, the Oversight Board filed the *Debtors' Identification of Expert Witnesses* [ECF No. 18044] (the "List of Opinion Witnesses").  The List of Opinion Witnesses includes experts that may provide opinion testimony in support of the Plan. *Id.* ¶ 1. In connection therewith, on September 13, 2021, the Debtors filed the *Debtors' Opening Expert Reports and Disclosures* [ECF No. 18097], which included expert reports (collectively, the "Expert Reports") from:

>     (a) Andrew Wolfe, Economic Advisor to the Oversight Board [ECF No. 18097-2] (the "Wolfe Expert Report"); and
>
>     (b) Marti Murray, Principal of The Brattle Group. [ECF No. 18097-1] (the "Murray Expert Report").

38.     On September 13, 2021, the Oversight Board filed the *Debtors' Amended List of Witnesses to be Offered in Support of Confirmation of Plan of Adjustment* [ECF No. 18094] (the "List of Witnesses").[4]  The List of Witnesses set forth the names of witnesses who may testify on behalf of the Debtors in support of confirmation of the Plan, and the topics about which each witness is expected to testify. *Id.* ¶ 1.

39.     On October 8, 2021, the Oversight Board, as administrative supervisor pursuant to Section 601(a)(1) of PROMESA, commenced a case under Title VI of PROMESA for approval of Qualifying Modifications for PRIFA and CCDA.  PRIFA and CCDA, as relevant, and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), together with the Oversight Board as Administrative Supervisor, are co-proponents of the Qualifying Modifications.  The monoline insurers of PRIFA Bonds insure and hold the right to vote fifty-

---

[4] This filing amended the *Debtors' Preliminary List of Witnesses to be Offered in Support of Confirmation of Plan of Adjustment* [ECF No. 17679], originally filed on August 3, 2021.

three percent (53%) of the PRIFA Bonds and are a party to the PRIFA PSA and PRIFA Holders holding an additional twenty-four percent (24%) of the PRIFA Bonds have joined the PRIFA PSA pursuant to joinder agreements and are thus bound to vote in favor of PRIFA's Qualifying Modification.  As such, the Oversight Board anticipates that no less than seventy-seven percent (77%) of holders and insurers of PRIFA Bonds will accept PRIFA's Qualifying Modification. The insurers of CCDA Bonds—which insure one hundred percent (100%) of the CCDA Bonds and hold the right to vote all the claims against CCDA arising from or relating to the CCDA Bonds—are the only CCDA creditors entitled to vote to accept or reject CCDA's Qualifying Modification.  As such, and pursuant to the HTA/CCDA PSA and joinder agreements thereto, there will be one hundred percent (100%) acceptance of CCDA's Qualifying Modification.

40.     On October 8, 2021, the Debtors filed the proposed *Order and Judgment Confirming Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 18447] (the "Proposed Confirmation Order").

41.     On October 11, 2021, the Debtors filed the *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* [ECF No. 18470, Exhibit A] (the "Plan Supplement").

42.     On October 25, 2021, the Debtors filed the *Notice of Filing Proposed Findings of Fact and Conclusions of Law in Connection with Confirmation of the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 18739].

43.     On October 25, 2021, in accordance with the Confirmation Procedures, the Debtors filed the declarations (collectively, the "Declarations") of:

   (a) Natalie Jaresko, Executive Director of the Oversight Board [ECF No. 18729] (the "Jaresko Declaration");

   (b) David A. Skeel, Jr., Chairperson of the Oversight Board [ECF No. 18731] (the "Skeel Declaration");

14

(c) Steve Zelin, Partner and Head of the Restructuring and Special Solutions Group in the Americas at PJT Partners Inc. [ECF No. 18734] (the "Zelin Declaration");

(d) Ojas Shah, Partner at McKinsey & Company [ECF No. 18730] (the "Shah Declaration");

(e) Gaurav Malhotra, Principal and Head of the U.S. Restructuring Practice at Ernst & Young, LLP [ECF No. 18738] (the "Malhotra Declaration");

(f) Juan Santambrogio, Managing Director at Ernst & Young, LLP [ECF No. 18736] (the "Santambrogio Declaration");

(g) Adam Chepenik, Principal at Ernst & Young, LLP [ECF No. 18735] (the "Chepenik Declaration");

(h) Sheva Levy, Principal at Ernst & Young, LLP [ECF No. 18737] (the "Levy Declaration");

(i) Jay Herriman, Managing Director at Alvarez & Marsal [ECF No. 18732] (the "Herriman Declaration");

(j) David Brownstein, Managing Director at Citigroup, Inc., N.A. [ECF No. 18726] (the "Brownstein Declaration");

(k) Andrew Wolfe, Economic Advisor to the Oversight Board [ECF No. 18725] (the "Wolfe Declaration"); and

(l) Marti Murray, Principal of The Brattle Group. [ECF No. 18724] (the "Murray Declaration").

Additionally, on or before November 3, 2021, the Oversight Board will file the declaration of Christina Pullo (the "Voting Declaration"), Managing Director at Prime Clerk LLC ("Prime Clerk"), the Debtors' notice and balloting agent.

**C.  The 2021 Fiscal Plan for the Commonwealth, PBA, and ERS**

44.     On April 23, 2021, the Oversight Board certified the 2021 Commonwealth Fiscal Plan (the "Fiscal Plan").  The Fiscal Plan includes the fiscal plan for PBA, and for ERS, which, following the enactment of the PayGo Legislation (defined below) and the Commonwealth's assumption of pension liabilities, has no ongoing operations, and will be dissolved upon the Effective Date of the Plan.

15

**D.** **The Disclosure Statement Order and Confirmation Procedures Order**

45.     The Disclosure Statement filed on July 30, 2021 was approved by this Court by order entered on August 2, 2021 [ECF No. 17639] (the "Disclosure Statement Order").   The confirmation procedures were also approved by order entered on August 2, 2021 [ECF No. 17640], which order was amended on October 5, 2021 [ECF No. 18394] (as amended, the "Confirmation Procedures").   Pursuant to the Disclosure Statement Order, the Court granted the DS Approval Motion and approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.   Disclosure Statement Order at 3. The Court also (i) established October 19, 2021 at 5:00 p.m. (Atlantic Standard Time) as the deadline to object to confirmation of the Plan (the "Confirmation Objection Deadline"), *id.* at 15, (ii) established October 4, 2021 at 5:00 p.m. (Atlantic Standard Time) as the voting deadline by which (a) ballots to accept or reject the Plan were required to be received by Prime Clerk (the "Voting Deadline") *id.* at 17, and (b) the election deadline by which ballots to elect the form of distribution were required to be received by Prime Clerk (the "Election Deadline"), *id.* at 18, and (iii) scheduled a hearing commencing on November 8, 2021 at 9:30 a.m. (Atlantic Standard Time) and continuing on November 9–10, 12, 15–18, and 22–23, of 2021 to consider confirmation of the Plan (the "Confirmation Hearing").   *Id.* at 13.  On September 27, 2021, the Court entered an order extending the Voting Deadline by 14 days, through October 18, 2021, at 5:00 p.m. (Atlantic Standard Time).   [ECF No. 18258 at 2].   The Confirmation Hearing was subsequently scheduled to be held via video conference.   [ECF No. 18276].   Numerous parties interposed objections to the Plan.   A response to such objections is set forth below and in the contemporaneously filed omnibus reply (the "Reply") to objections to the Plan.

16

**E.  The Solicitation and Tabulation of Votes in Favor of the Plan**

46.  Consistent with the Disclosure Statement Order, Prime Clerk served solicitation packages on all claimholders entitled to vote and/or make any applicable election.  The solicitation packages contained, among other things:  (i) the notice setting forth the time, date, and place of the Confirmation Hearing (the "Confirmation Hearing Notice"); (ii) a flash drive (or hard copy, in the Debtors' discretion) containing the Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of ballot for voting on the Plan (the "Ballot") or Notice, if any, with instructions for voting and/or making any applicable election, and, as applicable, a pre-addressed, pre-paid return envelope; (iv) with respect to Class 51, the Retiree Committee Letter and Information Guide, and (v) with respect to Classes 54, 58, and 66, the Creditors' Committee Letter; with each of the foregoing accompanied by its Spanish-language translation.  *See Affidavit of Service of Solicitation Materials*, dated October 21 and 23, 2021 [ECF Nos. 18635, 18689, 18690].  The Debtors also published print newspaper and magazine advertisements, disseminated radio advertisements, and created an information hotline to provide information about the Confirmation Hearing, Objection Deadline, and Voting Deadline and Election Deadline, as required by the Disclosure Statement Order.  *See* Publication Affidavit, filed October 23, 2021 [ECF No. 18688]; *infra* ¶ 147.

47.  As of the date hereof, the Debtors have received sufficient votes in favor of the Plan to satisfy section 1129(a)(10) of the Bankruptcy Code and support their request for an order confirming the Plan.  The Voting Declaration will provide the details and audited results of the vote by each Class, and includes information regarding the status of the various bondholder elections of taxable or tax-exempt treatment.

## THE PLAN MEETS EACH OF THE REQUIREMENTS
## UNDER TITLE III OF PROMESA AND SHOULD BE CONFIRMED

48.    To confirm the Plan, the Debtors must demonstrate the Plan satisfies the provisions of title 11 of the Bankruptcy Code made applicable to Title III Cases by PROMESA section 301, with respect to each Debtor.  *See* PROMESA § 314(b)(1).[5]  Additionally, the Debtors must demonstrate the Plan complies with the provisions of title III of PROMESA with respect to each Debtor.  *Id.* § 314(b)(2).  Through the collective filings with the Court, including the Plan, the Disclosure Statement, the Plan Supplement, this Memorandum, the Reply, the Voting Declaration and the other Declarations, the Expert Reports, and any additional evidence adduced at the Confirmation Hearing, the Debtors will demonstrate the Plan satisfies all applicable subsections of title 11 of the Bankruptcy Code and title III of PROMESA with respect to each Debtor.

### A.    PROMESA § 314(b)(1):  The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301

49.    The language in PROMESA section 314(b)(1) mirrors that of section 1129(a)(1) of the Bankruptcy Code, which provides a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  This provision ensures the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and contents of a plan, respectively, have been satisfied.  H.R. REP. NO. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Charles St. African Methodist Episcopal Church of Boston*, 499 B.R. 66, 95 (Bankr. D. Mass. 2013); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y 1986), *aff'd in part*, *rev'd in part on other grounds*, 78

---

[5]    As relevant to this Memorandum, such sections are as follows:  1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1123(d), 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), and 1129(b)(2)(B).

B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir.

1988).   The Plan complies fully with the requirements of sections 1122 and 1123 applied by

PROMESA section 301, as well as other applicable provisions of the Bankruptcy Code.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

50.      Section 1122 of the Bankruptcy Code sets forth the requirements for the

classification of claims and interests in a plan.  Section 1122(a) provides:

> Except as provided in subsection (b) of this section, a plan may place a claim or
> an interest in a particular class only if such claim or interest is substantially
> similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  As this Court recognized, the plain language of section 1122(a) "limits the

circumstances in which claims may be joined together in a single class.  It does not require that

substantially similar claims be joined together in the same class." July 14, 2021 Hr'g Trans.

77:15–21 (quoting *In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R.

at 95).

51.      The Oversight Board has Broad Discretion to Determine Whether Claims Are

Substantially Similar.  Under PROMESA section 301(e), the determination of whether claims are

"substantially similar" for purposes of placing claims in the *same* class is left to the Oversight

Board, which "shall consider whether such claims are secured and whether such claims have

priority over other claims." PROMESA § 301(e); *see* July 14, 2021 Hr'g Trans. 79:23–80:12

("[T]he plain text of section 301(e) shows that it concerns how the Oversight Board interprets

section 1122(a) of the Bankruptcy Code.  It does not expand the scope of section 1122(a).").  By

only requiring the Oversight Board to "consider" these factors, section 301(e) provides the

Oversight Board flexibility to consider other factors, and to afford those other factors greater

weight.  *United States v. Savoie*, 985 F.2d 612, 618 (1st Cir. 1993) ("the [statute] itself demands

no more than that the district court 'consider' the factors enumerated therein.").

52.    The Oversight Board May Separately Classify Similar Claims For Legitimate

Governmental Reasons.  There are no express limitations in PROMESA or the Bankruptcy Code

on the Oversight Board's ability to place similar claims in *separate* classes.  Given the absence

of an express standard for separate classification in the Bankruptcy Code, the overwhelming

majority of courts have held that "[g]enerally, § 1122 allows plan proponents broad discretion to

classify claims and interests according to the particular facts and circumstances of each case."

*Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*, 542 B.R.

261, 280 (B.A.P. 9th Cir. 2015) (quoting *In re City of Colo. Springs Spring Creek Gen.*

*Improvement Dist.*, 187 B.R. 683, 687 (Bankr. D. Colo. 1995)).[6]  A plan proponent may exercise

significant flexibility in classifying claims under section 1122(a) so long as there is a reasonable,

non-gerrymandering, basis for the classification structure.  *See, e.g.*, *Aetna Cas. & Sur. Co. v.*

*Clerk, United States Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996)

("[C]lassification is constrained by two straight-forward rules:  [d]issimilar claims may not be

classified together; similar claims may be classified separately only for a legitimate reason.");

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993)

(citation omitted) ("[T]he classification of the claims or interests must be reasonable."); *In re*

*Nat'l Paper & Type Co. of P.R.*, 120 B.R. 624, 626 (D.P.R. 1990) (holding that "as long as the

---

[6] *See also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280
F.3d 648, 661 (6th Cir. 2002) (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 585 (6th Cir. 1986)
("Congress incorporated into section 1122 . . . broad discretion to determine proper classification
according to the factual circumstances of each individual case."); *In re Greate Bay Hotel &*
*Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (quoting *In re Holywell Corp.*, 913 F.2d
873, 880 (11th Cir.1990)) ("most courts agree that a proponent has 'considerable discretion to
classify claims and interests according to the facts and circumstances of the case.'").

separate classification is not aimed primarily to manipulate class voting, similar claims may be separately classified where supported by a reasonable business or economic justification"); *Mineral Techs., Inc. v. Novinda Corp. (In re Novinda Corp.)*, 585 B.R. 145, 154 (B.A.P. 10th Cir. 2018) (observing "one clear rule" that separate classification of similar claims is generally permitted if not done for the purposes of gerrymandering classes for confirmability); *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 234 (Bankr. N.D. Tex. 2015) ("Under the Bankruptcy Code, classes must contain 'substantially similar' claims, but similar claims can be separated into different classes for 'good business reasons.'"); *In re City of Detroit*, 524 B.R. 147, 245–46 (Bankr. E.D. Mich. 2014) (citation omitted) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the classification scheme, and the claims or interests within each particular class are substantially similar.").

53.     In PROMESA Title III cases, the standard for claims classification is best understood as requiring a governmental justification.  As both this Court and the First Circuit Court of Appeals have recognized, PROMESA is more akin to Chapter 9 of the Bankruptcy Code than it is to Chapter 11.  Thus, "[u]nlike a commercial bankruptcy, which attempts to balance the rights of creditors and debtors, the principle purpose of Chapter 9, and, by analogy, PROMESA, 'is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations.'" *Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 954 F.3d 1, 7–8 (1st Cir. 2020) (citation omitted).  Consistent with this purpose, the Court concluded that the purported strict classification rule from *Granada Wines*[7] was not imported into PROMESA because the "flexibility to separately

---

[7] *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42 (1st Cir. 1984).  The Court further reasoned that the purported strict classification in *Granda Wines,* which "represents the importation of a classification rule from Chapter X of the

21

classify and treat claims from different unsecured creditors potentially strengthens Title III

debtors' ability to propose plans of adjustment that protect the viability of the government and its

instrumentalities, and the ability of the government to continue to provide services to its people,

and to ensure the economic viability of the territory." July 14, 2021 Hr'g Trans. 80:13–19.

54.     <u>The Oversight Board May Separately Classify Similar Claims to Implement a</u>

<u>Settlement</u>.  An integral component of the Oversight Board's settlement with the GO and PBA

bondholders is different recoveries for the issuances based in large part on the increased

invalidation risk of later vintage bonds based on the Commonwealth having potentially exceeded

the Commonwealth's constitutional debt limit when issuing such bonds.  The classes of GO/PBA

bond claims in the Plan reflect this settlement.  Also, different classes of retiree claims reflect the

Oversight Board's settlement with the Retiree Committee and other retiree representatives.

Courts have routinely held that settlement of claims constitutes a reasonable basis for separate

classification. *See, e.g.*, *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 455 (Bankr. E.D. Cal. 1999)

("Here, there are business and economic justifications for classifying the general unsecured

creditors separately from DHS . . . the debtor entered into a settlement with DHS which

significantly reduced DHS's claims . . . .").  The Oversight Board's separate classification of

certain classes of claimants based on settlements reached with those claimants is thus

appropriate.  The Chapter 9 case of *In re City of Stockton* illustrates the point. 542 B.R. 261

(B.A.P. 9th Cir. 2015). There, the court approved a plan proposing different treatment, including

different payment terms and percentage recoveries, for each settling bond creditor.  *Id.* at 281.

The court found that by settling with the bond creditors, the debtor "avoided a number of

---

Bankruptcy Act," has no application in PROMESA because it is too "protective of the interests
of creditors, at the expense of flexibility for the debtor."  July 14, 2021 Hr'g Trans. at 78:7–8,
78:25–79:1.

potentially protracted, expensive and risky valuation proceedings," which made legitimate business and economic sense, and therefore the debtor was permitted to separately classify such claims based on the settlement treatment. *Id.*; *see also Official Comm. of Unsecured Creditors of the Commonwealth of P.R. v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 360 F. Supp. 3d 65, 75–76 (D.P.R. 2019) (noting that continued litigation would further delay the Debtors "in progressing towards fiscal responsibility and access to the capital markets," result in significant expense, and further delay and inconvenience to the Debtors' stakeholders and the ability of their creditors to receive any distribution on their claims); *In re Dow Corning Corp.*, 244 B.R. 634, 664 (Bankr. E.D. Mich. 1999) ("[T]he fact that, in the Debtor's judgment, different [] claims warrant different settlement offers is a perfectly 'legitimate reason' to classify those claims separately."). Indeed, some courts have even found that settlement changes the legal character of a claim, rendering it uniquely situated. *See, e.g.*, *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 236 (Bankr. W.D. Tex. 2008) ("[t]hose unsecured claims, as a result of . . . settlements with the Debtor, are now fixed and liquidated . . . The Class 5 claims are thus uniquely situated."), *aff'd*, 2009 U.S. Dist. Lexis 121177 (W.D. Tex. Sept. 29, 2009), *aff'd*, 632 F.3d 168 (5th Cir. 2011) .

55.     As in the cases above, the Debtors conserved considerable resources and avoided contentious, drawn-out proceedings by settling with numerous parties, and accordingly separately classified those parties under the Plan as they had to do. The settlements each provided different treatments, and Bankruptcy Code section 1123(a)(4) requires each claim in a class to be offered the same treatment. Thus, each different settlement required a separate class of the creditors agreeing to that treatment. Moreover, the Plan contains well over thirty impaired

accepting classes, including multiple accepting classes at each Debtor, thus dispelling any potential objections to classification based on gerrymandering concerns.

56.    The Plan's classification scheme is as follows:

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |
| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |

24

| Claim | Class | Debtor(s) |
|---|---|---|
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold Claims | Class 51C | Commonwealth |
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

57.     Legitimate Reasons Justify Separate Classification of Commonwealth Bond Claims Based on The Settlement of Different Legal Risks and Rights.  All holders of Claims in Classes 1–11 hold PBA bonds and assert the guarantee claims  against the Commonwealth, but are classified separately based on whether they are issued (a) prior to 2010 and are uninsured (Class 1) and held by a Retail Investor (Class 7), or are insured by Assured (Class 2), National (Class 3), Ambac (Class 4), FGIC (Class 5), or Syncora (Class 6), (b) issued in 2011 and are uninsured (Class 8) and held by a Retail Investor (Class 9), or (c) issued in 2012 and are uninsured (Class 10) and held by a Retail Investor (Class 11).   Separate classification of uninsured versus insured claims is justified because insured claimants have recourse to "sources outside of the debtor's assets, such as the potential for recovery from a nondebtor or nonstate source."  *Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76 LLC)*, 465 B.R. 525, 540

(B.A.P. 9th Cir. 2012) (holding existence of guarantee on deficiency claim enabled debtor to separately classify claims from general unsecured claims), *aff'd*, 578 F. App'x 644 (6th Cir. 2014). Claims insured by different insurers are separately classified as different insurance agreements provide bondholders different rights thereunder leading to the insurers having different reimbursement or subrogation claims back against the debtor. Claims of Retail Investors are separately classified to facilitate the calculation and distribution of the Retail Support Fee of $50 million to each Retail Investor member of a Class voting in favor of the Plan, which shall be in an amount equal to 1.321% of the aggregate amount of such Retail Investor's CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims. Additionally, bonds are separately classified on account of the date of issuance based on differing risk profiles associated with such issuance having potentially violated the Constitutional Debt Limit. The Oversight Board believes there was little invalidation risk prior to 2011, but that such risk increased with each later issuance.

58.     For the same reasons, bond claims against the Commonwealth in Classes 15–50 are classified separately based on whether they are (a) issued prior to March 2011 (Classes 15–29), March or later in 2011 (Classes 30–39), in 2012 (Classes 40–45), or 2014 (Classes 46–50), (b) uninsured (Classes 15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and 47), or are insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac (Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and 28). Likewise, based on the elections offered under the Plan to receive taxable bonds, holders of Vintage CW Bonds, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims that are either Puerto

Rico Institutions or Puerto Rico Individuals will have their claims shifted to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to account for the alternative form of distribution elected.  A taxable bond is less valuable to mainland investors, who unlike Puerto Rico Individuals and Puerto Rico Institutions, are not otherwise exempt from federal tax. Separate classes for bond holders receiving tax-exempt and taxable bonds maximizes the amount of tax-exempt securities available for mainland investors and increases consideration available to both Puerto Rico investors and mainland investors.  *See* Brownstein Decl. ¶ 16.

59.     Legitimate Government or Other Reasons Justify Separate Classification of Certain Commonwealth and ERS Unsecured Claims.  Consistent with a legitimate governmental purpose, the Oversight Board classified the following unsecured claimants separately from General Unsecured Claims:

(a)     Pension Classes:  Classes 51A–51L consist of claims arising from pensions owed to the Commonwealth's active and retired public employees.  Active employees are integral to the basic provision of governmental services to the Commonwealth's residents and, without them, the government simply could not function.  Among the government's most important functions is to protect its residents from crime, respond to natural disasters and other similar emergencies, and educate over 345,000 K–12 children through public education programs.   None of these services, among others, would be possible without the Commonwealth's dedicated policemen, fire fighters, teachers, and other public employees who are the holders of such pension claims.  Moreover, upon a review of the Commonwealth's future financial obligations and evaluation of its obligations to pensioners under multiple recovery scenarios, the Oversight Board determined it would be in the best interests of the Commonwealth and all its stakeholders to ensure pensioners a minimum monthly benefit to keep them above the

federal poverty guidelines and maintain an ability to support themselves without requiring additional future support from the Commonwealth.  As a result, although each of the pension claims is a general unsecured claim, the Oversight Board agreed to separate classification and treatment of pension claims in connection with certain settlements, described in further detail above, with (i) the Official Committee of Retirees and (ii) the American Federation of State, City, and Municipal Employees and certain affiliates ("AFSCME"), which settlements included amended collective bargaining agreements and other concessions.  These pension Classes are further classified separately based on whether the pensioners are (a) retired (Classes 51A–F) or active (Classes 51G–L), (b) members of ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS (Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination program (Classes 51K and 51L), because each program has different funding sources and liabilities, and (c) below the poverty threshold (Classes 51A–C and 51K) (which claims are not subject to reduction) or above the poverty threshold (Classes 51D–F and 51L).  This classification scheme is eminently reasonable and supports the Oversight Board's mission of ensuring that the Commonwealth can sustainably provide government services.

(b)    AFSCME Claims:    Class 52 contains all claims against the Commonwealth related to the rejection of certain collective bargaining agreements between AFSCME and the Commonwealth.  As one of the primary unions representing public employees, AFSCME is a critical bargaining unit within the Commonwealth's workforce.  Notably, the Oversight Board was able to come to an agreement on amended collective bargaining agreements that provide the Commonwealth more flexibility in utilizing and modifying their workforce.  In addition to this increased workforce flexibility, this agreement secured multiple significant benefits, including eliminating the risk of costly, lengthy, and complex litigation

29

surrounding the rejection of the collective bargaining agreements, and aligning the incentives of

the Commonwealth and its workforce going forward by providing the public employees with an

opportunity to share in the Commonwealth's excess cash surplus in the future.  In satisfaction of

the claims for damages related to the rejection of the collective bargaining agreements, a new

collective bargaining agreement will be adopted providing each of the AFSCME-represented

employees one-time cash bonuses of $500, and a one-time payment of $5 million will be issued

to AFSCME to be distributed as a one-time cash bonus to its member employees, and AFSCME

will also receive a one-time payment of $5 million as a support fee.  These payments are

reasonable and justified in view of the savings to be achieved by avoiding litigation related to the

rejection of the collective bargaining agreements, the benefits obtained by amending such

collective bargaining agreements, and the savings to be further secured by re-aligning the

Commonwealth and its public employees towards a common purpose.  Courts have repeatedly

held that, given employees' stake in a debtor's future vitality, promoting harmonious labor

relations is a legitimate reason to separately classify their claims from general unsecured claims.

For example, in *In re U.S. Truck Co.*, 800 F.2d 581 (6th Cir. 1986), the Sixth Circuit, after

delving into the legislative history of section 1122 and distinguishing it from its counterpart

provisions in the Bankruptcy Act, permitted the separate classification of union claims from

other unsecured claims.  Noting that in pre-Code cases "courts were given broad discretion to

determine proper classification according to the factual circumstances of each individual case,"

the Sixth Circuit found that the union's "different stake in the future viability of the reorganized

company" warranted separate classification.  *Id*. at 586–87.  Similarly, the Second Circuit in

*Aetna Cas. & Sur. Co. v. Clerk, United States Bankruptcy Court (In re Chateaugay Corp.)*, 89

F.3d 942, 951 (2d Cir. 1996), held that "promoting harmonious labor relations" was a legitimate

business reason to categorize separately the claims of unpaid workers (who were given priority status) and those of paid workers (who received payment from surety on prepetition worker's compensation claims and were treated as unsecured creditors under the plan).  For these reasons, the Oversight Board determined and submits that separate classification of the AFSCME rejection damages claims are reasonable and justified and are supported by a governmental purpose.

(c)    Dairy Claims:   Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the Commonwealth's primary producers and source of dairy for the population—are classified separately in Class 53.   Dairy production is one of the Commonwealth's largest agricultural industries, which ensures its residents, including hundreds of thousands of school-children have access to dairy on a daily basis—a necessity for any person's nutritional intake.  As an island, and given dairy's short shelf-life, dairy products are particularly costly and logistically difficult to reliably import on a regular basis.  Moreover, as the Commonwealth's largest agricultural industry, the dairy industry employs a significant number of Puerto Rico's residents. *See, e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir. 1987) (confirming a plan by a chapter 9 debtor which separately classified certain constituencies integral to the functioning of the debtor).  For these reasons, the Oversight Board submits it is reasonable for the claims held by large dairy producers who provide necessary nutritional goods for the Commonwealth's residents to be separately classified.

(d)    Eminent Domain Claims:  In the performance of its governmental duties, the Commonwealth has exercised its constitutional rights to appropriate private property for public use.   In connection therewith, the Commonwealth has commenced condemnation proceedings in the Court of First Instance in accordance with 32 L.P.R.A. section 2905 to obtain

title to the subject real property, and has submitted a deposit with the Clerk of the Court of First Instance on account of the claim arising from such condemnation proceeding.  Class 54 consists of such eminent domain claims and is separately classified from other general unsecured claimholders because they are in different circumstances—these claims are partially secured by such deposit and unsecured as to the remainder.  Accordingly, these claims will receive payment in full to the extent of the secured portion of their claim and, to the extent that any remaining claim exists, such unsecured portion of such claim will receive its pro rata share of the CW GUC Recovery.  Because of the hybrid nature of such Claims, it is appropriate and reasonable to separately classify them.

(e)    Energy Incentive Claims:  Like many other governments around the world, the Commonwealth is motivated to address climate change and promote the production of renewable energy.  As an island that has experienced countless climate-related natural disasters, the Commonwealth is particularly desirous of promoting measures to address the impact of climate change on the environment.  Class 55 consists of claims arising from, or relating to, the Puerto Rico Green Energy Incentives Act, Act No. 83-2010, as incorporated under the New Incentives Code, Act 60-2019 (the "Energy Incentive Act").  Generally speaking, the Energy Incentive Act provides tax incentives for those residents who undertake certain clean-energy projects to reduce their carbon footprint related to their household's energy use.  The Oversight Board determined and submits that, given the low total of such claims (only approximately $466,772), the meritorious goal that is supported by the Energy Incentive Act, and the fact that such claims are not paid in cash but rather are satisfied through reductions in taxes which only exist to the extent of the claimants' earnings, it is reasonable and justified to separately classify and satisfy such claims in full through tax reductions, not cash payments.

32

(f)    <u>Med Center Claims</u>:  Class 56 consists of all claims of certain federally qualified health centers arising from or relating to the Medicaid Act, 42 U.S.C. section 1396a(bb).  One of the government's most important interests is supporting and ensuring the health of its residents.  This is made even more critical by the COVID-19 pandemic that has engulfed the Commonwealth and the world.  Accordingly, the Oversight Board determined and submits that claims held by the Med Centers should be separately classified from General Unsecured Claims because such claims are (a) accompanied by a plan support agreement which includes, among other things, the dismissal of risky and costly litigation, (b) held by integral members of the Commonwealth who continue to provide critical medical treatment to innocent third parties, particularly while in the midst of a global pandemic, and (c) are payable through Medicare/Medicaid funds from the federal government which are earmarked for the payment of such claims and not available to other general unsecured claimholders.

(g)    <u>Tax Credit Claims</u>.  Class 57 consists of claims (other than Energy Incentive Claims) relating to the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income tax credits, deductions, or carryforwards.  Such Tax Credit Claims were designed and implemented by the Commonwealth to incentivize certain behavior and to benefit the Commonwealth and support the economy as a whole.  These claims are not paid in cash or other monies in the Title III case, but rather are satisfied through reductions in tax revenue.  For these reasons, the Oversight Board determined and submits it was in the best interests of the Commonwealth and its economy to continue to honor and offer such tax incentives upon which residents and local businesses have relied, and to separately classify such claims.

(h)   <u>CW Appropriations Class</u>.  Class 63 consists of claims arising from or related to indebtedness only payable from appropriations of the Commonwealth legislature under existing loans or legislative resolutions.  These claimants have significantly lesser rights than holders of CW General Unsecured Claims, as they have no ability to compel payment of their Claims and hold only contingent rights to payment to the extent appropriated by the government of the Commonwealth.  Therefore, the Oversight Board has a compelling governmental purpose in separately classifying such claims and not providing such claims with any recovery pursuant to the Plan because they have no enforceable right to payment for purposes of Bankruptcy Code section 101(5).

(i)   <u>Section 510(b) Subordinated Claims Class</u>.  Class 64 consists of claims against the Commonwealth, ERS, or PBA determined pursuant to a Final Order to be subject to section 510(b) of the Bankruptcy Code.  Section 510(b) of the Bankruptcy Code subordinates such Claims to other general unsecured claims.  Because they have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and not be provided with any recovery pursuant to the Plan.

(j)   <u>Convenience Class</u>.  Class 68 contains a Class of "Convenience Claims" with respect to the Commonwealth and ERS consisting of claims equal to or less than $20,000 or claims held by a common holder who has agreed to reduce such claims to $40,000 or less in the aggregate.  Section 1122(a) of the Bankruptcy Code provides that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Section 1122(b), in turn, provides "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the

court approves as reasonable and necessary for administrative convenience." 11 U.S.C.
§ 1122(b). The Commonwealth's Title III case represents the largest municipal bankruptcy in
history and, naturally, hundreds of thousands of claims have been filed and scheduled against the
Debtors. The significant administrative burden of reconciling such claims is highly costly to the
Commonwealth. The Oversight Board has determined and submits that, given the
extraordinarily large number of claims asserted against the Commonwealth and ERS, that the
separate classification of such claims is reasonable and necessary to ease the administrative
burden on the Commonwealth and that it would be less costly to simply pay such claims than it
would be to administer them through the claims reconciliation process. The separate treatment
of such "Convenience Claims" therefore benefits both the Commonwealth and all its
stakeholders in reducing administrative costs and more efficiently administering the Plan and
getting payments of claims to its residents as quickly as possible.

### 2. The Plan Satisfies Section 1123(a) of the Bankruptcy Code

60.     Section 1123(a) of the Bankruptcy Code contains seven requirements a chapter 11
plan must satisfy. *See* 11 U.S.C. § 1123(a). However, PROMESA incorporates only the first
five of those requirements, sections 1123(a)(1)–(5). PROMESA § 301. As demonstrated below,
the Plan complies with each of these requirements.

### a. The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(1) By Designating Classes of Claims

61.     Section 1123(a)(1) of the Bankruptcy Code provides a plan may designate,
subject to section 1122, classes of claims and interests other than claims of a kind specified in
sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap"
period in an involuntary case), and 507(a)(8) of the Bankruptcy Code (unsecured priority tax
claims). *See* 11 U.S.C. § 1123(a)(1). As discussed above, Article IV of the Plan designates

sixty-nine (69) separate Classes of Claims for the Debtors.  *See* Plan, Art. IV.  Thus, the Plan

complies with the requirements of section 1123(a)(1) of the Bankruptcy Code.

### b. The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(2) By Specifying Unimpaired Classes

62.     Section 1123(a)(2) of the Bankruptcy Code requires the Plan to "specify any class

of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  The Plan

meets this requirement by identifying each unimpaired Class of Claims under the Plan.  Section

84.2 of the Plan specifies that Claims in Classes 13, 51A through 51C, 51K, 55, 57, 67, and 68

are unimpaired pursuant to the Plan, are deemed to have accepted the Plan, and are not entitled to

vote to accept or reject the Plan.  Thus, the Plan complies with the requirements of section

1123(a)(2) of the Bankruptcy Code.

### c. The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(3) By Specifying the Treatment of Impaired Classes

63.     Section 1123(a)(3) of the Bankruptcy Code requires the Plan to "specify the

treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C.

§ 1123(a)(3).  The Plan meets this requirement by setting forth the treatment of impaired Classes.

Articles V through LXXIII of the Plan identify the treatment of all Classes of Claims impaired

under the Plan.  Thus, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy

Code.

### d. The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(4) By Providing Equal Treatment within Each Class of Claims

64.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the

same treatment for each claim or interest of a particular class, unless the holder of a particular

claim or interest agrees to a less favorable treatment of such particular claim or interest."  11

U.S.C. § 1123(a)(4).  Pursuant to sections 1122 and 1123(a)(4) of the Bankruptcy Code, Articles

V through LXXIII of the Plan provide each holder of an Allowed Claim within a particular Class will receive the same treatment as other Allowed Claims in such Class, except to the extent that holders have agreed to less favorable treatment.  *See* Plan, Art. V–XIV.  Under the Plan, if a holder of a Claim in Class 15 or 16, 23, 30 or 31, 34, 36 or 38, 40 or 41, 44, 46 or 47, or 49 elects out of such Class so as to receive a distribution of taxable bonds, pursuant to the Plan, such holder is no longer in such Class and, instead, is treated as a holder of a Claim in Class 22, 29, 33, 35, 39, 43, 45, 48, or 50, respectively.  Therefore, all holders of Claims in each of Classes 15, 16, 23, 30, 31, 34, 36, 38, 40, 41, 44, 46, 47, and 49 receive the same treatment as holders of other Claims in the same Class pursuant to the Plan.

65.     Certain parties are receiving payment of Support Agreement Administrative Expenses under the Plan, as described below.  Such costs and fees are not awarded on account of the respective creditors' Claims.  *See infra* ¶¶ 201–208.  Rather, the (i) consummation costs are provided in consideration of certain creditors' assistance in the formulation of the Plan and to compensate them for the reasonable fees and expenses incurred in connection with the negotiation and execution of various plan support agreements, which made development of the Plan possible; and (ii) restriction fees are provided in connection with certain parties' commitment to "lock up" their bonds pursuant to the terms of respective plan support agreements.  Notably, these creditors and their professionals participated in the negotiation and drafting of settlement provisions and documents that protect all the claims in their classes, not just themselves.  Therefore, payment of these fees does not violate section 1123(a)(4), and the Plan complies with the requirements of section 1123(a)(4) of the Bankruptcy Code.

### e. The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(5) By Providing Adequate Means for Its Implementation

66.     Section 1123(a)(5) of the Bankruptcy Code  requires that, [n]otwithstanding any otherwise applicable nonbankruptcy law, a Plan provide "adequate means" for its implementation.  *See* 11 U.S.C. § 1123(a)(5).  Various provisions of the Plan provide for the means by which the Plan will be implemented:

- Article III provides for the payment of administrative expense claims required to be paid on the Effective Date;

- Section 74.1 provides for the issuance and distribution of the New GO Bonds;

- Section 74.2 provides for the issuance and distribution of the CVIs;

- Section 74.5 support feasibility of the Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated;"

- Section 76.1 provides, subject to sections 76.5 and 76.7 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) of PBA and relating to the lease or sublease of PBA Property, (b) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (c) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, or (d) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement…;"

- Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

- Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

- Section 81.2 vests in the Disbursing Agent, among other things, the power to issue distributions contemplated by the Plan;

- Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article LXXXIII provides for the funding and administration of the Pension Reserve under the Plan; and

- Section 92.1 provides for the re-vesting of assets:  "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order)."

67.    Additionally, Article LXXXVIII provides that "[o]n the Effective Date all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds and the CVIs (collectively, the "New Plan Securities"), the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule".

68.    In addition to the Plan, the Plan Supplement contains, among other things, substantially final forms of custodial trust documents for the Monolines, the ERS Trust Agreement, the Schedule of Executory Contracts and Unexpired Leases to be Assumed, trust agreements for the New Plan Securities, and draft legislation to authorize the issuance of the New Plan Securities.  Accordingly, the Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation, and thus the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### 3.  The Plan Complies with Section 1123(b) of the Bankruptcy Code

69.    In addition to the requirements of section 1123(a) of the Bankruptcy Code, section 1123(b) contains discretionary provisions that may be (but are not required to be)

incorporated into a chapter 11 plan. *See* 11 U.S.C. § 1123(b). The Plan contains several discretionary provisions permitted by section 1123(b) of the Bankruptcy Code, as described below.

### a.  The Plan Permissibly Provides for the Impairment/Unimpairment of Certain Claims

70.     Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). Article LXXXIV of the Plan identifies which Classes of Claims are Impaired and which Classes of Claims are left Unimpaired. Accordingly, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### b.  The Plan Permissibly Provides for the Assumption and Rejection of Executory Contracts

71.     Section 1123(b)(2) allows a plan, subject to section 365 of the Bankruptcy Code, to provide for the assumption, assignment, or rejection of executory contracts and unexpired leases of the debtor not previously rejected. *See* 11 U.S.C. § 1123(b)(2). Article LCCVI of the Plan provides

> [A]ll Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) of PBA and relating to the lease or sublease of PBA Property, (b) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (c) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, or (d) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.

Plan § 76.1.  Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

> **c.      The Plan Permissibly Provides for the Settlement or Adjustment of the Debtors' Claims**

72.      The Plan incorporates settlements reached with almost every major creditor constituency which settlements are embodied in stipulations or plan support agreements.  As explained below, the terms of these settlements incorporated into the Plan should be approved by the Court.

73.      Section 1123(b)(3)(A) of the Bankruptcy Code provides a plan may "provide for the settlement or adjustment of any claim . . . belonging to the debtor[.]"   11 U.S.C. § 1123(b)(3)(A).  The standard for a settlement pursuant to section 1123(b)(3)(A) is the same as that for approval of motion brought under Bankruptcy Rule 9019.  *See, e.g.*, *Resolution Trust Corp.* v. *Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68 F.3d 26 (2d Cir. 1995).  The First Circuit has emphasized that "[s]tipulations of settlement are favored by the courts, and they will rarely be set aside absent fraud, collusion, mistake or other such factors." *United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.)*, 289 B.R. 269, 282 (B.A.P. 1st Cir. 2003) (citation omitted); *see also Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n.5 (1st Cir. 1998).

74.      The approval of settlements is within the court's "wide discretion."  *See Jeremiah v. Richardson*, 148 F.3d 17, 22 (1st Cir. 1998).  However, while a court should apply its own independent judgment to determine whether to approve a settlement, it should also afford deference to the judgment of the trustee or debtor in possession; *see City Sanitation, LLC v.*

*Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011); *In re Receivership Estate of Indian Motorcycle Mfg., Inc.*, 299 B.R. 8, 21 (D. Mass. 2003) (the court should give "substantial deference to the business judgment of a bankruptcy trustee when deciding whether to approve a settlement"); *Hill v. Burdick (In re Moorhead Corp.)*, 208 B.R. 87, 89 (B.A.P. 1st Cir. 1997) ("The [bankruptcy] judge . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference."), *aff'd*, 201 F.3d 428 (1st Cir. 1998); *In re Healthco* 136 F.3d at 50 n.5; and consider the paramount interests of creditors; *see Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995) (noting that court should give proper deference to the reasonable views of creditors). Accordingly, a settlement should generally be approved unless it "falls below the lowest point in the range of reasonableness." *In re Am. Cartage*, 656 F.3d at 91 (quoting *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)).

75.     In determining the reasonableness of a settlement, courts in the First Circuit consider the following four factors: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. *Jeffrey*, 70 F.3d at 185; *see also In re Indian Motorcycle Co.*, 289 B.R. at 283; *In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, No. 04-10585, 2009 Bankr. LEXIS 2846, at *9 (Bankr. P.R. Mar. 31, 2009); *In re C.P. del Caribe, Inc.*, 140 B.R. 320, 325 (Bankr. D.P.R. 1992).

76.     An integral component of the settlements embodied in the Plan are the administrative expenses (the "Support Agreement Administrative Expenses") agreed to be paid

pursuant to the Plan to the settling claimholders (each, an "Administrative Expense Party")

pursuant to the various agreements and accepting classes of retail bondholders.  *See* Plan §§ 3.3–

3.9.  These payments are discussed in Section I.D.1 below.  *See infra* ¶¶ 198–226.

77.     Each of the claims being settled pursuant to the Plan satisfies the standard for

approval of settlements under section 1123(b)(3)(A) of the Bankruptcy Code.  Those claims, and

the agreements pursuant to which they are settled, are described below.

78.     ERS Stipulation.  Prior to the ERS Petition Date, ERS issued bonds in the

aggregate principal amount of approximately $2.9 billion, which were secured by Employers'

Contributions (as defined in the bond documents) and ERS's right to receive Employers'

Contributions.  Thereafter, ERS became almost totally unfunded and ceased making payment to

its bondholders.  This resulted in the commencement of pre- and post-petition litigation by the

ERS Bondholders on several fronts.  The ERS Stipulation provides a global resolution of the

various claims and causes of action relating to the ERS Bonds, each of which, if resolved

adversely to the Oversight Board, could have resulted in allowance of a $3 billion or greater

secured or administrative claim against the Commonwealth and/or ERS.  Specifically, the ERS

Stipulation resolves the following actions:

79.     *Lien-Scope Adversary Proceedings*.  In the ERS Lien-Scope APs,[8] the Oversight

Board asserted the ERS Bondholders only hold valid and enforceable security interests in ERS's

accounts receivable in Employers' Contributions owed prepetition, which aggregate

approximately $71 million in value.  Thus, other ERS assets not subject to such security interest,

include (i) cash and investments, (ii) accounts receivable and collections with respect to

---

[8] The "ERS Lien-Scope APs" are, collectively, *Financial Oversight & Management Board for
Puerto Rico v. Andalusian Global Designated Activity Company*, Adv. Proc. No. 19-00366, and

Additional Uniform Contributions, and (iii) certain loans made to ERS participants, and repayments thereof.  The Oversight Board relied on the language of the granting clauses in the ERS bond documents and the First Circuit decision holding section 552 of the Bankruptcy Code prevented the ERS Bondholders' security interest from attaching to Employers' Contributions generated after the ERS Petition Date.  *Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight and Mgmt. Bd. for P.R.)*, 948 F.3d 457, 468 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 844 (2020).  The ERS Bondholders filed counterclaims in the ERS Lien-Scope APs asserting their valid and enforceable security interests in ERS assets are much broader, covering collateral with a value of over $3 billion including funds transferred by ERS to the Commonwealth.  At the time the ERS Stipulation was executed, the Court had scheduled oral argument on the parties' respective motions for summary judgment to determine which assets were subject to the ERS Bondholders' security interest.  [Adv. Proc. No. 19-00366, ECF No. 158].  Also, at that time, the Oversight Board and ERS Bondholders had prepared expert reports setting forth their conflicting views of the assets in which the ERS Bondholders had a security interest.

80.    *ERS Bondholders' PayGo Challenge Action*.  In the PayGo Challenge Action,[9] certain ERS Bondholders challenged the Commonwealth's enactment of Joint Resolution 188 and Act 106 (the "PayGo Legislation"), which changed the funding mechanism for ERS from contributions by employers which the bondholders claimed was subject to their security interest to a system where the Commonwealth directly paid retirement benefits and would be reimbursed by government employers.  They sought a judgment that such enactment violated the automatic

---

*Financial Oversight & Management Board for Puerto Rico v. Glendon Opportunities Fund, L.P.*, Adv. Proc. No. 19-00367.

stay in ERS's Title III Case, and the Taking and Contracts Clauses of the United States and
Puerto Rico Constitutions, asserted damages in the full amount of the Fiscal Agent ERS Proof of
Claim, which totaled $3.850 billion, and asserted that such judgment cannot be impaired in a
plan of adjustment.  If successful, that action could have created a nondischargeable liability of
over $3 billion against the Commonwealth.  The Commonwealth argued the enactment of the
PayGo Legislation was not an action subject to the automatic stay or was within an exception to
the automatic stay as an exercise of  the Commonwealth's police and regulatory powers.  The
Commonwealth also asserted there was no Taking Clause violation because the ERS
Bondholders did not have a property interest in the Employers' Contributions (defined in the
ERS Bond documents) that were purportedly transferred to the Commonwealth, and that the
Commonwealth's enactment of the PayGo Legislation was not a violation of the Contracts
Clause in light of the reasonable expectation that the Commonwealth might reduce or eliminate
the Employers' Contributions if the Commonwealth faced continuing financial difficulties, as
discussed in the offering statement for the ERS Bonds.  This proceeding had been stayed in light
of the First Circuit's opinion in the ERS Lien-Scope AP, *In re Fin. Oversight & Mgmt. Bd. for
Puerto Rico*, 948 F.3d at 468, although it was incorporated in the ERS Bondholders'
administrative expense claims and subject to the motion practice described in paragraph 82
below.  At the time the ERS Stipulation was executed, the Oversight Board's motion to dismiss
the PayGo Challenge Action was terminated without prejudice.  [Adv. Proc. No. 17-00219, ECF
No. 70; Adv. Proc. No. 17-00220, ECF No. 68].

---

[9] The "PayGo Challenge Action" is, collectively, *Altair Global Credit Opportunities Fund (A),
LLC, et al. v. Commonwealth of Puerto Rico, et. al.*, Adv. Proc. Nos. 17-00219; 17-00220.

81.     *Oversight Board's Ultra Vires Actions*.  In the Ultra Vires Actions,[10] the Special

Claims Committee of the Oversight Board and the official committees appointed in these cases

sought a determination that the issuance of the ERS Bonds was *ultra vires* because the ERS

Enabling Act did not authorize publicly underwritten bond debt, and accordingly, ERS was not

obligated to make payments with respect thereto.  The Special Claims Committee also sought to

recover as voidable transfers certain interest payments made to holders of ERS Bonds prior to

the commencement of the ERS Title III Case.  The ERS Bondholders asserted numerous

equitable and legal defenses to the Ultra Vires Actions, including that the language and

contemporary interpretations of the ERS Enabling Act authorized the issuance of the ERS

Bonds, that the ERS bonds were enforceable under Puerto Rico Uniform Commercial Code

section 8-202, and that if the ERS Bonds were invalid, the ERS Bondholders would be entitled to

recover in equity under the doctrine of unjust enrichment.  At the time the ERS Stipulation was

executed, the Court had scheduled oral argument on the parties' respective motions for summary

judgment.  [Case No. 17-bk-3566, ECF No. 1101].

82.     *ERS Bondholders' Administrative Expense and Prepetition Claims*.  In various

ERS Bondholder Administrative Expense Motions[11] and proofs of claim, including the Fiscal

---

[10] The "Ultra Vires Actions" are, collectively, *Special Claims Committee FOMB v. Jefferies LLC*
et al., Adv. Proc. No. 19-00355, *Special Claims Committee FOMB v. American Enterprise
Investment Servs. Inc. et al.*, Adv. Proc. No. 19-00356, *Special Claims Committee FOMB v. First
Southwest Company et al.*, Adv. Proc. No. 19-00357, *Special Claims Committee FOMB v.
Defendant 1F et al.*, Adv. Proc. No. 19-00358, *Special Claims Committee FOMB v. Defendant
1H et al.*, Adv. Proc. No. 19-00359, and *Special Claims Committee FOMB v. Defendant 1G* et
al., Adv. Proc. No. 19-00361

[11]  The "ERS Bondholder Administrative Expense Motions" are, collectively, the *ERS
Bondholders' Motion and Request for Allowance and Payment of Post-Petition and
Administrative Expense Claims*, [Case No. 17-bk-3566, ECF No. 707], and *the ERS
Bondholders' Motion and Request for Allowance and Payment of Post-Petition and
Administrative Expense Claims*, [Case No. 17-bk-3566, ECF No. 710].

Agent ERS Proof of Claim[12] (collectively, the "ERS Bond Claims"), the ERS Bondholders argued they were entitled to an administrative expense claim against the Commonwealth and/or ERS in the full amount of the Fiscal Agent ERS Proof of Claim, and in the alternative, that such amounts should be allowed prepetition claims against the Commonwealth and/or ERS based on the Commonwealth's enactment of the PayGo Legislation.  The ERS Bondholders principally relied on *Reading Co. v. Brown*, 391 U.S. 471 (1968), in which the United States Supreme Court granted an administrative expense claim to an innocent third party damaged by the postpetition actions of a negligent trustee operating a business in a chapter XI arrangement.  The ERS Bondholders argued the enactment of the PayGo Legislation, which eliminated the Employers' Contributions, was a similar harm entitling them to an administrative expense claim.  The Oversight Board argued Bankruptcy Code section 552, and not the PayGo Legislation, was the cause of the ERS Bondholders' loss of collateral, and in any event the *Reading* doctrine was inapplicable to prepetition lenders, such as the ERS Bondholders.  If successful, the ERS Bonds Claims could have resulted in a more than $3 billion administrative expense claim against the Commonwealth, rendering unconfirmable any plan of adjustment for the Commonwealth or ERS which did not pay such claim in full.  Alternatively, the ERS Bond Claims could have resulted in an over $3 billion unsecured claim against the Commonwealth, diluting recoveries to other holders of unsecured claims against the Commonwealth, and making agreement with the Creditors Committee significantly more difficult.  At the time the ERS Stipulation was executed, the parties had filed their Rule 12 Motions (as defined in the Disclosure Statement) seeking judgment on the pleadings in connection with the ERS Bonds Claims, and oral argument was scheduled to take place on April 29, 2021

---

[12] The "Fiscal Agent ERS Proof of Claim" filed by the ERS Bondholders' fiscal agent against

83.     *ERS Bondholders' Federal Circuit Action Against the U.S. Government.*   In the
Federal Circuit Action,[13] certain ERS Bondholders brought claims against the United States for
allegedly "taking" their property in violation of the Fifth Amendment of the U.S. Constitution
through the enactment of PROMESA and acts taken pursuant to PROMESA.  Specifically, the
ERS Bondholders argued the Oversight Board was a federal entity that "took" their property
through the enactment of the PayGo Legislation.  They also argued the ERS Title III Petition and
the application of Section 552 of the Bankruptcy Code took their security interest in future
Employers' Contributions and their contractual right to post-petition Employers' Contributions.
The United States responded that the Supreme Court's ruling that the Oversight Board is not part
of the federal government, *Fin. Oversight & Management Board for Puerto Rico v. Auerlius
Investments*, LLC, 140 S. Ct. 1649 (2020) precluded the claim alleging damages from actions
taken by the Oversight Board, and that because the ERS Bondholders lacked a property interest
in Employers' Contributions generated post-petition, *In re Fin. Oversight & Mgmt. Bd. for P.R.*,
948 F.3d at 468, the PayGo Legislation did not effectuate a taking.  If the ERS Bondholders were
successful, the U.S. government could have sought reimbursement from the Commonwealth or
ERS of amounts owed to satisfy claims by the ERS Bondholders or otherwise reduced payments
to the Commonwealth.  At the time the ERS Stipulation was executed, the ERS Bondholders'
appeal of the district court's order granting summary judgment to the United States was pending
before the Federal Circuit.

84.     In exchange for the settlement of such actions, ERS and the Commonwealth
agreed to allow the Fiscal Agent ERS Proof of Claim against ERS in an aggregate amount of

---

ERS is Claim No. 16777.
[13] The "Federal Circuit Action" is *Altair Global Credit Opportunities Fund (A), LLC,* et al., *v.
U.S.* (Case No. 21-1577) (Fed. Cir. 2021).

$3,168,698,776.55, with all other Proofs of Claim filed by ERS Bondholders expunged.  The holders of allowed Claims with respect to the ERS Bonds shall receive (i) $373,000,000 in cash distributions and (ii) the rights to the proceeds from the sale of the Private Equity Portfolio, which proceeds will be no less than $70,750,000.  This treatment was agreed to by ERS Bondholders holding over $2 billion of ERS Bonds, which is approximately 70% of all such claims.

85.    In addition to the consideration available to all ERS Bondholders pursuant to the ERS Stipulation, the Oversight Board agreed to provide the ERS Bondholders signatory to the ERS Stipulation with a $75,000,000 ERS Restriction Fee, paid ratably to such signatories.  As described in the Plan and previously in the Disclosure Statement, the payment of the ERS Restriction Fee is being made "in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to 'lock-up' ERS Bonds in accordance with the terms of the ERS Stipulation"  Plan § 3.7.

86.    GO/PBA Plan Support Agreement.  Prior to the Petition Date, the Commonwealth issued GO bonds in the aggregate principal amount of approximately $13 billion, and Commonwealth-guaranteed bonds and notes, which total approximately $4.8 billion (including PBA Bonds totaling approximately $4 billion and approximately $78 million of PRIFA bond anticipation notes ("PRIFA BANs" and collectively, the "CW Guaranteed Bonds").  During the Commonwealth's Title III case, there were numerous disputes regarding the validity and related rights of certain GO Bonds that may have been issued in violation of the Puerto Rico debt limit, as set forth in Article VI, section 2 of the Commonwealth Constitution (the "Constitutional Debt

Limit").[14]   Conversely, holders of GO Bonds claimed a priority over all the Commonwealth's available resources and the GO Bonds were secured by a statutory lien.  There was also litigation regarding (i) the characterization of purported leases between PBA and the Commonwealth as disguised financing transactions, (ii) the amount, if any, of administrative rent the Commonwealth may owe PBA for the use and occupancy of PBA facilities following the commencement of the Commonwealth Title III Case, and (iii) the ownership of certain PBA facilities and property as between the Commonwealth and PBA (the PBA Litigation, discussed *infra* ¶ 97).  Finally, there were disputes regarding the PRIFA BANs, as the bondholders asserted a Takings Claim against the U.S. Government, and the Special Claims Committee of the Oversight Board commenced an action against holders of PRIFA BANs, arguing the Commonwealth's guarantee of such bonds  violated the Constitutional Debt Limit.

87.     Protracted litigation of the multitude of complex issues described in detail below could last for years, would come at a substantial cost to the Commonwealth, both as a result of the significant expenses that would be incurred and because its ability to exit Title III would be hindered and further delayed.   The Plan, as a result of the GO/PBA PSA, eliminates the uncertainty regarding the allowance and amount of the affected bonds.  The settlement also ensures that PRIFA, which is not a Title III debtor, contributes to the payment of a portion of the claims arising from PRIFA BANs, which are guaranteed by the Commonwealth.  If the GO Bondholders were successful, it could have resulted in full recovery on $17.8 billion in claims. Moreover, he consequence of the GO Bondholders prevailing on their priority argument,  would have inflicted grave harm on the Commonwealth and its residents because the Commonwealth

---

[14] Specifically, Article VI, section 2 of the Commonwealth Constitution provides for a cap on obligations of the Commonwealth backed by its good faith, credit and taxing power, is colloquially referred to as "general obligation" or "constitutional" debt.

would have lost control of billions of dollars of revenues needed to sustain the Commonwealth,

Instead, the revenues would have been payable to the GO Bondholders.   This would have

prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out

its statutory mission.  Specifically, the GO/PBA PSA resolved the following actions:

88.     *Debt Related Objections.*[15]  As a result of investigations by the Oversight Board's

Special Claims Committee, it was determined that certain GO Bonds and CW Guaranteed Bonds

may have been issued in violation of the Constitutional Debt Limit.  The Oversight Board, acting

through its Special Claims Committee, and jointly with the UCC, filed an objection to claims

[ECF No. 4784] (the "Joint Claim Objection") asserting that certain GO Bonds issued in 2012

and 2014 were issued in violation of the Constitutional Debt Limit, and therefore were invalid.

The Special Claims Committee based this position on the fact that the Commonwealth excluded

$4 million in PBA Bonds that bear hallmarks of general obligations of the Commonwealth (as

discussed more fully below).  The Special Claims Committee also asserted that regardless of the

characterization of the PBA Bonds, certain 2014 GO Bonds were issued in violation of the

Constitutional Debt Limit, and thus were invalid, because approximately $425 million in debt

service costs paid through withholdings against the proceeds of the issuance were excluded from

the Commonwealth's calculation of the Constitutional Debt Limit.

89.     Although the Special Claims Committee limited its objection to GO Bonds issued

in 2012 and 2014, subsequently-filed claims objections by the UCC, the Ad Hoc Group of

General Obligation Debt (the "GO Group"), and the Lawful Constitutional Debt Coalition (the

"LCDC") asserted the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds, the PBA

---

[15] The "Debt Related Objections" includes objections, joinders, and counts of requested relief
challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012

Bonds, the PRIFA BANs, and the CW Guaranteed Bonds were all issued in violation of the Constitutional Debt Limit (collectively, with the Joint Claim Objection, the "Bond Claim Objections").[16]   The Bond Claim Objections also raised issues regarding which bonds the Constitutional Debt Limit applies to, when the limit was violated (if at all), and how to calculate the applicable debt limit if certain bonds are found invalid.  The UCC also asserted certain bonds were issued in violation of the balanced budget provision of Article VI, section 7 of the Commonwealth Constitution.[17]   The Bond Claim Objections to the validity of GO Bonds and PBA Bonds sought disallowance of the claims filed against the Commonwealth in respect thereof.

90.     The GO Group and LCDC asserted novel theories regarding the validity of certain bonds.  For example, the GO Group asserted the Commonwealth engaged in a "sham" by

---

GO Bonds, the 2014 GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Guarantee Bond Claims, or CW Bond Claims.

[16] *See Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Bonds [*ECF No. 7057] (the "Expanded Objection"); *Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds* [ECF No. 8141] (the "PBA Bond Objection"); *Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 6099] (the "Conditional Objection"); *Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth* [ECF No. 9730] ("LCDC Omnibus Objection"); *and Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico (Claim Number 29485) Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bond Issued by Port of Americas Authority, (II) Claim of Scotiabank de Puerto Rico (Claim Number 47658) Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority* [ECF No. 9735] ("UCC 2020 Objection").
[17] Joint Claim Objection at 32 n.18.

mischaracterizing the PBA Bonds, and if the PBA Bonds are recharacterized as general obligation debt, they were all invalidly issued.[18]  The LCDC, in turn, asserted that PBA Bonds should not be treated as direct general obligation debt, but as guarantee obligations, and accordingly, PBA Bonds should only be included in calculation of the Constitutional Debt Limit to the extent payments were made by the Commonwealth as opposed to any other purported lessor.[19]

91.    To date, several bondholders and groups thereof filed motions to dismiss the Bond Claim Objections and related memoranda (the "Motions to Dismiss Bond Claim Objections").[20]  In the Motions to Dismiss Bond Claim Objections, bondholders raised a number

---

[18] *See* [ECF No. 6099].

[19] *See* [ECF No. 9730].

[20] The Motions to Dismiss Bond Claim Objections include, to date, the *Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* [ECF No. 10702] (the "Ad Hoc Group Motion"); *Supplemental Memorandum of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. in Support of Motion to Dismiss* [ECF No. 10704] (the "AHG Supplement"); *The QTCB Noteholder Group's Response to Certain Omnibus Objections and Limited Joinder to the Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of Constitutional Debtholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* (the "QTCB Response") [ECF No. 10705]; *Individual Commonwealth GO and PBA Bondholder Motion to Dismiss Claims Objections to Claims by Holders of Commonwealth GO and PBA Bonds* [sic] [ECF No. 11148] (the "Hein Motion"); *Response and Joinder of Kenneth Kirschenbaum and Kenneth Kirschenbaum Family Trust to Motions to Dismiss Omnibus Claim Objections to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority Bonds* [ECF No. 11149]; *Joint Motion Requesting Dismissal of "Omnibus Objections" to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds* [ECF No. 11258] (the "Cooperative Motion"); *DRA Parties' Motion to Dismiss (I) Official Committee of Unsecured Creditors' Objection on Constitutional Debt Limit Grounds to Claim Of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain*

of arguments to the effect the GO and PBA Bonds did not breach the Constitutional Debt Limit or should otherwise not be held invalid. For example, bondholders have asserted characterization of PBA's debt as general obligation debt or constitutional debt is precluded by the Puerto Rico Constitution and/or PBA's legal existence and legitimacy.[21] Other bondholders disputed the methods of calculation of the Constitutional Debt Limit in the Bond Claim Objections, and requested remedies.[22]

92.    The bondholders also asserted equitable and legal defenses to the various claims objections, including that certain recitals in connection with the issuance of the challenged GO Bonds foreclose any challenge to their validity, the Constitutional Debt Limit acts only as a bar on legislative action rather than bondholder remedies, and bondholders would be entitled to recover in equity under the doctrine of unjust enrichment. The Oversight Board also anticipated that bondholders may raise defenses under section 8-202 of the Uniform Commercial Code, which provides for the validation of invalid securities under specified conditions as a defense to an issuer's assertion of invalidity, and section 8-210, which provides a remedy to holders of securities issued in excess of the issuer's power.

---

*Bond Issued by Port of Americas Authority [Dkt. No. 9735] And (II) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant To Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth [Dkt. No. 9730]* [ECF No. 11260]. Several parties have filed statements joining in the above motions to dismiss and, in some cases, seeking to extend the requested relief to related litigation regarding tort claims and avoidance claims relating to extension of Commonwealth guarantees to debt issued by other entities. *See, e.g.*, [ECF Nos. 11153, 11241, 11247, 11251, 11261, 11264, 11267, 11281, 11292].

[21] *See, e.g.*, Ad Hoc Group Motion at 13–18.

[22] *See id.* at 59–64.

93.   *Invalidity Actions.*[23]   Following the filing of the Joint Claim Objection, the Oversight Board commenced eight adversary proceedings against approximately 450 purported beneficial owners of the bonds, identified by pseudonym, and 120 banks disclosed as record holders, asserting that another consequence of the bonds' invalidity would be that any amounts paid by the Commonwealth on account of such purported bonds: (i) were *per se* unlawful and are recoverable under Puerto Rico law, and (ii) are avoidable as fraudulent transfers pursuant to the Bankruptcy Code and Puerto Rico law.   Accordingly, the Commonwealth asserted it could recover principal and interest payments with respect to the challenged bonds.

94.   The Oversight Board limited this litigation to individual holders in excess of $2.5 million in the bonds at issue during the lookback period, excluding small-scale diversified portfolio investors and pursuing relief only against sophisticated investors that should have understood the bonds' infirmities prior to investing.   Unlike the Bond Claim Objections described above, the Invalidity Actions required expensive and complex discovery, further

---

[23] The "Invalidity Actions" are, collectively, *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC*, Adv. Proc. No. 19-00281; *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec*, Adv. Proc. No. 19-00282; *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co.*, Adv. Proc. No. 19-00283; *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E*, Adv. Proc. No. 19-00284; *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A*, Adv. Proc. No. 19-00285; *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B*, Adv. Proc. No. 19-00286; *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C*, Adv. Proc. No. 19-00287; and *The Special Claims Comm. Of the Fin. Oversight and Mgmt. Board for Puerto Rico and the Official*

complicating litigation of these issues.  Numerous bondholders filed motions to dismiss the
Invalidity Actions and joinders asserting many of the same arguments described above with
respect to the Debt Related Objections.[24]

95.     *Lien Challenge Actions.*[25]    The Lien Challenge Actions were filed by the
Commonwealth against more than 450 defendant holders of bonds issued or guaranteed by the

---

*Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D*,
Adv. Proc. No. 19-00288.

[24] The joinders and motions to dismiss include, *The UBS Trust Company of Puerto Rico,
Representing Several Trusts That Hold Certain Commonwealth General Obligation Bonds,
Joinder to "Motion of the Ad Hoc Group of General Obligation Bondholders, Ad Hoc Group of
Constitutional Debtholders, Assured Guaranty Corp., and Assured Guaranty Municipal Corp.,
and the Invesco Funds to Dismiss Omnibus Claim Objections to Claims Filed or Asserted By
Holders of Certain Commonwealth General Obligation Bonds and Public Buildings Authority
Bonds"* [ECF No. 11251]; *The Bank of Nova Scotia's Joinder and Supplemental Motion to
Dismiss the Official Committee of Unsecured Creditors' Objection to the Bank of Nova Scotia's
Proof of Claim No. 47658 on Constitutional Debt Limit Grounds* [ECF No. 11261];  *Motion of
the PRIFA BANs Bondholders to Dismiss the Omnibus Objections Filed by the Official
Committee of Unsecured Creditors and the Lawful Constitutional Debt Coalition with Respect to
the PRIFA BANs Guaranty* [ECF No. 11267]; *Joinder of the Bank of New York Mellon, as
Trustee, to Motion of the PRIFA BANs Bondholders to Dismiss the Omnibus Objections Filed by
the Official Committee of Unsecured Creditors and the Lawful Constitutional Debt Coalition
with Respect to the PRIFA BANs Guaranty* [ECF No. 11281]; *Cooperativa de Ahorro y Credito
Naguabena's Motion to Join the Motion of the PRIFA BANs Bondholders to Dismiss the
Omnibus Objections Filed by the Official Committee of Unsecured Creditors and the Lawful
Constitutional Debt Coalition. [Dkt. No. 11267]* [ECF No. 11292]; *Joint Motion Requesting
Dismissal of "Omnibus Objections" to Claims Filed or Asserted by Holders of Certain
Commonwealth General Obligation Bonds,* [ECF No. 11258] (the "Cooperative Motion"); *DRA
Parties' Motion to Dismiss (I) Official Committee of Unsecured Creditors' Objection on
Constitutional Debt Limit Grounds to Claim Of Government Development Bank for Puerto Rico
[Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth
Guaranty of Certain Bond Issued by Port of Americas Authority [Dkt. No. 9735] And (II)
Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant To Bankruptcy Code
Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds
Issued or Guaranteed by the Commonwealth [Dkt. No. 9730]* [ECF No. 11260].

[25] The "Lien Challenge Actions" are, collectively, *The Financial Oversight and Management
Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the
Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v.
Autonomy Master Fund Ltd.*, Adv. Proc. No. 19-00291; *The Financial Oversight and
Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al.,
and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than*

Commonwealth who asserted security interests or statutory liens.  The defendant bondholders

asserted their bond claims are secured by one or more of the following: (1) the Commonwealth's

"good/full faith, credit and taxing power," (2) the Commonwealth's "available resources" (as

referenced in the Commonwealth Constitution Article VI, section 8), (3) Allocable Revenues,

and (4) property tax revenues authorized under Puerto Rico Act 83-1991.  In response, the

Oversight Board filed seven complaints seeking declarations the defendant bondholders have

entirely prepetition unsecured claims (to the extent their claims are valid at all), do not possess

liens against any of the Commonwealth's property on the asserted bases above, and if they do

possess such liens, certain of them are voidable.

96.     Monoline insurers and others filed motions to dismiss the Oversight Board's

complaints,[26] and numerous other parties filed joinders.  In addition, multiple *pro se* defendants

filed answers to the complaints.  In the motions to dismiss, bondholders argued, among other

things, (1) the Commonwealth Constitution's applicable provision is based on New York state's

constitution that has been definitively construed to also create a statutory lien, (2) that the

---

*COFINA) v. Cooperativa de Ahorro y Credito de Rincon*, Adv. Proc. No. 19-00292; *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta*, Adv. Proc. No. 19-00293; *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez*, Adv. Proc. No. 19-00294; *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso*, Adv. Proc. No. 19-00295; *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman*, Adv. Proc. No. 19-00296; and *The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt.*, Adv. Proc. No. 19-00297.
[26] *E.g.*, Adv. Proc. No. 19-00291, [ECF No. 53].

applicable excise statutes give rise to a statutory lien in favor of the bondholders because (a) they establish a condition not articulated in Article VI, Section 8 (namely, a deficiency of funds to pay public debt remaining after application of other available resources), and (b) they contain their own mandatory, self-executing "shall" language not found in Article VI, Section 8, (3) certain counts seek impermissible advisory opinions, (4) the existence of allegedly junior liens implies the existence of senior liens, and (5) alleged liens cannot be avoided.

97.    *PBA Leases Litigation*.  The PBA Litigation[27] centers around a dispute regarding the characterization of purported leases entered into by PBA with departments, agencies, instrumentalities, authorities, public corporations, and municipalities of the Commonwealth (the "PBA Leases").  The Oversight Board asserts the PBA Leases are not true leases based on certain features of the underlying transactions.  For example, "rent" payments are calculated in accordance with debt service requirements, as opposed to PBA's costs or comparative market rent prices.  The leases also provide for adjustment of rent obligations upward or downward in relation to PBA Bond financing costs, and their expiration coincides with the maturity dates of PBA Bonds.  In addition, the PBA Leases contain provisions requiring purported lessees to pay "rent" in full at all times and under all circumstances for the remainder of the lease term (*i.e.*, the life of the PBA Bonds), even if the property has been sold or destroyed, and provisions that pass all maintenance and operation expenses to the lessees in addition to debt service obligations.  In addition, the Oversight Board and the UCC have concluded that whether flowing through purported leases or directly from the Commonwealth treasury, the Commonwealth makes the payments on the PBA Bonds, irrespective of any purported operations or activities of PBA.

---

[27] The "PBA Litigation" is *The Financial Oversight and Management Board for Puerto Rico v. Puerto Rico Public Buildings Authority*, Adv. Pro. No. 18-AP-149-LTS.

98.     Jointly with the UCC, the Oversight Board filed a complaint against PBA that contends PBA has no right under PROMESA or the Bankruptcy Code to receive post-petition rent payments from, or assert administrative claims against, the Debtors because the purported leases are not rental transactions, but rather disguised financing transactions.  The complaint seeks declarations (1) the leases between PBA and various governmental agencies are not subject to treatment in accordance with Bankruptcy Code section 365(d)(3), which requires the performance of all obligations of the debtor under any unexpired lease of nonresidential real property until such lease is assumed or rejected, and thus the Debtors have no obligation to make payments to PBA under the leases, and (2) PBA is not entitled to a priority administrative expense claim pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(2).

99.     Although the Oversight Board believes its characterization of the purported leases is correct, an adverse judgment represents significant risk of administrative expense treatment for approximately $401.6 million in annual rent payments under the leases, which the Debtors would be obligated to pay in cash and in full.  In addition, an adverse resolution of the PBA Lease Litigation might have been determinative for many of the issues in dispute in the Debt Related Objections, Invalidity Litigation, and Lien Challenge Actions, due to the nexus of facts these issues revolve around.

100.     *PRIFA BANs Stipulation*.  Disputes arose in the Commonwealth's Title III case regarding the PRIFA BANs.  First, certain holders of PRIFA BANs (the "PRIFA BANs Holders") filed a complaint in the U.S. Court of Federal Claims asserting a claim against the United States government for alleged violations of the Takings Clause[28] (the "PRIFA BANs Takings Litigation").  According to the PRIFA BANs Holders, the United States government,

---

[28] *Puerto Rico BAN (VL) LLC, et al. v. United States*, No. 19-482C (Fed. Cl. filed Apr. 1, 2019).

acting by and through the Oversight Board, "planned, directed, and implemented legislative action" that reallocated funds away from PRIFA, resulting in a taking of the PRIFA BANs Holders' property.   When the PRIFA BANs Stipulation was executed, the PRIFA BANs bondholders were preparing to reply to the United States government's motion to dismiss.

101.   Second, the Special Claims Committee of the Oversight Board commenced an action against holders of PRIFA BANs, arguing the Commonwealth's guarantee of such bonds violated the Constitutional Debt Limit.  In addition, the Special Claims Committee contended the guarantees may be avoided because the Commonwealth was insolvent at the time the guarantees were made and did not receive reasonably equivalent value in exchange for its extension of a guarantee because the obligors of the debts did not use the debt proceeds in a manner that provided any benefit to the Commonwealth.

102.   In exchange for settling the disputes described above surrounding the PRIFA BANs, the Commonwealth agreed that in satisfaction of PRIFA's obligations with respect to the PRIFA BANs, PRIFA would deposit $12,657,508.81 in cash into a segregated interest-bearing escrow account for the payment of principal and accrued but unpaid interest on the PRIFA BANs, to be released, on the Effective Date, to the trustee for the benefit of the holders of the PRIFA BANs.  Further, on the Effective Date, the "Trustee PRIFA/CW Claim" would be deemed an "Allowed CW Guarantee Bond Claim" in the aggregate amount of $83,589,101.69.

103.   If the Commonwealth's guarantee of the PRIFA BANs were upheld, the obligations could dilute the recoveries of other bondholders holding debt validly issued or guaranteed by the Commonwealth.  And, regardless of the ruling in the proceedings listed above, it is almost certain that multiple appeals would follow.  Moreover, an adverse decision in the

PRIFA BANs Takings Litigation could have imperiled the Commonwealth's relationship with the federal government.

104.    When the GO/PBA PSA was executed, the litigation described above was stayed pursuant to the *Final Order Regarding (A) Stay Period, (B) Mandatory Mediation, and (C) Certain Deadlines Related Thereto* [ECF No. 12189] (the "<u>Final Stay and Mediation Order</u>"), and further action is stayed through Plan confirmation.

105.    Holders of CW Bond Claims and PBA Bond Claims would receive $6.624 billion in cash.  Claimholders will also receive new bonds (the "<u>New GO Bonds</u>") having an aggregate original principal amount of $7,414,063,543.25, structured as follows: (i) $6,683,315,000 in aggregate original principal amount of current interest bonds; (ii) $442,506,553.50 of aggregate original principal amount of 5.375% capital appreciation bonds; and (iii) $288,241,989.75 in aggregate original principal amount of 5.000% capital appreciation bonds.  Claimholders will also receive a contingent value instrument (the "<u>GO CVIs</u>") in the aggregate original notional amount of $3,500,000,000.00 having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, that is based on potential outperformance relative to projections in the Commonwealth's 2020 certified fiscal plan of the Commonwealth's sales and use taxes based on the amount calculated to be a proportion of the SUT that corresponds to a 5.5% tax rate (the "<u>5.5% SUT</u>").  The GO CVIs are subject to a $400 million cap on annual payments, as well as a lifetime cap of $3.5 billion.

106.    If the Plan is confirmed, in exchange for resolving the outstanding disputes with the holders of PBA Bonds regarding their validity, priority, characterization, and asserted secured status, and the agreement not to commence, prosecute, or pursue any pending or further litigation on account of the PBA Bonds, such holders will receive $1.073 billion of cash as an

allowed administrative expense claim in consideration of unpaid rent related to the PBA Leases. In addition, holders of PBA Bonds will have an allowed claim against PBA equal to the principal amount outstanding of PBA Bonds, plus accrued and unpaid interest, as of the PBA Petition Date. All allocations of Plan consideration between and within classes of GO Bonds and PBA Bonds are to be distributed pro rata.

107.   The GO/PBA PSA also contemplates certain fees to be granted to the signatories and others ("GO/PBA PSA Fees"). In exchange for executing and delivering the GO/PBA PSA and agreeing to all its terms and conditions, including the agreement to "lock-up" its bonds, subject to the entry of the Confirmation Order, each of the GO/PBA PSA Restriction Fee Creditors will be entitled to receive 1.321% of the outstanding principal amount of GO Bonds and PBA Bonds such creditors hold, plus interest accrued as of the respective Petition Date (the "GO/PBA Restriction Fee"). The restriction on fee recipients' transfer of their bonds greatly increases the chances that the signatory to the GO/PBA PSA will participate in and support the Plan, thereby increasing the chances that Plan confirmation can be achieved.

108.   To compensate certain parties for the cost of negotiation, confirmation, and consummation of the GO/PBA PSA and the Plan, each Initial GO/PBA PSA Creditor will be entitled to receive consummation costs as a pro rata share of cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to 1.50% of the aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims. If the Effective Date does not occur by January 31, 2022, parties to the GO/PBA PSA may terminate the GO/PBA PSA and assert payment of the GO/PBA Restriction Fee and Consummation Costs in an aggregate amount of $100,000,000.00 as an administrative expense claim. The maximum amount of GO/PBA Restriction Fees and Consummation Costs is, in aggregate, $411 million. *See* Zelin Decl. ¶ 86.

109.    In order to provide all holders of GO Bonds and PBA Bonds an opportunity to share in fees for supporting the GO/PBA PSA, up to $50 million (the "Retail Support Fee") is available to investors holding GO or PBA Bonds totaling less than $1 million in aggregate ("Retail Investors").  As Retail Investors were initially not eligible to join the GO/PBA PSA, the Retail Support Fee was designed to deliver the same amount of fee consideration, as a percentage of claim amount held, to Retail Investors as to recipients of the GO/PBA Restriction Fee.  *See* Zelin Decl. ¶¶ 81–82.  The Retail Support Fee will be available to each class of Retail Investors who vote, as a class, to accept the Plan.  Any portion of the Retail Support Fee allocated to a class that votes to reject the Plan will be distributed pro rata to the classes of Retail Investors who voted to accept the Plan and creditors eligible to receive the GO/PBA Restriction Fee.

110.    The cash, bond, and CVI consideration described above, as well as the GO/PBA PSA Fees, were agreed to by holders of GO Bonds and PBA Bonds holding over $17.5 billion of such bonds, which is approximately 94% of all such claims.  *See* Zelin Decl. ¶ 46.  Such consideration is reasonable given the nature of the claimholders' claims and the benefits conferred by the creditor signatories thereto, including the obligations not to sell or otherwise transfer their applicable claims, not to file any additional proofs of claim against the Commonwealth, to support the continued stay of various litigation proceedings, and to support the Plan.

111.    *Allocable Revenue Settlements*.  Prior to the Petition Date, HTA, PRIFA, and CCDA issued bonds in the principal amounts of $4.158 billion, $2.373 billion, and $386 million respectively that were allegedly secured by and payable from the Allocable Revenues collected by the Commonwealth and transferred to the relevant instrumentality and deposited in certain accounts maintained by the fiscal agent for such bonds.  Both prior and subsequent to the

Commonwealth Petition Date, collections of the respective Allocable Revenues were no longer being transferred to HTA, CCDA, and PRIFA. This resulted in the commencement of litigation on several fronts where holders or insurers of these bonds asserted a property interest in Allocable Revenues under a variety of legal theories.

112.    First, the holders or insurers of HTA,[29] CCDA,[30] and PRIFA[31] bonds filed motions in the Commonwealth and HTA Title III cases seeking an order granting (i) relief from the automatic stay to allow them to commence a proceeding in a non-Title III Court to seek to compel the application of the Allocable Revenues to the payment of Bonds or, in the alternative, (ii) for adequate protection of their alleged interests in the Allocable Revenues collected and retained by the Commonwealth. In addition, these bondholders and insurers filed proofs of claim in the Commonwealth Title III Case. These proofs of claim assert, among other things, (i) bondholders have a statutory lien, security interest, and/or property interest in the relevant Allocable Revenues, (ii) the Commonwealth purportedly violated the Commonwealth and U.S. Constitutions by not appropriating and transferring the Allocable Revenues to the relevant instrumentality, and (iii) various statutory, tort, and contractual theories of liability against the

---

[29] The HTA Lift Stay Motions include (a) *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico*, [ECF No. 10102; Case No. 17-3567, ECF No. 673], (b) *AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board for Puerto Rico* [ECF No. 7643; Case No. 17-bk-3567, ECF No. 591], (c) *Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.*, [United States Court of Appeals for the First Circuit, Case No. 20-1930], (d) *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Proc. No. 17-00151-LTS in Case No. 17-bk-3567, [ECF No. 1], as amended, (e) *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.*, Adv. Proc. No. 17-00152-LTS in Case No. 17-bk-3567, [ECF No. 1], as amended.
[30] The CCDA Lift Stay Motion is *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board* [ECF No. 10104].
[31] The PRIFA Lift Stay Motion is *Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board* [ECF No. 10602].

Commonwealth.  The Oversight Board filed adversary proceedings[32] objecting to those proofs of claim and seeking to disallow them in their entirety (the "Revenue Bond Claim Disallowance Litigation").  Among other things, the Commonwealth asserted (i) the claimants lack standing to assert a claim against the Commonwealth as to the bonds as any claim belongs to the instrumentality, (ii) the claimants do not have a statutory lien, security interest, ownership interest, or other property interest in the collection of Allocable Revenues retained by the Commonwealth and not appropriated and transferred to the instrumentality, (iii) any security interest held by the claimants in Allocable Revenues is limited to the Allocable Revenues transferred to and received by the instrumentality and deposited in specified deposit accounts held by the fiscal agent, (iv) the claimants lack subrogation, reimbursement, or contribution rights, (v) the pre-PROMESA retention of Allocable Revenues by the Commonwealth was permitted by Commonwealth law and the documents governing the bonds, (vi) any Commonwealth law purporting to appropriate Allocable Revenues to an instrumentality without regard to whether such appropriations are contained in a Commonwealth fiscal plan certified by the Oversight Board and a Commonwealth budget certified by the Oversight Board are inconsistent with, and preempted by, PROMESA, (vii) the Commonwealth's retention of Allocable Revenues is not a breach of contract or tort by the Commonwealth, nor violates the Commonwealth and U.S. Constitutions, and (viii) the Commonwealth is not liable to the claimants under PROMESA section 407 for retaining Allocable Revenues and not appropriating and transferring such funds to the appropriate instrumentality.

113.    The Oversight Board moved for summary judgement in each of the adversary proceedings.  In support, the Oversight Board argued PROMESA preempts any requirement to

---

[32] See Adv. Proc. No. 20-00003-LTS; Adv. Proc. No. 20-00004-LTS; Adv. Proc. No. 20-00005-

transfer the collections of Allocable Revenues because Commonwealth laws appropriating Commonwealth money without regard to the Oversight Board's certified budgets are inconsistent with PROMESA §§ 201, 202, 207, and Title III, and because absent preemption of inconsistent Commonwealth statutes, PROMESA cannot be carried out. The claimants argued the statutes which created the Allocable Revenues and provided for the transfer to the instrumentalities of amounts collected (the "Allocable Revenue Statutes") were consistent with PROMESA, the certification of budgets is an exercise of local, not federal, power and cannot preempt Commonwealth law. The Oversight Board also argued the claimants do not possess statutory liens or consensual liens against the Allocable Revenues because the relevant enabling act provides the Commonwealth is not liable for the bonds, the relevant enabling act does not contain language necessary to create a statutory lien, and the only security interest granted to claimants was limited to funds actually deposited in the sinking fund. The claimants argued the enabling acts contained language sufficient to create a statutory lien, and the relevant instrumentality granted a security interest in Allocable Revenues received by the Commonwealth. The Oversight Board argued the claimants do not have perfected security interests in Allocable Revenues because they lack the necessary deposit control agreement or other control of the Commonwealth's account. The claimants argued the Oversight Board's claims were time barred, their liens were perfected by the filing of financing statements and/or their security interest is self-perfecting pursuant to the relevant statute. The Oversight Board contended that nothing in the relevant enabling act provides the claimants with any property interest in the Allocable Revenues or creates a trust in favor of the claimants, and the Enabling Act gives the Commonwealth (in certain circumstances) and the instrumentality freedom to use

LTS; Adv. Proc. No. 20-00007-LTS.

the Allocable Revenues.  The claimants argued the Allocable Revenue Statutes used language indicating the Allocable Revenues were held in trust by the Commonwealth for the benefit of Defendants.  The Oversight Board sought disallowance of claimants' claims predicated on PROMESA section 407 because claimants cannot satisfy the elements of a cause of action under section 407, including a transfer of the Allocable Revenues.  The claimants argued they met the elements of section 407 because the statute protects deprivations of property. The Oversight Board sought disallowance of claimants' claims predicated on the Contract Clause because there was no impairment of contract given the Allocable Revenue Statutes authorize retention of the Allocable Revenues and no state or territory legislation created the alleged impairment.  And the retention of Allocable Revenues was due to PROMESA, not any state or territory legislation. The claimants argued retention of Allocable Revenues was an exercise of legislative power that impaired their contractual rights and that the conditions for retention of Allocable Revenues under the Puerto Rico Constitution were not met.  With respect to all objections asserted by the Oversight Board, claimants argued disputes of fact precluded summary judgment.

114.    If the HTA, PRIFA, or CCDA bondholders prevailed on their property interest contentions regarding ownership, statutory lien or consensual security interest, it would have inflicted grave harm on the Commonwealth and its residents because the Commonwealth would have lost control of billions of dollars of revenues needed to sustain the Commonwealth as the Allocable Revenues would continue to be transferred to the Commonwealth instrumentalities. This would have prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory mission.  Moreover, the claimants contended the alleged diversion of the Allocable Revenues from payment of their bond claims gave rise to nondischargeable administrative expense claims and/or nondischargeable Takings Clause claims.

These claims could have required the use of hundreds of millions of dollars in Commonwealth funds to pay claimants, rendering any plan of adjustment not providing for full payment for such claims unconfirmable. At the time the HTA/CCDA PSA and the PRIFA RSA were executed, the claimants had been conducting supplemental discovery in connection with the Oversight Board's motions for partial summary judgment.

115. *The HTA Section 926 Motion*. Ambac, Assured, FGIC, and National (the "Section 926 Movants") also filed a motion for an order appointing them as co-trustees for HTA pursuant to Section 926 of the Bankruptcy Code to pursue certain avoidance claims against the Commonwealth (the "Section 926 Motion"). The Section 926 Motion asserted (i) HTA had valid avoidance claims against the Commonwealth that the Oversight Board had unjustifiably refused to pursue and (ii) the Oversight Board suffers from an unresolvable conflict of interest because it simultaneously represents both HTA and the Commonwealth in their respective Title III cases. The Oversight Board opposed and the Court denied the Section 926 Motion. Ambac, Assured, FGIC, and National appealed the denial of the Section 926 Motion to the First Circuit Court of Appeals. Following execution of the HTA/CCDA PSA, the Section 926 Movants voluntarily dismissed that appeal.

116. HTA/CCDA Plan Support Agreement. The HTA/CCDA PSA provides for a global resolution for the various claims and causes of action relating to the HTA Bonds and the CCDA Bonds. Specifically, the HTA/CCDA PSA resolves the actions collectively referred to as the HTA/CCDA PSA Litigation.[33]

---

[33] The "HTA/CCDA PSA Litigation" means, collectively, the Commonwealth-HTA Revenue Bond Litigation, the HTA Revenue Bond Litigation, the CCDA Revenue Bond Litigation, the HTA Lift Stay Motion, the Section 926 Motion, and the CCDA Lift Stay Motion, as defined herein.

117.    In exchange for the settlement of the HTA/CCDA PSA Litigation, holders of such claims will receive Clawback CVIs from the Commonwealth.  As described in the HTA/CCDA PSA and the Plan, the Clawback CVI is a contingent value instrument based on sharing the potential outperformance of the 5.5% SUT, relative to projections in the Commonwealth's 2020 Certified Fiscal Plan.    That is, potential payments would be contingent upon the Commonwealth's Sales and Use Taxes exceeding performance metrics.  The Clawback CVI allocable to Allowed CW/HTA Claims is subject to a lifetime cap of $3,697,668,995.00.

118.    Additionally, holders of claims against HTA arising from or relating to HTA 68 Bonds (as set forth in the HTA/CCDA PSA) (the "HTA 68 Bond Claims") will receive in aggregate $184.8 million in cash from HTA (the "HTA 68 Bond Cash"), and holders of claims against HTA arising from or relating to HTA 98 Senior Bonds (as set forth in the HTA/CCDA PSA) ("HTA 98 Senior Bond Claims" and, together with the HTA 68 Bond Claims, the "HTA Bond Claims") will receive in aggregate $79.2 million in cash from HTA (the "HTA 98 Senior Bond Cash" and, together with the HTA 68 Bond Cash, the "HTA Cash"). The principal amount of the HTA 68 Bonds and HTA 98 Senior Bonds, and corresponding HTA Bond Claims, shall be reduced by the amount of HTA Cash.  As provided in the HTA/CCDA PSA, HTA will propose a plan of adjustment pursuant to which it will also issue $1.245 billion in new bonds (the "New HTA Bonds"), including current interest bonds, capital appreciation bonds, and convertible capital appreciation bonds, to holders of HTA Bond Claims.

119.    In addition to the consideration available to the HTA bondholder signatories, the Initial HTA/CCDA PSA Creditors will be compensated for fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA PSA in an amount equal to one percent of the creditor's CCDA Bond Claims (the "CCDA Consummation Costs").  Further,

in exchange for agreeing to "lock-up" their respective bonds in accordance with the terms of the HTA/CCDA PSA, each Initial HTA/CCDA PSA Creditor and HTA/CCDA Joinder Creditor holding or insuring CCDA Bonds is entitled to receive a restriction fee (the "CCDA Restriction Fee"). The CCDA Consummation Costs and the CCDA Restriction Fee are available up to an aggregate maximum amount of $15 million. The restriction on fee recipients' transfer of their bonds greatly increases the chances the signatories to the HTA/CCDA PSA will participate in and support the Plan, thereby increasing the chances that Plan confirmation can be achieved.

120.    In addition to the CCDA Consummation Costs and CCDA Restriction Fee, and in exchange for executing the HTA/CCDA PSA and structuring the payments to be made pursuant to the HTA/CCDA PSA, Assured is entitled to receive $39.3 million in cash and National is entitled to receive $19.3 million in cash (the "HTA/CCDA PSA Structuring Fees"). The structuring fees to Assured and National increase the chances the signatories to the HTA/CCDA PSA will participate in and support the Plan, thereby increasing the chances that Plan confirmation can be achieved.

121.    The cash, bond, and CVI consideration described above, as well as the fees noted above, were agreed to by (i) $384 million of CCDA claims (100% of such claims), (ii) over $700 million of HTA 68 claims (over 85% of such claims), and (iii) over $2.1 billion of HTA 98 Senior Claims (over 67% of such claims). *See* Zelin Decl. ¶ 46. Such consideration is reasonable given the nature of the claimholders' claims and the benefits conferred by the creditor signatories thereto, including the obligations not to sell or otherwise transfer their applicable claims, not to file any additional proofs of claim against the Commonwealth, to support the continued stay of various litigation proceedings, and to support the Plan. In addition, the constituencies who participated in the negotiations were instrumental in the development of the

HTA/CCDA PSA and the Plan. The negotiations leading to the execution of the HTA/CCDA

PSA were at arm's length and in good faith and led to a compromise of contested positions

between the parties to the HTA/CCDA PSA. Such parties were represented by sophisticated

counsel and other professional advisors.

122.     <u>PRIFA Plan Support Agreement</u>. The PRIFA PSA provides a global resolution

for the various claims and causes of action relating to the PRIFA Bonds, each of which, if

resolved adversely to the Oversight Board or the Commonwealth, could have resulted in

significant liability to the Commonwealth. Specifically, the PRIFA PSA resolves various

litigations and actions relating to the PRIFA Bonds ("<u>Resolved PRIFA Actions</u>") including

litigation with the PRIFA Bondholders, the trustee for the PRIFA Bonds, and monoline insurers

of PRIFA Bonds relating to the Commonwealth's retention of PRIFA Allocable Revenues.

123.     Holders of claims arising from or relating to the PRIFA Bonds ("<u>PRIFA Bond

Claims</u>") will receive interests in a trust (the "<u>PRIFA Trust</u>") containing certain contingent value

instruments, subject to such holders' rights to opt out of receiving their pro rata share of

distributions from the PRIFA Trust, as explained in the PRIFA PSA and the Plan. As described

in the PRIFA PSA and the Plan, the Clawback CVIs and contingent value instruments based on

the outperformance of the Commonwealth's general fund rum tax revenues paid by the United

States government to the Commonwealth (the "<u>Rum Tax CVI</u>") will be distributed to the PRIFA

Trust. Distributions from the PRIFA Trust on account of Clawback CVI and Rum Tax CVI

payments are subject to a lifetime cap of $1,301,525,288.00. The lifetime cap may be reduced

based on the decisions of eligible holders of Allowed CW/PRIFA Rum Tax Claims (other than

claims insured by FGIC or Ambac) to opt out of recovering their *pro rata* share of distributions

from the PRIFA Trust. The Commonwealth will also deposit $193.5 million in cash into the

PRIFA Trust for the benefit of holders of PRIFA Bond Claims (the "PRIFA Cash"). Payment of the PRIFA Cash pursuant to the PRIFA PSA will reduce the outstanding principal amount of the PRIFA Bonds in an equal amount.

124.    In exchange for agreeing to "lock-up" their respective bonds in accordance with the terms of the PRIFA PSA, each Initial PSA Creditor and Joinder Creditor (each as defined in the PRIFA PSA) holding or insuring PRIFA Bonds is entitled to receive a restriction fee (the "PRIFA Restriction Fee"). The PRIFA Restriction Fee is available up to an aggregate maximum amount of $10 million. Additionally, in exchange for executing the PRIFA PSA and structuring the payments to be made pursuant to the PRIFA PSA, Ambac is entitled to receive $34.75 million in cash and FGIC is entitled to receive $21.75 million in cash (the "PRIFA PSA Structuring Fees").

125.    Plan Support Agreement with AFSCME and Local Affiliates. During the course of these Title III Cases, the Oversight Board participated in negotiations with AFSCME, which represents more than 10,900 current employees of the Commonwealth, and AFT and AMPR, which represent teachers in the Commonwealth's public school system, concerning proposed modifications to the collective bargaining agreements governing the employment relationships between the Commonwealth and its public employees (the "AFSCME CBAs," and "AMPR CBA," respectively, and together, the "Union CBAs"). One of the Oversight Board's primary mandates in these Title III Cases was to address the approximately $55 billion of pension debt owed by the Commonwealth and its pension systems, which ultimately unfunded pension debt was a significant cause of the Commonwealth's fiscal issues.

126.    Addressing the overhang of the Commonwealth's pension debt required, among other things, modification or rejection of the Union CBAs that provided for such burdensome

and unsustainable pension obligations.  The Oversight Board and AFSCME engaged in extensive negotiations regarding the AFSCME CBAs and, on June 7, 2019, the Oversight Board entered into a plan support agreement with AFSCME (the "<u>AFSCME PSA</u>").  The Oversight Board and AFT and AMPR also engaged in negotiations regarding the AMPR CBA; however, the public school teachers constituting AFT's and AMPR's membership voted against ratifying a modified collective bargaining agreement and plan support agreement on or around September 28, 2021

127.     In negotiating the terms of the AFSCME PSA, the Oversight Board considered, among other things, (a) more flexibility to comply with the fiscal measures contemplated in eh Fiscal Plan and (b) the substantial benefits of amendments to the AFSCME CBA that will, among other things, give the Commonwealth more flexibility to right-size material components of its labor force than exists under the current AFSCME CBA.  *See* Santambrogio Decl. ¶¶ 28– 29.  In light of these considerations, and, as a result of the Oversight Board's and AFSCME's extensive efforts, on June 7, 2019, the Oversight Board reached agreement with AFSCME on the terms of the AFSCME PSA.  The AFSCME PSA is the product of months of arms'-length negotiations between the Oversight Board and AFSMCE.  *See id.* ¶¶ 11–12.

128.     Pursuant to the AFSCME PSA, the parties agreed to take reasonable actions to support the Plan, including the pension modifications and modified collective bargaining agreements accomplished thereby, and also not to pursue any litigation that would breach or frustrate the carrying out of the AFSCME PSA.  While the Oversight Board believes it could have legally rejected the AFSCME CBA, doing so necessarily would involve significant time and expense and litigation.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984) (permitting the rejection of collective bargaining agreements pursuant to section 365 of the Bankruptcy Code, but requiring debtors to first engage in reasonable efforts to negotiate a voluntary

73

modification and prove that a consensual agreement was not possible). Moreover, harmonious relationships with the Commonwealth's public employees are integral to its mission of providing governmental services to its residents.

129. Through the consensual resolution accomplished through the AFSCME PSA, the Commonwealth will receive reductions in its pension liabilities through pension cuts and freezes, as well as increased workforce flexibility through certain "Right-Sizing Provisions" that will enable the Commonwealth to more easily address oversized employee payroll negatively impacting its budgets. In exchange for AFSCME's support of the Plan and the budgetary concessions provided to the Commonwealth under the AFSMCE PSAs, the union members will receive increased employer healthcare contributions, increased accruals of sick leave and vacation pay, certain one-time payments, and an opportunity to share in the Commonwealth's fiscal success through the Fiscal Surplus Sharing Plan. In addition, the unions will each have their professional fees and expenses incurred in negotiating and implementing the modified AFSCME CBA reimbursed. Accordingly, the AFSCME PSA is in the best interests of creditors, and the terms therein and in the AFSCME CBA incorporated into the Plan should be approved.

130. While the Oversight Board believes the risk of a materially adverse outcome in connection with the actions being settled pursuant to the ERS Stipulation, GO/PBA PSA, HTA/CCDA PSA, PRIFA PSA, and AFSCME PSA were materially less than fifty percent, a final resolution on the issues settled provides certainty to the Oversight Board with respect to the claims held by the various claimholders, and builds the foundation for a confirmable Plan. Such resolutions also save significant time and expense and continued litigation in connection with the disputes, which, as briefed, involved significant questions of law and fact that had not yet been

ruled upon by the Court, and would likely involve multiple rounds of appeal no matter which party prevailed initially.

131.    In addition to the substantive fairness of the settlements described herein, the process the Oversight Board undertook to reach such agreements was in good faith and designed to reach a fair, arm's-length agreement, negotiated with the assistance of sophisticated counsel and financial advisors.  The Oversight Board's independent expert, Marti Murray has specifically opined that:

> The settlements underpinning the Plan were reached between sophisticated parties over a more than four year period, in a manner consistent with typical custom and practice for complex debt restructurings.  The major stakeholder parties were represented by sophisticated counsel and financial advisors, with each stakeholder group well-equipped to act in its own economic best interest.  The settlements are reasonable and consistent with what would be expected in deal negotiations between sophisticated parties undertaken as part of a complex debt restructuring.

Murray Expert Report at 7.

132.    The Zelin Declaration further details the extensive, good-faith efforts taken by the Oversight Board in connection with the various settlements incorporated into the Plan, including the GO/PBA PSA, ERS Stipulation, HTA/CCDA PSA, and the PRIFA PSA.  Specifically, following the 2019 PSA, which incorporated agreements among the Oversight Board and certain holders of GO Bonds and PBA Bonds, in July 2019, the Court ordered a stay and mediation on issues related to the validity, secured status (if any), and priority of each of the GO, PBA, ERS, HTA, CCDA, and PRIFA Bonds, as well as the validity and impact of the retention of Allocable Revenues.  *See* Zelin Decl. ¶ 15; [ECF No. 8244].  Thereafter, the Oversight Board filed the Initial Plan, which incorporated the settlements contained in the 2019 PSA and the AFSCME PSA, and continued negotiations with stakeholders which led to the 2020 PSA and 2020 Plan, and later the current Plan.  *See id.* ¶ 16.

133.   Accordingly, the settlements embodied in the Plan should be approved, and the

Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### d.   The Plan Permissibly Provides for the Retention and Enforcement of Claims

134.   Section 1123(b)(3)(B) of the Bankruptcy Code provides a plan may "provide for

the retention and enforcement by the debtor" of certain claims or interests.   11 U.S.C.

§ 1123(b)(3)(B).   Article LXXVIII of the Plan establishes an Avoidance Actions Trust "for the

sole purpose of Avoidance Actions and distributing its assets," and which shall be vested with

the Avoidance Actions Trust Assets.   The Plan also provides:

> In furtherance of and consistent with the purpose of the Avoidance Trust Actions and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions Trustee shall, among other things, have the following rights, powers, and duties, (i) to hold, manage, convert to Cash, and timely distribute the Avoidance Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust, (ii) to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (iii) in the Avoidance Actions Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, or litigation of the Avoidance Actions Trust . . . (v) in the Avoidance Actions Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Avoidance Actions Trust will be responsible . . . .

Plan § 78.6.

135.   Section 79.1 of the Plan provides: "[e]xcept as settled and released herein, from

and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and

power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such

Avoidance Actions, upon approval of the Bankruptcy Court."

136.   Further, section 82.1(a) of the Plan provides that:

> Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through

the Oversight Board, and in consultation with AAFAF, shall object to, and shall
assume any pending objection filed by the Debtors to, the allowance of Claims
filed with the Title III Court with respect to which it disputes liability, priority or
amount, including, without limitation, objections to Claims that have been
assigned and the assertion of the doctrine of equitable subordination with respect
thereto. All objections, affirmative defenses and counterclaims shall be litigated to
Final Order; provided, however, that Reorganized Debtors, by and through the
Oversight Board, and in consultation with AAFAF, shall have the authority to
file, settle, compromise, or withdraw any objections to Claims, without approval
of the Title III Court.

137.    Accordingly, the Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy

Code because it provides for the retention and enforcement by the Debtors or an assigned estate

representative of all claims and interests.

### e.    The Plan Permissibly Provides for the Sale of the Debtors' Property

138.    Section 1123(b)(4) of the Bankruptcy Code provides a plan may "may provide for

the sale of all or substantially all of the property of the estate, and the distribution of the proceeds

of such sale among holders of claims or interests[.]" 11 U.S.C. § 1123(b)(4).  Section 69.2 of the

Plan provides the Commonwealth, up to and including April 10, 2023, "shall have the option to

purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . .   In the event that the

Commonwealth declines to exercise the option or fails to provide notice of its exercise of the

Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall

have the option to exercise the Bondholder Election and purchase all of the interests in the ERS

Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the

Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity

Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant

to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by

providing written notice thereof to the Commonwealth on or prior to April 15, 2023."  However,

"[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have

been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity
Portfolio for the ERS Portfolio Price . . . ."  Under Section 69.1 of the Plan, in either scenario,
the proceeds of the purchase of the ERS Private Equity Portfolio, along with $373 million, shall
be distributed to holders of Allowed ERS Bond Claims.  Accordingly, the Plan is consistent with
section 1123(b)(4) of the Bankruptcy Code.

> **f.    The Plan Permissibly Provides for Modification of Claimholders'
> Rights**

139.    Section 1123(b)(5) of the Bankruptcy Code provides for the modification of rights
of secured or unsecured claimholders under the Plan.  Articles V through LXXIII of the Plan
modify the rights of holders of Claims in the Impaired Classes, and leave intact those holders of
Claims in the Unimpaired Classes.  Accordingly, the Plan is consistent with section 1123(b)(5)
of the Bankruptcy Code.

> **g.    The Plan Permissibly Includes Other Appropriate Provisions**

140.    Section 1123(b)(6) of the Bankruptcy Code is a catch-all provision that permits
inclusion of any appropriate provision as long as it is consistent with applicable provisions of the
Bankruptcy Code.  In accordance with the Bankruptcy Code and as further detailed herein,
Articles XCII and LXXXVI of the Plan provide for, among other things, (a) certain releases,
injunctions, and exculpations, (b) an exemption from registration pursuant to Bankruptcy Code
section 1145 for the issuance and distribution of the New GO Bonds and the CVIs, and (c) entry
of a Confirmation Order that provides that neither the Governor nor the Legislature shall enact,
adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise,
consummation and implementation of the transactions contemplated by the Plan.  Accordingly,
the Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### 4. The Plan Complies with Section 1123(d) of the Bankruptcy Code By Providing for the Cure of Defaults Under the Plan

141.    Section 1123(d) of the Bankruptcy Code provides that, if a plan proposes to cure a default, the amount necessary to cure the default shall be determined "in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d).  Section 76.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts that are assumed, or assumed and assigned under the Plan.  Any cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan.  Accordingly, the Plan complies with the requirements of section 1123(d) of the Bankruptcy Code.

### 5. Section 1129(a)(2):  The Debtors Have Complied  with the Applicable Provisions of the Bankruptcy Code

142.    Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(2); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).  The legislative history to section 1129(a)(2) explains this provision is intended to incorporate the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. REP. NO. 95-595, at 412 (1977),  *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6368 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Johns-Manville Corp.*, 68 B.R. at 630; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).  The Debtors (i) have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court, and (ii) have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the

Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the

Election Notices, and related documents, and in soliciting and tabulating votes on the Plan.

> **a.      The Debtors Have Complied with Section 1125 of the Bankruptcy Code**

143.    Section 1125 of the Bankruptcy Code provides, in pertinent part, that:

(b)     An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary or the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information . . . .

(c)     The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

11 U.S.C. § 1125.

144.    On July 30, 2021, the Debtors filed the Disclosure Statement.  After notice and a

hearing on August 2, 2021, the Court entered the Disclosure Statement Order approving the

Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing "adequate

information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical

of the Debtor's claimholders to make an informed judgment whether to accept or reject the Plan.

Pursuant to the Disclosure Statement Order, the Court also approved, among other things:  (i) all

materials to be included in the solicitation packages ("Solicitation Packages"); (ii) the forms of

Ballots; (iii) the procedures for voting and for tabulation of votes to accept or reject the Plan; and

(iv) the manner of service of the Solicitation Packages.  That same day, the Court also approved

the Confirmation Procedures.

145.    Thereafter, in accordance with the Disclosure Statement Order, the Debtors, by

and through Prime Clerk, the Debtor's balloting agent, distributed Solicitation Packages to all

holders of Claims entitled to vote under the Plan, which contained: (i) the Confirmation Hearing Notice; (ii) a flash drive (or hard copy, in the Debtors' discretion) containing the Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making any applicable election, and, as applicable, a pre-addressed, pre-paid return envelope; (iv) with respect to Class 51, the Retiree Committee Letter and Information Guide, and (v) with respect to Classes 54, 58, and 66, the Creditors' Committee Letter; with each of the foregoing accompanied by its Spanish-language translation. *See Affidavit of Service of Solicitation Materials*, dated October 21 and 23, 2021 [ECF Nos. 18635, 18689, 18690]. The Debtors did not solicit acceptances or rejections of the Plan from any holder of Claims prior to the transmission of the Solicitation Packages. As will be set forth in the Voting Declaration and established at the Confirmation Hearing, Prime Clerk solicited and tabulated votes in accordance with the Disclosure Statement Order. Furthermore, the Court entered orders establishing the (i) Confirmation Objection Deadline, (ii) Voting Deadline, (iii) Election Deadline, and (iv) Confirmation Hearing Date, putting creditors and other parties in interest on notice of the pertinent deadlines for the process of confirming the Plan.

146.     Additionally, as required by the Disclosure Statement Order, the Debtors, through Prime Clerk, published the Confirmation Hearing Notice, on one occasion, in each of *El Nuevo Dia* in Spanish (primary circulation is in Puerto Rico), *Caribbean Business* in English (primary circulation is in Puerto Rico), *El Diario* in Spanish (primary circulation is in New York), *El Nuevo Herald* in Spanish (primary circulation is Miami), *The New York Times*, *The Bond Buyer*, *El Vocero* in Spanish (primary circulation is in Puerto Rico), and *Primera Hora* in Spanish (primary circulation is in Puerto Rico) to the extent possible, (i) between August 29, 2021 and

September 4, 2021, (ii) between September 12, 2021 and September 18, 2021, and (iii) between September 26, 2021 and October 2, 2021.  *See* Publication Affidavit, filed October 23, 2021 [ECF No. 18688].

147.    The Debtors also, through Prime Clerk, caused no fewer than ten (10) radio advertisements, to be aired during the periods from (i) August 29, 2021 up to and including September 4, 2021, (ii) September 12, 2021 up to and including September 18, 2021, and (iii) September 26, 2021 up to and including October 2, 2021 (for a total of thirty (30) radio advertisements), on (a) WMEG FM (contemporary hit radio) in Spanish and (b) WKAQ AM (Spanish language talk radio) in Spanish, informing listeners of (i) the approval of the Disclosure Statement and the scheduling to the Confirmation Hearing, (ii) the date by which Confirmation Objections must be filed and served, (iii) the Voting Deadline and the Election Deadline, and (iv) an information hotline to receive certain additional information.  *See* Publication Affidavit, filed October 23, 2021 [ECF No. 18688].

148.    The Debtors will establish at the Confirmation Hearing the methodology for the tabulation of Ballots and results of voting with respect to the Plan.

> **b.    The Debtors Have Obtained Acceptances of the Plan Consistent with Section 1126 of the Bankruptcy Code**

149.    Section 1126 of the Bankruptcy Code sets forth the requirements for acceptance of a plan of reorganization.  *See* 11 U.S.C. § 1126.  Under section 1126, only holders of allowed claims and allowed equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.  *See id*. The statute provides, in pertinent part, that:

> (a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan . . .

> (f)     Notwithstanding any other provision of this section, a class that is not
> impaired under a plan, and each holder of a claim or interest of such class,
> are conclusively presumed to have accepted the plan, and solicitation of acceptances
> with respect to such class from the holders of claims or interests of such class is
> not required.

*Id*.

150.    As to impaired classes entitled to vote to accept or reject a plan, section 1126(c)

of the Bankruptcy Code specifies the requirements for acceptance of a plan by classes of claims:

> (c)     A class of claims has accepted a plan if such plan has been accepted by
> creditors, other than any entity designated under subsection (e) of this section,
> that hold at least two-thirds in amount and more-than one-half in number of the
> allowed claims of such class held by creditors, other than any entity designated
> under subsection (e) of this section, that have accepted or rejected the plan.

11 U.S.C. § 1126(c).

151.    As set forth in the Disclosure Statement and this Memorandum, and in accordance

with section 1126 of the Bankruptcy Code, the Debtors solicited votes from the holders of all

Claims allowed for voting purposes in each Class of impaired Claims entitled to vote on the

Plan.  Specifically, votes were solicited from the holders of Claims in Classes 1–21, 23–28, 30–

32, 34, 36–38, 40–42, 44, 46, 47, 49, 51B, 51D–I, 51L, 52–54, 56, 58–62, 65, 66, and 69.

Creditors who elect to be treated within Classes 22, 29, 33, 35, 39, 43, 45, 48, 50, or 68, rather

than within Classes 15, 16, 23, 30, 31, 34, 36, 38, 40, 41, 44, 46, 47, 49, 58, or 66, as applicable,

are deemed to have accepted the Plan.

152.    Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in

unimpaired Classes are conclusively presumed to have accepted the Plan and were not entitled to

vote on the Plan.  Accordingly, holders of Claims in Classes 51A, 51C, 51J, 51K, 55, 57, 67, and

68 did not receive a ballot.  In addition, Claims in Classes 63 and 64 are impaired and not

receiving a distribution, and are deemed to have rejected the Plan.  Accordingly, holders of

Claims in Classes 63 and 64 did not receive a ballot.  Further, in accordance with the Disclosure

Statement Order, the Debtors distributed a notice of the Confirmation Hearing and non-voting

status to each holder of Claims in the Non-Voting Class.

### 6. Section 1129(a)(3): The Plan was Proposed in Good Faith and Not by Any Means Forbidden by Law

153.    Section 1129(a)(3) of the Bankruptcy Code requires a plan be "proposed in good

faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Bankruptcy Code

does not define "good faith," but rather, courts generally interpret it to mean that there exists a

reasonable likelihood the plan will achieve a result consistent with the objectives of the

Bankruptcy Code.  *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d

762, 765 (1st Cir. 1983); *In re Corey*, 892 F.2d 829, 835 (9th Cir. 1989).

154.    Title III of PROMESA is analogous to Chapter 9 of the Bankruptcy Code, as it

adopts many of the same provisions of the Bankruptcy Code that Chapter 9 adopts.  *Compare*

PROMESA § 301(a) *with* 11 U.S.C. § 901(a).  The principal purpose of Chapter 9 "is to allow an

insolvent municipality to restructure its debts in order to continue to provide public services."  *In*

*re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999); *In re City of Detroit*, 524

B.R. at 248.  "The primary purpose of debt restructure for a municipality is not future profit, but

rather continued provision of public services."  *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34;

*In re City of Detroit*, 524 B.R. at 248.  Furthermore, one of the purposes of PROMESA is to

"provide a method for a covered territory to achieve fiscal responsibility and access to capital

markets." PROMESA § 101(a).  A sustainable restructuring of existing obligations as provided

for in the Plan is a prerequisite to achieving these objectives.

155.    In determining whether the plan achieves a result consistent with the objectives

and purposes of Chapter 9, courts look at the totality of the circumstances in a particular case.

*See In re City of Stockton*, 542 B.R. at 279; *In re Mount Carbon Metro Dist.*, 242 B.R. at 39; *In*

*re City of Detroit*, 524 B.R. at 248*; Berliner v. Pappalardo* (*In re Puffer*), 674 F.3d 78, 81–82

(1st Cir. 2012).

156.    The Plan was proposed by the Oversight Board in good faith, and with the

legitimate and honest purpose of restructuring over $130 billion of debt and pension obligations,

consistent with its statutory mandate under PROMESA.  As discussed in greater detail herein,

the Plan (including the settlements and compromises contained therein) is the result of extensive,

arms'-length negotiations among certain important constituencies through mediation led by the

Mediation Team.  *See* Jaresko Decl. ¶ 81.  The Plan was the product of an independent process

overseen by the Mediation Team in which the Oversight Board did not control the parties

entitled to participate.  *See id.*

157.    The Plan is the seventh amended version of the plan of adjustment because the

Oversight Board has worked continuously since these Title III Cases began, with the assistance

of its legal and financial advisors, to develop consensus with creditors and to evaluate the

Commonwealth's and its instrumentalities' current and future financial circumstances.  *See*

Jaresko Decl. ¶ 82.  The Oversight Board and its advisors have endeavored to maximize

resources available for all the Commonwealth's stakeholders, including making good faith

efforts to maximize the tax treatment of the consideration distributed pursuant to the Plan by

utilizing the taxable election and seeking tax exempt status for the CVIs.  *See* Brownstein Decl.

¶¶ 9–11.  These circumstances have been subject to constant change as the Oversight Board, the

Commonwealth, creditors, and the people of Puerto Rico have fought to address the island's

needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes,

earthquakes, and other natural disasters, as well as the impact of the global COVID-19

pandemic.  *See* Jaresko Decl. ¶ 82.

158.    The Plan is the culmination of all these efforts and is designed to implement the settlement and compromise of numerous risky and costly disputes, maximizing value for the Debtors' creditors, while avoiding protracted litigation that could delay distributions to creditors. *See* Jaresko Decl. ¶ 83.   The overwhelming support for the Plan received from all Classes entitled to vote provides independent evidence of the Oversight Board's good faith efforts. Likewise, the Court's docket shows the extensive litigation and outcomes preceding the Plan. That litigation demonstrates both the key disputes, many of them novel, among the parties, and the time required to resolve or narrow them.   The Plan is the alternative to continuing that litigation to resolve the remaining issues instead of settling them now.   The Oversight Board, and its, members, employees, agents, affiliates, and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, thereby satisfying the "good faith" requirement of section 1129(a)(3) of the Bankruptcy Code.

159.    In light of the foregoing, it is clear the Plan was proposed in good faith and promotes the rehabilitative objectives and purposes of PROMESA and the Bankruptcy Code, and therefore satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

### 7.   Section 1129(a)(6):  The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission

160.    Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its businesses approve any rate change provided for in the Plan.  *See* 11 U.S.C. § 1129(a)(6). Because the Debtors' businesses are not governed by regulated rates, this provision is not applicable for purposes of confirming the Plan.

8. **Section 1129(a)(8): The Plan Has Not Been Accepted By Each Impaired Class of any Debtor Under the Plan, But Nonetheless Can Be Confirmed By Satisfying 11 U.S.C. §§ 1129(a)(10) and (b)**

161.   Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims either accept the Plan or not be impaired under the plan, subject to the exceptions identified in section 1129(b).  *See* 11 U.S.C. §§ 1129(a)(8), 1129(b).  Section 1126 provides a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims held by the class members that voted on the plan.  *See* 11 U.S.C. § 1126.  Under section 1126(g) of the Bankruptcy Code, however, impaired classes that neither receive nor retain any property under the plan are deemed to reject the plan.  Accordingly, the Plan has not been accepted by each Class of any Debtor, as Class 64 (Section 510(b) Subordinated Claims) is deemed to have rejected the Plan for each Debtor.

162.   As the Voting Declaration will demonstrate, (i) Classes 51B, 51D, 51F, 51G, 51H, 51I, and 51L; Class 53 (Dairy Producer Claims); Class 54 (Eminent Domain Claims); and Class 58 (CW General Unsecured Claims) of claims against the Commonwealth, (ii) Class 66 (ERS General Unsecured Claims) of claims against ERS, (iii) and Class 12 (PBA/DRA Secured Claim), Class 13 (PBA General Unsecured Claims), and Class 14 (PBA/DRA Unsecured Claims) of Claims against PBA voted not to accept the Plan with the requisite numerosity and dollar amounts required by section 1126(c) of the Bankruptcy Code.  Confirmation is nevertheless achievable, as explained in more detail below, because the Plan satisfies the requirements of sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.  Accordingly, the Debtors' Plan overcomes the requirement of section 1129(a)(8) by satisfying sections 1129(a)(10) and 1129(b).

### 9. Section 1129(a)(10): At Least One Impaired Class of Claims Voted in Favor of the Plan, Without Including Claims of Insiders

163.    Section 1129(a)(10) requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." *Id*; *see also In re Resorts Int'l*, 145 B.R. 412, 479 (Bankr. D.N.J. 1990) (where four classes of impaired creditors accepted the plan, exclusive of insiders, requirements of section 1129(a)(10) were satisfied).

164.    As the Voting Declaration will demonstrate, at least one impaired Class at each Debtor—*e.g.*, Class 30 (2011 CW Bond Claims); Class 65 (ERS Bond Claims), and Class 8 (2011 PBA Bond Claims)—has accepted the Plan without counting votes by insiders.. Accordingly, the requirement of section 1129(a)(10) of the Bankruptcy Code has been met.

165.    Although individual members of the Retail Bondholder classes voted to reject the plan, and have filed objections to confirmation, this does not trigger the requirements of Section 1129(b). When a class of creditors votes to accept a plan, any member of the class is bound by the votes of its Class and may not object to the Plan on the grounds that the Plan is not fair and equitable or unfairly discriminates against that claimholder. *See In re City of Colorado Springs Creek Improvement Dist*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995) (fair treatment analysis of § 1129(b) inapplicable because arguably secured claimholder was "simply a dissenting creditor in an accepting class. . . . In Chapter 9, dissenting creditors in an accepting class are bound by the accepting vote of the other members."); 11 U.S.C. § 1129(b)(2)(A); *see also* 11 U.S.C. § 944(a) (made applicable to the Title III Cases pursuant to PROMESA section 301(a)) (a confirmed plan binds "any creditor, whether or not – (3) such creditor has accepted the plan."); *cf.* 11 U.S.C. § 1141(a) (parallel provision in chapter 11 to section 944(a) of the Bankruptcy Code).  While this principle is almost never challenged, courts routinely enter confirmation orders providing that

plans of reorganization or adjustment are binding on dissenting creditors. *See, e.g.*, *In re Alpha Natural Res., Inc.*, No. 15-33896, 2016 Bankr. LEXIS 3246, at *133 (Bankr. E.D. Va. July 12, 2016) ("in accordance with section 1141(a) of the Bankruptcy Code . . . the Plan and this Order shall be binding upon . . . (d) any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted, rejected or are deemed to have accepted or rejected the Plan)").

### 10. Section 1129(b)(1):  The Plan Satisfies the Cram-Down Requirements with Respect to the Classes that Did Not Accept the Plan

166.    Section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes. *See* 11 U.S.C. § 1129(b)(1).  In particular, section 1129(b)(1) requires that, to confirm a plan that has not been accepted by all impaired Classes, the plan proponent must show the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired Classes. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999); *see also John Hancock* 987 F.2d at 157 n.5.  The plan proponent bears the burden of proof by a preponderance of the evidence. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

167.    Classes 63 (CW Appropriations Claims) and 64 (Section 510(b) Subordinated Claims) receive no recovery pursuant to the Plan, and are deemed to have rejected the Plan.  Plan §§ 67.1; 68.1.  Further, according to preliminary voting results, the following Classes of claims against the Commonwealth voted to reject the Plan:  pension Classes 51B, 51D, 51F, 51G, 51H, 51I, and 51L; Class 53 (Dairy Producer Claims); Class 54 (Eminent Domain Claims); and Class 58 (CW General Unsecured Claims) have voted to reject the Plan.  Class 66 (ERS General

Unsecured Claims) is the only Class of claimholders against ERS voting to reject the Plan.  And

Class 12 (PBA/DRA Secured Claim), Class 13 (PBA General Unsecured Claims), and Class 14

(PBA/DRA Unsecured Claims) voted against accepting PBA's Plan.  Accordingly, the Debtors

must satisfy section 1129(b) of the Bankruptcy Code with respect to these rejecting Classes to

procure an order confirming the Plan.

> **a.     The Plan Does Not Unfairly Discriminate Against the Rejecting
> Classes and Complies with the Requirements of 11 U.S.C. § 1129(b)(1)**

168.    PROMESA incorporates section 1129(b)(1), which allows the confirmation of a

plan over the objection of a rejecting, impaired class if the "plan does not discriminate unfairly,

and is fair and equitable, with respect to each class of claims or interests that is impaired under,

and has not accepted the plan."  11 U.S.C. § 1129(b)(1).  The Bankruptcy Code does not define

unfair discrimination, nor provide a standard for when "unfair discrimination" exists.  *See In re*

*203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd,* 126 F.3d 955

(7th Cir. 1997), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N.*

*LaSalle St. P'ship*, 526 U.S. 434 (1999); *In re Johns-Manville Corp.*, 68 B.R. at 636.  By its

terms, section 1129(b)(1) "prohibits only unfair discrimination, not all discrimination." *In re*

*Aztec Co.*, 107 B.R. 585, 588–89 (Bankr. M.D. Tenn. 1989).  Indeed, it is "necessarily inherent

in the term 'unfair discrimination' . . . that there may be 'fair' discrimination in the treatment of

classes of creditors." *In re Simmons*, 288 B.R. 737, 747–48 (Bankr. N.D. Tex. 2003) (citing 7

Collier on Bankruptcy ¶ 1129.04[3] (15th ed. 2002)).

169.    Courts typically examine the facts and circumstances of the case and determine

whether unfair discrimination has occurred in each particular case.  *See, e.g.*, *In re Rivera*

*Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991); *In re Freymiller Trucking, Inc.*, 190 B.R.

913, 916 (Bankr. W.D. Okla. 1996) (holding a determination of unfair discrimination requires a

court to "consider all aspects of the case and the totality of all the circumstances"); *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 879 (5th Cir. 1980) ("A bankruptcy court can permit discrimination when the facts of the case justify it."); *In re Dow Corning Corp.*, 255 B.R. 455, 537–38 (E.D. Mich. 2000) (citation omitted) ("a plan will not unfairly discriminate if there is a 'rational or legitimate basis for discrimination and [if] the discrimination [is] . . . necessary for the reorganization'").

170.    This has been particularly true in Chapter 9 cases.  *See In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ("[U]nlike the other Chapters, Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather, to meet the special needs of a municipal debtor.").  In Chapter 9, as under PROMESA, "the purpose . . . is to restructure the municipality's debt so that it can provide adequate municipal services.  To that end, chapter 9 leaves the municipality in control of its affairs while facilitating its debt restructuring.  This suggests that a more flexible standard of unfair discrimination in chapter 9 cases is appropriate." *In re City of Detroit*, 524 B.R. at 256.  Accordingly, courts assessing plans of adjustment in chapter 9 have emphasized the unique need to consider the overarching purpose of chapter 9 and the general social welfare when addressing issues of plan confirmation.  *See, e.g.*, *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012) ("[O]f particular importance to the Court is that the [p]lan preserves the availability of healthcare services to citizens and patients in the [c]ounty."); *In re City of Detroit*, 524 B.R. at 257 (permitting discrimination where "necessary to [the City's] mission" and reasoning "if each of the settlements in the plan is reasonable, then the resulting discrimination in the plan must be fair.").

> **(i)** **The Plan does not unfairly discriminate against Classes of Claims that voted to reject the Commonwealth Plan**

171.    Here, certain Classes of unsecured claims against the Commonwealth have voted to reject the Plan and have argued the treatment they have been afforded under the Plan is unfairly discriminatory given the better treatment provided to certain other unsecured Classes. Specifically, the Classes of unsecured claims receiving treatment pursuant to the Plan greater than the CW General Unsecured Claims include the Pension Classes (defined below), the Dairy Producer Claims (Class 53), Med Center Claims (Class 56), and Tax Credit Claims (Class 57). The Oversight Board has carefully considered and analyzed the Commonwealth's finances and obligations, both current and future, and, in light of such considerations, the Plan provides treatment to each Class that will ensure that the Commonwealth is best able to provide critical governmental services to its residents and that certain claimants are able to continue to provide such necessary governmental services to the residents of Puerto Rico in an efficient, reliable, and sustainable manner.   The different treatments of creditor classes is justified and does not constitute unfair discrimination.

172.    <u>Pension Classes</u>:  Classes 51A–51L (the "<u>Pension Classes</u>"), consist of certain pension claims held by current and former Commonwealth employees.  Like any other government, the Commonwealth's purpose is to provide municipal services to its residents, such as protection from crime, emergency response services, and access to public education.  The employees within the Pension Classes are the backbone of the Commonwealth's ability to provide these integral services and the Oversight Board determined it would be in the government's best interests to provide pensioners with treatment at least sufficient to guarantee their pensions are not reduced to an amount that would fall below the federal poverty guidelines, and preferably sufficient to provide pensioners dignified retirements.  Absent such treatment, the

Commonwealth may be required to support such pensioners in the future with alternative public funds. Accordingly, the Pension Classes are receiving a more favorable recovery than other classes of unsecured claims.

173. The Plan's treatment of the Pension Classes based on these factors is consistent with treatment levels approved as "fair" in Chapter 9 cases. *See, e.g.*, *In re City of Detroit*, 524 B.R. at 257 (confirming the City of Detroit's plan of adjustment's treatment of pension claims at approximately 60% recoveries, and general unsecured creditors, at approximately 13% recoveries because the better treatment to pensioners was "necessary to [the government's] mission [of providing public services]."); *see also In re City of Stockton*, 526 B.R. 35, 60 (Bankr. E.D. Cal. 2015) (confirming chapter 9 plan providing nearly 100% recovery to pensions and 1% recovery to GUCs because the elimination of certain post-employment benefits showed pensioners were "sharing the pain"); *In re Cnty. of Orange*, Case No. 9:94-bk-22272, [ECF No. 3418] (May 16, 1996) (confirming chapter 9 plan with no impairment of pension claims); *In re City of San Bernardino*, Case No. 6:12-bk-28006, [ECF No. 2164] (Feb. 7, 2017) (same); *In re City of Vallejo*, [ECF No. 1113] (Aug. 4, 2011) (same); *In re Jefferson County*, Case No. 2:11-bk-05736, [ECF No. 2248] (Nov. 22, 2013) (order confirming chapter 9 plan with pensioners not even listed as creditors for plan purposes).

174. Significantly, the GO and PBA Bondholders claimed priority to all available resources, but did not complain pensioners are being paid more than the bondholders who have no claims under the Puerto Rico constitution to priority. If, however, other classes of general unsecured claims were paid more, it is likely no settlement could have been done with the GO and PBA bondholders.

175.    All of the pension claim sub-Classes included in Class 51 that were entitled to vote on the Plan (except for Class 51E) voted to reject the Plan.   The Oversight Board determined that it is in the best interests of the Commonwealth and its stakeholders to both freeze and progressively impair pensions in a manner that would ensure that no pensioner receives a recovery that would render them impoverished under the federal poverty guidelines such that they would require supplemental assistance from the Commonwealth.   Accordingly, there is a legitimate governmental interest in freezing and progressively treating the Pension Classes necessary to ensure the government can adequately provide public services.   But, even absent that governmental interest, it is not unfair discrimination to pay pensioners receiving more than $1,500 per month more than pensioners receiving up to $1,500 per month, even if the amount above $1,500 per month is discounted.   Similarly, it is not unfair to freeze pension benefits for active employees, especially given the Commonwealth cannot afford to go back to increasing defined benefit plans and has substituted defined contribution plans for active workers.   Further, pension claimants are recovering more on their claims than virtually all other unsecured claimholders.

176.    Dairy Producer Claims:   Under the Plan, Class 53 (Dairy Producer Claims) Claims are also receiving a more favorable recovery than CW General Unsecured Claims.   The Oversight Board determined it was in the Commonwealth's and its stakeholders' best interests to secure sustainable and affordable dairy products for its residents by helping the dairy producers avoid losses.   Because of the short shelf lives, heat, and perishable nature of dairy products, including milk, obtaining dairy products from outside Puerto Rico is not a good option.   Absent the treatment provided to the Dairy Producer Claims under the Plan, the Commonwealth's residents—many of whom are employed by the holders of Dairy Producer Claims—would not

have access to dairy products necessary for a balanced diet.  Without a settlement of these claims, and given the short shelf-life of dairy products and their necessity for hundreds of thousands of growing school-aged children, the Commonwealth may have to incur the significantly higher cost of regularly importing dairy products for its population.  The Oversight Board determined that this would be less favorable to the Commonwealth's financial future and the health of its residents than providing more favorable treatment to these claims.

177.   Tax Credit Claims.  Tax Credit Claims relating to the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income tax credits, deductions, or carryforwards.  Such Tax Credit Claims were designed and implemented by the government of the Commonwealth to incentivize certain commercial behavior and to benefit the Commonwealth and support the economy as a whole.  These claims are not paid in cash or other monies in the Title III case, but rather are satisfied through reductions in tax credits which only have value to the extent the claimant earns taxable income.  For these reasons, the Oversight Board determined and submits that it was in the best interests of the Commonwealth and its economy to continue to honor and offer such tax incentives upon which residents and local businesses have relied, to allow such claimholders to receive the full benefit of the promised tax credit.

178.   Med Center Class:  In the midst of the global pandemic, the Oversight Board determined it was necessary for the health and safety of its residents to provide favorable treatment to Class 56 (Med Center Claims) Claims, which represent claims of certain federally qualified health centers arising from or relating to the Medicaid Act, 42 U.S.C. section 1396a(bb).  Moreover, these claims are payable through Medicare/Medicaid funds from the federal government earmarked for the payment of such claims and not available to other general

unsecured claimholders.  Providing medical treatment to its residents is among the most important services provided by the Commonwealth government, as recognized in other Chapter 9 cases.  *See*, *e.g.*, *In re Barnwell Cnty. Hosp.*, 471 B.R. at 869 ("[O]f particular importance to the Court is that the [p]lan preserves the availability of healthcare services to citizens and patients in the [c]ounty.").  For this reason, the Oversight Board reasonably determined that favorable treatment of Med Center Claims was in the government's best interests and does not cost other creditors anything.

179.  <u>Eminent Domain Claims</u>.  As explained above, some the Eminent Domain Claims are hybrid claims:  partially secured, and partially unsecured.  *See supra* ¶ 59(d).  Class 54 (Eminent Domain Claims) include only the unsecured component of such Claims, and the Class's treatment does not account for the distribution of monies on deposit with the Puerto Rico Court of First Instance with respect to property that may have been taken.  Disclosure Statement at 23 n.58.  For the unsecured portion of the Eminent Domain Claims, such claims are included in the claim amount for the CW General Unsecured Claims and receive the same treatment.  As set forth in the reply brief filed contemporaneously with this Memorandum, Eminent Domain Claims may be discharged and treated like any other unsecured claim.  Accordingly, the Plan does not unfairly discriminate against such claims.

180.  <u>CW Appropriations Claims</u>.  Class 63 (CW Appropriations Claims), will not receive any recovery pursuant to the Plan.  Such claims would only recover outside of Title III to the extent the Commonwealth decides specifically to appropriate funds to satisfy such claims, and the claimholders have no right to compel payment.  Thus, they are not "claims" having rights to payment for purposes of Bankruptcy Code section 101(5), made applicable by PROMESA section 301(a).  Additionally, to the extent appropriations claims rely on statutes providing for

the appropriations, such statutes are subject to repeal by future legislatures and/or, in any event, are preempted by PROMESA's placing appropriations under the control of the Oversight Board. Accordingly it is not unfair discrimination for such creditors to receive no distributions in contrast to other unsecured claimholders.

181.   Section 510(b) Subordinated Claims.[34]   Class 64 (Section 510(b) Subordinated Claims), which will not receive any recovery pursuant to the Plan, constitutes claims subordinate to general unsecured claims, and thus there are no classes with equal priority in the Plan, so there can be no unfair discrimination with respect to that Class.

**(ii)   The Plan does not unfairly discriminate against Classes of Claims that voted to reject the ERS Plan**

182.   ERS General Unsecured Claims (Class 66).   The Plan's treatment of unsecured claims against ERS is proper; as there are no other classes of unsecured claims at ERS, there can be no unfair discrimination with respect to that Class.   Further, ERS General Unsecured Claims are projected to be paid in full.

**(iii)   The Plan does not unfairly discriminate against Classes of Claims that voted to reject the PBA Plan**

183.   PBA/DRA Claims.   Class 12 (PBA/DRA Secured Claims) and Class 14 (PBA/DRA Unsecured Claims) have equal priority to Class 13 (PBA General Unsecured Claims), and are receiving equal treatment with the other non-bondholder Classes at PBA—a ten percent recovery.   The claims in Class 12 are denominated as secured as they are purportedly secured by the proceeds of certain Commonwealth real property if and when such property is sold.   The distribution to such class under the Plan is appropriate as the claims in that Class are in fact unsecured, as summarized below (*infra* ¶¶ 186–187) and set forth more fully in the

97

*Complaint of Puerto Rico Public Buildings Authority Pursuant to Bankruptcy Code Sections 544, 551, and 552 for Avoi*nce *and Preservation of Security Interests Asserted by GDB Debt Recovery Authority* [Case No. 19-bk-5233, Adv. Proc. No. 21-00100, ECF No. 1] (the "PBA/DRA Avoidance Complaint").  Accordingly, neither Class 12 nor Class 14 are being unfairly discriminated against.  Alternatively, if the Court finds that the claims in Class 12 are in fact secured, then there would be no Classes at PBA with a similar priority, making unfair discrimination impossible.

184.   PBA General Unsecured Claims.   Class 13 (PBA General Unsecured Claims) have equal priority with and receive equal treatment as the other unsecured non-bondholder Classes of Claims at PBA (Class 12 and Class 14) a ten percent distribution on their Allowed Claims.  Accordingly, there is no unfair discrimination.

**b.     The Plan Is Fair and Equitable with Respect to the Rejecting Classes and Complies with the Requirements of 11 U.S.C. § 1129(b)(2)(B)**

185.   Section 1129(b)(2)(B) of the Bankruptcy Code—the codification of the absolute priority rule—provides for a plan to be fair and equitable with respect to unsecured claimholders, such creditors may receive less than the value of their claims as of the effective date of a plan only if no class of junior claims or interests receives any distribution on account of the claims therein.  11 U.S.C. § 1129(b)(2)(B).  The Plan is fair and equitable with respect to each rejecting Class, and accordingly satisfies section 1129(b)(2)(B) of the Bankruptcy Code.

186.   Class 12 (PBA/DRA Unsecured Claims), Class 13 (PBA Unsecured Claims), and Class 14 (PBA/DRA Unsecured Claims).   Although Class 12 is titled "PBA/DRA Secured Claims," such claims are in fact unsecured.  The PBA/DRA Secured Claims are based on a loan

---

[34] The analysis for Class 64 Claims is the same at each Debtor.

made to PBA by the GDB, which is now held by the DRA (the "PBA/DRA Loan Agreement"),[35]

and purportedly secured by an interest in the proceeds of the sale of two government buildings

(the "Real Estate") if and when such property is sold.  *See* Claim No. 174309 at 3.  However, as

set forth in the PBA/DRA Avoidance Complaint, the DRA's purported security interest is

unperfected rendering them unsecured claimholders of PBA.  Further, even if there were a

security interest, section 552(a) of the Bankruptcy Code prevents any such security interest from

attaching to sale proceeds where there is no sale or contract for sale as of the PBA Petition Date.

187.    As set forth more fully in the PBA/DRA Avoidance Complaint, the Oversight

Board was able to identify only a security agreement and the filing of a UCC-1 in 2006, which

filing would have lapsed no later than 2016.  Even if not lapsed, perfection of a security interest

in real property requires the proper execution and filing of a real estate mortgage, and no such

mortgage was filed.  Furthermore, the UCC-1 does not properly describe the alleged security

interest in personal property proceeds of real estate.  Accordingly, the PBA/DRA Secured

Claims are unsecured and have the same priority as the PBA/DRA Unsecured Claims and the

PBA General Unsecured Claims.  As all three Classes are receiving the same treatment pursuant

to the Plan—a ten percent distribution on their Allowed Claims—and no classes of junior Claims

will receive distributions under the Plan and no class of senior Claims will receive more than

100% on account of such Claims, the Plan is fair and equitable with respect to Class 12, Class

13, and Class 14.

188.    To the extent the Court determines holders of Claims in Class 12 hold secured

Claims, the Plan will be modified to provide that such Claims are satisfied by the retention of

---

[35] A copy of the PBA/DRA Loan Agreement can be found as Exhibit 1 to the PBA/DRA
Avoidance Complaint.

their lien on the applicable governmental properties and will be satisfied upon any future sale of such properties to the extent of the net proceeds of any such sale. *See* Jaresko Decl. ¶ 89.

189. <u>ERS General Unsecured Claims (Class 66)</u>. The Plan's treatment of unsecured claims against ERS is proper, because no class of junior Claims will receive distributions under the Plan, and no class of senior Claims will receive more than 100% on account of such Claims. In fact, ERS General Unsecured Claims are projected to receive 100% of amount of their Claims.

190. <u>Commonwealth Unsecured Claims</u>. The Plan's treatment of unsecured claims against the Commonwealth is proper, because no class of junior Claims will receive distributions under the Plan, and no class of senior Claims will receive more than 100% on account of such Claims.

191. <u>Claims Receiving No Distributions</u>. Class 63 (CW Appropriations Claims) Claims are not entitled to receive distributions unless the Commonwealth specifically appropriates revenues for them, so they are, at best, junior to all unsecured claimholders, and realistically, they are not claims at all because they have no right to payment under Bankruptcy Code section 101(5). Their payment is completely discretionary. Additionally Class 64 (Section 510(b) Subordinated Claims) Claims are subordinated, so they are not entitled to receive any distributions in any circumstances. There is no class junior to Class 64; therefore, there is no junior class receiving any distribution. Accordingly, the Plan is fair and equitable with respect to Class 64 Claims.

**B. <u>PROMESA § 314(b)(2): The Plan Fully Complies with Title III of PROMESA</u>**

192. There is little to no legislative history on section 314(b)(2) of PROMESA. As its language mirrors that of section 314(b)(1) of PROMESA, which in turn is modeled on section 1129(a)(1) of the Bankruptcy Code, the Oversight Board submits it is instructive. *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (where "Congress adopts a new law incorporating

sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

193.    As set forth herein, the Plan complies fully with the requirements of sections 314(b)(1)–(7) of PROMESA, as well as other applicable provisions of the Bankruptcy Code. Accordingly, the Plan complies with PROMESA section 314(b)(2).

### C. PROMESA § 314(b)(3):  The Debtors are Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan

194.    PROMESA § 314(b) provides, in relevant part, that a court "shall" confirm a plan if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." *Id.* § 314(b)(3).

195.    The legislative history of PROMESA does not provide any guidance on PROMESA § 314(b)(3).  Chapter 9 of the Bankruptcy Code contains an identical provision to PROMESA § 314(b)(3)—Bankruptcy Code § 943(b)(4).  *See* 11 U.S.C. § 943(b)(4) ("The court shall confirm a plan if . . . the debtor is not prohibited by law from taking any action necessary to carry out the plan.").  There are very few opinions that analyze the parameters of Bankruptcy Code § 943(b)(4).  In *In re Sanitary & Improvement Dist. No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989), the debtor proposed a plan of adjustment that issued new notes to the debtor's bondholder at a discounted rate.  *Id.* at 972.  There, completely ignoring the preemption necessary to render all bankruptcy laws effective, certain bondholders objected to confirmation, arguing Bankruptcy Code § 943(b)(4) was not satisfied because state law required bonds to be paid in full and the new notes did not pay them in full on their prepetition claims.  *Id.* at 973.  The court held the debtor could impair the bond claims and alter the principal amount, interest rate, and term of the bonds notwithstanding the existence of state law requiring payment in full.  *Id.* at 974–75.  As the court explained:

101

> If a municipality were required to pay prepetition bondholders the full
> amount of their claim with interest as contained on the face of the bonds
> and the [municipality] had no ability to impair the bondholder claims over
> objection, the whole purpose and structure of Chapter 9 would be of little
> value …. To create a federal statute [chapter 9 of the Bankruptcy Code]
> based upon the theory that federal intervention was necessary to permit
> adjustment of a municipality's debts and then to prohibit the municipality
> from adjusting such debts is not, in the point of view of this Court, a
> logical or necessary result.

*Id*. at 974.  However, the bonds issued under the chapter 9 plan had a call provision permitting

payment at less than the par amount of the new notes.  *Id*.  The court found this call provision

was "prohibited by state law and . . . prohibited by Section 943(b)(4) of the Bankruptcy Code."

*Id*. at 975.  The court reasoned the new bonds "must be issued in conformance with state law and

the terms of their redemption and payment must be in conformance with state law."  *Id*. at 974.

The court determined the ability to redeem the notes below par violated the state law requirement

that bondholders' must be paid in full.  The Oversight Board does not subscribe to the notion that

state law or territory law can limit the types of debt distributable under a Title III plan, but that is

not at issue here.

196.    Significantly, in the Title III context, the Tenth Amendment concerns that exist in

the chapter 9 context do not pose a similar barrier to any Plan proposed by the Oversight Board

or the transactions to be carried out thereunder.  Accordingly, while the "law" referred to in

section 943(b)(4) of the Bankruptcy Code generally refers to state law, under PROMESA, the

"law" which the Plan cannot violate includes PROMESA, and, where applicable, PROMESA's

preemption of otherwise contrary Commonwealth laws.  Here, the Plan contains no provisions

which would violate applicable law.  Like in *Sanitary & Improvement Dist. No.* 7 and *Detroit*,

here, the Plan impairs prepetition Claims.  But, consistent with *Sanitary & Improvement Dist.*

*No.* 7 and *Detroit*, the Debtors are not seeking to implement post-Effective Date actions which

would require violation of applicable law.  Further, any Commonwealth laws which otherwise require payments not provided for by the Plan are preempted.  *See infra* ¶¶ 271–301.

197.    Accordingly, the Plan satisfies PROMESA section 314(b)(3).

**D.   PROMESA § 314(b)(4):  The Plan Provides for Full Payment of All Allowed Priority Claims**

198.    Section 1129(a)(9) of the Bankruptcy Code requires persons holding claims entitled to priority treatment under section 507(a) of the Bankruptcy Code receive specified cash payments under a plan.  *See* 11 U.S.C. § 1129(a)(9).  While PROMESA does not incorporate Section 1129(a)(9), it does include an essentially identical requirement in section 314(b)(4), which provides that:

> The court shall confirm the plan if—except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in 507(a)(2) of title 11, United States Code, will receive on account of such claim cash equal to the allowed amount of such claim[.]

PROMESA § 314(b)(4).  The primary difference between the sections of PROMESA and the Bankruptcy Code is PROMESA's exclusion of Bankruptcy Code requirements to pay types of claims which do not exist in a title III case under PROMESA.  For example, Bankruptcy Code section 1129(a)(9)(A) provides unsecured claims allowed under section 502(f) of the Bankruptcy Code are required to be paid in full.  *See* 11 U.S.C. § 1129(a)(9)(A).  As Bankruptcy Code section 502(f) contemplates claims arising in an involuntary case, which cannot occur under PROMESA, the payment of the amount of such allowed claims in cash could not have been incorporated into PROMESA.

199.    In accordance with PROMESA section 314(b)(4), section 3.1 of the Plan provides that on the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each

holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.  Plan § 3.1.

### 1.  The Support Agreement Administrative Expenses in the Plan Should be Approved.

200.    As the Court knows from presiding over these Title III cases from their inceptions, there have been numerous and unforeseeable setbacks requiring renegotiations to account for the economic hits caused by hurricanes, earthquakes, and the COVID-19 pandemic. Thus, while creditors in each class who negotiated and paid for their professionals to document deals benefitting their entire classes are entitled to compensation based on the consistent jurisprudence cited below, these cases provide a special reason justifying such compensation. Namely, in these Title III cases, creditors (and the Debtors) learned that any negotiated deal might be delayed and might have to be revised due to circumstances outside anyone's control. Under these special circumstances, it would have been impracticable to expect creditors to undertake the effort and expense of negotiating and documenting complex transactions without

being compensated because no one could know whether and when any given settlement might be consummated.

201.     The Support Agreement Administrative Expenses included in sections 3.3–3.9 of the Plan should be approved as administrative expenses.   Here, the Support Agreement Administrative Expenses are classified as Administrative Expense Claims in the Plan because they are not payments on account of prepetition claims held by the Administrative Expense Parties.  *See* Plan §§ 3.3–3.9.  Instead, as described in the Plan and previously in the Disclosure Statement, the payment of the Support Agreement Administrative Expenses is being made to compensate the Administrative Expense Parties for the cost of the negotiation, confirmation, and consummation of the various support agreements and the Plan, and in consideration of (a) the negotiation, execution and delivery of the various support agreements and (b) the obligations and covenants contained therein, as applicable.  *See supra* ¶¶ 85, 108, 119, 124, 129.  Thus, the Support Agreement Administrative Expenses are being paid on account of the actual and necessary expenses in negotiating, and performing under, the various support agreements, which settles extremely complex issues and allows the Debtors to emerge from bankruptcy in an expedited fashion without squandering value in continued contentious litigation to the detriment of the Puerto Rico people and all claimholders as a whole..

202.     As a result, the Support Agreement Administrative Expenses are properly considered administrative expenses under section 503(b)(1)(A), which authorizes the payment of the "actual, necessary costs and expenses of preserving the estate[.]"  11 U.S.C. § 503(b)(1)(A). In each instance, the creditors receiving the payments negotiated and documented deals benefitting their whole class, yet paid all the fees on the creditors' side.

203.    Case law supports the payment of the Support Agreement Administrative Expenses.  In *In re CHC Grp. Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex. Mar. 3, 2017) [ECF No. 1794], Chief Judge Houser approved a plan that provided some members of class 5 with a Put Option Premium to compensate them for agreeing to backstop a rights offering under the plan.  Judge Houser held, in relevant part:

> The Put Option Premium payable to the Plan Sponsors is not a distribution on their Class 5 Claims, but is consideration for the Plan Sponsors' commitment to backstop the Rights Offering . . . [and] the Debtors' agreement to pay the Put Option Premium was necessary to obtain the Plan Sponsors' commitment to backstop the Rights Offering.  The Debtors wanted the assurance up front that the substantial funds they needed to demonstrate feasibility of the Plan were committed – irrespective of what might happen to the Debtors' business and operations between the filing of the Plan and its confirmation and consummation. The Debtors received this assurance in the form of the Backstop Agreement, and the cost of that assurance was the Put Option Premium.  Accordingly, the Court concludes that *the payment of the Put Option Premium to the Plan Sponsors does not constitute impermissible disparate treatment in violation of section 1123(a)(4) of the Bankruptcy Code, but is instead consideration paid in return for the Plan Sponsors' agreement to backstop the Rights Offering.*

*Id.* at *52–54 (emphasis added); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (no violation of section 1123(a)(4) when only certain second lien noteholders were permitted to participate in a backstop of a rights offering, and the court ruled that "[h]ere, all holders of allowed Second Lien Note claims are classified together, and receive the same treatment on account of their claims.  The Backstop Fee proposed to be paid to the Backstop Parties is not a distribution to the Second Lien Noteholders on account of their Second Lien Note claims.  Rather, the Backstop Fee is offered as consideration for the $225 million commitment made by the Backstop Parties, which will be paid only if the $225 million is funded.  There is no violation of the classification mandate of § 1123(a)(4)."); *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, No. 4:17-CV-01053, 2017 U.S. Dist. LEXIS 47231, at *15–16 (E.D. Mo. Mar. 30, 2017) ("The Ad Hoc Committee has not

presented any authority for the proposition that providing preferential opportunities to participate
in equity investments (with related backstop commitments) violates § 1123(a)(4).  The few cases
addressing this issue suggest that it does not . . . .  At this stage, the Court is not sufficiently
persuaded that the PPA and related agreements constituted treatment on account of class
members' claims or interests, rather than treatment on account [of] the class members' other
rights or contributions, including their commitments (and ability) to provide financing.").

204.    Other cases provide additional support for allowing payment of the Support
Agreement Administrative Expenses.  In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr.
D. Del. 2013), following months of negotiation, various holders of second and third lien debt
(the "Restructuring Support Parties") entered into a restructuring support agreement.  In it, the
Restructuring Support Parties pledged to support a plan that contemplated the debtors selling
substantially all of their assets, so long as the debtors could obtain a sufficiently high price.  The
debtors filed a plan based on the restructuring support agreement, which, among other things,
sought to pay the "legal and professional fees of the Restructuring Support Parties."  *Id.* at 300.
Other parties objected to this as a violation of section 1123(a)(4), as it gave certain members of
the classes of second and third lien debt "extra" compensation.

205.    The Bankruptcy Court for the District of Delaware held the payments were
permissible, holding the payments were permitted under section 503(b)(1)(A) as an actual,
necessary cost of the reorganization.  For various reasons, including that the Restructuring
Support Parties had also supported the debtors' debtor-in-possession financing requests and the
fees were also approved under the debtor-in-possession financing order entered in the case, the
court agreed with the debtors that in helping draw up the restructuring support agreement, the
Restructuring Support Parties "performed a central role in the formulation of the confirmable

107

Plan and to otherwise keep these proceedings moving forward." *Id.* at 301. As such, the court held that:

> Allowance of the fees and expenses under § 503(b) is supported by the record in these proceedings and by the Court's own observations that, in the absence of the laboriously negotiated resolution built into the RSA and the Plan, these cases would either have either dragged on (expensively) for many more months or devolved (much more expensively) into ferocious litigation between and among the Debtors and their stakeholders. Accordingly, the Court finds that the Debtors have carried their burden to demonstrate that payment of the professional fees and expenses of the Restructuring Support Parties is permissible pursuant to Bankruptcy Code § 503(b).

*Id.* As a result, the court held that the plan did not violate section 1123(a)(4). This was because the Restructuring Support Parties were getting the same treatment under the plan as all other members of the same class. While recognizing the professional fee payments were a "substantial sum," the court held the payments did not represent an "enhanced distribution," but rather, separate payments justified by section 503 (and by the previously entered DIP order).

206.    The parallels between *In re Indianapolis Downs* and the facts here are substantial. As such, the Support Agreement Administrative Expenses should be properly seen as a permissible payment under section 503 that is *not* on account of the creditors' prepetition claims, and therefore permissible under section 1123(a)(4).

207.    Other cases also support the legitimacy of the Support Agreement Administrative Expenses. For example, in *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C. 1992), the plan classified a variety of partners of a law firm together and gave them all the same distribution. The plan also provided that certain partners who agreed to contribute funds to the plan to release certain other parties would receive the benefit of a permanent injunction of claims against them. This was challenged as a violation of section

1123(a)(4), on the grounds some partners would end up benefitting from the permanent injunction, while others in the same class would not.

208.    The court held this was not a violation of section 1123(a)(4) because "[t]he plan's provisions dealing with partner contributions, releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class.  These provisions constitute a separate feature of the plan, designed to allow adequate funding of the plan."  *Id.*  "This policy is applied to every partner without regard to his status as a claim or interest holder.  As such, it does not constitute treatment of a claim of a particular class for purposes of § 1123(a)(4)."  *Id.*

209.    Similarly, here, the Support Agreement Administrative Expenses do not constitute treatment on account of the Administrative Expense Parties' prepetition claims and, therefore, their payment does not violate Bankruptcy Code section 1123(a)(4).  Each category of Support Agreement Administrative Expenses Fees is described below.

210.    <u>GO/PBA PSA Fees</u>.  The Plan provides for the payment of the following fees and costs incurred in connection with the GO/PBA PSA:

- ***GO/PBA Consummation Costs.***    Creditors party to the GO/PBA Plan Support Agreement at its execution are entitled to a *pro rata* share of cash in an amount equal to 1.50% of the aggregate amount of such holders' or insurers' PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication).  Plan § 3.3.

- ***GO/PBA Restriction Fee.***  GO/PBA PSA Creditors will receive a GO/PBA Restriction Fee in an aggregate amount equal to the product of (a) 1.321% times (b) the outstanding principal amount of GO Bonds and PBA Bonds held by such creditors, plus interest accrued thereon during the period up to, but not including, the Commonwealth Petition Date and the PBA Petition Date, respectively.  Plan § 3.5.

- ***Retail Support Fee.***  An aggregate amount of fifty million dollars ($50,000,000.00) in cash is made available to Retail Investors holding CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims.  The Retail Support Fee will be available to each class of Retail Investors who vote, as a class, to accept the Plan.  If a class of Retail Investors votes to reject the Plan, the share of the Retail Support Fee allocable to such class will be

reallocated pro rata to the classes of Retail Investors who voted to accept the Plan, and parties eligible to receive the GO/PBA Restriction Fee.  Plan § 3.6.

211.    The GO/PBA Consummation Costs are in consideration for the fees and expenses incurred by such holders or insurers in connection with the negotiation and execution of the GO/PBA PSA and the prosecution of the approval of the Disclosure Statement and confirmation of the Plan.  Zelin Decl. ¶ 80.  Additionally, the GO/PBA Restriction Fee is in consideration for executing the GO/PBA PSA and agreeing to tender and "lock-up" such party's bonds in accordance with the terms of the GO/PBA PSA.  *Id.*

212.    In considering the "net" cost of paying the GO/PBA Consummation Costs, it must be noted that the bondholders receiving such fees hold nearly $11.8 billion in outstanding PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims, respectively.   Thus, approximately 62.8% of the GO/PBA Consummation Costs would have been distributed to the holders of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims party to the GO/PBA PSA in the absence of the GO/PBA Consummation Costs.  Accordingly, the GO/PBA Consummation Costs provide for a "net" incremental payment of approximately 0.4% of the total PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims of the Creditors who are party to the GO/PBA PSA, for a total net amount of $65.8 million.

213.    In considering the "net" cost of paying the GO/PBA Restriction Fee, it must be noted that the bondholders receiving such fees hold nearly $17.7 billion in outstanding PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims, respectively.  Thus, approximately 94.6% of the GO/PBA Restriction Fee would have been distributed to the holders of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims party to the GO/PBA PSA in the absence of the GO/PBA Restriction Fee.  Accordingly, the GO/PBA Restriction Fee provide for a "net" incremental payment of approximately 0.1% of the total PBA Bond Claims,

CW Bond Claims, and CW Guarantee Bond Claims of the Creditors who are party to the GO/PBA PSA, for a total net amount of $12.7 million.

214.    As Retail Investors were not automatically made parties to the GO/PBA PSA, the Retail Support Fee set forth in the Plan was designed to provide Retail Investors with compensation akin  to the compensation received by the recipients of the GO/PBA Restriction Fee.  Retail Investors are able to receive a pro rata share of the GO/PBA Restriction Fee by timely tendering and exchanging their bonds for an equivalent bond classified under the Plan as eligible for the GO/PBA Restriction Fee.  For those that did not tender, they nonetheless remain eligible for the Retail Support Fee if their class votes to accept the Plan.

215.    "Toggle" provisions like the Retail Support Fee, which provide additional consideration to certain Classes if they vote to accept the Plan, are routinely permitted so long as the plan does not violate absolute priority or effectively deprive a class of its voting rights or objection rights.  There is no prohibition in the Code against a Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the Plan.  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 140 B.R. 347, 350 (S.D.N.Y.1992) (a plan which provided warrants to accepting classes but not to rejecting class was not unfairly discriminatory and could be confirmed).  "One justification for such disparate treatment is that, if the class accepts, the Plan proponent is saved the expense and uncertainty of a cramdown fight.  This is in keeping with the Bankruptcy Code's overall policy of fostering consensual plans of reorganization and does not violate the fair and equitable requirement of section 1129(b)."  *In re Zenith Elecs. Corp.*, 241 B.R. at 105; *see also In re Affordable Auto Repair, Inc.*, No. 6:19-bk-18367, 2020 WL 6991012 (Bankr. C.D. Cal. Sept. 2, 2020) ("[a]dditionally, it is in keeping with the Bankruptcy Code's overall policy of fostering consensual plans of reorganization and does not

violate the fair and equitable requirement of 11 U.S.C. § 1129(b). … [s]tated somewhat differently, there is a valid and legitimate business purpose for the disparate treatment.").

216.     In *In re Drexel Burnham Lambert Group, Inc.*, the plan classified three equity classes separately, but each was treated equally.  The toggle provision there provided that accepting classes would receive equity warrants, but rejecting classes would receive no distribution under the plan.  The court upheld this proposed treatment:

> the only class that is affected by its negative vote is the class itself and not any junior classes . . . we find no statutory provision that proscribes such discrimination.  Indeed, § 1129(a)(3) provides that the Court shall confirm a plan only if . . . the plan is proposed in good faith and not by any means forbidden by law.  We do not view the carrot and the stick, factually presented in this case, as forbidden by the Code or any law we know of.

*In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1992).

217.     Indeed, toggle provisions have become customary in chapter 11 plans and are consistent with the Bankruptcy Code's overall policy of fostering consensual plans of reorganization by avoiding prolonged cramdown fights.  *See In re MPM Silicones, LLC*, No. 14-22503, 2014 WL 4637175, at *3 (S.D.N.Y. Sept. 17, 2014) ("Such fish-or-cut-bait, death-trap, or toggle provisions have long been customary in Chapter 11 plans"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 275 (Bankr. S.D.N.Y. 2007) ("I see no valid Absolute Priority Rule objection to the so called 'deathtrap provision,' requiring equity holders to vote in favor of the Plan or forfeit their distributions under it . . . a 'carrot and stick'" [in] the Plan is wholly permissible).  Here, the Retail Support Fee provision is not structured in such a way as to deny a class the right to effectively vote, nor does it strip any party of their right to object.  Finally there is nothing punitive in providing a Retail Support Fee for Plan approval and thus there is no risk of violation of the absolute priority or best interests tests.  *Cf. In re MCorp Fin., Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex.) (refusing to confirm a plan with a death trap which discriminated

against the other two classes by depriving them of their right to vote and violated the absolute

priority rule), *appeal dismissed and remanded*, 139 B.R. 820 (S.D. Tex. 1992).

218.    ERS Stipulation Fees.  The Plan provides for the payment of the ERS Restriction

Fee, pursuant to which, each of the ERS bondholders party to the ERS Stipulation (or their

designee) will be entitled to receive, without setoff or deduction for taxes, their Pro Rata Share

(based upon such parties' Net Allowed ERS Bond Claims held as of April 2, 2021) of

$75,000,000.00.   Plan § 3.7.   This fee is in exchange for executing and delivering the ERS

Stipulation, and agreeing to all its terms and conditions, including to "lock-up" ERS Bonds in

accordance with the terms of the ERS Stipulation.  *See* Zelin Decl. ¶ 83.

219.    In considering the "net" cost of paying the ERS Restriction Fee, it must be noted

that the ERS Bondholders receiving such fee hold nearly $2.256 billion of the outstanding

$3.169 billion in outstanding ERS Bond claims.  Thus, approximately $53.4 million ($75 million

multiplied by $2.256 billion / $3.169 billion) of the ERS Restriction Fee (2.4% of their collective

$2.256 billion claim) would have been distributed to the ERS Bondholders party to the ERS

Stipulation in the absence of the ERS Restriction Fee provision.   Accordingly, the ERS

Restriction Fee provision provides for a "net" incremental payment of approximately $21.6

million.  This amount equates to approximately 0.7% of the total Allowed ERS Bond Claims of

the ERS Bondholders party to the ERS Stipulation.

220.    HTA/CCDA PSA Fees.  The Plan provides for the payment of the following fees

and costs incurred in connection with the HTA/CCDA PSA:

- ***CCDA Consummation Costs.*** Each HTA/CCDA PSA creditor, to the extent a holder or
  insurer of CCDA Bonds, will be entitled to receive an amount equal to 1.00% of such
  Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative
  expense claim, in an aggregate amount not greater than $15,000,000.00.  Plan § 3.8.

- ***CCDA Restriction Fee.***  Each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds will be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in cash in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims held or insured by such CCDA Restriction Fee Creditor as of the expiration of the HTA/CCDA PSA Restriction Fee Period.  Plan § 3.9.

221.    The CCDA Consummation Costs are provided to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA PSA and the Plan.  *See* Zelin Decl. ¶ 84.  Additionally, the CCDA Restriction Fee is provided to certain parties for agreeing to all the HTA/CCDA PSA terms and conditions, including the agreement to "lock-up" bonds in accordance with the terms of the HTA/CCDA PSA, subject to the entry of the Confirmation Order.  *See id.*  Every holder or insurer of CCDA Bonds is a party to the HTA/CCDA PSA, *see id.* ¶ 46; therefore, aggregate recoveries to such holders is unchanged by the payment of the CCDA Consummation Costs and CCDA Restriction Fee to such Parties.  *See id.* ¶ 84.

222.    <u>AFSCME Professional Fees</u>:  The Plan provides for the payments of the following fees and costs incurred in connection with the AFSCME PSA:[36]

- ***AFSCME Professional Fees***:  AFSCME shall be reimbursed its reasonable professional fees and expenses incurred in order to compensate AFSCME for the cost of negotiation, confirmation and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions.  Plan § 3.4.

223.    Additionally, to compensate AFSCME for its negotiation and implementation of the new CBA and issues relating to the retirement plans, the Commonwealth agreed to reimburse AFSCME's reasonable professional fees and expenses related thereto.  The reimbursement of such expenses is typical in large restructurings that involve the negotiations of union contracts like those resolved in the ASFCME PSA.

224.   In the alternative, the Debtors have the authority to use their property as they see fit, including to pay the Support Agreement Administrative Expenses to parties who significantly contributed to the Plan.   In general, under chapter 11 of the Bankruptcy Code, both sections 1129(a)(4) and 363(b) prohibit the payment of expenses such as the Support Agreement Administrative Expenses without prior court approval.   *See* 11 U.S.C. § 1129(a)(4) ("The court shall confirm a plan only if all of the following requirements are met . . . [a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, *has been approved by, or is subject to the approval of, the court as reasonable.*"); 11 U.S.C. § 363(b) (emphasis added) (The trustee, "*after notice and a hearing*, may use, sell, or lease, other than in the ordinary course of business, property of the estate").

225.   However, similar to chapter 9 of the Bankruptcy Code, PROMESA does not incorporate either of these provisions into Title III.   *See* PROMESA § 301(a); 11 U.S.C. § 901(a).   Accordingly, the Debtors can make these payments without seeking prior court approval.   Even though the Support Agreement Administrative Expenses could be paid by the Debtors at any time, the Debtors have structured the payments to coincide with the Effective Date of the Plan to guarantee that such payments are only made if and when the Plan has been consummated.

226.   As provided for by the Plan, the Support Agreement Administrative Expenses shall be paid in Cash on the Effective Date of the Plan.   All other Allowed Administrative

---

[36] The Plan contemplated payment of fees and costs to AMPR if the members of the AFT and AMPR ratified the tentative plan support agreements.   As such members rejected the proposed modifications, they are not entitled to payment of administrative expenses.

Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1 of the Plan. Thus, the requirements of PROMESA section 314(b)(4) are satisfied.

### E.   PROMESA § 314(b)(5):  The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals

227.    PROMESA § 314(b)(5) provides the court shall confirm a plan if, among other things, "any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval."  PROMESA § 314(b)(5) is plainly modelled upon Bankruptcy Code section 943(b)(6), which requires, in chapter 9 cases, that "any legislative, regulatory, or electoral approval necessary under applicable [nonbankruptcy] law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval."  *See, e.g.*, Congressional Research Service, *The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA; H.R. 5278, S. 2328)* at 17 (2016).  Here, there are no transactions contemplated pursuant to the Plan requiring any approvals, including the issuance of the New Plan Securities, which will be issued pursuant to the New GO Bonds Legislation and CVI Legislation.

228.    Notably, the New GO Bonds Legislation is not required here by PROMESA section 314(b)(5).  It is required by the GO/PBA PSA.  The Oversight Board does not believe any PROMESA Title III debtor needs territorial permission to distribute debt PROMESA requires.  In the main, a governmental debtor can only distribute cash and debt, with minor exceptions for tax credits and the like.  It would be contrary to the supremacy of federal law if local permission were necessary to carry out federal law by distributing debt under a Title III plan of adjustment.

116

229.    In Chapter 9 cases, most courts summarily find the debtor has complied with Bankruptcy Code section 943(b)(6).  In *In re Connector 2000 Association*, 447 B.R. 752 (Bankr. D.S.C. 2011), the debtor provided authorization to the Department of Transportation to take the actions necessary to implement the terms embodied in the chapter 9 plan, so the court determined that Bankruptcy Code section 943(b)(6) was satisfied.  *Id.* at 765.  Other cases contain a similarly brief analysis.  *See, e.g.*, *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 868–69 (section 943(b)(6) satisfied where the county assuming the debtor's pension debt under the chapter 9 plan passed the requisite ordinance authorizing such assumption); *In re City of Stockton*, 542 B.R. at 269 (section 943(b)(6) satisfied where residents of city voted in favor of sale tax increase necessary to fund chapter 9 plan, as required by state law).

230.    PROMESA section 314(b)(5) is different from Bankruptcy Code section 943(b)(6) in two respects.  The first difference is that section 943(b)(6) requires the debtor obtain approvals "necessary under applicable *nonbankruptcy* law." (emphasis added).  However, in PROMESA section 314(b)(5), Congress chose to delete the word "nonbankruptcy."  Thus, section 943(b)(6) might serve as a reverse preemption rendering certain nonbankruptcy law binding on bankruptcy law.  Conversely, section 314(b)(5) can only require a debtor to obtain "legislative, regulatory, or electoral approvals" under laws or regulations not otherwise preempted by PROMESA.  Non-preempted law includes PROMESA itself, and federal and Commonwealth law not inconsistent with and preempted by PROMESA.

231.    The second difference between the two provisions is PROMESA section 314(b)(5) includes "legislative" consent.  The legislative history of PROMESA does not provide any guidance on the scope or intent of this provision, or on the inclusion of legislative approvals. The likely reason for the addition is the Commonwealth, unlike many chapter 9 debtors (for

117

example, a sanitation district), has a governing legislative body.  *Cf. In re Connector 2000 Ass'n*, 447 B.R. at 765 (Bankruptcy Code "[s]ection 943(b)(6) requires regulatory or electoral approval for any action to be taken under the plan that would require such approval in the absence of the chapter 9 case.").

232.    Here, there are no federal, state, or local consents necessary to consummate and carry out the transactions pursuant to the Plan that have not been obtained.  Further, while the Debtors believe they do not need legislative approval to issue the New Plan Securities, in accordance with the settlements contained in the GO/PBA PSA, the Debtors intend to obtain such legislative approval on or prior to the Effective Date.  Accordingly, the Plan satisfies PROMESA section 314(b)(5).

### F.   PROMESA § 314(b)(6):  The Plan is in the Best Interests of Creditors and is Feasible

#### 1.   The Plan is in the Best Interests of Creditors of each of the Debtors.

233.    Section 943(b)(7) of the Bankruptcy Code requires a plan to be in the "best interests" of claimholders and interest holders.  11 U.S.C. § 943(b)(7).  The best interests of creditors test in chapter 9 under the Bankruptcy Code "simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives." *In re Sanitary & Improvement Dist.*, No. 7, 98 B.R. at 974.  If it is not at least as good, a plan under chapter 9 is not confirmable.

234.    A different test exists in Title III of PROMESA.  Section 314(b)(6) requires the Court to "consider" whether creditors may recover more under non-bankruptcy laws.  Section 314(b)(6) does not impose a litmus test as to whether a Title III plan of adjustment can be confirmed.  Specifically, section 314(b)(6) provides:

> The court shall confirm the plan if—the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies

under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan.

PROMESA § 314(b)(6).

235.    The Shah Declaration establishes the Plan is in the best interests of the creditors of each of the Debtors.  Specifically, the Shah Declaration explains that the analyses performed in the best interests test reports (the "Reports") for the Commonwealth, ERS, and PBA show that the creditors of each Debtor, in the aggregate, will receive a recovery on their claims under the Plan in the aggregate that is within the range or greater than the range of the projected recoveries for such claimholders in the aggregate in the Report for each of the Debtors.  A chart setting forth the comparison recoveries under the Plan and the aggregate recoveries (or range of aggregative recoveries) projected in the Reports is set forth below.

| Title III Debtor | Aggregate Plan Recoveries (% and $ billion) | Aggregate Recoveries in the Reports (% and $ billion) |
|---|---|---|
| Commonwealth[37] | 69% / $15.7 | 34%–62% / $9.3–15.3 |
| ERS | 14% / $0.4 | 5%–100% / $0.2-3.7 |
| PBA | 21% / $1.1 | 5% / $0.3 |

See Shah Decl. ¶ 35.  Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and be subject to significant litigation.  See id. ¶ 12.  Accordingly, the Plan is in the bests interests of the creditors of each of the Debtors.

236.    Collier suggests the chapter 9 "best interests" test acts as a floor requiring a reasonable effort at payment of creditors by the municipal debtor, and the "feasibility" requirement sets a corresponding ceiling which prevents the chapter 9 debtor from promising

---

[37] Excludes Federal Claims, which receive 100% recovery within the Plan and the Commonwealth Report, and any recovery PBA Bondholders receive from PBA.

more than it can deliver.  4 Collier on Bankruptcy ¶ 943.03[7] (16th ed. 2021); *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34.

237.    In *In re City of Detroit*, the court performed the best interests test by first analyzing what state law remedies would provide creditors if the case were dismissed.  Looking to state law, the court concluded the only remedy this provided creditors was "the right to take the judgment to the 'supervisor' or 'assessing officer' of the municipality, who then 'shall proceed to assess the amount [of the judgment] ... upon the taxable property' of the municipality, 'upon the then next tax roll.'"  524 B.R. at 213–14.  The court noted:

> The principal asset of a municipality is its taxing power and that, unlike an asset of a private corporation, can not be available for distribution.  An unsecured municipal security is therefore merely a draft on the good faith of a municipality in exercising its taxing power. . . . In effect, therefore, the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power.  The only remedy for the enforcement of such a claim is a mandamus to compel the levying of authorized taxes.

*Id.* at 214 (citing *Faitoute Iron & Steel, Co. v. City of Asbury Park*, 316 U.S. 502 (1942)).

238.    Second, the court analyzed what creditors would actually recover in the event of a dismissal.  The court reviewed the testimony of the city's experts, who testified that raising taxes would not raise any revenue.  *Id.* at 215.  The court agreed.  Accordingly:

> If the case were dismissed, therefore, unsecured creditors, including retiree creditors, would be limited to any additional property tax revenues that the City could levy in addition to the City's existing property tax collections for its general fund.

*Id.* at 214.  Accordingly, the right would be an "empty right to litigate" to require Detroit to raise taxes to pay the unsecured claimholders, which it wouldn't do, both because it would be unlikely to raise much (if any) additional revenue, and because Detroit was not legally allowed to raise tax rates.

239.    The *Detroit* court additionally noted "[t]here is no more money available for creditors in the City's already tight budget projections.   Every dollar is accounted for in providing necessary services, in implementing the necessary RRIs ("Reinvestment and Restructuring Initiatives"), and in meeting plan obligations." *Id.* at 219.  However, the court did not indicate this finding was essential to its determination the plan was in the best interests of the creditors.

240.    In computing creditors' recovery, the *Detroit* court examined the creditors' loss of other plan benefits in the event the case were dismissed.   *Id.* at 217.   If the plan were not confirmed, in addition to losing the benefits of the plan settlements, the court found the city would lose, among other things, the state contributions, contributions from the Detroit Institute of Art, and contributions from charitable foundations.  It would also have to finance the balance of its obligations under its swap settlement, lose funds it was going to use to refinance its post-petition loan, lose any potential enhancement to its credit rating, and, most importantly, lose the benefits of the RRIs.  *Id.*

241.    Additionally, the court made clear the creditors could access no other assets in the bankruptcy case.  City assets were off-limits.  The only remedy under state law was "a court-ordered property tax assessment process under Michigan's Revised Judicature Act."  *Id.* at 218. Accordingly, the value of the city's assets were irrelevant to the best interests test (similar reasoning would apply to the city's determinations about what spending was necessary, although the court in *Detroit* did not opine on this issue in either direction).  *Id.*

242.    The chapter 9 best interests test is applied to creditors collectively, not individually, consistent with the wording of PROMESA § 314(b)(6).  *In re City of Detroit* held that "[c]onfirmation may not be denied simply because some creditors may do better upon

dismissal . . . The Court finds that the plan is in the best interests of the creditors as a whole." 524 B.R. at 217; *see also In re City of Stockton*, 542 B.R. at 286 ("We conclude that the 'best interests' test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors."). This interpretation (that the test applies to creditors as a whole) is further corroborated by the plain language of section 314(b)(6) of PROMESA, which uses the plural "creditors" when discussing the best interests test. Accordingly, for the Plan to be in the best interests of creditors, the Court need consider whether creditors of each Debtor in the aggregate receive at least an equal percentage recovery on their claims pursuant the Plan than such creditors would receive if no plan of adjustment is confirmed, the Title III case of the relevant Debtor is dismissed, and the stay of debt enforcement is terminated. The statute's direction that the Court "consider" the best interest test shows it is not a litmus test and the Court can also consider the Commonwealth's needs for its people and sustainability. The Court can also consider that creditors in Title III are not granted allowable claims for postpetition interest. That is barred by Bankruptcy Code section 502(b)(2). Here, nearly five years have passed generating interest claims cognizable outside Title III, but not inside Title III.

243. Here, the dismissal of the Title III Cases will result in lower economic growth and worse financial recoveries for all creditors of the Commonwealth. As Congress found in enacting PROMESA, "[t]he current fiscal emergency has . . . affected the long-term economic stability of Puerto Rico by contributing to the accelerated outmigration of residents and businesses" and "the [automatic] stay"—which would be lifted if the Title III Cases are dismissed—"is essential to stabilize the region for the purposes of resolving this territorial crisis." PROMESA §§ 405(m)(3), (5). Courts have also acknowledged the instability that would

result from lifting the automatic stay and allowing creditors to pursue remedies under Commonwealth law. *See In re City of Detroit*, 524 B.R. at 216 ("the Court finds that chaos would ensue if the City's creditors engaged in the proverbial 'race to the courthouse' to obtain judgments against the City upon the dismissal of the chapter 9 case. Moreover, the state courts would be powerless to order the City's creditors to compromise their debts to ensure anything like an equitable or fair distribution. *Cf. Sanitary & Improvement Dist., No. 7*, 98 B.R. at 975–76.").

244.    If the Plan is not confirmed, the parties will likely lose the benefit of the various settlements (i) resolving the numerous disputes relating to GO, PBA, ERS, HTA, and PRIFA Bonds, and the retention of Allocable Revenues, (ii) resolving the treatment of the retiree claims and the claims of general unsecured creditors, and (iii) implementing the new collective bargaining agreement proposed to be entered into by AFSCME. Litigation with respect thereto will continue in an all-or-nothing fashion. Even if an individual creditor might do better if a Debtor's Title III Case were dismissed, in the aggregate, all creditors of each Debtor receive better treatment pursuant to the Plan than if the Plan is not confirmed and the Title III Cases are dismissed. The overwhelming acceptance of the Plan by the various classes indicates such creditors believe this Plan to be in their best interests.

### 2.   The Plan is Feasible for Each of the Debtors.

245.    Both PROMESA and chapter 9 contain the same language requiring the plan to be feasible. Therefore, the PROMESA feasibility inquiry should be the same as in chapter 9, *i.e.*, whether the plan offers a reasonable prospect of success and is workable.

246.    Given that creditors want the Debtors to pay them more, not less, it is unlikely creditors will be arguing the Plan is not feasible, because then the Plan may have to be modified to pay creditors less.

123

247.    The legislative history of the chapter 9 feasibility test is sparse.  The feasibility

test, the legislative history explains, requires the debtor to have a "reasonable prospect" that its

financial projections will perform under the plan as anticipated.

> The feasibility requirement means that there is a reasonable prospect that the
> petitioner will be able to perform under the plan.  That is, it must appear to the
> court, based on the petitioner's past and projected future tax revenues and
> expenses that it will have enough to make the payments required by the plan. . . .
> (W)here future tax revenues are the only source to which creditors can look for
> payment of their claims, considered estimates of those revenues constitute the
> only available basis for appraising the respective interests of different classes of
> creditors.  In order that a court may determine the fairness of the total amount of
> cash or securities offered to creditors by the plan, the court must have before it
> data which will permit a reasonable, and hence an informed, estimate of the
> probable future revenues available for the satisfaction of creditors. . . .
> Appropriate facts which might have been considered . . . are the revenues which
> have in the past been received from each source of taxation, the present assessed
> value of property subject to each tax, the tax rates currently prescribed, the
> probate effect on future revenues of a revision in the tax structure adopted in
> 1941, the extent of past tax delinquencies, and any general economic conditions
> of the District which may reasonably be expected to affect the percentage of
> future delinquencies . . . .

H.R. Rep. 94-686, 32–33 (1975), *as reprinted in* 1976 U.S.C.C.A.N. 539, 570–71.

248.    Further, a feasible plan need not be in balance on the confirmation date of the

plan, but instead, "within a reasonable period of time after confirmation of the plan."  *In re*

*Mount Carbon Metro. Dist.*, 242 B.R. at 34 n.46.  A colloquy on the floor of the House of

Representatives referred favorably to *Kelley v. Everglades Drainage District*, 319 U.S. 415

(1943), and stated the feasibility requirement as found in *Kelley* is a "require[ment] that a

reasoned estimate be made of current and projected future revenues and expenses in order that

the court be able to evaluate the likelihood of performance and the availability of funds to meet

the petitioner's obligations under the plan."  121 Cong. Rec. H39413 (daily ed. Dec. 9, 1975)

(remarks of Reps. Kindness and Edwards), reprinted in Norton Bankruptcy Law and Practice 2d

at 915 (1998–99).

249.     "[A] plan of adjustment is feasible under section 943(b)(7) if it offers 'a reasonable prospect of success and is workable.'"  *In re Mount Carbon Metro. Dist.*, Feb. 23, 2010 Hr'g Trans. at 3:19–21 (Bankr. D. Colo. 1999).  A bankruptcy court must, in the course of determining feasibility of a chapter 9 plan, evaluate whether it is probable that a debtor can both pay postpetition debt and provide future public services at the level necessary to its viability as a municipality.  *Id.*

250.     The court has an independent duty to determine if the plan is feasible.  *See In re Mount Carbon Metro. Dist.*, 242 B.R. at 36 ("Not only is feasibility an express requirement set out in § 943(b)(7), but the long history of Chapter 9 requires an objective evaluation of the [chapter 9 debtor's] proposed reorganization.") (citing *Kelley*, 319 U.S. at 418–19).  *In re City of Detroit*, 524 B.R. at 219.  A plan is feasible if the following question can be answered in the affirmative:

> Is it likely that the [Debtor], after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of [the Debtor] and to meet the obligations contemplated in the Plan without the significant probability of a default?

*Id.* at 222; *see also In re Mount Carbon Metro Dist.*, 242 B.R. at 35.

251.     Here, the Plan is feasible for each of the Debtors.

### a.     The Plan is Feasible for the Commonwealth

#### (i)     The financial obligations imposed by the Plan are not inconsistent with the debt sustainability analyses in the certified Fiscal Plans for the Debtors and the Debtors' other financial obligations.

252.     The Debt Sustainability Analysis ("DSA") contained in the Fiscal Plan provides a framework for evaluating how much debt service the Commonwealth can reasonably support on an annual basis.  The DSA does not set a bright line test, a hard cap, or a specific amount of debt

that the Commonwealth may incur.  Rather, it provides ranges based on different metrics.  *See* Malhotra Decl. ¶ 56.

253.    The DSA reviews five different metrics including (i) debt service to own-source revenues, (ii) fixed costs to own-source revenues, (iii) debt per capita, (iv) debt to GDB, and (v) debt to state or territory person income.  The DSA then utilizes the Fiscal Plan's long-term macroeconomic forecast to determine a range of illustrative implied debt capacity based on the following benchmarks: (1) debt and fixed cost metrics of the average U.S. state; (2) the debt and fixed cost metrics of the ten highest-indebted U.S. states; the debt and fixed cost metrics of the 25 highest-indebted U.S. states; and the debt and fixed cost metrics of the 25 lowest-indebted U.S. states.  *See* Malhotra Decl. ¶¶ 56–59.

254.    On the basis of these various metrics, the DSA calculates ranges for the Commonwealth's implied debt capacity (maximum principal outstanding) based on a 25-year term and certain assumptions about interest rates and cash flow available for debt service payment.  Exhibit 35 of the 2021 Fiscal Plan shows the implied debt capacity under different illustrative interest rate and available cash flow scenarios, ranging up to implied capacity of $10,148 million assuming 5% interest rate and $800 million of cash flow available for payment with 90% of such cash flow actually utilized for payment.  The total debt service provided for by the Plan is within the implied debt capacity.  *See* Malhotra Decl. ¶ 61; Murray Expert Report ¶ 72.

255.    The cash payments on the effective date and CVIs are not contemplated by the DSA because they are not fixed debt and the CVI's are serviced only out of revenues exceeding projections.  CVI payments are contingent in nature and are, by definition, incremental to the

Fiscal Plans' projections.  *See* Malhotra Decl. ¶ 60.  Accordingly, the debt service contemplated

under the Plan is consistent with the DSA incorporated into the Fiscal Plan.

256.    Additionally, the estimated financial impacts of the proposed changes to pension

results in savings of over $9 billion through fiscal year 2051.  *See* Levy Decl. ¶ 54.  To provide

for pensions, the Plan establishes a Pension Reserve Trust, and provides that the Pension Reserve

Trust will be funded through annual contributions of $175 million, plus additional amounts as

calculated pursuant to section 1.116 of the Plan, from FY 2023 through FY 2030.  The Plan also

requires the Pension Reserve Trust be "managed by an independent entity whose members shall

meet the independence, professionalism, experience and qualification standards set forth in the

Pension Reserve Deed of Trust . . . ."  Plan § 83.2.  By contributing substantial sums to the

Pension Reserve Trust while the Commonwealth is experiencing surpluses, the Plan ensures that

funds will be available for the payment of existing retiree benefits even if deficits reemerge.  The

Pension Reserve Trust therefore reduces the likelihood the Commonwealth will need to either

borrow additional funds to meet its pension obligations, or be forced to cut pensions, in the event

the currently projected deficits materialize.  Further, by requiring the Pension Reserve Trust to be

independently and professionally managed, the Plan insulates and protects the funding available

to pay retiree pensions, regardless of the political or economic environment.  *See* Malhotra Decl.

¶ 34.

#### (ii)    The Plan is not likely to be followed by the need for further financial reorganization.

257.    Confirmation of the Plan is not likely to be followed by the need for further

financial reorganization.  That is true notwithstanding the fact that, based on the Fiscal Plan

projections, deficits after debt service are expected to reemerge in approximately FY 2035.  As

set forth in the Malhotra Declaration, this conclusion is based on a number of factors: (i) by the

time deficits are projected to emerge, the amount of Commonwealth general obligation debt outstanding will only be $2.1 billion, as compared to prepetition debt liabilities of $30.5 billion. the Plan reduces the Commonwealth's overall debt; (ii) the Plan includes multiple provisions designed to insulate the Commonwealth from downside risks; (iii) based on the Wolfe Expert Report, to avoid default, the Commonwealth can implement certain reforms the Oversight Board identified that could result in additional liquidity, which could eliminate the projected deficit; and (iv) the Plan—and the financial projections incorporated into the Fiscal Plan—do not take into account potential upside factors which, if they materialize, would result in additional liquidity. *See* Malhotra Decl. ¶ 29.

258.   As set forth in the Wolfe Expert Report, there are a number of structural reforms the Commonwealth could undertake which, if implemented, would substantially improve the Commonwealth's growth, creating a sustainable level of financial resources and improving the Commonwealth's cash flows such that it is capable of meeting the debt service and other payments contemplated by the Plan.

259.   Specifically, there are at least three areas of potential structural reforms that would significantly improve the Commonwealth's financial health: (i) reforms to labor markets; (ii) ease of doing business reforms; and (iii) taxation reforms. Wolfe Expert Report ¶ 11. Within these three areas, the proposed reforms are divided into three categories. *Id.* ¶ 15. Category 1 reforms are reforms that were recommended by the Oversight Board in the 2021 Commonwealth Fiscal Plan, that have been evaluated as to their impact on financial growth, and whose impact are incorporated into the Fiscal Plan's projections. *Id.* Category 2 reforms were recommended by the Oversight Board in the Fiscal Plan as additional structural measures that should be adopted by the Commonwealth, but whose impact has not been incorporated into the Fiscal

Plan's projections.  *Id*.  Category 3 reforms are reforms that were not discussed in the Fiscal

Plan, but which, in Mr. Wolfe's opinion, can and should be adopted by the Commonwealth in

order to further stimulate growth.  *Id*.

260.    If the areas of Category 2 and 3 reforms are adopted by the Commonwealth, the

Commonwealth will build cumulative surpluses of approximately $30 billion over the period of

FY 2022–FY 2046.  *Id.* ¶ 27.  Implementation of the Category 2 and 3 reforms described in Dr.

Wolfe's report would not only reverse the Commonwealth's projected deficits, but would

provide sufficient cumulative surpluses to enable the Commonwealth to pay the debt service

contemplated by the Plan.  *See* Malhotra Decl. ¶ 43.

> **(iii)    The Commonwealth will have sufficient working
> capital  balances  and  emergency  reserves
> following confirmation of the Plan.**

261.    The  Fiscal  Plan  includes  the  provision  of  minimum  cash  needs  for  the

Commonwealth, which is the amount of unrestricted cash the Oversight Board recommends be

maintained by the Commonwealth to ensure the operation of the central government and certain

public corporations following the Effective Date of the Plan.  *See* Chepenik Decl. ¶ 15.  This

recommended amount includes a core minimum unrestricted general cash balance of between

$1.2 billion to $1.7 billion.  *See id.* ¶ 28.  The Fiscal Plan also provides for (i) a disaster aid

revolving fund of $750 million, *see id.* ¶ 31, and (ii) an emergency reserve fund of $1.3 billion to

quickly respond to natural disasters.  *See id.* ¶ 38.  These amounts were determined after a

thorough analysis of the core minimum cash needs for the Commonwealth.  *See id.* ¶¶ 15–42.

262.    Accordingly, the Plan is feasible with respect to the Commonwealth and is not

likely to result in the need for a further restructuring of the Commonwealth.

### b.      The Plan is Feasible for ERS

263.     The Plan is feasible with respect to ERS, as ERS no longer has pension obligations, which obligations were assumed by the Commonwealth following the enactment of the PayGo Legislation.  Under the Plan, in addition to paying the ERS Restriction Fee of $75 million, ERS must make distributions to the holders of Allowed ERS Bond Claims in an amount of $373 million, as well as payments to holders of Allowed ERS General Unsecured Claims in a *de minimis* amount.  ERS has over $1 billion in current assets, and accordingly will be able to make the distributions required under the Plan.  *See* Jaresko Decl. ¶¶ 98–99.

264.     Additionally, ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed ERS Bond Claims.  ERS will dissolve after the Effective Date of the Plan and that all remaining assets of ERS shall be transferred to the Commonwealth.  ERS will therefore have no material obligations after the Effective Date.  Accordingly, the Plan is feasible with respect to ERS and is not likely to result in the need for a further restructuring of ERS.

### c.      The Plan is Feasible for PBA

265.     PBA will reject all leases and subleases of PBA's properties to departments, agencies, instrumentalities, authorities, public corporations, and municipalities of the Commonwealth.  Accordingly, following such rejection, PBA will have no ongoing obligations to creditors or other stakeholders.  *See* Jaresko Decl. ¶ 100.  Furthermore, PBA holds sufficient cash to pay its obligations to all of its creditors under the Plan.  *See id*.  Accordingly, the Plan is feasible with respect to PBA and is not likely to result in the need for a further restructuring of PBA.

266.    Based upon the foregoing, the Plan satisfies the best interests test and feasibility

test, and the requirements of section 314(b)(6) of PROMESA, for each of the Debtors.

**G.  PROMESA § 314(b)(7):  The Plan is Consistent with the Fiscal Plan for the Debtors.**

267.    PROMESA section 314(b)(7) requires that the Plan be consistent with the Fiscal

Plan certified by the Oversight Board.  The Debtors believe the Plan is consistent with the Fiscal

Plan, and the Oversight Board has certified the Plan is indeed consistent with the Fiscal Plan

pursuant to PROMESA section 104(j).  At a hearing held on October, 6, 2021, the Court ruled

PROMESA section 106(e) does not preclude the Court from making its own ruling on section

314(b)(7) after considering evidence other than the Oversight Board's certification under section

104(j).  *See* [ECF No. 18408 at 2].

268.    On April 23, 2021, the Oversight Board certified the Fiscal Plan.  The Fiscal Plan

factored in the economic and fiscal impact of the COVID-19 pandemic as well as substantial

federal and local stimulus, the slower than expected disaster relief funding spending, and the

updated estimates of the potential impact of structural reforms.  *See* Skeel Decl. ¶ 49.

269.    On July 30, 2021, the Oversight Board certified the Plan.  *See id.* ¶ 50.

270.    In addition to the Oversight Board's certification of the Plan, the Murray Expert

Report demonstrates the Plan is consistent with the Fiscal Plan for the Debtors in two key

respects.  The Murray Expert Report specifically finds that "the Plan and the [Fiscal Plan] are

consistent because (1) [i]mplementation of the Plan will leave the Debtors will sufficient cash,

consistent with the up-front cash needs anticipated as part of the [Fiscal Plan]; and

(2) [i]mplemenation of the Plan will result in a level of future non-contingent debt service that is

consistent with sustainable debt levels as set forth in the [Fiscal Plan]."  Murray Expert Report

at 6.  Accordingly, the Plan is consistent with the Fiscal Plan for the Debtors.

## COMMONWEALTH LAWS INCONSISTENT WITH PROMESA ARE PREEMPTED.

271.    Provisions of the Commonwealth Constitution, statutes, executive orders, rules
regulations, and policies ("Commonwealth Laws") inconsistent with PROMESA—specifically,
with the Oversight Board's powers and authority under Titles II and III—are preempted.  A non-
exclusive list of such preempted statutes is annexed as Exhibit K to the Plan.

272.    Under the United States Constitution's Supremacy Clause, federal law "shall be
the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the
Contrary notwithstanding."   U.S. Const. art. VI, cl. 2.   A state law that runs afoul of the
Supremacy Clause is thus "a nullity" and is preempted.  *Mass Ass'n of Health Maint. Orgs v.
Ruthhardt*, 194 F.3d 176, 178 (1st Cir. 1999).[38]

273.    Preemption can be express (through a preemption provision) or implied (where
state law makes impossible or poses an obstacle to compliance with federal law).  *Arizona v.
United States*, 567 U.S. 387, 399–400 (2012).  Both forms of preemption apply here.

274.    Specifically, PROMESA's express preemption provision, section 4, is broad and
unequivocal: "The provisions of this Act *shall prevail* over any general or specific provisions of
territory law, State law, or regulation that is inconsistent with this Act."   PROMESA § 4
(emphasis added).

275.    Regarding implied preemption, there are two types:   (i) "impossibility
preemption" occurs when "compliance with both federal and state [law] is a physical
impossibility"; and (ii) "obstacle preemption" occurs when state law (here the appropriation
provisions) poses an "obstacle to the accomplishment and execution of the full purposes and

---

[38] The laws of Puerto Rico are the "functional equivalent" of state laws for preemption purposes.
*Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 323 (1st Cir. 2012).

objectives of Congress." *Arizona*, 567 U.S. at 399 (discussing impossibility preemption);[39]

*Freightliner Corp. v. Myric*k, 514 U.S. 280, 287 (1995) (discussing obstacle preemption); *see

also Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (same).[40]   In assessing obstacle

preemption, the Court's "ultimate task . . . is to determine whether state regulation is consistent

with the structure and purpose of the [federal] statute as a whole," "[l]ooking to the provisions of

the whole law, and to its object and policy."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S.

88, 98, 103 (1992) (citation omitted).

276.    PROMESA's preemption of inconsistent Commonwealth Laws is settled.  *See,

e.g.*, *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd.

for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019) ("Under PROMESA's preemption provision, the

grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail

over *any* general or specific provisions of territory law' . . . .") (emphasis added) (citation

omitted); *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &

Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A] budget approved and adopted

by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and

inconsistent Commonwealth laws are preempted."), *aff'd*, 945 F.3d 3 (1st Cir. 2019).

---

[39] *See also AT&T Mobility v. Concepcion*, 563 U.S. 333, 343, 352 (2011) (holding state rule
preempted by the Federal Arbitration Act because the rule stood "as an obstacle to the
accomplishment of the FAA's objectives"); *Gustavsen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241,
246 (D. Mass. 2017) (when "'it is impossible . . . to comply with both state and federal
requirements[,]' . . . the state law is preempted." (quoting *Pliva v. Mensing*, 564 U.S. 604, 618
(2011)).

[40] For this reason, statutes purporting to create obligations that frustrate or interfere with federal
bankruptcy law are preempted.  *See, e.g.*, *Perez v. Campbell*, 402 U.S. 637, 654 (1971) (state law
conditioning driver's license renewal on bankrupt paying discharged automobile tort judgment
was preempted because it had the "effect of frustrating federal [bankruptcy] law"); *Int'l Shoe Co.
v. Pinkus*, 278 U.S. 261, 265 (1929) ("States may not pass or enforce laws to interfere with or
complement the Bankruptcy Act or to provide additional or auxiliary regulations.").

277.    In addition to the express preemptive effect of PROMESA sections 201 and 202,

PROMESA section 207 likewise expressly preempts inconsistent Commonwealth Laws.   It

prohibits the creation of, modification of, redemption of, or similar transactions affecting

Commonwealth debt without Oversight Board consent (as required under PROMESA such as

PROMESA sections 201–204 and 207).

278.    Additionally, Title III of PROMESA expressly preempts any Commonwealth

Law that would require payment in full of prepetition debt without regard to whether such an

entitlement is provided in Title III or the Plan.[41]   Such Commonwealth Laws would contradict

Title III's provision of a broad discharge pursuant to a confirmed Plan.[42]

---

[41] *See Cty. of Orange v. Merrill Lynch & Co. (In re Cty. of Orange)*, 191 B.R. 1005, 1021
(Bankr. C.D. Cal. 1996) ruling that Chapter 9 does not permit states to override the Bankruptcy
Code's priority scheme through state laws that require certain creditors—such as bondholders—
to be paid in full*); In re City of Detroit*, 504 B.R. 97, 161 (Bankr. E.D. Mich. 2013) ("state law
cannot reorder the distributional priorities of the bankruptcy code."); *In re Sanitary & Imp. Dist.,
No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay
prepetition bondholders the full amount of their claim with interest as contained on the face of
the bonds … the whole purpose and structure of Chapter 9 would be of little value.  State law
already requires full payment of the bonds issued prepetition and the state and the municipality
are forbidden the opportunity to compromise the amounts due, without 100 percent consent of
the bondholders.  To create a federal statute based upon the theory that federal intervention was
necessary to permit adjustment of a municipality's debts and then to prohibit the municipality
from adjusting such debts is not, in the point of view of this Court, a logical or necessary
result.").

[42] 11 U.S.C. § 944 ("The provisions of a confirmed plan bind the debtor and any creditor
… [T]he debtor is discharged from all debts as of the time when the plan is confirmed …").
Upon the effective date of the Plan, claims predicated on breaches of prepetition promises, are
discharged to the extent not otherwise provided in the Plan. *See* 11 U.S.C. § 944 ("The
provisions of a confirmed plan bind the debtor and any creditor . . . . [T]he debtor is discharged
from all debts as of the time when the plan is confirmed . . . ."); *id.* § 1123(a)(5)
("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide
adequate means for the plan's implementation, such as (A) retention by the debtor of all or any
part of the property of the estate . . . ."); *In re Fin. Oversight & Mgmt. Bd.*, 361 F. Supp. 3d 203,
256-57 (D.P.R. 2019) ("The Settlement and the allocation of the Pledged Sales Taxes are
necessary for the implementation of the Plan, and pursuant to Bankruptcy Code section
1123(a)(5), made applicable to COFINA's Title III Case pursuant to PROMESA section 301(a),
are ***self-executing and preemptive*** notwithstanding otherwise applicable nonbankruptcy law,

---

279.     Here, under both express and implied preemption, Commonwealth Laws that would create, require, or enforce payment obligations not provided for in the Plan or in Board-certified budgets or fiscal plans are preempted by PROMESA.  So, too, are Commonwealth Laws that would require transfer or appropriation of Commonwealth revenues not otherwise provided in Oversight Board-certified budgets or fiscal plans.  And, Commonwealth Laws that would authorize issuance of debt or modify existing debt are preempted to the extent such debt or modifications are not provided for in the Plan.  All or any of these Commonwealth Laws are preempted because they conflict with (i) the Oversight Board's exclusive powers under PROMESA sections 201 and 202 to certify  budgetary allocations; (ii) the Oversight Board's exclusive authority to approve the issuance or modification of debt under PROMESA section 207; and/or (iii) the Oversight Board's exclusive power under Title III to file a Plan.  Examples of these kinds of Commonwealth Laws are listed in Exhibit K to the Plan.

280.     At least four aspects of Commonwealth Laws in Exhibit K of the Plan are expressly and/or impliedly preempted to the extent they are in conflict with PROMESA: (i) appropriations not provided for in an Oversight Board-certified budget or fiscal plan; (ii) requirements to repay prepetition debt in full, including pensions and other benefits; (iii) authorizations to issue debt without following the requirements under PROMESA (i.e., Oversight Board approval); and (iv) requirements for Governor or Legislature approval to issue new debt.  Prior to confirmation, the Oversight Board reserve the right to file an updated Exhibit K to include, among other things, laws passed subsequent to the filing of the Plan which

---

including otherwise applicable Commonwealth law.") (emphasis added); *In re Pub. Serv. Co. of New Hampshire*, 108 B.R. 854, 882 (Bankr. D.N.H. 1989) (plan preempts inconsistent state regulatory requirements in the future to the extent of "the restructuring necessary and required for feasible reorganization has been effectuated as part of a confirmed plan of reorganization").

135

are preempted by the Plan and PROMESA.  The preempted Commonwealth Laws, and a brief explanation why such laws are preempted, are set forth in **Exhibit A**.

A. **Commonwealth Law Provisions Requiring Appropriations Outside of Board-Certified Budget or Fiscal Plan Are Preempted.**

281.    Appropriation provisions are expressly and impliedly preempted to the extent the appropriations are not provided for in any Oversight Board-certified budget or fiscal plan, or in the Plan itself, because such appropriations are inconsistent with PROMESA.  PROMESA sections 201 and 202 grant the Oversight Board exclusive authority to certify fiscal plans and budgets for the Commonwealth, setting all Commonwealth appropriations.  Specifically, section 201 authorizes the Oversight Board to certify a fiscal plan that, among other things, provides a "method" for the Commonwealth to "achieve fiscal responsibility and access to the capital markets" and to accomplish various other objectives.  PROMESA § 201(b)(1).  Certification of a fiscal plan falls to the Oversight Board's "sole discretion."   PROMESA §§ 201(c)(3), (d)(2). Section 202(c)(1) similarly authorizes the Oversight Board, "in its sole discretion," to approve Commonwealth budgets compliant with the applicable fiscal plan.  Budgets certified by the Oversight Board are deemed "in full force and effect."  PROMESA § 202(e)(1)(C).

282.    Thus, any appropriations not contained in an Oversight Board-certified budget or fiscal plan are preempted by PROMESA.

283.    As the First Circuit and this Court recognized, because PROMESA gives the Oversight Board the exclusive authority to certify budgets, PROMESA section 4 expressly preempts any Commonwealth Law appropriating funds without regard to a budget certified by the Oversight Board.  *See Vázquez-Garced v. Fin. Oversight Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019) ("Simply put, if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources

not listed in that budget, regardless of what any territorial laws say."), *cert. denied*, 141 S. Ct.

241 (2010); *Méndez-Núñez*, 916 F.3d at 116 (same); *Rosselló Nevares*, 330 F. Supp. 3d at 701

(same); *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd.*

*for P.R.)*, 327 F. Supp. 3d 365, 372 (D.P.R. 2018) ("Congress' determination, in PROMESA, to

empower the Oversight Board to accept, reject, develop and certify budgets, and to render

certified budgets effective by operation of law, prevails over the general allocation of budgetary

power to Puerto Rico's legislature."), *aff'd*, 916 F.3d 98 (1st Cir. 2019).

284.     This Court explained in *Rosselló Nevares*:

> It beggars reason, and would run contrary to the reliability and transparency
> mandates of PROMESA, to suppose that a budget for a fiscal year could be
> designed to do anything less than comprehend all projected revenues and financial
> resources, and all expenditures, for the fiscal year. Since a certified budget is in
> full effect as of the first day of the covered period, means and sources of
> government spending are necessarily rendered unavailable if they are not
> provided for within the budget. ***A prior year authorization for spending that is
> not covered by the budget is inconsistent with PROMESA's declaration that the
> Oversight Board-certified budget for the fiscal year is in full force and effect,
> and is therefore preempted by that statutory provision by force of Section 4 of
> PROMESA.***

330 F. Supp. 3d at 704 (emphasis added).

285.     This now well-settled law demonstrates that any expenditure outside of an

Oversight Board certified budget or fiscal plan, including preexisting statutory appropriations,

are expressly preempted by PROMESA. So, for example, the DRA Parties' argument that prior

Commonwealth law conditionally appropriating funds to HTA is not expressly preempted by

PROMESA, is wholly without merit. *See, e.g.*, *Objection of the DRA Parties to the Seventh*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico et al. [Dkt. No.*

*17627]* (the "DRA Parties' Objection") ¶ 73, [ECF No. 18590]. The Oversight Board has

demonstrated in (a) its motion to dismiss the DRA Parties' complaint [Case No. 21-00068-LTS,

ECF No. 40] (the "DRA Adversary Motion to Dismiss"), (b) its reply in support of the DRA

Motion to Dismiss [Case No. 21-00068-LTS, ECF No. 67] (the "DRA Adversary Reply"), and

(c) its objection to the DRA Parties' motion for allowance of its purported administrative

expense claim [Case No. 17-BK-3283-LTS, ECF No. 18065] (the "DRA Administrative Expense

Motion Objection") that the Act 30-31 Excise Tax Statutes are preempted by PROMESA.  The

DRA Parties' Objection does nothing more than regurgitate the DRA Parties' prior arguments,

and should be rejected for all the same reasons explained in the Oversight Board's prior briefs.

286.    Briefly, the DRA Parties are wrong that PROMESA does not preempt the Act 30-

31 Excise Tax Statutes.  The DRA Parties acknowledge that PROMESA expressly preempts

"any general or specific provisions of territory law, State law, or regulation that inconsistent

with" PROMESA.  *See* DRA Parties' Obj. ¶ 74. Their argument that preexisting statutory

appropriations are consistent with PROMESA is misplaced.  *See* DRA Parties' Obj. ¶ 81. If that

argument were correct, then all appropriations to HTA, PRIFA, and CCDA would be enforceable

meaning all debt at those entities would be paid and could not be restructured.  Moreover, an

appropriation is less than a promise to pay.  As such, it can be nothing more than a general

prepetition unsecured claim, at best.  As noted above, this argument is contrary to PROMESA's

text, the law of preemption, and binding precedent (*see supra* ¶¶ 286–287). It is also contrary to

PROMESA section 405(m)(2), which clearly states the Commonwealth is unable to provide

"effective services" to its residents.  Thus, requiring all preexisting statutory appropriations is not

an option.

287.    The DRA Parties also erroneously contend that PROMESA sections 201 and 202

"do not displace Commonwealth law" and they instead "make clear that the budgets and fiscal

plans of the [Oversight Board] must comply with Commonwealth law . . . ."  DRA Parties' Obj.

¶ 78. The DRA Parties contend PROMESA section 201(b)(1)(N) evinces an intent to preserve lawful priorities or lawful liens in certified fiscal plans.  But Section 201(b)(1)(N) does not address appropriation statutes at all.  Section 201(b)(1)(N) therefore is immaterial on its face. Moreover, section 201(b)(1)(N) only applies to *fiscal plans* certified in Title II.  It does not impact the Oversight Board's Title III powers to treat statutory and contractual obligations as, at most, unsecured claims.  To argue that PROMESA did not envision any impairment of obligations in a statute or otherwise is to ignore Title III.  Furthermore, Commonwealth laws and jurisprudence, consistent with the laws and jurisprudence of all jurisdictions, provides for the enforcement of all valid debts.  If the DRA Parties were correct, all debt in the Commonwealth would have to be paid in full and there could be no restructuring.

288.    The DRA Parties' arguments made in connection with Title III of PROMESA similarly fail.  They argue while PROMESA section 301 incorporates numerous sections of the Bankruptcy Code, it does not incorporate the bulk of the waterfall priority provision in section 507 of the Bankruptcy Code.  *See* DRA Parties' Obj. ¶ 79.  They also argue that PROMESA section 314(b)(3),(6) demonstrates Congress' intent to preserve "creditors' rights, interests, and remedies under Puerto Rico law, and not to displace them through PROMESA."  *Id.* ¶ 80.  Both arguments fail.  It is clear that any Commonwealth law requiring monetary obligations to be paid in full is preempted by Title III—if it wasn't, there could be no restructuring of any debt. Similarly, here, the Act 30-31 Excise Tax Statutes must be preempted to the extent they require full payment of the Act 30-31 Revenues to HTA.  The DRA Parties have no answer to this necessary and logical conclusion.  In any event, it is clear state law priorities are preempted in Chapter 9 cases, where, similarly to PROMESA, only Bankruptcy Code section 507(a)(2) is

applicable.[43]   For the same reason, the reliance of the DRA Parties on PROMESA section

314(b)(6) and 314(b)(3) is wrong—these sections are similar to Bankruptcy Code sections

943(b)(4) and 943(b)(7), there is no real dispute that chapter 9 preempts state law.

289.   Moreover, the DRA Parties' Objection should be overruled because it is premised

entirely on an erroneous proposition:  that the DRA Parties have a security interest in the Act 30-

31 Revenues retained by the Commonwealth or an administrative expense claim against the

Commonwealth based on their retention.  However, as the Oversight Board demonstrated in the

DRA Adversary Motion to Dismiss, the DRA Adversary Reply, and the DRA Administrative

Expense Motion Objection, the DRA Parties do not have a valid security interest in Act 30-31

Revenues retained by the Commonwealth, nor do the DRA Parties have an administrative

expense claim.  Notably, the Commonwealth has never executed an agreement or otherwise

promised the DRA Parties anything in connection with the Act 30-31 Revenues.   DRA

---

[43] *See, e.g.*, *Cnty. Of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)*, 191 B.R. 1005,
1017 (Bankr. C.D. Cal. 1996) ("The California legislature cannot rewrite bankruptcy priorities. .
. . [The Code] explicitly defined the order of creditor priority and declared the congressional
intent of federal supremacy over declared but conflicting state law orders of priority.") (internal
quotations and citation omitted); *In re City of Detroit*, 504 B.R. 97, 161 (Bankr. E.D. Mich.
2013) ("[S]tate law cannot reorder the distributional priorities of the bankruptcy code.").  This
aligns with unanimous jurisprudence holding that state law priorities are preempted in
bankruptcy cases.  *See Ohio v. Kovacs*, 469 U.S. 274, 285-86 (1985) (O'Connor, concurring)
(stating that although the nature of a creditor's claim is determined under state law, the Code
establishes the priorities of claims); *Elliot v. Bumb*, 356 F.2d 749, 754-55 (9th Cir. 1966)
("[S]tate law shall not be permitted to confer preference on one class of the creditors of one
adjudged a bankrupt under federal law, even though the state may have the highest public
purpose in attempting to do so."); *In re Trahan*, 283 F. Supp. 620, 621 (W.D. La. 1968)
("However, there is also a policy against allowing those creditors whose only security is a state-
created priority which is not a 'lien' to assert their 'priority' claims as secured claims against the
assets."); *Int'l Bhd. of Teamsters v. Hawk Int'l, Inc. (In re Kitty Hawk, Inc.)*, 255 B.R. 428
(Bankr. N.D. Tex. 2000); *In re Lull Corp.*, 162 B.R. 234 (Bankr. D. Minn. 1993) (state statute
allowing state-created workers' compensation fund to step into shoes of employees for purposes
of priority is invalid in bankruptcy); *In re Redford Roofing Co.*, 54 B.R. 254 (Bankr. N.D. Ill.
1985) (state statute granting priority to workers' compensation claims not effective in
bankruptcy).

Adversary Motion to Dismiss at 12–13.  The only party that did was HTA, and HTA does not have any property interest in the Act 30-31 Revenues until they are actually transferred to HTA. *Id.* at 13–21.  The Act 30-31 Excise Tax Statutes are appropriation statutes that conditionally appropriate the Act 30-31 Revenues to HTA but do not transfer a property interest to HTA.  *Id.* at 15–19.  As they lack any rights under the Act 30-31 Excise Tax Statutes, the DRA Parties cannot raise any meritorious objection to the Plan based on those statutes' provisions, even setting aside preemption.

290.   Appropriation provisions are also impliedly preempted because "compliance with both [PROMESA] and [the appropriation provision] is a physical impossibility."  *Arizona*, 567 U.S. at 399.[44]  The Commonwealth cannot both (i) make appropriations or transfer money not provided for in a budget or fiscal plan, and (ii) comply with PROMESA's requirement that there be no spending by the Commonwealth except as authorized in certified budgets and fiscal plans. Similarly, prepetition statutes that create obligations to appropriate moneys would also conflict with the goals of PROMESA as Puerto Rico cannot provide "effective services" to its residents (*see* PROMESA §405(m)(2)), and at the same time make all prepetition payment obligations. This reasoning demonstrates that appropriation provisions, such as the ones at issue in the DRA Parties' Objection, are also impliedly preempted under impossibility preemption. The DRA Parties' assertion that it is theoretically possible for the Oversight Board to issue certified budgets "respecting statutory money flows," *see* DRA Parties' Obj. ¶ 88, should be rejected. It does not explain how such budgets paying creditors such as the DRA Parties leave funds to

---

[44] The law on impossibility preemption is clear that if a party "'cannot satisfy its . . . duties' under a state law 'without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by the federal agency,'" then "'that party cannot independently satisfy those state duties for pre-emption purposes,' and the state law is

sustain the Commonwealth.  Preemption occurs because, even in such a hypothetical world, where the Oversight Board had determined to include such payments, a requirement for the Commonwealth to appropriate those funds (such as the requirement in the Act 30-31 Excise Tax Statutes) would be inconsistent with PROMESA's grant of budgetary authority to the Oversight Board.

291.    Provisions that require appropriations outside a certified budget or fiscal plan would also pose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.  Through PROMESA, Congress set out for Puerto Rico to regain "fiscal responsibility and access to capital markets," and provided the means to effectuate that goal: endowing the Oversight Board with complete control over Commonwealth expenditures.  PROMESA §§ 101, 202.  If prepetition appropriation provisions remain in full force and effect, the Oversight Board's exclusive power to appropriate Commonwealth monies is meaningless, and the Oversight Board's ability to balance the budget to enable Puerto Rico to achieve fiscal responsibility and access to the capital markets would be nullified.  It would completely frustrate Congress's expressed intent in passing PROMESA.  In other words, restructuring of territorial debt would be impossible if the territory was bound to comply with any prepetition statutory obligations.

292.    The Supreme Court reached a similar conclusion in *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000).  There, a Massachusetts law restricting authority of its agencies to purchase goods or services from companies doing business with Burma was preempted because it undermined the intended purpose and "natural effect" of a federal law conferring discretion to the President to control economic sanctions against Burma and directing

---

preempted." *Gustavsen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241, 246 (D. Mass. 2017) (quoting

the President to develop a comprehensive, multilateral strategy towards Burma.  *Id.*; *see also*

*Franklin Cal. Tax-Free Tr. v. P.R.*, 85 F. Supp. 3d 577, 602 (D.P.R. 2015), *aff'd*, *P.R. v.*

*Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016) (holding Puerto Rico's Recovery Act

preempted by the federal Bankruptcy Code); *Hines v. Davidowitz*, 312 U.S. 52, 69 (1941) (where

Congress provided for a complete scheme for the regulation of aliens, a preexisting state law

could not interfere with, curtail, or complement the federal law, or enforce additional or auxiliary

regulations).

293.    So too here: preexisting Puerto Rico statutes purporting to appropriate moneys in

future fiscal years conflict with PROMESA's express intent to achieve fiscal responsibility and

to charge the Oversight Board with development of "[a] comprehensive approach to fiscal,

management, and structural problems and adjustments that exempts no part of the Government

of Puerto Rico."  PROMESA § 405(m)(4).  Through PROMESA, Congress set out for Puerto

Rico to regain "fiscal responsibility and access to capital markets," and provided the means to

effectuate that goal: giving the Oversight Board complete control over Commonwealth debt and

expenditures.  PROMESA §§ 101, 202, 405(m)(4).

294.    Thus, preexisting Commonwealth law appropriating funds, such as the ones at

issue in the DRA Parties' objection, are also preempted under obstacle preemption. Even

accepting the DRA Parties' far too narrow formulation of PROMESA's purpose—"that the

[Oversight Board] temporarily guide the [Island] so it can return to economic growth and self-

sufficiency"—obstacle preemption is apparent.  *See* DRA Parties' Obj. ¶ 93.  If the Act 30-31

Excise Tax Statutes' continuing appropriation of Act 30-31 Revenues to HTA, as well as other

similar statutes appropriating similar funds to other entities, must be satisfied without regard to

---

*Pliva v. Mensing*, 564 U.S. 604, 623-24 (2011)).

whether they are provided for in a certified budget or fiscal plan, or a plan of adjustment, the Oversight Board could neither successfully restructure the Commonwealth's debt nor guide it to economic growth and self-sufficiency.[45]  This scenario exemplifies obstacle preemption.[46]

295.    In addition, certain objectors argue that the Plan cannot preempt a future legislatures' decision to appropriate funds to pay preexisting debts.  One objector, U.S. Bank as Trustee for the Puerto Rico Finance Corporation Bonds, specifically contends "the Oversight Board appears to believe PROMESA completely preempts the right of any future legislature to *ever* appropriate funds to pay" the notes securing the debt service on the PFC bonds. *See Objection of U.S. Bank, as Trustee for the Puerto Rico Finance Corporation Bonds, to the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* ¶ 50 [ECF No. 18631].  This argument fails to comprehend the interface between preemption and Title III.  Title III discharges debt forever.  It does not spring back.  Preemption, depending on the circumstances, may be temporary or permanent.    In the instant context, when an

---

[45] Indeed, Supreme Court precedent is clear "[a] state law [] is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992).  When it enacted PROMESA, Congress intended for Puerto Rico to be returned to fiscal responsibility and access to capital markets by giving the Oversight Board the sole authority to control the Commonwealth's spending.  PROMESA § 202.  The DRA Parties' position would clearly interfere with Congress's intended method for returning Puerto Rico to prosperity, and is thus preempted.

[46] This section highlights why one of the creditors' (the DRA Parties) arguments regarding whether preexisting statutory appropriations are preempted by PROMESA are without merit.  There are many other flaws to such objections. As it relates to the DRA Parties, the Oversight Board has explained these flaws in motion to dismiss briefing pending in an adversary proceeding brought by the DRA Parties. *See Intervening Defendant Financial Oversight and Management Board's Memorandum of Law in Support of Motion to Dismiss, or in the Alternative, to Stay Counts I, II, and IV of the Complaint*, Case No. 21-00068, [ECF No. 40 ¶¶ 64–81]; *see also Intervening Defendant Financial Oversight and Management Board's Reply in Support of Motion to Dismiss, or in the Alternative, to Stay Counts I, II, and IV of the Complaint*, Case No. 21-00068, [ECF No. 67 ¶¶ 40–59]. The Oversight Board adopts and incorporates such arguments as if fully stated herein.

appropriation statute is designed to furnish funds until certain debt is repaid, and the debt is discharged, there is no basis for the statute to be revived.   Additionally, preemption here stems from multiple concurrent forces.  As long as the Oversight Board is in existence, its control over budgets and debt under PROMESA sections 202 and 207 preempt the appropriation statutes. But, Title III also preempts them and results in permanent preemption.  Any expenditure not authorized by an Oversight Board certified budget and fiscal plan is preempted, including any preexisting appropriation of funds used to repay the PFC bonds.  *See, e.g.*, *Rosselló Nevares*, 330 F. Supp. 3d at 701.  And, upon the effective date of the Plan, claims predicated on breaches of prepetition promises, are discharged to the extent not otherwise provided in the Plan. *See* 11 U.S.C. § 944 ("The provisions of a confirmed plan bind the debtor and any creditor . . . . [T]he debtor is discharged from all debts as of the time when the plan is confirmed . . . ."); *see also supra* n.42 (collecting authorities).  To be sure, future legislatures may make gifts to prior creditors, but creditors have no rights to demand them.

B. **Commonwealth Law Provisions Requiring Payment of Prepetition Debt in Full Are Preempted.**

296.    To the extent Commonwealth Laws would require the Commonwealth to repay in full prepetition debt, including pensions or other retiree benefits, without regard to fiscal plans or budgets certified by the Oversight Board, or the Plan itself, such provisions are expressly and impliedly preempted, for the reasons discussed above.  Such payment obligations would run afoul of the Oversight Board's exclusive authority over Commonwealth finances under Titles II and III; it is impossible to enforce such provisions *and* comply with Oversight Board-certified budgets and fiscal plans, or the Plan; and enforcing such provisions would completely frustrate the purpose of PROMESA and the restructuring contemplated in the Plan.

297.     Peter Hein's argument in the *Objection to Confirmation of Plan by Individual Go and PBA Bondholder (Peter C. Hein)* [ECF No. 18575 at 11] (the "Hein Objection"), that the Puerto Rico Constitution requires payment in full of Commonwealth bonds fails.   The acceptance of the Classes in which Hein holds claims (7, 16, 31, and 41) precludes Hein from complaining about his treatment because Bankruptcy Code section 944(a)(3), made applicable by PROMESA section 301(a), binds dissenters.   All the classes containing GO Bond claims are settlements.   They settle the holders' claims to constitutional priority and all the Debtor's claims why the bond claims may be invalid.   Each such class pays its claims more than other general unsecured claims, but less than full priority would yield.   Hein desires not to settle.   His pleading insists on rolling the dice and hoping they land on full priority.   But, the majority of claims in his Classes voted to settle and that settlement binds Hein.   As a practical matter, the Hein priority argument under the Puerto Rico constitution is an uphill battle.   Title III does not grant priority to any claims other than administrative claims under Bankruptcy Code section 507(a)(2).   Hein provides no authority to the contrary.[47]

298.     The Asociacón de Maestros Puerto Rico and the Asociacón de Maestros de Puerto Rico-Local Sindical's (collectively, "AMPR") argument that Act 106, which, among other things, codified the defined benefit pension plan for teachers, is not preempted by PROMESA because PROMESA does not explicitly reference Act 106 or teacher's pension rights, fails because it is inconsistent with PROMESA.   *See Objection of Asociacón de Maestros Puerto Rico and Asociacón de Maestros de Puerto Rico-Local Sindical to Confirmation of the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No.

---

[47] With little in the way of explanation, Hein also contends that Art. II, § 7, Art. II, § 9, and Art. II, § 12 of the Puerto Rico Constitution "prohibit actions to carry out the Plan for substantially the same reasons."   Hein Obj. at 11.   These fail for the same reasons just discussed.

18585 ¶¶ 3, 22] (the "AMPR's Objection").   AMPR is mistaken in claiming that because

PROMESA does not specifically list a statute, it is not expressly preempted by PROMESA.

PROMESA's express preemption provision states "[t]he provisions of this Act shall prevail over

any general or specific provisions of territory law, State law, or regulation that is inconsistent

with this Act."  PROMESA § 4.  There is no requirement that an inconsistent act, such as Act

106, be listed to be preempted as AMPR claims.  Act 106, like other Commonwealth laws that

require the Commonwealth to repay full prepetition debt without regard to fiscal plans or budgets

certified by the Oversight Board, or the Plan itself, are expressly and impliedly preempted.

Requiring such payment obligations would infringe on the Oversight Board's exclusive authority

over Commonwealth finances under Titles II and III since it is impossible to enforce Act 106 and

comply with Board-certified budgets and fiscal plans, or the Plan.

299.    In its objection, AMPR incorrectly argues that the Puerto Rican Supreme Court's

decision in *AMPR v. Sist. Retiro Maestros IV*, 190 P.R. Dec. 854 [Offic. Trans. at 10] (2014) (the

"TRS Pension Decision") prevents the preemption of Act 106.  AMPR's Obj. ¶ 30.  In the TRS

Pension Decision, Puerto Rico's Supreme Court held that the reduction to existing teacher

pension benefits included in Act 160 of 2013 violated the teachers' rights under the Puerto Rico

Constitution's contract clause, Art. II, § 7.  TRS Pension Decision [Offic. Trans. at 8]. The court

found that Act 160 "impaired the contractual rights of thousands of teachers without even

making certain that this would advance the interest of ensuring the solvency of the TRS."  *Id.*

The court upheld sections of Act 160 altering non-pension benefits and found that teachers

entering the retirement system after the passage of the Act 160 did not suffer impairment of their

contractual rights.  *Id.* at 10.   Unlike Act 160, a territorial law, PROMESA is federal law

unbound by the Puerto Rico constitution.  It preempts inconsistent territory law, including Act

160 and the Puerto Rico Constitution.  AMPR's argument that Act 106 requires full payment directly conflicts with PROMESA Tile III, and PROMESA's grant of exclusive authority over Commonwealth finances to the Oversight Board. Enforcing provisions, such as those contained in Act 106, would completely frustrate Congress's purpose of PROMESA and the restructuring contemplated in the Plan.  Thus, TRS Pension Decision is inapplicable and AMPR's argument should be rejected.

C.  **Commonwealth Law Provisions Authorizing Issuance of New Debt Without Oversight Board Approval Are Preempted.**

300.    PROMESA section 207 is unequivocal: for so long as the Oversight Board is in operation, no debt may be issued, guaranteed, exchanged, modified, repurchased, or redeemed without Oversight Board approval.  To the extent provisions of Commonwealth Law would purport to do so, PROMESA section 4 expressly preempts such provisions because they (i) conflict with the Oversight Board's sole and exclusive authority over Commonwealth finances under PROMESA, (ii) require payment in full of prepetition obligations that are not afforded priority under Title III of PROMESA, and/or (iii) would incur debt inconsistent with Title II of PROMESA and the certified Fiscal Plan.

301.    Additionally, such provisions are impliedly preempted because they (i) cannot be enforced simultaneously with PROMESA section 207, (ii) are inconsistent with the Fiscal Plan and may also frustrate the feasibility of the Plan (*cf.* PROMESA § 314(b)(6)), and (iii) would frustrate the purpose of PROMESA to enable Puerto Rico to regain fiscal responsibility and access capital markets.

**THE INJUNCTION AND RELEASE PROVISIONS EMBODIED
IN THE PLAN ARE PERMISSIBLE AND SHOULD BE APPROVED**

302.    The Plan includes release, exculpation, and injunction provisions.   These discretionary provisions are proper because, among other things, they are an integral part of the

hard fought settlements embedded in the Plan, and are critical to obtaining the support of the Debtors' key creditors for the Plan.  Such release, exculpation, and injunction provisions are fair and equitable, are not overbroad, are given for valuable consideration, and are in the best interests of the Debtors and their creditors.  The release, exculpation, and injunction provisions are consistent with the Bankruptcy Code and, thus, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.

303.     The Court has jurisdiction under PROMESA section 306 of the United States Code to approve the injunction, exculpation, and releases set forth in the Plan.  In addition, section 105(a) of the Bankruptcy Code permits issuance of the injunction and approval of the releases and exculpation set forth in the Plan. [48]

## A. **The Debtors' Release of Claims Should Be Approved**

304.     Under section 92.5 of the Plan, except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, each of the Debtors and Reorganized Debtors, the Disbursing Agent, and each of the Debtors' and Reorganized Debtors' Related Persons proposed to release the Released Parties[49] from Claims or Causes of Action they may have against such Released Parties.  A plan that proposes to release a claim or a cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying section 1123(b)(3)(A) of the Bankruptcy Code.  *See, e.g.*, *In re Midway Gold US, Inc.*, 575 B.R. 475, 509 (Bankr. D. Colo. 2017) (citing *In re Spansion*, 426 B.R. 114, 142–43 n.48 (Bankr. D. Del. 2010)).

---

[48] To the extent granting of the release, exculpation, and injunction requires the Oversight Board to consent to the Court's jurisdiction over the release, exculpation, and injunction, the Oversight Board hereby provides a waiver for this purpose pursuant to PROMESA section 305.

[49]     The "Released Parties" are, "[c]ollectively, solely to the extent provided in the Plan, (a) the Government Parties, (b) the PSA Creditors, (c) the Retiree Committee, (d) the Creditors'

305.     Section 92.5 of the Plan represents a valid settlement pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 of any Claims each of Debtors and Reorganized Debtors, the Disbursing Agent, and each of the Debtors' and Reorganized Debtors' Related Persons may have against the Released Parties in exchange for the treatment set forth in the Plan with respect to such Released Parties' Claims against them.  Here, the Debtors' releases are in the best interests of the Debtors and represent a sound exercise of the Debtors' judgment.  The release of key negotiating claimholders and debtor fiduciaries is customary in a restructuring, and it would have been nearly impossible to convince the PSA Creditors and statutory committees to participate in negotiations and agree to settle, discharge, and release claims against the Debtors had they not understood that the Debtors would be releasing claims against them.  *See* Zelin Decl. ¶ 100.  Significantly, this is not a case where any claims being released have been identified.  This is the classic situation in which the release is being requested to avoid future nuisance litigation.

306.     The settlement embodied in the releases complies with the standard set forth by the First Circuit in *Jeffrey*, 70 F.3d 183.  The releases are an integral component of the Plan.  *See* Plan § 92.4.  The Debtors' releases are consistent with the consensual nature of the Plan. The Plan is a global compromise and integrated settlement of claims and causes of action among the Debtors and key stakeholders, embodied in the provisions of Article II of the Plan. All parties involved in the negotiation and development of the Plan benefit from the certainty the releases provide. The parties receiving releases all made significant contributions to the negotiation and development of the Plan, and incurred costs and expenses during the course of their participation in the negotiations.  *See* Zelin Decl. ¶¶ 101–02.

---

Committee, (e) AFSCME, and (f) with respect to the foregoing clauses (a) through (e), each of

307.    The Debtors' releases constitute a sound exercise of the Debtors' judgment.  The

releases are fair, reasonable, and in the best interests of the Debtors.  It is in the Debtors' interest

to fully and finally resolve the Commonwealth, ERS, and PBA Title III Cases and the releases

provided to the Released Parties substantially increased the likelihood of success that the Debtors

would be able to do so.  *See* Zelin Decl. ¶ 103.  The Debtors' releases incentivized PSA

Creditors to support, and undertake actions to support, the Plan and its confirmation, without fear

of baseless lawsuits in the future.  In exchange for the Debtors' and Reorganized Debtors' (and

their Related Persons') releases, the Debtors secured the substantial concessions reflected in the

settlements and, ultimately, the Plan.  Consummation of the Plan would have been substantially

less likely without the Debtors' releases.  *See* Zelin Decl. ¶ 101.

308.    As part of the various plan support agreements, the Released Parties have each

made material contributions to the Plan, which contributions have flowed directly to the recovery

afforded the claimholders and thus are indispensable to the Plan.  For example, litigation over the

Claims and Causes of Action related to the Clawback Actions and Lift Stay Motions was hard-

fought and remained active as between the Commonwealth, on the one hand, and the Monolines

(who would ultimately become GO/PBA PSA Creditors) on the other, even as other creditor

groups had long agreed to the terms of settlement with the Commonwealth in, for example, the

2019 PSA and the 2020 PSA.  By agreeing to settle these disputes, the GO/PBA PSA Creditors

provided a clear benefit to the Debtors by eliminating the need to incur additional costs, and

mitigating the substantial risk associated with, further litigation.  The Commonwealth's debt

burden was also reduced in the process.  The settlement with the GO/PBA PSA Creditors thus

marked a major step forward toward building a broader base of consensus for the Plan.  *See* Zelin

---

their respective Related Persons."  Plan § 1.425.

Decl. ¶ 97.   Accordingly, as set forth above, the Debtors' release of the Released Parties represents a valid exercise of their authority, is necessary for the consummation of the Plan, and should be approved.

309.   The Consensual Releases (defined below) provide for appropriate carve-outs to ensure that the releases are not overly broad.  Among others, the Plan does not release Claims or Causes of Action against PREPA arising from or related to PREPA-issued bonds, including Monolines-issued insurance relating to such bonds.  The Plan provides that such claims and causes of action will be addressed in PREPA's Title III case, which is appropriate because PREPA-related claims are not addressed in the settlements that form the basis for the Plan.  *See* Zelin Decl. ¶ 108.

310.   Certain claims, causes of action, or other rights or powers held by the SEC, the United States, and parties to certain Underwriter Actions (as defined in section 1.495 of the Plan) are also carved out from the Plan's releases.  Likewise, as confirmed by the definition of Released Claims, *see* Plan, section 1.424, claims against CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA are not released under the Plan, which entities are or may be subject to their own PROMESA proceedings.  These carve-outs help to ensure that only those releases reasonable and necessary to Plan confirmation are being provided.  *See* Zelin Decl. ¶ 109.

## B. The Consensual Releases Should Be Approved

311.   The Plan also provides for (i) a discharge of the Debtors and Reorganized Debtors and a release by all parties having Claims or Causes of Action against the Debtors or Reorganized Debtors that arose, in whole or in part, prior to the Effective Date (*see* Plan § 92.2(a)), and (ii) a release of Claims or Causes of Action by the GO/PBA PSA Creditors

against the Government Releasees,[50] including those related to the Clawback Actions and Lift

Stay Motions (*see* Plan § 92.2(c)) (collectively, the "Consensual Releases").

312.    Courts have also widely acknowledged that it is also perfectly appropriate for a

chapter 11 plan to contain consensual third party releases.[51]  Indeed, creditors are free to release

by contract.  Here, the releases in Section 92.2 of the Plan are consensual.

313.    The Debtors submit that, under the circumstances of the Debtors' Title III Cases,

the Consensual Releases are appropriate and should be approved in their entirety.    The

Consensual Releases seek only to release parties that made a significant contribution to the Plan,

including:

> (a) The Debtors and Reorganized Debtors, from all Claims or Causes of Action, and
> from all Entities, *see* Plan § 92.2(a)–(b);[52]
>
> (b) the Government Releasees, from all Government Released Claims or any of the
> claims or causes of action asserted or which could have been asserted in the
> Actions, who are being released by each of the parties to the various plan support
> agreements and their respective Related Persons, *see* Plan, § 92.2(c); and
>
> (c) the Released Parties, from all Claims and Causes of Action that arose, in whole or
> in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or

---

[50]    The "Government Releasees" are, collectively, "the Government Parties and the Debtors, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Cases in their capacities as such; provided, however, that, notwithstanding the foregoing, "Government Releasees" shall not include CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and related to the CW Appropriations Claims." Plan § 1.277.

[51]    *See, e.g.*, *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent"); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (third party releases "may . . . be used if the affected creditors consent").

[52]    The release of the Debtors and Reorganized Debtors can also be justified as a discharge pursuant to section 944 of the Bankruptcy Code, made applicable to the Debtors' Title III case by PROMESA section 301, which discharges the Debtors "from all debts as of the time when the plan is confirmed[.]"  11 U.S.C. § 944(b)(1).

Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action.  *See* Plan § 92.2(a).

314.   The Consensual Releases are necessary and essential to the Plan.  They were negotiated with key stakeholders in the robust, arms'-length process described above.  That process led to broad support for the restructuring framework contemplated by the Plan, including the release provisions.  The Plan would not be successful without the claimholders' releases.  The Consensual Releases provide the parties with assurance that their disputes will be fully and finally resolved upon confirmation of the Plan, and help to enable the prompt, efficient conclusion of these Title III cases by providing for a comprehensive resolution and settlement of these disputes.  *See* Zelin Decl. ¶ 106.

315.   The Consensual Releases serve two simple but valuable functions: (i) incentivizing the applicable released parties to support, and undertake actions that support, confirmation of the Plan without the fear of future lawsuits, and (ii) facilitating the Reorganized Debtors' fresh start post emergence from the Debtors' Title III Cases.  *See, e.g.*, *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("[S]takeholders in chapter 11 cases, unhappy with their recoveries, have more than occasionally brought frivolous litigation against estate fiduciaries."); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" (quoting *Grogan v. Garner*, 498 U.S. 279 (1991)).  The Oversight Board submits that such objectives are well-warranted and support approval of the Consensual Releases.  The releases are necessary and essential to the Plan.  *See* Zelin Decl. ¶ 98.  Accordingly, the Consensual Releases should be approved.

### C. **The Exculpation Sought In the Plan Is Appropriate**

316.    Courts, including courts in the First Circuit, have held that exculpation provisions like the one in Section 92.7 of the Plan (the "Exculpation Provision") are appropriate when the parties are released or exculpated for acts or omissions in connection with or related to the "the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence . . . ." *See In re Montreal Me. & Atl. Ry.*, No. 13-10670, 2015 Bankr. LEXIS 3737, at *24, 26 (Bankr. D. Me. Oct. 9, 2015); *In re PWS Holding Corp.*, 228 F.3d at 245–47 (holding that release of, among others, debtors and creditor committees, including such parties' officers, directors, employees, professionals and advisors, was appropriate where it was given for activity related to the pursuit of the chapter 11 plan and excluded willful misconduct and gross negligence); *In re Yellowstone Mountain Club, LLC*, No. 08–61570–11, 2009 WL 2163528, at *5 (Bankr. D. Mont. July 16, 2009) (exculpation provision which does not release willful misconduct or gross negligence is "perfectly proper"); *Murphy v. Weathers*, No. 7:07-CV-00027, 2008 WL 4426080, at *6 (M.D. Ga. Sept. 25, 2008) (exculpation which includes professionals other than just the creditors committee and its members does not run afoul of section 524(e) of the Bankruptcy Code if it does not extend to acts of gross negligence, willful misconduct, or breach of fiduciary duties); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation clause that excludes gross negligence and intentional misconduct); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006); *see also Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 504 (S.D.N.Y. 2005) (upholding exculpation provisions of plan that were "reasonable and customary and in the best interests of the estates"); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 261 (Bankr. M.D. Fla. 2006)

(exculpation appropriate where beneficiaries of exculpation had expectation of its approval, it
was a result of negotiation, and the plan was overwhelmingly accepted).

317.    The parties who are beneficiaries of the Exculpation Provision (the "Exculpated
Parties") include: (a) AAFAF; (b) the Oversight Board and each of its members; (c) each of the
PSA Creditors solely in its capacity as a party to the GO/PBA Plan Support Agreement and/or
the HTA/CCDA Plan Support Agreement and a Creditor; (d) each of the members of the Retiree
Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as
applicable; (e) each of the members of the Creditors' Committee, solely in its capacity as a
member of the Creditors' Committee, and the Creditors' Committee, and each of the Creditors'
Committee's Related Persons, (f) AFSCME solely in its capacity as a party to the AFSCME Plan
Support Agreement and a Creditor, as applicable, and each of their respective Related Persons;
and (g) Ambac, Assured, FGIC, National, Syncora Guarantee Inc., and their Related Persons, for
any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in
connection with the formulation, preparation, dissemination, implementation, acceptance,
confirmation, or approval of the Plan.  In general, the Exculpated Parties "shall not have or incur
any liability to any Entity for any act taken or omitted to be taken in connection with the Title III
Cases," among other things.  *See* Plan § 92.7(a).  Such Exculpated Parties have participated in
good faith in formulating and negotiating the Plan and should be entitled to protection for the
activities engaged in during the Debtors' Title III Cases.  In *PWS Holding Corp.*, the Third
Circuit approved a plan provision exculpating, among others, the debtors, the reorganized
debtors, a certain "Creditor Representative,"[53] the committee or any of their respective members,
employees, and professionals from claims of creditors for "any act or omission in connection

with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence." *In re PWS Holding Corp.*, 228 F.3d at 246.   The *PWS* decision, and subsequent decisions in the Third and other Circuits, have granted exculpations to entities serving functions that are similar in nature to the Exculpated Parties. *See, e.g.*, *W. Mining & Invs., LLC v. Bankers Trust Co.*, No. C.A.02-1445, 2003 WL 503403, at *4 (D. Del. Feb. 19, 2003) (there is nothing inherently suspect about a plan provision releasing, among others, the DIP lenders, bank lenders, and the committee, from any liability for past, present, and future acts or omissions in connection with the sale and liquidation of the debtor's assets, other than those arising out of gross negligence or willful misconduct); *In re Genesis Health Ventures*, 266 B.R. at 605–06 (approving exculpation clause for administrative agents and lenders under various credit agreements, as well as their respective members, officers, directors, employees, agents, or professionals, and noting, "to the extent that [release provisions] set forth the applicable standards of liability for persons associated with and providing services toward the reorganization of the debtors, the provisions may be approved."); *In re Quincy Med. Ctr., Inc.*, No. 11-16394, 2011 WL 5592907, at *8–9 (Bankr. D. Mass. Nov. 16, 2011) (approving exculpations for parties that provided valuable consideration to the estate by negotiating the framework of a plan); *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 234 (Bankr. E.D. Va. 2012) (approving "exculpation provision [ ] limited to acts or omissions taken in connection [with] the bankruptcy case itself"); *Meritage Homes of Nev., Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge LLC)*, 478 B.R. 403, 416 (D. Nev. 2012) (affirming bankruptcy

---

53   In *In re Genesis Health Ventures, Inc.*, 266 B.R. at 606 n.14, the bankruptcy court noted the "creditor representative" probably served a similar function to an administrative agent.

court's approval of exculpation provision relating generally to the Chapter 11 case, the disclosure
statement, the confirmed plan or any document entered into during the Chapter 11 case).

318.    The DRA Parties argue in a footnote that non-fiduciary exculpation provisions are
impermissible. *See* DRA Parties Obj. ¶ 150 n.37.  Exculpation provisions, however, may
properly extend beyond estate fiduciaries to, for example, "court-supervised and court-approved
transactions" because parties involved in those transactions "should be not be [sic] subject to
claims that effectively seek to undermine or second-guess th[e] Court's determinations." *In re
Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019); *see also In
re Willowood U.S. Holdings, LLC*, No. 19-11079 KHT, 2020 Bankr. LEXIS 3706, at *37 (Bankr.
D. Colo. Feb. 14, 2020) ("The Court approves the approach taken in *Aegean Marine*, to the
extent non-estate fiduciaries should not be able to be sued for implementing and acting upon
Court Orders or approved transactions.").

319.    Accordingly, in the *PWS* decision and other decisions within the First and other
Circuits, courts have granted exculpations to entities serving functions that are similar in nature
to the Exculpated Parties. *See, e.g.*, *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084–85 (9th Cir.
2020) (approving exculpation of creditor closely involved in drafting of plan), *cert. denied*, 141
S. Ct. 1395 (2021); *Airadigm Communs., Inc. v. FCC* (*In re Airadigm Communs., Inc.*), 519 F.3d
640, 657–58 (7th Cir. 2008) (approving a non-fiduciary exculpation provision); *In re Quincy
Med. Ctr., Inc.*, No. 11-16394-MSH, 2011 WL 5592907, at *3 (Bankr. D. Mass. Nov. 16, 2011)
(finding the inclusion of the indenture trustee and bondowners in the exculpation clause
reasonable due to their provision of "financial and other consideration to the estate."); *In re
Montreal Me. & Atl. Ry.*, No. 13-10670, 2015 Bankr. LEXIS 3737, at *24–26 (Bankr. D. Me.
Oct. 9, 2015) (approving a non-fiduciary exculpation provision).

320.    The court in *Montreal Maine*, for example, approved a Chapter 11 plan that included an exculpation clause covering "(a) the Trustee, (b) the Creditors' Committee, (c) the Monitor, (d) MMA Canada" along with their respective fiduciaries.  *Id.*   at *24 (emphasis omitted).  The court found that "the exculpation provision is appropriate under applicable law because it is part of a Plan proposed in good faith, was vital to the Plan formulation process and is appropriately limited in scope. The exculpation provision, including its carve-out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others."  *Id.* at *26. Here, too, the exculpation provisions in the Plan carve out intentional fraud or willful misconduct (*see* Plan § 92.7), and are necessary for the reorganization.  *See* Zelin Decl. ¶ 95.

321.    Exculpation provisions like the one in Section 92.7 of the Plan provide appropriate protection for key parties involved in negotiating the Plan and preserving assets for the estate, employees, officers, and directors of the debtors, and professionals from frivolous litigation.  *See, e.g.*, *Murphy*, 2008 WL 4426080, at *6 (exculpation is appropriate, particularly where litigation has been threatened); *In re Firstline Corp.*, No. 06–70145, 2007 WL 269086, at *3 (Bankr. M.D. Ga. Jan. 27, 2007) (exculpation clauses are "necessary to discourage any frivolous litigation.").

322.    All the Exculpated Parties played a key role in the development of the Plan and the negotiations that paved the way for a successful reorganization, and would expect to receive a customary exculpation for their efforts during these cases.  *See* Zelin Decl. ¶ 110.  The exculpation being provided here is customary in the restructuring context for parties and their professionals in connection with their efforts toward negotiating a consensual resolution with broad support.  *See id.* ¶ 111.  An exculpation (subject to certain customary carve-outs for certain

intentional wrongdoing) incentivizes all parties to negotiate freely without fear of liability that will slow down the negotiations. *See id.* The expectation the Exculpated Parties would be exculpated incentivized claimholders to participate in the negotiations, and support, and undertake actions that support, confirmation of the Plan without fear of future baseless lawsuits. *See id.* Failing to approve the exculpation provisions would likely expose the parties to litigation after months of good faith negotiations. *See id.*

323. Exculpation for parties participating in the plan process also is appropriate where plan negotiations could not have occurred without protection from liability. *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"). Accordingly, the Exculpation Provision should be approved.

**D. The Injunction Sought is Necessary to Enforce the Releases and Exculpations Contained in the Plan**

324. Sections 92.3, 92.6, 92.9, and 92.11 of the Plan provide for an injunction (the "Injunction") against all Entities from commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property, from and after the Effective Date. The Injunction is necessary to preserve and enforce the releases and exculpations, and is narrowly tailored to achieve that purpose. *See* Zelin Decl. ¶ 113. Accordingly, the Injunction should be approved.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

325.   The Debtors respectfully submit this Court should confirm the Plan.

Dated: October 27, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s/  Martin J. Bienenstock*

Martin J. Bienenstock
Brian. S. Rosen
Jeffrey W. Levitan
Ehud Barak
Joshua A. Esses
(Admission *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.647.3503
dvelawoffices@gmail.com

**OF COUNSEL FOR
A&S LEGAL STUDIO, PSC**
434 Avenida Hostos
San Juan, PR 00918
Tel. (787) 751-6764/763-0565
Fax (787) 763-8260

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*