# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

[*Caption continued on next page*]

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

| | |
|---|---|
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Movants,<br><br>vs.<br><br>PLAN AND/OR CONFIRMATION ORDER OBJECTORS<br><br>Respondents. | **Re: ECF Nos. 9223, 12701, 16481, 16668, 16871, 16872, 16939, 16955, 16969, 17001, 17005, 17013, 17016, 17021, 17047, 17062, 17116, 17175, 17202, 17436, 17438, 17526, 17627, 17998, 18091, 18111, 18249, 18418, 18433, 18453, 18479, 18485, 18486, 18504, 18505, 18506, 18511, 18512, 18513, 18529, 18535, 18538, 18548, 18549, 18551, 18558, 18563, 18564, 18565, 18566, 18567, 18569, 18573. 18566, 18573, 18575, 18582, 18583, 18585, 18588, 18589, 18590, 18592, 18593, 18594, 18588, 18560, 18631, 18632, 18634, 18636, 18637, 18663, 18670, 18685, 18742, 18453, 18479, 18486, 18562, 18569, 18570, 18574, 18584, 18588, 18589, 18595, 18601, 18637, 18645, 18658, 18662, 18679, 18694, 18757, 18848, 18558, 18647, 18651, 18670, 18685, 18742** |

**OMNIBUS REPLY OF THE
COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO
RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY TO
<u>OBJECTIONS TO SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT</u>**

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **A&S LEGAL STUDIO, PSC**<br>434 Avenida Hostos<br>San Juan, PR 00918<br>Telephone: (787) 751-6764<br>Facsimile: (787) 763-8260 |

*Attorneys for the Financial Oversight and Management Board
as Representative for the Commonwealth, ERS, and PBA in their Title III Cases*

Dated: October 27, 2021

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

A.    CONSIDERATION OF THE BEST INTERESTS TEST WARRANTS
CONFIRMATION ...........................................................................3

    1.    The Commonwealth Report—and not the Prager Report—uses the
correct methodology to calculate available resources to creditors ..............5

    2.    The DRA Parties Are Incorrect as a Matter of Law that the OMB
Act Will Determine Commonwealth Distributions Outside of Title
III.................................................................................................7

    3.    The Prager Report Unreasonably Assumes that All Revenues
Projected by the Fiscal Plan Would Still Materialize if the
Commonwealth's Title III Case is Dismissed .............................9

    4.    The Prager Report does not contain a reasonable estimate of the
Commonwealth's liquidity needs and projected available cash ...............17

B.    THE PLAN APPROPRIATELY CLASSIFIES CLAIMS IN
ACCORDANCE WITH BANKRUPTCY CODE § 1122....................................21

C.    THE PLAN PROVIDES EQUAL TREATMENT TO CLAIMS WITHIN
EACH CLASS .........................................................................26

D.    THE CONSTITUTIONAL CHALLENGES TO THE PLAN FAIL ..................27

    1.    The Plan Does Not Violate the Contract Clause........................................28

    2.    The Plan Does Not Violate the Takings Clause........................................30

        a.    *The DRA Parties' Takings Clause Objection Should be
Overruled.* .........................................................................30

        b.    *Hein's Takings Clause Objection Should be Overruled* ...............33

    3.    The Plan Does Not Violate the Privileges and Immunities, Due
Process, or Equal Protection Clauses.........................................36

E.    CONSTITUTIONAL CLAIMS ARE
DISCHARGED PURSUANT TO THE PLAN ....................................41

F.    THE PLAN IS CONSISTENT WITH THE FISCAL PLAN AS
REQUIRED BY PROMESA § 314(b)(7)............................................56

G.      THE HTA/CCDA PSA DOES NOT RENDER THE PLAN
        UNCONFIRMABLE .................................................................................59

        1.      The Plan Does Not Function as a *Sub Rosa* HTA Plan. ...........................59

                a.      The HTA/CCDA PSA Does Not Dictate the Terms of an
                        HTA Plan ........................................................................................61

                b.      Pre-Confirmation Distributions Are Permissible Under
                        PROMESA.......................................................................................62

                c.      The DRA Parties Mischaracterize the Releases............................63

        2.      The HTA Related Settlements Do Not Violate Bankruptcy Rule
                9019...................................................................................................64

H.      The Plan's Pension Reform Measures Are Permissible Under PROMESA..........65

        1.      The Plan May Implement the Freeze of TRS and JRS Pension
                Plans...................................................................................................65

        2.      The Commonwealth's Pension Liabilities Do Not Constitute
                Administrative Expense Claims................................................................70

        3.      Reductions to Judicial Pensions Do Not Violate Constitutional
                Rights and are Otherwise Appropriate.......................................................75

I.      THE FISCAL PLAN'S REVENUE AND EXPENSE ESTIMATES ARE
        RELIABLE ..............................................................................................77

        1.      Hein's Criticisms of the Oversight Board's Population Data in the
                April 2021 Certified Fiscal Plan Are Unfounded. .....................................77

        2.      Hein's Criticisms of The Oversight Board's Revenue Estimates
                Are Inapposite. ....................................................................................79

        3.      Hein's Medicaid Arguments Are Inapposite. ...........................................79

J.      OMNIBUS REPLY TO THE OBJECTIONS ......................................................80

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*Americredit Fin. Servs. v. Nichols (In re Nichols)*,
　440 F.3d 850 (6th Cir. 2006) ...............................................45

*Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
　954 F.3d 1 (1st Cir. 2020) ...............................................25

*Baldwin v. Fish & Game Comm'n of Mont.*,
　436 U.S. 371 (1978) ...............................................37

*Baldwin v. Hale*,
　68 U.S. 223 (1863) ...............................................39

*Balt. Teachers Union v. Mayor of Baltimore*,
　6 F.3d 1012 (4th Cir. 1993) ...............................................8

*Bank of N.Y. v. Treco (In re Treco)*,
　240 F.3d 148 (2d Cir. 2001) ...............................................30, 44

*Barron v. Mayor of Baltimore*,
　32 U.S. 243 (1833) ...............................................41, 52

*Bayrón Toro v. Serra*,
　19 P.R. Offic. Trans. 646 (P.R. Nov. 18, 1987) ...............................................66

*Bd. of Trs. v. Thompson Bldg. Materials, Inc.*,
　749 F.2d 1396 (9th Cir. 1984) ...............................................45

*Binns v. United States*,
　194 U.S. 486 (1904) ...............................................40

*Blake v. McClung*,
　176 U.S. 59 (1900) ...............................................38

*Blanchette v. Conn. Gen. Ins. Corps.*,
　419 U.S. 102 (1974) ...............................................40, 54, 55

*Buffalo Teachers Fed'n v. Tobe*,
　464 F.3d 362 (2d Cir. 2006) ...............................................30

*Capital Cities Cable, Inc. v. Crisp*,
　467 U.S. 691 (1984) ...............................................41

v

*Cedar Point Nursery v. Hassid,*
141 S. Ct. 2063 (2021) ................................................................35, 54

*Cobb v. City of Stockton (In re City of Stockton),*
909 F.3d 1256 (9th Cir. 2018) ....................................... *passim*

*Connolly v. Pension Benefit Guarantee Corp.,*
475 U.S. 211 (1986) ................................................................33, 35

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),*
536 F.2d 950 (1st Cir. 1976) ................................................73

*Czyzewski v. Jevic Holding Corp.,*
137 S. Ct. 531 (2017) ................................................................62

*Dandridge v. Williams,*
397 U.S. 471 (1970) ................................................................38

*Deocampo v. Potts,*
836 F.3d 1134 (9th Cir. 2016) ....................................45, 50

*Domen v. Vimeo, Inc.,*
433 F. Supp. 3d 592 (S.D.N.Y. 2020),
*aff'd,* 2021 U.S. App. Lexis 28995 (2d Cir. Sept. 24, 2021) .................................41

*E. Enterprises v. Apfel,*
524 U.S. 498 (1998) ................................................................38

*Enter. Energy Corp. v. Unites States (In re Columbia Gas Sys. Inc.),*
50 F.3d 233 (3d Cir. 1995) ................................................68

*Export Grp. v. Reef Indus.,*
54 F.3d 1466 (9th Cir. 1995) ................................................47

*Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño,*
604 F.3d 7 (1st Cir. 2010) ................................................42

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC,*
140 S. Ct. 1649 (2020) ................................................40

*First English Evangelical Lutheran Church v. County of Los Angeles,*
482 U.S. 304 (1987) ................................................................54

*Goble & Jimenez, Inc. v. Dore Rice Mill, Inc.,*
108 D.P.R. 89, 8 P.R. Offic. Trans. 90 (1978) ................................72

*Hawes v. Club Ecuestre El Comandante,*
535 F.2d 140 (1st Cir. 1976) ................................................37

vi

*Helvering v. Griffiths*,
   318 U.S. 371 (1943) ................................................................................................51

*Hermandad De Empleados del Fondo del Seguro del Estado, Inc. v. Fin. Oversight &*
   *Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   979 F.3d 10 (1st Cir. 2020),
   *cert. denied*, 2021 U.S. Lexis 4785 (2021) ..........................................................30

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934) ..................................................................................................8

*Horne v. Dep't of Agric.*,
   576 U.S. 350 (2015) ................................................................................................35

*Hunter v. City of Pittsburgh*,
   207 U.S. 161 (1907) ................................................................................................33

*In re Acequia, Inc.*,
   787 F.2d 1352 (9th Cir. 1986) ...............................................................................27

*In re Ashe*,
   669 F.2d 105 (3d Cir. 1983) ...................................................................................42

*In re Ashe*,
   712 F.2d 864 (3d Cir. 1983) ...................................................................................45

*In re Baldwin United Corp.*,
   43 B.R. 888 (Bankr. S.D. Ohio 1984) ....................................................................60

*In re Bamberg Cnty. Mem'l Hosp.*,
   No. 11-03877, 2012 WL 1890259 (Bankr. D.S.C. May 23, 2012) ........................10

*In re Braniff Airways, Inc.*,
   700 F.2d 935 (5th Cir. 1983) .............................................................59, 61, 62, 63

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y 1990) ......................................................................23

*In re Cajun Elec. Power Co-op, Inc.*,
   119 F.3d 349 (5th Cir. 1997) ...........................................................................59, 62

*In re Capmark Fin. Grp., Inc.*,
   438 B.R. 471 (Bankr. D. Del. 2010) .......................................................................62

*In re CGE Shattuck, LLC*,
   254 B.R. 5 (Bankr. D. N.H. 2000) .........................................................................64

*In re Chrysler LLC,*
   405 B.R. 84 (Bankr. S.D.N.Y. 2009),
   *aff'd sub nom. Ind. State Police Pension Tr. v. Chrysler LLC (In re Chrysler LLC),*
   576 F.3d 108 (2d Cir. 2009)....................................................................................45

*In re City of Detroit,*
   504 B.R. 97 (Bankr. E.D. Mich. 2013) ........................................................67, 68, 69

*In re City of Detroit,*
   524 B.R. 147 (Bankr. E.D. Mich. 2014) ....................................10, 20, 48, 49, 51, 52

*In re City of Prichard, Alabama,*
   Case No. 09-15000 (Bankr. S.D. Ala. Oct. 27, 2009) ............................................69

*In re City of Stockton,*
   526 B.R. 35, 39 (Bankr. E.D. Cal. 2015).........................................................68, 69

*Cobb v. City of Stockton (In re City of Stockton),*
   909 F.3d 1256, 1266 (9th Cir. 2018) ............................................................. *passim*

*In re Craig Cnty. Hosp. Auth.,*
   572 B.R. 340 (Bankr. N.D. Okla. 2017) ................................................................74

*In re El Comandante Mgmt. Co.,*
   2006 WL 3903593 (Bankr. D.P.R. Mar. 3, 2006) .................................................23

*In re Energy Future Holding Corp.,*
   527 B.R. 157 (D. Del. 2015)...................................................................................59

*In re Fin. Oversight & Mgmt. Bd.,*
   583 B.R. 626 (D.P.R. 2017)....................................................................................57

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
   478 F. Supp. 3d 190 (D.P.R. 2020).........................................................................32

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
   618 B.R. 349 (D.P.R. 2020)....................................................................................72

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
   618 B.R. 619 (D.P.R. 2020),
   *aff'd,* 989 F.3d 170 (1st Cir. 2021) ........................................................................32

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
   621 B.R. 289 (D.P.R. 2020)....................................................................................74

*In re Hardeman County Hosp. Dist.,*
   540 B.R. 229 (Bankr. N.D. Tx. 2015)......................................................................11

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007)................................................................60, 63

*In re J. R. Nieves & Co.*,
    446 F.2d 188 (1st Cir. 1971)........................................................................34

*In re LightSquared, Inc.*,
    513 B.R. 56 (Bankr. S.D.N.Y. 2014)............................................................23

*In re Marvel Entm't Grp.*,
    222 B.R. 243 (D. Del. 1998)........................................................................60

*In re Miami Metals I, Inc.*,
    603 B.R. 531 (Bankr. S.D.N.Y. 2019)..........................................................60

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ............................................................19

*In re Nortel Networks, Inc.*,
    522 B.R. 491 (Bankr. D. Del. 2014) ............................................................60

*In re Plant Insulation Co.*,
    469 B.R. 843 (Bankr. N.D. Cal. 2012)*,*
    *aff'd*, 485 B.R. 203 (N.D. Cal. 2012),
    *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013) ...........................45

*In re Sentinel Mgmt. Grp.. Inc.*,
    398 B.R. 281(Bankr. N.D. Ill. 2008) ...........................................................23

*In re Shubh Hotels Pittsburgh, LLC*,
    439 B.R. 637 (Bankr. W.D. Pa. 2010) ...................................................60, 63

*Jacobs v. United States*,
    290 U.S. 13 (1933)........................................................................54, 55, 56

*John K. & Catherine S. Mullen Benevolent Corp. v. United States*,
    290 U.S. 89 (1933)......................................................................................32

*Knick v. Twp. of Scott*,
    139 S. Ct. 2162 (2019)..........................................................................49, 53

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)....................................................................................35

*Las Cennizas En Penuelas, Inc. v. Fin. Oversight & Mgmt. Bd. for P.R. (In Fin.
    Oversight & Mgmt. Bd. for P.R.)*,
    9 F.4th 1 (1st Cir. 2021)........................................................................71, 72

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005).................................................................34

*Lopez v. Post-Effective Date Comm. of Creditors (In re Valley Health Syst.)*,
    2012 Bankr. LEXIS 3632 (9th Cir. B.A.P. July 19, 2012) ....................................69

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935).................................................................30, 33, 49

*Lynch v. United States*,
    292 U.S. 571 (1934).................................................................33

*McAndrews v. Fleet Bank of Mass., N.A.*,
    989 F.2d 13 (1st Cir. 1993).................................................................35

*McBurney v. Young*,
    667 F.3d 454 (4th Cir. 2012),
    *aff'd*, 569 U.S. 221 (2013) .................................................................37

*Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*,
    66 F.3d 1091 (9th Cir. 1995) .................................................................12

*Mullaney v. Anderson*,
    342 U.S. 415 (1952).................................................................38

*Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in
    Possession (re Tower Auto., Inc.)*,
    241 F.R.D. 162 (S.D.N.Y. 2006) .................................................................60

*Ohio v. Kovacs*,
    469 U.S 274 (1985) .................................................................67

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    786 F.2d 794 (7th Cir. 1986) .................................................................43

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001).................................................................56

*Palmore v. United States*,
    411 U.S. 389 (1973).................................................................39

*Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.
    Bd. for P.R.)*,
    899 F.3d 1 (1st Cir. 2018).................................................................33

*Penn Central Transp. Co. v. City of New York*,
    438 U.S. 104 (1978).................................................................34, 35

x

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*,
    467 U.S. 717 (1984)................................................................28

*People of Puerto Rico ex rel.Isabela Irr. Serv. v. United States*,
    134 F.2d 267 (1st Cir. 1943)................................................32

*Pointsett Lumber Mfg v. Drainage Dist. No. 7*,
    119 F.2d 270 (8th Cir. 1941) ...............................................47

*Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cnty.*,
    57 F.3d 505 (7th Cir. 1995) .................................................34

*Puerto Rico v. Franklin California Tax-Free Trust*,
    136 S. Ct. 1938 (2016).........................................................10

*Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.)*,
    327 F. Supp. 3d 365 (D.P.R. 2018),
    *aff'd*, 916 F.3d 98 (1st Cir. 2019) ......................................77

*Saenz v. Roe*,
    526 U.S. 489 (1999).......................................................37, 38

*San Diego Gas & Elec. Co. v. San Diego*,
    450 U.S. 621 (1981).............................................................54

*Strom v. Peikes (In re Corson Furniture Co.)*,
    123 F.2d 1003 (2d Cir. 1941)...............................................34

*Supreme Court of Va. v. Friedman*,
    487 U.S. 59 (1988)...............................................................37

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño*,
    633 F.3d 37 (1st Cir. 2011).............................................29, 30

*United States v. Bello*,
    194 F.3d 18 (1st Cir. 1999) .................................................78

*United States v. Kras*,
    409 U.S. 434 (1973).............................................................38

*United States v. Martin (In re Martin)*,
    542 B.R. 479 (B.A.P. 9th Cir. 2015).....................................47

*United States v. Norwood*,
    602 F.3d 830 (7th Cir. 2010) ...............................................36

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982)...............................................................53

*V.W. ex rel. Barber v. City of Vallejo,*
   No. CIV. S-12-1629, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013) .......................................45

*Vaquería Tres Monjitas, Inc. v. Comas,*
   5 F. Supp 3d 179 (D.P.R. 2014)...............................................................................................55

*Webb's Fabulous Pharms. v. Beckwith,*
   449 U.S. 155 (1980)...........................................................................................................42, 52

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank,*
   473 U.S. 172 (1985)....................................................................................................48, 49, 50

*Wright v. Union Cent. Life Ins. Co.,*
   311 U.S. 273 (1940)...........................................................................................................33, 51

*Wright v. Vinton Branch of Mountain Tr. Bank,*
   300 U.S. 440 (1937)...........................................................................................................50, 51

## STATUTES

3 L.P.R.A. § 1913 ........................................................................................................................25

9 L.P.R.A. § 2004 ........................................................................................................................31

32 L.P.R.A. § 2907 ......................................................................................................................42

11 U.S.C. § 101...................................................................................................................... 33, 43

11 U.S.C. § 363..............................................................................................................26, 63, 64

11 U.S.C. § 365...................................................................................................................*passim*

11 U.S.C  § 503................................................................................................................... 11, 73

11 U.S.C. § 944....................................................................................................................41, 43

11 U.S.C. § 1122..................................................................................................................20, 21

11 U.S.C. § 1123..........................................................................................................24, 26, 27

48 U.S.C. §§ 2101–2241...............................................................................................................1

PROMESA § 201 .........................................................................................................................57

PROMESA § 314....................................................................................................................3, 6, 56

## OTHER AUTHORITIES

P.R. Const. art. II, § 9 .................................................................................................................38

P.R. Const. art. II, § 9 ..............................................................................................41

P.R. Const. art. V ....................................................................................................76

U.S. Const. amend. V ............................................................................................41,

U.S. Const. amend. XIV, § 1 .................................................................................42

U.S. Const. art. I, § 10, cl. 1 .................................................................................28

U.S. Const. art. IV, § 3 ..........................................................................................39

U.S. Const. art. VI, cl. 2 ........................................................................................41

6 Collier on Bankruptcy § 943.03 (16th ed. 2021) ...........................................11, 19

Paul Carillo, Anthony Yezer, Jozefina Kalaj, *Could Austerity Collapse the Economy of Puerto Rico?*, Inst. For Int'l Econ. Policy, George Washington Univ., Sept. 2017 ...............15

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>"), as the sole Title III representative of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>"), and the Puerto Rico Public Buildings Authority ("<u>PBA</u>"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("<u>PROMESA</u>")[2] (the Oversight Board, in its capacity as Title III representative of the Commonwealth, ERS, and PBA, is referred to as the "<u>Debtors</u>"), respectfully submits this omnibus reply ("<u>Reply</u>") to objections to the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 17627][3] (as it may be amended, modified, or supplemented, the "<u>Plan</u>").   This Reply is being submitted in conjunction with the *Memorandum of Law in Support of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (the "<u>Confirmation Brief</u>") [ECF No. 18869].[4]

## PRELIMINARY STATEMENT

1.      Virtually no one, including the Government, challenges the overwhelming benefits the Plan confers on the Commonwealth.  The vast majority of Classes entitled to vote on the Plan have overwhelmingly accepted the Plan.[5]  Failure to confirm the Plan would not only forfeit all these benefits designed to provide the people of the Commonwealth a dignified future, but could result in a chaotic race to the courthouse to grab the Commonwealth's money, as the Court made clear at the October 25, 2021 status conference.

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3] All ECF No. references are to Case No. 17 BK 3283-LTS, unless otherwise indicated.

[4] Capitalized terms used but not otherwise defined herein shall have those meanings ascribed to them below, in the Plan, Reply Chart, or Confirmation Brief, as appropriate.

[5] Based on unaudited results at the time of this filing.

1

2.      To obtain confirmation, all the Government was asked to do was to authorize a little debt to replace a lot of debt.  Nevertheless, the Government insists on conditioning its authorization on increased expenses with no offsetting tax increases or other revenues.  However well-intentioned, the conditional authorization creates a material annual fiscal burden. Numerous other creditors object to confirmation attempting to procure more for themselves, in many instances based on misstating Plan provisions and sometimes to extract leverage.  Because this reply must be filed before the Oversight Board can fully analyze and deliberate over the Government's conditional debt authorization, this reply limits itself to the Government's filed plan objections, and all other timely filed objections.   The Oversight Board will report to the Court on or before November 5, 2021 about whether it believes it should continue to prosecute the Plan and whether any amendments and additional notices or pleadings are necessary.

3.      Objections to confirmation of the Plan (collectively, the "Plan Objections") and to the proposed form of confirmation order [ECF No. 18447] (as it may be amended, the "Confirmation Order") many of which repeated their Plan objections (the "Proposed Order Objections" and, together with the Plan Objections, the "Objections") are set forth on **Exhibit A**. Additionally, certain parties filed reservations of rights or other statements with respect to the Plan and/or Confirmation Order, which are set forth on **Exhibit B**.

4.      The Debtors submit, subject to the impact of the Government's conditional debt authorization, all the Objections should be overruled, the Plan should be confirmed, and the Confirmation Order be entered.  The responses to the Objections are set forth in brief form in the body of this Reply (the "Reply Brief") organized by subject matter, on the omnibus reply chart to the Plan Objections organized by objector (the "Plan Reply Chart"), attached hereto as **Exhibit C**, and on the omnibus reply chart to the Proposed Order Objections organized by

objector (the "Proposed Order Reply Chart" and, together with the Plan Reply Chart, the "Reply Chart"), attached hereto as **Exhibit D**.

A. **CONSIDERATION OF THE BEST INTERESTS TEST WARRANTS CONFIRMATION**

5.      The DRA Parties argue the Plan is not in the best interests of creditors because, they alleged, the Commonwealth has more assets available for distribution and could increase those assets through certain reforms and other actions not currently contemplated by the Fiscal Plan [ECF No. 18590 ] (the "DRA Parties Objection").  These arguments are without merit.

6.      The DRA Parties[6] object to the Plan on the basis that it is not in the best interests of creditors as required by PROMESA section 314(b)(6).   DRA Parties Obj. ¶¶ 42–57.   In support thereof, the DRA Parties submitted a report by David W. Prager (the "Prager Report"). Mr. Prager purports to show the Commonwealth will have more funds available to creditors if the Commonwealth's Title III case is dismissed than if the Plan is confirmed.  Specifically, Mr. Prager concludes that "[a]t least $3.4 billion (and up to $23.5 billion) of additional cash and future value would be available to creditors under non-bankruptcy law than is provided in the Plan."  DRA Parties Obj. ¶ 45; Prager Rep. at 4.  To reach this dramatic conclusion that more revenues would be available in a chaotic race to the court house, Mr. Prager makes special assumptions and deploys inaccurate methodologies.  It is not credible, and does not convincingly contradict the analysis set forth in the *Declaration of Ojas N. Shah in Respect of Plan of*

---

[6] To the extent the Court will determine as part of its ruling on the Oversight Board's motion to dismiss the DRA Parties' adversary complaint (Adv. Pro. No. 21-00068-LTS, [ECF No. 40]) (the "Motion to Dismiss") the DRA Parties do not have a security interest in the Retained Act 30-31 Revenues (as defined in the Motion to Dismiss), the Oversight Board reserves all rights to object to the DRA Parties' standing to make any objection that is outside the scope of permitted objections allowed by the Transfer Agreement, dated November 29, 2018 [ECF No. 16276-25, Exhibit G].  The Oversight Board hereby incorporates its argument in the *Objection Of Financial Oversight And Management Board For Puerto Rico To DRA Parties' Motion For Allowance Of Administrative Expense Claim* [ECF No. 18065].

*Confirmation* [ECF No. 18730] ("Shah Declaration") and in the best interests test report for the
Commonwealth [ECF No. 17628, Exhibit P] (the "Commonwealth Report") showing the Plan is
in the best interests of creditors of each of the Debtors.

7.      As explained below, the DRA Parties and the Prager Report make at least four
fundamental errors. *First*, Mr. Prager ignores the statutes that require the Commonwealth to
transfer funds to certain instrumentalities outside Title III.  Although PROMESA continues to
apply, once the expenses in the Oversight Board's certified budget are paid and the
Commonwealth debt obligations are brought up to date (without acceleration because there is no
acceleration of GO bonds), money would be available for HTA, PRIFA, and CCDA.  To reach
his desired conclusion, Mr. Prager compounds that error by not projecting Commonwealth cash
flows on a year-by-year basis, and instead looking only at Commonwealth revenues in the
aggregate in the years covered by the Fiscal Plan.  In doing so, he and the DRA Parties overstates
the amounts available for creditors.  *Second*, Mr. Prager ignores PROMESA's preemptive effect
and the police power in the Puerto Rico constitution and asserts Commonwealth law will require
payment to creditors before operating expenses of the Commonwealth may be paid.  *Third*, Mr.
Prager makes highly unrealistic assumptions about Commonwealth finances and settlements with
constituencies outside of Title III.  Specifically, the Prager Report assumes (i) that the Fiscal
Plan projections with respect to structural reforms and fiscal measures proposed to improve the
Commonwealth's finances would be unaffected by the chaos from financial and political
instability and race-to-the-courthouse brought on by the dismissal of the Commonwealth's Title
III case, (ii) that the proposed pension reforms embodied in the Plan would remain in place, and
(iii) potential court-ordered reductions in spending to what the Prager Report denotes as "non-

Core Services" may instead be allocated to creditors, all without examining the harms to Puerto
Rico's economy and reduced revenue that would result from dismissal of the Title III cases.
None of Mr. Prager's unsupported assumptions are realistic.   *Fourth*, the Prager Report
overestimates the Commonwealth's available cash and then allocates it to Commonwealth
creditors by (i) underestimating the minimum liquidity the Commonwealth needs to operate
outside of Title III and (ii) aggressively estimating a higher level of federal funding from
Medicaid.

> **1.  The Commonwealth Report—and not the Prager Report—uses the correct
> methodology to calculate available resources to creditors**

8.      The DRA Parties and Mr. Prager criticize the Commonwealth Report's analysis of
specific payments to specific creditors, arguing that "[s]uch a construct conflates an analysis of
various intercreditor disputes with the fundamental question of whether more value is available
[if the Commonwealth's Title III case is dismissed] than under the Plan.  DRA Parties Obj. ¶ 47;
Prager Rep. at 12.  First, that is incorrect, as the Commonwealth Report analyzes the recoveries
of creditors on an aggregated basis, reporting the "[e]stimated likely range of overall recovery to
Commonwealth creditors," which the Commonwealth Report projects outside of Title III to be
$9.3 billion to $15.3 billion.  *See* Shah Decl. ¶ 35.  Accordingly, the DRA Parties are mistaken to
state that the "[Commonwealth] Report does not measure whether creditors, taken as a whole,
would attain a higher recovery by exercising their remedies under applicable non-bankruptcy law
than under the Plan."  DRA Parties Obj. ¶ 47.[7]

9.      Second, the DRA Parties are mistaken to ignore the legal disputes that would need
to be resolved outside of Title III, as not every dispute discussed in the Commonwealth Reports

---

[7] The DRA Parties accept that, when the Court considers if the Plan is in the best interests of
creditors, it should consider the recoveries of all creditors in the aggregate if the Title III cases
were dismissed.  DRA Parties Obj. ¶ 43; Prager Rep. at 12.

is a mere "intercreditor dispute," and the resolution of such disputes may increase payments to non-Commonwealth creditors (*e.g.*, the Allocable Revenue Entities).   Although PROMESA section 314(b)(6) requires the "best interests test" to implement "non-bankruptcy law and the constitution of the territory[,]" Mr. Prager dispenses with the work of forecasting how funds actually would flow on a year-by-year basis.  Instead, it starts with an oversimplified calculation of the total consideration to be provided to Commonwealth creditors pursuant to the Plan—$19.28 billion, *id.* at 8—and concludes that additional monies should be made available to creditors, and accordingly that creditors are better without the Plan.  *Id.*  Similarly, the Prager Report does not consider litigation risks related to the validity of certain Constitutional Debt issued by the Commonwealth.

10.     For example, if certain GO Bonds are determined to be invalid, that would change the waterfall of payments, as in any given year the Commonwealth will only pay claims of holders of Constitutional Debt that are deemed valid by a court.  This will increase funds available to stakeholders holding the next priority to Commonwealth funds, which would include the Allocable Revenue Entities (i.e., HTA, PRIFA, and CCDA), which are not creditors of the Commonwealth.  The Prager Report, however, contains no discussion of payments to non-creditors in years in which all other obligations are current, including payments to Allocable Revenue Entitles.  *See* Prager Depo. Tr. 66:21–67:6, attached hereto as **Exhibit E**.

11.     In the Shah Declaration, Mr. Shah, a Partner at McKinsey & Co. ("McKinsey") who led the development of the Commonwealth Report, makes clear that, in preparing the Commonwealth Report, McKinsey went to great lengths to forecast the flow of funds if the Commonwealth's Title III case were dismissed.  For each fiscal year, McKinsey estimated the Commonwealth's starting cash, revenues, and projected operating expenses (including the

payment of current pension obligations) in the hypothetical non-Title III world, and after deduction of those expenses, allocated resources in accordance with Commonwealth law: first, to Constitutional Debt due and payable in that fiscal year; second, to the Allocable Revenue Entities; and third, to unsecured creditors, in each case to the extent funds are available after paying the expenses in the Oversight Board's budgets. *See* Shah Decl. ¶¶ 16–34; Commonwealth Rep. at 15 (Exhibit 3). In light of the cash the Commonwealth has collected during the pendency of these Title III cases under the protection of the automatic stay, in the early years, the Commonwealth would have sufficient resources to make payments both to (i) Allocable Revenue Entities and (ii) certain, if not all, budgetary expenses, including those the Prager Report designates as "non-Core Services." The Prager Report does essentially none of that analysis. Instead, Mr. Prager simply assumes both amounts (and more) are available for creditor recoveries outside of Title III. Accordingly, the methodology in the Prager Report for determining payments to Commonwealth creditors is fundamentally inaccurate and unreliable.

**2. The DRA Parties Are Incorrect as a Matter of Law that the OMB Act Will Determine Commonwealth Distributions Outside of Title III**

12. The central tenet of the DRA Parties' best interests test objection is their assumption that outside of Title III, the OMB Act (as defined in the DRA Parties Objection) requires the payment of all Constitutional Debt before some or even any other Commonwealth expenses may be paid. DRA Parties Obj. ¶ 48. Starting from this assumption, the Prager Report calculates amounts available for creditor payments on an aggregate basis over the life of the Fiscal Plan (as opposed to a year-by-year basis) and determines they would be distributed to creditors in accordance with the OMB Act. *See* Prager Rep. at 13. Based on this analysis, the DRA Parties argue that outside of Title III, "all current cash resources would be made available

to creditors, which would result in at least $1.3 billion of additional cash that could be paid to creditors [if the Commonwealth's Title III case is dismissed]."  DRA Parties Obj. ¶ 48.

13.      However, the DRA Parties' reliance on the OMB Act is misplaced.  The Act is preempted by provisions of PROMESA that would continue to apply even after the Title III cases were dismissed.  *See* Confirmation Br. ¶¶ 271–301 (explaining that PROMESA preempts, among other things, appropriations inconsistent with Oversight Board-certified fiscal plans and budgets).  The Prager Report even acknowledges the Fiscal Plan's preemptive effect, as it explains that DRA Parties' counsel instructed Mr. Prager to assume all powers of the Oversight Board "other than with respect to debt enforcement" would continue outside Title III.  Prager Rep. at 30.  The DRA Parties do not explain why the Oversight Board's authority over Commonwealth fiscal plans and budgets can remain in effect, yet contrary to the Oversight Board's budget, the OMB Act would mandate payment to creditors before some or even all operating expenses of the Commonwealth Government could be paid.  Nor do they explain why the Commonwealth Government would allow the OMB Act to remain in effect to provide for payments to creditors but not for important public goods and services.  The Prager Report assumptions are simply the opposite of common sense and logic.

14.      Even assuming for the sake of argument the Oversight Board's preemption arguments were incorrect, the police power will allow the Commonwealth to forgo debt payments to benefit the public.  Courts in analogous circumstances have allowed governmental entities to retain resources and impair their own contracts to ensure their solvency.  *See Balt. Teachers Union v. Mayor of Baltimore*, 6 F.3d 1012, 1022 (4th Cir. 1993) (allowing Baltimore to modify its' employees contracts to balance its budget, after exhausting alternatives, without violating the Contracts Clause) *see also Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398,

8

436–37 (1934) ("The economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.").

15.     Additionally, Mr. Prager assumes all amounts he identifies as potential cuts from the Commonwealth Government's expenses would be paid to creditors.  *See, e.g.*, Prager Rep. at 9.  Mr. Prager does even purport to have considered the effects of such cuts on the Commonwealth economy and whether the cuts would impair the Commonwealth from providing sufficient public services to its citizens.  Remarkably Mr. Prager stated during his deposition that he has no opinion whether or to what degree any spending cuts would affect the Commonwealth's economy (including a possible increase in outmigration, decrease in tourism, *etc.*).  *See* Prager Depo. Tr. 112:5–9, 11–20; *id* at 112:25–113:15.  This failure highlights the fundamental unreliability of Mr. Prager's methodology.

16.     Even the Prager Report does not really follow the strict waterfall in the OMB Act.  Mr. Prager parses through the Commonwealth's expenditures, denotes certain expenditures as "non-Core", and then declares they would be made available to creditors if the Commonwealth's Title III case is dismissed.  *See* Prager Rep. at 15.  He does that even though he admits the Oversight Board has done "a fine job of prioritizing [and] controlling expenses"  Prager Depo. Tr. 113:14–5.

### 3.  The Prager Report Unreasonably Assumes that All Revenues Projected by the Fiscal Plan Would Still Materialize if the Commonwealth's Title III Case is Dismissed

17.     The Commonwealth Report observes that the dismissal of the Commonwealth's Title III case would lead to political and economic uncertainties that would, among other things, negatively impact the Government's implementation of fiscal measures and adoption of structural reforms contemplated by the Fiscal Plan.  Commonwealth Rep. at 4, 8.  Accordingly, the Commonwealth Report includes a range of downward adjustments to the Fiscal Plan

projections, each of which reduces projected resources available to creditors and non-creditors alike in the non-Title III setting.  *See* Shah Decl. ¶ 25.

18.     The Prager Report, on the other hand, makes the bald, unsupported assumption that, notwithstanding the dismissal of the Commonwealth's title III case, "[a]s the [Oversight] Board continues to have its full powers, all structural reforms and fiscal measures set forth in the F[iscal] P[lan] would be implemented."  Prager Rep. at 30.  This assumption means he thinks the Commonwealth government would impose measures to help creditors while providing their people less services!  One need not be an expert to know legislators dependent on elections do not operate that way..  *See* Prager Depo. Tr. 139:5–10 (admitting prior certified fiscal plans included still unimplemented structural reforms); 139:11–22 (admitting political challenges to implementing structural reforms); 143:12–22 (witness unable to recall any specific structural reforms included in certified fiscal plans that have been implemented).

19.     It is also wrong for several reasons.  First, if the Commonwealth's Title III case were dismissed, the Commonwealth  likely would return to the state of financial instability that existed prior to the enactment of PROMESA and the protection of the automatic stay.  *See* PROMESA § 405(m)(2) ("as a result of its fiscal emergency, the Government of Puerto Rico has been unable to provide its citizens with effective services").   As the Supreme Court acknowledged in 2016, "Puerto Rico and its instrumentalities are in the midst of a fiscal crisis. More than $20 billion of Puerto Rico's climbing debt is shared by three government-owned public utilities companies . . . ."  *Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938, 1942 (2016).  The amount of this debt has only increased since 2016.

20.     Outside of Title III and without a confirmed plan of adjustment, creditors would race to the courthouse to recover on their claims.  *See, e.g.*, *In re City of Detroit*, 524 B.R. 147,

216 (Bankr. E.D. Mich. 2014) ("the Court finds that chaos would ensue if the City's creditors engaged in the proverbial 'race to the courthouse' to obtain judgments against the City upon the dismissal of the chapter 9 case"); *In re Bamberg Cnty. Mem'l Hosp.*, No. 11-03877, 2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012) ("In the absence of [the chapter 9] plan it is unlikely that there would be any orderly distribution to creditors. Instead, those creditors able to pursue litigation most quickly would benefit at the expense of others."); *see also* 6 Collier on Bankruptcy § 943.03 (16th ed. 2021) ("In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds. Clearly, such a result is chaos, especially in those cases where the debt burden of the municipality is too high to support on the taxes that the lands of the municipality will bear or the taxes or fees that the inhabitants or the users of municipal services will pay.").

21. Settlements to be resolved pursuant to the Plan would disappear and new litigation would arise therefrom which could severely disrupt the Commonwealth and its operations. *In re Hardeman County Hospital District*, 540 B.R. 229, 242 (Bankr. N.D. Tx. 2015) ("In the event of dismissal of this [chapter 9] Case, such chaos would ensue, and the Debtor would face substantial unpaid debts and millions of dollars in asserted liabilities that have been otherwise settled in the many settlements that have taken place during the Case or satisfied in full by the Plan.").

22. Finally, the Commonwealth would face liquidity constraints in the ordinary operation of its government and the services provided thereby. Given existing defaults on substantial proportions of its debt, without the benefit of administrative expense priority pursuant to Bankruptcy Code section 503, trade counterparties would be unlikely to extend credit to the Commonwealth, and instead would demand payment prior to providing any goods or services.

11

*See, e.g.*, *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d 1091, 1097 (9th Cir. 1995) ("§ 503's principal purpose is to induce entities to do business with a debtor after bankruptcy by insuring that those entities receive payment for services rendered."). This is especially true if, as assumed in the Prager Report, some or even all Commonwealth funds would first go to pay the Constitutional Debt. *See* Prager Rep. at 8.

23.     The Prager Report also engages in the assumption that "[p]ension and other union settlements contemplated by the F[iscal] P[lan] could be implemented outside of a plan of adjustment and are assumed to continue." Prager Rep. at 30. It is entirely unclear why, or even how, this arguably could be true. Without a confirmed plan of adjustment, there would be no collective action mechanism by which to bind dissenters. Further, it is unclear why such constituencies would agree to a restructuring when they would have little likelihood of being paid, given the deficits that the Commonwealth would be likely to run in the years after the Commonwealth's Title III were dismissed. The agreements reached by the Oversight Board with the Retiree Committee and AFSCME and incorporated in the Plan, and the pension payments provided for under the Plan, are predicated on the Commonwealth confirming a plan that substantially reduces prepetition debt obligations and provides a funding mechanism for future pension payments.

24.     Ultimately, the Prager Report is indifferent to pension reform, asserting that "any alternative pension reform (or lack thereof), would simply result in a reallocation of value to retiree creditors from other creditors, with net neutral effect on overall value available." Prager Rep. at 30. But the Plan will implement certain modifications to pension benefits, such as a benefits freeze and elimination of cost of living adjustments, *see* Plan Article LV, and those adjustments will not occur if the Commonwealth's Title III case is dismissed. Accordingly,

benefit entitlements will continue to accrue if the Commonwealth's Title III case were dismissed, diverting funds that may otherwise go to creditors.  Without a settlement, the obligations to make these future payments to non-creditors would be higher.

25.    With respect to pension reform, the Prager Report contradicts itself, as it also assumes that "the [$2.8 billion in] value [through Fiscal Year 2030] contributed to the Pension Reserve Trust", which is not included in the Commonwealth Report, "would be available for creditor distribution."  Prager Rep. at 35.  The Pension Reserve Trust is an integral part of the Commonwealth's settlements with retirees and is incorporated into the Plan to provide assurance that pensions will be paid.  Even if the Commonwealth were somehow able to consummate the settlements proposed with retirees outside of the Plan, by its terms, such settlement would include the Pension Reserve Trust.  The Prager Report cannot self-servingly cherry-pick the components of settlements it likes (here, a reduction in pensions) and does not like (here, declining to establish a Pension Reserve Trust) in order to generate the highest possible recoveries for creditors of the Commonwealth outside of Title III.

26.    The DRA Parties purport to rely on statements by Oversight Board experts in asserting that more money would be available to Commonwealth creditors if the Commonwealth's Title III case were dismissed.  They note that Dr. Andrew Wolfe has opined that there are structural reforms not included the Oversight Board's recommendations in the current Fiscal Plan that, if adopted by the Commonwealth, could generate substantial additional value.  DRA Parties Obj. ¶ 52.  But the DRA Parties fail to acknowledge that Dr. Wolfe's testimony examines if the Commonwealth be able to make "full repayment of the Commonwealth's restructured post-confirmation debt services (principal and interest) as provided for in the [Plan].  Wolfe Expert Report ¶ 7.  As noted above, in the absence of

confirmation of the Plan, the circumstances and incentives for the Commonwealth's adoption of the structural reforms recommended in the Fiscal Plan, and the conditions necessary for those reforms to generate the economic growth contemplated in the Fiscal Plan, will not exist.  It is highly unlikely the structural reforms contemplated in the Fiscal Plan will be adopted or implemented without a Plan, let alone the additional reforms outlined in the Wolfe Report.  *See supra* ¶ 12.   Mr. Prager ignores Dr. Wolfe's observations that the government has not implemented many measures the Oversight Board has imposed.  And, he ignores that the focus of Dr. Wolfe's report is to show what measures could be adopted to stay out of default.  That is a different world than the best interests analysis finds itself.  In the best interests analysis, the Commonwealth is in default and there is a struggle between the people and the creditors for cash and services.  Mr. Prager cannot, or at least should not, assume that contrary to human nature, the politicians will favor the creditors.

27.     The DRA Parties' citation to the Report of Marti Murray is even more confusing, DRA Parties Obj. ¶ 53, as Ms. Murray testified to the feasibility of the Commonwealth paying its future debt service *if the Plan is confirmed.  See* Murray Expert Report ¶ 17 ("I have been asked to determine . . . whether implementation of the Plan will result in a level of future debt service that is consistent with sustainable debt levels[.]").  She did not opine that current debt service— which is billions of dollars greater than what will be owed pursuant to the Plan—can be paid by the Commonwealth.

28.     Independent of its erroneous assumption that all reforms contemplated by the Fiscal Plan would materialize outside of Title III,  the Prager Report posits that creditors of the Commonwealth would obtain injunctions precluding the Commonwealth from spending money on some or all of what it denotes "non-Core Services"  Prager Rep. at 34.  However, even

assuming a Commonwealth court might foreclose some spending on "non-Core Services" and direct those monies to creditors, the Prager Report's analysis on this issue is half-baked.  Indeed, Mr. Prager admits that his report does not provide for a dynamic analysis.  *See* Prager Depo. Tr. at 102:14–17 ("Q: Did you go into the model and make any adjustment with respect to spending, to see how it would impact the outputs?  A: No, it wasn't necessary.").  For example, the Prager Report asserts that $1.8 million spent on a Professional Golf Association event in Puerto Rico could be redirected to creditors by a Court.  *See* Prager Rep. at 16.  While that may reduce expenses, the Prager Report contains no offsetting reduction in economic activity and corresponding taxes (e.g., hotel and sales and use taxes) received by the Commonwealth from the cancellation of such an event.  More generally, Mr. Prager uses golf as an example of an expense that can be eliminated, but totally ignores that the people of Puerto Rico will only accelerate out-migration as recreational expenses are taken away.  Again, Mr. Prager ignores human nature.  Other hypothesized cuts are similarly looked at in isolation.  *See generally* Prager Rep. at 16 (proposing cuts in addition to the Professional Golf Associatoin Event to airline incentives and the Caribbean Class Equestrian Event, among others, without accounting for a corresponding reduction in Commonwealth revenue, taxes, or expenditures, including from employment taxes or unemployment benefits which might need to be paid to terminated employees).  Cutting services that the Prager Report treats as "non-Core Services" will lead to less growth, less surplus in the long run and likely will accelerate outmigration.  *See, e.g.*, Paul Carrillo, Anthony Yezer, Jozefina Kalaj, *Could Austerity Collapse the Economy of Puerto Rico?*, Inst. for Int'l Econ. Policy, George Washington Univ., Sept. 2017 (significant austerity in circumstances of defaults and debt crises produces large negative impacts on growth and can

induce a steep and prolonged recession, spurring mass outmigration and a downward spiraling economy). [8]

29.     More generally, the Prager Report assumes there would be no difference whatsoever in the economic performance of the Commonwealth if the Commonwealth were to slash spending on priorities that Mr. Prager defines as "non-Core" even though such services provide a measure of goods and services that incentivize people to live, work, and travel in Puerto Rico and otherwise stimulate growth.  *See* Prager Depo. Tr. 97:14–23 (no downward adjustment to projected revenues in certified fiscal plan); 102:7–19 (no use of model to analyze adjustments to spending); 112:5–9, 11–20 (no opinion on effect of reducing spending on culture programs); 112:25–113:8, 113:10–15 (no opinion on effect on tourism of reducing spending on culture programs).  Without a macroeconomic view of such cuts, and their impact on the size of Puerto Rico's economy, its tax revenues, and the quality of life in the Commonwealth, the Mr. Prager's conclusion that so-called "non-Core" expenses could instead be paid to creditors with no negative economic effects is entirely unpersuasive.  In contrast, the Commonwealth Report included a dynamic analysis that adjusted the Fiscal Plan projections to a scenario where the Title III were dismissed, as well as its effect on the amounts of projected revenues.

_____

[8] In addition to failing to consider the possible negative economic effect of eliminating funding for the kinds of revenue-generating activities described above, the Prager Report also identifies potential cuts in expenses funded by the federal government, including programs expressly dedicated to the increase of economic activity on the Island, such as federal funding for the Department of Economic Development and Commerce and the Public Private Partnership Authority.  Prager Rep. at 16.  Mr. Prager admitted during his deposition he did not know whether items listed in his "government functions" and "non-core" categories might be federally funded (Prager Depo. Tr. 84:9–85:3), and that he did nothing to investigate whether they were ("I don't believe we -- I delved into the specifics of each line item, tying it to -- to federal funding."  Prager Depo. Tr. 85:8–10).  Of course, eliminating those federally funded expenditures would not increase amounts available to creditors, as Mr. Prager assumes, because federal funds are earmarked for their authorized purposes.  And elimination of the expenditures would further reduce growth and economic activity.

30.     Further, the DRA Parties erroneously assert the Reports contain a methodological error.  Specifically, they argue that the Commonwealth Report "improperly assumes that $2.8 billion in value contributed by the Commonwealth to the Pension Reserve Trust would not be available for the Commonwealth creditors [if the Commonwealth's Title III case is dismissed.]" DRA Parties Obj. ¶ 50.  But the Commonwealth Report did no such thing and does not contemplate the establishment of any pension reserve if the Commonwealth's Title III case is dismissed, as pensions are treated as operating expenses and paid in the year they come due.  *See supra* ¶ 11.  Further, even if the Commonwealth Report had incorporated contributions to a reserve trust, it would actually reduce future Commonwealth expenses and make more money available to creditors, as the trust funds are projected to earn interest, which reduces funds from the operating budget needed to pay pensions in future years.  *See* Malhotra Decl. ¶ 34.

### 4.   The Prager Report does not contain a reasonable estimate of the Commonwealth's liquidity needs and projected available cash

31.     The Prager Report asserts that the Commonwealth has more cash available to distribute to creditors than is distributed pursuant to the Plan.  Specifically, the Prager Report observes that the Commonwealth projects having $2.7 billion of "net unrestricted cash" available upon the emergence from Title III, but that the Report reserves only $1.2 billion to $1.7 billion as the minimum liquidity the Commonwealth requires.  Prager Report at 20.  Accordingly, the Prager Report concludes, "a minimum of $972 [million] of additional cash would be available for creditor distributions [if the Commonwealth's Title III case was dismissed."  *Id.*; *see also* DRA Parties Obj. ¶ 48 ("at least $1.3 billion of additional cash . . . could be paid to creditors [if the Commonwealth's Title III case is dismissed]").

32.     The Prager Report further takes issue with the Commonwealth Report's projections of minimum liquidity needs, which it argues are overestimated and that a court would

find to be lower by a range of $130 million to $435 million.  Prager Rep. at 21.  The Oversight

Board disagrees, and relies upon the work of its expert (which is incorporated into the

Commonwealth Report), Adam Chepenik, who has extensively analyzed minimum liquidity

needs for sovereigns comparable to the Commonwealth, and determined that the minimum

liquidity of $1.2 to $1.7 billion is appropriate.  *See* Chepenik Decl. ¶ 29.  The Prager Report's

attempt to undermine this analysis is unconvincing.  Specifically, the Prager Report notes that

"[s]ince the [Commonwealth] began reporting its current cash position, its largest intra-year

decline in cash is only $320 [million,]" and that "[t]he empirical evidence of the

[Commonwealth]'s liquidity needs indicates $880 [million] of additional cash available for

distribution."  Prager Rep. at 22.  However, these cherry-picked numbers ignore that the

Commonwealth has only been reporting its current cash position since 2017, which is after the

commencement of the Commonwealth's Title III case and corresponding imposition of the

automatic stay.  Of course, since the Commonwealth Petition Date, the Commonwealth has not

paid prepetition bond claims, allowing the Commonwealth to build up a significant cash balance.

In a chaotic world brought upon by the dismissal of the Title III case and the loss of the

protection of the automatic stay, it would be entirely prudent for the Commonwealth to maintain

a higher level of liquidity than a myopic examination of cash outflows during the last few years

might allow.

33.     The Prager Report also objects to the Commonwealth's projections of future U.S.

government Medicaid funding as set forth in the Fiscal Plan and relied upon in the production of

the Commonwealth Report.  Prager Rep. at 38.  However, the amounts projected in the Fiscal

Plan are well-founded.  While it is true that the U.S. Department of Health and Human Services

has more recently announced that Medicaid allocations should be set in line with the current

funding, growing at the rate of medical cost inflation, Prager Rep. at 38, the Prager Report fails
to mention that validity of this determination is uncertain, remains subject to legal and political
challenge, and that it remains uncertain whether additional Medicaid funding will be allocated to
Puerto Rico, and if so, what the amount of that funding will be.  *See* Malhotra Decl. ¶¶ 46–47.
Accordingly, the Prager Report's claim, and the DRA Parties' assertion, that billions of dollars
of additional value of Medicaid funding will be available to the Commonwealth and thus free up
resources to pay creditors, *see* DRA Parties Obj. ¶ 53, is not a certainty, and the Oversight Board
will not assume the availability of revenues in its Fiscal Plan, or commit the Commonwealth to
make payments to creditors from funds that may not materialize.  Fundamentally, Mr. Prager
provides no explanation why the United States government will provide more funds if they will
go to creditors.

34.    Even if the DRA Parties were correct that the Commonwealth has more value
available than is projected to be distributed pursuant the Plan, *see* DRA Parties Obj. ¶¶ 54–56,
the DRA Parties have not shown that it would affect the Court's analysis of whether the best
interests test is satisfied here, which requires the Court to consider whether-recoveries under the
Plan would be better if the Commonwealth's Title III case were dismissed, and as compared to
some hypothetical best possible Plan.  As the DRA Parties acknowledge, the best interests test
does not require that the Commonwealth squeeze every last dollar available and distribute those
resources to creditors pursuant to the Plan, but that the court "find a middle ground between the
repayment of creditors and providing government services when assessing best interests."  DRA
Parties Obj. ¶ 44 (citing *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo.
1999)).  Because the debtor is performing an important government function, it cannot be
liquidated, and must retain sufficient funds with which to operate and to make necessary

19

improvements to its facilities.  *See* 6 Collier on Bankruptcy § 943.03[7] (16th ed. 2021) ("An interpretation of the best interests of creditors test that required the municipality to devote all resources available to the repayment of creditors equals or exceeds the fair and equitable standard, which is a higher standard than the best interests test.  Creditors cannot expect that all excess cash go to the payment of their claims.  The debtor must retain sufficient funds with which to operate and to make necessary improvements in and to maintain its facilities.").

35.     The DRA Parties' citations to *Detroit* misconstrues the opinion, *see* DRA Parties Obj. ¶ 56, as the *Detroit* court did not hold that "creditors as a whole" are entitled to the "best recovery scenario possible", but rather that the plan must be in the collective interest of "creditors as a whole" and that "[c]onfirmation may not be denied simply because some creditors may do better upon dismissal."  *In re City of Detroit*, 524 B.R. 147, 217 (Bankr. E.D. Mich. 2014).  As the Plan is better for creditors of Commonwealth as a whole than dismissal of the Commonwealth's Title III case, the Plan satisfies the best interests of creditors test.

36.     Finally, Plan recoveries are just a baseline, as outperformance with respect to certain financial measures in the years following confirmation of the Plan will lead to additional distributions on account of the CVIs being distributed pursuant to the Plan.  *See* Plan, Exhibit J. Thus, the DRA Parties' contention that outside of Title III, "Commonwealth creditors [may] recover from actual [Commonwealth] financial performance, whereas the Plan limits creditor recoveries based on the economic forecast in the . . . Fiscal Plan[,]" DRA Parties Obj. ¶ 51, is mistaken, as creditor recoveries under the Plan will increase if the Commonwealth outperforms certain Fiscal Plan projections.

**B. THE PLAN APPROPRIATELY CLASSIFIES CLAIMS IN ACCORDANCE WITH BANKRUPTCY CODE § 1122**

37.     Numerous parties object to the Plan on the basis it allegedly improperly classifies their respective claims in contravention of Bankruptcy Code section 1122.  Not surprisingly, the common theme throughout these Objections is that their respective claims should either be placed in a class receiving superior treatment, or their claim should be separately classified and paid in full.  As explained in the Confirmation Brief (at ¶¶ 50–59), these arguments—which, in essence, concern *treatment* and not *classification* of claims—are misguided because (1) section 1122 only provides similar claims may be classified in the same class, thereby providing flexibility for the Oversight Board to separately classify claims, (2) the Oversight Board has broad discretion to determine whether claims are substantially similar for purposes of section 1122, (3) the Oversight Board may separately classify claims for legitimate governmental reasons, and (4) the Oversight Board may separately classify claims to implement a settlement. Most importantly, it is undisputed that each Debtor has one or more impaired accepting classes. In no case does anyone contend the classification of its claim was to gerrymander an impaired accepting class to satisfy Bankruptcy Code section 1129(a)(10), made applicable by PROMESA section 301(a).  Therefore, there is virtually no basis for any meritorious objection to classification.

38.     Objections based on the First Circuit's purported "strict approach" to classification have already been rejected.  Certain Objections, such as that of the Group Wage Creditors [ECF No. 17021] and Miriam E. Lima Colon, *et al.* [ECF No. 18583], are predicated on the argument the First Circuit requires all claims of equal legal priority be placed in the same class.  This Court, however, ruled that any such requirement was not imported into PROMESA, and instead observed that the plain language of section 1122(a) "limits the circumstances in

which claims may be joined together in a single class.  It does not require that substantially similar claims be joined together in the same class." July 14, 2021 Hr'g Trans. 77:15–21 (quoting *In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R. at 95). Thus, consistent with the purposes of PROMESA, the Oversight Board is provided "flexibility to separately classify and treat claims from different unsecured creditors." *Id.* 80:13–19.  Such flexibility, in turn, strengthens "Title III debtors' ability to propose plans of adjustment that protect the viability of the government and its instrumentalities, and the ability of the government to continue to provide services to its people, and to ensure the economic viability of the territory." *Id.*  Accordingly, Objections to the Plan predicated on the First Circuit's purported "strict classification" approach should be overruled.[9]

39.     <u>Other Classification Objections Should be Overruled.</u>  A number of objectors argue their claims have been improperly placed in a class with unsecured claims not substantially similar because their claims enjoy superior legal rights.  As explained, however, in the Confirmation Brief (at ¶¶ 57–59), the objectors are wrong because the Oversight Board correctly determined these claims are of similar priority and/or have the same collateral as the other claims in their class.

40.     For example, parties such as Sucesión Pastor Mandry Mercado [ECF No. 16481], Mapfre PRAICO Insurance Company [ECF Nos. 18512; 18513], and Cooperativa de Ahorro y Credito Vegabajena [ECF No. 18551] argue their claims cannot be classified with other unsecured claims because their claims are secured and/or not subject to discharge.  However, should the Court determine these parties hold secured or non-dischargeable claims, these claims will be treated as such.  This issue can be determined after confirmation of the Plan as part of the

---

[9] *See* Confirmation Brief ¶¶ 51–53.

claim resolution process.   No claimholder will be prejudiced, and if the Court eventually determines any claimholder is entitled to different treatment, it will receive that treatment.   Any other rule that would require the complete resolution of disputed claims before confirmation would effectively prevent the Commonwealth from emerging from Title III until thousands of disputed claims were finally resolved.   Post-confirmation claim resolution is a well-established process that takes place in every major reorganization for precisely this reason.   Thus, these Objections do not render the Plan unconfirmable.

41.   In addition, Finca Matilde Inc. [ECF No. 18566] asserts a claim arising from a proceeding in which it alleges Commonwealth actions significantly impaired the use of its real property, an impairment which it characterizes as an indirect condemnation.   It argues its claim should be in the same class as claims arising from the Commonwealth taking possession of property, which it characterizes as stemming from a direct condemnation, because both types of claims stem from the same legal authority.[10]   However, the Oversight Board has separately classified such claims because the "direct condemnation" claims are partially secured by amounts on deposit with the Commonwealth Court.   These claims will be paid to the extent of the deposit, and treated as CW General Unsecured Claims to the extent of their remaining claim. Thus, a legitimate reason exists for their separate classification.

---

[10] [ECF No. 18566 at 17–19].   The opinions cited by Finca Matilde Inc. are each irrelevant to this argument or support the Plan's proposed classification of its claims.   *In re LightSquared, Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014), is irrelevant because it found unfair discrimination when similar claims were separately classified and treated very differently.   Here, Finca Matilde's claim is totally unsecured, while the direct condemnation claims are partially secured by cash deposits.   Finca Matilde's other authorities are similarly unhelpful to it.   *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y 1990) (secured claims could be separately classified because they each had unique collateral); *In re El Comandante Mgmt. Co.*, 2006 WL 3903593, *5 (Bankr. D.P.R. Mar. 3, 2006) (separate classification of unsecured claims is permitted); *In re Sentinel Management Group. Inc.*, 398 B.R. 281, 298–99 (Bankr. N.D. Ill. 2008) (same).

42.     The Group Wage Creditors argue their claims should have been in the same class as the AFSCME Claims because both types of claims relate to employee wages.   [ECF No. 17021 ¶ 44].  The Group Wage Creditors ignore, however, that the AFSCME classification stems from a settlement with one of the primary unions representing public employees, and is thus critical to promoting harmonious labor relations and aligning the Commonwealth and its public employees towards a common purpose.  *See* Confirmation Br. at ¶ 59(b).  The rationale for the separate classification of AFSCME is set forth in ¶ 51 of the Jaresko Declaration, which explains, among other things "[t]he separate classification is compelled because the treatment of these claims is the adoption of a new collective bargaining agreements".   On the other hand, the Group Wage Creditors' claims arise from a litigated damages award, and the same overarching governmental reasons animating the AFSCME settlement—*i.e.* new collective bargaining agreements and a settlement to promote ongoing labor relations—are not present. Bankruptcy Code section 1123(a)(4) requires the same treatment of each claim in a class.  There is no new collective bargaining agreement to provide the Group Wage Creditors.  Therefore, their claims cannot be in the same class with AFSCME.  Thus, there is a compelling Government interest in the separate classification.  *See* Confirmation Br. ¶ 59(b).  There is no doubt that judgment creditors are unsecured claimholders.

43.     <u>The PFC Trustee's Claims Are Appropriately Classified as Appropriations Claims</u>.  U.S. Bank, as trustee for the PFC Bonds (the "<u>PFC Trustee</u>"), argues the Plan improperly classifies the PFC Trustee's general unsecured claims for breach of contract, *dolo* (bad faith), breach of duty of good faith, and tortious interference as CW Appropriations Claims in Class 63.  [ECF No. 18631 at ¶ 20] (the "<u>U.S. Bank PFC Objection</u>").  The PFC Trustee's objection fails because it has no general unsecured claims against the Commonwealth.  Each of

24

its purported general unsecured claims requires the existence of a contractual relationship with the Commonwealth.[11]   The PFC Trustee, however, only has contractual privity with PFC, while the Commonwealth only has obligations, if any, to PFC.   If and to the extent the PFC Trustee proves claims against the Commonwealth, they can be allowed and obtain distributions from the appropriate class of general unsecured claims, but for now, the claims are disputed.

44.   Recognizing the lack of a contractual relationship, the PFC Trustee alleges it is "indisputably an intended third party beneficiary of the Notes" between the Commonwealth and PFC.   U.S. Bank PFC Obj. ¶ 24.   This too fails because section 1404 of the Notes expressly provide there are "No Third Party Rights."   *Id.*, Ex. A. at 61.

45.   The separate classification of PFC bonds from general unsecured claims is also appropriate because the trustee's claims are based on statutes subject to repeal.   *See Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 954 F.3d 1, 7–8 (1st Cir. 2020). Also, such appropriation statutes are preempted by PROMESA because they are inconsistent with PROMESA's grant to the Oversight Board of power over appropriations.   In contrast, general unsecured claims are based on contracts or violations of law (torts) that cannot be repealed.   Moreover, unlike other appropriation statutes that contain a "Covenant with bondholders" wherein the Commonwealth may have been obligated to continue making certain appropriations,[12] the PFC Trustee points to

---

[11] Recognizing the court may find a lack of contractual relationship, the PFC Trustee asserts a claim for unjust enrichment in the alternative.   U.S. Bank PFC Obj. at 16.   This fails as well because the documents governing the Notes and PFC Bonds specify the rights and obligations of the parties and therefore there can be no separate claim for unjust enrichment.

[12] For example, 3 L.P.R.A. section 1913, entitled "Covenant of Commonwealth with bondholders" provides "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with the Authority, pursuant to the provisions hereof, that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full . . . ."

no similar provisions in "Appropriation Acts" such as Act 164 that would potentially give rise to a direct contractual relationship between the Trustee and the Commonwealth.

46.     Therefore, PFC-related claims are appropriately classified as Class 63 CW Appropriation Claims.

C.  **THE PLAN PROVIDES EQUAL TREATMENT TO CLAIMS WITHIN EACH CLASS**

47.     As set forth in the Confirmation Brief (at ¶ 38), the Plan complies with the requirements of Bankruptcy Code section 1123(a)(4) by providing equal treatment within each class of claims.  The DRA Parties, however, argue the Plan treats the claims of holders of HTA bonds in Class 59 (CW/HTA Claims) differently than the DRA's HTA loan claims in the same class.  Their objection fails for the following reasons.

48.     The DRA Parties first argue HTA Bondholders are receiving additional consideration on account of their claims because the Plan provides the order confirming the Plan must provide for HTA to make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds, in the amounts of $184.8 million and $79.2 million, respectively, upon the satisfaction of the HTA Distribution Conditions (the "HTA Interim Distribution").  DRA Parties Obj. ¶ 121.  This argument fails because the HTA Interim Distribution is a distribution made by HTA, not the Commonwealth, pursuant to the HTA/CCDA PSA.  The HTA Interim Distribution by HTA is a condition precedent to Plan effectiveness; it is *not* treatment of claims against the Commonwealth under the Plan.  *See* Plan § 86.1(b)(xv).  Further, as explained below, *infra* ¶ 115, HTA does not require court approval to make the HTA Interim Distribution because Bankruptcy Code section 363 is not incorporated into PROMESA Title III.

49.     The DRA Parties next argue the Plan violates 1123(a)(4) because it provides (1) PSA Restriction Fees and HTA Consummation Costs to certain HTA bondholders, and

26

(2) structuring fees to Assured and National not available to the DRA.  DRA Parties Obj. ¶ 122. As explained in the Confirmation Brief (at ¶¶ 38–39), such costs and fees are not awarded on account of the respective creditors' claims.  Rather, they are provided in consideration of these creditors' assistance in the formulation of the Plan and to compensate them for the reasonable fees and expenses incurred in connection with the negotiation and execution of various PSAs, which facilitated development of the Plan for all stakeholders.  Moreover, restriction fees are provided in connection with certain parties' commitment to "lock up" their bonds pursuant to the terms of respective PSAs.  These payments do not reduce the claims of the claimants within the class, and thus, contrary to the DRA Parties' contention are not "additional consideration on account of the bondholders' CW/HTA Claims."  DRA Parties Obj. ¶ 122.

50.    *Finally*, the DRA Parties argue the consent rights provided to Assured and National with respect to certain HTA plan documents also results in unequal treatment.  DRA Parties Obj. ¶¶ 123–25.  As a preliminary matter, such consent rights are intangible, non-economic benefits that do not constitute treatment on account of a claim for purposes of section 1123(a)(4) of the Bankruptcy Code.  *See, e.g.*, *In re Acequia, Inc.*, 787 F.2d 1352 (9th Cir. 1986) (holding Plan did not provide unequal treatment to two claimants where it provided each claimant with the same voting rights and economic treatment on account of their claims, despite separate plan provisions permitting one of the two claimants to participate in management post-bankruptcy).  The DRA Parties cite no authority that consent rights—which are not being distributed under the Plan— must be provided equally to all creditors in a class.

### D.  <u>THE CONSTITUTIONAL CHALLENGES TO THE PLAN FAIL</u>

51.    Various objectors, including Peter C. Hein ("<u>Hein</u>") and the DRA Parties, assert the Plan cannot be confirmed because it violates the U.S. and/or Puerto Rico Constitution.  These Objections are without merit.

### 1. The Plan Does Not Violate the Contract Clause

52.     Hein objects to confirmation on the ground it would cause his contractual rights to be impaired in violation of the Contract Clause.  Hein Obj. at 28–33.  That objection fails for several reasons.

53.     *First*, the Contract Clause applies only when legislation enacted by a state impairs a party's contractual rights.  *See* U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts.").  The entire reason for the Contract Clause was to restrict to the federal government the power to impair contractual obligations.  Here, no state legislation impairs Hein's contractual rights.   Any impairment arises from the Court's confirmation of the Plan pursuant to Title III of PROMESA.  A federal court's confirmation of a reorganization plan under federal law cannot violate the Contract Clause.  *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 732 n.9 (1984) (holding that the Contract Clause does not apply to non-legislative actions); *see also* [ECF No. 5053 at 51] ("[T]his Court may approve the Plan under PROMESA, a federal law enacted by Congress with the express purpose of allowing Puerto Rico to achieve fiscal responsibility and access to the capital markets through, inter alia, adjustment of its debts and those of its instrumentalities, without offending the Constitution.").  If a plan of adjustment could create a Contract Clause violation, it could mean that any bankruptcy restructuring of debt that includes impairment of any contractual obligation would be impossible—that is an absurd result because it renders debt restructurings impossible.

54.     Hein is also wrong when he argues his contractual rights would be impaired by the New GO Bonds Legislation, which will authorize the issuance of new securities to creditors whose claims were adjusted by the Plan.  *See* Hein Obj. at 28.  It is confirmation of the Plan that affects Hein's existing contractual claims against the Commonwealth—not the New GO Bonds

28

Legislation.  The legislation merely authorizes the issuance of new securities after confirmation of the Plan has already discharged the claims of the Commonwealth's creditors.

55.    Hein's argument that the fiscal plan certified by the Oversight Board is a state law that impairs his contractual rights likewise misses the mark.  *See* Hein Obj. at 28.  This Court correctly rejected the identical argument in confirming the COFINA plan.  *See* [ECF No. 5053 at 51–52].  The Fiscal Plan is not legislation, and it does not affect Hein's contractual rights in any manner.  Even if the Fiscal Plan were legislation it does not purport to discharge claims or extinguish liens.   Indeed, it says so in its fourth paragraph on page 2.   *See* Certified Commonwealth Fiscal Plan, dated April 23, 2021.  It is only the plan of adjustment confirmed by a federal court pursuant to the federal PROMESA statute that impairs his contractual rights.

56.    *Second*, Hein has not established that any impairment of his contractual rights would be substantial.  To make out a claim under the Contract Clause, a party must show a "substantial impairment" of contractual rights.  *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño* ("*UAW*"), 633 F.3d 37, 41 (1st Cir. 2011).   Hein's Objection does not even attempt to establish a substantial impairment.  Given that Hein is receiving commensurate value in new securities and cash under the Plan, he cannot establish a substantial impairment.

57.    *Third*, even if the New GO Bonds Legislation substantially impaired Hein's contractual obligations, the legislation would pass muster under the Contract Clause because it is "reasonable and necessary to serve an important government purpose."  *See UAW*, 633 F.3d at 41.  The New GO Bonds Legislation is similar to the legislation enacted in conjunction with the COFINA plan of adjustment, which resulted in the cancellation of the old COFINA bonds and provided creditors with substantial commensurate value in new secured bonds.  *See* [ECF No.

5053 at 53]. This Court found that legislation was reasonable and necessary "in light of the ongoing fiscal emergency in Puerto Rico." *Id.* The same is true here.

58.     Hein's proposed "alternatives" to the new bond legislation consist of generic arguments the Commonwealth should have raised taxes, cut spending, and improved its "business climate." Hein Obj. 29–33. Such generic suggestions are insufficient to show the New GO Bonds Legislation is unreasonable or unnecessary to aid the resolution of the Commonwealth's fiscal crisis. *See Hermandad De Empleados del Fondo del Seguro del Estado, Inc. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 979 F.3d 10, 18 (1st Cir. 2020) ("bare bones" and nonspecific alternatives—such as "[i]ncrease in compliance and revenue collection" or "elimination of useless tax credits"—were insufficient to show challenged law was unreasonable or unnecessary), *cert. denied*, 2021 U.S. Lexis 4785 (Oct. 4, 2021); *UAW*, 633 F.3d at 47 (alleging Puerto Rico can enlist "federal aid to help offset its deficit" is insufficient alternative under Contract Clause); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 372 (2d Cir. 2006) (rejecting argument that tax increases or cuts to other programs were "alternatives" to challenged contractual impairment).

## 2.   The Plan Does Not Violate the Takings Clause

### a.     *The DRA Parties' Takings Clause Objection Should be Overruled.*

59.     The DRA Parties object to confirmation on the ground the Plan allegedly violates the Takings Clause by diverting certain revenues from HTA that are subject to their purported security interest. DRA Parties Obj. ¶¶ 95–98. That objection fails because the DRA Parties have no security interest in the revenues at issue, and the Takings Clause applies only to secured claims. *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602 (1935); *Bank of N.Y. v. Treco (In re Treco)*, 240 F.3d 148, 161 (2d Cir. 2001) ("If the claim is unsecured, it is not 'property' for purposes of the Takings Clause.").

30

60.     The DRA Parties' purported security interest arises out of certain loans extended to HTA by the Government Development Bank for Puerto Rico ("GDB") and assigned to the DRA parties.  *See Amerinational Cmty. Servs., LLC v. Ambac Assurance Corp.*, Adv. Proc. No. 21-00068-LTS, [ECF No. 1, ¶ 46] (D.P.R. 2021).  Those loans are allegedly payable from "any available moneys and resources of HTA," including the "revenues implemented through Acts 30 and 31 and allocated to HTA."  *Id.* ¶¶ 46, 49.  The DRA Parties allege that an August 28, 2013 security agreement pledged to them as security HTA's "rights, title, obligations and interest in" the Act 30-31 revenues.  *Id.* at ¶ 50.  It is the supposed diversion of the Act 30-31 revenues that constitutes the alleged taking.

61.     As explained in detail in the fully briefed and pending motion to dismiss the DRA Parties' complaint in Adversary Proceeding No. 21-00068-LTS and the Oversight Board's objection to the DRA Parties' administrative expense motion, the Act 30-31 revenues were never transferred to HTA, and they are therefore not subject to the DRA Parties' alleged security interest.  *See* [ECF No. 17009]; *Amerinational*, Adv. Proc. No. 21-00068-LTS, [ECF No. 40]. HTA does not have any ownership interest or rights in the Act 30-31 revenues until the Commonwealth transfers those revenues to HTA.   Because those revenues were never transferred to HTA, they are not HTA property.  And if they are not HTA property, HTA could not have pledged the revenues to the DRA Parties as HTA could not pledge to the DRA Parties an interest it did not own.  The DRA Parties' asserted security interest is based solely on the security agreement between HTA and GDB, to which the Commonwealth was not a party and which does not grant a security interest in Commonwealth revenues.

62.     Further, HTA's enabling act authorizes HTA to grant a security interest only in revenues "made available" to HTA by the Commonwealth.  *See* 9 L.P.R.A. § 2004(l).   The

31

revenues at issue were not "made available" to HTA because they were collected and retained by the Commonwealth. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 619, 634–35 (D.P.R. 2020); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 478 F. Supp. 3d 190, 195–96 (D.P.R. 2020), *aff'd*, 989 F.3d 170 (1st Cir. 2021). The revenues were thus not pledged to the DRA Parties and are not subject to their purported security interest. Since the DRA Parties have no security interest in revenues retained by the Commonwealth, they have no takings claim with respect to those revenues.

63. Similarly, the alleged diversion of funds preventing a security interest from attaching are insufficient to create any claim, let alone a takings claim. The Supreme Court has expressly held that actions taken by the U.S. government that make it significantly harder for a municipality to fund a sinking fund from which the municipality's bondholders are paid do not give rise to a Takings Clause claim in favor of the bondholders. *See John K. & Catherine S. Mullen Benevolent Corp. v. United States*, 290 U.S. 89, 94–95 (1933) (The government's acquisition of lands "at most frustrated action by the city to replenish the assessment fund to which alone the bondholder must look for payment of his bonds. But this was not a taking of the bondholder's property."). The First Circuit adopted *Mullen* in a case involving similar facts. *See People of Puerto Rico ex rel. Isabela Irr. Serv. v. United States*, 134 F.2d 267, 272 (1st Cir. 1943). Here, the fact the Commonwealth may have—prepetition—taken actions making it harder for HTA to repay its debts does not give rise to any claim in favor of the DRA Parties, let alone a takings claim.

64. To avoid burdening the Court with duplicative briefing, the Board incorporates herein the arguments contained in its objection to the DRA Parties' motion for payment of

administrative expense claim and its motion to dismiss Adversary Proceeding No. 21-00068. *See* [ECF No. 17009]; *Amerinational*, Adv. Proc. No. 21-00068-LTS, [ECF No. 40].[13]

### b.    *Hein's Takings Clause Objection Should be Overruled*

65.    Hein objects to the plan on the ground it allegedly effectuates a taking of his property without just compensation.  Hein Obj. at 15.  That argument fails for at least three reasons.

66.    *First*, the plan does not affect Hein's property rights, and there can be no taking unless property rights are implicated.  *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602 (1935).  Hein holds nothing more than a contractual right to payment, which is not a constitutionally protected property interest.  *See Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940).[14]  Hein's contention that the "priority and security interests under Puerto Rico's Constitution and statutes constitute property rights" is likewise wrong.  *See* Hein Objection at 15. To create a statutory lien, a statute must specify a circumstance or condition giving rise to a lien and provide that the lien automatically attaches upon the specified circumstance or condition being satisfied.  11 U.S.C. § 101(53); *Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 1, 11 (1st Cir. 2018).  Hein cites no constitutional or statutory provision with mandatory lien-creating "shall" language because there is none.  Hein points to language in Act 83 of 1991 providing that 1.03% of the property tax

---

[13] Because the DRA Parties have no property interest in the Act 30-31 revenues, their extensive discussion of *Hunter v. City of Pittsburgh*, 207 U.S. 161 (1907), and other takings cases is irrelevant.  *See* DRA Parties Obj. ¶¶ 101–106.  There can be no taking without a property interest.

[14] Although the Supreme Court once referred to contracts as property under the Takings Clause in *Lynch v. United States*, 292 U.S. 571, 579 (1934), the Court's later decision in *Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. 211 (1986), "effectively overrul[ed], if it had not already been overruled, *Lynch* . . . to the extent that [*Lynch*] flatly holds that contracts are property that the government may not take without compensation."  *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cnty.*, 57 F.3d 505, 510 n.2 (7th Cir. 1995).

"will be considered to be a prior lien bond." Hein Obj. at 10.  However, that provision at most creates a preempted payment priority; it does not state that GO Bondholders shall be secured by such property taxes.  Similarly, Hein refers to Article VI Section 8 of the Puerto Rico Constitution, Hein Obj. at 10, but does not cite any lien-creating language so that section also, at most, creates a payment priority.  It is well-settled that a state-mandated priority of payment does not create a statutory lien.  *See Strom v. Peikes (In re Corson Furniture Co.)*, 123 F.2d 1003, 1005 (2d Cir. 1941); *see also In re J. R. Nieves & Co.*, 446 F.2d 188, 189 (1st Cir. 1971) (referring to a priority created by statute as "a mere local rule of priority invalid in bankruptcy").

67.    To the extent Hein is hinging his takings claim on his contentions the bonds are secured by the 1.03% property tax, the Plan already provides the proceeds of that tax shall be used to pay distributions on General Obligation bonds under the Plan.  Plan § 74.1(e).  The same is true for clawback revenues.  While this was just belt and suspenders to avoid unnecessary litigation, the Plan makes crystal clear the bondholders receive what some of them contend is their collateral.  Notably, Hein never treated any of this as his collateral in the last four and a half years.   He never requested adequate protection and never requested stay relief while the Commonwealth was using the tax revenues and clawback funds for purposes other than paying debt service on Hein's bonds.

68.    *Second*, there was no taking in any event.  As this Court recognized in rejecting Hein's nearly-identical takings challenge to the COFINA plan, any takings claim would be analyzed as a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978).  [ECF No. 5053 at 53].[15]  Under *Penn Central*, a court considers (i) "the

---

[15] *Per se* takings are limited to cases where the "government requires an owner to suffer a permanent physical invasion of her property" or the government's regulations "completely deprive an owner of 'all economically beneficial us[e]' of her property."  *Lingle v. Chevron*

economic impact of the regulation on the claimant," (ii) "the extent to which the regulation has

interfered with distinct investment-backed expectations," and (iii) "the character of the

governmental action."  438 U.S. at 124.

69.    As in COFINA, Hein's takings claim fails all three prongs of *Penn Central*.  *See*

[ECF No. 5053 at 53–55].  Considering the first factor, the Plan provides Hein with substantial

value in new securities and cash.  Considering the second factor, Hein invested in a public entity;

he therefore assumed the risk that any reorganization would consider the interests of the public.

*See New Haven Inclusion Cases*, 399 U.S. 392, 491–92 (1970).  Considering the third factor, the

Plan is a necessary step in the comprehensive effort to address the Commonwealth's fiscal crisis

and promote the common good.  *See Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225

(1986); *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 18–19 (1st Cir. 1993).

Considering those three factors together, there was no regulatory taking.  *See* [ECF No. 5053 at

53–55].  In rejecting Hein's previous takings challenge, the Court found the COFINA plan was a

"quintessential example of a 'public program adjusting the benefits and burdens of economic life

to promote the common good.'"  *Id.* at 54 (quoting *Penn Cent.*, 438 U.S. at 124).  That same

reasoning applies here.

70.    *Third*, Hein will receive just compensation in all events.  The Plan provides Hein

with new securities and cash in amounts commensurate to the current value of his bonds.  The

allocation of distributions was determined via a long mediation and settlement process among

---

*U.S.A. Inc.*, 544 U.S. 528, 538 (2005)—neither of which occurred here.  The cases to which Hein
cites all involve physical invasion or appropriation of property or deprivation of all of the
property's economically beneficial use.  *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570
U.S. 595, 606 (2013) (government's denial of a permit to develop wetlands because the applicant
refused to turn over property); *Horne v. Dep't of Agric.*, 576 U.S. 350, 357 (2015) (government
"program requir[ing] physical surrender" of personal property); *Cedar Point Nursery v. Hassid*,

sophisticated parties, and creditors have ratified the result by overwhelmingly voting in favor of the Plan (including the classes that in which Hein is a claimholder).  These characteristics provide sufficient proof the consideration to be received by bondholders pursuant to the plan constitutes just compensation within the meaning of the Takings Clause.  Contrary to Hein's contention, "just compensation" is not "full compensation." *United States v. Norwood*, 602 F.3d 830, 834 –35 (7th Cir. 2010).[16]

### 3.  The Plan Does Not Violate the Privileges and Immunities, Due Process, or Equal Protection Clauses.

71.     Hein objects to confirmation on the ground the Plan discriminates against mainland U.S. investors in violation of the Privileges and Immunities, Due Process, and Equal Protection Clauses because it allows on-island investors to elect to receive taxable bonds without offering off-island bondholders the same option.  Hein Obj. at 26–27.  In so arguing, Hein mischaracterizes the taxable-bond election, which is intended to allow Puerto Rico investors to receive taxable New GO Bonds with a higher interest rate, increasing the likelihood that a greater number of tax-exempt bonds are available for mainland U.S. bondholders.  *See* Brownstein Decl. ¶ 16.  Puerto Rico residents normally do not pay federal income tax.  The Plan therefore attempts to make the limited number of tax-exempt bonds more readily available to mainland bondholders by giving Puerto Rico bondholders the option to elect taxable bonds.  *See id.*.  The plan merely attempts to maximize recovery for bondholders without prejudicing anyone.

---

141 S. Ct. 2063, 2069 (2021) (regulation granting labor organizations a "right to take access" to an agricultural employer's property in order to solicit support for unionization).

[16] The cases to which Hein cites do not hold otherwise.  *Knick v. Township of Scott* simply removed a state-law exhaustion requirement for bringing a federal takings claim. 139 S. Ct. 2162, 2167 (2019).   And *Monongahela Navigation v. United States* merely held the determination of just compensation under the Fifth Amendment is a judicial function.  148 U.S. 312, 327–28 (1893).

72.    <u>Privileges and Immunities Clause.</u>    The taxable-bond election does not violate

Article IV's Privileges and Immunities Clause.  That Clause "limit[s] . . . powers of states and in

no way affects the powers of a federal district court."  *Hawes v. Club Ecuestre El Comandante*,

535 F.2d 140, 145 (1st Cir. 1976).  The Plan will be confirmed by a federal court pursuant to a

federal statute.  Provisions of the Plan are therefore not subject to the Privileges and Immunities

Clause of Article IV.[17]  Even if the Privileges and Immunities Clause applied, the Plan's taxable-

bond election would not violate it.  There is a two-step inquiry to determine whether a

classification violates the Privileges and Immunities Clause.  *Supreme Court of Va. v. Friedman*,

487 U.S. 59, 64 (1988).  *First*, the classification must burden an activity "sufficiently basic to the

livelihood of the Nation" because "[o]nly with respect to those 'privileges' and 'immunities'

bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident

and nonresident, equally."  *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 383, 388

(1978).  *Second*, the challenged action must not be "closely related to the advancement of a

substantial state interest."  *Friedman*, 487 U.S. at 65.  Neither prong is satisfied here.  The Plan's

taxable-election provision affects only distributions under the Plan and does not affect any

activity fundamental to the vitality of the Nation.  *See McBurney v. Young*, 667 F.3d 454, 462–63

(4th Cir. 2012) (noting that the "'fundamental rights' protected under the Privileges and

Immunities Clause . . . cover a much narrower range of activity" "including the rights to: (1)

practice a trade or profession; (2) access courts; (3) transfer property; and (4) obtain medical

services"), *aff'd*, 569 U.S. 221 (2013).  With respect to the second prong, the taxable-election

---

[17] Hein also invokes the Privileges and Immunities Clause of the Fourteenth Amendment.  Hein
Obj. at 26.  The Fourteenth Amendment's Privileges and Immunities Clause, however, applies
only to the right to travel and the right of citizens of one state who elect to become permanent
residents in another state "to be treated like other citizens of that State."  *Saenz v. Roe*, 526 U.S.
489, 500–03 (1999).  It has no application here.

provision advances the Commonwealth's substantial interest in restructuring its debt and regaining market access.  As the Court found in the COFINA case, the plan was a "quintessential example of a 'public program adjusting the benefits and burdens of economic life to promote the common good.'"  [ECF No. 5053 at 54].  That same reasoning applies here.  Further, as already explained, the provision does not discriminate based on residence but rather accounts for the existing differences in federal income taxation.  *See* Brownstein Decl. ¶ 16.  Notably, the provision benefits mainland U.S. investors like Hein by enhancing the likelihood they will receive the limited quantity of tax-exempt bonds issued under the Plan.  *Id*.[18]

73.   <u>Due Process and Equal Protection Clauses.</u>  The Plan's taxable-election provision likewise does not violate the Due Process and Equal Protection Clauses.  Because the provision does not infringe a fundamental right or discriminate based on a protected status, it need only be supported by a rational basis.  *See Dandridge v. Williams*, 397 U.S. 471, 519–20 (1970) (Marshall, J., dissenting); *United States v. Kras*, 409 U.S. 434, 446 (1973).  The taxable-election provision of the Plan has a rational purpose because it seeks to enhance recoveries for mainland investors without harming investors in Puerto Rico.  *See* Brownstein Decl. ¶ 16.  That rational basis easily satisfies the Equal Protection and Due Process Clauses.

74.   In addition, Hein summarily argues that the Plan's "release of Commonwealth from claims of GO and PBA bondholders" violates the Due Process and Ex Post Facto Clauses.  Hein Obj. at 17.  The Ex Post Facto Clause, however, applies only in criminal cases, not bankruptcy cases.  *See E. Enterprises v. Apfel*, 524 U.S. 498, 538–39 (1998).  And Hein's

---

[18] Hein's cases are inapposite because they all involve challenges to state laws and not to a plan of adjustment confirmed by a federal court pursuant to a federal statute.  *See Saenz*, 526 U.S. at 492 (California welfare-benefit law); *Mullaney v. Anderson*, 342 U.S. 415, 416 (1952) (Alaska Territory fishing-license law); *Blake v. McClung*, 176 U.S. 59, 60 (1900) (Tennessee bankruptcy law granting payment-priority to Tennessee creditors).

reliance on a due-process theory put forth by Justice Kennedy in a concurrence in *Eastern Enterprises* is misguided because no other Justice has accepted Justice Kennedy's postulation that takings allegations can sometimes be analyzed under the Due Process Clause, 524 U.S. at 550 (Kennedy, J. concurring)—and, in any event, there was no taking for the reasons stated herein.

75.     Uniformity Clause.  Hein and Arthur Samodovitz ("Samodovitz") object to the Plan on the ground PROMESA allegedly violates the requirement in Article I of the Constitution that bankruptcy laws be uniform.  *See* [ECF No. 18433 at 11] (the "Samodovitz Objection"); Hein Obj. at 33–34.  As the Court knows, Ambac Assurance Corporation brought a complaint based on the Uniformity Clause on May 26, 2020.  *Ambac Assurance Corp. v. Fin. Oversight & Mgmt. Bd. for P.R.*, Adv. Proc. No. 20-00068-LTS, (D.P.R. 2020) [ECF No. 1 ].  The Oversight Board's motion to dismiss was fully briefed and argued, and is currently stayed pending confirmation and consummation of the Plan.  The Oversight Board incorporates by reference its motion to dismiss and supporting memoranda of law.  Here, it does not appear Hein and Samodovitz have complied with Bankruptcy Rule 9005.1, which incorporates Fed. R. Civ. P. 5.1's requirement that a party questioning the constitutionality of a federal statute to file a notice of constitutional question and serve it on the United States Attorney General.

76.     PROMESA is not subject to Article I's uniformity requirement because it was not enacted under Article I but rather under Congress's plenary Article IV powers to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const., art. IV, § 3; *see also* PROMESA § 101(b)(2).  When Congress legislates under Article IV, it has all of the police powers of a state government.  *See Palmore v.*

*United States*, 411 U.S. 389, 397 (1973).  Those police powers include the authority to enact local bankruptcy laws like PROMESA.  *See Baldwin v. Hale*, 68 U.S. 223, 228 (1863).

77.   When enacting local legislation for a territory under Article IV, Congress is not subject to any uniformity requirement found in Article I.  *See Binns v. United States*, 194 U.S. 486, 491–92 (1904) (holding local tax law enacted for Alaska territory under Article IV was not subject to Article I's requirement that tax laws be uniform); *accord Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC,*, 140 S. Ct. 1649, 1656–57 (2020) (holding while the Appointments Clause governs Congress's creation of federal offices in Puerto Rico under Article I, it does not govern Congress's creation of local territorial offices under Article IV).  The uniformity requirement only constrains Congress's authority to enact national bankruptcy statutes under Article I, but it does not govern Congress's enactment of local bankruptcy legislation for a territory under Article IV.

78.   PROMESA would satisfy uniformity in any event.  Uniformity is a "flexib[le]" concept that "does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 158–59 (1974).  PROMESA is uniform because it addresses a specific problem related to a defined class of debtors:  the territory of Puerto Rico and the juridically separate instrumentalities of Puerto Rico.  Like the statute in *Blanchette*, PROMESA creates a bankruptcy law for a class of debtors within a particular region to address problems unique to that class of debtors.  Moreover, even if PROMESA is understood as applying to a single debtor—Puerto Rico—the statute is uniform because it applies to all territories that were in need of reorganization proceedings when

PROMESA was enacted.   PROMESA thus does not single out any territory in need of reorganization because Puerto Rico was the only such territory.

79.   Finally, Congress determined the solution to any uniformity problem is not to strike down PROMESA but rather to extend it to any territory that requests an oversight board. *See* PROMESA § 3(b).   Accordingly, even if PROMESA violates a uniformity requirement, Congress determined the court should not invalidate the statute, and there is thus no reason not to proceed with confirmation.

### E.  CONSTITUTIONAL CLAIMS ARE DISCHARGED PURSUANT TO THE PLAN

80.   Many Objections assert the objecting party has an eminent domain claim or similar claim for "just compensation" from the taking of property, and that such claim may not be impaired or discharged by the Plan.  These Objections should be overruled.

81.   The final clause of the Fifth Amendment to the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const., amend. V (the "U.S. Takings Clause").[19]  The U.S. Takings Clause does not itself apply to the states, municipalities, or to the territory of Puerto Rico.  *See, e.g.*, *Barron v. Mayor of Baltimore*,

---

[19]  Some objectors also cite to Section 9 of Article II of the Puerto Rico Constitution, which provides:   "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law."  P.R. Const., art. II, § 9 (the "P.R. Takings Clause"); *see, e.g.*, [ECF No. 9223 at 7; ECF No. 18418 at 4]; [ECF Nos. 16481 at 6 n.10; 12701 at 4 n.8; 17062 at 6 n.10; 17998 at 7 n.9].  Pursuant to the Supremacy Clause of the United States Constitution, valid laws enacted by Congress take precedence over "any Thing in the Constitution or Laws of any State."  U.S. Const., art. VI, cl. 2; *see also, e.g.*, *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 716 (1984) (Oklahoma Constitution's ban on advertising alcoholic beverages preempted by federal regulations implementing Communications Act); *Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 605 (S.D.N.Y. 2020) ("federal law preempts conflicting State Constitutions under the Supremacy Clause"), *aff'd*, 2021 U.S. App. Lexis 28995 (2d Cir. Sept. 24, 2021).  As a result, to the extent the P.R. Takings Clause would purport to prohibit the discharge of Eminent Domain Claims it would be preempted by the Bankruptcy Code, as made applicable by PROMESA, which provides for the discharge of "all debts."  11 U.S.C. § 944(b).

32 U.S. 243, 247–48 (1833) (holding Bill of Rights only applies to federal government).  Instead,

courts have held that the principles contained in the U.S. Takings Clause apply to the states and

Puerto Rico pursuant to the Fourteenth Amendment's Due Process Clause, which provides that

no "[S]tate [shall] deprive any person of life, liberty, or property, without due process of law."

U.S. Const. amend. XIV, § 1; *see, e.g.*, *Webb's Fabulous Pharms. v. Beckwith*, 449 U.S. 155,

160 (1980) ("Th[e] prohibition [contained in the Takings Clause], of course, applies against the

States through the Fourteenth Amendment."); *Fideicomiso De La Tierra Del Caño Martin Peña*

*v. Fortuño*, 604 F.3d 7, 12 (1st Cir. 2010) (principles of the U.S. Takings Clause "applies to the

states and to Puerto Rico through the Fourteenth Amendment."); *In re Ashe*, 669 F.2d 105, 110

(3d Cir. 1983) (the U.S. Takings Clause's "substantive rule has been incorporated into the

Fourteenth Amendment due process clause with respect to state takings for public purposes.").[20]

82.    As is discussed in greater detail below, the Eminent Domain Claims and any other

claims for just compensation based on the taking of property by the Commonwealth[21] are

unsecured claims for the payment of money compensation from the Commonwealth[22] and

---

[20] The analysis contained below does not change based on whether the Fifth Amendment or the
Fourteenth Amendment applies to Puerto Rico.  *Cf.* [ECF No. 9223 at 2 n.1]; [ECF No. 18418 at
2 n.2]; [ECF No. 16481 at 3 n.2]; [ECF No. 12701 at 2 n.2]; [ECF No. 17062 at 3 n.2]; [ECF No.
17998 at 3 n.2].

[21] For example, claims based on the alleged "regulatory taking" of certain property are treated as
General Unsecured Claims and discharged as such under the Plan.  Similarly, certain other
creditors may have asserted claims against the Commonwealth based on the alleged "taking" of
their property in a manner that requires "just compensation."  The same principles and analysis
apply to such claims as apply to the Eminent Domain Claims.

[22] Pursuant to section 1.211 of the Plan, an "Eminent Domain Claim" is "[a] Claim arising from
or related to an Eminent Domain Proceeding and a Final Order entered therein for an amount in
excess of the amount deposited by the condemnor in accordance with the terms and provisions of
32 L.P.R.A. section 2907, including, without limitation, interest accrued with respect thereto."
Plan, Art. 1.211.  Pursuant to Article 58.1 of the Plan, to the extent any money is on deposit with
the Court of First Instance to pay a holder of a claim arising from the prepetition taking of real
property by the Commonwealth, that money will be released to such holder.  Plan, Art. 58.1.
The Eminent Domain Claims at issue here are claims against the Commonwealth for additional

nothing in the U.S. Constitution prevents their impairment.  All circuit courts to decide the issue have held that claims for just compensation for the taking of property can be impaired and discharged in a plan of adjustment, and there is no reason for this Court to depart from that jurisprudence here.  Notably, the Plan does not propose to take any claimant's real property—the Eminent Domain Claimants' rights in their real property had already been transferred to the Commonwealth before the Commonwealth Petition Date.  *See e.g.*, [ECF No. 9223 at 4; ECF No. 18418 at 2–3]; [ECF Nos. 16481,at 4; 12701 at 3; 17062 at 3–4, 17998 at 4]; [ECF No. 17013 at 8].  It is only claims for additional money payment that are being adjusted in the Plan (*i.e.*, amounts beyond those that were deposited with the Court of First Instance).  This is permissible because, under the Bankruptcy Code, Eminent Domain Claims (and other claims for just compensation) are rights to money payment which constitute "claims" under Bankruptcy Code section 101(5)'s broad definition.  The claims are not secured by any of the Commonwealth's property—they are therefore unsecured claims.  Nothing in PROMESA grants a priority to those claims.  Bankruptcy Code section 944(b) provides for the discharge of "*all* debts,"[23] and does not specify any exception for Eminent Domain Claims (or other claims arising under the U.S. Constitution).  The Plan thus proposes to adjust and discharge them the same as other unsecured claims.  This makes perfect sense, because even if the holders of Eminent Domain Claims and other takings plaintiffs were to succeed in their lawsuits against the Commonwealth their claims would be reduced to a judgment.  A judgment creditor is an unsecured creditor, whose claim can be discharged.  *See Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 799 (7th Cir. 1986).  Conceptually, the taking of a person's

---

compensation (beyond the amount deposited with the Court of First Instance), which will be treated the same as General Unsecured Claims under the Plan.
[23] Pursuant to Bankruptcy Code section 101(12), "[t]he term 'debt' means liability on a claim."

property by the government is no different than claims against the government for tortiously injuring a person's property.  In both cases, the government is liable to pay the person for the value the person lost due to the government's action.  The liability for taking property has no greater priority than the liability for injuring property.

83.     Various holders of Eminent Domain Claims nonetheless have objected to the Plan, and argued they hold constitutional claims protected from adjustment and discharge by the U.S. Takings Clause.  *See, e.g.*, *PFZ Properties Inc. Objection* [ECF No. 9223; ECF No. 18418]; *Suiza Dairy Corp. Objection* [ECF Nos. 17526; 17013], *Oscar Adolfo Mandry Apararicio et al Objections* [ECF Nos. 16481; 12701; 17062; 17998]; (collectively, including all similar claims, the "Eminent Domain Claim Objections").  These Objections fall short.

84.     The main contention of the Eminent Domain Claim Objections is their claims for just compensation for the prepetition taking of their real property cannot be impaired and discharged without violating the U.S. Takings Clause. *See e.g.*, [ECF No. 9223 at 7; ECF No. 18418 at 4–5]; [ECF Nos. 16481 at 6; 12701 at 4; 17062, at 6; 17998 at 7]; [ECF No. 17526 at 1; ECF No. 17013 at 1].  That contention is incorrect.

85.     The U.S. Takings Clause permits the discharge of such claims.  As the Ninth Circuit has held, "[t]he Takings Clause is only implicated in bankruptcy if the creditor has actual property rights . . . If the purported property interest is, in reality, just a contractual or statutory right for monetary relief, then the debt can be adjusted in bankruptcy." *Cobb v. City of Stockton (In re City of Stockton)*, 909 F.3d 1256, 1266 (9th Cir. 2018).  The significance of actual property rights is that they may create secured claims which are entitled to the value of the collateral in bankruptcy.  Here, there is no secured interest at stake other than money in escrow for payment of some of the claims.  Rights to those escrows are not impaired by the Plan.  Every circuit case

ever to decide the issue has held that unsecured claims can be impaired and discharged in bankruptcy.  *See, e.g.*, *Bank of N.Y. v. Treco (In re Treco)*, 240 F.3d 148, 161 (2d Cir. 2001) (unsecured claims are "not 'property' for purposes of the Takings Clause" in bankruptcy); *In re Ashe*, 712 F.2d 864, 869 (3d Cir. 1983) (creditor without attached lien in specific property not protected by the U.S. Takings Clause in bankruptcy); *Americredit Fin. Servs. v. Nichols (In re Nichols)*, 440 F.3d 850, 854 (6th Cir. 2006) (distinguishing between a contractual right to payment and a secured creditor's property rights in collateral for Takings Clause purposes and noting that "[b]ankruptcy laws have long been construed to authorize the impairment of contractual obligations").[24]

86.   This has been held to be true even with respect to claims based on or arising out of the U.S. Constitution, such as claims arising from civil rights violations, including violations of the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *V.W. ex rel. Barber v. City of Vallejo*, No. CIV. S-12-1629, 2013 WL 3992403, at *2–3 (E.D. Cal. Aug. 2, 2013) (willful civil rights violations are dischargeable); *Deocampo v. Potts*, 836 F.3d 1134, 1140 n.10 (9th Cir. 2016) (willful civil rights violation are dischargeable); *see also In re City of Stockton*, 909 F.3d at 1268 ("constitutionally based lawsuits seeking money damages, such as § 1983 claims, are routinely adjusted in bankruptcy").  Here, it is undisputed (and indisputable) that the Eminent

---

[24]   *See also, e.g.*, *In re Plant Insulation Co.*, 469 B.R. 843, 875 (Bankr. N.D. Cal. 2012) (only "claims that rise to the level of an enforceable interest in specific property are protected under the Takings Clause")*, aff'd*, 485 B.R. 203 (N.D. Cal. 2012)*, rev'd on other grounds,* 734 F.3d 900 (9th Cir. 2013); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) (rejecting a tort creditor's claim the Takings Clause was violated by a free and clear sale as "the objector holds an unsecured claim, rather than a lien in some collateral that is property of the estate, which is a necessary prerequisite to a [takings] claim in the bankruptcy context."), *aff'd sub nom. Ind. State Police Pension Tr. v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108 (2d Cir. 2009); *Bd. of Trs. v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1406 (9th Cir. 1984) (recognizing "distinction between purely contractual rights and identifiable property rights" for purpose of Takings Clause).

Domain Claims (and other claims for just compensation) are unsecured claims against the Commonwealth for additional compensation (beyond the compensation already provided by the Commonwealth when it took the objectors' property). As unsecured claims, they can be impaired and discharged without implicating the U.S. Takings Clause's requirement that secured claimholders are entitled to payment of the value of their collateral.

87. The only two circuit courts to decide the issue both held that claims for just compensation arising from the taking of property can be impaired and discharged in bankruptcy the same as any other unsecured claim. *In re City of Stockton*, 909 F.3d 1256 (9th Cir. 2018) is instructive. There, Cobb's real property was taken by the City of Stockton, with title to the real property vesting in the city. Later, Stockton commenced a case under chapter 9 of the Bankruptcy Code. In Stockton's bankruptcy case, Cobb asserted a claim against the city, alleging that the city had not provided sufficient "just compensation" for the taking of Cobb's real property. Stockton nonetheless sought confirmation of a plan that proposed to discharge Cobb's U.S. Takings Clause claim after paying it only cents on the dollar. Cobb objected to the plan, arguing that his eminent domain claim was nondischargeable and had to be paid in full. The bankruptcy court nonetheless confirmed Stockton's plan of adjustment over Cobb's objection.

88. On appeal, after holding that Cobb's appeal was equitably moot, the Ninth Circuit Court of Appeals went on to reject his contention that his taking claim was nondischargeable. *Id.* at 1266–69. The Ninth Circuit pointed out that Cobb's real property had been taken years before Stockton filed for bankruptcy, and that, as a result, by the time the bankruptcy was filed, all Cobb possessed was "an unsecured statutory monetary claim for greater compensation." *Id.* at 1266–67. This, the Ninth Circuit held, was a "purely [] monetary claim" that could be adjusted

in bankruptcy like any other unsecured claim.  *Id.*  The Ninth Circuit rejected the argument that

the fact Cobb's claim was rooted in the U.S. Takings Clause protected it from impairment and

discharge.  *Id.* at 1268–69.  As the Ninth Circuit held, "constitutionally based lawsuits seeking

money damages, such as § 1983 claims, are routinely adjusted in bankruptcy."  *Id.* at 1268.

Nothing required taking claims to be treated differently—they therefore could be impaired and

discharged the same as any other unsecured claims.[25]  *Id.* at 1268–69.

89.     The Eighth Circuit Court of Appeals came to the same conclusion in *Pointsett*

*Lumber Manufacturing v. Drainage District No. 7*, 119 F.2d 270 (8th Cir. 1941).[26]  Specifically,

---

[25]   While the majority of the Ninth Circuit first held that Cobb's claims were equitably moot, *In re City of Stockton*, 909 F.3d at 1256–66, it nonetheless provided a fulsome, detailed discussion of the issue as to whether eminent domain claims are dischargeable as a second basis for its decision.  *Id.* at 1266–69.  As an alternate ground for the Ninth Circuit's decision, the holding relating to the dischargeability of Cobb's taking claim is not merely *dicta*.  *See, e.g.*, *United States v. Martin (In re Martin)*, 542 B.R. 479, 490 (B.A.P. 9th Cir. 2015) ("When alternate grounds are given for a holding, neither ground constitutes non-binding dicta."); *see also Export Grp. v. Reef Indus.*, 54 F.3d 1466, 1471 (9th Cir. 1995) (alternate ground for decision is binding *ratio* of case).

One objector in the Title III cases further attacks the value of the Ninth Circuit's holding in *Cobb* by arguing that, due to certain intricacies of California law, including the purported fact the City's eminent domain proceeding against Cobb was dismissed due to lack of prosecution, Cobb retained title to his land.  [ECF 18418 at 10 n.12]  This argument was rejected by the Ninth Circuit and is, in any event, entirely beside the point.  The Ninth Circuit reviewed the procedural history between Cobb and the City, concluding that Cobb had waived any substantive property rights by electing to withdraw the quick-take compensation fund when the City initially took possession of the land.  *In re City of Stockton*, 909 F.3d at 1266.  Cobb's lack of property rights was further solidified by the dismissal of his suit to quiet title over the land against the City.  *Id.* at 1266–67.  Cobb was thus determined to have lost all title to the land, and only retained the right to sue for increased money damages through an inverse condemnation claim.  *Id.* at 1267.  Regardless, the procedural history of Cobb's condemnation proceedings cannot obscure the fact the Ninth Circuit held that claims for just compensation for the taking of property are dischargeable, a holding to which the objectors have no response.

[26] One Objection argues that *Pointsett* is inapplicable because, according to the objector, *Pointsett* "did not involve a municipal debtor, it involved a two-party dispute in a composition proceeding under the revoked Bankruptcy Act."  [ECF No. 18566 at 160 n.4].  This is wrong and mischaracterizes *Pointsett Lumber*.  *Pointsett* arose from the bankruptcy of a governmental debtor—a municipal drainage district that was "created under the laws of the state of Arkansas," *Pointsett Lumber*, 119 F.2d at 271, under a predecessor statute to the Bankruptcy Code.  In it, a

there the Eighth Circuit held a taking claim could be impaired and discharged in bankruptcy, rejecting the taking claimant's argument that the claim was nondischargeable because it was "invested with a constitutional sanctity beyond other forms of liability" due to its having arisen under the takings clauses of the Arkansas and U.S. Constitutions. *Id.* at 272–73.

90.     The Eminent Domain Claim Objections cite a collection of cases to argue their claims are not dischargeable, but none avail them.  Many objections rely on *In re City of Detroit*, 524 B.R. 147 (Bankr. E. D. Mich. 2014), asking this Court to follow the *Detroit* court's holding that claims for just compensation are non-dischargeable. *See* [ECF No. 9223 at 13; ECF No. 18418 at 9; ECF No. 16481 at 10; ECF No. 12701 at 7; ECF No. 17062 at 10; ECF No. 17998 at 11; ECF No. 17013].

91.     We respectfully submit the *Detroit* case is simply wrongly decided and is not binding on this court.   While the *Detroit* court did hold that taking claims could not be discharged, the *Detroit* court's ruling was based on (i) a misapprehension of constitutional law and (ii) two precedents that have been overruled by the Supreme Court.  Most importantly, the *Detroit* court failed to either recognize or grapple with the point that Detroit had taken the objectors' property prepetition, and that the objectors' taking claims had been reduced to unsecured claims for additional compensation.   As discussed above, those claims, being unsecured claims, could be discharged under the U.S. Takings Clause, even though they arose under the constitution.

---

creditor alleged it had a claim "for just compensation" against this municipal drainage district based on "the taking of its land" by the district. *Id.* at 272. (explaining that Appellant believed "it is entitled under the constitution . . . to 'just compensation' for its injury."). The Eighth Circuit Court of Appeals held that this claim for just compensation was dischargeable consistent with the U.S. Constitution. *Id.*  Therefore *Pointsett* and its holding on the dischargeability of Takings Clause claims is highly relevant to the case at hand, and none of the objectors have any refutation of its holding.

92.   In making its ruling, the *Detroit* court relied predominantly on two cases: (1) *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985), and (2) *Louisville Joint Stock Land Bank*, 295 U.S. at 589. These cases demonstrate the *Detroit* court's errors. To reach its conclusions, the *Detroit* court specifically relied upon *Williamson County*'s holding as to when a claim arises under the U.S. Takings Clause. *See Williamson Cnty.*, 473 U.S. 172, 194 n.13 (holding that under the U.S. Takings Clause "no constitutional violation occurs until just compensation has been denied."). Based on *Williamson County*, the *Detroit* court surmised that confirming a plan discharging creditors' takings claims would, under *Williamson County*, itself violate the U.S. Takings Clause. *See In re City of Detroit*, 524 B.R. at 269. *Williamson County* however, has since been harshly criticized by the Supreme Court and overruled on precisely this point. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2173–75 (2019) (referring to *Williamson Cnty*. as "confused" with "poor reasoning," and overruling it). And *Knick v. Township of Scott* clearly states that "[c]ontrary to *Williamson County*, a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Id*. at 2170.

93.   *Williamson County* is thus no longer good law, and the *Detroit* court's reliance on it makes clear the *Detroit* decision was made in error. *Knick* makes clear the Eminent Domain Claims sprung into existence when the property was taken by the Commonwealth—that is, prepetition. The Eminent Domain Claims are therefore unsecured claims based on pre-petition actions and are thus unsecured claims freely dischargeable. The *Detroit* decision cannot stand, given the Supreme Court's decision to overturn a key precedent on which the *Detroit* court relied.

49

94.     The *Detroit* court also proceeded from a misunderstanding of *Louisville Joint Stock Land Bank*, 295 U.S. at 589, a case which several of the Eminent Domain Claim Objections also cite.  *See, e.g.*, [ECF No. 9223 at 8; ECF No. 18418 at 5; ECF No. 16481 at 6; ECF No. 12701 at 4; ECF No. 17062 at 6; ECF No. 17998 at 7].  While the Supreme Court in *Radford* stated "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment," that statement was made in the midst of the court's ruling that a bankruptcy law passed by Congress could not, constitutionally, simply eliminate a *secured* creditor's rights in its collateral.  295 U.S. at 589–91.  Nowhere did the Supreme Court indicate that an unsecured claim arising from the U.S. constitution was immune from discharge (the argument of the objectors here), and no court before *Detroit* ever thought that it did.  *See In re City of Stockton*, 909 F.3d at 1268 ("The Supreme Court has never held that the Takings Clause renders claims that accrued after the Bankruptcy Code was enacted immune from the Bankruptcy power, or the bankruptcy process."); *see also, e.g., Deocampo v. Potts*, 836 F.3d 1134, 1140 n.10 (9th Cir. 2016) (civil rights claim dischargeable).[27]  This makes sense because, if *Radford* had held that the U.S. Takings Clause prohibits the discharge of unsecured claims, it would have eliminated the bankruptcy power in its entirety.

---

[27] Objectors' appeal to the dissent in *In re City of Stockton* is unpersuasive. [ECF. No. 16481 at 10 n.13].  The dissent in *In re City of Stockton*, 909 F.3d at 1273–1280, should similarly be rejected, for many of the same reasons as the *Detroit* case (which the dissent relied on for several of its arguments).  The same as the court in *Detroit*, the dissent in *Cobb*:  (1) failed to recognize that no court has ever held that unsecured claims (such as the taking claims at issue here and in *Cobb*) are protected by the U.S. Takings Clause; (2) relied on *Williamson Cnty.* to reach its decision, which has subsequently been overruled, *id.* at 1274; (3) relied on a misreading of *Radford* and other cases discussed in the main text, none of which suggested taking claims could not be discharged, *id.* at 1272–73; and (4) created an unjustifiable distinction between Fourteenth Amendment claims (which the dissent said could be discharged) and taking claims, without recognizing anywhere that taking claims are Fourteenth Amendment claims and that the Fourteenth Amendment does not say anything about providing "just compensation."  *Id.* at 1280.

95.    Moreover, *Radford* is of extremely slight, if any, precedential value.   Only a handful of years after *Radford* was decided, the Supreme Court effectively overruled it, holding that bankruptcy laws could eliminate both unsecured rights and certain rights of a secured creditor in its collateral.   *See, e.g.*, *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440 (1937); *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273 (1940).   At the same time the Supreme Court clarified that the U.S. Constitution did not protect unsecured claims from discharge—it only protects "the rights of secured creditors, throughout the proceedings, to the extent of the value" of the creditors' collateral. *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273, 278 (1940).   The Supreme Court later referred to *Radford* as an error which had been overruled.   *See Helvering v. Griffiths*, 318 U.S. 371, 400–401, n.52 (1943) (indicating *Radford* had been overruled by *Wright v. Vinton Branch* after Congress took action requiring the Supreme Court "to reexamine its previous judgment[]"); *see also In re City of Stockton*, 909 F.3d at 1268 ("the precedential weight of *Radford* is uncertain in light of *Wright v. Vinton Branch of Mountain Bank Trust*").[28]   Nonetheless, the *Detroit* court failed to identify any of these issues with *Radford* in its discussion of the dischargeability of taking claims, instead simply assuming *Radford* was good law and that it prohibited the discharge of takings claims.   *In re City of Detroit*, 524 B.R. at 268.

---

[28] Objectors' claim that *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440 (1937) merely stands for a finding that the amended Frazier-Lemke Act was constitutional. *See* [ECF 9223 at 10 n.6; ECF No. 18418 at 6 n.9]; [ECF No. 17998 at 8 n.11].   This is incorrect. As the *Cobb* court states "the [*Wright*] Court upheld the same act struck down in *Radford* following relatively minor amendment.   Indeed, the relevant problem addressed in *Radford* is 'the taking of substantive rights in specific property acquired by the bank prior to the act.' … constitutional infirmity could be avoided by reading a bankruptcy statute as not compromising security interests created before the statute was enacted. … [the] Supreme Court has never held that the Takings Clause renders claims that accrued after the Bankruptcy Code was enacted immune from the Bankruptcy power, or the bankruptcy process.'"   *In re City of Stockton*, 909 F.3d at 1268 (internal citations omitted).

51

96.     Finally, the *Detroit* ruling should not be followed because it creates an illogical distinction between different types of claims arising under the Fourteenth Amendment of the U.S. Constitution.[29]   Specifically, before ruling on the dischargeability of takings claims, the *Detroit* court held that all claims arising from the Due Process Clause of the Fourteenth Amendment (for actions such as police brutality and false imprisonment) were dischargeable in bankruptcy.  *Id.* at 263–65.  Without explanation, however, the *Detroit* court went on to hold that eminent domain claims were nondischargeable.   This is logically indefensible.   As explained above, *see supra* ¶ 81, it is uncontroversial that the U.S. Takings Clause does not apply to municipalities like Detroit, only to the federal government.  *Barron*, 32 U.S. at 247–48.  Instead, courts have fashioned a rule stating that if a state or municipal government takes property without providing just compensation, the government violates the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *Webb's Fabulous Pharms. v. Beckwith*, 449 U.S. 155, 159 (1980).  As a result, the taking claims in *Detroit* in reality were claims arising from the Due Process Clause of the Fourteenth Amendment—that is, exactly the same kind of claims that the *Detroit* court, only pages earlier, held were dischargeable in bankruptcy.  *In re City of Detroit*, 524 B.R. at 263–65.  Failing to recognize or discuss any of this, however, the *Detroit* court went on to hold that claims for the taking of real property could not be discharged, despite the fact they were analytically the same as the Fourteenth Amendment claims it had just decided could

---

[29] Notably, while certain objectors claim it is unclear whether the Fifth Amendment or the Fourteenth Amendment apply to Puerto Rico due to Puerto Rico's unique constitutional status and the impact of the *Insular Cases*, *see, e.g.*, [ECF No. 9223 at n.1]; [ECF No. 18418 at 2 n.2]; [ECF No. 16481 at 3 n.2]; [ECF No. 12701 at 2 n.2]; [ECF No. 17062 at 3 n.2]; [ECF No. 17998 at 3 n.2], there is and can be no dispute that the Fifth Amendment does not apply to Detroit. *Barron v. Mayor of Baltimore*, 32 U.S. 243, 247–48 (1833) (holding Bill of Rights only applies to federal government).

be impaired. *Id*.  The *Detroit* court provided no reasoning justifying this unsupportable distinction—there is none.

97.    The objectors (and the *Detroit* court) also cite to *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982), but this case supports the Oversight Board.  *See e.g.*, [ECF No. 9223 at 11; ECF No. 18418 at 7; ECF Nos. 16481 at 6–7; ECF No. 12701 at 4–5; ECF No. 17062 at 6–7; ECF No. 17998 at 7–8; ECF No. 17013 at 20].  In *Security Industrial Bank*, the Supreme Court expressly recognized that unsecured rights to payment on a claim could be discharged consistent with the U.S. Takings Clause, even when that worked a retroactive elimination of their payment rights.  459 U.S. at 75–76.  The Supreme Court only ruled that the U.S. Takings Clause likely prohibited the retroactive elimination of secured creditors' liens.  *Id*. at 78.  Here, the objectors do not have liens that are being eliminated—they have unsecured claims with a right to payment, which the Supreme Court explicitly held could be impaired and discharged consistent with the U.S. Takings Clause.

98.    Objectors also cite to *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), but this case is not on point. *See e.g.*, [ECF No. 17013 at 18; ECF No. 16481 at 11; ECF No. 12701 at 8; ECF No. 17062 at 11; ECF No. 17998 at 12].  The issue presented in *Knick* was whether a claimant asserting a violation of the U.S. Takings Clause had to exhaust their remedies in state court before they could file a federal court action relating to the taking.  The Supreme Court held that the federal court action was ripe the moment the claimant's property was taken (*i.e.* when the claim arose), and that the claimant did not have to exhaust state court remedies before filing suit in federal court.  *Knick*, 139 S. Ct. at 2170–71.  In so ruling, the court stated, "[t]he Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner."  *Id*. at 2170.  While certain objectors

53

seize on this statement (and other similar statements) to suggest that claims arising from the taking of real property are not dischargeable, they can only do so by adding to the ruling that the Fifth Amendment right to full compensation is nondischargeble..  *See* [ECF No. 16481 at 11; ECF No. 12701 at 8; ECF No. 17062 at 11; ECF No. 17998 at 12].   Whether claims for just compensation could be discharged in bankruptcy simply was not before the court in *Knick*. Moreover, as discussed above, by overruling *Williamson County* the Supreme Court in *Knick*, if anything, further confirmed the Oversight Board's position and demonstrated that the Eminent Domain Claims are unsecured claims that arose prepetition and thus can be discharged.[30]

99.     Several objectors also cite to *Blanchette v. Connecticut General Insurance Corp.*, 419 U.S 102 (1974) for the proposition that "any deficiency of constitutional magnitude in the compensation [of seized property] . . . will indeed be a taking of private property for public use . . ." [ECF No. 12701 at 6]; s*ee also* [ECF No. 9223 at 10–11; ECF No. 18418 at 7; ECF No. 16481 at 8; ECF No. 12701 at 6; ECF No. 17062 at 8; ECF No. 17998 at 9], but *Blanchette* has

---

[30] The other cases cited in support of these main arguments are equally lacking in bankruptcy applicability. *See* [ECF No. 16481 at 12] (arguing that the Supreme Court decided in *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304 (1987) that "a property owner acquires an irrevocable right to just compensation immediately upon a taking"); [ECF No. 17013 at 2] (arguing "a property owner has a constitutional claim for just compensation at the time of the taking").   But *First English Evangelical Lutheran Church* had nothing to do with the bankruptcy power and merely reiterated that a party subject to a taking has a claim for damages, a rule the Board does not dispute. *See also* [ECF No. 12701 at 9; ECF No. 17062 at 12; ECF No. 17998 at 13] (citing *Jacobs v. United States*, 290 U.S. 13 (1933) to argue that "a property owner found to have a valid takings claim is entitled to compensation … consist[ing] of the total value of the property…").  Again, *Jacobs* has nothing to do with the treatment of unsecured claims in bankruptcy and merely reiterates the obvious proposition that a taking yields a claim for damages.  One of the Eminent Domain Claim Objections also cites *San Diego Gas & Elec. Co. v. San Diego*, 450 U.S. 621 (1981) to assert, matching *Knick*'s language, that once property is taken a constitutional violation has occurred.  [ECF No. 16481 at 12].  Once again, the Board does not dispute this proposition, but it does nothing to suggest claims for just compensation cannot be discharged.  Similarly, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) did not involve the question of whether takings claims can be discharged in bankruptcy—

no similarity to the Commonwealth's Title III case and does not support the contention that taking claims cannot be discharged (an issue which was not before the Supreme Court).   In *Blanchette*, 419 U.S. 102, 155 (1972), the court held that the forced conveyance of the debtors' property to a newly-created entity, pursuant to a special railroad bankruptcy law, in exchange for securities in that new entity, which had not been valued, would potentially constitute a taking of "the rail properties of [the debtor]."   *Id.* at 118.   The Supreme Court however, held that the relevant statute was not itself unconstitutional, because it left open the possibility for the debtor, and for any *secured* creditors, to sue the U.S. under the Tucker Act to obtain whatever just compensation they were entitled to.   *Id.* at 154.   The Supreme Court again indicated that only "secured creditors" were entitled to protection by the U.S. Takings Clause.   *Id*.   Here, holders of Eminent Domain Claims (and other claims for just compensation) are unsecured, and nothing in *Blanchette* suggests that their claims cannot be discharged.

100.   Finally, Suiza Dairy asserts that a regulatory scheme which precluded them from making a profit constituted a taking of property in violation of the Takings Clause.   [ECF No. 17013 at 6].   The parties reached a settlement agreement which was approved by the district court in November 2013.   *Vaquería Tres Monjitas, Inc. v. Comas*, 5 F. Supp. 3d 179 (D.P.R. 2014).   They assert that the Commonwealth's breach of its obligation to pay under the settlement constitutes a regulatory taking by the Commonwealth.   As a preliminary matter, even if Suiza Dairy were right, its claim would be dischargeable for all the reasons explained above:  its claim is an unsecured claim that is dischargeable like every other unsecured claim.   In any event, Suiza

---

it simply confirmed the unremarkable proposition that an obligation to pay just compensation arises when the government takes property.

Dairy's claim arises from a prepetition promise to pay contained in a settlement agreement, and thus is nothing more than an unsecured claim for breach of contract.[31]

## F.   THE PLAN IS CONSISTENT WITH THE FISCAL PLAN AS REQUIRED BY PROMESA § 314(b)(7).

101.   The DRA Parties, in an effort to show the Plan is inconsistent with the Fiscal Plan, misrepresent and cherry-pick excerpts from the Expert Report of Marti P. Murray [ECF. No. 18097-1] (the "Murray Exprt Report") and the Fiscal Plan.  Such arguments are unfounded and should be rejected.

102.   The DRA Parties claim the Oversight Board "has not presented evidence sufficient to show that the Plan is consistent with the 2021 CW Fiscal Plan."  DRA Parties Obj. ¶ 156.  But the examples the DRA Parties offer for this claim misrepresent what "consistency" means and apply inapposite tests to the Plan.  The Murray Expert Report notes that consistency "means that there are no material provisions in the Plan relating to the [two] categories of focus that conflict with the 2021 [Fiscal Plan]."  Murray Expert Report ¶ 62.  It does not mean all provisions of the Plan and Fiscal Plan "are necessarily identical."  *Id.*  Moreover, Ms. Murray's

---

[31] Suiza is wrong that under *Jacobs v. United States*, 290 U.S. 13 (1933) a taking converted into a promise to pay remains a constitutional claim that must be fully compensated. *See* [ECF No. 17013 at 18] ("the form of the remedy did not qualify the right. It rested upon the Fifth Amendment."). Suiza misstates the holding in *Jacobs*.  In *Jacobs* the government owed damages from the taking of landowner property after it had created a servitude which impaired the land for agricultural purposes. 290 U.S. at 16.  When the landowners attempted to enforce their right to compensation the court of appeals erroneously held the suits were based on an implied contract and so could not recover damages.  *Id.*  The Supreme Court reversed, and held the right to compensation was founded on the constitutional right to compensation and so no statute or contract grant of rights was needed. *Id.* at 17.  This case merely represents the obvious rule that a Takings claim can be asserted upon constitutional grounds.  It does not however offer any comment on payment of unsecured claims or the treatment of judgment creditors in a bankruptcy, or change the fact that a breach of a promise to pay gives rise to nothing more than a general unsecured claim.  Suiza also cites *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) in which the court remanded a takings case for further consideration of the value remaining in the tract of land. Bankruptcy and the discharge of unsecured claims are never mentioned and were not at issue in *Palazzolo*.

two areas of focus are the only areas of overlap between the Plan and the Fiscal Plan, *i.e.* the resources of the Debtors available for distribution to their creditors and the post-reorganization debt level.  On these matters, the Murray Expert Report makes clear the Plan and Fiscal Plan are consistent.

103.    The DRA Parties fail to understand that the Fiscal Plan and plan of adjustment serve very different purposes and are thus inherently different.  Consistency does not and cannot mean identical.  The Fiscal Plan is the "blue print" for the Commonwealth attaining fiscal responsibility and applies with and without a Title III case.  *See In re Fin. Oversight & Mgmt. Bd.*, 583 B.R. 626, 632 (D.P.R. 2017) (describing the fiscal plan as the blueprint).  The plan of adjustment is the operative document that adjusts creditors' claims in an equitable manner that will insure the debtor continued operation.  Where the Fiscal Plan and Plan touch is with respect to the debt sustainability analysis ("<u>DSA</u>").  Both the Murray Expert Report (at ¶ 72) and the Malhotra Declaration (at ¶ 61) carry the burden of showing that the debt issued under the plan is consistent with the DSA.

104.    Additionally, the DRA Parties attempt to conflate the requirements for a fiscal plan under PROMESA section 201—certification of which is determined by the Oversight Board in its sole discretion—with the question of whether the Plan and Fiscal Plan are consistent.  The DRA Parties claim "[t]he Murray Expert Report did not evaluate whether the Plan was consistent with the Fiscal Plan in terms of any of the elements required of a Fiscal Plan under PROMESA Section 201(b)."  DRA Parties Obj. ¶ 156.  This argument is nonsensical.  PROMESA section 201(b) lists the requirements for a fiscal plan; it has nothing to do with whether the certified Fiscal Plan is consistent with the Plan, which has entirely different purposes and elements.  For the same reason the DRA argument that the Murray Expert Report fails to evaluate whether the

Plan was consistent with the Fiscal Plan in terms of the elements enumerated in PROMESA section 201(b) makes no sense.  DRA Parties Obj. ¶ 156.  Most of these elements have nothing to do with a plan of adjustment.  Congress does not require in Title III that the Court assess the fiscal plan.  To the contrary, it takes the fiscal plan as it is and asks the Court to determine whether the plan of adjustment is consistent with it.

105.    The DRA Parties also claim the Murray Expert Report "expressly shows a multi-billion dollar inconsistency between the Plan and the 2021 CW Fiscal Plan," alleging the "Fiscal Plan provides that pension obligations should be paid on a current basis through the 'PayGo' system, and not through funding of a pension account as contemplated in the Plan."  DRA Parties Obj. ¶ 157.  The DRA Parties cite to pages 281–84 of the Fiscal Plan, but seem to have missed the plain language on pages 278–79, which states very clearly "a pension reserve trust will be established and *funded* to ensure that future PayGo benefits can be supported regardless of the future economic or political situation in the Commonwealth."  [ECF No. 18596-13], Fiscal Plan at 278 (emphasis added).  "Funding for the pension reserve trust is to be provided according to a formula based on the Commonwealth's annual surpluses."  *Id.*  The DRA Parties' selective reading of the Fiscal Plan ignores its express provision for a pension reserve trust, and their assertion that there is "a multi-billion dollar inconsistency between the Plan and 2021 CW Fiscal Plan"[32] is simply false.  DRA Parties Obj. ¶ 157.  The purpose of the reserve fund is to establish a pool of assets to be used for PayGo payments if the Commonwealth economy falls into deficit in the future—it does not add a dime to the cost of pensions.  Ms. Murray's report does not draw

---

[32] Though they nowhere explain how they derived the figure, the DRA Parties presumably added contributions to the pension reserve on top of the amount of payments to retirees to baselessly conclude there exist billions of dollars of inconsistencies between the Fiscal Plan and the Plan on this issue.

a contrary conclusion.  Most importantly for this argument, the pension trust is required by the

Fiscal Plan and provided in the Plan.

106.    As the DRA Parties ground all their claims in a blatant misreading of PROMESA

and the Fiscal Plan, and provide no evidence that the Plan and Fiscal Plan are inconsistent in any

way, this argument fails.

## G.  THE HTA/CCDA PSA DOES NOT RENDER THE PLAN UNCONFIRMABLE

107.    The DRA Parties argue the Plan is not confirmable because (i) the Plan functions

as a *sub rosa* HTA plan of adjustment and (ii) the HTA-related settlements violate Bankruptcy

Rule 9019.[33]  DRA Parties Obj. ¶¶ 110–18.  All these arguments lack support.

### 1.  The Plan Does Not Function as a *Sub Rosa* HTA Plan.

108.    A *sub rosa* plan is "a *de facto* plan of reorganization" that "leaves little prospect

or occasion for further reorganization."  *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th

Cir. 1983); *In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015).  Accordingly,

Courts reject settlements, "which enable[] a debtor to restructure its debt while bypassing many

of the Bankruptcy Code's fundamental creditor protections."  *Energy Future Holding*, 527 B.R.

at 168.  Courts evaluate four factors in determining whether an agreement is a *sub rosa* plan:

whether the agreement (1) has the practical effect of dictating some terms of the debtor's

reorganization; (2) disposes of all claims against the debtor; (3) restricts creditors' voting rights;

and (4) disposes of virtually all of the debtor's assets.  *Id.*; *see also In re Cajun Elec. Power Co-

op, Inc.*, 119 F.3d 349, 355 (5th Cir. 1997).

109.    Courts rarely hold a settlement is a *sub rosa* plan, doing so only in extreme cases

where the settlement dictates the bulk of the reorganization and evades the confirmation process.

---

[33]  The DRA Parties further reserve their rights "with respect to CCDA and any attempted
adjustment of CCDA's obligations to the DRA under the Plan."  DRA Parties Obj. ¶ 178.

A settlement that is "a step towards possible confirmation of a plan of reorganization and not an evasion of the plan confirmation process" is not a *sub rosa* plan. *In re Iridium Operating LLC*, 478 F.3d 452, 467 (2d Cir. 2007). Even substantial settlements of principal issues are not *sub rosa* plans because they further the reorganization process, rather than evade it.[34] Importantly, a settlement that is contingent on subsequent plan confirmation is not a *sub rosa* plan. *In re Marvel Entm't Grp.*, 222 B.R. 243, 251 (D. Del. 1998) (holding a settlement was not a *sub rosa* plan because it was contingent of confirmation and the parties would be able to litigate the details of a future plan).

110.    Here, the DRA Parties selectively and misleadingly cherry pick statements from the jurisprudence to incorrectly contend that a substantial settlement that would require certain terms to be included in a proposed HTA plan when it is filed must be a *sub rosa* plan.[35] To support their argument, they point to three features of the HTA/CCDA PSA: (1) the HTA/CCDA PSA requires HTA to make the HTA Interim Distribution to holders of HTA 68 Bonds and HTA

---

[34] *In re Nortel Networks, Inc.*, 522 B.R. 491, 508–09 (Bankr. D. Del. 2014) (settlement of the "principal plan issue" approved where "countless other plan issues remain[ed] outstanding" and settlement was a step toward reorganization); *Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto., Inc.)*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006) ("[C]ourts have approved even large and important settlements prior to confirmation."); *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984) ("Unlike the *Braniff* situation, the transaction in question will not effectively liquidate the debtor. . . . To the contrary, the removal of this asset and its attendant problems should have the effect of clearing away substantial obstacles to reorganization.").

[35] It is incorrect to assert [as the DRA does] that any pre-confirmation payments or "settlements that require a debtor to make distributions to creditors outside of a confirmed plan" constitute a *sub rosa* plan. *See* DRA Parties Obj. ¶ 112; *see also In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 645 (Bankr. W.D. Pa. 2010) ("The fact that a transaction affects a debtor's reorganization does not automatically convert the contemplated transaction into a *sub rosa* plan. To hold otherwise would impede a debtor's ability to successfully reorganize."); *compare In re Miami Metals I, Inc.*, 603 B.R. 531, (Bankr. S.D.N.Y. 2019) (in which the court rejected a settlement that would give senior lenders the full benefit of a proffered settlement prior to confirmation, regardless of when or if the plan was eventually confirmed).

98 Senior Bonds in partial satisfaction of their respective claims against HTA; (2) the

HTA/CCDA PSA and section 63.2 of the Plan condition the distribution of cash from the HTA

Clawback CVI to holders of Allowed CW/HTA Claims on, among other things, an agreement by

the FOMB, Assured and National regarding the documentation of the HTA plan of adjustment,

the HTA confirmation order and the New HTA Bonds Indenture; and (3) the Plan contains

releases that the DRA Parties assert release the DRA Parties' claims against the Monolines and

HTA, as well as HTA's claims against various non-Debtor instrumentalities and certain

Monolines.  Even if the DRA Parties had properly characterized all these features—they do

not—none of these features taken individually or collectively comes close to a *sub rosa* HTA

plan which disposes of HTA's assets, restricts creditor voting rights, and effectively leaves

nothing left to restructure.

### a.    The HTA/CCDA PSA Does Not Dictate the Terms of an HTA Plan

111.    As a preliminary matter, the DRA Parties' *sub rosa* objection is filed in the wrong

case.  It has no relevance regarding confirmation of the Plan in the Commonwealth case.

112.    Nevertheless, the *sub rosa* objection fails.   While the HTA/CCDA PSA

constitutes a settlement with one of HTA's largest creditor constituencies on principal issues, it

is a far cry from the extreme circumstances where the settlement dictates the bulk of the

reorganization and evades the confirmation process.   Significantly, the settlement is not

extraneous.  The settlement arose due to the HTA creditors asserting they have claims against the

Commonwealth for their HTA debt because the Commonwealth had statutes providing for

appropriations to HTA until their debt was repaid.  The seminal case on *sub rosa* plans, *In re*

*Braniff Airways, Inc.*, involved a transfer of virtually all the bankrupt airlines' assets to another

airline in exchange for "scrip" to travel on the purchaser's airline.  700 F.2d 935, 939 (5th Cir.

1983).   The agreement provided that this scrip could only be distributed to the debtor's

stakeholders in a reorganization plan, effectively dictating some of the terms of the plan. *Id*. at 939–40. The agreement also required secured creditors to vote for any plan approved by the unsecured creditors, and it provided for the release of all claims against the debtor, its secured creditors, and its officers and directors. *Id*. at 940. The court rejected the proposed transfer as a *sub rosa* plan that short circuited the Bankruptcy Code's plan confirmation requirements.

113. In contrast to *Braniff*, the HTA/CCDA PSA does not "dispose of virtually all of [HTA's] assets, leaving little prospect or occasion for further reorganization." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997) (citation omitted). Other than the HTA Interim Distribution, which condition precedent to the Plan may be waived by the Oversight Board (*see* Plan § 86.2), the HTA/CCDA PSA does not contemplate disposal of any HTA assets. *See* Plan § 63.2(b); *see also* Plan Exhibit J. Neither does the HTA/CCDA PSA otherwise affect claims against HTA, restrict creditors' rights to vote as they deem fit on a plan of adjustment (other than Supporting Holders who agree to vote for an HTA Plan "upon satisfaction of the HTA Distribution Conditions"), or affect the rights of other of HTA creditors, including the DRA parties. *See In re Cajun Elec. Power Coop.*, 119 F.3d at 355 ("The instant settlement is not a *sub rosa* reorganization of the type disapproved in *Braniff*. It does not dispose of all claims against [the debtor], nor does it restrict creditors' right to vote as they deem fit on a proposed reorganization plan."). In this way, PROMESA's confirmation requirements for an HTA plan of adjustment are not in any way bypassed by the HTA/CCDA PSA.

### b. Pre-Confirmation Distributions Are Permissible Under PROMESA

114. Furthermore, courts often approve payments to claimholders prior to confirmation of a plan, such as the HTA Interim Distribution, and "there is no *per se* rule against paying pre-petition claims outside of a plan of reorganization." *In re Capmark Fin. Grp., Inc.*, 438 B.R.

471, 510 (Bankr. D. Del. 2010).  The Supreme Court has also approved of settlements involving pre-confirmation distributions when they serve important objectives such as furthering the reorganization process.  *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 531, 537 (2017) (citing *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007)) (discussing the Second Circuit's decision approving a settlement requiring interim pre-confirmation payments).  "The fact that a transaction affects a debtor's reorganization does not automatically convert the contemplated transaction into a *sub rosa* plan.  To hold otherwise would impede a debtor's ability to successfully reorganize."  *In re Shubh Hotels Pittsburgh, LLC,* 439 B.R. 637, 645 (Bankr. W.D. Pa. 2010).

115.    Additionally, unlike in *Braniff*, section 363 of the Bankruptcy Code does not apply to these Title III cases and HTA is thus free to use its property as it sees fit.  As this Court has recognized, under PROMESA "Congress intended to preserve governmental debtors' ability to initiate transactions affecting their assets."[36]

### c.    The DRA Parties Mischaracterize the Releases

116.    Finally, the DRA Parties incorrectly assert the Plan contains release, injunction, and exculpation provisions which would eliminate (a) the DRA Parties' claims against certain Monolines and HTA and (b) HTA's claims against various non-Debtor instrumentalities of the Commonwealth and certain Monolines.  Nowhere does the HTA/CCDA PSA purport to release claims against HTA on behalf of creditors who are not parties to it.  The DRA Parties go out of their way to manufacture an issue through a strained and overbroad interpretation of the language in the releases.  Nevertheless, the Oversight Board will make any necessary clarifications to the language in the releases to confirm the Plan contains no third party releases except where parties

specifically agreed to them.  Thus the releases are not impermissibly broad and do not support

the DRA Parties *sub rosa* plan argument.  Most definitely, the DRA Parties are not compelled to

release anyone in respect of HTA.

117.    Accordingly, the Plan and HTA Interim Distribution leave all other issues related

to HTA's reorganization unresolved, including the ultimate treatment of all creditors' claims.

The DRA Parties have not been deprived of any right to vote in an HTA plan of adjustment[37]

which, as contemplated by the HTA/CCDA PSA, will be filed no later than January 31, 2021.

Further, none of the DRA Parties' claims against HTA are being released pursuant to the Plan.

*See supra* ¶ 116.  PROMESA's confirmation requirements for an HTA plan remain intact, are

not "short-circuited" by the HTA/CCDA PSA, and, therefore, the HTA/CCDA PSA is not a *sub

rosa* plan.

### 2.  The HTA Related Settlements Do Not Violate Bankruptcy Rule 9019

118.    The DRA Parties argue the HTA-related settlements embodied in the Plan violate

Bankruptcy Rule 9019(a) because (a) the HTA Interim Distribution is not "fair and equitable",

and (b) they impermissibly release and enjoin claims by and against HTA.  DRA Parties Obj.

¶ 117.  The DRA Parties tacitly acknowledge that this argument is derivative of their *sub rosa*

argument.  *Id.* ("the Plan containing such settlements fails to satisfy Bankruptcy Rule 9019

because, as a *sub rosa* HTA plan, it violates the law.").  As such, this argument fails for the same

reasons.

119.    *First,* as explained above, payments made pursuant to a settlement outside of a

plan are permissible under PROMESA, particularly where they help further the reorganization

---

[36] *See Memorandum Order Denying Motion of Official Committee of Unsecured Creditors for
Entry of an Order Enforcing the Automatic Stay*, Case No. 17-BK-3283-LTS, (D.P.R. Sep. 18,
2018) [ECF No. 3941 at 6].

process.  Moreover, PROMESA section 305 and the absence of Bankruptcy Code section 363
enable Title III debtors to use their assets as they see fit.

120.    *Second*, the HTA/CCDA PSA does not implicate the "fair and equitable" standard
because it does not alter the relative priorities of any HTA creditors vis-à-vis HTA or the
Commonwealth.  As the Oversight Board has acknowledged, the Plan provides that the GDB
Loan Priority Determination can be made in either the Commonwealth or HTA Title III Case.
*See* Plan § 1.258.  It is the Court's determination, and not the Plan or HTA/CCDA PSA, that will
establish the relative priorities of HTA's creditors, and there is nothing in the Plan that
establishes the priority between creditors in an HTA plan of adjustment.  The HTA/CCDA PSA
does not prejudice the DRA Parties and provide for a mechanism to ensure that amounts
provided on account of the HTA CVI will be held in trust until the subordination issues are
adjudicated.

121.    *Finally*, as explained above, the DRA Parties' arguments regarding the releases
rely on a strained interpretation to manufacture a Plan objection, and the Oversight Board may
amend them as appropriate to remove any confusion.

### H.  The Plan's Pension Reform Measures Are Permissible Under PROMESA

#### 1.  The Plan May Implement the Freeze of TRS and JRS Pension Plans

122.    The Plan provides for the "freeze" of the defined benefit plans in place for certain
teachers and judges under the enabling acts of the Teachers Retirement System ("TRS") and the
Judicial Retirement System ("JRS"), meaning that no additional benefits will accrue after the
Effective Date of the Plan (benefits accrued up to that point will be honored, subject to the cuts
effectuated pursuant to the Monthly Benefit Modification).  The Plan, using section 365 of the

---

[37] Courts generally find a *sub rosa* plan only where non-settling parties' rights to vote are
impacted.  *See In re CGE Shattuck, LLC*, 254 B.R. 5, 9 (Bankr. D. N.H. 2000).

Bankruptcy Code (as made applicable to pursuant PROMESA section 301), properly provides for implementation of the freeze of these plans through (a) rejection of the contractual right of participants to accrue pensions though retirement, and (b) the preemption of the enabling acts of the two plans and related statutes identified on Exhibit K to the Plan as these laws create and require payment of obligations subject to discharge under Title III and therefore cannot remain enforceable because that would be inconsistent with the discharge, among other things.

123.    Puerto Rico case law treats statutory pension benefits and future accruals of active employees as contractual rights of pension plan participants. *Bayrón Toro v. Serra*, 19 P.R. Offic. Trans. 646 (P.R. Nov. 18, 1987).   In *Bayrón Toro*, the Puerto Rico Supreme Court interpreted the nature of these public employee pension benefits and determined, even where statutorily created pensioners have a "property interest of a *contractual nature* protected by the [C]ommonwealth's constitutional guarantee against *impairment of contractual obligations*." *Id.* at 649 (emphasis added).   In ruling pension benefits are not state gratuities, the Puerto Rico Supreme Court stated "that Government pension plans are obligations in the nature of contracts." *Id.* at 663.   Recent case law has reaffirmed this principle many times over, analyzing potential pension modifications under a Contract Clause analysis. *See Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de P.R.*, 190 D.P.R. 854, 871 (2014) ("parties stipulated that the plaintiff teachers have a valid contract with the Government of Puerto Rico with respect to their retirement"); *see also Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828 (2013).

124.    Throughout its objection to confirmation [ECF No. 18585], AMPR concedes these rights of TRS Participants are contractual, and indeed, it previously stipulated TRS Participants have a contract with the Government of Puerto Rico with respect to their pension in the litigation it brought challenging the Government's prior attempt to freeze TRS. *Asociación*

66

*de Maestros de P.R.*, 190 D.P.R. 854 (applying a Contracts Clause analysis to determine the permissibility of modifications to teachers' pensions in Puerto Rico). Because pension accrual rights are contractual under Puerto Rico law, the contractual obligations to accrue and pay public pension benefits can be rejected and adjusted under a Title III plan of adjustment. Even if not contractual, the Supreme Court has shown statutory obligations can be discharged the same as other claims. *Ohio v. Kovacs*, 469 U.S. 274, 283 (1985) ("the only performance sought was the payment of money … the cleanup order had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy.").

125.     In *Asociación de Maestros de P.R.*, the Puerto Rico Supreme Court recognized a contract right existed and analyzed whether its impairment through the TRS freeze required under Act 160-2013 violated the Contracts Clause of the Puerto Rico Constitution, concluding that it did. *Id.* That ruling denied impairment by territory legislation, not by federal law such as PROMESA Title III. First, the core purpose of the Plan is to address Puerto Rico's fiscal crisis and emerge from Title III with more sustainable governmental obligations. The most important aspects of this effort are reducing the Commonwealth's debt service obligations and addressing over $55 billion in pension liabilities, including obligations that continue to accrue to teachers and judges. The Plan is possible in part because of the freezes of these pension plans, which will collectively save the Commonwealth close to $4 billion over the next 30 years. *See* Levy Decl. at ¶ 54. Absent the freeze of the pension systems, the Commonwealth would continue to be burdened by liabilities it cannot afford, increasing the likelihood of a return to deficits sooner rather than later. *See* Malhotra Declaration [ECF No. 18729 ¶¶ 65, 66].

126.     More importantly, the decision by the Puerto Rico Supreme Court precluded the freeze of TRS by the territorial government. It did not, and could not, preclude freezing the

teachers' defined benefit plans under PROMESA.  *See In re City of Detroit*, 504 B.R. 97, 138,

150 (Bankr. E.D.  Mich. 2013) (finding the Bankruptcy Clause "necessarily authorizes Congress

to make laws that would impair contracts.  It long has been understood that bankruptcy law

entails impairment of contracts," and noting "[i]mpairing contracts is what the bankruptcy

process does.") (citation omitted).

127.    Under section 365 of the Bankruptcy Code, as applicable to PROMESA pursuant

to section 301, "the trustee, subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Supreme Court has found

section 365 to be essential to the process of reorganization in bankruptcy because it allows the

debtor to be released from burdensome, executory contracts, which are not beneficial to the

debtor, and ultimately, impede the debtor's successful reorganization.  *Id*.  Executory contracts

are not defined under the Bankruptcy Code, however case law, as well as legislative history,

indicate that executory contracts are generally broadly defined as "contracts on which

performance remains is due to some extent on both sides."  *Enter. Energy Corp. v. United States*

*(In re Columbia Gas Sys. Inc.)*, 50 F.3d 233, 238 (3d Cir. 1995) (citations omitted).  As applied

here, the contract between the teachers and the Commonwealth to defined pension benefits is

undoubtedly executory because the teachers owe their continued labor, while the Commonwealth

owes the accrual and payment of pension benefits.  As an executory contract, the Commonwealth

may exercise its business judgment and reject the contract because the underfunded pension

systems would "ultimately impede the debtor's successful reorganization."  *Id*.  This principle

has been applied to contractual pension obligations of municipal debtors.  *In re City of Detroit*,

504 B.R. at 154 (finding that contractual pension liabilities are "subject to impairment in a

federal bankruptcy proceeding" and that "the only remedy for impairment of pensions is a claim

for breach of contract."); *In re City of Stockton*, 526 B.R. 35, 39 (Bankr. E.D. Cal. 2015) (authorizing the rejection of the pension servicing contract of the California Public Employee Retirement System). In *In re City of Stockton*, the court held "the California statute forbidding rejection of a contract with CalPERS in a chapter 9 case is constitutionally infirm in the face of the exclusive power of Congress to enact uniform laws on the subject of bankruptcy under Article 1, Section 8 of the U.S. Constitution – the essence of which laws is the impairment of contracts – and of the Supremacy Clause." 526 B.R. at 39 (citations omitted). Similarly, in the chapter 9 case of Detroit, Michigan, the bankruptcy court held Detroit's pension obligations owed to both active employees and retirees, which are contractual interests under Michigan's Constitution, are subject to impairment in a federal bankruptcy case. *See In re City of Detroit*, 504 B.R. at 154.[38]

128. Even if the Court holds that the pension obligations cannot be rejected pursuant to section 365 of the Bankruptcy Code, the statutory appropriations of pension benefits under the enabling acts, Act 106, and any other applicable Puerto Rico law are preempted under PROMESA. *See* Confirmation Br. ¶¶ 296–301.

129. For these reasons the freeze of the pension plans of TRS and JRS is permissible and may be implemented pursuant to a Title III plan.

---

[38] *See also Lopez v. Post-Effective Date Comm. of Creditors (In re Valley Health Sys.)*, 2012 Bankr. LEXIS 3632, at *1-2, 4 (9th Cir. B.A.P. July 19, 2012) ("[Debtor's] confirmed chapter 9 plan of adjustment specified, among other things, that any claims held by [debtor's Defined Benefit] Retirement Plan participants against [debtor] would 'not be entitled to receive any distributions' under the Chapter 9 Plan."); *In re City of Prichard, Alabama*, Case No. 09-15000 (Bankr. S.D. Ala. Oct. 27, 2009) (confirming plan of adjustment that modified city worker pensions, on that basis that Alabama law forbidding changes to public pension rights was preempted by the Bankruptcy Code pursuant to the Supremacy Clause of the U.S. Constitution, and thus pension claims were a prepetition debtor-creditor relationship that could be altered).

## 2. The Commonwealth's Pension Liabilities Do Not Constitute Administrative Expense Claims

130. AMPR further argues the pensioners' contractual pension rights cannot be rejected pursuant to section 365 of the Bankruptcy Code because they allegedly arose against the Commonwealth under Act 106, a post-petition statute, such that any rejection would give rise to administrative expense claims that must be paid in full as a requirement to Plan confirmation. To reach this conclusion, AMPR misinterprets the effect of Act 106 on the Commonwealth's pension obligations and, accordingly, mischaracterizes the nature of the associated claims. The objectors overlook that Act 106 is nothing but a substitute for prepetition pension obligations. In addition, AMPR failed to demonstrate the continued accrual of pensions, indefinitely, for teachers would provide any benefit to the estate and rise to the level of an administrative expense claim.

131. In enacting the enabling acts of the three pension systems decades ago, the Commonwealth established an obligation to provide pension benefits to its public employees, among others, teachers and judges. To support its obligations to pensioners and provide a funding mechanism that it intended to be perpetual, the Commonwealth established certain trusts, funded with employer and employee contributions, as a means to pay its future pension obligations. Unfortunately, the pension systems became irredeemably insolvent and the Commonwealth was forced to provide an alternative funding mechanism for its public pension obligations. Act 106-2017 ("the measures taken in this Act are necessary and reasonable to properly address the fiscal crisis and the actuarial insolvency of the [three pension systems]."). Accordingly, in August 2017, the Government of Puerto Rico passed Act 106-2017—the "Law to Guarantee Payment to *our* Pensioners and Establish a New Plan for Defined Contributions for Public Servants"—ostensibly "for the purpose of reforming the Puerto Rican Government

70

Employee Retirement System and the Teacher Retirement System, according to the economic and fiscal reality in Puerto Rico," modifying the funding structure from the trusts to a "PayGo" system. Act 106-2017.

132. AMPR argues that, because Act 106 was enacted postpetition, it is a new postpetition obligation of the Commonwealth that gives rise to administrative expense claims. Not so. Act 106 did not purport to create new obligations, but rather revised the funding structure contained within the Commonwealth's existing prepetition contracts with its public employees. Significantly, both AMPR and the Government of Puerto Rico conceded this point years before this Title III case in *Asociación de Maestros de P.R.*, in which *both parties* stipulated that the "teachers have a valid contract with the Government of Puerto Rico with respect to their retirement." 190 D.P.R.. at 871. This modification in the mechanics of funding pensions is insufficient under Puerto Rico Law to novate the contract and is properly understood as an amendment of the prepetition agreement. "Whether a novation has occurred is a question of the parties' intent, and 'novation is never presumed.'" *Campamento Contra Las Cennizas En Penuelas, Inc. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re the Fin. Oversight & Mgmt. Bd. for P.R.)*, 9 F.4th 1, 11 (1st Cir. 2021) (citing *Warner Lambert Co. v. Superior Court*, 1 P.R. Offic. Trans. 527, 544 (1973)). It further cannot be argued that Act 106 effected an assumption of prepetition pension obligations under section 365 of the Bankruptcy Code. There was no order approving any assumption. Moreover, legislation cannot unilaterally effect an assumption of contractual obligations, which requires an order by the Title III Court, and which only the Oversight Board has the authority to seek as representative of the Debtor pursuant to PROMESA section 315. Any attempt to assume such obligations by legislation, outside PROMESA Title III, is preempted.

133.    Here, prior to and following the enactment of Act 106, the Commonwealth's public employees maintained their rights under the same defined benefit plans.  The change in Act 106 made little practical difference for the recipients of pensions, only serving to provide an alternative funding source for theses preexisting obligations given the underfunded status of the retirement systems.  *See Goble & Jimenez, Inc. v. Dore Rice Mill, Inc.*, 108 D.P.R. 89, 8 P.R. Offic. Trans. 90, 91 (1978) (explaining "the surrounding circumstances at the moment the agreements between the parties were reached" are relevant to determining whether the parties had the "will to novate").  The subject pension obligations accrued over decades prior to the Commonwealth Petition Date and the enactment of Act 106, and remained unaltered thereafter. A revision to the funding source for an obligation the Commonwealth already had is insufficient to qualify as a novation.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 9 F.4th at 12 ("[t]he only material change is the point at which PREPA pays [the obligation].  We do not think this is the sort of 'radical change' that indicates an intent to novate 'without any trace of doubt.'") (citing *Warner Lambert* at 544).  Further, Act 106 was explicit as to its purpose "to . . . *amend* [the enabling acts for the pension systems]".  *See* Act 106-2017 at 1; *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*, 9 F.4th 1, 11 (where the contract "expressly declare[s] an intent to 'amend' and 'restate' the original agreement . . ." a party is precluded from arguing a will to novate unless the "circumstances surrounding the agreements reveal 'such a radical change in the nature of the new obligation[s] with respect to the old one[s], that both cannot coexist for being mutually exclusive.'") (citation omitted).  Because Act 106 served only to amend the Commonwealth's pre-existing prepetition pension obligations, theses contractual obligations remain subject to rejection and impairment under the terms of the Bankruptcy Code, to the extent incorporated by PROMESA.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 349, 357–

58 (D.P.R. 2020) (finding prepetition agreements amended postpetition may be assumed and rejected under section 365 of the Bankruptcy Code).

134.    Moreover, even if the Court were to find Act 106 effected a novation of the Commonwealth's pension obligations, such that the obligations are determined to have been incurred by the Commonwealth for the first time postpetition, this issue is not dispositive of whether impairment of the obligation would give rise to an administrative expense claim.

135.    To start, the accrual of liability for the subject pension plans does not serve to benefit the debtor.  In Title III, if the Government and the Oversight Board explicitly consent to allowance of an administrative expense claim, administrative expenses may be allowed under subsection 503(b)(1)(A) of the Bankruptcy Code, so long as the transaction arose postpetition and the expense benefits the debtor, because PROMESA incorporates sections 503 and 507(a)(2) of the Bankruptcy Code.  Here, Act 106 was not enacted to benefit the Commonwealth.  It was enacted to burden the Commonwealth because there was no other source of payment for retirees. The direct payment by the Commonwealth of pension obligations, as opposed to the failed trusts of the retirement systems, adds substantial costs and increases the possibility of future deficits and is thus detrimental to the Commonwealth.  In fact, it is for this very purpose the Plan freezes TRS and JRS; absent the freeze, billions of dollars of additional liabilities would remain with the Commonwealth, causing a drag on economic performance and growth and potentially returning the Commonwealth to structural deficits.  Because Act 106 is detrimental, rather than beneficial to the Commonwealth, it cannot give rise to administrative expense claims.   *See Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976) (claimant entitled to administrative expense priority "only to the extent that the consideration supporting

the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.").

136.    Additionally, the Oversight Board, as Title III representative of the Commonwealth, has not consented to treatment of these obligations as administrative expense claims.  In a municipal bankruptcy such as this Title III Case, an administrative expense claim is appropriate only where (1) the services are necessary to preserve the operations of the debtor, and (2) the debtor consents to payment of the claim as an administrative expense.  *See In re Craig Cnty. Hosp. Auth.*, 572 B.R. 340 (Bankr. N.D. Okla. 2017); *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*, 621 B.R. 289, 301 (D.P.R. 2020) ("In light of the restrictions on judicial authority and the scope of PROMESA that are imposed by sections 303 and 305 of the statute, Oversight Board and debtor consent are also relevant considerations.").  Under section 305 of PROMESA, the Title III Court may not "interfere with . . . (2) any of the property or revenues of the debtor," "unless the Oversight Board consents or the plan provides . . . ."  PROMESA § 305. Simply put, the Oversight Board does not consent to the treatment of all accrued and future defined benefit pension claims as administrative expenses.  Were the Court to conclude the Commonwealth is obligated to continue to honor all such liabilities as administrative claims, it would mean Puerto Rico's $55 billion in pension claims, by far its largest prepetition liability, are simply incapable of being adjusted under PROMESA.  Moreover, this interpretation of Act 106's impact is entirely inconsistent with the purpose of PROMESA as requiring full payment of all prepetition pension obligations would conflict with every single Fiscal Plan since its enactment in violation of section 204 of PROMESA.  The contrary result would add billions of dollars in additional expenditures rendering the Plan unfeasible and would saddle the

Commonwealth and its residents with the very same burdensome liabilities that were a significant factor in leading the Commonwealth to bankruptcy.

### 3. Reductions to Judicial Pensions Do Not Violate Constitutional Rights and are Otherwise Appropriate

137.     The Asociacion de Jubilados de la Judicatura de Puerto Rico and the Hon. Hector Urgell Cuebas (collectively, "AJJPR") argue in their objection to confirmation [ECF No. 18549] that the accrued pensions of retired judges cannot be modified by the Plan.  *First*, AJJPR argues that as retired judges their pension rights are no longer akin to an executory contract (which they concede would be the case for active judges in JRS), and thus not subject to rejection under section 365.  The Plan, however, does not modify pension benefits accrued prior to the Petition Date to current retirees pursuant to contract rejection, it modifies them as an accrued contract right under a prepetition contract with the Commonwealth that is no longer executory—and therefore as unsecured prepetition claims against the Commonwealth.

138.     *Second*, AJJPR argues their interests in their accrued pensions are a property right that cannot be impaired in bankruptcy.  They do not cite to any authority establishing their rights to accrued pension benefits under Puerto Rico law are anything other than general unsecured claims.  Their references to case law from New Mexico, Connecticut, and Wisconsin [ECF No. 18549 ¶¶ 9, 13] are inapposite and do not change this result—unlike the law in those jurisdictions as described by AJJPR, Puerto Rico law is crystal clear that pension rights of public employees are contractual, not proprietary, as explained above.[39]

---

[39] AJJPR concedes the effect of Puerto Rico law on this point in stating "in the absence of clear language granting public employees a contractual right to pension benefits, the modern trend among the States is to hold that the interest amounted to a property right . . . ."  [ECF No. 18549 ¶ 10].  Here, no such absence exists—the Puerto Rico Supreme Court has consistently ruled pension rights are contractual.

139.     *Third*, AJJPR contests the elimination of cost of living adjustments ("COLAs"),
elimination of certain bonuses (*i.e.*, Christmas, Summer, and Medicine Bonus), and other special
benefits, also on the basis these benefits are property rights that cannot be impaired by a
governmental entity under the Commonwealth and U.S. Constitutions.  AJJPR mischaracterizes
the interests of retired judges in these benefits.  Unlike pension benefits themselves, Puerto Rico
law makes clear COLAs and these bonuses are not considered part of pension rights and thus not
even contractual in nature, but rather mere "legislative gifts" ("*gracias legislativas*") in which a
participant does not have a proprietary or even contractual interest.  *Asociación de Maestros de
P.R.*, 190 D.P.R. at 879.  The Commonwealth is therefore able to modify, revise, or amend these
benefits at its own discretion.   Thus, the Plan's elimination of COLAs and modification of
bonuses under the Monthly Benefit Modification are proper.

140.     Finally, AJJPR argues the retired judges' pensions are expressly provided for and
protected by the Puerto Rico Constitution.  [ECF No. 18549 ¶¶ 8, 11].  While the Puerto Rico
Constitution may require the legislature to provide a pension to Puerto Rico judges (with which
it complied in enacting the JRS enabling act), it does not provide the judges' pensions are
property rights or have a different legal status than that of any other pension rights of public
employees, *i.e.*, contractual.  P.R. Const., Art. V.  AJJPR relies on *Brau v. E.L.A*, 190 D.P.R. 315
(2014) for the proposition that judicial pensions are entitled to superior treatment as property
rights that cannot be subject to reduction.  To the contrary, *Brau* stands for the principle that
judges cannot be singled out and targeted with salary reductions, but clearly states that "the
salary of judges may be indirectly reduced through laws generally applicable to all citizens."
Under the Plan, the judges are receiving identical treatment to other similarly-situated pension

classes.  Judicial pensions are therefore just as subject to adjustment in the Commonwealth's

Title III case as any other contractual obligation.

I.  **THE FISCAL PLAN'S REVENUE AND EXPENSE ESTIMATES ARE
     RELIABLE**

1.  **Hein's Criticisms of the Oversight Board's Population Data in the April 2021
    Certified Fiscal Plan Are Unfounded.**

141.    Hein asserts the Oversight Board has used "[u]nsupported data" "inconsistent"

with U.S. census data and estimates, Hein Objection at 6, but that is inaccurate and misleading.

The Oversight Board uses the best available information at the time it certifies a fiscal plan, and

did so in connection with the Fiscal Plan.  Hein cannot and does not contend otherwise.  Rather,

he complains that Census data made available for the first time in July 2021 reflect a higher

population estimate for Puerto Rico than estimated in the Fiscal Plan.  *Id.*  From this, he asserts

inaccurately and without basis that "[a] larger population than [the Oversight Board] assumed

will enhance Puerto Rico's ability to pay its prepetition contractual debt service."  *Id.* at 8.

142.    As a threshold issue, Hein's argument is irrelevant to confirmation because it does

not seek to show the Plan is infeasible or inconsistent with the Fiscal Plan.  To the extent Hein

criticizes the assumptions in the Fiscal Plan, no response is required here—it is indisputable that

the Oversight Board has sole discretion and the exclusive and unreviewable right to certify fiscal

plans. PROMESA section 106(e) bars Hein's objection because it directly challenges and

implicates the Oversight Board's certification decision and the legal effects thereof.  *See Rivera-

Schatz v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt Bd.)*, 327 F. Supp. 3d 365,

371 (D.P.R. 2018), *aff'd*, 916 F.3d 98, 109, 112–13 (1st Cir. 2019).

143.    In any event, the Oversight Board's population estimates in the Fiscal Plan were

based on the best information available.  Puerto Rico's population declined by 14.3% from 2010-

2019 (a point Mr. Hein neither acknowledges nor contests), and the Oversight Board updated its

population projections using the latest available macroeconomic projections, as well as updated

birth, death, and outmigration statistics.

144.    Moreover, Hein's conclusion that "[a] larger population than [the Oversight

Board] assumed will enhance Puerto Rico's ability to pay its prepetition contractual debt

service[,]," Hein Obj. at 86, is unfounded.  A larger population in Puerto Rico does not correlate

to an enhanced ability to pay:  growth is independent of population in the fiscal plan model, as

negative growth is driving outmigration (not the other way around).  Puerto Rico's 43.5%

poverty rate,[40] labor participation rate of just 41.50%,[41] with approximately half of the

Commonwealth's population on Medicaid,[42] and a median income less than a third of that of the

continental United States,[43] among other things, all show Hein's facile assumption that a larger

population means more revenue to pay creditors is baseless.[44]

---

[40]    U.S. Census Bureau:  Puerto Rico, Persons in poverty, percent (2019),
https://www.census.gov/quickfacts/PR (last visited Oct. 26, 2021).

[41]    *Informacion del Mercado Laboral Puerto Rico*, Departamento del Trabajo y Recursos
Humanos Gobierno de Puerto Rico, , www.mercadolaboral.pr.gov (last visited Oct. 27, 2021).

[42]    *Puerto Rico, Medicaid Overview*, Medicaid.gov, Puerto Rico, Medicaid Overview,
https://medicaid.gov/state-overviews/puerto-rico.html (last visited Oct. 26, 2021).

[43] Gloria G. Guzman, *Household Income: 2017,* American Community Survey Briefs, U.S.
Census Bureau (Sept. 2018),
https://www.census.gov/content/dam/Census/library/publications/2018/acs/acsbr17-01.pdf (last
visited Oct. 26, 2021).

[44]    Pursuant to Fed. R. Evid. 201, the Oversight Board respectfully requests the Court take
judicial notice of the statistics concerning Puerto Rico's poverty rate, labor participation rate,
Medicaid participation rate, and median income referenced in this paragraph.  Rule 201 permits
judicial notice of certain adjudicative facts, which are "not subject to reasonable dispute in that
they are either (1) generally known within the territorial jurisdiction of the trial court or
(2) capable of accurate and ready determination by resort to sources whose accuracy cannot
reasonably be questioned."  *United States v. Bello*, 194 F.3d 18, 23–25 (1st Cir. 1999).  Here, the
sources cited in footnotes 35, 37, 38, and 39 are government sources meeting both categories
described in the Rule.  These facts are relevant to rebut Mr. Hein's assertions concerning the
economic impact of Puerto Rico's population.

### 2.   Hein's Criticisms of The Oversight Board's Revenue Estimates Are Inapposite.

145.   Hein also appears to argue the Oversight Board's revenue estimates are "unreliabl[e]" because the Commonwealth collected more revenue in FY2021 than the May 2020 Certified Fiscal Plan—not the current Fiscal Plan—had projected.  Hein Obj. at 6.  That is inapposite for at least two reasons.  *First*, Hein's critique of a projection in a fiscal plan not at issue during confirmation is irrelevant, because the question is whether the Plan is consistent with the currently certified Fiscal Plan.  *Second*, the fact the Oversight Board's forward-looking estimates from a prior fiscal plan not at issue did not match actual revenues does not render the estimates unreliable, or show that the Fiscal Plan's estimates are unreliable.  The Plan will guide the Commonwealth's finances over decades, and revenue surpluses from over-performance are earmarked for distribution to creditors through CVIs and the Pension Reserve Trust, among other things.  The Oversight Board has the responsibility to ensure the Plan does not impose obligations on the Commonwealth that it likely will not have the resources to perform.

### 3.   Hein's Medicaid Arguments Are Inapposite.

146.   Finally, Hein contends the Oversight Board should not have concluded Medicaid funding would hit a fiscal cliff, but instead should have made the "more realistic assumption" federal funding would have kept pace with Medicaid expenses.  Hein Obj. at 7.  Specifically, Hein argues the regular occurrence of temporary increases in federal funding in the past should have caused the Oversight Board to assume future increases would occur (and, he notes, recent public statements from government officials indicate they believe additional federal Medicaid reimbursement will be funded).  *Id.*  But, Hein has no basis for his facile assertion.  And, the Oversight Board cannot count on uncertain funding sources that are dependent on the federal political process in developing a fiscal plan or plan of adjustment and obligate the Commonwealth to spend money it may not receive.  The statements that Hein relies upon are

based on the validity of the new Centers for Medicare & Medicaid Services interpretation of section 1108 of the Social Security Act.  This interpretation in uncertain, and remains subject to legal and political challenge.  It remains unclear whether additional Medicaid funding will be allocated to Puerto Rico, and if so, what the amount of that funding will be.  *See* Malhotra Decl. ¶¶ [48–49].  Hein's objection is a criticism without consequence.

### J.  OMNIBUS REPLY TO THE OBJECTIONS

147.    With respect to the Objections to the Plan and Confirmation Order not addressed above, the Plan Reply Chart, attached hereto as Exhibit C, and the Proposed Order Reply Chart, attached hereto as Exhibit D, sets forth the reasons such Objections should be overruled.

*[Remainder of page intentionally left blank]*

**WHEREFORE** the Debtors respectfully request the Court overrule the Objections, confirm the Plan, and grant the Debtors such other and further relief as is just and proper.

Dated: October 27, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s/  Martin J. Bienenstock*

Martin J. Bienenstock
Brian. S. Rosen
Jeffrey W. Levitan
Ehud Barak
Joshua A. Esses
(Admission *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/ Luis F. del Valle-Emmanuelli*

Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.647.3503
dvelawoffices@gmail.com

**OF COUNSEL FOR**
**A&S LEGAL STUDIO, PSC**
434 Avenida Hostos
San Juan, PR 00918
Tel. (787) 751-6764/763-0565
Fax (787) 763-8260

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*