**<u>Exhibit E</u>**

**Prager Deposition Excerpts**

```
                                                    Page 1

 1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF PUERTO RICO
 2   _____
     In re:                      PROMESA
 3                                 Title III
 4   THE FINANCIAL OVERSIGHT
     AND MANAGEMENT BOARD FOR
 5   PUERTO RICO,
 6     as representative of
 7   THE COMMONWEALTH OF         Case No.17-BK-3283
     PUERTO RICO, et al.,        (Jointly Administered)
 8   THE COMMONWEALTH OF
     PUERTO RICO, et al.,
 9
                 Debtors.
10   _____
     In re:                      PROMESA
11                                Title III
     THE FINANCIAL OVERSIGHT
12   AND MANAGEMENT BOARD OF
     PUERTO RICO,
13
        as representative of
14                               Case No. 17-BK-3566
     THE EMPLOYEES RETIREMENT
15   SYSTEM OF THE GOVERNMENT
     OF THE COMMONWEALTH OF
16   PUERTO RICO,
17               Debtor.
     _____
18   In re:                      PROMESA
                                 Title III
19   THE FINANCIAL OVERSIGHT
     AND MANAGEMENT BOARD FOR
20   PUERTO RICO,
21     as representative of
                                 Case No. 19-BK-5523
22   PUERTO RICO PUBLIC
     BUILDINGS AUTHORITY,
23
                 Debtor.
24   _____
25                      *   *   *
```

Page 2

1          Remote videoconferenced deposition of

2    DAVID W. PRAGER, Witness herein, called by the

3    Financial Oversight and Management Board as

4    Representative for the Debtors for

5    cross-examination pursuant to the Federal Rules of

6    Civil Procedure, taken before me, April L. Crites,

7    RPR, RMR, CRR, a Notary Public in and for the

8    State of Ohio, in New York City, New York, on

9    Tuesday, October 19, 2021, at 9:31 a.m., Atlantic

10   Standard Time.

11                      *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                  Page 3

 1    APPEARANCES: (All parties appeared remotely)
 2        On behalf of the Cantor-Katz Collateral
          Monitor, LLC, as Collateral Monitor for GDB
 3        Debt Recovery Authority:
 4            Schulte Roth & Zabel, LLP
 5        By:  Douglas I. Koff, Esq.
               Taleah E. Jennings, Esq.
 6             919 Third Avenue
               New York, New York 10022
 7             212-756-2773
               douglas.koff@srz.com
 8             taleah.jennings@srz.com
 9             Noah N. Gillespie, Esq.
               Jacqueline Maero Blaskowski, Esq.
10             Douglas S. Mintz, Esq.
               901 Fifteenth Street, NW
11             Suite 800
               Washington, D.C.  20005
12             202-729-7483
               202-469-4614
13             noah.gillespie@srz.com
               jacqueline.maeroblaskowski@srz.com
14             douglas.mintz@srz.com
15        On behalf of the Financial Oversight and
          Management Board as Representative for the
16        Debtors:
17            Proskauer Rose LLP
18        By:  Michael T. Mervis, Esq.
               Ehud Barak, Esq.
19             Laura E. Stafford, Esq.
               Chantel L. Febus, Esq.
20             Julia D. Alonzo, Esq.
               Eleven Times Square
21             8th Avenue and 41st Street
               New York, New York  10036-8299
22             212-969-3565
               mmervis@proskauer.com
23             ebarak@proskauer.com
               lstafford@proskauer.com
24             cfebus@proskauer.com
               jalonzo@proskauer.com
25
```

```
                                                        Page 4

 1    APPEARANCES: (Continued)
 2            Proskauer Rose LLP - New York (continued)
 3            Jeffrey W. Levitan, Esq.
              Joshua A. Esses, Esq.
 4            Eleven Times Square
              8th Avenue and 41st Street
 5            New York, New York  10036-8299
              212-969-3239
 6            jlevitan@proskauer.com
              jesses@proskauer.com
 7
              Scott P. Cooper, Esq.
 8            2029 Century Park East
              Suite 2400
 9            Los Angeles, California 90067-3010
              310-284-5669
10            scooper@proskauer.com
11            Corey I. Rogoff, Esq.
              1001 Pennsylvania Avenue, N.W.
12            Suite 600, South
              Washington, D.C.  20004
13            202-416-6884
              crogoff@proskauer.com
14
              William D. Dalsen, Esq.
15            One International Place
              Boston, Massachusetts  02110-2600
16            617-526-9429
              wdalsen@proskauer.com
17
      On behalf of Ambac Assurance Corporation:
18
              Milbank, LLP
19
      By:  Jonathan Ohring, Esq.
20            Atara Miller, Esq.
              55 Hudson Yards
21            New York, New York  10001-2163
              212-530-5147
22            johring@milbank.com
              amiller@milbank.com
23
          \
24
          \
25
          \
```

Page 5

```
 1   APPEARANCES: (Continued)
 2      On behalf of the Financial Guaranty Insurance
        Company (FGIC):
 3
             Butler Snow, LLP
 4
        By:  Adam M. Langley, Esq.
 5           Crescent Center
             6075 Poplar Avenue
 6           Suite 500
             Memphis, Tennessee 38119
 7           901-680-7316
             adam.langley@butlersnow.com
 8
        On behalf of the Official Committee of Retired
 9      Employees:
10           Jenner & Block, LLP
11      By:  Landon S. Raiford, Esq.
             (Telephonically)
12           353 North Clark Street
             43rd Floor
13           Chicago, Illinois  60654-3456
             312-840-8663
14           lraiford@jenner.com
15      On behalf of AmeriNational Community
        Services, LLC:
16
             McConnell Valdes, LLC
17
        By:  Arturo J. Garcia-Sola, Esq.
18           Nayuan Zouairabani-Trinidad, Esq.
             Alejandro J. Cepeda-Diaz, Esq.
19           270 Munoz Rivera Avenue
             Seventh Floor
20           Hato Rey, Puerto Rico  00918
             787-250-5632
21           ajg@mcvpr.com
             nzt@mcvpr.com
22           ajc@mcvpr.com
23      /
24      /
25      /
```

Page 6

```
 1    APPEARANCES: (Continued)
 2        On behalf of National Public Finance Guarantee
          Corporation:
 3
              Weil Gotshal & Manges, LLP
 4
          By:  Alexander Whitelaw, Esq.
 5             Robert S. Berezin, Esq.
               Austin B. Crabtree, Esq.
 6             767 Fifth Avenue
               New York, New York  10153-0119
 7             212-310-8728
               alexander.whitelaw@weil.com
 8             robert.berezin@weil.com
               austin.crabtree@weil.com
 9
          On behalf of the National Public Finance
10        Guarantee Corporation:
11            Adsuar Muniz Goyco Seda &
              Perez-Ochoa, PSC:
12
          By:  Alexandra Casellas-Cabrera, Esq.
13             (Telephonically)
               268 Munoz River Avenue
14             Suite 1400
               San Juan, Puerto Rico  00918
15             787-756-9000
               acasellas@amgprlaw.com
16
          On behalf of Assured Guaranty Corp. and
17        Assured Guaranty Municipal Corp.:
18            Cadwalader, Wickersham & Taft, LLP
19        By:  William J. Natbony, Esq.
               Casey John Servais, Esq.
20             Thomas J. Curtin, Esq.
               200 Liberty Street
21             New York, New York  10281
               212-504-6351
22             bill.natbony@cwt.com
               casey.servais@cwt.com
23             thomas.curtin@cwt.com
          /
24
          /
25
          /
```

Page 7

1                    I  N  D  E  X

2          EXAMINATIONS CONDUCTED              PAGE

3                DAVID W. PRAGER

4      Cross-Examination By Mr. Mervis............   11

5

6                      *   *   *

7                     EXHIBITS

8      MARKED              DESCRIPTION              PAGE

9    Exhibit 1     Report of David W. Prager,        35

                   CFA, Respecting Best

10                 Interests of Creditors Test,

                   October 8, 2021

11

12                      *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

```
 1    APPEARANCES: (Continued)
 2       On behalf of the QTCB Noteholder Group:
 3          Morgan Lewis & Bockius, LLP
 4       By:  David K. Shim, Esq.
             One State Street
 5             Hartford, Connecticut  06103-3178
             860-240-2535
 6             david.shim@morganlewis.com
 7       On behalf of the Puerto Rico Fiscal Agency and
         Financial Advisory Authority:
 8
             O'Melveny & Myers, LLP
 9
         By:  Elizabeth L. McKeen, Esq.
10             Joseph L. Roth, Esq.
             610 Newport Center Drive
11             Seventeenth Floor
             Newport Beach, California 92660
12             949-823-7150
             949-823-7102
13             emckeen@omm.com
             joeroth@omm.com
14
         On behalf of Official Committee of Unsecured
15       Creditors:
16             Paul Hastings, LLP
17       By:  Nicholas A. Bassett, Esq.
             875 15th Street, N.W.
18             Washington, D.C.  20005
             202-551-1700
19             nicholasbassett@paulhastings.com
20       On behalf of the Ad Hoc Group of Constitutional
         Debt Holders:
21
             Morrison & Foerster, LLP
22
         By:  Theresa A. Foudy, Esq.
23             Roy Berman, Esq.
             250 West 55th Street
24             New York, New York  10019
             212-468-8000
25             tfoudy@mofo.com
             rberman@mofo.com
```

Page 9

1    APPEARANCES: (Continued)

2       Also Present:

3           Kroll:

4               Edmond Esses

5           Veritext:

6               David Young, Videographer

7               Karen Patterson, Account Rep.

8               Paul Baker, Concierge

9                       *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 66

1          A.   I don't recall --

2          Q.   Do you -- sorry.  Let me ask a

3     slightly different question.

4               Do you know how -- or what period of

5     time, under the plan, the disaster liquidity

6     revolver would be funded?

7          A.   Well, what I know is that -- I know

8     the fiscal plan -- there is no release of those

9     funds, and, therefore, on the economic basis

10    that's being analyzed here, those money are

11    permanently being set aside and not available to

12    creditors.

13         Q.   Your understanding is that -- do you

14    have an understanding one way or the other as to

15    whether the -- the $750 million of funding

16    under -- for -- for the disaster liquidity

17    revolver is ultimately paid to creditors?

18         A.   It is -- that money is incremental

19    to the money that's in the fiscal plan, because

20    there's no way that that money is flowing back

21    into the fiscal plan.  If it were to be released

22    and used, you know, that -- that would be, you

23    know, effectively a wash with other areas, in

24    the -- in the analysis here.

25         Q.   But my question was a little more

Page 67

1    specific.

2              Do you know whether, under either

3    the plan or the fiscal plan, the 750 million will

4    at some point be distributed to creditors?

5         A.   I know that it is not incremental to

6    the value of creditors otherwise set forth in

7    the -- in the analysis here.  How it is managed

8    over time, I would have to refresh my

9    recollection on that.

10             Q.   Fair enough.

11             Go to slide 13, please.

12        A.   Yes, sir.

13        Q.   There's a discussion in the

14   left-hand column about statutory priority.

15             Do you see that?

16        A.   Are you referring to the bullet

17   points with green next to them.

18        Q.   Yes, sir.  No.  Oh, yeah, I guess

19   they are green.  Yeah.

20        A.   I -- I see the bullet points.  I --

21   I will not comment on your characterization of

22   them as a discussion, but I see the bullet

23   points.

24             Q.   Fair enough.

25             The statements that are made in

Page 84

1    I put that in what's here, the Government

2    Functions category, or also referred to as

3    Regulatory and Administrative.  It's the subtotal

4    here, Regulatory and Administrative.

5              And then beyond that, there were --

6    was the other category, and that is what I refer

7    to as Noncore.

8    BY MR. MERVIS:

9         Q.   With respect to the programs that

10   are under the Noncore heading, do you know

11   whether any of them, under the current budget,

12   are funded in whole or in part by federal funds?

13        A.   It's possible that some of them are.

14   I am aware that that could be an issue that if

15   you were to tie it down into a detailed discovery

16   process on this, you might find that some of the

17   noncore are offset by federal funds, or

18   otherwise, similarly, if you were to dive down

19   into what's classified here categorically as core

20   or government functions, you might find things

21   that should probably be in noncore.  So it's

22   consistent with the discussion we had earlier

23   about this being preliminary or illustrative.

24   It's -- the basic approach here was to follow

25   the -- the face of the budget and to not dive

Page 85

1    much deeper, not dive deeper than that, because

2    that was -- we're not in litigation over this

3    specific issue.

4         Q.   In classifying the programs that are

5    listed under the Noncore heading on slide 16 of

6    your report, did you -- did you do anything to

7    investigate whether federal funding was involved?

8         A.   I don't believe we -- I delved into

9    the specifics of each line item, tying it to --

10   to federal funding.  Again, as I mentioned, I

11   think that there are things that could move from

12   the noncore list to the government functions or

13   to the core list, and things that can move from

14   core and government functions back onto the

15   noncore list, for one to investigate in kind of a

16   fully litigated manner.

17        Q.   Do you know whether -- I'm sorry.

18             MR. MERVIS:  Can I ask the court

19   reporter just to read back the beginning of that

20   answer?

21             (Thereupon, the record was read.)

22             MR. MERVIS:  Okay.  I got it.

23             Thank you.

24   BY MR. MERVIS:

25        Q.   Do you know whether the extent of

Page 86

1   federal funding of any of the programs that are

2   listed under the Noncore column is publicly

3   available information?

4          A.   Again, I don't know that anything in

5   this column is federal funding, if it relates to

6   federal funding.  If it is, I imagine how you

7   might be able to connect the dots and pull it all

8   back together through -- through kind of a fully

9   vetted kind of document review.  The purpose here

10  is merely to provide an order of magnitude and

11  directional point that not only are the noncore,

12  but there's also the government functions that

13  under the plain reading of the law would call --

14  would come even below the third priority of -- of

15  expenses and to set forth an initial allocation

16  of those values, subject to, if we were to

17  litigate this fully -- by additional discovery

18  and additional fact searches.

19         Q.   Right.  But public -- you're not --

20  just to be clear, are -- you're not saying that

21  you need discovery to find out whether federal

22  funds are used to fund any of the programs that

23  are listed under the Noncore column --

24             MR. KOFF:  Objection to form.

25  BY MR. MERVIS:

Page 87

1        Q.   -- on page 16?

2             MR. KOFF:  Sorry.  Objection to

3    form.

4             THE WITNESS:  That's not exactly

5    what I said.

6    BY MR. MERVIS:

7        Q.   I understand that.

8             But do you think you would need

9    discovery to determine whether federal funds are

10   used to fund, in whole or in part, any of the

11   programs that are listed under the Noncore column

12   on page 16 of your report?

13       A.   I believe that discovery would be

14   the most sufficient method to -- to determining

15   that, but there are probably other methods, at

16   least for some of them.

17       Q.   Including the -- well, withdrawn.

18            In your alternative -- in your

19   conservative alternative enforcement scenario, do

20   you assume that all of the programs that are in

21   the Noncore column on page 16 are not funded?

22       A.   No.

23       Q.   What -- in your alternative

24   enforcement scenarios, do you assume that all of

25   the programs under -- I'm sorry -- the money

1              To make sure I understand, you're --

2      you're not -- you're not opining, I gather, that

3      any particular services would be cut in the -- in

4      your alternative enforcement scenarios?

5              A.   That's correct.

6              Q.   You -- you are opining that in -- in

7      your alternative enforcement scenarios, a court

8      might direct that certain expenditures be cut; is

9      that correct?

10             A.   I don't think I've even gone that

11     far so --

12             Q.   Okay.  Your alternative -- well,

13     let's see if we can establish a couple things.

14             The revenues that you used -- that

15     you use in your alternative enforcement scenarios

16     include the revenues that are projected in the

17     2021 fiscal plan; is that right?

18             A.   Yes.

19             Q.   Okay.  And with respect to those

20     projections, in your report you don't make any

21     downward adjustments to the projections; is that

22     correct?

23             A.   Correct.

24             Q.   And then you also, in your report,

25     call for some commentary about potential

Page 102

1    fiscal plan's model.

2           Q.   Right.  But in -- again, I'm focused

3    on the dynamic piece of it.

4                Did you actually go into the

5    model -- well, let me take a specific example.

6           A.   Sure.

7           Q.   On page 15, right -- or slide 15 of

8    your report, there's a one point -- you know,

9    there's this non -- this total noncore line item

10   that's 1.177.  Did you go into the model to --

11   and actually make that adjustment to spending to

12   see how it might impact the out -- the outputs?

13          A.   No.

14          Q.   Did you go into the model and make

15   any adjustment with respect to spending, to see

16   how it would impact the outputs?

17          A.   No.  It wasn't necessary.  That

18   model was fairly self-explanatory of what the

19   data are.

20          Q.   You're not saying, are you, that if

21   you did go into the model and cut some of the

22   spending, it would have no impact on the -- the

23   outputs, right?  Let me ask a different -- let me

24   ask it a different way.

25               The way you understand the fiscal

Page 112

1   protections of persons and property, public

2   education programs, public welfare programs, for

3   payment of employer contributions to retirement

4   systems.

5            Q.   If a court were to decide to cut --

6   or to mandate the elimination of spending on the

7   culture programs that you identify on slide 16,

8   do you have an opinion as to how that might

9   impact the level of out-migration on the island?

10           MS. JENNINGS:  Objection to form.

11           THE WITNESS:  I have no opinion.

12   Again, as we've discussed at length this morning,

13   the policy decisions on what to -- to cut, or

14   rather to raise taxes in lieu of cutting, or how

15   to fund some of these programs, is not the basis

16   of my opinion.

17           My opinion is solely to say that a

18   court might find that these expenses should not

19   have priority over public debts or other

20   contractual commitments.

21           Q.   Sticking with slide 16.  The box to

22   the far right, Incentives paid to airlines to

23   increase tourism.  Do you see that?

24           A.   I do.

25           Q.   What is your understanding of the --

Page 113

1    the nature of that program or those incentives?

2                A.   It's my understanding that there is

3    $5 million a year being paid to airlines in order

4    to increase tourism.

5                Q.   And do you have an opinion one way

6    or the other as to whether if a court were to

7    mandate that that money not be spent, there would

8    be a negative impact on tourism?

9                MS. JENNINGS:   Objection to form.

10               THE WITNESS:   Again, I -- I am

11   not -- I'm taking no position on whether these

12   monies should be spent or not spent; indeed, my

13   analysis assumes that the Oversight Board has

14   done a fine job of prioritizing -- or -- or

15   controlling expenses.

16               What I am flagging here is that

17   there are expenses that are in the budget which

18   not only are they being elevated amongst first

19   and second priority, they shouldn't -- they don't

20   even appear to meet the clear language of the

21   third priority of expenses, nor do they even seem

22   to be proper functioning of the government.

23               And so as I understand what

24   nonbankruptcy law as a layperson, but who

25   practices in this area, would understand what

Page 139

1   would be considered as a measure as opposed to

2   reform.  Some of the pension reform -- some of

3   the pension changes were, I believe, classified

4   as measures versus as a structural reform.

5           Q.   And do you know whether any of the

6   fiscal measures that are in the 2021 fiscal plan

7   appeared in prior iterations of the Oversight

8   Board fiscal plan?

9           A.   I believe many or most of them did

10  in some form.

11          Q.   In the second sentence, you say --

12  your -- or the report says, While implementation

13  may present certain challenges.

14              Do you see that?

15          A.   I see that as a fragment of that

16  sentence.

17          Q.   Yeah, as a fragment.

18              What challenges are you thinking of

19  there?

20          A.   I think political would be probably

21  the -- the key amongst the -- the key qualifier

22  of what type of challenges.

23          Q.   And what do you mean by political?

24          A.   I am aware that the -- the board and

25  the government have disagreed about certain of

Page 143

1    enacted so far?

2           A.   As I stated to you previously, I --

3    I am not keeping score.  I believe that they are

4    executing as well as they -- as they can with the

5    tools that they believe that they have and with

6    the strategic approach that they have decided

7    to -- to execute.  I believe that they certified

8    their plan -- the fiscal plan -- in good faith

9    and with the understanding that the -- that the

10   reforms that they are setting forth, that they

11   are attainable.

12          Q.   Do you know -- do you know if any of

13   the structural reforms that have been included in

14   the Oversight Board's fiscal plans have been

15   implemented up till now?

16          A.   I have a recollection of some of

17   them having been -- having been implemented.

18          Q.   And what do you recall?

19          A.   I recall earlier fiscal plans moving

20   certain assumptions from -- from baseline --

21   or -- or from measures and -- and upsides into --

22   in baseline.  I don't recall the specifics of it.

23               As I said, I'm not here to score

24   them, to take a view on how effective they will

25   be at doing their job.  I believe that they will