**Hearing Date:  November 8, 2021**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**OBJECTION OF THE DRA PARTIES TO THE SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL. [DKT. NO. 17627]**

---

[1]   The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801).

## Table of Contents

**Page**

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ...........................................................................................6

I.      The DRA Was Created Pursuant to the GDB Restructuring Act .......................6

II.     The GDB Transferred Assets to the DRA, Including the GDB's Commonwealth,
        PBA, and HTA Credits ........................................................................6

III.    The Commonwealth Has Unlawfully Retained the Act 30-31 Revenues, Causing the
        DRA and Other Parties to Seek Relief from the Court........................................9

        A.      The "Clawback": The Puerto Rico Constitution and Statutes Protect
                Revenues Pledged for Service of HTA's Debt Obligations Owed to the
                DRA ...................................................................................9

        B.      The DRA Sought Relief Based on the Commonwealth's Diversion and
                Retention of the Act 30-31 Revenues ....................................................11

                1.      The DRA Sought Payment of Adequate Protection or, in the
                        Alternative, Relief from the Automatic Stay .............................11

                2.      The DRA Has Sought Allowance of an Administrative Expense
                        Claim..........................................................................12

        C.      The Monolines Sought Relief from the Automatic Stay .......................13

        D.      The DRA Commenced an Adversary Proceeding Challenging the HTA
                Bondholders' Liens and Other Rights....................................................15

IV.     The HTA/CCDA Plan Support Agreement ..................................................16

V.      The Classification and Treatment of the DRA's Claims Under the Plan ..........................17

OBJECTION.................................................................................................18

I.      The Plan is Unconfirmable Because it is Not in the Best Interests of Creditors ..............19

II.     The Plan Cannot be Confirmed Because it Violates Applicable Puerto Rico and U.S.
        Law .................................................................................................24

        A.      The Plan Violates Commonwealth Law ....................................................24

                1.      The Retention of the Act 30-31 Revenues Was Not Permitted Under
                        Commonwealth Law........................................................24

2.     The Plan Sanctions a Perpetual and Impermissible Clawback ................28

3.     The FOMB's Overbroad Preemption Theory Does Not Justify the Commonwealth's Illegal Retention of the Act 30-31 Revenues ..............30

B.     The Plan Violates the U.S. and Puerto Rico Constitutions' Takings Clauses ................................................................................................39

III.     The HTA/CCDA PSA Includes Numerous Terms that Render the Plan Unconfirmable ............................................................................................45

A.     The Settlements Contained in the HTA/CCDA PSA and Incorporated Into the Plan (Together with Other Plan Provisions) Effectuate a Sub Rosa HTA Plan in Violation of POMESA Sections 314(b)(1) and (b)(3) ...................45

B.     The HTA-Related Settlements Contained in the Plan Violate Bankruptcy Rule 9019 .................................................................................................49

IV.     The Plan is Not Confirmable Because it Provides for Disparate Treatment of the DRA's Claims Relative to HTA Bondholder Claims in the Same Class ..........................50

V.     The Plan Contains Impermissible Release, Exculpation and Injunction Provisions That Violate PROMESA Section 314(b)(3) ........................................................53

A.     Problematic Release, Exculpation, and Injunction Provisions .............................53

1.     Release of the DRA's Claims Against the Monolines ...............................53

2.     Release of the DRA's Claims against HTA and CCDA............................55

3.     Release of HTA's and CCDA's Claims Against Other Non-Debtor Agencies and Instrumentalities of the Commonwealth and the Monolines .................................................................................................56

4.     Improper Releases are Combined with Injunctions ...................................57

5.     Improper Exculpation of HTA, CCDA and the Monolines......................59

B.     The Problematic Release, Injunction, and Exculpation Provisions Violate Applicable Law ..............................................................................................59

VI.     The Plan Fails to Satisfy PROMESA Sections 314(b)(1) and (5) and Bankruptcy Code Section 1123(a)(5) Because the Legislation Necessary to Implement the Plan Has Not Been Approved. ....................................................................................63

VII.     The Plan Fails to Provide for the Payment of the DRA's Administrative Expense Claim...............................................................................................................64

ii

VIII.   The Plan is Not Consistent with the Fiscal Plan .................................................65

IX.   The Plan is Not Feasible ................................................................................67

X.   The Plan Cannot Be Confirmed for the Following Additional Reasons ...........................68

    A.   The Plan Must Correct Internal Inconsistencies Related to the DRA
       Claims .........................................................................................68

       1.   DRA's Allowed CW/HTA Claims ............................................68

       2.   DRA's PBA Secured Claim....................................................69

    B.   The Plan Was Not Proposed in Good Faith ............................................71

    C.   The Plan Cannot Discharge the DRA's Administrative Expense Claim or
       Settle the DRA Adversary Proceeding ................................................72

    D.   The Plan Cannot Discharge CCDA's Loan Obligations to the DRA ..................73

RESERVATION OF RIGHTS ...............................................................................73

CONCLUSION..................................................................................................73

## TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*In re ADnational Corp.*,
No. 03-81614,
2006 WL 5003849 (Bankr. D. Md. Mar. 7, 2006)................................................................64

*Antilles Cement Corp. v. Fortuño*,
670 F.3d 310 (1st Cir. 2012).................................................................................................36

*Armstrong v. United States*,
364 U.S. 40 (1960).................................................................................................................41

*In re Augusto's Cuisine Corp.*,
No. 15-09390 (ESL),
2017 WL 1169537 (Bankr. D.P.R. Mar. 28, 2017) ...............................................................18

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)...............................................................................................................63

*Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*,
507 U.S. 218 (1993) ..............................................................................................................34

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (S.D.N.Y. 2018)...............................................................................................50

*Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla*,
217 F. Supp. 3d 508 (D.P.R. 2016)........................................................................................40

*In re C.P. del Caribe, Inc.*,
140 B.R. 320 (Bankr. D.P.R. 1992)........................................................................................49

*In re Capmark Fin. Grp. Inc.*,
438 B.R. 471 (Bankr. D. Del. 2010) ...............................................................................49, 4

*In re CGE Shattuck, LLC*,
254 B.R. 5 (Bankr. D.N.H. 2000) ..........................................................................................50

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011)...............................................................................................................31

*In re Charles St. Afr. Methodist Episcopal Church of Boston*,
578 B.R. 56 (Bankr. D. Mass. 2017) ......................................................................................18

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014)......................................................................19, 24, 67

iv

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020)..................................................................................40

*Cobb v. City of Stockton (In re City of Stockton),*
    909 F.3d 1256 (9th Cir. 2018) .............................................................................39

*In re Costa Bonita Beach Resort, Inc.,*
    479 B.R. 14 (Bankr. D.P.R. 2012)........................................................................72

*Credithrift of Am. v. Webber (In re Webber),*
    674 F.2d 796 (9th Cir. 1982) ...............................................................................40

*In re Crowthers McCall Pattern, Inc.,*
    114 B.R. 877 (Bankr. S.D.N.Y. 1990) ................................................................46

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993).....................................................................................31, 34

*In re Dow Corning Corp.,*
    192 B.R. 415 (Bankr. E.D. Mich. 1996) .............................................................49

*Enery Future Intermediate Holdings, LLC v. Energy Future Holding Corp.(In re*
    *Energy Future Holding Corp.),*
    527 B.R. 157 (Bankr. D. Del. 2015) ...................................................................46

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
    583 B.R. 626 (D.P.R. 2017)................................................................................35

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
    361 F. Supp. 3d 203 (D.P.R. 2019)...............................................................19, 67

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
    618 B.R. 619 (D.P.R. 2020)................................................................................14

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132 (1963)...........................................................................................36

*Freightliner Corp. v. Myrick,*
    514 U.S. 280 (1995)...........................................................................................36

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960).................................................................................41, 43, 44

*Graham v. R.J. Reynolds Tobacco Co.,*
    857 F.3d 1169 (11th Cir. 2017) ..........................................................................30

*Hillsborough Cnty. v. Automated Med. Labs., Inc.,*
    471 U.S. 707 (1985)...........................................................................................34

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ..............................................................................................37

*Holt v. Henley*,
    232 U.S. 637 (1914) ............................................................................................42

*Hunter v. City of Pittsburgh*,
    207 U.S. 161 (1907) ...............................................................................42, 43, 44

*Igartua-De La Rosa v. United States*,
    417 F.3d 145 (1st Cir. 2005) ...............................................................................43

*Kansas v. Garcia*,
    140 S. Ct. 791 (2020) ...................................................................................34, 37

*In re La Trinidad Elderly LP SE*,
    No. 19-01830 (ESL),
    2019 Bankr. LEXIS 2862 (Bankr. D.P.R. Sept. 13, 2019) ..................................71

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ..........................................................59, 62

*In re Momenta, Inc.*,
    455 B.R. 353 (Bankr. D.N.H. 2011) ....................................................................64

*Motorola, Inc. v. Off.icial Comm. of Unsecured Creditors & JPMorgan Chase*
    *Bank, N.A. (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) ................................................................................46

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ..............................................................19, 68

*Mountain Side Holdings, Inc.* v. *Butters (In re Mountain Side Holdings, Inc.)*,
    142 B.R. 421 (D. Colo. 1992) ..............................................................................63

*In re Nortel Networks, Inc.*,
    522 B.R. 491 (Bankr. D. Del. 2014) .............................................................437, 48

*Notinger v. Robotic Vision Sys., Inc. (In re Robotic Vision Sys., Inc.)*,
    378 B.R. 417 (B.A.P. 1st Cir. 2007) ....................................................................49

*P.R. Dept. of Consumer Affairs v. ISLA Petroleum Corp.*,
    485 U.S. 495 (1988) ............................................................................................37

*P.R.. Highways & Transp. Auth. v. In re Fin. Oversight & Mgmt. Bd. for P.R. (In*
    *re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    989 F.3d 170, 175 (1st Cir. 2021) .......................................................................14

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
700 F.2d 935 (5th Cir. 1983) ................................................................46

*In re Plaza Antillana Inc.*,
No. 13-10013 (ESL),
2014 WL 585299 (Bankr. D.P.R. Feb. 14, 2014) ..............................................71

*In re Quincy Med. Ctr.*, Inc
No. 11-16394-MSH,
2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011)...........................................60

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)........................................................................31

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R., (In re Fin. Oversight &
Mgmt. Bd. for P.R.,)* 330 F. Supp. 3d 685 (D.P.R. 2018) ....................................35

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
140 S. Ct. 2183 (2020)....................................................................34

*Siegel v. Sony Elecs., Inc. (In re Circuit City Stores, Inc.)*,
515 B.R. 302 (Bankr. E.D. Va. 2014 ......................................................64

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002)........................................................................39

*Talbott v. C.R. Bard, Inc.*,
63 F.3d 25 (1st Cir. 1995)..................................................................31

*In re Tempnology, LLC*,
542 B.R. 50 (Bankr. D.N.H. 2015) ........................................................46

*United States v. AWECO, Inc. (In re AWECO, Inc.)*,
725 F.2d 293 (5th Cir. 1984) ..............................................................49

*United States v. Sec. Indus. Bank*,
459 U.S. 70 (1982).....................................................................39, 42

*Va. Uranium, Inc. v. Warren*,
139 S. Ct. 1894 (2019)....................................................................37

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013).................................................................51

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) .......................................................63

*In re Weber*,
209 B.R. 793 (Bankr. D. Mass. 1997) ........................................................71, 72

*Wright v. Union Cent. Life Ins. Co.*,
311 U.S. 273 (1940)....................................................................................42

*Wyeth v. Levine*,
555 U.S. 555 (2009)................................................................................34, 35

**United States Constitution**

U.S. Const. amend. V, cl. 5 .............................................................................39

U.S. Const. art. VI, § 2 ..................................................................................34

**Puerto Rico Constitution**

P.R. Const. art. II, § 9 ...................................................................................39

P.R. Const. art. VI, § 7 ..................................................................................25

P.R. Const. art. VI, § 8 ...............................................................*9, 25, 27, 28*

P.R. Const. art. VI, § 9 ..................................................................................25

**United States Statutes**

11 U.S.C. § 503(b)(1)(A) ...............................................................................12

11 U.S.C. § 507....................................................................................29, 30

11 U.S.C. § 507(a)(2)..........................................................................18, 33, 64

11 U.S.C. § 522(f)(2).....................................................................................42

11 U.S.C. § 1123(a)(4)......................................................................50, 51, 53

11 U.S.C. § 1123(a)(5)...........................................................................63, 64

11 U.S.C. § 1123(a)(5)(j)................................................................................63

11 U.S.C. § 1129(a)(2)....................................................................................18

11 U.S.C. § 1129(a)(3)..............................................................................18, 71, 72

11 U.S.C. § 1129(a)(6)....................................................................................18

11 U.S.C. § 1129(a)(8)....................................................................................18

11 U.S.C. § 1129(a)(10) ............................................................................................18

11 U.S.C. § 1129(b) ..................................................................................................18

11 U.S.C. § 1129(b)(1) .............................................................................................18

11 U.S.C. § 1129(b)(2) .............................................................................................18

11 U.S.C. § 1129(b)(2)(A) ........................................................................................71

48 U.S.C. §§ 2101-2241 ............................................................................................1

48 U.S.C. § 2103 ...............................................................................................30 31

48 U.S.C. § 2121(a) ..................................................................................................38

48 U.S.C. § 2123(c) ..................................................................................................31

48 U.S.C. § 2141 ......................................................................................................32

48 U.S.C. § 2141(a) ..................................................................................................38

48 U.S.C. § 2141(b)(1)(A)(i) ....................................................................................35

48 U.S.C. § 2141(b)(1)(A)(ii) ...................................................................................35

48 U.S.C. § 2141(b)(1)(J) .........................................................................................38

48 U.S.C. § 2141(b)(1)(M) .......................................................................................38

48 U.S.C. § 2141(b)(1)(N) ........................................................................................32

48 U.S.C. § 2142 ......................................................................................................32

48 U.S.C. § 2142(a) ..................................................................................................38

48 U.S.C. § 2142(d) ..................................................................................................38

48 U.S.C. § 2142(e) ..................................................................................................38

48 U.S.C. § 2143(c) ..................................................................................................38

48 U.S.C. § 2143(d)(2) ..............................................................................................38

48 U.S.C. § 2143(e) ..................................................................................................38

48 U.S.C. § 2144(c)(3)(B) .........................................................................................32

48 U.S.C. § 2147(b)(6) .......................................................................................19, 67

48 U.S.C. § 2161 ................................................................................................32

48 U.S.C. § 2163 ................................................................................................38

48 U.S.C. § 2170 ................................................................................................49

48 U.S.C. § 2174(b) ...........................................................................................16

48 U.S.C. § 2174(b)(1) .......................................................................................50

48 U.S.C. § 2174(b)(3) .......................................................................................33

48 U.S.C. § 2174(b)(4) .......................................................................................64

48 U.S.C. § 2174(b)(5) .......................................................................................63

48 U.S.C. § 2174(b)(6) .......................................................................................33

48 U.S.C. § 2174(b)(7) .......................................................................................65

48 U.S.C. § 2192 ................................................................................................38

48 U.S.C. § 2194(n)(5) .......................................................................................38

48 U.S.C. § 2241 ................................................................................................38

**Puerto Rico Statutes**

9 L.P.R.A. § 2021 ...............................................................................................25

9 L.P.R.A. § 5681 .........................................................................................10, 25

13 L.P.R.A. § 31751(a)(1)(A) ............................................................................10

13 L.P.R.A. § 31751(a)(1)(C) .......................................................................10, 25

13 L.P.R.A. § 31751(a)(3)(A) ............................................................................10

13 L.P.R.A. § 31751(a)(3)(C) .......................................................................10, 25

23 L.P.R.A. § 104(c)(1) .......................................................................................9

23 L.P.R.A. § 104(c)(2) .......................................................................................9

23 L.P.R.A. § 104(c)(3) ...........................................................................9, 21, 27

23 L.P.R.A. § 104(c)(4) .......................................................................................9

23 L.P.R.A. § 104(c)(5) .......................................................................................9

*Government Development Bank for Puerto Rico Debt Restructuring Act* ("GDB
Restructuring Act"),
Act No. 109-2017, *as amended by* Act No. 147-2018 ................................................1, 6

*Internal Revenue Code for a New Puerto Rico Act*
Act No. 1-2011, as amended by Act No. 31 2013 ..........................................*passim*

*Management and Budget Office Organic Act* ("OMB Act"),
Act. No. 147 (June 18, 1980) ....................................................................................9

*Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*
("First Moratorium")*, Act No. 21-2016 ....................................................................7

*Puerto Rico Vehicles and Traffic Act,*
Act No. 22-2000, as amended by Act No. 30-2013 .......................................*passim*

*Statement of Motives of Act,*
Act No. 1-2015, P.R. Laws tit. 1, § 601 ...............................................................36, 38

**Rules of Procedure**

Fed R. Bankr. P. 7001(2) .........................................................................................70

Fed. R. Bankr. P. 9019 ........................................................................................49, 50

Fed. R. Bankr. P. 9019(a) ...................................................................................49, 50

**Other Authorities**

4 Collier on Bankruptcy ¶ 506.03 (16th ed. 2017) ..............................................40

6 Collier on Bankruptcy ¶ 943.03 (16th ed. 2010) ..............................................20

**COME NOW** AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties"), which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018, and the approved qualifying modification (the "Qualifying Modification")[2] for the Government Development Bank for Puerto Rico (the "GDB") under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA")[3], by and through the undersigned legal counsel, and respectfully submit this objection (this "Objection") to the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Dkt. No. 17627] (the "Plan") filed by the Financial Oversight and Management Board for Puerto Rico (the "FOMB"), as representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth and ERS, the "Debtors").[4]

## PRELIMINARY STATEMENT

1.      During the latter half of 2018, the FOMB, Commonwealth and GDB bondholders agreed to restructure the GDB.  This restructuring created the DRA—a meaningful creditor of the Commonwealth (including its instrumentalities and municipalities)—holding aggregate claims in

---

[2]      *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).

[3]      PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[4]      Capitalized terms used but not otherwise defined herein  shall have the meanings assigned to such terms in the Plan.

1

these plenary proceedings of approximately $6 billion.   Specifically, the GDB restructuring provided for, among other things:

    a.   the exchange of the $4.7 billion of outstanding GDB bonds for $2.59 billion of new bonds issued by the DRA;

    b.   the transfer of substantially all of the GDB's assets to the DRA; those assets primarily include approximately $1.3 billion of performing loans to municipalities in Puerto Rico and approximately $4.1 billion of non-performing obligations of the Commonwealth and various instrumentalities of the Commonwealth; and

    c.   the appointment of the Servicer and the Collateral Monitor vested with authority to protect those assets, maximize their value, monetize them for the benefit of bondholders and distribute available cash on a semi-annual basis.

2.    The DRA Parties were not appointed until the end of 2018, after the restructuring of the GDB had been completed and became effective.  Shortly after their appointment, the DRA Parties attempted (without success) to engage with the FOMB and Commonwealth to become a constructive participant in this restructuring process.  The DRA Parties were surprised (and continue to be flummoxed) by the consistent and intentional exclusion of the DRA Parties from any meaningful participation in these Title III cases and the ferocious attempts to prevent the DRA Parties from advocating to protect the DRA's interests.[5]

---

[5]   The FOMB has taken every opportunity to lay obstacles in the DRA Parties' path, ranging from vigorously objecting to the DRA Parties' standing (*e.g.*, *Order Concerning the Government Parties' Objection to the DRA Parties' Standing to Seek Relief from the Automatic Stay or in the Alternative, Ordering Payment of Adequate Protection* [Dkt. No. 17725]) to engaging in wasteful litigation tactics such as improper designations of retained experts as Federal Rule of Civil Procedure 26(a)(2)(C) witnesses (*see The DRA Parties' Motion in Limine to Exclude Certain  FRCP 26(A)(2)(C) Expert Witnesses or Testimony* [Dkt. No. 18340]).

3.     The result of this intentional and inexplicable exclusion from the restructuring process is that the DRA Parties are left with no choice but to object vigorously to confirmation of the Plan.[6]  The DRA Parties' principals have histories of being constructive participants in developing consensual resolutions of disputes in massive and complex reorganization cases, with over 50 years of experience and have negotiated the settlements of over $100 billion of disputed claims.  Rather than leaning into the opportunity to present this Court with a consensual plan, the FOMB and other major participants in these cases, have *unnecessarily* chosen to negotiate a plan to the exclusion of the DRA Parties and now ask the Court to consider and confirm an unlawful plan over the DRA Parties' objections.

4.     The Plan cannot be confirmed because it fails to satisfy a number of the confirmation requirements under PROMESA as discussed in detail in this Objection.

5.     *First*, the Plan fails to satisfy the best interests test.  The Commonwealth is holding at least $3.4 billion in cash and value (and up to $23.5 billion) that the FOMB should make available to creditors, including the DRA.  But the FOMB has refused to do so.  The FOMB must put enough value to work for the Debtors' creditors to ensure that creditors as a whole are receiving more value than they would receive if the Court dismissed these Title III cases.

6.     The DRA Parties will present testimony from their expert, David Prager, that confirms that the Commonwealth is hoarding this value and that creditors would fare better outside of a Title III case.  The Prager analysis proves that the Commonwealth has far more value available to creditors than the Plan provides—the Commonwealth is in possession of more than $1 billion in *cash* that could be distributed to creditors immediately.  If the Commonwealth distributed its

---

[6]     Invariably, the FOMB and others will tell the Court that negotiation sessions and other communications with the DRA Parties have occurred.  While that may be true, a good faith negotiation did not occur, ever.

assets following the priorities detailed under Commonwealth law it would be able to service current debt many times over.

7.     *Second*, the FOMB has built the Plan on violations of applicable Commonwealth and U.S. law.  Most notably, the Commonwealth has violated the Puerto Rico Constitution and other applicable statutes by "clawing-back" hundreds of millions of dollars of DRA collateral from HTA for the Commonwealth's benefit.  The FOMB justifies this clawback by asserting that PROMESA preempts Commonwealth law explicitly or implicitly.  It does not.  To the contrary, PROMESA expressly incorporates many provisions of Commonwealth law—including priority of debt.  A plan built on the notion that PROMESA preempts wide swathes of Commonwealth law is not a lawful plan.  It is a contrivance.  The Court should not confirm a plan of adjustment that violates applicable law.

8.     *Third*, not only has the FOMB tried to wrap up these Title III cases for the Commonwealth, ERS and PBA, but, in cutting deals with various Commonwealth bondholders that also hold large amounts of HTA bonds, the FOMB has improperly negotiated agreements and included terms that fix a plan at HTA prematurely and without any meaningful participation of the DRA Parties in that process.  The DRA is likely the single largest creditor of HTA.  The Plan cannot be used as a surrogate for an HTA plan.  And the Court should not approve the Plan (and the HTA/CCDA PSA (as defined below)), because they amount to a *sub rosa* HTA plan.

9.     *Fourth,* the Plan contains overbroad release, exculpation, and injunction provisions that are impermissible under applicable law.  Moreover, these provisions may prejudice the DRA's rights.  For example, as part of the DRA Adversary Proceeding (as defined below), the Monolines have argued that the DRA's claims should be equitably subordinated based on alleged bad acts by the GDB.  In the event that this Court finds that the DRA's claim should be equitably subordinated,

4

the DRA may have claims against the FOMB, Commonwealth and/or Monolines for gross negligence, willful misconduct or intentional fraud based on their participation in the conduct justifying equitable subordination. However, the Plan's overbroad release provisions may inappropriately cause the DRA to release its claims against these parties. To be clear, the DRA's claims should not be equitably subordinated, but if this Court finds that bad acts have occurred, the parties involved should not be released of liability for such misconduct.

10. Finally, the Plan suffers from several other infirmities that render it unconfirmable, including that it:

    a. disparately treats DRA's Class 59 CW/HTA Claims as compared to the bondholders' claims in the same class by, among other things, providing consideration to such bondholders that is not available to the DRA;

    b. is not feasible because it is premised on conditions that the FOMB has not demonstrated can be met;

    c. is conditioned on a statute that Puerto Rico's legislature has not yet passed, and if such legislation is not passed prior to confirmation, it would put the Plan in flux;

    d. fails to reserve funds for the full payment of DRA's administrative claim (to the extent such claim is allowed); and

    e. is inconsistent with the Commonwealth's certified fiscal plan.

11. Having failed to produce a confirmable plan, the FOMB must return to the drawing board, work with *all* creditors (not just a select group of them), and develop a plan that satisfies Congress' rigorous confirmation standards. Until the FOMB has done so, the Court cannot confirm the Plan.

## BACKGROUND

### I. The DRA Was Created Pursuant to the GDB Restructuring Act

12.  On November 5, 2018, the FOMB certified the Qualifying Modification under PROMESA for the <u>GDB</u>, which Qualifying Modification this Court subsequently approved by an order dated November 7, 2018.  *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS).  Notably, neither the FOMB nor any other participant in these Title III cases has indicated to this Court, or public investors, that the GDB engaged in inequitable conduct prior to 2018 that would justify equitable subordination of certain of the rights transferred from the GDB to the DRA.

13.  The DRA is a statutory public trust and governmental instrumentality of the Commonwealth created by the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018 dated July 18, 2018, to facilitate the GDB's Title VI restructuring of certain indebtedness pursuant to the Qualifying Modification.  *See* Act No. 109-2017 at Arts. 201 and 204.

### II. The GDB Transferred Assets to the DRA, Including the GDB's Commonwealth, PBA, and HTA Credits

14.  To secure the DRA's obligations under the new bonds, the GDB consensually transferred a substantial portion of its assets to the DRA, including debt obligations against the Commonwealth, PBA and HTA that are subject to, or affected by, the terms of the Plan.  *See infra* ¶ 39; Act No. 109-2017; *see also* Zouarabani Decl. Ex. A[7], Master Transfer Agreement, dated

---

[7]  The *Declaration of Nayuan Zouarabani Trinidad in Support of the Objection of the DRA Parties to the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. [Dkt. No. 17627]* (the "<u>Zouarabani Decl.</u>") has been filed contemporaneously herewith.

November 29, 2018, between the GDB and DRA, § 2.  The following provides an overview of these credits.

15. ***GO Obligations***.  The DRA is owed $55,883,944.76 in outstanding principal and $7,340,406.94 in outstanding interest under certain bilateral loans (the "GO Loans") made by its predecessor, the GDB, to the Commonwealth in 2012 and 2013 pursuant to two separate promissory notes. *See* Zouarabani Decl. Ex. B, Offering Memorandum for GDB Debt Recovery Authority Bonds (Taxable), dated as of Nov. 7, 2018 (the "OM") at 126.  The obligations under the GO Loans are "public debt" under Article VI, Section 8 of the Puerto Rico Constitution because the Puerto Rico legislature passed statutes providing that the debts are backed by a pledge of the Commonwealth's good faith, credit and taxing power. *See* Act Nos. 242-2011, Act 33-1942 and Act 47-2013.[8]

16. ***PBA Loans***.  The DRA holds claims against PBA on account of four loans made by the GDB to PBA, which as of PBA's September 27, 2019 petition date, totaled at least $207,332,233.40. *See* Proof of Claim No. 174309 filed on July 28, 2020 by the Servicer against PBA.  Three of the PBA Loans (the "PBA Unsecured Loans") are unsecured obligations of PBA and, as of PBA's petition date, totaled $88,592,916.04 in principal amount and $50,086,019.67 in interest.  One loan (the "PBA Secured Loan," and together with the PBA Unsecured Loans, the "PBA Loans"), which consisted of $48,821,233.11 in principal amount and $19,832,064.58 in interest as of PBA's petition date, is secured by a security interest in the proceeds of the sale or disposition of two real properties in San Juan consisting of buildings where the Commonwealth's Department of Justice and Treasury Department are currently located. *See id*.

---

[8]  Act No. 21-2016, the *Puerto Rico Emergency Moratorium and Rehabilitation Act* ("First Moratorium"), defines "public debt" as "full faith and credit debt protected by the Constitution."

7

17.     ***HTA Loans and Bonds***.  The DRA is likely HTA's single largest secured creditor. Prior to the GDB's Title VI restructuring, the GDB made significant loans to HTA in the original principal amount of nearly $2 billion (the "HTA Loans").  As of HTA's petition date, the HTA Loans had an aggregate outstanding principal balance in excess of $1.7 billion and not less than $420 million in interest, plus fees and expenses that have accrued under the terms of the loans. *See* Proof of Claim No. 151149 filed on June 29, 2018 by the Servicer against HTA.

18.     Obligations under the HTA Loans are secured by the Assignment and Security Agreement, dated as of August 28, 2013 (as amended, supplemented or otherwise modified, the "Security Agreement") between the GDB and HTA.  Under the Security Agreement, HTA granted the GDB a lien on certain excise tax revenues allocated and assigned to HTA by the Commonwealth (the "Act 30-31 Revenues") pursuant to Act No. 30-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("Act 30") and Act No. 31-2013 approved by the Legislature of the Commonwealth on June 25, 2013 ("Act 31").[9]  *See* Zouarabani Decl. Ex. C, Security Agreement § 1.2.

19.     The DRA also holds $200,000,000 in the aggregate original principal amount of Puerto Rico Highway and Transportation Authority, Transportation Revenue Bonds (Series A), which HTA issued under Resolution No. 98-06, adopted by HTA on February 26, 1998.  *See* OM at 128.  As of HTA's petition date, HTA owed the GDB not less than $1.8 million in accrued interest plus fees and expenses related to these bonds.  *See* Proof of Claim No. 151149 filed on June 29, 2018 by the Servicer against HTA.

---

[9]     For certified English translations of Acts 30 and 31, see Exhibits R & S, respectively, of the Zouarabani Decl..

III.    **The Commonwealth Has Unlawfully Retained the Act 30-31 Revenues, Causing the
        DRA and Other Parties to Seek Relief from the Court**[10]

   A.    *The "Clawback": The Puerto Rico Constitution and Statutes Protect Revenues
         Pledged for Service of HTA's Debt Obligations Owed to the DRA*

20.    The Puerto Rico Constitution requires that the Commonwealth's annual
appropriations not exceed its annual revenues, and, when the Commonwealth's resources are
insufficient to cover its annual appropriations, it requires the Commonwealth to satisfy fiscal-year
interest and amortization on general obligation bonds before it satisfies other obligations.  *See* P.R.
Const. art. VI, § 8.  Section 4(c) of the *Management and Budget Office Organic Act* (the "OMB
Act"), creates a waterfall of payment priorities for "when the available funds for a specific fiscal
year are not sufficient to cover the appropriations approved for that year."  Act No. 147 § 4(c)
(June 18, 1980).   Under this provision, if there are insufficient funds for the fiscal year, the
Commonwealth must apply available funds in the following order:

   (i)     first, to the "payment of interest and amortizations corresponding to the
           public debt" (*see* 23 L.P.R.A. § 104(c)(1));

   (ii)    second, to, among other things, the payment of "commitments entered into
           by virtue of legal contracts in force . . . " (*see* 23 L.P.R.A. § 104(c)(2)),
           which obligations include HTA's debt obligations;

   (iii)   third, to the payment of "regular expenses" related to government
           operations, including payments for "[c]onservation of public health,"
           "[p]rotection of persons and property," "[p]ublic education programs,"
           "[p]ublic welfare programs," pension obligations and any "remaining
           public services" (*see*  23 L.P.R.A. § 104(c)(3));

   (iv)    four, to expenditures for "construction of capital works or improvements"
           (*see* 23 L.P.R.A. § 104(c)(4)); and

   (v)     five, to "contracts and commitments contracted under special
           appropriations" (*see* 23 L.P.R.A. § 104(c)(5)).

---

[10]    A complete discussion of this issue can be found in the DRA Administrative Expense Claim Motion (as defined
below), which was filed at Dkt. No. 17009.

21.     Acts 30 and 31 each require that the Act 30-31 Revenues be transferred and conveyed from the Commonwealth to HTA unless Article VI, Section 8 of the Puerto Rico Constitution is invoked.  *See* 9 L.P.R.A. § 5681; 13 L.P.R.A. §§ 31751(a)(1)(A), 31751(a)(1)(C), 31751(a)(3)(A), and 31751(a)(3)(C).

22.     On December 1, 2005, then-Governor Alejandro Garcia-Padilla issued Executive Order 2015-046, which ordered the Treasury Secretary to "retain the revenues assigned to [HTA] for the payment of certain [HTA] obligations . . . ."  *See* Zouarabani Decl. Ex. D, Admin. Bulletin OE-2015-046 at 2.  This order was allegedly issued under the auspices of Article VI, Section 8 of the Puerto Rico Constitution. *Id.* at 3.

23.     On December 8, 2015, then-Governor Garcia-Padilla issued Executive Order 2015-049, which stated that the Governor or the Director of the Office of Management and Budget "may establish budgetary reserves and restrict those resources that are at the disposal of government entities in the manner that they see fit, when deemed necessary in the course of executing and controlling the budget", and that the Director shall "make any budget adjustments necessary in the allocations contained in the Budget in order to match them with available resources."  *See* Zouarabani Decl. Ex. 7, Admin. Bulletin OE-2015-049 at 2, 3.  This executive order unlawfully authorized the Commonwealth to use pledged HTA revenues "in the manner that [it] see[s] fit," to pay virtually any other general expense ahead of GO debt.  *See id*. at 2.

24.     The Department of Treasury issued Circular Letter No. 1300-15-16 on December 17, 2015 to provide guidelines for the disbursement of HTA and other revenues recovered pursuant to the aforementioned executive orders.  The letter directed the Commonwealth officials to disburse pledged HTA revenues to pay for, among other things, "essential services," payroll and pensions, and "any other expense . . . which, at the Treasury Secretary's discretion, is deemed

10

necessary to guarantee the operation and stability of the central government of the [Commonwealth] and the welfare of its inhabitants", as well as expenses for emergencies.  Circular Letter No. 1300-15-16 at ¶ 2.

25.     On April 6, 2016, the Commonwealth approved the First Moratorium.  Pursuant to the authority granted to him by this Act, then-Governor Garcia-Padilla issued three executive orders (collectively, the "Clawback Executive Orders") that (i) suspended the repayment of HTA's debts (including those owed to the GDB and, subsequently, to the DRA), (ii) continued to withhold various government sources of revenue (including the DRA's collateral), and (iii) redirected the withheld funds to satisfy the operating expenses of the Commonwealth.  *See* Zouarabani Decl. Ex. F, Administrative Bulletin OE-2016-018 (May 17, 2016); Zouarabani Decl. Ex. G, Administrative Bulletin EO-2016-030 (June 30, 2016); and Zouarabani Decl. Ex. H, Administrative Bulletin EO-2016-031 (June 30, 2016).

26.     The Commonwealth issued the Clawback Executive Orders but made no effort to show how the diversion of the revenues complied with the Puerto Rico Constitution's "clawback" provision and applicable laws.  Each of the Clawback Executive Orders therefore violated the priority of debt payments set forth in the Puerto Rico Constitution, the OMB Act, and Acts 30 and 31 by elevating the priority of the payment of general expenses over the payment of HTA's senior secured debt, including the HTA Loans and the HTA 98 Bonds.  The Commonwealth's diversion of the Act 30-31 Revenues has continued throughout the pendency of its Title III case.

**B.     The DRA Sought Relief Based on the Commonwealth's Diversion and Retention of the Act 30-31 Revenues**

**1.     The DRA Sought Payment of Adequate Protection or, in the Alternative, Relief from the Automatic Stay**

11

27. On June 25, 2019, the DRA Parties filed a motion seeking adequate protection or, in the alternative, relief from the automatic stay. *See* Dkt. No. 7643. The DRA Parties subsequently amended this motion on March 31, 2021. *See* Dkt. No. 16276 (the "DRA Amended Lift Stay Motion"). In the DRA Amended Lift Stay Motion, the DRA Parties asserted that the Commonwealth's illegal diversion, retention and use of the Act 30-31 Revenues violated the Puerto Rico Constitution and Puerto Rico statutes, and alleged that the dissipation of the DRA's collateral remained ongoing. *See* DRA Amended Lift Stay Motion ¶¶ 25-34.

28. The Court has found that the DRA has standing to prosecute the Amended Lift Stay Motion, as to its motion seeking adequate protection. *See* Dkt. No. 17725 at 7-8.[11] Further briefing on the merits of the DRA's request for adequate protection is currently stayed pending a determination of whether the DRA holds an interest in the Act 30-31 Revenues. *See* Dkt. No. 17802 at 1-2.

### 2. The DRA Has Sought Allowance of an Administrative Expense Claim

29. On June 15, 2021, the DRA Parties filed a motion seeking the allowance of an administrative expense claim under Bankruptcy Code section 503(b)(1)(A) (the "DRA Administrative Expense Claim Motion") based on the Commonwealth's illegal post-petition retention of the Act 30-31 Revenues. *See* Dkt. No. 17009 ¶¶ 62-75.[12] This matter is currently pending before the Court.

---

[11] As to the DRA's alternate request to obtain relief from the automatic stay, the Court deferred consideration of the FOMB and AAFAF's objections pending further clarification of the type and scope of actions the DRA intends to take should stay relief be granted. *See id.* at 8.

[12] On September 9, 2021, the FOMB objected to the DRA Administrative Expense Claim Motion. *See* Dkt. No. 18065. The DRA Parties subsequently responded to the FOMB's objection on September 24, 2021. *See* Dkt. No. 19244.

30.     In May 2021, the Servicer, on behalf of the DRA, retained TMF Financial Forensics and Lighthouse Consulting Group, LLC to analyze certain financial and accounting issues related to the Commonwealth's retention of the Act 30-31 Revenues from July 2014 through June 30, 2021.

31.     The results of this analysis are reflected in the *Expert Report of Lizette Martinez, CPA, CFF, CFE*, dated as of September 13, 2021 (as supplemented on October 7, 2021, the "Martinez Expert Report").[13]   As set forth in the Martinez Expert Report, HTA was allocated $688.6 million in Act 30-31 Revenues during the HTA post-petition period[14] and received at least $463 million of the allocated amount.  *See* Zouarabani Decl. Ex. I, Martinez Expert Report at 68. The Commonwealth has therefore unlawfully retained at least $153.3 million of the Act 30-31 Revenues allocated to HTA during this period.  *See id*.

### C.     The Monolines Sought Relief from the Automatic Stay

32.     In August 2019, certain monoline insurers (the "Monolines"), as direct holders and insurers of HTA 68 Bonds and HTA 98 Bonds, filed a motion for adequate protection or, in the alternative, for relief from the automatic stay with respect to bonds issued by HTA (as amended, the "Monolines' Amended Lift Stay Motion").  *See* Dkt. Nos. 8536 & 10102.  The Monolines alleged that they had a perfected security interest in certain pledged revenues, including some of the Act 30-31 Revenues, and that stay relief was warranted because the Commonwealth had

---

[13]   In accordance with the protective orders filed at Dkt. No. 12912, Dkt. No. 12920, Dkt. No. 16681-2, and Dkt. No. 76 of Adv. No. 20-0005 (LTS), an unredacted version of the Martinez Expert Report was previously filed under seal with the Court (*see* Dkt. No. 18244 and 18441) and served on all parties eligible to receive an unredacted copy of the report under the terms of the protective orders.

[14]   The relevant post-petition period in the Martinez Expert Report is based on HTA's May 21, 2017 petition date. However, for purposes of calculating the DRA's asserted administrative expense claim, the relevant time period begins as of the Commonwealth's petition date, which is May 3, 2017.

unlawfully diverted the revenues in violation of Article VI, Section 8 of the Puerto Rico Constitution. *See* Dkt. No. 10102 ¶¶ 4-24.

33.     On July 2, 2020, the Court issued a decision in connection with the Monolines' Amended Lift Stay Motion, in which the Court concluded that the Monolines had failed to make the required showing of a *prima facie* security interest in the excise tax revenues (other than those that had been deposited in certain special funds).[15] *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 619 (D.P.R. 2020). The decision noted that certain HTA excise tax revenues (including the Act 30-31 Revenues) "are not able to be used or obtained by HTA nor are they at HTA's disposal" and are instead "within the possession and control of the Commonwealth." *Id.* at 634-35 (internal quotations omitted). However, the Court did not reach the ultimate question of whether HTA's lack of possession of the Act 30-31 Revenues means that HTA lacked any interest in the Act 30-31 Revenues. The Court also did not address the basis or justification for the Commonwealth's diversion of the revenues away from HTA or whether such diversion is permissible based on the framework of Acts 30 and 31 as well as applicable Puerto Rico law, including the Puerto Rico Constitution.[16]

34.     The DRA's security interest in the Act 30-31 Revenues does not suffer from the deficiencies identified by this Court concerning the Monolines' Amended Lift Stay Motion. Unlike the Monolines' liens, the DRA's liens attach to the Act 30-31 Revenues "*whether presently*

---

[15]   Supplemental briefing on the Monolines' Amended Lift Stay Motion was ordered by the Court concerning whether the Monolines could establish cause for stay relief based on certain grounds. *See* Dkt. No. 13607. On September 9, 2020, the Court issued a memorandum opinion and order denying the Monolines' Amended Lift Stay Motion. *See* Dkt. No. 14186. The Monolines appealed the Court's lift-stay orders to the United States Court of Appeals for the First Circuit (the "First Circuit") on September 23, 2020. *See* Dkt. No. 14389. On March 3, 2021, the First Circuit issued its decision affirming the Court's prior orders (the "Monolines' Appeal Opinion"). *P.R.. Highways & Transp. Auth. v. In re Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),* 989 F.3d 170, 175 (1st Cir. 2021).

[16]   The Monolines' Appeal Opinion did not address these questions either or the validity and extent of the DRA's security interest in the Act 30-31 Revenues. *See Fin. Oversight & Mgmt. Bd. for P.R.*, 989 F.3d at 175.

14

*held or hereafter acquired and wherever located*," and the post-petition stream of future revenues stemming therefrom.  *See* Zouarabani Decl. Ex. C, Security Agreement § 1.2 (emphasis added). Therefore, the Court's basis for denying the Monolines' Amended Lift Stay Motion simply does not apply to the DRA.

### D.   The DRA Commenced an Adversary Proceeding Challenging the HTA Bondholders' Liens and Other Rights

35.   On June 26, 2021, the DRA Parties commenced an adversary proceeding (the "DRA Adversary Proceeding") by filing an adversary complaint (the "DRA Adversary Complaint") against the Monolines, Peaje Investments LLC, and the Bank of New York Mellon, as fiscal agent, seeking a declaratory judgment regarding the validity, extent, seniority and priority of the liens, security interests, rights and claims of each of the DRA and the defendants' named in the DRA Adversary Complaint with respect to HTA.  *See* Dkt. No. 1 of Adv. Pro. No. 21-00068-LTS.  The DRA Parties filed this action in response to the Plan's classification and treatment of Class 59 CW/HTA Claims, which requires the Court's determination of the relative rights and priorities of the DRA's HTA Loan claims and HTA Bond claims in Class 59 before distributions can be made on account of such claims in accordance with the Plan.  *See* DRA Adversary Complaint ¶ 100; Plan § 63.1.[17]  This litigation remains pending before the Court.[18]

---

[17]   On August 26, 2021, the defendants in the DRA Adversary Complaint, and the FOMB and AAFAF (as intervenors) moved to dismiss the complaint.  *See* Dkt. Nos. 17983, 17979 of Adv. Pro. No. 21-00068-LTS. On September 23, 2021, the DRA Parties filed their opposition to the motions to dismiss.  *See* Dkt. No. 60 of Adv. Pro. No. 21-00068-LTS.

[18]   For the avoidance of doubt, the DRA reserves all of its rights with respect to the validity, extent, seniority and priority of its liens security interests, rights and claims with respect to HTA.

## IV.     The HTA/CCDA Plan Support Agreement

36.     On May 5, 2021, the FOMB entered into the HTA/CCDA Plan Support Agreement

(the "HTA/CCDA PSA")[19] with a group of bondholders (largely the Monolines) owning

Commonwealth GO debts as well as HTA (and CCDA) debts.   Among other things, the

HTA/CCDA PSA (i) requires HTA to make a distribution of $264 million to holders of HTA 68

Bonds and HTA 98 Senior Bonds in partial satisfaction of their respective claims (*see id*. §

4.9(b)(xx)), (ii) provides for the payment of $140 million in PSA Restriction Fees and up to $125

million in HTA Consummation Costs (as each is defined in the HTA/CCDA PSA) to certain

holders of HTA 68 Bonds and HTA 98 Senior Bonds (*see id*. §§ 1.2 (definitions of HTA

Consummation Costs and PSA Restriction Fees), 6.1(a) & (b)), (iii) provides for the payment of

an additional $58.6 million in fees to Assured and National in settlement structuring fees (*see id*.

§§ 1.2 (definition of Clawback Structuring Fee), 6.1(d)), and (iv) conditions distribution of cash

from the HTA Clawback CVI on, among other things, the completion of HTA plan documents in

a form that is satisfactory to the FOMB, Assured and National, but not the DRA (s*ee id*. §

4.9(b)(xxii)).   Other than the payment of the PSA Restriction Fees and HTA Consummation Costs,

these provisions are also included in the Plan (as required under the HTA/CCDA PSA).   Failure

to confirm a plan containing these terms—some of which have no bearing on the Commonwealth,

PBA, or ERS—would constitute a breach of the HTA/CCDA PSA and, in turn, potentially make

the Plan unconfirmable.   *See* Plan §§ 1.171, 63.2, 74.2(c), 86.1(b)(xv), 86.1(b)(xvi), 92.2(a), 92.3,

92.5, 92.6, 92.9, Ex. J.

---

[19]     A copy of the HTA/CCDA PSA is filed as Exhibit C to the Disclosure Statement.  *See* Dkt. No. 17628-3.

37.     The HTA/CCDA PSA settles the clawback claims that certain of the HTA/CCDA

PSA Creditors have against the Commonwealth based on the Commonwealth's illegal diversion,

retention and use of, among other revenue streams, the Act 30-31 Revenues.  Fundamentally, this

is the conduct that serves as the bases for the DRA's Administrative Expense Motion, the DRA's

CW/HTA Claims and the objections contained herein under the Takings Clauses of the U.S. and

Puerto Rico constitutions.

**V.      The Classification and Treatment of the DRA's Claims Under the Plan**

38.     The Plan classifies and treats the DRA's claims as follows:

| CLAIM[20] | CLASS | TREATMENT |
|---|---|---|
| PBA Secured Loan – $49M | PBA/DRA Secured Claim (Class 12) | Cash in an amount equal to 10% of allowed claim. |
| PBA Unsecured Loans – $88M | PBA/DRA Unsecured Claims (Class 14) | Cash in an amount equal to 10% of allowed claim. |
| GO Loans – $56M | 2012 CW Bond Claims (Class 40) | New GO Bonds, GO CVIs and cash, with 72.4% fixed recovery (excluding recoveries on account of GO CVIs) |
| HTA clawback claims, calculated based on:<br>• HTA Loans – $1,734M<br>• HTA 98 Senior Bonds – $200M | CW/HTA Claims (Class 59) | Under the Plan, distributions of HTA Clawback CVIs to holders of CW/HTA Claims would be made pursuant to a waterfall that would pay the DRA on account of its HTA Loan claims only after all of the HTA bondholders are paid the amount allocated to such bondholders under the Plan.  The distribution of cash from the HTA Clawback CVI between the holders of HTA 98 Bonds and the HTA Loans will be reserved pending a determination by the Court regarding the relative priorities of the HTA 98 Bonds and the HTA Loans. |

---

[20]    Claim amount with respect to each claim reflects the amount of principal due as of the relevant Debtor's petition date.

17

## OBJECTION

39.     The Plan cannot be confirmed because it fails to comply with the confirmation requirements set forth in PROMESA section 314(b), which includes certain provisions of the Bankruptcy Code that are made applicable to these Title III cases.

40.     Under PROMESA section 314(b), a court shall approve a debt adjustment plan if: (1) the plan complies with the provisions of the Bankruptcy Code made applicable to a Title III case[21]; (2) the plan complies with PROMESA; (3) the debtor is not legally prohibited from taking any action necessary to carry out the plan; (4) the plan provides that each claim holder of a type specified in Bankruptcy Code section 507(a)(2) will receive cash equal to the allowed amount of the claim, except to the extent the claimholder has agreed otherwise; (5) any legislative, regulatory, or electoral approval necessary to effectuate any plan provision has been obtained, or the provision is expressly conditioned on approval; (6) the plan is feasible and in the best interests of creditors, requiring the court to consider possible available non-bankruptcy remedies; and (7) the plan is consistent with the Fiscal Plan certified by the Oversight Board.  *See* 48 U.S.C. § 2174(b).

41.     The FOMB, as Plan proponent, bears the burden of proof that it has satisfied all of the plan confirmation requirements by the preponderance of the evidence.  *See In re Charles St. Afr. Methodist Episcopal Church of Boston*, 578 B.R. 56, 94 (Bankr. D. Mass. 2017); *In re Augusto's Cuisine Corp.*,  No. 15-09390 (ESL), 2017 WL 1169537, at *5 (Bankr. D.P.R. Mar. 28,

---

[21]  The applicable provisions of the Bankruptcy Code include sections 1129(a)(2) (requiring that the plan proponent comply with the applicable provisions of the Bankruptcy Code), 1129(a)(3) (requiring that the plan be "proposed in good faith and not by any means forbidden by law"), 1129(a)(6) (requiring that a governmental regulatory commission approve any rate change provided in the plan or that such rate change is expressly conditioned on such approval), 1129(a)(8) (requiring that each class of impaired claims or interests either accepts the plan or is not impaired under the plan), and section 1129(a)(10) (requiring that the plan be accepted by at least one class of impaired claims without reference to any insiders).  *See* 11 U.S.C. §§ 1129(a)(2), (3), (6), (8), (10).  If the plan proponent cannot satisfy Bankruptcy Code section 1129(a)(8), then it must seek confirmation under Bankruptcy Code section 1129(b), which requires that the plan "not discriminate unfairly" and be "fair and equitable" with respect to the non-accepting impaired classes.  *See* 11 U.S.C. § 1129(b)(1), (2).

2017) ("The plan proponent bears the burden of proving by a preponderance of the evidence that each requirement of Section 1129(a) is satisfied.").  Here, the Plan cannot be confirmed because it fails to satisfy multiple confirmation requirements as set forth below.

**I.      The Plan is Unconfirmable Because it is Not in the Best Interests of Creditors**

42.      To be confirmed under PROMESA section 314(b)(6), the Plan must be "in the best interests of creditors."  *See* 48 U.S.C. § 2147(b)(6).  In determining whether a plan is in the best interests of creditors, the court "shall . . . consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in greater recovery for the creditors than is provided by [the debt adjustment] plan."  *Id.*

43.      The case law interpreting PROMESA section 314(b)(6) is scarce.  PROMESA's "best interests" standard appears to draw from the case law interpreting a similar standard in Bankruptcy Code chapter 9 cases.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 250-51 (D.P.R. 2019) ("As in Chapter 9, PROMESA's 'best interests' test differs substantially from the Chapter 11 'best interests' requirement.").  In evaluating whether a plan satisfies the best interests of creditors in chapter 9 cases, courts determine whether creditors as a whole would receive better treatment under the plan than they would in the event of a dismissal. *See In re City of Detroit*, 524 B.R. 147, 216-17 (Bankr. E.D. Mich. 2014) ("[T]he question is whether the plan is in the best interests of creditors as a whole.") (citations omitted).

44.      Because the primary purpose of a municipal debt restructuring is the continued provision of governmental services, the court must find a middle ground between the repayment of creditors and providing government services when assessing best interests.  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999).  Although municipalities are not required to devote all available resources, or to unjustifiably raise taxes, to pay creditors in full, there must be

19

"a reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case." 6 Collier on Bankruptcy ¶ 943.03 at 18 n.115a, 19 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

45.    As set forth in the *Report of David W. Prager, CFA, Respecting Best Interests of Creditors Test* [Dkt. No. 18445] (the "Prager Report"), the Plan deprives the Commonwealth creditors of between $3.4 and $23.5 billion of additional value that can be captured outside of the Plan without sacrificing the Commonwealth's ability to provide government services to its citizens. *See* Zouarabani Decl. Ex. J, Prager Report at 4, 8-10. According to the Prager Report, this "additional value far exceeds the value depicted in the [FOMB's best interests report] and represents materially greater recoveries to creditors" outside of the Plan when compared to what the Plan provides. *Id.* at 41.

46.    The Prager Report serves to rebut and dismantle the FOMB's expert report on the best interests of creditors test prepared by McKinsey & Company Puerto Rico Consulting, Inc. (the "McKinsey Report").[22]  The McKinsey Report is flawed and has limited utility for the following reasons.

47.    *First*, contrary to applicable law (*see supra* ¶¶ 44-45), the McKinsey Report does not measure whether creditors, taken as a whole, would attain a higher recovery by exercising their remedies under applicable non-bankruptcy law than under the Plan. *See* Zouarabani Decl. Ex. K, Shah Tr. 49:12-50:8, 148:23-150:25. Instead, the report adopts an alternative metric of analyzing payments to specific creditor groups. *See* Zouarabani Decl. Ex. J, Prager Report at 12; Zouarabani Decl. Ex. K, Shah Tr. 116:7-118:14.

---

[22]    *See Notice of Filing Exhibit N (Best Interests Test Reports) to Disclosure Statement for the Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Dkt. No. 16927]; Disclosure Statement Ex. P.

48.     *Second*, the McKinsey Report does not comply with the requirements of PROMESA section 314(b)(6). Specifically, it ignores the proper priority of payments under non-bankruptcy law, which is enforceable by the Commonwealth creditors under the Puerto Rico Constitution and other applicable law (an "<u>Alternative Enforcement</u>").  *See id.* at 12-17.  The McKinsey Report assumes, in its Alternative Enforcement scenario, that, in the absence of the Plan, the Commonwealth would pay operating expenses before making any debt service payments, thereby depriving creditors of greater recoveries than those provided under the Plan.  *See id.* at 8. However, this assumption conflicts with Commonwealth law, including the OMB Act.  *See infra* ¶¶ 59-61.   For the Alternative Enforcement scenario to be consistent with applicable Commonwealth law, it must assume that all current cash resources would be made available to creditors, which would result in at least $1.3 billion of additional cash that could be paid to creditors in an Alternative Enforcement scenario.  *See* Zouarabani Decl. Ex. J, Prager Report at 9. The McKinsey Report did not consider these aspects of Puerto Rico law because McKinsey adopted numerous assumptions from counsel about the amount of cash the Commonwealth should retain for minimum liquidity, which funds constitute the "resource envelope" available for distribution to creditors, and creditor priorities.  *See* Zouarabani Decl. Ex. K, Shah Tr. 116:7-118:14, 125:23-134:23, 137:5-138:1, 139:9-141:25.

49.     *Third*, even if the Court were to accept the FOMB's theory that operating expenses should be paid before debt service, the McKinsey Report improperly includes $1.5 billion to $17.1 billion of expenses that should not be prioritized over debt service because they are not "core services" related to public health, safety, education, welfare, and pension contributions that are identified in the OMB Act.  *See* Zouarabani Decl. Ex. J, Prager Report at 9; 23 L.P.R.A. § 104(c)(3).

21

50.     *Fourth*, the McKinsey Report improperly assumes that $2.8 billion in value contributed by the Commonwealth to the Pension Reserve Trust would not be available for the Commonwealth creditors in an Alternative Enforcement scenario.  *See id.* at 26, 35.

51.     *Finally*, the McKinsey Report fails to recognize that an Alternative Enforcement would enable Commonwealth creditors to recover from actual financial performance, whereas the Plan limits creditor recoveries based on the economic forecast in the 2021 CW Fiscal Plan.  *See id.* at 9.

52.     Leaving aside the flaws in the McKinsey Report, evidence produced through the FOMB's other witnesses demonstrates that the Plan is not in the best interests of creditors because it omits significant value in an Alternative Enforcement scenario.  For example, the FOMB submitted Dr. Andrew Wolfe's expert report on the Plan's feasibility, which estimated the substantial value that certain reforms could generate if they were implemented by the Commonwealth.  *See* Zouarabani Decl. Ex. L, Expert Report of Andrew Wolfe (Corrected), Dkt. No. 18151-1 (the "Wolfe Report").  These reforms, which are proposed by the FOMB, but are not reflected in the financial projections set forth in the *2021 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity (Apr. 23, 2021)* (the "2021 CW Fiscal Plan"), would allow the Commonwealth to generate "more fiscal surplus."  *See* Zouarabani Decl. Ex. N, Wolfe Tr. 31:3-25, 36:7-12, 40:11-42:18.[23]

53.     Additionally, another FOMB expert, Marti Murray, confirmed that the future debt service level is "reasonable" because "it makes it possible that the Commonwealth will have access

---

[23]   Specifically, the labor, "ease of doing business" and tax reforms would increase the cumulative surplus from fiscal year 2022 to fiscal year 2051 by $46 billion, which amounts to $11.9 billion in present value.  *See* Zouarabani Decl. Ex. L, Wolfe Report App'x 4; Zouarabani Decl. Ex. N, Wolfe Tr. 37:2-39:18; Zouarabani Decl. Ex. J, Prager Report at 9-10, 39.

to the capital markets in the future." Zouarabani Decl. Ex. O, Murray Rough Tr. 97:15-25.  Finally,

Ojas Shah from McKinsey & Company Puerto Rico Consulting, Inc., the FOMB's designated

expert on the best interests of creditors analysis, admitted that if the Commonwealth has a larger

surplus in the future, that value would be available for distribution to creditors in a nonbankruptcy

scenario.  Zouarabani Decl. Ex. K, Shah Tr. 149:6-17.  Such value is likely to be available based

on additional funding that was recently authorized by the U.S. Government, which would reduce

the Commonwealth's burden for core services and free up funds for other purposes in an

Alternative Enforcement scenario.  *See* Zouarabani Decl. Ex. J, Prager Report at 9, 38.  This

funding, which is not reflected in the 2021 CW Fiscal Plan or the McKinsey Report, will create

approximately $1.2 billion of value in fiscal year 2022 alone and, if sustained for the duration of

the Biden Administration, would add approximately $5.7 billion of future value.

54.     The Prager Report's conclusion that the Commonwealth possesses additional value

(beyond what is reflected in the Plan and the McKinsey Report) is further supported by the

statements made in FOMB's (i) October 5, 2021 status report (Dkt. No. 18401 ¶¶ 5-9) ("the FOMB

Status Report") and (ii) October 14, 2021 letter to Puerto Rico's Governor, President of the Senate

and Speaker of the House of Representatives (the "Oct. 14, 2021 Letter").[24]  In the FOMB Status

Report, the FOMB stated that, if the Puerto Rico legislature enacts the necessary legislation for

the Plan, the FOMB would, among other things, increase the threshold for retirees exempt from

any reduction in benefits from $1,500 per month to $2,000 per month.  *See* FOMB Status Report

¶ 5.

---

[24]     For a true and correct copy of the Oct. 14, 2021 Letter, see Exhibit W of the Zouarabani Decl..

55. Additionally, in the Oct. 14, 2021 Letter, the FOMB (i) acknowledges that "confirmation of the Plan would allow for certain additional spending" for the Commonwealth, (ii) states that there will be "no cuts to the accrued pensions of retired public employees and current employees of the Commonwealth", and (iii) confirms that it will not oppose the following Commonwealth expenditures (x) "additional funding . . . to the municipalities," (y) "additional funding for UPR . . . that appropriations total $500 million per year," and (z) "funding of $1,000,000 to conduct a study of the feasibility of extending medical coverage to currently uninsured residents." *See* Oct. 14, 2021 Letter at 2.

56. The fact that the FOMB has been able to suddenly identify new sources of value for certain creditor constituencies demonstrates that: (i) the Plan is not providing *creditors as a whole* with the best recovery scenario possible (*see City of Detroit*, 524 B.R. at 216-17); (ii) the Commonwealth is deliberately withholding additional distributable value from other creditors; and (iii) the FOMB is using the Plan to unilaterally pick winners and losers, with the "winners" receiving the value that is being taken away from the "losers" without justification.

57. Accordingly, the evidence produced by the DRA Parties and the FOMB's own witnesses demonstrate that Plan is *not* in the best interests of creditors.

## II. The Plan Cannot be Confirmed Because it Violates Applicable Puerto Rico and U.S. Law

### A. *The Plan Violates Commonwealth Law*

#### 1. *The Retention of the Act 30-31 Revenues Was Not Permitted Under Commonwealth Law*

##### (a) *Applicable Law*

58. Article VI, Section 7 of the Puerto Rico Constitution provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said

24

appropriations is provided by law." P.R. Const. art. VI, § 7. Section 7 requires the Commonwealth to increase tax revenue whenever necessary to provide sufficient funds to cover appropriations, including fiscal-year operating expenses and general obligation debt service. *See id.* Section 7 also prohibits the Commonwealth from rolling budget shortfalls into successive fiscal years. *See id.* Additionally, Article VI, Section 8 of the Puerto Rico Constitution provides that "[i]n case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8. Further, Article VI, Section 9 of the Puerto Rico Constitution mandates that "[p]ublic property and funds shall only be disposed of for public purposes . . . pursuant to law." P.R. Const. art. VI, § 9.

59. Applicable law regarding the use, disposition, and flow of funds related to the DRA's collateral (the Act 30-31 Revenues) under Commonwealth law includes (i) the OMB Act and (ii) Acts 30 and 31. *See supra* ¶¶ 21-22.

60. When read together, Article VI, Sections 7 through 9 of the Puerto Rico Constitution and Acts 30 and 31 make clear that the Commonwealth may *only* use the Act 30-31 Revenues: (i) when the fiscal year begins with a balanced budget (*see* P.R. Const. art. VI, § 7); (ii) to pay *only* interest and amortizations on GO debt *if all other available resources for the fiscal year are insufficient to cover such GO debt service* (*see* P.R. Const. art. VI, §§ 8-9; 23 L.P.R.A. § 104(c)(1); 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C)); and, (iii) once the above is satisfied, to be used otherwise only to pay obligations of HTA. *See id.* Under all other circumstances, the Act 30-31 Revenues shall be used solely for the payment of principal of, and interest on, the bonds and other obligations of HTA.

        **(b)**      **The Commonwealth Has Improperly Deprived the DRA of Its Collateral**

61.     Since December 1, 2015, the Commonwealth has continued to strip away from the DRA each stream of the Act 30-31 Revenues that constitutes its collateral by diverting such funds away from HTA to pay for purported "essential services" and other general expenses of the Commonwealth. *See supra* ¶¶ 21-27. These actions contravene Article VI, Section 8 of the Puerto Rico Constitution and other applicable law, including Acts 30 and 31. The Commonwealth and FOMB have made no attempt to demonstrate that the Commonwealth has complied with such law. *See supra* ¶¶ 21-27.

62.     The Commonwealth's clawback of the funds was, and continues to be, improper because it violates two of the requirements needed for a constitutional clawback—a budget deficit and the application of the funds to GO debt. *See supra* ¶ 21.

63.     Based on the report of Douglas Brickley, the DRA Parties' expert on analyzing the Commonwealth's clawback of revenues from HTA (the "Brickley Report")[25], the Commonwealth failed to satisfy the relevant standard under the Puerto Rico Constitution and other applicable law for clawback for the period between January 1, 2016 and September 13, 2021. *See* Zouarabani Decl. Ex. P, Brickley Report at 3, 8. According to the Brickley Report, the Commonwealth's audited financial statements reveal that the Commonwealth has had a surplus beginning in the fiscal year 2018 and was projected to continue to have surpluses until fiscal year 2021. *See id*. at 7. Despite the surpluses in 2018, 2019, 2020, and 2021, the Commonwealth clawed-back the Act 30-31 Revenues during the same period. *See id*. at 7-8.

---

[25]   In accordance with the protective orders filed at Dkt. No. 12912, Dkt. No. 12920, Dkt. No. 16681-2, and Dkt. No. 76 of Adv. No. 20-0005 (LTS), a redacted version of the Brickley Report was filed with the Court on September 20, 2021 (*see* Dkt. No. 18163-1), and the DRA Parties served an unredacted copy of the report upon all eligible parties to receive it under the terms of the protective orders.

64.     Even if the initial retention of these funds had been proper, which it was not, the
Commonwealth used the funds improperly because it failed to use them to pay the GO debt, as
required under Article VI, Section 8 of the Puerto Rico Constitution.  The Commonwealth's most
recent payment toward the GO debts using the clawed-back funds was in January 2016 when it
made a single payment of $163,940,875.30 from the clawed-back funds.  *See id.* at 3, 7-8.  The
FOMB has previously argued (and will likely argue again) that the clawed-back revenues do not
have to be used to pay the GO debt during the fiscal years at issue and/or that the FOMB can
somehow reverse the order of the payments prescribed in the waterfall under the OMB Act.  *See
Debtors' Motion for Order Excluding Expert Testimony of Douglas Brickley* [Dkt. No. 18331] ¶
43.  These arguments, however, are without merit because they are inconsistent with Article VI,
Section 8 of the Puerto Rico Constitution.  The Puerto Rico Constitution specifically mandates
that the GO debt be paid first and that no other disbursements be made under the waterfall until
such payment has been satisfied.  *See* P.R. Const. art. VI, § 8 ("[i]n case the available resources
including surplus for any fiscal year are insufficient to meet the appropriations made for that year,
interest on the public debt and amortization thereof shall first be paid, and other disbursements
shall thereafter be made in accordance with the order of priorities established by law.").

65.     Instead of adhering to the Puerto Rico Constitution, as the DRA Parties have
asserted in the DRA Administrative Expense Claim Motion and the DRA Amended Lift Stay
Motion, the Commonwealth has spent the improperly retained revenues to pay for operating
expenses—which contravenes the payment priorities established under the Puerto Rico
Constitution and the OMB Act.  *See* P.R. Const. art. VI, § 8; 23 L.P.R.A. § 104(c)(3).  The
unlawfully retained revenues were not used to pay GO debt service but were instead used to pay
for operating expenses.  These actions expressly violate the Puerto Rico Constitution because the

27

clawback cannot be invoked to cover budget shortfalls, which is exactly what appears to have been happening for the past several years.[26]

### 2.    *The Plan Sanctions a Perpetual and Impermissible Clawback*

66.    If the Plan is confirmed, it will sanction the continuation of an illegal clawback post-confirmation.  Under section 86.1(h) of the Plan, the Confirmation Order must make a finding that "[t]he clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth."  Plan § 86.1(h);

---

[26]    In his dissent in *Hernández Torres v. Hernández Colón*, 129 DPR 824 (1992) (a case where the majority did not resolve the dispute as to clawback), a former Puerto Rico Supreme Court Associate Justice Negrón García, explains that Article VI, Sections 7 and 8 of the Puerto Rico Constitution operate, jointly, as follows:

> What happens if, the budget appropriations —over time— exceed the resources? The question leads us to Art. VI, § 8 of the Constitution of the Commonwealth. . .

> On its own terms, *this section cannot be activated to remedy a situation in which the Legislature begins with a deficit budget, due to incurring in ab initio appropriations in excess of the total resources' calculations. The constitutional precept was conceived to remedy exceptional situations created by random and different circumstances, outside the legislative evolutionary scope, and of course, of the First Executive*. . .

> [T]he constitutional requirement of a balanced budget prevents the Legislative Assembly and the First Executive from approving the general budget if they know, based on the projections of all available resources, that they are limited and exceed the appropriations. *In that moment, neither of the branches can "balance" nor "complete" the budget with the use of the exceptional mechanism established by Art. VI, § 8 of the Constitution of the Commonwealth, supra, and the provisions of the Government Accounting Act [...]*. To reach another conclusion would mean artificially creating the impression that the budget is balanced, that is, that the expenditures do not exceed the estimated resources. In that initial stage, when the approved appropriations exceed the total calculated resources, the mechanism of imposing taxes must be used. In its absence, because the Governor is constitutionally prevented from endorsing a budget that contains a deficit, he must veto the items —Const. E.L.A., *supra*, Art. III, § 20— and downgrade or eliminate any appropriation that grants funds in excess. This is the only way to save the constitutional problem of a deficit budget.

> It is impossible to argue that, during the process of approving the budget, the Governor can invoke the mechanism of priorities contained in Art. VI, § 8 of the Constitution of the Commonwealth, *supra*, and the provisions of the Government Accounting Law of Puerto Rico, Act No. 230, *supra*. This conception is totally foreign to the minimum constitutional plan of "maintaining the economic stability of the government". Journal of Sessions, *supra*, Vol. 4, page 2587. (Translation ours and emphasis added).

> *Id*. at 861-63.

28

*see also Notice of Filing of Proposed Order and Judgement Confirming Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.* [Dkt. No. 18447] ¶ 4.

67.     In addition, based on the Fiscal Plan for the Puerto Rico Highways & Transportation Authority (HTA) FY 2022-FY 2051 (May 26, 2021) (the "2021 HTA Fiscal Plan"), the Commonwealth intends to retain the Act 30-31 Revenues going forward and substitute these funds with a $113 million "variable transfer" (average per year) from the Commonwealth to HTA. *See* Zouarabani Decl. Ex. Q, 2021 HTA Fiscal Plan at 109.  The amount of the variable transfer allocated to HTA each year is less than 25% of the total Act 30-31 Revenues generated during fiscal years 2018 to 2020, leaving a shortfall of approximately $445 and $528 million per year.

68.     Over $8.2 billion of cash is being used to pay settlements under the Commonwealth plan, made possible by the Commonwealth's growing cash balance, which is attributable, in part, to the retention of the Act 30-31 Revenues.[27]  *See* Plan §§ 2.1, 2.2, 89.3, Ex. K-3 (noting settlement payments to be made under the Plan and PROMESA's alleged preemption of Commonwealth law); *see also Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Dkt. No. 17628] (the "Disclosure Statement") at 87-88; GO/PBA Plan Support Agreement, Ex. I at 1-3; HTA/CCDA PSA at 80-86.

69.     The FOMB has presented no evidence to demonstrate that the Commonwealth satisfies the standards required under Commonwealth law to effectuate the clawback being implemented by the Plan.  This non-compliance is further evidenced by House of Representatives Bill 1003 dated September 27, 2021 (the "House Bill 1003"), which proposes to eliminate any

---

[27]   For reference, the Treasury Single Account cash balance has ballooned from $1.6 billion in November 2017 (the first bank account balance summary made available post-petition) to $11.8 billion as of October 1, 2021.  *See* Summary of Bank Account Balances for Puerto Rico Governmental Instrumentalities as of November 30, 2017 at 6; Puerto Rico Department of Treasury – Treasury Single Account ("TSA") FY 2022 Cash Flow As of October 1, 2021 at 5 (indicating increase in cash balance).

continued transfer of the Act 30-31 Revenues to HTA and, instead, seeks to prospectively deposit these funds into the Commonwealth's general fund.  *See* Zouarabani Decl. Ex. V, House Bill 1003 at 506, 512.  The fact that the proposed statute *seeks to* implement such a provision makes it clear that the Commonwealth, to date and until there has been a change in law, is not authorized to implement a perpetual clawback under Commonwealth law.

### 3. The FOMB's Overbroad Preemption Theory Does Not Justify the Commonwealth's Illegal Retention of the Act 30-31 Revenues

70.     Because Commonwealth law does not permit the clawback of the Act 30-31 Revenues at this time (or at any time post-petition), the FOMB has historically turned to, and will likely pursue at confirmation, a different argument—that the Commonwealth can retain the Act 30-31 Revenues because the so-called "appropriation provisions" in Acts 30 and 31 are preempted by PROMESA.  *See, e.g.*, *Intervening Defendant Financial Oversight and Management Board's Memorandum of Law in Support of Motion to Dismiss, or in the Alternative, to Stay Counts I, II, and IV of the Complaint*, No. 21-00068-LTS (D.P.R. Aug. 26, 2021) ¶¶ 64-81; *see also* Plan § 89.3 (alleging that PROMESA preempts Puerto Rico law governing Commonwealth appropriations and the clawback thereof).

71.     The FOMB, however, cannot rely on its far-reaching theory of preemption to destroy the DRA's property rights in the Act 30-31 Revenues.

72.     Federal law can only displace local law when the two are in conflict.  U.S. Const. . art. VI § 2; *see also* 48 U.S.C. § 2103.  As discussed in further detail below, the FOMB has not made the required showing that the applicable statutes are inconsistent.  *See, e.g.*, *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017) (en banc) ("A party asserting conflict preemption faces a high bar.").  To the contrary, PROMESA largely harmonizes and respects Commonwealth law, and the Plan must therefore conform with Commonwealth law.

         **(a)**       ***PROMESA Titles II and III Do Not Expressly Preempt Acts 30 and 31***

73.      PROMESA does not expressly preempt Acts 30 and 31 because the text of PROMESA clearly shows congressional intent to supplement, rather than replace, local law. *See*, *e.g.*, *Talbott v. C.R. Bard, Inc.*, 63 F.3d 25, 27 (1st Cir. 1995) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) ("congressional intent to displace state law must be 'clear and manifest' before preemption is found").

74.      When a federal law contains an express preemption clause, "the plain wording of the clause . . . necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Congress stated explicitly its intent for PROMESA to supplement—not supplant—territorial law and to displace territorial law only when it directly conflicts with PROMESA. PROMESA expressly provides that "[t]he provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is *inconsistent* with this Act." 48 U.S.C. § 2103.

75.      PROMESA makes clear that Congress did not see a conflict between PROMESA and Acts 30 and 31. *First*, where Congress intended to exclude territorial law, it said so expressly. For example, PROMESA section 103(c) provides that "[t]he Executive Director and staff of the Oversight Board may be appointed and paid without regard to any provision of the laws of the covered territory or the Federal Government governing appointments and salaries. *Any provision of the laws of the covered territory governing procurement shall not apply to the Oversight Board*." 48 U.S.C. § 2123(c) (emphasis added).

76.      *Second*, PROMESA section 204(c)(3)(B) provided a limited authorization for the FOMB to "review, in its sole discretion, rescind, any law that—(i) was enacted during the

period between . . . May 4, 2016 . . . and the date of appointment of all members and the Chair of the Oversight Board; and (ii) alters pre-existing priorities of creditors in a manner outside the ordinary course of business or inconsistent with the territory's constitution or the laws of the territory as of . . . May 4, 2016 . . . *but such rescission shall only be to the extent that the law alters such priorities*." 48 U.S.C. § 2144(c)(3)(B) (emphasis added).

77.     In other words, Congress provided the FOMB with limited authority to rescind statutes under PROMESA section 204(c)(3)(B).  Otherwise, PROMESA was meant to preserve the legal status quo so that the FOMB could preserve the creditor rights and priorities under pre-existing laws that preceded the imminent passage of PROMESA.  This specific focus and brief period of time—which does not extend all the way back to Acts 30 and 31 further evidences Congress' care in circumscribing the FOMB's authority.

78.     *Third*, PROMESA sections 201 and 202 (48 U.S.C. §§ 2141, 2142)—the relevant provisions that establish the process for approval of fiscal plans and certified budgets—do not displace Commonwealth law.  Rather they make clear that the budgets and fiscal plans of the FOMB must comply with Commonwealth law (and not the opposite, as the FOMB would have it).  PROMESA section 201(b)(1)(N) expressly provides that any fiscal plan shall "*respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to [June 30, 2016].*"  48 U.S.C. § 2141(b)(1)(N) (emphasis added).  Certified budgets, in turn, must be "compliant with the applicable Fiscal Plan."  Id. § 2142(c)(1).

79.     *Fourth*, although PROMESA section 301 incorporates numerous sections of the Bankruptcy Code, it does not incorporate the bulk of the waterfall priority provisions in Bankruptcy Code section 507.  *See* 48 U.S.C. § 2161.  PROMESA section 301 only incorporates

Bankruptcy Code section 507(a)(2), which gives priority to administrative expense claims. Congress' decision not to incorporate the entirety of Bankruptcy Code section 507 into PROMESA further indicates that it did not intend for PROMESA to displace existing territorial law on creditor priorities; rather, Congress intended to maintain priorities existing under Commonwealth law.  The exclusion of Bankruptcy Code section 507, the creation of a unique best interest test for Title III (differing from the Bankruptcy Code's best interests test), and the other terms of PROMESA section 314, reveal Congress' intent to incorporate the Commonwealth's priority scheme into PROMESA.  These sections reflect that there is no direct conflict between PROMESA and pre-existing creditor priority schemes under Commonwealth law.

80.     *Finally*, certain plan confirmation requirements denote Congress' intent to preserve creditors' rights, interests, and remedies under Puerto Rico law, and not to displace them through PROMESA.   Specifically, PROMESA section 314(b)(6) provides that, for purposes of confirmation of a Title III plan of adjustment, the plan must be "feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."  48 U.S.C. § 2174(b)(6).  Additionally, PROMESA section 314(b)(3) requires that the debtor not be "prohibited by law from taking any action necessary to carry out the plan."  48 U.S.C. § 2174(b)(3).

81.     For all these reasons, PROMESA's text evidences Congress' intent to harmonize the statute with existing territorial law, and not displace existing creditor priority designations or security or property interests in the absence of a clear conflict.  Thus, the FOMB cannot rely on any theory of express preemption to disregard the Commonwealth's obligation to transfer the Act

30-31 Revenues to HTA, or to disregard HTA's property interests and the DRA's security interest

in such revenues.

### (b)   PROMESA Title II Does Not Implicitly Preempt Acts 30 and 31

82.     Because PROMESA does not explicitly preempt Acts 30 and 31, the FOMB has

further argued that PROMESA "impliedly" preempts Commonwealth law.  *See* Adv. Pro. No. 17-

03567-LTS [Dkt. No. 1082] ¶¶ 76-80.  PROMESA does not impliedly preempt Acts 30-31 through

theories of impossibility preemption (*see infra* ¶¶ 87-89), or obstacle preemption (*see infra* ¶¶ 90-

93), because there is no actual conflict between PROMESA and Commonwealth law.

83.     Implied preemption requires an actual conflict between federal and local law.  U.S.

Const. art. VI § 2; 48 U.S.C. § 2103.  "[L]ike all preemption arguments, [it] must be grounded in

the text and structure of the statute at issue." *Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020) (quoting

*CSX Transp.*, 507 U.S. at 664).  To demonstrate implied preemption, one must overcome "the

basic assumption that Congress did not intend to displace state law." *Bldg. & Constr. Trades*

*Council of Metro. Dist. v. Associated Builders & Contractors of Mass/R.I., Inc.*, 507 U.S. 218, 224

(1993) (unanimous); *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("In all pre-emption cases, . . . we

start with the assumption that the historic police powers of the States were not to be superseded by

the Federal Act unless that was the clear and manifest purpose of Congress."); *see also*

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 717-18 (1985) (unanimous)

(holding that the comprehensiveness of a federal scheme is insufficient by itself to establish

implied preemption).  Here, there is no such conflict.

84.     When enacting PROMESA, Congress struck a careful balance between local

governance and the FOMB's powers.  PROMESA expressly obligates the FOMB, in carrying out

its duties, to respect all "applicable laws," including "the relative lawful priorities or lawful liens,

34

as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality *in effect prior to the date of enactment of this Act*." PROMESA § 201(b)(1)(A)(i), (N), 48 U.S.C. § 2141(b)(1)(A)(i), (N) (emphasis added); *see In re Fin. Oversight & Mgmt. Bd.*, 583 B.R. 626, 636 (D.P.R. 2017) (observing that Titles I and II of PROMESA mandate the FOMB and the Commonwealth to "work together to establish a fiscally responsible path forward that is acceptable to the FOMB" and stating that "*Congress might have chosen to make the FOMB's job easier in the short term by granting it direct control and disabling the Commonwealth government's ability to dissent, but it did not do so*"; rather "*Congress deliberately divided responsibility and authority between the two*") (emphasis added). Notably, the FOMB concedes that PROMESA does not preempt "security interests, liens, and property interests." *See* Case No. 20-AP-00005-LTS, Dkt. No. 102 ¶ 170.

85.     As the Court has previously directed, under PROMESA, the FOMB and the Government must "work together . . . within the statutory structure in which neither of them holds all of the cards." *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R., (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701-02 (D.P.R. 2018). In particular, the FOMB can only suggest to the Legislature the "specific bills that require enactment in order to reasonably achieve the [monetary] projections of the Fiscal Plan," and must abide by the limits in the Puerto Rico Constitution in shifting funds between government instrumentalities. 48 U.S.C. § 2141(b)(1)(A)(ii), (b)(1)(M).

> *(i)     Theories of Impossibility Preemption Are Inapplicable Because the Commonwealth and the FOMB Can Approve Budgets That Conform With Acts 30 and 31*

86.     "Impossibility pre-emption is a demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). This defense requires a showing that it is a "physical impossibility" to follow

both local and federal law.  *See*, *e.g.*, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963).  Compliance with state and federal schemes—"despite the dissimilarity of the standards"—is impossible only where there is "inevitable collision between the two schemes."  *Id.*

87.     The Puerto Rico legislature (i) made it clear that the Act 30-31 Revenues were established to provide HTA with the means to repay the GDB and (ii) authorized HTA to pledge those revenues in support of its obligations to the GDB.  *See* Zouarabani Decl. Ex. R, Statement of Motives of Act No. 30-2013, at 2; Zouarabani Decl. Ex. S, Statement of Motives of Act No. 31-2013, at 2; *see also* Zouarabani Decl. Ex. T, Statement of Motives of Act 1-2015, PR LEGIS 1 (2015).  Acts 30 and 31 do not require the Commonwealth to *annually reauthorize* HTA to pledge the Acts 30-31 Revenues to the GDB.  This fact is further underscored by the proposed modification of the treatment to the Act 30-31 Revenues in House Bill 1003 discussed above.  *See supra* ¶ 70.  If, as the FOMB posits, the Act 30-31 Revenues were always in the nature of discretionary annual appropriations to HTA, then there would be no need to alter their treatment in House Bill 1003.

88.     It is entirely possible—and required—for the FOMB to issue fiscal plans and certified budgets pursuant to its authority under PROMESA while simultaneously respecting statutory money flows.  *See*, *e.g.*, *Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (state law can impose more stringent requirements than federal highway safety regulations); *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 324-25 (1st Cir. 2012) (Puerto Rico's more demanding criteria for procurement of foreign goods allow compliance with both local and federal law).  The FOMB could do so by identifying and allocating revenues and expenses according to the appropriations in the fiscal plan and budget while ensuring that statutory revenues were authorized to continue to flow to their originally authorized purposes.

36

> **(ii)** ***Theories of Obstacle Preemption Fail Because Complying With Acts 30 and 31 Would Not Frustrate the Purposes and Objectives of PROMESA***

89.    To demonstrate "obstacle preemption," the FOMB must establish that Acts 30 and 31 prevent "the accomplishment and execution of the full purposes and objectives of Congress" with respect to PROMESA.  *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (quoting the "obstacle preemption" language from *Hines*, 312 U.S. at 67).  The FOMB cannot accomplish this by pursuing "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives."  *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (citations omitted); *see Va. Uranium*, 139 S. Ct. at 1901 (2019) (Gorsuch, J.) (judgment of the Court) ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law.") (quoting *P.R. Dept. of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)); *see Va. Uranium,* 139 S. Ct at 1915-16 (Ginsburg, J., concurring in judgment)  (finding no federal objective in conflict).

90.    The FOMB's preemption theory overstates FOMB's authority under PROMESA.  PROMESA does not authorize the FOMB to adjust the revenue streams that Acts 30 and 31 made evergreen.  Nor does the Commonwealth's transfer of those revenue streams to HTA pose any "obstacle" to the FOMB's powers under PROMESA to set budgets and fiscal plans with respect to the Commonwealth funds subject to appropriation.

91.    By authorizing the FOMB to set the fiscal plan and budget that govern Puerto Rico's appropriations for each fiscal year, PROMESA sections 201 and 202 displace only the ordinary mechanism by which the Government of Puerto Rico previously made budgeting decisions.  As the text makes plain, for "each fiscal year thereafter during which the Oversight Board is in operation," the FOMB shall develop a fiscal plan that "satisfies the requirements set

forth in subsection (b)"—*i.e.*, preserving the legislature's prerogative over new necessary bills, respecting preexisting law regarding priority and property interests, and following the Puerto Rico Constitution's limits on intragovernmental transfers—and certify a budget conforming to the fiscal plan.  48 U.S.C. §§ 2141(a), 2142(a), (d), (e), 2143(c), (d)(2), (e).

92.    Acts 30 and 31 were designed "to identify other sources of income that [will] allow [HTA] to continue operating and repay such financing to the GDB", "achieve a greater borrowing capacity", and ultimately "maintain and finance the development of the highways infrastructure of Puerto Rico".  *See* Zouarabani Decl. Ex. R, Statement of Motives of Act No. 30-2013, at 2; Zouarabani Decl. Ex. S, Statement of Motives of Act No. 31-2013, at 2; *see also* Zouarabani Decl. Ex. T, Statement of Motives of Act 1-2015; PR LEGIS 1 (2015).  These purposes complement PROMESA's purposes of supplying the "capital expenditures and investments necessary to promote economic growth," 48 U.S.C. § 2141(b)(1)(J), while respecting existing Puerto Rico law, *e.g.*, *id.* §§ 2141(b)(1)(M)-(N), 2163, 2194(n)(5), 2241.

93.    In sum, Acts 30 and 31 pose no obstacle to PROMESA's purposes: that the FOMB temporarily guide the Commonwealth so it can return to economic growth and self-sufficiency. 48 U.S.C. §§ 2121(a), 2141(b)(1)(J), 2163, 2192, 2194(n)(5), 2241.  The FOMB has articulated no basis for the Court to disregard Congress' clear intent for the FOMB to respect Puerto Rico law as it carries out its temporary budgetary authority.  Acts 30 and 31 are therefore not preempted.

94.    For these reasons, the Commonwealth has not demonstrated that it is legally permitted to retain Act 30-31 Revenues.  Because the Commonwealth cannot legally seize

ownership of the Act 30-31 Revenues, the Plan's conversion of the revenues into property of the Commonwealth is contrary to law, rendering the Plan unconfirmable.[28]  *See supra* ¶¶ 22-27.

## B.    *The Plan Violates the U.S. and Puerto Rico Constitutions' Takings Clauses*

95.     The Takings Clause of the U.S. Constitution provides that "[p]rivate property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V, cl. 5 (the "U.S. Constitution Takings Clause").  The Puerto Rico Constitution similarly provides that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law."  P.R. Const. art. II, § 9 (the "Puerto Rico Constitution Takings Clause" and, together with the U.S. Constitution Takings Clause, the "Takings Clauses").  A taking requiring just compensation occurs when the government "takes possession of an interest in property for some public purpose."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002).

96.     Bankruptcy law has always been read to protect a secured creditor's property interests from being taken without compensation.  *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982).  In *Security Industrial Bank*, the Supreme Court explained that the Fifth Amendment's limitations in the bankruptcy context begin and end with its prohibition on adjusting specific, identifiable collateral.  459 U.S. at 74.  The Court observed that Congress's power under the bankruptcy clause of the U.S. Constitution "has been regularly construed to authorize the retrospective impairment of contractual obligations."  *Id.*  Its only recognized limit is that it cannot be used to "defeat traditional property interests" in collateral held by secured creditors.  *Id.* at 75; *see also Cobb v. City of Stockton (In re City of Stockton)*, 909 F.3d 1256 (9th Cir. 2018) ("The

---

[28]   *See* the DRA Amended Lift Stay Motion, the DRA Administrative Expense Claim Motion, and *Plaintiffs' Memorandum of Law in Opposition to the Motions to Dismiss* [Adv. Pro. No. 21-00068-LTS, Dkt No. 60].

[U.S. Constitution] Takings Clause is only implicated in bankruptcy if the creditor has actual property rights. In other words, the creditor must have an 'in rem right under nonbankruptcy law to look to specific items of property' in order for the debt to be paid ahead of unsecured creditors.") (citing 4 Collier on Bankruptcy ¶ 506.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017)).

97. Accordingly, the Bankruptcy Code's discharge provision cannot be employed to extinguish a creditor's rights in specific identifiable collateral, such as a perfected lien or a mortgage. *See Credithrift of Am. v. Webber (In re Webber)*, 674 F.2d 796, 803 (9th Cir. 1982) ("Congress may not under the bankruptcy power completely take for the benefit of a debtor rights in specific property."); *Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 519 (D.P.R. 2016) ("Secured creditors are, in short, entitled to constitutional protection for their bargained for property interest.") (internal quotation marks and citation omitted).

98. The Plan cannot be confirmed under PROMESA section 314(b)(3) because it violates the DRA's rights under the Takings Clauses. *First*, section 89.3 of the Plan together with exhibit K-3 provides for the preemption of Puerto Rico law governing Commonwealth appropriations and the clawback thereof by PROMESA. *See* Plan § 89.3, Ex. K-3. The clawed-back funds—as property of HTA[29] subject to the DRA's perfected liens—constitute a property interest subject to constitutional protection under the Takings Clauses. *See Armstrong v. United*

---

[29] The limited exception of the clawback confirms that HTA has a constitutionally protected property interest in the Act 30-31 Revenues. If the Commonwealth had full discretion on the use of these revenues (as the FOMB suggests), the constitutional "clawback" provisions would be superfluous because the Commonwealth would have always been free to use the Act 30-31 Revenues as it saw fit. *See City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020) ("Courts generally ought not to interpret statutes in a way that renders … phrases … superfluous."). This has never been the case as evidenced by the fact that House Bill 1003 now, for the first time since Acts 30 and 31's enactment, is attempting to modify the statutes in order to allow for such revenues to be deposited into the Commonwealth's general fund going forward. *See* Zouarabani Decl. Ex. V, House Bill 1003 at 506 & 512.

*States*, 364 U.S. 40, 48 (1960) (liens "constitute compensable property" and cannot be destroyed without just compensation). Additionally, section 2.1 of the Plan purports to settle all disputes relating to "revenues historically conditionally appropriated to . . . HTA . . . and "clawed back" by the Commonwealth" (*see* Plan § 2.1) even though litigation concerning the DRA's asserted administrative expense claim based on the Commonwealth's illegal post-petition retention of the Act 30-31 Revenues has not been resolved and is still pending before the Court (*see supra* ¶ 30). Together, these two provisions attempt to convert illegally clawed-back HTA funds to property of the Commonwealth and then distribute these funds to Commonwealth creditors. *See* Plan §§ 2.1, 89.3, Ex. K-3; *see also* Disclosure Statement at 87-88.

99.     *Second*, the Plan destroys the DRA's liens and priority designations by: (i) ratifying an illegal clawback (*see* Plan § 89.3 (alleging that PROMESA preempts Puerto Rico law governing Commonwealth appropriations and the clawback thereof)); (ii) requiring HTA to make distributions to certain of its creditors outside of a confirmed HTA plan (*see id.* § 86.1(b)(xv)); (iii) releasing and enjoining the DRA's, HTA's and CCDA's claims against certain non-Debtors; and (iv) granting impermissibly broad exculpations to HTA, CCDA and the Monolines. *See infra* ¶ 144.

100.     Accordingly, the Plan effectively "takes possession" of the liens and confiscates the DRA's essential secured property rights without providing the DRA just compensation as required under the Takings Clauses. *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322 (noting that "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner."). The FOMB has previously argued (and likely will argue again) that it is constitutionally permitted to extinguish the revenue

41

source behind a lien as long as the lien remains intact.[30]  This argument, however, fails because the liens at issue are on the Act 30-31 Revenues, and extinguishing the funding source of those revenues without providing adequate replacement, nullifies the liens and destroys the property interest.  Such elimination of the DRA's lien violates the Takings Clauses and bankruptcy law.  *See Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940) ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, *to the extent of the value of the property*.") (emphasis added).   The FOMB's argument also ignores the Supreme Court's admonition that a statute should not be read to extinguish a preexisting lien without a clear statement to the contrary. *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 79-82 (1982) (declining to construe 11 U.S.C. § 522(f)(2) to destroy a preexisting lien without a clear statement); *Holt v. Henley*, 232 U.S. 637, 639 (1914) (establishing that bankruptcy statutes apply prospectively absent a clear expression of Congressional intent).   A court cannot, based on inferences, read a statute to undermine secured property rights.  *See Security Industrial Bank*, 459 U.S. at 79-82; *Holt*, 232 U. S. at 639.  Nevertheless, that is exactly what the FOMB will likely urge in support of the Plan.

101.    The FOMB will also likely rely on *Hunter v. City of Pittsburgh* in arguing that its confiscation of the DRA's collateral without just compensation under the Plan does not amount to an unconstitutional taking.  207 U.S. 161 (1907).  In *Hunter*, the Supreme Court considered whether Pennsylvania's consolidation of the former City of Allegheny into the neighboring City

---

[30]    *See The Financial Oversight and Management Board's Response to DRA Parties' Opening Response to (I) Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., ,Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay, or, in the alternative, Adequate Protection (Dkt. No. 10102), and (II) Opposition of Financial Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief from the Automatic Stay or, in the alternative, Adequate Protection (Dkt. No. 10613)* [Dkt. No. 12496] ¶ 15.

42

of Pittsburgh violated the Contracts Clause or the Takings Clause.  *Id.*  Reasoning that States have broad "political" powers to create, combine, or destroy municipal corporations, the Court found that the consolidation, without more, did not infringe on these rights.  *Id.* at 178.

102.    The FOMB's reliance on *Hunter*, however, is inapposite for at least three reasons.  *First*, Puerto Rico is not a State.  The *Hunter* court abstained from interfering with a State's arrangement of its own municipalities to respect the State's sovereignty.  Making a stark departure from monarchy, the Framers "split the atom of sovereignty itself into one Federal Government and the States."  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2202 (2020).  As the First Circuit held *en banc*, Puerto Rico's current status as a Commonwealth "is not statehood within the meaning of the Constitution."  *Igartua-De La Rosa v. United States*, 417 F.3d 145, 147 (1st Cir. 2005) (*en banc*).  A different result requires either amending the Constitution or Congress making Puerto Rico into a State.  *Id.* at 148.  Unlike in *Hunter*, there is no policy concern that should obviate the takings claim here merely because HTA is an instrumentality of the Commonwealth.

103.    *Second*, *Hunter* does not apply here.  In *Gomillion v. Lightfoot*, 364 U.S. 339, 342-43 (1960), the Supreme Court observed that "[a]ll that the [*Hunter*] case held was (1) that there is no implied contract between a city and its residents that their taxes will be spent solely for the benefit of that city, and (2) that a citizen of one municipality is not deprived of property without due process of law by being subjected to increased tax burdens as a result of the consolidation of his city with another."  *See also Hunter*, 207 U.S. at 177.  That is hardly analogous to the facts here where the issue is whether the Commonwealth can take the economic property rights of the DRA, as a creditor of HTA.

104.     Even if *Hunter* were to apply here, limitations imposed on localities in *Hunter* were subsequently narrowed in *Gomillion*, where the Supreme Court circumscribed a state's powers that were "used as an instrument for circumventing a federally protected right."  364 U.S. at 347. Such action could not be justified under *Hunter*.  *See Gomillion*, 364U.S. at 342 (finding that "[t]o exalt [the] power [of a state] into an absolute is to misconceive the reach and rule of this Court's decisions in the leading case of *Hunter v. Pittsburgh*").  Here, if the FOMB's position were to prevail, it would have the effect of the Commonwealth circumscribing the DRA's constitutionally protected property rights.

105.     *Finally*, the *Hunter* court did not reach the Takings Clause question.  It could not. At the time, "the Fifth Amendment to the Constitution [was] not restrictive of State, but only of national, action."   *Hunter*, 207 U.S. at 176.   Today, however, the principles of the Fifth Amendment apply equally to States.  *See supra* ¶ 104.  The Court held that the consolidation of two cities according to a notice, hearing, and fair election process satisfied due process to effect the consolidation, and the only injury the plaintiffs could point to were possible tax changes. *Hunter*, 207 U.S. at 177-79.  Indeed, in that case, the residents of Allegheny did not lose their water or electricity systems.  Rather, some of the money they paid in taxes (and which was no longer their property) would go to help build satisfactory systems for Pittsburgh.  *Id.* at 180.

106.     Critically, the statute in *Hunter* protected the interests of the creditors of each preexisting city.  *Hunter*, 207 U.S. at 175.  The Supreme Court in later cases has "refused to allow a State to abolish a municipality, or alter its boundaries, or merge it with another city, without preserving for the creditors of the old city some effective recourse for the collection of debts owed them."  *Gomillion*, 364 U.S. at 344.  Accordingly, *Hunter* bears no parallel to the seizure of the DRA's property for public use, which demands just compensation.

44

107.    As discussed above, the Commonwealth (since December 1, 2015) has been continuously violating the DRA's Takings Clause rights under the U.S. and Puerto Rico Constitutions by diverting the Act 30-31 Revenues away from HTA.  Confirmation of the Plan, which seeks to convert such illegally retained HTA funds to property of the Commonwealth for distribution to its creditors, would ratify the Commonwealth's historic violations of the DRA's Takings Clause rights and condone prospective violations of the U.S. and Puerto Rico Constitutions going forward.

III.    **The HTA/CCDA PSA Includes Numerous Terms that Render the Plan Unconfirmable**

108.    As noted above, the FOMB entered into the HTA/CCDA PSA with a group of bondholders (largely the Monolines) owning Commonwealth GO debts that also held HTA (and CCDA) debts to secure support for the Plan.  As a condition for such support, the HTA/CCDA PSA requires the FOMB to modify the Plan to include a number of provisions that impact HTA creditors even though HTA is not a party to the Plan.

109.    Importantly, the HTA/CCDA PSA contains key terms of an HTA plan structure with HTA creditors that the parties to the HTA/CCDA PSA seek to implement through the Plan— outside the gaze of HTA creditors.  *See supra* ¶ 37.  For the reasons discussed below, the Plan containing such terms cannot be confirmed as it violates applicable law.

A.    *The Settlements Contained in the HTA/CCDA PSA[31] and Incorporated Into the Plan (Together with Other Plan Provisions) Effectuate a Sub Rosa HTA Plan in Violation of POMESA Sections 314(b)(1) and (b)(3)*

---

[31]    The settlement of claims at HTA in the HTA/CCDA PSA and incorporated in the Plan was negotiated without the involvement or inclusion of HTA's single largest creditor, the DRA, which holds more than $1.7 billion in in principal amount of loan claims at HTA and more than $200 million in principal amount of HTA 98 Senior Bonds.

45

110. Courts have held that a *sub rosa* plan is "a broad settlement that amounts to a de facto plan of reorganization, which enables a debtor to restructure its debt while bypassing many of the Bankruptcy Code's fundamental creditor protections." *Enery Future Intermediate Holdings, LLC v. Energy Future Holding Corp. (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (Bankr. D. Del. 2015) (citations omitted). Courts have, therefore, prohibited *sub rosa* plans because such plans "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan." *See In re Tempnology, LLC*, 542 B.R. 50, 64 (Bankr. D.N.H. 2015) (citing *Motorola, Inc. v. Official Comm. of Unsecured Creditors & JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007)).

111. *Sub rosa* plans violate the Bankruptcy Code and are therefore unconfirmable under PROMESA section 314(b)(1) (which requires the Plan to comply with the provisions of the Bankruptcy Code made applicable to a case under Title III) and section 314(b)(3) (which requires that the debtor not be prohibited by law from taking any action necessary to carry out the plan). *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) (*sub rosa* plans "raise the concern that the scheme of Chapter 11 will be distorted").

112. In determining whether a settlement amounts to a *sub rosa* plan, courts will consider whether the settlement "has the effect of dictating the terms of a prospective Chapter 11 plan." *Energy Future Holding Corp.*, 527 B.R. at 168. Settlements that require a debtor to make distributions to creditors outside of a confirmed plan or that include broad releases have also been found to constitute *sub rosa* plans. *See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939-40 (5th Cir. 1983) (finding that a plan support agreement constituted a *sub rosa* plan when it, among other things, "changed the composition of [the Debtor's] assets," "had the practical effect of dictating some of the terms of any future

reorganization plan," and "provided for the release of claims by all parties against [the Debtor], its secured creditors and its officers and directors."); *In re Nortel Networks, Inc.*, 522 B.R. 491, 508 (Bankr. D. Del. 2014) (considering whether "funds are going 'out the door'" when determining whether a settlement agreement constituted a *sub rosa* plan).

113.    Here, the HTA/CCDA PSA and the Plan constitute a *sub rosa* plan for HTA and violate PROMESA sections 314(b)(1) and (b)(3) for several reasons. *First*, the Plan seeks to fix distributions of HTA *assets* to HTA *creditors*, and conditions the HTA Clawback CVI distributions on consents of a select group of HTA creditors, outside of a confirmed HTA plan— which is a key hallmark of a *sub rosa* plan. *See Braniff Airways,* 700 F.2d at 940 (5th Cir. 1983) (finding that an agreement constituted a *sub rosa* plan when it "dictat[ed] some of the terms of any future reorganization plan" by requiring such plan to allocate certain distributions in accordance with the terms of the agreement); *see also Nortel Networks*, 522 B.R. at 508 (finding that settlement agreements that purport to dispose of all claims against the estate constitute improper *sub rosa* plans).

114.    Specifically, the HTA/CCDA PSA and the Plan require HTA to make a distribution of $264 million to holders of HTA 68 Bonds and HTA 98 Senior Bonds in partial satisfaction of their respective claims. *See* HTA/CCDA PSA § 4.9(b)(xx); Plan § 86.1(b)(xv). In addition, the HTA/CCDA PSA and section 63.2 of the Plan condition the distribution of cash from the HTA Clawback CVI to holders of Allowed CW/HTA Claims on, among other things, the completion of the HTA plan, the HTA confirmation order and the New HTA Bonds Indenture in forms agreed upon by the FOMB, Assured and National. *See* HTA/CCDA PSA § 49(b)(xxii); Plan § 63.2. The FOMB's and HTA/CCDA PSA Creditors' attempt to lock-in HTA bondholder recoveries[32] and

---

[32]    The Plan and Disclosure Statement do not disclose the source of the funds that will be used by HTA to make this

the form of HTA plan documents is precisely what the *Braniff* and *Nortel Networks* courts found

to be improper.  *See Braniff Airways*, 700 F.2d at 940; *Nortel Networks*, 522 B.R. at 508.

115.     *Second*, the Plan's broad release, injunction and exculpation provisions that seek to

eliminate (a) the DRA's claims against certain Monolines and HTA and (b) HTA's claims against

various non-Debtor instrumentalities of the Commonwealth and certain Monolines further

evidence that the Plan is a *sub rosa* HTA plan.  *See* Plan §§ 92.2(a), 92.5; *infra* ¶¶ 127-151; *see*

*also* Plan § 92.3 (enjoining all actions or proceedings relating to "Claims" and "Causes of Action"

released under the Plan); § 92.6 (enjoining all actions to enforce claims that are "Released Claims"

under the Plan); § 92.9 (enjoining all "Claims" against any of the "Released Parties").  Courts have

found settlements that contain broad releases constitute *sub rosa* plans.  *Braniff Airways,* 700 F.2d

at 940.  Given that the Plan is a plan of adjustment for the Commonwealth, not for HTA, it is

improper and premature for it to (i) release the DRA's claims against the Monolines, (ii) release

the DRA's claims against HTA and the CCDA, (iii) release HTA's and CCDA's claims against

other Commonwealth agencies and instrumentalities as well as the Monolines, (iv) enjoin

prosecution of the foregoing claims that are released under the Plan, and (v) exculpate HTA,

CCDA and the Monolines because it improperly binds HTA creditors to these provisions without

giving them the opportunity to fully vet and vote on such provisions in an HTA plan context.  *See*

*infra* ¶¶ 127-151.  The FOMB cannot short circuit the confirmation requirements for an HTA plan

of adjustment, and disregard the protections afforded to the DRA and other HTA creditors under

---

payment—but irrespective of the source, the proposed distribution would violate several confirmation
requirements if it is included in an HTA plan of adjustment.  Specifically, to the extent the source of the payment
is revenues on which the HTA bondholders have a lien, it discriminates against holders of HTA Bonds that are
not sharing in the payments (which includes the DRA).  In addition, to the extent the source of the payment
is (in whole or in part) Act 30-31 Revenues, the payment could not be made because such revenues are the DRA's
collateral.  Finally, to the extent that the payment would be made from funds that are not the DRA's collateral
and are not the HTA bondholders' collateral, then the payment would discriminate against all HTA unsecured
creditors that are not sharing in the payment.

PROMESA, by shoehorning into the Plan releases, injunctions and exculpations that should only be granted under an HTA plan.  *See supra* ¶ 113.

> **B.      The HTA-Related Settlements Contained in the Plan Violate Bankruptcy Rule 9019**

116.      Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).[33] Before a settlement can be approved as part of the Plan, the FOMB must show that the HTA/CCDA PSA is fair, equitable and otherwise satisfies the requirements of Bankruptcy Rule 9019.  *See In re Dow Corning Corp.*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) ("Whether the compromise is effected separately or in the body of a reorganization plan will not affect the approval analysis required of the bankruptcy court."); *see also* Fed. R. Bankr. P. 9019; *Notinger v. Robotic Vision Sys., Inc. (In re Robotic Vision Sys., Inc.),* 378 B.R. 417 (B.A.P. 1st Cir. 2007) (noting that a settlement should be "fair and equitable and in the best interests of the estate").  A settlement is "fair and equitable" under Bankruptcy Rule 9019 if the priority of senior creditors over junior ones are respected.  *See In re C.P. del Caribe, Inc.*, 140 B.R. 320, 326 (Bankr. D.P.R. 1992) ("The terms 'fair and equitable' have been defined to mean that senior interests are entitled to full priority over junior interests.") (citing *United States v. AWECO, Inc.* (*In re AWECO, Inc.*), 725 F.2d 293, 298 (5th Cir.1984)).  Moreover, a court cannot approve a settlement that violates applicable law.  *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 476 (Bankr. D. Del. 2010) ("Of course, the Court may not approve a settlement that would violate applicable law, regardless of whether it is a 'good deal' for a debtor").

---

[33]   Bankruptcy Rule 9019 is made applicable to these Title III cases through PROMESA section 310.  *See* 48 U.S.C. § 2170.

117.    The settlements contained in the HTA/CCDA PSA and incorporated into the Plan also violate Bankruptcy Rule 9019(a) because, as noted above, they, among other things, (i) seek to distribute out HTA's assets and (ii) impermissibly release and enjoin claims by and against HTA.  *See supra* ¶¶ 111-116; *In re CGE Shattuck, LLC*, 254 B.R. 5, 11 (Bankr. D.N.H. 2000) (refusing to approve a creditor's settlement proposal to make distributions to certain other creditors where "the economic substance and effect" of the proposal would be to sanction a distribution scheme that violates the Bankruptcy Code).  Additionally, the Plan containing such settlements fails to satisfy Bankruptcy Rule 9019 because, as a *sub rosa* HTA plan, it violates the law.  *See Capmark Fin. Grp. Inc.*, 438 B.R. at 476 (stating that a settlement cannot be approved if it violates applicable law).

118.    Accordingly, the Plan containing settlements that violate Bankruptcy Rule 9019 and applicable law cannot be confirmed.

## IV.    The Plan is Not Confirmable Because it Provides for Disparate Treatment of the DRA's Claims Relative to HTA Bondholder Claims in the Same Class

119.    Bankruptcy Code section 1123(a)(4), which is incorporated into PROMESA through PROMESA section 301(a), requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  *See* 11 U.S.C. § 1123(a)(4).  In addition, PROMESA section 314(b)(1) requires the Plan to comply with the provisions of the Bankruptcy Code made applicable to a case under Title III.  *See* 48 U.S.C. § 2174(b)(1).  It is well settled that equality of treatment means that "all class members receive equal value and pay the same consideration in exchange for their distributions."  *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (S.D.N.Y. 2018).  The key inquiry under Bankruptcy Code section 1123(a)(4) is

whether all of the claimants in a class "have the same opportunity for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (citation omitted).

120.    The provisions in the Plan prescribed by the HTA/CCDA PSA relating to the disparate treatment of the DRA's HTA Loan claims in Class 59 vis-à-vis the HTA Bond claims in Class 59 violate Bankruptcy Code section 1123(a)(4) (and, by extension, PROMESA section 314(b)(1)) for the following reasons.

121.    *First*, as required by the HTA/CCDA PSA, the Plan provides to holders of HTA 68 Bonds and HTA 98 Senior Bonds in Class 59 consideration that is not available to the DRA's HTA Loan claims in Class 59.  For example, section 86.1 of the Plan provides accelerated distributions of $264 million from HTA to the holders of HTA 68 Bonds and HTA 98 Senior Bonds.  *See* Plan § 86.1(b)(xv); s*ee also* HTA/CCDA PSA § 4.9(b)(xx).  Although characterized as a condition precedent to Plan effectiveness, these accelerated distributions are being made to pay down the HTA 68 Bond and HTA 98 Senior Bond claims.  *See* Plan § 86.1(b)(xv); s*ee also* HTA/CCDA PSA § 4.9(b)(xx).

122.    In addition, certain holders of HTA 68 Bonds and HTA 98 Senior Bonds that are parties to the HTA/CCDA PSA are receiving up to $140 million in PSA Restriction Fees and up to $125 million in HTA Consummation Costs (as each is defined in the HTA/CCDA PSA).  *See* HTA/CCDA PSA §§ 1.2 (definitions of HTA Consummation Costs and PSA Restriction Fees), 6.1(a) & (b).  Separately, Assured and National are receiving an additional $58.6 million in fees for structuring the settlement set forth in the HTA/CCDA PSA (the "Structuring Fees").  *See* Plan § 86.1(b)(xvi) (providing that payment of Clawback Structuring Fee is a condition to the Effective Date); HTA/CCDA PSA §§ 1.2 (definition of Clawback Structuring Fee), 6.1(d).  While the payment of (i) the PSA Restriction Fees and HTA Consummation Costs are structured as plan

support agreement fees and (ii) the Structuring Fee is disguised as a condition precedent to plan effectiveness, these fees, like the $264 million accelerated distribution, are being provided as additional consideration on account of the bondholders' CW/HTA Claims whereas the DRA's CW/HTA Claims in the same class are not receiving the same treatment.  *See*  Plan § 86.1(b)(xv) & (xvi); HTA/CCDA PSA §§ 1.2 (definitions of HTA Consummation Costs, PSA Restriction Fees and Clawback Structuring Fee), 6.1(a), (b) & (d).

123.    *Second*, the distribution of cash from the HTA Clawback CVI on account of the DRA's CW/HTA Claim is conditioned on, among other things, the completion of HTA plan documents in a form that is satisfactory to the FOMB, Assured and National, whereas the DRA is not granted similar consent rights.  *See* Plan § 1.301 (definition of "HTA Distribution Conditions"). As a result, the DRA has no means of receiving its Class 59 distributions if Assured and National do not reach agreement on HTA plan documents with the FOMB, yet the DRA has no say in whether Assured and National receive their Class 59 distributions.  *See Plan* §§ 63.1, 63.2.  At a minimum, the Plan should be amended to provide the DRA with consent rights over the forms of the HTA plan documents as a condition to the HTA Clawback CVI distribution.

124.    Similarly, all creditors in Class 59 should have equal consent rights over the structure of the CVI Payment Reserve.  Section 63.2 states that the Clawback CVI Reserve for HTA Clawback CVI "shall be reasonably acceptable to Assured and National" but does not require that such reserve also be acceptable to the DRA notwithstanding the fact that the DRA (like Assured and National) is a claimholder in Class 59 and would be receiving HTA Clawback CVI. *See id.* § 63.2.  The CVI Payment Reserve exists, in large part, to protect the DRA's rights, and Assured and National have diametrically opposite interests to the DRA's.  As such, the DRA's

rights are not protected by Assured and National and the DRA should be granted consent rights over the structure of the CVI Payment Reserve.

125.    Accordingly, the Plan's disparate treatment of the DRA's CW/HTA claims in Class 59 violates Bankruptcy Code section 1123(a)(4), and by extension PROMESA section 314(b)(1), which renders the Plan unconfirmable.  Similarly, the provisions of the HTA/CCDA PSA that allow for such infirmity are likewise unenforceable.

## V.    The Plan Contains Impermissible Release, Exculpation and Injunction Provisions That Violate PROMESA Section 314(b)(3)

126.    As discussed herein, the Plan contains problematic release, exculpation and injunction provisions that render the Plan unconfirmable.  Specifically, the Plan seeks to (i) release the DRA's claims against the Monolines, (ii) release the DRA's claims against HTA and the CCDA, (iii) release HTA's and CCDA's claims against other Commonwealth agencies and instrumentalities as well as the Monolines, (iv) enjoin prosecution of the foregoing claims that are released under the Plan, and (v) exculpate HTA, CCDA and the Monolines.   As explained below, none of these overbroad releases, exculpation, and injunction provisions are permissible under applicable law.

### A.    Problematic Release, Exculpation, and Injunction Provisions

#### 1.    Release of the DRA's Claims Against the Monolines

127.    Section 92.2(a) of the Plan, given its broad construct, could have the effect of improperly releasing, settling and discharging claims held by the DRA (and other creditors) against the Monolines that relate to HTA.  That section of the Plan provides, in relevant part, that "all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of all Claims or Causes of Action against the Released Parties . . . of any nature whatsoever."  *See* Plan § 92.2(a).

128.    Released Parties are defined in the Plan to include, among others, the PSA Creditors, which comprise the GO/PBA PSA Creditors and the HTA/CCDA PSA Creditors. *See id*. §§ 1.418, 1.425.  The Plan defines GO/PBA PSA Creditors and HTA/CCDA PSA Creditors as creditors that are signatories or parties to the GO/PBA Plan Support Agreement (the "GO/PBA PSA" and, together with the HTA/CCDA PSA, the "PSAs"). *See id*. § 1.271.  The Monolines are captured within the definition of PSA Creditors because they are parties to one or both of the PSAs and, as PSA Creditors, they are "Released Parties" who benefit from the "complete satisfaction, settlement, discharge and release of all Claims or Causes of Action" against them under section 92.2(a) of the Plan. *See id*. § 92.2(a).

129.    Section 92.2(a) of the Plan purports to limit released claims to those that "relat[e] to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever". *Id*.  However, this limitation is meaningless because HTA is an instrumentality of the Commonwealth and so there is necessarily a relationship between HTA and a substantial portion of its assets, on the one hand, and the Title III Cases, the Commonwealth and its assets, property and interests, on the other hand.  Any of the DRA's claims against the Monolines that relate to HTA, in turn, relate to the Commonwealth and may therefore be swept up by the releases in section 92.2(a) of the Plan. *See id*.

130.    The DRA is not the only creditor troubled by the scope of the Plan's release provisions.  The language at the end of section 92.2(a) of the Plan that excepts claims relating to PREPA and PREPA-issued bonds from the Plan's release provisions was added as a direct result of an objection filed by U.S. Bank National Association, in its capacity as PREPA Bond Trustee, arguing that the Plan's release language is "so vague and ill-defined" that "PREPA Bondholders

are thus faced with the absurd worry that their Claims and Causes of Action against PREPA might

be released". *See* Dkt. No. 16975 ¶ 11.  The same is true for HTA creditors, including the DRA.

131.    Moreover, the Monolines have argued that the DRA's claims should be equitably

subordinated.  In the event this Court finds that bad acts have occurred, the DRA may have claims

against the Monolines based on their participation in the misconduct.  It is inappropriate for the

Plan to release parties of liability for gross negligence, willful misconduct or intentional fraud.[34]

### 2.    *Release of the DRA's Claims against HTA and CCDA*

132.    Section 92.2(a) of the Plan also impermissibly releases the DRA's claims against

HTA and CCDA as Released Parties.  Released Parties are defined in the Plan to include the

Government Parties and "each of their respective Related Persons".  *Id.* § 1.425.  HTA and CCDA

are each a Related Person[35] of the Commonwealth, and therefore, a Released Party that benefits

from the settlement, discharge and release of claims against it under Section 92.2(a) of the Plan.

*See id*. § 92.2(a).

133.    The definition of Government Parties provides that it "shall not include CCDA

[and] HTA."  While HTA and CCDA may not be Government Parties, the foregoing limitation

does not exclude HTA and CCDA from the definition of Released Parties.  HTA and CCDA are

---

[34]    The DRA may also have claims against the FOMB, Commonwealth and GDB (which is a Released Party because
it is a Related Person of the Government Parties) based on their participation in any misconduct.

[35]    The Plan broadly defines the Related Persons of any entity to include, among others:

".  .  . its predecessors, successors and assigns (whether by operation of law or otherwise) and their
respective current and former employees, managers, elected or appointed officials, directors,
officers, board members, principals, members, equity holders (whether such interests are held
directly or indirectly), partners, financial advisors, attorneys, accountants, consultants, agents and
professionals (including, without limitation, any and all Professionals retained by the Debtors and
AAFAF), or other representatives, nominees or investment managers . . . ."

*Id*. § 1.423.

swept into the definition of Released Parties as *Related Persons* of a Government Party—not as
Government Parties.

### 3. Release of HTA's and CCDA's Claims Against Other Non-Debtor Agencies and Instrumentalities of the Commonwealth and the Monolines

134.     As noted above, the term Released Parties in the Plan also captures other non-
Debtor agencies or instrumentalities of the Commonwealth as its Related Parties, as well as the
Monolines (as PSA Creditors).   The Plan (through sections 92.2(a) and 92.5[36]) seeks to
prematurely and permanently settle, discharge and release HTA's and CCDA's claims against such
parties, which claims may serve as potentially valuable sources of recovery for HTA and CCDA
and, by extension, their creditors.

135.     Specifically, depriving HTA and CCDA of such potentially valuable claims and
causes of action without consideration reduces the pool of assets that would be otherwise available
for distribution to HTA's creditors, the largest of which is the DRA, or CCDA's creditors, which
includes the DRA.

136.     Like section 92.2(a) of the Plan, there is language in section 92.5 of the Plan that
purports to limit the scope of claims being released.   Claims released under section 92.5 of the
Plan are limited to Released Claims, which "shall not include claims against CCDA, HTA, MBA,
PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA."   *See id.* §§ 1.424, 92.5.   However, this

---

[36]   Section 92.5 of the Plan provides in relevant part that:

. . . each of the Debtors and Reorganized Debtors . . . and . . . [their] Related Persons shall be deemed
to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release,
acquit, and discharge the Released Parties from any and all Claims or Causes of Action that . . . that
are Released Claims . . .

*Id.* § 92.5.

limitation does not exclude *every* agency of the Commonwealth that HTA may have a claim against, or the Monolines, which HTA may also have claims against.

### 4.    *Improper Releases are Combined with Injunctions*

137.    The Plan also features sweeping injunctions, which the Court should not approve. Section 92.3 of Plan enjoins all claims released under section 92.2 of the Plan, which includes (i) the DRA's claims against HTA, CCDA and the Monolines (*see supra* ¶¶ 128-134), and (ii) HTA's and CCDA's claims against other agencies of the Commonwealth and Monolines (*see supra* ¶¶ 135-137):

> . . . all Entities . . . who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 92.2 hereof are permanently enjoined, from . . . commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property . . . .

Plan § 92.3.

138.    In addition, section 92.6 of the Plan enjoins all claims released under section 92.5 of the Plan that are "Released Claims", which enjoins HTA and CCDA from pursuing their claims against other non-Debtor agencies of the Commonwealth as well as the Monolines (*see supra* ¶ 136):

> . . . all Entities that hold, have held, or may hold a Released Claim that is released pursuant to Section 92.5 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from . . . commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum [against] any Entity released under Section 92.5 hereof . . . .

Plan § 92.6.

139.     The definition of Released Claims does not include *claims against* CCDA and

HTA.  *See id*. § 1.424.  However, the issue here is that HTA and CCDA are releasing, and being

enjoined from pursuing, *their claims* against other non-Debtor agencies of the Commonwealth and

Monolines.  *See id*. § 92.6.

140.     Finally, section 92.9 of the Plan enjoins all claims against Released Parties based

upon, related to, or arising out of or in connection with any of the Released Claims or these Title

III cases, which includes (i) certain of the DRA's claims against HTA and CCDA (*see supra* ¶

133), (ii) the DRA's claims against the Monolines (*see supra* ¶¶ 128-129), and (iii) HTA's and

CCDA's claims against other non-Debtor agencies of the Commonwealth and Monolines (*see*

*supra* ¶¶ 128-136):

> . . . each and every Entity is permanently enjoined, barred and restrained
> from instituting, prosecuting, pursuing or litigating in any manner any and
> all Claims, demands, rights, liabilities, or causes of action of any and every
> kind, character or nature whatsoever, in law or in equity, known or
> unknown, direct or derivative, whether asserted or unasserted, against any
> of the Released Parties based upon, related to, or arising out of or in
> connection with any of the Released Claims, confirmation and
> consummation of the Plan, the negotiation and consummation of the
> GO/PBA Plan Support Agreement, or any claim, act, fact, transaction,
> occurrence, statement or omission in connection with or alleged or that
> could have been alleged in the Title III Cases . . . .

Plan § 92.9.

141.     While the definition of Released Claims does not include claims against HTA and

CCDA (*see id*. § 1424), the DRA's claims against HTA and CCDA that are "related to, or arising

out of or in connection with . . . confirmation and consummation of the Plan, the negotiation and

consummation of the GO/PBA Plan Support Agreement, or any claim, act, fact, transaction,

occurrence, statement or omission in connection with or alleged or that could have been alleged in

the Title III Cases . . . " (*see id*. § 92.9) are still enjoined by section 92.9 of the Plan.  The breadth

of the injunction in section 92.9 of the Plan is far too broad.

142.    Permanent injunctions such as these are akin to releases because the DRA, HTA

and CCDA will not be able to prosecute potentially valuable claims and causes of action against

the "Released Parties."  As explained further below, depriving the DRA, HTA and CCDA of these

claims is not permissible under applicable law.

### 5.    *Improper Exculpation of HTA, CCDA and the Monolines*

143.    In addition to the impermissibly broad third-party releases and improper injunctions

described herein, section 92.7 the Plan improperly seeks to exculpate HTA and CCDA (as Related

Persons of the Debtors), and the Monolines (as PSA Creditors) "[from] any liability to any Entity

for any act taken or omitted to be taken in connection with the Title III Cases, the formulation,

preparation, dissemination, implementation, confirmation or approval of the Plan . . . or

contemplated in connection with the consummation of the transactions set forth in the Plan . . ."

*Id*. §§ 92.7(a), 92.7(b).   In addition, section 92.7(f) provides that "Ambac, Assured, FGIC,

National, Syncora, and their Related Persons shall not have or incur any liability to any Entity for

any act taken or omitted to be taken consistent with the Plan or in connection with the formulation,

preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan."

*Id*. § 92.7(f).

### B.    *The Problematic Release, Injunction, and Exculpation Provisions Violate Applicable Law*

144.    In the First Circuit, the lower courts have adopted the five-factor test set forth in *In

re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937–38 (Bankr. W.D. Mo. 1994) to determine

whether, and to what extent, to confirm plans containing release, exculpation and injunction

provisions.  Courts consider whether:

(1) there's an identity of interest … between the debtor and the third-party being released such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2) the non-debtor being released has contributed substantial assets to the reorganization;

(3) the proposed injunction is essential to the reorganization and without it, there is little likelihood of success;

(4) a substantial majority of the creditors agree to the injunction, specifically, whether the impacted classes have 'overwhelmingly' voted to accept the proposed plan treatment; and

(5) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class affected by the injunction.

*See In re Quincy Med. Ctr.*, No. 11-16394-MSH, 2011 WL 5592907, at *2 (Bankr. D. Mass. 2011) (describing the various standards courts have applied to determine the permissibility of plan release, exculpation and injunction provisions, and noting that a number of courts within the First Circuit apply the 5-factor test articulated in *In re Master Mortg. Inv.t. Fund, Inc.*).

145.   The FOMB has not satisfied any of the *Master Mortgage* factors to justify the overbroad releases, exculpation, and injunction provisions contained in the Plan.  *First*, the Debtors, HTA, CCDA, and the Monolines each purport to be separate legal entities with their own assets and liabilities.  Moreover, while each of HTA and CCDA is an instrumentality of the Commonwealth, neither is a Debtor in these cases or under the Plan (and each will restructure though its own separate process at the relevant time).  Nevertheless, each of HTA, CCDA and the Monolines are receiving releases and exculpations (and claims against them are being enjoined and forever barred) under the Plan as "Related Persons" and "Released Parties", as applicable. The FOMB has not shown that there is an identity of interest between the Debtors, on the one hand, and HTA, CCDA the Monolines and the other non-Debtor beneficiaries of Plan releases, exculpations and injunctions, on the other hand.

146.     *Second*, none of HTA, CCDA, the Monolines and the other non-Debtors that are

intended to be released and/or exculpated under the Plan have contributed substantial assets to the

Commonwealth's reorganization.  In fact, the opposite is true because the Monolines, as PSA

Creditors, have depleted the Commonwealth's assets by requiring the payment of various

restriction, consummation and other fees in exchange for their entry into the applicable plan

support agreements.  *See* HTA/CCDA PSA §§ 1.2, 6.1(d).  Moreover, the FOMB has offered no

evidence to support the granting of releases, exculpations and/or injunctions in favor of HTA or

CCDA, including evidence of contribution (if any) being made by HTA or CCDA in exchange for

such extraordinary relief.

147.     *Third,* the broad releases, exculpations and injunctions being granted in favor of

HTA, CCDA and the Monolines (all of which are detailed above) are not essential to a "successful

reorganization" of the Commonwealth.  *See supra* ¶ 133 (discussing releases granted to HTA and

CCDA); ¶¶ 128-129 (discussing releases granted to the Monolines, including by the DRA and

other creditors); ¶ 144 (discussing exculpations); ¶¶ 138-142 (discussing injunctions).  There are

no bases for (a) HTA and CCDA to release potentially valuable claims against other non-Debtor

agencies or instrumentalities of the Commonwealth or the Monolines, or (b) for the DRA to release

its claims against HTA, CCDA and the Monolines, for the Commonwealth (or the other Debtors)

to accomplish a successful restructuring.  *See* Plan § 2.3 (alleging without evidence, that the

"releases, injunctions and exculpation provided in [the Plan] are integral to obtaining the value

provided [under the Plan] and constitute an essential component of the compromises reached and

are not severable from the other provisions of this Plan"); *id.* § 92.4 (alleging without evidence

that the "injunction, exculpation and release provisions provided in [the Plan] is an integral part of

the Plan and is essential to its implementation").

148.     *Fourth*, the FOMB has failed to demonstrate that (i) a "substantial majority" of the creditors of the HTA, CCDA or any of the other non-Debtor "Government Entities" that will be impacted by the Plan's releases, exculpations and injunctions will support a Plan containing such provisions or (ii) the impacted classes of creditors have "overwhelmingly" voted to accept the Plan.  In fact, votes of many of the creditors impacted by such provisions, including those of HTA and CCDA, are not being solicited *at all* because, among other reasons, HTA and CCDA are not Debtors or Plan proponents—yet their creditors are being deprived of their rights and claims.  As explained in *Master Mortgage*, this is "the single most important factor" in determining whether the releases, exculpations and injunctions in a plan can be approved and, for the foregoing reasons, that factor cannot be satisfied in these cases.  *In re Master Mortgage Invest. Fund, Inc.*, 168 B.R. at 937–38.  The fact that HTA is granting releases without its creditors having a say in those releases makes clear the *sub rosa* nature of this Plan.

149.     *Finally,* the Plan does not provide for the payment of all, or substantially all, of the claims of the parties affected by the release, exculpation and injunction provisions.  Specifically, the DRA is not receiving payment for all, or substantially all, of its claims against HTA, CCDA the Monolines or other Released Parties in exchange for the releases, exculpations and injunctions that it is granting.  The Plan also fails to satisfy all, or substantially all, of HTA's or CCDA's claims against the various non-Debtor parties being released and exculpated under the Plan in exchange for taking those claims away from HTA and CCDA.  By depriving HTA and CCDA of such claims without consideration has the effect of reducing the pool of assets that may be available to their creditors, the largest of which at HTA is the DRA.

150.   For all of the foregoing reasons, the Plan containing the existing release, exculpation and injunction provisions fails to satisfy the *Master Mortgage* factors and cannot be confirmed.[37]

## VI.   The Plan Fails to Satisfy PROMESA Sections 314(b)(1) and (5) and Bankruptcy Code Section 1123(a)(5) Because the Legislation Necessary to Implement the Plan Has Not Been Approved.

151.   PROMESA section 314(b)(5) requires that the Plan cannot be confirmed unless "any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval." 48 U.S.C. § 2174(b)(5).  Additionally, Bankruptcy Code section 1123(a)(5) provides, in relevant part, that a plan "shall provide adequate means for . . . implementation."  *See* 11 U.S.C. § 1123(a)(5)(j); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 450 (1999) (explaining that 1123(a)(5)(j) allows for the issuance of new securities "in exchange for" old claims to implement a plan of reorganization); *Mountain Side Holdings, Inc.* v. *Butters (In re Mountain Side Holdings, Inc.)*, 142 B.R. 421 (D. Colo. 1992) (holding that 1123(a)(5)(j) expressly authorizes the issuance of new securities in a reorganized debtor to ensure there are adequate means for a plan's implementation).

152.   The Plan violates PROMESA section 314(b)(5) and Bankruptcy Code section 1123(a)(5) because, as noted above, the Commonwealth has not passed the legislation that is a precondition to the issuance of the New GO Bonds and CVIs, which is necessary for the Plan's

---

[37]   Additionally, as it relates to the Plan's exculpation provisions specifically, in addition to failing to pass must under *Master Mortgage*, these provisions seek to exculpate non-estate fiduciaries, which courts in other jurisdictions have found as impermissible.  *See, e.g., In re Wash. Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (stating that exculpation clauses at confirmation are "limited to the *fiduciaries* who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers").  Accordingly, the Monolines and other Released Parties that are not fiduciaries of the Debtors or the Creditors' Committee should not be exculpated under the Plan.

implementation and consummation.  *See* Plan §§ 1.170, 1.363; Art. LXXIV & § 86.1(d)).  The

statute (Act 33 of 1942) that the FOMB had previously cited as authorizing the issuance of the

new bonds without the need for additional legislation was repealed by Governor Pedro R. Pierluisi

on September 16, 2021.  *See* FOMB Status Report ¶ 8.  Based on FOMB's own admission, absent

the passage of acceptable New GO Bond and CVI legislation, "the [FOMB] is uncertain whether

the currently proposed plan of adjustment can be confirmed without modification".  *Id*. at ¶ 6.

Accordingly, unless and until the legislation necessary for the issuance of the New GO Bonds and

CVIs is passed, the Plan cannot be implemented under Bankruptcy Code section 1123(a)(5) or

satisfy PROMESA sections 314(b)(1) and (5).

**VII.    The Plan Fails to Provide for the Payment of the DRA's Administrative Expense
         Claim**

153.    Under PROMESA section 314(b)(4), a plan cannot be confirmed unless it pays all

administrative expense claims in full on its effective date.  *See* 48 U.S.C. 2174(b)(4) (requiring a

plan to provide "that on the effective date of the plan each holder of a claim of a kind specified in

507(a)(2) of title 11 will receive on account of such claim cash equal to the allowed amount of

such claim"); *see also In re ADnational Corp.*, No. 03-81614, 2006 WL 5003849, at *2 (Bankr.

D. Md. Mar. 7, 2006) (ordering debtor to "establish a Disputed Claims Reserve from the cash on

hand in the full amount of [creditor's] Administrative Expense Claims"); *Siegel v. Sony Elecs.,

Inc. (In re Circuit City Stores, Inc.)*,  515 B.R. 302, 313 n.8 (Bankr. E.D. Va. 2014) (holding that

the plan could not have been confirmed if the liquidating trust did not maintain "a reserve account

in which it holds sufficient funds that have been set aside to pay all unresolved administrative

claims"); *In re Momenta, Inc*., 455 B.R. 353, 356 (Bankr. D.N.H. 2011) (finding that "allowance

of a significant administrative expense claim may require a chapter 11 debtor to have a large cash

reserve available on the date of confirmation" because "the holder of an administrative expense claim must receive cash equal to the amount of their claim on the effective date of the plan").

154.    The Plan cannot be confirmed because it fails to provide for the payment in full of, or reserve in a sufficient amount to pay, the DRA's administrative expense claim.  Even though the FOMB has challenged the DRA's entitlement to an administrative expense claim, this does not relieve the FOMB of the obligation to provide for the payment of, or an adequate reserve for, all administrative expense claims, including the DRA's administrative expense claim, in order to confirm the Plan.  Accordingly, at a minimum, the Plan provisions providing for a Disputed Claims reserve must be revised to increase the size of such reserve to include the full asserted amount of the DRA's administrative expense claim.  *See supra* ¶¶ 30-32.

## VIII.   The Plan is Not Consistent with the Fiscal Plan

155.    Under PROMESA section 314(b)(7), a plan cannot be confirmed unless the Court determines that it is "consistent with the applicable Fiscal Plan" certified by the FOMB.  48 U.S.C. § 2174(b)(7).

156.    The FOMB has not presented evidence sufficient to show that the Plan is consistent with the 2021 CW Fiscal Plan.  Although it is the plan proponent, the FOMB has presented only a narrow report finding certain consistencies and assuming away inconsistencies.  Specifically, in the Expert Report of Marti P. Murray [Dkt. No. 18097-1] (the "Murray Report"), the FOMB's expert on feasibility of the Plan, Ms. Murray's opinion of consistency was limited to two specific financial elements:  (i) the up-front cash requirements of the Plan and (ii) debt sustainability.  *See* Zouarabani Decl. Ex. O, Murray Rough Tr. 38:10-19, 63:20-64:25; *see also id.* 69:22-70:4 (considering as material to up-front cash requirements only "how much money has to be set aside up front based on the treatment for certain creditors, and what payment obligations are being

65

created on a going-forward basis, based on the terms of the plan of adjustment"). The Murray Report did not evaluate whether the Plan was consistent with the Fiscal Plan in terms of <u>any</u> of the elements required of a Fiscal Plan under PROMESA Section 201(b). *See* Zouarabani Decl. Ex. O, Murray Rough Tr. 47:18-66:7.

157. Additionally, the Murray Report expressly shows a multi-billion dollar inconsistency between the Plan and 2021 CW Fiscal Plan. As detailed in the Murray Report, the 2021 CW Fiscal Plan provides that pension obligations should be paid on a current basis through the "PayGo" system, and not through funding of a pension account as contemplated in the Plan. *See* Zouarabani Decl. Ex. M, 2021 CW Fiscal Plan at 66, 281-284; *See* Zouarabani Decl. Ex. U, Murray Report ¶ 69. While the Fiscal Plan directs that the "PayGo system must…reduce the current benefit amounts paid," the Plan increases the current payments to the pension system. *See* Zouarabani Decl. Ex. M, 2021 CW Fiscal Plan at 169. The Murray Report simply assumes away this and two other discrepancies. *See* Zouarabani Decl. Ex. U, Murray Report ¶ 69 ("[T]he Plan also calls for the funding of a pension reserve trust. Funding of the pension reserve trust has not been reflected in the 2021 CFP. I have been asked to assume the funding of the pension reserve trust will be reflected in a later fiscal plan, and will not result in the Commonwealth realizing a deficit before debt service any earlier than projected in the 2021 CFP."); *id.* ¶ 62 ("I have been asked by counsel to assume that a modified fiscal plan will be issued that will address the results of these later negotiations" relating to collective bargaining agreements and others not known at the time the FOMB certified the 2021 CW Fiscal Plan; *id.* ¶ 91 n.131 ("Certain modifications, including Elimination of Occupational and One-Year Salary Death Benefits (JRS), Elimination of Free Post-Retirement Death Benefit (JRS), Suspension of Benefits (TRS), Defined Contribution

Transfer from Prior Plans (TRS) have not been reflected as separate line items in the 2021 CFP

but I have been advised have been incorporated into the financial projections.").

158.     Accordingly, the Plan cannot be confirmed absent an amendment to resolve this

inconsistency with the Fiscal Plan.

## IX.     The Plan is Not Feasible

159.     Section 314(b)(6) of PROMESA requires that the Plan "[be] feasible" and "in the

best interest of creditors."  *See* 48 U.S.C. § 2147(b)(6).  Once again, this section appears to draw

from the same standard applicable in Chapter 9 bankruptcy cases, namely section 943(b)(7).  *See*

*Fin. Oversight & Mgmt. Bd.*, 361 F. Supp. 3d at 250-51.

160.     "[T]he Court has an independent duty to determine [feasibility] and to make

specific findings of fact."  *City of Detroit*, 524 B.R. at 220.  In determining feasibility, courts

usually rely on some of the factors considered in Chapter 11 cases, including that the plan "offer[s]

a reasonable prospect of success and be workable[, which] requires a practical analysis of whether

the debtor can accomplish what the plan proposes and provide governmental services".[38]  *Id.*

(quoting *In re Mt. Carbon Metro. Dist.*, 242 B.R. 18, 35 (Bankr. D. Colo. 1999)).

161.     The Debtors' Plan is not feasible for three main reasons.  *First*, the success of the

Plan is wholly dependent on the FOMB being able to demonstrate that it is legally entitled to retain

the illegally clawed backed revenues to make payments to certain creditor groups under the Plan.

As previously explained, the FOMB will not be able to make this showing.  *See supra* ¶¶ 59-95.

---

[38]     To be clear, the DRA Parties do not take the position that the Plan lacks sufficient economic means to be
implemented.  As discussed above, the Commonwealth has additional value that it can distribute to creditors
under the Plan, but has chosen not to do so.  *See supra* ¶¶ 38-52.  However, should the Court find that the
Commonwealth's ability to perpetually retain the clawed-back revenues and/or that the legislation to approve the
New GO Bonds and CVIs has not passed, then the Plan cannot be implemented and is therefore not feasible.

162.     *Second*, as discussed above, the Commonwealth's issuance of the New GO Bonds and CVIs is a significant component of the consideration being provided to Commonwealth creditors and is subject to legislative approval, which approval is also a condition precedent to the Plan's effectiveness.  *See* Plan §§ 1.170, 1.363; Art. LXXIV & § 86.1(d).  As discussed above, such legislative approval has not been obtained.  The FOMB Status Report concedes that until satisfactory New GO Bonds and CVI Legislation is approved, "the Oversight Board is uncertain whether the currently proposed plan of adjustment can be confirmed without modification".  *See* Dkt. No. 18401 at ¶¶ 8, 6.

163.     *Third*, as previously noted, the recent concessions made by the FOMB in the Oct. 14, 2021 Letter further underscore that the Plan's economic projections and baselines are premised on "visionary schemes" and unrealistic promises as opposed to reasonably accurate financial projections.  *See supra* ¶ 55.  Either the numbers in the Plan are correct, in which case the Plan is unfeasible and the concessions offered by FOMB in the Oct. 14 2021 Letter are designed to falsely incentivize a particular sector of the Commonwealth's creditors, or the numbers in the Oct. 14 2021 Letter are correct, in which case the Plan fails the best interests of creditors tests because its projections and available value to creditors would have always been wrong from the get-go (as evidenced by the Prager Report).

164.     Accordingly, the FOMB has not demonstrated that the Plan is feasible under section 314(b)(6) of PROMESA**.**

**X.**     **The Plan Cannot Be Confirmed for the Following Additional Reasons**

**A.**     ***The Plan Must Correct Internal Inconsistencies Related to the DRA Claims***

**1.**     ***DRA's Allowed CW/HTA Claims***

165.     Section 2.2(a) of the Plan provides that the CW/HTA Claims (which include the

DRA's clawback claims "asserted on account of the GDB HTA Loans" (*see* Plan § 1.183)) are

"*allowed*" in the total amount of $6,257,585,807.42 "*for purposes of confirmation and

consummation of the Plan and the distributions to be made* [thereunder]." *Id.* § 2.2(a) (emphasis

added).[39]

166.     Notwithstanding the clear language of section 2.2(a), the Plan's definition of GDB

Loan Priority Determination, in clause (b), provides that as part of such determination the Court

may determine that "*the Government Development Bank Debt Recovery Authority does not possess

an allowable claim* or entitlement to recover with respect to the HTA Clawback CVI based upon

such GDB HTA Loans." *Id.* § 1.258(b) (emphasis added).

167.     Section 2.2(a) was added to the Plan as part of the fourth amendment thereto, but it

appears that the FOMB failed to make a corresponding change to the definition of GDB Loan

Priority Determination in section 1.258 to eliminate clause (b) of that definition and the

inconsistency among the two Plan provisions.  The Plan, therefore, should be revised to eliminate

clause (b) of section 1.258 of the Plan and this inconsistency.

### 2.     *DRA's PBA Secured Claim*

168.     The Plan defines the "PBA/DRA Secured Claim" as the DRA's claims based on

loans made by the GDB to PBA in the outstanding principal amounts of $66,222,028.00, the

repayment of which is secured by the sale proceeds of certain real property. *See* Plan § 1.383.  The

Plan assumes that the "PBA/DRA Secured Claim" is unsecured, which the DRA Parties dispute.

*See* Plan § 16.1.

---

[39]   Given that the DRA's CW/HTA Claims are based on the same facts as the CW/HTA Claims of the HTA
bondholders, the Plan's allowance of DRA's CW/HTA Claims in section 2.2(a) is entirely appropriate and
consistent with its allowance of the HTA bondholders' CW/HTA Claims.  *See supra* 28 & 33.

169.    On September 26, 2021, just 43 days before the start of the confirmation hearing, the FOMB, on behalf of PBA, commenced an adversary proceeding (the "PBA Adversary Proceeding") against the Servicer and Collateral Monitor with respect to PBA/DRA Secured Claim.  *See* Adv. Pro. No. 21-00100-LTS.  In its complaint, the FOMB asserted that neither the GDB nor the DRA adequately perfected its liens or security interests in the proceeds of the real property that collateralizes PBA's loan obligations to the DRA.  *See* Adv. Pro. No. 21-00100-LTS [Dkt. No. 1] ¶¶ 32-33, 35-36, 40, 41.  As a result, the FOMB alleges (i) that the DRA's interests are unenforceable, (ii) that PBA's interests should be preserved, (iii) the DRA's interests have not attached to any personal property that has or will arise post-petition, and (iv) the DRA's claims asserting security interests should be disallowed.  *See id.* ¶¶ 46, 54, 68, 72, 79.  The DRA Parties disagree and intend to challenge the FOMB's allegations in the context of the PBA Adversary Proceeding.

170.    Under Bankruptcy Rule 7001(2) (as made applicable to these Title III cases through PROMESA section 310), the issue of whether the DRA holds a properly perfected security interest against PBA must be determined in the PBA Adversary Proceeding.  *See* Fed R. Bankr. P. 7001(2) (providing that an adversary proceeding is required to "determine the validity, priority, or extent of a lien or other interest in property").  Therefore, it is inappropriate for the Plan to treat the PBA/DRA Secured Claim as unsecured until a determination has been made as to the secured status of such claim in the PBA Adversary Proceeding.  The DRA Parties believe that such a determination can be made following Plan confirmation but the Plan must be revised to account for the fact that the PBA/DRA Secured Claim is, in fact, secured and provide it the applicable treatment upon such determination. *See* 11 U.S.C. § 1129(b)(2)(A) (permitting confirmation of a

plan over the objection of a class of secured claims if the plan is "fair and equitable" with respect

to such class by requiring secured claims to receive certain specified treatment).

### B.     The Plan Was Not Proposed in Good Faith

171.     PROMESA section 301(a) incorporates Bankruptcy Code section 1129(a)(3),

which requires that a plan be "proposed in good faith."  11 U.S.C. § 1129(a)(3).  While "good

faith" is not defined in the Bankruptcy Code, "[i]t is often stated  that the term is generally

interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result

consistent with the objective and purposes of the Bankruptcy Code."  *In re Weber*, 209 B.R. 793,

797 (Bankr. D. Mass. 1997) (citation omitted); *see also In re Plaza Antillana, Inc.*, No. 13-10013

(ESL), 2014 WL 585299, *6 (Bankr. D.P.R. Feb. 14, 2014) ("Lack of good faith or bad faith is

atypical conduct that constitutes an abuse of the bankruptcy process.").  A plan filed in good faith

"seek[s] to preserve or create some value that would otherwise be lost outside of bankruptcy."  *In

re La Trinidad Elderly LP SE*, No. 19-01830 (ESL), 2019 Bankr. LEXIS 2862 (Bankr. D.P.R.

Sept. 13, 2019).

172.     In determining whether a plan is filed in good faith, courts consider a number of

factors, and "[t]he plan must be viewed in light of the totality of the circumstances surrounding

confection of the plan."  *Weber*, 209 B.R. at 797 (citation omitted); *see also In re Costa Bonita

Beach Resort, Inc.,* 479 B.R. 14, 40 (Bankr. D.P.R. 2012) (holding that the First Circuit rejects a

mechanical checklist approach to the good faith analysis and identifying "good faith" as "an

abstract idea generalized from particular circumstances and not a working assumption.").

Accordingly, when applying this standard, "courts have considered a wide variety of factors, such

as whether the plan was proposed exclusively for tax considerations; whether the plan served only

as a vehicle for the personal profit of the debtor's investors; and whether the plan was proposed

by a competitor solely to drive the debtor out of business." *Weber*, 209 B.R. at 797 (citations

omitted).

173.    As discussed above, the HTA/CCDA PSA, which provisions are expressly

incorporated into the Plan, was entered and agreed to without the presence of the DRA Parties

*despite* expressly resolving, negotiating, and adjudicating the DRA's claims, liens, and priority

rights with regards to their HTA Loans.  The Plan fails to satisfy the good faith requirements of

Bankruptcy Code section 1129(a)(3) because of the exclusion of the DRA Parties from the

discussions affecting their recoveries and rights as holders of Class 59 CW/HTA Claims as well

as their rights and claims under a future HTA plan of adjustment.

### C.      The Plan Cannot Discharge the DRA's Administrative Expense Claim or Settle the DRA Adversary Proceeding

174.    Section 2.1 of the Plan provides for "a global compromise and integrated settlement

of, among other issues, asserted and unasserted disputes . . . raised by certain holders of . . . GDB

HTA Loans asserting rights to receive revenues historically conditionally appropriated to . . . HTA

. . . and "clawed back" by the Commonwealth" and disputes "relating to the validity, priority,

secured status and related rights attendant to the GDB HTA Loans."  *See* Plan § 2.1.

175.    Litigation concerning the DRA's asserted administrative expense claim based on

the Commonwealth's illegal post-petition retention of the Act 30-31 Revenues is currently pending

before the Court.  *See supra* ¶ 30.  The Plan cannot discharge the DRA's asserted administrative

expense claim without consideration because, as previously discussed, PROMESA section

314(b)(4) requires a plan of adjustment to pay all administrative expense claims in full on its

effective date.  *See supra* ¶¶ 154-155.  Accordingly, section 2.1 of the Plan should be amended to

clarify that the DRA's asserted administrative expense claim is not being discharged prior to the

Court's determination regarding the allowance of such claim—which determination can be made

post-confirmation under the terms of the Plan itself.  *See* Plan § 1.51 (setting an administrative

claims bar date of "no more than ninety (90) days after the Effective Date").

176.    In addition, the DRA Adversary Proceeding, remains pending as of the date

hereof.  As such, section 2.1 of the Plan should be amended to clarify that the DRA Adversary

Proceeding is not being settled and discharged.

### D.    The Plan Cannot Discharge CCDA's Loan Obligations to the DRA

177.    CCDA remains obligated to the DRA through unsecured loans made by the GDB

to CCDA on August 20, 1996 (as amended, the "1996 CCDA Loans").  As of the date hereof,

$138.4 million in outstanding principal and $69.8 million in outstanding interest remains due

thereunder.[40]

178.    To the extent the Plan seeks to do so, it cannot adjust or alter CCDA's obligations

to the DRA.  Accordingly, the DRA reserves all of its rights with respect to CCDA and any

attempted adjustment of CCDA's obligations to the DRA under the Plan.

### RESERVATION OF RIGHTS

179.    The DRA Parties do not waive, and expressly reserve, all of their rights to assert

further or additional objections to confirmation of the Plan (or any other plan), and/or propound

discovery related thereto, either prior to or at the confirmation hearing.

### CONCLUSION

**WHEREFORE**, based on the foregoing, the DRA Parties hereby respectfully request that

this Court enter an order denying confirmation of the Plan.  To the extent the Court is inclined to

---

[40]    In addition to the 1996 CCDA Loans, the GDB made an unsecured loan to CCDA on September 30, 2013.  This
loan had $4.4 million in outstanding principal and $1.27 million in outstanding interest due thereunder.  In 2019,
the DRA obtained $4,303,888.93 in proceeds from the sale of Parcel C of the Convention Center
District.  $190,061.07 in additional proceeds are currently being held in escrow pending the resolution of certain
property tax issues.  Proceeds from the sale of Parcel C are the only source of repayment of the 2013 Loan.

confirm the Plan, the DRA Parties hereby respectfully request that the Court (i) require the FOMB

to amend the Plan and the proposed Confirmation Order consistent with this Objection, and (ii)

make such other additional modifications to the Plan and the proposed Confirmation Order, and

grant such other relief, as may be just and proper.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 19th day of October, 2021.

**WE HEREBY CERTIFY** that, in accordance with the Court's *Fifteenth Amended Notice, Case Management and Administrative Procedures Order* (the "CMP Order") [Dkt. No. 17127-1] on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case. We further certify that, on this same date, we served the foregoing upon all the Standard Parties as identified and defined in the CMP Order, as well as upon all of the parties identified in the Master Service List maintained at https://cases.primeclerk.com/puertorico/.

| | |
|---|---|
| **MCCONNELL VALDÉS LLC** | **C. CONDE & ASSOC. LAW OFFICES** |
| 270 Muñoz Rivera Avenue, Suite 7<br>Hato Rey, Puerto Rico 00918<br>P.O. Box 364225<br>San Juan, PR 00936-4225<br>Tel:    787-250-5632<br>Fax:    787-759-9225 | By:    */s/ Carmen D. Conde Torres*<br>Carmen D. Conde Torres<br>(USDC No. 207312)<br><br>*/s/ Luisa S. Valle Castro*<br>Luisa S. Valle Castro<br>(USDC No. 215611) |
| By:    */s/ Arturo J. García-Solá*<br>Arturo J. García-Solá<br>(USDC No. 201903)<br>E-mail: ajg@mcvpr.com | 254 San José Street<br>Suite 5<br>San Juan, PR 00901-1523<br>Tel:    787-729-2900<br>Fax:    787-729-2203<br>E-mail: condecarmen@condelaw.com |
| */s/ Nayuan Zouairabani*<br>Nayuan Zouairabani<br>(USDC No. 226411)<br>E-mail: nzt@mcvpr.com | -and- |
| ***Attorneys for AmeriNational Community Services, LLC, as Servicer for the GDB Debt Recovery Authority*** | **SCHULTE ROTH & ZABEL LLP** |
| | By:    */s/ Douglas S. Mintz*<br>Douglas S. Mintz (admitted *pro hac vice*)<br>901 Fifteenth Street, NW, Suite 800<br>Washington, DC 20005<br>Tel:    202-729-7470<br>Fax:    202-730-4520<br>E-mail: douglas.mintz@srz.com |
| | -and- |

Douglas Koff (admitted *pro hac vice*)
Adam C. Harris (admitted *pro hac vice*)
Taleah Jennings (admitted *pro hac vice*)
Abbey Walsh (admitted *pro hac vice*)
Peter J. Amend (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Tel:    212-756-2000
Fax:    212-593-5955
E-mail: douglas.koff@srz.com
        adam.harris@srz.com
        taleah.jennings@srz.com
        abbey.walsh@srz.com
        peter.amend@srz.com

*Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for the GDB Debt
Recovery Authority*