# EXHIBIT B

NEW ISSUE – FULL BOOK-ENTRY                                                                    NOT RATED

*INTEREST ON THE NEW BONDS (AS DEFINED HEREIN) IS <u>NOT</u> EXCLUDED FROM GROSS INCOME FOR FEDERAL INCOME TAX PURPOSES. FOR A MORE COMPLETE DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS WITH RESPECT TO THE NEW BONDS, SEE "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" IN THIS OFFERING MEMORANDUM.*

# GDB DEBT RECOVERY AUTHORITY

## GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE)

### $2,597,754,625 AGGREGATE PRINCIPAL AMOUNT OF 7.500% BONDS DUE 2040

The GDB Debt Recovery Authority (the "Issuer") is a newly formed statutory public trust and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to the GDB Restructuring Act (as defined herein) enacted by the Legislative Assembly of the Commonwealth (the "Legislative Assembly") for the purpose of receiving the Transferred Property (as defined herein) from Banco Gubernamental de Fomento para Puerto Rico (Government Development Bank for Puerto Rico, herein "GDB") and issuing the 7.500% GDB Debt Recovery Authority Bonds (taxable) due 2040 (the "New Bonds"). The Issuer was created by the GDB Restructuring Act to facilitate the restructuring of certain of GDB's indebtedness pursuant to a Qualifying Modification under Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") (such Qualifying Modification as so certified by the Financial Oversight and Management Board (the "Oversight Board") under Section 601(g)(2)(A) of PROMESA, the "Qualifying Modification"). The Qualifying Modification was certified by the United States District Court for the District of Puerto Rico on November 7, 2018 as required under PROMESA.

The New Bonds will be issued by the Issuer in exchange for Participating Bond Claims (as defined in the Solicitation Statement referred to herein) held by creditors of GDB in order to effect the Qualifying Modification (holders of such New Bonds, the "Bondholders"). The New Bonds will be issued pursuant to the provisions of that certain Bond Indenture, dated as of the Closing Date (as defined herein), as amended or supplemented (the "Bond Indenture"), by and between the Issuer and Wilmington Trust, N.A., as trustee (the "Indenture Trustee"). The New Bonds will bear interest at 7.500% per annum, payable semi-annually in arrears, and are secured by a first priority statutory lien on the Restructuring Property (as defined herein). The New Bonds are further described herein. To the extent there is insufficient Available Cash (as defined herein) on any Payment Date (as defined herein) to pay in full in cash all interest accrued during the Interest Period (as defined herein) preceding such Payment Date on the New Bonds, such accrued interest on the New Bonds will be paid in cash pro rata to the extent of and from Available Cash and the principal of the New Bonds will accrue an amount equal to the amount of any Available Cash shortfall (each such amount of shortfall, a "PIK Amount"). Principal payments on the New Bonds will be made from Available Cash to the extent available after the payment of all accrued interest with respect to any Payment Date, thereby reducing the outstanding principal balance of the New Bonds by such amount. In addition, on the Closing Date or as soon thereafter as reasonably practicable (the "Special First Payment Date"), the Issuer will apply all Cash Assets (as defined herein) received from GDB on the Closing Date, in accordance with the payment priority in "Payments to Bondholders—Priority of Payments," making payments on the New Bonds after the payment or retention, as applicable, of the other amounts required pursuant to such payment priority. The Final Scheduled Payment Date (as defined herein) on the New Bonds is August 20, 2040 (which date may be delayed, as described herein), and the Payment Dates are the Special First Payment Date and, thereafter, each February 20 and August 20 (each such date, a "Payment Date").

**Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).**

*The inside cover page contains additional information on the Final Scheduled Payment Date, interest rate and other information on the New Bonds.*

THE NEW BONDS ARE SPECIAL LIMITED OBLIGATIONS OF THE ISSUER AND ARE NOT INDEBTEDNESS OR LIABILITIES OF GDB, THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY ("AAFAF," BY ITS SPANISH ACRONYM), THE COMMONWEALTH OR ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER. THE NEW BONDS ARE NOT BACKED BY THE GOOD FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH NOR ARE THEY PAYABLE OR SECURED BY GDB, AAFAF OR ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER. THE NEW BONDS WILL REPRESENT INDEBTEDNESS SOLELY OF THE ISSUER AND WILL NOT BE PAYABLE OR GUARANTEED BY GDB, AAFAF, THE COMMONWEALTH, ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER, OR ANY OTHER PERSON OR ENTITY. THE NEW BONDS ARE SPECIAL LIMITED OBLIGATIONS OF THE ISSUER PAYABLE SOLELY FROM, SECURED SOLELY BY, AND HAVING RECOURSE SOLELY TO, THE RESTRUCTURING PROPERTY (AS DEFINED HEREIN); PROVIDED, THAT, IN LIMITED CIRCUMSTANCES, THE ISSUER, THE INDENTURE TRUSTEE AND THE BONDHOLDERS, AS APPLICABLE, MAY HAVE CERTAIN CLAIMS AGAINST GDB PURSUANT TO THE KEEPWELL AGREEMENT (AS DEFINED HEREIN). THE ISSUER DOES NOT HAVE ANY TAXING AUTHORITY.

**Investing in the New Bonds involves significant risks. Prior to making any decisions with respect to the New Bonds, you should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to analyze the terms and risks of the New Bonds. For additional information on certain of the risks relating to the New Bonds, see "*Risk Factors*" in this Offering Memorandum. Further, the U.S. federal income tax classification of the New Bonds and consequent tax treatment of their holders is uncertain. For a more complete discussion of this uncertainty and of the Issuer's intended tax reporting treatment of the New Bonds, see "*Certain U.S. Federal Income Tax Considerations*" in this Offering Memorandum.**

Certain legal matters will be passed upon for the Issuer by its U.S. counsel, King & Spalding LLP, and its Puerto Rico counsel, Cancio Covas & Santiago, LLP; for the Issuer and GDB by the Secretary of Justice of Puerto Rico; for GDB by its General Counsel; for GDB and AAFAF by their U.S. counsel, O'Melveny & Myers LLP, and their Puerto Rico counsel, Pietrantoni Méndez & Alvarez LLC; and for the Dealer Managers by their counsel, Squire Patton Boggs (US) LLP. However, due solely to litigation, it is not expected that a legal opinion with respect to the validity or enforceability of the New Bonds will be delivered. See "*Risk Factors—Risks Related to the New Bonds and the Keepwell Agreement—Certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from closing conditions and closing deliverables that are typically required in municipal debt offering transactions*" and "*Litigation*."

It is expected that the New Bonds will be available for delivery in book-entry-only form through the facilities of The Depository Trust Company on or about November 29, 2018.

*BofA Merrill Lynch*                                                                    *Barclays*

Dated: November 7, 2018

**MATURITY AND PRICING SCHEDULE**

| Final Scheduled Payment Date | Aggregate Principal Amount | Interest Rate | CUSIP[†] |
|---|---|---|---|
| August 20, 2040, as may be extended as described herein | $2,597,754,625 | 7.500% | 36829QAA3 |

[†] CUSIP® is a registered trademark of the American Bankers Association. CUSIP Global Services (CGS) is managed on behalf of the American Bankers Association by S&P Capital IQ. Copyright© 2017 CUSIP Global Services. All rights reserved. CUSIP® data herein is provided by CUSIP Global Services. This data is not intended to create a database and does not serve in any way as a substitute for the CGS database. CUSIP® numbers are provided for convenience of reference only. None of the Issuer, GDB, AAFAF, the Oversight Board, the Dealer Managers or their respective agents or counsel assume responsibility for the use or accuracy of such numbers.

## TABLE OF CONTENTS

IMPORTANT INFORMATION ...................................................................................................................3
WHERE YOU CAN FIND MORE INFORMATION
     AND INCORPORATION BY REFERENCE.....................................................................................4
CAUTIONARY STATEMENT CONCERNING
     FORWARD-LOOKING STATEMENTS AND HYPOTHETICAL SCENARIOS ...............................4
DISCLAIMERS.........................................................................................................................................5
SUMMARY................................................................................................................................................6
SUMMARY OF PARTIES TO THE TRANSACTION..................................................................................9
SUMMARY OF FLOW OF COLLECTIONS ON THE RESTRUCTURING PROPERTY............................10
SUMMARY OF DISTRIBUTIONS OF CASH FROM THE COLLECTION ACCOUNT ...............................11
SUMMARY OF TERMS OF NEW BONDS ..............................................................................................12
RISK FACTORS ......................................................................................................................................32
THE ISSUER ...........................................................................................................................................57
GDB ........................................................................................................................................................60
DESCRIPTION OF THE COMMONWEALTH AND ITS CURRENT FINANCIAL CONDITION ..................63
THE GDB RESTRUCTURING ACT ........................................................................................................70
USE OF PROCEEDS ..............................................................................................................................76
SERVICE PROVIDERS...........................................................................................................................77
MUNICIPALITIES....................................................................................................................................83
THE RESTRUCTURING PROPERTY .....................................................................................................100
THE KEEPWELL AGREEMENT .............................................................................................................138
DESCRIPTION OF THE NEW BONDS AND THE BOND INDENTURE ...................................................139
COLLECTIONS ON THE RESTRUCTURING PROPERTY AND CALCULATION OF AVAILABLE CASH ..........151
PAYMENTS TO BONDHOLDERS ..........................................................................................................154
TRANSFER AGREEMENT ......................................................................................................................155
SERVICING AGREEMENT......................................................................................................................158
CERTAIN PUERTO RICO TAX CONSIDERATIONS................................................................................167
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS.................................................................170
ERISA CONSIDERATIONS .....................................................................................................................179
INFORMATION CONCERNING OFFERING RESTRICTIONS IN CERTAIN JURISDICTIONS OUTSIDE THE
     UNITED STATES.............................................................................................................................181
LITIGATION.............................................................................................................................................183
CONTINUING DISCLOSURE ..................................................................................................................191
DEALER MANAGERS .............................................................................................................................194
LEGAL MATTERS ...................................................................................................................................194
MISCELLANEOUS ..................................................................................................................................195
APPENDIX A: INDEX OF DEFINED TERMS IN THIS OFFERING MEMORANDUM ................................196
APPENDIX B: THE TRANSFERRED PROPERTY....................................................................................203
APPENDIX C: GDB RETAINED LOANS .................................................................................................217
APPENDIX D: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS ..............................218
APPENDIX E: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS, THE ADDITIONAL
     RECOVERY AUTHORITY LOANS AND PROCEEDS FROM THE SALE OF REAL PROPERTY ASSETS ..............220
APPENDIX F: HYPOTHETICAL AMORTIZATION OF THE NEW BONDS ...............................................221
APPENDIX G: CONTINGENT AND UNLIQUIDATED CLAIMS.................................................................225

––––––––––––––––––

## IMPORTANT INFORMATION

You should read this entire Offering Memorandum in full before making any decisions with respect to the New Bonds.

You are solely responsible for making your own independent appraisal of all matters that you deem appropriate in evaluating the New Bonds. You should not construe the contents of this Offering Memorandum as investment, legal or tax advice. You should consult your own legal, financial and tax advisors regarding the characteristics and risks of the New Bonds.

The Issuer and GDB have reviewed the information contained in this Offering Memorandum and to the best of their knowledge, based upon information provided by and representations by GDB, the information contained in this Offering Memorandum is accurate and complete as of the date hereof. The information contained or incorporated by reference in this Offering Memorandum may only be accurate as of the date hereof or the dates of the documents incorporated by reference herein. The delivery of this Offering Memorandum will not, under any circumstances, create any implication that the information contained in this Offering Memorandum is current as of any time subsequent to the date of such information or that there has been no change in the information set out in it or in the affairs of the Issuer since the date of this Offering Memorandum. For additional discussion of risks related to the Issuer and the information contained herein, see "*Risk Factors—Risks Related to the Issuer.*"

No person has been authorized to give any information or to make any representation about the Issuer or the New Bonds not included in this Offering Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Issuer or any of its respective agents or affiliates.

―――――――――――

## WHERE YOU CAN FIND MORE INFORMATION
## AND INCORPORATION BY REFERENCE

The Issuer is "incorporating by reference" into this Offering Memorandum certain information it may file after the date hereof with the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA") system. This means that the Issuer is disclosing important information to you by referring you to these filings. The information that the Issuer incorporates by reference is considered to be part of this Offering Memorandum. Unless expressly stated herein, the Issuer does not incorporate by reference any other documents that the Issuer, GDB or AAFAF (as defined herein) has filed with EMMA prior to the date hereof. You should not rely on any such previously filed information, unless otherwise expressly incorporated herein.

Any statement contained in this Offering Memorandum or in a document (or part thereof) incorporated or considered to be incorporated by reference into this Offering Memorandum will be considered to be modified or superseded for purposes of this Offering Memorandum to the extent that a statement contained in any other subsequently filed document (or part thereof) that is or is considered to be incorporated by reference in this Offering Memorandum modifies or supersedes that statement. The modifying or superseding statement need not state that it has modified or superseded a prior statement or include any other information set forth in the document that it modifies or supersedes. Any statement so modified or superseded will not be considered, except as so modified or superseded, to constitute part of this Offering Memorandum.

Unless expressly stated herein, the information contained on each of the Issuer's, GDB's, AAFAF's and the Oversight Board's websites is not incorporated by reference into this Offering Memorandum and you should not consider such information to be part of this Offering Memorandum.

―――――――――――

## CAUTIONARY STATEMENT CONCERNING
## FORWARD-LOOKING STATEMENTS AND HYPOTHETICAL SCENARIOS

Certain statements contained in this Offering Memorandum and the documents incorporated by reference herein are not descriptions of historical facts, but instead are forecasts, hypotheticals and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Issuer, including those risks identified in "*Risk Factors*" in this Offering Memorandum. In this respect, the words "may," "will," "could," "continue," "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, hypothetical scenarios, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement; actual results may differ materially from those expressed or implied by forward-looking statements. The Issuer cannot assure you that any forward-looking statements will prove to be correct. The Issuer is under no obligation to (and expressly disclaims any obligation to) update or alter any forward-looking statements whether as a result of new information, future events or otherwise, except as required by law.

The hypothetical scenarios set forth in this Offering Memorandum were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. The hypothetical scenarios set forth in this Offering Memorandum have been provided by GDB, were prepared on a reasonable basis and reflect the best estimates and judgments as of the Cutoff Date (as defined herein); however, such hypothetical scenarios are based on a number of important assumptions and limitations and involve substantial uncertainty, including with respect to items outside of the Issuer's control. Such hypothetical scenarios have not been updated to reflect certain changes to the Restructuring Property, to the Issuer's anticipated expenses post-closing, and to the aggregate principal amount of New Bonds to be issued after the Cutoff Date, which

4

are described under "*The Restructuring Property*" and "*Litigation*" in this Offering Memorandum. However, GDB believes that the aggregate effect of such subsequent developments will not materially change such hypothetical scenario analysis. Furthermore, such prospective financial information is not fact and should not be relied upon as being indicative of future results, and you are cautioned not to place undue reliance on the prospective financial information. No independent auditors have compiled, examined or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. No independent auditors have been consulted in connection with the preparation of the prospective financial information set forth in this Offering Memorandum. For additional discussion of risks related to the Issuer and the information contained herein, see "*Risk Factors—Risks Related to the Issuer.*"

---

## DISCLAIMERS

This Offering Memorandum does not constitute an offer or an invitation to acquire the New Bonds in any jurisdiction in or from which, or to or from any person to or from whom, it is unlawful to make such offer or invitation under applicable securities laws. The distribution of this Offering Memorandum in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Memorandum comes are required to inform themselves about, and to observe, any such restrictions.

The Dealer Managers have provided the following sentence for inclusion in this Offering Memorandum: The Dealer Managers have reviewed the information in this Offering Memorandum in accordance with, and as part of, their responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Dealer Managers do not guarantee the accuracy or completeness of such information.

**The New Bonds, if and when issued, will not have been recommended by any federal or state securities commission or regulatory authority (including the Oversight Board and AAFAF). Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Offering Memorandum. Any representation to the contrary is a criminal offense.**

---

# SUMMARY

*The following information highlights selected information from this Offering Memorandum. It does not contain all of the information that may be important to a holder of the New Bonds. For a more complete understanding of the Issuer and the New Bonds, we urge you to read this entire Offering Memorandum carefully, including the sections entitled "Risk Factors," "Cautionary Statement Concerning Forward-Looking Statements and Hypothetical Scenarios" and "Where You Can Find More Information and Incorporation by Reference."*

## Overview

Upon the terms and subject to the conditions set forth in this Offering Memorandum (as may be supplemented and amended from time to time, this "Offering Memorandum"), the Issuer is offering the New Bonds.

The Issuer is a newly formed statutory public trust and governmental instrumentality of the Commonwealth created pursuant to the GDB Restructuring Act by the Legislative Assembly. On the date on which the Issuer issues the New Bonds (the "Closing Date"), which will be the soonest date reasonably practicable following entry of the District Court order approving the Qualifying Modification and satisfaction of the other conditions set forth in the Restructuring Support Agreement, and from time to time thereafter, GDB will transfer certain specified assets (collectively, the "Transferred Property") to the Issuer pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement (as defined herein). The New Bonds will be secured by a statutory lien on the Transferred Property and any assets, collections, fees, charges, proceeds, revenues, rents, insurance payments, income or other funds generated by, or received by the Issuer, the Servicer (as defined herein) or GDB in respect of the Transferred Property on or after the Cutoff Date (as defined herein), including in respect of the administration or reinvestment thereof (collectively, the "Collections" and, together with the Transferred Property, the "Restructuring Property"). On and after the Closing Date, the Issuer's assets are expected to consist solely of the Restructuring Property. For additional information on the Issuer and the Restructuring Property, see *The Issuer* and *The Restructuring Property*," respectively, in this Offering Memorandum.

The New Bonds have a 7.500% annual coupon rate, payable on the Special First Payment Date and, thereafter, on each February 20 and August 20 (in cash or in kind, as further explained below), and will be secured by a first priority statutory lien on the Restructuring Property. For each $1,000 of Participating Bond Claims (calculated, for the avoidance of doubt, as principal plus unpaid interest accrued up to, but not including, the Closing Date) exchanged in the Qualifying Modification, holders of such claims will receive New Bonds having a face amount equal to $550. Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).

**The New Bonds are special limited obligations of the Issuer and are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer.** The New Bonds will represent indebtedness solely of the Issuer and will not be payable or guaranteed by GDB, AAFAF, the Commonwealth, any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer, or any other person or entity.

The New Bonds are special limited obligations of the Issuer payable solely from, secured solely by, and having recourse solely to, the Restructuring Property; *provided* that, in limited circumstances, the Indenture Trustee and the Bondholders, as applicable, may have certain claims against GDB pursuant to the Keepwell Agreement. The Issuer does not have any taxing authority. For additional information on the terms and conditions of the New Bonds, see *Description of the New Bonds and the Bond Indenture*" in this Offering Memorandum.

The New Bonds are complex financial instruments and holding the New Bonds involves substantial risks. Prior to making any decisions with respect to the New Bonds, you should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to analyze the terms and risks of the New Bonds. For additional information on certain of the risks relating to the New Bonds, see *Risk Factors*" in this Offering Memorandum.

## The Issuer

The Issuer is a newly formed statutory public trust and governmental public instrumentality of the Commonwealth created by Article 201 of the GDB Restructuring Act. The Issuer is independent and separate from any other governmental instrumentality of the Commonwealth and is independently operated and governed by a Board of Trustees. The GDB Restructuring Act restricts the Issuer from engaging in activities other than those specifically prescribed therein.

The Issuer is not expected to own any assets or property other than the Restructuring Property. The New Bonds are special limited obligations of the Issuer payable solely from, secured solely by, and having recourse solely to, the Restructuring Property; *provided* that, in limited circumstances, the Indenture Trustee and the Bondholders, as applicable, may have certain claims against GDB pursuant to the Keepwell Agreement. For additional information on the Restructuring Property and the Keepwell Agreement, see "*The Restructuring Property*" and "*The Keepwell Agreement*" in this Offering Memorandum. The Issuer will have limited internal administrative support and will for the most part depend on third-party service providers to perform its functions. The Issuer is not expected to have any officers or employees other than the Executive Director, who will be a member of the Board of Trustees. All management of the Restructuring Property (including all day-to-day operations in respect thereof) will be conducted on behalf of the Issuer by the Servicer and other service providers pursuant to contractual arrangements, herein described. See "*Service Providers*" in this Offering Memorandum.

Each New Bond will represent a special limited obligation of the Issuer. The New Bonds are the only securities being offered hereby. The Issuer may not issue securities other than the New Bonds. Except for the New Bonds and the obligations to pay certain costs in connection with the restructuring of GDB, the Issuer is prohibited from incurring indebtedness or making Loans (as defined herein) to any other person, although the Issuer may incur expenses after the Closing Date as contemplated herein.

For additional information on the Issuer, see "*The Issuer*" in this Offering Memorandum.

### The Servicer

The Servicer will be engaged to act as the servicer of the Restructuring Property and will manage the Restructuring Property pursuant to the Servicing Agreement. For additional information on the Servicer and the Servicing Agreement, see "*Service Providers—The Servicer*" and "*Servicing Agreement*," respectively, in this Offering Memorandum.

### The Solicitation and Approval

On August 9, 2018, GDB and AAFAF used the Solicitation Statement to commence the solicitation of votes (the "Solicitation") seeking creditor approval of the Qualifying Modification under Title VI of PROMESA. In September 2018, the Solicitation was concluded with (i) Eligible Voters (as defined in the Solicitation Statement) holding over 50% of the outstanding principal amount of outstanding Participating Bonds (as defined in the Solicitation Statement) in each Pool (as defined in the Solicitation Statement) voting to approve the Qualifying Modification; and (ii) Eligible Voters holding over 66 2/3% of the outstanding principal amount of outstanding Participating Bonds in each Pool that voted in the Solicitation voting to approve the Qualifying Modification.

Epiq Corporate Restructuring, as Calculation Agent for the Solicitation, reported that for the GDB Bond Claims Pool (as defined in the Solicitation Statement), over 74.8% of the aggregate principal amount of Participating Bond Claims in the GDB Bond Claims Pool voted and, of those that voted in such pool, over 94.7% of the Participating Bond Claims voted to approve the Qualifying Modification, reflecting over 72.9% of the aggregate principal amount. For the Guaranteed Bond Claims Pool (as defined in the Solicitation Statement), 100% of the aggregate principal amount of the Participating Bond Claims in such pool voted to approve the Qualifying Modification.

On November 6, 2018, the United States District Court for the District of Puerto Rico held the hearing to consider the Approval Application (as defined herein) and, after considering all arguments, filings, and evidence regarding approval of the Qualifying Modification, approved the Qualifying Modification on the record, and entered the order approving the Qualifying Modification on November 7, 2018.

For more information, see *"GDB"* in this Offering Memorandum.

### The Qualifying Modification and Mutual Releases

The Qualifying Modification will result in the organized restructuring of certain portions of GDB's indebtedness pursuant to the creditor collective action procedures set forth in Title VI of PROMESA. Specifically, upon the consummation of the Qualifying Modification, all of the Participating Bond Claims will be mandatorily exchanged for the New Bonds, and GDB will transfer the Transferred Property (as defined herein) to the Issuer and enter into a keepwell agreement with the Issuer and the Indenture Trustee, to be dated as of the Closing Date (the "Keepwell Agreement"), in consideration for the Issuer's issuance of the New Bonds and the resulting cancellation of the Participating Bond Claims. Upon exchange of Participating Bond Claims for New Bonds, and GDB's, the Issuer's and the Indenture Trustee's execution of the Keepwell Agreement (as described herein), all Participating Bond Claims will be extinguished and cancelled and holders of such Participating Bond Claims will immediately and forever cease to have any rights, interests or claims against GDB or any of its assets, or any successors or assigns thereof in respect of such Participating Bond Claims, other than as set forth in the Keepwell Agreement.

The Qualifying Modification provides for the Mutual Releases that are part of the overall settlement of claims by and among GDB and the holders of the Participating Bond Claims. GDB, the Issuer, holders of Participating Bond Claims who vote in favor of the Qualifying Modification and those who vote to reject the Qualifying Modification or do not vote and, in either case, do not mark the Ballot to indicate their desire not to participate in the Mutual Releases, and certain other parties will each be deemed to have released each other from all Claims (as defined herein), Causes of Action (as defined herein) and liabilities. Notwithstanding anything to the contrary, the Mutual Releases will not release (i) any Claim in respect of any obligation of any party under the Qualifying Modification or any document, instrument or agreement executed to implement the terms of the Qualifying Modification, including, but not limited to, the Restructuring Support Agreement, the Transfer Agreement, the New Bonds and the Bond Indenture, and any obligation of GDB in connection with the transfer of the Transferred Property to the Issuer, (ii) any Claim of GDB or the Issuer in respect of the enforcement of any asset constituting Restructuring Property or a GDB Retained Loan, including, but not limited to, in connection with the performance or repayment of any Loan owed to GDB or the Issuer including, without limitation, the Loans listed on Appendices B and C to this Offering Memorandum, (iii) any Claim in respect of any obligation of any party under the Keepwell Agreement, (iv) any Claim of a holder of a Participating Bond Claim against the Indenture Trustee under the Bond Indenture or (v) any Claim of the Indenture Trustee against the Issuer or the holders of Participating Bond Claims. In addition, any holder of Participating Bond Claims that, after the Voting Deadline, takes any action to object to, interfere with, delay or impede consummation of, the Qualifying Modification (before or after the District Court enters an order with respect to the Qualifying Modification) will not receive a release from, or to the extent the Closing Date has occurred such release will be revoked by, GDB or any other Release Party (as defined herein) pursuant to the Mutual Releases regardless of whether such party grants a release hereunder.

The Mutual Releases operate in addition to any claims barred by operation of law under Section 601(m)(2) of PROMESA, which provides that, upon entry of a District Court order approving the Qualifying Modification, the Qualifying Modification shall be valid and binding on any person or entity asserting claims or other rights in respect of the Bonds (as defined herein) subject to the Qualifying Modification. The Qualifying Modification may have broad implications for claims in respect of holders' Participating Bond Claims. Holders should consult with their legal and other advisors in respect of any such claims that may be affected thereby, including by operation of Section 601(m)(2) of PROMESA.

### Risk Factors

The New Bonds are complex financial instruments and holding the New Bonds involves substantial risks. These risks include, among other things, risks related to the fact that the Issuer has no on-going business and limited assets (*i.e.*, the Restructuring Property) from which payments on the New Bonds can be derived and that there is material ongoing litigation relating to the Qualifying Modification (as defined herein), the Issuer and the New Bonds, any of which may have a material adverse impact on the Issuer's ability to pay interest in cash as it comes due and make principal payments on the New Bonds. As further described herein, because principal and interest due on the New Bonds are expected to exceed the amounts that are anticipated to be collected on the Restructuring Property, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). Prior to making any decisions with respect to the New Bonds, you should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to analyze the terms and risks of the New Bonds. See *"Risk Factors"* in this Offering Memorandum and the accompanying disclosure herein for a discussion of these and certain other factors that you should consider before making any decisions with respect to the New Bonds.

## SUMMARY OF PARTIES TO THE TRANSACTION

This chart provides only a simplified overview of the relationships between the key parties to the transaction. For additional information, see the more detailed descriptions found in this Offering Memorandum.



---

1. The Issuer is a newly formed statutory public trust and governmental instrumentality of the Commonwealth created pursuant to the GDB Restructuring Act. For additional information on the Issuer, see "*The Issuer*" in this Offering Memorandum.

2. On the Closing Date, the New Bonds will be issued by the Issuer to holders of Participating Bond Claims in exchange for such Participating Bond Claims and the Participating Bond Claims will be concurrently cancelled. For additional information on the Participating Bond Claims, see "*The GDB Restructuring Act*" in this Offering Memorandum.

3. On the Closing Date, and from time to time thereafter in accordance with the Transaction Documents, GDB will transfer the Transferred Property to the Issuer, pursuant to the GDB Restructuring Act and the Qualifying Modification. For additional information on the Transferred Property, see "*The Restructuring Property*" and "*Appendix B: The Transferred Property*" in this Offering Memorandum. Pursuant to the Qualifying Modification, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on the GDB Retained Loans (subject to the limitations described herein) and (b) provide the Issuer, the Servicer, and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such Loans. For additional information on the GDB Retained Loans and GDB's duties in respect thereof, see "*The Restructuring Property*" in this Offering Memorandum.

4. Concurrently with the exchange of the Participating Bond Claims for the New Bonds and the transfer of the Transferred Property to the Issuer, GDB will enter into the Keepwell Agreement with the Issuer and the Indenture Trustee, which will provide that if any Restructuring Property is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such Restructuring Property to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Transaction Documents. Furthermore, under the Keepwell Agreement, GDB will indemnify and hold the Bondholders harmless from and against all damages and losses suffered or incurred by the Bondholders as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee and the Bondholders in respect of the Restructuring Property or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms, subject to certain limitations described herein. For additional information on the Keepwell Agreement, see "*The Keepwell Agreement*" in this Offering Memorandum.

5. The Issuer is independent and separate from any other governmental instrumentality of the Commonwealth and is independently operated and governed by the Board of Trustees, the members of which are appointed as described herein. For additional information on the Board of Trustees, see "*The Issuer—Board of Trustees*" in this Offering Memorandum.

6. The Servicer will act as servicer for the Restructuring Property pursuant to the Servicing Agreement. The Servicer will handle all Collections, administer defaults, delinquencies and adjustments and otherwise manage the Restructuring Property. The Servicer, as described below, will also have responsibility for preparing certain reports for the Bondholders. For additional information on the Servicer and the Servicing Agreement, see "*Service Providers—The Servicer*" and "*Servicing Agreement,*" respectively, in this Offering Memorandum.

7. The Indenture Trustee will serve as trustee of the New Bonds pursuant to the Bond Indenture, which provides for the terms and conditions of the New Bonds. For additional information on the Indenture Trustee and the Bond Indenture, see "*Service Providers—The Indenture Trustee*" and "*Description of the New Bonds and the Bond Indenture*" in this Offering Memorandum.

8. The Indenture Trustee will engage the Collateral Monitor to, among other things, monitor the activities of the Servicer and the condition and performance of the Restructuring Property and deliver a semi-annual report to the Bondholders, the Issuer and the Servicer. For additional information on the Collateral Monitor, see "*Service Providers—The Collateral Monitor*" in this Offering Memorandum.

**SUMMARY OF FLOW OF COLLECTIONS ON THE RESTRUCTURING PROPERTY**

This chart provides only a simplified overview of the flow of Collections on the Restructuring Property. For additional information, see "*Collections on the Restructuring Property and Calculation of Available Cash*" in this Offering Memorandum.



_____

1. For example, with respect to the General Municipal Obligations (as defined herein), property taxes that are used to pay these Loans (as defined herein) are collected by CRIM (as defined herein) (or the municipal obligors on the General Municipal Obligations, which then deposit such tax revenues with CRIM), and then deposited by CRIM into the GO Redemption Fund (as defined herein) held at Banco Popular de Puerto Rico, before being paid to the Servicer in satisfaction of the relevant General Municipal Obligation on each payment date for such Loans. For additional information on the General Municipal Obligations, see "*The Restructuring Property—Detailed Description of the Restructuring Property—Municipal General Obligations*" in this Offering Memorandum.

**SUMMARY OF DISTRIBUTIONS OF CASH FROM THE COLLECTION ACCOUNT**

  This chart provides only a simplified overview of the distributions to be made from the Collection Account. For additional information, see "*Payments to Bondholders*" in this Offering Memorandum.



**CASH IN THE COLLECTION ACCOUNT**
(Collections on the Restructuring Property and interest thereon)

1ST

**HOLDBACK FOR FEES AND EXPENSES RESERVE**
(on each Payment Date, an amount equal to the amount of cash reasonably expected to be required to pay all Issuer Expenses (as defined herein) that are capable of estimation (which will not include, for the avoidance of doubt, amounts owed in respect of the New Bonds and Servicing Fee and Collateral Monitor Fee determined on the basis of cash Collections) through the next Determination Date (as defined herein) based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees (such amount, the "Fees and Expenses Reserve") will be retained in the Collection Account)

2ND

**THIRD-PARTY FEES AND EXPENSES**
(on each Payment Date or otherwise as such amounts become due, make payments to each of the Servicer, the Indenture Trustee and the Collateral Monitor, of the respective amount of any fees, expenses and indemnification amounts due to it, and to the Issuer or other applicable third party, the amount of any other due and payable Issuer Expenses, including Reimbursable Servicer Expenses (as defined herein), subject, as applicable, to the Issuer Operating Expenses Cap (as defined herein) and other applicable restrictions on Issuer Expenses described herein; *provided*, for the avoidance of doubt, that the payment of all Issuer Expenses validly incurred and payable from the Collection Account pursuant to the terms of the Transaction Documents as described herein will be paid prior to the calculation of Available Cash, notwithstanding any shortfall in the Fees and Expenses Reserve for the applicable semi-annual period)

**AVAILABLE CASH**

3RD

**BONDHOLDERS**
(on each Payment Date, accrued and unpaid cash interest on the New Bonds with respect to such Payment Date)

4TH

**BONDHOLDERS**
(on each Payment Date, outstanding principal amount)

11

## SUMMARY OF TERMS OF NEW BONDS

*The following information highlights selected information from this Offering Memorandum and provides a general overview of the terms and conditions of the New Bonds. To understand all of the terms and conditions of the New Bonds, you should carefully read this entire Offering Memorandum, including any documents incorporated by reference herein, and consult with your legal, financial and tax advisors before making any decisions with respect to the New Bonds.*

**Parties**

| | |
|---|---|
| **Issuer** | GDB Debt Recovery Authority (the "Issuer"), a newly formed statutory public trust and governmental instrumentality of the Commonwealth created pursuant to the GDB Restructuring Act. |
| **GDB** | Government Development Bank for Puerto Rico ("GDB"). |
| **Servicer** | AmeriNational Community Services, LLC ("AmeriNat") or its successor, as may be appointed from time to time (the "Servicer").<br><br>The Servicer will manage the Restructuring Property. The Servicer will handle all Collections, administer defaults, delinquencies and adjustments and otherwise manage the Restructuring Property. The Servicer will manage the Restructuring Property until the Servicing Agreement is terminated pursuant to the Servicer's resignation or removal or otherwise, as further described in "*Servicing Agreement—Termination*" and "*Servicing Agreement—Removal of Servicer*" in this Offering Memorandum. |
| **Indenture Trustee** | Wilmington Trust, N.A., a national banking association (the "Indenture Trustee"). |
| **Collateral Monitor** | Cantor-Katz Collateral Monitor LLC ("Cantor-Katz"), a Delaware limited liability company, or its successor, as may be appointed from time to time (the "Collateral Monitor").<br><br>The Collateral Monitor will be responsible for, among other things, monitoring the activities of the Servicer and the condition and performance of the Restructuring Property and preparing and delivering (via the Indenture Trustee) a semi-annual report to the Indenture Trustee, for dissemination to the Bondholders, the Issuer and the Servicer. |
| **The New Bonds** | 7.500% GDB Debt Recovery Authority Bonds (Taxable) due 2040. |
| **Amortization of the New Bonds** | The Issuer's ability to pay interest on the New Bonds in cash and make principal payments on the New Bonds is entirely dependent upon Collections on the Restructuring Property. Based on current projections and as further described in "*Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations*" and "*Payments to Bondholders—Hypothetical Amortization of the New Bonds*" in this Offering Memorandum, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). **In addition, and as further described herein, the Collections on the Restructuring Property may be materially and adversely affected by events and circumstances outside of the Issuer's control, which may result in actual Collections on the Restructuring Property being materially less than those reflected in the Collection Schedule included herein.** For additional information regarding the assumptions underlying the Collection Schedule, see "*Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations*" and "*Payments to Bondholders—Hypothetical Amortization of the New Bonds*" in this Offering Memorandum. |

| | |
|---|---|
| **Additional Bonds** | After the Closing Date, in addition to the New Bonds offered pursuant to this Offering Memorandum, the Issuer may be required, pursuant to the terms of the Qualifying Modification and consistent with the terms of the Bond Indenture, to authorize from time to time the issuance of additional New Bonds (the "Additional Bonds") under the Bond Indenture in respect of certain contingent claims against GDB that are described in Appendix G. For a description of the contingent claims, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" and "*Appendix G: Contingent and Unliquidated Claims*" attached to this Offering Memorandum. |
| | From time to time after the Closing Date, solely upon receipt of instructions from GDB or AAFAF, the Issuer will authorize such Additional Bonds in the amount(s) specified by GDB or AAFAF, as applicable, and will execute and deliver such Additional Bonds in accordance with such instructions from GDB or AAFAF. |
| | The Additional Bonds and the previously issued New Bonds will be part of the same series under the Bond Indenture and the Additional Bonds will be issued in the same form as the previously issued New Bonds; provided, however, if the Additional Bonds are not fungible with the previously issued New Bonds for U.S. federal income tax purposes, such Additional Bonds will be issued with a different CUSIP number from the previously issued New Bonds. |
| | For additional information regarding the Additional Bonds, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" in this Offering Memorandum. |

**Key Documents**

| | |
|---|---|
| **Bond Indenture** | The bond indenture, dated as of the Closing Date, as amended or supplemented (the "Bond Indenture"), entered into by and between the Issuer and the Indenture Trustee, will provide the terms and conditions of the New Bonds. |
| | For additional information on the Bond Indenture, see "*Description of the New Bonds and the Bond Indenture*" in this Offering Memorandum. |
| **GDB Restructuring Act** | Act No. 109 of August 24, 2017, as amended by Act No. 147 of July 18, 2018, known as the "Government Development Bank for Puerto Rico Debt Restructuring Act" (the "GDB Restructuring Act"). |
| | For additional information on the GDB Restructuring Act, see "*The GDB Restructuring Act*" in this Offering Memorandum. |
| **Transfer Agreement** | The transfer agreement entered into by and between the Issuer and GDB (the "Transfer Agreement"), will document the transfer of the Transferred Property by GDB to the Issuer, pursuant to the GDB Restructuring Act and the Qualifying Modification. |
| | For additional information on the Transfer Agreement, see "*Transfer Agreement*" in this Offering Memorandum. |
| **Servicing Agreement** | The servicing agreement entered into by and between the Issuer and the Servicer (the "Servicing Agreement"), will govern the Servicer's management of the Restructuring Property and Collections with respect thereto. |
| | For additional information on the Servicing Agreement, see "*Servicing Agreement*" in this Offering Memorandum. |
| **Collateral Monitor Agreement** | The Collateral Monitor Agreement (as defined herein) will be entered into by the Indenture Trustee, on behalf of the Bondholders, and the Collateral Monitor. The Collateral Monitor Agreement will govern the duties and rights of the Collateral Monitor with respect to its monitoring, consultation, reporting and other duties. The Issuer will enter into a fee letter with the Collateral Monitor (the "Collateral Monitor Fee Letter") under which the Issuer will agree to pay to the Collateral Monitor from amounts in the Collection Account the fees, expenses, indemnification and other amounts owed to the Collateral Monitor under the Collateral Monitor Agreement. |

| | |
|---|---|
| **Transaction Documents** | The Bond Indenture, the New Bonds, the Transfer Agreement, the Servicing Agreement, the Keepwell Agreement, the Disclosure Agreement (as defined herein), the Collateral Monitor Agreement, the Collateral Monitor Fee Letter and any other agreement or instrument entered into by the Issuer or GDB to secure the obligations of the Issuer or GDB under any of the foregoing are collectively referred to herein as the "Transaction Documents." |

**Relevant Dates**

| | |
|---|---|
| **Closing Date** | November 29, 2018 (the "Closing Date"). |
| **Cutoff Date** | July 1, 2018 (the "Cutoff Date"). The Issuer will be entitled to all Collections on, including all proceeds, interest and any other distribution or payment in respect of, the Restructuring Property received by or on behalf of GDB on or after the Cutoff Date. |
| **Date of Statistical Data** | Unless otherwise indicated, the data concerning the Transferred Property in this Offering Memorandum is based on the Transferred Property as of the Cutoff Date. |
| **Collection Period** | The period commencing on the first day of the calendar month that is six calendar months preceding each Payment Date and ending on the last day of the calendar month immediately preceding each Payment Date (or, in the case of the first Collection Period, from and including the Closing Date and ending on the last day of the calendar month immediately preceding the first Payment Date following the Special First Payment Date) (the "Collection Period"). |
| **Determination Dates** | The Business Day immediately preceding each Payment Date (each, a "Determination Date"). |
| **Payment Dates** | The Special First Payment Date (as defined herein) and, thereafter, each February 20 and August 20 (each such date, a "Payment Date"), provided that if any such Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay. |
| | A "Business Day" is any day except: |
| | ▪ a Saturday or Sunday; or |
| | ▪ a day on which banks in New York, New York, or San Juan, Puerto Rico, are authorized by law, regulation or governmental order to remain closed. |
| **Special First Payment Date** | On the Closing Date, or as soon thereafter as reasonably practicable (the "Special First Payment Date"), the Issuer will apply all Cash Assets received from GDB on the Closing Date in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments*," to make payments on the New Bonds after the payment or retention, as applicable, of the other amounts required pursuant to such payment priority. |
| **Final Scheduled Payment Date** | The final scheduled payment date for the New Bonds is August 20, 2040 (such date, or thereafter as such date may be delayed by vote of the Bondholders pursuant to the procedure described in the paragraph below, the "Final Scheduled Payment Date"). **Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).** For additional information, see "*—The New Bonds—Amortization of the New Bonds*" above. |
| | If the Issuer fails to pay all outstanding amounts on the New Bonds on or prior to the Final Scheduled Payment Date, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. For additional information regarding the treatment of the New Bonds and the Restructuring Property at and after the Final Scheduled Payment Date, including if the aggregate |

principal amount of the New Bonds has not been repaid in full on or before such date, see "—*Liquidation of the Restructuring Property*" and "—*Bond Indenture Events of Default*" below.

| | |
|---|---|
| **Payment Record Date** | See "—*Registration of the New Bonds*" below. So long as the New Bonds are in book-entry form, the Issuer will make payments on the New Bonds to the related holders of record on the day immediately preceding the related Payment Date (the "Payment Record Date"); *provided* that if the New Bonds are issued in definitive form, the Payment Record Date will be the last day of the calendar month preceding the month during which the related Payment Date occurs and *provided, further*, that the Payment Record Date with respect to the Special First Payment Date will be the Closing Date or as soon thereafter as reasonably practicable. |
| **Suspension of Trade Settlements** | To facilitate the exchange of Participating Bond Claims for the New Bonds and the payment of the Special First Payment, the settlement of trades in Participating Bond Claims are expected to be suspended by DTC (as defined herein) just prior to the mandatory exchange of Participating Bond Claims for New Bonds, in accordance with DTC's customary procedures, and the settlement of trades in New Bonds will be suspended from such date until the Special First Payment has been processed by DTC, which is expected to occur on the second business day after the Closing Date or as soon as practicable thereafter. Holders of Participating Bond Claims who wish to settle trades of Participating Bond Claims or the New Bonds during such period should consult their advisors to prevent a failed settlement. |
| **Registration of the New Bonds** | Interests in the New Bonds will generally be held through The Depository Trust Company ("DTC") in the United States or Clearstream Banking, S.A. ("Clearstream Banking") or Euroclear Bank SA/NV ("Euroclear") as operator for the Euroclear System. This is referred to as book-entry form. Bondholders will not receive a definitive bond, except under limited circumstances.

For additional information, see "*Description of the New Bonds and the Bond Indenture—Book-Entry Registration*" and "*Description of the New Bonds and the Bond Indenture—Definitive Bonds*" in this Offering Memorandum. |

**Structural Summary**

| | |
|---|---|
| **The Transferred Property and Related Data** | The Transferred Property will be transferred by GDB to the Issuer on the Closing Date, and from time to time thereafter, pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. The Issuer's only source of funds to make payments on the New Bonds will be the Restructuring Property, which initially will consist solely of the Transferred Property.

The Transferred Property will include all of GDB's legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the following: |

- various types of Loans (as defined herein) made by GDB to Commonwealth municipalities (collectively, the "Municipal Loan Assets");

- several Loans made by GDB to the Commonwealth that benefit from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Loan Assets");

- a bond issued by the Port of the Americas Authority (the "PAA") to GDB that is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Guaranteed Loan Asset");

- Loans made by GDB to various public corporations and instrumentalities of the Commonwealth (the "Public Corporation Loan Assets");

- (i) rights associated with a reverse repurchase agreement (the "Repurchase Agreement") by and between the Puerto Rico Housing Finance Authority ("HFA") and GDB and (ii) certain Loans to non-government entities (the "Private Loans" and, collectively with the Repurchase Agreement, the "Other Loan Assets");

- the Beneficial Interest (as defined herein) in, and the proceeds of (such Beneficial Interest and proceeds, the "GDB Retained Loan Rights"), certain specified public entity Loans (the "GDB Retained Loans"), including the Additional Recovery Authority Loans (as defined herein), that will be retained and continue to be serviced by GDB pursuant to, and on the terms set forth in, the Qualifying Modification;

- upon the date on which GDB is required, or chooses at its option, to transfer any GDB Retained Loan, such GDB Retained Loan transferred or to be transferred;

- certain real property in Puerto Rico (the "Real Property Assets");

- all cash and cash equivalents of GDB as of the Closing Date in excess of (a) the Cash Adjustments (as defined herein) required to pay the permitted uses for which such Cash Adjustments are reserved and (b) $10 million in Excess Reserved Cash, which shall be used to satisfy an obligation of GDB under the Stipulation Resolving the Objections of the Official Committee of Unsecured Creditors of all Title III Debtors (Other than COFINA) to the Approval Application, The Government Development Bank for Puerto Rico, Case No. 18-CV-1561-LTS (D. P.R. Oct. 9, 2018) ECF No. 18 (the "Committee Settlement Stipulation") as described herein (such cash and cash equivalents in excess of (a) and (b) being the "Cash Assets"). As used herein, "Cash Adjustments," means the cash and cash adjustments to be retained by GDB on the Closing Date in the aggregate amount of: (i) the Specified Cash Assets, (ii) cash in the amount of $57.3 million to be used to pay any transaction costs of the Qualifying Modification, including professional fees and expenses of GDB, AAFAF and the professionals to be paid pursuant to the Restructuring Support Agreement, (iii) the 2015-17 Excess CAE Settlement Amount, (iv) the Committee Fixed Settlement Amount of $20 million cash (for further information regarding the Committee Settlement Stipulation, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), and (v) cash in the amount of $7 million to be distributed to Siemens Transportation Partnership Puerto Rico, S.E. in satisfaction of GDB's obligations under the Siemens Settlement  (for further information regarding the Siemens Settlement, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Siemens Transportation Partnership Puerto Rico, S.E.*");

- (i) the Beneficial Interest in all causes of action of GDB, including contingent or unknown causes of action (other than any causes of action to enforce assets that constitute Transferred Property and the Excluded Causes of Action (as defined herein) (such causes of action, the "Retained Causes of Action") and (ii) the Litigation Proceeds (as defined herein and subject to the limitations set forth herein) (the Transferred Property described in (i) and (ii) are referred to collectively herein as the "Causes of Action Rights");

- all other assets of GDB that are in existence at any point from the Cutoff Date up to and including the Closing Date (whether or not identified as of the Cutoff Date) that do not constitute Excluded GDB Assets (as defined herein) and are not otherwise identified as Transferred Property (the "Unknown Assets"); and

- all Collections in respect of the foregoing, from and after the Cutoff Date.

"Beneficial Interest" means, with respect to any asset or cause of action, the beneficial interest therein, and the right to receive the proceeds (net of expenses associated with realizing such proceeds) thereof, in each case, after giving effect to the rights of GDB as set forth herein; *provided* that GDB will have no duty to pursue any cause of action on account of a beneficial interest therein and will have the absolute discretion to settle, offset against claims of GDB, or release such cause of action.

All Transferred Property in existence on the Closing Date will be irrevocably assigned and transferred to the Issuer on the Closing Date; *provided* that GDB will take any necessary steps to complete the transfer of any Unknown Assets and any otherwise unidentifiable assets within fifteen days after the discovery or identification thereof. Any proceeds in respect of the GDB Retained

Loans will be transferred to the Issuer within fifteen days after the receipt thereof. GDB will retain all proceeds of the Causes of Action ("Litigation Proceeds") and shall be authorized to use such proceeds (net of any expenses associated with realization of such proceeds) solely to (a) satisfy or resolve any contingent and unliquidated claims against GDB arising on or before the Closing Date (other than those resolved pursuant to the Qualifying Modification or the GDB Restructuring Act) and (b) comply with certain of its obligations under the Committee Settlement Stipulation as described herein (see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"). Upon GDB's sole determination that all such contingent and unliquidated claims and all such obligations under the Committee Settlement Stipulation have been satisfied or resolved, GDB shall transfer to the Issuer the remaining Litigation Proceeds in GDB's possession or control at such time and all Litigation Proceeds received by GDB thereafter within fifteen days after the receipt thereof. For the avoidance of doubt (i) the retention of the Retained Causes of Action by GDB will not affect any rights or defenses of GDB or any third parties with respect to such Retained Causes of Actions; and (ii) none of the Transferred Property (other than the Litigation Proceeds), the GDB Retained Loans, the Cash Adjustments or the proceeds of any of the foregoing shall be used to satisfy or resolve any such contingent and unliquidated claims against GDB.

Each Additional Recovery Authority Loan will be transferred to the Issuer no later than the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such Loan and (b) 18 months after the Closing Date. Each other GDB Retained Loan may be transferred to the Issuer at any time at GDB's discretion.

Unless otherwise indicated, the data concerning the Transferred Property presented throughout this Offering Memorandum is based on unaudited information of GDB about the assets to be included in the Transferred Property as of the Cutoff Date. The Issuer makes no representation as to the amount or value of the Transferred Property, the status of the obligors on such Transferred Property or as to any information contained herein regarding the projected Collections on such Transferred Property.

The following table shows the allocation of the Transferred Property among such classes of assets as of the Cutoff Date based on information provided by GDB (in the case of Loans, the allocation reflects the Closing Date Adjustments and considers payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date) (for information as of the date hereof regarding the Transferred Property, see "*The Restructuring Property—Summary Characteristics of the Restructuring Property*"):

<b>Allocation of the Transferred Property</b>

| Asset Class | Balance (in millions) [1] | % of Transferred Property |
|---|---|---|
| Municipal Loan Assets[2] | $1,244.5 | 20.8% |
| Commonwealth Loan Assets[2] | $169.4 | 2.8% |
| Commonwealth Guaranteed Loan Asset[2] | $225.5 | 3.8% |
| Public Corporation Loan Assets[2] | $2,670.8 | 44.6% |
| GDB Retained Loans[3] | $1,131.8 | 18.9% |
| Real Property Assets[4] | $37.5 | 0.6% |
| Other Loan Assets[2] | $20.1 | 0.3% |
| Cash Assets[5] | $488.3 | 8.2% |
| Causes of Action Rights | N/A[6] | N/A[6] |
| Unknown Assets | N/A[7] | N/A[7] |
| Total | $5,988.0 | 100% |

(1) Balance shown does not include accrued and unpaid interest.

(2) Reflects the aggregate outstanding principal balance as of the Cutoff Date, net of the Closing Date Adjustments (if applicable) and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date.

(3) Reflects the aggregate outstanding principal balance as of the Cutoff Date of the GDB Retained Loans, although the Transferred Property includes the GDB Retained Loan Rights, rather than the GDB Retained Loans themselves.

(4) Reflects the aggregate book value of the Real Property Assets as of December 31, 2017.

(5) Reflects the amount of cash and cash equivalents held by GDB as of the Cutoff Date (adjusted for debt service payments received by GDB on July 2, 2018), net of the Cash Adjustments (as estimated at the time of the launch of the Solicitation). The amount of the Cash Adjustments has varied since then as a result of, among other things, increased transaction expenses and expenses related to the settlement of litigation (including the Committee Settlement Stipulation and the Siemens Settlement).

(6) The value of Causes of Action Rights cannot be determined.

(7) The value of Unknown Assets cannot be determined.

Source: GDB

After the Cutoff Date, GDB sold four of the Real Property Assets that were previously contemplated would be transferred to the Issuer on the Closing Date. The book value of the remaining Real Property Assets is approximately $17.8 million. Moreover, GDB's cash has also varied since the Cutoff Date as a result of GDB's operational expenses, cash received by GDB from the repayment of Loans and the sale of Real Property Assets, among other factors. The Cash Assets expected to be transferred to the Issuer on the Closing Date amount to approximately $493.4 million.

As of the Cutoff Date, the Municipal Loan Assets, which are expected to provide the majority of the Collections generated by the Restructuring Property, had the following characteristics:

| General Characteristics Municipal Loan Assets | |
|---|---|
| Aggregate Outstanding Principal Balance | $1,244.5 million |
| Range of Principal Balances | $557–$64.3 million |
| Weighted Average Effective APR[1] | 5.46% |
| Range of Effective APRs[2] | 2.34%–7.75% |
| Weighted Average Maturity Date[3] | July 1, 2032 |
| Range of Maturity Date[4] | January 1, 2019–July 1, 2040 |

[1] Weighted by principal balance as of the Cutoff Date. Most of the Municipal Loan Assets bear interest at variable rates, based on the three-month London Interbank Offered Rate ("LIBOR") or the U.S. Prime Rate (the "Prime Rate") plus a spread, subject to a legal interest rate limit of 12%. Certain of the Municipal Loan Assets are also subject to an interest rate floor (ranging from 2.3% to 7.0%).

[2] Excludes three Loans with an aggregate principal balance of approximately $1.19 million, each of which has a 0% stated interest rate.

[3] Weighted by principal balance as of the Cutoff Date. Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

[4] Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

Source: GDB

The table below presents the aggregate outstanding principal balance of Loans in each category and subcategory of Restructuring Property assets that were current two business days after the Cutoff Date (i.e., the day after the July 1, 2018 payments were due by virtue of rollover to the next business day from the Cutoff Date) and those that, as of such date, were past due by the number of days specified in each column below. Furthermore, the table also illustrates the outstanding principal balance of the Loans in each category and subcategory of the Restructuring Property that were classified by GDB as performing and non-performing as of such date.

| Loan Delinquency Statistics[1] | |
|---|---|
| Performing | Non-Performing |

| Category | Current | 1–29 days past due | 30–89 days past due | 90–179 days past due | > 180 days past due | Total Outstanding Principal Balance |
|---|---|---|---|---|---|---|
| Municipal Loan Assets ..... | | | | | | |
| *Municipal General Obligations* ............ | $768,628,411 | - | - | - | - | $768,628,411 |
| *Sales Tax Obligations* | 308,409,058 | $5,206,271 | - | - | - | 313,615,329 |
| *Operational Loans* ..... | 77,112,314 | - | - | - | - | 77,112,314 |
| *Revenue Loans* .......... | - | 49,692,375 | - | - | - | 49,692,375 |
| *Municipal Lines of Credit* ................... | - | - | - | - | $ 35,473,554 | 35,473,554 |
| Commonwealth Loan Assets ........................... | - | - | - | - | 169,438,038 | 169,438,038 |
| Commonwealth Guaranteed Loan Asset..... | - | - | - | - | 225,533,700 | 225,533,700 |
| Public Corporation Loan Assets ............................ | - | - | - | - | 2,670,798,011 | 2,670,798,011 |
| Private Loans.................. | 131,918 | - | - | - | 339,948 | 471,866 |
| GDB Retained Loans........ | 117,769,180 | - | - | - | 1,014,053,886 | 1,131,823,066 |
| Total ................................ | $1,272,050,881 | $54,898,646 | - | - | $4,115,637,137 | $5,442,586,664 |

[1] Loan balances are shown as of the Cutoff Date but considering any payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date, and reflecting the Closing Date Adjustments.

Source: GDB

For additional information on the Transferred Property, see "*The Restructuring Property*" and "*Appendix B: The Transferred Property*" in this Offering Memorandum.

**Excluded GDB Assets**

Pursuant to the GDB Restructuring Act and the Qualifying Modification, certain of GDB's assets will not be transferred by GDB to the Issuer, and will not make up any portion of the Transferred Property (the "Excluded GDB Assets"). The Excluded GDB Assets consist exclusively of (i) the GDB Retained Loans, provided that the Beneficial Interests in such GDB Retained Loans will be Transferred Property that is transferred to the Issuer on the Closing Date and all proceeds of such GDB Retained Loans will constitute Transferred Property and be promptly transferred to the Issuer upon receipt thereof, *provided further* that if GDB, at its option, transfers to the Issuer any such Loans at any time, such transferred Loans will constitute Transferred Property upon such transfer, and *provided further* that each of the Additional Recovery Authority Loans will be transferred to the Issuer and will constitute Transferred Property on the date that is the earlier of (x) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (y) 18 months after the Closing Date, (ii) cash and cash equivalents consisting of (A) Cash Adjustments required to pay the permitted uses for which such Cash Adjustments are reserved and (B) up to $10 million in Excess Reserved Cash (as defined herein), if any, to satisfy certain of GDB's obligations under the Committee Settlement Stipulation (see "*Litigation— Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), (iii) the Retained Causes of Action (except the Beneficial Interest therein), (iv) causes of action (a) to enforce Loans that constitute Public Entity Trust Assets or (b) that GDB asserts, or is a party to, exclusively in its capacity as the former fiscal agent and financial advisor to the Government and its instrumentalities and for which the primary economic beneficiary of such cause of action, as of the Closing Date, is a Commonwealth government entity other than GDB, which will be treated as property of those Government entities with an economic interest in such cause of action ((a) and (b), collectively, the "Excluded Causes of Action"), (v) Loans to public agencies and departments of the Commonwealth primarily payable from legislative appropriations, with a principal balance of approximately $890.6 million as of the Cutoff Date (but reflecting the Closing Date Adjustments), to be identified in the Transfer Agreement and transferred to the Public Entity Trust on or after the Closing Date (the "Public Entity Trust Assets"), (vi) Loans with an outstanding principal balance of approximately $12.5 million as of the Cutoff Date securing an account in the name of Asociación de Empleados del ELA (the "Secured Deposit Account") and (vii) office furniture, equipment and other supplies owned by GDB and used in the ordinary course of GDB's business (excluding all such property relating to the Real Property Assets that are Transferred Property), if any; *provided* that any Excess Reserved Cash in excess of $10 million (the "Residual GDB Cash Assets") will constitute Transferred Property and will be transferred to the Issuer as set forth in the Transfer Agreement.

"Excess Reserved Cash" means the Cash Adjustments in excess of the amounts required to pay the permitted uses for which cash is reserved, if any.

The "Specified Cash Assets" will equal the sum of (a) the Vendor Claim Reserve (as defined herein), (b) $19 million to be transferred by GDB to a new trust pursuant to Article 705 of the GDB Restructuring Act for the payment of certain obligations of GDB to former employees under several pre-retirement programs and (c) $26.5 million for operating cash requirements of GDB and the Public Entity Trust; *provided* that the Vendor Claim Reserve Residual will constitute Transferred Property and, once identified, such Vendor Claim Reserve Residual will be delivered to the Issuer as set forth in the following paragraph.

Cash in the amount of $15 million to be set aside and used for the settlement of claims asserted against GDB by parties that provided goods and services to GDB in the ordinary course of business (such amount at any time, the "Vendor Claim Reserve"), which claims are disputed by GDB on the Closing Date or for which payment has not yet become due ("Open or Disputed Vendor Claims"), will remain at GDB in a separate account subject to a perfected security interest in favor of the Issuer securing GDB's obligation to transfer the Vendor Claim Reserve Residual to the Issuer. Any cash or cash equivalents remaining in the account in respect of the Vendor Claim Reserve after the payment of all Open or Disputed Vendor Claims determined by GDB to be valid (the "Vendor Claim Reserve Residual") will be Excess Reserved Cash.

For additional information regarding the characteristics of the Excluded GDB Assets as of the Cutoff Date, see "*The Restructuring Property—Excluded GDB Assets*" and "*Appendix C: GDB Retained Loans*" in this Offering Memorandum.

| | |
|---|---|
| **Management of the Restructuring Property** | The GDB Restructuring Act and the Qualifying Modification establish certain rights and limitations regarding the management of the Restructuring Property by the Issuer, the Servicer and the Indenture Trustee, as applicable. Pursuant to the Servicing Agreement and as required under the terms of the Bond Indenture, the Issuer will delegate to the Servicer all management of the Restructuring Property (including all day-to-day operations in respect thereof), subject to the rights and limitations established in the GDB Restructuring Act and the Qualifying Modification. Therefore, pursuant to the GDB Restructuring Act, the Qualifying Modification and the Servicing Agreement, the Restructuring Property will be managed in accordance with the following: |

1.  The Servicer (on behalf of the Issuer) will have all rights and powers that GDB has in respect of the Municipal Loan Assets, as of immediately prior to the Closing Date, except (i) that the Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser and (ii) as provided in item (8) below.

    An "Approved Purchaser" is a person or entity that is (i) a private or public bank operating in Puerto Rico that holds, or held at any time since the effective date of the GDB Restructuring Act, Loans issued by one or more Commonwealth municipalities or (ii) otherwise approved by AAFAF or another agent designated by the Commonwealth, which entity may take into account the public policy goals of the Commonwealth, which approval will not be unreasonably withheld (taking into account such public policy goals) if so requested.

2.  The Servicer (on behalf of the Issuer) will have the right to exercise remedies in respect of the Public Corporation Loan Assets, the Commonwealth Loan Assets, and the Commonwealth Guaranteed Loan Asset, but solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Loans (consistent with applicable Oversight Board-approved fiscal plans, if any, and Oversight Board-approved budgets, if any) are applied to such Loans in accordance with the applicable Loan documents, legal priority and the security or other pledge rights benefiting the same. Furthermore, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to preserve, protect or defend any priority, security or other pledge rights benefiting such Public Corporation Loan Assets, Commonwealth Loan Assets and Commonwealth Guaranteed Loan Asset. For any such Loan where the obligor is in a proceeding under Title III or Title VI of PROMESA and such obligor has other creditors that have the same legal priority, security or pledge rights as the Issuer, the

Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to ensure that the Issuer receives treatment in such proceedings that is the same as that provided to other creditors that have the same legal priority, security or pledge rights.

3.  The Servicer (on behalf of the Issuer) may transfer, assign, sell or otherwise dispose of the Restructuring Property (other than the Municipal Loan Assets, or interests in such property, without the consent of AAFAF or any other agent of the Commonwealth; provided, that such sale is consistent with the servicing standards set forth in the Servicing Agreement.

4.  The Servicer (on behalf of the Issuer) may not enter into any material modification, extension, accommodation, sale or other disposition of any Restructuring Property unless the Collateral Monitor has been given ten days' prior written notice of such transaction and has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable.

5.  Any modification by GDB of the Additional Recovery Authority Loans will (i) not include any provision that would result in the removal of any lien, security or other pledge rights benefiting such Loan except to the extent required for the sale of any such collateral where the proceeds of that collateral will be immediately made available to the Issuer and (ii) be approved, if such modification occurs prior to the Closing Date, by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement) or, if such modification occurs after the Closing Date, by the Servicer as commercially reasonable (provided, for the avoidance of doubt, that the Servicer's approval of such modification may only be given after the Collateral Monitor has received ten days' prior written notice of the approval of the modification and has not objected).

6.  In respect of the GDB Retained Loans, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on such Loans, provided that it will not be required to bring any action seeking to obtain a judgment against such public entity or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such Loans.

7.  None of the Issuer, the Servicer, or any other person or entity (other than GDB) will have the right to commence or direct any litigation or other enforcement action in respect of, or sell, transfer or dispose of the Causes of Action.

8.  None of the Issuer, the Servicer or any other person or entity will have the right to unilaterally increase the fixed interest rate or variable interest rate spread, as applicable, on the Municipal Loan Assets, the Public Corporation Loan Assets, the Commonwealth Loan Assets or the Commonwealth Guaranteed Loan Asset, and such Loans will continue to bear interest at the applicable fixed or variable rates in effect on the Closing Date, as such rates are certified by GDB and AAFAF. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

9.  The Indenture Trustee (upon the occurrence and during the continuance of a Bond Indenture Event of Default (as defined herein) or as otherwise provided in the Bond Indenture) and any subsequent holder of any Restructuring Property (upon the sale or transfer of any such Restructuring Property pursuant to the Servicing Agreement) will be subject to all limitations (including the limitations on the exercise of remedies set forth herein) applicable to the Issuer and the Servicer and, unless otherwise contractually limited, will have all rights and remedies in respect of the Restructuring Property to the same extent as the Issuer and the Servicer, except that neither the Indenture Trustee nor any subsequent holder of any Restructuring Property will be bound by the standards set

forth in the Servicing Agreement or be required to obtain the Collateral Monitor's consent to dispose of the Restructuring Property or any interest in such assets.

For the avoidance of doubt, the foregoing rights and limitations regarding the management of the Restructuring Property by the Servicer are also applicable to the Issuer pursuant to the GDB Restructuring Act. For additional information on the management of the Restructuring Property, see "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum.

GDB, AAFAF and San Juan entered into a settlement agreement to resolve San Juan's claims against GDB and San Juan's objections to the Qualifying Modification. As part of such settlement, the Servicer and the Collateral Monitor entered into certain agreements regarding the Municipal Loan Assets, as described under "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Various Municipalities—Settlement of Litigation with the Municipality of San Juan.*"

|  |  |
|---|---|
| **Keepwell Agreement** | On the Closing Date, GDB will enter into the Keepwell Agreement with the Issuer and the Indenture Trustee, which will provide that if any Restructuring Property is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such Restructuring Property to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Transaction Documents (or if such retransfer or reconveyance violates any law or court order, to take such other actions as may be necessary such that the Bondholders receive the economic equivalent thereof), until payment in full of the New Bonds with any remaining balance delivered to the Issuer. |

The Keepwell Agreement will further provide that GDB will indemnify and hold the Bondholders (collectively, the "Indemnified Parties") harmless from and against all damages and losses suffered or incurred by the Indemnified Parties as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms (the "Covered Losses"); provided that an impairment resulting from an immaterial diminution in value of the Restructuring Property will not independently give rise to a claim for indemnification; provided further that an Indemnified Party will not be entitled to indemnification for Covered Losses to the extent the circumstances giving rise to such Covered Losses result from the actions of such Indemnified Party or the actions of the Indenture Trustee taken at the direction of such Indemnified Party. For the avoidance of doubt, it is the intention of the parties that such indemnification and hold harmless provision will give rise to claims in favor of the Indemnified Parties against GDB in an amount such that, after giving effect to such claims and any distributions thereon, including in any bankruptcy, insolvency, receivership or similar proceedings in respect of GDB, the Indemnified Parties will be fully compensated for the Covered Losses, subject to the proviso in the foregoing sentence.

Under the terms of the Keepwell Agreement, the Bondholders will be express third-party beneficiaries of the Keepwell Agreement and will be entitled to the rights and benefits thereunder and may enforce the provisions thereof, as if they were parties thereto, notwithstanding (i) any waiver or other action by the Issuer or (ii) any legislative action or determination by a court resulting, in the case of (ii), in the rescission, avoidance or other unenforceability of the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds.

For additional information on the Keepwell Agreement, see "*The Keepwell Agreement*" in this Offering Memorandum.

|  |  |
|---|---|
| **Transfer and Lien** | The transfer of the Transferred Property by GDB to the Issuer will be a "true sale" or "true transfer" pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. Pursuant to the GDB Restructuring Act and the Qualifying Modification, after such transfer, creditors and other claimants against GDB will no longer have any interest or right to the Transferred Property or any Collections thereon. |

Simultaneously with the issuance of the New Bonds, automatically and without further action, pursuant to the GDB Restructuring Act, the New Bonds and all obligations thereunder will be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders.

**Review of Transferred Property**

In connection with the transactions described herein, GDB has performed a review of the Transferred Property and will make certain limited representations and warranties about the Transferred Property in the Transfer Agreement.

**Servicer's Compensation**

On the Closing Date, the Issuer will pay the Servicer $225 per Loan transferred to the Issuer on the Closing Date for management by the Servicer (the "Initial Portfolio Transfer Fee").

On each Payment Date, the Issuer will pay the Servicer a semi-annual fee (the "Servicing Fee") calculated, with respect to each Collection Period, as the sum of (i) $225 per Loan transferred to the Issuer subsequent to the Closing Date and during such Collection Period, (ii) 0.120% of the aggregate principal amount of the performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iii) 0.025% of the aggregate principal amount of the non-performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iv) 3.000% of Net Collections (as defined herein) generated during such Collection Period upon the sale or settlement of any Loan constituting Restructuring Property and (v) 3.000% of Net Collections generated upon the sale of any Real Property Asset during such Collection Period, subject to the limitations described herein. The Servicer will also be entitled to reimbursement or payment by the Issuer for certain expenses and indemnification amounts incurred in connection with the performance of its duties under the Servicing Agreement. The Servicing Fee and such expenses and indemnification may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds, in each case, subject to the terms and conditions contained in the Servicing Agreement.

For additional information regarding the compensation payable to the Servicer, see "*Servicing Agreement—Servicing Compensation and Payment of Expenses*" in this Offering Memorandum.

**Indenture Trustee's Compensation**

On each Payment Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments,*" the Issuer will pay the Indenture Trustee a semi-annual fee of $2,500 (the "Indenture Trustee Fee"). The Indenture Trustee will also be entitled to reimbursement or payment by the Issuer for all expenses and indemnification amounts incurred in connection with the performance of its duties under the Bond Indenture. The Indenture Trustee Fee and such expenses and indemnification amounts will be paid from Collections on the Restructuring Property prior to any payments on the New Bonds. The Indenture Trustee will also be entitled to compensation for any report it files on the EMMA website pursuant to the Bond Indenture or notice of any event it files on the EMMA website as Dissemination Agent, if applicable.

For additional information regarding fees, expenses and indemnification amounts reimbursable or payable to the Indenture Trustee, see "*Service Providers—Fees and Expenses of the Service Providers—Indenture Trustee*" in this Offering Memorandum.

| | |
|---|---|
| **Collateral Monitor's Compensation** | The Issuer will pay the Collateral Monitor, for each Collection Period, a fee (the "Collateral Monitor Fee") based on a percentage of the cash Collections received during such Collection Period for each asset constituting Restructuring Property. Different rates apply to the Collections on different assets depending on the type and performing status of the asset in addition to other factors, and the applicable rate for an asset is subject to change over time. The aggregate Collateral Monitor Fees for any six consecutive Collection Periods may not exceed $9.0 million, provided that if the amount resulting from the calculation in the preceding sentence plus the aggregate Collateral Monitor Fees for the prior five Collection Periods exceeds $9.0 million, such excess may be added to the Collateral Monitor Fee due in any of the following five Collection Periods, subject to the cap described in this sentence. In certain circumstances specified in the Collateral Monitor Agreement, upon termination of Cantor-Katz's engagement as Collateral Monitor, Cantor-Katz may be entitled to true-up payments to compensate it for services provided prior to such termination but for which cash Collections are not yet realized by the Issuer or to compensate it for removal without cause prior to the third anniversary of the Closing Date. The Collateral Monitor will also be entitled to reimbursement for certain expenses and certain indemnification amounts. The Collateral Monitor Fee, true-up payments (if any) and such expenses and indemnification amounts may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds. |
| | For additional information regarding fees, expenses and indemnification amounts reimbursable or payable to the Collateral Monitor, see "*Service Providers—Fees and Expenses of the Service Providers—Collateral Monitor*" in this Offering Memorandum. |
| **Board of Trustees' Annual Compensation** | Annual compensation for the members of the Board of Trustees of the Issuer is expected to be $75,000 per year for each member of the Board of Trustees; *provided*, that the Executive Director of the Issuer is expected to be paid an additional amount of $75,000 per year. The members of the Board of Trustees are also expected to be paid the sum of $125,000 each as compensation for their work in connection with the issuance of the New Bonds and the structuring of the exchange. For additional information on the compensation of the Board of Trustees, see "*The Issuer—Board of Trustees—Board Member Annual Compensation and Board Expenses*" in this Offering Memorandum. |

| | |
|---|---|
| **Interest and Principal Payments** | **Interest Rate**<br><br>The New Bonds will bear interest at 7.500% per annum until payment of the principal amount thereon has been made or duly provided for.<br><br>**Interest Accrual and Payment**<br><br>Interest due on each Payment Date will be that which has accrued during the period from and including the immediately preceding Payment Date on which interest has been paid (in cash or in kind) (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid (each such period, an "Interest Period"). Interest on the New Bonds will be calculated on an actual/360 basis. This means that the interest due on the New Bonds on each Payment Date will be the product of: (i) the principal amount of the New Bonds outstanding on that Payment Date (including, for the avoidance of doubt, previously accrued PIK Amounts (as defined herein)), before giving effect to the payment of principal on that date, (ii) the interest rate and (iii) the number of days from and including the immediately preceding Payment Date (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid divided by 360.<br><br>To the extent there is insufficient Available Cash on any Payment Date to pay in full in cash all interest accrued during the Interest Period preceding such Payment Date on the New Bonds, such accrued interest on the New Bonds will be paid in cash pro rata to the extent of and from Available Cash, and principal of the New Bonds will accrue an amount equal to the amount of any Available Cash shortfall (each such amount of shortfall, a "PIK Amount"). Following an increase in the principal amount of the New Bonds as a result of the accrual of a PIK Amount, the New Bonds will bear interest on the then-outstanding principal, which will include such accrued PIK Amount.<br><br>**Principal Payments**<br><br>Principal payments on the New Bonds will be made from Available Cash on each Payment Date to the extent available after all accrued interest with respect to such Payment Date has been paid in full in cash, thereby reducing the outstanding principal balance of the New Bonds by such amount.<br><br>For additional information regarding the payment of interest and principal on the New Bonds, see "*Description of the New Bonds and the Bond Indenture—Payments of Interest*," "*Description of the New Bonds and the Bond Indenture—Payments of Principal*" and "*Payments to Bondholders*" in this Offering Memorandum. |
| **Priority of Payments** | The Indenture Trustee will make payments from amounts in the Collection Account (as defined herein) or will retain amounts in the Collection Account, as applicable, in the following order of priority:<br><br>1.  *Holdback for Fees and Expenses Reserve* — on each Payment Date, an amount equal to the amount of cash reasonably expected to be required to pay all Issuer Expenses that are capable of estimation (which will not include, for the avoidance of doubt, amounts owed in respect of the New Bonds and Servicing Fee and Collateral Monitor Fee determined on the basis of cash Collections) through the next Determination Date based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees (such amount, the "Fees and Expenses Reserve") will be retained in the Collection Account;<br><br>2.  *Third-Party Fees and Expenses* — on each Payment Date or otherwise as such amounts become due, make payments to each of the Servicer, the Indenture Trustee and the Collateral Monitor, of the respective amount of any fees, expenses and indemnification amounts due to it, and to the Issuer or other applicable third party, the amount of any other due and payable Issuer Expenses, including Reimbursable Servicer Expenses, subject, as applicable, to the Issuer Operating Expenses Cap and other applicable restrictions on Issuer Expenses described herein; *provided*, for the avoidance of doubt, that the payment of all |

Issuer Expenses validly incurred and payable from the Collection Account pursuant to the terms of the Transaction Documents as described herein will be paid prior to the calculation of Available Cash, notwithstanding any shortfall in the Fees and Expenses Reserve for the applicable semi-annual period;

3.  *Current Interest on the New Bonds* — on each Payment Date, make payments to the Bondholders of accrued and unpaid interest on the New Bonds relating to such Payment Date; and

4.  *New Bond Principal* — on each Payment Date, make payments to the Bondholders until the principal amount of the New Bonds is reduced to zero.

**Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).**

For additional information regarding the priority of payments on the New Bonds, see "*Collections on the Restructuring Property and Calculation of Available Cash—Calculation of Available Cash*" and "*Payments to Bondholders—Priority of Payments*" in this Offering Memorandum.

**Issuer Operating Expenses Cap**

Unless otherwise consented to by the Collateral Monitor, which consent may not be unreasonably withheld, the Issuer may not incur Issuer Operating Expenses (as defined herein) after the Closing Date exceeding, in the aggregate, (i) $650,000 per year through the first Payment Date following the first Annual Filing Date (prorated for any partial years) and (ii) an amount to be determined by the Board of Trustees for each year thereafter, which amount shall not exceed $650,000 and shall be subject to the consent of the Collateral Monitor, which consent may not be unreasonably withheld (it being understood that such amounts are expected to decrease after the first Payment Date following the first Annual Filing Date) (the "Issuer Operating Expenses Cap").

"Issuer Operating Expenses" means all expenses, liabilities or other obligations of the Issuer other than Excluded Expenses and amounts owed in respect of the New Bonds.

"Excluded Expenses" means (a) amounts to be paid for any transaction costs of the Qualifying Modification, including the professional fees and expenses of GDB, AAFAF, the Issuer and the professionals required to be paid pursuant to the Restructuring Support Agreement, (b) amounts owed to, or on behalf of, the Servicer, the Indenture Trustee or the Collateral Monitor (including, in each case, in respect of reimbursable expenses) under the Transaction Documents and (c) expenses arising from (i) Bondholder solicitations required under the terms of the Bond Indenture, (ii) litigation brought against or reasonably brought by the Issuer or the Board of Trustees (including any related legal fees and indemnification costs), (iii) the creation and distribution of information for U.S. tax reporting purposes, (iv) directors and officers insurance or (v) auditing fees.

"Issuer Expenses" means Issuer Operating Expenses and Excluded Expenses.

| | |
|---|---|
| **Liquidation of the Restructuring Property** | Subject to the limitations as described in "*The Restructuring Property—Management of the Restructuring Property*" herein, the Servicer will be required to use commercially reasonable efforts to liquidate all remaining Restructuring Property, if any, as soon as reasonably practicable after, and in no event later than the end of the month of the date that is four months following (or such other date thereafter as reasonably agreed to by the Issuer, the Servicer and the Collateral Monitor) the Final Scheduled Payment Date, unless either (i) all principal, interest and any other amounts owing on the New Bonds have been paid or (ii) following a solicitation of veto conducted by the Issuer prior to the then-current Final Scheduled Payment Date, Bondholders holding not less than 25% in principal amount of the New Bonds for which votes are submitted vote against such liquidation and to delay the Final Scheduled Payment Date by a one-year period; *provided* that if the Board of Trustees, in consultation with the Collateral Monitor, determines in good faith that the expected Collections to be generated in respect of the Restructuring Property after the Final Scheduled Payment Date are unreasonably small in comparison to the expected cost to continue to manage such Restructuring Property, no such solicitation of veto will occur and the Servicer will liquidate the remaining Restructuring Property. The proceeds from such liquidation will constitute Collections on the Restructuring Property and, as such, will be deposited in the Collection Account and distributed in accordance with the Bond Indenture based on the payment priority set forth in "*Payments to Bondholders—Priority of Payments*" on the date that is six months after the Final Scheduled Payment Date (or such other date thereafter as reasonably determined by the Issuer, the Servicer and the Collateral Monitor), including as the Final Scheduled Payment Date may be extended (such distribution date, the "Liquidation Payment Date"). The process described above will apply to the initial Final Scheduled Payment Date and each subsequent Final Scheduled Payment Date resulting from a delay of the then-applicable Final Scheduled Payment Date.

Upon the liquidation of all remaining Restructuring Property and distribution of all remaining Collections in accordance with the requisite payment priority, the Bondholders will have no further claims against the Issuer in respect of the New Bonds. For additional information regarding the termination of the Issuer and liquidation of the Restructuring Property, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Termination of the Bond Indenture*" in this Offering Memorandum. |
| **Termination of the Bond Indenture** | With respect to the New Bonds, the obligations of the Servicer, GDB, the Collateral Monitor and the Indenture Trustee, as the case may be (except as otherwise provided in the Servicing Agreement, the Collateral Monitor Agreement, the Transfer Agreement or the Bond Indenture, as applicable), will terminate upon the surrender or redemption (as applicable) and cancellation of all New Bonds and the payment of all principal, interest and other amounts required to be paid to Bondholders pursuant to the Bond Indenture, which will occur upon the earlier of (i) the surrender for payment in full of all principal, interest and any other amounts owing on the New Bonds, (ii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture after termination (in accordance with the terms of the applicable Loan documents) of all Restructuring Property and (iii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture, after liquidation of all remaining Restructuring Property or, if no such liquidation occurs, a pro rata distribution of all remaining Available Cash, if any, in each case, in accordance with the terms of the Bond Indenture. |
| **Remaining Interest** | Following the termination of the Bond Indenture, the remaining assets of the Issuer, if any, will be distributed to the Public Entity Trust (as defined herein) on account of a residual interest it will have in the Issuer. |
| **Servicer Removal** | Subject to the procedures set forth below, the Servicer may be removed and replaced by the Bondholders upon the occurrence of a Servicer Default (as defined herein) that is material to the interests of the Bondholders (a "Servicer Replacement Event"). The Collateral Monitor will notify the Indenture Trustee and the Issuer when (a) the Collateral Monitor believes, in good faith, that a Servicer Default has occurred and is continuing and (b) the Collateral Monitor believes, in its sole discretion, that such Servicer Default is material to the interests of the Bondholders. Such notice from the Collateral Monitor will give a detailed narrative and explanation of (i) the facts supporting the evaluation of the Collateral Monitor, (ii) the possible effects on the interests of the Bondholders and (iii) the recommendation of the Collateral Monitor regarding the possible Servicer Replacement Event. The Servicer will have the opportunity to provide a written explanation of such Servicer Default to the Collateral Monitor and the Issuer; *provided* that notwithstanding any such |

27

explanation, the Collateral Monitor's decision to give notice of a possible Servicer Replacement Event, and such notice actually given, will not be subject to challenge by the Servicer or any other person or entity. The Indenture Trustee will make available to the Bondholders the Collateral Monitor's notice along with the recommendation, if any, of the Issuer regarding the possible Servicer Replacement Event.

Promptly upon the Collateral Monitor's notice of a possible Servicer Replacement Event, but in no event later than 30 days thereafter, the Indenture Trustee will issue a posting on the EMMA website or other similar public posting and a Bondholder vote will be solicited regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced. If the New Bond Requisite Holders do not deliver affirmative votes in respect of the solicitation, which will have a period of not less than 30 days and not more than 60 days, the Servicer Default and possible Servicer Replacement Event will be deemed waived. If the New Bond Requisite Holders deliver affirmative votes in respect of the solicitation, a Servicer Replacement Event will have occurred and, upon the Servicer's receipt of notice by the Indenture Trustee of the results of the Bondholder vote, the Servicer's appointment under the Servicing Agreement will be terminated pending the appointment of a successor Servicer. The Issuer will then initiate a competitive process, reasonably satisfactory to the Collateral Monitor, for the identification of a possible successor Servicer, who must be "qualified" and "independent" (as such terms are defined in the Transaction Documents), of recognized national standing and with the requisite expertise and Spanish-speaking capability. The Issuer (or, if the Issuer fails to act within 45 days of such vote, the Collateral Monitor) will then designate a successor Servicer acceptable to the Collateral Monitor for a preliminary 60-day period on terms of engagement acceptable to the Collateral Monitor. Any approval of the successor Servicer or terms of its engagement required from the Collateral Monitor may not be unreasonably withheld. The Collateral Monitor will then give notice to the Indenture Trustee, and the Indenture Trustee will make such notice available to the Bondholders, of (a) the successor Servicer, (b) the terms of the successor Servicer's engagement, (c) the terms of the preliminary 60-day engagement period and opportunity for Bondholder objection, (d) any additional information the Collateral Monitor would like to provide and (e) any additional information the Issuer would like to provide. If the New Bond Requisite Holders do not object to the identity or terms of the successor Servicer's engagement within 60 days after the Bondholders receipt of such notice, the successor Servicer's engagement will become final, subject to the terms and conditions of such Servicer's Servicing Agreement. If a successor Servicer is not appointed within six months after the delivery of affirmative votes of the New Bond Requisite Holders in respect of the solicitation, the Servicer Replacement Event and underlying Servicer Default will be deemed waived and the Servicer will remain in place.

Servicer Defaults include, without limitation:

a)   for cause, as set forth under the terms and conditions of the Servicing Agreement;

b)   failure to meet the Compliance Test (as defined herein);

c)   failure to timely deliver the information necessary to verify the Compliance Test;

d)   failure to use commercially reasonable efforts to maximize the value of the Restructuring Property (subject to the limitations described in "The Restructuring Property— Management of the Restructuring Property" in this Offering Memorandum); and

e)   entering into any modifications, extensions or accommodations in respect of the Restructuring Property that are, individually or in the aggregate, not commercially reasonable (subject to the limitations described in "The Restructuring Property— Management of the Restructuring Property" in this Offering Memorandum).

For additional information regarding removal of the Servicer, see "*Servicing Agreement— Removal of Servicer*."

| | |
|---|---|
| **Bond Indenture Events of Default** | Bond Indenture Events of Default are: |

a)  a failure by the Issuer to accrue any PIK Amount as required or to make any required payment from Available Cash in respect of any of the New Bonds on the date on which the same is due;

b)  a failure by the Issuer to observe or perform any covenant or agreement (other than a covenant or agreement referred to in clause (a) above) contained in the Bond Indenture, and such failure continues or is not cured for a period of 60 days after written notice by the Indenture Trustee or Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding;

c)  the Issuer, pursuant to or within the meaning of any U.S. federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation PROMESA (collectively, "Bankruptcy Laws"): (i) commences proceedings to be adjudicated bankrupt or insolvent; (ii) consents to the institution of bankruptcy or insolvency proceedings against it; (iii) files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law; (iv) consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property; *provided*, for the avoidance of doubt, that any such official appointed in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (c)(iv); (v) makes a general assignment for the benefit of its creditors; (vi) is deemed to be a covered territorial instrumentality under PROMESA or is otherwise determined to be subject to oversight under applicable Bankruptcy Law; or (vii) takes any corporate or similar action in furtherance of any of the foregoing;

d)  a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against the Issuer in a proceeding in which the Issuer is to be adjudicated bankrupt or insolvent; (ii) approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer under any Bankruptcy Law; (iii) appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer for all or any substantial part of the property of the Issuer; *provided*, for the avoidance of doubt, that any such order or decree entered in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (d)(iii); or orders the liquidation, dissolution or winding up of the Issuer and the order or decree remains unstayed and in effect for 60 consecutive days;

e)  any legislation is enacted, governmental action is taken (including any action by the Government, the Commonwealth instrumentalities or any Government-controlled or managed entities, including entities with directors or management controlled or appointed by the Government and any failure by the Government and any Commonwealth instrumentality to observe or perform the non-impairment covenant set forth in Article 407 of the GDB Restructuring Act (as in effect as of the Closing Date)) or any party (other than an obligor on the Restructuring Property) is determined by a final, non-appealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affect (i) the receipt of current or future Collections on the Restructuring Property to which the Issuer is entitled (other than by reason of (A) a failure, delay or default of the obligor under such Restructuring Property, (B) an obligor being subject to a proceeding under PROMESA or to any provision thereof or (C) changes in taxation or restrictions on the enforcement of rights or remedies, so long as such changes or restrictions are not directed solely at the Issuer, the Restructuring Property, the New Bonds or the Bondholders relative to any other entity, asset, security or security holder) in respect of assets having an aggregate value on the Closing Date of $25 million or more (as determined by the face amount of any such asset, in the case of Loans, or the book value of any such asset, in the case of other assets) or (ii) the binding effect or enforcement of, in accordance with their

respective terms, the GDB Restructuring Act (as in effect as of the Closing Date), the Qualifying Modification, the Public Entity Trust, the Bond Indenture, the New Bonds or the liens on the Restructuring Property;

f)   any entry of a judgment against the Issuer in the amount of $10 million or more;

g)   the occurrence of an event of default by GDB under the Transfer Agreement; and

h)   the Issuer permits the validity or effectiveness of the Transaction Documents to be impaired, and such impairment affects the enforceability of or payments on the New Bonds, or any person to be released from any covenants or obligations with respect to the New Bonds.

If a Bond Indenture Event of Default occurs and is continuing, the Indenture Trustee may, or upon direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will, declare the principal of such New Bonds and accrued but unpaid interest and any other amounts owed thereon to be immediately due and payable, in the order of priority specified for payments.

Following a Bond Indenture Event of Default, the Indenture Trustee may exercise any remedies available under applicable law (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*," in this Offering Memorandum), but may exercise remedies only if (i) Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, consent to such exercise or (ii) the proceeds of such exercise are sufficient to pay in full the principal of and the accrued interest and any other amounts owed on the outstanding New Bonds at the date of such exercise. In addition, the Indenture Trustee must institute proceedings to collect amounts due and exercise such remedies if Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, direct the Indenture Trustee to do so. Notwithstanding the foregoing, the Indenture Trustee may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser.

In addition, if a Bond Indenture Event of Default occurs and is continuing, or the Issuer fails to pay all outstanding amounts on the New Bonds by the Final Scheduled Payment Date, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage and control the Restructuring Property for the benefit of the Bondholders and will exercise all the rights and powers of the Issuer with respect to such Restructuring Property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby.

For additional information regarding Bond Indenture Events of Default, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Bond Indenture Events of Default; Rights Upon Bond Indenture Event of Default*" and "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Remedies*" in this Offering Memorandum.

| | |
|---|---|
| **Tax Considerations** | For information regarding important tax-related matters, see "*Certain Puerto Rico Tax Considerations*" and "*Certain U.S. Federal Income Tax Considerations*" in this Offering Memorandum. |
| **ERISA Considerations** | For information regarding important ERISA-related matters, see "*ERISA Considerations*" in this Offering Memorandum. |
| **Minimum Denominations** | The New Bonds will be issued in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof. |

| | |
|---|---|
| **Exemption from Registration; No Registration Rights** | The New Bonds have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon exemptions contained in the Securities Act. The registration or qualification of the New Bonds in accordance with applicable provisions of laws of the jurisdictions to which the New Bonds may be subject and the exemption from registration or qualification in such jurisdictions cannot be regarded as a recommendation thereof. Neither the Securities and Exchange Commission nor any state securities commission or regulatory authority (including the Oversight Board and AAFAF) has passed upon the merits of the New Bonds or the accuracy or completeness of this Offering Memorandum. Any representation to the contrary may be a criminal offense.<br><br>The Bondholders will not have the benefit of any exchange or registration rights. |
| **Certain Other Considerations** | The Issuer will rely on an exclusion or exemption from the definition of "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act"), contained in Section 2(b) of the Investment Company Act, although there may be additional exclusions or exemptions available to the Issuer. |

## RISK FACTORS

*The New Bonds involve significant risks. You should carefully consider the risk factors set forth below regarding the New Bonds, as well as all other information contained or incorporated by reference into this Offering Memorandum. The following risk factors are not the only risks the Issuer faces, are not meant to be a complete list of risks associated with the New Bonds and do not necessarily reflect the relative importance of various risks. Additional risks and uncertainties not currently known to the Issuer or that the Issuer does not currently consider to be material, or that are generally applicable to all governmental instrumentalities, also may materially and adversely affect the Issuer, the Restructuring Property and the Issuer's ability to make payments on the New Bonds. You are advised to consider the following risk factors, among others, and to review the other information contained or incorporated by reference into this Offering Memorandum before making any decisions with respect to the New Bonds. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value and the liquidity of the New Bonds. There can be no assurance that other risk factors not discussed below will not become material in the future.*

**Neither the Oversight Board nor any federal or state securities commission or regulatory authority has approved or disapproved the New Bonds or passed on the adequacy or accuracy of this Offering Memorandum.**

On July 12, 2017, the Oversight Board certified the Restructuring Support Agreement, as amended, as a "Qualifying Modification" pursuant to Section 601(g)(2)(A) of PROMESA. On May 8, 2018, due to certain amendments agreed to among the parties, the Oversight Board re-certified the Restructuring Support Agreement, as amended, as a "Qualifying Modification" pursuant to Section 601(g)(2)(A) of PROMESA. The certification and re-certification of the Restructuring Support Agreement by the Oversight Board relates solely to compliance with the requirements of PROMESA as set forth in Section 601(g)(2)(A). Neither the Oversight Board nor any federal or state securities commission or regulatory authority has approved or disapproved the New Bonds or passed upon the adequacy or accuracy of this Offering Memorandum.

**Bondholders should not expect to receive payment in full in cash of principal and interest on the New Bonds and, as a result, the New Bonds are expected to trade at a significant discount to their stated principal amount.**

The Issuer's ability to pay interest in cash and make principal payments is entirely dependent upon Collections on the Restructuring Property. Based on current projections, and as further described in "*Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations*" and "*Payments to Bondholders—Hypothetical Amortization of the New Bonds*" in this Offering Memorandum, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all such payments of interest and principal (including any PIK Amounts). **In addition, and as further described herein, the Collections on the Restructuring Property may be materially and adversely affected by events and circumstances outside of the Issuer's control, which may result in actual Collections on the Restructuring Property being materially less than those reflected in the Collection Schedule included herein.** As a result, the New Bonds are expected to trade at a significant discount to their stated principal amount. For additional information regarding the assumptions underlying the Collection Schedule, see "*Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations*" and "*Payments to Bondholders— Hypothetical Amortization of the New Bonds*" in this Offering Memorandum. See also "*Risks Related to the New Bonds and the Keepwell Agreement—Bondholders must rely for repayment only upon Collections generated in respect of the Restructuring Property, which are not expected to be sufficient to make all payments of interest and principal (including PIK Amounts) on the New Bonds.*"

**Risks Related to the Issuer**

**The Issuer is a newly formed statutory public trust and governmental instrumentality with limited operations and administrative support and will delegate most of its administration (including actions with respect to Collections) to third-party service providers.**

The Issuer has been formed for the purpose of acquiring the Restructuring Property and making payments on the New Bonds from Collections on the Restructuring Property. The Issuer will have limited internal administrative support and will for the most part depend on third-party service providers to perform its functions. The Issuer is not expected to have any officers or employees other than the Executive Director, who will be a member of the Board of Trustees. All management of the Restructuring Property (including all day-to-day operations in respect thereof) will be conducted on behalf of the Issuer by the Servicer and other service providers pursuant to contractual arrangements, herein described. In particular, all actions with respect to the Collections and all collateral relating to the New Bonds will be performed by the Servicer. The Issuer will have a limited ability to amend the Servicing Agreement and agreements with third-party service providers with respect to the New Bonds generally. The service providers will only be required to provide services at standards set forth in their respective agreements. Therefore, even if the services provided by third-party service providers are at sub-optimal levels, it may be difficult or impossible to change the levels of service other than as provided for in the applicable agreement with such service provider, and any such change could take time to accomplish. Furthermore, the Issuer can provide no assurances that such service providers will not default or breach such contractual agreements. As well, even if the Servicer defaults or breaches the Servicing Agreement, including for lack of performance by the Servicer, the Issuer will not have an independent right to

terminate the Servicing Agreement. Even if the Collateral Monitor believes that a Servicer Replacement Event has occurred, if the required votes are not received from the Bondholders to replace the Servicer, the Servicer will continue to manage the Restructuring Property, which may adversely affect Collections thereon. For additional information, see "*Service Providers.*"

***The financial information contained herein, including the information related to the Transferred Property, is based upon GDB's books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.***

The financial information contained herein, including the information related to the Transferred Property, has not been, and will not be, audited or reviewed by any independent accounting firm or third party and is limited in scope. Although GDB believes that it has used its reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained herein is without material inaccuracies or inconsistencies. In addition, the historical data provided in this Offering Memorandum relating to Collections on the Loans that make up the Transferred Property may differ substantially from future Collections. The Issuer has not independently verified the financial information contained herein, including information relating to the Transferred Property, the status of the obligors on such Transferred Property or as to any information contained herein regarding the projected Collections on such Transferred Property. Furthermore, certain events that are not within the control of the Issuer may materially impact future Collections on the Transferred Property. As a result, you are cautioned not to place undue reliance on any of the financial information contained herein. For additional discussion of the risks related to the Restructuring Property and the obligors thereunder, see "*Risks Related to the Restructuring Property*" and "*Risks Related to the Obligors on the Restructuring Property.*"

***The commencement by the Issuer of a proceeding under Title III of PROMESA or a similar proceeding could result in losses or delays in payments on the New Bonds.***

If the Issuer were to become subject to a proceeding under Title III of PROMESA or a similar proceeding, the Bondholders may experience losses or delays in payments on the New Bonds. If a Title III proceeding is commenced on behalf of the Issuer, a creditor, including the Indenture Trustee and the Bondholders, would be prohibited from repossessing the Restructuring Property from the Issuer without court approval. Moreover, PROMESA permits a debtor to continue to retain and to use collateral and the proceeds, products, rents or profits of the collateral, even though the debtor is in default under the applicable debt instruments, *provided* that a secured creditor is given adequate protection of its interest in such collateral, under bankruptcy principles, as incorporated in PROMESA. It is impossible to predict how long payments on the New Bonds could be delayed following commencement of a Title III proceeding for the Issuer, whether or when the Indenture Trustee would be permitted to repossess or dispose of the Restructuring Property, and whether or to what extent the Bondholders would be compensated for any delay in payment or loss of value of the collateral as a result of the requirements of "adequate protection."

Furthermore, in the event that the presiding court in a Title III proceeding determines that the value of the Restructuring Property is not sufficient to repay all amounts due on the New Bonds, the Bondholders would have "undersecured claims," as to the difference. PROMESA does not permit the payment of accrued interest, costs and attorney's fees for "undersecured claims" during the debtor's bankruptcy case. Additionally, the Indenture Trustee's ability to foreclose on or the Servicer's ability to monetize the Restructuring Property on the Bondholders' behalf is limited by the Transaction Documents and may be subject to the consent of third parties and practical problems associated with the realization of the Indenture Trustee's lien on the Restructuring Property.

***The Issuer, the Servicer (on behalf of the Issuer) and the Indenture Trustee will have limited rights with respect to the Loans that are part of the Restructuring Property, which may reduce the value of such assets and limit the amount of Available Cash for payments on the New Bonds.***

The GDB Restructuring Act and the Qualifying Modification establish certain rights and limitations regarding the management of the Restructuring Property by the Issuer, the Servicer and the Indenture Trustee, as applicable. The Issuer will delegate all management of the Restructuring Property (including all day-to-day operations in respect thereof) to the Servicer pursuant to the Servicing Agreement, subject to the rights and limitations established in the GDB Restructuring Act and the Qualifying Modification. Pursuant to the GDB Restructuring Act and the Servicing Agreement, the Servicer (on behalf of the Issuer) will have the right to exercise remedies in respect of the Commonwealth Loan Assets, the Commonwealth Guaranteed Loan Asset, and the Public Corporation Loan Assets solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Loans (consistent with applicable Oversight Board-approved fiscal plans, if any, and Oversight Board-approved budgets, if any) are applied to such Loans in accordance with the applicable Loan documents, legal priority and the security or other pledge rights benefiting such Loans. Furthermore, pursuant to the GDB Restructuring Act and the Servicing Agreement, the Servicer (on behalf of the Issuer) will be entitled to rights and remedies necessary to preserve, protect or defend any security or other pledge rights benefiting such Loans. For any such Loan where the obligor on such Loan is in proceedings under Title III or Title VI of PROMESA and such obligor has other creditors that have the same legal priority, security or pledge rights as the Issuer, the Servicer (on behalf of the Issuer) and the Indenture Trustee, as applicable, will be entitled to rights and remedies necessary to ensure that the Issuer receives treatment in such proceeding that is the same as that provided to other creditors that have the same legal priority, security or pledge rights as the Issuer.

The Servicer (on behalf of the Issuer) may sell or otherwise dispose of the Restructuring Property (other than the Municipal Loan Assets), *provided* that such sale must be consistent with the servicing standards set forth in the Servicing Agreement, including the limitations on the ability to pursue enforcement actions described in the preceding paragraph. The Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser. For the avoidance of doubt, the foregoing rights and limitations regarding the management of the Restructuring Property by the Servicer are also applicable to the Issuer pursuant to the GDB Restructuring Act.

The Servicer (on behalf of the Issuer) may not enter into any material modification, extension, accommodation, sale or other disposition of any Restructuring Property unless the Collateral Monitor has been given 10 days' prior written notice of such transaction and has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable.

The Indenture Trustee (upon the occurrence and during the continuance of a Bond Indenture Event of Default or as otherwise provided in the Bond Indenture) and any subsequent holder of Restructuring Property (upon the sale or transfer of any such Restructuring Property pursuant to the Servicing Agreement) will be subject to all limitations (including the limitations on the enforcement of remedies described herein) applicable to the Issuer and the Servicer, except that neither the Indenture Trustee nor any subsequent holder of any Restructuring Property will be bound by the standards set forth in the Servicing Agreement or be required to obtain the Collateral Monitor's consent to dispose of the Restructuring Property or any interest in such assets.

The foregoing limitations may significantly limit the ability of the Issuer, the Servicer (on behalf of the Issuer) and the Indenture Trustee to realize as much value in respect of the Loans that are part of the Restructuring Property as they would be able to do if they were allowed to pursue enforcement actions or sell the Loans without limitation.

**Risks Related to the New Bonds and the Keepwell Agreement**

***Bondholders must rely for repayment only upon Collections generated in respect of the Restructuring Property, which are not expected to be sufficient to make all payments of interest and principal (including PIK Amounts) on the New Bonds.***

The Issuer is a newly formed statutory public trust and governmental instrumentality of the Commonwealth created by the GDB Restructuring Act. The Issuer will have substantially no assets until the Transferred Property is transferred to the Issuer from GDB, nor any liabilities until the New Bonds are issued. The New Bonds are special limited obligations of the Issuer secured solely by the Restructuring Property and the only sources of payment on the New Bonds are Collections received on the Restructuring Property. The value of the Restructuring Property may increase or decrease after the Closing Date, and Collections on the Restructuring Property are expected to be materially less than the Restructuring Property's notional value.

A substantial portion of the Restructuring Property consists of non-performing assets. Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). This result would only improve if the Issuer is able to realize significant recoveries in respect of the currently non-performing portions of the Restructuring Property, including Loans to the Commonwealth and distressed public corporations that may be difficult to realize upon, and if such recoveries in respect of the currently non-performing portions of the Restructuring Property outweigh the impact of any currently performing assets becoming non-performing. No assurance can be made that significant recoveries on such non-performing Loans will be achieved or that a significant amount of currently performing assets will not become non-performing.

***Although the New Bonds are called bonds, they are complex financial instruments with unique characteristics and risks that are unlike those typically found in debt securities and may not be suitable for all investors.***

Although the New Bonds are called bonds, they are complex financial instruments with unique characteristics and risks that are unlike those typically found in debt securities. For instance, among other things, the New Bonds are expected to incur significant paid-in-kind interest and will be solely paid from Collections derived from the Restructuring Property after payment of certain costs and expenses. As a result, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). Because of the unique nature of the Issuer, the New Bonds and the sources of payments on the New Bonds, substantial uncertainty and risk exist with respect to the New Bonds that may not exist with other debt investments. The New Bonds may not be a suitable investment for all investors, including any investor that requires a regular or predictable schedule of payments or payment on specific dates. You should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to understand the prepayment, reinvestment and default risks, the tax consequences of an investment and the interaction of these factors before making any decisions with respect to the New Bonds.

*Concurrently with the consumption of the Qualifying Modification, GDB, the Issuer and the Indenture Trustee will enter into the Keepwell Agreement. However, the Keepwell Agreement is not expected to provide a source of recovery to Bondholders other than in limited circumstances.*

Concurrently with the consumption of the Qualifying Modification, GDB, the Issuer and the Indenture Trustee will enter into the Keepwell Agreement. The Keepwell Agreement is different than other similarly named instruments. Following the consumption of the Qualifying Modification, GDB will have little to no assets remaining, but will be required, under the Keepwell Agreement, to provide certain covenants and indemnifications to the Bondholders as described further in "*The Keepwell Agreement*" in this Offering Memorandum. Furthermore, GDB will not be subject to covenants requiring the maintenance of any financial ratios. As such, the Keepwell Agreement is not expected to provide a source of recovery to Bondholders other than in limited circumstances.

*The New Bonds are special limited obligations of the Issuer and are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth, nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The Issuer does not have any taxing authority.*

The New Bonds are special limited obligations of the Issuer payable solely from, secured solely by, and having recourse solely to, the Restructuring Property. The New Bonds are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds represent indebtedness solely of the Issuer and will not be insured or guaranteed by GDB, AAFAF, the Commonwealth, the Servicer, the Collateral Monitor, the Indenture Trustee or any of their respective affiliates, any Commonwealth government entity or any other person. The Issuer does not have any taxing authority.

*Acceleration of the New Bonds upon a Bond Indenture Event of Default may not provide an effective remedy because such an acceleration will not change the timing or amount of the Collections on the Restructuring Property and the liquidation of the Restructuring Property may result in lower recoveries on the New Bonds.*

Certain events, including events that are not within the control of the Issuer, may result in Bond Indenture Events of Default and cause, or permit Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding to cause, acceleration of all outstanding New Bonds. Following a Bond Indenture Event of Default resulting in an acceleration of the New Bonds, the Indenture Trustee, if directed by Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will liquidate the Restructuring Property (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum) and apply the proceeds to the payment of the New Bonds. However, because a majority of the Collections generated by the Restructuring Property is expected to come from the Municipal Loan Assets, which the Indenture Trustee may only sell to an Approved Purchaser, and since an acceleration of the New Bonds will not change the timing or amount of the Collections on such Restructuring Property, acceleration of the New Bonds may not be an effective remedy. In addition, the Issuer cannot predict how long it would take to liquidate the Restructuring Property. It is not anticipated that the amounts received from a sale in these circumstances will be sufficient to pay all amounts owed to the Bondholders, and there is significant risk that the Bondholders would receive lower recoveries on the New Bonds after acceleration. All outstanding New Bonds may be affected by any shortfall in liquidation proceeds.

*If the Restructuring Property generates insufficient cash, the interest obligations on the New Bonds will be paid in the form of additional principal amount on the New Bonds, referred to herein as PIK Amounts, rather than in cash, which will increase a Bondholder's exposure to the New Bonds and intensify the risks related to the New Bonds.*

If the Restructuring Property generates insufficient cash, the interest obligations on the New Bonds will be paid in the form of additional principal amount on the New Bonds, referred to herein as PIK Amounts, rather than in cash, which will increase a Bondholder's exposure to the New Bonds and intensify the risks related to the New Bonds. Because the anticipated Collections on the Restructuring Property are not expected to be sufficient to pay in full in cash all interest on the New Bonds as it comes due, it is anticipated that the New Bonds will accrue significant PIK Amounts.

*Failure to pay interest in the form of cash or principal on the New Bonds due to there being insufficient Available Cash will not constitute a Bond Indenture Event of Default.*

The amount of cash interest and principal required to be paid to the Bondholders on each Payment Date prior to the Final Scheduled Payment Date is limited to the Issuer's Available Cash on the applicable Payment Date. Therefore, if there is insufficient Available Cash to pay all accrued interest in cash or make principal payments on the New Bonds on an applicable Payment Date, the Issuer's failure to pay all interest in cash or make principal payments on the New Bonds, as applicable, on such Payment Date will not,

by itself, result in the occurrence of a Bond Indenture Event of Default. Notwithstanding the foregoing, the failure to accrue PIK Amounts as required will result in the occurrence of a Bond Indenture Event of Default. For additional information on the termination of the Bond Indenture and the Final Scheduled Payment Date, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Termination of the Bond Indenture*" in this Offering Memorandum.

***The absence of a secondary market for the New Bonds or a lack of liquidity in the secondary markets could limit Bondholders' ability to resell any New Bonds or adversely affect the market value of the New Bonds.***

The New Bonds will not be listed on any securities exchange, and no financial institution has agreed to make a market in the New Bonds. Therefore, the secondary market for the New Bonds is expected to be limited, and Bondholders may not be able to sell the New Bonds when they want to do so or obtain the price that they wish to receive for the New Bonds, and, as a result, could suffer significant losses. These risks are exacerbated by the unique characteristics of the New Bonds, which are complex financial instruments that are unlike most other municipal or asset-backed securities. As a result, many prospective purchasers may be unwilling or unable to purchase the New Bonds.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the New Bonds and limiting Bondholders' ability to sell the New Bonds. Concerns with the Commonwealth's fiscal crisis may also adversely affect the market value and liquidity of the New Bonds.

In addition, the issuance of the New Bonds is not anticipated to comply with the requirements of Articles 404-410 of Regulation (EU) No. 575/2013 of the European Parliament and of the Council of June 26, 2013, known as the Capital Requirements Regulation, and similar rules applicable to certain investors subject to regulation in member states of the European Economic Area. Lack of compliance with the Capital Requirements Regulation and similar rules may preclude certain investors from purchasing the New Bonds. As a result, Bondholders may be unable to obtain the price that they wish to receive for the New Bonds and, consequently, may suffer significant losses.

***An adverse rating of the New Bonds could adversely affect the market price of the New Bonds.***

The Issuer does not anticipate seeking a rating for the New Bonds from any rating agency. However, a rating agency may nonetheless issue an unsolicited rating on the New Bonds, employing quantitative and qualitative factors, including the Issuer's actual or perceived financial strength, the prospects for payment of principal and interest on the New Bonds, the impact of the Commonwealth's fiscal crisis, and other macroeconomic conditions in the Commonwealth or otherwise. Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice. Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of the Issuer's indebtedness or placing the Issuer on negative outlook for possible future downgrading. Such action may be taken at any time and is beyond the Issuer's control. The downgrade or withdrawal of any credit rating of Issuer's indebtedness, including the New Bonds, or placing the Issuer on negative outlook for possible future downgrading may have a negative effect on the value of the New Bonds.

***GDB is subject to claims that will not be satisfied or discharged prior to or as a result of the consummation of the Qualifying Modification. GDB being subject to a proceeding under Title III of PROMESA or similar proceedings could result in losses or delays in payments on the New Bonds.***

GDB is subject to claims that will not be satisfied or discharged prior to or as a result of the consummation of the Qualifying Modification. If GDB were to become subject to a proceeding under Title III of PROMESA or a similar proceeding, Bondholders could experience losses or delays in the payments on the New Bonds. On or prior to the Closing Date, GDB will transfer the Transferred Property to the Issuer pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. However, if GDB were to become subject to a proceeding under Title III of PROMESA or a similar proceeding, the court in such Title III or similar proceeding could find that the Restructuring Property would be subject to such proceeding. Such risk is exacerbated by the fact that many of these questions are matters of first impression where there is not a well-developed body of case law surrounding proceedings under PROMESA, especially with respect to Title VI of PROMESA, pursuant to which the Qualifying Modification will be implemented. If a court were to find that the Restructuring Property would be subject to such proceeding, Bondholders could experience losses or delays in payments on the New Bonds as a result of, among other things:

- the "automatic stay" that prevents certain secured creditors from exercising remedies against a debtor in bankruptcy without permission from the court;

- provisions of PROMESA that permit substitution of collateral in certain circumstances; and

- certain competing claims to GDB's property.

In addition, since these matters are largely questions of first impression where the applicable court will not have the benefit of a well-developed body of case law, the final resolution of such items may be subject to substantial delay. Such delay, and the uncertainty related thereto, may have a material adverse effect on the value of the New Bonds and the ability of the Issuer to make timely payments thereon.

***Although the New Bonds will be automatically secured by a statutory lien on the Transferred Property and all Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders, pursuant to the GDB Restructuring Act, such rights of the Bondholders may be adversely affected by issues generally associated with the realization of liens on collateral.***

Simultaneously with the issuance of the New Bonds, automatically and without further action, pursuant to the GDB Restructuring Act, the New Bonds will be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders. Pursuant to the GDB Restructuring Act, the statutory lien securing the New Bonds will occur automatically and will automatically be perfected, valid and binding from and after the issuance of the New Bonds, without further act or agreement and will be senior to any other lien encumbering the Restructuring Property (except for certain existing and ordinary course liens). The GDB Restructuring Act further provides that no instrument needs to be delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory lien or to establish or maintain the priority thereof, and the Bond Indenture will contain further assurances with respect to the lien and any after-acquired property. The Issuer is prohibited, pursuant to the GDB Restructuring Act, from pledging, creating or recording liens on any of its properties (including the Restructuring Property) other than the pledge to secure the payment of the New Bonds and the obligations to pay certain costs in connection with the restructuring of GDB. However, notwithstanding the foregoing, no court has had the opportunity to opine on the validity of such lien, and the same may be challenged notwithstanding the GDB Restructuring Act. The occurrence of any such events may negatively impact the liens on the Restructuring Property or the priority of the lien in favor of the Bondholders against third parties. Moreover, the Indenture Trustee may be unable to realize the full value of the collateral due to the practical challenges generally associated with the realization of liens on collateral.

***Certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from closing conditions and closing deliverables that are typically required in municipal debt offering transactions.***

Given the unique nature of the Qualifying Modification, certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from those typically required in municipal debt offering transactions. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Qualifying Modification will differ materially from and be more limited than those typical requirements, including but not limited to the fact that, due solely to litigation (see "*Litigation*"), it is not expected that a legal opinion with respect to the validity or enforceability of the New Bonds will be delivered.

***Any future issuances of Additional Bonds to holders of contingent claims may dilute the value of the New Bonds.***

After the Closing Date, the Issuer may be required to authorize from time to time the issuance of Additional Bonds under the Bond Indenture in respect of certain contingent claims against GDB that are described in Appendix G. Any such issuance of Additional Bonds may dilute the value of the then-existing New Bonds by decreasing the total amount of Available Cash to be paid to then-existing Bondholders pro rata. For a description of the contingent claims, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" and "*Appendix G: Contingent and Unliquidated Claims*" attached to this Offering Memorandum.

**Risks Related to the Obligors on the Restructuring Property**

***General Risks Related to the Obligors on the Restructuring Property***

***Due to the concentration of the obligors on the Restructuring Property in the Commonwealth and their reliance on payment of taxes by residents and businesses in the Commonwealth, the Issuer's ability to receive Collections on the Restructuring Property will be highly impacted by adverse conditions prevailing in the Commonwealth, regardless of the conditions (economic and otherwise) in the United States as a whole or globally.***

As noted above, the New Bonds are entirely dependent on the Collections and other recoveries on the Restructuring Property. Therefore, risks in relation to payments and Collections on the Restructuring Property will significantly and directly affect Bondholder recoveries on the New Bonds. As of the Cutoff Date, substantially all of the obligors on the Loans constituting Restructuring Property were municipalities or instrumentalities of the Commonwealth or the Commonwealth itself and the Real Property Assets were physically located in the Commonwealth. Because of the geographic concentration of obligors and assets in the Commonwealth, as well as the fact that the majority of the obligors are similarly situated, the Issuer will be highly impacted by any existing or future adverse conditions (economic or otherwise) in the Commonwealth, regardless of the conditions in the United States as a whole or globally. As further discussed herein, the Commonwealth is currently experiencing a severe fiscal and economic crisis and was significantly impacted by

two major hurricanes in September 2017, Hurricanes Irma and María. The Issuer's ability to make payments on the New Bonds will be adversely affected if the relevant obligors on the Restructuring Property are unable to make timely payments.

The obligors' ability to make timely payments on the Restructuring Property is affected by a variety of factors, many of which are outside of their control. For instance, future extreme weather conditions or natural disasters affecting the Commonwealth could cause substantial business disruptions, economic losses, unemployment and an economic downturn in the Commonwealth resulting in municipal obligors being unable to make timely payments on the Restructuring Property. Similarly, terrorist attacks, war or armed hostilities between countries or non-state actors, or the fear of such events, could adversely affect the economy of the Commonwealth resulting in obligors being unable to make timely payments on the Restructuring Property. Outbreaks of SARS, bird flu, swine flu, the Zika virus, Ebola or other pandemic diseases, or the fear of such events, could provoke responses, including government-imposed travel restrictions, which could negatively affect the economy of the Commonwealth and the ability of obligors to make timely payments on the Restructuring Property.

***Actions by the obligors on the Restructuring Property and third parties may impact the Issuer's ability and right to collect payments on the Restructuring Property, which may materially impact the Available Cash that exists for distribution to Bondholders.***

If obligors on the Restructuring Property or third parties contest the Issuer's right to Collections on the Restructuring Property or the GDB Restructuring Act, the Issuer may be forced to expend significant resources in defending its right to such Collections and, ultimately, if unsuccessful, the Issuer's ability to make timely payments on the New Bonds may be negatively impacted. Furthermore, political, legislative and legal action in the Commonwealth may impact the obligors' ability to make timely payments on the Restructuring Property. If a court or the Legislative Assembly were to limit or block the payments on the Restructuring Property by obligors, the obligors on the Restructuring Property may not make timely payments on the Restructuring Property and the Issuer's ability to make payments on the New Bonds may be adversely affected.

Similarly, the fiscal and economic crisis in the Commonwealth has substantially impacted the financial health of the obligors on the Restructuring Property and such obligors could seek relief or protection under PROMESA, in particular if they are unable to continue providing basic services while continuing to honor their debt service obligations. Pursuant to the provisions of PROMESA, political subdivisions of the Commonwealth (such as municipalities) and public corporations, are included in the definition of "territorial instrumentalities." PROMESA authorizes the Oversight Board to designate territorial instrumentalities as "covered territorial instrumentalities," which makes such entities subject to the oversight and other powers of the Oversight Board, such as having to obtain Oversight Board approval in order to perform certain actions that in the past they could carry out without the Oversight Board's review or approval. These approval rights, in turn, could lead to delays in implementing programs that in the past could be implemented without third-party review or approval and cause such entities to lose operational flexibility, which may affect their ability to honor their obligations when due.

The designation of an entity as a covered territorial instrumentality may result in significant expenditure increases, including additional expenditures related to the contracting of additional staff and consultants for the preparation of fiscal plans, periodic reports and statistics and to comply with other requirements. Such additional expenditures may further reduce the revenues available to those entities for the provision of basic services. This designation would also make certain obligors potentially eligible to seek relief pursuant to Title III or Title VI of PROMESA. Holders of obligations of such entities may be subject to involuntary reductions of interest or principal (or both) on such obligations as a result of restructuring proceedings under PROMESA. The Commonwealth and the Puerto Rico Highways and Transportation Authority ("HTA"), which are each obligors on the Restructuring Property, have already commenced proceedings pursuant to Title III. No municipality has yet been designated as a covered territorial instrumentality. If restructurings of obligors on the Restructuring Property under Title III or Title VI or PROMESA were achieved, the Issuer's ability to make payments on the New Bonds may be adversely affected if such restructuring results in reductions in principal and interest collectible on assets included in the Restructuring Property.

***The Commonwealth's ongoing fiscal and economic crisis and global economic developments could adversely affect the performance and market value of the New Bonds.***

The Commonwealth is in the midst of a profound fiscal and economic crisis, which has affected many of the Commonwealth's public instrumentalities and municipalities. The Commonwealth's gross national product contracted in real terms in every year except one between fiscal year 2007 and fiscal year 2017 (inclusive). According to the Puerto Rico Planning Board's latest economic forecast (published in April 2017), gross national product is also projected to further contract by 1.5% during fiscal year 2018. In addition, these forecasts were compiled prior to the recent disruption caused by Hurricanes Irma and María, which are expected to further negatively affect economic growth. The Revised Commonwealth Fiscal Plan, which accounts for the impact of Hurricanes Irma and María, estimates a 16.1% contraction in real gross national product in fiscal year 2018, without considering the impact of disaster relief funding or the measures and structural reforms contemplated by the plan. Taking into account such factors, the Revised Commonwealth Fiscal Plan estimates an 8.0% contraction in real gross national product in fiscal year 2018.

Factors that may continue to adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, changes in federal policy, the cost of repairs and rebuilding from severe weather events, United States and global economic and trade conditions, population decline, epidemics or pandemics of communicable diseases, the Commonwealth's high level of debt and the ongoing debt restructuring proceedings. Thus far, efforts by the Commonwealth to alleviate the recession have been unsuccessful, and it is not expected that the recession will end in the near to medium term.

Population decline has had, and may continue to have, an adverse impact on the Commonwealth's economic growth. According to the United States Census Bureau, the population of the Commonwealth decreased by 2.2% from 2000 to 2010, and by an estimated 6.8% from 2010 to 2015, driven primarily by a falling birth rate, a rising death rate, and migration to the United States mainland. The U.S. Census Bureau estimates suggest that the Commonwealth continued to lose population during fiscal year 2017 as well. Although it is too soon to accurately forecast the full effect and impact of the recent disruption caused by Hurricanes Irma and María, it is anticipated that population decline will accelerate. Reductions in population, particularly of working-age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short or medium term. In addition, the average age of the population of the Commonwealth is increasing, due mainly to a reduction in the birth rate and the migration of younger people to the United States mainland. This phenomenon is likely to affect every sector of the economy to the extent that the local consumer base is diminished and the local labor force fails to meet the demand for workers. Moreover, this trend increases the demand for health and other services provided by the Commonwealth and its municipalities, and the relative cost to the Commonwealth and its municipalities of providing such services.

Events in the global financial markets, including downgrades of sovereign debt, devaluation of currencies by foreign governments and slowing economic growth, have caused or may cause a significant reduction in liquidity in the secondary market for asset-backed securities, which could adversely affect the market value of the New Bonds and limit the ability of an investor to sell its New Bonds. On June 23, 2016, the United Kingdom voted in a referendum to discontinue its membership in the European Union. On March 29, 2017, the United Kingdom provided formal notice to the European Council stating its intention to leave the European Union. The exit of the United Kingdom or any other country out of the European Union or the abandonment by any country of the euro may have a destabilizing effect on all Eurozone countries and their economies and a negative effect on the global economy as a whole. No prediction or assurance can be made as to the effect that these developments may have on the Commonwealth's economy and, consequently, on the rate of delinquencies and/or losses on the Restructuring Property or the market value of the New Bonds.

If the recession in the Commonwealth continues or is exacerbated by other regional or global economic downturns, as the case may be, the ability of municipalities or instrumentalities within the Commonwealth to make timely payments on the Restructuring Property may be impaired and the values of the Real Property Assets could further decrease, which could lead to increased delinquencies and losses on the Restructuring Property and could in turn reduce the expected cash payments on the New Bonds as they become due.

***The full effect of the damage caused by Hurricanes Irma and María, which struck the Commonwealth in September 2017, is currently unknown, but was significant and may have a material adverse effect on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property and the Issuer's ability to make payments on the New Bonds.***

In September 2017, Hurricanes Irma and María struck the Commonwealth. The physical damage from such storms was significant and widespread and there was substantial damage to the Commonwealth's power grid, infrastructure, buildings, residences and other structures. The U.S. federal government approved a major disaster declaration for the Commonwealth, and the Federal Emergency Management Agency has made federal disaster assistance available to the Commonwealth. Recovery efforts continue throughout the Commonwealth.

It is not possible at present to quantify with any certainty the medium-term or long-term impacts of Hurricanes Irma and María on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property or the Issuer's ability to make payments on the New Bonds, any offsetting economic benefit that may result from recovery and rebuilding activities or the amount of additional resources from federal, Commonwealth and other local sources that will be required. In particular, the Municipal Loan Assets, on which the Issuer will substantially rely to fund payments on the New Bonds, are primarily dependent on property and sales and use tax collections, which may be impaired for an unknown period following the hurricanes. No assurances can be given as to the impact of Hurricanes Irma and María or other future severe weather events on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property and the Issuer's ability to make payments on the New Bonds.

***The Commonwealth's macroeconomic data may not accurately reflect the performance of its economy and that of its municipalities.***

The Puerto Rico Planning Board has acknowledged the existence of certain significant deficiencies in the calculation of its macroeconomic data. The deficiencies relate mostly to the deflators of the components of trade-related services and, in some cases, monetary accounts of certain components of gross national product. As a result, the historical rate of change in gross national product

at constant prices (real gross national product change) and at current prices (nominal gross national product change) could have been either overstated or understated for several years. It is still too early to determine how these deficiencies have affected, or will affect, the Commonwealth's macroeconomic data. Until such time as these revisions are finalized and fully applied to the Commonwealth's macroeconomic data, there is no assurance that previously reported macroeconomic data accurately reflects the performance of the economy of the Commonwealth.

### Risks Related to Municipal Obligors and their Operations

***Municipal governments have a significant amount of issued and outstanding indebtedness and, to the extent that their source of revenues is affected by the economy, severe weather events and other external factors, they may be unable to sustain expenses associated with providing essential services to their residents while continuing to honor their debt obligations as they come due.***

Municipal governments have a significant amount of issued and outstanding debt. These debt obligations were issued based on available debt margins provided by various laws. The current and prolonged fiscal, financial and economic crisis of the Commonwealth, however, has led to a decline in economic activity subject to municipal taxes, which has reduced municipal revenues. This trend has been further aggravated by the impact of Hurricanes Irma and María. Moreover, municipal governments have also been forced to dedicate more of their limited resources to providing essential services to their residents. This has been exacerbated recently by high expenditures relating to Hurricanes Irma and María. Therefore, a debt burden that may have been manageable at the time of incurrence has become more burdensome for most municipalities. As a result, municipal governments may be unable to sustain the growing expenses required to maintain basic municipal operations, such as security and trash removal, in addition to their debt service obligations.

***Many municipalities are considered autonomous entities under Commonwealth law and there is no repository of municipal economic data. As a result, there is no assurance that the available information regarding the economies of the municipalities is accurate or complete.***

Many of the larger municipalities operate pursuant to the provisions of Act No. 81-1991, as amended, known as the "Autonomous Municipalities Act." Based on the provisions of this law, such municipalities operate as quasi-independent entities within the Commonwealth. These municipalities provide basic services to their residents, collect municipal revenues and enforce municipal revenue laws and gather data regarding their municipalities. As quasi-independent entities, these municipalities are not required to provide much public data regarding their operations and their financial condition, other than their budgets, audited financial statements and other data as may be required to obtain Loans or other financings. Municipal financial data, however, is typically published and available at the Office of the Municipal Commissioner and information about tax revenues is typically available from CRIM, but the publication of data is often substantially delayed. As a result, the economic and operating data regarding these municipalities may be limited, not up-to-date, and may not have been prepared with sufficient safeguards to confirm its accuracy and completeness. Therefore, the Issuer, the Servicer and the Bondholders may not have access to reliable financial and operational information to assess the creditworthiness of each municipality, including their ability to make payments on the Municipal Loan Assets.

***The Revised Commonwealth Fiscal Plan provides for the reduction and eventual elimination of a substantial portion of the central government's subsidy to municipalities, which may adversely affect the ability of municipal governments to continue providing essential services and servicing their debt obligations.***

Municipal entities have historically relied upon subsidy payments from the Commonwealth's central government for some of their budget. In some cases, these subsidy payments have represented a substantial portion of such municipal entities' revenue. Pursuant to the Revised Commonwealth Fiscal Plan, aggregate appropriations from the Commonwealth to municipalities were decreased by $150 million in fiscal year 2018 and by an additional $45 million in fiscal year 2019 (from approximately $370 million in fiscal year 2017 to approximately $220 million in fiscal year 2018 and approximately $175 million in fiscal year 2019). The Revised Commonwealth Fiscal Plan provides for additional reductions in Commonwealth appropriations to municipalities every fiscal year, holding appropriations constant at approximately 45-50% of current levels starting in fiscal year 2022 before ultimately phasing out all appropriations in fiscal year 2024. These appropriations were intended in part to replace foregone *ad valorem* taxes due to the exemption available for owner-occupied residential property, and were typically deposited into the Municipal Matching Fund and allocated to municipalities pursuant to Act No. 80 of August 30, 1991, as amended (the "CRIM Act"). Municipalities traditionally use the funds received from the central government to fund municipal services and capital improvement in order to provide services to its residents. The gradual reduction of these appropriations will have an adverse effect on most municipalities to the extent they are unable to replace this revenue source or reduce their expenses, but may have a disproportionate effect on municipalities with a smaller tax base and which rely heavily on such appropriations. It has been reported that municipalities are currently contemplating various initiatives in order to mitigate the impact caused by the loss of a portion of the central government appropriations, including through proposed changes in legislation. As of the date hereof, however, no such legislative changes have been implemented. There is no assurance that municipalities will be able to replace this revenue source and, to the extent they are unable to make such replacement, they may be unable to continue to sustain expenses associated with providing the same level of essential services to their residents while honoring debt payment obligations, including the Municipal Loan Assets, as they become due.

40

*The depletion of the assets of the public pension system in which municipalities participated and the change to a pay-as-you-go model could result in a material increase in the pension benefit expenses payable by the municipalities that could materially adversely affect the financial condition of some municipalities and their ability to meet their obligations in full, including the Municipal Loan Assets.*

All municipalities previously participated in the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("ERS"), a statutory trust created by Puerto Rico law that administers a cost-sharing, multiple-employer, hybrid-defined benefit plan. Historically, participating employers were required to contribute to ERS an amount determined by statute and established as a percentage of payroll, rather than an amount determined on an actuarial basis. This resulted in a historical underfunding of ERS, with actual employer contributions averaging approximately 32.7% of what were the annual required contributions determined actuarially. Following the pension reform legislation enacted in fiscal year 2013, all participating employers in ERS were required to make additional contributions to ERS, but most employers, including the Commonwealth and various municipalities, were unable to meet such additional contributions. As a result, ERS is now insolvent and has depleted its liquid assets. To address this problem, which threatens pension payments to thousands of retired public employees in the Commonwealth, including retired municipal employees, the Commonwealth enacted Act 106-2017, adopted on August 23, 2017 ("Act 106"), which, among other matters, adopts a pay-as-you-go model for the continuing payment of public pension benefits. Under this model, the Commonwealth will continue to honor public pension benefits and participating employers, including municipalities, are required to pay to the Commonwealth an amount determined by AAFAF corresponding to the actual payments of pension benefits to retirees and beneficiaries of each particular participating employer. Most municipalities and many public corporations were unable to make all payments required to be made by them to the Commonwealth to cover the pension benefits of their retirees under the new pay-as-you-go model during fiscal year 2018 and therefore still owe significant sums to the Commonwealth with respect thereto. Pursuant to Act 106, the Retirement Board established under such law may require CRIM to transfer from the unencumbered property taxes of a municipality any amounts owed by such municipality under the pay-as-you-go system. Amounts required to be paid by the municipalities under the pay-as-you-go system could represent a material increase in the historical pension benefits expenses payable by the municipalities, adversely affecting their financial condition and ability to meet their obligations in full, including the Municipal Loan Assets.

*Municipal governments may now have to provide essential services that were previously provided by the Commonwealth's central government, which may adversely affect their ability to service their debt obligations.*

The Revised Commonwealth Fiscal Plan provides for reductions in services that the Commonwealth traditionally provided. Moreover, HTA, which is currently in a proceeding under Title III of PROMESA, provides services related to the Commonwealth's transportation infrastructure, such as road maintenance and repairs. To the extent the Commonwealth and certain public corporations responsible for capital improvement and maintenance to basic infrastructure are unable to adequately cover these responsibilities, municipal governments may have to step in and undertake to provide such services. In certain cases, municipal governments may seek to divert limited resources, subject to or in contravention of restrictions on the use of such resources under applicable law, in order to undertake such services and, in other cases, municipal governments may not have the resources or expertise to provide the services at the required level. To the extent municipal governments seek to divert resources to cover these services, and are able to do so pursuant to or in contravention of then-current applicable law, their ability to service their debt on a timely basis may be affected. If, on the other hand, municipal governments are unable to ensure basic services to their residents and such inability causes a deterioration of economic activity and property values in the municipality, their revenues may be adversely affected and they may become unable to service their debt on a timely basis, including the Municipal Loan Assets.

*Municipal revenues are dependent on legislation enacted by the Legislative Assembly and any amendments to such legislation may have an adverse effect on the ability of municipalities to collect revenues.*

Municipalities are created by the Legislative Assembly and their rights and powers are granted by legislation. Although municipalities are authorized by the Constitution of the Commonwealth of Puerto Rico (the "Commonwealth Constitution") to impose taxes, the nature and extent of most of those taxes are provided for by the Legislative Assembly. As a result, changes or amendments to Commonwealth legislation that authorizes municipalities to impose certain taxes may adversely affect their ability to raise and collect revenues.

Moreover, the Legislative Assembly also has the power to exempt entities from taxes, including municipal taxes. For example, various economic development laws enacted by the Legislative Assembly over the past years have exempted certain businesses from the payment of real property, personal property and other municipal taxes as an incentive to promote their establishment in the Commonwealth. To the extent the Legislative Assembly continues to enact legislation that exempts businesses from municipal taxes, municipalities may be adversely affected as their tax base is reduced and their ability to collect revenues is reduced. Furthermore, there is certain pending legislation that, if ultimately approved, could adversely affect Collections on the Municipal Loans Assets. For a discussion of such pending legislation, see "*Municipalities—Recent and Pending Legislation Impacting Municipalities*" in this Offering Memorandum.

41

*Municipalities may be subject to additional or new federal and local regulations that may increase their operational expenses and capital improvement requirements and, as a result, materially adversely affect their ability to service their debt obligations while maintaining essential services.*

Prevailing economic conditions in the Commonwealth have limited the amount of revenues collected by municipalities. These revenues, in turn, have been spread thin by the demand for additional services provided by municipalities to their residents. For example, municipal governments typically have owned or operated landfills and have provided waste disposal services to their residents. Many of these landfill operations are not compliant with local and federal environmental regulations and many municipal governments do not have the resources required to bring these operations into compliance. If these landfills are not brought into legal and regulatory compliance, municipalities may be required to stop their operation and find an alternative to waste disposal for its residents, which could result in an increase of operating expenses as the municipality finds waste disposal alternatives. If municipal governments are unable to comply with applicable laws and regulations with respect to certain of their operations or if they are unable to comply with additional local or federal regulations imposed on municipal operations, municipalities may be unable to assume such additional expenses without severely affecting their ability to continue providing other basic services. As a result, if municipal expenses increase due to additional local or federal regulation, municipalities may be unable to continue providing services at current levels and this, in turn, may affect their ability to cover debt service on their outstanding debt, including the Municipal Loan Assets.

*The fiscal and financial challenges faced by many municipalities may lead to the creation of regional consortiums or ultimately to their consolidation with larger, more solvent municipalities. To the extent municipal consolidation occurs, it is unclear what effect, if any, such consolidation would have on the outstanding obligations of the consolidated municipalities.*

As of the date of this Offering Memorandum, the Commonwealth has 78 municipalities. Many of these municipalities are small and may not have a significant revenue base to maintain independent operations. It has been reported that this has led to discussions regarding the creation of regional consortia, which would allow for the administrative consolidation of smaller municipalities with larger municipalities that have a robust tax base in the form of significant private commercial activity. Although municipal consolidation has also been discussed, the Commonwealth's Constitution requires the affirmative vote of a majority of the residents of a municipality in order to consolidate or abolish such municipality. To the extent municipalities form regional consortia or consolidate, it is unclear what would happen to such municipality's outstanding debt, and which entity would be responsible for its payment. It is unclear whether the larger municipality would assume such debt or if such municipality would be able to refuse to assume such debt to the extent its particular debt load is close to, or would be in excess of, its allowed borrowing margin. As a result, the Issuer may have difficulty recovering amounts due on the Municipal Loan Assets of the municipalities that either form a regional consortium or consolidate into one another.

*Municipal governments may be unable to raise additional revenues without undermining economic activity.*

Municipal governments currently impose a myriad of municipal taxes, including real property taxes, personal property taxes, municipal license taxes, sales and use taxes, and construction excise taxes, among others. Through the years, municipal governments have been forced to slowly increase these taxes in order to raise revenues to maintain municipal services and service their debt. Although many municipalities may continue to increase the rates at which these taxes are imposed, the population loss caused by the Commonwealth's economic conditions make increasing tax rates less effective. As a result, municipal governments may not be able to effectively increase their taxes without undermining economic activity in their municipalities. This, in turn, may lead to municipalities being unable to raise additional revenues, which could materially affect the municipality's ability to honor its obligations, including the Municipal Loan Assets, while continuing to provide essential services.

*Municipal governments may not have sufficient borrowing margin or access to financing and may be unable to continue funding their public works programs and operational deficits.*

In the past, municipalities have financed their public works programs and operational deficits through borrowings. A municipality's ability to borrow, however, is limited by law. If a municipality has reached its borrowing limit, it cannot legally incur additional debt payable from that revenue source. GDB historically served as an important source of liquidity to municipal governments by providing financing to such entities. However, given GDB's current financial situation and the orderly wind down of its operations contemplated in the GDB Fiscal Plan, GDB is no longer in a position to provide such financings. While certain municipalities may be able to obtain financing from private financial institutions to continue funding their public work programs and operations, others may not be able to obtain such financing. To the extent municipalities are unable to borrow funds to finance their public works programs and operations, they may be unable to continue providing adequate municipal services to their residents, which may cause those residents or businesses to move to other municipalities, thus affecting the municipality's tax base. This may lead to a decrease in revenues and the municipality's inability to honor its obligations, including those constituting Restructuring Property, when due, while continuing to provide essential services.

*Municipal governments will begin paying for their consumption of electricity, which may significantly increase their operating expenses and adversely affect their ability to honor their obligations when due.*

Historically, municipal governments have paid for the electric power they receive from the Puerto Rico Electric Power Authority ("PREPA") through a contribution-in-lieu-of-taxes mechanism. This mechanism, set in place by the Legislative Assembly, had allowed municipalities to offset their entire electric consumption bill to compensate them for foregone tax revenue related to the properties owned by PREPA in such municipality. As a result of this mechanism, in the past, municipalities typically did not have to pay for electric power with their internal revenues. This mechanism was recently modified by the Legislative Assembly by providing for a cap on the electric consumption expense that could be compensated by a municipal government and requiring a gradual reduction of municipal government electric consumption. As a result, municipal governments will now have to use their internal revenues to cover any electric consumption expense in excess of those covered by the contribution-in-lieu-of-taxes mechanism. Furthermore, PREPA's fiscal plan, as approved by the Oversight Board, requires additional changes to the contribution-in-lieu-of-taxes mechanism. PREPA's fiscal plan also contemplates the privatization of the Commonwealth's electric system, which may lead to stricter payment and collection policies for all PREPA customers. As a result, municipalities may have to start using an even greater proportion of municipal revenues to pay for electric service at their facilities. There is no assurance that municipalities will have sufficient available resources to assume this added expense and, consequently, some municipalities may be required to divert resources from debt repayment, including payments on Municipal Loan Assets, other programs and essential services in order to cover the cost of electricity.

*To the extent a municipality defaults on Loans granted to it by the U.S. federal government under the Community Disaster Loan Program, the U.S. federal government may exercise certain rights that could adversely affect the ability of the municipality to continue providing essential services and pay debt service on its other Loans, including the Municipal Loan Assets.*

Certain municipalities have obtained Loans (the "CDL Loans") from the U.S. federal government under the Community Disaster Loan program of the Robert Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act"). The CDL Loans are payable from and secured by a pledge of the municipality's revenues for each year while any of such municipality's CDL Loans are outstanding. Under the Stafford Act, the CDL Loans may be forgiven under certain circumstances. However, to the extent the CDL Loans are not forgiven and a municipality defaults on its CDL Loan, Federal Emergency Management Agency ("FEMA") is authorized to take action to recover the outstanding principal plus related interest under federal debt collection authorities, including administrative offset against other federal funds payable to the municipality and/or referral to the U.S. Department of Justice for judicial enforcement of collection. To the extent FEMA exercises any such rights, the ability of municipalities to continue providing essential services and pay debt service on their other Loans, including the Municipal Loan Assets, may be adversely affected.

**Risks Related to the Restructuring Property**

### General Risks Related to the Restructuring Property

*The Restructuring Property that is currently classified as performing solely consists of the Municipal Loan Assets and the Additional Recovery Authority Loans. To the extent such Loans do not perform as expected, the Collections expected to be received by the Issuer may be significantly reduced.*

The only performing Loans to be held by the Issuer as of the Closing Date are Municipal Loan Assets, of which approximately 97.1% (or Loans with a principal balance of approximately $1,209 million) were classified by GDB as performing as of the Cutoff Date. As a result, a substantial majority of Collections to be generated by the Restructuring Property is expected to be derived from the Municipal Loan Assets. The Restructuring Property also includes the Beneficial Interest in, and the proceeds of the GDB Retained Loans, including the Additional Recovery Authority Loans. The Additional Recovery Authority Loans, which are required to be transferred by GDB to the Issuer after the Closing Date in accordance with the Transfer Agreement, are also performing as of the Cutoff Date. Although the Municipal Loan Assets and the Additional Recovery Authority Loans have been performing to date, the future performance of such Loans is subject to many risks and, to the extent these risks materialize, either in whole or in part, such Loans may generate significantly less Collections than expected. As a result, any defaults in the Municipal Loan Assets or the Additional Recovery Authority Loans may result in the Issuer receiving lower Collections than expected, which would adversely affect the amount expected to be paid to the Bondholders.

A substantial amount of the Loans that are part of the Restructuring Property accrue interest at a variable rate typically determined by an underlying benchmark plus a spread. Although the interest rate on such Loans is capped at 12% pursuant to Puerto Rico law, the current interest rate accruing on such Loans is substantially below 12%. In particular, any increase in the interest rate applicable to the Municipal Loan Assets may further strain the municipalities' finances and undermine their ability to continue paying their obligations as they come due. There is no assurance that the Municipal Loan Assets and the Additional Recovery Authority Loans will continue to perform as expected in an increasing interest rate environment.

*Ongoing or future litigation challenging the treatment of certain claims against GDB or settlement of such claims under the Qualifying Modification and/or the GDB Restructuring Act could adversely affect the value of the Restructuring Property.*

There is certain pending or threatened litigation by holders of claims against GDB challenging the treatment of their claims under the Qualifying Modification and/or the GDB Restructuring Act. Certain parties, for example, have commenced litigation claiming that they are entitled to the return of funds purportedly held "in escrow" without any reduction or impairment. Similarly, certain municipalities claim that certain of their deposits with GDB were held "in trust" and are not subject to being diminished or impaired as other deposit claims. While GDB believes that the treatment of claims against GDB under the Qualifying Modification and the GDB Restructuring Act is appropriate and intends to defend any lawsuit challenging such treatment, there can be no assurance that GDB will prevail in any litigation. A judicial ruling adverse to GDB or a settlement could result in some claimants receiving more from their claims than currently projected, thus reducing the value of the Restructuring Property.

*Future litigation against GDB based on its past role as fiscal agent and financial advisor of the Commonwealth and its instrumentalities could adversely affect the Restructuring Property.*

On September 6, 2017, the Oversight Board hired the firm of Kobre & Kim, LLP ("Kobre") to perform an investigation of the debt issuance practices of the Commonwealth and its instrumentalities. As part of the investigation, Kobre conducted many interviews, including of past and current officers of GDB. On August 20, 2018, Kobre issued its Final Investigative Report (the "Kobre Report") with its findings as to the Commonwealth's past debt issuance and disclosure practices. Although the Kobre Report is not intended to assign fault to any party, the Kobre Report addresses a broad range of potentially actionable conduct and claims against various parties, which include concerns regarding GDB's role as fiscal agent and financial advisor. As a result, creditors and other third parties may commence litigation trying to impose liability on GDB for its role in the Commonwealth's debt issuance and disclosure policies. While GDB believes that its performance as financial advisor and fiscal agent was consistent with applicable law and intends to defend any lawsuit raising such claims, there can be no assurance that GDB will prevail in any litigation. A judicial ruling adverse to GDB or a settlement could result in a reduction in the value of the Restructuring Property.

*While the Restructuring Property has a high notional value, the Issuer's ability to make payments to the Bondholders will depend upon Collections on the Restructuring Property rather than such notional value.*

While the Restructuring Property has a high notional value, the Collections on the Restructuring Property are not expected to be equivalent to such notional value. As such, the Issuer's ability to make payments to the Bondholders will depend upon Collections on the Restructuring Property rather than such notional value. For additional information on the sources of payment on the New Bonds, see "*Risks Related to the New Bonds and the Keepwell Agreement—Bondholders must rely for repayment only upon Collections generated in respect of the Restructuring Property, which are not expected to be sufficient to pay in full in cash all interest as it comes due or pay all principal amounts (including PIK Amounts) of the New Bonds.*"

*Certain assets that constitute the Restructuring Property share their source of repayment with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property.*

The Restructuring Property consists mainly of intragovernmental Loans with debt service schedules that typically do not include balloon payments. Many of the governmental entities that borrowed from GDB, including many municipalities, also entered into loan agreements with private financial institutions. Such private Loans, however, contain payment terms that differ from those entered into with GDB, including the structuring of debt service schedules with balloon payments. In the past, such governmental entities were able to refinance balloon payments with GDB or private financial institutions. In the future, however, GDB will not be available to refinance such payments, and governmental entities may have to honor their debt service obligations as they come due unless they are able to secure private financing. In particular, municipalities have entered into Loans with private financial institutions that are payable from the same source of funds as the Loan assets included in the Restructuring Property. If a municipality is required to honor a balloon payment, the amount due may significantly reduce the amounts available for payment of the municipality's other obligations secured from the same source, including Loans that are part of the Restructuring Property. To the extent municipalities are required to cover balloon payments in the future, there is no assurance that municipalities will be able to cover debt service payments due under the Restructuring Property in their entirety, which may significantly reduce Collections on the Restructuring Property.

*Future Collections on the Restructuring Property are subject to substantial risk and may materially deviate from GDB's historical Collections and the Collection Schedule set forth in this Offering Memorandum, due in part to conditions and events outside of the control of the Issuer and Bondholders. Such change may reduce Bondholder recoveries on the New Bonds or adversely affect the market value of the New Bonds.*

Future Collections on the Restructuring Property are subject to substantial risks, including those described herein, and may materially deviate from GDB's historical Collections and the Collection Schedule set forth in this Offering Memorandum. While the Restructuring Property primarily consists of Loans with fixed payment schedules, the overall mix of the Restructuring Property and the

non-performing status of the various Loans therein make the Collection Schedule for the Restructuring Property subject to substantial change, due in part to conditions and events outside of the control of the Issuer and the Bondholders. If such schedule of payments changes, the amount of Collections will change and may adversely affect recoveries on the New Bonds. For instance, the Restructuring Property includes certain current Loans that have annual percentage rates ("APRs") that are less than the interest rates on the New Bonds. To the extent that obligors on current Loans with higher APRs are able to prepay or refinance their Loans at lower interest rates, such repayment may result in the Issuer holding Restructuring Property that will generate even lower Collections available to make current cash payments of interest on or principal of the New Bonds.

The Collection Schedule and all hypothetical scenarios presented in this Offering Memorandum are indicative only and there can be no assurance that actual Collections on the Restructuring Property or actual amortization of the New Bonds will not materially deviate from such Collection Schedule and hypothetical scenarios.

***Unpredictable Collections on the Restructuring Property may cause earlier than expected principal payments on the New Bonds, resulting in reduced returns on investment and reinvestment risk. The subordination of payments on the New Bonds to the Servicing Fee, the Collateral Monitor Fee and other Issuer Expenses may also result in reduced or delayed cash payments of principal and interest on the New Bonds.***

Bondholders may receive payments of principal on the New Bonds earlier than expected. If that happens, Bondholders may not be able to reinvest the principal received at a rate as high as the rate on the New Bonds. Early Collections on the Restructuring Property may shorten the life of the New Bonds in a way that cannot be fully predicted. The rate of Collections on the Restructuring Property may be influenced by a variety of economic and other factors. It is not possible to fully predict the actual rate of Collections on the Restructuring Property. Bondholders will bear any reinvestment risks resulting from a faster or slower rate of payments of the Restructuring Property.

Bondholders that receive payments of principal earlier than expected are exposed to greater reinvestment risk, and Bondholders that receive payments of principal later than expected are exposed to greater risk of loss. In either case, the yields on the New Bonds could be materially and adversely affected by Collections that differ from the Collection Schedule set forth herein.

In addition, the New Bonds are subject to risk because payments of principal and interest on the New Bonds on each Payment Date are subordinated to the payment of the Servicing Fee, the Collateral Monitor Fee and certain other amounts payable to the Servicer, Collateral Monitor and the Indenture Trustee in respect of fees, expenses and indemnification amounts and other Issuer Expenses. This subordination could result in reduced or delayed cash payments of principal and interest on the New Bonds.

***The Restructuring Property primarily consists of receivables in respect of intergovernmental transactions and the formal documentation of such transactions may not be comprehensive. As a result, it may be difficult to determine what rights, if any, the Issuer has with respect to certain of the assets included in the Restructuring Property and its ability to collect on such obligations may be significantly limited.***

The Restructuring Property mainly consists of assets created as a result of intergovernmental transactions. In many instances, these intergovernmental transactions were not fully documented because the authority or requirement to provide the Loans and its source of repayment is set forth in applicable law. Moreover, GDB did not have a need to comprehensively and formally document these transactions because it did not have a real expectation of selling this portfolio and, in those cases where Loans could be securitized through the Municipal Financing Authority ("MFA"), it had the contractual right of modifying the Loan documents to what would then be required by MFA. As a result, the formal documentation evidencing the Restructuring Property is not as comprehensive as those documents that typically evidence Loans in the private sector. Moreover, the Loan documents evidencing these assets may have inconsistent provisions or differing rights, depending on when they were prepared and by whom. Therefore, the Issuer may have difficulty in determining what rights, other than those provided by law, if any, it has under the Loans and which of those rights it may be able to enforce effectively. This, in turn, may affect the amount of the Collections to be received by the Issuer in respect of the Restructuring Property and the amounts that will be available to make payments on the New Bonds. For example, Municipal General Obligations are evidenced by Interim Receipts (as defined herein), which are simple notes that were issued to GDB with the expectation that such receipts would be replaced with definitive bonds upon the completion of a securitization transaction through MFA. The Interim Receipts were not replaced with definitive bonds because an MFA transaction was not completed.

***The statutory provisions purporting to secure, dedicate or pledge the revenue streams benefiting the Loans that constitute Restructuring Property are untested and may prove to be ineffective in bankruptcy or otherwise.***

Municipal governments are authorized to borrow against several of their revenue sources. This authority to borrow is set forth in different laws, which usually provide how the obligations will be incurred, how a particular revenue source will be used or dedicated to pay such obligations and how the proceeds derived from such borrowing may be used by the municipality. The efficacy of such statutory provisions in a bankruptcy context or otherwise has not been challenged or resolved before a Commonwealth court. However, the Oversight Board, in litigation commenced by the Municipality of San Juan, argued that the statutory language providing for the

incurrence of Municipal General Obligations falls short of creating a statutory lien. The issue of whether such sources of revenue constitute "special revenues" under applicable bankruptcy law has also not been raised or resolved before a court. Such lawsuits and any other challenges to the sources of payment for such obligations may result in payments being interrupted or the Loans being treated as unsecured obligations or being otherwise impaired, which may adversely affect the Issuer's recovery.

***The foreclosure of liens or the enforcement of other rights securing Loans included as part of the Restructuring Property may be unavailable to the extent the obligor on such Loan seeks relief under Title III of PROMESA.***

The Servicer (on behalf of the Issuer) may be unable to foreclose on liens or enforce other rights securing Loans of obligors that have sought or hereinafter seek relief pursuant to the provisions of Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the Title III petition. Moreover, revenues received by the corresponding entity subsequent to the filing of the Title III petition may not be subject to such liens, which may adversely affect the Issuer's recovery.

***Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.***

The allowance, classification, and treatment of claims under a plan of adjustment approved in a proceeding under Title III of PROMESA may take into account the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, as incorporated by section 301 of PROMESA, or otherwise. There is a risk that creditors of the Commonwealth, HTA, or another obligor on the Restructuring Property in a pending or future Title III proceeding could object to a plan of adjustment for such entity on the basis that the Loans made by GDB to such obligor should be reclassified or subordinated in a Title III plan of adjustment. Generally, courts consider the following factors in determining whether to equitably subordinate a claim: (i) whether the creditor was engaged in inequitable conduct, (ii) whether the misconduct injured other creditors or gave an unfair advantage to the creditor in question, and (iii) whether subordination would be consistent with the provisions of the Bankruptcy Code. Insiders and affiliates may be held to a higher standard than are unaffiliated third parties.

***The Restructuring Property securing the New Bonds includes certain Loan proceeds that will not be transferred to the Issuer until received by GDB after the Closing Date. Although the New Bonds will be secured by a lien on the Beneficial Interest in such Loans, the lien on such proceeds received by GDB after a hypothetical GDB Title III filing could be subject to challenge.***

Pursuant to the GDB Restructuring Act, the New Bonds will be automatically secured by a statutory lien on the Restructuring Property, which includes the right to receive the proceeds of, and 100% of the Beneficial Interests in, any property remaining at GDB as of the Closing Date, the net proceeds of which are required to be transferred to the Issuer once received by GDB after the Closing Date. Notwithstanding the foregoing, there is a risk that the lien on such proceeds to be transferred after the Closing Date could be challenged if GDB commences a proceeding under Title III of PROMESA prior to receiving such proceeds.

***The payment statistics provided by GDB may not accurately reflect the delinquency of the Transferred Property and, as a result, the Transferred Property's actual performance may be worse than presented.***

In the past, GDB acted as an intergovernmental bank and provided financing to government entities in order to fund their operations and capital improvement programs. In certain instances, the financing provided could not be timely paid by such government entity and GDB would negotiate a refinancing or a Loan modification that would extend the amortization of the Loan in order to provide such entity some additional time to pay. In certain instances, this process was repeated with government entities that, at that time, did not have the capacity to repay their Loans. As a result, the payment information related to the Loans that compose the Restructuring Property may not accurately represent the performance of the portfolio to the extent that the information related to these refinancing and Loan modifications are not captured by the financial information presented. This means that entities that are shown as current or performing may not actually have the resources to honor their obligations as they become due and that the information regarding delinquencies contained herein may be understated. Therefore, the Collections may be significantly delayed or significantly less than those shown in the Collection Schedule.

***Collections on ad valorem real and personal property taxes, which constitute the principal source of payment of certain Municipal Loan Assets, may be adversely affected as a result of a number of factors, including recent legislation, changes to applicable law and the lack of sufficient resources to adequately assess and collect such taxes.***

*Ad valorem* taxes imposed by the municipalities, which are property taxes assessed based on the value of the property, are collected by the Municipal Revenues Collection Center ("CRIM" by its Spanish acronym). CRIM is a municipal instrumentality of the Commonwealth created by law. CRIM's enabling act delegates many functions related to collection of property taxes to CRIM, such as assessing, collecting and distributing the funds collected as a result of *ad valorem* taxes. CRIM is authorized to charge municipalities a commission of up to 5.0% of total Basic Tax revenues collected in order to fund its operations.

On August 6, 2017, Act No. 77-2017 was enacted, which amended certain provisions related to the imposition and collection of *ad valorem* taxes. In particular, municipalities were granted the authority to collect such taxes and to take any action to embargo or foreclose on taxpayer property with prior notice to CRIM. Prior to such amendment, certain municipalities were authorized to take such actions pursuant to various agreements between CRIM and such municipalities, which required that any funds collected by the municipality be deposited with CRIM. Although the amendment also provides that funds collected by the municipalities must be deposited with CRIM, CRIM has yet to approve the regulation that would provide for the implementation of these provisions. Moreover, the amendment provides that municipalities that exercise these powers are not required to pay CRIM the commission of up to 5.0% of total Basic Tax revenues collected. To the extent that municipalities begin to implement these provisions and forego paying CRIM's commission, CRIM's operational revenues may be significantly reduced and its ability to perform its functions may be adversely affected. If CRIM is unable to continue performing its collection responsibilities, all municipalities, including those without the necessary financial resources, would be forced to undertake these assessment and collection functions in order to secure their *ad valorem* tax revenue streams. Considering CRIM has centralized many functions that would have to be decentralized, municipalities may not have the resources to implement an alternate collection system to effectively replace CRIM. As a result, any change in the CRIM structure and powers as a result of this or any other future legislation could significantly affect a municipality's ability to continue to honor its debt obligations, including the Municipal Loan Assets, as they become due while continuing to provide essential services to its residents.

Furthermore, like many government entities in the Commonwealth, CRIM has been affected by the fiscal and financial challenges of the Commonwealth and the recent severe weather events. Specifically, CRIM's responsibilities require sufficient personnel to make field visits and assess the value of new properties or improvements to existing properties in order to impose and collect *ad valorem* taxes. CRIM also requires personnel to review records and inspect real property in order to verify that such properties have not been modified in a way that would require the owner to pay additional *ad valorem* taxes. Moreover, CRIM has to carry out these assessments and review duties in a limited period of time because the statute of limitations to assess the value of new real properties or improvements on existing properties is five years and, in many cases, CRIM has not been able to make such assessments within such timeframe. After the statute of limitations has run, CRIM and the municipality lose their legal right to impose *ad valorem* taxes retroactively for periods prior to five years before the date of assessment on such new property or improvement. Therefore, CRIM's limited resources and personnel may adversely affect municipal revenue collections to the extent that CRIM is unable to properly and timely assess the *ad valorem* taxes attributable to real property in a municipality and, thereafter, collect such *ad valorem* taxes. This failure could lead to municipalities receiving less than potential collections and an inability by the affected municipality to honor its obligations as they become due, including the Municipal Loan Assets.

Finally, it has recently been reported that certain legislators are considering filing legislation to eliminate the portion of the personal property taxes corresponding to taxes on inventory. The elimination of such taxes, especially if a substitute revenue source is not identified, could aversely affect the financial condition of the municipalities and the repayment of the Municipal Loan Assets. For a discussion of recent and pending legislation impacting municipalities, see "*Municipalities—Recent and Pending Legislation Impacting Municipalities*" in this Offering Memorandum.

***Ad valorem taxes collected on real property in a municipality are assessed by converting current property values to the property values prevailing in 1957, which results in municipalities being unable to realize the collections that would be due on the current value of such property. Moreover, it is unclear how any change to the manner in which ad valorem taxes are imposed may affect such collections.***

*Ad valorem* taxes are assessed based on fiscal year 1957–1958 property values. No real property reassessment has been made since fiscal year 1957–1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in fiscal year 1957–1958. As a result, assessed valuations of real property are usually substantially lower than actual market values of such property. In addition, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available. For years, administrations of different political parties and economists have identified this practice as one that needs to be reformed in order to capture the current value of real property when assessing taxes. This system, however, has not been reformed due to the complexity and the resources required to complete such task. To the extent the *ad valorem* tax system remains unchanged, municipalities will be unable to realize tax revenues in respect of the increases in real property values over the last 60 years.

Notwithstanding the foregoing, and in light of the Commonwealth's depressed economy and the state of the real estate market, it is unclear how any change to the manner in which *ad valorem* taxes are imposed may affect municipal *ad valorem* tax revenues.

### Risks Related to the Municipal General Obligations

***There is no judicial precedent in the Commonwealth for the enforcement of a municipal pledge of its good faith, credit and taxing power and it is unclear whether a court could order a municipality and its municipal legislature to increase taxes in order to pay its General Obligations.***

The documents evidencing the Municipal General Obligations, in accordance with Act No. 64-1996, as amended, known as the Municipal Financing Act (the "Municipal Financing Act"), provide that the good faith, credit and taxing power of the municipality are pledged to the payment of the Municipal General Obligations. The Commonwealth's Supreme Court has never had the opportunity to rule on whether holders of Municipal General Obligations have the right to compel the municipal legislature to increase taxes in the event that *ad valorem* taxes are insufficient to pay the Municipal General Obligations, or to rule on how such right, if determined to exist, could be enforced.

***Although Municipal General Obligations are paid primarily from a municipality's Special Additional Tax and the rate at which such tax is imposed is not capped, municipalities may be unable to continue raising such tax due to the current economic conditions prevailing in the Commonwealth.***

The Municipal Financing Act provides that the principal source of repayment for municipal general obligations is the Special Additional Tax. The Special Additional Tax is an *ad valorem* tax that municipalities impose on real property located in their territorial bounds and the rate at which such tax is imposed is not capped by law. Although a municipality is required by law to increase such Special Additional Tax to a level that would allow it to continue honoring its obligations as they become due, a municipality's ability to raise the Special Additional Tax from current levels may be limited by prevailing economic conditions in the Commonwealth. Raising the Special Additional Tax may cause business to relocate to other municipalities and lead to reduced collections. As a result, a municipality may be limited in its ability to raise the Special Additional Tax and, if raised, such Special Additional Tax may not produce the collections required to continue honoring its municipal debt service while continuing to provide essential services to its residents.

### Risks Related to Sales Tax Obligations

***A municipality's authority to impose or collect the municipal sales and use tax may be affected by temporary tax holidays, amendments or modifications approved by the Legislative Assembly or by ongoing or future litigation challenging such authority.***

A portion of the municipal obligations included in the Restructuring Property are payable from municipal sales and use tax collections. The Commonwealth's Internal Revenue Code authorizes and requires municipalities to impose a sales and use tax of 1.0% on taxable items and provides for an additional 0.5% municipal sales and use tax that is deposited, on behalf of the municipalities, in the Municipal Administration Fund (the "FAM" by its Spanish acronym). Sales Tax Obligations are payable from a portion of the municipal sales and use taxes deposited in the FAM. Although these funds are allocated to the municipalities, the authority to impose such taxes and collect them derives from legislation approved by the Legislative Assembly. Moreover, the authorized uses of these funds are set forth in laws enacted by the Legislative Assembly. To the extent the Legislative Assembly deems it necessary to amend these laws to modify the rate at which the taxes are imposed or their authorized uses, the municipalities would be significantly adversely affected and their ability to collect municipal sales and use tax revenues could be reduced. In addition, a municipality's authority to collect sales and use taxes could also be temporarily affected by the declaration of sales and use tax holidays by the Commonwealth's central government. For example, current law provides for a three-day sales and use tax holiday during the back-to-school period. Also, the Governor is authorized to declare sales and use tax holidays during declared emergencies, which authority the Governor exercised following Hurricanes Irma and María by temporarily suspending the application of sales and use taxes on processed foods due to the lack of electric power for a significant period of time. The Governor also suspended the application of sales and use taxes to goods sold and services provided by merchants with annual sales of $1 million or less from November 20, 2017 to December 31, 2017.

Traditionally, municipal taxes and revenues, such as the municipal sales and use tax, were considered not to constitute "available resources" of the Commonwealth for purposes of Section 8 of Article VI of the Commonwealth's Constitution subject to the Commonwealth "clawback" for the payment of its general obligation debt. Holders of the Commonwealth's general obligation bonds, however, have recently claimed in the Title III proceeding that they have rights over these municipal sales and use taxes. To the extent that holders of the Commonwealth's general obligation bonds are successful in this claim, municipalities would be deprived of their municipal sales and use tax collections and the Sales Tax Obligations could lose their source of repayment for an indefinite period of time. Moreover, to the extent that municipal sales and use tax revenues are clawed back, municipal obligations payable from a municipality's operational funds, such as the Operational Loans, would also be adversely affected due to the decrease in resources available to cover debt service.

*Sales Tax Obligations are payable from municipal sales and use tax collections, which may be materially adversely affected by prevailing economic conditions and continued population decline and, to the extent municipal sales and use tax collection are insufficient, municipalities may be unable to honor their obligation to pay Sales Tax Obligations when due.*

Unlike Municipal General Obligations, which benefit from a pledge of the municipality's good faith, credit and taxing power, Sales Tax Obligations are principally payable from municipal sales and use tax collections deposited in the FAM. Sales and use tax collections are dependent on economic activity and have experienced a reduction due to economic conditions in the Commonwealth, which is in the midst of a severe recession since 2006 that has been exacerbated by the impact of Hurricanes Irma and María. In an attempt to limit these reductions, the Commonwealth and municipal governments have broadened the base of the tax and, in the case of the Commonwealth, significantly increased the rates at which they are applied. This, in turn, has caused a further reduction in consumer spending and consumption, which continues to affect sales and use tax collections. As a result, a continued decline in sales and use tax collections, either as a result of prevailing economic conditions or additional increases in sales and use tax rates, may significantly adversely affect sales and use tax collections and the funds available to pay Sales Tax Obligations. Moreover, to the extent sales and use tax collections are reduced, holders of Sales Tax Obligations may not receive payment in full, if at all. Finally, to the extent that municipal sales and use taxes deposited in the FAM are insufficient to cover debt service on Sales Tax Obligations, there are no alternative dedicated revenue streams. As a result, if municipal sales and use tax collections decline and the municipality does not use other available resources to cover debt service on such Sales Tax Obligations, holders of Sales Tax Obligations may not receive full payment on such municipal debt and may have limited or no recourse against other municipal funds.

*Sales Tax Obligations may be judicially determined not to be secured by a lien on municipal sales and use taxes and to be effectively subordinated to Loans payable from municipal sales and use taxes granted by private financial institutions to certain municipalities.*

Act No. 18-2014, as amended (the "FAM Act"), which created the FAM, provides for the deposit of 0.5% of the sales and use tax into a segregated account to be used to pay Sales Tax Obligations and for other specified purposes. The Municipal Financing Act and the FAM Act authorize municipalities to issue obligations payable from a portion of the sales and use tax allocated to them under the FAM structure. The language through which the sales and use tax funds are dedicated to the payment of the Sales Tax Obligations has not been challenged or resolved by a Commonwealth court. If a court were to determine that this statutory language does not constitute an effective lien, holders of Sales Tax Obligations may not be able to seek effective enforcement of the municipality's obligation to pay such obligations.

In addition, the Municipal Financing Act authorizes municipalities to obtain financing from private financial institutions payable from municipal sales and use taxes deposited into the Municipal Redemption Fund that is part of the FAM. In granting these Loans, private financial institutions have entered into security agreements with the municipalities and created contractual liens over the municipal sales and use taxes that constitute the source of repayment for those Loans. To the extent it is determined that the statutory language providing for the issuance of Sales Tax Obligations does not constitute an effective lien, payment of these obligations may be effectively subordinated to the Loans payable from the municipal sales and use taxes in which a contractual security interest has been granted to private financial institutions to secure such Loans.

### Risks Related to Operational Loans

*Operational Loans issued by municipalities are unsecured Loans that are subordinated to Municipal General Obligations.*

Operational Loans issued by municipalities are unsecured and do not have a lien on any particular revenue or asset of a municipality. Although a municipality is required to pay its Operational Loans from operating revenues, a municipality may pledge its revenues for the payment of other debts. To the extent that municipal revenue is pledged for the payment of debt other than Operational Loans, a municipality may not have enough resources to cover its debt service payments in respect of its Operational Loans in full. Moreover, holders of Operational Loans may not have any effective means of enforcing their obligations. As a result, holders of Operational Loans may have a higher risk of payment default than holders of other types of municipal debt.

Operational Loans are also subordinated in payment priority to Municipal General Obligations. This means that municipalities are required to cover the payment of debt service on their Municipal General Obligations before applying any available funds to the payment of their Operational Loans. As a result, to the extent a municipality experiences financial and economic difficulties that reduce its revenues, such municipality may not have sufficient resources to pay its Operational Loans after covering the payments due on its Municipal General Obligations.

Finally, the Municipal Financing Act authorizes municipalities to obtain financing from private financial institutions payable from operational revenues. In granting these Loans, private financial institutions have entered into security agreements with the municipalities and created contractual liens over certain municipal operational revenues that constitute the source of repayment for those Loans. Since the Operational Loans constituting part of the Restructuring Property are not secured by a lien, payment of these obligations may be effectively subordinated to the Loans payable from the municipal operational revenues in which a contractual security interest has been granted to private financial institutions to secure such Loans.

*Risks Related to Municipal Revenue Loans*

***Municipal Revenue Loans, which are not backed by the municipality's good faith, credit and taxing power, are payable primarily from the revenues generated by the project for which the Loan proceeds were used and debt service payments are legally subordinated to the expenses required to operate and maintain the project and to the payment of other municipal Loans, if any, secured by a lien on the revenues generated by such project.***

Municipal Revenue Loans are payable primarily from the revenues generated by the project for which such Loan was originally granted and are not backed by the municipality's good faith, credit and taxing power. This means that a municipality may have pledged or may hereafter pledge the revenues received from a project as security for the payment of other obligations. Moreover, the Municipal Financing Act provides that debt service due on a project that is not secured by a lien on the revenues generated by the project is paid only after the expenses related to the maintenance and operation of a project and the debt service on any obligation secured by a lien on the project's revenues have been paid. This means that debt service on Municipal Revenue Loans may be subordinated in priority of payment to the operational and maintenance expenses of the project and to the payment of any other municipal indebtedness secured by a lien on the revenues generated by the same project. To the extent the revenue generated by a project is not sufficient to cover such expenses and such other municipal indebtedness, the municipality may not have sufficient revenue to cover debt service on the Municipal Revenue Loans in full. Finally, holders of Municipal Revenue Loans do not have a right to enforce the payment of their obligations by requiring the use of any particular revenue stream and may not have recourse to sufficient municipal resources in order to collect their debt in full.

*Risks Related to Municipal Lines of Credit*

***Municipal Lines of Credit do not have an identifiable source of repayment. As a result, municipalities may not be able to honor their obligations to pay debt service on the Municipal Lines of Credit when due and may not be required by law to apply any particular resources to cover such obligations.***

The Municipal Lines of Credit were either (i) granted in anticipation of the issuance of revenue bonds that were not ultimately issued or (ii) payable from future legislative appropriations, which the Legislative Assembly has not made. As a result, Municipal Lines of Credit do not have an identifiable source of repayment. Moreover, Municipal Lines of Credit are not secured by a lien, or backed by the municipality's good faith, credit and taxing power and are not payable in a particular manner or from a particular source set forth in law. Therefore, if a municipality does not honor its obligation to pay debt service on the Municipal Lines of Credit when due, it may not be required by law to apply any particular resources to cover such obligations.

*Risks Related to the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset*

***The Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are classified by GDB as non-performing and are currently subject to a payment moratorium. As a result, and given the deteriorated fiscal and economic condition of the Commonwealth and its instrumentalities, recoveries on the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are subject to significant uncertainty and could be minimal.***

All of the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are classified by GDB as non-performing as of the Cutoff Date. Such Loans are also currently subject to a payment moratorium pursuant to various executive orders issued under Act 21-2016, as amended, and Act 5-2017, as amended. Moreover, the Commonwealth and its instrumentalities are in the midst of a profound fiscal and economic crisis, which has been further aggravated by the impact of Hurricanes Irma and María. As a result, recoveries, if any, on the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are subject to significant uncertainty and could be minimal.

***The Commonwealth has sought relief pursuant to the provisions of Title III of PROMESA, which provides for the restructuring of its outstanding debt obligations. As a result, the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are subject to being restructured in the Commonwealth's Title III proceeding and recoveries pursuant to these obligations, if any, are uncertain at this time.***

The Commonwealth is currently in the midst of a Title III proceeding pursuant to the provisions of PROMESA in order to restructure its debts. Through the years, the Commonwealth issued a significant amount of general obligation debt, similar to that included in the Restructuring Property. The Commonwealth's general obligation debt is not secured by a specific lien and will likely be treated as unsecured debt within a Title III proceeding. As a result, it is uncertain what recovery, if any, the Issuer will receive on the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset.

*Although the Commonwealth Guaranteed Loan Asset is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power, the guaranty and pledge may be subject to challenge in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*

The Commonwealth Guaranteed Loan Asset is guaranteed by the Commonwealth and such guaranty benefits from a pledge of the Commonwealth's good faith, credit and taxing power. The Commonwealth is currently in the midst of a proceeding under Title III of PROMESA, in which the Commonwealth Guaranteed Loan Asset could be restructured. There is significant uncertainty regarding the treatment of the guaranty under Title III of PROMESA. If successful, a challenge to all or a portion of the guaranty could adversely affect the Issuer's recovery on the Commonwealth Guaranteed Loan Asset.

### Risks Related to the Public Corporation Loan Assets

*The Public Corporation Loan Assets are classified by GDB as non-performing, and some of them are currently subject to a payment moratorium. As a result, and given the deteriorated fiscal and economic condition of the Commonwealth and its instrumentalities, recoveries on the Public Corporation Loan Assets are subject to significant uncertainty and could be minimal.*

All of the Public Corporation Loan Assets are classified by GDB as non-performing as of the Cutoff Date. Certain of such Loans are also currently subject to a payment moratorium pursuant to various executive orders issued under Act 21-2016, as amended, and Act 5-2017, as amended. Moreover, the Commonwealth and its instrumentalities are in the midst of a profound fiscal and economic crisis, which has been further aggravated by the impact of Hurricanes Irma and María. As a result, recoveries, if any, on the Public Corporation Loan Assets are subject to significant uncertainty and could be minimal.

*HTA, which is the largest obligor on the Public Corporation Loan Assets, has currently sought relief pursuant to the provisions of Title III of PROMESA and is in the process of restructuring its obligations. As a result, the HTA Debt (as defined herein) will be restructured and recoveries pursuant to these obligations, if any, are uncertain at this time.*

HTA is the largest obligor included in the Public Corporation Loan Assets with approximately $1.7 billion in outstanding principal of HTA Loans and approximately $200 million in outstanding principal of HTA Bonds. HTA is currently in the midst of a Title III proceeding pursuant to the provisions of PROMESA in order to restructure its debts. Through the years, HTA issued a significant amount of debt secured by various sources of revenue, such as toll revenues and taxes and fees conditionally assigned to it by the Commonwealth, which are subject to first being used by the Commonwealth to pay its general obligation debt pursuant to the provisions of the Commonwealth Constitution, and which are currently being retained by the Commonwealth and not being applied to the payment of HTA's debts pursuant to several executive orders issued under the Moratorium Act (as defined herein). The portion of the HTA Debt corresponding to HTA Bonds is also payable from toll revenues generated by HTA. However, such revenues are also not currently being applied to the payment of the HTA Bonds pursuant to an executive order issued under the Moratorium Act. As a result, it is uncertain what recovery, if any, the Issuer will receive on the HTA Debt. Furthermore, HTA bondholders have asserted in HTA's Title III proceeding that they have a superior lien on a substantial portion of the revenues securing the HTA Loans. Although GDB believes that there are no superior liens on such revenues, if bondholders were to prevail in such arguments, the recovery on the HTA Loans would be substantially impaired.

*The other public corporations that are obligors on the Public Corporation Loan Assets portfolio are also "covered territorial instrumentalities" pursuant to PROMESA and may seek relief under Title VI or Title III of PROMESA in the future. As a result, debt obligations owed by public corporations may be restructured and recoveries pursuant to these obligations, if any, are uncertain at this time.*

The public corporations that constitute the obligors on the Public Corporation Loan Assets are "covered territorial instrumentalities" under PROMESA and may seek to restructure their debts in the future pursuant to Title VI or Title III of PROMESA. To the extent that any of these public corporations seek to restructure their debts, it is uncertain what recoveries, if any, holders of their Loans will receive.

### Risks Related to the Real Property Assets

*The appraisals provided for the Real Property Assets have not been recently updated and the values provided therein may no longer be current because the real property market in the Commonwealth has been and continues to be materially adversely affected by economic conditions and could be further affected by the impact of Hurricanes Irma and María.*

The real estate market in the Commonwealth continues to be materially adversely affected by prevailing economic conditions and could be further affected as a result of the impact of Hurricanes Irma and María. Real estate values have declined and, given the prevailing economic conditions in the Commonwealth and the aftermath of Hurricanes Irma and María, could continue to decline in the foreseeable future. Some of the appraisals for the Real Property Assets have not been recently updated. In light of the negative real estate market conditions in the Commonwealth, the realizable value of the Real Property Assets will likely be significantly below what is

shown in the appraisals and could be significantly below what is assumed in the Collection Schedule. Moreover, the Issuer may be unable to find a willing buyer for any of the Real Property Assets and, therefore, be unable to realize any value for such asset, which may also adversely affect Collections.

***The Real Property Assets may have title defects or restrictions on transfer that could affect the Issuer's ability to realize value from such assets.***

GDB will transfer the Real Property Assets to the Issuer on an "as is, where is" basis. As a result, the Issuer will receive the Real Property Assets with any and all defects or restrictions on transfer such assets had when held by GDB. Specifically, certain Real Property Assets are subject to title defect and restrictions on transfer that may materially adversely affect the Issuer's ability to realize any value on such assets. To the extent any such title defects or restrictions on transfer cannot be cured or addressed, the Issuer may be unable to sell such assets and realize any value with respect to such asset. This, in turn, may materially reduce Collections on the Real Property Assets.

### Risks Related to the GDB Restructuring Act and Future Judicial and Legislative Actions

***The Issuer was created, the Transferred Property is being transferred by GDB to the Issuer and the New Bonds are being issued pursuant to the GDB Restructuring Act, which is newly enacted legislation that has not been validated by judicial decisions.***

The GDB Restructuring Act, which was enacted on August 24, 2017 and amended on July 18, 2018, may be challenged by judicial action by any party affected by its provisions. While the Commonwealth and GDB believe that the GDB Restructuring Act is constitutional and intend to defend its constitutionality, there can be no assurance that the final resolution of any challenge will be consistent with the Commonwealth's and GDB's position. An adverse judicial determination regarding the constitutionality of the GDB Restructuring Act or certain of its provisions (such as the transfer of the Transferred Property and/or the settlement of certain claims effected thereunder) could, among other things, affect the validity or enforceability of the Transaction Documents, including the New Bonds, and the New Bonds' source of repayment. Defending such litigation could also involve substantial fees and expenses, and the costs of such defense would have to be paid out of Collections before the determination of Available Cash for payment on the New Bonds.

Furthermore, the GDB Restructuring Act, by its terms, strips the government entities of the Commonwealth of authority and standing to challenge the GDB Restructuring Act, the Qualifying Modification and all related transactions.

In addition, there is uncertainty associated with the New Bonds because there is no judicial experience interpreting the provisions of the GDB Restructuring Act. Judicial interpretations of the GDB Restructuring Act, including those related to the enforcement of liens created thereunder, could affect the value of the New Bonds and the recovery thereunder.

***Notwithstanding the GDB Restructuring Act's non-impairment provisions, future legislative action could reduce the value of the New Bonds.***

Notwithstanding the GDB Restructuring Act's non-impairment provisions, future action by the Legislative Assembly could change the GDB Restructuring Act in ways that affect the security and sources of payment on the New Bonds. Any such action would be subject to the Commonwealth's statutory covenant to the Bondholders that it will not impair, limit, restrict, rescind, delay or modify the rights and powers of the Issuer, the Indenture Trustee or the holder of the New Bonds under the GDB Restructuring Act or under or in respect of the Restructuring Property, or the Issuer's ability to meet its obligations to Bondholders, until the New Bonds have been paid in full or are otherwise discharged. Any such action, as well as the litigation that likely would ensue, might adversely affect the value of the New Bonds and the recoveries on the New Bonds. Furthermore, the enforcement of any rights against the Commonwealth under the Commonwealth's statutory non-impairment covenant may be subject to the exercise of judicial discretion and limitations on legal remedies against the Commonwealth or the enforcement of the non-impairment covenant.

In addition, other future actions by the Legislative Assembly that do not violate the Commonwealth's statutory non-impairment covenant could also materially adversely affect the value of the New Bonds and the recoveries on the New Bonds.

**Risks Related to GDB and the Service Providers**

***The Issuer's expenses, including third-party service providers' compensation, may change prior to the Final Scheduled Payment Date, and such changes may be material. Since all such expenses will be paid from Collections on the Restructuring Property prior to making any payments to Bondholders, if the amounts of such expenses are material or increase prior to the Final Scheduled Payment Date, the amount of Available Cash available for distribution to the Bondholders will be reduced, which may have a material adverse effect on the Bondholders' ability to receive cash payments of interest and principal on the New Bonds.***

The Issuer's actual expenses prior to the Final Scheduled Payment Date are currently unknown. A large portion of the Issuer's expenses will consist of compensation paid to third-party service providers, and the amounts of such compensation may vary significantly prior to the Final Scheduled Payment Date from the expected amounts described herein, and such differences may affect the value of, and return on, the New Bonds. For instance, the hypothetical amortization of the New Bonds includes estimates for Issuer Expenses, including payments to third-party service providers, as further described in "*Payments to Bondholders—Hypothetical Amortization of the New Bonds*" and "*Appendix F: Hypothetical Amortization of the New Bonds*" in this Offering Memorandum.

While the Issuer has described the terms of its contractual arrangements with third-party service providers, including compensation amounts for such services, there can be no assurance that the actual compensation ultimately paid by the Issuer will not change materially prior to the Final Scheduled Payment Date. In addition, the Issuer Operating Expenses Cap excludes the payment of certain amounts. See "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Certain Covenants of the Issuer.*" Furthermore, since all such expenses will be paid from Collections on the Restructuring Property prior to making any payments to Bondholders, if such amounts are material, or if they increase prior to the Final Scheduled Payment Date, the amount of Available Cash available for distribution to the Bondholders will be reduced, which may have a material adverse effect on the Bondholders' ability to receive cash payments of interest and principal on the New Bonds.

***Total Collections on the Restructuring Property will be impacted by, among other things, the Servicer's ability to appropriately manage the Restructuring Property and the costs and expenses incurred to do so.***

Total Collections on the Restructuring Property will be impacted by, among other things, the Servicer's ability to appropriately manage the Restructuring Property and the costs and expenses incurred to do so. The Restructuring Property is made up of a complex, non-homogenous pool of Loans and other assets that have a diverse mix of terms, rights, obligations, obligors and maturities. In addition, a large amount of the Restructuring Property is in various stages of default because the obligors thereunder have failed to make payments when due or otherwise comply with the terms and conditions of their Loans. As such, servicing the Restructuring Property is a complex undertaking and there can be no assurance that the Servicer will be successful in optimizing Collections on the Restructuring Property. Transitions of servicing obligations and changes to collection practices on the Restructuring Property may exacerbate this risk and have a material adverse effect on Collections on the Restructuring Property. In addition, the Servicer's ability to manage the Restructuring Property will differ in material ways from GDB's historical servicing of the Restructuring Property. For example, the Servicer will not have the ability to lend additional funds to the obligors on the Restructuring Property.

***Servicing of the Restructuring Property may be negatively affected by GDB's operational wind down.***

As a result of downsizing at GDB and its operational wind down that has already occurred in accordance with the GDB Fiscal Plan, GDB does not have the number, or experience level, of personnel necessary to adequately apprise the Servicer on how to manage the Restructuring Property in a manner consistent with past practice. After the transfer of the Transferred Property to the Issuer, there may be disruptions in servicing due to the time and process involved in transferring files and information. These and other factors may negatively impact the amount and timing of Collections, which could reduce the amount of Available Cash as of any Payment Date available to make payments on the New Bonds.

***GDB will make limited representations regarding the Transferred Property, and there will be no recourse to GDB for any deficiencies in the Transferred Property.***

GDB will make limited representations regarding the Transferred Property. To the extent there are deficiencies in the Transferred Property or the enforceability thereof, the Issuer will have no recourse to GDB or any other party.

*Any transfer of the servicing of the Restructuring Property from the Servicer to a successor Servicer, including after a Servicer Replacement Event, may result in additional costs, increased servicing fees by such successor Servicer or a diminution in servicing performance, including higher delinquencies and defaults, all of which may have an adverse effect on payments on the New Bonds.*

If a Servicer Replacement Event occurs, the Servicer may be removed by the Bondholders and replaced by the Issuer or the Collateral Monitor, as further described in "*Servicing Agreement—Removal of Servicer*" in this Offering Memorandum. In the event of the removal of the Servicer and the appointment of a successor Servicer, the Issuer cannot predict:

- the cost of the transfer of servicing to the successor;

- the ability of the successor to perform the obligations and duties of the Servicer under the Servicing Agreement, including ensuring timely Collections on the Restructuring Property; or

- the servicing fees charged by the successor.

Furthermore, the Issuer and the Collateral Monitor, as applicable, may experience difficulties in appointing a successor Servicer. During any transition phase, it is possible that normal servicing activities could be disrupted, resulting in increased delinquencies and/or defaults on the Restructuring Property, which could lead to delays or reductions in the payments on the New Bonds.

Additionally, because the Servicer may be paid the Servicing Fee based on a percentage of the value of the Restructuring Property, the Servicing Fee may be reduced as the amount of Restructuring Property decreases over time. At some point, if the need arises to obtain a successor Servicer, the fee that such successor Servicer would earn, if such fee were similarly calculated, might not be sufficient to induce a potential successor Servicer to agree to manage the remaining Restructuring Property, which could result in increased delinquencies and/or defaults on the Restructuring Property.

*The insolvency, bankruptcy or similar proceedings of the Servicer could give the Servicer the right to reject the Servicing Agreement, delay the appointment of a successor Servicer and, consequently, delay or reduce payments on the New Bonds.*

In the event of a Servicer Default resulting solely from certain events of insolvency or the bankruptcy of the Servicer, there is a chance that neither the Indenture Trustee nor the Bondholders would be able to appoint a successor Servicer or prevent the Servicer from appointing a sub-servicer, as the case may be, without the consent or action, respectively, of the bankruptcy trustee and/or the bankruptcy court, and delays in the collection of payments on the Restructuring Property may occur. Any delay in the collection of payments on the Restructuring Property would delay or reduce payments to Bondholders.

*Collections on the Restructuring Property could be affected by the Servicer's consolidation of or change in servicing operations.*

From time to time, the Servicer may update its systems in order to improve operating efficiency, update technology and enhance services, among other things. In connection with such updates, the Servicer could experience disruptions in activities both during and following the rollout of the new systems or platforms caused by, among other things, periods of system downtime and periods devoted to user training. These and other implementation related difficulties could contribute to higher delinquencies of payment on the Restructuring Property. It is not possible to predict with any degree of certainty all of the potential adverse consequences that may be experienced but, if such adverse consequences are experienced, they could impact the Issuer's ability to make payments on the New Bonds.

**Risks Related to the Tax Treatment of the New Bonds**

*The Exchange of Participating Bond Claims for New Bonds will be a taxable event to U.S. Holders.*

The exchange of Participating Bond Claims for New Bonds will constitute a taxable exchange of the Participating Bond Claims for U.S. federal income tax purposes. Therefore, a U.S. Holder (as defined in "*Certain U.S. Federal Income Tax Considerations*") will recognize gain or loss equal to the difference between the amount realized on the exchange (except to the extent attributable to accrued and unpaid interest) and the U.S. Holder's adjusted tax basis in the Participating Bond Claims on the date of the exchange. To the extent that any portion of the aggregate consideration received by a U.S. Holder pursuant to the exchange is attributable to accrued and unpaid interest on a Claim, such portion generally will be includable in gross income as ordinary interest income if such accrued interest has not been included previously in gross income for U.S. federal income tax purposes. The extent to which such consideration will be considered attributable to accrued interest is unclear. See "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bond*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Accrued Interest.*"

*Classification of the New Bonds as debt of the Issuer for U.S. federal income tax purposes is subject to uncertainty.*

The Issuer intends to report the New Bonds as indebtedness of the Issuer rather than equity or another form of interest for U.S. federal income tax purposes. However, there is uncertainty as to the appropriate tax classification of the New Bonds. Thus, there is no assurance the Issuer's intended treatment of the New Bonds as indebtedness of the Issuer for U.S. federal income tax purposes would withstand a challenge by the Internal Revenue Service (the "IRS"). If the New Bonds were to be characterized as an interest that is not debt for U.S. federal income tax purposes, the resulting tax consequences to a U.S. Holder of such New Bonds could be materially different and potentially less favorable than the consequences to a U.S. Holder if the New Bonds were treated as debt. See "*Certain U.S. Federal Income Tax Considerations—Characterization of the New Bonds as Debt of the Issuer*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes.*"

*The New Bonds will be taxed differently than the existing Participating Bond Claims.*

The New Bonds are complex financial instruments and it is expected that the tax consequences to a U.S. Holder of holding New Bonds will differ substantially from the U.S. tax consequences of holding Participating Bond Claims. For instance, certain U.S. Holders of Participating Bond Claims hold financial instruments that are exempt from U.S. federal income taxation and such exemption will not be available with respect to the New Bonds. Moreover, as discussed below, the manner in which interest accruals will be calculated and taxed to U.S. Holders of the New Bonds may result in materially greater tax as compared to the way in which U.S. Holders have been taxed while holding Participating Bond Claims.

*If the New Bonds are classified as an interest that is not debt for tax purposes, the state and local tax exemptions could be impacted.*

Existing U.S. law provides that bonds issued by an instrumentality of the Commonwealth are generally exempt from state and local income taxation. However, whether that exemption would apply to the New Bonds if they are re-characterized as an interest that is not debt for tax purposes is uncertain. See "*Certain U.S. Federal Income Tax Considerations—Characterization of the New Bonds as Debt of the Issuer*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes—Tax Consequences to U.S. Holders—State and Local Income Taxation.*"

*The manner in which interest accruals should be calculated with respect to the New Bonds for U.S. tax purposes is subject to uncertainty.*

There is uncertainty regarding the appropriate method for determining how interest accruals on the New Bonds should be determined for U.S. federal income tax purposes.

The Issuer intends to treat the New Bonds as "contingent payment debt instruments" under the applicable Regulations (as defined herein). Under this characterization, interest accruals on the New Bonds will be determined under original issue discount principles, and each U.S. Holder, regardless of its method of accounting for U.S. federal income tax purposes, will be required to accrue interest income on the New Bonds on a constant yield basis at the "comparable yield" (as defined herein) that will be determined (along with the "projected payment schedule" resulting in such yield) by the Issuer at the time of issuance of the New Bonds. These interest accruals will be adjusted upward or downward to reflect any difference between the actual and projected amounts of the contingent payments on the New Bonds during the year. In addition, any gain recognized by a U.S. Holder on the sale or other disposition of a New Bond will be treated as ordinary interest income, and any loss will be an ordinary loss to the extent of the interest previously included in gross income and, thereafter, as a capital loss. See "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Ownership of New Bonds—Interest Accruals and Adjustments to Accruals on the New Bonds*" and "*Certain U.S. Federal Income Tax Considerations —Tax Consequences to U.S. Holders—Ownership of New Bonds—Sale, Exchange or Retirement of the New Bonds.*"

The Issuer's intended treatment of the New Bonds as contingent payment debt instruments, as well as the manner in which interest accruals are to be calculated under the Regulations with respect to the New Bonds assuming such treatment is correct, are both subject to uncertainty. Accordingly, there is a risk that the IRS may challenge the Issuer's intended treatment of the New Bonds or assumptions for calculating interest and original issue discount accruals for a U.S. Holder's tax reporting purposes. For example, the IRS could assert that the "comparable yield" or "projected payment schedule" used by the Issuer to determine interest accruals under the Regulations governing contingent payment debt instruments is incorrect. Alternatively, the IRS could assert that interest accruals should be determined under the methodology described in Section 1272(a)(6) of the U.S. Tax Code by asserting that principal payments on the New Bonds could be accelerated due to excess Available Cash arising from prepayments on the Restructuring Property. If any challenge by the IRS were to be successful, it could materially affect the timing and amounts of taxable income a U.S. Holder should have reported in the affected years, possibly resulting in an overstatement or understatement of tax as well as interest and penalties on any underpayments. Accordingly, holders should consult their tax advisors regarding the accrual of interest on the New Bonds and the consequences of the application of different accrual rules. See "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Ownership of New Bonds—Interest Accruals and Adjustments to Accruals on the New Bonds.*"

*U.S. Holders may be required to report interest income in certain years in excess of the amount of interest actually paid to such holders in those years, resulting in "phantom income" for U.S. federal income tax purposes.*

As discussed above, U.S. Holders will be required to include interest on the New Bonds in gross income for U.S. federal income tax purposes as it accrues over the term of the New Bonds under original issue discount principles, regardless of such U.S. Holder's method of accounting. If interest accruals exceed the cash payments on a New Bond in any year, a U.S. Holder will have "phantom income" in that year, which may be substantial. See "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Ownership of New Bonds—Treatment of the New Bonds as Contingent Payment Debt Instruments*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Issue Price of New Bonds*."

*All holders should read the discussion of the United States federal income tax consequences of the purchase, ownership, and the disposition of the New Bonds that is contained in this Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations."*

**THE ISSUER**

**Overview**

The Issuer is a newly formed statutory public trust and governmental public instrumentality of the Commonwealth created by Article 201 of the GDB Restructuring Act. The Issuer is independent and separate from any other governmental instrumentality of the Commonwealth and is independently operated and governed by a board of trustees (the "Board of Trustees" or the "Board"). The GDB Restructuring Act restricts the Issuer from engaging in activities other than those specifically prescribed therein, as described in "—*Purpose and Permitted Activities*" below.

The Issuer is not expected to own any assets or property other than the Restructuring Property and will have a limited amount of funds in order to cover its operating expenses. While GDB, pursuant to Article 403 of the GDB Restructuring Act, transferred certain funds to the Issuer prior to the Closing Date to help cover the Issuer's operating expenses through the Closing Date, after the Closing Date the Issuer's operating expenses will be paid solely out of Collections on the Restructuring Property, subject to certain limitations. For additional information on the Issuer's Operating Expenses, see "—*Issuer's Operations and Expense*" below.

Each New Bond will represent a special limited obligation of the Issuer. The New Bonds (including the Additional Bonds, if any) are the only securities to be issued by the Issuer. Except for the New Bonds, and the obligation to pay certain costs in connection with the restructuring of GDB and the ongoing obligations of the Issuer in connection with the New Bonds, the Issuer is prohibited from incurring any indebtedness and from making Loans to any person.

The Issuer will engage the Servicer to act as the servicer of the Restructuring Property and to manage the Restructuring Property pursuant to the Servicing Agreement. For additional information on the Servicer, see "*Service Providers—The Servicer*" in this Offering Memorandum.

The Issuer's fiscal year end will occur on the 30th day of June each year, unless such fiscal year end is changed by the Issuer, *provided that* such change may be made only if it would have no impact on the timing or amount of payments on the New Bonds.

**Purpose and Permitted Activities**

The GDB Restructuring Act creates the Issuer in order to effectuate the restructuring of certain liabilities of GDB. To this end, the Issuer is authorized to issue the New Bonds to the holders of the liabilities of GDB that are subject to and bound by the Qualifying Modification.

The GDB Restructuring Act authorizes the Issuer to carry out certain limited activities and prohibits the Issuer from taking certain actions. Many of the activities authorized to be carried out by the Issuer pursuant to the GDB Debt Restructuring Act, including, without limitation, those related to all management of the Restructuring Property (including all day-to-day operations in respect thereof), will be carried out by the Servicer pursuant to the Servicing Agreement. For additional information regarding permissible activities of, or restrictions on, the Issuer and the Servicer pursuant to the GDB Restructuring Act, see "*The GDB Restructuring Act—Permitted Activities,*" "*The GDB Restructuring Act—Prohibited Actions*" and "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum.

Furthermore, the activities of the Issuer will also be limited contractually under the Bond Indenture. For additional information regarding permissible activities of or restrictions on the Issuer pursuant to the Bond Indenture, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Certain Covenants of the Issuer*" in this Offering Memorandum.

**Board of Trustees**

***Board Composition***

The Issuer's business and affairs are managed under the direction of its Board of Trustees, which consists of three members who are appointed by, and serve at the pleasure of, the Governor. Each member of the Board of Trustees (i) is appointed for a three-year term and may serve for consecutive terms as an appointed member, (ii) is entitled to one vote, and (iii) must satisfy the independence and qualification standards set forth in the Qualifying Modification and the Transaction Documents (including that no member of the Board of Trustees may be an officer, employee or director of any government entity of the Commonwealth (other than the Issuer) and that the members of the Board of Trustees must have executive experience in finance or with respect to assets like the Restructuring Property and be otherwise qualified to serve on the Board of Trustees).

The members of the Board of Trustees are required to select a chairperson from among themselves. David Pauker has been elected as the Chairperson of the Board, Matthew Karp has been elected as the Secretary of the Issuer and Jorge Padilla has been elected as the Executive Director of the Issuer.

In the event of a vacancy in the Board of Trustees due to death, removal, resignation or otherwise, the Governor will appoint a successor that meets the independence and qualification standards set forth in the Transaction Documents and Qualifying Modification, including that no member may be an officer, employee or director of the Commonwealth or any instrumentality thereof (other than the Issuer) and must have executive experience in finance or with respect to assets like the Restructuring Property and be otherwise qualified to serve on the Board of Trustees, to serve the remainder of the unexpired term of the member that created the vacancy.

*Initial Board Members*

On February 6, 2018, the Governor announced the appointment of the three initial members of the Board of Trustees of the Issuer. Below is a list of the initial members of the Board of Trustees and their respective ages and positions, and a brief account of the business experience of each.

| Name | Age | Position |
| --- | --- | --- |
| David Pauker ....................... | 59 | Board Member/Chairperson |
| Jorge L. Padilla ................... | 62 | Board Member/Executive Director |
| Matthew Karp ..................... | 44 | Board Member/Secretary |

**David Pauker:** Mr. Pauker has more than 25 years of experience as a financial consultant and turnaround manager specializing in underperforming companies and troubled investments. He has been a senior advisor to institutional investors, lenders and management in connection with companies in consumer products, energy and natural resources, financial services, manufacturing, media and telecommunications, real estate, retail, textile and apparel and other industries. He is a member of the board of directors of post-confirmation Lehman Brothers Holdings, Inc. ("Lehman"), appointed pursuant to the Lehman bankruptcy plan in 2012, and was chairman of the board from 2015-2016. He is a member of the board of the Rescap Liquidating Trust created under the bankruptcy plan for Residential Capital, and served as an independent director during the restructurings of Terraform Power and Interstate Bakeries. Mr. Pauker spent 25 years at Goldin Associates, LLC, a leading national restructuring advisory firm, including 14 years as its executive managing director, and left the firm in 2015. From 2016 to 2017, he served as Chief Restructuring Officer of Essar Steel Minnesota. Mr. Pauker has served variously as Interim Chief Executive Officer, Chief Operating Officer and Chief Restructuring Officer for numerous companies undergoing significant transition and has advised clients in connection with many of the largest restructurings of the past 25 years. He is a fellow of the American College of Bankruptcy and an active member of the board of directors of Social Accountability International, a global nonprofit that promotes worker rights. Mr. Pauker received a JD from Columbia University School of Law in 1984 and a BS from Cornell University in 1981.

**Jorge L. Padilla**: Mr. Padilla is retired from a 29-year career with island insurer Universal Group Inc., where he served in diverse roles, including principal financial officer and president of its finance division from 2005 to 2014. At Universal Group Inc., Mr. Padilla managed an investment portfolio of over $2 billion and the negotiation of several major transactions. From 1979 to 1985, Mr. Padilla served as an Audit Manager at Deloitte & Touche. Mr. Padilla is also a board member of U.S. Income Tactical Fund LLC, an investment fund based in Puerto Rico, and Converge, a Puerto Rico based international reinsurer. Mr. Padilla is a Certified Public Accountant and is an active member of the Puerto Rico CPA Society, the AICPA and the Puerto Rico Financial Analyst Association. Mr. Padilla received his B.B.A. in Accounting and Finance from the University of Puerto Rico in 1979.

**Matthew Karp:** Since 2017, Mr. Karp has held the position of Head of Americas for Amstar Group LLC, a real estate investment firm with $1.1 billion in assets, where he is responsible for U.S. acquisitions and new business initiatives as well as overseeing the asset management of existing positions. He has been involved in the acquisition and rehabilitation of real estate in Puerto Rico for approximately a decade. From 2016 to 2017, Mr. Karp served as Partner and Head of Real Estate of TriSpan LLP, where he directed all elements of investment strategy and capital deployment within the real estate division. From 2010 to 2016, Mr. Karp served as Partner and Chief Acquisitions Officer at CPG Real Estate (f/k/a Caribbean Property Group), where he oversaw CPG's acquisition and investment strategy and execution including the acquisition of over $2 billion of non-performing loans acquired from a variety of Commonwealth financial institutions. In addition, while with CPG Real Estate, Mr. Karp established CPG Island Servicing in San Juan which executed the servicing and asset management functions for the workout of these distressed assets. From 2004 to 2010 Mr. Karp served as Vice President at Cerberus Capital Management, where he was a senior investment professional responsible for underwriting and originating opportunistic real estate debt and equity investments. Mr. Karp received an MBA from Columbia Business School in 2004 and a BS from Cornell University in 1997.

*Actions by the Board of Trustees*

A majority of the members of the Board of Trustees serving at the time will constitute a quorum to make decisions or exercise any power or function of the Issuer, and the affirmative vote of a majority of the members of the Board of Trustees at the time serving is necessary for any action that the Board may take. Any one or more members may participate in a meeting of the Board of Trustees by teleconference or similar communications equipment, which will constitute presence in person at the meeting. Any action necessary or allowed in any meeting of the Board of Trustees will be authorized with no need for a meeting, insofar as all members of the Board of Trustees give their written consent concerning such action. For additional information on the functions and powers of the Board of Trustees, see "—*Purpose and Permitted Activities,*" above.

It is anticipated that the Board of Trustees will adopt rules and procedures governing its activities under the GDB Restructuring Act, which may be amended from time to time. In addition, the Board of Trustees may delegate to one or more members, officers, agents and employees such powers and duties as the Board of Trustees may deem appropriate in accordance with the GDB Restructuring Act and the Qualifying Modification.

*Issuer's Operations and Expenses*

The Issuer is not expected to have any officers or employees other than the Executive Director, who will be a member of the Board of Trustees. Jorge L. Padilla has been designated as the Issuer's initial Executive Director. The Issuer will engage the Servicer and delegate thereto all management of the Restructuring Property (including all day-to-day operations in respect thereof) pursuant to the Servicing Agreement. Furthermore, the Issuer is entering into a continuing disclosure undertaking with respect to the New Bonds, but certain components of the Annual Report required under the Disclosure Agreement are expected to be prepared by the Servicer pursuant to the Servicing Agreement.

The Issuer will incur certain expenses, including for the compensation of service providers, which may be material. Issuer Expenses as described herein (subject, in certain instances, to the Issuer Operating Expenses Cap and other restrictions set forth herein) will be paid from Collections on the Restructuring Property prior to making any payments to Bondholders. For additional information on the Issuer's operating expenses, see "*Collections on the Restructuring Property and Calculation of Available Cash—Fees and Expenses Reserve*" and "*Service Providers—Fees and Expenses of the Service Providers*" in this Offering Memorandum.

*Board Member Annual Compensation and Board Expenses*

Annual compensation for the members of the Board of Trustees of the Issuer is expected to be $75,000 per year for each member of the Board of Trustees; *provided*, that the Executive Director of the Issuer is expected to be paid an additional amount of $75,000 per year. The members of the Board of Trustees are also expected to be paid the sum of $125,000 each as compensation for their work in connection with the issuance of the New Bonds and the structuring of the exchange. The Chairperson of the Board and the Secretary of the Board shall serve as such without additional compensation beyond that paid for serving as a Board member. The Issuer shall also reimburse the members of the Board of Trustees for their reasonable and actual out-of-pocket expenses, including, but not limited to, travel, lodging and meal expenses incurred in connection with meetings or other business of the Issuer.

*Indemnification; Directors and Officers Insurance*

The Issuer's by-laws require the Issuer to indemnify the members of the Board of Trustees to the fullest extent permitted under Commonwealth law against liabilities that may arise by reason of their service to the Issuer, and to advance expenses reasonably incurred as a result of any proceeding against them for which they could be indemnified. The Issuer will also obtain directors' and officers' insurance coverage. Indemnification payments by the Issuer, including legal fees and expenses, and the cost of such directors' and officers' insurance coverage will constitute Issuer Expenses and will be payable from Collections on the Restructuring Property prior to making any payments to Bondholders as described above under "*Issuer's Operations and Expenses.*"

## Relationship of the Issuer to GDB; Information Regarding Transferred Property

The GDB Restructuring Act requires that the Issuer keep its assets and liabilities separate and distinct from GDB and any other entity and further provides that any delay in transferring the Transferred Property to the Issuer or commingling of assets will not defeat or impair the Issuer's ownership of the Restructuring Property.

The Issuer has not independently verified the information in this Offering Memorandum relating to the Commonwealth, the Transferred Property, the municipalities, or any other entities responsible for payments on the Transferred Property, or the status of repayment of the amounts due on the Transferred Property, nor has the Issuer participated in the preparation of, or verified any information in this Offering Memorandum relating to projected Collections on the Transferred Property, all of which has been prepared by or at the direction of GDB for use in this Offering Memorandum.

**GDB**

GDB is a public corporation and governmental instrumentality of the Commonwealth, which was created by the Legislative Assembly of the Commonwealth (the "Legislative Assembly") in 1948 to aid the government of the Commonwealth (the "Government") in performing its fiscal duties and in more effectively carrying out its responsibility to develop the economy of the Commonwealth. Historically, GDB's principal functions were to: (i) act as fiscal agent, paying agent and financial advisor to the Government and its instrumentalities, public corporations and municipalities, (ii) provide interim and long-term financing to the Government and its instrumentalities, public corporations and municipalities, and to private parties for economic development and (iii) act as depositary of funds for the Government and its instrumentalities, public corporations and municipalities.

Over time, GDB was also called upon to provide the Government and its instrumentalities, public corporations and municipalities financial support during periods of financial distress with the Government, leveraging GDB's strong access to the capital markets to provide financial support to troubled public entities and assist them in regaining financial stability.

As a result, GDB's liquidity and financial condition was largely dependent on the ability of such entities to repay their Loans with GDB. During 2013, the Commonwealth and its public corporations experienced a significant increase in credit spreads and limited market access, which adversely affected GDB's liquidity position because those conditions led to delays in the repayment by the Commonwealth and its public corporations of their Loans to GDB and, at the same time, caused the Commonwealth and its public corporations to increase their reliance on GDB for their financing needs. In February 2014, the principal credit rating agencies downgraded the credit of the Commonwealth and most of its public corporations, including GDB, to below investment grade categories, which resulted in, among other things, further difficulties in accessing the bond market to meet their financing needs. The worsening of the fiscal and economic crisis and the rapid deterioration of the financial condition of the Commonwealth and its public corporations after fiscal year 2014 significantly affected GDB's liquidity position and its ability to continue to provide financing to such entities and honoring its obligations as they became due.

On April 6, 2016, the Government enacted the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act* (the "Moratorium Act"), which granted the governor of the Commonwealth (the "Governor") the authority to, among other things, (i) implement a moratorium on debt service payments, (ii) redirect certain revenues assigned to public entities for the payment of their obligations to the payment of essential services and (iii) temporarily stay related creditor remedies. In connection with the Moratorium Act, the former Governor, Alejandro Garcia Padilla, issued a number of executive orders, including orders to declare a moratorium on the payment of debt service by various government entities. As it pertains to GDB, the former Governor issued executive orders under the Moratorium Act to: (i) declare a state of emergency at GDB, (ii) impose restrictions on the withdrawal of funds deposited with GDB and of other disbursements by GDB, and (iii) implement a moratorium on the payment of debt service on GDB's outstanding notes. As a result of such actions, since July 2016, there have been no debt service payments on GDB's notes, and, since April 2016, deposit disbursements have only been allowed pursuant to the executive orders issued under the Moratorium Act.

Also, on April 6, 2016, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" by its Spanish acronym) was created under the Moratorium Act for the purpose of assuming GDB's role as fiscal agent, financial advisor and reporting agent to the Commonwealth and its instrumentalities and municipalities. In January 2017, AAFAF's role was expanded to include additional responsibilities related to the restructuring of the indebtedness of the Commonwealth and its instrumentalities and to oversee compliance with the fiscal plans and budgets of said entities approved by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") pursuant to PROMESA. As a result of the transfer of GDB's fiscal agency and financial advisory functions to AAFAF, GDB's role was limited to serving as agent to collect on its Loan portfolio and disbursing deposits pursuant to strict priority guidelines.

On February 21, 2017, pursuant to PROMESA, AAFAF and GDB prepared and submitted to the Oversight Board a fiscal plan for GDB (the "February 2017 GDB Fiscal Plan"). The February 2017 GDB Fiscal Plan acknowledged that there was no clear path for the long-term viability of GDB based on its then-current financial condition. The February 2017 GDB Fiscal Plan assumed approximately $2.0 billion of total cash inflows to be collected through fiscal year 2027, including approximately (i) $56 million from appropriation Loans through the end of fiscal year 2017, (ii) $1.8 billion of cash flow based on contracted interest and amortization schedules of the municipal Loans that were performing as of such date, and (iii) $133 million of cash flow based on several Loans of Commonwealth instrumentalities that were performing as of such date. The February 2017 GDB Fiscal Plan also assumed approximately $2.1 billion of total cash outflows through fiscal year 2027 based on (x) essential services required to wind-down operations and (y) approximately $2.0 billion of distributable cash flow to be allocated to GDB depositors and other creditors. The February 2017 GDB Fiscal Plan did not resolve the mechanism by which scheduled distributable cash flow should be allocated among GDB's depositors and other creditors.

The Oversight Board certified the February 2017 GDB Fiscal Plan on April 28, 2017. Then, on May 15, 2017, AAFAF, GDB and certain of GDB's creditors entered into a Restructuring Support Agreement (the "Initial Restructuring Support Agreement" and, as amended, modified or supplemented, the "Restructuring Support Agreement") to effectuate a consensual restructuring of certain of GDB's indebtedness through a Title VI proceeding under PROMESA. For additional information on PROMESA and Title VI

thereunder, see "—*PROMESA*" below. The Initial Restructuring Support Agreement was consistent with the underlying strategy of the GDB Fiscal Plan, namely providing for a transaction resulting in an orderly wind-down of GDB's operations. The Initial Restructuring Support Agreement also resolved the mechanism by which distributable cash flow would be allocated among GDB's various creditors and provided greater clarity as to how GDB's operations would be wound down.

On June 30, 2017, AAFAF and GDB submitted a revised fiscal plan (the "June 2017 GDB Fiscal Plan") to the Oversight Board to, among other things, reflect: (i) a reduction in operating expenses consistent with the Restructuring Support Agreement and wind-down of GDB's operations, (ii) a reduction in the minimum amount of cash on hand to be held by the Issuer and GDB after the transfer of the Transferred Property (as defined herein) to the Issuer, (iii) an adjustment of the projected sale dates for the real estate portfolio properties to incorporate activity since the February 2017 GDB Fiscal Plan was certified and (iv) the inclusion of third-party servicing fees for the Restructuring Property (as defined herein) commencing in 2019. On July 12, 2017, the Oversight Board issued a unanimous written consent certifying the June 2017 GDB Fiscal Plan and certifying the Initial Restructuring Support Agreement as a Voluntary Agreement and a Qualifying Modification under Sections 104(i)(1) and 601(g)(2), respectively, of PROMESA.

In September 2017, Hurricanes Irma and María struck the Commonwealth causing severe and widespread damage, including substantial damage to the Commonwealth's power grid, infrastructure, residences and other structures. The hurricanes placed additional strain on the already fragile economic condition of the Commonwealth and its municipalities. As a result, GDB and its creditors began extensive discussions on the impact of the hurricanes on GDB, the Qualifying Modification and the related transactions.

On October 20, 2017, December 20, 2017, and March 20, 2018, AAFAF, GDB and certain of GDB's creditors entered into the First Amendment to the Restructuring Support Agreement, the Second Amendment to the Restructuring Support Agreement and the Third Amendment to the Restructuring Support Agreement, respectively, to, among other things, extend certain transaction milestones between GDB and its creditors as negotiations continued.

On April 6, 2018, AAFAF, GDB and certain of GDB's creditors entered into the Fourth Amendment to the Restructuring Support Agreement, to, among other things: (i) further refine and restructure the terms of the Qualifying Modification, including simplifying the overall transaction structure, (ii) provide additional relief to municipalities as they recover from the hurricanes and (iii) ensure that the Issuer will receive additional assets in the restructuring.

On March 21, 2018, AAFAF and GDB submitted a revised fiscal plan (the "March 2018 GDB Fiscal Plan") to the Oversight Board to, among other things, amend the June 2017 GDB Fiscal Plan consistent with the Fourth Amendment to the Restructuring Support Agreement to reflect: (i) the adjustment of certain financial assumptions based on information available post-Hurricanes Irma and María, (ii) the inclusion of certain terms of the Restructuring Support Agreement providing for, on the Closing Date, the application of the full amount of a municipality's deposits with GDB against the balance of any Loan owed by such municipality to GDB and (iii) the completion of GDB's wind-down and substantial termination of its operations, with GDB remaining a legal entity without operations beyond those related to the completion of the Qualifying Modification and the management of certain assets thereafter. On April 20, 2018, the Oversight Board issued a unanimous written consent certifying the March 2018 GDB Fiscal Plan (so certified, the "GDB Fiscal Plan").

On May 8, 2018, the Oversight Board issued a unanimous written consent (i) re-certifying the Restructuring Support Agreement, as amended, as a Voluntary Agreement and a Qualifying Modification under Sections 104(i)(1) and 601(g)(2), respectively, of PROMESA, (ii) notifying GDB that Epiq Corporate Restructuring is reasonably acceptable to serve as the Calculation Agent and Information Agent for the Solicitation under Sections 601(k) and 601(l), respectively, of PROMESA, and (iii) certifying the GDB Bond Claims Pool (as defined in the Solicitation Statement) and the Guaranteed Bond Claims Pool (as defined in the Solicitation Statement) as separate Pools (as defined in PROMESA) and the only Pools of the Qualifying Modification pursuant to Section 601(d) of PROMESA.

On June 8, 2018 and August 3, 2018, AAFAF, GDB and certain of GDB's creditors entered into the Fifth Amendment to the Restructuring Support Agreement and the Sixth Amendment to the Restructuring Support Agreement, respectively, to, among other things, further extend certain transaction milestones between GDB and its creditors as negotiations continued.

On August 9, 2018, subject to the terms and conditions set forth in the Solicitation Statement, dated August 9, 2018 (the "Solicitation Statement"), GDB and AAFAF commenced the solicitation of votes (the "Solicitation") seeking creditor approval of the Qualifying Modification under Title VI of PROMESA.

On August 10, 2018, GDB and AAFAF filed the *Application of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority, Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act, for Approval of the Qualifying Modification for GDB* [ECF No. 1] (the "Approval Application"), thereby commencing the action under Title VI of PROMESA. Concurrently with the filing of the Approval Application, GDB and AAFAF filed the *Motion for an Order Approving Procedures and Setting a Schedule for Approval of the Qualifying Modification for the Government Development Bank for Puerto Rico* [ECF No. 4]. On September 17, 2018, the court entered the *Order*

*Approving Procedures and Setting a Schedule for Approval of the Qualifying Modification for the Government Development Bank for Puerto Rico* [ECF No. 148] (the "Procedures Order"). Pursuant to the Procedures Order, the court set certain deadlines related to asserting objections to, and seeking discovery regarding, the Qualifying Modification.

GDB and AAFAF received several objections and reservations of rights related to the Qualifying Modification, including from (i) National Public Finance Guarantee Corporation with respect to the federal funds deposited at GDB; (ii) National Public Finance Guarantee Corporation, Ambac Assurance Corporation, Assured Guaranty Corp. and Assured Municipal Corp. in connection with the preservation of certain claims under the Qualifying Modification; (iii) Fidelity and Deposit Company of Maryland and Zurich American Insurance Company; (iv) the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA); (v) Fundacion Biblioteca Rafael Hernandez Colon, Inc. and Fundacion Sila M. Calderon, Inc.; (vi) Siemens Transportation Partnership Puerto Rico, S.E.; (vii) the Municipality of San Juan; and (viii) the United States of America. *See* ECF Nos. 13, 15, 18, 21, 22, 59, 95, 136, 159, 160, 192, 201, 203. GDB and AAFAF ultimately reached settlements with each of the objecting parties, resolving all objections to the Qualifying Modification. *See* ECF Nos. 157, 175, 187, 238, 251. Certain of these objections and the resulting settlement are described in more detail under "*Litigation*" in this Offering Memorandum.

On September 20, 2018, Epiq Corporate Restructuring, as Calculation Agent, filed the *Declaration of Jane Sullivan of Epiq Corporate Restructuring, as Calculation Agent, Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Qualifying Modification Under Title VI of PROMESA* [ECF No. 156], indicating that (i) Eligible Voters (as defined in the Solicitation Statement) holding over 50% of the outstanding principal amount of outstanding Participating Bonds (as defined in the Solicitation Statement) in each Pool voted to approve the Qualifying Modification; and (ii) Eligible Voters holding over 66 2/3% of the outstanding principal amount of outstanding Participating Bonds in each Pool that voted in the Solicitation voted to approve the Qualifying Modification. Epiq Corporate Restructuring reported that for the GDB Bond Claims Pool, over 74.8% of the aggregate principal amount of Participating Bond Claims in the GDB Bond Claims Pool voted and, of those that voted in such pool, over 94.7% of the Participating Bond Claims voted to approve the Qualifying Modification, reflecting over 72.9% of the aggregate principal amount. For the Guaranteed Bond Claims Pool, 100% of the aggregate principal amount of the Participating Bond Claims in such pool voted to approve the Qualifying Modification.

On November 6, 2018, the court held the hearing to consider the Approval Application and, after considering all arguments, filings, and evidence regarding approval of the Qualifying Modification, approved the Qualifying Modification on the record. On November 7, 2018, the court entered the *Findings of Fact, Conclusions of Law, and Order Approving Qualifying Modification for the Government Development Bank for Puerto Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act* [ECF No. 270] (the "Approval Order").

**DESCRIPTION OF THE COMMONWEALTH AND ITS CURRENT FINANCIAL CONDITION**

*The description of the Commonwealth below is intended to provide you with background information on the Commonwealth and its financial condition. The New Bonds are special limited obligations of the Issuer and are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The Issuer does not have any taxing authority.*

**The Commonwealth**

*General.* The Commonwealth is an island located in the Caribbean approximately 1,600 miles southeast of New York City. It has an area of approximately 3,500 square miles and a population estimated by the United States Census Bureau of approximately 3.34 million as of July 1, 2017.

The Commonwealth came under United States sovereignty pursuant to the Treaty of Paris of 1898. Puerto Ricans have been citizens of the United States since 1917. In 1950, the United States Congress authorized the Commonwealth to draft and approve its own Constitution, which was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of the Commonwealth, amended and ratified by the United States Congress, and subsequently approved by the President of the United States in 1952. The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative and judicial branches of government. The current Governor, Ricardo Rosselló, was sworn into office for a four-year term on January 2, 2017. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.

The people of the Commonwealth are citizens of the United States but do not vote in Presidential elections and are represented in Congress by a non-voting Resident Commissioner. Most federal taxes, except those such as Social Security and Medicare taxes, are not levied in the Commonwealth.

The United States and the Commonwealth share a common defense, market and currency. In general terms, the Commonwealth historically exercised virtually the same control over its internal affairs as do the 50 states. Recently, as a result of the current fiscal crisis that affects the Commonwealth, the United States Congress enacted PROMESA, which established the Oversight Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs.

*Description of the Commonwealth's Public Corporations and Instrumentalities.* In the Commonwealth, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the Commonwealth. Public corporations may obtain revenues from rates charged for services or products but, as described further below, many receive sizable subsidies from the Commonwealth. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are ascribed to departments of the Commonwealth. Capital improvements of most of the larger public corporations have been financed historically by revenue bonds issued under trust agreements or bond resolutions or by notes or other obligations issued under loan agreements.

Through the years, many public corporations and other instrumentalities have traditionally relied on subsidies, in the form of appropriations from the general fund of the Commonwealth and/or assignments of Commonwealth taxes or other revenues, to fund a material portion of their operations. Certain of these instrumentalities, including the Puerto Rico Health Insurance Administration, the Puerto Rico Medical Services Administration, the Puerto Rico Integrated Transit Authority, the Puerto Rico and Island Municipalities Maritime Transport Authority, the Metropolitan Bus Authority, HTA and the University of Puerto Rico ("UPR"), provide essential services to the residents of the Commonwealth and rely heavily on such subsidies to fund their day-to-day operations. Other subsidized public corporations, like the Public Buildings Authority ("PBA"), provide essential services to the Commonwealth's central government, which are in turn necessary to provide essential services to Commonwealth residents.

Commonwealth appropriations and tax revenues are also a principal source of funding for certain public corporations dedicated to fiscal and advisory functions (*e.g.*, AAFAF), infrastructure development (*e.g.*, the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Puerto Rico Public Private Partnerships Authority), air and maritime transportation and logistics (*e.g.*, the PAA), and economic, tourism and cultural promotion (*e.g.*, the Puerto Rico Tourism Company, the Puerto Rico Convention Center District Authority ("CCDA"), the Puerto Rico Industrial Development Company (primarily with respect to the Special Fund for Economic Development and the Rums of Puerto Rico Program) and the Institute of Puerto Rican Culture). In addition, the Legislative Assembly has assigned tax and fee revenues, by law, to certain of these public corporations.

Other public corporations, such as the Puerto Rico Sales Tax Financing Corporation ("COFINA," by its Spanish acronym) and the Puerto Rico Public Finance Corporation ("PFC"), have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (in the case of COFINA) or appropriations (in the case of PFC) as their sole source of repayment.

Notwithstanding the Commonwealth's substantial level of support, certain of these public corporations suffer from significant annual operating losses and carry material amounts of accounts payable (particularly to other government entities such as the State Insurance Fund, ERS, PREPA and the Puerto Rico Aqueduct and Sewer Authority). If the Commonwealth's financial condition does not improve, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues. This may result in reduced services to the Commonwealth's population. However, since some of the services provided by these public corporations are essential to maintain health, public safety and welfare, the Commonwealth may prioritize the funding of such services over financial or other obligations.

**Description of the Commonwealth's Economy and Fiscal Challenges**

*General.* The Commonwealth and most of its public corporations are in the midst of a profound fiscal crisis. Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues. During the past 12 years, the Commonwealth's balance sheet has significantly deteriorated due to years of economic recession, recurring budget deficits, the financing of recurrent expenses with long-term debt and the failure to adequately fund legacy obligations, such as pensions.

A framework for understanding the fiscal challenges faced by the Commonwealth during the next decade was first outlined in a 2015 report commissioned by GDB and prepared by Anne O. Krueger, Ranjit Teja and Andrew Wolfe (the "Krueger Report"), which analyzed the Commonwealth's macroeconomic condition and proposed a strategy to address the Commonwealth's financial crisis by implementing policies relating to certain structural reforms, financial reform and public debt and institutional credibility. The framework outlined in the Krueger Report was further developed and refined in the Fiscal and Economic Growth Plan presented to then-Governor Alejandro García Padilla in September 2015, which was prepared by the Working Group for the Fiscal and Economic Recovery of Puerto Rico created by Governor Padilla in June 2015. This framework sought to compare the resources and expenditures that the Commonwealth (and most of its public corporations) expected to collect and incur, respectively, on a consolidated basis, during the next 10 years assuming no changes to current laws and policies. The analysis of the Krueger Report highlighted the need to measure the Commonwealth's financial health not on the basis of the Commonwealth's general fund (the Commonwealth's principal accounting fund for its operating expenses) exclusively, but rather on a more comprehensive and consolidated manner that captures the cost of legacy liabilities, including debt and pensions, the results of operations of those Commonwealth public corporations that provide essential government services and that are directly supported by the Commonwealth's taxes or appropriations and the cost of necessary capital expenditures.

The Commonwealth's balance sheet deterioration, combined with continued structural imbalances between revenues and expenditures and the Commonwealth's inability to access the capital markets, resulted in the Commonwealth and certain of its instrumentalities becoming unable to make scheduled debt payments while continuing to provide government services and ultimately being placed into debt restructuring proceedings under Title III of PROMESA. For additional information regarding such proceedings, see "*Description of the Commonwealth's PROMESA Filings,*" in this Offering Memorandum.

*The Commonwealth's Economy.* The Commonwealth's economy entered a recession in the fourth quarter of fiscal year 2006, and the Commonwealth's gross national product ("GNP") has contracted (in real terms) every fiscal year between 2007 and 2017, with the exception of fiscal year 2012. The slight GNP growth in fiscal year 2012 was due mainly to the large number of stimuli and deficit spending injected into the Commonwealth's economy during the period and not as a result of economic recovery.

The Puerto Rico Planning Board (the "Planning Board") has the legal responsibility of creating an annual Economic Report to the Governor and the Legislative Assembly, presenting the Commonwealth's economic outlook and an analysis of its economic behavior. According to the Planning Board's report released in January 2018, the Commonwealth's real GNP for fiscal years 2016 and 2017 decreased by 1.3% and 2.4%, respectively. The Planning Board's GNP forecast for fiscal year 2018, which was released in April 2017 and has not been revised, projects a contraction of 1.5%. In each case, such analysis does not account for the impact of Hurricanes Irma or María, which are expected to have a materially adverse effect on the Commonwealth's GNP. All macroeconomic accounts for fiscal year 2017 shown in this Offering Memorandum are preliminary until the revised figures for fiscal year 2017 are released and the forecasts for fiscal year 2018 is revised. The Planning Board could revise back more than two years to the extent it obtains more complete information.

In fiscal year 2017, preliminary aggregate personal income in the Commonwealth was $64.5 billion and personal income per capita was $19,140.

The dominant sectors of the Commonwealth's economy are manufacturing and services. The manufacturing sector has undergone fundamental changes in recent years as a result of the elimination of certain tax incentives under the U.S. Tax Code and an increased concentration in higher-wage, high-technology industries, such as pharmaceuticals, computer products, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities and other services, leads all sectors in providing employment.

The economy of the Commonwealth is closely linked to the United States economy, as most of the external factors that affect the Commonwealth's economy (other than oil prices) are determined by the policies and performance of the United States economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation and tourist expenditures. During fiscal year 2017, approximately 78% of the Commonwealth's exports went to the United States mainland, which was also the source of approximately 53% of the Commonwealth's imports.

Certain information regarding current economic activity is available in the form of the Economic Development Bank for Puerto Rico ("BDE") Economic Activity Index ("BDE-EAI"), a coincident indicator of ongoing economic activity. This index, shown in the following graph (published by GDB from December 2009 to March 2016, and by AAFAF from April 2016 to September 2018), is composed of several variables (total payroll employment based on the Establishment Survey, total electric power generation, cement sales and consumption of gasoline) that highly correlate to the Commonwealth's real GNP. However, the BDE-EAI does not measure the real GNP annual growth rates. Since the BDE-EAI is generated with only four variables, it is more volatile than the real GNP figures. This means that both increments and declines reflected in the BDE-EAI amplify the corresponding movements of the real GNP. The BDE-EAI for September 2018 was 121.5, an increase of 5.2% compared to September 2017, the first year-over-year increase in 69 consecutive months. On a year-to-date basis (from July 2018 to September 2018), the index increased 1.5% when compared to the same period in 2017 mainly due to the recovery efforts in the aftermath of Hurricanes Irma and María. For more information about the BDE-EAI methodology and recent modifications to reduce volatility, see BDE's website at www.bde.pr.com under "Puerto Rico Economic Data."

**Economic Activity Index**



***Recurrent Deficits.*** One of the principal causes of the Commonwealth's current fiscal crisis has been its inability to increase its revenues and reduce its expenditures in order to avoid recurrent structural deficits. These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, and by deferring the cost of certain legacy liabilities. The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities such as employee retirement benefits, the ballooning cost of healthcare and the contraction of the revenue base due to prevailing economic conditions, have led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to Generally Accepted Accounting Principles in the United States. The Commonwealth's financial statements for fiscal year 2015, which are the most recent audited financial statements for the Commonwealth, reflect a total net position deficit of approximately $67,038 million for the Commonwealth's primary government.

***Employment.*** Total average annual employment, as measured by the Commonwealth's Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey" (which is generally used for the computation of the unemployment and participation rates), has decreased in recent years. The reduction in total employment began in the fourth quarter of fiscal year 2007, when total employment was 1,244,425, and continued consistently until the first half of fiscal year 2015, after which it mostly stabilized. According to the most recent Household Survey released in July 2018, total employment in the Commonwealth in

June 2018 was approximately 996,000, a 1% increase from total employment of approximately 985,000 in June 2017. Similarly, such Household Survey reports an unemployment rate of approximately 9.3% in June 2018, a 1% decrease from an unemployment rate of approximately 10.3% in June 2017.

According to the Establishment Survey (also known as the Payroll Survey), which is a survey generally used to measure employment across the various sectors of the economy, total payroll non-farm employment decreased by 1% during fiscal year 2017 as compared to fiscal year 2016. Total private employment also fell during fiscal year 2017 by 0.6%, which translates to a reduction of almost 4,000 employees, as compared to the same period for the prior fiscal year.

*Economic Legislative Initiatives.* In order to address the fragile state of the Commonwealth's economy and spur economic growth, the Legislative Assembly has enacted legislation designed to strengthen the Commonwealth's competitiveness in the global economy. For example, the Legislative Assembly enacted an amendment to the legal framework of its public-private partnership law to leverage the private sector's expertise and resources by strengthening the mechanisms through which private parties can present projects to the government and undertake the studies required to establish public-private partnerships in the Commonwealth. The Government has also proposed comprehensive tax, ease of doing business and power sector reforms aimed at promoting economic development.

*Aggregate Debt Burden of the Commonwealth and its Instrumentalities.* As of March 31, 2017, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $72.1 billion (including accreted interest on capital appreciation bonds). Of this amount, approximately $55.9 billion represents General Obligation bonds, debt payable from Commonwealth taxes or appropriations and debt of tax-supported public corporations.

For fiscal year 2018, the aggregate scheduled annual debt service on all bonds and notes issued by the Commonwealth and its instrumentalities was approximately $4.6 billion. The debt burden of the Commonwealth and its instrumentalities significantly increased during the past decade. A significant portion of the debt issued during this period was used to cover operational expenses of the Commonwealth and its public corporations.

The Commonwealth's ratio of tax-supported debt to revenue is more than double that of Connecticut, the state with the highest debt-to-revenue ratio, and almost seven times the U.S. state median. The Commonwealth's tax-supported debt per capita, as a share of GDP and as a share of personal income, is also disproportionally high when compared to mainland jurisdictions. Both the Krueger Report and the Revised Commonwealth Fiscal Plan (as described herein) concluded that the Commonwealth's debt burden was unsustainable and has to be restructured.

*Pension Liabilities.* In addition to debt service on outstanding bonds, notes and other financial debt obligations, one of the most significant expenditures faced by the Commonwealth and its public corporations are pension benefits payable to retired employees. Prior to fiscal year 2018, Commonwealth employees, together with employees of certain public corporations and municipalities, participated in the following three principal retirement systems: ERS, the Puerto Rico System of Annuities and Pensions for Teachers ("TRS") and the Retirement System for the Judiciary of the Commonwealth of Puerto Rico ("JRS" and, together with ERS and TRS, the "Retirement Systems"). ERS is the largest of the three Retirement Systems. The combined Retirement Systems' net pension liability was approximately $49 billion as of June 30, 2015.

Given the insolvency and impending exhaustion of ERS's liquid assets, on May 29, 2017, the Oversight Board, at the request of ERS, filed a voluntary petition for relief in the District Court to commence a debt restructuring proceeding under Title III of PROMESA for ERS. Furthermore, on August 2017, the Legislative Assembly enacted Act 106, pursuant to which the Commonwealth adopted a "pay-as-you-go" system for the payment of pension benefits. Under Act 106, the Commonwealth makes pension payments from its general fund. The Retirement Systems are required to transfer to the Commonwealth their remaining liquid assets and the public corporations and municipalities are required to reimburse the Commonwealth the amounts necessary to meet pension benefit payments to their respective retirees (in lieu of the prior statutory employer contributions payable to the Retirement Systems). The Fiscal Year 2019 Certified Budget (as defined herein) for the Commonwealth includes approximately $2.5 billion to cover the "pay-as-you-go" expense. Most municipalities and many public corporations were unable to make all payments required to be made by them to the Commonwealth to cover the pension benefits of their retirees under the new pay-as-you-go model during fiscal year 2018 and therefore still owe significant sums to the Commonwealth with respect thereto.

## The Commonwealth Fiscal Plan

On March 13, 2017, the Oversight Board certified a fiscal plan for the Commonwealth (the "Commonwealth Fiscal Plan"), which was prepared by AAFAF on behalf of the Commonwealth and the government entities covered therein. As a result of the aftermath of Hurricanes Irma and María, on October 31, 2017, the Oversight Board announced a process to revise the fiscal plan for the Commonwealth. The Oversight Board recognized that the hurricanes fundamentally changed Puerto Rico's reality and that a revised fiscal plan for the Commonwealth must take that new reality into account.

As requested by the Oversight Board, the Commonwealth prepared and presented the Oversight Board with various drafts of a revised fiscal plan for the Commonwealth and certain of its instrumentalities. Notwithstanding the Commonwealth's efforts, on April 19, 2018, the Oversight Board certified its own version of a revised fiscal plan for the Commonwealth and certain of its instrumentalities. After further negotiations between the Government and the Oversight Board regarding certain labor reform requirements, the Oversight Board re-certified the revised fiscal plan on May 30, 2018 based on the commitment that legislation would be enacted to convert Puerto Rico into an at-will employment jurisdiction through the repeal of Act No. 80 of 1976, as amended ("Act 80").

On June 29, 2018, the Oversight Board certified a new, revised fiscal plan for Puerto Rico (the "Revised Commonwealth Fiscal Plan") due to the failure to repeal Act 80 and convert Puerto Rico to an at-will employment jurisdiction as required by the fiscal plans certified on April 19, 2018 and re-certified on May 30, 2018. The Revised Commonwealth Fiscal Plan covers a six-year period, from fiscal year 2018 to fiscal year 2023. Although the Revised Commonwealth Fiscal Plan adopted significant parts from the draft fiscal plans presented by the Commonwealth, it differs in certain material aspects from the Commonwealth's proposals. The Oversight Board also certified a budget for the Commonwealth for fiscal year 2019 that is based on the Revised Commonwealth Fiscal Plan (the "Fiscal Year 2019 Certified Budget"). On July 5, 2018, the Governor and AAFAF filed an adversary complaint against the Oversight Board in the Commonwealth's Title III proceeding, which seeks a declaration that certain actions taken by the Oversight Board, including related to the Revised Commonwealth Fiscal Plan and the budget, exceed its powers under PROMESA and abrogate the rights of the Government. The complaint also seeks injunctive relief that would prohibit the Oversight Board from enforcing certain disputed provisions of the Revised Commonwealth Fiscal Plan and the budget. The Oversight Board filed a motion to dismiss this complaint on July 12, 2018 and the matters were argued before the court on July 25, 2018. On August 7, 2018, the court issued an order granting in part and denying in part the Oversight Board's motion to dismiss.

On August 1, 2018, the Oversight Board announced that it would commence a process to further revise the Revised Commonwealth Fiscal Plan. Revisions would incorporate, among other things, fiscal year 2018 actuals and revised federal disaster estimates, which the Oversight Board indicated should improve the Revised Commonwealth Fiscal Plan's revenue projections. The revisions would also include the correction of a recently discovered forecasting error, which results in the demographic projections in the Revised Commonwealth Fiscal Plan being too negative. The Oversight Board indicated that, due to the per capita rate of healthcare spending, this error leads to a projected surplus over 30 years for the Commonwealth that is too high by approximately $4 billion.

On August 21, 2018, the Commonwealth prepared and presented to the Oversight Board a revised draft of the Revised Commonwealth Fiscal Plan. On August 30, 2018, the Oversight Board notified the Commonwealth that the revised draft of the Revised Commonwealth Fiscal Plan required certain revisions before it could be certified. In particular, the Oversight Board required changes or adjustments in the macroeconomic, revenue and expenditure projections used by the Commonwealth and the structural reforms and fiscal measures proposed by the Commonwealth. On September 10, 2018, the Commonwealth presented the Oversight Board with a further revision of the Revised Commonwealth Fiscal Plan. On October 22, 2018, the Oversight Board published a draft of the Commonwealth fiscal plan that it planned to adopt and, on October 23, 2018, the Oversight Board adopted the revised Commonwealth fiscal plan (the "October Revised Commonwealth Fiscal Plan").

The following summary describes certain provisions of the October Revised Commonwealth Fiscal Plan. This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the October Revised Commonwealth Fiscal Plan, which the Oversight Board has indicated will be amended and which may be further amended in the future. In addition, the October Revised Commonwealth Fiscal Plan is forward looking and the ability of the Commonwealth to achieve the various objectives outlined therein is subject to substantial uncertainty, including as a result of events and conditions outside of the Commonwealth's control.

The October Revised Commonwealth Fiscal Plan addresses the finances of central government agencies, certain other government agencies and certain public corporations and instrumentalities but excludes those entities for which an independent fiscal plan has been or is being developed. As a result, entities such as GDB, PREPA, the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), the HTA, UPR, COFINA and the Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico ("COSSEC") are not included in the October Revised Commonwealth Fiscal Plan. Other entities excluded from the October Revised Commonwealth Fiscal Plan include The Children's Trust Fund, municipalities, the Puerto Rico Public Finance Corporation, the Puerto Rico Municipal Finance Corporation, the Puerto Rico Municipal Finance Agency and certain other special, independent funds created by the Commonwealth for particular purposes.

The October Revised Commonwealth Fiscal Plan estimates an 8.0% contraction in real gross national product in fiscal year 2018, but projects a marked increase in macroeconomic growth for fiscal year 2019 that gradually decreases until fiscal year 2023, assuming that the structural reforms outlined in the October Revised Commonwealth Fiscal Plan are implemented. This macroeconomic growth projection takes into account a projected population decline during the period covered by the October Revised Commonwealth Fiscal Plan of approximately 5.5%. The October Revised Commonwealth Fiscal Plan also includes financial projections that are largely driven by macroeconomic projections. Without the fiscal and structural measures included in the October Revised Commonwealth Fiscal Plan, the cumulative surplus for the six-year period covered by the October Revised Commonwealth Fiscal Plan was expected to total $3.9 billion before the payment of any debt service. After the application of the fiscal measures provided for under the October Revised Commonwealth Fiscal Plan, and the fiscal impact of the structural reforms described therein, the October Revised Commonwealth Fiscal

Plan projects a surplus of approximately $17 billion for the applicable six-year period before the payment of any debt service. In addition, the October Revised Commonwealth Fiscal Plan projects increased revenues buoyed by a positive macroeconomic trajectory resulting from significant disaster relief funding stimulus, as well as federal Medicaid funding. The October Revised Commonwealth Fiscal Plan includes illustrative estimates of the implied debt capacity of the Commonwealth and the instrumentalities covered by the plan, based on a range of interest rates and assuming a 30-year term for such debt. Such estimates confirm the need for significant debt restructuring and write-downs.

The October Revised Commonwealth Fiscal Plan seeks to achieve its objectives through the implementation of a myriad of structural and fiscal reforms. Structural reforms include human capital and welfare reforms, ease of doing business reforms, power sector reforms and infrastructure reform and capital investment. Human capital and welfare reforms are geared to address Puerto Rico's low labor participation rate by making it easier and more affordable to create jobs in Puerto Rico and to enable more people to work in Puerto Rico through initiatives articulated in the October Revised Commonwealth Fiscal Plan. These initiatives include implementing education targets for higher proficiency in Spanish, English and STEM subjects, providing workforce training opportunities, enacting and implementing more flexible and less costly labor laws and regulations, including those to establish employment benefits at levels that are competitive with other jurisdictions, and creating incentives to work through welfare reforms and local earned income tax credit benefits.

Structural reforms articulated in the October Revised Commonwealth Fiscal Plan are also centered on making Puerto Rico more competitive in the global economy. For example, ease of doing business reforms are geared to attract new investments and business by making it easier to do business in Puerto Rico. These initiatives include improving current World Bank Ease of Doing Business rankings, digitalizing government services and modernizing systems, reducing regulatory burdens, such as licensing and other requirements, minimizing tax compliance costs and simplifying permitting and startup costs. Energy sector reform is also critical for residents and businesses alike because affordable, reliable and resilient electricity should lead to economic development. Initiatives in this field include lowering electric rates, rebuilding resilient infrastructure, diversifying the fuel mix and updating technologies, establishing efficient and robust transmission and distribution systems, and putting a strong and independent expert regulator in place.

The October Revised Commonwealth Fiscal Plan also articulates infrastructure reforms geared towards the goal of providing better service for residents and businesses. The October Revised Commonwealth Fiscal Plan proposes centralized administration of federal recovery funds in order to set government priorities that will guide future infrastructure investment. These reforms are expected to lead to an accelerated infrastructure reconstruction process and a sustainable funding and financing model. Finally, it is expected that these reforms will lead to procurement and delivery practices in line with best practices in the United States and around the world.

The October Revised Commonwealth Fiscal Plan also provides for significant fiscal reform in order to achieve the objectives set forth therein. Fiscal reform initiatives are concentrated on reducing government expenditures through rightsizing, reforming historically high cost programs and implementing measures to assure transparency, balanced budgets and fiscal controls.

The October Revised Commonwealth Fiscal Plan sets forth measures to reduce government expenditures through rightsizing initiatives that promote a more efficient and affordable government to provide necessary services. Key to these initiatives is a consolidation of agencies and shared services, which is anticipated to lead to personnel reductions mainly through attrition and retirement. Government reform will also aim to achieve reductions and/or elimination of subsidies, reduction of bureaucracy through regionalization initiatives and lower costs for goods and services through procurement reform.

The October Revised Commonwealth Fiscal Plan also calls for healthcare and pension reform. As two of the major budget items for the Commonwealth, cost savings in respect of these systems could be significant. The Government recently achieved a healthcare reform objective by implementing a simple, unified regional system to drive efficiency and cost reductions. Healthcare reform objectives would also include consolidation of health-related government agencies to address redundancy and overlap. New technologies would be used to detect fraud and overuse in order to control costs. Finally, cost control through standardization of fees and limitations on emergency room use and increased generic (as opposed to brand-name) drug use would also be implemented. With respect to pension reform, the October Revised Commonwealth Fiscal Plan would freeze defined benefit accumulations, establish individual retirement accounts to protect employee contributions, provide for a 10% pension benefit reduction which would not be applicable to those with combined pension and social security benefits of below $1,000 per month, and enroll in the Social Security program those government workers that currently do not participate in such program (mainly teachers, police officers and judges).

Fiscal reform will also address the Commonwealth's tax and financial reporting apparatus. With respect to tax reform, the October Revised Commonwealth Fiscal Plan will aim to reduce unfairness and improve compliance and capture rates by broadening the tax base, implementing a unified tax payment system and other new technology, increasing collection personnel, adjusting existing taxes and revenues, and reducing certain taxes while maintaining revenue neutrality. These changes will be coupled with the creation of the Office of the Chief Financial Officer, which will be tasked with establishing and maintaining controls over Commonwealth finances. The primary objectives of this office will be to centralize treasury and liquidity management and reporting functions, through budget development and monitoring and contract and personnel policy compliance oversight. It will also drive standardization of accounting systems and implement other processes to ensure timely publication of the Commonwealth's audited financial statements.

**Description of the Commonwealth's PROMESA Filings**

Section 405 of PROMESA imposed a temporary stay on litigation related to the financial indebtedness of Commonwealth government entities, which expired on May 1, 2017. Following the expiration of the temporary stay, on May 3, 2017, the Oversight Board issued a restructuring certification pursuant to Sections 104(j) and 206 of PROMESA and filed a voluntary petition for relief on behalf of, and at the request of, the Commonwealth, commencing a case under Title III of PROMESA in the United States District Court for the District of Puerto Rico, Case No. 17-03283 (the "Commonwealth Title III Case"). The Oversight Board has similarly issued a restructuring certificate and filed voluntary petitions for the following entities (collectively, with the Commonwealth Title III Case, the "Title III Cases"):

- Puerto Rico Sales Tax Financing Corporation, Case No. 17-03284, commenced on May 5, 2017;

- Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Case No. 17-03566, commenced on May 21, 2017;

- Puerto Rico Highways and Transportation Authority, Case No. 17-03567, commenced on May 21, 2017;

- Puerto Rico Electric Power Authority, Case No. 17-0478, commenced on July 3, 2017.

The Title III Cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 17-03283. On May 5, 2017, U.S. Supreme Court Chief Justice John Roberts selected U.S. District Court Judge Laura Taylor Swain (S.D.N.Y.) to preside over the Title III Cases pursuant to Section 308(a) of PROMESA. Upon the commencement of each of the Title III Cases, an automatic stay immediately went into effect pursuant to Sections 362 and 922 of the Bankruptcy Code, as made applicable to the Title III Cases pursuant to Section 301(a) of PROMESA.

The deadline for filing proofs of claim against the debtors in each of the pending Title III cases was June 29, 2018, at 4:00 p.m. (Atlantic Standard Time) (the "Bar Date"). As of the Bar Date, approximately 170,000 proofs of claim were filed against the Title III debtors. As of the date hereof, no plan of adjustment has been proposed or confirmed in any of the Title III cases.

## THE GDB RESTRUCTURING ACT

The GDB Restructuring Act was enacted on August 24, 2017, and amended on July 18, 2018, and establishes the legal framework for the wind down of GDB and the restructuring of its financial indebtedness. To this end, the GDB Restructuring Act provides for (i) the creation of the Issuer and the delegation and limitation of its powers, (ii) the creation of the GDB Public Entity Trust (the "Public Entity Trust") and the delegation and limitation of its powers, (iii) the determination of the balances of certain liabilities of GDB and other government entities, (iv) the authorization for the transfer of certain assets and obligations of GDB to each of the Issuer and to the Public Entity Trust, (v) the authorization for the Issuer to issue the New Bonds and provide for the terms of such bonds, (vi) the creation of the statutory lien that will secure the New Bonds, (vii) the authorization of certain disbursements from GDB related thereto, (viii) the amendment of certain laws to replace GDB with a designated trustee (which may be AAFAF or one or more private financial institution(s) designated by AAFAF), (ix) the confirmation of the validity of certain Loans made by GDB, (x) the confirmation of the validity of the transactions performed pursuant to the GDB Restructuring Act and the release of any claims by government entities against GDB and (xi) the lack of authority and standing of government entities to challenge the GDB Restructuring Act, the Qualifying Modification, or any other transactions contemplated by the GDB Restructuring Act in any local or federal court.

Below is a summary description of certain provisions of the GDB Restructuring Act, which does not purport to be complete and is qualified in its entirety by reference to the full text of the GDB Restructuring Act.

**Purpose of the Issuer**

The GDB Restructuring Act provides that the Issuer was created for the purposes of:

(i)     issuing the New Bonds in order to (a) implement the Qualifying Modification, (b) facilitate compliance with the GDB Fiscal Plan, and (c) facilitate the funding of essential government or public services by the Government of the Commonwealth (the "Government"); and

(ii)    owning and managing the Restructuring Property.

The Issuer is expected to enter into the Servicing Agreement with the Servicer, pursuant to which the Servicer will be responsible for all management of the Restructuring Property (including all day-to-day operations in respect thereof). For additional information regarding the Servicing Agreement, see "*Servicing Agreement*" in this Offering Memorandum.

The GDB Restructuring Act states that the Issuer was created and constituted to exercise essential government and public functions, and that the performance by the Issuer of the activities and powers granted under the GDB Restructuring Act are considered and constitute an essential function of the Commonwealth for the good of the people of the Commonwealth. The Issuer will not be operated for the purpose of making a profit, and no part of the revenues or assets of the Issuer will inure to the benefit of or be distributable to any private person or entity, except to service and pay the New Bonds and pay fees and costs for actual services rendered as herein provided or as otherwise required to carry out the intent of the GDB Restructuring Act.

In the GDB Restructuring Act, the Legislative Assembly found that the Qualifying Modification (i) has a public purpose and is in the best interests of the people of Puerto Rico, (ii) is fair and equitable for all creditors of GDB, (iii) is necessary to ensure compliance with the GDB Fiscal Plan, (iv) achieves fiscal responsibility for the people of Puerto Rico by providing for an orderly restructuring of the liabilities of GDB, (v) settles and resolves potential claims between GDB and other government entities, and (vi) permits the provision of essential public services by the Commonwealth and other government entities.

The provisions of Act 219-2012, as amended, known as the Puerto Rico Trusts Act, will not be applicable to the Issuer.

For additional information on the Issuer, see "*The Issuer*" in this Offering Memorandum.

**Permitted Activities**

The GDB Restructuring Act provides that the Issuer will not engage in any activity other than:

(i)     receiving the Transferred Property and owning the Restructuring Property described below in "*The Restructuring Property*" and the other property of the Issuer and the Collections thereon;

(ii)    adopting resolutions of the Board of Trustees authorizing: (a) the issuance of the New Bonds and describing the terms thereof, (b) receipt of the Transferred Property and ownership of the Restructuring Property, subject to the statutory lien and (c) the payment of certain financing costs associated with the Qualifying Modification;

(iii)     issuing:

(a)     the New Bonds; and

(b)     the Additional Bonds, if any;

(iv)     entering into the Transaction Documents;

(v)     servicing or contracting for the servicing of the Restructuring Property and the New Bonds and for administrative services;

(vi)     collecting, receiving, owning, enforcing, monitoring, selling and protecting the Restructuring Property or otherwise authorizing any of the foregoing, in accordance with the Transaction Documents and for the sole purpose of realizing on, or preserving, the value of the Restructuring Property or the Collections thereon, including, without limitation, by initiating necessary legal action (subject to Article 207 of the GDB Restructuring Act);

(vii)     fully accounting for and making or contracting with the Servicer and the Indenture Trustee to account for or make all payments and allocating partial payments, in accordance with the Bond Indenture and the Transaction Documents;

(viii)     entering into contracts and taking any other necessary or convenient actions with respect to realizing the maximum value of the Restructuring Property (subject to Article 207 of the GDB Restructuring Act), including related to the collection, enforcement, sale, monitoring, protection, forbearance or settlement thereof consistent with the terms and conditions of the Transaction Documents;

(ix)     preparing or directing the Servicer to prepare reports and financial statements as required by the Transaction Documents, including filing continuing disclosure reports in accordance with the Disclosure Agreement (with substantially all of the content of such reports to be prepared by others, including the Servicer, the Collateral Monitor and the auditor of the Issuer);

(x)     using or directing the use of the Restructuring Property in accordance with the Transaction Documents;

(xi)     making an election under Section 301.7701-3 of the U.S. Treasury Regulations promulgated under the U.S. Tax Code (as defined herein); and

(xii)     taking any and all other actions as may be necessary or appropriate to effectuate this transaction.

Additionally, the GDB Restructuring Act grants the Issuer certain ancillary powers described in Article 205 of the GDB Restructuring Act, in order to carry out its authorized activities. Pursuant to the provisions of said Article 205, the Issuer is expected to enter into certain agreements with third-party service providers, including the Servicer, related to, among other things, all management of the Restructuring Property (including all day-to-day operations in respect thereof). Therefore, many of the functions authorized to be carried out by the Servicer pursuant to the GDB Debt Restructuring Act, including, without limitation, those referenced in items (v) through (x), above, will be carried out by the Servicer pursuant to the Servicing Agreement. For more information, see "*Service Providers*" below.

**Prohibited Actions**

Pursuant to Article 206 of the GDB Restructuring Act, the Issuer will be prohibited from taking any of the following actions: (i) merging or consolidating, directly or indirectly, with any person, (ii) incurring, guaranteeing or otherwise becoming obligated to pay any debt or other obligations other than the New Bonds and certain other costs, (iii) pledging, creating or recording liens on any of its properties (including the Restructuring Property), other than the statutory lien securing the payment of the New Bonds and certain other costs, (iv) engaging in any business activities other than as expressly authorized by the GDB Restructuring Act, (v) dissolving, liquidating, transferring or selling any or all of the Restructuring Property, except as permitted by the GDB Restructuring Act and the Transaction Documents, and (vi) taking any other action that is inconsistent with the Issuer's purpose as set forth in the GDB Restructuring Act or ancillary thereto.

**The Issuer and the Qualifying Modification**

*Authorization of the New Bonds.* In order to authorize the issuance of the New Bonds, the Issuer must adopt one or more resolutions providing for the (i) issuance of the New Bonds and the terms thereof, (ii) receipt of the Transferred Property (described as the "Restructuring Authority Assets" in the GDB Restructuring Act) and the ownership of the Restructuring Property, and (iii) payment of certain costs and expenses, each in accordance with the terms of the Qualifying Modification.

*Transfer of the Transferred Property.* Pursuant to the GDB Restructuring Act, on the Closing Date and from time to time thereafter, all legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the Transferred Property will be transferred by GDB to the Issuer. For additional information on the Transferred Property, see "*The Restructuring Property*" in this Offering Memorandum.

*Source of Repayment of the New Bonds.* The New Bonds will be payable solely from the Restructuring Property, in accordance with the terms of the Bond Indenture and the other Transaction Documents, without recourse to the credit or any other assets of the Issuer or GDB (other than pursuant to the Keepwell Agreement). Moreover, the New Bonds will not constitute a debt of the Commonwealth or of any public corporation or instrumentality of the Commonwealth other than as a special limited obligation of the Issuer as described herein.

*Creation of Statutory Lien on the Restructuring Property.* Upon the issuance of the New Bonds, the New Bonds will be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders. Such lien will be senior to any other lien encumbering the Restructuring Property (except for valid liens and encumbrances existing as of the effective date of the GDB Restructuring Act or that arise in the ordinary course of business after the effective date of the GDB Restructuring Act and are existing as of the Closing Date, in each case with respect to any Real Property Assets and any personal property assets related thereto that are part of the Restructuring Property) and may be enforced subject to the provisions of the GDB Restructuring Act and pursuant to the terms of the Transaction Documents. Such statutory lien will occur automatically and will be perfected, valid and binding from and after the Closing Date, in any case without any further act or agreement. No instrument needs to be delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory lien or to establish or maintain the priority thereof. No commingling of any Restructuring Property with any other property of GDB or any other party will limit, defeat, impair or interfere with such statutory lien.

*Appointment of a Receiver.* Upon the occurrence of an event of default under certain of the Transaction Documents and the continuation of such event of default for a period of 30 days or as otherwise provided in the Transaction Documents, any Bondholder or Bondholders (subject to any contractual limitation as to a specific percentage of such holders (see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Remedies*")), or trustee therefor, will have the right to apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage, and control the property of the Issuer, including the Restructuring Property, and will exercise all the rights and powers of the Issuer with respect to such property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby.

*Participating Bond Claims; Keepwell Agreement.* Once the holders of Participating Bond Claims receive the New Bonds, such holders will not have any recourse against GDB with respect to such Participating Bond Claims. Notwithstanding the foregoing, GDB will enter into the Keepwell Agreement for the benefit of the Issuer and the Bondholders. For additional information on the Participating Bond Claims and the Keepwell Agreement, see "*The Restructuring Property—Detailed Description of the Restructuring Property*" and "*The Keepwell Agreement*" in this Offering Memorandum.

*Non-Impairment Covenant.* The Commonwealth agrees and covenants with any person that acquires the New Bonds that it will not, and no Commonwealth government entity will be authorized to, impair, limit, restrict, rescind, delay or modify the rights or powers of the Issuer, the Indenture Trustee or the Bondholders under the GDB Restructuring Act or under or in respect of the Restructuring Property, or the Issuer's ability to meet its obligations to its bondholders until the New Bonds, together with the interest thereon, and all amounts and obligations under the Transaction Documents, have been completely paid in full in cash or are otherwise discharged in accordance with their terms; *provided*, *however*, that any actions or omissions by the Commonwealth or by any Commonwealth government entity relating to appropriations or funding pursuant to the Revised Commonwealth Fiscal Plan will not be deemed to be a violation of such covenant. The Commonwealth further agrees and covenants that no amendment to the GDB Restructuring Act would impair, limit, restrict, delay or modify any obligation or commitment of (i) the Issuer to the Bondholders or (ii) GDB to the Bondholders under the Keepwell Agreement.

**GDB Public Entity Trust**

*Purpose of the Trust.* The Public Entity Trust was established in order to address GDB's deposit liabilities to non-municipal government entities, including federal funds as may be determined by AAFAF, and the municipalities having claims in respect of federal funds on deposit with GDB, as determined by AAFAF (the "Designated Depositors"). The Designated Depositors are not holders of Participating Bond Claims that will be restructured through the issuance of New Bonds by the Issuer. As a result, certain specified assets of GDB that are not part of the Restructuring Property securing the New Bonds will be transferred to the Public Entity Trust and will constitute the source of any distributions provided to the Designated Depositors. These specified assets consist of Loans to public agencies and departments of the Commonwealth that are primarily payable from legislative appropriations, with a principal balance of approximately $890.6 million as of the Cutoff Date (but reflecting the Closing Date Adjustments, as defined herein).

*Establishment of the Trust.* In order to create the Public Entity Trust, GDB is authorized to execute a deed of trust (the "Public Entity Deed of Trust") to be effective as of the Closing Date, creating and establishing the Public Entity Trust for the benefit of the Designated Depositors and providing for the terms and conditions related to the operation thereof. The Public Entity Trust will be a public trust and governmental instrumentality of Puerto Rico, independent and separate from any other Commonwealth government entity (including, without limitation, GDB and the Issuer). The Public Entity Deed of Trust will set forth the manner in which the assets identified by the Public Entity Deed of Trust, legal and equitable title for which is to be irrevocably transferred by GDB to the Public Entity Trust (the "Public Entity Trust Assets"), will be distributed among the Designated Depositors. The Secretary of Treasury of the Commonwealth is also authorized to appear in the Public Entity Deed of Trust on behalf of the Designated Depositors and to agree to the terms and conditions contained therein. The provisions of Act 219-2012, as amended, known as the Puerto Rico Trusts Act, will not be applicable to the Public Entity Trust.

*Transfer of Public Entity Trust Assets.* GDB is authorized to transfer, on or after the Closing Date, the Public Entity Trust Assets to the Public Entity Trust, and the Public Entity Trust is authorized to assume, effective as of the Closing Date, the Designated Deposits, pursuant to the Public Entity Deed of Trust in order to satisfy the conditions of the Qualifying Modification. A portion of the Public Entity Trust Assets will be transferred to the Public Entity Trust on the Closing Date and the remainder of the Public Entity Trust Assets, or any portion thereof, will be transferred to the Public Entity Trust in one or more series of transactions, as set forth in the Public Entity Deed of Trust (as defined in the GDB Restructuring Act). A transfer of the Public Entity Trust Assets by GDB to the Public Entity Trust pursuant to the Public Entity Deed of Trust will be an irrevocable, non-voidable and absolute transfer of all of GDB's legal and equitable right, title and interest (as a true sale), and not a pledge or other financing, of the Public Entity Trust Assets. Upon the transfer of the Public Entity Trust Assets to the Public Entity Trust and the assumption by the Public Entity Trust of the Designated Deposits, the Designated Depositors will, immediately and forever, and without further actions or documentation, cease to have any right, interest or claim against GDB or any of its assets, or any successors or assigns thereof (other than the Public Entity Trust).

*Residual Equity Interest in the Issuer.* Effective as of the Closing Date, the Public Entity Trust will have a residual equity interest in the Issuer, pursuant to which it will receive a distribution of the remaining assets of the Issuer, if any, after the New Bonds, certain costs in connection with the restructuring of GDB and other indebtedness of the Issuer have been paid in cash in full or otherwise discharged pursuant to the terms of the Transaction Documents. The Public Entity Trust will have no rights or remedies in respect of such residual equity interest other than the right to a distribution, if any, upon the dissolution of the Issuer, in accordance with the GDB Restructuring Act and the Transaction Documents.

*Trustee of the Public Entity Trust.* The trustee of the Public Entity Trust will have such powers as are conferred to it in the Public Entity Deed of Trust. GDB will initially act as trustee of the Public Entity Trust, *provided* that AAFAF will be authorized to act as trustee or to designate any other person to act as trustee of the Public Entity Trust upon GDB's resignation or in the event that GDB is otherwise unable to continue acting as trustee of the Public Entity Trust, as determined by AAFAF.

**Determination and Payment of Certain Government Obligations**

*Recalculation of Non-Municipal Obligations.* Notwithstanding any other law of the Government, effective as of the Closing Date, the balance of liabilities owed between any non-municipal Commonwealth government entity, on a dollar-for-dollar basis, and GDB will be automatically determined by applying the outstanding balance of any deposit of such entity against the outstanding balance of any Loan made to such government entity by GDB or of any bond or note of such entity held by GDB as of such date (other than any loan, bond or note of a non-municipal government entity secured by a mortgage over real property) in a manner consistent with the conditions of the Qualifying Modification without the need for any further action. Such application will be effected by reducing any remaining installments of principal in inverse order of maturity and will not otherwise affect the repayment schedule of the corresponding bond, note or loan.

*Recalculation of Municipal Obligations.* Pursuant to the provisions of the Municipal Financing Act, GDB provided Loans to municipalities that were evidenced as bonds, notes or other evidences of indebtedness. These bonds, notes and loans would be fully drawn upon their execution and their proceeds would remain on deposit with GDB in accounts created for the particular municipality. The GDB Restructuring Act provides that the remaining balance of these bonds, notes and loans will be reduced by the undisbursed

73

balance of any such proceeds held in GDB deposit accounts, which undisbursed remaining balance will be certified by AAFAF. The reduction will be automatic and without the need for further action by GDB and will be effected by reducing any remaining installment on such bonds, notes and loans in inverse order of maturity. The repayment schedule of these bonds, notes and loans will not be otherwise affected. Moreover, upon such reduction, future interest payments will be determined based on the remaining balance of such bond, note or loan. The GDB Restructuring Act does not limit or prohibit municipalities from refinancing their bonds, notes or loans through other financial institutions pursuant to the Municipal Financing Act.

Any remaining deposit of a municipality held at GDB as of the Closing Date (other than deposits identified by AAFAF as consisting of federal funds) will be automatically reduced, effective as of the Closing Date, on a dollar-for-dollar basis, from the outstanding principal amount of any corresponding bond, note and/or loan of such municipality (excluding the loans that are collateral for secured deposit accounts), relative to the type of corresponding deposit, as determined by AAFAF, in a manner consistent with the Qualifying Modification. Such application will be effected in ascending order of outstanding loan balances. In cases where deposits are not enough to pay the bond, note or loan in full, the application will be effected by reducing installments of principal in inverse order of maturity without affecting the repayment schedule of the bond, note or loan.

The remaining balances of the liabilities of each municipality and non-municipal Commonwealth government entity to GDB after giving effect to the transactions contemplated by the GDB Restructuring Act will be those certified by AAFAF. All future interest payments on said bonds, notes and/or loans will be computed based on the remaining balance of such liabilities pursuant to the GDB Restructuring Act and as certified by AAFAF.

Nothing contained in the GDB Restructuring Act will be construed to prohibit or limit municipalities from refinancing their current bonds, notes or loans through another financial institution pursuant to the Municipal Financing Act.

*Payment of Excess CAE.* The GDB Restructuring Act requires GDB to pay, in cash, on or prior to the Closing Date, to each municipality that has deposit claims against GDB for Excess CAE (as defined herein) certified by GDB prior to January 2017 corresponding to fiscal years 2015, 2016, and 2017 (such Excess CAE, "2015-17 Excess CAE"), an amount equal to 55% of such municipality's undisbursed 2015-17 Excess CAE, consistent with the conditions of the Qualifying Modification. Any remainder will be deemed fully discharged, no municipality will have any further rights to such amounts, and GDB will have no further liability or obligation, with respect thereto. For the avoidance of any doubt, 2015-17 Excess CAE does not include, and the GDB Restructuring Act does not address, those proceeds of the special additional tax which AAFAF has certified as surplus from the Municipal Debt Redemption Fund (as defined in the Municipal Financing Act) after January 1, 2017 pursuant to Article 20(e) of the Municipal Financing Act, corresponding to fiscal years 2017 and beyond and which are deposited in the Municipal Financing Act accounts created in financial institutions outside of GDB in the name or for the benefit of each municipality.

*Limitation and Mediation of Certain Claims against Municipalities.* The GDB Restructuring Act provides that all claims against a municipality related to a capital improvement project financed with a bond, note or loan subject to recalculation will be stayed from the Closing Date to June 30, 2019. The stay, however, does not apply to the commencement or continuation of litigation in order to participate in mediation related to the stayed claim. The goal of such mediation is to establish an alternate repayment plan or other satisfactory resolution of such claim and reflect such an arrangement in the municipality's fiscal year 2020 budget. Notwithstanding the stay, municipalities may still make payments related to such stayed claims.

**Certain Additional Provisions**

*Confirmation of Loans.* The GDB Restructuring Act provides that all loans made by GDB to a Commonwealth government entity, including municipalities, prior to the effective date of the GDB Restructuring Act are confirmed and continue to be valid and binding obligations of the applicable entity in accordance with their terms.

*Binding Effect of the Qualifying Modification; Lack of Authority to Challenge.* The GDB Restructuring Act provides that the Qualifying Modification will be valid and binding with respect to all government entities, including municipalities, as of the Closing Date. Moreover, the GDB Restructuring Act provides that no Commonwealth government entity will have any further rights or claims against GDB, the Issuer or the Public Entity Trust, other than those expressly provided in the GDB Restructuring Act, the Transaction Documents and the Public Entity Deed of Trust, and that each Commonwealth government entity is deemed to forever waive, release and discharge GDB, the Issuer and the Public Entity Trust, and any officers, directors, employees, agents and other representatives thereof, from any and all such claims. Finally, pursuant to the GDB Restructuring Act, no Commonwealth government entity, including municipalities, will have authority or standing to challenge the GDB Restructuring Act, the Qualifying Modification or the other transactions contemplated in the GDB Restructuring Act in any local or federal court.

***Trust for the Benefit of Retired Employees.*** In anticipation of the final wind-down of GDB pursuant to the GDB Fiscal Plan, notwithstanding any other law to the contrary, GDB is authorized to execute a deed of trust to create and establish a trust for the benefit of persons that retired from GDB pursuant to applicable pre-retirement programs (and any other beneficiary under said programs), to transfer to such trust funds to satisfy GDB's obligations under said pre-retirement programs (consistent with the GDB Fiscal Plan), and to take any and all actions necessary or convenient in furtherance of the foregoing. GDB may not transfer to such trust any asset that is not an Excluded GDB Asset. AAFAF is also authorized and empowered to act as trustee of such trust (or to designate any other entity to act as trustee thereof) and to take any and all actions necessary or convenient in furtherance of the foregoing. This trust will be a governmental instrumentality and will be totally exempt from, and will not be required to pay, any kind of taxes, assessments, licenses, stamps, fees or other similar charges levied by the Government or any government entity upon any of the property it owns, possesses, holds or uses or on its activities, or upon any income, payment or gain derived therefrom. The provisions of Act 219-2012, as amended, known as the "Trusts Act" will be applicable to the trust created for this purpose.

**USE OF PROCEEDS**

The Issuer will not receive any cash proceeds in this offering. Instead, the Issuer will (i) receive the Transferred Property from GDB and (ii) will issue the New Bonds to the holders of the Participating Bond Claims.

### SERVICE PROVIDERS

**The Servicer**

*Description of the Servicer*. AmeriNational Community Services, LLC ("AmeriNat"), a national firm providing loan servicing and other specialized financial services, will manage the Restructuring Property (AmeriNat or any successor thereof appointed in accordance with the terms of the Qualifying Modification, the "Servicer") pursuant to the terms of a servicing agreement (the "Servicing Agreement") by and between the Issuer and the Servicer. In August 2017, AAFAF issued a request for proposals with regard to the engagement of the Servicer, and AmeriNat was selected by AAFAF with the approval of the parties to the Restructuring Support Agreement as the Servicer based on its response to such request for proposals.

AmeriNat provides loan servicing for loan portfolios owned or originated by government, quasi-government, financial institutions, private investors and non-profit entities nationwide. Founded in 1975, AmeriNat manages loans and related deposits for approximately 300 city, county, state and non-governmental organization clients from its offices in Downey, California; Albert Lea, Minnesota; Baltimore, Maryland; Tampa, Florida; Wailuku, Hawaii and San Juan, Puerto Rico.

*Duties of the Servicer*. The Servicer, for the benefit of the Issuer and the Bondholders, will manage, service, administer and make Collections on the Restructuring Property in accordance with the terms of the Servicing Agreement, which will provide, among other things, that the Servicer will act (a) in accordance with applicable laws and regulations and the terms of the provisions of such Restructuring Property, (b) consistent with the Servicer's standard servicing procedures (if applicable), (c) in accordance with the other express terms of the Servicing Agreement, which for the avoidance of doubt will include the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" and (d) with reasonable care, using the same degree of skill and attention that a prudent lender or asset manager would exercise with respect to comparable assets that it services for itself or others (i) with a view to the timely collection of all periodic payments due on the Loans that make up the Restructuring Property and a duty to maximize the realizable value (in present value terms) of the Restructuring Property and (ii) without regard to any relationship that the Servicer may have with the related obligor or any other creditor of such obligor (collectively, the "Accepted Servicing Practices"). In addition, the Servicer will be permitted to engage one or more third parties to perform all or a portion of its servicing obligations at the Servicer's expense, which expense is subject to reimbursement to the extent provided in the Servicing Agreement. Such an appointment does not relieve the Servicer of its obligations or liability for managing the Restructuring Property in accordance with the provisions of the Servicing Agreement. The Servicer is also responsible for preparing on behalf of the Issuer the periodic continuing disclosure filings described under "*Continuing Disclosure*."

**The Indenture Trustee**

*Description of the Indenture Trustee.* Wilmington Trust, N.A., a national banking association, will serve as the indenture trustee (the "Indenture Trustee") pursuant to the terms of a bond indenture (the "Bond Indenture") by and between the Issuer and the Indenture Trustee. In December 2017, AAFAF issued a request for proposals with regard to the engagement of the Indenture Trustee, and Wilmington Trust, N.A. was selected as the Indenture Trustee based on its response to such request for proposals.

Wilmington Trust, N.A., a national banking association and a member of the Federal Reserve System and the FDIC, commenced operations on October 2, 1995. The deposit liabilities of Wilmington Trust, N.A. are insured by the FDIC through the Deposit Insurance Fund. The main office of Wilmington Trust, N.A. is located at 1100 North Market Street, Wilmington, Delaware 19890. As of March 31, 2018, Wilmington Trust, N.A. had total assets of $3.376 billion, deposits of $2.808 billion and shareholder's equity of $540 million.

*Duties of the Indenture Trustee*. The Indenture Trustee will be required to perform only those duties specifically required of it under the Bond Indenture. Generally, if no Bond Indenture Event of Default has occurred and is continuing, those duties will be limited to the administration of the payment of principal and interest on the New Bonds as required by the Bond Indenture and the receipt of the various certificates, reports or other instruments required to be furnished to the Indenture Trustee under the Bond Indenture. The Indenture Trustee will not have any obligation or responsibility to monitor or enforce the Servicer's compliance with its duties under the Servicing Agreement. The Indenture Trustee will not be charged with knowledge of a failure by the Servicer to perform its duties under the Servicing Agreement unless the Indenture Trustee obtains actual knowledge of such failure as will be specified in the Bond Indenture. The Indenture Trustee will make no representations as to the validity or sufficiency of the Bond Indenture, the New Bonds (other than the execution and authentication thereof) or of any Restructuring Property or related documents and will not be accountable for the use or application by the Servicer of any funds paid to the Servicer in respect of the New Bonds(or the Restructuring Property) or the investment of any monies by the Servicer before such monies are deposited into the Collection Account.

The Indenture Trustee will, on behalf of the Bondholders, engage the Collateral Monitor and enter into the Collateral Monitor Agreement. The Collateral Monitor may be removed and replaced by the Indenture Trustee for cause and must be removed and replaced by the Indenture Trustee at the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, in each case, which removal decision may be rescinded and annulled by Bondholders holding not less than a majority in

principal amount of the New Bonds then outstanding. Upon the removal of the Collateral Monitor, the Indenture Trustee will notify the Issuer and the Bondholders and accept nominations from the Bondholders for successor Collateral Monitor candidates. The Indenture Trustee will then submit to a vote of the Bondholders each such nominated candidate and the successor Collateral Monitor will be the candidate receiving the votes of Bondholders holding not less than a plurality in principal amount of the New Bonds voting. If the Bondholders fail to nominate any successor Collateral Monitor candidates, the Indenture Trustee will notify the Issuer, and the Issuer will undertake a competitive process to identify and designate a successor Collateral Monitor. The Indenture Trustee will engage such successor Collateral Monitor on terms substantially similar to those in the Collateral Monitor Agreement of the then-outgoing Collateral Monitor (or on terms otherwise negotiated by the Indenture Trustee after consultation with Bondholders, in the Indenture Trustee's discretion) for a preliminary 60-day period, during which time the terms of engagement of the successor Collateral Monitor (and, in the case of a successor Collateral Monitor designated by the Issuer, the identity of such successor Collateral Monitor) will be subject to objection by the Bondholders. If the New Bond Requisite Holders do not object within 60 days, the successor Collateral Monitor's engagement will become final, subject to the terms and conditions of such successor Collateral Monitor's Collateral Monitor Agreement. If the Indenture Trustee is unable or unwilling to engage the Collateral Monitor for any reason at any time, another entity, acting on behalf of the Bondholders, may engage the Collateral Monitor pursuant to the same terms outlined herein.

In addition, the Indenture Trustee will have an obligation to provide, upon request, the Servicer with copies of any documents in its possession relating to the Restructuring Property. The Indenture Trustee will make available to the Servicer such copies or originals of documents as are necessary or desirable to permit the Servicer to service, manage, or otherwise enforce contractual rights with respect to the Restructuring Property.

The Indenture Trustee will be under no obligation to exercise any of the rights or powers vested in it by the Bond Indenture or to institute, conduct or defend any litigation under the Bond Indenture or in relation to the Bond Indenture at the request, order or direction of any of the Bondholders pursuant to such agreements unless such Bondholders have offered to the Indenture Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities that may be incurred therein or thereby. For additional information, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture*" in this Offering Memorandum.

The Indenture Trustee's liability in connection with the issuance and the sale of the New Bonds is limited solely to the express obligations described in the Bond Indenture. The Indenture Trustee may resign at any time by providing written notice of its resignation to the Issuer. If the Indenture Trustee resigns, the Issuer will be obligated to appoint a successor thereto. The Issuer may also remove the Indenture Trustee if (i) the Indenture Trustee ceases to meet the qualifications as such under the Bond Indenture, (ii) the Indenture Trustee becomes legally unable to act, (iii) the Indenture Trustee is adjudged bankrupt or insolvent or (iv) a receiver or other public officer will take charge of the Indenture Trustee or its property. In such circumstances, the Issuer will be obligated to promptly appoint a successor Indenture Trustee. Any resignation or removal of the Indenture Trustee and appointment of a successor thereto will not become effective until acceptance of the appointment by such successor. If a successor Indenture Trustee does not take office within 30 days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

GDB, the Issuer and their respective affiliates may maintain normal commercial banking relations with the Indenture Trustee and its respective affiliates. The Bond Indenture will provide that the Issuer will pay the fees and expenses of the Indenture Trustee in connection with its duties under the Bond Indenture. The Bond Indenture will further provide that the Indenture Trustee will be entitled to indemnification by the Issuer for, and will be held harmless against, any loss, liability or expense incurred in connection with the performance of its duties (including reasonable and documented attorneys' fees and fees and expenses incurred in the enforcement of the Issuer's obligations) under the Bond Indenture not resulting from its own willful misconduct, bad faith or gross negligence. The Indenture Trustee will notify the Issuer promptly of any claim for which it may seek indemnity; *provided* that, failure by the Indenture Trustee to provide such notification will not relieve the Issuer of its obligations under the Bond Indenture if no prejudice to the Issuer will have resulted from such failure. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, bad faith or gross negligence.

**The Collateral Monitor**

***Description of the Collateral Monitor***. Cantor-Katz Collateral Monitor LLC ("Cantor-Katz"), a Delaware limited liability company, will serve as the collateral monitor (Cantor-Katz or any successor thereof appointed in accordance with the terms of the Qualifying Modification, the "Collateral Monitor") pursuant to the terms of a collateral monitor agreement (the "Collateral Monitor Agreement") by and between the Indenture Trustee, on behalf of the Bondholders, and the Collateral Monitor. The Issuer will enter into a fee letter with the Collateral Monitor (the "Collateral Monitor Fee Letter") under which the Issuer will agree to pay to the Collateral Monitor from amounts in the Collection Account the fees, expenses, indemnification and other amounts owed to the Collateral Monitor under the Collateral Monitor Agreement. Matthew Cantor and Richard Katz will operate and carry out the obligations of the Collateral Monitor. In January 2018, AAFAF issued a request for proposals with regard to the engagement of the Collateral Monitor, and Cantor-Katz was selected as the Collateral Monitor based on its response to such request for proposals.

**Matthew Cantor.** Mr. Cantor has over twenty years of experience in corporate restructurings. Since 2012, he has held the position of Executive Vice President of Legal Affairs and Chief General Counsel at Lehman, where he is responsible for Lehman's legal strategy in connection with the liquidation of its assets and resolution of disputed claims. Prior to Lehman, Mr. Cantor founded and operated a distressed and event-driven credit fund, which managed at its peak over $500 million. In addition, Mr. Cantor has practiced business reorganization and restructuring law as a member of the law firms of Weil, Gotshal & Manges LLP and Kirkland & Ellis LLP.

**Richard Katz.** Mr. Katz is also a part of the post-reorganization team at Lehman, where he has been primarily responsible for managing the unwind of its distressed corporate credit and residential mortgage portfolios and intercompany claims and derivative exposures since 2012. In addition to Lehman, Katz has served on the post-reorganization boards of directors of MF Global Holdings Ltd., LBI ehf. (previously Landsbanki Islands, an insolvent Icelandic bank), and SunEdison, Inc. Mr. Katz also spent 18.5 years at Goldman, Sachs & Co. in a variety of risk management and investment positions, including as a workout officer and as the portfolio manager of the High Yield Distressed Investing Desk, Goldman Sachs's broker/dealer-based proprietary trading group for event driven situations (such as distress and bankruptcy) in corporate credit.

David Pauker, one of the members of the Issuer's Board of Trustees, is also one of seven members of the board of directors of post-reorganization Lehman and is the chairman of the board's legal affairs committee. As mentioned above, Matthew Cantor is executive vice president and chief legal officer of Lehman and Richard Katz is an employee of Lehman. Messrs. Cantor and Katz report directly to Lehman's CEO and do not report to Mr. Pauker.

***Duties of the Collateral Monitor.*** The Collateral Monitor will be responsible for monitoring the activities of the Servicer and the condition and performance of the Restructuring Property. The Collateral Monitor will also be responsible for reporting to the Bondholders.

Specifically, the Collateral Monitor will be responsible for, among other things, overseeing the Servicer's efforts to maximize the realizable present value of the Restructuring Property by reviewing all material transactions in respect of the Restructuring Property (which may not be entered into without the Collateral Monitor's consent or non-objection), meeting regularly with the Servicer, monitoring possible Servicer Defaults and notifying the Bondholders of any possible Servicer Replacement Events, reviewing and approving, as appropriate, the Issuer Operating Expenses Cap and any Issuer Operating Expenses above the Issuer Operating Expenses Cap and preparing the Semiannual Bondholder Report.

The Collateral Monitor will be given not less than ten days' prior written notice of any material transaction in respect of the Restructuring Property or any Additional Recovery Authority Loan, including any waiver, modification, amendment, consent, other accommodation, sale, settlement or other disposition, which may be entered into (or approved) by the Servicer (on behalf of the Issuer). Such transaction may be consummated only if the Collateral Monitor does not, within such ten-day period, reasonably object in writing to such transaction on the grounds that such transaction is not commercially reasonable (or that the Collateral Monitor has received inadequate information or time to make such a determination). At the time of delivery of such written notice by the Servicer, the Servicer shall be required to provide the Collateral Monitor with access to the Servicer and all information necessary in order to make a determination as to the commercial reasonableness of such waiver, modification, amendment, consent, other accommodation, sale, settlement or other disposition, but the Collateral Monitor will have no right to participate in discussion or negotiations (in any form) with obligors on the Restructuring Property.

At the conclusion of each Collection Period, the Servicer will provide the Collateral Monitor with a report of, among other things, all interest and amortization collections on the Municipal Loan Assets. The Collateral Monitor will compare these actual cash flows to the Municipal Loans Collection Schedule, which is attached to this Offering Memorandum as Appendix D, as adjusted to reflect any modification to the amortization schedule of any of the Municipal Loan Assets pursuant to the agreements entered into by the Servicer and Collateral Monitor in connection with the settlement of certain claims and objections raised by San Juan, as described under "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Various Municipalities—Settlement Agreement with the Municipality of San Juan*." For additional information, see "*Appendix D: Scheduled Collections on the Municipal Loan Assets*," attached to this Offering Memorandum. The Collateral Monitor will then determine whether the cumulative shortfall, if any, of the actual Municipal Loan Assets cash flow as compared to the Municipal Loans Collection Schedule (as adjusted) flows from July 1, 2018 through the date on which the relevant Collection Period ends (each such date, a "Test Date") is less than 10% as of the end of the Collection Period (the "Compliance Test"). If the cumulative shortfall is 10% or more as of any applicable Test Date, a Servicer Default will have occurred. For additional information on Servicer Defaults, see "*Servicing Agreement—Removal of Servicer,*" in this Offering Memorandum.

The Collateral Monitor will also be responsible for initiating the Servicer removal process and for reviewing (and, if necessary, participating in) the Servicer replacement designation process. For additional information on the Servicer removal and replacement process, see "*Servicing Agreement—Removal of Servicer*" in this Offering Memorandum.

**Reports to Bondholders**

In addition to the information required to be provided by the Issuer pursuant to the Disclosure Agreement (see "*Continuing Disclosure*"), the Transaction Documents will require the following additional information to be prepared and made available to Bondholders:

(a)   The Servicing Agreement will require the Servicer, on or prior to each Determination Date, to prepare and provide to the Issuer, the Collateral Monitor, the Indenture Trustee and other specified parties a report (the "Payment Date Report") to be delivered or made available to the Bondholders on or prior to the related Payment Date. Each such Payment Date Report will include (to the extent applicable) the following information:

1.   the amount of Available Cash for the related Payment Date, and the calculation thereof;

2.   the aggregate amount paid or distributed in respect of interest on the New Bonds on such Payment Date, if any;

3.   the aggregate amount of any shortfall of funds available to pay interest on the New Bonds on such Payment Date after giving effect to all payments of interest on such Payment Date, if any;

4.   the aggregate amount paid or distributed in respect of principal on the New Bonds on such Payment Date, if any;

5.   the aggregate outstanding principal amount (including PIK Amounts) of the New Bonds before and after giving effect to payments on such Payment Date;

6.   the amount of fees, expenses and indemnification amounts due and payable to each of the Servicer, the Collateral Monitor and the Indenture Trustee before and after giving effect to payments on such Payment Date, and the amount of any remaining unpaid amounts from prior Payment Dates; and amounts due in respect of any other Issuer Expenses on such Payment Date, before and after giving effect to payments on such Payment Date;

7.   the aggregate amount of all Issuer Expenses that have been paid or reimbursed through withdrawals from the Collection Account or otherwise corresponding to the related Collection Period, the aggregate amount of such Issuer Expenses corresponding to each of the Servicer, the Collateral Monitor, the Indenture Trustee and the Issuer, and the individual amount of each such material Issuer Expense;

8.   the aggregate amount of Collections for the related Collection Period; and

9.   the budget for the following six-month period (the "Semiannual Budget") providing the calculation for the Fees and Expenses Reserve, which will include (i) the amounts set aside in the Fees and Expenses Reserve corresponding to the estimated fees, expenses and indemnification amounts expected to be payable to, or in respect of, each of the Servicer, the Collateral Monitor and the Indenture Trustee, (ii) the estimated Issuer Expenses other than those set forth in the foregoing (i) expected to be incurred by the Issuer, and (iii) the estimated amount of any expected individual material Issuer Expense; and any item included in the Semiannual Budget for which no amount is set aside in the Fees and Expenses Reserve.

(b)   The Servicing Agreement will also require the Servicer to prepare and provide to the Issuer, the Collateral Monitor, the Indenture Trustee and other specified parties a report (the "Quarterly Budget Report") to be delivered or made available to the Bondholders on or prior to the date that is 45 days after the end of each fiscal quarter that is not the end of a Collection Period (the "Quarterly Budget Report Date"). Each such Quarterly Budget Report will include (to the extent applicable) the following information:

1.   the aggregate amount of all Issuer Expenses that have been paid or reimbursed through withdrawals from the Collection Account or otherwise corresponding to the related fiscal quarter, the aggregate amount of such Issuer Expenses corresponding to each of the Servicer, the Collateral Monitor and the Indenture Trustee and the Issuer, and the individual amount of each such material Issuer Expense; and

2.   the aggregate amount of Collections for such fiscal quarter.

(c)   The Collateral Monitor Agreement will require the Collateral Monitor, on or prior to the date that is 120 days after the last day of each Collection Period (the "Semiannual Bondholder Report Date"), to prepare and provide to the Issuer, the Servicer, the Indenture Trustee and other specified parties a report (the "Semiannual Bondholder Report") regarding such Collection Period to be delivered or made available to the Bondholders on or prior to such Semiannual

Bondholder Report Date. Each such Semiannual Bondholder Report will include the following information with respect to such Collection Period:

1. the results of the Compliance Test;

2. the Collateral Monitor's assessment of the Servicer's performance and compliance with the Accepted Servicing Practices;

3. delinquency and loss information with respect to the Restructuring Property for the related Collection Period, in accordance with agreed upon reporting standards identified in the Servicing Agreement;

4. a brief description of any material actions taken in respect of the Restructuring Property, including material modifications, extensions or waivers to the Restructuring Property's terms, fees, penalties or payments during the related Collection Period, or that have cumulatively become material over time;

5. a brief description of any actions taken in respect of non-performing Restructuring Property, including all Loans that are more than 90 days past due and all real estate, cash and other non-interest-bearing assets;

6. a brief description of any Servicer conflicts-of-interest; and

7. any other information the Collateral Monitor determines, in its sole discretion, is relevant to the interests of Bondholders.

The Bond Indenture will require the Indenture Trustee to provide each Payment Date Report, Quarterly Budget Report and Semiannual Bondholder Report to the MSRB through the EMMA website (http://emma.msrb.org) on or prior to the relevant deadline as set forth above.

See also "*The Servicing Agreement—-Reporting to Indenture Trustee, Collateral Monitor and Issuer.*"

**Fees and Expenses of the Service Providers**

Below is a description of the fees and expenses expected to be payable on each Payment Date to the Servicer, the Indenture Trustee and the Collateral Monitor. Additionally, under certain circumstances to be described in the Servicing Agreement, the Bond Indenture and the Collateral Monitor Agreement, the Servicer, the Indenture Trustee or the Collateral Monitor, respectively, will be entitled to additional payments for out of pocket expenses incurred and pursuant to indemnification obligations.

*Servicer.*

On the Closing Date, the Issuer will pay the Servicer $225 per Loan transferred on the Closing Date to the Issuer for management by the Servicer (the "Initial Portfolio Transfer Fee").

On each Payment Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments,*" the Issuer will pay the Servicer a semi-annual fee (the "Servicing Fee") calculated, with respect to each Collection Period, as the sum of (i) $225 per Loan transferred to the Issuer subsequent to the Closing Date and during such Collection Period, (ii) 0.120% of the aggregate principal amount of the performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iii) 0.025% of the aggregate principal amount of the non-performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iv) 3.000% of Net Collections generated during such Collection Period upon the sale or settlement of any Loan constituting Restructuring Property and (v) 3.000% of Net Collections generated upon the sale of any Real Property Asset during such Collection Period, subject to the limitations described herein. The Servicer will also be entitled to reimbursement or payment by the Issuer for certain expenses and indemnification amounts incurred in connection with the performance of its duties under the Servicing Agreement.

The Servicing Fee and such expenses and indemnification may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds, in each case, subject to the terms and conditions contained in the Servicing Agreement.

For purposes of calculating the Servicing Fee, (a) the term "Net Collections" means cash Collections in respect of the Restructuring Property net of any documented Reimbursable Servicer Expenses related to realizing such Collections and (b) the term

"settlement" means, with respect to any Loan, a disposition, other than a sale, resulting in cash Collections. For the avoidance of doubt, if a non-performing Loan is restructured, all amounts due thereon will be considered to have been paid for purposes of its classification so long as all amounts due under the Loan's restructured terms have been paid.

### Collateral Monitor.

In accordance with the payment priority in "*Payments to Bondholders—Priority of Payments,*" the Issuer will pay the Collateral Monitor, for each Collection Period, a fee (the "Collateral Monitor Fee") calculated as the sum of (a) with respect to each Type A Asset and Type C Asset, 0.500% of cash Collections, plus an additional 2.500% of cash Collections during a Step-Up Fee Period and (b) with respect to each Type B Asset, 0.500% of cash Collections. The aggregate Collateral Monitor Fees for any six consecutive Collection Periods may not exceed $9.0 million, provided that if the amount resulting from the calculation in the preceding sentence plus the aggregate Collateral Monitor Fees for the prior five Collection Periods exceeds $9.0 million, such excess may be added to the Collateral Monitor Fee due in any of the following five Collection Periods, subject to the cap described in this sentence. In certain circumstances specified in the Collateral Monitor Agreement, upon the termination of Cantor-Katz's engagement as Collateral Monitor, Cantor-Katz may be entitled to true-up payments (i) to compensate Cantor-Katz for services provided prior to such termination but for which all or a portion of the related Step-Up Fee Period occurs after such termination, in which case, Cantor-Katz will be entitled to continue to receive a fee equal to 2.500% of cash Collections relating to such Step-Up Period and (ii) to compensate Cantor-Katz in the event it is terminated without cause prior to the third anniversary of the Closing Date, in which case, Cantor-Katz will be entitled to continue to receive a fee equal to 0.500% of cash Collections until the third anniversary of the Closing Date. The Collateral Monitor will also be entitled to reimbursement for certain expenses and certain indemnification amounts. The Collateral Monitor Fee, the true-up payments (if any) and such expenses and indemnification amounts may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds.

For purposes of calculating the Collateral Monitor Fee, the following definitions apply:

"Type A Asset" means each Real Property Asset, Municipal Loan Asset and Additional Recovery Authority Loan (after transferred to the Issuer).

"Type B Asset" means each PRASA Loan and the HTA Bonds that constitute Restructuring Property.

"Type C Asset" means each Loan and other obligation that constitutes Restructuring Property that is not a Type A Asset or a Type B Asset.

"Credit Event" means, with respect to a Type A Asset, either of the following events, as of the date on which the Servicer has actual knowledge thereof: i) a default by the obligor in the payment of any amount due to the Issuer, or a default by the obligor in the payment of any amount due under indebtedness to another person, which default is continuing and remains uncured after the expiration of any cure period provided in the applicable Loan documents or otherwise 15 days, or ii) a filing by, or in respect of, the obligor of proceedings under any Bankruptcy Law.

"Step-Up Fee Period" means (a) with respect to each Type A Asset, (i) the period beginning on the occurrence of a Credit Event and ending on (but including) the earlier of (A) the date on which such Credit Event is cured and (B) the date on which the cumulative length of time of the Step-Up Fee Periods that have been applied to such asset equals 18 months, and (ii) the period beginning on the date of the consummation of a restructuring transaction in respect of such asset and ending on (but including) the fifth anniversary of the date on which the Issuer receives a material payment in respect of such asset following the consummation of such restructuring transaction, and (b) with respect to each Type C Asset, the period beginning on the Closing Date and ending on (but including) the fifth anniversary of the date on which the Issuer receives a material payment in respect of such asset, in each case subject to certain limitations set forth in the Collateral Monitor Agreement. "Material payment," as used in this defined term, will be determined based on thresholds set forth in the Collateral Monitor Agreement.

### Indenture Trustee.

On each Payment Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments,*" the Issuer will pay the Indenture Trustee a semi-annual fee of $2,500 (the "Indenture Trustee Fee"). The Indenture Trustee will also be entitled to reimbursement or payment by the Issuer for all expenses and indemnification amounts incurred in connection with the performance of its duties under the Bond Indenture. The Indenture Trustee Fee and such expenses and indemnification amounts will be paid from Collections on the Restructuring Property prior to any payments on the New Bonds. In addition to the Indenture Trustee Fee, the Indenture Trustee will be entitled to compensation in the amount of $100 per report to Bondholders that it files on the EMMA website pursuant to the Bond Indenture (which reports are described under "*—Reports to Bondholders*" above) or per notice of any event pursuant to the Disclosure Agreement (which events are described under "*Continuing Disclosure*" in this Offering Memorandum) should the Indenture Trustee at any time serve as Dissemination Agent with respect to the Disclosure Agreement.

## MUNICIPALITIES

**General**

Pursuant to Article VI, Section 1 of the Commonwealth Constitution, the Legislative Assembly has the power to create, abolish, consolidate and reorganize municipalities, and to determine their organization and functions. It has recently been reported that the fiscal difficulties faced by many municipalities have led to discussions regarding the creation of regional consortia or municipal consolidation. Pursuant to the Commonwealth Constitution, however, no law abolishing or consolidating municipalities may take effect until ratified in a referendum by a majority of the qualified electors voting in said referendum in each of the municipalities to be abolished or consolidated. For a discussion of the risks related to the formation of regional consortia or the consolidation of municipalities on the Municipal Loan Assets, see "Risk Factors—*Risks Related to Obligors on the Restructuring Property—Risks Related to Municipal Obligors and Their Operations—The fiscal and financial challenges faced by many municipalities may lead to the creation of regional consortiums or ultimately to their consolidation with larger, more solvent municipalities. To the extent municipal consolidation occurs, it is unclear what effect, if any, such consolidation would have on the outstanding obligations of the consolidated municipalities.*"

The Autonomous Municipalities Act sets forth the general provisions regarding the organization and functions of municipal governments. Each municipality is a political legal entity with full legislative and administrative powers in every area of municipal government and with legal personality, separate and independent from the Commonwealth's central government. Each of the municipal governments consists of its Mayor and a Municipal Legislature, each of which are elected by the residents of the applicable municipality every four years. The Mayor is responsible, among other matters, for: (i) establishing and carrying out the policies and the ordinances of the Municipal Legislature, (ii) overseeing the day-to-day operations of the municipal government, and (iii) appointing the heads of the various municipal departments. The Municipal Legislature is responsible, among other matters, for (i) adopting municipal ordinances and resolutions, (ii) adopting the budget for each fiscal year, and (iii) approving the appointment by the Mayor of the heads of the various municipal departments.

Pursuant to the provisions of PROMESA, political subdivisions of the Commonwealth, such as municipalities, are included in the definition of "territorial instrumentalities." PROMESA authorizes the Oversight Board to designate territorial instrumentalities as "covered territorial instrumentalities," which makes such entities subject to the oversight and other powers of the Oversight Board, such as having to obtain Oversight Board approval in order to perform certain actions that in the past they could carry out without the Oversight Board's review or approval. Such designation would also make municipalities potentially eligible to seek relief pursuant to Title III or Title VI of PROMESA. As of the date of this Offering Memorandum, no municipality has yet been designated as a covered territorial instrumentality.

Information in this section relating to the municipalities, municipal revenues and other similar information has been provided from the sources indicated and the Issuer has not independently verified such information.

**Population, Income and Employment**

The following table shows the estimated population of each municipality in the years indicated below and the percentage changes ("Δ") in estimated population for each municipality compared to the previous year for which an estimate is provided.

| Municipality | **Population** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1990 | 2000 | Δ | 2010 | Δ | 2016 | Δ |
| Adjuntas | 19,436 | 19,159 | -1.4% | 19,472 | 1.6% | 18,314 | -5.9% |
| Aguada | 36,038 | 42,110 | 16.8% | 41,912 | -0.5% | 38,938 | -7.1% |
| Aguadilla | 59,448 | 64,701 | 8.8% | 60,765 | -6.1% | 54,582 | -10.2% |
| Aguas Buenas | 25,497 | 28,680 | 12.5% | 28,653 | -0.1% | 26,471 | -7.6% |
| Aibonito | 25,000 | 26,504 | 6.0% | 25,874 | -2.4% | 23,605 | -8.8% |
| Añasco | 25,300 | 28,338 | 12.0% | 29,265 | 3.3% | 27,540 | -5.9% |
| Arecibo | 93,531 | 100,142 | 7.1% | 96,273 | -3.9% | 87,939 | -8.7% |
| Arroyo | 18,904 | 19,141 | 1.3% | 19,572 | 2.3% | 18,236 | -6.8% |
| Barceloneta | 20,976 | 22,406 | 6.8% | 24,827 | 10.8% | 24,467 | -1.5% |
| Barranquitas | 25,672 | 29,057 | 13.2% | 30,323 | 4.4% | 28,977 | -4.4% |
| Bayamón | 220,295 | 224,001 | 1.7% | 207,626 | -7.3% | 184,374 | -11.2% |
| Cabo Rojo | 38,700 | 47,050 | 21.6% | 50,970 | 8.3% | 49,361 | -3.2% |
| Caguas | 133,581 | 140,732 | 5.4% | 142,863 | 1.5% | 132,164 | -7.5% |
| Camuy | 29,050 | 35,276 | 21.4% | 35,124 | -0.4% | 32,434 | -7.7% |
| Canóvanas | 36,956 | 43,542 | 17.8% | 47,696 | 9.5% | 46,477 | -2.6% |
| Carolina | 177,942 | 185,522 | 4.3% | 176,421 | -4.9% | 158,457 | -10.2% |
| Cataño | 34,446 | 30,058 | -12.7% | 28,082 | -6.6% | 24,968 | -11.1% |
| Cayey | 46,556 | 47,435 | 1.9% | 48,109 | 1.4% | 44,796 | -6.9% |
| Ceiba | 17,157 | 17,903 | 4.3% | 13,612 | -24.0% | 11,937 | -12.3% |
| Ciales | 18,119 | 19,734 | 8.9% | 18,752 | -5.0% | 17,021 | -9.2% |
| Cidra | 35,751 | 42,787 | 19.7% | 43,483 | 1.6% | 40,599 | -6.6% |
| Coamo | 33,920 | 37,719 | 11.2% | 40,578 | 7.6% | 39,558 | -2.5% |
| Comerío | 20,247 | 20,117 | -0.6% | 20,790 | 3.3% | 19,699 | -5.2% |
| Corozal | 33,172 | 36,831 | 11.0% | 37,129 | 0.8% | 34,408 | -7.3% |

**Population**

| Municipality | 1990 | 2000 | Δ | 2010 | Δ | 2016 | Δ |
|---|---|---|---|---|---|---|---|
| Culebra | 1,548 | 1,868 | 20.7% | 1,820 | -2.6% | 1,797 | -1.3% |
| Dorado | 30,823 | 34,170 | 10.9% | 38,238 | 11.9% | 37,536 | -1.8% |
| Fajardo | 36,960 | 40,662 | 10.0% | 36,876 | -9.3% | 32,219 | -12.6% |
| Florida | 8,762 | 12,373 | 41.2% | 12,688 | 2.5% | 11,988 | -5.5% |
| Guánica | 20,020 | 21,862 | 9.2% | 19,377 | -11.4% | 16,897 | -12.8% |
| Guayama | 41,642 | 44,368 | 6.5% | 45,275 | 2.0% | 42,063 | -7.1% |
| Guayanilla | 21,609 | 23,063 | 6.7% | 21,523 | -6.7% | 19,125 | -11.1% |
| Guaynabo | 93,033 | 100,217 | 7.7% | 97,798 | -2.4% | 89,307 | -8.7% |
| Gurabo | 28,910 | 36,998 | 28.0% | 45,563 | 23.1% | 47,269 | 3.7% |
| Hatillo | 32,841 | 39,036 | 18.9% | 41,978 | 7.5% | 40,676 | -3.1% |
| Hormigueros | 15,239 | 16,638 | 9.2% | 17,250 | 3.7% | 16,290 | -5.6% |
| Humacao | 55,274 | 59,185 | 7.1% | 58,375 | -1.4% | 53,895 | -7.7% |
| Isabela | 39,259 | 44,539 | 13.4% | 45,653 | 2.5% | 42,744 | -6.4% |
| Jayuya | 15,563 | 17,317 | 11.3% | 16,640 | -3.9% | 14,984 | -10.0% |
| Juana Díaz | 45,313 | 50,608 | 11.7% | 50,733 | 0.2% | 47,309 | -6.7% |
| Juncos | 30,741 | 36,550 | 18.9% | 40,349 | 10.4% | 39,477 | -2.2% |
| Lajas | 23,335 | 26,299 | 12.7% | 25,704 | -2.3% | 23,434 | -8.8% |
| Lares | 29,133 | 34,369 | 18.0% | 30,631 | -10.9% | 26,629 | -13.1% |
| Las Marías | 9,342 | 11,040 | 18.2% | 9,868 | -10.6% | 8,645 | -12.4% |
| Las Piedras | 28,036 | 34,651 | 23.6% | 38,714 | 11.7% | 38,049 | -1.7% |
| Loíza | 29,368 | 32,509 | 10.7% | 30,017 | -7.7% | 26,583 | -11.4% |
| Luquillo | 18,135 | 19,836 | 9.4% | 20,055 | 1.1% | 18,660 | -7.0% |
| Manatí | 38,842 | 45,523 | 17.2% | 44,042 | -3.3% | 39,941 | -9.3% |
| Maricao | 6,207 | 6,444 | 3.8% | 6,277 | -2.6% | 5,786 | -7.8% |
| Maunabo | 12,348 | 12,746 | 3.2% | 12,215 | -4.2% | 11,074 | -9.3% |
| Mayagüez | 100,291 | 98,329 | -2.0% | 88,793 | -9.7% | 77,748 | -12.4% |
| Moca | 33,068 | 39,757 | 20.2% | 40,101 | 0.9% | 37,117 | -7.4% |
| Morovis | 25,391 | 30,074 | 18.4% | 32,651 | 8.6% | 31,603 | -3.2% |
| Naguabo | 22,640 | 23,865 | 5.4% | 26,773 | 12.2% | 26,448 | -1.2% |
| Naranjito | 27,945 | 29,752 | 6.5% | 30,387 | 2.1% | 28,805 | -5.2% |
| Orocovis | 21,213 | 23,847 | 12.4% | 23,419 | -1.8% | 21,529 | -8.1% |
| Patillas | 19,636 | 20,160 | 2.7% | 19,248 | -4.5% | 17,472 | -9.2% |
| Peñuelas | 22,604 | 26,689 | 18.1% | 24,215 | -9.3% | 21,117 | -12.8% |
| Ponce | 187,661 | 186,166 | -0.8% | 165,721 | -11.0% | 145,278 | -12.3% |
| Quebradillas | 21,510 | 25,511 | 18.6% | 25,895 | 1.5% | 24,201 | -6.5% |
| Rincón | 12,267 | 14,783 | 20.5% | 15,203 | 2.8% | 14,380 | -5.4% |
| Río Grande | 45,790 | 52,458 | 14.6% | 54,293 | 3.5% | 51,009 | -6.0% |
| Sabana Grande | 22,908 | 25,914 | 13.1% | 25,339 | -2.2% | 23,163 | -8.6% |
| Salinas | 28,392 | 31,139 | 9.7% | 31,043 | -0.3% | 28,846 | -7.1% |
| San Germán | 35,004 | 37,102 | 6.0% | 35,625 | -4.0% | 32,321 | -9.3% |
| San Juan | 437,584 | 434,488 | -0.7% | 394,251 | -9.3% | 347,052 | -12.0% |
| San Lorenzo | 35,289 | 41,043 | 16.3% | 41,023 | 0.0% | 38,174 | -6.9% |
| San Sebastián | 38,911 | 44,165 | 13.5% | 42,347 | -4.1% | 38,202 | -9.8% |
| Santa Isabel | 19,366 | 21,726 | 12.2% | 23,289 | 7.2% | 22,277 | -4.3% |
| Toa Alta | 44,502 | 64,652 | 45.3% | 74,279 | 14.9% | 73,980 | -0.4% |
| Toa Baja | 89,539 | 93,574 | 4.5% | 89,465 | -4.4% | 80,207 | -10.3% |
| Trujillo Alto | 61,432 | 75,845 | 23.5% | 74,760 | -1.4% | 68,242 | -8.7% |
| Utuado | 34,980 | 35,331 | 1.0% | 33,054 | -6.4% | 29,564 | -10.6% |
| Vega Alta | 34,627 | 38,005 | 9.8% | 39,945 | 5.1% | 38,230 | -4.3% |
| Vega Baja | 56,125 | 61,930 | 10.3% | 59,547 | -3.8% | 53,674 | -9.9% |
| Vieques | 8,609 | 9,119 | 5.9% | 9,305 | 2.0% | 8,825 | -5.2% |
| Villalba | 23,652 | 27,900 | 18.0% | 26,003 | -6.8% | 23,113 | -11.1% |
| Yabucoa | 36,533 | 39,135 | 7.1% | 37,880 | -3.2% | 34,358 | -9.3% |
| Yauco | 42,147 | 46,330 | 9.9% | 41,841 | -9.7% | 36,673 | -12.4% |
| Total | 3,527,593 | 3,810,605 | 8.0% | 3,721,525 | -2.3% | 3,411,307 | -8.3% |

Source: U.S. Census Bureau

84

The following table shows the median household income figures for the period from 2012 to 2016 for each municipality.

**Median Household Income (2012-2016)**

| Municipality | Income | Municipality | Income | Municipality | Income |
|---|---|---|---|---|---|
| Adjuntas | $11,296 | Fajardo | $19,482 | Naguabo | $18,973 |
| Aguada | $15,543 | Florida | $16,793 | Naranjito | $18,828 |
| Aguadilla | $17,191 | Guánica | $13,242 | Orocovis | $14,662 |
| Aguas Buenas | $15,409 | Guayama | $15,078 | Patillas | $13,975 |
| Aibonito | $18,145 | Guayanilla | $14,848 | Peñuelas | $16,764 |
| Añasco | $17,712 | Guaynabo | $33,979 | Ponce | $16,561 |
| Arecibo | $16,796 | Gurabo | $31,070 | Quebradillas | $15,641 |
| Arroyo | $16,387 | Hatillo | $18,480 | Rincón | $17,784 |
| Barceloneta | $15,549 | Hormigueros | $20,589 | Río Grande | $22,990 |
| Barranquitas | $14,778 | Humacao | $19,349 | Sabana Grande | $14,877 |
| Bayamón | $24,612 | Isabela | $15,947 | Salinas | $16,540 |
| Cabo Rojo | $17,088 | Jayuya | $15,893 | San Germán | $14,988 |
| Caguas | $24,278 | Juana Díaz | $20,231 | San Juan | $21,395 |
| Camuy | $17,206 | Juncos | $19,084 | San Lorenzo | $16,916 |
| Canóvanas | $20,426 | Lajas | $12,785 | San Sebastián | $13,866 |
| Carolina | $28,611 | Lares | $12,410 | Santa Isabel | $15,295 |
| Cataño | $18,562 | Las Marías | $13,132 | Toa Alta | $29,578 |
| Cayey | $20,577 | Las Piedras | $20,119 | Toa Baja | $23,889 |
| Ceiba | $20,038 | Loíza | $18,154 | Trujillo Alto | $30,427 |
| Ciales | $12,511 | Luquillo | $19,658 | Utuado | $15,875 |
| Cidra | $21,846 | Manatí | $18,534 | Vega Alta | $18,312 |
| Coamo | $18,453 | Maricao | $11,909 | Vega Baja | $17,634 |
| Comerío | $13,164 | Maunabo | $18,815 | Vieques | $17,535 |
| Corozal | $14,733 | Mayagüez | $15,017 | Villalba | $18,974 |
| Culebra | $20,956 | Moca | $14,157 | Yabucoa | $16,308 |
| Dorado | $28,133 | Morovis | $17,649 | Yauco | $14,666 |

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-year Estimates

The following table provides the average unemployment rates in each municipality for the years indicated below, and the percentage changes ("Δ") in the unemployment rate for each municipality compared to the previous year for which an estimate is provided.

**Unemployment Rate (%)**

| Municipality | 1990 | 2000 | Δ | 2010 | Δ | 2017 | Δ |
|---|---|---|---|---|---|---|---|
| Adjuntas | 16.5 | 12.5 | -4.0 | 19.6 | 7.1 | 15.1 | -4.5 |
| Aguada | 19.8 | 13.1 | -6.7 | 19.5 | 6.4 | 12.9 | -6.6 |
| Aguadilla | 18.7 | 13.2 | -5.5 | 20.4 | 7.2 | 14.6 | -5.8 |
| Aguas Buenas | 17.7 | 10.0 | -7.7 | 22.2 | 12.2 | 12.6 | -9.6 |
| Aibonito | 11.8 | 11.7 | -0.1 | 19.4 | 7.7 | 14.2 | -5.2 |
| Anasco | 19.2 | 12.5 | -6.7 | 19.3 | 6.8 | 12.5 | -6.8 |
| Arecibo | 15.8 | 11.2 | -4.6 | 18.0 | 6.8 | 11.7 | -6.3 |
| Arroyo | 21.6 | 14.6 | -7.0 | 23.0 | 8.4 | 17.9 | -5.1 |
| Barceloneta | 18.7 | 12.8 | -5.9 | 24.5 | 11.7 | 14.1 | -10.4 |
| Barranquitas | 12.3 | 10.9 | -1.4 | 17.7 | 6.8 | 11.5 | -6.2 |
| Bayamon | 9.6 | 7.6 | -2.0 | 12.9 | 5.3 | 7.5 | -5.4 |
| Cabo Rojo | 17.8 | 9.6 | -8.2 | 16.6 | 7.0 | 13.7 | -2.9 |
| Caguas | 14.0 | 9.3 | -4.7 | 15.6 | 6.3 | 9.1 | -6.5 |
| Camuy | 15.9 | 10.5 | -5.4 | 16.5 | 6.0 | 11.6 | -4.9 |
| Canovanas | 15.5 | 12.0 | -3.5 | 17.8 | 5.8 | 9.8 | -8.0 |
| Carolina | 8.3 | 7.9 | -0.4 | 13.0 | 5.1 | 7.6 | -5.4 |
| Cataño | 10.4 | 9.3 | -1.1 | 15.2 | 5.9 | 9.1 | -6.1 |
| Cayey | 17.8 | 11.4 | -6.4 | 15.8 | 4.4 | 10.2 | -5.6 |
| Ceiba | 16.6 | 10.7 | -5.9 | 20.7 | 10.0 | 13.5 | -7.2 |
| Ciales | 18.2 | 14.2 | -4.0 | 27.0 | 12.8 | 16.2 | -10.8 |
| Cidra | 15.2 | 10.5 | -4.7 | 15.7 | 5.2 | 8.5 | -7.2 |
| Coamo | 17.8 | 11.6 | -6.2 | 21.9 | 10.3 | 16.2 | -5.7 |
| Comerío | 20.9 | 12.0 | -8.9 | 22.2 | 10.2 | 11.7 | -10.5 |
| Corozal | 12.7 | 9.9 | -2.8 | 17.3 | 7.4 | 11.3 | -6.0 |
| Culebra | 6.1 | 5.9 | -0.2 | 10.2 | 4.3 | 4.2 | -6.0 |
| Dorado | 12.0 | 8.1 | -3.9 | 12.0 | 3.9 | 7.0 | -5.0 |
| Fajardo | 17.4 | 11.8 | -5.6 | 20.1 | 8.3 | 13.3 | -6.8 |
| Florida | 21.1 | 12.5 | -8.6 | 22.1 | 9.6 | 14.5 | -7.6 |
| Guánica | 22.5 | 15.8 | -6.7 | 25.6 | 9.8 | 18.2 | -7.4 |
| Guayama | 22.0 | 12.8 | -9.2 | 23.5 | 10.7 | 15.8 | -7.7 |
| Guayanilla | 22.0 | 15.6 | -6.4 | 24.4 | 8.8 | 16.5 | -7.9 |
| Guaynabo | 5.9 | 5.5 | -0.4 | 8.5 | 3.0 | 5.2 | -3.3 |
| Gurabo | 15.7 | 8.9 | -6.8 | 14.0 | 5.1 | 7.4 | -6.6 |
| Hatillo | 16.6 | 11.2 | -5.4 | 16.4 | 5.2 | 14.1 | -2.3 |
| Hormigueros | 15.0 | 10.6 | -4.4 | 16.4 | 5.8 | 12.9 | -3.5 |
| Humacao | 17.3 | 12.2 | -5.1 | 21.1 | 8.9 | 13.9 | -7.2 |
| Isabela | 16.2 | 14.0 | -2.2 | 20.0 | 6.0 | 13.4 | -6.6 |
| Jayuya | 12.4 | 12.5 | 0.1 | 19.5 | 7.0 | 12.7 | -6.8 |
| Juana Diaz | 20.6 | 12.6 | -8.0 | 18.0 | 5.4 | 13.0 | -5.0 |
| Juncos | 16.5 | 10.9 | -5.6 | 18.7 | 7.8 | 11.5 | -7.2 |
| Lajas | 19.2 | 12.9 | -6.3 | 22.8 | 9.9 | 19.4 | -3.4 |

**Unemployment Rate (%)**

| Municipality | 1990 | 2000 | Δ | 2010 | Δ | 2017 | Δ |
|---|---|---|---|---|---|---|---|
| Lares ..................... | 18.3 | 11.5 | -6.8 | 19.9 | 8.4 | 18.4 | -1.5 |
| Las Marías.............. | 16.1 | 13.9 | -2.2 | 18.3 | 4.4 | 20.0 | 1.7 |
| Las Piedras............. | 16.6 | 12.2 | -4.4 | 19.5 | 7.3 | 12.0 | -7.5 |
| Loíza ..................... | 12.6 | 11.6 | -1.0 | 16.8 | 5.2 | 9.5 | -7.3 |
| Luquillo................. | 20.2 | 12.8 | -7.4 | 20.5 | 7.7 | 13.0 | -7.5 |
| Manatí ................... | 17.7 | 13.4 | -4.3 | 18.8 | 5.4 | 10.7 | -8.1 |
| Maricao ................. | 14.6 | 12.2 | -2.4 | 18.3 | 6.1 | 19.8 | 1.5 |
| Maunabo ................ | 21.4 | 14.3 | -7.1 | 24.7 | 10.4 | 17.1 | -7.6 |
| Mayagüez................ | 16.5 | 12.3 | -4.2 | 18.7 | 6.4 | 13.5 | -5.2 |
| Moca ..................... | 22.4 | 13.0 | -9.4 | 20.4 | 7.4 | 14.8 | -5.6 |
| Morovis.................. | 16.9 | 12.9 | -4.0 | 22.8 | 9.9 | 12.6 | -10.2 |
| Naguabo................. | 19.5 | 12.1 | -7.4 | 21.4 | 9.3 | 11.2 | -10.2 |
| Naranjito ............... | 16.1 | 9.3 | -6.8 | 20.3 | 11.0 | 11.9 | -8.4 |
| Orocovis................. | 17.1 | 13.5 | -3.6 | 22.4 | 8.9 | 14.4 | -8.0 |
| Patillas.................. | 24.5 | 14.5 | -10.0 | 26.3 | 11.8 | 19.6 | -6.7 |
| Peñuelas ................ | 22.1 | 14.4 | -7.7 | 24.2 | 9.8 | 17.5 | -6.7 |
| Ponce .................... | 16.5 | 11.6 | -4.9 | 17.1 | 5.5 | 11.6 | -5.5 |
| Quebradillas ........... | 17.2 | 11.8 | -5.4 | 19.6 | 7.8 | 15.8 | -3.8 |
| Rincón .................. | 18.1 | 13.0 | -5.1 | 18.5 | 5.5 | 15.4 | -3.1 |
| Rio Grande ............ | 15.2 | 11.5 | -3.7 | 15.2 | 3.7 | 9.7 | -5.5 |
| Sabana Grande ........ | 17.5 | 12.2 | -5.3 | 21.6 | 9.4 | 16.9 | -4.7 |
| Salinas.................. | 28.4 | 13.8 | -14.6 | 26.0 | 12.2 | 19.1 | -6.9 |
| San Germán ............ | 19.0 | 13.4 | -5.6 | 18.4 | 5.0 | 15.6 | -2.8 |
| San Juan ................ | 8.4 | 7.4 | -1.0 | 10.3 | 2.9 | 6.9 | -3.4 |
| San Lorenzo ........... | 17.7 | 10.9 | -6.8 | 17.4 | 6.5 | 12.9 | -4.5 |
| San Sebastián .......... | 25.8 | 14.1 | -11.7 | 22.2 | 8.1 | 17.7 | -4.5 |
| Santa Isabel ........... | 29.3 | 11.7 | -17.6 | 20.7 | 9.0 | 13.5 | -7.2 |
| Toa Alta ................ | 10.6 | 6.9 | -3.7 | 12.0 | 5.1 | 7.8 | -4.2 |
| Toa Baja ................ | 8.0 | 7.4 | -0.6 | 12.7 | 5.3 | 8.1 | -4.6 |
| Trujillo Alto ........... | 6.9 | 6.8 | -0.1 | 10.5 | 3.7 | 5.9 | -4.6 |
| Utuado................... | 16.3 | 12.3 | -4.0 | 20.8 | 8.5 | 13.9 | -6.9 |
| Vega Alta ............... | 13.0 | 9.1 | -3.9 | 17.2 | 8.1 | 10.8 | -6.4 |
| Vega Baja ............... | 16.0 | 11.1 | -4.9 | 20.8 | 9.7 | 12.4 | -8.4 |
| Vieques ................. | 12.7 | 13.2 | 0.5 | 18.6 | 5.4 | 13.7 | -4.9 |
| Villalba.................. | 23.0 | 12.9 | -10.1 | 22.0 | 9.1 | 19.6 | -2.4 |
| Yabucoa ................ | 22.0 | 15.2 | -6.8 | 25.4 | 10.2 | 16.4 | -9.0 |
| Yauco.................... | 20.8 | 12.2 | -8.6 | 21.4 | 9.2 | 17.3 | -4.1 |

Source: U.S. Census Bureau

## Municipal Revenues

Municipal revenues are principally derived from *ad valorem* property taxes, sales and use taxes, municipal license fees ("*patente municipal*"), and Commonwealth Contributions (as defined herein).

The table below summarizes the revenues of each municipality for fiscal year 2016 (complete revenue information for fiscal year 2017 is not yet available for all municipalities). There is no assurance that actual municipal revenues for fiscal year 2018 and subsequent fiscal years will be similar to those shown below, especially since there is still significant uncertainty as to the full extent of the effect of Hurricanes Irma and María on municipal revenues. In particular, revenues derived from property taxes, sales and use taxes and municipal license fees for fiscal year 2018 and subsequent fiscal years could be significantly lower than those shown below as a result of the hurricanes. Moreover, and as further discussed below, the Revised Commonwealth Fiscal Plan contemplates significant reductions in Commonwealth Contributions to municipalities and the ultimate elimination of such contributions in fiscal year 2024.

**Municipal Revenues**
**Fiscal Year 2016**

| Municipality | Property Taxes | | Sales and Use Tax | Municipal License Tax | Intergovernmental Transfers[3] | Federal Grants and Awards | Other Revenues[4] | Total Revenues |
|---|---|---|---|---|---|---|---|---|
| | Special Additional Tax[1] | Basic Tax[2] | | | | | | |
| Adjuntas ............... | $242,625 | $816,883 | $841,841 | $167,885 | $6,313,212 | $1,597,652 | $534,022 | $10,514,120 |
| Aguada ................. | 1,468,786 | 2,150,630 | 1,973,063 | 1,342,751 | 7,822,882 | 4,364,426 | 4,238,858 | 23,361,396 |
| Aguadilla .............. | 6,411,783 | 9,508,095 | 4,533,836 | 9,670,687 | 4,716,390 | 9,537,408 | 4,862,651 | 49,240,850 |
| Aguas Buenas ........ | 1,003,774 | 1,540,760 | 1,097,866 | 633,871 | 8,472,108 | 2,125,606 | 395,398 | 15,269,383 |
| Aibonito................ | 690,766 | 6,447,336 | 1,031,481 | 1,838,818 | 1,662,913 | 1,629,704 | 455,748 | 13,756,766 |
| Añasco ................. | 1,403,405 | 3,023,163 | 1,839,821 | 1,966,811 | 5,717,040 | 1,524,746 | 1,630,518 | 17,105,504 |
| Arecibo................. | 8,394,401 | 11,345,504 | 3,972,189 | 7,649,336 | 9,031,803 | 8,146,409 | 3,889,229 | 52,428,871 |
| Arroyo ................. | 1,108,997 | 1,443,023 | 776,890 | 917,647 | 7,926,380 | 3,183,909 | 737,919 | 16,094,765 |
| Barceloneta .......... | 2,273,849 | 6,488,468 | 9,035,843 | 7,175,760 | 6,255,370 | 19,829,718 | 2,617,253 | 53,676,261 |
| Barranquitas.......... | 429,632 | 7,748,282 | 614,513 | 762,311 | 1,952,470 | 1,877,965 | 1,189,149 | 14,574,322 |
| Bayamón............... | 31,454,633 | 49,096,771 | 27,405,434 | 33,893,973 | 13,861,389 | 47,011,119 | 18,064,916 | 220,788,235 |
| Cabo Rojo.............. | 4,405,671 | 7,540,797 | 2,281,698 | 2,250,347 | 3,111,962 | 1,558,460 | 4,367,312 | 25,516,247 |
| Caguas ................. | 23,295,578 | 33,527,320 | 21,077,117 | 23,191,310 | 12,768,425 | 27,350,263 | 7,926,614 | 149,136,627 |
| Camuy ................. | 1,360,219 | 2,406,184 | 1,378,048 | 912,506 | 7,541,375 | 2,978,940 | 909,100 | 17,486,372 |
| Canóvanas ............ | 3,871,261 | 9,407,813 | 3,480,216 | 5,394,089 | 1,834,026 | 2,096,603 | 1,964,988 | 28,048,996 |
| Carolina ............... | 35,265,026 | 49,852,213 | 24,338,050 | 28,588,865 | 11,307,196 | 17,591,299 | 14,491,545 | 181,434,194 |

**Municipal Revenues**

**Fiscal Year 2016**

| Municipality | Property Taxes | | Sales and Use Tax | Municipal License Tax | Intergovernmental Transfers[3] | Federal Grants and Awards | Other Revenues[4] | Total Revenues |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Special Additional Tax[1] | Basic Tax[2] | | | | | | |
| Cataño................. | 9,368,552 | 17,245,614 | 4,942,442 | 10,789,863 | 5,148,092 | 681,743 | 2,454,909 | 50,631,215 |
| Cayey................... | 7,755,825 | 8,988,135 | 4,472,472 | 6,761,591 | 6,238,294 | 11,192,972 | 6,826,575 | 52,235,864 |
| Ceiba................... | 652,493 | 1,772,902 | 910,054 | 297,012 | 7,163,388 | 959,326 | 1,334,729 | 13,089,904 |
| Ciales................... | 557,362 | 1,151,277 | 1,113,958 | 410,157 | 6,814,710 | 1,736,274 | 995,890 | 12,779,628 |
| Cidra................... | 3,951,320 | 5,018,886 | 1,951,933 | 9,494,974 | 8,640,297 | 2,854,423 | 864,210 | 32,776,043 |
| Coamo.................. | 1,633,414 | 2,820,143 | 1,541,554 | 1,329,832 | 10,332,113 | 4,149,996 | 1,462,467 | 23,269,519 |
| Comerío................ | 333,391 | 697,809 | 799,414 | 503,245 | 10,608,789 | 2,108,446 | 708,434 | 15,759,528 |
| Corozal................ | 627,808 | 1,976,406 | 833,337 | 1,068,216 | 8,198,674 | 1,685,366 | 845,718 | 15,235,525 |
| Culebra................ | 182,039 | 498,739 | 1,645,318 | 202,775 | 3,425,402 | 1,111,400 | 469,615 | 7,535,288 |
| Dorado................. | 8,208,126 | 10,439,939 | 3,912,511 | 5,471,990 | 2,737,654 | 7,501,921 | 3,011,848 | 41,283,989 |
| Fajardo................ | 5,661,853 | 5,782,577 | 4,841,531 | 5,715,703 | 8,989,529 | 7,496,588 | 2,038,845 | 40,526,626 |
| Florida................. | 262,921 | 622,297 | 937,056 | 242,388 | 6,552,960 | 1,743,041 | 181,027 | 10,541,690 |
| Guánica................ | 891,608 | 880,598 | 869,971 | 389,689 | 8,231,363 | 2,159,449 | 2,553,133 | 15,975,811 |
| Guayama............... | 5,814,869 | 5,900,076 | 3,280,570 | 6,265,552 | 9,709,949 | 14,631,339 | 2,383,694 | 47,586,049 |
| Guayanilla ........... | 794,929 | 1,509,049 | 1,186,242 | 1,010,507 | 7,295,840 | 1,651,124 | 2,230,059 | 15,677,750 |
| Guaynabo............. | 38,589,647 | 47,317,694 | 16,200,326 | 41,851,236 | 11,085,151 | 18,253,639 | 21,647,741 | 194,945,434 |
| Gurabo................. | 6,498,812 | 6,434,017 | 2,544,742 | 3,306,090 | 4,979,051 | 1,847,677 | 1,275,535 | 26,885,924 |
| Hatillo................. | 4,541,607 | 6,183,678 | 5,194,647 | 4,553,714 | 6,350,836 | 1,543,024 | 2,902,333 | 31,269,839 |
| Hormigueros .......... | 1,935,032 | 1,748,488 | 1,950,264 | 1,686,421 | 5,171,389 | 2,296,038 | 3,253,042 | 18,040,674 |
| Humacao.............. | 6,706,851 | 13,241,678 | 6,145,231 | 18,190,200 | 5,370,731 | 13,982,536 | 2,815,887 | 66,453,114 |
| Isabela................. | 2,349,829 | 3,512,964 | 3,098,189 | 2,842,159 | 7,121,842 | 3,937,329 | 4,811,472 | 27,673,784 |
| Jayuya................. | 269,633 | 1,006,808 | 1,018,936 | 1,741,923 | 9,794,759 | 1,475,859 | 2,036,196 | 17,344,114 |
| Juana Díaz ........... | 1,832,999 | 3,850,577 | 2,375,554 | 2,227,653 | 6,645,754 | 8,561,612 | 1,605,456 | 27,099,605 |
| Juncos................. | 3,467,085 | 4,885,020 | 1,839,517 | 16,882,709 | 9,739,625 | 2,999,325 | 3,730,207 | 43,543,488 |
| Lajas................... | 1,459,357 | 2,419,152 | 1,452,128 | 696,630 | 8,060,000 | 2,276,553 | 446,442 | 16,810,262 |
| Lares................... | 1,056,867 | 1,896,394 | 1,040,948 | 703,745 | 8,614,503 | 1,628,961 | 1,263,282 | 16,204,700 |
| Las Marías ........... | 184,548 | 5,185,081 | 1,372,386 | 111,929 | 2,711,514 | 1,619,215 | 322,105 | 11,506,778 |
| Las Piedras .......... | 2,952,004 | 4,466,269 | 1,143,151 | 4,210,036 | 6,097,767 | 1,152,891 | 4,742,364 | 24,764,482 |
| Loíza................... | 1,141,302 | 2,021,456 | 878,539 | 444,246 | 7,516,473 | 786,344 | 350,378 | 13,138,738 |
| Luquillo................ | 1,590,691 | 2,317,638 | 1,415,431 | 814,786 | 5,524,588 | 2,758,219 | 1,655,219 | 16,076,572 |
| Manatí................. | 4,619,569 | 7,609,710 | 5,235,436 | 10,674,953 | 5,987,218 | 11,738,061 | 4,086,547 | 49,951,494 |
| Maricao................ | 111,411 | 4,202,449 | 1,339,639 | 193,000 | 692,465 | - | 1,444,518 | 7,983,483 |
| Maunabo.............. | 350,379 | 794,382 | 1,423,697 | 149,630 | 8,074,875 | 3,643,363 | 1,125,240 | 15,561,566 |
| Mayagüez.............. | 18,913,010 | 19,855,442 | 11,493,438 | 12,062,443 | 12,494,202 | 15,562,412 | 18,152,121 | 108,533,068 |
| Moca................... | 1,276,155 | 2,579,765 | 1,448,294 | 1,201,995 | 7,543,259 | 1,184,866 | 2,214,164 | 17,448,498 |
| Morovis................ | 758,023 | 7,882,978 | 1,453,225 | 858,313 | 1,836,745 | 2,006,052 | 1,023,865 | 15,819,201 |
| Naguabo............... | 1,203,099 | 2,179,476 | 1,237,002 | 880,815 | 7,495,652 | 1,823,418 | 591,718 | 15,411,180 |
| Naranjito.............. | 339,383 | 1,792,707 | 1,490,501 | 1,117,855 | 8,364,522 | 2,525,843 | 1,244,049 | 16,874,860 |
| Orocovis .............. | 273,200 | 986,762 | 804,792 | 415,987 | 9,467,047 | 8,560,128 | 1,999,356 | 22,507,272 |
| Patillas................ | 743,307 | 1,244,315 | 977,379 | 456,413 | 8,420,192 | 2,269,916 | 321,095 | 14,432,617 |
| Peñuelas............... | 1,281,631 | 3,391,885 | 837,540 | 6,964,630 | 6,954,671 | 6,487,159 | 1,391,835 | 27,309,351 |
| Ponce.................. | 18,162,203 | 31,415,805 | 18,516,458 | 18,619,305 | 13,053,325 | 30,481,238 | 5,615,076 | 135,863,410 |
| Quebradillas .......... | 639,362 | 2,127,184 | 1,201,026 | 747,816 | 7,462,866 | 4,551,851 | 1,904,646 | 18,634,751 |
| Rincón................. | 953,661 | 1,569,808 | 1,386,087 | 520,886 | 5,226,130 | 1,441,943 | 2,848,816 | 13,947,331 |
| Río Grande ........... | 3,796,677 | 8,285,177 | 3,220,010 | 2,771,506 | 5,052,943 | 1,473,962 | 1,518,403 | 26,118,678 |
| Sabana Grande ....... | 1,006,700 | 1,929,118 | 1,163,451 | 916,756 | 8,227,720 | 8,071,989 | 3,006,115 | 24,321,849 |
| Salinas................ | 1,360,425 | 2,165,673 | 1,446,450 | 1,087,898 | 9,258,335 | 1,204,166 | 830,518 | 17,353,465 |
| San Germán .......... | 2,928,774 | 2,774,029 | 2,197,578 | 3,360,481 | 6,244,904 | 3,890,192 | 9,015,686 | 30,411,644 |
| San Juan............... | 100,381,300 | 146,028,288 | 63,990,660 | 116,178,099 | 32,318,411 | 121,459,566 | 99,623,549 | 679,979,873 |
| San Lorenzo .......... | 2,377,748 | 3,473,695 | 1,821,003 | 3,029,178 | 9,011,483 | 1,696,325 | 1,675,509 | 23,084,941 |
| San Sebastián ........ | 1,894,435 | 4,119,953 | 2,260,252 | 1,938,993 | 8,276,602 | 6,882,102 | 1,777,225 | 27,149,562 |
| Santa Isabel.......... | 702,907 | 2,414,772 | 2,350,297 | 1,530,503 | 5,183,516 | 1,124,664 | 1,292,709 | 14,599,368 |
| Toa Alta............... | 3,971,503 | 5,544,891 | 2,043,696 | 1,791,268 | 5,248,028 | 2,686,204 | 5,046,773 | 26,332,363 |
| Toa Baja .............. | 14,042,059 | 13,061,915 | 7,196,043 | 9,657,954 | 5,371,136 | 15,151,042 | 2,787,982 | 67,268,131 |
| Trujillo Alto .......... | 7,550,320 | 9,294,333 | 3,671,025 | 3,941,500 | 8,046,627 | 5,313,454 | 1,493,647 | 39,310,906 |
| Utuado................ | 675,042 | 1,816,289 | 1,530,548 | 603,128 | 7,971,095 | 8,290,352 | 521,599 | 21,408,053 |
| Vega Alta.............. | 1,022,956 | 8,392,276 | 2,189,714 | 2,463,891 | 2,233,192 | 943,541 | 2,356,941 | 19,602,511 |
| Vega Baja ............. | 5,117,318 | 5,437,321 | 3,021,969 | 5,847,149 | 5,987,156 | 11,973,769 | 6,790,903 | 44,175,585 |
| Vieques................ | 680,922 | 1,014,548 | 1,057,829 | 557,899 | 9,004,679 | 1,492,219 | 902,272 | 14,710,368 |
| Villalba................ | 670,201 | 1,056,509 | 899,512 | 1,727,490 | 8,812,621 | 2,843,704 | 985,124 | 16,995,161 |
| Yabucoa............... | 1,586,835 | 2,257,664 | 1,231,723 | 3,754,460 | 11,009,768 | 2,462,863 | 871,638 | 23,174,951 |
| Yauco................. | 3,337,629 | 3,965,969 | 2,521,126 | 2,265,479 | 8,440,362 | 3,913,140 | 1,484,524 | 25,928,229 |
| Total ................. | $447,081,324 | $684,399,691 | $339,243,658 | $494,861,612 | $583,937,725 | $572,336,361 | $335,438,195 | $3,457,298,566 |

[1] Includes revenues from the Special Additional Tax (as defined below) received by municipalities during fiscal year 2016, revenues from the Special Additional Tax corresponding to fiscal year 2016 not collected at year-end, and funds received from the Commonwealth as compensation for the Special Additional Tax revenues foregone as a result of the Property Tax Exemptions.

[2] Includes revenues from the Basic Tax (as defined below) received by municipalities during fiscal year 2016, revenues from the Basic Tax corresponding to fiscal year 2016 not collected at year-end, and funds received from the Commonwealth as compensation for the Basic Tax revenues foregone as a result of the Property Tax Exemptions (as defined below).

[3] Includes Commonwealth Contributions (other than those related to the Property Tax Exemptions), electricity consumption by the municipality under the contribution-in-lieu-of-taxes mechanism and other funds received by the municipalities from the Commonwealth and other Commonwealth government entities.

[4] Includes revenues derived from construction excise taxes, service charges, interest on deposits, among others.

Source: Audited financial statements for each municipality for fiscal year 2016.

Furthermore, the following table shows the fiscal year 2017 revenues of nine of the top ten obligors on the Municipal Loan Assets (in descending order of outstanding Loan balances). The 2017 audited financial statements for Toa Baja, the fourth largest obligor on the Municipal Loan Assets, were not available for review.

**Municipal Revenues**
**Fiscal Year 2017**

| Municipality | Property Taxes | | Sales and Use Tax | Municipal License Tax | Intergovernmental Transfers[3] | Federal Grants and Awards | Other Revenues[4] | Total Revenues |
| | Special Additional Tax[1] | Basic Tax[2] | | | | | | |
|---|---|---|---|---|---|---|---|---|
| San Juan ........ | $86,147,585 | $143,981,167 | $64,699,435 | $111,899,243 | $28,818,870 | $118,952,361 | $96,186,647 | $650,685,308 |
| Guaynabo ...... | 27,421,054 | 47,891,399 | 17,613,404 | 40,983,772 | 10,884,268 | 21,422,960 | 26,163,758 | 192,380,615 |
| Ponce ............ | 24,266,930 | 31,188,537 | 19,046,692 | 20,916,546 | 13,896,606 | 33,015,872 | 7,268,490 | 149,599,671 |
| Aguadilla ........ | 4,906,627 | 10,110,988 | 5,386,724 | 8,313,331 | 6,815,633 | 9,578,122 | 3,950,113 | 49,061,538 |
| Manatí .......... | 5,577,268 | 6,129,802 | 1,367,766 | 12,231,570 | 6,244,301 | 8,343,501 | 5,290,667 | 45,184,875 |
| Caguas .......... | 16,364,994 | 32,603,118 | 20,645,222 | 22,864,481 | 12,444,457 | 28,489,407 | 8,107,323 | 141,519,002 |
| Dorado.......... | 6,680,243 | 10,288,742 | 4,889,411 | 3,654,848 | 6,017,574 | 7,362,159 | 3,520,839 | 42,413,816 |
| Bayamón ........ | 26,066,452 | 51,087,052 | 28,967,443 | 34,294,309 | 11,672,913 | 43,685,264 | 15,037,366 | 210,810,799 |
| Juncos .......... | 1,544,932 | 4,525,700 | 1,732,672 | 16,928,140 | 11,344,015 | 2,713,472 | 4,129,624 | 42,918,555 |
| Total ............ | $198,976,085 | $337,806,505 | $164,348,769 | $272,086,238 | $108,138,637 | $273,563,118 | $169,654,827 | $1,524,574,179 |

[1] Includes revenues from the Special Additional Tax received by municipalities during fiscal year 2017, revenues from the Special Additional Tax corresponding to fiscal year 2017 not collected at year-end, and funds received from the Commonwealth as compensation for the Special Additional Tax revenues foregone as a result of the Property Tax Exemptions.

[2] Includes revenues from the Basic Tax received by municipalities during fiscal year 2017, revenues from the Basic Tax corresponding to fiscal year 2017 not collected at year-end, and funds received from the Commonwealth as compensation for the Basic Tax revenues foregone as a result of the Property Tax Exemptions (as defined below).

[3] Includes Commonwealth Contributions (other than those related to the Property Tax Exemptions), electricity consumption by the municipality under the contribution-in-lieu-of-taxes mechanism and other funds received by the municipalities from the Commonwealth and other Commonwealth government entities.

[4] Includes revenues derived from construction excise taxes, service charges, interest on deposits, among others.

Source: Audited financial statements for each municipality for fiscal year 2017.

The following table shows for each municipality (i) the amount of Basic Tax and Special Additional Tax collected from municipal taxpayers and (ii) the amount of Commonwealth Contributions to municipalities for each of the fiscal years indicated below. The information included below was obtained from CRIM and the form in which CRIM categorizes municipal revenues differs in certain aspects from the form in which such revenues are categorized in the municipalities' audited financial statements. For example, funds received from the Commonwealth as compensation for the Basic Tax and the Special Additional Tax revenues foregone as a result of the Property Tax Exemptions are classified in the municipalities' financial statements as property tax revenues, yet they are classified by CRIM (and presented in the table below) as Commonwealth Contributions. Furthermore, municipalities recognize property tax revenues in the financial statements for the year in which the tax was levied, whereas the information from CRIM presented in the table below shows the property tax revenues in the year in which the revenues were collected. Therefore, the information included below for fiscal years 2016 and 2017 regarding property taxes, which was provided by CRIM, varies from the information included in the tables above, which are based on each municipality's audited financial statements.

**Municipal Property Tax Collections and Commonwealth Contributions**
**Fiscal Year Ended June 30,**

| Municipality | 2015 | | | 2016 | | | 2017 | | |
| | From Municipal Taxpayers | From Commonwealth Contributions | Total | From Municipal Taxpayers | From Commonwealth Contributions | Total | From Municipal Taxpayers | From Commonwealth Contributions | Total |
|---|---|---|---|---|---|---|---|---|---|
| Adjuntas........ | $1,103,549 | $5,391,308 | $6,494,858 | $1,130,089 | $5,409,581 | $6,539,670 | $1,052,710 | $5,473,100 | $6,525,809 |
| Aguada ........ | 3,855,976 | 5,629,011 | 9,484,987 | 3,916,839 | 5,628,832 | 9,545,671 | 4,205,469 | 5,564,717 | 9,770,186 |
| Aguadilla ........ | 11,977,823 | 3,671,192 | 15,649,014 | 12,561,666 | 3,563,362 | 16,125,028 | 12,943,502 | 3,475,780 | 16,419,282 |
| Aguas Buenas........ | 2,035,879 | 5,850,269 | 7,886,148 | 2,270,009 | 5,805,098 | 8,075,107 | 2,231,414 | 5,861,684 | 8,093,098 |
| Aibonito........ | 2,021,798 | 4,976,256 | 6,998,054 | 2,497,274 | 4,844,419 | 7,341,693 | 2,571,446 | 4,894,235 | 7,465,681 |
| Añasco ......... | 3,826,544 | 4,330,069 | 8,156,613 | 3,853,411 | 4,349,366 | 8,202,777 | 4,117,677 | 4,287,031 | 8,404,707 |
| Arecibo......... | 14,723,030 | 3,656,665 | 18,379,694 | 14,539,153 | 3,811,390 | 18,350,542 | 15,908,249 | 3,463,366 | 19,371,614 |
| Arroyo ......... | 1,708,053 | 5,232,526 | 6,940,579 | 1,862,719 | 5,224,703 | 7,087,422 | 1,993,121 | 5,211,326 | 7,204,447 |
| Barceloneta.... | 10,512,575 | 3,437,427 | 13,950,001 | 10,984,302 | 3,375,022 | 14,359,324 | 11,044,735 | 3,364,132 | 14,408,867 |
| Barranquitas.... | 1,653,191 | 6,599,118 | 8,252,309 | 1,606,196 | 6,639,317 | 8,245,512 | 1,769,332 | 6,647,269 | 8,416,601 |
| Bayamón........ | 62,017,814 | 14,204,935 | 76,222,750 | 63,202,534 | 14,072,668 | 77,275,202 | 68,189,341 | 13,858,034 | 82,047,374 |
| Cabo Rojo...... | 11,390,762 | 1,912,388 | 13,303,150 | 10,885,714 | 2,132,759 | 13,018,473 | 11,789,653 | 1,866,027 | 13,655,680 |
| Caguas.......... | 42,127,415 | 8,898,298 | 51,025,713 | 42,253,072 | 8,806,981 | 51,060,053 | 44,030,343 | 8,415,781 | 52,446,123 |
| Camuy ......... | 2,862,184 | 5,745,305 | 8,607,489 | 2,929,060 | 5,752,811 | 8,681,871 | 3,001,275 | 5,760,565 | 8,761,840 |
| Canóvanas ..... | 8,401,075 | 4,410,714 | 12,811,789 | 10,202,326 | 3,883,617 | 14,085,943 | 9,560,471 | 4,060,688 | 13,621,160 |

**Municipal Property Tax Collections and Commonwealth Contributions**

**Fiscal Year Ended June 30,**

| Municipality | 2015 | | | 2016 | | | 2017 | | |
|---|---|---|---|---|---|---|---|---|---|
| | From Municipal Taxpayers | From Commonwealth Contributions | Total | From Municipal Taxpayers | From Commonwealth Contributions | Total | From Municipal Taxpayers | From Commonwealth Contributions | Total |
| Carolina ......... | 63,344,327 | 15,051,652 | 78,395,979 | 62,424,354 | 15,248,247 | 77,672,601 | 66,096,255 | 14,820,741 | 80,916,996 |
| Cataño ............ | 19,091,544 | 6,088,513 | 25,180,058 | 18,757,775 | 6,310,881 | 25,068,656 | 18,974,050 | 6,283,305 | 25,257,355 |
| Cayey ............. | 13,032,805 | 2,761,793 | 15,794,598 | 13,441,909 | 2,671,040 | 16,112,949 | 13,434,444 | 2,642,599 | 16,077,043 |
| Ceiba ............. | 1,665,381 | 4,463,752 | 6,129,133 | 1,778,228 | 4,462,039 | 6,240,267 | 1,879,493 | 4,434,677 | 6,314,169 |
| Ciales ............. | 1,392,166 | 4,762,197 | 6,154,363 | 1,462,277 | 4,754,596 | 6,216,873 | 1,422,532 | 4,805,748 | 6,228,280 |
| Cidra .............. | 7,094,575 | 3,797,635 | 10,892,210 | 8,045,233 | 3,513,979 | 11,559,211 | 8,055,764 | 3,656,909 | 11,712,673 |
| Coamo ........... | 3,501,994 | 5,392,244 | 8,894,238 | 3,620,688 | 5,398,708 | 9,019,396 | 3,916,859 | 5,320,898 | 9,237,757 |
| Comerío .......... | 920,914 | 6,831,642 | 7,752,555 | 955,050 | 6,857,993 | 7,813,043 | 1,002,757 | 6,887,814 | 7,890,571 |
| Corozal ........... | 2,331,105 | 6,446,631 | 8,777,736 | 2,858,537 | 6,335,077 | 9,193,614 | 2,617,057 | 6,444,054 | 9,061,111 |
| Culebra ........... | 712,899 | 1,921,156 | 2,634,055 | 652,015 | 1,950,945 | 2,602,960 | 824,337 | 1,905,742 | 2,730,079 |
| Dorado ............ | 15,695,245 | 1,972,684 | 17,667,929 | 15,872,644 | 1,936,280 | 17,808,925 | 16,474,099 | 1,820,733 | 18,294,832 |
| Fajardo ........... | 12,034,477 | 3,624,067 | 15,658,544 | 11,841,946 | 3,692,623 | 15,534,768 | 12,601,838 | 3,495,961 | 16,097,799 |
| Florida ........... | 694,205 | 5,192,859 | 5,887,064 | 753,408 | 5,194,361 | 5,947,770 | 959,315 | 5,167,500 | 6,126,815 |
| Guánica ........... | 1,806,232 | 4,917,129 | 6,723,361 | 1,813,602 | 4,927,825 | 6,741,427 | 1,932,067 | 4,914,559 | 6,846,626 |
| Guayama .......... | 11,788,639 | 2,217,681 | 14,006,320 | 12,161,185 | 2,071,737 | 14,232,923 | 12,246,046 | 2,022,270 | 14,268,316 |
| Guayanilla ....... | 2,245,581 | 4,438,356 | 6,683,937 | 1,537,997 | 4,640,268 | 6,178,265 | 1,564,256 | 4,674,530 | 6,238,786 |
| Guaynabo ........ | 72,251,037 | 6,674,890 | 78,925,927 | 69,954,578 | 7,336,911 | 77,291,489 | 72,126,938 | 6,551,112 | 78,678,050 |
| Gurabo ........... | 10,627,603 | 3,188,783 | 13,816,386 | 11,204,903 | 3,124,017 | 14,328,920 | 10,277,239 | 3,275,863 | 13,553,102 |
| Hatillo ............ | 9,836,067 | 3,136,803 | 12,972,870 | 9,396,627 | 3,237,629 | 12,634,255 | 9,507,401 | 3,184,286 | 12,691,686 |
| Hormigueros .... | 3,105,736 | 3,603,671 | 6,709,407 | 3,342,041 | 3,575,378 | 6,917,419 | 3,339,828 | 3,600,592 | 6,940,420 |
| Humacao ......... | 15,895,950 | 2,709,230 | 18,605,180 | 17,212,168 | 2,397,647 | 19,609,815 | 18,371,625 | 2,220,852 | 20,592,477 |
| Isabela ............ | 6,336,950 | 4,614,958 | 10,951,908 | 6,440,286 | 4,608,385 | 11,048,671 | 7,357,374 | 4,419,988 | 11,777,361 |
| Jayuya ............ | 1,034,561 | 4,748,175 | 5,782,736 | 1,146,362 | 4,729,525 | 5,875,887 | 1,021,976 | 4,804,401 | 5,826,377 |
| Juana Díaz ...... | 4,313,729 | 4,283,818 | 8,597,546 | 4,352,286 | 4,298,044 | 8,650,329 | 4,936,430 | 4,147,335 | 9,083,764 |
| Juncos ............ | 5,889,689 | 4,376,426 | 10,266,115 | 4,703,474 | 4,773,755 | 9,477,229 | 7,498,956 | 3,920,849 | 11,419,805 |
| Lajas .............. | 2,952,700 | 4,520,537 | 7,473,237 | 2,948,951 | 4,532,559 | 7,481,510 | 3,043,341 | 4,512,406 | 7,555,747 |
| Lares .............. | 2,115,198 | 6,256,430 | 8,371,628 | 2,415,921 | 6,202,910 | 8,618,830 | 2,498,637 | 6,214,273 | 8,712,910 |
| Las Marías ...... | 982,146 | 4,677,651 | 5,659,797 | 517,523 | 4,846,334 | 5,363,856 | 619,958 | 4,839,282 | 5,459,241 |
| Las Piedras ..... | 5,317,303 | 3,567,201 | 8,884,504 | 5,314,746 | 3,590,956 | 8,905,702 | 5,339,612 | 3,605,327 | 8,944,939 |
| Loíza ............. | 2,506,708 | 6,515,351 | 9,022,059 | 2,395,464 | 6,575,223 | 8,970,872 | 2,596,807 | 6,560,101 | 9,156,908 |
| Luquillo .......... | 3,988,138 | 3,416,384 | 7,404,521 | 4,161,073 | 3,380,906 | 7,541,979 | 4,005,505 | 3,426,178 | 7,431,683 |
| Manatí ........... | 9,551,519 | 4,420,462 | 13,971,981 | 10,083,840 | 4,155,871 | 14,239,712 | 10,222,302 | 4,156,574 | 14,378,876 |
| Maricao .......... | 401,100 | 3,811,719 | 4,212,819 | 443,996 | 3,819,314 | 4,263,311 | 435,957 | 3,851,474 | 4,287,432 |
| Maunabo ......... | 837,446 | 5,211,536 | 6,048,982 | 890,202 | 5,211,200 | 6,101,401 | 959,611 | 5,218,049 | 6,177,661 |
| Mayagüez ........ | 28,715,755 | 4,626,000 | 33,341,755 | 29,889,166 | 4,375,047 | 34,264,212 | 29,059,727 | 4,471,872 | 33,531,599 |
| Moca .............. | 2,991,013 | 5,560,614 | 8,551,626 | 3,167,229 | 5,531,430 | 8,698,658 | 3,821,134 | 5,421,508 | 9,242,642 |
| Morovis ........... | 2,085,846 | 6,423,825 | 8,509,670 | 2,104,196 | 6,456,009 | 8,560,205 | 2,610,978 | 6,344,186 | 8,955,165 |
| Naguabo .......... | 2,622,580 | 4,701,490 | 7,324,070 | 2,590,206 | 4,752,757 | 7,342,963 | 2,768,134 | 4,749,651 | 7,517,784 |
| Naranjito ........ | 2,679,241 | 6,448,399 | 9,127,640 | 2,463,435 | 6,526,451 | 8,989,886 | 2,517,612 | 6,581,677 | 9,099,288 |
| Orocovis ......... | 1,189,857 | 6,734,943 | 7,924,800 | 1,316,681 | 6,709,037 | 8,025,718 | 1,300,596 | 6,759,339 | 8,059,935 |
| Patillas ........... | 1,347,339 | 5,132,546 | 6,479,885 | 1,846,956 | 4,998,931 | 6,845,888 | 1,503,814 | 5,138,467 | 6,642,281 |
| Peñuelas ......... | 3,830,558 | 3,658,232 | 7,488,790 | 3,813,692 | 3,677,088 | 7,490,779 | 3,550,072 | 3,781,069 | 7,331,141 |
| Ponce ............. | 45,214,758 | 7,549,466 | 52,764,224 | 42,603,545 | 7,917,629 | 50,521,174 | 43,011,644 | 7,864,698 | 50,876,342 |
| Quebradillas .... | 2,086,445 | 5,154,843 | 7,241,288 | 2,119,039 | 5,175,663 | 7,294,702 | 2,224,674 | 5,183,985 | 7,408,659 |
| Rincón ............ | 2,992,459 | 3,935,549 | 6,928,008 | 2,824,464 | 4,026,037 | 6,850,501 | 3,076,141 | 3,969,764 | 7,045,906 |
| Río Grande ...... | 11,079,941 | 2,332,976 | 13,412,916 | 10,692,070 | 2,533,080 | 13,225,150 | 11,250,062 | 2,350,403 | 13,600,465 |
| Sabana Grande .. | 1,924,347 | 4,988,830 | 6,913,177 | 2,010,189 | 4,989,673 | 6,999,862 | 2,164,380 | 4,986,597 | 7,150,977 |
| Salinas ........... | 2,638,595 | 5,114,750 | 7,753,344 | 2,900,361 | 5,077,788 | 7,978,149 | 3,151,680 | 5,025,653 | 8,177,332 |
| San Germán ..... | 4,858,197 | 4,590,057 | 9,448,254 | 5,014,761 | 4,540,811 | 9,555,573 | 5,187,322 | 4,525,549 | 9,712,872 |
| San Juan.......... | 203,091,822 | 24,667,208 | 227,759,030 | 202,587,331 | 25,111,701 | 227,699,032 | 206,876,376 | 23,935,969 | 230,812,345 |
| San Lorenzo ..... | 4,688,137 | 5,558,955 | 10,247,091 | 4,721,683 | 5,567,232 | 10,288,915 | 4,845,279 | 5,560,550 | 10,405,829 |
| San Sebastián ... | 4,388,717 | 5,331,684 | 9,720,400 | 4,970,389 | 5,167,529 | 10,137,918 | 5,019,043 | 5,180,915 | 10,199,957 |
| Santa Isabel..... | 3,847,029 | 3,801,933 | 7,648,962 | 3,850,880 | 3,849,629 | 7,700,508 | 4,088,363 | 3,822,082 | 7,910,446 |
| Toa Alta.......... | 7,967,950 | 4,608,991 | 12,576,941 | 7,754,320 | 4,737,894 | 12,492,214 | 8,663,348 | 4,510,127 | 13,173,475 |
| Toa Baja ......... | 19,582,968 | 5,989,415 | 25,572,383 | 19,437,321 | 6,099,438 | 25,536,758 | 19,858,539 | 6,008,174 | 25,866,712 |
| Trujillo Alto..... | 12,105,224 | 5,302,513 | 17,407,737 | 12,471,685 | 5,294,715 | 17,766,400 | 12,663,441 | 5,276,191 | 17,939,632 |
| Utuado ........... | 1,913,266 | 6,362,827 | 8,276,093 | 2,538,273 | 6,168,860 | 8,707,133 | 2,070,561 | 6,368,039 | 8,438,600 |
| Vega Alta........ | 6,503,030 | 3,741,809 | 10,244,839 | 6,289,577 | 3,872,511 | 10,162,087 | 6,496,986 | 3,827,942 | 10,324,928 |
| Vega Baja ....... | 9,243,665 | 4,591,762 | 13,835,427 | 8,669,538 | 4,725,856 | 13,395,394 | 9,017,985 | 4,667,143 | 13,685,127 |
| Vieques .......... | 1,828,363 | 3,436,117 | 5,264,480 | 1,719,799 | 3,491,287 | 5,211,085 | 1,762,556 | 3,497,262 | 5,259,819 |
| Villalba .......... | 1,299,054 | 6,459,034 | 7,758,089 | 1,364,519 | 6,468,397 | 7,832,916 | 1,440,667 | 6,480,833 | 7,921,499 |
| Yabucoa.......... | 3,104,207 | 5,390,349 | 8,494,556 | 3,174,069 | 5,383,563 | 8,557,632 | 3,196,044 | 5,411,253 | 8,607,297 |
| Yauco ............ | 5,278,705 | 4,845,390 | 10,124,096 | 5,280,177 | 4,902,066 | 10,182,243 | 5,653,533 | 4,838,628 | 10,492,161 |
| Total ............. | $896,612,402 | $410,600,001 | $1,307,212,403 | $899,781,387 | $411,791,394 | $1,311,572,781 | $931,420,092 | $406,550,243 | $1,337,970,335 |
| % of Total Revenues ........ | 68.59% | 31.41% | 100.00% | 68.60% | 31.40% | 100.00% | 69.61% | 30.39% | 100.00% |

Source: CRIM

89

The following table shows total municipal revenues during fiscal years 2012 through 2016.

**Historical Municipal Revenues**
**Previous Fiscal Years**

| Municipality | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Adjuntas | $15,698,257 | $14,184,029 | $14,434,016 | $12,324,782 | $10,514,120 |
| Aguada | 23,672,898 | 21,230,706 | 24,408,027 | 23,256,344 | 23,361,396 |
| Aguadilla | 60,235,423 | 56,042,176 | 52,923,037 | 52,119,300 | 49,240,850 |
| Aguas Buenas | 15,124,972 | 15,239,816 | 16,940,525 | 16,622,251 | 15,269,383 |
| Aibonito | 17,949,648 | 16,610,497 | 13,785,171 | 13,409,765 | 13,756,766 |
| Añasco | 17,516,737 | 19,276,478 | 18,146,342 | 19,508,920 | 17,105,504 |
| Arecibo | 64,549,731 | 65,171,177 | 54,245,898 | 62,847,992 | 52,428,871 |
| Arroyo | 14,244,596 | 14,035,820 | 16,212,605 | 16,581,525 | 16,094,765 |
| Barceloneta | 39,708,895 | 40,707,106 | 40,961,851 | 50,032,320 | 53,676,261 |
| Barranquitas | 17,520,342 | 19,060,364 | 21,330,749 | 21,548,371 | 14,574,322 |
| Bayamón | 209,306,862 | 219,322,560 | 211,305,334 | 202,496,290 | 220,788,235 |
| Cabo Rojo | 31,998,892 | 29,285,293 | 28,213,998 | 26,227,660 | 25,516,247 |
| Caguas | 160,263,044 | 151,575,364 | 154,966,858 | 148,836,386 | 149,136,627 |
| Camuy | 22,579,883 | 28,720,603 | 20,709,064 | 18,714,324 | 17,486,372 |
| Canóvanas | 35,435,530 | 33,612,157 | 31,000,751 | 28,142,330 | 28,048,996 |
| Carolina | 190,033,376 | 187,528,211 | 192,783,992 | 228,869,011 | 181,434,194 |
| Cataño | 47,792,700 | 49,483,717 | 46,631,606 | 49,335,776 | 50,631,215 |
| Cayey | 44,977,559 | 49,666,738 | 50,065,211 | 52,438,825 | 52,235,864 |
| Ceiba | 12,892,982 | 10,900,632 | 12,294,421 | 11,867,655 | 13,089,904 |
| Ciales | 18,669,243 | 16,708,330 | 12,877,829 | 13,612,526 | 12,779,628 |
| Cidra | 29,421,705 | 27,874,330 | 30,651,654 | 31,383,572 | 32,776,043 |
| Coamo | 20,582,329 | 22,088,861 | 26,233,824 | 24,234,421 | 23,269,519 |
| Comerío | 14,963,566 | 15,112,700 | 16,740,783 | 15,918,097 | 15,759,528 |
| Corozal | 18,638,011 | 20,524,545 | 17,777,306 | 17,154,843 | 15,235,525 |
| Culebra | 6,183,361 | 6,703,372 | 7,074,240 | 7,866,770 | 7,535,288 |
| Dorado | 36,300,149 | 37,727,416 | 40,000,325 | 39,945,296 | 41,283,989 |
| Fajardo | 40,384,035 | 41,333,238 | 44,444,745 | 40,120,320 | 40,526,626 |
| Florida | 9,165,518 | 12,081,008 | 10,423,820 | 10,757,595 | 10,541,690 |
| Guánica | 13,018,629 | 14,819,491 | 14,788,817 | 14,864,737 | 15,975,811 |
| Guayama | 48,177,295 | 47,481,836 | 47,550,152 | 61,827,197 | 47,586,049 |
| Guayanilla | 16,760,855 | 15,071,751 | 16,630,167 | 15,444,591 | 15,677,750 |
| Guaynabo | 208,351,458 | 201,254,292 | 191,134,843 | 191,453,695 | 194,945,434 |
| Gurabo | 28,268,926 | 25,764,432 | 28,120,275 | 31,358,805 | 26,885,924 |
| Hatillo | 27,189,814 | 23,948,614 | 27,675,918 | 30,263,525 | 31,269,839 |
| Hormigueros | 16,349,406 | 15,897,280 | 17,197,178 | 17,611,685 | 18,040,674 |
| Humacao | 66,285,039 | 69,209,024 | 64,411,258 | 68,505,651 | 66,453,114 |
| Isabela | 31,107,999 | 30,447,832 | 33,863,644 | 29,602,572 | 27,673,784 |
| Jayuya | 21,062,756 | 16,950,736 | 19,390,489 | 16,874,503 | 17,344,114 |
| Juana Díaz | 29,146,625 | 26,574,208 | 31,038,495 | 29,436,376 | 27,099,605 |
| Juncos | 41,230,123 | 38,472,400 | 37,977,308 | 39,116,828 | 43,543,488 |
| Lajas | 13,689,174 | 15,233,168 | 15,059,542 | 16,666,880 | 16,810,262 |
| Lares | 17,561,487 | 18,059,469 | 16,548,982 | 14,196,482 | 16,204,700 |
| Las Marías | 11,328,512 | 12,196,775 | 10,631,252 | 9,976,667 | 11,506,778 |
| Las Piedras | 22,657,831 | 20,781,924 | 20,923,850 | 22,795,716 | 24,764,482 |
| Loíza | 18,158,883 | 17,829,760 | 14,722,320 | 12,779,661 | 13,138,738 |
| Luquillo | 15,452,752 | 16,354,853 | 16,967,619 | 16,849,828 | 16,076,572 |
| Manatí | 47,044,195 | 47,501,842 | 43,484,890 | 58,976,488 | 49,951,494 |
| Maricao | 13,332,727 | 10,106,320 | 8,909,176 | 8,897,252 | 7,983,483 |
| Maunabo | 13,286,341 | 14,417,499 | 17,809,321 | 21,107,678 | 15,561,566 |
| Mayagüez | 100,116,191 | 96,342,179 | 99,737,489 | 97,291,002 | 108,533,068 |
| Moca | 19,068,501 | 16,907,408 | 20,361,440 | 16,981,861 | 17,448,498 |
| Morovis | 19,778,100 | 15,679,860 | 15,311,967 | 15,406,794 | 15,819,201 |
| Naguabo | 16,869,871 | 17,596,932 | 15,810,241 | 16,269,258 | 15,411,180 |
| Naranjito | 19,135,309 | 19,577,497 | 19,223,804 | 19,475,703 | 16,874,860 |
| Orocovis | 31,829,792 | 29,143,704 | 22,496,784 | 22,356,083 | 22,507,272 |
| Patillas | 15,875,036 | 15,656,330 | 15,286,580 | 13,820,706 | 14,432,617 |
| Peñuelas | 32,276,613 | 28,878,166 | 28,703,328 | 29,105,093 | 27,309,351 |
| Ponce | 174,794,228 | 167,315,984 | 151,829,915 | 147,314,790 | 135,863,410 |
| Quebradillas | 15,247,355 | 16,247,784 | 17,282,543 | 18,305,271 | 18,634,751 |
| Rincón | 13,153,321 | 13,238,449 | 15,435,331 | 13,184,062 | 13,947,331 |
| Río Grande | 28,317,999 | 27,418,383 | 29,800,931 | 25,937,082 | 26,118,678 |
| Sabana Grande | 22,992,514 | 23,610,728 | 24,977,598 | 26,871,271 | 24,321,849 |
| Salinas | 17,126,687 | 15,988,486 | 16,981,255 | 16,647,710 | 17,353,465 |
| San Germán | 27,291,277 | 26,159,622 | 29,936,252 | 28,479,390 | 30,411,644 |
| San Juan | 695,415,194 | 657,975,980 | 660,354,223 | 675,896,830 | 679,979,873 |
| San Lorenzo | 24,294,077 | 21,743,252 | 24,979,857 | 23,490,467 | 23,084,941 |
| San Sebastián | 32,342,722 | 28,913,823 | 26,660,594 | 25,022,213 | 27,149,562 |
| Santa Isabel | 18,111,318 | 19,715,418 | 18,486,967 | 15,144,026 | 14,599,368 |
| Toa Alta | 26,037,609 | 25,832,522 | 25,165,758 | 27,720,566 | 26,332,363 |
| Toa Baja | 82,161,582 | 79,127,873 | 70,823,249 | 68,166,612 | 67,268,131 |
| Trujillo Alto | 42,413,195 | 40,442,582 | 41,967,498 | 39,435,887 | 39,310,906 |
| Utuado | 30,856,197 | 22,546,842 | 22,845,103 | 22,194,723 | 21,408,053 |
| Vega Alta | 24,128,472 | 24,823,613 | 20,971,001 | 23,021,960 | 19,602,511 |
| Vega Baja | 43,299,725 | 44,020,000 | 43,407,167 | 42,690,430 | 44,175,585 |
| Vieques | 15,481,474 | 14,239,341 | 13,481,038 | 15,807,038 | 14,710,368 |
| Villalba | 16,845,314 | 15,087,677 | 18,925,392 | 17,776,280 | 16,995,161 |

**Historical Municipal Revenues**
**Previous Fiscal Years**

| Municipality | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Yabucoa ........................................ | 27,875,324 | 25,217,353 | 25,664,387 | 23,812,701 | 23,174,951 |
| Yauco ............................................ | 37,347,824 | 29,164,259 | 27,895,849 | 25,945,310 | 25,928,229 |
| Total ............................................ | $3,625,753,892 | $3,518,792,787 | $3,491,790,137 | $3,538,351,205 | $3,457,298,566 |

[1] Includes revenues derived from construction excise taxes, service charges, interest on deposits, among others.

Sources: Audited financial statements for each municipality for fiscal years 2012 through 2016.

### *Major Categories of Revenue*

#### *Municipal Property Taxes*

Municipalities are authorized to impose municipal property taxes pursuant to Act No. 83 of August 30, 1991, as amended (the "Municipal Tax Act"). Specifically, the Municipal Tax Act authorizes municipalities to impose the following property taxes: (i) a special additional tax (the "Special Additional Tax" or "CAE" by its Spanish acronym) over real and personal property within each municipality, without limitation as to rate or amount, and (ii) a basic property tax to fund operating expenses up to a maximum amount of 6% of the assessed valuation on all real property within such municipality and up to a maximum amount of 4% of the assessed valuation on all personal property within such municipality (collectively, the "Basic Tax"). A portion of the Basic Tax levied by a municipality is transferred to other municipalities by operation of the Matching Fund (as defined herein). For additional information regarding the Matching Fund, see "*Municipal Matching Fund*" below.

The Special Additional Tax rates for all municipalities for fiscal year 2019 vary from 1.20% to 5.50% of the assessed valuation, in the case of real property, and from 1.00% to 5.50% of the assessed valuation, in the case of personal property. The fiscal year 2019 Basic Tax rate for all municipalities is 6.00% of the assessed valuation, in the case of real property (except for the Municipality of Hatillo, where the Basic Tax rate for real property is 5.72%), and varies from 3.00% to 4.00% of the assessed valuation, in the case of personal property. In the aggregate, current property tax rates (including the Special Additional Tax and the Basic Tax) for the municipalities vary from 8.03% to 12.33% of the assessed valuation, in the case of real property, and from 5.80% to 9.83% of the assessed valuation, in the case of personal property.

Under the Municipal Financing Act, each municipality is required to levy the Special Additional Tax in such amount as will be required for the payment of its general obligation Loans for which such municipality has pledged its good faith, credit and taxing power ("Municipal General Obligations"). The proceeds of the Special Additional Tax are required by law to be deposited in the GO Redemption Fund (as defined herein) and used for the payment of Municipal General Obligations. To the extent that the funds in a municipality's GO Redemption Fund exceed the amount necessary to cover 12 months' debt service on such municipality's then outstanding Municipal General Obligations, as determined by AAFAF, and to pay such municipality's statutory debts (certain debts with Commonwealth government entities and public corporations), the Municipal Financing Act requires the disbursement of any such excess to the municipality, at its request, once during each fiscal year. Such excess is generally referred to as "Excess CAE." In calculating the 12 months' debt service reserve, AAFAF assumes the refinancing of the Municipal General Obligations that certain municipalities have with private financial institutions that include Balloon Payments (as defined herein) prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments.

Basic Tax revenues are used primarily by municipalities to cover their operating expenses and to pay debt service on their special obligation Loans. Furthermore, the municipality's Basic Tax revenues are also available to make debt service payments on Municipal General Obligations to the extent that the Special Additional Tax revenues, together with monies on deposit in the municipality's GO Redemption Fund, are not sufficient to cover such debt service.

The Municipal Tax Act provides for an exemption from the Special Additional Tax and Basic Tax on the first $15,000 of assessed valuation of primary personal residences of individuals (the "$15,000 Real Property Exemption") and an exemption from personal property taxes on the first $50,000 of assessed valuation of personal property owned by businesses that have gross revenues of less than $150,000 per annum (the "$50,000 Personal Property Exemption"). Act No. 16 of May 31, 1960 also provides for an exemption of 0.20% of the assessed valuation of all taxable property within the municipalities (the "0.20% Exemption" and, collectively with the $15,000 Real Property Exemption, and the $50,000 Personal Property Exemption, the "Property Tax Exemptions").

The Commonwealth has historically made annual appropriations to the municipalities from its general fund as compensation for the amount of the revenues foregone as a result of the Property Tax Exemptions. Under the Municipal Tax Act, however, appropriations from the Commonwealth will not be provided to cover any amount of property taxes which any municipality elects to forgive for primary personal residences registered for the first time after January 1, 1992, or for personal property of certain businesses

registered for the first time after July 1, 1991. Moreover, annual Commonwealth Contributions to municipalities corresponding to the Property Tax Exemptions decreased significantly in fiscal years 2018 and 2019 and are expected to further significantly decrease in the coming years as a result of the reductions contemplated by the Revised Commonwealth Fiscal Plan. As a result of the recent reductions in the level of Commonwealth Contributions to municipalities, municipalities have not received compensation for the amounts foregone as a result of the Property Tax Exemption since fiscal year 2018.

Real property taxes are assessed based on 1957-1958 property values, as no general real property reassessment has been made since then. Real property taxes are payable semi-annually on January 1 and July 1 of each year. Taxpayers are entitled to receive a discount of 10% or 5% of the total real property tax owed if the corresponding payment is made within 30 days or between 31 and 60 days of receipt of the invoice, respectively. Interest is charged on delinquent real property taxes at the rate of 10%, with a surcharge of up to 10% of the tax owed.

Personal property taxes are assessed on the net book value (or, if the net book value does not reasonably reflect the fair market value, the fair market value) of all taxable personal property as of January 1 of each year. Personal property tax returns must be filed on or before May 15 of each year, and estimated personal property tax payments are due quarterly on August 15, November 15, February 15, and May 15 of each year. Each year, taxpayers are required to make estimated personal property tax payments equal to the lesser of (i) 90% of their estimated personal property tax for the current taxable year or (ii) 100% of the total tax reflected on their personal property tax return of the prior taxable year. Any difference between estimated and actual personal property taxes is required to be paid by, or reimbursed to, the taxpayer upon the filing of the personal property tax return for the corresponding taxable year. A 5% discount for early payment is available for taxpayers that pay, on or before August 15 of each year, at least 100% of the self-assessed tax for the preceding taxable year. In the event of non-payment or underpayment of any installment, 5% of the unpaid amount is added to the tax. Interest is charged on delinquent personal property taxes at the rate of 10%, with a surcharge of up to 15% of the tax owed (or up to 40% if the delinquency also involves failure to file the required tax return).

The table below sets forth the Special Additional Tax rate and the Basic Tax rate for each municipality for fiscal year 2019.

| Property Tax Rates (%) | | | |
|---|---|---|---|
| Municipality | Special Additional Tax Rate (Real Property) | Special Additional Tax Rate (Personal Property) | Basic Tax Rate (Real Property) | Basic Tax Rate (Personal Property) |
|---|---|---|---|---|
| Adjuntas | 1.50 | 1.50 | 6.00 | 4.00 |
| Aguada | 2.00 | 2.00 | 6.00 | 4.00 |
| Aguadilla | 3.50 | 2.00 | 6.00 | 4.00 |
| Aguas Buenas | 3.50 | 3.50 | 6.00 | 4.00 |
| Aibonito | 2.50 | 2.50 | 6.00 | 4.00 |
| Añasco | 2.85 | 2.85 | 6.00 | 4.00 |
| Arecibo | 4.80 | 3.50 | 6.00 | 4.00 |
| Arroyo | 3.50 | 3.50 | 6.00 | 4.00 |
| Barceloneta | 3.50 | 3.50 | 6.00 | 4.00 |
| Barranquitas | 2.50 | 2.50 | 6.00 | 4.00 |
| Bayamón | 2.75 | 2.75 | 6.00 | 4.00 |
| Cabo Rojo | 3.25 | 2.00 | 6.00 | 4.00 |
| Caguas | 3.50 | 3.50 | 6.00 | 4.00 |
| Camuy | 3.50 | 2.00 | 6.00 | 4.00 |
| Canóvanas | 3.50 | 3.50 | 6.00 | 4.00 |
| Carolina | 4.50 | 4.50 | 6.00 | 4.00 |
| Cataño | 3.50 | 3.50 | 6.00 | 4.00 |
| Cayey | 3.75 | 3.75 | 6.00 | 4.00 |
| Ceiba | 2.50 | 1.25 | 6.00 | 3.72 |
| Ciales | 3.50 | 3.50 | 6.00 | 4.00 |
| Cidra | 5.50 | 5.50 | 6.00 | 4.00 |
| Coamo | 3.50 | 3.50 | 6.00 | 4.00 |
| Comerío | 2.25 | 2.25 | 6.00 | 4.00 |
| Corozal | 3.00 | 3.00 | 6.00 | 4.00 |
| Culebra | 2.00 | 2.00 | 6.00 | 4.00 |
| Dorado | 3.75 | 4.00 | 6.00 | 4.00 |
| Fajardo | 3.50 | 2.00 | 6.00 | 4.00 |
| Florida | 3.50 | 3.50 | 6.00 | 4.00 |
| Guánica | 3.75 | 3.75 | 6.00 | 4.00 |
| Guayama | 3.25 | 3.25 | 6.00 | 4.00 |
| Guayanilla | 4.00 | 4.00 | 6.00 | 4.00 |
| Guaynabo | 3.25 | 3.25 | 6.00 | 4.00 |
| Gurabo | 5.00 | 3.00 | 6.00 | 4.00 |
| Hatillo | 2.50 | 2.50 | 5.72 | 3.72 |
| Hormigueros | 3.00 | 3.00 | 6.00 | 4.00 |
| Humacao | 2.00 | 2.00 | 6.00 | 4.00 |
| Isabela | 2.50 | 2.50 | 6.00 | 4.00 |
| Jayuya | 1.25 | 1.25 | 6.00 | 4.00 |
| Juana Díaz | 2.50 | 3.50 | 6.00 | 4.00 |

**Property Tax Rates (%)**

| Municipality | Special Additional Tax Rate (Real Property) | Special Additional Tax Rate (Personal Property) | Basic Tax Rate (Real Property) | Basic Tax Rate (Personal Property) |
|---|---|---|---|---|
| Juncos | 4.50 | 4.50 | 6.00 | 4.00 |
| Lajas | 5.50 | 5.50 | 6.00 | 4.00 |
| Lares | 3.25 | 3.25 | 6.00 | 4.00 |
| Las Marías | 1.35 | 1.35 | 6.00 | 4.00 |
| Las Piedras | 3.50 | 2.00 | 6.00 | 4.00 |
| Loíza | 4.90 | 4.90 | 6.00 | 4.00 |
| Luquillo | 2.00 | 2.00 | 6.00 | 4.00 |
| Manatí | 2.75 | 2.75 | 6.00 | 4.00 |
| Maricao | 3.50 | 1.00 | 6.00 | 4.00 |
| Maunabo | 3.00 | 2.00 | 6.00 | 4.00 |
| Mayagüez | 3.75 | 3.75 | 6.00 | 4.00 |
| Moca | 2.75 | 1.75 | 6.00 | 4.00 |
| Morovis | 4.00 | 2.25 | 6.00 | 4.00 |
| Naguabo | 3.00 | 1.70 | 6.00 | 4.00 |
| Naranjito | 3.00 | 3.00 | 6.00 | 4.00 |
| Orocovis | 1.20 | 1.20 | 6.00 | 4.00 |
| Patillas | 3.50 | 3.50 | 6.00 | 4.00 |
| Peñuelas | 1.75 | 1.75 | 6.00 | 4.00 |
| Ponce | 5.50 | 5.50 | 6.00 | 4.00 |
| Quebradillas | 2.00 | 2.00 | 6.00 | 4.00 |
| Rincón | 4.00 | 4.00 | 6.00 | 4.00 |
| Río Grande | 3.50 | 2.00 | 6.00 | 4.00 |
| Sabana Grande | 3.50 | 3.50 | 6.00 | 4.00 |
| Salinas | 3.50 | 3.50 | 6.00 | 4.00 |
| San Germán | 3.25 | 2.75 | 6.00 | 4.00 |
| San Juan | 3.50 | 3.50 | 6.00 | 4.00 |
| San Lorenzo | 3.40 | 3.40 | 6.00 | 4.00 |
| San Sebastián | 2.25 | 2.00 | 6.00 | 3.00 |
| Santa Isabel | 4.00 | 4.00 | 6.00 | 4.00 |
| Toa Alta | 4.50 | 3.50 | 6.00 | 4.00 |
| Toa Baja | 5.00 | 5.00 | 6.00 | 4.00 |
| Trujillo Alto | 3.75 | 3.75 | 6.00 | 4.00 |
| Utuado | 2.00 | 2.00 | 6.00 | 4.00 |
| Vega Alta | 1.85 | 1.85 | 6.00 | 4.00 |
| Vega Baja | 3.50 | 3.50 | 6.00 | 4.00 |
| Vieques | 4.00 | 4.00 | 6.00 | 4.00 |
| Villalba | 2.75 | 3.50 | 6.00 | 4.00 |
| Yabucoa | 4.00 | 4.00 | 6.00 | 4.00 |
| Yauco | 3.50 | 3.50 | 6.00 | 4.00 |

Source: CRIM

The following table provides, for each municipality, the percentage of its property tax revenues derived from real property taxes and personal property taxes during fiscal year 2017.

**Property Tax Collections**

| Municipality | Real Property | Personal Property | Municipality | Real Property | Personal Property |
|---|---|---|---|---|---|
| Adjuntas | 84% | 16% | Juncos | 76% | 24% |
| Aguada | 74% | 26% | Lajas | 84% | 16% |
| Aguadilla | 66% | 34% | Lares | 75% | 25% |
| Aguas Buenas | 83% | 17% | Las Marías | 85% | 15% |
| Aibonito | 68% | 32% | Las Piedras | 71% | 29% |
| Añasco | 64% | 36% | Loíza | 86% | 14% |
| Arecibo | 66% | 34% | Luquillo | 85% | 15% |
| Arroyo | 69% | 31% | Manatí | 58% | 42% |
| Barceloneta | 51% | 49% | Maricao | 70% | 30% |
| Barranquitas | 65% | 35% | Maunabo | 91% | 9% |
| Bayamón | 50% | 50% | Mayagüez | 59% | 41% |
| Cabo Rojo | 86% | 14% | Moca | 70% | 30% |
| Caguas | 55% | 45% | Morovis | 79% | 21% |
| Camuy | 77% | 23% | Naguabo | 76% | 24% |
| Canóvanas | 69% | 31% | Naranjito | 63% | 37% |
| Carolina | 57% | 43% | Orocovis | 81% | 19% |
| Cataño | 30% | 70% | Patillas | 81% | 19% |
| Cayey | 54% | 46% | Peñuelas | 78% | 22% |
| Ceiba | 92% | 8% | Ponce | 52% | 48% |
| Ciales | 82% | 18% | Quebradillas | 77% | 23% |
| Cidra | 60% | 40% | Rincón | 86% | 14% |
| Coamo | 76% | 24% | Río Grande | 81% | 19% |
| Comerío | 77% | 23% | Sabana Grande | 71% | 29% |
| Corozal | 68% | 32% | Salinas | 72% | 28% |

**Property Tax Collections**

| Municipality | Real Property | Personal Property | Municipality | Real Property | Personal Property |
|---|---|---|---|---|---|
| Culebra | 88% | 12% | San Germán | 64% | 36% |
| Dorado | 76% | 24% | San Juan | 60% | 40% |
| Fajardo | 68% | 32% | San Lorenzo | 64% | 36% |
| Florida | 82% | 18% | San Sebastián | 73% | 27% |
| Guánica | 80% | 20% | Santa Isabel | 46% | 54% |
| Guayama | 68% | 32% | Toa Alta | 85% | 15% |
| Guayanilla | 72% | 28% | Toa Baja | 51% | 49% |
| Guaynabo | 57% | 43% | Trujillo Alto | 71% | 29% |
| Gurabo | 78% | 22% | Utuado | 77% | 23% |
| Hatillo | 43% | 57% | Vega Alta | 73% | 27% |
| Hormigueros | 60% | 40% | Vega Baja | 59% | 41% |
| Humacao | 70% | 30% | Vieques | 83% | 17% |
| Isabela | 65% | 35% | Villalba | 67% | 33% |
| Jayuya | 66% | 34% | Yabucoa | 74% | 26% |
| Juana Díaz | 67% | 33% | Yauco | 60% | 40% |

Source: CRIM

*Sales and Use Taxes*

Act No. 117-2006 originally imposed the Commonwealth sales and use tax and authorized municipalities to impose a sales and use tax of 1.5%. However, the FAM Act subsequently changed this framework, imposing a required municipal sales and use tax of 1.0% (the "Municipal SUT") and reallocating the remaining 0.5% to the FAM, a fund created to provide a financial mechanism to finance the debt of the municipalities. Pursuant to Act No. 19-2014, as amended, the Municipal SUT is collected by the Municipal Financing Corporation ("COFIM" by its Spanish acronym). COFIM deposits the first monies collected from the Municipal SUT into the COFIM Redemption Fund until the amounts on deposit therein equal 30% of the revenues attributable to the Municipal SUT or a fixed amount set forth in Act No. 19-2014, as amended. After the required deposits into the COFIM Redemption Fund have been made, excess revenues from the Municipal SUT are distributed to the municipalities based on the sales occurring in each municipality. To the extent the money on deposit in the COFIM Redemption Fund is not used to pay COFIM debt, such amounts are distributed to the municipalities, after the payment of any outstanding advances made by GDB to the municipalities under the COFIM Act. As of the date of this Offering Memorandum, COFIM does not have any debts outstanding. As a result, funds in the COFIM Redemption Fund are available to be disbursed to municipalities, after the payment of any outstanding advances made by GDB to the municipalities under the COFIM Act.

Similar to the Commonwealth sales and use tax, the Municipal SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. Certain items, such as fuel, crude oil and petroleum products and vehicles, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth sales and use tax or the Municipal SUT. Furthermore, unlike the Commonwealth sales and use tax, the Municipal SUT does not apply to services rendered to other merchants or to certain designated professional services.

*Municipal License Tax (Patente)*

Act No. 113 of July 10, 1974, as amended, known as the "Municipal License Tax Act," authorizes the imposition of a municipal license tax (a volume of business tax or "patente") on gross revenues of for-profit entities (not otherwise totally or partially exempt) engaged in any industry or business in a municipality in Puerto Rico. The municipal license tax is imposed based on the volume of business attributable to the operations carried on by the business in each municipality. The municipal license tax rate varies depending on the municipality, but it cannot exceed 0.5% of gross revenues in the case of non-financial businesses and 1.5% of gross revenues in the case of financial businesses.

Each municipality collects the municipal license tax. The municipal license tax declaration is due every year on or before the fifth working day after April 15. The municipal license tax may be paid in two equal installments. The first installment must be paid between July 1 and July 15 following the due date for filing the declaration and the second installment must be paid between January 1 and January 15 of the following year. If the total municipal license tax due is paid on the due date for filing the declaration, a 5% discount for prompt payment will apply.

*Intergovernmental Transfers*

Municipalities receive contributions from the Commonwealth and other Commonwealth government entities. The majority of such contributions are established in the Municipal Tax Act and the CRIM Act, which provide for the following Commonwealth contributions to the municipalities: (i) 2.50% of the net internal revenues of the Commonwealth's general fund; (ii) 35% of the annual net revenues derived from the operation of the additional lottery system created by Act No. 10 of May 24, 1989, as amended (the amounts in clauses (i) and (ii), collectively, the "Designated Commonwealth Contributions"); and (iii) an annual amount from the

Commonwealth's general fund to compensate the municipalities for the Property Tax Exemptions (the amounts in clauses (i) through (iii) the "Commonwealth Contributions"). The contributions in items (i) and (iii) above are subject to appropriations for such purposes being included in the Commonwealth's budget for the corresponding fiscal year. The Commonwealth Contributions are collected or received by CRIM on behalf of each municipality and are allocated by CRIM among the municipalities in accordance with the Municipal Tax Act and the CRIM Act, to the extent sufficient appropriations are received to make all distributions required by such statutes. Municipalities also receive contributions for other purposes, such as the development of specific projects or activities, through appropriations from the Legislative Assembly.

Pursuant to the Revised Commonwealth Fiscal Plan, Commonwealth Contributions, other than the portion corresponding to revenues from the operation of the additional lottery, were reduced by $150 million in fiscal year 2018 and by an additional $45 million in fiscal year 2019 (from approximately $370 million in fiscal year 2017 to approximately $220 million in fiscal year 2018 and approximately $175 million in fiscal year 2019). The Revised Commonwealth Fiscal Plan provides for additional reductions in such appropriations every fiscal year, holding appropriations constant at approximately 45-50% of current levels starting in fiscal year 2022, before ultimately phasing out all appropriations in fiscal year 2024. Furthermore, the transfers received by CRIM from the Commonwealth related to the additional lottery system for distribution among the municipalities during fiscal year 2018 were approximately 34% lower than those received in fiscal year 2017, primarily as a result of the impact of Hurricanes Irma and María on the additional lottery revenues. As a result of the foregoing, Commonwealth Contributions decreased significantly in fiscal year 2018 and are expected to further significantly decrease subsequent fiscal years, resulting in municipalities not receiving from CRIM all distributions required under the Municipal Tax Act and the CRIM Act.

*Federal Grants*

Municipalities are eligible to receive financial assistance under various federal programs. The use of funds received by municipalities under federal assistance programs is restricted by the applicable laws and regulations establishing the program. As a result, such funds are only available for use by municipalities for the purposes and to the extent authorized by such laws and regulations. While the amount of federal assistance received by municipalities in fiscal year 2018 may be higher than that received in previous fiscal years, due to the amount of federal emergency management funds received and to be received by municipalities related to the recovery efforts after Hurricanes Irma and María, such federal assistance may not fully compensate for the reduction in tax revenues and the increase in expenses of the municipalities in fiscal year 2018 related to the hurricanes.

## CRIM

Prior to July 1, 1993, the Secretary of the Treasury collected all municipal taxes upon real and personal property (which includes intangible property) in each municipality. Since July 1, 1993, pursuant to the CRIM Act, CRIM has assumed the Secretary of the Treasury's responsibilities relating to the collection and distribution of such taxes. CRIM is primarily responsible for the appraisal, assessment, notice of imposition, and collection of all municipal property taxes. Act No. 77-2017, however, granted municipalities the authority to collect property taxes directly and to take any action to embargo or foreclose on taxpayer property with prior notice to CRIM. Prior to such amendment, certain municipalities were authorized to collect property taxes directly pursuant to various agreements between CRIM and such municipalities, which require that any funds collected by the municipality be deposited with CRIM. Although the recent amendment also provides that funds collected by the municipalities must be deposited with CRIM, CRIM has yet to approve the regulation that would provide for the enforcement of these provisions. Approximately 97% of all property taxes collected during fiscal year 2017 were collected by CRIM and approximately 3% were collected by the municipalities pursuant to the aforementioned agreements with CRIM. However, a greater percentage of property taxes may be collected by municipalities in subsequent fiscal years as a result of the enactment of Act No. 77-2017 and upon CRIM's approval of the corresponding regulation.

CRIM is governed by a board (the "CRIM Board") composed of the Executive Director of AAFAF, the Commissioner of Municipal Affairs, five mayors belonging to the Governor's political party, and four mayors belonging to the minority party. The mayors elected as members of the CRIM Board hold office for a term of four years (and not more than two consecutive terms) and until their successors have been appointed. The Executive Director of CRIM since February 2018 is Reinaldo Paniagua, and CRIM's principal offices are located at Carretera #1, Km. 17.2, Antiguo Edificio Cruz Azul, San Juan, Puerto Rico 00919. In addition, CRIM operates nine regional centers located in the municipalities of Aguadilla, Arecibo, Bayamón, Caguas, Carolina, Humacao, Mayagüez, Ponce, and San Juan.

Real property is assessed by CRIM (and, in certain cases, by municipalities) and personal property is self-assessed. The current gross assessed valuations for real property and personal property taxes for all municipalities are approximately $8,002 million and $4,624 million, respectively. These assessment values have not been adjusted to reflect the Property Tax Exemptions. As discussed above, no real property reassessment has been made in the Commonwealth since 1958. Therefore, all real property taxes are assessed on the basis of the replacement cost of the related real property in fiscal year 1957-58 values, regardless of when any improvement on such property was constructed.

*Municipal Matching Fund*

The CRIM Act established the Municipal Matching Fund (the "Matching Fund") into which CRIM is required to deposit the total amount collected on account of Basic Taxes and the Commonwealth Contributions (other than the portion corresponding to the compensation for the Property Tax Exemptions). Certain monies in the Matching Fund (the "Equalization Monies") are available to CRIM in order to guaranty that each municipality will receive revenues in an amount at least equivalent to that received from Equalization Monies in the previous fiscal year. The Equalization Monies are made up of: (i) the Designated Commonwealth Contributions; and (ii) a portion of the Basic Tax equal to 1% of the assessed value of personal property and 3% of the assessed value of real property collected by each municipality (the "Designated Basic Tax").

All Equalization Monies are allocated to the municipalities as follows: *first*, as may be required so that each municipality receives at least the same amount of aggregate revenues received during the previous fiscal year on account of Equalization Monies, using first the Designated Commonwealth Contributions, and then, to the extent necessary, the Designated Basic Tax; *second*, Designated Basic Tax revenues remaining in the Equalization Monies are allocated to the municipalities in proportion to the amount by which revenues from their Basic Tax in such fiscal year exceed their Basic Tax revenues in the previous fiscal year; and *third*, to all municipalities based on certain economic and demographic criteria specified in the CRIM Act. The remaining Matching Fund monies are returned to the municipalities whose Basic Tax levies gave rise to such remaining monies, and are used, with their other revenues, to meet operating expenses.

**Municipal Expenses**

Municipalities assume either partial or full responsibility for providing services related to public safety, health, welfare, culture and recreation, education, economic development and other general services to their residents. A significant portion of municipal expenditures are related to the provision of such services. Other major expenditures incurred by municipalities include operating expenses related to municipal management, debt service on outstanding bonds and notes, and pension payments to retired employees. Furthermore, following the impact of Hurricanes Irma and María, municipalities have had to incur and will need to continue to incur significant extraordinary expenses. Such additional expenditures could adversely affect the ability of municipalities to provide certain of the services they have historically provided to their residents while continuing to honor their financial obligations and could require the implementation of extraordinary expense reduction and liquidity management measures.

*Municipal Services.* A brief description of each major category of services currently provided by municipalities follows.

Safety. Each municipality is served by a municipal police department, in addition to the Commonwealth's police department. Each municipal police department is charged with preventing, discovering and investigating crimes committed within the jurisdictional limits of the municipality and enforcing the ordinances and regulations promulgated by the municipality. Each municipal police department operates independently, with the highest authority in the direction of the municipal police being vested in the Mayor of the corresponding municipality.

Health and Welfare. Each municipality is included in the Commonwealth's Health Insurance Program. This program provides health insurance coverage for qualifying low income residents through a managed care system. Under this program, the Government selects, through a bidding system, one private health insurance company in each of the several designated regions in Puerto Rico and pays such insurance company the premiums for each eligible beneficiary in such region. The municipalities pay the Government an amount mandated by law to cover part of the insurance premium paid by the Government for its qualifying residents. Certain municipalities also own or operate hospitals and other healthcare facilities. Further, municipalities operate various types of social welfare programs for the benefit of their residents.

Culture and Recreation. Each municipality develops and promotes a variety of cultural and recreational activities and projects that contribute to the development and appreciation of, among other things, history of each municipality and of Puerto Rico, the arts, literature, cinema, sports, and folklore.

Public Works. Each municipality is responsible for coordinating, among other things, garbage collections, cleaning and maintenance of municipal parks, streets, canals, streams, flood pumps and roads and other services relating to the construction, renovation and maintenance of the municipality's infrastructure.

*Operating Expenses*

Municipalities incur significant expenses related to the management and administration of the municipality, including payroll and professional services.

*Debt Service*

Pursuant to the Municipal Financing Act, municipalities are authorized to borrow money to be evidenced by bonds, notes or other instruments. These include Municipal General Obligations, Operational Loans, Sales Tax Obligations, and Revenue Bonds, among others. A significant portion of the municipalities' revenues are devoted to the payment of debt service on their outstanding indebtedness. For a discussion related to the risks of the amount of issued and outstanding municipal debt on the Municipal Loan Assets, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property—Risks Related to Municipal Obligors and Their Operations—Municipal governments have a significant amount of issued and outstanding indebtedness and, to the extent that their source of revenues is affected by the economy, severe weather events and other external factors, they may be unable to sustain expenses associated with providing essential services to their residents while continuing to honor their debt obligations as they come due.*"

**Pension Obligations**

Substantially all full-time employees of the municipalities participated in ERS. Prior to fiscal year 2018, each municipality was required to make employer contributions to ERS based on a statutory percentage of the municipality's payroll, and ERS would pay pension and other benefits to retirees using the employer and employee contributions it received and its own assets. As ERS exhausted its liquidity, however, the Commonwealth enacted Act 106, which requires that all employers that participate in ERS, including municipalities, transfer to the Commonwealth during each fiscal year an amount equal to the actual pension and other benefits to be paid to retirees of such employer during said fiscal year. These amounts could represent a material increase in the historical pension benefit expense of the municipalities. The aggregate amount required to be transferred by municipalities to the Commonwealth under the pay-as-you-go system during fiscal year 2018 was approximately $160.5 million, of which the Commonwealth had received only approximately $47 million as of May 31, 2018. Pursuant to Act 106, the Retirement Board established under such law may require CRIM to transfer from the unencumbered property taxes of a municipality any amounts owed by such municipality under the pay-as-you-go system. For additional information regarding the potential impact of the pay-as-you-go system on municipalities and the Municipal Loan Assets, see "*Risk Factors—Risks Related to Municipal Obligors and their Operations—The depletion of the assets of the public pension system in which municipalities participated and the change to a pay-as-you-go model could result in a material increase in the pension benefit expenses payable by the municipalities that could materially adversely affect the financial condition of some municipalities and their ability to meet their obligations in full, including the Municipal Loan Assets.*"

## Budgeting Process

The Mayor of each municipality is responsible for preparing and submitting a draft balanced general budget resolution to the applicable Municipal Legislature no later than May of each year. The draft budget resolution must include a budget message and a financing plan. The budget message must include a summary of the principal budget aspects and justification for the principal budget requests. The financing plan must provide, among other things, a summary of municipal expenditures by category, such as salaries, wages, materials, services and permanent works for the upcoming fiscal year, a detailed estimate of resources to cover expenditures, a comparative statement of proposed appropriations and information with respect to each program and its objectives.

The Mayor is required to include in the draft general budget resolution the following items, in order of priority:

1.  interest and amortization payments on public municipal debt;

2.  other statutory obligations or expenses;

3.  payment of judgments;

4.  amounts necessary to cover any prior year deficit;

5.  amounts required to be paid by the municipality under established contractual commitments;

6.  expenses and obligations required to be included by law; and

7.  other operating expenses.

Pursuant to the Autonomous Municipalities Act, the Municipal Legislature may amend the budget resolution, but it may not eliminate or reduce the items set forth in items 1 through 5 above (among others). The Municipal Legislature is required to approve and submit the budget to the Mayor no later than by mid-June of each year, and the Mayor has six days after receipt to approve it or return it to the Municipal Legislature for amendments.

**Overview of Fiscal Situation of Municipalities**

The Commonwealth has been experiencing economic contraction for more than a decade and is currently in the midst of a profound fiscal and economic crisis. Municipalities also face similar challenges. Persistent economic contraction in the Commonwealth has impaired the ability of municipalities to generate tax and other revenues to support their operations and provide services to their residents. Municipal revenues also have been and will continue to be adversely impacted as a result of the decrease in Commonwealth Contributions contemplated in the Revised Commonwealth Fiscal Plan. Furthermore, following the impact of Hurricanes Irma and María, municipalities have had to incur significant extraordinary expenditures, while also experiencing a decrease in revenues. The hurricanes also have negatively affected the Commonwealth's economy and exacerbated the ongoing fiscal crisis, which could also further negatively affect the fiscal situation of its municipalities. For additional discussion of the challenges faced by the Commonwealth, see "*Description of the Commonwealth and its Current Financial Condition—Description of the Commonwealth's Economy and Fiscal Challenges*" in this Offering Memorandum.

Pursuant to the Revised Commonwealth Fiscal Plan, municipalities operate with an annual operating deficit of approximately $260 million and will need to undergo substantial operating model changes or else risk increasing such deficit to approximately $500 million annually, due to, among other things, the additional reductions in Commonwealth Contributions contemplated by the Revised Commonwealth Fiscal Plan.

The Center for Public Policy Research (the "CPPR"), an independent non-profit research organization, published in July 2017 a report titled "Municipal Financial Health Index" (the "Report"), which analyzes and compares the fiscal health of the Commonwealth's municipalities (other than 10 municipalities that did not submit their audited financial statements on time to the CPPR) using various metrics. According to the Report, during fiscal year 2016: (i) 42 municipalities (62% of the municipalities covered by the Report), had an excess of expenditures over revenues, (ii) 36 municipalities (53% of the municipalities covered by the Report) experienced a decrease in their net assets compared to the prior fiscal year, (iii) 34 municipalities (50% of the municipalities covered by the Report) experienced a decrease in their general fund balances compared to the prior fiscal year, (iv) 30 municipalities (44% of the municipalities covered by the Report) had a negative general fund balance, (v) 27 municipalities (40% of the municipalities covered by the Report) used more than 15% of their general fund revenues for the payment of debt service, and (vi) 30 municipalities (44% of the municipalities covered by the Report) received more than 40% of their revenues from the Commonwealth.

The index developed by CPPR to assess the financial health of the municipalities considers the following factors: liquidity, fiscal discipline, debt, and the ability of the municipality to cover its operations with its own recurring revenues. Based on the foregoing factors, the following 10 municipalities were assigned the highest scores in the Report (indicating relatively stronger fiscal health): Fajardo, Isabela, Aibonito, Culebra, Hatillo, Rincón, Cayey, Naguabo, and Peñuelas. The following 10 municipalities were assigned the lowest scores (indicating relatively weaker fiscal health): Salinas, Gurabo, Cabo Rojo, Guayama, Arecibo, Maunabo, Ciales, Ponce, Toa Alta and Arroyo. The following 10 municipalities are not covered by the Report, as they failed to submit their audited financial statements on time to the CPPR: Canóvanas, Ceiba, Cidra, Guánica, Lajas, Loíza, Santa Isabel, Toa Baja, Villalba, and Yauco.

As discussed above, the impact of Hurricanes Irma and María and the reduction in Commonwealth Contributions have resulted in a reduction in municipal revenues and are expected to place additional stress on the fiscal situation of the Commonwealth's municipalities. It is still, however, too early to know the full extent of the impact of the hurricanes and the reduction in Commonwealth Contributions on the economic and fiscal situation of municipalities.

**Federal Community Disaster Loans**

Certain municipalities have obtained CDL Loans from the U.S. federal government under the Community Disaster Loan program of the Stafford Act. The purpose of the CDL Loans is to allow municipalities to continue providing essential services as they recover from hurricanes Irma and María. FEMA announced on July 24, 2018 that nearly $210 million has been approved in CDL Loans for 51 Commonwealth municipalities, up to $5 million per municipality. Loan applications are still pending for other municipalities. The CDL Loans are payable from and secured by a pledge of the municipality's revenues for each year while any of such municipality's CDL Loans are outstanding. Under the Stafford Act, the CDL Loans may be forgiven under certain circumstances. However, to the extent the CDL Loans are not forgiven and a municipality defaults on its CDL Loan, FEMA is authorized to take action to recover the outstanding principal plus related interest under federal debt collection authorities, including administrative offset against other federal funds payable to the municipality and/or referral to the U.S. Department of Justice for judicial enforcement of collection.

**Recent and Pending Legislation Impacting Municipalities**

A number of measures have been filed in the Legislative Assembly in recent months to provide financial assistance and liquidity to municipalities, particularly in the aftermath of Hurricanes Irma and María. Several of such measures have been enacted into law. For instance, recently enacted legislation (i) authorizes municipalities to use certain legislative appropriations, originally assigned for other purposes, for hurricane relief efforts, (ii) amends the Autonomous Municipalities Act to allow municipalities to amortize their existing

debts for up to 45 years (instead of 40 years) for financial statement purposes, and (iii) authorizes government entities to establish payment plans for the debts owed to them by municipalities.

Certain other bills have been approved by the Legislative Assembly, but vetoed by the Governor, including Senate Bill 535, which sought to authorize municipalities to obtain Loans secured by the Excess CAE, and provided that the amount of Excess CAE of each municipality would be determined by CRIM (rather than the Designated Trustee, as currently provided by the Municipal Financing Act). Senate Bill 550 was also recently approved by the Legislative Assembly but vetoed by the Governor. Such bill sought to create an integrated system for the collection and management of property taxes through the establishment of a public-private partnership. Finally, Senate Bill 745, which was also approved by the Legislative Assembly and vetoed by the Governor, would have eliminated the requirement that the Designated Trustee ensure the payment of a municipality's statutory debts (certain debts with Commonwealth government entities and public corporations) prior to disbursing any Excess CAE to such municipality. In the case of Senate Bill 745, the Senate voted to override the Governor's veto. The House of Representatives, however, has not voted to override the Governor's veto as of the date of this Offering Memorandum. For additional information regarding Excess CAE, see "*The Restructuring Property—Detailed Description of the Restructuring Property—Municipal General Obligations*" in this Offering Memorandum.

Several other measures have been filed in the Legislative Assembly, but have not been approved as of the date of this Offering Memorandum, including a measure to eliminate personal property taxes and increase the municipal license tax (House Bill 1411) and a measure to authorize the appraisal of real properties by private appraisers for purposes of real property tax assessments (Senate Bill 857). The latter also seeks to establish that, in the case of properties appraised by private appraisers, real property taxes would be assessed based on 10.55% of the current appraisal value (rather than on 1957-1958 property values) and that all real property tax proceeds derived from such properties would be deposited in the Matching Fund (rather than segregating the portion corresponding to Special Additional Tax for deposit in the GO Redemption Fund). AAFAF has formally expressed its opposition to the enactment of House Bill 1411 and Senate Bill 857 through memoranda (*ponencias*) sent to the relevant legislative commissions.

Finally, there were recent reports regarding a possible elimination of the portion of the personal property taxes corresponding to taxes on inventory in connection with the recent tax reform approved by the Legislative Assembly (House Bill 1544). Such bill, as approved by the Legislative Assembly, does not eliminate such taxes. However, it has been reported that certain legislators are continuing to evaluate such alternative and could be filing legislation to such effect during the next legislative session. The elimination of the portion of personal property taxes corresponding to taxes on inventory, especially if a substitute revenue source is not identified, could adversely affect the financial condition of the municipalities and the repayment of the Municipal Loan Assets.

**THE RESTRUCTURING PROPERTY**

On the Closing Date, and from time to time thereafter, GDB will transfer the Transferred Property to the Issuer pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. Simultaneous with the transfer of the Transferred Property and the issuance of the New Bonds, automatically and without further action, pursuant to the GDB Restructuring Act, the New Bonds will be secured by a statutory lien on the Transferred Property and all Collections thereon (*i.e.*, the Restructuring Property) in favor of the Indenture Trustee for the benefit of the Bondholders. Such statutory lien will attach automatically to any GDB Retained Loan or other asset transferred to the Issuer from GDB after the Closing Date. On and after the Closing Date, the Issuer's assets are expected to consist solely of the Restructuring Property. As described under "*The Issuer—Relationship of the Issuer to GDB; Information Regarding Transferred Property*," the Issuer has not participated in the preparation or review of the information regarding the Restructuring Property or the expected Collections on the Restructuring Property, all of which was provided for use in this Offering Memorandum by GDB.

**Summary Characteristics of the Restructuring Property**

The Restructuring Property will include all legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the Transferred Property and the Collections. The Transferred Property will be made up of a non-homogeneous pool of assets, which have differing rights, conditions and characteristics, and which consist primarily of Loans (as defined herein) of Commonwealth government entities. As used herein, "Loans" means all loans, bonds, notes, lines of credit, letters of credit, interim receipts, reimbursement obligations, subrogation rights, recovery rights, other borrowing titles, obligations of insurance and other financial indebtedness for borrowed money, with each such type of financing referred to herein as a "Loan." Pursuant to the GDB Restructuring Act, the outstanding amount of all Loans of a Commonwealth government entity with GDB will be reduced as of the Closing Date by the amount of the deposits of such Commonwealth government entity with GDB in the manner described in this Offering Memorandum under "*The GDB Restructuring Act—Determination and Payment of Certain Government Obligations.*"

The outstanding balances of all Loans that will be part of the Transferred Property are shown in this section as of the Cutoff Date (but considering any reductions in Loan balances resulting from debt service payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), reflecting the adjustments to be effected pursuant to the GDB Restructuring Act as of the Closing Date (the "Closing Date Adjustments") based on estimated deposit balances as of the Cutoff Date. The Closing Date Adjustments, however, will be effected pursuant to the GDB Restructuring Act on the Closing Date based on the mutual liabilities of GDB and the other Commonwealth government entities as of such date.

All Loan balances shown in this section are preliminary and may vary through the Closing Date, including as a result of the Closing Date Adjustments and payments received or interest accrued on the Loans, among other factors. Furthermore, the Closing Date Adjustments may affect the Maturity Date of certain Loans, since such adjustments will be made by reducing principal installments in inverse order of maturity based on certain specific criteria. The maturity dates shown herein in respect of the Municipal Loan Assets reflect the impact of the Closing Date Adjustments. The maturity dates shown for the other Loans that are part of the Restructuring Property, however, do not reflect the impact of such adjustments.

Below is a brief description of each major category of assets included in the Restructuring Property. For additional information on the Restructuring Property, see "*Detailed Description of the Restructuring Property*" in this Offering Memorandum and, for a discussion of certain material risks associated with the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*" in this Offering Memorandum.

***Municipal Loan Assets.*** The Transferred Property will include various types of Loans made by GDB to Commonwealth municipalities (collectively, the "Municipal Loan Assets"). As of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), the Municipal Loan Assets had an aggregate outstanding principal balance of approximately $1,244.5 million. As of July 3, 2018, Loans representing approximately 92.7% of the aggregate principal balance outstanding of such Municipal Loan Assets (or approximately $1,154 million) were current, and approximately 97.1% of the aggregate principal balance outstanding of all Municipal Loan Assets (or approximately $1,209 million) were classified by GDB as performing Loans. For additional information on how Loans are classified as "current," "performing" or "non-performing," see "*Delinquency and Credit Status of the Loans Comprising the Restructuring Property*" below. These are the only Loans that will be part of the Transferred Property transferred to the Issuer on the Closing Date that were current or classified as performing as of the Cutoff Date. As a result, the Municipal Loan Assets are expected to provide most of the Collections that the Issuer will receive on the Restructuring Property. It is uncertain, however, if and how reduced tax collections by municipalities in the aftermath of Hurricanes Irma and María and other factors, such as the reduction in Commonwealth Contributions to municipalities pursuant to the Revised Commonwealth Fiscal Plan, will affect the payment of the Municipal Loan Assets and whether the amount of non-performing Municipal Loan Assets will increase following the next payment date in January 2019. For additional discussion regarding these risks, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property—The full effect of the damage caused by Hurricanes Irma and María, which struck the Commonwealth in September 2017, is currently unknown, but was significant and may have a material adverse effect on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property*

*and the Issuer's ability to make payments on the New Bonds"* and *"Risk Factors—Risks Related to Municipal Obligors and their Operations—The Revised Commonwealth Fiscal Plan provides for the reduction and eventual elimination of a substantial portion of the central government's subsidy to municipalities, which may adversely affect the ability of municipal governments to continue providing essential services and servicing their debt obligations."*

The Municipal Loan Asset obligors with the five largest principal amounts outstanding are the municipalities of San Juan, Guaynabo, Ponce, Toa Baja and Aguadilla, with outstanding principal balances as of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date) of approximately $220.7 million, $92 million, $71.0 million, $66.1 million, and $55.0 million, respectively. As of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), the aggregate outstanding principal balance of the 10 Municipal Loan Asset obligors with the largest outstanding principal balances is approximately $668.9 million, or approximately 53.8% of all Municipal Loan Assets. The Issuer and the Servicer (on behalf of the Issuer) will have all rights and powers that GDB has in respect of the Municipal Loan Assets, as of immediately prior to the Closing Date, except that (i) the Issuer and the Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser (as defined herein) and (ii) neither the Issuer nor the Servicer will be able to unilaterally increase the interest rate on the Loans. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below.

**Commonwealth Loan Assets.** The Transferred Property will include several Loans made by GDB to the Commonwealth that benefit from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Loan Assets"). As of the Cutoff Date, the Commonwealth Loan Assets had an aggregate outstanding principal balance of approximately $169.4 million and are classified by GDB as non-performing. As further discussed in "*Description of the Commonwealth and its Current Fiscal Condition*" in this Offering Memorandum, the Commonwealth is facing a severe fiscal and economic crisis, is currently in the process of restructuring its debts, including the Commonwealth Loan Assets, in a court-supervised proceeding under Title III of PROMESA, and was impacted by two major hurricanes in 2017. As a result, it is uncertain what recovery, if any, the Issuer will receive on the Commonwealth Loan Assets. In light of the financial condition of the Commonwealth, significant Collections on the Commonwealth Loan Assets are not expected, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections. Moreover, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Loan Assets. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below.

**Commonwealth Guaranteed Loan Asset.** The Transferred Property will include a bond issued by the Port of the Americas Authority (the "PAA") to GDB that is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Guaranteed Loan Asset"). As of the Cutoff Date, the Commonwealth Guaranteed Loan Asset had an outstanding principal balance of approximately $225.5 million and is classified by GDB as non-performing. The PAA does not have a recurring source of revenue and has been historically dependent on legislative appropriations and other Commonwealth subsidies, which the Commonwealth is no longer in a position to provide due to its own fiscal and economic challenges. As a result, it is expected that Collections, if any, on the Commonwealth Guaranteed Loan Asset will come from the Commonwealth under its guarantee, rather than from the PAA. However, the Commonwealth's obligation under its guarantee of the Commonwealth Guaranteed Loan Asset is subject to the Commonwealth's ongoing debt restructuring proceeding under Title III of PROMESA. As a result, it is uncertain what recovery, if any, the Issuer will receive on the Commonwealth Guaranteed Loan Asset. Given the fiscal condition of the Commonwealth and the PAA, which has been further adversely impacted by Hurricanes Irma and María, significant Collections on the Commonwealth Guaranteed Loan Asset are not expected, and the Collection Schedule included herein reflects the assumption that such Loan will not generate Collections. Moreover, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Guaranteed Loan Asset. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below.

**Public Corporation Loan Assets.** The Transferred Property will include Loans made by GDB to various public corporations and instrumentalities of the Commonwealth (the "Public Corporation Loan Assets"). As of the Cutoff Date, the Public Corporation Loan Assets had an aggregate outstanding principal balance of approximately $2,670.8 million and are classified by GDB as non-performing. The Public Corporation Loan Assets consist of a non-homogeneous pool of assets with differing rights, source of repayments and characteristics. However, all Public Corporation Loan Assets have been materially adversely affected by the financial and economic condition of the Commonwealth and its instrumentalities and, more recently, as a result of the impact of Hurricanes Irma and María. Moreover, obligations of HTA with an outstanding principal balance of approximately $1,924.9 million constitute approximately 72.1% of the Public Corporation Loan Assets' outstanding principal balance. HTA is facing significant fiscal challenges and is currently in the process of restructuring its debts, including those to be included as part of the Transferred Property, in a court-supervised proceeding under Title III of PROMESA. While formal debt restructuring proceedings under PROMESA have not been commenced for the other Public Corporation Loan Asset obligors, such entities are also facing significant fiscal challenges and may need to avail themselves of such proceedings in the future. Moreover, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Public Corporation Loan Assets. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Public Corporation Loan Assets are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

**GDB Retained Loan Rights.** The Transferred Property will include the Beneficial Interest in, and the proceeds of (such Beneficial Interest and proceeds, the "GDB Retained Loan Rights"), the GDB Retained Loans, including the Additional Recovery Authority Loans (as defined herein), that will be retained and continue to be serviced by GDB on the Closing Date, pursuant to, and on the terms set forth in, the Qualifying Modification. As of the Cutoff Date (but considering any payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), the GDB Retained Loans had an aggregate outstanding principal balance of approximately $1,131.8 million, of which approximately $144.6 million corresponds to Additional Recovery Authority Loans. All of the GDB Retained Loans (other than the Additional Recovery Authority Loans) are classified by GDB as non-performing. The obligors on the GDB Retained Loans are public instrumentalities of the Commonwealth that face fiscal and economic challenges similar to those faced by the obligors on the Public Corporation Loan Assets. As a result, the amounts, if any, to be received by the Issuer in respect of the GDB Retained Loan Rights are uncertain at this time and are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans (other than the Additional Recovery Authority Loans) will not generate Collections.

All Additional Recovery Authority Loans were classified by GDB as performing as of the Cutoff Date, *provided that*, as further discussed below, a portion of the 2001 CRIM Loan (as defined herein) with an outstanding principal balance of approximately $26.9 million, had been placed by GDB in non-accrual status as of the Cutoff Date. Each Additional Recovery Authority Loan will be transferred to the Issuer as Transferred Property on the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (b) 18 months after the Closing Date. GDB will have certain duties to the Issuer with respect to the GDB Retained Loans and, upon the transfer of the Additional Recovery Authority Loans and any other GDB Retained Loan (at GDB's discretion) to the Issuer, the Issuer will be subject to limitations on its exercise of rights and remedies in respect of such Loan to the same extent as with respect to the Public Corporation Loan Assets.

"Beneficial Interest" means, with respect to any asset or cause of action, the beneficial interest therein, and the right to receive the proceeds (net of expenses associated with realizing such proceeds) thereof, in each case, after giving effect to the rights of GDB as set forth herein; provided that GDB will have no duty to pursue any cause of action on account of a beneficial interest therein and will have the absolute discretion to settle, offset against claims of GDB, or release such cause of action.

For additional information on such duties and limitations, see "*—Management of the Restructuring Property,*" below.

**Real Property Assets.** The Transferred Property will include certain real property located in Puerto Rico (the "Real Property Assets") that was transferred to GDB by the Commonwealth and various public corporations in full or partial payment of Loans of such entities with GDB. As of the dates of the respective appraisals, conducted between 2013 and 2017, the Real Property Assets originally expected to be part of the Transferred Property had an aggregate appraised value of approximately $56.3 million. The aggregate book value of the Real Property Assets, however, was approximately $37.5 million as of December 31, 2017, and the Collections Schedule included herein assumes aggregate Collections of approximately $33.8 million in respect of the Real Property Assets through July 2019 (after the payment of estimated expenses related to the sale of such Real Property Assets), and no Collections with respect to such assets thereafter. However, after the Cutoff Date, GDB sold four of the Real Property Assets that were previously contemplated would be transferred to the Issuer on the Closing Date and for which the Collection Schedule assumed $22.5 million in Collections during 2018 and 2019. The net proceeds of the sale of such Real Property Assets, which were approximately $15.6 million (excluding approximately $900,000 held in escrow pending the satisfaction of certain conditions), are part of the Cash Assets (as defined herein) to be transferred to the Issuer on the Closing Date. GDB is also in negotiations to sell certain of the remaining Real Property Assets. To the extent the sale of any other Real Property Asset is completed prior to the Closing Date, the net proceeds of such sale will also be part of the Cash Assets (as defined herein). The aggregate book value as of December 31, 2017 and the aggregate appraisal value as of the date of the respective appraisals of the remaining Real Property Assets are $17.8 million and $23.1 million, respectively. The realizable value of the Real Property Assets, however, may be significantly lower than the foregoing values and may further decrease in the aftermath of Hurricanes Irma and María.

**Other Loan Assets**. The Transferred Property will include (i) rights associated with a reverse repurchase agreement by and between the Puerto Rico Housing Finance Authority ("HFA") and GDB (the "Repurchase Agreement") and (ii) certain Loans to non-government entities (the "Private Loans" and, collectively with the Repurchase Agreement, the "Other Loan Assets"). The outstanding balance of the obligations of HFA under the Repurchase Agreement was approximately $19.6 million as of the Cutoff Date, and the aggregate outstanding principal balance of the Private Loans was approximately $0.5 million as of the Cutoff Date. The Private Loans include approximately $0.1 million in mortgage Loans (the "Mortgage Loans"). All of the Other Loan Assets (other than the Mortgage Loans) are classified by GDB as non-performing as of the Cutoff Date. The Mortgage Loans were classified by GDB as performing as of the Cutoff Date. It is uncertain what recovery, if any, the Issuer will receive on the Other Loan Assets. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Other Loan Assets are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

**Cash Assets**. The Transferred Property will include the Cash Assets, which will consist of all cash and cash equivalents of GDB as of the Closing Date in excess of (a) the Cash Adjustments (as defined herein) required to pay the permitted uses for which such Cash Adjustments are reserved and (b) $10 million in Excess Reserved Cash, which shall be used to satisfy an obligation of GDB under

the Committee Settlement Stipulation as described herein. As used herein, "Cash Adjustments" means the cash and cash adjustments to be retained by GDB on the Closing Date in the aggregate amount of: (i) the Specified Cash Assets, (ii) cash in the amount of $57.3 million to be used to pay any transaction costs of the Qualifying Modification, including professional fees and expenses of GDB, AAFAF and the professionals to be paid pursuant to the Restructuring Support Agreement, (iii) the 2015-17 Excess CAE Settlement Amount (as defined herein), (iv) cash in the amount of $20 million to be distributed to the Public Entity Trust in satisfaction of certain of GDB's obligations under the Committee Settlement Stipulation (the "Committee Fixed Settlement Amount") (for further information regarding the Committee Settlement Stipulation, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), and (v) cash in the amount of $7 million to be distributed to Siemens Transportation Partnership Puerto Rico, S.E. in satisfaction of GDB's obligations under the Siemens Settlement (for further information regarding the Siemens Settlement, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Siemens Transportation Partnership Puerto Rico, S.E.*").

GDB had approximately $488.3 million in cash as of the Cutoff Date, net of the Cash Adjustments and including payments received by GDB on July 2, 2018 in respect of debt service due on July 1, 2018 (by virtue of rollover to the next business day). Such amount has varied since the Cutoff Date as a result of GDB's operational expenses, cash received by GDB from the repayment of Loans and the sale of Real Property Assets, among other factors. The Cash Assets expected to be transferred to the Issuer on the Closing Date amount to approximately $493.4 million.

***Causes of Action Rights***. The Transferred Property will include (i) the Beneficial Interest in all Causes of Action of GDB, including contingent or unknown causes of action (other than any causes of action to enforce assets that constitute Transferred Property and the Excluded Causes of Action) (such causes of action, the "Retained Causes of Action") and (ii) the Litigation Proceeds (subject to the limitations set forth herein) (the Transferred Property described in (i) and (ii) are referred to collectively herein as the "Causes of Action Rights"). However, the Issuer will not have the right to commence or direct any litigation or other enforcement action in respect of, or to sell, transfer or dispose of the Causes of Action. The value of the Causes of Action Rights, if any, cannot be determined at this time. In addition, GDB will retain all Litigation Proceeds and shall be authorized to use such proceeds (net of any expenses associated with realization of such proceeds) solely to (a) satisfy or resolve any contingent and unliquidated claims against GDB arising on or before the Closing Date (other than those resolved pursuant to the Qualifying Modification or the GDB Restructuring Act) and (b) comply with certain of its obligations under the Committee Settlement Stipulation as described herein (see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"). Upon GDB's sole determination that all such contingent and unliquidated claims and all such obligations under the Committee Settlement Stipulation have been satisfied or resolved, GDB shall transfer to the Issuer the remaining Litigation Proceeds in GDB's possession or control at such time and all Litigation Proceeds received by GDB thereafter within fifteen days after the receipt thereof. For the avoidance of doubt (i) the retention of the Retained Causes of Action by GDB will not affect any rights or defenses of GDB or any third parties with respect to such Retained Causes of Actions; and (ii) none of the Transferred Property (other than the Litigation Proceeds), the GDB Retained Loans, the Cash Adjustments or the proceeds of any of the foregoing shall be used to satisfy or resolve any such contingent and unliquidated claims against GDB.

***Unknown Assets***. The Transferred Property will include the Unknown Assets, which consist of any other assets of GDB in existence at any point from the Cutoff Date up to and including the Closing Date (whether or not identified as of the Cutoff Date) that do not constitute Excluded GDB Assets and are not otherwise identified as Transferred Property. The value of the Unknown Assets, if any, cannot be determined at this time.

The following table shows the allocation of the Transferred Property among such classes of assets as of the Cutoff Date (in the case of Loans, the table reflects the Closing Date Adjustments and considers payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date).

**Allocation of the Transferred Property**

| Asset Class | Balance (in millions) [1] | % of Transferred Property |
|---|---|---|
| Municipal Loan Assets [2] | $1,244.5 | 20.8% |
| Commonwealth Loan Assets [2] | $169.4 | 2.8% |
| Commonwealth Guaranteed Loan Asset [2] | $225.5 | 3.8% |
| Public Corporation Loan Assets [2] | $2,670.8 | 44.6% |
| GDB Retained Loans [3] | $1,131.8 | 18.9% |
| Real Property Assets [4] | $37.5 | 0.6% |
| Other Loan Assets [2] | $20.1 | 0.3% |
| Cash Assets [5] | $488.3 | 8.2% |
| Causes of Action Rights | N/A [6] | N/A [6] |
| Unknown Assets | N/A [7] | N/A [7] |
| Total | $5,988.0 | 100% |

(1) Balance shown does not include accrued and unpaid interest.

(2) Reflects the aggregate outstanding principal balance as of the Cutoff Date, net of the Closing Date Adjustments (if applicable) and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date.

(3) Reflects the aggregate outstanding principal balance as of the Cutoff Date of the GDB Retained Loans, although the Transferred Property includes the GDB Retained Loan Rights, rather than the GDB Retained Loans themselves.

(4) Reflects the aggregate book value of the Real Property Assets as of December 31, 2017.

(5) Reflects the amount of cash and cash equivalents held by GDB as of the Cutoff Date (adjusted for debt service payments received by GDB on July 2, 2018), net of the Cash Adjustments (as estimated at the time of the launch of the Solicitation). The amount of the Cash Adjustments has varied since then as a result of, among other things, increased transaction expenses and expenses related to the settlement of litigation (including the Committee Settlement Stipulation and the Siemens Settlement).

(6) The value of Causes of Action Rights cannot be determined.

(7) The value of Unknown Assets cannot be determined.

Source: GDB

After the Cutoff Date, GDB sold four of the Real Property Assets that were previously contemplated would be transferred to the Issuer on the Closing Date. The book value of the remaining Real Property Assets is approximately $17.8 million. Moreover, GDB's cash has also varied since the Cutoff Date as a result of GDB's operational expenses, cash received by GDB from the repayment of Loans and the sale of Real Property Assets, among other factors. The Cash Assets expected to be transferred to the Issuer on the Closing Date amount to approximately $493.4 million.

**Excluded GDB Assets**

Pursuant to the GDB Restructuring Act and the Qualifying Modification, certain of GDB's assets will not be transferred by GDB to the Issuer, and will not make up any portion of the Transferred Property (the "Excluded GDB Assets"). The Excluded GDB Assets consist exclusively of: (i) the GDB Retained Loans, *provided* that the Beneficial Interests in such GDB Retained Loans will be Transferred Property that is transferred to the Issuer on the Closing Date and all proceeds of such GDB Retained Loans will constitute Transferred Property and be promptly transferred to the Issuer upon receipt thereof, *provided further* that if GDB, at its option, transfers to the Issuer any such Loans at any time, such transferred Loans will constitute Transferred Property upon such transfer, and *provided further* that each of the Additional Recovery Authority Loans will be transferred to the Issuer and will constitute Transferred Property on the date that is the earlier of (x) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (y) 18 months after the Closing Date, (ii) cash and cash equivalents consisting of (A) Cash Adjustments required to pay the permitted uses for which such Cash Adjustments are reserved and (B) up to $10 million in Excess Reserved Cash (as defined herein), if any, to satisfy certain of GDB's obligations under the Committee Settlement Stipulation (see "*Litigation— Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), (iii) the Retained Causes of Action (except the Beneficial Interest therein), (iv) causes of action (a) to enforce Loans that constitute Public Entity Trust Assets or (b) that GDB asserts, or is a party to, exclusively in its capacity as the former fiscal agent and financial advisor to the Government and its instrumentalities and for which the primary economic beneficiary of such cause of action, as of the Closing Date, is a Commonwealth government entity other than GDB, which will be treated as property of those Government entities with an economic interest in such cause of action ((a) and (b), collectively, the "Excluded Causes of Action"), (v) Loans to public agencies and departments of the Commonwealth primarily payable from legislative appropriations, with a principal balance of approximately $890.6 million as of the Cutoff Date (but reflecting the Closing Date Adjustments), to be identified in the Transfer Agreement and transferred to the Public Entity Trust on or after the Closing Date (the "Public Entity Trust Assets"), (vi) Loans with an outstanding principal balance of approximately $12.5 million as of the Cutoff Date securing an account in the name of Asociación de Empleados del ELA (the "Secured Deposit Account") and (vii) office furniture, equipment and other supplies owned by GDB and used in the ordinary course of GDB's business (excluding all such property relating to the Real Property Assets that are Transferred Property), if any; *provided* that any Excess Reserved Cash in excess of $10 million (the

"Residual GDB Cash Assets") will constitute Transferred Property and will be transferred to the Issuer as set forth in the Transfer Agreement.

"Excess Reserved Cash" means the Cash Adjustments in excess of the amounts required to pay the permitted uses for which cash is reserved, if any.

The "Specified Cash Assets" will equal the sum of (a) the Vendor Claim Reserve (as defined herein), (b) $19 million to be transferred by GDB to a new trust pursuant to Article 705 of the GDB Restructuring Act for the payment of certain obligations of GDB to former employees under several pre-retirement programs and (c) $26.5 million for operating cash requirements of GDB and the Public Entity Trust; *provided* that the Vendor Claim Reserve Residual will constitute Transferred Property and, once identified, such Vendor Claim Reserve Residual will be delivered to the Issuer as set forth in the following paragraph.

Cash in the amount of $15 million to be set aside and used for the settlement of claims asserted against GDB by parties that provided goods and services to GDB in the ordinary course of business (such amount at any time, the "Vendor Claim Reserve"), which claims are disputed by GDB on the Closing Date or for which payment has not yet become due ("Open or Disputed Vendor Claims"), will remain at GDB in a separate account subject to a perfected security interest in favor of the Issuer securing GDB's obligation to transfer the Vendor Claim Reserve Residual to the Issuer. Any cash or cash equivalents remaining in the account in respect of the Vendor Claim Reserve after the payment of all Open or Disputed Vendor Claims determined by GDB to be valid (the "Vendor Claim Reserve Residual") will be Excess Reserved Cash.

**Management of the Restructuring Property**

The GDB Restructuring Act and the Qualifying Modification establish certain rights and limitations regarding the management of the Restructuring Property by the Issuer, the Servicer and the Indenture Trustee, as applicable. Pursuant to the Servicing Agreement and as required under the terms of the Bond Indenture, the Issuer will delegate to the Servicer all management of the Restructuring Property (including all day-to-day operations in respect thereof), subject to the rights and limitations established in the GDB Restructuring Act and the Qualifying Modification. Therefore, pursuant to the GDB Restructuring Act, the Qualifying Modification and the Servicing Agreement, the Restructuring Property will be managed in accordance with the following:

1.  The Servicer (on behalf of the Issuer) will have all rights and powers that GDB has in respect of the Municipal Loan Assets, as of immediately prior to the Closing Date, except (i) that the Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser and (ii) as provided in item (8) below.

    An "Approved Purchaser" is a person or entity that is (i) a private or public bank operating in Puerto Rico that holds, or held at any time since the effective date of the GDB Restructuring Act, Loans issued by one or more Commonwealth municipalities or (ii) otherwise approved by AAFAF or another agent designated by the Commonwealth, which entity may take into account the public policy goals of the Commonwealth, which approval will not be unreasonably withheld (taking into account such public policy goals) if so requested.

2.  The Servicer (on behalf of the Issuer) will have the right to exercise remedies in respect of the Public Corporation Loan Assets, the Commonwealth Loan Assets, and the Commonwealth Guaranteed Loan Asset, but solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Loans (consistent with applicable Oversight Board-approved fiscal plans, if any, and Oversight Board-approved budgets, if any) are applied to such Loans in accordance with the applicable Loan documents, legal priority and the security or other pledge rights benefiting the same. Furthermore, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to preserve, protect or defend any priority, security or other pledge rights benefiting such Public Corporation Loan Assets, Commonwealth Loan Assets, and Commonwealth Guaranteed Loan Asset. For any such Loan where the obligor is in a proceeding under Title III or Title VI of PROMESA and such obligor has other creditors that have the same legal priority, security or pledge rights as the Issuer, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to ensure that the Issuer receives treatment in such proceedings that is the same as that provided to other creditors that have the same legal priority, security or pledge rights.

3.  The Servicer (on behalf of the Issuer) may transfer, assign, sell or otherwise dispose of the Restructuring Property (other than the Municipal Loan Assets), or interests in such property, without the consent of AAFAF or any other agent of the Commonwealth provided that such sale is consistent with the servicing standards set forth in the Servicing Agreement.

4.  The Servicer (on behalf of the Issuer) may not enter into any material modification, extension, accommodation, sale or other disposition of any Restructuring Property unless the Collateral Monitor has been given 10 days' prior written notice of such transaction and has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable.

5.  Any modification by GDB of the Additional Recovery Authority Loans will (i) not include any provision that would result in

the removal of any lien, security or other pledge rights benefiting such Loan except to the extent required for the sale of any such collateral where the proceeds of that collateral will be immediately made available to the Issuer and (ii) be approved, if such modification occurs prior to the Closing Date, by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement) or, if such modification occurs after the Closing Date, by the Servicer as commercially reasonable (provided, for the avoidance of doubt, that the Servicer's approval of such modification may only be given after the Collateral Monitor has received 10 days' prior written notice of the approval of the modification and has not objected).

6.   In respect of the GDB Retained Loans, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on such Loans, *provided* that it will not be required to bring any action seeking to obtain a judgment against such public entity or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such Loans.

7.   None of the Issuer, the Servicer, or any other person or entity (other than GDB) will have the right to commence or direct any litigation or other enforcement action in respect of, or sell, transfer or dispose of the Causes of Action.

8.   None of the Issuer, the Servicer, or any other person or entity will have the right to unilaterally increase the fixed interest rate or variable interest rate spread, as applicable, on the Municipal Loan Assets, the Public Corporation Loan Assets, the Commonwealth Loan Assets or the Commonwealth Guaranteed Loan Asset, and such Loans will continue to bear interest at the applicable fixed or variable rates in effect on the Closing Date, as such rates are certified by GDB and AAFAF. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

9.   The Indenture Trustee (upon the occurrence and during the continuance of a Bond Indenture Event of Default or as otherwise provided in the Bond Indenture) and any subsequent holder of any Restructuring Property (upon the sale or transfer of any such Restructuring Property pursuant to the Servicing Agreement) will be subject to all limitations (including the limitations on the exercise of remedies set forth herein) applicable to the Issuer and the Servicer and, unless otherwise contractually limited, will have all rights and remedies in respect of the Restructuring Property to the same extent as the Issuer and the Servicer, except that neither the Indenture Trustee nor any subsequent holder of any Restructuring Property will be bound by the standards set forth in the Servicing Agreement or be required to obtain the Collateral Monitor's consent to dispose of the Restructuring Property or any interest in such assets.

For the avoidance of doubt, the foregoing rights and limitations regarding the management of the Restructuring Property by the Servicer are also applicable to the Issuer pursuant to the GDB Restructuring Act.

GDB, AAFAF and San Juan entered into a settlement agreement to resolve San Juan's claims against GDB and San Juan's objections to the Qualifying Modification. As part of such settlement, the Servicer and the Collateral Monitor entered into certain agreements regarding the Municipal Loan Assets, as described under "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Various Municipalities—Settlement of Litigation with the Municipality of San Juan.*"

**Origination of the Loans Comprising the Restructuring Property**

GDB is a public corporation and instrumentality of the Commonwealth created under Act No. 17 of September 23, 1948, as amended (the "GDB Enabling Act"). One of GDB's main functions under the GDB Enabling Act was to provide financing to the Commonwealth, its instrumentalities and its municipalities. GDB traditionally served as interim lender to such entities in anticipation of the issuance of bonds and notes and provided Loans to such entities to finance capital works, budget deficits, and collateral requirements under swap agreements, and to meet mandatory payment obligations. The Loans comprising the Restructuring Property (other than the Private Loans) were originated by GDB in its statutory role as lender to Commonwealth government entities, and pursuant to applicable legislation.

The Municipal Loan Assets, which are expected to provide most of the Collections from the Restructuring Property, were originated by GDB in accordance with the provisions of the Municipal Financing Act. GDB, in its prior capacity as fiscal agent and financial advisor to the Commonwealth, its instrumentalities and its municipalities, was required to determine if each municipality had sufficient available legal margin and payment capacity, as applicable, to incur such Loans pursuant to the requirements of the Municipal Financing Act and the regulations issued thereunder. As further discussed below, GDB expected to be able to monetize the Municipal General Obligations, which are a significant portion of the Municipal Loan Assets, through the sale of such Loans to the Puerto Rico Municipal Finance Agency ("MFA"), which historically issued bonds secured by the revenues generated by Municipal General Obligations acquired by MFA. However, an MFA transaction was not completed and, as a result, GDB was not able to monetize such Loans.

A significant portion of the remaining Loans were originated by GDB in anticipation of the issuance of long-term debt by the Commonwealth and the other obligors thereunder or were otherwise expected to be repaid with the proceeds of future bond issuances or from future legislative appropriations. At the time of the origination of most of such Loans, the Commonwealth and its instrumentalities had investment grade credit ratings and reasonable access to the capital markets. However, as the economic and fiscal situation of the Commonwealth deteriorated, and the credit ratings of the Commonwealth and its instrumentalities were downgraded to non-investment grade, such entities lost access to the capital markets. The lack of access to the capital markets, coupled with deteriorating economic and fiscal conditions in the Commonwealth, resulted in the Commonwealth and its instrumentalities not being able to repay their indebtedness to GDB.

### General Characteristics of the Transferred Property

Below is certain data regarding the composition of the Municipal Loan Assets, which are expected to provide the majority of the Collections generated by the Restructuring Property, and of the other Loans constituting Restructuring Property as of the Closing Date (consisting of the Commonwealth Loan Assets, the Commonwealth Guaranteed Loan Asset, the Public Corporation Loan Assets, and the Private Loans), which have been classified by GDB as non-performing (except for the Mortgage Loans) and are not expected to generate material Collections (and for which the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections). The following information is based on unaudited information of GDB about the assets to be included in the Transferred Property as of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date). For information on the risks relating to the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*." For additional discussion of risks related to the Issuer and the information contained herein, see "*Risk Factors—Risks Related to the Issuer*."

### Municipal Loan Assets

**General Characteristics**
**Municipal Loan Assets**

| | |
|---|---|
| Aggregate Outstanding Principal Balance | $1,244.5 million |
| Range of Principal Balances | $557–$64.3 million |
| Weighted Average Effective APR[1] | 5.46% |
| Range of Effective APRs[2] | 2.34%–7.75% |
| Weighted Average Maturity Date[3] | July 1, 2032 |
| Range of Maturity Dates[4] | January 1, 2019– July 1, 2040 |

(1) Weighted by principal balance as of the Cutoff Date. Most of the Municipal Loan Assets bear interest at variable rates, based on the three-month London Interbank Offered Rate ("LIBOR") or the U.S. Prime Rate (the "Prime Rate") plus a spread, subject to a legal interest rate limit of 12%. Certain of the Municipal Loan Assets are also subject to an interest rate floor (ranging from 2.3% to 7.0%).

(2) Excludes three Loans with an aggregate principal balance of approximately $1.19 million, each of which has a 0% stated interest rate.

(3) Weighted by principal balance as of the Cutoff Date. Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

(4) Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

Source: GDB

### Non-Municipal Loan Assets

**Characteristics**
**Non-Municipal Loan Assets**

| | |
|---|---|
| Aggregate Outstanding Principal Balance | $4,217.7 million |
| Range of Principal Balances[1] | $6 – $398 million |
| Weighted Average Effective APR[2] | 3.48% |
| Range of Effective APRs | 4.11%–12% |
| Weighted Average Maturity Date[3] | July 1, 2025 |
| Range of Maturity Dates[4] | December 31, 1991 –January 1, 2045 |

(1) The principal balances of the Private Loans range from $6 to $89,532 and the principal balances of the Commonwealth Loan Assets, the Commonwealth Guaranteed Loan Asset and the Public Corporation Loan Assets range from $995,450 to $398 million.

(2) Weighted by principal balance as of the Cutoff Date. Certain of the Loans bear interest at variable rates, based on LIBOR or the Prime Rate plus a spread, subject to a floor (ranging from 6.0%-6.5%), and a legal interest rate limit of 12%.

(3) Weighted by principal balance as of the Cutoff Date. Includes approximately $1.9 billion in Loans with past due maturities or no stated maturity dates. Based on contracted maturity dates (not including impact of Closing Date Adjustments).

(4)  Includes approximately $1.9 billion in Loans with past due maturities or Loans with no stated maturity dates.
Based on contracted maturity dates (not including impact of Closing Date Adjustments).

Source: GDB

## Delinquency and Credit Status of the Loans Comprising the Restructuring Property

The table below presents the aggregate outstanding principal balance of Loans in each category and subcategory of Restructuring Property assets that were current two business days after the Cutoff Date (i.e., the day after the July 1, 2018 payments were due by virtue of rollover to the next business day from the Cutoff Date) and those that, as of such date, were past due by the number of days specified in each column below. Furthermore, the table also illustrates the outstanding principal balance of the Loans in each category and subcategory of the Restructuring Property that were classified by GDB as performing and non-performing as of such date. A Loan is classified by GDB as performing if it is current or not more than 90 days past due and as non-performing if it is more than 90 days past due. Past due loans classified as performing in the table below would become non-performing if they become 90 days or more past due.

The data presented herein is for illustrative purposes only and may not accurately reflect the ability of an obligor to repay its Loans when due. For instance, Loans that have been refinanced, restructured or for which a payment plan has been established due to the obligor being unable to repay the debt service as originally scheduled are not deemed by GDB to be, and not reflected herein as, past due, to the extent that the obligor has complied with the refinanced or restructured Loan or payment plan. Therefore, the obligors of certain Loans that are shown as current or performing Loans may not actually have the resources to honor their obligations as they become due. In particular, even though all Municipal General Obligations are reflected as current in the table below, certain municipalities did not have sufficient funds in the Municipal Public Debt Redemption Fund (the "GO Redemption Fund") account at Banco Popular de Puerto Rico ("BPPR") to make the full principal and interest payments on their Municipal General Obligations due on July 1, 2018, and made such payments with an extraordinary aggregate disbursement of approximately $5.2 million from such municipalities' deposits with GDB. Such deficiency was primarily due to (i) a portion of the GO Redemption Fund being deposited with GDB and subject to restrictions on withdrawal and (ii) decreased property tax collections following Hurricanes Irma and María. For additional information regarding the July 1, 2018 payment on Municipal General Obligations, see "*Detailed Description of the Restructuring Property—Municipal Loan Assets—Municipal General Obligations—Estimated Fiscal Year 2018 Debt Service Coverage*," below.

Furthermore, there is no assurance that the Issuer's delinquency experience with respect to the Restructuring Property will be similar to that described below. In particular, it is uncertain if and how reduced tax collections by municipalities in the aftermath of Hurricanes Irma and María and other factors, such as the reduction in Commonwealth Contributions to municipalities pursuant to the Revised Commonwealth Fiscal Plan, will affect the payment of the Municipal Loan Assets and whether the amount of non-performing Municipal Loan Assets will increase following the next payment date on January 1, 2019. For additional information on the risks relating to the effect of Hurricanes Irma and María on the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*."

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Loan Delinquency Statistics[1]** | | | | | |
| | **Performing** | | | **Non-Performing** | | |
| Category | Current | 1–29 days past due | 30–89 days past due | 90–179 days past due | > 180 days past due | Total Outstanding Principal Balance |
| Municipal Loan Assets ...................................... | | | | | | |
| *Municipal General Obligations* ................... | $768,628,411 | - | - | - | - | $768,628,411 |
| *Sales Tax Obligations* ................................ | 308,409,058 | $5,206,271 | - | - | - | 313,615,329 |
| *Operational Loans* ..................................... | 77,112,314 | - | - | - | - | 77,112,314 |
| *Revenue Loans* ........................................... | - | 49,692,375 | - | - | - | 49,692,375 |
| *Municipal Lines of Credit* ......................... | - | - | - | - | $ 35,473,554 | 35,473,554 |
| Commonwealth Loan Assets.......................... | - | - | - | - | 169,438,038 | 169,438,038 |
| Commonwealth Guaranteed Loan Asset ........... | - | - | - | - | 225,533,700 | 225,533,700 |
| Public Corporation Loan Assets........................ | - | - | - | - | 2,670,798,011 | 2,670,798,011 |
| Private Loans ................................................. | 131,918 | - | - | - | 339,948 | 471,866 |
| GDB Retained Loans ...................................... | 117,769,180 | - | - | - | 1,014,053,886 | 1,131,823,066 |
| Total ............................................................. | $1,272,050,881 | $54,898,646 | - | - | $4,115,637,137 | $5,442,586,664 |

[1] Loan balances are shown as of the Cutoff Date but considering any payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date, and reflecting the Closing Date Adjustments.

Source: GDB

**Detailed Description of the Restructuring Property**

### *Municipal Loan Assets*

The Municipal Loan Assets consist of Loans issued by GDB to Puerto Rico municipalities pursuant to the Municipal Financing Act and are divided into the following sub-categories: (i) Municipal General Obligations, payable primarily from *ad valorem* taxes and backed by the good faith, credit and taxing power of the issuing municipality, (ii) special obligation Loans of municipalities payable from the municipal sales and use tax ("Sales Tax Obligations"), (iii) special obligation Loans of municipalities payable from the operating revenues of such municipalities (the "Operational Loans"), (iv) Loans of municipalities payable primarily from the revenues generated by the project or system financed with the bond proceeds (the "Revenue Loans") and (v) lines of credit issued by GDB to municipalities and which do not have a specified source of repayment (the "Municipal Lines of Credit"). The Sales Tax Obligations, the Operational Loans, the Revenue Loans and the Municipal Lines of Credit are not general obligations of the municipalities and are not backed by the good faith, credit and taxing power of the municipalities.

The following table summarizes the distribution of the Municipal Loan Assets among the different subcategories. The general characteristics of each subcategory are described below. Each of the following Loan balances is shown as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018 by virtue of rollover to the next business day from the Cutoff Date. For additional discussion regarding the GDB Restructuring Act and the Closing Date Adjustments, see "*The GDB Restructuring Act—Determination and Payment of Certain Government Obligations.*"

**Allocation of the Municipal Loan Assets**

| Subcategory of Municipal Loan Assets | Outstanding Principal Balance (in millions)[1] | % of Total Outstanding Principal Balance of Municipal Loan Assets |
|---|---|---|
| Municipal General Obligations | $768.6 | 62% |
| Sales Tax Obligations | 313.6 | 25% |
| Operational Loans | 77.1 | 6% |
| Revenue Loans | 49.7 | 4% |
| Municipal Lines of Credit | 35.5 | 3% |
| Total | $1,244.5 | 100% |

[1] Does not include accrued and unpaid interest.

Source: GDB

### *Municipal General Obligations*

***General.*** The Municipal General Obligations are Loans of a municipality payable from *ad valorem* taxes, without limitation as to rate or amount, on all taxable real and personal property within the boundaries of such municipality. The good faith, credit and taxing power of each municipality are pledged to the payment of its Municipal General Obligations. As authorized pursuant to the Municipal Financing Act and the municipal resolutions or ordinances authorizing the issuance of Municipal General Obligations, the Municipal General Obligations that will be part of the Restructuring Property are evidenced by interim receipts (the "Interim Receipts") issued by the corresponding municipality pending the issuance of final bonds or notes. Pursuant to the Interim Receipts, municipalities are required to issue definitive bonds or notes to the holder thereof upon the surrender of the Interim Receipt to GDB. The corresponding definitive bonds or notes have not been issued as of the Cutoff Date and will not be issued prior to the Closing Date and, therefore, GDB continues to hold the Interim Receipts and will transfer the Interim Receipts to the Issuer on the Closing Date. Pursuant to the terms of the Interim Receipts, the holder thereof is entitled to all rights and privileges of a holder of definitive bonds or notes, which includes, without limitation, the payment of the scheduled debt service and the protections afforded to other Municipal General Obligation holders under the Municipal Financing Act and other relevant statutes.

Pursuant to the Interim Receipts, interest on the Municipal General Obligations is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. The Interim Receipts also provide that the Municipal General Obligations bear interest at the rate of 12% per annum or at such other rate or rates of interest as may be determined by GDB. GDB has set the rate for the Municipal General Obligations at variable rates (with limited exceptions) based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.34% to 7%). Pursuant to the GDB Restructuring Act, none of the Issuer, the Servicer, or any other person or entity will have the right to unilaterally increase the interest rate (that is, increase the spread over the applicable benchmark rate) on the Municipal General Obligations, and such Loans will continue to bear interest at the applicable variable rates in effect as of the Closing Date, as such rates are certified by AAFAF and GDB. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

The following table shows the Municipal General Obligations that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018 by virtue of rollover to the next business day from the Cutoff Date.

**Municipal General Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Municipal General Obligations |
|---|---|---|---|---|---|
| Adjuntas | $1,019,613 | 2 | 3.6% | 7/1/2029 | 0.1% |
| Aguada | 1,010,120 | 2 | 4.0% | 7/1/2031 | 0.1% |
| Aguadilla | 17,933,585 | 7 | 5.2% | 7/1/2035 | 2.3% |
| Aguas Buenas | 749,130 | 1 | 3.6% | 7/1/2025 | 0.1% |
| Aibonito | 491,714 | 2 | 5.9% | 7/1/2037 | 0.1% |
| Añasco | 1,155,714 | 2 | 3.6% | 7/1/2033 | 0.2% |
| Arecibo | 10,062,892 | 6 | 6.0% | 7/1/2038 | 1.3% |
| Arroyo | 1,690,628 | 3 | 4.6% | 7/1/2031 | 0.2% |
| Barceloneta | 13,686,063 | 8 | 4.8% | 7/1/2036 | 1.8% |
| Cabo Rojo | 13,972,290 | 3 | 6.3% | 7/1/2038 | 1.8% |
| Caguas | 9,493,042 | 2 | 6.3% | 7/1/2038 | 1.2% |
| Camuy | 1,274,981 | 2 | 4.4% | 7/1/2026 | 0.2% |
| Canóvanas | 11,453,179 | 6 | 6.3% | 7/1/2034 | 1.5% |
| Cayey | 11,073,466 | 5 | 5.3% | 7/1/2033 | 1.4% |
| Ceiba | 285,405 | 1 | 6.3% | 7/1/2034 | 0.0% |
| Ciales | 2,000,066 | 3 | 6.3% | 7/1/2036 | 0.3% |
| Cidra | 4,870,671 | 2 | 4.3% | 7/1/2032 | 0.6% |
| Coamo | 2,949,771 | 3 | 5.3% | 7/1/2036 | 0.4% |
| Comerío | 634,585 | 2 | 6.3% | 7/1/2035 | 0.1% |
| Corozal | 1,800,136 | 1 | 6.3% | 7/1/2027 | 0.2% |
| Dorado | 30,081,215 | 14 | 5.9% | 7/1/2036 | 3.9% |
| Florida | 228,380 | 1 | 6.3% | 7/1/2030 | 0.0% |
| Guánica | 2,462,204 | 2 | 6.1% | 7/1/2037 | 0.3% |
| Guayama | 9,873,390 | 2 | 6.3% | 7/1/2026 | 1.3% |
| Guayanilla | 3,682,000 | 6 | 5.3% | 7/1/2034 | 0.5% |
| Guaynabo | 70,531,737 | 8 | 6.1% | 7/1/2035 | 9.2% |
| Gurabo | 16,338,398 | 5 | 4.4% | 7/1/2034 | 2.1% |
| Hormigueros | 87,659 | 1 | 3.6% | 7/1/2021 | 0.0% |
| Isabela | 3,355,590 | 3 | 4.7% | 7/1/2027 | 0.4% |
| Jayuya | 433,339 | 2 | 5.6% | 7/1/2035 | 0.1% |
| Juana Díaz | 5,289,736 | 4 | 4.7% | 7/1/2033 | 0.7% |
| Juncos | 18,957,183 | 5 | 5.4% | 7/1/2034 | 2.5% |
| Lajas | 3,738,484 | 2 | 5.6% | 7/1/2039 | 0.5% |
| Las Piedras | 10,353,160 | 3 | 6.2% | 7/1/2036 | 1.3% |
| Loíza | 4,781,767 | 6 | 5.5% | 7/1/2037 | 0.6% |
| Luquillo | 3,440,270 | 3 | 4.1% | 7/1/2032 | 0.4% |
| Manatí | 15,425,246 | 8 | 5.7% | 7/1/2037 | 2.0% |
| Maricao | 397,774 | 2 | 3.8% | 7/1/2028 | 0.1% |
| Maunabo | 2,468,948 | 4 | 5.3% | 7/1/2034 | 0.3% |
| Mayagüez | 8,745,791 | 2 | 6.3% | 7/1/2026 | 1.1% |
| Moca | 3,646,820 | 5 | 5.6% | 7/1/2034 | 0.5% |
| Morovis | 574,115 | 1 | 6.3% | 7/1/2025 | 0.1% |
| Naguabo | 1,194,909 | 1 | 6.3% | 7/1/2036 | 0.2% |
| Naranjito | 4,631,961 | 2 | 5.3% | 7/1/2034 | 0.6% |
| Orocovis | 741,599 | 2 | 3.6% | 7/1/2031 | 0.1% |
| Patillas | 3,027,864 | 3 | 6.0% | 7/1/2036 | 0.4% |
| Peñuelas | 3,464,464 | 4 | 3.8% | 7/1/2032 | 0.5% |
| Ponce | 59,462,949 | 7 | 6.3% | 7/1/2038 | 7.7% |
| Quebradillas | 2,196,688 | 3 | 4.7% | 7/1/2031 | 0.3% |
| Río Grande | 14,202,727 | 5 | 5.2% | 7/1/2037 | 1.8% |
| Sabana Grande | 1,521,765 | 3 | 5.5% | 7/1/2033 | 0.2% |
| Salinas | 5,870,496 | 4 | 6.0% | 7/1/2037 | 0.8% |
| San Germán | 408,250 | 1 | 7.0% | 7/1/2025 | 0.1% |
| San Juan | 185,908,419 | 6 | 5.8% | 7/1/2038 | 24.2% |
| San Lorenzo | 8,401,111 | 6 | 5.2% | 7/1/2037 | 1.1% |

**Municipal General Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Municipal General Obligations |
|---|---|---|---|---|---|
| San Sebastián | 7,904,699 | 7 | 6.0% | 7/1/2038 | 1.0% |
| Santa Isabel | 10,183,094 | 5 | 5.6% | 7/1/2034 | 1.3% |
| Toa Alta | 10,874,853 | 5 | 6.0% | 7/1/2029 | 1.4% |
| Toa Baja | 63,209,257 | 7 | 6.0% | 7/1/2037 | 8.2% |
| Trujillo Alto | 19,175,274 | 6 | 6.0% | 7/1/2038 | 2.5% |
| Utuado | 84,284 | 1 | 3.6% | 7/1/2019 | 0.0% |
| Vega Alta | 2,342,898 | 2 | 6.3% | 7/1/2024 | 0.3% |
| Vega Baja | 14,351,790 | 10 | 5.6% | 7/1/2035 | 1.9% |
| Vieques | 2,785,152 | 4 | 5.6% | 7/1/2036 | 0.4% |
| Villalba | 556,302 | 2 | 6.0% | 7/1/2031 | 0.1% |
| Yabucoa | 7,210,235 | 5 | 5.4% | 7/1/2038 | 0.9% |
| Yauco | 16,417,111 | 16 | 6.1% | 7/1/2038 | 2.1% |
| Total | $768,628,411 | 269 | - | - | 100% |

Source: GDB

***Source of Repayment.*** The principal source of payment for Municipal General Obligations is the Special Additional Tax, which, as provided by the Municipal Tax Act, may be imposed by a municipality without limitation as to rate or amount on all taxable real and personal property within a municipality. Under the Municipal Financing Act, each municipality is required to levy the Special Additional Tax in such amounts as will be required for the payment of all its outstanding Municipal General Obligations. The Special Additional Tax rates for municipalities for fiscal year 2019 vary from 1.2% to 5.5% of the applicable assessed valuation in the case of real property and from 1.0% to 4.9% of the applicable assessed valuation in the case of personal property. Real property taxes in the Commonwealth are assessed based on fiscal year 1957-1958 property values, since no real property reassessment has been made since then. Construction taking place after fiscal year 1957-1958 has been assessed on the basis of what the value of the property would have been in fiscal year 1957-1958.

Real property taxes are payable semi-annually on January 1 and July 1 of each year and personal property taxes are payable annually on May 1 of each year. Certain specific discounts are established by law in both cases to incentivize early or prompt payment. *Ad valorem* taxes on real and personal property, including the Special Additional Tax, are generally collected on behalf of the municipalities by CRIM. Act No. 77-2017, however, granted municipalities the authority to collect property taxes directly and to take any action to embargo or foreclose on taxpayer property with prior notice to CRIM. Prior to such amendment, certain municipalities were authorized to take such actions pursuant to various agreements between CRIM and such municipalities, which require that any funds collected by the municipality be deposited with CRIM. Although the recent amendment also provides that funds collected by the municipalities must be deposited with CRIM, CRIM has yet to approve the regulation that would provide for the enforcement of these provisions. Approximately 97% of all property taxes collected during fiscal year 2017 were collected by CRIM and approximately 3% were collected by the municipalities pursuant to the aforementioned agreements with CRIM. However, a greater percentage of property taxes may be collected by municipalities in subsequent fiscal years as a result of the enactment of Act No. 77-2017 and upon CRIM's approval of the corresponding regulation. For additional information regarding municipal property taxes see, "*Municipalities— Municipal Revenues—Major Categories of Revenue—Municipal Property Taxes*" in this Offering Memorandum.

The proceeds of the Special Additional Tax are required by law to be deposited in the GO Redemption Fund and used for the payment of Municipal General Obligations. To the extent that the funds in a municipality's GO Redemption Fund exceed the amount necessary to cover 12 months' debt service on such municipality's then outstanding Municipal General Obligations, as determined by AAFAF, and to pay such municipality's statutory debts (certain debts with Commonwealth government entities and public corporations), the Municipal Financing Act requires the disbursement of such excess to the municipality, at its request, once during each fiscal year. Such excess is generally referred to as "Excess CAE." The Municipal General Obligations that are part of the Restructuring Property consist of long-term Loans provided by GDB with level debt service payments that amortize such Loans through their maturity date. Certain municipalities, however, have outstanding Municipal General Obligations with private financial institutions with shorter maturities and whose amortization schedules include bullet maturities or balloon payments ("Balloon Payments"). In calculating the 12 months' debt service reserve for purposes of disbursing Excess CAE, AAFAF assumes the refinancing of such Loans on or before the due date of any Balloon Payments and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments. Hence, if a municipality is unable to refinance any scheduled Balloon Payments under similar repayment terms, the 12 months' debt service reserve may not be sufficient to cover in full the next payments of principal and interest due on such municipality's Municipal General Obligations. For a discussion of the risks related to the Balloon Payments on the municipalities' Loans with private financial institutions, see "*Risk Factors—Risks Related to the Restructuring Property—General Risks Related to the Restructuring Property—Certain assets that constitute the Restructuring Property share their source of repayment*

*with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property."*

Prior to the enactment of the GDB Restructuring Act, the Municipal Financing Act provided that the GO Redemption Fund would constitute a trust established by CRIM with GDB. Until 2015, the entire GO Redemption Fund was deposited with GDB. In June 2015, CRIM filed a mandamus action against GDB in the Court of First Instance, San Juan Part, requesting that GDB execute a deed of trust with respect to the GO Redemption Fund. CRIM and GDB settled such case and executed the corresponding deed of trust in November 2015. Pursuant to such deed of trust, the GO Redemption Fund was divided into two separate sub-funds, one of which would be invested in GDB deposits and used for the payment of Municipal General Obligations held by GDB, and the other one would be invested in certain qualified instruments and used for the payment of Municipal General Obligations held by private financial institutions and MFA (known as the "Private Sub-Fund"). The Private Sub-Fund was, and continues to be as of the Cutoff Date, invested in deposits with BPPR. This structure was in place until April 2016, when, upon the imposition of restrictions on the withdrawal of funds on deposit with GDB, no additional Special Additional Tax revenues were transferred to GDB. Thereafter, all Special Additional Tax revenues have been deposited by CRIM at BPPR and have been kept in two accounts as follows: (i) in the Private Sub-Fund, an amount based on the debt service payable on the Municipal General Obligations held by private financial institutions and MFA and (ii) in a separate account at BPPR, an amount based on the debt service payable on the Municipal General Obligations held by GDB.

As of the Cutoff Date, of the approximately $563.9 million in the GO Redemption Fund, approximately $238.5 million is on deposit with GDB and approximately $325.4 million is on deposit with BPPR. However, as recognized by the GDB Restructuring Act and the Qualifying Modification, funds on deposit with GDB are no longer considered available for the payment of Municipal General Obligations or otherwise available to the municipalities given GDB's current financial situation and the applicable restrictions on withdrawals of GDB deposits. Approximately $39.3 million of the GO Redemption Fund monies on deposit with GDB correspond to proceeds of the Special Additional Tax that were certified by GDB as Excess CAE of certain municipalities in fiscal years 2015 through 2017 ("2015-17 Excess CAE"). Pursuant to the GDB Restructuring Act, 55% of such 2015-17 Excess CAE, or approximately $21.6 million, has been or will be disbursed to the corresponding municipalities on or prior to the Closing Date, and the remaining 45% of the 2015-17 Excess CAE, or approximately $17.7 million, will be discharged. Of the total amounts required to be disbursed to municipalities in satisfaction of their 2015-17 Excess CAE, approximately $2.5 million remains to be disbursed as of the date of this Offering Memorandum (the "2015-17 Excess CAE Settlement Amount").

The GDB Restructuring Act amended the Municipal Financing Act to, among other things, replace GDB with the "Designated Trustee," as trustee of the GO Redemption Fund. As amended, the Municipal Financing Act provides that the "Designated Trustee" will be AAFAF or one or more private financial institutions designated by AAFAF. AAFAF has recently assumed such responsibility, and AAFAF and CRIM are expected to execute a new deed of trust in respect of the municipal funds collected by CRIM. On and after the Closing Date, the GO Redemption Fund is expected to consist of one account to be held at a private financial institution, with separate accounting within such account for each municipality.

***Security***. The Municipal Financing Act provides for a first lien in respect of Municipal General Obligations that operates as follows: (i) the Special Additional Tax is collected and transferred to the GO Redemption Fund, (ii) to the extent that a municipality's funds in the GO Redemption Fund are insufficient to satisfy the payment in full of such municipality's Municipal General Obligations, as determined by the Designated Trustee, CRIM will deposit in the GO Redemption Fund other revenues subject to the first lien to cover such insufficiency, and (iii) the Designated Trustee will use the funds in the GO Redemption Fund to pay, on behalf of the municipality, the principal and interest on such municipality's Municipal General Obligations. The Municipal Financing Act provides that the Special Additional Tax and other amounts deposited in the GO Redemption Fund are to be utilized first for the payment of the principal of and premium, if any, and interest on each municipality's Municipal General Obligations. The nature of the lien provided for in the Municipal Financing Act, however, has recently been subject to challenge. For further information regarding such challenge, see "*Risk Factors — Risks Related to the Restructuring Property—General Risks Related to the Restructuring Property—The statutory provisions purporting to secure, dedicate or pledge the revenue streams benefiting the Loans that constitute Restructuring Property are untested and may prove to be ineffective in bankruptcy or otherwise.*"

***Flow of Funds***. The following diagram illustrates the flow of funds for the payment of Municipal General Obligations. For a description of the flow of funds under the Bond Indenture after deposit in the Collection Account, see "*Summary of Distributions of Cash from the Collection Account*" in this Offering Memorandum.



---

(1) Municipalities are authorized to collect property taxes directly pursuant to individual agreements with CRIM and will be able to collect property taxes pursuant to certain amendments introduced by Act No. 77-2017 upon approval of regulation to that effect by CRIM.

(2) As further discussed under "*Municipalities*" in this Offering Memorandum, municipalities receive certain appropriations from the Commonwealth's general fund that are distributed by the Commonwealth to CRIM and by CRIM to the applicable municipalities.

(3) Pursuant to the Municipal Financing Act, the Designated Trustee will request that CRIM transfer additional property tax revenues of a municipality to the extent that the funds in the GO Redemption Fund corresponding to such municipality are insufficient for the payment of its Municipal General Obligations. See "*Municipalities*" in this Offering Memorandum for information regarding the Matching Fund.

(4) Pursuant to the Municipal Financing Act, municipalities may request the disbursement of funds in the GO Redemption Fund in excess of the required 12-month reserve one time during each fiscal year.

***Estimated Fiscal Year 2018 Debt Service Coverage***. The following table presents for each municipality a debt service coverage ratio analysis based on (i) the aggregate contractual debt service due on all outstanding Municipal General Obligations of such municipality on January 1, 2018 and July 1, 2018, (ii) the aggregate debt service due on all outstanding Municipal General Obligations of such municipality on January 1, 2018 and July 1, 2018 assuming a long-term straight line amortization (based on the contractual principal and interest payments, but amortizing any Balloon Payments), (iii) the funds of each municipality on deposit in the GO Redemption Fund as of July 1, 2017 (excluding amounts attributable to the former GO Redemption Fund held at GDB as of such date) after the payment of the Municipal General Obligation debt service due on such date, and (iv) the preliminary estimates of Special Additional Tax collections of such municipality during fiscal year 2018.

Column A of the table below reflects that certain municipalities had negative balances in the GO Redemption Fund as of July 1, 2017 after the payment of the Municipal General Obligation debt service due on such date. Such negative balances were primarily due to (i) the exclusion of GO Redemption Fund monies on deposit with GDB (due to the applicable restrictions on the withdrawal of such deposits imposed in April 2016) and (ii) differing timing of inflows and outflows from the GO Redemption Fund. However, most municipalities made the debt service payments due on July 1, 2017 in full on such date and the remaining municipalities made such payments pursuant to three-month payment plans agreed upon by GDB. The July 1, 2017 payments on Municipal General Obligations were made in full, notwithstanding that certain municipalities did not have sufficient funds in the GO Redemption Fund account at BPPR as of such date to pay the full amount of principal and interest due on their Municipal General Obligations on such date, because the aggregate balance in the GO Redemption Fund account at BPPR as of July 1, 2017 was sufficient to pay the debt service due on such date on all municipalities' outstanding Municipal General Obligations. This resulted in various municipalities having negatives balances in the GO Redemption Fund following the July 1, 2017 payments (*i.e.*, the municipalities that did not have sufficient funds deposited in the GO Redemption Fund as of July 1, 2017 to cover in full the payments due on such date). Such deficits were subsequently replenished from Special Additional Tax collections of the corresponding municipality during fiscal year 2018.

The municipalities of Bayamón, Caguas, Carolina and Fajardo had Balloon Payments due on July 1, 2018 on their Municipal General Obligations with private financial institutions. As reflected in column H of the table below, such municipalities' starting balances in the GO Redemption Fund in fiscal year 2018, combined with their estimated Special Additional Tax collections during fiscal year 2018, were not sufficient to pay all contractual debt service (including the Balloon Payments) due by each municipality on January 1, 2018 and July 1, 2018. However, such Balloon Payments are in the process of being refinanced and, in certain cases, their maturity dates were extended for a short period pending such refinancing.

For a discussion of the risks related to the Balloon Payments on municipal Loans held by private financial institutions with respect to the Municipal Loan Assets, see "*Risk Factors–Risks Related to the Restructuring Property–Certain assets that constitute the Restructuring Property share their source of repayment with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property*."

A debt service coverage ratio of less than 1 in column I of the table below reflects that the starting balance of a municipality in the GO Redemption Fund in fiscal year 2018, combined with the estimated Special Additional Tax collections of such municipality during fiscal year 2018, was not sufficient to cover all debt service due on January 1, 2018 and July 1, 2018 on such municipality's Municipal General Obligations, excluding Balloon Payments due on July 1, 2018. Even though column I reflects a debt service coverage ratio of less than 1 for certain municipalities, all municipalities made the required debt service payments (excluding Balloon Payments) in full on their due dates. In certain cases, the municipality had sufficient funds on deposit in the GO Redemption Fund at BPPR to cover in full the debt service due on such date (due primarily to funds deposited in the GO Redemption Fund during fiscal year 2017 corresponding to Special Additional Taxes levied in fiscal year 2017 and thus not reflected in the table below). In other cases, the municipalities completed such payments with an extraordinary aggregate disbursement of approximately $5.2 million from such municipalities' deposits with GDB. As discussed above, other property tax revenues of a municipality are also available to pay its Municipal General Obligations to the extent that the municipality's funds in the GO Redemption Fund and Special Additional Tax collections are insufficient. However, such application was not requested in order to allow municipalities to continue to use such funds to provide essential services to their residents.

The estimated Special Additional Tax collections for each municipality shown below are preliminary and subject to change. Actual Special Additional Tax collections for each municipality during fiscal year 2018 are not yet available. Furthermore, there is no assurance that actual Special Additional Tax collections in fiscal year 2019 and subsequent fiscal years will be similar to those shown below, as Special Additional Tax collections may be adversely impacted by a number of factors, including factors related to the impact of Hurricanes Irma and María. For additional information on the risks relating to general economic conditions and the effect of Hurricanes Irma and María on the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*."

114

2018 Debt Service Coverage
Municipal General Obligations

| Municipality | Starting Balance in GO Redemption Fund (1) | Special Additional Tax (CAE) Collections (2) | GO Redemption Fund Starting Balance and CAE Collections (3) | Contractual Debt Service(4) | Debt Service Excluding Balloon Payments(5) | Debt Service Coverage Ratio based on Contractual Debt Service | | Debt Service Coverage Ratio based on Debt Service Excluding Balloon Payments | |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C = (A+B) | D | E | F=B/D | G=C/D | H=B/E | I=C/E |
| | | | | | | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections |
| Adjuntas | $19,094 | $198,941 | $218,035 | $112,584 | $112,584 | 1.77 | 1.94 | 1.77 | 1.94 |
| Aguada | 274,177 | $984,329 | 1,258,506 | 1,207,902 | 1,207,902 | 0.81 | 1.04 | 0.81 | 1.04 |
| Aguadilla | 184,490 | $4,107,701 | 4,292,191 | 4,927,798 | 4,927,798 | 0.83 | 0.87 | 0.83 | 0.87 |
| Aguas Buenas | 327,862 | $691,177 | 1,019,038 | 357,345 | 357,345 | 1.93 | 2.85 | 1.93 | 2.85 |
| Aibonito | 101,099 | $353,056 | 454,156 | 418,250 | 418,250 | 0.84 | 1.09 | 0.84 | 1.09 |
| Añasco | 638,020 | $1,295,095 | 1,933,115 | 793,661 | 793,661 | 1.63 | 2.44 | 1.63 | 2.44 |
| Arecibo | 1,290,540 | $5,493,976 | 6,784,516 | 5,780,806 | 5,780,806 | 0.95 | 1.17 | 0.95 | 1.17 |
| Arroyo | 335,775 | $650,805 | 986,580 | 591,330 | 591,330 | 1.10 | 1.67 | 1.10 | 1.67 |
| Barceloneta | 1,131,217 | $4,176,364 | 5,307,581 | 3,674,509 | 3,674,509 | 1.14 | 1.44 | 1.14 | 1.44 |
| Barranquitas | (204,162) | $480,416 | 276,253 | 549,102 | 549,102 | 0.87 | 0.50 | 0.87 | 0.50 |
| Bayamon | 2,350,190 | $21,567,283 | 23,917,473 | 51,491,820 | 22,715,868 | 0.42 | 0.46 | 0.95 | 1.05 |
| Cabo Rojo | 764,445 | $3,612,014 | 4,376,459 | 3,023,658 | 3,023,658 | 1.19 | 1.45 | 1.19 | 1.45 |
| Caguas | 1,727,882 | $15,394,488 | 17,122,370 | 29,720,105 | 16,423,488 | 0.52 | 0.58 | 0.94 | 1.04 |
| Camuy | 211,429 | $898,169 | 1,109,597 | 748,583 | 748,583 | 1.20 | 1.48 | 1.20 | 1.48 |
| Canóvanas | 542,671 | $3,252,318 | 3,794,988 | 3,000,921 | 3,000,921 | 1.08 | 1.26 | 1.08 | 1.26 |
| Carolina | (5,718,069) | $29,078,096 | 23,360,027 | 32,890,545 | 28,180,545 | 0.88 | 0.71 | 1.03 | 0.83 |
| Cataño | 485,719 | $7,803,128 | 8,288,847 | 5,036,416 | 5,036,416 | 1.55 | 1.65 | 1.55 | 1.65 |
| Cayey | 1,385,240 | $5,478,851 | 6,864,090 | 4,801,341 | 4,801,341 | 1.14 | 1.43 | 1.14 | 1.43 |
| Ceiba | 100,054 | $432,909 | 532,963 | 382,310 | 382,310 | 1.13 | 1.39 | 1.13 | 1.39 |
| Ciales | 243,523 | $437,924 | 681,446 | 415,160 | 415,160 | 1.05 | 1.64 | 1.05 | 1.64 |
| Cidra | 864,807 | $2,791,500 | 3,656,307 | 2,739,387 | 2,739,387 | 1.02 | 1.33 | 1.02 | 1.33 |
| Coamo | 210,922 | $1,279,139 | 1,490,061 | 1,036,485 | 1,036,485 | 1.23 | 1.44 | 1.23 | 1.44 |
| Comerío | 120,075 | $237,185 | 357,259 | 265,201 | 265,201 | 0.89 | 1.35 | 0.89 | 1.35 |
| Corozal | 481,406 | $793,018 | 1,274,424 | 721,287 | 721,287 | 1.10 | 1.77 | 1.10 | 1.77 |
| Culebra | 10,369 | $168,255 | 178,624 | 34,762 | 34,762 | 4.84 | 5.14 | 4.84 | 5.14 |
| Dorado | 1,294,306 | $6,440,191 | 7,734,496 | 6,459,393 | 6,459,393 | 1.00 | 1.20 | 1.00 | 1.20 |
| Fajardo | 659,478 | $4,097,555 | 4,757,033 | 16,644,766 | 3,234,766 | 0.25 | 0.29 | 1.27 | 1.47 |
| Florida | 16,407 | $237,592 | 253,999 | 46,254 | 46,254 | 5.14 | 5.49 | 5.14 | 5.49 |
| Guánica | 136,998 | $673,845 | 810,842 | 586,586 | 586,586 | 1.15 | 1.38 | 1.15 | 1.38 |
| Guayama | 179,979 | $4,312,287 | 4,492,266 | 4,569,524 | 4,569,524 | 0.94 | 0.98 | 0.94 | 0.98 |
| Guayanilla | 16,015 | $569,356 | 585,371 | 824,059 | 824,059 | 0.69 | 0.71 | 0.69 | 0.71 |
| Guaynabo | 152,565 | $26,767,829 | 26,920,395 | 29,046,276 | 29,046,276 | 0.92 | 0.93 | 0.92 | 0.93 |
| Gurabo | 895,255 | $4,600,128 | 5,495,383 | 3,149,369 | 3,149,369 | 1.46 | 1.74 | 1.46 | 1.74 |
| Hatillo | 791,428 | $3,316,506 | 4,107,934 | 1,233,820 | 1,233,820 | 2.69 | 3.33 | 2.69 | 3.33 |
| Hormigueros | 536,592 | $1,176,078 | 1,712,670 | 931,434 | 931,434 | 1.26 | 1.84 | 1.26 | 1.84 |
| Humacao | 542,821 | $4,424,042 | 4,966,863 | 4,702,880 | 4,702,880 | 0.94 | 1.06 | 0.94 | 1.06 |
| Isabela | 1,118,482 | $1,920,874 | 3,039,356 | 944,344 | 944,344 | 2.03 | 3.22 | 2.03 | 3.22 |
| Jayuya | 172,577 | $186,182 | 358,758 | 144,799 | 144,799 | 1.29 | 2.48 | 1.29 | 2.48 |
| Juana Díaz | 474,692 | $1,409,548 | 1,884,240 | 1,187,376 | 1,187,376 | 1.19 | 1.59 | 1.19 | 1.59 |
| Juncos | 327,571 | $2,210,516 | 2,538,087 | 2,683,861 | 2,683,861 | 0.82 | 0.95 | 0.82 | 0.95 |
| Lajas | 249,817 | $1,022,976 | 1,272,794 | 701,968 | 701,968 | 1.46 | 1.81 | 1.46 | 1.81 |
| Lares | 29,546 | $751,581 | 781,128 | 307,650 | 307,650 | 2.44 | 2.54 | 2.44 | 2.54 |
| Las Marías | 97,079 | $82,504 | 179,583 | 91,778 | 91,778 | 0.90 | 1.96 | 0.90 | 1.96 |
| Las Piedras | 193,976 | $1,863,379 | 2,057,354 | 1,750,315 | 1,750,315 | 1.06 | 1.18 | 1.06 | 1.18 |
| Loíza | 163,972 | $845,635 | 1,009,607 | 673,427 | 673,427 | 1.26 | 1.50 | 1.26 | 1.50 |
| Luquillo | 201,766 | $1,066,568 | 1,268,334 | 805,670 | 805,670 | 1.32 | 1.57 | 1.32 | 1.57 |
| Manatí | 1,113,022 | $3,137,013 | 4,250,035 | 3,719,061 | 3,719,061 | 0.84 | 1.14 | 0.84 | 1.14 |
| Maricao | (134,607) | $115,627 | (18,980) | 285,196 | 285,196 | 0.41 | (0.07) | 0.41 | (0.07) |
| Maunabo | 89,899 | $248,421 | 338,320 | 310,527 | 310,527 | 0.80 | 1.09 | 0.80 | 1.09 |
| Mayagüez | 3,937,612 | $11,627,717 | 15,565,329 | 10,161,081 | 10,161,081 | 1.14 | 1.53 | 1.14 | 1.53 |
| Moca | (110,563) | $900,316 | 789,753 | 893,275 | 893,275 | 1.01 | 0.88 | 1.01 | 0.88 |
| Morovis | 304,435 | $701,964 | 1,006,399 | 666,149 | 666,149 | 1.05 | 1.51 | 1.05 | 1.51 |
| Naguabo | 237,459 | $743,947 | 981,406 | 446,835 | 446,835 | 1.66 | 2.20 | 1.66 | 2.20 |
| Naranjito | 36,921 | $778,305 | 815,225 | 882,456 | 882,456 | 0.88 | 0.92 | 0.88 | 0.92 |
| Orocovis | 127,181 | $194,476 | 321,656 | 175,295 | 175,295 | 1.11 | 1.83 | 1.11 | 1.83 |
| Patillas | 184,351 | $529,830 | 714,181 | 524,746 | 524,746 | 1.01 | 1.36 | 1.01 | 1.36 |
| Peñuelas | (528,481) | $898,780 | 370,299 | 1,214,472 | 1,214,472 | 0.74 | 0.30 | 0.74 | 0.30 |
| Ponce | 3,276,284 | $17,002,142 | 20,278,426 | 13,765,390 | 13,765,390 | 1.24 | 1.47 | 1.24 | 1.47 |
| Quebradillas | 65,698 | $510,154 | 575,852 | 440,860 | 440,860 | 1.16 | 1.31 | 1.16 | 1.31 |
| Rincón | 175,028 | $703,974 | 879,002 | 654,132 | 654,132 | 1.08 | 1.34 | 1.08 | 1.34 |
| Rio Grande | 597,020 | $3,770,036 | 4,367,057 | 2,376,799 | 2,376,799 | 1.59 | 1.84 | 1.59 | 1.84 |
| Sabana Grande | 58,074 | $603,909 | 661,982 | 788,467 | 788,467 | 0.77 | 0.84 | 0.77 | 0.84 |
| Salinas | 231,127 | $1,008,636 | 1,239,764 | 1,047,695 | 1,047,695 | 0.96 | 1.18 | 0.96 | 1.18 |
| San Germán | 779,671 | $1,727,408 | 2,507,078 | 1,448,770 | 1,448,770 | 1.19 | 1.73 | 1.19 | 1.73 |
| San Juan | 11,569,757 | $79,408,306 | 90,978,064 | 68,353,422 | 68,353,422 | 1.16 | 1.33 | 1.16 | 1.33 |
| San Lorenzo | 406,069 | $1,707,572 | 2,113,641 | 1,820,995 | 1,820,995 | 0.94 | 1.16 | 0.94 | 1.16 |
| San Sebastián | 461,986 | $1,317,117 | 1,779,103 | 1,424,104 | 1,424,104 | 0.92 | 1.25 | 0.92 | 1.25 |
| Santa Isabel | 123,615 | $1,645,935 | 1,769,550 | 1,546,313 | 1,546,313 | 1.06 | 1.14 | 1.06 | 1.14 |
| Toa Alta | 1,563,082 | $3,178,269 | 4,741,380 | 2,464,685 | 2,464,685 | 1.29 | 1.92 | 1.29 | 1.92 |
| Toa Baja | 2,496,121 | $9,280,160 | 11,776,281 | 10,287,447 | 10,287,447 | 0.90 | 1.14 | 0.90 | 1.14 |
| Trujillo Alto | 1,356,230 | $4,575,064 | 5,931,294 | 4,551,701 | 4,551,701 | 1.01 | 1.30 | 1.01 | 1.30 |
| Utuado | 279,963 | $499,017 | 778,980 | 293,224 | 293,224 | 1.70 | 2.66 | 1.70 | 2.66 |
| Vega Alta | (193,540) | $1,627,037 | 1,433,497 | 2,089,857 | 2,089,857 | 0.78 | 0.69 | 0.78 | 0.69 |
| Vega Baja | 1,270,884 | $3,467,570 | 4,738,454 | 3,860,459 | 3,860,459 | 0.90 | 1.23 | 0.90 | 1.23 |
| Vieques | 134,604 | $594,042 | 728,646 | 486,246 | 486,246 | 1.22 | 1.50 | 1.22 | 1.50 |
| Villalba | 245,109 | $426,341 | 671,451 | 310,225 | 310,225 | 1.37 | 2.16 | 1.37 | 2.16 |

2018 Debt Service Coverage
Municipal General Obligations

| | A | B | C = (A+B) | D | E | F=B/D | G=C/D | H=B/E | I=C/E |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Debt Service Coverage Ratio based on Contractual Debt Service | | Debt Service Coverage Ratio based on Debt Service Excluding Balloon Payments | |
| Municipality | Starting Balance in GO Redemption Fund (1) | Special Additional Tax (CAE) Collections (2) | GO Redemption Fund Starting Balance and CAE Collections (3) | Contractual Debt Service(4) | Debt Service Excluding Balloon Payments(5) | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections |
| Yabucoa | 521,697 | $1,110,274 | 1,631,971 | 1,309,963 | 1,309,963 | 0.85 | 1.25 | 0.85 | 1.25 |
| Yauco | 781,995 | $2,074,190 | 2,856,185 | 2,285,385 | 2,285,385 | 0.91 | 1.25 | 0.91 | 1.25 |
| Total | $47,587,796 | $335,744,886 | $383,332,682 | $373,092,048 | $ 312,899,480 | 0.90 | 1.03 | 1.07 | 1.22 |

1) Represents the funds on deposit in the GO Redemption Fund at BPPR as of July 1, 2017 after the payment of the debt service on Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) due on such date. Excludes funds in the GO Redemption Fund on deposit with GDB.

2) Represents the estimated Special Additional Tax collections of each municipality during fiscal year 2018. Estimates are based on actual property tax collections in fiscal year 2018, but the allocation of the Special Additional Tax among the municipalities is estimated based on historical trends. As a result, the estimates included herein are preliminary and subject to change. Furthermore, the estimates included in this column do not represent the amounts deposited in the GO Redemption Fund for each municipality during fiscal year 2018. Actual deposits in the GO Redemption Fund for each municipality may be greater or lower than those shown in this column.

3) Represents (a) funds on deposit in the GO Redemption Fund at BPPR as of July 1, 2017 after the payment of the debt service on Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) due on such date and (b) estimated Special Additional Tax collections of each municipality during fiscal year 2018 (preliminary and subject to change).

4) Represents aggregate contractual debt service payments due on each municipality's outstanding Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) on January 1, 2018 and July 1, 2018, including any Balloon Payments. Not affected by the Closing Date Adjustments.

5) Represents aggregate debt service payments due on each municipality's outstanding Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) on January 1, 2018 and July 1, 2018 assuming a long-term straight line amortization (based on the contractual principal and interest payments, but amortizing any Balloon Payments). Not affected by the Closing Date Adjustments.

Sources: GDB and CRIM

*Ability of Municipalities to Issue Municipal General Obligations.* Prior to approving any proposed issue of Municipal General Obligations, AAFAF (previously, GDB) is required to verify that the municipality has GO Available Legal Margin and GO Payment Capacity (as such terms are defined herein) to incur such additional Municipal General Obligations. As provided by the Commonwealth Constitution, the Legislative Assembly has fixed a limitation for the issuance of municipal obligations for the payment of which the good faith, credit and taxing power of each municipality may be pledged. The principal amount outstanding of any such Municipal General Obligations may not exceed 10% of the aggregate assessed valuation of the taxable property within such municipality (the "GO Legal Margin," and the amount by which such municipality's GO Legal Margin exceeds a municipality's outstanding Municipal General Obligations, the "GO Available Legal Margin"). The Municipal Financing Act provides that, in calculating the GO Available Legal Margin of a municipality, the amount of outstanding Municipal General Obligations of such municipality is reduced by the amount of the excess, if any, of the funds deposited in such municipality's GO Redemption Fund over the amount of accrued but unpaid interest on such general obligation debt.

The Municipal Financing Act also requires that in order for a municipality to issue additional Municipal General Obligations, such municipality must have sufficient "payment capacity." The Municipal Financing Act provides that a municipality has sufficient "payment capacity" to incur additional Municipal General Obligations if available funds of such municipality in the GO Redemption Fund that are available for the payment of its Municipal General Obligations, and the annual amounts collected with respect to such municipality's Special Additional Tax, as projected by AAFAF (previously, GDB), will be sufficient to service to maturity the municipality's outstanding Municipal General Obligations and the additional proposed Municipal General Obligations ("GO Payment Capacity"). In calculating the GO Payment Capacity, AAFAF assumes the refinancing of the Municipal General Obligations that certain municipalities have with private financial institutions that include Balloon Payments prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization (based on the contractual principal and interest payments, but amortizing any Balloon Payments). Hence, even if a municipality is determined to have sufficient GO Payment Capacity to incur Municipal General Obligations, it may not be able to cover scheduled debt service payments due on all of its outstanding Municipal General Obligations if, among other things, it is not able to refinance Balloon Payments under similar repayment terms.

As discussed above, a portion of the GO Redemption Fund (consisting of approximately $238.5 million) was deposited with GDB and is subject to the GDB Restructuring Act and the Qualifying Modification. Given the applicable restrictions on the withdrawal of GDB deposits, such deposits have not been included for purposes of the calculation of the GO Legal Margin and the GO Payment Capacity since 2017.

*Sales Tax Obligations*

*General.* The Sales Tax Obligations are special obligation Loans of a municipality evidenced by bonds or notes payable from a portion of the Commonwealth's sales and use tax revenues (the "Commonwealth SUT") allocated by law to municipalities. The Sales

Tax Obligations are issued pursuant to the Municipal Financing Act and the FAM Act. The good faith, credit and taxing power of the municipalities are not pledged for the payment of Sales Tax Obligations.

Interest on the Sales Tax Obligations is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. The Sales Tax Obligations bear interest at variable rates based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.59% to 6%).

The following table shows the Sales Tax Obligations that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day from the Cutoff Date:

**Sales Tax Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principle Balance of Sales Tax Obligations |
|---|---|---|---|---|---|
| Adjuntas | $5,431,735 | 2 | 5.1% | 7/1/2034 | 1.7% |
| Aguadilla | 5,202,536 | 2 | 3.6% | 7/1/2032 | 1.7% |
| Aguas Buenas | 2,923,137 | 1 | 6.3% | 7/1/2034 | 0.9% |
| Aibonito | 3,657,224 | 2 | 5.0% | 7/1/2034 | 1.2% |
| Añasco | 1,129,097 | 2 | 3.6% | 7/1/2033 | 0.4% |
| Arecibo | 6,483,921 | 4 | 6.3% | 7/1/2036 | 2.1% |
| Arroyo | 4,184,827 | 2 | 4.1% | 7/1/2033 | 1.3% |
| Barceloneta | 4,715,225 | 4 | 4.7% | 7/1/2035 | 1.5% |
| Barranquitas | 1,341,654 | 1 | 3.6% | 7/1/2028 | 0.4% |
| Bayamon | 22,807,997 | 3 | 4.5% | 7/1/2035 | 7.3% |
| Cabo Rojo | 5,206,271 | 2 | 6.3% | 7/1/2030 | 1.7% |
| Caguas | 15,821,556 | 5 | 5.1% | 7/1/2036 | 5.0% |
| Camuy | 3,047,030 | 2 | 4.1% | 7/1/2035 | 1.0% |
| Cataño | 1,966,170 | 1 | 6.3% | 7/1/2034 | 0.6% |
| Cayey | 2,155,024 | 1 | 6.3% | 7/1/2023 | 0.7% |
| Ceiba | 1,542,779 | 2 | 6.3% | 7/1/2038 | 0.5% |
| Ciales | 3,610,558 | 3 | 5.9% | 7/1/2032 | 1.2% |
| Cidra | 2,791,658 | 2 | 4.3% | 7/1/2034 | 0.9% |
| Coamo | 3,948,534 | 7 | 5.1% | 7/1/2035 | 1.3% |
| Comerío | 2,128,745 | 1 | 3.6% | 7/1/2027 | 0.7% |
| Corozal | 3,643,012 | 3 | 6.3% | 7/1/2035 | 1.2% |
| Culebra | 419,857 | 1 | 3.6% | 7/1/2024 | 0.1% |
| Dorado | 2,949,490 | 2 | 3.6% | 7/1/2032 | 0.9% |
| Florida | 2,654,666 | 1 | 6.3% | 7/1/2036 | 0.8% |
| Guánica | 2,482,849 | 3 | 4.6% | 7/1/2032 | 0.8% |
| Guayanilla | 4,778,420 | 3 | 5.0% | 7/1/2035 | 1.5% |
| Guaynabo | 21,547,494 | 1 | 3.6% | 7/1/2031 | 6.9% |
| Gurabo | 12,739 | 1 | 6.3% | 7/1/2019 | 0.0% |
| Hormigueros | 1,114,989 | 2 | 5.4% | 7/1/2030 | 0.4% |
| Isabela | 1,507,651 | 1 | 6.3% | 7/1/2030 | 0.5% |
| Jayuya | 5,516,757 | 3 | 5.0% | 7/1/2035 | 1.8% |
| Juana Díaz | 4,803,951 | 4 | 4.6% | 7/1/2035 | 1.5% |
| Juncos | 2,692,874 | 5 | 6.3% | 7/1/2036 | 0.9% |
| Lajas | 2,992,147 | 2 | 4.7% | 7/1/2034 | 1.0% |
| Las Marias | 3,523,455 | 4 | 3.9% | 7/1/2035 | 1.1% |
| Las Piedras | 3,570,981 | 2 | 5.2% | 7/1/2035 | 1.1% |
| Loíza | 315,980 | 1 | 6.3% | 7/1/2030 | 0.1% |
| Luquillo | 1,186,758 | 1 | 3.6% | 7/1/2027 | 0.4% |
| Manatí | 6,486,126 | 3 | 4.2% | 7/1/2032 | 2.1% |
| Maricao | 4,862,847 | 3 | 5.4% | 7/1/2035 | 1.6% |
| Maunabo | 6,398,824 | 5 | 4.7% | 7/1/2037 | 2.0% |
| Moca | 3,777,285 | 3 | 6.3% | 7/1/2033 | 1.2% |
| Morovis | 5,812,555 | 3 | 5.1% | 7/1/2035 | 1.9% |
| Naguabo | 1,525,294 | 1 | 6.3% | 7/1/2028 | 0.5% |
| Naranjito | 4,379,120 | 3 | 5.0% | 7/1/2036 | 1.4% |
| Orocovis | 1,619,546 | 3 | 6.3% | 7/1/2026 | 0.5% |
| Patillas | 5,083,768 | 3 | 5.2% | 7/1/2035 | 1.6% |
| Peñuelas | 4,554,611 | 3 | 4.6% | 7/1/2035 | 1.5% |

117

**Sales Tax Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principle Balance of Sales Tax Obligations |
|---|---|---|---|---|---|
| Ponce | 11,490,616 | 1 | 3.6% | 7/1/2028 | 3.7% |
| Quebradillas | 1,403,857 | 1 | 6.3% | 7/1/2029 | 0.4% |
| Río Grande | 3,600,286 | 2 | 6.3% | 7/1/2032 | 1.1% |
| Sabana Grande | 38,652 | 1 | 6.3% | 7/1/2019 | 0.0% |
| Salinas | 4,236,608 | 3 | 6.3% | 7/1/2036 | 1.4% |
| San Germán | 668,064 | 1 | 3.6% | 7/1/2031 | 0.2% |
| San Juan | 34,830,374 | 2 | 4.2% | 7/1/2032 | 11.1% |
| San Lorenzo | 4,112,791 | 3 | 5.8% | 7/1/2037 | 1.3% |
| San Sebastián | 5,571,053 | 3 | 5.0% | 7/1/2032 | 1.8% |
| Santa Isabel | 5,365,463 | 2 | 4.5% | 7/1/2033 | 1.7% |
| Toa Alta | 808,064 | 1 | 6.3% | 7/1/2029 | 0.3% |
| Toa Baja | 2,837,599 | 1 | 6.3% | 7/1/2035 | 0.9% |
| Trujillo Alto | 3,402,638 | 2 | 4.0% | 7/1/2033 | 1.1% |
| Utuado | 1,716,617 | 1 | 3.6% | 7/1/2028 | 0.5% |
| Vega Alta | 135,744 | 1 | 6.3% | 7/1/2019 | 0.0% |
| Vega Baja | 4,569,725 | 3 | 4.3% | 7/1/2032 | 1.5% |
| Vieques | 2,403,657 | 1 | 3.6% | 7/1/2033 | 0.8% |
| Villalba | 2,857,658 | 6 | 3.9% | 7/1/2033 | 0.9% |
| Yabucoa | 4,544,126 | 3 | 4.9% | 7/1/2035 | 1.4% |
| Yauco | 8,712,011 | 3 | 5.4% | 7/1/2035 | 2.8% |
| Total | $313,615,329 | 161 | - | - | 100% |

Source: GDB

***Source of Repayment.*** The FAM Act requires the Commonwealth to deposit in the FAM an amount equal to the product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator will be 0.5% and whose denominator will be the rate of the Commonwealth SUT. The FAM is currently held on deposit at BPPR and, pursuant to the FAM Act, is administered by COFIM.

The amounts received by the FAM are divided into three separate funds as follows: (i) an amount equal to 40% of the Commonwealth SUT deposited in the FAM (*i.e.*, product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator is 0.2% and whose denominator is the rate of the Commonwealth SUT) is transferred to the FAM structure's Municipal Redemption Fund (the "FAM Redemption Fund"), (ii) an amount equal to 40% of the Commonwealth SUT deposited in the FAM (*i.e.*, the product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator is 0.2% and whose denominator is the rate of the Commonwealth SUT) is transferred to the Municipal Development Fund (the "Development Fund"), and (iii) an amount equal to 20% the Commonwealth SUT deposited in the FAM (*i.e.*, the product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator is 0.1% and whose denominator is the rate of the Commonwealth SUT) is transferred to the Municipal Improvement Fund (the "Improvement Fund"). The FAM Redemption Fund is distributed among the municipalities pursuant to a predetermined formula provided by Act 1-2011, as amended (the "PR Code"), which is based on the amounts collected in each municipality during the prior fiscal year. In turn, the Development Fund is distributed among the municipalities pursuant to a predetermined formula provided by the PR Code, which is based on each municipality's budget and population. Finally, funds in the Improvement Fund are distributed pursuant to legislative appropriations.

Sales Tax Obligations are payable from the sales and use tax revenues required by law to be deposited in the FAM Redemption Fund. In addition, Section 4050.08 of the Puerto Rico Internal Revenue Code Act 1-2011, as amended, authorizes municipalities to elect to transfer all or a portion of the funds in such municipality's Development Fund to the FAM Redemption Fund to increase their borrowing capacity. The funds so transferred from the Development Fund to the FAM Redemption Fund are also available for the payment of Sales Tax Obligations. All municipalities (except for the municipalities of Guayama, Hatillo, Isabela, and Sábana Grande) have elected to transfer to the FAM Redemption Fund all or a portion of the funds allocated by law to the Development Fund. Furthermore, the municipalities of Bayamón, Cabo Rojo, Carolina, Guaynabo, Mayaguez, Ponce and San Juan waived their rights to the Development Fund pursuant to Section 4050.07 of the PR Code.

The funds in the FAM Redemption Fund are required by law to be applied for the payment of Sales Tax Obligations. The Sales Tax Obligations that are part of the Restructuring Property, however, may be effectively subordinated to the payment of other Sales Tax Obligations secured by a security interest in municipal sales and use taxes granted by municipalities to private financial institutions to secure such Loans. For additional discussion regarding these risks, see "*Risk Factors—Risks Related to the Restructuring Property— Sales Tax Obligations may be judicially determined not to be secured by a lien on municipal sales and use taxes and to be effectively subordinated to Loans payable from municipal sales and use taxes granted by private financial institutions to certain municipalities.*"

118

For additional information regarding municipal sales and use taxes see, "*Municipalities—Municipal Revenues—Major Categories of Revenue—Sales and Use Taxes*" in this Offering Memorandum.

*Flow of Funds*. The following diagram illustrates the flow of funds for the payment of the Sales Tax Obligations. For a description of the flow of funds under the Bond Indenture after deposit in the Collection Account, see "*Summary of Distributions of Cash from the Collection Account*" in this Offering Memorandum.



---

(1)     First revenues up to the "Pledged Sales Tax Base Amount" for the particular fiscal year are deposited with the COFINA Trustee. Then, an amount equal to the amount deposited with the COFINA Trustee is transferred to the Commonwealth's general fund. All other amounts after the Commonwealth has received such amount are divided equally between COFINA and the Commonwealth.

(2)     Funds remaining after the payment of COFIM expenses are transferred to the corresponding municipality.

(3)     Pursuant to the FAM Act, certain municipalities have elected for the funds in the Municipal Development Fund to be transferred to the FAM Redemption Fund. In such cases, such revenues are also available for the payment of Sales Tax Obligations.

(4)     Since 2014, the 1% sales and use tax allocated to COFIM flows directly from the point of sale to a COFIM account at Banco Popular, without going through the Unified Internal Revenue System.

**Estimated Fiscal Year 2018 Debt Service Coverage**. The following table presents for each municipality a debt service coverage ratio analysis based on (i) the aggregate contractual debt service due on all outstanding Sales Tax Obligations of such municipality on January 1, 2018 and July 1, 2018, (ii) the funds of each municipality on deposit in the FAM Redemption Fund as of July 1, 2017 after the payment of Sales Tax Obligation debt service due on such date, and (iii) the preliminary estimates of sales and use tax collections of such municipality during fiscal year 2018 available for the payment of Sales Tax Obligations.

No municipalities had Balloon Payments due on their Sales Tax Obligations on January 1, 2018 or July 1, 2018, but some municipalities may have Balloon Payments on their Sales Tax Obligations with private financial institutions on subsequent payment dates. For a discussion of the risks related to the Balloon Payments on municipal Loans held by private financial institutions with respect to the Municipal Loan Assets, see "*Risk Factors–Risks Related to the Restructuring Property–Certain assets that constitute the Restructuring Property share their source of repayment with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property*."

A debt service coverage ratio of less than 1 in column G of the table below reflects that the starting balance of a municipality in the FAM Redemption Fund in fiscal year 2018, combined with the estimated sales tax collections of such municipality during fiscal year 2018 available for the payment of debt service on its Sales Tax Obligations, was not sufficient to cover all debt service due on January 1, 2018 and July 1, 2018. All municipalities made the debt service payments on their Sales Tax Obligations in full on such dates, except for the municipality of Cabo Rojo, for which column G of the table below reflects a coverage of less than 1, and which was unable to make in full the debt service payments due on July 1, 2018 on its Sales Tax Obligations.

The estimated sales and use tax collections of each municipality shown below are preliminary and subject to change. Furthermore, there is no assurance that actual sales and use tax collections in fiscal year 2019 and subsequent fiscal years will be similar to those shown below, as future sales and use tax collections may be adversely impacted by a number of factors, including factors related to general economic conditions and the impact of Hurricanes Irma and María. For additional information on the risks relating to the effect of Hurricanes Irma and María on the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*."

Fiscal Year 2018 Debt Service Coverage
Sales Tax Obligations

| Municipality | A<br>FAM Redemption Fund Starting Balance [1] | B<br>.20% FAM Redemption Fund Collections [2] | C<br>Contributed Portion of .20% Development Fund [3] | D=A+B+C<br>FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service [4] | E<br>Contractual Debt Service [5] | F=(B+C)/E<br>Debt Service Coverage Ratio based Contractual Debt Service<br>SUT Collections Available for Debt Service | G=D/E<br>FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service |
|---|---|---|---|---|---|---|---|
| Adjuntas | $169,025 | $19,530 | $1,134,737 | $1,323,292 | $564,973 | 2.04 | 2.34 |
| Aguada | 93,180 | 230,546 | 587,443 | 911,170 | 485,418 | 1.69 | 1.88 |
| Aguadilla | 105,342 | 744,533 | 457,786 | 1,307,660 | 685,602 | 1.75 | 1.91 |
| Aguas Buenas | 122,688 | 86,016 | 421,295 | 629,999 | 354,541 | 1.43 | 1.78 |
| Aibonito | 188,338 | 199,834 | 752,190 | 1,140,361 | 699,735 | 1.36 | 1.63 |
| Añasco | 25,050 | 161,242 | 333,939 | 520,232 | 106,655 | 4.64 | 4.88 |
| Arecibo | 282,575 | 702,597 | 459,984 | 1,445,157 | 784,230 | 1.48 | 1.84 |
| Arroyo | 95,350 | 76,084 | 403,150 | 574,584 | 347,463 | 1.38 | 1.65 |
| Barceloneta | 123,273 | 792,734 | 155,599 | 1,071,605 | 509,135 | 1.86 | 2.10 |
| Barranquitas | 93,978 | 127,105 | 575,892 | 796,975 | 458,343 | 1.53 | 1.74 |
| Bayamón [6] | 737,700 | 4,241,767 | - | 4,979,467 | 3,101,127 | 1.37 | 1.61 |
| Cabo Rojo [6] | - | 333,255 | - | 333,255 | 769,860 | 0.43 | 0.43 |
| Caguas | 483,968 | 3,303,481 | 475,771 | 4,263,220 | 1,837,702 | 2.06 | 2.32 |
| Camuy | 69,038 | 160,773 | 321,413 | 551,224 | 316,971 | 1.52 | 1.74 |
| Canóvanas | 13,650 | 477,309 | 449,158 | 940,117 | 445,538 | 2.08 | 2.11 |
| Carolina [6] | 872,114 | 3,682,968 | - | 4,555,082 | 4,251,088 | 0.87 | 1.07 |
| Cataño | 164,793 | 774,782 | 126,546 | 1,066,120 | 527,715 | 1.71 | 2.02 |
| Cayey | 141,050 | 787,843 | 350,679 | 1,279,572 | 678,896 | 1.68 | 1.88 |
| Ceiba | 58,825 | 48,133 | 459,672 | 566,630 | 225,058 | 2.26 | 2.52 |
| Ciales | 119,888 | 53,630 | 839,693 | 1,013,211 | 454,961 | 1.96 | 2.23 |
| Cidra | 72,950 | 247,341 | 467,614 | 787,906 | 439,210 | 1.63 | 1.79 |
| Coamo | 116,958 | 158,308 | 693,398 | 968,663 | 367,943 | 2.31 | 2.63 |
| Comerío | 43,563 | 58,212 | 408,699 | 510,473 | 295,415 | 1.58 | 1.73 |
| Corozal | 132,375 | 154,005 | 331,261 | 617,641 | 428,516 | 1.13 | 1.44 |
| Culebra | 26,175 | 35,809 | 260,000 | 321,984 | 110,840 | 2.67 | 2.90 |
| Dorado | 94,425 | 651,934 | 333,245 | 1,079,604 | 462,519 | 2.13 | 2.33 |
| Fajardo | - | 732,038 | 428,246 | 1,160,284 | - | - | - |
| Florida | 94,153 | 29,661 | 381,612 | 505,425 | 276,154 | 1.49 | 1.83 |
| Guánica | 71,513 | 64,988 | 750,319 | 886,820 | 480,595 | 1.70 | 1.85 |
| Guayama | 17,550 | 480,459 | - | 498,009 | 394,088 | 1.22 | 1.26 |
| Guayanilla | 142,175 | 65,940 | 784,841 | 992,956 | 463,726 | 1.83 | 2.14 |
| Guaynabo [6] | 470,625 | 2,627,026 | - | 3,097,651 | 2,041,389 | 1.29 | 1.52 |
| Gurabo | 102,215 | 319,169 | 459,364 | 880,748 | 314,900 | 2.47 | 2.80 |
| Hatillo | 259,448 | 1,058,907 | - | 1,318,354 | 399,285 | 2.65 | 3.30 |

120

Fiscal Year 2018 Debt Service Coverage

Sales Tax Obligations

| | A | B | C | D=A+B+C | E | F=(B+C)/E | G=D/E |
|---|---|---|---|---|---|---|---|
| | | | | | | Debt Service Coverage Ratio based Contractual Debt Service | |
| Municipality | FAM Redemption Fund Starting Balance [1] | .20% FAM Redemption Fund Collections [2] | Contributed Portion of .20% Development Fund [3] | FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service [4] | Contractual Debt Service [5] | SUT Collections Available for Debt Service | FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service |
| Hormigueros ............... | 78,580 | 234,014 | 361,098 | 673,692 | 236,359 | 2.52 | 2.85 |
| Humacao ..................... | 209,869 | 1,048,473 | 324,213 | 1,582,555 | 777,188 | 1.77 | 2.04 |
| Isabela ........................ | 105,463 | 429,262 | - | 534,725 | 277,314 | 1.55 | 1.93 |
| Jayuya ........................ | 186,809 | 71,475 | 830,808 | 1,089,092 | 578,656 | 1.56 | 1.88 |
| Juana Díaz .................. | 123,450 | 321,202 | 656,133 | 1,100,786 | 464,908 | 2.10 | 2.37 |
| Juncos ........................ | 104,975 | 226,799 | 337,391 | 669,165 | 526,402 | 1.07 | 1.27 |
| Lajas .......................... | 79,663 | 113,913 | 761,436 | 955,012 | 375,960 | 2.33 | 2.54 |
| Lares .......................... | 16,900 | 126,152 | 310,385 | 453,437 | 146,619 | 2.98 | 3.09 |
| Las Marías .................. | 66,215 | 15,227 | 650,000 | 731,442 | 265,590 | 2.50 | 2.75 |
| Las Piedras ................. | 145,425 | 203,362 | 566,854 | 915,641 | 449,041 | 1.72 | 2.04 |
| Loíza .......................... | 20,800 | 62,209 | 404,858 | 487,867 | 58,916 | 7.93 | 8.28 |
| Luquillo ...................... | 168,063 | 125,692 | 876,542 | 1,170,297 | 662,187 | 1.51 | 1.77 |
| Manatí ........................ | 176,533 | 654,638 | 397,727 | 1,228,898 | 707,095 | 1.49 | 1.74 |
| Maricao ...................... | 165,788 | 5,797 | 975,000 | 1,146,584 | 727,861 | 1.35 | 1.58 |
| Maunabo .................... | 153,713 | 16,376 | 1,192,403 | 1,362,492 | 661,843 | 1.83 | 2.06 |
| Mayagüez[6] ................ | 708,749 | 1,659,926 | - | 2,368,675 | 1,779,034 | 0.93 | 1.33 |
| Moca .......................... | 164,450 | 148,013 | 679,714 | 992,178 | 492,676 | 1.68 | 2.01 |
| Morovis ...................... | 155,563 | 121,805 | 749,841 | 1,027,209 | 504,277 | 1.73 | 2.04 |
| Naguabo ..................... | 84,825 | 93,067 | 347,667 | 525,559 | 273,703 | 1.61 | 1.92 |
| Naranjito .................... | 137,900 | 180,582 | 551,900 | 870,382 | 430,961 | 1.70 | 2.02 |
| Orocovis .................... | 56,963 | 88,483 | 398,944 | 544,389 | 347,441 | 1.40 | 1.57 |
| Patillas ...................... | 174,875 | 62,017 | 876,081 | 1,112,973 | 591,475 | 1.59 | 1.88 |
| Peñuelas .................... | 105,900 | 88,940 | 540,116 | 734,955 | 356,447 | 1.76 | 2.06 |
| Ponce[6] ..................... | 339,183 | 2,679,227 | - | 3,018,409 | 2,213,061 | 1.21 | 1.36 |
| Quebradillas ............... | 105,788 | 102,027 | 396,630 | 604,445 | 282,922 | 1.76 | 2.14 |
| Rincón ....................... | 14,665 | 113,913 | 241,678 | 370,256 | 193,322 | 1.84 | 1.92 |
| Río Grande.................. | 123,425 | 407,520 | 262,320 | 793,265 | 462,550 | 1.45 | 1.71 |
| Sabana Grande ............ | 3,738 | 109,036 | - | 112,773 | 61,993 | 1.76 | 1.82 |
| Salinas ....................... | 155,838 | 157,921 | 770,285 | 1,084,043 | 491,563 | 1.89 | 2.21 |
| San Germán ................ | 97,933 | 273,548 | 245,160 | 616,640 | 312,707 | 1.66 | 1.97 |
| San Juan[6] .................. | 1,101,763 | 9,814,099 | - | 10,915,862 | 6,157,502 | 1.59 | 1.77 |
| San Lorenzo ............... | 138,820 | 220,063 | 542,342 | 901,225 | 521,757 | 1.46 | 1.73 |
| San Sebastián .............. | 151,550 | 286,150 | 580,607 | 1,018,307 | 541,001 | 1.60 | 1.88 |
| Santa Isabel................ | 140,965 | 300,950 | 674,013 | 1,115,927 | 503,348 | 1.94 | 2.22 |
| Toa Alta ..................... | 184,925 | 265,231 | 560,197 | 1,010,353 | 585,984 | 1.41 | 1.72 |
| Toa Baja .................... | 104,975 | 1,108,201 | 456,727 | 1,669,903 | 286,402 | 5.46 | 5.83 |
| Trujillo Alto ............... | 68,125 | 477,075 | 71,511 | 616,711 | 270,697 | 2.03 | 2.28 |
| Utuado ....................... | 107,375 | 135,017 | 718,029 | 960,421 | 434,126 | 1.96 | 2.21 |
| Vega Alta ................... | 156,163 | 288,366 | 593,257 | 1,037,786 | 687,171 | 1.28 | 1.51 |
| Vega Baja ................... | 152,850 | 391,486 | 609,772 | 1,154,108 | 614,716 | 1.63 | 1.88 |
| Vieques ...................... | 41,766 | 97,334 | 513,265 | 652,365 | 271,507 | 2.25 | 2.40 |
| Villalba ...................... | 55,958 | 55,635 | 340,833 | 452,425 | 268,037 | 1.48 | 1.69 |
| Yabucoa ..................... | 117,034 | 139,423 | 585,613 | 842,070 | 376,852 | 1.92 | 2.23 |
| Yauco ........................ | 245,820 | 338,726 | 642,832 | 1,227,378 | 768,111 | 1.28 | 1.60 |
| Total ........................ | $12,604,066 | $47,546,329 | $35,197,732 | $95,348,127 | $52,076,868 | 1.59 | 1.83 |

(1)  Represents the funds on deposit in each municipality's FAM Redemption Fund on July 1, 2017 after the payment of the debt service on Sales Tax Obligations (including the Sales Tax Obligations held by GDB and private financial institutions) due on such date.

(2)  Represents estimated collections on the .20% sales and use tax required to be deposited in the FAM Redemption Fund during fiscal year 2018. Estimates are based on actual sales and use tax collections in fiscal year 2018, but the allocation of such collections among the municipalities is estimated based on historical trends and the formula established in the PR Code. As a result, the estimates included herein are preliminary and subject to change.

(3)  Represents estimated collections during fiscal year 2018 on the portion of each municipality's sales and use taxes allocated to such municipality's Development Fund that the municipality elected to transfer to its FAM Redemption Fund. Estimates are based on actual sales and use tax collections in fiscal year 2018, but the allocation of such collections among the municipalities is estimated based on historical trends and the formula established in the PR Code. As a result, the estimates included herein are preliminary and subject to change.

(4)  Represents the sum of (a) the funds on deposit in each municipality's FAM Redemption Fund on July 1, 2017 after the payment of the debt service on Sales Tax Obligations (including the Sales Tax Obligations held by GDB and private financial institutions) due on such date and (b) estimated collections during fiscal year 2018 of municipal sales and use taxes available for the payment of debt service on a municipality's Sales Tax Obligations (preliminary and subject to change) consisting of (i) the .20% sales and use tax required to be deposited in the FAM Redemption Fund and (ii) the portion of each municipality's sales and use taxes allocated to such municipality's Development Fund that the municipality elected to transfer to its FAM Redemption Fund.

(5)  Represents aggregate contractual debt service payments due on each municipality's outstanding Sales Tax Obligations (including the Sales Tax Obligations held by GDB and private financial institutions) on January 1, 2018 and July 1, 2018. No municipalities had Balloon Payments due on their Sales Tax Obligations on such dates. Not affected by Closing Date Adjustments.

(6)  Municipality waived all rights to the Development Fund pursuant to Section 4050.07 of the PR Code.

Source: GDB

***Ability of Municipalities to Issue Sales Tax Obligations.*** Pursuant to the Municipal Financing Act, Sales Tax Obligations are not subject to the limitations on margin capacity applicable to Municipal General Obligations or other special obligation debt. The regulation issued under the Municipal Financing Act, however, requires that in order for a municipality to be able to issue additional Sales Tax Obligations, such municipality must have sufficient "payment capacity." Pursuant to such regulation, a municipality has sufficient "payment capacity" to incur additional Sales Tax Obligations if the deposits in such municipality's FAM Redemption Fund and the annual amounts collected with respect to such municipality's FAM Redemption Fund, based on the average of such collections in the prior two fiscal years, will be sufficient to service to maturity the municipality's outstanding sales tax debt and the additional proposed sales tax debt. In calculating a municipality's payment capacity to issue Sales Tax Obligations, AAFAF assumes the refinancing of the Sales Tax Obligation that certain municipalities have with private financial institutions that include Balloon Payments prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments. Hence, even if a municipality is determined to have sufficient payment capacity to incur Sales Tax Obligations, it may not be able to cover scheduled debt service payments due on all of its Sales Tax Obligations if, among other things, it is not able to refinance Balloon Payments under similar repayment terms.

### Operational Loans

***General.*** The Operational Loans are special obligation Loans of a municipality payable from such municipality's operating revenues. The good faith, credit and taxing power of the municipalities are not pledged for the payment of the Operational Loans.

Interest on the Operational Loans is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. Operational Loans bear interest at variable rates (with limited exceptions) based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12%. Certain of the Operational Loans are also subject to an interest rate floor (ranging from 2.34% to 6%).

The following table shows the Operational Loans that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day from the Cutoff Date:

| | | | | **Operational Loans** | |
|---|---|---|---|---|---|
| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Operational Loans |
| Adjuntas | $6,463,267 | 1 | 5.3% | 7/1/2036 | 8.4% |
| Aguadilla | 1,923,296 | 1 | 3.6% | 7/1/2026 | 2.5% |
| Añasco | 1,647,868 | 2 | 3.5% | 7/1/2027 | 2.1% |
| Arecibo | 8,108,497 | 2 | 4.1% | 7/1/2028 | 10.5% |
| Barceloneta | 5,903,472 | 2 | 6.3% | 7/1/2038 | 7.7% |
| Caguas | 7,948,330 | 2 | 3.6% | 7/1/2033 | 10.3% |
| Camuy | 1,663,389 | 1 | 3.6% | 7/1/2029 | 2.2% |
| Ciales | 13,145 | 1 | 3.6% | 7/1/2020 | 0.0% |
| Cidra | 890,565 | 1 | 3.6% | 7/1/2023 | 1.2% |
| Coamo | 4,666,620 | 1 | 6.3% | 7/1/2029 | 6.1% |
| Corozal | 318,787 | 1 | 4.9% | 7/1/2032 | 0.4% |
| Guánica | 629,967 | 1 | 3.3% | 7/1/2025 | 0.8% |
| Guayanilla | 464,064 | 1 | 3.6% | 7/1/2027 | 0.6% |
| Gurabo | 1,471,751 | 1 | 3.6% | 7/1/2027 | 1.9% |
| Jayuya | 537,587 | 2 | 3.6% | 7/1/2029 | 0.7% |
| Juana Díaz | 346,142 | 1 | 6.3% | 7/1/2020 | 0.4% |
| Juncos | 1,509,286 | 1 | 3.6% | 7/1/2027 | 2.0% |
| Las Marías | 817,991 | 3 | 4.9% | 7/1/2028 | 1.1% |
| Loíza | 254,720 | 1 | 3.6% | 7/1/2028 | 0.3% |
| Manatí | 992,933 | 1 | 3.3% | 7/1/2026 | 1.3% |
| Maricao | 416,954 | 1 | 3.3% | 7/1/2025 | 0.5% |
| Maunabo | 2,138,676 | 1 | 6.3% | 7/1/2038 | 2.8% |
| Moca | 161,308 | 1 | 3.6% | 7/1/2025 | 0.2% |
| Morovis | 3,144,566 | 4 | 3.9% | 7/1/2027 | 4.1% |
| Naranjito | 877,519 | 2 | 6.3% | 7/1/2035 | 1.1% |
| Orocovis | 40,410 | 1 | 6.3% | 7/1/2019 | 0.1% |
| Peñuelas | 3,996,515 | 3 | 3.5% | 7/1/2030 | 5.2% |
| Quebradillas | 1,385,121 | 2 | 3.4% | 7/1/2027 | 1.8% |
| Sabana Grande | 1,298,986 | 3 | 3.3% | 7/1/2025 | 1.7% |
| Salinas | 666,848 | 2 | 3.6% | 7/1/2028 | 0.9% |
| San Germán | 9,757,788 | 1 | 6.3% | 7/1/2038 | 12.7% |

**Operational Loans**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Operational Loans |
|---|---|---|---|---|---|
| San Lorenzo ........................ | 206,180 | 1 | 3.6% | 7/1/2020 | 0.3% |
| Santa Isabel........................ | 1,205,316 | 2 | 3.6% | 7/1/2027 | 1.6% |
| Vega Alta ............................ | 188,183 | 1 | 3.6% | 7/1/2020 | 0.2% |
| Vieques .............................. | 2,023,444 | 3 | 3.5% | 7/1/2027 | 2.6% |
| Villalba ............................. | 1,583,961 | 1 | 3.6% | 7/1/2032 | 2.1% |
| Yabucoa............................. | 473,766 | 2 | 4.2% | 7/1/2030 | 0.6% |
| Yauco ................................ | 975,097 | 3 | 3.6% | 7/1/2028 | 1.3% |
| Total ................................ | $77,112,314 | 61 | - | - | 100% |

Source: GDB

***Source of Repayment.*** Operational Loans are payable from a municipality's operating revenues, consisting primarily of remittances made by CRIM to each municipality. Although a municipality's Operational Loans are payable from its operating revenues, a municipality may pledge such revenues for the payment of other debts. Moreover, such revenues may also be available to pay debt service on its Municipal General Obligations, with priority over special obligation debt (including the Operational Loans), in the event that such municipality's Special Additional Tax revenues are insufficient for the payment of its Municipal General Obligations. Therefore, a municipality's Operational Loans are effectively subordinated to its Municipal General Obligations. Further, since the funds in the FAM Redemption Fund are required by law to be used for various purposes, including for the payment of Sales Tax Obligations, prior to being disbursed to a municipality, a municipality's Operational Loans are also effectively subordinated to such other obligations.

The Operational Loans that are a part of the Restructuring Property are unsecured and do not have a lien on the municipality's operating revenues or on any other particular revenue or asset of a municipality. As a result, such Operational Loans may be effectively subordinated to the payment of other Loans secured by a security interest in municipal operational revenues granted by municipalities to private financial institutions to secure such Loans.

***Ability to Issue Special Obligation Debt.*** Prior to approving any proposed issue of special obligation Loans (other than Sales Tax Obligations), AAFAF (previously, GDB) is required to verify that the municipality has SO Available Legal Margin and SO Payment Capacity (each such term as defined below) to incur such additional special obligation debt. Pursuant to the Municipal Financing Act, no municipality may incur special obligation debt if the annual payment of the principal and interest on such debt, together with the annual payment of the principal and the interest on all other special obligation debt of the municipality outstanding at that time (excluding Sales Tax Obligations), exceeds 10% of the average recurring operating income of the municipality for the two fiscal years immediately preceding the fiscal year in which it will issue such debt (the "SO Available Legal Margin").

The regulation issued under the Municipal Financing Act also requires that in order for a municipality to be able to issue additional special obligation debt, such municipality must have sufficient "payment capacity." Such regulation provides that a municipality has sufficient "payment capacity" to incur additional special obligation debt if the annual payment of the principal and the interest on all special obligation debt of the municipality outstanding at that time is less than 10% of the average recurring operating income of the municipality for the two fiscal years immediately preceding the fiscal year in which it will issue such debt (the "SO Payment Capacity"). In calculating the SO Payment Capacity, AAFAF assumes the refinancing of the special obligations that certain municipalities have with private financial institutions that include Balloon Payments prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments. Hence, even if a municipality is determined to have sufficient SO Payment Capacity to incur special obligations, it may not be able to cover scheduled debt service payments due on all of its outstanding special obligations if it is not able to refinance Balloon Payments under similar repayment terms.

***Revenue Loans***

***General.*** Revenue Loans are Loans incurred by a municipality to finance the development of a particular project or system. The good faith, credit and taxing power of the municipalities are not pledged for the payment of its Revenue Loans.

Interest on the Revenue Loans is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. Certain of the Revenue Loans bear interest at variable rates based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.59% to 7%). Several Revenue Loans bear interest at fixed rates of 6% or 7%.

The following table shows the Revenue Loans that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments:

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Revenue Loans |
|---|---|---|---|---|---|
| Aguadilla ......................... | $13,848,627 | 2 | 6.2% | 7/1/2037 | 27.9% |
| Barceloneta ....................... | 4,450,000 | 2 | 5.4% | 7/1/2034 | 9.0% |
| Bayamon........................... | 7,200,000 | 1 | 6.3% | 7/1/2028 | 14.5% |
| Manati.............................. | 12,876,584 | 2 | 6.1% | 7/1/2038 | 25.9% |
| Morovis ........................... | 1,318,207 | 1 | 6.3% | 7/1/2024 | 2.7% |
| San Germán ...................... | 2,840,283 | 2 | 6.3% | 7/1/2036 | 5.7% |
| Santa Isabel....................... | 43,500 | 1 | 6.0% | 7/1/2019 | 0.1% |
| Trujillo Alto...................... | 3,809,657 | 1 | 7.0% | 7/1/2033 | 7.7% |
| Vega Alta.......................... | 1,436,000 | 4 | 3.2% | 7/1/2021 | 2.9% |
| Villalba ............................ | 1,869,517 | 2 | 6.3% | 7/1/2040 | 3.8% |
| Total ................................ | $49,692,375 | 18 | - | - | 100% |

Source: GDB

***Source of Repayment.*** Pursuant to the Municipal Financing Act, income generated by projects financed with Revenue Loans will be used by the municipality in the following order of priority: *first*, to pay all operating and maintenance expenses of the project; *second*, to provide reserves for the operation and maintenance and the repair and replacement of the project; *third*, to pay the principal, and the premium, if any, and the interest on the revenue bonds for the payment of which the income of the revenue generating project has been committed or otherwise encumbered and to provide for the corresponding reserves; *fourth*, to pay the principal, the premium, if any, and the interest on any other obligation or other lien on the income of the project, but was issued to provide resources to pay the cost of such project; and *fifth*, any surplus from the income of the revenue generating project, after complying with the preceding items, may be transferred to the general fund of the municipality and used for any other legal purpose of the municipality. The Revenue Loans that will form part of the Restructuring Property are not secured by a lien or encumbrance on the revenues generated by the corresponding project or system. Therefore, the repayment thereof falls within the fourth order of priority, subordinated to the payment of the project's operating and maintenance expenses, repair and replacement reserves and the repayment of any Loan secured by a pledge of the revenues generated by the project.

In addition, pursuant to the Municipal Financing Act, to the extent that the revenues generated by a specific project are insufficient for the payment of debt service on such municipality's Revenue Loans related that project, CRIM will retain funds from such municipality's monthly remittances of operating revenues in the amount necessary to cover such insufficiency.

### *Municipal Lines of Credit*

***General.*** The Municipal Lines of Credit consist of Loans granted by GDB to various municipalities to finance the construction of capital projects. The Municipal Lines of Credit were either (i) issued in anticipation of the issuance of Revenue Loans and expected to be paid from the revenues generated by the financed project, but which project was not ultimately completed, and the Revenue Loans were not issued or (ii) payable from future legislative appropriations by the Commonwealth, which the Legislative Assembly is not required to make. The good faith, credit and taxing power of the municipalities are not pledged for the payment of its Municipal Lines of Credit.

Certain Municipal Lines of Credit bear interest at variable rates based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.59% to 6.25%). Several Municipal Lines of Credit bear interest at fixed rates ranging from 3.57% or 6.62% and two Municipal Lines of Credit do not accrue interest.

The following table shows the Municipal Lines of Credit that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments:

**Lines of Credit**

| Municipality | Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Weighted Average Effective Annual Interest Rate | Maturity Date | % of Total Outstanding Principal Balance of Municipal Lines of Credit |
|---|---|---|---|---|---|---|
| Aguadilla | $16,092,093 | $3,844,333 | 1 | 6.3% | 12/13/2024 | 45.4% |
| Arecibo | 2,529,739 | 221,174 | 1 | 3.6% | 4/24/2010 | 7.1% |
| Cayey | 4,214,441 | 685,195 | 1 | 4.6% | 7/6/2015 | 11.9% |
| Coamo | 113,709 | 41,511 | 1 | 6.3% | 2/15/2014 | 0.3% |
| Guánica | 347,153 | - | 2 | 0.0% | 6/30/2024 | 1.0% |
| Hatillo | - | 221,760 | 1 | N/A | 6/30/2012 | 0.0% |
| Jayuya | 998,100 | 236,253 | 1 | 5.5% | 10/30/2014 | 2.8% |
| Juncos | 8,870,921 | 3,219,714 | 1 | 6.6% | 12/31/2017 | 25.0% |
| Las Marías | 92,992 | 29,381 | 1 | 6.0% | 6/30/2015 | 0.3% |
| Rincón | - | 54,466 | 2 | N/A | 6/10/2017 | 0.0% |
| San Sebastián | 2,214,406 | 476,506 | 1 | 5.0% | 6/30/2007 | 6.2% |
| Total | $35,473,554 | $9,030,292 | 10 | - | - | 100% |

Source: GDB

*Source of Repayment.* The Municipal Lines of Credit are unsecured obligations of a municipality that do not have a designated source of repayment or whose source of repayment consists of future legislative appropriations by the Commonwealth, which the Legislative Assembly is not required to make. As a result, the Municipal Lines of Credit have a delinquency rate that is much higher than that of the other sub-categories of Municipal Loan Assets. As shown above under "*Delinquency and Credit Status of the Loans Comprising the Restructuring Property*," all Municipal Lines of Credit that are part of the Restructuring Property are classified by GDB as non-performing as of the Cutoff Date. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Municipal Lines of Credit are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

### Commonwealth Loan Assets

*General.* The Commonwealth Loan Assets comprise four general obligation Loans made by GDB to the Commonwealth in 2012 and 2013 with an aggregate outstanding principal balance as of the Cutoff Date of approximately $169.4 million, plus accrued and unpaid interest as of the Cutoff Date of approximately $40.9 million. Such Loans were issued by the Commonwealth pursuant to legislation enacted by the Legislative Assembly authorizing the Commonwealth to issue such debt and to pledge its good faith, credit and taxing power for the repayment thereof. The Commonwealth Loan Assets are payable on June 30 of each year, bear interest at a variable rate equal to the Prime Rate, plus 150 basis points, subject to a floor of 6% and a legal interest rate limit of 12%, and mature on June 30, 2041, 2042 and 2043.

The Commonwealth's financial obligations are currently subject to a temporary moratorium pursuant to various executive orders issued under Act 21-2016, as amended (the "Moratorium Act") and Act 5-2017, as amended (the "Fiscal Responsibility Act"). Moreover, the Commonwealth is currently in the midst of a debt restructuring proceeding pursuant to the provisions of Title III of PROMESA. As a result, the Issuer's recovery, if any, on the Commonwealth Loan Assets will be determined in such proceeding and cannot be estimated at this time. Moreover, litigation and claims against the Commonwealth, including litigation and claims related to the Commonwealth Loan Assets, are subject to the automatic stay that came into effect upon the filing of the Title III petition. For additional discussion of such proceeding, see "*Description of the Commonwealth and its Current Financial Condition—Description of the Commonwealth's PROMESA Filings.*"

On May 25, 2018, GDB filed a proof of claim in the Commonwealth's Title III proceeding (Claim No. 29485) in respect of all indebtedness owed by the Commonwealth to GDB as of the commencement date of the Commonwealth's Title III proceeding under PROMESA (May 3, 2017). Such proof of claim includes, among other things, a claim for $169,438,036 of principal and $28,849,289 of pre-petition interest in respect of the Commonwealth Loan Assets. GDB's asserted claim against the Commonwealth does not account for the Closing Date Adjustments, and, as with all proofs of claim filed in the Commonwealth's Title III proceeding, is subject to review by parties in interest and, if objected to, subsequent allowance by order of the District Court whether pursuant to an order confirming a plan of adjustment or otherwise. For a discussion of certain risks related to the treatment of the Commonwealth Loan Assets in the Commonwealth's Title III proceeding, see "*Risk Factors—Risks Related to the Restructuring Property—Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*"

The following table shows the Loans that are part of the Commonwealth Loan Assets as of the Cutoff Date:

**Commonwealth Loan Assets**

| Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Commonwealth Loan Assets |
|---|---|---|---|---|---|
| $21,095,310 | $4,693,108 | 1 | 6.3% | 6/30/2041 | 12.5% |
| 63,135,000 | 16,517,694 | 1 | 6.3% | 6/30/2042 | 37.5% |
| 50,419,093 | 13,049,573 | 1 | 6.3% | 6/30/2043 | 29.8% |
| 34,788,635 | 6,595,534 | 1 | 6.3% | 6/30/2043 | 20.5% |
| $169,438,038 | $40,855,910 | 4 | - | - | 100% |

Source: GDB

*Source of Repayment*. The Commonwealth Loan Assets benefit from a pledge of the Commonwealth's good faith, credit and taxing power and, as a result, constitute "public debt" of the Commonwealth under Article VI, Section 8 of the Commonwealth Constitution. The Commonwealth Loan Assets are part of the approximately $13,606 million in principal amount of Commonwealth general obligations subject to the Commonwealth's Title III proceeding. Pursuant to Article VI, Section 8 of the Commonwealth Constitution, public debt of the Commonwealth constitutes a first claim on the Commonwealth's "available resources." What revenues constitute available resources of the Commonwealth for purposes of such constitutional provision is currently subject to ongoing litigation. There is also ongoing litigation regarding the priority of the Commonwealth's general obligation debt *vis a vis* its expenses related to the provision of essential services and other governmental functions. As a result, the Issuer's potential recovery under the Commonwealth Loan Assets will depend, among other things, on the outcome of such litigation.

*Security*. The Commonwealth Loan Assets are not secured by a lien on specific revenues on the Commonwealth. As a result, the Commonwealth Loan Assets will likely be treated as unsecured debt within the Commonwealth's Title III proceeding.

*Limitation on Enforcement and Collection Actions*. The Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Loan Assets. For additional information on such limitations, see "—*Management of the Restructuring Property*" above.

**Commonwealth Guaranteed Loan Asset**

*General*. The Commonwealth Guaranteed Loan Asset consists of a refinancing bond issued by the PAA to GDB in 2014 with an outstanding principal balance of approximately $225.5 million as of the Cutoff Date, plus accrued and unpaid interest of $56.7 million, and which is guaranteed by the Commonwealth (the "PAA Bond"). The PAA Bond is payable on August 1 of each year, bears interest at an annual rate of 9.5% and matures on January 1, 2045.

The Commonwealth's financial obligations, including obligations under its guarantees, are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act. Moreover, the Commonwealth is currently in the midst of a debt restructuring proceeding pursuant to the provisions of Title III of PROMESA. As a result, the Issuer's recovery, if any, on the Commonwealth Guaranteed Loan Asset will be determined in such proceeding and cannot be estimated at this time. Moreover, litigation and claims against the Commonwealth, including litigation and claims related to the Commonwealth Guaranteed Loan Asset, are subject to the automatic stay that came into effect upon the filing of the Title III petition. For additional discussion of such proceeding, see "*Description of the Commonwealth and its Current Financial Condition—Description of the Commonwealth's PROMESA Filings*."

On May 25, 2018, GDB filed a proof of claim in the Commonwealth's Title III proceeding (Claim No. 29485) in respect of all indebtedness owed by the Commonwealth to GDB as of the commencement date of the Commonwealth's Title III proceeding under PROMESA (May 3, 2017). Such proof of claim includes a claim for $225,553,700 of principal and $37,178,151 of pre-petition interest in respect of the Commonwealth Guaranteed Loan Asset. GDB's asserted claim against the Commonwealth does not account for the Closing Date Adjustments, and, as with all proofs of claim filed in the Commonwealth's Title III proceeding, is subject to review by parties in interest and, if objected to, subsequent allowance by order of the District Court whether pursuant to an order confirming a plan of adjustment or otherwise. For a discussion of certain risks related to the treatment of the Commonwealth Guaranteed Loan Asset in the Commonwealth's Title III proceeding, see "*Risk Factors—Risks Related to the Restructuring Property—Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*"

***Source of Repayment***. The Commonwealth Guaranteed Loan Asset is a direct obligation of the PAA. The PAA, however, does not have a recurring source of revenue and has been historically dependent on legislative appropriations and other Commonwealth subsidies for its operations and to meet its financial obligations, which the Commonwealth is no longer in a position to provide due to its own fiscal and economic challenges. As a result, it is expected that Collections, if any, on the Commonwealth Guaranteed Loan Asset will come from the Commonwealth under its guarantee, rather than from the PAA. Pursuant to Act No. 409-2004, as amended, the payment of the PAA Bond is backed by the good faith, credit and taxing power of the Commonwealth, to the extent that the revenues and other monies of the PAA are insufficient for the payment thereof. The Commonwealth Guaranteed Loan Asset is part of the approximately $5,920 million in general obligation guarantees included in the Commonwealth's Title III proceeding. For further discussion regarding the sources of repayment of the Commonwealth's public debt, see "*Commonwealth Loan Assets—Source of Repayment*" in this Offering Memorandum. For a discussion regarding risks related to the treatment of the guarantee, see "*Risk Factors—Risks Related to the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Assets—Although the Commonwealth Guaranteed Loan Asset is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power, the guaranty and pledge may be subject to challenge in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*"

***Security***. The Commonwealth Guaranteed Loan Asset is not secured by a lien on specific revenues of the PAA or the Commonwealth. As a result, the Commonwealth Guaranteed Loan Asset will likely be treated as unsecured debt within the Commonwealth's Title III proceeding.

***Limitation on Enforcement and Collection Actions***. The Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Guaranteed Loan Asset. For additional information on such limitations, see "*—Management of the Restructuring Property*" above.

### Public Corporation Loan Assets

The Public Corporation Loan Assets comprise various Loans made by GDB to several public corporations and instrumentalities of the Commonwealth with an aggregate outstanding principal balance as of the Cutoff Date of approximately $2,670.8 million. The Public Corporation Loan Assets have differing rights, sources of repayment and characteristics. However, all Public Corporation Loan Assets are classified by GDB as non-performing as of the Cutoff Date. The Public Corporation Loan Assets are not backed by the good faith, credit and taxing power of the Commonwealth.

The Public Corporation Loan Assets bear interest at variable rates, subject, in most cases, to a floor (ranging from 5% to 7%) and a cap (ranging from 8% to the legal interest rate limit of 12%). While certain of the Loan documents for the Public Corporation Loans authorized GDB to unilaterally modify the applicable interest rates on such Loans, pursuant to the GDB Restructuring Act, none of the Issuer, the Servicer, or any other person or entity will have the right to unilaterally increase the fixed interest rate or variable interest rate spread, as applicable, on such Public Corporation Loan Assets, and such Loans will continue to bear interest at the applicable fixed or variable rates in effect as of the Closing Date, as such rates are certified by AAFAF and GDB. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

Pursuant to the GDB Restructuring Act, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Public Corporation Loan Assets. For additional information on such limitations, see "*—Management of the Restructuring Property,*" above. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Public Corporation Loan Assets are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

The following table summarizes the Public Corporation Loans that will be part of the Restructuring Property. All Loan balances shown in this section with respect to Public Corporation Loan Assets are the balances as of the Cutoff Date, reflecting the Closing Date Adjustments.

**Public Corporation Loan Assets**

| Obligor | Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date[1] | % of Total Outstanding Principal Balance of Public Corporation Loans |
|---|---|---|---|---|---|---|
| HTA Loans[2][6] | $1,724,903,305 | $537,849,114 | 23 | 6.25% | 1/31/2016 | 64.6% |
| HTA Bonds[2] | 200,000,000 | 19,989,041 | 1 | 12.00% | 7/1/2028 | 7.5% |
| Ports Authority[2][3] | 266,575,179 | 75,213,947 | 5 | 6.33% | 12/5/2044 | 10.0% |
| PBA | 140,718,828 | 57,273,889 | 4 | 6.52% | 6/30/2044 | 5.3% |
| CCDA | 142,838,039 | 39,095,185 | 3 | 6.97% | 6/30/2027 | 5.3% |
| PRIDCO[2] | 53,116,550 | 13,874,502 | 4 | 6.65% | 6/30/2040 | 2.0% |
| PRSWMA[4] | 50,292,645 | 19,357,127 | 4 | 7.00% | 6/30/2040 | 1.9% |
| PRASA[5] | 53,607,940 | 10,872,063 | 1 | 6.25% | 3/31/2019 | 2.0% |
| Port Authority of Ponce | 20,762,619 | 5,366,333 | 1 | 7.18% | 6/30/2044 | 0.8% |
| Agricultural Development[2] | 15,287,458 | 3,218,765 | 1 | 5.00% | 3/1/2027 | 0.6% |
| PAA (Loan) | 1,700,000 | 596,000 | 1 | 8.00% | 10/31/2014 | 0.1% |
| Interagency Committee | 995,449 | 380,393 | 1 | 6.75% | 3/14/2013 | 0.0% |
| Total | $2,670,798,011 | $783,086,359 | 49 | - | - | 100% |

(1)    Does not account for the impact of Closing Date Adjustments.

(2)    As defined herein.

(3)    Includes the Ports Authority Reimbursement Obligations and the Ports Authority Loans, as defined herein.

(4)    Puerto Rico Solid Waste Management Authority.

(5)    Puerto Rico Aqueduct and Sewer Authority.

(6)    Balance reflects the full offset of HTA's deposits with GDB against the HTA Loans notwithstanding that, pursuant to an agreement between Financial Guaranty Insurance Company ("FGIC") and GDB settling FGIC's objection to the Title VI proceeding (the "FGIC Settlement"), approximately $8.5 million of HTA deposits will not be applied to offset HTA Loans on the Closing Date pending a determination as to whether, consistent with the pertinent agreements and applicable law, such deposits can be subject to the Closing Date Adjustments.

Source: GDB

More detailed information related to the Public Corporation Loan Assets of the obligors with Loans having an aggregate outstanding principal balance of more than $100 million as of the Cutoff Date and an overview of the other Public Corporation Loan Assets is included below.

### *Puerto Rico Highways and Transportation Authority.*

HTA is responsible for highway construction in Puerto Rico. Such construction was historically financed by debt (interim notes and revenue bonds), revenues of HTA, and federal and Commonwealth grants. According to its preliminary financial information, HTA reported an operating loss of approximately $458.2 million for fiscal year 2017, compared to net operating losses of approximately $432.1 million and $408.4 million for fiscal years 2016 and 2015, respectively. As of December 31, 2017, HTA's total debt was approximately $5,911.1 million, consisting of approximately $4,177.4 million of public bonds and approximately $1,733.7 million of Loans from GDB (not accounting for the Closing Date Adjustments).

HTA is the single largest net debtor of GDB. HTA's indebtedness to GDB that will be part of the Restructuring Property (after the Closing Date Adjustments) will consist of: (i) $1,725 million in Loans made by GDB to HTA that are payable primarily from, and secured by a pledge of, the Act 30-31 Revenues (as defined herein) (the "HTA Loans") (balance reflects the full offset of HTA's deposits with GDB against the HTA Loans notwithstanding that, pursuant to the FGIC Settlement, approximately $8.5 million of HTA deposits will not be applied to offset HTA Loans on the Closing Date pending a determination as to whether, consistent with the pertinent agreements and applicable law, such deposits can be subject to the Closing Date Adjustment) and (ii) $200 million in Transportation Revenue Bonds, Series A, issued by HTA under Resolution No. 98-06 (the "98 Resolution") adopted by HTA on February 26, 1998 (the "HTA Bonds" and, collectively with the HTA Loans, the "HTA Debt").

HTA's financial obligations are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act. Moreover, HTA is currently in the process of restructuring its liabilities pursuant to Title III of PROMESA. As a result, the Issuer's recovery, if any, on the HTA Debt will be determined in such proceeding and cannot be estimated at this time. Moreover, litigation and claims against HTA, including litigation and claims related to the HTA Debt, are subject to the automatic stay that came into effect upon the filing of the Title III petition.

On May 25, 2018, GDB filed a proof of claim in HTA's Title III proceeding (Claim No. 29533) in respect of all amounts owed by HTA to GDB under the HTA Debt as of the commencement date of HTA's Title III proceeding under PROMESA (May 21, 2017). On June 29, 2018, GDB filed an amended and restated proof of claim in HTA's Title III proceeding. Such proof of claim includes a claim for $1,733,697,499 of principal and $420,390,698 in pre-petition interest in respect of the HTA Loans and for $200,000,000 of principal and $1,886,368 of pre-petition interest in respect of HTA Bonds. GDB's asserted claim against HTA does not account for the Closing Date Adjustments, and, as with all proofs of claim filed in HTA's Title III proceeding, is subject to review by parties in interest and, if objected to, subsequent allowance by order of the District Court whether pursuant to an order confirming a plan of adjustment or otherwise. For a discussion of certain risks related to the treatment of the HTA Debt in HTA's Title III proceeding, see "*Risk Factors— Risks Related to the Restructuring Property—Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA*."

**HTA Loans.** All HTA Loans have matured and bear interest at a variable rate equal to the Prime Rate plus 150 basis points, subject to a floor of 6% and a legal cap of 12%. The HTA Loans are payable primarily from, and secured by a pledge of, the revenues allocated by the Commonwealth to HTA by Act No. 30-2013 and Act No. 31-2013 (collectively, the "Act 30-31 Revenues"). The Act 30-31 Revenues consist of (i) revenues from the increase in the Commonwealth's petroleum products excise tax introduced by Act No. 31-2013 (generating approximately $62.6 million in fiscal year 2017), (ii) the portion of the motor vehicle license fees in excess of the $15 pledged for the payment of certain of HTA's outstanding public bonds (generating approximately $60.6 million in fiscal year 2017), and (iii) $20 million of the Commonwealth's cigarette excise tax each fiscal year. The pledge of the Act 30-31 Revenues, however, is subject to Article VI, Section 8 of the Commonwealth Constitution and, thus, conditioned upon such revenues in any given fiscal year not being necessary for the payment of debt service on the Commonwealth's general obligation debt (which, as discussed above, is currently not being paid). To the extent that other revenues of the Commonwealth are insufficient for the payment of the Commonwealth's general obligation debt, the Act 30-31 Revenues may be "clawed-back" by the Commonwealth and applied to pay debt service on such debt. Further, according to the security agreement pursuant to which HTA granted a security interest on the Act 30-31 Revenues to secure the HTA Loans, such security interest is subordinated to the security interest (if any) of the holders of public bonds issued by HTA with respect to the Act 30-31 Revenues. While GDB believes that there are no superior liens on the Act 30-31 Revenues, certain HTA bondholders have asserted in HTA's Title III proceeding that they have a superior lien on a substantial portion of such revenues. For discussion regarding the risks related to such claims, see "*Risk Factors—Risks Related to the Public Corporation Loan Assets—HTA, which is the largest obligor on the Public Corporation Loan Assets, has currently sought relief pursuant to the provisions of Title III of PROMESA and is in the process of restructuring its obligations. As a result, the HTA Debt (as defined herein) will be restructured and recoveries pursuant to these obligations, if any, are uncertain at this time*."

The Act 30-31 Revenues have not been applied to the payment of the HTA Loans since December 2015 as result of the Commonwealth's and HTA's financial difficulties, the retention by the Commonwealth of such funds pursuant to the exercise of the "clawback" in fiscal year 2016 and the suspension of the transfer of such funds thereafter pursuant to the Moratorium Act. The legality of the exercise of the "clawback" by the Commonwealth and the constitutionality of the Commonwealth's actions under the Moratorium Act and subsequent legislation are currently being challenged in several legal proceedings.

**HTA Bonds.** The HTA Bonds bear interest at a fixed annual rate of 12% and mature on July 1, 2028. The HTA Bonds (along with other HTA bonds issued under the 98 Resolution) are payable primarily from, and secured by a pledge of: (i) the Commonwealth's petroleum product excise tax revenues allocated to HTA pursuant to Act 34-1997, as amended, up to $120 million each fiscal year (the "Crude Oil Revenues"), (ii) certain tax and fee revenues pledged for the payment of bonds issued by HTA under Resolution No. 68-18, adopted June 13, 1968 (the "68 Resolution") upon the cancellation of such bonds (the "68 Resolution Revenues"), and (iii) tolls or charges imposed by HTA for the use of any of the toll facilities other than those pledged for the payment of the bonds issued under the 68 Resolution (the "Toll Revenues"). The pledge of the Crude Oil Revenues and the 68 Resolution Revenues, however, is subject to Article VI, Section 8 of the Commonwealth Constitution and, thus, conditioned upon such revenues in any given fiscal year not being necessary for the payment of debt service on the Commonwealth's general obligation debt (which, as discussed above, is currently not being paid). To the extent that other revenues of the Commonwealth are insufficient for the payment of the Commonwealth's general obligation debt, the Crude Oil Revenues and the 68 Resolution Revenues may be "clawed-back" by the Commonwealth and applied to pay debt service on such debt.

The Crude Oil Revenues and the 68 Resolution Revenues have not been applied for the payment of HTA's bonds since December 2015 as a result of the retention of such funds by the Commonwealth due to the exercise of the "clawback" and the suspension of the transfer of such funds to HTA pursuant to the Moratorium Act. The Toll Revenues have also not been applied to the payment of HTA's bonds since May 2016, when HTA's obligation to transfer such funds to the trustee of its bonds was suspended pursuant to the Moratorium Act. As provided above, the legality of the exercise of the "clawback" by the Commonwealth and the constitutionality of the Commonwealth's actions under the Moratorium Act and subsequent legislation are currently being challenged in several legal proceedings.

***Puerto Rico Ports Authority.*** The Puerto Rico Ports Authority (the "Ports Authority") owns and operates all major airport and seaport facilities in Puerto Rico, except for Puerto Rico's principal airport which has been operated by a private consortium since 2013. The Ports Authority derives revenues from a variety of sources, including charges on airplane fuel sales, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. The Ports Authority's financial statements reported a decrease in net position of approximately $22.4 million in fiscal year 2017 (unaudited and subject to change) and of approximately $10 million in fiscal year 2016.

The indebtedness of the Ports Authority that will be part of the Transferred Property consists of (i) obligations of the Ports Authority (the "Ports Authority Reimbursement Obligations") arising under a Letter of Credit Disbursement and Reimbursement Agreement by and between GDB and the Ports Authority (the "Reimbursement Agreement") relating to all unreimbursed draws honored by GDB (or its successors or assigns) under a direct-pay letter of credit issued by GDB (the "GDB Letter of Credit") in connection with the Puerto Rico Infrastructure Financing Authority Revenue Bonds (Ports Authority Project) (the "PRIFA Bonds") and (ii) two Loans made by GDB to the Ports Authority (the "Ports Authority Loans").

***Ports Authority Reimbursement Obligations.*** PRIFA issued the PRIFA Bonds pursuant to a Loan and Trust Agreement by and among PRIFA, the Ports Authority and The Bank of New York Mellon, dated as of December 1, 2011 (the "Loan and Trust Agreement"). The proceeds of the PRIFA Bonds were loaned by PRIFA to the Ports Authority. Pursuant to the Loan and Trust Agreement, the PRIFA Bonds are payable primarily from draws on the GDB Letter of Credit and from payments made by the Ports Authority under the credit facility extended by PRIFA. Pursuant to the Reimbursement Agreement, the Ports Authority has an obligation to reimburse GDB for any payments made by GDB under the GDB Letter of Credit. The Ports Authority Reimbursement Obligations correspond to payments made by GDB under the GDB Letter of Credit, which the Ports Authority is required to reimburse to GDB pursuant to the Reimbursement Agreement.

The Ports Authority Reimbursement Obligations are obligations of the Ports Authority secured by a lien upon and security interest in the Ports Authority's Revenues (as defined in the Trust Agreement, dated as of January 1, 1972, as amended and supplemented as of December 1, 2011, by and among the Ports Authority, The Bank of New York Mellon, as successor trustee, and Banco Popular de Puerto Rico, as successor co-trustee) and any rights to receive the same. In accordance with the Reimbursement Agreement, amounts owed by the Ports Authority to GDB under the Ports Authority Reimbursement Obligations were due no later than 3:00 p.m. on the date of each draw, *provided* that if the draw was not reimbursed in full by the Ports Authority to GDB on such date, interest would accrue on the amount of each draw at the Prime Rate plus 150 basis points, but in no event less than 6% per annum and, *provided further* that, to the extent that the full amount of the draw was not reimbursed to GDB within 10 days following each draw, interest would accrue thereafter at a rate equal to 400 basis points over the then-applicable rate. Notwithstanding such provision, due to the Ports Authority's inability to pay the Reimbursement Obligations, GDB has continued to accrue interest on such Loans at the Prime Rate plus 150 basis points.

The obligations of GDB under the GDB Letter of Credit and the obligations of the Ports Authority to make transfers to the trustee of the PRIFA Bonds relating to payments under the underlying credit facility are currently suspended pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act. While the obligations of the Ports Authority under the Ports Authority Reimbursement Obligations are not currently suspended or subject to a moratorium, all Ports Authority Reimbursement Obligations are classified by GDB as non-performing.

The following table provides an overview of the Ports Authority Reimbursement Obligations, as of the Cutoff Date, and additional information regarding such obligations is set forth below.

**Ports Authority Reimbursement Obligations**

| Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Ports Authority Reimbursement Obligations |
|---|---|---|---|---|
| $69,405,015 | $19,764,900 | 6.25% | 12/1/2018 | 35.4% |
| 90,058,014 | 25,420,646 | 6.25% | 2/1/2019 | 45.9% |
| 36,847,625 | 10,215,150 | 6.25% | 3/1/2019 | 18.7% |
| $196,310,654 | $55,400,696 | - | - | 100.0% |

(1)       Does not account for the impact of Closing Date Adjustments.

Source: GDB

In addition to the draws honored by GDB prior to the Closing Date identified in the table above, The Bank of New York Mellon made a final draw request to GDB in May 2017 for $190,630,000 and $9,398,112 on account of principal and interest, respectively, due on the PRIFA Bonds. This draw request is a Participating Bond Claim for which New Bonds are to be issued pursuant to the Qualifying Modification. For the avoidance of doubt, any rights of GDB under the Reimbursement Agreement arising out of the issuance of, or any payments on, the New Bonds in respect of such outstanding draw requests under the GDB Letter of Credit will be included in the Transferred Property.

**Ports Authority Loans.** The Ports Authority Loans consist of two Loans made by GDB to the Ports Authority in 2008 (the "2008 Ports Authority Loan") and 2014 (the "2014 Ports Authority Loan") for the development of certain projects. The Ports Authority Loans are classified by GDB as non-performing as of the Cutoff Date. The following table summarizes certain information regarding the Ports Authority Loans as of the Cutoff Date, and additional information regarding each of the Loans is set forth below.

**Ports Authority Loans**

| | Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Outstanding Principal Balance of Ports Authority Loans |
|---|---|---|---|---|---|
| 2008 Ports Authority Loan............. | $40,941,805 | $13,227,500 | 6.25% | 6/30/2023 | 60.1% |
| 2014 Ports Authority Loan............. | 29,322,720 | 6,585,751 | 7.00% | 12/05/2044 | 39.9% |
| Total ............................................ | $70,264,525 | $19,813,251 | - | - | 100.0% |

(1) Does not account for the impact of Closing Date Adjustments.

Source: GDB

**2008 Ports Authority Loan.** The 2008 Ports Authority Loan was granted by GDB to the Ports Authority to finance the construction of the project known as the "San Juan Waterfront Project" in Puerta de Tierra. Pursuant to the loan agreement, the 2008 Ports Authority Loan is payable from the proceeds of the sale or lease of parcels in the San Juan Waterfront Project and from legislative appropriations. Interest on the 2008 Ports Authority Loan is payable monthly and the entire principal amount of the Loan is payable at maturity on June 30, 2023, *provided* that, pursuant to the loan agreement, to the extent that no appropriations are made for the payment of such Loan, the maturity thereof will be extended to June 30, 2026. The Loan bears interest at a variable rate equal to LIBOR plus 150 basis points, subject to a 6% floor, and, pursuant to the loan agreement, to the extent that the entire principal amount of the Loan is not paid at maturity, the Loan will bear interest thereafter at a rate equal to 200 basis points above the then-applicable interest rate.

The 2008 Ports Authority Loan is secured by a mortgage in the principal amount of $180 million over a parcel of land located in San Juan, having an area of approximately 38.93 *cuerdas* and which is commonly known as the "San Juan Waterfront Parcel." The mortgage, however, is junior to other liens encumbering the San Juan Waterfront Parcel. Moreover, the fair market value of the San Juan Waterfront Parcel as of the Cutoff Date is unknown, but is likely significantly lower than the principal amount of the mortgage. An appraisal of the San Juan Waterfront Parcel dated as of February 12, 2010 estimated the market value of the San Juan Waterfront Parcel to be approximately $55 million as of such date, which is approximately 30% of the principal amount of the mortgage. While a more recent appraisal has not been obtained by GDB, the fair market value of the San Juan Waterfront Parcel as of the Cutoff Date could be materially lower than that estimated in the 2010 appraisal, since property values in Puerto Rico have continued to decrease since then.

**2014 Ports Authority Loan.** The 2014 Ports Authority Loan was granted by GDB to the Ports Authority to refinance certain outstanding indebtedness of the Ports Authority and for the development of a maintenance, repair and overhaul facility in the Rafael Hernández Airport in Aguadilla (the "Aguadilla Airport"). Pursuant to the loan agreement, principal and interest on the 2014 Ports Authority Loan are payable annually. The Loan bears interest at a rate equal to LIBOR plus 150 basis points, with a floor of 7%. To the extent that the entire principal amount of the Loan is not paid at maturity, the Loan will bear interest thereafter at a rate equal to 400 basis points above the then-applicable interest rate.

Pursuant to the loan agreement, the 2014 Ports Authority Loan is payable from (i) future legislative appropriations, (ii) lease payments required to be made by Lufthansa Technik Puerto Rico, LLC ("LTPR") in excess of a minimum rent determined by the Ports Authority under a certain Lease Agreement by and between LTPR, Ports Authority and Puerto Rico Industrial Development Company ("PRIDCO") dated as of April 10, 2014 with respect to several areas in the Aguadilla Airport (the "LTPR Lease"), (iii) proceeds of future bond issuances, (iv) the Ports Authority's interest with respect to a rent support letter of credit in the maximum amount of $3 million issued by Commerzbank AG to support LTPR's rent payment obligations under the LTPR Lease, (v) proceeds from the sale of the PRIDCO Mortgaged Properties (as defined herein), and (vi) to the extent the foregoing sources of payment are insufficient for the payment of debt service on the 2014 Ports Authority Loan, any other revenues of the Ports Authority. The 2014 Ports Authority Loan is secured by an assignment of the payments required to be made by LTPR under the LTPR Lease in excess of a minimum rent determined by the Ports Authority and a mortgage in the aggregate principal amount of $4 million over four real properties owned by PRIDCO and located in the municipalities of Caguas, Guayama and San Juan (the "PRIDCO Mortgaged Properties"). The mortgages are junior to various easements encumbering the PRIDCO Mortgaged Properties. The fair market value of the PRIDCO Mortgaged

Properties as of the Cutoff Date is unknown, but could be significantly lower than the principal amount of the mortgage. Furthermore, the amount of rental payments assigned to secure the obligations of the Ports Authority under the 2014 Ports Authority Loan is controlled by the Ports Authority, since only such rental payments made by LTPR in excess of the minimum rent determined by the Ports Authority are pledged to secure such obligations. As a result, the actual value of such assignment is unquantifiable.

***Puerto Rico Public Buildings Authority.*** PBA was created to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations and instrumentalities of the Commonwealth, and has issued public bonds to finance such facilities. PBA's public bonds, which are guaranteed by the Commonwealth, are payable from lease payments that are largely derived from legislative appropriations. Approximately $4,176 million aggregate principal amount of PBA issued public bonds are outstanding, which are currently subject to a moratorium and are not being paid.

The Transferred Property will include four Loans (the "PBA Loans") of PBA with an aggregate outstanding principal balance as of the Cutoff Date of approximately $141 million. Unlike the bonds issued by PBA in the capital markets, the PBA Loans are not guaranteed by the Commonwealth and, thus, the Commonwealth's good faith, credit and taxing power is not pledged for the payment thereof. Moreover, all financial obligations of PBA are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act, and the PBA Loans are classified by GDB as non-performing as of the Cutoff Date. The PBA Loans may be classified into two categories, as described below.

The following table summarizes certain information regarding the PBA Loans as of the Cutoff Date, and additional information regarding each of the Loans is set forth below.

**PBA Loans**

| | Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Outstanding Principal Balance of PBA Loans |
|---|---|---|---|---|---|
| 2006 PBA Loan ...................... | $49,995,337 | $15,263,013 | 7.00% | 6/30/2018 | 35.5% |
| Other PBA Loans..................... | 12,110,752 | 7,165,180 | 6.25% | 6/30/2044 | 8.6% |
| | 39,204,590 | 16,919,542 | 6.25% | 6/30/2044 | 27.9% |
| | 39,408,149 | 17,926,154 | 6.25% | 6/30/2044 | 28.0% |
| Total ......................................... | $140,718,828 | $57,273,889 | - | - | 100% |

(1)    Does not account for the impact of Closing Date Adjustments.

Source: GDB

***2006 PBA Loan.*** The Transferred Property will include a Loan made by GDB to PBA in 2006, the proceeds of which were used by PBA to finance its operating expenses and refinance certain outstanding indebtedness (the "2006 PBA Loan"). The 2006 PBA Loan has an outstanding principal balance of as of the Cutoff Date of approximately $50 million and matures on June 30, 2018. Pursuant to the loan agreement, the 2006 PBA Loan bears interest at a fixed rate equal to 7%. The 2006 PBA Loan is an unsecured obligation of PBA payable from (i) the rental income received by PBA from the lease or sublease of real estate properties to other Commonwealth government entities, (ii) proceeds from the sale or disposition of certain real property, and (iii) proceeds of future bond issuances. Moreover, the 2006 PBA Loan is secured by a security interest in the proceeds of the sale or disposition of two real properties located in San Juan consisting of the buildings where the Commonwealth's Department of Justice and Treasury Department are currently located. Such security interest, however, is subordinated to all rights of holders of outstanding PBA bonds in respect of such funds.

***Other PBA Loans.*** The remaining PBA Loans that will form part of the Transferred Property consist of three Loans made by GDB to PBA to finance the acquisition and development of certain facilities or improvements by PBA in anticipation of the issuance of revenue bonds by PBA. Such Loans have an aggregate outstanding principal balance of approximately $90 million as of the Cutoff Date. Pursuant to the loan agreements, interest on the PBA Loans is payable monthly in arrears (no later than 10 days from the receipt of an invoice from GDB), and principal is payable at maturity. Pursuant to the applicable loan agreements, such Loans bear interest at a variable rate equal to the Prime Rate, plus 150 basis points, subject to a 6% floor and a legal interest rate limit of 12%, *provided* that, after their maturity, each Loan will bear interest at a rate equal to 2% over the then-applicable interest rate. The Loans are unsecured obligations of PBA payable from (i) the proceeds of future PBA bond issuances and (ii) the revenues received by PBA in respect of rental payments corresponding to the facilities financed with the corresponding Loans, which facilities are not identified in the Loan documents.

***Puerto Rico Convention Center District Authority.*** CCDA was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Rosselló González Convention Center and designated private parcels located within the Convention Center District in San Juan. The convention center opened on November 17, 2005. CCDA also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum (the "Agrelot Coliseum"). CCDA has approximately $386.4 million in outstanding bonds issued in March 2006 to finance the convention center, which are payable from a portion of the hotel room tax. CCDA's bonds are subject to a moratorium and are currently not being paid.

GDB issued three Loans to CCDA, which have an aggregate outstanding principal balance as of the Cutoff Date of approximately $142.8 million (the "CCDA Loans"). All financial obligations of CCDA are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act, and the CCDA Loans are classified by GDB as non-performing as of the Cutoff Date.

The following table summarizes certain information regarding the CCDA Loans as of the Cutoff Date, and additional information regarding each Loan is set forth below.

**CCDA Loans**

|  | Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Outstanding Principal Balance of PBA Loans |
|---|---|---|---|---|---|
| 1996 CCDA Loans | $138,423,659 | $37,816,283 | 7.00% | 6/30/2027 | 96.9% |
| 2013 CCDA Loan | 4,414,379 | 1,278,901 | 6.00% | 9/30/2014 | 3.1% |
| Total | $142,838,038 | $39,095,185 | - | - | 100% |

(1)    Does not account for the impact of Closing Date Adjustments.

Source: GDB

***1996 CCDA Loans.*** The CCDA Loans include Loans originally made by GDB to PBA in 1996 to finance the development of the Agrelot Coliseum. Such Loans (the "1996 CCDA Loans") were assumed by CCDA in 2004 following the transfer of the Agrelot Coliseum property to CCDA. The 1996 CCDA Loans have an outstanding principal balance of approximately $138.4 million as of the Cutoff Date. Pursuant to the loan agreement, interest on the 1996 CCDA Loans is payable monthly in arrears (no later than 10 days from the receipt of an invoice from GDB), and principal is payable at its maturity on June 30, 2027. The Loans bear interest at a fixed rate equal to 7%. The 1996 CCDA Loans are unsecured and, pursuant to the loan agreement, are payable from appropriations from the Legislative Assembly.

***2013 CCDA Loan.*** The CCDA Loans include a Loan originally made by GDB to CCDA to finance the acquisition by CCDA through eminent domain of a parcel commonly known as Parcel C located in the Convention Center District in San Juan ("Parcel C"). Such Loan (the "2013 CCDA Loan") has an outstanding principal balance of approximately $4.4 million as of the Cutoff Date. Pursuant to the loan agreement, the entire outstanding principal balance of the Loan, plus accrued interest, was due on September 30, 2014. The 2013 CCDA Loan bears interest at a fixed rate equal to 6%. The 2013 CCDA Loan is unsecured and, pursuant to the loan agreement, is payable solely from the proceeds of the sale or other revenues generated by CCDA from Parcel C, with no recourse to other assets of CCDA. While the Loan documents contemplated the constitution of a mortgage over Parcel C to secure CCDA's obligations under the 2013 CCDA Loan, such mortgage was not ultimately constituted and the eminent domain proceeding pursuant to which CCDA acquired title to Parcel C is still ongoing due to challenges brought by the previous owner of such property.

***Other Public Corporation Loan Assets.*** The remaining Public Corporation Loan Assets, which constitute approximately 7% of all Public Corporation Loan Assets, consist of 13 Loans to seven public corporations and instrumentalities of the Commonwealth with an aggregate outstanding principal balance as of the Cutoff Date of approximately $195.8 million. The outstanding principal balances of the individual Loans range from approximately $995,449 to $53.6 million. These Public Corporation Loan Assets are mostly unsecured and payable from legislative appropriations or proceeds of future bond issuances, with the following exceptions: (i) a Loan to the Comprehensive Fund for the Agricultural Development of Puerto Rico (the "Agricultural Development Fund") with an outstanding principal balance as of the Cutoff Date of approximately $15.3 million, which is secured by a security interest in the proceeds of certain revenues allocated to the Agricultural Development Fund pursuant to Act No. 165-2001, as amended, and Act No. 166-2001, as amended, corresponding to Commonwealth excise taxes on sugar and imported coffee, respectively, but which are not currently being transferred by the Commonwealth's Department of Treasury to the Agricultural Development Fund, and (ii) a Loan to PRIDCO with an aggregate principal balance as of the Cutoff Date of approximately $24.7 million, which is secured by a security interest in the product and net proceeds of the sale or disposition of 27 real properties owned by PRIDCO. All of these Loans are classified by GDB as non-performing as of the Cutoff Date.

### GDB Retained Loan Rights

The Transferred Property will include the Beneficial Interest in, and the proceeds of (such Beneficial Interest and proceeds are referred to herein as the GDB Retained Loan Rights), the GDB Retained Loans, including the Additional Recovery Authority Loans, that will be retained and continue to be serviced by GDB, pursuant to, and on the terms set forth in, the Qualifying Modification. The GDB Retained Loans consist of Loans granted by GDB to several public corporations and instrumentalities with an aggregate principal balance as of the Cutoff Date of approximately $1,131.8 million, of which the Additional Recovery Authority Loans comprise approximately $144.6 million. The "Additional Recovery Authority Loans" are Loans to CRIM, Economic Development Bank for Puerto Rico ("EDB"), and University Medical Services, Inc. ("SMU"), further described below.

Pursuant to the GDB Restructuring Act and the Qualifying Modification, GDB will be required to transfer the proceeds of the GDB Retained Loans to the Issuer as soon as practicable but in no event later than 15 days after receipt thereof. Other than the Additional Recovery Authority Loans (upon the transfer thereof to GDB as provided below) and the Beneficial Interest in the GDB Retained Loans, the GDB Retained Loans will not be part of the Transferred Property.

As explained above under "—*Management of the Restructuring Property*," pursuant to the Qualifying Modification, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on the GDB Retained Loans, *provided* that it will not be required to bring any action seeking to obtain a judgment against a public entity that is an obligor on a GDB Retained Loan or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material information relating to any modification, restructuring or similar transaction in respect of such Loans.

The Additional Recovery Authority Loans will be transferred to GDB as Transferred Property on the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (b) 18 months after the Closing Date. Upon the required transfer of the Additional Recovery Authority Loans to the Issuer and upon the transfer of any other GDB Retained Loan to the Issuer at the discretion of GDB, the Issuer will be subject to the limitations on its exercise of rights and remedies in respect of such Loan to the same extent as with respect to the Public Corporation Loan Assets. For additional information on such duties and limitations, see "—*Management of the Restructuring Property*" above.

All GDB Retained Loans (other than the Additional Recovery Authority Loans) are classified by GDB as non-performing. All Additional Recovery Authority Loans were classified by GDB as performing as of the Cutoff Date, *provided that*, as further discussed below, a portion of the 2001 CRIM Loan (as defined herein) with a principal balance of $26.9 million, had been placed by GDB in non-accrual status as of the Cutoff Date.

The following table provides an overview of certain additional information regarding the GDB Retained Loans as of the Cutoff Date (but considering any payments received by GDB on July 2, 2018 by virtue of rollover to the next business day from the Cutoff Date), and a brief description of each Additional Recovery Authority Loan follows.

**GDB Retained Loan Rights[1]**

| Obligor | Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date[2] | % of Total Outstanding Principal Balance of GDB Retained Loans |
|---|---|---|---|---|---|---|
| ASEM[3] | $282,447,692 | $ 64,161,740 | 1 | 6.25% | 11/30/2022 | 25% |
| Special Communities[4] | 240,708,020 | 92,889,979 | 1 | 7.00% | 6/30/2040 | 21% |
| ASES[5] | 182,196,066 | 41,817,876 | 1 | 6.25% | 10/31/2022 | 16% |
| CRIM | 129,083,721 | 19,350,423 | 2 | 4.11% | 7/1/2032 | 11% |
| Cancer Center[6] | 120,482,398 | 20,509,820 | 2 | 6.55% | 12/31/2043 | 11% |
| TDF[7] | 44,925,998 | - | 3 | - | - | 4% |
| EDB Loan[8] | 6,556,583 | 0 | 1 | 6.00% | 6/1/2026 | 1% |
| EDB Deposit[9] | 35,122,200 | 0 | 1 | N/A | N/A | 3% |
| Cantera Peninsula[10] | 37,791,088 | 10,007,699 | 2 | 7.00% | 6/30/2040 | 3% |
| PRIFA | 37,361,150 | 8,897,649 | 1 | 6.25% | 6/30/2017 | 3% |
| SMU[8] | 8,988,973 | - | 1 | 6.25% | 6/30/2025 | 1% |
| PPP[11] | 6,159,177 | 949,295 | 1 | 6.25% | 1/31/2016 | 1% |
| Total | $1,131,823,066 | $258,584,482 | 17 | - | - | 100% |

(1) Additional Recovery Authority Loans are identified in bold.

(2) Does not account for the impact of Closing Date Adjustments.

(3) Puerto Rico Medical Services Administration.

(4) Special Communities Perpetual Trust.

(5) Puerto Rico Health Insurance Administration.

(6) Puerto Rico Comprehensive Cancer Center.

(7) Puerto Rico Tourism Development Fund.

(8) As defined herein.

(9) Non-performing overnight deposit of GDB at EDB.

(10) Cantera Peninsula Integral Development Company.

(11) Puerto Rico Public-Private Partnerships Authority.

Source: GDB

***CRIM Loans.*** CRIM is a municipal entity of the Commonwealth that is primarily responsible for assessing and collecting real and personal property taxes for the benefit of the municipalities. Loans to CRIM comprising Additional Recovery Authority Loans consist of two Loans made by GDB to CRIM in 2001 (the "2001 CRIM Loan") and 2002 (the "2002 CRIM Loan") that have an aggregate outstanding principal balance as of the Cutoff Date of approximately $129.1 million.

***2001 CRIM Loan.*** The 2001 CRIM Loan was made by GDB to CRIM pursuant to Act No. 42-2000 to cover CRIM's operational deficit resulting from excess remittances made by CRIM to municipalities based on estimates of annual property tax

collections that later resulted to be greater than the actual tax collections. Municipalities are indebted to CRIM for the amount of the excess remittances received, and CRIM withholds funds from the municipalities' remittances for the payment of the 2001 CRIM Loan. As of the Cutoff Date, the 2001 CRIM Loan has an outstanding principal balance of approximately $101.7 million and accrued and unpaid interest of approximately $19.1 million. The 2001 CRIM Loan is payable on January 1 and July 1 of each year, bears interest at a variable rate equal to LIBOR, plus 125 basis points, and matures on July 1, 2032. The 2001 CRIM Loan is unsecured and, pursuant to the loan agreement, is payable from Commonwealth appropriations related to an increase in Commonwealth subsidies to municipalities authorized pursuant to Act 42-2000. As of the Cutoff Date, CRIM has made all payments due on the 2001 CRIM Loan in full with funds withheld by CRIM from municipalities as repayment of excess remittances received by such municipalities. As a result, the 2001 CRIM Loan was classified by GDB as performing as of the Cutoff Date. However, certain municipalities have objected to CRIM withholding remittances for this purpose, which may result in CRIM not being able to continue making all debt service payments due under the 2001 CRIM Loan. As a result, GDB has placed the portion of the 2001 CRIM Loan corresponding to such municipalities (approximately $26.9 million) in non-accrual status as of the Cutoff Date. Moreover, GDB and CRIM are currently negotiating a possible moratorium on payments of principal on the 2001 CRIM Loan. As a result, the Collections Schedule included herein assumes a two-year moratorium on payments of principal on the 2001 CRIM Loan. Any such modification would need to be approved by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement), if it occurs prior to the Closing Date, and by the Servicer in accordance with the Servicing Agreement, if it occurs after the Closing Date.

*2002 CRIM Loan.* The proceeds of the 2002 CRIM Loan were used by CRIM to cancel a debt issued by it in connection with a transaction for the sale of delinquent tax debts. As of the Cutoff Date, the 2002 CRIM Loan has an outstanding principal balance of approximately $27.3 million and accrued and unpaid interest of approximately $222 thousand. Interest on the 2002 CRIM Loan is payable on March 31 and September 30 of each year, and principal is payable on March 31 of each year. The 2002 CRIM Loan bears interest at a variable rate equal to LIBOR, plus 125 basis points. The 2002 CRIM Loan is unsecured and, pursuant to the loan agreement, was expected to be payable from Commonwealth appropriations to municipalities. As of the Cutoff Date, the 2002 CRIM Loan was classified by GDB as performing. However, GDB and CRIM are currently negotiating a possible moratorium on payments of principal on the 2002 CRIM Loan. As a result, the Collections Schedule included herein assumes a two-year moratorium on payments of principal on the 2002 CRIM Loan. Any such modification would need to be approved by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement), if it occurs prior to the Closing Date, and by the Servicer in accordance with the Servicing Agreement, if it occurs after the Closing Date.

*EDB Loan.* EDB is a public bank that is an instrumentality of the Commonwealth and provides Loans to individuals and private entities to promote economic development, primarily in the manufacturing, agriculture and tourism industries. GDB made a Loan to EDB (the "EDB Loan") in 1998 for the acquisition and improvement of the building in San Juan, Puerto Rico, in which EDB currently has its offices (the "EDB Property"). As of the Cutoff Date, the EDB Loan had an outstanding principal balance of approximately $6.6 million. Interest on the EDB Loan is payable semi-annually on June 1 and December 1 of each year, and principal is payable on June 1 of each year. The EDB Loan bears interest at a fixed rate of 6% per year. The Loan is secured by a mortgage in the principal amount of approximately $14.2 million over the EDB Property. The most recent appraisal of the EDB Property prepared at the request of GDB (dated August 2016) reflects an appraisal value of $7.7 million. As of the Cutoff Date, the EDB Loan was classified by GDB as current.

*SMU Loan.* SMU is a not-for-profit corporation created by the UPR, the Commonwealth's public university system, to administer certain of the university's medical facilities. GDB made a Loan to SMU (the "SMU Loan") to finance operating expenses and make certain improvements to the medical facilities. As of the Cutoff Date, the SMU Loan had an outstanding principal balance of approximately $9.0 million. The SMU Loan is payable monthly and bears interest at a variable rate equal to the Prime Rate plus 150 basis points. The Loan is unsecured and benefits from a payment guarantee from the UPR. As of the Cutoff Date, the SMU Loan was classified by GDB as current.

### Real Property Assets

The Real Property Assets comprise real properties that were transferred to GDB by the Commonwealth and certain public corporations of the Commonwealth in full or partial payment of certain Loans of such entities with GDB. The majority of the real properties comprising the Real Property Assets were acquired by GDB from the Commonwealth (through the Puerto Rico Lands Administration) in 2008 pursuant to a Deed of Assignment, Transfer and Conveyance in Partial Payment of Loan. All of the Real Property Assets are located in the Commonwealth. GDB will transfer the Real Property Assets to the Issuer on an "as is, where is" basis. As a result, the Issuer will receive the Real Property Assets with any and all defects and restrictions on transfer such assets had when held by GDB.

Certain of the Real Property Assets have been offered for sale by GDB since 2009 and, more actively, during the last year. GDB has conducted request for proposal processes to sell certain of the Real Property Assets and has issued several notices of award following such processes.

Certain of the Real Property Assets are subject to, or have in the past been subject to, litigation or other claims from other government entities or third parties, including, without limitation, claims challenging GDB's title to such assets. Further, certain of the Real Property Assets (i) have been determined to contain hazardous materials or be subject to other adverse environmental conditions, (ii) are occupied by third parties (squatters), (iii) are subject to zoning and building restrictions that limit their potential uses, (iv) are located in zones designated as flood zones by the Federal Emergency Management Agency, (v) are subject to various types of liens, encumbrances and other restrictions, including leases, covenants and laws restricting their sale or use or requiring that they be dedicated to public uses, and/or (vi) have not yet been recorded in the name of GDB in the Registry of the Property. The estimated value of the Real Property Assets has been significantly reduced in recent years primarily as a result of general economic and real estate market conditions in the Commonwealth. The various issues discussed in this paragraph, as well as other conditions, including conditions that are unknown at this time, may significantly affect the realizable value of the Real Property Assets. For additional discussion regarding the risks related to the foregoing matter, see "*Risk Factors—Risks Related to the Restructuring Property—Risks Related to the Restructuring Property Assets—The Real Property Assets may have title defects or restrictions on transfer that could affect the Issuer's ability to realize value from such assets*".

The following table contains a summary of certain characteristics of the Real Property Assets and, following the table is a more detailed description of each of the Real Property Assets that have an estimated appraisal value of more than $10,000,000.

**Real Property Assets**

| Real Property Asset | Location | Approximate Surface Area (sq.mt) [1] | Date of Last Appraisal | Appraisal Value | Purchase Offers [2] |
|---|---|---|---|---|---|
| Parcel B [4] | Santurce Ward, San Juan | 20,809.03 | Oct-16 | $13,525,000 | $3,000,000-$3,250,000 |
| Río Bayamón Norte Community Lot [4] | Juan Sánchez Ward, Bayamón and Pueblo Viejo Ward, Guaynabo | 729,590.93 | Jul-17 | 12,000,000 | $10,000,000-$12,000,000 |
| National Guard [4] | Puerta de Tierra Ward, San Juan | 14,972.50 | Oct-17 | 7,000,000 | None |
| Former Leprosarium | Las Cuevas Ward, Trujillo Alto | 100,269.62 | Jan-16 | 6,020,000 | None |
| Josefa Farm Rural Property (Parcel A) | Quebrada Vueltas, Fajardo | 168,190.67 | Nov-14 | 3,825,000 | None |
| Josefa Farm Rural Property (Parcel C-4) | Quebrada Vueltas, Fajardo | 270,265.79 | Nov-14 | 1,500,000 | None |
| Property adjacent to San Lucas Hospital | Machuelos Ward, Ponce | 307,872.07 | Dec-15 | 5,090,000 | $5,090,000 [5] |
| Former Ruiz Soler Hospital Complex | Juan Sánchez Ward, Bayamón | 3,662.18 | Jan-16 | 2,470,000 | $750,000-$900,000 [6] |
| Property Adjacent to Former AcuaExpreso Terminal | San Juan | 6,396.33 | Oct-13 | 2,400,000 | None |
| Former Luchetti School | Tanamá Ward, Arecibo | 31,958.49 | Jan-16 | 1,360,000 | None |
| Parkland [4] | Pueblos and Santa Rosa Ward, Guaynabo | 3,677.19 | May-15 | 700,000 | $625,000 [3] |
| Guayanés | Barrio Guayanés, Yabucoa | 221,910.14 | Dec-15 | 260,000 | None |
| Former Mini-Golf Range | Las Cuevas Ward, Trujillo Alto | 14,221.71 | Oct-13 | 185,000 | None |
| Total | - | - | - | $56,335,000 | - |
| Total excluding Real Property Assets sold after the Cutoff Date | - | - | - | $23,110,000 | - |

(1) Surface area is based on legal description of the properties.

(2) Purchase offers received by GDB, if any, for each Real Property Asset from January 2017 to the Cutoff Date.

(3) After conducting a request for proposals process, GDB issued a notice of award to sell this property for this price.

(4) Property was sold by GDB after the Cutoff Date.

(5) A transaction pursuant to this offer was not consummated and, subsequent to the Cutoff Date, GDB received a new offer to purchase this property for $3 million.

(6) Transactions pursuant to these offers were not consummated and, subsequent to the Cutoff Date, GDB received a new offer to purchase this property for 1.074 million.

Source: GDB

*Parcel B.* The Real Property Asset known as "Parcel B" is a vacant lot with an area of approximately 20,809.03 sq.mt. located across the street southwest of Sagrado Corazón Urban Train Station, Martín Peña Sector, Santurce Sur Ward, San Juan, Puerto Rico ("Parcel B"). GDB acquired Parcel B from the Commonwealth in 2007 pursuant to a Deed of Subdivision, Consolidation and Exchange. The most recent appraisal of Parcel B prepared at the request of GDB is dated October 2016 and assigned the property a market value of approximately $13.525 million. However, after conducting a request for proposals process and marketing the property for over a year, the offers received by GDB for the purchase of this property are significantly lower than its appraisal value.

*Río Bayamón Norte Community.* The Real Property Asset known as the "Río Bayamón Norte Community" property has a surface area of approximately 729,590.93 sq.mt. and comprises various parcels of land located in the Juan Sanchez Ward of Bayamón and the Pueblo Viejo Ward of Guaynabo (the "Río Bayamón Property"). GDB acquired the Río Bayamón Property from the Puerto Rico Urban Renewal and Housing Corporation, a Commonwealth public corporation that later was merged into the Puerto Rico Housing Finance Authority, pursuant to a Deed of Assignment in Lieu of Debt Payment in 1997.

The parcels comprising the Río Bayamón Property were expected to be developed into multi-family residential projects and mixed residential/commercial use projects pursuant to a master development plan. While the construction of the common infrastructure

for such projects was substantially completed in 2015, the projects have not been developed. Moreover, the contractor of the property's common infrastructure commenced litigation against GDB in 2017 seeking the payment of approximately $21 million on account of final withholding, extended overhead and other charges in connection with such development. At the request of GDB, the court entered judgment on January 2018 dismissing the claim for lack of jurisdiction due to the construction contract including a mandatory arbitration clause.

The most recent appraisal of the Río Bayamón Property prepared at the request of GDB is dated June 2017 and assigned the property a market value of approximately $12.0 million. The same appraiser had estimated the market value of the property to be approximately $19.6 million in October 2016.

***Sale of Real Properties after the Cutoff Date.*** After the Cutoff Date, GDB sold the real properties identified as "Parcel B," "Rio Bayamón Norte Community," "National Guard," and "Parklane" in the table above. The net proceeds of such sales, which amount to approximately $15.6 million (excluding approximately $900,000 held in escrow pending the satisfaction of certain conditions), are part of the Cash Assets to be transferred to the Issuer on the Closing Date. The aggregate book value as of December 31, 2017 and the aggregate appraisal value as of the date of the respective appraisals of the remaining Real Property Assets are $17.8 million and $23.1 million, respectively. GDB is also in negotiations to sell certain of the remaining Real Property Assets.  To the extent the sale of any other Real Property Asset is completed prior to the Closing Date, the net proceeds of such sale will also be part of the Cash Assets.

### Other Loan Assets

***Repurchase Agreement.*** The Transferred Property will also include a Repurchase Agreement between HFA and GDB, pursuant to which HFA owes GDB approximately $19.6 million as of the Cutoff Date (the "Repurchase Agreement"). The obligations of HFA under the Repurchase Agreement are secured by a security interest in certain mortgage Loans with an outstanding principal balance of approximately $8.8 million as of the Cutoff Date granted by HFA to public and private housing developers for the development of rental housing for low and moderate-income families. The Repurchase Agreement is classified by GDB as non-performing.

***Private Loans.*** The Transferred Property will also include the Private Loans, which consist of approximately 70 Loans to various private entities and individuals with an aggregate outstanding balance as of the Cutoff Date of approximately $471,866, with the principal balances of the individual Private Loans ranging from $6 to $89,532. The Private Loans include the Mortgage Loans, which have an aggregate principal balance of approximately $131,918 as of the Cutoff Date, and are classified by GDB as performing. As of the Cutoff Date, all of the other Private Loans are classified by GDB as non-performing. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Private Loans are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

## THE KEEPWELL AGREEMENT

**General**

On the Closing Date, concurrently with the consummation of the Qualifying Modification, GDB will enter into a keepwell agreement (the "Keepwell Agreement") with the Issuer and the Indenture Trustee. The Keepwell Agreement will provide, in limited circumstances, to the Indenture Trustee and the Bondholders, as applicable, certain claims against GDB in the event that the Restructuring Property is returned to GDB or the restructuring under the Qualifying Modification is impaired, except as described below.

The Keepwell Agreement is not, and nothing done pursuant to the Keepwell Agreement by GDB will be deemed to constitute, a guarantee by GDB of any of the New Bonds or other obligation, indebtedness or liability of any kind or character of the Issuer whatsoever. The Keepwell Agreement is governed by the laws of the State of New York and PROMESA.

**The Keepwell Agreement is different than other similarly named instruments. Following the consummation of the Qualifying Modification, GDB will have little to no assets remaining, but will be required, under the Keepwell Agreement, to provide certain covenants and indemnifications to Bondholders, as described below. Furthermore, GDB will not be subject to covenants requiring the maintenance of any financial ratios. As such, the Keepwell Agreement is not expected to provide an additional source of recovery to Bondholders other than in limited circumstances.**

The Keepwell Agreement will provide that if any Restructuring Property is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such Restructuring Property to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Transaction Documents (or if such retransfer or reconveyance violates any law or court order, to take such other actions as may be necessary such that the Bondholders receive the economic equivalent thereof), until payment in full of the New Bonds with any remaining balance delivered to the Issuer.

The Keepwell Agreement will further provide that GDB will indemnify and hold the Bondholders (collectively, the "Indemnified Parties") harmless from and against all damages and losses suffered or incurred by the Indemnified Parties as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms (the "Covered Losses"); *provided*, that an impairment resulting from an immaterial diminution in value of the Restructuring Property will not independently give rise to a claim for indemnification; *provided further* that an Indemnified Party will not be entitled to indemnification for Covered Losses to the extent the circumstances giving rise to such Covered Losses result from the actions of such Indemnified Party or the actions of the Indenture Trustee taken at the direction of such Indemnified Party. For the avoidance of doubt, it is the intention of the parties that such indemnification and hold harmless provision will give rise to claims in favor of the Indemnified Parties against GDB in an amount such that, after giving effect to such claims and any distributions thereon, including in any bankruptcy, insolvency, receivership or similar proceedings in respect of GDB, the Indemnified Parties will be fully compensated for the Covered Losses, subject to the proviso in the foregoing sentence.

**Third-Party Beneficiaries**

Under the terms of the Keepwell Agreement, the Bondholders will be express third-party beneficiaries of the Keepwell Agreement and will be entitled to the rights and benefits thereunder and may enforce the provisions thereof, as if they were parties thereto, notwithstanding (i) any waiver or other action by the Issuer or (ii) any legislative action or determination by a court resulting, in the case of (ii), in the rescission, avoidance or other unenforceability of the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds.

### DESCRIPTION OF THE NEW BONDS AND THE BOND INDENTURE

**General**

 The New Bonds will be issued pursuant to the terms and conditions of the Bond Indenture, to be agreed upon by the Indenture Trustee and the Issuer, subject to approval by the Requisite Bondholders (as defined in the Restructuring Support Agreement). The following summary describes certain expected terms and conditions of the New Bonds and the Bond Indenture. This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the New Bonds and the Bond Indenture.

**Payment Dates**

 Payments on the New Bonds will be made on the Special First Payment Date (as defined herein) and, thereafter, each February 20 and August 20 (each such date, a "Payment Date"), *provided* that if any such Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay.

 On the Closing Date or as soon thereafter as reasonably practicable (the "Special First Payment Date"), the Issuer will apply all Cash Assets received from GDB on the Closing Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments*," to make payments on the New Bonds after the payment or retention, as applicable, of the other amounts required pursuant to such payment priority.

**Payments of Interest**

 Interest on the outstanding principal amounts (including, for the avoidance of doubt, previously accrued PIK Amounts) of the New Bonds will accrue at a rate per annum of 7.500%, payable to the Bondholders on each Payment Date.

 Interest due on each Payment Date will be that which has accrued during the period from and including the immediately preceding Payment Date on which interest has been paid (in cash or in kind) (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid (each such period, an "Interest Period"). Interest on the New Bonds will be calculated on an actual/360 basis. This means that the interest due on the New Bonds on each Payment Date will be the product of: (i) the principal amount of the New Bonds outstanding on that Payment Date (including, for the avoidance of doubt, previously accrued PIK Amounts (as defined herein), before giving effect to the payment of principal on that date, (ii) the interest rate and (iii) the number of days from and including the immediately preceding Payment Date (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid divided by 360.

 To the extent there is insufficient Available Cash on any Payment Date to pay in full in cash all interest accrued during the Interest Period preceding such Payment Date on the New Bonds, such accrued interest on the New Bonds will be paid in cash pro rata to the extent of and from Available Cash, and principal of the New Bonds will accrue an amount equal to the amount of any Available Cash shortfall (each such amount of shortfall, a "PIK Amount"). Following an increase in the principal amount of the New Bonds as a result of the accrual of a PIK Amount, the New Bonds will bear interest on the then-outstanding principal, which will include such accrued PIK Amount. For additional information, see "*Payments to Bondholders*" in this Offering Memorandum.

 In addition, to the extent there is insufficient Available Cash on any Payment Date to pay at least $1.00 of interest for every $1,000 of outstanding principal amount of New Bonds, there will be no distribution to Bondholders on such Payment Date and any Available Cash will remain in the Collection Account until the following Payment Date.

**Payments of Principal**

 The principal amount of the New Bonds will be due on August 20, 2040 (such date, or thereafter as such date may be delayed by vote of the Bondholders pursuant to the procedure described under "*Termination of the Bond Indenture*" below, the "Final Scheduled Payment Date"). Principal payments on the New Bonds will be made from Available Cash on each Payment Date to the extent available after all accrued interest with respect to such Payment Date has been paid in full in cash, thereby reducing the outstanding principal balance of the New Bonds by such amount. For additional information, see "*Payments to Bondholders*" in this Offering Memorandum.

**Allocation of Losses**

 Losses on the Restructuring Property will not be allocated to write down the principal amount of the New Bonds. Instead, losses will reduce the amount of Available Cash available to make payments on the New Bonds on the Payment Dates that follow.

**Additional Bonds**

After the Closing Date, in addition to the New Bonds offered pursuant to this Offering Memorandum, the Issuer may be required, pursuant to the terms of the Qualifying Modification and consistent with the terms of the Bond Indenture, to authorize from time to time the issuance of Additional Bonds under the Bond Indenture in respect of certain contingent claims against GDB that are described in Appendix G. For a description of the contingent claims, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" and "*Appendix G: Contingent and Unliquidated Claims*" attached to this Offering Memorandum.

From time to time after the Closing Date, solely upon receipt of instructions from GDB or AAFAF, the Issuer will authorize such Additional Bonds in the amount(s) specified by GDB or AAFAF, as applicable, and will execute and deliver such Additional Bonds in accordance with such instructions from GDB or AAFAF.

The Additional Bonds and the previously issued New Bonds will be part of the same series under the Bond Indenture and the Additional Bonds will be issued in the same form as the previously issued New Bonds; provided, however, if the Additional Bonds are not fungible with the previously issued New Bonds for U.S. federal income tax purposes, such Additional Bonds will be issued with a different CUSIP number from the previously issued New Bonds.

**No Setoff Rights**

By accepting delivery of the New Bonds, Bondholders will be deemed to have waived any right to setoff (except for any Closing Date Adjustment), or receive credit for, amounts that the Bondholders may owe to the Issuer or GDB as obligors on the Restructuring Property, if any, against amounts payable by the Issuer to such Bondholders on the New Bonds.

**Bond Indenture**

***Modification of the Bond Indenture.*** Subject to the limitations described below, the Issuer and the Indenture Trustee may, with the consent of Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding, execute supplemental indentures to add provisions to, change in any manner or eliminate any provisions of, the Bond Indenture, or modify in any manner the rights of the Bondholders. For purposes of determining whether Bondholders representing the requisite percentage of outstanding principal amount of the New Bonds have given any request, demand, authorization, direction, notice, consent or waiver under the Bond Indenture, New Bonds held beneficially or owned by the Issuer or its affiliates will be disregarded and deemed not to be "outstanding," except that, in determining whether the Indenture Trustee will be protected in relying upon any such request, demand, authorization, direction, notice, consent, or waiver, only New Bonds that a Trust Officer (as defined in the Bond Indenture) of the Indenture Trustee actually knows to be so owned will be so disregarded.

The Issuer and the Indenture Trustee may enter into supplemental indentures without obtaining the consent of the Bondholders, for the purpose of, (i) curing any ambiguity, omission, defect, or inconsistency in the Bond Indenture or in the New Bonds, (ii) conforming the provisions in the Bond Indenture to the descriptions thereof contained in this Offering Memorandum, (iii) providing for the issuance of Additional Bonds in accordance with the limitations set forth in the Bond Indenture, (iv) adding additional property to the description of the Restructuring Property, (v) adding additional covenants of the Issuer for the benefit of the Bondholders, (vi) conveying, or otherwise transferring or pledging, property to the Indenture Trustee, (vii) adding or changing any of the provisions of the Bond Indenture as necessary and permitted to facilitate the administration by more than one indenture trustee, (viii) making any change that would provide additional rights or benefits to the Bondholders or (ix) evidencing and providing for the appointment of a successor indenture trustee; *provided* that such supplemental indenture will not adversely affect the interests of any Bondholder (other than in the case of the issuance of Additional Bonds made in accordance with the terms of the Bond Indenture), as determined by the Collateral Monitor (or, if the Collateral Monitor is unable to make such determination, another financial advisor unaffiliated with the Issuer) and external legal counsel of recognized national standing.

Notwithstanding the foregoing, without the consent of the holder of each outstanding New Bond affected thereby, no supplemental indenture will: (i) change the due date of any principal of or interest on any such New Bond or reduce the principal amount of any such New Bond, the interest rate specified thereon or change any place of payment where, or the coin or currency in which, any such New Bond or any interest thereon is payable; (ii) impair the right to bring suit for the enforcement of provisions of the Bond Indenture regarding payment; (iii) reduce the percentage of the aggregate amount of outstanding New Bonds, the consent of the holders of which is required to amend the Bond Indenture or certain other related agreements or the consent of the holders of which is required for any waiver of compliance with certain provisions of the Bond Indenture or of certain defaults under the Bond Indenture and their consequences as provided for in the Bond Indenture; (iv) modify or alter the provisions of the Bond Indenture regarding the voting of New Bonds held by the Issuer, any other obligor on such New Bonds or an affiliate of any of them; (v) reduce the percentage of the aggregate amount of outstanding New Bonds, the consent of the holders of which is required to direct the Indenture Trustee to sell or liquidate the Restructuring Property after a Bond Indenture Event of Default if the proceeds of such sale would be insufficient to pay the principal amount and accrued but unpaid interest on the outstanding New Bonds; or (vi) permit the creation of any lien or security interest ranking senior to or on a parity with the lien of the Bond Indenture with respect to any of the Restructuring Property or, except

as otherwise permitted or contemplated in such Bond Indenture, terminate the lien of such Bond Indenture with respect to any such Restructuring Property or deprive the holder of any such Bond of the security afforded by the lien of such Bond Indenture.

**Bond Indenture Events of Default; Rights Upon a Bond Indenture Event of Default.** With respect to the New Bonds, each of the following is an event of default under the Bond Indenture (each, a "Bond Indenture Event of Default"):

i.    a failure by the Issuer to accrue any PIK Amount as required or to make any required payment from Available Cash in respect of any of the New Bonds on the date on which the same is due;

ii.   a failure by the Issuer to observe or perform any covenant or agreement (other than a covenant or agreement referred to in clause (i) above) contained in the Bond Indenture, and such failure continues or is not cured for a period of 60 days after written notice by the Indenture Trustee or Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding;

iii.  the Issuer, pursuant to or within the meaning of any U.S. federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation PROMESA (collectively, "Bankruptcy Laws"):

   A.   commences proceedings to be adjudicated bankrupt or insolvent;

   B.   consents to the institution of bankruptcy or insolvency proceedings against it;

   C.   files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

   D.   consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property; *provided*, for the avoidance of doubt, that any such official appointed in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (iii)(D);

   E.   makes a general assignment for the benefit of its creditors;

   F.   is deemed to be a covered territorial instrumentality under PROMESA or is otherwise determined to be subject to oversight under applicable Bankruptcy Law; or

   G.   takes any corporate or similar action in furtherance of any of the foregoing;

iv.   a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

   A.   is for relief against the Issuer in a proceeding in which the Issuer is to be adjudicated bankrupt or insolvent;

   B.   approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer under any Bankruptcy Law;

   C.   appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer for all or any substantial part of the property of the Issuer; *provided*, for the avoidance of doubt, that any such order or decree entered in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (iv)(C); or

   D.   orders the liquidation, dissolution or winding up of the Issuer and the order or decree remains unstayed and in effect for 60 consecutive days;

v.    any legislation is enacted, governmental action is taken (including any action by the Government, the Commonwealth instrumentalities or any Government-controlled or managed entities, including entities with directors or management controlled or appointed by the Government and any failure by the Government or any Commonwealth instrumentality to observe or perform the non-impairment covenant set forth in Article 407 of the GDB Restructuring Act (as in effect as of the Closing Date)) or any party (other than an obligor on the Restructuring Property) is determined by a final, non-appealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affect (i) the receipt of current or future Collections on the Restructuring Property to which the Issuer is entitled (other than by reason of (A) a failure, delay or default of the obligor under such Restructuring Property, (B) an obligor being subject to a proceeding under PROMESA or to any provision thereof or (C) changes in taxation or restrictions on the enforcement of rights or remedies, so long as such changes or restrictions are not directed solely at the Issuer, the Restructuring Property, the New Bonds or the Bondholders relative to any other entity, asset, security or security

holder) in respect of assets having an aggregate value on the Closing Date of $25 million or more (as determined by the face amount of any such asset, in the case of Loans, or the book value of any such asset, in the case of other assets) or (ii) the binding effect or enforcement of, in accordance with their respective terms, the GDB Restructuring Act (as in effect as of the Closing Date), the Qualifying Modification, the Public Entity Trust, the Bond Indenture, the New Bonds or the liens on the Restructuring Property;

vi.    any entry of a judgment against the Issuer in the amount of $10 million or more;

vii.    the occurrence of an event of default by GDB under the Transfer Agreement; and

viii.    the Issuer permits the validity or effectiveness of the Transaction Documents to be impaired, and such impairment affects the enforceability of or payments on the New Bonds, or any person to be released from any covenants or obligations with respect to the New Bonds.

Notwithstanding any other provision of the Bond Indenture, no default under the Disclosure Agreement will be deemed a Bond Indenture Event of Default, and the sole remedy under the Disclosure Agreement in the event of any failure of the Issuer or the Dissemination Agent to comply with the Disclosure Agreement will be an action to compel performance.

***Remedies.*** If a Bond Indenture Event of Default occurs and is continuing, the Indenture Trustee may, or upon direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will, declare the principal of such New Bonds and accrued but unpaid interest and any other amounts owed thereon to be immediately due and payable, in the order of priority specified for payments. Such declaration may be rescinded and annulled by Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding, if:

i.    the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

A.    all payments of principal of and interest on the New Bonds and all other amounts that would then be due on such New Bonds or in accordance with the terms of such New Bonds if the Bond Indenture Event of Default giving rise to such acceleration had not occurred; and

B.    all sums paid by the Indenture Trustee under the Bond Indenture and the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel; or

ii.    all Bond Indenture Events of Default, other than the nonpayment of the principal or interest of the New Bonds that has become due solely by such acceleration, have been cured or waived.

Following the occurrence of a Bond Indenture Event of Default and acceleration of the maturity of the New Bonds, the Indenture Trustee is not required to sell the Restructuring Property and may sell the Restructuring Property as described below only after meeting requirements specified in the Bond Indenture and described below.

Following a Bond Indenture Event of Default, the Indenture Trustee may exercise any remedies available as described hereunder and otherwise available under applicable law (subject to the limitations described in "*The Restructuring Property— Management of the Restructuring Property*," in this Offering Memorandum), but may exercise remedies only if (i) Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, consent to such exercise or (ii) the proceeds of such exercise are sufficient to pay in full the principal of and the accrued interest and any other amounts owed on the outstanding New Bonds at the date of such exercise. In addition, the Indenture Trustee must institute proceedings to collect amounts due and exercise such remedies if Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, direct the Indenture Trustee to do so. If the Bondholders do not direct the Indenture Trustee, and the Indenture Trustee does not elect, to exercise such remedies, the Issuer will maintain possession of the Restructuring Property and the Servicer will continue to manage the Restructuring Property, and the Collections thereon will be distributed in accordance with the payment priority set forth in "*Payments to Bondholders—Priority of Payments*." The proceeds from a liquidation of the Restructuring Property conducted by the Indenture Trustee will constitute Collections on the Restructuring Property and, as such, will be deposited in the Collection Account and distributed in accordance with the payment priority set forth in "*Payments to Bondholders—Priority of Payments*." Upon the liquidation of all remaining Restructuring Property and distribution of all remaining Collections in accordance with the requisite payment priority, the Bondholders will have no further claims against the Issuer in respect of the New Bonds.

In the event of a sale of any of the Restructuring Property following a Bond Indenture Event of Default, the Indenture Trustee will provide public notice of the sale of such assets and the Indenture Trustee and/or Bondholders may, by following the procedures outlined in such notice, submit a bid in respect of such sale.

If a Bond Indenture Event of Default occurs and is continuing for a period of 30 days, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage and control the Restructuring Property for the benefit of the Bondholders and will exercise all the rights and powers of the Issuer with respect to such Restructuring Property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby. The Servicing Agreement will remain in effect notwithstanding the appointment of a receiver, subject to removal of the Servicer in accordance with the terms described in "*Servicing Agreement—Removal of the Servicer*."

If a Bond Indenture Event of Default occurs and is continuing and the Indenture Trustee has actual knowledge of such Bond Indenture Event of Default, the Indenture Trustee will be obligated to notify each Bondholder of the Bond Indenture Event of Default within twenty days of the Indenture Trustee's discovery thereof; *provided, however*, that the Indenture Trustee may withhold notice to the Bondholders if and so long as a committee of its officers in good faith determines that withholding such notice is in the best interests of the Bondholders.

Subject to the provisions of the Bond Indenture relating to the duties of the Indenture Trustee, if a Bond Indenture Event of Default occurs and is continuing, the Indenture Trustee will be under no obligation to exercise any of the rights or powers under the Bond Indenture at the request or direction of any of the Bondholders if the Indenture Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities that might be incurred by it in complying with such request. Subject to the provisions for indemnification and certain limitations contained in the Bond Indenture, Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will have the right to direct the time, method and place for conducting any proceeding for any remedy available to the Indenture Trustee or exercising any trust or power conferred on the Indenture Trustee, and Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding may, in certain cases, waive any default under the Bond Indenture except a default resulting from, or in respect of, (i) a failure by the Issuer to accrue any PIK Amount as required or to make any required payment from Available Cash in respect of any of the New Bonds, on the applicable Payment Date on which the same is due, (ii) any insolvency, bankruptcy, reorganization, restructuring, receivership or any other form of debtor relief sought by or against the Issuer, whether under federal or Commonwealth law or (iii) a failure by the Issuer to observe or perform any covenant or provision of the Bond Indenture that cannot be modified without the waiver or consent of each affected Bondholder.

Any New Bonds owned by the Issuer, the Servicer, the Collateral Monitor or any affiliate of the foregoing will be entitled to equal and proportionate benefits under the Bond Indenture, except that such New Bonds, while owned by the Issuer or any of its affiliates, will not be considered to be outstanding for the purpose of determining whether the requisite percentage of Bondholders have given any request, demand, authorization, direction, notice, consent or other action under the Bond Indenture.

No Bondholder will have the right to institute any proceeding with respect to the Bond Indenture, unless (i) such holder previously has given to the Indenture Trustee written notice of a continuing Bond Indenture Event of Default, (ii) Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding have made written request to the Indenture Trustee to institute such proceeding in its own name, (iii) such holder or Bondholders have offered the Indenture Trustee security or indemnity reasonably satisfactory to it, (iv) the Indenture Trustee has for 30 days failed to institute such proceeding and (v) no direction inconsistent with such written request has been given to the Indenture Trustee during such 30-day period by Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding.

Notwithstanding the foregoing, the right of any Bondholder to receive payment or delivery, as the case may be, of cash interest or principal, on or after the respective dates on which the same are due and payable from Available Cash, or to bring suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Issuer, may not be impaired or affected without the consent of such Bondholder.

With respect to the Issuer, neither the Indenture Trustee in its individual capacity nor any of its owners, beneficiaries, agents, officers, directors, employees, affiliates, successors or assigns will, in the absence of an express agreement to the contrary, be personally liable for the payment of any amount on the New Bonds or for the agreements of the Issuer contained in the Bond Indenture.

***Final Scheduled Payment Date.*** On the Final Scheduled Payment Date, all outstanding amounts on the New Bonds will be due and payable.

If the Issuer fails to pay all outstanding amounts on the New Bonds on or prior to the Final Scheduled Payment Date, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer pursuant to the terms of the Transaction Documents. Such receiver so appointed will have, hold, use, operate, manage, and control the Restructuring Property for the benefit of the Bondholders and will exercise all the rights and powers of the Issuer with respect to such Restructuring Property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby.

***Certain Covenants of the Issuer.***

The Bond Indenture will provide that the Issuer will, among other things:

i.     promptly report to the Indenture Trustee any Bond Indenture Event of Default or the occurrence of any default that, with notice and/or the passage of time, would become a Bond Indenture Event of Default;

ii.    delegate to, and confer upon, the Servicer all authority to manage and service the Restructuring Property in accordance with the terms of the Bond Indenture;

iii.   deposit, or cause to be deposited, any Collections into the Collection Account to be held in trust for the benefit of the Bondholders in accordance with the terms of the Bond Indenture;

iv.    designate and authorize the Indenture Trustee or other Independent Person to act as paying agent with respect to all amounts to be paid from the Collection Account in accordance with the terms of the Bond Indenture;

v.     maintain in the Borough of Manhattan, in the City of New York, an office or agency where New Bonds may be presented or surrendered for payment, where the New Bonds may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Issuer in respect of the New Bonds and the Bond Indenture may be served and give prompt written notice to the Indenture Trustee of the location and of any change in the location of such office or agency;

vi.    file IRS Form 8281 reporting the New Bonds as contingent payment debt instruments as defined in U.S. Treasury Regulations Section 1.1275-4 and reflecting a "comparable yield" equal to the applicable Federal rate based on the presumption based on the applicable Federal rate as set forth in subsection (b)(4)(i)(B) thereof;

vii.   timely file a protective election under U.S. Treasury Regulations Section 301.7701-3 to elect to be classified as a partnership for U.S. tax purposes in the event that holders of New Bonds are treated as holding equity interests in the Issuer;

viii.  in the event that the U.S. Internal Revenue Service asserts that the New Bonds are characterized as equity interests of the Issuer for U.S. federal income tax purposes, use commercially reasonable efforts to provide, or cause to be provided, such information as is reasonably requested by Bondholders to enable them to comply with their U.S. federal income tax reporting obligations, and use commercially reasonable efforts to retain or cause the Servicer to retain possession of records and information relevant to the foregoing;

ix.    require the Servicer or any subsequent servicer, pursuant to the Servicing Agreement or any subsequent servicing agreement, as applicable, to provide to the Indenture Trustee for provision to the Bondholders the reports of the Servicer described under "*Service Providers—Reports to Bondholders*" in this Offering Memorandum;

x.     comply with the GDB Restructuring Act in all material respects;

xi.    at all times maintain bylaws that require each member of the Board of Trustees to be independent, have executive experience in finance or with respect to assets like the Restructuring Property and be otherwise qualified to serve on the Board of Trustees; and

xii.   take commercially reasonable efforts to cooperate with the Servicer and the Collateral Monitor to facilitate the execution of each of their respective duties, including by providing information available to the Issuer reasonably requested by the Servicer or Collateral Monitor.

Unless expressly permitted by the Bond Indenture, the Issuer will not, among other things:

i.     sell, transfer, encumber, exchange, otherwise dispose of, or waive any rights with respect to any of the assets of the Issuer, including any of the Restructuring Property, other than as directed by the Servicer;

ii.    claim any credit on or make any deduction from the principal and interest payable in respect of the New Bonds other than amounts that, in accordance with written advice from outside counsel of national standing or a recognized firm of reputable standing within the Commonwealth, are required by law to be withheld from such payments or assert any claim against any present or former holder of the New Bonds because of the payment of taxes levied or assessed upon the Issuer;

iii.   consolidate with or merge into any other entity;

iv.      dissolve or liquidate in whole or in part;

v.      at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of the Bond Indenture; and the Issuer (to the extent that it may lawfully do so) will expressly waive all benefit or advantage of any such law, and covenant that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted;

vi.      permit the validity or effectiveness of the Transaction Documents to which the Issuer is a party to be impaired, fail to enforce the obligations of counterparties under the Transaction Documents to which the Issuer is a party, or release any person from any covenants or obligations with respect to the New Bonds under the Transaction Documents to which the Issuer is a party;

vii.      fail to observe or perform under any covenant or agreement contained in the Transaction Documents, provided that the sole remedy for a default by the Issuer under the Disclosure Agreement will be an action to compel performance;

viii.      unless otherwise consented to by the Collateral Monitor, which consent may not be unreasonably withheld, incur Issuer Operating Expenses after the Closing Date in any year exceeding the Issuer Operating Expenses Cap.

ix.      permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance to be created on or extended to or otherwise arise upon or burden the assets of the Issuer or any part thereof, or any interest in the assets of the Issuer or the proceeds thereof other than the liens on the Restructuring Property securing the Bond Indenture and the obligations of the Issuer under the New Bonds, the Bond Indenture and any related documents or instruments;

x.      incur, assume or guarantee any indebtedness other than indebtedness incurred under the New Bonds and pursuant to the Bond Indenture;

xi.      fail to at all times, to the extent permitted by law, defend, preserve and protect, or cause to be defended, preserved and protected, the pledge of the Restructuring Property and all the rights of the Indenture Trustee and the Bondholders under the Bond Indenture against all claims and demands of all persons whomsoever;

xii.      fail to execute, acknowledge where appropriate, and deliver, and use its best efforts to cause others to execute, acknowledge where appropriate, and deliver, from time to time promptly at the request of the Indenture Trustee or the Servicer, all such instruments and documents as in the reasonable opinion of the Indenture Trustee or the Servicer, as applicable, are necessary or advisable to carry out the intent and purpose of the Bond Indenture or the Servicing Agreement, as applicable, and to take such other action as may be reasonably necessary to carry out the transactions contemplated hereby and thereby;

xiii.      engage in any activity other than as expressly authorized in the Bond Indenture and the GDB Restructuring Act (as in effect as of the Closing Date), or required pursuant to the other Transaction Documents;

xiv.      subject to the applicable contractual and legal limitations, take any action that is inconsistent with the maximization of the recoverable value of the Restructuring Property and the Collections thereon or payment of amounts owing on the New Bonds;

xv.      not take any action, or fail to take any action permitted by law, the result of which would be the Issuer failing to keep in full effect its existence, rights and franchises as a statutory public trust and governmental instrumentality of the Commonwealth under the laws of the Commonwealth;

xvi.      make any expenditure (by long-term or operating lease or otherwise) for the purchase of capital assets (either realty or personalty) other than immaterial expenditures in the ordinary course of business approved by the Collateral Monitor, other than Eligible Investments made in accordance with the terms of the Bond Indenture;

xvii.      make any direct payments or distributions from the Collection Account; or

xviii.      fail to at all times, to the extent permitted by law and to the extent not delegated to the Servicer, defend against all claims and demands brought against the Issuer or the Board of Trustees that would adversely affect maximization of the recoverable value of the Restructuring Property and Collections thereon or the performance of the Issuer's obligations under the Transaction Documents.

**_Satisfaction and Discharge of the Bond Indenture._** The Bond Indenture will be discharged with respect to the Restructuring Property securing the New Bonds upon the delivery to the Indenture Trustee for cancellation of all such New Bonds or, with certain

limitations, upon deposit with the Indenture Trustee of funds sufficient for the payment in full of all New Bonds, including interest thereon, and the payment in full of any fees, expenses and indemnification amounts due and payable pursuant to the Bond Indenture.

*Termination of the Bond Indenture.* With respect to the New Bonds, the obligations of the Indenture Trustee will terminate upon the surrender or redemption (as applicable) and cancellation of all New Bonds and the payment of all principal, interest and other amounts required to be paid to Bondholders pursuant to the Bond Indenture, which will occur upon the earlier of (i) the surrender for payment in full of all principal, interest and any other amounts owing on the New Bonds, (ii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture after termination (in accordance with the terms of the applicable Loan documents) of all Restructuring Property and (iii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture, after liquidation of all remaining Restructuring Property or, if no such liquidation occurs, a pro rata distribution of all remaining Available Cash, if any, in each case, in accordance with the terms of the Bond Indenture.

The Indenture Trustee will give ten days' written notice of termination of the Bond Indenture to each Bondholder of record. The final distribution to any Bondholder will be made only upon cancellation of that holder's New Bond after delivery at any office or agency of the Indenture Trustee specified in the notice of termination. Any funds of the Issuer remaining, after the Indenture Trustee has taken measures to locate Bondholders as described in the Bond Indenture and those measures have failed, will be distributed, subject to applicable law, as provided in the Bond Indenture.

On or prior to the date that is six months prior to the Final Scheduled Payment Date, the Servicer will prepare and provide to the Indenture Trustee, the Board of Trustees and the Collateral Monitor statements to be delivered or made available to the Bondholders that will include the aggregate principal amount outstanding on the New Bonds, a description of the amount of any Restructuring Property remaining, the Servicer's good faith projections of the expected Collections to be generated in respect of such Restructuring Property on or prior to the Final Scheduled Payment Date and thereafter and the Servicer's good faith estimate of the cost to continue to manage such Restructuring Property after the Final Scheduled Payment Date.

Subject to the limitations as described in "*The Restructuring Property—Management of the Restructuring Property*" herein the Servicer will be required to use commercially reasonable efforts to liquidate all remaining Restructuring Property, if any, as soon as reasonably practicable after, and in no event later than the end of the month of the date that is four months following (or such other date thereafter as reasonably agreed to by the Issuer, the Servicer and the Collateral Monitor) the Final Scheduled Payment Date, unless either (i) all principal, interest and any other amounts owing on the New Bonds have been paid or (ii) following a solicitation of veto conducted by the Issuer prior to the then-current Final Scheduled Payment Date, Bondholders holding not less than 25% in principal amount of the New Bonds for which votes are submitted vote against such liquidation and to delay the Final Scheduled Payment Date by a one-year period; *provided* that if the Board of Trustees, in consultation with the Collateral Monitor, determines in good faith that the expected Collections to be generated in respect of the Restructuring Property after the Final Scheduled Payment Date are unreasonably small in comparison to the expected cost to continue to manage such Restructuring Property, no such solicitation of veto will occur and the Servicer will liquidate the remaining Restructuring Property. The proceeds from such liquidation will constitute Collections on the Restructuring Property and, as such, will be deposited in the Collection Account and distributed in accordance with the Bond Indenture based on the payment priority set forth in "*Payments to Bondholders—Priority of Payments*" on the date that is six months after the Final Scheduled Payment Date (or such other date thereafter as reasonably determined by the Issuer, the Servicer and the Collateral Monitor), including as the Final Scheduled Payment Date may be extended (such distribution date, the "Liquidation Payment Date"). The process described above will apply to the initial Final Scheduled Payment Date and each subsequent Final Scheduled Payment Date resulting from a delay of the then applicable Final Scheduled Payment Date.

Upon the liquidation of all remaining Restructuring Property and distribution of all remaining Collections in accordance with the requisite payment priority, the Bondholders will have no further claims against the Issuer in respect of the New Bonds.

**Remaining Interest**

Following the termination of the Bond Indenture, the remaining assets of the Issuer, if any, will be distributed to the Public Entity Trust on account of a residual interest it will have in the Issuer. For additional information on the termination of the Bond Indenture and the Public Entity Trust's residual interest in the Issuer, see "*—Termination of the Bond Indenture*" and "*The GDB Restructuring Act*" in this Offering Memorandum.

**Notices**

Except as may be provided otherwise in this Offering Memorandum or in the Bond Indenture, Bondholders of record will be notified in writing by the Indenture Trustee of any Bond Indenture Event of Default or removal and replacement of the Servicer promptly upon a Trust Officer (as defined in the Bond Indenture) obtaining actual knowledge thereof. While New Bonds are held in book-entry form, these notices will be delivered by the Indenture Trustee to DTC. If New Bonds are issued in definitive form, these notices will be

mailed to the addresses provided to the Indenture Trustee by the Bondholders of record as of the relevant Payment Record Date. Such notices will be deemed to have been given as of the date of delivery to DTC or mailing.

**Governing Law**

The Bond Indenture and the New Bonds are governed by and will be construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction.

**Venue**

Any legal action, suit, or proceeding arising out of or relating to the New Bonds, brought by any party or its successors or assigns must be brought in any federal district court sitting in the Commonwealth and any appellate court from any thereof or, in the event such federal court does not have or accept jurisdiction, a Commonwealth court and any appellate court from any thereof.

**Minimum Denominations**

The New Bonds will be issued in U.S. Dollars in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof.

**Book-Entry Registration**

*General.* The New Bonds are anticipated to be represented by one or more New Bonds registered in the name of Cede & Co., as the nominee of DTC, the clearing agency (together with any successor depositary, the "Depositary"). Accordingly, such nominee is expected to be the holder of record of the New Bonds. Unless and until definitive bonds are issued under the limited circumstances described in this Offering Memorandum, no Bondholder will be entitled to receive a physical certificate representing a New Bond. All references in this Offering Memorandum to actions by Bondholders refer to actions taken by the Depositary upon instructions from its participating organizations (the "Depositary Participants") and all references in this Offering Memorandum to payments, notices, reports and statements to Bondholders refer to payments, notices, reports and statements to the Depositary or its nominee, as the registered holder of the New Bonds, for distribution to Bondholders in accordance with the Depositary's procedures with respect thereto. Beneficial interests in the New Bonds may be held through DTC, Clearstream Banking or Euroclear as operator of the Euroclear System, directly as a participant or indirectly through organizations that are participants in such system. DTC, Clearstream Banking and Euroclear are collectively referred to herein as the "Clearing Systems." Clearstream Banking and Euroclear will hold through a DTC participant. None of Euroclear, Clearstream Banking or DTC is under any obligation to perform or continue to perform the procedures referred to below, and such procedures may be discontinued at any time.

Neither the Issuer nor any of its agents will have any responsibility for the performance by Euroclear, Clearstream Banking or DTC or their respective direct or indirect participants or account holders of their respective obligations under the rules and procedures governing their operations or the arrangements referred to below.

**The information in this Offering Memorandum concerning the Clearing Systems has been obtained from sources that the Dealer Managers and the Issuer believe to be reliable, but the Dealer Managers and the Issuer take no responsibility for the accuracy thereof.**

*DTC Book-Entry-Only System.* DTC will act as securities depository for the New Bonds in the United States. The New Bonds will be issued as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully registered bond certificate will be issued for the New Bonds, in the aggregate principal amount of such New Bonds, and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.6 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company of DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others, such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly

or indirectly ("Indirect Participants"). DTC has an S&P Global Ratings rating of AA+. The DTC rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of the New Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the New Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the New Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their beneficial ownership interests in the New Bonds, except in the event that use of the book-entry system for the New Bonds is discontinued.

To facilitate subsequent transfers, all New Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the New Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not affect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the New Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such New Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of the New Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the New Bonds, such as redemptions, tenders, defaults, and proposed amendments to the bond documents. For example, Beneficial Owners of the New Bonds may wish to ascertain that the nominee holding the New Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the Indenture Trustee and request that copies of notices be provided directly to them.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the New Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts such New Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payments of principal of and interest on the New Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Issuer or the Indenture Trustee, on the payment date in accordance with their respective holdings shown on DTC's records. With respect to the New Bonds, principal payments shall be credited to Direct Participants as selected by lot in amounts as close as reasonably practicable to a pro rata allocation among all such Direct Participants, in minimum authorized denominations of $1.00, consistent with DTC procedures. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC nor its nominee, the Indenture Trustee or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Indenture Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the New Bonds at any time by giving reasonable notice to the Issuer or the Indenture Trustee. Under such circumstances, in the event that a successor depository is not appointed, bond certificates are required to be printed and delivered.

The Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, bond certificates will be printed and delivered.

NONE OF THE DEALER MANAGERS, THE ISSUER, THE INDENTURE TRUSTEE OR THE COMMONWEALTH WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DTC PARTICIPANTS, INDIRECT PARTICIPANTS OR BENEFICIAL OWNERS WITH RESPECT TO THE PAYMENTS OR THE PROVIDING OF NOTICE TO DTC PARTICIPANTS, INDIRECT PARTICIPANTS OR BENEFICIAL OWNERS.

None of the Dealer Managers, the Issuer, the Indenture Trustee or the Commonwealth can give any assurances that DTC, DTC Participants, Indirect Participants or others will distribute payments of principal and interest on the New Bonds paid to DTC or its

nominee, as the registered Owner, or any notice, to the Beneficial Owners or that they will do so on a timely basis or that DTC will serve and act in a manner described in this Offering Memorandum.

***Euroclear and Clearstream Banking.*** Euroclear and Clearstream Banking have advised the Issuer as follows:

Euroclear and Clearstream Banking each hold securities for their customers and facilitate the clearance and settlement of securities transactions by electronic book-entry transfer between their respective account holders. Euroclear and Clearstream Banking provide various services including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Euroclear and Clearstream Banking also deal with domestic securities markets in several countries through established depositary and custodial relationships. Euroclear and Clearstream Banking have established an electronic bridge between their two systems across which their respective participants may settle trades with each other.

Euroclear and Clearstream Banking customers are worldwide financial institutions, including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to Euroclear and Clearstream Banking is available to other institutions that clear through or maintain a custodial relationship with an account holder of either system, either directly or indirectly.

***Clearing and Settlement Procedures.*** New Bonds sold in offshore transactions will be initially issued to investors through the book-entry facilities of DTC, or Clearstream Banking and Euroclear in Europe if the investors are participants in those systems, or indirectly through organizations that are participants in the systems. For any of such New Bonds, the record holder will be DTC's nominee. Clearstream Banking and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream Banking's and Euroclear's names on the books of their respective depositories.

The depositories, in turn, will hold positions in customers' securities accounts in the names of their respective DTC participants through which they hold such securities on the books of DTC. Because of time zone differences, the securities account of a Clearstream Banking or Euroclear participant as a result of a transaction with a participant, other than a depository holding on behalf of Clearstream Banking or Euroclear, will be credited during the securities settlement processing day, which must be a business day for Clearstream Banking or Euroclear, as the case may be, immediately following the DTC settlement date. These credits or any transactions in the securities settled during the processing will be reported to the relevant Euroclear participant or Clearstream Banking participant on that business day. Cash received in Clearstream Banking or Euroclear as a result of sales of securities by or through a Clearstream Banking participant or Euroclear participant to a DTC Participant, other than the depository for Clearstream Banking or Euroclear, will be received with value on the DTC settlement date but will be available in the relevant Clearstream Banking or Euroclear cash account only as of the business day following settlement in DTC.

Transfers between participants will occur in accordance with DTC rules. Transfers between Clearstream Banking participants or Euroclear participants will occur in accordance with their respective rules and operating procedures. Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream Banking participants or Euroclear participants, on the other, will be affected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositories, however, cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in the system in accordance with its rules and procedures and within its established deadlines in European time. The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its depository to take action to affect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream Banking participants or Euroclear participants may not deliver instructions directly to the depositories.

The Issuer will not impose any fees in respect of holding the New Bonds; however, holders of book-entry interests in the New Bonds may incur fees normally payable in respect of the maintenance and operation of accounts in the Clearing Systems.

***Initial Settlement.*** Interests in the New Bonds will be in uncertified book-entry form. Purchasers electing to hold book-entry interests in the New Bonds through Euroclear or Clearstream Banking accounts will follow the settlement procedures applicable to conventional New Bonds. Book-entry interests in the New Bonds will be credited to Euroclear and Clearstream Banking participants' securities clearance accounts on the business day following the date of delivery of the New Bonds against payment (value as on the date of delivery of the New Bonds). Direct Participants acting on behalf of purchasers electing to hold book-entry interests in the New Bonds through DTC will follow the delivery practices applicable to securities eligible for DTC's Same Day Funds Settlement system. Direct Participants' securities accounts will be credited with book-entry interests in the New Bonds on the date of delivery of the New Bonds.

***Secondary Market-Trading.*** Secondary market trades in the New Bonds will be settled by transfer of title to book-entry interests in the Clearing Systems. Title to such book-entry interests will pass by registration of the transfer within the records of Euroclear, Clearstream Banking or DTC, as the case may be, in accordance with their respective procedures. Book-entry interests in the New Bonds may be transferred within Euroclear and within Clearstream Banking and between Euroclear and Clearstream Banking in accordance with procedures established for these purposes by Euroclear and Clearstream Banking. Book-entry interests in the New Bonds may be transferred within DTC in accordance with procedures established for this purpose by DTC. Transfer of book-entry

interests in the New Bonds between Euroclear or Clearstream Banking and DTC may be affected in accordance with procedures established for this purpose by Euroclear, Clearstream Banking and DTC.

**Accounts with DTC, Clearstream Banking or Euroclear Participants**

Since the New Bonds are anticipated to be issued in book-entry form and will only be issued after the Closing Date as definitive bonds in limited circumstances described under "—*Definitive Bonds*" below, each Bondholder must obtain prior to the Closing Date, and maintain as long as it holds New Bonds, an account with a participant in the DTC, Clearstream Banking or Euroclear systems, through which such Bondholder will hold its New Bonds.

**Definitive Bonds**

The New Bonds will be issued in fully registered, definitive form to owners of beneficial interests or their nominees rather than to the Depositary or its nominee, only if:

(a)     the Issuer advises the Indenture Trustee in writing that the Depositary is no longer willing or able to discharge properly its responsibilities as depositary with respect to the New Bonds, and the Issuer is unable to locate a qualified successor; or

(b)     after a Bond Indenture Event of Default or a Servicer Replacement Event, beneficial owners representing not less than a majority in principal amount of the New Bonds then outstanding, advise the Indenture Trustee and the Depositary in writing that the continuation of a book-entry system through the Depositary (or a successor) is no longer in the best interests of the Bondholders.

Upon the occurrence of any of the events described in the immediately preceding paragraph, the Indenture Trustee through the Depositary and its participating members will be required to notify all owners of beneficial interests in a global bond of the occurrence of such event and of the availability through the Depositary of New Bonds in definitive registered form. Upon surrender by the Depositary of the book-entry global bonds representing the New Bonds and instructions for re-registration, the Indenture Trustee will reissue the New Bonds in definitive registered form, and thereafter the Indenture Trustee will recognize the holders of the definitive registered bonds as Bondholders.

Payments or distributions of principal of and interest on the New Bonds will be made by a paying agent directly to Bondholders in definitive registered form in accordance with the procedures set forth in the Bond Indenture. Payments or distributions on each Payment Date (including the Final Scheduled Payment Date and the Liquidation Payment Date, if any) will be made to holders in whose names the Definitive Bonds were registered at the close of business on the Payment Record Date. Payments or distributions will be made by check mailed to the address of each Bondholder as it appears on the register maintained by the Indenture Trustee. The final payment or distribution on any New Bond, whether New Bonds in definitive registered form or New Bonds registered in the name of Cede & Co., however, will be made only upon presentation and surrender of the New Bonds at the office or agency specified in the notice of final payment or distribution to Bondholders.

New Bonds in definitive registered form will be transferable and exchangeable at the offices of the Indenture Trustee, or at the offices of a transfer agent or registrar named in a notice delivered to Bondholders in definitive registered form. No service charge will be imposed for any registration of transfer or exchange, but the Indenture Trustee, transfer agent or registrar may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith.

**List of Bondholders**

Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding may, by written request to the Indenture Trustee, obtain access to the list of all Bondholders maintained by the Indenture Trustee for the purpose of communicating directly with other Bondholders with respect to their rights under the Bond Indenture or under the New Bonds. The Indenture Trustee may elect not to afford the requesting Bondholders access to the list of Bondholders if it agrees to mail the desired communication or proxy, on behalf of and at the expense of the requesting Bondholders, to all Bondholders contained within such list.

The Bond Indenture will not provide for the holding of annual or other meetings of Bondholders.

**COLLECTIONS ON THE RESTRUCTURING PROPERTY AND CALCULATION OF AVAILABLE CASH**

**Collections on the Restructuring Property**

The Restructuring Property consists of a non-homogeneous pool of assets. In addition, the Collections on the Restructuring Property are, and will be, subject to complex financial arrangements including, in certain instances, Collections passing through intermediary entities that are governmental instrumentalities of the Commonwealth. For detailed descriptions of the anticipated cash flows from the various classes of assets making up the Restructuring Property, see "*The Restructuring Property—Detailed Description of the Restructuring Property*" in this Offering Memorandum.

**The Collection Account**

On or prior to the Closing Date, the Indenture Trustee will establish a trust account for the benefit of the Bondholders (such account, the "Collection Account"), into which all Collections generated in respect of the Restructuring Property will be deposited, together with any net income received on the investment of funds on deposit in the Collection Account. The Servicer will have full authority to make deposits into and request payments from the Collection Account.

The Servicer will, to the extent practicable, cause Collections collected during each Collection Period to be deposited directly into a payment clearing account and within one Business Day thereafter to be deposited into the Collection Account or, to the extent not practicable to do so, to be subsequently deposited into the Collection Account as promptly as practicable after receipt. The Servicer may direct the Indenture Trustee to invest amounts (other than amounts corresponding to the Fees and Expenses Reserve) held in the Collection Account in Eligible Investments from the time deposited into the Collection Account until the Business Day before the next Payment Date. As promptly after receipt of any Collections that are not cash as is consistent with the Servicer's duty to maximize the value of the Restructuring Property, the Servicer will sell such Collections for cash in an arm's length transaction to a person or entity that is not an affiliate of the Issuer or GDB and deposit the proceeds thereof into the Collection Account.

From time to time after each Payment Date and prior to the following Determination Date, the Servicer may withdraw funds from the Collection Account (i) to pay reimbursable expenses or indemnification amounts owed to, or on behalf of, the Servicer, the Collateral Monitor or the Indenture Trustee, (ii) upon the request of the Issuer, to pay the Issuer Expenses budgeted under the Fees and Expenses Reserve, and (iii) upon the reasonable request of the Issuer, to pay Issuer Expenses not otherwise budgeted under the Fees and Expenses Reserve, *provided that* if a withdrawal as described in the foregoing clause (ii) or (iii) would result in the Issuer Operating Expenses exceeding the Issuer Operating Expenses Cap, as described below, or if such withdrawal would result in the reasonable likelihood of the Issuer Operating Expenses exceeding the Issuer Operating Expenses Cap, the Servicer will not withdraw any such funds without the consent of the Collateral Monitor, which consent will not be unreasonably withheld. All other withdrawals from the Collection Account will be made on each Payment Date in accordance with the priority of payments set forth in the Bond Indenture and any other applicable terms set forth therein. Following the Collateral Monitor's notice of a possible Servicer Replacement Event until the replacement of the Servicer or waiver by the Bondholders of such possible Servicer Replacement Event, all Servicer decisions in respect of the Collection Account will be subject to the approval of the Collateral Monitor, which will be exercised promptly and in such a manner as to allow for servicing in accordance with the servicing standards set forth in the Servicing Agreement.

Unless otherwise consented to by the Collateral Monitor, which consent may not be unreasonably withheld, the Issuer may not incur Issuer Operating Expenses (as defined herein) after the Closing Date exceeding, in the aggregate, (i) $650,000 per year through the first Payment Date following the first Annual Filing Date (prorated for any partial years) and (ii) an amount to be determined by the Board of Trustees for each year thereafter, which amount shall not exceed $650,000 and shall be subject to the consent of the Collateral Monitor, which consent may not be unreasonably withheld (it being understood that such amounts are expected to decrease after the first Payment Date following the first Annual Filing Date) (the "Issuer Operating Expenses Cap").

"Issuer Operating Expenses" means all expenses, liabilities or other obligations of the Issuer other than Excluded Expenses and amounts owed in respect of the New Bonds.

"Excluded Expenses" means (a) amounts to be paid for any transaction costs of the Qualifying Modification, including the professional fees and expenses of GDB, AAFAF, the Issuer and the professionals required to be paid pursuant to the Restructuring Support Agreement, (b) amounts owed to, or on behalf of, the Servicer, the Indenture Trustee or the Collateral Monitor (including, in each case, in respect of reimbursable expenses) under the Transaction Documents and (c) expenses arising from (i) Bondholder solicitations required under the terms of the Bond Indenture, (ii) litigation brought against or reasonably brought by the Issuer or the Board of Trustees (including any related legal fees and indemnification costs), (iii) the creation and distribution of information for U.S. tax reporting purposes, (iv) directors and officers insurance or (v) auditing fees.

"Issuer Expenses" means Issuer Operating Expenses and Excluded Expenses.

The Servicer will not be required to, and is not expected to, make advances of interest or principal payments on the Restructuring Property.

## Fees and Expenses Reserve

The Servicer will prepare, and on the Business Day prior to each Payment Date (each, a "Determination Date") deliver to the Issuer, the Collateral Monitor and the Indenture Trustee, the Payment Date Report, which will include, among other things, the Semiannual Budget, which will set forth the reasonably expected Issuer Expenses (other than amounts owed in respect of the New Bonds and amounts due to the Servicer and the Collateral Monitor calculated on the basis of cash Collections) through the next Determination Date based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees, which approval will not be unreasonably withheld. The amount of cash needed to satisfy the amounts set forth in the Semiannual Budget (such amount, the "Fees and Expenses Reserve") will be reserved in the Collection Account on the related Payment Date. From time to time after each Payment Date and prior to the following Determination Date, the Servicer may withdraw funds corresponding to the Fees and Expenses Reserve as described in "—*The Collection Account*" above.

## Calculation of Available Cash

The Payment Date Report will also include a statement setting forth the amount of funds available for payment to the Bondholders on the relevant Payment Date (such amount, the "Available Cash"), and the calculation thereof, which will be calculated as follows:

(i) the sum of all amounts in the Collection Account as of the applicable Determination Date (whether arising from the Collections or otherwise), *less*

(ii) the sum of (x) the Fees and Expenses Reserve and (y) the sum of amounts due to the Servicer, the Indenture Trustee and the Collateral Monitor and amounts otherwise in respect of validly incurred Issuer Expenses due on such date.

## Collection Schedule and Yield Considerations

The Issuer's ability to pay interest on the New Bonds in cash as it comes due and make principal payments on the New Bonds depends on the rate of Collections on the Restructuring Property, which will be influenced by a variety of economic, social and other factors. There can be no assurance as to the amount of cash interest or principal payments, if any, to be made on the New Bonds on each Payment Date, since the amount will depend on the amount collected on the Restructuring Property during the applicable Collection Period.

The Collection schedule for the Municipal Loan Assets, the Additional Restructuring Authority Assets and the Real Property Assets is attached hereto as Appendix E (the "Collection Schedule"). There can be no assurance that Collections on, including proceeds from sales of, any of the Restructuring Property, including the Municipal Loan Assets, will be generated in the amounts and according to the schedules set forth herein or at all.

If Collections occur earlier than, or in greater amounts than, projected, payments of principal on the New Bonds could occur significantly earlier than anticipated. If this occurs, Bondholders will bear the risk of not being able to reinvest such amounts at yields equal at least to the yield on their respective New Bonds. Such reinvestment risk includes the risk that interest rates may be lower at the time such Bondholders receive payments from the Issuer than interest rates would otherwise be had such payments not been made or had such payments been made at a later time.

Additionally, to the extent that obligors on Restructuring Property that have Loans with higher interest rates are able to prepay or refinance their Loans at lower interest rates, such repayment may result in the Issuer holding Restructuring Property that will generate Collections in amounts less than those set forth on the Collection Schedule, which will result in less Available Cash from which to make interest or principal payments on the New Bonds.

Likewise, delayed principal payments on the Restructuring Property could result in an actual yield that is less than the anticipated yield, and expedited principal payments on the Restructuring Property could result in an actual yield that is less than the anticipated yield.

## Eligible Investments of Funds in the Collection Account

Funds in the Collection Account may be invested, at the written direction of the Servicer, in Eligible Investments.

"Eligible Investments" means certain highly rated obligations and securities, including, in the case of any obligation or security issued by a U.S. party, only (a) obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency thereof, provided such obligations are backed by the full faith, credit and taxing power of the United States and (b) certificates of deposit issued by any bank, trust company, savings bank or other savings institution that is an Eligible Institution and is fully insured by the Federal Deposit Insurance Corporation (the "FDIC"), in either case with a total duration of no more than 183 days from the date of original issue and a remaining duration consistent with the payment of Available Cash due on the following Payment Date.

The Collection Account will be maintained as either (a) a segregated account with an Eligible Institution or (b) an Eligible Deposit Account. "Eligible Deposit Account" means a segregated trust account with the corporate trust department of a depositary institution organized under the laws of the United States of America or any one of the states thereof, the District of Columbia or the Commonwealth (or any domestic branch of a foreign bank), having corporate trust powers and acting as trustee for funds deposited in such account, so long as the short term securities of such depositary institution are rated A-1 by S&P, P-1 by Moody's and F1+ by Fitch or the long term securities of such depositary institution are rated at least BB by S&P, Baa by Moody's and BB by Fitch. "Eligible Institution" means a depositary institution or trust company (including the Indenture Trustee or any of its affiliates) so long as the short term securities of such depositary institution are rated A-1 by S&P, P-1 by Moody's and F1+ by Fitch or the long term securities of such depositary institution are rated at least BB by S&P, Baa by Moody's, and BB by Fitch and whose deposits are insured by the FDIC. The Collection Account will be initially held at the Indenture Trustee, and the Servicer will have full authority to make deposits to and request payments therefrom. In the event the Indenture Trustee no longer qualifies as an Eligible Institution, the Indenture Trustee will use reasonable efforts to cause the Collection Account to be moved to an Eligible Institution within 30 days from the date on which the Indenture Trustee fails to be an Eligible Institution.

**PAYMENTS TO BONDHOLDERS**

On each Determination Date, the Servicer will inform the Issuer, the Indenture Trustee and the Collateral Monitor of, among other things, the amount of Available Cash to be distributed to the Bondholders as described in more detail in "*Collections on the Restructuring Property and Calculation of Available Cash—Calculation of Available Cash*," in this Offering Memorandum.

The Indenture Trustee will make payments to the Bondholders out of the Available Cash. The Available Cash to be distributed to the Bondholders will be allocated in the manner described below.

## Priority of Payments

*Priority of Payments.* The Indenture Trustee will make payments from amounts in the Collection Account or will retain amounts in the Collection Account, as applicable, in the following order of priority:

1. *Holdback for Fees and Expenses Reserve* — On each Payment Date, an amount equal to the amount of cash reasonably expected to be required to pay all Issuer Expenses that are capable of estimation (which will not include, for the avoidance of doubt, amounts owed in respect of the New Bonds and Servicing Fee and Collateral Monitor Fee determined on the basis of cash Collections) through the next Determination Date based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees (such amount, the "Fees and Expenses Reserve") will be retained in the Collection Account;

2. *Third-Party Fees and Expenses* — On each Payment Date or otherwise as such amounts become due, make payments to each of the Servicer, the Indenture Trustee and the Collateral Monitor, of the respective amount of any fees, expenses and indemnification amounts due to it, and to the Issuer or other applicable third party, the amount of any other due and payable Issuer Expenses, including Reimbursable Servicer Expenses, subject, as applicable, to the Issuer Operating Expenses Cap and other applicable restrictions on Issuer Expenses described herein; *provided*, for the avoidance of doubt, that the payment of all Issuer Expenses validly incurred and payable from the Collection Account pursuant to the terms of the Transaction Documents as described herein will be paid prior to the calculation of Available Cash, notwithstanding any shortfall in the Fees and Expenses Reserve for the applicable semi-annual period;

3. *Current Interest on the New Bonds* — On each Payment Date, make payments to the Bondholders of accrued and unpaid interest on the New Bonds relating to such Payment Date; and

4. *New Bond Principal* — On each Payment Date, make payments to the Bondholders until the principal amount of the New Bonds is reduced to zero.

## Hypothetical Amortization of the New Bonds

As discussed above, the cash payments to the Bondholders on each Payment Date, if any, are dependent upon Collections on the Restructuring Property in the corresponding Collection Period and the amount of Available Cash that the Issuer holds. Such Collections are highly dependent upon a number of factors, including many that are outside of the Issuer's control.

In connection with the transfer of the Transferred Property from GDB to the Issuer, GDB has prepared a Collection Schedule for the Restructuring Property, which includes scheduled payments on the Restructuring Property Loans classified as performing as of the Cutoff Date (*i.e.*, the performing Municipal Loan Assets and Additional Recovery Authority Loans), projected sales of Real Property Assets and distributable Cash Assets, and which is attached hereto as Appendix E. However, there can be no assurance that the actual Collections on the Restructuring Property will not materially deviate, both in relation to the timing and amount of any such Collections, from the contractually scheduled payments. In particular, as a result of Hurricanes Irma and María, the tax revenues on which the Municipal Loan Assets rely may be materially reduced for an unknown period. In addition, such schedule and the scenario analysis assume zero Collections on any of the Restructuring Property other than the Municipal Loan Assets, the Additional Recovery Authority Loans and the Real Property Assets. Any recoveries on other portions of the Restructuring Property, which are uncertain and speculative as to timing and amount, may materially change the hypothetical scenario analysis presented below. Furthermore, subsequent to the Cutoff Date, certain developements, including the Committee Settlement Stipulation, the Siemens Settlement, the San Juan Settlement, the sale of Real Property Assets and the accrual of additional Collections, have occurred, each of which may change the hypothetical scenario analysis presented herein; however, GDB believes that the aggregate effect of such subsequent developments will not materially change such hypothetical scenario analysis.

Subject to the qualifications and assumptions described above and on Appendix F, a hypothetical scenario analysis regarding the hypothetical amortization of the New Bonds can be found on "*Appendix F: Hypothetical Amortization of the New Bonds*," attached to this Offering Memorandum.

**TRANSFER AGREEMENT**

The following summary describes certain terms and conditions of the transfer agreement, entered into by and between the Issuer and GDB (the "Transfer Agreement"). The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, all the provisions of the Transfer Agreement.

**Transfer and Assignment of Restructuring Property**

On the Closing Date, pursuant to the GDB Restructuring Act and the Qualifying Modification, the Transfer Agreement will require GDB to irrevocably assign and transfer, without recourse to GDB or its assets (except as provided in the Keepwell Agreement), to the Issuer, in consideration for cancellation of certain of GDB's existing bond obligations and other indebtedness pursuant to the Qualifying Modification, all of GDB's legal and equitable right, title and interest in, to and under, and claims and causes of action to enforce, all of the Transferred Property (other than the GDB Retained Loans and the Residual GDB Cash Assets) and any security interests related to the Transferred Property. Furthermore, upon (i) the discovery of any Unknown Assets, (ii) the receipt of any proceeds of the GDB Retained Loans, Litigation Proceeds (subject to the provisions of the Transfer Agreement) or Collections (other than Collections subject to the Keepwell Agreement) or (iii) the identification of any Cash Assets, including the Residual GDB Cash Assets, GDB will also be required to take all necessary steps to complete the transfer thereof (in each case, net of the expenses associated with obtaining such Unknown Assets, proceeds or Cash Assets, as applicable) to the Issuer within fifteen days, pending which such assets will be held in trust for the Issuer. In addition, the Transfer Agreement will require that all retained rights, title and interests in and to, and claims and causes of action to enforce, the Additional Recovery Authority Loans (i.e., other than the Beneficial Interests therein transferred on the Closing Date) be transferred to the Issuer, and will provide that each such Additional Recovery Authority Loan will constitute Transferred Property, no later than the date that is the earlier of (A) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (B) 18 months after the Closing Date. The Transfer Agreement will also permit GDB to transfer, at its option (except as described in the preceding sentence), all rights, title and interest in, to and under, and claims and causes of action to enforce, any of the GDB Retained Loans at any time, at which time, such GDB Retained Loans will be deemed Transferred Property. The Transfer Agreement will also provide that GDB will retain all proceeds of Causes of Action (the "Litigation Proceeds") and will be authorized to use such proceeds (net of any expenses associated with realization of such proceeds) solely to (y) satisfy or resolve any contingent and unliquidated claims against GDB arising on or before the Closing Date (other than those resolved pursuant to the Qualifying Modification or the GDB Restructuring Act) and (z) comply with certain of its obligations under the Committee Settlement Stipulation as described herein (see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"). Upon its sole determination that all such contingent and unliquidated claims and all such obligations under the Committee Settlement Stipulation have been satisfied or resolved, GDB shall transfer to the Issuer the remaining Litigation Proceeds in GDB's possession or control at such time and all Litigation Proceeds received by GDB thereafter within fifteen days after the receipt thereof.

The Transfer Agreement will require that such transfers, effectuated pursuant to the GDB Restructuring Act and the Qualifying Modification, be documented under the Transfer Agreement, and that each item of the Transferred Property be identified in a written transfer notice delivered to the Issuer and the Servicer in accordance therewith; *provided* that such identification may be made in general terms. Pursuant to the Transfer Agreement, each transfer thereunder will be irrevocable, non-voidable and an absolute transfer of all of GDB's title and interest (as a true sale) and not a pledge or other financing, in accordance with the GDB Restructuring Act.

An initial budget providing the projected sources and uses of GDB's cash through the remainder of GDB's operations will be included in the Transfer Agreement, and the Transfer Agreement will provide that GDB will prepare and deliver to the Issuer an updated budget in form and substance satisfactory to the Collateral Monitor at the end of each fiscal quarter until all Transferred Property has been transferred to the Issuer, each GDB Retained Loan has been transferred to the Issuer or terminated according to its terms and each Retained Cause of Action has been resolved, released or otherwise extinguished (and, in any such case, all Litigation Proceeds have been transferred to the Issuer as Transferred Property to the extent required by the Transfer Agreement). Upon GDB's determination that all obligations required to be paid with such cash have been provided for, GDB will transfer (i) any Excess Reserved Cash in an aggregate amount up to $10 million to the Public Entity Trust in satisfaction of GDB's obligations under Paragraph 2 of the Committee Settlement Stipulation and (ii) any surplus cash and cash equivalents to the Issuer as Residual GDB Cash Assets.

In accordance with the Transfer Agreement, GDB will be required to provide notice to each obligor and relevant payment intermediary in respect of the Loans constituting Transferred Property and all other relevant parties of such transfers notifying such parties of the transfer of the Transferred Property and directing such parties to send all future payments in respect of such Transferred Property directly to the Collection Account. GDB will use reasonable best efforts and cooperate with the Servicer to ensure the relevant payors make all future payments in respect of the Transferred Property directly to the Collection Account or otherwise to the Servicer. In the event that, after the Closing Date, any Collections in respect of the Transferred Property are not remitted directly to the Servicer or the Collection Account or are received by GDB in any manner, GDB will remit or cause to be remitted such Collections to the Servicer.

In addition, the Transfer Agreement will require GDB, in connection with any transfer of Transferred Property, at its own expense, on or prior to the date of such transfer, to deliver certain books, records and other documents (whether in physical or electronic form) relating to such Transferred Property to a designated document custodian, which will thereafter hold such documents for the benefit of the Issuer, and that the respective accounting records and computer files of GDB and the Issuer will reflect such transfer and assignment. For additional information, see, among other things, "*Risk Factors—Although the New Bonds will be automatically secured by a statutory lien on the Transferred Property and all Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders, pursuant to the GDB Restructuring Act, such rights of the Bondholders may be adversely affected by issues generally associated with the realization of liens on collateral*" and "*Risk Factors—The Restructuring Property securing the New Bonds includes certain Loan proceeds that will not be transferred to the Issuer until received by GDB after the Closing Date. Although the New Bonds will be secured by a lien on the Beneficial Interest in such Loans, the lien on such proceeds received by GDB after a future GDB Title III filing, if any, could be subject to challenge.*"

Furthermore, under the Transfer Agreement, GDB will agree to use commercially reasonable efforts, in cooperation with the Servicer and the Issuer, to perform the actions of GDB required to transfer the servicing of the Restructuring Property from GDB to the Servicer.

The Transfer Agreement will require the Issuer to assume on the Closing Date, in connection with the transfer of the Transferred Property to the Issuer, liability for the payment of any transaction costs of the Qualifying Modification, including professional fees and expenses of GDB, AAFAF, and the professionals to be paid pursuant to the Restructuring Support Agreement, to the extent not paid in full by GDB prior to or on the Closing Date (notwithstanding the foregoing, GDB intends and expects to pay all such expenses in full on the Closing Date, as required by the Restructuring Support Agreement).

Pursuant to the Transfer Agreement, GDB will covenant, among other things, to use commercially reasonable best efforts to maximize the return on the GDB Retained Loans, provided that it shall not be required to bring any action seeking to obtain a judgment against a public entity obligor on such Loan or seeking to foreclose upon any of such public entity's assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans. In addition, GDB will covenant to provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of the GDB Retained Loans. Upon the occurrence of an event of default under the Transfer Agreement, including, but not limited to, the failure by GDB to transfer any Transferred Property as contemplated by the Transfer Agreement, the failure to disclose to the Issuer the existence of any asset that is required to be transferred to the Issuer but not yet transferred or to comply with any other covenant contained in the Transfer Agreement in any material respect, the Servicer, on behalf of the Issuer, shall be authorized and empowered to take certain actions to effectuate the terms of the Transfer Agreement, including to effectuate the transfer of any such property, including by way of specific performance in addition to any other remedy to which they are entitled at law or in equity.

**No GDB Repurchase Obligation**

The Transfer Agreement will provide that GDB will have no obligation to repurchase any the Transferred Property.

**Amendment**

The Transfer Agreement will provide that the Transfer Agreement may be amended by the parties thereto, without the consent of the Bondholders or the Indenture Trustee, to cure any ambiguity, to correct or supplement any provisions in the Transfer Agreement or for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Transfer Agreement or of modifying in any manner the rights of the Bondholders; *provided* that an officer's certificate will have been delivered by the Servicer to the Indenture Trustee certifying that such officer reasonably believes that such amendment will not adversely affect the interests of any Bondholder.

The Transfer Agreement will provide that it may also be amended by the parties thereto with the written consent of the Indenture Trustee for any other purpose (i) if the Indenture Trustee concludes that such amendment will not adversely affect the interests of the Bondholders or (ii) for any other purpose, so long as the Indenture Trustee has obtained the consent of Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding.

The Transfer Agreement will also provide, however, that no amendment to the Transfer Agreement may reduce the percentage of the aggregate principal amount of outstanding New Bonds required to consent to amendments pursuant to (i) and (ii) in the preceding paragraph without the consent of each Bondholder.

**Third-Party Beneficiaries**

The Transfer Agreement will provide that the Indenture Trustee, on behalf of the Bondholders, and the Servicer will be express third-party beneficiaries of the Transfer Agreement. The Transfer Agreement provides that any Bondholder is authorized and

empowered to enforce any provision of the Transfer Agreement on behalf of the class of all Bondholders under the circumstances and to the extent Bondholders are permitted under the Bond Indenture to institute proceedings with respect to the Bond Indenture.

### SERVICING AGREEMENT

The following summary describes certain terms and conditions that are to be included in the Servicing Agreement entered into by the Issuer and the Servicer.

**Servicing Procedures**

The Servicer, for the benefit of the Issuer and the Bondholders, will manage, service, administer and make Collections on the Restructuring Property in accordance with the terms of the Servicing Agreement, which will provide, among other things, that the Servicer will act (a) in accordance with applicable laws and regulations and the terms of the provisions of such Restructuring Property, (b) consistent with the Servicer's standard servicing procedures, if applicable, (c) in accordance with the other express terms of the Servicing Agreement, which for the avoidance of doubt, will include the limitations described in "*The Restructuring Property—Management of the Restructuring Property*," and (d) with reasonable care, using the same degree of skill and attention that a prudent lender or asset manager would exercise with respect to comparable assets that it services for itself or others (i) with a view to the timely collection of all periodic payments due on the Loans that make up the Restructuring Property and a duty to maximize the realizable value (in present value terms) of the Restructuring Property and (ii) without regard to any relationship that the Servicer may have with the related obligor or any other creditor of such obligor (collectively, the "Accepted Servicing Practices").

The Servicer's duties will include performance of the following services, in each case, in accordance with the Accepted Servicing Practices (the "Services"):

(a)     using commercially reasonable efforts to maximize the realizable present value of the Restructuring Property, including, as appropriate, through the collection of all payments called for under the terms of each Loan as and when the same become due, the sale, settlement or other disposition of the Restructuring Property or the enforcement of all rights and remedies of the Issuer in respect of the Restructuring Property through the commencement of legal proceedings or other enforcement actions;

(b)     using commercially reasonable efforts to enforce the Issuer's rights under the Transfer Agreement, including by: (i) collecting all proceeds in respect of the GDB Retained Loans and the Causes of Action and receiving, on behalf of the Issuer, the Additional Recovery Authority Loans, and enforcing the Issuer's rights to each of the foregoing in accordance with the Transfer Agreement; (ii) enforcing GDB's covenant under the Transfer Agreement and the Qualifying Modification to use commercially reasonable best efforts to maximize the return on the GDB Retained Loans; and (iii) reviewing any proposed modification by GDB of any Additional Recovery Authority Loan and providing approval of such modification only if, after consultation with and non-objection by the Collateral Monitor, the Servicer determines in good faith that such modification is commercially reasonable;

(c)     with respect to obligors on the Restructuring Property: (i) using commercially reasonable efforts to respond to inquiries of such obligors; (ii) using commercially reasonable efforts to investigate and manage delinquencies, defaults and potential defaults on the Restructuring Property, including by using commercially reasonable efforts to contact and interview any obligor to determine the financial condition of such obligor, the economic viability of the related Restructuring Property and such obligor's intentions with respect to making payments in respect of the Restructuring Property; and (iii) sending payment coupons and reporting tax information to such obligors;

(d)     establishing, maintaining and cooperating with the Issuer and the Indenture Trustee in the establishment and maintenance of certain accounts and managing all deposits therein and withdrawals therefrom (for additional information on the Services relating to the Collection Account, see "*Collections on the Restructuring Property and Calculation of Available Cash—Collections* on the Restructuring Property" in this Offering Memorandum);

(e)     preparing, or causing to be prepared, and delivering (i) the Annual Report and certain other disclosures required pursuant to the Disclosure Agreement (including unaudited annual financial information necessary for the Issuer to file unaudited financial information in the event that the Issuer's audited financial statements are not available by the date the Annual Report is required to be filed under the Disclosure Agreement), (ii) the Payment Date Report, including the Semiannual Budget, and the Quarterly Budget Report, (iii) the information required by the Collateral Monitor to conduct the Compliance Test and prepare the Semiannual Bondholder Report and (iv) the information required by the auditor of the Issuer to prepare the Issuer's annual audited financial statements, including the management's discussion and analysis;

(f)     entering servicing information on a current basis into the servicing report system utilized by the Servicer in accordance with the Accepted Servicing Practices, including by crediting Collections against the Restructuring Property only once actually received by the Servicer, and maintaining and ensuring the safe custody of, as property of the Issuer, a complete, accurate and separate set of books and records pertaining to the Servicer's performance of the Services, including (i) all Collections received by the Servicer or otherwise deposited in the Collection Account in respect of

the Restructuring Property, the GDB Retained Loans or the Causes of Action, (ii) all expenses to be paid by the Issuer relating to the Restructuring Property and (iii) relevant copies of notes, correspondence and documentation of all servicing efforts and activities, including all material meetings and telephone calls with obligors or made in connection with obligors or the Restructuring Property;

(g)     maintaining an effective system of audits and controls adequate to ensure that the Servicer's agents, representatives, employees and other staff perform their respective obligations and comply with the Accepted Servicing Practices;

(h)     taking all steps necessary, on behalf of the Issuer, to continuously maintain the Issuer's ownership interest in the Restructuring Property and all Collections thereon and perfected security interests in or liens on any collateral securing any Loan constituting Restructuring Property and the Vendor Claim Reserve and any proceeds thereof, including by, as necessary, (i) obtaining the execution of all necessary documentation by the applicable obligor or GDB, (ii) recording, registering, filing, re-recording, re-filing and re-registering all applicable security agreements, financing statements and continuation statements, (iii) amending the title documents of such property and (iv) using all commercially reasonable efforts to defeat any adverse claims to the Restructuring Property or the Vendor Claim Reserve Residual, including to the sources of repayment of the Issuer, and to preserve the Restructuring Property and the enforceability of the Issuer's rights thereto;

(i)     responding to inquiries of federal, state or local government authorities with respect to the Restructuring Property, using commercially reasonable efforts to generate information for U.S. federal tax reporting purposes, as is available to the Servicer, for the Issuer and, in the event that the U.S. Internal Revenue Service asserts that the New Bonds are characterized as equity interests of the Issuer for U.S. federal income tax purposes, using commercially reasonable efforts to provide, or cause to be provided, such information as is reasonably requested by Bondholders to enable them to comply with their U.S. federal income tax reporting obligations and to retain possession of records and information relevant to the foregoing; and

(j)     performing the other duties, including administrative functions, as specified in the Servicing Agreement.

Subject to the Accepted Servicing Practices, including the limitations described in "*The Restructuring Property—Management of the Restructuring Property*," the Servicer will be authorized and empowered to:

(a)     act as agent for the Issuer to perform the Services and all other actions required by the Servicer under the Servicing Agreement, and to do any and all things in connection therewith that it may deem necessary or desirable; for the avoidance of doubt, the Servicer will be authorized and empowered to act as agent for the Issuer to prepare, or cause to be prepared, the Annual Report and certain other notifications required under the Disclosure Agreement;

(b)     exercise all available rights and seek all available remedies in respect of the Restructuring Property, including, without limitation (i) commencing, in its own name or in the name of the Issuer, a legal proceeding to enforce rights and seek remedies under the Restructuring Property or any lien or similar interest or claim relating thereto, (ii) commencing or participating in any legal proceeding (including, without limitation, a proceeding under Title III or Title VI of PROMESA or similar proceeding) relating to or involving the Restructuring Property, including defaults on the Restructuring Property and (iii) executing and delivering, in the Servicer's name or in the name of the Issuer, any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such proceeding described in the foregoing clause (i) or (ii); for the avoidance of doubt, the Issuer will appoint the Servicer as its attorney in fact and agent of the Issuer to exercise all available rights and seek all available remedies in respect of the Restructuring Property, or waiving, modifying or varying any term of, or selling, any Loan constituting Restructuring Property;

(c)     waive, modify or vary any term of, or sell or settle, any Loan constituting Restructuring Property if, in the Servicer's reasonable and prudent determination, such waiver, modification, postponement or indulgence will maximize the amounts (in present value terms) to be received by the Bondholders in respect of such Loan;

(d)     execute and deliver, on behalf of itself or the Issuer, any and all agreements necessary to effectuate any transaction allowed under the Servicing Agreement and any and all instruments of satisfaction, cancellation, partial or full release or discharge and all other comparable instruments with respect to the Restructuring Property; *provided* that the Servicer will not, except pursuant to an order from a court of competent jurisdiction, or as part of a legitimate restructuring transaction of such Restructuring Property (which transaction has been approved by the Collateral Monitor as commercially reasonable), release an obligor from payment of any unpaid amount under any Restructuring Property or waive the right to collect the unpaid balance of any Restructuring Property from any obligor, except that the Servicer may forego collection efforts if the amount subject to collection is *de minimis* or such release or waiver is otherwise consistent with the Accepted Servicing Practices; and

(e)     subject to the reimbursement limitations described in "*Servicing Compensation and Payment of Expenses*" below, engage third-party vendors, legal counsel, brokers, property managers and other sub-contractors in connection with the servicing, collection, resolution, restructuring, enforcement, litigation, settlement, sale or other disposition of the Restructuring Property.

The Servicer will have the exclusive right to the extent permitted by law to vote, to give consents, ratifications and waivers and to take any other action with respect to the Restructuring Property with the same force and effect as if the Servicer were the absolute and sole owner thereof, in each case, in accordance with the Accepted Servicing Practices, and the Issuer will take all such action as the Servicer may reasonably request from time to time to give effect to such right. Under the Servicing Agreement, in order to authorize and empower the Servicer to carry out the Services, the Issuer will grant the Servicer powers of attorney to the fullest extent permitted by law to enable the Servicer to carry out its servicing and administrative duties under the Servicing Agreement, and the Issuer will furnish any additional documents the Servicer deems necessary or appropriate in connection therewith.

In addition, if the Servicer commences or participates in a legal proceeding in respect of the Restructuring Property in its own name, the Issuer will be deemed to have automatically assigned the applicable Restructuring Property (subject to the lien in favor of the Indenture Trustee for the benefit of the Bondholders) and any other related property of the Issuer with respect to such Restructuring Property to the Servicer for purposes of commencing or participating in any such proceeding as a party or claimant. If in any enforcement suit or legal proceeding, it will be held that the Servicer may not enforce rights under the Restructuring Property on the grounds that it will not be a real party in interest or a holder entitled to enforce such rights under the Restructuring Property, the Issuer will, at the Servicer's written direction, take such steps as the Servicer may direct to enforce such rights under the Restructuring Property, including bringing suit in its name. For the avoidance of doubt, the Servicer will not acquire any right or title to, or interest in, the Restructuring Property, other than the servicing rights conveyed by the Servicing Agreement.

The Servicing Agreement will not create any fiduciary duties of the Servicer to the Bondholders, and such duties will only exist to the extent arising under applicable law.

**Oversight by the Collateral Monitor**

The Servicing Agreement and the Collateral Monitor Agreement will provide that the activities of the Servicer will be subject to the ongoing oversight and review of the Collateral Monitor and require the Servicer and the Collateral Monitor to meet and confer regularly and in good faith in fulfillment of their respective duties under such agreements. The Servicing Agreement will require the Servicer to cooperate with the Collateral Monitor by, among other things, providing, and responding to reasonable requests of the Collateral Monitor for, (i) access to the Servicer, (ii) access to or copies of documents relating to the Restructuring Property or any other reasonably available papers or information regarding the activities of the Issuer and the Servicer, including, without limitation, all information relating to any potential material transaction in respect of the Restructuring Property and (iii) temporary on-site access and work space for the Collateral Monitor and the Issuer at the Servicer's facilities from which it is primarily performing the Services, in each case, as reasonably necessary to permit the Collateral Monitor and the Issuer to carry out such entities' duties in respect of oversight of the Servicer. Such agreements will provide further that, unless waived by the Collateral Monitor in its sole discretion, the Servicer and the Collateral Monitor will meet at least once each month for the first 24 months after the Closing Date and once each fiscal quarter thereafter, if such reduced schedule is agreed to by the Collateral Monitor, to discuss, among other things, the Servicer's performance, the Collections on the Restructuring Property, delinquencies on the Restructuring Property and strategy and expected timing for returning any non-performing assets to performing status, and preparation of the reports and budgets required under the Servicing Agreement. Pursuant to the Servicing Agreement, the Issuer will have a right to, but will not be required to, attend such meetings or to receive an update from the Collateral Monitor as to the results of any such meeting.

In addition, the Servicing Agreement will provide that if the Servicer engages in any negotiations relating to, or consideration of, or if the Servicer is approached regarding, any potential material transaction in respect of any Restructuring Property or any Additional Recovery Authority Loan held by GDB, including any potential waiver, modification, amendment, consent, other accommodation, sale or other disposition, the Servicer will notify the Collateral Monitor and provide, on an ongoing basis throughout the course of such negotiations and consideration, the Collateral Monitor with all information necessary for the Collateral Monitor to make a determination as to the commercial reasonableness of such transaction. The Servicing Agreement and the Collateral Monitor Agreement will require the Servicer and the Collateral Monitor to collaborate in good faith to ensure the completeness and timely delivery of the information provided to the Collateral Monitor, and, in all events, the Servicer will be required to provide all such information to the Collateral Monitor no later than 10 business days prior to the date the Servicer proposes to enter into any such transaction. In accordance with the restrictions described in "*The Restructuring Property—Management of the Restructuring Property*," the Servicing Agreement will not permit the Servicer to enter into or consent to any such transaction if the Collateral Monitor has objected to such transaction. The Collateral Monitor Agreement will require the Collateral Monitor, on the last day of each Collection Period (each, a "Test Date"), to conduct a test (the "Compliance Test") to determine if the cumulative shortfall of the actual cash Collections received in respect of the Municipal Loan Assets identified on the Municipal Loans Collection Schedule (as adjusted as described in "*Service Providers—The Collateral Monitor—Duties of the Collateral Monitor*") as compared to the scheduled interest and

amortization payments identified therein from July 1, 2018, through such Test Date is 10% or more, which will be a Servicer Default under the Servicing Agreement (described below in "—Removal of Servicer").

**Servicing Compensation and Payment of Expenses**

The Servicing Agreement will provide that, on the Closing Date, the Servicer will be paid a fee of $225 for each Loan transferred to the Issuer on the Closing Date for management by the Servicer under the Servicing Agreement (the "Initial Portfolio Transfer Fee").

The Servicing Agreement will also provide that, on each Payment Date, the Issuer will pay the Servicer a fee (the "Servicing Fee") calculated, with respect to each Collection Period, as the sum of (i) $225 per Loan transferred to the Issuer subsequent to the Closing Date during such Collection Period, (ii) 0.120% of the aggregate principal amount of the performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iii) 0.025% of the aggregate principal amount of the non-performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iv) 3.000% of Net Collections generated during such Collection Period upon the sale or settlement of any Loan constituting Restructuring Property and (v) 3.000% of Net Collections generated upon the sale of any Real Property Asset during such Collection Period, subject to certain limitations. The Servicing Agreement will also entitle the Servicer to reimbursement or payment by the Issuer for certain expenses and indemnification amounts incurred in connection with the performance of its duties under the Servicing Agreement, as described below. (The Servicing Fee and such expenses and indemnification may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds, in each case, subject to the terms and conditions contained in the Servicing Agreement.)

For purposes of calculating the Servicing Fee under the Servicing Agreement, (a) the term "Net Collections" will mean cash Collections in respect of the Restructuring Property net of any documented Reimbursable Servicer Expenses related to realizing such Collections and (b) "settlement" will mean, with respect to any Loan, a disposition, other than a sale, resulting in cash Collections. The Servicing Agreement will provide, for the avoidance of doubt, that if a non-performing Loan is restructured, all amounts due thereon will be considered to have been paid for purposes of its classification so long as all amounts due under the Loan's restructured terms have been paid.

The Servicer will be entitled to be paid the Servicing Fee pursuant to the Servicing Agreement solely to the extent of monies on deposit in the Collection Account and in accordance with the priority of payments described in "*Payments to Bondholders—Priority of Payments*" in this Offering Memorandum.

The Servicing Fee will compensate the Servicer for performing the Services under the Servicing Agreement. In addition, the Servicer will be entitled to reimbursement pursuant to the Servicing Agreement for the reasonable and necessary documented "out of pocket" costs and expenses incurred in the performance of the Servicer's obligations including expenses arising from (i) the establishment or maintenance of the Collection Account, (ii) legal and other fees and expenses in connection with the enforcement of rights and remedies under the Restructuring Property or in connection with an allowed transaction in respect of any Restructuring Property, (iii) the maintenance of any security interest securing any Restructuring Property, (iv) insurance, to the extent required, for any Restructuring Property, and (v) outside accounting fees in connection with the preparation of any of the reports and budgets required under the Servicing Agreement (collectively, "Reimbursable Servicer Expenses"). The Servicing Agreement will also provide that, to the extent the Servicer incurs Reimbursable Servicer Expenses exceeding the amount in the Fees and Expenses Reserve corresponding to Reimbursable Servicer Expenses, such expenses so incurred will be treated as advances by the Servicer ("Servicer Advances") and will be repaid, in addition to interest thereon from the date of the advance at the rate of 1.0% per month compounded monthly, on the succeeding Payment Date prior to any other amounts due to the Servicer.

The Servicing Agreement will provide that, notwithstanding the foregoing, the Servicer may receive reimbursement for a third-party expense only if the Servicer has obtained the prior written consent of the Collateral Monitor to engage such third party, which consent may not be unreasonably withheld if the Collateral Monitor determines that such engagement is commercially reasonable; provided that the Collateral Monitor will have the opportunity to review all invoices of such third party and may terminate such engagement upon finding that it is no longer commercially reasonable. The Servicing Agreement will further provide that, if the Collateral Monitor has provided such written consent for the Servicer's engagement of a third party in connection with the performance of the Services, it will give notice of such consent to the Issuer and include notice of such engagement to the Bondholders in its next Semiannual Bondholder Report and, in addition, include a requirement that information regarding all Reimbursable Servicer Expenses, whether paid from the Fees and Expenses Reserve or as Servicer Advances, be documented in reasonable detail, including information regarding amounts paid to each third party and the services provided by such third parties, and provided to the Bondholders in the next Quarterly Budget Report or Payment Date Report following incurrence of such amounts.

The Servicing Agreement will not permit the Servicer to collect and retain as additional servicing compensation any investment earnings or interest earned from the investment of monies on deposit in the Collection Account. For additional information, see "*Collections on the Restructuring Property and Calculation of Available Cash—Collections on the Restructuring Property*" in this Offering Memorandum.

**Resignation of Servicer Permitted Under Limited Circumstances**

The Servicing Agreement will provide that the Servicer may not resign from its obligations and duties unless (i) as a result of a change in law, the Servicer's duties under the Servicing Agreement are no longer permissible under applicable law or the Servicer receives a written notice from a relevant governmental or regulatory authority to the effect that the Servicer's duties under the Servicing Agreement are not permissible under applicable law, (ii) through no fault of the Servicer's, material, non-disputed amounts due to the Servicer in respect of the Servicing Fee or Servicer Advances or otherwise are not paid from monies on deposit in the Collection Account on the applicable Payment Date, which nonpayment is not remedied within 30 days following such Payment Date, (iii) (A) the Servicer has proposed a Qualified Successor Servicer to the Issuer and the Collateral Monitor in writing and such proposed Qualified Successor Servicer is acceptable to the Issuer and the Collateral Monitor and (B) such proposed Qualified Successor Servicer has agreed in writing to assume the obligations of Servicer under the Servicing Agreement or a substantially similar servicing agreement acceptable to the Collateral Monitor or (iv) the Servicing Agreement is otherwise terminated in accordance with its terms after the Servicer has provided at least three-months' notice of its intention to resign to the Issuer and the Collateral Monitor. The Servicing Agreement will further provide that, subject to applicable law or the direction of an applicable governmental or regulatory authority, resignation pursuant to the foregoing clause (iii) or (iv) above will become effective at the earlier of (a) the date a successor Servicer is able to provide the Services and enters into a servicing agreement with the Issuer, which successor Servicer's identity and Servicing Agreement are acceptable to the Collateral Monitor and (b) 24 months following the date of the Servicer's resignation, and the Transaction Documents will provide that any such successor Servicer will be subject to the same preliminary 60-day period for objection by the New Bond Requisite Holders (described below in "*—Removal of Servicer*").

**Removal of Servicer**

The Servicing Agreement and the Bond Indenture will provide that, subject to the procedures set forth therein (as described below), the Servicer may be removed and replaced by the Bondholders upon the occurrence of a Servicer Default (as defined herein) that is material to the interests of the Bondholders (a "Servicer Replacement Event"). Pursuant to the Collateral Monitor Agreement, the Collateral Monitor will be required to notify the Indenture Trustee and the Issuer when (a) the Collateral Monitor believes, in good faith, that a Servicer Default has occurred and is continuing and (b) the Collateral Monitor believes, in its sole discretion, that such Servicer Default is material to the interests of the Bondholders and that such notice from the Collateral Monitor will provide a detailed narrative and explanation of (i) the facts supporting the evaluation of the Collateral Monitor, (ii) the possible effects on the interests of the Bondholders and (iii) the recommendation of the Collateral Monitor regarding the possible Servicer Replacement Event. Pursuant to the Servicing Agreement, the Servicer will have the opportunity to provide a written explanation of such Servicer Default to the Collateral Monitor and the Issuer; *provided* that notwithstanding any such explanation, the Collateral Monitor's decision to give notice of a possible Servicer Replacement Event pursuant to the Collateral Monitor Agreement, and such notice actually given, will not be subject to challenge by the Servicer or any other person or entity. Pursuant to the Bond Indenture and the Collateral Monitor Agreement, the Indenture Trustee will be required to make available to the Bondholders the Collateral Monitor's notice along with the recommendation, if any, of the Issuer regarding the possible Servicer Replacement Event.

The Bond Indenture will require, promptly upon the Collateral Monitor's notice of a possible Servicer Replacement Event, but in no event later than 30 days thereafter, the Indenture Trustee to issue a posting on the EMMA website or other similar public posting and to solicit a Bondholder vote regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced. The Bond Indenture will provide that, if the New Bond Requisite Holders do not deliver affirmative votes in respect of the solicitation, which will have a period of not less than 30 days and not more than 60 days, the Servicer Default and possible Servicer Replacement Event will be deemed waived. The Bond Indenture will also provide that, if the New Bond Requisite Holders deliver affirmative votes in respect of the solicitation, a Servicer Replacement Event will have occurred and, upon the Servicer's receipt of notice by the Indenture Trustee of the results of the Bondholder vote, the Servicer's appointment under the Servicing Agreement will be terminated pending the appointment of a successor Servicer. Under such circumstances, the Transaction Documents will require the Issuer to initiate a competitive process, reasonably satisfactory to the Collateral Monitor, for the identification of a possible successor Servicer, who must be "qualified" and "independent" (as such terms are defined in the Transaction Documents), of recognized national standing and with the requisite expertise and Spanish speaking capability. The Transaction Documents will provide further that the Issuer (or, if the Issuer fails to act within 45 days of such vote, the Collateral Monitor) will be required to designate a successor Servicer acceptable to the Collateral Monitor for a preliminary 60-day period on terms of engagement acceptable to the Collateral Monitor and that any approval of the successor Servicer or terms of its engagement required from the Collateral Monitor may not be unreasonably withheld. The Collateral Monitor will be required to give notice to the Indenture Trustee under the Collateral Monitor Agreement, and the Indenture Trustee will be required to make such notice available to the Bondholders under the Bond Indenture, of (i) the successor Servicer, (ii) the terms of the successor Servicer's engagement, (iii) the terms of the preliminary 60-day engagement period and opportunity for Bondholder objection, (iv) any additional information the Collateral Monitor would like to provide and (vi) any

additional information the Issuer would like to provide. The Transaction Documents will provide that, if the New Bond Requisite Holders do not object to the identity or terms of the successor Servicer's engagement within 60 days after the Bondholders receipt of such notice, the successor Servicer's engagement will become final, subject to the terms and conditions of such Servicer's Servicing Agreement and that, if a successor Servicer is not appointed within six months after the delivery of affirmative votes of the New Bond Requisite Holders in respect of the solicitation, the Servicer Replacement Event and underlying Servicer Default will be deemed waived and the Servicer will remain in place.

Each of the following events will constitute a "Servicer Default" under the Servicing Agreement:

(a)   The failure by the Servicer, if within the Servicer's power to do so, to deposit or deliver to the Indenture Trustee for deposit in the Collection Account any required payment or to make any required payment or distribution therefrom, which failure continues unremedied for a period of five Business Days after discovery of the failure by an officer of the Servicer or written notice of such failure is provided to the Servicer by the Issuer or the Collateral Monitor;

(b)   The Compliance Test carried out by the Collateral Monitor shows a cumulative shortfall of 10% or more as of any applicable Test Date, *provided* that any Servicer Default occurring as the result of such a cumulative shortfall will be deemed waived and voided if notification of a possible Servicer Replacement Event is not made by the Collateral Monitor in respect of such Servicer Default within 30 days of the results of the Compliance Test being published in the Semiannual Bondholder Report;

(c)   Information necessary to verify compliance with the Compliance Test as of any Test Date or any of the other information necessary for the Collateral Monitor's Semiannual Bondholder Report is not delivered to the Collateral Monitor on a timely basis;

(d)   The Servicer fails to use commercially reasonable efforts to maximize the realizable present value of the Restructuring Property (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum), as detailed in writing to the Servicer and not remedied within 30 days of the Servicer being notified thereof;

(e)   The Servicer enters into modifications, extensions or accommodations in respect of the Restructuring Property that are, individually or in the aggregate, not commercially reasonable (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum); *provided* that if the Collateral Monitor fails to object to a modification, extension or accommodation during the ten-day period described in such limitations, such modification, extension or accommodation will be presumed to be commercially reasonable and will not, individually, be the basis for a Servicer Default;

(f)   The Servicer fails to maintain its existence in good standing as an entity under the laws of its jurisdiction of incorporation or organization or to obtain and preserve its Qualification or Independence;

(g)   There occurs an Insolvency Event with respect to the Servicer;

(h)   A violation by the Servicer of any provision of applicable law or any judgment of any court or governmental authority applicable to the Servicer that would materially adversely affect its ability to perform its obligations under the Servicing Agreement in any material respect;

(i)   The Servicer engages in fraudulent or criminal activities that would (i) adversely affect its ability to perform its obligations under the Servicing Agreement in any material respect or (ii) present an unacceptable level of risk or damage to (A) the reputation of the Issuer or (B) the ability to make payments to Bondholders;

(j)   Any representation, warranty or statement of the Servicer made in the Servicing Agreement or any certificate, report or other writing delivered pursuant to the Servicing Agreement proves to be incorrect in any material respect as of the time made (and, if such representation, warranty or statement is reasonably capable of cure, continues unremedied for a period of 30 days after the date on which written notice of such failure has been given to the Servicer by the Issuer or the Collateral Monitor);

(k)   There occurs any material adverse change in the Servicer's financial position that has a material adverse effect on the Servicer's ability to perform its obligations under the Servicing Agreement;

(l)   Failure on the part of the Servicer to observe or perform any covenant or agreement set forth in the Servicing Agreement other than those set forth above that, to the extent capable of remedy, continues unremedied for a period of up to 30 days after the date on which written notice of such failure has been given to the Servicer by the Issuer or the Collateral Monitor, as set forth in the Servicing Agreement; *provided, however*, that for a breach capable of being

163

remedied but of the nature that it cannot be reasonably expected to be remedied within such 30-day period and the Collateral Monitor determines that the Servicer is using its good faith efforts to cure such breach, the 30-day period will be extended for up to an additional 90 days so long as the Servicer continues to use good faith efforts to cure the breach; and

(m)        Other customary events of default.

For purposes of the Servicing Agreement:

"Affiliate" will mean, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through ownership of shares, equity in registered capital or other voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing. The Servicing Agreement will state that, for the avoidance of doubt, the Commonwealth of Puerto Rico, and its municipalities, public corporations and instrumentalities are Affiliates of GDB and of the Issuer.

"Independent" will mean, with respect to any Person, a Person that (a) is not an Affiliate of GDB, (b) is not a manager, director, officer or employee of GDB or its Affiliates (not including the Person's provision of services to GDB or its Affiliates in the ordinary course of business, subject to the following clause (c)) and (c) does not receive more than 10% of its annual revenue from, collectively, GDB and its Affiliates.

"Insolvency Event" will mean, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Servicer or any substantial part of its property in an involuntary case under any applicable federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect (including, where applicable, PROMESA), or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or for any substantial part of its property, or ordering the winding-up or liquidation of the Servicer's affairs, and such decree or order remains unstayed and in effect for a period of 30 consecutive days; or (b) the commencement by the Servicer of a voluntary case under any applicable federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Servicer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Servicer to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for the Servicer or for any substantial part of its property, or the making by the Servicer of any general assignment for the benefit of creditors, or the failure by the Servicer generally to pay its debts as such debts become due, or the taking of action by the Servicer in furtherance of any of the foregoing.

"New Bond Requisite Holders" will mean Bondholders holding not less than one-third in principal amount of the New Bonds then outstanding (or, if a Bond Indenture Event of Default under the New Bonds has occurred and is continuing, Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding).

"Person" will mean an individual, a corporation, a limited liability company, a company, a partnership, a joint venture, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Qualification" will mean those material licenses and material approvals required to qualify as a manager of the Restructuring Property on behalf of the Issuer pursuant to applicable law.

"Qualified Successor Servicer" will mean any Person that, at the time of determination (a) is organized and doing business pursuant to the laws of the United States of America or any of its states or territories, (b) is duly authorized to perform the duties of the Servicer on the terms set forth in the Servicing Agreement on behalf of the Issuer, (c) is not restricted or prohibited from contracting with the Issuer, (d) has obtained Qualification, (e) is Independent, (f) is of recognized national standing and (g) is equipped with the requisite expertise and Spanish speaking capability to perform the Services.

**Transition Periods**

If the Servicer resigns or is removed in accordance with the terms of the Servicing Agreement and the Bond Indenture, the outgoing Servicer will be obligated under the Servicing Agreement to (i) use commercially reasonable efforts to cooperate with the successor Servicer in effecting the termination of the responsibilities and rights of the Servicer under the Servicing Agreement, (ii) allow the successor Servicer to examine all the books or accounts, records, reports, agreements, Loan documents and other papers of the outgoing Servicer relating to the Restructuring Property, and (iii) cooperate with the Issuer and the Collateral Monitor to effect such transition and to provide the successor Servicer with such documents and any monies in its possession and held in its capacity as the Servicer under the Servicing Agreement. The Servicing Agreement will provide that, in addition to (and without duplication of) any rights and remedies of the Issuer under applicable law, all reasonable transition and conversion costs and expenses borne or incurred by the Issuer (including, without limitation, the reasonable costs and expenses of counsel to the Issuer) associated with engaging, and

transferring the servicing of the Restructuring Property to, the successor Servicer as a result of the resignation or removal of the outgoing Servicer in accordance with the Servicing Agreement will be borne by the outgoing Servicer; *provided* that such transition or conversion costs and expenses borne by the outgoing Servicer may be capped. (Any such costs and expenses not paid by the outgoing Servicer within 90 days will be paid solely in accordance with the priority of payments described in "*Payments to Bondholders—Priority of Payments*" in this Offering Memorandum. The Bond Indenture will require the Indenture Trustee to provide prompt written notice of any resignation or termination of the Servicer to the Bondholders, which requirement will apply to any transition from one Servicer to a successor Servicer.) The Servicing Agreement will provide that the successor Servicer will hold all the rights of the outgoing Servicer under the Servicing Agreement.

**Reporting to Indenture Trustee, Collateral Monitor and Issuer**

The Servicing Agreement will require the Servicer to act as agent for the Issuer in respect of certain of the Issuer's obligations under the Disclosure Agreement, including preparing or causing to be prepared the Annual Report required thereunder, subject to review and approval of each such Annual Report by the Issuer and the Collateral Monitor. See "*Continuing Disclosure*."

In addition, the Servicing Agreement will require the Servicer to provide the Collateral Monitor with the information needed by the Collateral Monitor to conduct the Compliance Test and to prepare the Semiannual Bondholder Report described in "*Service Providers—Reports to Bondholders*," and any and all other information, including asset lists, reasonably requested by the Collateral Monitor. Further, the Servicing Agreement will require the Servicer to prepare and provide to the Issuer, the Collateral Monitor and the Indenture Trustee, for dissemination to the Bondholders, the Payment Date Report and the Quarterly Budget Report, on the dates and with the information described in "*Service Providers—Reports to Bondholders*."

**Certain Matters Regarding the Servicer; Servicer Liability; Indemnity**

The Servicing Agreement will provide that any Person into which the Servicer may be merged or consolidated, or any Person resulting from any merger or consolidation to which the Servicer is a party, or any Person succeeding to all or substantially all of the servicing business of the Servicer will be the successor of the Servicer under the Servicing Agreement, unless (i) such merger, consolidation, amalgamation, or transfer is reasonably determined by the Collateral Monitor to materially and adversely affect the Servicer's ability to perform its obligations, in which case, such transaction may be deemed to be a Servicer Default, in accordance with the terms of the Servicing Agreement, and may result in the Servicer's removal in accordance with the procedures described above in "*—Removal of Servicer*" or (ii) such Person cannot meet the requirements of a Qualified Successor Servicer.

The Servicing Agreement will further provide that neither the Servicer nor any of its directors, officers, employees or agents will have any liability to the Issuer or the Bondholders for taking any action or for refraining from taking any action in good faith pursuant to the Servicing Agreement or for errors in judgment, except that neither the Servicer nor any such Person will be protected against any breach of representations or warranties made by it therein or liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of the Servicer's duties under the Servicing Agreement or by reason of reckless disregard of its obligations and duties under the Servicing Agreement. In addition, the Servicing Agreement will provide that, subject to certain restrictions, the Servicer may rely in good faith upon the advice of a Qualified Advisor (as to be defined in the Servicing Agreement, but which will include the Collateral Monitor) in connection with the exercise of any of the Servicer's duties or obligations under the Servicing Agreement to the extent such advice is of a type for such advisor has expertise.

The Servicing Agreement will require the Issuer to indemnify and hold the Servicer harmless from and against certain losses, liabilities and expenses (including reasonable fees and expenses of counsel) incurred in connection with its performance under the Servicing Agreement. In addition, the Servicing Agreement will provide that the Servicer is under no obligation to appear in, prosecute or defend any legal action that is not incidental to the Servicer's servicing responsibilities under the Servicing Agreement and that, in its opinion, may cause it to incur any expense or liability for which it is not indemnified.

**Amendment**

The Servicing Agreement will provide that the provisions thereof may be amended, modified or waived by the parties thereto, with the consent of the Collateral Monitor and without the consent of the Bondholders, *provided* that the Collateral Monitor determines, in its sole discretion, that such amendment will not materially and adversely affect the interest of any Bondholder.

The parties to the Servicing Agreement will also be permitted to otherwise amend, modify or waive any of the provisions of the Servicing Agreement with the consent of Bondholders holding not less than a majority in principal amount of the New Bonds then outstanding, subject to certain limitations.

**Termination**

The Servicing Agreement will terminate upon the earlier of (a) the resignation or removal of the Servicer in accordance with the Servicing Agreement and (b) the termination of the Bond Indenture. For additional information regarding the termination of the Bond Indenture and liquidation of the assets of the Issuer, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Termination of the Bond Indenture*" in this Offering Memorandum.

**Third-Party Beneficiaries**

Each of the Collateral Monitor, the Bondholders and the Indenture Trustee, for the benefit of the Bondholders, will be third-party beneficiaries of the Servicing Agreement. The Servicing Agreement provides that each of the Bondholders, the Indenture Trustee and the Collateral Monitor will be authorized and empowered to enforce all provisions of the Servicing Agreement, *provided* that the Bondholders may not enforce the Servicing Agreement unless Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding instruct the Indenture Trustee to enforce the Servicing Agreement and the Indenture Trustee, after such Bondholders have complied with the terms of the Bond Indenture, fails to do so, in which case any Bondholder may do so. The Servicing Agreement also states that the Servicing Agreement does not create any fiduciary duties of the Servicer to the Bondholders, and such duties only exist to the extent they exist under applicable law.

**Servicer Challenges**

Any challenge brought by the Servicer against the Collateral Monitor with respect to any decision or other action by the Collateral Monitor in respect of the Servicer's duties under the Servicing Agreement will be subject to mandatory binding arbitration. In addition, the Servicing Agreement will provide that any objection by the Collateral Monitor to any material transaction or the Collateral Monitor's refusal of consent in respect of the Servicer's engagement of any third party or any other decision or action of the Collateral Monitor that, in any such case, is based upon the Collateral Monitor receiving inadequate information will be deemed reasonable. Finally, the Servicing Agreement will provide that, notwithstanding the foregoing, the Collateral Monitor's decision to give notice of a possible Replacement Event, and such notice actually given, will be in the Collateral Monitor's sole discretion and will not be subject to challenge by the Servicer, the Issuer or any other Person.

## CERTAIN PUERTO RICO TAX CONSIDERATIONS

The following discussion summarizes the Puerto Rico tax treatment of the Issuer and certain Puerto Rico tax consequences to the holders of Participating Bond Claims (the "Claims") of the exchange of Claims for New Bonds and the ownership and disposition of the New Bonds. This summary is based on the Puerto Rico Internal Revenue Code of 2011, as amended (the "P.R. Tax Code"), the regulations promulgated thereunder, the GDB Restructuring Act, judicial decisions and published administrative rules and pronouncements of the Puerto Rico Treasury Department (the "P.R. Treasury"), all as in effect on the date hereof (collectively, "Applicable P.R. Tax Law"). Changes in or new interpretations of Applicable P.R. Tax Law may have retroactive effect and could significantly affect the Puerto Rico income tax consequences described below. Neither GDB nor the Issuer has requested, nor will they request, any ruling or determination from the P.R. Treasury or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the P.R. Treasury or the courts. No assurance can be given that the P.R. Treasury would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically noted otherwise, this summary does not address U.S. federal, state, local or foreign tax consequences of the exchange, nor does it purport to address all aspects of Puerto Rico taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as broker-dealers, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, corporations or individuals, persons who hold Claims or who will hold the New Bonds as part of a straddle, hedge, conversion transaction, or other integrated investment, or subsequent purchasers of New Bonds). Furthermore, this summary assumes that a holder holds a Claim only as a "capital asset" (within the meaning of Section 1034.01(a)(1) of the P.R. Tax Code).

As used herein, and except as provided below, the term "P.R. Investor" means a beneficial owner of Claims or New Bonds that is (i) a resident of Puerto Rico for Puerto Rico income tax purposes, (ii) a corporation (including an entity treated as a corporation for Puerto Rico income tax purposes) created or organized in or under the laws of Puerto Rico, (iii) an estate, the income of which is subject to Puerto Rico income taxation regardless of its source or (iv) a trust (other than a business trust), all of the beneficiaries of which are residents of Puerto Rico for Puerto Rico income tax purposes. As used herein, the term "Non-P.R. Investor" means a beneficial owner of Claims or New Bonds (other than a partnership or other entity treated as a partnership for Puerto Rico income tax purposes) that is not a P.R. Investor.

If a partnership (including for this purpose any other entity treated as a partnership for Puerto Rico income tax purposes) holds Claims or New Bonds, the tax treatment of a partner (including for this purpose any other owner treated as a partner for Puerto Rico income tax purposes) in the partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner of a partnership holding Claims or New Bonds, you should consult your tax advisor regarding the tax consequences of the exchange and the ownership and disposition of the New Bonds.

**THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF PUERTO RICO INCOME TAX LAWS, AS WELL AS THE APPLICATION OF NON-INCOME TAX LAWS AND THE LAWS OF NON-PUERTO RICO TAXING JURISDICTIONS, TO YOUR PARTICULAR SITUATION.**

**Tax Treatment of Issuer**

The Issuer is fully exempt from all taxes imposed by the Government and any of its municipalities, instrumentalities and taxing authorities.

**Tax Consequences to P.R. Investors**

***Exchange of Claims for New Bonds***

The exchange of Claims for New Bonds will constitute a taxable exchange of the Claims for Puerto Rico income tax purposes. Therefore, a P.R. Investor will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Investor's adjusted tax basis in the Claims on the date of the exchange. The amount realized on the exchange of a Claim will equal the fair market value of each New Bond received in exchange for such Claim, which includes any cash payment received by the P.R. Investor on the date of the exchange.

Gain or loss on the exchange of Claims for New Bonds will generally be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Investor's holding period for the Claim is longer than one year. Long-term capital gains recognized by P.R. Investors are subject to a reduced Puerto Rico income tax rate of a maximum of 15% (or up to a maximum of 24% if the alternate basic tax is applicable), in the case of non-corporate P.R. Investors, and 20% in the case of corporate P.R. Investors.

P.R. Investors may deduct capital losses realized in the exchange of the Claims for New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Investors may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

### Ownership of New Bonds

The New Bonds will be considered debt for Puerto Rico tax purposes.

**Interest.** Interest paid or accrued to P.R. Investors on the New Bonds will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

The excess of the principal amount of the New Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

Ownership of the New Bonds may result in a portion of the interest paid or accrued by a P.R. Investor and other expenses incurred by the P.R. Investor attributable to interest on the New Bond being disallowed as deductions for Puerto Rico income tax purposes.

**Sale, Exchange or Retirement of the New Bonds.** The gain realized by a P.R. Investor upon a sale, exchange or retirement of a New Bond will be exempt from Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

P.R. Investors may deduct capital losses realized in the exchange of the Claims for New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Investors may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

**Property Taxes.** The New Bonds will be exempt from Puerto Rico property taxes.

**Estate and Gift Taxes.** The transfer of the New Bonds by gift or upon the death of a P.R. Investor will not be subject to Puerto Rico estate or gifts taxes, as the case may be.

## Tax Consequences to Non-P.R. Investors

### Exchange of Claims for New Bonds

Non-P.R. Investors who are individuals nonresident of Puerto Rico for Puerto Rico income tax purposes, corporations (or entities treated as corporations under the P.R. Tax Code) organized under the laws other than of Puerto Rico that are not engaged in trade or business in Puerto Rico, and trusts and estates will not be subject to Puerto Rico income tax on the gain, if any, recognized by any such Non-P.R. Investor on the exchange of the Claims for New Bonds. On the other hand, Non-P.R. Investors that are corporations (or treated as corporations under the P.R. Tax Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if the gain is effectively connected with their Puerto Rico trade or business.

### Ownership of New Bonds

**Payments of Interest.** Interest paid or accrued on the New Bonds to a Non-P.R. Investor will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

The excess of the principal amount of the New Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax, and municipal license tax.

Ownership of the New Bonds may result in a portion of the interest paid or accrued by a Non-P.R. Investor subject to Puerto Rico income tax and other expenses incurred by such Non-P.R. Investor attributable to interest on the New Bonds being disallowed as deductions for Puerto Rico income tax purposes.

**Sale, Exchange or Retirement of New Bonds.** Gain recognized on the sale or exchange of the New Bonds by a Non-P.R. Investor will not be subject to Puerto Rico income tax, by way of withholding or otherwise, or municipal license tax.

**Property Taxes.** The New Bonds will be exempt from Puerto Rico property taxes.

***Estate and Gift Taxes.*** The transfer of the New Bonds by gift or upon the death of a Non-P.R. Investor will not be subject to Puerto Rico gift or estate taxes, as the case may be.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain United States ("U.S.") federal income tax consequences to the holders of Participating Bond Claims of the exchange of Participating Bond Claims for New Bonds and the ownership and disposition of the New Bonds. This summary is based on the Internal Revenue Code of 1986, as amended (the "U.S. Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law"). Changes in or new interpretations of such Applicable U.S. Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Neither GDB nor the Issuer has requested, nor will they request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically noted otherwise, this summary does not address U.S. state, local or non-U.S. tax consequences of the exchange, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as certain former citizens and long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Participating Bond Claims or who will hold the New Bonds as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, holders deemed to sell the Participating Bond Claims or the New Bonds under the constructive sale provisions of the U.S. Tax Code, or subsequent purchasers of New Bonds). Furthermore, this summary assumes that a holder holds a Participating Bond Claim only as a "capital asset" (within the meaning of Section 1221 of the U.S. Tax Code). This summary also assumes that the Issuer will not hold assets that generate income subject to withholding under the U.S. Tax Code.

As used herein, and except as provided below, the term "U.S. Holder" means a beneficial owner of Participating Bond Claims or New Bonds that is for U.S. federal income tax purposes (i) a citizen or resident of the United States, (ii) a corporation (including an entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (b) the trust was in existence on August 20, 1996, and properly elected to continue to be treated as a United States person. The term "U.S. Holder" does not include a Puerto Rico Individual (as defined herein) or a Puerto Rico Corporation (as defined herein). As used herein, the term "Non-U.S. Holder" means a beneficial owner of Participating Bond Claims or New Bonds (other than a partnership or other entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder, a Puerto Rico Individual or a Puerto Rico Corporation.

As used herein, the term "Puerto Rico Individual" means a beneficial owner of a Participating Bond Claim or New Bond that is an individual and a bona fide resident of the Commonwealth within the meaning of Section 937 of the U.S. Tax Code and the Regulations for the entire taxable year, including the taxable year in which the exchange occurs or the New Bond is acquired. As used herein, the term "Puerto Rico Corporation" means a beneficial owner of a Participating Bond Claim or New Bond that is a corporation organized under the laws of the Commonwealth.

If a partnership (including for this purpose any other entity treated as a partnership for U.S. federal income tax purposes) holds Participating Bond Claims or New Bonds, the tax treatment of a partner (including for this purpose any other owner treated as a partner for U.S. federal income tax purposes) in the partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner of a partnership holding Participating Bond Claims or New Bonds, you should consult your tax advisor regarding the tax consequences of the exchange and the ownership and disposition of the New Bonds.

**THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS, AS WELL AS THE APPLICATION OF NON-INCOME TAX LAWS AND THE LAWS OF ANY U.S. STATE, LOCAL OR NON-U.S. TAXING JURISDICTION, TO YOUR PARTICULAR SITUATION.**

### Characterization of the New Bonds as Debt of the Issuer

The Issuer intends to report on IRS Form 8281 the New Bonds as debt of the Issuer for U.S. federal income tax purposes. Whether an instrument is characterized as debt rather than equity or another form of interest for U.S. federal income tax purposes depends upon the facts and circumstances surrounding the issuer and the terms and operation of the particular instrument. The courts and the IRS have identified many factors to be considered in making a debt/equity determination. Among these factors are the following: (i) the intent of the parties; (ii) the form of the instrument; (iii) a reasonable expectation of repayment and the source of repayment; (iv) security for repayment; (v) the presence of a maturity date; (vi) subordination of the instrument; (vii) payment of interest;

(viii) creditor rights; (ix) adequacy of capitalization; (x) the order of payments; (xi) the treatment of the instrument as debt or equity for non-tax purposes, including regulatory, rating agency and financial accounting purposes; (xii) the relationship between the debtor and the creditors and (xiii) participation in management or voting rights. No single factor is relevant in every case, and the significance of any particular factor depends on the facts and circumstances.

Notwithstanding the Issuer's intended reporting treatment of the New Bonds as debt, holders should recognize that the appropriate classification of the New Bonds for U.S. federal income tax purposes is uncertain. A number of factors, such as the intent of the parties, form of the instrument, the status of the Issuer as a governmental instrumentality of the Commonwealth, treatment of the New Bonds for non-tax purposes, certain creditor rights and the context in which the exchange is occurring (*i.e.*, a workout of distressed debt between unrelated parties intended to maximize recovery on the Participating Bond Claims and enhance the holders' positions as creditors) tend to support debt treatment. On the other hand, certain aspects of the New Bonds may be indicative of non-debt classification, including the considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including PIK Amounts). **Accordingly, there is no assurance that the IRS or a court will agree with the Issuer's intended tax treatment of the New Bonds as debt for U.S. federal income tax purposes.**

If the New Bonds were to be characterized as an interest other than debt for U.S. federal income tax purposes, the tax consequences to a holder of the New Bonds could differ materially from the consequences to such holder of debt treatment. See the discussion under "—*Tax Consequences if the New Bonds are Not Treated as Debt for U.S. Federal Income Tax Purposes—Tax Consequences to U.S. Holders*."

Except where specifically noted below, the following discussion assumes that the New Bonds are properly characterized as debt for U.S. federal income tax purposes.

**Tax Consequences to U.S. Holders**

*Exchange of Participating Bond Claims for New Bonds*

The exchange of Participating Bond Claims for New Bonds will constitute a taxable exchange of the Participating Bond Claims for U.S. federal income tax purposes. Therefore, a U.S. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange (except to the extent attributable to accrued and unpaid interest, as discussed below) and the U.S. Holder's adjusted tax basis in the Participating Bond Claims on the date of the exchange (except to the extent any recognized loss may be deferred under the "wash sale" rules of the U.S. Tax Code). The amount realized on the exchange of a Participating Bond Claim will equal the "issue price" of the New Bonds received in exchange for such Participating Bond Claim, plus the value of any cash payment to be received on the Special First Payment Date to the extent the value of such cash payment is not reflected in the issue price of such New Bonds (described below under "—*Issue Price of New Bonds*"). The New Bonds will have an initial tax basis equal to their respective issue prices and will have a new holding period commencing on the day after the exchange. Subject to the discussions under "—*Market Discount*" and "—*Accrued Interest*" below, gain or loss on the exchange will generally be capital gain or loss and may be long-term capital gain or loss if the U.S. Holder's holding period for the Participating Bond Claim is longer than one year. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

***Issue Price of New Bonds.*** The New Bonds are expected to be "publicly traded" as defined by the Regulations, in which case the "issue price" of the New Bonds will be equal to their fair market value on the date of the exchange. The New Bonds will be considered to be "publicly traded" if, within the meaning of the Regulations, at any time during the 31-day period ending fifteen days after the exchange, (i) there is a "sales price" for an executed purchase or sale of the New Bonds appearing in a medium available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments, (ii) there are one or more "firm quotes" for the New Bonds available from at least one broker, dealer or pricing service and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the New Bonds or (iii) there are one or more "indicative quotes" available from at least one broker, dealer or pricing service for the New Bonds. The fair market value of the New Bonds on the date of the exchange will generally be presumed to be equal to such sales price or quoted price. The treatment of any cash payment received by such U.S. Holder on the Special First Payment Date will depend on whether the value of the payment is reflected in the issue price of such New Bonds, as described above. If the value of the cash payment is reflected in the issue price of the New Bonds, the payment will be included in the projected payment schedule (as described below) for the New Bonds and will not be treated as an amount separately received in exchange for a Participating Bond Claim. Alternatively, if the value of the payment is not reflected in the issue price of the New Bonds, the payment will be treated as an amount received in exchange for the Participating Bond Claim in addition to the issue price of the New Bonds, subject to the discussion of amounts attributable to accrued but unpaid interest in "—*Exchange of Participating Bond Claims for New Bonds*" above and "—*Accrued Interest*" below. Based on the Regulations and the anticipated trading prices of the New Bonds at the time of issuance, the Issuer anticipates that the "issue price" of the New Bonds will be less than their stated principal amounts. See "—*Ownership of New Bonds—Treatment of the New Bonds as Contingent Payment Debt Instruments*" below.

*Market Discount.* If a U.S. Holder acquired Participating Bond Claims with market discount, any gain recognized on the exchange of such Participating Bond Claims for New Bonds should be treated as ordinary income to the extent of the accrued market discount, unless such holder previously elected to include market discount in income as it accrued for U.S. federal income tax purposes. For these purposes, market discount is generally the excess, if any, of the stated principal amount of the Participating Bond Claim over such holder's initial tax basis in the Participating Bond Claim, if such excess exceeds a de minimis amount.

*Accrued Interest.* To the extent that any consideration (i.e. New Bonds (or portions thereof) received in exchange for a Participating Bond Claim plus the value of any cash payment to be received on the Special First Payment Date to the extent the value of such cash payment is not reflected in the issue price of such New Bonds) received by a U.S. Holder pursuant to the exchange is attributable to accrued and unpaid stated interest on the Participating Bond Claim, that amount of consideration generally will be includible in gross income as ordinary interest income if such accrued interest has not been included previously in gross income for U.S. federal income tax purposes. Holders of tax-exempt Participating Bond Claims should consult their advisors regarding the extent to which any amounts received in the exchange should be treated as tax-exempt interest.

The New Bonds (or portions thereof) received by the U.S. Holder in respect of such interest will have an issue price determined in the same manner as described above under "—*Issue Price of New Bonds*," a tax basis equal to their issue price and a holding period commencing on the day after the New Bonds are received. In the event a U.S. Holder previously included in gross income any accrued and unpaid interest on the Participating Bond Claims in an amount higher than the aggregate consideration such U.S. Holder will receive in respect of such interest, the difference may be deductible to such U.S. Holder. The extent to which the amount of aggregate consideration will be attributable to accrued interest is unclear. Under the terms and conditions of the exchange, the aggregate consideration to be received by holders of Participating Bond Claims will be allocated first to the principal amount of the Participating Bond Claims, with any excess allocated to unpaid interest that accrued on such Participating Bond Claims, if any. By way of analogy, certain legislative history indicates that an allocation of consideration as between principal and interest provided in certain reorganizations under the United States Bankruptcy Code is binding for U.S. federal income tax purposes, while certain Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the terms and conditions of the exchange. Holders of Participating Bond Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them pursuant to the exchange.

### Ownership of New Bonds

**NO U.S. FEDERAL TAX EXEMPTION. INTEREST ON THE NEW BONDS WILL NOT BE EXCLUDED FROM GROSS INCOME FOR U.S. FEDERAL INCOME TAX PURPOSES.**

*U.S. State and Local Tax Exemption.* Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, the New Bonds and interest thereon will be exempt from U.S. state and local income taxation. However, see "—*Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes—Tax Consequences to U.S. Holders—State and Local Income Taxation*" below.

*Treatment of the New Bonds as Contingent Payment Debt Instruments.* The Issuer intends to treat the New Bonds as indebtedness subject to the Regulations governing contingent payment debt instruments (the "contingent payment debt regulations") and to report information on IRS Form 8281 consistent with this treatment. However, there is no statutory or judicial authority that directly addresses all aspects of the treatment of the New Bonds for U.S. federal income tax purposes, and the application of the contingent payment debt regulations to the New Bonds is unclear. Therefore, no assurance can be given that the IRS will not assert that the New Bonds should be treated under a different method for accruing interest and original issue discount. For instance, the IRS could assert that interest accruals should be determined under the methodology described in Section 1272(a)(6) of the U.S. Tax Code by asserting that principal payments on the New Bonds could be considered to be accelerated due to excess Available Cash arising from prepayments on the Restructuring Property. Based on the terms of the Restructuring Property and the historical experience of GDB and other factors, the Issuer believes that the likelihood of prepayments on the Restructuring Property is remote. However, the IRS may disagree with this conclusion or otherwise assert that the methodology described in Section 1272(a)(6) should nonetheless apply. Application of different rules for accruing interest on the New Bonds upon a successful challenge by the IRS or a change in law could significantly affect the amount, timing and character of income, gain or loss to a U.S. Holder of the New Bonds. For example, a U.S. Holder might be required to accrue interest at a higher or lower rate, and might recognize capital gain rather than ordinary income upon a taxable disposition of the New Bonds. Accordingly, U.S. Holders should consult their tax advisers regarding the accrual of interest on the New Bonds and the consequences of the application of different accrual rules.

The remainder of this discussion assumes that the New Bonds will be treated as indebtedness subject to the contingent payment debt regulations as discussed above.

*Interest Accruals and Adjustments to Accruals on the New Bonds.* No stated interest on the New Bonds will be "qualified stated interest" under the U.S. Tax Code. Under the contingent payment debt regulations, a U.S. Holder, regardless of its method of

accounting for U.S. federal income tax purposes, will be required to accrue interest income on the New Bonds on a constant yield basis at an assumed yield (the "comparable yield") that will be determined by the Issuer of the New Bonds at the time of issuance, adjusted upward or downward to reflect any difference between the actual and projected amounts of the contingent payments on the New Bonds during the year (as described below). There may be differences between the timing of accrual of interest income under these rules and the timing of adjustments for actual payments. Because of potential differences between the method by which interest income is computed for U.S. federal income tax purposes and amounts paid as payments of interest on the New Bonds, a U.S. Holder may be required to include interest income in some years in excess of the interest actually received in that year.

The term "comparable yield" as used in the contingent payment debt regulations generally means the greater of (i) the annual yield an issuer of a contingent payment debt instrument would pay, as of the issue date, on a fixed-rate debt instrument with no contingent payments, but with terms and conditions otherwise comparable to those of the contingent payment debt instrument, including the level of subordination, term, timing of payments and general market conditions, but excluding any adjustments for the riskiness of the contingencies or the liquidity of the instrument, and (ii) the applicable federal rate (which is published monthly by the IRS). However, the Regulations also provide that if the debt instrument provides for one or more contingent payments not based on market information and is part of an issue that is marketed or sold in substantial part to persons for whom the inclusion of interest is not expected to have a substantial effect on their U.S. tax liability, the instrument's comparable yield is presumed to be the applicable federal rate (the "AFR Presumption") (which, for the month of November 2018, is 3.19% for debt instruments with a term exceeding nine years with interest that compounds semi-annually). The Issuer intends to take the position that the AFR Presumption applies to the New Bonds. However, there is no guidance under Applicable U.S. Tax Law as to the precise circumstances in which the AFR Presumption will be deemed to apply to a debt instrument or the manner in which the AFR Presumption applies to instruments in which stated payments under the instruments result in a yield that exceeds the applicable federal rate. Accordingly, there is no assurance that the IRS will not successfully challenge the application of the AFR Presumption to the New Bonds.

**Solely for purposes of determining the amount of interest income that a U.S. Holder is required to accrue, the Issuer is required to construct a "projected payment schedule" in respect of the New Bonds representing a series of payments the amount and timing of which produce a yield to maturity equal to the comparable yield. A U.S. Holder will generally be bound by the comparable yield and the projected payment schedule determined by the Issuer, unless the U.S. Holder determines its own comparable yield and projected payment schedule and explicitly discloses such schedule to the IRS, and explains to the IRS the reason for preparing its own schedule.**

Income accrued on the basis of the comparable yield is adjusted upward or downward to reflect the difference between projected and actual payments made during the taxable year. In addition to the interest accrual discussed above, a U.S. Holder will be required to recognize interest income equal to the amount of any excess of actual payments over projected payments (a "positive adjustment") in respect of a New Bond for a taxable year. On the other hand, if, in a taxable year, a U.S. Holder receives actual payments that, in aggregate, are less than the projected payments in respect of a New Bond for such taxable year, the U.S. Holder will incur a "net negative adjustment" equal to the amount of such difference. This net negative adjustment will (i) first reduce the amount of interest in respect of the New Bond that a U.S. Holder would otherwise be required to include in income in that taxable year and (ii) to the extent of any excess, give rise to an ordinary loss equal to that portion of such excess that does not exceed the excess of (A) the amount of all previous interest inclusions on the New Bond over (B) the total amount of the U.S. Holder's net negative adjustments treated as ordinary loss on the New Bond in prior taxable years. Any negative adjustment in excess of the amounts described in (i) and (ii) will be carried forward to offset future interest income in respect of the New Bond or, if there is a negative adjustment carryforward on the New Bond in a taxable year in which the New Bond is sold, exchanged, redeemed or retired, to reduce the amount realized on a sale, exchange or retirement of the New Bond. A net negative adjustment is not subject to the limitation imposed on miscellaneous deductions under Section 67 of the U.S. Tax Code.

**The comparable yield and projected payment schedule are not determined for any purpose other than the determination of a U.S. Holder's interest accruals and adjustments thereof in respect of the New Bonds for U.S. federal income tax purposes and do not constitute a projection or representation by GDB, the Issuer or any third party regarding the actual amount that will be paid on the New Bonds.**

The precise manner of determining the comparable yield and projected payment schedule in the case of the New Bonds is uncertain. The IRS could challenge the Issuer's determination of the comparable yield and projected payment schedule. The yield, if re-determined as a result of such a challenge, could be greater or less than the comparable yield provided by the Issuer, and the projected payment schedule could differ materially from the projected payment schedule constructed by the Issuer. In such case, the taxable income of a holder arising from the ownership and disposition of a New Bond could be increased or decreased.

Based on the comparable yield and the issue price of the New Bonds (determined as described above under "—*Exchange of Participating Bond Claims for New Bonds—Issue Price of New Bonds*"), a U.S. Holder (regardless of its accounting method) will be required to accrue interest income equal to the sum of the daily portions of interest on a New Bond for each day in the taxable year on which the U.S. Holder holds the New Bond, adjusted upward or downward to reflect the difference, if any, between the actual and projected amount of any payments on the New Bonds (as described above). The daily portions of interest in respect of a New Bond are

determined by allocating to each day in an accrual period the ratable portion of interest on the New Bond that accrues in the accrual period. The amount of interest on a New Bond that accrues in an accrual period is the product of the comparable yield on the New Bond (adjusted to reflect the length of the accrual period) and the adjusted issue price of the New Bond as of the beginning of the accrual period. The "adjusted issue price" of a New Bond at the beginning of any accrual period is (x) the sum of the issue price of the New Bond and any interest previously accrued thereon (disregarding any positive or negative adjustments described above) minus (y) the projected amount of any payments (in accordance with the projected payment schedule described above) previously made with respect to the New Bond. Interest income accrued on the New Bonds will be foreign source income for U.S. federal income tax purposes.

Legislation enacted in 2017 modified the rules regarding the timing of income to be recognized by accrual method taxpayers. Under these modifications, if a U.S. Holder is an accrual method taxpayer and has an applicable financial statement, notwithstanding any discussion above, the U.S. Holder may be required to include stated interest, original issue discount, and other income on a note no later than when the relevant item is taken into account as revenue in an applicable financial statement, if any. These new rules will generally apply to stated interest and other income for taxable years beginning after December 31, 2017, but will not apply to original issue discount until taxable years beginning after December 31, 2018. U.S. Holders should consult their own tax advisor concerning the application of these rules in their particular situation.

***Sale, Exchange or Retirement of the New Bonds.*** Upon a sale, exchange or retirement of a New Bond, a U.S. Holder will generally recognize taxable gain or loss in an amount equal to the difference between (i) the amount of cash and the fair market value of any property received, reduced by any net negative adjustment carried forward, and (ii) such U.S. Holder's adjusted tax basis in the New Bond. A U.S. Holder's adjusted tax basis in a New Bond will generally be equal to the U.S. Holder's initial tax basis for the New Bond (which will be equal to the issue price of the New Bonds for U.S. Holders receiving New Bonds in exchange for Participating Bond Claims), increased by any interest income previously accrued by the U.S. Holder (determined without regard to any positive or negative adjustments to interest accruals described above) and decreased by the projected amounts of any payments scheduled to have been previously made on the New Bonds to the U.S. Holder (without regard to actual amounts paid). A U.S. Holder generally will treat any gain as ordinary interest income, and any loss as ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and the balance as capital loss. The deductibility of capital losses is subject to limitations. A U.S. Holder that sells the New Bonds at a loss that meets certain thresholds may be required to file a disclosure statement with the IRS.

For the purposes of the contingent payment debt instrument rules, payments of principal made prior to the maturity date of the New Bonds that are not made pursuant to the New Bonds' payment schedule will be treated as "pro rata prepayments" on the New Bonds. In determining gain or loss attributable to such prepayments of principal, a pro rata prepayment is treated as a repurchase by the Issuer from a U.S. Holder of a pro rata portion of the principal amount of a New Bond for the amount paid by the Issuer to such U.S. Holder. Resulting gain or loss would be calculated by assuming that each New Bond consists of two instruments, one that is retired and one that remains outstanding. The adjusted issue price, the U.S. Holder's adjusted basis, and accrued but unpaid original issue discount in respect of the original New Bond determined immediately before the pro rata prepayment are allocated between these two instruments based on the portion of the New Bond that is treated as retired by the prepayment of principal. The application of these rules to the New Bonds is complex and U.S. Holders should consult their tax advisors regarding the treatment of payments of principal made prior to the maturity date of the New Bonds if the New Bonds are properly characterized as contingent payment debt instruments.

### Additional Tax on Passive Income

Under current law, certain individuals, estates and trusts whose income exceeds certain thresholds will be required to pay a 3.8% tax on "net investment income" including, among other things, interest and net gain from disposition of property (other than property held in certain trades or businesses). U.S. Holders are encouraged to consult their own tax advisors regarding the effect, if any, of this tax on their ownership and disposition of the New Bonds.

## Tax Consequences to Puerto Rico Individuals & Puerto Rico Corporations

### Exchange of Participating Bond Claims for New Bonds

In general, pursuant to the provisions of Section 1.937-2 of the Regulations, the source of the income from the disposition of personal property by a Puerto Rico Individual is determined under the rules of Section 865 of the U.S. Tax Code. Accordingly, a gain on the exchange of Participating Bond Claims for New Bonds that is recognized by a Puerto Rico Individual will constitute Puerto Rico-source income and, therefore, will qualify for the income exclusion under Section 933(1) of the U.S. Tax Code. A Puerto Rico Corporation generally will not be subject to income or withholding tax under the U.S. Tax Code on gain recognized on the sale or exchange of the Participating Bond Claims, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and certain other requirements are satisfied.

*Ownership of New Bonds*

**Payments of Interest.** Interest paid or accrued on the New Bonds to a Puerto Rico Individual will constitute gross income from sources within Puerto Rico and, therefore, will not be included in gross income and will be exempt from U.S. federal income taxation pursuant to Section 933(1) of the U.S. Tax Code. In addition, for U.S. federal income tax purposes, no deduction or credit will be allowed that is allocable to or chargeable against amounts so excluded from the Puerto Rico Individual's gross income. Interest paid or accrued on the New Bonds to a Puerto Rico Corporation will not be subject to income taxation under the U.S. Tax Code, *provided* that such interest is not effectively connected, or treated as effectively connected, with or attributable to the conduct of a trade or business within the United States by such Puerto Rico Corporation.

**Sale, Exchange or Retirement of New Bonds.** In general, pursuant to the provisions of Section 1.937-2 of the Regulations, the source of the income from the disposition of personal property by a Puerto Rico Individual will be determined under the rules of Section 865 of the U.S. Tax Code. Accordingly, gain on the sale or exchange of the New Bonds that is recognized by a Puerto Rico Individual will constitute Puerto Rico-source income and, therefore, qualify for the income exclusion under Section 933(1) of the U.S. Tax Code. A Puerto Rico Corporation generally will not be subject to income or withholding tax under the U.S. Tax Code on gain recognized on the sale or exchange of the New Bonds, unless the gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and certain other requirements are satisfied.

## Tax Consequences to Non-U.S. Holders

### Exchange of Participating Bond Claims for New Bonds

Gain recognized by a Non-U.S. Holder on the exchange of Participating Bond Claims for New Bonds will generally not be subject to U.S. federal income tax unless the gain is effectively connected with its conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment that such Non-U.S. Holder is treated as maintaining in the United States), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described below under "—*Ownership of New Bonds*"; or such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange and such gain is derived from sources within the United States. Certain other exceptions may be applicable, and a Non-U.S. Holder should consult its tax advisor in this regard. Any New Bonds received by a Non-U.S. Holder that are attributable to accrued and unpaid interest on a Participating Bond Claim generally will be taxable in the same manner as described below under "—*Ownership of New Bonds*."

### Ownership of New Bonds

Subject to the discussion below concerning backup withholding, payments of interest on a New Bond (including original issue discount) to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, and gain recognized upon a sale, exchange or retirement of a New Bond by a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax if the Non-U.S. Holder is not deemed to conduct a trade or business in the United States. If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including original issue discount and gain recognized upon the sale, exchange or retirement of New Bonds, which generally will be treated as interest under the contingent payment debt regulations, as discussed above under "—*Tax Consequences to U.S. Holders—Ownership of New Bonds—Sale, Exchange or Retirement of the New Bonds*") on the New Bonds is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including original issue discount and gain recognized upon a sale, exchange or retirement of New Bonds) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income at a rate of 30% unless an applicable income tax treaty applies to reduce such rate.

## Backup Withholding and Information Reporting

### U.S. Holders, Puerto Rico Individuals and Puerto Rico Corporations

In general, information-reporting requirements may apply to the exchange of Participating Bond Claims for New Bonds, and such requirements will apply to certain payments of interest (and accruals of original issue discount) on, or proceeds from a disposition (including a retirement or redemption) of, New Bonds unless, in each case, the holder is an exempt recipient such as a corporation. Backup withholding may apply to the exchange of Participating Bond Claims for New Bonds and payments of interest on or proceeds from disposition (including a retirement or redemption) of New Bonds if a U.S. Holder, Puerto Rico Individual or Puerto Rico Corporation fails to provide its correct taxpayer identification number, fails to certify that it is not subject to backup withholding, or otherwise fails to establish an exemption. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

Certain U.S. Holders who are individuals (and certain entities closely held by individuals) may be required to report information relating to their ownership of the New Bonds, subject to certain exceptions (including an exception for New Bonds held in accounts maintained by U.S. financial institutions). U.S. Holders should consult their tax advisors regarding their reporting obligations with respect to the New Bonds.

### Non-U.S. Holders

In general, a Non-U.S. Holder will not be subject to backup withholding with respect to the exchange of Participating Bond Claims for New Bonds or interest (including original issue discount) paid to it on the Participating Bond Claims or New Bonds, *provided* that the payor does not have actual knowledge or reason to know that such Non-U.S. Holder is a U.S. person as defined under the U.S. Tax Code, and the Non-U.S. Holder has provided a validly completed IRS Form W-8BEN or W-8BEN-E (or other applicable form) establishing that it is not a U.S. person (or it satisfies certain documentary evidence requirements for establishing that it is not a U.S. person). Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition of Participating Bond Claims or New Bonds made within the United States or conducted through certain United States-related financial intermediaries, unless the Non-U.S. Holder certifies to the payor under penalties of perjury that it is not a United States person (and the payor does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person), or otherwise establishes an exemption. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

## Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes

As discussed above, the IRS could seek to treat the New Bonds as interests other than debt for U.S. federal income tax purposes on the basis that the value of the Restructuring Property and expectations of repayment are not sufficiently supportive of debt characterization. In that event, if the New Bonds were treated as equity interests in the Issuer, they could be treated as equity interests in either a corporation or a partnership if the Issuer is considered to be a "business entity" under Applicable U.S. Tax Law, or as beneficial interests in a trust if the Issuer is not considered to be a "business entity." Although the issue is not free from doubt, the Issuer intends to take the position that it should be classified as business entity and will file a "check the box" election under applicable Regulations in order to be classified as a partnership rather than a corporation if the New Bonds are treated as equity for U.S. federal income tax purposes. If, instead, the Issuer were to be classified as a trust rather than a business entity, the tax treatment of the holders of the New Bonds would be similar in many respects to their tax treatment if the New Bonds were treated as partnership interests as described below. However, because the Issuer would be classified as a foreign trust, U.S. Holders would be exposed to certain onerous reporting requirements and possibly penalties for non-compliance.

Alternatively, it is possible that the New Bonds could be characterized as contractual rights to payments from a governmental entity that are neither debt nor equity for U.S. federal income tax purposes. Although the tax treatment of such contractual rights is unclear, the timing of income earned with respect to such rights could potentially be accounted for under "open transaction" principles.

Holders of Participating Bond Claims should consult their own tax advisors regarding the characterization of the New Bonds as debt of the Issuer, the classification of the Issuer as a business entity, and the consequences if the Issuer's intended positions are successfully challenged.

The following paragraphs describe some of the material U.S. federal income tax consequences to a holder of Participating Bond Claims if the New Bonds are treated as partnership interests rather than debt for tax purposes.

### Tax Consequences to U.S. Holders

***Exchange of Participating Bond Claims for New Bonds that are Treated as Partnership Interests.*** A U.S. Holder of New Bonds that are treated as partnership interests would recognize gain or loss equal to the difference between (i) the fair market value of the New Bonds received in exchange for the Participating Bond Claim plus the value of any cash payment to be received on the Special First Payment Date to the extent the value of such cash payment is not otherwise taken into account in determining the fair market value of such New Bonds and (ii) the U.S. Holder's adjusted tax basis in the Participating Bond Claims on the date of the exchange (except to the extent any recognized loss may be deferred under the "wash sale" rules of the U.S. Tax Code). The New Bonds would have a new holding period commencing on the day after the exchange. Subject to the discussions of accrued interest principles under "*—Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Accrued Interest*" above and market discount principles under "*—Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Market Discount*" above, gain or loss on the exchange would generally be capital gain or loss and may be long-term capital gain or loss depending on the holding period in the Participating Bond Claim of the U.S. Holder. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

***Ownership of New Bonds that are Treated as Partnership Interests.*** Each U.S. Holder of a New Bond that is treated as a partnership interest would be required to take into account its allocable share of items of income, gain, loss, and deduction of the Issuer (as computed for U.S. federal income tax purposes) in computing its U.S. federal income tax liability, regardless of whether or when cash distributions are made by the Issuer.

In addition, as a result of the exchange each of the underlying debt obligations and other assets that comprise the Restructuring Property would likely be treated as having a new initial tax basis in the hands of the Issuer equal to its deemed fair market value on the date of the exchange. To the extent such new tax basis is less than the amount due on a particular debt obligation, the difference would be "market discount" that could result in gain (taxable as ordinary income) being recognized as principal payments are made on the repayment of the obligation. See discussion of market discount principles under "—*Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Market Discount*" above.

Distributions that are not in partial or full redemption of the New Bonds held by a U.S. Holder would generally be governed by Section 731 of the U.S. Tax Code. Section 731(a)(1) generally provides that a partner will not recognize taxable gain in connection with a partnership distribution except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution. Section 731(a)(2) generally provides that a partner will not recognize loss upon a non-liquidating distribution.

***Sale, Exchange or Retirement of New Bonds that are Treated as Partnership Interests.*** U.S. Holders generally would recognize gain or loss upon the sale or other taxable disposition of a New Bond that is treated as a partnership interest equal to the difference between (a) the sum of the cash or fair market value of other property received in exchange for such New Bond plus the share of the Issuer's liabilities allocated to such holder under partnership tax principles, if any, and (b) such U.S. Holder's adjusted tax basis in the New Bond. A U.S. Holder's adjusted tax basis in the New Bond would generally be equal to (1) the fair market value of the New Bond on the date of the exchange of Participating Bond Claims for the New Bond; plus (2) the Issuer's liabilities allocated to such holder under partnership tax principles, if any; plus (3) the Issuer's income and gain previously allocated to such holder; minus (4) the Issuer's losses previously allocated to, distributions to, and the share of nondeductible, noncapitalized expenses allocated to, such holder (which decrease such holder's tax basis, but not below zero).

Gain or loss recognized by a U.S. Holder in a sale or other taxable disposition of New Bonds that are treated as partnership interests should generally be taxable as capital gain or loss. However, a portion of this gain or loss, which could be substantial, would be separately computed and taxed as ordinary income or loss under Section 751 of the U.S. Tax Code to the extent attributable to "unrealized receivables" or to "inventory items" of the Issuer. Notably, the term "unrealized receivables" would include any market discount on the debt obligations held by the Issuer to the extent of the amount that would be treated as ordinary income if such obligations were to be sold by the Issuer at the time of the sale or other disposition of the New Bonds.

Distributions by the Issuer in redemption or liquidation of any New Bonds that are treated as partnership interests should be subject to Sections 731 and 751(b) of the U.S. Tax Code. Section 731(a)(1) generally provides that a partner will not recognize taxable gain in connection with a partnership distribution except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution. Section 731(a)(2) generally provides that a partner will not recognize taxable loss unless (a) a distribution is in liquidation of a partner's interest in the partnership and (b) only money, unrealized receivables (as defined in Section 751(c) of the U.S. Tax Code) and inventory (as defined in Section 751(d) of the U.S. Tax Code) are distributed, in which case loss will be recognized to the extent of the excess of the adjusted basis of the partner's interest in the partnership over the sum of the property distributed.

The calculation of gain or loss in connection with the application of Section 751 is complex, and holders of New Bonds should consult with their own tax advisors with respect such calculations in the event such New Bonds are characterized as partnership interests.

***Certain Reporting Requirements.*** For U.S. federal income tax purposes, partnerships organized in Puerto Rico are considered foreign entities. The U.S. Tax Code and the Regulations require certain U.S. persons that own certain interests in a foreign partnership or transfer property to a foreign partnership in exchange for a partnership interest to file a properly completed Form 8865 with the IRS. If required to be filed, Form 8865 must be filed with a U.S. person's annual tax return for the applicable year. Failure to file a required Form 8865 can result in significant penalties. U.S. Holders are urged to consult their tax advisors as to the advisability of filing a protective Form 8865 for their taxable year that includes the exchange and for later taxable years because of the possibility that the IRS may successfully assert that their New Bonds are properly treated as equity interests in a foreign partnership rather than debt.

Certain U.S. Holders who are individuals (and certain entities closely held by individuals) may be required to report information relating to their ownership of the New Bonds, subject to certain exceptions (including an exception for New Bonds held in accounts maintained by U.S. financial institutions). U.S. Holders should consult their tax advisors regarding their reporting obligations with respect to the New Bonds.

***State and Local Income Taxation.*** Although the Applicable U.S. Tax Law provides that bonds issued by Puerto Rico are generally exempt from U.S. state and local income taxation, whether that exemption would apply to the New Bonds if they are characterized as equity of the Issuer rather than debt for tax purposes is uncertain. Bondholders should consult their own tax advisors as to the U.S. state and local tax implications of acquiring and holding the New Bonds if they are treated as equity interests of the Issuer for tax purposes.

### Tax Consequences to Puerto Rico Individuals & Puerto Rico Corporations

Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, the treatment of the New Bonds as partnership interests rather than debt for U.S. federal income tax purposes should not alter the U.S. federal income tax consequences of the exchange or the ownership or disposition of the New Bonds to Puerto Rico Individuals and Puerto Rico Corporations. Accordingly, a Puerto Rico Individual or a Puerto Rico Corporation should not be subject to U.S. federal income taxation on any income or gain arising from the exchange of Participating Bond Claims for New Bonds that are treated as partnership interests or as a result of owning or disposing of New Bonds unless, in the case of a Puerto Rico Corporation, such income or gain is effectively connected with the conduct by the Puerto Rico Corporation of a trade or business in the United States and certain other requirements are satisfied.

### Tax Consequences to Non-U.S. Holders

***Exchange of Participating Bond Claims for New Bonds that are Treated as Partnership Interests.*** Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, the treatment of the New Bonds as partnership interests rather than debt for U.S. federal income tax purposes should not materially alter the U.S. federal income tax consequences of the exchange of Participating Bond Claims for the New Bonds by Non-U.S. Holders. See "*—Tax Consequences to Non-U.S. Holders— Exchange of Participating Bond Claims for New Bonds*" above.

***Ownership of New Bonds that are Treated as Partnership Interests.*** Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, the treatment of the New Bonds as partnership interests rather than debt for U.S. federal income tax purposes should not materially alter the U.S. federal income tax consequences to Non-U.S. Holders. Accordingly, subject to the discussion concerning backup withholding above, a Non-U.S. Holder generally should not be subject to U.S. federal income taxation on its allocable share of the income of the Issuer attributable to such New Bonds provided such income is not effectively connected with the conduct of a trade or business in the United States. A Non-U.S. Holder whose income with respect to the New Bonds is effectively connected to the conduct of a U.S. trade or business will generally be taxed as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income at a rate of 30% unless an income tax treaty applies to reduce such rate. See "*—Tax Consequences to Non-U.S. Holders—Ownership of New Bonds*" above.

***Sale, Exchange or Retirement of New Bonds that are Treated as Partnership Interests.*** Assuming that, as the Issuer believes, the Issuer will not be deemed to be engaged in a U.S. trade or business, any gain realized by a Non-U.S. Holder upon the sale, exchange or retirement of a New Bond that is treated as a partnership interest rather than debt for U.S. federal income tax purposes generally will not be subject to U.S. federal income tax unless the gain is treated as effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment that such Non-U.S. Holder is treated as maintaining in the United States), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described above under "*—Tax Consequences to Non-U.S. Holders—Ownership of New Bonds*"; or such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange, and such gain is derived from sources within the United States. Certain other exceptions may be applicable, and a Non-U.S. Holder should consult its tax advisor in this regard.

### ERISA CONSIDERATIONS

Participating Bond Claims are in some instances held by pension, profit sharing or other employee benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including an entity such as a collective investment fund and separate accounts whose underlying assets include the assets of such plans, subject to ERISA (a "Plan"). Each fiduciary of a Plan holding Participating Bond Claims should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before determining whether to consent to the Qualifying Modification. Accordingly, among other factors, the fiduciary should consider the description of "Risk Factors" in the Solicitation Statement and this Offering Memorandum when considering the Plan's vote on the Qualifying Modification.

In addition, each fiduciary of a Plan that is considering an investment in the New Bonds should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before authorizing an investment in the New Bonds. For example, the only sources of payment on the New Bonds are payments, Collections received on the Restructuring Property and interest thereon, and the New Bonds will not be insured or guaranteed by the Commonwealth or any other person. For those and other reasons, an investment in the New Bonds may not be appropriate for some Plans.

In addition, Section 406 of ERISA and Section 4975(c) of the U.S. Tax Code generally prohibit transactions between a Plan (including for this purpose many individual retirement accounts and plans established by self-employed individuals or Keogh plans (each, also a "Plan")) and a "party in interest" within the meaning of Section 3(14) of ERISA ("Party In Interest"), or a "disqualified person" within the meaning of Section 4975(e)(2) of the U.S. Tax Code. If a non-exempt prohibited transaction does occur, it could result in the transaction being voided or rescinded, as well as excise tax or other monetary penalties and liabilities under ERISA and/or Section 4975 of the U.S. Tax Code. Governmental, church and foreign plans to which ERISA does not apply may be subject to similar rules under federal, state, local or foreign law. Under ERISA and various prohibited transaction class exemptions ("PTCEs") issued by the U.S. Department of Labor, exemptive relief may be available for a potential direct or indirect prohibited transaction that may occur from a purchase, holding or disposition of New Bonds. Those exemptions include PTCE 96-23 (for certain transactions determined by in house asset managers), PTCE 95-60 (for certain transactions involving insurance company general accounts), PTCE 91-38 (for certain transactions involving bank collective investment funds), PTCE 90-1 (for certain transactions involving insurance company separate accounts), PTCE 84-14 (for certain transactions determined by independent qualified asset managers), and the exemption under Section 408(b)(17) of ERISA and Section 4975(d)(20) of the U.S. Tax Code, for certain arm's-length transactions with a person that is a Party In Interest solely by reason of providing services to Plans or being an affiliate of such a service provider.

Any purchaser, including any fiduciary purchasing on behalf of a Plan, transferee or holder of the New Bonds will be deemed to have represented, in its corporate and its fiduciary capacity, by its purchase of the New Bonds, that either (a) it is not a Plan or an entity whose underlying assets include plan assets by reason of any Plan's investment in the entity, and is not purchasing the New Bonds on behalf of or with plan assets of any Plan or with any assets of a governmental, church or foreign plan that is subject to any federal, state, local or foreign law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the U.S. Tax Code or (b) its purchase is eligible for exemptive relief or such purchase is not prohibited by ERISA or Section 4975 of the U.S. Tax Code (or in the case of a governmental, church or foreign plan, any substantially similar federal, state, local or foreign law).

Under ERISA, assets of a Plan may include assets held in the general account of an insurance company that has issued an insurance policy to such plan or assets of an entity in which the Plan has invested. Accordingly, insurance company general accounts that include assets of a Plan must ensure that one of the foregoing exemptions is available.

Due to the complexity of the prohibited transaction rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries of Plans or other persons considering purchasing the New Bonds on behalf of or with "plan assets" of any Plan consult with their counsel regarding the prohibited transaction rules.

Purchasers of the New Bonds have exclusive responsibility for ensuring that their purchase does not violate the prohibited transaction rules of ERISA or the U.S. Tax Code or any similar regulations applicable to governmental, church or foreign plans, as described above.

In addition, Section 3(42) of ERISA and the U.S. Department of Labor regulation located at 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") describe what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA and the Code, including the fiduciary responsibility provisions of Title I of ERISA and Section 4975 of the Code. Under Section 3(42) of ERISA and the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or that, immediately after the most recent acquisition of any equity interest in the entity, Plans hold less than 25% of the total value of each class of "equity interest" in the entity. Under the Plan Asset Regulation, an "equity interest" means any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and that has no substantial equity features.

The New Bonds will not constitute "publicly-offered securities" for purposes of the Plan Asset Regulation. In addition, the Issuer will not be registered under the Investment Company Act, and it is not likely that the Issuer will qualify as an "operating company" for purposes of the Plan Asset Regulation. Therefore, if the New Bonds are deemed to constitute equity interests for purposes of the Plan Asset Regulation, and Plans hold 25% or more of the New Bonds, the Restructuring Property could be considered to be the assets of any Plans that hold New Bonds. If for any reason the Restructuring Property are deemed to be "plan assets," certain transactions involving the Restructuring Property might constitute non-exempt "prohibited transactions" under Section 406 of ERISA or Section 4975 of the Code and might have to be rescinded at significant cost to the Issuer. In addition, the Issuer and/or the Servicer might be deemed fiduciaries of the investing Plans and could be subject to other significant penalties and liabilities. In such circumstances, in addition to considering the applicability of ERISA and Section 4975 of the Code to the New Bonds, a fiduciary considering an investment in the New Bonds should consider, among other things, the applicability of ERISA and Section 4975 of the Code to transactions involving the Restructuring Property, including whether such transactions might constitute a direct or indirect prohibited transaction under ERISA or Section 4975 of the Code or otherwise may result in a breach of fiduciary duty under ERISA.

Although there is little guidance on the subject, assuming the New Bonds constitute debt for local law purposes, the Issuer believes that, at the time of their issuance, the New Bonds should not be treated as equity interests in the Issuer for purposes of the Plan Asset Regulation. This determination is based in part upon the traditional debt features of the New Bonds, including the absence of equity conversion rights, warrants and other typical equity features.

Neither the Issuer, the Servicer, nor any of their respective affiliates, agents or employees will act as a fiduciary to any Plan with respect to the Plan's decision to invest in the New Bonds. Each fiduciary or other person with investment responsibilities over the assets of a Plan considering an investment in the New Bonds must carefully consider the above factors before making an investment. Fiduciaries of Plans considering the purchase of the New Bonds should consult their legal advisors regarding whether the Restructuring Property would be considered "plan assets," the possibility of exemptive relief from the prohibited transaction rules and other issues and their potential consequences.

**INFORMATION CONCERNING OFFERING RESTRICTIONS IN CERTAIN JURISDICTIONS OUTSIDE THE UNITED STATES**

**MINIMUM UNIT SALES**

THE NEW BONDS WILL TRADE AND SETTLE ON A UNIT BASIS (ONE UNIT EQUALING ONE BOND OF $1.00 PRINCIPAL AMOUNT). FOR ANY SALES MADE OUTSIDE THE UNITED STATES, THE MINIMUM PURCHASE AND TRADING AMOUNT IS 1 UNIT (BEING 1 NEW BOND IN AN AGGREGATE PRINCIPAL AMOUNT OF $1.00).

**NOTICE TO INVESTORS IN CANADA**

THE NEW BONDS MAY BE SOLD IN CANADA ONLY TO PURCHASERS PURCHASING, OR DEEMED TO BE PURCHASING, AS PRINCIPAL THAT ARE ACCREDITED INVESTORS, AS DEFINED IN NATIONAL INSTRUMENT 45-106 PROSPECTUS EXEMPTIONS OR SUBSECTION 73.3(1) OF THE SECURITIES ACT (ONTARIO), AND ARE PERMITTED CLIENTS, AS DEFINED IN NATIONAL INSTRUMENT 31-103 REGISTRATION REQUIREMENTS, EXEMPTIONS AND ONGOING REGISTRANT OBLIGATIONS. ANY RESALE OF THE NEW BONDS MUST BE MADE IN ACCORDANCE WITH AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE PROSPECTUS REQUIREMENTS OF APPLICABLE SECURITIES LAWS.

SECURITIES LEGISLATION IN CERTAIN PROVINCES OR TERRITORIES OF CANADA MAY PROVIDE A PURCHASER WITH REMEDIES FOR RESCISSION OR DAMAGES IF THIS OFFERING MEMORANDUM (INCLUDING ANY AMENDMENT THERETO) CONTAINS A MISREPRESENTATION, *PROVIDED* THAT THE REMEDIES FOR RESCISSION OR DAMAGES ARE EXERCISED BY THE PURCHASER WITHIN THE TIME LIMIT PRESCRIBED BY THE SECURITIES LEGISLATION OF THE PURCHASER'S PROVINCE OR TERRITORY. THE PURCHASER SHOULD REFER TO ANY APPLICABLE PROVISIONS OF THE SECURITIES LEGISLATION OF THE PURCHASER'S PROVINCE OR TERRITORY FOR PARTICULARS OF THESE RIGHTS OR CONSULT WITH A LEGAL ADVISOR.

PURSUANT TO SECTION 3A.3 OF NATIONAL INSTRUMENT 33-105 UNDERWRITING CONFLICTS (NI 33-105), THE UNDERWRITERS ARE NOT REQUIRED TO COMPLY WITH THE DISCLOSURE REQUIREMENTS OF NI 33-105 REGARDING UNDERWRITER CONFLICTS OF INTEREST IN CONNECTION WITH THIS OFFERING.

**NOTICE TO INVESTORS IN THE EUROPEAN ECONOMIC AREA**

THIS OFFERING MEMORANDUM IS NOT A PROSPECTUS FOR THE PURPOSES OF EUROPEAN COMMISSION DIRECTIVE 2003/71/EC (AS AMENDED) (THE "PROSPECTUS DIRECTIVE") AS IMPLEMENTED IN EACH MEMBER STATE OF THE EUROPEAN ECONOMIC AREA. IT HAS BEEN PREPARED ON THE BASIS THAT ALL OFFERS OF THE NEW BONDS WILL BE MADE PURSUANT TO AN EXEMPTION UNDER ARTICLE 3 OF THE PROSPECTUS DIRECTIVE, AS IMPLEMENTED IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA, FROM THE REQUIREMENT TO PRODUCE A PROSPECTUS FOR SUCH OFFERS. THIS OFFERING MEMORANDUM IS ONLY ADDRESSED TO AND DIRECTED AT PERSONS IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA WHO ARE "QUALIFIED INVESTORS" WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE AND ANY RELEVANT IMPLEMENTING MEASURE IN EACH MEMBER STATE OF THE EUROPEAN ECONOMIC AREA ("QUALIFIED INVESTORS"). THIS OFFERING MEMORANDUM MUST NOT BE READ, ACTED ON OR RELIED ON IN ANY SUCH MEMBER STATE OF THE EUROPEAN ECONOMIC AREA BY PERSONS WHO ARE NOT QUALIFIED INVESTORS. ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH THIS OFFERING MEMORANDUM RELATES IS AVAILABLE ONLY TO QUALIFIED INVESTORS IN ANY MEMBER STATE OF THE EUROPEAN ECONOMIC AREA AND WILL NOT BE ENGAGED IN WITH ANY OTHER PERSONS. EACH PERSON WHO INITIALLY ACQUIRES ANY NEW BONDS OR TO WHOM ANY OFFER OF NEW BONDS MAY BE MADE WILL BE DEEMED TO HAVE REPRESENTED, ACKNOWLEDGED AND AGREED THAT IT IS A "QUALIFIED INVESTOR" WITHIN THE MEANING OF ARTICLE 2(1)(E) OF THE PROSPECTUS DIRECTIVE.

**NOTICE TO INVESTORS IN SWITZERLAND**

THIS OFFERING MEMORANDUM IS NOT INTENDED TO CONSTITUTE AN OFFER OR SOLICITATION TO PURCHASE OR INVEST IN THE NEW BONDS DESCRIBED HEREIN. THE NEW BONDS MAY NOT BE PUBLICLY OFFERED, SOLD OR ADVERTISED, DIRECTLY OR INDIRECTLY, IN, INTO OR FROM SWITZERLAND AND WILL NOT BE LISTED ON THE SIX SWISS EXCHANGE LTD. OR ON ANY OTHER EXCHANGE OR REGULATED TRADING FACILITY IN SWITZERLAND. NEITHER THIS OFFERING MEMORANDUM NOR ANY OTHER OFFERING OR MARKETING MATERIAL RELATING TO THE NEW BONDS CONSTITUTES A PROSPECTUS AS SUCH TERM IS UNDERSTOOD PURSUANT TO ARTICLE 652A OR ARTICLE 1156 OF THE *SWISS CODE OF OBLIGATIONS* OR A LISTING PROSPECTUS WITHIN THE MEANING OF THE LISTING RULES OF THE SIX SWISS EXCHANGE LTD. OR ANY OTHER REGULATED TRADING FACILITY IN SWITZERLAND. ACCORDINGLY, THIS OFFERING MEMORANDUM IS COMMUNICATED IN OR

FROM SWITZERLAND TO A LIMITED NUMBER OF SELECTED INVESTORS ONLY, AND NEITHER THIS OFFERING MEMORANDUM NOR ANY OTHER OFFERING OR MARKETING MATERIAL RELATING TO THE NEW BONDS MAY BE PUBLICLY DISTRIBUTED OR OTHERWISE MADE PUBLICLY AVAILABLE IN OR FROM SWITZERLAND.

### LITIGATION

On August 9, 2018, GDB and AAFAF commenced the Solicitation, seeking creditor approval of the Qualifying Modification under Title VI of PROMESA. On August 10, 2018, GDB and AAFAF filed the Approval Application, thereby commencing the Title VI proceeding. Prior to the commencement of the Solicitation, numerous lawsuits were filed challenging PROMESA and the actions of the Oversight Board, the Solicitation, the Qualifying Modification and the treatment of the claims of various creditors of GDB. Furthermore, other parties filed complaints against GDB and the Issuer seeking monetary damages or other relief for claims and other relief primarily related to GDB's previous role as fiscal agent. Subsequent to the commencement of the Solicitation, various parties filed additional complaints challenging the Solicitation and the Qualifying Modification and filed objections to the Qualifying Modification in the Title VI case. On November 6, 2018, the United States District Court for the District of Puerto Rico held the hearing to consider the approval of the Qualifying Modification and, after considering all arguments, filings, and evidence, approved the Qualifying Modification on the record, and entered the Approval Order on November 7, 2018. While the majority of the lawsuits have been dismissed and/or settled and all objections to the Qualifying Modification in the Title VI case were settled prior to the entry of the Approval Order, as described below, certain of these settlements resulted in cash payments or other agreements (such as an increase in the amount of Participating Bond Claims) that reduce the projected recoveries on the New Bonds. In addition, certain pending complaints and other litigation may arise in the future, particularly by parties whose claims are not bound by the Title VI court order and the Qualifying Modification, which could materially adversely impact the Qualifying Modification and the validity or enforceability of the Transaction Documents, including the New Bonds. For more information regarding the Title VI proceeding, see "*GDB*" in this Offering Memorandum.

**Pending Litigation Challenging the Constitutionality of PROMESA and/or the Actions of the Oversight Board**

As of the date hereof, there are several pending complaints challenging the constitutionality of PROMESA and/or the actions of the Oversight Board. Given the recent enactment of PROMESA, no assurances can be given as to the outcome of any litigation relating to PROMESA. Although most of the cases were dismissed by the Title III court, those cases are on appeal. If any of those appeals result in an unfavorable decision after the consummation of the Qualifying Modification, that could, among other things, affect the validity or enforceability of the Transaction Documents, including the New Bonds, or otherwise materially adversely affect the rights and remedies of holders of the New Bonds and the payment of principal of and interest on the New Bonds.

*In re: The Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, et al.* (Case No. 17 BK 3283). On August 7, 2017, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, "Aurelius"), as creditors of the Commonwealth, submitted in the District Court an Objection and Motion to Dismiss the petition filed by the Oversight Board under Title III of PROMESA in respect of the Commonwealth for, among other matters, lack of authority to initiate the proceedings. In its motion, Aurelius challenges the constitutionality of PROMESA on the grounds that the appointment of the members of the Oversight Board violates the Appointments Clause and separation of powers principles of the U.S. Constitution, inasmuch as such members were not appointed by the President with the advice and consent of the Senate. Aurelius argues that because of this constitutional defect, the actions taken by the Oversight Board are therefore void. AAFAF and the Oversight Board filed briefs in opposition to Aurelius' motion to dismiss the Commonwealth Title III case and certain other creditor groups have also opposed Aurelius' objection and motion to dismiss. On December 6, 2017, the United States, which has a statutory right to intervene in any federal court action in which the constitutionality of an Act of Congress is called into question, also filed a brief in support of the constitutionality of PROMESA, arguing that PROMESA's appointments scheme to the Oversight Board is not subject to the Appointments Clause and, therefore, does not violate the separation of powers provision of the U.S. Constitution. On July 13, 2018, the court issued an opinion and order denying Aurelius' Motion to Dismiss. Aurelius appealed the order to the First Circuit Court of Appeals.

In a separate PROMESA Title III case, *In re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Electric Power Authority, et al.* (Case No. 17 BK 4780), the Union de Trabajadores de la Industria Eléctrica y Riego ("UTIER"), a labor union of the Puerto Rico Electric Power Authority ("PREPA"), filed an adversary proceeding raising the same constitutional challenges as Aurelius and seeking to have all acts of the Oversight Board declared invalid and to enjoin the defendants from pursuing any Title III cases. *See Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority, et al.,* No. 17-00228-LTS (D.P.R. Aug. 7, 2017). UTIER filed an amended complaint on November 10, 2017. AAFAF and the Oversight Board moved to dismiss UTIER's adversary complaint. As in the Aurelius proceedings, the United States filed a statement in support of PROMESA's constitutionality. On August 15, 2018, the court entered an order dismissing UTIER's adversary proceeding. UTIER appealed the order to the First Circuit Court of Appeals.

Separately, on July 23, 2018, Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured") filed a separate adversary complaint in a third Title III case, *In re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority,* against the Oversight Board and its members asserting the same Appointments Clause challenge brought by Aurelius and UTIER, and asking the court to dismiss HTA's Title III proceeding. *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, et al.*, (Case No. 18-00087). On August 3, 2018, the District Court entered a stipulated judgment in the Oversight Board's favor. Assured filed a notice of appeal to the First Circuit the same day.

The First Circuit Court of Appeals consolidated the Aurelius, UTIER, and Assured's appeals into a single proceeding. *In re: The Financial Oversight and Management Board for Puerto Rico, as Representative for the Commonwealth of Puerto Rico, et al. v. Aurelius Investment, LLC, at al.* (Appellate Case Nos. 18-1671, 18-1746, 18-1787). The consolidated appeals were fully briefed as of November 2, 2018. Oral argument is set for December 3, 2018 in Boston before the Court of Appeals in Boston, MA.

On July 25, 2018, certain leaders of the Popular Democratic Party filed a separate lawsuit asserting a similar Appointments Clause challenge as the Aurelius case against the Oversight Board. *Hernández-Montañez v. The Financial Oversight and Management Board for Puerto Rico* (Case No. 18-00090). The adversary complaint seeks a declaratory judgment that the appointment of the Oversight Board's members violated the Appointments Clause or, in the alternative, a declaratory judgment that the Oversight Board violates the separation of powers doctrine. Plaintiffs also seek to enjoin the Oversight Board from exercising authority pursuant to PROMESA. On July 30, 2018, the District Court certified the constitutional challenge to the Attorney General. On October 4, 2018, the Oversight Board moved to dismiss the complaint or stay the litigation pending resolution of the consolidated Aurelius, UTIER, and Assured challenges before the First Circuit Court of Appeals. The District Court took the Motion under advisement without oral argument on October 26, 2018. The court has not yet issued an opinion.

While these challenges to PROMESA are brought in the Commonwealth's, PREPA's, and HTA's Title III cases and thus are not directly related to GDB, a decision holding that the members of the Oversight Board were not validly appointed could in turn result in the voidance of any decisions by the Oversight Board, including, but not limited to, the certification by the Oversight Board of the Restructuring Support Agreement as a Voluntary Agreement and a Qualifying Modification under PROMESA, and in the reconstitution of the Oversight Board. Such an outcome could result in significant delays in consummating, or the inability to consummate, the Qualifying Modification as there can be no assurance that a reconstituted Board would ratify or reaffirm the decisions in favor of the Solicitation and the Qualifying Modification. If occurring after consummation of the Qualifying Modification, the voidance of all actions taken by the Oversight Board in furtherance of the Solicitation and the Qualifying Modification could result in reverting the legal standing of GDB's creditors, including the holders of Participating Bond Claims, to the legal standing that existed prior to the Qualifying Modification.

**Other Pending Litigation Against GDB and the Issuer**

*Cooperativa de Ahorro y Crédito Abraham Rosa et al. v. Commonwealth of Puerto Rico* (Adv. Proc. No. 18-028 LTS in Case No. 17-BK-3283 LTS). This complaint was filed on March 22, 2018, in the U.S. District Court, by several state-chartered credit unions against GDB, the Public Corporation for the Supervision and Insurance of Cooperatives ("COSSEC"), the Issuer, AAFAF, the Oversight Board, the Commonwealth, the public corporations that are in Title III proceedings, and other defendants. The plaintiffs allege that the defendants maliciously and under false pretenses offered and sold to the plaintiffs unsound bonds issued by the Commonwealth and its instrumentalities, including GDB. They allege that this resulted in an undue concentration of bonds in the cooperatives' portfolios and created a systemic risk for the plaintiffs. Additionally, they allege that GDB, as fiscal agent to the Commonwealth, exerted significant undue influence on COSSEC, the public corporation in charge of regulating the Commonwealth's credit unions, which resulted in the bonds being offered and sold to the plaintiffs in violation of statutory, fiduciary and regulatory duties, causing them material losses. The plaintiffs request a determination that the plaintiffs' claims against all debtors in Title III proceedings are exempted from discharge in such proceedings, the imposition of monetary damages and compensation for losses suffered for breach of contract, violations to securities laws, negligence, breach of fiduciary duties, fraud, misrepresentations, and unjust enrichment.

On August 6, 2018, GDB filed a motion to dismiss alleging, generally, that the complaint should be dismissed in its entirety because it fails to meet the heightened pleading standard for fraud under Rule 9(b) of Federal Rules of Civil Procedure, fails to plead a claim for breach of contract or breach of warranties, the claims are premature or not actionable against GDB, and, in the alternative, are time barred or otherwise preempted by special statutes. The Issuer and all other co-defendants have also moved for the dismissal of the complaint. Plaintiffs' oppositions are due on December 6, 2018 and defendants' replies on January 9, 2019. GDB and the Issuer believe that the plaintiffs' claims in this case are without merit and intend to vigorously defend themselves. An adverse decision or ruling that requires GDB and/or the Issuer to pay monetary damages, however, could reduce recoveries on the New Bonds.

**Dismissed and/or Settled Litigation and Objections to the Qualifying Modification**

Various parties, including several municipalities and other GDB creditors, filed lawsuits in the U.S. District Court directly challenging the Solicitation and the Qualifying Modification. In addition, various parties filed objections to the Qualifying Modification in the Title VI case. While all of these lawsuits have been dismissed and/or settled and all objections to the Qualifying Modification in the Title VI case were settled, as described below, certain of these settlements resulted in cash payments by GDB or other agreements (such as an increase in the amount of Participating Bond Claims) that reduce the projected recoveries on the New Bonds.

GDB believes that entering into the settlements described below is in the best interest of GDB's stakeholders, including holders of Participating Bond Claims, depositors (including municipalities) and other parties, because it settled a significant challenge to consummating the Qualifying Modification. By agreeing to the settlements, GDB intends to be able to proceed in an orderly manner to consummate the Qualifying Modification, while minimizing litigation that would have otherwise increased GDB's expenses, delayed

distributions to stakeholders, decreased the value of GDB's assets and otherwise have been detrimental to GDB's stakeholders.

**Settlement of Litigation with Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)**

The Official Committee of Unsecured Creditors (the "Committee") of the debtors with cases pending under Title III of PROMESA (other than COFINA) (the "Title III Debtors") filed (i) two motions in the Title III cases seeking relief to challenge the Qualifying Modification, (ii) a lawsuit challenging the GDB Restructuring Act, and (iii) a preliminary objection to the Qualifying Modification in the Title VI case (collectively, the "Committee Litigation"). In the lawsuit challenging the GDB Restructuring Act, the Committee sought declaratory relief stating that the GDB Restructuring Act is invalid and unenforceable. The complaint alleged, among other things, that the GDB Restructuring Act (i) amounts to a *de facto* bankruptcy law that is inconsistent with Title III of PROMESA; (ii) is preempted by PROMESA insofar as it purports to release rights and claims of the Title III Debtors unrelated to any bond affected by the Qualifying Modification; and (iii) is inconsistent with the automatic stay. The Committee also filed an urgent motion in the Commonwealth's Title III case stating that the Qualifying Modification and the GDB Restructuring Act violate the automatic stay and a motion asking the District Court to grant the Committee derivative standing to act on behalf of the Title III Debtors in connection with the GDB restructuring. In the motion seeking enforcement of the automatic stay, the Committee sought an order stating that (i) the GDB restructuring violates the automatic stay under section 362 of the Bankruptcy Code and the District Court's June 29, 2017 stay order; (ii) any limitations on claims that have been or may be asserted by the Title III Debtors against GDB or related third-parties are void; and (iii) any transfer or "shielding" of assets pursuant to the GDB restructuring that could have been used, prior to the implementation of the GDB restructuring, to satisfy claims of the Title III Debtors by GDB, is void. On August 29, 2018, FGIC filed a response in support of the Committee's motion.

On October 5, 2018, GDB, AAFAF, the Oversight Board and the Committee entered into a stipulation (the "Committee Stipulation") in the Title VI case, resolving the Committee Litigation. On October 9, 2018, the District Court so-ordered the Stipulation Resolving the Objections of the Official Committee of Unsecured Creditors of all Title III Debtors (Other than COFINA) to the Approval Application, The Government Development Bank for Puerto Rico, Case No. 18-CV-1561-LTS (as so ordered, the "Committee Settlement Stipulation").

*Overview of the Committee Settlement Stipulation*

Pursuant to the terms of the Committee Settlement Stipulation, the Committee shall withdraw, with prejudice, and not refile or otherwise assert or pursue, directly or indirectly, any claims challenging the GDB Restructuring Act, the Qualifying Modification or the GDB restructuring.

The Committee Settlement Stipulation requires that (i) GDB make (a) certain fixed and contingent cash payments to the Public Entity Trust at and after the Closing Date, and (b) certain adjustments to claim amounts against, and the priority of payments within, the Public Entity Trust; and (ii) GDB acknowledge and affirm that certain legal claims with respect to GDB's prior role as fiscal agent and financial advisor or such other representative capacity to certain Title III Debtors (to the extent any such claims exist) and other governmental entities are the property of the applicable Title III Debtors and other governmental entities.

For additional information on the Committee Settlement Stipulation, see "*Additional Information Regarding the Committee Settlement Stipulation*" below.

*Additional Information Regarding the Committee Settlement Stipulation*

Subject to the conditions contained therein, the Committee Settlement Stipulation provides that:

Committee Releases

- The Committee agreed to withdraw, with prejudice, and not refile or otherwise assert or pursue, directly or indirectly, (i) any and all claims, objections, filings, requests for relief, or discovery requests in connection with, arising out of, or relating to the GDB Restructuring Act, the Qualifying Modification and the GDB restructuring; (ii) any and all claims, objections, filings, motions, and requests for relief in the Title III cases (Case Nos. 17-3283, 17-3566, 17-9686, 17-4780, Adv. Proc. No. 18-0101) pertaining to the GDB Restructuring Act, the Qualifying Modification or the GDB restructuring, including any appeals related thereto; and (iii) any and all claims, objections, filings, motions, requests for relief, and discovery requests in the GDB Title VI case.

- The Committee shall not commence, join, seek any relief with respect to, or otherwise participate in, including as *amicus curiae*, any future proceedings (including, but not limited to, any appellate proceedings) in or in connection with the GDB Title VI case or otherwise relating to the GDB Restructuring Act, the Qualifying Modification or the GDB restructuring, other than to give effect to and enforce the terms of the Committee Settlement Stipulation.

185

- The Committee shall release, and will not bring, assert, pursue, or otherwise advance, directly or indirectly, on its own behalf or derivatively, any claims, objections, avoidances, rights, rights of recovery, remedies or causes of action against GDB, GDB's current officers or directors, the Issuer, the Issuer's directors and officers, or the assets transferred to the Issuer, or seek to require GDB to assert any cause of action; *provided*, *however*, that any rights that the Committee may have to object to GDB's claim against the Commonwealth, and any rights of other parties to oppose such objection, are preserved.

- The Committee shall modify its pending discovery requests under Rule 2004 of the Federal Rules of Bankruptcy in the Title III case so that such requests (and any future requests under Rule 2004 of the Federal Rules of Bankruptcy, or any other discovery requests related to the GDB restructuring) ("Discovery") are limited to matters unrelated to the GDB restructuring. Additionally, the Committee shall not seek Discovery in connection with any cause of action that will be released by the Qualifying Modification and the GDB Restructuring Act (as in effect on the date hereof, but reflecting the modifications set forth in the *Informative Motion Regarding Releases Under Article 702 of the GDB Restructuring Act* [Docket No. 151 in Case No. 18-1561 (LTS)]).

GDB Cash Payments

- On the Closing Date, GDB shall transfer $20.0 million dollars in cash to the Public Entity Trust (the "Fixed Settlement Cash").

- On a date after the Closing Date after which GDB has satisfied all of its obligations in anticipation of winding-down as more fully described under "*Summary of Terms of New Bonds—Excluded GDB Assets*" in this Offering Memorandum, GDB will be required to transfer to the Public Entity Trust any remaining cash after satisfaction of such obligations pursuant to the Cash Adjustment for which such cash was retained, in an aggregate amount up to $10.0 million, and any additional cash above the $10 million amount required to be paid to the Public Entity Trust will be paid to the Issuer.

Public Entity Trust Adjustments

- On account of the restructuring of certain federal funds by the Commonwealth, certain adjustments will be made both to the amount of the claim against the Commonwealth that is an asset of the Public Entity Trust and the priority of payments within the Public Entity Trust.

- On a date after the Closing Date, GDB shall transfer to the Public Entity Trust the first cash or cash equivalents that constitute net proceeds of Causes of Action, if any, in respect of Causes of Action (to the extent any such Causes of Action exist), and after, in GDB's sole determination, all contingent and unliquidated claims against GDB arising on or before the Closing Date have been satisfied, until the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("ERS") and the Puerto Rico Electric Power Authority ("PREPA") obtain net proceeds totaling 55 cents on the dollar of the Title III Debtor designated deposits. Thereafter, any such proceeds will be transferred to the Issuer.

- For the avoidance of doubt (i) GDB shall continue to have the sole authority and absolute discretion to commence, prosecute, settle, offset against claims against GDB, or release any such Causes of Action and (ii) the Committee shall not have the right to, and shall not have or seek standing to, directly, indirectly or derivatively, commence, direct, compel the prosecution of, settle, resolve, sell, transfer or dispose of any such Cause of Action or any litigation, other enforcement action or resolution thereof.

- The designated deposits of ERS and PREPA will be allowed claims against the Public Entity Trust, senior to all other designated deposits in respect of the cash provided under the Committee Settlement Stipulation, and shall not be subject to additional setoff or reduction, including in respect of any causes of action for preferential transfers, which will be deemed settled. Thus, certain claims GDB might have against ERS and PREPA (including for preference exposure) are being settled under the Committee Settlement Stipulation.

Acknowledgment with Respect to Certain Legal Claims

- GDB shall acknowledge and affirm that certain legal claims with respect to GDB's prior role as fiscal agent and financial advisor or such other representative capacity to certain Title III Debtors and other governmental entities (to the extent any such claims exist) and for which the intended or actual primary economic beneficiary of the transaction or series of transactions giving rise to the cause of action was a Title III Debtor (or the entity that became a Title III Debtor) or a government entity (other than GDB) are the property of the applicable Title III Debtors and other governmental entities.

**Settlement of Litigation with Siemens Transportation Partnership Puerto Rico, S.E.**

On March 26, 2018, Siemens Transportation Partnership Puerto Rico, S.E. ("Siemens"), filed an adversary proceeding against HTA, the Oversight Board, AAFAF and GDB in the U.S. District Court. The complaint sought to collect monies and asserted a breach

of contract claim in connection with a settlement agreement whereby Siemens was to receive the sum of $52 million from HTA related to the construction of a mass transit system for HTA. Specifically, Siemens requested the disbursement of the last completion payment of $13 million, which, according to Siemens, was deposited by HTA in an escrow account at GDB and was the property of Siemens. Siemens also sought an injunction against the defendants prohibiting the dissipating of the funds allegedly held in escrow and an order to release the monies to Siemens. On May 29, 2018, GDB filed a motion to dismiss arguing, among other things, that the case should be considered as part of GDB's Title VI proceedings given that Siemens' claim was with respect to a GDB deposit subject to the Qualifying Modification, pursuant to which GDB had designated a Participating Bond Claim of $13 million in favor of HTA related to this deposit. The District Court ordered, among other things, that the controversies posed in this adversary proceeding be resolved in connection with GDB's Title VI proceeding. On October 17, 2018, Siemens filed an objection to the Qualifying Modification in the Title VI case asserting that it was entitled to the funds held in escrow at GDB and that their claim could not be modified under the Qualifying Modification. Siemens' claims were set to be considered on the merits during the Title VI hearing to consider the Qualifying Modification on November 6, 2018. On that date the parties reached an agreement in principle to settle Siemens' lawsuit (the "Siemens Settlement").

Pursuant to the Siemens Settlement, (i) GDB will allow, as part of the Qualifying Modification, a Participating Bond Claim in the amount of $15 million, which shall be bifurcated into (a) a Participating Bond Claim in the amount of $14 million, which shall be deemed sold to certain other holders of Participating Bond Claims, and (b) a Participating Bond Claim in favor of Siemens in the Amount of $1 million; and (ii) pay Siemens $11 million in cash, a portion of which shall be derived from the sale of the $14 million Participating Bond Claim, as set forth in the preceding clause (i)(a). In consideration for the above payments, Siemens will provide a general release to GDB, HTA, the Issuer and the other defendants to the adversary proceeding with respect to all claims related to the disputed amounts, and will seek the dismissal with prejudice of the adversary proceeding and withdraw all objections to the Qualifying Modification.

### Settlement of Litigation with Fundación Biblioteca Rafael Hernández Colón, Inc. and Fundación Sila María Calderón, Inc.

Prior to the commencement of the Solicitation, Fundación Biblioteca Rafael Hernández Colón, Inc. ("FBRHC") and Fundación Sila María Calderón, Inc. ("FSMC"), two not-for-profit entities established by former governors of the Commonwealth, had filed two separate complaints against the Commonwealth, GDB and other defendants before the Puerto Rico Court of First Instance. In the complaints, which made substantially similar allegations and sought similar relief, plaintiffs alleged that GDB acts as trustee of a special fund created by Act 290-2000, to which the proceeds of certain cigarette excise taxes were deposited, for the benefit of foundations established by former governors and first ladies, and that moneys in such fund could not be commingled with other funds deposited with GDB. The plaintiffs sought, among other relief, that the court order GDB to disburse to plaintiffs its pro rata share of the funds in the special fund for certain years. In both actions, the Secretary of Justice, on behalf of the Commonwealth, filed a notice of stay pursuant to Title III of PROMESA and GDB filed a request for stay and motion to dismiss. While resolution of these cases was pending, FBRHC and FSMC filed oppositions to the approval of the Qualifying Modification in the Title VI case arguing that funds deposited in the Act 290-2000 special fund were reserved for the benefit of foundations established by former governors and first ladies, and could not be subject to the Qualifying Modification.

On October 31, 2018, GDB entered into a Settlement and Release Agreement with FBRHC and FSMC pursuant to which GDB agreed to reserve an amount equal to $631,252 from the funds in the Act 290-2000 special fund (the "Act 290 Settlement") for the benefit of any and all entities entitled to receive funds under Act 290-2000 (the "Act 290 Repositories"), and FBRHC and FSMC agreed to withdraw their objection to the application for approval of the Qualifying Modification and to seek dismissal with prejudice of all claims pending against GDB in the state actions. Pursuant to the terms of the Settlement and Release Agreement, upon the entry of the final order approving the Qualifying Modification in the Title VI case, GDB made pro-rata payments to each FBRHC and FSMC from the Act 290 Settlement and placed the remaining amount in an account in a commercial bank in Puerto Rico for the benefit of the other Act 290 Repositories. In exchange for the above conditions, FBRHC and FSMC gave GDB a general release of any and all claims in relation to the funds in the Act 290 special fund.

### Settlement of Litigation with National Public Finance Guarantee Corporation

On January 16, 2018, National Public Finance Guarantee Corporation ("National") filed a motion in HTA's Title III case seeking discovery from GDB under Rule 2004 of the Federal Rules of Bankruptcy. The discovery sought by National was related to existence and status of the funds deposited with GDB in the Puerto Rico State Infrastructure Bank account ("PR SIB Fund"), which served as collateral for certain HTA bonds insured by National.

National appeared in the Title VI case and notified an intention to object to the Qualifying Modification. On September 20, 2018, GDB and National entered into a stipulation for National's withdrawal of its intention to object to the Qualifying Modification. In turn, GDB agreed to recognize the funds in the PR SIB Fund as federal funds for purposes of the Public Entity Trust.

**Entry into Stipulation with L.P.C. & D. Inc., Fidelity and Deposit Company of Maryland and Zurich American Insurance Company**

On July 14, 2017 L.P.C.&D. Inc. ("L.P.C.&D."), a general contractor, filed a complaint for collection of monies against GDB. Plaintiff claimed that GDB owed approximately $21.7 million related to a construction contract for a real estate development project (the "Development").

Fidelity and Deposit Company of Maryland and Zurich American Insurance Company (jointly, "F&D/Zurich") appeared in the Title VI proceeding to oppose the Qualifying Modification. F&D/Zurich claimed a right to receive payment from the funds in deposit at GDB as retainage for the Development. As a result of alleged subrogation and assignment rights, F&D/Zurich claimed that they were owed approximately $7.7 million by GDB.

On November 2, 2018, GDB and F&D/Zurich entered into a stipulation for F&D/Zurich's withdrawal of their objection to the Qualifying Modification. In exchange, GDB agreed that, to the extent L.P.C.&D. is entitled to any retainage payment, and F&D/Zurich succeed in establishing their subrogation and/or assignment rights, F&D/Zurich may obtain payment from the Vendor Claim Reserve.

**Settlement of Litigation with Various Municipalities**

Various municipalities also filed complaints seeking the payment of municipal funds deposited with GDB and/or alleging that certain municipal funds were trust funds that were not the property of GDB, and seeking damages. While these complaints did not expressly challenge the Qualifying Modification, the claimants sought a treatment of certain municipal claims with respect to funds deposited with GDB that was inconsistent with the treatment of such claims under the Qualifying Modification. After the launch of the Solicitation, however, a number of municipalities, including the municipalities that had pending cases against GDB, entered into settlement agreements with GDB in connection with the payment of the 2015-2017 Excess CAE pursuant to the GDB Restructuring Act (the "CAE Settlements"). Through the CAE Settlements, the municipalities accepted 55% of their 2015-2017 Excess CAE as full, final and complete settlement, accord and satisfaction of the full amount of their 2015-2017 Excess CAE, and the remaining portion of undisbursed 2015-2017 Excess CAE was discharged. In consideration for such payment, the municipalities also waived, released and discharged all claims against GDB, the Issuer, and the Public Entity Trust that were based on facts existing or occurring prior to the date of such agreements (other than any rights with respect to such municipalities' Participating Bond Claims, if any, or with respect to federal funds that would be claims in the Public Entity Trust, if any). Below is a summary of certain of the claims made by municipalities in litigation commenced prior to the commencement of the Solicitation, which claims were waived pursuant to the CAE Settlements.

*Municipality of San Germán v. Banco Gubernamental de Fomento para Puerto Rico et al.* (Case No. SJ2016CV00351). This complaint for preliminary and permanent injunctions, mandamus and declaratory judgment was filed on December 29, 2016, before the Puerto Rico Court of First Instance, San Juan Part, against GDB and the Commonwealth of Puerto Rico. The plaintiff sought the payment of Excess CAE funds deposited with GDB in the amount of $1,275,000 as of November 2016 and challenged certain laws and executive orders that controlled the way in which such funds were paid.

*Municipality of Añasco v. Banco Gubernamental de Fomento para Puerto Rico et al.* (Case No. SJ2017CV00444). This complaint for preliminary and permanent injunctions, mandamus and declaratory judgment was filed on June 15, 2017, before the Puerto Rico Court of First Instance, San Juan Part, against GDB and the Commonwealth of Puerto Rico. The plaintiff sought payment of all funds currently held at GDB and constituting funds deposited by, on behalf of, or for the municipality, including alleged Excess CAE funds in the amount of $1,375,073; municipal loan proceeds in the amount of $2,755,000; and other funds in the amount of $522,957.

*Municipality of Hormigueros and Municipality of San German v. Municipal Revenue Collection Center and Government Development Bank for Puerto Rico* (Case No. ISCI201800246 (307)). This complaint was filed on April 2, 2018, before the Puerto Rico Court of First Instance, by the Municipalities of Hormigueros and San Germán against CRIM and GDB. The municipalities alleged that they had not received the Excess CAE for fiscal years 2015 through 2017 and that GDB had failed to disburse the full amount of the municipal Loans granted to the municipalities despite requiring that the municipalities pay for the service of municipal debt with GDB on the basis of the entire amount loaned to the municipalities. The municipalities requested declaratory and injunctive relief for (1) CRIM to distribute the Excess CAE for fiscal year 2018 directly to the municipalities and that such excess be calculated based on loaned amounts actually disbursed by GDB, and (2) an order against GDB (a) so that it may only collect from the municipalities the amounts owed in principal and interests based on the actual loaned amounts disbursed to the municipalities and not on the total amount of the Loans, and (b) for the reimbursement of any amounts paid by the municipalities on account of the repayment of portions of the Loans that have not been disbursed by GDB.

*Municipality of Caguas v. Government Development Bank et al.* (Case No. 17-01973). This complaint for declaratory, equitable and injunctive relief was filed on July 17, 2017, in the U.S. District Court against GDB, AAFAF, the Municipal Revenue Collection Center and certain officers thereof. The plaintiff sought declaratory judgment and injunctive relief to prohibit GDB and AAFAF from continuing with the Qualifying Modification on the grounds that it is in violation of PROMESA, contrary to other applicable law and/or unconstitutional. In particular, the plaintiff alleged, among other matters, that certain municipal deposits

188

designated as Participating Bond Claims in the Qualifying Modification are not "Bonds" under PROMESA and thus may not be altered under Title VI of PROMESA.

**Litigation with the Municipality of San Juan**

*Municipality of San Juan v. Government Development Bank et al.* (Case No. 17-02009). This complaint for declaratory judgment and injunctive relief was filed on July 26, 2017, in the District Court against the Oversight Board, GDB and AAFAF. In its original complaint, the plaintiff sought, among other things, a declaratory judgment that the Restructuring Support Agreement is invalid for failure to comply with PROMESA's voting pool requirements and that the treatment in the Restructuring Support Agreement of certain purported trust funds (designated as Participating Bond Claims in the Qualifying Modification) violates PROMESA, and a permanent injunction against the Oversight Board from certifying a Restructuring Support Agreement that does not provide a separate voting pool for municipal depositors with set-off rights or contemplates use of purported trust funds for the benefit of non-municipal creditors. On August 25, 2017, the plaintiff filed a motion for a preliminary injunction to enjoin GDB and AAFAF from initiating the Solicitation in connection with the Qualifying Modification and requesting an expedited briefing schedule. On September 11, 2017, the District Court denied the plaintiff's request for a preliminary injunction. On October 27, 2017, the District Court granted motions from seven other municipalities – specifically, the municipalities of Juana Díaz, Cabo Rojo, Hormigueros, San Germán, Luquillo, San Lorenzo and Mayagüez – to intervene in this action. These other municipalities filed intervenor complaints alleging the same causes of action San Juan asserted in its original complaint and seeking the same relief sought by San Juan. On December 1, 2017, the Municipality of San Juan filed an amended complaint for declaratory judgment, damages and injunctive relief. As a whole, San Juan's core allegations and legal theories largely mirrored those in the original complaint, but also included allegations that the provisions of the GDB Restructuring Act limiting the ability of government entities to challenge the Restructuring Support Agreement were preempted by PROMESA, that GDB's refusal to disburse certain monies to the municipality for the provision of essential services was unlawful, that GDB had breached fiduciary duties and contractual provisions of a deed of trust with respect to certain municipal funds, and that the court should impose a constructive trust in favor of the municipality with respect to approximately $83.3 million of funds held in accounts at GDB.

*Municipality of San Juan v. Banco Gubernamental de Fomento para Puerto Rico et al.* (Case No. SJ2017CV00501). This complaint for preliminary and permanent injunctions, mandamus and declaratory judgment was filed on June 26, 2017, before the Puerto Rico Court of First Instance, San Juan Part, against GDB and its President. The plaintiff sought, among other things, payment of, and a declaration that it had proprietary interest over, certain 2015-2017 Excess CAE funds held at GDB. An amended complaint was filed on July 31, 2017, which withdrew the requests for the issuance of a preliminary injunction and mandamus. The Municipalities of Arroyo, Cabo Rojo, Comerío, Hormigueros, Isabela, Juana Díaz, Luquillo, Patillas, Salinas, San Germán, San Lorenzo, and Yabucoa sought to intervene as the plaintiffs in the case raising the same allegations as the Municipality of San Juan.

*Travelers Casualty & Surety Company v. Municipality of San Juan* (Case No. 17-01290). This complaint for breach of contract and collection of monies was filed on February 28, 2017, in the District Court by Travelers Casualty and Surety Company against the Municipality of San Juan. The plaintiff is seeking payment of $338,656 allegedly owed by the Municipality of San Juan to a contractor with respect to two construction projects. The Municipality of San Juan admitted essential facts but filed a third-party complaint against GDB on July 12, 2017, claiming that the amounts due should be paid by GDB, as the funds for paying such contracts were allegedly deposited with, and under the control of, GDB.

*Wilma Figueroa Alvarez v. Newport Bonding v. Municipality of San Juan v. GDB et al.* (Case No. KCD2015-1141 (602)). This complaint for collection of monies and damages was filed on May 28, 2015, before the Puerto Rico Court of First Instance by Figueroa Alvarez against the Municipality of San Juan. The plaintiff is seeking payment of approximately $48,000 for work performed under a construction contract with the municipality and $500,000 as compensation for damages allegedly suffered by the plaintiff due to the municipality's failure to pay. The Municipality of San Juan filed a third-party complaint against GDB and its President on May 8, 2017, which was served on December 1, 2017. In the third-party complaint, the municipality alleged that it had been unable to make payments under the construction contract because such payments were to be made by the municipality from the proceeds of a loan made to it by GDB, which proceeds were allegedly under the control of GDB. The municipality alleged that, as a result, GDB was directly responsible for the outstanding payments.

**Settlement Agreement with the Municipality of San Juan**

On September 19, 2018, GDB and the Municipality of San Juan ("San Juan") entered into a settlement agreement to resolve San Juan's claims against GDB and provide for the payment to San Juan of 55% of its 2015-2017 Excess CAE. In addition to the provisions included in other CAE Settlements (described above), the settlement agreement between San Juan and GDB (the "San Juan Settlement") included the following material terms:

- Each of the Servicer and the Collateral Monitor agreed on its behalf and on behalf of any successor and/or assigns that may serve as Servicer or Collateral Monitor that, upon closing of the Qualifying Modification, a certain Municipal General Obligation Loan owed by San Juan to GDB (the "Designated Loan"), with a principal amount outstanding of approximately

$65 million as of July 1, 2018, shall be reamortized to provide additional cash flow relief to San Juan (The Designated Loan is one of the six Municipal General Obligations of San Juan that are part of the Restructuring Property). See "*Description of the Restructuring Property–Detailed Description of the Restructuring Property–Municipal General Obligations*."

- The Servicer and the Collateral Monitor further agreed that at the time of the closing of the Qualifying Modification, they will agree, based on the financial condition of the applicable municipality, to consent to any reasonable request by a municipality for a modification to the amortization schedule of one or more of the Municipal Loan Assets owed to the Issuer by such municipality, based on the specific facts and circumstances of such municipality, *provided* that such modification  (i) extends by no more than two years the final maturity date for such Municipal Loan Asset (as set forth in "*Appendix B: The Transferred Property*" in this Offering Memorandum), (ii) does not affect the aggregate principal amount outstanding or the interest rate with respect to such Municipal Loan Asset, (iii) does not affect the scheduled interest payment dates (except to the extent additional scheduled interest payment dates are added in connection with the extension of the maturity date) with respect to such Municipal Loan Asset, (iv) the net present value of such Municipal Loan Asset to the Issuer remains approximately unchanged or increases, (v) is consistent with the servicing and/or monitoring standards, rights, duties and obligations set forth in the Servicing Agreement, the Collateral Monitor Agreement, the other Transaction Documents, the Solicitation Statement and the GDB Restructuring Act, as applicable, and (vi) is supported by reasonable documentation demonstrating that such municipality will reasonably be able to make all payments on the applicable Municipal Loan Asset(s) as so modified.  The Service and the Collateral Monitor also agreed to consider in good faith each request for amortization relief by a municipality to determine whether such request satisfies the foregoing conditions. This agreement would not preclude any other Loan restructuring or modification that may be agreed upon in the future by an obligor on the Restructuring Property, the Servicer and the Collateral Monitor or otherwise prohibit any obligor from seeking to refinance an existing Loan.

While the settlement agreement with San Juan is not expected to have a negative effect on Collections, it may affect the timing of the receipt of such Collections. Moreover, to the extent one or more other municipalities request and are granted a modification of their respective amortization schedules, it is possible such modification could further affect the timing of receipt of cash flows, which then, in turn, could negatively affect the cash payments of principal and interest on the New Bonds.

**CONTINUING DISCLOSURE**

The following is a summary of the Issuer's obligations under the Disclosure Agreement (as defined herein). For information regarding additional periodic reporting requirements to Bondholders under the Transaction Documents, see "*Service Providers—Reports to Bondholders*."

Consistent with the requirements of Rule 15c2-12 of the United States Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time (the "Rule"), the Issuer will covenant in a Continuing Disclosure Agreement (the "Disclosure Agreement"), dated as of the Closing Date, among the Issuer, AAFAF, as dissemination agent (the "Dissemination Agent"), and the Indenture Trustee, to provide certain ongoing continuing disclosure with respect to the New Bonds, for the benefit of the Bondholders and the Beneficial Owners of the New Bonds (as defined herein and, generally, the tax owners of the New Bonds) and the Dealer Managers.

The Issuer has not previously entered into any continuing disclosure undertakings pursuant to the Rule or otherwise.

**Provision of Annual Reports**

Pursuant to the Disclosure Agreement, the Issuer will covenant and agree as follows:

(a) to prepare, or to cause to be prepared, and provide to the Dissemination Agent, not later than 210 days after the end of the Issuer's fiscal year (the "Annual Filing Date") (which fiscal year as of the date hereof ends June 30), commencing with the fiscal year ending June 30, 2019, an annual report (the "Annual Report"), containing or including by reference (i) the audited financial statements of the Issuer for the prior fiscal year, prepared in accordance with generally accepted accounting principles applicable to the Issuer; provided, however, if such audited financial statements are not available by the time the annual report is required to be filed, the annual report will contain unaudited financial statements in a format that complies with current generally accepted accounting principles and the audited financial statements will be filed in the same manner as the annual report when such financial statements become available, (ii) an update of the information similar to that contained under the following headings in this Offering Memorandum, to the extent not included in the financial statements (including notes thereto) described in the immediately preceding clause (i): (1) "*Summary of Flow of Collections on the Restructuring Property*," (2) "*Summary of Distributions of Cash from the Collection Account*," and (3) "*Collections on the Restructuring Property and Calculation of Available Cash*" and (iii) an update of the information contained in Appendix D and Appendix E attached hereto solely to the extent such information is not included in the financial statements (including notes thereto) described in the preceding clause (i); and

(b) to file or cause to be filed with MSRB through the EMMA website (http://emma.msrb.org) established by the MSRB each Annual Report no later than the Annual Filing Date.

Any or all of the items listed above may be included by specific reference to other documents that have been filed with the MSRB (or any other entity designated or authorized by the SEC to receive reports pursuant to the Rule) or the SEC. The Issuer will clearly identify, or will cause to be clearly identified, each such other document so included by reference.

**Reporting of Significant Events**

Pursuant to the Disclosure Agreement, the Issuer will also covenant and agree to file, or cause to be filed, with the MSRB through EMMA, notice of failure of the Issuer to comply with the Annual Report requirements described above and notice of the occurrence of any of the following events with respect to the New Bonds, in each case in a timely manner but in no event later than 10 business days after the occurrence of the event:

 1. principal and interest payment delinquencies;

 2. non-payment related defaults, if material;

 3. unscheduled draws on debt service reserves reflecting financial difficulties;

 4. unscheduled draws on credit enhancement reflecting financial difficulties;

5.  substitution of credit or liquidity providers, or their failure to perform;

6.  adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the New Bonds, or other material events affecting the tax status of the New Bonds;

7.  modifications to rights of the holders (including Beneficial Owners) of the New Bonds, if material;

8.  bond calls, if material, and tender offers;

9.  defeasances;

10. release, substitution or sale of property securing repayment of the New Bonds, if material;

11. rating changes;

12. bankruptcy, insolvency, receivership, or similar event of the Issuer;

13. the consummation of a merger, consolidation or acquisition involving the Issuer or the sale of all or substantially all of the assets of the Issuer, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

14. the appointment of a successor or additional trustee, or the change in the name of a trustee, if material.

For purposes of the event identified in (12), the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the Bankruptcy Code or in any other proceeding under Commonwealth, state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Issuer, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Issuer.

In addition to the events listed above, the Issuer will give, or will cause to be given, notice in a timely manner but in no event later than 10 business days after the occurrence of (i) the appointment of a successor or additional Servicer or Collateral Monitor, or the change of name of a Servicer or Collateral Monitor, if material, or (ii) the Issuer becoming aware of the failure (A) to receive Collections on Restructuring Property in the Collection Account or (B) to make required disbursements therefrom.

**Termination of Reporting Obligations**

The parties' obligations under the Disclosure Agreement will terminate upon the termination of the Bond Indenture.

**Dissemination Agent**

The Issuer may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under the Disclosure Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent. The Disclosure Agreement provides that the Dissemination Agent will not be responsible in any manner for the content of any notice or report provided by the Issuer pursuant to the Disclosure Agreement. The Dissemination Agent (if other than the Indenture Trustee) may resign by providing thirty (30) days written notice to the Issuer. The Disclosure Agreement also provides that (i) the Dissemination Agent will have no duty to prepare any information report nor will the Dissemination Agent be responsible for filing any report not provided to it by the Issuer in a timely manner and in a form suitable for filing and (ii) if at any time there is not any other designated Dissemination Agent, the Indenture Trustee will be the Dissemination Agent. The initial Dissemination Agent will be AAFAF.

**Amendment; Waiver**

The Issuer, the Dissemination Agent and the Indenture Trustee may amend the Disclosure Agreement (and each of the Dissemination Agent and the Indenture Trustee will be required to agree to any amendment so requested by the Issuer which does not impose any greater duties, nor greater risk of liability, on such party) and any provision of the Disclosure Agreement may be waived, provided that the following conditions are satisfied:

(a)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Issuer, or type of business conducted;

(b)     the Disclosure Agreement, as amended, would, as determined by outside legal counsel of recognized national standing, have been consistent with the requirements of the Rule at the time of the issuance of the New Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and

(c)     the amendment either (i) is approved by the Bondholders in the same manner as provided in the Bond Indenture for amendments to the Bond Indenture with the consent of the Bondholders or (ii) does not impair the interests of Bondholders or Beneficial Owners of the New Bonds, as determined by outside legal counsel of recognized national standing.

In the event of any amendment or waiver of a provision of the Disclosure Agreement, the Disclosure Agreement requires the Issuer to describe such amendment in the next Annual Report. In addition, if the amendment relates to the accounting principles to be followed in preparing financial statements, the Issuer is required to file, or cause to be filed, notice of such change in the same manner as for the events listed under (1) through (14) above. Notwithstanding the conditions set forth in (a)-(c) above, the Disclosure Agreement may be amended in accordance with subsequent guidance from the Securities and Exchange Commission regarding amendments to continuing disclosure agreements under the Rule.

**Additional Information**

Nothing in the Disclosure Agreement will be deemed to prevent the Issuer from disseminating, or causing to be disseminated, any other information, using the means of dissemination set forth in the Disclosure Agreement or any other means of communication, or including any other information in any Annual Report or notice of occurrence of an event, in addition to that which is required by the Disclosure Agreement. If the Issuer chooses to include, or cause to be included, any information in any Annual Report or notice of occurrence of an event, in addition to that which is specifically required by the Disclosure Agreement, the Issuer will have no obligation under the Disclosure Agreement to update such information or include it in any future Annual Report or notice of occurrence of an event pursuant to the Disclosure Agreement.

**Default**

In the event of a failure of the Issuer or the Dissemination Agent to comply with any provision of the Disclosure Agreement, the Disclosure Agreement provides that the Indenture Trustee may and, at the request of Bondholders holding at least twenty-five percent (25%) in aggregate principal amount of the New Bonds then outstanding, will (but only to the extent it has been indemnified to its satisfaction from any loss, liability, or expense, including without limitation, reasonable fees and out-of-pocket expenses of its attorneys), and any Bondholder or Beneficial Owner of the outstanding New Bonds may, take such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Issuer or the Dissemination Agent, as the case may be, to comply with its respective obligations under the Disclosure Agreement.

A default under the Disclosure Agreement will not be deemed a Bond Indenture Event of Default and the sole remedy under the Disclosure Agreement in the event of any failure of the Issuer or the Dissemination Agent to comply with the Disclosure Agreement will be an action to compel performance.

## DEALER MANAGERS

Bank of America Merrill Lynch and Barclays Capital Inc. (collectively, the "Dealer Managers") have agreed to manage the exchange of the New Bonds for the Participating Bond Claims. The obligations of the Dealer Managers are subject to certain conditions precedent, but either of the Dealer Managers may in good faith, pursuant to such agreement, determine it to be inadvisable to continue to render services pursuant to such agreement. Notwithstanding such determination, the Dealer Managers' continued involvement is not a condition precedent to the consummation of the Qualifying Modification.

GDB will pay the Dealer Managers customary fees for their services and reimburse the Dealer Managers for their reasonable out-of-pocket expenses in connection therewith. GDB and the Issuer have agreed to indemnify the Dealer Managers for certain liabilities.

The Dealer Managers and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. The Dealer Managers and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Dealer Managers and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank Loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

## LEGAL MATTERS

Certain legal matters will be passed upon for the Issuer by its U.S. counsel, King & Spalding LLP, and its Puerto Rico counsel, Cancio Covas & Santiago, LLP; for the Issuer and GDB by the Secretary of Justice of Puerto Rico; for GDB by its General Counsel; for GDB and AAFAF by their U.S. counsel, O'Melveny & Myers LLP, and their Puerto Rico counsel, Pietrantoni Méndez & Alvarez LLC; and for the Dealer Managers by their counsel, Squire Patton Boggs (US) LLP. However, due solely to litigation, it is not expected that a legal opinion with respect to the validity or enforceability of the New Bonds will be delivered. See "*Risk Factors—Risks Related to the New Bonds and the Keepwell Agreement—Certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from closing conditions and closing deliverables that are typically required in municipal debt offering transactions.*"

**MISCELLANEOUS**

The foregoing summaries of or references to the GDB Restructuring Act, the New Bonds, the Transaction Documents and the other agreements and matters referred to herein, are made subject to all the detailed provisions thereof to which reference is hereby made and do not purport to be complete statements of any or all of such provisions.

The agreements with the Bondholders are fully set forth in the Transaction Documents. This Offering Memorandum is not to be construed as a contract with the Bondholders or of any other obligations of the Issuer.

The execution and delivery of this Offering Memorandum has been duly authorized by the Issuer.

**GDB DEBT RECOVERY AUTHORITY**

By: /s/ David Pauker
     Chairperson

### APPENDIX A: INDEX OF DEFINED TERMS IN THIS OFFERING MEMORANDUM

Below is an index of defined terms used in this Offering Memorandum.

| Term | Page(s) |
|---|---|
| 1996 CCDA Loan | 133 |
| 2001 CRIM Loan | 134 |
| 2002 CRIM Loan | 134 |
| 2006 PBA Loan | 132 |
| 2008 Ports Authority Loan | 131 |
| 2013 CCDA Loan | 133 |
| 2014 Ports Authority Loan | 131 |
| 2015-17 Excess CAE | 74, 112 |
| 2015-17 Excess CAE Settlement Amount | 112 |
| 68 Resolution | 129 |
| 68 Resolution Revenues | 129 |
| 98 Resolution | 128 |
| AAFAF | 1, 60 |
| Accepted Servicing Practices | 77, 158 |
| Act 30-31 Revenues | 129 |
| Act 290 Repositories | 187 |
| Act 290 Settlement | 187 |
| Act 106 | 41 |
| Act 80 | 67 |
| Additional Bonds | 13 |
| Additional Recovery Authority Loans | 133 |
| adjusted issue price | 174 |
| Affiliate | 164 |
| AFR Presumption | 173 |
| Agrelot Coliseum | 132 |
| Agricultural Development Fund | 133 |
| Aguadilla Airport | 131 |
| Annual Filing Date | 191 |
| Annual Report | 191 |
| Applicable P.R. Tax Law | 167 |
| Applicable U.S. Tax Law | 170 |
| Approval Application | 61 |
| Approval Order | 62 |
| Approved Purchaser | 20, 105 |
| APRs | 45 |
| Assured | 183 |
| Aurelius | 183 |
| Autonomous Municipalities Act | 40 |
| automatic stay | 36 |
| Available Cash | 152 |
| Balloon Payments | 111 |
| Bankruptcy Laws | 29, 141 |
| Bar Date | 69 |
| Basic Tax | 91 |
| BDE | 65 |
| BDE-EAI | 65 |
| Beneficial Interest | 16, 102 |
| Beneficial Owner | 148 |
| Board | 57 |
| Board of Trustees | 57 |
| Bond Indenture | 1, 13, 77 |
| Bond Indenture Event of Default | 141 |
| Bondholders | 1 |

| Term | Page(s) |
|------|---------|
| BPPR | 108 |
| Business Day | 14 |
| CAE | 91 |
| CAE Settlements | 188 |
| Cantor-Katz | 12, 78 |
| Cash Adjustments | 16, 103 |
| Cash Assets | 16 |
| CCDA | 63 |
| CCDA Loans | 133 |
| Causes of Action Rights | 16 |
| CDL Loans | 43 |
| Clearing Systems | 147 |
| Clearstream Banking | 15 |
| Closing Date | 6, 14 |
| Closing Date Adjustments | 100 |
| COFIM | 94 |
| COFINA | 63 |
| Collateral Monitor | 12, 78 |
| Collateral Monitor Agreement | 78 |
| Collateral Monitor Fee | 24, 82 |
| Collateral Monitor Fee Letter | 13, 78 |
| Collection Account | 151 |
| Collection Period | 14 |
| Collection Schedule | 152 |
| Collections | 6 |
| Committee | 185 |
| Committee Fixed Settlement Amount | 103 |
| Committee Litigation | 185 |
| Committee Settlement Stipulation | 16, 185 |
| Committee Stipulation | 185 |
| Commonwealth | 1 |
| Commonwealth Constitution | 41 |
| Commonwealth Contributions | 95 |
| Commonwealth Fiscal Plan | 66 |
| Commonwealth Guaranteed Loan Asset | 15, 101 |
| Commonwealth Loan Assets | 15, 101 |
| Commonwealth SUT | 116 |
| Commonwealth Title III Case | 69 |
| comparable yield | 173 |
| Compliance Test | 79, 160 |
| contingent payment debt regulations | 172 |
| COSSEC | 67, 184 |
| Covered Losses | 22, 138 |
| covered territorial instrumentalities | 38, 51, 83 |
| CPPR | 98 |
| Credit Event | 82 |
| CRIM | 47 |
| CRIM Act | 40 |
| CRIM Board | 95 |
| Crude Oil Revenues | 129 |
| Cutoff Date | 14 |
| Dealer Managers | 194 |
| Depositary | 147 |
| Depositary Participants | 147 |
| Designated Basic Tax | 96 |
| Designated Commonwealth Contributions | 94 |
| Designated Depositors | 73 |

| Term | Page(s) |
|---|---|
| Designated Loan | 189 |
| Designated Trustee | 112 |
| Determination Date | 14, 152 |
| Development Fund | 118 |
| Direct Participants | 147 |
| Disclosure Agreement | 191 |
| Discovery | 186 |
| Dissemination Agent | 191 |
| DTC | 15 |
| DTCC | 147 |
| EDB | 133 |
| EDB Loan | 135 |
| EDB Property | 135 |
| Eligible Deposit Account | 153 |
| Eligible Institution | 153 |
| Eligible Investments | 153 |
| EMMA | 4 |
| Equalization Monies | 96 |
| equity interest | 179 |
| ERISA | 179 |
| ERS | 41, 186 |
| Euroclear | 15 |
| Excess CAE | 91, 111 |
| Excess Reserved Cash | 20, 105 |
| Excluded Causes of Action | 19, 104 |
| Excluded Expenses | 26, 151 |
| Excluded GDB Assets | 19, 104 |
| F&D/Zurich | 188 |
| FAM | 48 |
| FAM Act | 49 |
| FAM Redemption Fund | 118 |
| FBRHC | 187 |
| FDIC | 153 |
| February 2017 GDB Fiscal Plan | 60 |
| FEMA | 43 |
| Fees and Expenses Reserve | 11, 25, 152, 154 |
| FGIC | 128 |
| FGIC Settlement | 128 |
| Final Scheduled Payment Date | 14, 139 |
| Fiscal Responsibility Act | 125 |
| Fiscal Year 2019 Certified Budget | 67 |
| Fixed Settlement Cash | 186 |
| forward-looking statements | 4 |
| FSMC | 187 |
| GDB | 1, 12 |
| GDB Enabling Act | 106 |
| GDB Fiscal Plan | 61 |
| GDB Letter of Credit | 130 |
| GDB Restructuring Act | 13 |
| GDB Retained Loans | 16 |
| GDB Retained Loan Rights | 16, 102 |
| GNP | 64 |
| GO Available Legal Margin | 116 |
| GO Legal Margin | 116 |
| GO Payment Capacity | 116 |
| GO Redemption Fund | 108 |
| Government | 60, 70 |

| Term | Page(s) |
|------|---------|
| Government Development Bank for Puerto Rico Debt Restructuring Act | 13 |
| Governor | 60 |
| HFA | 15, 102 |
| Household Survey | 65 |
| HTA | 38 |
| HTA Bonds | 128 |
| HTA Debt | 128 |
| HTA Loans | 128 |
| Improvement Fund | 118 |
| Indemnified Parties | 22, 138 |
| Indenture Trustee | 1, 12, 77 |
| Indenture Trustee Fee | 23, 82 |
| Independent | 164 |
| Indirect Participants | 148 |
| Initial Portfolio Transfer Fee | 23, 81, 161 |
| Initial Restructuring Support Agreement | 60 |
| Insolvency Event | 164 |
| Interest Period | 25, 139 |
| Interim Receipts | 109 |
| Investment Company Act | 31 |
| IRS | 55 |
| issue price | 171 |
| Issuer | 1, 12 |
| Issuer Expenses | 26, 151 |
| Issuer Operating Expenses | 26, 151 |
| Issuer Operating Expenses Cap | 26, 151 |
| JRS | 66 |
| June 2017 GDB Fiscal Plan | 61 |
| Kobre | 44 |
| Kobre Report | 44 |
| Krueger Report | 64 |
| L.P.C.&D. | 188 |
| Lehman | 58 |
| Legislative Assembly | 1, 60 |
| LIBOR | 18, 107 |
| Litigation Proceeds | 17, 155 |
| Liquidation Payment Date | 27, 146 |
| Loan and Trust Agreement | 130 |
| Loan | 100 |
| LTPR | 131 |
| LTPR Lease | 131 |
| market discount | 177 |
| Matching Fund | 96 |
| MFA | 45, 106 |
| Moratorium Act | 60, 125 |
| Municipal Financing Act | 48 |
| Municipal License Tax Act | 94 |
| Municipal Lines of Credit | 109 |
| Municipal Loan Assets | 15, 100 |
| Municipal Tax Act | 91 |
| National | 187 |
| Net Collections | 81, 161 |
| net negative adjustment | 173 |
| New Bond Requisite Holders | 164 |
| New Bonds | 1 |
| Non-P.R. Investor | 167 |

| Term | Page(s) |
|---|---|
| Non-U.S. Holder | 170 |
| October Revised Commonwealth Fiscal Plan | 67 |
| Offering Memorandum | 6 |
| Open or Disputed Vendor Claims | 20, 105 |
| Operational Loans | 109 |
| Other Loan Assets | 15, 102 |
| Oversight Board | 1, 60 |
| P.R. Investor | 167 |
| P.R. Tax Code | 167 |
| P.R. Treasury | 167 |
| PAA | 15, 101 |
| PAA Bond | 126 |
| Parcel B | 136 |
| Parcel C | 133 |
| Party In Interest | 179 |
| Payment Date | 1, 14, 139 |
| Payment Date Report | 80 |
| Payment Record Date | 15 |
| PBA | 63 |
| PBA Loans | 132 |
| Person | 164 |
| PFC | 63 |
| phantom income | 56 |
| PIK Amount | 1, 25, 139 |
| Plan | 179 |
| Plan Asset Regulation | 179 |
| Planning Board | 64 |
| Ports Authority | 130 |
| Ports Authority Loans | 130 |
| Ports Authority Reimbursement Obligations | 130 |
| positive adjustment | 173 |
| PR Code | 118 |
| PR SIB Fund | 187 |
| PRASA | 67 |
| PREPA | 43, 183, 186 |
| PRIDCO | 131 |
| PRIDCO Mortgaged Properties | 131 |
| PRIFA | 63 |
| PRIFA Bonds | 130 |
| Prime Rate | 18, 107 |
| Private Loans | 15, 102 |
| Private Sub-Fund | 112 |
| Procedures Order | 62 |
| PROMESA | 1 |
| Property Tax Exemptions | 91 |
| Prospectus Directive | 181 |
| PTCEs | 179 |
| Public Corporation Loan Assets | 15, 101 |
| Public Entity Deed of Trust | 73 |
| Public Entity Trust | 70 |
| Public Entity Trust Assets | 19, 73, 104 |
| Puerto Rico Corporation | 170 |
| Puerto Rico Individual | 170 |
| Qualification | 164 |
| Qualified Investors | 181 |
| Qualified Successor Servicer | 164 |
| Qualifying Modification | 1, 32 |

| Term | Page(s) |
|---|---|
| Real Property Assets | 16, 102 |
| Regulations | 170 |
| Reimbursable Servicer Expenses | 161 |
| Reimbursement Agreement | 130 |
| Report | 98 |
| Repurchase Agreement | 15, 102, 137 |
| Residual GDB Cash Assets | 19, 105 |
| Restructuring Property | 6 |
| Restructuring Support Agreement | 60 |
| Retained Causes of Action | 16, 103 |
| Retirement Systems | 66 |
| Revenue Loans | 109 |
| Revised Commonwealth Fiscal Plan | 67 |
| Río Bayamón Norte Community | 136 |
| Río Bayamón Property | 136 |
| Rule | 191 |
| Sales Tax Obligations | 109 |
| San Juan | 189 |
| San Juan Settlement | 189 |
| San Juan Waterfront Parcel | 131 |
| San Juan Waterfront Project | 131 |
| Secured Deposit Account | 19, 104 |
| Securities Act | 31 |
| Semiannual Bondholder Report | 80 |
| Semiannual Bondholder Report Date | 80 |
| Semiannual Budget | 80 |
| Servicer | 12, 77 |
| Servicer Advances | 161 |
| Servicer Default | 163 |
| Servicer Replacement Event | 27, 162 |
| Services | 158 |
| Servicing Agreement | 13 |
| Servicing Fee | 23, 81, 161 |
| Siemens | 186 |
| Siemens Settlement | 187 |
| SMU | 133 |
| SMU Loan | 135 |
| SO Available Legal Margin | 123 |
| SO Payment Capacity | 123 |
| Solicitation | 7, 61 |
| Solicitation Statement | 61 |
| Special Additional Tax | 91 |
| Special First Payment Date | 1, 14, 139 |
| Specified Cash Assets | 20, 105 |
| Stafford Act | 43 |
| Step-Up Fee Period | 82 |
| territorial instrumentalities | 38, 83 |
| Test Date | 79, 160 |
| Title III Cases | 69 |
| Title III Debtors | 185 |
| Toll Revenues | 129 |
| Transaction Documents | 14 |
| Transfer Agreement | 13, 155 |
| Transferred Property | 6 |
| TRS | 66 |
| Type A Asset | 82 |
| Type B Asset | 82 |

| Term | Page(s) |
|---|---|
| Type C Asset | 82 |
| U.S. | 170 |
| U.S. Holder | 170 |
| U.S. Tax Code | 170 |
| UCC Fixed Settlement Amount | 103 |
| undersecured claims | 33 |
| Unknown Assets | 16 |
| unrealized receivables | 177 |
| UPR | 63 |
| UTIER | 183 |
| Vendor Claim Reserve | 20, 105 |
| Vendor Claim Reserve Residual | 20, 105 |

**APPENDIX B: THE TRANSFERRED PROPERTY**

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30000131000100203 | Municipal General Obligations | Adjuntas | $254,613.32 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30000131000100201 | Municipal General Obligations | Adjuntas | $765,000.00 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000231000100216 | Municipal General Obligations | Aguada | $120,119.52 | 7/1/2020 | VARIABLE | P+1.5 | 7.00 |
| 30000231000100205 | Municipal General Obligations | Aguada | $890,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100216 | Municipal General Obligations | Aguadilla | $502,769.95 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100207 | Municipal General Obligations | Aguadilla | $1,754,923.70 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100204 | Municipal General Obligations | Aguadilla | $1,908,495.09 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100213 | Municipal General Obligations | Aguadilla | $2,490,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100219 | Municipal General Obligations | Aguadilla | $2,423,157.26 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100208 | Municipal General Obligations | Aguadilla | $3,056,030.45 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100201 | Municipal General Obligations | Aguadilla | $5,798,208.48 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000431000100202 | Municipal General Obligations | Aguas Buenas | $749,130.01 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30000531000100206 | Municipal General Obligations | Aibonito | $72,896.62 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30000531000100208 | Municipal General Obligations | Aibonito | $418,817.74 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30000631000100207 | Municipal General Obligations | Anasco | $29,285.06 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30000631000100204 | Municipal General Obligations | Anasco | $1,126,428.48 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100209 | Municipal General Obligations | Arecibo | $287,983.72 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100212 | Municipal General Obligations | Arecibo | $581,418.51 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100206 | Municipal General Obligations | Arecibo | $831,482.44 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100217 | Municipal General Obligations | Arecibo | $1,823,226.28 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100210 | Municipal General Obligations | Arecibo | $3,155,576.73 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100216 | Municipal General Obligations | Arecibo | $3,383,204.67 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100204 | Municipal General Obligations | Arroyo | $117,473.87 | 7/1/2021 | VARIABLE | N+1 | 2.34 |
| 30000831000100205 | Municipal General Obligations | Arroyo | $689,055.27 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100202 | Municipal General Obligations | Arroyo | $884,098.67 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100212 | Municipal General Obligations | Barceloneta | $109,806.63 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100210 | Municipal General Obligations | Barceloneta | $700,000.00 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100211 | Municipal General Obligations | Barceloneta | $920,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100215 | Municipal General Obligations | Barceloneta | $1,229,256.82 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100207 | Municipal General Obligations | Barceloneta | $1,440,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100216 | Municipal General Obligations | Barceloneta | $1,497,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100224 | Municipal General Obligations | Barceloneta | $3,755,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100208 | Municipal General Obligations | Barceloneta | $4,035,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30001231000100209 | Municipal General Obligations | Cabo Rojo | $805,618.72 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30001231000100211 | Municipal General Obligations | Cabo Rojo | $5,462,023.06 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30001231000100206 | Municipal General Obligations | Cabo Rojo | $7,704,648.61 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100210 | Municipal General Obligations | Caguas | $903,042.21 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100238 | Municipal General Obligations | Caguas | $8,589,999.78 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30001431000100211 | Municipal General Obligations | Camuy | $374,981.34 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30001431000100204 | Municipal General Obligations | Camuy | $900,000.00 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |

---

[1] As of the Cutoff Date, after giving effect to the Closing Date Adjustments and adjusted for payments received on July 2, 2018 (by virtue of rollover to the next business day).

[2] Maturity dates adjusted to give effect to the Closing Date Adjustments.

[3] "N" means 3-month London Interbank Offered Rate ("LIBOR"). "P" means the U.S. Prime Rate (the "Prime Rate").

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30001531000100210 | Municipal General Obligations | Canovanas | $303,229.67 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100211 | Municipal General Obligations | Canovanas | $404,986.05 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100206 | Municipal General Obligations | Canovanas | $1,104,640.01 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100208 | Municipal General Obligations | Canovanas | $2,029,354.71 | 7/1/2021 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100207 | Municipal General Obligations | Canovanas | $3,716,065.57 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30001531000100205 | Municipal General Obligations | Canovanas | $3,894,903.08 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100226 | Municipal General Obligations | Cayey | $697,187.26 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100217 | Municipal General Obligations | Cayey | $1,530,972.77 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100216 | Municipal General Obligations | Cayey | $2,270,590.11 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100215 | Municipal General Obligations | Cayey | $2,752,145.74 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100204 | Municipal General Obligations | Cayey | $3,822,570.35 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30001931000100209 | Municipal General Obligations | Ceiba | $285,404.69 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100206 | Municipal General Obligations | Ciales | $77,743.05 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100208 | Municipal General Obligations | Ciales | $963,428.69 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100205 | Municipal General Obligations | Ciales | $958,894.51 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30002131000100210 | Municipal General Obligations | Cidra | $1,250,110.97 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002131000100206 | Municipal General Obligations | Cidra | $3,620,559.59 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100211 | Municipal General Obligations | Coamo | $820,018.33 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100209 | Municipal General Obligations | Coamo | $1,048,186.29 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100205 | Municipal General Obligations | Coamo | $1,081,566.40 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30002331000100204 | Municipal General Obligations | Comerio | $44,634.88 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30002331000100202 | Municipal General Obligations | Comerio | $589,949.93 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100205 | Municipal General Obligations | Corozal | $1,800,136.22 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100239 | Municipal General Obligations | Dorado | $531,325.21 | 7/1/2027 | VARIABLE | P+1.5 | 7.00 |
| 30002631000100230 | Municipal General Obligations | Dorado | $753,011.96 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100223 | Municipal General Obligations | Dorado | $800,346.98 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100220 | Municipal General Obligations | Dorado | $1,200,031.32 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100225 | Municipal General Obligations | Dorado | $1,563,689.25 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100227 | Municipal General Obligations | Dorado | $1,532,402.84 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100219 | Municipal General Obligations | Dorado | $1,507,297.85 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100229 | Municipal General Obligations | Dorado | $1,647,256.14 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100216 | Municipal General Obligations | Dorado | $1,886,067.75 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100236 | Municipal General Obligations | Dorado | $2,091,477.33 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100226 | Municipal General Obligations | Dorado | $2,429,717.71 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100211 | Municipal General Obligations | Dorado | $2,623,687.04 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100237 | Municipal General Obligations | Dorado | $2,589,903.99 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30002631000100228 | Municipal General Obligations | Dorado | $8,925,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002831000100205 | Municipal General Obligations | Florida | $228,379.79 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30002931000100207 | Municipal General Obligations | Guanica | $93,793.15 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30002931000100210 | Municipal General Obligations | Guanica | $2,368,411.07 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30003031000100207 | Municipal General Obligations | Guayama | $4,420,075.68 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30003031000100204 | Municipal General Obligations | Guayama | $5,453,314.58 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100203 | Municipal General Obligations | Guayanilla | $85,884.75 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003131000100201 | Municipal General Obligations | Guayanilla | $220,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30003131000100205 | Municipal General Obligations | Guayanilla | $350,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---------|-----------|--------------|-------------------------------|------------------|--------------------|------------------|----------------|
| 30003131000100212 | Municipal General Obligations | Guayanilla | $504,435.14 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100206 | Municipal General Obligations | Guayanilla | $635,000.00 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30003131000100211 | Municipal General Obligations | Guayanilla | $1,886,680.59 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100211 | Municipal General Obligations | Guaynabo | $2,186,816.05 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30003231000100215 | Municipal General Obligations | Guaynabo | $4,639,782.39 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30003231000100218 | Municipal General Obligations | Guaynabo | $4,959,889.07 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100222 | Municipal General Obligations | Guaynabo | $7,267,479.20 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100229 | Municipal General Obligations | Guaynabo | $7,430,401.69 | 7/1/2033 | VARIABLE | P+1.5 | 7.00 |
| 30003231000100219 | Municipal General Obligations | Guaynabo | $9,759,261.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100224 | Municipal General Obligations | Guaynabo | $17,174,359.78 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003231000100220 | Municipal General Obligations | Guaynabo | $17,113,747.65 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30003331000100216 | Municipal General Obligations | Gurabo | $178,946.31 | 7/1/2020 | VARIABLE | P+1.5 | 7.00 |
| 30003331000100208 | Municipal General Obligations | Gurabo | $906,712.36 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100213 | Municipal General Obligations | Gurabo | $4,806,257.89 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003331000100207 | Municipal General Obligations | Gurabo | $4,941,063.13 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100203 | Municipal General Obligations | Gurabo | $5,505,418.42 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003531000100202 | Municipal General Obligations | Hormigueros | $87,658.89 | 7/1/2021 | VARIABLE | N+1.25 | 2.59 |
| 30003731000100207 | Municipal General Obligations | Isabela | $261,367.62 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30003731000100206 | Municipal General Obligations | Isabela | $1,279,221.89 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30003731000100201 | Municipal General Obligations | Isabela | $1,815,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30003831000100202 | Municipal General Obligations | Jayuya | $89,193.63 | 7/1/2023 | VARIABLE | N+1 | 2.34 |
| 30003831000100203 | Municipal General Obligations | Jayuya | $344,145.50 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100209 | Municipal General Obligations | Juana Diaz | $235,475.48 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100206 | Municipal General Obligations | Juana Diaz | $1,389,341.79 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100205 | Municipal General Obligations | Juana Diaz | $1,593,356.81 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100208 | Municipal General Obligations | Juana Diaz | $2,071,562.22 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100207 | Municipal General Obligations | Juncos | $406,596.25 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004031000100212 | Municipal General Obligations | Juncos | $2,073,420.87 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100215 | Municipal General Obligations | Juncos | $4,493,812.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100209 | Municipal General Obligations | Juncos | $5,616,253.97 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004031000100214 | Municipal General Obligations | Juncos | $6,367,099.66 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004131000100206 | Municipal General Obligations | Lajas | $841,151.77 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004131000100213 | Municipal General Obligations | Lajas | $2,897,332.46 | 7/1/2039 | VARIABLE | P+1.5 | 6.00 |
| 30004431000100205 | Municipal General Obligations | Las Piedras | $126,918.49 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30004431000100210 | Municipal General Obligations | Las Piedras | $1,862,560.88 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30004431000100211 | Municipal General Obligations | Las Piedras | $8,363,680.97 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004531000100204 | Municipal General Obligations | Loiza | $299,142.72 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30004531000100206 | Municipal General Obligations | Loiza | $375,000.00 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30004531000100202 | Municipal General Obligations | Loiza | $628,770.27 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30004531000100212 | Municipal General Obligations | Loiza | $643,853.25 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30004531000100213 | Municipal General Obligations | Loiza | $1,359,882.21 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30004531000100214 | Municipal General Obligations | Loiza | $1,475,118.71 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30004631000100205 | Municipal General Obligations | Luquillo | $411,631.58 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30004631000100206 | Municipal General Obligations | Luquillo | $1,008,708.66 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30004631000100203 | Municipal General Obligations | Luquillo | $2,019,929.55 | 7/1/2032 | FIXED | 2.59 | n.a |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---------|-----------|--------------|-------------------------------|------------------|--------------------|-----------------|----------------|
| 30004731000100209 | Municipal General Obligations | Manati | $26,903.72 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100205 | Municipal General Obligations | Manati | $725,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100215 | Municipal General Obligations | Manati | $1,223,167.83 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100219 | Municipal General Obligations | Manati | $1,417,290.40 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100212 | Municipal General Obligations | Manati | $2,280,873.37 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100220 | Municipal General Obligations | Manati | $2,457,730.73 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100217 | Municipal General Obligations | Manati | $2,590,000.00 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100218 | Municipal General Obligations | Manati | $4,704,279.71 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004831000100206 | Municipal General Obligations | Maricao | $27,774.06 | 7/1/2019 | VARIABLE | P+1.5 | 7.00 |
| 30004831000100203 | Municipal General Obligations | Maricao | $370,000.00 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30004931000100206 | Municipal General Obligations | Maunabo | $214,700.87 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100204 | Municipal General Obligations | Maunabo | $585,732.81 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100203 | Municipal General Obligations | Maunabo | $831,183.95 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100201 | Municipal General Obligations | Maunabo | $837,329.96 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005031000100211 | Municipal General Obligations | Mayaguez | $1,997,456.96 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30005031000100210 | Municipal General Obligations | Mayaguez | $6,748,334.21 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100201 | Municipal General Obligations | Moca | $128,529.33 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30005131000100210 | Municipal General Obligations | Moca | $460,974.30 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100213 | Municipal General Obligations | Moca | $549,598.20 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100206 | Municipal General Obligations | Moca | $696,113.05 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005131000100214 | Municipal General Obligations | Moca | $1,811,605.21 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30005231000100215 | Municipal General Obligations | Morovis | $574,115.06 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30005331000100209 | Municipal General Obligations | Naguabo | $1,194,908.79 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100201 | Municipal General Obligations | Naranjito | $1,688,151.06 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30005431000100202 | Municipal General Obligations | Naranjito | $2,943,809.97 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100205 | Municipal General Obligations | Orocovis | $246,598.58 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30005531000100201 | Municipal General Obligations | Orocovis | $495,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100204 | Municipal General Obligations | Patillas | $557.28 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100205 | Municipal General Obligations | Patillas | $299,155.75 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100209 | Municipal General Obligations | Patillas | $2,728,151.24 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100210 | Municipal General Obligations | Penuelas | $236,751.34 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100206 | Municipal General Obligations | Penuelas | $933,637.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100204 | Municipal General Obligations | Penuelas | $1,090,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100209 | Municipal General Obligations | Penuelas | $1,204,075.79 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005831000100216 | Municipal General Obligations | Ponce | $1,312,312.88 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100210 | Municipal General Obligations | Ponce | $3,832,425.82 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100222 | Municipal General Obligations | Ponce | $9,094,274.94 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100223 | Municipal General Obligations | Ponce | $9,796,862.96 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100212 | Municipal General Obligations | Ponce | $11,049,072.53 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100215 | Municipal General Obligations | Ponce | $11,368,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100204 | Municipal General Obligations | Ponce | $13,010,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30005931000100203 | Municipal General Obligations | Quebradillas | $355,944.24 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100202 | Municipal General Obligations | Quebradillas | $875,000.00 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100209 | Municipal General Obligations | Quebradillas | $965,744.13 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100212 | Municipal General Obligations | Rio Grande | $1,561,695.82 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30006131000100213 | Municipal General Obligations | Rio Grande | $2,285,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100201 | Municipal General Obligations | Rio Grande | $2,590,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30006131000100205 | Municipal General Obligations | Rio Grande | $2,750,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30006131000100208 | Municipal General Obligations | Rio Grande | $5,016,030.88 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30006231000100212 | Municipal General Obligations | Sabana Grande | $205,495.55 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30006231000100205 | Municipal General Obligations | Sabana Grande | $428,909.54 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30006231000100208 | Municipal General Obligations | Sabana Grande | $887,360.00 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100203 | Municipal General Obligations | Salinas | $594,145.74 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30006331000100211 | Municipal General Obligations | Salinas | $1,076,919.14 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100215 | Municipal General Obligations | Salinas | $1,230,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100214 | Municipal General Obligations | Salinas | $2,969,431.37 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100211 | Municipal General Obligations | San German | $408,250.16 | 7/1/2025 | VARIABLE | P+1.5 | 7.00 |
| 30006531000100208 | Municipal General Obligations | San Juan | $13,847,472.33 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30006531000100203 | Municipal General Obligations | San Juan | $16,196,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006531000100218 | Municipal General Obligations | San Juan | $22,404,558.07 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006531000100213 | Municipal General Obligations | San Juan | $23,182,647.50 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006531000100221 | Municipal General Obligations | San Juan | $45,958,514.27 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30006531000100219 | Municipal General Obligations | San Juan | $64,319,226.75 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100212 | Municipal General Obligations | San Lorenzo | $200,781.34 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100206 | Municipal General Obligations | San Lorenzo | $1,089,173.75 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30006631000100213 | Municipal General Obligations | San Lorenzo | $1,590,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100211 | Municipal General Obligations | San Lorenzo | $1,660,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100208 | Municipal General Obligations | San Lorenzo | $1,695,143.28 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100205 | Municipal General Obligations | San Lorenzo | $2,166,012.35 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30006731000100210 | Municipal General Obligations | San Sebastian | $103,175.67 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100208 | Municipal General Obligations | San Sebastian | $809,765.33 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100203 | Municipal General Obligations | San Sebastian | $825,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006731000100209 | Municipal General Obligations | San Sebastian | $1,228,970.38 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100214 | Municipal General Obligations | San Sebastian | $1,453,326.88 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100212 | Municipal General Obligations | San Sebastian | $1,717,105.06 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100215 | Municipal General Obligations | San Sebastian | $1,767,355.78 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100212 | Municipal General Obligations | Santa Isabel | $584,483.95 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100207 | Municipal General Obligations | Santa Isabel | $670,000.00 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100216 | Municipal General Obligations | Santa Isabel | $1,053,659.79 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100208 | Municipal General Obligations | Santa Isabel | $1,960,000.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100213 | Municipal General Obligations | Santa Isabel | $5,914,949.83 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100203 | Municipal General Obligations | Toa Alta | $1,141,500.98 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30006931000100211 | Municipal General Obligations | Toa Alta | $1,643,744.08 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100210 | Municipal General Obligations | Toa Alta | $1,484,294.01 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100209 | Municipal General Obligations | Toa Alta | $2,581,526.97 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30006931000100212 | Municipal General Obligations | Toa Alta | $4,023,786.77 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100211 | Municipal General Obligations | Toa Baja | $536,153.31 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007031000100216 | Municipal General Obligations | Toa Baja | $1,439,402.12 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100214 | Municipal General Obligations | Toa Baja | $1,310,000.00 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100212 | Municipal General Obligations | Toa Baja | $3,112,085.13 | 7/1/2032 | FIXED | 2.59 | n.a |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30007031000100219 | Municipal General Obligations | Toa Baja | $3,585,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100220 | Municipal General Obligations | Toa Baja | $25,195,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100217 | Municipal General Obligations | Toa Baja | $28,031,616.80 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100211 | Municipal General Obligations | Trujillo Alto | $392,480.08 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100212 | Municipal General Obligations | Trujillo Alto | $1,954,374.13 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100201 | Municipal General Obligations | Trujillo Alto | $1,950,804.98 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007131000100207 | Municipal General Obligations | Trujillo Alto | $4,169,634.89 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100208 | Municipal General Obligations | Trujillo Alto | $5,337,454.76 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100210 | Municipal General Obligations | Trujillo Alto | $5,370,525.49 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007231000100203 | Municipal General Obligations | Utuado | $84,284.40 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30007331000100228 | Municipal General Obligations | Vega Alta | $247,897.78 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30007331000100225 | Municipal General Obligations | Vega Alta | $2,094,999.99 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100210 | Municipal General Obligations | Vega Baja | $374,914.51 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100209 | Municipal General Obligations | Vega Baja | $1,027,586.35 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007431000100223 | Municipal General Obligations | Vega Baja | $1,014,708.08 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100211 | Municipal General Obligations | Vega Baja | $1,100,952.30 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100216 | Municipal General Obligations | Vega Baja | $1,118,009.09 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100220 | Municipal General Obligations | Vega Baja | $1,357,799.36 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100219 | Municipal General Obligations | Vega Baja | $1,736,076.76 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100217 | Municipal General Obligations | Vega Baja | $1,945,966.38 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100204 | Municipal General Obligations | Vega Baja | $2,310,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30007431000100215 | Municipal General Obligations | Vega Baja | $2,365,777.05 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30007531000100210 | Municipal General Obligations | Vieques | $309,946.06 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30007531000100201 | Municipal General Obligations | Vieques | $636,253.51 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30007531000100208 | Municipal General Obligations | Vieques | $765,113.48 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007531000100209 | Municipal General Obligations | Vieques | $1,073,838.86 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007631000100206 | Municipal General Obligations | Villalba | $169,269.72 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100212 | Municipal General Obligations | Villalba | $387,032.55 | 7/1/2023 | VARIABLE | P+1.5 | 7.00 |
| 30007731000100207 | Municipal General Obligations | Yabucoa | $792,229.31 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100211 | Municipal General Obligations | Yabucoa | $1,276,629.64 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100212 | Municipal General Obligations | Yabucoa | $1,675,742.66 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100202 | Municipal General Obligations | Yabucoa | $1,730,000.00 | 7/1/2027 | VARIABLE | N+1 | 2.34 |
| 30007731000100213 | Municipal General Obligations | Yabucoa | $1,735,633.35 | 7/1/2030 | VARIABLE | P+1.5 | 7.00 |
| 30007831000100205 | Municipal General Obligations | Yauco | $33,569.68 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100227 | Municipal General Obligations | Yauco | $125,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100215 | Municipal General Obligations | Yauco | $185,000.00 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100223 | Municipal General Obligations | Yauco | $200,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100212 | Municipal General Obligations | Yauco | $245,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100224 | Municipal General Obligations | Yauco | $271,495.50 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100226 | Municipal General Obligations | Yauco | $425,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100228 | Municipal General Obligations | Yauco | $445,854.73 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100211 | Municipal General Obligations | Yauco | $370,210.92 | 7/1/2021 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100222 | Municipal General Obligations | Yauco | $474,095.03 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100219 | Municipal General Obligations | Yauco | $560,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100225 | Municipal General Obligations | Yauco | $790,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30007831000100216 | Municipal General Obligations | Yauco | $1,560,036.71 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100217 | Municipal General Obligations | Yauco | $2,450,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100220 | Municipal General Obligations | Yauco | $2,708,848.73 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100221 | Municipal General Obligations | Yauco | $5,573,000.00 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30000131000100701 | Sales Tax Obligations | Adjuntas | $2,293,835.50 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000131000100702 | Sales Tax Obligations | Adjuntas | $3,137,899.04 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000331000100701 | Sales Tax Obligations | Aguadilla | $222,368.46 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100702 | Sales Tax Obligations | Aguadilla | $4,980,167.99 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30000431000100701 | Sales Tax Obligations | Aguas Buenas | $2,923,136.55 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000531000100701 | Sales Tax Obligations | Aibonito | $1,683,090.33 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30000531000100703 | Sales Tax Obligations | Aibonito | $1,974,133.50 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000631000100703 | Sales Tax Obligations | Anasco | $377,079.80 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30000631000100704 | Sales Tax Obligations | Anasco | $752,017.58 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100701 | Sales Tax Obligations | Arecibo | $1,446,925.26 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100703 | Sales Tax Obligations | Arecibo | $1,461,345.24 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100702 | Sales Tax Obligations | Arecibo | $1,776,830.01 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000731000100705 | Sales Tax Obligations | Arecibo | $1,798,820.59 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100702 | Sales Tax Obligations | Arroyo | $896,703.06 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30000831000100701 | Sales Tax Obligations | Arroyo | $3,288,124.19 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30000931000100707 | Sales Tax Obligations | Barceloneta | $126,385.91 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100703 | Sales Tax Obligations | Barceloneta | $900,480.40 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100702 | Sales Tax Obligations | Barceloneta | $934,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100701 | Sales Tax Obligations | Barceloneta | $2,754,358.77 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30001031000100701 | Sales Tax Obligations | Barranquitas | $1,341,653.56 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30001131000100701 | Sales Tax Obligations | Bayamon | $2,598,347.13 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30001131000100705 | Sales Tax Obligations | Bayamon | $8,163,012.44 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30001131000100703 | Sales Tax Obligations | Bayamon | $12,046,637.35 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30001231000100702 | Sales Tax Obligations | Cabo Rojo | $1,631,970.27 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30001231000100701 | Sales Tax Obligations | Cabo Rojo | $3,574,300.91 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100703 | Sales Tax Obligations | Caguas | $5,904.77 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30001331000100706 | Sales Tax Obligations | Caguas | $286,689.83 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100704 | Sales Tax Obligations | Caguas | $3,834,081.23 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100707 | Sales Tax Obligations | Caguas | $5,176,359.30 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100702 | Sales Tax Obligations | Caguas | $6,518,521.00 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30001431000100703 | Sales Tax Obligations | Camuy | $597,682.15 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30001431000100701 | Sales Tax Obligations | Camuy | $2,449,347.85 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30001731000100702 | Sales Tax Obligations | Catano | $1,966,170.01 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30001831000100701 | Sales Tax Obligations | Cayey | $2,155,024.20 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30001931000100702 | Sales Tax Obligations | Ceiba | $39,924.58 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30001931000100703 | Sales Tax Obligations | Ceiba | $1,502,854.83 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100705 | Sales Tax Obligations | Ciales | $143,399.92 | 7/1/2031 | VARIABLE | P+1.5 | 6.00 |
| 30002031000100702 | Sales Tax Obligations | Ciales | $457,158.27 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30002031000100704 | Sales Tax Obligations | Ciales | $3,010,000.00 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30002131000100702 | Sales Tax Obligations | Cidra | $721,489.69 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30002131000100701 | Sales Tax Obligations | Cidra | $2,070,168.64 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30002231000100705 | Sales Tax Obligations | Coamo | $29,005.75 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100701 | Sales Tax Obligations | Coamo | $138,209.34 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100706 | Sales Tax Obligations | Coamo | $218,143.81 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100704 | Sales Tax Obligations | Coamo | $579,021.97 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30002231000100703 | Sales Tax Obligations | Coamo | $602,019.24 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100702 | Sales Tax Obligations | Coamo | $1,018,351.59 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100708 | Sales Tax Obligations | Coamo | $1,363,781.98 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30002331000100701 | Sales Tax Obligations | Comerio | $2,128,745.39 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30002431000100702 | Sales Tax Obligations | Corozal | $396,870.34 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100701 | Sales Tax Obligations | Corozal | $1,578,546.30 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100703 | Sales Tax Obligations | Corozal | $1,667,595.30 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30002531000100701 | Sales Tax Obligations | Culebra | $419,857.02 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100703 | Sales Tax Obligations | Dorado | $306,029.42 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30002631000100701 | Sales Tax Obligations | Dorado | $2,643,461.01 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002831000100702 | Sales Tax Obligations | Florida | $2,654,665.86 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30002931000100702 | Sales Tax Obligations | Guanica | $610,326.75 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002931000100701 | Sales Tax Obligations | Guanica | $944,965.67 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30002931000100705 | Sales Tax Obligations | Guanica | $927,556.75 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100704 | Sales Tax Obligations | Guayanilla | $371,573.61 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100703 | Sales Tax Obligations | Guayanilla | $2,165,608.54 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003131000100702 | Sales Tax Obligations | Guayanilla | $2,241,237.78 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30003231000100701 | Sales Tax Obligations | Guaynabo | $21,547,494.24 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100704 | Sales Tax Obligations | Gurabo | $12,739.23 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30003531000100703 | Sales Tax Obligations | Hormigueros | $344,094.46 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30003531000100705 | Sales Tax Obligations | Hormigueros | $770,894.92 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30003731000100701 | Sales Tax Obligations | Isabela | $1,507,651.34 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30003831000100704 | Sales Tax Obligations | Jayuya | $845,793.64 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003831000100702 | Sales Tax Obligations | Jayuya | $2,057,613.54 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30003831000100701 | Sales Tax Obligations | Jayuya | $2,613,349.45 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100706 | Sales Tax Obligations | Juana Diaz | $379,481.96 | 7/1/2025 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100703 | Sales Tax Obligations | Juana Diaz | $701,895.63 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100704 | Sales Tax Obligations | Juana Diaz | $749,740.22 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30003931000100701 | Sales Tax Obligations | Juana Diaz | $2,972,833.00 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30004031000100707 | Sales Tax Obligations | Juncos | $180,469.56 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100702 | Sales Tax Obligations | Juncos | $238,312.38 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100701 | Sales Tax Obligations | Juncos | $512,404.53 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100703 | Sales Tax Obligations | Juncos | $664,225.35 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100705 | Sales Tax Obligations | Juncos | $1,097,462.31 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30004131000100704 | Sales Tax Obligations | Lajas | $1,287,195.58 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004131000100702 | Sales Tax Obligations | Lajas | $1,704,951.72 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100703 | Sales Tax Obligations | Las Marias | $392,455.18 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100706 | Sales Tax Obligations | Las Marias | $430,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30004331000100704 | Sales Tax Obligations | Las Marias | $660,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100701 | Sales Tax Obligations | Las Marias | $2,040,999.61 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004431000100704 | Sales Tax Obligations | Las Piedras | $722,698.23 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30004431000100703 | Sales Tax Obligations | Las Piedras | $1,430,241.45 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30004431000100702 | Sales Tax Obligations | Las Piedras | $1,418,041.67 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30004531000100702 | Sales Tax Obligations | Loiza | $315,980.27 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30004631000100701 | Sales Tax Obligations | Luquillo | $1,186,758.14 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100702 | Sales Tax Obligations | Manati | $378,738.94 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100703 | Sales Tax Obligations | Manati | $1,479,104.90 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100701 | Sales Tax Obligations | Manati | $4,628,282.23 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30004831000100704 | Sales Tax Obligations | Maricao | $240,175.82 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30004831000100701 | Sales Tax Obligations | Maricao | $1,472,671.08 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30004831000100706 | Sales Tax Obligations | Maricao | $3,150,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100706 | Sales Tax Obligations | Maunabo | $135,016.63 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100705 | Sales Tax Obligations | Maunabo | $225,554.06 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100704 | Sales Tax Obligations | Maunabo | $474,948.49 | 7/1/2027 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100702 | Sales Tax Obligations | Maunabo | $1,754,317.24 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30004931000100701 | Sales Tax Obligations | Maunabo | $3,808,987.11 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005131000100704 | Sales Tax Obligations | Moca | $379,194.68 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100702 | Sales Tax Obligations | Moca | $1,404,297.07 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100703 | Sales Tax Obligations | Moca | $1,993,793.15 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30005231000100701 | Sales Tax Obligations | Morovis | $397,410.01 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100702 | Sales Tax Obligations | Morovis | $2,115,671.89 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100703 | Sales Tax Obligations | Morovis | $3,299,472.83 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005331000100703 | Sales Tax Obligations | Naguabo | $1,525,293.89 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100706 | Sales Tax Obligations | Naranjito | $1,146,028.08 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100705 | Sales Tax Obligations | Naranjito | $1,264,745.76 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100702 | Sales Tax Obligations | Naranjito | $1,968,346.53 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005531000100705 | Sales Tax Obligations | Orocovis | $14,545.72 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100701 | Sales Tax Obligations | Orocovis | $140,000.00 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100702 | Sales Tax Obligations | Orocovis | $1,465,000.00 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30005631000100703 | Sales Tax Obligations | Patillas | $161,481.72 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30005631000100701 | Sales Tax Obligations | Patillas | $2,022,286.52 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005631000100702 | Sales Tax Obligations | Patillas | $2,900,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100702 | Sales Tax Obligations | Penuelas | $1,209,915.41 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100701 | Sales Tax Obligations | Penuelas | $1,566,163.41 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30005731000100703 | Sales Tax Obligations | Penuelas | $1,778,532.04 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005831000100701 | Sales Tax Obligations | Ponce | $11,490,615.51 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100701 | Sales Tax Obligations | Quebradillas | $1,403,857.13 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100702 | Sales Tax Obligations | Rio Grande | $520,286.05 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30006131000100701 | Sales Tax Obligations | Rio Grande | $3,080,000.00 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30006231000100701 | Sales Tax Obligations | Sabana Grande | $38,652.48 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100705 | Sales Tax Obligations | Salinas | $267,061.48 | 7/1/2023 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100704 | Sales Tax Obligations | Salinas | $784,805.17 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006331000100702 | Sales Tax Obligations | Salinas | $3,184,740.94 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100701 | Sales Tax Obligations | San German | $668,064.28 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006531000100703 | Sales Tax Obligations | San Juan | $8,813,001.71 | 7/1/2021 | VARIABLE | P+1.5 | 6.00 |
| 30006531000100702 | Sales Tax Obligations | San Juan | $26,017,372.33 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30006631000100701 | Sales Tax Obligations | San Lorenzo | $667,638.25 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30006631000100708 | Sales Tax Obligations | San Lorenzo | $1,045,000.00 | 7/1/2037 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100705 | Sales Tax Obligations | San Lorenzo | $2,400,153.14 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100702 | Sales Tax Obligations | San Sebastian | $970,464.59 | 7/1/2032 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100703 | Sales Tax Obligations | San Sebastian | $1,910,588.48 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30006731000100701 | Sales Tax Obligations | San Sebastian | $2,690,000.00 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100702 | Sales Tax Obligations | Santa Isabel | $1,793,078.48 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100701 | Sales Tax Obligations | Santa Isabel | $3,572,384.90 | 7/1/2031 | VARIABLE | N+1.25 | 2.59 |
| 30006931000100702 | Sales Tax Obligations | Toa Alta | $808,064.14 | 7/1/2029 | VARIABLE | P+1.5 | 6.00 |
| 30007031000100701 | Sales Tax Obligations | Toa Baja | $2,837,598.69 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100703 | Sales Tax Obligations | Trujillo Alto | $500,322.35 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30007131000100701 | Sales Tax Obligations | Trujillo Alto | $2,902,315.65 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007231000100701 | Sales Tax Obligations | Utuado | $1,716,616.64 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30007331000100701 | Sales Tax Obligations | Vega Alta | $135,743.55 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100702 | Sales Tax Obligations | Vega Baja | $110,333.51 | 7/1/2033 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100703 | Sales Tax Obligations | Vega Baja | $1,155,437.21 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007431000100701 | Sales Tax Obligations | Vega Baja | $3,303,954.26 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007531000100702 | Sales Tax Obligations | Vieques | $2,403,656.70 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100707 | Sales Tax Obligations | Villalba | $36,480.81 | 7/1/2026 | VARIABLE | P+1.5 | 6.00 |
| 30007631000100704 | Sales Tax Obligations | Villalba | $348,704.78 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100709 | Sales Tax Obligations | Villalba | $310,000.00 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30007631000100703 | Sales Tax Obligations | Villalba | $484,095.02 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100702 | Sales Tax Obligations | Villalba | $502,909.98 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100701 | Sales Tax Obligations | Villalba | $1,175,467.60 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100702 | Sales Tax Obligations | Yabucoa | $27,177.44 | 7/1/2023 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100703 | Sales Tax Obligations | Yabucoa | $2,266,378.91 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100701 | Sales Tax Obligations | Yabucoa | $2,250,569.49 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100706 | Sales Tax Obligations | Yauco | $1,926,075.55 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30007831000100704 | Sales Tax Obligations | Yauco | $2,844,935.85 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100705 | Sales Tax Obligations | Yauco | $3,941,000.00 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30000331500100208 | Municipal Lines of Credit | Aguadilla | $16,092,092.94 | 12/13/2024 | VARIABLE | P+1 | 6.25 |
| 30000731500100201 | Municipal Lines of Credit | Arecibo | $2,529,739.18 | 4/24/2010 | VARIABLE | N+1.25 | 2.59 |
| 30001831500100200 | Municipal Lines of Credit | Cayey | $4,214,440.74 | 7/6/2015 | FIXED | 4.63 | n.a |
| 30002231500100201 | Municipal Lines of Credit | Coamo | $113,709.47 | 2/15/2014 | VARIABLE | P+1.5 | 6.00 |
| 30002931500100301 | Municipal Lines of Credit | Guanica | $343,494.50 | 6/30/2024 | FIXED | 0 | n.a |
| 30002931500100302 | Municipal Lines of Credit | Guanica | $3,658.05 | 6/30/2024 | FIXED | 0 | n.a |
| 30003831500100201 | Municipal Lines of Credit | Jayuya | $998,100.15 | 10/30/2014 | FIXED | 5.5 | n.a |
| 30004031500100202 | Municipal Lines of Credit | Juncos | $8,870,921.14 | 12/31/2017 | FIXED | 6.62 | n.a |
| 30004331500100202 | Municipal Lines of Credit | Las Marias | $92,992.10 | 6/30/2015 | FIXED | 6 | n.a |
| 30006731500100201 | Municipal Lines of Credit | San Sebastian | $2,214,405.56 | 6/30/2007 | VARIABLE | N+1.25 | 5.00 |
| 30000131000100201 | Operational Loans | Adjuntas | $6,463,266.59 | 7/1/2036 | FIXED | 5.3 | n.a |
| 30000331000100201 | Operational Loans | Aguadilla | $1,923,295.95 | 7/1/2026 | VARIABLE | N+1.25 | 2.59 |
| 30000631000100202 | Operational Loans | Anasco | $168,132.52 | 7/1/2021 | VARIABLE | N+1 | 2.34 |
| 30000631000100201 | Operational Loans | Anasco | $1,479,735.22 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30000731000100202 | Operational Loans | Arecibo | $2,428,497.30 | 7/1/2028 | FIXED | 6 | n.a |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30000731000100201 | Operational Loans | Arecibo | $5,680,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30000931000100219 | Operational Loans | Barceloneta | $13,471.91 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100227 | Operational Loans | Barceloneta | $5,890,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30001331000100205 | Operational Loans | Caguas | $2,564,329.95 | 7/1/2023 | VARIABLE | N+1.25 | 2.59 |
| 30001331000100208 | Operational Loans | Caguas | $5,383,999.89 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30001431000100201 | Operational Loans | Camuy | $1,663,388.69 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30002031000100201 | Operational Loans | Ciales | $13,145.15 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30002131000100204 | Operational Loans | Cidra | $890,564.52 | 7/1/2023 | VARIABLE | N+1.25 | 2.59 |
| 30002231000100201 | Operational Loans | Coamo | $4,666,619.99 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30002431000100204 | Operational Loans | Corozal | $318,787.33 | 7/1/2032 | FIXED | 4.88 | n.a |
| 30002931000100205 | Operational Loans | Guanica | $629,966.53 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30003131000100207 | Operational Loans | Guayanilla | $464,063.79 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30003331000100201 | Operational Loans | Gurabo | $1,471,751.22 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30003831000100209 | Operational Loans | Jayuya | $252,835.39 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30003831000100210 | Operational Loans | Jayuya | $284,751.66 | 7/1/2029 | VARIABLE | N+1.25 | 2.59 |
| 30003931000100211 | Operational Loans | Juana Diaz | $346,142.38 | 7/1/2020 | VARIABLE | P+1.5 | 6.00 |
| 30004031000100208 | Operational Loans | Juncos | $1,509,285.82 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100208 | Operational Loans | Las Marias | $12,991.42 | 7/1/2019 | VARIABLE | N+1 | 2.34 |
| 30004331000100203 | Operational Loans | Las Marias | $350,000.00 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |
| 30004331000100201 | Operational Loans | Las Marias | $455,000.00 | 7/1/2028 | FIXED | 6 | n.a |
| 30004531000100205 | Operational Loans | Loiza | $254,719.77 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30004731000100203 | Operational Loans | Manati | $992,932.89 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30004831000100202 | Operational Loans | Maricao | $416,953.73 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30004931000100207 | Operational Loans | Maunabo | $2,138,676.45 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30005131000100203 | Operational Loans | Moca | $161,308.13 | 7/1/2025 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100201 | Operational Loans | Morovis | $86,745.38 | 7/1/2022 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100211 | Operational Loans | Morovis | $442,820.75 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30005231000100207 | Operational Loans | Morovis | $1,255,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005231000100208 | Operational Loans | Morovis | $1,360,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005431000100203 | Operational Loans | Naranjito | $34,708.38 | 7/1/2022 | VARIABLE | P+1.5 | 6.00 |
| 30005431000100205 | Operational Loans | Naranjito | $842,810.69 | 7/1/2035 | VARIABLE | P+1.5 | 6.00 |
| 30005531000100206 | Operational Loans | Orocovis | $40,409.58 | 7/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30005731000100207 | Operational Loans | Penuelas | $480,515.08 | 7/1/2024 | VARIABLE | N+1 | 2.34 |
| 30005731000100201 | Operational Loans | Penuelas | $1,065,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30005731000100205 | Operational Loans | Penuelas | $2,451,000.00 | 7/1/2030 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100207 | Operational Loans | Quebradillas | $300,120.64 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30005931000100205 | Operational Loans | Quebradillas | $1,085,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30006231000100203 | Operational Loans | Sabana Grande | $83,316.04 | 7/1/2019 | VARIABLE | N+1.25 | 2.59 |
| 30006231000100201 | Operational Loans | Sabana Grande | $355,670.33 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30006231000100204 | Operational Loans | Sabana Grande | $860,000.00 | 7/1/2025 | VARIABLE | N+1 | 2.34 |
| 30006331000100201 | Operational Loans | Salinas | $201,881.19 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30006331000100202 | Operational Loans | Salinas | $464,966.49 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30006431000100210 | Operational Loans | San German | $9,757,788.25 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30006631000100202 | Operational Loans | San Lorenzo | $206,180.10 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30006831000100202 | Operational Loans | Santa Isabel | $195,693.82 | 7/1/2024 | VARIABLE | N+1.25 | 2.59 |

| Loan ID | Portfolio | Municipality | Outstanding Principal Amount[1] | Maturity Date[2] | Interest Rate Type | Interest Rate[3] | Floor Rate (%) |
|---|---|---|---|---|---|---|---|
| 30006831000100203 | Operational Loans | Santa Isabel | $1,009,622.11 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007331000100218 | Operational Loans | Vega Alta | $188,183.24 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30007531000100204 | Operational Loans | Vieques | $182,744.47 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007531000100203 | Operational Loans | Vieques | $450,700.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30007531000100202 | Operational Loans | Vieques | $1,390,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100209 | Operational Loans | Villalba | $1,583,961.27 | 7/1/2032 | VARIABLE | N+1.25 | 2.59 |
| 30007731000100208 | Operational Loans | Yabucoa | $148,765.67 | 7/1/2030 | VARIABLE | P+1.5 | 6.00 |
| 30007731000100201 | Operational Loans | Yabucoa | $325,000.00 | 7/1/2026 | VARIABLE | N+1 | 2.34 |
| 30007831000100206 | Operational Loans | Yauco | $35,540.73 | 7/1/2020 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100214 | Operational Loans | Yauco | $370,000.00 | 7/1/2027 | VARIABLE | N+1.25 | 2.59 |
| 30007831000100203 | Operational Loans | Yauco | $569,555.87 | 7/1/2028 | VARIABLE | N+1.25 | 2.59 |
| 30000331000100202 | Revenue Loans | Aguadilla | $5,843,328.29 | 7/1/2028 | VARIABLE | N+1.25 | 5.00 |
| 30000331000100220 | Revenue Loans | Aguadilla | $8,005,298.46 | 7/1/2037 | VARIABLE | P+1.5 | 7.00 |
| 30000931000100220 | Revenue Loans | Barceloneta | $1,300,000.00 | 7/1/2034 | VARIABLE | P+1.5 | 6.00 |
| 30000931000100204 | Revenue Loans | Barceloneta | $3,150,000.00 | 7/1/2028 | VARIABLE | N+1.25 | 5.00 |
| 30001131000100216 | Revenue Loans | Bayamon | $7,200,000.00 | 7/1/2028 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100221 | Revenue Loans | Manati | $5,885,000.00 | 7/1/2038 | VARIABLE | P+1.5 | 6.00 |
| 30004731000100213 | Revenue Loans | Manati | $6,991,584.21 | 7/1/2033 | FIXED | 6 | n.a |
| 30005231000100216 | Revenue Loans | Morovis | $1,318,207.00 | 7/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100205 | Revenue Loans | San German | $47,800.00 | 1/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 30006431000100204 | Revenue Loans | San German | $2,792,483.44 | 7/1/2036 | VARIABLE | P+1.5 | 6.00 |
| 30006831000100206 | Revenue Loans | Santa Isabel | $43,500.00 | 7/1/2019 | FIXED | 6 | n.a |
| 30007131000100205 | Revenue Loans | Trujillo Alto | $3,809,657.17 | 7/1/2033 | FIXED | 7 | n.a |
| 30007331000100212 | Revenue Loans | Vega Alta | $840,000.00 | 7/1/2021 | FIXED | 0 | n.a |
| 30007331000100214 | Revenue Loans | Vega Alta | $263,000.00 | 6/1/2019 | FIXED | 7.63 | n.a |
| 30007331000100215 | Revenue Loans | Vega Alta | $283,000.00 | 6/1/2020 | FIXED | 7.75 | n.a |
| 30007331000100216 | Revenue Loans | Vega Alta | $50,000.00 | 8/1/2020 | FIXED | 7.75 | n.a |
| 30007631000100211 | Revenue Loans | Villalba | $362,974.69 | 7/1/2033 | VARIABLE | N+1.25 | 2.59 |
| 30007631000100213 | Revenue Loans | Villalba | $1,506,541.83 | 7/1/2040 | FIXED | 7 | n.a |

| Loan ID | Entity/Category | Outstanding Principal Amount[4] | Maturity Date[5] | Interest Rate Type | Interest Rate[6] | Floor Rate (%) |
|---|---|---|---|---|---|---|
| 200079215142 | Puerto Rico Highways and Transportation Authority Loans | $133,812,005.07 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215143 | Puerto Rico Highways and Transportation Authority Loans | $121,538,951.31 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215147 | Puerto Rico Highways and Transportation Authority Loans | $397,970,996.83 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215148 | Puerto Rico Highways and Transportation Authority Loans | $110,436,951.62 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 200079215149 | Puerto Rico Highways and Transportation Authority Loans | $16,338,850.34 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151410 | Puerto Rico Highways and Transportation Authority Loans | $37,707,751.95 | 1/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151411 | Puerto Rico Highways and Transportation Authority Loans | $2,673,220.95 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151412 | Puerto Rico Highways and Transportation Authority Loans | $61,712,626.03 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151413 | Puerto Rico Highways and Transportation Authority Loans | $114,855,315.10 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151414 | Puerto Rico Highways and Transportation Authority Loans | $196,841,591.22 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151415 | Puerto Rico Highways and Transportation Authority Loans | $40,334,226.08 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151416 | Puerto Rico Highways and Transportation Authority Loans | $86,732,402.55 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151417 | Puerto Rico Highways and Transportation Authority Loans | $4,747,401.62 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151418 | Puerto Rico Highways and Transportation Authority Loans | $16,170,048.12 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151419 | Puerto Rico Highways and Transportation Authority Loans | $26,518,876.00 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151420 | Puerto Rico Highways and Transportation Authority Loans | $21,680,708.74 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151422 | Puerto Rico Highways and Transportation Authority Loans | $166,200,871.57 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151423 | Puerto Rico Highways and Transportation Authority Loans | $4,533,490.73 | 8/31/2015 | VARIABLE | P+1.5 | 6.00 |
| 2000792151424 | Puerto Rico Highways and Transportation Authority Loans | $49,074,798.55 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151426 | Puerto Rico Highways and Transportation Authority Loans | $9,819,542.36 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151427 | Puerto Rico Highways and Transportation Authority Loans | $32,447,432.79 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151428 | Puerto Rico Highways and Transportation Authority Loans | $58,748,983.31 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |
| 2000792151429 | Puerto Rico Highways and Transportation Authority Loans | $14,006,262.04 | 6/30/2015 | VARIABLE | P+1.5 | 6.00 |
| HTA Bonds | Puerto Rico Highways and Transportation Authority Bonds | $200,000,000.00 | 7/1/2028 | FIXED | 12 | n.a |
| 200055210141 | Ports Authority Reimbursement Obligations | $69,405,014.78 | 12/1/2018 | VARIABLE | P+1.5 | 6.00 |
| 200055210142 | Ports Authority Reimbursement Obligations | $90,058,013.81 | 2/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 200055210143 | Ports Authority Reimbursement Obligations | $36,847,624.60 | 3/1/2019 | VARIABLE | P+1.5 | 6.00 |
| 200055215134 | 2008 Ports Authority Loan | $40,941,805.11 | 6/30/2023 | VARIABLE | P+1.5 | 6.00 |
| 2000552151412 | 2014 Ports Authority Loan | $29,322,720.42 | 12/5/2044 | VARIABLE | P+1.5 | 7.00 |
| 200561215141 | PAA (Loan) | $1,700,000.00 | 10/31/2014 | FIXED | 8 | N/A |
| Port of America Bonds | Commonwealth Guaranteed Loan Asset | $225,533,700.45 | 1/1/2045 | FIXED | 9.52 | N/A |
| Treasury GO2151347 | Commonwealth Loan Assets | $21,095,309.51 | 6/30/2041 | VARIABLE | P+1.5 | 6.00 |
| Treasury GO2151348 | Commonwealth Loan Assets | $63,135,000.00 | 6/30/2042 | VARIABLE | P+1.5 | 6.00 |
| Treasury GO2151353 | Commonwealth Loan Assets | $50,419,093.00 | 6/30/2043 | VARIABLE | P+1.5 | 6.00 |
| Treasury GO2151356 | Commonwealth Loan Assets | $34,788,635.25 | 6/30/2043 | VARIABLE | P+1.5 | 6.00 |
| 200057215141 | 1996 CCDA Loans | $81,401,212.08 | 6/30/2027 | FIXED | 7 | N/A |
| 200057215142 | 1996 CCDA Loans | $57,022,447.09 | 6/30/2027 | FIXED | 7 | N/A |
| 200057215144 | 2013 CCDA Loan | $4,414,379.81 | 9/30/2014 | FIXED | 6 | N/A |
| 200082215142 | 2006 PBA Loan | $49,995,336.92 | 6/30/2018 | FIXED | 7 | N/A |
| 200082215144 | Other PBA Loans | $12,110,751.59 | 6/30/2044 | VARIABLE | P+1.5 | 6.00 |
| 200082215145 | Other PBA Loans | $39,204,590.16 | 6/30/2044 | VARIABLE | P+1.5 | 6.00 |

[4] As of the Cutoff Date, after giving effect to the Closing Date Adjustments and adjusted for payments received on July 2, 2018 (by virtue of rollover to the next business day).

[5] Maturity date sourced from original contractual maturity, not adjusted for Closing Date Adjustments.

[6] "N" means LIBOR and "P" means the Prime Rate.

| Loan ID | Entity/Category | Outstanding Principal Amount[4] | Maturity Date[5] | Interest Rate Type | Interest Rate[6] | Floor Rate (%) |
|---|---|---|---|---|---|---|
| 2000822151410 | Other PBA Loans | $39,408,148.90 | 6/30/2044 | VARIABLE | P+1.5 | 6.00 |
| 200011210141 | Puerto Rico Aqueduct and Sewer Authority | $53,607,940.17 | 3/31/2019 | VARIABLE | P+1.5 | 6.00 |
| 200108210141 | Puerto Rico Industrial Development Company | $24,668,614.07 | 11/1/2024 | VARIABLE | P+1.5 | 6.00 |
| 200108215141 | Puerto Rico Industrial Development Company | $7,130,989.31 | 6/30/2040 | FIXED | 7 | N/A |
| 200108215142 | Puerto Rico Industrial Development Company | $8,208,135.24 | 6/30/2040 | FIXED | 7 | N/A |
| 200108215143 | Puerto Rico Industrial Development Company | $13,108,811.09 | 6/30/2040 | FIXED | 7 | N/A |
| 200080215141 | Puerto Rico Solid Waste Management Authority | $4,955,409.20 | 6/30/2040 | FIXED | 7 | N/A |
| 200080215142 | Puerto Rico Solid Waste Management Authority | $14,341,884.49 | 6/30/2018 | FIXED | 7 | N/A |
| 200080215143 | Puerto Rico Solid Waste Management Authority | $5,208,369.98 | 6/30/2018 | FIXED | 7 | N/A |
| 200080215144 | Puerto Rico Solid Waste Management Authority | $25,786,980.93 | 6/30/2040 | FIXED | 7 | N/A |
| 200566215141 | Port Authority of Ponce | $20,762,619.12 | 6/30/2044 | FIXED | 1/7/1900 | N/A |
| AFV Rev | Repurchase Agreement | $19,611,048.73 | 1/13/2017 | FIXED | 3 | N/A |
| 200271215131 | Fund for the Agricultural Development of Puerto Rico | $15,287,457.81 | 3/1/2027 | VARIABLE | N+1.25 | 5.00 |
| 200556215141 | Interagency Committee | $995,449.28 | 3/14/2013 | VARIABLE | P+2 | 6.50 |
| Private | Other Private Loans | $339,948.37 | N/A | N/A | N/A | N/A |
| Mortgage | Mortgage Loans | $131,917.96 | N/A | N/A | N/A | N/A |

---

[1] "N" means the London Interbank Offered Rate ("LIBOR"). "P" means the U.S. Prime Rate ("Prime").

**APPENDIX C: GDB RETAINED LOANS**

| Loan ID | Entity | Outstanding Balance[7] | Maturity Date | Interest Rate Type[1] | Interest Rate | Floor Rate (%) |
|---|---|---|---|---|---|---|
| 200003215131 | Puerto Rico Medical Services Administration | $282,447,691.65 | 11/30/2022 | VARIABLE | P+1.5 | 6.00 |
| 200277215141 | Special Communities Perpetual Trust | $240,708,020.23 | 6/30/2040 | FIXED | 7 | N/A |
| 200006215131 | Puerto Rico Health Insurance Administration | $182,196,066.45 | 10/31/2022 | VARIABLE | P+1.5 | 6.00 |
| 200543215141 | Puerto Rico Comprehensive Cancer Center | $31,932,463.76 | 10/31/2021 | FIXED | 6 | N/A |
| 200543215142 | Puerto Rico Comprehensive Cancer Center | $88,549,933.86 | 12/31/2043 | VARIABLE | P+2 | 6.50 |
| 200243215141 | 2002 CRIM Loan | $27,345,225.14 | 7/1/2032 | VARIABLE | N+1.25 | N/A |
| 200243215141P | 2001 CRIM Loan | $74,878,370.07 | 7/1/2032 | VARIABLE | N+1.25 | N/A |
| TDF St. Regis | Puerto Rico Tourism Development Fund | $16,742,815.96 | N/A | N/A | N/A | N/A |
| TDF Rio Mar | Puerto Rico Tourism Development Fund | $17,900,928.01 | N/A | N/A | N/A | N/A |
| TDF Condado Duo | Puerto Rico Tourism Development Fund | $10,282,254.21 | N/A | N/A | N/A | N/A |
| 200061215141 | Economic Development Bank Loan | $6,556,582.87 | 6/1/2026 | FIXED | 6 | N/A |
| 200061Overnight | Economic Development Bank Deposit | $35,122,199.76 | N/A | N/A | N/A | N/A |
| 200022215141 | Cantera Peninsula Integral Development Company | $8,797,013.77 | 6/30/2040 | FIXED | 7 | N/A |
| 200022215142 | Cantera Peninsula Integral Development Company | $28,994,073.76 | 6/30/2040 | FIXED | 7 | N/A |
| 200592151420 | Puerto Rico Infrastructure Financing Authority (PRIFA) | $37,361,150.22 | 6/30/2017 | VARIABLE | P+1.5 | 6.00 |
| 200549215142 | 2001 CRIM Loan | $26,860,125.74 | 7/1/2032 | FIXED | 5.83 | N/A |
| 200272215133 | SMU Loan | $8,988,973.42 | 6/30/2025 | VARIABLE | P+1.5 | 6.00 |
| 200551215131 | Puerto Rico Public-Private Partnerships Authority | $6,159,176.94 | 1/31/2016 | VARIABLE | P+1.5 | 6.00 |

[7] As of the Cutoff Date, after giving effect to the Closing Date Adjustments and adjusted for any payments received on July 2, 2018 (by virtue of rollover to the next business day after the Cutoff Date).

## APPENDIX D: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS
### ($ IN MILLIONS)

The Municipal Loan Assets comprise five types of Loans issued by GDB to municipalities, characterized by their source of repayment. This Municipal Loans Collection Schedule is prepared based upon the aggregate amortization and interest schedules for the Municipal Loan Assets classified as performing as of the Cutoff Date (excludes the Municipal Lines of Credit, all of which are non-performing as of the Cutoff Date), determined by the terms of the individual loan agreements, including the contractual interest rates applicable to the individual Loans, and assuming compliance with such schedules. A forward interest rate curve is applied to all Loans with variable interest rates. The forward interest curve is based on the annual forward rates for 3-month LIBOR and Prime rates, respectively, based on annual update from Bloomberg shown on the following page.

| Payment Date | Municipal Loans Assets (Principal and Interest) | | | | Scheduled Total Collections |
|---|---|---|---|---|---|
| | Municipal General Obligations | Sales Tax Obligations | Operational Loans | Revenue Loans | |
| Jan-19 | 25.5 | 9.1 | 2.0 | 5.3 | 41.9 |
| Jul-19 | 62.4 | 28.2 | 8.1 | 3.7 | 102.3 |
| Jan-20 | 24.3 | 8.1 | 1.9 | 1.5 | 35.8 |
| Jul-20 | 62.8 | 28.7 | 8.0 | 3.7 | 103.2 |
| Jan-21 | 22.9 | 7.5 | 1.7 | 1.4 | 33.5 |
| Jul-21 | 63.1 | 28.6 | 7.9 | 3.5 | 103.1 |
| Jan-22 | 21.6 | 6.9 | 1.6 | 1.3 | 31.4 |
| Jul-22 | 63.6 | 26.7 | 8.1 | 3.5 | 101.9 |
| Jan-23 | 20.2 | 6.4 | 1.4 | 1.3 | 29.2 |
| Jul-23 | 65.3 | 27.0 | 7.7 | 3.6 | 103.7 |
| Jan-24 | 18.8 | 5.8 | 1.3 | 1.2 | 27.1 |
| Jul-24 | 66.6 | 27.2 | 7.5 | 4.2 | 105.5 |
| Jan-25 | 17.2 | 5.3 | 1.1 | 1.1 | 24.6 |
| Jul-25 | 66.2 | 27.1 | 7.4 | 3.6 | 104.3 |
| Jan-26 | 15.6 | 4.7 | 1.0 | 1.0 | 22.4 |
| Jul-26 | 63.4 | 27.7 | 7.0 | 3.7 | 101.8 |
| Jan-27 | 14.2 | 4.1 | 0.8 | 0.9 | 20.1 |
| Jul-27 | 61.5 | 28.0 | 5.4 | 3.8 | 98.7 |
| Jan-28 | 12.8 | 3.5 | 0.7 | 0.9 | 17.9 |
| Jul-28 | 61.6 | 26.4 | 4.1 | 9.3 | 101.3 |
| Jan-29 | 11.0 | 2.9 | 0.6 | 0.6 | 15.1 |
| Jul-29 | 61.8 | 23.5 | 3.2 | 2.4 | 90.9 |
| Jan-30 | 9.4 | 2.3 | 0.5 | 0.5 | 12.8 |
| Jul-30 | 59.7 | 23.0 | 2.9 | 2.5 | 88.0 |
| Jan-31 | 7.8 | 1.8 | 0.5 | 0.4 | 10.5 |
| Jul-31 | 57.8 | 21.0 | 2.7 | 2.6 | 84.1 |
| Jan-32 | 6.1 | 1.2 | 0.4 | 0.4 | 8.2 |
| Jul-32 | 51.1 | 16.1 | 2.7 | 2.6 | 72.6 |
| Jan-33 | 4.6 | 0.8 | 0.3 | 0.3 | 6.0 |
| Jul-33 | 41.5 | 10.2 | 2.6 | 2.6 | 56.9 |
| Jan-34 | 3.3 | 0.5 | 0.3 | 0.2 | 4.2 |
| Jul-34 | 36.2 | 8.1 | 2.1 | 1.7 | 48.0 |
| Jan-35 | 2.1 | 0.2 | 0.2 | 0.2 | 2.7 |
| Jul-35 | 25.4 | 5.2 | 2.2 | 1.6 | 34.4 |
| Jan-36 | 1.3 | 0.1 | 0.1 | 0.1 | 1.6 |
| Jul-36 | 19.5 | 1.1 | 1.8 | 1.6 | 24.0 |
| Jan-37 | 0.6 | 0.0 | 0.1 | 0.1 | 0.8 |
| Jul-37 | 10.2 | 0.4 | 1.6 | 1.0 | 13.2 |
| Jan-38 | 0.3 | 0.0 | 0.0 | 0.0 | 0.3 |
| Jul-38 | 8.0 | 0.1 | 0.9 | 0.6 | 9.6 |
| Jan-39 | 0.0 | – | – | 0.0 | 0.0 |
| Jul-39 | 0.3 | – | – | 0.1 | 0.4 |
| Jan-40 | – | – | – | 0.0 | 0.0 |
| Jul-40 | – | – | – | 0.1 | 0.1 |
| **Total** | **$1,247.3** | **$455.6** | **$110.5** | **$80.7** | **$1,894.1** |

| Forward Interest Curve | | |
|---|---|---|
| Date | Prime | 3 Month Libor |
| | Basis Adj Fwd (%) | Forward Rate (%) |
| 6/19/2018 | 5.03 | 2.33 |
| 6/19/2019 | 5.68 | 2.92 |
| 6/21/2021 | 5.61 | 2.94 |
| 6/20/2022 | 5.62 | 2.92 |
| 6/19/2023 | 5.59 | 2.92 |
| 6/19/2024 | 5.61 | 2.94 |
| 6/19/2025 | 5.56 | 2.98 |
| 6/19/2026 | 5.59 | 3.01 |
| 6/21/2027 | 5.61 | 3.03 |
| 6/19/2028 | 5.69 | 3.11 |
| 6/19/2029 | 5.61 | 3.03 |
| 6/19/2030 | 5.62 | 3.03 |
| 6/19/2031 | 5.62 | 3.03 |
| 6/21/2032 | 5.61 | 3.03 |
| 6/20/2033 | 5.58 | 3.00 |
| 6/19/2034 | 5.57 | 2.99 |
| 6/19/2035 | 5.56 | 2.98 |
| 6/19/2036 | 5.55 | 2.96 |
| 6/19/2037 | 5.53 | 2.95 |
| 6/21/2038 | 5.48 | 2.90 |
| 6/20/2039 | 5.47 | 2.88 |
| 6/19/2040 | 5.45 | 2.86 |
| 6/19/2041 | 5.43 | 2.84 |
| 6/19/2042 | 5.40 | 2.82 |

| Bloomberg Assumptions | | |
|---|---|---|
| | Prime | Libor |
| Screen | IVCS 86 | IVCS 23 |
| Interval | 1 yr | 1 yr |
| Up to | 25 yrs | 25 yrs |

# APPENDIX E: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS, THE ADDITIONAL RECOVERY AUTHORITY LOANS AND PROCEEDS FROM THE SALE OF REAL PROPERTY ASSETS
## ($ IN MILLIONS)

Collections on the Restructuring Property included in the following Collection Schedule are limited to scheduled payments on the Loans classified as performing as of the Cutoff Date (*i.e.*, performing Municipal Loan Assets and Additional Recovery Authority Loans), projected sales of the Real Property Assets and the distributable Cash Assets received from GDB on the Closing Date. Collections from non-performing Restructuring Property Loans and non-performing GDB Retained Loans have not been included in the Collection Schedule. The scheduled Collections are not guarantees of future performance. While evaluating the Collection Schedule, Bondholders should carefully consider "*Cautionary Statement Concerning Forward-Looking Statements and Hypothetical Scenarios*" in this Offering Memorandum.

| Payment Date | Scheduled Collection from Municipal Loans Assets (Principal and Interest) | Additional Recovery Authority Loans[1] | Proceeds from Sale of Real Property Assets[2] | Cash Assets | Scheduled Total Collections[3] |
|---|---|---|---|---|---|
| Dec-18 | – | – | – | $492.7 | $492.7 |
| Jan-19 | 41.9 | 0.4 | 13.4 | – | 55.7 |
| Jul-19 | 102.3 | 4.6 | 20.4 | – | 127.3 |
| Jan-20 | 35.8 | 3.9 | – | – | 39.7 |
| Jul-20 | 103.2 | 6.5 | – | – | 109.7 |
| Jan-21 | 33.5 | 5.7 | – | – | 39.2 |
| Jul-21 | 103.1 | 8.4 | – | – | 111.4 |
| Jan-22 | 31.4 | 5.6 | – | – | 37.0 |
| Jul-22 | 101.9 | 8.4 | – | – | 110.3 |
| Jan-23 | 29.2 | 5.6 | – | – | 34.8 |
| Jul-23 | 103.7 | 8.4 | – | – | 112.0 |
| Jan-24 | 27.1 | 4.5 | – | – | 31.6 |
| Jul-24 | 105.5 | 7.3 | – | – | 112.8 |
| Jan-25 | 24.6 | 4.4 | – | – | 29.1 |
| Jul-25 | 104.3 | 7.3 | – | – | 111.6 |
| Jan-26 | 22.4 | 4.4 | – | – | 26.7 |
| Jul-26 | 101.8 | 7.3 | – | – | 109.1 |
| Jan-27 | 20.1 | 4.3 | – | – | 24.4 |
| Jul-27 | 98.7 | 6.3 | – | – | 105.0 |
| Jan-28 | 17.9 | 4.3 | – | – | 22.2 |
| Jul-28 | 101.3 | 6.2 | – | – | 107.6 |
| Jan-29 | 15.1 | 4.3 | – | – | 19.4 |
| Jul-29 | 90.9 | 6.2 | – | – | 97.1 |
| Jan-30 | 12.8 | 4.2 | – | – | 17.0 |
| Jul-30 | 88.0 | 6.2 | – | – | 94.2 |
| Jan-31 | 10.5 | 4.2 | – | – | 14.7 |
| Jul-31 | 84.1 | 6.2 | – | – | 90.3 |
| Jan-32 | 8.2 | 4.2 | – | – | 12.3 |
| Jul-32 | 72.6 | 8.1 | – | – | 80.7 |
| Jan-33 | 6.0 | 11.5 | – | – | 17.5 |
| Jul-33 | 56.9 | – | – | – | 56.9 |
| Jan-34 | 4.2 | – | – | – | 4.2 |
| Jul-34 | 48.0 | – | – | – | 48.0 |
| Jan-35 | 2.7 | – | – | – | 2.7 |
| Jul-35 | 34.4 | – | – | – | 34.4 |
| Jan-36 | 1.6 | – | – | – | 1.6 |
| Jul-36 | 24.0 | – | – | – | 24.0 |
| Jan-37 | 0.8 | – | – | – | 0.8 |
| Jul-37 | 13.2 | – | – | – | 13.2 |
| Jan-38 | 0.3 | – | – | – | 0.3 |
| Jul-38 | 9.6 | – | – | – | 9.6 |
| Jan-39 | 0.0 | – | – | – | 0.0 |
| Jul-39 | 0.4 | – | – | – | 0.4 |
| Jan-40 | 0.0 | – | – | – | 0.0 |
| Jul-40 | 0.1 | – | – | – | 0.1 |
| **Total** | **$1,894.1** | **$168.7** | **$33.8** | **$492.7** | **$2,589.2** |

[1] Assumes collections on the Additional Recovery Authority Loans in accordance with their contracted amortization schedules, provided that no Collections are assumed with respect to the portion of the 2001 CRIM Loan that had been placed by GDB on non-accrual status as of the Cutoff Date, consisting of approximately $26.9 million, and provided further that the scheduled Collections assume an application of a two year principal moratorium on the 2001 CRIM Loan and the 2002 CRIM Loan.

As with the Municipal Loans Collection Schedule, the scheduled Collections for performing Additional Recovery Authority Loans on this Collection Schedule are prepared based upon the aggregate amortization and interest schedules for such Loans, determined by the individual loan agreements, including the contractual interest rates applicable to the individual Loans, assuming compliance with such schedules, as described in further detail in "*The Restructuring Property—Summary Characteristics of the Restructuring Property—GDB Retained Loan Rights*."

[2] Scheduled Collections on the Real Property Assets have been included with consideration for the impact of Hurricanes Irma and María and have been valued with the assistance of commercial real estate servicers assuming liquidation of the Real Property Assets by June 2020.

[3] Includes interest on cash balance in the Collection Account at a rate of 0.25%. The distribution of cash on the Special First Payment Date does not include any accrued interest.

**APPENDIX F: HYPOTHETICAL AMORTIZATION OF THE NEW BONDS**

The following examples illustrate how the payments on the New Bonds could be applied for each New Bond until the Final Scheduled Payment Date. The payments provided for in the tables below reflect the Collections on the Municipal Loan Assets, the Additional Recovery Authority Loans, proceeds from the sale of Real Property Assets, and distribution of Cash Assets in accordance with Appendix E hereto. The tables below assume that no amounts will be collected on any of the other Restructuring Property. If Collections are generated in respect of such other Restructuring Property or if the currently performing assets become non-performing, then the tables below could materially change.

The tables below are for illustrative purposes only and are not guarantees of future performance. While evaluating the table below, Bondholders should carefully consider "*Cautionary Statement Concerning Forward-Looking Statements and Hypothetical Scenarios*" in this Offering Memorandum.

**Certain Important Assumptions**

The tables below assume that all Collections on the Municipal Loan Assets, the Additional Recovery Authority Loans and the Real Property Assets will follow the Collection Schedule as detailed in Appendix E hereto. However, if the timing or amount of Collections deviate from such Collection Schedule, or any of the other assumptions described herein change, such deviations or changes could have a material adverse effect on expected payments on the New Bonds.

In addition, the tables below assume:

- *Closing Date:* December 1, 2018.

- *Issuer Expenses*: The Issuer will incur expenses for its Board of Trustees as laid out in the GDB Fiscal Plan, as adjusted for the negotiated compensation arrangements described herein. Fee arrangements are forecasted through 2027, at which time expenses are shown herein as declining linearly to $100,000 on a semi-annual basis by fiscal year 2040.

- *Size of the Closing Date Distribution:* $490.3 million, paid on the Special First Payment Date.

- *2015-17 Excess CAE Settlement Amount:* $21.6 million, paid on or prior to the Closing Date.

- *Interest on Cash Balances:* 0.25%, as described in the GDB Fiscal Plan.

- *Additional Bonds.* The Issuer does not issue any Additional Bonds after the Closing Date.

Subsequent to the Cutoff Date, certain developments, including the Committee Settlement Stipulation, the Siemens Settlement, the San Juan Settlement, the sale of Real Property Assets and the accrual of additional Collections, have occurred, each of which may change the hypothetical scenario analysis presented herein; however, GDB believes that the aggregate effect of such subsequent developments will not materially change such hypothetical scenario analysis. For additional information, see "*The Restructuring Property*" and "*Litigation*" in this Offering Memorandum. The aggregate principal amount of New Bonds to be issued on the Closing Date is expected to be $2,597,754,625.

Numbers in the tables below have been rounded for ease of analysis. These examples do not take into account any tax consequences from holding the New Bonds. All dates included below are subject to the business day convention.

***Hypothetical Aggregate Collections and Payments on the New Bonds.*** The table below presents the hypothetical aggregate Collections on the Restructuring Property, hypothetical Issuer Expenses withheld in reserve, hypothetical Available Cash for distribution to the Bondholders and the hypothetical amount of cash to be distributed to the Bondholders as a whole on all of the New Bonds, subject to the assumptions described above. This scenario reflects that the hypothetical Collections will not be sufficient to pay interest and principal on the New Bonds in full and that, as a result of PIK Amounts, the aggregate outstanding principal amount of the New Bonds on their maturity date would be higher than their initial principal amount.

If any of the assumptions described above were to change, such change could have a material impact on the table below. Numbers below are in millions.

| Payment Date | Hypothetical Collections | Issuer Expense Reserve Withheld | Available Cash | New Bonds | | | |
|---|---|---|---|---|---|---|---|
| | | | | Interest Paid in Cash | Principal Paid in Cash | PIK Accrued Per Period | Total Ending Principal |
| Dec-18 | $492.7 | ($2.4) | $490.3 | – | $490.3 | – | $2,090.2 |
| Feb-19 | 55.7 | (4.7) | 51.1 | $39.2 | 11.9 | – | 2,078.3 |
| Aug-19 | 127.3 | (4.2) | 123.1 | 77.9 | 45.1 | – | 2,033.2 |
| Feb-20 | 39.7 | (3.8) | 35.9 | 35.9 | – | $40.4 | 2,073.6 |
| Aug-20 | 109.7 | (4.2) | 105.5 | 77.8 | 27.8 | – | 2,045.8 |
| Feb-21 | 39.2 | (3.7) | 35.4 | 35.4 | – | 41.3 | 2,087.1 |
| Aug-21 | 111.4 | (4.1) | 107.3 | 78.3 | 29.1 | – | 2,058.0 |
| Feb-22 | 37.0 | (3.7) | 33.3 | 33.3 | – | 43.8 | 2,101.9 |
| Aug-22 | 110.3 | (4.0) | 106.2 | 78.8 | 27.4 | – | 2,074.4 |
| Feb-23 | 34.8 | (3.6) | 31.2 | 31.2 | – | 46.6 | 2,121.0 |
| Aug-23 | 112.0 | (3.9) | 108.1 | 79.5 | 28.5 | – | 2,092.5 |
| Feb-24 | 31.6 | (3.5) | 28.1 | 28.1 | – | 50.4 | 2,142.9 |
| Aug-24 | 112.8 | (3.9) | 108.9 | 80.4 | 28.5 | – | 2,114.3 |
| Feb-25 | 29.1 | (3.4) | 25.7 | 25.7 | – | 53.6 | 2,167.9 |
| Aug-25 | 111.6 | (3.8) | 107.9 | 81.3 | 26.6 | – | 2,141.4 |
| Feb-26 | 26.7 | (3.3) | 23.4 | 23.4 | – | 56.9 | 2,198.2 |
| Aug-26 | 109.1 | (3.7) | 105.4 | 82.4 | 23.0 | – | 2,175.3 |
| Feb-27 | 24.4 | (3.2) | 21.2 | 21.2 | – | 60.4 | 2,235.7 |
| Aug-27 | 105.0 | (3.1) | 101.9 | 83.8 | 18.1 | – | 2,217.6 |
| Feb-28 | 22.2 | (2.9) | 19.3 | 19.3 | – | 63.9 | 2,281.4 |
| Aug-28 | 107.6 | (2.8) | 104.8 | 85.6 | 19.2 | – | 2,262.2 |
| Feb-29 | 19.4 | (2.6) | 16.8 | 16.8 | – | 68.1 | 2,330.3 |
| Aug-29 | 97.1 | (2.5) | 94.7 | 87.4 | 7.3 | – | 2,323.0 |
| Feb-30 | 17.0 | (2.3) | 14.7 | 14.7 | – | 72.4 | 2,395.4 |
| Aug-30 | 94.2 | (2.2) | 92.1 | 89.8 | 2.2 | – | 2,393.2 |
| Feb-31 | 14.7 | (2.0) | 12.7 | 12.7 | – | 77.1 | 2,470.2 |
| Aug-31 | 90.3 | (1.9) | 88.4 | 88.4 | – | 4.2 | 2,474.5 |
| Feb-32 | 12.3 | (1.7) | 10.6 | 10.6 | – | 82.2 | 2,556.6 |
| Aug-32 | 80.7 | (1.6) | 79.2 | 79.2 | – | 16.7 | 2,573.3 |
| Feb-33 | 17.5 | (1.4) | 16.1 | 16.1 | – | 80.4 | 2,653.8 |
| Aug-33 | 56.9 | (1.3) | 55.6 | 55.6 | – | 43.9 | 2,697.6 |
| Feb-34 | 4.2 | (1.1) | 3.1 | 3.1 | – | 98.0 | 2,795.7 |
| Aug-34 | 48.0 | (1.0) | 47.0 | 47.0 | – | 57.8 | 2,853.5 |
| Feb-35 | 2.7 | (0.8) | 1.9 | 1.9 | – | 105.1 | 2,958.6 |
| Aug-35 | 34.4 | (0.7) | 33.7 | 33.7 | – | 77.2 | 3,035.8 |
| Feb-36 | 1.6 | (0.5) | 1.1 | 1.1 | – | 112.8 | 3,148.6 |
| Aug-36 | 24.0 | (0.4) | 23.6 | 23.6 | – | 94.5 | 3,243.1 |
| Feb-37 | 0.8 | (0.4) | 0.4 | 0.4 | – | 121.2 | 3,364.2 |
| Aug-37 | 13.2 | (0.4) | 12.9 | 12.9 | – | 113.3 | 3,477.5 |
| Feb-38 | 0.3 | (0.4) | – | – | – | 130.4 | 3,607.9 |
| Aug-38 | 9.6 | (0.4) | 9.2 | 9.2 | – | 126.1 | 3,734.0 |
| Feb-39 | 0.0 | (0.4) | – | – | – | 140.0 | 3,874.0 |
| Aug-39 | 0.4 | (0.4) | – | – | – | 145.3 | 4,019.3 |
| Feb-40 | 0.0 | (0.4) | – | – | – | 150.7 | 4,170.0 |
| Aug-40 | 0.1 | – | – | – | – | 156.4 | 4,326.4 |
| **Total** | **$2,589.2** | **($102.1)** | **$2,487.8** | **$1,702.8** | **$785.0** | **$2,530.9** | **N/A** |

***Hypothetical Aggregate Collections and Payments on $1,000 of New Bonds.*** The table below presents the hypothetical aggregate Collections on the Restructuring Property, hypothetical Issuer Expenses withheld in reserve, hypothetical Available Cash for distribution to the Bondholders and the hypothetical amount of cash to be received by a Bondholder holding $1,000 in New Bonds as of the Closing Date, subject to the assumptions described above. Furthermore, the following table assumes that New Bonds are issued in the aggregate principal amount of approximately $2,580.5 million. This scenario reflects that a Bondholder holding $1,000 in New Bonds on the Closing Date would receive approximately $661.50 in cash interest and approximately $298.90 in cash principal payments through the Final Scheduled Payment Date, as the hypothetical Collections would not be sufficient to pay interest and principal on the New Bonds in full and that, as a result of PIK Amounts, the aggregate outstanding principal amount of the New Bonds on the Final Scheduled Payment Date would be approximately $1,676.60 (higher than the initial principal amount of $1,000).

If any of the assumptions described above were to change, such change could have a material impact on the table below. Only the numbers below under "Hypothetical Collections," "Issuer Expense Reserve Withheld" and "Available Cash" are in millions.

| Payment Date | Hypothetical Collections | Issuer Expense Reserve Withheld | Available Cash | Per $1,000 in New Bonds | | | |
|---|---|---|---|---|---|---|---|
| | | | | Interest Paid in Cash | Principal Paid in Cash | PIK Accrued Per Period | Total Ending Principal |
| Dec-18 | $492.7 | ($2.4) | $490.3 | – | $190.0 | – | $810.0 |
| Feb-19 | 55.7 | (4.7) | 51.1 | $15.2 | 4.6 | – | 805.4 |
| Aug-19 | 127.3 | (4.2) | 123.1 | 30.2 | 17.5 | – | 787.9 |
| Feb-20 | 39.7 | (3.8) | 35.9 | 13.9 | – | $15.6 | 803.6 |
| Aug-20 | 109.7 | (4.2) | 105.5 | 30.1 | 10.8 | – | 792.8 |
| Feb-21 | 39.2 | (3.7) | 35.4 | 13.7 | – | 16.0 | 808.8 |
| Aug-21 | 111.4 | (4.1) | 107.3 | 30.3 | 11.3 | – | 797.5 |
| Feb-22 | 37.0 | (3.7) | 33.3 | 12.9 | – | 17.0 | 814.5 |
| Aug-22 | 110.3 | (4.0) | 106.2 | 30.5 | 10.6 | – | 803.9 |
| Feb-23 | 34.8 | (3.6) | 31.2 | 12.1 | – | 18.1 | 821.9 |
| Aug-23 | 112.0 | (3.9) | 108.1 | 30.8 | 11.1 | – | 810.9 |
| Feb-24 | 31.6 | (3.5) | 28.1 | 10.9 | – | 19.5 | 830.4 |
| Aug-24 | 112.8 | (3.9) | 108.9 | 31.1 | 11.1 | – | 819.4 |
| Feb-25 | 29.1 | (3.4) | 25.7 | 10.0 | – | 20.8 | 840.1 |
| Aug-25 | 111.6 | (3.8) | 107.9 | 31.5 | 10.3 | – | 829.8 |
| Feb-26 | 26.7 | (3.3) | 23.4 | 9.1 | – | 22.0 | 851.9 |
| Aug-26 | 109.1 | (3.7) | 105.4 | 31.9 | 8.9 | – | 843.0 |
| Feb-27 | 24.4 | (3.2) | 21.2 | 8.2 | – | 23.4 | 866.4 |
| Aug-27 | 105.0 | (3.1) | 101.9 | 32.5 | 7.0 | – | 859.4 |
| Feb-28 | 22.2 | (2.9) | 19.3 | 7.5 | – | 24.8 | 884.1 |
| Aug-28 | 107.6 | (2.8) | 104.8 | 33.2 | 7.5 | – | 876.7 |
| Feb-29 | 19.4 | (2.6) | 16.8 | 6.5 | – | 26.4 | 903.0 |
| Aug-29 | 97.1 | (2.5) | 94.7 | 33.9 | 2.8 | – | 900.2 |
| Feb-30 | 17.0 | (2.3) | 14.7 | 5.7 | – | 28.1 | 928.3 |
| Aug-30 | 94.2 | (2.2) | 92.1 | 34.8 | 0.9 | – | 927.4 |
| Feb-31 | 14.7 | (2.0) | 12.7 | 4.9 | – | 29.9 | 957.3 |
| Aug-31 | 90.3 | (1.9) | 88.4 | 34.3 | – | 1.6 | 958.9 |
| Feb-32 | 12.3 | (1.7) | 10.6 | 4.1 | – | 31.8 | 990.8 |
| Aug-32 | 80.7 | (1.6) | 79.2 | 30.7 | – | 6.5 | 997.2 |
| Feb-33 | 17.5 | (1.4) | 16.1 | 6.2 | – | 31.2 | 1,028.4 |
| Aug-33 | 56.9 | (1.3) | 55.6 | 21.6 | – | 17.0 | 1,045.4 |
| Feb-34 | 4.2 | (1.1) | 3.1 | 1.2 | – | 38.0 | 1,083.4 |
| Aug-34 | 48.0 | (1.0) | 47.0 | 18.2 | – | 22.4 | 1,105.8 |
| Feb-35 | 2.7 | (0.8) | 1.9 | 0.7 | – | 40.7 | 1,146.5 |
| Aug-35 | 34.4 | (0.7) | 33.7 | 13.1 | – | 29.9 | 1,176.5 |
| Feb-36 | 1.6 | (0.5) | 1.1 | 0.4 | – | 43.7 | 1,220.2 |
| Aug-36 | 24.0 | (0.4) | 23.6 | 9.2 | – | 36.6 | 1,256.8 |
| Feb-37 | 0.8 | (0.4) | 0.4 | 0.2 | – | 47.0 | 1,303.7 |
| Aug-37 | 13.2 | (0.4) | 12.9 | 5.0 | – | 43.9 | 1,347.6 |
| Feb-38 | 0.3 | (0.4) | – | – | – | 50.5 | 1,398.2 |
| Aug-38 | 9.6 | (0.4) | 9.2 | 3.6 | – | 48.9 | 1,447.0 |
| Feb-39 | 0.0 | (0.4) | – | – | – | 54.3 | 1,501.3 |
| Aug-39 | 0.4 | (0.4) | – | – | – | 56.3 | 1,557.6 |
| Feb-40 | 0.0 | (0.4) | – | – | – | 58.4 | 1,616.0 |
| Aug-40 | 0.1 | – | – | – | – | 60.6 | 1,676.6 |
| **Total** | **$2,589.2** | **($102.1)** | **$2,487.8** | **$659.9** | **$304.2** | **$980.8** | **N/A** |

***Hypothetical Aggregate Collections and Payments on $1,000 of Participating Bond Claims.*** The table below presents the hypothetical aggregate Collections on the Restructuring Property, hypothetical Issuer Expenses withheld in reserve, hypothetical Available Cash for distribution to the Bondholders and the hypothetical amount of cash to be received by any Bondholder who had $1,000 in Participating Bond Claims (calculated to include principal plus unpaid interest accrued up to but not including the Closing Date in respect of the GDB Bonds and the Guaranteed Bonds (each as defined in the Solicitation Statement)), subject to the assumptions described above. A Bondholder who has $1,000 in Participating Bond Claims on the Closing Date would receive $550 in New Bonds. Furthermore, the following table assumes that New Bonds are issued in the aggregate principal amount of approximately $2,580.5 million. This scenario reflects that a Bondholder holding $1,000 in Participating Bond Claims ($550 in New Bonds) on the Closing Date would receive approximately $363.80 in cash interest and $164.40 in cash principal payments through the Final Scheduled Payment Date, as the hypothetical Collections would not be sufficient to pay interest and principal on the New Bonds in full and that, as a result of PIK Amounts, the aggregate outstanding principal amount of the New Bonds on the Final Scheduled Payment Date would be $922.10 (higher than the initial principal amount of $550).

If any of the assumptions described above were to change, such change could have a material impact on the table below. Only the numbers below under "Hypothetical Collections," "Issuer Expense Reserve Withheld" and "Available Cash" are in millions.

| Payment Date | Hypothetical Collections | Issuer Expense Reserve Withheld | Available Cash | Per $550 in New Bonds | | | |
|---|---|---|---|---|---|---|---|
| | | | | Interest Paid in Cash | Principal Paid in Cash | PIK Accrued Per Period | Total Ending Principal |
| Dec-18 | $492.7 | ($2.4) | $490.3 | – | $104.5 | – | $445.5 |
| Feb-19 | 55.7 | (4.7) | 51.1 | $8.4 | 2.5 | – | 443.0 |
| Aug-19 | 127.3 | (4.2) | 123.1 | 16.6 | 9.6 | – | 433.4 |
| Feb-20 | 39.7 | (3.8) | 35.9 | 7.7 | – | $8.6 | 442.0 |
| Aug-20 | 109.7 | (4.2) | 105.5 | 16.6 | 5.9 | – | 436.0 |
| Feb-21 | 39.2 | (3.7) | 35.4 | 7.5 | – | 8.8 | 444.8 |
| Aug-21 | 111.4 | (4.1) | 107.3 | 16.7 | 6.2 | – | 438.6 |
| Feb-22 | 37.0 | (3.7) | 33.3 | 7.1 | – | 9.3 | 448.0 |
| Aug-22 | 110.3 | (4.0) | 106.2 | 16.8 | 5.8 | – | 442.1 |
| Feb-23 | 34.8 | (3.6) | 31.2 | 6.7 | – | 9.9 | 452.1 |
| Aug-23 | 112.0 | (3.9) | 108.1 | 17.0 | 6.1 | – | 446.0 |
| Feb-24 | 31.6 | (3.5) | 28.1 | 6.0 | – | 10.7 | 456.7 |
| Aug-24 | 112.8 | (3.9) | 108.9 | 17.1 | 6.1 | – | 450.6 |
| Feb-25 | 29.1 | (3.4) | 25.7 | 5.5 | – | 11.4 | 462.1 |
| Aug-25 | 111.6 | (3.8) | 107.9 | 17.3 | 5.7 | – | 456.4 |
| Feb-26 | 26.7 | (3.3) | 23.4 | 5.0 | – | 12.1 | 468.5 |
| Aug-26 | 109.1 | (3.7) | 105.4 | 17.6 | 4.9 | – | 463.6 |
| Feb-27 | 24.4 | (3.2) | 21.2 | 4.5 | – | 12.9 | 476.5 |
| Aug-27 | 105.0 | (3.1) | 101.9 | 17.9 | 3.9 | – | 472.7 |
| Feb-28 | 22.2 | (2.9) | 19.3 | 4.1 | – | 13.6 | 486.3 |
| Aug-28 | 107.6 | (2.8) | 104.8 | 18.2 | 4.1 | – | 482.2 |
| Feb-29 | 19.4 | (2.6) | 16.8 | 3.6 | – | 14.5 | 496.7 |
| Aug-29 | 97.1 | (2.5) | 94.7 | 18.6 | 1.6 | – | 495.1 |
| Feb-30 | 17.0 | (2.3) | 14.7 | 3.1 | – | 15.4 | 510.6 |
| Aug-30 | 94.2 | (2.2) | 92.1 | 19.1 | 0.5 | – | 510.1 |
| Feb-31 | 14.7 | (2.0) | 12.7 | 2.7 | – | 16.4 | 526.5 |
| Aug-31 | 90.3 | (1.9) | 88.4 | 18.8 | – | 0.9 | 527.4 |
| Feb-32 | 12.3 | (1.7) | 10.6 | 2.3 | – | 17.5 | 544.9 |
| Aug-32 | 80.7 | (1.6) | 79.2 | 16.9 | – | 3.6 | 548.5 |
| Feb-33 | 17.5 | (1.4) | 16.1 | 3.4 | – | 17.1 | 565.6 |
| Aug-33 | 56.9 | (1.3) | 55.6 | 11.9 | – | 9.4 | 575.0 |
| Feb-34 | 4.2 | (1.1) | 3.1 | 0.7 | – | 20.9 | 595.9 |
| Aug-34 | 48.0 | (1.0) | 47.0 | 10.0 | – | 12.3 | 608.2 |
| Feb-35 | 2.7 | (0.8) | 1.9 | 0.4 | – | 22.4 | 630.6 |
| Aug-35 | 34.4 | (0.7) | 33.7 | 7.2 | – | 16.5 | 647.1 |
| Feb-36 | 1.6 | (0.5) | 1.1 | 0.2 | – | 24.0 | 671.1 |
| Aug-36 | 24.0 | (0.4) | 23.6 | 5.0 | – | 20.1 | 691.2 |
| Feb-37 | 0.8 | (0.4) | 0.4 | 0.1 | – | 25.8 | 717.1 |
| Aug-37 | 13.2 | (0.4) | 12.9 | 2.7 | – | 24.1 | 741.2 |
| Feb-38 | 0.3 | (0.4) | – | – | – | 27.8 | 769.0 |
| Aug-38 | 9.6 | (0.4) | 9.2 | 2.0 | – | 26.9 | 795.9 |
| Feb-39 | 0.0 | (0.4) | – | – | – | 29.8 | 825.7 |
| Aug-39 | 0.4 | (0.4) | – | – | – | 31.0 | 856.7 |
| Feb-40 | 0.0 | (0.4) | – | – | – | 32.1 | 888.8 |
| Aug-40 | 0.1 | – | – | – | – | 33.3 | 922.1 |
| **Total** | **$2,589.2** | **($102.1)** | **$2,487.8** | **$362.9** | **$167.3** | **$539.4** | **N/A** |

### APPENDIX G: CONTINGENT AND UNLIQUIDATED CLAIMS

| Contingent and Unliquidated Claims | |
| --- | --- |
| PR Public Finance Corporation Stand-By Letter of Credit[1] | $ 86,710,112[2] |
| Lehman Brothers Special Financing, Inc. - Debt Service Deposit Agreement[3] | $26,000,000[4] |

**Notes**

(1)   Represents a stand-by letter of credit (the "Stand-by LOC") for the benefit of Puerto Rico Public Finance Corporation 2011 Series A and B Bonds and 2012 Series A Bonds (the "PFC Bonds").The trustee for the Bonds may only draw from the Stand-by LOC when the following conditions exist: (i) a budget for a new fiscal year is not approved and adopted, and (ii) a legislative appropriation for the then-current fiscal year exists and is lower than the debt service payment due on the PFC Bonds for the next fiscal year for which a new budget is not adopted. In such an instance, the Stand-by LOC may be drawn in the amount that the debt service on the PFC Bonds for the upcoming fiscal year is higher than the appropriated amount for debt service on the PFC Bonds during the then-current fiscal year, if any. The Stand-by LOC is not intended to and does not cover the risk that no appropriation is made by the Legislature of Puerto Rico for any particular fiscal year, or that an appropriation is made in an amount lower than the amount of debt service on the PFC Bonds due with respect to any fiscal year. If the budget for any fiscal year is adopted but no appropriation for the payment of the PFC Bonds is included in such budget, or an appropriation is made in an amount lower than the amount of debt service on the PFC Bonds, the trustee may not make a drawing under the Stand-by LOC. No appropriations have been approved by the Legislative Assembly for the payment of the PFC Bonds since fiscal year 2016.

(2) Represents the estimated potential amount of the contingent and unliquidated claim against GDB (discounted to reflect the likelihood thereof) with respect to the Stand-by LOC for which Additional Bonds may be issued (at a 55% exchange ratio) under the Bond Indenture. Amount is based on the debt service for the PFC Bonds during fiscal year 2018.

(3)   The Commonwealth, GDB and Lehman Brothers Special Financing, Inc. ("Lehman") are parties to a Debt Service Deposit Agreement (the "DSDA"). Under the DSDA, the Commonwealth made deposits to a "Redemption Fund" in an amount sufficient to make debt service payments on the Commonwealth's General Obligation Bonds. If the DSDA is breached, the Commonwealth and GDB are jointly liable to Lehman for a termination amount (the "Termination Amount") calculated pursuant to the terms of the DSDA as the amount required for Lehman to preserve the economic equivalent of its rights under the DSDA. However, the DSDA provides that Lehman must first pursue remedies against the Commonwealth prior to pursuing remedies against GDB and that GDB will not be required to make a payment under the DSDA unless the Commonwealth has, among other things, repudiated the DSDA or raised a defense of immunity.

(4) Represents the estimated potential amount of the contingent and unliquidated claim against GDB with respect to the DSDA for which Additional Bonds may be issued (at a 55% exchange ratio) under the Bond Indenture. Amount is based on the projected Termination Amount as of June 1, 2018.