# EXHIBIT K

Page 1

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF PUERTO RICO
2
                 Case Number 17 BK 3283-LTS
3                    PROMESA Title III
4
   In re:                              )
5                                      )
   THE FINANCIAL OVERSIGHT AND         )
6   MANAGEMENT BOARD FOR PUERTO RICO.   )
                                       )
7       as representative of           )
                                       )
8   THE COMMONWEALTH OF PUERTO RICO,    )
   et al.,                             )
9                                      )
                          Debtors,     )
10
11
12
13
14    REMOTE VIDEO-RECORDED DEPOSITION OF OJAS N. SHAH
15
16
17
18        The remote video-recorded deposition upon
   oral examination of OJAS N. SHAH, a witness
19   remotely sworn by me, Tara Gandel Hudson, RPR, CRR,
   a Notary Public in and for the County of Hancock,
20   State of Indiana, taken on behalf of Cantor-Katz
   Collateral Monitor LLC, with the witness located in
21   Florham Park, Morris County, New Jersey, on the 6th
   day of October, 2021, scheduled to commence at
22   9:30 a.m., pursuant to the Federal Rules of Civil
   Procedure with written notice as to the time and
23   place thereof.
24
25

```
 1                      APPEARANCES
                   (All appearing remotely.)
 2
 3    For the Cantor-Katz Collateral Monitor, LLC, as
      Collateral Monitor for GDB Debt Recovery Authority
 4
               Noah Gillespie
 5             Jacqueline Maero Blaskowski
               SCHULTE ROTH & ZABEL LLP
 6             901 Fifteenth Street NW
               Suite 800
 7             Washington, D.C.  20005
               202.729.7470
 8             noah.gillespie@srz.com
               jacqueline.maeroblaskowski@srz.com
 9
               Douglas I. Koff
10             SCHULTE ROTH & ZABEL LLP
               919 Third Avenue
11             New York, NY  10022
               212.756.2000
12             douglas.koff@srz.com
13
14    For the Financial Oversight and Management Board as
      Representative for the Debtors:
15
               Michael Mervis
16             Margaret A. Dale
               Joshua A. Esses
17             PROSKAUER
               Eleven Times Square
18             New York, NY  10036
               212.969.3000
19             mmervis@proskauer.com
               mdale@proskauer.com
20             jesses@proskauer.com
21             Scott Cooper
               PROSKAUER
22             2029 Century Park
               Suite 2400
23             310.557.2900
               scooper@proskauer.com
24
25
```

Page 3

1                    APPEARANCES
              (All appearing remotely.)
2
3    For the Financial Oversight and Management Board as
     Representative for the Debtors:
4
                 William D. Dalsen
5                PROSKAUER
                 One International Place
6                Boston, MA  02110-2600
                 617.526.9429
7                wdalsen@proskauer.com
8
                 Gabriel A. Miranda
9                O'NEILL & BORGES LLC
                 250 Munoz Rivera Avenue
10               Suite 800
                 San Juan, Puerto Rico  00918-1813
11               787.764.8181
                 gabriel.miranda@oneillborges
12
13
     For Ambac Assurance Corporation:
14
                 Alexandra Paslawsky
15               MILBANK LLP
                 55 Hudson Yards
16               New York, NY  10001-2163
                 212.530.5511
17               apaslawsky@milbank.com
18
19   For Financial Guaranty Insurance Company (FGIC):
20               Candice M. Carson
                 BUTLER SNOW
21               2911 Turtle Creek Blvd
                 Suite 1400
22               Dallas, TX  75219
                 419.680.5500
23               candice.carson@butlersnow.com
24
25

```
                                              Page 4

 1                    APPEARANCES
                 (All appearing remotely.)
 2

 3    For the Official Committee of Unsecured Creditors:
 4            Leah Lopez
              PAUL HASTINGS
 5            200 Park Avenue
              New York, NY  10166
 6            212.318.6043
              leahlopez@paulhastings.com
 7

 8    For the Official Committee of Retired Employees:
 9            Laura E. Pelanek
              JENNER & BLOCK
10            353 N. Clark Street
              Chicago, IL
11            312.222.9350
              lpelanek@jenner.com
12

13    For the National Public Finance Guarantee Corporation:
14            Robert Berezin
              Colin McGrath
15            Stephanie Morrison
              WEIL, GOTSHAL & MANGES
16            767 Fifth Avenue
              New York, NY  10153-0119
17            212.310.8000
              robert.berezin@weil.com
18            colin.mcgrath@weil.com
              stephanie.morrison@weil.com
19

20    For the Assured Guaranty Corp. and Assured Guaranty
      Municipal Corp.:
21
              Casey John Servais
22            CADWALADER WICKERSHAM & TAFT LLP
              200 Liberty Street
23            New York, NY  10281
              212.504.6193
24            casey.servais@cwt.com
25
```

```
                                                      Page 5

1                         APPEARANCES
                   (All appearing remotely.)
2
3     For the QTCB Noteholder Group:
4             David K. Shim
              MORGAN LEWIS & BOCKIUS
5             One State Street
              Hartford, CT   06103-3178
6             860.240.2580
              david.shim@morganlewis.com
7
8
      For the National Public Finance Guarantee Corporation:
9
              Alexandra C. Casellas-Cabrera
10            ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA, PSC
              208 Ponce de Leon Avenue
11            Popular Center building
              16th Floor
12            San Juan, PR   00918
              787.281.1816
13            acasellas@amgprlaw.com
14
15    For the Witness, Ojas N. Shah:
16            Andrew B. Joseph
              FAEGRE DRINKER
17            600 Campus Drive
              Florham Park, NY   07932
18            Indianapolis, IN   46204
              973.549.7000
19            andrew.joseph@faegredrinker.con
20
21
22
23
24
25
```

```
                                              Page 6

 1                    APPEARANCES
                (All appearing remotely.)
 2
 3   For the Puerto Rico Fiscal Agency and Financial
     Advisory Authority:
 4
 5              Peter Friedman
                O'MELVENY & MYERS
 6              1625 Eye Street, NW
                Washington, D.C.  20006
 7              202.383.5302
                pfriedman@omm.com
 8
                Ashley Pavel
 9              Joseph L. Roth
                O'MELVENY & MYERS
10              610 Newport Center Drive
                17th Floor
11              Newport Beach, CA  9266-
                949.823.7138
12              apavel@omm.com
                joeroth@omm.com
13
14   ALSO PRESENT:
15              Roy Berman, Law Clerk, Morrison & Foerster
                Edmond Esses, Kroll
16              Matthew Pinos, Law Clerk, SRZ
                David W. Prager, Kroll
17              Clint Thomas, Technician
                Steven Troncone, Videographer
18              Manny Valenciano, Veritext
19
20
21
22
23
24
25
```

Page 7

1
2
                    INDEX OF EXAMINATION
3                                                    PAGE
4    DIRECT EXAMINATION ..........................11
         Questions by Noah Gillespie
5
6
7
8                    INDEX OF EXHIBITS
                                                     PAGE
9    Deposition Exhibit:

10   Exhibit  1 - Analysis of Creditor Recoveries ...49
                    should the Title III Case be
11                  Dismissed for Creditors of the
                    Commonwealth of Puerto Rico
12
     Exhibit  2 - Debtors' Opening Expert Reports ...61
13                  and Disclosures
14   Exhibit  3 - 104 Governor-Duties and powers ....84
15   Exhibit  4 - FOMB_CONF_88825, Spreadsheet .....105
16   Exhibit  5 - Disclosure Statement for the .....121
                    Seventh Amended Title III Joint
17                  Plan of Adjustment of the
                    Commonwealth of Puerto Rico, et al.
18
     Exhibit  6  - Puerto Rico's Proposed Plan ....133
19                  of Adjustment Benefits
20   Exhibit  7 - CR Legislation Approved by .......147
                    Congress Has Medicaid Funding
21                  Measure for Puerto Rico and USVI,
                    CDL Cancellation Language
22
23
24
25

Page 8

1    (9:41 a.m.)

2           THE VIDEOGRAPHER:  Okay.  We are now on the

3       video record.  Today is October 6, 2021.  Time

4       is approximately 9:41 a.m.

5           We are here in the matter of the insolvency

6       proceedings for The Commonwealth of Puerto Rico

7       to take the deposition of Ojas Shah.

8           The court reporter may proceed.

9                   OJAS SHAH,

10   having been first duly sworn to tell the truth, the

11   whole truth and nothing but the truth relating to

12   said matter, was examined and testified as follows:

13       MR. GILLESPIE:  Good morning everybody.  My

14      name is Noah Gillespie, and I'm an attorney with

15      Schulte Roth & Zabel.  And together with the law

16      firm McConnell Valdes, we represent certain

17      creditors known in this proceeding as the DRA

18      parties.

19          I'm joined today by Doug Koff and

20      Jacqueline Maero Blaskowski of my firm and also

21      certain colleagues from McConnell Valdes.

22          Before we went on the record, we had a

23      discussion just to note that the witness has a

24      keyboard and computer screen, computer monitor

25      in front of him.

1          Mr. Joseph acknowledged that this is simply
2     to access the Exhibit Share platform that we'll
3     be using, and so that's how we will proceed.
4          At this point, I think it may be
5     appropriate, since we have a number of counsel
6     on the line, if we could briefly go around and
7     state attorney appearances for the record, if
8     the attorneys --
9          MS. DALE:  Hi, everyone.  It's Margaret.
10    My understanding was that we would take care of
11    that afterward just because of the number of
12    parties on.  She has --
13         She obviously has the most important folks,
14    which is you, Noah, and Mr. Mervis so -- and of
15    course the witness, Ojas, I'm sorry, and Andy.
16         I think we should just proceed with the
17    deposition, and we'll work with you all to sort
18    it out if there's any questions about who is
19    here.  We have the participant list and the
20    like.
21         MR. GILLESPIE:  That's fine.
22         MS. DALE:  Okay.  Thank you.
23         MR. GILLESPIE:  And I think we should also
24    just put the stipulations on the record; that
25    objections today will be reserved aside from

Page 10

1      objections to form and privilege.

2           So I just want to make sure that that's

3      agreeable to counsel and that none of the other

4      counsel on the line have any objection to that.

5           MR. MERVIS:  It's fine by me.

6           MR. JOSEPH:  That's fine.

7           MR. GILLESPIE:  Okay.  And hearing no

8      objections.

9           Also, I just want to acknowledge that we

10     are conducting the deposition today virtually.

11     You know, I hope everyone can be cognizant of

12     the technical difficulties that may present and

13     that we'll just, you know, work to avoid

14     speaking over one another and to be courteous.

15          For exhibits today, we're going to be using

16     the Egnyte Exhibit Share system.  My colleague

17     Jacqueline Maero Blaskowski will be marking and

18     publishing any of the exhibits we'll be using

19     today, and so everyone should be able to see the

20     exhibits there.  We also have the capability to

21     share a screen if that's --

22          With that, I'll dive in.

23

24

25

Page 11

1
2                          OJAS N. SHAH,
3    having been first remotely sworn to tell the truth,
4    the whole truth and nothing but the truth relating
5    to said matter, was examined and testified as
6    follows:
7
8    DIRECT EXAMINATION,
9        QUESTIONS BY NOAH GILLESPIE:
10   Q    Good morning, Mr. Shah.  How are you?
11   A    Good.  How are you?
12   Q    I'm doing very well.  Thank you.
13            Have you been deposed before?
14   A    This is a first for me.
15   Q    Welcome.
16            Have you ever given any trial testimony
17       before?
18   A    No.
19   Q    Let me give you a little overview of the
20       deposition process for today.  I'll be the
21       person asking questions, and so I'd appreciate
22       if you would let me finish asking my questions
23       before you begin to answer.
24            Similarly, I'll let you finish your answer
25       before moving onto my next question.  I'm sure

1      each of us might violate that goal from time to

2      time, but this will help us get a clearer

3      transcript.

4          Ms. Hudson, our court reporter, will need

5      to be taking everything down, and that will help

6      a lot.

7          Do you understand?

8   A  Sure.

9   Q  And also to ensure a clear transcript, please be

10     sure to give all of your answers verbally.  For

11     example, if you nod your head, we won't be able

12     to take that down.  And so please make sure to

13     speak your answer.

14         Do you understand that?

15  A  Understood.

16  Q  As we mentioned, this is a remote deposition.

17     And so if at any point you're having any

18     technical issues; for example, you weren't able

19     to hear the question properly or you can't view

20     the screen, just let us know.

21         Do you understand?

22  A  Yes.  I understand.

23         MR. JOSEPH:  We're getting an echo.  I

24     don't know where that's coming from, but let's

25     see if that clears up.

Page 13

1              Go ahead, Noah.

2              MR. GILLESPIE:  Thank you for pointing that

3         out.  It's a good example of exactly what we're

4         talking about.

5    BY MR. GILLESPIE:

6    Q    If at any point today you find any of my

7         questions unclear or you don't understand the

8         question, please let me know, and I'll do my

9         best to clarify.  If you do not ask me to do

10        that, then I'll assume that you understand my

11        questions.

12             Do you understand that?

13   A    Yes, I understand.

14   Q    Now, from time to time, some of the other

15        counsel may object, and if they do, you're still

16        required to answer the question unless counsel

17        directs you not to answer.

18             Do you understand?

19   A    Understood.

20   Q    We'll be taking regular breaks today.  If at any

21        point you need a break, just feel free to ask

22        for one.  My only request is that if a question

23        is already pending, that you would first answer

24        the question before we go to the break.

25             Do you understand that?

Page 14

1    A    Yes.

2    Q    Our focus today is to gather information from

3         you in response to the questions that I ask; so

4         please try to be attentive to my questions.

5              Attorneys for the oversight board and your

6         counsel are present, and if they or anybody else

7         would like to seek further explanation, they can

8         do that after I finish.

9              Do you understand?

10   A    Yes.

11   Q    Mr. Shah, is there any reason that you cannot

12        testify truthfully today?

13   A    No.

14   Q    Are you taking any medications that might affect

15        your memory or your ability to testify?

16   A    No.

17   Q    Do you understand that you are under oath and

18        that any testimony that you give here has the

19        same weight as if we were in a court of law?

20   A    Yes.

21   Q    What did you do to prepare for your testimony

22        today?

23   A    I reviewed the filed best interest analyses as

24        well as spoke to my attorneys to understand the

25        timing and, you know, who is deposing me and

Page 15

1      what to expect.

2   Q   Thank you.

3          When you say "your attorneys," which law

4      firm or law firms?

5   A   Drinker and Proskauer.

6   Q   Very good.

7          How many hours did you take to prepare

8      overall?

9   A   It was a handful.  Less than five.

10   Q   During any of your preparation, did you meet

11      with anyone who is not an attorney?

12   A   I would have had a conversation or two with

13      members of my team.

14   Q   Did you have any of those conversations with

15      your team without attorneys for Proskauer or

16      Drinker Biddle present?

17          MR. MERVIS:  Objection to the form.  Sorry,

18      sorry.  Objection to the form.

19          But you can answer.

20          THE WITNESS:  Okay.

21   A   The conversations were with Andrew Joseph

22      involved.

23   BY MR. GILLESPIE:

24   Q   Understood.

25          Who did you communicate with regarding your

1      testimony or potential testimony in this case?

2          I'm really trying to understand if there

3      was anyone beyond attorneys that you

4      communicated with, again, regarding your

5      testimony or potential testimony in this case?

6          MR. JOSEPH:  Objection.  Form.

7   A   Sir, I don't understand the question.  Is that a

8      different question than what you just asked me?

9   BY MR. GILLESPIE:

10  Q   Sure.  I'll rephrase.

11         Did you have any conversations with anyone

12     regarding your testimony or potential testimony

13     in this case?

14         MR. JOSEPH:  Objection.  Asked and

15     answered.

16         Go ahead.

17  A   As I discussed, I had conversations with Andrew

18     Joseph, who is my attorney, as well as the

19     attorneys from Proskauer with regards to this

20     deposition.

21  BY MR. GILLESPIE:

22  Q   Understood.  Okay.

23         Just a little while ago, you mentioned that

24     there were certain employees that you spoke

25     with --

Page 17

1   A   Sure.

2   Q   -- while Mr. Joseph was present.

3       Do you remember that?

4   A   Yes.

5   Q   Could you just tell me the names of those

6       employees who participated?

7   A   Yes.  They were members of my team: Justin

8       Collins and Gaby Piere and one more, Rafael

9       Rivera.

10  Q   Just for the benefit of the court reporter,

11      could you please spell Gaby's last name for the

12      record.

13  A   P-I-E-R-E.

14  Q   Thank you.

15      Mr. Shah, you're aware that there was a

16      best interest test analysis attached to the

17      disclosure statement?

18  A   Yes, that's right.

19  Q   You were involved in that analysis?

20  A   I was involved in preparing it, yes.

21  Q   Who did you communicate with regarding your

22      analysis in that best interest test report?

23      MR. MERVIS:  Objection to the form.

24  A   I'm sorry.  Can you help me understand the

25      question.

Page 18

1           What do you mean by "communicate"?

2    BY MR. GILLESPIE:

3    Q    You were saying that you were involved in the

4         best interest test analysis attached to the

5         disclosure statement; correct?

6    A    That's right.

7    Q    I'm trying to understand who did you communicate

8         with regarding that analysis?

9           MR. JOSEPH:   Same objection.

10   A    When you say "regarding the analysis," are you

11        referring to the preparation of the analysis?

12        Can you give me some context so I can try and

13        answer the question?

14   BY MR. GILLESPIE:

15   Q    Sure.

16          Let's start with the preparation.  Who were

17        the people that you communicated with to prepare

18        the best interest test analysis?

19   A    So the analysis was -- it was a combination of

20        folks.  One, I had the members of my team who I

21        just referenced to you who were involved in

22        preparing the analysis.  And we also spent a

23        considerable amount of time with FOMB counsel to

24        understand the legal assumptions that, you know,

25        would be relevant for the purpose of this

Page 19

1       analysis.

2            In addition to that, we also set out to

3       collect the necessary facts required to prepare

4       the analysis, and to the extent that there were

5       materials provided by other of the FOMB

6       advisers, we obviously engaged in making sure we

7       understood the materials that were shared with

8       us.

9    Q  In terms of collecting facts from FOMB advisers,

10      who were the different advisers that you spoke

11      with?  And the company names are fine.

12   A  Sure.

13           MR. MERVIS:  Sorry.  Objection to the form.

14           Go ahead.

15   A  So the other advisers are the primary advisers

16      that serve the FOMB:  PJT, Citibank, and Ernst &

17      Young.

18   BY MR. GILLESPIE:

19   Q  Any others that you can recall at this point?

20   A  Outside the legal advisers?  No.

21           MR. GILLESPIE:  I apologize.  There's some

22      sirens in the background here.

23           MR. JOSEPH:  I thought the video froze.

24           MR. GILLESPIE:  No.  That was getting in

25      the way.  I apologize.

Page 20

1          MR. JOSEPH:  We can't hear them; so don't

2      hold up on our account.

3          MR. GILLESPIE:  Thank you.

4   BY MR. GILLESPIE:

5   Q   So aside from the attorneys and the FOMB

6       advisers that you mentioned --

7   A   Mm-hmm.

8   Q   -- were there any other persons or entities that

9       you communicated with to prepare the best

10      interest test analysis?

11          MR. JOSEPH:  Objection to form.

12          Go ahead.

13  A   From what I can recall, there is -- the one

14      other group that I believe we had perhaps one

15      conversation with is the board's claim track

16      conciliate adviser, Alvarez.

17  BY MR. GILLESPIE:

18  Q   So with respect to PJT, how many conversations

19      were you involved with involving PJT?

20  A   I don't recall the number of conversations.

21  Q   And do you recall the format, whether it was

22      over telephone or by video?

23  A   I don't recall the exact format.

24  Q   Did you have any conversations with PJT --

25      strike that.

Page 21

1          You said you don't recall the exact number

2      of conversations with PJT.  Was it more than

3      five?

4   A   I don't believe so.

5   Q   What did you talk about in the conversations

6      with PJT?

7          MR. JOSEPH:  Objection to form.

8          Go ahead.

9          MR. MERVIS:  Objection.

10  A   The conversations would have been focused on

11     understanding the debt schedule information that

12     they would have shared with us with regards to

13     the outstanding debt.

14  BY MR. GILLESPIE:

15  Q   What was the purpose of the conversation with

16     PJT?

17  A   As I referenced earlier, we were gathering the

18     facts necessary in preparation to conduct the

19     analysis.

20  Q   Let's turn to Citibank.

21          Do you recall how many -- how many

22     conversations you had with Citibank?

23          MR. MERVIS:  Object to the form.

24  A   Again, I don't recall the exact number, but it

25     would have been a handful.

Page 22

1    BY MR. GILLESPIE:

2    Q    And similarly, what was the purpose of speaking

3         with Citibank?

4              MR. JOSEPH:   Objection.   Form.

5    A    Again, it was related to understanding the facts

6         around certain of the debt issuances to

7         complement the information from PJT, and we also

8         had a conversation with regards to, you know, a

9         reasonable discount rate for municipal debt.

10   BY MR. GILLESPIE:

11   Q    Any other topics that you discussed with

12        Citibank?

13   A    No, not that I'm aware of.

14   Q    You also mentioned you had -- you were involved

15        in conversations with Ernst & Young?

16   A    That's correct.

17   Q    What were the topics of your conversations with

18        Ernst & Young?

19             MR. JOSEPH:   Objection to form.

20             Go ahead.

21             MR. GILLESPIE:   Excuse me, Mr. Shah.

22             Counsel, can I ask what's the basis of the

23        objection?

24             MR. JOSEPH:   Sure.

25             He could have had conversations on any

1      number of topics that could have occurred on any

2      number of times.  Each conversation could be on

3      different subject matter.

4          I'm trying to get a sense of what we're

5      doing here; so that's the basis for the

6      objection.

7          MR. GILLESPIE:  Thank you.

8          I think we're covering the conversations

9      that he had in connection with his analysis.

10         (Reporter clarification.)

11         MR. KOFF:  I said, Noah, let's please move

12     on.  I believe it's a ridiculous objection; so

13     let's just move on.

14         If he continues, just give him a standing

15     objection because let's just try not to have all

16     the clutter.

17         MR. JOSEPH:  Yeah.  This is Andrew Joseph

18     responding.

19         You know, Doug, he asked for an explanation

20     of why I objected.  I provided it.  And I would

21     just appreciate as a professional courtesy that

22     you avoid commentary like that.  Inappropriate,

23     unnecessary, and inaccurate.

24         So, please, let's move on.

25

Page 24

1    BY MR. GILLESPIE:

2    Q    Mr. Shah, we were talking about your

3         conversation with Ernst & Young in connection

4         with your analysis in terms of the best interest

5         test reports, and my question was what were the

6         topics that you discussed with Ernst & Young?

7              MR. JOSEPH:  Objection to form.

8              Go ahead.

9    A    Sure.

10             The topics discussed with Ernst & Young

11        were related to the board's cash analysis that

12        is referenced in the BIT.  Ernst & Young was

13        involved in preparing that analysis.

14   BY MR. GILLESPIE:

15   Q    What was the purpose of the conversations that

16        you just outlined for us?

17             MR. JOSEPH:  Objection to form.

18             Go ahead.

19             MR. GILLESPIE:  I'm happy to give you a

20        standing objection, if you like.  I think that

21        was a follow-up question from the question that

22        I just asked.

23             MR. MERVIS:  Yeah, but it's cleaner.  Just

24        takes a second.  Let's just have a clean record

25        without debating standing objections.

Page 25

1          MR. JOSEPH:  If it's cleaner, just have a

2      standing objection, because --

3          MR. KOFF:  No, it's not.

4          MR. JOSEPH:  -- then that's not clutter,

5      and have a standing objection.

6          MR. KOFF:  Yeah.  I don't agree with you.

7          MR. JOSEPH:  It stops the signaling of a

8      witness; it stops the interruption of the flow.

9          No one would make these objections in a

10     court of law.  Let's just move on.

11         MR. MERVIS:  Yeah, I don't agree to a

12     standing objection.  I'm not sure why Mr. Koff

13     is insinuating himself on the record, but I will

14     not agree to a standing objection.

15         The questions should be objected to

16     question by question or not objected to question

17     by question.

18  BY MR. GILLESPIE:

19  Q   Mr. Shah, what was the purpose of the

20      conversations you were involved with with Ernst

21      & Young?

22  A   Noah, I believe I just answered that.  It's with

23      regards to the cash report that was published by

24      the FOMB and used as a source of information for

25      our analysis.

Page 26

1    Q    Thank you.

2         You testified there was one conversation

3         that you had involving Alvarez; is that correct?

4    A    That's correct.

5    Q    What topics did you cover with Alvarez in that

6         conversation or those conversations?

7    A    It would have been related to an estimate of

8         what the -- the estimate, the time of what the

9         outstanding unsecured claims may be in the case.

10        (A discussion was held off the record to

11        correct technical issues.)

12        THE TECHNICIAN:  This is Clint Thomas.

13        That was David Prager.

14        I muted his mic because there was

15        background talking going on.

16   BY MR. GILLESPIE:

17   Q    Mr. Shah, now that we've gone through these

18        individuals, is there anyone else, any other

19        entities you recall speaking with in connection

20        with your best interest test report?

21   A    I think we have covered it outside of the

22        lawyers.

23   Q    Mr. Shah, what is your educational background?

24   A    I have an undergraduate degree from the

25        University of Pennsylvania with a dual major in

Page 27

1      finance and computer engineering.

2            I also have an MBA from Columbia

3      University.

4   Q   Can you give me a thumbnail sketch of your

5      professional history?

6   A   Sure.

7            How far back would you like me to go or --

8      I'm happy to share as much detail as you'd like.

9   Q   Sure.

10           Let's see.  When did you --

11           What year did you graduate from Columbia?

12  A   2004.  Full disclosure:  I did an executive

13     program; so I was also doing some work at the

14     time.  But I finished my MBA in 2004.

15  Q   Then I guess I should ask what year did you

16     graduate from Penn?

17  A   '96.

18  Q   Why don't you -- strike that.

19           Mr. Shah, could you lead us through some of

20     the highlights of your career and what positions

21     you've held in the past that are -- I'm sorry.

22     Let me start over.

23           Mr. Shah, why don't you just start in 1996

24     and lead us through just a sketch of the

25     professional history of your career.

Page 28

1   A    Sure.

2           So after graduating from undergrad in '96,

3        I joined Deloitte consulting working in their

4        restructuring services group.  I don't remember

5        the exact title of the group at the time.

6           I was at Deloitte for three years.  I left

7        in 1999 and joined a start-up called Internet

8        Appliance Network.  I was the director of

9        finance for the start-up and helped grow that

10       business over two years.

11          And in 2001, at -- you know, in the middle

12       of the dot-com burst, that company failed, and I

13       essentially was self-employed and worked as an

14       independent workout consultant working with

15       technology companies that were in a similar boat

16       from 2001 to 2004.

17          Also, during that period of time, I got my

18       MBA at Columbia through the executive program at

19       Columbia.

20          I finished my MBA in 2004 and then joined a

21       middle-market restructuring firm called X-Roads

22       Solutions, spelled X-Roads.

23          I was at X-Roads from 2004 until I believe

24       around 2007, at which point I went to work for

25       Bear Stearns as a leverage finance banker.

1          Unfortunately, you know, we had the

2      financial crisis in 2008, and so my time at Bear

3      Stearns was limited after the JPMorgan deal.

4      And it was at that time that I went to work for

5      AlexPartners in 2008.  I was at AlexPartners

6      from 2008 to 2014 working in their restructuring

7      group.

8          And then I joined McKinsey in 2014 as a

9      part of McKinsey's transformation practice.

10     Focused on distressed transformations and

11     restructurings and have been at McKinsey ever

12     since 2014.

13  Q  How has your role at McKinsey evolved since you

14     joined in the transformation practice in 2014?

15  A  So I joined in 2014 as a senior vice president,

16     and I became a partner in the practice the

17     beginning of 2018.

18  Q  How did -- well, sorry.

19          What was your role as a senior

20     vice president?

21          MR. JOSEPH:  Objection to form.

22  A  I would on a -- you know, on a particular study

23     or engagement, I would lead the day-to-day work.

24  BY MR. GILLESPIE:

25  Q  What were your responsibilities with respect to

Page 30

1         day-to-day work as a senior vice president?

2    A    I'm not sure exactly how to answer.  Depending

3         on what -- I would lead a team of three, five,

4         maybe more folks on the preparation of an

5         analysis or a model or some other deliverable,

6         depending on the situation and, you know, what

7         was required.

8    Q    How, if at all, did that change when you became

9         a partner at McKinsey?

10   A    It would have changed in that I now have broader

11        responsibilities for an overall team and, you

12        know, potentially managing multiple workstreams

13        or, in some situations, playing more senior

14        roles, whether it was a chief transformation

15        officer or more of a senior adviser to senior

16        executives of our clients.

17   Q    Since you became a partner in 2018, have your

18        responsibilities at McKinsey evolved?

19   A    Again, not sure how to answer that; so give

20        me --

21            What do you mean?

22   Q    The inverse of the question is have your

23        responsibilities remained the same throughout

24        the time that you've been a partner at McKinsey?

25            MR. JOSEPH:  Objection to form.

Page 31

1              But answer if you can.

2    A    I mean, you know, I think, you know, I have

3         evolved as a partner in the -- you know, across

4         a diverse client base that I serve, and so

5         relative --

6              I mean, as a partner, I would say my role

7         has probably evolved a bit in that, you know, in

8         the level of client counseling to senior clients

9         that I do now versus when I first became a

10        partner.  But as a partner in general, my role

11        is, you know, largely the same.

12   BY MR. GILLESPIE:

13   Q    Today, as a partner at McKinsey, how many people

14        do you oversee?

15   A    As a partner, I don't have a set number of

16        people I oversee.  I'm a partner of a large

17        firm, and the people that I may work with on a

18        day-to-day basis is dependent on the engagement

19        or what we call "study" that I may be involved

20        in.

21   Q    Mr. Shah, do you remember the best interest test

22        analysis that we mentioned earlier that's

23        attached to the disclosure statement?

24   A    Yes.

25   Q    So other than that best interest test analysis,

1      what work have you done over your career for the

2      FOMB or the Puerto Rico government?

3    A   Let's see.  So I -- I've been involved

4      supporting the FOMB since 2017.  So over that

5      period of time, I have done work with regards to

6      some liquidity analyses and liquidity monitoring

7      work which was part of our scope at the time.

8          I have been asked to prepare some specific

9      analyses in support of the FOMB, as Puerto Rico

10     has navigated a multitude of challenges over the

11     years.

12         And then I'm also a senior leader of our

13     overall effort in Puerto Rico; so I spend time,

14     you know, making sure that we're continuing to

15     develop our people and our team that's here in

16     Puerto Rico.

17         MR. JOSEPH:  Sorry.

18         THE WITNESS:  I want to make sure I can

19     hear.  I thought you may have said something.

20         I see your lips moving, but I don't hear

21     anything.  Sorry.

22   BY MR. GILLESPIE:

23   Q   That's fine.

24         Through these projects that you did for the

25     FOMB earlier, you know, so before the best

Page 33

1      interest test report --

2   A   Yes.

3   Q   -- I think you mentioned a few things.  I

4      mean --

5          What are the issues that you looked into

6      for the FOMB before the best interest test

7      report?

8          MR. JOSEPH:  Objection to form.

9          Go ahead.

10  A   The issues I looked into before the best

11     interest.

12         So if I go back to some of our early

13     support, we were asked to essentially set up a

14     process to monitor overall liquidity in -- in

15     the Commonwealth and the information that the

16     board was receiving from the government.

17         So we would review the liquidity reports

18     and provide a summary to the board in changes in

19     liquidity.

20         That work ultimately was then transitioned

21     to the board several years ago as the board has

22     continued to grow in terms of its resources and

23     people.

24         And then there have been other specific

25     requests.  So, for example, one that rings a

Page 34

1      bell is post the hurricanes that hit

2      Puerto Rico, you know, when Irma and Maria hit,

3      and the board was looking for ways to support

4      the government, as they just started the

5      response, we were asked, on the basis of some of

6      the liquidity work, to try and, you know, put

7      together an approach and perspective on how you

8      could estimate potentially what the short-term

9      liquidity need may be; and, you know, what

10     that -- how you would go about trying to put

11     together a perspective on what that may be so

12     that, you know, the board could be helpful to

13     the government, at least in that time of crisis.

14         One other request, there was at some point

15     a request by I believe one of the creditor

16     groups trying to understand how the changing

17     cash kind of correlates to surplus.

18         And we were asked by the FOMB to put

19     together kind of a -- some sort of implied cash

20     surplus analysis to, you know, try and reconcile

21     some of the historical changes in cash to

22     surplus.

23         So those were -- if I think about the

24     period 2017 to '19, those were probably some of

25     the bigger lifts and big reports that, you know,

Page 35

1       we would have worked on.

2   BY MR. GILLESPIE:

3   Q    Thank you.

4           In that period between 2017 to 2019, how

5       did you monitor the liquidity?

6   A    There was reporting from the government and

7       prepared by the government's advisers that we

8       would review and obviously ask questions if we

9       had questions on what we were seeing.

10  Q    When you were looking at liquidity, were these

11      in connection with the hurricane?

12  A    Yes.

13  Q    How did you monitor liquidity in that

14      circumstance?

15  A    It was less about monitoring.  It was trying

16      to -- try and estimate what could happen based

17      on the liquidity projections that existed pre

18      hurricane in terms of, you know, what would

19      happen if the island stops, you know,

20      functioning; what could happen to the receipts

21      that were anticipated, if stuff comes in later

22      and yet expenditures continue to have to get

23      paid to figure out potentially how big that hole

24      could be.

25           It was with limited facts, the best

1        modeling you could do, you know, to prepare a

2        perspective and, you know, help try and, you

3        know, further thinking on how to size what that

4        hole may be, absent whatever the government may

5        have been doing at that time.

6    Q   How does the work that you personally were doing

7        between 2017 and 2019 relate, if at all, to the

8        best interest test report?

9            MR. MERVIS:  Objection to form.

10            MR. JOSEPH:  Objection to form.

11            Go ahead.

12   A   I'm not sure there is much of a correlation

13       other than it involved a level of modeling.  It

14       has a financial aspect to it.

15            Obviously, there is a cash component which,

16       you know, is helpful, but it's not -- none of

17       that work directly informs the best interest

18       analysis.

19   BY MR. GILLESPIE:

20   Q   Is the same true for the work that your team was

21       doing from 2017 to 2019?

22   A   Yeah.  I don't think it would be different.

23   Q   So then you --

24            We kind of left off at 2019.

25   A   Yes.

Page 37

1   Q   Were there other projects that you were involved
2       with from 2019 onward other than the best
3       interest test report?
4   A   That was certainly my primary responsibility.  I
5       don't recall any other discrete projects other
6       than, as I've referenced earlier, as a member of
7       our team, there's certainly a level of QC or
8       others on other work product produced by the
9       team that I would have done, but those were not
10      individual projects.
11  Q   When did you start work on what's now the best
12      interest test report?
13          MR. MERVIS:  Object to the form.
14  A   There would have been some --
15          MR. GILLESPIE:  What's the nature of the
16      objection?
17          MR. MERVIS:  What's that?
18          MR. GILLESPIE:  I'm sorry, Mr. Mervis.
19      What's the nature of the objection?
20          MR. MERVIS:  The nature of the objection is
21      I don't think your question is sufficiently
22      precise when you say "best interest test report"
23      because there have been multiple iterations over
24      time.
25

Page 38

1    BY MR. GILLESPIE:

2    Q   Mr. Shah, if I use the phrase "best interest

3        test report" today to refer to what's attached

4        to the disclosure statement as Exhibit P, is

5        that something you understand?

6    A   Actually, no.

7            I was actually going to ask was your

8        question in reference to the original best

9        interest test that was filed?

10           There was one filed, I believe, in '19 or

11       sometime late '19; and then there was a more

12       recent update filed I believe in May of 2021;

13       and then I believe there's probably another

14       update to the disclosure statement after that,

15       which it wouldn't have had an update to the BIT,

16       but it may have been refiled.

17           So just help me understand what time frame

18       you're talking about and with regards to which

19       analysis.

20   Q   That's helpful.  That's helpful.  To give more

21       background to that.

22           So from 2019 to the present, has your team

23       at McKinsey done work for the FOMB other than

24       any of these best interest test reports?

25   A   Are you talking about the McKinsey team?

Page 39

1   Q   Yes.

2   A   Are you talking about --

3           Yes.  McKinsey has served the FOMB on a

4       multitude of topics.

5   Q   What projects has your team worked on for the

6       FOMB from 2019 to present other than the best

7       interest test reports?

8           MR. MERVIS:  Sorry.  Can you read that

9       back, Madame Reporter, or Tara.

10          (The requested text was read by the

11      reporter.)

12          MR. JOSEPH:  I'm objecting to the form.

13          MR. MERVIS:  Yeah, me too.

14  A   Noah, let me give you -- so I can try and review

15      all of what our scope has been, but our scopes

16      are filed publicly on the FOMB's website.  Our

17      contracts are filed publicly with our scope;

18      however, those scopes have changed over time.

19          So at the risk of omitting something or

20      missing something, I just did want to note that;

21      that the scope of McKinsey's work -- and this is

22      where I wanted -- that's why I clarified, you

23      know, are you talking about the full McKinsey

24      team?

25          You know, there is a broad series of things

Page 40

1          that we do for the FOMB; so all that information

2          is available on the FOMB's website, if not other

3          sources.

4               But to try and answer your question the

5          best I can from -- so McKinsey as a firm more

6          broadly serves the FOMB across the different

7          Title III cases in that there is an ongoing case

8          for the Commonwealth; there is an ongoing case

9          for PREPA; there's an ongoing case for HTA.

10              We have teams that support the FOMB across

11         each of those Title III cases, and we also have

12         a team that has been supporting the FOMB with

13         regards to -- and non-Title III -- kind of

14         strategic support matters and has been for many

15         years I think starting in late 2016.

16              This is where I'm not going to remember the

17         full scope of our contracts.

18              Our scope of services across the

19         Commonwealth focuses on work to support the FOMB

20         in the preparation of fiscal plans.  It also

21         involves specific expertise on various topics,

22         whether it's health care, public sector

23         expertise, other -- just from our government

24         practice, you know, bringing efficiency ideas,

25         et cetera.

Page 41

1          Then we also support for a work on the best

2      interests tests.  Then there is kind of broad

3      support on supporting stakeholder requests;

4      right?  Whether it's requests from creditors on

5      mediation sessions, information requests,

6      et cetera, that we support.

7          Then in a similar fashion, we have a team

8      supporting the work that's being done in the

9      PREPA case where they support the FOMB in the

10      preparation and valuation of fiscal plans,

11      interactions with the government, and the

12      challenges that PREPA faces.

13          Then in a similar boat, we have a handful

14      of folks that support HTA in a similar fashion.

15          So again, at the risk of knowing I've

16      probably missed some things, I encourage you to

17      take a look at our contracts with the public

18      which provide the full scope of our services,

19      but hopefully, I've hit the highlights.

20   BY MR. GILLESPIE:

21   Q   Were you personally involved in all of these

22      projects?

23   A   No.

24          We have a large team involved, multiple

25      partners from McKinsey involved in supporting

Page 42

1      the FOMB and have been involved for several
2      years.
3              That's where it is just helpful for me,
4      when you reference "team." You know, I mean,
5      there is, you know, my day-to-day team involved
6      in supporting the best interest tests, and then
7      there's more broadly the McKinsey team.
8              And if I failed to ask for clarification
9      before going forward, it's helpful if you can
10     clarify what the question is in relation to.
11  Q  Which of the projects that you ran through were
12     you personally involved with?
13  A  So the projects I've been personally involved in
14     are the projects I referenced earlier. So I
15     did -- back in the earlier -- or my earlier
16     times was related to the liquidity monitoring;
17     some of these other projects around
18     understanding the needs post-Maria; this implied
19     surplus analysis; obviously the best interest
20     test, which has been a big focus of my time.
21             And I'm sure there's a couple of other ad
22     hoc things that I'm not remembering off the top
23     of my head as I sit here.
24             But with regards to some of the other major
25     deliverables, there's other partners who have

1      led that work.

2   Q   Earlier when we talked about the team that you

3       spoke with for the best interest reports, you

4       mentioned three names.  You mentioned Justin

5       Collins, Gaby Piere, and Rafael Rivera?

6   A   That's right.

7   Q   Which of the projects for the FOMB were these

8       three individuals personally involved with?

9   A   They were involved on the best interest test

10      analysis that's -- again, this is where I

11      thought that was your request on "team."

12  Q   Yes.

13  A   So that -- but we have a much broader team

14      serving, you know, the FOMB on a number of

15      other -- of the other topics.

16  Q   So do I understand correctly that these three

17      individuals did not work on any other projects

18      for the FOMB other than the best interest test

19      reports?

20  A   I don't know that for a certainty.  They could

21      obviously have been asked to do something else

22      by another partner.  I would not have asked them

23      to work on something else, that much I can tell

24      you.

25          But some of these folks have been with the

Page 44

1    team for some time and very well could have been

2    involved in other aspects of some of our work.

3  Q  Mr. Shah, when did you first learn that you may

4    be a witness in this case?

5  A  I -- when the FOMB prepared its witness

6    designation list that, you know, that we were

7    asked to provide somebody who could testify with

8    regards to this work that we've done for the

9    best interest test.  I don't remember the exact

10    time frame but --

11  Q  That was not part of your understanding when you

12    were first brought into the engagement with the

13    FOMB?

14  A  Well, no.  I mean, you asked the question of

15    when I found out that I was going to testify.

16  Q  Hm-mmm.

17  A  You know, as part of our overall support, as

18    it's included in the scope of our contracts, we

19    have in that scope -- you know, obviously part

20    of our scope would be to support the board, you

21    know, with testimony as may be required, you

22    know, in the situation.  You know, it was --

23        Just given the environment we're in, it

24    would be unrealistic to think that that wouldn't

25    have been a possibility.  It's been part of the

Page 45

1       contract for quite some time.  I don't recall

2       whether it was in the first or the second scope,

3       but, you know, it's been in there for several

4       years.

5   Q   How is McKinsey compensated by the FOMB?

6   A   Sorry.  When you say "what is the nature of our

7       contract"?

8           So again, it's -- the contract is public.

9       It's available.

10          It's a fixed-fee, monthly run rate contract

11      that gets renegotiated with the board on an

12      annual basis based on scope.

13  Q   How are you compensated in connection with your

14      testimony today?

15          MR. MERVIS:  Objection to the form.

16          MR. JOSEPH:  Objection to the form as well.

17  A   I have no linkage between this testimony and my

18      compensation.

19  BY MR. GILLESPIE:

20  Q   How does McKinsey's compensation vary, if at

21      all, based on your participation in the

22      deposition today?

23          MR. JOSEPH:  Objection.  I believe it was

24      asked and answered.

25          But go ahead.

Page 46

1    A    As I mentioned, we have a fixed-fee, monthly run

2         rate contract; so there's -- there's no impact

3         on McKinsey's compensation unless there was some

4         perspective that we obviously didn't live up to

5         our scope.

6    BY MR. GILLESPIE:

7    Q    You've said that McKinsey's contract is a fixed,

8         monthly run rate contract.  How much --

9              How much money is that per month?

10   A    I don't have the figures off the top of my head.

11   Q    Do you recall whether it's structured as a cap

12        of some kind?

13   A    I'm not sure.  It's a fixed monthly.  There's

14        a -- you know, there's a certain amount that's

15        fixed each month for the services we provide; so

16        I'm not sure how a cap is relevant or, you know,

17        is pertinent.  Maybe I misunderstood the

18        question so --

19   Q    Well, I'm trying to understand the fixed fees.

20        Is fixed-fee more of a minimum that there's a

21        certain --

22   A    No.

23   Q    -- fixed amount?

24   A    There's a certain fixed amount each month for

25        the scope of services that we provide to the

Page 47

1       board, and that's been the nature of our

2       contracts for years with the FOMB.

3              MR. GILLESPIE:  Mr. Shah, I think this may

4       be a point for a short break.

5              THE WITNESS:  Okay.

6              MR. GILLESPIE:  I don't know if we should

7       take ten minutes?

8              MR. JOSEPH:  Whatever you want.  We're

9       good.  Ten minutes is fine.

10             THE VIDEOGRAPHER:  Going off the record at

11      10:42.  Please stand by.

12             (A recess was taken.)

13             THE VIDEOGRAPHER:  We are back on the

14      record.  10:56.

15             MR. GILLESPIE:  I'm going to ask my

16      colleague to mark the first exhibit.  I believe

17      it should be uploaded.  I understand that on the

18      Egnyte platform, you may need to reload the

19      Marked Exhibits folder to see it.

20             (A discussion was held off the record to

21      correct technical issues.)

22             MR. JOSEPH:  Exhibit 001, is that what I'm

23      looking at?

24             MR. KOFF:  Noah, are you going to share a

25      screen, too, like we did yesterday?

Page 48

1          Sorry about that.  I don't have it on my
2     screen, and I think others may not.
3          MR. GILLESPIE:  Why don't we have that put
4     up on the Screen Share so that everyone can see
5     it easily as well.
6          MR. JOSEPH:  Okay.  This is Andrew
7     speaking.  Both myself and the witness have the
8     document in front of us on the screen.
9          MR. GILLESPIE:  Mr. Thomas, are you able to
10    screen-share for the benefit of the others?
11         THE TECHNICIAN:  Sure.  I didn't know if
12    you wanted me to do it or not.  I'll bring it
13    up.
14         Sorry.  My computer kind of stuttered for a
15    second.  It's on the screen now.
16         MR. GILLESPIE:  Very good.  I can see that.
17  BY MR. GILLESPIE:
18  Q   Mr. Shah, are you able to see the Screen Share
19      as well?
20  A   Yes.
21  Q   Mr. Shah, is this your report?
22         MR. JOSEPH:  Can he scroll through it.
23    What we're looking at is the first page.  He's
24    got the ability on the screen; so you don't need
25    to do it up there.

Page 49

1    A    I've scrolled through, really fast, the first

2         30, 40 pages, but, yes, this looks like my

3         report.

4              (Deposition Exhibit 1 was presented for

5         identification.)

6              MR. GILLESPIE:   And I'll note for the

7         record that what we marked for identification

8         as Shah Exhibit 1 bears some docket stamps from

9         the docket in the main proceeding which are

10        17628-16.

11   BY MR. GILLESPIE:

12   Q    Mr. Shah, do you stand behind this report?

13   A    I do.

14   Q    What was McKinsey's assignment in connection

15        with this report?

16   A    We were asked to prepare an analysis on the

17        recoveries that creditors could receive should

18        the Title III cases be dismissed.

19   Q    What conclusions did you reach?

20              MR. MERVIS:   Objection to form.

21              MR. JOSEPH:   Objection to form.

22   A    My conclusions.

23              The analysis has a series of outputs that

24        estimate a range of recoveries.  That would be

25        our, I use your term, "conclusions."  Although

1    if you're asking are there other conclusions,

2    yeah, the conclusions are the scheduled outputs

3    that we have in the analysis.

4   BY MR. GILLESPIE:

5   Q   So I understand that the results of the analysis

6       in this report are the schedules of outputs that

7       are in the tables of the reports?

8   A   That's right.

9   Q   Mr. Shah, please describe in detail your role

10      with respect to this report.

11  A   Sure.

12          So I led the team to prepare this report; I

13      was involved in reviewing the information and

14      data that was collected as well as the

15      development of the methodology used; and then

16      ultimately reviewing the analysis and signing

17      off on the output of our work; and I also was

18      involved in drafting the report that you see

19      here.

20  Q   To the extent you just described, you were

21      personally involved in the preparation of this

22      report?

23  A   That's right.

24  Q   Were you personally involved in any other aspect

25      of the preparation of this report?

1          MR. JOSEPH:   Objection to the form.

2          MR. MERVIS:   Same objection.

3          Go ahead.

4     A   I'm not sure I understand.   Can you clarify the

5          question.

6     BY MR. GILLESPIE:

7     Q   I just want to make sure we have a complete

8          understanding of the ways that you were

9          personally involved in preparing this report.

10          You mentioned a number of them.   I just

11          want to make sure we're not overlooking anything

12          else you were personally involved with for this

13          report.

14    A   I don't believe I overlooked anything.

15    Q   In connection with preparing this report, you

16          accepted assumptions from legal advisers?

17    A   That's right.

18    Q   And you also accepted information and data from

19          financial advisers?

20    A   That's correct.

21    Q   Did you review all of the language in this

22          report?

23    A   Again, help me understand your question.   Is the

24          question did I -- maybe you can clarify the

25          question.   I just want to make sure I answer it

Page 52

1      appropriately.

2           MR. JOSEPH:  If you don't understand, he'll

3      rephrase it for you.

4  BY MR. GILLESPIE:

5  Q   We're looking here at what's been marked Shah

6      Exhibit 1.

7           Did you review this report in its entirety

8      before it was finalized?

9  A   I did review the report, yes.

10 Q   And did you review the language of the report?

11 A   Yes.

12 Q   Did you approve all the language of the report?

13 A   I did sign off on the report, as I mentioned; so

14     yes.

15 Q   Is there any other person at McKinsey who is

16     more knowledgeable than you about this report?

17 A   No.

18 Q   Who wrote the report?

19 A   This -- when -- well, help me clarify.  Are you

20     asking who literally wrote each of the words?

21 Q   Yes.  Who are all of the individuals who were

22     involved in drafting this report?

23 A   It would be myself and the team that I

24     identified earlier.

25 Q   Just remind us who makes up that team.

Page 53

1    A    Rafael Rivera, Justin Collins, Gaby Piere.

2    Q    How much of this report did you yourself write?

3    A    I don't have an exact answer for you but a good

4         chunk of it.

5    Q    Can you estimate how many words in the report

6         are yours?

7              MR. JOSEPH:  Objection.  Objection to form.

8    A    I have no idea.  I can't answer that question.

9    BY MR. GILLESPIE:

10   Q    In the drafting of this report, were any

11        portions drafted by attorneys?

12   A    Of this report?  No.

13             Well, let me clarify.  When you reference

14        the report, are you talking about the analysis

15        portion, or are you talking about the legal

16        assumption appendix at the end of the report?

17   Q    I'm talking about, really, the entirety of Shah

18        Exhibit 1.  Are there any portions --

19   A    Then, yes, there are portions drafted by

20        attorneys.

21   Q    I think you're referring to the Assumptions

22        section in Appendix 5.

23             Is that one of the places that attorneys

24        were involved in the drafting?

25   A    That would be one of the places, yes.

Page 54

1  Q   Are there any other sections where attorneys

2      contributed to the drafting of Shah Exhibit 1?

3  A   So Appendix 5, which we just referenced starting

4      on page 29, and there's similar appendices in

5      the other -- I'll get you the reference,

6      page numbers.

7          Appendix 1 starting on page 88, and

8      Appendix 1 starting on page 104.

9  Q   Okay.  So other than the Assumptions tables in

10     the three appendices that you noted, are there

11     other portions of the report that attorneys

12     contributed to drafting?

13 A   So again, clarify what you mean by "contributing

14     to drafting."

15 Q   Did attorneys write any of the language that we

16     now see in Shah Exhibit 1 outside of the three

17     appendices that you've identified?

18 A   There were one or two comments with regards to

19     references to legal assumptions that we did get

20     some feedback on that are incorporated in the

21     memo.

22 Q   Did you receive any other attorney -- excuse me.

23         Did you receive any other comments from

24     attorneys in the rest of the body of the report

25     other than what we've already talked about?

Page 55

1    A    No.

2    Q    Going back to your personal involvement in

3         drafting this report, would you say that

4         50 percent of the report is your words?

5              MR. MERVIS:  Object to the form.

6    A    Sure.  That's probably right.

7    BY MR. GILLESPIE:

8    Q    Who would you say -- like which individual

9         person, whether it's you or someone on your

10        team, would you say wrote the most

11        of Shah Exhibit 1?

12             MR. JOSEPH:  Objection to form.

13             But go ahead.

14   A    That wrote the most?  I would say I wrote the

15        most of it, compared to anyone else on the team.

16   BY MR. GILLESPIE:

17   Q    Mr. Shah, how much interaction have you had with

18        Ms. Marti Murray?

19   A    Zero.  I don't --

20             The name sounds familiar, but I don't

21        recall having much interaction with her.  I'm

22        trying to -- there may have been one

23        conversation at some point, but even that I

24        don't recall.

25             Just the name sounds familiar; so I can't

Page 56

1      say it's a total stranger.

2  Q   Are you aware that Ms. Murray has submitted a

3      report in this case?

4  A   Yes.  I am aware that she has prepared a report,

5      yes.

6  Q   Before you submitted your analysis

7      in Shah Exhibit 1, had you read her report?

8  A   No.

9  Q   As of today, have you read her report?

10 A   No.

11 Q   Was her report part of your analysis?

12 A   No.

13 Q   So you have no idea whether her report changes

14     your conclusions?

15 A   No.

16 Q   How much interaction have you had with

17     Dr. Andrew Wolfe?

18 A   I am aware of Andy Wolfe, who has served the

19     board nearly as long as we have.

20 Q   Are you aware that Dr. Wolfe has submitted a

21     report in this case?

22 A   I was not aware that Andy prepared a report.

23 Q   So you have no idea whether anything in his

24     report would change your conclusions?

25         MR. JOSEPH:  Objection to form.

Page 57

1   A    No.

2         MR. GILLESPIE:  What's the nature of the

3         objection?

4         MR. JOSEPH:  He just said he was not aware

5         that he prepared a report, and now you're asking

6         him whether or not he thinks anything in that

7         report might change his conclusions.

8         How can he possibly answer that question?

9         MR. GILLESPIE:  My question was, "You have

10        no idea?"  I'm asking the witness, and the

11        witness isn't able to do so.

12        MR. JOSEPH:  I understand.  The witness

13        told you he's not aware he even prepared the

14        report; so the question about whether or not

15        that would change conclusions or whatever you're

16        implying, it's inappropriate.

17        There's been no foundation for it.  That's

18        the basis for the objection.  Please move on.

19   BY MR. GILLESPIE:

20   Q    Mr. Shah, how much interaction have you had with

21        Gaurov Malhotra?

22   A    Can you, again, frame a reference maybe?  I'm

23        not -- Gaurov is another professional who serves

24        the board and has for a considerable amount of

25        time.

Page 58

1    Q    Have you communicated with him about any

2         analysis he might be performing for the FOMB in

3         this case?

4    A    Again, are you asking -- is there a particular

5         time frame?  Are you asking about over the last

6         four years?

7              Again, maybe a little bit of reference so I

8         can answer the question that you're asking.

9    Q    Have you spoken with Mr. Malhotra in 2021?

10   A    Have I spoken with Mr. Malhotra?  I have spoken

11        with him on occasion in 2021.

12   Q    Did any of those conversations pertain to

13        analysis Mr. Malhotra is doing for the FOMB?

14             MR. JOSEPH:  Object to form.

15   A    You would have to be more specific on what

16        analysis or, you know, if there's analysis.

17        Again, I don't know the context to be able to

18        answer your question.

19   BY MR. GILLESPIE:

20   Q    Did any of your conversations with Mr. Malhotra

21        in 2021 relate to work that he was doing for the

22        FOMB?

23   A    I would -- I would think there's probably some

24        relationship to work that he's done for the

25        FOMB.

Page 59

1    Q    Let me take a step back.

2            Do you recall the topics that you spoke

3        about with Mr. Malhotra?

4    A    Off the top of my head, I don't, no.

5    Q    How much interaction have you had with Jay

6        Herriman?

7    A    I don't know the name Jay Herriman.

8    Q    Mr. Shah, has your declaration for this case

9        been started?

10   A    I'm not aware of any work on a declaration.

11           THE TECHNICIAN:  I'm sorry.  This is Clint,

12       the tech.

13           Noah, do you still want this exhibit up on

14       the screen?

15           MR. GILLESPIE:  We can take it down for

16       right now.

17           Thank you.

18   BY MR. GILLESPIE:

19   Q    To your knowledge, is there anyone else at

20       McKinsey who might submit a declaration in this

21       case?

22           MR. JOSEPH:  I'm going to object to the

23       lack of foundation.

24           But go ahead.

25   A    Sorry.  Can you repeat the question?

Page 60

1   BY MR. GILLESPIE:

2   Q   Yeah.

3       The question is to your knowledge, are you

4       aware of anyone else at McKinsey who will submit

5       or who might submit a declaration in this case?

6   A   I'm not aware of anyone.

7   Q   Have you had any interaction with any other

8       experts retained by AAFAF in this case?

9           MR. MERVIS:  Object to the form.

10          MR. JOSEPH:  Same objection.

11  A   Maybe you can clarify.  Who do you consider an

12      expert retained by AAFAF?

13  BY MR. GILLESPIE:

14  Q   That's about -- but, you know -- but, yeah,

15      that's a fair thing.

16          MR. GILLESPIE:  Jacque, if I could ask you

17      to please mark Tab 2.

18          MR. JOSEPH:  So, Noah, is it okay if I

19      explain to the witness how he had can access 2?

20          MR. GILLESPIE:  Yes, please.

21          MR. JOSEPH:  See on the top left double

22      arrow, go back with that one.  And now if we

23      refresh on the Marked Exhibits, it should be

24      there.

25          Not yet.  In a minute.

Page 61

1          THE TECHNICIAN:  This is Clint, the tech.

2     It just appeared in there.

3          MR. JOSEPH:  Double click it.

4          Nope.  On the left-hand side Marked

5     Exhibits.  There you go.

6          (Deposition Exhibit 2 was presented for

7     identification.)

8          THE WITNESS:  Exhibit 2, is that --

9          MR. JOSEPH:  Yes.

10          THE WITNESS:  Okay.

11          MR. JOSEPH:  We both have Exhibit 2 in

12     front of us.

13          THE WITNESS:  Okay.

14          MR. GILLESPIE:  Thank you.

15          Mr. Thomas, if you could put that up on the

16     Screen Share.

17          Thank you.

18   BY MR. GILLESPIE:

19   Q   So, Mr. Shah, just to go a little bit more

20       straightforward:  Could you please scroll

21       through Shah Exhibit 2.

22   A   Uh-huh.

23   Q   Just paying attention to the names in bold.

24       Please let me know if you've had any interaction

25       with the individuals that are named in bold here

Page 62

1          in Exhibit 2.

2     A    When you say "any interaction," is there a time

3          frame or other context that I can try and answer

4          the question?

5     Q    Let's keep it to 2021 and whether you've had any

6          conversations or communications, including

7          emails, with any of the individuals listed in

8          bold here in Shah Exhibit 2.

9     A    Over the course of 2021, I would believe I would

10         have had some interaction with some of the folks

11         listed here.

12    Q    Which individuals are you referring to?  Just

13         their names.

14    A    I would expect there is probably some

15         interaction --

16              I don't know Jay, so I don't believe Jay

17         would be on the list.  But I would expect

18         there's probably some interaction over the

19         course of 2021 with the others related to some

20         topic or the other, possibly.

21    Q    And so I understand that's everybody else --

22    A    Yes.

23    Q    -- except Jay?

24              MR. GILLESPIE:  Mr. Shah and Mr. Thomas,

25         could we please go back to Shah Exhibit 1.

Page 63

1    BY MR. GILLESPIE:

2    Q    In Shah Exhibit 1, let's go to page 2.

3    A    Okay.

4    Q    I'll direct your attention to the third

5         paragraph, the one that starts:

6              "This analysis was prepared by McKinsey."

7    A    Yes.

8    Q    And so the report states:

9              "Proskauer Rose" --

10             (Reporter request for clarification.)

11   Q    And perhaps I can summarize.

12             So the second sentence starts with

13        Proskauer Rose, and it says that:

14             "Legal advisers to the FOMB provided

15        McKinsey & Company with a set of legal

16        assumptions used in the preparation of this

17        analysis."

18             Did I read that correctly?

19   A    That's right.

20   Q    It goes on to say:

21             "The legal assumptions are included in

22        Appendix 5 of this document."

23             Did I read that right?

24   A    Yes.

25   Q    And then the next sentence goes on to talk about

Page 64

1          how the financial advisers of the FOMB provided

2          McKinsey:

3               "With financial information used in the

4          preparation of this analysis.  Such financial

5          information included schedules, detailing

6          estimates of outstanding bond debt, perspectives

7          on cash balances, and other financial data."

8               Did I read that correctly?

9     A    That's right.

10    Q    The next paragraph begins by saying:

11               "McKinsey & Company has accepted as true,

12         accurate, and appropriate all legal and

13         financial information and assumptions provided."

14               Did I read that correctly?

15    A    Yes.

16    Q    So I'd like to understand the information this

17         is talking about.  Let's start with the

18         financial information.

19               What financial information did you receive

20         from the FOMB's financial advisers?

21    A    It was schedules related to outstanding debt;

22         the profile of the debt, meaning the principal

23         and interest schedules and interest rate that

24         may have been associated with that debt.

25    Q    I think page 2 also references prospectives on

Page 65

1      cash balances.
2           What financial information did you receive
3      about cash balances?
4   A  With regards to the cash balances, it's the
5      FOMB's cash report that we discussed earlier.
6   Q  Page 2 also mentions other financial data.
7           What does that include?
8   A  The other financial data would have been in
9      reference to the nonbond -- or nonfinancial debt
10     claims that exist.
11  Q  When did you receive this financial information?
12          MR. JOSEPH:  Objection to form.
13          Go ahead.
14  A  So is your question with regards to this best
15     interest test report?
16  BY MR. GILLESPIE:
17  Q  Yes.  We were just talking about, for this best
18     interest test report, Shah Exhibit 1 --
19  A  Yes.
20  Q  -- that financial advisers, the FOMB, had
21     provided these three categories of financial
22     information that we were just talking about?
23  A  That's right.
24  Q  And so when did McKinsey receive this financial
25     information?

Page 66

1          MR. JOSEPH:  Objection to form.

2          Go ahead.

3    A   So it would be over time.  And some of this

4        information would have been received back when

5        the original best interest test was being

6        prepared, as the factual data on the bond

7        issuances, maturity schedules, and interest

8        schedules really haven't changed over time.

9          Some of this information would have been

10       prepared -- or would have been received, you

11       know, released information used in this

12       report, you know, at the time this report was

13       being prepared.  For example, you know, the most

14       recent estimates of unsecured claims or, you

15       know, the cash information that was available at

16       that time.

17   BY MR. GILLESPIE:

18   Q   Am I understanding you correctly that in this

19       best interest test report, you also relied on

20       some of the financial information provided for

21       earlier best interest reports?

22   A   That's correct.

23   Q   Did you receive any financial information from

24       counsel?

25   A   There are certain pieces of information that

Page 67

```
 1         counsel helped provide to us where they were
 2         the -- they were the liaison, for example, with
 3         the Alvarez team that was doing the claims work.
 4         So that information, for example, on the
 5         unsecured claims came to us through counsel.
 6   Q     Were there any other types of financial
 7         information that counsel facilitated for you?
 8   A     Not that I'm aware of, no.
 9   Q     Did you receive any financial information from
10         AAFAF?
11   A     Specifically for this analysis, no.
12   Q     For this analysis, did you receive any financial
13         information from the government of Puerto Rico?
14   A     To directly ask your question:  Did the
15         government directly send us information?  No.
16   Q     We talked about the financial information you
17         received from the FOMB's financial advisers.
18              Did you receive any financial information
19         from the FOMB itself?
20   A     Did we receive -- we did not receive any
21         information from the FOMB.
22   Q     Looking back here at page 2, third paragraph --
23         or, excuse me, the fourth paragraph, in the last
24         sentence or the last line there, the report
25         states that:
```

Page 68

1          "McKinsey & Company has not taken any

2      independent position with respect to this

3      information and these assumptions."

4          Do you see that?

5  A   That's correct.

6  Q   And so you have not independently verified any

7      of the financial information or assumptions you

8      were provided?

9  A   That's correct.

10 Q   I want to focus now on the facts and data

11     provided to you that you considered in forming

12     your opinions, including what was provided to

13     you by attorneys.

14         Did you rely on any documents that counsel

15     provided in performing the analysis

16     in Shah Exhibit 1?

17 A   So I believe we covered this, but the legal

18     assumption appendix was provided by counsel and

19     relied upon in the preparation of the analysis.

20 Q   Yes.

21         And aside from assumptions, did you receive

22     any documents from counsel that you relied upon

23     in performing your analysis?

24 A   Outside of the assumptions, you're asking?

25 Q   Correct.

1    A    Again, we referenced that counsel had served as

2         kind of a liaison with regards to the unsecured

3         claims information with the Alvarez team; so

4         that also is information that was shared with us

5         that was used in the preparation of the

6         analysis.

7    Q    Can you identify all of the assumptions that you

8         relied on in forming your opinions that were

9         provided to you, including by attorneys?

10   A    Sorry.  Can you -- can you ask the question

11        again, Noah.  I want to make sure I understand

12        what's being asked.

13   Q    I'm trying to identify all of the assumptions

14        that you were provided in forming your opinions,

15        whether those came to you from attorneys or

16        someone else.

17             MR. JOSEPH:  I'm going to object to the

18        form of the question.

19             If you can answer, go ahead.

20   A    So I -- I will try and answer to the best of my

21        recollection to be comprehensive.

22             So in terms of -- and again, I'll ask for

23        another point:  When you say "all of the

24        assumptions," are you considering data

25        assumptions, or maybe you can just clarify, you

1          know, what falls within this category of your

2          question for all of the assumptions.

3     BY MR. GILLESPIE:

4     Q   Yes.  I think it's all of the assumptions that

5          you relied upon in forming the opinions

6          in Shah Exhibit 1.  Those would be fact

7          opinions, legal opinions, any type -- or, excuse

8          me, same thing -- any type of factual

9          assumptions or legal assumptions, any

10         assumptions at all.  And I'd love for you to

11         identify for me as best as you can --

12    A   Yes.

13    Q   -- the assumptions that you relied upon.

14    A   Again --

15            MR. JOSEPH:  Object to form.

16            Go ahead.

17    A   Does data qualify as an assumption here?  I just

18         am trying to figure out whether I need to recap

19         the data that's provided as well.

20    BY MR. GILLESPIE:

21    Q   Do I understand correctly, you know, McKinsey

22         received the financial information that we

23         talked about from financial advisers and others,

24         and McKinsey accepted all of that -- all of that

25         data as accurate?

Page 71

1    A    Mm-hmm.  That's correct.

2    Q    So aside from that --

3    A    Okay.  So aside --

4         Okay.  Go ahead.

5    Q    Aside from that, were there other assumptions

6         that anyone provided to you that you relied on

7         in formulating this report?

8         MR. JOSEPH:  Objection to form.

9         Go ahead if you can.

10   A    Okay.  So aside from the data provided and the

11        FOMB's cash report, which we have also talked

12        about and is publicly available, there are a

13        series of legal assumptions, which we've talked

14        about and is in the appendix.

15        Outside of that -- let's see.  Would there

16        have been anything --

17        The only thing that jumps out that I can

18        recall that wouldn't -- that wasn't covered in

19        those other categories is there is weekly

20        reporting the TSA -- that the government does on

21        TSA cash activity.  I believe we may have looked

22        at one of those reports that the government

23        provides to a broad host of stakeholders.

24        Beyond that and the things that we've

25        already talked about, I don't believe anything

Page 72

1      else is missing.

2    BY MR. GILLESPIE:

3    Q    Did you refuse to adopt any assumption that

4         anyone provided to you?

5              MR. JOSEPH:   Objection to form.

6    A    Again, I'm -- maybe you can clarify:  When you

7         say "anyone," are you talking about the lawyers?

8         Are you talking about others?  It's a very broad

9         question.

10   BY MR. GILLESPIE:

11   Q    I'm happy to break it down.

12              Did you refuse to adopt any assumption that

13        any attorney asked you to make?

14   A    We did not refuse any assumption that was

15        provided by counsel.

16   Q    Did anyone else ask you to make any assumptions?

17              MR. JOSEPH:   Objection to form.

18              Go ahead.

19   A    No.  No.

20   BY MR. GILLESPIE:

21   Q    Let's walk through some of the assumptions that

22        you flag in your report.

23              MR. GILLESPIE:   And, Mr. Thomas, if we

24        could please go to page 5.

25              Actually, I think we should go to page 4.

Page 73

1        I'm sorry.

2             I'm sorry.  I had it right the first time.

3        Let's go to page 5.  It's the first paragraph.

4        I apologize.

5    BY MR. GILLESPIE:

6    Q   So are you able to see page 5, Mr. Shah?

7    A   Yes.

8    Q   In looking at the first paragraph there, it

9        states:

10            "Based on discussions with the FOMB's

11       financial advisers, this analysis assumes an

12       annual discount rate of 5 percent."  ^

13            (Reporter request for clarification.)

14   Q   -- "as reasonable for the calculation of the

15       present value of future principal and interest

16       payments."

17            Do you see that?

18   A   I do.

19   Q   How did you determine that 5 percent was a

20       reasonable discount rate?

21   A   I believe we covered this near the beginning of

22       the session, but as I referenced, this was based

23       on a conversation with the folks at Citi who are

24       well versed in the municipal credit markets.

25   Q   What did you share in terms of why 5 percent was

Page 74

1    a reasonable rate here for present value

2    calculations?

3  A  Sorry.  It cut out a little bit.  I didn't catch

4    the whole question.

5  Q  So you were saying that you had discussions with

6    Citi regarding the appropriate discount rate?

7  A  That's correct.

8  Q  And so what did City communicate to you about

9    why 5 percent was a reasonable discount rate for

10    this analysis?

11  A  They simply gave us a number as what would be --

12    what would be reasonable.

13  Q  Do you know one way or another whether the past

14    experience of the Commonwealth informed this

15    figure?

16  A  I don't.

17  Q  Do you think that the Commonwealth's experience

18    in the past five or more years may be relevant

19    to whether 5 percent is a reasonable discount

20    rate?

21         MR. JOSEPH:  Objection.  Form.

22         Go ahead.

23  A  I don't know.

24  BY MR. GILLESPIE:

25  Q  You don't know one way or another?

Page 75

1   A    No.

2   Q    Let's go ahead and look at Appendix 5.  The

3        header is on page 29, but the content starts on

4        page 30.  So let's go ahead and look at page 30,

5        please.

6             Mr. Shah, let me know when you have page 30

7        in front of you.

8   A    I have it.  Page 30.

9             MR. JOSEPH:  Could I just -- one quick

10       question.

11            The page 30, you're talking about the page

12       number on the header; correct?  Because just

13       looking on the pdf, for whatever reason, mine

14       shows up on page 29, but it says page 30 on the

15       header.  I don't know why that is, but I want to

16       make sure we're on the same page.

17            MR. GILLESPIE:  Thank you for that

18       clarification.  Yes, I will be referring to the

19       blue numbers at the top of the pages

20       consistently throughout.

21   BY MR. GILLESPIE:

22   Q    Mr. Shah, are you looking at page 30?

23   A    Yes.

24   Q    So there's a table in front of us.  The two

25       substantive columns, one says "Question" and the

Page 76

1       other says "Assumption."

2           Do you see that?

3   A   Yes.

4   Q   Who formulated the questions that are in this

5       Appendix 5?

6   A   The questions were questions asked by my team to

7       counsel.

8   Q   So looking at Question 1, I see in the

9       Assumption column, there is an Assumption 1 and

10      an Assumption 2.

11          Which of these assumptions did you adopt?

12  A   So the base case of the analysis uses what's

13      called the "main assumption."

14  Q   So what role do the assumptions that are not

15      main assumptions play in your analysis?

16  A   It depends on whether the assumptions not called

17      main assumptions are relevant to the scenario

18      that was being modeled.

19  Q   Looking at the main assumption here in Question

20      Number 1, at the end of the Assumption text, it

21      says:

22          "The non-GO and non-CW guarantee creditors'

23      only recourse is to wait for a legislative

24      appropriation of amounts to pay their claims

25      once GOs are paid in full."

Page 77

1          Do you see that?

2  A   I do.

3  Q   What is the basis for why legislative

4      appropriations would be necessary for non-GO

5      creditors to obtain a recovery under this

6      assumption?

7          MR. JOSEPH:  Objection to form.

8          Go ahead.

9  A   I don't know.  It's a legal question.

10 BY MR. GILLESPIE:

11 Q   Do you have a view as to why legislative

12     appropriations might be necessary in this

13     circumstance?

14 A   I don't.

15 Q   I noticed in a number of these assumptions,

16     there's discussion of the term "police power."

17          Are you familiar with that term?

18 A   I am.

19 Q   What is your understanding of what police power

20     means in the context of these assumptions?

21          MR. JOSEPH:  Objection to form.

22          Go ahead.

23          MR. GILLESPIE:  I'm sorry, Counsel.  What's

24     the nature of the objection?

25          MR. JOSEPH:  Because I don't know which

1      assumption you're speaking of and in what

2      context police power is being used; so the

3      answer could be multiple different things.

4           So I would like to know if you could be

5      more specific.  That's all.

6   BY MR. GILLESPIE:

7   Q   Mr. Shah, you're welcome to specify as much as

8      you would need to if there are circumstances or

9      nuances that would affect your answer.

10          I don't know if there is an overall

11     assumption of police power that you can share

12     with us that applies to all of these

13     assumptions.

14          MR. JOSEPH:  I object.

15          Just ask him a question, please, Noah.

16  BY MR. GILLESPIE:

17  Q   Just so we're clear, the question is what is

18     your understanding of police power in the

19     context of these assumptions?

20          MR. JOSEPH:  Same objection.

21          Go ahead.

22  A   So in the context of these assumptions, I can't

23     answer that question.  I didn't write the

24     assumptions.

25

Page 79

1    BY MR. GILLESPIE:

2    Q   Let's try to look on page 32, Question 4.

3            THE TECHNICIAN:  Sorry, Noah.  What was

4        that page number?

5            MR. GILLESPIE:  There was a --

6            First look at page 32 so we can see the

7        question, and it's Question Number 4.

8    BY MR. GILLESPIE:

9    Q   Mr. Shah, please feel free to take some time to

10       review.  My question is going to be about the

11       basis that runs onto the next page.

12           So on page 33, for example, there's a

13       sentence that says:

14           "Section 8, however, appears subject to the

15       CW police power."

16           There's some other mentions of police power

17       in this answer to the question, and so my

18       question for you is do you have an understanding

19       of what the term "police power" means in the

20       context of this assumption?

21   A   So given I didn't write the assumption, I don't

22       think I can -- it would be -- it would be me to

23       speculate to say I've got a full understanding

24       of police power with respect to this assumption;

25       so I don't think I can answer that question.

Page 80

1    Q    Are you saying that you do not know what the

2         assumptions mean?

3              MR. JOSEPH:  I object to the form of the

4         question.

5              MR. MERVIS:  As do I.

6    A    No.  So you ask -- your question was do I

7         understand police power with regards to this

8         legal assumption?  And I can't answer on behalf

9         of the lawyer who may have drafted this for what

10        they fully meant by police power.

11   BY MR. GILLESPIE:

12   Q    I hear you.

13             I'm trying to understand, Mr. Shah, whether

14        or not you have an understanding of this

15        assumption.

16             MR. MERVIS:  Object to the form.

17             MR. JOSEPH:  Again, I'm sorry.  Is there --

18             I didn't know if there's a question; so I

19        didn't --

20             Could you just repeat the question, Noah?

21             MR. GILLESPIE:  Yes.

22   BY MR. GILLESPIE:

23   Q    Mr. Shah, do you understand what Assumption

24        Number 1 to Question 4 means?

25   A    What Assumption Number 1 to Question 4 means.

Page 81

1          I have an understanding of what

2      Assumption 1 of 4 means, which is also outlined

3      in the memo that I've got that was drafted.

4    Q   What is your understanding of the meaning of

5      Assumption 1, in your own words?

6    A   That the conditionally --

7          (Reporter request for clarification.)

8    A   That the conditionally allocable revenues could

9      be used to pay GO or Commonwealth guaranteed

10     debt to the extent that it was required to be

11     used to meet obligations.

12         And if not, that those -- if those -- if

13     those revenues were not required to pay the GO

14     debt or the Commonwealth guaranteed obligations,

15     that that money would then be returned.  And

16     there -- well, I don't -- let me make sure I

17     stay within this assumption because there is

18     multiple assumptions related to this, but yeah.

19     And that --

20   Q   Finish.  Please continue.

21   A   And that to the extent that the Commonwealth

22     required the need to use conditionally allocable

23     revenues to cover its operating expenses due

24     to -- deficits aren't unavailable, the

25     availability of funds, that the Commonwealth

Page 82

```
 1        could execute its police powers in order to be
 2        able to do that.
 3   Q    Thank you.
 4             And in terms of the understanding you just
 5        described --
 6   A    Yep.
 7   Q    -- what does "police powers" mean in your
 8        understanding?
 9   A    My understanding is that in the event that the
10        Commonwealth is facing deficits and does not
11        have enough resources to cover its expenses, it
12        can use police powers in order to retain the
13        conditionally allocable revenues to cover those
14        expenses.
15   Q    Do you have an understanding of the extent of
16        the police power in this context?
17   A    That would be a legal question.  I can't answer
18        that.
19   Q    Looking into Assumption Number 1 here, the
20        second sentence, I believe, on page 32 --
21             Maybe we should start a bit earlier.
22             So Assumption 1, main assumption, reads:
23             "An allocable revenue entity or its
24        bondholders may assert a claim against the
25        Commonwealth for allocable revenues the
```

Page 83

1       Commonwealth has retained but not used to pay GO

2       debt or CW-guaranteed debt."

3            Let me just stop there.  See if I read that

4       correctly.

5            The next sentence reads:

6            "This claim is an unsecured,

7       nonpriority" --

8            -- and then goes on to say "claim."

9            It says:

10           "An unsecured, nonpriority claim against

11      the Commonwealth."

12           Do you see that?

13   A   I do.

14   Q   Do you know how this was determined?

15   A   I don't.

16           MR. JOSEPH:  Objection to the form.

17   BY MR. GILLESPIE:

18   Q   In terms of prioritizing expenditures, did you

19      consider the Management and Budget Office

20      Organic Act in Puerto Rico?

21           MR. JOSEPH:  Object to form.

22           Go ahead.

23   A   I'm not familiar with what that is.

24           MR. GILLESPIE:  Let's go ahead.  And,

25      Jacque, if you could please mark Tab 3.

Page 84

1          (Deposition Exhibit 3 was presented for
2       identification.)
3              THE TECHNICIAN:  It's available now.
4              THE WITNESS:  Okay.  I can see the screen.
5              MR. GILLESPIE:  Mine is still loading.
6  BY MR. GILLESPIE:
7  Q   Let's go ahead and look at page 3.
8              MR. JOSEPH:  Are we looking at Statute
9       Section 104, Governor-Duties and Powers?  Is
10      that right?
11             MR. GILLESPIE:  That's right.
12             MR. JOSEPH:  And now we're going to page 3,
13      you said?
14             MR. GILLESPIE:  Yes.  To look at
15      Subsection C, as in "Charlie."
16             MR. JOSEPH:  Give me one second.
17             MR. GILLESPIE:  Yes.
18             THE WITNESS:  Where are we looking?
19  BY MR. GILLESPIE:
20  Q   We're going to be looking at Subsection C, which
21      starts in the middle of page 3.
22  A   Okay.
23  Q   Feel free to take as much time to review that as
24      you would like.
25             My question is are you familiar with this

Page 85

1      subsection?

2              MR. JOSEPH:  I'm just going to -- are you

3      going to ask the witness whether he's familiar

4      with a legal statute?  That's what we're doing,

5      Noah?

6              MR. GILLESPIE:  Yes.

7              MR. JOSEPH:  I object.  It's an

8      inappropriate line of questioning.

9              But you can answer whether or not you're

10     familiar.

11  A   I'm not familiar with this.

12  BY MR. GILLESPIE:

13  Q   Okay.  Thank you.

14          Let's return to Exhibit Number 1, please.

15     We'll go to page 36.

16          I'm looking at Question Number 6,

17     Assumption Number 1, which says:

18          "Assume operating expenses outlined in the

19     certified financial plan are paid before debt

20     service."

21          Do you see that?

22  A   I do.

23  Q   And then under Basis, the first sentence says

24     that:

25          "The fiscal plan already projects

1       reductions in operating expenses through a

2       series of fiscal measures aimed at reducing

3       government-wide expenditures to adapt the budget

4       to a size appropriate for PR's population."

5            Do you see that?

6    A   I do.

7    Q   What do you understand that to mean?

8    A   Again, I'm not sure how to answer that question.

9        I read it for what it is.

10           But maybe you can clarify.  I mean, I can

11       read the sentence I think as well as you can

12       so --

13   Q   I'm asking you if you have an understanding of

14       what it's saying, what it means when the basis

15       says:

16           "Adapt the budget to a size appropriate for

17       Puerto Rico's population."

18   A   The sentence -- the sentence, as it's read, is

19       making a statement that the fiscal plan already

20       projects reductions in operating expenses that

21       adapt the budget to be appropriate for

22       Puerto Rico's population.

23           That's what the sentence says.

24   Q   Thank you.

25           Let's please turn back to page 6 of this

Page 87

1       Exhibit 1.  I'm looking at the second paragraph

2       of the page.

3   A   Let me get there.

4   Q   Yes, of course.  Please let me know when you

5       have page 6.

6   A   Okay.  Page 6, yeah.

7   Q   I'm looking at the second paragraph.  The first

8       sentence talks about the Puerto Rico cash

9       analysis.

10          Do you see that?

11  A   I do.

12  Q   And it stated that:

13          "Unrestricted cash is ten thousand, a

14      ninety-three million as of June 30, 2020"?

15  A   That's correct.

16  Q   Then the next sentence uses projections to

17      estimate the cash accumulation from July 2020 to

18      June of 2021?

19  A   Okay.

20  Q   And the paragraph concludes estimating that:

21          "The amount of unrestricted cash as of

22      June 30, 2021, is assumed to be eleven thousand

23      and four million."

24          Do you see that?

25  A   Yes, yes.

Page 88

1   Q   So we're looking through this analysis here of

2       the amount of unrestricted cash available at

3       different points in time.

4           Is that a fair summary of what this

5       paragraph is talking about?

6   A   Yes.

7   Q   Is this the type of analysis that you performed

8       in your daily work for the Commonwealth outside

9       of the best interest test reports?

10  A   No.

11  Q   What work did you do on this issue outside of

12      preparing your report?

13  A   What issue are you specifically -- are you

14      asking about?

15  Q   We're talking about the amount of unrestricted

16      cash at different points in time.  My question

17      is what work did you do on unrestricted cash

18      outside of preparing Shah Exhibit 1?

19  A   I did not do work on unrestricted cash.

20  Q   Okay.  Let's please go to page 8.

21          I'm looking in the middle of the page.

22      There's a paragraph that starts:

23          "For the IFCUs."

24          I'm looking at the last sentence of that

25      paragraph.

Page 89

1          MR. JOSEPH:  I'm sorry.  There's two

2      paragraphs that start "IFCUs."

3          MR. GILLESPIE:  My mistake.

4  BY MR. GILLESPIE:

5  Q   The first of those two.

6  A   Okay.

7  Q   I'm looking at the last sentence of that

8      paragraph which reads:

9          "However, as assumed in the fiscal plan,

10     IFCUs that generate operating deficits in any

11     given year are assumed to have those operating

12     deficits funded by the Commonwealth."

13         Do you see that?

14 A   Yes.

15 Q   Is this the type of analysis that you perform in

16     your daily work for the Commonwealth outside of

17     the best interest test reports?

18         MR. FRIEDMAN:  This is Peter Friedman.  I

19     object to form.  Mr. Shah works for the

20     oversight board, not the Commonwealth.

21         MR. GILLESPIE:  Let me rephrase.

22 BY MR. GILLESPIE:

23 Q   Does this type of analysis, is it the type of

24     analysis, Mr. Shah, that you perform in your

25     daily work for the FOMB aside from the best

Page 90

1      interest test reports?

2   A   Sorry.  You're not showing me an analysis.  What

3       is it that I'm commenting on here?

4   Q   This is the statement about the Commonwealth

5       funding operating deficits of IFCUs.

6   A   This --

7           MR. MERVIS:  Well, hold on.  That's not a

8       question; so I object.

9           MR. JOSEPH:  I object as well.

10          Let him ask a question.

11  A   I'm still confused.  Sorry.

12          Can I ask you to clarify?  What is the

13      question?

14  BY MR. GILLESPIE:

15  Q   Of course.

16          So we looked at this statement at the end

17      of the paragraph about if IFCUs generate

18      operating deficits, it is assumed that the

19      operating deficits will be funded by the

20      Commonwealth.

21          Do you see that?

22  A   Yes, I do.

23  Q   And so my question for you is in your daily work

24      for the FOMB, outside of the best interest test

25      reports, do you do analysis about this issue?

Page 91

1          MR. JOSEPH:  Objection to the form.

2          MR. MERVIS:  Objection to the form.

3    A    I'm still not following the question, but I will

4          try again.

5          MR. JOSEPH:  If you don't understand his

6          question, have him clarify.

7          THE WITNESS:  Okay.

8    A    Can you clarify what you mean by "you" -- or who

9          you're referring to as "you" and what you mean

10         by "analysis" because, again, there is no

11         analysis presented here.

12   BY MR. GILLESPIE:

13   Q    I am hearing what you're saying.

14         So let's -- if we want to go back to

15         page 6.  I think that was the analysis we were

16         looking at in terms of the unrestricted cash.

17         Just to clarify in terms of -- you

18         personally did not perform analysis for the FOMB

19         outside of the best interest test report related

20         to unrestricted cash?

21   A    That's correct.

22   Q    And then what about your team at McKinsey?

23   A    McKinsey did not do work on unrestricted cash.

24   Q    Understood.  Okay.

25         Let's move forward to page 10, please.  I'm

Page 92

1      looking at the second paragraph on the page or

2      the first full paragraph on the page that begins

3      with:

4           "The projections of Commonwealth revenues."

5   A  Okay.

6   Q  And, you know, so this paragraph goes on to

7      say -- it goes on to talk about structural

8      reforms, and the final sentence says:

9           "Structural forms are designed to promote

10     growth in the economy which would ultimately

11     increase Commonwealth revenue generation."

12          Do you see that?

13  A  I do.

14  Q  So apart from your personal work on the best

15     interest test reports, do you personally do any

16     work on structural reforms?

17  A  I personally do not.

18  Q  And then the team that works with you on the

19     best interest test reports at McKinsey, do any

20     of them work on structural reforms for the FOMB?

21  A  Sorry.  Can you repeat the question?

22  Q  Sure.

23          As we talked earlier, there's a team that

24     works with you on the best interest test

25     reports?

Page 93

1   A   Yes.

2   Q   So the McKinsey employees, do you work for the

3       FOMB on structural reforms?

4   A   Those employees I don't believe do any work on

5       structural reforms.

6   Q   I want to look generally at page 17 through 27.

7       There's a variety of tables.  Look through the

8       tables on page 17 through 27.

9   A   Sorry.  You cut out there a little bit.  Say

10      that again.

11  Q   I'm trying to direct your attention to pages 17

12      through 27.

13  A   Okay.

14  Q   You see there's a number of tables beginning

15      with what's marked -- what's called Exhibit 4

16      all the way through Appendix 3?

17  A   Yep.

18  Q   And I want to understand --

19          Well, first of all, what is the nature of

20      the analysis that you're presenting?  I think we

21      talked about the outputs earlier.

22          Do you remember that discussion?

23  A   That's correct.

24  Q   So I take it that pages 17 through 27 show a

25      number of outputs from the analysis that

Page 94

1      McKinsey performed?

2    A   That's correct.

3    Q   Describe for me what is -- what are the

4        questions or issues that these analyses as a

5        whole are trying to address?

6            MR. JOSEPH:  I'm going to object to form.

7            You're talking about 14 or 15 different

8        tables.

9    A   Yeah, I'm -- can you be more specific, Noah, on

10       what --

11           If there's a specific table or a specific

12       output that you would like some explanation for,

13       I can try and answer that.

14   BY MR. GILLESPIE:

15   Q   Is it fair to say that the outputs in the tables

16       on pages 17 through 27 project creditor

17       recoveries under various scenarios?

18           MR. JOSEPH:  Objection to form.

19           Go ahead.

20   A   It's a fair representation that these tables,

21       under a variety of scenarios, present a range of

22       recoveries for the debt that, you know, may

23       exist in each one of these scenarios or for the

24       recovery to creditors in the various groups.

25

Page 95

1    BY MR. GILLESPIE:

2    Q   Apart from the best interest test reports, do

3        you personally do any work for the FOMB related

4        to creditor recoveries?

5    A   Again, I'm not sure how to answer that question.

6        You would have to be more specific.

7    Q   We talked earlier about, you know, a number of

8        projects that you've worked on for the FOMB over

9        the years?

10   A   That's correct.

11   Q   And we talked about how there are a few

12       different best interest test reports?

13   A   That's right.

14   Q   So I'm trying to understand if it's outside of

15       your personal work on those best interest test

16       reports if you've done work for the FOMB related

17       to creditor recoveries?

18           MR. JOSEPH:   Objection to form.

19           Go ahead.

20           MR. MERVIS:   Same objection.

21   A   I'm not -- maybe you can clarify what

22       constitutes your description of "work" on

23       creditor recoveries.

24   BY MR. GILLESPIE:

25   Q   Have you personally performed an analysis

Page 96

1     similar to the ones represented here in

2     Exhibit 1 for the FOMB outside of your work on

3     the best interest test reports?

4  A  Oh, no.

5  Q  And the members of your team who work with you

6     on the best interest test reports, have they

7     performed any analysis for the FOMB like the

8     analysis here in Exhibit 1?

9  A  Just to clarify, you're asking if they perform

10    similar analyses outside of the best interest

11    test?

12 Q  Yes.

13 A  Is that your question?

14         MR. JOSEPH:  Object to form.

15         But go ahead.

16 A  Not that I'm aware of.

17 BY MR. GILLESPIE:

18 Q  So, I mean, there were several best interest

19    test reports for the FOMB; correct?

20 A  Maybe by "several," was there more than one?

21    Yes.

22 Q  The first one was back in 2019?

23 A  That's correct.

24 Q  And then the latest one was more recent.  When

25    was that?

Page 97

1    A    There was a report filed I want to say early

2         June of '21, and I believe that is the same

3         report that is here as part of the July update

4         to the disclosure statement.

5    Q    And you were personally involved in other

6         projects for the FOMB from, let's say, 2018

7         forward?

8    A    That's correct.

9    Q    Did any of that other work relate to the best

10        interest test reports?

11   A    No.

12   Q    And then when we look at the team at McKinsey

13        who works on the best interest test report, did

14        any of their work from 2018 forward relate to

15        the best interest test report?

16            MR. JOSEPH:  Objection to form.

17            Go ahead.

18   A    I can't answer that.  I don't know.  I don't

19        know what else they would have -- I don't know

20        the full slate of what they may have been doing.

21   BY MR. GILLESPIE:

22   Q    Let's look at page 10 in Exhibit 1.

23   A    Page 10?

24   Q    Yes, please.  So there are --

25            Let me know when you're there.

Page 98

```
 1   A   I'm there.

 2   Q   There are a number of bullet points, and the

 3       paragraph introducing the bullet points says:

 4           "Based upon guidance provided by FOMB's

 5       legal advisers, this analysis reflects

 6       modifications to the fiscal plan projections of

 7       certain expenditures to account for the absence

 8       of Title III protections and a plan of

 9       adjustment."

10           Did I read that correctly?

11   A   That's correct.

12   Q   And it goes on to say:

13           "As previously discussed, the specific

14       fiscal plan expense lines that are adjusted

15       are" --

16           -- and then there's a --

17           Do you see that?

18   A   I do.

19   Q   Let's look through these items to understand the

20       adjustments that we're talking about.

21           So under -- the first item is Pension

22       Costs, and there you explain that:

23           "In this analysis, we do not include the

24       reduction in pension benefits or the freeze and

25       accrual of benefits."
```

Page 99

1           Do you see those?

2    A    Yes.

3    Q    And then also:

4           "The analysis sets to zero contributions to

5        Social Security."

6           Do you see that?

7    A    Yes.

8    Q    And then:

9           "The analysis assumes a continuation of

10       PayGo contributions to assist in 2,000

11       participants"?

12   A    Yes.

13   Q    And so these are the adjustments that you made

14       in this analysis compared to what's in the

15       fiscal plan related to the --

16   A    That's correct.

17   Q    And then there's another bullet point about

18       Health Care Contributions.

19           Do you see that?

20   A    Yes.

21   Q    And we also have a bullet for Professional Fees.

22           Do you see that?

23   A    That's right.  Yes.

24   Q    A bullet for FOMB Expenditure?

25   A    Yes.

Page 100

1   Q    And finally, a bullet point reserved for

2        Emergency Fund which says that:

3             "The transfer of $130 million per year

4        outlined in the fiscal plan is assumed to be

5        zero."

6             Do you see that?

7   A    That's correct.

8   Q    Are these the only things that you've adjusted

9        compared with the fiscal plan?

10            MR. JOSEPH:  Objection to the form.

11            MR. MERVIS:  Same objection.

12  A    If -- no, there is another adjustment.

13  BY MR. GILLESPIE:

14  Q    And what's that?

15  A    It's related to the implementation of structural

16       reforms and one of the fiscal measures detailed

17       later in the memo.

18  Q    I think we can see that also in the second

19       paragraph -- or the first full paragraph on this

20       page 10 because it says that:

21            "The projections of the Commonwealth

22       revenues and expenses also incorporate the

23       impact of the structural reforms as outlined in

24       the fiscal plan."

25            Do you see where that's written?

Page 101

1   A    Sorry.  Tell me where you're --

2   Q    It's the second paragraph on this page:

3              "The projections of the Commonwealth

4        revenues."

5   A    Yeah.

6   Q    Is that sentence referring to what you were just

7        mentioning?

8   A    No, it's not.

9   Q    What you were just mentioning is that in your

10       analysis, you assume the growth from structural

11       reforms?

12            MR. MERVIS:  Objection to the form.

13            MR. JOSEPH:  Same objection.

14  A    I don't understand the question.  Can you

15       restate the question.

16  BY MR. GILLESPIE:

17  Q    I must have missed it.

18            Can you please tell me what the other

19       adjustment is that you made to the fiscal plan

20       that's not here on page 10?

21  A    So later in the memo, there is a discussion in

22       the section referenced the estimated likely

23       recovery or something like that, where in that

24       section, there's a discussion around the

25       ability -- or, you know, an adjustment with

Page 102

1        regards to the ability to implement certain

2        structural reforms and fiscal measures.  And

3        ultimately, that impacts the analysis, and

4        that's not detailed here.

5   Q    I see.

6            So other than the adjustment you just

7        mentioned later in the report, are there any

8        other adjustments that you made to the fiscal

9        plan?

10  A    No, that should be it.

11  Q    Was turning off these items your opinion or an

12       assumption presented to you?

13           MR. MERVIS:  Objection to form.

14           MR. JOSEPH:  Objection to form.

15  A    Can you repeat the question?  I want to make

16       sure I heard that right.

17  BY MR. GILLESPIE:

18  Q    Yeah.  Let me break it apart.

19           Were these adjustments to the fiscal plan

20       an assumption presented to you?

21  A    When you say "these adjustments," are you

22       talking about all of these adjustments?

23  Q    Yes.  The bullet points here.

24  A    Yeah.  So were they --they were not assumptions

25       presented to me.

Page 103

1    Q    Did you decide which adjustments should be made?

2    A    Correct.  These -- well, these assumptions --

3         These adjustments, or the vast majority of

4         these assumptions, were the result of

5         conversations with counsel to understand the

6         impact of the dismissal of the Title III, as

7         it's referenced here.

8    Q    And so are there particular items that were

9         assumptions from counsel as opposed to items

10        that you decided to include in your analysis?

11        MR. JOSEPH:  Object to the form of the

12        question.

13   A    So the assumptions that are outlined on this

14        page, as it's kind of described here in the

15        paragraph we reviewed, referenced those items

16        that no longer occur or, you know, change as a

17        result of the Title III being dismissed, from a

18        legal perspective.

19        So, for example, as we talked, the pension

20        cuts without a plan of adjustment, you know, are

21        not implemented or can't be implemented;

22        therefore, we had to roll those back.

23        Similarly, without a Title -- or without a

24        plan, the health care contributions were not

25        going to be changed; so we rolled those back,

Page 104

1    and so on.

2         So for the items identified here, these

3    were a function of understanding the

4    implications on fiscal plan assumptions for the

5    Title III plan not being confirmed.

6         MR. GILLESPIE:  I see it's a little past

7    12:30.  Perhaps we could go on a lunch break and

8    then come back?

9         MR. JOSEPH:  Sure.  Any sense of timing,

10   Noah?

11        THE VIDEOGRAPHER:  Going off the record at

12   12:33.  Please stand by.

13        THE VIDEOGRAPHER:  We are back on the video

14   record at 1:11.

15        MR. GILLESPIE:  Mr. Thomas, if we could put

16   back up Exhibit 1, please, on page 10.

17   BY MR. GILLESPIE:

18   Q   Mr. Shah, we were looking at the bullet towards

19       the bottom of the page about Professional Fees.

20   A   Yes.

21   Q   All right.  So let's just look here at the

22       summary.  This paragraph on Professional Fees,

23       the second sentence reads:

24            "Legal fees are assumed to double in fiscal

25       year 2022 relative to fiscal year 2021 and then

Page 105

1      grow with inflation through fiscal year 2026"?

2  A   That's correct.

3  Q   It goes on to say:

4          "In fiscal year 2027, legal fees are

5      assumed to be cut in half relative to fiscal

6      year 2026 and then grow with inflation through

7      fiscal year 2031"?

8  A   That's correct.

9  Q   And then we talk about Nonlegal Fees.

10         It says:

11         "Nonlegal fees are assumed to be halved

12     upon the dismissal of the Title III case and

13     then grow with inflation through fiscal year

14     2031"?

15  A   That's correct.

16         MR. GILLESPIE:  So at this point, I'll ask

17     Jacque to please mark as an exhibit --

18         Let me know when what we're marking

19     as Shah Exhibit 4 is available to you.

20         THE WITNESS:  It's available.

21         (Deposition Exhibit 4 was presented for

22     identification.)

23  BY MR. GILLESPIE:

24  Q   Feel free to zoom in here.  Let me start by

25     asking are you familiar with what we're looking

Page 106

1      at here?

2   A   I believe this is an excerpt from the model.

3   Q   When you say "the model," just so we are all on

4      the same page, which model are we talking about?

5   A   The best interest test model.

6   Q   This is the model that McKinsey prepared as part

7      of the analysis of the best interest test

8      reports that we've been looking at in Exhibit 1?

9   A   That's correct.

10          MR. GILLESPIE:  I'll state for the record

11      that this is an excerpt from a document bearing

12      the Bates stamp FOMB_CONF_88825.

13  BY MR. GILLESPIE:

14  Q   So I'd like to direct your attention --

15          MR. GILLESPIE:  And, Mr. Thomas, I don't

16      know if you can zoom in at all.

17  BY MR. GILLESPIE:

18  Q   -- to Professional Fees, Row 28.

19          Mr. Shah, if you want to direct your

20      attention there to Row 28, Professional Fees,

21      Legal Fees.

22          Do you see that?

23  A   Uh-huh.

24  Q   And so if we look --

25          If we carry that row over to the column

Page 107

1      marked "Fiscal Year 2022," we start with the

2      value negative 118.4?

3   A   Okay.

4   Q   And then that increases year by year through and

5      including fiscal year 2026; is that correct?

6   A   Sorry.  I'll just wait for the screen to stop

7      moving.

8          That's correct.

9   Q   So fiscal year 2026 has a value of negative

10      125.4; correct?

11   A   That's right.

12   Q   And then fiscal year 2027, the value is negative

13      63.6?

14   A   That's right.

15   Q   So the values increase from fiscal year 2027

16      through the end of fiscal year -- excuse me --

17      2031?

18          MR. MERVIS:  Where do you see -- I only

19      see --

20          Mine only goes to 28, but maybe I'm not

21      seeing.

22          MR. JOSEPH:  You've got to slide it over on

23      the bottom.

24          MR. MERVIS:  Okay.  Thanks.

25   A   Okay.

Page 108

1    BY MR. GILLESPIE:

2    Q    I'm trying to follow on back from Exhibit 1

3         where we said:

4              "Legal fees are assumed to double in Fiscal

5         Year 2022 relative to Fiscal Year 2021 and then

6         grow with inflation through 2026."

7              Are these the figures for legal fees that

8         you arrived at for that period?

9    A    Yes.

10   Q    And then how the legal fees are cut in half in

11        fiscal year 2027 relative to fiscal year 2026.

12             That's what we're seeing in the column

13        Fiscal Year 2027 here in Exhibit 4?

14   A    That's right.  That's right.

15   Q    Then they continue to grow with inflation

16        through fiscal year 2031.  We see the rest of

17        the figures that result in the remainder of that

18        row?

19   A    That's right.

20   Q    Then we'll probably have to move the view back

21        to the left so we can see the label for the row

22        under that.  The next row, Row 29, is labeled

23        "Professional Fees, Nonlegal Fees"; is that

24        right?

25   A    That's right.

Page 109

1   Q   If we scroll over, I think we're -- we can see

2       that there's, you know, a starting value in the

3       earlier period.  I mean, I can only see on this

4       view, fiscal year 2022.  That's 44.1?

5   A   Mm-hmm.

6   Q   And we see that that grows slowly over time.

7           Do you see that?

8   A   I do.

9   Q   And so these are the figures you arrived at that

10      you were describing in Exhibit 1 as the nonlegal

11      fees are soon to be halved on the dismissal of

12      the Title III case and then grow with inflation

13      through fiscal year 2031?

14  A   That's correct.

15  Q   And then let's look at the row below that.

16          MR. GILLESPIE:  So if we can go more back

17      to the left.

18  BY MR. GILLESPIE:

19  Q   This is that last item in the category.

20          It says:

21          "FOMB baseline budget postmeasures."

22          Do you see that?

23  A   Yes.

24  Q   And we can refer back to Exhibit 1, if you like.

25      Why don't we look at that quickly.

Page 110

1           MR. GILLESPIE:  And if we can go back,

2       Mr. Thomas, to Exhibit 1, the view should be

3       there.

4   BY MR. GILLESPIE:

5   Q   There's a bullet, FOMB Expenditure.  This one is

6       saying:

7           "The FOMB is assumed to continue to exist."

8           Do you see that?

9   A   Yes.

10  Q   If we return to Exhibit 4, we see that the first

11      value that's listed is fiscal year 2022.  Then

12      it says negative 65.0?

13  A   That's right.

14  Q   And that means $65 million?

15  A   That's correct.

16          MR. GILLESPIE:  And then if we just move

17      our view to the right so we can see the

18      remainder of the columns, please.

19  BY MR. GILLESPIE:

20  Q   So, let's see, the first five years.  I see the

21      value is constant at 65.0?

22  A   That's right.

23  Q   And then beginning in fiscal year 2027, the

24      value begins to increase, and it continues

25      increasing through fiscal year 2031?

Page 111

1    A    That's right.

2    Q    And the value that's in fiscal year 2031 is

3         70.2?

4    A    Correct.

5    Q    So when we're looking at the Legal, Professional

6         Fees, how do you know they are going to be this

7         high?

8              MR. JOSEPH:  Object to the form.

9              MR. MERVIS:  Same objection.

10   A    Sorry, can -- can you repeat the question.  How

11        do I know what?

12             MR. GILLESPIE:  Can I ask Madam Court

13        Reporter to please read the question back.

14             (The requested text was read by the

15        reporter.)

16   A    It's -- I don't know for sure what the

17        professional fees would be; however, with the

18        dismissal of a Title III, one of the assumptions

19        is that litigation will exist, which is

20        described in the memo, and as a result of that,

21        the fees would be higher than the baseline fees

22        projected in the fiscal plan; therefore, this

23        reflects our assumption to account for

24        additional fees.

25

Page 112

1    BY MR. GILLESPIE:

2    Q   What will the attorneys be doing, say, in fiscal

3        year 2026?

4            MR. JOSEPH:   Objection to form.

5            Go ahead.

6    A   I can't tell you exactly what an attorney may be

7        doing in any given year.

8    BY MR. GILLESPIE:

9    Q   I see in fiscal year 2026, you have a value of

10       125.4 million.

11           So what litigation are you projecting will

12       be going on at that point?

13           MR. MERVIS:   Object to the form.

14           MR. JOSEPH:   Same objection.

15           Go ahead.

16   A   I don't have a perspective on specific

17       litigation.

18   BY MR. GILLESPIE:

19   Q   How about in these last five years, fiscal year

20       2027 through fiscal year 2031.   What litigation

21       do you believe will be taking place during that

22       period?

23   A   I don't have a perspective on specific

24       litigation.

25   Q   Why did you assume that litigation will continue

Page 113

1       for a total of ten more years after dismissal of

2       the Title III case?

3   A   The assumption was developed in conjunction with

4       conversations with counsel to understand what

5       could be reasonably expected in terms of the

6       length of litigation that would continue.

7   Q   Did you give any consideration for a learning

8       curve that might reduce the legal spend over

9       time?

10          MR. JOSEPH:  I'm sorry.

11          Tara, can you read that question back,

12      please.

13          (The requested text was read by the

14      reporter.)

15          MR. JOSEPH:  Thank you.

16          MR. MERVIS:  Object to the form.

17  A   I'm not sure what that even means.  Do you want

18      to clarify?

19  BY MR. GILLESPIE:

20  Q   Do you think that after the first five years of

21      litigation that attorneys may be able to work

22      more efficiently because of what they have

23      learned through those five years of experience?

24          MR. JOSEPH:  Objection to form.

25          Go ahead.

Page 114

1   A   It's possible, but I can't speak to how

2       attorneys would work or operate.

3   BY MR. GILLESPIE:

4   Q   Let's look at the line for the FOMB.

5           What do you expect that the FOMB will be

6       doing five years from now in fiscal year 2025?

7   A   I can't tell you specifically what the FOMB

8       would be doing.  I would assume it would be

9       carrying out its duties.

10  Q   We can see that the cost in the FOMB line stays

11      the same or increases throughout fiscal year

12      2031; is that right?

13  A   Sure.

14  Q   So do you think that the FOMB will have more to

15      do in 2029 than today?

16          MR. MERVIS:  Objection to the form.

17          MR. JOSEPH:  Same objection.

18  A   As I said before, I can't -- I don't have an

19      opinion on what the FOMB is going to be doing in

20      2029 versus today.

21  BY MR. GILLESPIE:

22  Q   I think you referenced earlier the FOMB will

23      continue to carry out its duties.

24          Do you have an understanding of what those

25      duties are?

Page 115

1   A    Not in its entirety, no.

2   Q    Do you have any sense of what the FOMB will

3        accomplish during this period time?

4             MR. JOSEPH:  Objection to form.

5   A    Yeah, I don't -- I have no basis to be able to

6        answer that question.

7             MR. GILLESPIE:  We can take down this

8        exhibit.

9   BY MR. GILLESPIE:

10  Q    Mr. Shah, I'll just ask generally, as we get

11       started, talking about the creditor recovery

12       analysis that you performed.

13            And, first of all, when I say "the creditor

14       recovery analysis," do you understand what I'm

15       referring to?

16  A    I'm assuming that you're referring to the

17       document filed in Exhibit 1 -- is that right? --

18       or whatever we -- the first exhibit we tagged?

19  Q    Yes.  Yes, that's correct.

20            So your analysis considered different

21       classes of creditors; is that correct?

22  A    Correct.  There's the different groups of

23       creditors, yes.

24  Q    Why did you find that helpful?

25            MR. MERVIS:  Object to form.

Page 116

1        MR. JOSEPH:  Same objection.

2        Find what helpful?

3   A    I'm sorry.  Can you clarify what you mean?  I

4        don't --

5            Why did -- why did I find what helpful?

6   BY MR. GILLESPIE:

7   Q    We were just talking about the creditor recovery

8        analysis and that that looks at different

9        classes of creditors?

10  A    There's different groups of creditors.

11       "Classes" are your term.

12  Q    When you looked at different groups --

13  A    Mm-hmm.

14  Q    -- why did you choose that approach?

15  A    Based on the information that we were provided

16       with regards to the creditors and how

17       creditors -- what rights certain creditors may

18       have or the order of priority.

19  Q    Could you have reached the outputs that are

20       presented without looking at groups of creditors

21       separately?

22           MR. MERVIS:  I object to the form.

23           MR. JOSEPH:  I object to the form as well.

24  A    Depends which output you're referring to.

25

Page 117

1    BY MR. GILLESPIE:

2    Q    You agree with me that several of the outputs

3         identify the groups of creditors that you looked

4         at?

5    A    That's correct.

6    Q    I'm just trying to understand why you did it

7         that way rather than, say, some overall number

8         for each of the scenarios.

9              MR. MERVIS:  I object to the form of the

10        question.

11             MR. JOSEPH:  I object to the form as well.

12   A    So can I ask you:  Your question is why did we

13        look at groups of creditors?

14   BY MR. GILLESPIE:

15   Q    Yes.

16   A    Because of the priority of flow of certain

17        components of the resource envelope versus

18        others, which is outlined in the memo.

19   Q    So how did you arrive at the numbers shown in

20        the outputs?

21             MR. JOSEPH:  Objection to form.

22             MR. MERVIS:  Object to form.

23   A    When you say "how did I arrive," I mean, clarify

24        what -- what you're asking for.

25

Page 118

1    BY MR. GILLESPIE:

2    Q    We're just talking about the groups of creditors

3         that are presented in the outputs.

4    A    Mm-hmm.

5    Q    And I'm trying to understand how did you -- how

6         did you arrive at the groups that you presented?

7              MR. MERVIS:  Objection to form.

8              MR. JOSEPH:  I also object.

9    A    I think we just spoke to this, but we grouped

10        the creditors based on those that have similar

11        priorities for rights to -- or, you know, the

12        priority to give aid ahead of other creditors

13        with regards to certain components of the

14        resource envelope.

15   BY MR. GILLESPIE:

16   Q    How did you form your understanding of the

17        classification and treatment of claims under the

18        plan?

19              MR. JOSEPH:  Objection to form.

20   A    Sorry.  "Under the plan"?  Can you clarify what

21        plan you're talking about?

22   BY MR. GILLESPIE:

23   Q    I mean the plan of adjustment in this case.

24   A    Well, I -- again, can you repeat the question.

25              MR. GILLESPIE:  Madam Court Reporter, could

Page 119

1      I please have you read it back.

2              (The requested text was read by the

3      reporter.)

4              MR. JOSEPH:  Object as vague and ambiguous.

5              But go ahead.

6  A    I didn't form an opinion of the treatment of

7      classes or groups of creditors under the plan.

8  BY MR. GILLESPIE:

9  Q    Does your analysis in Exhibit 1 consider the

10     consent fees that are distributed in the plan to

11     be a creditor recovery?

12             MR. JOSEPH:  I object to the form.

13             MR. MERVIS:  Same objection.

14 A    No.

15 BY MR. GILLESPIE:

16 Q    How about restriction fees?

17             MR. JOSEPH:  Object to the form.

18             What about them?

19             MR. GILLESPIE:  It's the same question that

20     the witness answered --

21 A    Again, there's nothing related to the plan, as

22     there is no plan assumed in my analysis.

23             MR. GILLESPIE:  Let's mark another exhibit.

24             Actually, let's see.  Jacque, if I could

25     please have you mark Tab 5.

Page 120

1        And then while we're working on loading
2     that, if I could have Mr. Thomas bring us back
3     to Exhibit 1.  We'll look again at page 10.
4  BY MR. GILLESPIE:
5  Q   Mr. Shah, if I could direct your attention to
6     the FOMB Expenditures bullet.
7        Let me know when you're there, please.
8  A   You're on page 10, FOMB Expenditures.  Okay.
9     I'm there.
10 Q   And so the last sentence says basically that:
11       "The analysis says the FOMB will continue
12    through the period of analysis."
13       And my question is how long is that?  What
14    is the last fiscal year in the analysis?
15 A   I believe it -- ultimately, the analysis runs
16    through the time line of the fiscal plan, which
17    I believe was 2049, if I'm not mistaken.  I
18    don't have it in front of me but --
19 Q   Do you recall the total period of the analysis?
20    Like how many years --
21 A   The fiscal plan is a 30-year set of projections;
22    so the overall analysis would have run over that
23    same period.
24 Q   So this means that your analysis is assuming
25    that the FOMB will continue to operate for the

Page 121

1      next 30 years?

2   A   I believe if the criteria to dismiss the FOMB

3      are not met, then the FOMB will continue to

4      exist; that's right.

5   Q   I hear that.  I'm trying to clarify in your

6      analysis --

7   A   Yeah.

8   Q   -- that it runs through --

9          So let me be clear.  Under your analysis,

10      the FOMB is assumed to continue to operate for

11      that entire 30-year period?

12   A   I would have to go back to double check.

13   Q   Whatever it means here by "period of analysis,"

14      it would be that entire time frame?

15   A   Correct.  That is the assumption.

16          MR. GILLESPIE:  I'm hearing the next

17      exhibit is taking a while to come up because of

18      its size; so let me know when I believe it will

19      be Shah Exhibit 5 is available to you.

20          MR. JOSEPH:  It's available.

21          THE WITNESS:  It is.

22          (Deposition Exhibit 5 was presented for

23      identification.)

24   BY MR. GILLESPIE:

25   Q   If we could look, please, at page 421.  That's

Page 122

1    based on the numbering of the pdf and also the

2    blue page numbers at the top.

3         Let me know when you're on page 421,

4    Mr. Shah.

5  A   Sorry.  It's the blue 421 and not the page

6    numbers; right?

7  Q   That's right.  And I believe you can enter 421

8    into the page box and that should take you right

9    there.

10        MR. JOSEPH:  I don't have a page box.

11        THE WITNESS:  Yeah, that's a good --

12        I'm almost there.

13        MR. GILLESPIE:  I don't know if you can see

14   the shared screen.

15        MR. MERVIS:  421, yes?

16        MR. GILLESPIE:  Yes.  Great.

17 BY MR. GILLESPIE:

18 Q   And let's look at Bullet Number 9.

19 A   Okay.

20 Q   Really, we should probably look -- yeah, maybe

21   we can look at 8 and 9 together.  And I'll

22   represent --

23 A   Wait.  What is this document that you're asking

24   me to look at?

25 Q   Right.  Yes.

Page 123

1          So I'll represent to you that this is the

2      disclosure statement in connection with the plan

3      of adjustment in this case.

4   A   Okay.

5   Q   It is Docket Entry Number 17628.

6          And we'll look here at Numbers 8 and 9,

7      this is talking about --

8          MR. GILLESPIE:  If we could scroll up just

9      a little bit, Mr. Thomas, so we can see the

10     start of 8 as well.

11  BY MR. GILLESPIE:

12  Q   -- we're talking about CCDA, the consummation

13     costs and restriction fees under certain plan

14     support agreements in the case.

15         It talks about an aggregate amount of not

16     greater than $15 million.

17         Do you see that under Number 8?

18  A   I do.

19  Q   So my question for you is do you account for the

20     CCDA restriction fee in any of your uses of cash

21     analysis?

22         MR. MERVIS:  I object to the form of the

23     question.

24  A   I don't believe so.

25

Page 124

1    BY MR. GILLESPIE:

2    Q    I'll ask more generally.

3              Is there anywhere we would see, in your

4         uses of cash analysis, any of the creditor fees

5         from the settlements in this case?

6              MR. JOSEPH:   Objection to form.

7              MR. MERVIS:   Same objection.

8    A    The settlements under the plan wouldn't be part

9         of the analysis excluding the plan; so no.

10   BY MR. GILLESPIE:

11   Q    Understood.

12             We can return to Exhibit Number 1.  Let's

13        look at page 6, please.

14             So we're going to talk now about liquidity.

15   A    Okay.

16   Q    I would direct your attention, first of all, to

17        Footnote 10 that's at the bottom of this page 6.

18   A    Sorry.  I was still on the wrong doc.  Let me go

19        back.

20             Yeah, sure.  Footnote 10.  Okay.

21   Q    And you see they talk about there's -- about

22        cash restrictions, and then there are other

23        categories labeled there such as "Not Reviewed,"

24        "Potentially Unavailable Cash."

25             Did you examine any of these other

Page 125

1       categories mentioned in Footnote 10?

2    A  Help me understand what you mean by "examine."

3    Q  So the analysis elsewhere on page 6 and also in

4       the table called Exhibit 1 on page 6, do you see

5       how it's talking about the amount of

6       unrestricted cash?

7    A  That's right.

8    Q  So when you're trying to calculate unrestricted

9       cash, did you review any of these categories

10      that were labeled: Not Reviewed; Potentially

11      Unavailable Cash; Potentially Inaccessible Cash?

12   A  I'm struggling on what you mean by "review."

13          We did what we say we did.  And as

14      identified above in the reference, this

15      information was taken from the cash analysis

16      prepared by the FOMB, and, as we say in

17      Footnote 10, use -- those identified as legally

18      restricted were determined to be restricted.

19   Q  The end of the footnote goes on to say that

20      these other categories are considered

21      unrestricted?

22   A  That's right.  That's the approach we took.

23   Q  Did you do any work to independently determine

24      what was restricted or unrestricted cash?

25   A  And I think this was asked earlier, but, no, we

Page 126

1          did not.

2     Q    So then we went --

3               We discussed this -- some of the paragraphs

4          and tables on this page before, and we talked

5          about how there was roughly $11 billion as of

6          June 30, 2021?

7     A    That was the estimate, yes.

8     Q    And that that estimate was a projection based on

9          a figure from June 30, 2020?

10    A    That's correct.

11              MR. GILLESPIE:  Let's return to Exhibit 5,

12         the very long one, and let's please go to

13         page 178.

14              Mr. Thomas, I'm still seeing page 421.  Can

15         we move the Screen Share to page 178.

16              MR. JOSEPH:  Wrong doc.  It's the -- he's

17         going back to the disclosure statement,

18         Exhibit 5, page 178.

19              MR. GILLESPIE:  Yes.

20    A    Okay.  178.  Mm-hmm.

21    BY MR. GILLESPIE:

22    Q    So there's a table in the middle of the page,

23         and there's a line that says:

24              "CW Subtotal."

25              Do you see that?

Page 127

1    A    CW Subtotal, yes.

2    Q    And under Unrestricted, it reflects 11 billion,

3         609 million, and some dollars?

4    A    Okay.

5    Q    Do you see that this is the balance -- this is

6         based on the balance as of March 31 of 2021?

7    A    That's correct.

8    Q    If we go back to Exhibit 1, what would the table

9         of Exhibit 1 look like if we started from the

10        March 2021 balance?

11            MR. MERVIS:  I object to the form.

12   A    I don't know.  I can't calculate that just

13        sitting here today.

14            MR. MERVIS:  I don't know what happened.

15            THE WITNESS:  Yes.  Sorry.

16            MR. MERVIS:  The screen went blank.

17            MR. JOSEPH:  You disappeared for a second.

18            Did you get his answer?

19            MR. GILLESPIE:  I got the answer.

20            MR. KOFF:  The screen's still blank here.

21            MR. JOSEPH:  You know, just five seconds,

22        it went dark, and you guys are back.

23            So go ahead, Noah.

24            MR. GILLESPIE:  We're back.

25

Page 128

1    BY MR. GILLESPIE:

2    Q   Here in Exhibit 1, let's go ahead to page 26.

3             MR. GILLESPIE:  Mr. Thomas, I don't know if

4        we can navigate to page 26.

5             THE TECHNICIAN:  I thought you said

6        Exhibit 6.  I'm sorry.

7             MR. GILLESPIE:  No.

8             THE TECHNICIAN:  There you go.  26.

9             MR. GILLESPIE:  Thank you.

10   BY MR. GILLESPIE:

11   Q   So, Mr. Shah, let's look here on page 26 at what

12       you've called Exhibit 16.

13   A   Okay.

14   Q   Can I direct your attention to the Starting Cash

15       figures in the --

16   A   Okay.

17   Q   How did you calculate the Starting Cash amounts

18       here?

19   A   These amounts come from that table we were just

20       looking at.

21   Q   Maybe we should go back to that table and you

22       can just walk us through.

23            THE TECHNICIAN:  And what page is the last

24       table on?

25            MR. GILLESPIE:  It's on page 6.

Page 129

1          THE TECHNICIAN:  Thank you.

2     A    Okay.

3          So your question is to walk through this

4          calculation?

5     BY MR. GILLESPIE:

6     Q    Let's take it piece by piece.

7          I see here, in what you've labeled

8          Exhibit 1 on page 6 of Shah Exhibit 1, we can

9          start with just the Unrestricted, CW Cash

10         Balance.

11         And as of June 30, 2021 --

12    A    Uh-huh.

13    Q    -- that is listed as 11 thousand 4, which means

14         11 billion, 4 million dollars?

15    A    That's correct.

16    Q    And so then why don't you walk us down the table

17         from there, just the different steps that gets

18         us to the cash available.

19    A    So the 11 billion 4 is adjusted for the minimum

20         cash requirements required for the Commonwealth,

21         which are estimated between one two and 1.7; and

22         the nine three O four to nine eight O four is

23         simply the eleven zero zero four subtracting the

24         one seven zero zero and the one two zero zero.

25    Q    Understood.

Page 130

1           So if we go back to page 26.

2    A    Mm-hmm.  Yes.

3    Q    You see the starting cash there is either of

4         those two values.  There's the left column, the

5         starting cash is equal to 9.3 billion, and the

6         column to the right of that, we're starting cash

7         at 9.8 billion; is that right?

8    A    Correct.

9    Q    If we go down to page 28.

10   A    Page 28.  Okay.

11   Q    This is called Appendix 4.

12           So, you know, could you tell us how you

13        arrived at the 1.2 to 1.7 range for the minimum

14        cash requirements?

15           MR. MERVIS:  Objection to the form.

16   A    The 1.2 to 1.7 is per the analysis that's

17        depicted here, looking at benchmarks, and this

18        analysis is -- it was also included in the

19        FOMB's cash report that we discussed previously

20        and where the cash analysis is contained.

21   BY MR. GILLESPIE:

22   Q    So let's look at I think it's the fourth item,

23        Community Disaster Loans.

24           Do you see that?

25   A    I do, yes.

Page 131

1    Q    The description there is that U.S. Treasury gave

2         Puerto Rico access to CDLs as needed.  And so

3         this is a measure --

4              Is it fair to say this is a measure based

5         on Puerto Rico?

6              MR. JOSEPH:  Objection to form.

7              MR. MERVIS:  I object to the form.

8    A    I can't comment on what U.S. Treasury based its

9         analysis on.

10   BY MR. GILLESPIE:

11   Q    The description says here:

12              "The U.S. Treasury gave Puerto Rico access

13        to CDLs."

14              And that's what that row of this Exhibit 19

15        is representing; is that right?

16   A    That's correct.  What that row represents is, as

17        it says there, where the U.S. Treasury, with

18        respect to accessing CDLs, had kind of set its

19        target.

20   Q    In here, the range, based on CDLs, is from

21        800 million to $1.1 billion?

22              MR. MERVIS:  Object to the form.

23   A    That's what the chart says, yes.

24   BY MR. GILLESPIE:

25   Q    And if we're --

Page 132

1    A    Actually, no, that's not.

2    Q    Okay.

3    A    So what the chart says is that the Treasury set

4         the reserve target at 1.1 billion.  It was

5         increased from 800 -- at some point, there was

6         probably an initial target at 800, which was

7         then raised to 1.1.  That's what that says.

8    Q    And the row above it is labeled "Municipality

9         Comparable"?

10   A    That's correct.

11   Q    And the description references the City of

12        Detroit?

13   A    That's correct.

14   Q    And based on this metric, the description says:

15             "Correspondingly, Puerto Rico would retain

16        $1 billion."

17             Is that right?

18   A    That's what that line says; correct.

19             MR. GILLESPIE:  Jacque, if I could please

20        have you mark Tab 6, please.

21             THE TECHNICIAN:  It's there already.

22             MR. GILLESPIE:  Pull that up, please.  I'll

23        direct your attention to page 18.

24             MR. JOSEPH:  Identify for the record what

25        this is.

Page 133

1          MR. GILLESPIE:  This is a presentation

2     available on the FOMB's website, which is dated

3     September 17 of this year.

4          (Deposition Exhibit 6 was presented for

5     identification.)

6          MR. JOSEPH:  Thank you.

7     BY MR. GILLESPIE:

8     Q   We're looking at page 18, and I would direct

9         your attention to the box that's on the bottom

10        right.

11             Let me know when you're there.

12    A   I am here.

13    Q   You'll see that there's an entry for Min Cash

14        Balance?

15    A   Min?  Maybe you can draw -- I'm just not seeing

16        it.

17             MR. JOSEPH:  Is it 18 of the slide or is it

18        18 of the --

19    A   You said there's a box?  No.

20    BY MR. GILLESPIE:

21    Q   I'm looking at Shah Exhibit 6, and it's page 18.

22        When you look at it, there's an 18 on the bottom

23        right of the page.

24             MR. JOSEPH:  Yeah.  Got it.

25

Page 134

1   BY MR. GILLESPIE:

2   Q   I'm looking at the box on the bottom right that

3       starts with 4,900 million for CW Public Corps.?

4   A   Yes.

5   Q   And a few lines down from that, there's an entry

6       for Min Cash Balance?

7   A   Yes.

8   Q   The value there is $1 billion?

9   A   That's -- that's there.  Yes.

10  Q   We can return back it Exhibit 1.  My question

11      is --

12          Let's see.  We looked at the starting cash

13      amounts that resulted from the minimum cash

14      requirements that we were talking about.

15          Do you remember that?

16  A   Yes.

17  Q   Has McKinsey looked into different starting cash

18      amounts?

19          MR. MERVIS:  Objection to form.

20          MR. JOSEPH:  Same objection.

21          Go ahead.

22  A   Again, you're asking have we done an analysis?

23      We have not done an analysis on cash.

24  BY MR. GILLESPIE:

25  Q   Are you familiar with the emergency reserve

Page 135

1       fund?

2   A   Can you help me understand what "familiar"

3       means.

4   Q   Have you heard of an emergency reserve fund for

5       Puerto Rico?

6   A   Yes.  It's a piece of the fiscal plan.

7   Q   In your analysis, are these funds considered

8       restricted?

9   A   They are not.

10  Q   Look at Exhibit 1, page 4.

11  A   So we're going back to Exhibit 1.  All right.

12      Okay.

13  Q   The third bullet point says:

14          "The transfer of 130 million per year

15      through fiscal year 2028 to the reserve for

16      emergency fund outlined in the fiscal plan is

17      assumed not to occur."

18  A   That's correct.

19  Q   If we look back at Exhibit 6, again on page 18,

20      I'll direct your attention to the line below the

21      Minimum Cash Balance.

22          Do you see there's an item for Disaster

23      Revolver?

24  A   I see that there's an item for Disaster

25      Revolver, yes.

Page 136

1   Q   It says it has a value of $750 million?

2   A   That's right.

3   Q   And this box that we've been talking about on

4       page 18 is connected to a label that says:

5           "CW cash retained by the government"?

6   A   That's what it says, yes.

7   Q   Mr. Shah, I want to take you back a little bit.

8       We're talking about one of the earlier projects

9       that you did for the Commonwealth.

10          MR. GILLESPIE:  Mr. Thomas, we can take

11      down the Screen Share for this moment.

12  A   Okay.

13  BY MR. GILLESPIE:

14  Q   I don't know if you remember the testimony,

15      Mr. Shah, about one of the projects that you

16      worked on for the FOMB before was liquidity

17      monitoring?

18  A   That's right.

19  Q   And there may have been other liquidity analysis

20      that you also worked on.  I apologize, I forgot

21      the name of --

22  A   Sure.  Yes.

23  Q   So I'm wondering has any of that work been

24      refreshed more recently by you and your team?

25  A   No.

Page 137

1   Q   So do you know where the Commonwealth is in

2       terms of its liquidity position this fiscal

3       year, one way or another?

4   A   It's not something I track regularly.

5   Q   We've mentioned a few times in passing something

6       that you referred to as the "resource envelope"?

7   A   That's correct.

8           MR. GILLESPIE:  It may help if we pull up

9       Exhibit 1 again and look at page 4.

10  BY MR. GILLESPIE:

11  Q   Let me know when you're there.

12  A   Okay.  Page 4.  Yes.

13  Q   So there are bullet points for the Resource

14      Envelope, Outstanding Debt, and Priorities for

15      Distribution of Funds?

16  A   That's right.

17  Q   How did you know what the priorities for

18      distribution of funds should be?

19  A   This was a combination of the legal assumptions

20      here as well as conversations with counsel.

21  Q   Based on your analysis, what assets did you

22      consider available to creditors?

23          MR. MERVIS:  I object to the form.

24          MR. JOSEPH:  Yeah, I also object.

25  A   The analysis assumes the resource envelope, as

Page 138

1       it's defined here.

2    BY MR. GILLESPIE:

3    Q    I see.

4         Does the resource envelope in your analysis

5       include COFINA-related funds?

6         MR. MERVIS:  Objection to the form.

7    A    Again, give me -- I need more information to

8       understand what funds you're referring to.

9    BY MR. GILLESPIE:

10   Q    It might help if we look, for example --

11        Start with this.

12        Mr. Shah, are you familiar with an agency

13       in Puerto Rico called COFINA?

14   A    I am familiar with the term "COFINA."

15   Q    So what I'm trying to understand is whether or

16       not the resource envelope here includes any

17       assets related to COFINA.

18        MR. MERVIS:  Objection to the form.

19   A    When you say "assets related to COFINA," can you

20       be a little more specific so I can answer the

21       question.

22   BY MR. GILLESPIE:

23   Q    I can ask it more generally.

24        When you are calculating the resource

25       envelope, did you include assets that belong or

Page 139

1        might be determined by court to belong to any of

2        the instrumentalities of Puerto Rico?

3               MR. JOSEPH:  Objection.  Form.

4               MR. MERVIS:  Yeah, I object to the form.

5    A   Again, I have to know specifically what assets

6        you're referring to to be able to answer the

7        question.

8    BY MR. GILLESPIE:

9    Q   What does the resource envelope include?

10   A   So the resource envelope includes -- as we've

11       outlined here, it includes CRIM revenues; it

12       includes conditionally allocable revenues; it

13       includes any appropriations that can get pulled

14       back from IFCUs; and it includes the surplus

15       generated under the fiscal plan when excluding

16       these other three items because they are already

17       accounted for so we're not double counting.

18              Plus there's an assumption that with the

19       confirmation of an ERS plan, there is a certain

20       amount of ERSs that will come back to the

21       Commonwealth as available.

22   Q   So are there any assets of the Commonwealth that

23       are not included in the resource envelope?

24              MR. MERVIS:  Objection to the form.

25              MR. JOSEPH:  Same objection.

Page 140

1   A    I mean, I don't -- when you say "any assets," I
2        don't know what that refers to.
3   BY MR. GILLESPIE:
4   Q    First of all, is restricted cash included in the
5        resource envelope?
6   A    Is restricted cash -- no.
7             As it states here, it's the cash on hand
8        available for debt service, and we've just
9        walked through how we calculate that.
10  Q    How would your conclusion change if the resource
11       envelope included all of the Commonwealth's
12       assets except for earmarked federal funds?
13            MR. JOSEPH:  Objection to form.  Calls for
14       speculation.
15  A    I don't know.  I have no way to answer that
16       question just sitting here today.
17  BY MR. GILLESPIE:
18  Q    You and your team conducted the analysis in
19       Exhibit 1 based on the resource envelope that
20       you've described; correct?
21  A    That's correct.
22  Q    Do you have an understanding of whether the
23       resource envelope would be greater than the one
24       that you assumed if it included all of the
25       Commonwealth's assets except for federal funds?

Page 141

1          MR. MERVIS:  Object to the form.

2          MR. JOSEPH:  Same objection.

3          Go ahead.

4    A    I don't know.  I would have to understand what

5         those assets are and what contribution they

6         would make to the resource envelope.

7    BY MR. GILLESPIE:

8    Q    Is there unrestricted cash in Puerto Rico aside

9         from earmarked federal funds?

10          MR. MERVIS:  Objection to the form.

11   A    I don't understand.  Can you repeat that

12        question.  Is there what?

13   BY MR. GILLESPIE:

14   Q    My question is is there unrestricted cash beyond

15        earmarked federal funds?

16   A    I don't know how to answer that question.  I

17        don't know.

18   Q    In your analysis, you reached an estimate of the

19        amount of unrestricted cash that the

20        Commonwealth holds?

21   A    Yes.  We have an estimate for that number.

22   Q    Do you have an understanding of the components

23        that go into that total of unrestricted cash?

24   A    We have the components outlined in the board's

25        cash analysis.

Page 142

1   Q   So when we look at the resource envelope --

2           Mr. Shah, the resource envelope that you

3       used in your analysis, that comes from -- strike

4       that.

5           So in order to conduct your analysis, you

6       based the resource envelope on the assumptions

7       given to you by counsel?

8           MR. MERVIS:  Objection to the form.

9           MR. JOSEPH:  Same objection.

10          Go ahead.

11  A   That's not what I said.  So the resource

12      envelope is calculated exactly how it's outlined

13      here.

14          MR. MERVIS:  For the record, what are you

15      referring to as "here"?

16          THE WITNESS:  I'm sorry.

17  A   This is -- you know, as it's outlined, the

18      resource envelope is a component of the pieces

19      as outlined on page 4 of 109 in the bullet point

20      labeled "Resource Envelope."

21  BY MR. GILLESPIE:

22  Q   And so to determine the money available to

23      satisfy Commonwealth creditor obligations, you

24      drew that from the cash report you referenced

25      earlier?

Page 143

1          MR. MERVIS:  I'm sorry.  Tara, can you read

2      that back, please.

3          (Reporter clarification.)

4          MR. MERVIS:  Sure.

5          I did.  Yeah, I did.  I heard enough to

6      object.  I object to the form.

7          (A discussion was held off the record to

8      correct technical issues.)

9   A   I don't think that's correct.  I don't think

10      that's an accurate statement, what you just

11      said.

12  BY MR. GILLESPIE:

13  Q   I think you mentioned a few minutes ago a cash

14      report --

15  A   That's right.

16  Q   -- you relied upon?

17          And so which cash report is that?

18  A   That's the board's cash analysis, which we

19      reference as a source of information for the

20      previous cash exhibit we looked at.

21  Q   And did you decide which components would be

22      included in the resource envelope?

23          MR. MERVIS:  I object to the form.

24  A   Again, sorry.  I didn't follow --

25          Can you restate the question, or can

Page 144

1       someone read back what the question was.  I'm

2       trying to --

3            Did I what?

4            MR. JOSEPH:  If you don't understand it,

5       he'll rephrase it for you.

6   BY MR. GILLESPIE:

7   Q   Let's look at page 5 of Exhibit 1.  So there's a

8       heading that says "Resource Envelope"?

9   A   That's correct.

10  Q   It lays out in the following pages a few

11      components of the resource envelope?

12  A   That's right.

13  Q   My question for you is whether these numbered

14      components of the resource envelope were an

15      assumption given to you?

16  A   It was not an assumption directly given to us.

17           This was part of the process that we went

18      through to determine what the possible sources

19      of --the possible sources available for this

20      analysis, and these were the sources that were

21      determined by virtue of the information in the

22      fiscal plan as well as conversations with

23      counsel.  And the cash report.

24  Q   You mentioned the fiscal plan.  Has McKinsey

25      looked at what creditors would get if the

Page 145

```
 1      unadjusted fiscal plan was distributable to
 2      creditors?
 3              MR. JOSEPH:  I'm just going to object --
 4              MR. MERVIS:  Yeah.
 5              MR. JOSEPH:  Let me just get this out,
 6      Mike.
 7              Object.  You can ask the witness what he
 8      knows, but the broad question by McKinsey I
 9      think is a little beyond what he's here for.
10              But go ahead.
11              MR. MERVIS:  I object to the form but for a
12      different reason.
13  A   Sorry.  It's not something I've looked at.
14  BY MR. GILLESPIE:
15  Q   Do you know if any of the members of the team
16      that work with you on the best interest test
17      reports have looked into what creditors would
18      get if the fiscal plan was distributable to
19      creditors?
20  A   Just -- you asked a slightly different question;
21      so just -- so I just want to make --
22              I think the prior question and maybe -- I
23      mean, the prior question was the -- if the
24      fiscal plan, you know, as is was --
25              All right.  Sorry, now I'm confused.
```

Page 146

1          But I think with the first question -- and

2     this question I thought was slightly different.

3     Maybe you can just restate the question and I'll

4     answer it, but sorry.

5          MR. GILLESPIE:  Madam Court Reporter, if I

6     could have you read back not the last question

7     but the question before it.  We'll start there.

8          (The requested text was read by the

9     reporter.)

10   BY MR. GILLESPIE:

11   Q   Mr. Shah, let's take it in the two versions that

12       you would like.  Let's stick with this question,

13       but first, rather than McKinsey's work --

14   A   Yes.

15   Q   -- did you work?

16   A   I have not.

17   Q   Then the members of your team that work on the

18       best interest test reports, have they worked on

19       this issue?

20   A   I'm not aware of anyone working on that issue.

21          MR. MERVIS:  Just before you ask another

22       question, we've been going a while.  Would it be

23       okay to take a ten-minute break?

24          Obviously it's up to Andrew, but I wouldn't

25       mind one myself.

Page 147

1          MR. JOSEPH:  I'm good with a break now.

2          MR. KOFF:  Well, let's finish up the line

3      of questioning, if you want, and then take a

4      break; right?  I mean, unless you're done.

5          MR. GILLESPIE:  I think this is an

6      appropriate time to break.

7          THE VIDEOGRAPHER:  Going off the record at

8      2:24.

9          (A recess was taken.)

10          THE VIDEOGRAPHER:  We are back on the

11      record at 2:38.

12          MR. GILLESPIE:  I'll ask Jacque to

13      introduce Tab 7.

14          THE TECHNICIAN:  Should be ready.

15   BY MR. GILLESPIE:

16   Q   Mr. Shah, let me know when you have that

17      available to you.

18   A   I have it here.

19          (Deposition Exhibit 7 was presented for

20      identification.)

21   Q   I'll let you review it as much as you like.  My

22      question for you is, you know, are you aware of

23      the Biden administration's potential

24      improvements to Medicaid funding for

25      Puerto Rico?

Page 148

1    A    This is the first I'm seeing this; so I'd have

2         to read it to try and understand it.

3    Q    That was not a factor in your report?

4              MR. JOSEPH:  I think he just said he has to

5         read it to understand what it is; so let's let

6         him do that.

7              MR. GILLESPIE:  Sure.

8    A    Okay.

9    BY MR. GILLESPIE:

10   Q    Mr. Shah, now that you've had a chance to review

11        Exhibit 7, did you consider potential

12        improvements to Medicaid funding from the Biden

13        administration in your analysis?

14   A    Did I consider potential improvements?  No, I

15        haven't considered any potential improvements.

16             MR. GILLESPIE:  We can take down the Screen

17        Share.

18   BY MR. GILLESPIE:

19   Q    Mr. Shah, I think you said earlier that your

20        analysis in what we are looking at today as

21        Exhibit 1 deals with the --

22             (Reporter request for clarification.)

23   Q    Mr. Shah, I think you were telling us earlier

24        today your analysis in what we've been looking

25        at as Exhibit 1 deals with the scenario where

Page 149

1      the Title III case is dismissed?

2   A   That's correct.

3   Q   And so that's essentially a nonbankruptcy

4      scenario?

5   A   That's correct.

6   Q   So in the nonbankruptcy scenario, if Puerto Rico

7      has a bigger surplus in the future, what will

8      that mean for creditors' recoveries?

9         MR. JOSEPH:  Objection to form.

10  A   In a nonbankruptcy scenario, if the creditors

11     have -- or if the Commonwealth, you said, has

12     more surplus?  Is that what you said --

13  BY MR. GILLESPIE:

14  Q   Yes.

15  A   -- in the future?

16        It should mean that that surplus will

17     benefit some creditor.

18  Q   What is your understanding of the best interest

19     test?

20        MR. JOSEPH:  Objection to form.

21        (Reporter clarification.)

22        MR. MERVIS:  Yeah.  I object to the form.

23  A   I don't understand the question.  Maybe you can

24     provide a little bit of context.  Is it a

25     general question?  What is concept?  Context?

Page 150

1      It's hard to answer.

2   BY MR. GILLESPIE:

3   Q   In Exhibit 1 that we were looking at throughout

4       the course of the day, it's entitled "Best

5       Interest Test Report"; right?

6   A   The report I've prepared is an analysis of

7       creditor recoveries, which is what the title

8       says.  The exhibit here is titled "Best Interest

9       report."  Yes.

10  Q   In your view, were you looking at whether or not

11      the best interest test was satisfied?

12          MR. JOSEPH:  Objection.  Form.

13          Go ahead.

14  A   This report is a report estimating what

15      recoveries would be available if the Title III

16      was dismissed.  That's what this report does.

17  BY MR. GILLESPIE:

18  Q   Did you consider whether or not the plan of

19      adjustment in this case satisfies the best

20      interest test?

21          MR. JOSEPH:  Object to the form.

22          MR. MERVIS:  Yeah, object to the form.

23  A   Again, this report outlines the recoveries -- an

24      estimate of likely recoveries should the

25      Title III cases be dismissed.

Page 151

1    BY MR. GILLESPIE:

2    Q    Okay.  And, Mr. Shah, I think we've talked

3         throughout the course of the day about Exhibit 1

4         and how you had conversations with attorneys

5         about the report that is Exhibit 1.

6              Do I recall that correctly?

7    A    We discussed conversations with counsel

8         regarding the legal assumptions that are

9         pertinent for us to prepare this analysis.

10   Q    I see.  And --

11   A    And if that's what you're --

12              If that's what you're referring to, then

13         that would be accurate.

14   Q    Yeah.

15              And I guess to be clear, I'm also asking

16         you about any other -- if there were

17         conversations that you had with counsel about

18         any other portions of Exhibit 1, even beyond the

19         appendices showing the assumptions.

20              MR. JOSEPH:  Objection.  Asked and

21         answered.

22   A    I'm not -- I don't know where you're making the

23         distinction, but whether it's -- there were

24         conversations with regards to the legal

25         assumptions but -- you know, that are described

Page 152

1          in the appendix, but it would also potentially

2          extend to the application of those assumptions

3          to ensure we're applying them consistently as we

4          prepared the analysis.

5     BY MR. GILLESPIE:

6     Q   So could you please --

7              I would like to know who were the attorneys

8          that you spoke with about any aspect of

9          Exhibit 1.

10             MR. MERVIS:  Hold on.  Can you exclude from

11         that the prep sessions?  In other words, you're

12         talking about communications or conversations,

13         whatever your word was, that predate the

14         finalization of Exhibit 1.

15             MR. GILLESPIE:  Yes.  Let me clarify.

16    BY MR. GILLESPIE:

17    Q   So I'd like to know who all the attorneys are

18         that you communicated with in preparing and

19         finalizing what's now Exhibit 1.

20             MR. JOSEPH:  I'm also going to object and

21         ask you to exclude any conversations he may have

22         had with, you know, attorneys representing

23         McKinsey with respect to the report.

24             I don't imagine that you're looking for

25         that either, but if there were any such

Page 153

1      discussions, I want to make sure that's excluded

2      as well.

3           MR. GILLESPIE:  Mr. Joseph, right now I'm

4      just asking who the attorneys are.

5           MR. JOSEPH:  Who the attorneys are is fine.

6           THE WITNESS:  Sorry.

7  A   Then can I --

8           All right.  One clarification is you're

9      talking about the work not just to prepare the

10     actual exhibit but the work that we've done as

11     we've collected and analyzed data, you know, as

12     we got assumptions to try and make sure we're

13     applying it appropriately.

14          More broadly, the overall work product that

15     we -- the overall work that we did.  Is that

16     what you're asking?

17  BY MR. GILLESPIE:

18  Q   I'm talking about the work that created this

19     best interest test report.

20  A   Sure.  Okay.

21          Are you asking firms?  Names of

22     individuals?

23  Q   As best as you can remember, the firms and the

24     individual attorneys.

25  A   Okay.  In terms of the firms, it would have been

Page 154

1      Proskauer and O'Neill & Borges.

2           Individual attorneys, let me -- Josh.

3      Josh's last name I don't -- Esses maybe, starts

4      with an E.  Jeff Levitan from Proskauer.

5           Let's see, who else?

6           Paul Possinger at some point from

7      Proskauer.  Ehud Barak at some point.

8      Mia Zargel, when she was at Proskauer.

9           I'm trying to think who I'm missing.

10          I'm not -- I can't -- that's who I can

11     recall from Proskauer.  Just I'm not -- drawing

12     a blank on if there was anybody else.

13          And with regards to O'Neill, there was

14     Hermann, and I don't know Hermann's last name.

15     And there was another attorney from O'Neill, and

16     I'm drawing a blank on his name at the moment.

17     But that would be the majority that I can

18     remember sitting here right now.

19  Q   Thank you.

20          So we mentioned a number of individuals at

21     Proskauer and at O'Neill Borges.

22          Are there any other firms that you

23     communicated with about the best interest test

24     analysis?

25  A   I mean, the only other one would have been

Page 155

1      Andrew, who's here with me.

2   Q   Yes.

3          How did you communicate with these

4      attorneys?

5   A   How?  For the -- I believe for the most part by

6      phone.  Maybe there was a video here or there,

7      but I don't -- I don't recall the exact -- the

8      exact mix.

9          In most cases, it was asking questions and

10     being able to try and make sure we understood

11     some of these -- the assumptions that were

12     shared with us from Proskauer.

13  Q   How many times did you have these phone or

14     possibly a few video conversations?

15         MR. MERVIS:  Object to the form of the

16     question.

17  A   I don't know but -- I couldn't tell you.  I

18     haven't been keeping track.

19  BY MR. GILLESPIE:

20  Q   What was the substance of these conversations?

21         MR. MERVIS:  Object to the form.

22         MR. JOSEPH:  And I'll certainly object to

23     the form of any conversations with me, that

24     would be privileged, and instruct you not to

25     answer.

Page 156

1   A    Okay.  So conversations with Proskauer and

2        O'Neill, for that matter, would have related to

3        the legal assumptions for, you know, if there

4        was a question that we've encountered as we were

5        working on our analysis that had a legal

6        component to it that wasn't addressed in the

7        assumptions that we had at that time.  And

8        hence, you see a lot of the questions that we've

9        asked, and that legal memo has grown.

10  BY MR. GILLESPIE:

11  Q    Did you also have any emails with Proskauer or

12       O'Neill?

13  A    I mean, we certainly shared this legal

14       assumption memo via email, and there's probably

15       some back-and-forth regarding that.

16  Q    Did you have any text messages with any

17       attorneys at Proskauer or O'Neill?

18           MR. MERVIS:  About?  Objection to form.

19  A    Is there a --

20           I mean, you're asking with regards to this

21       topic?

22  BY MR. GILLESPIE:

23  Q    To the best interest test report.

24  A    No.

25  Q    You mentioned that there were discussions about

Page 157

1      certain of the assumptions in --

2            You know, we have the assumptions --

3            MR. JOSEPH:  Noah, sorry, you cut out.

4      Maybe you can start over.  It's hard to hear.

5            MR. GILLESPIE:  I'm sorry.  Yeah.

6   BY MR. GILLESPIE:

7   Q   I just want to understand.  You said that these

8       conversations dealt with the assumptions that

9       are listed, for example, in the appendices we've

10      looked at before; is that right?

11  A   I said they were related to the legal

12      assumptions.

13  Q   Are there any that you can remember that are not

14      listed in the appendix?

15  A   Sorry, I didn't --

16            MR. JOSEPH:  Objection to form.

17            You mean the appendices?  I think there's a

18      few.

19            MR. GILLESPIE:  That's fair.

20  A   Yes.  Can I remember what?  You're asking

21      assumptions?

22  BY MR. GILLESPIE:

23  Q   Yes.  Assumptions that were the subject of these

24      conversations that are not included in the

25      appendices we identified earlier.

Page 158

1    A    I don't -- I don't know.  I don't know the

2         answer to that.

3    Q    Thank you.

4              MR. GILLESPIE:  And so the DRA parties will

5         reserve the right to ask any follow-up

6         questions.  And at this point, I finished my

7         initial questioning; so I will turn it over to

8         the other parties, if they have questions at

9         this time consistent with the procedures

10        governing depositions in this case.

11             MR. MERVIS:  Does anybody have any --

12             Does any party have any questions for the

13        witness?

14             Hearing none, I guess we're adjourned.

15             THE VIDEOGRAPHER:  Going off the record at

16        2:58.  Please stand by.

17             MR. MERVIS:  I do want a rough of this

18        transcript, but that's all I can say right now.

19             Review and sign to Andrew Joseph at Faegre.

20             (Time noted:  3:03 p.m.)

21             AND FURTHER THE DEPONENT SAITH NOT.

22

23

24

25

Page 159

1   STATE OF INDIANA              )

                                  )   SS:

2   COUNTY OF HANCOCK             )

3        I, Tara Gandel Hudson, RPR, CRR, a Notary

4   Public in and for the County of Hancock, State of

5   Indiana at large, do hereby certify that the

6   deponent, OJAS N. SHAH, was by me remotely sworn to

7   tell the truth, the whole truth, and nothing but

8   the truth in the aforementioned matter;

9        That the foregoing deposition was taken on

10  behalf of Cantor-Katz Collateral Monitor LLC, with

11  the witness located in Florham Park, Morris County,

12  New Jersey, on the 6th day of October, 2021,

13  scheduled to commence at 9:30 a.m., pursuant to the

14  Federal Rules of Civil Procedure;

15       That said deposition was taken down

16  stenographically and transcribed to English under

17  my direction, and that the transcript is a true

18  record of the testimony received remotely of said

19  deponent; and that the signature of said deponent

20  to his deposition was requested;

21       That the parties were represented by their

22  counsel as aforementioned.

23       I do further certify that I am a disinterested

24  person in this cause of action; that I am not a

25  relative or attorney of either party, or otherwise

Page 160

1   interested in the event of this action, and am not

2   in the employ of the attorneys for either party.

3        IN WITNESS WHEREOF, I have hereunto set my

4   hand and affixed my notarial seal this 10th day of

5   October, 2021.

6

7                 Tara Gandel Hudson

     _____

8

                    Seal

9       Notary Public, State of Indiana
              Commission No. 682534

10      My Commission Expires March 27, 2024

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 161

```
 1                    Veritext Legal Solutions
                         1100 Superior Ave
 2                          Suite 1820
                       Cleveland, Ohio 44114
 3                     Phone: 216-523-1313
 4
       October 11, 2021
 5
       To: Mr. Joseph
 6
       Case Name: In Re: The Financial Oversight And Management Board For
 7     Puerto Rico v.
 8     Veritext Reference Number: 4833795
 9     Witness:  Ojas N. Shah          Deposition Date:  10/6/2021
10
       Dear Sir/Madam:
11
12     Enclosed please find a deposition transcript.  Please have the witness
13     review the transcript and note any changes or corrections on the
14     included errata sheet, indicating the page, line number, change, and
15     the reason for the change.  Have the witness' signature notarized and
16     forward the completed page(s) back to us at the Production address
       shown
17
       above, or email to production-midwest@veritext.com.
18
19     If the errata is not returned within thirty days of your receipt of
20     this letter, the reading and signing will be deemed waived.
21
       Sincerely,
22
       Production Department
23
24
25     NO NOTARY REQUIRED IN CA
```

```
                                                        Page 162
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 4833795
 3       CASE NAME: In Re: The Financial Oversight And Management
    Board For Puerto Rico v.
         DATE OF DEPOSITION: 10/6/2021
 4       WITNESS' NAME: Ojas N. Shah
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have made no changes to the testimony
    as transcribed by the court reporter.
 8

    _____          _____
 9  Date                       Ojas N. Shah
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
             Statement; and
14       Their execution of this Statement is of
             their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
             _____
18           Notary Public
19           _____
             Commission Expiration Date
20
21
22
23
24
25
```

Page 163

1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS

2

         ASSIGNMENT REFERENCE NO: 4833795
3        CASE NAME: In Re: The Financial Oversight And Management
    Board For Puerto Rico v.
         DATE OF DEPOSITION: 10/6/2021
4        WITNESS' NAME: Ojas N. Shah
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9        I request that these changes be entered
    as part of the record of my testimony.

10

         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Ojas N. Shah

14

         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18          in the appended Errata Sheet;
         They signed the foregoing Sworn
19          Statement; and
         Their execution of this Statement is of
20          their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20____.
23       _____
         Notary Public

24

         _____
25       Commission Expiration Date

Page 164

1                          ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                    ASSIGNMENT NO: 4833795
3      PAGE/LINE(S) /         CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____        _____
20     Date                   Ojas N. Shah
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24

                      _____
25                    Commission Expiration Date

**[& – 212.756.2000]**                                                                 Page 1

| & |
|---|
| **&**   2:5,10 3:9 4:9 4:15,22 5:4,10 6:5 6:9,15 8:15 19:16 22:15,18 24:3,6,10 24:12 25:21 63:15 64:11 68:1 154:1 |

| 0 |
|---|
| **001**   47:22 |
| **00918**   5:12 |
| **00918-1813**   3:10 |
| **02110-2600**   3:6 |
| **06103-3178**   5:5 |
| **07932**   5:17 |

| 1 |
|---|
| **1**   7:10 49:4,8 52:6 53:18 54:2,7,8,16 55:11 56:7 62:25 63:2 65:18 68:16 70:6 76:8,9,20 80:24,25 81:2,5 82:19,22 85:14,17 87:1 88:18 96:2,8 97:22 104:16 106:8 108:2 109:10,24 110:2 115:17 119:9 120:3 124:12 125:4 127:8,9 128:2 129:8,8 132:16 134:8,10 135:10,11 137:9 140:19 144:7 148:21,25 150:3 151:3,5,18 152:9 152:14,19 |
| **1.1**   131:21 132:4 |
| **1.1.**   132:7 |
| **1.2**   130:13,16 |

| **1.7**   129:21 130:13 130:16 |
| **10**   91:25 97:22,23 100:20 101:20 104:16 120:3,8 124:17,20 125:1 125:17 |
| **10/6/2021**   161:9 162:3 163:3 |
| **10001-2163**   3:16 |
| **10022**   2:11 |
| **10036**   2:18 |
| **10153-0119**   4:16 |
| **10166**   4:5 |
| **10281**   4:23 |
| **104**   7:14 54:8 84:9 |
| **105**   7:15 |
| **109**   142:19 |
| **10:42**   47:11 |
| **10:56**   47:14 |
| **10th**   160:4 |
| **11**   7:4 126:5 127:2 129:13,14,19 161:4 |
| **1100**   161:1 |
| **118.4**   107:2 |
| **121**   7:16 |
| **125.4**   107:10 112:10 |
| **12:30**   104:7 |
| **12:33**   104:12 |
| **130**   100:3 135:14 |
| **133**   7:18 |
| **14**   94:7 |
| **1400**   3:21 |
| **147**   7:20 |
| **15**   94:7 123:16 |
| **16**   128:12 |
| **1625**   6:6 |
| **16th**   5:11 |

| **17**   1:2 93:6,8,11,24 94:16 133:3 |
| **17628**   123:5 |
| **17628-16**   49:10 |
| **178**   126:13,15,18 126:20 |
| **17th**   6:10 |
| **18**   132:23 133:8,17 133:18,21,22 135:19 136:4 |
| **1820**   161:2 |
| **19**   34:24 38:10,11 131:14 |
| **1996**   27:23 |
| **1999**   28:7 |
| **1:11**   104:14 |

| 2 |
|---|
| **2**   7:12 60:17,19 61:6,8,11,21 62:1 62:8 63:2 64:25 65:6 67:22 76:10 |
| **2,000**   99:10 |
| **20**   162:16 163:22 164:22 |
| **200**   4:5,22 |
| **20005**   2:7 |
| **20006**   6:6 |
| **2001**   28:11,16 |
| **2004**   27:12,14 28:16,20,23 |
| **2007**   28:24 |
| **2008**   29:2,5,6 |
| **2014**   29:6,8,12,14 29:15 |
| **2016**   40:15 |
| **2017**   32:4 34:24 35:4 36:7,21 |
| **2018**   29:17 30:17 97:6,14 |
| **2019**   35:4 36:7,21 36:24 37:2 38:22 |

| **39**:6 96:22 |
| **202.383.5302**   6:7 |
| **202.729.7470**   2:7 |
| **2020**   87:14,17 126:9 |
| **2021**   1:21 8:3 38:12 58:9,11,21 62:5,9,19 87:18,22 104:25 108:5 126:6 127:6,10 129:11 159:12 160:5 161:4 |
| **2022**   104:25 107:1 108:5 109:4 110:11 |
| **2024**   160:10 |
| **2025**   114:6 |
| **2026**   105:1,6 107:5 107:9 108:6,11 112:3,9 |
| **2027**   105:4 107:12 107:15 108:11,13 110:23 112:20 |
| **2028**   135:15 |
| **2029**   2:22 114:15 114:20 |
| **2031**   105:7,14 107:17 108:16 109:13 110:25 111:2 112:20 114:12 |
| **2049**   120:17 |
| **208**   5:10 |
| **21**   97:2 |
| **21162**   160:6 |
| **212.310.8000**   4:17 |
| **212.318.6043**   4:6 |
| **212.504.6193**   4:23 |
| **212.530.5511**   3:16 |
| **212.756.2000**   2:11 |

**[212.969.3000 - adjourned]**                                                                Page 2

**212.969.3000**  2:18
**216-523-1313**
  161:3
**2400**  2:22
**250**  3:9
**26**  128:2,4,8,11
  130:1
**27**  93:6,8,12,24
  94:16 160:10
**28**  106:18,20
  107:20 130:9,10
**29**  54:4 75:3,14
  108:22
**2911**  3:21
**2:24**  147:8
**2:38**  147:11
**2:58**  158:16

**3**

**3**  7:14 83:25 84:1
  84:7,12,21 93:16
**30**  49:2 75:4,4,6,8
  75:11,14,22 87:14
  87:22 120:21
  121:1,11 126:6,9
  129:11
**31**  127:6
**310.557.2900**  2:23
**312.222.9350**  4:11
**32**  79:2,6 82:20
**3283**  1:2
**33**  79:12
**353**  4:10
**36**  85:15
**3:03**  158:20

**4**

**4**  7:15 72:25 79:2
  79:7 80:24,25
  81:2 93:15 105:19
  105:21 108:13
  110:10 129:13,14

129:19 130:11
  135:10 137:9,12
  142:19
**4,900**  134:3
**40**  49:2
**419.680.5500**  3:22
**421**  121:25 122:3,5
  122:7,15 126:14
**44.1**  109:4
**44114**  161:2
**46204**  5:18
**4833795**  161:8
  162:2 163:2 164:2
**49**  7:10

**5**

**5**  7:16 53:22 54:3
  63:22 72:24 73:3
  73:6,12,19,25 74:9
  74:19 75:2 76:5
  119:25 121:19,22
  126:11,18 144:7
**50**  55:4
**55**  3:15

**6**

**6**  7:18 8:3 85:16
  86:25 87:5,6
  91:15 124:13,17
  125:3,4 128:6,25
  129:8 132:20
  133:4,21 135:19
**600**  5:17
**609**  127:3
**61**  7:12
**610**  6:10
**617.526.9429**  3:6
**63.6**  107:13
**65**  110:14
**65.0**  110:12,21
**682534**  160:9

**6th**  1:21 159:12

**7**

**7**  7:20 147:13,19
  148:11
**70.2**  111:3
**750**  136:1
**75219**  3:22
**767**  4:16
**787.281.1816**  5:12
**787.764.8181**  3:11

**8**

**8**  79:14 88:20
  122:21 123:6,10
  123:17
**800**  2:6 3:10
  131:21 132:5,6
**84**  7:14
**860.240.2580**  5:6
**88**  54:7
**88825**  7:15 106:12

**9**

**9**  122:18,21 123:6
**9.3**  130:5
**9.8**  130:7
**901**  2:6
**919**  2:10
**9266**  6:11
**949.823.7138**  6:11
**96**  27:17 28:2
**973.549.7000**  5:18
**9:30**  1:22 159:13
**9:41**  8:1,4

**a**

**a.m.**  1:22 8:1,4
  159:13
**aafaf**  60:8,12
  67:10
**ability**  14:15 48:24
  101:25 102:1

**able**  10:19 12:11
  12:18 48:9,18
  57:11 58:17 73:6
  82:2 113:21 115:5
  139:6 155:10
**absence**  98:7
**absent**  36:4
**acasellas**  5:13
**accepted**  51:16,18
  64:11 70:24
**access**  9:2 60:19
  131:2,12
**accessing**  131:18
**accomplish**  115:3
**account**  20:2 98:7
  111:23 123:19
**accounted**  139:17
**accrual**  98:25
**accumulation**
  87:17
**accurate**  64:12
  70:25 143:10
  151:13
**acknowledge**  10:9
  162:11 163:16
**acknowledged**  9:1
**act**  83:20 162:14
  163:20
**action**  159:24
  160:1
**activity**  71:21
**actual**  153:10
**ad**  42:21
**adapt**  86:3,16,21
**addition**  19:2
**additional**  111:24
**address**  94:5
  161:16
**addressed**  156:6
**adjourned**  158:14

[adjusted - apavel]

**adjusted** 98:14 100:8 129:19

**adjustment** 7:17 7:19 98:9 100:12 101:19,25 102:6 103:20 118:23 123:3 150:19

**adjustments** 98:20 99:13 102:8,19,21 102:22 103:1,3

**administration** 148:13

**administration's** 147:23

**adopt** 72:3,12 76:11

**adsuar** 5:10

**adviser** 20:16 30:15

**advisers** 19:6,9,10 19:15,15,20 20:6 35:7 51:16,19 63:14 64:1,20 65:20 67:17 70:23 73:11 98:5

**advisory** 6:3

**affect** 14:14 78:9

**affixed** 160:4 162:15 163:21

**aforementioned** 159:8,22

**afterward** 9:11

**agency** 6:3 138:12

**aggregate** 123:15

**ago** 16:23 33:21 143:13

**agree** 25:6,11,14 117:2

**agreeable** 10:3

**agreements** 123:14

**ahead** 13:1 16:16 19:14 20:12 21:8 22:20 24:8,18 33:9 36:11 45:25 51:3 55:13 59:24 65:13 66:2 69:19 70:16 71:4,9 72:18 74:22 75:2 75:4 77:8,22 78:21 83:22,24 84:7 94:19 95:19 96:15 97:17 112:5 112:15 113:25 118:12 119:5 127:23 128:2 134:21 141:3 142:10 145:10 150:13

**aid** 118:12

**aimed** 86:2

**al** 1:8 7:17

**alexandra** 3:14 5:9

**alexpartners** 29:5 29:5

**allocable** 81:8,22 82:13,23,25 139:12

**alvarez** 20:16 26:3 26:5 67:3 69:3

**ambac** 3:13

**ambiguous** 119:4

**amended** 7:16

**amgprlaw.com** 5:13

**amount** 18:23 46:14,23,24 57:24 87:21 88:2,15 123:15 125:5 139:20 141:19

**amounts** 76:24 128:17,19 134:13 134:18

**analyses** 14:23 32:6,9 94:4 96:10

**analysis** 7:10 17:16,19,22 18:4,8 18:10,11,18,19,22 19:1,4 20:10 21:19 23:9 24:4 24:11,13 25:25 30:5 31:22,25 34:20 36:18 38:19 42:19 43:10 49:16 49:23 50:3,5,16 53:14 56:6,11 58:2,13,16,16 63:6 63:17 64:4 67:11 67:12 68:15,19,23 69:6 73:11 74:10 76:12,15 87:9 88:1,7 89:15,23,24 90:2,25 91:10,11 91:15,18 93:20,25 95:25 96:7,8 98:5 98:23 99:4,9,14 101:10 102:3 103:10 106:7 115:12,14,20 116:8 119:9,22 120:11,12,14,15 120:19,22,24 121:6,9,13 123:21 124:4,9 125:3,15 130:16,18,20 131:9 134:22,23 135:7 136:19 137:21,25 138:4 140:18 141:18,25 142:3,5 143:18 144:20 148:13,20

**amounts** 148:24 150:6 151:9 152:4 154:24 156:5

**analyzed** 153:11

**andrew** 5:16 15:21 16:17 23:17 48:6 56:17 146:24 155:1 158:19

**andrew.joseph** 5:19

**andy** 9:15 56:18 56:22

**annual** 45:12 73:12

**answer** 11:23,24 12:13 13:16,17,23 15:19 18:13 30:2 30:19 31:1 40:4 51:25 53:3,8 57:8 58:8,18 62:3 69:19,20 78:3,9,23 79:17,25 80:8 82:17 85:9 86:8 94:13 95:5 97:18 115:6 127:18,19 138:20 139:6 140:15 141:16 146:4 150:1 155:25 158:2

**answered** 16:15 25:22 45:24 119:20 151:21

**answers** 12:10

**anticipated** 35:21

**anybody** 14:6 154:12 158:11

**apart** 92:14 95:2 102:18

**apaslawsky** 3:17

**apavel** 6:12

[apologize - ave]                                                                Page 4

**apologize**  19:21,25
  73:4 136:20
**appear**  162:11
  163:15
**appearances**  2:1
  3:1 4:1 5:1 6:1 9:7
**appeared**  61:2
**appearing**  2:1 3:1
  4:1 5:1 6:1
**appears**  79:14
**appended**  163:11
  163:18
**appendices**  54:4
  54:10,17 151:19
  157:9,17,25
**appendix**  53:16,22
  54:3,7,8 63:22
  68:18 71:14 75:2
  76:5 93:16 130:11
  152:1 157:14
**appliance**  28:8
**application**  152:2
**applies**  78:12
**applying**  152:3
  153:13
**appreciate**  11:21
  23:21
**approach**  34:7
  116:14 125:22
**appropriate**  9:5
  64:12 74:6 86:4
  86:16,21 147:6
**appropriately**
  52:1 153:13
**appropriation**
  76:24
**appropriations**
  77:4,12 139:13
**approve**  52:12
**approved**  7:20

**approximately**  8:4
**arrive**  117:19,23
  118:6
**arrived**  108:8
  109:9 130:13
**arrow**  60:22
**ashley**  6:8
**aside**  9:25 20:5
  68:21 71:2,3,5,10
  89:25 141:8
**asked**  16:8,14
  23:19 24:22 32:8
  33:13 34:5,18
  43:21,22 44:7,14
  45:24 49:16 69:12
  72:13 76:6 125:25
  145:20 151:20
  156:9
**asking**  11:21,22
  50:1 52:20 57:5
  57:10 58:4,5,8
  68:24 86:13 88:14
  96:9 105:25
  117:24 122:23
  134:22 151:15
  153:4,16,21 155:9
  156:20 157:20
**aspect**  36:14 50:24
  152:8
**aspects**  44:2
**assert**  82:24
**assets**  137:21
  138:17,19,25
  139:5,22 140:1,12
  140:25 141:5
**assignment**  49:14
  162:2 163:2 164:2
**assist**  99:10
**associated**  64:24
**assume**  13:10
  85:18 101:10

112:25 114:8
**assumed**  87:22
  89:9,11 90:18
  100:4 104:24
  105:5,11 108:4
  110:7 119:22
  121:10 135:17
  140:24
**assumes**  73:11
  99:9 137:25
**assuming**  115:16
  120:24
**assumption**  53:16
  68:18 70:17 72:3
  72:12,14 76:1,9,9
  76:10,13,19,20
  77:6 78:1,11
  79:20,21,24 80:8
  80:15,23,25 81:2,5
  81:17 82:19,22,22
  85:17 102:12,20
  111:23 113:3
  121:15 139:18
  144:15,16 156:14
**assumptions**  18:24
  51:16 53:21 54:9
  54:19 63:16,21
  64:13 68:3,7,21,24
  69:7,13,24,25 70:2
  70:4,9,9,10,13
  71:5,13 72:16,21
  76:11,14,15,16,17
  77:15,20 78:13,19
  78:22,24 80:2
  81:18 102:24
  103:2,4,9,13 104:4
  111:18 137:19
  142:6 151:8,19,25
  152:2 153:12
  155:11 156:3,7
  157:1,2,8,12,21,23

**assurance**  3:13
**assured**  4:20,20
**attached**  17:16
  18:4 31:23 38:3
  163:7
**attention**  61:23
  63:4 93:11 106:14
  106:20 120:5
  124:16 128:14
  132:23 133:9
  135:20
**attentive**  14:4
**attorney**  8:14 9:7
  15:11 16:18 54:22
  72:13 112:6
  154:15 159:25
**attorneys**  9:8 14:5
  14:24 15:3,15
  16:3,19 20:5
  53:11,20,23 54:1
  54:11,15,24 68:13
  69:9,15 112:2
  113:21 114:2
  151:4 152:7,17,22
  153:4,5,24 154:2
  155:4 156:17
  160:2
**authority**  2:3 6:3
**authorize**  163:11
**availability**  81:25
**available**  40:2
  45:9 66:15 71:12
  84:3 88:2 105:19
  105:20 121:19,20
  129:18 133:2
  137:22 139:21
  140:8 142:22
  144:19 147:17
  150:15
**ave**  161:1

**avenue** 2:10 3:9
4:5,16 5:10
**avoid** 10:13 23:22
**aware** 17:15 22:13
56:2,4,18,20,22
57:4,13 59:10
60:4,6 67:8 96:16
146:20 147:22

**b**

**b** 5:16
**back** 27:7 33:12
39:9 42:15 47:13
55:2 59:1 60:22
62:25 66:4 67:22
86:25 91:14 96:22
103:22,25 104:8
104:13,16 108:2
108:20 109:16,24
110:1 111:13
113:11 119:1
120:2 121:12
124:19 126:17
127:8,22,24
128:21 130:1
134:10 135:11,19
136:7 139:14,20
143:2 144:1 146:6
147:10 156:15
161:16
**background** 19:22
26:15,23 38:21
**balance** 127:5,6,10
129:10 133:14
134:6 135:21
**balances** 64:7 65:1
65:3,4
**banker** 28:25
**barak** 154:7
**base** 31:4 76:12
**based** 35:16 45:12
45:21 73:10,22

98:4 116:15
118:10 122:1
126:8 127:6 131:4
131:8,20 132:14
137:21 140:19
142:6
**baseline** 109:21
111:21
**basically** 120:10
**basis** 22:22 23:5
31:18 34:5 45:12
57:18 77:3 79:11
85:23 86:14 115:5
**bates** 106:12
**beach** 6:11
**bear** 28:25 29:2
**bearing** 106:11
**bears** 49:8
**beginning** 29:17
73:21 93:14
110:23
**begins** 64:10 92:2
110:24
**behalf** 1:20 80:8
159:10
**believe** 20:14 21:4
23:12 25:22 28:23
34:15 38:10,12,13
45:23 47:16 51:14
62:9,16 68:17
71:21,25 73:21
82:20 93:4 97:2
106:2 112:21
120:15,17 121:2
121:18 122:7
123:24 155:5
**bell** 34:1
**belong** 138:25
139:1
**benchmarks**
130:17

**benefit** 17:10
48:10 149:17
**benefits** 7:19
98:24,25
**berezin** 4:14
**berman** 6:15
**best** 13:9 14:23
17:16,22 18:4,18
20:9 24:4 26:20
31:21,25 32:25
33:6,10 35:25
36:8,17 37:2,11,22
38:2,8,24 39:6
40:5 41:1 42:6,19
43:3,9,18 44:9
65:14,17 66:5,19
66:21 69:20 70:11
88:9 89:17,25
90:24 91:19 92:14
92:19,24 95:2,12
95:15 96:3,6,10,18
97:9,13,15 106:5,7
145:16 146:18
149:18 150:4,8,11
150:19 153:19,23
154:23 156:23
**beyond** 16:3 71:24
141:14 145:9
151:18
**biddle** 15:16
**biden** 147:23
148:12
**big** 34:25 35:23
42:20
**bigger** 34:25 149:7
**billion** 126:5 127:2
129:14,19 130:5,7
131:21 132:4,16
134:8
**bit** 24:12 31:7
38:15 58:7 61:19

74:3 82:21 93:9
123:9 136:7
149:24
**bk** 1:2
**blank** 127:16,20
154:12,16
**blaskowski** 2:5
8:20 10:17
**block** 4:9
**blue** 75:19 122:2,5
**blvd** 3:21
**board** 1:6 2:14 3:3
14:5 33:16,18,21
33:21 34:3,12
44:20 45:11 47:1
56:19 57:24 89:20
161:6 162:3 163:3
**board's** 20:15
24:11 141:24
143:18
**boat** 28:15 41:13
**bockius** 5:4
**body** 54:24
**bold** 61:23,25 62:8
**bond** 64:6 66:6
**bondholders**
82:24
**borges** 3:9 154:1
154:21
**boston** 3:6
**bottom** 104:19
107:23 124:17
133:9,22 134:2
**box** 122:8,10
133:9,19 134:2
136:3
**break** 13:21,24
47:4 72:11 102:18
104:7 146:23
147:1,4,6

breaks   13:20
briefly   9:6
bring   48:12 120:2
bringing   40:24
broad   39:25 41:2
    71:23 72:8 145:8
broader   30:10
    43:13
broadly   40:6 42:7
    153:14
brought   44:12
budget   83:19 86:3
    86:16,21 109:21
building   5:11
bullet   98:2,3 99:17
    99:21,24 100:1
    102:23 104:18
    110:5 120:6
    122:18 135:13
    137:13 142:19
burst   28:12
business   28:10
butler   3:20
butlersnow.com
    3:23

c

c   5:9 84:15,20
ca   6:11 161:25
cabrera   5:9
cadwalader   4:22
calculate   125:8
    127:12 128:17
    140:9
calculated   142:12
calculating   138:24
calculation   73:14
    129:4
calculations   74:2
call   31:19
called   28:7,21
    76:13,16 93:15

125:4 128:12
    130:11 138:13
calls   140:13
campus   5:17
cancellation   7:21
candice   3:20
candice.carson
    3:23
cantor   1:20 2:3
    159:10
cap   46:11,16
capability   10:20
care   9:10 40:22
    99:18 103:24
career   27:20,25
    32:1
carry   106:25
    114:23
carrying   114:9
carson   3:20
case   1:2 7:10 16:1
    16:5,13 26:9 40:7
    40:8,9 41:9 44:4
    56:3,21 58:3 59:8
    59:21 60:5,8
    76:12 105:12
    109:12 113:2
    118:23 123:3,14
    124:5 149:1
    150:19 158:10
    161:6 162:3 163:3
casellas   5:9
cases   40:7,11
    49:18 150:25
    155:9
casey   4:21
casey.servais   4:24
cash   24:11 25:23
    34:17,19,21 36:15
    64:7 65:1,3,4,5
    66:15 71:11,21

87:8,13,17,21 88:2
    88:16,17,19 91:16
    91:20,23 123:20
    124:4,22,24 125:6
    125:9,11,11,15,24
    128:14,17 129:9
    129:18,20 130:3,5
    130:6,14,19,20
    133:13 134:6,12
    134:13,17,23
    135:21 136:5
    140:4,6,7 141:8,14
    141:19,23,25
    142:24 143:13,17
    143:18,20 144:23
catch   74:3
categories   65:21
    71:19 124:23
    125:1,9,20
category   70:1
    109:19
cause   159:24
ccda   123:12,20
cdl   7:21
cdls   131:2,13,18
    131:20
center   5:11 6:10
century   2:22
certain   8:16,21
    16:24 22:6 46:14
    46:21,24 66:25
    98:7 102:1 116:17
    117:16 118:13
    123:13 139:19
    157:1
certainly   37:4,7
    155:22 156:13
certainty   43:20
certificate   163:11
certification   162:1
    163:1

certified   85:19
certify   159:5,23
cetera   40:25 41:6
challenges   32:10
    41:12
chance   148:10
change   30:8 56:24
    57:7,15 103:16
    140:10 161:14,15
    163:8 164:3
changed   30:10
    39:18 66:8 103:25
changes   33:18
    34:21 56:13
    161:13 162:7
    163:7,9
changing   34:16
charlie   84:15
chart   131:23
    132:3
check   121:12
chicago   4:10
chief   30:14
choose   116:14
chunk   53:4
circumstance
    35:14 77:13
circumstances
    78:8
citi   73:23 74:6
citibank   19:16
    21:20,22 22:3,12
city   74:8 132:11
civil   1:22 159:14
    162:5 163:5
claim   20:15 82:24
    83:6,8,10
claims   26:9 65:10
    66:14 67:3,5 69:3
    76:24 118:17

[clarification - consideration]

clarification  23:10
42:8 63:10 73:13
75:18 81:7 143:3
148:22 149:21
153:8
clarified  39:22
clarify  13:9 42:10
51:4,24 52:19
53:13 54:13 60:11
69:25 72:6 86:10
90:12 91:6,8,17
95:21 96:9 113:18
116:3 117:23
118:20 121:5
152:15
clark  4:10
classes  115:21
116:9,11 119:7
classification
118:17
clean  24:24
cleaner  24:23 25:1
clear  12:9 78:17
121:9 151:15
clearer  12:2
clears  12:25
clerk  6:15,16
cleveland  161:2
click  61:3
client  31:4,8
clients  30:16 31:8
clint  6:17 26:12
59:11 61:1
clutter  23:16 25:4
cofina  138:5,13,14
138:17,19
cognizant  10:11
colin  4:14
colin.mcgrath
4:18

collateral  1:20 2:3
2:3 159:10
colleague  10:16
47:16
colleagues  8:21
collect  19:3
collected  50:14
153:11
collecting  19:9
collins  17:8 43:5
53:1
columbia  27:2,11
28:18,19
column  76:9
106:25 108:12
130:4,6
columns  75:25
110:18
com  28:12
combination
18:19 137:19
come  104:8 121:17
128:19 139:20
comes  35:21 142:3
coming  12:24
commence  1:21
159:13
comment  131:8
commentary
23:22
commenting  90:3
comments  54:18
54:23
commission  160:9
160:10 162:19
163:25 164:25
committee  4:3,8
commonwealth
1:8 7:11,17 8:6
33:15 40:8,19
74:14 81:9,14,21

81:25 82:10,25
83:1,11 88:8
89:12,16,20 90:4
90:20 92:4,11
100:21 101:3
129:20 136:9
137:1 139:21,22
141:20 142:23
149:11
commonwealth's
74:17 140:11,25
communicate
15:25 17:21 18:1
18:7 74:8 155:3
communicated
16:4 18:17 20:9
58:1 152:18
154:23
communications
62:6 152:12
community
130:23
companies  28:15
company  3:19
19:11 28:12 63:15
64:11 68:1
comparable  132:9
compared  55:15
99:14 100:9
compensated  45:5
45:13
compensation
45:18,20 46:3
complement  22:7
complete  51:7
completed  161:16
component  36:15
142:18 156:6
components
117:17 118:13
141:22,24 143:21

144:11,14
comprehensive
69:21
computer  8:24,24
27:1 48:14
concept  149:25
conciliate  20:16
concludes  87:20
conclusion  140:10
conclusions  49:19
49:22,25 50:1,2
56:14,24 57:7,15
conditionally  81:6
81:8,22 82:13
139:12
conduct  21:18
142:5
conducted  140:18
conducting  10:10
conf  7:15 106:12
confirmation
139:19
confirmed  104:5
confused  90:11
145:25
congress  7:20
conjunction  113:3
connected  136:4
connection  23:9
24:3 26:19 35:11
45:13 49:14 51:15
123:2
consent  119:10
consider  60:11
83:19 119:9
137:22 148:11,14
150:18
considerable
18:23 57:24
consideration
113:7

considered  68:11
  115:20 125:20
  135:7 148:15
considering  69:24
consistent  158:9
consistently  75:20
  152:3
constant  110:21
constitutes  95:22
consultant  28:14
consulting  28:3
consummation
  123:12
contained  130:20
content  75:3
context  18:12
  58:17 62:3 77:20
  78:2,19,22 79:20
  82:16 149:24,25
continuation  99:9
continue  35:22
  81:20 108:15
  110:7 112:25
  113:6 114:23
  120:11,25 121:3
  121:10
continued  33:22
continues  23:14
  110:24
continuing  32:14
contract  45:1,7,8
  45:10 46:2,7,8
contracts  39:17
  40:17 41:17 44:18
  47:2
contributed  54:2
  54:12
contributing
  54:13
contribution
  141:5

contributions  99:4
  99:10,18 103:24
conversation
  15:12 20:15 21:15
  22:8 23:2 24:3
  26:2,6 55:23
  73:23
conversations
  15:14,21 16:11,17
  20:18,20,24 21:2,5
  21:10,22 22:15,17
  22:25 23:8 24:15
  25:20 26:6 58:12
  58:20 62:6 103:5
  113:4 137:20
  144:22 151:4,7,17
  151:24 152:12,21
  155:14,20,23
  156:1 157:8,24
cooper  2:21
corp  4:20,20
corporation  3:13
  4:13 5:8
corps  134:3
correct  18:5 22:16
  26:3,4,11 47:21
  51:20 66:22 68:5
  68:9,25 71:1 74:7
  75:12 87:15 91:21
  93:23 94:2 95:10
  96:19,23 97:8
  98:11 99:16 100:7
  103:2 105:2,8,15
  106:9 107:5,8,10
  109:14 110:15
  111:4 115:19,21
  115:22 117:5
  121:15 126:10
  127:7 129:15
  130:8 131:16
  132:10,13,18

135:18 137:7
  140:20,21 143:8,9
  144:9 149:2,5
corrections  161:13
  163:17
correctly  43:16
  63:18 64:8,14
  66:18 70:21 83:4
  98:10 151:6
correlates  34:17
correlation  36:12
correspondingly
  132:15
cost  114:10
costs  98:22 123:13
counsel  9:5 10:3,4
  13:15,16 14:6
  18:23 22:22 66:24
  67:1,5,7 68:14,18
  68:22 69:1 72:15
  76:7 77:23 103:5
  103:9 113:4
  137:20 142:7
  144:23 151:7,17
  159:22
counseling  31:8
counting  139:17
county  1:19,21
  159:2,4,11 162:10
  163:15
couple  42:21
course  9:15 62:9
  62:19 87:4 90:15
  150:4 151:3
court  1:1 8:8 12:4
  14:19 17:10 25:10
  111:12 118:25
  139:1 146:5 162:7
courteous  10:14
courtesy  23:21

cover  26:5 81:23
  82:11,13
covered  26:21
  68:17 71:18 73:21
covering  23:8
cr  7:20
created  153:18
credit  73:24
creditor  7:10
  34:15 94:16 95:4
  95:17,23 115:11
  115:13 116:7
  119:11 124:4
  142:23 149:17
  150:7
creditors  4:3 7:11
  8:17 41:4 49:17
  76:22 77:5 94:24
  115:21,23 116:9
  116:10,16,17,17
  116:20 117:3,13
  118:2,10,12 119:7
  137:22 144:25
  145:2,17,19 149:8
  149:10
creek  3:21
crim  139:11
crisis  29:2 34:13
criteria  121:2
crr  1:19 159:3
ct  5:5
curve  113:8
cut  74:3 93:9
  105:5 108:10
  157:3
cuts  103:20
cw  76:22 79:15
  83:2 126:24 127:1
  129:9 134:3 136:5
cwt.com  4:24

[d - distributable]

| d | | | |
|---|---|---|---|
| **d**  3:4 | **debtors**  1:9 2:14 | **described**  50:20 | **direction**  159:17 |
| **d.c.**  2:7 6:6 | 3:3 7:12 | 82:5 103:14 | **directly**  36:17 |
| **daily**  88:8 89:16 | **decide**  103:1 | 111:20 140:20 | 67:14,15 144:16 |
| 89:25 90:23 | 143:21 | 151:25 | **director**  28:8 |
| **dale**  2:16 9:9,22 | **decided**  103:10 | **describing**  109:10 | **directs**  13:17 |
| **dallas**  3:22 | **declaration**  59:8 | **description**  95:22 | **disappeared** |
| **dalsen**  3:4 | 59:10,20 60:5 | 131:1,11 132:11 | 127:17 |
| **dark**  127:22 | **deed**  162:14 | 132:14 | **disaster**  130:23 |
| **data**  50:14 51:18 | 163:20 | **designation**  44:6 | 135:22,24 |
| 64:7 65:6,8 66:6 | **deemed**  161:20 | **designed**  92:9 | **disclosure**  7:16 |
| 68:10 69:24 70:17 | **deficits**  81:24 | **detail**  27:8 50:9 | 17:17 18:5 27:12 |
| 70:19,25 71:10 | 82:10 89:10,12 | **detailed**  100:16 | 31:23 38:4,14 |
| 153:11 | 90:5,18,19 | 102:4 | 97:4 123:2 126:17 |
| **date**  161:9 162:3,9 | **defined**  138:1 | **detailing**  64:5 | **disclosures**  7:13 |
| 162:19 163:3,13 | **degree**  26:24 | **determine**  73:19 | **discount**  22:9 |
| 163:25 164:20,25 | **deliverable**  30:5 | 125:23 142:22 | 73:12,20 74:6,9,19 |
| **dated**  133:2 | **deliverables**  42:25 | 144:18 | **discrete**  37:5 |
| **david**  5:4 6:16 | **deloitte**  28:3,6 | **determined**  83:14 | **discussed**  16:17 |
| 26:13 | **department** | 125:18 139:1 | 22:11 24:6,10 |
| **david.shim**  5:6 | 161:22 | 144:21 | 65:5 98:13 126:3 |
| **day**  1:21 29:23,23 | **dependent**  31:18 | **detroit**  132:12 | 130:19 151:7 |
| 30:1,1 31:18,18 | **depending**  30:2,6 | **develop**  32:15 | **discussion**  8:23 |
| 42:5,5 150:4 | **depends**  76:16 | **developed**  113:3 | 26:10 47:20 77:16 |
| 151:3 159:12 | 116:24 | **development** | 93:22 101:21,24 |
| 160:4 162:16 | **depicted**  130:17 | 50:15 | 143:7 |
| 163:22 164:22 | **deponent**  158:21 | **different**  16:8 | **discussions**  73:10 |
| **days**  161:19 | 159:6,19,19 | 19:10 23:3 36:22 | 74:5 153:1 156:25 |
| **de**  5:10 | **deposed**  11:13 | 40:6 78:3 88:3,16 | **disinterested** |
| **deal**  29:3 | **deposing**  14:25 | 94:7 95:12 115:20 | 159:23 |
| **deals**  148:21,25 | **deposition**  1:14,18 | 115:22 116:8,10 | **dismiss**  121:2 |
| **dealt**  157:8 | 7:9 8:7 9:17 10:10 | 116:12 129:17 | **dismissal**  103:6 |
| **dear**  161:10 | 11:20 12:16 16:20 | 134:17 145:12,20 | 105:12 109:11 |
| **debating**  24:25 | 45:22 49:4 61:6 | 146:2 | 111:18 113:1 |
| **debt**  2:3 21:11,13 | 84:1 105:21 | **difficulties**  10:12 | **dismissed**  7:11 |
| 22:6,9 64:6,21,22 | 121:22 133:4 | **direct**  7:4 11:8 | 49:18 103:17 |
| 64:24 65:9 81:10 | 147:19 159:9,15 | 63:4 93:11 106:14 | 149:1 150:16,25 |
| 81:14 83:2,2 | 159:20 161:9,12 | 106:19 120:5 | **distinction**  151:23 |
| 85:19 94:22 | 162:1,3 163:1,3 | 124:16 128:14 | **distressed**  29:10 |
| 137:14 140:8 | **depositions**  158:10 | 132:23 133:8 | **distributable** |
| | **describe**  50:9 94:3 | 135:20 | 145:1,18 |

[distributed - example]                                                                    Page 10

distributed   119:10
distribution
  137:15,18
district   1:1,1
dive   10:22
diverse   31:4
doc   124:18 126:16
docket   49:8,9
  123:5
document   48:8
  63:22 106:11
  115:17 122:23
documents   68:14
  68:22
doing   11:12 23:5
  27:13 36:5,6,21
  58:13,21 67:3
  85:4 97:20 112:2
  112:7 114:6,8,19
dollars   127:3
  129:14
dot   28:12
double   60:21 61:3
  104:24 108:4
  121:12 139:17
doug   8:19 23:19
douglas   2:9
douglas.koff   2:12
dr   56:17,20
dra   8:17 158:4
drafted   53:11,19
  80:9 81:3
drafting   50:18
  52:22 53:10,24
  54:2,12,14 55:3
draw   133:15
drawing   154:11
  154:16
drew   142:24
drinker   5:16 15:5
  15:16

drive   5:17 6:10
dual   26:25
due   81:23
duly   8:10
duties   7:14 84:9
  114:9,23,25

### e

e   4:9 17:13,13
  154:4
earlier   21:17
  31:22 32:25 37:6
  42:14,15,15 43:2
  52:24 65:5 66:21
  82:21 92:23 93:21
  95:7 109:3 114:22
  125:25 136:8
  142:25 148:19,23
  157:25
early   33:12 97:1
earmarked   140:12
  141:9,15
easily   48:5
echo   12:23
economy   92:10
edmond   6:15
educational   26:23
efficiency   40:24
efficiently   113:22
effort   32:13
egnyte   10:16
  47:18
ehud   154:7
eight   129:22
either   130:3
  152:25 159:25
  160:2
eleven   2:17 87:22
  129:23
email   156:14
  161:17

emails   62:7 156:11
emergency   100:2
  134:25 135:4,16
employ   160:2
employed   28:13
employees   4:8
  16:24 17:6 93:2,4
enclosed   161:12
encountered   156:4
encourage   41:16
engaged   19:6
engagement   29:23
  31:18 44:12
engineering   27:1
english   159:16
ensure   12:9 152:3
enter   122:7
entered   163:9
entire   121:11,14
  162:5 163:5
entirety   52:7
  53:17 115:1
entities   20:8 26:19
entitled   150:4
entity   82:23
entry   123:5
  133:13 134:5
envelope   117:17
  118:14 137:6,14
  137:25 138:4,16
  138:25 139:9,10
  139:23 140:5,11
  140:19,23 141:6
  142:1,2,6,12,18,20
  143:22 144:8,11
  144:14
environment
  44:23
equal   130:5
ernst   19:16 22:15
  22:18 24:3,6,10,12

25:20
errata   161:14,19
  163:7,10,18 164:1
ers   139:19
erss   139:20
essentially   28:13
  33:13 149:3
esses   2:16 6:15
  154:3
estimate   26:7,8
  34:8 35:16 49:24
  53:5 87:17 126:7
  126:8 141:18,21
  150:24
estimated   101:22
  129:21
estimates   64:6
  66:14
estimating   87:20
  150:14
et   1:8 7:17 40:25
  41:6
event   82:9 160:1
everybody   8:13
  62:21
evolved   29:13
  30:18 31:3,7
exact   20:23 21:1
  21:24 28:5 44:9
  53:3 155:7,8
exactly   13:3 30:2
  112:6 142:12
examination   1:18
  7:2,4 11:8
examine   124:25
  125:2
examined   8:12
  11:5
example   12:11,18
  13:3 33:25 66:13
  67:2,4 79:12

103:19 138:10
157:9
**excerpt**  106:2,11
**exclude**  152:10,21
**excluded**  153:1
**excluding**  124:9
139:15
**excuse**  22:21
54:22 67:23 70:7
107:16
**execute**  82:1
**executed**  163:10
**execution**  162:14
163:19
**executive**  27:12
28:18
**executives**  30:16
**exhibit**  7:9,10,12
7:14,15,16,18,20
9:2 10:16 38:4
47:16,22 49:4,8
52:6 53:18 54:2
54:16 55:11 56:7
59:13 61:6,8,11,21
62:1,8,25 63:2
65:18 68:16 70:6
84:1 85:14 87:1
88:18 93:15 96:2
96:8 97:22 104:16
105:17,19,21
106:8 108:2,13
109:10,24 110:2
110:10 115:8,17
115:18 119:9,23
120:3 121:17,19
121:22 124:12
125:4 126:11,18
127:8,9 128:2,6,12
129:8,8 131:14
133:4,21 134:10
135:10,11,19

137:9 140:19
143:20 144:7
147:19 148:11,21
148:25 150:3,8
151:3,5,18 152:9
152:14,19 153:10
**exhibits**  7:8 10:15
10:18,20 47:19
60:23 61:5
**exist**  65:10 94:23
110:7 111:19
121:4
**existed**  35:17
**expect**  15:1 62:14
62:17 114:5
**expected**  113:5
**expenditure**  99:24
110:5
**expenditures**
35:22 83:18 86:3
98:7 120:6,8
**expense**  98:14
**expenses**  81:23
82:11,14 85:18
86:1,20 100:22
**experience**  74:14
74:17 113:23
**expert**  7:12 60:12
**expertise**  40:21,23
**experts**  60:8
**expiration**  162:19
163:25 164:25
**expires**  160:10
**explain**  60:19
98:22
**explanation**  14:7
23:19 94:12
**extend**  152:2
**extent**  19:4 50:20
81:10,21 82:15

**eye**  6:6

**f**

**faces**  41:12
**facilitated**  67:7
**facing**  82:10
**fact**  70:6
**factor**  148:3
**facts**  19:3,9 21:18
22:5 35:25 68:10
**factual**  66:6 70:8
**faegre**  5:16 158:19
**faegredrinker.con**
5:19
**failed**  28:12 42:8
**fair**  60:15 88:4
94:15,20 131:4
157:19
**falls**  70:1
**familiar**  55:20,25
77:17 83:23 84:25
85:3,10,11 105:25
134:25 135:2
138:12,14
**far**  27:7
**fashion**  41:7,14
**fast**  49:1
**federal**  1:22
140:12,25 141:9
141:15 159:14
**fee**  45:10 46:1,20
123:20
**feedback**  54:20
**feel**  13:21 79:9
84:23 105:24
**fees**  46:19 99:21
104:19,22,24
105:4,9,11 106:18
106:20,21 108:4,7
108:10,23,23
109:11 111:6,17
111:21,21,24

119:10,16 123:13
124:4
**fgic**  3:19
**fifteenth**  2:6
**fifth**  4:16
**figure**  35:23 70:18
74:15 126:9
**figures**  46:10
108:7,17 109:9
128:15
**filed**  14:23 38:9,10
38:12 39:16,17
97:1 115:17
**final**  92:8
**finalization**
152:14
**finalized**  52:8
**finalizing**  152:19
**finally**  100:1
**finance**  4:13 5:8
27:1 28:9,25
**financial**  1:5 2:14
3:3,19 6:3 29:2
36:14 51:19 64:1
64:3,4,7,13,18,19
64:20 65:2,6,8,11
65:20,21,24 66:20
66:23 67:6,9,12,16
67:17,18 68:7
70:22,23 73:11
85:19 161:6 162:3
163:3
**find**  13:6 115:24
116:2,5 161:12
**fine**  9:21 10:5,6
19:11 32:23 47:9
153:5
**finish**  11:22,24
14:8 81:20 147:2
**finished**  27:14
28:20 158:6

**[firm - fully]**

**firm** 8:16,20 15:4
28:21 31:17 40:5
**firms** 15:4 153:21
153:23,25 154:22
**first** 8:10 11:3,14
13:23 31:9 44:3
44:12 45:2 47:16
48:23 49:1 73:2,3
73:8 79:6 85:23
87:7 89:5 92:2
93:19 96:22 98:21
100:19 110:10,20
113:20 115:13,18
124:16 140:4
146:1,13 148:1
**fiscal** 6:3 40:20
41:10 85:25 86:2
86:19 89:9 98:6
98:14 99:15 100:4
100:9,16,24
101:19 102:2,8,19
104:4,24,25 105:1
105:4,5,7,13 107:1
107:5,9,12,15,16
108:4,5,11,11,13
108:16 109:4,13
110:11,23,25
111:2,22 112:2,9
112:19,20 114:6
114:11 120:14,16
120:21 135:6,15
135:16 137:2
139:15 144:22,24
145:1,18,24
**five** 15:9 21:3 30:3
74:18 110:20
112:19 113:20,23
114:6 127:21
**fixed** 45:10 46:1,7
46:13,15,19,20,23
46:24

**flag** 72:22
**floor** 5:11 6:10
**florham** 1:21 5:17
159:11
**flow** 25:8 117:16
**focus** 14:2 42:20
68:10
**focused** 21:10
29:10
**focuses** 40:19
**foerster** 6:15
**folder** 47:19
**folks** 9:13 18:20
30:4 41:14 43:25
62:10 73:23
**follow** 24:21 108:2
143:24 158:5
**following** 91:3
144:10
**follows** 8:12 11:6
**fomb** 7:15 18:23
19:5,9,16 20:5
25:24 32:2,4,9,25
33:6 34:18 38:23
39:3,6 40:1,6,10
40:12,19 41:9
42:1 43:7,14,18
44:5,13 45:5 47:2
58:2,13,22,25
63:14 64:1 65:20
67:19,21 89:25
90:24 91:18 92:20
93:3 95:3,8,16
96:2,7,19 97:6
99:24 106:12
109:21 110:5,7
114:4,5,7,10,14,19
114:22 115:2
120:6,8,11,25
121:2,3,10 125:16
136:16

**fomb's** 39:16 40:2
64:20 65:5 67:17
71:11 73:10 98:4
130:19 133:2
**footnote** 124:17,20
125:1,17,19
**foregoing** 159:9
162:13 163:18
**forgot** 136:20
**form** 10:1 15:17
15:18 16:6 17:23
19:13 20:11 21:7
21:23 22:4,19
24:7,17 29:21
30:25 33:8 36:9
36:10 37:13 39:12
45:15,16 49:20,21
51:1 53:7 55:5,12
56:25 58:14 60:9
65:12 66:1 69:18
70:15 71:8 72:5
72:17 74:21 77:7
77:21 80:3,16
83:16,21 89:19
91:1,2 94:6,18
95:18 96:14 97:16
100:10 101:12
102:13,14 103:11
111:8 112:4,13
113:16,24 114:16
115:4,25 116:22
116:23 117:9,11
117:21,22 118:7
118:16,19 119:6
119:12,17 123:22
124:6 127:11
130:15 131:6,7,22
134:19 137:23
138:6,18 139:3,4
139:24 140:13
141:1,10 142:8

143:6,23 145:11
149:9,20,22
150:12,21,22
155:15,21,23
156:18 157:16
**format** 20:21,23
**forming** 68:11
69:8,14 70:5
**forms** 92:9
**formulated** 76:4
**formulating** 71:7
**forth** 156:15
**forward** 42:9
91:25 97:7,14
161:16
**found** 44:15
**foundation** 57:17
59:23
**four** 58:6 87:23
129:22,22,23
**fourth** 67:23
130:22
**frame** 38:17 44:10
57:22 58:5 62:3
121:14
**free** 13:21 79:9
84:23 105:24
162:14 163:20
**freeze** 98:24
**friedman** 6:5
89:18,18
**front** 8:25 48:8
61:12 75:7,24
120:18
**froze** 19:23
**full** 27:12 39:23
40:17 41:18 76:25
79:23 92:2 97:20
100:19
**fully** 80:10

[function - good]                                                    Page 13

**function** 104:3
**functioning** 35:20
**fund** 100:2 135:1,4
  135:16
**funded** 89:12
  90:19
**funding** 7:20 90:5
  147:24 148:12
**funds** 81:25 135:7
  137:15,18 138:5,8
  140:12,25 141:9
  141:15
**further** 14:7 36:3
  158:21 159:23
**future** 73:15 149:7
  149:15

**g**

**gabriel** 3:8
**gabriel.miranda**
  3:11
**gaby** 17:8 43:5
  53:1
**gaby's** 17:11
**gandel** 1:19 159:3
  160:7
**gather** 14:2
**gathering** 21:17
**gaurov** 57:21,23
**gdb** 2:3
**general** 31:10
  149:25
**generally** 93:6
  115:10 124:2
  138:23
**generate** 89:10
  90:17
**generated** 139:15
**generation** 92:11
**getting** 12:23
  19:24

**gillespie** 2:4 7:4
  8:13,14 9:21,23
  10:7 11:9 13:2,5
  15:23 16:9,21
  18:2,14 19:18,21
  19:24 20:3,4,17
  21:14 22:1,10,21
  23:7 24:1,14,19
  25:18 26:16 29:24
  31:12 32:22 35:2
  36:19 37:15,18
  38:1 41:20 45:19
  46:6 47:3,6,15
  48:3,9,16,17 49:6
  49:11 50:4 51:6
  52:4 53:9 55:7,16
  57:2,9,19 58:19
  59:15,18 60:1,13
  60:16,20 61:14,18
  62:24 63:1 65:16
  66:17 70:3,20
  72:2,10,20,23 73:5
  74:24 75:17,21
  77:10,23 78:6,16
  79:1,5,8 80:11,21
  80:22 83:17,24
  84:5,6,11,14,17,19
  85:6,12 89:3,4,21
  89:22 90:14 91:12
  94:14 95:1,24
  96:17 97:21
  100:13 101:16
  102:17 104:6,15
  104:17 105:16,23
  106:10,13,15,17
  108:1 109:16,18
  110:1,4,16,19
  111:12 112:1,8,18
  113:19 114:3,21
  115:7,9 116:6
  117:1,14 118:1,15

  118:22,25 119:8
  119:15,19,23
  120:4 121:16,24
  122:13,16,17
  123:8,11 124:1,10
  126:11,19,21
  127:19,24 128:1,3
  128:7,9,10,25
  129:5 130:21
  131:10,24 132:19
  132:22 133:1,7,20
  134:1,24 136:10
  136:13 137:8,10
  138:2,9,22 139:8
  140:3,17 141:7,13
  142:21 143:12
  144:6 145:14
  146:5,10 147:5,12
  147:15 148:7,9,16
  148:18 149:13
  150:2,17 151:1
  152:5,15,16 153:3
  153:17 155:19
  156:10,22 157:5,6
  157:19,22 158:4
**give** 11:19 12:10
  14:18 18:12 23:14
  24:19 27:4 30:19
  38:20 39:14 84:16
  113:7 118:12
  138:7
**given** 11:16 44:23
  79:21 89:11 112:7
  142:7 144:15,16
**go** 9:6 13:1,24
  16:16 19:14 20:12
  21:8 22:20 24:8
  24:18 27:7 33:9
  33:12 34:10 36:11
  45:25 51:3 55:13
  59:24 60:22 61:5

  61:19 62:25 63:2
  65:13 66:2 69:19
  70:16 71:4,9
  72:18,24,25 73:3
  74:22 75:2,4
  76:22 77:4,8,22
  78:21 81:9,13
  83:1,22,24 84:7
  85:15 88:20 91:14
  94:19 95:19 96:15
  97:17 104:7
  109:16 110:1
  112:5,15 113:25
  119:5 121:12
  124:18 126:12
  127:8,23 128:2,8
  128:21 130:1,9
  134:21 141:3,23
  142:10 145:10
  150:13
**goal** 12:1
**goes** 63:20,25 83:8
  92:6,7 98:12
  105:3 107:20
  125:19
**going** 10:15 26:15
  38:7 40:16 42:9
  44:15 47:10,15,24
  55:2 59:22 69:17
  79:10 84:12,20
  85:2,3 94:6
  103:25 104:11
  111:6 112:12
  114:19 124:14
  126:17 135:11
  145:3 146:22
  147:7 152:20
  158:15
**good** 8:13 11:10
  11:11 13:3 15:6
  47:9 48:16 53:3

**[good - improvements]**

122:11 147:1
**gos** 76:25
**gotshal** 4:15
**governing** 158:10
**government** 32:2
33:16 34:4,13
35:6 36:4 40:23
41:11 67:13,15
71:20,22 86:3
136:5
**government's** 35:7
**governor** 7:14
84:9
**goyco** 5:10
**graduate** 27:11,16
**graduating** 28:2
**great** 122:16
**greater** 123:16
140:23
**group** 5:3 20:14
28:4,5 29:7
**grouped** 118:9
**groups** 34:16
94:24 115:22
116:10,12,20
117:3,13 118:2,6
119:7
**grow** 28:9 33:22
105:1,6,13 108:6
108:15 109:12
**grown** 156:9
**grows** 109:6
**growth** 92:10
101:10
**guarantee** 4:13
5:8 76:22
**guaranteed** 81:9
81:14 83:2
**guaranty** 3:19
4:20,20

**guess** 27:15
151:15 158:14
**guidance** 98:4
**guys** 127:22

**h**

**half** 105:5 108:10
**halved** 105:11
109:11
**hancock** 1:19
159:2,4
**hand** 61:4 140:7
160:4
**handful** 15:9
21:25 41:13
**happen** 35:16,19
35:20
**happened** 127:14
**happy** 24:19 27:8
72:11
**hard** 150:1 157:4
**hartford** 5:5
**hastings** 4:4
**he'll** 52:2 144:5
**head** 12:11 42:23
46:10 59:4
**header** 75:3,12,15
**heading** 144:8
**health** 40:22 99:18
103:24
**hear** 12:19 20:1
32:19,20 80:12
121:5 157:4
**heard** 102:16
135:4 143:5
**hearing** 10:7
91:13 121:16
158:14
**held** 26:10 27:21
47:20 143:7
**help** 12:2,5 17:24
36:2 38:17 51:23

52:19 125:2 135:2
137:8 138:10
**helped** 28:9 67:1
**helpful** 34:12
36:16 38:20,20
42:3,9 115:24
116:2,5
**hereunto** 160:3
**hermann** 154:14
**hermann's** 154:14
**herriman** 59:6,7
**hi** 9:9
**high** 111:7
**higher** 111:21
**highlights** 27:20
41:19
**historical** 34:21
**history** 27:5,25
**hit** 34:1,2 41:19
**hm** 44:16
**hmm** 20:7 71:1
109:5 116:13
118:4 126:20
130:2
**hoc** 42:22
**hold** 20:2 90:7
152:10
**holds** 141:20
**hole** 35:23 36:4
**hope** 10:11
**hopefully** 41:19
**host** 71:23
**hours** 15:7
**hta** 40:9 41:14
**hudson** 1:19 3:15
12:4 159:3 160:7
**huh** 61:22 106:23
129:12
**hurricane** 35:11
35:18

**hurricanes** 34:1

**i**

**idea** 53:8 56:13,23
57:10
**ideas** 40:24
**identification** 49:5
49:7 61:7 84:2
105:22 121:23
133:5 147:20
**identified** 52:24
54:17 104:2
125:14,17 157:25
**identify** 69:7,13
70:11 117:3
132:24
**ifcus** 88:23 89:2,10
90:5,17 139:14
**iii** 1:3 7:10,16 40:7
40:11,13 49:18
98:8 103:6,17
104:5 105:12
109:12 111:18
113:2 149:1
150:15,25
**il** 4:10
**imagine** 152:24
**impact** 46:2
100:23 103:6
**impacts** 102:3
**implement** 102:1
**implementation**
100:15
**implemented**
103:21,21
**implications** 104:4
**implied** 34:19
42:18
**implying** 57:16
**important** 9:13
**improvements**
147:24 148:12,14

148:15
**inaccessible**
125:11
**inaccurate** 23:23
**inappropriate**
23:22 57:16 85:8
**include** 65:7 98:23
103:10 138:5,25
139:9
**included** 44:18
63:21 64:5 130:18
139:23 140:4,11
140:24 143:22
157:24 161:14
**includes** 138:16
139:10,11,12,13
139:14
**including** 62:6
68:12 69:9 107:5
**incorporate**
100:22
**incorporated**
54:20 163:12
**increase** 92:11
107:15 110:24
**increased** 132:5
**increases** 107:4
114:11
**increasing** 110:25
**independent** 28:14
68:2
**independently**
68:6 125:23
**index** 7:2,8
**indiana** 1:20 159:1
159:5 160:9
**indianapolis** 5:18
**indicating** 161:14
**individual** 37:10
55:8 153:24 154:2

**individuals** 26:18
43:8,17 52:21
61:25 62:7,12
153:22 154:20
**inflation** 105:1,6
105:13 108:6,15
109:12
**information** 14:2
21:11 22:7 25:24
33:15 40:1 41:5
50:13 51:18 64:3
64:5,13,16,18,19
65:2,11,22,25 66:4
66:9,11,15,20,23
66:25 67:4,7,9,13
67:15,16,18,21
68:3,7 69:3,4
70:22 116:15
125:15 138:7
143:19 144:21
**informed** 74:14
**informs** 36:17
**initial** 132:6 158:7
**insinuating** 25:13
**insolvency** 8:5
**instruct** 155:24
**instrumentalities**
139:2
**insurance** 3:19
**interaction** 55:17
55:21 56:16 57:20
59:5 60:7 61:24
62:2,10,15,18
**interactions** 41:11
**interest** 14:23
17:16,22 18:4,18
20:10 24:4 26:20
31:21,25 33:1,6,11
36:8,17 37:3,12,22
38:2,9,24 39:7
42:6,19 43:3,9,18

44:9 64:23,23
65:15,18 66:5,7,19
66:21 73:15 88:9
89:17 90:1,24
91:19 92:15,19,24
95:2,12,15 96:3,6
96:10,18 97:10,13
97:15 106:5,7
145:16 146:18
149:18 150:5,8,11
150:20 153:19
154:23 156:23
**interested** 160:1
**interests** 41:2
**international** 3:5
**internet** 28:7
**interruption** 25:8
**introduce** 147:13
**introducing** 98:3
**inverse** 30:22
**involved** 15:22
17:19,20 18:3,21
20:19 22:14 24:13
25:20 31:19 32:3
36:13 37:1 41:21
41:24,25 42:1,5,12
42:13 43:8,9 44:2
50:13,18,21,24
51:9,12 52:22
53:24 97:5
**involvement** 55:2
**involves** 40:21
**involving** 20:19
26:3
**irma** 34:2
**island** 35:19
**issuances** 22:6
66:7
**issue** 88:11,13
90:25 146:19,20

**issues** 12:18 26:11
33:5,10 47:21
94:4 143:8
**item** 98:21 109:19
130:22 135:22,24
**items** 98:19
102:11 103:8,9,15
104:2 139:16
**iterations** 37:23

**j**

**jacque** 60:16
83:25 105:17
119:24 132:19
147:12
**jacqueline** 2:5
8:20 10:17
**jacqueline.maer...**
2:8
**jay** 59:5,7 62:16
62:16,23
**jeff** 154:4
**jenner** 4:9
**jenner.com** 4:11
**jersey** 1:21 159:12
**jesses** 2:20
**joeroth** 6:12
**john** 4:21
**joined** 8:19 28:3,7
28:20 29:8,14,15
**joint** 7:16
**joseph** 5:16 6:9
9:1 10:6 12:23
15:21 16:6,14,18
17:2 18:9 19:23
20:1,11 21:7 22:4
22:19,24 23:17,17
24:7,17 25:1,4,7
29:21 30:25 32:17
33:8 36:10 39:12
45:16,23 47:8,22
48:6,22 49:21

51:1 52:2 53:7
55:12 56:25 57:4
57:12 58:14 59:22
60:10,18,21 61:3,9
61:11 65:12 66:1
69:17 70:15 71:8
72:5,17 74:21
75:9 77:7,21,25
78:14,20 80:3,17
83:16,21 84:8,12
84:16 85:2,7 89:1
90:9 91:1,5 94:6
94:18 95:18 96:14
97:16 100:10
101:13 102:14
103:11 104:9
107:22 111:8
112:4,14 113:10
113:15,24 114:17
115:4 116:1,23
117:11,21 118:8
118:19 119:4,12
119:17 121:20
122:10 124:6
126:16 127:17,21
131:6 132:24
133:6,17,24
134:20 137:24
139:3,25 140:13
141:2 142:9 144:4
145:3,5 147:1
148:4 149:9,20
150:12,21 151:20
152:20 153:3,5
155:22 157:3,16
158:19 161:5
**josh**  154:2
**josh's**  154:3
**joshua**  2:16
**jpmorgan**  29:3

**juan**  3:10 5:12
**july**  87:17 97:3
**jumps**  71:17
**june**  87:14,18,22
  97:2 126:6,9
  129:11
**justin**  17:7 43:4
  53:1

## k

**k**  5:4
**katz**  1:20 2:3
  159:10
**keep**  62:5
**keeping**  155:18
**keyboard**  8:24
**kind**  34:17,19
  36:24 40:13 41:2
  46:12 48:14 69:2
  103:14 131:18
**know**  10:11,13
  12:20,24 13:8
  14:25 18:24 22:8
  23:19 28:11 29:1
  29:22 30:6,12
  31:2,2,3,7,11
  32:14,25 34:2,6,9
  34:12,20,25 35:18
  35:19 36:1,2,3,16
  39:23,25 40:24
  42:4,5 43:14,20
  44:6,17,19,21,22
  44:22 45:3 46:14
  46:16 47:6 48:11
  58:16,17 59:7
  60:14 61:24 62:16
  66:11,12,13,15
  70:1,21 74:13,23
  74:25 75:6,15
  77:9,25 78:4,10
  80:1,18 83:14
  87:4 92:6 94:22

95:7 97:18,19,19
97:25 101:25
103:16,20 105:18
106:16 109:2
111:6,11,16
118:11 120:7
121:18 122:3,13
127:12,14,21
128:3 130:12
133:11 136:14
137:1,11,17 139:5
140:2,15 141:4,16
141:17 142:17
145:15,24 147:16
147:22 151:22,25
152:7,17,22
153:11 154:14
155:17 156:3
157:2 158:1,1
**knowing**  41:15
**knowledge**  59:19
  60:3
**knowledgeable**
  52:16
**known**  8:17
**knows**  145:8
**koff**  2:9 8:19 23:11
  25:3,6,12 47:24
  127:20 147:2
**kroll**  6:15,16

## l

**l**  6:9
**label**  108:21 136:4
**labeled**  108:22
  124:23 125:10
  129:7 132:8
  142:20
**lack**  59:23
**language**  7:21
  51:21 52:10,12
  54:15

**large**  31:16 41:24
  159:5
**largely**  31:11
**late**  38:11 40:15
**latest**  96:24
**laura**  4:9
**law**  6:15,16 8:15
  14:19 15:3,4
  25:10
**lawyer**  80:9
**lawyers**  26:22
  72:7
**lays**  144:10
**lead**  27:19,24
  29:23 30:3
**leader**  32:12
**leah**  4:4
**leahlopez**  4:6
**learn**  44:3
**learned**  113:23
**learning**  113:7
**led**  43:1 50:12
**left**  28:6 36:24
  60:21 61:4 108:21
  109:17 130:4
**legal**  18:24 19:20
  51:16 53:15 54:19
  63:14,15,21 64:12
  68:17 70:7,9
  71:13 77:9 80:8
  82:17 85:4 98:5
  103:18 104:24
  105:4 106:21
  108:4,7,10 111:5
  113:8 137:19
  151:8,24 156:3,5,9
  156:13 157:11
  161:1 164:1
**legally**  125:17
**legislation**  7:20

**legislative** 76:23
77:3,11
**length** 113:6
**leon** 5:10
**letter** 161:20
**level** 31:8 36:13
37:7
**leverage** 28:25
**levitan** 154:4
**lewis** 5:4
**liaison** 67:2 69:2
**liberty** 4:22
**lifts** 34:25
**limited** 29:3 35:25
**line** 9:6 10:4 67:24
85:8 114:4,10
120:16 126:23
132:18 135:20
147:2 161:14
163:7 164:3
**lines** 98:14 134:5
**linkage** 45:17
**lips** 32:20
**liquidity** 32:6,6
33:14,17,19 34:6,9
35:5,10,13,17
42:16 124:14
136:16,19 137:2
**list** 9:19 44:6
62:17
**listed** 62:7,11
110:11 129:13
157:9,14 163:7,17
**listing** 163:7
**literally** 52:20
**litigation** 111:19
112:11,17,20,24
112:25 113:6,21
**little** 11:19 16:23
58:7 61:19 74:3
93:9 104:6 123:9

136:7 138:20
145:9 149:24
**live** 46:4
**llc** 1:20 2:3 3:9
159:10
**llp** 2:5,10 3:15
4:22
**loading** 84:5 120:1
**loans** 130:23
**located** 1:20
159:11
**long** 56:19 120:13
126:12
**longer** 103:16
**look** 41:17 75:2,4
79:2,6 84:7,14
93:6,7 97:12,22
98:19 104:21
106:24 109:15,25
114:4 117:13
120:3 121:25
122:18,20,21,24
123:6 124:13
127:9 128:11
130:22 133:22
135:10,19 137:9
138:10 142:1
144:7
**looked** 33:5,10
71:21 90:16
116:12 117:3
134:12,17 143:20
144:25 145:13,17
157:10
**looking** 34:3 35:10
47:23 48:23 52:5
67:22 73:8 75:13
75:22 76:8,19
82:19 84:8,18,20
85:16 87:1,7 88:1
88:21,24 89:7

91:16 92:1 104:18
105:25 106:8
111:5 116:20
128:20 130:17
133:8,21 134:2
148:20,24 150:3
150:10 152:24
**looks** 49:2 116:8
**lopez** 4:4
**lot** 12:6 156:8
**love** 70:10
**lpelanek** 4:11
**lts** 1:2
**lunch** 104:7

**m**

**m** 3:20
**ma** 3:6
**madam** 111:12
118:25 146:5
161:10
**madame** 39:9
**maero** 2:5 8:20
10:17
**main** 49:9 76:13
76:15,17,19 82:22
**major** 26:25 42:24
**majority** 103:3
154:17
**making** 19:6 32:14
86:19 151:22
**malhotra** 57:21
58:9,10,13,20 59:3
**management** 1:6
2:14 3:3 83:19
161:6 162:3 163:3
**managing** 30:12
**manges** 4:15
**manny** 6:18
**march** 127:6,10
160:10

**margaret** 2:16 9:9
**maria** 34:2 42:18
**mark** 47:16 60:17
83:25 105:17
119:23,25 132:20
**marked** 47:19
49:7 52:5 60:23
61:4 93:15 107:1
**market** 28:21
**markets** 73:24
**marking** 10:17
105:18
**marti** 55:18
**materials** 19:5,7
**matter** 8:5,12 11:5
23:3 156:2 159:8
**matters** 40:14
**matthew** 6:16
**maturity** 66:7
**mba** 27:2,14 28:18
28:20
**mcconnell** 8:16,21
**mcgrath** 4:14
**mckinsey** 29:8,11
29:13 30:9,18,24
31:13 38:23,25
39:3,23 40:5
41:25 42:7 45:5
52:15 59:20 60:4
63:6,15 64:2,11
65:24 68:1 70:21
70:24 91:22,23
92:19 93:2 94:1
97:12 106:6
134:17 144:24
145:8 152:23
**mckinsey's** 29:9
39:21 45:20 46:3
46:7 49:14 146:13
**mdale** 2:19

**mean** 18:1 30:21
31:2,6 33:4 42:4
44:14 54:13 80:2
82:7 86:7,10 91:8
91:9 96:18 109:3
116:3 117:23
118:23 125:2,12
140:1 145:23
147:4 149:8,16
154:25 156:13,20
157:17
**meaning** 64:22
81:4
**means** 77:20 79:19
80:24,25 81:2
86:14 110:14
113:17 120:24
121:13 129:13
135:3
**meant** 80:10
**measure** 7:21
131:3,4
**measures** 86:2
100:16 102:2
**mediation** 41:5
**medicaid** 7:20
147:24 148:12
**medications** 14:14
**meet** 15:10 81:11
**member** 37:6
**members** 15:13
17:7 18:20 96:5
145:15 146:17
**memo** 54:21 81:3
100:17 101:21
111:20 117:18
156:9,14
**memory** 14:15
**mentioned** 12:16
16:23 20:6 22:14
31:22 33:3 43:4,4

46:1 51:10 52:13
102:7 125:1 137:5
143:13 144:24
154:20 156:25
**mentioning** 101:7
101:9
**mentions** 65:6
79:16
**mervis** 2:15 9:14
10:5 15:17 17:23
19:13 21:9,23
24:23 25:11 36:9
37:13,17,18,20
39:8,13 45:15
49:20 51:2 55:5
60:9 80:5,16 90:7
91:2 95:20 100:11
101:12 102:13
107:18,24 111:9
112:13 113:16
114:16 115:25
116:22 117:9,22
118:7 119:13
122:15 123:22
124:7 127:11,14
127:16 130:15
131:7,22 134:19
137:23 138:6,18
139:4,24 141:1,10
142:8,14 143:1,4
143:23 145:4,11
146:21 149:22
150:22 152:10
155:15,21 156:18
158:11,17
**messages** 156:16
**met** 121:3
**methodology**
50:15
**metric** 132:14

**mia** 154:8
**mic** 26:14
**michael** 2:15
**middle** 28:11,21
84:21 88:21
126:22
**midwest** 161:17
164:1
**mike** 145:6
**milbank** 3:15
**milbank.com** 3:17
**million** 87:14,23
100:3 110:14
112:10 123:16
127:3 129:14
131:21 134:3
135:14 136:1
**min** 133:13,15
134:6
**mind** 146:25
**mine** 75:13 84:5
107:20
**minimum** 46:20
129:19 130:13
134:13 135:21
**minute** 60:25
146:23
**minutes** 47:7,9
143:13
**miranda** 3:8
**missed** 41:16
101:17
**missing** 39:20 72:1
154:9
**mistake** 89:3
**mistaken** 120:17
**misunderstood**
46:17
**mix** 155:8
**mm** 20:7 71:1
109:5 116:13

118:4 126:20
130:2
**mmervis** 2:19
**mmm** 44:16
**model** 30:5 106:2
106:3,4,5,6
**modeled** 76:18
**modeling** 36:1,13
**modifications** 98:6
**moment** 136:11
154:16
**money** 46:9 81:15
142:22
**monitor** 1:20 2:3,3
8:24 33:14 35:5
35:13 159:10
**monitoring** 32:6
35:15 42:16
136:17
**month** 46:9,15,24
**monthly** 45:10
46:1,8,13
**morgan** 5:4
**morganlewis.com**
5:6
**morning** 8:13
11:10
**morris** 1:21
159:11
**morrison** 4:15
6:15
**move** 23:11,13,24
25:10 57:18 91:25
108:20 110:16
126:15
**moving** 11:25
32:20 107:7
**multiple** 30:12
37:23 41:24 78:3
81:18

**multitude**  32:10
39:4
**municipal**  4:20
22:9 73:24
**municipality**
132:8
**muniz**  5:10
**munoz**  3:9
**murray**  55:18
56:2
**muted**  26:14
**myers**  6:5,9

**n**

**n**  1:14,18 4:10
5:15 11:2 159:6
161:9 162:4,9
163:4,13 164:20
**name**  8:14 17:11
55:20,25 59:7
136:21 154:3,14
154:16 161:6
162:3,4,15 163:3,4
163:21
**named**  61:25
**names**  17:5 19:11
43:4 61:23 62:13
153:21
**national**  4:13 5:8
**nature**  37:15,19
37:20 45:6 47:1
57:2 77:24 93:19
**navigate**  128:4
**navigated**  32:10
**near**  73:21
**nearly**  56:19
**necessary**  19:3
21:18 77:4,12
**need**  12:4 13:21
34:9 47:18 48:24
70:18 78:8 81:22
138:7

**needed**  131:2
**needs**  42:18
**negative**  107:2,9
107:12 110:12
**network**  28:8
**new**  1:21 2:11,18
3:16 4:5,16,23
159:12
**newport**  6:10,11
**nine**  129:22,22
**ninety**  87:14
**noah**  2:4 7:4 8:14
9:14 11:9 13:1
23:11 25:22 39:14
47:24 59:13 60:18
69:11 78:15 79:3
80:20 85:5 94:9
104:10 127:23
157:3
**noah.gillespie**  2:8
**nod**  12:11
**non**  40:13 76:22
76:22 77:4
**nonbankruptcy**
149:3,6,10
**nonbond**  65:9
**nonfinancial**  65:9
**nonlegal**  105:9,11
108:23 109:10
**nonpriority**  83:7
83:10
**nope**  61:4
**notarial**  160:4
**notarized**  161:15
**notary**  1:19 159:3
160:9 161:25
162:10,18 163:15
163:23 164:23
**note**  8:23 39:20
49:6 161:13

**noted**  54:10
158:20
**noteholder**  5:3
**notice**  1:22
**noticed**  77:15
**nuances**  78:9
**number**  1:2 9:5,11
20:20 21:1,24
23:1,2 31:15
43:14 51:10 74:11
75:12 76:20 77:15
79:4,7 80:24,25
82:19 85:14,16,17
93:14,25 95:7
98:2 117:7 122:18
123:5,17 124:12
141:21 154:20
161:8,14
**numbered**  144:13
**numbering**  122:1
**numbers**  54:6
75:19 117:19
122:2,6 123:6
163:7
**nw**  2:6 6:6
**ny**  2:11,18 3:16
4:5,16,23 5:17

**o**

**o**  129:22,22
**o'melveny**  6:5,9
**o'neill**  3:9 154:1
154:13,15,21
156:2,12,17
**oath**  14:17
**object**  13:15 21:23
37:13 55:5 58:14
59:22 60:9 69:17
70:15 78:14 80:3
80:16 83:21 85:7
89:19 90:8,9 94:6
96:14 103:11

111:8 112:13
113:16 115:25
116:22,23 117:9
117:11,22 118:8
119:4,12,17
123:22 127:11
131:7,22 137:23
137:24 139:4
141:1 143:6,6,23
145:3,7,11 149:22
150:21,22 152:20
155:15,21,22
**objected**  23:20
25:15,16
**objecting**  39:12
**objection**  10:4
15:17,18 16:6,14
17:23 18:9 19:13
20:11 21:7,9 22:4
22:19,23 23:6,12
23:15 24:7,17,20
25:2,5,12,14 29:21
30:25 33:8 36:9
36:10 37:16,19,20
45:15,16,23 49:20
49:21 51:1,2 53:7
53:7 55:12 56:25
57:3,18 60:10
65:12 66:1 71:8
72:5,17 74:21
77:7,21,24 78:20
83:16 91:1,2
94:18 95:18,20
97:16 100:10,11
101:12,13 102:13
102:14 111:9
112:4,14 113:24
114:16,17 115:4
116:1 117:21
118:7,19 119:13
124:6,7 130:15

[objection - participant]                                          Page 20

131:6 134:19,20
138:6,18 139:3,24
139:25 140:13
141:2,10 142:8,9
149:9,20 150:12
151:20 156:18
157:16
**objections**   9:25
10:1,8 24:25 25:9
**obligations**   81:11
81:14 142:23
**obtain**   77:5
**obviously**   9:13
19:6 35:8 36:15
42:19 43:21 44:19
46:4 146:24
**occasion**   58:11
**occur**   103:16
135:17
**occurred**   23:1
**ochoa**   5:10
**october**   1:21 8:3
159:12 160:5
161:4
**office**   83:19
**officer**   30:15
**official**   4:3,8
162:15 163:21
**oh**   96:4
**ohio**   161:2
**ojas**   1:14,18 5:15
8:7,9 9:15 11:2
159:6 161:9 162:4
162:9 163:4,13
164:20
**okay**   8:2 9:22 10:7
15:20 16:22 47:5
48:6 54:9 60:18
61:10,13 63:3
71:3,4,10 84:4,22
85:13 87:6,19

88:20 89:6 91:7
91:24 92:5 93:13
107:3,24,25 120:8
122:19 123:4
124:15,20 126:20
127:4 128:13,16
129:2 130:10
132:2 135:12
136:12 137:12
146:23 148:8
151:2 153:20,25
156:1
**omitting**   39:19
**omm.com**   6:7,12
6:12
**once**   76:25
**oneillborges**   3:11
**ones**   96:1
**ongoing**   40:7,8,9
**onward**   37:2
**opening**   7:12
**operate**   114:2
120:25 121:10
**operating**   81:23
85:18 86:1,20
89:10,11 90:5,18
90:19
**opinion**   102:11
114:19 119:6
**opinions**   68:12
69:8,14 70:5,7,7
**opposed**   103:9
**oral**   1:18
**order**   82:1,12
116:18 142:5
**organic**   83:20
**original**   38:8 66:5
**outlined**   24:16
81:2 85:18 100:4
100:23 103:13
117:18 135:16

139:11 141:24
142:12,17,19
**outlines**   150:23
**output**   50:17
94:12 116:24
**outputs**   49:23 50:2
50:6 93:21,25
94:15 116:19
117:2,20 118:3
**outside**   19:20
26:21 54:16 68:24
71:15 88:8,11,18
89:16 90:24 91:19
95:14 96:2,10
**outstanding**   21:13
26:9 64:6,21
137:14
**overall**   15:8 30:11
32:13 33:14 44:17
78:10 117:7
120:22 153:14,15
**overlooked**   51:14
**overlooking**   51:11
**oversee**   31:14,16
**oversight**   1:5 2:14
3:3 14:5 89:20
161:6 162:3 163:3
**overview**   11:19

**p**

**p**   17:13 38:4
**p.m.**   158:20
**page**   7:3,8 48:23
54:4,6,7,8 63:2
64:25 65:6 67:22
72:24,25 73:3,6
75:3,4,4,6,8,11,11
75:14,14,16,22
79:2,4,6,11,12
82:20 84:7,12,21
85:15 86:25 87:2
87:5,6 88:20,21

91:15,25 92:1,2
93:6,8 97:22,23
100:20 101:2,20
103:14 104:16,19
106:4 120:3,8
121:25 122:2,3,5,8
122:10 124:13,17
125:3,4 126:4,13
126:14,15,18,22
128:2,4,11,23,25
129:8 130:1,9,10
132:23 133:8,21
133:23 135:10,19
136:4 137:9,12
142:19 144:7
161:14,16 163:7
164:3
**pages**   49:2 75:19
93:11,24 94:16
144:10
**paid**   35:23 76:25
85:19
**paragraph**   63:5
64:10 67:22,23
73:3,8 87:1,7,20
88:5,22,25 89:8
90:17 92:1,2,6
98:3 100:19,19
101:2 103:15
104:22
**paragraphs**   89:2
126:3
**park**   1:21 2:22 4:5
5:17 159:11
**part**   29:9 32:7
44:11,17,19,25
56:11 97:3 106:6
124:8 144:17
155:5 163:9
**participant**   9:19

**participants** 99:11
**participated** 17:6
**participation** 45:21
**particular** 29:22 58:4 103:8
**parties** 8:18 9:12 158:4,8 159:21
**partner** 29:16 30:9,17,24 31:3,6 31:10,10,13,15,16 43:22
**partners** 41:25 42:25
**party** 158:12 159:25 160:2
**paslawsky** 3:14
**passing** 137:5
**paul** 4:4 154:6
**paulhastings.com** 4:6
**pavel** 6:8
**pay** 76:24 81:9,13 83:1
**paygo** 99:10
**paying** 61:23
**payments** 73:16
**pdf** 75:13 122:1
**pelanek** 4:9
**pending** 13:23
**penn** 27:16
**pennsylvania** 26:25
**pension** 98:21,24 103:19
**people** 18:17 31:13,16,17 32:15 33:23
**percent** 55:4 73:12 73:19,25 74:9,19

**perez** 5:10
**perform** 89:15,24 91:18 96:9
**performed** 88:7 94:1 95:25 96:7 115:12
**performing** 58:2 68:15,23
**period** 28:17 32:5 34:24 35:4 108:8 109:3 112:22 115:3 120:12,19 120:23 121:11,13
**person** 11:21 52:15 55:9 159:24
**personal** 55:2 92:14 95:15
**personally** 36:6 41:21 42:12,13 43:8 50:21,24 51:9,12 91:18 92:15,17 95:3,25 97:5 162:11 163:15
**persons** 20:8
**perspective** 34:7 34:11 36:2 46:4 103:18 112:16,23
**perspectives** 64:6
**pertain** 58:12
**pertinent** 46:17 151:9
**peter** 6:5 89:18
**pfriedman** 6:7
**phone** 155:6,13 161:3
**phrase** 38:2
**piece** 129:6,6 135:6
**pieces** 66:25 142:18

**piere** 17:8 43:5 53:1
**pinos** 6:16
**pjt** 19:16 20:18,19 20:24 21:2,6,16 22:7
**place** 1:23 3:5 112:21
**places** 53:23,25
**plan** 7:17,18 85:19 85:25 86:19 89:9 98:6,8,14 99:15 100:4,9,24 101:19 102:9,19 103:20 103:24 104:4,5 111:22 118:18,20 118:21,23 119:7 119:10,21,22 120:16,21 123:2 123:13 124:8,9 135:6,16 139:15 139:19 144:22,24 145:1,18,24 150:18
**plans** 40:20 41:10
**platform** 9:2 47:18
**play** 76:15
**playing** 30:13
**please** 12:9,12 13:8 14:4 17:11 23:11,24 47:11 50:9 57:18 60:17 60:20 61:20,24 62:25 72:24 75:5 78:15 79:9 81:20 83:25 85:14 86:25 87:4 88:20 91:25 97:24 101:18 104:12,16 105:17 110:18 111:13

**113:12 119:1,25** 120:7 121:25 124:13 126:12 132:19,20,22 143:2 152:6 158:16 161:12,12
**plus** 139:18
**point** 9:4 12:17 13:6,21 19:19 28:24 34:14 47:4 55:23 69:23 99:17 100:1 105:16 112:12 132:5 135:13 142:19 154:6,7 158:6
**pointing** 13:2
**points** 88:3,16 98:2,3 102:23 137:13
**police** 77:16,19 78:2,11,18 79:15 79:16,19,24 80:7 80:10 82:1,7,12,16
**ponce** 5:10
**popular** 5:11
**population** 86:4 86:17,22
**portion** 53:15
**portions** 53:11,18 53:19 54:11 151:18
**position** 68:2 137:2
**positions** 27:20
**possibility** 44:25
**possible** 114:1 144:18,19
**possibly** 57:8 62:20 155:14
**possinger** 154:6

**post** 34:1 42:18
**postmeasures** 109:21
**potential** 16:1,5,12 147:23 148:11,14 148:15
**potentially** 30:12 34:8 35:23 124:24 125:10,11 152:1
**power** 77:16,19 78:2,11,18 79:15 79:16,19,24 80:7 80:10 82:16
**powers** 7:14 82:1 82:7,12 84:9
**pr** 5:12
**pr's** 86:4
**practice** 29:9,14 29:16 40:24
**prager** 6:16 26:13
**pre** 35:17
**precise** 37:22
**predate** 152:13
**prep** 152:11
**prepa** 40:9 41:9,12
**preparation** 15:10 18:11,16 21:18 30:4 40:20 41:10 50:21,25 63:16 64:4 68:19 69:5
**prepare** 14:21 15:7 18:17 19:3 20:9 32:8 36:1 49:16 50:12 151:9 153:9
**prepared** 35:7 44:5 56:4,22 57:5 57:13 63:6 66:6 66:10,13 106:6 125:16 150:6 152:4

**preparing** 17:20 18:22 24:13 51:9 51:15 88:12,18 152:18
**present** 6:14 10:12 14:6 15:16 17:2 38:22 39:6 73:15 74:1 94:21
**presentation** 133:1
**presented** 49:4 61:6 84:1 91:11 102:12,20,25 105:21 116:20 118:3,6 121:22 133:4 147:19
**presenting** 93:20
**president** 29:15,20 30:1
**previous** 143:20
**previously** 98:13 130:19
**primary** 19:15 37:4
**principal** 64:22 73:15
**prior** 145:22,23
**priorities** 118:11 137:14,17
**prioritizing** 83:18
**priority** 116:18 117:16 118:12
**privilege** 10:1
**privileged** 155:24
**probably** 31:7 34:24 38:13 41:16 55:6 58:23 62:14 62:18 108:20 122:20 132:6 156:14

**procedure** 1:22 159:14 162:5 163:5
**procedures** 158:9
**proceed** 8:8 9:3,16
**proceeding** 8:17 49:9
**proceedings** 8:6
**process** 11:20 33:14 144:17
**produced** 37:8
**product** 37:8 153:14
**production** 161:16 161:17,22
**professional** 23:21 27:5,25 57:23 99:21 104:19,22 106:18,20 108:23 111:5,17
**profile** 64:22
**program** 27:13 28:18
**project** 94:16
**projected** 111:22
**projecting** 112:11
**projection** 126:8
**projections** 35:17 87:16 92:4 98:6 100:21 101:3 120:21
**projects** 32:24 37:1,5,10 39:5 41:22 42:11,13,14 42:17 43:7,17 85:25 86:20 95:8 97:6 136:8,15
**promesa** 1:3
**promote** 92:9
**properly** 12:19

**proposed** 7:18
**proskauer** 2:17,21 3:5 15:5,15 16:19 63:9,13 154:1,4,7 154:8,11,21 155:12 156:1,11 156:17
**proskauer.com** 2:19,19,20,23 3:7
**prospectives** 64:25
**protections** 98:8
**provide** 33:18 41:18 44:7 46:15 46:25 67:1 149:24
**provided** 19:5 23:20 63:14 64:1 64:13 65:21 66:20 68:8,11,12,15,18 69:9,14 70:19 71:6,10 72:4,15 98:4 116:15
**provides** 71:23
**psc** 5:10
**public** 1:19 4:13 5:8 40:22 41:17 45:8 134:3 159:4 160:9 162:10,18 163:15,23 164:23
**publicly** 39:16,17 71:12
**published** 25:23
**publishing** 10:18
**puerto** 1:1,6,8 3:10 6:3 7:11,17 7:18,21 8:6 32:2,9 32:13,16 34:2 67:13 83:20 86:17 86:22 87:8 131:2 131:5,12 132:15 135:5 138:13 139:2 141:8

147:25 149:6
161:7 162:3 163:3
**pull**   132:22 137:8
**pulled**   139:13
**purpose**   18:25
21:15 22:2 24:15
25:19
**pursuant**   1:22
159:13
**put**   9:24 34:6,10
34:18 48:3 61:15
104:15

**q**

**qc**   37:7
**qtcb**   5:3
**qualify**   70:17
**question**   11:25
12:19 13:8,16,22
13:24 16:7,8
17:25 18:13 24:5
24:21,21 25:16,16
25:16,17 30:22
37:21 38:8 40:4
42:10 44:14 46:18
51:5,23,24,25 53:8
57:8,9,14 58:8,18
59:25 60:3 62:4
65:14 67:14 69:10
69:18 70:2 72:9
74:4 75:10,25
76:8,19 77:9
78:15,17,23 79:2,7
79:7,10,17,18,25
80:4,6,18,20,24,25
82:17 84:25 85:16
86:8 88:16 90:8
90:10,13,23 91:3,6
92:21 95:5 96:13
101:14,15 102:15
103:12 111:10,13
113:11 115:6

117:10,12 118:24
119:19 120:13
123:19,23 129:3
134:10 138:21
139:7 140:16
141:12,14,16
143:25 144:1,13
145:8,20,22,23
146:1,2,3,6,7,12
146:22 147:22
149:23,25 155:16
156:4
**questioning**   85:8
147:3 158:7
**questions**   7:4 9:18
11:9,21,22 13:7,11
14:3,4 25:15 35:8
35:9 76:4,6,6 94:4
155:9 156:8 158:6
158:8,12
**quick**   75:9
**quickly**   109:25
**quite**   45:1

**r**

**r**   17:13
**rafael**   17:8 43:5
53:1
**raised**   132:7
**ran**   42:11
**range**   49:24 94:21
130:13 131:20
**rate**   22:9 45:10
46:2,8 64:23
73:12,20 74:1,6,9
74:20
**reach**   49:19
**reached**   116:19
141:18
**read**   39:8,10 56:7
56:9 63:18,23
64:8,14 83:3 86:9

86:11,18 98:10
111:13,14 113:11
113:13 119:1,2
143:1 144:1 146:6
146:8 148:2,5
162:5,6,12 163:5,6
163:17
**reading**   161:20
**reads**   82:22 83:5
89:8 104:23
**ready**   147:14
**really**   16:2 49:1
53:17 66:8 122:20
**reason**   14:11
75:13 145:12
161:15 163:8
164:3
**reasonable**   22:9
73:14,20 74:1,9,12
74:19
**reasonably**   113:5
**recall**   19:19 20:13
20:20,21,23 21:1
21:21,24 26:19
37:5 45:1 46:11
55:21,24 59:2
71:18 120:19
151:6 154:11
155:7
**recap**   70:18
**receipt**   161:19
**receipts**   35:20
**receive**   49:17
54:22,23 64:19
65:2,11,24 66:23
67:9,12,18,20,20
68:21
**received**   66:4,10
67:17 70:22
159:18

**receiving**   33:16
**recess**   47:12 147:9
**recollection**   69:21
**reconcile**   34:20
**record**   8:3,22 9:7
9:24 17:12 24:24
25:13 26:10 47:10
47:14,20 49:7
104:11,14 106:10
132:24 142:14
143:7 147:7,11
158:15 159:18
163:9
**recorded**   1:14,18
**recourse**   76:23
**recoveries**   7:10
49:17,24 94:17,22
95:4,17,23 149:8
150:7,15,23,24
**recovery**   2:3 77:5
94:24 101:23
115:11,14 116:7
119:11
**reduce**   113:8
**reducing**   86:2
**reduction**   98:24
**reductions**   86:1,20
**refer**   38:3 109:24
**reference**   38:8
42:4 53:13 54:5
57:22 58:7 65:9
125:14 143:19
161:8 162:2 163:2
**referenced**   18:21
21:17 24:12 37:6
42:14 54:3 69:1
73:22 101:22
103:7,15 114:22
142:24 162:11
163:15

**references** 54:19
   64:25 132:11
**referred** 137:6
**referring** 18:11
   53:21 62:12 75:18
   91:9 101:6 115:15
   115:16 116:24
   138:8 139:6
   142:15 151:12
**refers** 140:2
**refiled** 38:16
**reflects** 98:5
   111:23 127:2
**reforms** 92:8,16
   92:20 93:3,5
   100:16,23 101:11
   102:2
**refresh** 60:23
**refreshed** 136:24
**refuse** 72:3,12,14
**regarding** 15:25
   16:4,12 17:21
   18:8,10 74:6
   151:8 156:15
**regards** 16:19
   21:12 22:8 25:23
   32:5 38:18 40:13
   42:24 44:8 54:18
   65:4,14 69:2 80:7
   102:1 116:16
   118:13 151:24
   154:13 156:20
**regular** 13:20
**regularly** 137:4
**relate** 36:7 58:21
   97:9,14
**related** 22:5 24:11
   26:7 42:16 62:19
   64:21 81:18 91:19
   95:3,16 99:15
   100:15 119:21

138:5,17,19 156:2
   157:11
**relating** 8:11 11:4
**relation** 42:10
**relationship** 58:24
**relative** 31:5
   104:25 105:5
   108:5,11 159:25
**released** 66:11
**relevant** 18:25
   46:16 74:18 76:17
**relied** 66:19 68:19
   68:22 69:8 70:5
   70:13 71:6 143:16
**reload** 47:18
**rely** 68:14
**remainder** 108:17
   110:18
**remained** 30:23
**remember** 17:3
   28:4 31:21 40:16
   44:9 93:22 134:15
   136:14 153:23
   154:18 157:13,20
**remembering**
   42:22
**remind** 52:25
**remote** 1:14,18
   12:16
**remotely** 1:19 2:1
   3:1 4:1 5:1 6:1
   11:3 159:6,18
**renegotiated**
   45:11
**repeat** 59:25 80:20
   92:21 102:15
   111:10 118:24
   141:11
**rephrase** 16:10
   52:3 89:21 144:5

**report** 17:22 25:23
   26:20 33:1,7 36:8
   37:3,12,22 38:3
   48:21 49:3,12,15
   50:6,10,12,18,22
   50:25 51:9,13,15
   51:22 52:7,9,10,12
   52:13,16,18,22
   53:2,5,10,12,14,16
   54:11,24 55:3,4
   56:3,4,7,9,11,13
   56:21,22,24 57:5,7
   57:14 63:8 65:5
   65:15,18 66:12,12
   66:19 67:24 71:7
   71:11 72:22 88:12
   91:19 97:1,3,13,15
   102:7 130:19
   142:24 143:14,17
   144:23 148:3
   150:5,6,9,14,14,16
   150:23 151:5
   152:23 153:19
   156:23
**reporter** 8:8 12:4
   17:10 23:10 39:9
   39:11 63:10 73:13
   81:7 111:13,15
   113:14 118:25
   119:3 143:3 146:5
   146:9 148:22
   149:21 162:7
**reporting** 35:6
   71:20
**reports** 7:12 24:5
   33:17 34:25 38:24
   39:7 43:3,19 50:7
   66:21 71:22 88:9
   89:17 90:1,25
   92:15,19,25 95:2
   95:12,16 96:3,6,19

97:10 106:8
   145:17 146:18
**represent** 8:16
   122:22 123:1
**representation**
   94:20
**representative** 1:7
   2:14 3:3
**represented** 96:1
   159:21
**representing**
   131:15 152:22
**represents** 131:16
**request** 13:22
   34:14,15 43:11
   63:10 73:13 81:7
   148:22 163:9,11
**requested** 39:10
   111:14 113:13
   119:2 146:8
   159:20
**requests** 33:25
   41:3,4,5
**required** 13:16
   19:3 30:7 44:21
   81:10,13,22
   129:20 161:25
**requirements**
   129:20 130:14
   134:14
**reserve** 132:4
   134:25 135:4,15
   158:5
**reserved** 9:25
   100:1
**resource** 117:17
   118:14 137:6,13
   137:25 138:4,16
   138:24 139:9,10
   139:23 140:5,10
   140:19,23 141:6

[resource - schulte]                                                            Page 25

142:1,2,6,11,18,20
143:22 144:8,11
144:14
**resources**  33:22
82:11
**respect**  20:18
29:25 50:10 68:2
79:24 131:18
152:23
**responding**  23:18
**response**  14:3 34:5
**responsibilities**
29:25 30:11,18,23
**responsibility**
37:4
**rest**  54:24 108:16
**restate**  101:15
143:25 146:3
**restricted**  125:18
125:18,24 135:8
140:4,6
**restriction**  119:16
123:13,20
**restrictions**
124:22
**restructuring**  28:4
28:21 29:6
**restructurings**
29:11
**result**  103:4,17
108:17 111:20
**resulted**  134:13
**results**  50:5
**retain**  82:12
132:15
**retained**  60:8,12
83:1 136:5
**retired**  4:8
**return**  85:14
110:10 124:12
126:11 134:10

**returned**  81:15
161:19
**revenue**  82:23
92:11
**revenues**  81:8,13
81:23 82:13,25
92:4 100:22 101:4
139:11,12
**review**  33:17 35:8
39:14 51:21 52:7
52:9,10 79:10
84:23 125:9,12
147:21 148:10
158:19 161:13
162:1 163:1
**reviewed**  14:23
103:15 124:23
125:10
**reviewing**  50:13
50:16
**revolver**  135:23
135:25
**rico**  1:1,6,8 3:10
6:3 7:11,17,21 8:6
32:2,9,13,16 34:2
67:13 83:20 87:8
131:2,5,12 132:15
135:5 138:13
139:2 141:8
147:25 149:6
161:7 162:3 163:3
**rico's**  7:18 86:17
86:22
**ridiculous**  23:12
**right**  17:18 18:6
41:4 43:6 50:8,23
51:17 55:6 59:16
63:19,23 64:9
65:23 73:2 84:10
84:11 95:13 99:23
102:16 104:21

107:11,14 108:14
108:14,19,24,25
110:13,17,22
111:1 114:12
115:17 121:4
122:6,7,8,25 125:7
125:22 130:6,7
131:15 132:17
133:10,23 134:2
135:11 136:2,18
137:16 143:15
144:12 145:25
147:4 150:5 153:3
153:8 154:18
157:10 158:5,18
**rights**  116:17
118:11
**rings**  33:25
**risk**  39:19 41:15
**rivera**  3:9 17:9
43:5 53:1
**roads**  28:21,22,23
**robert**  4:14
**robert.berezin**
4:17
**role**  29:13,19 31:6
31:10 50:9 76:14
**roles**  30:14
**roll**  103:22
**rolled**  103:25
**rose**  63:9,13
**roth**  2:5,10 6:9
8:15
**rough**  158:17
**roughly**  126:5
**row**  106:18,20,25
108:18,21,22,22
109:15 131:14,16
132:8
**roy**  6:15

**rpr**  1:19 159:3
**rules**  1:22 159:14
162:5 163:5
**run**  45:10 46:1,8
120:22
**runs**  79:11 120:15
121:8

---
s
---

**s**  161:16 163:8,8
164:3
**saith**  158:21
**san**  3:10 5:12
**satisfied**  150:11
**satisfies**  150:19
**satisfy**  142:23
**saying**  18:3 64:10
74:5 80:1 86:14
91:13 110:6
**says**  63:13 75:14
75:25 76:1,21
79:13 83:9 85:17
85:23 86:15,23
92:8 98:3 100:2
100:20 105:10
109:20 110:12
120:10,11 126:23
131:11,17,23
132:3,7,14,18
135:13 136:1,4,6
144:8 150:8
**scenario**  76:17
148:25 149:4,6,10
**scenarios**  94:17,21
94:23 117:8
**schedule**  21:11
**scheduled**  1:21
50:2 159:13
**schedules**  50:6
64:5,21,23 66:7,8
**schulte**  2:5,10 8:15

---

[scooper - similar]                                                                                    Page 26

**scooper** 2:23
**scope** 32:7 39:15
  39:17,21 40:17,18
  41:18 44:18,19,20
  45:2,12 46:5,25
**scopes** 39:15,18
**scott** 2:21
**screen** 8:24 10:21
  12:20 47:25 48:2
  48:4,8,10,15,18,24
  59:14 61:16 84:4
  107:6 122:14
  126:15 127:16
  136:11 148:16
**screen's** 127:20
**scroll** 48:22 61:20
  109:1 123:8
**scrolled** 49:1
**seal** 160:4,8
  162:15 163:21
**second** 24:24 45:2
  48:15 63:12 82:20
  84:16 87:1,7 92:1
  100:18 101:2
  104:23 127:17
**seconds** 127:21
**section** 53:22
  79:14 84:9 101:22
  101:24
**sections** 54:1
**sector** 40:22
**security** 99:5
**seda** 5:10
**see** 10:19 12:25
  27:10 32:3,20
  47:19 48:4,16,18
  50:18 54:16 60:21
  68:4 71:15 73:6
  73:17 76:2,8 77:1
  79:6 83:3,12 84:4
  85:21 86:5 87:10

87:24 89:13 90:21
92:12 93:14 98:17
99:1,6,19,22 100:6
100:18,25 102:5
104:6 106:22
107:18,19 108:16
108:21 109:1,3,6,7
109:22 110:8,10
110:17,20,20
112:9 114:10
119:24 122:13
123:9,17 124:3,21
125:4 126:25
127:5 129:7 130:3
130:24 133:13
134:12 135:22,24
138:3 151:10
154:5 156:8
**seeing** 35:9 107:21
  108:12 126:14
  133:15 148:1
**seek** 14:7
**self** 28:13
**send** 67:15
**senior** 29:15,19
  30:1,13,15,15 31:8
  32:12
**sense** 23:4 104:9
  115:2
**sentence** 63:12,25
  67:24 79:13 82:20
  83:5 85:23 86:11
  86:18,18,23 87:8
  87:16 88:24 89:7
  92:8 101:6 104:23
  120:10
**separately** 116:21
**september** 133:3
**series** 39:25 49:23
  71:13 86:2

**servais** 4:21
**serve** 19:16 31:4
**served** 39:3 56:18
  69:1
**serves** 40:6 57:23
**service** 85:20
  140:8
**services** 28:4
  40:18 41:18 46:15
  46:25
**serving** 43:14
**session** 73:22
**sessions** 41:5
  152:11
**set** 19:2 31:15
  33:13 63:15
  120:21 131:18
  132:3 160:3
**sets** 99:4
**settlements** 124:5
  124:8
**seven** 129:24
**seventh** 7:16
**shah** 1:14,18 5:15
  8:7,9 11:2,10
  14:11 17:15 22:21
  24:2 25:19 26:17
  26:23 27:19,23
  31:21 38:2 44:3
  47:3 48:18,21
  49:8,12 50:9 52:5
  53:17 54:2,16
  55:11,17 56:7
  57:20 59:8 61:19
  61:21 62:8,24,25
  63:2 65:18 68:16
  70:6 73:6 75:6,22
  78:7 79:9 80:13
  80:23 88:18 89:19
  89:24 104:18
  105:19 106:19

115:10 120:5
121:19 122:4
128:11 129:8
133:21 136:7,15
138:12 142:2
146:11 147:16
148:10,19,23
151:2 159:6 161:9
162:4,9 163:4,13
164:20
**share** 9:2 10:16,21
  27:8 47:24 48:4
  48:10,18 61:16
  73:25 78:11
  126:15 136:11
  148:17
**shared** 19:7 21:12
  69:4 122:14
  155:12 156:13
**sheet** 161:14 163:7
  163:10,18 164:1
**shim** 5:4
**short** 34:8 47:4
**show** 93:24
**showing** 90:2
  151:19
**shown** 117:19
  161:16
**shows** 75:14
**side** 61:4
**sign** 52:13 158:19
**signaling** 25:7
**signature** 159:19
  160:6 161:15
**signed** 162:13
  163:18
**signing** 50:16
  161:20
**similar** 28:15 41:7
  41:13,14 54:4
  96:1,10 118:10

similarly 11:24
22:2 103:23
simply 9:1 74:11
129:23
sincerely 161:21
sir 16:7 161:10
sirens 19:22
sit 42:23
sitting 127:13
140:16 154:18
situation 30:6
44:22
situations 30:13
size 36:3 86:4,16
121:18
sketch 27:4,24
slate 97:20
slide 107:22
133:17
slightly 145:20
146:2
slowly 109:6
snow 3:20
social 99:5
solutions 28:22
161:1 164:1
somebody 44:7
soon 109:11
sorry 9:15 15:17
15:18 17:24 19:13
27:21 29:18 32:17
32:21 37:18 39:8
45:6 48:1,14
59:11,25 69:10
73:1,2 74:3 77:23
79:3 80:17 89:1
90:2,11 92:21
93:9 101:1 107:6
111:10 113:10
116:3 118:20
122:5 124:18

127:15 128:6
142:16 143:1,24
145:13,25 146:4
153:6 157:3,5,15
sort 9:17 34:19
sounds 55:20,25
source 25:24
143:19
sources 40:3
144:18,19,20
speak 12:13 114:1
speaking 10:14
22:2 26:19 48:7
78:1
specific 32:8 33:24
40:21 58:15 78:5
94:9,11,11 95:6
98:13 112:16,23
138:20
specifically 67:11
88:13 114:7 139:5
specify 78:7
speculate 79:23
speculation
140:14
spell 17:11
spelled 28:22
spend 32:13 113:8
spent 18:22
spoke 14:24 16:24
19:10 43:3 59:2
118:9 152:8
spoken 58:9,10,10
spreadsheet 7:15
square 2:17
srz 6:16
srz.com 2:8,8,12
ss 159:1
stakeholder 41:3
stakeholders
71:23

stamp 106:12
stamps 49:8
stand 47:11 49:12
104:12 158:16
standing 23:14
24:20,25 25:2,5,12
25:14
start 18:16 27:22
27:23 28:7,9
37:11 64:17 82:21
89:2 105:24 107:1
123:10 129:9
138:11 146:7
157:4
started 34:4 59:9
115:11 127:9
starting 40:15
54:3,7,8 109:2
128:14,17 130:3,5
130:6 134:12,17
starts 63:5,12 75:3
84:21 88:22 134:3
154:3
state 1:20 5:5 9:7
106:10 159:1,4
160:9 162:10
163:15
stated 87:12
statement 7:16
17:17 18:5 31:23
38:4,14 86:19
90:4,16 97:4
123:2 126:17
143:10 162:13,14
163:19,19
states 1:1 63:8
67:25 73:9 140:7
statute 84:8 85:4
stay 81:17
stays 114:10

stearns 28:25 29:3
stenographically
159:16
step 59:1
stephanie 4:15
stephanie.morris...
4:18
steps 129:17
steven 6:17
stick 146:12
stipulations 9:24
stop 83:3 107:6
stops 25:7,8 35:19
straightforward
61:20
stranger 56:1
strategic 40:14
street 2:6 4:10,22
5:5 6:6
strike 20:25 27:18
142:3
structural 92:7,9
92:16,20 93:3,5
100:15,23 101:10
102:2
structured 46:11
struggling 125:12
study 29:22 31:19
stuff 35:21
stuttered 48:14
subject 23:3 79:14
157:23
submit 59:20 60:4
60:5
submitted 56:2,6
56:20
subscribed 162:10
163:14 164:21
subsection 84:15
84:20 85:1

**substance** 155:20
**substantive** 75:25
**subtotal** 126:24
  127:1
**subtracting**
  129:23
**sufficiently** 37:21
**suite** 2:6,22 3:10
  3:21 161:2
**summarize** 63:11
**summary** 33:18
  88:4 104:22
**superior** 161:1
**support** 32:9
  33:13 34:3 40:10
  40:14,19 41:1,3,6
  41:9,14 44:17,20
  123:14
**supporting** 32:4
  40:12 41:3,8,25
  42:6
**sure** 10:2 11:25
  12:8,10,12 16:10
  17:1 18:15 19:6
  19:12 22:24 24:9
  25:12 27:6,9 28:1
  30:2,19 32:14,18
  36:12 42:21 46:13
  46:16 48:11 50:11
  51:4,7,11,25 55:6
  69:11 75:16 81:16
  86:8 92:22 95:5
  102:16 104:9
  111:16 113:17
  114:13 124:20
  136:22 143:4
  148:7 153:1,12,20
  155:10
**surplus** 34:17,20
  34:22 42:19
  139:14 149:7,12

149:16
**sworn** 1:19 8:10
  11:3 159:6 162:10
  162:13 163:14,18
  164:21
**system** 10:16

**t**

**tab** 60:17 83:25
  119:25 132:20
  147:13
**table** 75:24 94:11
  125:4 126:22
  127:8 128:19,21
  128:24 129:16
**tables** 50:7 54:9
  93:7,8,14 94:8,15
  94:20 126:4
**taft** 4:22
**tagged** 115:18
**take** 8:7 9:10
  12:12 15:7 41:17
  47:7 59:1,15 79:9
  84:23 93:24 115:7
  122:8 129:6 136:7
  136:10 146:11,23
  147:3 148:16
**taken** 1:20 47:12
  68:1 125:15 147:9
  159:9,15
**takes** 24:24
**talk** 21:5 63:25
  92:7 105:9 124:14
  124:21
**talked** 43:2 54:25
  67:16 70:23 71:11
  71:13,25 92:23
  93:21 95:7,11
  103:19 126:4
  151:2
**talking** 13:4 24:2
  26:15 38:18,25

39:2,23 53:14,15
  53:17 64:17 65:17
  65:22 72:7,8
  75:11 88:5,15
  94:7 98:20 102:22
  106:4 115:11
  116:7 118:2,21
  123:7,12 125:5
  134:14 136:3,8
  152:12 153:9,18
**talks** 87:8 123:15
**tara** 1:19 39:9
  113:11 143:1
  159:3 160:7
**target** 131:19
  132:4,6
**team** 15:13,15
  17:7 18:20 30:3
  30:11 32:15 36:20
  37:7,9 38:22,25
  39:5,24 40:12
  41:7,24 42:4,5,7
  43:2,11,13 44:1
  50:12 52:23,25
  55:10,15 67:3
  69:3 76:6 91:22
  92:18,23 96:5
  97:12 136:24
  140:18 145:15
  146:17
**teams** 40:10
**tech** 59:12 61:1
**technical** 10:12
  12:18 26:11 47:21
  143:8
**technician** 6:17
  26:12 48:11 59:11
  61:1 79:3 84:3
  128:5,8,23 129:1
  132:21 147:14

**technology** 28:15
**telephone** 20:22
**tell** 8:10 11:3 17:5
  43:23 101:1,18
  112:6 114:7
  130:12 155:17
  159:7
**telling** 148:23
**ten** 47:7,9 87:13
  113:1 146:23
**term** 34:8 49:25
  77:16,17 79:19
  116:11 138:14
**terms** 19:9 24:4
  33:22 35:18 69:22
  73:25 82:4 83:18
  91:16,17 113:5
  137:2 153:25
**test** 17:16,22 18:4
  18:18 20:10 24:5
  26:20 31:21,25
  33:1,6 36:8 37:3
  37:12,22 38:3,9,24
  39:7 42:20 43:9
  43:18 44:9 65:15
  65:18 66:5,19
  88:9 89:17 90:1
  90:24 91:19 92:15
  92:19,24 95:2,12
  95:15 96:3,6,11,19
  97:10,13,15 106:5
  106:7 145:16
  146:18 149:19
  150:5,11,20
  153:19 154:23
  156:23
**testified** 8:12 11:5
  26:2
**testify** 14:12,15
  44:7,15

testimony   11:16
14:18,21 16:1,1,5
16:5,12,12 44:21
45:14,17 136:14
159:18 162:6,7
163:6,9,12
tests   41:2 42:6
text   39:10 76:20
111:14 113:13
119:2 146:8
156:16
thank   9:22 11:12
13:2 15:2 17:14
20:3 23:7 26:1
35:3 59:17 61:14
61:17 75:17 82:3
85:13 86:24
113:15 128:9
129:1 133:6
154:19 158:3
thanks   107:24
thereof   1:23
thing   60:15 70:8
71:17
things   33:3 39:25
41:16 42:22 71:24
78:3 100:8
think   9:4,16,23
23:8 24:20 26:21
31:2 33:3 34:23
36:22 37:21 40:15
44:24 47:3 48:2
53:21 58:23 64:25
70:4 72:25 74:17
79:22,25 86:11
91:15 93:20
100:18 109:1
113:20 114:14,22
118:9 125:25
130:22 143:9,9,13
145:9,22 146:1

147:5 148:4,19,23
151:2 154:9
157:17
thinking   36:3
thinks   57:6
third   2:10 63:4
67:22 135:13
thirty   161:19
thomas   6:17 26:12
48:9 61:15 62:24
72:23 104:15
106:15 110:2
120:2 123:9
126:14 128:3
136:10
thought   19:23
32:19 43:11 128:5
146:2
thousand   87:13,22
129:13
three   28:6 30:3
43:4,8,16 54:10,16
65:21 87:14
129:22 139:16
thumbnail   27:4
time   1:22 8:3 12:1
12:2 13:14,14
18:23 26:8 27:14
28:5,17 29:2,4
30:24 32:5,7,13
34:13 36:5 37:24
38:17 39:18 42:20
44:1,10 45:1
57:25 58:5 62:2
66:3,8,12,16 73:2
79:9 84:23 88:3
88:16 109:6 113:9
115:3 120:16
121:14 147:6
156:7 158:9,20

times   2:17 23:2
42:16 137:5
155:13
timing   14:25
104:9
title   1:3 7:10,16
28:5 40:7,11,13
49:18 98:8 103:6
103:17,23 104:5
105:12 109:12
111:18 113:2
149:1 150:7,15,25
titled   150:8
today   8:3,19 9:25
10:10,15,19 11:20
13:6,20 14:2,12,22
31:13 38:3 45:14
45:22 56:9 114:15
114:20 127:13
140:16 148:20,24
told   57:13
top   42:22 46:10
59:4 60:21 75:19
122:2
topic   62:20 156:21
topics   22:11,17
23:1 24:6,10 26:5
39:4 40:21 43:15
59:2
total   56:1 113:1
120:19 141:23
track   20:15 137:4
155:18
transcribed
159:16 162:7
transcript   12:3,9
158:18 159:17
161:12,13 162:5
162:12 163:5,11
163:17

transfer   100:3
135:14
transformation
29:9,14 30:14
transformations
29:10
transitioned   33:20
treasury   131:1,8
131:12,17 132:3
treatment   118:17
119:6
trial   11:16
troncone   6:17
true   36:20 64:11
159:17
truth   8:10,11,11
11:3,4,4 159:7,7,8
truthfully   14:12
try   14:4 18:12
23:15 34:6,20
35:16 36:2 39:14
40:4 62:3 69:20
79:2 91:4 94:13
148:2 153:12
155:10
trying   16:2 18:7
23:4 34:10,16
35:15 46:19 55:22
69:13 70:18 80:13
93:11 94:5 95:14
108:2 117:6 118:5
121:5 125:8
138:15 144:2
154:9
tsa   71:20,21
turn   21:20 86:25
158:7
turning   102:11
turtle   3:21
two   15:12 28:10
54:18 75:24 89:1

**[two - weil.com]**

89:5 129:21,24
130:4 146:11
**tx** 3:22
**type** 70:7,8 88:7
89:15,23,23
**types** 67:6

## u

**u.s.** 131:1,8,12,17
**uh** 61:22 106:23
129:12
**ultimately** 33:20
50:16 92:10 102:3
120:15
**unadjusted** 145:1
**unavailable** 81:24
124:24 125:11
**unclear** 13:7
**undergrad** 28:2
**undergraduate**
26:24
**understand** 12:7
12:14,21,22 13:7
13:10,12,13,18,25
14:9,17,24 16:2,7
17:24 18:7,24
34:16 38:5,17
43:16 46:19 47:17
50:5 51:4,23 52:2
57:12 62:21 64:16
69:11 70:21 80:7
80:13,23 86:7
91:5 93:18 95:14
98:19 101:14
103:5 113:4
115:14 117:6
118:5 125:2 135:2
138:8,15 141:4,11
144:4 148:2,5
149:23 157:7
**understanding**
9:10 21:11 22:5

42:18 44:11 51:8
66:18 77:19 78:18
79:18,23 80:14
81:1,4 82:4,8,9,15
86:13 104:3
114:24 118:16
140:22 141:22
149:18
**understood** 12:15
13:19 15:24 16:22
19:7 91:24 124:11
129:25 155:10
**unfortunately**
29:1
**united** 1:1
**university** 26:25
27:3
**unnecessary** 23:23
**unrealistic** 44:24
**unrestricted** 87:13
87:21 88:2,15,17
88:19 91:16,20,23
125:6,8,21,24
127:2 129:9 141:8
141:14,19,23
**unsecured** 4:3
26:9 66:14 67:5
69:2 83:6,10
**update** 38:12,14
38:15 97:3
**uploaded** 47:17
**use** 38:2 49:25
81:22 82:12
125:17
**uses** 76:12 87:16
123:20 124:4
**usvi** 7:21

## v

**v** 161:7 162:3
163:3

**vague** 119:4
**valdes** 8:16,21
**valenciano** 6:18
**valuation** 41:10
**value** 73:15 74:1
107:2,9,12 109:2
110:11,21,24
111:2 112:9 134:8
136:1
**values** 107:15
130:4
**variety** 93:7 94:21
**various** 40:21
94:17,24
**vary** 45:20
**vast** 103:3
**verbally** 12:10
**verified** 68:6
**veritext** 6:18
161:1,8 164:1
**veritext.com.**
161:17
**versed** 73:24
**versions** 146:11
**versus** 31:9 114:20
117:17
**vice** 29:15,20 30:1
**video** 1:14,18 8:3
19:23 20:22
104:13 155:6,14
**videographer** 6:17
8:2 47:10,13
104:11,13 147:7
147:10 158:15
**view** 12:19 77:11
108:20 109:4
110:2,17 150:10
**violate** 12:1
**virtually** 10:10
**virtue** 144:21

## w

**w** 6:16
**wait** 76:23 107:6
122:23
**waived** 161:20
**walk** 72:21 128:22
129:3,16
**walked** 140:9
**want** 10:2,9 32:18
39:20 47:8 51:7
51:11,25 59:13
68:10 69:11 75:15
91:14 93:6,18
97:1 102:15
106:19 113:17
136:7 145:21
147:3 153:1 157:7
158:17
**wanted** 39:22
48:12
**washington** 2:7
6:6
**way** 19:25 74:13
74:25 93:16 117:7
137:3 140:15
**ways** 34:3 51:8
**wdalsen** 3:7
**we've** 26:17 44:8
54:25 71:13,24
106:8 136:3 137:5
139:10 140:8
146:22 148:24
151:2 153:10,11
156:4,8 157:9
**website** 39:16 40:2
133:2
**weekly** 71:19
**weight** 14:19
**weil** 4:15
**weil.com** 4:17,18
4:18

welcome   11:15
   78:7
went   8:22 28:24
   29:4 126:2 127:16
   127:22 144:17
whereof   160:3
wickersham   4:22
wide   86:3
william   3:4
witness   1:18,20
   5:15 8:23 9:15
   15:20 25:8 32:18
   44:4,5 47:5 48:7
   57:10,11,12 60:19
   61:8,10,13 84:4,18
   85:3 91:7 105:20
   119:20 121:21
   122:11 127:15
   142:16 145:7
   153:6 158:13
   159:11 160:3
   161:9,12 162:1,4
   162:11 163:1,4,15
witness'   161:15
wolfe   56:17,18,20
wondering   136:23
word   152:13
words   52:20 53:5
   55:4 81:5 152:11
work   9:17 10:13
   27:13 28:24 29:4
   29:23 30:1 31:17
   32:1,5,7 33:20
   34:6 36:6,17,20
   37:8,11 38:23
   39:21 40:19 41:1
   41:8 43:1,17,23
   44:2,8 50:17
   58:21,24 59:10
   67:3 88:8,11,17,19
   89:16,25 90:23

91:23 92:14,16,20
93:2,4 95:3,15,16
95:22 96:2,5 97:9
97:14 113:21
114:2 125:23
136:23 145:16
146:13,15,17
153:9,10,14,15,18
worked   28:13 35:1
   39:5 95:8 136:16
   136:20 146:18
working   28:3,14
   29:6 120:1 146:20
   156:5
workout   28:14
works   89:19 92:18
   92:24 97:13
workstreams
   30:12
write   53:2 54:15
   78:23 79:21
written   1:22
   100:25
wrong   124:18
   126:16
wrote   52:18,20
   55:10,14,14

**x**

x   28:21,22,23

**y**

yards   3:15
yeah   23:17 24:23
   25:6,11 36:22
   39:13 50:2 60:2
   60:14 81:18 87:6
   94:9 101:5 102:18
   102:24 115:5
   121:7 122:11,20
   124:20 133:24
   137:24 139:4

143:5 145:4
149:22 150:22
151:14 157:5
year   27:11,15
   89:11 100:3
   104:25,25 105:1,4
   105:6,7,13 107:1,4
   107:4,5,9,12,15,16
   108:5,5,11,11,13
   108:16 109:4,13
   110:11,23,25
   111:2 112:3,7,9,19
   112:20 114:6,11
   120:14,21 121:11
   133:3 135:14,15
   137:3
years   28:6,10
   32:11 33:21 40:15
   42:2 45:4 47:2
   58:6 74:18 95:9
   110:20 112:19
   113:1,20,23 114:6
   120:20 121:1
yep   82:6 93:17
yesterday   47:25
york   2:11,18 3:16
   4:5,16,23
young   19:17 22:15
   22:18 24:3,6,10,12
   25:21

**z**

zabel   2:5,10 8:15
zargel   154:8
zero   55:19 99:4
   100:5 129:23,23
   129:24,24,24,24
zoom   105:24
   106:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.