# EXHIBIT O

UNCERTIFIED ROUGH DRAFT

1

1        This transcript is an UNCERTIFIED

2   ROUGH DRAFT TRANSCRIPT.  It contains raw output

3   from the Court Reporter's stenotype machine

4   translated into English by the Court Reporter's

5   computer without the benefit of proofreading.  It

6   will contain untranslated steno outlines,

7   mistranslations (Wrong Words), and misspellings.

8   These and any other errors will be corrected in

9   the final transcript.

10        Since this ROUGH DRAFT

11   TRANSCRIPT has not been proofread, the Court

12   Reporter cannot assume responsibility for any

13   errors therein.  This ROUGH DRAFT TRANSCRIPT is

14   intended to assist attorneys in their case

15   preparation and is not to be construed as the

16   final transcript.  It is not to be read by the

17   witness or quoted in any pleading or for any

18   other purpose and may not be filed with any

19   court.

20                     *   *   *

21

22

23

24

25

UNCERTIFIED ROUGH DRAFT

2

09:31:10AM 1              THE VIDEOGRAPHER:  Okay.  We are now

2    on the video record.

3              Today is October 13, 2021.  The time

4    is approximately 9:31 Eastern time.

5              We are here in the matter of the

6    insolvency proceedings for the Commonwealth of

7    Puerto Rico to take the deposition of Marti

8    Murray.

9              Counsel will be identified on the

10   stenographic record, and the court reporter may

11   proceed.

12              MARTI P. MURRAY

13   of lawful age, Witness herein, having been first

14   duly cautioned and sworn, as hereinafter

15   certified, was examined and said as follows:

16              CROSS-EXAMINATION

17   BY MS. JENNINGS:

18        Q.   Good morning, Ms. Murray.  How are

19   you today?

20        A.   Good morning.

21        Q.   My name is Taleah Jennings.  I'm

22   with the law firm of Schulte Roth & Zabel.  We

23   represent Cantor-Katz Collateral Monitor, and I

24   am joined with my colleagues from Schulte, Noah

25   Gillespie and Jacqueline Maero Blaskowski.  I'm

UNCERTIFIED ROUGH DRAFT

3

09:32:19AM  1    also joined by co-counsel from McConnell Valdes.

2    I will be asking questions on behalf of the

3    DRA parties today, okay?

4            A.    Okay.

5            Q.    And someone from my team may have

6    additional questions once I'm done, but I will be

7    taking the bulk of this.

8                  I just want to confirm with Ms. Dale

9    that the usual stipulations are in place.  We --

10   you can object to form and to privilege, all

11   other objections are reserved.

12           MS. DALE:  That's fine.

13           MS. JENNINGS:  Okay.  The objection

14   of one party is an objection for all.

15           MS. DALE:  Agreed.

16           MS. JENNINGS:  And unless anyone

17   else on the call has any objections, I will

18   assume everyone else agrees as well.

19   BY MS. JENNINGS:

20           Q.    Ms. Murray, you have been deposed

21   before, correct?

22           A.    Yes.

23           Q.    And so you know how this -- how this

24   goes.  I'll ask you questions, you provide

25   answers.  You need to try to give me a chance to

UNCERTIFIED ROUGH DRAFT

4

09:33:19AM  1    complete my question.  I will obviously try to

2    make sure I give you the chance to complete your

3    answer, okay?

4            A.    Yes.

5            Q.    If there's any question I ask of you

6    that is confusing or that you don't understand,

7    just tell me, and I will try to rephrase it for

8    you, okay?

9            A.    Yes.

10           Q.    Okay.  And although this is a remote

11   deposition with video, we have a court reporter.

12   So we need to hear all of your responses

13   verbally, okay?

14           A.    Yes.

15           Q.    And if you have any technical

16   issues, if you can't hear me or you can't see

17   something on the screen, just let us know, and we

18   will hold the deposition and get that fixed,

19   okay?

20           A.    Yes.

21           Q.    And you, I assume, are aware that

22   someone may object -- your counsel may object to

23   some of my questions, unless there's a direction

24   not to answer, the objection does not mean that

25   you do not answer the question; you should still

UNCERTIFIED ROUGH DRAFT

5

09:34:19AM  1   answer my question.  Okay?

2          A.   Yes.

3          Q.   Okay.  And if you need a break at

4   any time, just ask for one, and as long as

5   there's no question pending, we should be able to

6   accommodate that.  Okay?

7          A.   Yes.

8          Q.   Okay.  Is there any reason you

9   cannot testify truthfully today?

10          A.   No.

11          Q.   Okay.  And are you on any medication

12   that impairs your memory or any sort of

13   functioning cognitively?

14          A.   No.

15          Q.   And you understand that you're under

16   oath today.

17          A.   Yes.

18          Q.   Okay.  Are you represented today by

19   counsel?

20          A.   I believe so, yes.

21          Q.   Okay.  Who are you represented by?

22          A.   Proskauer.

23          Q.   And did you meet with Proskauer to

24   prepare for today's deposition?

25          A.   Me?

UNCERTIFIED ROUGH DRAFT
6

09:35:20AM  1         Q.   Meet.

           2         A.   Not in person, no.

           3         Q.   Okay.  On the phone or by video?

           4         A.   Yes.

           5         Q.   Okay.  Who did you meet with at

           6    Proskauer to prepare for your deposition today?

           7         A.   I met with Margaret Dale and Chantel

           8    Febus, among others.

           9         Q.   Others from Proskauer?

          10         A.   Yes.

          11         Q.   Anyone from outside of Proskauer?

          12         A.   Yes.

          13         Q.   Who -- who were those?

          14         A.   My team at Brattle.

          15         Q.   And who are members of your team at

          16    Brattle?

          17         A.   Julia Zhu, Nitin barrage, Paulson,

          18    among others.

          19         Q.   And are those three individuals the

          20    three individuals that attended your deposition

          21    preparation meetings, or did additional

          22    individuals attend?

          23         A.   Additional individuals attended.

          24         Q.   Can you name all of the individuals

          25    who attended your deposition-preparation

UNCERTIFIED ROUGH DRAFT

7

09:36:33AM   1    meetings, to the extent you have not already

2    identified them?

3            A.    From Brattle?

4            Q.    From Brattle, yes, and then if

5    there's others, I'll ask for those names as well.

6            A.    I recall from Brattle, Rohit Nair.

7    I can't recall any others sitting here today.

8            Q.    Okay.  And was there anyone who

9    attended the sessions who did not attend from

10   Brattle or from Proskauer, who are affiliated

11   with other entities?

12           A.    Yes.

13           Q.    Who?

14           A.    We had a Veritext training as part

15   of the deposition preparation.

16           Q.    Anyone else outside of individuals

17   from Veritext?

18           A.    Not that I can recall.

19           Q.    Okay.  And how many calls or

20   videoconferences did you have in preparation for

21   your deposition today?

22           A.    With who?

23           Q.    With anybody.

24           A.    That's hard to say.

25           Q.    What's hard about it?

UNCERTIFIED ROUGH DRAFT

8

09:38:06AM   1          A.   Well, I talked to people on my team

2    at Brattle frequently, so it's hard for me to

3    count how many calls I had with my team.

4          Q.   In connection with preparing for

5    this particular deposition?

6          A.   Yes.

7          Q.   Okay.  When did you start preparing

8    for this deposition?

9          A.   Focusing on this deposition, I would

10   say about a week ago.  Maybe a little longer.

11         Q.   Okay.  And since then, how many

12   meetings have you had where Proskauer was in

13   attendance to prepare for your deposition?

14         A.   Probably somewhere between three and

15   five.

16         Q.   And how long did those meetings

17   last, approximately?

18         A.   It varied.

19         Q.   It varied from what to what?

20         A.   As I recall, it varied from maybe a

21   half an hour to a few hours.

22         Q.   And when you say a few hours, what

23   does that mean?

24         A.   More than two, less than four.

25         Q.   And did you review documents during

UNCERTIFIED ROUGH DRAFT

9

09:40:01AM  1   those meetings that you had with Proskauer?

2          A.   Yes.

3          Q.   Do you know approximately how many

4   documents you reviewed?

5          A.   I would say a few.

6          Q.   What's a few?  Between two and four?

7          A.   As I recall, less than five.

8          Q.   And do you recall which documents

9   those were?

10             MS. DALE:  Answer that yes or no.

11             THE WITNESS:  Yes.

12   BY MS. JENNINGS:

13         Q.   Okay.  Which documents?

14             MS. DALE:  I'm going to direct you

15   not to answer that question.  I think that's part

16   of our privileged communications concerning

17   preparation.

18             MS. JENNINGS:  The documents that

19   she reviewed in connection with preparing to

20   testify?

21             MS. DALE:  Yes.

22             MS. JENNINGS:  And --

23             MS. DALE:  They're all -- all

24   publicly -- they're all produced.  There's

25   nothing not produced.

UNCERTIFIED ROUGH DRAFT

10

09:41:24AM   1   BY MS. JENNINGS:

2            Q.   Ms. Murray, are you going to abide

3   by that directive?

4            A.   I'm sorry, am I going to abide by --

5            Q.   Ms. Dale's directive not to identify

6   the documents you reviewed in connection with the

7   testimony that you're giving today?

8            A.   Yes, I am.

9            Q.   Okay.  And did you determine which

10   documents to review, or did counsel provide you

11   with the documents to review during your prep

12   sessions?

13            A.   Can you repeat that?

14            MS. JENNINGS:  Ms. Court Reporter,

15   could you repeat the question?

16            (Thereupon, the record was read.)

17            THE WITNESS:  I would say both.

18   BY MS. JENNINGS:

19            Q.   What document with respect to the

20   first category that you selected to review, which

21   documents are those?

22            MS. DALE:  Objection, and I'm going

23   to direct the witness not to answer the question.

24            MS. JENNINGS:  I'm not asking about

25   documents that you provided her or that your firm

UNCERTIFIED ROUGH DRAFT

11

09:42:44AM  1   provided her to review, or identify.  She just

2   testified that she identified certain documents

3   to review.

4               MS. DALE:  Marti, you can answer the

5   question.

6               I'll withdraw my objection to that

7   question.

8               MS. JENNINGS:  Thank you.

9               MS. DALE:  You can answer that

10  question.

11              THE WITNESS:  I'm sorry.  Could you

12  repeat the question, please?

13              MS. JENNINGS:  Ms. Court Reporter,

14  can you read the question?

15              (Thereupon, the record was read.)

16              THE WITNESS:  The one I recall was

17  an FOMB presentation.

18  BY MS. JENNINGS:

19       Q.   What presentation?

20       A.   It was a presentation on the effects

21  of the plan of adjustment.

22       Q.   And is this a document that is

23  listed in the documents considered appendix to

24  your report?

25       A.   I believe so, yes.

UNCERTIFIED ROUGH DRAFT

12

09:43:52AM   1          Q.   Okay.  We'll take a look, because

2    I'm going to ask you to identify it shortly.

3               As I -- you can suspect I have some

4    questions about your actual report, so if we

5    can --

6               MS. JENNINGS:  Jacq, can you publish

7    Tab 1?  And we're going to mark this as Exhibit

8    Number 1.

9               (Exhibit 1, Expert Report of

10   Marti P. Murray, September 13, 2021, was marked

11   for purposes of identification.)

12              MS. JENNINGS:  Can we put it up on

13   the screen for a second?  I want to make sure

14   we're looking at the same document.

15   BY MS. JENNINGS:

16          Q.   Who would be able to put that up on

17   the screen for us?  Okay.  Thank you.

18              All right.  Let's scroll to the next

19   page.  Ms. Murray, is this an expert report that

20   you have prepared in connection with this

21   proceeding?

22          A.   Yes.

23          Q.   Okay.  And have you amended or

24   supplemented this report since the date of the

25   report, September 13th?

UNCERTIFIED ROUGH DRAFT

13

09:45:41AM   1          A.    No.

2          Q.    Okay.

3                MS. JENNINGS:  You can take that

4    down for now.

5    BY MS. JENNINGS:

6          Q.    I'm assuming there was an initial

7    draft of the report created before September 13;

8    is that right?

9          A.    What do you mean an initial draft?

10         Q.    So were there drafts of this report?

11         A.    There's only one draft of the

12   report.

13         Q.    Okay.  So this -- the final report

14   is what we looked at.  There are no prior drafts

15   of this report?

16         A.    No.

17         Q.    Okay.  And who wrote this report?

18         A.    I did.

19         Q.    Did you write the entirety of the

20   report?

21         A.    Yes.

22         Q.    Okay.  And when did you start

23   writing the report?

24         A.    Shortly after I was engaged.

25         Q.    When was that?

UNCERTIFIED ROUGH DRAFT

14

09:46:46AM  1          A.   In early August 2021.

2          Q.   And so between August 2021 and

3     September 13, 2021, there was only one version of

4     this report ever created; there was never any

5     iterations made or changes made?

6          A.   There was a draft, and the draft

7     became the final report.

8          Q.   So there was -- I'm -- I'm not

9     following, then, your prior testimony.  You said

10     there were no drafts, this is the only draft.

11          A.   The draft evolved into the final

12     report.

13          Q.   Okay.  So were there -- was there a

14     version one of the draft, version two of the

15     draft, and so forth?

16          A.   No.

17          Q.   Okay.  And so did you work with

18     counsel on preparing the report, or you just

19     drafted it on your own?  It's a yes-or-no

20     question.

21          A.   It -- it's not really a yes-or-no

22     question, the way you asked it.

23          Q.   Okay.  Let me rephrase it.

24               Did you work with counsel in

25     connection with drafting the report?

UNCERTIFIED ROUGH DRAFT

15

09:48:09AM  1          A.   Yes.

         2          Q.   Okay.  Did you -- and that's counsel

         3  from Proskauer?

         4          A.   Yes.

         5          Q.   Did you work with anyone else, other

         6  than members of your team at Brattle in

         7  connection with drafting this report?

         8          A.   How do you mean, work with anyone

         9  else?

        10          Q.   Well, what are you -- do you

        11  understand what work with people means?

        12          A.   I am trying to understand the

        13  context in -- in which you mean it.

        14          Q.   Well, I -- why don't I start with,

        15  do you understand what it means when I ask you,

        16  did you work with anyone from Proskauer?  What

        17  did you understand that question to mean?

        18          A.   Did I work with Proskauer on the

        19  report.

        20          Q.   Okay.  And so when I say, Did you

        21  work with anyone else, I mean it the same way,

        22  but just people who are not associated with

        23  Proskauer.

        24          A.   No.

        25          Q.   Okay.  When is the last time you

UNCERTIFIED ROUGH DRAFT

16

09:49:30AM  1  reviewed this report?

2          A.   I've looked at some elements of it

3  this morning.

4          Q.   And to your knowledge, is

5  everything -- to your knowledge today, is

6  everything in this report accurate?

7          A.   To my knowledge, there is -- there

8  are -- there is a footnote that I think should be

9  modified.

10          Q.   Which footnote is that?

11          A.   Bear with me a moment.  I have to

12  find it.

13          Q.   Sure.

14  BY MS. JENNINGS:

15          Q.   If you can tell me the substance of

16  it, I may be able to help you find it.

17          A.   It has to do with a cash balance and

18  what entities it includes.  I believe it's

19  footnote 105.

20          Q.   Okay.  So footnote 105, can you tell

21  me how you think it needs to be modified?

22          A.   I -- I think that -- as I recall,

23  it does not include the cash from the CRIM,

24  PREPA, PRASA, PRIDCO, GDB, UPR, COSSEC, and

25  CONFINA.

UNCERTIFIED ROUGH DRAFT

17

09:52:50AM  1         Q.   So it would -- if you were to modify

          2   it, you would think where it's "and cash" from

          3   those entities should be crossed out?  Is that --

          4   am I understanding you correctly?

          5         A.   I'd want to go back and confirm that

          6   with the team, but that's how I recall it.

          7         Q.   Okay.  Other than that footnote, to

          8   your knowledge, is everything in your report

          9   accurate?

         10         A.   Yes.

         11         Q.   And is there anything else in your

         12   report that you feel you would need or want to

         13   change?

         14         A.   I'm not recalling anything as I sit

         15   here today.

         16         Q.   Okay.  You say you were engaged in

         17   early August 2021; is that right?

         18         A.   Yes.

         19         Q.   Okay.  Were you engaged pursuant to

         20   a contract between the FOMB and Brattle?

         21         A.   Yes, that's my understanding.

         22         Q.   Are you aware -- or to your

         23   knowledge, has Brattle been engaged by the FOMB

         24   in any other capacity?

         25         A.   Yes, to my knowledge, Prattle has

UNCERTIFIED ROUGH DRAFT

18

09:54:21AM  1   been engaged in another capacity.

2          Q.   What other capacity?

3          A.   I believe Brattle has been doing

4   consulting work for the FOMB.

5          Q.   What kind of consulting work?

6          A.   I'm not familiar with the details.

7          Q.   Do you know generally what kind of

8   consulting work?

9          A.   I'm not familiar with the details.

10          Q.   No, I'm not asking for the details.

11   I'm just asking you, if you have a general

12   understanding of what type of consulting work?

13          A.   Not enough to testify to.

14          Q.   So, no, you have no understanding?

15          A.   Not enough to testify to.

16          Q.   Well, I'm not -- I'm not -- I don't

17   understand your response.

18               Do you have -- do you have an

19   understanding, or you have no understanding?

20               MS. DALE:  Asked and answered.  She

21   already gave you the understanding that she has,

22   which is that there is -- they have other

23   capacities including a consulting role.

24   BY MS. JENNINGS:

25          Q.   Yeah, I'm asking a different

UNCERTIFIED ROUGH DRAFT

19

09:55:37AM  1  question.

2            Do you have any understanding of the

3  type of consulting work that Brattle has been

4  engaged to do for the FOMB?

5        A.   No.

6        Q.   Okay.  Are you aware of any other --

7  other than the consulting work and the work you

8  have been engaged to do, are you aware of any

9  other work that the Brattle company has been

10  engaged to do for the FOMB?

11        A.   No.

12            MS. JENNINGS:  Jacq, could you

13  publish tab 4, please?  And let's get that up on

14  the screen.

15            (Exhibit 2, Independent Contractor

16  Services Agreement The Brattle Group, Inc.

17  Effective date:  March 25, 2019, was marked for

18  purposes of identification.)

19  BY MS. JENNINGS:

20        Q.   This is marked as Exhibit 2.

21            Ms. Murray, are you familiar with

22  this document in.

23        A.   No.

24        Q.   Have you ever seen it before?

25        A.   No.

UNCERTIFIED ROUGH DRAFT

20

09:57:27AM   1                    MS. JENNINGS:  Can you scroll down

2       to page 9 of this document?

3       BY MS. JENNINGS:

4            Q.    And, Ms. Murray, do you see that

5       this -- you can look at the whole document, but I

6       just want to focus on this page that's titled

7       Project Assignment Number 1, with The Brattle

8       Group, dated March 25, 2019.  Do you see that?

9            A.    Yes.

10           Q.    Do you know what project assignment

11      number one is in this context?

12           A.    No, I -- I've never seen this

13      document before.

14           Q.    Okay.  Have you ever heard of

15      project assignment number one with respect to the

16      work that The Brattle Group has done for the

17      FOMB?

18           A.    No.

19           Q.    Okay.  And do you know what work The

20      Brattle Group is doing for the FOMB as of

21      March 25, 2019?  Is that the consulting work you

22      were talking about?

23                 MS. DALE:  Objection to the form of

24      the question.

25                 THE WITNESS:  Can you repeat the

UNCERTIFIED ROUGH DRAFT

21

09:58:42AM  1  question, please?

2                MS. JENNINGS:  Sure.  Ms. Court

3  Reporter, can you please repeat the question?

4                (Thereupon, the record was read.)

5                MS. DALE:  Objection.

6                THE WITNESS:  There's two questions

7  there.  Can you please separate the questions?

8  BY MS. JENNINGS:

9        Q.   Sure.  Court reporter, can you

10  please read the question back?  I don't have a

11  realtime in front of me, and I'll tell you when

12  to stop.

13                (Thereupon, the record was read.)

14        A.   No.

15                MS. DALE:  Objection to the form.

16                MS. JENNINGS:  And can you scroll

17  down to page 12, please?

18                This says project assignment

19  number 2 with The Brattle Group, dated

20  January 29, 2020, and in the description here --

21  do you see this page, Ms. Murray?

22                MS. DALE:  I'm sorry.  I'm not

23  seeing it, Taleah.

24                MS. JENNINGS:  It's on the screen.

25                MS. DALE:  It says page 1 on the

UNCERTIFIED ROUGH DRAFT

22

10:00:24AM  1   screen.  Oh, it's page 12 of the pdf?  Sorry.

2                   MS. JENNINGS:  Yeah.  At the top it

3   says project assignment number 2.  Do you see

4   that?

5                   THE WITNESS:  Yes.

6   BY MS. JENNINGS:

7            Q.   And this is dated January 29, 2020?

8            A.   Yes.

9            Q.   Do you see that?

10                Do you know what work The Brattle

11   Group was engaged to do for the FOMB on or around

12   January 29, 2020?

13           A.   No.

14           Q.   And when you were engaged in August

15   of -- you said 2021; is that right?

16           A.   Yes.

17           Q.   How did that come about?  Did

18   someone from The Brattle Group ask you to work on

19   this matter, or were you contacted by Proskauer?

20           A.   I was contacted by Proskauer.

21           Q.   Okay.  And did you know at the time

22   that The Brattle Group was performing services

23   for Proskauer and the FOMB?

24           A.   I was generally aware that The

25   Brattle Group was performing services.  I can't

UNCERTIFIED ROUGH DRAFT

23

10:01:48AM   1   say I was aware as of the time.  I -- I can't say

2   I was aware as of August 2021 what Brattle was

3   doing.

4           Q.   Have you ever been engaged by the

5   FOMB, other than in connection with this

6   proceeding, for anything --

7           A.   No.

8           Q.   And have you ever been engaged by

9   Proskauer, other than in connection with this

10  proceeding?

11          A.   Yes.

12          Q.   How many times?

13          A.   As I recall, one time.

14          Q.   Okay.  You can take this down --

15  document down.

16               And when was that?

17          A.   I can't recall the exact year.

18          Q.   Was it before the pandemic?

19          A.   Yes.

20          Q.   Okay.  Was it in the past five

21  years?

22          A.   Possibly.

23          Q.   And was it in connection with the

24  litigation?

25          A.   Yes.

UNCERTIFIED ROUGH DRAFT

24

10:03:05AM  1          Q.   Did you provide testimony in

2    connection with that engagement?

3          A.   Yes.

4          Q.   What did the testimony concern,

5    subject matter?

6          A.   It related to an M&A sale process.

7          Q.   And was it a case that was pending

8    in court?

9          A.   That's my understanding.

10         Q.   What case was it?

11         A.   Brown Jordan International, et al.,

12   v Christopher Carmichael.

13         Q.   And other than in connection with

14   that case, have you ever worked with Proskauer

15   on -- in connection with any other proceeding,

16   other than the instant proceeding?

17         A.   As an expert?

18         Q.   In any capacity.

19         A.   I was a distressed debt investor for

20   a very long time.  I may have worked with

21   Proskauer in that capacity.  I don't recall one

22   way or the other.

23         Q.   So other than this matter and the

24   matter -- the litigation you just described, you

25   don't recall working with Proskauer in

UNCERTIFIED ROUGH DRAFT

25

10:05:05AM   1   connection -- in any other capacity; is that

2   correct?

3          A.   That's right.

4          Q.   Is it your understanding that you

5   will be providing testimony at the confirmation

6   hearing on behalf of the FOMB?

7          A.   If I am asked to?

8          Q.   Have you been asked to yet?

9          A.   No.

10          Q.   Have you discussed the possibility

11   of providing testimony at the confirmation

12   hearing on behalf of the FOMB with anyone?

13          A.   I don't recall it.

14          Q.   With regard to the expert report

15   that we just looked at, have you communicated

16   with anyone outside of Proskauer or The Brattle

17   Group regarding the contents of your expert

18   report?

19          A.   Yes.

20          Q.   Who?

21          A.   I communicated with certain of the

22   financial advisors/consultants retained on behalf

23   of the FOMB.

24          Q.   Can you identify who you spoke to,

25   please?

UNCERTIFIED ROUGH DRAFT

26

10:07:09AM   1          A.   As I recall, I spoke with

2    individuals at Citibank, EY, McKinsey, and PJT.

3          Q.   Okay.  With regard to Citibank, who

4    did you speak to?

5          A.   As I recall, the gentleman's name is

6    David Brownstein.

7          Q.   And when you spoke to him, was it

8    just you and him, or was counsel involved in that

9    conversation?

10          A.   Counsel was involved.

11          Q.   Which counsel?

12          A.   Proskauer.

13          Q.   When did you have that conversation?

14          A.   I can't recall with specificity.

15          Q.   Generally?

16          A.   Sometime between my retention and

17   when I filed the report.

18          Q.   So sometime in August or September?

19          A.   Correct.

20          Q.   And do you know whether it was

21   before Labor Day or after Labor Day?

22          A.   I -- I can't recall with

23   specificity.

24          Q.   I'm just asking if you know whether

25   it was before Labor Day or after Labor Day?

UNCERTIFIED ROUGH DRAFT

27

10:08:40AM   1          A.   I can't recall.

             2          Q.   Okay.  And who did you speak with at

             3   EY?

             4          A.   I spoke with -- I believe her name

             5   Sheva Levy.  Among others.

             6          Q.   How many others?

             7          A.   A few.  I can't recall specifically.

             8          Q.   Do you know their names?

             9          A.   I can't recall.

            10          Q.   You don't recall their names?

            11          A.   No, I'd have to go back and check my

            12   records.

            13          Q.   And how many conversations did you

            14   have with Ms. Levy at EY?

            15          A.   I recall one.

            16          Q.   Do you recall when that occurred?

            17          A.   So same date range:  Between when I

            18   was retained from August and when the report was

            19   filed.

            20          Q.   And you don't know if it was in

            21   August or September?

            22          A.   I don't.

            23          Q.   Okay.  And was counsel present for

            24   that meeting as well?

            25          A.   Yes.

UNCERTIFIED ROUGH DRAFT

28

10:10:03AM  1          Q.   And the conversation you had with

         2   the gentleman from Citibank, was that one

         3   conversation or more than one?

         4          A.   I'm only recalling one.

         5          Q.   And --

         6          A.   There may be others.  I just can't

         7   recall.

         8          Q.   And the same question regarding

         9   McKinsey.  Who did you speak to?  How many times?

        10   And who was present?

        11          MS. DALE:  Objection to the form,

        12   but I think we got this.  Marti, you can answer.

        13          THE WITNESS:  I would -- I believe

        14   the individual's name from McKinsey was Otis

        15   Shaw, and, I'm sorry, I think there was another

        16   part of the question.

        17   BY MS. JENNINGS:

        18          Q.   Yes.  How many times did you speak

        19   with Mr. Shaw?

        20          A.   I'm recalling once.

        21          Q.   And counsel was present for that

        22   conversation?

        23          A.   Yes.

        24          Q.   Do you recall when that conversation

        25   occurred?

UNCERTIFIED ROUGH DRAFT

29

10:11:12AM  1          A.   The same date range I gave you

2      previously:  Sometime between when I was retained

3      and when I filed my report.

4          Q.   And you don't know whether it was

5      August or September?

6          A.   I don't.

7          Q.   Okay.  And PJT.  Same question.  Who

8      did you speak to from PJT?

9          A.   I spoke with Steve Zelin.

10          Q.   Mm-hmm.  When did you -- how many

11      times did you speak with him?

12          A.   I'm recalling once.

13          Q.   Was counsel present?

14          A.   Yes.

15          Q.   And do you know whether that meeting

16      happened in August or September?

17          A.   I do not.

18          Q.   Do you know who Dr. Andrew Wolfe is?

19          A.   No.

20          Q.   You reference a best-interest test

21      report in your expert report.  Correct?

22          A.   Yes.

23          Q.   And is that best interest test

24      report a document that you discussed with

25      Mr. Shaw?

UNCERTIFIED ROUGH DRAFT

30

10:12:51AM   1       A.   Yes.

             2       Q.   I just want to show you one other

             3   document before I move on.

             4            MS. JENNINGS:  Let's put up Tab3 for

             5   a minute.  Mark it as Exhibit 3.

             6            (Exhibit 3, Disclosure Statement For

             7   the Seventh Amended Title III Joint Plan of

             8   Adjustment of the Commonwealth of Puerto Rico,

             9   et al., was marked for purposes of

            10   identification.)

            11            MS. JENNINGS:  Can we put it on the

            12   screen?  That's not tab 3, Jacq.  You know what?

            13   We don't actually need to put it up.  Let me just

            14   ask you a question.

            15   BY MS. JENNINGS:

            16       Q.   Have you ever seen the notice that

            17   the DRA parties submitted for your deposition --

            18   seeking your deposition testimony?

            19       A.   Yes.

            20       Q.   Okay.  And it's -- it asked for you

            21   to sit for a deposition on September 27th.  Do

            22   you recall that?

            23       A.   I think that's right.

            24       Q.   Okay.  And are you familiar with the

            25   discovery schedule that the court has entered in

UNCERTIFIED ROUGH DRAFT

31

10:15:14AM 1   this case?

2           A.   Not in detail.

3           Q.   Generally?

4           A.   Not really.

5           Q.   Were their dates between

6   September 27th and today, during which you were

7   unavailable to sit for the deposition in this

8   case?

9           A.   Yes.

10          Q.   Which dates were those?

11          A.   As of what date in.

12          Q.   September 27th through today.

13               MS. DALE:  Objection to the form.

14               THE WITNESS:  Yes.  I'm asking you,

15   as of what date was I unavailable?

16   BY MS. JENNINGS:

17          Q.   And my question to you is, are there

18   any dates from September 27 through today that

19   you were unavailable to testify for a deposition

20   in this case?

21          A.   The answer to that is, Yes.

22          Q.   Okay.  Which dates?

23          A.   And the answer to that is, It

24   depends as of what date you're asking me that

25   question.

UNCERTIFIED ROUGH DRAFT

32

10:16:30AM   1          Q.   I'm asking you today.

2          A.   I --

3               MS. DALE:  Objection.

4   BY MS. JENNINGS:

5          Q.   -- to identify which dates you were

6   unavailable.

7          A.   Well, I was unavailable for the week

8   starting the 27th and the following week.

9          Q.   All right.  I'm just looking at my

10  calendar.

11              So you were unavailable from --

12  during the week of September 27 through

13  October 1?  That's the week of the 27th, right?

14         A.   If the 27th is a Monday, I --

15         Q.   Yeah.

16         A.   -- was unavailable for the week of

17  the 27th and the following week.

18         Q.   And that's the week of October 4?

19         A.   If that's the Monday -- if that's

20  the next Monday, yes.

21         Q.   And you were unavailable for Monday

22  through Friday of both of those weeks?

23         A.   As of the date I received my

24  deposition notice, yes, I was unavailable for

25  those two weeks.

UNCERTIFIED ROUGH DRAFT

33

10:17:41AM   1         Q.   And at some -- at some point in

2   time, did that change?

3         A.   I don't -- I don't believe it

4   changed from my perspective, no.

5         Q.   Okay.  And why were you unavailable

6   on those ten days?

7         A.   It was two weeks.

8         Q.   Yes.  And there's five business days

9   in each week.

10        A.   Oh, okay.

11             I was involved with an arbitration

12   that started on that Monday, and I was instructed

13   to reserve those two weeks for that arbitration.

14        Q.   Instructed by whom?

15        A.   Counsel in that arbitration.

16        Q.   Okay.  And how long did that

17   arbitration -- when did that arbitration start

18   and when did that arbitration end?

19        A.   It started on that Monday, I believe

20   it was the 27th.

21        Q.   And when did it end?

22        A.   The following Friday.

23        Q.   So it ended on October 8?

24        A.   Yes.

25        Q.   And did you attend each day of that

UNCERTIFIED ROUGH DRAFT

34

10:18:54AM  1   deposition -- of that arbitration?

2          A.   No.

3          Q.   Which days did you attend the

4   arbitration proceedings?

5          A.   I attended the 27th.

6          Q.   And you didn't attend any other day

7   after the 27th?

8          A.   I did not attend.  I was on call.

9          Q.   Were you participating on a call, or

10  you were just available for a call?

11         A.   I was available to counsel.

12         Q.   Okay.

13         A.   Is this a good time for a break?

14         Q.   Sure.

15              THE VIDEOGRAPHER:  Okay.  Going off

16  the record at 10:19.  Please stand by.

17              (A brief recess was taken.)

18              THE VIDEOGRAPHER:  We are back on

19  the video record at 10:30.

20  BY MS. JENNINGS:

21         Q.   Ms. Murray, by the way, where are

22  you located right now?

23         A.   Long Island.

24         Q.   Okay.  You're at home?

25         A.   Yes.

UNCERTIFIED ROUGH DRAFT

35

10:30:48AM   1          Q.    Okay.  And do you have any documents

2    with you in the room where you are?

3          A.    I have a copy of my report.

4          Q.    Any other documents?

5          A.    Not related to this matter.

6          Q.    Okay.  And do you have any documents

7    on an electronic screen in front of you?

8          A.    I have the Egnyte on another screen.

9          Q.    You have the what?

10          A.    Egnyte.  The documents that are

11   exhibits in this matter.

12          Q.    Okay.  No other documents?

13          A.    No.

14          Q.    Okay.  And you don't have a line of

15   communication open with anybody on any

16   electronic -- through any electronic means, like

17   with counsel or anyone else, other than this

18   virtual deposition; is that right?

19          A.    While I'm testifying?

20          Q.    Yeah.

21          A.    No.

22          Q.    Okay.  Ms. Murray, you are aware,

23   are you not, that as part of the Title III

24   process, in connection with this proceeding, the

25   FOMB was required to certify a plan of

UNCERTIFIED ROUGH DRAFT

36

10:32:15AM   1   adjustment?

2          A.   Certify a plan of adjustment?

3          Q.   Yes.

4          A.   I'm not familiar with that term,

5   certify a plan of adjustment.

6          Q.   Okay.  Why don't we take a look at

7   your report?

8               MS. JENNINGS:  Can we put that up?

9   It's Exhibit 1.  Paragraph 32, which is on

10   page 11 of the report.

11   BY MS. JENNINGS:

12          Q.   Let me know when you're at

13   paragraph 32, Ms. Murray.

14          A.   I'm there.

15          Q.   Do you see the first sentence?  You

16   write, As part of the Title III process, the FOMB

17   must certify the plan.

18          A.   Yes.

19          Q.   Is it your understanding that the

20   certified plan refers to the plan of adjustment?

21          A.   Yes.

22          Q.   Okay.  Does that clarify what I

23   was -- my prior question for you?

24          A.   Yes.  I thought of it more in terms

25   of the FOMB has to determine that the plan is

UNCERTIFIED ROUGH DRAFT

37

10:33:42AM 1  consistent with the 2021 certified fiscal plan.

2          Q.   Well, that would be my next

3  question.

4               So it's your understanding that to

5  certify the plan of adjustment, the FOMB must

6  determine that the plan is consistent with the

7  2021 certified fiscal plan, correct?

8          A.   Correct.

9          Q.   And you provided an opinion with

10  regard to certain elements of -- well, let's just

11  go to your opinion.  Your opinion number 1.

12              In your first opinion --

13              MS. JENNINGS:  You can -- you can

14  keep it up, since we'll be referencing it.

15  BY MS. JENNINGS:

16          Q.   But in your first opinion, am I

17  correct that you take the opinion the plan and

18  the fiscal plan are consistent with respect to

19  two aspects?  Do I have that right so far?

20              I'm just asking the question without

21  reference to --

22          A.   I am -- yes.

23          Q.   I can't -- can you just face the

24  camera while we're talking?

25          A.   I'm sorry.  I'm sorry.  I'm looking

UNCERTIFIED ROUGH DRAFT

10:35:00AM  1   at the report.

2          Q.   Okay.  But before we take a look at

3   the report, I just have a question for you.

4          MS. DALE:  Well, the witness can be

5   looking at the report while you have a question

6   for her, so that's fine.

7   BY MS. JENNINGS:

8          Q.   So, Ms. Murray, before we take a

9   look at the exhibit, just let me ask my question.

10          Is it your opinion that the plan and

11   the fiscal plan are consistent in connection with

12   two -- in two respects?

13          A.   It's they're consistent with key

14   financial elements that I evaluated.

15          Q.   And in --

16          A.   The cash -- which includes the --

17   the up-front cash requirements of the plan and

18   debt sustainability.  And then within those

19   categories, there are multiple categories.

20          Q.   Okay.  So let's start with the

21   broader two categories.

22          By the way, did you identify any

23   subcategories anywhere in your report?

24          A.   Yes, they're discussed in the

25   report.

UNCERTIFIED ROUGH DRAFT

39

10:36:15AM    1         Q.   Can you -- can you let me know what

2    categories you're referring to, what

3    subcategories?

4         A.   Sure.  Consistent with respect to

5    System 2000 and how that is to be treated,

6    consistent with respect to the emergency reserve

7    to be established.  Then I discussed the pension

8    reserve trust.  I discuss the level of cash

9    balances.

10         Q.   Yeah, I'm sorry.  Before you go on.

11    I know that there's a lot of discussions, but I'm

12    asking with regard to the subcategories that you

13    say are consistent when you look at the plan and

14    the fiscal plan are consistent in connection

15    with, that's my specific question.

16              MS. DALE:  Objection to the form.

17    BY MS. JENNINGS:

18         Q.   So as long as your answer is

19    responsive to that, that's fine.  You can keep

20    going.

21         A.   Can you repeat the question, please?

22    I want to make sure I understand it.

23         Q.   Yes.

24              So the way I read your opinion, you

25    say, The plan of adjustment and the certified

UNCERTIFIED ROUGH DRAFT

40

10:37:54AM 1    fiscal plan are consistent as it relates to the

2    debtors' up-front cash needs -- that's number

3    one -- and, number two, sustainable debt service

4    levels.  Correct?

5           A.   Yes.

6           Q.   And when I asked you that before,

7    you said, and you also determined that the plan

8    and the fiscal plan were consistent with regard

9    to other categories that fall underneath those

10   umbrellas.  Correct?

11          A.   Yes.

12          Q.   And so I'm asking you to identify

13   those other categories.

14          A.   Yes.  That's what I was doing.

15          Q.   Okay.  The I wanted to confirm,

16   because you said you discuss things, and I want

17   to confirm that we're not talking about things

18   you discuss, but things in your opinion that are

19   consistent when you look at the fiscal plan and

20   certified -- and the plan of adjustment.

21          A.   Yes, and I --

22          Q.   Okay.

23          A.   -- I address those issues in those

24   opinions, which I was going through before.

25          Q.   Perfect.  And if you're looking at

UNCERTIFIED ROUGH DRAFT

41

10:38:53AM  1   particular paragraphs, can you identify those for

2   me?

3          A.   Yes.  The System 2000 is discussed

4   in paragraphs 65 and 66.  The emergency reserve

5   is discussed in paragraphs 67 and 68.  The

6   pension reserve trust is referred to in

7   paragraph 69.  And then the cash available on

8   emergence is discussed in paragraph 70.

9          Q.   Okay.  And are there any other

10   subcategories that fall within the umbrella of

11   your opinion relating to the debtors' up-front

12   cash needs and sustainable debt service levels?

13              MS. DALE:  Objection to the form.

14              THE WITNESS:  Can you repeat the

15   question?

16              MS. JENNINGS:  Ms. Court Reporter,

17   can you repeat the question?

18              (Thereupon, the record was read.)

19              THE WITNESS:  Well, the categories I

20   was referring to earlier only related to up-front

21   cash needs and did not relate to the sustainable

22   debt levels.

23   BY MS. JENNINGS:

24          Q.   All right.  So then let's start with

25   the first part.

UNCERTIFIED ROUGH DRAFT

42

10:40:53AM   1           Are there any other subcategories to

2    which your opinion relates under the up-front

3    cash needs umbrella?

4           A.   Whatever is in the report is in the

5    report.  The paragraphs I directed you to relate

6    to the up-front cash needs.

7           Q.  Okay.  And other than what you have

8    identified, is your opinion with regard to the

9    up-front cash needs, does it cover any other

10   subcategories?

11          A.   Sorry.  I lost my headphone.  Can

12   you repeat that?

13          Q.   Yes.

14           With regard to your opinion that the

15   plan of adjustment and the certified fiscal plan

16   are consistent as it relates to the debtors'

17   up-front cash needs, are there any other

18   subcategories other than the four you identified

19   that fall within that umbrella?

20          A.   I mean, the report spikes for

21   itself; whatever's in the report is in the

22   report.

23          Q.   And you wrote the report, right?

24          A.   Yes.

25          Q.   Okay.  And so is there anything else

UNCERTIFIED ROUGH DRAFT

43

10:42:13AM  1   in -- I'm just asking for your opinion.  I assume

2   you know it better than I do.

3              Are there any other categories?

4        A.   Are there any other categories --

5   can you -- can you state the question again?

6        Q.   No, I think I got what I need there.

7              Then you said with regard to the

8   second part of your opinion number 1, the plan of

9   adjustment and the certified fiscal plan are

10  consistent as it relates to sustainable debt

11  service levels.  Do I have that right?

12       A.   Implementation of the plan will

13  result in a level of future debt service that is

14  consistent with sustainable debt levels as set

15  forth in the 2021 certified fiscal plan.

16            MS. JENNINGS:  Ms. Court Reporter,

17  could you please repeat my question?

18            (Thereupon, the record was read.)

19  BY MS. JENNINGS:

20       Q.   Do I have that right?

21       A.   I was only restating -- I was giving

22  you the answer to state it properly, the way I

23  understand it.

24       Q.   So I'm reading -- why don't I read,

25  then, from -- if you go to page 25, because I

UNCERTIFIED ROUGH DRAFT
44

10:44:00AM   1   think I read it from your own words, so I'm not

2   sure if you're saying that it's improper.

3            But on page 25, in opinion -- do you

4   see where it says opinion number 1?

5            A.   Yes.

6            Q.   Okay.  And under opinion number 1,

7   it says, The plan of adjustment and the 2021 CFP,

8   that's certified fiscal plan, correct?

9            A.   Yes.

10            Q.   -- are consistent as it relates

11   to -- we already talked about the debtors'

12   up-front cash needs and the second portion is and

13   sustainable debt service levels.  Do you see

14   that?

15            A.   Yes.

16            Q.   Is that your opinion?

17            A.   Yes.

18            Q.   Okay.  And before, when we started

19   this discussion, you said in addition to these

20   two categories, there are subcategories that fall

21   within them.

22            So my question is:  Are there any

23   subcategories with regard to the sustainable debt

24   service levels element?

25            A.   Yes.

UNCERTIFIED ROUGH DRAFT

45

10:45:48AM   1        Q.    Okay.  What are they?  And if you're

2    looking at a particular paragraph, just let me

3    know which paragraph.

4        A.    I would say it's paragraph 73

5    through 89.

6        Q.    And what are the subcategories that,

7    in your opinion, the plan of adjustment and the

8    certified fiscal plan are consistent?

9        MS. DALE:  Objection to the form.

10       THE WITNESS:  That the debt burden

11   after the plan is implemented will be

12   significantly lower and that there will be a

13   projected surplus after debt service through --

14   there won't be a deficit after debt service of --

15   until 2035-2036 time frame.  So that's consistent

16   with the certified fiscal plan.  There is a debt

17   sustainability analysis in the certified fiscal

18   plan that contains various metrics that are

19   applied to look at the creditworthiness, or

20   sustainable debt levels, of a municipality, and

21   as applied to the Commonwealth.  The

22   Commonwealth's metrics fall within a range of

23   where other investment grade states are.  And I

24   go through an analysis of that.

25   BY MS. JENNINGS:

UNCERTIFIED ROUGH DRAFT

46

10:48:35AM   1        Q.   Any other categories that are the

2   subject of your opinion, or subcategories, I

3   should say?

4        A.   One moment, please.

5        Q.   Ms. Murray, are you taking a break,

6   or are you reading your report?

7        A.   No, I'm looking for something in the

8   report.

9             MS. JENNINGS:  Ms. Court Reporter,

10   can you just note the time?

11             MS. DALE:  Taleah, really?

12   Seriously?

13             Okay, note the one minute.

14             THE WITNESS:  No, there is another

15   issue, but it's discussed in opinion 3.

16   BY MS. JENNINGS:

17        Q.   Okay.  What -- what is that issue

18   that's part of -- is the -- are you saying

19   there's something in opinion 3 that's relevant to

20   your opinion number 1?

21        A.   Somewhat, yeah.

22        Q.   Can you tell me what that is --

23        A.   Yes.

24        Q.   And if you are looking to a

25   particular paragraph, just direct me to that

UNCERTIFIED ROUGH DRAFT

47

10:50:27AM  1  paragraph.

2          A.    Yes, I'm at opinion 3, which is

3  paragraph 99 through 102.

4          Q.    And --

5          A.    And it relates to a cap on net tax

6  supported debt service equal to 7.94 percent of

7  debt policy revenues.  And the fact that under

8  the certified fiscal plan, the Commonwealth will

9  be below that 7.94 percent cap on net tax

10  supported debt service as a percentage of the --

11  of the debt policy revenues.

12          Q.    And how does that relate to your

13  opinion 1?

14          A.    It relates to -- it relates to the

15  fact that the debt levels incorporated in the

16  plan are consistent with the certified fiscal

17  plan and are sustainable.

18          Q.    Okay.  Ms. Murray, is it your

19  opinion that the plan and the certified fiscal

20  plan are consistent with regard to ensuring the

21  funding of essential public services in the

22  Commonwealth?

23              MS. DALE:  Objection to the form.

24              THE WITNESS:  I think that's outside

25  the scope of my report.

UNCERTIFIED ROUGH DRAFT

48

10:52:15AM  1   BY MS. JENNINGS:

2          Q.   So you don't have an opinion one way

3   or another on that?

4          A.   I don't.

5          Q.   And is it your opinion that the plan

6   and the certified fiscal plan are consistent with

7   regard to the provision of adequate funding for

8   public pension systems?

9               MS. DALE:  Again, objection to the

10  form.

11              THE WITNESS:  I'm not sure I follow

12  your question.

13              MS. JENNINGS:  Ms. Court Reporter,

14  can you please repeat the question and then you

15  can -- Ms. Murray, if there's something you don't

16  understand about it, I'll try to rephrase.

17              THE WITNESS:  Thank you.

18              (Thereupon, the record was read.)

19              THE WITNESS:  I don't know what you

20  mean by adequate funding for public pension

21  systems.

22              I've opined that the treatment --

23  the proposed treatment of the -- of the pension

24  plan is reflected in the certified fiscal plan.

25         Q.   All right.  You're aware that the

UNCERTIFIED ROUGH DRAFT

49

10:53:28AM  1  fiscal plan -- that the Oversight Board may

2  certify the fiscal plan if it determines the

3  fiscal plan meets certain statutory requirements,

4  right?

5          A.   I think that's outside the scope of

6  the work that I did.

7          Q.   Are you unaware of that fact?

8              MS. DALE:  Objection to the form.

9              THE WITNESS:  It's outside the

10  scope -- it wasn't something I focused on.

11  BY MS. JENNINGS:

12          Q.   Well, putting aside what you focused

13  on, are you aware of that fact?

14              MS. DALE:  October to the form.

15              THE WITNESS:  Which fact are you

16  referring to?

17              MS. JENNINGS:  Ms. Court Reporter,

18  could you please read back my question?

19              (Thereupon, the record was read.)

20              THE WITNESS:  I'm not familiar with

21  that.

22  BY MS. JENNINGS:

23          Q.   Ms. Murray, you said you wrote your

24  report, right?

25          A.   Yes.

UNCERTIFIED ROUGH DRAFT

50

10:55:28AM   1          Q.   You testified to that.  Okay.

2               Take a look --

3               MS. JENNINGS:  Can we go to page 14

4     of the report, paragraph 38?

5     BY MS. JENNINGS:

6          Q.   You can read the whole paragraph,

7     but I want to focus on the last sentence in that

8     paragraph.

9          A.   Yes.

10         Q.   Do you see it says, and you say that

11    you wrote this, the FOMB may certify a proposed

12    fiscal plan if in the FOMB's social discretion it

13    meets 14 different statutory requirements set

14    forth in PROMESA.

15              Do you see that statement?

16         A.   Yes.

17         Q.   And you wrote that statement?

18         A.   Yes.

19         Q.   And now do you agree that that's

20    something you understand?

21         A.   Yes.  I stated it to the disclosure

22    statement.  It's not something that I have

23    particular knowledge of.  It's a -- it's relying

24    on the disclosure statement.

25         Q.   But it's something you wrote in your

UNCERTIFIED ROUGH DRAFT
51

10:56:34AM  1  report.

2          A.   Yes.

3          Q.   Do you understand that sentence to

4  be accurate?

5          A.   Yes.

6          Q.   Okay.  And you cited to the

7  disclosure statement.  Did you read the

8  disclosure statement in connection with including

9  this sentence in your report?

10         A.   Yes.

11         Q.   Okay.  So let's go to where you

12  cite.  The cite is to disclosure statement at

13  page 194.

14              MS. JENNINGS:  Can we, Jacq -- I

15  think we have an excerpt prepared of the

16  disclosure statement that I want to put up and

17  mark as Exhibit 4.

18              THE WITNESS:  Can we --

19              MS. JENNINGS:  Exhibit 3.

20              MS. DALE:  Sorry, Taleah, I wanted

21  to see -- before Exhibit 3 came up -- so we're

22  not -- we're substituting a new Exhibit 3?

23              MS. JENNINGS:  Exhibit 3, yes.

24              MS. DALE:  Thank you.

25  BY MS. JENNINGS:

UNCERTIFIED ROUGH DRAFT

52

10:57:52AM    1           Q.   Ms. Murray, is Exhibit 3 the

2    document that you cite in footnote 50 of your

3    report?

4           A.   It looks to be.

5                MS. DALE:  An excerpt.

6                THE WITNESS:  Yes, an excerpt.

7    BY MS. JENNINGS:

8           Q.   Yeah.  Okay.

9                So let's look at the excerpt.

10                MS. JENNINGS:  Can you scroll to the

11    next page on the screen?

12    BY MS. JENNINGS:

13           Q.   And if you look at the bottom -- you

14    cite to page 194 in your report.  At the bottom

15    of page 194, the last sentence -- or

16    second-to-last sentence:  Following submission,

17    the Oversight Board may certify the proposed

18    fiscal plan if it determines that such fiscal

19    plan meets 14 statutory requirements, and then it

20    cites the provision.  Do you see that?

21                MS. DALE:  Well, it doesn't say

22    exactly that, but, yes, it goes on to -- there's

23    a quote.

24    BY MS. JENNINGS:

25           Q.   Do you see that Ms. Murray?

UNCERTIFIED ROUGH DRAFT

53

10:58:53AM   1          A.   It says, following submission, the

2   Oversight Board may certify the proposed fiscal

3   plan if it determines that such fiscal plan meets

4   14 statutory requirements set forth in PROMESA

5   section 201.2 B which are -- (reading) -- and

6   access to the capital markets, end quote.

7          Q.   Okay.  You see that language, right?

8          A.   Yes.

9          Q.   Okay.  And then it says, the fiscal

10   plan must, and then there's some bullet point --

11   there's a bullet point that starts on 194, and it

12   goes into --

13              MS. JENNINGS:  If you can scroll to

14   195?

15   BY MS. JENNINGS:

16          Q.   -- do you see all of those bullet

17   points?

18          A.   Yes.

19          Q.   Okay.  So on the first bullet point

20   on this page 195, 245 was a question you

21   answered.  I asked you about that.  I asked if it

22   was your opinion that the plan and the certified

23   fiscal plan are consistent with regard to

24   ensuring the funding of essential public

25   services, and you testified it was outside the

UNCERTIFIED ROUGH DRAFT

54

10:59:58AM   1   scope of your opinion, you are not opining on

2   that, correct?

3          A.   Correct.

4          Q.   And so my second question concerns

5   the second bullet point.  It says, if we go back

6   to the earlier page, the fiscal plan must provide

7   adequate funding for public pension systems.

8              Do you have an understanding of what

9   that means.

10             MS. DALE:  Objection to the form of

11  the question.

12             MS. JENNINGS:  Can you go to 195?

13  BY MS. JENNINGS:

14         Q.   Do you have an understanding of what

15  provide adequate funding for public pension

16  systems means, based on your knowledge and

17  experience?

18         A.   That was not a focus of my work in

19  formulating my opinions and writing my report.

20         Q.   Okay.  That's -- that's not my

21  question.

22             My question is:  In your -- with

23  your knowledge and your extensive experience that

24  you've outlined in your report, do you have an

25  understanding of what that bullet point means, go

UNCERTIFIED ROUGH DRAFT

55

11:01:02AM  1  provide adequate funding for public pension

2  systems?

3              MS. DALE:  Objection to the form of

4  the question.

5              It's completely outside the scope of

6  her opinions.  You're wasting our time.  I don't

7  know what you're trying to get at, Taleah.  We're

8  not litigating the certified fiscal plan here,

9  which we've discussed many times.

10              So what is the question that

11  pertains to Ms. Murray's opinion?

12              MS. JENNINGS:  Can you repeat the

13  question, Ms. Court Reporter?  And, Ms. Murray,

14  I'll ask you to answer my question.

15              MS. DALE:  She's answered your

16  question.

17              What -- what -- what does it pertain

18  to the opinions that Ms. Murray is trying to give

19  here?

20              MS. JENNINGS:  Ms. Court Reporter --

21  I -- I don't need to explain my questions to you.

22  I'm not the one who's sitting for the deposition,

23  Ms. Dale.  So I'm going to keep going.  If you

24  want to direct the witness not to answer

25  anything, and you have the basis to do so, then

UNCERTIFIED ROUGH DRAFT
                                                              56

11:02:01AM  1  that's what you'll do.  But I'm not going to

            2  answer the reasons for my questions and where

            3  it's going.  I don't have to give you my

            4  strategy.

            5          MS. DALE:  No, you don't, but you

            6  have to respect the process that we're doing

            7  here.  So if you want to go off -- if you want to

            8  go off the record --

            9          MS. JENNINGS:  Process -- it's my

           10  deposition.

           11          MS. DALE:  If you want to go off the

           12  record, I'm happy to do that and we can have a

           13  conversation about what you're trying to achieve.

           14          MS. JENNINGS:  I don't need to go

           15  off the record.  I actually want to stay on the

           16  record.

           17          And, Ms. Court Reporter, could you

           18  repeat my last question?

           19          (Thereupon, the record was read.)

           20          MS. DALE:  Objection to the form.

           21          THE WITNESS:  My understanding is

           22  the words on the page provide adequate funding

           23  for public pension systems.

           24  BY MS. JENNINGS:

           25          Q.   Okay.  And do you understand what

UNCERTIFIED ROUGH DRAFT

57

11:03:24AM    1    that means?

2              A.   Well, I'm reading the word on the

3    page.  It means that there is some determination

4    that the funding is adequate.  How that

5    determination is made is outside the scope of my

6    report.

7              Q.   So you have no opinion on whether

8    the plan and the certified fiscal plan are

9    consistent with regard to the provision of

10   adequate funding for public pension systems; is

11   that right?

12             MS. DALE:  Objection to the form.

13             THE WITNESS:  I have an opinion that

14   they're consistent with respect to the fact that

15   the certified fiscal plan reflects the intended

16   treatment of E R S, T R S, J R S.  I don't have

17   an opinion on provide adequate funding for public

18   pension systems with respect to a determination

19   being made of what might be quote/unquote

20   adequate, and what is not.  That's a separate

21   issue.

22   BY MS. JENNINGS:

23             Q.   And the third bullet point.  Provide

24   for the elimination of structural deficits.

25             Do you understand what that means?

UNCERTIFIED ROUGH DRAFT

58

11:04:36AM  1            MS. DALE:  Objection to the form.

2            THE WITNESS:  I can read the words

3    on the page, but it -- it -- it's outside the

4    scope of my report.

5    BY MS. JENNINGS:

6        Q.    I -- I --

7        A.    I have not focused ton.

8        Q.    I -- I have no doubt that you can

9    read.  My question is, do you understand what

10   that means, Provide for the elimination of

11   structural deficits?

12           MS. DALE:  Objection to the form.

13   In the context of PROMESA section 2 -- 201-B-1,

14   is that what you're asking her, for a legal

15   opinion?  Because that's objectionable.  So what

16   are you asking for again?

17           MS. JENNINGS:  You can object to

18   form.  Speaking objections are inappropriate.  I

19   am asking Ms. Murray a question, if she can

20   answer it, she can answer it.  If she can't, she

21   can't.  You're doing more talking than her.

22           MS. DALE:  Because you're wasting

23   our time.

24           MS. JENNINGS:  Okay.  Let me -- let

25   me waste my own time, but I would prefer me to

UNCERTIFIED ROUGH DRAFT

59

11:05:39AM 1   waste it rather than you waste it with your

2   speaking objections.

3   BY MS. JENNINGS:

4         Q.   So, Ms. Murray, do you have an

5   understanding as to what that means -- provide

6   for the elimination of structural deficit?

7             MS. DALE:  Objection.  Calls for a

8   legal conclusion; irrelevant; unnecessary.

9             THE WITNESS:  I have not spent time

10   on that.  It's outside the scope of my report.

11   And to the extent that it involves a legal

12   conclusion, it's -- it's -- you're asking for a

13   legal conclusion, which I'm not --

14   BY MS. JENNINGS:

15        Q.   No, I'm not asking for a legal

16   conclusion.  I'm asking, within the scope of your

17   knowledge and experience, do you know what

18   Provide for the elimination of structural

19   deficits means?  Do you know what structural

20   deficits are?

21        A.   I will not answer that question

22   without investigating it further, and that

23   investigation is outside the scope of my report.

24        Q.   So then, it is not part of your

25   opinion that the plan and the certified fiscal

UNCERTIFIED ROUGH DRAFT

60

11:06:41AM   1   plan are consistent with regard to the

2   elimination of structural deficits; is that

3   right?

4          A.   I don't provide an opinion on that.

5          Q.   Okay.  Is it your opinion that the

6   plan and the certified fiscal plan are consistent

7   with regard to improving fiscal governance,

8   accountability, and internal controls?

9          A.   Outside the scope of my report.

10          Q.   So that's -- you don't -- you don't

11   have an opinion on that; is that right?

12          A.   That's right.  It's outside the

13   scope of my report.

14          Q.   And is it your opinion that the plan

15   and the certified fiscal plan are consistent with

16   regard to enabling the achievement of fiscal

17   targets?

18          A.   What do you mean by fiscal targets?

19          Q.   Do you have an understanding of what

20   that -- fiscal targets means?

21          A.   It depends on the context.

22          Q.   In the context of a certified fiscal

23   plan.

24          A.   I don't know what you mean by fiscal

25   targets.  You'd have to be more specific.

UNCERTIFIED ROUGH DRAFT

61

11:08:05AM  1          Q.   Do you have an understanding -- and

2     maybe the answer's no -- of what fiscal targets

3     mean in the context of a certified fiscal plan?

4               MS. DALE:  Objection to the form.

5     BY MS. JENNINGS:

6               Q.   In particular -- in particular this

7     one.

8               MS. DALE:  Objection to the form.

9     Calling for a legal conclusion.

10     BY MS. JENNINGS:

11               Q.   Yes or no?

12               MS. DALE:  She's not here to give a

13     statutory interpretation, Taleah.

14               THE WITNESS:  I'd -- I'd have to

15     refresh on what the definition of fiscal targets

16     is.  I'm not familiar with that term as I sit

17     here today.

18     BY MS. JENNINGS:

19               Q.   And so with regard to your opinion,

20     it does not cover whether the plan and the

21     certified fiscal plan are consistent with regard

22     to the achievement of fiscal targets, correct?

23               MS. DALE:  Objection to the form.

24               THE WITNESS:  I can't answer that

25     question without understanding what you mean by

UNCERTIFIED ROUGH DRAFT

62

11:09:07AM   1   fiscal targets.

2   BY MS. JENNINGS:

3            Q.   Well, you have -- you said you don't

4   understand what fiscal targets means, so it's

5   certainly not a part of the opinion you're

6   giving, is it?

7            A.   Can you repeat your question?

8            Q.   Sure.

9                 Is it your opinion that the plan and

10   the certified fiscal plan are consistent with

11   regard to the achievement of fiscal targets?

12            MS. DALE:   Objection to the form.

13            THE WITNESS:   Without knowing what

14   you mean by fiscal targets, I'm unable to answer

15   that question.

16   BY MS. JENNINGS:

17            Q.   Okay.   And if you don't know what

18   fiscal targets means you certainly are not

19   including that in the context of your opinion,

20   correct?

21            MS. DALE:   Objection to the form of

22   the question.

23            THE WITNESS:   I'm saying that the --

24   the debt structure that is anticipated as a

25   result of the plan of adjustment is consistent

UNCERTIFIED ROUGH DRAFT

63

11:10:20AM  1    with the certified fiscal plan in that the -- it

2    fits in with the debt sustainability analysis.

3    BY MS. JENNINGS:

4            Q.    All right.

5            A.    And I do not specifically address

6    fiscal targets, and I don't know what you mean by

7    it, so I can't answer your question.

8            Q.    Okay.  And is it your opinion that

9    the plan and the certified fiscal plan are

10   consistent with regard to the provision for

11   capital expenditures and investments necessary to

12   promote economic growth?

13           MS. DALE:  Objection to the form.

14   Calls for a legal conclusion.

15           THE WITNESS:  That's outside the

16   scope of my report.

17   BY MS. JENNINGS:

18           Q.    You don't have an opinion on that?

19           A.    No.

20           Q.    Is there a reason that you limited

21   your opinion number 1 to the areas that you

22   identified and not other aspects of the fiscal

23   plan?

24           A.    No.

25           Q.    No reason?

UNCERTIFIED ROUGH DRAFT

64

11:12:18AM   1          A.    Other aspects of the fiscal plan?

2          Q.    Yeah.

3          A.    Looked at the -- the key elements

4    and looked for consistency -- or inconsistency.

5          Q.    And who defined the key elements for

6    you?

7          A.    I did.

8          Q.    But for many -- many aspects of the

9    fiscal plan -- so, for example, the ones we went

10   through for which you have no opinion -- you

11   don't consider those key aspects of the fiscal

12   plan?

13              MS. DALE:  Objection.

14              THE WITNESS:  I relied on the

15   certified fiscal plan as it was -- as it -- as it

16   is.  And I checked for consistency between that

17   certified fiscal plan and the plan of adjustment.

18   BY MS. JENNINGS:

19         Q.    With regard to only certain

20   elements?

21         A.    With regard to key financial

22   elements.

23         Q.    Okay.  And you determined what those

24   key elements were?

25         A.    Yes.

UNCERTIFIED ROUGH DRAFT

65

11:13:31AM   1          Q.   And they did not include, for

2     example, some of the things that we just listed,

3     like providing adequate funding for essential

4     public services, or the elimination of structural

5     deficits.

6                MS. DALE:  Objection to the form.

7     You can answer, Marti.

8                THE WITNESS:  I did not evaluate

9     each line item in the certified fiscal plan.  I

10    relied on the fiscal plan as it exists, and I

11    looked for consistencies or inconsistencies with

12    the plan of adjustment.  That was the scope of my

13    work.

14    BY MS. JENNINGS:

15          Q.   With regard to certain categories,

16    right?

17          A.   With regard to the categories I

18    identified.

19          Q.   Right.  Not other categories.

20          A.   The fiscal plan is what it is, so

21    the -- the categories you're talking about would

22    not -- would not come into the equation with what

23    I did.

24          Q.   I understand that.

25          A.   I accepted the certified fiscal plan

UNCERTIFIED ROUGH DRAFT
66

11:14:40AM  1   as it is and then I compared that to the plan of

2   adjustment.  I did not look at the certified

3   fiscal plan and have opinions about elements of

4   that fiscal plan that should or should not be

5   changed; for example, capital expenditures.

6   That's well outside the scope of the work that I

7   did.

8            Q.   I think your testimony is clear on

9   that point.  So if you look --

10           MS. JENNINGS:  Can we put your

11  report back up on the screen?

12           And if we go to the opinion 1 page.

13  I forget what page it was.

14  BY MS. JENNINGS:

15           Q.   Page 25 of your report.

16           Are you aware of any aspect of the

17  plan and the certified fiscal plan that are

18  inconsistent?  Not limiting it to the two

19  elements that -- that you say are consistent.

20  Are you aware of anything in the plan and the

21  certified fiscal plan that are inconsistent?

22           A.   I think I noted in the report that

23  the funding of the pension reserve trust was not

24  reflected in the certified fiscal plan.

25           Q.   Is that something that you would

UNCERTIFIED ROUGH DRAFT

67

11:17:13AM  1  consider inconsistent?

2          A.   It's not inconsistent, because it

3  works within the certified fiscal plan.  But I

4  did note that it was not -- it wasn't -- we did

5  not see it in the -- in the underlying work that

6  we reviewed.

7          Q.   All right.  So let me ask the

8  question again.

9               Is there anything in the plan and

10  the certified fiscal plan that in your opinion is

11  inconsistent?

12          A.   Not that I've seen, no.  There may

13  be some small things, but nothing material.

14          Q.   What do you consider material?

15          A.   I don't think there's really a

16  bright-line definition of material.  It would

17  depend on the context.

18          Q.   And the context in which you stated

19  it, what do you mean?

20          A.   Well, if there was a provision, for

21  example, that the -- the -- the pension -- the

22  pension fund reserve was to be funded with

23  $5 million up front, let's say, and that was

24  not -- if the trust was to be funded with

25  $5 million up front, and somehow that was not --

UNCERTIFIED ROUGH DRAFT

68

11:19:09AM  1    not reflected someplace, I don't know that I

2    would view that as material.

3              Q.   I'm asking what you view as

4    material.

5                   What is material?  You used the word

6    material, so I'm asking you what it means, not

7    what does not qualify as material.

8              A.   And I think I answered --

9              MS. DALE:  Objection.

10             THE WITNESS:  I said there isn't a

11   bright line test for what's material.  It depends

12   on the context, and then I gave you an example of

13   something I don't think is material.

14   BY MS. JENNINGS:

15             Q.   Okay.  And so my question is really

16   different.  It's what -- I'm trying to look for

17   what you consider material to be.

18             MS. DALE:  Asked and answered.

19             THE WITNESS:  It depends on the

20   context.

21   BY MS. JENNINGS:

22             Q.   Okay.  So let's take a look at

23   paragraph 62 in your report.  There's your word

24   "context. "

25                  The first sentence says, in this

UNCERTIFIED ROUGH DRAFT

69

11:20:14AM   1   context -- you know what context you're referring

2   to there?

3   A.   The context of my report.

4   Q.   Okay.  So in this context,

5   consistency means there are no material

6   provisions in the plan related to the three

7   categories -- that conflict with the 2021

8   certified fiscal plan -- (reading)?

9   Do you see that sentence?

10   A.   Yes.

11   Q.   And so in this context, which you

12   said is the context of your report, what does --

13   what are material provisions?

14   A.   The material provisions relating to

15   the treatment of various stakeholders in the

16   plan.

17   MS. JENNINGS:  Okay.  Can you read

18   that answer back, Ms. Court Reporter?  I want to

19   make sure I got it.

20   (Thereupon, the record was read.)

21   BY MS. JENNINGS:

22   Q.   Okay.  And what are those

23   provisions?  What provisions are you considering

24   material?  That's what I'm trying to get at.

25   A.   How much money has to be set aside

UNCERTIFIED ROUGH DRAFT

70

11:21:36AM  1   up front based on the treatment for certain

2   creditors, and what payment obligations are being

3   created on a going-forward basis, based on the

4   terms of the plan of adjustment.

5         Q.   Okay.  And here it says there's --

6   you talk about three categories of focus.  What

7   are those three categories?

8         A.   I believe that refers to the

9   System 2000 treatment, the emergency reserve

10  treatment, and the pension reserve trust.

11        Q.   Is that your understanding?  I --

12  I'm a little confused by your statement that you

13  believe it refers.  Do you know what those refer

14  to?

15        A.   I believe that's what it is.  I'd

16  have -- I'd have to go back and talk to the team

17  about it.

18        Q.   You don't know what your -- your

19  sentence in here in your report is referring to

20  without speaking to your team?

21        A.   My understanding is that's what it

22  refers to.

23        Q.   But you can't state that with

24  confidence without speaking to your team?

25             MS. DALE:  Objection.

UNCERTIFIED ROUGH DRAFT

71

11:23:22AM   1              THE WITNESS:  I'd like to go back

2    and check with the team.

3    BY MS. JENNINGS:

4         Q.   And in paragraph 62, you say that,

5    consistency does not mean that all provisions are

6    identical.

7              Do you see that?  I'm

8    paraphrasing --

9         A.   Yes.

10        Q.   -- but that's what the sentence

11   saying.

12             And you say that provisions may not

13   be identical among other reasons, because from

14   are timing differences relating to when the 2021

15   certified fiscal plan and the plan were each

16   finalized, and because certain negotiations'

17   results were not necessarily known at the time of

18   the -- the -- the certification of the certified

19   fiscal plan.  Right?

20        A.   Yes.

21        Q.   And when you say among other

22   reasons, what are the other reasons?

23        A.   There may be other reasons.

24        Q.   Do you know what those are?

25        A.   Not sitting here today.

UNCERTIFIED ROUGH DRAFT

72

11:24:54AM   1          Q.   So when you wrote that, you really

2     meant there may be other reasons, but you are not

3     aware of any other reasons?

4          A.   Yes.

5          Q.   And I just want to go back to the

6     three categories of focus that you identify here.

7               Elsewhere in your report, both

8     before paragraph 62 and after, you refer to two

9     categories.  In the opinion, you referred to --

10    the heading, you refer to two categories.  In

11    paragraph 61, you refer to two categories.

12              Do you see that?

13         A.   Yes.

14         Q.   And then paragraph 63, you refer to

15    two categories.  Do you see that?

16         A.   Well, I think for certain categories

17    identified in one and two below.

18         Q.   Okay.  And in paragraph 64, you

19    refer to two categories, correct?

20         A.   One and -- yes, one and two below.

21         Q.   And then there are actually two

22    subheadings, titled One and Two in this section.

23              Do you see that?

24         A.   Yes.

25         Q.   Was there ever at some point a third

UNCERTIFIED ROUGH DRAFT

73

11:26:58AM  1   category other than one and two that was included

2   in this report?

3           A.   No -- not an opinion, no.

4           Q.   Not of opinion number one?

5           A.   No.

6           Q.   And was there ever a third category

7   considered, to include in opinion number one?

8           A.   I don't recall.

9           Q.   You don't -- there may have been,

10   and you don't recall?

11           A.   The same -- the same opinions may

12   have been organized differently in some way, but

13   I can't really recall the details of it.

14           Q.   My question is, there may have been

15   a third category, but you don't recall whether

16   there was or not, is that -- do I have your

17   testimony correct?

18               MS. DALE:  Objection.  Misstates her

19   testimony.

20               THE WITNESS:  There was no third

21   category of opinion.  The categories may have

22   been arranged differently at some point, covering

23   the same information.

24   BY MS. JENNINGS:

25           Q.   So there may have been categories

UNCERTIFIED ROUGH DRAFT
74

11:28:45AM   1   one, two, and three, instead of categories one

2   and two?  But you don't recall --

3           A.   I --

4           Q.   -- one way or the other?

5           A.   I don't recall.

6           Q.   Would you need to check with your

7   team on that?

8           A.   Yes.

9           Q.   Paragraph 63 talks about -- where it

10   states that you were able to verify -- something

11   just changed.  Oh, there it is.

12           That you were able to verify no

13   inconsistencies with regard to your two

14   categories outlined, between the plan and the

15   200 -- 2021 certified fiscal plan from

16   information contained in those two documents as

17   well as additional documents or analyses.

18           Do you see that?

19           A.   Yes.

20           Q.   And if we can go to page 100 of your

21   report, Appendix C.  Actually, it's not page 100.

22   Let me see.  Page 95.

23           All right.  This spans across a

24   couple pages.  Are these the documents that you

25   considered in connection with the opinions

UNCERTIFIED ROUGH DRAFT

75

11:30:54AM 1    provided in your report?

2              A.   Yes.

3              Q.   And are there any other documents

4    that you reviewed outside of these documents?

5              A.   Yes.

6              Q.   In connection --

7              A.   What was -- you didn't finish your

8    question.

9              Q.   Are there any other documents that

10   you reviewed in connection with preparing your

11   report?

12             A.   Yes.

13             Q.   Which documents?

14             A.   I don't know, because I didn't think

15   they were relevant.

16             Q.   Do you have any idea of how many

17   documents you reviewed in connection with the

18   preparation of your report that you ultimately --

19   that you determined were not relevant?

20             A.   I don't have a firm number.

21             Q.   Is it a handful?  Is it dozens?

22             A.   I don't real -- I can't give you a

23   number.

24             Q.   Where did you come across these

25   documents?

UNCERTIFIED ROUGH DRAFT

76

11:32:06AM   1        A.   I mean, the -- I may have read an

2    article.  It -- I looked at it, it wasn't

3    relevant.  I didn't -- it's -- it didn't -- it --

4    it did not contribute to my analysis or

5    evaluation or the formation of my opinions.

6        Q.   Do you have a list of those

7    documents anywhere?

8        A.   I don't know.  I'd have to check

9    with the team.

10        Q.   Who on your team would you check

11   with to determine if you have a list of the

12   documents that you reviewed and considered

13   irrelevant?

14        A.   Gara Paulson.

15        Q.   And are these -- would the documents

16   be maintained electronically?

17        A.   That's my understanding.

18        Q.   And were they sent to you by e-mail?

19        A.   I don't know that, one way or

20   another.

21        Q.   So I'm just trying to gain an

22   understanding of -- you said you don't know the

23   number of documents.  Are we talking, you know,

24   10 documents, 50 documents?  Can you give me any

25   sort of ballpark?

UNCERTIFIED ROUGH DRAFT

77

11:33:27AM   1            MS. DALE:  Objection.

             2            Asked and answered.

             3            THE WITNESS:  I said I couldn't give

             4   you a count sitting --

             5   BY MS. JENNINGS:

             6        Q.   Yeah, I'm not asking for a specific

             7   count.  I'm asking if you can give me a ballpark.

             8        A.   I can't imagine it was more than

             9   maybe 20 documents.

            10        Q.   Okay.

            11        A.   But I don't -- I also cannot testify

            12   with certainty on that number.

            13        Q.   Okay.  And with regard to those

            14   documents, were any of those documents provided

            15   to you by counsel?

            16        A.   I don't believe so.

            17        Q.   Were any of those documents provided

            18   to you by members of your team?

            19        A.   Potentially.  I can't testify to it

            20   one way or the other.

            21        Q.   Were any of the documents provided

            22   to you by member -- or by any of your colleagues

            23   at The Brattle Group?

            24        A.   You mean other than my team?

            25        Q.   Yes.

UNCERTIFIED ROUGH DRAFT

78

11:35:00AM  1          A.   I don't recall that, no.

2          Q.   Okay.  And were any of the

3     documents, documents that you affirmatively went

4     out to look for?

5          A.   I don't recall that one way or the

6     other.

7          Q.   And other than the people who I

8     asked you about -- your counsel, colleagues at

9     The Brattle Group, and your team members -- do

10    you know if you got any of these documents that

11    you reviewed but considered to be irrelevant from

12    any other source?

13         A.   I don't recall getting documents

14    from any other source.

15         Q.   Okay.

16              MS. DALE:  Taleah, when it's

17    convenient, can we take a break for a few

18    minutes?

19              MS. JENNINGS:  Yeah.  Can we --

20    maybe five minutes?  In about five minutes?

21              MS. DALE:  That's fine.  Yeah.

22    BY MS. JENNINGS:

23         Q.   Is that good with you, Ms. Murray?

24         A.   Yes.

25         Q.   When we were looking at your report,

UNCERTIFIED ROUGH DRAFT

79

11:36:01AM  1   you said you looked at -- you considered

2   documents and analyses.  What -- are the analyses

3   identified in Appendix C at all, or are they

4   something different?

5           A.   I don't believe they're something

6   different.

7           Q.   So can you tell me on these

8   documents considered list which ones are

9   analyses?

10           A.   Generally, which ones are analyses?

11           Q.   Well, let's see how long the list

12   is.  I don't think it's that long, so I would

13   like for you to identify any analyses.

14           A.   Under Party Documents, the

15   Commonwealth 2021 Fiscal Plan Model.

16           Q.   I'm sorry.  Which page is that?

17           A.   96.

18           Q.   Okay.  Any other analyses that you

19   considered?

20           A.   The FOMB Commonwealth Cash Position

21   Presentation.

22               I believe the FOMB Commonwealth of

23   Puerto Rico Title III Case:  Plan Support

24   Agreement Presentation.

25               And the FOMB Puerto Rico's Proposed

UNCERTIFIED ROUGH DRAFT

80

11:38:01AM  1  Plan of Adjustment Benefits Presentation.

2                 And there may be others.

3         Q.   Well, just take a look.  It's only

4  another page or two.

5         A.   Well, I'm saying I -- there may be

6  others on any of the pages I've looked at.

7         Q.   Do you see any others?

8         A.   Hold on just a moment.

9              I -- I can't give you an exclusive

10  list, because what I say in that paragraph is

11  that, in some cases, I was able to verify there

12  are no inconsistencies from the information

13  contained in those documents themselves, and in

14  other cases, I obtained additional documentation

15  or analysis so that I could evaluate...

16              I can't tell you, sitting here

17  today, which documents on my list -- and -- I

18  cannot tell you every single document on that

19  list that may have had some analysis.  I am

20  pointing out to you certain documents on the list

21  that it's evident to me, looking at it, that it's

22  analysis.  But there may be others, so I can't

23  give you an exhaustive list.

24         Q.   But there's no analyses outside of

25  what's listed on these documents considered list?

UNCERTIFIED ROUGH DRAFT
81

11:39:56AM  1          A.    Not that I'm aware of.

            2          Q.    Well, you would be aware if you

            3     considered them, right?  There's none that exist

            4     that are not listed on this Appendix C?

            5          A.    Not that I'm aware of.  And the --

            6     they should be cited in the body of the report as

            7     well, whatever analysis we relied on.

            8          Q.    What is -- there is an analysis

            9     cited called the Sources and Use of Funds

           10     Analysis.  What is that?  And is that contained

           11     in one of these documents?

           12          A.    Can you show me where it's cited,

           13     please?

           14          Q.    Yeah.  I'll give you an example.

           15     Paragraph 65.

           16          A.    It does cite it at footnote 97.

           17          Q.    I see the citation.  I'm asking you,

           18     where -- where the analysis -- what's the

           19     analysis?  Or where is it?  Is it in the

           20     document?

           21          A.    It's in one of the -- it's in a

           22     document that I believe is on a documents -- or

           23     the document list.

           24          Q.    Do you know which document it is in?

           25          A.    I believe it is in -- but I would

UNCERTIFIED ROUGH DRAFT

82

11:41:43AM   1   have to check with the team.  But I think it's in

2   the document that's referred to as the FOMB

3   Commonwealth Cash Position Presentation of

4   August 23, 2021.

5         Q.   Okay.  We'll take a look.  And is

6   there -- is it titled Sources and Uses of Fund

7   Analysis, do you recall what it looks like or how

8   many pages the analysis is?

9         A.   I believe that the file title is

10   what's shown in footnote 97.  That's the name of

11   the file.  And I think that that document is one

12   of those FOMB presentations.

13         Q.   But the actual analysis, does it

14   span across a certain number of pages or do you

15   recall what it looks like?

16         A.   As I -- as I recall, it does.

17         Q.   Okay.  Do you recall how long it is?

18         A.   No.  But the footnote says that this

19   particular cite is to page 15 which --

20         Q.   I'm just asking -- are you familiar

21   with the analysis?  Because it's cite -- it's

22   cited quite frequently in your report, and I'm

23   just trying to identify what it is or if -- if

24   you have an understanding of what it is, what it

25   looks like?

UNCERTIFIED ROUGH DRAFT

83

11:43:16AM   1         A.   Yes.   I think I just testified to

2     that.

3             Q.   And so how many pages is it?

4             A.   I -- I just testified I can't tell

5     you with specificity how many pages it is.   But

6     because this cite is to page 15, that's

7     suggestive it's at least 15 pages.

8             Q.   Is this an analysis that is more

9     than a hundred pages, to your knowledge, or is it

10    a table?

11            A.   Is it a table?

12            Q.   Yeah.   I mean, like, you have tables

13    in your report.   I'm just trying to get a sense

14    of what it is.   Is it a hundred-page analysis

15    you're citing here, or is this a, you know, a

16    sort of table, a chart, or --

17            A.   Well, it says in the footnote, it's

18    a PowerPoint presentation.

19            Q.   The analysis is the entire

20    PowerPoint presentation?

21            A.   The analysis is contained in a

22    PowerPoint presentation.

23            Q.   Okay.   And so that's what I'm trying

24    to get at.

25                 Is the analysis like a chart that is

UNCERTIFIED ROUGH DRAFT

84

11:44:21AM  1  in a PowerPoint presentation?  Is it a discussion

2  that spans a hundred pages?  Or some other number

3  of pages?  What is it?

4          A.   It's a -- it's a -- it's not a

5  chart.  It's -- it's a visual representation.

6              MS. DALE:  Why don't we just call up

7  the document that's cited?

8              MS. JENNINGS:  Well, I actually am

9  interested to hear if Ms. Murray knows what the

10  document is.

11             MS. DALE:  She's been testifying

12  about it for the last five minutes.

13             MS. JENNINGS:  Yeah.

14  BY MS. JENNINGS:

15          Q.   And so when you say it's a visual

16  representation, can you describe what that is?

17          A.   Yes.  It's -- you start off with a

18  certain amount of cash, and then you -- the cash

19  is used for certain expenditures or

20  disbursements, and then you are left with a

21  certain amount of cash.  It's a bridge between

22  what your cash is at a point of time and what

23  your cash is going to be after you institute

24  certain elements of the plan of adjustment.

25          Q.   And do you know who prepared it, the

UNCERTIFIED ROUGH DRAFT

85

11:45:37AM  1   visual representation you're referring to?

2          A.   I -- my understanding, it was -- it

3   was prepared by one of the financial advisors to

4   the FOMB.

5          Q.   Do you know which one?

6          A.   I do not.

7          Q.   And did you have any discussions

8   with any of the financial advisors about this

9   analysis or visual representation?

10          A.   I don't recall it.

11               Is this a good time for a break?

12               MS. JENNINGS:   Yes.   I think this is

13   a good time for a break.

14               THE VIDEOGRAPHER:   Okay.   One

15   moment.   We're going off the record at 11:46.

16   Please stand by.

17               (A brief recess was taken.)

18               THE VIDEOGRAPHER:   We are back on

19   the video record at 12:02.

20   BY MS. JENNINGS:

21          Q.   Ms. Murray, I have a few more

22   questions about your Appendix C, the documents

23   considered list.

24          A.   Sure.

25          Q.   Did you prepare Appendix C?

UNCERTIFIED ROUGH DRAFT

86

12:02:27PM   1          A.   I did not personally prepare

2    Appendix C.

3          Q.   Do you know who did?

4          A.   As I recall, Gara Paulson prepared

5    Appendix C.

6          Q.   Okay.  And in the first -- the first

7    line under the title, says, In considering the

8    documents listed below, a review was performed of

9    those portions of documents that were relevant to

10   Brattle's analysis and evaluation of the issues

11   addressed in this report.  Do you see that?

12         A.   Yes.

13         Q.   And where it says, A review was

14   performed, is that a review by you or someone

15   else?

16              I mean, did you review all of these

17   documents that are listed in Appendix C?

18         A.   In connection with preparing

19   Appendix C?

20         Q.   In connection with preparing your

21   report.

22         A.   I reviewed many of them.  I can't

23   say I reviewed every single one.

24         Q.   And so when it says a review was

25   performed, was a review performed by someone else

UNCERTIFIED ROUGH DRAFT

87

12:03:51PM 1   of the documents you didn't review?

2         A.   Yes.

3         Q.   By whom?

4         A.   Gara Paulson and other members of

5   the team.

6         Q.   Can you identify the documents that

7   you did not review on this report?

8         A.   I can't review -- I can't recall

9   having reviewed the latest audited financial

10   statement for the debtors.

11         Q.   Anything else?

12         A.   An example -- I can't recall having

13   reviewed the Certified COFINA Fiscal Plan.  I may

14   have; I just don't recall it.

15         Q.   Anything else?

16         A.   I can't recall reviewing the Amended

17   Order and Judgment Confirming the Third Amended

18   Title III Plan of Adjustment of Puerto Rico Sales

19   Tax Financing Corporation.

20         Q.   Anything else?

21         A.   I can't read -- I can't recall

22   reviewing -- I don't know.  I may have reviewed

23   that.  The Capital Appreciation Bonds, Fiscal

24   Notes, March 2016.  Current Interest Bonds, Law

25   Insider.  I can't recall one way or the other, I

UNCERTIFIED ROUGH DRAFT

88

12:06:56PM   1   may have read those.

2        (Notary interruption.)

3   BY MS. JENNINGS:

4        Q.   Are you done with your list?

5        A.   I mean, it's a long list of

6   documents that I need to review to answer your

7   question. And in some cases I can't recall

8   whether I looked at it or not.

9        Q.   You don't know whether you read

10   something --

11        A.   Most of -- most of these documents I

12   did review.

13        Q.   And it says, A review was performed

14   of those portions of documents that were relevant

15   to Brattle Analysis.

16        The Brattle Analysis is your report,

17   right?

18        A.   Yes.

19        Q.   And who determined which portions of

20   documents were relevant to your report?

21        A.   I can't say there was any one person

22   that determined that. It would be a team effort.

23        Q.   Do you have any record of which

24   portions were deemed relevant to your report?

25        A.   Do I have the record? Personally?

UNCERTIFIED ROUGH DRAFT

89

12:08:28PM  1          Q.   Does anyone have a record?  Does a

2      record exist?

3          A.   I believe so.

4          Q.   In what form?

5          A.   I -- I couldn't tell you that.

6          Q.   So what is your belief based upon?

7          A.   Our usual custom and practice.

8          Q.   Which is what?

9          A.   That we would have a record of that.

10          Q.   Of the portions of the documents

11      that you reviewed?

12          A.   Yes.

13          Q.   And in your regular custom and

14      practice, in what form does that record -- is

15      that record created?

16          A.   I can't answer that.

17          Q.   You don't know what your regular --

18               (Overlapping speakers.)

19          A.   -- what the form is.

20          Q.   You said -- you've just testified

21      that you had a custom and practice of retaining

22      that information, of having --

23          A.   I said the firm -- I said the firm

24      has a custom and practice of retaining the

25      information.

UNCERTIFIED ROUGH DRAFT

90

12:09:34PM  1          Q.    And you don't know in what form that

2     record is retained?

3          A.    I can't specify -- I can't testify

4     to it, no.

5          Q.    Okay.  You can't testify to the

6     custom and practice of your firm's practices?

7          A.    I can't testify to the form in which

8     the record is retained.

9          Q.    Okay.  Let's take a look at

10    paragraph 65 of your report.  It's on page 27 of

11    the report.  And I guess it's really the heading,

12    this number 1.  That's the first part of your

13    opinion one, right?

14         A.    Yes.

15         Q.    That the, Implementation of the plan

16    will leave debtors with sufficient cash,

17    consistent with the up-front cash needs

18    anticipated as part of the certified fiscal plan.

19    Right?

20         A.    Yes.

21         Q.    What are the up-front cash needs?

22         A.    The up-front cash needs include

23    paying out any cash that's required to be paid

24    out under the plan to stakeholders as well as

25    setting aside money for the System 2000

UNCERTIFIED ROUGH DRAFT

91

12:11:08PM   1   settlement, setting aside money for an emergency

2   reserve.

3          Q.   Anything else?

4          A.   Leaving sufficient cash in the

5   Commonwealth.

6          Q.   For what purpose?

7          A.   To operate, for working capital.

8          Q.   And what is the -- a sufficient

9   amount that needs to be left in the Commonwealth

10   for operations?

11          A.   My understanding is it is somewhere

12   around 2.5 billion.

13          Q.   And does that -- where -- where does

14   that understanding come from?

15          A.   My review of the documents.

16          Q.   Which documents?

17          A.   I can't recall.

18          Q.   So is it your testimony that you

19   understand that the Commonwealth needs

20   $2.5 billion as part of its up-front cash needs,

21   outside of cash that would be paid to the

22   stakeholders, the emergency fund, System 2000,

23   just for operational purposes?

24          A.   It's my understanding that -- that

25   the parties had -- I believe that the

UNCERTIFIED ROUGH DRAFT

92

12:13:43PM  1   Commonwealth needs a certain amount of funds

2   available upon emergence.

3        Q.   Which parties?

4        A.   The -- the parties that are involved

5   with formulating the plan of adjustment and the

6   FOMB.

7        Q.   And your understanding is that those

8   parties believe that they need $2.5 billion to --

9   for the Commonwealth to operate outside of paying

10  cash to stakeholders, system 2000, and the

11  emergency funds?

12       A.   It's my understanding that the

13  parties believe that there's a certain amount of

14  cash that would be prudent to have in the

15  Commonwealth upon emergence.

16       Q.   And is that -- is it your

17  understanding that that amount is $2.5 billion?

18       A.   It's my understanding that it's a

19  combination of cash and other facilities, and it

20  could be $2.5 billion.

21       Q.   And you don't know other than saying

22  based on some documents that you don't -- and you

23  can't identify them, that's where your

24  understanding comes from on that --

25            MS. DALE:  Objection.  Objection to

UNCERTIFIED ROUGH DRAFT

93

12:15:07PM  1  the form.

2          THE WITNESS:  My recollection -- my

3  recollection it's -- it is either in the

4  disclosure statement or it's in the certified

5  fiscal plan.  I just can't recall sitting here

6  today where -- which of those two it's in.

7  BY MS. JENNINGS:

8          Q.   That figure, 2.5 billion?

9          A.   Yes.

10          Q.   And based on your review of the plan

11  and the fiscal plan and all of the other

12  documents you've seen, is it your

13  understanding -- so you're saying now it's what

14  the parties believe.  Is it your understanding

15  that the Commonwealth needs 2 -- an extra $2.5

16  billion in up-front cash in addition to the

17  amount needed to pay out cash to the

18  stakeholders, System 2000, and then the emergency

19  fund?  Is that --

20          A.   I --

21          Q.   Is --

22          A.   I did not evaluate that.  That's

23  outside the scope of my report.

24          Q.   I believe you just testified before

25  we went into detail that part of the up-front

UNCERTIFIED ROUGH DRAFT

94

12:16:31PM  1   cash needs you -- you described what those

2   contain -- and you said there was, the System

3   2000, the emergency funds, paying out cash to

4   stakeholders, and leaving a sufficient amount in

5   the Commonwealth to operate.  And I asked you how

6   much is necessary for the Commonwealth to

7   operate, and your answer was $2.5 billion.  Are

8   you now saying that that's outside the scope of

9   what you were asked to look at, or is that

10  actually your understanding?

11          A.   No, I believe that my answer was, if

12  that's what the parties believe is prudent to

13  leave in the Commonwealth, so that the

14  Commonwealth has sufficient working capital with

15  which to operate.  I did not independently do an

16  analysis of what that number should be, and that

17  was outside the scope of my report.

18          Q.   Okay.  And you don't know whether

19  that's -- an accurate number or not?  That's just

20  what you understand the parties, like the FOMB,

21  to believe, correct?

22          A.   Yes.  Yes.  And the -- the other

23  parties.

24          Q.   And is it your understanding that

25  other than the amount needed to pay cash to the

UNCERTIFIED ROUGH DRAFT

95

12:17:46PM 1   stakeholders, outside of the System 2000

2   settlement funds, and the emergency funds that

3   are required, there is approximately $2.5 billion

4   in leftover cash?

5          A.   Yes, that's listed in my report,

6   it's in Table 3.  It indicates that there --

7   there should be 2.4 -- 2.426 billion in cash,

8   plus the emergency reserve balance at emergence

9   of 390 million for a total of $2.816 billion.

10         Q.   So your answer is, yes, you do

11  understand that that will be left over in

12  addition, correct?

13         A.   That was based on the projected

14  sources and uses of funds as of the date I looked

15  at it, and that may have changed.

16         Q.   I want to go to page 29 of your

17  report, which is the second category that you've

18  identified as opining on.  And here, your

19  opinion, if I'm reviewing it right, is that

20  implementation of the plan will result in a level

21  of future debt service that is consistent with

22  sustainable debt levels as set forth in the 2021

23  certified fiscal plan, correct?

24         A.   Yes.

25         Q.   And what are sustainable debt levels

UNCERTIFIED ROUGH DRAFT

96

12:19:33PM  1    as you're referring to them here?

2         A.   Levels of debt and debt service that

3    the Commonwealth can handle, given the certified

4    fiscal plan projections.

5         Q.   And how do you come -- how did you

6    come to that determination of what they could

7    handle?

8         A.   I looked at the -- the debt

9    sustainability analysis that's in the fiscal

10   plan, and I evaluated whether the levels of debt

11   that are going to be incurred, that result in

12   noncontingent debt payments, are consistent with

13   the debt sustainability analysis in the fiscal

14   plan.  And I also looked at -- as I mentioned

15   earlier, I also looked at the -- the levels of

16   debt service that have been agreed to as part of

17   the plan, which is the 7.94 percent that I was

18   referencing earlier, to confirm that the levels

19   of noncontingent debt service that are going to

20   be created as a result of the plan of adjustment

21   fall within that 7.94 percent ceiling.

22        Q.   If we can scroll to paragraph 79.  I

23   want to look at another one of your sentences.

24             By the way, you testified that you

25   wrote this report, correct?

UNCERTIFIED ROUGH DRAFT

97

12:21:08PM   1         A.   Yes.  You asked me that.

2         Q.   And when you said -- when you say

3    thank you wrote the report, did you write all the

4    words in the report, or did your team write some

5    of the report?  I just want to make sure I

6    understand what you mean when you say you wrote

7    it.

8         A.   I wrote the report.  The report is

9    my work product.  And I was assisted by a team.

10   But I -- I wrote the report.

11        Q.   The first sentence here says, in

12   providing a framework for how much debt service

13   the Commonwealth can reasonably carry going

14   forward, the DSA considers a number of factors.

15            When you say, how much debt service

16   the Commonwealth can reasonably carry going

17   forward, what -- do you have an understanding of

18   what reasonably means here?

19        A.   Yes.

20        Q.   What is that?

21        A.   It's reasonable, it's prudent, it

22   doesn't over-leverage.  It -- it makes it

23   possible that the Commonwealth will have access

24   to the capital markets in the future.  It's

25   reasonable.  Commercially reasonable.

UNCERTIFIED ROUGH DRAFT

98

12:22:36PM   1         Q.   And is that based on your judgment,

2   or some objective standard, other than what

3   you've already testified about?

4         A.   I'm not sure I understand your

5   question.

6         Q.   Commercially -- commercially

7   reasonable.

8              When you conclude that something is

9   commercially reasonable in the context that you

10   just testified to, is that your own judgment, or

11   is it pursuant to some test or objective standard

12   that you know of?

13         A.   Well, in this case, the debt

14   sustainability analysis includes a number of

15   metrics that are deemed relevant in determining

16   what a reasonable level of debt might be.  So in

17   this case, I am considering metrics, and I am --

18   that are -- that are metrics that are provided,

19   and I am evaluating where the Commonwealth falls

20   in relation to those metrics.

21         Q.   Based on your judgment?

22         A.   And -- and I am saying in relation

23   to those metrics, it's reasonable.

24         Q.   Based on your judgment?

25         A.   Yes.

UNCERTIFIED ROUGH DRAFT

99

12:24:17PM  1            MS. JENNINGS:  This is actually a

2      good segue in your opinion 4, which is the

3      reasonableness of settlements that was reached by

4      the debtors.

5            And if I understand your opinion

6      number 4 correctly, your opinion number 4 is the

7      settlements reached by the debtors is -- are

8      reasonable; is that right?

9            A.   Commercially reasonable, yes.

10            Q.   Okay.  When you say -- are you

11      making a distinction between reasonable and

12      commercially reasonable in your response?

13            A.   Well, I'm not providing a legal

14      opinion as to what reasonable may or may not be

15      in some context.  I'm not here to provide legal

16      opinion.  I am an expert on bankruptcy and

17      restructuring and restructuring negotiations, and

18      I'm saying in the context of bankruptcy and

19      restructuring negotiations that the settlements

20      are reasonable, commercially reasonable.

21            Q.   Okay.  But are you -- I'm just --

22      I -- I'm -- I don't know if it's wordplay or not,

23      but I want to make sure I understand your

24      testimony.

25                 Is it that the settlements are, in

UNCERTIFIED ROUGH DRAFT

100

12:25:28PM  1    your words, commercially reasonable, or that the

2    settlements are reasonable?

3              MS. DALE:  Objection.

4    BY MS. JENNINGS:

5         Q.   What is your testimony?

6         A.   The settlements are reasonable, and

7    when I use that word, I'm not providing legal

8    opinion as to what reasonable may be judicially

9    determined.  I am saying as an industry

10   practitioner, and someone who's been involved

11   with bankruptcy and restructurings now for

12   35 years, that I view the settlements as

13   reasonable.

14        Q.   And have you ever provided expert

15   testimony on the reasonableness of a settlement?

16        A.   I provided testimony on

17   reasonableness in a number of matters.

18        Q.   I -- I'm not sure I follow.

19             Do you -- can you -- can you answer

20   my question with a yes or no answer?  Have you

21   provided expert testimony regarding -- ever,

22   regarding whether a settlement was reasonable?

23        A.   Yeah, I may have.  I have to go

24   through my CV.

25        Q.   Go through it, because I'd like

UNCERTIFIED ROUGH DRAFT

101

12:26:45PM  1   to -- I would like you to do that.

2          A.   I have given testimony on the

3   reasonableness of reserves that should be set

4   aside.

5          Q.   That's not my question, Ms. Murray.

6          A.   I don't know that I've given

7   testimony specifically on whether a settlement is

8   reasonable.  I've given testimony in other

9   bankruptcy and restructuring-related topics about

10  reaching settlements and restructurings, and I've

11  been retained as an expert in matters that relate

12  to reaching settlements and bankruptcies and

13  restructurings, and I have also served as a

14  financial advisor in bankruptcies and

15  restructurings.

16              MS. JENNINGS:  Okay.  I think

17  Ms. Dale would like to take a break at this

18  point.  I just want to ask one question.

19  BY MS. JENNINGS:

20         Q.   During the last break, did you speak

21  to anybody?

22         A.   Yes.

23         Q.   Who did you speak to?

24         A.   I spoke to counsel.

25         Q.   And what was the -- did you speak

UNCERTIFIED ROUGH DRAFT

102

12:29:32PM  1   about your testimony?

2          A.    No.

3          Q.    What was the topic of conversation?

4          MS. DALE:  We're not answering these

5   questions, Taleah.  The conversations that I have

6   with the witness are protected.

7          MS. JENNINGS:  I didn't ask you,

8   Ms. Dale.  I asked Ms. Mart -- Ms. Murray.

9          MS. DALE:  Well, I will direct her

10  not to answer that question.  Appreciate that I

11  need to get off the phone.

12  BY MS. JENNINGS:

13         Q.    Ms. Murray are you going to accept

14  that instruction and not answer the question

15  about what you spoke to counsel about during the

16  break?

17         A.    Yes, I'm going to follow the

18  instruction of counsel.

19         Q.    Okay.

20         MS. JENNINGS:  Yes, let's pick up --

21  why don't we just do a 1:15?  Does that work for

22  everyone?

23         MS. DALE:  That would be great.

24  Thank you.

25         THE VIDEOGRAPHER:  Going off the

UNCERTIFIED ROUGH DRAFT

103

12:30:21PM  1  record at 12:30.  Please stand by.

2              (Thereupon, a luncheon recess was

3  taken.)

4              THE VIDEOGRAPHER:  We are back on

5  the video record at 1:16.

6  BY MS. JENNINGS:

7      Q.   Good afternoon, Ms. Murray.

8      A.   Good afternoon.

9      Q.   I'm just going to pick up where we

10  left off.  We were talking about your opinion

11  number 4.

12              Have you ever provided expert

13  testimony on the typical custom and practice used

14  in connection with settlements?

15              MS. DALE:  Objection to the form.

16              THE WITNESS:  Yeah, I've been

17  retained to provide testimony on that.  And the

18  case I was retained in settled prior to my report

19  being filed.

20  BY MS. JENNINGS:

21      Q.   You -- you prepared a report on the

22  custom and practice of settlements?

23      A.   Yes, in the context of bankruptcy

24  restructuring.

25      Q.   Okay.  But you did not -- you were

UNCERTIFIED ROUGH DRAFT

104

01:17:09PM  1  not able to provide testimony in connection with

2  that?

3         A.   The case settled prior to my

4  providing testimony.

5         Q.   And have you ever -- is that the

6  only instance in which you were retained to

7  provide expert testimony on that issue?

8         A.   Expert -- can you repeat, expert

9  testimony on?

10         Q.   On the issue of typical custom and

11  practice for settlements.

12         MS. DALE:  Objection to the form.

13         THE WITNESS:  I have been -- I have

14  been an expert in a case that dealt with industry

15  custom and practice for reasonable best efforts

16  in connection with M&A transactions, which is

17  somewhat related.

18  BY MS. JENNINGS:

19         Q.   Okay.  But what about in connection

20  with settlements?

21         A.   Well, I think it's somewhat related

22  to settlements, because it would relate to

23  settling -- with respect to certain provisions of

24  a -- of a contract.

25         Q.   What about settlements of legal

UNCERTIFIED ROUGH DRAFT

105

01:18:32PM  1  claims, to be more specific?

2          A.   Settlements --

3               MS. DALE:  Objection to the form.

4               THE WITNESS:  Okay.  Settlements of

5  legal claims?

6  BY MS. JENNINGS:

7          Q.   Yes.

8          A.   Have I been retained as an expert?

9          Q.   That was my question.

10         A.   Okay.  That's -- I think that's

11 different than the question you were asking

12 before.  But let me think about that one.  I

13 can't recall whether I've been retained as an

14 expert on the topic of settling legal claims, but

15 I certainly have settled a number of legal claims

16 myself.

17         Q.   Have you ever been provided expert

18 testimony regarding whether stakeholders were

19 well equipped to act in their economic best

20 interests, other than in connection with this

21 proceeding?

22         A.   The -- the matter I was alluding to

23 before, where I was the retained expert on

24 industry custom and practice in debt

25 restructurings would fall in that category.

UNCERTIFIED ROUGH DRAFT

106

01:20:01PM   1        Q.   And in that category you provided

2   testimony regarding whether stakeholders were

3   well equipped to act in their economic best

4   interests?

5        A.   I wrote a report on it, but it

6   settled before it got to trial.

7        Q.   Okay.  Regarding that issue?

8        A.   Yes, on that issue.

9        Q.   Okay.  And have you ever -- you've

10   provided expert testimony in a range of matters,

11   right?

12        A.   Yes.

13        Q.   Have you ever been excluded from

14   testifying?

15        A.   No.

16        Q.   Okay.  I want to direct you to

17   paragraph -- let's see, page 52 of your report.

18   And this is the first subheading under your

19   opinion number 4, which I'm looking at.  The

20   stakeholders were sophisticated parties

21   represented by qualified counsel and advisors.

22             Do you see that?

23        A.   Yes.

24        Q.   And is that an opinion that you're

25   providing in connection with your engagement as

UNCERTIFIED ROUGH DRAFT

107

01:21:23PM  1   an expert witness here?

2          A.   Yes.

3          Q.   Is it your opinion that that

4   statement is meaningful to whether or not the

5   settlements that were reached by the debtors are

6   reasonable?

7          A.   Yes.

8          Q.   And what is meaningful about that?

9          A.   The process --

10          Q.   Let -- let me break it out.

11          What is meaningful about being

12   represented by qualified counsel?  And then I'll

13   ask separately about advisors.

14          A.   It's meaningful, because you have

15   experienced parties who have worked on other

16   restructuring to advise you in your settlement

17   negotiations.

18          Q.   And what about -- what is meaningful

19   about being represented by advisors in connection

20   with settlement discussions?

21          A.   It's meaningful, because you have

22   parties who are experienced in other

23   restructurings to advise you on your options and

24   recommend various courses of action to you, and

25   do various financial analyses to support your

UNCERTIFIED ROUGH DRAFT

108

01:22:40PM  1   negotiating posture in a restructuring.

2          Q.   And so without the advisors, would

3   you take that into consideration in your

4   reasonableness opinion, if the stakeholder did

5   not have an advisor?

6          A.   That would depend on the facts and

7   circumstances.

8          Q.   Let's take a look at table 12, which

9   is on page 54 of your report.

10          First question here is:  Did you

11   prepare this table?

12          A.   Brattle prepared the table.

13          Q.   Who at Brattle?

14          A.   Members of my team.

15          Q.   Do you know who?

16          A.   I believe Julia Zhu, and there may

17   have been others assisting.

18          Q.   How many members were a part of your

19   team at Brattle?

20          A.   It varied at various points in time.

21          Q.   So you were engaged in, you said,

22   early August, and you prepared -- your report is

23   dated, I think, September 15th, if I'm not

24   mistaken.

25          MS. DALE:  13th.

UNCERTIFIED ROUGH DRAFT

109

01:24:01PM   1            THE WITNESS:  The report is dated

2   September 13th.

3   BY MS. JENNINGS:

4            Q.   Right.  So you were engaged for --

5   was it a six-week period if we assume the very

6   beginning of August?

7            A.   Five or six weeks, I think.

8            Q.   Okay.  And during that five or six

9   weeks, how many different members were on your

10   team at Brattle?

11            A.   At any point in time, or over that

12   time in.

13            Q.   Over that time period, how many

14   people were a -- were ever members of your team?

15   If you were to list the members, how many people

16   would be on that list?

17            A.   I don't have an exact number for

18   you.

19            Q.   Approximate number?

20            A.   Eight to twelve.

21            Q.   Okay.  Can you list those 8 to 12

22   and tell me what their roles were?

23            A.   I can list some of them.

24            Q.   Okay.  Let's start with the ones you

25   can.

UNCERTIFIED ROUGH DRAFT

110

01:25:04PM   1        A.   Julia Zhu.

2        Q.   And what was her role?

3        A.   She worked on -- she supported me on

4   certain aspects of the report.

5        Q.   Which aspects?

6        A.   She worked on certain of the

7   background information, and she worked on

8   information with respect to opinion 4, and there

9   may be other things.  I can't recall exactly what

10   each person did.

11        Q.   Okay.  Who else?

12        A.   Mohnish Zaveri.  She worked on the

13   sources and uses of funds analysis, the cash

14   position, and interest may be other things.  I

15   can't recall.

16        Q.   All right.  Next?

17        A.   Nitin Bajaj.

18        Q.   Role?

19        A.   He worked on issues relating to the

20   pension settlement.

21        Q.   Anything else?

22        A.   There may be other items I can't

23   recall.

24        Q.   Okay.  Anyone else?

25        A.   Gar Paulson.

UNCERTIFIED ROUGH DRAFT

111

01:26:53PM   1          Q.   Role?

          2          A.   She assists with report preparation,

          3   audit, documents, lists, things of that nature.

          4          Q.   What do you mean by report

          5   preparation?

          6          A.   Preparing the report, formatting,

          7   things of that nature.

          8          Q.   Like type -- actually typing the

          9   report?

         10          A.   No.  Not typing the report.  Form --

         11   maybe formatting the report, working on the

         12   formatting of -- of footnotes, and involved with

         13   quality control and audit of the report, working

         14   on the documents list.

         15          Q.   Okay.  That's four.

         16          A.   Anna Parlin.

         17          Q.   Mm-hmm.  Role?

         18          A.   She worked on aspects of the

         19   background, and she also supported me in

         20   connection with the debt sustainability analysis

         21   and the pro forma levels that the Commonwealth

         22   will have post-emergence, and there may have been

         23   other things as well.

         24          Q.   Okay.  Anyone else on your team at

         25   any point in time?

UNCERTIFIED ROUGH DRAFT

112

01:28:28PM   1          A.   Yes.

            2          Q.   Do you want to continue to name

            3   them, or no?

            4          A.   I was waiting for the question.

            5   Rohit Nair, N-A-I-R.

            6          Q.   Role?

            7          A.   He provided support to the

            8   individuals I previously mentioned on various

            9   aspects of the report.

           10          Q.   Next?

           11          A.   Monet Lee.

           12          Q.   Role?

           13          A.   She provided support for the

           14   individuals I've mentioned on various aspects of

           15   the report.

           16          Q.   Next?

           17          A.   Those are the individuals that I can

           18   recall sitting here today.  There may be others.

           19          Q.   And you said -- you named seven

           20   individuals, and you said there may have been

           21   eight to twelve, right?

           22          A.   Yes.

           23          Q.   During that five-to-six-week period,

           24   were you engaged -- were you working primarily on

           25   this matter?

UNCERTIFIED ROUGH DRAFT

113

01:29:58PM   1        A.   Yes.

              2        Q.   More than half of your time spent on

              3   this matter, would you say?

              4        A.   Yes, I think that's right.

              5        Q.   Okay.  Full time?

              6        MS. DALE:  Objection to the form.

              7   Is there a question?  I mean, full time of what?

              8   BY MS. JENNINGS:

              9        Q.   Do you understand what full time

             10   means, Ms. Murray?

             11        A.   I think I need more of a time

             12   specification, because there could have been days

             13   I was working on it full time and then other days

             14   I wasn't working on it full time.

             15        Q.   Okay.  Of the five-to-six-week

             16   period, how many days, approximately, were you

             17   working on this matter full time?

             18        A.   I -- I can't answer that with it,

             19   with any assuredness.

             20        Q.   Okay.  Just tell me to the best of

             21   your recollection.  You asked me to ask you the

             22   question that way, so I assume you have some

             23   sense --

             24        MS. DALE:  Objection.  She did not.

             25        THE WITNESS:  I don't recall asking

UNCERTIFIED ROUGH DRAFT

114

01:31:04PM   1   you to ask me a question in any certain way.  I

2   was simply saying that there could have been days

3   where I was working full time on this matter, and

4   there could have been other days that I wasn't.

5   I do have other matter -- I did have other

6   matters at the time, and I can't tell you with

7   specificity.  I can tell you that I -- as I

8   recall it, I was working on this matter primarily

9   for periods of time between when -- whether I was

10  retained in August and September 13, when I filed

11  the report.

12  BY MS. JENNINGS:

13       Q.   How many other matters were you

14  working on during that time period?

15       A.   I can't -- I can't say.

16       Q.   So it's October 13th.  You don't

17  know a month ago how many matters you were

18  working on in addition to this matter?

19       A.   Actually, I don't.  I have a -- a

20  group of matters that some are more active than

21  others.  Some things come in and out.  And I

22  can't tell you with specificity what other

23  matters I was working on between my retention and

24  when the report was filed, without going back and

25  looking at my records.  I can tell you, as you're

UNCERTIFIED ROUGH DRAFT

115

01:32:40PM  1    aware, I did have an arbitration in another

2    matter, and I -- it -- the -- it occurred in late

3    September, and I do recall I had a rebuttal

4    report in that matter, as well.  So I do believe

5    there was some other work going on in that matter

6    and potentially other matters, but I cannot tell

7    you with specificity.

8              Q.   Are you working on multiple matters

9    today?  I don't mean today.  I mean at this time

10    period.

11             MS. DALE:  Objection to the form.

12             THE WITNESS:  Yes.

13    BY MS. JENNINGS:

14             Q.   And how many matters are you working

15    on at this time, as of this date?

16             A.   Well, when you -- when you say

17    working on, and you want me to do a count, what

18    do you mean by that?

19             Q.   Whatever you mean by it when you say

20    you're working on many matters.  I'm trying to

21    find out how many matter you're -- you don't

22    remember how many you were working on a month

23    ago.  So I'm asking you if you know how many

24    you're working on now.

25             MS. DALE:  Objection to the form.

UNCERTIFIED ROUGH DRAFT

116

01:33:47PM   1                 THE WITNESS:  I need a little more

2    specificity on what we mean when we say working

3    on.  If --

4    BY MS. JENNINGS:

5                 Q.   Well, what do you mean?

6                 A.   Well, I'm engaged in a number of

7    other matters.

8                 Q.   Okay.  And so how many --

9                      (Overlapping speakers.)

10                     Go ahead.

11                A.   And my work on those matters, it may

12   come in and out over time.

13                Q.   Okay.  How many matters are you

14   engaged on today?

15                A.   I would have to it, to take pen to

16   paper to determine that.

17                Q.   There's that many?

18                A.   It's -- it -- there are enough that

19   I would need to take pen to paper to determine

20   it, which I can do in a break.

21                Q.   Is it more than ten?

22                     (Audio difficulties.)

23                     I'm sorry?

24                A.   I can't testify that it's more than

25   ten.  I think it's probably not more than ten,

UNCERTIFIED ROUGH DRAFT

117

01:35:07PM   1   but I can't really testify to it without putting

2   pen to paper.

3           Q.   More than five?

4           A.   Yes.

5           Q.   So somewhere between, approximately,

6   five and ten.

7               Is that consistent with your general

8   assignment load at any given time?

9               MS. DALE:  Objection to the form of

10   the question.

11               THE WITNESS:  It varies over time,

12   and it really depends how -- what the workload is

13   in various matters that I'm engaged in as of a

14   point in time.  I may be engaged in a matter, and

15   it may be in a lull period where there isn't much

16   work required; I'm still engaged.

17   BY MS. JENNINGS:

18           Q.   And when you testify -- you

19   testified about custom and practice in various

20   situations.  You base -- you must have a decent

21   memory if you're able to testify about custom and

22   practice based on experience; is that right?

23               MS. DALE:  Objection to the form of

24   the question.  Misstates her testimony.

25               THE WITNESS:  Yeah, I -- I -- I

UNCERTIFIED ROUGH DRAFT

118

01:36:16PM  1   think you mischaracterized what I testified

2   about.  I testified about a -- a wide range of

3   matters, including industry custom and practice.

4   BY MS. JENNINGS:

5         Q.   Yes.  And so I'm talking about your

6   custom and practice testimony.

7              When you provide testimony regarding

8   custom and practice, it requires you to have a

9   decent memory, doesn't it?

10             MS. DALE:  Objection to the form of

11   the question.

12             THE WITNESS:  I don't know what you

13   mean.

14   BY MS. JENNINGS:

15        Q.   Do you have a decent memory?

16        A.   I think I do.

17        Q.   Okay.  But you don't remember how

18   many matters you were engaged on a month ago?

19             MS. DALE:  Objection.  Misstates her

20   testimony.

21             What is the point, Taleah?  What are

22   we doing?

23   BY MS. JENNINGS:

24        Q.   Ms. Murray?

25        A.   You're --

UNCERTIFIED ROUGH DRAFT

119

01:37:04PM  1                 MS. JENNINGS:  Ms. Dale, all you're

2       doing is supposed to object to form.  I'm asking

3       questions, and Ms. Murray is supposed to answer

4       them.  That's what we're doing.

5                 THE WITNESS:  Yeah.  What I said is

6       I'm engaged in a number of matters.  If you want

7       an exact count of how many matters I'm engaged

8       in, I would need to take pen to paper and do

9       that.

10                 I don't see how that has any bearing

11      on what my memory is.

12      BY MS. JENNINGS:

13         Q.   Okay.  Are you -- do you know who

14      Mr. Prager is?  David Prager?

15         A.   Yes.

16         Q.   And are you aware that Mr. Prager

17      submitted an expert report in connection with

18      this proceeding?

19         A.   Yes.

20         Q.   Have you read Mr. Prager's report?

21         A.   No.

22         Q.   Has anyone on your team, to your

23      knowledge, read his report?

24         A.   No.  That I'm aware of.

25         Q.   Do you have any understanding as to

UNCERTIFIED ROUGH DRAFT

120

01:38:01PM  1   what his report contains?

2          A.   I have some understanding.

3          Q.   What's your under --

4               MS. DALE:   To the extent -- excuse

5   me, to the extent your understanding is based on

6   conversations with counsel, I'm going to add --

7   you know, just direct you not to answer.   To the

8   extent it comes from some other source, go ahead.

9   BY MS. JENNINGS:

10          Q.   So where does your understanding

11   come from?

12          A.   From conversations with counsel.

13          Q.   Okay.   And do you plan -- based on

14   your understanding, do you -- do you dispute

15   anything that you understand as in Mr. Prager's

16   report?

17               MS. DALE:   Objection to the form of

18   the question.   I don't know how you answer that

19   question.

20               THE WITNESS:   I --

21               MS. JENNINGS:   -- Ms. Dale.

22   BY MS. JENNINGS:

23          Q.   Ms. Murray --

24          A.   Yeah, I don't -- I don't have enough

25   information.   I don't have enough information to

UNCERTIFIED ROUGH DRAFT

121

01:39:03PM  1   have a view on his report.

2           Q.   Okay.  One way or another?  You

3   don't dispute nor accept?

4           A.   I haven't reviewed his report.  I

5   have no other -- I cannot offer you any opinion

6   about his report.

7           Q.   Okay.  But based on what you

8   understand his report to contain, do you dispute

9   anything in his report?  I know that may be

10   limited.  But based on what you know, do you

11   have -- do you dispute any aspect of his report?

12           MS. DALE:  Objection to the form of

13   the question.  I'm directing the witness not to

14   answer the question, because anything she knows

15   about it is coming from counsel.  So how can she

16   possibly answer that without revealing something

17   that counsel told her.

18           MS. JENNINGS:  Easy, by answering my

19   question, which is a yes or no question.

20           MS. DALE:  No.  Because it depends.

21   If she said, Yes, I dispute it, then you'd say,

22   Why?

23   BY MS. JENNINGS:

24           Q.   Maybe.  Maybe not.  Let her answer

25   the question.

UNCERTIFIED ROUGH DRAFT

122

01:39:57PM   1            MS. DALE:  Well, she doesn't have

             2   a -- Marti, you can answer the question.

             3            THE WITNESS:  I won't form an

             4   opinion on anyone's expert report unless -- until

             5   I've reviewed their expert report.

             6   BY MS. JENNINGS:

             7        Q.   I take it you get that answer from

             8   your counsel, but I appreciate it.  Similar to

             9   the rest of your report, but okay.

            10        A.   I'm sorry, I don't know what that

            11   means.  I -- my answers are my own.

            12            MS. DALE:  It's okay.  Marti, don't

            13   even engage.  Just wait for the next question.

            14   BY MS. JENNINGS:

            15        Q.   Let's take a look at paragraph --

            16   well, we were looking at paragraph 103, I think,

            17   and in that paragraph, you discussed the parties'

            18   participation in mediation.  Do you see that?

            19        A.   Yes.

            20        Q.   Okay.  And in your view, does

            21   participation in a mediation indicate one way or

            22   another that a settlement is commercially

            23   reasonable?

            24        A.   I think it's something that goes

            25   into the mix when considering the -- the

UNCERTIFIED ROUGH DRAFT

123

01:41:23PM  1   reasonableness of the process.

2          Q.   So is your opinion that the process

3   in which the settlements reached were reasonable,

4   and the settlements themselves or --

5          A.   It's my opinion that the parties

6   have been involved in -- in this restructuring

7   for over four years, and there've been a lot of

8   eyes on it, including through the mediation

9   process, and they're highly sophisticated

10  financial advisors and legal counsel advising the

11  parties.  And many of the parties themselves are

12  very sophisticated parties that have been

13  involved in other municipal restructurings and

14  other large-bankruptcy restructuring cases, and I

15  think that those -- the combination of those

16  factors increases the likelihood that the

17  settlements are going to end up being

18  commercially reasonable.

19         Q.   Okay.  I don't think that was in

20  response to my question.

21              But is your position -- is it your

22  opinion that the process by which the settlements

23  are reached is reasonable, or that the

24  settlements themselves are reasonable?

25         A.   I think it's both.

UNCERTIFIED ROUGH DRAFT

124

01:42:54PM   1          Q.   That's your opinion?

2          A.   Yes.  And -- and if you look at

3    Appendix A in the report --

4          Q.   I was just -- it was actually just a

5    yes or no.

6               MS. DALE:  Taleah, let the witness

7    answer the question.

8               MS. JENNINGS:  She did.  She did.

9    And there's no question pending.  Let me ask my

10   next question.

11              MS. DALE:  She.  Wow, okay.  You're

12   cutting off the witness from answering.

13              MS. JENNINGS:  No, I'm cutting off

14   you, Margaret.  Cutting you off.

15              MS. DALE:  Cutting off the witness.

16   Make sure the record is clear.

17   BY MS. JENNINGS:

18         Q.   Ms. Murray, how much do you know

19   about the mediation process in this case?

20         A.   I know that there was a mediation

21   process.  I know that there was a panel of judges

22   that were appointed to be mediators, that judge

23   Hauser was the head mediator.

24         Q.   Have you had any conversations with

25   the mediation team?

UNCERTIFIED ROUGH DRAFT

125

01:43:49PM  1          A.   I have not.

            2          Q.   Did you participate in any of the

            3   mediations?

            4          A.   No.

            5          Q.   Did you prepare any materials that

            6   were used in connection with the mediations?

            7          A.   No.

            8          Q.   You mentioned that the parties to

            9   the settlements were involved -- or were

           10   represented by counsel with extensive experience

           11   in restructuring, and you also mentioned in your

           12   report that some of the major shareholders were

           13   involved in the Detroit restructuring.  Do you

           14   recall stating that in yo you are report?

           15          A.   No, I never said the shareholders

           16   were involved in the Detroit restructuring.

           17          Q.   The stakeholders.

           18          A.   Stakeholders, correct.

           19          Q.   And do you consider that meaningful

           20   for certain of the stakeholders to be involved in

           21   the -- in the Detroit restructuring?

           22          A.   Yes.

           23          Q.   Why is that?

           24          A.   Because it's a large municipal

           25   restructuring, and the parties have been through

UNCERTIFIED ROUGH DRAFT

126

01:45:07PM   1   that before with respect to -- with respect to

2   their guarantees -- their guaranteeing -- or

3   ensuring certain of the debt of Detroit.

4          Q.   And based on their participation,

5   you believe that makes the settlements in this

6   case more reasonable than not?

7               MS. DALE:  Objection to the form.

8               THE WITNESS:  I think it informs

9   their -- that they came into this case with prior

10   experience, which I think would be helpful to

11   them.  In determining what they believe would be

12   a reasonable settlement.

13   BY MS. JENNINGS:

14          Q.   And what about the ones who were not

15   involved in the Detroit restructuring?

16          A.   What about them?

17               MS. DALE:  What about --

18   BY MS. JENNINGS:

19          Q.   What does it say about them?

20               MS. DALE:  Objection to the form.

21   What does what say about them?

22               Marti, do you understand the

23   question?

24               THE WITNESS:  Not really.

25   BY MS. JENNINGS:

UNCERTIFIED ROUGH DRAFT

127

01:46:18PM  1         Q.   Okay, Ms. Murray, if you don't

         2   understand the question, you should ask me, and

         3   I'm happy to clarify for you.

         4         A.   Could you clarify, please in.

         5         Q.   Yes.

         6              So do you think that there is any

         7   significance to the fact that some of the

         8   stakeholders in this proceeding were not involved

         9   in the Detroit restructuring?

        10         A.   Well, the stakeholders that I noted

        11   as having been involved with the Detroit

        12   restructuring, those are the stakeholders that I

        13   could identify specifically that had been

        14   involved with the Detroit restructuring.  It

        15   doesn't mean that other stakeholders are not

        16   involved in the Detroit restructuring.  And,

        17   also, they were advised by sophisticated counsel

        18   and sophisticated financial advisors, who also

        19   may have been involved in prior restructurings.

        20   So it's just something that goes into the mix.

        21   It's not, you know, dispositive one way or

        22   another, but it's another fact factor that would

        23   increase the likelihood that you have parties

        24   involved in these negotiations who are well

        25   advised, who have had -- there's been plenty of

UNCERTIFIED ROUGH DRAFT

128

01:47:30PM  1   time in this case of four-plus years, and you had

2   a mediation team to assist, and these are just

3   factors that go into the mix that make it more

4   likely that the settlement -- that the

5   settlements will be reasonable.

6        Q.   And so if I understand you

7   correctly, it's -- it goes into the mix if they

8   were involved in the Detroit restructuring, but

9   it doesn't go into the mix if they were not

10  involved in the Detroit restructuring; is that

11  right?

12       A.   It helps the process with respect to

13  those parties' negotiations and the positions

14  those parties might take in this case, that

15  they've been involved with prior restructurings.

16  Yes, it helps the process.  And I can't -- I'm

17  not going to tell you that if somebody had not

18  been involved with the Detroit process, that they

19  were somehow more likely to enter into a

20  settlement that was not reasonable, because I'm

21  not saying that.  But on the margin, it helps --

22  with those particular parties, the amount of

23  lines I was able to identify on the margin, it

24  did help.  It would be helpful, in my opinion,

25  that they had had prior experience with a

UNCERTIFIED ROUGH DRAFT

129

01:48:55PM  1    municipal restructuring.

2              Q.    In paragraph 105 of your report, you

3         say that the restructuring of the City of Detroit

4         is viewed by some as the most comparable

5         restructuring to that of the Commonwealth.  Do

6         you remember putting that in your report?

7              A.    Yes.

8              Q.    Is that how you view the Detroit

9         restructuring, as the most comparable

10        restructuring to that of the Commonwealth?

11             A.    Well, I believe it's the -- it is

12        the largest municipal restructuring.

13             Q.    Are you included in the people --

14        you say it's viewed by some as the most

15        comparable restructuring to that of the

16        Commonwealth.  Does that include you?

17             A.    No.

18             Q.    -- way?

19             A.    No, it did not include me.

20             Q.    Because you were not involved in

21        that, right?

22             A.    That's right.

23             Q.    Who -- when you say it's viewed by

24        some as the most comparable restructuring, who

25        is -- who is -- who, to your knowledge, views it

UNCERTIFIED ROUGH DRAFT

130

01:50:14PM  1  that way?  Who are you referring to?

2          A.    Yeah, there -- there should be a

3  cite there.  I don't know why it isn't there.

4  There should be a citation to the source that

5  that was drawn from.

6          Q.    So that's not based on your

7  knowledge.  That's based on something that comes

8  from somewhere else?

9          A.    Yes.

10          Q.    And when you wrote that sentence,

11  did you understand at the time who viewed the

12  Detroit restructuring as the most comparable

13  restructuring to that of the Commonwealth?

14          A.    Yes, as I recall, and as I just

15  mentioned, there should be a citation for that.

16          Q.    Yeah.  So when you wrote it, who did

17  you understand that to include?

18          A.    It was cited to a document, and I

19  can't recall what it was.

20          Q.    And -- so -- I'm not asking about

21  where the information came from.  I'm asking,

22  when you wrote that sentence, did you have an

23  understanding as to who viewed the -- the Detroit

24  restructuring as the most comparable

25  restructuring to that of the Commonwealth?

UNCERTIFIED ROUGH DRAFT

131

01:51:34PM  1          A.   Yes.

         2          Q.   Okay.  And do you recall who that --

         3     those people or entities, who are unnamed in this

         4     document, are?

         5          A.   No.

         6          Q.   Okay.  So that's not something you

         7     remember.

         8          A.   No, as I said, I think -- I believe

         9     that should be cited to a document, and it's not.

        10          Q.   In paragraph 106, you comment --

        11     it's actually the -- the subheading, that the

        12     debtors have been successful at reaching

        13     agreements with major creditor groups, and in 106

        14     you say that the FOMB has reached agreements in

        15     settlements with almost all major stakeholders

        16     groups.  Do you see that?

        17          A.   Yes.

        18          Q.   And --

        19          A.   As shown in Appendix A, which is in

        20     the back of the report, which shows the evolution

        21     of the settlements in the case that have been

        22     reached over time.

        23          Q.   Okay.  And in paragraph 115, if you

        24     look at the second sentence, you say, The ability

        25     to achieve such a consensus here is evidence in

UNCERTIFIED ROUGH DRAFT

132

01:52:52PM   1   and of itself that the settlements are

2   reasonable.

3            Do you see that?

4        A.   Yes.

5        Q.   And what do you mean by that?  What

6   does that mean, that sentence that you wrote?

7        A.    It -- what it means is you have, you

8   know -- you have competing parties vying for a

9   slice of the pie.  And these competing parties

10   are sophisticated parties.  You have a veritable

11   who's who list of funds that specialize in

12   investing in distressed and bankrupt companies.

13   You have Goldman Sachs, you have Golden Tree, you

14   have Canyon Capital, you have Vada Capital, you

15   have the Monolines, you have the official

16   committees, the statutory committees in the case.

17   You have all of these parties represented by

18   sophisticated counsel/financial advisors, there's

19   a mediation team, there's been four-plus years to

20   work this out.  It's going to be everyone's

21   natural tendency to fight for as big a piece of

22   the pie that they can get.  So the fact that

23   you're able to achieve a consensus among all

24   these different parties, in my view, is in and of

25   itself an indicator that the settlements were

UNCERTIFIED ROUGH DRAFT

133

01:54:32PM  1  reasonable.  If they weren't reasonable, those

2  sophisticated parties would not have agreed to

3  them.

4          Q.   So simply because those parties

5  agreed to them, and there was a number of

6  sophisticated parties, you think that's an

7  indication that the settlements are reasonable?

8              MS. DALE:  Objection to the form.

9  BY MS. JENNINGS:

10          Q.   Is that underlying your opinion?

11             MS. DALE:  Objection to the form.

12             THE WITNESS:  I -- I just -- I just

13  testified as to the constellation of issues that

14  I think provides evidence that the settlements

15  were reasonable.  There's a consensus here

16  between most of the parties on Appendix A.  And

17  when I look at Appendix A, there are one, two,

18  three, four, five, six, seven, eight, nine, ten,

19  11, 12, 13, 14, 15, 16, 17 -- 17 parties.  I

20  think that's a pretty good indication that the

21  parties have gotten -- those parties have gotten

22  to a point where they mutually agree that they've

23  reached a reasonable solution, and they'd like to

24  go forward with that solution.

25  BY MS. JENNINGS:

UNCERTIFIED ROUGH DRAFT

134

01:55:57PM  1         Q.   And how does that inform you that

2    the underlying settlements are reasonable?

3              MS. DALE:  Objection to the form and

4    asked and answered.

5              THE WITNESS:  It's one of the --

6    it's one of the aspects that I considered, among

7    others.

8    BY MS. JENNINGS:

9         Q.   So your last sub-point in this

10   section is that the settlements reached are

11   reasonable.  Correct?

12        A.   I'm sorry; where are you?

13        Q.   I wasn't in a particular place.  I

14   was just pointing out the final aspect of this

15   part of your opinion, is that the settlements

16   reached are reasonable.

17        A.   They're reasonable from the

18   standpoint that they're commercially reasonable.

19        Q.   Right.

20        A.   Me, as an industry practitioner, as

21   someone who has been involved in more

22   restructurings in and out of bankruptcy than I

23   can count, and been involved with these processes

24   over my 35-year career, around bankruptcy and

25   restructuring.

UNCERTIFIED ROUGH DRAFT

135

01:57:55PM   1        Q.   And can you tell me what you

2   considered in determining that the various

3   settlements are commercially reasonable based on

4   your experience, not on the legal standard -- I

5   understand you're saying based on your

6   experience.

7        A.   Well, I consider the process, as

8   we've been discussing, and I also consider the --

9   the upside scenario and the downside scenario

10   that these various categories of stakeholders may

11   have faced.  If they ultimately prevailed on all

12   of the positions, or if they might take -- or if

13   they ultimately lost on positions that other

14   parties in the case might take.

15        Q.   And did you do any independent -- or

16   did you conduct any independent analysis as to

17   what the upside scenarios would be, or could be?

18        A.   Yes.

19        Q.   What independent analysis did you

20   undertake?

21        A.   It's included in my report.  I

22   use --

23        Q.   Describe it to me.

24        A.   I'm happy to.

25        Q.   Okay.

UNCERTIFIED ROUGH DRAFT

136

01:59:09PM   1          A.   I considered what the -- the upside

2   scenario and the downside scenario might be to

3   various classes of creditors if the Title III

4   case was dismissed and the parties just pursued

5   their legal remedies outside of a Title III

6   proceeding, without the plan of adjustment being

7   confirmed.

8          Q.   And how did you come up with the

9   upside scenario figure?

10          A.   I did not come up with a figure.  I

11   relied on figures that are -- that are provided

12   as part of the best interests test report.

13          Q.   So you did not conduct any

14   independent analysis to come up with the upside

15   scenario?

16          A.   No.

17          Q.   And you did not conduct any

18   independent analysis to arrive at the downside

19   scenario?

20          A.   Well, let me -- let me rephrase

21   that -- my answer.  I said, no.  But the analysis

22   that I conducted was to look at the best interest

23   test reports and to extract from those reports

24   various expected recoveries given certain

25   outcomes, and then the analysis that -- that I

UNCERTIFIED ROUGH DRAFT

137

02:00:33PM   1   did -- there was an analysis that I did that

2   overlaid the numbers that were in the best

3   interests test report.  So I extracted numbers

4   from the best interests test report, and used

5   those numbers in my own analysis.

6          Q.   Okay.  I don't think that is

7   responsive to my question.  What I asked was, you

8   didn't perform any independent analysis to come

9   up with the downside scenario figures, correct?

10          MS. DALE:  Objection.

11          THE WITNESS:  Actually, I was being

12   responsive.  I was modifying the answer I had

13   given to your question about the upside scenario,

14   and because it's the same answer for the downside

15   scenario -- you framed the question as, you

16   didn't do any analysis to come up with.  And what

17   I'm saying is, actually, I did do an analysis.

18   BY MS. JENNINGS:

19          Q.   Right.

20          A.   It was based on figures I extracted

21   from the best interests test reporting.

22          Q.   But I'm asking you whether you did

23   an analysis to come up with those figures, and

24   what you're telling me is you took those figures

25   from the best interests test report?

UNCERTIFIED ROUGH DRAFT

138

02:01:39PM  1          A.   Yes.  The analysis was the overlay.

         2          Q.   Okay.  So you need to listen to my

         3     question.  It's whether you did any independent

         4     analysis to come up with the upside scenario

         5     figure.

         6          A.   I am listening to your question.  In

         7     my view, it is analysis.

         8          Q.   To come up with those figures?

         9          A.   No, I'm taking a number --

        10          Q.   So that's why you're not listening

        11     to my question.  The figures --

        12          MS. DALE:  Taleah, this is not

        13     productive.  She's trying to answer your

        14     question.

        15          MS. JENNINGS:  No, she's trying to

        16     evade the question.

        17          MS. DALE:  Why don't you ask her

        18     what she means.

        19     BY MS. JENNINGS:

        20          Q.   Why don't we do this ease -- why

        21     don't you point to me, go to the actual figures

        22     in your report.

        23          MS. DALE:  Yeah.  Brilliant.

        24     BY MS. JENNINGS:

        25          Q.   Where are those figures, Ms. Murray?

UNCERTIFIED ROUGH DRAFT

139

02:02:23PM  1    Is that table 14?

2              A.   Hold on just a moment.

3              Q.   On page 67?

4              A.   Yes, page 67.

5              Q.   So --

6              A.   This is my analysis.

7              Q.   I haven't asked a question yet.

8                   So if we look at the first line, the

9    general obligation bonds issued before 2012, do

10   you see the column low.

11             A.   Yes.

12             Q.   And what does that column mean?

13   What does that represent?

14             A.   It represents the low end of an

15   estimated likely range of recoveries assuming the

16   Title III cases are dismissed and automatic stay

17   is lifted.

18             Q.   And that's what you previously

19   referred to as the downside scenario, correct?

20             A.   Yes.

21             Q.   And so that number, 52 percent,

22   that's a number that comes from the best

23   interests test reports, correct?

24             A.   Correct.

25             Q.   Okay.  And if you go -- if you

UNCERTIFIED ROUGH DRAFT

140

02:03:31PM 1    scroll down through all of the remaining numbers

2    in there, under the column Low, which, as you

3    testified, is the downside scenario, those come

4    from the best interest report.

5            A.    Correct.

6            Q.    Correct?  Okay.

7                  Now, let's look at the next column.

8    It says, High at the top.  Do you see that?

9            A.    Yes.

10           Q.    And that's upside scenario.  That's

11   what you were referring to as upside scenario,

12   correct?

13           A.    Correct.

14           Q.    Okay.  And that first figure is

15   100 percent.  That comes from the McKinsey best

16   interests test report, correct?

17           A.    Yes.

18           Q.    And the same with the number right

19   below it, 84 percent?

20           A.    Yes.

21           Q.    And the remaining numbers in that

22   column of upside scenario figures, correct?

23           A.    Yes.

24           Q.    Okay.  That's all I have to ask

25   about that.

UNCERTIFIED ROUGH DRAFT

141

02:05:06PM   1            Ms. Murray, in your experience,

2   would it be reasonable for a debtor in a

3   bankruptcy proceeding to settle claims that would

4   require it to pay a separate debtor's

5   obligations?

6            MS. DALE:  Objection.  Incomplete

7   hypothetical.

8            THE WITNESS:  Yeah, I would need

9   more information to -- to give you an opinion on

10  that.

11  BY MS. JENNINGS:

12       Q.   You don't think it's -- you don't

13  think that's clear?  You would need more

14  information, in some circumstances that would be

15  reasonable?

16       A.   I would need more information.

17       Q.   Well, are there any circumstances in

18  which that would be reasonable, based on your

19  experience?  You are the expert here.

20       A.   Can you repeat the question?

21            MS. JENNINGS:  Miss court reporter,

22  can you please repeat the question?

23            (Thereupon, the record was read.)

24            MS. DALE:  Objection to the form.

25  BY MS. JENNINGS:

UNCERTIFIED ROUGH DRAFT

142

02:06:24PM  1          Q.    Prior -- prior to that.

            2                (Thereupon, the record was read.)

            3                MS. DALE:  Objection to the form.

            4                THE WITNESS:  I can't really answer

            5  that, and I think that might be a legal question.

            6  It could be reasonable, and then it's a matter

            7  of -- you know, it -- it becomes a legal

            8  question.

            9  BY MS. JENNINGS:

           10          Q.    Based on your extensive experience

           11 with settlements, has that ever occurred?

           12          A.    It may have.  I just -- I can't

           13 recall sitting here today.

           14          Q.    You can't think of one instance

           15 where that has occurred?

           16          A.    I -- it may have occurred.  I

           17 can't -- I can't, off the top of my head, recite

           18 to you which case it could have been.

           19          Q.    Okay.  Why don't we take a short

           20 break, and I think ten minutes would be good.

           21                THE VIDEOGRAPHER:  Okay.  Going off

           22 the record at 2:08.  Please stand by.

           23                (A brief recess was taken.)

           24                THE VIDEOGRAPHER:  We are back on

           25 the video record at 2:19.

UNCERTIFIED ROUGH DRAFT

143

02:19:23PM  1   BY MS. JENNINGS:

2          Q.   Ms. Murray, good afternoon again.

3          A.   Good afternoon.

4          Q.   I think I have the magic words that

5   people love to hear in the early afternoon of a

6   deposition, which is I have no further questions

7   at this time.  I will just open it up to my

8   co-counsel at McConnell Valdes to see if they

9   have any additional questions and, you know, any

10   other parties following them.

11          MR. GARCIA:  Hello Marti, hello to

12   all, who is listening.

13          No, I do not have questions at the

14   moment, unless -- obviously, I will reserve my

15   right should any -- any other attorney ask

16   questions that would require us to jump in, or

17   jump back in.  Thank you.

18          MS. JENNINGS:  I think the baton

19   passes to you, Margaret, if you have anything.

20          MS. DALE:  No, thanks, I'm done.

21          MS. JENNINGS:  Thank you very much,

22   Ms. Murray.  Thank you, everyone.

23          THE VIDEOGRAPHER:  Going off the

24   record at 2:20.  Please stand by.

25              \

UNCERTIFIED ROUGH DRAFT

144

02:20:40PM   1                    (The deposition was concluded at

2   2:20 p.m.)

3                         *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25