UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-----------------------------------------------------------------x

In re:                                                                 PROMESA

THE FINANCIAL OVERSIGHT AND                                            Title III
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of                                     No. 17 BK 3283-LTS

THE COMMONWEALTH OF PUERTO RICO                                        (Jointly Administered)
et al.,

           Debtors.[1]

-----------------------------------------------------------------x

OPINION AND ORDER DENYING THE DRA PARTIES' MOTION
FOR ALLOWANCE OF AN ADMINISTRATIVE EXPENSE CLAIM

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

APPEARANCES:

MCCONNELL VALDÉS LLC

By:     Arturo J. García-Solá
            Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
PO Box 364225
San Juan, Puerto Rico 00936-4225

*Attorneys for AmeriNational Community
Services, LLC as servicer for the GDB Debt
Recovery Authority*

C. CONDE & ASSOC. LAW OFFICES

By:     Carmen D. Conde Torres
            Luisa S. Valle Castro
254 San José Street, Suite 5
San Juan, PR 00901-1523

SCHULTE ROTH & ZABEL LLP

By:     Douglas S. Mintz
            Noah N. Gillespie
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005

            *and*

            Douglas Koff
            Abbey Walsh
            Peter J. Amend
919 Third Avenue
New York, NY 10022

*Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for GDB Debt
Recovery Authority*

O'NEILL & BORGES LLC

By:     Hermann D. Bauer
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP

By:     Martin J. Bienenstock
            Ehud Barak
            Jeffrey W. Levitan
            Joshua A. Esses
Eleven Times Square
New York, NY 10036

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Commonwealth of Puerto
Rico*

LAURA TAYLOR SWAIN, United States District Judge

Pending before the Court is *The DRA Parties' Motion for Allowance of an
Administrative Expense Claim* (Docket Entry No. 17009 in Case No. 17-03283-LTS,[2] the
"Motion") filed by AmeriNational Community Services, LLC (the "Servicer"), as servicer for
the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a
Delaware limited liability company (the "Collateral Monitor," and together with the Servicer, the
"DRA Parties"). The Motion requests allowance of an administrative expense claim in the
Commonwealth Title III Case pursuant to section 503(b)(1)(A) of the Bankruptcy Code, 11
U.S.C. § 503(b)(1)(A),[3] and the "fundamental fairness" doctrine derived from Reading Co. v.
Brown, 391 U.S. 471 (1968).

The Financial Oversight and Management Board for Puerto Rico (the "Oversight
Board"), acting as the statutory representative of the Commonwealth of Puerto Rico under Title
III of PROMESA, filed an objection to the Motion (Docket Entry No. 18065, the "Objection"),
and the DRA Parties filed a reply in support of the Motion. (Docket Entry No. 18888-1, the
"Reply").

The Court, which has subject matter jurisdiction of this action pursuant to section
306(a) of PROMESA, 48 U.S.C. § 2166(a), has carefully reviewed the papers submitted in
connection with the Motion.[4] For the following reasons, the Motion is denied.

---

[2]   All docket entry references herein are to entries in Case No. 17-03283-LTS (the
      "Commonwealth Title III Case"), unless otherwise specified.

[3]   All provisions of the Bankruptcy Code referenced in this Opinion and Order are made
      applicable to this contested matter by section 301(a) of the Puerto Rico Oversight,
      Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2161(a).

[4]   The Court has also reviewed the briefing submitted by the DRA Parties and the Oversight
      Board in connection with the Oversight Board's motion to dismiss certain counts of the

## I.

### Background

Except as otherwise indicated, the following are undisputed facts alleged in the Motion or drawn from the documents cited or annexed therein.

### A.  The HTA Enabling Act and the GDB/HTA Loans

HTA was established as a public corporation by Act No. 74-1965 to facilitate the construction and maintenance of roads and other transportation infrastructure.  See 9 L.P.R.A. § 2002.  Pursuant to its enabling act (the "HTA Enabling Act"), HTA is statutorily authorized to borrow money and issue bonds.  9 L.P.R.A. § 2004(l).

Between March 2008 and January 2014, HTA executed fifteen loan agreements (the "GDB/HTA Loans") with the Government Development Bank of Puerto Rico (the "GDB"), and HTA issued twenty-three promissory notes evidencing the indebtedness.  (Mot. ¶ 5; Obj. ¶ 13.)

On June 25, 2013, the Commonwealth enacted Act No. 30-2013 ("Act 30") and Act No. 31-2013 ("Act 31" and, together with Act 30, the "Excise Tax Statutes").  The Excise Tax Statutes' Statements of Motives declare that, due to the "precarious situation caused by a decrease in its revenues, aggravated by additional burdens that have increased its operating costs," HTA lacked "the capacity to cover the needs of its future capital improvement plan" and the Commonwealth therefore needed "to identify other sources of income that allow [HTA] to continue operating and repay [the GDB/HTA Loans] to" the GDB.  (Docket Entry No. 16276-29

---

adversary proceeding captioned AmeriNational Community Services, LLC, et al. v. Ambac Assurance Corporation, et al., Adv. Proc. No. 21-00068-LTS (D.P.R. 2021).

at 1-2; Docket Entry No. 16276-30 at 1-2.)  While there is some variance between the language

of Act 30 and that of Act 31, each authorizes HTA to pledge certain excise tax revenues

collected by the Commonwealth (the "Act 30-31 Revenues") and states that those revenues

"shall be covered" into a "Special Deposit" for HTA's benefit.  In relevant part, Act 30 provides

that

> Except as otherwise provided in this chapter the amount of the fees
> collected in accordance with §§ 5681 . . . of this title shall be covered
> in its entirety into a Special Deposit in the name and for the benefit
> of the Highways and Transportation Authority.
>
> The Authority is hereby authorized to pledge or encumber the
> proceeds of the taxes collected for the payment of the principal of
> and interest on any bonds or other obligation or for any other lawful
> purpose of the Authority. Such pledge or encumbrance shall be
> subject to the provisions of Section 8 of Article VI of the
> Constitution of Puerto Rico. The proceeds of the taxes collected
> shall be used solely for the payment of the interest on and
> amortization of the public debt, as provided in Section 8 of Article
> VI of the Constitution of Puerto Rico, insofar as the other available
> resources referred to in said Section does not suffice to attain such
> purposes. Otherwise, the proceeds of said tax, in the necessary
> amount, shall be used solely for the payment of principal of and
> interest on the bonds and other obligations of the Authority and to
> meet any stipulation agreed upon by the Authority to the holders of
> its bonds and other obligations.

9 L.P.R.A. § 5681.  Section 3060.11(a) of Act 31 provides, in relevant part, that

> (1) The sum of the tax collected on gasoline and four cents (4¢) of
> the gas oil or diesel oil tax established by Section 3020.06 of this
> Subtitle, and the total amount per fiscal year of the excise tax
> collected for crude oil, partially finished and finished oil by-
> products, and any other hydrocarbon mixtures established in Section
> 3020.07 of this Subtitle, shall be covered into a special deposit in
> favor of the Highways and Transportation Authority for its
> corporate purposes.
>
> (A) The Secretary shall transfer every month, or as agreed on with
> the Highways and Transportation Authority, the amounts covered
> into said special deposit, deducting from these the amounts
> reimbursed according to the provisions of Section 3030.19 and
> 3030.20 of this Subtitle.

. . .

(C) The Highways and Transportation Authority is hereby authorized to commit or pledge the proceeds of the collection thus received on gasoline and the tax of four cents (4¢) on gas oil or diesel oil fixed in Section 3020.06 and the amount appropriated by virtue of this Subtitle of the excise tax on crude oil, partially finished and finished oil by-products, and any other mixture of hydrocarbons fixed in Section 3020.07, for the payment of the principal and the interest on bonds or other obligations or for any other legal purpose of the Authority. Said commitment or pledge shall be subject to the provisions of Section 8 of Item VI of the Constitution of the Commonwealth of Puerto Rico. The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, until the other resources available to which reference is made in said section are insufficient for such purposes. Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations.

. . .

(3) The revenues collected from the tax on cigarettes established in Section 3020.05 of this Subtitle up to twenty million dollars ($20,000,000) per fiscal year shall be covered into a special deposit account in favor of the Highways and Transportation Authority for its corporate powers and purposes.

(A) The Secretary shall transfer every month or as agreed on with the Highways and Transportation Authority, the amounts covered into such special deposit account, deducting therefrom any amounts reimbursed in accordance with the provisions of Section 3030.18 of this Subtitle.

. . .

(C) The Highways and Transportation Authority is hereby authorized to pledge or encumber the proceeds from the excise tax on cigarettes established in Section 3020.05 for the payment of the principal of and interest on any bonds or other obligation or for any other lawful purpose of the Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the

> Constitution of Puerto Rico. The proceeds from such taxes shall be
> used solely for the payment of the interest on and amortization of
> the public debt, as provided in Section 8 of Article VI of the
> Constitution of the Government of Puerto Rico, insofar as the other
> available resources referred to in said Section do not suffice to attain
> such purposes. Otherwise, the proceeds from said tax, in the
> necessary amount, shall be used solely for the payment of principal
> of and interest on the bonds and other obligations of the Authority
> and to meet any stipulation agreed on by the Authority to the holders
> of its bonds and other obligations.

13 L.P.R.A. § 31751(a).

On August 28, 2013, HTA and GDB executed an Assignment and Security Agreement (Docket Entry No. 16276-23, the "Security Agreement"). (Mot. ¶ 7; Obj. ¶ 14.) Pursuant to the Security Agreement, HTA assigned to GDB, as "security for the prompt and complete payment and performance when due of all of its Obligations," its "rights, title, obligations and interest in the revenues allocated in favor of [HTA] by Acts No. 30-2013 & 31-2013," and assigned, pledged, and granted "a continuing security interest, which shall be junior, inferior and subordinate in all respects to the outstanding bonds of [HTA] issued pursuant to the [HTA] Bond Resolutions, in all of the right, title and interest of [HTA] in the revenues allocated to it by Acts No. 30-2013 & 31-2013 approved by the Legislature of the Commonwealth of Puerto Rico on June 25, 2013, whether presently held or hereafter acquired and wherever located . . . ." (Security Agreement §§ 1.1, 1.2.) The DRA Parties contend that the liens granted under the Security Agreement were perfected by a UCC financing statement filed on August 29, 2013 and amended on March 31, 2015. (Mot. ¶ 9.)

### B.  The Non-Payment of the GDB/HTA Loan Obligations

On November 30, 2015, Governor Alejandro García-Padilla issued an administrative bulletin directing the Treasury Secretary to retain the Act 30-31 Revenues for

payment of the Commonwealth's debts instead of for payment of HTA's obligations.  (See Docket Entry No. 10107-25).)  On April 6, 2016, the Governor signed into law the Puerto Rico Emergency Moratorium and Rehabilitation Act, Act No. 21-2016, which authorized the Governor to declare a state of emergency for the Commonwealth or any of its instrumentalities. (Mot. ¶ 26.)

PROMESA was enacted on June 30, 2016, to address the fiscal emergency in Puerto Rico created by a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."  48 U.S.C.A. § 2194(m)(1) (Westlaw through P.L. 116-145).[5]  Following the enactment of PROMESA and the appointment of the Oversight Board, the Oversight Board has certified a series of fiscal plans and budgets that have provided for use of retained Act 30-31 Revenues by the Commonwealth for purposes other than payment of HTA's obligations.

C.   The GDB Qualifying Modification

On July 12, 2017, the Oversight Board authorized GDB to use Title VI of PROMESA to restructure its debts.  (Mot. ¶ 10.)  The Court approved GDB's Qualifying Modification in GDB's Title VI proceeding on November 5, 2018.  (Mot. ¶ 11.)  In connection with the Qualifying Modification, on November 29, 2018, GDB and the DRA executed a Master Transfer Agreement (Docket Entry No. 16276-25, the "Transfer Agreement"), pursuant to which GDB transferred various assets, including the GDB/HTA Loans and certain HTA bonds, to the DRA.  (Mot. ¶ 12; Obj. ¶ 20.)

---

[5]       PROMESA is codified at 48 U.S.C. §§ 2101 et seq.

II.

<u>DISCUSSION</u>

1.  <u>Standing</u>

As a threshold issue, the Oversight Board argues that the DRA Parties lack prudential standing to prosecute the Motion and that the DRA is not a "party in interest" within the meaning of the Bankruptcy Code[6] because any rights to receive the Act 30-31 Revenues under Act 30 and Act 31 belong to HTA, not the DRA.  (Obj. ¶¶ 33-35.)  The Oversight Board contends that, rather than being the direct beneficiary of any rights against the Commonwealth arising from Act 30 and Act 31, the DRA has only derivative rights arising out of its claims against HTA.  (<u>See</u> Obj. ¶ 33 ("[A]ny appropriations made under the Act 30-31 Excise Tax Statutes are made to HTA for HTA's 'corporate purposes,' not to any particular creditor . . . . The DRA Parties are, at most, a creditor of a creditor (HTA), and, . . . a creditor of a creditor lacks standing to assert the rights of the latter." (citations omitted)).)

Contrary to the Oversight Board's argument, the DRA Parties are not simply seeking to vindicate DRA's rights as a creditor of HTA.  Rather, as acknowledged by the Oversight Board, the Security Agreement assigned HTA's rights and interests in the Act 30-31 Revenues and granted to GDB a security interest in the Act 30-31 Revenues allocated to HTA.  (Obj. ¶ 14.)  That disposition of HTA's rights[7] distinguishes the instant dispute from that in <u>Bank</u>

---

6       Section 1109(b) of the Bankruptcy Code, which is titled "Right to be heard," provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C.A. § 1109(b) (Westlaw through P.L. 117-51).

7       The Oversight Board has made various arguments about the scope and enforceability of those rights, including arguments that the Excise Tax Statutes have been preempted, that any security interest in the postpetition Act 30-31 Revenues was terminated by section

of New York Mellon v. P.R. Sales Tax Fin. Corp. (In re Fin. Oversight & Mgmt. Bd. for P.R.),

301 F. Supp. 3d 306 (D.P.R. 2017).  There, the Court held that the holders of Commonwealth

general obligation bonds had no basis to assert or enforce the Commonwealth's rights—if any—

to the pledged sales tax funds that were due to be paid to COFINA by Bank of New York Mellon

because they had "allege[d] only that they are creditors of the Commonwealth, which is a

creditor of COFINA."  Id. at 312 ("The members of the [general obligation bondholder group]

are not COFINA creditors, and have no direct claim to the Interpleaded Funds.").  Here, in

contrast, the DRA Parties do allege that they have direct claims to the Act 30-31 Revenues

arising from the assignment of HTA's rights in the Security Agreement and from the injury

arising from the Commonwealth's retention of the Act 30-31 Revenues.  (See, e.g., Mot. ¶¶ 48-

51.)  Although the Oversight Board contests the scope of those rights and disputes whether those

rights entitle the DRA to an administrative expense claim, the Oversight Board's arguments

implicate the merits of the DRA Parties' request for allowance of an administrative expense

claim rather than issues of standing.

       Accordingly, the Court finds that the DRA Parties have prudential standing to

pursue this Motion practice.


     2.  The Transfer Agreement Asset Restrictions

       The Oversight Board also contends that certain terms of the Transfer Agreement

governing the transfer of assets from the GDB to the DRA preclude the DRA Parties'

prosecution of the Motion.  (Obj. ¶ 28.)  Section 1(b) of the Transfer Agreement provides, in

_____

552(a) of the Bankruptcy Code, and that 9 L.P.R.A. § 2015 precludes the assertion of
claims arising out of HTA's funded indebtedness against the Commonwealth.  These
arguments implicate the merits of the Motion rather than issues of standing.

relevant part, that "the Issuer shall comply, and shall direct the Servicer to comply, with the
Asset Restrictions with respect to the Transferred Property . . . ."  Accordingly, the DRA Parties
are required to comply with the "Asset Restrictions," which are defined in Schedule 1 to the
Transfer Agreement.  In relevant part, subsection (b)(2) of the Asset Restrictions provision
("Clause 2") provides that "with respect to any Non-Municipal Loan,[8] rights, remedies and
powers in respect of such Non-Municipal Loan may be exercised solely to the extent necessary .
. . to preserve, protect or defend any security or other pledge rights benefiting such Non-
Municipal Loan."  The Oversight Board argues that the Motion falls outside the scope of conduct
permitted by this section because it does "not seek to preserve or protect [the DRA's] security
interest or to ascertain the status of certain funds" but, rather, the DRA's Motion "seek[s]
affirmative relief in the form of an administrative expense claim to compensate [the DRA] for
purported violations of law."  (Obj. ¶ 31.)

> Contrary to the Oversight Board's argument, the claims asserted by the DRA
Parties are not barred by Clause 2 of the Transfer Agreement.  Rather, where the DRA Parties
are alleging that the collateral that is the subject of their security interest is being
misappropriated by the Commonwealth, the assertion of rights to repayment in the
Commonwealth's Title III case constitutes the "exercis[e] of the DRA Parties' "rights, remedies
and powers . . . to preserve, protect or defend" the DRA's "security or other pledge rights."  The
definitions of the terms "protect" and "preserve" upon which the Oversight Board relies are not

---

[8]     Under the Transfer Agreement, each of the GDB/HTA Loans was defined to be a "Non-
Municipal Loan" that was transferred to the DRA.  (See Transfer Agreement Sched. 1 at
1-4 (defining "Public Corporation Loan Assets" to mean "the Loans made by GDB to
various public corporations and instrumentalities of the Commonwealth, as listed in
Schedule 4" and defining "Non-Municipal Loan" to include "any . . . Public Corporation
Loan Asset").

to the contrary.  The DRA Parties are seeking "to defend or guard from attack [or] loss" (Obj. ¶ 31 (quoting Webster's Unabridged Dictionary of the English Language 1553 (2d ed. 2001)) their alleged interests in the Act 30-31 Revenues, and to "maintain" the DRA's alleged rights to the Act 30-31 Revenues as set forth in the Motion.  (Obj. ¶ 31 (quoting In re Brown, No. 05-41071, 2007 WL 494990, at *1 (Bankr. D. Mass. Feb. 13, 2007).)  To the extent the Oversight Board contends that the DRA lacks substantive rights to the collateral, such that there are no rights or remedies that may be asserted against the Commonwealth, its arguments go to the merits of the Motion.

Accordingly, the Asset Restrictions do not preclude the DRA from pursuing this Motion practice.

### 3.  Section 503(b)(1)(A)

With respect to the merits of the DRA Parties' request for allowance of an administrative expense claim, the Court will first address the DRA Parties' argument that such a claim in the amount of the delinquent postpetition loan payments should be allowed as one for "the actual, necessary costs and expenses of preserving the estate" due to the Commonwealth's retention and use of the Act 30-31 Revenues for its own purposes.

To further the Bankruptcy Code's purpose of "rehabilitat[ing] and preserv[ing] the value of [a] financially distressed" debtor, section 507(a)(2) of the Bankruptcy Code "grants first priority in the distribution of the limited assets of the estate to administrative expenses allowed under section 503, which include 'the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]'" Mason v. Official Comm. of Unsecured Creditors (In re FBI

Distribution Corp.), 330 F.3d 36, 41 (1st Cir. 2003) (citations omitted) (quoting 11 U.S.C.

§ 503(b)(1)(A)).  Although there is no "estate" in a Title III case, the First Circuit has held that,

in the context of applying section 503(b)(1)(A) in a Title III case, the term "estate" should be

understood to refer to "property of the debtor."  See Union de Trabajadores de la Industria

Eléctrica y Riego v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for

P.R.), 7 F.4th 31, 38 (1st Cir. 2021).

> Section 503 of the Bankruptcy Code provides, in relevant part, that:
>
> (a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
>
> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate . . . .

11 U.S.C.A. § 503 (Westlaw through P.L. 117-51).  In Woburn Associates v. Kahn (In re

Hemingway Transport, Inc.), 954 F.2d 1 (1st Cir. 1992), the First Circuit set forth the general

criteria that should be considered to determine whether to allow an administrative expense claim.

The court explained that a request for priority payment of an administrative expense under

Section 503(a) of the Bankruptcy Code "may qualify if (1) the right to payment arose from a

postpetition transaction with the debtor estate, rather than from a prepetition transaction with the

debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of

the debtor."  In re Hemingway Transp., Inc., 954 F.2d at 5.  "[S]tatutory priorities are narrowly

construed, and the burden of proving entitlement rests with the party seeking it."  In re FBI

Distribution Corp., 330 F.3d at 41-42 (citing In re Hemingway Transp., Inc., 954 F.2d at 5).

The DRA Parties' theory is that, due to the DRA's alleged rights to the Act 30-31

Revenues under the Security Agreement and Puerto Rico law (including the Excise Tax Statutes

and the Puerto Rico Constitution), the Commonwealth's retention of the Act 30-31 Revenues is a

"postpetition transaction" that benefits the Commonwealth when it uses the Act 30-31 Revenues

for its own purposes.  (See Mot. ¶ 78; Reply ¶¶ 26-28.)

In analyzing whether there is merit to the DRA Parties' argument, it is helpful

first to address whether the DRA Parties are correct that the Commonwealth is retaining the

DRA's property when it fails to transfer the Excise Tax Revenues to HTA.  The Court rejects the

basic legal premise of the DRA Parties' argument: that the DRA has a property interest in the

Act 30-31 Revenues in the possession of the Commonwealth.  The Court has already considered

and rejected substantially similar arguments from holders of HTA bonds in two decisions

addressing and denying the bondholders' request to lift the automatic stay so as to permit them to

seek to apply certain revenues (including the Act 30-31 Revenues) collected by the

Commonwealth and HTA to the payment of claims on account of bonds issued by HTA.  See

generally In re Fin. Oversight & Mgmt. Bd. for P.R., 618 B.R. 619 (D.P.R. 2020) ("HTA I") &

In re Fin. Oversight & Mgmt. Bd. for P.R., 485 F. Supp. 3d 351 (D.P.R. 2020) ("HTA II"), aff'd,

989 F.3d 170 (1st Cir. 2021).[9]  There, addressing substantially the same statutory scheme, the

Court concluded that the holders of HTA bonds did not have "a colorable claim to equitable or

beneficial ownership of" the Act 30-31 Revenues.  HTA I, 618 B.R. at 637.  The Court noted

that, as here, specific documents and statutes governed the parties' rights and that, "had the

---

[9]     Although the DRA Parties correctly note that the Court's decision on prior stay relief
motions does not have a preclusive effect concerning the parties' substantive rights, see
Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 35 (1st Cir. 1994), the Court concludes,
as explained here, that the DRA Parties have provided no basis in fact or law to modify
the analysis and conclusions set forth in HTA I and HTA II.

Commonwealth intended to transfer ownership of the Excise Taxes, it could have done so." HTA I, 618 B.R. at 635-37 ("Movants have not demonstrated a legal basis for their assertion that [excise tax revenues] are actually owned by HTA."). Accordingly, the Court held that, even to the extent that the Excise Tax Statutes "provide commitments to transfer certain of the Revenues to HTA for the benefit of the Bondholders, [they] do not go so far as to purport to grant property rights in the Revenues before they are transferred." HTA I, 618 B.R. at 636; see also HTA II, 485 F. Supp. 3d at 362 ("[T]he Court has already found that Movants lack colorable claims to security or other property interests in the relevant revenue streams . . . ."). Although, here, the obligee is DRA rather than the holders of HTA bonds, the applicable statutory language compels the same result.

The DRA Parties' emphasis on the broad scope of the Security Agreement does not change the analysis. (See, e.g., Mot. ¶ 50; Reply ¶¶ 70-71.) Critically, HTA could not and did not transfer to the DRA rights that are any more expansive than its own rights. See 19 L.P.R.A. § 2233(b)(2) ("[A] security interest is enforceable against the debtor and third parties with respect to the collateral only if . . . the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party . . . ."); In re AA 10,000 Corp., Case No. 07-06601-ESL, 2008 WL 11275079, at *6 (Bankr. D.P.R. May 9, 2008) ("Cases decided under the UCC or the common law of commerce uniformly hold that for Westernbank's security interest to attach, the Debtor must have had 'rights' in the property."); see also Vehicle Dev. Corp. PTY LTD v. Livernois Vehicle Dev., LLC, 995 F. Supp. 2d 758, 768 (E.D. Mich. 2014) ("A security interest does not attach to a particular asset; rather, it attaches to the debtor's rights in a particular asset. The Court must then determine what rights Livernois had in the Trucks." (citation omitted)). Thus, to prevail on its argument that the DRA's rights to the Act 30-31 Revenues

extend to "each dollar of Act 30-31 . . . Revenues collected by the Commonwealth," even if

those revenues are retained in "the Commonwealth's coffers" (Reply ¶ 71), the DRA Parties

would have to demonstrate that HTA had a property interest in those revenues that it was able to

transfer in the first place.  However, as explained above and in HTA I, the Excise Tax Statutes

did not transfer to HTA a property interest in the Act 30-31 Revenues upon or before their

collection by the Commonwealth, and HTA was therefore incapable of assigning any such

interest to GDB or the DRA through the Security Agreement.

       Absent a property interest in the Commonwealth's retained Act 30-31 Revenues,

the only remaining basis that DRA can rely upon for alleging a beneficial postpetition transaction

is that the Commonwealth is in breach of its obligation under the Excise Tax Statutes[10] to

transfer the Act 30-31 Revenues.  Here, the Excise Tax Statutes were enacted before the petition

date, but they contemplate ongoing transfers of the Act 30-31 Revenues from the

Commonwealth to HTA.  See, e.g., 13 L.P.R.A. § 31751(a)(a)(C) ("The Secretary shall transfer

every month, or as agreed on with the Highways and Transportation Authority, the amounts

covered into said special deposit . . . .").  Even though the obligation to transfer revenues to HTA

comes due postpetition, however, "a claim is not entitled to priority simply because *the right to

payment* arises after" the petition date.  Goody's Family Clothing, Inc. v. Mountaineer Prop. Co.

II, LLC (In re Goody's Fam. Clothing, Inc.), 401 B.R. 656, 671 n.14 (D. Del. 2009) (quoting In

re Philadelphia Mortg. Tr., 117 B.R. 820, 828 (Bankr. E.D. Pa. 1990)), aff'd, 610 F.3d 812 (3d

Cir. 2010); see In re FBI Distribution Corp., 330 F.3d at 48 ("The contingent claim . . . is not

---

[10]    The Court assumes, without deciding, that the Commonwealth is in breach of obligations
imposed by the Excise Tax Statutes to transfer the Act 30-31 Revenues to HTA.  In light
of the disposition of the Motion, the Court need not address the parties' arguments
concerning preemption of the Excise Tax Statutes.

entitled to priority simply because the right to payment arises during the reorganization when the contingency occurs."). A review of case law assessing whether obligations arise pre- or post-petition for purposes of section 503(b)(1)(A) demonstrates why that is the case.

In the seminal case <u>Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)</u>, 536 F.2d 950 (1st Cir. 1976), the First Circuit addressed claims for severance pay by employees of a debtor whose jobs were terminated soon after the petition date. Applying the Bankruptcy Act precursor to section 503(b)(1)(A), the First Circuit determined that, where the amount of severance was determined by reference to the claimant's length of employment, "the consideration supporting appellants' claims was the services performed for Mammoth Mart over the entire period of each appellant's employment," <u>id.</u> at 955, and the employees did not have postpetition administrative expense claims on account of their severance claims. <u>Id.</u> The court stated as a general principle that "a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." <u>Id.</u> at 954; <u>see also</u> <u>In re FBI Distribution Corp.</u>, 330 F.3d at 48 (holding that administrative expense claim of executive whose employment was terminated postpetition was limited to the reasonable value of her postpetition services, notwithstanding severance provisions of rejected employment agreement).

Likewise, in <u>Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)</u>, 66 F.3d 1091 (9th Cir. 1995), where the debtor and Microsoft were parties to a prepetition agreement permitting the debtor to sell certain software in exchange for installment payments to Microsoft totaling up to $2.75 million (some of which were due after the petition date), the court "look[ed] through [the contract's] form to the economic realities of th[e] particular arrangement"

and determined that its pricing structure rendered it "more akin to a sale of an intellectual property than to a lease for use of that property." Id. at 1095. As such, the debtor "received all of its rights under the agreement when the term of the agreement commenced," and, although the debtor continued to make postpetition sales of the software, such sales did not transform the installment payment obligations that came due after the petition date into administrative expense claims. Id. at 1096. Accordingly, as in Mammoth Mart, the critical fact was that the consideration provided to the debtor was delivered before the petition date. Id. ("[T]he economic realities of this agreement indicate that it was basically a sale, not a license to use. The debt arose prepetition, and Microsoft did not provide the debtor any consideration postpetition. Microsoft was not entitled to an administrative expense claim.").

Finally, in In re FBI Distribution Corp., 330 F.3d 36, the First Circuit held that a debtor's obligations under a nonexecutory contract for which the creditor owes no additional performance give rise to ordinary prepetition claims rather than priority administrative expense claims, even where payment of such claims only arises due to a postpetition contingency. Id. at 48 ("The consideration supporting the Retention Agreement—to forgo other employment opportunities—was supplied the moment she signed the agreement. Only the right to payment arose after the petition date.").

The clear lesson from these and other cases applying section 503(b)(1)(A) is that the timing of the consideration supplied by the creditor is a critical issue because the rationale for section 503(b)(1)(A) is that "creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function." In re Jartran, Inc., 732 F.2d 584, 586 (7th Cir. 1984) (citing In re Mammoth Mart, Inc., 536 F.2d 950, 954 (1st Cir. 1976)).

The DRA is in substantially the same position as a creditor that is a party to a nonexecutory contract that, by its terms, requires ongoing postpetition payments.  It has not extended postpetition credit to HTA or to the Commonwealth.  Any consideration underlying the DRA's claims was provided prepetition to HTA—a separate Title III debtor—under the prepetition GDB/HTA Loan Agreements.  To the extent the Court were to assess the economic realities of the transactions underlying the DRA's claims, review of the Statement of Motives for each of the Excise Tax Statutes reveals that they were enacted prepetition for the stated purpose of shoring up HTA's finances to "allow [HTA] to continue operating and repay" the prepetition GDB/HTA Loans to the GDB.  (Docket Entry No. 16276-29 at 1-2; Docket Entry No. 16276-30 at 1-2.)  The Commonwealth's ongoing alleged breach of its obligation to transfer to HTA the excise tax revenues collected pursuant to the Excise Tax Statutes is not materially different from the nonpayment of prepetition general unsecured claims that occurs upon the commencement of every bankruptcy case.  The automatic stay protects the debtor from collection of such payments upon commencement of a bankruptcy case,[11] and the bankruptcy estate benefits from the ability to use resources that would otherwise be used for the timely satisfaction of prepetition unsecured claims.

Although the DRA's claims are based on statutory provisions rather than on a contract, the DRA Parties have presented no basis for differentiating obligations arising out of statutes from obligations arising out of nonexecutory contracts.  Cf. Commonwealth of Mass.

---

[11]   If it were otherwise, "a debtor's debts arising out of any non-executory contracts, even promissory notes, could not be handled as claims in the bankruptcy proceedings. Instead, the debtor would have a continuing obligation to pay those debts. Such a result would seriously constrain a debtor's ability to resolve his financial affairs through bankruptcy." Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.), 64 F.3d 141, 145–46 (4th Cir. 1995)

Div. of Employment and Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.),
291 F.3d 111, 126 (1st Cir. 2002) (determining that statutory obligation to reimburse state for
unemployment compensation benefits did not give rise to administrative expense claim because
benefits were based on employees' prepetition employment); Pension Benefit Guar. Corp. v.
Sunarhauserman, Inc. (In re Sunarhauserman, Inc.), 126 F.3d 811, 818 (6th Cir. 1997)
("[R]egardless of the substantive law on which the claim is based, the proper standard for
determining that claim's administrative priority looks to when the acts giving rise to a liability
took place, not when they accrued."); In re Old Carco LLC, No. 09-50002 AJG, 2010 WL
4455648, at *7 (S.D.N.Y. Nov. 2, 2010) ("Having a state law claim . . . cannot be enough to
establish an administrative expense priority.  Otherwise, any state law claim would qualify and
the exception would swallow the rule.").  Both kinds of obligations give rise to "claims" within
the meaning of the term in the Bankruptcy Code, see 11 U.S.C. § 101(5)(A) (defining claim as
"right to payment, whether or not such right is . . . contingent, matured, [or] unmatured"), and
state laws cannot in and of themselves elevate a claim to administrative expense priority.  Cf. In
re Bos. Reg'l Med. Ctr., Inc., 291 F.3d at 126 ("[T]o the extent that we were to read the
Employment and Training Law to require that the Division receive administrative expense
priority for a claim that the Bankruptcy Code would assign general unsecured status, the state
law would then be inconsistent with federal law and so preempted." (citations omitted)).

   Accordingly, there is no postpetition transaction conferring postpetition benefits
on the Commonwealth to support allowance of an administrative expense claim for the DRA
Parties under section 503(b)(1)(A).

4.   The Fundamental Fairness Doctrine

Movant also invokes a different basis upon which administrative expense claims

that are not explicitly contemplated by the Bankruptcy Code have been allowed.  The

"fundamental fairness" doctrine, which has its origins in Reading Co. v. Brown, 391 U.S. 471

(1968), has been interpreted within the First Circuit to support administrative expense claim

priority for two categories of claims that do not otherwise come within the plain language of

section 503(b) of the Bankruptcy Code.  See Hicks, Muse & Co., Inc. v. Brandt (In re Healthco

Intern., Inc.), 272 B.R. 510, 513 (B.A.P. 1st Cir. 2002), aff'd, 310 F.3d 9 (1st Cir. 2002).  As the

Bankruptcy Appellate Panel for the First Circuit has explained, "the 'fundamental fairness'

exception is recognized when the debtor's postpetition operations occasion tortious injuries to

third parties (Reading[]), or when the claim arises from postpetition actions that deliberately

violate applicable law and damage others (Charlesbank[])."  Id.  (citing Reading Co., 391 U.S.

471; Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.), 755 F.2d 200, 203

(1st Cir. 1985)).

To the extent that the claim underlying the Motion is for the misappropriation or

conversion of property belonging to the DRA or HTA, the Court has already explained why

neither entity has a property interest in the retained Act 30-31 Revenues, and such claims

therefore are not a basis for an allowable administrative expense claim under section

503(b)(1)(A).  Beyond claims based upon the diversion of property in which the DRA has an

interest, the DRA Parties have provided only generalized characterizations of the kind of claims

that they believe can be asserted based upon the Commonwealth's retention and use of the Act

30-31 Revenues for its own purposes.  (See, e.g., Mot. ¶ 69 ("The Commonwealth's conduct was

tortious and a deliberate violation of Puerto Rico law . . . .").)  For purposes of this analysis, the

Court will assume without deciding that there would be some non-bankruptcy law foundation for a claim by the DRA against the Commonwealth on account of the Commonwealth's failure to transfer the Act 30-31 Revenues in the manner contemplated by the Excise Tax Statutes.  See Madison Equities, LLC v. Condren (In re Theatre Row Phase II Assocs.), 385 B.R. 511, 521 (Bankr. S.D.N.Y. 2008) ("An allowable claim for an expense of administration must have a satisfactory basis in law other than Code § 503(a)(1), such as contract or tort, as well as factual validity.").

Even with that assumption, the DRA Parties have not cited precedent in which the rationale of Reading has been applied to prioritize the payment of obligations to a creditor arising from the ongoing nonpayment of unsecured debts that originated before the petition date. The reason for the absence of any such authority is presumably because section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)—one of the fundamental debtor protections provided by the bankruptcy laws—"automatically stays a broad variety of creditor actions against the debtor or the debtor's property upon the debtor's filing of a bankruptcy petition." Assured Guaranty Corporation v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 931 F.3d 111, 112 (1st Cir. 2019).

If the DRA Parties were correct that a debtor's nonpayment of prepetition obligations coming due postpetition could, without more, establish a basis for an administrative expense claim under Reading, then vast swaths of prepetition claims would merit prioritization as administrative expense claims simply based upon when their payments come due.  Such a result is inconsistent with the principles underlying Reading and with the principle that the Bankruptcy Code's priorities should be construed narrowly.  See In re Bos. Reg'l Med. Ctr., Inc., 291 F.3d at 126 ("If the [creditor] is arguing that today's result is so unfair or so inexpedient as

to require us to develop a new rule that would look past the distinction, basic to bankruptcy,

between the debtor's prepetition expenses and the bankruptcy estate's postpetition expenses—a

distinction preserved by <u>Reading Co.</u> and our subsequent cases—we disagree."); <u>In re FBI

Distribution Corp.</u>, 330 F.3d at 41-42; <u>see also</u> <u>In re Sunarhauserman, Inc.</u>, 126 F.3d at 817

("[E]ven in <u>Reading</u> and cases following it, the debt at issue arose post-petition. . . . <u>Reading</u>

does not eliminate the requirement that a debt arise post-petition in order to be accorded

administrative expense priority.").


III.

CONCLUSION

For the foregoing reasons, the Motion is denied.  The Oversight Board's

*Evidentiary Objection to the Expert Report of Lizette Martinez Attached as Exhibit A to the DRA*

*Parties' Reply to the Objection to the DRA Parties' Motion for Allowance of Administrative*

*Expense Claim* (Docket Entry No. 18270, the "Evidentiary Objection"), which objected to an

expert report filed by the DRA Parties concerning the magnitude of the DRA Parties' purported

administrative claim, is rendered moot by the denial of the Motion and is therefore denied

without prejudice.  (<u>See</u> Evidentiary Obj. ¶ 4 (arguing that the expert report "is wholly irrelevant

unless and until the Court determines the DRA Parties have an allowable administrative expense

claim"); *DRA Parties' Response to Evidentiary Objection to the Expert Report of Lizette*

*Martinez Attached as Exhibit A to the DRA Parties' Reply to the Objection to the DRA Parties'*

*Motion for Allowance of Administrative Expense Claim*, Docket Entry No. 18429 ¶ 6 ("[T]he

DRA Parties consent at this time to the [Oversight Board]'s proposal that the Court first

determine whether 'the DRA . . . [has] an allowable administrative expense claim,' before

considering the size of the DRA's administrative expense claim.").)

     This Opinion and Order resolves Docket Entry Nos. 17009 and 18270 in Case No. 17-03283-LTS.

    SO ORDERED.

Dated: October 29, 2021

              /s/ Laura Taylor Swain
             LAURA TAYLOR SWAIN
             United States District Judge