```
 1                     UNITED STATES DISTRICT COURT

 2                      DISTRICT OF PUERTO RICO

 3
         In Re:                    )     Docket No. 3:17-BK-3283(LTS)
 4                                 )
                                   )     PROMESA Title III
 5       The Financial Oversight and )
         Management Board for      )
 6       Puerto Rico,              )     (Jointly Administered)
                                   )
 7       as representative of      )
                                   )
 8       The Commonwealth of       )
         Puerto Rico, et al.       )     October 28, 2021
 9                                 )
                      Debtors,     )
10
         _____
11

12                        URGENT MOTION HEARING

13       BEFORE THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

14                    UNITED STATES DISTRICT COURT JUDGE

15       _____

16
         APPEARANCES:
17
         ALL PARTIES APPEARING BY VIDEOCONFERENCE
18
         For The Commonwealth
19       of Puerto Rico, et al.:  Ms. Margaret A. Dale, PHV
                                   Mr. Michael T. Mervis, PHV
20                                 Ms. Julia D. Alonzo, PHV

21       For Cantor-Katz
         Collateral Monitor,
22       LLC:                      Ms. Taleah E. Jennings, PHV
                                   Mr. Thomas L. Mott, PHV
23

24

25
```

```
 1 ┃ APPEARANCES, Continued:
   ┃
 2 ┃
   ┃ For AmeriNational
 3 ┃ Community Services,
   ┃ LLC, as servicer for
 4 ┃ the GDB Debt Recovery
   ┃ Authority:              Mr. Arturo J. Garcia Sola, Esq.
 5 ┃                         Mr. Nayuan Zouairabani Trinidad, Esq.
   ┃
 6 ┃
   ┃
 7 ┃
   ┃
 8 ┃
   ┃
 9 ┃
   ┃
10 ┃
   ┃
11 ┃
   ┃
12 ┃
   ┃
13 ┃
   ┃
14 ┃
   ┃
15 ┃
   ┃
16 ┃
   ┃
17 ┃
   ┃
18 ┃
   ┃
19 ┃
   ┃
20 ┃
   ┃
21 ┃
   ┃
22 ┃
   ┃
23 ┃
   ┃
24 ┃ Proceedings recorded by stenography.  Transcript produced by
   ┃ CAT.
25 ┃
```

```
 1                            I N D E X

 2   WITNESSES:                                          PAGE

 3         None.

 4

 5   EXHIBITS:

 6         None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    October 28, 2021

 3                                    At or about 1:59 PM

 4                           *      *      *

 5           THE COURT:  Good afternoon, everyone.

 6           MS. JENNINGS:  Good afternoon.

 7           MS. DALE:  Good afternoon, Your Honor.

 8           THE COURT:  All right.  Everybody ready?

 9           MR. GARCIA SOLA:  Yes.  Your Honor.  Good

10    afternoon.

11           THE COURT:  Good afternoon.

12           Can we call the case?

13           MS. CARUSO:  Yes, we can.

14           The United States District Court for the District of

15    Puerto Rico is now in session.  The Honorable Judge Dein

16    presiding.  Today is Thursday, October 28th, 2021.  Case No.

17    17-BK-3283, *In re: The Financial Oversight and Management*

18    *Board for Puerto Rico*, *as representative of the Commonwealth*

19    *of Puerto Rico*, will now be heard.

20           This is a general reminder that all persons granted

21    remote access to the hearing are reminded of the general

22    prohibition against photographing, recording, and

23    rebroadcasting of court proceedings.  Violation of these

24    prohibitions may result in sanctions, including removal of

25    Court-issued media credentials, restricted entry for future
```

1    hearings, denial of entry for future hearings, or any other

2    sanctions deemed necessary by the Court.

3         Will the parties please identify themselves for the

4    record?

5         MS. JENNINGS:  Good afternoon, Your Honor.  Taleah

6    Jennings from Schulte Roth & Zabel.  And excuse my voice.  I

7    lost it this morning, but it's coming back.  We represent

8    Cantor-Katz Collateral Manager, one of the DRA parties.  And

9    I'm hear with my colleague, Thomas Mott.

10        MR. GARCIA SOLA:  Good afternoon, Your Honor, and

11   other members of the court.  My name is Arturo Garcia Sola.  I

12   appear together with Nayuan Zouairabani, and we represent

13   AmeriNational Community Services, the other DRA party.

14        MS. DALE:  Good afternoon, Your Honor.  Margaret Dale

15   from Proskauer Rose for the Financial Oversight and Management

16   Board of Puerto Rico, and I'm with my colleagues, Michael

17   Mervis and Julia Alonzo.

18        THE COURT:  Thank you, everybody.  I see that you've

19   allocated some time consistent with the orders.  For those of

20   you who have lived discovery with me before, you kind of know

21   this is a little more interactive than that, but we can start

22   that way.  But please know that I have been through

23   everything.  I've been through the pleadings.  I've been

24   through the deposition.  So please focus your comments

25   accordingly.

6

 1          All right.  I guess, who's speaking for the moving

 2   parties?

 3          MS. JENNINGS:  Taleah Jennings, Your Honor.

 4          THE COURT:  Okay.  And you'll keep it short, because

 5   you're losing your voice.

 6          MS. JENNINGS:  I know, unfortunately.

 7          THE COURT:  Go ahead.

 8          MS. JENNINGS:  Thank you, Your Honor.  I understand

 9   you've read all of the papers.  I think I just want to point

10   out a few things.  What's at issue here is the FOMB's failure

11   to comply with the Court's Order regarding the 30(b)(6)

12   Deposition Notice that was issued to the FOMB.  Specifically,

13   the Order expressly adopted certain of the parties'

14   agreements, which are reflected in paragraphs 10 to 17 of the

15   Joint Motion submitted by the parties.

16          One of those agreements provides, and I'll quote:

17   The Oversight Board agrees that it shall be responsible for

18   preparing the EY representative for the deposition in

19   accordance with Rule 30(b)(6), including but not limited to

20   with respect to each of the topics set forth in the deposition

21   notice, which is defined there as the deposition notice issued

22   to the FOMB.

23          Mr. Chepenik, when he testified, confirmed that the

24   FOMB did not prepare him to testify.  I don't think that

25   that's under dispute, and it seems like it should be a pretty

1    easy ruling here.

2         The question is, and I think the only question that's

3    relevant, is what is required to prepare a witness in

4    connection with a 30(b)(6) deposition.  30(b)(6) itself says

5    that a witness testifying pursuant to 30(b)(6) must testify

6    about information known or reasonably available to the

7    organization.

8         The FOMB's counsel told us, excuse me, that

9    Ms. Natalie Jaresko was the most knowledgeable person at the

10   FOMB regarding the topic set forth in the deposition notice.

11   Yet the EY representative testified in response to every

12   single one of the topics that he did not speak to anyone at

13   the FOMB regarding the topics; he did not speak to

14   Ms. Jaresko.  She is clearly reasonably available to both the

15   FOMB and to him.

16        He said he speaks to the FOMB representatives

17   regularly.  Ms. Jaresko he spoke to as recently as a day --

18   the night before, or the day before his 30(b)(6) deposition.

19   And there's simply no excuse to have not prepared him, with

20   the FOMB's knowledge and access to FOMB representatives, to

21   prepare to testify on the 30(b)(6) topics.

22        THE COURT:  Okay.  So let me interrupt you there,

23   because I'm -- I understand your argument, but I am confused.

24   It seems to me -- I'm looking at the subpoena notice.  It says

25   that, in accordance with 30(b)(6), EY must designate one or

1    more officers, directors, or other person who consent to

2    testify on its behalf with respect to what is known or

3    reasonably available to EY, as relates to work performed by EY

4    for the FOMB concerning each of the topics of examination set

5    forth in the attached Exhibit A.

6              I have to say, as I read this, to shortcut it, and

7    you can try to talk me out of it, all right, but it was -- as

8    I read it, the topics that have been designated have facts

9    relating to the financial condition and things that were done

10   in the finances.  To the extent that there were financial

11   information being sought in the deposition, it was the

12   Oversight Board's position that the -- that Ernst & Young

13   would have those facts as opposed to Ms. Jaresko, who probably

14   doesn't know the details of the financial information.

15             And the Oversight Board then says, look, this is the

16   person -- Ernst & Young is going to testify as to these facts

17   in your topics, and we're bound by them, we're accepting those

18   facts as being put forth by Ernst & Young.

19             MS. JENNINGS:  Yes.  However, the topics are not just

20   facts, financial facts.  For example, if you look at topic

21   number two, it specifically says we wanted to know about any

22   efforts undertaken by the FOMB to determine whether or not the

23   Commonwealth had a balanced budget for years 2016 through the

24   present.

25             EY limited -- said it wouldn't provide any testimony

1    regarding years 2016 and 2017, because it was not yet

2    engaged.

3              THE COURT:  Yes.  But why does the subpoena say that

4    they need to designate someone who's known or reasonably known

5    to Ernst & Young as it relates to the work performed by Ernst

6    & Young for the Oversight Board?  Why does it say that?  I

7    mean, I didn't draft the notice.

8              MS. JENNINGS:  No.  And, actually, I didn't draft the

9    specific notice either.

10             MR. GARCIA SOLA:  I did.

11             MS. JENNINGS:  Go ahead, Arturo.

12             MR. GARCIA SOLA:  I can answer that, Your Honor.

13             THE COURT:  Okay.

14             MR. GARCIA SOLA:  Again, for the record, Arturo J.

15   Garcia on behalf of AmeriNational Community Services.  The

16   reason why it says that, Your Honor, is that, first of all, we

17   were not interested in serving a subpoena upon EY.

18             THE COURT:  I'm sorry?

19             MR. GARCIA SOLA:  We were not interested in serving a

20   subpoena on EY.  The only reason we served the subpoena upon

21   EY is because the FOMB said, it's just a piece of paper.  They

22   need it for their own purposes.  Please serve a subpoena on

23   them.  They just need it to be able to appear at the

24   deposition.  But they will testify to the topics on the notice

25   that was served on the FOMB, and they will be prepared, as the

 1   parties agreed, which agreement was documented in the joint

 2   motion and then in the Order.

 3          So, again, there was no interest on our part to send

 4   a subpoena.  The EY attorney asked that the language of the

 5   subpoena be changed to what is on the record, but we never

 6   understood that we were taking a deposition of an EY person --

 7   to the knowledge that that person had about the topics that we

 8   were going to be asking during deposition.  We were always

 9   under the understanding that the FOMB was going to do what it

10   said it would do, which is to prepare the person to testify to

11   the facts that, you know, the FOMB was in possession of with

12   respect to the -- to the topics.

13          Now, I have to say, there's another background piece

14   of information that's relevant here, Your Honor.

15          THE COURT:  But first address this language for me.

16          MR. GARCIA SOLA:  Yes.  Go ahead.

17          THE COURT:  The language says that they need to come

18   up with a witness who's going to testify as it relates to the

19   work performed by Ernst & Young.  And I also, I guess, need to

20   understand, did you expect this deposition to give you facts

21   about what was happening with these funds or not?

22          MR. GARCIA SOLA:  We expected the deponent to give us

23   facts and whatever other relevant information that the

24   deponent would have that would bind the FOMB about the topics

25   that were being asked as part of the deposition.  Yes, we

1    expected that, Your Honor.

2         THE COURT:  So as I understand it, if this witness

3    testified, look, this is what this account held, that the

4    Oversight Board is then bound by that testimony?

5         MR. GARCIA SOLA:  Yes.

6         THE COURT:  It's the financial information that was

7    conducted by Ernst & Young --

8         MR. GARCIA SOLA:  But, Your Honor, quite frankly, we

9    were not interested in the information that the EY

10   representative will give to us in response to the questions.

11   We were interested in the information that the FOMB would

12   provide to the witness in the process of preparing the witness

13   for the deposition.  That would then bind the FOMB, because it

14   was information that was in the possession or control of the

15   FOMB.  That's the information we were asking for.

16        We served a 30(b)(6) notice on the FOMB.  The FOMB on

17   the eve of the fact deposition of Natalie Jaresko, which I

18   took, Your Honor, sent us a letter saying that on that very

19   day that we were going to depose her on other issues, the

20   issues that she had been designated to appear on in the

21   initial witness disclosure statements by the FOMB, so we were

22   prepared to take her deposition on those issues, which had

23   mostly to do, Your Honor, with the Plan confirmation process.

24        We were interested in getting information from the

25   FOMB, as the 30(b)(6) deponent, on the topics that are in the

1    Notice of Deposition, Your Honor, so we served it.  There was

2    a lot of, you know, back and forth on the Notice of the

3    deposition.  Ultimately, on the day before we were to take the

4    deposition of Natalie Jaresko, they sent us a letter saying,

5    ah, by the way, tomorrow Ms. Jaresko will be available also to

6    testify to the 30(b)(6) Deposition Notice topics.

7           We understood that it was very unfair that on the

8    eve, the very eve when we were preparing for the deposition on

9    other topics, Your Honor, that they would try to spring a

10   change in circumstances for the deposition, so we disagreed

11   with them.  However, Your Honor, right after that deposition,

12   Taleah, myself, and some others engaged in discussions with

13   FOMB counsel, all of whom are present here in the hearing,

14   Your Honor.  I'm sure they'll say what they have to say.  But

15   we ultimately arrived at the agreement that's reflected in the

16   joint motion that was filed with the Court, and then the Court

17   so ordered it.

18          So we were expecting to have someone at the

19   deposition not only that would have knowledge that EY would

20   have communicated to that person, but also, and more

21   particularly, Your Honor, information that the FOMB would have

22   had about that -- those topics.  And we didn't get any of

23   that, Your Honor.  Nothing of that.

24          MS. JENNINGS:  And, Your Honor --

25          THE COURT:  Allow me.  This is -- I have really a

1    very straightforward question.  I'm looking at the topics.  It

2    says, whether or not the Commonwealth had a balanced budget

3    for each fiscal year.  That's topic two.  The witness

4    testified there was no balanced budget, and he explained why.

5    That's a fact.

6         I assume, based on the structure of this, that the

7    Oversight Board is bound by that testimony, the facts of that

8    testimony.  I don't see anything in the topics that say, we

9    want to know whether the Oversight Board thought there was a

10   balanced budget.  It says, we want to know what the facts are.

11        I'm assuming these are facts that relate to your

12   expert deposition -- your expert testimony, who has opined on

13   these subjects, so I don't see -- I'm missing the

14   inappropriateness, I guess, if that's a word, of having Ernst

15   & Young, who has the facts, who has the financial information

16   that binds the Oversight Board, why that's not the appropriate

17   witness in this arrangement, if you want the facts.

18        MR. GARCIA SOLA:  Yeah.  Well, Your Honor, I mean,

19   the topic states, whether or not the Commonwealth had a

20   balanced budget.  Yes, that's what it states.  But ultimately,

21   at the end of the day, what we were trying to get at, Your

22   Honor, was information related to whether or not a clawback, a

23   constitutional clawback -- and I understand the FOMB's

24   arguments about preemption and all of that.  Okay.  So let's

25   set those aside.  Those are not at issue here.

1          Ultimately, we were inquiring about whether or not

2     the clawback was validly exercised, and so we understood we

3     had a right to inquire as to not only the balanced budget, but

4     if it was not balanced, why wasn't it balanced; if it was

5     balanced, why was it balanced; whether it was balanced at the

6     beginning of the year, and then unbalanced at the end of the

7     year; and the witness could not tell us any of that.  Yes, he

8     said.  Well, you know, I understand that there was -- that the

9     budget was balanced -- I'm sorry, it was unbalanced.  That's

10    what he ended up testifying, but we couldn't get any of the

11    circumstances, Your Honor, that would help us to understand

12    the implementation.  And particularly, Your Honor, whether it

13    was validly implemented pursuant to the Constitution of the

14    United States -- I'm sorry, of Puerto Rico, were the

15    Constitution of Puerto Rico not preempted.

16          And as I'm sure you understand, we think that the

17    Constitution of Puerto Rico is not preempted, notwithstanding

18    whatever the FOMB wants to say about it.  So it's just -- it's

19    not just the balanced budget.  It's the facts around the

20    balanced budget:  If it was not balanced, why was it not

21    balanced; if it was balanced, why was it balanced; all of

22    those things which we were entitled to ask, which we tried to

23    ask, and we got no answers to.

24          Yeah, the witness did say it was balanced.  He also

25    did say it was balanced, but, you know, the debt services had

15

1    been paid.  That's the only piece of information I recall. And

2    I have -- and I didn't read the transcript this morning, but

3    that's the only information I recall that the witness was able

4    to give us.  But nothing around that -- those top -- the topic

5    of whether it was balanced, how it was balanced, whether it

6    was not, why wasn't it balanced, if it was at the beginning of

7    the year and then not at the end of the year, or vice versa,

8    we couldn't get any of that information from him.

9          And I think, Your Honor, that that's information that

10   someone like Natalie Jaresko, who FOMB's counsel has indicated

11   is the most knowledgeable person about the topics, would be

12   able to provide.  And so she should have been able, had the

13   effort been undertaken, to prepare Mr. Chepenik to discuss

14   those issues and answer those questions that we were trying to

15   ask.

16         MS. JENNINGS:  Yes.  And, Your Honor, if I may add,

17   that is exactly why we entered into the joint motion and

18   submitted it to the Court.  It was because, instead of taking

19   a member of the Oversight Board's deposition, and we were

20   going to EY, we agreed to do that so long as the FOMB agreed

21   to prepare that person, which means preparing them with all

22   knowledge reasonably available to it.  And they specifically

23   did not do that.

24         They sat in some of the deposition preparation

25   sessions, but they didn't provide him any information.  And it

1    was only counsel that sat in those preparation sessions.  He

2    intentionally did not prepare by speaking to anyone from FOMB.

3    I mean, we did not get to obtain the deposition that we were

4    seeking, and it was because they put this -- they put him,

5    this EY representative in this seat instead of somebody who

6    would have the additional knowledge that we wanted to get at.

7    That's what they did.

8            And we put it in the Order, and the Order was entered

9    into -- in the proposed Order, and the proposed Order was

10   entered into by the Court.  Had they not agreed to do that, we

11   would have been in front of Your Honor earlier with our

12   discovery dispute.  We were prepared to come to you.  And this

13   was the resolution.  This is what we agreed to.

14           THE COURT:  Ms. Dale, do you want to respond?

15           MS. DALE:  Yes, please.

16           Good afternoon, Your Honor.  We are missing the

17   inappropriateness of what the DRA parties are contending

18   happened here as well.  There was no intention, or I would say

19   there was no effort, intention, we didn't seek to mislead

20   them.  We didn't seek to do some back room deal and do a bait

21   and switch on the DRA parties.

22           I can go through the details, but you said you've

23   read them, so I don't want to do that unless Your Honor has a

24   specific issue that you'd like us to raise.  The point here is

25   that, as we said to them repeatedly, the topics are legal

1    topics by and large in respect of the clawback.

2            They have all of the facts that they need.  Their

3    expert witness had all of the facts that he needed to provide

4    an opinion on these topics.  When we look at this practically,

5    we're trying to understand what facts they think they don't

6    have or they couldn't get from the EY witness.

7            THE COURT:  Well, I would --

8            MS. DALE:  Mr. -- I'm sorry.

9            THE COURT:  The facts that say, the efforts

10   undertaken by the FOMB --

11           MS. DALE:  Your Honor, may I add just on that?  On

12   the September 10th letter, which is attached to my declaration

13   I believe as Exhibit 1, the same topics that were put -- not

14   exactly the same wording, but very similar topics were in

15   their request for production of documents.

16           And on September 10th, we wrote them a letter and

17   said -- and I'm quoting from page 2 of that letter -- you

18   know, your September 3 e-mail contends that "analyses as to

19   whether the budget is balanced and whether there are

20   sufficient revenues or surpluses directly relevant to the DRA

21   parties' case," and therefore, quote, directs the Oversight

22   Board to please produce documents responsive to requests 7

23   through 9 as soon as possible.

24           We disagreed with that.  We said, and I'm quoting

25   from the letter again, as the Oversight Board and AAFAF

1    explained in our August 31 meet and confer, would the requests

2    7 through 9 reflect a misunderstanding of the process by which

3    the Commonwealth budgets are created.  In developing the

4    Commonwealth certified budget, the Oversight Board does not

5    perform specific analyses regarding "whether or not the

6    Commonwealth had a balanced budget;" "whether or not the

7    available revenues of the Commonwealth were insufficient to

8    meet the appropriations for the fiscal year;" or "the amount

9    necessary to be retained for there to be sufficient revenues

10   to meet the appropriations" as requested in your September 3

11   e-mail.

12       We went on, but the point is, we don't have

13   information to give them.  We told them there are no analyses

14   like this that the FOMB does.  We told them, if you want some

15   information regarding the topics of whether the Commonwealth

16   had a balanced budget, whether or not the available revenues

17   were insufficient to meet the appropriations, whether or not

18   revenues of the Commonwealth were diverted, retained,

19   reallocated or redirected, EY would have the information.  EY

20   was prepared.  EY testified about that information.

21       So, if -- on their reply brief, we asked in our

22   opposition, what facts don't you have that you think you need,

23   and we didn't get anything back in reply as to what they think

24   they need.  They have everything they need.  The clawback

25   issues have been briefed extensively.

1              Mr. Garcia's statement here that they need

2    information about whether the constitutional clawback was

3    validly exercised or validly implemented all relate to legal

4    issues, which are inappropriate for a 30(b)(6) witness in the

5    first place.  We made it clear that there was no more

6    discoverable information.

7              Footnote four of the reply brief seems to indicate

8    that the DRA parties believe they have what they need and they

9    win on their legal argument.  I think the Court will decide

10   that, but I think that it's an acknowledgment that they don't

11   really need anything else.

12             We're not quite sure why we're here.  We were trying

13   very hard to avoid a discovery -- you know, a discovery

14   dispute that we needed to bring to the Court's attention.  You

15   read the Subpoena.  Exhibit 6 to my Declaration -- sorry,

16   Exhibit 10 to my Declaration has an exchange between

17   Mr. Alejandro Cepeda Diaz and the EY in-house counsel -- no.

18   I'm sorry.  It's between Julia Alonzo and the DRA counsel,

19   which says, we're not -- it's not a -- it won't be a

20   deposition of the FOMB.  It will be a deposition of EY.  And

21   then the subpoena was created that way as well.

22             It's very clear.  I feel like we're going into like

23   parol evidence on a breach of contract case.  I'm happy to

24   answer any questions the Court has, but I don't think -- we

25   certainly didn't violate the Order.  We certainly didn't do

1  anything intentionally to mislead anybody about it, and there

2  are no more facts to give the DRA parties.

3          Thank you.

4          MS. JENNINGS:  Your Honor, may I just respond?

5          THE COURT:  Yes.

6          MS. JENNINGS:  There's -- and I started at the

7  beginning with this.  The Order required the FOMB to prepare

8  the EY witness.  The response by the FOMB makes no reference

9  to the Order in its 25 pages, not a single reference to the

10  Order.  They're focused on the subpoena, because the subpoena

11  is something that EY's counsel said, I don't want to

12  incorporate anything in this subpoena that you and the FOMB

13  agreed to.

14          And we are not going against the EY and saying, you

15  failed to comply with your obligations.  What we are saying is

16  that the FOMB failed to comply with its court-mandated

17  obligations to prepare this witness to testify on these

18  topics.  And I have not heard them say anything about any

19  efforts that they actually undertook to prepare this witness,

20  which was required by the Order.

21          MS. DALE:  Your Honor, Mr. Mervis, myself, Ms. Alonzo

22  were in preparation meetings with the witness, with his

23  counsel.  We talked about these topics.  As I've just said,

24  there is nothing for him to speak to Natalie Jaresko or

25  anybody else at the FOMB to get at these legal issues that

1    they're seeking to relitigate or spend time on --

2              MS. JENNINGS:  Your Honor --

3              MS. DALE:  I'm not --

4              MS. JENNINGS:  Your Honor, if I just -- the testimony

5    by the witness says that Proskauer did not provide him any

6    information regarding these topics.

7              THE COURT:  So, actually, the way I read the

8    deposition was that there was a lot of testimony -- it seemed

9    to me that he was prepared to speak about things that Ernst &

10   Young did beyond his personal involvement, though the

11   questions at some point seemed to shift entirely to him

12   personally, you know.  And I'm not quite sure why, but they

13   did.

14             I certainly am not privy to the meetings that went

15   on, though he did testify that he prepared; he prepared with

16   counsel; he prepared with his -- Ernst & Young's counsel; he

17   prepared with the Oversight's counsel.  I would assume that to

18   prepare in accordance with 30(b)(6) says, you can't rely

19   solely on your own knowledge; you need to rely on the

20   knowledge of the entity.  And he did testify that he spoke

21   with a number of other people at Ernst & Young to get

22   information about the work, the scope of the work that Ernst &

23   Young did, and the facts.  That's how I read it.

24             I would say I have no doubt that you both truly

25   believed you were performing what you thought your agreement

 1   was.  I think -- I think there was a misunderstanding, and I

 2   think, for the DRA parties, I'm stuck on the language of the

 3   subpoena.  I'm just stuck on why it says that they need to

 4   provide a witness who knows what Ernst & Young did, and beyond

 5   that, so that's -- I don't find a violation of the Court

 6   Order.  I think the Court Order was not as clear as it should

 7   have been.

 8          I understand what -- I think it's very clear that the

 9   Oversight Board is not designating Ernst & Young as its 30(b)

10   witness.  I think it's very clear that Ernst & Young -- that

11   the Oversight Board is binding itself to whatever Ernst &

12   Young says.  That I think is clear.

13          I think it's less clear as to what -- the scope of

14   the preparation, what the role was to be in preparing pursuant

15   to 30(b)(6).  I think that then becomes clarified in the

16   subpoena, which says, this is who you have to produce, and the

17   person has to know about what Ernst & Young did.

18          Beyond that, though, I don't understand, if you get

19   the facts from these topics, why do you need more?  Like, why

20   do you need what -- the steps the Oversight Board did?  Isn't

21   your argument, this is where the money went; it shouldn't have

22   gone there; legally it should have gone to us?  I mean,

23   fundamentally isn't that what your arguments are?

24          And I guess I share the inquiry on what other facts

25   from the Oversight Board's personal knowledge -- how that

1    affects your case.

2            MR. GARCIA SOLA:  If I may answer that, Your Honor?

3            THE COURT:  Yes.

4            MR. GARCIA SOLA:  Okay.  Again, for the record,

5    Arturo Garcia on behalf of AmeriNational Community Services.

6            You touched upon one of the topics in the -- in the

7    Notice.  That was number two, with respect to balanced budget,

8    and we discussed that already.  However, Your Honor, if you go

9    to -- if you go to the other topics --

10           THE COURT:  I mean, I thought the witness testified,

11   he said, look, if they had paid all the debt service they

12   needed to pay, there wasn't enough money; and then, if they

13   had paid all the bills that they needed to pay, there wasn't

14   enough money.  I mean, that's what he testified to.

15           MR. GARCIA SOLA:  If you go to the other topics --

16   I'm not very techy, Your Honor, and I'm trying to get -- I

17   apologize.

18           THE COURT:  Way too many papers and way too many

19   screens.

20           MR. GARCIA SOLA:  Yes.  That's exactly what's

21   happening here to me.  So my colleague is trying to get them

22   for me.  He's far more techy, and he appears to be having the

23   same issues with me --

24           THE COURT:  You need someone who's 12 years old.

25           MR. GARCIA SOLA:  Yes.

24

1           THE COURT:  Do we have any 12-year-olds here who can

2   work all these screens --

3           MR. GARCIA SOLA:  I have a grandson who is only two.

4   He probably would be able to help me, but he's not here today.

5           MR. ZOUAIRABANI TRINIDAD:  We do, Your Honor -- he

6   touched something, and if you'll give me a sec --

7           THE COURT:  But what's the point?

8           MR. GARCIA SOLA:  So what I wanted to do is go into

9   some of the other topics.  Okay.  Here they are.

10          So some of the other topics are broader in scope than

11  the balanced budget topic, because -- for instance, let's take

12  topic number four.  And the witness clearly didn't have any

13  information.  Nobody provided any information to him on this

14  topic, this topic being whether or not any of the revenues of

15  the Commonwealth were diverted, retained, reallocated or

16  redirected in order for there to be sufficient available

17  revenue.

18          Now, in response to this, in order to get information

19  on this particular topic, we understood that we were entitled

20  to ask questions about if they were diverted, how much they

21  were diverted, where were they diverted to, why were they

22  diverted to those particular entities, and the same and so

23  forth for all the other issues there, which, you know, include

24  retained, reallocated or redirected.

25          The witness testified that he had no knowledge of

1  that.  So either EY didn't have any knowledge that that was

2  transmitted to him, or the witness himself didn't have any

3  knowledge, even though the witness had been working with the

4  FOMB for a long time before the -- before the deposition, and

5  particularly on financial issues, such as these types of

6  issues, you know, budgets and the like.  But he was not able

7  to provide any or much information at all with respect to

8  question number four.

9       The same goes for question number five, which talks

10  about amounts of clawback funds that were disbursed for uses

11  other than the payment of General Obligation debt.  So he did

12  know that GO debt had not been paid since 2016; but he didn't

13  know whether the clawback funds had been used to pay any other

14  expenses, and, if so, what other expenses.

15       And frankly, Your Honor, in order to be able to

16  determine or at least make the analysis whether the -- whether

17  the clawback had been implemented in the correct way, we had a

18  right to have all of that information.  And if not in EY's

19  knowledge, then for sure someone like Natalie Jaresko, the

20  executive director of the Board, should have known that

21  information.

22       And so clearly the deponent that was designated to

23  answer on behalf of EY, but to be able to join the FOMB, based

24  on the FOMB's representation and commitment to prepare the

25  witness to be able to speak to the information that was in the

1    knowledge of the FOMB, was not at the deposition.  I didn't

2    have that witness.  I didn't have Natalie Jaresko, nor anybody

3    else.  And the witness did not speak with Natalie Jaresko, nor

4    anybody else.

5          And the same goes for topic number six, Your Honor,

6    which talks about Act 30-31 incremental revenues.  As you know

7    or may know, I'm sure you know, that is a very important issue

8    relevant to the DRA parties.  It's an issue that's been

9    briefed in many -- in many documents that we filed with the

10   Court.

11         We wanted to ask the witness if he had any

12   information about the Act 30-31 incrementals, and in

13   particular whether any of those revenues or any other revenues

14   of HTA were again diverted, retained, reallocated or

15   redirected.  We came out of the deposition, Your Honor, with

16   nothing, with zip, because the witness was not prepared to

17   answer those questions, had no knowledge, either because EY

18   didn't have the knowledge, he personally didn't have the

19   knowledge, and nobody at FOMB sat down with the witness to do

20   what we were told that they would do, which is prepare the

21   witness with the information that the FOMB had to be able to

22   testify at the deposition based on knowledge provided to him

23   by their position.

24         Because, you know, 30(b)(6) depositions can be of

25   anybody.  It doesn't -- they don't have to be -- it didn't

1   have to be of someone that was at the FOMB or any member or

2   staff of the FOMB.  But they had an obligation, and they

3   agreed to comply with the obligation to prepare the witness,

4   which clearly they did not.

5        MS. JENNINGS:  They know that that is the only reason

6   we agreed to it.  And I appreciate Your Honor saying that

7   everyone probably thinks they complied.  I disagree.  In my

8   own opinion, I was part of -- I was the primary person who

9   discussed with Ms. Dale the process here.  In the

10  meet-and-confer, she said, it's just a piece of paper; what

11  are you guys not doing; you're going to get the same exact

12  thing; it's just going to be a different body sitting in the

13  seat.

14        And then her and I had a follow-up conversation on

15  the phone, and it's unfortunate that she is -- I'll just say,

16  I have represented to the Court exactly what was represented

17  and discussed during that phone call.  And it was that they

18  would prepare this person to speak just as if it was a member

19  of the Board sitting for the deposition.  That's why we agreed

20  to it, and it's the only reason we agreed to this process.

21        And I believe, truly, that Ms. Dale, maybe her

22  partners, maybe not, but Ms. Dale certainly knows that.

23        MS. DALE:  I am totally -- I'm totally offended by

24  this.

25        MS. JENNINGS:  And -- and --

1            THE COURT:  Ms. Jennings, I would like you to stop
2    this --
3            MS. DALE:  Yes.  Could you just stop?
4            THE COURT:  -- because I need to say it would have
5    been actually much easier if we had had the original motion --
6            MS. DALE:  Yes.
7            THE COURT:  -- because this topic is problematic.
8    Okay.  And I think that I find it unfortunate that you didn't
9    communicate equally here or have a -- the exact understanding
10   of what was going on, but I still, Ms. Jennings, with all due
11   respect, don't understand what you thought this deposition
12   was.

13           I mean, I read it.  I didn't see anybody showing
14   Ernst & Young a financial statement that said, where did this
15   money come from or where does this money go.  I mean, this was
16   a very general deposition that, to the extent that you have a
17   real issue with where money went -- first of all, I believe
18   one of your experts has already detailed extensively the HTA
19   funds, right, the Act 30 and 31 funds.  Those have been shaped
20   -- those have been traced.  I don't know what other funds have
21   been traced or not.  I -- my ignorance of all of your exhibits
22   is going to be overwhelming, but they did get filed recently,
23   so -- but you have that -- that's not what this deposition
24   was.

25           I mean, I'm not quite sure -- the legal fight is

1    working its way through the court.  The significance of how

2    this money was spent is working its way through the court in

3    connection with your various pending matters.  The facts,

4    though, I -- I'm still not convinced that there was anything

5    else to give you.  To the extent that you wanted facts about

6    what happened to the money, Ernst & Young appears to have been

7    the right entity, and the Board is bound by that.

8            To the extent that you want a separate statement by

9    the Oversight Board on what they knew, I don't think further

10   deposition testimony -- I don't understand the significance of

11   it, and you haven't convinced me that we need any more

12   depositions on that point.  If you had had Ms. Jaresko, it

13   seems to me she would say Ernst & Young did the financial

14   calculations and it's in the papers.

15           MR. ZOUAIRABANI TRINIDAD:  Your Honor, if I may?

16           MR. GARCIA SOLA:  So, Your Honor, if I may?

17           MS. DALE:  May I just respond, Your Honor?

18           THE COURT:  Let Mr. Garcia, please, first.

19           MR. GARCIA SOLA:  Yes, Your Honor.  Let me just say

20   something.  First of all, the question -- your question is a

21   very fair question, by the way, but the situation we're in is

22   that we were at that point in time in discovery, in the middle

23   of hectic discovery for the Plan confirmation processes.

24   Unfortunately, there was a very unbalanced playing field.  The

25   information was in the domain of the FOMB or the government.

1    It was not in the -- in the hands or in the knowledge of the

2    DRA parties.

3              We were -- what we were trying to do through the

4    30(b)(6) notice, which originally went to the FOMB, was to

5    balance the playing field somewhat.  And when we obtained the

6    commitment by the FOMB, which is reflected in paragraph 15 of

7    the joint motion, which reads, and I quote, "additionally, the

8    Oversight Board agrees that it shall be responsible for

9    preparing the EY representative for the deposition in

10   accordance with Rule 30(b)(6), including but not limited to

11   with respect to each of the topics set forth in deposition

12   notice, except for topic number one," which we did not get

13   into topic number one.

14             But the fact of the matter is, Your Honor, that the

15   witness showed no facts, was able to testify as to no facts on

16   most of the -- of the topics that were the object of the

17   Deposition Subpoena and the 30(b)(6) Notice.  He specifically

18   said, no, I do not know; no, I didn't speak with anybody from

19   the FOMB; no, I didn't get any information from the FOMB; and

20   no, I wasn't prepared by anybody from the FOMB.

21             As Ms. Jennings said before, he went so far as to

22   say, I meet regularly with folks from the FOMB, including

23   Natalie Jaresko the night before, the day before; and still he

24   didn't ask Natalie Jaresko, he didn't -- not even -- as far as

25   I know, he did not even tell her that night that he was going

1    to be deposed the next day.

2         THE COURT:  What's your understanding, just because

3    you're living it -- what's your understanding of Ernst &

4    Young's role, vis-a-vis the finances, and the Oversight

5    Board's?  Do you think Ms. Jaresko has done the calculations

6    and that Ernst & Young should have asked her for the

7    calculations?  Is that what you think?

8         MR. GARCIA SOLA:  Well, first of all, what I know is

9    what was stated to us by FOMB's counsel, which is that

10   Ms. Jaresko is the person most knowledgeable about all the

11   topics in the deposition notice.  That's the first thing I

12   know.

13        Second, you asked me about EY's role.  He testified

14   during the deposition to his various roles, but among those

15   roles were working with the FOMB on the fiscal plans and

16   budgets.  Evidently he works on those documents.  But there

17   has to have been someone on the side of the FOMB working

18   alongside of him.  Whether that's Ms. Jaresko or not, I do not

19   know.

20        If I were to take as true the statement by the FOMB

21   counsel, she was the person most knowledgeable, then she maybe

22   would have been the person knowledgeable about each of the

23   topics.  I don't know that, because I didn't ask.  I didn't

24   have an opportunity to ask her.  But somebody from the FOMB

25   would have been the counterpart of Mr. Chepenik in doing the

1    work he was doing on the budgets and on the -- and on the

2    fiscal plans, which I think would have been the person, had we

3    gone with the FOMB instead of the EY person.  Because we

4    always wanted a FOMB person, but we didn't get anybody from

5    the FOMB, because instead they took us in the direction of EY

6    and said they would prepare the person.

7              And so, Your Honor, again, we were trying to balance

8    the playing field.  It's already -- it's a hugely unbalanced

9    playing field.  And when we start playing games or

10   gamesmanship, like the one that I think, respectfully -- and I

11   respect my colleagues from Proskauer, by the way, very much,

12   very much, but on the other side, what I see is gamesmanship,

13   Your Honor.

14             And we could not get the information that we should

15   have been able to get had a witness from the FOMB either been

16   deposed, or had someone from the FOMB prepared the EY witness

17   the way they committed to do.

18             MR. ZOUAIRABANI TRINIDAD:  Your Honor, if I may, I

19   would like to add a point.

20             THE COURT:  Just one more question, and then I'll let

21   you speak.

22             Did your experts have access to the documents in the

23   document room?

24             MR. ZOUAIRABANI TRINIDAD:  Your Honor, actually,

25   that's exactly what I wanted to address, so thank you for

1    doing the question.  For the record, Attorney Nayuan

2    Zouairabani for AmeriNational Community Services, LLC, as one

3    of the DRA parties.

4         The reason I say that I'm glad that you asked the

5    question, if you look at the expert report of Douglas

6    Brickley, which was attached as part of the Declaration of

7    Margaret Dale in connection to this issue, I would like to

8    point you out to his Exhibit B.  In part of his report, and

9    when they -- actually, FOMB took his deposition.  They asked

10   him in terms of how complete it was.  He said it was complete

11   based on the information that was made available to him, but

12   that he would have liked to have looked at more information to

13   further strengthen his analysis.

14        And the Exhibit B is a list that he prepared of

15   financial information that he would have liked to have had

16   access to, to review.  And if you compare that Exhibit B to

17   the Exhibit A, which is a document that was available to him

18   to review, Exhibit B far outweighs Exhibit A.

19        So it goes back to the point that my fellow colleague

20   Arturo Garcia -- Arturo Garcia was mentioning with regard to

21   the even playing field.  The financial information with regard

22   to this particular matter, we'll call it the whole clawback

23   matter, really the dice is loaded towards the government

24   parties who have possession of the information, if it exists.

25   And the only trickle information that we've been able to

1   obtain leads us to the expert report that Mr. Brickley put

2   out.  But there has to be much more information.

3          If you look at the constitutional requirements, it's

4   not just, oh, there's not enough money, I'll just go ahead and

5   pay.  There are two elements to that.  The first one is

6   activation, which is whether there are sufficient revenues to

7   satisfy the appropriations, and that goes back to the concept

8   of balanced budget as well.  Then the next aspect of it is --

9   once it's activated, it's distribution and disbursement, and

10  there's a priority order there.

11         Mr. Brickley made his analysis based on the scant

12  information that's been publicly available and that has been

13  submitted to us by the government parties, both AAFAF and

14  FOMB, as part of the discovery dispute.  The playing field is

15  not even.  We're making lemonade out of lemons, Your Honor.

16         The whole idea of the 30(b)(6) deposition was to get

17  as much information as possible with regard to this particular

18  topic.  When we entered into the agreement that was ultimately

19  contained in the Order, the FOMB mentioned that EY would be

20  the best person with regard to this topic.  That's who they

21  proposed.  But the idea was we always wanted to take the

22  30(b)(6) deposition of the FOMB.

23         Now, by saying that he was not prepared, he was not

24  able to make the -- answer the questions under the agreement.

25  FOMB did not prepare him.  According to his testimony, he did

1 | not speak with personnel from Proskauer who were able to help

2 | him out.

3 |        Specifically, points four, five and six, as

4 | Mr. Garcia pointed out, we feel like it's bait and switch,

5 | Your Honor.  We have a reason to feel suspicious about this,

6 | and our experts definitely would have benefited from this

7 | information.

8 |        THE COURT:  Anybody else -- Ms. Dale, do you want to

9 | respond?

10 |        MS. DALE:  Just a few things, Your Honor.

11 |        With respect to Ms. Jaresko, we had served some

12 | responses and objections to the Notice of Deposition.  We had

13 | indicated that EY would be the most appropriate party to

14 | respond, and they would need a subpoena.  And that was

15 | rejected.  And so the -- so then we said, okay, we don't want

16 | to have a dispute about this.  We'll designate Ms. Jaresko.

17 | She was going on for deposition in her individual capacity the

18 | next day.

19 |        And I think that's the e-mail that they're referring

20 | to as "the most knowledgeable person."  I don't think -- I'm

21 | not sure who sent that, but it was from our side, and they

22 | rejected that.  Mr. Garcia didn't have enough time to prepare,

23 | and so the -- after Ms. Jaresko's deposition was when we

24 | started the negotiations over the subpoena.  So that's where

25 | the most knowledgeable person came in.

1          I stand on my position about the fact that we don't

2     have additional facts on these topics.  We told them that on

3     September 10th.  And I also reject the contention that they

4     didn't get information that they wanted from this witness.

5     Perhaps they didn't ask certain questions of this witness;

6     but, for example, Mr. Garcia said they asked about topic four,

7     and he had no information.  They asked about topic five, and

8     he had no information.

9          In his deposition at pages -- topic four was referred

10    to starting at page 157 of his deposition, and then pages 159

11    to 165, there was discussions of the topic of clawback, either

12    the -- you know, diverted, retained clawback, these terms were

13    discussed.  And at one point, this is page 161, line around

14    13, the witness says, and it sort of mischaracterizes the

15    budgeting process, which is what I'm familiar with.  And the

16    budgeting process takes the revenues from the fiscal plan,

17    sets a revenue envelope, and that revenue envelope is used to

18    establish the spending parameters that the government uses to

19    set its budget that the Board ultimately certifies.

20          There's no -- in the context of this question,

21    there's no -- there's no way to differentiate between the

22    different revenues that are used for those expenditures, and,

23    therefore, to know what funds are redirected, retained,

24    reallocated, or redirected.  The revenue envelope is just

25    pulled from the fiscal plan revenue parameters.  That's why

1    it's hard for me to answer with more specificity for you.

2         Topic five, he goes on, pages 167 to 169, regarding

3    topic five, the clawback funds, and if you'll just indulge me

4    for a moment.  Question, line 5, page 167:  I'll ask you, do

5    you have any knowledge of whether the clawback funds as we

6    identified them just prior to going into the break have been

7    used to pay GO debt service?

8         Answer:  From fiscal '18 onward, question mark?

9         That's correct.

10        I'm not aware of the clawback funds, or any funds for

11   that matter, being used to pay GO debt service.

12        During that time period -- sorry.  Question:  During

13   that time period, has any GO debt service been paid, to your

14   knowledge?

15        Answer:  The only GO debt service that I believe

16   might have been paid would have been insured debt service.

17        And it goes on.  He's giving them the facts as he

18   knows them.  There are no other facts from the FOMB.

19        We did not violate the Order.

20        THE COURT:  All right.  I do appreciate the passion

21   with which everybody has staked out their positions, but as I

22   see it, we really do have a legal dispute here that is being

23   carried out at the courts as this -- that's based on your

24   different legal positions that are being addressed in the

25   motions to dismiss the administrative claim.

1       Again, as I read it, the Oversight Board is bound by

2   the testimony of Ernst & Young, but Ernst & Young was not

3   officially the 30(b)(6) representative.  Ernst & Young was the

4   entity with the most knowledge about the actual financial

5   condition and use of revenues.

6       I have read the reports and the Exhibit A and Exhibit

7   B.  The Exhibit B, in my mind, was -- of the expert's report

8   was a wish list, you know, but it -- the basic numbers that it

9   needed was taken from the publicly available fiscal plans and

10  other reports.  I don't see that the Oversight Board is

11  challenging those numbers.  Those numbers are what they are.

12      The significance of those numbers will be decided in

13  the context of the law, or in a confirmation hearing, or

14  wherever it's going to be played out.  I don't see that there

15  was -- I will say that I don't think that the Order was as

16  clear as it should have -- you know, adopting your phrasing,

17  was not as clear as it should have been.  I don't see --

18  you've not explained to me what additional facts the Oversight

19  Board would have had.

20      I'm convinced by the Oversight Board's responses to

21  the document requests and other discovery requests that the

22  Oversight Board does not have facts relating to the treatment

23  of those funds, separate and apart what -- from what Ernst &

24  Young provided in response to the deposition.

25      So the motion to compel is denied.  I guess it's a

1    motion to compel.  I don't even know what it is.  I guess a

2    motion to compel, which I do think, frankly, should have been

3    brought as part of the proceedings that have been set out for

4    expedited resolution of these disputes.

5              MR. GARCIA SOLA:  Thank you, Your Honor.  I hear you,

6    and I respect it.  Can I just say one more thing, perhaps in

7    reconsideration?  Yes, there is a lot --

8              THE COURT:  I don't even get a minute?  I don't even

9    -- do I have to reconsider?  Go ahead.

10             MR. GARCIA SOLA:  Just one thing, Your Honor.  One of

11   the -- one of the factual matters that we were hoping to get,

12   which I believe was something that the FOMB should have had

13   knowledge of, or be able to get the information, is where the

14   revenues went, Your Honor.  Either the Act 30 or 31 revenues,

15   or other revenues belonging to the -- to the HTA.  We were not

16   able to get any of that information.  The witness clearly

17   didn't know that information.  He simply kept referring to the

18   revenue letter.

19             And I understand that, Your Honor, but there are many

20   sources of revenues that go into the number that ultimately is

21   included in the revenue letter.  And we understand, Your

22   Honor, that we were entitled to get information and discovery

23   on where those revenues were going, not just that they were

24   included in some revenue letter that would then be part of one

25   side of the budget of the Government of Puerto Rico.

1          And by the way, Your Honor, I've been working with

2    the Government of Puerto Rico for many years in the Fortuno

3    administration years, where there was already a little bit of

4    a crisis, or at least the front runner of the crisis,

5    financial crisis.  I worked with the government in its own

6    fiscal board at the time.  So I know how a Government of

7    Puerto Rico budget is prepared.  I do not have to be, you

8    know, taught or told how it is prepared.

9          There are some issues that are somewhat different,

10   because there's now a fiscal board.  But the revenues, the

11   revenues are the revenues.  And yes, there's a revenue letter,

12   and the Puerto Rico legislature takes that revenue letter to

13   prepare its budget.  But underlying that revenue letter,

14   there's a whole host of sources of revenue, including the Act

15   30-31 incremental revenues or the Act 30-31 revenues that we

16   understand we had a right to at least trace.

17         We were able to trace some of those, Your Honor, for

18   a particular period, thanks in part to the work that was done

19   by one of our experts, a forensic accountant, but we're still

20   mostly in the dark, Your Honor, as to where the totality of

21   those funds went to in an exercise of the clawback.  The

22   clawback doesn't just say, you need to pay GO debt.  It says

23   other things, and then it takes -- it takes the reader to the

24   OMB enabling statute, which then has the waterfall.

25         We couldn't get any of that, Your Honor, which I

1    think was fair game in trying to get information on the

2    clawback and how it was implemented.  So if anything, Your

3    Honor, and I -- as I said, you know, I respect the court

4    system too much, and I respect you a lot, just as I do respect

5    my colleagues from Proskauer, you know.  We feel that,

6    unfortunately, we were not able to get the testimony that we

7    should have been able to get had we gone along with the

8    deposition of the FOMB, and, instead, were sidetracked to EY.

9         And if anything, Your Honor, I'm asking you to at

10   least consider that aspect of our request, and let us inquire

11   further as to the sources of revenue and where those revenues

12   went.

13        THE COURT:  I'm just surprised.  I would think that

14   your expert would have had access to all the financial

15   information.  Is that not right?  I mean, it seemed to me that

16   Ms. Martinez was able to trace certain funds, and I know that

17   the document depository has backup financial information.

18        MR. GARCIA SOLA:  I will ask my colleague, Nayuan

19   Zouairabani, to answer that question, Your Honor.

20        MR. ZOUAIRABANI TRINIDAD:  Yes.  For the record,

21   Nayuan Zouairabani again for AmeriNat.

22        So our expert, Lizette Martinez, had access to

23   documents that were a part of the revenue bond adversary, and

24   the lift stay, the analogous lift stay proceedings.  And the

25   revenues that she and her team were tracing were aimed

1   directly, specifically as to some clawback funds from HTA.  So

2   not all of the revenue sources, and specifically, the Act

3   30-31 incremental revenues.

4        So even though she had access to that information,

5   she did not have access to all of the information, just as a

6   matter of background.  Some of the issues -- some of the

7   depositions that we were going to take had to do with AAFAF

8   with regard to the flow of funds.  Specifically, the witness

9   in the previous proceedings had been Mr. Timothy Ahlberg, and

10  we were in discussions with regard to how to manage that

11  situation.

12       So going back to the whole question, now, HTA is just

13  one bucket of the clawback funds under the Puerto Rico

14  Constitution.  There's other buckets of clawback funds.  You

15  have CCDA, you have PRIFA, and the list goes on.  So in order

16  to make an assessment as to whether the clawback was

17  implemented according to the Puerto Rico Constitution, the

18  undertaking would have required far more revenue sources than

19  putting information that we had available.  And the reason we

20  had it available was because it was part of the prior

21  proceedings.

22       Bear in mind, Your Honor, the DRA, not up until we

23  got close to confirmation, did not have an opportunity to do

24  discovery at those prior proceedings.  We had limited

25  participation, just to receive the information that was being

1    remitted.

2         So with that in mind, Your Honor, we were working

3    with the information that we had, but we did not have all of

4    the information necessary, specifically as it relates to the

5    exercise, total -- in terms of whether the clawback would be

6    illegally activated, and whether the funds were distributed

7    pursuant to the clawback.

8         MR. GARCIA SOLA:  So the short answer, Your Honor, is

9    no, we did not have -- we did not have all the information

10   that should have been available.  It was not all provided.

11        MS. DALE:  Your Honor, it's Margaret Dale again.

12   We're far afield from where we were, but the witness testified

13   about revenue.  He testified about the con -- I think it's

14   called conditionally allocable revenues, which are these

15   clawback funds, page 164 and 165.  This was part of what I was

16   reading from before.

17        He says, I'm -- the question at line 20 is, I asked

18   what your understanding was of the clawback, referred to the

19   conditionally allocable funds.

20        Answer: So my understanding is it refers to those

21   revenues in the fiscal plan, those particular revenue streams.

22        And then there's another question.  Are -- and are

23   some of those revenue based on the discussion we had before

24   related to some of the taxes that were in Act 30 and 31, like

25   cigarette tax, petroleum tax, gasoline tax, and the rest?

1    And answer:  The revenues under Act 30 and 31 I do

2  believe are included as conditionally allocable revenues in

3  the fiscal plan, yes.

4    Question:  So to the extent -- they would have been

5  clawback funds, correct?

6    Answer:  Yes.  I believe those fall into the category

7  of clawback funds.

8    We take a break.  We come back.  And then the

9  questions go on.  I'm sorry.  I just lost my reference.  Hold

10 on one moment.  At one point -- here, it's on page 169.

11 Mr. Chepenik at line 5 is answering the question.

12    The question, I'll read it.  I'm sorry I'm taking up

13 so much time.  So would that include -- you don't know whether

14 any of the clawback funds would have been transferred back to

15 HTA?

16    And the answer is:  I'm not aware of any instance of

17 clawback funds being used for any purpose other than one

18 special resolution in 2019.  Again, I think I explained this

19 earlier.  It sort of mischaracterizes the process, the

20 budgeting process.  The revenue envelope is set from revenues

21 drawn from the fiscal plan.  It doesn't distinguish in this

22 budget year, for instance, that revenue letter does not

23 diversify what funds are being used.  It's a pool of cash, a

24 pool of revenue that can be used to fund expenditures.

25    He testified about these issues, Your Honor.

1          THE COURT:  And it seems to me that what you're

2   asking for is a further refinement of perhaps the amount of

3   your claim, not necessarily the merits of what you're entitled

4   to, so I -- you have enough information, it seems to me, to

5   have -- to put forth your legal arguments.  And I believe that

6   this witness answered the factual questions that were asked.

7   I think it went a little south somewhere to become his

8   personal involvement and not the Ernst & Young involvement,

9   but I don't see that it's significant.

10         So I have reconsidered.  I thank you, but I'm not

11  changing my mind.  And if at some point at the claims stage,

12  if you find that you're missing some facts, it seems that at

13  that point you can renew a request for some specific factual

14  information.  But I don't think that it's -- you haven't

15  convinced me that it's worth reopening discovery at this

16  point.  And I find that you have sufficient information to put

17  forth all of your -- the claims that are at issue.

18         And your experts have provided their reports, and I

19  don't see actually -- it's not like a factual dispute over the

20  experts either.  It's sort of the consequences of -- I don't

21  see this as a battle -- I don't see a head-on-head battle of

22  experts here.  I think we have a more fundamental question as

23  to the legal significance of things that happened.  And so I

24  have re-thought it, but you're stuck with my answer.

25         And I just briefly -- on the break, on the attorney

1   -- my position is, and just so you know, I don't ban all

2   conversations during breaks.  I don't see anything here that

3   indicates in any way that there was leading of the witness.

4   That I am thoroughly opposed to.  But I have reviewed the --

5   as I said, I've reviewed the whole transcript.  It did not

6   look like any of the breaks were related to difficult topics,

7   pending questions, or otherwise inappropriate times to take a

8   break.

9        So I'm not finding any further need for an

10  explanation of what took place during those times.  I do

11  appreciate all of your work.  I think I don't have anything

12  else to say, other than court's in recess.

13        MS. DALE:  Your Honor --

14        THE COURT:  Can I say that?  Court's in recess.

15        MS. DALE:  Thank you.

16        MR. GARCIA SOLA:  Thank you, Your Honor.   Thank you

17  very much for listening.

18        THE COURT:  Thank you.

19                    *     *     *

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 47 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States Magistrate Judge Judith Gail Dein on October 28, 2021.

 8

 9

10

11   S/ Amy Walker

12   Amy Walker, CSR 3799

13

14

15

16

17

18

19

20

21

22

23

24

25
```