ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| SUCESIÓN SALVADOR EDUARDO MANDRY DONES Y OTROS<br><br>Apelados<br><br>v.<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO Y OTROS<br><br>Apelantes | KLAN201901253 | APELACION procedente del Tribunal de Primera Instancia, Sala Ponce<br><br>Civil Núm.:<br>J AC2008-0853<br><br>Sobre:<br>Expropiación a la Inversa |

Panel integrado por su presidenta, la Jueza Gloria L. Lebrón Nieves, el Juez Misael Ramos Torres y la Jueza Reyes Berríos.[1]

Reyes Berríos, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 14 de septiembre de 2021.

Comparece ante nos el Estado Libre Asociado de Puerto Rico, por conducto de la Oficina del Procurador General, ("ELA" o apelante), y solicita que revoquemos una *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce, (TPI, Foro Primario o Foro *a quo*), el 6 de agosto de 2019, registrada y notificada el 23 de diciembre de 2019.[2] Mediante el referido dictamen, el TPI declaró con lugar una demanda sobre expropiación forzosa a la inversa incoada por los herederos que componen la Sucesión Salvador Mandry Nones ("Sucesión Mandry", demandantes o apelados). En consecuencia, el Foro Primario condenó al ELA al pago de $30,496,000.00 por

---

[1] Mediante Orden Administrativa Núm. TA-2021-002 se designó al Hon. Misael Ramos Torres en sustitución de la Hon. Aida Nieves Figueroa. Además, se redujo el panel a tres integrantes, ya que la Hon. Ivelisse M. Domínguez Irizarry no participa en los procesos.

[2] Aclaramos que la *Sentencia* apelada fue notificada en diciembre de 2019 ya que, al levantarse la paralización automática previamente decretada, si bien la Corte Federal de Quiebras autorizó la continuación de los procedimientos hasta la adjudicación final del caso de autos, excluyó del "*Lift of Stay Notice*" el registro de la sentencia que en su día recayera, así como todo procedimiento de ejecución de sentencia y la obtención de remedios provisionales. Véase, Anejos LXI-LXIV, págs. 1443-1561.

concepto de justa compensación e intereses sobre dicha cuantía desde la fecha de la incautación hasta su pago total, más costas.

Contando con el beneficio de la comparecencia de las partes y la *Transcripción de la Prueba Oral*, de conformidad con el Derecho aplicable, resolvemos las controversias ante nuestra consideración.

## I.

El caso de epígrafe encuentra su génesis en la aprobación de la Ley Núm. 227 de 9 de agosto de 2008 ("Ley Núm. 227"), cuyo propósito fue designar el área natural Punta Cucharas del Municipio de Ponce como área de Reserva Natural del Estado Libre Asociado de Puerto Rico, para ser administrada bajo las disposiciones de la Ley Núm. 150 de 4 de agosto de 1988, conocida como "Ley del Programa de Patrimonio Natural de Puerto Rico". En virtud de la Ley Núm. 227, cientos de cuerdas de terreno, ubicadas en el Municipio de Ponce, pasaron a formar parte de una reserva natural creada mediante legislación, con el fin específico de ser administradas por el Departamento de Recursos Naturales y Ambientales ("DRNA") de conformidad con la Ley Núm. 150[3].

La referida Ley Núm. 150, le concedió al DRNA un mecanismo para permitir y facilitar "la adquisición de áreas de alto valor natural para protegerlas y conservarlas para el uso y disfrute de ésta y futuras generaciones de puertorriqueños".[4] Entre los objetivos de dicho estatuto, se encuentra el "fomentar y fortalecer las organizaciones no gubernamentales en el país para que éstas puedan continuar compartiendo con el Gobierno la carga y la responsabilidad de la conservación de nuestros recursos".[5] Cónsonamente, la Ley Núm. 150 dispuso que "[l]a adquisición de los terrenos a través del

---

[3] *Supra.*
[4] Exposición de Motivos, Ley Núm. 150-1988.
[5] *Id.*

Programa de Patrimonio Natural de Puerto Rico se llevará a cabo utilizando estrategias variadas e innovadoras en estrecha coordinación entre el Gobierno del Estado Libre Asociado, el Gobierno Federal y organizaciones privadas locales y del exterior".[6] Ello, reconociendo que la conservación de los recursos naturales de Puerto Rico no puede lograrse si el Gobierno actúa solo, sino que es responsabilidad de todos.[7] Contando con el trasfondo legislativo esbozado, procederemos a relatar los hechos atinentes a las controversias que nos ocupan.

El 24 de octubre de 2008, el Sr. Salvador Mandry Nones y varios miembros de su familia[8] presentaron una demanda sobre expropiación forzosa a la inversa contra el ELA y el Sr. Javier Enrique Mandry Mercado[9] (Sr. Mandry Mercado) reclamando la justa compensación por el valor de ciertas fincas de su propiedad. En síntesis, los apelados alegaron ser dueños en pleno dominio de dos (2) inmuebles sitos en el Barrio Canas del Municipio de Ponce, los cuales describieron de la siguiente manera:

> PARCELA MT-3 - RÚSTICA: Radicada en el Barrio Canas del término municipal de Ponce con cabida de ochocientas una cuerda cuarenta y seis céntimos, equivalente a trescientas quince hectáreas, cero áreas, cincuenta y ocho centiáreas y trescientas ochenta y cuatro miliáreas, cabida ésta que resulta una vez descontadas cinco punto cuatro (5.04) cuerdas para el polígono de tiro de la Policía de Puerto Rico, y que está formada de las siguientes porciones:
> PORCIÓN A RÚSTICA: Radicada en el Barrio Canas del término municipal de Ponce, compuesta de ciento noventa y dos cuerdas cincuenta y un céntimo, equivalentes a setenta y cinco hectáreas, sesenta y seis áreas, cuarenta y una centiárea y trescientas cuatro miliáreas, de terrenos llanos, identificados en el plano de

---

[6] *Íd.*
[7] *Íd.*
[8] El demandante Salvador Mandry Nones, falleció el 1 de febrero de 2011 y fue sustituido por sus cinco hijos Salvador Rafael, Eduardo José, Margarita Rosa y Adrián Roberto, y Javier de apellidos Mandry Mercado, quienes ya eran partes en el pleito, así como por su viuda Rosa Estela Mercado Guzmán, quien se sometió voluntariamente a la jurisdicción del foro primario.
[9] Surge de la demanda que, el Sr. Mandry Mercado no se unió como codemandante en la acción de epígrafe, a pesar de tener una participación de 13.100% en las fincas en cuestión. Por motivo de ello, al ser parte indispensable, fue traído al pleito como codemandado. Véase, Anejo I, pág. 4 del Apéndice de la Apelación.

segregación como Porción MT3-Llana, colindando por el Norte, con terrenos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, Oficina Regional, en una alineación de doscientos ocho punto seis (208.06) metros, con terrenos del Gobierno Municipal de Ponce en dos alineaciones que totalizan cuatrocientos cincuenta y tres punto tres (454.03) metros y con la carretera estatal número Dos en seis alineaciones que totalizan seiscientos veintiséis punto noventa y ocho (626.98) metros; por el Este, con la Porción MT-2 Llana en una alineación de ochocientos treinta y seis punto cero nueve (836.09) metros; por el Sur, con el Mar Caribe en seis alineaciones que totalizan ochocientos sesenta punto cuarenta y siete (860.47) metros y por el Oeste, con la porción MT-4 Llana en una alineación de setecientos veinte punto cuarenta y un (720.41).

Consta inscrita al folio 293, del tomo 635 de Ponce II, finca 1,908, inscripción 1 era.[10]

RÚSTICA: Parcela TM-2 radicada en el Barrio Canas del término Municipal de Ponce, Puerto Rico, compuesta de TRECE PUNTO OCHENTA Y NUEVE CUERDAS equivalentes a CINCUENTA Y CUATRO MIL QUINIENTOS NOVENTA Y TRES PUNTO MIL DOSCIENTOS SETENTA Y SIETE METROS CUADRADOS; en lindes por el Norte, en 65.292 metros con Carretera Estatal Núm. 2; por el Sur, en 64.554 metros y .430 metros con el Mar Caribe; por el Este, en 86.087 metros con terrenos propiedad de Sucesión Mandry Mercado y por el Oeste, en 845.48 1 metros con terrenos de la finca de la cual se segrega.

Consta inscrita al folio 8, del tomo 696 de Ponce II, finca 4, 751, inscripción 1 era.[11]

Los apelados manifestaron, en cuanto a su origen, que las fincas arriba descritas habían sido segregadas de una finca de mayor cabida conocida como "La Matilde", como resultado de la partición de los bienes pertenecientes a la extinta sociedad agrícola "Mario Mercado e Hijos".[12] Señalaron que dichos inmuebles estaban ubicados en una zona que, a partir de diciembre de 2003, se incluyó en un plan especial de desarrollo bajo el Reglamento de Ordenación Territorial del Municipio de Ponce designado como "PL.E. 2 La Matilde". Alegaron que los objetivos de desarrollo de ese plan especial

---

[10] Los apelantes alegaron que la cabida de dicho inmueble disminuyó en 8.4201 cuerdas mediante una expropiación efectuada por la Autoridad de Carreteras de Puerto Rico en el caso civil núm. K EF2007-0320. *Íd.*, a la pág. 5.

[11] Asimismo, los apelantes adujeron que la cabida del referido inmueble disminuyó en 0.9567 cuerdas mediante una expropiación efectuada por la Autoridad de Carreteras de Puerto Rico en el caso civil núm. K EF2007-0321. *Íd.*, a la pág. 6.

[12] *Íd.*

eran "maximizar el potencial del área para proyectos de carácter residencial y turístico, de preferencia orientados al Mar Caribe y comercial, de preferencia a lo largo del futuro expreso PR-2 a la vez que establecer una zona de protección de humedales".[13]

Argumentaron que, allá para el 2005, el Sr. Salvador Mandry Nones había presentado ante el Municipio de Ponce la propuesta "Mandry Sea Side Estate", un proyecto de desarrollo preliminar turístico comercial, consistente de 814 unidades de vivienda, un "condohotel" de 256 unidades y un área comercial de 258,480 pies cuadrados, entre otros. Indicaron que, posteriormente, la Asamblea Legislativa aprobó la Ley Núm. 227 antes mencionada y designó el área concernida como Reserva Natural del Estado a ser administrada por el DRNA bajo las disposiciones de la Ley Núm. 150[14]. Es decir, sostuvieron que, como resultado de la acción legislativa, las fincas de su propiedad previamente descritas habían pasado a formar parte de la Reserva Natural aludida, establecida por la Ley Núm. 227.[15]

Por tanto, adujeron que tal actuación del ELA, de incluir las fincas en el área de Reserva Natural Punta Cucharas, había privado "a los demandantes de toda posible utilización de sus propiedades y [constituía] una incautación de su derecho real de propiedad imponiendo restricciones a la propiedad mediante leyes y reglamentos, sin que el Estado [hubiese] presentado previamente una acción de expropiación [y] consignado una justa compensación".[16] También arguyeron que, como paso previo a la inclusión de las fincas de los demandantes dentro del área de Reserva Natural, en el 2007 el DRNA había realizado un deslinde "arbitrario e ilegal" de la Zona Marítimo Terrestre ("ZMT") y, como consecuencia, gran parte de una

---

[13] *Id.*
[14] *Supra.*
[15] Anejo 1, Apéndice de la Apelación, pág. 7.
[16] *Id.*, a la pág. 8, párrafo 15.

de las fincas quedó dentro de la ZMT.[17] Esto, como subterfugio, ya que el DRNA contemplaba la futura adquisición de las fincas, con el fin de convertir dichas tierras en bienes de dominio público para reducir la compensación a la que tendrían derecho los demandantes propietarios en su día. De conformidad con lo aseverado, solicitaron al TPI que condenara al ELA a pagarles la suma de $44,924,475.00, en concepto de justa compensación por el valor de los terrenos de su propiedad incluidos en el área de la Reserva Natural Punta Cucharas.[18]

En respuesta, el 11 de diciembre de 2008 el Sr. Mandry Mercado compareció, por primera vez, por conducto del Lcdo. Manuel Purcell Requena, sometiendo su contestación a la demanda. Posteriormente, el Sr. Mandry Mercado pretendió retirar la referida contestación a la demanda suscrita por el Lcdo. Purcell Requena y sustituirla por una contestación a demanda enmendada suscrita por derecho propio. El TPI no autorizó la presentación de la contestación enmendada y ordenó al codemandado a contratar representación legal. Tras el reiterado incumplimiento del Sr. Mandry Mercado con lo ordenado, el TPI no acogió su contestación a demanda y se le anotó la rebeldía.[19]

Por su parte, el 25 de marzo de 2009, el ELA presentó una moción de desestimación, ya que los demandantes no contaban con una causa de acción que justificara la concesión de un remedio.[20] En apretada síntesis, el apelante expuso que de la faz de una acción de

---

[17] *Íd.*
[18] *Íd.*
[19] Específicamente, el 28 de mayo de 2010 el TPI no autorizó al señor Javier Mandry Mercado a comparecer por derecho propio, por lo que le ordenó que contratara representación legal. Ante el reiterado incumplimiento de Javier Mandry con las órdenes del foro de instancia, el 17 de noviembre de 2010, se dictó una orden eliminando su alegación y le anotó la rebeldía. Pese a ello, el Sr. Mandry Mercado prosiguió presentando escritos por derecho propio, lo que provocó que el Foro *a quo* el 5 de diciembre de 2017, le apercibiera que una nueva violación se podría entender como "un desacato al Tribunal y podría acarrear severas sanciones." Anejo LIV, págs. 1306-1335, 1309 del Apéndice de la Apelación.
[20] *Íd.*, Anejo II, págs. 12-31.

expropiación a la inversa instada por razón de una alegada incautación reglamentaria debía surgir que la parte demandante había agotado todo el trámite administrativo previo a la presentación de una acción judicial. En cuanto al alegado deslinde ilegal realizado por el DRNA, el ELA argumentó que el proceso de deslinde de la ZMT no constituía un intento de establecer titularidad, sino meramente la extensión real y física de un bien marítimo terrestre tierra adentro.

Es decir, alegó que el deslinde llevado a cabo por la agencia se circunscribía a constatar una realidad física, que requiere la intervención de un profesional certificado en agrimensura, para realizar la labor técnica de comprobar sobre el terreno las características físicas de los bienes identificados como marítimo terrestre. Por motivo de esto, aseveró que si los demandantes pretendían impugnar el deslinde de la ZMT efectuado sobre los terrenos en controversia, ciertamente, el foro correspondiente para ello lo era el DRNA y no el foro judicial.[21]

De otro lado, el ELA sostuvo que, según la Ley de Expropiación Forzosa[22] y la jurisprudencia interpretativa relacionada a la incautación reglamentaria, el Estado podía afectar cualesquiera terrenos de propiedad privada, por un término de 8 años, reservándolos para un fin o uso público. De manera que, conforme a lo anterior, planteó que los terrenos objeto de la demanda podían ser reservados por el Estado por un periodo no mayor de 8 años a partir

---

[21] Resulta menester señalar que luego de varios incidentes procesales, el 7 de agosto de 2013 el ELA y los apelados presentaron el "Informe de la Conferencia Preliminar entre Abogados". En lo pertinente, allí estipularon que no había controversia en cuanto que el ELA no tiene intención de reivindicar parte alguna de las fincas de la demandante descritas en el expositivo 2 de la demanda por estar dentro de los límites de un deslinde de ZMT. Al respecto, los apelados expresaron en la parte de las reclamaciones o defensas renunciadas lo siguiente; "[d]ebido a que el ELA estipuló que no reclama que ninguna porción de las fincas descritas en la demanda sea de dominio público por formar parte de la zona marítimo terrestre, **se desiste de la reclamación relativa a la nulidad del deslinde efectuado por el DRNA en el 2007**". (Énfasis provisto). *Íd.*, Anejo VIII, pág. 222.

[22] Ley de 12 de marzo de 1903, según enmendada, conocida como "Ley General de Expropiación Forzosa", 32 LPRA sec. 2901 *et seq.*

de la afectación. Por consiguiente, arguyó que al presentarse la demanda no habían transcurrido 8 años desde la aprobación de la Ley Núm. 227, por lo que los demandantes estaban impedidos de solicitar la expropiación de los terrenos en cuestión hasta que transcurriera el mencionado término.

Los demandantes se opusieron a dicha moción de desestimación y, a su vez, solicitaron al TPI que dictara una sentencia sumaria parcial a su favor.[23] El 18 de mayo de 2009, el foro *a quo* celebró la conferencia inicial y, entre otras cosas, denegó la moción de desestimación presentada por el ELA y le ordenó a dicha parte a presentar su oposición a la moción de sentencia sumaria parcial instada por los demandantes.[24] En cumplimiento, el 21 de julio de 2009 el ELA presentó su "Contestación a Demanda", así como la correspondiente "Moción en Oposición a Solicitud de Sentencia Sumaria".[25]

El 20 de noviembre de 2009, el TPI dictó una *Resolución*[26] mediante la cual declaró No Ha Lugar la solicitud de sentencia sumaria parcial presentada por los demandantes. En lo pertinente, el Foro Primario emitió las siguientes determinaciones de hechos incontrovertidos:

> 1) La Ley Núm. 227 fue aprobada por la Asamblea Legislativa de Puerto Rico el 9 de agosto de 2008 y entró en vigor después de su aprobación.
>
> 2) La Ley Núm. 227 designó el Área Natural Punta Cucharas del Municipio de Ponce como Área de Reserva Natural del Estado Libre Asociado de Puerto Rico para ser administrada bajo las disposiciones de la Ley Núm. 150 de 4 de agosto de 1988 (conocida como Ley del Programa de Patrimonio Natural de Puerto Rico).
>
> 3) Los demandantes son titulares de las fincas junto con el codemandado Javier Mandry Mercado.

---

[23] *Íd.*, Anejo III, págs. 32-52.
[24] Íd., Anejo IV, págs. 53-54.
[25] Íd., Anejo V, págs. 55-81 y Anejo VII, págs. 91-94.
[26] *Íd.*, Anejo VI, págs. 82-90.

4) El título de propiedad de los demandantes y del codemandado Javier Mandry Mercado consta inscrito en el Registro.

5) El Departamento de Recursos Naturales y Ambientales preparó un "Informe sobre Valor Natural Área Punta Cucharas" en junio de 2004.

6) Dicho informe recomendó la designación del área como reserva natural y sirvió de base a la aprobación de la Ley Núm. 227.

7) El Secretario del DRNA envió una carta al codemandante Salvador Mandry Nones notificándole que los días 19 de julio y 31 de agosto de 2005, personal técnico de la División de Agrimensura y de la Secretaría Auxiliar de Planificación visitaron el área de la Finca Matilde con el propósito de iniciar los trabajos de deslinde del Límite de la Zona Marítimo Terrestre en terrenos conocidos corno Finca Matilde en Ponce.[27]

8) Se levantó un plano titulado "Acquisition Plan for La Matilde Natural Reserve, Finca La Matilde, Ponce, Puerto Rico", a requerimiento del DRNA.

9) En dicho plano aparecen las fincas descritas en la demanda con los números 003 y 004.

1O) El área de la finca 003 en dicho plano y que se identifica como 003-01 tiene una cabida de 133.6696 cuerdas.

11) EL área de la finca 003 en dicho plano y que se identifica como 003-02 tiene una cabida de 49.8228 cuerdas.

12) El área de la finca 004 en dicho plano y que se identifica como 004-01 tiene una cabida de 7.8730 cuerdas.

13) El área de la finca 004 en dicho plano y que se identifica como 004-02 tiene una cabida de 4.0760 cuerdas.

14) La parte demandante no tenía que agotar remedios administrativos ya que fue el DRNA quien designó el área como una de reserva natural.[28]

Por el contrario, el TPI determinó que los siguientes asuntos estaban en controversia:

1) Si la legislación a que se alude en este caso tuvo o no el efecto de zonificar y si la misma privó o no a los demandantes de todo uso productivo y desarrollo de la

---

[27] Íd., Anejo III, a la pág. 50; Anejo VI, a la pág. 88; Anejo VIII, a la págs. 100 y 111.
[28] Íd., véase Anejo VI, Apéndice de la Apelación, págs. 87-88. Con relación a este inciso, el Estado en su *Moción de Desestimación* aclaró que desistió del planteamiento a los efectos que la parte demandante tenía que agotar los remedios administrativos para poder instar su demanda. Véase nota al calce 4, en el escrito de Apelación, pág. 4.

propiedad de los demandantes. Es decir, si el hecho de que una ley designe un área como reserva natural impide a los propietarios de esa área de todo uso productivo de su propiedad.

2) La legalidad o ilegalidad del deslinde realizado, si el DRNA cumplió con los requisitos legales y reglamentarios.

3) Si el Estado ha intentado reivindicar los terrenos de los demandantes por estar dentro de los límites de un deslinde de la Zona Marítimo Terrestre."[29]

Así las cosas, el Foro *a quo* determinó bifurcar los procedimientos, disponiendo que resolvería, en primera instancia, si la aprobación de la Ley Núm. 227[30], constituía una incautación de la propiedad de los demandantes, y luego, atendería lo relacionado a la justa compensación de proceder la misma.

El 11 de septiembre de 2013, los demandantes aquí apelados presentaron una segunda moción de sentencia sumaria parcial, en esa ocasión, únicamente en cuanto a su reclamación de que la inclusión de su propiedad en el área designada como Reserva Natural constituía una incautación por el Estado de propiedad privada para uso público sin mediar la debida compensación.[31] En respuesta, el 30 de octubre de 2013, el ELA presentó su oposición y solicitó que se dictara sentencia sumaria a su favor bajo el fundamento de que la mera aprobación del referido estatuto, aun reconociendo que tuvo el efecto de designar cierta área como reserva natural, de suyo, no constituía una incautación.[32]

El 27 de febrero de 2014, notificada el 5 de marzo del mismo año, el TPI emitió una *Sentencia Parcial* y determinó que la Ley Núm. 227 constituía una incautación legislativa o reglamentaria que privó

---

[29] *Íd.*, Anejo VI, pág. 88. Se aclara que en cuanto a la alegada ilegalidad del deslinde de la Zona Marítimo Terrestre los apelados desistieron de la reclamación concerniente a la nulidad del deslinde efectuado por el DRNA en el 2007. Véase nota al calce 5 del recurso de *Apelación Civil*, pág. 4 y Anejo VII, pág. 222 del Apéndice de la Apelación.
[30] *Supra*.
[31] *Íd.*, Anejo IX, págs. 227- 323.
[32] *Íd.*, Anejo X, págs. 324-731.

a los apelados de todo beneficio económico de su propiedad, expresando que solo restaba por adjudicarse lo concerniente a la justa compensación.[33] En desacuerdo, el 20 de marzo de 2014 el ELA presentó una moción de reconsideración, la cual fue debidamente denegada mediante *Resolución* de 23 de abril de 2014.[34] Ante tal denegatoria, el 30 de mayo de 2014 el ELA instó un recurso de *Certiorari* ante este Tribunal de Apelaciones, caso núm. KLCE201400713, solicitando la revisión y revocación de la referida *Sentencia Parcial* de 27 de febrero de 2014.[35]

Tras varios incidentes procesales a nivel apelativo, el 30 de junio de 2014, este Foro Apelativo emitió una *Resolución* en la cual denegó la expedición del auto de *certiorari* solicitado. Allí, un panel hermano de este Tribunal concluyó que, a la luz de los criterios dispuestos en la Regla 40 de nuestro Reglamento, no procedía la expedición del recurso discrecional interpuesto.[36] De dicha determinación el ELA recurrió en *Certiorari,* ante el Tribunal Supremo el 24 de septiembre de 2014, en el caso, *Sucesión Salvador Mandry Nones v. ELA,* CC-2014-0801. El Alto Foro denegó expedir el auto solicitado mediante *Resolución* de 5 de diciembre de 2014.[37]

---

[33] *Íd.*, Anejo XII, págs. 809-827.

[34] Los demandantes-apelados presentaron oposición a la moción de reconsideración el 9 de abril de 2014. Íd., ver Anejo XIII, págs. 828-846; Anejo XIV, págs. 847-855 y Anejo XV, págs. 856-858.

[35] En dicho recurso, el ELA señaló la comisión de los siguientes errores:

Erró el Tribunal de Primera Instancia al adjudicar sumariamente la procedencia de la demanda de expropiación a la inversa de epígrafe, concluyendo que la mera aprobación de la Ley 227 constituyó una incautación ("taking") reglamentaria o legislativa.

Erró el Tribunal de Primera Instancia al dictar sentencia a favor de los demandantes, aun cuando estos no establecieron la existencia de una determinación adjudicativa final emitida por las agencias concernidas que denegara a dicha parte todo uso productivo o razonable de su propiedad, conforme lo exige la jurisprudencia.

Erró el Tribunal de Primera Instancia al no desestimar la demanda sumariamente, a pesar de que el Estado, en su solicitud de sentencia sumaria de 30 de octubre de 2013, estableció como un hecho incontrovertido la inexistencia de una determinación adjudicativa final emitida por las agencias concernidas que denegara a la parte demandante todo uso productivo o razonable de su propiedad. Íd., véase Anejo XVII, págs. 898-908.

[36] *Ibid.*

[37] Anejo XXI, Apéndice de la Apelación, págs. 929-930.

KLAN201901253                                                         12

Así las cosas, luego de la emisión de los mandatos correspondientes, los procedimientos se continuaron ventilando ante el TPI, específicamente, lo relacionado a la adjudicación de la justa compensación. Tras varias incidencias procesales, el 11 de abril de 2017, el Estado presentó un escrito intitulado "Memorando de Derecho y Solicitud de Sentencia Sumaria"[38] y solicitó que se dispusiera sumariamente de las siguientes controversias inherentes a la adjudicación de la justa compensación correspondiente a los apelados:

> "1. Si el deslinde de la ZMT que realizó el DRNA entre los años 2006 y 2007 podía ser impugnado por los demandantes, a pesar de que no utilizaron la vía administrativa a tales efectos.
>
> 2) Si el referido deslinde es nulo.
>
> 3) Si para determinar el valor de la propiedad objeto de este pleito es necesario determinar la extensión de la ZMT, la servidumbre de salvamento y de vigilancia, de litoral, la extensión de la zona de humedales y mangle y la extensión de la zona clasificada (SREP.N) ya que son condiciones que afectan el uso de la propiedad, su mercadeabilidad, la cantidad de terreno que podrá ser desarrollado, la densidad del desarrollo que se permitirá, los costos de desarrollo y la viabilidad.
>
> 4) Si de acuerdo [con] tal determinación se afecta el uso a que puede dedicarse porción de la propiedad dentro de las áreas así delimitadas."[39]

Arguyó que, "los apelados intentaban ahora impugnar, dentro de este procedimiento, la validez del deslinde realizado entre los años 2006 a 2007 por el DRNA para justificar que se adjudicara el justo valor de la propiedad sin considerar que existe una amplia ZMT, que comprende más de 100 cuerdas, la que por su naturaleza, tiene restricciones de uso. Adujo que, la tasación realizada por el perito de los demandantes solamente había tomado en consideración 35 cuerdas de humedales que surgían de una determinación del Cuerpo de Ingenieros del Ejército de los Estados Unidos, la cual había perdido

---

[38] Anejo XXVIII, Apéndice de la Apelación, págs. 1014-1129.
[39] *Id.*

vigencia hacía varios años y, además, no necesariamente establecía la cabida total de humedales y de mangles contenidos en la parcela de controversia.[40]

A su vez, enfatizó, que tampoco se tomó en cuenta que el Plan de Ordenación Territorial del Municipio de Ponce clasificó una franja del terreno como Suelo Rústico Especialmente Protegido Natural (SREPN), lo que conllevaba restricciones de uso, que debían ser consideradas. Asimismo, argumentó que el hecho de que la propiedad ubicaba en una zona inundable dentro del "*Coastal Barrier Zone*", declarada así por las autoridades federales, debía ser considerado, puesto que las condiciones antes señaladas incidían sobre la determinación de justa compensación.[41] Por su parte, los apelados se opusieron oportunamente al referido escrito mediante una moción presentada el 24 de abril de 2017[42] y el ELA replicó mediante escrito presentado el 3 de mayo de 2017.[43]

El 28 mayo de 2017, el ELA presentó un "Aviso de Paralización de los Procedimientos por Virtud de la Presentación de la Petición presentada por el Gobierno de Puerto Rico bajo el Título III de PROMESA".[44] El 31 de mayo de 2017, los apelados se allanaron a la paralización de los procedimientos solicitada por el Estado. Por tanto, el 7 de junio de 2017, el TPI emitió una *Sentencia* de conformidad, paralizando los procedimientos del caso y ordenando su archivo administrativo.[45] Posteriormente, los apelados y el ELA presentaron una estipulación ante la Corte Federal de Quiebras, a los fines de que se levantara la paralización. Conforme a ella, la Corte Federal autorizó

---

[40] *Íd.*, véase, además, Escrito de Apelación, pág. 7
[41] *Íd.*
[42] Véase, Anejo XXIX, págs. 1130-1135 del Apéndice de la Apelación.
[43] *Íd.*, Anejo XXX, págs. 1136-1140.
[44] Anejo XXXI, págs. 1141-1143.
[45] Anejo XXXV, Apéndice de la Apelación, págs. 1154-1159.

la continuación de los procedimientos con la condición de que la sentencia que recayera en su día no fuera registrada.[46]

En consecuencia, se levantó la paralización y el juicio en su fondo se celebró los días 6-9 y 16-17 de agosto de 2018, 4 y 6 de septiembre de 2018 y 4, 6 y 30 de octubre de 2018.[47] Por la parte demandada-apelante testificaron:

- Sr. Vicente Quevedo Bonilla, Biólogo y Técnico del DRNA
- Sr. Gerardo Ramos, Agrimensor
- Sr. Esteban Núñez Camacho, Perito Tasador

Por la parte demandante-apelada declararon:

- Sr. Javier Bonnin Orozco, Arquitecto
- Dr. Máximo Cerame Vivas, Ecólogo marino
- Ingeniero Ismael Isern Suárez, Perito Tasador

Tras finalizar el testimonio del Ing. Isern Suárez, el ELA planteó que el informe preparado por dicho perito y presentado en evidencia por los demandantes-apelados no correspondía a la copia suministrada a la parte demandada. El asunto fue discutido en sala y los apelados admitieron que por error e inadvertencia, ofrecieron en evidencia una copia preliminar del informe del Ing. Isern Suárez, habiéndose admitido la copia equivocada. Ante esta situación, el TPI ordenó que el Ing. Isern Suárez regresara a la silla testifical para clarificar cuál de los informes proporcionados era el final que debía quedar sometido en evidencia.

De su parte, y como resultado de lo anterior, el ELA ofreció como evidencia el informe del Ing. Isern Suárez que este identificó como preliminar –a pesar de tener igual fecha de preparación y de emisión y cuyo contenido era igual, salvo en lo concerniente al valor de tasación–. Entiéndase que, la copia del informe erróneamente

---

[46] Anejo XXXVI, Apéndice de la Apelación, págs. 1160-1193.
[47] El 16 de octubre de 2018 se presentó una moción informando el fallecimiento de la demandante Estrella María Aparicio Vázquez, el 28 de agosto de 2018 y solicitando su sustitución por sus herederos, su hijo Oscar Adolfo Aparicio, a sus nietos María del Carmen y Selma Verónica, de apellidos Mandry Llombart, y Oscar Adolfo y Gustavo Alejandro, de apellidos Mandry Bonilla.

admitida y marcada como Exhibit de los apelados, tenía una valoración menor al valor reflejado en el documento suministrado al Estado. El Estado intentó sin éxito, someter en evidencia el referido informe identificado como el preliminar y erróneamente ofrecido por los demandantes y admitido por el TPI, como prueba de impugnación.[48]

Por motivo de ello, el ELA solicitó que el referido informe preliminar se marcara como evidencia ofrecida y no admitida al amparo de la Regla 104(b) de Evidencia, junto con los documentos relacionados al valor de las propiedades comparables y un documento intitulado "Informe sobre Gestiones Realizadas por la Oficina de Ordenación Territorial para la Protección y Mantenimiento del Sistema Natural de la Laguna Salinas", cuya prueba se había ofrecido con el fin de impugnar al perito de los apelados.[49]

Culminado el juicio, el 6 de agosto de 2019, el TPI emitió la *Sentencia* apelada y consignó las siguientes determinaciones de hechos:

> Las partes estipularon la veracidad de los siguientes hechos:
>
> 1. Las cabidas de las fincas objeto del presente caso al 9 de agosto de 2008 eran: Finca 1,908, 184.0899 cuerdas; finca 4,751 era de 12.9333 cuerdas. La cabida combinada de ambas era de 197.0232 cuerdas.
>
> 2. En junio de 2004 el DRNA emitió un informe titulado *Informe Sobre Valor Natural Área Natural Punta Cucharas* en el que se recomendó la designación del área como reserva natural.
>
> 3. Como parte de las gestiones realizadas por el DRNA encaminadas a lograr la designación del Área Natural Punta Cucharas el DRNA realizó un deslinde de la Zona Marítimo Terrestre (ZMT).
>
> 4. El 2 de febrero de 2007, el Agrimensor José A. Vilanova Portalatín, Director de la División de Agrimensura del DRNA recomendó y el Secretario del

---

[48] TPO 30 de octubre de 2018, líneas 12-17, pág. 20.
[49] Anejo LXVI, Apéndice de la Apelación, págs. 2142-2164.

DRNA aprobó un plano titulado *Land Acquisition Plans for "La Matilde" Property.*

5. En el plano del 2 de febrero de 2007 titulado *Land Acquisition Plans for "La Matilde" Property* aparece deslindada la ZMT en las dos fincas objeto del presente caso. El área que se incluyó como parte de la ZMT en la finca 1,908 se designó en el plano como Parcela 003-01 con una cabida de 134.0042 cuerdas. El área que se incluyó como parte de la ZMT en la finca 4,751 se designó en el plano como Parcela 004-01 con una cabida de 7.1214 cuerdas.

6. **El 21 de febrero de 2007 el Secretario del DRNA envió una carta al Sr. Salvador Mandry Nones notificándole "que los días 19 de julio y 31 de agosto de 2005, personal técnico de la División de Agrimensura y de la Secretaría Auxiliar de Planificación visitaron el área de la Finca Matilde con el propósito de iniciar los trabajos de deslinde del Límite de la Zona Marítimo Terrestre en terrenos.**(Énfasis nuestro).

7. El Estado Libre Asociado de Puerto Rico no tiene intención de reivindicar parte alguna de los terrenos de los demandantes por estar dentro de los límites de un deslinde de Zona Marítimo Terrestre.

8. Las fincas 1,908 y 4,751 están ubicadas en un área que fue incluida en un Plan Especial de Área en el Plan de Ordenación Territorial denominado "PL.E.2 LA MATILDE". El artículo 44.3 del R.O.T. establece que "El Plan Especial para el área de La Matilde pretende facilitar un desarrollo residencial, turístico, y comercial condicionado a la protección de recursos naturales como La Laguna Salinas y una zona de humedales al sur del área identificada y a la conversión de la PR.2 en expreso con la construcción de calles marginales.

9. También dispone dicho artículo 44.3 que los objetivos de desarrollo del plan son:

   - "Maximizar el potencial del área para proyectos de carácter residencial y turístico, de preferencia orientados al Mar Caribe y comercial, de preferencia a lo largo del futuro expreso de la PR-2.
   - Ordenar el desarrollo a lo largo de marginales a la PR-2 para evitar las conexiones directas a la misma.
   - Establecer una zona de protección de humedales y de la laguna Salinas."

10. La finca 1,908 y la finca 4,751 estaban dentro de dos Distritos de Ordenación: el EV.4, cuyos propósitos y usos permitidos aparecen en el Capítulo 16 del R.O.T. y el SREP.N, cuyos propósitos y usos permitidos aparecen en el Capítulo 35 del R.O.T.

11. Las partes estipulan que los peritos tasadores de ambas partes, Ing. Ismael Isern, por los demandantes y el Sr. Esteban Núñez Camacho, por la parte demandada, están debidamente cualificados para declarar sobre la valoración de las fincas objeto de este litigio.

**En virtud de la prueba admitida y creída por el Tribunal** (énfasis nuestro) durante la vista en su fondo quedaron probados adicionalmente los hechos que a continuación se relacionan:

12. Las descripciones registrales de las fincas de las que los demandantes, junto con el demandado Javier Mandry, eran dueños en pleno dominio y que fueron incluidas en la Reserva Natural Punta Cuchara, son:

PARCELA MT-3- RÚSTICA: Radicada en el Barrio Canas del término municipal de Ponce con cabida de ochocientas una cuerdas cuarenta y seis céntimos, equivalentes a trescientas quince hectáreas, cero áreas, cincuenta y ocho centiáreas y trescientas ochenta y cuatro miliáreas, cabida ésta que resulta una vez descontadas cinco punto cuatro (5.04) cuerdas para el polígono de tiro de la Policía de Puerto Rico, y que está formada de las siguientes porciones:

PORCIÓN A RÚSTICA: Radicada en el Barrio Canas del término municipal de Ponce, compuesta de CIENTO NOVENTA Y DOS cuerdas cincuenta y un céntimos, equivalentes a setenta y cinco hectáreas, sesenta y seis áreas, cuarenta y una centiáreas y trescientas cuatro miliáreas, de terrenos llanos, identificados en el plano de segregación como Porción MT3-Llana, colindando por el Norte, con terrenos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, Oficina Regional, en una alineación de doscientos ocho punto seis (208.06) metros, con terrenos del Gobierno Municipal de Ponce en dos alineaciones que totalizan cuatrocientos cincuenta y tres punto tres (454.03) metros y con la carretera estatal número Dos en seis alineaciones que totalizan seiscientos veintiséis punto noventa y ocho (626.98) metros; por el Este, con la Porción MT-2 Llana en una alineación de ochocientos treinta y seis punto cero nueve (836.09) metros; por el Sur, con el Mar Caribe en seis alineaciones que totalizan ochocientos sesenta punto cuarenta y siete (860.47) metros y por el Oeste, con la porción.MT-4 Llana en una alineación de setecientos veinte punto cuarenta y un (720.41) metros.

Consta inscrita al folio 293, del tomo 635 de Ponce II, finca 1,908, inscripción 1era.

RUSTICA: Parcela MT-2 radicada en el Barrio Canas del término Municipal de Ponce, Puerto

Rico, compuesta de TRECE PUNTO OCHENTA Y
NUEVE CUERDAS equivalentes a CINCUENTA Y
CUATRO MIL QUINIENTOS NOVENTA Y TRES
PUNTO MIL DOSCIENTOS SETENTA Y SIETE
METROS CUADRADOS; en lindes por el Norte, en
65.292 metros con Carretera Estatal Núm. 2; por
el Sur, en 64.554 metros y .430 metros con el Mar
Caribe; por el Este, en 836.087 metros con
terrenos propiedad de Sucesión Mandry Mercado
y por el Oeste, en 845.481 metros con terrenos de
la finca de la cual se segrega.

Consta inscrita al folio 8, del tomo 696 de Ponce
II, finca 4,751, inscripción 1era.

13. Las fincas antes descritas colindan entre sí y forman
un cuerpo continuo con las mismas características
físicas y topográficas. Ambos tasadores coincidieron
en que las fincas pueden considerarse como una
unidad a los efectos de valoración, aunque el tasador
del ELA valoró las dos fincas por separado. En
adelante se denominarán ambas fincas como "las
fincas sujeto".

14. Las fincas sujeto ubican al Sur de la carretera PR-2
(en adelante, "la PR-2") a la altura del Km. 222.8. La
PR-2 es una vía de gran flujo vehicular ya que es la
ruta de conexión entre Ponce y el Oeste de la isla. La
porción de la PR-2 donde se encuentran las fincas ya
había sido convertida en expreso para la fecha de
aprobación de la Ley 227. Las fincas tienen acceso a
la PR2 desde una de las marginales de esta carretera.

15. La topografía es prácticamente llana en su totalidad,
aunque alguna inclinación de Norte a Sur.

16. La mayor parte de las fincas se encuentra dentro de
la zona susceptible de inundación con una
clasificación "AE" y la parte más próxima al Mar
Caribe, un área de humedales y manglares, tiene
clasificación "VE". La Zona "AE" indica áreas en las
que se ha determinado elevación de la inundación
base.

17. **Conforme atestó el Arq. Javier Bonnin Orozco, el
Reglamento 13 de la Junta Planificación, sobre
áreas especiales de riesgo a inundación, establece
que clasificación "AE" no es un impedimento al
desarrollo de los terrenos, si no que dispone que
las construcciones en las áreas con clasificación
"AE" deben tener una elevación sobre el nivel de
inundación. Esto puede lograrse media el uso de
relleno, lo que es usual en los terrenos en Ponce.
Solo en el área próxima al Mar Caribe, que tiene
una clasificación "VE", quedaría limitado
desarrollo.** (Énfasis nuestro).

18. El Plan de Ordenación Territorial del Municipio
Autónomo de Ponce de 2003 establece dos
clasificaciones para los terrenos de las fincas sujeto.

La mayor parte de las fincas sujeto tiene una clasificación como suelo urbano que ubica en un distrito subyacente EV.4 con un distrito sobrepuesto, el (PL.E). El área de humedales próxima al Mar Caribe tiene una calificación de SREP.N.

19. El Distrito PL.E (Planes Especiales) se establece para facilitar, mediante guías de ordenamiento, el desarrollo o redesarrollo armónico de área que ameritan atención especial. Las condiciones para usos, actividades, intensidades y otros parámetros se establecen en los Distritos subyacentes identificados en los Planos de Ordenación y no en los planes especiales de los distritos sobrepuestos. Los usos y actividades preferenciales y el diseño de la infraestructura que se indican en los planes especiales son solamente a título ilustrativo y deben considerarse como guías para armonizar los desarrollos.

20. El plan especial aplicable a las fincas sujeto es el PLE.2 (La Matilde)[50]. El propósito de este plan especial es facilitar un desarrollo residencial, turístico y comercial, condicionado la protección de recursos naturales como la Laguna Salinas y una zona de humedales al sur del área identificada y la conversión de la PR-2 en expreso con la construcción de calles marginales. Los objetivos de desarrollo del plan incluyen el maximizar el potencial del área para proyectos de carácter residencial y turístico, de preferencia orientados al Mar Caribe y comercial, de preferencia a lo largo del futuro expreso de la PR-2. El plano que ilustra las guías de desarrollo del plan especial ubica el sujeto en un área para nuevos desarrollos de conformidad con el Distrito de Ordenación EV.4.

21. **El Distrito EV.4 se establece para fomentar el desarrollo residencial, comercial, de servicios y de industria liviana en sectores que permiten una amplia variedad de usos con alta intensidad**[51] (énfasis nuestro).

22. La porción de las fincas sujeto más cercana al Mar Caribe está en un Distrito de Ordenación SREP.N. **El Distrito SREP.N se establece para proteger o restaurar recursos naturales sensitivos, establecer nuevos bosques y áreas de amortiguamiento y permitir el desarrollo ecoturístico en sectores que lo ameriten. Este distrito aplicará también para proteger los ecosistemas que bordean los cuerpos de agua. No se permite segregar los terrenos identificados por el Distrito SREP.N, a menos que sea para separarlos de la finca original con propósito de reservarlos o dedicarlos para fines de**

---

[50] Reglamento de Ordenación, Sec. 44.3.
[51] Los tasadores de ambas partes coincidieron en que el Distrito de Ordenación EV.4 permite una gran variedad de usos de alta intensidad que tanto los usos comerciales como residenciales son usos permitidos ministerialmente.

**conservación**[52] (énfasis nuestro). El Distrito SREP.N permite la construcción de viviendas unifamiliares, museos, sitios históricos, campos recreativos y de vacaciones, parques públicos y jardines, bajo ciertas condiciones y restricciones del propio Reglamento de Ordenación del Plan Territorial de Ponce. Cualquier desarrollo debe cumplir con una intensidad de uso de 1 unidad de vivienda por cada solar legalmente segregado, una altura máxima de 2 plantas, las construcciones solo pueden ocurrir en terrenos con una pendiente menor de 25%, con patios laterales y posteriores mínimo de 20 metros entre otras restricciones[53].

23. Las fincas tenían disponibles todos los servicios de infraestructura necesarios para su desarrollo.

24. El vecindario donde ubica el Sujeto, es uno de amplio desarrollo urbano. En el área existían para el 2008, urbanizaciones residenciales, desarrollos industriales, hoteles, restaurantes, oficinas de los gobiernos estatal y municipal, el área recreativa del Balneario "El Tuque", restaurantes de comida rápida y, a minutos de las fincas sujeto, los centros comerciales de Ponce Towne Center, Ponce Mall, Sam's Club, Walgreens, y K-Mart. Según se aprecia de las fotografías aéreas presentadas en evidencia, al sur de la PR-2, no existen desarrollos residenciales.

25. Tomando en consideración los factores que surgen de la totalidad de la evidencia presentada por las partes respecto de la localización, accesos, exposición a la PR-2, topografía, usos predominantes en el vecindario, infraestructura disponible y las guías de desarrollo del plan especial que ubican las fincas sujeto en un área para nuevos desarrollos de conformidad con el Distrito de Ordenación EV.4, y la (sic) que la cabida total de ambas fincas es 197.023 cuerdas, el Tribunal determina que el mejor y más productivo uso sujeto debe establecerse por sectores.

26. **Este Tribunal acoge la opinión del perito tasador de los demandantes, el Ing. Isern, atendiendo el valor de ambas fincas sujeto como un todo y subdividirse en tres áreas o sectores**. (Énfasis nuestro).

27. La más próxima a la PR-2, con una cabida de 50 cuerdas, su mejor y más productivo uso o destino es para fines comerciales. Tal cabida tiene como base varios elementos: las disposiciones del Reglamento de Ordenación Territorial, entre las que se encuentra destinar el frente de carretera para un comercial, la topografía y cabida total de las fincas sujeto; su ubicación en el área oeste de Ponce, donde ha habido un extenso desarrollo comercial; su exposición visual

---

[52] Reglamento de Ordenación, Sec. 35.1.
[53] Reglamento de Ordenación, Sec. 35.2 a la 35.9.

a la Carretera PR-2; que el tamaño de los usos comerciales en el área sugiere una proporción de 3 de ancho a 2 de fondo para acomodar espacio de estacionamiento; que las condiciones económicas que demostraba el informe del Banco Popular de Puerto Rico para el período de 2006 al 2008, revelaban la viabilidad económica del uso comercial en un área de esa cabida.

28. **El área más cercana al Mar Caribe, donde ubican los manglares, con una cabida de 35.075 cuerdas, su mejor uso es para fines de conservación. El Ing. Isern determinó la cabida del área a la que asignó un mejor uso de conservación a base de un plano que presentó el Arq. Federico Montilla a la Oficina de Permisos del Municipio Autónomo de Ponce -en adelante, "la Oficina de Permisos"- en 2005 para un proyecto multiusos denominado Mandry Seaside Estates. Este plano, a su vez, descansa en una determinación jurisdiccional -en adelante la "JD" por las siglas en inglés de "Jurisditional (sic) Determination"- sobre humedales que se emitió para las fincas sujeto por el Cuerpo de Ingenieros del Ejército de Estados Unidos -en adelante, "el Cuerpo de Ingenieros"- el 1 de noviembre de 1995. Esa JD fue gestionada por el Dr. Máximo Cerame Vivas y estableció que los humedales a protegerse (Wetlands) cubrían un área de 35.075 cuerdas y los terrenos susceptibles de desarrollo (Upland), 171 .280 cuerdas. La vigencia de la JD era de 5 años.** (Énfasis nuestro).

29. Al someterse el proyecto "Mandry Seaside Estates" en 2005, **la Oficina de Permisos requirió la preparación de una JD actualizada.** El 5 de agosto de 2005, funcionarios de la Oficina de Permisos del Municipio Autónomo de Ponce que evaluaban el proyecto de "Mandry Seaside Estates" enviaron una carta al Sr. Salvador Mandry en la que **se le requirió una revisión de la delimitación de la zona marítimo terrestre que aparecía en los planos sometidos.** El 24 de octubre de 2005, el Cuerpo de Ingenieros le indicó al Arq. Montilla que la nueva JD se haría conforme al "1987 Wetland Delineation Manual", el mismo que se usó para la de 1995. La gestión para tramitar la actualización de la JD se le encomendó nuevamente al Dr. Cerame Vivas. (Énfasis nuestro).

30. El Dr. Cerame Vivas declaró que en el descargo de esa encomienda realizó varias visitas a las fincas caminándola, sobrevolándolas y fotografiándolas. **Aunque el proceso de gestión de la JD actualizada no se llegó a concluir, sus observaciones le llevaron a concluir que no hubo una variación significativa en el área de humedales durante los años transcurridos desde la JD de 1995.** El Dr. Cerame Vivas explicó que para emitir la JD el Cuerpo de Ingenieros negocia su jurisdicción y escoge el área que interesa proteger, lo que significa que es posible

que en el área de "Upland" puedan existir humedales que no se tengan que proteger. (Énfasis nuestro).

31. **El testimonio del Dr. Cerame Vivas mereció completo crédito al Tribunal, y permite la inferencia que para agosto de 2008 el área de humedales no desarrollable de las fincas sujeto tenía una cabida de 35.075 cuerdas.**[54] (Énfasis nuestro).

32. A la porción de las fincas sujeto que ubica entre el área a la que atribuyó un mejor uso comercial y el área a la que asignó un mejor uso para de conservación, con cabida de 111.948 cuerdas, su mejor y más productivo es para fines residenciales turísticos.

33. El Ing. Isern valoró el área de 50 cuerdas, (196,519.8300 m.c.) próxima a la carretera PR-2, a la que atribuyó un mejor uso comercial, en $20,600,000.00, con un precio unitario de $105.00 por metro cuadrado. Hizo la valoración utilizando el método de ventas comparables, para lo que usó cuatro ventas de propiedades ubicadas en Ponce, con la misma clasificación EV.4 y un mejor uso comercial. Los unitarios ajustados de las ventas comparables fueron de $115.00/m.c. para la número 1, $131.00/m.c. para la número 2, $161.00/m.c. para la número 3 y $105.00/m.c. para la número 4.

34. El tasador del Estado, Sr. Núñez, asignó un mejor uso mixto, comercial-residencial a los terrenos próximos a la PR-2. Valoró la Parcela 003-02, a la que atribuyó una cabida de 49.8228 cuerdas, (195,823,1866 m.c.) en $13,708,000, con un precio unitario de $70.00 por metro cuadrado[55]. Utilizó el método de ventas comparables, usando cuatro ventas, tres de las cuales estaban en distritos de ordenación EV-4 y una en un distrito EV-3. Los unitarios ajustados de las ventas comparables para valorar la Parcela 003-02 fueron de $73.00/m.c. para la número 1, $69.00/m.c. para la número 2, $72.00/m.c. para la número 3 y $67.00/m.c. para la número 4.

35. A los terrenos colindantes, la Parcela 004-02, con cabida 4.0760 cuerdas (16,020.3265 m.c.) los valoró en $2,243,000.00, con un precio unitario de $140.00 por metro cuadrado. Utilizó el método de ventas comparables con cuatro ventas, tres de las cuales estaban en distritos de ordenación EV-4 y una en un distrito EV-3.

36. La cabida de la Parcelas 003-02 que indica el plano de adquisición estipulado no es de 49.8228 cuerdas,

---

[54] Regla 110 (C) de las de Evidencia establece que para establecer un hecho no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.

[55] En el informe de valoración efectivo el 15 de noviembre de 2007 concluyó que el valor de esta parcela era $14,882,600.00 con un precio unitario de $76.00/m.c.

sino de 64.05061 cuerdas, equivalentes a 253,534.6697 m.c[56]. **La cabida de esta parcela utilizada por el Sr. Núñez surge de un plano que se le suministró, que difiere del plano estipulado.** Si se valora la Parcela 003-02 con la cabida de 253,534.6697 m.c. que aparece en el plano estipulado, utilizando el precio unitario de \$70/m.c. establecido por el Sr. Núñez, el valor de la misma ascendería a \$17,747,426.88. (Énfasis nuestro).

37. El área de 50 cuerdas a las que el Ing. Isern le atribuye un mejor uso comercial está dentro de la cabida combinada de 53.8998 cuerdas de las Parcelas 003-02 y 004-02 a las que el Sr, Núñez atribuye un mejor uso mixto comercial- residencial.

38. La opinión del Ing. Isern de que las 50 cuerdas más próximas a la PR-2 tienen un mejor y más productivo uso comercial, está sustentada en criterios de razonabilidad que surgen de su informe y de su testimonio **y no fueron refutados por el ELA**. Al comparar las opiniones de valor de ambos peritos sobre los terrenos próximos a la PR-2, concluimos que el valor estimado por el Ing. Isern para las 50 cuerdas a las que asigna un mejor uso comercial se justifica y es razonable. (Énfasis nuestro).

39. **El Sr. Núñez no hizo valoración de terrenos cuyo mejor uso fuera para fines residenciales. Ni de su informe ni de su testimonio sobre la Parcelas 003-02 y 004-02, próximas a la PR-2 a las que atribuyó un mejor uso mixto comercial residencial, se puede colegir una valoración para el mejor uso residencial. En sus informes sobre ambas parcelas, tres de las cuatro comparables que consideró para la valoración tienen mejor uso comercial y una, un uso mixto, residencial-comercial**. (Énfasis nuestro).

40. El Ing. Isern valoró el predio de 111.948 cuerdas, (440,000.0386 m.c.), al que atribuyó un mejor uso residencial en \$9,700,000, a base de un precio unitario de \$22.00 m.c. Para llegar a ese valor utilizó tres ventas comparables con valores ajustados de \$42.00, la número 6; \$38.00 la número 7 y \$17.00, la número 5.

41. El uso de las comparables 6 y 7 fue cuestionado por el Sr. Núñez quien testificó que tenían un mejor uso comercial. **En contrainterrogatorio reconoció, sin embargo, que la clasificación EV.2 de la venta número 6, solo permitía usos residenciales. La clasificación de la venta comparable número 7 es de EV.4 que también permite usos residenciales, pero aún si se descarta esta comparable, el precio unitario de \$22.00/m.c. para el uso residencial, sigue siendo razonable.** (Énfasis nuestro).

---

[56] Exhibit I por estipulación, hoja 4.

42. El Ing. Isern valoró las 35.070 cuerdas a las que atribuyó un mejor uso de conservación en $196,000.00 basado en un precio unitario de $5,600.00/cuerda. Utilizó el método de ventas comparables con tres ventas comparables. [Al] número 8 le dio un unitario ajustado de $1,900.00/cuerda; a la número 9 le dio un unitario ajustado de $5,600.00/cuerda y a la número 10 le dio un unitario ajustado de $3,200.00/cuerda.

43. **El tasador del Estado, Sr. Núñez, asignó un mejor uso de conservación a las parcelas 003-01 y 004-01, con cabidas de 134.2271 cuerdas y 8.8573 cuerdas, respectivamente.** Valoró la Parcela 003-01, en $537,000.00, con un precio unitario de $4,000.00 por cuerda. Utilizó el método de ventas comparables con cinco ventas comparables. Los unitarios ajustados de las ventas comparables para valorar la Parcela 003-01 fueron de $3,132.95/cuerda para la número 1, $3,250.00/cuerda para la número 2, $5,111.10/cuerda para la número 3; $5,268.92/cuerda para la número 4 y $3,632.85/cuerda para la número 5. El análisis de ajustes en **la página 83 del Informe de la Parcela 003-01[57], hace evidente que calificó como "superiores" las fincas de unitarios más altos por su errónea interpretación respecto del efecto de la inclusión en la zona marítimo terrestre en los usos permitidos en las fincas sujeto. Este error de análisis nos lleva a concluir que el unitario asignado por el Sr. Núñez para los terrenos de mejor uso para conservación es muy bajo y debe descartarse.** (Énfasis nuestro).[58]

A base de las determinaciones antes transcritas, el Foro Primario declaró "Ha Lugar" la demanda de autos y condenó al ELA a pagarle a la parte demandante una suma ascendente a $30,496,000.00 en concepto de "justa compensación", tras otorgarle entero crédito al informe de valoración presentado por el perito tasador de los apelados.

Por otra parte, de conformidad con lo previamente ordenado por la Jueza de la Corte Federal de Quiebras, Hon. Laura Taylor Swain, en su "Memorandum Order" de 7 de julio de 2017, el TPI no ordenó el registro de la sentencia apelada e hizo constar que dicho

---

[57] El Sr. Núñez no hizo informe detallado para la parcela 004-01, limitándose a indicar que utilizaría el valor asignado a la Parcela 003-01.
[58] Anejo LIV, págs. 1312-1322.

dictamen no podría ejecutarse, ni obtenerse remedios provisionales para su ejecución, sin la debida autorización de la Corte Federal de Distrito en el caso de *In re-Commonwealth of Puerto Rico*, Civil No. 17 BK-03283 -LTS. No obstante, a pesar de que el foro *a quo* no ordenó el registro de la *Sentencia*, el volante de notificación emitido por la Secretaría del TPI hizo constar que se había efectuado el correspondiente registro y archivo en autos de la misma.[59] Este acto provocó varios trámites procesales tanto a nivel del Foro Primario como a nivel de la Corte Federal de Quiebras.

En el ínterin, como resultado de lo indicado en el volante de notificación, el 23 de agosto de 2019 y dentro del plazo dispuesto por la Regla 47 de las de Procedimiento Civil, el ELA presentó una moción de reconsideración.[60] En respuesta, el 4 de septiembre de 2019, los demandantes presentaron su *Oposición a Solicitud de Reconsideración*.[61] Atendidos ambos escritos, el 6 de septiembre de 2019, el foro *a quo* notificó una *Resolución* declarando "No Ha Lugar" la moción de reconsideración sometida por el ELA.[62]

Así las cosas, y como mencionamos, de conformidad con el procedimiento federal de rigor, el 15 de agosto de 2019, la parte demandante-apelada había presentado ante la Corte Federal de Quiebras un "Motion in Compliance with Order" solicitando que autorizara y ordenara el registro de la *Sentencia* de 6 de agosto de 2019 dictada en el caso de marras por el Tribunal de Primera Instancia, Sala Superior de Ponce.[63] Ello, con el único fin de proteger el derecho de las partes a apelar el dictamen una vez adviniera final.

---

[59] *Íd.*, a las págs. 1306-1307.
[60] Anejo LVIII, págs. 1372-1427.
[61] Anejo LIX, págs. 1428-1440.
[62] Anejo LX, págs. 1441-1442.
[63] Anejo LVII, págs. 1341-1371. Tomamos conocimiento judicial de la presentación de dicha moción, a tenor con lo dispuesto en la Regla 201 de las de Evidencia, 32 L.P.R.A. Ap. VI R. 201, la cual establece que puede tomarse conocimiento judicial de la celebración de un proceso judicial, es decir de todos los incidentes ocurridos en dicho proceso. *Asociación de Periodistas v. González*, 127 DPR 704, 712-715 (1991).

El 6 de septiembre de 2019, los demandantes remitieron a los abogados del ELA el "Lift of Stay Notice", con el propósito de llegar a una estipulación a los únicos fines de que el TPI ordenara el registro de la *Sentencia* de 6 de agosto de 2019 para que fuese final y apelable, haciendo constar que la paralización de los procedimientos continuaría con relación a la ejecución del dictamen y la concesión de remedios provisionales.[64] Dicha estipulación fue suscrita por las partes el 23 de octubre de 2019 mediante documento intitulado "Stipulation Modifying the Automatic Stay Between the Commonwealth and Sucesión Pastor Mandry Mercado".[65]

Cónsono con lo anterior, el 30 de octubre de 2019, los demandantes presentaron ante el TPI un escrito intitulado "Moción Informando sobre Estipulación sobre Modificación de Relevo de Paralización Automática Bajo el Capítulo III de la Ley PROMESA y Solicitando se Registre la Sentencia Dictada el 6 de agosto de 2019".[66] A su vez, el ELA hizo lo propio y el 31 de octubre de 2019 presentó su "Moción Informativa sobre Modificación a la Paralización Automática de los Procedimientos para que se Ordene a la Secretaría del Tribunal de Primera Instancia el Registro de la Sentencia".[67] El 19 de diciembre de 2019, el foro *a quo* emitió una *Resolución* mediante la cual declaró *Ha Lugar* la moción presentada por los demandantes y, en consecuencia, ordenó a la Secretaria del Tribunal a notificar nuevamente, en esa misma fecha, la *Sentencia* apelada, originalmente emitida el 6 de agosto de 2019.[68]

---

[64] Anejo LXI, págs. 1443-1474.
[65] Anejo LXII, págs. 1475-1480.
[66] Anejo LXIII, págs. 1481-1488.
[67] Anejo LXIV, págs. 1489-1561.
[68] Anejo I, pág. 1 del *Alegato de la Parte Apelada, Sucesión de Salvador Mandry Nones*. El dictamen aludido fue emitido luego de que la Corte Federal de Quiebras emitiera el "Thirteenth Omnibus Order Granting Relief from the Automatic Stay", véase, Anejo 4 de la *Moción Eliminatoria y en Solicitud de la Descalificación del Sr. Javier Mandry Mercado para Comparecer por Derecho Propio* sometida ante nos por los apelados el 23 de diciembre de 2019.

Inconforme con el referido dictamen, acude el ELA ante este Foro Apelativo e imputa al TPI la comisión de los siguientes errores:

**Primer Error** Erró el Tribunal de Primera Instancia al concluir que la mera aprobación de la Ley 227-2008 constituyó una incautación ("taking") reglamentaria o legislativa.

**Segundo Error** Erró el Tribunal de Primera Instancia al concluir que al denegar la expedición del auto de *certiorari* presentado por el Estado para recurrir de la Sentencia Parcial de 27 de febrero de 2014, este Honorable Tribunal de Apelaciones "ratificó" en los méritos, la validez de la determinación contenida en ese dictamen parcial en cuanto a que la mera aprobación de la Ley 227-2008 constituyó una incautación reglamentaria de la propiedad de los demandantes.

**Tercer Error** Erró el Tribunal de Primera Instancia al dictar sentencia a favor de los demandantes, aun cuando estos no establecieron que el Estado le denegó todo uso productivo o razonable de su propiedad, conforme lo exige la jurisprudencia.

**Cuarto Error** Erró el Tribunal de Primera Instancia al determinar que la justa compensación a ser pagada a la parte demandante es de $30,496,000.00, otorgándole entero crédito al informe de valoración presentado por el perito tasador de dicha parte, a pesar de que dicho informe no tomó en consideración factores determinantes y críticos, tales como las condiciones físicas, características del terreno y restricciones de uso que precedían la declaración de reserva natural, las cuales, conforme a la jurisprudencia, reducen sustancial y significativamente el justo valor en el mercado de la propiedad. Dicho error resultó en una compensación exageradamente alta de la propiedad en disputa.

## II.

### A.

"El derecho fundamental a disfrutar de la propiedad privada está reconocido expresamente en nuestra Constitución.[69] Al respecto, el Art. II, Sec. 9 de nuestra Constitución de Puerto Rico establece que:

"No se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley. […]."[70]

---

[69] *Mun. de Guaynabo v. Adquisición M2*, 180 DPR 206, 216 (2010).
[70] Art. II, Sec. 9, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 333.

Cónsono con la disposición constitucional aludida, el Tribunal Supremo ha reiterado que el derecho a la propiedad no es absoluto, pues el mismo está "sujeto al poder inherente del Estado de establecer restricciones sobre la propiedad de los ciudadanos".[71] Dicho de otra manera, "[e]l derecho al disfrute de la propiedad, consagrado en el Art. II, Sección 7 de la Constitución de Puerto Rico[72], está supeditado al poder inherente del Estado para establecer restricciones sobre las propiedades privadas en favor del bienestar común".[73] Así, la expropiación forzosa ha sido reconocida como "[...] el poder soberano que reside en el Estado para adquirir el dominio de una propiedad sita dentro de sus límites territoriales".[74] De manera que, por ser el poder de expropiar un atributo inherente al poder soberano del Estado, los derechos de propiedad están supeditados a dicho poder de superior jerarquía.[75]

Ahora bien, para que "el Estado pueda expropiar forzosamente una propiedad privada, la Constitución exige que pague una justa compensación, destine el bien expropiado a un fin o uso público y proceda con sujeción a las leyes que regulan este procedimiento en nuestra jurisdicción".[76] En ese sentido, podemos decir que "la autoridad para expropiar está limitada por la exigencia de que el bien sea para un fin público y el Estado pague una justa compensación".[77]

---

[71] *Mun. de Guaynabo v. Adquisición m2*, 180 DPR 206 (2010).
[72] Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1.
[73] *ELA v. El Ojo de Agua Development*, 2020 TSPR 122, a la pág. 14, 205 DPR ___ (2020), Op. de 9 de octubre de 2020, citando *Mun. de Guaynabo v. Adquisición m2, supra*, a la pág. 216; *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, 174 DPR 409, 424 (2008); *A.C.T. v. 780614m2*, 165 DPR 121, 130 (2005). Véase, además, *ELA v. Rosso*, 95 DPR 501, 536 (1967).
[74] *Adm. Terrenos v. Corp. Pesquera Henares*, 201 DPR 14 (2018).
[75] *Íd.*, *ACT v. 780.614m2*, 165 DPR 121, 130 (2005); *ELA v. Registrador*, 111 DPR 117 (1981); *ELA v. Rosso, supra*, a la pág. 536.
[76] *Administración de Terrenos de Puerto Rico v. Ponce Bayland Enterprises, Inc.*, 2021 TPPR 91, a la pág. 16, 207 DPR ___ (2021), Op. de 29 de junio de 2021, citando Ley de Expropiación Forzosa, 32 LPRA sec. 2901 *et seq.*; Reglas 58 y 60 de Procedimiento Civil, 32 LPRA Ap. V. Véase también el Art. 282 del Código Civil, 31 LPRA sec. 1113 ("Nadie podrá ser privado de su propiedad sino por autoridad competente, por causa justificada de utilidad pública o beneficio social, y mediante el pago de una justa compensación que se fijará en la forma provista por ley").
[77] *Culebra Enterprises Corp. v. E.L.A.*, 127 DPR 943, 952 (1991).

Ello, pues la facultad de expropiar ha sido regulada con el fin de impedir actuaciones arbitrarias o abusivas por parte del Estado.[78] De modo que, se busca establecer un balance entre la facultad de expropiar del soberano y el derecho de propiedad del ciudadano, ambos de envergadura constitucional. Por un lado, la Sección 7 del Artículo II de nuestra Constitución reconoce como derecho fundamental el disfrute de la propiedad.[79] Mientras que la Sección 9 del Artículo II, limita el poder soberano del Estado al establecer que: "[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley".[80]

A través de la justa compensación lo que se procura es "colocar al dueño de la propiedad en una situación económica equivalente a la que se encontraba con anterioridad a la expropiación de su propiedad."[81] Por lo tanto, la justa compensación debe comprender el valor de la propiedad al momento de la incautación y los daños que ocasione, incluyendo aquellos compensables provocados al remanente de la propiedad expropiada.[82]

Cónsono con lo antes mencionado, en nuestro ordenamiento se ha reconocido consistentemente que, la obligación del Estado de pagar una justa compensación se puede manifestar en tres instancias: 1) mediante el ejercicio directo del poder de dominio eminente, instando un recurso de expropiación; 2) por medio de su reglamentación; y 3) cuando ocurre una incautación de hecho al afectar sustancialmente el uso de la propiedad físicamente.[83]

---

[78] *Adm. Terrenos v. Corp. Pesquera Henares*, supra; *Mun. de Guaynabo v. Adquisición m2, supra*, a la pág. 229.
[79] Art. II, sec. 7, Const. ELA, 1 LPRA, Tomo 1.
[80] Art. II, sec. 9, Const. ELA, 1 LPRA, Tomo 1.
[81] *Adm. Terrenos v. Corp. Pesquera Henares*, ante, citando a *Amador Roberts v. ELA*, 191 DPR 268, 278-279 (2014). Véase, además, *ELA v. Rexco Industries*, 137 DPR 683 (1994).
[82] *Adm. Terrenos v. Corp. Pesquera Henares, supra*.
[83] *Aut. Carreteras v. 8,554.741 M/CI*, 172 DPR 278, 292 (2008).

Asimismo, se ha requerido el pago de justa compensación cuando la reglamentación priva al dueño de todo uso productivo de su propiedad, porque la privación total del uso económico de una propiedad equivale a una invasión física por parte del Estado aunque el efecto de la privación haya sido temporero.[84] Es decir, la posterior liberación de las restricciones impuestas no exime al Estado del deber de compensar.[85] En estos casos, el Estado debe asegurar el pago de una justa compensación que incluya tanto el valor en el mercado de la propiedad expropiada, como los daños que la expropiación cause al remanente de ésta y los intereses por sentencia.[86]

De otra parte;

> en el ejercicio del poder de dominio eminente del Estado, existen casos excepcionales en los que el Estado puede ocupar o incautar un derecho real sin haber iniciado el procedimiento judicial de expropiación forzosa y sin haber consignado el pago de la justa compensación.[87]

Como consecuencia de lo anterior, en Puerto Rico, al igual que en el ámbito federal, se ha reconocido una acción de expropiación forzosa a la inversa,

> para aquellos casos excepcionales de ocupación física, incautación de un derecho real o restricciones a la propiedad mediante reglamento, sin que el Estado haya presentado previamente la acción de expropiación ni consignado una justa compensación. El pleito de expropiación a la inversa se insta por el titular contra el Estado para obtener la compensación a que tiene derecho.[88]

Mediante la acción de expropiación a la inversa, "se garantiza el cumplimiento del Estado con las disposiciones constitucionales que establecen que nadie será privado de su propiedad sin un debido proceso de ley y sin haber mediado justa compensación".[89] Dicha

---

[84] *Hampton Development Corp. v. ELA*, 139 DPR 877 (1996).
[85] *Id.*
[86] C. Torres Torres, *La Expropiación Forzosa de Puerto Rico: Ley, Jurisprudencia, Estudio y Guía Práctica*, First Book Publishing of P.R., 2003, págs. 135-136, 173 y 216-217.
[87] *Id.*, a la pág. 279.
[88] *Aner Investment Corp. v. J.P.*, 148 DPR 241, 248 (1999).
[89] *Amador Roberts et als. v. ELA*, 191 DPR 268, 279 (2014).

acción es el remedio que tiene el dueño de una propiedad afectada u ocupada por una entidad del gobierno, que no ha seguido el trámite en ley para su adquisición.[90] Instada la acción, el propietario deberá demostrar que el Estado ocupó o incautó su propiedad y litigará la existencia del uso público y la justa compensación, de la misma forma que estas cuestiones se dilucidan en un pleito de expropiación forzosa.[91]

Sin embargo, el Tribunal Supremo ha advertido que "la acción de expropiación a la inversa no pretende hacer del Estado un comprador involuntario de la propiedad e investirse con el título absoluto de dominio de la propiedad como, de ordinario, ocurre en la acción de expropiación iniciada por el Estado".[92] Al respecto, nuestro Máximo Foro señaló que:

> Si se demuestra que el Estado incautó una propiedad, la obligación del Estado es compensar al propietario y colocarlo en una situación económica equivalente a la que se encontraba con anterioridad a la incautación de su propiedad. En cuyo caso, el Estado puede optar por expropiar la propiedad o liberarla, e indemnizar al propietario por el tiempo en que la propiedad permaneció afectada. Así, por ejemplo, el Tribunal Supremo de Estados Unidos sostuvo [en *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 US 304, 321 (1987)] que "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective".[93] Además, mediante esta acción, el propietario puede reclamar los daños ocasionados al remanente de la propiedad por razón de la incautación, así como el pago de intereses, contados a partir del momento de la ocupación de su propiedad. (Citas en original omitidas).[94]

"Una vez presentada una acción de expropiación forzosa a la inversa, nada impide que el Estado, en el ejercicio de su poder de

---

[90] *Íd.*, a las págs. 279-280.

[91] *Íd.*, citando *ELA v. Northwestern Const., Inc.*, 103 DPR 377, 383-384 (1975).

[92] *Amador Roberts y als. v. ELA*, *supra*, a la pág. 280.

[93] Sobre este particular, el Tribunal Supremo de Puerto Rico se expresó en *Hampton Development Corp. v. ELA*, 139 DPR 877, 890 (1996) al señalar que, aunque el efecto de una incautación sea temporero, "procede una compensación por el valor del uso de la propiedad durante el tiempo en que el Estado privó al dueño de todo uso productivo de la misma. La posterior liberación de las restricciones impuestas no exime al Estado del deber de compensar", haciendo referencia a los normativos federales *Lucas v. South Carolina Coastal Council*, 505 US 1003 (1992); *First English Evangelical Lutheran Church v. Los Angeles County*, 482 US 304 (1987).

[94] *Amador Roberts et als. v. ELA*, *supra*, a la pág. 281.

dominio eminente, opte por iniciar una acción de expropiación forzosa ("expropiación forzosa directa") sobre la propiedad en controversia".[95] De ser ese el caso, "si el Estado presenta una de expropiación forzosa directa sobre el terreno en controversia y consigna el pago de la justa compensación, la de expropiación a la inversa queda fundada en el pleito de expropiación forzosa instado por el Estado".[96] En consecuencia, "el pleito de expropiación a la inversa se torna académico" y procede su desestimación.[97] De lo contrario, si el Estado no presenta posteriormente la acción directa, corresponderá al presunto expropiado y demandante en la acción de expropiación a la inversa probar que, en efecto, el Estado ocupó o incautó su propiedad, litigando la existencia del uso público y la justa compensación a la que alega tener derecho.

Acorde con lo antes expresado, y retomando el tema de la justa compensación, podría surgir el caso en que, aun cuando el Estado argumente lo contrario, el tribunal determine -a base de la prueba desfilada por la parte demandante- que hubo una expropiación. Como resultado de tal determinación, y en lo pertinente al caso que nos ocupa, nace la obligación del Estado de pagar una justa compensación por haber realizado una incautación de hecho tras afectar de manera sustancial el uso de la propiedad en controversia, ya sea físicamente o por medio de su reglamentación.[98] En cuyo caso, el Estado puede optar entre expropiar la propiedad o liberarla, indemnizando al propietario por el tiempo en que la propiedad permaneció afectada.[99] En ese sentido, el Tribunal Supremo ha

---

[95] *Íd.*, a la pág. 282.
[96] *Pamel Corp. v. E.L.A.*, 124 DPR 853 (1989); *Sucn. García v. Aut. de Carreteras*, 114 DPR 676 (1983); *Olivero v. Autoridad de Carreteras*, 107 DPR 301 (1978).
[97] *Pamel Corp. v. E.L.A.*, ante, a las págs. 857–858.
[98] *Culebra Enterprises Corp. v. E.L.A.*, 143 DPR 935, 946–947 (1997).
[99] *Amador Roberts v. ELA* supra; *ELA v. Northwestern Const. Inc.*, supra.

expresado que el determinar qué constituye una compensación justa en un pleito de expropiación es una tarea eminentemente judicial.

Así lo reiteró, recientemente, al señalar que:

> [La justa compensación] es una controversia judicial y no legislativa. La legislatura puede determinar qué propiedad privada se necesita para propósitos públicos —[e]sta es una controversia de carácter político y legislativo; pero cuando se ha ordenado la expropiación, entonces la controversia sobre la compensación es judicial. [...] La [C]onstitución ha declarado que se tiene que pagar justa compensación y que su determinación es una cuestión que le compete a los tribunales". (Traducción en el original).[100]

Finalmente, tomando en cuenta que el propósito de la justa compensación es colocar al dueño del bien inmueble expropiado "en una posición pecuniaria tan buena a la que estaría si la propiedad no se hubiese expropiado"[101], dicha compensación será justa en la medida que ésta refleje "el valor en el mercado del bien expropiado". En cuanto a eso último, se refiere al "precio que un comprador estaría dispuesto a pagar en una venta voluntaria y que un vendedor estaría dispuesto a aceptar, **considerando para ello las condiciones en que se halle el bien a la fecha de la expropiación**" y el mejor uso de la propiedad en un futuro razonablemente cercano.[102] Habida cuenta de ello, "[p]ara determinar el valor en el mercado de la propiedad expropiada, el tribunal deberá tomar en consideración 'todo elemento o indicador que un comprador prudente consideraría'".[103]

---

[100] *Administración de Terrenos de Puerto Rico v. Ponce Bayland Enterprises, Inc.*, *supra*, a la pág. 20, nota al calce 44, haciendo referencia a *ELA v. Rexco Industries, Inc.*, 137 DPR 683, 688-689 (1994) (citando a *Monongahela Navigat'n Co. v. United States*, 148 US 312, 327 (1893).

[101] *Administración de Terrenos de Puerto Rico v. Ponce Bayland Enterprises, Inc.*, supra, a la pág. 20, citando *ELA v. Rexco Industries, Inc.*, 137 DPR 683, 689 (1994).

[102] *Id.*, a la pág. 21 citando *ELA v. Fonalledas Córdova*, 84 DPR 573, 579 (1962); Ley de Expropiación Forzosa, 31 LPRA sec. 2915 ("[e]n el caso de compra o expropiación forzosa de la propiedad particular para fines de utilidad pública o beneficio social, la indemnización se deberá basar en el valor razonable en el mercado de tal propiedad [...]"); véase también *Pueblo v. Huyke*, 70 DPR 754, 757 (1950), donde el Tribunal Supremo definió "valor en el mercado" como:

> el precio que un comprador en una venta no forzada estaría dispuesto a pagar y aquel en que un vendedor, en las mismas circunstancias, estaría dispuesto a vender, consideradas las condiciones en que se halle el terreno en la fecha de la expropiación, y el uso más productivo a que el dueño pudiere dedicarlo dentro de un futuro razonable cercano.

[103] *Id.*, citando *Administración de Terrenos de P.R. v. Nerashford Development Corp.*, 136 DPR 801, 809 (1994).

## B.

Cónsono con el marco doctrinal antes expuesto, la Constitución de Puerto Rico establece como política pública del Estado "... la más eficaz conservación de los recursos naturales y su mayor aprovechamiento para el beneficio general de la comunidad".[104] El Tribunal Supremo ha reiterado que la disposición constitucional aludida "no es meramente la expresión de un insigne afán, ni constituye tampoco sólo la declaración de un principio general de carácter exhortativo", sino que se trata de un *mandato que debe observarse rigurosamente, y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste*".[105]

Asimismo, el Más Alto Foro ha señalado que la política pública consagrada en el Art. VI, sec. 19 de nuestra Ley Suprema "fija de modo incuestionable el criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma o decisión relativa al uso o protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental".[106]

De conformidad con el referido mandato constitucional, la Asamblea Legislativa aprobó la "Ley del Programa de Patrimonio Natural de Puerto Rico".[107] En la Exposición de Motivos del referido estatuto se reconoció que "Puerto Rico alberga una gran diversidad de plantas y animales", de entre las cuales "[...] el Departamento de Recursos Naturales y Ambientales ha determinado que el 18 por ciento de las plantas (586) y el 33 por ciento de los animales (99) son elementos críticos, esto es, son especies raras, vulnerables o están en

---

[104] Art. VI, sec. 19, Const. ELA, LPRA, Tomo 1.
[105] *Mun. de San Juan v. J.C.A.,* 152 DPR 673, 710 (2000); *Misión Ind. P.R. v. J.C.A.,* 145 DPR 908 (1998).
[106] *Buono Correa v. Srio. Rec. Naturales,* 177 DPR 415, 440 (2009), citando *Misión Ind. P.R. v. J.C.A., supra,* a las págs. 919-920.
[107] Ley Núm. 150 de 4 de agosto de 1988, según enmendada, "Ley del Programa de Patrimonio Natural de Puerto Rico", 12 LPRA sec. 1225 *et seq.*, (Ley Núm. 150).

peligro de extinción".[108] A su vez, se indicó que la causa principal del estado crítico de estas especies lo era la pérdida, destrucción o deterioro de su hábitat. Por tanto, la Ley Núm. 150 dispuso lo siguiente:

> En atención a esta situación, el Gobierno de Puerto Rico ha iniciado un programa abarcador y agresivo para proteger el patrimonio natural de nuestro pueblo, cumpliendo así con el compromiso de "intensificar nuestros esfuerzos de conservación de áreas verdes y otros preciosos recursos naturales para beneficio de otras generaciones", [...]. Al tomar esta decisión, se reconoce la importancia de proteger estas especies y las comunidades que las albergan para el uso y disfrute de futuras generaciones de puertorriqueños.
> Se reconoce que, además del valor intrínseco de la naturaleza y los seres que la componen, estas especies y sus hábitats tienen un valor presente y futuro como fuente de diversidad genética para el mejoramiento de especies de importancia económica. Reconoce su valor estético y recreativo, así como la importancia de las comunidades naturales como reservas de vida silvestre y para mejorar y aumentar los abastos de agua, vitales para el desarrollo económico del país. El impacto e importancia de la conservación y manejo sabio de las comunidades naturales, la vida silvestre y todos los recursos naturales del país en la industria turística no pasa desapercibido. **Esta ley tiene como meta dotar al Departamento de Recursos Naturales y Ambientales de un mecanismo que permita la adquisición de áreas de alto valor natural para protegerlas y conservar las para el uso y disfrute de ésta y futuras generaciones de puertorriqueños.** También tiene como meta fomentar y fortalecer las organizaciones no gubernamentales en el país para que éstas puedan continuar compartiendo con el Gobierno la carga y la responsabilidad de la conservación de nuestros recursos. **La adquisición de los terrenos a través del Programa de Patrimonio Natural de Puerto Rico se llevará a cabo utilizando estrategias variadas e innovadoras en estrecha coordinación entre el Gobierno del Estado Libre Asociado, el Gobierno Federal y organizaciones privadas locales y del exterior.** Al hacerlo así, se reconoce que la conservación de los recursos naturales de nuestro pueblo no puede lograrse si el Gobierno actúa solo, sino que es responsabilidad de todos. (Énfasis suplido).[109]

En lo pertinente, la sec. 2 de la Ley Núm. 150, 12 LPRA sec. 1226, define lo siguientes términos:

> A los fines de esta ley, los siguientes términos tendrán el significado que a continuación se indica:
> [...]
> **5) Reserva Natural** — Área de valor natural que haya sido declarada como Reserva Natural por la Junta de Planificación
> **6) Áreas de Valor Natural** — Terrenos o cuerpos de agua de importancia ecológica
> [...]

---

[108] Exposición de Motivos de la Ley Núm. 150.
[109] *Id.*

**9) Conservación** — Uso o manejo de un recurso natural sin deteriorar su naturaleza

**10) Agencia de Gobierno de Puerto Rico** — Las agencias, departamentos, oficinas, dependencias, municipios y corporaciones públicas.

Del mismo modo, la sec. 4 de la referida ley[110], le reconoce una serie de facultades al Secretario del Departamento de Recursos Naturales y Ambientales para cumplir el propósito legislativo promulgado por el estatuto, entre ellas, la facultad de "[a]dquirir terrenos mediante compra, donación, legado, permuta, **expropiación** o de cualquier otro modo legal, de cualquier persona natural o jurídica, agencia del Gobierno o del Gobierno de los Estados Unidos de América". Igualmente, el estatuto faculta al Secretario a "[r]ecomendar a la Junta de Planificación la designación como reserva natural de cualquier área incluida en el inventario de áreas de valor natural por el Programa de Patrimonio Natural".[111]

Por otra parte, también con el fin de cumplir con el mandato constitucional del Art. VI, sec. 19, la Asamblea Legislativa aprobó la Ley Núm. 227-2008, "Ley para designar el área natural Punta Cucharas del Municipio de Ponce como área de Reserva Natural del ELA". Como expusimos brevemente al reseñar los hechos, el referido estatuto se limita a designar el área natural Punta Cucharas del Municipio de Ponce como área de reserva natural del ELA para ser administrada bajo las disposiciones de la Ley Núm. 150. Se desprende de la Exposición de Motivos de la Ley Núm. 227 que durante el verano de 2004 el Área de Planificación Integral de la División de Patrimonio Natural del Departamento de Recursos Naturales y Ambientales presentó un Informe sobre Valor Natural del Área Punta Cucharas del Municipio de Ponce.

---

[110] 12 LPRA sec. 1228.
[111] *Id.*

Además, aparte de delimitar el área que comprende la reserva natural, surge de la Exposición de Motivos que las conclusiones del estudio realizado por el Departamento de Recursos Naturales y Ambientales, destacan la gran diversidad y complejidad de los hábitats presentes en el Área Natural Punta Cucharas, así como su flora y fauna. Por lo cual, la referida División recomendó designar el área como "reserva natural", toda vez que "la conservación de este recurso natural amerita el compromiso de las agencias gubernamentales concernidas y la protección de ley que puede otorgar la delimitación de una reserva natural bajo el Programa de Patrimonio Natural creado por la Ley Núm. 150...".[112] Así, de conformidad con lo recomendado, la Ley Núm. 227 fue aprobada, únicamente, para declarar el área como una reserva natural, a ser protegida a tenor con las disposiciones del Programa de Patrimonio Natural de Puerto Rico.

## c.

La sentencia sumaria es un mecanismo procesal, cuyo fin es acelerar la tramitación de los casos, pues permite disponer de ellos sin celebrar un juicio.[113] Los tribunales pueden dictar sentencia sumaria respecto a una parte de una reclamación o sobre la totalidad de ésta. Regla 36.1 de Procedimiento Civil[114].

La sentencia sumaria procederá si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada que se presente, si alguna, demuestran que no hay controversia real y sustancial sobre

---

[112] Exposición de Motivos de la Ley Núm. 227-2008, "Ley para designar el área natural Punta Cucharas del Municipio de Ponce como área de Reserva Natural del ELA".
[113] *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *S.L.G. Szendrey-Ramos v. Consejo Titulares*, 184 DPR 133, 166 (2011).
[114] 32 LPRA Ap. V, R. 36.1; *Meléndez González et al. v. M. Cuebas*, 193 DPR 100 (2015).

KLAN201901253                                                    38

algún hecho esencial y pertinente y que, como cuestión de derecho, procede hacerlo.[115]

Se trata de un remedio rápido y eficaz para aquellos casos en que la parte promovente logra establecer que no existe controversia sobre los hechos materiales del caso.[116] En ese sentido, un hecho material es aquel que "puede afectar el resultado de la reclamación al amparo del derecho sustantivo aplicable."[117] Una controversia de hechos derrotará una moción de sentencia sumaria si provoca en el juzgador una duda real sustancial sobre un hecho relevante y pertinente.[118] Si el tribunal no tiene certeza respecto a todos los hechos pertinentes a la controversia, no debe dictar sentencia sumaria.[119] Como corolario de ello, toda duda en torno a si existe una controversia o no debe ser resuelta en contra de la parte promovente.[120]

En cuanto a las formalidades, la Regla 36.3(a) de Procedimiento Civil[121], establece que la moción de sentencia sumaria deberá contener: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; (4) una relación concisa y organizada en párrafos enumerados, de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el

---

[115] Regla 36.3 (e) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(e); *González Santiago v. Baxter Healthcare*, supra, a la pág. 291; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).
[116] *Rodríguez de Oller v. T.O.L.I.C.*, 171 DPR 293, 310-311 (2007).
[117] *Abrams Rivera v. E.L.A.*, 178 DPR 914, 932 (2010).
[118] *Pepsi-Cola v. Mun. Cidra, et al.*, 186 DPR 713, 756 (2012).
[119] *Cruz Marcano v. Sánchez Tarazona*, 172 DPR 526, 550 (2007).
[120] *Íd.*
[121] 32 LPRA Ap. V, R. 36.3(a).

expediente del tribunal; (5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido.

Asimismo, en cuanto a la parte opositora, la Regla 36.3(b) de Procedimiento Civil[122], dispone que ésta tendrá un término de 20 días desde la notificación de la moción de sentencia sumaria para presentar su contestación. De manera que, si dicha parte no presenta su contestación en el término provisto, se entenderá que la moción ha quedado sometida para la consideración del tribunal. Regla 36.3(e) de Procedimiento Civil.[123]

Ahora bien, de presentarse la contestación oportunamente, la parte opositora deberá citar específicamente los párrafos según enumerados por el promovente que entiende están en controversia y, para cada uno de los que pretende controvertir, detallar la evidencia admisible que sostiene su impugnación con cita a la página o párrafo pertinente. Regla 36.3(b)(2) de Procedimiento Civil[124]. Es decir, para derrotar una solicitud de sentencia sumaria, la parte opositora deberá presentar contradeclaraciones juradas y contradocumentos, admisibles en evidencia, que pongan en controversia los hechos presentados por el promovente.[125]

Habida cuenta de ello, el promovido –entiéndase, contra quien se ha presentado una solicitud de sentencia sumaria– no puede descansar meramente en las afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva. Por el contrario, dicha parte está obligada a contestar de forma tan detallada y específica como lo hizo la parte promovente.[126] De manera que, si el oponente no

---

[122] *Supra.*
[123] 32 LPRA Ap. V, R. 36.3(e).
[124] 32 LPRA Ap. V, R. 36.3(b)(2).
[125] *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 677 (2018), citando a *Ramos Pérez v. Univisión*, 178 DPR 200, 215 (2010).
[126] 32 LPRA Ap. V, R. 36.3(c); *Nieves Díaz v. González Massas*, 178 DPR 820, 848 (2010).

controvierte los hechos propuestos según lo requiere la Regla 36.3 antes citada, el tribunal podrá considerarlos como admitidos y dictar sentencia en contra del promovido, si procede.[127]

Entonces, partiendo del marco legal aludido, al considerar una solicitud de sentencia sumaria, se tomarán por ciertos los hechos no controvertidos que surjan de los documentos que presente la parte promovente.[128] A su vez, cualquier inferencia que surja de los hechos incontrovertidos debe efectuarse de la forma más favorable a la parte promovida.[129] Como consecuencia, no se debe dictar sentencia sumaria si: "(1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho no procede."[130]

De otra parte, sobre el análisis que le corresponde a este Tribunal Apelativo realizar al momento de revisar la denegatoria o la concesión de una moción de sentencia sumaria, el Tribunal Supremo de Puerto Rico estableció en *Meléndez González et al. v. M. Cuebas*[131], que debemos aplicar "los mismos criterios que la Regla 36 de Procedimiento Civil y la jurisprudencia le exigen al Foro Primario."[132]

Sin embargo, no nos corresponde considerar prueba que no haya sido presentada ante el TPI, ni adjudicar hechos materiales en controversia, si alguno, ya que eso le incumbe al Foro Primario luego de celebrar un juicio en su fondo.[133] Lo que nos atañe, como Tribunal revisor, es evaluar si la moción y su oposición cumplen con los

---

[127] *Roldán Flores v. M. Cuebas et al.*, supra, a la pág. 677.
[128] *Díaz Rivera v. Srio. de Hacienda*, 168 DPR 1, 27 (2006).
[129] *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 130 (2012).
[130] *Pepsi-Cola v. Mun. Cidra, et al.*, supra, a la pág. 757.
[131] *Supra.*
[132] *Íd.*, pág. 118.
[133] *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 118.

requisitos de la Regla 36 de Procedimiento Civil, así como examinar si existen hechos materiales en controversia.

De ser ese el caso, nos corresponde hacer una lista tanto de los hechos incontrovertidos, como de aquellos esenciales y pertinentes en controversia.[134] Podemos realizar tal determinación en la Sentencia que disponga del caso, haciendo referencia "al listado numerado de hechos incontrovertidos que emitió el Foro Primario en su Sentencia."[135] Luego, nos quedaría revisar *de novo* si el tribunal de primera instancia aplicó correctamente el Derecho a la controversia.[136]

## D.

Considerando las particularidades del caso que nos ocupa, resulta medular discutir algunas disposiciones y reglas probatorias relacionadas a la prueba pericial. En lo pertinente, la Regla 702 de las de Evidencia establece lo siguiente:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita -conforme a la Regla 703[137]- podrá testificar en forma de opiniones o de otra manera.
> **El valor probatorio del testimonio dependerá, entre otros, de:**
> **(a) si el testimonio está basado en hechos o información suficiente;**
> **(b) si el testimonio es el producto de principios y métodos confiables;**

---

[134] *Íd.*
[135] *Íd.*
[136] *Íd.,* a la pág. 119.
[137] Por su parte, la Regla 703 de las de Evidencia, 32 LPRA Ap. VI, R. 703 dispone:
**(a)** Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.
**(b)** El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.
**(c)** La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

**(c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;**

**(d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;**

**(e) las calificaciones o credenciales de la persona testigo; y**

**(f) la parcialidad de la persona testigo.**

La admisibilidad del testimonio pericial será determinada por el Tribunal de conformidad con los factores enumerados en la Regla 403.[138]

De manera que, el testimonio pericial, si bien es un medio de prueba, también es una gestión auxiliadora para el juez, ya que ayuda al tribunal a comprender la evidencia o a determinar un hecho en controversia.[139] Por lo tanto, una persona está cualificada para declarar en calidad de perito, "si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio".[140]

De otra parte, la Regla 704 de las de Evidencia dispone que:

Las opiniones o inferencias de una persona como testigo pericial pueden estar basadas en hechos o datos percibidos por ella o dentro de su conocimiento personal o informados a ella antes de o durante el juicio o vista. Si se trata de materia de naturaleza tal que las personas expertas en ese campo razonablemente descansan en ella para formar opiniones o hacer inferencias sobre el asunto en cuestión, los hechos o datos no tienen que ser admisibles en evidencia. [...].[141]

Así, la regla "permite admitir testimonio pericial fundado en información obtenida antes del juicio o vista, aunque se trate de evidencia inadmisible. Lo determinante es que los datos utilizados para conformar la opinión pericial sean[n] un[os] que los peritos en ese campo razonablemente utilizarían para emitir sus opiniones o hacer inferencias sobre el asunto en controversia".[142]

---

[138] 32 LPRA Ap. VI, R. 702.
[139] *San Lorenzo Trading* v. *Hernández,* 114 DPR 704, 711 (1983).
[140] Regla 703 de las de Evidencia, *supra*; Véase, además, *Díaz* v. *Pneumatics & Hydraulics,* 169 DPR 273, 292-293 (2006).
[141] Regla 703 de las de Evidencia, *supra*.
[142] Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, *Informe de las Reglas de Derecho Probatorio,* Marzo 2007, pág. 432.

En cuanto al valor probatorio del testimonio pericial, el Tribunal Supremo, citando al profesor E. L. Chiesa, expresó que: "[éste] depende de varios factores, entre los que se destacan los siguientes: 1) las cualificaciones del perito; 2) la solidez de las bases de su testimonio; 3) la confiabilidad de la ciencia o técnica subyacente y; 4) la parcialidad del perito."[143] Habida cuenta de ello, aunque un mínimo de información sea suficiente para cualificar un testigo como perito, cuando sus credenciales sean excelentes es conveniente ofrecer toda la evidencia respecto a éstas, de modo que **el valor probatorio sea mayor**.[144] Cónsono con los criterios antes mencionados, la **especialidad** de un perito en un área también puede ser decisiva en cuanto al valor probatorio de su testimonio.[145]

Por último, es meritorio señalar que los tribunales revisores estamos en igual posición que el Foro Primario para evaluar la corrección de las determinaciones de hechos a las que alude el ELA en su alegato, ya que están basadas en prueba pericial y documental.[146] El Tribunal Supremo resolvió, en *Culebra Enterprises Corp. v. ELA*, que los foros apelativos no estamos obligados a seguir ineludiblemente "la opinión, juicio, conclusión o determinación de un perito o facultativo... y que todo tribunal está en plena libertad de

---

https://www.ramajudicial.pr/sistema/supremo/Informe_Reglas-de-Derecho-Probatorio-2007.pdf. Cabe señalar que, en del precitado informe surge que el Comité recomendó:

[...] sustituir la palabra "generalmente" por "razonablemente", pues el criterio de razonabilidad permite al Tribunal mayor discreción para evaluar la confiabilidad de la información en la que los peritos descansan para formular sus opiniones. Este criterio no requiere que la opinión del perito sea generalmente aceptada en la comunidad científica para ser lo suficientemente confiable y de ayuda al juzgador de los hechos. Lo que requiere es que el perito base su opinión en métodos en los que otros peritos en su área razonablemente descansarían para formular sus propias opiniones, aunque sean diversas u opuestas. Íd., a la pág. 433.

[143] *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.,* 150 DPR 658, 663-664 (2000).
[144] *Íd.*
[145] *Íd.*, véase, además, E. L. Chiesa, *Tratado de Derecho Probatorio*, Tomo I, Publicaciones JTS, pág. 564 (1998). Cfr. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 4ta ed., San Juan, Ediciones SITUM, Inc., 2015, págs.428 *et seq.*
[146] *Dye-Tex P.R., Inc. v. Royal Ins. Co.,* 150 DPR 658, 662-663 (2000); *Rodríguez Cancel v. A.E.E.,* 116 DPR 443, 450 (1985).

adoptar su criterio propio en la apreciación o evaluación de la prueba pericial".[147] En lo atinente, expresó:

> "Reafirmamos la norma de que, como foro apelativo, **no estamos obligados "a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo ... y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la prueba pericial y hasta descartar la misma, aunque resulte ser técnicamente correcta**".
> También reiteramos la doctrina establecida de que sólo intervendremos si la cuantía es exagerada o muy baja. (Énfasis suplido). (Citas en original omitidas).[148]

En consecuencia, como foro apelativo, estamos facultados para ejercer nuestro propio criterio en cuanto al valor probatorio de la evidencia pericial que le fue presentada al foro *a quo*. Lo anterior no significa que nuestra revisión se dé en ausencia de parámetros que la delimiten. Por el contrario, para medir el valor probatorio del testimonio de un perito, tomaremos en cuenta los factores de rigor aludidos, tales como las cualificaciones, la solidez de las bases de sus testimonios, la confiabilidad de la ciencia o técnica subyacente y su grado de parcialidad. También será pertinente la especialidad de los peritos, pues, aunque no incida sobre la cualificación como testigo experto, puede resultar crucial a la hora de conferirle valor probatorio y credibilidad. Es decir, "se afirma que la carencia de especialidad concernida afecta el peso de la prueba pericial pero no la cualificación".[149]

### III.

Por estar íntimamente relacionados entre sí y para un entendimiento cabal de las cuestiones de derecho ante nuestra

---

[147] *Culebra Enterprises Corp. v. ELA*, 143 DPR 935, 952 (1997); *Valldejuli Rodríguez V. AAA*, 99 DPR 917,921 (1971): *Prieto v. Maryland Casualty Co.*, 98 DPR 594, 623 (1970).
[148] *Culebra Enterprises Corp. v. ELA, supra*, a las págs. 952-953.
[149] Ernesto L. Chiesa, *Tratado de Derecho Probatorio*, Publicaciones J.T.S., Tomo I, 1998, pág. 593-594; *Dye-Tex P.R., Inc. v. Royal Ins. Co., supra*, a la pág. 664.

consideración, procederemos a discutir los primeros tres errores de manera conjunta y luego el cuarto y último error.

En esencia, la parte apelante sostiene que incidió el TPI al concluir que la mera aprobación de la Ley Núm. 227-2008 constituyó una incautación reglamentaria o legislativa. Igualmente, aduce que erró el Foro Primario al concluir que al denegar la expedición del auto de *certiorari* presentado por el Estado para recurrir de la Sentencia Parcial de 27 de febrero de 2014, este Tribunal de Apelaciones "ratificó" en los méritos la validez del dictamen parcial recurrido, en cuanto a que la mera aprobación de la Ley Núm. 227-2008 constituyó una incautación reglamentaria de la propiedad de los demandantes. Además, argumenta el ELA que incidió el TPI al dictar sentencia a favor de los demandantes, aun cuando estos no establecieron que el Estado los privó de todo uso productivo de su propiedad.

De umbral, aclaramos que, tal y como lo arguye el ELA, la determinación sobre que la aprobación de la Ley Núm. 227-2008 constituyó una incautación reglamentaria, en efecto, nunca fue atendida por este Tribunal Apelativo ni por el Tribunal Supremo, ya que, al recurrir de dicha determinación ambos foros revisores denegaron la expedición del recurso discrecional de *certiorari*. De manera que, contrario a lo expresado por el Foro Primario en la *Sentencia* apelada, este Tribunal no ratificó que la aprobación de la Ley Núm. 227-2008 constituyera una incautación, por lo que, la parte apelante podía, como lo hizo, levantar nuevamente el error. Esto así, pues como ha expresado el Tribunal Supremo "[d]ebe de quedar claro que la denegatoria a expedir no implica la ausencia de error en el dictamen, cuya revisión se solicitó, ni constituye una adjudicación en sus méritos".[150] Por lo tanto, erró el TPI al expresar que este Foro

---

[150] *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 98 (2008).

Apelativo había ratificado, al denegar la expedición del recurso de *certiorari* en el caso núm. KLCE201400713, que la mera aprobación del estatuto en cuestión constituyó una incautación.

Partiendo de lo anterior, procedemos a atender si, en efecto, la aprobación de una ley, en este caso, la Ley Núm. 227-2008, constituyó una incautación legislativa de la propiedad de los demandantes. En primera instancia, conforme al marco legal arriba esbozado, aclaramos que la mera designación de un área como reserva natural no implica automáticamente que el Estado ha expropiado a los titulares, si alguno, del área así destinada. Es decir, nuestro ordenamiento reconoce la posibilidad de que exista un ciudadano, dueño de una finca, cuya determinada porción sea destinada a ser reserva natural y tal designación no hace de esas cuerdas menos privadas, ni las convierte en un bien de dominio público.

Dicho esto, son las consecuencias de dicha designación las que determinarán si la misma equivale a una incautación de hecho por parte del Estado de propiedad privada. Como ocurre en el caso de autos, al evaluar el claro lenguaje de la Ley Núm. 227-2008, se desprende que la misma designa el área natural Punta Cucharas como área de "reserva natural", con la incuestionable intención legislativa de que los terrenos así designados queden bajo el control del DRNA. Tal y como indicó el TPI en su *Sentencia Parcial* de 27 de febrero de 2014, el historial legislativo del estatuto en cuestión muestra indicios de parte del DNRA dirigidos a adquirir los terrenos, hoy designados reserva natural. Más importante aun, a la luz de lo dispuesto tanto por la Ley Núm. 227-2008, como por la Ley Núm. 150, no vemos cómo los apelados podrían hacer uso productivo de sus tierras cuando por mandato legislativo estas deben ser administradas por una agencia de gobierno, a saber, el DRNA.

Por otro lado, tal y como lo expresó un panel hermano en el KLAN201400552, al atender la misma controversia planteada por otros demandantes, la Ley General de Expropiación Forzosa, no contempla la designación de un terreno como "reserva natural". Consecuentemente, dada la referida ausencia en la Ley de Expropiación Forzosa y considerando que la Ley Núm. 227 expresamente designa el área natural Punta Cucharas como área de "reserva natural", a ser administrada por el DRNA, es correcto concluir que la aprobación de la Ley Núm. 227, a la luz de la clara intención legislativa, constituyó una incautación estatutaria de la propiedad de los apelados. Dicho de otra manera, tomando en cuenta que la ley expresamente designa la propiedad "reserva natural", así como el término conservación adoptado de la Ley Núm. 150, definido como el "[u]so o manejo de un recurso natural sin deteriorar su naturaleza", queda meridianamente claro que el estatuto Núm. 227 explícita y solapadamente a la vez, consagra cuáles serán los posibles usos de los terrenos en cuestión. Ello, puesto que el legislador estableció que la Reserva Natural Punta Cucharas ha de regularse por la Ley Núm. 150.

Es decir, a través de la designación expresa de "reserva natural", el legislador ya está determinando que el uso de dichas tierras es proteger y conservar el área. Por consiguiente, tras un estudio minucioso del expediente ante nos, a la luz del derecho aplicable, es forzoso concluir que al aprobar la Ley Núm. 227, el Estado realizó una incautación de hecho que tuvo el efecto de privar de forma inmediata y sustancial todo uso productivo de la propiedad, ya que al incluir los terrenos propiedad de los apelados dentro de la demarcación de la Reserva Natural Punta Cucharas, concluimos que se privó todo uso productivo de la propiedad.

En el cuarto y último error, nos corresponde determinar si los $30,496,000, más los intereses sobre dicha suma desde la fecha de la incautación hasta su pago total y costas, otorgados a los apelados como justa compensación es una cuantía sustentada por y basada en la prueba desfilada, o si por el contrario y como alega el ELA, es una suma exageradamente alta. Es decir, que (i) la parte sur de la finca, a la que el ELA atribuye la mayor porción de la finca (poco más de 140 cuerdas), se encuentra en la zona marítimo terrestre y es inundable, lo que "reduce significativamente su valor en el mercado"[151], (ii) el ELA no tiene que pagar por oportunidades que el dueño pueda perder como resultado de la expropiación, y (iii) que por la existencia de las características del terreno, era un hecho que el dueño conocía o debía conocer, que su propiedad estaría sujeta a reglamentación más estricta, y que por tanto, su potencial estaría limitado.[152]

De otra parte, los apelados, nos invitan a examinar, en síntesis, que tal como concluyó el Foro Primario, en su determinación de hecho número 36, e incluyó a manera de discusión la determinación de hecho número 39, que preferimos citar *ad verbatim*, a la página 13 de la Sentencia apelada, con relación a la tasación del perito del Estado, el Sr. Núñez, concluyó y citamos:

> 36. La cabida de la Parcela 003-02 que indica el plano de adquisición estipulado no es de 49.8228 cuerdas sino de 64.05061 cuerdas equivalentes a 253,534.6697 m/c. La cabida de esta parcela la utilizada por el señor Núñez surge de un plano que se les suministró, **que difiere del plano estipulado** (énfasis nuestro). Si se valora la parcela 003-02 con la cabida de 253,534.6697 m/c que aparece en el plano estipulado, utilizando el precio unitario de $70 m/c establecido por el señor Núñez, el valor de la misma ascendería a 17,747 426.88.
>
> ...
>
> 39. El señor Núñez no hizo valoración de terrenos cuyo mejor uso fuera para fines residenciales. Ni de su

---

[151] Alegato Suplementario del Apelante, pág. 4.
[152] *Íd.*, pág. 5.

informe ni de su testimonio sobre las parcelas 003-02 y 004-02 próximas a la PR- 2 a las que atribuyó un mejor uso mixto comercial-residencial, se puede colegir una valoración para el mejor uso residencial. En sus informes sobre ambas parcelas tres de las cuatro comparables que consideró para la valoración tienen mejor uso comercial y una, un uso mixto, residencial comercial.

Sostienen que del tasador del Estado no haber cometido tal error, de asignar arbitrariamente y sin base legal alguna un mejor "uso de conservación a más de dos terceras partes de las fincas, su valoración probablemente habría sido más alta que la del tasador de los demandantes"[153], aquí apelados.

Aclaramos de antemano que el único fin del juicio celebrado los días 6, 7, 8, 9, 16, y 17 de agosto de 2018; 4 y 6 de septiembre de 2018; y 4 y 30 de octubre de 2018, era determinar la justa compensación y a ello se circunscribió la prueba presentada.[154] Así las cosas, partiendo del análisis arriba esbozado, luego de un **minucioso estudio** de la extensa TPO, nos vemos forzados a concluir que la prueba parcial y documental presentada por los apelados sustenta la suma/cuantía concedida a dicha parte por la incautación estatutaria de su propiedad. Por lo extenso de los testimonios, nos circunscribiremos a los de mayor relevancia para la resolución de esta controversia. Veamos.

Durante el juicio, el Ing. Ismael Isern Suárez testificó que es ingeniero civil, licencia 12209 y evaluador profesional autorizado.

---

[153] Alegato de la Parte Apelada, Sucesión de Salvador Mandry Nones, pág. 20.
[154] Tal como expusimos en el tracto procesal de esta *Sentencia*, este caso fue bifurcado por el TPI, donde atendió, en primer término, la controversia sobre si la acción del Estado constituyó una expropiación estatutaria por la mera aprobación de la Ley Núm. 227-2008. Una vez el TPI, resolvió el asunto en la afirmativa, mediante su Sentencia Parcial emitida el 27 de febrero de 2014, el Estado recurrió oportunamente de esta mediante el recurso de *Certiorari*, tanto ante este Foro Intermedio como al Tribunal Supremo. Ambos foros, denegaron la expedición del auto presentado por el Estado, con la consecuencia jurídica de que el argumento del Estado podía, como se hizo, ser reproducido en esta apelación. Sin embargo, tal como esbozado en la discusión conjunta de los errores primero, segundo y tercero, de esta *Sentencia*, y por los fundamentos allí expuestos, acogemos, así como hizo el TPI, como hechos incontrovertidos los mencionados en la referida *Sentencia Parcial* del 27 de febrero de 2014. (*Sentencia Parcial*, pág. 2, del Apéndice del Recurso de Apelación, a las págs. 735-752.) Además, estos mismos hechos (que acogemos como incontrovertidos) fueron reproducidos por las partes, y fue parte de la prueba oral y documental, durante el juicio.

También es tasador de bienes raíces, licencia 684, y posee una certificación federal, número156, para tasar propiedades en la cual hayan envueltos fondos federales. Ejerce su profesión como evaluador de bienes raíces desde 1994. [155]

Además, declaró que se le dio la encomienda de establecer el valor en el mercado de los inmuebles, objeto de esta controversia, a la fecha del 2008, cuando se aprobó la ley para establecer la reserva natural. Por lo cual, preparó un informe de valoración. [156] En el mismo, tomó en consideración las características "físicas y legales" de calificación, tales como inundación, y todas las demás características del terreno.[157] Esto para determinar, lo que calificó como "la piedra angular", que es "el mejor uso de la propiedad". Una vez determinado, buscó las ventas comparables que fueran compatibles con ese mejor uso. Continuó declarando, que se ajustaron esas ventas comparables y se llegó a "un unitario, a una opinión de valor de cada parte, y con eso concluyó el valor de la propiedad."[158]

De este modo, testificó que el término "mejor y más provechoso uso", se caracteriza por lo siguiente: (i) si son físicamente posibles, los distintos usos que se aprueban en la tasación, que pueden ser comerciales, residenciales, industriales, de conservación; (ii) si esos usos físicamente identificados son legalmente permisibles, y se descartan aquellos usos que no sean leales y (iii) finalmente, si ese uso identificado es económicamente viable.[159] En su declaración afirmó que estos elementos están presentes en las 197 cuerdas, de la finca ya que "tiene toda la infraestructura cercana, buenos accesos a

---

[155] Transcripción de la prueba oral (TPO) del 7 de agosto de 2018, líneas 18 a la 27, pág. 6. Se estipuló su testimonio pericial por parte de la representante legal de Estado. *Id.*
[156] TPO del 7 de agosto de 2018, líneas 21-27, pág. 7.
[157] TPO del 7 de agosto de 2018, líneas 11-28, pág. 11.
[158] *Id.*
[159] TPO del 7 de agosto de 2018, líneas 9-24, pág. 12.

la carretera estatal número 2, ... acueducto, planta de tratamiento cerca, y que esta propiedad está bajo el Plan de Ordenamiento Territorial de Ponce" [160], Oficina que en ese entonces, junto al Municipio de Ponce, otorgaba los permisos. Establece en su testimonio, que la calificación de estas cuerdas de terreno, en su gran mayoría es EV.4, y la porción sur su calificación es de suelo rústico especialmente protegido. Estas últimas, las que quedan "al sur hacia el Mar Caribe de residencial turístico".[161] Destacó en su testimonio, que el Plan de Ordenamiento Territorial del Municipio de Ponce, identificó 35 cuerdas para conservación, cuyo título pertenece a los dueños, y por ello, están también sujetas a valoración. Por lo tanto, concluyó, en síntesis, que las primeras 50 cuerdas tenían uso comercial, 111 cuerdas eran con destino residencial, y las 35 cuerdas con uso de conservación.[162] Testificó que el deslinde de 2007 por el DRN, en torno a la delimitación de la ZMT no fue "*taking*", porque la ZMT es de dominio público, así que priva de todo uso productivo.[163] Luego, su testimonio, entre otros, se basó en lo pertinente, sobre las comparables utilizadas para su informe.[164]

El señor Javier L. Bonnin Orozco, testigo de los demandantes-apelados, declaró que es arquitecto, licencia número 12518, tiene una maestría en arquitectura y era en esos momentos residente del estado de Oregon, E.E.U.U., donde ofrece cursos en el departamento de arquitectura de la universidad. Además, participó en el proceso de elaboración del plan territorial de Ponce.[165] También, fue director de

---

[160] TPO del 7 de agosto de 2018, líneas 29-32, pág. 12 y líneas de la 1-31, pág.13.
[161] TPO del 7 de agosto de 2018, líneas 26-27, pág. 13.
[162] TPO del 7 de agosto de 2018, líneas 1-29, pág. 14 y líneas de la 1-32, pág.15 y líneas 1-4, pág. 16.
[163] TPO del 7 de agosto de 2018, líneas 5-32, pág. 16.
[164] TPO del 7 de agosto de 2018, líneas 15-32, pág. 17; líneas de la 1-32, pág.18; líneas 1-32, pág. 19; líneas 1-32, pág. 20; líneas 1-32, pág. 21 a la pág. 28 hasta la línea 18.
[165] TPO del 6 de agosto de 2018, líneas 27-31 de la pág. 17; líneas 1-22, pág. 18; líneas 3-32, pág. 19; y líneas 1-28, pág. 20,

la Oficina de Ordenamiento Territorial de Ponce, y fue consultor del Plan de Ordenamiento Territorial de Ponce que entró en vigor en el 2003, además de consultor y colaborador en otros municipios.

Durante su testimonio tuvo el propósito de establecer los usos permitidos en los terrenos en controversia, y las condiciones de dichos terrenos para tales usos.[166] En específico, declaró sobre su participación en proyectos de zonas costeras, como el proyecto de revitalización de Boquerón, el del Parque Tabaiba en la playa de Ponce, el Parque del Litoral Mayagüez 2010, los parques lineales de los ríos Bucaná y Portugués de Ponce, entre otros.[167]

El arquitecto Bonnin, declaró que para el 2008, la entidad que determinaba los usos permitidos en el territorio del Municipio Autónomo de Ponce era la Oficina de Ordenación Territorial de dicho Municipio, en virtud de la Ley de Municipios Autónomos[168]. Además, testificó ampliamente sobre distintos conceptos, tales como: los distritos de ordenación (representación gráfica o cartográfica de donde aplican las distintas normativas urbanísticas...), que se basan en la "forma urbana, en la edificación como tal, ... mientras el distrito de zonificación está basado estrictamente en uso".[169] En lo pertinente, testificó que los terrenos fueron clasificados EV.4, "con excepción de la zona más cercana a la parte costera, que se clasificó como suelo rústico, especialmente protegido, por razones de recursos naturales."[170] Los terrenos objeto del litigio estaban contemplados en el Plan Especial II "La Matilde", del Municipio de Ponce, según la

---

[166] El Estado informó al TPI, no tener reparo sobre la capacidad pericial del arquitecto Bonnin, TPO, del 6 de agosto de 2018, líneas 26-32, pág. 23. Su testimonio fue admitido por el TPI como perito en materias de usos de terrenos permitidos a la fecha en que ocurrió la expropiación, además de aquellas "condiciones que no exceda la ciencia de la arquitectura y la planificación", TPO, del 6 de agosto de 2018, líneas 11-14, pág. 30.
[167] TPO del 6 de agosto de 2018, líneas 21-32, pág. 25.
[168] TPO del 6 de agosto de 2018, líneas 10-32, pág. 31. La Ley de Municipios Autónomos aplicable a la fecha de los hechos y derogada por la Ley Núm. 107-2020. 21 LPRA sec. 4001 *et. seq.*
[169] TPO del 6 de agosto de 2018, líneas 15-24, pág. 32.
[170] TPO del 6 de agosto de 2018, líneas 20-23, pág. 33.

prueba estipulada. Sobre el particular, testificó el Arquitecto Bonnin, que allí se pretendía facilitar un desarrollo residencial, turístico y comercial condicionado a la protección de recursos naturales como la laguna Salinas y una zona de humedales "al sur del área identificada y a la conversión de la PR-2 en expreso con la construcción de calles marginales.[171]

Por lo que, el Plan Especial II, perseguía tres propósitos: maximizar el potencial del área para proyectos de carácter residencial y turístico; ordenar el desarrollo a lo largo de las marginales de la PR-2 y establecer una zona de protección de humedales y de la laguna Salinas.[172] Así, indicó que el distrito EV.4, es un "distrito especial, de aplicación puntual", esto porque se utilizó solo para marcar parcelas de "gran potencial de desarrollo por lo que no se establecieron límites, buscando el máximo desarrollo posible". Es decir, que el distrito clasificado, EV.4 no tiene límites; es un "uso ministerial que no puede ser modificado, según lo que estableció el reglamento." [173]

Además, testificó que, con relación a la característica de inundación de los terrenos, estos están divididos en tres zonas. La primera comprende la parte norte de los terrenos más cercanos a la carretera PR-2, que son clasificados zona X, no inundable. La mayor parte del cuerpo central de los terrenos estaban clasificados AE, con niveles de elevación predeterminada, en cuya clasificación se puede construir (mediante relleno o elevación de las estructuras), y la última que es una franja paralela a la costa que está clasificada VE.[174]

Por ello, declaró que la distribución de uso que hizo el Ing. Isern es compatible con los usos permitidos por el Plan Orden Territorial del Municipio de Ponce.[175] Por lo que la única zona restrictiva, en

---

[171] TPO del 6 de agosto de 2018, líneas 24-32, pág. 34.
[172] TPO del 6 de agosto de 2018, líneas 3-10, pág. 35.
[173] TPO del 6 de agosto de 2018, líneas 1-16, pág. 60 y líneas 1-12, de la pág. 61.
[174] TPO del 6 de agosto de 2018, líneas 10-32, pág. 61 y líneas 4-11, de la pág. 62.
[175] TPO del 6 de agosto de 2018, líneas 22-30, pág. 62.

términos de inundación, es la marcada como Zona VE, que "es la zona pegada a la costa."[176] Finalmente, declaró que el deslinde de la ZMT, no deja sin efecto o hace inútil el Distrito de Ordenación del plan territorial, cuando los predios siguen siendo privados.[177] Tampoco afectaba, el informe de valoración preparado por el Ing. Isern.[178]

Por otro lado, en apoyo a las conclusiones del Ing. Isern, y del arquitecto Bonnin, el testimonio del ecólogo marino, el Dr. Máximo Cerame Vivas[179], sirvió para establecer que las condiciones y características de los terrenos en cuestión, en especial las 35.075 cuerdas de conservación, permanecían inalterados.[180] Así, mediante la emisión en el 1995 de una Certificación, por el Cuerpo de Ingenieros de los Estados Unidos de Norteamérica, las 35.075 cuerdas fueron declaradas terrenos de conservación, y por ende, bajo su jurisdicción exclusiva. Si bien es cierto que la expedición y expiración de la referida "Certificación" a los 5 años de su emisión, tenía su justificación en un permiso solicitado en ese entonces por los demandantes-apelados, su expiración no vició el testimonio creído y no controvertido por el Estado, justificando así, el "uso" indicado por el Ing. Isern al calcular el valor de los terrenos en cuestión.

Aunque el apelante trató de impugnar estos testimonios, sus intentos resultaron imprecisos. Por ejemplo, en su turno de contrainterrogatorio del Estado al arquitecto Bonnin:

*Lcda. Betancourt Jiménez:*

---

[176] TPO del 6 de agosto de 2018, líneas 11-14, pág. 63.
[177] TPO del 6 de agosto de 2018, líneas 23-32, pág. 67 y líneas 1-32, de la pág. 68.
[178] TPO del 6 de agosto de 2018, líneas 1-10, pág. 69.
[179] El testimonio fue traído por la parte demandante, como perito en el área de ecología y gestor del trámite ante el Cuerpo de Ingenieros en el 1995, para la determinación jurisdiccional de la referida agencia. TPO del 6 de agosto de 2018, líneas 1-32, pág. 113. Declaró además que visitó en varias ocasiones la finca, la caminó, le tomó fotos aéreas y la sobrevoló en dos ocasiones. TPO del 6 de agosto de 2018, líneas 1-32, pág. 116. También, sirvió de consultor ante la solicitud de un nuevo permiso en el 2005, para el proyecto de los demandantes "Mandry Sea Side Estates", del cual posteriormente desistieron.
[180] TPO del 6 de agosto de 2018, líneas 27-31, pág. 117 y líneas 1-5, pág. 118.

> *P: Okay. En el plan de área de La Matilde, cual usted habló esta mañana, usted entiende que este plan de área es lo que aplica como usted dijo a esa propiedad [181]independientemente de zonificación.*

> *R: No, no. Primero, no es un plan de área, es un plan especial que forma parte del plan territorial. El plan de área es otra figura de planeamiento distinta. No..., no... ahora perdí un poquito el hilo, pero entiendo que no afecta porque el plan especial es un distrito sobrepuesto y se sobrepone sobre los Distritos de Ordenación.*

> *P. Sí, sí. Pero, pero...*

> *R. De Ninguna manera...*

Más adelante, a preguntas del Estado declara[182]:

> *P: ¿Y, pero sabe qué efecto tiene el hecho de que tuviera una zona o una parte de la propiedad en barrera costera?*

> *R: El mapa de inundación al que hicimos referencia durante la mañana establece las zonas que son parte de la barrera costera, el coastal barrier y los terrenos objetos de este caso no están comprendidos dentro de esta barrera ni tampoco sobre la zona de causa mayor.*

En su contrainterrogatorio, el Estado trata de establecer que hay límites de condiciones para atacar la viabilidad real de los usos designados por el Ing. Isern[183]:

> *P: La pregunta no es si modifica la zonificación que existe sino la pregunta es si estas son las condiciones generales para todas las propiedades que están en esa área del PL.E. 2, La Matilde, independientemente de la zonificación que tengan.*

> *R: sí con una salvedad o con un señalamiento y es que el plan especial se formula sobre el distrito de ordenación y los reconoce en el mismo plan.*

Primeramente, del testimonio de los tasadores de ambas partes, el señor Esteban Núñez Camacho por el Estado y del Ing. Ismael Isern por los demandantes, coinciden en que el Distrito de Ordenación EV.4., permite una gran variedad de usos de alta intensidad, y se permiten ministerialmente tanto usos comerciales como residenciales. Dicho esto, conforme a las determinaciones de hechos número 17 a la 29 de la *Sentencia* objeto de revisión en este

---

[181] TPO del 6 de agosto de 2018, líneas 21-32, pág. 69.
[182] TPO del 6 de agosto de 2018, líneas 26-32, pág. 71.
[183] TPO del 6 de agosto de 2018, líneas 3-10, pág. 70.

recurso, al TPI le mereció mayor credibilidad el testimonio del Ing. Isern y del arquitecto Bonnin, que la otorgada al perito tasador de bienes raíces del Estado, el señor Esteban Núñez Camacho, dadas las inconsistencias y errores que minaron el testimonio de la prueba pericial presentada por el apelante.

Evaluados ambos informes periciales, por todo lo antes expresado, sin lugar a duda, el preparado por el Ingeniero Ismael Isern goza de mayor confiabilidad, y lo que es más entendible, sus conclusiones están sustentadas y en cumplimiento con los requisitos de ley a tenor con las normas jurídicas previamente pormenorizadas.

Si bien el apelante trató impugnar estos testimonios, sus intentos resultaron imprecisos. El testimonio del señor Vicente Quevedo Bonilla, biólogo del DRNA, fue insuficiente para mover al TPI a obviar lo declarado por el ecólogo marino, Dr. Máximo Cerame Vivas[184] y concluir que el uso indicado no procedía, toda vez que, las condiciones de los terrenos habían variado.

Por el contrario, lo que quedó probado fue que el Informe de tasación del Ing. Isern cumplió con los requisitos pertinentes a la definición de "uso". A saber, de que los usos contemplados (comercial, de vivienda, y de conservación) fueron: físicamente posibles, legalmente permisibles y económicamente viables.

El apelante no nos colocó en posición, reseñando alguna prueba que demostrara que el Foro Primario haya actuado con parcialidad, pasión, prejuicio o error manifiesto, que nos lleve a intervenir con su determinación. Finalmente, reconocemos que, según dijimos, los foros revisores no estamos obligados a adoptar la prueba pericial, pudiendo descartarla, no obstante, a tenor con la prueba testimonial

---

[184] Apéndice 1344 del Recurso de Apelación, *Sentencia*, véase la determinación de hecho número 31: "El testimonio del Dr. Cerame Vivas mereció completo crédito al Tribunal, y permite la inferencia que para agosto de 2008 el área de humedales no desarrolla hable de las fincas sujeto tenía una cabida de 35.075 cuerdas."

y documental sometida a este Foro, no podemos hacer otra cosa que concurrir con el TPI.

**IV.**

Por los fundamentos antes expuestos, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

La Jueza Lebrón Nieves concurre con el resultado sin voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones