Certified Translation MC-2021-170
Page 1 of 58

COMMONWEALTH OF PUERTO RICO
COURT OF APPEALS
SPECIAL PANEL

| | | |
|---|---|---|
| SALVADOR EDUARDO MANDRY DONES ESTATE AND OTHERS<br><br>Respondents<br><br>v.<br><br>COMMONWEALTH OF PUERTO RICO AND OTHERS<br><br>Appellants | KLAN201901253 | *APPEAL* originating from the Court of First Instance, Ponce Part<br>Civil No.:<br>J AC2008-0853<br><br>Re:<br>Inverse condemnation |

Panel composed of its chief Judge Gloria L. Lebrón Nieves, Judge Misael Ramos Torres, and Judge Reyes Berrios[1]

Reyes Berríos, Presiding Judge

### JUDGEMENT

In San Juan, Puerto Rico, on September 14, 2021.

Appears before us the Commonwealth of Puerto Rico, through the Office of the Attorney General, ("Commonwealth" or appellant), and requests that we revoke a Judgment issued by the Court of First Instance, Superior Part of Ponce, (TPI, Primary Forum or *a quo* Forum), on August 6, 2019, recorded and notified on December 23, 2019.[2] Through that opinion, the CFI declared a claim for reverse condemnation brought by the heirs who compose the Salvador Mandry Nones Estate ("Mandry Estate," plaintiffs or respondents). Consequently, the Primary Forum ordered the Commonwealth to pay $30,496,000.00 for

---

[1] By Administrative Order No. TA-2021-002 Hon. Misael Ramos Torres was designated replacing Hon. Aida Nieves Figueroa. In addition, the panel was reduced to three members, since Hon. Ivelisse M. Dominguez Irizarry did not participate in the proceedings.

[2] We clarify that the appealed *Judgment* was notified in December 2019 since, when the automatic stay previously decreed was lifted, although the Federal Bankruptcy Court authorized the continuation of proceedings until the final adjudication of this case, it excluded from the "*Lift of Stay Notice*" the recording of the judgment entered in due course, as well as any procedure for the enforcement of a judgment and the obtaining of provisional remedies. See Attachments LXI-LXIV, pp. 1443-1561.

Identifier Number
SEN2021_____

Case:17-03283-LTS Doc#:18994-2 Filed:11/01/21 Entered:11/01/21 14:23:01 Desc:
Exhibit Certified Translation of the Judgment Page 2 of 58

Certified Translation MC-2021-170

Page 2 of 58

KLAN201901253 2

fair compensation and interest on that amount from the date of taking until its full payment, plus costs.

With the benefit of the appearance of the parties and the *Transcript of the Oral Evidence*, in accordance with the applicable Law, we decide the issues before our consideration.

## I.

The above-captioned case finds its genesis in the passage of Act No. 227 of August 9, 2008 ("Act No. 227"), which purpose was to designate the Punta Cucharas natural area of the Municipality of Ponce as a Nature Reserve area of the Commonwealth of Puerto Rico, to be administered under the provisions of Act No. 150 of August 4, 1988, known as the "Puerto Rico Natural Heritage Program Act." Under Act No. 227, hundreds of cuerdas[TN] of land, located in the Municipality of Ponce, became part of a nature reserve created by legislation, with the specific purpose of being administered by the Department of Natural and Environmental Resources ("DNER") in accordance with Act No. 150[3].

Act No. 150 granted the DNER a mechanism to allow and facilitate "the acquisition of areas of high natural value to protect and conserve them for the use and enjoyment of this and future generations of Puerto Ricans."[4] Among the objectives of this statute is to "encourage and strengthen non-governmental organizations in the country so that they can continue to share with the Government the burden and responsibility of the conservation of our resources,"[5] Accordingly, Act No. 150 provided that "[t]he acquisition of land through the

---

TN: Translator's note: A *cuerda* is a land measurement that equals 3930.395625 meters.
[3] *Supra.*
[4] Explanatory Memorandum, Act No. 150-1988.
[5] *Id.*

Puerto Rico Natural Heritage Program will be carried out using varied and innovative strategies in close coordination between the Government of the Commonwealth, the Federal Government, and local and foreign private organizations."[6] This, recognizing that the conservation of Puerto Rico's natural resources cannot be achieved if the Government acts alone; rather, it is everyone's responsibility.[7] With the legislative background set forth above, we will proceed to relate the facts related to the controversies at hand.

On October 24, 2008, Mr. Salvador Mandry Nones and several members of his family[8] filed a complaint for inverse condemnation against the Commonwealth and Mr. Javier Enrique Mandry Mercado[9] (Mr. Mandry Mercado), claiming fair compensation for the value of certain properties they owned. In summary, respondents claimed to be owners in fee simple of two (2) properties located in the Canas Ward of the Municipality of Ponce, which they described as follows:

> PLOT MT-3 - RUSTIC: Located in the Canas Ward of the municipality of Ponce with a space of eight hundred cuerdas forty-six centimes, equivalent to three hundred and fifteen hectares, zero areas, fifty-eight centiareas, and three hundred eighty-four miliareas, this is accommodated once discounted five point four (5.04) cuerdas for the firing range of the Police of Puerto Rico, and which consists of the following portions:
> PORTION A RUSTIC: Located in the Canas Ward of the municipality of Ponce, composed of one hundred and ninety-two cuerdas fifty-one cent, equivalent to seventy-five hectares, sixty-six areas, forty-one centiarea, and three hundred and four miliareas, of flat land, identified in the segregation

---

[6] *Id.*
[7] *Id.*
[8] Plaintiff, Salvador Mandry Nones died on February 1, 2011, and was replaced by his five children Salvador Rafael, Eduardo José, Margarita Rosa and Adrián Roberto, and Javier surnamed Mandry Mercado, who were already parties to the dispute, as well as his widow Rosa Estela Mercado Guzmán, who voluntarily submitted to the jurisdiction of the primary forum.
[9] It appears from the complaint that Mr Mandry Mercado did not join as co-plaintiffs in the above captioned action, despite having a 13,100% stake in the properties in question. For this reason, being an indispensable party, he was brought to the lawsuit as a co-defendant. See, Attachment I, p. 4 of the Appeal Appendix.

plan as MT3-Flat Portion, bordering to the North, with land of the Aqueduct and Sewerage Authority of Puerto Rico, Regional Office, in an alignment of two hundred eight point six (208.06) meters, with land of the Municipal Government of Ponce in two alignments totaling four hundred and fifty-three point three (454.03) meters and with state highway number Two in six alignments totaling six hundred and twenty-six point ninety-eight (626.98) meters; to the East, with the MT-2 Flat Portion in an alignment of eight hundred and thirty-six zero point nine (836.09) meters; on the South, with the Caribbean Sea in six alignments totaling eight hundred and sixty point forty-seven (860.47) meters and on the West, with the MT-4 FLat portion in an alignment of seven hundred and twenty point forty-one (720.41).

It is recorded on folio 293, volume 635 of Ponce II, farm 1,908, 1st recordation.[10]

RUSTIC: Plot TM-2 located in the Canas Ward of the municipality of Ponce, Puerto Rico, composed of THIRTEEN POINT EIGHTY-NINE CUERDAS equivalent to FIFTY-FOUR THOUSAND FIVE HUNDRED AND NINETY-THREE POINT ONE THOUSAND TWO HUNDRED AND SEVENTY-SEVEN SQUARE METERS; on the northern borders, at 65,292 meters with State Highway No. 2; to the South, at 64,554 meters and .430 meters with the Caribbean Sea; on the East, at 86,087 meters with land owned by Mandry Mercado Estate and on the West, at 845.48 1 [sic] meters with land of the farm from which it is segregated. It is recorded on folio 8, volume 696 of Ponce II, farm 4, 751, 1st recordation.[11]

Appellants stated, as to their origin, that the farms described above had been segregated from a larger farm known as "La Matilde" as a result of the partition of the assets belonging to the "Mario Mercado e Hijos" extinct agricultural partnership.[12] They pointed out that these properties were located in an area that, as of December 2003, was included in a special development plan under the Territorial Planning Regulation of the Municipality of Ponce designated as "PL.E. 2 La Matilde". They alleged that the development objectives of this special plan

---

[10] Appellants alleged that the space of this property was reduced by 8,4201 cuerdas through an expropriation carried out by the Puerto Rico Highway Authority in civil case No. EF2007-0320. *Id.*, at p. 5.

[11] Appellants also argued that the capacity of that property was reduced by 0.9567 cuerdas through an expropriation carried out by the Puerto Rico Highway Authority in civil case No. K EF2007-0321. *Id.*, at p. 6.

[12] *Id.*

were "to maximize the potential of the area for residential and tourist projects, preferably oriented to the Caribbean Sea and commercial, preferably throughout the future PR-2 expressway while establishing a wetland protection zone."[13]

They argued that, back in 2005, Mr. Salvador Mandry Nones had submitted to the Municipality of Ponce the "Mandry Sea Side Estate" proposal, a preliminary commercial tourism development project, consisting of 814 housing units, a "condo-hotel" of 256 units, and a commercial area of 258,480 square feet, among others. They indicated that, subsequently, the Legislative Assembly approved the aforementioned Act No. 227 and designated the concerned area as a State Nature Reserve to be administered by the DNER under the provisions of Act No. 150[14]. That is, they maintained that, as a result of the legislative action, the farms of their property described above had become part of the aforementioned Nature Reserve, established by Act No. 227.[15]

Therefore, they argued that such action by the Commonwealth, of including the farms in the Punta Cucharas Nature Reserve area, had deprived "plaintiffs of any possible use of their properties and [constituted] a taking of their real right of property by imposing restrictions on property through laws and regulations, without the State having previously filed an expropriation action [and] deposited a fair compensation."[16]  They also argued that, as a step prior to including the plaintiffs' lands within the Nature Reserve area, in 2007 the DNER had carried out an "arbitrary and illegal" demarcation of the Maritime Land Zone ("MLZ") and,          as          a          consequence,          a          large          part          of          one

---

[13] *Id.*
[14] *Supra.*
[15] Attachment 1, Appeal Appendix, p. 7.
[16] *Id.*, at p. 8, paragraph 15.

of the plots remained within the MLZ.[17] This, as a subterfuge, because the DNER contemplated the future acquisition of the farms in order to convert these lands into public property to reduce the compensation to which the owner plaintiffs would be entitled in due course. In accordance with the assertions, they asked the CFI to order the Commonwealth to pay them the sum of $44,924,475.00 as fair compensation for the value of the land they owned included in the area of the Punta Cucharas Nature Reserve.[18]

In response, on December 11, 2008, Mr. Mandry Mercado appeared, for the first time, through Mr. Manuel Purcell Requena, submitting his answer to the complaint. Subsequently, Mr. Mandry Mercado sought to withdraw the referred answer to the complaint signed by Mr. Purcell Requena and replace it with an amended answer to the complaint signed pro se. The CFI did not authorize the filing of the amended response and ordered the co-defendant to engage legal representation. After Mr. Mandry Mercado repeatedly failed to comply with the order, the CFI did not accept his response to the complaint and was noted in default.[19]

On the other hand, on March 25, 2009, the Commonwealth filed a motion to dismiss since the plaintiffs did not have a cause of action justifying the granting of a remedy.[20] In tight summary, appellants argued that from the face of an action of inverse

---

[17] *Id.*
[18] *Id.*
[19] Specifically, on May 28, 2010, the CPI did not authorize Mr Javier Mandry Mercado to appear pro se, and therefore ordered him to retain legal representation. Faced with Javier Mandry's repeated failure to comply with the orders of the instance forum, on November 17, 2010, an order was issued eliminating his pleading and he was found in default. Despite this, Mr. Mandry Mercado continued to submit briefs pro se, which caused the Forum a quo on December 5, 2017, to advise him that a new violation could be understood as "contempt of court and could lead to severe penalties." Attachment LIV, pp. 1306-1335, 1309 of the Appellate Appendix.
[20] *Id.*, Attachment II, pp. 12-31.

Case:17-03283-LTS  Doc#:18994-2  Filed:11/01/21  Entered:11/01/21 14:23:01  Desc:
Exhibit Certified Translation of the Judgment  Page 7 of 58

Certified Translation MC-2021-170
Page 7 of 58

condemnation filed by reason of an alleged regulatory taking, it must appear that plaintiffs had exhausted all administrative proceedings prior to the filing of a legal action. As for the alleged illegal demarcation carried out by the DNER, the Commonwealth argued that the process of demarcation of the MLZ did not constitute an attempt to establish ownership, but merely the actual and physical extension of an inland maritime property.

In other words, it claimed that the demarcation carried out by the agency was limited to verifying a physical reality, which requires the intervention of a certified professional in surveying, to carry out the technical work of verifying in the field the physical characteristics of the goods identified as maritime land. Therefore, it stated that if plaintiffs intended to challenge the demarcation of the MLZ made on the lands at issue, it was certainly the corresponding forum for that purpose was the DNER and not the judicial forum.[21]

On the other hand, the Commonwealth held that, according to the Eminent Domain Act[22] and the interpretative jurisprudence related to regulatory taking, the State could affect any privately owned land for a term of 8 years, reserving it for a public purpose or use. Thus, in accordance with the foregoing, it stated that the land subject to the lawsuit could be reserved by the State for a period not exceeding 8 years from

---

[21] It should be noted that, following several procedural incidents, on August 7, 2013 the Commonwealth and the respondents submitted the "Report of the Preliminary Conference between Counsel". As appropriate, they stipulated that there was no dispute in that the Commonwealth does not intend to claim any part of the plaintiff's properties described in exhibit 2 of the complaint because they are within the limits of a MLZ demarcation. In this regard, the respondents expressed the following in the part of the renounced claims or defenses; "[i]n the fact that the Commonwealth stipulated that it does not claim that any portion of the properties described in the lawsuit be in the public domain because they are part of the maritime land zone, **the claim regarding the nullity of the demarcation made by the DNER in 2007 is withdrawn**." (Emphasis provided). *Id.*, Attachment VIII, p. 222.

[22] Act of March 12, 1903, as amended, known as the "General Eminent Domain Act", 32 LPRA sec. 2901 et seq.

the affectation. Accordingly, it argued that 8 years had not elapsed since the adoption of Act No. 227 at the time of the filing of the complaint and that plaintiffs were therefore prevented from seeking the expropriation of the land in question until that period had elapsed.

Plaintiffs opposed that motion to dismiss and, in turn, requested the CFI to issue partial summary judgment in their favor.[23] On May 18, 2009, the *a quo* forum held the initial conference and, among other things, rejected the motion to dismiss filed by the Commonwealth and ordered that party to file its opposition to the motion for partial summary judgment requested by plaintiffs.[24] In compliance, on July 21, 2009, the Commonwealth filed its "Answer to the Complaint," as well as the corresponding "Motion in Opposition to Request for Summary Judgment."[25]

On November 20, 2009, the CFI entered a *Resolution*[26] denying plaintiffs' request for partial summary judgment. In what is relevant, the Primary Forum issued the following findings of undisputed facts:

> (1) Act No. 227 was passed by the Legislative Assembly of Puerto Rico on August 9, 2008, and entered into force after its passage.
>
> (2) Act No. 227 designated the Punta Cucharas Natural Area of the Municipality of Ponce as a Nature Reserve Area of the Commonwealth of Puerto Rico to be administered under the provisions of Act No. 150 of August 4, 1988 (known as the Puerto Rico Natural Heritage Program Act).
>
> 3) The plaintiffs are owners of the properties together with the co-defendant Javier Mandry Mercado.

---

[23] *Id.*, Attachment III, pp. 32-52.
[24] *Id.*, Attachment IV, pp. 53-54.
[25] *Id.*, Attachment V, pp. 55-81 and Attachment VII, pp. 91-94.
[26] *Id.*, Attachment VI, pp. 82-90.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 9 of 58

Certified Translation MC-2021-170
Page 9 of 58

KLAN201901253                                             9

(4) The title deeds of plaintiffs and of co-defendant Javier Mandry Mercado are recorded in the Registry.

5) The Department of Natural and Environmental Resources prepared a "Punta Cucharas Area Natural Value Report" in June 2004.

(6) Said report recommended the designation of the area as a nature reserve and served as the basis for the adoption of Act No. 227.

(7) The Secretary of the DNER sent a letter to co-plaintiff Salvador Mandry Nones notifying him that on July 19 and August 31, 2005, technical personnel of the Surveying Division and the Assistant Planning Secretariat visited the area of Finca Matilde with the purpose of initiating work on the demarcation of the Boundary of the Maritime Land Zone on lands known as Finca Matilde in Ponce.[27]

8) A plan entitled "Acquisition Plan for La Matilde Nature Reserve, Finca La Matilde, Ponce, Puerto Rico" was issued upon request of the DNER.

9) In this plan appear the farms described in the complaint with the numbers 003 and 004.

10) The area of farm 003 in said plan and which is identified as 003-01, has a space of 133.6696 cuerdas.

11) The area of farm 003 in said plan and which is identified as 003-02, has a space of 49.8228 cuerdas.

12) The area of farm 004 in said plan and which is identified as 004-01, has a space of 7.8730 cuerdas.

13) The area of farm 004 in said plan and which is identified as 004-02, has a space of 4.0760 cuerdas.

(14) Plaintiffs did not have to exhaust administrative remedies since it was the DNER who designated the area as a nature reserve.[28]

Rather, the CFI ruled that the following matters were at issue:

(1) Whether or not the legislation referred to in this case had the effect of zoning and whether or not it deprived plaintiffs of all productive use and development of

---

[27] *Id.*, Attachment III, at p. 50; Attachment VI, p. 88; Attachment VIII, at pp. 100 and 111.

[28] *Id.*, see Attachment VI, Appeal Appendix, pp. 87-88. With respect to this paragraph, the State in its Motion to Dismiss clarified that it withdrew from the scope to the effects that plaintiffs had to exhaust administrative remedies in order to be able to file their complaints. See footnote 4 in the Appeal, p. 4.

plaintiffs' property. That is, whether the fact that a law designates an area as a nature reserve prevents the owners of that area from any productive use of their property.

2) The legality or illegality of the demarcation carried out if the DNER complied with the legal and regulatory requirements.

(3) Whether the State has attempted to claim plaintiffs' land because it is within the boundaries of demarcation of the Maritime Land Zone."[29]

Thus, the *a quo* Forum decided to bifurcate proceedings, providing that it would decide, in first instance, whether the passage of Act No. 227[30] constituted a taking of the plaintiffs' property, and then, would entertain what was related to the just compensation if it was proper.

On September 11, 2013, plaintiffs-respondents herein filed a second motion for partial summary judgment, on that occasion, only as to their claim that the inclusion of their property in the area designated as a Nature Reserve constituted a taking by the State of private property for public use without due compensation.[31] In response, on October 30, 2013, the Commonwealth filed its opposition and requested that summary judgment be entered in its favor on the grounds that the mere passage of that statute while acknowledging that it had the effect of designating a certain area as a nature reserve, in itself, did not constitute a taking.[32]

On February 27, 2014, notified on March 5 of the same year, the CFI issued a *Partial Judgment* and determined that Act No. 227 constituted a legislative or regulatory taking that deprived

---

[29] *Id.*, Attachment VI, p. 88. It is clarified that as regards the alleged illegality of the demarcation of the Maritime Terrestrial Zone, respondents withdrew the claim concerning the nullity of the demarcation made by the DNER in 2007. See footnote 5 of the *Civil Appeal*, p. 4 and Attachment VII, p. 222 of the Appeal Appendix.
[30] *Supra.*
[31] *Id.*, Attachment IX, pp. 227-323.
[32] *Id.*, Attachment X, pp. 324-731.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 11 of 58

Certified Translation MC-2021-170
Page 11 of 58

respondents of any economic benefit of their property, stating that only what concerned fair compensation remained to be awarded.[33] In disagreement, on March 20, 2014, the Commonwealth filed a motion for reconsideration, which was duly denied by *Resolution* of April 23, 2014.[34] Faced with such denial, on May 30, 2014, the Commonwealth filed a request for Certiorari before this Court of Appeals, Case No. KLCE201400713, requesting the review and revocation of the aforementioned *Partial Judgment* of February 27, 2014.[35]

After several procedural incidents at the appellate level, on June 30, 2014, this Appellate Forum entered a Resolution wherein it denied the issue of the requested writ of *certiorari*. There, a sister panel of this Court concluded that, in the light of the criteria set forth in Rule 40 of our Rules of Procedure, the discretionary appeal should not be issued.[36] From this ruling, the Commonwealth appealed in *Certiorari* to the Supreme Court on September 24, 2014, in the case *Salvador Mandry Nones Estate v. Commonwealth*, CC-2014-0801. The High Forum refused to issue the order requested by *Resolution* of December 5, 2014.[37]

---

[33] *Id.*, Attachment XII, pp. 809-827.
[34] Plaintiff-appellants filed an opposition to the motion for reconsideration on April 9, 2014. *Id.*, see Attachment XIII, pp. 828-846; Attachment XIV, pp. 847-855 and Attachment XV, pp. 856-858.
[35] In that action, the Commonwealth stated that the following errors were committed:

> The Court of First Instance erred in summarily adjudicating the merits of the above captioned inverse condemnation, concluding that the mere passage of Act 227 constituted a regulatory or legislative taking.
>
> The Court of First Instance erred in entering judgment in favor of plaintiffs, even though they did not establish the existence of a final award determination issued by the concerned agencies denying that party any productive or reasonable use of their property, as required by the jurisprudence.
>
> The Court of First Instance erred in not dismissing the complaint summarily, despite the fact that the State, in its request for summary judgment of October 30, 2013, established as an undisputed fact the absence of a final adjudicative determination issued by the concerned agencies that would deny plaintiffs of any productive or reasonable use of their property. *Id.*, see Attachment XVII, pp. 898-908.

[36] *Ibid.*
[37] Attachment XXI, Appeal Appendix, pp. 929-930.

Thus, after the issue of the corresponding mandates, proceedings continued to be tried before the CFI, specifically in regard to the award of fair compensation. After several procedural incidents, on April 11, 2017, the State filed a brief entitled "Memorandum of Law and Request for Summary Judgment"[38] and requested that the following issues inherent in the award of the just compensation corresponding to respondents be summarily disposed of:

"1. Whether the demarcation of the MLZ made by the DNER between 2006 and 2007 could be challenged by the plaintiffs, even though they did not use the administrative route for that purpose.

2) Whether the aforementioned demarcation is void.

3) Whether, in order to determine the value of the property subject to this lawsuit, it is necessary to determine the extension of the MLZ, the salvage and surveillance easement, the coastline, the extension of the wetland and mangrove area, and the extension of the classified area (SREP. N) as they are conditions that affect the use of the property, its marketability, the amount of land that can be developed, the density of the development that will be allowed, the costs of development and feasibility.

(4) Whether in accordance [with] such finding, the use to which portion of the property may be devoted within the areas thus delimited is affected."[39]

It argued that "respondents were now trying to challenge, within this proceeding, the validity of the demarcation made between 2006 and 2007 by the DNER to justify awarding the fair value of the property without considering that there is a large MLZ, comprising more than 100 cuerdas, which by its nature, has restrictions on use. It argued that the appraisal by plaintiffs' expert had only taken into consideration 35 cuerdas of wetland arising from a finding by the United States Army Corps of Engineers, which had lost its

---

[38] Attachment XXVIII, Appeal Appendix, pp. 1014-1129.
[39] Id.

validity several years ago and, moreover, did not necessarily establish the total size of wetlands and mangroves contained in the plot at issue.[40]

In turn, he emphasized that it was not taken into account that the Territorial Planning Plan of the Municipality of Ponce classified a strip of land as Specially Protected Natural Rustic Land (SREPN [Spanish Acronym), which entailed restrictions on use, that should be considered. It also argued that the fact that the property was located in a flood zone within the "Coastal Barrier Zone," so declared by federal authorities, should be considered since the aforementioned conditions affected the finding of fair compensation.[41] For their part, respondents duly opposed that letter by means of a motion filed on April 24, 2017,[42] and the Commonwealth replied by means of a brief filed on May 3, 2017.[43]

On May 28, 2017, the Commonwealth filed a "Notice of Stay of Proceedings by Virtue of the Filing of the Petition Filed by the Government of Puerto Rico under PROMESA Title III."[44] On May 31, 2017, respondents joined the stay of proceedings requested by the state. Therefore, on June 7, 2017, the CFI entered *Judgment* accordingly, staying proceedings of the case and ordering its administrative closing.[45]   Subsequently, respondents and the Commonwealth filed a stipulation with the Federal Bankruptcy Court to lift the stay. Accordingly, the Federal                         Court                         authorized

---

[40] *Id.*, see also Appeal Brief, p. 7
[41] *Id.*
[42] See Attachment XXIX, pp. 1130-1135 of the Appeal Appendix.
[43] *Id.*, Attachment XXX, pp. 1136-1140.
[44] Attachment XXXI, pp. 1141-1143.
[45] Attachment XXXV, Appeal Appendix, pp. 1154-1159.

the continuation of the proceedings on the condition that the judgment entered in due course not be recorded.[46]

Accordingly, the stay was lifted, and the trial on its merits was held on August 6-9 and 16-17, 2018, September 4 and 6, 2018, and October 4, 6, and 30, 2018.[47] For defendants-appellants testified:

- Mr. Vicente Quevedo Bonilla, Biologist and DNER Technician
- Mr. Gerardo Ramos, Surveyor
- Mr. Esteban Núñez Camacho, Expert Appraiser

Testifying for plaintiffs-respondents:

- Mr. Javier Bonnin Orozco, Architect
- Dr. Máximo Cerame Vivas, Marine Ecologist
- Engineer Ismael Isern Suárez, Expert Appraiser

After concluding the testimony of Eng. Isern Suárez, the Commonwealth stated that the report prepared by said expert and presented in evidence by plaintiffs-respondents did not correspond to the copy provided to the defendant. The matter was discussed in court, and respondents admitted that by mistake and inadvertence, they offered into evidence a preliminary copy of Eng. Isern Suárez's report, having admitted the wrong copy. Faced with this situation, the CFI ordered that Eng. Isern Suárez return to the witness stand to clarify which of the reports provided was the final one that should be submitted in evidence.

For its part, and as a result of the above, the Commonwealth offered as evidence the report of Eng. Isern Suárez which he identified as preliminary -despite having the same date of preparation and issue and which content was the same, except with regard to the appraised value-. It is understood that the copy of the report erroneously

---

[46] Attachment XXXVI, Appeal Appendix, pp. 1160-1193.
[47] On 16 October 2018, a motion was filed informing the death of plaintiff Estrella María Aparicio Vázquez on August 28, 2018, and requesting her substitution by her heirs, her son Oscar Adolfo Aparicio, her grandchildren María del Carmen and Selma Verónica, of surnames Mandry Llombart, and Oscar Adolfo and Gustavo Alejandro, of surnames Mandry Bonilla.

admitted and marked as respondents' Exhibit, had a valuation lower than the value reflected in the document provided to the State. The State attempted unsuccessfully to submit into evidence the aforementioned report identified as preliminary and erroneously offered by plaintiffs and admitted by the CFI as rebuttal evidence.[48]

For this reason, the Commonwealth requested that the aforementioned preliminary report be marked as evidence offered and not admitted under Rule 104(b) of Evidence, together with the documents related to the value of comparable properties and a document entitled "Report on Efforts Made by the Office of Territorial Planning for the Protection and Maintenance of the Natural System of Laguna Salinas," the evidence of which had been offered in order to challenge respondents' expert.[49]

After the trial, on August 6, 2019, the CFI issued the appealed *Judgment* and recorded the following findings of facts:

The parties stipulated the veracity of the following facts:

1. The areas of the farms at issue in this case as of August 9, 2008, were: Finca 1,908, 184,0899 cuerdas; Farm 4,751 was 12.9333 cuerdas. The combined space of both was 197.0232 cuerdas.

2. In June 2004, the DNER issued a report entitled *Report on Natural Value Punta Cucharas Natural Area,* wherein the designation of the area as a nature reserve was recommended.

3. As part of the efforts made by the DNER aimed at achieving the designation of the Punta Cucharas Natural Area, the DNER carried out a demarcation of the Maritime Terrestrial Zone (MLZ).

4. On February 2, 2007, Surveyor José A. Vilanova Portalatin, Director of the Surveying Division of the DNER, recommended and the Secretary of the

---

[48] OCT 30, 2018, lines 12-17, p. 20.
[49] Attachment LXVI, Appeal Appendix, pp. 2142-2164.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 16 of 58

Certified Translation MC-2021-170
Page 16 of 58

DNER approved a plan entitled *Land Acquisition Plans for "La Matilde" Property.*

5. In the plan of February 2, 2007, entitled *Land Acquisition Plans for "La Matilde" Property*, the MLZ is demarcated in the two farms subject to this case. The area that was included as part of the MLZ on farm 1,908 was designated in the plan as Plot 003-01 with a capacity of 134,0042 cuerdas. The area that was included as part of the MLZ on farm 4,751 was designated on the plan as Plot 004-01 with a space of 7.1214 cuerdas.

6. **On February 21, 2007, the Secretary of the DNER sent a letter to Mr. Salvador Mandry Nones notifying him "that on July 19 and August 31, 2005, technical personnel from the Surveying Division and the Office of the Under Secretary of Planning visited the Area of the Matilde Estate with the purpose of initiating work on the demarcation of the Boundary of the inland Maritime Land Zone.** (Emphasis ours).

7. The Commonwealth of Puerto Rico has no intention of claiming any part of plaintiffs' land because it is within the boundaries of a maritime land zone.

8. Farms 1,908 and 4,751 are located in an area that was included in a Special Area Plan in the Territorial Planning Plan called "PL.E.2 [Spanish Acronym] LA MATILDE". Article 44.3 of the T.P.R. establishes that "The Special Plan for the area of La Matilde aims to facilitate a residential, tourist, and commercial development conditioned on the protection of natural resources such as La Laguna Salinas and a wetland area south of the identified area and the conversion of PR.2 into an expressway with the construction of frontage roads.

9. Article 44.3 also provides that the objectives of the development of the plan are:

- Maximize the potential of the area for residential and tourist projects, preferably oriented toward the Caribbean Sea and commercial, preferably throughout the future of the PR-2 expressway.
- Order development along frontage roads to PR-2 to avoid direct connections to it.
- Establish a wetland and Salinas lagoon protection zone."

10. Farm 1,908 and Farm 4,751 were within two Planning Districts: EV.4, whose purposes and permitted uses appear in Chapter 16 of the T.P.R. and the SREP. N, whose purposes and permitted uses appear in Chapter 35 of the T.P.R.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 17 of 58

Certified Translation MC-2021-170
Page 17 of 58

KLAN201901253                                                        17

11. The parties stipulate that the appraisal experts of both parties, Mr. Ismael Isern, for plaintiffs, and Mr. Esteban Núñez Camacho, for defendants, are duly qualified to give a position on the valuation of the properties at issue in this suit.

**By virtue of the evidence admitted and believed by the Court** (emphasis ours) during the hearing on its merits, the following facts were additionally proven:

12. The recordation descriptions of the properties of which plaintiffs, together with defendant Javier Mandry, were owners in fee simple and which were included in the Punta Cuchara Nature Reserve, are:

PLOT MT-3- RUSTIC: Located in the Canas Ward of the municipality of Ponce with space of eight hundred and one cuerdas forty-six centimes, equivalent to three hundred and fifteen hectares, zero areas, fifty-eight centiareas, and three hundred and eighty-four miliareas, resulting area once discounted five point four (5.04) cuerdas for the firing range of the Puerto Rico Police, and which consists of the following portions:

RUSTIC PORTION A: Located in the Canas Ward of the municipality of Ponce, composed of ONE HUNDRED AND NINETY-TWO cuerdas fifty-one centimes, equivalent to seventy-five hectares, sixty-six areas, forty-one centiareas and three hundred and four miliareas, of flat land, identified in the plan of segregation as Portion MT3-FLat, bordering by the North, with land of the Puerto Rico Aqueduct and Sewer Authority, Regional Office, in an alignment of two hundred and eight-point six (208.06) meters, with land of the Municipal Government of Ponce in two alignments totaling four hundred and fifty-three point three (454.03) meters and with state highway number Two in six alignments totaling six hundred and twenty-six point ninety-eight (626.98) meters; to the East, with the MT-2 Flat Portion in an alignment of eight hundred and thirty-six zero point nine (836.09) meters; on the South, with the Caribbean Sea in six alignments totaling eight hundred and sixty point forty-seven (860.47) meters and on the West, with the portion. MT-4 Flat in an alignment of seven hundred and twenty point forty-one (720.41) meters.

It is recorded on folio 293, volume 635 of Ponce II, farm 1,908, 1st recordation.

RUSTIC: Plot MT-2 located in the Canas Ward of the Municipality of Ponce, Puerto

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 18 of 58

Certified Translation MC-2021-170
Page 18 of 58

KLAN201901253                                                                 18

Rico, composed of THIRTEEN POINT EIGHTY-NINE CUERDAS equivalent to FIFTY-FOUR THOUSAND FIVE HUNDRED AND NINETY-THREE POINT ONE THOUSAND TWO HUNDRED AND SEVENTY-SEVEN SQUARE METERS; on the northern borders, at 65,292 meters with State Highway No. 2; to the South, at 64,554 meters and .430 meters with the Caribbean Sea; on the East, at 836,087 meters with land owned by Mandry Mercado Estate and on the West, at 845,481 meters with land of the farm from which it is segregated.

It is recorded on folio 8, volume 696 of Ponce II, farm 4,751, 1st recordation.

13. The farms described above adjoin each other and form a continuous body with the same physical and topographical characteristics. Both appraisers agreed that the farms could be considered as a unit for valuation purposes, although the Commonwealth appraiser valued the two farms separately. From now on, both farms will be referred to as "the subject farms."

14. The subject farms are located south of the PR-2 road (hereinafter, "the PR-2") at the height of Km. 222.8. PR-2 is a road of great vehicular flow because it is the connecting route between Ponce and the West of the island. The portion of PR-2 where the farms are located had already been converted into an expressway by the date of approval of Act 227. The farms have access to PR2 from one of the frontage road areas of this road.

15. The topography is practically flat in its entirety, although some inclination from North to South.

16. Most of the farms are located within the flood-susceptible zone with an "AE" classification and the part closest to the Caribbean Sea, an area of wetlands and mangroves, has a "VE" classification. Zone "AE" indicates areas where base flood elevation has been determined.

17. **As testified by Arch. Javier Bonnin Orozco, Regulation 13 of the Planning Board, on special areas of risk to flood, establishes that classification "AE" is not an impediment to the development of the land but provides that the constructions in the areas with classification "AE" must have an elevation above the flood level. This can be achieved through the use of filler, which is usual on land in Ponce. Only in the area near the Caribbean Sea, which has a "VE" classification, there would be limited development.** (Emphasis ours).

18. The Territorial Planning Plan of the Autonomous Municipality of Ponce of 2003 establishes two classifications for the lands of the subject farms.

Case:17-03283-LTS  Doc#:18994-2  Filed:11/01/21  Entered:11/01/21 14:23:01  Desc:
Exhibit Certified Translation of the Judgment  Page 19 of 58

Certified Translation MC-2021-170
Page 19 of 58

KLAN201901253                                                      19

Most of the subject farms have a classification as urban land that is located in an underlying EV.4 district with an overlapping district, the (PL.E). The wetland area near the Caribbean Sea has an SREP.N rating.

19. PL.E (Special Plans) District is established to facilitate, through planning guides, the harmonious development or redevelopment of an area that deserves special attention. The conditions for uses, activities, intensities, and other parameters are established in the underlying Districts identified in the Planning Plans and not in the special plans of the overlapping districts. The preferential uses and activities and infrastructure design indicated in the special plans are for illustrative purposes only and should be considered as guides for harmonizing developments.

20. The special plan applicable to the subject farms is PLE.2 (La Matilde)[50]. The purpose of this special plan is to facilitate a residential, tourist, and commercial development conditioned to the protection of natural resources such as Salinas lagoon and a wetland area south of the identified area and the conversion of PR-2 into an expressway with the construction of frontage roads. The development objectives of the plan include maximizing the potential of the area for residential and tourist projects, preferably oriented to the Caribbean Sea and commercial, preferably throughout the future PR-2 expressway. The plan illustrating the development guides of the special plan places the subject in an area for new developments in accordance with the EV.4 Planning District.

21. `**The EV.4 District is established to encourage residential, commercial, service, and light industrial development in sectors allowing for a wide variety of uses with high intensity**[51] (emphasis ours).

22. The portion of the subject farms closest to the Caribbean Sea is in an SREP.N. Planning District. **The SREP.N District is established to protect or restore sensitive natural resources, establish new forests and buffer areas and allow ecotourism development in sectors that merit it. This district will also apply to protect the ecosystems that border the bodies of water. Segregation of land identified by the SREP.N District is not permitted unless it is to separate them from the original property for the purpose of reserving or dedicating them                    for                    conservation**

---

[50] Planning Regulation, Sec. 44.3.
[51] Appraisers on both sides agreed that the EV.4 Planning District allows for a wide variety of high intensity uses that both commercial and residential uses are ministerially permitted uses.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 20 of 58

Certified Translation MC-2021-170
Page 20 of 58

KLAN201901253                                                   20

**purposes**[52] (emphasis ours). The SREP.N District allows the construction of single-family homes, museums, historical sites, recreational and holiday fields, public parks and gardens, under certain conditions and restrictions of the Planning Regulations of the Ponce Territorial Plan. Any development must comply with an intensity of use of 1 housing unit for each legally segregated plot, a maximum height of 2 floors, constructions can only occur on land, side, and back yards with a minimum of 20 meters, among other restrictions[53].

23. The farms had available all the infrastructure services necessary for their development.

24. The neighborhood where the Subject is located is one of extensive urban development. In the area, there were by 2008, residential developments, industrial developments, hotels, restaurants, offices of the state and municipal governments, the "El Tuque" recreational beach area, fast food restaurants and, minutes from the subject farms, the shopping centers of Ponce Towne Center, Ponce Mall, Sam's Club, Walgreens, and K-Mart. As can be seen from the aerial photographs presented in evidence, south of PR-2, there are no residential developments.

25. Taking into consideration the factors arising from the totality of the evidence presented by the parties regarding the location, accesses, exposure to PR-2, topography, predominant uses in the neighborhood, available infrastructure, and the development guides of the special plan that locate the subject farms in an area for new developments in accordance with the EV Planning District.4, and the (sic) that the total space of both farms is 197,023 cuerdas, the Court determines that the best and most productive subject use must be established by sectors.

26. **This Court accepts the opinion of plaintiffs' appraiser, Mr. Isern, addressing the value of both properties as a whole and subdividing them into three areas or sectors.** (Emphasis ours).

27. The closest to PR-2, with a space of 50 cuerdas, its best and most productive use or destination is for commercial purposes. This space is based on several elements: the provisions of the Territorial Planning Regulation, among which is to allocate the road front for a commercial, the topography and total capacity of the subject farms; its location in the western area of Ponce, where there has been extensive commercial development;          its          visual          exposure

---

[52] Planning Regulation, Sec. 35.1.
[53] Regulations, Sec. 35.2 to 35.9.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 21 of 58

Certified Translation MC-2021-170
Page 21 of 58

KLAN201901253                                                          21

to Highway PR-2; that the size of commercial uses in the area suggests a ratio of 3 wide to 2 deep to accommodate parking space; that the economic conditions demonstrated by the Banco Popular de Puerto Rico report for the period from 2006 to 2008 revealed the economic feasibility of commercial use in an area of that space.

28. **The area closest to the Caribbean Sea, where the mangroves are located, with a space of 35,075 cuerdas, its best use is for conservation purposes. Eng. Isern determined the space of the area to which he assigned a better use of conservation based on a plan presented by Arch. Federico Montilla to the Permit Office of the Autonomous Municipality of Ponce - hereinafter, "the Permit Office" - in 2005 for a multipurpose project called Mandry Seaside Estates. This plan, in turn, rests on a jurisdictional determination – hereinafter the "JD" for the acronym in English of "Jurisditional (sic) Determination"- on wetlands that was issued for the farms subject to the Corps of Engineers of the United States Army - hereinafter, "the Corps of Engineers" - on November 1, 1995. That JD was managed by Dr. Máximo Cerame Vivas and established that the wetlands to be protected (Wetlands) covered an area of 35,075 cuerdas and the lands susceptible to development (Upland), 171.280 cuerdas. The validity of the JD was 5 years.** (Emphasis ours).

29. When the Mandry Seaside Estates project was submitted in 2005, **the Permit Office required the preparation of an updated JD.** On August 5, 2005, officials of the Permit Office of the Autonomous Municipality of Ponce evaluating the "Mandry Seaside Estates" project sent a letter to Mr. Salvador Mandry **requesting a review of the demarcation of the maritime land area that appeared in the submitted plans**. On October 24, 2005, the Corps of Engineers instructed Arch. Montilla that the new JD would be made according to the "1987 Wetland Demarcation Manual", the same one that was used for the one of 1995. The endeavor to process the update of the JD was again entrusted to Dr. Cerame Vivas. (Emphasis ours).

30. Dr. Cerame Vivas testified that in the discharge of that parcel, he made several visits to the farms walking, flying over, and photographing them. **Although the management process of the updated JD was not concluded, his observations led him to conclude that there was no significant variation in the wetland area during the years since the 1995 JD.** Dr. Cerame Vivas explained that to issue the JD, the Corps of Engineers negotiates its jurisdiction and chooses the area that it is interested in protecting, which     means     that     it     is     possible

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 22 of 58

Certified Translation MC-2021-170
Page 22 of 58

KLAN201901253                                           22

that in the "Upland" area, there may be wetlands that need not be protected. (Emphasis ours).

31. **Dr. Cerame Vivas' testimony deserved full credit to the Court and allowed the inference that by August 2008, the non-developable wetland area of the subject farms had a space of 35,075 cuerdas.**[54] (Emphasis ours).

32. For the portion of the subject farms that is located between the area to which it attributed a better commercial use and the area to which it assigned a better use for conservation, with a space of 111,948 cuerdas, its best and most productive is for tourist residential purposes.

33. Eng. Isern valued the area of 50 cuerdas (196,519,8300 s.m.) near road PR-2, to which he attributed a better commercial use, at $20,600,000.00, with a unit price of $105.00 per square meter. He did the valuation using the comparable sales method, for which he used four sales of properties located in Ponce, with the same EV.4 classification and best commercial use. Adjusted units of comparable sales were $115.00/s.m. for No. 1, $131.00/s.m. for No. 2, $161.00/s.m. for No. 3, and $105.00/s.m. for No. 4.

34. The State appraiser, Mr. Núñez, assigned a best mixed, commercial-residential use to the land near PR-2. He valued Plot 003-02, to which he attributed a space of 49,8228 cuerdas (195,823,1866 s.m.) at $13,708,000, with a unit price of $70.00 per square meter[55] He used the comparable sales method, using four sales, three of which were in EV-4 planning districts and one in an EV-3 district. The adjusted units of comparable sales to value Plot 003-02 were $73.00/s.m. for number 1, $69.00/s.m. for number 2, $72.00/s.m. for number 3 and $67.00/s.m. for number 4.

35. The adjoining lands, Plot 004-02, with space of 4,0760 cuerdas (16,020,3265 s.m.), he valued them at $2,243,000.00, with a unit price of $140.00 per square meter. He used the comparable sales method with four sales, three of which were in EV-4 planning districts and one in an EV-3 district.

36. The space of Plots 003-02 indicated in the stipulated acquisition plan is not 49.8228 cuerdas,

---

[54] Rule 110 (C) of Evidence establishes that in order to establish a fact does not require such degree of proof which, excluding the possibility of error, produces absolute certainty.

[55] In the valuation report effective November 15, 2007, he concluded that the value of this plot was $14,882,600.00 with a unit price of $76.00/s.m.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 23 of 58

Certified Translation MC-2021-170
Page 23 of 58

KLAN201901253                                                                    23

but 64.05061 cuerdas, equivalent to 253.534.6697 s.m[56]. **The space of this plot used by Mr. Núñez arises from a plan that was provided to him, which differs from the stipulated plan.** If Plot 003-02 is valued with the space of 253,534,6697 s.m. that appears in the stipulated plan, using the unit price of $70/s.m. established by Mr. Núñez, its value would amount to $17,747,426.88. (Emphasis ours).

37. The area of 50 cuerdas to which Eng. Isern attributes a better commercial use is within the combined capacity of 53.8998 cuerdas of Plots 003-02 and 004-02 to which Mr. Núñez attributes a better mixed commercial-residential use.

38. Eng. Isern's view that the 50 cuerdas closest to PR-2 have a best and more productive commercial use is based on reasonableness criteria arising from his report and testimony **and were not rebutted by the Commonwealth**. By comparing the value opinions of both experts on the land near PR-2, we conclude that the value estimated by Eng. Isern for the 50 cuerdas to which he assigns a best commercial use is justified and reasonable. (Emphasis ours).

39. **Mr. Núñez did not make a valuation of lands which best used were for residential purposes. Neither from his report nor from his testimony on Plots 003-02 and 004-02, close to PR-2 to which he attributed a best residential, commercial mixed-use, can a valuation be drawn for the best residential use. In his reports on both plots, three of the four comparables he considered for valuation have better commercial use, and one, a mixed-use, residential-commercial**. (Emphasis ours).

40. Eng. Isern valued the property of 111,948 cuerdas (440,000,0386 s.m.), to which he attributed a better residential use of $9,700,000, based on a unit price of $22.00 s.m. To reach that value, he used three comparable sales with adjusted values of $42.00, number 6; $38.00, number 7 and $17.00, number 5.

41. The use of comparables 6 and 7 was challenged by Mr. Núñez, who testified that they had a best commercial use. **In cross-examination, however, he acknowledged that the EV.2 classification of sale number 6 only allowed residential uses. The rating of comparable sale number 7 is EV.4, which also allows residential uses, but even if this comparable is discarded, the unit price of $22.00/s.m. for residential use is still reasonable.** (Emphasis ours).

---

[56] Exhibit I by stipulation, sheet 4.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 24 of 58

Certified Translation MC-2021-170
Page 24 of 58

KLAN201901253                                                        24

42. Eng. Isern valued the 35,070 cuerdas to which he attributed a better conservation use at $196,000.00 based on a unit price of $5,600.00/cuerda. He used the comparable sales method with three comparable sales. [To] number 8, he gave an adjusted unit of $1,900.00/cuerda; number 9 was given an adjusted unit of $5,600.00/cuerda, and number 10 was given an adjusted unit of $3,200.00/cuerda.

43. **The State appraiser, Mr. Núñez, assigned a best conservation use to plots 003-01 and 004-01, with spaces of 134.2271 cuerdas and 8.8573 cuerdas respectively.** He valued Plot 003-01, at $537,000.00, with a unit price of $4,000.00 per cuerda. He used the comparable sales method with five comparable sales. Adjusted units of comparable sales to value Plot 003-01 were $3,132.95/cuerda for number 1, $3,250.00/cuerda for number 2, $5,111.10/cuerda for number 3; $5,268.92/cuerda for number 4, $3,632.85/cuerda for number 5. The analysis of adjustments **on page 83 of the Plot Report 003-0157[57]makes it evident that he qualified as "superior" the farms of higher unitary because of this erroneous interpretation regarding the effect of inclusion in the maritime land zone on the uses and allowed in the subject farms. This error of analysis leads us to conclude that the unit assigned by Mr. Núñez for the land of best use for conservation is very low and should be discarded.** (Emphasis ours).[58]

Based on the findings transcribed above, the Primary Forum "Granted" the Complaint and ordered the Commonwealth to pay plaintiffs a sum amounting to $30,496,000.00 as "fair compensation" after granting full credit to the valuation report presented by respondents' appraisal expert.

On the other hand, in accordance with what was previously ordered by the Judge of the Federal Bankruptcy Court, Hon. Laura Taylor Swain, in her "Memorandum Order" of July 7, 2017, the CFI did not order the recording of the appealed sentence and stated that said

---

[57] Mr Núñez did not make a detailed report for plot 004-01, merely indicating that he would use the value allocated to Plot 003-01.
[58] Attachment LIV, pp. 1312-1322.

opinion could not be enforced, nor provisional remedies obtained for its execution, without proper authorization of the Federal District Court in the case of *In re-Commonwealth of Puerto Rico*, Civil No. 17 BK-03283 -LTS. However, despite the fact that the *a quo* forum did not order the recording of the *Judgment*, the notification sheet issued by the Clerk of the CFI stated that the corresponding recording and filing thereof had been carried out.[59] This act provoked several procedural incidents both at the level of the Primary Forum and at the level of the Federal Bankruptcy Court.

In the meantime, as a result of what is indicated in the notification sheet, on August 23, 2019, and within the period provided for by Rule 47 of the Civil Procedure, the Commonwealth filed a motion for reconsideration.[60] In response, on September 4, 2019, plaintiffs filed their *Opposition to Request for Review*.[61] In light of both briefs, on September 6, 2019, the *a quo* forum notified a *Resolution* "Denying" the motion for reconsideration submitted by the Commonwealth.[62]

Thus, and as we mentioned, in accordance with the required federal procedure, on August 15, 2019, plaintiffs-respondents had filed with the Federal Bankruptcy Court a "Motion in Compliance with Order" requesting that it authorize and order the recording of the *Judgment* of August 6, 201,9 entered in the case at bar by the Court of First Instance, Superior Part of Ponce.[63] This, with the sole purpose of protecting the right of the parties to appeal the ruling once                     it                   becomes                    final.

---

[59] *Id.*, at pp. 1306-1307.
[60] Attachment LVIII, pp. 1372-1427.
[61] Attachment LIX, pp. 1428-1440.
[62] Attachment LX, pp. 1441-1442.
[63] Attachment LVII, pp. 1341-1371. We take judicial notice of the filing of said motion, in accordance with the provisions of Rule 201 of the Evidence, 32 L.P.R.A. Ap. VI R. 201, which establishes that judicial notice of the holding of a judicial process, that is, of all the incidents that occurred in said process, can be taken. *Asociación de Periodistas v. González*, 127 DPR 704, 712-715 (1991).

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 26 of 58

Certified Translation MC-2021-170
Page 26 of 58

KLAN201901253                                                      26

On September 6, 2019, plaintiffs sent to counsel for the Commonwealth the "Lift of Stay Notice," with the purpose of reaching a stipulation for the sole purpose of the CFI ordering the recording of the *Judgment* of August 6, 2019, to be final and binding, stating that the stay of the proceedings would continue in relation to the enforcement of the opinion and the granting of provisional remedies.[64] This stipulation was signed by the parties on October 23, 2019, through a document entitled "Stipulation Modifying the Automatic Stay Between the Commonwealth and the Pastor Mandry Mercado Estate."[65]

In accordance with the above, on October 30, 2019, plaintiffs filed with the CFI a brief entitled "Motion Informing of Stipulation on Modification of Automatic Stay Of Relief Under PROMESA Chapter III and Requesting the Recording of the Judgment Issued on August 6, 2019."[66] In turn, the Commonwealth followed suit, and on October 31, 2019, filed its "Informative Motion on Modification to the Automatic Stay of Proceedings so that the Clerk of the Court of First Instance is Ordered to Record the Judgment."[67] On December 19, 2019, the *a quo* forum entered a *Resolution Granting* the motion filed by plaintiffs and, consequently, ordered the Clerk of the Court to give new notice, on the same date, of the *Judgment* under appeal, originally delivered on August 6, 2019.[68]

---

[64] Attachment LXI, pp. 1443-1474.
[65] Attachment LXII, pp. 1475-1480.
[66] Attachment LXIII, pp. 1481-1488.
[67] Attachment LXIV, pp. 1489-1561.
[68] Attachment I, p. 1 of *Respondent's Brief, Salvador Mandry Nones Estate.* The aforementioned opinion was entered after the Federal Bankruptcy Court issued the "Thirteenth Omnibus Order Granting Relief from the Automatic Stay", see, Attachment 4 of the *Eliminatory Motion and in Request for the Disqualification of Mr. Javier Mandry Mercado to Appear Pro Se* submitted to us by respondents on December 23, 2019.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 27 of 58

Certified Translation MC-2021-170
Page 27 of 58

KLAN201901253                                                                27

Dissatisfied with the aforementioned opinion, the Commonwealth resorts to this Appellate Forum and charges the CFI of the commission of the following errors:

**_First Error_** The Court of First Instance erred in concluding that the mere approval of Act 227-2008 constituted a regulatory or legislative taking.

**_Second Error_** The Court of First Instance erred in concluding that by denying the issuance of the writ of _certiorari_ presented by the State to appeal the Partial Judgment of February 27, 2014, this Honorable Court of Appeals "ratified" on the merits, the validity of the determination contained in that partial opinion that the mere approval of Act 227-2008 constituted a regulatory taking of plaintiffs' property.

**_Third Error_** The Court of First Instance erred in delivering a judgment in favor of plaintiffs, even though they did not establish that the State denied them any productive or reasonable use of their property, as required by the jurisprudence.

**_Fourth Error_** The Court of First Instance erred in determining that the fair compensation to be paid to plaintiffs is $30,496,000.00, giving full credit to the valuation report presented by the appraisal expert of that party, even though that report did not take into account determining and critical factors, such as physical conditions, characteristics of the land and restrictions of use that preceded the declaration of nature reserve, which, according to the jurisprudence, substantially and significantly reduce the fair market value of the property. Such error resulted in an exaggeratedly high compensation of the property in dispute.

**II.**

**A.**

"The fundamental right to enjoy private property is expressly recognized in our Constitution.[69] In this regard, Article II, Sec. 9 of our Constitution of Puerto Rico states that:

"Private property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law.
[...]".[70]

---

[69] _Mun. de Guaynabo v. Acquisition_ M2, 180 DPR 206, 216 (2010).
[70] Art. II, Sec. 9, Const. Commonwealth, LPRA, Vol. 1, ed. 2016, p. 333.

KLAN201901253                                                           28

In accordance with the aforementioned constitutional provision, the Supreme Court has reiterated that the right to property is not absolute because it is "subject to the inherent power of the State to establish restrictions on the property of citizens."[71] Stated otherwise, "[t]he right to the enjoyment of property, enshrined in Article II, Section 7 of the Constitution of Puerto Rico,[72] is subject to the inherent power of the State to establish restrictions on private property in favor of the common welfare."[73] Thus, eminent domain has been recognized as "[...] the sovereign power that resides in the State to acquire the domain of a property located within its territorial limits."[74] Thus, since the power to expropriate is an attribute inherent in the sovereign power of the State, property rights are subject to that power of superior hierarchy.[75] However, in order for "the State to condemn private property, the Constitution requires it to pay fair compensation, allocate the expropriated property to a public purpose or use, and proceed subject to the laws governing this procedure in our jurisdiction."[76] In that sense, we can say that "the authority to expropriate is limited by the requirement that the good be for a public purpose and that the State pays fair compensation."[77]

---

[71] *Mun. de Guaynabo v. Acquisición* m2, 180 DPR 206 (2010).

[72] Art. II, Sec. 7, Cnst. ELA, LPRA, Volume 1.

[73] *ELA v. El Ojo de Agua Development*, 2020 TSPR 122, at p. 14, 205 DPR (2020), Op. 9, 2020, citing *Mun. de Guaynabo v. Acquisición* m2, *supra*, at p. 216; *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, 174 DPR 409, 424 (2008); *A.C.T. v. 780614m2*, 165 DPR 121, 130 (2005). See also *ELA v. Rosso*, 95 DPR 501, 536 (1967).

[74] *Adm. Tierras v. Corp. Pesquera Henares*, 201 DPR 14 (2018).

[75] *Id.*, *ACT v. 780.614m2*, 165 DPR 121, 130 (2005); *ELA v. Registrador*, 111 DPR 117 (1981); ELA v. Rosso, supra, at p. 536.

[76] *Administración de Terrenos de Puerto Rico v. Ponce Bayland Enterprises, Inc.*, 2021 TPPR 91, at p. 16, 207 DPR___ (2021), Op. 29, 2021, citing Eminent Domain Act, 32 LPRA sec. 2901 *et seq.*; Rules 58 and 60 of Civil Procedure, 32 LPRA Ap. V. See also Art. 282 of the Civil Code, 31 LPRA sec. 1113 ("No one may be deprived of his property except by competent authority, for justified cause of public utility or social benefit, and by payment of a just compensation to be fixed in the manner provided by law").

[77] *Culebra Enterprises Corp. v. E.L.A.*, 127 DPR 943, 952 (1991).

KLAN201901253                                                                29

This, since the power to expropriate has been regulated in order to prevent arbitrary or abusive actions by the State.[78] Thus, it seeks to establish a balance between the sovereign's power to expropriate and the citizen's right to property, both of constitutional magnitude. On the one hand, Section 7 of Article II of our Constitution recognizes the enjoyment of property as a fundamental right.[79] Whereas Section 9 of Article II limits the sovereign power of the State by therefore establishing that: "[p]rivate property shall be taken or harmed for public use except by payment of fair compensation and in accordance with the form provided by law."[80]

Through fair compensation, what is sought is "to place the owner of the property in an economic situation equivalent to that which was prior to the expropriation of his property."[81] Therefore, fair compensation must include the value of the property at the time of taking and the damages it causes, including those compensable caused to the remnant of the expropriated property.[82]

In accordance with the above, our legal system has consistently recognized that the State's obligation to pay just compensation can be manifested in three instances: 1) through the direct exercise of the power of eminent domain, filing a writ for expropriation; (2) through its regulation; and (3) when a de facto taking occurs by substantially affecting the use of the property physically.[83]

---

[78] *Adm. Tierras v. Corp. Pesquera Henares*, supra; *Mun. de Guaynabo v. Acquisición m2, supra*, at p. 229.
[79] Art. II, sect. 7, Const. ELA, 1 LPRA, Volume 1.
[80] Art. II, sect. 9, Const. ELA, 1 LPRA, Volume 1.
[81] *Adm. Terrenos v. Corp. Pesquera Henares*, ante, citing *Amador Roberts v. ELA*, 191 DPR 268, 278-279 (2014). See also E*LA v. Rexco Industries*, 137 DPR 683 (1994).
[82] *Adm. Terrenos v. Corp. Pesquera Henares, supra*.
[83] *Aut. Carreterras v. 8,554.741 M/CI*, 172 DPR 278, 292 (2008).

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 30 of 58

Certified Translation MC-2021-170
Page 30 of 58

KLAN201901253                                                                    30

Likewise, the payment of just compensation has been required when the regulation deprives the owner of any productive use of his property because the total deprivation of the economical use of a property is equivalent to a physical invasion by the State even if the effect of the deprivation has been temporary.[84] That is, the subsequent release of the restrictions imposed does not exempt the State from the duty to compensate.[85] In these cases, the State must ensure the payment of fair compensation that includes both the market value of the expropriated property, as well as the damages that the expropriation causes to its remnant of it and the interest per judgment.[86]

On the other hand;

in the exercise of the power of eminent domain of the State, there are exceptional cases in which the State may occupy or take an in rem right without having initiated the judicial procedure of eminent domain and without having recorded the payment of just compensation.[87]

As a consequence of the above, in Puerto Rico, as at the federal level, an action of inverse condemnation has been recognized,

for those exceptional cases of physical occupation, taking of a real right or restrictions on the property by regulation, without the State having previously filed the expropriation action nor deposited a just compensation. The inverse condemnation lawsuit is sought by the holder against the State to obtain the compensation to which he is entitled.[88]

Through the action of inverse condemnation, "the State's compliance with the constitutional provisions that establish that no one shall be deprived of his property without a due process of law and without having mediated just compensation is guaranteed."[89] Such

---

[84] *Hampton Development Corp. v. ELA*, 139 DPR 877 (1996)
[85] *Id.*
[86] C. Torres Torres, *La Expropriación Forzosa de Puerto Rico: Ley, Jurisprudencia, Estudio y Guía Práctica*, First Book Publishing of P.R., 2003, pp. 135-136, 173 and 216-217.
[87] *Id.*, at p. 279.
[88] *Aner Investment Corp. v. J.P.*, 148 DPR 241, 248 (1999).
[89] *Amador Roberts et als. v. ELA*, 191 DPR 268, 279 (2014).

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 31 of 58

Certified Translation MC-2021-170
Page 31 of 58

KLAN201901253                                                                31

action is the remedy that the owner of a property affected or taken by a government entity, which has not followed the legal process for its acquisition, has.[90] Once the action is brought, the owner must prove that the State occupied or seized his property and will litigate the existence of public use and just compensation, in the same way that these issues are elucidated in a lawsuit of forced expropriation.[91]

However, the Supreme Court has advised that "the action of inverse condemnation is not intended to make the State an involuntary buyer of the property and to invest itself with the absolute title of ownership of the property as, ordinarily, occurs in the expropriation action initiated by the State."[92] In this regard, our Maximum Forum noted that:

> If it is shown that the State took property, the State's obligation is to compensate the owner and place him in an economic situation equivalent to that which he was in prior to the taking of his property. In which case, the State may choose to expropriate the property or release it and indemnify the owner for the time the property remained affected. Thus, for example, the U.S. Supreme Court held [in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 US 304, 321 (1987)] that "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective."[93] In addition, through this action, the owner can claim damages caused to the remainder of the property by reason of the taking, as well as the payment of interest, counted from the moment of the taking of his property. (Original citations omitted).[94]

"Once an action for inverse condemnation has been filed, there is nothing to prevent the State, in the exercise of its power of

---

[90] *Id.*, at pp. 279-280.

[91] *Id.*, citing *ELA v. Northwestern Const., Inc.*, 103 DPR 377, 383-384 (1975).

[92] *Amador Roberts et als. v. ELA, supra*, at p. 280.

[93] In this regard, the Supreme Court of Puerto Rico expressed itself in *Hampton Development Corp. v. ELA*, 139 DPR 877, 890 (1996) in stating that, although the effect of a taking is temporary, "compensation is appropriate for the value of the use of the property during the time when the State deprived the owner of all productive use of it. The subsequent release of the restrictions imposed does not relieve the State of the duty to compensate", referring to federal regulations *Lucas v. South Carolina Coastal Council*, 505 US 1003 (1992); *First English Evangelical Lutheran Church v. Los Angeles County*, 482 US 304 (1987).

[94] *Amador Roberts et als. v. ELA, supra*, at p. 281

Certified Translation MC-2021-170
Page 32 of 58

KLAN201901253                                                          32

eminent domain, from choosing to initiate an action for condemnation ("direct forced expropriation") over the property in dispute."[95] If that is the case, "if the State presents a direct forced expropriation on the disputed ground and records the payment of the just compensation, the inverse condemnation is merged into the lawsuit of condemnation requested by the State."[96] Consequently, "the inverse condemnation lawsuit in becomes moot" and is dismissed.[97] Otherwise, if the State subsequently files the direct action, it will not be up to the alleged expropriated and plaintiffs in the inverse condemnation action to prove that, in fact, the State occupied or took his property, litigating the existence of public use and the just compensation to which he claims to be entitled.

In accordance with the above, and returning to the issue of fair compensation, the case could arise in which, even if the State argues otherwise, the court determines –based on the evidence presented by plaintiff– that there was an expropriation. As a result of such determination, and as far as the present case is concerned, the State's obligation to pay just compensation for having made a de facto taking after substantially affecting the use of the property in dispute arises, either physically or through its regulation.[98] In which case, the State may choose between expropriating the property or releasing it, compensating the owner for the time the property remained affected.[99] In this regard, the Supreme Court has

---

[95] *Id.*, at p. 282.
[96] *Pamel Corp. v. E.L.A.*, 124 DPR 853 (1989); *Sucn. Garcia v. Aut. Carreteras*, 114 DPR 676 (1983); *Olivero v. Autoridad de Carreteras*, 107 DPR 301 (1978).
[97] *Pamel Corp. v. E.L.A*, ante, at pp. 857-858.
[98] *Culebra Enterprises Corp. v. E.L.A.*, 143 DPR 935, 946-947 (1997
[99] *Amador Roberts v. ELA* supra; *ELA v. Northwestern Const. Inc.*, supra.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 33 of 58

Certified Translation MC-2021-170
Page 33 of 58

KLAN201901253                                              33

stated that determining what constitutes fair compensation in an expropriation lawsuit is an eminently judicial task.

This was reiterated recently when stating:

> [Fair compensation] is a judicial and not a legislative controversy. The legislature can determine what private property is needed for public purposes – [t]here is a political and legislative controversy; but when expropriation has been ordered, then the dispute overcompensation is judicial. [...] The [C]onstitution has stated that fair compensation has to be paid and that its determination is a matter for the courts." (Translation in the original).[100]

Finally, bearing in mind that the purpose of just compensation is to place the owner of the expropriated real estate property "in such a good pecuniary position as he would be if the property had not been expropriated,"[101] such compensation will be fair to the extent that it reflects "the market value of the expropriated property." As for the latter, it refers to the "price a buyer would be willing to pay in a voluntary sale and which a seller would be willing to accept, **considering for this the conditions in which the property is found at the date of expropriation**" and the best use of the property in the reasonably near future.[102] In view of this, "[i]n order to determine the market value of the expropriated property, the court must take into consideration any element or indicator which a prudent buyer would consider."[103]

---

[100] *Administración de Terrenos de Puerto Rico* v. *Ponce Bayland Enterprises, Inc., supra*, at p. 20, footnote 44, referring to *ELA v. Rexco Industries, Inc.*, 137 DPR 683, 688-689 (1994) (citing *Monongahela Navigat'n Co. v. United* States, 148 US 312, 327 (1893).

[101] *Administración de Terrenos v. Ponce Bayland Enterprises, Inc.*, supra, at p. 20, citing *ELA v. Rexco Industries, Inc.*, 137 DPR 683, 689 (1994).

[102] *Id.*, at p. 21 citing *ELA v. Fonalledas Córdova*, 84 DPR 573, 579 (1962); *Forced Expropriation Act*, 31 LPRA sec. 2915 ("[i]n the case of purchase or forced expropriation of private property for purposes of public utility or social benefit, compensation shall be based on the fair market value of such property [...]"); see also *Pueblo v. Huyke*, 70 DPR 754, 757 (1950), where the Supreme Court defined "market value" as:

> the price that a buyer in an unforced sale would be willing to pay and the price at which a seller, in the same circumstances, would be willing to sell, taking into consideration the conditions in which the land is located on the date of the expropriation, and the most productive use to which the owner could dedicate it within a reasonable near future.

[103] *Id*, citing *Administración de Terrenos de Puerto Rico v. Nerashford Development Corp.*,136 DPR 801,809 (1994).

**B.**

In consonance with the doctrinal framework set forth above, the Constitution of Puerto Rico establishes as public policy of the State "… the most effective conservation of natural resources and their greatest use for the general benefit of the community".[104] The Supreme Court has reiterated that the constitutional provision referred to "is not merely the expression of a distinguished eagerness, nor does it constitute only the declaration of a general principle of an exhortative nature," but that it is a "*mandate* that must be strictly observed, and which prevails over any statute, regulation or ordinance that is contrary to it."[105]

Likewise, the Highest Forum has pointed out that the public policy enshrined in Article VI, sec. 19 of our Supreme Law "unquestionably establishes the primary legal criterion for judging the validity or interpretation of the meaning of any norm or decision relating to the use or protection of natural resources formulated by the Legislative Assembly or by any agency, department, municipality or governmental instrumentality."[106]

In accordance with the aforementioned constitutional mandate, the Legislative Assembly approved the "Natural Heritage Program of Puerto Rico Act,"[107] In the Explanatory Memorandum of the aforementioned statute, it was recognized that "Puerto Rico is home to a great diversity of plants and animals," among which "[.....] the Department of Natural and Environmental Resources has determined that 18 percent of plants (586) and 33 percent of animals (99) are critical elements, that is,         they         are         rare,         vulnerable         or

---

[104] Art. VI, sect. 19, Const. ELA, LPRA, Volume 1.
[105] *Mun. de San Juan v. J.C.A.*, 152 DPR 673, 710 (2000): *Misión Ind. P.R. v. J.C.A.*, 145 DPR 908 (1998)
[106] *Buono Correa v. Srio. Rec. Naturales*, 177 DPR 415, 440 (2009), citing *Misión Ind. P.R. v. J.C.A., supra*, at pp. 919-920.
[107] Act No. 150 of August 4, 1988, as amended, "Natural Heritage Program of Puerto Rico Act", 12 LPRA sec. 1225 et seq., (Act No. 150).

Certified Translation MC-2021-170
Page 35 of 58

KLAN201901253                                                            35

endangered species."[108]  In turn, it was indicated that the main cause of the critical status of these species was the loss, destruction, or deterioration of their habitat. Therefore, Act No. 150 provided the following:

> In attention to this situation, the Government of Puerto Rico has initiated a comprehensive and aggressive program to protect the natural heritage of our people, thus fulfilling the commitment to "intensify our efforts to conserve green areas and other precious natural resources for the benefit of other generations," [...]. In making this decision, the importance of protecting these species and the communities that house them for the use and enjoyment of future generations of Puerto Ricans is recognized.
>
> It is recognized that, in addition to the intrinsic value of nature and the beings that compose it, these species and their habitats have a present and future value as source of genetic diversity for the improvement of species of economic importance. It recognizes their aesthetic and recreational value, as well as the importance of natural communities as wildlife reserves and to improve and increase water supplies, vital for the economic development of the country. The impact and importance of the conservation and wise management of natural communities, wildlife, and all the country's natural resources in the tourism industry do not go unnoticed.
>
> **This law aims to provide the Department of Natural and Environmental Resources with a mechanism that allows the acquisition of areas of high natural value to protect them and conserve them for the use and enjoyment of this and future generations of Puerto Ricans**. It also aims to encourage and strengthen non-governmental organizations in the country so that they can continue to share with the Government the burden and responsibility for the conservation of our resources. **The acquisition of the land through the Puerto Rico Natural Heritage Program will be carried out using varied and innovative strategies in close coordination between the Government of the Commonwealth, the Federal Government, and local and foreign private organizations**. In doing so, it is recognized that the conservation of the natural resources of our people cannot be achieved if the Government acts alone but is the responsibility of all. (Emphasis added).[109]

As proper, sec. 2 of Act No. 150, 12 LPRA sec. 1226, defines the following terms:

> For the purposes of this law, the following terms shall have the following meaning:
> [...]
> **5) Nature Reserve** – Area of natural value that has been declared a Nature Reserve by the Planning Board
> **6) Areas of Natural Value** - Lands or bodies of water

---

[108] Explanatory Memorandum to Act No. 150.
[109] *Id.*

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 36 of 58

Certified Translation MC-2021-170
Page 36 of 58

KLAN201901253                                                        36

of ecological importance
[...]

**9) Conservation** - Use or management of a natural resource without deteriorating its nature

**10) Government Agency of Puerto Rico** - Agencies, departments, offices, dependencies, municipalities, and public corporations.

Similarly, sec. 4 of the aforementioned law[110] recognizes a series of powers to the Secretary of the Department of Natural and Environmental Resources to fulfill the legislative purpose enacted by the statute, among them, the power to "[a]dquire land by purchase, donation, legacy, exchange, **expropriation** or in any other legal way, of any natural or legal person, agency of the Government or Government of the United States of America." Likewise, the statute empowers the Secretary to "[r]ecomend to the Planning Board the designation as a nature reserve of any area included in the inventory of areas of natural value by the Natural Heritage Program."[111]

On the other hand, also in order to comply with the constitutional mandate of Art. VI, sec. 19, the Legislative Assembly approved Act No. 227-2008, "An Act to designate the Punta Cucharas natural area of the Municipality of Ponce as an area of Nature Reserve of the Commonwealth." As we briefly explained when reviewing the facts, the aforementioned statute is limited to designating the Punta Cucharas natural area of the Municipality of Ponce as a nature reserve area of the Commonwealth to be administered under the provisions of Act No. 150. It is apparent from the Explanatory Memorandum of Act No. 227 that during the summer of 2004, the Integral Planning Area of the Natural Heritage Division of the Department of Natural and Environmental Resources presented a Report on the Natural Value of the Punta Cucharas Area of the Municipality of Ponce.

---

[110] 12 LPRA sec. 1228
[111] *Id.*

Case:17-03283-LTS  Doc#:18994-2  Filed:11/01/21  Entered:11/01/21 14:23:01  Desc:
Exhibit Certified Translation of the Judgment  Page 37 of 58

Certified Translation MC-2021-170
Page 37 of 58

KLAN201901253                                    37

Further, apart from delimiting the area that comprises the nature reserve, it appears from the Explanatory Memorandum that the conclusions of the study carried out by the Department of Natural and Environmental Resources highlight the great diversity and complexity of the habitats present in the Punta Cucharas Natural Area, as well as its flora and fauna. Therefore, the referred Division recommended designating the area as a "nature reserve" because "the conservation of this natural resource merits the commitment of the government agencies concerned and the protection of the law that can grant the delimitation of a nature reserve under the Natural Heritage Program created by Act No. 150 ...".[112] Thus, as recommended, Act No. 227 was approved solely to declare the area a nature reserve, to be protected in accordance with the provisions of the Puerto Rico Natural Heritage Program.

**c.**

The summary judgment is a procedural mechanism, which purpose is to expedite the processing of cases because it allows them to be disposed of without holding a trial.[113] Courts may grant summary judgment in respect of part or all of a claim. Rule 36.1 of Civil Procedure.[114]

The summary judgment will proceed if the pleadings, depositions, answers, interrogatories, and admissions offered, together with any affidavit that is presented, if any, demonstrate that there is no real and substantial issue over

---

[112] Explanatory Memorandum of Act No. 227-2008, "Act to designate the Punta Cucharas natural area of the Municipality of Ponce as an area of Nature Reserve of the Commonwealth".

[113] *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); S.*L.G. Szendrey-Ramos v. Consejo Titulares*, 184 DPR 133, 166 (2011).

[114] 32 LPRA Ap. V, R. 36.1; *Meléndez González et al. v.M. Cuebas*, 193 DPR 100 (2015).

any essential and pertinent fact and that, as a matter of law, it is proper to do so.[115]

It is a quick and effective remedy for such cases in which the promoting party manages to establish that there is no issue about the material facts of the case.[116] In that sense, a material fact is one that "may affect the outcome of the claim under the applicable substantive law."[117] An issue of facts will defeat a motion for summary judgment if it gives the judge real substantial doubt as to a relevant and pertinent fact.[118] If the court is uncertain regarding all the facts relevant to the controversy, it should not enter summary judgment.[119] As a corollary to this, any doubt as to whether or not there is an issue should be decided against the promoting party.[120]

With regard to formalities, Rule 36.3(a) of Civil Procedure[121] provides that the motion for summary judgment shall contain: (1) a brief statement of the parties' pleadings; (2) litigious matters or at issue; (3) the cause of action, claim or part in respect of which the summary judgment is sought; (4) a concise and organized statement in listed paragraphs, of all essential and relevant facts over which there is no substantial dispute, indicating the paragraphs or pages of the affidavits or other proof admissible into evidence setting them forth, as well as any other documents admissible into evidence found in the

---

[115] Rule 36.3(e) of Civil Procedure, 32 LPRA V, R. 36.3(e); *González Santiago v. Baxter Healthcare*, supra, at p. 291; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).
[116] *Rodriguez de Oller v. T.O.L.I.C.*, 171 DPR 293, 310-311 (2007).
[117] *Abrams Rivera v. E.L.A.*, 178 DPR 914, 932 (2010).
[118] *Pepsi-Cola v. Mun. Cidra, et al.*, 186 DPR 713, 756 (2012).
[119] *Cruz Marcano v. Sánchez Tarazona*, 172 DPR 526, 550 (2007).
[120] *Id.*
[121] 32 LPRA Rev. V, R. 36.3(a).

Case:17-03283-LTS Doc#:18994-2 Filed:11/01/21 Entered:11/01/21 14:23:01 Desc:
Exhibit Certified Translation of the Judgment Page 39 of 58

Certified Translation MC-2021-170
Page 39 of 58

KLAN201901253                                              39

Court record; (5) the reasons why the judgment should be entered, arguing the applicable law, and (6) the remedy to be granted.

Likewise, with regard to the opposing party, Rule 36.3(b) of Civil Procedure[122] provides that the opposing party shall have a period of 20 days from the notice of the motion for summary judgment to present its answer. Thus, if that party does not present its answer within the term provided, it will be understood that the motion has been submitted for the consideration of the court. Rule 36.3(e) of Civil Procedure.[123]

However, if the answer is submitted in a timely manner, the opposing party must specifically cite the paragraphs listed by the movant that it understands are in dispute and, for each of those it intends to contest, detail the admissible evidence supporting its challenge with citation to the relevant page or paragraph. Rule 36.3(b)(2) of Civil Procedure.[124] That is, to defeat a request for a summary judgment, the opposing party must submit sworn counter-statements and counter-documents admissible into evidence that put in dispute the facts presented by the movant.[125]

In view of this, the applicant - to wit, against whom a request for a summary judgment has been made - cannot merely rely on the statements contained in his pleadings or take a passive attitude. On the contrary, that party is obliged to reply in as detailed and specifically as the party in question did.[126] Thus, if the opponent does not

---

[122] *Supra.*
[123] 32 LPRA Ap. V, R. 36.3(e).
[124] 32 LPRA Ap. V, R. 36.3(b)(2).
[125] *Roldán Flores v.M. Cuebas et al.*, 199 DPR 664, 677 (2018), citing *Ramos Pérez v. Univision*, 178 DPR 200, 215 (2010).
[126] 32 LPRA Rev. V, R. 36.3(c); Nieves Díaz v. González Massas, 178 DPR 820, 848 (2010).

Case:17-03283-LTS Doc#:18994-2 Filed:11/01/21 Entered:11/01/21 14:23:01 Desc:
Exhibit Certified Translation of the Judgment Page 40 of 58

Certified Translation MC-2021-170
Page 40 of 58

KLAN201901253                                                        40

contest the proposed facts as required by Rule 36.3 above, the court may consider them as admitted and enter judgment against respondent, if applicable.[127]

Thus, starting from the aforementioned legal framework, when considering a request for summary judgment, the undisputed facts arising from the documents presented by the movant will be deemed true.[128] In turn, any inference arising from the undisputed facts must be made in the manner most favorable to the respondent.[129] As a consequence, summary judgment should not be entered if: "(1) there are material and essential facts at issue; (2) there are affirmative claims in the complaint that have not been rebutted; (3) a real issue appears from the same documents attached to the motion, or (4) as a matter of law, it is not proper."[130]

On the other hand, regarding the analysis that this Appellate Court is to make when reviewing the denial or granting of a motion for summary judgment, the Supreme Court of Puerto Rico established in *Meléndez González et al. v. M. Cuebas[131]*, that we must apply "the same criteria that Rule 36 of Civil Procedure and jurisprudence require of the Primary Forum."[132]

However, it is not for us to consider evidence that has not been submitted to the CFI or to adjudicate material facts in dispute if any, because that is the responsibility of the Primary Forum after a trial on its merits.[133] What concerns us, as the Reviewing Tribunal, is to assess whether the motion and its opposition meet the

---

[127] *Roldán Flores v. M. Cuebas et al.,* supra, at p. 677.
[128] *Diaz Rivera v. Srio, de Hacienda,* 168 DPR 1, 27 (2006).
[129] *Const. Jose Carro v. Mun. Dorado,* 186 DPR 113, 130 (2012).
[130] *Pepsi-Cola v. Mun. Cidra, et al.,* supra, at p. 757.
[131] *Supra.*
[132] *Id.,* p. 118.
[133] *Meléndez González et al. v.M. Cuebas, supra,* at p. 118.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 41 of 58

Certified Translation MC-2021-170
Page 41 of 58

KLAN201901253                                                        41

requirements of Rule 36 of Civil Procedure, as well as to examine whether there are material facts at issue.

If that is the case, it is up to us to make a list of both the undisputed facts and those essential and relevant to the issue.[134] We can make such a determination in the Judgment that disposes of the case, referring "to the numbered list of undisputed facts issued by the Primary Forum in its Judgment."[135] Then, we would have to review *de novo* whether the court of first instance correctly applied the law to the controversy.[136]

**D.**

Considering the particularities of the case at hand, it is essential to discuss some provisions and evidentiary rules related to expert evidence. As appropriate, Rule of Evidence 702 provides as follows:

> Where scientific and technical expertise is of assistance to the judge in understanding the evidence or determining a disputed fact, a witness qualified as an expert witness in accordance with Rule 703[137] may testify in the form of opinions or otherwise.
> **The probative value of the testimony will depend, among others, on:**
> **(a) whether the testimony is based on sufficient facts or information;**
> **(b) whether the testimony is the product of reliable principles and methods;**

---

[134] *Id.*
[135] *Id.*
[136] *Id.*, at p. 119.
[137] On its part, Rule 703 of Evidence, 32 LPRA Ap. VI, R. 703 provides:
**(a)** Any person is qualified to testify as an expert witness if he or she has special knowledge, skill, experience, training or instruction sufficient to qualify him or her as an expert in the matter in which they are to testify. If there is an objection by a party, such special knowledge, skill, training or instruction must be proven before the witness can testify as an expert.
**(b)** The special knowledge, skill, experience, training or education of a person who is an expert witness may be proved by any admissible evidence, including their own testimony.
**(c)** The stipulation on the qualification of an expert person is not an impediment to the parties being able to present evidence as to the probative value of the expert testimony.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 42 of 58

Certified Translation MC-2021-170
Page 42 of 58

KLAN201901253                                                                          42

**(c) whether the witness reliably applied the principles and methods to the facts of the case;**

**(d) whether the principle underlying the testimony has been generally accepted in the scientific community;**

**(e) the witness's qualifications or credentials; and**

**(f) the bias of the witness.**

The admissibility of expert testimony shall be determined by the Court in accordance with the factors listed in Rule 403.[138]

Thus, expert testimony, although it is a means of proof, is also an endeavor of assistance for the judge because it helps the court understand the evidence or determine a disputed fact.[139] A person is, therefore, qualified to testify as an expert "if they possess special knowledge, skill, experience, training or education sufficient to qualify them as an expert in the case in which they are to testify."[140]

On the other hand, Rule 704 of the Evidence provides that:

The opinions or inferences of a person as an expert witness may be based on facts or data perceived by them within their personal knowledge or informed to them before or during the trial or hearing. If it is a matter of such a nature that experts in that field reasonably rely on it to form opinions or make inferences on the matter at hand, the facts or data need not be admissible into evidence. [...].[141]

Thus, the rule "allows admitting expert testimony based on information obtained before the trial or hearing, even if it is inadmissible evidence. What is decisive is that the data used to form the expert opinion is such that experts in that field would reasonably use to render their opinions or make inferences on the matter at issue."[142]

---

[138] 32 LPRA Ap. VI, R. 702.
[139] *San Lorenzo Trading v. Hernández*, 114 DPR 704, 711 (1983).
[140] Rule 703 of the Evidence, supra; See also *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 292-293 (2006).
[141] Rule 703 of the Evidence, *supra*.
[142] Supreme Court of Puerto Rico, Secretariat of the Judicial and Notarial Conference, *Informe de las Reglas de Derecho Probatorio*, March 2007, p. 432.

As to the probative value of the expert testimony, the Supreme Court, quoting Professor E. L. Chiesa, stated that: "[it] depends on several factors, among which the following stand out: 1) the qualifications of the expert; 2) the soundness of the basis of his testimony; (3) the reliability of the underlying science or technique and; (4) the bias of the expert."[143] In view of this, even if a minimum of information is sufficient to qualify a witness as an expert when his credentials are excellent, it is convenient to offer all the evidence regarding them so that **the probative value is greater**.[144]   In accordance with the aforementioned criteria, the **specialty** of an expert in an area can also be decisive as to the probative value of their testimony.[145]

Finally, it is warranted to state that the reviewing courts are in the same position as the Primary Forum to evaluate the accuracy of the findings of fact to which the Commonwealth alludes in its brief because they are based on expert and documentary evidence.[146] The Supreme Court decided, in Cu*lebra Enterprises Corp. v. ELA*, that appellate forums are not obliged to inescapably follow "the opinion, judgment, conclusion or finding of an expert or practitioner ... and that every court is at full liberty to

---

https://www.ramajudicial.pr/sistema/supremo/Informe_Reglas-de-Derecho-Probatorio-2007.pdf. It should be noted that, from the above-mentioned report, it appears that the Committee recommended:

> [...] replace the word "generally" with "reasonably", as the reasonableness criterion allows the Court greater discretion to assess the reliability of the information on which the experts rely to formulate their opinions. This criterion does not require that the expert's opinion be generally accepted in the scientific community to be sufficiently reliable and helpful to the judge of the facts. What it requires is that the expert base their opinion on methods in which other experts in their area would reasonably rely to formulate their own opinions, even if they are diverse or opposed. *Id.*, at p. 433.

[143] *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.*, 150 DPR 658, 663-664 (2000).
[144] *Id.*
[145] *Id.*, see, in addition, E. L. Chiesa, *Tratado de Derecho Probatiòro*, Volume I, JTS Publications, p. 564 (1998). Cf. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 4th ed., San Juan, Ediciones SITUM, Inc., 2015, pp. 428 *et seq.*
[146] *Dye-Tex P.R., Inc. v. Royal Ins. Co.*, 150 DPR 658, 662-663 (2000); *Rodríguez Cancel v. A.E.E.*, 116 DPR 443, 450 (1985).

adopt its own judgment in the assessment or evaluation of expert evidence".[147]  As to that regard, it said:

> "We reaffirm the rule that, as an appellate forum, **we are not obliged "to unfailingly follow the opinion, judgment, conclusion or determination of an expert or physician … and that every court is at full liberty to adopt its own criteria in the assessment and evaluation of expert evidence and even to discard it, even if it turns out to be technically correct"**.
> We also reiterate the established doctrine that we will only intervene if the amount is exaggerated or very low.
> (Emphasis added). (Original citations omitted).[148]

Accordingly, as an appellate forum, we are entitled to exercise our own judgment as to the probative value of the expert evidence that was presented to the *a quo* Forum. This does not mean that our review occurs in the absence of parameters that delimit it. On the contrary, to measure the probative value of an expert's testimony, we will take into account the aforementioned required factors, such as qualifications, the soundness of the bases of their testimonies, the reliability of the underlying science or technique, and their degree of bias. The specialty of experts will also be relevant since, although it does not affect the qualification as an expert witness, it can be crucial in giving it probative value and credibility. That is, "it is affirmed that the lack of the concerned specialty affects the weight of the expert evidence but not the qualification."[149]

## III.

Because they are intimately related to each other and for a full understanding of the questions of law before our

---

[147] *Culebra Enterprises Corp. v. ELA*, 143 DPR 935, 952 (1997); *Valldejuli Rodríguez v. AAA*, 99 DPR 917,921 (1971): Prieto v. Maryland Casualty Co., 98 DPR 594, 623 (1970).
[148] *Culebra Enterprises Corp. v. ELA*, *supra*, at pp. 952-953.
[149] Ernesto L. Chiesa, *Tratado sobre Derecho Probatorio*, J.T.S. Publications, Volume I, 1998, pp. 593-594; *Dye-Tex P.R., Inc. v. Royal Ins. Co.*, supra, at p. 664.

consideration, we will proceed to discuss the first three errors jointly and then the fourth and final error.

In essence, appellants submit that the CFI erred in concluding that the mere adoption of Act No. 227-2008 constituted a regulatory or legislative taking. Likewise, they argue that the Primary Forum erred in concluding that by denying the issue of the writ of *certiorari* filed by the State to appeal the Partial Judgment of February 27, 2014, this Court of Appeals "ratified" on the merits the validity of the appealed partial opinion, whereas the mere adoption of Act No. 227-2008 constituted a statutory taking of plaintiffs' property. Further, the Commonwealth argues that the CFI erred in ruling in favor of plaintiffs, even though it did not establish that the State deprived them of all productive use of their property.

As a threshold, we clarify that, as argued by the Commonwealth, the finding that the approval of Act No. 227-2008 constituted a regulatory taking was, in fact, never heard by this Appellate Court or by the Supreme Court, because, in appealing against that determination, both reviewing forums refused to issue the discretionary appeal of certiorari. Thus, contrary to what was stated by the Primary Forum in the appealed Judgment, this Court did not confirm that the passage of Act No. 227-2008 constituted a taking; therefore, appellants could, as they did, lift the error again. This is so because, as the Supreme Court has stated, it "[m]ust be clear that the refusal to be issued does not imply the absence of error in the opinion, whose review was requested, nor does it constitute an award on its merits."[150] Therefore, the CFI erred in stating           that           this           Appellate           Forum

---

[150] *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 98 (2008).

Case:17-03283-LTS Doc#:18994-2 Filed:11/01/21 Entered:11/01/21 14:23:01 Desc:
Exhibit Certified Translation of the Judgment Page 46 of 58

Certified Translation MC-2021-170
Page 46 of 58

KLAN201901253                                                      46

had ratified, by refusing to issue the appeal of certiorari in Case No. KLCE201400713, that the mere approval of the statute in question constituted a taking.

On the basis of the above, we proceed to entertain whether, in fact, the passage of a law, in this case, Act No. 227-2008, constituted a legislative taking of plaintiffs' property. In the first instance, in accordance with the legal framework set forth above, we clarify that the mere designation of an area as a nature reserve does not automatically imply that the State has expropriated the owners, if any, from the area thus destined. That is, our system recognizes the possibility that there is a citizen, owner of a land, whose certain portion is destined to be a nature reserve, and such designation does not make those cuerdas less private, nor does it make them a public good.

That said, it is the consequences of such a designation that will determine whether it amounts to a de facto taking by the State of private property. As in the present case, when assessing the clear language of Act No. 227-2008, it is clear that it designates the Punta Cucharas natural area as a "nature reserve" area, with the unquestionable legislative intention that the lands so designated should be under the control of the DNER. As indicated by the CFI in its *Partial Judgment* of February 27, 2014, the legislative history of the statute in question shows indications on the part of the DNRA aimed at acquiring the land; today designated a nature reserve. More importantly, in light of the provisions of both Act No. 227-2008 and Act No. 150, we do not see how respondents could make productive use of their land when by legislative mandate, it must be administered by a government agency, namely the DNER.

On the other hand, as stated by a sister panel in KLAN201400552, when dealing with the same controversy raised by other plaintiffs, the General Eminent Domain Act does not contemplate the designation of land as a "nature reserve." Consequently, given the aforementioned absence in the Law of Forced Expropriation and considering that Act No. 227 expressly designates the Punta Cucharas natural area as a "nature reserve" area to be administered by the DNER, it is correct to conclude that the approval of Act No. 227, in light of the clear legislative intention, constituted a statutory taking of the respondents' property. In other words, taking into account that the law expressly designates the property "nature reserve," as well as the term conservation adopted from Act No. 50, defined as the "[a]so or management of a natural resource without deteriorating its nature," it is crystal clear that Statute No. 227 explicitly and surreptitiously at the same time, enshrines what will be the possible uses of the land in question. This, because the legislator established that the Punta Cucharas Nature Reserve must be regulated by Act No. 150.

That is, through the express designation of "nature reserve," the legislator is already determining that the use of such lands is to protect and conserve the area. Therefore, after a thorough study of the file before us, in the light of the applicable law, it is necessary to conclude that by approving Act No. 227, the State made a de facto taking that had the effect of immediately and substantially depriving all productive use of the property because by including the land owned by respondents within the demarcation of the Punta Cucharas Nature Reserve, we conclude that they were deprived all productive use of the property.

Case:17-03283-LTS  Doc#:18994-2  Filed:11/01/21  Entered:11/01/21 14:23:01  Desc:
Exhibit Certified Translation of the Judgment  Page 48 of 58

Certified Translation MC-2021-170
Page 48 of 58

KLAN201901253                                              48

In the fourth and final error, it is up to us to determine whether the $30,496,000, plus interest over that sum from the date of the taking to its full payment and costs, granted to respondents as fair compensation is an amount supported by and based on the evidence presented, or if, on the contrary, and as alleged by the Commonwealth, it is an exaggeratedly high sum. That is, (i) the southern part of the farm, to which the Commonwealth attributes the largest portion of the farm (just over 140 cuerdas), is located in the maritime land zone and is floodable, which "significantly reduces its value in the market," ii) the Commonwealth does not have to pay for opportunities that the owner may lose as a result of the expropriation, and (iii) that due to the existence of the characteristics of the land, it was a fact that the owner knew or should know, that his property would be subject to stricter regulation, and that therefore, its potential would be limited.[151]

On the other hand, respondents invite us to examine, in summary, that as concluded by the Primary Forum, in its finding of fact number 36, and included by way of discussion finding of fact number 39, which we prefer to quote *ad verbatim*, at page 13 of the appealed Judgment, in relation to the appraisal of the Expert of the State, Mr. Núñez concluded, and we quote:

> 36. The space of Plot 003-02 that indicates the stipulated acquisition plan is not 49.8228 cuerdas but 64.05061 cuerdas equivalent to 253.534.6697 m/c. The space of this plot used by Mr. Núñez arises from a plan that was provided to them, **which differs from the stipulated plan** (emphasis ours). If plot 003-02 is valued with the space of 253,534.6697 m/c that appears in the stipulated plan, using the unit price of $ 70 m/c established by Mr. Núñez, its value would amount to 17,747 426.88.
> ...
> 39. Mr. Núñez did not evaluate the land which best use was for residential purposes. Neither                    from

---

[151] *Id.*, p. 5.

his report nor from his testimony on plots 003-02 and 004-02 near PR-2 to which he attributed a better mixed commercial-residential use, a valuation can be inferred for the best residential use. In his reports on both plots, three of the four comparable ones that he considered for valuation have better commercial use and one, a mixed-use, commercial residential.

They argue that the State appraiser had not made such an error, of arbitrarily assigning without any legal basis a better "conservation use to more than two-thirds of the farms, his valuation would probably have been higher than that of the appraiser of the plaintiffs," respondents herein.

We clarify in advance that the sole purpose of the trial held on August 6, 7, 8, 9, 16, and 17, 2018; September 4 and 6, 2018; and October 4 and 30, 2018, was to determine the fair compensation and the evidence presented was circumscribed to this.[152] That being the case, on the basis of the analysis outlined above, after a **thorough study** of the extensive TOT, we are forced to conclude that the partial and documentary evidence submitted by the respondents supports the sum/amount granted to that party for the statutory taking of its property. Due to the length of the testimonies, we will confine ourselves to those of greatest relevance for the resolution of this controversy.  Let us see.

At trial, Mr. Ismael Isern Suárez testified that he is a civil engineer, license 12209, and an authorized professional evaluator. He is also a real estate appraiser, license 684, and holds a federal

---

[152] As we explained in the procedural tract of this *Judgment*, this case was bifurcated by the CFI, where it dealt, in the first place, with the issue as to whether the State's action constituted a statutory expropriation by the mere approval of Act No. 227-2008. Once the CFI decided the case in the affirmative, through its Partial Judgment entered on February 27, 2014, the State duly appealed against it through the writ of *Certiorari*, both before this Intermediate Forum and the Supreme Court. Both forums refused to issue the writ filed by the State, with the legal consequence that the State's argument could, as was done, be reproduced in this appeal. However, as outlined in the joint discussion of the first, second and third errors of this Judgment, and for the reasons set forth therein, we accept, as did the CFI, as undisputed facts those mentioned in the aforementioned *Partial Judgment* of February 27, 2014. (*Partial Judgment*, p. 2, of the Appeal Appendix, at pp. 735-752.) In addition, these same facts (which we accept as uncontroverted) were reproduced by the parties, and were part of the oral and documentary evidence, at trial.

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 50 of 58

Certified Translation MC-2021-170
Page 50 of 58

KLAN201901253                                                                50

certification, number 156, to appraise properties in which federal funds are involved. He has been practicing as a real estate evaluator since 1994.[153]

In addition, he testified that he was endeavored the task of establishing the market value of the real estate property, object of this controversy, as of 2008, when the law to establish the nature reserve was passed. Therefore, he prepared a valuation report.[154] In it, he took into consideration the "physical and legal" characteristics of qualification, such as flooding and all other characteristics of the terrain.[155] This is to determine what he called "the cornerstone," which is "the best use of the property." Once determined, he looked for comparable sales that were compatible with that best use. He continued testifying that those comparable sales were adjusted and a unitary was reached, an opinion of the value of each party, and with that, he concluded the value of the property."[156]

Thus, he testified that the term "best and most profitable use" is characterized by the following: (i) whether the different uses that are approved in the appraisal, which can be commercial, residential, industrial, conservation are physically possible; (ii) whether those physically identified uses are legally permissible, and those uses that are not fair are discarded, and (iii) finally, whether that identified use is economically feasible.[157] In his testimony, he affirmed that these elements are present in the 197 cuerdas of the land because "it has all the infrastructure nearby, good access

---

[153] Transcript of the Oral Testimony (TOT) of August 7, 2018, lines 18 to 27, p. 6. His expert testimony was stipulated by the legal representative of the State. *Id.*
[154] TOT of 7 August 2018, lines 21-27, p. 7.
[155] TOT of 7 August 2018, lines 11-28, p. 11
[156] *Id.*
[157] TOT of 7 August 2018, lines 9-24, p. 12.

to the state highway number 2, ... aqueduct, treatment plant nearby, and that this property is under the Territorial Planning Plan of Ponce"[158], Office that, at that time, together with the Municipality of Ponce, granted the permits. He established in his testimony that the qualification of these cuerdas of land, in their great majority, is EV.4, and the southern portion of its qualification is of specially protected rustic soil. The latter, those that are "south towards the Caribbean Sea of tourist residential."[159] He highlighted in his testimony that the Territorial Planning Plan of the Municipality of Ponce identified 35 cuerdas for conservation, whose title belongs to the owners, and therefore, they are also subject to valuation. Therefore, he concluded, in summary, that the first 50 cuerdas had commercial use, 111 cuerdas were for residential use, and the 35 cuerdas were for conservation use.[160] He testified that the 2007 demarcation by the DNER around the delimitation of the MLZ was not a "taking" because the MLZ is in the public domain, so it is deprived of all productive use.[161] Then, his testimony, among others, was based on what is relevant, on the comparables used for his report.[162]

Mr. Javier L. Bonnin Orozco, plaintiffs-respondents' witness, stated that he is an architect, license number 12518, has a master's degree in architecture and at that time was a resident of the state of Oregon, USA, where he teaches courses in the department of architecture of the university. In addition, he participated in the process of preparing the Ponce territorial plan.[163] He        was        also        director        of

---

[158] TOT of 7 August 2018, lines 29-32, p. 12 and lines 1-31, p. 13.
[159] TOT of 7 August 2018, lines 26-27, p. 13.
[160] TOT of 7 August 2018, lines 1-29, p. 14 and lines 1-32, p. 15 and lines 1-4, p. 16.
[161] TOT of 7 August 2018, lines 5-32, p. 16.
[162] TOT of 7 August 2018, lines 15-32, p. 17; lines 1-32, p. 18; lines 1-32, p. 19; lines 1-32, p. 20; lines 1-32, pp. 21 to page 28 to line 18.
[163] TOT of 6 August 2018, lines 27-31 of p. 17; lines 1-22, p. 18; lines 3-32, p. 19; and lines 1-28, p. 20

the Ponce Territorial Planning Office and was a consultant to the Ponce Territorial Planning Plan that entered into force in 2003, as well as a consultant and collaborator in other municipalities.

During his testimony, he intended to establish the permitted uses on the lands at issue and the conditions of such lands for such uses.[164] Specifically, he stated that he participated in projects in coastal areas, such as the Boquerón revitalization project, the Tabaiba Park on the Ponce beach, the Mayagüez 2010 Litoral Park, the linear parks of the Bucaná and Portugués de Ponce rivers, among others.[165]

Architect Bonnin stated that as of 2008, the entity that determined the permitted uses in the territory of the Autonomous Municipality of Ponce was the Territorial Planning Office of that Municipality, under the Autonomous Municipalities Act[166]. Further, he testified extensively on different concepts, such as the planning districts (graphic or cartographic representation of where the different urban regulations apply ...), which are based on the "urban form, on the building as such, ... while the zoning district is strictly based on use."[167] In what is relevant, he testified that the land was classified EV.4, "with the exception of the area closest to the coastal part, which was classified as rustic land, specially protected, for reasons of natural resources."[168] The lands object of the dispute was covered by Special Plan II "La Matilde," of the Municipality of Ponce, according                                    to                                    the

---

[164] The State informed the CFI that it had no reservations about the expert capacity of the architect Bonnin, TOT, of August 6, 2018, lines 26-32, p. 23. His testimony was admitted by the CFI as an expert in matters of land uses permitted at the date on which the expropriation occurred, in addition to those "conditions that do not exceed the science of architecture and planning", TOT, August 6, 2018, lines 11-14, p. 30.
[165] TOT of 6 August 2018, lines 21-32, p. 25.
[166] TOT of 6 August 2018, lines 10-32, p. 31. The Autonomous Municipalities Act applicable at the date of the events and repealed by Act No. 107-2020. 21 LPRA sec. 4001 et. Seq.
[167] TOT of 6 August 2018, lines 15-24, p. 32.
[168] TOT of 6 August 2018, lines 20-23, p. 33.

stipulated evidence. In this regard, Architect Bonnin testified that there it was intended to facilitate a residential, tourist, and commercial development conditioned to the protection of natural resources such as the Salinas lagoon and a wetland area "to the south of the identified area and the conversion of the PR-2 into an expressway with the construction of frontage streets.[169]

Therefore, the Special Plan II pursued three purposes: to maximize the potential of the area for residential and tourist projects, plan development along the frontage roads of PR-2, and establish a wetland and Salinas lagoon protection zone.[170] Thus, he indicated that district EV.4 is a "special district, of punctual complaint" because it was used only to mark plots of "great development potential, so no limits were established, seeking the maximum possible development." In other words, the district classified EV.4 has no limits; it is a "ministerial use that cannot be modified, as established by the regulations."[171]

Further, he testified that, in regard to the flooding characteristic of the land, it is divided into three zones. The first comprises the northern part of the land closest to the PR-2 road, which is classified as zone X, not floodable. Most of the central body of the land was classified AE, with predetermined elevation levels, in whose classification it can be built (by filling or elevation of the structures), and the last one that is a strip parallel to the coast that is classified VE.[172]

Therefore, he testified that the distribution of use made by Eng. Isern is compatible with the uses allowed by the Territorial Order Plan [sic] of the Municipality of Ponce.[173] Thus, the only restrictive                         zone,                         in

---

[169] TOT of 6 August 2018, lines 24-32, p. 34.
[170] TOT of 6 August 2018, lines 3-10, p. 35.
[171] TOT of 6 August 2018, lines 1-16, p. 60 and lines 1-12, p. 61.
[172] TOT of 6 August 2018, lines 10-32, p. 61 and lines 4-11, p. 62.
[173] TOT of 6 August 2018, lines 22-30, p. 62.

terms of flooding is the one marked as Zone VE, which "is the zone attached to the coast."[174] Finally, he testified that the demarcation of the MLZ does not render ineffective or render useless the Planning District of the territorial plan if the properties remain private.[175] Nor did it affect the valuation report prepared by Eng. Isern.[176]

On the other hand, in support of Eng. Isern's conclusions, of the architect Bonnin, the testimony of the marine ecologist, Dr. Máximo Cerame Vivas[177], served to establish that the conditions and characteristics of the lands in question, especially the 35,075 cuerdas for conservation, remained unchanged.[178] Thus, by issuing a Certification in 1995 by the Corps of Engineers of the United States of America, the 35,075 cuerdas were declared lands of conservation, and therefore under its exclusive jurisdiction. While it is true that the issuance and expiration of the aforementioned "Certification" 5 years after its issue had its justification in a permit requested at that time by the plaintiffs-respondents, its expiration did not invalidate the testimony believed and not disputed by the State, thus justifying the "use" indicated by Eng. Isern when calculating the value of the land in question.

Although appellants tried to challenge these testimonies, their attempts proved imprecise. For example, in cross-examination of the State to architect Bonnin:

*Ms. Betancourt Jimenez:*

---

[174] TOT of 6 August 2018, lines 11-14, p. 63.
[175] TOT of 6 August 2018, lines 23-32, p. 67 and lines 1-32, p. 68.
[176] TOT of 6 August 2018, lines 1-10, p. 69.
[177] The testimony was brought by plaintiffs, as an expert in the area of ecology and manager of the procedure before the Corps of Engineers in 1995, for the jurisdictional determination of that agency. TOT of August 6, 2018, lines 1-32, p. 113. He also stated that he visited the farm on several occasions, walked it, took aerial photos of it, and flew over it twice. TOT of August 6, 2018, lines 1-32, p. 116. He also served as a consultant on the complaint for a new permit in 2005 for the plaintiffs' "Mandry Sea Side Estates" project, which they later withdrew.
[178] TOT of 6 August 2018, lines 27-31, p. 117 and lines 1-5, p. 118.

*Q: Okey. In the La Matilde area plan, which you spoke about this morning, you understand that this area plan is what applies, as you said to that property[179], regardless of zoning.*

*A: No, no. First, it is not an area plan; it is a special plan that is part of the territorial plan. The area plan is a different planning figure. No..., no... now I lost my train of thought a little, but I understand that it does not affect because the special plan is an overlapping district and overlaps over the Planning Districts.*

*Q. Yes, yes. But, but...*

*A. No way...*

Later, to questions from the Government, he testified[180]:

*Q: And, but do you know what effect does the fact that it had an area or a part of the property on a coastal barrier have?*

*A: The flood map which we referred to during the morning establishes the areas that are part of the coastal barrier, the coastal barrier, and the lands object of this case are not included within this barrier nor on the area of major cause.*

In cross-examination, the Government sought to establish that there are limits of conditions to attack the real feasibility of the uses designated by Eng. Isern[181];

*Q: The question is not whether it modifies the zoning that exists, but the question is whether these are the general conditions for all the properties that are in that PL.E. 2, La Matilde area, regardless of the zoning they have.*
*A: Yes, with a caveat or with a statement, and that is that the special plan is formulated on the management district and recognizes them in the same plan.*

First, from the testimony of the appraisers of both parties, Mr. Esteban Núñez Camacho for the State and Mr. Ismael Isern for the plaintiffs, they agree that the EV.4. Planning District allows a great variety of high-intensity uses, and both commercial and residential uses are allowed ministerially. That said, in accordance with the findings of facts number 17 to 29 of the *Judgment* under review                          in                          this

---

[179] TOT of 6 August 2018, lines 21-32, p. 69.
[180] TOT of 6 August 2018, lines 26-32, p. 71.
[181] TOT of 6 August 2018, lines 3-10, p. 70.

Certified Translation MC-2021-170
Page 56 of 58

KLAN201901253                                                                56

appeal, the testimony of Eng. Isern and the architect Bonnin deserved greater credibility to the CFI than that granted to the expert appraiser of real estate of the State, Mr. Esteban Núñez Camacho, given the inconsistencies and errors that undermined the testimony of the expert evidence presented by the appellant.

Evaluated both expert reports, for all of the above, without a doubt, the one prepared by Engineer Ismael Isern enjoys greater reliability, and what is more understandable, its conclusions are supported and in compliance with the requirements of the law in accordance with the previously detailed legal norms.

While appellants tried to challenge these testimonies, their attempts proved imprecise. The testimony of Mr. Vicente Quevedo Bonilla, DNER biologist, was insufficient to move the CFI to ignore what was stated by the marine ecologist, Dr. Máximo Cerame Vivas[182], and conclude that the indicated use was not proper because the conditions of the land had varied.

On the contrary, what was proven was that Eng. Isern's Appraisal Report met the requirements relevant to the definition of "use." Namely, that the intended uses (commercial, housing, and conservation) were: physically possible, legally permissible, and economically viable. Appellant did not place us in a position, reviewing any evidence that would demonstrate that the Primary Forum acted with bias, passion, prejudice, or manifest error, which would lead us to intervene with its determination. Finally, we recognize that, as we said, the revisory forums are not obliged to adopt the expert evidence, being able to discard it; however, according          to          the          testimonial          and

---

[182] Appendix 1344 of the Appeal, *Judgment*, see finding of fact number 31: "The testimony of Dr. Cerame Vivas deserved full credit to the Court, and allows the inference that by August 2008 the wetland area does not develop talk about the subject farms had a space of 35,075 cuerdas."

documentary evidence submitted to this Forum, we can do nothing but concur with the CFI.

**IV.**

On the grounds set out above, the appealed *Judgment* is affirmed.

So agreed and ordered by the Court and certified by the Clerk of the Court.

Judge Lebrón Nieves concurs with the result without a written vote.

[Signature]
Ms. Lilia M. Oquendo Solis
Clerk of the Court of Appeals

Case:17-03283-LTS   Doc#:18994-2   Filed:11/01/21   Entered:11/01/21 14:23:01   Desc:
Exhibit Certified Translation of the Judgment   Page 58 of 58

Certified Translation MC-2021-170
Page 58 of 58

**No. 2021-170  TRANSLATOR'S CERTIFICATE OF ACCURACY**

I, Mayra Cardona Durán, of legal age, single, resident of Guaynabo, Puerto Rico, Certified Interpreter of the United States Courts (Certification No. 98-020) and certified by the National Association of Judiciary Interpreters and Translators (10671), holding a Master's Degree in Translation and admitted to the Puerto Rico Bar Association (Bar No. 12390, RUA No. 11038) hereby CERTIFY: that according to the best of my knowledge and abilities, the foregoing is a true and rendition into English of the original Spanish text, which I have translated and it is stamped and sealed as described therein.  This document is comprised of Fifty-Eight (58) Pages, including this certification page, and does not contain changes or erasures.

In Guaynabo, Puerto Rico today, Friday, October 29, 2021

Lcda. Mayra Cardona
BA Lit/Fr, MA Trans, JD
United States Courts Certified Interpreter
NAJIT Certified Interpreter and Translator
3071 Alejandrino Ave. PMB 306 Guaynabo, Puerto Rico 00969-7035
Tel. (787) 530-1414
e-mail: mayra@cardona.com