1                           UNITED STATES DISTRICT COURT

2                            DISTRICT OF PUERTO RICO

3
     In Re:                         )          Docket No. 3:17-BK-3283(LTS)
4                                   )
                                    )          PROMESA Title III
5    The Financial Oversight and )
     Management Board for           )
6    Puerto Rico,                   )          (Jointly Administered)
                                    )
7    *as representative of*         )
                                    )
8    The Commonwealth of            )
     Puerto Rico, *et al.*          )          November 1, 2021
9                                   )
                   Debtors,         )
10

11   _____

12   In Re:                         )          Docket No. 3:17-BK-3566(LTS)
                                    )
13                                   )          PROMESA Title III
     The Financial Oversight and )
14   Management Board for           )
     Puerto Rico,                   )          (Jointly Administered)
15                                   )
     *as representative of*         )
16                                   )
     The Employees Retirement       )
17   System of the Government       )
     of the Commonwealth of         )
18   Puerto Rico,                   )
                                    )
19                   Debtors,       )

20   _____

21

22

23

24

25

```
 1   _____

 2

 3   In Re:                    )      Docket No. 3:19-BK-5523(LTS)
                               )
 4                             )      PROMESA Title III
     The Financial Oversight and )
 5   Management Board for      )
     Puerto Rico,              )      (Jointly Administered)
 6                             )
     as representative of      )
 7                             )
     The Puerto Rico Public    )
 8   Buildings Authority,      )
                               )
 9              Debtors,       )

10   _____

11

12                       MOTION HEARING

13    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14              UNITED STATES DISTRICT COURT JUDGE

15     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

16              UNITED STATES DISTRICT COURT JUDGE

17   _____

18
     APPEARANCES:
19
     ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY
20
     For The Commonwealth
21   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
22                            Mr. Michael A. Firestein, PHV
                              Ms. Margaret A. Dale, PHV
23                            Mr. Michael T. Mervis, PHV
                              Mr. Elliot Stevens, PHV
24                            Mr. Lary Rappaport, PHV

25
```

```
 1     APPEARANCES, Continued:

 2     For Puerto Rico Fiscal
       Agency and Financial
 3     Advisory Authority and
       the Governor of
 4     Puerto Rico:              Mr. John Rapisardi, PHV
                                 Mr. Peter Friedman, PHV
 5

 6     For The Official
       Committee of Retired
 7     Employees:               Mr. Robert Gordon, PHV

 8     For Cantor-Katz
       Collateral Monitor,
 9     LLC:                     Mr. Thomas L. Mott, PHV
                                Mr. Peter J. Amend, PHV
10                              Ms. Elizabeth Curran, PHV
                                Mr. Douglas Mintz, PHV
11

12     For the DRA Parties
       and AmeriNational
13     Community Services:      Mr. Arturo J. Garcia Sola, Esq.
                                Mr. Nayuan Zouairabani Trinidad, Esq.
14                              Mr. Alejandro Cepeda Diaz, Esq.

15     For Peter Hein:          Mr. Peter Hein, Pro Se

16     For Suiza Dairy:         Mr. Rafael Gonzalez Valiente, Esq.

17     For Finca Matilde:       Mr. Eduardo Capdevila, Esq.

18     For the Creditors
       Committee:               Mr. Luc Despins, PHV
19

20     For PFZ:                 Mr. David Carrion Baralt, Esq.

21     For Assured:             Mr. William J. Natbony, PHV

22

23

24

25
```

1   APPEARANCES Continued:

2   Also present:

3        Honorable Bankruptcy Judge J. Barbara Houser, Mediation
              Team Leader
4
         Honorable Circuit Judge Thomas J. Ambro
5
         Honorable District Judge Nancy F. Atlas
6
         Honorable Bankruptcy Judge Roberta A. Colton
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.

```
 1                              I N D E X

 2    WITNESSES:                                        PAGE

 3          None.

 4

 5    EXHIBITS:

 6          None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                  San Juan, Puerto Rico

 2                                  November 1, 2021

 3                                  At or about 9:43 AM

 4                         *    *    *

 5          THE COURT:  Good morning.  This is Judge Swain

 6   speaking.

 7          Ms. Tacoronte, can you hear me in San Juan?

 8          COURTROOM DEPUTY:  Good morning, Your Honor.  We can

 9   hear you.

10          THE COURT:  Very well.  Good morning.

11          Would you please call the case?

12          COURTROOM DEPUTY:  Absolutely, Your Honor.

13          The United States District Court for the District of

14   Puerto Rico is now in session.  The Honorable Laura Taylor

15   Swain presiding.  Also present the Honorable Magistrate Judge

16   Judith Dein.  God save the United States of America and this

17   Honorable Court.

18          In re: The Financial Oversight and Management Board

19   for Puerto Rico, as representative of the Commonwealth of

20   Puerto Rico et al., PROMESA Title III, Case No. 2017-BK-3283,

21   for pretrial conference.

22          THE COURT:  Thank you, Ms. Tacoronte.

23          Buenos dias to all.  Please turn your cameras on for

24   these introductory remarks and instructions, but leave your

25   microphone muted.
```

1      Welcome Counsel, parties in interest, and members of

2   the public and press.  I also wish to thank the judges of our

3   mediation team, some of whom are participating today on zoom

4   and listening through AT&T, including Judges Barbara Houser,

5   Thomas Ambro, Nancy Atlas and Roberta Colton.  Without their

6   tireless efforts over the past several years, we would not be

7   where we are today, on the threshold of a hearing as to

8   whether the Plan of Adjustment proposed for the Commonwealth,

9   ERS, and PBA can be confirmed.  I thank them sincerely for

10   their work, which continues.

11      To ensure the orderly operation of today's virtual

12   conference, once we turn to our Agenda items, all parties

13   appearing by Zoom must mute their microphones when they are

14   not speaking, and turn off their video cameras if they are not

15   directly involved in the presentation or argument.  When you

16   need to speak, turn your camera on, and unmute your microphone

17   on the Zoom screen.

18      I remind everyone that consistent with court and

19   judicial conference policies, and the orders that have been

20   issued, no recording or retransmission of the hearing is

21   permitted by anyone, including but not limited to the parties,

22   members of the public, and members of the press.  Violations

23   of this rule may be punished with sanctions.

24      I will be calling on each speaker during the

25   proceeding.  When I do, please turn your camera on, unmute

1    yourself, and identify yourself by name for clarity of the

2    record.  If you wish to be heard when I invite speakers not

3    specifically listed on the Agenda to respond or make remarks,

4    please turn your camera on and use the "raise hand" feature at

5    the appropriate time.  The "raise hand" feature can be

6    accessed by selecting the reactions icon in the tool bar

7    located at the bottom of your Zoom screen.  I'll call on the

8    speakers one by one.  After you have finished speaking, you

9    should select the "lower hand" feature on the tool bar.

10           Please don't interrupt each other or me during the

11   hearing.  If we interrupt each other, it is difficult to

12   create an accurate transcript of the proceeding, but having

13   said that, I apologize in advance for breaking the rule,

14   because I may interrupt if I have questions or if I need to do

15   so to manage the conference efficiently.  If anyone has

16   difficulty hearing me or another participant, please use the

17   "raise hand" feature immediately.

18           The Agenda, which was filed at Docket Entry No. 18990

19   in Case No. 17-3283 is available to the public at no cost on

20   Prime Clerk for those who are interested.  I encourage each

21   speaker to keep track of his or her own time for the timed

22   portions of the Agenda.  The Court will also be keeping track

23   of the time allocations, and will alert each speaker when

24   there are two minutes remaining with one buzz and when time is

25   up, with two buzzes.  Here's an example of the buzzer sound.

1          (Sound played.)

2          THE COURT:  If your allocation is two minutes or

3  less, you'll just hear the final two buzzes.

4          If we need to take a break, I will direct everyone on

5  the AT&T line to disconnect and dial back in at a specified

6  time.  This morning's session will go until ten minutes to

7  1:00, which is 12:50 PM.  We'll have a ten-minute break at

8  about 11:15.  We'll resume if necessary after the midday

9  break, going from 2:10 to 5:00, and, again, there'll be a

10 ten-minute break in the afternoon at about 3:30.

11         I'd ask now that all who are not involved in the

12 first Agenda item, turn your cameras off now.  Thank you.

13         The first item on the Agenda is the debtors' motion

14 in limine for an order excluding the expert testimony of

15 Lizette Martinez.  I have scheduled to speak in relation to

16 this matter Mr. Stevens, representing the Oversight Board;

17 Mr. Zouairabani Trinidad, representing the DRA Servicer;

18 Mr. Mintz and/or Mr. Amend, representing the DRA Collateral

19 Monitor; and Mr. Stevens, who will come back for a reply.  So

20 the first speaker is Mr. Stevens, for the Oversight Board, who

21 I have scheduled for ten minutes.

22         Good morning, Mr. Stevens.

23         MR. STEVENS:  Good morning, Your Honor.  My name is

24 Elliot Stevens of Proskauer Rose.  I'm appearing today on

25 behalf of the Oversight Board as the debtors' representative

1  in these Title III cases.

2        As Your Honor identified, this is the Oversight

3  Board's Motion in Limine to exclude the expert testimony of

4  Ms. Lizette Martinez, upon which the DRA parties propose to

5  rely in connection with their confirmation objection.  Your

6  Honor, Ms. Martinez' testimony, as disclosed by her expert

7  report, would revolve around essentially two different topics.

8  The first one is tracing and calculating the amounts of Act

9  30-31 revenues that the Commonwealth collected between the

10  years 2015 to 2020, and that the Commonwealth either retained

11  at the Commonwealth level or that the Commonwealth then

12  transferred to HTA during that time period.  Ms. Martinez -- a

13  second topic, Your Honor, would be analyzing how HTA

14  potentially used revenues that were transferred to it during

15  that time period.

16        Your Honor, the motion asks the Court to enter an

17  order excluding Ms. Martinez' testimony on the basis it is

18  irrelevant to the Confirmation Plan.  I'm going to discuss

19  that as we go forward, Your Honor.

20        Briefly put, the legal standard here is that to be

21  admissible under Rule 402 of the Federal Rules of Evidence,

22  evidence must be relevant.  It can't be irrelevant.  Under

23  Rule 401, evidence is only relevant if it tends to make a fact

24  which is of consequence to the determination of the action

25  more or less probable.  Here, the relevant action is plan

1    confirmation proceedings.  Under -- further, as this is expert

2    testimony, Rule 702 applies and requires, among other things,

3    that the evidence help the trier of fact understand the

4    evidence or a determine a fact at issue.

5          Your Honor, we submit, as discussed in greater detail

6    in our motion in reply, that Ms. Martinez' testimony does not

7    satisfy the standards for relevance, and can't be admitted.

8    We submit this is true, because it doesn't go to any fact

9    which is relevant to whether the Plan should be confirmed or

10   not.

11         With respect to Ms. Martinez' first topic of

12   testimony, the amount of revenues the Commonwealth either

13   retained or transferred to HTA, this is relevant solely to

14   quantifying one of two things:  Either the value of the DRA

15   parties' asserted security interest in revenues retained by

16   the Commonwealth, or to quantify the size of their claim,

17   their asserted administrative expense claim against the

18   Commonwealth based on retention of its revenues.  Indeed, the

19   DRA parties essentially said as much in their response to the

20   Oversight Board's evidentiary objection in connection with

21   their administrative expense motion, where they agreed

22   Ms. Martinez' testimony was only relevant to calculate the

23   size of the administrative expense claim should one exist.

24         As of course Your Honor is aware, just this Friday,

25   however, this Court held two things:  The DRA parties did not

1   have any security interest in revenues retained by the

2   Commonwealth, and as a result of that, and for other reasons,

3   the DRA parties did not have a valid administrative expense

4   claim against the Commonwealth.  That's ECF no. 18892 in the

5   Commonwealth's case.

6           Your Honor, we submit that, simply put, Ms. Martinez'

7   testimony, because it relates solely to quantifying claims and

8   security interests that this Court has held do not exist, it

9   cannot be relevant to Plan confirmation, and thus should be

10  excluded.

11          Your Honor, the DRA parties in their opposition to

12  the motion in limine put forward a couple of arguments which

13  seek to disagree with that.  I'd like to quickly discuss the

14  main ones, Your Honor.  These are further discussed our Reply.

15          First, Your Honor, in their opposition to the motion

16  in limine, the DRA parties argue that the Court should lean in

17  favor of admitting expert testimony in a bench trial.  We

18  submit, however, Your Honor, this is wrong in this context.

19  None of the DRA parties' cases relate or suggest that

20  irrelevant expert testimony should be admitted.  In fact, they

21  all relate to the reliability prong of the *Daubert* inquiry.

22  They don't relate to relevance.  As a result, nothing suggests

23  that irrelevant expert testimony should be admitted, and

24  that's precisely what we suggest Ms. Martinez' testimony is.

25          If anything, Your Honor, and as cited in our motion

1    and in our reply brief, the First Circuit Rule indicates that

2    a higher relevancy standard exists for expert testimony,

3    because it must satisfy Rule 401, the general rule of

4    relevance, as well the Rule 702 requirement that it has to be

5    helpful to the trier of fact.  Nonetheless, Your Honor, under

6    any standard, as I mentioned a minute ago, evidence that only

7    goes to the quantification of claims and liens that the Court

8    has held do not exist cannot be relevant.

9         Further, Your Honor, the DRA parties argue

10   specifically that Ms. Martinez' testimony is relevant to plan

11   confirmation under PROMESA section 314(b)(3), which provides

12   that the Court shall confirm the plan if the debtor is not

13   prohibited by law from taking any action necessary to carry

14   out the plan.

15        DRA parties argue that the debtor is prohibited by

16   law from retaining Act 30-31 revenues on a go-forward basis,

17   and yet the Plan proposes for the debtor to do just that, and

18   that, therefore, the Plan violates 314(b)(3).  Your Honor, our

19   response to the merits of that is contained in our

20   confirmation briefs and our reply brief.  And I won't get into

21   that here, but we submit that this doesn't make Ms. Martinez'

22   testimony relevant for a couple of different reasons.

23        Notably, as a preliminary point, in their 70 page

24   long objection to the confirmation of the Plan, the DRA

25   parties do not cite Ms. Martinez' testimony or her report

1   anywhere in connection with their 314(b)(3) legal argument.

2   Indeed, the DRA parties don't actually cite Ms. Martinez'

3   report anywhere in their legal arguments.  It's solely

4   mentioned in a background paragraph.

5          We would submit that this tends to indicate the DRA

6   parties themselves didn't seem to think that her opinions, as

7   disclosed in her report, were greatly relevant to their

8   objection since they didn't rely on them there.  More

9   fundamentally though, Your Honor, under section 314(b)(3), it

10  only prohibits future -- the Plan from requiring the debtor to

11  engage in future prohibitions of the law.  That's why its

12  wording is clear about it.  It stops the Plan from providing

13  the debtor take actions that are prohibited by law that are

14  necessary to carry out the Plan or execute the Plan.

15         Similarly, jurisprudence cited in our Reply makes

16  clear that point, that -- it talks about future actions and

17  doesn't stop the discharge of past claims.  Ms. Martinez'

18  testimony, however, relates solely to the period of time of

19  2015 to 2020, which is the past.  It cannot tell us anything

20  about whether the Plan requires the debtor to take actions

21  that are prohibited by law in the future.  As a result of

22  further commitments, Ms. Martinez' testimony can't be ruled

23  relevant under 314(b)(3) --

24         THE COURT:  Mr. Stevens --

25         MR. STEVENS:  Yes, Your Honor.

1          THE COURT:  -- I haven't yet ruled on your contention

2     regarding the application of 314(b)(3), and so to the extent

3     that DRA argues that the past application and tracing of the

4     funds is bound up with and relevant to its 314(b)(3) argument,

5     wouldn't it be inappropriate for me to resolve this motion

6     based on an assumption as to -- or based on your argument as

7     to how the merits of the 314(b)(3) issue will come out?

8          MR. STEVENS:  Thank you, Your Honor.  I would submit

9     three things in response to that I think.  First, we would

10    submit the language is very clear, and that it's not really

11    deciding a particularly contentious point.  However, even

12    setting aside our argument --

13         (Sound played.)

14         MR. STEVENS:  -- as to the future violation point, we

15    submit Ms. Martinez' testimony is still irrelevant even if

16    Your Honor didn't want to get into that in the context of this

17    motion.  Specifically, we would argue that the DRA parties'

18    opposition of the motion in limine and, indeed, their

19    objection to the Plan make clear their 314(b)(3) arguments,

20    including to the extent it relates to past violations,

21    including theirs, entirely hinges on the existence of a

22    security interest against the Commonwealth.

23         They talk about how it violates the Takings Clause if

24    the Plan were to take away their property rights, for example.

25    It hinges on their security interest.  But as I previously

1   mentioned, and as you're aware, Your Honor, the Court has held

2   they don't have such a security interest.

3          And further, Your Honor, we would also submit that

4   Ms. Martinez' testimony is -- relates solely to the

5   quantification.  It's talking about amounts.  It's talking

6   about how much the Commonwealth retained or transferred.  A

7   violation of the law is a violation of the law, whether it

8   relates to a hundred dollars or a billion dollars, and,

9   therefore, Ms. Martinez' testimony doesn't really matter as to

10  whether retention is or is not a violation of the law.

11         So that would be my response to your question, Your

12  Honor.

13         Moving on, Your Honor, to the second topic quickly

14  before my time runs out, Ms. Martinez -- the second topic

15  relates to HTA's potential use of money that was transferred

16  to it and how HTA spent that money.  Your Honor, we simply

17  submit that this clearly isn't relevant to the Commonwealth

18  Plan, which doesn't relate to HTA, cover HTA's debts, or cover

19  its property.

20         The DRA's sole response is to say it's background

21  evidence.  However, Your Honor, the DRA parties and the case

22  law makes clear that background evidence must itself be

23  relevant to some facts that are at issue to be admissible, and

24  evidence as to how a legally separate entity not covered by

25  the Plan used revenues that were transferred to it cannot be

1   relevant and isn't relevant.  And the DRA parties don't put

2   forward a reason as to why it would be relevant to whether the

3   Commonwealth Plan should be confirmed.

4          (Sound played.)

5          MR. STEVENS:  Your Honor, unless you have any further

6   questions, I will cede the virtual microphone to the DRA

7   parties' counsel.

8          THE COURT:  Thank you, Mr. Stevens.

9          We will now hear from the counsel for the servicer

10  for the DRA parties, Ms. Zouairabani, for 11 minutes.

11         MR. ZOUAIRABANI TRINIDAD:  Good morning, Your Honor.

12  Attorney Nayuan Zouairabani from McConnell Valdes, LLC,

13  representing AmeriNational Community Services, LLC. I am

14  joined by my co-counsel Peter Amend of Schulte Roth & Zabel,

15  representing Cantor-Katz Collateral Monitor, jointly referred

16  to as the DRA parties.

17         COURT REPORTER:  I'm sorry, Your Honor.  This is the

18  court reporter.  I'm sorry to interrupt, but I'm getting a

19  duplicate, a repetition of the words coming through like

20  before we started.

21         THE COURT:  So you're hearing an echo?  Are you

22  hearing that when I speak, also?

23         COURT REPORTER:  No.  Only when other people speak.

24  I think it's coming out of the speakers in your courtroom,

25  into your mics, and I'm getting a repetition a second later.

1           THE COURT:  That's not good.  Let's see.

2   Mr. Zouairabani, obviously I have not started your time yet.

3   Would you say testing, one, two, three?

4           MR. ZOUAIRABANI TRINIDAD:  Yes, Your Honor.  Testing

5   one, two, three.

6           THE COURT:  Are you hearing it now, Ms. Court

7   Reporter?

8           COURT REPORTER:  I'm sorry.  Could counsel repeat

9   that again?  I don't know if it's just breaking up or it's a

10  repeat.

11          MR. ZOUAIRABANI TRINIDAD:  Testing one, two, three.

12          COURT REPORTER:  That's better.  Thank you, Your

13  Honor.

14          THE COURT:  Thank you.

15          Mr. Zouairabani, if you would just slow down a bit,

16  that would help me and perhaps the court reporter, also.

17          MR. ZOUAIRABANI TRINIDAD:  Sure, Your Honor.  Should

18  I start from the beginning?

19          THE COURT:  Yes, please.

20          MR. ZOUAIRABANI TRINIDAD:  Sure.  Good morning, Your

21  Honor.  Attorney Nayuan Zouairabani from McConnell Valdes,

22  LLC, representing AmeriNational Community Services, LLC.  I am

23  joined by co-counsel Peter Amend of Schulte Roth & Zabel,

24  representing Cantor-Katz Collateral Monitor, LLC, jointly

25  referred to as the DRA Parties.

1          Your Honor, from the outset, I'd like to mention that

2    we can't lose sight that this is a motion in limine to exclude

3    an expert testimony in a bench trial on the confirmation of

4    the Commonwealth Plan.  Law favors admission of expert

5    reports, particularly in bench trials, and excluding expert

6    testimony before the expert testifies at trial is disfavored.

7          COURT REPORTER:  I'm sorry, Your Honor.  I'm sorry,

8    Counsel.  I'm still getting a repetition a second later.  I'm

9    sorry.

10         THE COURT:  It's nothing to be sorry about.  It's

11   something that we need to fix.

12         So again, Mr. Zouairabani, I've stopped the clock on

13   you.

14         MR. ZOUAIRABANI TRINIDAD:  Let me take my headphones

15   off.  I don't know if that's the problem.

16         THE COURT:  I tend to doubt it, but you can try.

17         MR. ZOUAIRABANI TRINIDAD:  You let me know if this

18   works better.

19         COURT REPORTER:  It's the same, Your Honor.

20         THE COURT:  Let's see.  Is it possible in my

21   courtroom to mute the sound in my courtroom -- which will make

22   it a little complicated for me to ask questions in the

23   dialogue, but let's try that.  So will the controller in my

24   courtroom mute me now?

25         All right.  They're going to mute me, and then I'm

1  going to ask Mr. Zouairabani to tell us what the weather is

2  like where he is there.  So now I'm being muted, and then,

3  Mr. Zouairabani, talk about the weather.

4          MR. ZOUAIRABANI TRINIDAD:  Your Honor, it's very nice

5  here.  I think it's about 78 degrees, give or take.

6          COURT REPORTER:  Thank you, Your Honor.

7          THE COURT:  Was that better?

8          COURT REPORTER:  Yes, Your Honor.

9          THE COURT:  Okay.  This is going to be complicated,

10  but that is what we will do.

11          All right.  So, Mr. Zouairabani, you don't have to

12  repeat the introduction of Mr. Amend or the substance of your

13  argument that there should be a liberal admission for a bench

14  trial of expert testimony.  I would like you to get, as soon

15  as possible, to the relevance of this particular testimony in

16  light of the decisions that I've made in the past couple of

17  days regarding claims by DRA.

18          Now I am going to start your time.  About one minute

19  has elapsed, and I will have myself muted.

20          MR. ZOUAIRABANI TRINIDAD:  Thank you, Your Honor.

21  I'm going to move quickly then to answer the question that

22  Your Honor posed concerning the relevancy issues that have

23  been raised by the FOMB.

24          In a nutshell, the FOMB asserts the report does not

25  affect whether the plan satisfied the confirmation

1    requirements under 314(b) of PROMESA.  This is not proof.  And

2    the report of Ms. Martinez' testimony are directly tied to at

3    least plan confirmation analysis.  One of them is 314(b)(4).

4         And I'll just mention briefly, Your Honor, that we

5    are aware of the decision on Friday, still not final, and to

6    the extent that it may be relevant by the effective date,

7    that's an issue to consider.  I would, however, like to

8    mention 314(b)(3).  I'd like to spend some time there.

9         314(b)(3) requires the Commonwealth not to be

10   prohibited by law from taking any action necessary to carry

11   out the Plan.  Now, the Plan suffers from an illegality

12   infirmity.  A Constitutional Plan requires compliance with --

13   at least with the elements -- first, there needs to be a

14   proper activation of the clawback; and second is there needs

15   to be a proper distribution of the revenues under Puerto Rico

16   law.  The Plan does neither.

17        Now, Mr. Stevens mentioned that Ms. Martinez was, in

18   our brief -- her report wasn't mentioned with regard to these

19   issues, but that is just a red herring.  Her testimony and her

20   report are directly tied to 314(b)(3).  Now, what the Plan

21   attempts to do is convert illegally clawed back funds, such as

22   the Act 30-31 incremental revenues, to property of the

23   Commonwealth, and then distribute these funds to the creditors

24   in violation to Article VI, Section 8 of the Constitution.  It

25   does this by alleging that PROMESA preempts Puerto Rico Law,

1    Government, Commonwealth appropriations, and the clawback

2    thereof.  You can see references to this at sections 2.1, 89.3

3    of the Plan, Exhibit K-3.  You can also see it at the

4    Disclosure Statement, at 88 and 88 -- at 87 and 88.

5         In the absence of preemption, which the Court has not

6    determined has occurred, the only other option by which the

7    Commonwealth can retain these revenues is through compliance

8    with the constitutional clawback.  Now, the report details the

9    flow of the Act 30-31 incremental revenues.  It is a tranche

10   of funds that are subject to the constitutional clawback

11   requirements.  And this will help the Court understand the

12   mechanics of how the Commonwealth -- this illegal clawback of

13   such revenues occurred, where these funds were distributed,

14   and for what they were used.

15        The report demonstrates that as far as the Act 30-31

16   incremental revenues are concerned, these funds were not being

17   used and distributed pursuant to the required priorities and

18   waterfall under the Puerto Rico law.  Now, Mr. Stevens

19   mentioned that all of this was predicated on the DRA having a

20   security interest.  Your Honor, that is plainly wrong.  There

21   are various reasons why the DRA can still raise the matters,

22   on -- from lack of compliance with 314(b)(3).  I'll stop.

23        THE COURT:  Mr. Zouairabani, I have been --

24   apparently they're still finding some hearing interference in

25   San Juan.  Do you have another device near you?

1              MR. ZOUAIRABANI TRINIDAD:  I could try to call in,

2       Your Honor, through my phone.

3              THE COURT:  We'd prefer that you didn't do that.  So

4       there's no other computer playing this audio in the same room

5       as you?

6              MR. ZOUAIRABANI TRINIDAD:  Not that I'm aware of,

7       Your Honor.

8              THE COURT:  Okay.  Would you try once again taking

9       your headphones out?  I've stopped your clock again.  So would

10      you tell us about your weather again?

11             MR. ZOUAIRABANI TRINIDAD:  Yes.  Again, sunny, 78

12      degrees.

13             THE COURT:  Okay.  San Juan, is that any better?

14      Ms. Tacoronte?

15             COURTROOM DEPUTY:  Your Honor, good morning.  This is

16      Carmen.  We can hear you fine, so we can infer that the

17      problem is not your microphone.  So if counsel could

18      doublecheck and lower his microphone a little, you know, the

19      sound, that would be helpful maybe, because it's only him.

20             THE COURT:  Ms. Tacoronte, I think I was muted for

21      the past three minutes while he was talking, but then you

22      wrote and said that there was still a problem.  So I guess it

23      does sound like it's on his end.

24             COURTROOM DEPUTY:  Your Honor, can you confirm that

25      all the mics were muted from your courtroom?

1          THE COURT:  Let's see.  I am told all the mics are

2    muted from my courtroom, but it is -- actually, it's been

3    suggested that we take Mr. Zouairabani up on his offer to call

4    in so that he can use phone audio and I can still see him with

5    his camera on.  So to do that, so he can just mute his audio

6    with the connection that he has, and then dial in with his

7    phone.

8          What are the last four digits of the phone number

9    you'll be calling from?

10          MR. ZOUAIRABANI TRINIDAD:  It will be 6240, Your

11   Honor.

12          THE COURT:  Okay.  Fine.  We'll hold on until we get

13   you on audio that way.  Thank you.

14          COURTROOM DEPUTY:  Your Honor, this is the courtroom

15   deputy again.  I'm sorry to interrupt.

16          THE COURT:  Yes.

17          COURTROOM DEPUTY:  Can Your Honor ask counsel to

18   confirm whether all their mics are muted while counsel is

19   speaking?

20          THE COURT:  Yes.  Counsel, make sure that all of your

21   microphones are muted when anyone else is speaking.  It looks

22   as though that is what is happening looking at the chart.

23          This room is not muted, and the Puerto Rico courtroom

24   is not muted.

25          MR. ZOUAIRABANI TRINIDAD:  Your Honor, this is

1    Attorney Nayuan Zouairabani.  Can you hear me well over there?

2         THE COURT:  Ms. Tacoronte, can you hear clearly in

3    San Juan?

4         COURT REPORTER:  Your Honor, I'm sorry.  This is Amy.

5    There's still an echo.

6         COURTROOM DEPUTY:  I can hear the echo as well when

7    we speak, Your Honor, so apparently one of your -- I can hear

8    you well, but whenever Amy speaks, I hear her.  And my mics

9    are muted while she's speaking.

10        THE COURT:  Which means you're hearing her through my

11   mic?

12        COURTROOM DEPUTY:  Yes, that could be it.

13        THE COURT:  I'm just trying to figure out what you

14   want me to do.

15        COURT REPORTER:  Your Honor, this is Amy.  I believe

16   what's happening is the audio is coming through -- if everyone

17   else is muted, then it would have to be coming through New

18   York's speakers into an open mic and feeding back into the

19   system as an echo I think.

20        THE COURT:  All right.  Were you hearing that echo

21   while our microphones were muted in New York, which was the

22   bulk of Mr. Zouairabani's remarks before we stopped again?

23        COURT REPORTER:  I've heard it since we started, yes,

24   including the first speaker.

25        THE COURT:  Then it isn't -- just to confirm again,

1   Sarah, were all of our microphones muted?  There was one that

2   was not muted?  Okay.  Hold on a second.  We're checking

3   again.

4           I'm so sorry, everyone, but it's best we get these

5   technical issues worked out today.  Better today than next

6   week when we're on trial.  So we have to -- one of our

7   technical people is coming up to the courtroom here in New

8   York, so thank you all for your patience.  We'll get started

9   again as quickly as we can.

10          Good morning again, everyone.  Again, apologies for

11  the technical difficulties, which we think that we have

12  resolved.

13          So, Mr. Zouairabani, would you please resume?  You

14  were talking about the relationship between the Martinez

15  evidence and the 314(b)(3) clawback argument, and I believe I

16  heard you say that, in the absence of preemption, the

17  constitutional clawback argument is relevant, or clawback

18  misapplication argument is relevant to the 314(b)(3) position

19  of the DRA parties.

20          I am now going to restart your time.  I have four and

21  a half minutes of your time elapsed.  So please continue now.

22          I'm not hearing you.  Are you on your phone?

23          MR. ZOUAIRABANI TRINIDAD:  Your Honor, can you hear

24  me now?

25          THE COURT:  Now I can hear you.  Now I'll start your

1    clock.

2         MR. ZOUAIRABANI TRINIDAD:  Okay.  Sure.  Thank you.

3    And, Your Honor, you're absolutely correct.  That is our

4    position in a nutshell.

5         So Mr. Stevens mentioned during his argumentation

6    that Ms. Martinez' testimony hinges on the existence of a

7    security interest, and that -- but that is not correct.  The

8    DRA parties can still assert violations of Rule 314(b) of the

9    Plan.

10        The FOMB might forget that the DRA parties are a

11   creditor of the Commonwealth and are a creditor of PBA with

12   regard to this Plan.  The DRA has claims at classes 12, 14 --

13   both of them relate to PBA -- class 40, which has 2012 GOs,

14   and class 59.

15        As a creditor on the Plan, and under section 1109, it

16   is definitely a party at interest who has standing and a right

17   to question whether the Plan is confirmable or not under all

18   the provisions of section 314.  So it is not limited to

19   whether there was a decision on whether there was a security

20   interest, not a security interest, or an admin -- that is an

21   extreme oversimplification.

22        At the end of the day, the Court needs to make an

23   independent inquiry on whether this Plan satisfies all the

24   confirmation requirements under 314(b) of PROMESA, and the

25   Bankruptcy Code.  And as Your Honor mentioned, this all goes

1    back to the same issue.

2        If preemption, which is an issue that has not been

3    decided, were not to apply here, the only other way that the

4    Commonwealth can retain the revenues would be through a

5    clawback.  And Ms. Martinez' testimony and her report goes to

6    show that -- at least one of the elements of the clawback,

7    which is distribution, and how the clawback revenues were

8    distributed and funded and used for, becomes extremely

9    relevant as they go to the issue of whether the priorities

10   have been satisfied.  So this is squarely, squarely relevant

11   to the section 314(b)(3) issues with regard to the Plan.

12       And in sum, Your Honor, the motion in limine -- and

13   we've heard from the FOMB, and we've seen the motion in limine

14   and their reply.  It is premised exclusively on the FOMB's

15   belief that their view of the world is right with regards to

16   preemption, and their legal position on preemption and

17   clawback are correct.  These issues are not proper to be

18   brought in a motion in limine, Your Honor.

19       Then the motion in limine, we only need to address

20   whether the facts of the expert -- the expert complies with

21   Rule 702 in order to provide expert testimony, which no one

22   has challenged Ms. Martinez' qualifications.  No one has

23   challenged her methodology, her assertion, or that she's

24   applied it correctly.  There are no *Daubert* issues with regard

25   to Ms. Martinez.

1          And regarding the relevancy objections, which are the

2    only thing that they've made -- we've demonstrated why those

3    continue to be relevant with regard to the Plan.  In a bench

4    trial such as this, she should be admitted to testify.  She

5    should not be disqualified, especially when there are no

6    relevancy concerns here.

7          This is an improper use of a motion in limine, Your

8    Honor.  It should be rejected, because at the end of the day,

9    what the FOMB is really asking is for you to prejudge their

10   positions on 314(b)(3) prior to Plan confirmation and their

11   legal positions on preemption and clawback are correct.

12         Your Honor, I'll stop there.  In a nutshell, that is

13   our position.  I skimmed through a lot of my outline, because

14   I wanted to address your questions directly.  I don't know if

15   you have any other further questions that you'd like me to

16   address.  If not, I will turn over my time to my co-counsel,

17   Peter Amend.

18         THE COURT:  I do want to ask you to address one more

19   point of the Oversight Board, which is their argument that the

20   portion of Ms. Martinez' testimony that relates to application

21   by HTA of revenues transferred to HTA is not relevant to the

22   Commonwealth, PBA, and ERS Plan.

23         MR. ZOUAIRABANI TRINIDAD:  Yes, Your Honor.  And that

24   is a very good question.  It is squarely relevant, and it goes

25   back to what I mentioned, to the issues of the two

1   requirements for the constitutional clawback.

2          We're not talking about activation at this point and

3   whether it was properly activated.  We're working off of a

4   world where it was activated, not -- we're not saying that it

5   was legally activated --

6          (Sound played.)

7          MR. ZOUAIRABANI TRINIDAD:   -- but the monies have

8   been retained.  So the next question is -- Puerto Rico law and

9   the Constitution requires that those clawback revenues be

10  applied in a certain manner, in a certain priority, in a

11  certain waterfall.  There's a first priority that has to go

12  with regard to payment to GOs; a second priority with regard

13  to payment of contractually bound obligations, including

14  loans, et cetera; and a third for use on some type of services

15  that assist the citizenship and the people of Puerto Rico.

16         What we're seeing directly is that the FOMB retained

17  the clawback revenues, and instead of going through the

18  waterfalls, they jumped the line on various priorities and

19  started turning it back to HTA, instead of going through the

20  waterfall.  We, at a minimum, have a clear example of

21  leapfrogging the whole priority and the whole distribution.

22         So in terms of use and disbursement of those

23  revenues, the fact that the money flowed back to HTA, as it

24  relates to a constitutional clawback issue, is clearly

25  relevant, because we see an example, an example of how the

 1   FOMB has ignored the second prong of the constitutional

 2   clawback, has leapfrogged priorities, and has determined to

 3   use the revenues however they deem fit.

 4          THE COURT:  Thank you.  So --

 5          MR. ZOUAIRABANI TRINIDAD:  And I'll --

 6          THE COURT:  Sorry.

 7          MR. ZOUAIRABANI TRINIDAD:  If Your Honor has no

 8   further questions, I will yield the rest of my time to my

 9   co-counsel, Peter Amend.

10          THE COURT:  Thank you.

11          So that means Mr. Amend has an extra minute and ten

12   seconds.

13          MR. AMEND:  Hi.  Good morning, Your Honor.  I'll be

14   brief.  Peter Amend from Schulte on behalf of Cantor-Katz.

15          THE COURT:  Good morning.

16          MR. AMEND:  Good morning.  So I'll be brief.  I just

17   want to just note from the beginning that we reviewed Your

18   Honor's opinions from on Friday evening and during the day,

19   and we are considering -- we are considering it, and

20   discussing it with our clients, and conferring on next steps,

21   including an eventual appeal.  So I just wanted to make that

22   clear from the beginning.

23          I just wanted to add to what Mr. Zouairabani

24   mentioned, which is essentially that, you know, it doesn't

25   matter whether Ms. Martinez' report shows that a hundred

1   million dollars or a billion dollars was retained by the

2   Commonwealth.  Essentially, the report is showing that there

3   has been at least one dollar that's been diverted, and our

4   position is that that is in violation of Puerto Rico law.  And

5   that is the evidence that we are offering to show that section

6   314(b)(3) of PROMESA hasn't been satisfied.  And so,

7   therefore, for that reason, Your Honor, Ms. Martinez' report

8   is relevant.

9        That's all I have to say.  So I -- unless you have

10  questions --

11       THE COURT:  Well, I do have a practical question in

12  terms of thinking about the proof that does need to come in,

13  in specific and granular form.  I want to pick up on a remark

14  that you just said, that to the extent that you can show, and

15  to the extent it might not even be contested that there are

16  funds that were withheld, and I think that's sort of the crux

17  of the argument here anyway, if there were a stipulation that

18  funds were withheld and not put through the waterfall, given

19  my rulings on your security interest and your administrative

20  claim, is there a necessity for my consideration of the

21  details of the funds tracing and application by HTA?

22       MR. AMEND:  Your Honor, I think we'll -- you know, if

23  there is a stipulation that's proposed like -- we would

24  consider it, but, you know, we don't have a stipulation in

25  front of us right now.  So I think to answer that, we would

1    have to confer with the Oversight Board and get back -- and

2    inform the Court if we are able to agree to such a

3    stipulation.

4         THE COURT:  Thank you.  I may well ask you to do

5    that.

6         MR. AMEND:  Will do.

7         THE COURT:  Thank you.

8         So we'll go back to Mr. Stevens, who has five

9    minutes.

10        MR. STEVENS:  Thank you, Your Honor.

11        Your Honor, I want to briefly rebut some of these

12   points that were purported by DRA's counsel.  Very briefly,

13   Mr. Zouairabani referred to section 314(b)(4).  Very simply,

14   that relates solely to the treatment of administrative expense

15   claims.  Your Honor has held that the DRA parties do not have

16   one.

17        THE COURT:  I'm sorry.  I'm going to ask you to speak

18   a little slower, and to maybe raise your voice just a bit so

19   you're a little clearer.

20        MR. STEVENS:  Sure.  Sorry, Your Honor.

21   Mr. Zouairabani briefly raised section 314(b)(4) of PROMESA.

22   This relates solely to the treatment of administrative expense

23   claims.  Your Honor has held that the DRA parties do not have

24   one, so we do not understand how that could be a basis for

25   Ms. Martinez' testimony to be relevant.

1  More effort was put into section 314(b)(3), Your

2  Honor, and we submit that, simply put, the issue just doesn't

3  show that Ms. Martinez' testimony is relevant to the Plan.  As

4  Mr. Zouairabani pointed out, citing a string of Plan

5  provisions, it isn't in dispute here that the Commonwealth

6  retained the Act 30-31 revenues.  The debtors have said that,

7  I think, in probably every brief filed on this issue.  And it

8  isn't in dispute either that the Plan calls for that to go

9  forward pursuant to section -- I think it's 89.2, as

10  Mr. Zouairabani cited.

11  So evidence relating to whether the debtors -- solely

12  about whether the debtors retained these revenues, which is

13  pretty -- what I understood the DRA parties to be arguing

14  isn't relevant, it's not a disputed fact, and I think we would

15  be at least willing to discuss with the DRA parties a

16  stipulation relating to that, because I don't understand that

17  to be a disputed point.

18  So to the extent Your Honor -- there's a variety of

19  points here.  The argument was largely related to whether the

20  constitutional clawback requirements were satisfied.  In major

21  respects, that's what Mr. Brickley's testimony relates to, and

22  my colleague, Mr. Rappaport, who will deal with that, is going

23  to talk about that in more detail.

24  Ms. Martinez never once mentions anything about the

25  clawback requirements, Your Honor, and, indeed, doesn't talk

1   anywhere about how the Commonwealth used the money that the

2   Commonwealth retained.  Ms. Martinez solely talks about how

3   some money was transferred to HTA.

4        I understand the DRA parties' argument to be that

5   transferring money to HTA is what the law required, and so it

6   can only be evidence that the Commonwealth violated the law to

7   the extent they argued that the transfers to HTA somehow

8   demonstrate a violation of the law --

9        THE COURT:  Well, I think this is something that you

10  will need to cover in your meet and confer with them.  I think

11  I heard an argument that, to the extent the justification for

12  the withholding is Article VI, Section 8, then the money

13  should not have gone to HTA; it should have been in an Article

14  VI, Section 8 waterfall, starting with the GO bonds; but

15  you'll have to discuss that in determining what can be

16  stipulated and what meta points remain relevant.

17       You may go on, Mr. Stevens.

18       MR. STEVENS:  Thank you.

19       (Sound played.)

20       MR. STEVENS:  I'm sorry, Your Honor.  So, yes, we

21  understand we can discuss those points, Your Honor.  I think

22  fundamentally here the Court's rulings and the arguments made

23  here are clear that there may be some -- potentially some

24  unsecured claim, probably on the part of HTA's, and maybe the

25  DRA parties have a security interest in HTA's unsecured claim

1  against the Commonwealth for violating Section 8 of Article VI

2  if that is the case, which we would dispute.

3       The fact they may have an unsecured claim doesn't

4  show anything with respect to confirmation of the Plan.  The

5  confirmation of the Plan doesn't require the quantification of

6  unsecured claims against the Commonwealth, every single one of

7  them.  No confirmation requirement relates to quantifying

8  unsecured claims.

9       Ms. Martinez' testimony does solely relate to, and

10  indeed the DRA parties essentially said as much in their

11  response to an evidentiary objection to Ms. Martinez' report,

12  it solely goes to quantifying claims.  The DRA parties

13  seemingly admit that, and so we would submit, as it's clear

14  they do not have a security interest or an administrative

15  expense claim, this could certainly go to potential

16  quantification of an unsecured claim that simply does not

17  matter for Plan confirmation requirements and --

18       THE COURT:  Mr. Stevens, doesn't the Brickley

19  Declaration, which you have also challenged, rely on some of

20  the information in the Martinez Declaration?

21       MR. STEVENS:  Your Honor, that's correct.  The final

22  page, I understand, of Mr. Brickley's report refers to

23  Ms. Martinez' testimony.

24       (Sound played.)

25       MR. STEVENS:  Mr. Brickley -- may I finish my

1    response to you?

2            THE COURT:  Yes, please.

3            MR. STEVENS:  Mr. Brickley's testimony is obviously

4    subject to another motion in limine that Mr. Rappaport will

5    deal with briefly, but, Your Honor, to the extent to which

6    Ms. Martinez' testimony ultimately can't be changed beyond the

7    fact that all it talks about is whether the Commonwealth

8    retained this money or transferred it to HTA, and the DRA

9    parties do not put forward, as far as I can see, any argument

10   that it's in dispute that the Commonwealth retained some of

11   these monies.  And we would submit they can hardly have a

12   claim based on HTA transferring them to HTA, and, in any

13   event, we do have the arguments relating to preemption, and

14   would submit the Commonwealth's constitutional requirements do

15   not have to be satisfied.

16           Unless Your Honor has any further questions --

17           THE COURT:  No, I don't.  Thank you very much,

18   Mr. Stevens.

19           What I'd like to do, and what we will do is go now to

20   the arguments regarding the Brickley report.  Then I will

21   respond with my rulings as to both of the motions, and the

22   steps to be taken with respect to both of the motions.

23           So, Mr. Rappaport, I have you for ten minutes.

24           MR. ZOUAIRABANI TRINIDAD:  Your Honor, if I may, this

25   is Nayuan Zouairabani.  I would just like to clarify something

1    for the record, because I don't want it to become an issue of

2    contention.  With regard to the admin --

3              THE COURT:  Yes.

4              MR. ZOUAIRABANI TRINIDAD:  -- I just wanted to

5    mention that it could be subject to appeal, and that is why I

6    made the comment that it was not final.  I just want to

7    clarify, because I know that some folks may be raising that

8    matter going forward.

9              THE COURT:  Thank you.

10             Now we will turn to Mr. Rappaport with respect to the

11   Brickley testimony.

12             MR. RAPPAPORT:  Good morning, Your Honor.  Lary

13   Rappaport of Proskauer Rose on behalf of the Oversight Board.

14             Your Honor, it's obviously been set up for this

15   argument based on the questions and the comments that were

16   made by counsel and Your Honor.  We believe that there's two

17   distinct reasons why the motion in limine should be granted,

18   and Mr. Brickley's testimony should be precluded.

19             The first one is that he doesn't satisfy *Daubert*, and

20   it's precluded by Rule 702(a); and then the second one is

21   relevance.  And when I get to both of these arguments, it

22   really is going to tie in to part of the discussion and tie --

23   and it's also going to tie in to the discussion of Your

24   Honor's ruling last Friday with respect to the administrative

25   expense motion.

1          So, first, let's just level set what the rationale is

2    for Mr. Brickley's opinion.  It's basically they want

3    Mr. Brickley to opine that the Commonwealth was in violation

4    of Article VI, Section 8.  And to use their language, they say

5    that the clawback was improperly triggered, and that's clear

6    from the last page of Mr. Brickley's report where he states

7    what the opinion is.

8          First, it should be precluded under *Daubert* and Rule

9    702, because this is really nothing more than dressing up

10   counsel's legal arguments by saying it's having Mr. Brickley

11   state them as an expert.  It's clear, and we've cited the

12   cases in the papers, that First Circuit authority holds that

13   experts cannot give opinions about the substance of the law.

14   That's what he's trying to do.  And here we also have a

15   situation where Mr. Brickley is not an attorney.  And the

16   cases that we cite for that are *Soto-Rivera,* 133 F.3d 92,

17   and also the *San Juan Cable* case, which is 196 F. Supp. 3d

18   248.

19         Mr. Brickley's opinions also are not based on

20   scientific, technical, or other specialized knowledge.  What

21   he does is he's -- it's an eight-page report really.  It

22   carries a little bit over onto page 9.  It's almost entirely

23   based on assumptions that he was provided of statutes and the

24   interpretation of the law by counsel, and he acknowledges that

25   in the body of the report.

1      There's a small graph that's cut and pasted on page

2   7, which is public record.  It's from a fiscal plan.  There's

3   a reference to a discovery meet-and-confer letter, and then he

4   does cite to the conclusions that were made by Ms. Martinez.

5   And based upon that, he concludes that there was a violation

6   of law.

7      We would submit, Your Honor, that the Court is quite

8   capable of considering their legal arguments, capable of

9   considering the evidence, to the extent it's admissible, and

10  the Court can interpret Article VI, Section 8 without any

11  testimony by Mr. Brickley.  But beyond that, Your Honor, it's

12  also not relevant.  It's not relevant because, as Your Honor

13  ruled last Friday, there is an alternative basis that has

14  nothing to do with Article VI, Section 8 for the Commonwealth

15  retaining and using the Act 30-31 revenues.

16      In your Opinion, Your Honor, you held not only that

17  the DRA parties do not have a security interest, and HTA does

18  not have a property interest in the revenues that are retained

19  by the Commonwealth, but also that if the Commonwealth

20  breached a prepetition obligation to transfer Act 30-31

21  revenues to HTA, such a breach -- and then quoting from page

22  19 -- is not materially different from the nonpayment of

23  prepetition unsecured claims that occurs upon a commencement

24  of every bankruptcy case.

25      And as Your Honor wrote, also on page 19, the

1   automatic stay protects the debtor from collection of such

2   payments upon commencement of a bankruptcy case, and the

3   bankruptcy estate benefits from the ability to use resources

4   that would otherwise be used for the timely satisfaction of

5   prepetition unsecured claims.

6         Now, I recognize, as you asked Mr. Stevens -- and

7   Your Honor has not yet interpreted PROMESA Section 314(b)(3),

8   and, again, I believe that's something that Your Honor will

9   do, not Mr. Brickley.  But Section 314(b)(3) only requires

10  that it not be prohibited by law.  It does not state

11  Commonwealth law.  It does not state the Commonwealth

12  Constitution.  It says, not prohibited by law.

13        And as Your Honor held in denying the administrative

14  expense claim, bankruptcy law allows the Commonwealth to do

15  exactly what it did.  Also, as Mr. Stevens noted, if the

16  retention of Act 30-31 revenue breached a statutory

17  obligation, it's no different than a breach of contract.  If

18  HTA has a general unsecured claim arising from the breach,

19  that's a dischargeable claim under *Ohio v. Kovacs*.  It doesn't

20  rise to a constitutional violation.  But there's additional

21  reasons.  I mean, it's -- the independent ground that we've

22  just walked over, which stems from Your Honor's ruling last

23  Friday, that is independent of the Commonwealth Constitution.

24  And because it's permitted by bankruptcy law, we would submit,

25  Your Honor, that Mr. Brickley's testimony is not relevant to

1  the case.

2       Another ground, though, independent of that is

3  preemption.  I know that Your Honor hasn't reached preemption

4  yet.  I know that it's been teed up several times.  But to the

5  extent that Article VI, Section 8, or to the extent that the

6  Act 30-31 excise tax statutes are inconsistent with the

7  Commonwealth retaining the revenues and using the revenues,

8  either using them during Title III or using them underneath --

9  under a confirmed Plan of Adjustment, it would be

10  inconsistent.  It would be inconsistent with PROMESA, and

11  PROMESA is a law.

12       Article 314(b)(3) only states the Plan shall be

13  confirmed if the debtor is not prohibited by law.  Clearly, if

14  it's allowed by PROMESA to do this, it's allowed to do it.

15  It's not prohibited by law.

16       PROMESA, Title III, independently authorizes the

17  Commonwealth not to make payment on its prepetition debt.

18  Again, that's something which is allowed.  It's independent of

19  the Puerto Rico Constitution.  The automatic stay, as Your

20  Honor noted in the Opinion issued on Friday, the automatic

21  stay allows this.

22       PROMESA Section 305 specifically enjoins the Court

23  from entering any order that would interfere with the debtors'

24  use of the property, which, as the Court has held before,

25  precludes the Court from ordering the debtors to make payment

 1    on the debt.  And we would also submit, Your Honor, that based

 2    on the indisputable facts, the retention conditions of Article

 3    VI, Section 8 were, in fact, satisfied.

 4          When PROMESA was enacted, Congress expressly found in

 5    PROMESA Section 405(m) that there was a fiscal emergency in

 6    Puerto Rico that made the Commonwealth unable to provide its

 7    citizens with effective services.  That necessitated a fair

 8    and orderly restructuring of the Commonwealth debt.  But those

 9    findings in PROMESA demonstrate the Commonwealth does not have

10    the funds necessary to pay its debt and continue performing

11    basic --

12          (Sound played.)

13          MR. RAPPAPORT:   -- governmental services.

14          And, Your Honor, unless you have any more questions

15    regarding this argument, then what I would do is I would

16    retain the rest of my time for rebuttal purposes.

17          THE COURT:  Thank you.  I have no further questions

18    at this time, and you have a minute and a half left.

19          So now we will turn to Mr. Zouairabani again, who has

20    been allotted 11 minutes.

21          MR. ZOUAIRABANI TRINIDAD:  Good morning, Your Honor.

22    Again, for the record, Attorney Nayuan Zouairabani on behalf

23    of AmeritNat.  I am joined by my co-counsel, Peter Amend, from

24    Schulte Roth & Zabel, who represents Cantor-Katz Collateral

25    Monitor.

1           Your Honor, I would like to address, first of all,

2    the FOMB's contentions regarding *Daubert* for Mr. Brickley.

3    Now, before we discuss in detail why Mr. Brickley's testimony

4    should not be excluded under *Daubert*, it is important to

5    highlight specific facts.  The first matter that I would like

6    to highlight is that the FOMB, in their motion in limine and

7    in their reply, they do not challenge Mr. Brickley's

8    credentials, his background, and qualifications on complex

9    financial matters, or his ability to serve as an expert here.

10          Mr. Brickley has over 29 years of experience in

11   financial advisory and investment banking services.  He's a

12   certified insolvency and restructuring adviser.  He's also a

13   certified turnaround professional.  He has served as chief

14   restructuring officer, bankruptcy trustee, examiner, and

15   examiner with expanded powers, in Chapter 11 and Chapter 7

16   cases as applicable since 2002.  Nineteen years of experience.

17          Now, some of his regular duties and responsibilities

18   in those functions include performance of clawback assessment.

19   Granted, they're not constitutional clawback, but we're

20   talking about clawback assessments under Chapter 5 of the

21   Bankruptcy Code.  So your typical fraudulent conveyances, your

22   preferences.  And as I mentioned when we were discussing the

23   Martinez Motion in Limine, clawback has two main criteria.

24   The first one is activation, and the second one is

25   distribution.  That is not different.  It's the claim building

1  block as a clawback assessment under Chapter 5 of the

2  Bankruptcy Code.

3       You have to assess whether the activation for the

4  clawback in order -- for those Chapter 5 causes of action can

5  go forward, and you also have to determine what is the

6  appropriate use of the funds. But we can see that

7  Mr. Brickley's credentials and experience on this matter was

8  never questioned by the FOMB, and it wasn't questioned even

9  when they took his deposition. Therefore, these stand

10  unchallenged at this time.

11       Having clarified that, let's now move to some of the

12  substantive issues that the FOMB raises regarding *Daubert*

13  issues. The first is the FOMB's self-serving reading that the

14  Brickley report is a mere regurgitation of other documents,

15  and that mere issue, Your Honor, is belied by the report

16  itself. While Mr. Brickley references several documents and

17  legal provisions, the same were assessed to provide context

18  and the foundations for his conclusion, which, again, the FOMB

19  does not challenge. There's no challenge to those

20  conclusions.

21       The second contention from the FOMB is that

22  Mr. Brickley's report should be excluded, because his

23  conclusions are predicated upon legal assumptions provided by

24  counsel and is of no merit here, because he's not an attorney.

25  Now, even if such a challenge were applicable here, this would

1   not warrant the exclusion of Mr. Brickley's expert testimony.

2   This contention, if anything, would go to the weight, not the

3   admissibility of his testimony.  And we reference in our brief

4   to *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, at page 21,

5   which is Second Circuit, 1996.

6           Finally, none of the conclusions contained in the

7   Brickley report are legal in nature.  Instead, they are

8   factual conclusions made by Mr. Brickley by applying his

9   specialized knowledge.  As I mentioned, since 2002, in his

10  duties in bankruptcy, he has performed clawback assessments

11  before.  And, in fact, he has testified as to that before.

12  That was in question with regard to his experience testifying

13  before court.

14          So, he applied his specialized knowledge and

15  background, which are unchallenged and unquestioned, in

16  interpreting the documents relied upon for his opinion.  And

17  these opinions will help the Court determine the ultimate

18  legal question at issue here, namely, whether the clawback,

19  constitutional clawback affected by the Commonwealth for

20  several fiscal years was constitutional or not.

21          Now, Mr. Rappaport indicates that his report is eight

22  to nine pages long, and if it's nine -- eight to nine pages

23  long, that is only due to the fact that there was -- few

24  information was provided by the FOMB and the government

25  parties when we were undertaking discovery on this particular

1  topic.  When asked for those specific type of discovery

2  documentation, the information was scant.

3       Mr. Brickley performed a full assessment on the

4  available -- information that was available to him.  It is

5  complete, to the best of his knowledge and his specialized

6  experience, and, in fact, his report, actually it includes in

7  Exhibit B with -- a list of additional documentation that he

8  would have liked to have looked at in order to further support

9  his report, but those were not available to him through the

10  government parties.  So I believe length of the report does

11  not make it any more or less meaningful.

12       Having explained why Mr. Brickley meets the criteria

13  to be accepted as an expert in this case under Rule 702, we

14  now turn once again to the relevance objections, in which they

15  should be -- they should be denied for the same reasons that

16  we discussed when talking about Mr. Martinez' motion in

17  limine.  In this particular case, Mr. Brickley's report goes

18  back squarely to the issue of 314(b)(3) of PROMESA, and

19  whether the Plan satisfied the legality requirements, that it

20  not be prohibited by law.

21       Now, his conclusions specifically outline why the

22  Commonwealth did not comply with the clawback, with neither

23  the activation element of it, nor the distribution prong of

24  it.  As Your Honor mentioned, he relied upon doing his

25  analysis on Ms. Martinez' report with regard to the

1    distribution of the revenues, but his conclusions specifically

2    state that, first of all, there has not been a deficit in the

3    Commonwealth budget since 2018.  The Commonwealth clawback,

4    the Act 30-31 incremental revenues in fiscal year 2016 through

5    2020, no payment of the GO debt has been made since January

6    2016, and the Commonwealth failed to comply with the waterfall

7    priorities outlined in section 4(c) of the Office Management

8    Budget Act, despite transferring clawback funds to HTA.

9         So these conclusions establish through expert

10   testimony that the Plan does not satisfy section 314(b)(3) of

11   PROMESA due to the fact that the Commonwealth has unlawfully

12   retained the Act 30-31 incremental revenues in violation of

13   Article VI, Section 8 of the Puerto Rico Constitution.

14        As explained when we discussed with Ms. Martinez'

15   motion in limine, the DRA parties are entitled to raise this

16   as a creditor of the Commonwealth, as a creditor of the PBA,

17   and to challenge whether the Plan satisfies all of the

18   confirmation requirements.  Again, the Court has an

19   independent duty of assessing them before confirming a plan.

20        I would like to address briefly some of the points

21   Mr. Rappaport mentioned regarding why, at the end of the day,

22   this is relevant.  The first aspect that I want to address,

23   why 314(b)(3) is still important, Mr. Brickley's report is

24   still important here, if the FOMB bases itself, number one,

25   that preemption applies here -- again, no ruling has been made

1   on preemption.  Absent a -- absent a finding on preemption,

2   the only way the Commonwealth can legally retain the money

3   going forward in compliance -- to comply with the Plan

4   payments would be through the clawback.  And the Court would

5   have to make an assessment whether the clawback has been

6   legally satisfied here or not.

7          Mr. Rappaport's comments that it's a prepetition

8   breach, the automatic stay would permit them to do this, and

9   that it would be dischargeable have no bearing here.  Once

10  Your Honor -- if it were to confirm the Plan and the Plan

11  becomes effective, the automatic stay goes out the door.  The

12  discharge of anything would be to any prepetition claim using

13  Mr. Rappaport's analogy.  But going forward, now that there's

14  no automatic stay, and if there's no preemption, what's the

15  legal basis for the FOMB to retain the revenues in order to

16  comply with the Plan?  It would have to be the constitutional

17  clawback.

18         So constitutional clawback, whether the FOMB likes it

19  or not, is squarely relevant here, and it's an independent

20  assessment the Court needs to make.  So at the end, Your

21  Honor, and as you've seen from the FOMB's arguments and their

22  pleadings, they're confounding and asking the Court to

23  prejudge 314(b)(3) and the motion in limine, and to make a

24  determination on preemption and their views of clawback.  That

25  is improper to be done in a motion in limine asking to exclude

1  an expert who will provide testimony squarely relevant to a

2  confirmation matter and issue that the Court needs to assess.

3           Another matter that I would like to address --

4           (Sound played.)

5           MR. ZOUAIRABANI TRINIDAD:  -- that is highly improper

6  in the FOMB's motion in limine is that they've asserted for

7  the first time ever in four years that the conditions laid out

8  in Section 8 of Article VI of the Puerto Rico Constitution

9  have been met.  The motion in limine is not the appropriate

10 procedural vehicle through which to assert a substantive

11 argument regarding the legality of the clawback for the first

12 time.

13          In sum, the motion in limine is premised exclusively

14 on the FOMB's belief that their view of the world is right,

15 and their legal position on preemption and clawback are

16 correct.  That is improper, and the Court should reject the

17 motion in limine.

18          The report should not be excluded, and at the end of

19 the day, the report, Mr. Brickley's testimony, meet the low

20 threshold of relevance for consideration in the Plan

21 confirmation for all the reasons that we stated.

22          And unless Your Honor has any questions, I will yield

23 the remainder of my time to my co-counsel, Peter Amend.

24          THE COURT:  Thank you.  We will turn to Mr. Amend

25 now.

1            MR. AMEND:  Your Honor, nothing further from me.

2            THE COURT:  Thank you, Mr. Amend.

3            So we will return to Mr. Rappaport.

4            MR. RAPPAPORT:  Thank you, Your Honor.  I just want

5    to briefly respond to a couple points that were made by

6    counsel.

7            The first one is counsel argued that we didn't object

8    to the qualification to Mr. Brickley with respect to his

9    experience in financial matters.  That really misses the

10   point.  The point is that he's offering a legal opinion, and

11   he's not qualified to offer a legal opinion, nor is it

12   appropriate to offer a legal opinion.  Your Honor interprets

13   the law.

14           And on page 9, it concludes, it is our opinion that

15   by having performed these transfers of the Acts 30 and 31

16   incremental revenues to the HTA, the Commonwealth has failed

17   to make required GO debt payments under Article VI, Section 8

18   of the Constitution or comply with the waterfall priority

19   payments outlined by the L -- OMB Act.  That is we would

20   submit, Your Honor, a legal conclusion that is inappropriate.

21           Second, counsel spoke -- I think he misinterpreted my

22   comments about what the length of the report was.  The reason

23   I stated that was it's barely nine pages, and of that, it's

24   entirely the assumptions of counsel, a cut-and-paste graph,

25   reliance on Ms. Martinez.  There's nothing beyond that.  That

1   was the reason.  It wasn't that the length itself was either

2   long or short.

3        With respect to 314(b)(3), I disagree with counsel's

4   statement that there must be no violation of the clawback in

5   order for 314(b)(3) to be complied with.  Again, as Your Honor

6   found in your Opinion on Friday with respect to the

7   administrative expense claim, there is an independent basis

8   for the funds to be retained and to be used by the

9   Commonwealth.  That's also in addition to the preemption

10  argument.  That's also in addition to the 405(m) argument.

11  There's an independent ground.  You don't even have to get to

12  the clawback in order to determine that 314(b)(3) has been

13  satisfied.

14       And I would submit under that, Your Honor.

15       THE COURT:  Thank you, Mr. Rappaport.

16       So as to these two motions, docket entry no. 18328 in

17  case no. 17-3283, the Oversight Board's Motion in Limine to

18  Exclude the Testimony of Lizette Martinez, and docket entry

19  no. 18331 in case no. 17-3283, the Oversight Board's Motion to

20  Exclude the Testimony of Douglas Brickley, the Court is

21  reserving decision on both motions at this time in light of

22  the recency of the Court's rulings on the administrative

23  expense claim of the DRA parties, and the dismissal of the DRA

24  parties' adversary proceeding, and today's increased focus in

25  arguments on the DRA's PROMESA Section 314(b)(3) position, and

1    the Commonwealth's preemption arguments.

2          The Court directs the DRA parties and the Oversight

3    Board to meet and confer, and file a joint status report by

4    November 4th, which is Wednesday, at -- no.  I'm sorry.

5    November 4th is Thursday, at 12:00 noon, indicating whether

6    and to what extent they can stipulate as to facts relevant to

7    issues that have not yet been decided by the Court that are

8    implicated by these two expert proffers, and the extent, if

9    any, to which, by reason of the stipulations or otherwise, the

10   DRA intends to reduce or narrow the scope of the evidence and

11   objections with which it intends to go forward for the

12   confirmation hearing as to these witnesses in light of the

13   rulings of the Court at the end of last week on Friday.  So

14   decision is reserved pending the Court's receipt of that joint

15   status report.

16         We had a lot of technical difficulties this morning,

17   so we are not as far through the Agenda as I had expected to

18   be by this time, but we will take now the ten-minute morning

19   break.  So I am instructing the people who are on the AT&T

20   line to come back on -- I'm sorry.  There is a raised hand

21   first.

22         Mr. Mintz?

23         MR. MINTZ:  Good morning, Your Honor.  Doug Mintz for

24   Cantor-Katz on behalf of DRA.  I just wanted to confirm that

25   that time and date was Thursday at noon, as opposed to

1  Wednesday at noon.

2  THE COURT:  It is Thursday at noon, not Wednesday.

3  Sorry.  November 4th.

4  MR. MINTZ:  That's fine.  Thank you very much, Your

5  Honor.

6  THE COURT:  Thank you.

7  So we will resume at 11:25.  The people who are on

8  the AT&T line should disconnect and call back in before 11:25,

9  and those of us who are on Zoom can just mute and shut down

10 the cameras.

11 Thank you.  We are adjourned until 11:25.

12 (At 11:07 AM, recess taken.)

13 (At 11:22 AM, proceedings reconvened.)

14 THE COURT:  Good morning again.  Our next Agenda item

15 is the DRA parties' motion in limine to exclude certain Rule

16 26(a)(2)(C) expert witnesses or testimony, which is docket

17 entry no. 18340 in case no. 17-3283.  So would the following

18 counsel please open their cameras:  Mr. Mott, Mr. Cepeda Diaz,

19 Mr. Mervis.  It's just those three.

20 So I have first on my order of argument, Mr. Thomas

21 Mott for the DRA Collateral Monitor for ten minutes.

22 MR. MOTT:  Good morning, Your Honor.  My name is Tom

23 Mott.  I'm with --

24 THE COURT:  Good morning.

25 MR. MOTT:  -- Schulte Roth & Zabel.  I represent the

1    Collateral Monitor, one of the DRA parties.  I'm here with

2    Alejandro Cepeda Diaz, with McConnell Valdes, representing the

3    Servicer and the other DRA party.

4         To begin with, as we told the FOMB over the weekend,

5    we are no longer pursuing this motion with respect to

6    Mr. Herriman and Mr. Shah.  We are still pursuing a motion

7    with respect to Mr. Malhotra, but only because the FOMB

8    rejected our reasonable offer to withdraw the motion if they

9    agreed to let us depose Mr. Malhotra for one hour about his

10   declaration.  Counsel for the FOMB rejected this proposal last

11   night without providing any additional explanation.

12        Taking a step back, there was a procedures order in

13   place in this case that required expert reports by September

14   13.  For ten of the FOMB's witnesses, expert witnesses, they

15   did not provide any reports.  Instead, we've gotten their

16   expert opinions only a week ago, after the close of discovery

17   and after any chance for us to provide expert rebuttal reports

18   in response to that expert testimony.

19        Initially, we were going to move on that basis with

20   regard to all ten of their witnesses; but we worked through

21   it, and it only seemed to make sense to move on three, the

22   three most relevant to our case.  Since we got the

23   declarations last week, we've now been able to review those

24   declarations and winnow this down even further.

25        For Mr. Herriman, now that we have his declaration,

1   we can confirm that we have no issues with it being admitted

2   into evidence.  And now for Mr. Shah, we have been able to

3   look at this declaration and confirm it's substantially

4   similar to his best interest test reports --

5       THE COURT:  I'm sorry.  I think you need to move

6   yourself a little closer to your microphone.  Your sound got a

7   bit muddy when you sat back.

8       MR. MOTT:  I'm sorry about that.

9       For Mr. Herriman, now that we have his declaration,

10  we can confirm that we have no issues with it.  And with

11  respect to Mr. Shah's declaration, we've confirmed that it's

12  substantially similar to his best interest test reports, which

13  we were able to use while deposing him.

14      For Mr. Malhotra, unlike Mr. Herriman, we have

15  questions we want answered before confirmation about his

16  declaration, a declaration that we got last week.  And unlike

17  Mr. Shah, we did not have any of Mr. Malhotra's expert

18  opinions before we deposed him.

19      Under the Procedures Order, Mr. Malhotra's expert

20  testimony was supposed to be provided to us on September 13.

21  This was meant to allow us to depose him about his expert

22  opinions.  It was also meant to give us time to provide a

23  rebuttal expert report, if necessary.  Instead, because we've

24  only received his expert opinions last week, our

25  cross-examination of him at confirmation will be the very

1   first time we'll be able to ask him questions about his

2   specific opinions.

3           To avoid this trial by ambush and save time during

4   the hearing, we propose the FOMB that they reopen

5   Mr. Malhotra's deposition for one hour.  They rejected this

6   proposal.  Therefore, we're asking the Court to either

7   preclude Mr. Malhotra's deposition or enter an order reopening

8   his deposition.

9           I'll also note that, while the FOMB cites to the fact

10  that they agreed to provide us with a list of reliance --

11  documents relied on by Mr. Malhotra, we were never provided

12  with this list.  We certainly weren't provided with that list

13  before his deposition.  We've asked multiple times for the

14  list, and they've yet to include that list.

15          And despite what the FOMB says, despite what

16  Mr. Malhotra was coached to say, calling himself a

17  non-retained expert many times during his own deposition,

18  Mr. Malhotra does not qualify as a Rule 26(a)(2)(C) witness.

19  Rather, he was paid to provide expert testimony, and,

20  therefore, required to provide an expert report under Rule

21  26(a)(2)(B).

22          Mr. Malhotra is being paid to testify.  His

23  declaration is, in part, based on assumptions and facts

24  provided to him by counsel, rather than on his own firsthand

25  experience, other than the experience of drafting his own

1   declaration, which can't suffice.  In fact, Mr. Malhotra

2   during his deposition admitted to the fact that he developed

3   many of his opinions while drafting his own declaration, and

4   not in connection with any work that he'd performed prior to

5   that.

6        If the Court does not preclude Mr. Malhotra's

7   declaration and does not order that his deposition be

8   reopened, in the alternative, we ask the Court strike those

9   portions of Mr. Malhotra's declaration that are not based on

10  his firsthand experience.

11       Lastly, Your Honor, I just wanted to emphasize the

12  reasonableness of our offer here.  All we asked for was one

13  hour to depose Mr. Malhotra about a deposition that we

14  received a week ago.  We used less than six hours when we

15  first deposed him, and so we wouldn't be going over the seven

16  hours originally allotted for his deposition.

17       And unless Your Honor has any questions or -- I'm

18  available to answer any questions you may have.

19       THE COURT:  Thank you.  I'll wait to hear from

20  Mr. Cepeda Diaz if he's going to speak, and then the counsel

21  for the Oversight Board.

22       Does Mr. Cepeda Diaz have anything further at this

23  point?

24       MR. CEPEDA DIAZ:  Good morning, Your Honor.  This is

25  Alejandro Cepeda on behalf of AmeriNational Servicer.  At this

1    time, I have nothing to add to the arguments made by Mr. Mott.

2            THE COURT:  Thank you, Mr. Cepeda.

3            So now I will turn to Mr. Mervis for the Oversight

4    Board.

5            MR. MERVIS:  Good morning, Your Honor.  I think it

6    still is the morning.  Yes.  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MR. MERVIS:  Let me first say I'm going to resist the

9    temptation to respond to the allegations of coaching and

10   discussion of meet and confer discussions that happened

11   yesterday on the record.  I will also say that Your Honor has

12   the deposition testimony that the DRA parties proffered.  Your

13   Honor obviously can read it for -- the Court can read it for

14   itself.  I will simply say that the -- what is being

15   attributed -- the meaning that's being attributed to that

16   testimony just isn't supported by the testimony.

17           I think there are two threshold issues that are

18   presented here.  One is -- and now we are limited to

19   Mr. Malhotra -- is he or was he a 26(a)(2)(B) witness?  And

20   the answer to that, Your Honor, is no.  As his declaration

21   makes very clear, and as our designation of him as a

22   26(a)(2)(C) witness itself made clear, his testimony is based

23   on the work he has done for the Oversight Board as one of its

24   key advisors over the past four years.  It is not correct that

25   he developed his testimony while writing his declaration.  All

1    of his testimony, as set forth in his declaration, is based on

2    the work he's done and his familiarity with the Plan

3    provisions, the Fiscal Plan provisions, and related subject

4    matter.

5           So the -- regardless of how the Court interprets the

6    Procedures Order -- and it's Your Honor's order.  I'm not

7    going to argue which way it cuts -- this witness and none of

8    the witnesses that we designated as (a)(2)(C) witnesses

9    qualify as reporting retained experts.  None of them were

10   specially retained.  None of them are being specially paid to

11   testify.  To the extent that there's payment for

12   Mr. Malhotra's testimony, it's not to him.  It's to Ernst &

13   Young, and it's pursuant to their engagement agreements.

14          There was some suggestion that Mr. Malhotra is

15   relying on the work of others, and that is true to some

16   extent, but it ignores the way that the Oversight Board works.

17   It's a collaborative effort between Board staff, the various

18   professionals, and members of the Board itself.  There is

19   nothing in the case law that has been cited to you that

20   suggests that reliance -- or in this case, partial reliance on

21   the work of others makes somebody not a 26(a)(2)(C) expert and

22   converts them into a 26(a)(2)(B) expert.

23          The one thing that is sort of confounding, Mr. Mott

24   said this, and they said it in their papers, we did agree as

25   part of a discovery dispute that had originally been teed up

1    to Magistrate Judge Dein to provide a list of materials that

2    the witnesses relied on.  And we did, in fact, provide a list

3    for Mr. Malhotra.  It was uploaded to the Plan Discovery Data

4    Room into a folder named, aptly enough, Non-retained Expert

5    Reliance Materials.  And it was uploaded on October 13th at

6    1:27:38 Eastern Standard Time, and the witness deposed two

7    days later.  So I'm not sure where that allegation is coming

8    from, but we did, in fact, provide that list.

9         The other thing, Your Honor, that I think is

10   important to recognize is this case is a little different than

11   basically all the cases that have been cited by the parties.

12   This case has a disclosure statement that provides in

13   painstaking detail the Board's position and the disclosed

14   facts with respect to a plethora of subjects.  Everything in

15   Mr. Malhotra's declaration, and everything in the disclosure

16   for him is in that disclosure statement.  And that was fully

17   available to the DRA parties, and they could have educated

18   themselves about what the disclosure statement says.  They

19   could have asked the witness all about each subject, using the

20   disclosure statement as a guide.

21        The DRA parties cite *Owens v.* -- sorry.  *Owens-Hart*

22   *v. Howard University* in footnote 5 of their opening brief.

23   That case stands for the proposition that even where the

24   disclosures themselves may not be up to snuff, additional

25   supplementation gets -- can get it over the hurdle.

1          I'm not suggesting that our disclosures were not up

2   to snuff.  I think they were.  But the reliance list was above

3   and beyond, and they did, in fact, get it.

4          So let's move to the second subject, Your Honor,

5   which is what are his opinions and were they adequately

6   disclosed.  And that is something that Mr. Mott didn't talk

7   about, but I would like to.

8          There are only three arguable opinions in this

9   declaration.  They are exactly -- I don't know if they're

10  verbatim, but they're close to verbatim, what was disclosed in

11  the 26(a)(2)(C) disclosures.

12         Whether they rise to the level of Rule 702 expert

13  opinion or whether they are -- or whether they can be properly

14  viewed as a reasonable conclusion by a professional based on

15  his review of materials that he was involved in creating, that

16  may be debatable.  And that's exactly why we made the

17  disclosure, because we recognize that someone could say, hey,

18  this crosses the line into expert disclosure.

19         So if I could run through them very quickly, Your

20  Honor, I think you'll see that none is particularly

21  controversial, and they had ample notice of all.  So the first

22  topic, which is at paragraph 29 of the witness' declaration,

23  is that the Plan is not likely to be followed by the need for

24  further financial reorganization, and that's at paragraph 29.

25  And then from paragraphs 30 to 53, the witness talks about why

1  he makes that conclusion.  And here are the topics that he --

2  and the facts that he talks about.

3      The Plan reduces debt.  That's known to everyone.

4  The DRA parties could have questioned him on that.

5      The pension reserve trust.  That's discussed in the

6  Disclosure Statement, and, in fact, the DRA parties did

7  question him on it in the deposition at pages 106 and 107.

8      I understand, Your Honor, because of the way this

9  motion played out, you don't have the transcript in front of

10  you.  We're happy to provide it, but I'm making

11  representations, Your Honor.

12      The CVIs, paragraph 35 and 36 of his declaration,

13  again covered in the Disclosure Statement, covered in the

14  deposition at pages 106 and 110 through 111.

15      The debt management policy and the debt cap,

16  paragraphs 38 through 40 of his declaration, again covered in

17  the Disclosure Statement.

18      Additional reforms.  This is -- and this is

19  paragraphs 41 and 42, and this is where Mr. Malhotra

20  cross-references Mr. Wolfe's expert report, which the DRA

21  parties had, you know, from the time that the reports were

22  served and filed.

23      The next opinion has to do with Medicaid money and

24  the Biden administration interpretation of Medicaid

25  availability for the territories.  That was extensively

1 covered in the Prager expert report that the DRA parties

2 submitted. It was also discussed and questioned about during

3 the deposition.

4 The minimum unrestricted cash reserve. That's

5 paragraph 49. Again, both discussed in the Disclosure

6 Statement and discussed during the deposition.

7 The disaster aid recovery at paragraph 50, again,

8 discussed in the Disclosure Statement.

9 The emergency reserve at paragraph 51, discussed in

10 the Disclosure Statement, and also discussed during his

11 deposition.

12 The possibility that the Commonwealth may not

13 implement all structural reforms, discussed at various

14 parts -- places in the Disclosure Statement, also discussed

15 during his deposition.

16 And, finally, the possibility that federal funding

17 may be reduced from its current levels, again, also discussed

18 during -- discussed in the Disclosure Statement.

19 The second opinion, very simple, that the financial

20 obligations under the Plan are consistent with the debt

21 sustainability analysis, that conclusion is at paragraph 61 of

22 his deposition. Paragraphs 55 through 60 are the build-up.

23 It is essentially just a walk-through debt sustainability

24 analysis in the Fiscal Plan, which of course was available to

25 everyone, and could have been the subject of questioning at

1 | the deposition.

2 | The final and third opinion, Your Honor, is just

3 | math. It is that -- he talks about the financial impact of

4 | what the Oversight Board contends are preempted Commonwealth

5 | statutes. It's based on the statutes, and based on Exhibit K

6 | of the Disclosure Statement. And it's essentially just math.

7 | It's the witness calculating what the appropriations are under

8 | these very statutes, and adding them up.

9 | Again, I think it's very debatable whether any of

10 | these opinions cross over into Rule 702 territory. We

11 | disclosed under 26(a)(2)(C) to give more disclosure, not less.

12 | And to -- I guess to sort of close the loop, the question --

13 | or the implication is, well, gee, what's another hour with the

14 | witness? Well, two things on that, Your Honor. First of all,

15 | unless the Court finds that the disclosures were inadequate or

16 | improper, there's no basis for another deposition. This is

17 | how the rules work. They should have done a little more

18 | homework, and followed up a little bit more with the witness,

19 | and learned a little bit more what he had to say, particularly

20 | because, in many cases, he volunteered what he was going to

21 | testify about.

22 | But the second thing I'll say, Your Honor, is an hour

23 | actually does make a difference. We're very busy. Everyone's

24 | very busy. Mr. Malhotra, in addition to testifying at the

25 | hearing, has a day job working for the Oversight Board through

1   EY, and an hour taken away from that does matter.  So I

2   appreciate counsel, you know, suggesting that, oh, what's

3   another hour, but the hour has to be deserved and it has to be

4   earned.

5         Unless Your Honor has any questions, I have no

6   further remarks, Your Honor.

7         THE COURT:  Thank you, Mr. Mervis.

8         We'll return to Mr. Mott.

9         MR. MOTT:  Sure.  Just to respond to a few of

10  Mr. Mervis' points.  One, throughout the deposition, and I can

11  cite the page numbers of the transcript, but Mr. Malhotra

12  admitted to the fact that -- many of his opinions where -- he

13  had come to while drafting the declaration, and he also

14  admitted to the fact that many of the assumptions and

15  information that went into his declaration were provided to

16  him by FOMB counsel.

17        Two, he also admitted that EY engagement agreements

18  set out specifically that he was being paid for one of his

19  services, and that one of those services was to be providing

20  expert testimony in connection with this case.  So -- and then

21  just to go into, you know, Mr. Mervis was making a big deal

22  about how the disclosures set forth his opinions, and,

23  therefore, we should have known what he was going to say; but

24  his disclosures set forth the subject matter of his opinions.

25        And we did get to depose him, and I was the one

1   deposing Mr. Malhotra.  And so I was able to ask him, okay,
2   what do you mean by this subject, and what is your basis for
3   that.  But then when he provides what his opinion is, that's
4   different than getting an expert report and being able to
5   speak with my experts and figure out what it is exactly that
6   we want to ask him about.  But I'd have to do it on the fly,
7   on my toes, figure out what we want to ask him about.

8           And, you know, we've -- now that we have his
9   declaration, our experts have several new issues that were not
10  anywhere in his opening expert disclosures.  One example of
11  that is his declaration, and it's really specific as to the
12  bases for Mr. Malhotra's opinions.  But one example, and I'll
13  provide one, his declaration raises a new -- a legal case
14  regarding whether or not residents of Puerto Rico should have
15  access to Supplemental Security.  Now, this wasn't referenced
16  anywhere in his expert disclosure whatsoever.  And he mentions
17  the SSI as a potential variable, but in his declaration, he
18  does not provide an estimate or a figure for what impact that
19  might have.  And we would like to ask Mr. Malhotra if he's
20  quantified that potential figure.

21          And that's just one example.  And we think we with --
22  an hour, would provide us the ability to determine whether or
23  not we needed to ask those questions in a cross-examination
24  during the hearing, or once we get that information through
25  the deposition, it might be that we save the time during

1   confirmation and wouldn't need to get into those things.

2           And unless Your Honor has any other questions, I'm

3   happy to cede to counsel, Mr. Cepeda.

4           THE COURT:  Thank you.  I don't have further

5   questions for Mr. Mott.

6           Mr. Cepeda?

7           MR. CEPEDA:  Yes, Your Honor.  I have nothing further

8   to add.

9           THE COURT:  Thank you.

10          Give me just a moment to collect my thoughts.

11          Thank you for your patience.  The DRA parties have

12  moved in limine to exclude certain Rule 26(a)(2)(C) witnesses

13  or testimony.  That is Docket Entry No. 18340 in Case No.

14  17-3283.  The motion is being pressed today as against witness

15  Gaurav Malhotra only.

16          The DRA parties argue that the testimony should be

17  precluded, because the Oversight Board did not submit expert

18  reports -- well, an expert report for this witness as the DRA

19  parties believed the Procedures Order required.  They further

20  argue that the Oversight Board didn't provide sufficient

21  disclosures under Rule 26(a)(2)(C); that the disclosure

22  provided did not give sufficient information to demonstrate

23  that the witness is qualified to provide expert opinion

24  testimony under Rule 26(a)(2)(C); and today raised some

25  specific issues as to elements of the declaration that has

1    been provided for Mr. Malhotra.

2         The Court denies the motion.  First, the Procedures

3    Order didn't expressly override Rule 26(a)(2)(C), and the DRA

4    parties' motion, to the extent it contends that the Procedures

5    Order did override 26(a)(2)(C) in terms of requiring a report

6    for anyone characterized as an expert, is untimely.

7         The debtors filed their preliminary witness list on

8    August 3rd of 2021.  That identified this witness and other

9    challenged witnesses as possible Rule 26(a)(2)(C) witnesses,

10   and indicated that disclosure would be provided in accordance

11   with that rule should these individuals be tendered as experts

12   in addition to any tender as fact witnesses.  And further

13   witness identification material was filed in September.  There

14   was ample time for the DRA parties, prior to the filing of

15   their in limine motion, to challenge the debtors' invocation

16   of Rule 26(a)(2)(C) as violative of the Procedures Order.

17   And, thereafter, it has been acknowledged here, Mr. Malhotra

18   was produced for a deposition.

19        There was a discovery dispute relating to the

20   adequacy of the disclosures that was settled and withdrawn.

21   We have a representation from the Oversight Board that it did

22   upload to the database information concerning reliance

23   documents for Mr. Malhotra.

24        The Court finds that the dispute with regard to

25   whether a report should have been provided for Mr. Malhotra,

1  rather than relying on the 26(a)(2)(C) description, is

2  untimely.  The Court also finds that to the extent there was

3  any insufficiency, there is not prejudice to the DRA parties

4  warranting preclusion or limitation of the testimony of

5  Mr. Malhotra, because the DRA parties have had an ample

6  opportunity to investigate his qualifications, and the scope

7  and basis of his testimony, and to do any necessary work with

8  regard to rebuttal experts.

9       The issues with respect to additional specific

10  aspects of the declaration do not warrant the reopening of

11  discovery even for the one-hour deposition, which in this

12  compressed time schedule would be a significant commitment of

13  the parties' time and resources.  Accordingly, the motion in

14  limine concerning the challenged 26(a)(2)(C) witnesses, which

15  is specifically pressed as to Mr. Malhotra, and has been

16  withdrawn as to the other two challenged witnesses, is denied.

17       We will now proceed to Agenda Item No. 4, which is

18  the DRA parties' motion in limine to exclude certain opinions

19  offered by the debtors' expert witness, Marti Murray.  And the

20  first counsel I have listed to argue is Elizabeth Curran for

21  ten minutes representing the DRA Collateral Monitor.

22       Ms. Curran.

23       MS. CURRAN:  Good morning, Your Honor.  Can you hear

24  me okay?

25       THE COURT:  Yes, I can, and I can see you.  Good

1  morning.

2       MS. CURRAN:  Good morning.  I'm Elizabeth Curran from

3  Schulte Roth & Zabel.  I'll be speaking today on behalf of

4  Cantor-Katz, one of the DRA parties, and I'm here with my

5  colleague, Mr. Cepeda, who I believe will be speaking on

6  behalf of the Servicer.

7       As Your Honor knows, the DRA parties moved to exclude

8  improper legal opinion offered by debtors' plan expert,

9  Ms. Marti P. Murray.  Specifically, in her September 13 expert

10  report, Ms. Murray concludes that certain settlements

11  underlying the confirmation plan are unreasonable.  It's our

12  position, Your Honor, that Ms. Murray has overstepped the

13  bounds of permissible expert opinion by making this legal

14  conclusion in her report, and that her testimony must be

15  excluded.

16       Your Honor, the case law here is clear that pursuant

17  to Rule 9019 of the Federal Rules of Bankruptcy Procedure,

18  it's the job of the Court to determine whether a settlement is

19  reasonable within the context of approving that settlement.

20  And the Court must reach this decision by evaluating various

21  factors, including the potential success of the litigation

22  versus future benefits of the settlement; likelihood of

23  complex litigation; and the competency and experience of

24  counsel, just by way of example.

25       What Ms. Murray did in her report is she essentially

1  mimicked the procedure that a court would take in that she

2  analyzed some of these very same factors, but then she stated

3  a legal conclusion that, based on that analysis, the

4  settlements are reasonable.  It's well settled --

5          THE COURT:  May I just interrupt you for a minute?

6  You said that in her report she analyzed some of the factors.

7  Are you representing that you find in her analysis all of the

8  factors, including those relating to evaluation of legal risks

9  and counsels' performance?

10         MS. CURRAN:  Yes.  She did evaluate -- the examples

11  that I gave just now, she did evaluate those in her report.

12  Some of the case law, you know, cites additional factors, and

13  I don't think the case law is necessarily completely aligned

14  with each of the itemized factors, so that's why I said some

15  of them.  But the examples that I gave, she did analyze that

16  in her report, yes.

17         So just to continue, it's well settled that expert

18  testimony leads to the conclusion it must be excluded, and

19  here it's the Court that's required to evaluate these factors,

20  and then make an informed, independent judgment on

21  reasonableness.  The conclusion itself cannot come from an

22  expert.

23         Now, in opposition, the debtors, they try and draw a

24  false distinction between reasonableness, and what they're

25  calling financial reasonableness, and what Ms. Murray referred

1    to in her deposition testimony as commercial reasonableness.

2    You know, call it financial, call it commercial, the argument

3    is really just a distraction.  It's simply something that the

4    Oversight Board made up without any support in an attempt to

5    differentiate Ms. Murray's opinion.

6           But when you look at the factors that the Court is

7    considering that Ms. Murray evaluated, it's clear that there's

8    really no such distinction.  Looking at the financial

9    implications of a settlement, and then making a determination

10   as to whether that settlement is reasonable is exactly what

11   the Court is tasked with doing.

12          Now, just by way of example, a few of the factors

13   that I discussed earlier are potential success of litigation

14   versus future benefits of settlement and likelihood of long,

15   drawn out, complex litigation.  These factors are a way for

16   the Court to evaluate the financial impact of the proposed

17   settlement.  The distinction that the Oversight Board is

18   attempting to draw, it doesn't exist.  It's a complete

19   fiction.  And simply calling Ms. Murray's opinions something

20   different than a legal conclusion, or having her disclaim that

21   this is what she's actually doing in her deposition, it

22   doesn't change what her opinion is.

23          Ms. Murray followed a very specific process in her

24   report.  She analyzed many of the same factors, and then she

25   drew her legal conclusion.  It's not happenstance that she

1  describes the settlements as reasonable. It's a deliberate

2  use of that terminology. The problem is it's not her purview

3  to make a legal conclusion after analyzing the facts. The

4  conclusion is left to the Court, and Ms. Murray has to be

5  limited to giving her expert opinion on the facts that can

6  help the Court reach its conclusion. She can't state the

7  conclusion herself.

8          And finally, Your Honor, in its opposition, the

9  Oversight Board made reference to the fact that the

10  confirmation requirements under PROMESA don't prohibit expert

11  testimony on this issue. The confirmation requirements under

12  PROMESA, they lay out what the debtors have to prove in order

13  to get the Plan confirmed. It's, frankly, irrelevant to

14  whether or not Ms. Murray's testimony is admissible under the

15  Federal Rules of Evidence.

16          Your Honor, for all the reasons discussed in the DRA

17  parties' briefing and highlighted today, we respectfully

18  request that the Court exclude Ms. Murray's improper legal

19  conclusions as to reasonableness of the underlying

20  settlements.

21          THE COURT: Would you speak for a moment to Rule 704,

22  which does permit an opinion to embrace an ultimate issue? So

23  even if I did discern some legal aspects in what the Oversight

24  Board is tendering as a financial analysis or commercial

25  analysis, would I be bound to exclude that opinion,

1    particularly in the context of this bench trial where I

2    understand what my responsibilities are?

3         MS. CURRAN:  Sure, Your Honor.  Our understanding of

4    Rule 704 is that while Rule 704 does permit an expert to

5    testify to the ultimate conclusion, they're still not

6    permitted to testify to a legal conclusion.  The conclusion

7    has to be factual.  In our opinion, simply adding an adjective

8    to Ms. Murray's conclusion doesn't take it from being a legal

9    conclusion to a factual conclusion.  There is no distinction

10   there.

11        And, Your Honor, in terms of the fact that it's a

12   bench trial, we, of course, have utmost respect for your

13   judgment, and we understand that you would not consider

14   anything that shouldn't be considered.  I think our position

15   is this really isn't a close call.  She is using very

16   deliberate language.  Her report says what it says.  It's not

17   a close call, and we really don't think that her opinion

18   that -- or her legal conclusion that the settlements are

19   reasonable should be part of the record.

20        I hope that answers your question.

21        THE COURT:  Thank you.  Thank you.

22        Mr. Cepeda?

23        MR. CEPEDA:  Yes, Your Honor.  Alejandro Cepeda on

24   behalf of AmeriNational.  I have nothing further to add at

25   this time.

1           THE COURT:  Thank you, Mr. Cepeda.

2           I'll now turn to Ms. Dale for the Oversight Board.

3           MS. DALE:  Good afternoon, Your Honor.  It's Margaret

4    Dale from Proskauer Rose for the Oversight Board.

5           Your Honor, Ms. Murray should not be barred from

6    offering testimony regarding the financial reasonableness of

7    the settlements she discusses.  There's nothing in PROMESA or

8    the Bankruptcy Code that would restrict her opinions regarding

9    the reasonableness of the financial settlements.  If her

10   opinion is helpful to the Court, the Court can take that

11   opinion into account.

12          She's eminently qualified to offer these opinions.

13   They are factually based.  The DRA parties do not object to

14   her CV or to any of her other opinions.  Her status as a

15   restructuring expert is not challenged.  Her past as a

16   principal investor, court-approved expert on restructuring,

17   her 35 years of experience all indicate her expertise.

18          The DRA parties, in fact, state that they do not

19   object to her opinions regarding whether the parties were

20   represented by qualified legal counsel.  The downside risks of

21   certain of the stakeholders, and the impact of potential

22   litigations all were deemed to be within the scope of

23   permissible expert testimony that is used to assist the trier

24   of fact.  That's from their motion, the DRA parties' motion at

25   page seven.

1          Ms. Murray is using the term "reasonable" as a term

2     of art based on her experience.  It is in the context of

3     financial respons -- reasonability, excuse me, analyzed by a

4     financial and structuring expert.  And as Your Honor

5     mentioned, she's not a -- withdrawn.

6          As Your Honor mentioned, under Rule 704, even if

7     Ms. Murray were to be giving an opinion on legal

8     reasonableness, which she is not, that is authorized to the

9     extent that her opinion embraces the ultimate legal issue.  It

10    does not oblige the Court to take a specific view as to the

11    settlements themselves.

12         The opinions in question are supported by 15 pages of

13    analysis detailing facts, actors, and the background for each

14    of the settlements.  Those -- that information was -- an

15    analysis was provided to assist the Court in its rulings, and

16    listing these facts and issues does not usurp the Court's

17    right to make the final legal determination.  The motion

18    should be denied.

19         Unless the Court has any questions, I'm finished.

20    Thank you.

21         THE COURT:  Thank you.  I have no questions for you.

22         Ms. Curran, anything further?

23         MS. CURRAN:  Yes, Your Honor.  Just a few quick

24    points.

25         The Oversight Board is saying that there's nothing

1  that restricts Ms. Murray's opinion, but that's really not

2  true.  The Federal Rules of Evidence restrict her opinion

3  because legal conclusions under Rule 702 are not helpful to

4  the trier of fact and must be excluded.

5       And in terms of Ms. Murray's qualifications, frankly,

6  we believe that her qualifications are irrelevant to this

7  inquiry.  The DRA parties are not challenging her

8  qualifications at this time, but nothing qualifies an expert

9  to testify to inadmissible legal conclusions.  I will note,

10 however, that during her deposition, Ms. Murray stated that

11 she actually wasn't sure if she had ever given expert

12 testimony on reasonableness of settlements.

13      And in terms of kind of the semantics argument, the

14 Oversight Board is saying that Ms. Murray is simply using the

15 word "reasonable," but she's not drawing a legal conclusion.

16 It really ignores the substance of her report.  In the law,

17 words have meaning.  Experts can't throw out words and ignore

18 that meaning.  It's not enough to say, I use the word

19 "reasonable," but I'm not stating a legal conclusion.  I'm

20 using it as a word -- term of art.

21      Her report says what it says.  She followed a very --

22 a procedure, she analyzed factors, and then based on those

23 factors, she stated her legal conclusion.  But reasonableness

24 must be determined as a matter of law, and Ms. Murray should

25 not be permitted to testify to that legal conclusion.

1    We don't disagree that she can testify to the

2    underlying facts. She can give testimony that will help the

3    Court understand and evaluate the underlying factors. What

4    she can't do is say that, based on my analysis of these

5    factors, these settlements are reasonable. And that's

6    precisely what she's doing, and we believe that her opinion

7    must be excluded.

8        THE COURT: Thank you. Give me just a moment.

9        Thank you for your patience. I will now address the

10   DRA Parties' Motion in Limine to exclude certain opinions

11   offered by the debtors' expert, Ms. Marti Murray, which is

12   Docket Entry No. 18342 in Case No. 17-3283. The Court has

13   considered thoroughly all of the filings and submissions.

14       The Court denies the motion. The challenged

15   conclusion regarding the reasonableness of the settlements

16   underlying the proposed Plan of Adjustment is presented based

17   on Ms. Murray's subject matter expertise in financial advising

18   and evaluating plans of reorganization based on agreements

19   between parties. The financial analyses in the report

20   sufficiently suggests that she has grounded her opinion in

21   relevant scientific data and drawn conclusions from that data

22   based on that -- her relevant financial experience.

23       So the Court understands Ms. Murray's opinion as

24   going to reasonableness from a financial or commercial point

25   of view, consistent with her background, which is within the

1   scope of permissible expert testimony contemplated by Federal

2   Rule of Evidence 702, rather than to any ultimate legal

3   question.

4           Furthermore, the Court understands and embraces its

5   own obligation to make a determination as to whether the

6   settlements meet the legal standard of reasonableness.  We'll

7   deal with Ms. -- await Ms. Murray's testimony, and make

8   determinations as to its significance accordingly.

9   Accordingly, the DRA parties' motion to preclude Ms. Murray's

10  opinion, which is couched in the term reasonableness, is

11  denied.  Thank you.

12          The next set of Agenda items under II go to a variety

13  of issues, beginning with a stipulation regarding the parties'

14  exhibits for the confirmation hearing.  Would whoever wishes

15  to begin speaking to that, which was conveyed to the Court,

16  the stipulation in a letter from I believe it was Oversight

17  Board's counsel, please -- there, Ms. Dale has opened her

18  camera.

19          So, Ms. Dale, will you please begin?

20          MS. DALE:  Thank you, Your Honor.  Good afternoon.

21  Margaret Dale, from Proskauer Rose, for the Oversight Board.

22          Your Honor, in meeting and conferring with the

23  various parties who have submitted exhibits to be used at the

24  confirmation hearing, the parties had certain agreements

25  relating to those exhibits.  We detailed those in a letter to

1    the Court that was dated October 27th, but was filed on the

2    docket, I believe, over the weekend.  And I apologize, I don't

3    have the docket citation right now, but I can get that for the

4    Court.

5              THE COURT:  I believe it was filed at Docket Entry

6    No. 18988.

7              MS. DALE:  Thank you, Your Honor.

8              I would propose to just read those into the record,

9    if that's acceptable, and then to the extent the Court has any

10   questions, I can try to answer them.

11             THE COURT:  You may proceed.

12             MS. DALE:  Thank you.

13             So stemming from the meet and confer, the parties

14   have jointly agreed to the following reservation of rights

15   regarding the parties' exhibits for the confirmation hearing.

16   First, the parties believe objections to the relevance of a

17   particular exhibit will depend on pretrial rulings by the

18   Court on pending motions, including on motions in limine, and

19   other rulings made by the Court at the confirmation hearing.

20   Accordingly, subject to any other -- accordingly, subject to

21   any further order of the Court, the parties have agreed to

22   reserve objections on grounds of relevance with respect to all

23   exhibits.

24             The second reservation, in addition, in agreeing to

25   the admissibility of a document, no party is admitting,

1    acknowledging, or accepting as true statements in a document;

2    and all parties reserve the right to dispute matters in the

3    document and/or offer contrary evidence and/or dispute the

4    weight to be given to the document.

5         Finally, the stipulation between AAFAF and the

6    Oversight Board, which was filed at ECF No. 18733, is a

7    stipulation between those parties only, and has not been

8    agreed by any other party.

9         Your Honor, in addition, there's one further

10   stipulation.  The Oversight Board agrees that Mr. Hein and the

11   DRA parties reserve and do not waive any objections based on,

12   one, the position that documents pertaining to settlement

13   negotiations or mediation may not be offered, because other

14   documents on that subject have been withheld; and/or, two, the

15   position that predecisional or deliberative communications or

16   documents may not be offered, because other predecisional or

17   deliberative communications or documents have been withheld;

18   and/or, alternatively, that the disclosure of such withheld

19   documents should be ordered.

20        That is the extent of the reservations that the

21   parties had agreed to in our meet and confer, Your Honor.

22        THE COURT:  Thank you.

23        I note that in the same order in which I directed you

24   to file a copy of this letter on the record, I also directed

25   you to file early this week a list corresponding to the

1  division in the exhibit binders that you have submitted to the

2  Court of documents that the parties agree are admissible for

3  purposes of the hearing, subject to the reservations of rights

4  and documents whose admissibility is disputed, so that I can

5  keep track of those sorts of disputes.

6       MS. DALE:  Your Honor, we are endeavoring to file

7  those lists.  We have communicated with the various parties.

8  We're trying to get clarity and systematize the nomenclature

9  that's being used, so admit; admit, but not for the truth of

10  the matter asserted; and there are many exhibits on the

11  Oversight Board's list that are really for identification

12  only, Your Honor, including a large number of the statutes

13  that we refer to, which we would never intend to move into

14  evidence.

15       So we're endeavoring to get agreement on

16  nomenclature, so that the Court is receiving lists that look

17  alike, and is -- but we'll endeavor to do that in the time

18  that you identified for us to file those.

19       THE COURT:  That's very much appreciated, and I

20  understand that it may be a great deal of work.  It is better,

21  though, to have those issues sorted out, and the ability to

22  have the documents at hand prior to the commencement of the

23  trial, rather than scrambling and trying to agree on what

24  terms mean in the course of the trial.

25       I would also direct the parties that, again, in the

1   interest of the efficiency and clarity of the trial

2   proceedings, that if there is expected to be a dispute as to

3   relevance, or admissibility, or any other ground for potential

4   exclusion with respect to a particular segment of the trial

5   day, that they raise the issue with each other and determine

6   whether it's necessary to raise it with the Court for

7   resolution in advance of the testimony being presented, or at

8   least explain the context succinctly to the Court prior to the

9   examination of the witness, again, so that we don't have to

10  stop in the middle of an examination in order to provide

11  context for any ruling that may be necessary.  Perhaps through

12  this procedure, we can avoid the necessity of some rulings as

13  the trial record develops.

14      I also have a question for you regarding the

15  Oversight Board and AAFAF's stipulation that's referred to in

16  the third indented paragraph on page 2 of the letter that had

17  to do with retirement benefit issues.  Is that going to be

18  revised or withdrawn in any way in light of the legislation,

19  the Act 53-2021 legislation?

20      MS. DALE:  Your Honor, I see that Mr. Friedman has

21  opened up his window, and I will allow -- if it's all right

22  with you, Your Honor, if Mr. Friedman could address that?

23      THE COURT:  Yes.  Thank you.

24      MR. FRIEDMAN:  Good morning, Your Honor.  It's Peter

25  Friedman from AAFAF.

 1          That's the intention and the hope.  We're obviously

 2    working cooperatively with the Oversight Board.  Now, based on

 3    its disclosure of last week, it intends to move forward.  If

 4    there are no monthly benefit modifications, there's no reason

 5    for a stipulation to be entered into with respect -- a factual

 6    stipulation.  That factual stipulation was predicated on a

 7    plan that would contain the monthly benefit modification and

 8    our arguments against it.

 9          THE COURT:  Very well.  So you will file an

10    informative motion as soon as practicable informing the Court

11    and the other parties of your intentions in that regard?

12          MR. FRIEDMAN:  Yes, Your Honor, both with respect to

13    the proposed factual stipulations, as well as AAFAF's other

14    proposed exhibits.

15          THE COURT:  Thank you.  Are there other stipulations

16    of fact that you anticipate at this point?

17          MR. FRIEDMAN:  Not for AAFAF, Your Honor.

18          THE COURT:  Ms. Dale?

19          MS. DALE:  Your Honor, excuse me.  Not for the

20    Oversight Board at this point, Your Honor.

21          THE COURT:  Thank you.

22          Is there anyone else who needs to be heard in

23    connection with this Item II.1 on the Agenda, which was the

24    stipulations in the October 27th letter?

25          MS. DALE:  Not --

1          THE COURT:  I don't see any.

2          MS. DALE:  Not that I'm aware of, Your Honor.

3          THE COURT:  Thank you.

4          I don't see any hands raised, and so we will go on to

5   Item 2, which is the Oversight Board's objection to certain

6   exhibits offered by Peter Hein.  Those exhibits are at docket

7   entry no. 18760-19, which is an October 15th, 2021,

8   declaration by Mark Elliott, and docket entry no. 18761-3,

9   which is an October 6, 2021, declaration by Mr. Elliott.

10         So I have argument by the Oversight Board, by

11  Mr. Firestein, for seven minutes as the first person

12  addressing the Court.

13         Mr. Firestein.

14         MR. FIRESTEIN:  Yes.  Excuse me, Your Honor.  Good

15  morning.  Can you hear me?

16         THE COURT:  Yes.  Yes.

17         MR. FIRESTEIN:  Excellent.  And, Your Honor, in light

18  of the stipulations that Ms. Dale just announced, that is, in

19  fact, why there are so few exhibit objections, and at least

20  from the Oversight Board's perspective, there are just these

21  two that I wanted to talk about.

22         And, for the record, Your Honor, good morning.  At

23  least it remains morning in Los Angeles.  Michael Firestein of

24  Proskauer Rose for the Oversight Board, as representative of

25  the Title III debtors.

1           As the Court correctly noted, there are two exhibits.

2    I'll refer to them as the two Elliott Declarations.  There are

3    three grounds that relate to the Board's position on this.

4    One is this relates to a previously undisclosed witness; two,

5    that they were not noticed in conformity with the Court's

6    orders; and, three, even if you get past all of that, these

7    declarations, albeit short, are replete with inadmissible

8    hearsay, lacking in foundation and containing improper

9    argument.

10          The Court's Amended Procedures Order required that

11   all eligible creditors file, on September 6, a preliminary

12   fact witness list, including the topics about which each

13   witness would testify.  Mr. Hein filed his list on September

14   6, and stated that he had no confirmation hearing witnesses to

15   list at this time.  I can provide the ECF numbers if

16   necessary, but I don't know that it's really going to be

17   necessary for the Court's determination of these issues.

18          The Court's Procedures Order also required that all

19   parties serve opening expert disclosures.  I'm unaware of

20   Mr. Hein serving any such disclosures.  I checked the docket,

21   did not see one, and don't recall receiving one.

22          The Procedures Order, likewise, required that opening

23   expert reports be provided on September the 13th.  Again, I'm

24   unaware of Mr. Hein having served any, and certainly not as it

25   relates to the witness at issue here.

1          Similarly, the Court's Procedures Order requires that

2    all parties serve rebuttal expert reports, if any, on October

3    6.  For the same reasons, I'm unaware that Mr. Hein disclosed

4    any of those for this witness here.

5          Lastly, the Court's procedures orders require that

6    all parties file on October 22, among other things, a

7    finalized witness list.  Mr. Hein identified no specific

8    witness he intended to present at trial.  Instead, he filed at

9    ECF 18648 something he named an exhibit list, witness list,

10   and identification of previously filed declarations.

11         Buried in that document, Mr. Hein listed as the two

12   exhibits, which you've identified, Your Honor, at the docket

13   numbers, two prior signed declarations for Mr. Elliott, who

14   this Court might recall from the COFINA confirmation hearing.

15   One of those declarations was filed in connection with

16   Mr. Hein's voting extension motion, which was denied by the

17   Court.  The other declaration was filed as part of the

18   hundreds of pages of Mr. Hein's Plan objection that he filed

19   on the 19th.

20         To be clear, to my knowledge, nowhere did Mr. Hein

21   actually file a witness list specifically identifying

22   Mr. Elliott as a supposed witness in this proceeding, like all

23   the other parties who wanted to offer direct testimony did.

24   Then, on October 25th, after the deadline to file witness

25   lists passed, and after Mr. Hein and I had a conversation in

1   which I indicated to him that I did not understand him to be

2   offering any particular witness list, he filed what he labeled

3   as an amended exhibit list, witness list, and identification

4   of previously filed declarations at ECF 18708.

5          In that document, Mr. Hein continued to list the two

6   Elliott Declarations as part of his exhibit list and not in a

7   witness list.  He also listed at the back of that document the

8   same two Elliott Declarations, along with others, I think,

9   authored by him as part of some listing of declarations he

10  intended or indicated he intended to rely upon at

11  confirmation.

12         So that the record is clear, in my mind, that --

13  Mr. Hein never actually identified the witness in the manner

14  and time directed by the Court.  Principally, he referenced

15  them deep in an exhibit list, which he disclosed on October

16  22nd.  And despite his belated effort to correct that mistake,

17  he still really has not identified Mr. -- I'm sorry.

18         THE COURT:  I'm sorry.  Your sound cut out for a

19  minute.

20         MR. FIRESTEIN:  Am I back now?

21         THE COURT:  You are back.  So if you would go back

22  to, despite his belated something, and that's where we lost

23  you.

24         MR. FIRESTEIN:  Yes, Your Honor.  Happy to do so.

25  Despite his belated effort to correct that mistake, he really

1    has not identified Mr. Elliott as a witness he intends to

2    present to the Court.  Merely citing to exhibits filed as part

3    of other pleadings in one case regarding a motion that's

4    already been rejected by the Court is not a substitute for

5    compliance with the Court's Procedures Order.  So there is no

6    recent basis to allow this late identified witness to be part

7    of the proceeding.

8           However, even if the Court were to consider either

9    one or both of these declarations, they fail to follow other

10   required procedures orders and are full of patently

11   inadmissible evidence --

12          (Sound played.)

13          MR. FIRESTEIN:  -- including rank hearsay.  He

14   presents himself as -- that being Mr. Elliott, as some sort of

15   alleged securities expert.  And in each of those declarations,

16   he lists a number of licenses, and recites information

17   ostensibly based on his supposed expertise in the industry.

18          If he's offered as an expert under (a)(2)(B) or

19   (a)(2)(C), Mr. Hein hasn't complied with any of the Court's

20   requirements for doing so.  There was no disclosure.

21   Alternatively, if he's trying to offer him as some sort of

22   percipient witness, no matter how he's being presented, the

23   nature of the testimony is utterly and completely

24   inadmissible.

25          I don't know how the Court wishes to deal with this.

1   These declarations are pretty short.  They speak for

2   themselves.  But, for example, in the one that was filed by

3   Mr. Hein on --

4           THE COURT:  Yes.  I would like you to identify the

5   information that you claim is inadmissible hearsay in each of

6   these documents as succinctly as you can.

7           MR. FIRESTEIN:  I will.  Unfortunately, there's no

8   numbered paragraphs, so I can't specifically do that, but I

9   will --

10          THE COURT:  But there are pages --

11          MR. FIRESTEIN:  Yes.  Yes, there are.  So let me --

12          THE COURT:  -- and discernible paragraphs and

13  headings.

14          MR. FIRESTEIN:  I will do this as easily as I can.

15  The October 6 declaration under the heading Puerto Rico

16  General Obligation Public Building Authority, et cetera, when

17  Mr. Elliott says, I've spoken with management and customer

18  service of all three and processed -- most notably the

19  representative at Schwab said, and then he quotes a statement

20  -- clearly it's hearsay and inadmissible.  And that should be

21  stricken.

22          The next sentence as well is based upon information

23  presumably received from Schwab, because of it being so

24  complex --

25          (Sound played.)

 1           MR. FIRESTEIN:  I'm sorry, Your Honor.  I'm happy to

 2    just identify these, or submit them in an informative motion

 3    if the Court prefers it to be done that way.  There's quite a

 4    few.  That entire paragraph is, frankly, full of information

 5    that he's received from third parties, clearly being asserted

 6    for the truth of the matter.

 7           And as well, in the next sentence regarding the

 8    so-called price to be paid for each CUSIP at a 30 dollar fee,

 9    there's no foundation, and that's hearsay.

10           The same type of information is contained in the

11    other declaration, which was --

12           THE COURT:  I'm going to give you one additional

13    minute to characterize what's problematic in the other

14    declaration --

15           MR. FIRESTEIN:  Yes, Your Honor.

16           THE COURT:  -- so you --

17           MR. FIRESTEIN:  Yes, Your Honor.

18           THE COURT:  You have one extra minute.

19           MR. FIRESTEIN:  It's easy to do, because a lot of it

20    is repetitive.  He restates some of the same things.  If you

21    look at the other declaration under Puerto Rican General

22    Obligation heading, he once again recites his conversations

23    starting in the second sentence with, management and customer

24    service of all three, and speaks to what those particular

25    individuals or companies have implemented.  And that is

1   clearly based upon conversations he's had with them, and that

2   is inadmissible hearsay.

3           In the next paragraph, he recites once again the

4   quoted contents of discussions with Charles Schwab, clearly

5   intended to be submitted for the truth of the matter.  And

6   that would relate all the way down to the Prime Clerk

7   suggestion.  And, frankly, it continues on until the next

8   sentence about Prime Clerk, and following again what Charles

9   Schwab ostensibly required regarding some number of pages that

10  are necessary.

11          Indeed, the paragraph that says, furthermore, they

12  must verbally confirm, you know --

13          (Sound played.)

14          THE COURT:  Thank you.

15          MR. FIRESTEIN:  That is all information from the

16  additional brokers, and the rest of the page --

17          THE COURT:  Thank you, Mr. Firestein.

18          MR. FIRESTEIN:  Thank you, Your Honor.

19          THE COURT:  I will hear from Mr. Hein.

20          MR. HEIN:  Your Honor, can you hear me now?

21          THE COURT:  I can hear you.  I can't see you.  Would

22  you turn your camera on, please?

23          MR. HEIN:  Yes.

24          THE COURT:  I see you now.  Thank you.

25          MR. HEIN:  Great.  Thank you.

1          THE COURT:  You may proceed.

2          MR. HEIN:  Sure.  So I did timely identify the

3   Elliott Declarations as declarations in my October 22 filing,

4   docket 18648, which was entitled Exhibit List, Witness List,

5   and Identification of Previously Filed Declarations.  Your

6   Honor may recall that the September 6 lists were preliminary.

7   If one filed a list on September 6, one was entitled to amend

8   it, provided one met the October 22 deadline, which I did.

9          Mr. Elliott is not being offered as an expert here.

10  He's being offered as an individual who is providing

11  information with respect to the factual experience he

12  encountered in trying to go through the ATOP delivery and

13  voting process.

14         So I did include the Elliott Declarations in my

15  exhibits, because they had been exhibits to my objection, as

16  Mr. Firestein has pointed out, and to other papers I had filed

17  previously.  But the Elliott Declarations were, in addition,

18  listed in the separate section in my docket 18648 filing

19  titled, Declarations List.  That's 18648, page 12 of 13.  And

20  there I list the Elliott Declarations by name and date, and

21  specify the docket numbers and docket pages at which the

22  declarations had been filed.  So one didn't have to hunt

23  through a great group of papers, I provided that information

24  there.

25         After the Oversight Board's attorneys had told me

1    that they'd be objecting to the Elliott Declarations being

2    offered, I then, on October 27th, refiled my informative

3    motion on the Exhibit B, just to be clear that I was not

4    offering the Elliott Declarations as exhibits, they were being

5    offered as declarations.  And that's 18861, page 2 of 20, as

6    well as I believe it's page 12 and 14.

7            Both of the original orders establishing procedures

8    and deadlines, this is docket 17640, and also the amended

9    order, 18394, in a section called Summary of Deadlines, set

10   October 22 as the deadline for parties to file finalized

11   witness lists and exhibit lists, and October 25 as the

12   deadline for parties to file witness declarations to be used

13   at the confirmation hearing.

14           And I submit, Your Honor, I met the deadlines in

15   those two orders, and as I pointed out, my October 22 filing

16   is entitled, Exhibit List, Witness List and Identification of

17   Previously Filed Declarations.  It was filed on October 22.

18   The Elliott Declarations that were listed in that filing had

19   previously been filed, and thus were on file in the docket

20   prior to October 25.

21           I also filed an amended informative motion, and this

22   was timely on the morning of October 27.  That's docket 18821,

23   which states in Exhibit B, which is at docket 18821, page 4 of

24   20, the party -- witness cover sheet, that witness

25   declarations being offered by me all previously filed were

1    identified in 18648, page 12 of 13, the filing that was made

2    on October 22.  And there is no surprise here.

3          On October 26, in the course of a meet and confer

4    over exhibits, I was clear, and made clear that I was offering

5    the Elliott Declarations as declarations.  I referred to my

6    list of previously filed declarations, including the two by

7    Mark Elliott, in my October 22 filing.

8          Your Honor's docket 18502 order -- and I just want to

9    make this point, although I'm not sure that the Oversight

10   Board is even arguing this, in paragraph 4(a)(D), if a party

11   wishes to cross-examine any declarant or present by rebuttal

12   testimony, they should so state.  And I did not believe it was

13   necessary to present Mr. Elliott as a live rebuttal witness,

14   so in my Exhibit B that I timely filed the morning of the

15   27th, that's docket 18821, I said three things:  One, on

16   Exhibit B I said, witness declarations being offered by me,

17   all previously filed, were identified in 18648, page 12 of 13,

18   by list of the exhibits, witnesses, and previously filed

19   declarations.

20         I also said that apart from offering such

21   declarations, I do not contemplate offering an affirmative

22   live witness at this time, but reserve all rights.  And I

23   requested the opportunity to cross-examine certain FOMB

24   declarants.

25         In short, I read Exhibit B to apply to its desire to

1    cross-examine a witness live, or present live rebuttal

2    testimony, and -- because the Court's Order had previously

3    directed that any testimony by the witness should be offered

4    by declaration.  So that, I think, addresses the technical

5    issue being raised.

6           I did not hear, and I'd be happy to address it if I

7    misheard and didn't hear it, any issue as to relevance.  So

8    let me turn to the issues of hearsay and lack of foundation.

9           First of all, on the lack of foundation issue,

10   Mr. Elliott clearly has a foundation for the 30 dollar fee.

11   That is something which he would know by virtue of being a

12   bondholder and representing, as an investment adviser, other

13   bondholders, what the -- that they're being charged to make

14   the tenders.  And it is, indeed, true, and I've submitted

15   documentation as well on this from Merrill Lynch, that many

16   brokerage firms will charge the individual retail investors 30

17   dollars for each what they call voluntary corporate actions,

18   which this falls within.  So the individuals are being charged

19   30 dollars, or at least are subject to that charge if they

20   can't persuade their broker to waive it.

21          In terms of hearsay, one of Mr. Elliott's statements,

22   and I didn't hear Mr. Firestein comment on this, was that the

23   Prime Clerk number, when called, just provided a recorded

24   message stating that someone should leave a message and they

25   would try to call back in three days.  And I think Mr. Elliott

1   said he didn't get a call back.  The Prime Clerk answering

2   machine is a statement by FOMB's agent, and, in any event, the

3   statement of the Prime Clerk recording answering machine that

4   Prime Clerk would try to call back in three days is not

5   offered for the truth, but for the fact that when Mr. Elliott

6   called, that's the recording he got.  He got this recording

7   saying, leave a message; we'll try to call back in three days.

8   So that is not hearsay.

9          As to the statements of Charles Schwab

10  representatives, these are not being offered for the truth,

11  but for the fact that they were made in response to Elliott's

12  efforts to help himself and his clients navigate the complex

13  ATOP delivery and voting process.  So whether or not what the

14  Schwab people were saying -- if the Schwab people were saying,

15  well, we're not going to help you, you have to do X, whether

16  or not that's true, whether or not someone, in fact, has to do

17  X is being offered for the fact that Elliott, in trying to go

18  through and navigate the process for him and others of his

19  clients, was being told that.

20         So it's -- what's relevant here and what is being

21  offered for this is the response that Elliott was given.

22  Whether that reflected a truthful statement by the Schwab

23  person or not, it's relevant to show what Elliott was told.

24         (Sound played.)

25         MR. HEIN:  So I think to conclude, the point that I'm

1  offering the Elliott Declarations for, I think -- and why it's

2  relevant is I think evident from FOMB's own legal memorandum.

3  They're pointing to the fact that retail class votes to accept

4  the Plan support FOMB's position that the Plan should be

5  confirmed, that people find this something that's desirable.

6       Elliott makes the point that the ATOP delivery and

7  vote process was extremely burdensome and complex, very

8  difficult for small retail investors to navigate, even people

9  that had someone like Elliott trying to help them, that this

10 prevented or deterred people from voting.  He speaks from his

11 experience in dealing with three different brokerage firms.

12      Elliott's declaration thus supports my position that

13 the retail votes can't be viewed as a true gauge of sentiment.

14 And this is in addition to the fact, and the point I've made

15 in my objection, that the votes are not the product of a free

16 and fair choice based on adequate information.  The whole

17 voting process was coercive here.  Retail investors were told,

18 in essence, that if you vote to accept, you may receive this

19 added fee.  If you vote to reject, this is going to happen

20 anyway, but you may not get the fee.  No surprise that there

21 was overwhelming accept votes from people that are told, if

22 you want more money, you have to say accept.  If you vote

23 reject, you're not going to get that incremental compensation,

24 but this is going to go through anyway.

25      That was the basic message in the solicitation

1   materials.  And, therefore, based on the difficulty that

2   people had in tendering through the ATOP delivery process --

3              (Sound played.)

4              THE COURT:  You can finish your point.

5              MR. HEIN:  Finish the sentence?

6              THE COURT:  Yes.

7              MR. HEIN:  And this inherently coercive aspect of the

8   voting process, the retail votes in favor are not a true

9   gauge, in my view, of the retail sentiment about whether this

10  is actually a good thing for retail investors.

11             Thank you, Your Honor.

12             THE COURT:  Thank you.

13             Mr. Firestein?

14             MR. FIRESTEIN:  Thank you, Your Honor.

15             Mr. Hein's recitation of his legal issue does not

16  overcome the hearsay defects that are present in the

17  declaration.  Secondly, the 30 dollar fee reference, where he

18  indicates that he's describing what he does as an investment

19  advisor, as a professional, essentially as an expert advising

20  on this is one of the reasons why perhaps he should have been

21  designated as an expert witness.

22             That aside, I want to return, if I could, to the

23  second declaration to further identify the sentences, if

24  it's --

25             THE COURT:  I'm sorry.  You need to speak up a little

1    bit more for the microphone.  I'm losing the ends of your

2    sentences.

3         MR. FIRESTEIN:  If it's acceptable, I would rather --

4    I would like to return to the second declaration to identify

5    what I think are the offending sentences where I left off

6    last.

7         THE COURT:  Yes, you may.

8         MR. FIRESTEIN:  Thank you, Your Honor.

9         In the second declaration, on the second page in

10   this -- I left off in the middle, it says, after being

11   presented with this, and then he writes, essentially

12   impossible to understand statement, of course it's hearsay

13   with respect to the statement that was received, and an

14   improper argument, as opposed to what the content of that is.

15        (Sound played.)

16        MR. FIRESTEIN:  The next section, a little below

17   where it begins, if clients do not attest they have fully read

18   and understand these complicated documents, and then he goes

19   on, that remains hearsay through the end of that sentence.

20   And, frankly, to the extent it relates to the retail support

21   fee, that class has already approved they're going to get it.

22   I don't believe that that's relevant relative to this.

23        On the next page, in the paragraph that begins,

24   furthermore, the last parenthetical in that paragraph which

25   begins, indeed, a securities professional may be precluded

1   from putting unsolicited foreign media, that reference, that's

2   classic expert opinion.  He can only be doing that based upon

3   his position, and it's a reason why I submit that he's an

4   undisclosed expert.  That sentence should be stricken

5   regardless.

6           In the next paragraph that begins, furthermore, most

7   of the little written information sent to clients provides no

8   statement, that's once again an effort to recite the contents

9   of a document in some regard.  The document will say whatever

10  it says, but his characterization of it is hearsay.

11          In the next paragraph that says, furthermore, in my

12  case, I've taken extraordinary efforts, the concluding

13  sentence there is improper argument by Mr. Elliott.

14          In the next paragraph regarding the number of hours

15  it takes to answer the phones, I don't understand what the

16  relevance of that is.

17          And at the top of the next page, I also do not

18  understand what the relevance is where the sentence is that

19  begins, and while I waited for one client, I couldn't wait for

20  others, the countless small investors.  That section just has

21  nothing to do with anything that I understand is relevant for

22  confirmation.

23          And, lastly, Your Honor --

24          (Sound played.)

25          MR. FIRESTEIN:  --the second to last paragraph, if I

1  could just finish this --

2          THE COURT:  Yes.

3          MR. FIRESTEIN:  -- Your Honor, regarding secret

4  negotiations, favoring negotiating parties, Mr. Elliott had

5  nothing to do with this.  He was not even a party to any of

6  this.  It's completely without foundation and argumentative,

7  as is the last sentence concerning a lack of foundation on the

8  IRS tax deadlines.

9          With that, Your Honor, I'll submit.

10          THE COURT:  Thank you.

11          So I take it -- well, would I be correct in

12  understanding you also to be arguing that to the extent

13  Mr. Hein is claiming that he is offering these statements

14  attributed to Schwab not for the truth of them, but for the

15  fact that they were said, is there a 403 element in your

16  application?

17          MR. FIRESTEIN:  Yes, Your Honor.  I don't really

18  understand how that moves the needle, other than being, you

19  know -- other than being, you know, sort of far afield, and

20  whatever limited relevance it would have would be outweighed

21  by the supposed impact of what that sentence might mean, or

22  those characterizations might mean on the record.

23          THE COURT:  Well, I am directing you to supplement

24  this oral discussion by filing I guess it would be an

25  informative motion tomorrow by noon identifying, annotating

1  each of these exhibits to identify the portions objected to

2  and the grounds of the objection.  So that would be November

3  2nd at noon.  Then by November 4th at noon, Mr. Hein can file

4  his response, and I will take it under advisement pending the

5  filing of those documents.

6      Mr. Hein, once he identified these as declarations,

7  has filed declarations, and so I would -- I am going to deal

8  with the content and admissibility of these on the merits,

9  rather than on the timing issue, as he does have an argument

10 with respect to witness disclosure deadlines.

11     He is arguing that he is not offering Mr. Elliott as

12 an expert, which, as Mr. Firestein has shown, provides another

13 ground for Mr. Firestein's argument as to the propriety of

14 this as a set of fact witness declarations, but I need further

15 clarity from the Oversight Board.  I'm giving Mr. Hein the

16 opportunity to respond to that further clarity before I rule

17 on his declarations.

18     MR. FIRESTEIN:  Your Honor, may I just make one

19 inquiry?  I want to make sure I understand the Court's request

20 or directive on the submission.

21     THE COURT:  Yes.

22     MR. FIRESTEIN:  We're simply going to quote the

23 language, put the basis of the objection, but we're not going

24 to submit any further discussion or debate on either the

25 expert issue or on the disclosure point; is that right?

1          THE COURT:  That is correct.

2          What I would actually prefer that you do is mark by

3    box, or bracket, or shading the particular language to which

4    you are objecting, and then provide a key as to the basis of

5    the objection, so that when I rule, I can rule by reference to

6    the exhibits themselves without necessarily creating a

7    document that then pulls the language of the exhibits out.

8          MR. FIRESTEIN:  May I make one further inquiry on

9    this, to be sure?  That makes it easier.  And we'll simply

10   attach the declarations as an exhibit to the informative

11   motion with the shading, and bracketing, and the key that will

12   be like A, B, C, which will be directed to whether it's

13   relevance, or foundation, or hearsay, so that the Court will

14   have it handy?

15         THE COURT:  Yes.

16         MR. FIRESTEIN:  Fine.  Thank you.

17         THE COURT:  Thank you.

18         All right.  It is now time for the lunch break, and

19   so we will resume at 2:10.  Those who are on the AT&T line

20   should hang up and dial back in for 2:10.

21         Let me just ask my Zoom masters what's best with

22   respect to the Zoom participants.  Give me just a moment.

23         Sorry for the delay.  Zoom participants, you should

24   log back in by two o'clock so that you can be let in from the

25   waiting room.

1          Thank you all very much.  We will see you at 2:10.

2          (Recess taken.)

3          (Proceedings reconvened.)

4          THE COURT:  Good afternoon, everyone.  This is Judge

5    Swain speaking again, and we are continuing the pretrial

6    conference on the continuation of the confirmation hearing on

7    the proposed Plan of Adjustment on behalf of the Commonwealth,

8    ERS, and PBA.

9          A couple of reminders.  There is to be no recording

10   or retransmission of any of the content of this hearing.

11   Please keep your cameras off when you are not speaking to a

12   matter; and to the extent you want to be recognized, use the

13   "hand raise" feature on Zoom, and open your camera so that we

14   can see that you want to speak.

15         The next Agenda item is III, which has been labeled

16   Additional Matters in the Agenda prepared by the Oversight

17   Board.  The first item in that section of the Agenda is

18   labeled Witness Declarations, and the inquiry is whether the

19   parties should file amended witness declarations to include

20   references to the parties' exhibit lists.  The answer to that

21   question is an emphatic yes.  That would be very helpful to

22   the Court.

23         So would filing by the end of the day Wednesday be

24   feasible?  I see that Oversight Board's counsel have their

25   cameras on, and so I will start with Ms. Dale or Mr. Rosen on

1    that one.

2            MS. DALE:   Thank you, Your Honor.   Margaret Dale.

3            I think by the end of the day Wednesday should be

4    fine.   The only other thing I wanted to mention in connection

5    with that is that when we talk about some of the additional

6    matters, Plan modification, proposed confirmation order, and

7    the notice, which is number five, which Mr. Rosen and

8    Mr. Bienenstock are requesting to handle, we also wanted to

9    raise an issue of some short supplemental declarations that

10   are going to be needed in connection with those other items.

11   But yes, by the end of the day Wednesday.

12           And, Your Honor, just for clarity, each party to file

13   the witness declarations from October 25th but with respect --

14   including just the exhibit references to their exhibit lists,

15   correct?

16           THE COURT:   Yes.   Each party to refile its own

17   proffered declarations, including the exhibit designation in

18   the exhibit list with the ECF file number for that exhibit, to

19   the extent there are specific references to exhibits in the

20   declaration, so that I don't have to try to cross-correlate

21   and dig things up myself.

22           MS. DALE:   Thank you, Your Honor.

23           THE COURT:   That will be much appreciated, and of

24   course we will deal with other deadlines as we go along.

25           There is a raised hand from counsel for DRA.   I think

 1   it's Mr. Mintz.  Mr. Mintz?

 2          MR. MINTZ:  Yes, Your Honor.  Good afternoon.  Doug

 3   Mintz for Cantor-Katz, a DRA party.

 4          We will be able to submit new declarations on

 5   Wednesday.  Are those to be resigned by the witness?

 6          THE COURT:  No.  That is not necessary.  You can /S,

 7   and indicate that this is the updated version.

 8          MR. MINTZ:  Yes, Your Honor.  That's fine.

 9          I guess we'd also need a sense -- and maybe this will

10   come up as we continue through this afternoon's discussion,

11   whether the -- to what extent the Oversight Board and/or AAFAF

12   is planning to submit new testimony related to the revisions

13   of the Plan, regarding analysis that had to be revised based

14   on new numbers and things like that.

15          We'd like to understand that as soon as possible, and

16   obviously that also impacts the testimony of Mr. Prager, and

17   potentially others, depending on what that additional

18   testimony might consist of.

19          THE COURT:  Yes.  Well, the next Agenda item is Plan

20   Modifications, and I certainly intended to hear and inquire

21   after all of the ramifications of proposed modifications,

22   which would include evidentiary modifications, and what it is

23   the Oversight Board is proposing to do, both substantively and

24   procedurally.

25          MR. MINTZ:  Thank you, Your Honor.

1           THE COURT:  So do you have anything further at this

2    point, Mr. Mintz, before I turn to Mr. Rosen?

3           MR. MINTZ:  I'll only note that we'll wait to hear

4    obviously where that proceeds, and come back once we hear

5    that.

6           THE COURT:  Okay.  Thank you.  If you'll put then

7    your little hand down, and you can put it back up when you

8    want to speak.  Thank you.

9           Mr. Rosen, this is a whole new world of technology.

10          MR. ROSEN:  I just enjoyed the reference to the

11   little hand, Your Honor, but thank you.

12          Your Honor, thank you very much.  And if you don't

13   mind, I'll probably tag team this with Mr. Bienenstock, as we

14   have in the past, because Items 2, 3, and 5 are somewhat

15   together; and they go to, also, the reference to the

16   supplemental declarations that might be filed.

17          Your Honor, we have been working very closely with

18   the AAFAF team, as well as trying to be responsive to the --

19   some of the objections that we felt needed a response to, and

20   what were reflected in the reply chart that we filed last

21   Wednesday, to make certain modifications to the Plan, most

22   notably, things like the releases that some people have raised

23   some questions about.

24          We've also been working with VTM, one of the dairy

25   producers, to arrive at some language that worked for them;

1  working with the med center's online language that referred --

2  that they did require, so we do have a bunch of modifications,

3  Your Honor, that address some specific objections, but of

4  course don't really affect in any way the economics associated

5  with the Plan.

6       Likewise, Your Honor, with the passage of the

7  legislation and the acceptance by the Oversight Board, we are

8  making modifications consistent with the legislation, most

9  notably, Your Honor, as you know, with respect to the removal

10  of the monthly benefit modification effect to the Plan of

11  Adjustment.  So all of that, Your Honor, we're trying to --

12  and we will be running by these parties over the next few days

13  the language to make sure that everything works out for them.

14       And we do anticipate, Your Honor, filing the Plan,

15  what I'll refer to as the Eighth Amended Plan on November 4th.

16  I know that, based upon the conversation you just had with

17  Ms. Dale, there was a reference to filing the amended

18  declarations by the 3rd.  I just may have to coordinate that,

19  Your Honor, and accelerate the filing of -- the filing of the

20  Plan to coincide, because I wouldn't want declarations to be

21  filed referring to a plan that has yet to be filed.  So --

22       THE COURT:  Yes.

23       MR. ROSEN:  -- we'll try and work that out, Your

24  Honor.

25       Likewise, we've been revising the form of

1    confirmation order.  As you know, Your Honor, consistent with

2    the Scheduling Order, we filed that Confirmation Order, and

3    then we received reservation of rights, or some objections, or

4    some outright comments to that.  Some of them have been

5    extremely informal and very helpful, like from fiscal agents

6    and things like that, Your Honor, to some comments from the

7    Monolines.  And we will be circulating that probably very

8    quickly to those parties, as we've tried to address those

9    concerns.

10            And we will refile that, Your Honor, when we file the

11    Eighth Amended Plan, and coincide that with the filing of

12    those amended or supplemental declarations, which, Your Honor,

13    to address Mr. Mintz' comment -- and Mr. Bienenstock will go a

14    little bit more in depth -- we do not anticipate that these

15    supplemental declarations will be in any way lengthy.  They

16    are also quite short, and just deal with the legislation

17    specifically.

18            So that is our timeframe, Your Honor.  As I said, we

19    had hoped to do it on Thursday, but if you really are looking

20    for those declarations on Wednesday, we will try to accelerate

21    that.  But I would love if we could possibly push that date

22    back, notwithstanding your comment, to Thursday to make it

23    easy, because I really want to give people an opportunity to

24    get back to us and try to integrate some of their concerns.

25            THE COURT:  Well, I understand that you want to be

1   able to have necessary and appropriate back and forth with

2   people whom you're trying to accommodate, but the objectors,

3   the Court, and the rest of the world also need to have

4   sufficient time before we begin the trial to review, and to

5   recalibrate any preparation, and to prepare efficiently for

6   the trial on the eighth amendment -- Eighth Amended Plan.

7            To the extent there are adjustments to objections or

8   any reaction that your amendments properly trigger before the

9   confirmation hearing starts, by midnight Wednesday is

10  necessary.

11           MR. ROSEN:  Midnight Wednesday will be fine, Your

12  Honor.  We'll make that work.

13           Your Honor, if I could, then I'd like to hand the

14  virtual mic over to Mr. Bienenstock, so he can talk about Item

15  5.  Even though it's slightly out of order, I think it really

16  dovetails with what I was just referring to.

17           THE COURT:  That's the notice to the employees and

18  retirees?

19           MR. ROSEN:  It is, Your Honor.

20           THE COURT:  All right.  Let me just -- it may be that

21  Mr. Bienenstock would speak to this, but do you anticipate

22  changes to your economic evidence and your feasibility

23  representations based on the economic impact of the changes

24  that I imagine you are making to make the Plan consistent with

25  Act 53?

1          Since you've just said that you're going to be

2     talking about short supplemental declarations, I'd like to

3     have a better idea of how that relates to your core evidence

4     regarding the operation and feasibility of the Plan.

5          MR. ROSEN:  Your Honor, yes, I think Mr. Bienenstock

6     will address the short -- the feasibility question right now.

7          THE COURT:  Thank you very much.

8          So, Mr. Bienenstock, and we're on Item 5.

9          MR. ROSEN:  Thank you, Your Honor.

10          MR. BIENENSTOCK:   Good afternoon, Your Honor, and

11     good morning to those in California.  And thank you for the

12     opportunity to do this.

13          As Mr. Rosen mentioned, I need to address what is in

14     the Agenda as Notice to Employees and Retirees, and as Your

15     Honor will see, that covers some of Your Honor's questions

16     about feasibility and updates to various pleadings.

17          THE COURT:  I'm sorry.  Just before you go on, I've

18     been asked to clarify that by midnight Wednesday, I mean 11:59

19     PM Atlantic Standard Time on Wednesday, which is also still

20     Eastern Daylight Time, since we are in a number of time zones.

21          MR. ROSEN:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Sorry, Mr. Bienenstock.

24          MR. BIENENSTOCK:  No problem.  Thank you.

25          So as Your Honor has mentioned, Act 53-2021, because

1   it is a conditional authorization of the new debt to be issued

2   under the Plan, is going to change some of the cash flow

3   projections, feasibility comments, et cetera, for the simple

4   reason that the requirement that everyone agrees to, that that

5   statute requires, in order for the debt authorization to be

6   effective, is that the Plan delete its monthly benefit

7   modification, which is the reduction of up to eight and a half

8   percent of monthly pensions above certain amounts.

9        So that will obviously cost the Commonwealth more

10  money, and that will cause, you know, a change in projections

11  based on available cash flow, et cetera.  And for that reason,

12  if nothing more, we have to change, or at least submit

13  updated -- or supplements to declarations that go into

14  projections having to do with cash flow of the Commonwealth.

15       The Act itself has very clear, express language that

16  expressly authorizes the new debt if the monthly benefit

17  modification is deleted from the Plan.  And the Board believes

18  that that's basically the proposition of Act 53-2021, that we

19  delete the monthly benefit modification, the new debt is

20  authorized.

21       There is other language in Act 53-2021, phrases,

22  sentences here and there referring to zero cuts to pensions.

23  And simply looking at Reorg Research, the afternoon the

24  legislation was made public, immediately there were those who

25  contended reportedly that for the new debt to be authorized,

1    it's not good enough for the Plan to delete the monthly

2    benefit modifications, but the Plan must also eliminate what

3    we've referred to previously as the pension freeze, and the

4    elimination of cost-of-living adjustments to pension payments

5    in the future.

6         What we've referred to as "the freeze" has

7    alternately been explained from time to time as the conversion

8    of the Commonwealth's old defined benefit plan to the new

9    defined contribution plan.  The freeze represents the concept

10   that the former defined benefits, which would increase as wage

11   levels increase, without any limit, et cetera, would no longer

12   be taking effect, because we're eliminating the defined

13   benefit plan and making it a defined contribution plan, where

14   employees will actually own their contributions to their

15   pensions going forward.

16         There are two issues that that different

17   interpretation of the statute creates.  One is, for the Court

18   to confirm the Plan, on several levels the Court would have to

19   decide if by eliminating the monthly benefit modification, but

20   not eliminating the freeze or the elimination of the

21   cost-of-living adjustments, the Court would have to decide if

22   that entitles us to the debt authorization.  Otherwise, the

23   Plan would not be implementable.  It also wouldn't satisfy the

24   conditions in the Plan with the GO debtholders.

25         The second issue that that creates is even if the

1    Court agreed with the Oversight Board that only the monthly

2    benefit modification needs to be deleted from the Plan, it

3    opens up the risk that, in the future, an employee, or

4    retiree, or some party in interest would contend in this court

5    or in another court that the debt authorization really is not

6    valid, because we didn't eliminate the freeze or the

7    cancellation of the cost-of-living adjustments.

8           The way the law's severability provision works is the

9    whole thing blows up, including the debt authorization, if we

10   haven't satisfied the conditions, and there's no limiting

11   factor that says the conditions have to be satisfied at

12   confirmation if -- from our point of view, if God forbid a

13   court were to decide two years later that there were other

14   conditions to be satisfied and they had not been satisfied,

15   the debt authorization could blow up in the future.

16          Those are obviously risks that the Oversight Board

17   cannot and will not take.  We don't believe the Commonwealth

18   should want to take them, or anyone holding or trading the

19   debt should want to take or would take.  And the Court might

20   have strong feelings about whether it would want to launch a

21   reorganized Commonwealth into that risk situation.  So suffice

22   it to say, from the Oversight Board's point of view, it's an

23   intolerable risk, and it has created the need for certainty

24   that is binding on all parties in interest.

25          And the way we propose to procure that certainty, one

1    way or the other, whichever way the Court interprets the

2    statute, is to give notice to all current and former employees

3    and retirees that, in connection with confirmation, the Board

4    will be requesting certain additional findings in the proposed

5    confirmation order, making crystal clear what the statute does

6    and does not require in order for the debt authorization to be

7    valid and to be permanent.

8          And today, possibly within a matter of minutes or

9    hours, we'll be filing an urgent motion with Your Honor asking

10   Your Honor to approve the form of notice we proposed to serve

11   largely by publication, obviously by e-mail or mail where

12   possible.  But since the Oversight Board doesn't personally

13   have addresses and contact data for employees, we're going to

14   be asking for publication notice, except where Prime Clerk

15   does happen to have and can use electronic data for other

16   notice.  We'll obviously be giving actual notice to the

17   unions, and the government, and the people that we know and

18   have contact data for.

19         So we'll be asking the Court to approve a form of

20   notice which will notify all parties in interest of the

21   findings we will be asking for, a time to object to them, and

22   a time for the Oversight Board to reply to the objections.

23   And these dates will occur during the confirmation hearing,

24   but in plenty of time so that well before evidence is closed

25   and there is final argument, or whatever the Court desires at

1      the end, all the records will be complete as to these

2      additional findings.

3              And we believe that if we proceed this way, then the

4      findings Your Honor makes will not only be binding for

5      purposes of confirmation, but will be binding on all parties

6      who were served with this notice, with the express notice of

7      the relief we're seeking, and it will eliminate, to the

8      maximum extent possible, the risks I mentioned earlier going

9      forward.

10             There is -- as Your Honor probably knows, there's a

11     lot of precedent for this in cases where this procedure was or

12     was not followed, you know.  Where it was not followed perhaps

13     was the ignition switch defect in the GM bankruptcy, but it

14     was followed in other situations where everyone was given

15     notice and, therefore, bound by the confirmation order.

16             That's basically what I wanted to explain to the

17     Court and all the parties attending this hearing, and I can

18     answer whatever questions the Court may have.

19             THE COURT:  Well, let me start by asking you whether

20     this -- and I see that Mr. Hein has his hand up, but I'm going

21     to ask a couple questions first, and then I'll call on

22     Mr. Hein.

23             First, is this notice one that is going to provide a

24     legal, analytical rationale for the requested interpretation,

25     or is it just going to say that the Court is going to ask for

1    the interpretation and, you know, the purpose of it is X?  So

2    please describe what you have in mind there.

3              MR. BIENENSTOCK:  Okay.  Sure, Your Honor.

4              Currently, the form of notice we're proposing simply

5    notifies everyone of the proposed findings and conclusions

6    we'll be asking for in the confirmation order.  The urgent

7    motion that we're about to file summarizes the rationale, and

8    I've summarized it in my earlier remarks, as to why we think

9    the statute has a plain meaning.  And it is what we say it is,

10   but the notice does not provide that rationale.

11             THE COURT:  So how is it that on, you know, what will

12   be quite short notice, you believe that without the context

13   that you've provided here today, the employees and retirees

14   who are the targets of the notice can make an appropriately

15   reasoned decision as to whether to object?

16             MR. BIENENSTOCK:  As our urgent motion says, and as

17   I've explained, the only express language in the statute is

18   language that says that in section 104, that the debt is

19   authorized if the monthly benefit modification is deleted from

20   the Plan.

21             We believe that any fair reading of the statute would

22   be that that is all that is required, but as I said to Your

23   Honor, there are phrases here and there in the -- in the Act

24   that refer to zero pension cuts.  So what we were envisioning,

25   Your Honor, is that someone who wants to make a case that we

1   have to do more than just eliminate the monthly benefit

2   modification, they have to go through the statute and make a

3   case out of these bits and phrases that we don't think could

4   possibly be meritorious.  But that's what they have to do.

5           Our -- we didn't think that our telling them the

6   obvious, that the plain meaning is what we're saying it is,

7   because that's what the statute says, would tell them anything

8   they don't know.  But given Your Honor's question, we can

9   certainly fix that if Your Honor would prefer.

10          THE COURT:  Well, considering that you are planning

11  to send this to committees, but you are sending it to a bunch

12  of -- not a bunch, but a huge number of individuals who

13  probably haven't memorized the language of the statute, and so

14  if you are looking for me to make an interpretive

15  determination regarding the meaning of the statutory language,

16  it seems to me that at a minimum you need to propose some sort

17  of legal conclusion as to the -- as to why the references to

18  zero benefits means something.  You don't alter the meaning of

19  the express condition of removing the monthly benefit change,

20  so --

21          MR. BIENENSTOCK:  Your Honor, just -- go ahead.  I'm

22  sorry.

23          THE COURT:  No.  Please go on, Mr. Bienenstock.

24          MR. BIENENSTOCK:  I wanted to be clear on my

25  understanding of what Your Honor just said, because what I'm

1   not clear about is whether Your Honor was suggesting or

2   directing us to articulate our proposed additions to the Order

3   in a way that spells out the rationale, or whether we

4   separately, in the notice we'll be sending to everyone, simply

5   spend a few paragraphs or a few sentences explaining the

6   rationale.

7           THE COURT:  Well, now you are proposing -- we have a

8   number of different pieces here.  You ultimately are proposing

9   an order for me to sign.  You've also served proposed findings

10  of fact and conclusions of law, and in order for me to make a

11  legal conclusion that is ultimately resting on an

12  interpretation of the new statute, I need to have some legal

13  and textual rationale for that, given -- rationale for

14  understanding that this is a matter that is in controversy and

15  susceptible to -- and that needs to be resolved.

16          Also, then, if I'm going to grant your application,

17  include whatever language it is you are looking for in your

18  order, and, you know -- and also, I'm sure everybody

19  recognizes that this is a topic that was just put to me, and I

20  did not have an opportunity to think in advance about how to

21  design this process; but it does seem to me that both the

22  Court and the parties to whom notice and the opportunity to

23  object is being given should have -- and I am directing you to

24  provide, whether it is by a supplementation of your proposed

25  conclusions of law and findings of fact, in addition to the

1    request for the ruling and some excerpting of this new

2    language in the notice to the employees and retirees, or by

3    some other means that you'll describe to me, the employees and

4    retirees need to have context and an explanation of your

5    argument as to why it is appropriate for the Court to

6    interpret the statute in this particular way.

7        MR. BIENENSTOCK:  Okay.  Your Honor, the good news is

8    there is a very short list of sentences and phrases in the new

9    statute that go one way or the other on this, so it's really

10   not a problem for us to revise the notice that we'll propose

11   to send to everyone to include that, to explain what there is,

12   and why we read it the way we do, and why we're asking for

13   what we're asking for.

14       So my comments, if we haven't filed it yet -- well,

15   if we have filed it, we'll file a revised urgent motion.  If

16   we haven't filed it yet, we'll do what I just said before we

17   file it to provide the rationale that Your Honor is referring

18   to.

19       THE COURT:  Thank you.  I will also ask that you file

20   an English version of the statute, because we have not been

21   able to track one down through our public sources.

22       MR. BIENENSTOCK:  Sure.  Sure, Your Honor.

23       THE COURT:  Okay.  What is the timetable that you are

24   proposing for the urgent motion, for objections in response to

25   the notice when it does go out, and reply?

1        MR. BIENENSTOCK:  I think we'll be able to revise the

2    urgent motion and get it on file today.  Depending on how long

3    this hearing goes, it may be this evening.  It may be earlier

4    if it ends earlier.

5        I think the way we've set it up was we were leaving

6    it to the Court to say when people needed to respond to the

7    urgent motion, and we have found out from Prime Clerk the

8    number of days notice they needed to get things advertised and

9    all, so that was built into the timing.  The way it worked out

10   at the end of the day was that objections to the requested

11   relief would have to be filed by November 14, and replies to

12   those objections by I think the 18th.

13       THE COURT:  Thank you.

14       So I'll call on Mr. Hein now.

15       MR. HEIN:  Thank you, Your Honor.  This is Peter

16   Hein.  Can you hear me?

17       THE COURT:  Yes, I can.  Thank you.

18       MR. HEIN:  Great.  So I just am reacting to what I'm

19   hearing as well, but I had several concerns.  I just wanted

20   to, frankly, put them as a matter of record.

21       I have not -- I have been able to find on the

22   internet what I think may be the statute.  I'm not sure.

23   There is English at the end of the Spanish statute.  I don't

24   know if it's official, but this phrase is an extremely

25   material point from the point of view of individuals like me

1   who are going to be getting these 12 fragments.  And given our

2   relatively modest individual holdings, whereas a major

3   institution can deal with the uncertainty by selling pretty

4   promptly after the effective date, and has liquidity, the

5   Puerto Rico investors get one bond, rather than 12 splitters,

6   they can sell with some element of liquidity, retail investors

7   like me in the 50 states are basically going to be stuck with

8   these fragments, or else have to incur significant losses on

9   top of our existing losses just to sell in the illiquid market

10  for bits and pieces and fragments of splinter bonds.

11          So I think I have to look at this from the point of

12  view of where is this going to stand over 25 or 30 years?  Is

13  Puerto Rico going to stand behind its obligations?  Is someone

14  going to try to come up with some way of getting out of it?

15          And, you know, I'm in a position where right now we

16  have a constitutional provision that gives the bondholders, GO

17  bondholders priority.  That's now being effectively abrogated.

18  They're seeking to preempt state statutes that provide for the

19  first payment of GO bonds.

20          I would certainly contend that the GO bondholders

21  like me have a security position, but even if one disputes

22  that, what I'm now faced with is a situation where I'm going

23  to have fragments of bond.  I can't sell them.  And then I'm

24  going to be at the mercy of someone coming up five years from

25  now, ten years from now, don't want to pay, can't pay, well, I

1    didn't get notice -- based on the past issues with Prime Clerk

2    getting notices out, there's no reason to think that everyone

3    who's entitled to notice is going to get it.

4         Frankly, it would be my position that retail

5    investors, who I think are most at risk in this, retail

6    investors ought to be given a notice that lays this out and be

7    given a chance to revote.  So I wanted to be on record with my

8    objections and concerns.  And I think, to be more specific, I

9    have to wait to see what is actually filed by way of an

10   amended plan, but I do have very serious concerns.

11        And when I -- as I read this statute, I'm looking at

12   Article 605, Article 603 on severability.  Mr. Bienenstock

13   referred to these positions.  Personally, I find them

14   extremely troubling, and I think, Your Honor, that thousands

15   of individual unrepresented retail investors are being put in

16   a position where they are going to be most effected in terms

17   of their future payment streams over the next 25 or 30 years

18   by what occurs here.

19        And I just, again, want to register my objection.

20   Thank you.

21        THE COURT:  Thank you.

22        Mr. Bienenstock, will you respond?

23        MR. BIENENSTOCK:  Thank you, Your Honor.

24        Well, first, the Oversight Board's goal on behalf of

25   the debtors is to eliminate the very risk that Mr. Hein is

```
1    referring to.  That's why rather than simply go forward with

2    the confirmation hearing, we wanted to give this notice so

3    that everyone would be bound, and that's also why, taking into

4    account timing, and logistics, and such that we're asking in

5    our urgent motion for permission to use publication notice as

6    well, which should cover everyone.

7            So I think that that addresses Mr. Hein's concerns as

8    best as they can be addressed, and I think it's actually a

9    pretty good way of addressing them.  I obviously don't know if

10   he would agree.

11           THE COURT:  I think Mr. --

12           MR. BIENENSTOCK:  I think his concerns regarded --

13           THE COURT:  I hear Mr. Hein saying that if this

14   doesn't work, and perhaps even if it does, but -- there's

15   litigation down the road, the consideration being provided

16   under the Plan for the retail investors has become materially

17   more uncertain; and so he is arguing that I should stop the

18   presses and allow a revote, or at least saying that he might

19   make such a request.

20           Is there anything that you want to say about that

21   aspect of his comments at this point?

22           MR. BIENENSTOCK:  Sure, Your Honor.  To be entitled

23   to revote, the Plan has to be changed in a material and

24   adverse manner in respect of the entity wanting to revote, and

25   the Plan is not being changed at all in a material and adverse
```

1   manner.   The retail investors and all of the GO bondholders

2   are receiving exactly what the Plan has said all along they

3   will receive.

4          And actually, you know, as Mr. Hein probably knows,

5   the Oversight Board has believed all along we can do a Plan

6   without legislation, but it was to further accommodate holders

7   of the GO debt that we sought legislative approval.   And we

8   got it, based on satisfying this condition.   So it would be

9   quite, you know -- it would be really turning things upside

10  down to now say that we got what they wanted, but now they

11  think there's more risk and they want a revote.

12         I mean, that's the opposite of what the dialogue

13  between the bondholders and the debtors has been all this time

14  that the Plan was negotiated.

15         THE COURT:   Thank you.

16         Mr. Rosen has his hand up.

17         MR. ROSEN:   Thank you, Your Honor.

18         I just would like to add that the argument that

19  Mr. Hein makes regarding fragmentation of recoveries is the

20  same argument that the Court heard and overruled in connection

21  with the COFINA Plan.   Mr. Hein and all retail people are

22  getting the same swath, if you will -- or swatch of recoveries

23  that everyone else is, and it's because of the need to give

24  those sorts of recoveries across the entire platform of

25  creditors, and that they be treated fairly, that there are

1    multiple bonds being issued.

2            You know, I understand his concern about getting

3    smaller pieces, Your Honor, but he's being treated exactly the

4    same as all other creditors.  Thank you, Your Honor.

5            THE COURT:  Thank you, Mr. Rosen.

6            Let's go on -- Mr. Bienenstock, unless you have more

7    on number five, in which I'm looking forward to your filing,

8    shall we go on to three and -- well, number three, which is

9    the proposed confirmation order, is that subsumed in

10   Mr. Rosen's presentation regarding the filing of the Eighth

11   Amended Plan and related documents?

12           MR. ROSEN:  It is, Your Honor.  We'll do it all at

13   the same time.

14           THE COURT:  All right.  Thank you.  So we have

15   covered two, three, and five.

16           Four is objections to deposition designations.  I

17   don't recall that those objections or any counter designations

18   have been filed, so would somebody set me straight as to what

19   the status of filings is at this point?

20           MR. FIRESTEIN:  Yes, Your Honor.  This is Michael

21   Firestein of Proskauer on behalf of the Oversight Board.

22           If I might, I think I -- your remark is exactly the

23   reason why we wanted to afford some clarity to this.  May I

24   proceed?

25           THE COURT:  Yes, please.

1              MR. FIRESTEIN:  So I think pursuant to the -- again,

2    Michael Firestein of Proskauer on behalf of the Oversight

3    Board.  Our interpretation of the procedures order was that

4    everybody, to the extent they had any deposition designations,

5    the responding parties or other parties needed to serve

6    objections to those by Saturday evening, which people did.  I

7    don't recall -- or at least I don't recall seeing one, that

8    there was a mechanism for resolving those objections, and so

9    that's the reason why this item is on the Agenda.

10             And to avoid troubling the Court relative to this, I

11   will tell you that of the designations that were served, I

12   believe the only objections that were raised were ones by the

13   Oversight Board.  And even with respect to those, they were

14   quite modest.  There were a handful to a couple, and mostly

15   relating to completeness and adding a few lines one way or

16   another.  But I'm not asking the Court to take my word for

17   that.

18             The purpose of this was to establish a mechanism, and

19   I can think of two ways to do this.  One is to create some

20   sort of -- because the Court does not have the deposition

21   transcripts on which to be able to make any ruling relative to

22   the objections, so there are two ways to do this.  I'll

23   recommend, if I could, just on my own client's behalf, the

24   second way, which is if and when that testimony, if it's

25   necessary, is offered into evidence, that to the extent that

1    there is an objection that needs to be resolved, it be done

2    that way, because I believe each of the witnesses, perhaps

3    with one exception, is already slated to testify at the

4    confirmation trial, and will be available for

5    cross-examination by the party -- I think it's the DRA parties

6    who have essentially offered up the designations.  So that

7    might be the easier way to do this.

8         As an alternative, we can provide those designations

9    and the limited objections with the transcripts to the Court

10   in advance.  I mean at some time this week, or when the Court,

11   you know, directs that to be the case, but they may not be

12   necessary to be ruled upon, again, because it may not be

13   something that is actually ultimately offered by the

14   proffering party, because those witnesses will be available

15   for examination, and the transcripts will be used for whatever

16   their usual purposes would be.

17        So I'll stop and just ask the Court what the Court's

18   preference is on that score.

19        THE COURT:  Well, my preference would be the first

20   method, because, as you say, it may be that the witness will

21   appear for cross-examination, and it may not be necessary

22   to -- may or may not be necessary to use the designated

23   deposition excerpt.

24        So what I will require is that to the extent it is

25   anticipated that there will be a use of and controversy

1    regarding the deposition designations as to a witness, the

2    notice that is due at two o'clock the day before as to

3    witnesses to be examined should flag the issue; and the

4    material should be provided to the Court in electronic form

5    along with that notice as to what the designations and

6    objections or counter designations are, and the parties'

7    positions, and the deposition to which the Court would need to

8    refer in resolving it.  Then, if necessary, we can talk about

9    it the next day.

10           Does that seem reasonably efficient?  Mr. Firestein,

11   you're muted.  I didn't hear anything you said.

12           MR. FIRESTEIN:  I said, may I respond?

13           THE COURT:  Yes, please.

14           MR. FIRESTEIN:  Thank you.

15           I think that that is perfectly fine.  We'll work with

16   -- I believe it's just the DRA parties who are involved with

17   us relative to this.  I don't imagine there will be any

18   complications.

19           And are the existing procedures orders -- I just

20   don't have them committed to memory.  Do they provide for this

21   mechanism already, so there's no need for a further order, and

22   we'll just subsume this deposition issue within whatever those

23   day-before evidentiary issues might be involved?

24           THE COURT:  I don't think that the procedures orders

25   specifically address this, and so I am making this direction

1    on the record, but we will also file a supplement to the

2    procedures order covering this.

3            MR. FIRESTEIN:  Very well.  That's fine.  Thank you,

4    Your Honor.  That was the extent of the issue.

5            THE COURT:  Thank you.

6            All right.  The next item is the parties requested

7    time -- so sorry.  Just one moment.  We thought we saw a hand,

8    but now we don't.  Oh, we do now.  Mr. Mintz and Mr. Cepeda.

9    So first, Mr. Mintz?

10           MR. MINTZ:  I think Mr. Cepeda might be responding on

11   the prior topic, so it might make sense for him to go first.

12           THE COURT:  Okay.  Mr. Cepeda.

13           MR. CEPEDA:  Sure, Your Honor.  Thank you.  Alejandro

14   Cepeda on behalf of AmeriNational.  I just want to say I agree

15   with Your Honor's suggested procedure for dealing with the

16   deposition designations.  Thank you.

17           THE COURT:  Thank you, Mr. Cepeda.

18           Mr. Mintz?

19           MR. MINTZ:  Yes.  So I'm not a hundred percent sure

20   what's left to cover in the process, but I just want to make

21   sure, as we move on, that we come back to my questions

22   regarding how to proceed with the new testimony.  And maybe

23   that's coming up here in the questions about

24   cross-examination, but I know we were moving on.  And we've

25   covered some of those topics already, so I had a handful of

1  questions.  I can ask them now or I can wait.  I just didn't

2  want to move past them.

3       THE COURT:  All right.  So this is regarding your

4  comment that had anticipated the Oversight Board's oral notice

5  today that, in connection with the Eighth Amended Plan, it was

6  likely to serve additional or supplemental declarations and

7  factual material reflecting the change in the Plan and the

8  economic changes resulting from the elimination of the monthly

9  benefit; is that correct?

10       MR. MINTZ:  That is correct, Your Honor.  To the

11  extent it impacts feasibility, which we've heard already, and

12  potentially best interest arguments, and other financial

13  arguments, our witnesses will also have testimony that they

14  need to consider.  So I can't quite tell where we are in the

15  process, but we want to understand what's going to be provided

16  to us, when, and then obviously what's expected of us, and,

17  additionally, whether we'll have the opportunity to request

18  additional documents to the extent that's relevant, when, and

19  how that might work.

20       THE COURT:  I think the best way to deal with this is

21  to require the Oversight Board and the DRA parties to begin

22  meeting and conferring once the information is filed, and to

23  file what I hope will be a joint proposal as to deadlines and

24  procedures on Friday.

25       Mr. Rosen, is it -- or, yes, Mr. Rosen, can you give

1   something of an advanced preview picture to Mr. Mintz and

2   colleagues before midnight Wednesday, so that these

3   discussions can be as informed as possible under the

4   circumstances, and we can make use of the time in as efficient

5   a way as possible before the scheduled commencement of the

6   hearing?

7           MR. ROSEN:  Your Honor, I think we'll be able to set

8   up a call with him.  Yes, we will do that.

9           THE COURT:  All right.  So you'll set up a call with

10  him before you file?

11          MR. ROSEN:  Yes, Your Honor.

12          THE COURT:  Then promptly after you've filed, when

13  he's in more of a position to know what you've done, you will

14  meet and confer in an effort to come up with a joint proposal

15  to address any issues regarding additional evidence or

16  discovery?

17          MR. ROSEN:  Yes, Your Honor.  We will do that.

18          THE COURT:  Mr. Mintz, does that satisfy you as a

19  starting point of the procedure?

20          MR. MINTZ:  Yes, Your Honor.  In the short term of

21  course we're prepared to sit with Mr. Rosen and his team, and

22  follow that with a meet and confer.  We'll obviously want to

23  work through, as I said, the when and how we'll get

24  information, and then the opportunity to take any further

25  discovery if it's applicable.  And perhaps Mr. Rosen will

 1   address all that with whatever they provide to us right up

 2   front.

 3            THE COURT:  Very good.  You all, of course, know

 4   where to find Judge Dein and me.

 5            MR. MINTZ:  We do, Your Honor.  Thank you.

 6            THE COURT:  Okay.  Thank you.

 7            All right.  So the next Agenda item, which is

 8   denominated no. 6, is the parties' requested time for

 9   cross-examination, and a summary chart was provided as part of

10   the -- as part of the Agenda.  So of course you would have

11   that timing.  Any anticipated redirect will also affect timing

12   of the actual presentation of evidence.  So what precisely is

13   the issue that the Oversight Board would like me to address

14   now?

15            MR. MERVIS:  Good afternoon, Your Honor.  Michael

16   Mervis from Proskauer Rose for the Oversight Board.

17            The reason that we put this on the Agenda was simply

18   to give the Court an opportunity, if the Court had questions

19   about any of the parties' time estimates, that those could be

20   raised now, and we could meet and confer in response to those

21   questions.  But, otherwise, that was the only real reason for

22   putting this on the Agenda.

23            THE COURT:  All right.  There's someone who has a

24   hand up who I'll call in a moment.  I do not have particular

25   questions about the request at this point except to say that,

1   you know, to the extent anyone begins to think that their

2   request may be too short or too long, I urge the parties to

3   reach out and meet and confer, so that we don't have big

4   surprises the day before, as the report as to expected

5   evidence on a given day is being prepared.

6           I'll say again more directly what I alluded to a

7   minute ago.  The two o'clock notice to the Court as to what's

8   expected the following trial day should anticipate any

9   expected redirect and recross, as well as estimating what we

10  can get through in a given day.  So communications between the

11  parties concerned will be necessary to facilitate smooth

12  conduct of the trial.

13          Now, let me call on Mr. Capdevila for Finca Matilde,

14

15          MR. CAPDEVILA:  Yes.  Good afternoon.  For the

16  record, Eduardo Capdevila on behalf of Finca Matilde, Inc.

17          THE COURT:  Good afternoon.

18          MR. CAPDEVILA:  Yes.  I would like to address the

19  Court regarding an issue that is not directly related to

20  cross-examination, but it is related and it will affect the

21  timeframe of the Court, because I believe there are two

22  certain issues that remain lingering as to the logistics of

23  the confirmation hearing, if I may?

24          THE COURT:  Yes, you may.

25          MR. CAPDEVILA:  Well, first, we would like to point

1  out that while counsel for the Board approached us as to

2  opening and closing arguments, our -- there are several

3  objectors to the Plan, such as still my client, that our

4  objections are not procedural, do not require evidence, so

5  it's more of argumentation.  And I would like to know if the

6  Court is going to hear that like on opening and give space for

7  counter arguments, or if that's going to be at closing, or

8  perhaps at a specific date?  I don't know what's the Court's

9  position on that.

10         And that brings us also to a second point, which I

11  think is very important, which is regarding the interventions

12  for the Department of Justice on the constitutional

13  challenges.  Pursuant to Rule 5.1(c), the United States -- the

14  Attorney General has 60 days to appear, and according to the

15  rule, the Court cannot -- may not, I'm sorry, enter the

16  confirmation order unless the Attorney General has waived that

17  right.

18         That time has not been shortened, and from the date

19  it would -- Finca Matilde filed its constitutional challenge,

20  which was certified by the Court already at docket 18620, the

21  United States would -- the Department of Justice would have

22  until December 18 to appear.  And that's off the schedule of

23  the court.

24         So that would have an effect on the Court unless that

25  time -- the Department of Justice deadline is shortened by the

1  Court, which shortening is not -- shortening of that specific

2  term is not prohibited by Rule 90 -- 9006.

3          And those are my client's concerns on the

4  confirmation hearing and on the logistics.

5          THE COURT:  Yes.  Now, other than filing the

6  certification, the Court has not been in communication with

7  the Department of Justice as to any particulars of positions.

8  Has anyone from the Oversight Board or AAFAF had such a

9  communication?

10         Mr. Rosen?

11         MR. ROSEN:  Yes, Your Honor.  Thank you very much.

12         I don't know if Mr. Matthew Troy from the U.S.

13  Attorney's Office is on the phone, but -- or the Department of

14  Justice, but he and I did speak about that very issue on

15  Friday.  He mentioned to me that they were taking it very

16  seriously.

17         There was another pleading filed, I believe, by

18  Mr. Hein on Friday that I forwarded to him.  It was another

19  challenge.  So they are aware of this, Your Honor.  Mr. Troy

20  did say that they were looking at this and would be trying to

21  move as expeditiously as possible.  I don't know of a

22  timeframe in response to what counsel just said, whether or

23  not they will do it before the December 18th date or just on

24  that date, Your Honor; but I know that they are working on

25  this issue, and it's being referred internally.

1          THE COURT:  All right.  Well, we will -- I think we

2     need to press ahead with what we have control over in terms of

3     making a record of the arguments that have been and will be

4     articulated, and the legal constraints on the timing of any

5     Court rulings and the intervention of the Department of

6     Justice are what they are.  We will look forward to further

7     word from the Department of Justice.

8          As to the presentation of arguments that are legal in

9     nature, rather than factual, my anticipation had been that if

10    the Court would be -- considering, of course, the written

11    submissions, and then that parties making such arguments might

12    want to make some -- participate in the openings, at least to

13    the extent of outlining the contours of the argument, and how

14    it does or doesn't relate to proof expected to be received,

15    and then that the bulk of the argument would be in connection

16    with closings, again, bearing in mind that the Court will have

17    reviewed the written submissions, and so it won't be necessary

18    for counsel to tell me in detail what is in the written

19    submissions.

20         Is that acceptable, Mr. Capdevila, or do you wish to

21    request something else?

22         MR. CAPDEVILA:  For the record, Eduardo Capdevila,

23    once again, for Finca Matilde.  We would then request leave to

24    file a sur-reply to just -- short sur-reply as to the

25    Board's -- the Board's reply motion in regard to that issue,

1   since there will not be an exchange of, you know,

2   argumentation, cross-argumentation.

3           THE COURT:  Does the Board have any objection to a

4   brief sur-reply?

5           Mr. Rosen.

6           MR. ROSEN:  Sorry, Your Honor.  Thank you very much.

7           With respect to your timing, Your Honor, we actually

8   agree that the time to lay these issues out before the Court

9   would be in the context of the closing arguments themselves,

10  where to the extent that there are any issues that remain

11  outstanding, we could address them, as well as counsel for

12  Finca Matilde.  And we think that would be sufficient for the

13  back and forth.

14          We do not think that there is a need for further

15  briefing on this issue.  The Court set out very carefully what

16  the procedures were.  Our motion, Your Honor, or --

17  confirmation itself, objections, and then the reply, we do

18  not -- Your Honor, with the limited time left, we don't think

19  we should be getting involved in sur-replies or even the need

20  for us then to refile a sur-surreply.  So we would think, Your

21  Honor, that this has been already fully briefed, as the Court

22  already indicated, and we'll just move forward with closing

23  arguments and addressing -- and the objections, to the extent

24  the Court has issues with them.

25          THE COURT:  I see that counsel for -- that counsel

1    for Suiza and counsel for PFZ have their hands up, as well as

2    counsel for AAFAF.  I should have called on Suiza and PFZ

3    before calling on the Oversight Board.

4           So, first, Mr. Gonzalez Valiente for Suiza.

5           MR. GONZALEZ VALIENTE:   Good morning, Your Honor.  I

6    appreciate the opportunity to address the Court.  We just want

7    to join Mr. Capdevila in the request for filing a brief

8    sur-reply.

9           There is certain case law and arguments that were not

10   addressed in our opposition to the objection and the position

11   of the Board, and we would really appreciate a chance to file

12   a brief sur-reply also, Your Honor.

13          THE COURT:  Thank you.

14          For PFZ, Mr. Carrion Baralt.  You have to unmute,

15   sir.  I can't hear you.

16          MR. CARRION BARALT:  David Carrion Baralt on behalf

17   of PFZ.  May it please, the Court.

18          Your Honor, we would like to join the petition of

19   both Finca Matilde and Suiza Dairy.  As brother counsel just

20   mentioned, the Omnibus Reply that the fiscal -- Oversight

21   Board filed includes certain number of issues that need to be

22   addressed before the Court makes a final decision on that.  So

23   we would join their petition for a short reply, sur-reply in

24   this case.

25          THE COURT:  Thank you.

1            Now, Mr. Friedman.

2            MR. FRIEDMAN:  Your Honor, it's Peter Friedman from

3    O'Melveny & Myers.  I don't wish to be heard on sur-reply

4    issues.  My comments relate to a cross-examination issue.  So

5    if you'd prefer to conclude this line of it, you can come back

6    to me if that's better for the way you're flowing this

7    discussion.

8            THE COURT:  Yes.  It is better for me to finish with

9    the sur-replies.

10           Each of Mr. Capdevila's client, Suiza, and PFZ may

11   file a sur-reply of no more than eight double spaced pages,

12   and that may be filed by Friday, which is Friday, the 5th of

13   November.

14           MR. GONZALEZ VALIENTE:  Thank you, Your Honor.

15   Attorney Gonzalez Valiente for the record.

16           MR. CAPDEVILA:  Thank you, Your Honor.  Eduardo

17   Capdevila on behalf of Finca Matilde.

18           MR. CARRION BARALT:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           I'm sorry.  Mr. Rosen, you put your hand up again?

21           MR. ROSEN:  I did, Your Honor.  Just we obviously

22   don't -- we were responding to all of the issues that have

23   been raised initially in their objections, and to the extent

24   that they are now going to be raising something different,

25   Your Honor, I would just ask the Court if we could reserve the

1    right to respond, if necessary, in something short and sweet

2    to whatever they may be placing before the Court on Friday.

3          I don't know if it will be necessary, Your Honor, and

4    I hope that it won't be, but I just have no clue as to what

5    they're going to be doing.

6          THE COURT:  Yes.  Well, to the extent that new

7    matters are raised, a sur-reply is not an opportunity to open

8    new issues for discussion, and so a sur-surreply on anything

9    that was not implicated by the reply filing would not be

10   something I would entertain supplemental briefing on.

11         So you can -- your right to request the ability to

12   make a short additional submission as to anything that is

13   pertinent and within the proper scope of a reply, and to flag

14   anything you believe is not within the proper scope of a reply

15   is reserved.

16         MR. ROSEN:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         So, Mr. Friedman.

19         MR. FRIEDMAN:  Yes, Your Honor.  It's Peter Friedman

20   on behalf of AAFAF from O'Melveny & Myers.

21         Your Honor, one of the witnesses listed on the

22   cross-examination list is listed as an AAFAF witness, Tim

23   Ahlberg.  We're just -- we don't know exactly what to do with

24   that.  We did not submit a declaration for Mr. Ahlberg.

25   Mr. Ahlberg was listed by the Monolines as a witness.  They

1  did not submit a declaration or a witness statement from him.

2  So, you know, we certainly weren't intending on making

3  Mr. Ahlberg available.

4  THE COURT:  Mr. Friedman, you've frozen.  I don't

5  know if you can hear me.  Let's wait a minute to see if Mr. --

6  Okay.  Mr. Friedman, you're back.  You had frozen for a

7  minute.

8  Mr. FRIEDMAN:  Thank you.  Sorry, Your Honor.

9  So we were not intending on making Mr. Ahlberg

10  available, because he has not been tendered as a witness by

11  any party.  You may recall that he provided declarations in

12  connection with the Lift Stay Motion and the summary judgment

13  motions, which -- deposition testimony, as well as a

14  declaration in connection with the original Lift Stay Motion.

15  So --

16  THE COURT:  Mr. Friedman, may I interrupt you?  I

17  think what I'd like to do, since it's apparently DRA that had

18  listed a desire to cross-examine Mr. Ahlberg, as to whom no

19  declaration has been tendered, I'd ask that counsel for DRA

20  come on and explain what they have in mind, or whether in the

21  absence of a declaration, they would no longer be seeking to

22  cross-examine Mr. Ahlberg.

23  MR. GARCIA SOLA:  Your Honor?

24  THE COURT:  Yes.

25  MR. GARCIA SOLA:  This is Mr. Garcia Sola.  Can you

1   hear me?

2           THE COURT:  Yes.  Good afternoon, Mr. Garcia Sola.

3           MR. GARCIA SOLA:  Good afternoon.

4           If I may just speak to the declaration.  I don't know

5   whether Mr. Friedman is aware, but the declaration is

6   something that we were working on together with some other

7   attorneys at AAFAF.  My recollection is that it was Ashley.

8   And we agreed to a stipulation, and the declaration was

9   stipulated.  I believe it wasn't just the DRA parties, but

10  also the Monolines that participated in that stipulation.

11          What we wanted was to have a declaration, which we

12  understood would be used by AAFAF for Mr. Ahlberg as part of

13  their case-in-chief, so that we could then participate in

14  cross-examination of the witness.  It was something that we

15  were working on for, you know, days, if not weeks.

16          We finally arrived at a stipulated declaration, and

17  we understood that AAFAF would be submitting them to the Court

18  as their witness' declaration, so that we could then

19  cross-examine the witness.  That's where we left it, Your

20  Honor.

21          MR. FRIEDMAN:  Your Honor, may I be heard?

22          THE COURT:  Yes.  Is that -- is that Mr. Friedman?

23          MR. FRIEDMAN:  Yes, Your Honor.  Yes, Your Honor.  I

24  just got -- that's not, at least from my perspective, what

25  happened.  I believe what happened is the monolines requested

1    or listed -- if you go back and trace through it, the

2    monolines listed Mr. Ahlberg as a potential witness on the

3    initial witness disclosure deadlines.  AAFAF did not.  As the

4    Court knows, AAFAF is not a Plan proponent.  AAFAF listed one

5    potential witness, Mr. Bacha, whose declaration has

6    subsequently been withdrawn.

7           The monolines and the DRA parties both noticed

8    Mr. Ahlberg's deposition in some capacity.  He may have also

9    been a potential 30(b)(6) witness.  The parties then, and my

10   colleague, Ms. Pavel, who Mr. Garcia correctly identified,

11   negotiated with both parties over the following, which was if

12   you don't wish to take a deposition of Mr. Ahlberg, we would

13   provide you with a written declaration in lieu of deposition

14   testimony.

15          No party submitted that declaration, either as an

16   exhibit or as a witness statement.  AAFAF certainly didn't,

17   because, again, we're not Plan proponents, and this is not an

18   issue that is AAFAF -- dealt with AAFAF's objection.  The

19   monolines opted not to.  I think, and I won't speak for

20   Ms. Miller, but what I understood generally is they believed

21   ultimately the issues he might testify on were irrelevant,

22   because these were issues of law.

23          I think that's probably borne out by the Court's

24   decisions in connection with both the administrative expense

25   motion and the dismissal of the DRA adversary proceeding last

1  week, with -- the subject of Mr. Ahlberg's testimony is

2  really, can anybody tell what happened with Act 30-31

3  revenues, and sort of how do they get traced as a cash matter?

4  And so no party submitted this as a declaration.

5       To be very clear, Your Honor, AAFAF never, ever, ever

6  told anybody that it was going to submit witness testimony.

7  And that's really antithetical to the position we took in our

8  interrogatory responses and requests for admission, where we

9  noted on multiple occasions that we were not Plan proponents

10  or not a party that intended to -- you know, this was really

11  Board -- this would be something the Board would be

12  submitting, if anybody, or this kind of testimony would be

13  something that -- the Board is the debtors' Plan proponent.

14  It would be putting forward, if anybody.

15       And I think I -- certainly the Board didn't elect to

16  do that. And, again, the other party that was negotiating

17  with us in order to avoid a deposition with Mr. Ahlberg, the

18  monolines opted not to submit that testimony. So from our

19  perspective, with no party having listed Mr. Ahlberg as a

20  witness, and his declaration not being submitted, we don't

21  believe we should be required to bring Mr. Ahlberg, or have

22  him subject to cross-examination.

23       THE COURT: So, thank you, Mr. Friedman.

24       Ms. Miller has her hand raised. I will hear her

25  briefly. Then we will have our ten-minute break. I'm just

 1   going to encourage Mr. Garcia to confer off-line with

 2   Mr. Friedman and Ms. Miller, to the extent he believes there

 3   is any commitment that was made to him or his client, and, you

 4   know, ultimately you all know how to reach out to the Court if

 5   there is a dispute that you believe is appropriate for

 6   resolution by the Court.

 7         So, Ms. Miller, do you -- I don't see your hand

 8   anymore.  If you wish to speak --

 9         MS. MILLER:  Your Honor, Atara Miller from Milbank on

10   behalf of Ambac.  I just wanted to -- consistent with what

11   Mr. Friedman described, you know, we had been negotiating, as

12   I believe the DRA parties were as well, with AAFAF on a

13   declaration for Mr. Ahlberg.

14         Frankly, from our perspective, Mr. Ahlberg's

15   testimony was principally to establish certain documents and

16   records as business records, and the monolines decided that we

17   felt the issues could clearly be decided as a matter of law.

18   We did not need to rely on extrinsic evidence that needed the

19   business record, support, consistent now with Your Honor's

20   decision.

21         And so in deciding that, we never submitted the

22   declaration, which had we wanted to proffer Mr. Ahlberg as a

23   witness consistent with the initial witness list, we would

24   have filed that declaration, which was provided to us by AAFAF

25   and finalized before the deadline for the filing of witness

 1    declarations.  So the monolines have no intent at this point

 2    of offering Mr. Ahlberg as a witness.

 3             THE COURT:  Thank you for making that clear.

 4             So we will now take our afternoon break.  Please be

 5    prepared to proceed at 3:45.  I believe that the people on the

 6    AT&T line should disconnect and call back in.  Thank you.

 7             (At 3:29 PM, recess taken.)

 8             (At 3:42 PM, proceedings reconvened.)

 9             THE COURT:  Good afternoon.  There are just a few

10    further items that I believe should be addressed in connection

11    with today's conference.  The first is the matter of witness

12    -- we'll call it sequestration, which I don't anticipate the

13    need for, in connection with this Zoom hearing, but does

14    anyone intending to examine a witness believe that some sort

15    of sequestration is necessary?

16             Oh, I see that Mr. Garcia Sola has his hand up, so

17    let me call on him.

18             MR. GARCIA SOLA:  Yes, Your Honor.  I just wanted to

19    report back to you on my conversation with Mr. Friedman before

20    the break.

21             THE COURT:  Yes.  Yes.

22             MR. GARCIA SOLA:  We had a conversation about the

23    issue of the declaration of Mr. Ahlberg.  You know, he asked

24    me to speak with the monolines and also with the FOMB.  I

25    didn't have the time to do that over the break, but what we're

1   trying to do is not to bring any kind of dispute over this to

2   the Court.

3        So if we can resolve it, which I hope to be able to

4   resolve it either today or by tomorrow morning, we will be

5   informing, you know, both Mr. Friedman and also the FOMB and

6   the monolines about the resolution, and, of course, the Court.

7   So if you can indulge a few hours until, let's say, tomorrow

8   at noon time, we will inform the Court where we came out on

9   the meet and confer.

10       THE COURT:  Thank you very much for that update, and

11  for conferring with other counsel.  I thank you all for your

12  attempts to resolve this consensually.

13       MR. GARCIA SOLA:  Thank you.

14       THE COURT:  All right.  So back to the witness

15  sequestration issue.  I see no hands, which is good, and so I

16  just want to remind parties that the parties who are offering

17  the witnesses, the proponents of the witnesses have to be

18  prepared to inform their witnesses when it's time for them to

19  log into Zoom, so that they can be available promptly when

20  it's time for them to be examined.

21       We can keep them in the waiting room until it's time

22  for their testimony, but I do want to move smoothly from

23  witness to witness.  So do whatever you need to do to be able

24  to communicate with the witness or with the party that had

25  sponsored the witness, and have the witness in that party's

1    office, so that we don't have to wonder where the witness is

2    when it is time for the witness to be examined.

3          Then, with respect to interpretation, if any of the

4    witnesses who -- I'm sorry.  Did someone say something?

5          (No response.)

6          THE COURT:  All right.  If any of the witnesses who

7    will be examined will require an interpreter, let the court

8    know through our e-mail address at least two full business

9    days in advance of when the witness will testify, because our

10   court staff will need to coordinate with counsel and the

11   certified interpreter that is being provided by the original

12   proponent of the witness to ensure that the witness and the

13   interpreter and the counsel understand how to use a -- the

14   simultaneous interpretation feature of Zoom, which will allow

15   people who need to hear in Spanish, hear in Spanish, and those

16   of us who need to hear in English, hear in English.  We'll

17   move the examination along, and obviate the need for

18   sequential interpretation.

19          So then the next item is any evidence, testimony, or

20   exhibits that a party may wish to proffer under seal, and I

21   will say at this point that any party that anticipates

22   referring to or eliciting testimony concerning confidential

23   matters that the party would be requesting be kept under seal,

24   confer with the other parties involved in the presentation of

25   that evidence, presentation or production of the evidence, and

1   then raise any request to do it under seal as far in advance

2   of the segment of the trial as possible, so that I can review

3   and make any necessary ruling on the confidentiality claim,

4   and also determine whether the testimony or any argument

5   concerning it needs to occur in a break-out room.

6          I will endeavor to rule prior to the trial on any

7   outstanding sealing applications for any exhibits that the

8   parties anticipate that they will seek to admit.  Given the

9   volume of exhibits that the DRA has applied to file under

10  seal, the informative motion concerning presentation of proof

11  by the DRA, any stipulations and any narrowing of proof really

12  needs to be as specific as possible as to the extent to which

13  exhibits that are the subject of sealing applications are

14  expected to be relevant to the matters that remain for trial

15  of the confirmation application, in light of the Court's

16  rulings that were issued on October 29th, and our discussion

17  this morning as to whether granular detail on Act 30-31

18  revenues and similar subjects is necessary for the record of

19  this trial, given the legal issues that are being argued.

20         So that should be addressed in the joint status

21  report, which is due on Thursday, the 4th of November.  I

22  appreciate the efforts that the parties have related in the

23  course of this conference to confer and resolve any disputes

24  regarding the admissibility of evidence, and I encourage you

25  to continue in that vein.

1        In order to make sure that the openings can be

2   presented smoothly and without a lot of interruptions for

3   objections, I am directing the parties not to use or refer to

4   objected to evidence in their opening statements, and to the

5   extent that there are still objections to admissibility of

6   exhibits for testimony, the parties must -- I was going to ask

7   you for a joint status report by the Tuesday, but I realize

8   you may not know.

9        So again, by the -- in the 2:00 PM report each day

10  regarding evidence to be presented the next day, flag for the

11  Court any disputes regarding the admissibility of evidence

12  that is proposed for the next day, to the greatest extent

13  possible, and point me to or provide me with the relevant

14  documentation at that time.

15       To the extent that anyone wishes to use

16  demonstratives via screen sharing during arguments, please

17  exchange with the opposing parties for review in advance, and

18  avoid using demonstratives that you know are going to trigger

19  objections.  Again, we want to use our time as efficiently as

20  possible.

21       As to formalities, I remind everyone that even though

22  this hearing is occurring virtually, participants are expected

23  to maintain the same level of professionalism and formality

24  that they would if we were all together in the courthouse in

25  San Juan.  So I appreciate that today everyone has made sure

1    that they are actually centered in their cameras and can be

2    seen, and appreciate you working with us to make sure that

3    everyone can be heard.  So I will expect that that will go on

4    with witnesses and counsel alike.

5          I also appreciate the use of headsets, which has, on

6    the whole, helped audio quality and reduced background noise.

7          I see that Mr. Hein has his hand up.  So Mr. Hein?

8          MR. HEIN:  Thank you, Your Honor.  I had been

9    assuming that I would need to reply on the legal points

10   orally.  Just to be candid from a time point of view, I'm not

11   sure I'm going to be able to get in a brief reply by Friday at

12   5:00, but if I was able to, and thought there were legal

13   points that would be better dealt with in a brief reply as

14   opposed to orally, would I be permitted to do that as well?

15         THE COURT:  So this is a brief reply to what?

16         MR. HEIN:  To the Oversight Board's Reply and

17   Memorandum, the lengthy briefs that were served several days

18   ago.

19         THE COURT:  So are you speaking of a sur-reply of the

20   sort that the -- that Suiza and others requested this

21   afternoon?

22         MR. HEIN:  Yes.  Exactly, Your Honor.

23         THE COURT:  I'm told the AT&T line is down, so we'll

24   just have to wait a minute until we can get that back up.

25         I'm sorry.  We're still waiting for the AT&T line to

1  be brought back up.

2       Thank you all for your patience.  There apparently is

3  a problem with AT&T, but we will go forward.  The court

4  reporter is making a record here, and I will file appropriate

5  minute orders, if you will, after we're done.

6       So, Mr. Hein, with respect to your request to file a

7  brief sur-reply to the Oversight Board's reply, that request

8  is granted.  You have the same deadline of Friday, November

9  5th, and the same limitation of eight double-spaced pages, and

10 I will emphasize double spaced.  Not one and a half.  Double

11 spaced, please.

12      MR. HEIN:  Thank you.

13      THE COURT:  Thank you.

14      So I have a few more mechanics that I will just go

15 over to remind everyone of regarding timing and some logistics

16 for the trial, but is there any other matter anyone wanted to

17 raise?  Raise your hand now if there's anything else you want

18 to speak to.

19      Mr. Despins.

20      MR. DESPINS:  Good afternoon, Your Honor.

21      THE COURT:  Good afternoon.

22      MR. DESPINS:  Luc Despins for the Creditors Committee

23 with Paul Hastings.

24      Your Honor, as you know, the committee reached an

25 agreement with the Board regarding the Plan the past summer,

1   and we are in support of the Plan.  However, in the last two

2   days, a -- what I will describe as a plumbing mechanical issue

3   has arisen, and despite best efforts, we've been unable to

4   connect with counsel for the Oversight Board.  I'm not blaming

5   them.  I know they have their hands full.  They have a lot of

6   things going on.

7          And so the purpose of this is just -- I didn't want

8   to leave this call without Your Honor knowing that there's a

9   potential issue, which may very well go away, and that's the

10  hope.  But if not, we would need to raise that at the

11  confirmation hearing.

12         So that's the sole purpose of my intervention at this

13  time.  We're going to -- we're going to renew our efforts to

14  communicate with the FOMB counsel to try to see if there is an

15  issue, in fact, and if there is an issue, whether it can be

16  resolved.

17         Thank you, Your Honor.

18         THE COURT:  All right.  So are you concerned about,

19  you know, the right people picking up the telephone, or are

20  you telling me that there is -- simply telling me that there

21  is a subject that could be significant that's in discussion?

22         MR. DESPINS:  There have been no discussions yet.  I

23  hope they'll happen, you know, very soon.  I see Mr. Rosen

24  jumping in.

25         THE COURT:  You need someone to pick up the

1  telephone, and Mr. Rosen has put up his hand, so let's hear

2  from Mr. Rosen.

3          MR. ROSEN:  Your Honor, thank you.  I put up my hand,

4  and I will pick up the telephone.  Mr. Despins has tried

5  several times, and we've just been a little preoccupied with

6  some of the other pressing issues.  But we will address this

7  issue in the next day, and I don't think it will be an issue

8  for the Court.

9          THE COURT:  Thank you, Mr. Rosen.  Thank you,

10 Mr. Despins.

11         MR. DESPINS:  Thank you.  Thank you.

12         THE COURT:  I don't see any other hands raised, and

13 so this concludes the conference Agenda for this conference.

14 The next scheduled hearing is the commencement of the Plan

15 Confirmation Hearing, which is scheduled to begin next Monday,

16 November 8th, 2021, at 9:30 AM Atlantic Standard Time, which

17 is 8:30 AM Eastern Standard Time, because the mainland clocks

18 change on Saturday night, so please remember that.  If you're

19 on the mainland, it's 8:30 Eastern, and the times that

20 correspond to that across the country.

21         As with today's conference, the hearing will occur

22 over a combination of Zoom and a listen-only telephone line.

23 The Procedures Order is at Docket Entry No. 18877-1 in Case

24 No. 17-3283.

25         The first day of the hearing will be November 8th.

1    The hearing will then continue as necessary on November 9th

2    and 10th, the 12th, the 15th through 18th, and the 22nd and

3    23rd of November.

4            The Court will circulate the Zoom invitation link to

5    people who are properly registered to participate by Zoom

6    daily prior to each day of the hearing.  In the event that

7    registrants don't see the invitation sent to their inboxes,

8    all registrants are reminded to check their spam folders or

9    other applicable subfolders before contacting the Court.

10           I have already told you about the effect of the end

11   of daylight savings time, but I'll remind you again.  9:30

12   Atlantic Standard will be 8:30 Eastern Standard.

13           The Zoom participants for the trial should log on 30

14   minutes prior to the start time, use the proper naming

15   convention, and make sure that everyone is ready by the start

16   time.

17           Mr. Rosen, your hand is up.

18           MR. ROSEN:  Yes, Your Honor.  I apologize for one

19   last question.  I know Your Honor, in a prior order, you had

20   indicated that day one would be limited to opening statements;

21   day two would be limited to your receipt of certain statements

22   made by on-island pro se people.  I just want to be clear,

23   Your Honor, because we want to coordinate with our witnesses.

24           In the event that opening statements do not go the

25   full six hours that you have allotted, is it your intention to

1    limit day one only to the opening statements anyway, so that

2    we don't need to have our witnesses available on day one?

3              THE COURT:  That is my intention.

4              MR. ROSEN:  Okay.

5              THE COURT:  Unless you tell me that there's a

6    possibility that opening statements are only going to be two

7    hours or three hours, in which case I would revisit that.

8              MR. ROSEN:  At this point, I don't know, Your Honor.

9    I think we're still waiting for some information from some

10   people.  So I think at this point we'll just say we'll start

11   with the witnesses available then for Wednesday morning?

12             THE COURT:  Yes.  I think that is the most prudent

13   path.  If for any reason you want to request a change in that

14   and have witness testimony start on Monday, let me know sooner

15   rather than later.

16             MR. ROSEN:  Thank you, Your Honor.

17             THE COURT:  I'm sure we would be able to accommodate

18   that, unless you tell me at five o'clock on Sunday afternoon,

19   in which case we would not.

20             MR. ROSEN:  Thank you, Your Honor.

21             THE COURT:  So on each day, the Court will generally

22   provide a morning break of ten minutes and an afternoon break

23   of 20 minutes -- I'm sorry, of ten minutes.  So morning break,

24   afternoon break are ten minutes, and then there will be a

25   lunch break, which will run between an hour and an hour and 20

1    minutes, possibly longer on at least one day as the Court's

2    schedule may require.

3        The Court will be entering an order shortly that

4    invites members of the public to register for the opportunity

5    to address the Court in person at the Clemente Ruiz Nazario

6    United States Courthouse in San Juan on Tuesday, November 9th.

7    An entire trial day has been reserved for the important

8    purpose of hearing the views and opinions of members of the

9    public who will be affected if the proposed Plan is confirmed

10   by the Court.

11       Each speaker will be given ten minutes to provide

12   their views, and that will allow 25 people selected by lottery

13   to appear and provide remarks.  The ten minutes are inclusive

14   of any time needed for language interpretation, which will be

15   provided by the court.

16       And the Court expects that at a minimum, Counsel for

17   the Oversight Board, AAFAF, the official committees, and the

18   principal PSA participants to log into Zoom with their cameras

19   on to observe the entirety of the public testimony, so at

20   least one representative of each of those constituencies.

21       As always, I thank the Court staff in Puerto Rico,

22   Boston, and New York, and I thank counsel for all of their

23   work and their participation in the conference today.  Stay

24   safe and keep well, everyone.  I will look forward to the

25   further submissions later this week, and to the commencement

161

```
 1   of the hearing next Monday morning.
 2            We are adjourned.
 3            (At 4:08 PM, proceedings concluded.)
 4                        *      *      *
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 162 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   November 1, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```