**<u>Exhibit B</u>**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>               Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF ADAM CHEPENIK
## IN RESPECT OF THE CONFIRMATION OF SEVENTH
## AMENDED TITLE III JOINT PLAN OF ADJUSTMENT FOR THE
## COMMONWEALTH OF PUERTO RICO, ET AL.[2]

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Pursuant to the Court's *Order Memorializing Certain Rulings Made at the November 1, 2021 Pretrial Conference* [ECF No. 19009], this declaration has been amended solely to include references to the filed exhibits and their respective ECF numbers.

I, Adam Chepenik, hereby declare that:

1.      I am employed by Ernst & Young, LLP ("EY") and have worked at EY since April 2017.  I submit this declaration (the "Declaration") in respect of confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (together with all exhibits, and as amended, modified, and supplemented, the "Plan").[3] (Debtors' Exs. 1 and 3 [ECF Nos. 18785-1, 18785-3].)

2.      I am a Principal in EY, where I oversee EY's public sector restructuring advisory services engagements.  In that role, I advise public sector entities in financial distress on, among other things, the development of cash flow analysis, liquidity and budget forecasting, multi-year fiscal planning, structural reforms, creditor negotiations, labor contract reviews, legacy retiree obligations, pension reforms, and other in-court and out-of-court restructuring needs.  In total, I have more than 18 years of combined restructuring and public-sector experience, including six years at the U.S. Treasury Department, where I served as the inaugural Deputy Director of the Office of State and Local Finance, played a role in the federal government's response to Puerto Rico's fiscal and economic crisis and provided technical assistance to Congress in the drafting of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA").

3.      I hold an MBA from Harvard Business School and an MPA from Harvard University's John F. Kennedy School of Government, where I graduated as a public service fellow. I also hold three bachelor's degrees, in Finance, Economics and Management Science and Statistics from the University of Maryland, where I graduated Summa Cum Laude, Phi Beta Kappa.

---

[3] Capitalized terms used but not otherwise defined herein have the same meanings given to them as in the Plan.

4.      I am one of the engagement principals at EY responsible for advising the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") on a variety of subject matters since EY was engaged by the Oversight Board starting in 2017.  In this role, I have been, and remain in regular contact with, the members of the Oversight Board, its staff and its advisors.

5.       In this Declaration, I discuss: (i) the unrestricted cash reserve and disaster aid revolving fund, as described in the *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17628] (together with all exhibits, and as amended, modified, and supplemented, the "Disclosure Statement") (Debtors' Ex. 2 [ECF No. 18785-2]) (at pp. 169-173); (ii) the Commonwealth's emergency reserve, as described in the Disclosure Statement (at pp. 173-174); and (iii) the identification by the Oversight Board of cash accounts held by the Debtors, the amount of the funds held in the identified Debtors' cash accounts and the Oversight Board's analysis of legal restrictions on cash held in certain of those accounts, as described in the Disclosure Statement (at pp. 159-169).

6.      My statements set forth in this Declaration are based on my personal knowledge, except where I reference specific documents or communications as the basis of my statements.  In those instances where I reference a specific document or communication, I am not offering the documents to prove the truth of the content in those documents, or I am informed, the documents are otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.

7.      Where I provide opinions, they are based on, in addition to my personal knowledge, (i) my understanding of information shared with me by other members of the EY team working directly with me or under my supervision and direction; (ii) additional information provided by the Oversight Board and its other advisors, and other interested parties and their respective

advisors, concerning the restructuring, and/or (iii) my experience in the restructuring industry as described above. I understand this is the type of information professionals in my field typically consider and use in their work.

### Unrestricted Cash Reserve Policy

8. Although Puerto Rico's OMB Enabling Act (23 L.P.R.A. § 106)[4] requires the Commonwealth to set aside budgetary funds each year to maintain uninterrupted government operations, the Commonwealth government has historically addressed its urgent liquidity needs through a variety of one-time measures. These measures included actions such as: deferring the disbursement of certain budgetary outlays, delaying payment of tax refunds to residents, liquidating pension assets early to fund immediate cash needs, borrowing from the Commonwealth's proprietary insurance funds, failing to pay certain appropriation debts, withholding monthly set-aside funds for debt service, and stretching payment of accounts payables to vendors and other third parties.[5] As described in the 2021 certified Commonwealth Fiscal Plan ("Fiscal Plan") (Debtors' Ex. 10 [ECF No. 18785-10]), at one point, the Commonwealth government's primary cash account, the Treasury Single Account ("TSA"), fell to as little as $15 million.[6] The U.S. Secretary of the Treasury at the time observed, due to the Commonwealth's

---

[4] "Management and Budget Office Organic Act" [Act No. 147 of June 18, 1980, as amended]. See page 11. https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/Y%20-%20Ingl%C3%A9s/147-1980.pdf. (last accessed October 21, 2021). (Debtors' Ex. 98 at page 657 [ECF No. 18803-8].)
[5] Overview of Puerto Rico's Economic and Fiscal Crisis, published by the White House in October 2016. https://obamawhitehouse.archives.gov/sites/default/files/factsheet-puertoricoseconomicandfiscalcrisis.pdf. (Last accessed October 21, 2021)
[6] 2021 Certified Fiscal Plan for Puerto Rico, page 18.
https://drive.google.com/file/d/1reetKnfKsa1uR-A0u9l3FM6PfGamHCrx/view (last accessed October 21, 2021). (Debtors' Ex. 10 [ECF No. 18785-10].)

liquidity challenges, the government's ability to provide basic healthcare, legal, and education services was in serious doubt.[7]

9.      As described in the Disclosure Statement (Debtors' Ex. 2 [ECF No. 18785-2]), going forward, a certain level of unrestricted cash will be retained to help maintain uninterrupted government operations when unforeseen fiscal challenges emerge.[8]  This type of cash allocation is typically referred to as an unassigned fund balance ("Unassigned Fund Balance") and represents the net cash reserves after all revenues have been deposited and all expenses have been paid.[9]  The combined amount of the unrestricted cash reserves described in this section of my Declaration and the disaster aid revolving fund described starting in Paragraph 30 of my Declaration are both included as part of the value described as the "minimum cash balance" contemplated in the Plan.

10.     Maintaining an unrestricted cash reserve is consistent with recognized best practices for municipal government operations.  It is designed to mitigate against current and future risks and uncertainties (such as revenue shortfalls, unanticipated expenditures, and other forecasting errors), maintain stable tax rates, and allow for other unexpected changes during economic downturns or other unforeseen emergencies.[10]

---

[7] Remarks by Treasury Secretary Jacob J. Lew During a Press Availability in Puerto Rico. January 20, 2016.  https://www.treasury.gov/press-center/press-releases/Pages/jl0325.aspx  (Last accessed October 21, 2021).

[8] See Disclosure Statement (at pp. 169-173).  (Debtors' Ex. 2 [ECF No. 18785-2].)

[9] Statement No. 54 of the Governmental Accounting Standards Board.  Fund Balance Reporting and Governmental Fund Type Definitions.  See page 7.
https://gasb.org/resources/ccurl/313/494/GASBS%2054.pdf (last accessed October 23, 2021).

[10] Fund Balance Guidelines for the General Fund https://www.gfoa.org/materials/fund-balance-guidelines-for-the-general-fund (Last accessed October 21, 2021).  (Debtors' Ex. 35 [ECF No. 18797-6].); see also Barb Rosewicz et al., States' Total Rainy Day Funds Fall for First Time Since Great Recession, PEW (Last accessed October 21, 2021),
https://www.pewtrusts.org/en/research-and-analysis/articles/2021/05/17/states-total-rainy-day-funds-fall-for-first-time-since-great-recession (last accessed October 21, 2021)  (Debtors' Ex. 34 [ECF No. 18797-5].); Jeff Chapman & Josh Goodman, How States Can Manage Uncertainty,

11.     This type of unrestricted cash reserve is often managed by a state government as a budget stabilization fund ("Budget Stabilization Fund"), or as a rainy day fund ("Rainy Day Fund"), since it is designed to help states set aside certain revenues for times of unexpected economic shocks, revenue shortfalls or budget deficits.[11]  Each state's constitutional or statutory requirements determine the size of the Budget Stabilization Fund or Rainy Day Fund, how deposits into the Budget Stabilization Fund or Rainy Day Fund are made and how funds are withdrawn.[12] (Debtors' Ex. 39 [ECF No. 18797-10].)  I use the terms Budget Stabilization Fund, Rainy Day Fund, and Unassigned Fund Balance interchangeably in this Declaration; each term is intended to represent the allocation of unrestricted cash reserved to mitigate against current and future risks and uncertainties.

12.     Unrestricted cash funding for a Budget Stabilization Fund described herein is separate and distinct from an emergency reserve ("Emergency Reserve"), which is described starting in Paragraph 36 of this Declaration.  The funding of a Budget Stabilization Fund as well as an Emergency Reserve are both recommended for the Commonwealth because leading

---

Balance Budgets, and Help Communities in the Pandemic's Wake, PEW (Mar. 22, 2021) (last accessed October 21, 2021): https://www.pewtrusts.org/en/research-and-analysis/articles/2021/03/22/how-states-can-manage-uncertainty-balance-budgets-and-help-communities-in-the-pandemics-wake (last accessed October 21, 2021).

[11] Budget Stabilization Funds, How States Save for a Rainy Day.  November 27, 2017.  Urban Institute.  https://www.urban.org/research/publication/budget-stabilization-funds (last accessed October 23, 2021)

[12] Rainy Day Fund Structures, National Conference of State Legislatures. https://www.ncsl.org/research/fiscal-policy/rainy-day-funds.aspx (last accessed October 21, 2021).  (Debtors' Ex. 39 [ECF No. 18797-10].)

municipalities often segment reserves into different categories to clarify the purpose of the reserves and to provide transparency.[13]  (Debtors' Ex. 42 [ECF No. 18800-2].)

13.     Many states maintain Budget Stabilization Funds to help stabilize their budgets when unexpected fiscal challenges arise.[14]  States follow different rules on how much to contribute to their Budget Stabilization Funds annually, whether the balance should be capped and, if so, at what level, and under what conditions the funds can be spent.[15]  The funding target for a Budget Stabilization Fund is often calculated as a percentage of a government's general fund ("General Fund") spending, although financial resources available in other funds, such as federal funds and special revenue funds, are typically also considered when assessing the adequacy of a Budget Stabilization Fund.  The General Fund is a central government's basic operating fund.[16]

14.     The value of setting aside sufficient funds in a Budget Stabilization Fund was demonstrated during the outset of the COVID-19 pandemic in 2020.  When confronted with an uncertain revenue outlook at the beginning of the COVID-19 public health crisis, many U.S. states stabilized their budgets by using part (or all) of their Rainy Day Funds.[17]  This helped offset

---

[13] A Risk Bases Analysis of General Fund Requirements. https://www.gfoa.org/materials/a-risk-based-analysis-of-general-fund-reserve-requirements (last accessed October 21, 2021). (Debtors' Ex. 42 [ECF No. 18800-2].)

[14] States' Total Rainy Day Funds Fall For The First Time Since Great Recession. https://www.pewtrusts.org/en/research-and-analysis/articles/2021/05/17/states-total-rainy-day-funds-fall-for-first-time-since-great-recession (last accessed October 21, 2021).  (Debtors' Ex. 34 [ECF No. 18797-5].)

[15] Budget Stabilization Funds, How States Save for a Rainy Day.  November 27, 2017.  Urban Institute.  https://www.urban.org/research/publication/budget-stabilization-funds (last accessed October 23, 2021).

[16] Touring the Financial Statements Part III. The Governmental Funds. https://www.gasb.org/cs/ContentServer?cid=1176156735732&d=Touch&pagename=GASB%2FGASBContent_C%2FUsersArticlePage (last accessed Oct 21, 2021).

[17] Rainy Days Are Here: States Tap Budget Funds to Plug Budget Holes. https://www.ncsl.org/research/fiscal-policy/rainy-days-are-here-states-tap-reserve-funds-to-plug-budget-holes.aspx (last accessed October 21, 2021).

revenue shortfalls in the short-term caused by economic shutdowns, revenue reductions, and delayed tax filings.  Today, most states maintain some type of Budget Stabilization Fund, and many states also maintain additional funds earmarked for specific expenses such as K–12 education or disaster relief.[18]

15.    In the Commonwealth's case, the proposed level of unrestricted cash the Oversight Board recommends the Commonwealth maintain in a Budget Stabilization Fund would help facilitate the uninterrupted operation of the government following the Effective Date of the Plan. The recommended minimum level of unrestricted cash contemplated by the Oversight Board considers Puerto Rico's unique circumstances.   Factors the Oversight Board considered in estimating the recommended level of unrestricted cash included: (i) the predictability, seasonality, and volatility of the General Fund revenues and expenses; (ii) the composition and resiliency of the Commonwealth's economic base; (iii) the susceptibility to episodic destabilizing events; (iv) certain significant one-time outlays; (v) the potential availability and needs for other Commonwealth funds (*e.g.*, special revenue funds and federal funds); (vi) the Commonwealth's current lack of access to outside capital; (vii) the potential impact on future bond ratings and the cost of borrowing; and (viii) the need to maintain funds for specific purposes.  The proposed amount should help maintain a prudent level of financial resources for the Commonwealth's economic security programs such as health care, food assistance, and cash assistance in times of need, allow time to pass during an unexpected downturn before the government might be required

---

[18] See Sustainable Budgeting in the States Evidence on State Budget Institutions and Practices, November 2017, Urban Institute.
https://www.urban.org/sites/default/files/publication/93461/sustainable-budgeting-in-the-states_2.pdf (last accessed October 21, 2021) and Why States Save.  https://www.pewtrusts.org/-/media/assets/2017/02/why_states_save.pdf  (last accessed October 21, 2021).

to reduce expenses to balance the budget, and help provide financial stability and improved credit worthiness.[19]

16.     I was personally involved in collaborating with the Oversight Board and its staff and other professionals during their review of the foregoing factors and of the various approaches and methodologies used to establish the recommended range of unrestricted cash that should be allocated to a Budget Stabilization Fund.

17.     The first methodology the Oversight Board evaluated was the Government Finance Officers Association's ("GFOA") Best Practice Fund Balance Guidelines for the General Fund.[20] Founded in 1906, GFOA is a professional association of public-sector finance professionals representing more than 20,000 state, provincial, and local government finance officers at all levels of government in the United States and Canada involved in planning, financing, and implementing thousands of governmental operations in each of their jurisdictions.[21]  The GFOA's mission is to advance excellence in public finance and to identify, develop, and communicate leading practices in government financial management.[22]  To meet the needs of its members, the organization provides best practice guidance and offers publications on budgeting, internal controls, debt management, treasury management, and other financial management topics.  Accordingly, the Best

---

[19] See Why and How States Should Strengthen Their Rainy Day Funds, Center for Budget and Policy Priorities, February 3, 2011, https://www.cbpp.org/research/why-and-how-states-should-strengthen-their-rainy-day-funds and States Should Improve the Design of Their Rainy Day Funds, Center for Budget and Policy Priorities, June 3, 2021 https://www.cbpp.org/research/state-budget-and-tax/states-should-improve-the-design-of-their-rainy-day-funds. (last accessed October 21, 2021).

[20] Fund Balance Guidelines for the General Fund. https://www.gfoa.org/materials/fund-balance-guidelines-for-the-general-fund (last accessed October 21, 2021).  (Debtors' Ex. 35 [ECF No. 18797-6].)

[21] GFOA.  https://www.gfoa.org/about (last accessed October 21, 2021).

[22] GFOA By-Laws. https://www.gfoa.org/gfoa-bylaws (last accessed October 21, 2021).

Practice Fund Balance Guidelines for the General Fund defines specific policies and procedures that contribute to improved government management.[23]

18.     GFOA recommends that general-purpose governments, regardless of size, maintain a level of unrestricted funds of no less than two months (60 days) of regular General Fund operating revenues or regular General Fund operating expenditures. (Debtors' Ex. 35 [ECF No. 18797-6].) This advisory measure is not absolute and guidance over the course of past decades has moved the recommended balance upwards. The appropriate balance is determined by the factors described in Paragraph 15 of my Declaration and observations of historic volatility. Furthermore, a government's particular situation often may require a level significantly larger than the GFOA recommended minimum level.[24]

19.     The Commonwealth has a large concentration of collections from individual revenue sources (particularly corporate income, individual income, sales and use tax and certain excise taxes). Revenue collections are also vulnerable to economic shocks, the implication of which is magnified due to the Commonwealth's current lack of access to capital markets and exposure to potential cuts in federal grants. Consequently, the GFOA best practices approach implies the Commonwealth's government should maintain a larger than average Budget Stabilization Fund.[25] Based on the Commonwealth's FY2021 General Fund budget (Debtors' Ex.

---

[23] GFOA Best Practices. https://www.gfoa.org/best-practices (last accessed October 21, 2021).

[24] Fund Balance Guidelines for the General Fund. https://www.gfoa.org/materials/fund-balance-guidelines-for-the-general-fund (last accessed October 21, 2021). (Debtors' Ex. 35 [ECF No. 18797-6].)

[25] Fund Balance Guidelines for the General Fund. https://www.gfoa.org/materials/fund-balance-guidelines-for-the-general-fund (last accessed October 21, 2021). (Debtors' Ex. 35 [ECF No. 18797-6].)

12 [ECF No. 18791-2]), the GFOA approach implies the Commonwealth should maintain a minimum amount of unrestricted cash in a Budget Stabilization Fund of at least $1.65 billion.

20.     As a second approach, the Oversight Board evaluated a methodology proposed by The Pew Charitable Trusts ("Pew"), an independent non-profit, non-governmental organization whose mission is to "appl[y] a rigorous, analytical approach to improve public policy, inform the public, and invigorate civic life."[26]  Pew maintains a dedicated research team focused on state fiscal health that frequently publishes research and recommendations on state financial conditions, particularly on municipalities in distress.[27]  Pew's analysis reviews rules guiding when, how, and how much states are saving—including deposit rules and fund caps—and compares these policies with each state's experience with volatility to identify best practices.[28]

21.     According to Pew, a state's Rainy Day Fund balance should depend on: (i) the purpose of the funds; (ii) the state's experience with revenue volatility; and (iii) the appropriate period of time during which the funds should cover operations (*i.e.*, 30 days, 60 days, 90 days, etc.).[29]  Based on National Association of State Budget Officers ("NASBO") data, Pew calculates the median number of days states had to run government operations using Rainy Day Fund reserves, among other reserves, for fiscal year 2019 was 49.7 days and for fiscal year 2020 was 43.5 days.[30]  (Debtors' Ex. 34 [ECF No. 18797-5].)  Based on the Commonwealth's FY2021

---

[26] Pew Charitable Trusts. https://www.pewtrusts.org/en/.
[27] State Fiscal Health Project, Pew Charitable Trusts.
https://www.pewtrusts.org/en/projects/states-fiscal-health.
[28] Policies to Harness Revenue Volatility, Stabilize Budgets, and Strengthen Reserves.
https://www.pewtrusts.org/en/research-and-analysis/reports/2014/07/15/building-state-rainy-day-funds-policies-to-harness-revenue (last accessed October 21, 2021).
[29] Why States Save?  https://www.pewtrusts.org/en/research-and-analysis/reports/2015/12/why-states-save (last accessed October 21, 2021).
[30] States' Total Rainy Day Funds Fall for First Time Since Great Recession.
https://www.pewtrusts.org/en/research-and-analysis/articles/2021/05/17/states-total-rainy-day-

General Fund budget, and a 45 day average, the Pew approach implies the Commonwealth should maintain a minimum amount of unrestricted cash for a Budget Stabilization Fund of at least $1.24 billion.

22.     As a third approach, the Oversight Board reviewed the negotiations between the Federal Government, particularly the Federal Emergency Management Agency ("FEMA") and U.S. Department of the Treasury, and the Commonwealth's government regarding Puerto Rico's ability to access Community Disaster Loan ("CDL") program funding after Hurricane Maria.  The CDL program was established by Section 417 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. §5184, as amended).[31]  The CDL program provides financial assistance to local governments having difficulty providing government services because of a loss in tax or other revenue following a disaster.[32]  Following the devastation caused in Puerto Rico from Hurricanes Irma and Maria, Congress passed the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, which was signed into law in October 2017.[33]  The law included a $4.9 billion appropriation for CDLs to assist Puerto Rico, the U.S. Virgin Islands, and local governments in Florida and Texas, maintain essential services following the hurricanes.  Congress, however, modified the existing rules for Puerto Rico to access CDL funds, relinquishing responsibility for setting the terms, conditions, eligible uses, timing, and

---

funds-fall-for-first-time-since-great-recession (last accessed October 21, 2021).   (Debtors' Ex. 34 [ECF No. 18797-5].)  This median figure has fluctuated between 40 days to 48 days in fiscal years 2018-2020.

[31] FEMA's Community Disaster Loan Program: History, Analysis, and issues for Congress. https://sgp.fas.org/crs/homesec/R42527.pdf  (last accessed October 21, 2021).

[32] FEMA's Community Disaster Loan Program: History, Analysis, and issues for Congress. https://sgp.fas.org/crs/homesec/R42527.pdf  (last accessed October 21, 2021).

[33] H.R.2266 - Additional Supplemental Appropriations for Disaster Relief Requirements Act, 2017.  https://www.congress.gov/bill/115th-congress/house-bill/2266 (last accessed October 21, 2021).

the amount of federal disbursements of CDLs to the Secretary of Homeland Security, in consultation with the Secretary of the Treasury.[34]

23.    The Federal Government eventually set a specific level below which the Commonwealth's cash balance would need to fall before the Federal Government would permit the Commonwealth to access CDL funding.[35]   Initially, on February 20, 2018, the Federal Government proposed the cash level, or the floor, be set at $800 million (*i.e.,* if the Commonwealth had more than $800 million in cash, it would not be permitted to access CDL funding).[36]   The Commonwealth's government opposed the terms of the Federal Government's proposal as being too onerous and inconsistent with Puerto Rico's liquidity needs.[37]  Ultimately, on March 22, 2018, the Federal Government agreed to permit the Commonwealth to access CDL funding if the Commonwealth's cash balance declined below $1.1 billion.[38]   (Debtors' Ex. 38 [ECF No. 18797-9].)   This implies the Federal Government believed $1.1 billion was the minimum level of cash below which the Commonwealth may not have sufficient liquidity to maintain steady, uninterrupted operations.

---

[34] Congressional Research Service report on Community Disaster Loans: Homeland Security Issues in the 116th Congress, April 24, 2019.
https://crsreports.congress.gov/product/pdf/IN/IN11106 (last accessed October 21, 2021).
[35] January 9, 2018 letter from FEMA to Gerardo Portela, the Executive Director of AAFAF.
https://drive.google.com/file/d/1eX9F255WJ7riKq7cYQJSrD3XHoJ8Z7QB/view (last accessed October 21, 2021).
[36] Obstacles set by Treasury, El Nuevo Dia. March 4, 2018.
https://www.elnuevodia.com/english/news/story/obstacles-set-by-treasury/  (last accessed October 21, 2021).
[37] Governor Rossello letter to Congress, dated February 26, 2018.
https://www.puertoricoreport.com/wp-content/uploads/2018/03/RR-CDL-Letter.pdf  (last accessed October 21, 2021).
[38] Feds and Puerto Rico Reach Deal Allowing Disaster Recovery Loans to Start Flowing.  NPR, March 22, 2018.  https://www.npr.org/sections/thetwo-way/2018/03/22/596196849/feds-and-puerto-rico-reach-deal-allowing-disaster-recovery-loans-to-start-flowin (last accessed October 21, 2021).  (Debtors' Ex. 38 [ECF No. 18797-9].)

24.     As a fourth approach, the Oversight Board evaluated the unrestricted cash balance assumptions used by the City of Detroit during its recent Chapter 9 bankruptcy case.  As part of the City of Detroit's restructuring and 40-year projections in its plan of adjustment, the City of Detroit projected a unrestricted cash balance based on two months of payroll through fiscal year 2023 and at least a 7.5% of General Fund expenditures cash reserve thereafter.[39]  (Debtors' Ex. 44 [ECF No. 18800-4].)  Based on the Commonwealth's FY2021 General Fund budget, applying the example of the City of Detroit as a comparable jurisdiction implies the Commonwealth should maintain a minimum amount of unrestricted cash for a Budget Stabilization Fund of at least $753 million.

25.     As a fifth method, the Oversight Board reviewed a general practitioner approach by evaluating a range of state examples targeting the level of Rainy Day Fund balances published annually as part of the NASBO Fiscal Survey of States report.[40]  The 2021 NASBO analysis shows all but 14 states maintain Rainy Day Funds in excess of 5% of expenditures and 20 states maintain a Rainy Day Fund in excess of 10%.[41]  (Debtors' Ex. 37 [ECF No. 18797-8].)  Based on the Commonwealth's FY2021 General Fund budget, this approach implies that the Commonwealth should maintain an unrestricted cash balance between $500 million and $1.0 billion.

---

[39] City of Detroit, Plan of Adjustment, 40 Year Projections. https://mi.gov/sites/detroitmi.localhost/files/2018-05/Forty-Year%20Financial%20Projections.pdf (last accessed October 21, 2021).  (Debtors' Ex. 44 [ECF No. 18800-4].)

[40] The Fiscal Survey of States, Spring 2021, National Association of State Budget Officers, pages 70-71.  https://www.nasbo.org/reports-data/fiscal-survey-of-states (last accessed October 21, 2021).  (Debtors' Ex. 37 [ECF No. 18797-8].)

[41] The Fiscal Survey of States, Spring 2021, National Association of State Budget Officers, pages 70-71.  https://www.nasbo.org/reports-data/fiscal-survey-of-states (last accessed October 21, 2021).  (Debtors' Ex. 37 [ECF No. 18797-8].)

26.     As a sixth approach, the Oversight Board evaluated the projected cash needs of the TSA, the Commonwealth's primary operating account, as presented by the Commonwealth's government to the Oversight Board.[42]  (Debtors' Ex. 43 [ECF No. 18800-3].)  The primary inflows for the Commonwealth's TSA are tax-based revenue sources, which have economic risk and a seasonality component, and the primary disbursements are payroll and other fixed costs.  Based on materials provided to the Oversight Board by the government, it appears the Commonwealth government considered the structure of revenue and expense flows in estimating its assessment of the required level of funding for a Budget Stabilization Fund.  The materials indicate the government then adjusted for the number of months of cash needed for each category of need, based on the criticality of each payment and the type of funding source.  For example, the government indicated payroll funded by revenue collections required a 2-month reserve versus nutritional assistance funding, which is a federally funded pass-through expense, which the government estimated no reserve was required.

27.     The analysis provided to the Oversight Board by the Commonwealth government also included other considerations.  For instance, the materials provided to the Oversight Board indicate Puerto Rico is the beneficiary of numerous federal programs, which provide funding for government services in the areas of education, health, public safety and housing, among others.[43] Many of the programs funded by federal government agencies are reimbursement-based, meaning the Commonwealth's government will typically disburse the funds and then seek reimbursement from the corresponding federal agency.  Certain federal programs, however, provide for advances

---

[42] Government analysis provided to the Oversight Board via e-mail on December 11, 2020.
        (Debtors' Ex. 43 [ECF No. 18800-3].)
[43] Government analysis provided to the Oversight Board via e-mail on December 11, 2020.
        (Debtors' Ex. 43 [ECF No. 18800-3].)

of federal funds to be disbursed by the Commonwealth at a later date.  Variances in timing between federal funds receipts and disbursements contribute to the liquidity needs of the Commonwealth government.  The analysis implied the Commonwealth should maintain, at a minimum, an amount of unrestricted cash in a Budget Stabilization Fund that exceeds $1.7 billion.  (Debtors' Ex. 43 [ECF No. 18800-3].)

28.     Combining all six methodologies above produced a range of possible Budget Stabilization Fund balance levels evaluated by the Oversight Board.  After analyzing the recommended values ascribed by each approach above, risk weighing Puerto Rico's financial characteristics, considering all FY2021 budgets, and evaluating the Commonwealth's revenue volatility, the unrestricted cash balance range presented to the Oversight Board for a Budget Stabilization Fund was $1.2 billion to $1.7 billion.

29.     Based on the foregoing, it is my opinion a Budget Stabilization Fund balance in the range of $1.2 to $1.7 billion is within accepted bounds.

**Disaster Aid Revolving Fund**

30.     In addition to establishing a Budget Stabilization Fund, the Oversight Board agreed to fund a temporary $750 million disaster aid revolving line of credit ("Revolving Fund") from the Commonwealth.  The Puerto Rico Central Office for Recovery, Reconstruction and Resilience and FEMA recommended the establishment of a Revolving Fund from the Commonwealth for the purpose of financing FEMA Permanent Work and Hazard Mitigation Grant Program ("HMGP") disaster relief projects of central government agencies, public corporations, instrumentalities, and

municipalities in Puerto Rico ("Sub-Recipients") unable to secure such funding from Federally funded requests for advance funding or Requests for Reimbursement.[44]

31.    The Revolving Fund balance of $750 million was determined by (i) evaluating the federal disaster aid rollout timeline in the Fiscal Plan,[45] (ii) dividing annual federal disaster spending equally over a 12-month period,[46] (iii) removing certain federal disaster aid categories from the analysis, on the assumption either project work in these categories is eligible for advance funding from FEMA or revolving funds would not be needed (due to other funding sources, such as funding from private insurance), and (iv) assuming the timing for federal funds to be reimbursed may take up to four months.   With estimated monthly disbursements for projects averaging approximately $200 million or more per month, the Oversight Board determined a total funding amount for the Revolving Fund of $750 million would be adequate for the required cash flow needs of eligible Sub-Recipients.   The Oversight Board also determined the Revolving Fund should exist in its entirety until 2029, generally consistent with the disaster aid rollout timing in the Fiscal Plan.[47]   Starting in 2029, a portion of the funds would be released to creditors consistent with the Plan terms described in Paragraph 34 of my Declaration.

---

[44] Eligible Sub-Recipients must have incurred qualifying permanent work damage under FEMA's Public Assistance program and HMGP projects for incurred damages as a result of Hurricane Maria (DR- 4339-PR), Hurricane Irma (DR- 4336-PR), or the earthquakes declared in January 2020 under DR- 4473-PR.

[45] 2021 Certified Fiscal Plan for Puerto Rico, Chapter 4. https://drive.google.com/file/d/1reetKnfKsa1uR-A0u9l3FM6PfGamHCrx/view (last accessed October 21, 2021).  (Debtors' Ex. 10 [ECF No. 18785-10].)

[46] As part of the calculations completed, the deployment of funding was equally spread over the course of the year on a monthly basis.  It is possible the actual distribution of expenditures during the year, however, may vary due to timing of individual projects and seasonality.

[47] 2021 Certified Fiscal Plan for Puerto Rico, Chapter 4. https://drive.google.com/file/d/1reetKnfKsa1uR-A0u9l3FM6PfGamHCrx/view (last accessed October 21, 2021).  (Debtors' Ex. 10 [ECF No. 18785-10].)

32.     Joint Resolution 85-2020 codified the $750 million Revolving Fund from the Commonwealth into law.[48] (Debtors' Ex. 33 [ECF No. 18797-4].)  Under Joint Resolution 85-2020, Sub-Recipients are eligible to apply for funding through June 30, 2025.[49]  As provided in the Revolving Fund guidelines (Debtors' Ex. 40 [ECF No. 18797-11]), the expiration date for funding applications under Joint Resolution 85-2020 will need to be amended to conform to the terms of the Plan.[50]  Also, according to the Revolving Fund guidelines, funding is extended to an applicant only after a project is fully obligated.[51]  Certain funding requests (*e.g.*, certain types of cost overruns in Section 428 Stafford Act agreements and short-term FEMA emergency work) are not eligible.[52]  The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") will administer the Revolving Fund.[53]

33.     Once a Sub-Recipient application is submitted, it is evaluated and prioritized based on several criteria, including alignment with the central government's recovery plan.[54]  If funding is extended to a Sub-Recipient, that Sub-Recipient is required to comply with a budgeted spending

---

[48] Originally submitted act H.B. 773-2020. https://sutra.oslpr.org/osl/SUTRA/anejos/136235/0085c0773.pdf (last accessed October 21, 2021).

[49] Recovery Fund Guidelines, page 4. https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[50] Recovery Fund Guidelines, page 4. https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[51] Recovery Fund Guidelines. https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[52] Recovery Fund Guidelines, page 5. https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[53] Recovery Fund Guidelines. https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[54] Recovery Fund Guidelines. https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

plan and ongoing reporting requirements.[55]   The Sub-Recipient will be required to reimburse the Revolving Fund for any funding it receives from a variety of designated sources.[56]   According to the Revolving Fund guidelines, the Commonwealth's government plans to take several steps to limit potential reimbursement risks.[57]   Sub-Recipients who do not repay an advance on a timely basis will be subject to remedial and corrective actions, including, among other measures, a potential permanent ban from applying to borrow funds from the Revolving Fund in the future.[58]

34.     In structuring the Revolving Fund, the Oversight Board also provided for the eventual allocation of the monies in the Revolving Fund to creditors in the form of a 5.375% Capital Appreciation Bond with a July 1, 2033 maturity date and a repayment obligation of $750 million, callable on July 1, 2031, a portion of which will be distributed to creditors starting in 2029.[59]   The Commonwealth is the bond obligor and, as such, bears the risk of nonpayment.[60]

35.     Based on the foregoing, it is my opinion the Revolving Fund of $750 million is within accepted bounds.

### The Emergency Reserve

---

[55] Recovery Fund Guidelines. https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[56] Recovery Fund Guidelines.  https://recovery.pr/documents/Guias%20FOR.pdf.  Other sources of funds may include, but are not limited to, the Sub-Recipient's own capital, GPR allocated budget, and federally funded programs such as CDBG-DR.  (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[57] Recovery Fund Guidelines.  See pages 7-8.  https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[58] Recovery Fund Guidelines.  https://recovery.pr/documents/Guias%20FOR.pdf (last accessed October 21, 2021).  (Debtors' Ex. 40 [ECF No. 18797-11].)

[59] Seventh Amended Title III Joint Plan of Adjustment, Exhibit I. https://www.prd.uscourts.gov/promesa/sites/promesa/files/documents/1/7th%20Amended%20Plan.pdf  (last accessed October 21, 2021).  (Debtors' Ex. 1 at pages 262-66 [ECF No. 18785-1].)

[60] Seventh Amended Title III Joint Plan of Adjustment, See pages 111 – 112. https://www.prd.uscourts.gov/promesa/sites/promesa/files/documents/1/7th%20Amended%20Plan.pdf  (last accessed October 21, 2021).  (Debtors' Ex. 1 [ECF No. 18785-1].)

36.     The Fiscal Plan also calls for the continued funding of an Emergency Reserve to quickly respond to natural disasters.[61]  The Emergency Reserve is intended to expedite disaster response activities and, upon request, provide the Commonwealth agencies and affected local governments with capital in the event of an emergency of such severity and magnitude that effective response would exceed the capacity of budget resources and federal disaster assistance would not be available or timely available to respond to the emergency.[62]  Unlike the Budget Stabilization Fund, the Emergency Reserve is intended to be accessed only in response to extraordinary events like natural disasters or other events generally outside of human control and unpreventable.[63]  It is not intended to mitigate emergencies related to operational inefficiencies.[64]

37.     The International Monetary Fund ("IMF") has issued a guidance report for the Caribbean region (Debtors' Ex. 36 [ECF No. 18797-7]), which recommends territories in the region establish an Emergency Reserve of between 2% and 4% of gross domestic product to support unforeseen short-term cash needs following a natural disaster.[65]  In particular, the IMF

---

[61] 2021 Certified Fiscal Plan for Puerto Rico, page 57.
https://drive.google.com/file/d/1reetKnfKsa1uR-A0u9l3FM6PfGamHCrx/view (last accessed October 21, 2021).  (Debtors' Ex. 10 [ECF No. 18785-10].)
[62] 2021 Certified Fiscal Plan for Puerto Rico, page 57.
https://drive.google.com/file/d/1reetKnfKsa1uR-A0u9l3FM6PfGamHCrx/view (last accessed October 21, 2021).  (Debtors' Ex. 10 [ECF No. 18785-10].)
[63] FY2022 Commonwealth Certified Budget, Section 15.
https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed October 23, 2021).  (Debtors' Ex. 11 at page 114 [ECF No. 18791-1].)
[64] FY2022 Commonwealth Certified Budget, Section 15.
https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed October 23, 2021).  (Debtors' Ex. 11 at page 114 [ECF No. 18791-1].)
[65] International Monetary Fund, The Bahamas: Staff Report for the 2019 Article IV Consultation, at 48 https://www.imf.org/en/Publications/CR/Issues/2019/07/01/The-Bahamas-2019-Article-IV-Consultation-Press-Release-and-Staff-Report-47067   (last accessed October 21, 2021). (Debtors' Ex. 36 [ECF No. 18797-7].)

noted "[t]he increasing frequency and intensity of extreme weather events presents challenges to preserving human life, maintaining economic activity, and achieving fiscal sustainability."[66]

38.     In line with the IMF guidance, the Oversight Board's yearly certified fiscal plans for the Commonwealth (starting in 2018) provide the Commonwealth will set aside $130 million annually for a period of ten years into an Emergency Reserve until the reserve balance reaches $1.3 billion, or 2% of Puerto Rico's fiscal year 2018 Gross National Product.[67] In fiscal year 2019, the Commonwealth began the process of setting aside funds to deposit into the reserve.

39.     Eligible agencies and affected local governments must be in an emergency declared area and the Emergency Reserve funds must be used for response activities related to the declared event.[68] Non-profits, public corporations, and individuals are not eligible applicants for advances through the Emergency Reserve.[69]

40.     Several steps must be completed before the government may access the Emergency Reserve fund. These requirements include a written approval by the Oversight Board, a State of Emergency Declaration by the Governor of Puerto Rico, and an Office of Management and Budget request to the Oversight Board, which requests access to the Emergency Reserve for a finite period

---

[66] *Id.* at 10.

[67] GNP is used instead of Gross Domestic Product ("GDP") because GNP is the measure of national income that best ties to the base for tax collections. *See, e.g.*, *Declaration of Andrew Wolfe in support of Urgent Motion of Debtor Puerto Rico Electric Power Authority For Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens And Providing Superpriority Administrative Expense Claims, (C) Modifying The Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief*, No. 17-03283 (Jan. 27, 2018) [ECF No. 2298-2], at 6 n.4.

[68] FY2022 Commonwealth Certified Budget, Section 15. https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed October 23, 2021). (Debtors' Ex. 11 at page 114 [ECF No. 18791-1].)

[69] FY2022 Commonwealth Certified Budget, Section 15. https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed October 23, 2021). (Debtors' Ex. 11 at page 114 [ECF No. 18791-1].)

of time and includes the amount, proposed usage of the funds requested, and the repayment date.[70]

Funds must be replenished no later than the following fiscal year.[71]  To date, prior authorizations

have included responses to a variety of natural disasters such as storms, earthquakes, fires and

droughts.[72]

      41.    Quarterly reports must be submitted to the Oversight Board detailing the status of

Emergency Reserve funds, amounts provided to agencies and affected local governments, the

amount of funds expended, the amount of funds remaining, and updated projected repayment

dates.[73]  Agencies and local governments that receive funds from the Emergency Reserve are

required to file with FEMA a Request for Public Assistance program (FEMA's grant program that

provides financial assistance to state and local governments following a natural disaster) to

maximize the likelihood federal fund reimbursements are replenished into the Emergency

Reserve.[74]

---

[70] FY2022 Commonwealth Certified Budget, Section 15.
https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed October 23, 2021).  (Debtors' Ex. 11 at page 114 [ECF No. 18791-1].)

[71] FY2022 Commonwealth Certified Budget, Section 15.
https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed October 23, 2021).  (Debtors' Ex. 11 at page 114 [ECF No. 18791-1].)

[72] As examples of prior authorizations from the Oversight Board, see Letter dated August 14, 2021 https://drive.google.com/file/d/1HA_1ykRGMQD3i5bdjXQIzHRhfU8v4FvS/view; Letter dated January 7, 2020 (last accessed October 21, 2021)
https://drive.google.com/file/d/1xubgpGXpgwO52mR-r3Px-OJ8ClNS0emN/view; Letter dated July 5, 2020 (last accessed October 21, 2021)
https://drive.google.com/file/d/1Y5irf3H3bBCZLxi_BIHCxQZ0Dg1R0Wmy/view; and letter dated June 1, 2021 (last accessed October 21, 2021)
https://drive.google.com/file/d/1b52cIaECYMshgJEvG9Lu473_iqYCA3Yf/view (last accessed October 21, 2021).

[73] FY2022 Commonwealth Certified Budget, Section 15.
https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed October 23, 2021).  (Debtors' Ex. 11 at page 114 [ECF No. 18791-1].)

[74] FY2022 Commonwealth Certified Budget, Section 15.
https://drive.google.com/file/d/1SPvqOCyqu9c6Na3YMuUlTod2MEGhbhNr/view (last accessed

42.     Based on the foregoing, it is my opinion the Oversight Board's establishment of the $1.3 billion Emergency Reserve is within accepted bounds.

### The Identification of Cash Accounts Held By The Debtors and the Oversight Board's Restriction Analysis

43.     The Debtors' bank account balances as of March 31, 2021, and the Oversight Board's legal restriction categorizations, are detailed in Exhibit M to the Disclosure Statement (ECF 17628-13).[75]   As described further below, Exhibit M reflects the output of a collaboration between the Oversight Board, its legal advisors and its financial advisors, including EY.

44.     As further detailed below, EY assisted with several roles in this effort.  First, EY compiled a list of bank accounts held by the Debtors, based on documentation provided to the Oversight Board and its advisors.  Second, EY updated the lists of accounts and balances each quarter, based on information provided to the Oversight Board and its advisors.  Third, EY communicated with specific holders of each account (*e.g.*, various central government agencies and instrumentalities) to obtain information regarding the purpose of each account, the account holder-stated sources and uses of funds in each account, and the account holder-stated potential existence and basis of restrictions on the use of such funds.  Lastly, EY shared this information with the Oversight Board's legal advisors who, I understand, included this in their assessment of the amount of funds, if any, that were legally restricted such that those funds would not be available to creditors (and thus are not treated as part of the available cash balance under the Plan).

---

October 23, 2021) (Debtors' Ex. 11 at page 114 [ECF No. 18791-1]) and FEMA's Public Assistance Program Overview.  https://www.fema.gov/assistance/public/program-overview. (last accessed October 21, 2021).
[75] Exhibit M (ECF 17628-13).
https://www.prd.uscourts.gov/promesa/sites/promesa/files/documents/ajax/7th%20Discl%20Stmt%20Exh%20G-M.pdf (last accessed October 21, 2021).

45.     In March 2019, EY obtained a list of Commonwealth agencies, public corporations, and other instrumentalities (collectively, the "Accountholders") from Duff & Phelps, LLC ("Duff & Phelps"), which it confirmed through discussions with the Oversight Board's external advisors. (I understand Duff & Phelps had previously been retained by the Oversight Board to perform certain work relating to the identification of Commonwealth cash and bank accounts.)  EY used this list for the initial identification of Accountholders and their bank accounts as of June 30, 2018. EY also reviewed other documents, such as court filings, to confirm and identify other accounts.

46.     Beginning in May 2019, EY sent email communications to each Accountholder to obtain their confirmation that the Accountholder did in fact hold each bank account attributed to it.  Out of 44 Accountholders with known or expected active accounts as of September 30, 2021, 42 responded to EY's emails.[76]  For the two non-responsive Accountholders, EY liaised with the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Puerto Rico Department of Treasury, and/or the Oversight Board's other advisors to obtain the requested information and/or documentation.

47.     Many Accountholders provided consent letters to the financial institutions where their accounts were held that authorized EY to directly access account information (*e.g.*, via a web portal).  Out of the 44 agencies with active accounts as of September 30, 2021, EY has direct access to all accounts for 18 agencies and to some accounts for 14 additional agencies.  This does not include accounts for which Accountholders provided a consent letter authorizing EY to request or access data but for which direct access is unavailable (*e.g.*, due to technical limitations), in which cases EY requested this information from a contact person at the financial institution.

---

[76] The two Accountholders that did not respond to EY were the Puerto Rico Senate and the Joint Special Commission of Legislative Funds.

Certain Accountholders either declined to provide consent letters or failed over time to renew prior expired consent letters.  In these instances, EY relied on information provided directly by the Accountholders themselves.

48.     If an Accountholder indicated a specific account did not belong to it, EY contacted the financial institution named on the account to clarify the account ownership if EY has a consent letter for the Accountholder at the financial institution.  If the financial institution was unable to locate the account or EY was not given consent, EY attempted to first corroborate the existence and ownership of the account by contacting other parties with insight into government bank accounts, such as AAFAF, and then confirm the identified owner of the account by following the procedures described above.

49.     At the end of each fiscal quarter (the "Measurement Date"), EY asked the Accountholders and/or financial institutions to validate the status (*i.e.*, closed or open) of all accounts, and to disclose the existence of any new accounts.  If an Accountholder had closed an account, EY requested confirmation of closure from the financial institution, the exact closing date, and the destination of the funds (if any) transferred out of the account prior to closing.  If an Accountholder had opened a new account, EY inquired about the opening date.  EY also asked the Accountholders and financial institutions, depending on whether consent was provided, for quarter-end balances in any accounts to which EY did not have direct access.

50.     EY also asked the Accountholders to describe the purpose of each bank account, the sources and uses of funds therein, and the Accountholders' understanding with regard to the existence of any restrictions on the use of the funds.  If an Accountholder asserted certain funds were subject to restrictions on their use, EY also requested documentation supporting the asserted

restrictions.  EY also requested this information for any account subsequently identified or opened by the Accountholders.

51.     All of the information and documentation collected from the Accountholders, including factual source materials and raw data, was uploaded to and organized on an online document review platform.  EY assigned a unique bank account identifier to each bank account based on a combination of the Accountholder's agency identifier, the financial institution holding the bank account, a sequential numerical identifier, and the last four digits of the bank account number.  Each document uploaded to the platform was assigned one or more unique bank account identifiers to associate the document with the corresponding bank account.  The documents uploaded to the platform included email correspondence between EY and the Accountholders, files provided by the Accountholders, and bank statements or other documentation showing quarter-end balances.

52.     EY provided certain of the Oversight Board's other advisors, including attorneys at Proskauer Rose LLP and at O'Neill & Borges LLC (collectively, the "Legal Team"), access to the online platform to review the uploaded factual source materials and raw data.  After the Legal Team reviewed the uploaded materials, it from time-to-time conveyed its assessment of the sufficiency of such materials to EY.  In some instances, EY relayed follow-up inquiries or requests from the Legal Team to the Accountholders and uploaded additional Accountholder responses to the platform.  I understand the Legal Team provided the factual source materials and raw data to all Eligible Creditors via the Plan Depository (each as defined in the Confirmation Procedures Order) as of April 5, 2021.  I understand the Legal Team will also provide any factual source materials and raw data received after April 5, 2021 and up to October 25, 2021 to Eligible Creditors via the Plan Depository.

25

53.     Following every quarterly Measurement Date, EY provided the Legal Team with an updated list of the Accountholders' bank accounts and the quarter-end balances, based on then-current information.  EY categorized as "Pending" any bank account for which the quarter-end balance had not been confirmed with the corresponding financial institution.

54.     For every Measurement Date, the Legal Team provided EY with a preliminary legal restriction determination (the "Restriction Category") and a brief description summarizing the basis of the restriction determination.  In some instances, the Legal Team changed the Restriction Category from a prior Measurement Date based on its review of newly obtained information from the Accountholder or its re-evaluation of information previously obtained.

55.     As described previously, Exhibit M to the Disclosure Statement provides the list of Debtors' bank accounts, confirmed balances as of the March 31, 2021 Measurement Date, the Restriction Category of each bank account as determined by the Legal Team, and a brief summary provided by the Legal Team of the basis of the legal restriction, if applicable.  These accounts are listed in the order of highest confirmed balance to the lowest confirmed balance.  As of the filing of the Disclosure Statement, including Exhibit M, the Restriction Category is noted for all bank accounts with a confirmed balance of at least $6.9 million.

56.     Subsequent to the filing of the Disclosure Statement (Debtors' Ex. 2 [ECF No. 18785-2]), EY and the Legal Team have continued with the quarterly review and assessment of bank accounts as of June 30, 2021.  The Legal Team has also provided EY with Restriction Categories for bank accounts with a confirmed balance of at least $2.0 million.  Attached hereto as Exhibit A is a list of updated bank accounts, including the respective June 30, 2021 balances and Restriction Categories, based on the work performed by EY and the Restriction Category communicated by the Legal Team to EY as of the date of this Declaration.  Exhibit A sets forth:

a.   428 bank accounts held by the Commonwealth with a confirmed combined balance of $18.917 billion and 13 bank accounts for which balance confirmation is pending;

b.   20 bank accounts held by ERS with a confirmed combined balance of $1.303 billion; and

c.   34 bank accounts held by PBA with a confirmed combined balance of $0.186 billion.

57.   The total 482 bank accounts with an aggregate June 30, 2021 balance of $20.406 billion confirmed as of the date of this Declaration is categorized into the following 7 Restriction Categories (as determined by the Legal Team):

a.   Restricted on the basis of Federal Funds/Law: 76 bank accounts totaling $4.661 billion holding funds received from the federal government or funds subject to federal law regarding their uses;

b.   Restricted on the basis of Third Party funds: 87 bank accounts totaling $1.613 billion holding funds belonging to and held on behalf of third parties;

c.   Restricted on the basis of Court Order: 5 bank accounts totaling $0.076 billion holding funds subject to a court order regarding their use;

d.   Restricted on the basis of Internal Revenue Code: 1 bank account totaling $0.034 billion holding tax-exempt bond proceeds subject to Internal Revenue Code restrictions regarding their use;

e.  Asserted to be Restricted by Certain Creditors Unless Plan Is Confirmed and Consummated: 8 bank accounts held by Department of Treasury and ERS with a confirmed balance of $0.876 billion;[77]

f.  Unrestricted for Use by the Plan: 56 bank accounts totaling $13.109 billion, which funds are available for distribution to creditors under the Plan; or

g.  Unreviewed as to Existence of Legal Restriction:  249 bank accounts, each with a June 30, 2021 confirmed balance of less than $2.0 million, totaling $0.036 billion, for which the Legal Team has not provided EY with a Restriction Category.

58.  Exhibit A includes bank accounts that the Legal Team informed EY to classify as "Unrestricted" for Restriction Category purposes, notwithstanding the corresponding Accountholder contentions that restrictions existed on the use of the funds.  For example, the Office of Court Administration (a Commonwealth agency) asserted the account at First Bank, with account number ending in 9562 and a balance of $101,627,955.60 as of June 30, 2021, holds funds that can be used only pursuant to Act 286-2002, which established a budgetary formula for the judiciary's operating expenses.   Notwithstanding this assertion by the Office of Court Administration, the Legal Team informed EY to classify the funds in this account as "Unrestricted" because, according to the Legal Team, Act 286-2002 is preempted by PROMESA.

59.  Attached hereto as Exhibit B is a list of all the Debtors' bank accounts that had been classified by Accountholders as restricted and re-classified by the Legal Team as "Unrestricted." In total, there are 20 such accounts totaling $0.320 billion.

---

[77] Under the Plan, these amounts are considered as available for distribution to creditors.

60.     Finally, EY's review of the Debtors' bank accounts and coordination with the Legal Team will continue based on the most recent documentation and information received from the Accountholders and/or financial institutions.  Accordingly, I reserve the right to supplement this Declaration as appropriate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on November 3, 2021
Washington, DC

Adam Chepenik