**<u>Exhibit D</u>**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**DECLARATION OF NATALIE JARESKO IN RESPECT OF
CONFIRMATION OF SEVENTH AMENDED TITLE III JOINT PLAN OF
ADJUSTMENT FOR THE COMMONWEALTH OF PUERTO RICO, ET AL.[2]**

I, Natalie A. Jaresko, hereby declare and state as follows:

1.      I am the Executive Director of the Financial Oversight and Management Board for

Puerto Rico (the "Oversight Board"), the sole Title III representative of debtors the

Commonwealth of Puerto Rico (the "Commonwealth"), the Employee Retirement System of the

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Pursuant to the Court's *Order Memorializing Certain Rulings Made at the November 1, 2021 Pretrial Conference* [ECF No. 19009], this declaration has been amended solely to include references to the filed exhibits and their respective ECF numbers.

Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA") pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA").

2.      I submit this declaration (the "Declaration") in respect of confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17627] (as may be amended, supplemented, or modified further, the "Plan") (Debtors' Ex. 1 [ECF No. 18785-1]), and in response to certain objections interposed to confirmation of the Plan.  I have reviewed the Plan and any capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Plan.

3.      My statements set forth in this Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements.  In those instances where I reference a specific document or communication, the specific document or communication either is not being offered to prove the truth of the matter asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.

4.      I am familiar with, and have reviewed (i) the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), (ii) the *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17628] (the "Disclosure Statement") (Debtors' Ex. 2 [ECF No. 18785-2]), as approved by an order of the Title III Court, dated August 2, 2021 [Case No. 17-BK-3283-LTS, ECF No. 17639]; (iii) the *Supplement to the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 18470] (the "Plan Supplement") (Debtors' Ex. 3 [ECF

2

No. 18785-3]); (iv) the agreements among the Oversight Board and various parties to support the Plan; (v) the Fiscal Plan; and (vi) documents filed in these Title III Cases.

5.      As described below, in my role as Executive Director of the Oversight Board, I believe: (i) the settlements embodied in the various agreements discussed below are reasonable and fair; (ii) the Plan's release, injunction, and exculpation provisions are reasonable; and (iii) the Commonwealth laws identified as preempted in Exhibit K to the Plan are inconsistent with PROMESA.

## I.      Introduction and Overview Regarding Development of the Plan

### A.      My Background, Experience, and Responsibilities, and the Creation and Function of the Oversight Board

6.      I received my Master's Degree in Public Policy from the Harvard University Kennedy School of Government in 1989, and my Bachelor of Science Degree in Accounting from DePaul University in Chicago, Illinois in 1987.  From 1989 to 1992, I served in various economic positions at the U.S. State Department in Washington, D.C.  From 1992 to 1995, I served as the Chief of the Economic Section of the U.S. Embassy in Ukraine, where I was responsible for building a new economic relationship between the United States and newly-independent Ukraine. Between 1995 and 2014, I was the CEO of and managed multiple private equity funds, with over $600 million in assets under management focused on investments in small and medium-sized businesses in Eastern Europe.  From 2014 to 2016, I served as Minister of Finance of Ukraine at one of the most critical times in Ukraine's history, rocked by a deep recession, foreign occupation, and war on part of its territory.   During my tenure, I led the successful negotiation and implementation of one of the largest IMF programs in the institution's history, as well as a complex sovereign and sovereign-guaranteed debt restructuring, which required fiscal adjustment, state-owned enterprise reform, implementation of anti-corruption measures, and commercial banking

reform.  As a result of the Ukrainian government's actions during my tenure, Ukraine began to see signs of recovery, including stabilization of the domestic currency, growth in banking system deposits, sharply-reduced inflation, and growth in industrial production.  While the effects of the COVID-19 pandemic have in some ways disrupted Ukraine's continued recovery, I believe the changes I helped to implement in Ukraine provide a framework from which conditions can continue to improve when the pandemic subsides.  I believe my work experience in Ukraine provided a solid foundation for what I was hired to do for Puerto Rico.

7.      On June 30, 2016, President Obama signed into law PROMESA.  I understand the primary goals of PROMESA are to meet Puerto Rico's immediate need to provide its residents effective services, to formulate a debt restructuring, and to implement fiscal measures and structural reforms leading to a sustainable economy, fiscal responsibility, and access to the capital markets on reasonable terms.  To achieve those goals, PROMESA established an independent entity within Puerto Rico's government—the Oversight Board.

8.      On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members for a term of three years.  After approximately four years, some of the original members resigned, and some were replaced by new members, and others were reappointed to new terms that last for three years or until replaced after three years.  The Oversight Board currently has its full complement of seven members.  In March 2017, I was appointed Executive Director of the Oversight Board for an initial term of four years.  On July 30, 2021, the Oversight Board extended my term as Executive Director for an additional two years, to September 17, 2023.

9.      As Executive Director of the Oversight Board, I am responsible for, among other things:  (i) managing and leading the affairs of the Oversight Board as its highest-level executive, under the guidance and supervision of the Oversight Board; (ii) organizing and participating in the

4

Oversight Board's meetings and other meetings associated with the Oversight Board's business and operations, including meetings with Commonwealth elected and appointed government officials; (iii) coordinating the discussion and certification of the Commonwealth's fiscal plan and fiscal plans of other covered territorial instrumentalities, as well as the analysis and certification process of annual budgets of the Commonwealth and other covered territorial instrumentalities; (iv) assisting and participating, as required, in voluntary and court-ordered negotiations and mediations and debt restructuring processes of the Commonwealth and other covered territorial instrumentalities; and (v) promoting initiatives designed to create the necessary foundation for economic growth and restore opportunity to the people of Puerto Rico and access to the capital markets on reasonable terms.

10.     In my role, I regularly communicate with (i) the Oversight Board's advisors and consultants, (ii) the court-appointed mediation team (the "Mediation Team") led by Chief Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas, (iii) federal and Commonwealth government representatives, and (iv) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and its counsel, financial advisors, and consultants, in addition to other constituencies and their respective advisors.  In consultation with the members of the Oversight Board and its advisors, I also review legal documents and make recommendations to the Oversight Board on policy positions and strategies.  Copies of motions, status reports and other documents and pleadings filed by the Oversight Board with the Title III Court, in the Oversight Board's capacity as Title III representative of the Commonwealth, ERS and PBA, are routinely provided to me prior to filing.

11.     Since its establishment, the Oversight Board has focused on achieving its mandates under PROMESA, including, among other things, providing a method for Puerto Rico to regain

fiscal responsibility and access to capital markets.  To accomplish this, the Oversight Board's responsibilities include, without limitation, (i) the annual certification of fiscal plans and budgets for the Commonwealth and covered instrumentalities, (ii) a review of executive and legislative acts to ensure compliance with certified fiscal plans and budgets, and (iii) recommendations to the Governor or the Legislature with respect to actions the Commonwealth and its instrumentalities may take to ensure compliance with a certified fiscal plan, or to otherwise promote the financial stability, economic growth, management responsibility, and efficient delivery of government services to the People of the Commonwealth.  The Oversight Board's responsibilities also include, as the sole representative of the debtors pursuant to Title III of PROMESA, the filing of a plan of adjustment, which must satisfy certain criteria set forth in PROMESA, including that the plan be (i) feasible, (ii) in the best interests of creditors, and (iii) consistent with the applicable fiscal plan certified by the Oversight Board.

12.     Over the past several years, the Oversight Board has certified fiscal plans setting forth initiatives and reforms the Commonwealth and its agencies and instrumentalities must adopt to enable fiscal responsibility, to reduce Commonwealth spending while ensuring more efficient government services for the residents of the Island, to promote economic growth, and set Puerto Rico back on the path to prosperity.  No solution to the Commonwealth's financial condition would be complete without addressing Puerto Rico's unsustainable debt burden.  Accordingly, in 2017, the Oversight Board commenced Title III cases for the Commonwealth (the "Commonwealth Title III Case"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), ERS (the "ERS Title III Case"), the Puerto Rico Highways and Transportation Authority ("HTA" and the "HTA Title III Case"), and the Puerto Rico Electric Power Authority ("PREPA"), and in 2019, for PBA (the

"PBA Title III Case," and together with the Commonwealth Title III Case and the ERS Title III Case, the "Debtors' Title III Cases").

13.   The Oversight Board already has accomplished several milestones towards achieving fiscal responsibility of the Commonwealth.  These milestones include, among other things, (i) restructuring the debt of the Government Development Bank for Puerto Rico ("GDB") under Title VI of PROMESA, by approving GDB's Qualifying Modification and modifying approximately $4 billion of GDB's debt; and (ii) restructuring the debt of COFINA pursuant to a plan of adjustment under Title III of PROMESA, which reduced COFINA's debt by thirty-two percent (32%), and resulted in approximately $17.5 billion in debt service savings.

14.   The Oversight Board continues to work toward Puerto Rico attaining fiscal responsibility, gaining access to capital markets on reasonable terms, and achieving renewed economic prosperity and growth.  I believe the Plan represents a significant step towards achieving those goals.  The Plan was made possible by the Oversight Board's extensive negotiations with numerous claimholder constituencies.  To date, the Oversight Board has executed agreements with a wide range of claimholders, garnering substantial support for the Plan, including agreements with:  (i) certain holders of general obligation bonds issued by (or guaranteed by) the Commonwealth (the "GO Bonds," and the holders of GO Bonds, the "GO Bondholders") and bonds issued by PBA (the "PBA Bonds," and the holders of PBA Bonds, the "PBA Bondholders"), including traditional municipal investors and monoline bond insurers; (ii) certain holders of bonds issued by ERS (the "ERS Bonds," and the holders of ERS Bonds, the "ERS Bondholders"); (iii) certain holders and insurers of bonds issued by HTA (the "HTA Bonds," and the holders of HTA Bonds, the "HTA Bondholders"); (iv) certain holders and insurers of bonds issued by the Puerto Rico Convention Center District Authority ("CCDA") (the "CCDA Bonds," and the holders

7

of CCDA Bonds, the "CCDA Bondholders"); (v) certain holders and insurers of bonds issued by

the Puerto Rico Infrastructure Financing Authority ("PRIFA") (the "PRIFA Bonds," and the

holders of PRIFA Bonds, the "PRIFA Bondholders"); (vi) the Official Committee of Unsecured

Creditors (the "UCC"); (vii) the Official Committee of Retirees (the "Retiree Committee"), and

(viii) the American Federation of State, County, and Municipal Employees and certain affiliates

(collectively, "AFSCME").  The Oversight Board also reached an agreement in principle with the

American Federation of Teachers ("AFT") and its local affiliates, Asociacion de Maestros de

Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical (collectively, "AMPR").

This agreement, however, was subject to ratification by simple majority vote of AMPR's members.

On September 28, 2021, I was informed by representatives of AFT and AMPR that the members

voted against ratifying this agreement.

     **B.**    **The Oversight Board's Initial Actions to Fulfill PROMESA's Mandate**

     15.    As noted above, PROMESA was signed into law on June 30, 2016.  When

PROMESA was enacted, the Commonwealth had approximately $74 billion of indebtedness,

estimated pension liabilities of approximately $55.2 billion, and insufficient resources to meet

those obligations while providing necessary government services and building a sustainable

economy.  Upon formation, the Oversight Board immediately (i) announced a process for the

development, submission, approval, and certification of fiscal plans for the Commonwealth and

for covered territorial instrumentalities, (ii) designated an initial group of 63 entities as covered

entities under PROMESA, including the Commonwealth, HTA, GDB, ERS, the Judiciary

Retirement System ("JRS"), the Teachers Retirement System ("TRS"), COFINA, the Puerto Rico

Aqueduct and Sewer Authority ("PRASA"), PRIFA, PREPA, and PBA, (iii) requested a

significant amount of financial and budgetary information from the Commonwealth as a first step

to develop improvements to the Government's fiscal governance, accountability, internal controls,

and financial affairs, and (iv) began developing selection criteria and processes for expediting certain critical energy and infrastructure projects.

16.     Recognizing the need for immediate and accurate information, the Oversight Board required direct access to certain of the Government's financial information systems.   The Oversight Board's cash investigation, however, was severely hampered by the structural deficiencies in the internal accounting and reporting mechanisms of the Commonwealth and its top agencies and public corporations (the "Component Units").   Among other things, as described in the Independent Investigator's Final Report by Kobre & Kim LLP (Debtors' Ex. 132 [ECF No. 18807-10]), which was commissioned by the Oversight Board, there was no uniform accounting or reporting function across Component Units.   In fact, many of the Component Units utilized different accounting and record-keeping systems, many of which were incompatible with the Department of Treasury's system or otherwise inaccessible to the Office of Management and Budget.   Some Component Units used multiple incompatible accounting systems within their own entities.   All of these factors resulted in inadequate and inaccurate cash balance accounting and transparency by the Commonwealth and its Component Units, without any centralized system with visibility into all accounts.   To provide just one example of the significant issues this caused, in December 2017, the Commonwealth disclosed that it had discovered over 800 previously unknown bank accounts with a total of almost $6.9 billion in Government funds.

17.     To begin to address these concerns, the Oversight Board required the strengthening and expansion of the role of the Office of the Chief Financial Officer for Puerto Rico to ensure implementation of financial management best practices and to establish a series of reporting requirements to provide greater transparency into the Government's financial management, including (i) reporting on the Treasury Single Account (or "TSA") for the Commonwealth—a

single integrated account that offers visibility into all Central Government bank accounts as part of the Commonwealth's centralized cash management system—as well as bank accounts of the Component Units within the Commonwealth fiscal plan, (ii) the creation of a budget-to-actuals reporting requirement for the Central Government and other Component Units, (iii) accounts payable reporting, and (iv) personnel reporting.

18.     The Oversight Board has been and continues to be aware of the wide variety of stakeholders in the Commonwealth and the multiple interested parties affected by its efforts toward fiscal responsibility.   In an effort to gather information, understand concerns of the various constituencies, and begin progress towards a consensual resolution of Puerto Rico's financial emergency, the Oversight Board commenced meetings with representatives of multiple groups of claim holders, including retirees, GO Bondholders, bond insurers, GDB bondholders, HTA Bondholders and insurers, PRASA bondholders, PREPA bondholders and insurers, public employee unions, the Retiree Committee, the UCC and many others.

**C.     The Oversight Board's Policy Reforms**

19.     The Oversight Board has included significant structural and governance reforms in the certified fiscal plans, enabling reinvestment into areas of highest need for the Commonwealth. For example, the certified fiscal plan assumes the successful consolidation of many of the Commonwealth's more than 100 government agencies will reduce costs and promote more efficient government services.   In turn, the savings assumed to be generated by these governance reforms have enabled investment into areas such as teacher and police salaries and public safety equipment.

**D.     Actions Undertaken by the Oversight Board in Response to Natural Disasters and the COVID-19 Pandemic**

20.     In September 2017, Puerto Rico's financial status, and the difficulties in improving it, worsened when the Island was devastated by Hurricanes Irma and Maria.  Hurricanes Irma and Maria caused catastrophic destruction, leaving Puerto Rico completely without power, with many streets and roads flooded, and homes and buildings throughout the Island without roofs or running water.

21.     Acting in concert, the Government and the Oversight Board immediately undertook a series of actions to address this crisis.  The Oversight Board provided the Government with the flexibility to reapportion up to $1 billion in budgeted expenditures to cover disaster-related expenses.  Additionally, the Oversight Board sought the maximum amount of federal assistance, access to an emergency liquidity program, parity treatment for Medicaid funding, and waivers of caps and local share requirements for federal disaster assistance.  The Oversight Board also (i) collaborated with the Government to provide short and medium term worst case liquidity estimates, (ii) participated in numerous meetings with members of Congress, Congressional staff, and federal agencies (including the Office of Management and Budget and the U.S. Treasury), and (iii) had dozens of informational meetings with reporters, think-tanks, and universities.

22.     Unfortunately, Hurricanes Irma and Maria were only the first of several natural disasters that have plagued the Commonwealth's recent history.  On December 28, 2019, Puerto Rico experienced what was reported as a magnitude 4.7 earthquake—a harbinger of many significant earthquakes and aftershocks to follow.  On January 6, 2020, according to reports, Puerto Rico was struck by a magnitude 5.8 earthquake, closely followed by a 6.4 magnitude tremblor the next day.   On May 2, 2020, a 5.4 magnitude earthquake reportedly struck Puerto Rico's southwestern coast.  To help respond to these disasters, the Oversight Board authorized the

11

additional use of emergency reserve funds, which the certified fiscal plans established after the experience with Hurricanes Irma and Maria pointed to the need for emergency liquidity.

23.     While efforts to recover from these earthquakes were underway, Puerto Rico suffered a public health disaster when, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  The Oversight Board acted swiftly—and in conjunction with the Government—to combat the pandemic.  Making use of the available emergency reserve funds, the Oversight Board made an initial $5 million available to the Government to contain and mitigate COVID-19, and thereafter authorized the use of the balance of the $160 million emergency reserve fund to try and address the health and economic challenges created by this virus.  On March 23, 2020, the Government and the Oversight Board agreed to provide $787 million in additional financial support to those on the front line of the COVID-19 pandemic.  This funding was used as a bridge to address the dire condition of the Commonwealth until the Federal Government established the Coronavirus Aid, Relief, and Economic Security Act.

### E.      The Oversight Board Certifies Commonwealth Fiscal Plans

24.     PROMESA provides for the creation of fiscal plans for the Commonwealth which, in general terms, are intended to provide estimates of revenues and expenditures for the Commonwealth for the period covered by the Fiscal Plan, among other statutory requirements. The Oversight Board first certified a fiscal plan for the Commonwealth on March 13, 2017 (the "2017 Commonwealth Fiscal Plan") (Debtors' Ex. 4 [ECF No. 18785-4]).   The 2017 Commonwealth Fiscal Plan initially was proposed by the Governor, and certain amendments were added by the Oversight Board.  The Oversight Board also worked with the Government to develop and eventually certify on April 28, 2017 fiscal plans for other covered instrumentalities, including GDB, HTA, PRASA, and PREPA.

25.     Over the years, the Oversight Board has worked diligently to facilitate the successful development and implementation of additional fiscal plans, structural reforms and fiscal measures: (i) monthly meetings with priority agencies to spur implementation progress; (ii) public reporting of the status of progress achieved in Government implementation plans and progress reports; (iii) utilizing readiness assessments based on best practices to provide a framework for agencies to track progress on implementation and understand the scope of the different milestones; (iv) conducting public hearings on implementation in areas of much needed transformation; and (v) milestone budgeting to incentive implementation.

26.     During the months following Hurricanes Irma and Maria, the Oversight Board collaborated with the Government to continue to develop new fiscal plans.  Ultimately, after months of close collaboration with the Government, on June 29, 2018 the Oversight Board certified its own fiscal plan for the Commonwealth (Debtors' Ex. 6 [ECF No. 18785-6]), containing many fiscal measures necessary to right-size the Government, and reflecting a series of structural reforms necessary to promote economic growth, including human capital and welfare reform, ease of doing business reform, and power sector reform.  Certain investments were targeted for a means-tested scholarship fund for University of Puerto Rico students.  Over the past several years, the Oversight Board has certified further revised Commonwealth fiscal plans to reflect new information, delays in implementation, updated financial projections, investments into increased salaries for firefighters, teachers and police, and account for additional natural disaster and public health crises.

27.     In 2019, Puerto Rico faced significant political turmoil culminating in the resignation of then-governor Rosselló.  Just as the Island was recovering from political disruption and embarking on reconstruction at the end of 2019, Puerto Rico suffered the series of earthquakes

and aftershocks described above, causing structural damage to buildings across southwestern Puerto Rico.  Only two months later, Puerto Rico (along with the rest of the world) was confronted with the global COVID-19 pandemic.  Amidst the uncertainty, the Oversight Board represented a steady hand and worked diligently to address the economic and social impact of these events. Accordingly, on May 27, 2020, the Oversight Board certified a revised fiscal plan for the Commonwealth (the "2020 Commonwealth Fiscal Plan") (Debtors' Ex. 9 [ECF No. 18785-9]). Among other things, the 2020 Commonwealth Fiscal Plan again reflected close collaboration with the Government as incremental fiscal measures were delayed to enable the Government to focus on the critical response to the pandemic.  Structural reform implementation was also delayed. Greater investments were included, among others, allocating funds to address critical infrastructure gaps in Puerto Rico's public healthcare system, in telecommunications infrastructure, in the expanded use Electronic Health Record programs, in workforce development business and technology training, and expanding access to care through development of telehealth infrastructure.

28.     As the COVID-19 pandemic continued to impact the world, on April 23, 2021, the Oversight Board certified a revised fiscal plan for the Commonwealth (the "2021 Commonwealth Fiscal Plan") (Debtors' Ex. 10 [ECF No. 18785-10]).  The certified 2021 Commonwealth Fiscal Plan factors in the economic and social impact of the COVID-19 pandemic, including prolonged heightened unemployment rates in Puerto Rico, as well as substantial federal and local stimulus, the slower than expected disaster relief funding spending, and the updated estimates of the potential impact of structural reforms.  Among other things, the 2021 Commonwealth Fiscal Plan provides updates for new information about the macroeconomic environment, as well as Government revenues, expenditures and reform efforts, investments into civil service reform, and

presses the Government to implement much-needed reform measures to improve the conditions

for investment in the economy in a post-COVID-19 world, better serve the people of Puerto Rico,

and accomplish the goals of PROMESA to return to fiscal stability and regain access to capital

markets.

      **F.**      **The Plan and Plan Settlement Agreements**

      29.      As described herein, following the filing of the Debtors' Title III Cases, the

Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions

under the guidance and direction of the Mediation Team, and continued to negotiate directly with

various constituencies, all in an effort to build support for the restructuring of Commonwealth

debt.  Eventually, those negotiations culminated in certain agreements with various stakeholders

in furtherance of the successful implementation of the Plan.

      30.      On May 31, 2019, the Oversight Board entered into a plan support agreement (the

"2019 GO/PBA PSA") with certain holders of approximately $3 billion of GO Bond Claims and

PBA Bond Claims regarding the framework of a plan of adjustment that would resolve (i) disputes

regarding the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes

between the Commonwealth and PBA regarding the characterization of certain purported leases,

the amount of any administrative rent that may be owed by the Commonwealth for the use of PBA

facilities following the commencement of the Commonwealth Title III Case, and the ownership of

certain PBA facilities.  Although the 2019 GO/PBA PSA outlined the provisions of a potential

plan of adjustment for the Debtors, it was subject to certain conditions precedent, including,

without limitation, the negotiation and agreement as to the terms of new securities to be issued

under with the proposed plan.  Following entry into the 2019 GO/PBA PSA, the Oversight Board,

under the guidance of the Mediation Team, continued to negotiate with its creditors to generate

further consensus among the parties, including, but not limited to, other holders and insurers of GO Bonds and PBA Bonds.

31.     On June 7, 2019, the Oversight Board reached an agreement with (a) the Retiree Committee regarding, among other things, the treatment of ERS, JRS, and TRS benefits pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), and (b) AFSCME regarding, among other things, return of contributions of all public employees to ERS under the System 2000 plan, and modifications to a collective bargaining agreement and AFSCME's consent to the treatment of ERS benefits pursuant to the Plan (the "AFSCME PSA") (Debtors' Ex. 21 [ECF No. 18794-1]).

32.     On September 27, 2019, the Debtors filed the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 8765] (the "Initial Plan").  The Initial Plan contained the material terms outlined in the 2019 GO/PBA PSA, but the parties had not yet reached an agreement with respect to the terms of the securities proposed to be issued.  In addition, on the same date, the Oversight Board commenced the PBA Title III Case.

33.     Following the filing of the Initial Plan, the Oversight Board continued to negotiate with various stakeholders to generate further support for a plan of adjustment.  Accordingly, following a renegotiation of the 2019 GO/PBA PSA, the Oversight Board terminated the 2019 GO/PBA PSA and reached an agreement in principle with groups holding a majority of outstanding PBA Bonds and GO Bonds holding over $8 billion collectively (and, inclusive of Claims held by parties who executed joinders thereto, over $10 billion), memorialized in a plan support agreement dated February 9, 2020 (the "2020 GO/PBA PSA").  The 2020 GO/PBA PSA provided a revised framework for the treatment of PBA Bonds and GO Bonds and settled all challenges to the validity, priority, and secured status of such bonds.

34.     Consistent with the terms of the 2020 GO/PBA PSA, on February 28, 2020, the Oversight Board filed an amended proposed plan of adjustment and related disclosure statement [ECF Nos. 11946 and 11947, respectively].  The Oversight Board promptly pursued a hearing on the adequacy of information contained in the disclosure statement and, on March 10, 2020, the Title III Court entered an order [ECF No. 12187] establishing June 3-4, 2020 as the dates for such hearing.

35.     However, due to the spread of COVID-19 globally and throughout Puerto Rico, and its effects on the people and economy of Puerto Rico, the Oversight Board sought to adjourn the hearing to consider approval of the disclosure statement and related deadlines, subject to further status reports to be provided to the Title III Court, which request was granted by the Title III Court on March 27, 2020 [ECF No. 12549].  More importantly, the COVID-19 pandemic caused an unprecedented public health crisis, which required the Government to immediately establish a curfew and mandate business closures.  As of March 2021, the reported statistics show Puerto Rico had experienced 97,713 cases of COVID-19 and 2,113 deaths caused by the virus.  Moreover, the economy has suffered, as unemployment on the island doubled and hotel reservations reportedly fell by 95% as tourism decreased dramatically.  The Government's statistics show the effects of the sudden constriction in household income was felt across the Island, as retail sales plummeted in April 2020 to just 38% of February 2020 levels.  The uncertain combined impact of increased expenditures and decreased revenues were projected to significantly impair the Commonwealth's budget.

36.     Due to the impact of the virus on the Commonwealth's finances, as well as the impacts on its residents and local businesses, the Oversight Board re-engaged with the parties to the 2020 GO/PBA PSA and entered into further mediation and private sessions with the assistance

17

and guidance of the Mediation Team.  As a result of such mediation sessions, on February 23, 2021, the Oversight Board announced the termination of the 2020 GO/PBA PSA and the execution of a new plan support agreement with groups holding a majority of outstanding PBA Bonds and GO Bonds (the "Initial PSA" and, as amended on July 12, 2021, the "GO/PBA PSA") (Debtors' Ex. 16 [ECF No. 18791-6]).  A copy of the GO/PBA PSA is attached as Exhibit B to the Disclosure Statement.

37.     The GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]), together with the restructuring of COFINA's debt,  reduces the Commonwealth's debt service (including principal and interest from restructured COFINA bonds) by approximately 62%, from $90.4 billion to $34.1 billion (see Disclosure Statement at 35).  The GO/PBA PSA also (i) provides for a proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico Constitutional debt limit, (ii) provides for the issuance of new bonds and contingent value instruments ("CVIs"), along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth; (iii) resolves the outstanding disputes between the Commonwealth and PBA, and (iv) provides for the resolution of disputes regarding the PRIFA bond anticipation notes ("PRIFA BANs") pursuant to a stipulation, dated as of February 22, 2021 (the "PRIFA BANs Stipulation") (Debtors' Ex. 22 [ECF No. 18794-2]).

38.     Following entry into the Initial PSA, the Oversight Board continued to work to develop consensual resolutions with the greatest number of stakeholders possible.  In pursuit of this goal, the Oversight Board engaged with additional interested parties under the guidance of the Mediation Team, as led by Judge Houser, and ultimately reached several additional agreements with various stakeholders as support for the Commonwealth's restructuring grew.  On March 9,

2021, the Oversight Board reached an agreement (amended on April 2, 2021) with certain groups of ERS Bondholders and Bank of New York Mellon ("BNYM"), as fiscal agent, regarding the proposed treatment and settlement of disputes relating to ERS Bonds (the "ERS Stipulation"), a copy of which is attached as Exhibit E to the Disclosure Statement (Debtors' Ex. 19 [ECF No. 18791-9]).

39.     The ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]), among other things, (i) provides a global resolution of disputes regarding the validity and related rights of ERS Bonds and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a "pay as you go" system for payment of pension benefits to retirees, and (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth.

40.     On May 5, 2021, the Oversight Board reached an agreement with certain holders and insurers of HTA Bonds and certain holders and insurers of CCDA Bonds, regarding the proposed treatment and settlement of, among other things, certain "clawback claims" against the Commonwealth (the "HTA/CCDA PSA"), a copy of which is attached as Exhibit C to the Disclosure Statement (Debtors' Ex. 17 [ECF No. 18791-7]).  The HTA/CCDA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA PSA, (iv) provides

for the bondholders and insurers to support the Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA.

41.     On July 12, 2021, the Oversight Board reached an agreement in principle with the UCC regarding, among other things, proposed recoveries for classes of general unsecured claimholders while resolving the UCC's objections to the Plan and other Plan-related disputes (Debtors' Ex. 23 [ECF No. 18794-3]).

42.     Additionally, on July 27, 2021, the Oversight Board reached an agreement (the "PRIFA PSA," and, together with the AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]), GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]), ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]), HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]), the "Plan Settlement Agreements"), with certain holders and insurers of PRIFA Bonds resolving certain litigation among the parties, setting forth the terms of new securities to be issued pursuant to the Plan, and setting forth the agreement of the parties to support the plans of adjustment for the Commonwealth and PRIFA consistent with the PRIFA PSA, a copy of which is attached as Exhibit D to the Disclosure Statement (Debtors' Ex. 18 [ECF No. 18791-8]).  The PRIFA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the PRIFA PSA, and (iv) provides for the bondholders and insurers to support the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).

43.     Finally, after months of extensive and complex negotiations, in July 2021, the Oversight Board reached an agreement in principle with AFT and AMPR regarding the terms of a

new CBA for the teachers' union and consensual treatment of claims arising from the freeze of the TRS pension system.  As described more fully below in Section III.G., the union representatives solicited the votes of the union's membership to ratify this agreement in September 2021, and on September 28, 2021, AMPR reported its members rejected it.

44.     In Section III, below, I describe the details of the above-referenced settlements and why I think they are fair and reasonable.

## II.     The Plan Complies with the Factual Requirements in PROMESA Section 314(b)

45.     I believe the Plan  (Debtors' Ex. 1 [ECF No. 18785-1]) complies with the factual requirements in PROMESA Section 314(b) discussed below, based on (a) my understanding of the Plan, (b) the events that occurred throughout the Debtors' Title III Cases, and (c) various orders entered by the Title III Court during the Debtors' Title III Cases.

### A.     PROMESA § 314(b)(1):  The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301

#### 1.     Bankruptcy Code Section 1122(a):  Classification of Claims and Interests

46.     Section 1122(a) of the Bankruptcy Code states a claim may be classified in a particular class if it is substantially similar to the other claims or interests in such class.  In assessing this requirement, the Oversight Board considered many factors, including the security and priority of claims, in determining whether claims are substantially similar.

47.     The Plan (Debtors' Ex. 1 [ECF No. 18785-1]), provides for the separate classification of Claims in sixty-nine (69) Classes.  I believe such classifications comply with section 1122(a) of the Bankruptcy Code because Claims in each Class are either all unsecured Claims or are all secured Claims secured by the same collateral.  Specifically, Article IV of the Plan classifies the following sixty-nine (69) Classes of Claims:

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |
| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold Claims | Class 51C | Commonwealth |
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

Settlement Claims (Classes 1-50).

48.    To the extent unsecured Claims are separately classified, the reason for separate classification is never to gerrymander an accepting Class.  Indeed, the Plan Settlement Agreements provide the Debtors many accepting Classes.   Rather, separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.  I understand that all holders of Claims in Classes 1-11 hold PBA revenue bonds and alleged the same guarantee against the Commonwealth, but are separately classified based on three

factors: the year in which the bonds were issued, whether the bonds are insured and, if so, the insurer, and whether the bondholder is a retail investor. I understand that classification depending on year of issuance is based on differences in the risk profile associated with each issuance potentially having violated the Constitutional Debt Limit, with the treatment of Classes varying based on how much risk of disallowance of the Claims existed for each Class. I also understand that holders of insured bonds issued the same year are separately classified because the insurance agreements provide bondholders different rights. Thus, the holders of Claims in Classes 1-11 are classified by whether the PBA revenue bonds they hold: (a) were issued prior to 2011 and are (i) uninsured (Class 1), (ii) uninsured and held by a Retail Investor (Class 7), (iii) insured by Assured Guaranty Corp. or Assured Guaranty Municipal Corp. (together, "Assured") (Class 2), National Public Finance Guarantee Corporation ("National") (Class 3), Ambac Assurance Corporation ("Ambac") (Class 4), Financial Guaranty Insurance Company ("FGIC") (Class 5), or Syncora Guarantee Inc. ("Syncora") (Class 6); (b) were issued in 2011 and are (i) uninsured (Class 8), or (ii) uninsured and held by a Retail Investor (Class 9); or (c) were issued in 2012 and are (i) uninsured (Class 10), or (ii) uninsured and held by a Retail Investor (Class 11).

49.     I understand that, for similar reasons, bond claims against the Commonwealth in Classes 15-50 are classified separately based on the date of bond issuance, whether the bonds are insured and, if so, the insurer, and whether the bondholder is a retail investor as follows: (a) whether the bonds were issued prior to March 2011 (Classes 15-29), March or later in 2011 (Classes 30-39), in 2012 (Classes 40-45), or 2014 (Classes 46-50), and (b) whether the bonds are (i) uninsured (Classes 15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and 47), or (ii) insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac (Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and

28). Likewise, based on the elections offered under the Plan, holders of Vintage CW Bonds, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims that are either Puerto Rico Institutions or Puerto Rico Individuals, to the extent elections were made, were shifted to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to denote the election made to receive taxable distributions on account of their bonds, and the alternative form of distribution elected. I believe that, under applicable federal law, Puerto Rico residents are generally exempt from payment of federal income taxes. For this reason, the Oversight Board determined to make available to Puerto Rico Investors the opportunity to elect to receive their distribution under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) in the form of bonds, CVIs, or cash, as applicable, with higher interest rate coupons, which recovery would be treated as taxable for federal income tax purposes, but which such Puerto Rico Investors may be exempt from paying.

Pension Claims (Classes 51A-51L).

50. Active and retired employees holding pension Claims comprise Classes 51A-51L. I believe these active and former employees are integral to the basic provision of governmental services to the Commonwealth's residents and the Government could not function without them. For example, among the Government's most important functions is to protect its residents from crime, respond to natural disasters and other similar emergencies, and educate over 345,000 K-12 children through public education programs. None of these and other similar services would be possible without the Commonwealth's dedicated police officers, firefighters, teachers, and other public employees who make up the holders of such pension claims. Moreover, upon review of the Commonwealth's future financial obligations and evaluation of its obligations to pensioners under

26

multiple recovery scenarios, the Oversight Board determined it would be in the best interests of the Commonwealth and all its stakeholders to ensure that pensioners receive a minimum monthly benefit to keep them above the federal poverty guidelines and maintain an ability to support themselves without requiring additional future support from the Commonwealth.  As a result, although each of the pension claims is a general unsecured claim, the Oversight Board agreed to the separate classification and treatment of pension claims in connection with its agreement with the Retiree Committee.

51.      These pension claims are further classified separately based on whether the pensioners (a) are retired (Classes 51A-F, K, and L) or active (Classes 51G-J), (b) are participants in ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS (Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination program (Classes 51K and 51L), because each program has different funding sources and liabilities, and (c) receive a Total Monthly Retirement Benefit above (Classes 51D-F and 51L) or below (Classes 51A-C and 51K) a minimum threshold of $1,500, such that their Claims are or are not subject to reduction lest the Commonwealth be required to supplement such claimants' finances separately.  Finally, to best align the interests of the Commonwealth's public employees and pensioners, if the Excess Cash Surplus (as defined in the Plan) is equal to or exceeds $100 million in any given fiscal year up to and including fiscal year 2033, ten percent (10%) of such Excess Cash Surplus shall be allocated and applied pro rata to each participant based on the amount of total reductions experienced by such participant during such fiscal year pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), until such participant has received the amount cut from their pensions (the "Benefit Restoration"). In making these statements, I recognize there are on-going discussions concerning matters

regarding the Plan and, in particular, treatment of Pension Claims.  If necessary, I will supplement
this Declaration to reflect the results of those discussions.

AFSCME Claims (Class 52).

52.     Claims held by AFSCME, related to certain collective bargaining agreements
between AFSCME and the Commonwealth that will occur pursuant to the Plan (Debtors' Ex. 1
[ECF No. 18785-1]), are classified separately from general unsecured claims.  The separate
classification is compelled because the treatment of these claims is the adoption of a new collective
bargaining agreement.  This treatment is simply inapplicable to other Classes of unsecured Claims
and it is beneficial to the Commonwealth and all its stakeholders to provide such treatment as
opposed to payment of the Claim.  I am aware AFSCME is one of Puerto Rico's primary public
employee unions, representing over 9,500 of the Commonwealth's public employees.  I believe
AFSCME is an important bargaining unit whose members provide the Commonwealth's public
services.  The Oversight Board negotiated with AFSCME and agreed to a modified collective
bargaining agreement that I believe provides important flexibility to the Commonwealth's
utilization of its workforce.  The agreement with AFSCME also secured multiple significant
benefits, including aligning the incentives of the Commonwealth and its workforce going forward
by providing the public employees with an opportunity to share in the Commonwealth's Excess
Cash Surplus in the future.  I believe separate classification of these Claims is reasonable, justified
and supported by a governmental purpose because of, among other things, (i) the benefits obtained
by amending such collective bargaining agreements consensually, and (ii) the benefits that will be
further secured by re-aligning the Commonwealth and its public employees towards a common
purpose.

Dairy Claims (Class 53).

53.     The Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the Commonwealth's primary producers and source of dairy for the population—are classified separately in Class 53.  I understand that such Claims arose from a settlement agreement and memorandum of understanding, dated as of October 29, 2013, in the litigation styled *Vaqueria Tres Monjitas, Inc. and Suiza Dairy, Inc. v. Naftali Soto Santiago, et al.*, Case No. 04-1840 (DRD) in the United States District Court for the District of Puerto Rico.  My understanding is it is very costly and difficult for Puerto Rico to consistently import dairy, which has a short shelf life—a fact underscoring the importance of the domestic dairy industry to the Island and its residents.  I am aware that dairy production is one of the key issues of food security on the Island.  I believe a vibrant dairy industry is critical to ensuring that Puerto Rico's residents, including hundreds of thousands of school-children, have access to dairy on a daily basis.  In addition, the dairy industry is one of the Commonwealth's largest agricultural industries and employs a significant number of Puerto Rico's residents.  For these reasons, I believe it is reasonable and justified to classify separately claims held by large dairy producers and provide such Class with an enhanced 50% recovery on account of the holders' Claims, ensuring that such integral Claimants do not suffer further financial hardship and impair an industry vital to the health of the Commonwealth's citizens.

Eminent Domain Claims (Class 54).

54.     The Claims held by eminent domain claimants are separately classified in Class 54. I understand those claimants assert constitutional Claims based upon an alleged seizure of property pursuant to the Commonwealth's eminent domain power, and are partially secured (though the claimants contend they are fully secured based on the Fifth Amendment of the U.S. Constitution)

by deposits submitted by the Commonwealth with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims.  The amount of the Claim in excess of the deposit, if any, will receive the same treatment as other general unsecured claimholders.  These Claims are classified separately because the treatment of this Class settles the claimholders' Fifth Amendment Claims, which would entitle the Claims to payment if their Fifth Amendment argument were correct.

       Energy Incentive Claims (Class 55).

       55.    As Executive Director, I am aware the Commonwealth and its Government are motivated to address climate change and promote the production of renewable energy.  As an island that has experienced numerous climate-related natural disasters—including Hurricane Irma and Hurricane Maria—the Commonwealth desires to promote and implement measures to address the impact of climate change.  Class 55 consists of Claims arising from, or relating to, the Puerto Rico Green Energy Incentives Act, Act No. 83-2010, as incorporated under the New Incentives Code, Act 60-2019 (the "Energy Incentive Act").  I understand the Energy Incentive Act provides tax incentives for those citizens who undertake certain clean-energy projects to reduce their carbon footprint related to their household's energy use.  I further understand such Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue.  After an evaluation of the policy and review of the small amount of Claims under the Energy Incentive Act, the Oversight Board determined separate classification and full satisfaction of these Claims by continuing to honor and provide the claimed tax deductions is reasonable and justified because such tax incentives are deigned to benefit the Commonwealth and its economy as a whole.  I believe it is in the Commonwealth's best interests to promote the reasonable governmental purpose of supporting residents who are taking steps to address climate change and

who took those steps in reliance upon the availability of such tax deductions under the Energy Incentive Act.

Med Center Claims (Class 56).

56. Class 56 consists of all Claims of certain federally qualified health centers arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb). One of the Commonwealth government's most important interests is supporting and ensuring the health of Puerto Rico residents—an interest that has been further intensified by the COVID-19 pandemic engulfing the Commonwealth and the world. The Oversight Board determined that Claims held by the Med Centers should be separately classified from other General Unsecured Claims because such Claims are held by integral members of the Commonwealth who continue to provide critical medical treatment to innocent third parties, particularly while in the midst of a global pandemic, and are payable through Medicare/Medicaid funds from the federal government which are earmarked for the payment of such claims and not available to other general unsecured claimholders. For these reasons, I believe that separate classification of such Class and enhanced treatment on account of their Claims through the receipt of a 50% recovery is reasonable and justified to support such critical services and ensure that medical providers on the island are not underfunded.

Tax Credit Class (Class 57).

57. Class 57 consists of Claims (other than Energy Incentive Claims) relating to refunds or credits for the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income tax credits, deductions, or carryforwards. I understand that such Tax Credit Claims were designed and implemented by the Government of the Commonwealth to incentivize certain behavior and to benefit the Commonwealth and support the economy as a whole. Moreover, these Claims are not

paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue. The Oversight Board determined that it was in the best interests of the Commonwealth and its economy to continue to honor such tax incentives upon which residents and local businesses have relied, and to separately classify such Claims.

CW Appropriations Class (Class 63).

58.     Class 63 consists of Claims arising from or related to indebtedness only payable from appropriations of the Commonwealth legislature. I understand these claimants have significantly lesser rights than holders of CW General Unsecured Claims, as they have no ability to compel payment of their Claims and hold only contingent rights to payment to the extent appropriated by the government of the Commonwealth. For these reasons, I believe the Oversight Board has a compelling governmental purpose in separately classifying such Claims.

Section 510(b) Subordinated Claims Class (Class 64).

59.     Class 64 consists of Claims determined pursuant to a Final Order to be subject to section 510(b) of the Bankruptcy Code. I understand section 510(b) of the Bankruptcy Code subordinates such Claims to other general unsecured claims, and that such Claims are only eligible to receive a recovery under the Plan once all other unsecured creditors have been paid in full. Because they have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and treatment.

### 2.     Bankruptcy Code Section 1122(b)

60.     Section 1122(b) of the Bankruptcy Code permits a plan to "designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." Class 68 contains a Class of "Convenience Claims," consisting of Claims equal to or less than $20,000, or Claims which a given holder elected to reduce to $20,000 in accordance with the terms of the Plan.

In addition, any holder of multiple Claims in an aggregate amount of $40,000 or more may elect

to reduce all such Claims to an aggregate amount of $40,000 and be treated within this Class.

Given the extraordinarily large number of Claims asserted against the Commonwealth and ERS, I

believe the separate classification of such "Convenience Claims" is reasonable and necessary to

ease the administrative burden on the Commonwealth.  I further believe it would be less costly

simply to pay such Claims than it would to administer them through the claims reconciliation

process.

### 3.     Bankruptcy Code Section 1123(a)(1)

61.     Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate certain

claims, other than (as relevant here) those specified in section 507(a)(2), into separate classes in

accordance with section 1122 of the Bankruptcy Code.  As stated above, Article IV of the Plan

designates sixty-nine (69) separate Classes of Claims for the Debtors and the claims in each such

Class are substantially similar to other claims or interests within that Class.  None of those sixty-

nine (69) separate Classes of Claims contain claims of the type described in section 507(a)(2) of

the Bankruptcy Code.

### 4.     Bankruptcy Code Section 1123(a)(2)

62.     Section 1123(a)(2) of the Bankruptcy Code requires a plan to specify any class of

claims unimpaired under the plan.  Section 84.1[3] of the Plan (Debtors' Ex. 1 [ECF No. 18785-1])

specifies that Claims in Classes 1 through 12, 14 through 50, 51D through 51J, 51L, 52 through

54, 56, 58 through 62, 65, 66, and 69 are impaired and will receive distributions pursuant to the

---

[3]  Although Section 84.1 of the Plan initially listed Class 51J among the impaired Classes, I understand the Plan is
being amended to remove Class 51J from Section 84.1 and list it among the unimpaired Classes identified in Section
84.2 of the Plan.  Further, although Section 84.2 of the Plan initially listed Class 51B among the unimpaired Classes,
I understand the Plan is being amended to remove Class 51B from Section 84.2 and list it among the impaired Classes
identified in Section 84.1 of the Plan.

Plan, and that such Classes are entitled to vote to accept or reject the Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Classes 22, 29, 33, 35, 39, 43, 45, 48, 50, and 68 are deemed to have accepted the Plan. Additionally, existing holders of Claims in Classes 2, 17, 24, and 32 (Classes consisting of bonds insured by Assured) will receive, through payment by Assured, on the Effective Date, the Acceleration Price for their Assured Insured Bonds, and thus be effectively rendered unimpaired. However, I understand Assured will be subrogated to the rights of such holders and receive distributions pursuant to the Plan, rendering Assured's claims impaired. Additionally, the Claims in Classes 63 and 64 are impaired and not receiving a distribution pursuant to the Plan and Classes 63 and 64 are deemed to have rejected the Plan.

63.     I also am aware that Section 84.2 of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) specifies that Claims in Classes 13, 51A through 51C,[4] 51K, 55, 57, 67, and 68 are unimpaired pursuant to the Plan, are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. In sum, the Plan specifies each unimpaired class of claims.

**5.     Bankruptcy Code Section 1123(a)(3)**

64.     Section 1123(a)(3) of the Bankruptcy Code requires a plan to specify the treatment of any class of claims impaired under the plan. I am aware that Articles V through LXXIII of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) identify the treatment of each Class of Claims impaired by the Plan.

**6.     Bankruptcy Code Section 1123(a)(4)**

65.     Section 1123(a)(4) of the Bankruptcy Code requires a plan to provide the same treatment for all claims in any given class, subject to a claimant agreeing to less favorable

---

[4] Please see n. 2 above regarding movement of Class 51B from Section 84.2 to Section 84.1 of the Plan.

treatment.  Articles V through LXXIII of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.  If a holder of a Claim in Class 15 or 16, 23, 30 or 31, 34, 36 or 38, 40 or 41, 44, 46 or 47, or 49 elects out of such Class to receive a distribution of taxable bonds, such holder's Claim is no longer in such Class and, instead, is treated as a Claim in Class 22, 29, 33, 35, 39, 43, 45, 48, or 50, respectively.  I therefore believe that all holders of Claims in each of Classes 15, 16, 23, 30, 31, 34, 36, 38, 40, 41, 44, 46, 47, and 49 receive the same treatment as holders of other Claims in the same Class pursuant to the Plan.

66.     Certain parties are receiving payment of Consummation Costs, Restriction Fees, or support fees under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and in accordance with the Plan Settlement Agreements negotiated by the Oversight Board, as described further below.  The Oversight Board is not awarding such costs and fees on account of the respective creditors' Claims. Rather, (i) the Consummation Costs are provided in consideration of certain creditors' assistance in the formulation of the Plan for all creditors and to compensate them for the reasonable fees and expenses incurred in connection with the negotiation and execution of various Plan Settlement Agreements benefitting classes of creditors, which made development of the Plan possible; and (ii) Restriction Fees are provided in connection with certain parties' commitment to support the confirmation of the Plan and, in connection therewith, to "lock up" their bonds pursuant to the terms of respective Plan Settlement Agreements.  Because these fees are not being paid on account of the creditors' Claims, but as consideration for actions taken by these creditors to create the Plan benefitting all creditors, the Oversight Board believes these fees do not cause the Claims of the creditors receiving them to be treated differently than other Claims in each Class.

35

### 7. Bankruptcy Code Section 1123(a)(5)

67.     Section 1123(a)(5) of the Bankruptcy Code requires a plan to provide adequate means for the plan's implementation.  Various provisions of the present Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provide adequate and proper means for its implementation.  More specifically:

a.      Article III provides for the payment of Administrative Expense Claims required to be paid on the Plan Effective Date;

b.      Section 74.1 provides for the issuance and distribution of the New GO Bonds;

c.      Section 74.2 provides for the issuance and distribution of the CVIs;

d.      Section 74.5 ensures the feasibility of the present Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated;"

e.      Section 76.1 provides, subject to Sections 76.5 and 76.7 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) of PBA and relating to the lease or sublease of PBA Property, (b) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (c) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, or (d) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement . . . ."  It is my understanding that, prior to confirmation, the Plan will be amended to remove

36

subsection (a) from Section 76.1, such that the PBA Leases shall be deemed rejected in accordance therewith.

f.       Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

g.       Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

h.       Section 81.2 vests in the Disbursing Agent, among other things, the power to issue distributions contemplated by the Plan;

i.       Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

j.       Article LXXXIII provides for the funding and administration of the Pension Reserve Trust under the Plan;

k.       Article LXXXVIII provides that, "[o]n the Effective Date all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and

the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule;" and

l.    Section 92.1 provides for the re-vesting of assets:  "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order)."

68.    Additionally, I reviewed the Plan Supplement (Debtors' Ex. 3 [ECF No. 18785-3]). It contains, among other things, substantially final forms of:  (a) the New GO Bond Trust Agreement, (b) the CVI Trust Agreement, (c) the Avoidance Actions Trust Agreement, (d) the ERS Trust Agreement, (e) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (f) the Supplemental Ambac Election Notice, (g) the Assured Custodial Trust Documents, (h) the FGIC Custodial Trust Agreement, and (i) the Syncora Custodial Trust Documents.  The Plan Supplement will also include Guidelines for the Pension Reserve Trust, which were finalized with AAFAF and the COR after the initial Plan Supplement was filed on October 11, 2021 and which I have reviewed.  I believe that the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

### 8.    Bankruptcy Code Section 1123(b)(1)

69.    Section 1123(b)(1) of the Bankruptcy Code permits a plan to impair or leave unimpaired any class of claims.  Article LXXXIV of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.

### 9.   Bankruptcy Code Section 1123(b)(2)

70.   Section 1123(b)(2) of the Bankruptcy Code permits a plan to provide for the assumption, rejection, or assignment of any executory contract or unexpired lease not previously rejected.  Article LXXVI of the Plan provides that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) of PBA and relating to the lease or sublease of PBA Property, (b) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (c) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, or (d) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date." Plan (Debtors' Ex. 1 [ECF No. 18785-1]) § 76.1.  As discussed above, I understand that the Debtors intend to exercise their rights pursuant to this section of the Plan to amend such schedules to provide for the rejection of the leases and subleases comprising PBA Property.

### 10.   Bankruptcy Code Section 1123(b)(3)(A)

71.   Section 1123(b)(3)(A) of the Bankruptcy Code permits a plan to provide for the settlement or adjustment of any claim belonging to the debtor.  As described further below, the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) sets forth the terms and conditions for a global

compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes:  (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, the Metropolitan Bus Authority ("MBA"), and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation.  I believe such settlements and compromises are in the best interests of the Debtors and their creditors, and well within the range of reasonableness.

40

### 11. Bankruptcy Code Section 1123(b)(3)(B)

72.     Section 1123(b)(3)(B) of the Bankruptcy Code permits a plan to provide for the

retention and enforcement by the debtor, the trustee, or by a representative of the estate appointed

for such purpose, of any claim belonging to the debtor.  Article LXXVIII establishes an Avoidance

Actions Trust "for the sole purpose of Avoidance Actions and distributing its assets," and which

shall be vested with the Avoidance Actions Trust Assets.  The Plan also provides that: "[i]n

furtherance of and consistent with the purpose of the Avoidance Trust Actions and the Plan, and

subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust

Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions

Trustee shall, among other things, have the following rights, powers, and duties, (i) to hold,

manage, convert to Cash, and timely distribute the Avoidance Trust Assets, including prosecuting

and resolving the Claims belonging to the Avoidance Actions Trust, (ii) to hold the Avoidance

Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their

Claims are Allowed on or after the Effective Date, (iii) in the Avoidance Actions Trustee's

reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of

Action, or litigation of the Avoidance Actions Trust . . . (v) in the Avoidance Actions Trustee's

reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance

Actions Trust, objections to Claims on account of which the Avoidance Actions Trust will be

responsible . . . ."

73.     Section 79.1 of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides that:

"[e]xcept as settled and released herein, from and after the Effective Date, the Avoidance Actions

Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions

and (b) compromise and settle such Avoidance Actions, upon approval of the Bankruptcy Court."

74.     Section 82.1(a) of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) further provides that: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise, or withdraw any objections to Claims, without approval of the Title III Court."

75.     Based on the foregoing provisions, I believe the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides for the retention and enforcement by the Debtors or an assigned estate representative of all claims and interests.

**12.     Bankruptcy Code Section 1123(b)(4)**

76.     Section 1123(b)(4) of the Bankruptcy Code permits a plan to provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among claim holders.  The Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio, subject to certain conditions.  More specifically, Section 69.2 of the Plan provides that the Commonwealth, up to and including April 10, 2023, "shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . .  In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond

Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023."  However, "[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . ."  Under Section 69.1 of the Plan, in either scenario, the proceeds of the purchase of the ERS Private Equity Portfolio, along with the $373 million in cash, shall be distributed to holders of Allowed ERS Bond Claims.

### 13.      Bankruptcy Code Section 1123(b)(5)

77.      Section 1123(b)(5) of the Bankruptcy Code permits a plan to modify the rights of claimholders.  Articles V through LXXIII of the Plan modify the rights of holders of Claims in the Impaired Classes, and leave intact those holders of Claims in the Unimpaired Classes.

### 14.      Bankruptcy Code Section 1123(b)(6)

78.      Section 1123(b)(6) of the Bankruptcy Code permits a plan to include any other provision not inconsistent with the Bankruptcy Code.  Article XCII of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides for, among other things, (a) certain releases, injunctions, and exculpations, and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of the New GO Bonds and the CVIs.  I am unaware of any facts rendering Article XCII inconsistent with any requirements in the Bankruptcy Code.

### 15. Bankruptcy Code Section 1123(d)

79.     Section 1123(d) of the Bankruptcy Code requires a plan that proposes to cure a default to do so in accordance with the underlying agreement and applicable nonbankruptcy law. Section 76.4 of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed and assigned under the Plan. I am aware that any cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan.

### 16. Bankruptcy Code Section 1129(a)(2)

80.     Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply with applicable provisions of the Bankruptcy Code. To the best of my knowledge and belief, based on my experience and involvement in the process culminating in the Plan, as well as the plan process associated with the COFINA plan of adjustment [Case No. 17-BK-3284, ECF No. 436] (the "COFINA Plan"), the Debtors have complied with all statutory requirements in the Bankruptcy Code as shown by (i) the outcomes of each action brought by creditors to enforce against the Oversight Board requirements in the Bankruptcy Code, and (ii) the actions taken by the Oversight Board to procure approval of the Disclosure Statement and confirmation of the Plan. For instance, the Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement and sought and received input and comment thereon from all the parties to the Plan Settlement Agreements, and all other parties in interest. This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of section 1125 and 1126 of the Bankruptcy Code. Likewise, the Oversight Board will be proffering at the confirmation hearing evidence that the Debtors properly solicited and tabulated votes with respect to the Plan.

44

### 17. Bankruptcy Code § 1129(a)(3)

81.    Section 1129(a)(3) of the Bankruptcy Code requires a plan to be proposed in good faith and not by any means forbidden by law.  The Plan (Debtors' Ex. 1 [ECF No. 18785-1]) was proposed by the Oversight Board in good faith, and with the legitimate and honest purpose, consistent with its statutory mandate under PROMESA, of providing a method for the Commonwealth and the other Debtors to achieve fiscal responsibility and access to capital markets.  As discussed in great detail in Section III herein, the Plan (including the settlements and compromises contained therein) is the result of extensive, arms'-length negotiations among certain constituencies through the independent mediation process developed and guided by the Mediation Team.

82.    The Plan put forth for confirmation is the seventh amended version of the plan of adjustment because the Oversight Board has worked tirelessly since these Title III Cases began, with the assistance of its legal and financial advisors, to develop consensus with creditors and to evaluate the Commonwealth's and its instrumentalities' current and future financial circumstances.  These circumstances have been subject to constant change as the Oversight Board, the Commonwealth, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic.

83.    The Plan is the culmination of all of these efforts and is designed to implement the settlement and compromise of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors.

### 18.      Bankruptcy Code Section 1129(a)(6)

84.      Section 1129(a)(6) of the Bankruptcy Code requires any rate changes provided for under the plan to be approved by any governmental regulatory commission with jurisdiction.  The Plan (Debtors' Ex. 1 [ECF No. 18785-1]) does not provide for any rate changes by the Debtors.

### 19.      Bankruptcy Code Section 1129(a)(8)

85.      Section 1129(a)(8) of the Bankruptcy Code requires each class of claims to either accept the plan or to be unimpaired thereunder unless section 1129(b) of the Bankruptcy Code is applied to a rejecting class.  It is my understanding based on preliminary voting results reported to me by Prime Clerk that Classes 12, 13, 14, 51B, 51D, 51F through 51I, 51L, 53, 54, 58, and 66 are impaired under the Plan and have voted to reject the Plan (collectively, the "Cramdown Classes").  For these Cramdown Classes, the Oversight Board will request confirmation pursuant to section 1129(b) of the Bankruptcy Code.

### 20.      Bankruptcy Code Section 1129(a)(10)

86.      Section 1129(a)(10) of the Bankruptcy Code requires that at least one class of claims that is impaired by the plan has accepted the plan.  At least one Class of each of the Commonwealth creditors' impaired claims, PBA creditors' impaired claims, and ERS' creditors' impaired claims will be proven to have accepted the Plan.  It is reported to me by Prime Clerk, and will be proven at the confirmation hearing that, as of October 22, 2021, the following Classes have voted in the listed amount and number to accept the Plan:

| Class | Amount Voting to Approve (%) | Number Voting to Approve (%) |
|---|---|---|
| Class 1:  Vintage PBA Bond Claims | $920,005,278.99 (99.87%) | 2368 (99.71%) |
| Class 2:  Vintage PBA Bond Claims (Assured) | $97,171,262.34 (100%) | 1 (100%) |
| Class 3:  Vintage PBA Bond Claims (National) | $104,028,546.10 (100%) | 1 (100%) |

| Class | Amount Voting to Approve (%) | Number Voting to Approve (%) |
|---|---|---|
| Class 4: Vintage PBA Bond Claims (Ambac) | $92,985,116.06 (100%) | 1 (100%) |
| Class 5: Vintage PBA Bond Claims (FGIC) | $2,114,542.08 (98.81%) | 41 (95.35%) |
| Class 6: Vintage PBA Bond Claims (Syncora) | $11,902,049.67 (100%) | 1 (100%) |
| Class 7: Retail Vintage PBA Bond Claims | 377 (92.63%) | $5,620,569.25 (90.58%) |
| Class 8: 2011 PBA Bond Claims | 635 (98.15%) | $602,196,827.91 (98.82%) |
| Class 9: Retail 2011 PBA Bond Claims | 57 (96.61%) | $2,409,218.88 (99.77%) |
| Class 10: 2012 PBA Bond Claims | 480 (98.77%) | $297,130,404.51 (99.93%) |
| Class 11: Retail 2012 PBA Bond Claims | 114 (89.76%) | $2,541,965.99 (94.84%) |
| Class 15: Vintage CW Bond Claims | $2,742,540,930.54 (99.85%) | 5700 (99.42%) |
| Class 16: Retail Vintage CW Bond Claims | $30,318,451.40 (92.31%) | 1087 (91.96%) |
| Class 17: Vintage CW Bond Claims (Assured) | $1,054,975,000.00 (100%) | 1 (100%) |
| Class 18: Vintage CW Bond Claims (National) | $842,755,000.00 (100%) | 1 (100%) |
| Class 19: Vintage CW Bond Claims (Ambac) | $56,005,000.00 (100%) | 1 (100%) |
| Class 20: Vintage CW Bond Claims (FGIC) | $258,557,575.00 (96.92%) | 192 (83.12%) |
| Class 21: Vintage CW Bond Claims (Syncora) | $25,585,000.00 (100%) | 1 (100%) |
| Class 23: Vintage CW Guarantee Bond Claims | $710,350,805.85 (99.81%) | 2660 (98.63%) |
| Class 24: Vintage CW Guarantee Bond Claims (Assured) | $74,849,402.60 (100%) | 1 (100%) |
| Class 25: Vintage CW Guarantee Bond Claims (National) | $80,131,453.90 (100%) | 1 (100%) |
| Class 26: Vintage CW Guarantee Bond Claims (Ambac) | $71,624,883.94 (100%) | 1 (100%) |

| Class | Amount Voting to Approve (%) | Number Voting to Approve (%) |
|---|---|---|
| Class 27: Vintage CW Guarantee Bond Claims (FGIC) | $1,628,796.50 (98.81%) | 41 (95.35%) |
| Class 28: Vintage CW Guarantee Bond Claims (Syncora) | $9,167,950.33 (100%) | 1 (100%) |
| Class 30: 2011 CW Bond Claims | $208,976,827.77 (99.96%) | 233 (98.73%) |
| Class 31: Retail 2011 CW Bond Claims | $2,093,892.88 (94.79%) | 57 (96.61%) |
| Class 32: 2011 CW Bond Claims (Assured) | $210,000,000.00 (100%) | 1 (100%) |
| Class 34: 2011 CW Guarantee Bond Claims | $455,134,126.73 (98.79%) | 598 (97.71%) |
| Class 36: 2011 CW Series D/E/PIB Bond Claims | $507,476,750.48 (99.97%) | 566 (99.47%) |
| Class 37: 2011 CW Series D/E/PIB Bond Claims (Assured) | $10,400,000.00 (100%) | 1 (100%) |
| Class 38: Retail 2011 CW Series D/E/PIB Bond Claims | $2,935,913.89 (90.73%) | 105 (92.92%) |
| Class 40: 2012 CW Bond Claims | $2,032,335,448.21 (97.25%) | 2018 (98.78%) |
| Class 41: Retail 2012 CW Bond Claims | $16,762,705.74 (93.84%) | 427 (93.85%) |
| Class 42: 2012 CW Bond Claims (Assured) | $369,445,000.00 (100%) | 1 (100%) |
| Class 44: 2012 CW Guarantee Bond Claims | $230,286,555.04 (99.89%) | 578 (96.82%) |
| Class 46: 2014 CW Bond Claims | $3,273,016,488.13 (100%) | 229 (100%) |
| Class 47: Retail 2014 CW Bond Claims | $52,393,661.00 (100%) | 131 (100%) |
| Class 49: 2014 CW Guarantee Bond Claims | $276,620,000.00 (100%) | 20 (100%) |

### 21. Bankruptcy Code Section 1129(b)(1)

87.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all of the applicable

requirements of section 1129(a) are met with the exception of section 1129(a)(8), the Court is

required to confirm the plan so long as such plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired class of claims that has not accepted the plan. As described further above, I understand that the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) does not comply with section 1129(a)(8) of the Bankruptcy Code with respect to the Cramdown Classes, but believe that the Plan remains confirmable under this section. As described in further detail below, the Plan is fair and equitable with respect to holders of Claims in the Cramdown Classes.

### 22. Bankruptcy Code Section 1129(b)(2)

88. Section 1129(b)(2) of the Bankruptcy Code provides an impaired class of claims is treated fairly and equitably if (i) such class is secured and either (a) retains the liens securing such claims and receives deferred cash payments totaling at least the allowed amount of such claims, (b) the property subject to such liens is sold, with the liens attaching to the proceeds of such sale, or (c) such class receives the indubitable equivalent of its claims, or (ii) such class is unsecured and (a) receives property of a value equal to allowed amount of such claim, or (b) no class of claims that is junior to such class receives or retains property under the plan. I understand the Eminent Domain Claims, secured to the extent of the deposits submitted with the Clerk of the Court of First Instance, are the only Class of secured Claims in the Plan and are receiving payment in full on account of the secured portion of such Claim. Additionally, although Class 12 is titled "PBA/DRA Secured Claims," it is the Oversight Board's belief that the DRA Parties' Claim is unsecured and that issue is currently being litigated. I am aware certain creditors contend they are secured by proceeds of two pieces of real property. In the pending litigation, the Oversight Board has provided evidence it believes proves the creditors filed no security agreements in the real property records, do not have control of any cash account, and filed a UCC-1 financing statement that expired and was not renewed or extended. The Oversight Board found that no real property mortgage was filed or recorded.

89.    Furthermore, it is my understanding that the security interest alleged by the holders of Claims in Class 12 relates to a lien on the proceeds emanating from any sale of certain governmental property.  I understand that claimants cannot foreclose on sovereign property.  To the extent the Title III Court determines holders of Claims in Class 12 hold secured claims, the Plan will be modified to provide such Claims are satisfied by the retention of their lien on the applicable governmental properties and will be satisfied upon any future sale of such property to the extent of the net proceeds of any such sale.

90.    Additionally, no class of junior Claims will receive distributions under the Plan and no class of senior Claims will receive more than 100% on account of such Claims.

**B.    PROMESA § 314(b)(2):  The Plan Fully Complies with the Provisions in Title III of PROMESA**

91.    PROMESA section 314(b)(2) requires the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) to comply with the provisions in Title III.  The Oversight Board has strived to comply with every provision of Title III since it commenced the Commonwealth's Title III Case and evidence of such compliance will be proffered at the confirmation hearing.

**C.    PROMESA § 314(b)(3):  The Debtor is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan**

92.    PROMESA section 314(b)(3) requires that a debtor not be prohibited by law from taking any action necessary to carry out the Plan.  To the best of my knowledge, the Plan contains no provisions that would require it to violate Commonwealth law that is not preempted.  For instance, I believe virtually all jurisdictions have laws mandating payment in full of all lawful obligations.  But reorganization plans paying creditors less than in full are routinely confirmed because the local laws to the contrary are necessarily preempted.  The Plan (Debtors' Ex. 1 [ECF No. 18785-1]) contemplates that certain legislation will be enacted by the Government on or prior to the Effective Date of the Plan, authorizing the transactions contemplated thereunder (the

"Legislation").  I understand the Legislation would, among other things, authorize the issuance of (a) the CVIs, and (b) the New GO Bonds, consistent with the terms set forth in the Plan and the Plan Settlement Agreements.  To be clear, the Oversight Board does not believe local legislation is required to issue debt under a Title III plan of adjustment.  That said, the Oversight Board's currently proposed Title III plan of adjustment requires such legislation because creditors wanted it as part of their settlements.  If such legislation is not enacted or is not unconditional, the Oversight Board will pursue alternatives.  The current Plan, however, provides for such legislation as a condition of its effectiveness.

93.     I understand the Government passed Act 7-2021 ("Act 7") (Debtors' Ex. 110 [ECF No. 18803-20]), which generally provides that the Government's resources shall not be used to attain or achieve any plan of adjustment unless it conforms to Act 7's requirements.  On October 13, 2021, however, the Title III Court ruled Act 7 is nullified and enjoined its implementation.

**D.     PROMESA Section 314(b)(4):   The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date**

94.     PROMESA section 314(b)(4) provides, except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, a plan must provide that, on its effective date, each holder of a claim specified in Bankruptcy Code section 507(a)(2), which I understand is an administrative expense claim, will receive on account of such claim cash equal to the allowed amount of such claim.  Section 3.1 of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides that:  "[o]n the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be

agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan."

95.     As provided for by the Plan, certain Consummation Costs, Restriction Fees, and Retail Support Fees (as defined below) shall be paid in Cash on the Effective Date of the Plan.  All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1 of the Plan.

**E.     PROMESA § 314(b)(5):  The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals**

96.     PROMESA section 314(b)(5) requires any legislative, regulatory, or electoral approval necessary under applicable law to carry out any provision of the Plan to either have been obtained, or be required as a condition to implementing such provision.  As discussed above, the Oversight Board hopes that the Commonwealth will pass the Legislation authorizing and issuing the New GO Bonds and the CVIs.  If that does not occur, the Oversight Board will pursue alternatives.

**F.     PROMESA § 314(b)(6):  The Plan Is Feasible for ERS and PBA**

97.     PROMESA section 314(b)(6) requires the Plan be feasible and in the best interests of creditors.  I understand that, to make the best interests determination, the Court must consider

52

whether creditors would receive under non-bankruptcy laws and the Puerto Rico Constitution a greater recovery than is provided under the Plan.  The Disclosure Statement contains the Oversight Board's best interest analysis, and a witness from McKinsey will testify to it at the confirmation hearing.  In addition, a witness from Ernst & Young will testify as to the Plan's feasibility with respect to the Commonwealth.  I believe the Plan is feasible as to both ERS and PBA for the following reasons.

### 1. The Plan Is Feasible as to ERS

98.     The Plan is feasible with respect to ERS, as ERS no longer has pensions and other obligations to beneficiaries, which obligations now lie with the Commonwealth following the enactment of Act 106.   Under the Plan, ERS's assets are being sold and transferred to the Commonwealth in exchange for $373 million and the agreement to purchase the ERS Private Equity Portfolio for $70,750,000, subject to certain conditions.   ERS's obligations include distributing the $373 million in cash received from the Commonwealth to the holders of Allowed ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in a *de minimis* amount.

99.     ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed ERS Bond Claims.  I understand that ERS will dissolve after the Effective Date of the Plan and that all remaining assets of ERS shall be deemed sold and transferred to the Commonwealth.  ERS will therefore have no material obligations after the Effective Date.  Accordingly, I believe the Plan is feasible with respect to ERS because the risk of needing further restructuring of ERS is nil.

### 2.     The Plan Is Feasible as to PBA

100.    The Plan is feasible with respect to PBA, as PBA holds sufficient cash to pay its obligations to all of its Creditors under the Plan, including the Claims on account of loans made by GDB to PBA (the "DRA Loan Claims").  Furthermore, I understand the Plan will be amended to provide for the rejection, as of the Effective Date, of all leases and subleases of PBA's properties to departments, agencies, instrumentalities, authorities, public corporations, and municipalities of the Commonwealth (the "PBA Leases"), subject to the execution of a master lease with the Commonwealth which shall provide for lease payments in exchange for the use and occupancy of leased premises in an amount necessary to satisfy its obligations on a going-forward basis.

101.    The DRA Loan Claims are asserted by the claimholders to be secured by the proceeds of the sale or disposition of certain buildings or other property owned by PBA (the "PBA Property").  The Oversight Board contests this assertion and contends the DRA Loan Claims are, in fact, unsecured Claims against PBA because, among other things, (i) no mortgage or other security agreement was ever filed on account of the DRA Loan Claims, (ii) claimholders have no right to foreclose upon sovereign property owned by the Commonwealth or its instrumentalities, including the PBA, and (iii) the UCC-1 financing statement related to the DRA Loan Claims expired in 2016 and no extension was ever filed.

102.    I understand the priority of the DRA Loan Claims remains an issue under dispute by the parties and that such issue may be determined positively or adversely to the Oversight Board by the Title III Court.  Should the Title III Court determine that the DRA Loan Claims are secured by the PBA Property the Oversight Board will modify the Plan to provide for the holders of the DRA Loan Claims to retain their security interests in the subject PBA Property following the Effective Date and that such DRA Loan Claims will be payable upon the sale or other disposition of the subject PBA Property in accordance with the terms of the subject loans.

**G.      PROMESA § 314(b)(7):  The Plan Is Consistent with the Applicable Fiscal Plan Certified by the Oversight Board Under Title III**

103.    Section 314(b)(7) of PROMESA requires a plan of adjustment to be consistent with the applicable fiscal plan as certified by the Oversight Board pursuant to Title II.  Upon review of both the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and the 2021 Commonwealth Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), I believe that the Plan is consistent with the 2021 Commonwealth Fiscal Plan.  Nothing contained in the Plan would violate or otherwise interfere with the 2021 Commonwealth Fiscal Plan.  An objector has asserted the Plan is inconsistent with the 2021 Commonwealth Fiscal Plan because the Pension Reserve Trust in the Plan is not incorporated into the Commonwealth's fiscal projections.  Under the Plan, the Pension Reserve Trust is required to be funded in an amount of at least $175 million in each of the first 8 years following the Effective Date.  The 2021 Commonwealth Fiscal Plan explicitly provides for the establishment of a Pension Reserve Trust specifically to ensure that future pension benefits will be supported regardless of the future economic or political circumstances of the Commonwealth—exactly the purpose it serves in the Plan.  *See* 2021 Commonwealth Fiscal Plan at 278.  The Pension Reserve Trust merely provides a source of payment of pension obligations, to be funded with surpluses projected under the Fiscal Plan during each of the relevant years, to be applied to reduce the cost of pensions in later years.  It does not add any additional obligations to the Commonwealth.

**III.    The Plan Settlement Agreements**

104.    Beginning in early 2019, following confirmation of the COFINA Plan, the Oversight Board refocused its efforts on generating substantial consensus and support for a framework for a plan of adjustment for the Commonwealth.  In pursuit thereof, the Oversight Board engaged in mediation sessions and negotiations directed by and under the auspices of the Mediation Team.

105.    As described above, these mediation sessions culminated in the execution of the 2019 GO/PBA PSA by and between the Oversight Board and certain holders of GO Bonds and PBA Bonds.   Among other things, the 2019 GO/PBA PSA (i) resolved certain key disputes between the Commonwealth and PBA regarding whether the leases between the two entities were leases for purposes of section 365 of the Bankruptcy Code or were actually financings, and (ii) memorialized settlements of challenges regarding the validity, priority, and secured status of the GO Bonds.   In addition to the 2019 GO/PBA PSA, in June 2019, the Oversight Board reached agreement with the Retiree Committee regarding the treatment of over $55 billion in pension claims, and executed the AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]).   Further, the Oversight Board reached an agreement in principle with AFT and AMPR in July 2021, which was subsequently rejected by its membership.   As noted above, in making these statements, I recognize there are ongoing discussions concerning matters regarding the Plan, and, in particular, treatment of the Pension Claims.   To the extent it becomes necessary, I will supplement this Declaration to reflect the results of those discussions.

106.    Execution of the 2019 GO/PBA PSA and agreement on the treatment of certain claims thereunder led directly to the filing of the Initial Plan, which was filed on September 27. The Initial Plan embodied the terms of the 2019 GO/PBA PSA and the other agreements with creditor constituencies, providing a path for the Commonwealth to emerge from Title III.

107.    Following the filing of the Initial Plan, the Oversight Board continued to engage stakeholders in negotiations to build greater support for the Initial Plan.   Those negotiations were facilitated and led by the Mediation Team, and culminated in a revised agreement in principle with groups holding a majority of outstanding GO Bonds and PBA Bonds.   This agreement was memorialized in February 2020 in the 2020 GO/PBA PSA by and between the Oversight Board

56

and holders of approximately $8 billion in GO Bonds and PBA Bonds, replacing the 2019 GO/PBA PSA. Holders of an additional $2 billion in GO Bonds or PBA Bonds ultimately joined the 2020 GO/PBA PSA post-execution.

108. Unfortunately, shortly after the execution of the 2020 GO/PBA PSA and the Oversight Board's pursuit of a hearing on the adequacy of information contained in the Disclosure Statement, the global COVID-19 pandemic caused the Oversight Board to delay pursuit of Plan confirmation, and ultimately return to the negotiating table.

109. Over the past year and a half, after the Oversight Board certified the Commonwealth's fiscal plan and corresponding budget, taking into account the COVID-19 pandemic's impact on Puerto Rico, the Oversight Board resumed discussions with AAFAF and numerous sophisticated claimholder groups concerning a potential consensual restructuring for the Commonwealth, PBA and ERS. The negotiations were directed by and with the guidance of the Mediation Team. I am aware that the Oversight Board and its advisors also were involved in many informal discussions with claimholder groups and their advisors.

110. In my role as Executive Director of the Oversight Board, I participated with the Oversight Board's financial and legal advisors in the majority of the negotiations and discussions. The mediations, negotiations and discussions were extensive. The mediations normally included representatives of the various parties participating in the negotiations and their respective legal and financial advisors. I observed and am aware that the participants advocated strenuously for their respective positions. At times, the CEO of one or more major creditors attended and expressed his institution's views.

111. As a result of these negotiations and informal discussions, the Oversight Board reached agreements with various parties embodied in the GO/PBA PSA (Debtors' Ex. 16 [ECF

No. 18791-6]), the PRIFA BANs Stipulation (Debtors' Ex. 22 [ECF No. 18794-2]), the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]), the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]), the PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]), and the settlements with the Retiree Committee (Debtors' Ex. 20 [ECF No. 18791-10]) and UCC (Debtors' Ex. 23 [ECF No. 18794-3]).  Each of the Plan Settlement Agreements are described below.

112.    I have reviewed the GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]), the PRIFA BANs Stipulation (Debtors' Ex. 22 [ECF No. 18794-2]), the ERS Stipulation (Debtors' Ex. 22 [ECF No. 18794-2]), the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]), PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]), and AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]), most of which I signed as Executive Director of the Oversight Board, and am generally familiar with their respective business terms.   To help the Court better understand the facts and circumstances giving rise to each of the agreements, I describe in general terms below (i) the key disputes and litigation resolved by each agreement, (ii) the key terms of each agreement, including the consideration provided in exchange for (a) resolution of the relevant litigation and (b) support for the Plan, and (iii) why I believe each of the settlements is fair, reasonable and necessary to achieve a global consensual restructuring in the Title III cases.  Additionally, as described below at Section III.G., the Oversight Board reached an agreement in principle with AFT and AMPR in July 2021, which agreement was rejected by its members on September 28, 2021.

A.      **GO/PBA PSA**

1.      **Existing Disputes and Litigation Resolved by the GO/PBA PSA**

113.    The Oversight Board and, on certain matters, the UCC, have been involved in various disputes and litigations with: (i) GO and PBA Bondholders regarding the validity, priority, and secured status of certain bonds that may have been issued in violation of the Commonwealth Constitution; (ii) PBA regarding the characterization and treatment of purported leases between

PBA and the Commonwealth; and (iii) holders of PRIFA BANs ("PRIFA BANs Bondholders") with respect to the Commonwealth's guarantee of the PRIFA BANs and the validity and scope of any liens and security interests asserted by the PRIFA BANs Bondholders and trustee.  The parties to the GO/PBA PSA agreed to resolve the various adversary proceedings, contested matters, and lawsuits related to the GO and PBA Bonds, alleged PBA leases, and PRIFA BANs described below, on the terms set forth in the GO/PBA PSA, a copy of which is attached as Exhibit B to the Disclosure Statement (Debtors' Ex. 16 [ECF No. 18791-6]).

### i.      Debt Related Objections

114.    The Oversight Board, jointly with the UCC, filed an omnibus objection (the "Joint Objection") contending that several 2012 and 2014 issuances of GO Bonds violated the debt service limit set forth in Article VI, section 2 of the Commonwealth Constitution (the "Constitutional Debt Limit"), and that claims for principal and interest by purported holders of the GO Bonds should be disallowed.  The UCC and other parties filed other objections (together with the Joint Objection, the "Debt Related Objections") to bondholder claims relating to earlier issuances of GO Bonds, PBA Bonds, and PRIFA BANs (collectively, and together with 2012 and 2014 GO Bond issuances challenged by the Special Claims Committee, the "Challenged Bonds") that likewise were claimed to be in violation of the Constitutional Debt Limit.

115.    I am generally familiar with the issues litigated in the Debt Related Objections, which include, but are not limited to, whether certain GO and PBA Bonds and other bonds guaranteed by the Commonwealth are properly characterized as general obligation or constitutional debt for purposes of calculating the Constitutional Debt Limit, and whether bond issuances that violated the Constitutional Debt Limit, if any, were invalid.

### ii.    *Invalidity Actions*

116.    The Oversight Board, jointly with the UCC, also commenced eight adversary proceedings (the "<u>Invalidity Actions</u>," Adv. Pro. Nos. 19-00281–88, inclusive) against hundreds of GO Bondholders, including individual investors and numerous banks.

117.    I am familiar with the issues litigated in the Invalidity Actions, which include, but are not limited to, whether certain GO Bond issuances violated the Constitutional Debt Limit and were invalid, and whether amounts paid by the Commonwealth on account of invalid bonds are recoverable.

### iii.    *Lien Challenge Actions*

118.    In addition to the Debt Related Objections and the Invalidity Actions, the Oversight Board, jointly with the UCC, also commenced seven additional adversary proceedings (the "<u>Lien Challenge Actions</u>," Adv. Pro. Nos. 19-00291–97, inclusive) challenging the asserted secured status of claims filed against the Commonwealth by approximately 450 holders of bonds issued or guaranteed by the Commonwealth.

119.    I am generally aware that the issues litigated in the Lien Challenge Actions include, but are not limited to, whether defendant bondholders have valid and enforceable liens on the Commonwealth's full faith and credit and taxing power, or on certain Commonwealth revenues, including, among others, certain monies historically conditionally appropriated to the Commonwealth's instrumentalities under Puerto Rico law, and property tax revenues authorized under Puerto Rico Act 83-1991.

### iv.    *PBA Lease Complaint*

120.    In addition to the above actions, the Oversight Board, again jointly with the UCC, filed a complaint against PBA (the "<u>PBA Lease Litigation</u>," Adv. Pro. Nos. 18-00149, and, together with the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the

"GO/PBA PSA Litigation"), challenging the characterization of certain leases as "true leases". Certain PBA Bondholders and monoline insurers, including the QTCB Noteholder Group, the PBA Funds, and Assured, intervened in the PBA Lease Litigation as defendants and/or parties in interest and filed counterclaims against the Oversight Board.

121.    I am familiar with the issues litigated in the PBA Lease Litigation, which include, but are not limited to:  (i) whether purported leases between PBA and the Commonwealth were "true leases" for purposes of Bankruptcy Code section 365, or instead were disguised financing transactions or other debts on the part of the Commonwealth, and (ii) whether the Commonwealth owns, or owes any administrative rent for the use of, certain PBA facilities.

## 2.    Key Settlement Terms of the GO/PBA PSA

122.    On February 23, 2021, the Oversight Board announced that, following extensive discussions, it had terminated the 2020 GO/PBA PSA and entered into the GO/PBA PSA with certain holders of in excess of $11.7 billion of CW Bond Claims and PBA Bond Claims, which include traditional municipal investors and monoline bond insurers Assured, Syncora, and National.  The GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]) was amended and restated on July 12, 2021.

123.    The GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]), which I executed on behalf of Debtors, provides that, if the Plan is confirmed, in exchange for resolving the Debt Related Objections, Invalidity Actions, and Lien Challenge Actions, and the agreement not to commence or pursue any further litigation on account of the GO Bonds, GO Bondholders will receive a combination of cash, securities and new bonds, as described below.

124.    More particularly, GO and PBA Bondholders will collectively receive $6.624 billion of cash.  In addition, GO Bondholders will receive a CVI based on sharing the potential outperformance of 5.5% of the Commonwealth's Sales and Use Taxes, relative to projections in

the Commonwealth's 2020 Certified Fiscal Plan (the "GO CVI").  For the avoidance of doubt, payment upon the GO CVI is subject to payments on account of the bonds issued pursuant to the COFINA Plan.

125.    The GO CVI runs until FY 2043 and is subject to an annual cap on payments equal to the lesser of (i) the sum of $200 million and any unused amounts from previous years, and (ii) $400 million, as well as a lifetime cap of $3.5 billion.  GO Bondholders will also receive new bonds (the "New GO Bonds") structured as follows: $6,683,315,000 in aggregate original principal amount of current interest bonds, $442,506,553.50 of 5.375% in aggregate original principal amount capital appreciation bonds, and $288,241,989.75 of 5.000% in aggregate original principal amount capital appreciation bonds.

126.    If the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) is confirmed, in exchange for resolving the outstanding disputes with the holders of PBA Bonds, including the Debt Related Objections, Lien Challenge Actions and PBA Lease Complaint, and the agreement not to commence or pursue any pending or further litigation on account of the PBA Bonds, PBA Bondholders will receive $1.073 billion of the aforementioned cash as an allowed administrative expense claim in consideration of unpaid rent related to the PBA Leases.  In addition, PBA Bondholders will have an allowed claim against the Commonwealth equal to the principal amount outstanding of PBA Bonds, plus accrued and unpaid interest, as of the PBA Petition Date, less amounts received directly from PBA pursuant to the Plan.

127.    To compensate Initial GO/PBA PSA Creditors for fees and expenses they incurred in connection with the negotiation and execution of the GO/PBA PSA and prosecution of approval of the Disclosure Statement and confirmation of the Plan ("Consummation Costs"), those claimholders will also receive a pro rata share of cash in an amount equal to one and one half

percent (1.5%) of the aggregate amount of such holders' or insurers' PBA Bond Claims, GO Bond Claims, and CW Guarantee Bond Claims (without duplication).   In addition, GO/PBA PSA Creditors will receive 1.321% of the outstanding principal amount of GO Bonds and PBA Bonds, plus interest accrued as of the respective Petition Date in exchange for agreeing to tender and "lock-up" their bonds pursuant to the terms of the GO/PBA PSA (the "GO/PBA Restriction Fee"). Pursuant to the GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]), the parties agreed to provide until July 30, 2021 at 11:59 p.m. for any holders of GO Bonds or PBA Bonds interested in joining the GO/PBA PSA to tender for exchange their bond, become a party to the GO/PBA PSA, and receive in exchange their pro rata share of the GO/PBA Restriction Fee.

128.    Finally, to provide additional opportunity for certain holders of GO Bonds and PBA Bonds an opportunity to share in fees for supporting the GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]), up to $50 million (the "Retail Support Fee") is available to investors holding GO or PBA Bonds totaling less than $1 million in aggregate ("Retail Investors").  The Retail Support Fee was designed to deliver the same amount of fee consideration, as a percentage of Claim amount held, to Retail Investors as to recipients of the GO/PBA Restriction Fee.  The Retail Support Fee will be available to each class of Retail Investors who vote, as a class, to accept the Plan.  Any portion of the Retail Support Fee allocated to a class that votes to reject the Plan will be re-distributed pro rata to the classes of Retail Investors who voted to accept the Plan and claimholders eligible to receive the GO/PBA Restriction Fee.  More details regarding these fees are provided by Steve Zelin of PJT in his declaration in respect of Plan confirmation, which is filed concurrently herewith.

B.     **PRIFA BANs Stipulation**

1.     **Existing Disputes and Litigation Resolved by the PRIFA BANs Stipulation**

129.     The Oversight Board has engaged in various disputes and litigations with PRIFA BANs Bondholders and Bank of New York Mellon, as trustee (the "PRIFA BANs Trustee"). The parties to the PRIFA BANs Stipulation agreed to resolve the various adversary proceedings, contested matters, and lawsuits related to the PRIFA BANs described below, on the terms set forth in the PRIFA BANs Stipulation (Debtors' Ex. 22 [ECF No. 18794-2]).

*i.     PRIFA BANs Litigation*

130.     Certain PRIFA BANs Bondholders and the PRIFA BANs Trustee filed proofs of claim asserting claims against the Commonwealth arising from or relating to the PRIFA BANs, concerning, among other things, payment of default interest and an alleged statutory lien on certain petroleum tax revenues historically transferred to PRIFA by statute.

131.     The Oversight Board, jointly with the UCC, filed a complaint (the "PRIFA BANs Litigation," Adv. Pro. No. 19-00269) challenging the proofs of claim filed by the PRIFA BANs Bondholders and the PRIFA BANs Trustee.

132.     I am generally familiar with the issues litigated in the PRIFA BANs Litigation, which include, but are not limited to, whether (i) debt issued by certain Commonwealth instrumentalities and guaranteed by the Commonwealth violated the Constitutional Debt Limit and (ii) whether the Commonwealth's guarantees may be avoided as fraudulent transfers.

*ii.     PRIFA BANs Takings Litigation*

133.     Certain PRIFA BANs Bondholders filed their own complaint in the United States Court of Federal Claims ((*Puerto Rico BAN (VL) LLC, et al. v. United States*, No. 19-00482C), the "PRIFA BANs Takings Litigation" and, together with the PRIFA BANs Litigation the "PRIFA

BANs Stipulation Litigation"), alleging violations of the Takings clause of the United States Constitution.

134.    I am generally familiar with the issues litigated in the PRIFA BANs Takings Litigation, which include, but are not limited to, whether the United States Government, acting by and through the Oversight Board, directed the reallocation of funds away from PRIFA, resulting in a taking of the PRIFA BANs Bondholders' property, and whether PRIFA defaulted on the BANs even before the Oversight Board existed, such that there was no taking.

### 2.    Key Settlement Terms of the PRIFA BANs Stipulation

135.    On March 10, 2020, the Oversight Board announced that, following extensive discussions, it had entered into the PRIFA BANs Stipulation (Debtors' Ex. 22 [ECF No. 18794-2]) with holders of approximately 99.9% of the outstanding principal amount of the PRIFA BANs. It is my understanding, based on my review of the PRIFA BANs Stipulation, that, if the Plan is confirmed, in exchange for dismissing with prejudice all claims and litigation relating to holdings in the PRIFA BANs, including, but not limited to, claims related to the Commonwealth's guarantee of the PRIFA BANs, PRIFA BANs Bondholders will (i) receive $12,657,508.81 in cash deposited in an account by PRIFA, to be distributed on the Plan Effective Date for payment of the principal and accrued and unpaid interest in PRIFA BANs, and (ii) hold a Claim in Class 49 in the amount of $83,589,101.67 and receive the treatment provided to Claims in such Class.

### C.    ERS Stipulation

### 1.    Existing Disputes and Litigation Resolved by the ERS Stipulation

136.    The Oversight Board also has engaged in various disputes and litigations with ERS Bondholders and the fiscal agent for the ERS Bonds.  The parties to the ERS Stipulation agreed to resolve the various adversary proceedings, contested matters, and lawsuits related to the ERS

Bonds described below, on the terms set forth in the ERS Stipulation, <u>Exhibit E</u> to the Disclosure

Statement (Debtors' Ex. 19 [ECF No. 18791-9]).

### i. Ultra Vires Actions

137.   The Oversight Board filed adversary proceedings against ERS Bondholders

challenging the validity of the ERS Bonds (Adv. Proc. Nos. 19-00355 through 19-00359 and 19-

00361 in Case No. 17-BK-3283-LTS) (the "*Ultra Vires* Actions").  I am aware that AAFAF, the

UCC and the Retiree Committee made similar challenges in a related litigation or other

proceedings.

138.   The issues litigated in the *Ultra Vire*s Actions, include, but are not limited to,

whether the ERS Bonds were validly issued or enforceable, and if not, what rights of recovery

ERS or the ERS Bondholders may have.  When the ERS Stipulation was executed, the Title III

Court had scheduled oral argument on the parties' respective summary judgment motions in the

*Ultra Vire*s Actions, and further proceedings were stayed upon execution of the ERS Stipulation.

### ii. Lien-Scope Adversary Proceedings

139.   In addition to the *Ultra Vires* actions, the Oversight Board and the UCC also filed

adversary proceedings (Adv. Nos. 19-00366 and 19-00367 in Case No. 17-BK-3566-LTS) against

certain ERS Bondholders and BNYM, as fiscal agent, asserting ERS Bondholders have only a

limited enforceable security interest in certain employers' contributions owed for work performed

prepetition, and that they otherwise lack a valid and enforceable security interest in any of ERS's

remaining assets or the proceeds thereof (the "Lien-Scope Adversary Proceedings").

140.   I am generally familiar with the issues litigated in the Lien-Scope Adversary

Proceedings, which include, but are not limited to, whether the ERS Bondholders have a valid,

enforceable and perfected security interest in certain ERS assets, including certain employer

contributions, funds released by the Fiscal Agent to ERS, loans ERS made to employees or employee payments on those loans, and ERS's private equity investments.

141.    When the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]) was executed the Title III Court had scheduled oral argument on the parties' respective summary judgment motions in the Lien-Scope Adversary Proceedings, and further proceedings were stayed upon execution of the ERS Stipulation.

### iii.    ERS Bondholders' Administrative Expense and Pre-Petition Claims

142.    A number of ERS Bondholders also filed proofs of claim asserting claims against the Commonwealth and ERS arising from or relating to the ERS Bonds.  Certain ERS Bondholders filed motions for payment of administrative expense and pre-petition claims against ERS and the Commonwealth (Case No. 17-BK-3566, ECF Nos. 707 and 710) based largely on the Commonwealth's post-petition enactment of Joint Resolution 188, which directed ERS to liquidate and distribute its assets to the Commonwealth's primary operating fund, and Act 106, which, among other things, adopted a "pay-as-you-go" system ("PayGo") for the payment of pension benefits to retirees (the "Admin Expense and Pre-Petition Claims Motions").

143.    I am generally familiar with the issues being litigated in the Admin Expense and Pre-Petition Claims Motions, which include, but are not limited to, whether ERS had and breached any postpetition obligation owed to the ERS Bondholders and whether the Commonwealth's enactments of Joint Resolution 188 and Act 106 were unlawful.

144.    The Oversight Board filed a motion to dismiss and the ERS Bondholders and BNYM, as fiscal agent for the ERS Bonds, filed a motion for judgment on the pleadings, regarding the Admin Expense and Pre-Petition Claims Motions.  When the ERS Stipulation (Debtors' Ex.

19 [ECF No. 18791-9]) was executed, the Title III Court had scheduled oral argument regarding the parties' respective motions.

### iv.  PayGo Challenge Actions

145.    Certain ERS Bondholders filed adversary proceedings against the Oversight Board, the Commonwealth, and ERS, among others, concerning the Commonwealth's enactment of Joint Resolution 188 and Act 106 (Adv. Proc. No. 17-00219 in Case No. 17-BK-3283-LTS; Adv. Proc. No. 17-00220 in Case No. 17-BK-3283-LTS) (the "PayGo Challenge Actions").

146.    I am generally familiar with issues litigated in the PayGo Challenge Actions, which include, but are not limited to, whether Joint Resolution 188 or Act 106 violate the automatic stay in the ERS Title III Case and whether the liquidation and transfer of ERS assets pursuant to Joint Resolution 188 and Act 106 violate the Commonwealth and U.S. Constitutions.

147.    In the PayGo Challenge Actions, the Oversight Board filed a motion to dismiss, which was fully briefed and which the Title III Court had taken under submission as of January 29, 2018.  ERS Bondholders subsequently requested, and the Court ordered, that the PayGo Challenge Actions be stayed pending a decision in a related ERS proceeding pending before the First Circuit.  The Title III Court issued an order administratively closing the PayGo Challenge Actions pending resolution of related litigation, as described above, before the Title III Court. However, I understand that a disposition was not reached on the merits of the PayGo Challenge Actions.

### v.  ERS Bondholders' Federal Circuit Action against the U.S. Government

148.    Certain ERS Bondholders filed a complaint against the United States of America with the United States Court of Federal Claims, asserting Joint Resolution 188 and Act 106 were designed by the Oversight Board, which was created by PROMESA, and allegedly violated the

Takings clause of the United States Constitution (the "ERS Bondholders' Federal Circuit Action" and, together with the PayGo Challenge Actions, the *Ultra Vire*s Actions, the Lien-Scope Adversary Proceedings, the Admin Expense and Pre-Petition Claims Motions, the "ERS Stipulation Litigation").

149.    The United States Court of Federal Claims issued an order granting the Unites States' motion to dismiss the ERS Bondholders' Federal Circuit Action, and the ERS Bondholders' appeal from the order to the United States Court of Appeals for the Federal Circuit was pending at the time the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]) was executed.

### 2.      Summary of Key Terms of the ERS Stipulation

150.    On March 9, 2021, the Oversight Board entered into the ERS Stipulation, which was amended on April 2, 2021, with certain ERS Bondholders (Debtors Ex. 19 [ECF No. 18791-9]).

151.    The ERS Stipulation provides if the Plan is confirmed, in exchange for resolving the claims against the Commonwealth and ERS arising from or relating to the ERS Bonds, including the claims at issue in the various ERS Stipulation Litigation described above, holders of ERS Bond Claims will receive their pro rata share of (i) $373 million in cash distributions and (ii) the proceeds from the sale of the ERS Private Equity Portfolio (as described above in Section I.F.1), which shall be at least $70,750,000.00.

152.    I understand that, to compensate for fees and expenses incurred in connection with negotiating and executing the ERS Stipulation, as well as for agreeing to support confirmation of the Plan and "lock-up" their respective bonds in accordance with the terms of the ERS Stipulation, ERS Bondholders who are parties to the ERS Stipulation are entitled to receive their pro rata share of $75 million.

153.    In consideration for the Commonwealth making payments to support the cash distributions to be made pursuant to the Plan, all other ERS assets shall be sold, transferred to, and vest in the Commonwealth as of the Plan Effective Date.

**D.      HTA/CCDA PSA**

**1.      Existing Disputes and Litigation Resolved by the HTA/CCDA PSA**

154.    The Oversight Board, acting as the Title III  representative of the Commonwealth and, where applicable, HTA, has engaged in various disputes and litigations with: (i) HTA Bondholders, the fiscal agent for the HTA Bonds, and monoline insurers of HTA Bonds relating to the Commonwealth's retention of certain revenues from gasoline and cigarette excise taxes and vehicle license fees historically conditionally appropriated and transferred to HTA (the "HTA Allocable Revenues"); and (ii) CCDA Bondholders, the fiscal agent for the CCDA Bonds, and monoline insurers of CCDA Bonds relating to certain revenues from hotel occupancy taxes historically conditionally appropriated and transferred by the Puerto Rico Tourism Company (the "Tourism Company") to CCDA (the "CCDA Allocable Revenues").   The parties to the HTA/CCDA PSA agreed to resolve the various adversary proceedings, contested matters, and lawsuits related to the HTA Bonds and CCDA Bonds described below, on the terms set forth in the HTA/CCDA PSA, Exhibit C to the Disclosure Statement (Debtors' Ex. 17 [ECF No. 18791-7]).

*i.      The Commonwealth-HTA Revenue Bond Litigations*

155.    Ambac, Assured, National and FGIC, as holders and insurers of HTA Bonds, HTA Bondholder Peaje Investment, LLC ("Peaje"), and BNYM, as fiscal agent for the HTA Bonds (collectively, the "HTA Defendants"), filed proofs of claim in the Commonwealth Title III case, asserting, among other things, (i) HTA Bondholders have a statutory lien, security interest and/or property interest in the HTA Allocable Revenues, and (ii) the Commonwealth is liable to the HTA

70

Defendants under various statutory, tort, contractual and Constitutional theories, for failing to appropriate and transfer the HTA Allocable Revenues to HTA.

156.    The Oversight Board, as the Title III representative of the Commonwealth, filed an adversary proceeding against the HTA Defendants (Adv. No. 20-00005-LTS in Case No. 17-BK-3283-LTS) challenging their proofs of claim against the Commonwealth and seeking to disallow the HTA Defendants' claims in their entirety (the "Commonwealth-HTA Revenue Bond Litigation").

157.    I am generally familiar with the issues litigated in the Commonwealth-HTA Revenue Bond Litigation, and understand they include, but are not limited to, whether the HTA Defendants have a valid and enforceable lien, security interest or other property interest in the HTA Allocable Revenues retained by the Commonwealth and not appropriated and transferred to HTA, whether the Commonwealth's retention of HTA Allocable Revenues is a breach of any obligation owed to the HTA Defendants, and whether any laws purporting to appropriate HTA Allocable Revenues to HTA without regard to whether such appropriations are contained in a Commonwealth fiscal plan certified by the Oversight Board and a Commonwealth budget certified by the Oversight Board are inconsistent with, and preempted by, PROMESA.

158.    The Oversight Board, as the Title III representative of the Commonwealth, filed a motion for partial summary judgment.  At the time the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) was executed, the HTA Defendants were conducting supplemental discovery in connection with the motion for partial summary judgment and that no oral argument had been scheduled.

### ii.        The HTA Revenue Bond Litigation

159.    The HTA Defendants filed proofs of claim in the HTA Title III Case based on their alleged statutory lien, security interest and/or property interest in HTA Allocable Revenues and HTA's alleged failure to make payments of debt service on the HTA Bonds.

160.    The Oversight Board, as the Title III representative of HTA, filed an adversary proceeding against the HTA Defendants (Adv. No. 20-00007-LTS in Case No. 17-BK-3567-LTS) challenging their proofs of claim against HTA and seeking to disallow the HTA Defendants' claims, except as to any amounts deposited by HTA and held in certain specified deposit accounts by the fiscal agent pursuant to Commonwealth law and documents governing the HTA Bonds (the "HTA Revenue Bond Litigation").

161.    I am generally familiar with the issues litigated in the HTA Revenue Bond Litigation, and understand they include, but are not limited to, whether the HTA Defendants have a valid and enforceable lien, security interest or other property interest in the HTA Allocable Revenues retained by the Commonwealth and not appropriated and transferred to HTA, and whether the Commonwealth's retention of HTA Allocable Revenues violates any obligation owed by HTA to the HTA Defendants.

162.    At the time the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7])was executed, the HTA Revenue Bond Litigation was stayed pursuant to a case management order issued by the Title III Court.

### iii.        The CCDA Revenue Bond Litigation

163.    Ambac, Assured Guaranty Corp., FGIC, and BNYM, as fiscal agent for the CCDA Bonds (collectively, the "CCDA Defendants") filed proofs of claim in the Commonwealth Title III Case, asserting claims against the Commonwealth concerning CCDA Allocable Revenues.  The proofs of claim filed by the CCDA Defendants assert, among other things: (i) CCDA Bondholders

have a statutory lien, security interest and/or property interest in the CCDA Allocable Revenues, and (ii) the Commonwealth is liable to the CCDA Defendants under various statutory, tort, contractual and Constitutional theories, for not appropriating and transferring the CCDA Allocable Revenues to CCDA.

164.    The Oversight Board, as the Title III representative of the Commonwealth, filed an adversary proceeding against the CCDA Defendants (Adv. No. 20-00004-LTS in Case No. 17-BK-3283-LTS) challenging their proofs of claim against the Commonwealth and seeking to disallow the CCDA Defendants' claims in their entirety (the "CCDA Revenue Bond Litigation").

165.    I am generally familiar with the CCDA Revenue Bond Litigation and understand the issues litigated there include, but are not limited to, whether the CCDA Defendants have a valid and enforceable lien, security interest or other property interest in the CCDA Allocable Revenues retained by the Commonwealth and not appropriated and transferred to CCDA, whether the Commonwealth's retention of CCDA Allocable Revenues is a breach of any obligation owed to the CCDA Defendants, and whether Commonwealth law purporting to appropriate CCDA Allocable Revenues to CCDA without regard to whether such appropriations are contained in a Commonwealth fiscal plan certified by the Oversight Board and a Commonwealth budget certified by the Oversight Board are inconsistent with, and preempted by, PROMESA.

166.    The Oversight Board, as the Title III representative of the Commonwealth, filed a motion for partial summary judgment.  At the time the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) was executed, the CCDA Defendants were conducting supplemental discovery in connection with the motion for partial summary judgment and that no oral argument had been scheduled.

#### iv.     The HTA Lift Stay Motion

167.    The disputes regarding the HTA Allocable Revenues were not limited to the proofs of claim and adversary proceedings described above.  In this regard, Assured, Ambac, National, and FGIC also filed a motion in the Commonwealth and the HTA Title III cases seeking an order granting (i) relief from the automatic stay under PROMESA to allow them to enforce the application of the HTA Allocable Revenues to the payment of HTA Bonds or, in the alternative, (ii) for adequate protection of their alleged interests in the HTA Allocable Revenues (the "HTA Lift Stay Motion").  The Oversight Board, as Title III representative of the Commonwealth and HTA, filed an opposition to the HTA Lift Stay Motion.

168.    At the time the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) was executed, the Title III Court issued an order denying the HTA Lift Stay Motion, and the denial was affirmed by the United States Court of Appeals for the First Circuit.  However, I understand the Courts' rulings do not preclude Assured, Ambac, National, or FGIC from seeking stay relief or adequate protection in the future depending on the facts and circumstances.

#### v.     The HTA Section 926 Motion

169.    Beyond the HTA Lift Stay Motion and the other litigations described above, Ambac, Assured, FGIC and National (the "Section 926 Movants") filed a motion for an order appointing them as co-trustees for HTA under section 926 of the Bankruptcy Code for the purpose of pursuing certain avoidance claims against the Commonwealth (the "Section 926 Motion").

170.    I understand the disputes at issue in the Section 926 Motion involve, among other things, whether the Oversight Board unjustifiably refused to pursue avoidance claims HTA allegedly had against the Commonwealth and suffers from an unresolvable conflict of interest because it simultaneously represents both HTA and the Commonwealth in their respective Title III proceedings.

171.    At the time the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) was executed, the Title III Court issued an order denying the Section 926 Motion, which the Section 926 Movants had appealed to the First Circuit Court of Appeals.  The Section 926 Movants voluntarily dismissed the appeal in light of the agreement reached in the HTA/CCDA PSA.

### *vi.*    *CCDA Lift Stay Motion*

172.    Assured, Ambac, FGIC, and BNYM, as the fiscal agent, (collectively, the "CCDA Lift Stay Movants") filed a motion in the Commonwealth Title III Case seeking (i) an order that the automatic stay does not apply to their proposed action to enforce CCDA Bondholders' rights to the CCDA Allocable Revenues, or, in the alternative, (ii) relief from the automatic stay to pursue the proposed action or adequate protection for their alleged collateral (the "CCDA Lift Stay Motion" and, together with the Commonwealth-HTA Revenue Bond Litigation, the HTA Revenue Bond Litigation, the CCDA Revenue Bond Litigation, the HTA Lift Stay Motion, and the Section 926 Motion, the "HTA/CCDA PSA Litigation").

173.    When the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) was executed, the Title III Court had issued an order denying the CCDA Lift Stay Motion insofar as it sought relief from the automatic stay with respect to CCDA Allocable Revenues other than those that had been deposited into a specific account.  The Title III Court adjourned the final hearing with respect to the remainder of the CCDA Lift Stay Motion and held it would be deemed to have occurred when the Title III Court issued its final decisions in the CCDA Revenue Bond Litigation.  I understand the Title III Court's ruling does not preclude the CCDA Lift Stay Movants from seeking stay relief or adequate protection in the future depending on the facts and circumstances, and the Title III Court's eventual ruling with respect to CCDA Allocable Revenues other than those that had been deposited into a specific account may have been subject to appeal.

### 2.     Summary of Key Terms of the HTA/CCDA PSA

174.     On April 12, 2021, the Oversight Board announced it had reached an agreement in principle with Assured and National to settle claims against the Commonwealth and HTA relating to HTA Allocable Revenues and against the Commonwealth and CCDA relating to CCDA Allocable Revenues, and to restructure the HTA Bonds and CCDA Bonds.   Thereafter, the Oversight Board entered into and I, as Executive Director of the Oversight Board, executed the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) with certain HTA Bondholders, certain CCDA Bondholders, Assured, and National.   On July 15, 2021, Ambac, and FGIC joined the HTA/CCDA PSA pursuant to separate Joinder Agreements to the HTA/CCDA PSA, subject to a right to terminate the HTA/CCDA PSA solely as to themselves, which right expired on July 26, 2021.

175.     Pursuant to the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]), if the Plan is confirmed, in exchange for resolving the claims against the Commonwealth and HTA arising from or relating to the HTA Bonds, including the claims at issue in the Commonwealth-HTA and HTA Revenue Bond Litigations, and the agreement not to commence or pursue any pending or further litigation on account of the HTA Bonds, including in connection with the HTA Lift Stay Motion or the Section 926 Motion, holders of such claims will receive a combination of securities, cash, and/or new bonds, as described below.

176.     Holders of Allowed CW/HTA Claims will collectively receive 68.6% of the "Clawback CVI".   As described in the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) and Plan (Debtors' Ex. 1 [ECF No. 18785-1]), the Clawback CVI is a contingent value instrument that is based on sharing the potential outperformance of 5.5% of the Commonwealth's Sales and Use Taxes, relative to projections in the 2020 Commonwealth Fiscal Plan.   In other words, potential payments would be contingent upon the Commonwealth's Sales and Use Taxes

exceeding performance metrics.  The Clawback CVI has a term of 30 years.  For the first 22 years, the Clawback CVI is subject to a cumulative annual cap of the lesser of (i) the sum of $175 million and any unused amounts from previous years, and (ii) $350 million.  For the final 8 years, the Clawback CVI is subject to a cumulative annual cap of the lesser of (i) the sum of $375 million and any unused amounts from previous years, and (ii) $750 million.  The Clawback CVI allocable to Allowed CW/HTA Claims is subject to a lifetime cap of $3,697,668,995.00.  For the avoidance of doubt, payment upon the Clawback CVI is subject to payments on account of the bonds issued pursuant to the COFINA Plan.

177.    Additionally, upon satisfaction of the HTA Distribution Conditions, holders of claims against HTA arising from or relating to HTA 68 Bonds (as set forth in the HTA/CCDA PSA) (the "HTA 68 Bond Claims") will receive payment from HTA in the aggregate amount of $184.8 million in cash (the "HTA 68 Bond Cash"), and holders of claims against HTA arising from or relating to HTA 98 Senior Bonds (as set forth in the HTA/CCDA PSA) ("HTA 98 Senior Bond Claims" and, together with the HTA 68 Bond Claims, the "HTA Bond Claims") will receive payment from HTA in the aggregate amount of $79.2 million in cash (the "HTA 98 Senior Bond Cash" and, together with the HTA 68 Bond Cash, the "HTA Cash").  The principal amount of the HTA 68 Bonds and HTA 98 Senior Bonds, and corresponding HTA Bond Claims, shall be reduced by the amount of HTA Cash.  As provided in the HTA/CCDA PSA, HTA will also issue $1.245 billion in new bonds (the "New HTA Bonds"), including current interest bonds, capital appreciation bonds, and convertible capital appreciation bonds, to holders of HTA Bond Claims.

178.    To compensate the Initial HTA/CCDA PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA PSA, each Initial HTA/CCDA PSA Creditor will be entitled to receive an amount equal to one percent of its

respective HTA Bond Claim (the "HTA Consummation Costs"). In exchange for agreeing to support and vote to accept the Plan and to "lock-up" their respective bonds in accordance with the terms of the HTA/CCDA PSA, each Initial HTA/CCDA PSA Creditor and HTA/CCDA Joinder Creditor holding or insuring HTA Bonds is entitled to receive a restriction fee (the "HTA Restriction Fee"). The HTA Consummation Costs and the HTA Restriction Fee are available up to an aggregate maximum amount of $125 million, payable by HTA upon the effective date of a potential plan of adjustment for HTA.

179.    Pursuant to the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]), in exchange for resolving the claims against the Commonwealth arising from or relating to the CCDA Bonds, including the claims at issue in the CCDA Revenue Bond Litigation, and the agreement not to commence, prosecute, or pursue any pending or further litigation on account of the CCDA Bonds on any basis, including in connection with the CCDA Lift Stay Motion, holders of such Claims will receive a combination of securities and cash, described below.

180.    Holders of Allowed CW/Convention Claims will collectively receive 4% of the Clawback CVI. The portion of the Clawback CVI allocable to Allowed CW/Convention Claims is subject to a lifetime cap of $217,228,391.00. Additionally, holders of claims against CCDA arising from or relating to the CCDA Bonds ("CCDA Bond Claims") will receive in the aggregate $97 million in cash, distributable pursuant to the qualifying modification for CCDA.

181.    To compensate Initial HTA/CCDA PSA Creditors for their fees and expenses incurred in connection with the negotiation and execution of the HTA/CCDA PSA, each Initial HTA/CCDA PSA Creditor will receive an amount equal to one percent of its CCDA Bond Claims (the "CCDA Consummation Costs"). In exchange for agreeing to support and vote for the plan and to "lock-up" their respective bonds in accordance with the terms of the HTA/CCDA PSA,

each Initial HTA/CCDA PSA Creditor and HTA/CCDA Joinder Creditor holding or insuring CCDA Bonds is entitled to receive a restriction fee (the "CCDA Restriction Fee"). The CCDA Consummation Costs and the CCDA Restriction Fee are available up to an aggregate maximum amount of $15 million.

182.    In exchange for executing the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]) and structuring the payments to be made pursuant to the HTA/CCDA PSA, Assured is entitled to receive an additional $39.3 million in cash and National is entitled to receive an additional $19.3 million in cash.

### E.    PRIFA PSA

#### 1.    Existing Disputes and Litigation Resolved by the PRIFA PSA

183.    The Oversight Board has also engaged in various disputes and litigations arising from or related to the PRIFA Bonds. This includes litigation with PRIFA Bondholders, the trustee for the PRIFA Bonds, and monoline insurers of PRIFA Bonds, relating to the Commonwealth's retention of certain federal excise tax revenues on rum produced in Puerto Rico and sold on the U.S. mainland, collected by the federal government and appropriated and transferred to the Commonwealth each fiscal year, the first $117 million of which were historically conditionally appropriated and transferred to PRIFA (the "PRIFA Allocable Revenues"). The parties to the PRIFA PSA agreed to resolve the various adversary proceedings, contested matters, numerous discovery demands, and lawsuits related to the PRIFA Bonds described below, on the terms set forth in the PRIFA PSA, Exhibit D to the Disclosure Statement (Debtors' Ex. 18 [ECF No. 18791-8]).

### i.      *PRIFA Revenue Bond Litigation*

184.    Ambac and FGIC filed separate actions before the commencement of the Commonwealth Title III Case asserting various claims relating to the PRIFA Allocable Revenues (the "Initial PRIFA Revenue Bond Litigation").

185.    Ambac, Assured Guaranty Corp., FGIC, and U.S. Bank Trust National Association ("U.S. Bank"), as trustee for PRIFA Bondholders, (collectively, the "PRIFA Defendants") subsequently filed proofs of claim in the Commonwealth Title III Case, asserting, among other things, the PRIFA Bondholders have a statutory lien, security interest and/or property interest in the PRIFA Allocable Revenues and the Commonwealth is liable to the PRIFA Bondholders, under various statutory, tort, contractual and Constitutional theories, for not appropriating and transferring the PRIFA Allocable Revenues to PRIFA.

186.    The Oversight Board, as the Title III representative of the Commonwealth, filed an adversary proceeding against the PRIFA Defendants (Adv. No. 20-00003-LTS in Case No. 17-BK-3283-LTS) challenging the PRIFA Defendants' proofs of claim against the Commonwealth and seeking to disallow the PRIFA Defendants' claims in their entirety (the "PRIFA Revenue Bond Litigation").

187.    I am generally familiar with the issues litigated in the PRIFA Revenue Bond Litigation, which include, but are not limited to, whether the PRIFA Defendants have a valid and enforceable lien, security interest or other property interest in the PRIFA Allocable Revenues retained by the Commonwealth and not appropriated and transferred to PRIFA, whether the Commonwealth's retention of PRIFA Allocable Revenues is a breach of any obligation owed to the PRIFA Defendants, and whether any Commonwealth law purporting to appropriate PRIFA Allocable Revenues to PRIFA without regard to whether such appropriations are contained in a Commonwealth fiscal plan certified by the Oversight Board and a Commonwealth budget certified

by the Oversight Board are inconsistent with, and preempted by, PROMESA. Even beyond these proceedings, Ambac and others initiated various Section 2004 discovery proceedings demanding the production of extensive financial and other information concerning affairs and assets of the Commonwealth.

188. The Oversight Board, as Title III representative of the Commonwealth, had filed a motion for partial summary judgment. When the PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]) was executed, the PRIFA Defendants were conducting supplemental discovery in connection with the motion for partial summary judgment.

### ii. PRIFA Lift Stay Motion

189. Ambac, Assured, FGIC and U.S. Bank, as trustee for PRIFA Bondholders ("PRIFA Lift Stay Movants"), also filed a motion in the Commonwealth Title III Case seeking (i) an order that the automatic stay does not apply to their actions (a) against the United States Treasury for an equitable lien on pledged rum taxes before they are transferred to the Commonwealth and (b) against the Commonwealth and certain rum producers to enforce their purported lien on PRIFA Allocable Revenues, or, in the alternative, (ii) relief from the automatic stay to allow them to enforce the application of the PRIFA Allocable Revenues to the payment of PRIFA Bonds or adequate protection of their alleged interests in the PRIFA Allocable Revenues (the "PRIFA Lift Stay Motion" and, together with the Initial PRIFA Revenue Bond Litigation, PRIFA Revenue Bond Litigation, the "PRIFA PSA Litigation").

190. When the PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]) was executed, the Title III Court had issued an order denying the PRIFA Lift Stay Motion, and the denial was affirmed by the United States Court of Appeals for the First Circuit. However, I understand the Courts' rulings do not preclude the PRIFA Lift Stay Movants from seeking stay relief or adequate protection in the future depending on facts and circumstances.

## 2. Summary of Key Terms of the PRIFA PSA

191.    On July 14, 2021, the Oversight Board announced it had reached a verbal understanding of an agreement with Ambac and FGIC to settle claims against the Commonwealth relating to PRIFA Allocable Revenues and to restructure the PRIFA Bonds. Thereafter, the Oversight Board entered into, and I, as Executive Director of the Oversight Board, executed the PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]) with certain PRIFA Bondholders, Ambac, and FGIC.

192.    Pursuant to the PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]), if the Plan is confirmed, in exchange for resolving the claims against the Commonwealth arising from or relating to the PRIFA Bonds, including but not limited to the claims at issue in the PRIFA Revenue Bond Litigation, and the agreement not to commence, prosecute, or pursue any pending or further litigation on account of the PRIFA Bonds, including in connection with the PRIFA Lift Stay Motion, holders of such claims will receive a combination of securities and cash, as described below.

193.    Pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and related transactions, holders of claims arising from or relating to the PRIFA Bonds ("PRIFA Bond Claims") will receive, in full consideration, satisfaction, release, and exchange of such holder's PRIFA Bond Claim, their respective pro rata share of (i) 27% of the Clawback CVI, (ii) certain contingent value instruments based on the outperformance of the Commonwealth's general fund rum tax collections (the "Rum Tax CVI"), and $193.5 million in cash. Distributions allocable to PRIFA Bond Claims on account of Clawback CVI and Rum Tax CVI payments are subject to a combined lifetime cap of $1,301,525,288.00.

194.    In exchange for agreeing to support and vote for the Plan and to "lock-up" their respective bonds in accordance with the terms of the PRIFA PSA (Debtors' Ex. 18 [ECF No.

18791-8]), each Initial PSA Creditor and Joinder Creditor (each as defined in the PRIFA PSA) holding or insuring PRIFA Bonds is entitled to receive a restriction fee (the "PRIFA Restriction Fee"). The PRIFA Restriction Fee is available up to an aggregate maximum amount of $10 million, payable by PRIFA upon the effective date of a qualifying modification for PRIFA.

195. In exchange for executing the PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]) and structuring the payments to be made pursuant to the PRIFA PSA, Ambac is entitled to receive $34.75 million in cash and FGIC is entitled to receive $21.75 million in cash to be paid by the Commonwealth on the effective date of the qualifying modification for PRIFA.

### F. AFSCME PSA

#### 1. Existing Disputes Resolved by the AFSCME PSA

196. The Oversight Board participated in negotiations with AFSCME, which represents more than 9,500 current employees of the Commonwealth. The negotiations concerned proposed modifications to the collective bargaining agreements between AFSCME and the Commonwealth (the "AFSCME CBAs") to obtain the union's support for the Plan, obtain concessions consistent with the Fiscal Plan, and provide certain benefits to public employees including the return of System 2000 contributions. I am aware the union parties to the AFSCME PSA agreed to take reasonable actions to support the Plan and also to not pursue any litigation that would breach or frustrate the implementation of the Plan or the AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]). *See* Disclosure Statement, Exhibit G; Plan, Exhibit G.

197. The AFSCME PSA contemplates broad fiscal and labor reforms pursuant to the Plan which balance the competing interests of the Commonwealth in maintaining an appropriate size and cost of its workforce, and sustainability of benefits with ASCFME's concerns for their members' well-being. Negotiations between the Oversight Board and AFSCME focused on

modifications to certain provisions in the AFSCME CBAs (the "Right-Sizing Provisions")
regarding employee reassignment, layoff, and termination; pension cuts; and benefit restoration.

### 2. Summary of Key Terms of the AFSCME PSA

198. On June 7, 2019, negotiations between the Oversight Board and AFSCME
culminated in the AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]). Pursuant to the AFSCME
PSA, if the Plan is confirmed, in exchange for the adoption of modified terms to be set forth in a
new, five year CBA, consent to the Plan's treatment of pension benefits (as modified by the
AFSCME PSA, including the establishment of the Pension Reserve Trust), and support of the
filing and confirmation of the Plan, AFSCME union members will receive (i) a uniform healthcare
plan and increased employer contributions of $170 per month; (ii) a one-time signing bonus of
$500; (iii) full repayment of the amount of principal contributions made under the System 2000
and Act 3 retirement plans from 2000 through 2017; and (iv) an upside participation bonus, shared
with other public rank-and-file employees not represented by any union, to share in any excess
surplus above respective projections for any given year as long as such excess surplus in any given
year is more than $100 million. In addition, if the Plan is confirmed, AFSCME will receive (i) a
one-time support fee of $5 million, payable on the Effective Date from the Commonwealth in
recognition of AFSCME's efforts as lead negotiator of the new CBAs; (ii) an additional $5 million
one-time, discretionary payment, payable on the Effective Date from the Commonwealth for the
efforts undertaken by AFSCME to fulfill its obligations under the new CBAs; and (iii)
reimbursement of AFSCME's reasonable professional fees and expenses incurred in connection
with negotiation and implementation of the new CBAs and issues relating to the retirement plans.
As noted above, in making these statements, I recognize there are ongoing discussions concerning
matters regarding the Plan, and, in particular, treatment of the Pension Claims. To the extent it
becomes necessary, I will supplement this Declaration to reflect the results of those discussions.

### G.     AFT/AMPR Proposed Agreement

199.     In addition to the Plan Settlement Agreements, the Oversight Board reached an agreement with AFT and AMPR with respect to the terms of a proposed amended collective bargaining agreement and the treatment of claims held by teachers represented by AFT and AMPR, including with respect to accrued pension benefits (the "Proposed Settlement").  The terms of the Proposed Settlement were reflected in Exhibit F-2 to the Plan and provide for, among other things, (i) a freeze of benefit accruals under the TRS pension system as of the Effective Date, (ii) basic medical coverage provided by the Commonwealth, equal to at least $170 per month for all covered employees regardless of marital status or relationship, (iii) expanded vacation and sick leave accruals, and (iv) a one-time $3,000 cash bonus for each member.

200.     I understand the Proposed Settlement was subject to ratification by a vote of the members represented by AFT and AMPR and, accordingly, the Plan provided for alternative treatment of the subject Claims in the case where the membership declined to ratify the Proposed Settlement.  The treatment under these circumstances is reflected in Exhibit F-1 to the Plan and provides for, among other things, (i) a freeze of benefit accruals under the TRS pension system as of the Effective Date, and (ii) enrollment in Social Security by all teachers under the age of 45 and all members hired after the Effective Date.  On September 28, 2021, I was informed by representatives of AFT and AMPR that the members voted against ratifying the Proposed Settlement.  For this reason, the members will receive their respective treatment pursuant to the Plan, including the treatment under Exhibit F-1 rather than Exhibit F-2.

### H.     The Plan Settlement Agreements are Reasonable and Fair

201.     As described above, I participated in and am familiar with the Oversight Board's discussions and negotiations and agreements reached with respect to the GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]), the PRIFA BANs Stipulation (Debtors' Ex. 22 [ECF No. 18794-2]),

the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]), the HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]), PRIFA PSA (Debtors' Ex. 18 [ECF No. 18791-8]), and AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]).  In executing each of these Plan Settlement Agreements, and agreeing to their terms and conditions, the Oversight Board considered, among other things, (i) the extensive, good faith and arm's-length negotiations (led by the Mediation Team) among representatives of the Oversight Board, its consultants, and representatives of certain claim holders, (ii) the risks and expenses (and time commitment) relating to the substantial litigation remaining in the GO/PBA PSA Litigation, PRIFA BANs Stipulation Litigation, ERS Stipulation Litigation, HTA/CCDA PSA Litigation, PRIFA PSA Litigation (collectively, the "Plan Litigation"), all of which are resolved by the Plan Settlement Agreements, (iii) the potential for litigation and attendant risks and costs associated with the labor-related disputes ("Labor Disputes"), and (iv) the central components of each of the Plan Settlement Agreements.  For the reasons described below, I believe that each of the Plan Settlement Agreements is fair and reasonable and a necessary component of a largely consensual plan.

202.    Each of the Plan Settlement Agreements was reached following months of negotiations directed by the Mediation Team and/or other informal discussions that included party representatives, legal and financial advisors, and involved vigorous debate and discussion on both sides.  I believe the negotiations leading to the Plan Settlement Agreements were conducted at arms'-length and in good faith.

203.    The Plan Litigation resolved by the Plan Settlement Agreements involves extraordinarily complex, high-stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal issues.  Collectively, billions of dollars were at stake.  From the Oversight Board's perspective, the consequence of the GO Bondholders prevailing on their priority

argument, or the HTA, PRIFA, or CCDA bondholders prevailing on their property interest contentions would have inflicted grave harm on the Commonwealth and its residents because the Commonwealth, in either situation, would have lost control of billions of dollars of revenues needed to sustain the Commonwealth, Instead, the revenues would have been payable to the GO Bondholders and/or the HTA, PRIFA, and CCDA bondholders. This would have prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory mission. While the Oversight Board believed it should prevail in those litigations, a small risk of a negative and grave outcome was imprudent to undertake once settlement was possible on the terms in the Plan.

204. Additionally, the Plan Settlement Agreements resolve countless proofs of claim, adversary proceedings, contested matters, and disputes related to the Plan. The Plan Litigation has been vigorously litigated, and, if continued to be litigated to conclusion, would take up enormous amounts of time and resources (judicial and otherwise), and no matter the outcome, undoubtedly would be appealed by the unsuccessful side, resulting in further delays and protracted litigation, all of which would come at a substantial cost to the Commonwealth, because of both the significant expenses that would be incurred in such litigation and the potential impact any such litigation would have on the Commonwealth's ability to exit Title III. The Plan Litigation has been, and would certainly continue to be, extremely expensive to litigate. It is my understanding that the likelihood all the disputed issues would be resolved in the Commonwealth's favor is not certain. Resolution of the Plan Litigation avoids any such uncertainty, and the delay and significant expense it entailed.

205. In addition, while the Oversight Board believes the risk of a materially adverse outcome in connection with the various litigations was materially less than fifty percent based on

decisions rendered to date, an adverse determination in any one or more of the actions could have been catastrophic for the Commonwealth's restructuring efforts, as explained above.

206.    For example, if the GO/PBA PSA Litigation described in Section III.A.1 relating to the GO Bonds and PBA Bonds were resolved adversely to the Oversight Board, the Commonwealth, and/or PBA, it would render impossible the creation of a sustainable economy with market access, deplete the Debtors' resources available for other creditors, and, in practical terms, unravel years of critical restructuring efforts.  For instance, if it were determined that the respective bondholders in the Lien Challenge Actions held valid and perfected security interests or statutory liens that fully secured more than $6 billion in claims, I understand those claims could potentially be entitled to full recovery.  Any plan of adjustment that did not provide full recovery on account of such secured claims may have been unconfirmable.  Moreover, I understand that an adverse result in the Lien Challenge Actions would have set a precedent for approximately $11.5 billion in remaining GO Bond, PBA Bond, and other bonds guaranteed by the Commonwealth.  I also understand that an adverse result in the PBA Lease Litigation could result in administrative expense treatment for rents due on the alleged leases, requiring payment of approximately $401.6 million in annual "rent" under the PBA Leases.  To the extent those risks could be avoided by a reasonable settlement, it was and is the prudent path.

207.    Similarly, if the PRIFA BANs Stipulation Litigation described in Section III.B.1 relating to the PRIFA BANs were resolved adversely to the Commonwealth, the Commonwealth could be obligated to uphold its guarantee of the PRIFA BANs, resulting in at least $83.5 million in claims.

208.    If the ERS Stipulation Litigation described in Section III.C.1 were resolved adversely to the Oversight Board, the Commonwealth, and/or ERS, it could result in significant

liability of the Commonwealth and/or ERS.  I understand that if, for example, the enactment of
Joint Resolution 188 and/or Act 106 had been determined to give rise to nondischargeable
administrative expense claims and/or nondischargeable Takings clause claims in favor of the ERS
Bondholders, any plan of adjustment that did not provide for full payment of these claims, which
totaled over a $3 billion, may have been unconfirmable.  I also understand that even if the ERS
Bondholders did not have nondischargeable claims, the ERS Bond Claims could result in
unsecured claims against the Commonwealth in an amount in excess of $3 billion, which would
have diluted the recovery of other holders of unsecured claims against the Commonwealth.
Further, if the Lien Scope Adversary Proceedings were resolved in favor of the ERS Bondholders,
I understand such resolution could potentially give rise to a secured claim against the
Commonwealth and/or ERS of over $2 billion.

209.    Similarly, if the HTA/CCDA PSA Litigation and PRIFA PSA Litigation described
in Sections III.D.1 and III.E.1 relating to the HTA, CCDA, and PRIFA Bonds were resolved
adversely to the Commonwealth, it could result in significant liability of the Commonwealth that
could have to be satisfied in cash.  I understand that if, for example, it were determined that the
Commonwealth impermissibly retained the HTA, CCDA, and PRIFA Allocable Revenues, the
Commonwealth could be required to use over $1 billion of Commonwealth funds to pay holders
and monoline insurers of HTA, CCDA, and PRIFA Bonds.  I also understand that if the retention
of the HTA, CCDA, and PRIFA Allocable Revenues were determined to give rise to
nondischargeable administrative expense claims and/or nondischargeable Takings clause claims,
any plan of adjustment that does not provide for full payment of these claims, which totaled over
a $1 billion, would be unconfirmable.  Further, if the Commonwealth were required to resume
appropriating and transferring the HTA, CCDA, and PRIFA Allocable Revenues, these monies

would be unavailable for use by the Commonwealth.  As with the other disputes described above and resolved by the various agreements reached, settlement was by far the wiser path—and on terms the Commonwealth and the other Debtors can afford, while still being able to provide the necessary government services to the residents of Puerto Rico.

210.    Likewise, the Labor Disputes resolved by the AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]) related to AFSCME's support for the Plan and execution of new, modified CBAs.  The AFSCME PSA incorporates certain Right-Sizing Provisions of the proposed CBA amendments that provide the Commonwealth with more flexibility to address its current and future workforce.  In negotiating the terms of the AFSCME PSA, the Oversight Board considered, among other things, (a) the critical importance of the public employee constituencies to the Commonwealth's future, (b) the difficulty in achieving union and member support for the pension modifications contemplated by the AFSCME PSA and the Plan, (c) the significant cost and risk of litigation regarding opposition to such pension modifications without AFSCME's support, (d) the substantial benefits of amendments to the AFSCME CBAs that will, among other things, give the Commonwealth more flexibility to right-size material components of its labor force than exist under the current AFSCME CBAs, and (e) the extensive discussions among representatives of the Oversight Board, its consultants, the Commonwealth government, and AFSCME to develop a consensus regarding the terms of the AFSCME PSA.

211.    If the Labor Disputes were not resolved (in part) through the AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]), the Oversight Board may have been required to undergo costly, uncertain and lengthy litigation over the subject AFSCME CBAs to accomplish its goals of reforming the Commonwealth's significant pension liabilities and achieving labor measures contained in the amended CBAs, the outcome of which would be uncertain.

212.     I believe the government employees represented by AFSCME are critical to both the fiscal and operational future of the Commonwealth.  Without the settlements embodied in the AFSCME PSA (Debtors' Ex. 21 [ECF No. 18794-1]), disputes with AFSCME could result in strained relationships with government employees.  Moreover, the AFSCME PSA eliminates the risk of costly, time-consuming and uncertain litigation with AFSCME regarding the Labor Disputes and consensually and favorably establishes terms for new AFSCME CBAs.  Under the terms of the AFSCME PSA, AFSCME members receive many of their requested benefits and modifications to the applicable CBAs, and AFSCME members have the opportunity to share in any upside of the Commonwealth's fiscal future.  I believe these terms will incentivize governmental employees to maximize efficiencies.

213.     In light of the potential dramatic financial impact on the Commonwealth, it is my belief that if any of the Plan Litigations were resolved adversely to the Commonwealth, or if the referenced agreements were not reached regarding the AFSCME CBAs and Labor Disputes, the restructuring contemplated by the Plan would become far more difficult, and likely lead to an inferior result.

214.     Beyond avoiding the cost and expense of litigation, the Plan Settlement Agreements also prevent adverse results that could, among other things, dilute recoveries of other Commonwealth claimholders and jeopardize a consensual restructuring.  The Plan Settlement Agreements also free up consideration, which saved value can be (and was) used to obtain additional support for achieving a nearly completely consensual confirmation of the Plan.

215.     In my judgment, the Plan Settlement Agreements and the resolution of the disputes embodied therein are reasonable and fair and the product of extensive adversarial, arms'-length negotiations among sophisticated parties.  These Plan Settlement Agreements resolve billions of

dollars of claims against the Commonwealth, PBA and ERS, avoid time consuming litigation, and provide a reasonable solution to extraordinarily complex disputes and are in the best interest of the Commonwealth and its stakeholders.

216.    Moreover, the payment of the Consummation Costs, Restriction Fees, and Retail Support Fees were critical components of the Plan Settlement Agreements that made development of the Plan possible.  Specifically, in consideration for their efforts in assisting in the formulation of the Plan, and to compensate the PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the GO/PBA PSA (Debtors' Ex. 16 [ECF No. 18791-6]) and HTA/CCDA PSA (Debtors' Ex. 17 [ECF No. 18791-7]), the Oversight Board determined that it is fair and reasonable for the PSA Creditors to be paid the Consummation Costs.  Additionally, in exchange for agreeing to support the Plan and to "lock up" the parties' bonds in accordance with each of the GO/PBA PSA and HTA/CCDA PSA, the Oversight Board determined it is fair and reasonable to make PSA Restriction Fees available to such Consummation Cost Parties.  Similarly, in exchange for executing the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]) and agreeing to all of its terms and conditions, including agreeing to support the Plan and to "lock up" their ERS Bonds in connection with the ERS Stipulation, the Oversight Board determined that it is fair and reasonable to make an ERS Restriction Fee available to each ERS bondholder party to the ERS Stipulation.  In addition, as part of the negotiations culminating in the GO/PBA PSA, the Oversight Board fought for, and the Initial GO/PBA PSA Creditors agreed, to share certain amounts initially requested as part of the GO/PBA Restriction Fee with Retail Investors.  The Oversight Board determined that providing Retail Investors an opportunity to share in these payments is fair and reasonable, balances the interests of various creditor constituencies, and is beneficial to reduce the risk of potentially costly cramdown litigation in connection with Plan confirmation.  The

declaration in respect of Plan confirmation by Steve Zelin of PJT, filed concurrently herewith, provides additional detail regarding the Oversight Board's rationale for the various fees under the Plan Settlement Agreements.

## IV.    Discharge, Release, Exculpation and Injunction Provisions

217.    The Plan (Debtors' Ex. 1 [ECF No. 18785-1]) includes certain discharge, release, exculpation, and injunction provisions, which, based on my review of the Plan and my participation in the negotiation of the Plan Settlement Agreements, I believe are essential to the Debtors' restructuring and a consensual restructuring could not be successfully accomplished without these provisions.

### A.    The Releases are Appropriate and Essential to the Reorganization

218.    A critical element of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) is the complete resolution of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case. To achieve this, the Debtors and claimholders agreed to a mutual release of all Claims and Causes of Action arising, in whole or in part, prior to the Effective Date.

219.    The Debtors' releases incentivized claimholders to support, and undertake actions to support, the Plan and its confirmation, without fear of lawsuits in the future.  Based on my experience, I believe at least some parties to the Plan Settlement Agreements would not have entered into those agreements absent the Plan's release provisions.  Due in part to the Debtors' and Reorganized Debtors' (and their Related Persons') releases, the Debtors were able to secure the substantial concessions reflected in the settlements and, ultimately, the Plan.

220.    The Plan's discharge and releases granted by claimholders likewise provide the Debtors and Reorganized Debtors with assurance that the restructuring balance struck by the Plan will not be upset by further claims against the Reorganized Debtors after the Effective Date.  By obtaining the discharge and release of the Debtors for claims that were or could have been asserted

prior to the Effective Date, the Reorganized Debtors are better positioned to be successful in fulfilling their obligations under the Plan and, eventually, rejoining the capital markets. For example, among other things, the releases provide the Commonwealth with certainty that it will not become embroiled in litigation regarding its potential liability for having issued debt in excess of the Constitutional Debt Limit.

221. The releases of claims by the Debtors is intended to impact only those parties that made a significant contribution to the negotiation and development of the Plan, including the Debtors and Reorganized Debtors (and their Related Persons), the Government Parties, the GO/PBA PSA Creditors, the HTA/CCDA Creditors, the Retiree Committee, the UCC, AFSCME, and the Related Persons. To the extent the Plan is inconsistent with this intention, it is my understanding that the Plan will be modified to reflect that. The releasees and their representatives and advisors incurred cost and expense during the course of their essential participation in the negotiations.

222. Based on my experience, I believe the Debtors' releases of claims against, among others, certain Government Parties, PSA Creditors, and official committees are necessary and essential to the Plan. They were negotiated with each of the key stakeholders in a robust, arms'-length process. That process led to broad support for the restructuring framework contemplated by the Plan, including the release provisions. I further believe the releases are instrumental in obtaining broad support for the Plan and maximizing the Plan's chances for confirmation. I understand that, absent the discharge and release of prepetition Claims against the Debtors under the Plan, the Oversight Board would not be able to certify that expenditures do not exceed revenues of the Commonwealth. For these reasons, I believe both the releases of claims against the Debtors

94

by claimholders and the releases of Debtor claims against the releasees are fair and reasonable, and in the best interests of the Debtors to fully and finally resolve the Debtors' Title III Cases.

### B. The Plan Does Not Provide for Third-Party Releases

223. Based on my understanding of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and the negotiations that led to it, the Plan's releases are limited to those that are necessary to effect the Debtors' successful restructuring. Except as explicitly agreed to by the creditors in their respective Plan Settlement Agreements, the Plan is not intended to release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor. To the extent there is any inconsistency between the Plan and that intention, it is my understanding the Plan will be modified to reflect that intention.

### C. The Releases Provide for Appropriate Carve-Outs

224. Sections 92.2(d), (e), and (f) of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) also carve out from the Released Claims certain claims, causes of action, or other rights or powers that are held by the Securities and Exchange Commission, the United States, and parties to certain Underwriter Actions. Likewise, as confirmed by the definition of Released Claims (*see* Plan, section 1.424), claims against CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring proceedings, and Avoidance Actions generally are not released under the Plan. These carve-outs help to ensure that only those releases that are reasonable and necessary to Plan confirmation are being provided.

### D. The Plan's Exculpation Provisions are Necessary and Narrowly Tailored

225. Section 92.7 of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides for exculpation of the Government Parties, PSA Creditors, Retiree Committee, UCC, AFSCME, and the monoline bond insurers for, among other things, any acts taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance,

confirmation or approval of the Plan and the settlements contained therein (including, but not limited to, the Plan Settlement Agreements).  Based on my experience, I believe the expectation of exculpation incentivized claimholders to participate fulsomely in the negotiations and mediations, support, and undertake actions that support confirmation of the Plan without fear of future baseless lawsuits.  Failing to approve the exculpation provisions would likely expose the parties to litigation after months of good faith negotiations.

226.    I believe the Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the Plan.  All of the parties being exculpated in the Plan played a key role in the negotiation of the Plan and the settlements that enabled the Plan.  The Plan's exculpation provisions do not alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.

### E.    The Plan's Injunction Provisions are Necessary and Narrowly Tailored

227.    The Plan's injunction provisions (Debtors' Ex. 1 [ECF No. 18785-1]) Sections 92.3, 92.9, and 92.11) are necessary to the reorganization and are fair to those parties involved. The injunction ensures that the releases and exculpations discussed above are preserved and enforced by prohibiting legal action concerning the Released Claims, avoiding the time, burden and expense that could be incurred if parties were permitted to pursue Released Claims.  The Plan's injunction provisions are narrowly-tailored to serve just that purpose.

### V.    Preemption Pursuant to the Plan

228.    It is my belief the continued application of certain Commonwealth statutes that otherwise require spending inconsistent with the certified fiscal plans and budgets (and with any confirmed Title III plan of adjustment as proposed by the Oversight Board) would significantly frustrate the carrying out of PROMESA by hampering the Oversight Board's ability to carry out its mission and threaten the Oversight Board's achievements.

229. Section 89.3 of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) states, among other things, that, as of the Effective Date, "all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, are held preempted." I also reviewed Exhibit K to the Plan, entitled "List of Main Statutes Preempted by PROMESA," which contains a list of statutes identified as inconsistent with, and preempted by, PROMESA. The statutes identified in Exhibit K are listed in three sections: (i) Section I, "Commonwealth good faith and credit pledge statutes"; (ii) Section II, "Statutes appropriating Commonwealth revenues"; and (iii) Section III, "TRS and JRS Statutes." Exhibit K is a non-exhaustive list. However, I expect that a comprehensive list of statutes, which the Oversight Board has identified as inconsistent with, and preempted by, PROMESA will be submitted in advance of the confirmation hearing. That list will likely also include certain sections of the Puerto Rico Constitution, including certain sections of Article VI thereof.

230. I understand the statutes listed in Section I of Exhibit K generally require the Commonwealth to spend its money to repay its general obligation and guaranteed debt in full without regard to the fiscal plans and budgets certified by the Oversight Board. In my view, if these statutes continue to operate or otherwise were required to be complied with post-effectiveness of the Plan, they not only would be inconsistent with the Oversight Board's purpose and responsibilities under PROMESA described above, but also would undermine the restructuring contemplated by the Plan, which proposes to pay those claimholders less than the full amounts of their respective claims. On their face, the preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings.

231.    By way of example, I reviewed Articles V-XV and XIX-LIV of the Plan, which propose to pay GO Bonds and other Commonwealth guaranteed debt less than one hundred percent (100%) of the presented amount of their claims.  Any Puerto Rico statute or other law requiring the Commonwealth to pay those claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan.  Moreover, the continued application of such statutes would significantly hamper the Oversight Board's mission to return Puerto Rico to fiscal responsibility and access to capital markets because those laws would effectively nullify the Plan's restructuring of GO Bonds and other Commonwealth guaranteed debt and significantly weaken the Oversight Board's ability to control Commonwealth spending.

232.    Similarly, the statutes listed in Section I to Exhibit K authorize the Commonwealth to issue debt without obtaining Oversight Board approval.  As noted above, I believe continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets.

233.    I further understand the statutes listed in Section I of Exhibit K require the Governor to approve any debt the Commonwealth issues, regardless of whether that debt issuance is authorized under PROMESA or the Plan.  If these statutes have to be complied with, I believe they would undermine the restructuring of Commonwealth debt contemplated in the Plan.  For example, I reviewed Article 74 of the Plan, which provides for the issuance of new Commonwealth debt to fund distributions to certain claimholders, without the need to obtain the Governor's approval.

This Plan directive would be interfered with if the Governor's approval was required, particularly if the Governor chose not to grant such an approval.

234.     It is my understanding that the statutes listed in Section II of Exhibit K generally require the Commonwealth to transfer its money to numerous other entities to spend on various purposes, outside the Oversight Board's certified budget, fiscal plan and Plan.  Here, too, I believe these statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would undermine the restructuring and limited allowance of claims contemplated by the Oversight Board's proposed Plan.  Among other things, Articles LXIII–LXVII of the Plan propose to pay claims arising from obligations described in some of these statutes at less than one hundred percent (100%) of the claimed amounts.  Just like the statutes listed in Section I of Exhibit K, I believe the continued application of the statutes listed in Section II would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, because they provide for spending which is inconsistent with the certified Commonwealth budget, fiscal plan and the Plan.

235.     Lastly, it is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment.  If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which proposes to pay certain retiree claims in amounts less than what those statutes would otherwise require.  For example, Article LV of the present Plan would pay certain claims arising from these statutes less than in full and modify certain pension and other benefits to lower levels on a go-forward basis, and eliminate future accruals of pension

benefits altogether.  Once again, any Puerto Rico statute or other law requiring the Commonwealth to pay the over $55 billion of pension-related claims in full and to continue to accrue defined benefit obligations for teachers and judges is inconsistent with the restructuring contained in the present Plan and would nullify the present Plan's restructuring of retiree claims.  As a result, if such laws continued to operate, I believe the Oversight Board's mission to provide for Puerto Rico to achieve fiscal responsibility and access to capital markets would be undermined and the present Plan might be rendered not feasible.  As noted above, in making these statements, I recognize there are ongoing discussions concerning matters regarding the Plan, and, in particular, treatment of the Pension Claims.  To the extent it becomes necessary, I will supplement this Declaration to reflect the results of those discussions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 25, 2021                                   */s/ Natalie A. Jaresko*
      San Juan, Puerto Rico                           Natalie A. Jaresko
                                        Oversight Board, Executive Director