**Exhibit E**

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF SHEVA R. LEVY IN RESPECT OF CONFIRMATION OF SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *et al.*[2]

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Pursuant to the Court's *Order Memorializing Certain Rulings Made at the November 1, 2021 Pretrial Conference* [ECF No. 19009], this declaration has been amended solely to include references to the filed exhibits and their respective ECF numbers.

## I.      Professional Background

1.      I am a Principal of Ernst & Young LLP ("EY") in the People Advisory Services practice.  I received my bachelor's degree in mathematics from Cleveland State University in 1998. In January 1999, I joined EY in a staff position and have worked in various roles at EY for almost 23 years.  In July 2014 I was promoted to Principal at EY, in which capacity I lead a team of actuarial consultants who focus on issues relating to defined benefit pensions and other post-retirement programs.  I am an Enrolled Actuary, an Associate of the Society of Actuaries and a Member of the American Academy of Actuaries, and I meet the American Academy of Actuaries' "General Qualification Standard for Prescribed Statements of Actuarial Opinions" relating to pension plans.

2.      On or about February 15, 2017 (pursuant to an engagement agreement as amended thereafter from time to time), EY was engaged by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), in its capacity as the Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), to, among other items, assist with estimates related to pension contributions and benefits under various scenarios and for various purposes including to support negotiations with unions and other stakeholders and for inclusion in fiscal plan projections.

3.      I submit this declaration (the "Declaration") in connection with the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (the "Plan").  To the extent any capitalized terms are used but not defined in this Declaration, such terms shall have the meanings assigned to them in the Plan.  I recognize there are on-going discussions concerning matters regarding the Plan and, in particular, treatment of pension claims, and if necessary, I will supplement this Declaration to reflect the results of those discussions.

2

4.     During EY's engagement, I have been responsible for conducting actuarial analyses regarding the Commonwealth's three pension systems, including estimating the financial impact of pension reform measures proposed by the Oversight Board and assisting with actuarial analyses used by the Oversight Board in its negotiations with certain counterparties.  In this role, I have been and am in regular contact with the members of the Oversight Board, its staff, its counsel, and other advisors.  With the assistance of others employed by EY, I prepared the PROMESA Section 211 Report on the Puerto Rico Retirement Systems, dated September 2019 (the "Section 211 Report"), a copy of which is attached to the disclosure statement for the Plan as Exhibit J [ECF No. 17628-10] (Debtors' Ex. 45 [ECF No. 18800-5]).

5.     In preparing the Section 211 Report, I read and analyzed, among other documents available at the time:  (i) historical actuarial valuation reports for each of the Pension Systems (as defined below), (ii) the Commonwealth fiscal plan, as certified by the Oversight Board as of May 9, 2019 (Debtors' Ex. 8 [ECF No. 18785-18), (iii) certain Commonwealth and federal laws and (iv) certain plan support agreements between the Oversight Board and relevant stakeholders.  A complete list of the sources used to draft the Section 211 Report may be found attached thereto as Appendix A.

6.     My statements set forth in this Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements.  In those instances where I reference a specific document or communication, I am not offering the documents to prove the truth of the content in those documents, or, I am informed, are otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.

7.      In addition to the sources listed in Appendix A of the Section 211 Report (Debtors' Ex. 45 [ECF No. 18800-5]), a list of additional sources relied upon in the development of the actuarial analyses reflected in the Fiscal Plan for the Commonwealth certified by the Oversight Board on April 23, 2021 (the "Fiscal Plan") (Debtors' Ex. 10 [ECF No. 18785-10]) is contained in Exhibit 1 hereto.  The Oversight Board directed that these inputs be used in the development of these actuarial projections based on the understanding that it was the most recently available data at the time that those projections were prepared.

## II.      Puerto Rico's Pension Systems

7.      The Commonwealth maintains three public retirement systems for its employees: (i) the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("ERS"), (ii) the Puerto Rico Teachers Retirement System ("TRS"), and (iii) the Retirement System for the Judiciary of the Commonwealth of Puerto Rico ("JRS," and together with the ERS and TRS, the "Pension Systems").  The Pension Systems were established through legislation enacted between 1951 and 1954, creating the systems themselves and the benefits provided thereunder.  Each of the Pension Systems has multiple benefit structures, depending on the date an employee was hired.  The Pension Systems cover current employees of the Commonwealth ("Active Participants") and former participants currently receiving monthly payments ("Retired Participants"), as well as some individuals who have terminated employment but not yet begun receiving a monthly payment.

8.      It is my understanding that on May 21, 2017 (the "ERS Petition Date"), ERS filed for protection under PROMESA Title III.

### a. ERS

#### i. Establishment of ERS

9.     As described in the Section 211 Report (Debtors' Ex. 45 [ECF No. 18800-5]), including in Sections 1.1 and 2.1 and Appendix B, ERS was created by Act No. 447 of May 15, 1951, as amended ("Act 447"), to provide pension and other benefits to retired employees of the Commonwealth, most of the Commonwealth public corporations, and the municipalities of Puerto Rico.  As of July 1, 2016, based on information from the Pension System actuarial valuation report,[3] ERS had over 240,000 Active and Retired Participants from almost 200 employers.  As identified in the same actuarial valuation report, the average monthly benefit for Retirement Participants at that time was under $1,050.

10.     ERS was initially funded by both employee and employer contributions.  ERS was initially designed as a traditional defined benefit plan with benefits determined based on years of service and compensation levels prior to the date of an employee's retirement.  The applicable benefit formula (the "ERS Defined Benefit Plan") was modified over time, as described in the Section 211 Report, including in Sections 1.1 and 2.1 and Appendix B.  As a result of the continuing increase in the unfunded liability, the ERS Defined Benefit Plan was closed to new employees who joined ERS on or after January 1, 2000.

#### ii. System 2000

11.     In 1999, the ERS benefit structure was amended by Act 305-1999 ("Act 305"). Pursuant to Act 305, ERS employees hired on or after January 1, 2000 were automatically enrolled in "hybrid," or notional, retirement accounts, whereby employee contributions were to be tracked

---

[3] Available as of the date of this Declaration at https://www.retiro.pr.gov/estados–financieros/

and credited with notional interest until retirement, at which time the account would be converted into a lifetime annuity ("System 2000").

12. Due to the notional nature of the System 2000 accounts, no segregated accounts were actually created for contributions made by System 2000 participants. Instead, the employee contributions were pooled and invested by the ERS together with the assets corresponding to the ERS Defined Benefit Plan for employees hired prior to January 1, 2000 and were used to pay the then-current retirement benefits to ERS Retired Participants.

13. Act 305 did not solve the issue of ERS's declining funded status. By 2008, ERS was struggling to maintain its payment obligations to its then-current Retired Participants under its pension system, and issued approximately $3 billion in pension obligation bonds to raise capital to pay for pension benefits.

### iii. Act 3-2013

14. As the funded status of the ERS continued to decline, on April 4, 2013, Act 3-2013 ("Act 3") was enacted. Act 3 amended Act 447, Act 1-1990, and Act 305 by, among other measures, freezing accruals under the Defined Benefit Plan and transferring all Active Participants to the System 2000 hybrid account structure, with slight modifications. Additional background related to the modifications introduced by Act 3 is contained in Section 2.6 and Appendix B of the Section 211 Report.

### iv. Voluntary Retirement Programs

15. The government historically adopted various volunteer early retirement programs (collectively, the "Voluntary Retirement Programs") which reduced its workforce. Act 3-2013 indicates that at the time of its enactment more than 20 Voluntary Retirement Programs had been implemented since 1994. As described further in the Section 211 Report (Debtors' Ex. 45 [ECF No. 18800-5]), in 2019 alone, three separate Voluntary Retirement Programs were implemented

covering a total of 5,455 employees who received $14.3 million in payments.     Additional background related to the Voluntary Retirement Programs is contained in Section 2.3 of the Section 211 Report.

> v.   Financial Situation as of ERS Petition Date

16.     ERS's actuarial reports[4] show that just prior to the ERS Petition Date, ERS's assets had been almost depleted and ERS was unable to satisfy its obligations in the ordinary course.  As of June 30, 2016, ERS's gross assets were reported to be approximately $2.3 billion on an estimated $36.4 billion actuarial liability for all employers participating in ERS, excluding medical benefits.  ERS's net assets as of June 30, 2016 were negative $1.3 billion largely because of the $3.1 billion pension obligation bond issuance in 2008.

**b.  TRS**

> i.  Establishment of TRS

17.     As described in the Section 211 Report,[5] including in Sections 1.1 and 2.1 and Appendix B, TRS was established by Act 218 of 1951 to provide pension and other benefits mainly to retired teachers of the Puerto Rico Department of Education (an agency of the Commonwealth) and the employees of TRS.  Act 218 of 1951 was later repealed and replaced by Act 91 of 2004, which modified the structure and benefits provided to beneficiaries of TRS.

18.     Based on information from the Pension System actuarial valuation report, as of July 1, 2016, TRS had over 35,000 Active Participants and over 43,000 Retirement Participants.  As identified in the same actuarial valuation report, the average monthly benefit for Retired Participants at that time was under $1,450.

---

[4] Available as of the date of this Declaration at https://www.retiro.pr.gov/estados–financieros/
[5] Available as of the date of this Declaration at https://www.srm.pr.gov/nuestras-finanzas

19.     Much like ERS, TRS was initially structured as a defined benefit plan, under which the benefits are determined based on years of service and compensation levels prior to the date of an employee's retirement.   TRS Active Participants hired prior to August 1, 2014 currently continue to accrue benefits under a defined benefit plan ("TRS Defined Benefit Plan").

ii.  Act 160-2013

20.     In December 2013, the Commonwealth enacted Act 160-2013 ("Act 160") (Debtors' Ex. 107 [ECF No. 18803-17]) to address the chronic underfunding of the TRS.  As originally enacted, Act 160, among other changes, froze benefits accrued to active participants and replaced it with an individual account-based plan funded by employee contributions.

21.     On April 11, 2014, the Puerto Rico Supreme Court struck down the sections of Act 160 that froze the TRS Defined Benefit Plan on the ground the Commonwealth had not proved the amendments would improve the solvency of TRS.  As a result, TRS's actuarial documentation reflects that TRS members hired prior to August 1, 2014 currently continue to accrue benefits under the TRS Defined Benefits Plan, while those hired after such date participated in a hybrid account structure similar to System 2000 funded by member contributions.  A more detailed description of history and changes to TRS is contained in the Section 211 Report, including in Sections 1.1 and 2.1 and Appendix B.

iii.  Financial Situation of TRS

22.     TRS's actuarial reports[6] show that, as of June 30, 2016, the TRS net assets were approximately $895.5 million on an estimated $18.2 billion actuarial liability, excluding medical benefits.

---

[6] Available as of the date of this Declaration at https://www.srm.pr.gov/nuestras-finanzas

### c. JRS

#### i. Establishment of JRS

23.     As described in the Section 211 Report (Debtors' Ex. 45 [ECF No. 18800-5]), including in Sections 1.1 and 2.1 and Appendix B, JRS was established by Act 12 of 1954 to provide pension and other benefits to judges and other employees of the judicial branch of the Commonwealth.  Based on information from the Pension System actuarial valuation report,[7] as of July 1, 2014 JRS had 365 Active Participants and 431 Retirement Participants and 41 terminated participants who had not yet begun to receive an annuity.  As identified in the same actuarial valuation report, the average benefit for Retirement Participants at that time was over $4,000 per month.  Like ERS and TRS, JRS was initially established as a defined benefit plan.  Act 162-2013 modified the provisions of the JRS plan, which was later modified due to a February 21, 2014 decision of the Puerto Rico Supreme Court.  As a result of that decision, judges hired on or after July 1, 2014 receive a benefit that consists of a blend of a traditional defined benefit component with a hybrid plan structure.  All judges therefore participate in some level of benefit under a traditional defined benefit plan ("JRS Defined Benefit Plan").  See the Section 211 Report, including in Sections 1.1 and 2.1 and Appendix B, for a history of changes made to the benefit provisions under JRS.

#### ii. Financial Situation of JRS

24.     Based on information from JRS's actuarial valuation report,[8] JRS's assets had become almost entirely depleted by the time of the Commonwealth Petition Date such that as of

---

[7] Available as of the date of this Declaration at https://www.retiro.pr.gov/estados–financieros/

[8] Available as of the date of this Declaration at https://www.retiro.pr.gov/estados–financieros/

June 30, 2015, the JRS assets were approximately $42.7 million on an estimated $585.3 million actuarial liability, excluding medical benefits.

### d. Act 106-2017

25.     On August 23, 2017, the Commonwealth enacted Act 106-2017 ("Act 106") (Debtors' Ex. 106 [ECF No. 18803-16]), titled "An Act to Guarantee Pension Payments and Establish New Defined Contributions Plan for Public Employees."  Act 106 modified each of the Pension Systems.

26.     As described in the Section 211 Report (Debtors' Ex. 45 [ECF No. 18800-5]), including in Sections 1.1, 1.3, 1.4, 2.6 and 2.7, among other things, Act 106 established a "PayGo" system, whereby disbursements are to be made for all current and future Retired Participants with respect to their accrued benefits under ERS, TRS, and JRS.  It is my understanding that after the introduction of Act 106, participating government public corporation and municipal entities are invoiced in an amount equivalent to the annual amount payable to each retiree and survivor of that agency (the "PayGo Fee").

27.     For current employees, Act 106 established prospective defined contribution plans to be funded by the contributions from current employees, except for certain TRS and JRS Active Participants who remain covered under Defined Benefit Plans.

28.     Act 3 and Act 106 represented large reductions in the Commonwealth's pension benefits.  Some participants saw the value of their benefits reduced as compared with what they would have earned through an entire career with the Commonwealth based on benefit formulas previously in place.  While these acts impacted participants to various degrees, Section 2.6 of the Section 211 Report provides illustrative examples based on sample age, service and compensation levels.  The cumulative reductions for the illustrative Act 447, Act 1 and System 2000 examples provided are 44%, 53% and 82% respectively.

### III.    Proposed Treatment of Pensioners Under Plan

29.    Under the Plan, Active and Retired Participants in the various pension plans are classified in Classes 51A through 51L (the "Pension Classes"), differentiated on the basis of (a) whether such participant is active or retired, (b) which Pension System the participant is a beneficiary under, (c) for Retirement Participants, whether the benefit for such participants falls above or below the Monthly Benefit Modification threshold of $1,500 per month in total benefits, and (d) for ERS participants, whether the benefit is paid under the terms of Act 127-1958, Act 70-2010 or Act 211-2015.  It is my understanding that the treatment of some of the Pension Classes under the Plan is a product of certain settlements, including with the Committee of Retirees.

30.    It is my understanding that the Oversight Board developed the pension reform measures leading to the treatment of claims in the Pension Classes in the Plan, including the Monthly Benefit Modification (as described in detail below), elimination of cost-of-living adjustments ("COLAs") and the TRS and JRS freeze, to conform to its fiscal plan and budget projections in an effort to enable participants in the Pension Systems to receive their benefits (as adjusted by the Plan).

31.    The Plan specifies that the proposed modifications to benefits under the Plan will not apply to pension benefits in the Pension Systems that will have accrued between May 3, 2017 and the Effective Date of the Plan (i.e., pension benefits of certain teachers and judges as described above).

####    a.  ERS

#####        i.  Monthly Benefit Modification

######            1.  Summary of Treatment

32.    Pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), with respect to pension benefits in ERS accrued prior to May 3, 2017, with the exception of active System 2000

participants, any individual whose Total Monthly Retirement Benefit (exclusive of the Monthly Medical Insurance Plan Contribution, and any future annuitization of Act 3 Hybrid Accounts further described below, neither of which will be reduced under provisions of the Plan) is in excess of $1,500 per month (the threshold above which the Monthly Benefit Modification applies), will receive a flat reduction percentage equal to 8.5% of the Total Monthly Retirement Benefit, provided that the Total Monthly Retirement Benefit cannot fall below $1,500 per month.

33.     Article LV of the Plan provides the reduction in any individual pensioner's Total Monthly Retirement Benefit will be calculated in a four-step process:  (1) any annual Christmas Bonus will be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, (ii) the total reduction of 8.5% of the Total Monthly Retirement Benefit is reached, or (iii) the Christmas Bonus is entirely eliminated, whichever occurs first; (2) any Summer Bonus will be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, (ii) the total reduction of 8.5% of the Total Monthly Retirement Benefit is reached, or (iii) the Summer Bonus is entirely eliminated, whichever occurs first; (3) the Monthly Medicine Bonus will be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, (ii) the total reduction of 8.5% of the Total Monthly Retirement Benefit is reached, or (iii) the Monthly Medicine Bonus is entirely eliminated, whichever occurs first; and (4) the Monthly Base Pension will be reduced until (i) the Total Monthly Retirement Benefit is reduced to $1,500, or (ii) the total reduction of 8.5% of the Total Monthly Retirement Benefit is reached.

34.     It my understanding that the Oversight Board has structured the Plan such that any COLAs to which any participants in the Pension Systems are entitled are eliminated.   Further, it is my understanding that Act 3-2013 eliminated all COLAs for ERS participants granted by the ERS enabling acts and that ERS has interpreted the COLA elimination to also apply to the COLAs

provided under Section 3-A of Act 127-1958.  As a result, it is my understanding that no COLA is currently being provided to ERS participants.

35.     Under the Plan, the Monthly Benefit Modification become effective on the later to occur of (a) the first July 1 after the Effective Date, and (b) the date that is the first day of the month that is at least 180 days from the Effective Date.

> 2.   Summary of Average Benefits (Active and Retired), Average Impact of Monthly Benefit Modification, and Number of Participants Impacted

36.     See Exhibit 2 hereto for a summary of the impact of the Monthly Benefit Modification on the various ERS classes.  The exhibit also contains a description of the data sources provided by the Oversight Board containing this information. .Based on explanations from the Oversight Board's advisors regarding the provisions of both the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), I believe that the provisions related to the Monthly Benefit Modification and elimination of the COLA contained in the Commonwealth's Plan are consistent with the Fiscal Plan.

> ii.  System 2000 Claims

37.     Unlike ERS participants in the Defined Benefit Plan, participants in System 2000 contributed their own funds towards benefits tracked in notional retirement accounts, to be payable in the form of an annuity, as described in further detail above.  It is my understanding that the Board chose, under Article LV of the Plan, to exempt System 2000 Active Participants, who are represented in Class 51I in the Plan, from the benefit reductions and that the Plan provides that System 2000 participants that have not yet begun to receive a monthly benefit will receive the amount of their contributions to these plans from System 2000's enactment through June 30, 2017, plus interest accrued thereon pursuant to applicable law for the period up to, but not including, the Commonwealth Petition Date.

38.      It is my understanding that the Oversight Board estimates the aggregate sum of contributions plus accrued interest at approximately $1.2 billion.  Under the Plan, the respective portion of these amounts shall be deposited into each participant's defined contribution account established under Act 106, with a default investment into applicable life cycle funds.

### iii.   Pre-2000 hires that have not yet commenced pensions

39.      It is my understanding that the Plan provides that ERS employees in Class 51G, representing Active Participants hired before January 1, 2000, will not have any modifications to their benefits resulting from their Act 3 contributions. Additionally, it is my understanding that the Plan reflects the fact that the Oversight Board and AFSCME agreed that each employee in Class 51G that is an Active Participant as of the Effective Date will also receive a payment of $2,600 into their Act 106 defined contribution account on or around the Effective Date to approximate the value of any interest that would have accrued between the petition date and their respective retirement dates.

### iv.   Voluntary Retirement Program Claims

40.      It is my understanding that under the Plan, similar to other ERS participants, with the exception of System 2000 participants, employees who participated in the Voluntary Retirement Programs established under Act 70-2010 or Act 211-2015 (referred to in the Plan as Voluntary Transition Programs or "VTPs") who receive a monthly pension payment through the payroll of the Commonwealth or its agencies are to receive a flat reduction percentage equal to 8.5% of the Total Monthly Retirement Benefit with respect to pension benefits in ERS accrued prior to May 3, 2017, for any individual whose Total Monthly Retirement Benefit (exclusive of the Monthly Medical Insurance Plan Contribution, which will not be reduced) is in excess of $1,500 per month (the threshold above which the Monthly Benefit Modification applies), provided

that the Total Monthly Retirement Benefit cannot fall below $1,500 per month. See above for a more detailed description of the application of this formula.

### b. TRS

#### i. Freeze

41.     It is my understanding that under Article LV of the Plan, retirement benefits of TRS Active Participants hired on or before August 1, 2014 under the TRS Defined Benefit Plan shall be frozen, such that future defined benefits shall cease to accrue, effective as of the Effective Date of the Plan. As described in Exhibit F-1 of the Plan, upon the Effective Date, TRS Active Participants who are subject to the pension freeze will be enrolled into new defined contribution accounts under the Act 106 defined contribution plan, which will subsequently be funded with employee contributions in a minimum amount of 8.5%, reduced by the employee contribution to Social Security, as applicable and as described in greater detail below. Generally, the amount of accrued benefits through the Freeze Date shall be calculated through reference to the average compensation and the creditable service of each TRS Active Participant up to the Freeze Date, as described in Exhibit F-1 of the Plan.

#### 1. Summary of Treatment

42.     In addition to the freeze of benefits accrual under the TRS pension plans, under the Plan, current and future TRS Retired Participants with accrued defined benefits under the TRS pension plan shall receive a flat reduction percentage equal to 8.5% of the Total Monthly Retirement Benefit with respect to pension benefits in TRS accrued prior to May 3, 2017, for any individual whose Total Monthly Retirement Benefit (exclusive of the Monthly Medical Insurance Plan Contribution, which will not be reduced) is in excess of $1,500 per month (the threshold above which the Monthly Benefit Modification applies), provided that the Total Monthly

Retirement Benefit cannot fall below $1,500 per month.  The application of the pension reductions shall be the same as for ERS participants as described above.

43.     In addition to the freeze of benefits accrual under the TRS pension plans, the Plan also provides for further changes to TRS benefits, as described in Exhibit F-1 of the Plan, including (1) the elimination of (i) the $400 minimum monthly benefit for members hired before August 1, 2014, applicable to any members retiring after the Effective Date, (ii) any enhanced disability benefits, and (iii) any COLAs; and (2) a delay in the retirement age by three years for members hired prior to August 1, 2014 and who are not eligible for retirement as of the Effective Date.

44.     Finally, under Article LV of the Plan, effective as of the Effective Date, once TRS benefits are frozen, TRS Active Participants who had not been previously enrolled in the defined contribution plans established under Act 106 will be enrolled in that plan and will have their employee contributions directed to these segregated accounts that will be under the control of each individual employee.  Furthermore, TRS Active Participants under 45 and those 45 and older who opt in will have earnings withheld and contributed to be able to accrue Social Security benefits. The contribution to the Act 106 plan (8.5% of compensation) for those who are enrolled in Social Security will be reduced by 6.2% (for a net contribution rate of 2.3%) to reflect the employee contribution to Social Security so their take-home pay is not affected.

    2.   Summary of Average Benefits (Active and Retired), Average Impact of the Monthly Benefit Modification and the Number of Participants Impacted

45.     See Exhibit 2 for a summary of the impact of the Monthly Benefit Modification on the various TRS classes.  The exhibit also contains a description of the data sources provided by the Oversight Board containing this information.

46.     Based on explanations from the Oversight Board's advisors regarding the provisions of both the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and the Fiscal Plan Debtors'

Ex. 10 [ECF No. 18785-10]), respectively, I believe that the provisions related to the TRS pension freeze and Monthly Benefit Modification contained in the Commonwealth's Plan are consistent with the Fiscal Plan, after adjustments for the fact that the potential agreement with the American Federation of Teachers and the Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical was not ratified.

  **c. JRS**

   i. Freeze

47. It is my understanding that under Article LV of the Plan, the future accrual of defined benefits (including COLAs) of JRS Active Participants is frozen effective as of the Effective Date of the Plan.  The Plan provides that, upon the Effective Date, all JRS Active Participants will be enrolled into new defined contribution accounts under the Act 106 plan, which will subsequently be funded with employee contributions in a minimum amount of 8.5%, reduced by Social Security contributions, as applicable and as described in greater detail below.  Generally, the amount of accrued benefits shall be calculated through reference to the average compensation and the creditable service of each JRS Active Participant up to the Effective Date, as described in more detail in Exhibit E of the Plan.

   ii. Monthly Benefit Modification

    1. Summary of Treatment

48. In addition to the freeze of defined benefit accruals under the JRS pension plans, the Plan provides current and future JRS Retired Participants shall receive a flat reduction percentage equal to 8.5% of the Total Monthly Retirement Benefit with respect to pension benefits in JRS accrued prior to May 3, 2017, for any individual whose Total Monthly Retirement Benefit (exclusive of the Monthly Medical Insurance Plan Contribution, which will not be reduced) is in

excess of $1,500 per month (the threshold above which Monthly Benefit Modification apply), provided that the Total Monthly Retirement Benefit cannot fall below $1,500 per month.

49.     I understand that the reduction in any individual Retired Participant's Total Monthly Retirement Benefit will be calculated in the same manner as for Retired Participants in ERS and TRS as described above.

50.     Moreover, it is my understanding that under the Plan, JRS Active and Retired Participants shall no longer be entitled to receive future COLAs beyond those already reflected in their benefit level as of the Effective Date.

51.     Finally, it is my understanding that under the Plan, effective as of the Effective Date, JRS Active Participants who had not been previously enrolled in the defined contribution plans established under Act 106 will be enrolled in that plan and will have their employee contributions directed to these segregated accounts that will be under the control of the employee. Furthermore, JRS Active participants under 45, and those 45 and older who opt in, will have earnings withheld and contributed to be able to accrue Social Security benefits.  The contribution to the Act 106 plan (8.5% of compensation) for those who are enrolled in Social Security will be reduced by 6.2%, for a net contribution rate of 2.3%, to reflect the employee contribution to Social Security so their take-home pay is not affected.

> 2.  Summary of the Average Monthly Benefit (Active and Retired), Average Impact of the Monthly Benefit Modification and Number of Participants Impacted

52.     See Exhibit 2 for a summary of the impact of the Monthly Benefit Modification on the various JRS classes.  The exhibit also contains a description of the data sources provided by the Oversight Board containing this information.

53.     Based on explanations from the Oversight Board's advisors regarding the provisions of both the Plan and the Fiscal Plan, I believe that the provisions related to the JRS

pension freeze, COLA elimination and Monthly Benefit Modification in the Fiscal Plan are consistent with the Commonwealth's Plan. .

**IV.     Impact of Reforms on Commonwealth Finances Over Fiscal Plan Period**

54.     The estimated financial impacts of the pension measures described in this Declaration on PayGo and other related pension costs as reflected in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), based on the inputs and assumptions prescribed by the Oversight Board and outlined in Exhibit 1, are as follows:

a.  The estimated impact of the Monthly Benefit Modification reflected in the Fiscal Plan, for Fiscal Plan entities only, is aggregate savings of $1.9 billion from FY 2022-FY 2051.

b.  The estimated impact of the pension freezes reflected in the Fiscal Plan is aggregate savings of $5.6 billion from FY 2022-FY 2051.

c.  The estimated impact of added Social Security benefits reflected in the Fiscal Plan is an aggregate cost of $1.7 billion from FY 2022-FY 2051, which includes the cost for Social Security for future teachers and judges, current teachers and judges under 45, and teachers and judges over age 45 opting in.

Dated: October 25, 2021                    /s/ *Sheva Levy* _____
University Heights, Ohio                     Sheva Levy

# EXHIBIT 1

## Source Materials for Actuarial Analysis

As directed by the Oversight Board, the sources relied upon in the development of the actuarial analyses reflected in the Fiscal Plan for the Commonwealth certified by the Oversight Board on April 23, 2021 (the "Fiscal Plan") are as follows:

- Census data as of July 1, 2017 for ERS, TRS and JRS as used by the actuary for the Pension Systems, adjusted:
  - Based on experience factors utilized by the Pension System actuary
  - To reflect the expected System 2000 settlement
  - To incorporate experience data identifying retirements and contribution refunds for the TRS system through the end of 2020 as provided by the administrator of the Pension Systems
- Actuarial assumptions related to demographic experience utilized by the actuary for the Pension Systems, as disclosed in the most recent publicly available actuarial valuation reports, adjusted based on industry updates for mortality experience
- Summary of the benefit provisions for each of the Pension Systems as described by the actuary for the Pension Systems in each respective publicly available actuarial valuation report
- The description of the proposed treatment of the pension classes in the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico (the "Plan"), including:
  - The benefit reduction and COLA elimination provisions contained in the Plan Support Agreement ("PSA") for the Committee of Retirees, with a modified $1,500 threshold as instructed by the Oversight Board
  - The System 2000 settlement and treatment Act 447/1 participants described in the PSA for the American Federation of State, County and Municipal Employees ("AFSCME"), modified as instructed by the Oversight Board to include an additional $2,600 payment for Act 447/1 participants
  - The JRS freeze and Social Security provisions, as contained in Exhibit E of the Plan, and
  - The TRS freeze and Social Security provisions as contained in Exhibit F-1 of the Plan
- Various inputs utilized by the Oversight Board's advisors for the Fiscal Plan and the FY 2022 Budget for the Commonwealth certified by the Oversight Board related to payroll, PayGo, and inflation projections

Detailed results of this analysis, including additional supporting documentation related to the assumption selection process and data sources, were previously provided to the Oversight Board as part of the Fiscal Plan preparation process. The accuracy of the estimates contained in the Fiscal Plan is dependent on the accuracy of the underlying data and the choice of assumptions. Data to further assess the reasonableness of certain demographic assumptions was not available, although I am unaware of any information indicating that the assumptions are not reasonable representations of long-term expectations. It is my understanding that the assumptions selected by the Oversight

Board rely on the assessment of the reasonableness of assumptions performed by the actuary for the Pension Systems for reporting liabilities of the Pension Systems.

**EXHIBIT 2**

| Class | Average Monthly Total Retirement Benefit[9] | Estimated average percent reduction in Monthly Total Retirement Benefit[10] | Number of members included in Class[11] |
|---|---|---|---|
| Retired ERS Participant Below-Threshold (51A) | $749 | 0.0% | 93,634 |
| Retired JRS Participant Below-Threshold (51B) | $1,158 | 0.0% | 125 |
| Retired TRS Participant Below-Threshold (51C) | $988 | 0.0% | 23,613 |
| Retired ERS Participant Above-Threshold (51D) | $2,286 | 7.5% | 28,296 |
| Retired JRS Participant Above-Threshold (51E) | $5,124 | 8.5% | 473 |
| Retired TRS Participant Above-Threshold (51F) | $2,074 | 8.1% | 23,443 |
| Active ERS Participants (51G) | $717 | 0.3% | 47,895 |
| Active JRS Participants (51H) | $3,139 | 5.5% | 369 |
| Active TRS Participants (51I) | $843 | 0.5% | 36,049 |
| System 2000 Participants (51J) | N/A | N/A | 59,345 |
| VTP Payroll Participant Below-Threshold (51K) | $1,025 | 0.0% | 5,492 |
| VTP Payroll Participant Above-Threshold (51L) | $1,869 | 6.2% | 2,468 |

[9] Prior to application of the Monthly Benefit Modification.  Based on the sum of the monthly pension benefit currently in payment or payable in the future based on employment through May 4, 2017 plus the monthly equivalent of any Summer, Christmas or Medicine Bonuses for those identified by the actuary of the Pension Systems as eligible, as contained in actuarial valuation census data from the actuary of the Pension Systems.  Excludes medical insurance bonus, if any, since not subject to the Monthly Benefit Modification.  Benefits payable as of May 4, 2017 are approximated based on census data as of June 30, 2017 and the plan provisions included in the respective actuarial valuation reports.  Data for classes 51K and 51L are based on information from active VTP payroll from the Office of Management and Budget of Puerto Rico.

[10] Based on 8.5% Monthly Benefit Modification with $1,500 Threshold and underlying data as described in footnote 1.

[11] Based on data provided by the retirement systems of Puerto Rico to the Oversight Board as of April 1, 2021 for the purpose of voting distribution and tabulation