**<u>Exhibit H</u>**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY,<br><br>                          Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF OJAS N. SHAH IN RESPECT
## OF CONFIRMATION OF SEVENTH AMENDED TITLE III JOINT PLAN
## OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*[2]

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Pursuant to the Court's *Order Memorializing Certain Rulings Made at the November 1, 2021 Pretrial Conference* [ECF No. 19009], this declaration has been amended solely to include references to the filed exhibits and their respective ECF numbers.

I, Ojas N. Shah, hereby declare and state as follows:

1.      I am a Partner at McKinsey & Company ("McKinsey"). I submit this declaration (the "Declaration") in respect of confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 17627] (Debtors' Ex. 1 [ECF No. 18785-1]) (together with all exhibits, and as amended, modified, and supplemented, the "Plan").[1]

2.      Unless otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my review of materials published or directly provided by the Government of Puerto Rico or its advisors, materials provided by advisors for the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), or my expert opinion based on the Reports (defined below), the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), and the documents related thereto.

3.      My testimony in this Declaration is in four sections. The first section describes my background and qualifications and the Oversight Board's engagement of McKinsey in connection with these Title III cases. The second section provides an overview of the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]), which analyze creditor recoveries if the Title III cases for each of the Debtors are dismissed. The third section describes the methodology used in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]), including (i) key assumptions that underlie the estimate of resources available to pay creditor claims outside Title III, (ii) the various financial obligations the Debtors would expect to have if the Title III cases are dismissed,

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan or the *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 17628] (Debtors' Exhibit 2 [ECF No. 18785-2]) (the "Disclosure Statement"), as applicable.

and (iii) the waterfall of funds assumed for each fiscal year covered by the Reports to pay operating expenses and creditor claims. The fourth section discusses expected aggregate recoveries for creditors of each of the Debtors if each Title III case is dismissed and compares those recoveries to the aggregate recoveries for creditors of each Debtor under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).

## I.   **Background and Qualifications**

4.      I am a Partner at McKinsey, where I have worked since 2014. In my role as Partner, I have led client and consulting teams in several advisory and transformation assignments for underperforming or distressed companies as well as for the Commonwealth. Prior to joining McKinsey in 2014, I was a Director at AlixPartners in its Turnaround & Restructuring Services group.

5.      In or around November 2016, McKinsey was retained by the Oversight Board as the Title III representative of the Commonwealth pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"). Among other things, McKinsey's scope has included support to the Oversight Board in connection with its restructuring and Plan process for the Commonwealth, ERS, and PBA (the "Debtors"), including the preparation of an analysis of the estimated range of recoveries that would be available to creditors if a plan of adjustment is not confirmed, the Title III case of each of the Debtors is dismissed, and the stay of debt enforcement is terminated, which can be utilized by the Court in connection with the Best Interests Test (defined below) under PROMESA and to inform the Oversight Board in its formulation of plans of adjustment.

6.      In connection with McKinsey's engagement by the Oversight Board, I led the team that was responsible for preparing the best interests test reports for the Commonwealth (the "Commonwealth Report") and ERS (the "ERS Report") [ECF No. 17628, Exhibit P] (Debtors'

2

Ex. 130 [ECF No. 18807-8]) and for PBA [ECF No. 18369-1] (Debtors' Ex. 131 [ECF No. 18807-9]) (the "PBA Report" and, collectively with the Commonwealth Report and the ERS Report, the "Reports"), copies of which are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively.  We produced one Report for each of the Debtors, and each Report contains two documents (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]).  The first document, the "Analysis of Creditor Recoveries should the Title III Case be Dismissed for Creditors of the [Debtor]," includes an analysis of creditor recoveries against that Debtor assuming its Title III Case was dismissed on June 30, 2021.  The second document, the "Best Interests Test Analysis – Assumptions" (the "Assumptions Document"), was prepared by legal advisors to the Oversight Board and details various assumptions about certain litigation outcomes and other contingencies if the Title III case for each Debtor is dismissed.  McKinsey accepted as true, accurate, and appropriate all of the legal assumptions set forth in the Assumptions Document and certain other financial information provided to it, such as schedules detailing estimates of outstanding bond debt, perspectives on cash balances, and other financial data and claim amounts.  The analysis contained in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) is discussed below.

## II.  The "Best Interests of Creditors Test" in PROMESA Section 314(b)(6)

7.      I understand PROMESA section 314(b)(6) requires that a plan of adjustment be in the "best interests of creditors, which requires the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan" (the "Best Interests Test").  Accordingly, the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) provide an estimate of the range of recoveries that would be available to creditors if the Plan (Debtors' Ex. 1 [ECF No. 18785-

1]) is not confirmed, the Title III case of the relevant Debtor is dismissed, and the stay of debt enforcement is terminated.

8.      An analysis of creditor recoveries in such hypothetical circumstances requires application of a number of assumptions, including: (i) estimates of the resources that would be available for debt service, which requires an assessment of Commonwealth available cash, revenues, and operating expenses in the absence of a confirmed plan of adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of Title III; and (iii) the priority in which creditor claims would be paid outside Title III, which in certain circumstances requires consideration of assumptions regarding the potential outcome of litigation matters.

9.      Because potential litigation outcomes (and certain other assumptions) are inherently uncertain, the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) estimate a range of potential recoveries under three different assumed outcomes of litigation challenging the validity of certain general obligation bonds issued by the Commonwealth ("GO Bonds") and other Commonwealth guaranteed obligations that have the same priority as GO Bonds under Commonwealth law (collectively, "Constitutional Debt").  A description of the Constitutional Debt can be found on pages 12–13 of the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]).  The three different outcomes are: (x) a scenario where all Constitutional Debt issued in or after 2012 is invalid (the "Base Case"); (y) a scenario where all Constitutional Debt issued in or after March 2011 is invalid ("Scenario 1"); and (z) a scenario where all Constitutional Debt is valid, regardless of when it was issued ("Scenario 2" and, together with the Base Case and Scenario 1, the "Scenarios").  The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) utilize different assumptions, as applicable, to calculate projected creditor

4

recoveries for the most likely outcome as determined by the Oversight Board's financial and legal advisors (the "Commonwealth Main Assumptions" and "PBA Main Assumptions," respectively) in each Scenario.

10.     In addition, the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) also estimate the range of creditor recoveries utilizing certain alternative assumptions identified as "alternative scenarios" in the Reports.  For those alternatives, the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) considered certain assumptions denoted "litigation risk" as set forth in the applicable Assumptions Document.

11.     The ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) also estimates the range of recoveries that would be available to creditors, but they are not affected by the Scenarios noted above because all ERS bond debt was issued before 2011.  The ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) likewise utilizes different assumptions to calculate projected creditor recoveries for the most likely outcome, as determined by the Oversight Board's financial and legal advisors (the "ERS Main Assumptions" and, together with the Commonwealth Main Assumptions and PBA Main Assumptions, the "Main Assumptions") and certain alternative assumptions denoted as a "litigation risk" that are applicable to the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]).

12.     In general, the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) for each of the Debtors will result in recoveries for creditors in the aggregate that are within the range or greater than the recoveries that they would receive outside Title III based on data available as of the filing date of the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]).  Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face

great uncertainty, financial and political instability, and be subject to significant litigation.  The Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) posit that within this environment, the government will face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.  As described in the 2021 Certified Fiscal Plan for the Commonwealth (Debtors' Ex. 10 [ECF No. 18785-10]) (the "Fiscal Plan"), structural reforms are a key component driving future economic growth on the island.  Without the benefit of the uptick in growth from these reforms, overall economic growth and tax revenue will be lower, reducing the amounts available to pay all creditors.

13.     The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) establish that creditors in the aggregate will receive a percentage recovery on their claims under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) that is within the range or greater than projected recoveries in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) for such creditors in all Scenarios and using alternative assumptions identified below.  The Report for ERS (Debtors' Ex. 130 [ECF No. 18807-8]) establishes that creditors in the aggregate will receive a percentage recovery on their claims under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) that is greater than projected recoveries in the Report for such creditors in utilizing the Main Assumptions for ERS, and that ERS creditors do better outside of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) only if they prevail in their assertions that they have a security interest in PayGo Payments (defined below).

III.    **Methodology Used in the Reports**

14.     The Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) project expected recoveries for claimholders of each of the Debtors if the Title III case for each such Debtor were dismissed on 11:59 p.m. on June 30, 2021.  We used June 30, 2021 because the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) (which includes revenue and expense projections for

6

PBA and ERS) upon which the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) are based contains annual projections corresponding to Puerto Rico's fiscal year of July 1 through June 30.

### A. Legal Assumptions.

15. To reflect a range of possible outcomes for claimholders outside Title III given the various possible outcomes of litigation regarding, among other things, the validity of bonds, alleged creditor priorities, property rights, and the scope of security interests and liens, the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) include estimates of (a) claimholder recoveries if each of the Main Assumptions for each of the Debtors is realized for each of the Scenarios and (b) a range of alternative claimholder recoveries to account for certain litigation and other risks.

### B. Calculation of creditor recoveries

16. Our analysis relies on three components to calculate recoveries available to creditors: the resource envelope (which utilizes the revenue and expenditure projections contained in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), which are assumed to remain in effect after dismissal of the Title III case with certain adjustments); outstanding debt; and priorities for distribution of funds. The total amount of resources available to pay creditors' claims is referred to as the "Resource Envelope" herein and in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]).

### C. The Resource Envelope in the Commonwealth Report

17. For the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]), the Resource Envelope in any year is the sum of (1) starting cash available for debt service; (2) certain property tax revenues ("CRIM Revenues"); (3) Conditionally Allocable Revenues (defined below); 4) withholding of appropriations to certain Independently Forecasted Component Units

("IFCUs"), which are legally separate government entities (such as AAFAF and CCDA) that have been established by the Commonwealth; and (5) the annual surplus generated by the Commonwealth independent of the resources described in items 1–4 above adjusted to reflect certain assumptions in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]). In FY2022 the Resource Envelope also benefits from a one-time transfer of certain ERS assets to the Commonwealth.

18. _Starting cash available for debt service_. The first element of the Resource Envelope in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) is an estimate of starting cash available for debt. Our cash estimates reflected in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) were based on information available to us at the time the Reports were created and do not reflect more recent information regarding cash balances. The starting cash in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) is estimated to be $9.3 billion to $9.8 billion and consists of the sum of unrestricted cash less an assumption for "minimum cash requirements." The minimum cash requirements for the Commonwealth in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) is estimated to be $1.2 billion to $1.7 billion based on a benchmarking analysis prepared by the Oversight Board and published in December 2020.[2]

19. _CRIM and conditionally allocable revenues_. Based on guidance from the Oversight Board's legal advisors, the Resource Envelope for the Commonwealth also includes certain property tax revenues collected by the Municipal Revenue Collections Center ("CRIM"), as well as collections of tax and fee revenues that in the past were conditionally allocated to certain Commonwealth instrumentalities such as Puerto Rico Infrastructure Financing Authority

---

[2] https://emma.msrb.org/P11450397-P11124337-P11535399.pdf

("PRIFA") and Highways and Transportation Authority ("HTA") (the "Conditionally Allocable Revenues").

20.    Withholding of appropriations to certain IFCUs.  The Resource Envelope is also assumed to be supplemented by the Commonwealth withholding future annual appropriations that were historically made to IFCUs equal to the amount that revenues exceed expenses in a given fiscal year after the impact of any fiscal measures for that IFCU.  For IFCUs that do not receive an appropriation, it is assumed that the Commonwealth does not have access to surplus funds from that IFCU.  However, all IFCUs that generate operating deficits in any given year are assumed to have those operating deficits funded by the Commonwealth.

21.    Annual surplus generated by the Commonwealth independent of the resources described above.  The total revenues received by the Commonwealth minus its total operating and capital expenses constitute the annual Commonwealth surplus.  The Commonwealth surplus referred to in this section excludes starting cash, Conditionally Allocable Revenues and CRIM Revenues, as well as other sources available from withholding of appropriations to IFCUs that generate a surplus in certain years and accordingly are assumed not to receive appropriations in those years.

22.    The projections of Commonwealth revenues and expenditures in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) incorporate the impact of fiscal measures and structural reforms.  Fiscal measures are a series of actions intended to optimize revenue collection, reduce government expenditures, and streamline and transform the Commonwealth's government, including improving compliance in tax collection, implementing process changes and other operational reforms within agencies, optimizing the healthcare system to improve value for cost, improving the current pension system, and rationalizing subsidies to University of Puerto Rico and

9

various municipalities.  Structural reforms include actions to improve human capital and welfare, advance the ease of doing businesses in Puerto Rico, improve the education system, and enhance the availability and affordability of energy.  Structural reforms are designed to promote growth in the economy, which would ultimately increase Commonwealth revenue generation.

23.     The Resource Envelope in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) reflects modifications to the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) projections of certain expenditures to account for the absence of Title III protections and the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).  For example, professional fees are adjusted to reflect anticipated future litigation and the dismissal of the Title III cases.  The Oversight Board's expenditures are also adjusted, as it is assumed the Oversight Board will continue to exist as the requirements for dissolution of the Board as defined by PROMESA would not be met if the Title III cases are dismissed.  Additionally, the transfer of $130 million per year through FY2028 to the Reserve for Emergency Fund outlined in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) is assumed not to occur.

24.     The annual surplus in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) also includes adjustments to Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) projections for employer healthcare contributions and pension expenses.  The increase in employer healthcare contribution outlined in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) from $125 to $170 per employee per month for employees who are AFSCME union members, teachers, police, firefighters, UAW union members, and other non-union employees is assumed to not be implemented, as this benefit increase depends on effectiveness of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).  Changes to the retirement benefits paid to pensioners in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) are also assumed to not take place as they are dependent on

effectiveness of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).  Specifically, the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) includes a reduction in pension benefits of 8.5% to all beneficiaries who currently receive payments above $1,500 per month, a freeze in accrual of benefits in the retirement plans of judges and teachers, contributions to Social Security for judges and teachers, and the elimination of PayGo Payments for System 2000 participants.  The surplus projections in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) are adjusted to reflect these changes not occurring.  However, the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) does analyze claimholder recoveries utilizing alternative assumptions of a 5% or 10% reduction in pensions for retirees receiving over $1,500 per month, respectively (for reasons explained later in this Declaration), to create supplementary alternative scenarios for the estimated range of recoveries from a reduction in pension benefits.

25.     The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) also adjusts the projections of revenues and expenses outlined in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) to incorporate risks related to the implementation of structural reforms and certain fiscal measures.  Specifically, adjustments were made based on the assumption that the impact of structural reforms do not materialize and, in the low case for each Scenario, that the healthcare reform fiscal measure is not implemented.  The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) assumes Puerto Rico will face greater political and financial instability in a situation where the Title III cases are dismissed, which could cause an increase of litigation filings and create significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.  The lower end of the estimated likely range of recoveries also assumes that the healthcare reform fiscal measure included in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) will not be implemented.  Specifically, while the Oversight Board has the authority to

set spending levels, it might face challenges enforcing the healthcare expenditure levels included in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]). The healthcare reform in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) requires complex and coordinated actions across the various stakeholders in the healthcare system, which the Commonwealth may have limited incentive to undertake in the environment assumed in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]). Therefore, it is assumed in the lower range of recoveries that the healthcare reform fiscal measure will not materialize.

26. <u>Transfer of ERS assets to the Commonwealth</u>. The Commonwealth Main Assumptions include consummation of the transactions contemplated by the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]). Unrestricted assets remaining at ERS after required payments to ERS creditors are assumed to be transferred to the Commonwealth. An amount of $643 million of ERS unrestricted remaining assets are assumed to be transferred to the Commonwealth at the end of FY2022. The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]), however, also analyzes the range of creditor recoveries using an alternative assumption that the ERS Title III case is dismissed and the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]) is terminated, both (a) reducing recoveries of the ERS Bondholders because ERS Bondholders are assumed to have a worse litigation outcome if the ERS Title III case is dismissed than their recoveries pursuant to the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]) and (b) increasing the amount of ERS assets transferred to the Commonwealth.

**D.** **The Resource Envelope in the PBA Report**

27. The Resource Envelope in the PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) for any year is the sum of starting cash available for debt service and PBA rent receipts after paying operating expenses. For the PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]), the starting cash is estimated to be $87 million based on information available to us at the time the Reports were

created (and not reflective of more recent information).  No other assets, such as insurance or FEMA proceeds, are assumed to be available for bondholder payments.  As indicated in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), total PBA operating expenses are comprised of PBA payroll and personnel costs, payments for maintenance and utilities, and capital expenditures.  The PBA operating expenses also include annual retirement contributions to the PayGo System. Projections for expenditures take into consideration the estimated impact of fiscal measures outlined in the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), which are intended to reduce PBA expenditures and streamline its operations.

### E.       The Resource Envelope in the ERS Report

28.       The Resource Envelope in the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) equates to assets remaining in the Employees Retirement System ("ERS Assets").  Following guidance provided by the Oversight Board's legal advisors, ERS bonds are considered non-recourse outside of Title III, which limits their sources of recovery to their collateral.  Therefore, only the ERS Assets that are collateral of ERS bonds can be used to pay ERS Bondholders.  ERS assets that are not collateral of ERS bonds are assumed to be available for unsecured claims.  The ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) used an estimated total market value of ERS assets of $1,174 million and excluded amounts previously paid to bondholders through a pre-petition segregated account.

### F.       Debt Obligations and Outstanding Debt in the Reports

29.       Debt Obligations and Outstanding Debt.  The Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) include contractually required payments on outstanding debt and other claims against the Debtors.  The Commonwealth's debt and other obligations in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) includes all claims other than pensions and claims of the federal government that would be asserted against the Commonwealth

outside Title III, aggregating to approximately $24.7 billion assuming all Constitutional Debt is considered valid.  Pensions are excluded because they are treated as operating expenses in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]), and claims of the federal government are excluded because they are assumed to be satisfied in full.  The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) categorizes the approximately $13.5 billion owed to holders of GO Bonds as of the Commonwealth Title III Petition Date into three vintages: bonds issued (i) prior to March 2011 ($5.8 billion); (ii) between March and December 2011 ($1.1 billion); and (iii) in or after 2012 ($6.5 billion).  The Commonwealth also guaranteed certain other Constitutional Debt, including PBA bonds ($4.5 billion in principal and interest outstanding as of the PBA Petition Date), PRIFA bonds ($84 million in principal and interest outstanding), Port of Americas Authority bonds ($263 million in principal and interest outstanding), certain Hacienda loans ($198 million in principal and interest outstanding), and a General Services Administration loan ($25 million in principal and interesting outstanding).  The Commonwealth also guaranteed certain bonds issued by the Puerto Rico Aqueduct and Sewer Authority ($284 million in principal and interest outstanding); however, these bonds were not considered in the analysis based on the assumption that a PRASA default is currently unlikely to occur.  The Commonwealth has, in addition to the Constitutional Debt, additional unsecured obligations totaling approximately $6.0 billion, which includes litigation claims, claims to be settled through the Administrative Claims Process, Government Development Bank (the "GDB") Title VI Public Entity Trust claim, Puerto Rico intragovernmental claims, employee claims, trade payables, *Gracia-Gracia* insurance overpayment litigation claims, tax-related claims, together with other miscellaneous unsecured claims.  In the addition, the Commonwealth has an estimated $431 million in claims of the federal

government not included in the aggregate amount above, which are assumed to be paid in full upon removal of the stay of debt enforcement given offset rights from non-payment.

30.    Debt obligations in the PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) as of the PBA Petition Date include the PBA Bonds noted above as well as $410 million in unsecured claims and an additional $201 million in GDB Debt Recovery Authority (the "DRA") loan claims, which are also considered unsecured based on guidance from the Oversight Board's legal advisors.

31.    ERS debt obligations as of the ERS Petition Date include $3.169 billion in ERS bonds and $8 million in general unsecured claims.

32.    In computing the amount of general unsecured claims against each Debtor, the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) relied upon the accuracy of the estimates of such claims provided by other Commonwealth advisors.  Except for certain unsecured DRA claims that are noted in the PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]), the Reports assumed that there is no creditor debt acceleration based on guidance from the Oversight Board's legal advisors

### G.    Claimholder Recovery and Priority Methodology in the Reports

33.    Exhibit 3 of the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) sets forth the assumed waterfall of distributions to various claimholders.  The ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) also include the assumed priority of distributions to various claimholders as set forth in Exhibit 1 of the respective Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]).  The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) assume that all operating expenses must be satisfied in each year (including pension payments) prior to payment of debt service.  Then, all payments due and owing on Constitutional Debt are paid.  During a projected fiscal year where there are sufficient resources

to pay amounts due respecting Constitutional Debt in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]), Conditionally Allocable Revenues are assumed to be distributed to the applicable instrumentalities (such as HTA and PRIFA). It is assumed that certain Conditionally Allocable Revenues require the Commonwealth to reimburse the allocable revenue entities in the following year when allocable revenues are retained to pay Constitutional Debt, with such amounts accruing in favor of the allocable revenue entity until completely reimbursed. If any funds remain after all Conditionally Allocable Revenues payments are made, unsecured claims are assumed to be paid ratably.

34. After aggregating payments to each creditor class and applying an assumed annual 5% discount rate for all projected payments, the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]), ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]), and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) each provide an estimated range of aggregate claimholder recoveries for each Debtor, excluding any claims of pensioners.

IV. **The Estimated Likely Range of Recoveries Available to the Creditors of the Commonwealth, ERS, and PBA**

35. As described herein, the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) estimate a range of aggregate recoveries for all claimholders of each of the Debtors if each Title III case was dismissed as of June 30, 2021. As summarized in the chart immediately below and set forth in greater detail in this Declaration and the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]), for each of the Debtors, when utilizing (i) any of the Commonwealth Scenarios and Main Assumptions or alternative assumptions, (ii) any of the ERS Main Assumptions or alternative assumptions, and (iii) any of the PBA Scenarios and Main Assumptions or alternative assumptions, the creditors of each Debtor, in the aggregate, will receive a recovery on their claims under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) in the aggregate

16

that is within the range or greater than the range of the projected recoveries for such claimholders in the aggregate in the Report for each of the Debtors (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]).

| Title III Debtor | Aggregate Plan Recoveries (% and $ billion) | Aggregate Recoveries in the Reports (% and $ billion) |
|---|---|---|
| Commonwealth[3] | 69% / $15.7 | 34%–62% / $9.3–15.3 |
| ERS | 14% / $0.4 | 5%–100% / $0.2-3.7 |
| PBA | 21% / $1.1 | 5% / $0.3 |

36.     Set forth below is a more detailed discussion and comparison of estimated likely range of claimholder recoveries outside Title III for each Debtor to such claimholders' recoveries under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).

**A.      Commonwealth**

      **i.      *Claimholder Recoveries in the Best Interests Test Analysis***

           **(a)      *Recoveries for Base Case, Scenario 1, and Scenario 2 with the Main Assumptions***

37.     The estimated likely range of recoveries available for claimholders in any of the Commonwealth Scenarios with the Main Assumptions are found in Exhibits 4, 5, 6, 7 and 8 in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]).     The analysis for the Commonwealth makes various assumptions that affect recoveries to claimholders, some of which are discussed above.   The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) assumes that debt service will not be paid until after all operating expenses, including applicable pension benefits, are first satisfied based on guidance from the Oversight Board's legal advisors.

38.     In the Commonwealth Scenarios, GO Bondholders are projected to receive an estimated aggregate recovery outside Title III with a net present value as of June 30, 2021 of $5.8

---

[3] Excludes Federal Claims, which receive 100% recovery within the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]), and any recovery PBA Bondholders receive from PBA.

billion to $11.3 billion. Claims *pari passu* with GO Bondholders, such as deficiency claims of PBA Bondholders and other holders of debt guaranteed by the Commonwealth, receive an estimated aggregate recovery between $2.1 billion and $3.3 billion outside Title III. Claims other than those on account of Constitutional Debt, which total approximately $6.0 billion, are projected to receive an estimated aggregate recovery between $0.0 and $2.0 billion. The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) includes in its calculation of unsecured claims certain claims that receive specific treatment under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and are thus not included in the Plan's general unsecured creditor class, including union employee claims, intragovernmental claims, convenience class claims, and *Gracia-Gracia* claims. This results in a larger pool of unsecured claims outside of Title III, which dilutes potential recoveries for other unsecured claims.

39. In the aggregate, outside of Title III, holders of claims against the Commonwealth receive an estimated recovery of $9.3 billion to $14.6 billion. This implies an aggregate recovery of 37% to 59% for all claims assuming $24.7 billion in outstanding debt and other obligations. Thus, recoveries under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), which are projected to be 69%, are within range or exceed the recoveries outside of Title III in all Scenarios.[4]

**(b)** ***Alternative Assumptions***

40. In addition to calculating claimholder recoveries in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) with the Main Assumptions, the Commonwealth Report estimates creditor recoveries in other alternatives where certain of the Main Assumptions made in connection with the Commonwealth Report are not realized.

---

[4] Excludes Federal Claims, which receive 100% recovery within the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]).

41.     While the Oversight Board has assumed that, consistent with the Commonwealth's public statements and enacted legislation, the Commonwealth will not take action to cut pension or other retirement benefits outside of Title III, the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) includes two additional assumptions where the Commonwealth courts order pension reductions of 5% or 10%, respectively, on pensions above $1,500 per month because the Commonwealth could otherwise lack sufficient resources to satisfy Constitutional Debt.  In the aggregate, outside of Title III, holders of claims against the Commonwealth receive an estimated recovery of $9.3 billion to $15.3 billion assuming the Commonwealth courts order pension reductions of 5% of 10%.  This implies an aggregate recovery of 38% to 62% for all claims assuming $24.7 billion in outstanding debt and other obligations.

42.     Another alternative assumption is that the ERS Title III case is dismissed substantially contemporaneous with the dismissal of the Commonwealth Title III case, and the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]), pursuant to which the ERS Bondholders have resolved their claims against ERS, is ineffective.  In that assumption, distributions by ERS to ERS Bondholders are assumed to be approximately $142 million, which is less than the approximately $520 million in distributions and consummation costs to ERS Bondholders pursuant to the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]).  Accordingly, there will be more ERS assets transferred to the Commonwealth as compared to the Main Assumptions in the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) (approximately $1.023 billion compared to $643 million), which assume that only the Commonwealth Title III case is dismissed and that the ERS Stipulation (Debtors' Ex. 19 [ECF No. 18791-9]) remains operative.  However, because of the assumption that the ERS Bondholder claims are no longer settled, ERS Bondholders are assumed to be able to assert constitutional claims against the Commonwealth for enacting the

PayGo Legislation (defined below).   Under these assumptions, the Commonwealth has approximately $380 million more in its Resource Envelope to distribute to claimholders, but approximately $3.2 billion in additional unsecured claims on account of ERS Bondholder constitutional claims (resulting in total outstanding debt and other obligations of $27.9 billion), which claims recover ratably with all other unsecured claims of the Commonwealth.   In the aggregate, outside of Title III, holders of claims against the Commonwealth receive an estimated recovery of $9.6 billion to $14.6 billion assuming the ERS Title III case is dismissed.   This implies an aggregate recovery of 34% to 52% for all claims assuming $27.9 billion in outstanding debt and other obligations.

**(c)     *Summary Chart of Claimholder Recoveries Under the Various Scenarios and Assumptions***

43.      Set forth below is a chart showing aggregate range of recoveries based on the three Scenarios combined with the Main Assumptions, the 5% pension cut, 10% pension cut, and the dismissal of the ERS Title III case.   The percentage recoveries below represent the net present value of creditor recoveries in each of the Scenarios and alternative assumptions as a percentage of all debt and other obligations as of the Commonwealth Petition Date and PBA Petition Date for comparability to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).   When compared to aggregate recoveries pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), which, as set forth in paragraph 48 are approximately $15.7 billion excluding claims of the Federal government, aggregate recoveries within any of the Scenarios, Main Assumptions, or alternative assumptions as of the Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) filing date is within range or less than recoveries pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).

| Ranges of Creditor Recoveries (% and $ billion) | Main Assumptions | 5% Pension Reduction | 10% Pension Reduction | ERS Title III Case dismissed |
|---|---|---|---|---|
| Base Case | 39%-45% | 40%-45% | 41%-46% | 36%-41% |

|  | $9.7-11.0 | $9.9-11.2 | $10.1-11.3 | $10.1-11.4 |
|---|---|---|---|---|
| Scenario 1 | 37%-41% | 38%-42% | 38%-42% | 34%-38% |
|  | $9.3-10.3 | $9.3-10.3 | $9.4-10.4 | $9.6-10.6 |
| Scenario 2 | 52%-59% | 54%-61% | 55%-62% | 46%-52% |
|  | $12.9-14.6 | $13.2-15.0 | $13.5-15.3 | $12.9-14.6 |

## ii. *Claimholder Recoveries Pursuant to the Plan*

44.     I understand that in determining if the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) is in the best interests of creditors, the Court may consider how creditor recoveries outside of Title III compare with what creditors will receive pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).  Accordingly, I have examined creditor recoveries pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), discussed below.

45.     As set forth in the Disclosure Statement (Debtors' Ex. 2 [ECF No. 18785-2]), Classes 15–22, 30–33, 36–43, and 46–50 represent the claims of holders of GO Bonds.  These Classes include claims for all Constitutional Debt except for PBA bonds, which are included separately in the Plan (Debtors' Ex. 1 [ECF No. 18785-1]).  The claims in such classes total an estimated $14.1 billion, and, pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), are projected to receive $10.3 billion in fixed consideration, consisting of cash and bonds.

46.     Additionally, as set forth in the Disclosure Statement (Debtors' Ex. 2 [ECF No. 18785-2]), Classes 23–29, 34–35, and 44–45 represent the claims of holders of debt with a Commonwealth guarantee.  Specifically, these classes represent the deficiency claim against the Commonwealth for PBA Bonds, which have a Commonwealth guarantee.  The claims in such classes total an estimated $3.6 billion, and, pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), are projected to receive $2.6 billion in consideration, consisting of cash and bonds.

47.     The additional classes of claims against the Commonwealth, excluding pension claims and claims arising from rejected collective bargaining agreements, for which no claim amount is included in the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), include Dairy Producer Claims

(Class 53), Med Center Claims (Class 56), Tax Credit Claims (Class 57), Commonwealth General

Unsecured Claims (Class 58), *Gracia-Gracia* Claims (Class 67), Convenience Claims (Class 68)

(which include approximately $50,000 of ERS claims). The claims in such classes, as set forth in

the Disclosure Statement (Debtors' Ex. 2 [ECF No. 18785-2]), total an estimated $5.1 billion, and,

pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), are projected to receive $2.7 billion in

consideration, consisting of cash and bonds. Federal Claims (Class 69) total an estimated $1.1

billion and are projected to receive 100% recovery under the Plan (Debtors' Ex. 1 [ECF No. 18785-

1]).

48.     In the aggregate and excluding Federal Claims, there is an estimated $22.8 billion

in claims asserted against the Commonwealth, which are projected to receive $15.7 billion

pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), for an aggregate recovery of 69% for all

claimholders.     Realized Commonwealth creditor recoveries could be even higher, as the

distributions set forth in the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) exclude any additional

recoveries available on account of payments from the Avoidance Action Trust created pursuant to

the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), CVIs to be distributed to certain claimants (if the

Commonwealth outperforms the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]) projections),

restriction fees or consummation costs, or other fees.

**B.      ERS**

      **i.      *Claimholder Recoveries in the Best Interests Test Analysis***

         **(a)      *Main Assumptions***

49.     ERS's creditor obligations consist of approximately $3.169 billion owed on ERS

Bonds as of the ERS Petition Date, and approximately $8 million of unsecured claims. As

discussed in further detail in the Disclosure Statement (Debtors' Ex. 2 [ECF No. 18785-2]), in

2017 the Commonwealth enacted the "PayGo Legislation," which created a new pension system

(the "PayGo System") and transferred to the Commonwealth the obligation to make payments to pension beneficiaries of the three major pension systems: ERS, JRS, and TRS (the "PayGo Payments"). Accordingly, it is assumed that, according to the Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), ERS will be dissolved, and all of its assets (currently over $1 billion), which constitute the entirety of ERS's Resource Envelope, may be used to satisfy claims. Thereafter, it is assumed that either outside of Title III or under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), any remaining ERS assets will be transferred to the Commonwealth pursuant to the PayGo Legislation. This flow of funds is set forth in Exhibit 1 of the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]).

50.     In the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]), ERS Bondholders are projected to receive a recovery of approximately $142 million outside of an ERS Title III case. This assumes a determination that the ERS Bondholders' security interest is limited to assets with such value. Because the ERS Bondholders hold non-recourse claims, it is assumed that this amount will be their sole recovery. This assumption is discussed in greater detail in the second question of the Assumptions Document included in the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]). ERS General Unsecured Claims, which are recourse to ERS, recover 100% on a projected $8 million in claims, for an aggregate recovery with the ERS Main Assumptions of $151 million, or 5%. The projected amount of ERS unsecured claims in the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) is higher than the estimates in the Disclosure Statement (Debtors' Ex. 2 [ECF No. 18785-2]) as it includes amounts that would be subordinated in a Title III case pursuant to section 510(b) of the Bankruptcy Code.

51.     One of the Main Assumptions in the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) provides that the ERS Bondholders do not have any claims against ERS for its

enactment of the PayGo Legislation, and that such claims would lie against the Commonwealth. Another Main Assumption is that the claim that the issuance of the ERS Bonds was not authorized is assumed to have no merit.

### (b)    *Alternative Assumptions*

52.    The ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]) contains certain alternative assumptions.  In one alternative assumption, ERS Bondholders have a security interest in PayGo Payments and recover various percentages of the PayGo Payments through litigation or settlement. The aggregate recovery for ERS Bondholders and ERS General Unsecured Claims totals up to $3.7 billion, which is greater than the amount owed as of the ERS Petition Date as interest would continue to accrue on unpaid principal for ERS Bonds.

53.    In a separate alternative assumption for ERS, the issuance of ERS Bonds is held to be *ultra vires*, which could either (i) eliminate the bond claims or (ii) eliminate the bond claims and require the return of approximately $400 million in interest and adequate protection payments made to bondholders.  Using this assumption, only ERS General Unsecured Claims would receive any recovery on their claims.

### ii.    *Claimholder Recoveries Pursuant to the Plan*

54.    Pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), exclusive of the payment of the ERS Restriction Fee, ERS Bondholders are projected to receive a recovery of approximately $444 million on $3.169 billion of claims (representing principal plus accrued interest as of the ERS Petition Date), and ERS General Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of claims.  Accordingly, all holders of claims against ERS are projected to receive an implied aggregate recovery of implied aggregate recovery of approximately $444 million, or 14% pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), which is greater than the recoveries for ERS creditors in the ERS Report (Debtors' Ex. 130 [ECF No. 18807-8]),

except in the alternative assumption where ERS Bondholders recover various percentages of the

PayGo Payments through litigation or settlement.

### C. PBA

#### i. *Claimholder Recoveries in the Best Interests Test Analysis*

##### (a) *Recoveries for Base Case, Scenario 1, and Scenario 2 with the Main Assumptions*

55.     PBA's creditor obligations as of the PBA Petition Date include approximately $4.7

billion of PBA Bonds (including those bonds assumed to be invalid), which, like the GO Bonds,

are categorized into three vintages: (i) issued prior to March 2011 ($2.7 billion); (ii) issued

between March and December 2011 ($1.3 billion); and (iii) issued in or after 2012 ($0.7 billion).

PBA Bondholders are assumed to be secured by an assignment of rent payments to PBA.  GDB

also made four loans to PBA, now held by the DRA, totaling $201 million as of the PBA Title III

petition date.  The DRA alleges one loan is secured by the sale proceeds of two government

buildings, and the other loans are unsecured.  The PBA Report (Debtors' Ex. 131 [ECF No. 18807-

9]), based on guidance from the Oversight Board's legal advisors, however, assumes the loans are

all treated as unsecured claims because the DRA will not be able to force a sale of the two

government buildings.  PBA General Unsecured Claims (other than claims held by the DRA)

include intergovernmental claims and litigation claims, among others, and are projected to be

approximately $410 million.  Therefore, total claims against PBA as of the PBA Petition Date

amount to approximately $5.3 billion.

56.     The Resource Envelope for PBA consists of starting cash of approximately $87

million, generated by PBA's annual operating surplus.  In each year, the PBA Report (Debtors'

Ex. 131 [ECF No. 18807-9]) projects contractually mandated payments to holders of PBA Bonds

assumed to be valid in the given Scenario, and then ratably to PBA General Unsecured Claims and

claims of the DRA Parties.  If the Resource Envelope is insufficient to pay amounts owed under valid PBA Bonds, the PBA Bondholders are assumed to seek payment from the Commonwealth for any remainder owed on account of the Commonwealth guarantee of PBA Bonds.  This assumed flow of funds is set forth in Exhibit 1 of the PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]).

57.    In each of the PBA Scenarios, PBA Bondholders are projected to receive an aggregate recovery of approximately $258 million from PBA, which is exclusive of any additional recoveries available on account of guarantee claims against the Commonwealth.  PBA General Unsecured Claims are projected to receive zero recovery, and the DRA's claims are projected to receive zero recovery.  In total, all claimholders against PBA are projected to receive an aggregate recovery of approximately $258 million from PBA, or 5%.

### (b)    *Alternative Assumptions*

58.    The PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) also analyzes an alternative assumption where the holders of PBA Bonds do not hold a valid assignment of rents. In this analysis, the PBA Bonds share ratably with PBA General Unsecured Claims and the DRA's claims, although the aggregate recovery for holders of claims against PBA does not change and remains 5%.

### ii.    *Claimholder Recoveries Pursuant to the Plan*

59.    Pursuant to the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), all PBA Bondholders are projected to receive a recovery of $1.1 billion against PBA, exclusive of recoveries on their guarantee claims against the Commonwealth.  The Plan (Debtors' Ex. 1 [ECF No. 18785-1]) provides that the PBA/DRA Secured Claim, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims receive recoveries of approximately $6.6 million, $41.0 million, and $13.4 million, respectively.  Accordingly, all holders of claims against PBA are projected to receive an implied aggregate recovery of $1.1 billion, or 21% pursuant to the Plan (Debtors' Ex. 1 [ECF No.

18785-1]), which is within the range or greater than the recoveries for PBA creditors in any of the PBA Scenarios and with any of the assumptions.

### Conclusion

60.     Accordingly, based on the information presented and analyzed in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) and the recoveries in the Plan (Debtors' Ex. 1 [ECF No. 18785-1]), I conclude that the Plan yields creditors of the Commonwealth, ERS, and PBA present value recovery in the aggregate that is within the range or greater than the amounts creditors would receive outside Title III.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 25, 2021                                    */s/ Ojas N. Shah*
      New York, New York                                Ojas N. Shah
                                                   Partner, McKinsey & Company

28