# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF GAURAV MALHOTRA OF ERNST & YOUNG LLP IN RESPECT OF CONFIRMATION OF EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT FOR THE COMMONWEALTH OF PUERTO RICO, ET AL.**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA" as its Spanish acronym) (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, Gaurav Malhotra, hereby declare that:

1. I am a Principal and Head of the U.S. Restructuring Practice at Ernst & Young LLP ("EY"). I received a Masters of Business Administration from Case Western Reserve University with a dual major in Finance and Business Policy. I have over 20 years' experience in financial and operational restructuring. Prior to joining EY in 2009, I was a Director in the restructuring division of Macquarie Capital (USA) Inc., a leading merchant bank. I am a Chartered Financial Analyst and a member of both the Turnaround Management Association and the Association of Insolvency and Restructuring Advisors. My background and experience is set forth in more detail in my initial declaration [Case No. 17-BK-3283-LTS, ECF No. 18738] (the "Initial Declaration") filed in respect of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17627] (the "Seventh Amended Plan").

2. I submit this declaration (the "Supplemental Declaration") in respect of confirmation of the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 19053] (the "Plan"), and to discuss the impacts of the new legislation, known as Act 53-2021, titled "Law to End the Bankruptcy of Puerto Rico" ("Act 53"), recently enacted by the Commonwealth government, a copy of which is attached as Exhibit B to the *Urgent Motion of the Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 and (II) Scheduling Objection Deadline* [ECF No. 19002]. To the extent any capitalized terms are used but not defined in this Declaration, such terms shall have the meanings assigned to them in the Plan.

3. My statements set forth in this Supplemental Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements. In those instances where I reference a specific document or communication, I am informed that the specific document or communication either is not being offered to prove the truth of the matter asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible. Where my Declaration provides opinion testimony, in addition to the above, the opinions set forth herein are based on (i) my understanding of information shared with me by other members of the EY team working directly with me or under my supervision and direction; (ii) information provided by the Oversight Board and its advisors, and other interested parties and their respective advisors concerning the restructuring, and/or (iii) my experience in the industry as described below.

4. As pertinent to this Supplemental Declaration, I continue to be familiar with, and have reviewed, (i) the Plan and the various plan support agreements executed in connection with the Plan, as well as their terms, (ii) the certified 2020 Fiscal Plan ("2020 Fiscal Plan"), Debtors' Ex. 9 [ECF No. 18785-9], and the certified 2021 Fiscal Plan ("2021 Fiscal Plan," and together with the 2020 Fiscal Plan, the "Certified Fiscal Plans"), Debtors' Ex. 10 [ECF No. 18785-10], and (iii) the other documents I referenced in my Initial Declaration. I have also reviewed and am familiar with Act 53 as it relates to the modified terms of the Plan.

5. On October 25, 2021, I submitted my Initial Declaration. The Initial Declaration set forth, among other things, a discussion of the Seventh Amended Plan's treatment of pension obligations, including the treatment of ERS, TRS, and JRS participants, and my opinion that confirmation of the Seventh Amended Plan is not likely to be followed by the need for further

financial reorganization not contemplated in the Seventh Amended Plan. My Initial Declaration stated there were ongoing discussions concerning matters regarding the treatment of Pension Claims in the Seventh Amended Plan. Here, I supplement my Initial Declaration to reflect the result of those discussions. *See* Initial Decl. ¶ 21.

6. On October 26, 2021, the Governor of Puerto Rico signed into law Act 53, one of the stated purposes of which is to support the Plan and take the affirmative steps necessary to direct the exit of Puerto Rico from PROMESA Title III cases. Act 53 conditionally authorizes the issuance of New GO Bonds and CVIs, as provided for in the Seventh Amended Plan, on the Oversight Board filing a modified Plan eliminating the Monthly Benefit Modification. This is the Oversight Board's interpretation of Act 53. The Oversight Board is separately giving notice of its interpretation to parties in interest so the Court can resolve contrary interpretations, if any, in the context of the confirmation hearing.

7. As a result of the enactment of Act 53, the Oversight Board reviewed and considered the implications of the legislation upon the Seventh Amended Plan, the Commonwealth, and its residents, and determined to modify the Seventh Amended Plan to eliminate the Monthly Benefit Modification. In connection with this amendment, the Oversight Board also determined to increase the funding of the Pension Reserve Trust under the Plan.

8. On November 3, 2021, the Oversight Board filed the Plan. Below, I explain my belief that, under the modifications to the Plan, the Plan will be remain feasible even with the elimination of the Monthly Benefit Modification for ERS, JRS, and TRS participants, provided there are no other modifications or changes to the Plan involving pensions. Specifically, if the Plan were modified to (i) eliminate the freeze of JRS and TRS pension benefit accruals (the

3

"Pension Freeze") and (ii) retain any future pension benefit cost of living adjustments for JRS, TRS, or ERS Participants ("COLAs"), then the Plan will run the risk of not being feasible.

### It Remains My Opinion that Confirmation of the Plan, Including the Elimination of the Monthly Benefit Modification, Is Not Likely to Be Followed by the Need for Further Financial Reorganization Not Contemplated in the Plan

9. The modifications to the Plan to eliminate the Monthly Benefit Modification are estimated to add an average of approximately $87 million annually to the cost of the Commonwealth's PayGo obligations for the first ten years after the assumed July 1, 2022 Monthly Benefit Modification effective date assumed in the Fiscal Plan, which represents less than 5% of the Commonwealth's estimated PayGo expenses for this period, and less than 1% of the Commonwealth's overall budget for this period. *See* 2021 Fiscal Plan, Debtors' Ex. 10 [ECF No. 18785-10], at 303. This additional cost will be payable from the surpluses projected in the 2021 Fiscal Plan during this period. *See id.* Ex. 25 at 59; *see also id.*, Ex. 18 at 43 (projecting over $1 billion in surplus each fiscal year through fiscal year 2026). Thereafter, the incremental cost of eliminating the Monthly Benefit Modification will continue to decline through the 30-year projection period, and is estimated to cost an average of $69 million annually for the following decade, before falling further to an estimated $40 million average annual impact during the remainder of the Fiscal Plan projection period from fiscal years 2043 through 2051. Over the thirty-year period of the Fiscal Plan projections, the aggregate cost of eliminating the Monthly Benefit Modification is approximately $1.9 billion, *see* Levy Declaration [ECF No. 18737], ¶ 54, with an overall average annual cost increase of approximately $66 million over the 29 years in which the Monthly Benefit Modification was reflected in the Fiscal Plan. Therefore, the cost of eliminating the Monthly Benefit Modification is known and about half of the cost will be incurred during a period of primary surpluses. The elimination of the Monthly Benefit Modification could

have the effect of accelerating projected deficits in the later years. That effect can be mitigated if incremental structural reforms are adopted by the Commonwealth government.

10. Based on the Fiscal Plan projections, the elimination of the Monthly Benefit Modification, amounting to less than 1% of the Commonwealth's general fund on an annual basis, does not materially impact the feasibility analysis as set forth in my Initial Declaration.

11. In addition, the Pension Reserve Trust established by the Plan, as discussed in my Initial Declaration, reduces the risk that elimination of the Monthly Benefit Modification will result in the Commonwealth having insufficient funds for the payment of retiree benefits as it is designed to protect future pension benefits regardless of the future economic or political circumstances of the Commonwealth, such as the deficits currently projected to commence in fiscal year 2031 under the Fiscal Plan (*see* Exhibit 1).

12. To ensure the Pension Reserve Trust is adequately funded to cover the increased costs associated with the elimination of the Monthly Benefit Modification, the Commonwealth has increased the annual contributions to the Pension Reserve Trust from the Commonwealth General Fund. Under the Plan, the Commonwealth will make annual contributions to the Pension Reserve Trust from the Commonwealth General Fund for ten (10) Fiscal Years beginning in the Fiscal Year in which the Effective Date occurs, in an amount no less than $175 million per year (the "Base Contribution"), provided that, for any Fiscal Year ending after the Effective Date in which the projected unrestricted primary fiscal plan surplus minus the sum of (i) the projected CVI payments for such Fiscal Year, plus (ii) the positive difference, if any, of projected Non-Own Source Revenue minus actual Non-Own Source Revenue for such Fiscal Year (the "Projected Fiscal Plan Surplus"), is at least $1.750 billion, the Base Contribution shall increase to an amount equal to 50% of the Projected Fiscal Plan Surplus for that Fiscal Year. The Plan further provides that the

5

Commonwealth should also make an initial contribution of $5 million to the Pension Reserve Trust to fund its administrative fees, costs, and expenses. "Non-Own Source Revenue" means revenues of the Commonwealth received from the United States government or any of its agencies.

13. In the Plan, the Commonwealth also must make additional contributions to the Pension Reserve Trust in an annual amount equal to: (a) the lower of the actual unrestricted primary surplus minus the actual CVI payments for such Fiscal Year or the Projected Fiscal Plan Surplus, minus the sum of (i) the Base Contribution for such Fiscal Year, plus (ii) the Commonwealth debt service obligation pursuant to the Plan for such Fiscal Year, plus (iii) two hundred million dollars ($200,000,000.00); provided, however, that, in all instances, such additional amount cannot be negative, and (b) subject to applicable laws, including, without limitation, Titles I and II of PROMESA, such additional amounts as the Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust.

14. Based on the current Fiscal Plan's projections, Debtors' Ex. 10 [ECF No. 18785-10], the Commonwealth contributions to the Pension Reserve Trust are estimated to total approximately $2.4 billion during the ten years of funding, all of which will be paid during the time period in which the current Fiscal Plan projects the Commonwealth to have primary surpluses. 2021 Fiscal Plan, Debtors' Ex. 10 [ECF No. 18785-10], Ex. 25 at 59. Based on the Oversight Board's assumed annual return on investment for the Pension Reserve Trust of 4.5%, the Oversight Board estimates that the balance of the Pension Reserve Trust will total approximately $3.1 billion through the end of fiscal year 2031. Therefore, the Pension Reserve Trust will be available to help fund the Commonwealth's PayGo obligations if the currently-projected deficits materialize.

15. Therefore, it remains my opinion that confirmation of the Plan, including the elimination of the Monthly Benefit Modification, is not likely to be followed by the need for further

6

financial reorganization not contemplated in the Plan. As described in further detail in my Initial Declaration, my opinion is based on a number of factors, including: (*i*) the Plan reduces the Commonwealth's overall debt; (*ii*) the Plan includes multiple provisions designed to insulate the Commonwealth from downside risks; (*iii*) based on the Wolfe Report, to avoid default, the Commonwealth can implement certain reforms the Oversight Board identified that could result in additional liquidity, which could eliminate the projected deficit; and (*iv*) the Plan—and the financial projections incorporated into the 2021 Fiscal Plan—do not take into account potential upside factors which, if they materialize, would result in additional liquidity. Most notably, if even a portion of the Category 2 and 3 structural reforms identified in the Wolfe Report are implemented by the Commonwealth, the Commonwealth would build additional cumulative surpluses sufficient to avoid the Commonwealth's projected deficits, and to enable the Commonwealth to pay the debt service contemplated by the Plan and its pension obligations, including as increased by the elimination of the Monthly Benefit Modification. *See* Initial Decl. ¶ 43.

### If the Pension Freeze and COLA Elimination Are Not Implemented, There Would Be Increased Risk That the Plan May Not Be Feasible

16. Instituting the Pension Freeze and eliminating future COLAs is critical to (1) achieving fiscal responsibility, (2) providing consistent treatment to active employees, and (3) maintaining consistency with the Fiscal Plan.

17. The financial impact associated with eliminating the Pension Freeze and reinstating COLAs adds risk to the Commonwealth's long-term fiscal stability. Specifically, the PayGo impact of eliminating the Pension Freeze and reinstating COLAs relative to the Fiscal Plan is estimated to be approximately $5.6 billion over 30 years, or approximately $4.7 billion after taking into account social security costs. By 2047, the incremental PayGo cost associated with eliminating the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo

obligation by 25%.[2] This incremental cost includes assumptions for salary growth for teachers and judges that participate in TRS and JRS based on the estimates utilized by the Retirement Systems' actuaries, as projected in the Fiscal Plan. If, however, salaries for teachers and judges increase at a rate higher than projected in the Fiscal Plan, the financial impact on PayGo could be even higher because the pensions under TRS and JRS are calculated as a percentage of annual compensation. For example, when a $2,000 incremental salary increase for teachers that was incremental to the rate of assumed salary growth was reflected in a prior year's fiscal plan PayGo estimates, this resulted in an increase to the estimated savings generated by the Pension Freeze in that fiscal plan model by approximately $240 million over 30 years. Unlike the elimination of the Monthly Benefit Modification, the incremental cost of which decreases as the Commonwealth approaches the deficits projected by the Fiscal Plan, the incremental costs associated with eliminating the Pension Freeze and reinstating any COLAs are projected to grow larger as the Commonwealth approaches the deficits projected by the Fiscal Plan, thus running the risk that the Plan may not be feasible.

18. Absent the Pension Freeze, TRS and JRS pension liabilities will continue to increase relative to the Fiscal Plan. Eliminating the Pension Freeze creates an open-ended incremental defined benefit liability because TRS and JRS participants would continue to accrue new benefits for as long as they continue to work for the Commonwealth. On the other hand, other Commonwealth liabilities, including GO debt and ERS pension liabilities, are projected to decrease after the restructuring. Thus, unlike the costs associated with a frozen TRS and JRS,

---

[2] This represents the ratio of (a) the estimated net impact of eliminating the Pension Freeze to (b) the estimated PayGo from the Fiscal Plan (adjusted for the estimated impact of the elimination of the Monthly Benefit Modification) plus Fiscal Plan estimated employer Social Security contributions on behalf of teachers and judges.

which reduce over time, the cost of eliminating the Pension Freeze is projected to increase over time, including when the Commonwealth is expected to undergo budget deficits under the Fiscal Plan. Therefore, not implementing the Pension Freeze and the reinstatement of COLAs would increase the likelihood of needing to rely on the Pension Reserve Trust for payment of the Commonwealth's PayGo obligations and then potentially exacerbate any future deficits when the Pension Reserve Trust is exhausted.

19. The Pension Freeze also provides a consistent retirement treatment for all active employees of the Commonwealth. As of today, pension accruals for all of ERS participants are frozen. In addition, TRS has been closed to new entrants hired after August 1, 2014. However, TRS participants hired before August 1, 2014 and all judges continue to accrue pension benefits. Similarly, COLAs for ERS participants and TRS participants have been eliminated, while JRS has continued to receive a COLA every three years. The Pension Freeze and COLA elimination would mean that all three retirement systems (ERS, TRS, and JRS) across the public sector in the Commonwealth are afforded similar treatment to participants of each system.

20. If the pension systems of TRS and JRS are left unfrozen and in the event ERS were also unfrozen to provide consistent treatment, then the incremental costs would be even higher. I am aware that the Government has proposed and enacted several pension-related laws that are intended to increase retirement benefits for Commonwealth employees. The costs associated with such pension reform measures would increase the risk that the Plan may not be feasible. For example, if implemented, Act 81-2020 ("Act 81")—which would allow certain public employees hired prior to January 1, 2000 to retire when they turn fifty-five years old with an increased pension benefit, provided they have thirty years or more of service—would cost

9

approximately $2.4 billion over 30 years based on estimates of the number of participants expected to meet Act 81's eligibility requirements.

21. Finally, the Pension Freeze has been a component of each fiscal plan certified by the Oversight Board, including the 2021 Fiscal Plan, and PROMESA requires the Plan be consistent with the currently certified Fiscal Plan. Therefore, in order for the pension treatment in the Plan to be consistent with the pension treatment in the Fiscal Plan, the Plan needs to include the Pension Freeze.

22. In addition, I have become aware that the chart in paragraph 17 of my Initial Declaration, which sets forth the aggregate contributions on a yearly basis to the Debt Service Fund contemplated by the Plan, is inaccurate due to a mechanical error in the construction of the chart. The following paragraph replaces paragraph 17 of my Initial Declaration:

The aggregate contributions on a yearly basis to the Debt Service Fund contemplated by the Plan to service the New GO Bonds are as follows:

| Date (7/1/FY) | CIB Principal Amortization | CIB Interest | CAB Accreted Value Amortization | Aggregate Total GO Debt Service |
|---|---|---|---|---|
| 2022 | $372,660,000.00 | $311,618,300.00 | $105,968,971.50 | $790,247,271.50 |
| 2023 | 372,390,000.00 | 292,985,300.00 | 105,969,766.35 | 771,345,066.35 |
| 2024 | 371,350,000.00 | 274,365,800.00 | 105,970,000.00 | 751,685,800.00 |
| 2025 | 369,470,000.00 | 255,798,300.00 | - | 625,268,300.00 |
| 2026 | 366,675,000.00 | 237,324,800.00 | - | 603,999,800.00 |
| 2027 | 362,890,000.00 | 218,991,050.00 | - | 581,881,050.00 |
| 2028 | 358,030,000.00 | 200,846,550.00 | - | 558,876,550.00 |
| 2029 | 352,010,000.00 | 182,945,050.00 | 149,997,523.50 | 684,952,573.50 |
| 2030 | 344,740,000.00 | 165,344,550.00 | 149,997,764.30 | 660,082,314.30 |
| 2031 | 336,095,000.00 | 148,107,550.00 | 149,998,089.75 | 634,200,639.75 |
| 2032 | 325,990,000.00 | 131,302,800.00 | 149,998,937.80 | 607,291,737.80 |
| 2033 | 311,050,000.00 | 118,263,200.00 | 150,000,000.00 | 579,313,200.00 |
| 2034 | 294,385,000.00 | 105,821,200.00 | - | 400,206,200.00 |
| 2035 | 275,890,000.00 | 94,045,800.00 | - | 369,935,800.00 |
| 2036 | 256,025,000.00 | 81,793,250.00 | - | 337,818,250.00 |
| 2037 | 233,995,000.00 | 70,364,900.00 | - | 304,359,900.00 |
| 2038 | 209,660,000.00 | 59,848,850.00 | - | 269,508,850.00 |

| Year | | | | |
|---|---|---|---|---|
| 2039 | 182,860,000.00 | 50,338,850.00 | - | 233,198,850.00 |
| 2040 | 153,520,000.00 | 41,844,650.00 | - | 195,364,650.00 |
| 2041 | 124,765,000.00 | 34,465,050.00 | - | 159,230,050.00 |
| 2042 | 130,875,000.00 | 28,354,600.00 | - | 159,229,600.00 |
| 2043 | 136,110,000.00 | 23,119,600.00 | - | 159,229,600.00 |
| 2044 | 141,555,000.00 | 17,675,200.00 | - | 159,230,200.00 |
| 2045 | 147,220,000.00 | 12,013,000.00 | - | 159,233,000.00 |
| 2046 | 153,105,000.00 | 6,124,200.00 | - | 159,229,200.00 |
| Total | $6,683,315,000.00 | $3,163,702,400.00 | $1,067,901,053.20 | $10,914,918,453.20 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 3, 2021
Chicago, Illinois

                                                */s/ Gaurav Malhotra*
                                                Gaurav Malhotra

# **Exhibit 1**

Commonwealth of Puerto Rico — *All figures are illustrative estimates and subject to material change*

| ($ in millions) | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 10 yr FY22-FY31 | 25 yr FY22-FY46 | 30 yr FY22-FY51 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Surplus/(Deficit) Projections** | | | | | | | | | | | | | |
| Apr 2021 CFP - Full surplus /(deficit)[1] | $1,716 | $1,320 | $1,071 | $1,265 | $1,334 | $1,478 | $1,407 | $1,346 | $1,217 | $1,009 | $13,163 | $4,533 | $(5,403) |
| Apr 2021 CFP - Restricted surplus/(deficit)[1] | 141 | 142 | 138 | 143 | 152 | 169 | 182 | 189 | 233 | 238 | 1,726 | 5,507 | 7,111 |
| Apr 2021 CFP - Unrestricted surplus /(deficit)[1] | 1,575 | 1,178 | 933 | 1,122 | 1,182 | 1,309 | 1,226 | 1,157 | 984 | 771 | 11,437 | (974) | (12,514) |
| Apr 2021 CFP - Unrestricted surplus /(deficit)[1] | 1,575 | 1,178 | 933 | 1,122 | 1,182 | 1,309 | 1,226 | 1,157 | 984 | 771 | 11,437 | (974) | (12,514) |
| GO/PBA Recoveries[2] | (916) | (899) | (867) | (757) | (738) | (729) | (715) | (702) | (683) | (667) | (7,673) | (14,632) | (15,635) |
| Pension Trust (Contributions)/Withdrawals[3] | (449) | (175) | (175) | (175) | (175) | (210) | (175) | (175) | (175) | (175) | (2,059) | 1,205 | 1,437 |
| Full pension cut restoration[4] | - | (90) | (90) | (89) | (89) | (88) | (87) | (86) | (84) | (83) | (785) | (1,749) | (1,916) |
| Other adjustments including legislation impact[5] | (10) | (138) | (130) | (120) | (110) | (83) | (49) | (45) | (41) | (36) | (763) | (1,328) | (1,751) |
| **Annual Surplus/(Deficit)** | $200 | ($124) | ($329) | ($20) | $70 | $200 | $200 | $150 | $0 | ($190) | $157 | ($17,478) | ($30,379) |
| **Potential Federal Upside** | | | | | | | | | | | | | |
| Medicaid Funding[6] | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | 0 - 50,000 |
| **Potential Downside** | | | | | | | | | | | | | |
| Impact of lack of implementation of structural reforms included in FP projections[7] | 0 | (9) | (27) | (78) | (148) | (220) | (295) | (372) | (450) | (529) | (2,128) | (19,936) | (30,720) |
| 50% Federal Disaster Relief Funding[6] | (163) | (312) | (396) | (373) | (521) | (567) | (599) | (591) | (593) | (572) | (4,687) | (8,591) | (9,117) |
| Act 80[8] | (151) | (146) | (139) | (130) | (121) | (112) | (102) | (94) | (86) | (78) | (1,158) | (1,957) | (2,153) |
| Act 81[8] | (18) | (22) | (25) | (31) | (39) | (50) | (62) | (77) | (90) | (98) | (512) | (2,100) | (2,547) |
| Act 82[8] | (24) | (40) | (51) | (58) | (65) | (70) | (73) | (75) | (76) | (75) | (607) | (1,422) | (1,655) |
| **Other Considerations** | | | | | | | | | | | | | |
| Upside: Impact of additional structural reforms not included in FP projections[9] | (0) | (0) | 35 | 76 | 147 | 230 | 329 | 442 | 549 | 661 | 2,468 | 28,535 | 46,007 |
| Downside: Incremental costs related to Infrastructure & Implementation Risks | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| *Memo:* | | | | | | | | | | | | | |
| Downside: Cost to remove pension freeze[4] | (1) | (2) | (6) | (12) | (19) | (29) | (40) | (53) | (69) | (88) | (319) | (3,903) | (5,560) |
| Upside: Social Security not paid if pension freeze eliminated[4] | 18 | 35 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 35 | 326 | 791 | 867 |

Notes
1. Per April 2021 Certified Fiscal Plan and Model, 30 Year tab
2. Includes new GO Bonds, 5.0% CAB and estimated CVI based on the 8th Amended Plan of Adjustment
3. Pension Trust calculated per April 2021 Certified Fiscal Plan and recent adjustments
4. Per April 2021 Certified Fiscal Plan and Model, pension tab
5. Includes cost estimates related to recent legislation and other adjustments
6. Figures are illustrative estimates and subject to material change
7. Per April 2021 Certified Fiscal Plan and Model
8. FOMB letter to AAFAF following up on Acts 80, 81, and 82 dated October 21, 2020
9. Figures obtained from Corrected Expert Report of Andy Wolfe