UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

                Debtors.

---------------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

**[Related to Docket #19007]**

**RESPONSE TO FOMB OBJECTIONS TO
ADMISSIBILITY OF ELLIOTT DECLARATIONS**

Dated: November 4, 2021

Peter C. Hein, pro se, an individual bondholder, files this response to FOMB's objections to the Elliott Declarations offered as declarations at #18648-page-12-of-13.

The Elliott declarations were included in my exhibit list because one had been an exhibit to my Objection and another had been an exhibit to a prior filing in October 2021. However, the two Elliott declarations were, in addition, listed in the "Declarations List" on my Exhibit List, Witness List and Identification of Previously-Filed Declarations (#18648-page-12-of-13). I have clarified that I am offering these as declarations, not exhibits.

To enable the Court to match my response to each objection, I have added handwritten numbers in the margin on the copy of the Elliott declarations that FOMB submitted in #19007. That marked version is attached to this response. The numbers used below correspond to the numbers marked on the attached marked version.

**1.** Statement 1 describes the circumstances under which Elliott prepared his declaration. F.R. Evid. 402 and 403 provide no ground to preclude Statement 1, particularly in a bench trial and in light of the brevity of the one sentence statement. These points are likewise responses to FOMB's other, repeated Rule 402 and 403 objections, but I will not repeat these points as to each Statement covered in the discussions below.

**2.** Statement 2 is offered not for the truth, but to show the difficulties that Elliott experienced when trying to help his clients get their brokers to make delivery through ATOP and to cast their votes. To illustrate this point, assume (hypothetically) that a Charles Schwab representative actually believed FOMB's process for delivery through ATOP and voting was easy to use and clearly communicated, but falsely told Elliott that the Schwab representative was frustrated and confused. It is relevant for this purpose that Elliott, in his dealings with Schwab, is getting this response from the broker/asset custodian, and experiencing the difficulties Elliott goes on to describe, regardless of whether the broker actually was frustrated and confused.

**3.** Elliott's declaration itself shows the personal knowledge basis for Statement 3 that permits the testimony without Elliott being designated as an expert: for 20 years he has been a professional money manager and for more than 40 years an active investor, but he has never

before seen the process employed here. In addition, as per the unobjected to statement preceding Statement 2, he works with, and has spoken with, three major brokers/asset custodians. Furthermore, the unobjected to statements both preceding and following Statement 20 show the active nature of Elliott's personal involvement here. Elliott's Statement 3 is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Rather, Elliott's Statement 3 is akin to the examples of permissible lay testimony described in the Advisory Committee notes to the 2000 amendment to Rule 701.

4. Statement 4 is not offered for the truth, but to show the difficulties Elliott experienced.

5. Statement 5, the answering machine message of FOMB's agent Prime Clerk, is probative and puts the next sentence (no call back after almost 2 weeks) in context. The difficulties faced by individuals trying to understand and navigate FOMB's complex delivery to ATOP and voting process are relevant as a response to the suggestion that the "accept" vote of Retail Classes shows support by individual investors for the proposed Plan, as distinct from being the result of individuals finding it difficult to navigate the complex process to get their brokers to deliver to ATOP and vote, or individuals being coerced into voting "accept" in order to enhance their ability to get the added 1.321%.

6. Statement 6 describes the difficulties Elliott and his clients experienced with the Schwab requirements. The two not-objected-to sentences preceding Statement 2, Statement 4 and the not-objected-to sentences just before and after Statement 20, as well as other material in the declaration, show Elliott's basis in personal knowledge.

7. Statement 7 describes the difficulties Elliott and his clients encountered. The two sentences preceding Statement 2 and the sentences just before and after Statement 20, as well as Statements 3 and 4, show Elliott's basis in personal knowledge and provide the context for his difficulty in understanding the process.

8. Statement 8 is descriptive of what is referenced in more detail in Statements 6 and 7 and provides the temporal context for Statement 9.

**9-11.** Statements 9, 10 and 11 describe what occurred. The preceding material, and the sentences before and after Statement 20, show Elliott's basis for his personal knowledge of this.

**12.** Statement 12 is Elliott's further description of the difficulties he encountered with the process.

**13.** Statement 13 is Elliott's description of the situation Elliott faced.

**14.** The basis for Statement 14 is evidence from prior passages, including the section "Background Information" where Elliott explains he has been investing for family and friends since 1999, and that Elliott Asset Management provides hedge fund style investments to individuals at low cost. Elliott's statement provides context for his narrative of why the process was so complex and difficult to navigate.

**15.** Statement 15 is offered to show Elliott's state of mind and understanding of one of the difficulties that confronted him, and provides context for Elliott's narrative.

**16-17.** Statements 16 and 17 are Elliott description of the materials he and his clients received, which is corroborated by other evidence in the record. E.g., #18761-5, #18761-2, #18760-18.

**18.** The basis in personal knowledge for Statement 18 is shown in prior passages of the declaration.

**19.** Statement 19 reflects Elliott's background experience that is pertinent to understanding the difficulties that even someone with his prior experience in the COFINA situation faced in dealing with the delivery to ATOP and voting process used in this GO case.

**20.** Statement 20 describes the difficulties Elliott experienced, and the unobjected sentences before and after Statement 20, as well as other portions of the declaration, show the extensive personal involvement Elliott had here. Furthermore, it is a reasonable inference from the fact Elliott experienced delays in getting brokers on the phone, as well as from other facts Elliott recounts in his declaration, that the brokers were overwhelmed.

**21.** Elliott plainly has personal knowledge of Statement 21's description of the nature of Elliott's own clients and their inability to wait on hold to reach the broker/assest custodian

staff, and this Statement provides further information about the difficulties Elliott and his clients experienced.

22. Statement 22 describes the limitations Elliott faced that prevented him from assisting many of his clients. This is probative of whether many individuals were thwarted in their efforts to have their bonds delivered to ATOP and vote by the complexities of the process and the limited time available.

23. Statement 23 is an inference by a percipient witness who was actively involved in trying to assist a number of individual clients navigate the ATOP delivery and vote process. Elliott's active involvement permits him to provide information, based on his personal, hands-on experience with the difficulties faced by individual investors trying to navigate the ATOP delivery and vote process applicable to Retail Investors in this situation. (FOMB and its agents may provide information on the process to the Court, but they obviously do not represent the perspective of an individual Retail Investor on the receiving end of the solicitation process here.)

24. Statement 24 reflects Elliott's view, as an individual investor and as the advisor to other individual investors, on what is important for individual investors to know before voting.

25. Statement 25 reflects Elliott's perception as an individual investor who advises other individual investors. I understand from reviewing FOMB's declarations that various of FOMB's declarants/witnesses will be expressing their opinions about the reasonableness of the deal for bondholders and/or of the robustness of the negotiation process through which it came about. If FOMB's declarants are permitted to testify to how reasonable the deal is for bondholders – including individual bondholders – and what a robust and arm's-length negotiation process there assertedly was, surely Elliott's different perspective should be permitted.

26. The reference in Statement 26 to IRS tax deadlines reflects the fact (a matter of general knowledge) that October 15 was the final deadline for filing individual tax returns, a deadline which coincided with the deadlines that were set here. This is a point that is significant to Elliott and other individual investors, who may have been required to complete their tax return

review and preparation process in the first two weeks of October working with equally stressed (and back logged) tax accountants who service individual clients.

27. Statement 27 is not offered for the truth, but to show the difficulties Elliott encountered.

28. The Statement 28 sentences are not statements by a third party being offered for the truth, but rather Elliott's statements describing the difficulties Elliott and his clients encountered.

29. Statement 29 describes Elliott's efforts to reach Prime Clerk, the fact that he only got an answering machine, and what FOMB's agent Prime Clerk said on its answering machine. This Statement 29 is in the October 6 declaration. As shown in the unobjected to statement following Statement 5 in the October 15 declaration, Elliott never did receive a call back.

30. Statement 30 is a factual statement describing the process individual investors had to navigate. The documentation I have offered into evidence from my two brokers confirms the process had to be navigated CUSIP-by-CUSIP. E.g., #18761-5, #18761-2, #18760-18.

31. Statement 31 is a factual statement that – because of how FOMB structured the process – at many brokerage firms individual investors who do not have the clout to obtain a fee waiver are charged a $30 fee for each individual CUSIP they seek to deliver through ATOP and vote. Literally, and it bears repeating, as per Elliott Statements 30 and 31, because of the process FOMB established for delivery to ATOP as a pre-condition to voting, many individual investors faced having to pay a $30 fee, for each separate CUSIP they held, simply to be able to exercise their right to vote. Again, I have offered confirmatory evidence. E.g., #18761-4, last page, top paragraph ("A USD 30.00 per instruction service charge (SVCH) will be assessed …").

32. Statement 32 is again a factual statement that is confirmed by math. If an individual had 8 CUSIPs, each $10,000 par, and is being charged $30 for each delivery instruction and vote, that would be $30 x 8 = $240. These fees would be paid in order to be able to exercise one's right to vote and to get (potentially) the added pro rata consideration of 1.321% of par. Elliott is making the point that, for small positions, the $30 fees consume a significant

share of any added pro rata consideration. Elliott's observation that small investors are not going to take the immense amount of time required to understand the offer or retain counsel is made based on his personal experience as an individual investor and advisor to other individual investors and personal involvement here, as described in his declarations. Elliott's observation is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Rather, Elliott's statement is akin to the examples of permissible lay testimony described in the Advisory Committee notes to the 2000 amendment to Rule 701.

November 4, 2021

                                                    Respectfully Submitted,

                                                    /s/ Peter C. Hein
                                                    Peter C. Hein, pro se
                                                    101 Central Park West, Apt. 14E
                                                    New York, NY 10023
                                                    petercheinsr@gmail.com
                                                    (917) 539-8487

## Certificate of Service

I, Peter C. Hein, certify that I have caused "Response to FOMB Objections to Admissibility of Elliott Declarations" to be served via the Court's CM/ECF system.

November 4, 2021

                                                        /s/ Peter C. Hein
                                                        Peter C. Hein

# Exhibit 1

# Hein Exhibit JJ

# DECLARATION OF MARK ELLIOTT

I, MARK ELLIOTT, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge and belief:

## Background Information

I am the founder of the Registered Investment Advisory Firm Elliott Asset Management, a Boston-based independent investment advisory firm. I have a BS in Molecular Biology, Magna Cum Laude, from the College at Charleston. I attended Medical School at Dartmouth College and completed graduate coursework in Business Harvard University's Executive Education Program. I have passed the following industry exams and obtained the following licenses: Series 63, Series 65, and Series 66. I have been investing professionally for family and friends informally since 1999, and I founded Elliott Asset Management in 2006, which acts in a fiduciary capacity providing hedge fund style investments to individuals at a low cost.

① [This is written under severe time pressure due to the nature of the recent proceedings and events. A, B] I apologize for any errors, omissions, and lack of my regular careful professionalism.

## Puerto Rico General Obligation, Public Building Authority, and other Puerto Rico bond issues:

In the course of my business as a professional investment manager I work with three different asset custodians: Charles Schwab, Merrill Lynch, and Interactive Brokers. I have spoken with management and customer service of all three— ② [and all three have expressed frustration and utter confusion with the voting and tendering process. A, B, E] ③ [In fact, the situation has been so confusing to the custodians/brokers that some have implemented special handling procedures I have never before witnessed in my more than 20 years of being a professional money

manager and my more than 40 years being an active investor in the U.S. and international markets.[A, B, C, D, E]]

④ [For instance: In my discussions with Charles Schwab "Corporate Reorganizations Department" they expressed frustration and told me they were "not given enough information to know what is going on" and therefore they issued a special bulletin to their staff (that I personally saw and have a copy of) that states Schwab personnel are to "give no advice or feedback on these issues… and to direct all calls to PrimeClerk."[A, B, E]] ⑤ [As I have previously stated, the PrimeClerk number provided by the notices is nothing but an answering machine message offering to "try" to call back within three business days.[A, B]] After almost 2 weeks I *did not receive a call back*. ⑥ [And because of the complexity, Charles Schwab *required all clients to call them and verbally confirm and attest* they had read and understood all 4000 pages (plus associated referenced documents).[A, B, C, E]] ⑦ [Furthermore, they must verbally confirm they understand their bonds will be submitted via a complex series of procedures using terms that even, I, as an experienced investment professional, have little idea what they are referring to.[A, B, C, D, E]] ⑧ After being presented with this, [essentially impossible-to-understand statement,[A, B]] ⑨ [small investors must swear they understand that Schwab staff— even if they did understand what it all means (and almost none do)—are not allowed to provide any feedback to investors other than to refer the small investors to PrimeClerk[A, B, C, E]] (which, as noted, in my experience results in leaving a message on an answering machine with no call back). ⑩ [If clients do NOT attest they have fully read and understand these complicated documents[A, B, C, E]] (that I and ⑪ [others have difficulty understanding after several *days* of review) then they are not allowed to make an election and lose the potential to receive their share of the added fee amounts that otherwise would, and should, be paid to them.[A, B, C, E]] ⑫ [Furthermore there are other elections needed to be made for insured bonds that are equally as confusing (and other issues with insured and uninsured issues confusing matters even more).[A, B]]

EXHIBIT GG

000182

Furthermore, the fact that almost 700 CUSIPS are being reorganized in multiple sub entities and each with multiple classes of investors and different offers from insured and uninsured issuers, [all referencing opaque materials with nonspecific [A, B]] references to websites and thumb drives [(which are of little value since most individual investors know they are *not* to introduce unsolicited foreign media into their computers).[A, B, C]] [(Indeed, a securities professional may be precluded from putting unsolicited foreign media into a computer, at least absent taking various compliance steps.) [A, B, D]]

Furthermore, most of the [little [B]] written information sent to clients provides NO statement that the investors need to take ANY action to protect their rights, other than a [nonspecific [B]] reference suggesting investors to "call their brokers"—and the brokers then tell investors to "call PrimeClerk" (who do not answer) and [very few individual investors are even able to make an election, being utterly unable to understand it.[A, B, C]]

Furthermore, in my case, I have taken extraordinary efforts to understand what I can in the very limited time to advise my clientele. [I know to be ready because of my experience with being "jammed" in the COFINA matter, where I believe thousands of small investors unfairly lost hundreds of millions of dollars that benefitted hedge funds and government officials.[A, B, C, D]]

With my investors I must get them to agree to complex instructions *orally*, *with the broker agent on the phone*, and most of my investors are busy professionals and the brokers [have been overwhelmed because of the complexity of this deal and due to staff shortages from covid—so it takes them hours to answer the phones![A, B, C]]In fact I was on the phone the entire day on Wednesday, October 13, after spending much of the previous day and much of my time in the previous two weeks trying to prepare custodians for my calls.

[Some of my clients are surgeons or other medical professionals and could not and cannot wait on hold the hours it took to reach staff at Schwab to give their

(22) authorities. A, B, C] And while I waited for one client I couldn't wait for others—therefore [I was only able to help about half my clients make elections in time. A, B] [The countless small investors without someone like me who is fighting so hard for them surely achieved less satisfactory results. I am confident almost all

(23) small investors still have no idea what is even taking place—and this is BEFORE this last bombshell released in the last 24 hours: A, B, C]

(24) Finally, in the last 24 hours it was announced that Puerto Rico was allowed to make whole on 100% OF ALL PENSIONS with NO CUTS. [This is a VERY material change that completely changes the security offered in this transaction. Therefore I believe it is an IMPERATIVE investors be given proper time to be given an opportunity to CHANGE elections that have already been made, especially in light of this new material information. B, C, D]

(25) [This case is following a familiar pattern involving secret negotiations favoring the negotiating parties and then time sensitive, mind-numbingly complex and opaque "disclosure" is provided apparently with the intent to obfuscate to push the plan through quickly and implement it to make it unappealable due to "equitable mootness." A, B, C]

(26) And, as with previous Puerto Rico reorganizations the deadlines are around public holidays and other difficult times. [In this instance the IRS tax deadlines, with the IRS overwhelmed due to COVID back-ups. A, B, C]

Mark Elliott, President
Elliott Asset Management
October 15, 2021

# Exhibit 2

## Hein Exhibit AAA

# DECLARATION OF MARK ELLIOTT

I, MARK ELLIOTT, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge and belief:

## Background Information

1. I am the founder of the Registered Investment Advisory Firm Elliott Asset Management, a Boston-based independent investment advisory firm. I have a BS in Molecular Biology, Magna Cum Laude, from the College at Charleston. I attended Medical School at Dartmouth College and completed graduate coursework in Business Harvard University's Executive Education Program. I have passed the following industry exams and obtained the following licenses: Series 63, Series 65, and Series 66. I have been investing professionally for family and friends informally since 1999, and I founded Elliott Asset Management in 2006, which acts in a fiduciary capacity providing hedge fund style investments to individuals at a low cost.

## Puerto Rico General Obligation, Public Building Authority, and other Puerto Rico bond issues:

In the course of my business as a professional investment manager I work with three different asset custodians: Charles Schwab, Merrill Lynch, and Interactive Brokers. I have spoken with management and customer service of all three - [and

017

EXHIBIT G

(27) all three have expressed frustration and confusion with the voting and tendering process. Most notably the representative at Schwab said "I have never seen anything so complicated, except perhaps for the Puerto Rico COFINA bond mess. It is almost as if they want people to give up and not bother to vote."[A, B, E] [Because of

(28) it being so complex Schwab is not providing any feedback or help with understanding what is being voted upon. And they are requiring small investors to call and verbally state that they have *read and understand the entire plan of adjustment*. If there any questions they are told to direct people to the PrimeClerk website and phone number.[A,B,C,E]] [When I called Primeclerk last week I received an

(29) answering machine message that simply asked for my contact info. They state they will "try" to get back to callers within 3 business days.[A,B]]

(30) [And, finally, for investors with multiple CUSIPS in different bond classes (many of my investors), they must go through these processes with *each cusip*.[A,C,D]]

(31) [And, as this is considered an optional tender by the custodians, then for every cusip each investor must pay a $30 fee.[C,D]] [These fees add up to a substantial

(32) amount of any additional amounts investors may be eligible for - if they take the immense amount of time or hire counsel to try to understand the terms of the offer, which I believe no small investors will do.[A,B,C,D]]

Mark Elliott, President
Elliott Asset Management

October 6, 2021

018
EXHIBIT G