```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF PUERTO RICO

 3
       In Re:                    )        Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )        PROMESA Title III
 5     The Financial Oversight and )
       Management Board for       )
 6     Puerto Rico,              )        (Jointly Administered)
                                 )
 7     as representative of      )
                                 )
 8     The Commonwealth of       )
       Puerto Rico, et al.       )        November 8, 2021
 9                               )
                    Debtors,     )
10

11     _____

12     In Re:                    )        Docket No. 3:17-BK-3566(LTS)
                                 )
13                               )        PROMESA Title III
       The Financial Oversight and )
14     Management Board for       )
       Puerto Rico,              )        (Jointly Administered)
15                               )
       as representative of      )
16                               )
       The Employees Retirement  )
17     System of the Government  )
       of the Commonwealth of    )
18     Puerto Rico,              )
                                 )
19                    Debtors,     )

20     _____

21

22

23

24

25
```

```
_____

In Re:                        )        Docket No. 3:19-BK-5523(LTS)
                              )
                              )        PROMESA Title III
The Financial Oversight and )
Management Board for          )
Puerto Rico,                  )        (Jointly Administered)
                              )
as representative of          )
                              )
The Puerto Rico Public        )
Buildings Authority,          )
                              )
            Debtors,          )

_____



            CONFIRMATION HEARING - DAY ONE

  BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

            UNITED STATES DISTRICT COURT JUDGE

   AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

            UNITED STATES DISTRICT COURT JUDGE

_____


APPEARANCES:

ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY

For The Commonwealth
of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                         Mr. Brian S. Rosen, PHV
                         Ms. Julia Alonzo, PHV

For Puerto Rico Fiscal
Agency and Financial
Advisory Authority and
the Governor of
Puerto Rico:             Mr. John Rapisardi, PHV
```

```
 1   APPEARANCES, Continued:

 2   For The Lawful
     Constitutional Debt
 3   Coalition:             Mr. Susheel Kirpalani, PHV

 4   For Ambac Assurance
     Corporation:           Mr. Dennis F. Dunne, PHV
 5                          Ms. Atara Miller, PHV

 6   For Financial Guaranty
     Insurance Company:     Mr. Martin A. Sosland, PHV
 7
     For National Public
 8   Finance Guarantee
     Corporation:           Mr. Robert S. Berezin, PHV
 9
     For The Official
10   Committee of Retired
     Employees:             Ms. Catherine L. Steege, PHV
11
     For Cantor-Katz
12   Collateral Monitor,LLC: Mr. Douglas Mintz, PHV

13
     For AmeriNational
14   Community Services,LLC: Mr. Arturo J. Garcia Sola, Esq.
                            Mr. Nayuan Zouairabani Trinidad, Esq.
15                          Mr. Alejandro Cepeda Diaz, Esq.

16   For Peter C. Hein:     Mr. Peter C. Hein, Pro Se

17   For Suiza Dairy Corp.: Mr. Rafael A. Gonzalez Valiente, Esq.

18   For Finca Matilde, Inc.: Mr. Eduardo J. Capdevila Diaz, Esq.

19   For the Official
     Committee of Unsecured
20   Creditors:             Mr. Luc A. Despins, PHV

21   For Assured Guaranty
     Corp. and Assured
22   Guaranty Municipal Corp: Mr. William J. Natbony, PHV
                            Mr. Mark C. Ellenberg, PHV
23
     For Sucesion Pastor
24   Mandry Mercado:        Mr. Charles A. Cuprill, Esq.

25
```

4

```
1   APPEARANCES, Continued:

2   For U.S. Bank Trust
    National Association
3   and U.S. Bank National
    Association:              Mr. Ronald J. Silverman, PHV
4                             Mr. Pieter Van Tol, PHV

5   For Service Employees
    International Union and
6   International Union,
    United Automobile,
7   Aerospace and
    Agricultural Implement
8   Workers of America:       Mr. Peter D. DeChiara, PHV

9   For Credit Unions:        Mr. Enrique M. Almeida, Esq.

10  For Mapfre PRAICO
    Insurance Company:        Mr. Jose Sanchez Girona, Esq.
11
    For Underwriter
12  Defendants:               Mr. Howard Steel, PHV
                              Ms. Carrie Hardman, PHV
13
    For Arthur Samdovitz:     Mr. Arthur Samdovitz, Pro Se
14
    For Asociacion de
15  Maestros de Puerto Rico
    and Asociacion de
16  Maestros de Puerto
    Rico-Local Sindical:      Mr. Jose Luis Barrios Ramos, Esq.
17
    For Mapfre PRAICO
18  Insurance Company:        Mr. Jose Sanchez Girona, Esq.

19  For Quest:                Mr. Brett Fallon, PHV
                              Ms. Mariani Munoz Lara, Esq.
20
    Also present:
21
        Honorable Bankruptcy Judge J. Barbara Houser, Mediation
22          Team Leader

23

24
    Proceedings recorded by stenography.  Transcript produced by
25  CAT.
```

```
 1                        I N D E X

 2   WITNESSES:                                   PAGE

 3        The Declarations of Christina Pullo
            submitted into evidence               200
 4

 5
     EXHIBITS:                                     PAGE
 6
          Debtors' Exhibits 138, 139, 140 and 141   200
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                   San Juan, Puerto Rico

 2                                   November 8, 2021

 3                                   At or about 9:30 AM

 4                          *     *     *

 5          THE COURT:  Good morning.  Would the courtroom deputy

 6  please call the case?

 7          COURTROOM DEPUTY:  Absolutely, Your Honor.  Good

 8  morning.

 9          The United States District Court for the District of

10  Puerto Rico is now in session.  The Honorable Judge Laura

11  Taylor Swain presiding.  Also present in court, the Honorable

12  Magistrate Judge Judith Gail Dein.  God save the United States

13  of America and this Honorable Court.

14          In re: The Financial Oversight and Management Board

15  for Puerto Rico as representative of the Commonwealth of

16  Puerto Rico, et al., PROMESA Title III, Case Nos.

17  2017-BK-3283, 2017-BK-3566, and 2019-BK-5523 for Confirmation

18  Hearing.

19          THE COURT:  Thank you, Ms. Tacoronte.

20          Buenos dias.  Would all of the participants please

21  turn your cameras on for these introductory remarks and

22  instructions, and keep your microphones muted.

23          Welcome Counsel, parties in interest, and members of

24  the public, and press.  Today is the beginning of the

25  Confirmation Hearing for the proposed Eighth Amended Plan of
```

1   Adjustment, proposed Modified Eighth Amended Plan of

2   Adjustment for the Commonwealth of Puerto Rico, the Employees

3   Retirement System of the Government of the Commonwealth of

4   Puerto Rico, and the Puerto Rico Public Buildings Authority.

5       The Court has allotted a little over six hours for

6   the presentation of opening arguments by the Financial

7   Oversight and Management Board, several parties, and groups of

8   creditors that support the Plan of Adjustment, and parties or

9   groups of parties who have objected to the Plan of Adjustment.

10      To ensure the orderly operation of today's virtual

11  hearing, once we turn to our Agenda items, all parties

12  appearing by Zoom must mute their microphones when they are

13  not speaking, and turn off their video cameras if they are not

14  directly involved in the presentation or argument.  When you

15  need to speak, turn your camera on, and unmute your microphone

16  on the Zoom screen.

17      I remind everyone that, consistent with court and

18  judicial conference policies and the orders that have been

19  issued, no recording or retransmission of the hearing is

20  permitted by anyone, including but not limited to the parties,

21  members of the public, and members of the press.  Violations

22  of this rule may be punished with sanctions.

23      I will be calling on each speaker during the course

24  of the hearing.  When I do, please turn your camera on, unmute

25  yourself, and identify yourself by name for clarity of the

1    record.

2         If you wish to be heard when I invite speakers not

3    specifically listed on the Agenda to respond or make remarks,

4    please turn your camera on, and use the "raise hand" feature,

5    which is found at the bottom of your screen, at the

6    appropriate time.  The "raise hand" feature is in the

7    reactions icon in the tool bar at the bottom of the screen.  I

8    will then call on the speakers with hands raised one by one.

9    After you have finished speaking, you should select the "lower

10   hand" feature on the tool bar.

11        Please don't interrupt each other or me during this

12   hearing.  If we interrupt each other, it is difficult to

13   create an accurate transcript, but having said that, I

14   apologize in advance as usual for breaking this rule, because

15   I may interrupt if I have questions, or if I need to do so to

16   manage the hearing effectively.  If anyone has any trouble

17   hearing me or another participant, please use the "raise hand"

18   feature to let us know.

19        The Oversight Board has filed an informative motion

20   providing the sequence of speakers, and an allocation of

21   speaking times for the opening arguments.  That document was

22   filed as Docket Entry No. 19098 in Case No. 17-3283.  It is

23   available to the public at no cost on Prime Clerk for those

24   interested.

25        I encourage each speaker to keep track of his or her

1   own time for opening arguments.  The Court will also be

2   keeping track of the time allocations, and will alert each

3   speaker when there are two minutes remaining with one beep

4   and, when time is up, with two beeps.

5           Here is an example of that beeping sound.

6           (Sound played.)

7           THE COURT:  If your allocation is two minutes or

8   less, you'll just hear the final two beeps.

9           This morning's session will go until 12:50 PM

10  Atlantic Standard Time, which is 11:50 AM Eastern Standard

11  Time, and people in other time zones can figure out their own

12  time.  There will be a ten-minute break at about 11:15

13  Atlantic Standard Time, which is 10:15 Eastern Standard Time.

14  Then for the afternoon, we'll resume from 2:10 PM to 5:00 PM,

15  which is 1:10 to 4:00 PM Eastern Time, with a ten-minute break

16  at about 3:30, which is 2:30 PM Eastern Time.

17          I am very pleased to be presiding from the courthouse

18  in Hato Rey in San Juan.  Please turn off your cameras now,

19  and turn your camera back on when we reach you on the speaker

20  sequence, or if I call on you.

21          Thank you.  Before we begin the opening arguments, I

22  am calling on counsel for the Oversight Board.  I see that

23  Mr. Bienenstock is at a podium, and I would ask for an update

24  on the status of the Plan and our proceedings this morning

25  since the pretrial conference a week ago.

1          Good morning, Mr. Bienenstock.  Mr. Bienenstock,

2     you're muted.  You still seem to be muted.

3          MR. BIENENSTOCK:  Your Honor, can you hear me now?

4          THE COURT:  Yes, I can hear you now.  Thank you.

5          MR. BIENENSTOCK:  Good morning.

6          If it's okay, my partner, Brian Rosen, will give the

7     up-to-the-second current status.

8          THE COURT:  Very good.  Thank you.

9          MR. ROSEN:  Good morning, Your Honor.  Brian Rosen,

10    from Proskauer Rose, on behalf of the Oversight Board.

11         Your Honor, I appreciate your recognition early in

12    your remarks about the modified Eighth Amended Plan, and I'll

13    take the heat right now, because as everyone here knows, I

14    just couldn't mentally accept that it was going to be a Ninth

15    Amended Plan, so I referred to it as the Modified Eighth

16    Amended Plan.

17         We filed those modifications yesterday evening, Your

18    Honor, together with a complete version of the modified plan,

19    and a blackline to reflect the minor changes, which we

20    characterize, Your Honor, as technical in nature.  There was

21    one note, Your Honor, that we had worked out with the

22    Creditors Committee, to reflect that the GDB/PET claim would

23    not be included in the General Unsecured class.  This was

24    consistent with the agreement that we had reached with the

25    Creditors Committee way back when, Your Honor.  So we just

1   wanted the Plan to reflect that, and we created that class of

2   58A.

3         There also was a modification, Your Honor, with

4   respect to the formula for calculating the monies which are to

5   be deposited into the Pension Reserve Trust.  This was

6   something that we had been working on with the government, and

7   we hope -- we still have not received finalization of that,

8   but we hope and we pray that that is, in fact, the agreement

9   that has been reached with the government.

10        Your Honor, we also filed on Friday evening, as the

11  Court knows, an urgent motion with respect to the changing of

12  the votes of the DRA parties from rejections to acceptances.

13  Your Honor had entered an order saying that responses to that

14  were due on Sunday at noon Atlantic Standard Time.  When we

15  did not see anything reflected on the docket, Your Honor, the

16  Oversight Board filed a certificate of no objection to that.

17  And at this point in time, Your Honor, we do not -- we have

18  not seen on the docket the entry of an order authorizing or

19  approving that urgent motion.

20        But nevertheless, Your Honor, we filed with the Court

21  last evening a supplemental declaration of Christina Pullo,

22  who is the tabulating agent from Prime Clerk, and that

23  reflected several things, one of which was the hope for change

24  of the vote from rejections to acceptances at PBA, and the two

25  classes also at the Commonwealth, as well as the recognition,

1    based upon the enactment of Act 53, that several of the

2    classes that were previously noted as impaired in the employee

3    related classes, which Your Honor knows is Class 51, they are

4    now reflected as unimpaired based upon the elimination of the

5    freeze for certain of them and -- excuse me, the

6    implementation of the freeze and the elimination of the

7    cost-of-living adjustments.

8            So with that, Your Honor, we also then filed a

9    revised confirmation order, which reflected what we hope are

10   further understandings that we have reached with certain

11   parties to remove any remaining objections to confirmation of

12   the Plan.

13           So with that, Your Honor, I think that is

14   up-to-date.

15           THE COURT:  I just would ask you to go over again

16   your remark about Class 50 and Class 51.  Did you say that

17   with the implementation of the freeze, and the limitation of

18   cost-of-living adjustments, they are now unimpaired?

19           MR. ROSEN:  Your Honor, many of those classes which

20   were listed in Class 51 already had a cost-of-living

21   adjustment removed from their benefits years and years ago, so

22   the elimination of the cost-of-living adjustments now does not

23   affect their claims.  So, therefore, they are rendered

24   unimpaired.

25           THE COURT:  Thank you for that clarification.

```
1              MR. ROSEN:  Yes, Your Honor.
2              THE COURT:  Is there any change to the previously
3    announced speaker lineup for opening arguments?
4              MR. ROSEN:  Well, Your Honor, based upon the support
5    of the Plan by the DRA parties, I would assume that the two
6    speakers for the DRA parties who were listed to receive, I
7    think, 35 and 28 minutes respectively, one for the Collateral
8    Monitor and the other for the Servicer, will no longer be on
9    that side of the table, Your Honor.  I assume, therefore, they
10   will be stating something very briefly in support of the Plan.
11             As the Court may know, they did file this morning a
12   removal, or notice of a removal of all of the pleadings that
13   they had filed previously in opposition to the Plan.
14             THE COURT:  Yes.  They did file that withdrawal this
15   morning.  Then one other party, PFZ Properties, declined its
16   opportunity to open, and so I will not be calling on PFZ
17   parties.
18             Okay.  There is a hand raised.  There are two hands
19   raised for the DRA interests.  So first, for Cantor-Katz,
20   would you speak, the person representing Cantor-Katz?
21             MR. MINTZ:  Good morning, Your Honor.  Doug Mintz
22   from Schulte Roth for Cantor-Katz, one of the DRA parties.
23             Can you hear me, Your Honor?
24             THE COURT:  Yes.  Good morning, Mr. Mintz.
25             MR. MINTZ:  Good morning, Your Honor.  Thank you.
```

1          Yes, I can confirm that, as Mr. Rosen stated, that

2    Cantor-Katz will not be speaking in opposition based on what

3    was filed late Friday.  We had asked for, I think, eight

4    minutes for Cantor-Katz, and I think Mr. Garcia had requested

5    some additional time as well to speak on the supporting side,

6    presumably at the end of the long list of the --

7          THE COURT:  So what you want to do is speak for eight

8    minutes at the end of the supporters?

9          MR. MINTZ:  At any point among the supporters, yes,

10   Your Honor.

11         THE COURT:  Mr. Garcia or Mr. Zouairabani also wanted

12   to speak?  Did you say that?

13         MR. GARCIA SOLA:  Yes, Your Honor.  Arturo Garcia on

14   behalf of the DRA Servicer.  That's correct, Your Honor.  We

15   wanted to speak in support of the Plan.  We asked for two

16   minutes, so I am assuming that that would be towards the end

17   of the other speakers.

18         THE COURT:  I will put you at the end of the other

19   speakers, and then the opposing parties, when we get to that

20   stage, we'll begin with Mr. Hein, because that is the order of

21   speakers that I have.

22         Thank you for bringing me up-to-date on those

23   matters.

24         MR. MINTZ:  Thank you, Your Honor.

25         THE COURT:  So, let's see, that's the end of the

1    hands raised, and so with that, I will turn to the Oversight

2    Board for its opening statement.  We have allotted 120 minutes

3    on the clock in total for Messrs. Bienenstock and Rosen.

4              Mr. Rosen, you are still muted.

5              MR. ROSEN:  Your Honor.

6              THE COURT:  Good morning.  I can hear you now.

7              Actually, I could a minute ago.  I can't hear you

8    now, so hang on again.

9              MR. ROSEN:  Your Honor.

10             THE COURT:  Yes.  Now I can hear you.

11             MR. ROSEN:  Before I cede the podium back to

12   Mr. Bienenstock, I just want to say that I was handed a note

13   that the Order was just entered on the docket with respect to

14   the 3018 changing of the ballot.  So thank you very much, Your

15   Honor.

16             THE COURT:  Thank you.

17             Good morning, Mr. Bienenstock.

18             MR. BIENENSTOCK:  Good morning, Judge Swain.  My name

19   is Martin Bienenstock of Proskauer Rose, LLP, attorneys for

20   the Financial Oversight and Management Board for Puerto Rico,

21   as the Title III representative of the Commonwealth, PBA, and

22   ERS, as Title III debtors.

23             The Board is proud and grateful this morning for the

24   opportunity to ask the Court to confirm its proposed Modified

25   Eighth Amended Joint Title III Plan of Adjustment for the

1    three Title III debtors, and as the Board's attorneys, we are

2    honored and grateful to be able to request confirmation of the

3    Board's Plan.

4         Your Honor, the proposed Plan accomplishes much.  For

5    starters, we'll prove in connection with feasibility that debt

6    is reduced from approximately 30.5 billion to 7.4 billion.

7    That can be found in Mr. Malhotra's declaration at paragraph

8    31.  Annual debt service funded by the Commonwealth for

9    itself, HTA, PRIFA, and CCDA is reduced to an average of 666

10   million dollars per year -- again, Mr. Malhotra's declaration

11   at paragraph 31 -- from 2.1 billion per year to -- from 2.1

12   billion per year, and that's in paragraph 30.

13        As shown by Exhibit A of Christina Pullo's voting

14   declaration of last night, 57 of 71 classes accepted or are

15   deemed to accept the Plan, because their claims are not

16   impaired.  Of the 14 rejected classes, two are deemed to

17   reject because they received no distributions, because they

18   are either subordinated or are appropriation claims and do not

19   have rights to payment because their debt specifies they are

20   only payable if appropriations are made.  Seven are pension

21   claims, largely due to impairment by the freeze and the COLA

22   elimination.  The other five are comprised of the three

23   classes of General Unsecured claims at the Commonwealth, ERS,

24   and PBA, and the dairy producer claims, and the eminent domain

25   claims.

1     Despite the benefits to the debtors I've already

2    mentioned, and many more in the Plan that I will note soon,

3    the Board wishes the Plan could allow more to be done for the

4    people and higher payments to creditors, but the Plan is

5    dictated by what is necessary to carry out the statutory

6    missions assigned to the Board by Congress, fiscal

7    responsibility, and market access.  And the Plan must be and

8    is based on the facts on the ground.

9     For instance, Section 4.5 at page 41 of the Board's

10   Fiscal Plan certified April 23, 2021, reports that population

11   has been steadily declining from outmigration and because

12   deaths have exceeded births.  By 2026, the population is

13   projected to be 2.764 million, ten percent less than in 2019,

14   and 33 percent less in 2051, absent more turnaround steps.

15   Currently, the population is 2.928 million.

16     The Board certainly hopes the aftermath of the debt

17   restructuring will be material new investments in Puerto Rico

18   that turbocharge the economy, as was the case in Detroit and

19   other Chapter Nine municipalities.  If Puerto Rico becomes

20   more of a land of opportunity, trends can change in a hurry,

21   and very much for the better.  While the Board could not

22   prudently assume that will be the case for purposes of issuing

23   more hard debt under the Plan, the Contingent Value

24   Instruments distributed by the Plan divide between the people

25   and the creditors the up-side everyone hopes will occur.

1          Because of the confirmation objections, I'll be

2    spending some more time discussing pension issues raised on

3    behalf of retirees and active workers, but at the outset, with

4    one simple example, I want to provide the Court and parties

5    with a sense of the competing concerns the Board confronted

6    and resolves in the Plan.  If the Board were asked whether

7    governmental retirees in the Commonwealth are each entitled to

8    pensions providing for dignified retirements and fulfillment

9    of the promises made to them, the answer would be, of course;

10   but the Board was confronted with virtually zero funded

11   pension plans.  That required the shift to PayGo, under which

12   pensions are paid out of current revenues in the absence of

13   pension funding.  That meant the current taxpayers who pay the

14   current revenues must put away money for their own pensions in

15   the form of defined contributions from their salaries, while

16   also paying taxes to provide pensions for prior generations of

17   retirees.  How much of a burden can you put on current

18   government workers and other taxpayers to provide for their

19   own pensions and other people's pensions?  Clearly, that makes

20   the calculus much more complex and difficult.

21          As the Court will no doubt recall, these cases

22   started with multiple litigations requesting the Court, for

23   instance, to enjoin the Board from proposing a Plan of

24   Adjustment based on its fiscal plan and variations on that

25   theme.  Soon afterwards, some in government declared PROMESA

1    confirmed their worst fears, namely, the litigation.  Quite

2    possibly, what confirmed their worst fears was not PROMESA, it

3    was a law of nature.  Namely, that when the resources

4    available are materially less than required to pay all claims

5    substantially in full, creditors fight the debtors and each

6    other over who gets the limited resources.

7            That was certainly true here, compounded by

8    hurricanes, earthquakes, and COVID, each of which triggered

9    pauses for the resource envelope to be recomputed.  Not

10   surprisingly, the Commonwealth, from overwhelming financial --

11   I'm sorry.  Not surprisingly, the litigation lead to progress.

12   Much of it, such as the ERS litigation, freed the Commonwealth

13   from overwhelming financial obligations easily exceeding three

14   billion dollars, without counting the billions more and

15   respective other instrumentalities.  In that sense, the

16   litigation produced far more value to Puerto Rico than it

17   costs.  The Court's decisions the last four years narrowed the

18   uncertainty sufficiently to enable the debtors and creditors

19   to coalesce on the instant proposed Plan of Adjustment

20   overwhelmingly agreed to by creditors.

21           Your Honor, in conventional Chapter 11 reorganization

22   plans, covenants restricting the debtors' actions are normally

23   negotiated for by creditors.  Here, while creditors may have

24   desired some covenants, the Board's missions of fiscal

25   responsibility and market access had a material impact on the

1  covenants.

2           For example, it provides for funding future payments

3  and debt management policies, because the Board believes they

4  are necessary to carry out the mission Congress assigned to

5  it.  Section 74.5 of the Plan imposes requirements such as

6  allowing long-term debt only for capital investments, and

7  requiring it to be amortized.

8           Article 83 of the Plan requires a pension reserve

9  trust to be funded over time to ensure retirees get their

10  pensions, especially if the government starts running deficits

11  in later years, as the fiscal plan contemplates starting 2035

12  if further measures are not implemented.

13           Mr. Gaurav Malhotra, principal of Ernst & Young, and

14  as head of U.S. restructuring practice, opines the Plan is not

15  likely to be followed by further restructuring not

16  contemplated in the Plan in his declaration at page 29.  Among

17  the reasons Mr. Malhotra gives for opining the Plan is

18  feasible are both the additional measures in the Andrew

19  Wolfe Declaration -- Mr. Wolfe is the Oversight Board's

20  economist.  It says, measures that the Commonwealth can

21  implement to improve results, and additional measures

22  Mr. Malhotra mentions in paragraphs 44 through 51 of his

23  declaration.

24           Notably, Mr. Malhotra also identifies downside risks

25  to the Oversight Board's projections.  In paragraph 52 of his

1    declaration, Mr. Malhotra explains the Commonwealth

2    projections will be 32 billion dollars too high, almost one

3    billion per year over the term of the Fiscal Plan, if the

4    Commonwealth fails to implement structural reforms provided by

5    the Oversight Board's Certified Fiscal Plan.

6         The Board's statutory mission also has an even more

7    basic impact on the Plan of Adjustment, namely, how much cash

8    is available for creditors.  Adam Chepenik is a principal at

9    Ernst & Young who previously worked on PROMESA in the United

10   States Treasury Department as the inaugural deputy director of

11   the Office of State and Local Finance.  His declaration

12   explains what the Board did to identify the Commonwealth's

13   cash, how it dissected the so-called restricted cash to

14   isolate the cash that was truly restricted and unavailable

15   legally to pay creditor claims, and how it determined whether

16   the Budget Stabilization Fund, the Disaster Aid Revolving

17   Fund, and the Emergency Reserve, all which are in the Plan to

18   protect the Commonwealth, were reasonably sized.

19        At paragraph eight, Mr. Chepenik shows the need for

20   reform.  The Commonwealth have formally deferred paying

21   payables, prematurely liquidated pension assets, deferred

22   disbursing budgetary outlays and the like as one-time measures

23   to control cash.  Based on best practices, Mr. Chepenik

24   recommends the Commonwealth maintain a Budget Stabilization

25   Fund between 1.2 and 1.7 billion, a Disaster Revolving Fund of

1   750 million, and build an Emergency Reserve Fund up to 1.3

2   billion dollars.

3        The Plan and related actions benefited from the

4   expertise of Board members.  For example, it is no accident

5   that Dr. Betty Rosa is on the Board, and Act 53 specifies the

6   funding for the University of Puerto Rico, the extra funding

7   in Act 53 must be used to enhance the student experience.  She

8   is on the Commission of Education and president of the

9   University of the State of New York.

10       Similarly, the pension provisions benefited from the

11  experiences and expertise of Andrew Biggs and John Nixon.

12  Mr. Biggs is a senior fellow of the American Enterprise

13  Institute specializing in pensions, and Mr. Nixon was the

14  budget director of the State of Utah.

15       The debt restructuring provisions obviously benefited

16  from Professors Gonzalez and Skeel, who are well-known as two

17  of the greatest bankruptcy minds in the country.  It's been a

18  privilege for Proskauer to take full advantage of their brains

19  throughout the cases.

20       Certain Plan provisions, such as tax and bonds at

21  higher interest rates for island residents who do not pay

22  federal taxes, take into account the unique circumstances and

23  tax status of island residents.  And Antonio Medina, and Jose

24  Carrion before him, constantly advised the Board of island

25  conditions and needs.

1    Mr. Medina, who earned an M.B.A. from Wharton, has

2 held many positions for the public good in Puerto Rico, such

3 as serving as the executive director of the Puerto Rico

4 Industrial Development Company, PRIDCO.  He's also held many

5 board of director positions.  Mr. Medina's predecessor was

6 Jose Carrion, a businessman in Puerto Rico who always put the

7 public interest first.

8    Similarly, the underlying fiscal plans could likely

9 not have been accomplished without the Board's executive

10 director, Natalie Jaresko, and former Board member, Ana

11 Matosantos.  Ms. Jaresko's education includes a Master's from

12 Harvard's Kennedy School of Government.  And she served as the

13 Minister of Finance of the Ukraine, and guided it through its

14 own restructuring.

15    Ms. Jaresko's declaration for this Confirmation

16 Hearing is quite comprehensive.  That is because she has

17 indefatigably worked as close as a human can work to 24/7,

18 while minding every facet of the Board's activities.

19    Ms. Matosantos is currently a cabinet secretary for

20 the State of California, and, with Ms. Jaresko, created the

21 Board's initial fiscal plan, and budget processes and

22 procedures designed to restore fiscal responsibility.  This

23 included the basics of launching a cash investigation that

24 turned up 800 unknown bank accounts, holding approximately 6.9

25 billion dollars, as set forth in Ms. Jaresko's declaration at

1   paragraph 16.

2          The island finances would have taken far longer to

3   understand and reform without the expertise of Jose Ramon

4   Gonzalez and Carlos Garcia, both of whom had led the

5   Government Development Bank.  Mr. Gonzalez is president of the

6   Federal Home Loan Bank of New York.

7          Since coming on board, Justin Peterson provided

8   invaluable insights into government and creditor concerns.  He

9   is the managing partner of DCI Group, and is specialized in

10  energy, environmental, governmental relations.

11         Your Honor, the restructuring issues in the proposed

12  Plan of Adjustment are, in part, unique to PROMESA and, in

13  part, drawn from conventional Chapter 11 issues.  I'm going to

14  focus mostly on the unique issues, the connection between

15  Titles I and II and Title III impacted settlements, which are

16  all critical to the proposed Plan.

17         As explained in paragraphs 34 and 35 of Chairman

18  Skeel's declaration, even though the Oversight Board believed

19  its likelihood of success against the GO priority and the

20  appropriation statutes was greater than 50 percent, a loss

21  would have been catastrophic.  It would have tied up so much

22  revenue that the Board would have been unable to create a

23  sustainable economy with market access.

24         Mr. Steven Zelin, partner and global head of the

25  restructuring and special situations group at PJT explains in

1   his declaration that the outcomes of the negotiations were at

2   arm's length and reasonable from a business perspective.

3          The best interest of creditors test in Chapter 11,

4   creditors must receive at least what they would receive in

5   Chapter 7.  In Title III, the test is not written as the test

6   for every creditor.  PROMESA Section 314(b)(6) speaks in terms

7   of the aggregate paid to creditors under the Plan, as opposed

8   to what they would receive if they enforce their claims

9   outside Title III, and the Court is only asked to consider

10  what creditors would receive.  There is no litmus test.

11         Ojas Shah's declaration opines his analysis shows the

12  Plan provides as much or more aggregate creditor recovery than

13  recoveries would be outside Title III.  That's at his

14  declaration at pages 12 and 13.

15         Consistency between the Fiscal Plan and Plan of

16  Adjustment required by PROMESA Section 314(b)(7), Your Honor,

17  we have explained since the beginning of these cases that a

18  fiscal plan is not a plan of adjustment.  It does not provide

19  for treatment of claims, doesn't discharge claims, and it

20  doesn't extinguish liens.  The Plan of Adjustment does those

21  things.  Thus, 314(b)(7) essentially asks the Court to

22  determine that an apple is consistent with an orange.

23         So, what does consistency mean?  We submit, Your

24  Honor, it means does the Fiscal Plan allow for plan

25  obligations, starting with the debt sustainability analysis in

1    the Fiscal Plan.  Gaurav Malhotra's and Marti Murray's

2    declarations speak to it.  The Malhotra Declaration, at

3    paragraphs 55 to 61, shows the Plan is not inconsistent with

4    the Fiscal Plan's debt sustainability analysis.

5         Juan Santambrogio, managing director and

6    restructuring advisory services practice at Ernst & Young,

7    opines at paragraph 34 of his declaration that the AFSCME

8    settlement with the Commonwealth is consistent with the Fiscal

9    Plan.

10        I want to mention something about the timing of the

11   new fiscal plan and budget.  The current fiscal plan that's

12   certified was certified April 23, 2021.  It does not provide

13   explicitly for payment of the obligations under the Plan, and

14   will not do so, will not be amended unless and until the Court

15   confirms the Plan.  But the new certified Plan, if the Plan of

16   Adjustment is confirmed, will be done after the Court enters a

17   confirmation order and before its effective date, so a budget

18   can be done allowing for payments under the Plan.  The

19   consistency test in 314(b)(7) already shows, however, that the

20   Fiscal Plan has the elbow room, the debt sustainability

21   analysis, et cetera, to make all obligations timely that are

22   required by the proposed Plan of Adjustment.

23        Another unique feature of PROMESA in these Title III

24   cases is the prominence of preemption, the application of

25   preemption to the Puerto Rico Constitution, the application of

1   preemption to appropriation statutes, the application of

2   preemption to statutes creating pension obligations.  Gaurav

3   Malhotra estimates the impact in 2022 alone of the statutes

4   that we submit are preempted by PROMESA would cost the

5   Commonwealth 5.8 billion dollars, at his declaration at

6   paragraph 62.

7          As Mr. Malhotra explains at paragraph 66 of his

8   declaration, the certified budget for the Commonwealth was

9   13.6 billion for fiscal year 2022.  So if 5.8 billion is

10  preappropriated by these statutes, the Oversight Board would

11  be unable to control approximately 43 percent of its budget,

12  excluding federal funds.

13         Consequences of potential outcomes of GO bond

14  priority, as Mr. Skeel explains in his affidavit -- his

15  declaration, the Board had to take into account that if it

16  lost any of those battles on GO priority or the appropriation

17  statutes, it simply wouldn't have the money to create and

18  restore fiscal responsibility and market access.  The need for

19  a settlement was acute.

20         There's another issue in these PROMESA Title III

21  cases that is not at all unique, except in one aspect, and

22  that is that issue is raised, and I'm talking about the

23  Contracts Clause of the United States Constitution.  Going

24  back, Your Honor, to Alexander Hamilton, after the

25  Revolutionary War and the convening of the convention to draft

1   the United States Constitution, some states were repudiating

2   debt they issued to raise money to fight the war.  Alexander

3   Hamilton determined that the United States and each one of

4   them would have no credit if they developed a reputation for

5   issuing debt and then repudiating it.  And that is the very

6   simple reason why the Contracts Clause in the United States

7   Constitution, and in the states' constitutions, and in Puerto

8   Rico's Constitution all provide that the states and/or

9   territory shall not enact legislation impairing contractual

10  obligations.  That was a power given to the Federal Government

11  in the Bankruptcy Clause in Article I, Section 8, Clause 4 of

12  the Constitution.

13        I went through that short U.S. history, because in

14  Chapter 11, and in Chapter 9, no one even suggests that state

15  constitutions and other state laws requiring payment of debt

16  are enforceable.  Every jurisdiction we know of has laws,

17  whether in their jurisprudence or their statutes or their

18  constitutions, requiring that all valid debt be paid in full.

19  If that debt were enforceable in a restructuring proceeding,

20  there would be nothing to restructure.  That is the classic,

21  obvious preemption of federal law over state or territory law.

22  Nevertheless, the objections that are still pending to this

23  proposed confirmation rely heavily on the enforceability of

24  the Contracts Clause in the U.S. and the Puerto Rico

25  Constitution.

1    In Mr. Hein's objections, which are plentiful, there

2    is some agreement between Mr. Hein and the Oversight Board.

3    The Oversight Board, for instance, agrees the Plan does not

4    impact COFINA bonds, and, as Mr. Rosen will explain, there are

5    no third-party releases in the Plan.  There are exculpations

6    for acts in connection with the Title III cases.

7    Mr. Rosen will also explain that the extra fees

8    Mr. Hein claims are not for the debt claims; they are for

9    things like locking up the debt, and making it subject to the

10   Plan of Adjustment.

11   Mr. Hein contends the Oversight Board must prove its

12   fiscal plan projections are correct.  First, that is not what

13   Section 314(b)(7) says.  It says the Title III plan must be

14   consistent with the fiscal plan, not that the Court must agree

15   with the fiscal plan.  Second, Section 106(e) of PROMESA bars

16   Mr. Hein's effort to litigate the fiscal plan.

17   Mr. Hein claims he is entitled to the General

18   Obligation Bond priority in the Puerto Rico Constitution.

19   I've already explained why preemption makes that wrong.

20   In addition, Your Honor, Bankruptcy Code Section

21   944(a)(3) provides Mr. Hein is bound by the Plan, despite his

22   rejection, despite his not having accepted it.  His class

23   accepted the settlement of the GO priority embedded in the GO

24   classes' treatments.

25   Mr. Hein contends Section 314(b)(3) of PROMESA means

1    the Oversight Board must prove the debtors are not prohibited

2    by law from taking any action necessary to carry out the Plan.

3    Mr. Hein is actually complaining about payment of less than in

4    full.  No debt could ever be restructured if laws providing

5    for its payment were not preempted.  Again, this is a

6    Contracts Clause argument when the Contracts Clause basically

7    only means the territory laws can't be fulfilled, but doesn't

8    mean that those laws are not preempted and rendered

9    unenforceable by the bankruptcy law.

10           Mr. Hein complains the fiscal plan does not respect

11   his bonds' priorities and lawful liens.  First of all, the

12   fiscal plan is not a plan of adjustment, as I mentioned

13   earlier.  It does not discharge claims, pay claims, or

14   extinguish liens.  As a practical matter, the fiscal plan did

15   reduce expenses and did clawback the money that would

16   otherwise have gone to instrumentalities, thereby, in the

17   Oversight Board's view, respecting liens and priorities, but

18   that is not the subject of this Confirmation Hearing.

19           Mr. Hein claims his claims or property right's barred

20   from release by the Fifth Amendment Takings Clause.  Again,

21   Bankruptcy Code Section 944(a)(3) binds him to the Plan, and

22   the cases he cites are outside bankruptcy based once again on

23   enforcing the Contracts Clause outside bankruptcy.

24           So, to be clear, if Puerto Rico, outside Title III,

25   were to restructure Mr. Hein's claims as they are structured

1   in the Plan of Adjustment, Mr. Hein would have a good

2   objection under the Contracts Clause.  In this Title III case,

3   he simply does not.

4        And then he raises due process, and the ex post facto

5   clauses in the United States and Puerto Rico Constitutions,

6   and says they bar the release of his claims.  He's getting due

7   process right here.  He's had it throughout the case.  The ex

8   post facto clauses he refers to refer to what are really

9   retroactive criminal laws, which are not at issue here.  And

10  the failure to release claims does not mean they get paid.

11       Mr. Hein also raises another argument.  He insists

12  that the GO priority be litigated to the death in an adversary

13  proceeding.  There is no authority for such a rule that

14  litigation must trump settlement, and it doesn't, for obvious

15  reasons.  And we submit that the settlements in the Plan are

16  definitely above the lowest level of the zone of

17  reasonableness, and should be approved.

18       Mr. Hein also raises the Uniformity Clause as an

19  objection to confirmation.  In a lengthy objection, and after

20  four and a half years, Mr. Hein devotes a page to telling this

21  Court and all the parties that all the work they've done

22  should be thrown out because of the Uniformity Clause, which

23  he barely spells out in his -- one page in his objection.

24       Fortunately -- I never thought I'd say this, but

25  fortunately, Ambac raised that issue, and it caused the issue

1   to be fully briefed on both sides.  And we know the Court is

2   well familiar with it, and suffice it to say for now that for

3   all the reasons we said previously in connection with Ambac's

4   adversary proceeding, we believe the Uniformity Clause does

5   not come close to applying here.

6         Now, I'd like to address the objection of the -- I

7   apologize for the pronunciation, but the Asociación de

8   Maestros de Puerto Rico, which I'll refer to as AMPR.  They

9   basically object to the freeze.

10        As shown by Sheva Levy's declaration, at paragraph

11  54(b), the estimated impact of the freeze is 5.6 billion

12  dollars from fiscal year 2022 to 2051.  Ms. Levy is a

13  principal of Ernst & Young, an enrolled actuary, and has been

14  with Ernst & Young for nearly 23 years.

15        AMPR relies on the Puerto Rico Supreme Court's

16  decision in *Teachers' Association of Puerto Rico v. The Puerto*

17  *Rico Teachers' Retirement System*, decided April 11, 2014.  The

18  key thing about that decision is that in its third paragraph,

19  it provides "on the grounds set forth below, we hold that

20  under the constitutional clause that bars the impairment of

21  contractual obligations, P.R. Const. art. II, § 7, L.P.R.A.

22  vol. 1, Act No. 160 of 2013 is unreasonable and, consequently,

23  any part of said statute that alters plaintiffs-petitioner's

24  contractual rights to their retirement pensions is

25  unconstitutional pursuant to Act No. 91 of 2004 (18 L.P.R.A.

1   § 391 *et seq.*)."

2   So, Your Honor, there you have it.  Their entire

3   authority is based on the application of the Contracts Clause,

4   which, I've probably said too much, doesn't apply here,

5   because we're not enforcing territory law or state law.  We're

6   enforcing federal law, which is the one law that can impair

7   contractual obligations consistent with everyone's

8   constitution, the United States and Puerto Rico's.

9   AMPR contends its statutory right to defined benefits

10   cannot be rejected like a contract.  This Court's decision

11   dated October 29, 2021, in respect of the DRA parties' claims,

12   provides at pages 19 to 20 that the DRA parties "presented no

13   basis for differentiating obligations arising out of statutes

14   from obligations arising out of nonexecutory contracts."

15   Well, Your Honor, neither has AMPR.  There is simply no basis

16   to say that, because the defined benefit is in a statute and

17   not a contract, that it is not a claim restructurable by

18   PROMESA and Title III.

19   AMPR also contends its members' statutory right to

20   defined benefits are not subject to preemption.  Its first

21   argument against preemption is that imposing the freeze would

22   be contrary to the Puerto Rico Supreme Court's decision I

23   mentioned earlier.  That decision is not a bar for the reasons

24   I mentioned.

25   AMPR asks what it gets for its damage claim resulting

1  from the freeze, and contends its damage claim would be an

2  administrative expense.  AMPR's members, however, are getting

3  the accrual of defined benefits of Act 106 through the

4  effective date of this proposed Plan.  After that date, the

5  Act 106 claim is just a general unsecured claim.

6       The employees know if they work past the effective

7  date of this Plan, it's not for any further accruing defined

8  benefit.  That it was enacted post petition does not mean it

9  was not preempted by PROMESA.  Besides, AMPR's members are not

10  required to work after the effective date.  If they choose to

11  work, they are warned in advance they will not get further

12  defined benefit accruals.  Thus, they have not yet provided

13  benefit to the Commonwealth justifying administrative expense

14  beyond the accrual of defined benefits through the effective

15  date which they are being given.

16       THE COURT:  Mr. Bienenstock.

17       MR. BIENENSTOCK:  AMPR claims the Fiscal Plan does

18  not provide adequate funding for their defined benefits.  The

19  Fiscal Plan cannot be challenged, and funding of pensions can

20  only be interpreted to the funding of pensions that survive

21  the debt restructuring --

22       THE COURT:  Pardon me.

23       MR. BIENENSTOCK:  AMPR claims the Plan --

24       THE COURT:  I'm sorry.  I didn't mean to interrupt

25  you mid-sentence, but when you finish that sentence, I have a

1    question for you about AMPR.

2           MR. BIENENSTOCK:  Sure.

3           AMPR claims the Plan's not in the teachers' best

4    interest.  AMPR has not rebutted the McKinsey best interest

5    analysis.  And we'll leave the rest for the trial.

6           Your Honor, that was all I was going to say about

7    AMPR.

8           THE COURT:  Thank you.  I just have one quick

9    question for clarification about the response to AMPR's

10   administrative expense aspect of its argument.  I know that

11   you reject the proposition that the enactment of Act 106 was

12   somehow a novation that brought all pension accruals up to

13   post-petition obligations, but do you see a difference in the

14   right to a benefit accrued between the time of the enactment

15   of Act 106 and the effective date of the Plan, if confirmed,

16   to the extent people were working and accruing benefits during

17   that time, and is there any substance to an administrative

18   expense type claim that that should be treated more favorably?

19          MR. BIENENSTOCK:  Yes, Your Honor, and perhaps I

20   wasn't clear enough.  We are treating it more favorably.

21   We're freezing the benefits as of the effective date, so they

22   will get the additional accrued benefits that came into being

23   between the enactment of 106 and the effective date of the

24   Plan.

25          THE COURT:  So they'll get them in the ordinary

1  course of payments under the Plan when they're entitled to a

2  Plan benefit, as opposed to some sort of monetized

3  administrative claim dividend that would be paid as of the

4  time of the effective date of the Plan?

5          MR. BIENENSTOCK:  Yes, Your Honor.

6          This goes back to a discussion we had at a prior

7  hearing, that since these benefits are for the lifetime of the

8  employee, et cetera, you would have to guess -- to make it a

9  finite amount, you'd have to guess their longevity, so that's

10 not the way we do it.  We do it monthly, for as long as they

11 live.

12         THE COURT:  Thank you for clarifying that for me.

13         MR. BIENENSTOCK:  Your Honor, the eminent domain and

14 inverse condemnation claims' objections to confirmation we

15 think were handled totally in our reply brief, so I won't go

16 into that now.  The bottom line is we believe the Fifth

17 Amendment claims are dischargeable just like any other claim,

18 and respectfully submit that the Detroit Bankruptcy Court

19 decision was erroneously decided on that issue.

20         As I mentioned earlier, we don't intend for there to

21 be third-party nondebtor releases.  We are not asking that

22 third-party defendants, in the various Underwriter actions and

23 other actions, lose their defenses as a result of the

24 discharge, and will make any clarifications necessary.

25         My partner, Brian Rosen, will speak to the PSAs and

1   related issues, unless the Court has any further questions for

2   me.

3          THE COURT:  Thank you, Mr. Bienenstock.

4          MR. BIENENSTOCK:  Thank you.

5          THE COURT:  Good morning again, Mr. Rosen.

6          MR. ROSEN:  Good morning again, Your Honor.  Brian

7   Rosen, from Proskauer Rose, on behalf of the Oversight Board.

8          Your Honor, before I get to the business at hand and

9   detail the proposed calendar and some of the processes that we

10  hope to follow over the next week, I'd like to tell you a

11  short story about how we got from way back when, in 2019, to

12  where we are now, and the tale of two master builders, Judges

13  Houser and Colton.  And while the specifics, Your Honor, of

14  the story are set forth in certain of the declarations of

15  direct testimony that have been submitted, I'd like to preview

16  those for you, and put it into my own words, if I may.

17         Your Honor, when I stood before you in January of

18  2019 in connection with the COFINA Confirmation Hearing, we

19  all knew that eventually our attention would be drawn to the

20  Plan of Adjustment for the remaining Title III debtors, but I

21  didn't know how quickly that would be.  And in the category of

22  "there is no rest for the weary," Your Honor, Judges Houser

23  and Colton of the mediation team said, enjoy the weekend and

24  let's get back to it on Monday.

25         After many long sessions guided by the mediation

1    team, in May of 2019, a scant three months after the COFINA

2    effective date, the Oversight Board entered into a Plan

3    Support Agreement with holders of Commonwealth, GO debt, and

4    PBA Bond indebtedness that provided the foundation for our

5    Commonwealth, ERS, and PBA Plan of Adjustment, an agreement

6    that set forth agreed upon distributions of cash and new GO

7    bonds, but it also preserved the rights and ability of

8    non-Plan Support Agreement parties, notably, the later Vintage

9    bondholders, to continue to litigate, among other actions and

10   objections, the debt-related objections, the invalidity

11   actions to their conclusion, and to receive distributions

12   based upon the results of those litigations.

13          Consistent with the obligations of that initial Plan

14   Support Agreement, the Oversight Board did two things on

15   September 27, 2019:  First, it commenced the Title III case

16   for PBA in order to create a forum to address PBA's bond

17   indebtedness and other claims; and, second, it filed the Plan

18   of Adjustment for the Commonwealth, ERS, and PBA that included

19   the respective provisions set forth in the settlement summary

20   of terms attached to that initial Plan Support Agreement.

21          I liken this first Plan Support Agreement, Your

22   Honor, and the corresponding Plan of Adjustment to digging the

23   foundation and pouring concrete for a building, because

24   although lauded as a significant step towards exiting the

25   Title III cases, it truly was just a foundation for something

1   that would ultimately be built into a high-rise.

2        Shortly afterward, in the middle of October of 2019,

3   the mediation team reconvened the parties with a goal of

4   gaining additional support of the GO-PBA Plan Support

5   Agreement.  Obviously, and as one of my partners likes to say,

6   Judges Houser and Colton were playing four-dimensional chess

7   while we were playing checkers, and there seemed to be a

8   divine plan to add additional stories to the structure being

9   built.

10        By February of 2020, and again after numerous

11  mediation sessions, a new GO Plan Support Agreement was

12  entered into which replaced the prior one, and included the

13  bondholders to the initial Plan Support Agreement, as well as

14  late Vintage bondholders, bringing a total of over eight

15  billion dollars of bond indebtedness into the fold.  With

16  subsequent joinders being executed, this amount grew to over

17  10 billion dollars of bond indebtedness.

18        And now, Your Honor, pursuant to that Plan Support

19  Agreement, the litigation that was contemplated to be

20  preserved and continued for those so inclined would be

21  compromised and settled in connection with the Plan of

22  Adjustment, that Plan of Adjustment incorporating all of these

23  agreements filed with the Court shortly there -- afterwards on

24  February 28 of 2020.

25        As the Court is well aware, the world changed in the

1    beginning of March of 2020, and like everywhere else around

2    the globe, the effects of the pandemic were felt in Puerto

3    Rico as well.  The Court will recall that at that time, and

4    although the Court had set a time frame to consider the

5    corresponding approval -- excuse me, approval of the

6    corresponding disclosure statement that had been filed by the

7    Oversight Board, in March the Oversight Board asked the Court

8    for a timeout, so it could assess the effects of the pandemic

9    upon not only the people of Puerto Rico, but also the economic

10   ramifications upon the then proposed Plan of Adjustment.

11        This process of analysis continued for over eight

12   months, and with the Court establishing a February 2021

13   deadline for reaching a further understanding, the mediation

14   team continued its construction process.  And with its

15   guidance, and through a pandemic where all mediation sessions

16   were conducted virtually, and sometimes with over 100 persons

17   on screens, a replaced Plan Support Agreement was entered

18   into, and an amended Plan of Adjustment was filed in February

19   of 2021.

20        This time, Your Honor, not only did the Plan Support

21   Agreement have all of the same holders and joinders, and

22   actually more as to the immediately prior Plan Support

23   Agreement of February 2020, but three of the monolines,

24   Assured, National, and Syncora had joined in support, thereby

25   adding another story to the building.  Indeed, due to the

1   abundance of parties that were interested in supporting the

2   Plan of Adjustment and the Plan Support Agreement, the

3   joinders' threshold was reached in less than 12 hours, and

4   many parties wishing to join were temporarily shut out.

5   I mention temporarily, Your Honor, because as the

6   Court knows, the Oversight Board subsequently extended a

7   tender and exchange program, whereby any holder, large or

8   small, institutional or individual, could voice their support

9   for the Plan Support Agreement by tendering their bonds and be

10  entitled to receive a restriction fee in consideration for

11  such support.

12  But back to the overall story, Your Honor.  Yes, the

13  inclusion of Assured and National was contingent at that time

14  with the monolines having the option to terminate their

15  support within a brief window of time.  That contingency was

16  based upon reaching an understanding with respect to

17  recoveries on the well-worn clawback claims that were the

18  focus of numerous litigations, including lift stay motions,

19  the revenue bond litigations, and even a section 926 motion.

20  The parties agreed that they would focus on

21  addressing the clawback claims in an expedited time frame, so

22  that such contingency could be removed, and the Assured and

23  National support could be cemented.  While the parties began

24  discussions to address the clawback claims, the mediation team

25  opened another line of communication between the Oversight

1  Board and the ERS bondholders.

2         As the Court is well aware, these parties had been

3  locked into a battle royale regarding the validity and

4  authorization regarding the issuance of the ERS bonds, and the

5  validity and scope of any lien or security interest of the ERS

6  bondholders.  After several trips to the First Circuit, and

7  also an effort to gain the attention of the Supreme Court, and

8  while two rounds of litigation matters remain pending before

9  this Court, those associated with an asserted administrative

10  expense claim and remaining issues regarding the scope of

11  liens and security interests, in early April of this year, the

12  parties agreed upon the terms of a compromising settlement,

13  and set forth that agreement in what has been termed the ERS

14  stipulation.

15         Besides providing for an effective date of payment of

16  monies to the bondholders, as well as a future payment

17  associated with the sale of ERS' private equity portfolio, it

18  brought closure to the ERS litigation, and the support of the

19  largest impaired class of creditors in the ERS Title III case,

20  so another level was added to the building.

21         Again, not allowing anyone to rest on a piecemeal

22  solution, Your Honor, the mediation team led the Oversight

23  Board and the Assured and National monolines back to mediation

24  in an effort to improve the contingency associated with the

25  GO-PBA Plan Support Agreement.  And in mid-May of this year,

1    the parties reached an agreement that became encompassed in

2    the HTA-CCDA related Plan Support Agreement, and what set

3    forth contingent recoveries on account of clawback claims held

4    by HTA, PRIFA, CCDA, and a small entity known as MBA.

5           As the Court knows and will certainly see from the

6    declaration testimony, like the contingent valuation that's

7    being distributed to GO-PBA creditors, holders of clawback

8    claims would receive similar types of instruments subject to a

9    detailed waterfall arrangement, which became annexed to the

10   Plan of Adjustment.  And while all prior achievements and

11   proposed compromises have been significant and incremental, in

12   comparison, Your Honor, this was a giant leap, for not only

13   did it establish the quantum of consideration to be made

14   available, but it also developed the mechanism to bring the

15   remaining monolines, Ambac and FGIC, under the tent, and so it

16   did.

17          While the terms of the HTA-CCDA Plan Support

18   Agreement became public, the mediation team, the Oversight

19   Board, and the remaining monolines were able to negotiate and

20   reach closure on recoveries for the related PRIFA clawback

21   claims against the Commonwealth, and these understandings were

22   included in the PRIFA-related Plan Support Agreement.  If the

23   Court recalls, such agreement was reached just prior to the

24   commencement of the July Disclosure Statement Hearing, which

25   was then continued for memorialization of the agreement.

1          That agreement conceptualized by the mediation team

2   does not create additional potential obligations for the

3   Commonwealth.  Rather, it looked to a second line of assets to

4   provide a realization accelerator on the already agreed upon

5   Contingent Value Instrument for payment of the clawback claims

6   for PRIFA bondholders through the collection of Rum Tax

7   revenues.

8          The piece of the puzzle was included with another

9   amended Plan of Adjustment, the Plan which became the Seventh

10  Amended Plan, and for which acceptances and rejections were

11  solicited.  It's important to note, Your Honor, that this

12  1,000 piece jigsaw puzzle also spawned the resolution of two

13  entities that were not included in the Title III cases.

14         With the agreements reached, the Oversight Board,

15  AAFAF, and creditors have been able to quickly and nimbly move

16  forward with the development and solicitation for Title VI

17  proceedings for CCDA and PRIFA, and hopefully approval of

18  those agreements at the conclusion of this confirmation

19  hearing.

20         I would be remiss, Your Honor, if I did not mention

21  the work undertaken by the Oversight Board, and the further

22  development of our structure through the Creditors Committee,

23  the Retiree Committee, and AFSCME.  Throughout these Title III

24  cases, the Creditors Committee has defended, safeguarded the

25  interest of General Unsecured Creditors.  As part thereof, the

1   Creditors Committee has worked with the Oversight Board to

2   understand the claims reconciliation process and the projected

3   magnitude of the general unsecured claims that might be

4   allowed.

5          As the Court knows, and Mr. Herriman's declaration

6   points out, over 43 trillion dollars of claims were filed

7   against the Commonwealth.  Through the claims reconciliation

8   process, the projected amount of allowed Commonwealth general

9   unsecured claims will be approximately 2.75 billion dollars.

10          Based upon the Creditors Committee's involvement and

11   understanding, the Oversight Board and the Creditors Committee

12   were able to agree upon an amount for ultimate distribution to

13   General Unsecured Creditors, and a methodology to potentially

14   increase such amount through the prosecution of certain claims

15   and causes of action in an avoidance action trust, as well as

16   a mechanism to monitor the further reconciliation of disputed

17   claims, and the settlement of larger asserted claims.

18          Likewise, Your Honor, the resolution of

19   AFSCME-related claims, and the long-term agreements reached

20   presented a significant benefit to the Commonwealth as it

21   paves the way for labor stability there.  AFSCME has stood by

22   its agreement with the Oversight Board, and has supported the

23   Plan process throughout these Title III cases.

24          In chronological order, however, the agreement that

25   the Oversight Board reached with the Retiree Committee was

1    perhaps the earliest, or close to it, Your Honor.  It provided

2    a method to address the 55 billion dollars of unfunded pension

3    liabilities, and sets forth a formula and a threshold for its

4    application.

5        The reason I mention this last is because that

6    agreement and the pension benefit modifications agreed to by

7    the Retiree Committee has been subsumed by the recent

8    enactment of Act 53, which Mr. Bienenstock has addressed.

9    Now, those modifications have been removed from the Plan, but

10   based on the Oversight Board's insistence, the ability and

11   obligation to fund such remaining obligations and benefits

12   through the Pension Reserve Trust has been strengthened.

13       So, Your Honor, the building was complete, and it was

14   time for solicitation.  And as evidenced by the Pullo

15   Declaration and the Supplemental Pullo Declaration, the Plan

16   of Adjustment has been enthusiastically supported by

17   substantially all of the debtors' creditors.

18       On the bondholders' side, every class of funded debt,

19   including the classes of retail holders, voted to accept the

20   Plan of Adjustment.  In every retail class, the level of

21   acceptance was over 91 percent of number and amount, and with

22   one retail class voting unanimously to support the Plan.

23       On the employee side, with the benefit modifications

24   removed from the Plan but for the implementation of the freeze

25   and the elimination of the cost-of-living adjustments,

1   substantially all of the active and retired employee claims

2   have been rendered unimpaired.

3        So when looking at the solicitation results on a

4   debtor-by-debtor basis, it is clear that the Plan has gained

5   widespread support, and satisfied the solicitation aspects for

6   confirmation, as there are impaired accepting classes

7   throughout each of the debtors' capital structures.  Being

8   able to say that illustrates the true achievement of our

9   master builders, Judges Houser and Colton, I believe, Your

10  Honor, those results say it all.

11       And I would like to mention again that doing this

12  entirely in a virtual world has been amazing.  Creating a

13  schedule of sessions and delivery dates for proposals in order

14  to keep the ball moving down field forced all parties to focus

15  on the end game and the calendar for achievement.  And as one

16  person who participated in every session and the multitude of

17  phone calls in between, I would like to thank the mediation

18  team for their perseverance and their pragmatic approach.

19       We believe that over the course of the Confirmation

20  Hearing, the Court will learn and understand the details of

21  these very agreements, why the compromises and settlements

22  reached are so beneficial to the debtors, and are in their

23  best interest.  As Mr. Bienenstock has stated, the ingredients

24  to this momentous restructuring, the first of its kind, have

25  been mixed and baked, and the result is a product that

1    satisfies the requirements for confirmation pursuant to

2    PROMESA and the relevant provisions of the Bankruptcy Code.

3         Your Honor, if I might turn to process for the

4    moment, I would just like to again repeat some of the things

5    that we talked about earlier, just so that we know which way

6    we're going to be going forward for the balance of today and

7    beyond.  Your Honor, as I said to the Court, we filed the

8    urgent motion to change the votes of DRA on Friday evening.

9    This morning the Court entered the Order with respect to

10   changing those votes from rejections to acceptances, and there

11   was a reference in that Order, Your Honor, to the need to file

12   within one business day a revised tabulation summary.

13        Thinking ahead, Your Honor, last evening when we

14   filed the Supplemental Pullo Declaration, we already accounted

15   for the retabulation of the votes, so that is already before

16   the Court.  As I mentioned, Your Honor, that supplemental

17   declaration reflects the effect of Act 53 upon the

18   nonimpairment of certain classes of employee-related claims,

19   and the corresponding effect of the DRA changes.

20        As to the PBA votes that DRA changed, they were the

21   only votes in two such classes, a PBA secured -- a PBA-DRA

22   secured claim, and a PBA-DRA unsecured claim.  As a result,

23   those two classes now are accepting classes pursuant to the

24   Plan.

25        With respect to the Commonwealth classes in which DRA

1  claims were sitting, those classes had already accepted the

2  Plan, so the change merely enhanced the magnitude of the

3  already accepted classes.

4         As I noted earlier, Your Honor, yesterday we also

5  filed the Modified Eighth Amended Plan.  These were technical

6  glitches that we sought to clean up.  The inclusion of the

7  GDB/PET Class and 58A, Your Honor, I would note that the

8  holder of that class are governmental agencies; and, as a

9  result, there is no vote that was needed to be taken, as they

10 are deemed to reject the Plan, Your Honor.  So we just move

11 forward with that one.

12        And the other change, Your Honor, I would note was

13 the refinement of the formula to ensure the financing of the

14 Pension Reserve Trust.  None of these recent modifications,

15 or, for that matter, Your Honor, those that were contained in

16 the Eighth Amended Plan filed on November 3rd, adversely

17 affect the treatment of creditors who were solicited and

18 accepted the 7th Amended Plan.

19        Your Honor, also, as I mentioned earlier, we filed

20 the revised form of the Confirmation Order, and, again, those

21 changes merely reflect some further agreement with creditors

22 to resolve outstanding objections, as well as the discussions

23 with both the government and the Retiree Committee with

24 respect to certain paragraphs of the Confirmation Order.

25        Your Honor, yesterday, and it was an extremely busy

1  day, the Oversight Board filed proposed orders with respect to

2  the CCDA and the PRIFA Title VI proceedings.  Those

3  proceedings, which I noted earlier, have garnered tremendous

4  support from creditors, with 100 percent of the CCDA bonds

5  being voted in favor of the restructuring, and over 88 percent

6  of the PRIFA bonds voting their support for that Plan.  Those

7  proceedings are scheduled to follow the conclusion of this

8  Confirmation Hearing.

9       Lastly, Your Honor, following me, the Court will hear

10  from supporters of the Plan of Adjustment, as well as certain

11  objectors, which, based upon time allotments, will take

12  several hours in total.  Upon conclusion, it is the Oversight

13  Board's intention to present Ms. Pullo's declaration into

14  evidence.  Following that -- and I would note that no party

15  submitted an intention to cross-examine, as required pursuant

16  to the Court's Order -- if time remains available, and the

17  Court wishes to proceed, the Oversight Board has Ms. Natalie

18  Jaresko, the executive director of the Oversight Board,

19  available for the presentation of her testimony.

20       With that being said, however, Your Honor, I would

21  point out that this morning, Mr. Hein sent an e-mail to the

22  Oversight Board stating that it was his intention to

23  cross-examine Ms. Pullo for 15 minutes.  We have alerted

24  Mr. Hein that, despite his buffet table approach to litigation

25  where he can continue to go back for more, the Oversight Board

1    would oppose his request.

2         So, Your Honor, with that, if there's nothing more

3    for me, Your Honor, I would cede the podium to supporters of

4    the Plan.

5         THE COURT:  So when do you intend to engage this

6    dispute over Pullo cross-examination with Mr. Hein?

7         MR. ROSEN:  Your Honor, we would take that up after

8    opening arguments have been concluded, and at the time that we

9    are ready to present Ms. Pullo's declarations.

10        THE COURT:  Thank you.  Thank you, Mr. Rosen.

11        MR. ROSEN:  Thank you very much for your time, Your

12   Honor, and your patience.

13        THE COURT:  Thank you.

14        So I will now call on Mr. Kirpalani for the LCDC.

15   Good morning, Mr. Kirpalani.

16        MR. KIRPALANI:  Good morning, Your Honor.  Susheel

17   Kirpalani of Quinn Emanuel Urquhart & Sullivan on behalf of

18   the Lawful Constitutional Debt Coalition, one of the two

19   groups of bondholders that signed the initial Plan Support

20   Agreement for the Commonwealth back in May 2019, and every

21   subsequent Plan Support Agreement leading up to this Eighth

22   Amended Plan of Adjustment.

23        I'm not going to repeat the preview of evidence that

24   Mr. Bienenstock and Mr. Rosen so thoroughly took the Court

25   through.  I asked for some time, because certain of the

1    positions raised by an individual bondholder seek to undermine

2    the Plan Support Agreement, and compromises and benefits

3    achieved by the Board through it.

4         In particular, Peter Hein, holder of 700,000 dollars

5    in GO and PBA bonds raises arguments in defense of the

6    constitutional priority afforded GO and GO guaranteed bonds.

7    Some are embedded in Puerto Rico's own Constitution, some are

8    based on PROMESA, and some are enshrined by the U.S.

9    Constitution.  However, billions of dollars of claims that

10   would benefit from those very arguments if litigated to

11   successful conclusion, agreed to compromise those issues

12   instead.

13        As Professor David Skeel's testimony will show, the

14   Oversight Board had counterarguments to Mr. Hein's, and while

15   we may disagree with the Oversight Board as to which side had

16   the greater than 50-50 chance of winning, we, along with all

17   other parties that support the Plan, also recognize that

18   Puerto Rico needs to emerge from bankruptcy, and that the road

19   to emergence may not be so linear as just dealing with the GO

20   priority.  Rather, the government has many competing and

21   important interests to balance, and at the end of the day, if

22   the decision is made -- or not made with all those interests

23   in mind, PROMESA's goals will not be achieved.

24        Further, we believe if enough creditors ultimately

25   agreed to bend and compromise their legal rights, creditors

1   could do their part to achieve something beneficial for all

2   stakeholders by right-sizing the debt burden on Puerto Rico

3   and restoring access to the capital markets for Puerto Rico, a

4   primary goal of PROMESA.  That would only happen with a

5   concerted, years long effort to build consensus, and the

6   GO-PBA Plan Support Agreement was the critical first step in

7   this Title III case.

8           The LCDC members were among the first to reach across

9   the aisle to begin those discussions, promptly following the

10   consensual consummation of the COFINA Title III Plan of

11   Adjustment.  Whatever the merits may be of a dissenting GO

12   bondholder's legal position, and notwithstanding the Oversight

13   Board's contrary position, the debtor used its exclusive right

14   to formulate, develop, and file a plan by proposing a

15   settlement of that priority dispute.  That settlement was

16   resoundingly accepted by the Constitutional bondholders in

17   every class, including the retail holder class where

18   Mr. Hein's claims are placed.

19           For purposes of this confirmation hearing then, the

20   class containing Mr. Hein's bond voted to accept the treatment

21   that Mr. Hein complains of.  As such, while we would reserve

22   the right to argue all the same constitutional priority,

23   Takings Clause, and Contracts Clause issues if the Plan is not

24   confirmed and consummated, these issues are not being

25   litigated, because they were settled.  Indeed, the settlement

1  is critical even to the structure and acceptability of the new

2  GO bonds as the chosen currency under the Plan, and creditors'

3  willingness to accept that currency is the first step in

4  restoring access to the capital markets.

5         As for the Contracts Clause issues that

6  Mr. Bienenstock raised, we disagree with the Board.  We think

7  that the right analysis is not preemption, but that the

8  Contracts Clause jurisprudence is embodied in PROMESA.  And we

9  settled that issue of whether the Board's impairment was

10 reasonable and necessary, and that's reflected in the proposed

11 order confirming the Plan, Your Honor.

12        As to Mr. Steven Zelin, his testimony will show,

13 based on his wealth of experience, complex bankruptcies with

14 novel, untested legal issues like these are often the subject

15 of hard-fought, negotiated compromise by parties who engage in

16 arm's length, good faith negotiations over extended periods of

17 time.  Puerto Rico's historical Title III case is exactly such

18 a bankruptcy.

19        In terms of just compensation for the cancellation

20 and discharge of constitutional debt held by Mr. Hein, the

21 Plan gives such bondholders cash, new GO bonds, and Contingent

22 Value Instruments that align bondholder interests with the

23 revitalization of the Puerto Rico economy.  Using excess cash

24 on hand to pay down constitutional debt not only complies with

25 the debt's priority, but also lowers the long-term cost and

1    maturity profile of carrying the debt on Puerto Rico's books.

2    And as Mr. Zelin and Professor Skeel will explain in their

3    testimony, the cost of repaying debt will shrink dramatically

4    from what Congress viewed as unsustainable five years ago to

5    just a small fraction of Puerto Rico's general budget for the

6    foreseeable future.

7           On the plus side, for bondholders, the new GO bonds

8    will have not only the benefit of the constitutional catch,

9    but also the judicial blessing of validation through this

10   Federal Court process, together with a judicial forum, to come

11   back for the life of the bonds, if it ever becomes necessary,

12   in much the same way that COFINA's Plan did.

13          Furthermore, the new GO bond now enjoys strong

14   protections against deficit financing, excessive borrowing, or

15   the use of securitizations or liens on available resources.

16   Except as permitted, all of these protections seek to remedy

17   mistakes of the past, and further align bondholders' interests

18   with the citizens of Puerto Rico, who understandably are

19   asking when is it their turn for a prosperous economic future.

20   The Plan not only provides Puerto Rico with a fresh start, but

21   also lasting fiscal responsibility, another express goal of

22   PROMESA.

23          With respect to the legislative assemblies' passage

24   of Act 53, we are greatly appreciative of the government's

25   efforts, and had confidence they would recognize the benefits

1    the Plan provides to the citizens of Puerto Rico.  As the

2    Court knows from the emergency conference held on October 25,

3    the LCDC members were not prepared to pivot away from the

4    solution PROMESA intended, which was a foundational principle

5    of our PSA.  Puerto Rico's elected officials would need to do

6    their part to stand by any new issuance of debt as a critical

7    step to accessing capital markets, which is ultimately

8    necessary to end the role of the Oversight Board.

9         The Court will be asked by the Board to review the

10   legislation, and determine its validity and effectiveness,

11   because it is the only means of implementing the Plan that is

12   currently before the Court.  Without the legislation's

13   passage, validity, and effectiveness, the Plan as negotiated

14   could not be confirmed.

15        We reserve the right to be heard with respect to

16   closing argument on that issue, or whenever the Court deems it

17   appropriate.  In COFINA, Your Honor may recall that these

18   issues were discussed following the evidence.

19        Mr. Hein objects that the Oversight Board agreed to

20   pay certain fees to creditors who expended substantial time

21   and resources with no guarantee of a confirmed plan in order

22   to assist the Oversight Board to bring this case to

23   conclusion.  Ms. Natalie Jaresko, the executive director of

24   the Oversight Board, will testify that the agreement to pay

25   PSA fees was not on account of the claims held by creditors,

1  but rather to compensate parties for spending time, energy,

2  and their own money to serve as a counterparty to the debtor

3  in plan negotiations.

4          While this function is sometimes served by the

5  official statutory Creditors Committee, to the disputed

6  priority of constitutional debt by the representative of

7  General Unsecured Creditors, that body could not serve the

8  interest of municipal bondholders.  And the Board realized

9  that, and did what experienced restructuring advisors

10 typically do.  They organized the creditors, and they tried to

11 build consensus.

12          (Sound played.)

13          MR. KIRPALANI:  It bears emphasizing that the

14 administrative expenses payable as PSA fees to GO and PBA, PSA

15 compensated these creditors for two distinct types of costs,

16 as the testimony of Mr. Zelin and Ms. Jaresko will make clear.

17 First, the cost of having advisors for the anchor tenants of

18 the Plan to help the Board formulate, negotiate, and execute

19 the Plan in the way most likely to be well received by

20 municipal markets; and the second is the cost associated with

21 creditors giving up options by making their bonds restricted

22 or locked up to this particular Plan outcome, even if

23 circumstances subsequently got better and they could have been

24 able to negotiate for more cash or other hard currency.

25          And, Your Honor, we'll hear from Professor Skeel on

1    behalf of the Oversight Board that the lockup served the Board

2    well, as the amount of time that has elapsed from the first

3    lockup in May of 2019 enabled the Board to keep GO and PBA

4    bondholders effectively in check and frozen for two and a half

5    years at a certain level of recovery.  Meanwhile, the

6    Oversight Board freed up additional funds, and used them to

7    bring additional creditors, in our view junior creditors, into

8    the Plan process by giving them something now that the Board

9    knew the largest constitutional debtholders were already bound

10   to a deal.

11          In other words, the Board made a judgment call,

12   beginning two and a half years ago, that settling the GO

13   priority to give themselves the option of exploring other

14   settlements, while keeping the island's senior most creditors

15   in a holding pattern, was a smart restructuring strategy

16   beneficial to the process, and the result speaks for itself.

17          Mr. Zelin will testify as to that strategy and the

18   reasonableness of these fees based on his vast experience in

19   the market.  He will also explain that individual retail

20   holders like Mr. Hein had not one, but two opportunities in

21   2021 to receive, quote, economic parity with the PSA

22   creditors.  And as a result --

23          (Sound played.)

24          MR. KIRPALANI:  -- Mr. Hein will be getting the

25   exact same PSA restriction fee as holders who locked

1     themselves into a deal with the Board in 2019 and 2020.  So

2     any arguments that the consummation costs should be considered

3     part of the distribution on the claim, or that Mr. Hein or

4     other retail holders are being deprived of the opportunity to

5     participate will not be supported by any evidence.  To the

6     contrary, the evidence will support the fact that the amounts

7     represent reasonable, beneficial administrative expenses that

8     the Board intelligently and deliberately chose to incur.  And

9     the Board undoubtedly received the benefit of its bargain.

10           In conclusion, Your Honor, I'd like to thank the

11    mediation team, and in particular Judges Houser and Colton,

12    for their patience, their emotional intelligence, and their

13    perseverance.  And we respectfully ask that the Court consider

14    the evidence in light of the purposes of PROMESA, and to

15    confirm the Plan.

16           Thank you, Your Honor.

17           THE COURT:  Thank you, Mr. Kirpalani.

18           I will now call on Mr. Rapisardi for AAFAF.

19           MR. RAPISARDI:  Good morning, Your Honor.  John

20    Rapisardi of O'Melveny & Myers on behalf of the Puerto Rico

21    Fiscal Agency and Financial Advisory Authority.

22           THE COURT:  Good morning.

23           MR. RAPISARDI:  Your Honor, it has been exactly 1,650

24    days, or four years, six months, and five days since the

25    Commonwealth's Title cases began on May 3rd, 2017.  At that

1    very first hearing in these cases, the Court made clear that

2    the Commonwealth would not and could not liquidate, because it

3    is a living entity that has solemn and sacred responsibilities

4    to its citizens.  The Court made very clear that the promise

5    of PROMESA was a better future for Puerto Rico, but only if

6    all parties acted responsibly and in good faith.

7            Your Honor, I'm pleased to state that today we are on

8    the cusp of realizing PROMESA's promise.  Of course, we all at

9    that moment could never have foreseen all of the terrible

10   challenges that would further complicate and exacerbate the

11   financial distress that forced Puerto Rico into a Title III

12   case in the first place.

13           Waiting for us along that pathway were devastating

14   hurricanes, droughts, earthquakes, political turmoil, and a

15   global pandemic that would cause so much additional suffering

16   and uncertainty; but in the face of these obstacles, Puerto

17   Rico and its people show tremendous resilience, and that

18   resilience, Your Honor, has brought us to this momentous

19   threshold today.

20           Over the last four and a half years, AAFAF and the

21   Oversight Board have consistently worked together behind the

22   scenes to develop the Plan of Adjustment and achieve many of

23   the stipulated settlements, as just referred to by Mr. Rosen,

24   that are now before the Court, not to mention the anticipated

25   Title VI proceedings for PRIFA and CCDA, although there have

1  been -- to a limited extent, still remain some differences in

2  the policies and approaches of AAFAF and the Oversight Board,

3  these different views are entirely proper.

4       This Court recognized almost precisely four years

5  ago, in its November 16, 2017, Opinion and Order denying the

6  Oversight Board's motion to confirm the appointment of PREPA's

7  chief transformation officer, that PROMESA envisions an

8  interactive process between the Oversight Board and the

9  elected government.  Although PROMESA was then new, the Court

10 presciently observed about its -- PROMESA's respective powers,

11 and, more importantly, the responsibilities of the Board and

12 the elected government.

13      I quote from that Opinion:  With talented individuals

14 working in good faith on both sides, the joint structure

15 created by PROMESA is one that creates sound, long-lasting

16 change in which all have confidence going forward.  That is

17 the challenge and the expectation.  The power-sharing

18 structure created by PROMESA is also fraught with the

19 potential for mutual sabotage.  The Oversight Board could

20 repeatedly stymie fiscal plans proposed by the government,

21 disapprove contracts, deny access to credit, and invoke a

22 myriad of other barriers to progress.  Territorial authorities

23 could provoke such actions by acting irresponsibly, or by

24 refusing to adopt sensible recommendations that might not have

25 been the first choice for those in local government, but which

1  can, through work with the Oversight Board, garner both

2  government and market support.  These negative possibilities

3  should motivate the parties to work together for positive

4  change.

5        Your Honor, we have worked together and achieved

6  positive change.  From time to time over the past four years,

7  each side has come back to this Court to get further clarity

8  on their respective powers and where the lines drawn by

9  PROMESA fall.

10       Special thanks, Your Honor, is in order to members of

11  the Oversight Board, both past and present, who have

12  volunteered their time and efforts.  Throughout this time,

13  Your Honor, there was good faith both between the Board and

14  the government, and this good faith has resulted in a

15  tremendous progress for Puerto Rico.

16       When PROMESA was enacted in 2016, the government was

17  suffering from severe and systemic liquidity problems due to a

18  lack of fiscal controls and overspending across several

19  decades.  Puerto Rico had no ability to repay its staggering

20  debt, and could not access the capital markets to borrow and

21  grow the economy.

22       To put Puerto Rico's fiscal crisis in perspective,

23  the island had the highest per capita debt of any state in the

24  United States.  Interest alone cost the government 3.5 billion

25  dollars a year.  The island was drowning in debt, and the

1    government had less than 100 million dollars in liquidity.

2           Using the tools provided to it under PROMESA, the

3    government has made significant strides in adjusting its debts

4    to more sustainable levels.  To date, more than 23 billion

5    dollars has been successfully restructured through various

6    transactions, including the restructures of COFINA, GDB, and

7    PRASA.  Each of these deals involve significant cooperation

8    among the Governor, the creditors, the Oversight Board, and

9    the Puerto Rico legislative assembly.

10          During the past 1,650 days, the government has also

11   demonstrated its commitment to fiscal responsibility, and has

12   worked tirelessly with the Oversight Board to implement

13   structural reforms.  Among other things, the government,

14   through its own initiatives, exclusively addressed the

15   underfunding of its public government pension plans; the

16   enactment of Act 106, in which the government undertook the

17   effort to fund the timely payment of pension obligations out

18   of its own general fund; advanced the essential public-private

19   partnerships; successfully implemented critical labor reform;

20   reorganized and consolidated numerous government agencies;

21   reduced unemployment to the lowest levels in 40 years; and has

22   undertaken unprecedented measures to increase transparency in

23   the use of public funds.

24          This collaboration in good faith brings us to this

25   historic moment.  The people of Puerto Rico are now presented

1   with an opportunity to adjust and erase billions of dollars of

2   debt, and pave the way for Puerto Rico to achieve fiscal

3   responsibility and regain access to the capital markets.

4           The Plan before the Court today, Your Honor, has many

5   favorable qualities.  It will reduce claims and debt owed by

6   Puerto Rico by approximately 78 percent, and result in

7   bondholders taking an average reduction of their claims of 23

8   percent.

9           Taken together with COFINA restructuring, debt

10  service will be reduced on average of 1.7 billion per year

11  over the 25-year term of the new General Obligation Bonds for

12  approximately 42.1 billion over the same period.  This, Your

13  Honor, is the durable solution, in the words of PROMESA, that

14  the government can afford.

15          The Plan also ensures that the government will be in

16  a position to protect and promote the health, welfare, and

17  safety of its people, including providing its people with

18  essential services, because the government will have more own

19  source revenue to invest in its people.  This is key.

20  Immediate investments will not rely on borrowed money that

21  forced the island to live beyond its means, or funds raised

22  through gimmicky measures.

23          As important as what the Plan does is what the Plan

24  does not do.  It does not impose reductions in monthly benefit

25  pensions paid to public services.  As this Court knows, since

1   Governor Pierluisi took office in January, he has been

2   steadfast in his commitment to protecting pensioners.  His

3   commitment has resulted in an amended plan that eliminates the

4   provisions that would have affected a monthly pension benefit

5   reduction for all retirement system participants with a

6   pension benefit of greater than 1,500 per month.

7          In addition to preserving accrued pension benefits,

8   the Plan includes other safeguards for retirees, including

9   funding pension reserves and restoring employee retirement

10  accounts.  The removal of the monthly benefit modification was

11  crucial to the elected government's passage of Act 53, which

12  authorizes the Plan transactions in a way that is not only

13  fiscally sustainable and treats creditors fairly --

14          (Sound played.)

15          MR. RAPISARDI:   -- but also respects important

16  government public policy priorities.  This result is both

17  lawful under PROMESA and consistent with the accepted, sound

18  municipal bankruptcy principle that all public policy

19  considerations must be equitably balanced in devising a plan

20  of adjustment.

21          It is well-known that Puerto Rico's public pension

22  benefits were cut prior to these Title III cases, and the

23  Board's recent recognition that public pensioners cannot

24  experience further financial pain without causing additional

25  social and economic harm on the island shows how the ongoing

1    dialogue between the Board and the government, even on issues

2    with which we have had profound disagreement for years, has

3    made this week's proceedings possible.

4         Importantly, the act does not address potential

5    pension freezes, or the elimination of cost-of-living

6    adjustments.  Whether these provisions are lawful will be an

7    issue for this Court to decide within the context of the

8    objections filed by the teachers' and judges' unions.  The

9    government believes that these objections should be carefully

10   listened to.

11        We know the Court always treats all objections and

12   objectors with great care and respect, and the public can have

13   confidence in the Court's resolution of this question.

14   Regardless of the outcome, the government will abide by the

15   Court's ultimate decision, but in any case, the Board and the

16   government should continue to work collaboratively to find

17   ways to mitigate the impact of the potential freeze if upheld

18   by this Court on the most loyal core of Puerto Rico's

19   employees, its judges and its teachers.

20        For all of these reasons, Your Honor, the government

21   supports the Plan, and filed a notice of withdrawal of its

22   prior plan objection on Saturday, which is at docket 19109.

23        The resolution of the largest U.S. municipal debt

24   restructuring in history is within reach.  It is fitting, Your

25   Honor, that today's hearing commences a day after New York

1   City's 50th Marathon race.  Your Honor, these proceedings and

2   the background of external events that I have just referred to

3   has in many respects been a marathon, which has tested the

4   stamina and resolve of the people of Puerto Rico to bring to

5   closure its decade of fiscal and economic crisis through these

6   restructuring proceedings.

7       It is now time to see what began at the starting line

8   some 1,650 days ago cross the finish line.  And in crossing

9   that finish line, we all owe a huge debt of gratitude to this

10  Court, as well as Judges Houser, Colton, and Dein for your

11  collective steadfast patience, leadership, and guidance in

12  directing and encouraging parties along the way throughout

13  these proceedings and mediation sessions.

14      We also recognize the efforts of creditors, and we

15  appreciate, as this Court has recognized, that they have not

16  been paid during the past four and a half years.  The beauty

17  of the Plan is that it strikes a balance.  The Plan is not

18  only in the best interest of Puerto Rico, it is in the best

19  interest of Puerto Rico's creditors, as well.  It will achieve

20  a confident stability in payments they would not have realized

21  absent PROMESA.

22      Finally, on a personal note, Your Honor, I would like

23  to give thanks and recognize the tireless efforts by the

24  government staff, including the Governor and his staff in

25  office, and Omar Marrero, who is the head of AAFAF, and the

1   many members of AAFAF, which was charged with the

2   responsibility of always seeing to the restructuring of Puerto

3   Rico's governmental entities.  Needless to say, without the

4   collective support and efforts of these officials and

5   dedicated government workers, these hearings and proceedings

6   would not have been possible in a successful fashion.

7        If the Plan is approved and implemented, Puerto Rico

8   will have achieved a successful restructuring of more than 72

9   percent of its debts, and will be well on its way to emerging

10  from this financial crisis and regaining market access.

11  Puerto Rico will be able to attract people back to the island,

12  and set the stage for the people of Puerto Rico, its teachers,

13  government workers, hotel employees, policemen, firemen, the

14  elderly and their children, to realize a better and brighter

15  future for generations to come.

16       Finally, as set forth in the government's notice of

17  withdrawal, Your Honor, while the government supports the Plan

18  as an important step towards concluding these Title III cases,

19  it reserves its rights as to certain provisions of the Plan

20  and Confirmation Order that were added and amended on November

21  3rd.  The government has evaluated the impact and necessity of

22  these modifications, and is in constant dialogue with the

23  Board regarding the same.

24       The government will update the Court no later than

25  Wednesday, November 10th, as to whether it has any remaining

1   objections or issues with respect to the Plan with respect to

2   these latest changes following these discussions.

3   Notwithstanding these provisions, the government will strive

4   to resolve its differences with the Oversight Board, and work

5   cooperatively to implement the Plan.

6           Thank you, Your Honor.  If you have any questions, I

7   can address them at this time.

8           THE COURT:  Thank you, Mr. Rapisardi.  I have no

9   questions for you at this time.

10          Before we start our morning break, I'd like to ask

11  Mr. Rosen to come back to the podium.  I have some logistical

12  questions for him.

13          Mr. Rosen, are you available?  Hello, Mr. Rosen.

14  Will you just unmute?

15          Would someone unmute Mr. Rosen?

16          That's about to happen apparently, but it hasn't

17  happened yet.  Mr. Rosen, say something.

18          You've got your hand up like we should wait, so --

19  okay.

20          MR. ROSEN:  Can you hear me now, Your Honor?

21          THE COURT:  Yes.  Thank you very much.

22          MR. ROSEN:  Thank you.

23          THE COURT:  So --

24          MR. ROSEN:  Sorry about that.

25          THE COURT:  That's all right.  So I wanted to ask you

1    some questions about the logistics and mechanics of how you

2    plan to offer witnesses.  As established in the procedures

3    orders entered late in the summer, the direct testimony is by

4    declaration, so when you're saying you're presenting your

5    witnesses, do you mean you intend to tender the declaration,

6    or --

7            MR. ROSEN:  Yes, Your Honor.

8            THE COURT:  That's it?  Okay.

9            MR. ROSEN:  That is what we intend to do, Your Honor.

10   Logistically, we have, pursuant to the Court's Order, a

11   separate room for the witness and counsel to appear in.  We

12   will offer the declarations at the outset into evidence, and

13   in the event that there is someone who has properly suggested

14   -- or requested the opportunity to cross-examine that witness,

15   they will be in a separate room, Your Honor, available for

16   that cross-examination.

17           THE COURT:  Thank you.

18           Now, we have the issue as to whether it would be

19   proper to have any cross-examination of Ms. Pullo, which we

20   will take up later, since none was previously requested.  You

21   also mentioned that you might tender Ms. Jaresko today.

22           We didn't receive the notice the day before, or

23   lineup of cross-examiners, or evidence to be potentially

24   called on there, and we hadn't received a Zoom reservation for

25   her; so what have you done about these separate rooms and the

1   Zoom system?

2           MR. ROSEN:  Your Honor, Ms. Jaresko is here with us

3   in our offices.  We have her available.  I made mention of

4   that, Your Honor, solely because, based upon the elimination

5   of objections to confirmation, we thought that there might be

6   additional time available in your calendar today, and we

7   wanted to give you the opportunity, in case you wanted to

8   continue the hearing beyond Ms. Pullo, to have Ms. Jaresko's

9   declarations tendered into evidence and have her available for

10  cross-examination.

11          If you wish to allow that to go on Wednesday, we can

12  certainly accommodate that as well, but Ms. Jaresko is here.

13  She is available for the presentation of the declaration and

14  for cross-examination, if you'd like to do that.

15          THE COURT:  Well, what I'd encourage you to do while

16  I ponder that is to contact the people who had proposed to

17  cross-examine her to see if --

18          MR. ROSEN:  It's Peter Hein.

19          THE COURT:  Is it only Peter Hein?

20          MR. ROSEN:  It's only Mr. Hein.

21          THE COURT:  All right.  Well, if you will consult

22  with Mr. Hein as to whether he is prepared to cross-examine

23  today, and you can let me know that either at the end of this

24  break or at the end of lunch.

25          MR. ROSEN:  We will do that, Your Honor.  And I would

 1   note that I think, based upon the withdrawal of the DRA

 2   parties' objections and exhibits and other documents, the only

 3   party who wishes to cross-examine any witness is Mr. Hein.

 4        THE COURT:  I had not gone back and checked all my

 5   charts, so thank you for clarifying that for me.  So if you

 6   will let me know whether Mr. Hein wishes to go forward, and

 7   whether there are any exhibits that I would have to get handy

 8   for that cross-examination, I'd be grateful.

 9        MR. ROSEN:  We will do that.  We will contact

10   Mr. Hein immediately.

11        THE COURT:  Thank you very much.

12        It is now 11:28, so we will come back from this break

13   at 11:40 Atlantic Standard Time, and that is 10:40 Eastern

14   Standard Time.

15        Thank you all very much.

16        MR. ROSEN:  Thank you, Your Honor.

17        THE COURT:  We are adjourned.

18        (At 11:22 AM, recess taken.)

19        (At 11:42 AM, proceedings reconvened.)

20        THE COURT:  Good morning again, everyone.  My

21   apologies for our delay on this end.  We are ready to continue

22   with the opening arguments.  And next on my list I have Ambac

23   for eight minutes by Mr. Dunne and Ms. Miller.

24        Hello, Mr. Dunne.

25        MR. DUNNE:  Good morning, Your Honor.  Dennis Dunne

1    from Milbank, LLP, on behalf of Ambac Assurance Corporation;

2    and I'm joined in the virtual courtroom by my partner, Atara

3    Miller.

4         I'm going to call an inaudible and depart from my

5    script a little bit, because I'm not going to repeat some of

6    the arguments made by Mr. Kirpalani, which I agree with.  But

7    as the Court knows, Ambac has been a long term investor in,

8    and partner with, Puerto Rico for decades.  Its positions are

9    significant and scattered across a number of

10   instrumentalities, as well as the Commonwealth.

11        And it's worth kind of just repeating that Ambac

12   Assurance owns Vintage GO bonds, PBA bonds, HTA 60 bonds, HTA

13   98 bonds, CCDA bonds, and PRIFA bonds.  We've long been an

14   advocate for a comprehensive settlement that was not limited

15   to the direct debt issued by the Commonwealth, but that

16   included deals with the revenue bonds as well.  And we're

17   standing here today in full support of the Plan, because that

18   goal was attained.  The myriad of settlements embodied in the

19   Plan resolved key disputed issues, not just in the

20   Commonwealth case, but also in many other instrumentalities,

21   including HTA, PRIFA, and CCDA.

22        Panning back for a moment, when we go back over the

23   last few years, Your Honor, and we consider the complexity of

24   this restructuring, the number of novel legal issues, and the

25   host of affected parties, and the varied and often conflicting

1   interests of those parties, the fact that there is a feasible

2   proposed plan of adjustment at all, let alone one that has

3   garnered broad and overwhelming support from each core

4   constituent, including bondholders, trade, monoline insurers,

5   ERS, labor unions, and the government itself is nothing short

6   of monumental.  And the fact that there are so few remaining

7   objectors is also remarkable.

8          I'd say the fact that we're commencing confirmation

9   and the hearings are going proceed this week is a red letter

10  day for Puerto Rico and the Title III case.  And it's a

11  testament, which I'll discuss in a minute, for this Court

12  putting in place a process that worked, which leads me to the

13  mediation team.

14         This Plan is very much a product and culmination of

15  that mediation.  We would not be here today on the Plan with

16  such deep creditor buy in absent the tireless efforts and the

17  sage guidance of Judges Houser and Colton.  But I'd be remiss

18  if I didn't call out Judge Houser's efforts in particular with

19  respect to our settlements.  I spent many hours on Zoom, and

20  calls with her over this past year on weekends, on holidays,

21  on birthdays.  And there were numerous times this year when

22  other mediators would have simply called it a day, terminated

23  the mediation, and let the Plan proceed with fewer creditors

24  in favor of it, and corresponding -- more litigation issues

25  for the Court to adjudicate, but Judge Houser refused to fail.

1   She refused to let parties push back from the table.

2       And I'd say mediation was as widely successful,

3   because of that stead fast resolve of the mediators, and their

4   acute sense of the strengths and weaknesses of various legal

5   arguments, as well as and perhaps more important the

6   commercial limits and contours of what was practically

7   possible.  All in all, it was really a virtuoso performance,

8   and a heartfelt thank you to the mediation team.

9       As Your Honor knows, Ambac spent years vigorously

10  litigating and defending rights, challenging proposed action

11  and treatment whenever we felt improper.  We had heated

12  disagreements with the Oversight Board and their advisors

13  regarding various contractual and legal rights over the years,

14  and they never personally stopped looking for ways to find

15  common ground.  And now, over four years later, we submit

16  that the Oversight Board has proposed a plan that is fair and

17  is in the best interest of creditors and the residents of

18  Puerto Rico.  We appreciate and commend the efforts the OB and

19  advisors have expended over the years to get us to today.

20      The Plan incorporates and reflects negotiated

21  settlements, Your Honor, or virtually all the complex and

22  novel issues that have been joined over the years in these

23  cases, including constitutionality of certain GO debt, the

24  priority and certain status of various bonds, the scope of

25  creditors' liens, the predicates and terms of clawback,

1    pension priority, and the validity of certain executive

2    orders, each negotiated between the Oversight Board and

3    sophisticated counterparties with experienced counsel, and

4    each has been incorporated into the Plan, which has received

5    sweeping support.

6         I'd have to say, though, that the creation and

7    deployment of the CVI, the Contingent Value Instrument, was

8    key in propelling the negotiations to a successful resolution.

9    Why?  It allowed the parties to sidestep a fight to the end

10   over evaluation.  Said another way, the remaining objectors

11   are not wrong when they submit that the Oversight Board's

12   models over the past several years have been on the

13   conservative side, and that there is potential upside in the

14   numbers.  True.  But as the past four years have repeatedly

15   demonstrated, there is potential, and potentially significant

16   downside as well.

17        Macroeconomics is more art than science, and the

18   federal politics that are relevant here are far from

19   predictable.  The Plan takes these things into account.  The

20   Plans are anchored by the new GO bonds and by the CVIs.  In

21   this way, the Plan sets a floor for creditor recoveries, while

22   also establishing a mechanism for creditors to participate in

23   the economic upside if Puerto Rico outperforms the current set

24   of projections.  While imperfect, the construct avoids the

25   need for parties to convince each other, and ultimately to

1   convince Your Honor, that their crystal ball is more crystal

2   clear than the others.

3              (Sound played.)

4              MR. DUNNE:  What we have now is the best and likely

5   only path forward.  And as I said at the outset, it also sets

6   the stage for Title VI restructuring in PRIFA and CCDA.  And

7   those qualified modifications have received overwhelming

8   acceptance, and are the subject of no pending objections.  And

9   the Court will consider them at the conclusion of this

10  confirmation hearing.

11             In sum, Your Honor, confirmation of the Plan is

12  critical, and we're not saying that because we are enamored of

13  our distributions under the Plan.  Indeed, we strongly believe

14  we were legally entitled to substantially higher returns, and

15  I have no doubt the Oversight Board and its providers believe

16  they should have provided less to us.  Rather, I say this

17  because the Plan is fragile.  It involves multiple

18  settlements, and the consent of scores of parties with

19  divergent interests and fervently held but disparate views of

20  the law and relevant docs.

21             Whatever anyone thinks of their recoveries, the point

22  is this plan may be the only one available.  It would be a

23  mistake to assume if confirmation's denied, a new plan could

24  quickly be crafted to replace it.

25             Let's not lose site of the fact, as you heard, that

1    the Plan discharges billions of dollars of debt, while

2    positioning Puerto Rico for economic recovery and growth.

3    Were confirmation denied, we submit the likely outcome would

4    be dismissal of the case, which would be disastrous to all

5    involved.  There'd be no discharge of debt.  The Puerto Rico

6    economy would remain burdened by the full amount of the bonds,

7    and, on the other side of the aisle, those creditors would

8    have no direct path for recovery on the claims.

9         The situation would quickly devolve into pandemonium,

10   and a miasma of competing and conflicting lawsuits and

11   potentially divergent rulings from various courts.  In sum,

12   Your Honor, Ambac urges the Court to confirm this Plan, and

13   any objections that have not been resolved should be

14   overruled.

15        Unless you have any questions, I will yield the

16   floor.

17        THE COURT:  Thank you, Mr. Dunne.

18        Does Ms. Miller also wish to be heard?

19        MR. DUNNE:  Not at this time.

20        THE COURT:  Thank you very much.  I will now turn to

21   FGIC, by Mr. Sosland.

22        MR. SOSLAND:  Your Honor -- oh, there we are.  Thank

23   you.

24        THE COURT:  Good morning, Mr. Sosland.

25        MR. SOSLAND:  Good morning, Your Honor.  Martin

1  Sosland of Butler Snow, LLP, for Financial Guaranty Insurance

2  Company.

3        I'll try to -- as Mr. Dunne tried not to repeat what

4  Mr. Kirpalani said, similarly, except to make a couple of

5  points, I will try to follow that example with respect to both

6  of them.  I do, though, want to briefly address timing and the

7  settlements that the Court is being asked to approve -- the

8  settlements that the Court's being asked to approve as part of

9  the Plan.

10        With respect to timing, without going through the

11  litany of the history that you heard both from Mr. Bienenstock

12  and Mr. Rosen, as well as Mr. Dunne, I want to go back to a

13  day three years ago this month.  We were before Your Honor on

14  the Disclosure Statement for COFINA.

15        THE COURT:  Mr. Sosland, I need to ask you to turn

16  back about 15 seconds, because for some reason your sound went

17  very low and I didn't hear you.  So if you go back to three

18  years ago, you were before -- and then we lost it.

19        MR. SOSLAND:  Okay.  Can you hear me now?

20        THE COURT:  Yes.  Thank you.

21        MR. SOSLAND:  Three years ago we were before you on

22  the Disclosure Statement -- three years ago this month before

23  you for the Disclosure Statement for COFINA, and a couple of

24  months later at the confirmation hearing for COFINA, I told

25  you that it was -- it was time for that settlement, the

1   settlement embodied in the COFINA Plan, to be approved, even

2   though, as a representative of my client, which was -- only on

3   the Commonwealth side of that dispute, that we would have

4   hypothetically drawn the line somewhere differently, that it

5   was time to proceed.

6         Well, here, now FGIC is involved in most of the

7   credits that are before Your Honor in the -- under the Plan of

8   Adjustment, as well as the Title VI cases that will be going

9   on contemporaneously with respect to approval for PRIFA and

10  CCDA.  The PRIFA -- FGIC has over a billion dollars of

11  exposure, owned and insured bonds, that are GO and PBA Legacy

12  Bonds, Vintage Bonds, as well as HTA senior and subordinated

13  debt, CCDA debt, and PRIFA debt.

14        And the settlements that Your Honor will receive

15  testimony regarding, that have been previewed by Mr. Rosen and

16  Mr. Kirpalani, and the testimony of Mr. Zelin, Ms. Jaresko,

17  and others are not only in the best interest of the debtor, we

18  believe, of the Commonwealth, and the various agencies, but

19  unlike the situation with COFINA, when I told the Court

20  hypothetically I would have drawn the line in a different

21  place, as someone who's been intimately involved in those

22  negotiations, I can tell you, one, it does not matter where I

23  would hypothetically draw the line on any of these

24  settlements, but that the testimony will show that the

25  arm's-length negotiations that resulted in -- probably are the

1   only --

2          THE COURT:  Mr. Sosland, we missed a couple of words

3   there.  Sorry.  So the testimony will show --

4          Ms. Court Reporter, where did you stop?

5          COURT REPORTER:  Yes, Your Honor.  "That the

6   testimony will show that the arm's-length negotiations that

7   resulted in" -- and then it broke off.

8          THE COURT:  Did you hear the court reporter, Mr.

9   Sosland?

10          MR. SOSLAND:  Yes, Your Honor.

11          THE COURT:  Thank you.

12          MR. SOSLAND:  That resulted in settlements that are

13   probably the only settlements that could have been reached.

14   That, as Mr. Dunne suggested, the Commonwealth, the Oversight

15   Board would have liked to have paid the creditors less than

16   what they are paying.  They at least convinced us they would

17   not have paid more.  But I can tell you from our side that we

18   would not have taken less.

19          And I think that the Court is particularly

20   positioned, even better than many courts who hear testimony

21   regarding settlements, to understand the arm's-length nature

22   of the litigation that has occurred, and the complexity of the

23   issues that are being settled.  In the -- in the revenue bond

24   issues that result in the clawback consideration that's being

25   paid, the Court has had many contested hearings, and it fully

1  understands those issues and why those settlements would be

2  reasonable from the perspective of the debtors.  And although

3  FGIC's not involved with the ERS settlements, we would say the

4  same thing regarding the extent of the litigation there.

5         With respect to the potential litigation regarding

6  the validity and priority of the GO debt and the relationships

7  between the Vintage GO debt and the later issued debt, while

8  the Court has not conducted the sorts of hearings on those

9  issues that it has on the revenue bond issues, you've had at

10 least reviews of the issues that would be brought before the

11 Court, and you fully understand the complexity.  And when

12 you -- when you take the testimony that you will receive

13 regarding the reasonableness of those settlements, you will

14 have more than enough evidence to approve the settlements that

15 are embodied in the Plan.

16        And, Your Honor, our GO position that FGIC holds is

17 situated similarly to Mr. Hein's position; but we believe that

18 these settlements are reasonable, and you should confirm the

19 Plan and overrule the objections.  I do, as I said, after

20 presumably -- we hope that you will confirm the Plan after

21 you've heard all of the evidence, and at that point, we hope

22 that you take up consideration of the PRIFA --

23        (Sound played.)

24        MR. SOSLAND:  -- and CCDA qualified modifications,

25 and approve those as well.  Those are integral parts of the

1    settlements that have been negotiated.

2         Your Honor, if you have nothing -- if you have no

3    questions for me, I have nothing else at this time.

4         THE COURT:  Thank you, Mr. Sosland.

5         Next we will hear from Mr. Berezin from National, or

6    for National.

7         MR. BEREZIN:  I'm just trying to get my video on,

8    Your Honor.  It's saying it stopped -- the host has -- okay.

9    There you go.  There you are.

10        THE COURT:  Good morning, Mr. Berezin.

11        MR. BEREZIN:  Good morning, Your Honor.  Robert

12   Berezin of Weil, Gotshal & Manges for National Public Finance

13   Guarantee Corporation.

14        National, as a monoline insurer and bondholder, is

15   one of Puerto Rico's largest creditors.  As an insurer of

16   Commonwealth, HTA and PRIFA bonds, National has a vested

17   interest in the long term success of the Commonwealth, its

18   instrumentalities, and, most importantly, the people of Puerto

19   Rico.  Since 2014, National has worked tirelessly in the

20   courtroom and outside to achieve a fair resolution of this and

21   other Title III cases.

22        There are now three major plan support agreements for

23   the Commonwealth, for HTA, and for PREPA, and National is

24   party to all three.  Thanks to the hard work of this Court and

25   to so many, the beginning of the end of these Title III cases

1    is finally in sight.  To that end, confirmation of the Eighth

2    Amended Plan for the Commonwealth is an essential step

3    forward, and, indeed, a monumental one at that.

4         Still, Your Honor, there are those who would oppose

5    confirmation, or bend the careful settlements on which it is

6    based by rewriting material provisions of the proposed

7    confirmation order.  In that vein, I would like to briefly

8    address the objections of the Underwriter defendants.

9         National, and certainly other monolines, have brought

10   claims against the Underwriter defendants in connection with

11   the issuance of pre-petition bond debt.  In their objection,

12   the Underwriter defendants have proposed significant revisions

13   to the Confirmation Order that we submit are unsupportable.

14        The Underwriter defendants could argue that their

15   language permits them to assert against the Commonwealth and

16   other debtors, not third parties, pre-petition and other

17   claims properly subject to discharge.  In fact, the

18   Underwriter defendants' claims arising from the National

19   action are pre-petition, or were not timely asserted, or both,

20   and so should be barred and voided.

21        Now, the Underwriter defendants seem to acknowledge

22   in their objection that they cannot seek monetary damages

23   against the Commonwealth or other debtors, yet they propose to

24   delete language preventing them from asserting, for example,

25   indemnification and contribution claims against debtors when

1    these claims should be properly discharged and enjoined.

2           From National's perspective, the proposed

3    Confirmation Order's Underwriter action provisions as written

4    are appropriate, is an important part of a complex

5    negotiation, settlement that should be approved and not

6    disturbed by the Underwriter defendants' objection, which we

7    respectfully ask the Court to overrule.

8           As you have heard from many others today, Your Honor,

9    there is in fact peace in the valley, but it is fragile

10   indeed.  Now, we heard Mr. Bienenstock state this morning that

11   there may be changes made to the Underwriter language in the

12   proposed order.  National looks forward to reviewing any

13   changes, as it has certain consent rights under its settlement

14   with the Board.  We hope and expect that any revisions will be

15   reasonable, but we must and do reserve our rights.

16          With that said, Your Honor, on behalf of National, we

17   thank the Court for its stewardship throughout this Title III

18   case, and we join the Oversight Board in supporting the Eighth

19   Plan of Adjustment for the Commonwealth of Puerto Rico.  Thank

20   you.

21          THE COURT:  Thank you, Mr. Berezin.

22          Next we will hear from counsel for Assured.

23          MR. ELLENBERG:  If the Court please, Mark Ellenberg

24   on behalf of Assured Guaranty.

25          Your Honor, we are here this morning to voice our

1    support for this Plan.  It is a long way from the plan that we

2    envisioned when these cases began, but it represents an

3    acceptable set of compromises.  And Mr. Kirpalani summed up

4    extremely well the nature of those compromises as relates to

5    the GO priority and related issues.  And Mr. Dunne alluded to

6    a point I'd like to extend on, which is the interlocking

7    nature of all of the credits of Puerto Rico.

8         It was impossible for Assured to join the initial

9    Plan Support Agreement wholly apart from our views of the

10   adequacy of the GO settlement, because the clawback claims

11   relating to credits at HTA, and PRIFA, and CCDA were

12   completely interrelated to the Commonwealth Plan.  If we

13   prevailed on those clawback claims, the Commonwealth Plan was

14   not viable, and so it was impossible for those of us who had

15   multiple interests, had multiple debtors, to simply view this

16   as separate boxes to be checked off one at a time.  We had to

17   view it holistically, and we had to settle them all together.

18   And that is ultimately what happened.

19        We are very grateful for the efforts of the mediation

20   team in bringing us to that result.  They understood our

21   problem.  And we didn't always agree with the way they

22   approached solving that problem, but at the end of the day,

23   the problem was solved.  And their efforts were enormous and

24   tireless, and we're very grateful for that.  And we thank

25   them.

1          We also are very appreciative of the efforts of this

2     Court and Judge Dein for their guidance throughout.  I would

3     note that of course there is broad consent to this plan, as

4     others have mentioned.  There are also a few objectors.  They

5     deserve their day in court.  They are going to get it here.

6     But I think, as Mr. Bienenstock explained, the objections are

7     not meritorious, and I don't think they will long detain the

8     Court at this hearing's conclusion.

9          And so we wish, again, that the Court confirm this

10    plan.  And I would like to stress, as I've mentioned on

11    several prior occasions, that Assured, because of its

12    continuing policy commitments and because it is devoted to the

13    field of municipal finance, has a tremendous investment and

14    interest in the long-term financial health of Puerto Rico.  We

15    believe this plan is in the long-term financial health

16    interests of Puerto Rico, and we would not support the Plan if

17    we did not believe that.  Thank you.

18          THE COURT:  Thank you, Mr. Ellenberg.

19          Next we will hear from counsel for the Official

20    Retirees Committee, Ms. Steege.

21          MS. STEEGE:  Good morning, Your Honor, or I think

22    good afternoon in Puerto Rico, Your Honor.

23          THE COURT:  That's true.

24          MS. STEEGE:  Catherine Steege, from Jenner & Block,

25    on behalf of the Official Retiree Committee.  Almost four and

1   a half years ago, the eight members of the Retiree Committee

2   volunteered for a job that paid them nothing, and in every

3   sense of the word was truly a thankless task.

4        On the one side, the Oversight Board took the

5   position its original proposal for treating pensions was

6   generous under the circumstances, even though for some

7   retirees it would have had the effect of cutting their

8   pensions as much as 25 percent.  On the other side, their

9   fellow retirees and many, many politicians demanded no pension

10  cuts, but the eight brave members of the Retiree Committee

11  stood up for what they believed was right for the nearly

12  167,000 retirees they represent.

13       To put this group in perspective, the retirees as a

14  group constitute of almost five percent of Puerto Rico's total

15  population.  They constitute almost 26 percent of the

16  population over the age of 65.  Retirees also hold the largest

17  claim against the Commonwealth, at approximately 50 billion

18  dollars.  Unlike many other creditors in these cases, the

19  retirees mostly live in Puerto Rico, and have experienced on a

20  daily basis the effects of this economic crisis, the natural

21  disasters, the health crisis, the other things that have

22  occurred during this case.

23       Twenty-seven months ago, the Retiree Committee

24  reached the first Plan Support Agreement with the Oversight

25  Board.  It was difficult for the members of the Committee to

1    agree to an agreement that provided for any cuts to pensions,

2    but they did so, because they understood that while doing so

3    was not going to win them any popularity contests, and that

4    they might be attacked publicly for doing so, as they

5    subsequently were for reaching this agreement, the agreement

6    would quite significantly improve the situation for the vast

7    majority of government retirees.

8         Under the Retiree Plan Support Agreement, 72 percent

9    of retirees would not have experienced any cuts, as opposed to

10   the 36 percent of retirees under the Board's previous

11   proposal.  The percentage cut was reduced so that no retiree

12   would experience a cut greater than 8.5 percent.  And the

13   agreement protected not only the monthly pension payments, but

14   also retirees' rights to medical insurance payments, and

15   so-called bonuses that are an important part of each retiree's

16   annual income.  And, importantly, it also provided for

17   creation of a pension reserve trust to protect pensions from

18   future economic downturns.

19        The Retiree Committee also understood, by being both

20   the largest creditor group and first creditor group to reach

21   agreement with the Oversight Board, this might assist the

22   Oversight Board in reaching agreements with other creditors

23   that might be worried that the Oversight Board could cram down

24   a plan.  In that sense, the Retiree Committee believed that

25   Puerto Rico overall would be benefited, but even after the

1   Retiree Committee made its agreement with the Oversight Board,

2   it continued to meet with the government, it continued to meet

3   with the Oversight Board, suggesting ways in which the Plan

4   could be improved.

5        The Retiree Committee is very grateful that the

6   government and Oversight Board were able to work out their

7   differences and agree to legislation that eliminates all cuts

8   to accrued pensions, and allows the Plan to go forward.  This

9   new agreement also preserves for retirees their monthly

10  benefits, along with medical insurance payments, and Christmas

11  bonuses, and the Pension Reserve Trust.

12       And while the agreement as reflected in the Eighth

13  Amended Plan is good for retirees, it also is very good for

14  Puerto Rico, its future economy, and retiree creditors.  The

15  evidence the Retiree Committee will present in support of the

16  Plan rebuts any claim that the treatment retirees are

17  receiving is unfair to other creditors or not justified by the

18  economic circumstances of Puerto Rico.

19       The Retiree Committee offers the testimony of

20  Professor Simon Johnson in support of the Plan and the

21  conclusion that Puerto Rico and its other creditors are better

22  served by a plan that does not reduce pensions.  Professor

23  Johnson's declaration is at 19014, and the expert report is

24  marked as RTC Exhibit One.  No party has objected to the

25  admission of his report or his testimony.

1          Professor Johnson is very well qualified to testify.

2    He holds a Ph.D. in economics, and is a professor of long

3    standing at Massachusetts Institute of Technology.  He

4    previously served as chief economist for the International

5    Monetary Fund, senior fellow for Peterson Institute of

6    Economics, economic advisor to the Biden-Harris Transition

7    Team, testified before Congress with respect to then proposed

8    PROMESA legislation, and has served as a Congressional Advisor

9    for economic issues.

10          Professor Johnson opines any cut to pensions of

11   government employees would have a negative impact on Puerto

12   Rico's economy, because retirees comprise such a significant

13   component of local demand in Puerto Rico.  In his opinion,

14   which no one has challenged, cutting pensions actually could

15   destabilize Puerto Rico's economic prospects, lead to greater

16   out migration, and make it harder for Puerto Rico to obtain

17   credit in the future.  And savings from pension cuts do not

18   justify damages caused to the economy.

19          As set forth in Professor Johnson's testimony, he

20   will testify the impact of cutting pensions must be assessed

21   against the backdrop of the Puerto Rico pensions generally.

22   Approximately 45 percent of Puerto Rico's population is below

23   the poverty level, twice that of Mississippi and Louisiana,

24   two states with high poverty; 32 percent are food insecure;

25   and nine percent very food insecure.  Numbers that double

1   those of the poorest states.

2         In addition, the health care system in Puerto Rico is

3   fragile, as is the safety net for those in poverty.  Given the

4   island's poverty, troubled health care system, the population

5   is declining annually at significant rates, as Mr. Bienenstock

6   mentioned.  Roughly half of the retirees have pensions that

7   place them below the federal poverty level of 11,800 dollars

8   per year, single person household.

9         Retirees before PROMESA already experienced

10  substantial reductions in pensions, and except for the judges,

11  government retirees have not received cost-of-living increases

12  since 2008.  And many retirees since, the police and teachers,

13  have not received Federal Social Security payments.

14        Against this backdrop, Professor Johnson testifies

15  that the gross income of the approximately 167 thousand

16  government employees represents 6.4 percent of the total

17  household expenditures on the island, and 5.8 percent of

18  Puerto Rico's gross national income.

19        Professor Johnson will testify that the macroeconomic

20  impact of reducing the pensions of retirees on the overall

21  economy is significant, because each dollar that is not spent

22  by a retiree has a ripple effect throughout the economy.  The

23  loss of one dollar of retiree income impacts overall spending

24  on the island at a higher rate.  This is known as the fiscal

25  multiplier.  The Oversight Board itself has taken the position

1   every dollar of pension reduction results in $1.37 less

2   spending in Puerto Rico.

3        Profession Johnson opines this multiplier used by the

4   Board is too small, and -- based on the data for the United

5   States as a whole during times of relevant economic stability,

6   but that is not the situation in Puerto Rico, where the

7   economy is depressed and unemployment is high.  Professor

8   Johnson testifies that the fiscal multiplier of three dollars

9   --

10       (Sound played.)

11       MS. STEEGE:  -- is more consistent with the

12  experience of the state level in states with high unemployment

13  rates like Puerto Rico.  So cutting a dollar of pension

14  reduces overall spending by three dollars, with the resulting

15  loss in tax revenue.  He testifies that a multiplier of two,

16  which is closer to the multiplier the Board uses, would result

17  in a loss of 6,300 jobs on the island, and .6 percent

18  reduction in GNP in the near term.

19       Professor Johnson also opines that given the high

20  level of outmigration, including the fact that since 2016 that

21  outmigration has increased among the population that is

22  retired, pension cuts may force many retirees to move to the

23  United States to be with family members.  Increased

24  outmigration has a further negative impact on the economy, as

25  pension dollars are then spent outside of Puerto Rico.

1           Based on Professor Johnson's testimony and the

2    extensive data he presents in his report, the Retiree

3    Committee submits that the evidence will show that the Eighth

4    Amended Plan, which eliminates any reduction in pensions and

5    other retiree benefits, and provides for the creation of a

6    pension reserve trust is better for Puerto Rico's economy and

7    for other creditors, and justifies the treatment that retirees

8    are receiving at the Plan -- receiving under the Plan.

9           At the conclusion of the evidence, the Retiree

10   Committee will, therefore, ask this Court to confirm this Plan

11   with no pension cuts or any other benefit reductions, and with

12   the creation of the Pension Reserve Trust.  We would add, Your

13   Honor, as all others before us have, we thank the Court, we

14   thank the Oversight Board, AAFAF, the mediators, Unsecured

15   Creditors Committee, and all the other parties in this case

16   for getting us to this point.  And we would urge the Court to

17   confirm the Plan.

18          So unless the Court has any questions for the Retiree

19   Committee, we thank you for your attention.

20          THE COURT:  Thank you, Ms. Steege.

21          Next we will hear from Mr. Despins, for the UCC.

22          MR. DESPINS:  Good morning to the people in New York,

23   and good afternoon, Your Honor, in Puerto Rico.  My name is

24   Luc Despins, with Paul Hastings.  For the record, we represent

25   the Official Committee of Unsecured Creditors in these cases.

1        Before I get to the punchline, Your Honor, let me

2   start with a few caveats and disclaimers.  First, our support

3   here is support for the ultimate result under the Plan, not

4   necessarily every step taken to get us to that point.  And

5   what I mean by that is we really don't want to be in a

6   position where certain steps that were necessary in this case,

7   this Title III case, would be replayed to us in, for example,

8   the PREPA case, as under the guise of, you supported the

9   result there, therefore you support all these steps.  No.  We

10  support the result.

11       And that's the first disclaimer.  The second, as Your

12  Honor knows, the Committee has various consent rights under

13  the documents, and I'm happy to report that the plumbing

14  issues described at the pretrial conference appear to have

15  been resolved by the filing yesterday.  So that's good news.

16  But there remain a number of other documentation issues, and

17  we are hopeful that we will resolve them, so you'll never have

18  to hear from us about these issues later on in these

19  proceedings.

20       But I need to say that our support of the Plan

21  doesn't mean that we adopt the version of their various

22  documents that were filed yesterday, late yesterday by the

23  Board.  There's still some issues that need to be looked at,

24  and I'm fairly confident we'll be able to resolve them.

25       Now to the punchline, Your Honor.  The punchline, the

1    Committee supports confirmation of the Plan.  This has been a

2    very difficult case for Unsecured Creditors, as Your Honor

3    knows well.  And I think it would be inappropriate in this

4    context to try to talk about the accomplishments of the

5    Committee, but I think it's important to mention that the

6    Committee was comprised of seven volunteers who worked

7    thousands of hours, literally thousands of hours, weekends

8    included, and they worked as a unified team and a unified

9    force in these cases.  And that was instrumental in getting us

10   where we are.

11          There are some positive aspects.  For example, the

12   ECR process.  Under the ECR process, thousands of unsecured

13   creditors, if they have valid claims, will get paid in full.

14   That is obviously good news.  But the folks we are dealing

15   with here today, Your Honor, are people who would -- are

16   projected to get in the 20 percent range.  And we hope it gets

17   higher, through all sorts of recoveries and/or reduction of

18   claims, but for now we should look at it in the 20 percent

19   range.  And obviously that is materially less than a number of

20   other creditor groups, and we have to be, you know, objective

21   about that.

22          Then again, compared to three percent we've been

23   offered by the Board previously, 20 percent is a huge

24   recovery.  And this leads me to address what I would describe

25   as the elephant in the world, which is the class that we

1  represent voted to turn back the Plan, and, nevertheless, the

2  Committee supports confirmation.

3        And I have to say, Your Honor, I've been through a

4  lot of bankruptcy cases, and this is the first time I've been

5  in the position where the creditors in our class rejected the

6  Plan, but the Committee continues to support confirmation.

7  And I want to address that, because that's very important.

8        I would say -- I would start by saying most people

9  involved in these cases have gotten a new appreciation of how

10 voting works in Puerto Rico.  And what I mean by that is that

11 it is incredibly hard to get people who support something, or

12 who are not objecting to something, to affirmatively vote.

13 However, if they're not happy about something, they are very

14 organized, and they will vote against this.

15       So what the Committee did in this case, we plastered

16 the internet with our Committee support letter.  We scheduled

17 an informational session, and held these informational

18 sessions for people in Puerto Rico, urging them to vote for

19 the Plan.  And, nevertheless, the class rejected.  But, and

20 that's the key, Your Honor, only approximately 20 percent of

21 the class voted.

22       And I know, from a bankruptcy point of view, as the

23 Judge, you can only look at the people who cast the ballot,

24 and that's the result that controls.  And I'm not trying to

25 argue otherwise.  But the dynamics here are an overwhelming

1     majority of people did not vote, and our belief as a Committee

2     is that that tells us that they're not unhappy enough to cast

3     a "no" vote, or that they are in support of the Plan all

4     together.  And, therefore, that's a very important point.

5          So the Committee continues to support the Plan,

6     because we believe it's the best possible outcome under the

7     circumstances.  And this Plan was negotiated with the help of

8     the mediation team, Judges Houser and Colton, and we thank

9     them for that.  But, as Your Honor knows well the framework

10    under which we are negotiating, that was our inability to get

11    a ruling up or down on whether the GOs are entitled to

12    priority or not.  And that's not a secret to Your Honor.

13         You remember our objection, which is at docket no.

14    10638, that basically laid out our position that the GOs are

15    not entitled to priority.  And you might say, why is he

16    mentioning this; this sour grapes.  No, it's not.  It's to say

17    it would be ironic, and that's not even strong enough, to

18    allow some bondholders to argue the merits of the issue, while

19    others, other bondholders, I would say an overwhelming

20    majority of bondholders have settled the issue.

21         And while the Committee is essentially not able to

22    address the merits -- and we're not complaining about that.

23    That's the deal, and we're supportive of the deal.  But the

24    point is that, when we see Mr. Hein arguing the right of GO

25    bondholders to have priority, we want to act as a

1    counterweight to that.  And that's why we're pointing to you

2    our objection that was filed in I believe the spring of 2020.

3           So that's very important, and, frankly, I was very

4    pleased to hear Mr. Bienenstock come out and say there's

5    absolute preemption, and that the priority does not apply.

6    And that's our view as well.  But clearly we believe that we

7    also can act as a counterweight, not to litigate the issue,

8    but to -- so Your Honor can consider that when you consider

9    the objection by -- I believe it's probably one bondholder at

10   this point arguing the GO priority.

11          So for that reason, Your Honor, we believe that it

12   was important to give that context, and to explain why we're

13   still supporting the Plan, and why we believe that's the best

14   outcome under the circumstance.

15          Very briefly, because I'm not sure we'll get, in the

16   future here, to address that or not but, you know, Mr. Hein

17   relies on a case called *Sanitary Improvement*, a District case

18   out of Nebraska.  And he cites it for the proposition that if

19   -- you cannot modify bonds under state law -- you know, that

20   applies in Chapter Nine, but that case was not about that.

21          In that case, what happened there is that the old

22   bonds were being modified.  They were being reduced to a

23   lesser amount, to new bonds.  The real issue was that the new

24   bond that had to be issued under state law had a call feature

25   that violated state law.  So that case had nothing to do with

1   the issue of whether the bankruptcy court can modify the --

2   has to enforce the priorities under state law.  It is, rather,

3   the issue of whether new bonds issued under the Plan must

4   comply with the state law.

5          And that concludes our remarks, Your Honor.  Thank

6   you very much.

7          THE COURT:  Thank you, Mr. Despins.

8          I will now turn to counsel for Cantor-Katz,

9   Mr. Mintz.

10          MR. MINTZ:  Good afternoon, Your Honor, or good

11   morning.  I'm not sure where we are --

12          THE COURT:  Well, it's afternoon now, so either one

13   is fine.

14          MR. MINTZ:  Great.  Both.  Good day, Your Honor.

15   Doug Mintz from Schulte Roth appearing on behalf of

16   Cantor-Katz Collateral Monitor, LLC, as Collateral Monitor for

17   the GDB Debt Authority.

18          This is a day that is a long time coming.  And

19   obviously Your Honor has spent as much time as anyone here, if

20   not much more, but many, many of the folks working on this

21   matter -- many of the folks on this call spent many, many

22   years dealing with this issue -- dealing with these issues.

23   And it's obviously a monumental occasion for the people of

24   Puerto Rico, who, after so many years, hope to be able to move

25   on from these Title III cases.

1          As you know, the DRA was created from the ashes of

2     the Government Development Bank nearly three years ago.  It is

3     a liquidating entity, holding approximately six billion

4     dollars of assets that were transferred to it from the GDB for

5     the benefit of the GDB's creditors.  And so, as fiduciaries

6     for the stakeholders at the DRA, our clients have had the

7     responsibility to manage and monitor the disposition of these

8     former GDB assets and maximize their value.

9          The DRA parties' principals have a long history of

10     being constructive participants, developing consensual

11     resolutions of disputes in massive and complex reorganization

12     cases such as these, with collectively over 50 years of

13     combined experience of successfully negotiating settlements of

14     over a hundred billion dollars of disputed claims.  And our

15     clients are no strangers to negotiation tables.

16          Nevertheless, for a very long time, the calls to the

17     table never came here, and so in light of its duties to the

18     DRA creditors, our clients have worked for nearly three years

19     seeking to maximize their constituents' recoveries.  This was

20     particularly true with respect to claims at HTA, where the DRA

21     held more than two billion dollars worth of claims, making the

22     DRA the largest individual creditor at HTA.

23          And despite the massive size of this claim, the offer

24     and offering memorandum for the new DRA bonds issued at the

25     time of the creation of the DRA described these claims as of

1    minimal or insignificant value.  All of this left our clients

2    with little alternative but to push, to protect the DRA's

3    rights, which lead to an array of litigation, which is often

4    the case in these situations:  Administrative claim, motion

5    seeking to lift the stay, adequate protection, fighting over

6    seniority, and as that litigation proceeded, ultimately the

7    DRA parties were able to work with the Oversight Board to

8    resolve the open issues, only last week reaching final

9    resolution with the Oversight Board.

10          The Court and any interested parties can see details

11   of that resolution in the stipulation filed with the Court at

12   docket no. 19100, which was late Friday.  The Collateral

13   Monitor is very pleased to resolve these issues, further

14   constituents -- and while that settlement includes layers,

15   restrictions, fee payable upon effectiveness of a plan at HTA,

16   confirmation of distribution of CVIs consistent with the

17   clawback, CVI waterfall in Exhibit J to the Plan, allowance of

18   an array of claims, including 200 million dollars in principal

19   of 98 HTA Bonds, and 63 million of Commonwealth Hacienda

20   obligations, and the teeing up of future resolution of many

21   other key credits held by the HTA, including CRIM, HTA, and

22   ports.

23          In exchange, the DRA parties have agreed, among other

24   things, to support this plan here today, as well as the

25   framework for a plan at HTA, subject to the Plan complying

1   with that framework.  And as you may have seen on the docket

2   just now, or before the hearing commenced, we've withdrawn all

3   objections to the Plan.  All our witnesses, testimony,

4   experts, and other arguments have been withdrawn.

5          And just so the record is clear, in case anything was

6   missed in the order -- in the motion that was filed, to be 100

7   percent clear, we are not going forward with any objections to

8   this plan, subject to the changes that were submitted late

9   last night, which we are reviewing of course.  We support this

10  plan, and are prepared to move forward.

11         Look, no one loves a settlement once they reach the

12  end, but our client is supportive of this plan.  And we

13  believe the evidence that you will hear, and that we've seen

14  through declarations will show that the proposed settlement

15  here is reasonable and appropriate for all parties involved.

16         As Your Honor is well aware, this has been one of the

17  most complicated restructurings ever seen.  We of course have

18  had qualms about how we got here, but we are here.  We have

19  reached a resolution.  The DRA parties, and the Collateral

20  Monitor's support -- and the Collateral Monitor, like so many

21  other folks, including the millions of effected residents of

22  Puerto Rico who have had to live with this restructuring for

23  many years, are prepared to move ahead.

24         So we thank the Court for its extensive commitment to

25  this process and extensive efforts on behalf of this process,

1    and unless Your Honor has any questions, I have nothing

2    further, Your Honor.

3              THE COURT:  Thank you, Mr. Mintz.

4              I believe that Mr. Garcia also wished to be heard?

5              MR. GARCIA SOLA:  Yes, Your Honor.

6              THE COURT:  Good afternoon.

7              MR. GARCIA SOLA:  Good afternoon, Your Honor.  Arturo

8    Garcia -- oops.  Sorry.  Okay.  Can you see me now?

9              THE COURT:  Yes, I can.  Thank you.

10             MR. GARCIA SOLA:  Okay.  Good afternoon, Your Honor.

11   Arturo Garcia on behalf of the DRA Servicer, AmeriNational

12   Community Services, LLC.

13             In the interest of time, I will not repeat what has

14   been aptly stated by my colleague, Douglas Mintz.  I will

15   simply say that the DRA Servicer confirms that it reached a

16   stipulation with the FOMB on Friday, November 5, 2021, putting

17   an end to their differences concerning confirmation of the

18   Plan, and resolving and withdrawing their pending disputes in

19   these Title III cases.

20             By having entered into the stipulation, the DRA

21   parties are accepting the Plan, and expressly withdrew the

22   Plan objections and related documents.  With the filing of the

23   Eighth Amended Plan and the Stipulation, the DRA parties will

24   support and agree with confirmation of the Plan.

25             At the end of the day, Your Honor, as a Puerto Rican,

1    I am very glad that Puerto Rico is finally beginning to exit

2    bankruptcy.  Thank you very much for your patience and

3    stewardship.

4            THE COURT:  Thank you, Mr. Garcia.

5            So that concludes all of the statements of the

6    supporting parties.  After lunch, we will begin hearing the

7    statements of the opposing parties.

8            Before we break, Mr. Rosen, are there anymore updates

9    with respect to evidence presentation -- oh, I'm sorry.  There

10   was a hand raised by Mr. Gonzalez, or someone for Suiza?

11           MR. GONZALEZ VALIENTE:  Yes, Your Honor.  Attorney

12   Rafael Gonzalez Valiente, in representation of Suiza.

13           I just have a small comment and petition.  Since the

14   Plan objectors were granted 180 minutes to divide amongst

15   themselves, and the DRA parties had requested a big --

16   actually, the biggest chunk of that time, since they withdrew

17   -- and to accommodate them, we all had to relinquish part of

18   the time that we had requested.  Since they withdrew, or as my

19   count right now there's -- the objectors are going to be using

20   only 100 minutes I believe of the time, if we could each have

21   maybe two additional minutes, so we don't have to rush through

22   our presentations?

23           That might add 10 to 20 minutes at most, and I don't

24   believe that it would affect the timetable that the Court has

25   for today.  I believe that would be helpful for the Court and

1     all the parties that are objecting.

2            THE COURT:  That request is granted.  So, for

3     instance, parties who had eight minutes will have ten minutes;

4     Mr. Hein will have 32 minutes; and so on.  We will add two

5     minutes to the allocations of each of the objectors.

6            MR. GONZALEZ VALIENTE:  Thank you very much, Your

7     Honor.  And I hope not to have to use those two minutes, but

8     it's very, very good to have them, so that we don't have to

9     rush through our presentations.  Thank you very much.

10           THE COURT:  Yes.  That will help the court reporter,

11    too, so thank you for bringing that up.

12           There is another hand from counsel for the

13    Underwriter defendants.  Would you identify yourself, please?

14           MR. STEEL:  Yes, Your Honor.  Howard Steel from

15    Goodwin Procter on behalf of the Underwriter defendants.

16    Thank you for granting that request for a little additional

17    time.

18           On that note, we had agreed prior to the hearing to

19    cleave off a minute or two of our time to counsel for Quest,

20    Mr. Fallon of Faegre Drinker.  We had advised the debtor of it

21    in advance of the hearing, but I wanted to advise the Court

22    and make sure that was okay with Your Honor.

23           THE COURT:  So counsel for Quest was going to speak

24    for how many minutes?

25           MR. STEEL:  I think two minutes, Your Honor.

1          THE COURT:  You had been planning to go down from 12

2    to 10?

3          MR. STEEL:  Yes, but I'll take the 12 if it's okay

4    with the Court.

5          THE COURT:  That is fine.  I'm just thinking, two

6    minutes is a very short time to say anything, so Quest can

7    have up to four minutes, and I will put them at the end, after

8    AMPR, which now has 12 minutes.

9          MR. STEEL:  Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Steel.

11          I don't see any other hands up, and so now I will go

12    back to Mr. Rosen.  Mr. Rosen, are you there?

13          MR. ROSEN:  Can you hear me now, Your Honor?

14          THE COURT:  Yes, I can.  I can't see you yet, but I

15    can hear you.  Yes.  Now I see you, too.  You've appeared.

16          MR. ROSEN:  Okay.  Thank you, Your Honor.

17          I just wanted to report back that we did contact

18    Mr. Hein.  Mr. Hein requested that the cross-examination take

19    place on Wednesday, rather than today, so we will hold off on

20    the presentation of Ms. Jaresko until Wednesday morning, Your

21    Honor.

22          THE COURT:  Very good, and you will file by tomorrow

23    afternoon any of the information regarding her testimony that

24    is necessary, along with the necessary information regarding

25    any other witness you expect to have appear on Wednesday?

```
 1              MR. ROSEN:  We will, Your Honor.

 2              THE COURT:  Thank you.

 3              I think that is -- is there anything else that you

 4    think we need to address logistically before we break for

 5    lunch?

 6              MR. ROSEN:  No, Your Honor.  I think that's it for

 7    this morning.

 8              THE COURT:  Very well.  Thank you all.  We will

 9    resume at 12:00 -- I'm sorry, at 2:10 Puerto Rico time, which

10    is 1:10 Eastern Time.  So we are adjourned.  Thank you.

11              MR. ROSEN:  Thank you.

12              (At 12:39 PM, recess taken.)

13              (At 2:05 PM, proceedings reconvened.)

14              THE COURT:  Good afternoon, everyone.  We are ready

15    to resume.

16              I remind everyone that there is to be no recording or

17    retransmission by anyone of these proceedings, and unless you

18    are speaking, kindly keep your camera off.  When you wish to

19    speak, if I have not called on you, raise the "raise hand"

20    feature on Zoom, and then I will call on you.

21              So I see that Mr. Rosen has his hand raised.

22    Mr. Rosen?

23              MR. ROSEN:  Yes, Your Honor.  This is Brian Rosen.

24    Can you hear me?

25              THE COURT:  Yes.  We can't see you yet.  Would you
```

1   please turn on your camera?

2          MR. ROSEN:  Your Honor, I believe it is the host that

3   has not allowed us to use the camera.

4          THE COURT:  Well, that's not nice of the host.  Let's

5   see what we can do about that.

6          There.  Hello, Mr. Rosen.

7          MR. ROSEN:  Thank you, Your Honor.  I appreciate

8   that.

9          I just wanted to report, one of the parties who is

10  listed as an objector to the Plan of Adjustment, we have been

11  having ongoing conversations with that entity.  It is the U.S.

12  Bank, and it is with respect to the PFC bonds.  We have

13  reached an informal agreement with respect to a resolution of

14  that objection.  It does require formal Board approval, as

15  well as formal AAFAF and PFC approval.

16         We do not believe that there will be any impediment

17  to reaching that, but we wanted to alert the Court, because

18  that would remove the objection that would otherwise be voiced

19  by U.S. Bank.

20         I know Mr. Ron Silverman, representing them, is

21  available, and I saw him on the screen a few moments ago, so I

22  don't know if he wants to address the Court in that regard.

23         THE COURT:  Mr. Silverman, did you wish to address

24  the Court at this point?

25         MR. SILVERMAN:  Yes, Your Honor.

```
 1              THE COURT:  Good afternoon.
 2              MR. SILVERMAN:  Are you able to hear me?  I think my
 3    video is disabled.
 4              THE COURT:  We can hear you, and we're working on
 5    your video.  Just give us a moment.
 6              All right.  I can see you now, Mr. Silverman.
 7              MR. SILVERMAN:  Thank you so much, Your Honor.  Are
 8    you able to hear me as well?
 9              THE COURT:  Yes, I am.
10              MR. SILVERMAN:  Thank you.
11              So for the record, it's Ronald Silverman from Hogan
12    Lovells on behalf of U.S. Bank.
13              Your Honor, U.S. Bank, as trustee or fiscal agent,
14    actually has filed three objections to the Plan.  Two of those
15    I'll get to in a moment.  They are limited objections solely
16    with respect to trustee and fiscal agent issues.  But with
17    respect to the objection that we filed on behalf of the PFC
18    bondholders or the PFC bondholder trustee, that's a broader
19    objection, and Mr. Rosen is correct.  Just moments ago, we
20    have reached an agreement in principle with the FOMB and
21    related government entities that does address our PFC
22    Objection in terms of both economics and structure, so this is
23    a happy moment.
24              We would expect that, as Mr. Rosen said, over the
25    next days, and certainly prior to the conclusion of the
```

1 Confirmation Hearing, smart minds will figure out how to

2 document and embody that agreement and advise the Court.  And

3 we fully expect that capable hands can get that done.  So at

4 this point, therefore, we will not present an opening

5 statement in opposition of the Plan.  And we expect that by

6 the time of closing arguments, we'll be added to the list of

7 the speakers on the top line in support of the Plan.

8        So although everyone will not be surprised to hear me

9 say that we, of course, reserve rights pending the

10 documentation, we are indeed pleased to say that we have

11 reached a consensual resolution on an agreement in principle

12 with respect to the PFC objection.

13       And I would like to take a very short moment to thank

14 the FOMB, and AAFAF, and other entities, and their counsel for

15 what we view as a very open-minded and creative approach in

16 addressing our concerns.  And we will keep an eye on the ball

17 consummating consensual resolution that will achieve a just

18 and practical result for stakeholders.

19       So with that, I don't have anything more to say about

20 the PFC objection at the moment.  Since I am on the line, Your

21 Honor, in a matter of efficiency, I might just take one more

22 minute just to address our position with respect to the two

23 limited objections that we filed.

24       We filed a limited objection to the Title III Plan as

25 the trustee for PRIFA bonds, and as fiscal agent for PBA

1    bonds.  We filed a similar limited objection as the trustee

2    for the PRIFA bonds to the PRIFA qualifying modification.

3    Those limited objections do not object to the substantive

4    provisions of the Plan in terms of treatment, but they were

5    instead limited and focused on trustee and fiscal agent

6    issues, such as fees, expenses, indemnity rights, releases,

7    exculpations.

8         In the applicable FOMB replies, the FOMB stated that

9    it would discuss language to address the points we raised.

10   And we see that the FOMB has included it in the revised

11   proposed Confirmation Order, and in the proposed PRIFA Title

12   VI Order filed late last night, new language that does appear

13   to address the issues raised in the limited objections,

14   providing for payment protections to U.S. Bank as trustee and

15   fiscal agent.  And we believe that these additions address the

16   concerns of the limited objections in concept, and we're

17   seeking to confirm with the FOMB our understanding of the new

18   language.

19        And subject to any questions on the wording of the

20   language, we believe that that will address our limited

21   objections as well and resolve them.  If we have any remaining

22   issues on this again, we can come back to those in closing

23   arguments, but at this point, because of the resolution,

24   agreement in principle on the PFC objection, and the responses

25   and changes to the confirmation order and the documentation

1   that the FOMB has put in place with respect to our limited

2   objections, we will not be taking time on opening statements

3   to oppose the Plan, Your Honor.  Thank you.

4           THE COURT:  Thank you for those updates,

5   Mr. Silverman.

6           I see that Mr. Van Tol's picture is also up from your

7   firm.  Did Mr. Van Tol wish to say something else?

8           MR. VAN TOL:   No, Your Honor.

9           MR. SILVERMAN:   No, Your Honor.  He usually corrects

10  me, but not at the moment.

11          MR. VAN TOL:  Good afternoon, Your Honor.  Thank you

12  very much.

13          THE COURT:  Very well.  Thank you very much.

14          So now we will proceed with the opening statements in

15  opposition, beginning with Mr. Hein, who is now allotted 32

16  minutes.

17          Good afternoon, Mr. Hein.

18          MR. HEIN:  Thank you, Your Honor.  Can you hear me?

19          THE COURT:  I can hear you, but it seems like the

20  connection is slow, and you're not coming through clearly.

21  Would you say something again?

22          MR. HEIN:  Yes.  Can you hear me better now, Your

23  Honor?

24          THE COURT:  Yes, I can.  Thank you.

25          MR. HEIN:  Thank you.

1          Your Honor, Peter Hein.  And at the outset, I would

2    respectfully refer Your Honor to the legal discussion and the

3    specific citations to the record that I've submitted in my

4    objection, the objection to the proposed order, and the

5    sur-reply.

6          Today I want to focus on several specific key points.

7    My first point concerns same treatment of all bondholders.  If

8    a bondholder holds a particular series, that bondholder should

9    receive the same payments as other bondholders in that series.

10   This is a statutory requirement.  11 U.S.C. 1123(a)(4)

11   provides that a plan shall provide the same treatment for each

12   claim or interest of a particular class.  And this same

13   treatment requirement was specifically incorporated into

14   PROMESA.  Thus, under PROMESA 314(b)(1), the Oversight Board

15   has the burden to prove the same treatment.

16         My GO and PBA holdings were purchased between 2009

17   and early 2012, around the time Puerto Rico was selling the

18   bond issues, and I paid approximately what Puerto Rico sold

19   the bond for, approximately 100 cents on the dollars.  In

20   those years, Puerto Rico was investment grade, proudly stated

21   in each offering statement that it had never defaulted on its

22   bonds, and was issuing financial statements within a year of

23   the close of a fiscal year.

24         Now, I accept that under the same treatment rule, a

25   hedge fund that bought years later, in some cases for as

1  little as 20 cents on the dollar, after the default, after

2  interest stopped being paid, after PROMESA -- after this

3  proceeding was filed, after the multi-year delays in issuing

4  audited financials began, nevertheless, that fund is entitled

5  to the same treatment as someone who bought the bonds when

6  they were first sold.  I accept that, but what I object to

7  here, Your Honor, is preferential treatment for major holders

8  who get added prorated consideration that I and other

9  individuals like me do not.

10       As I understand the Oversight Board's filings, all

11  retail investors who navigated the complex ATOP delivery and

12  vote process with their brokers will now get the extra 1.321

13  percent pro rata.  Hopefully that includes me, although I

14  can't actually tell for sure.  However, no information has

15  been provided concerning how many individuals are in each

16  retail class, but were not able to navigate that ATOP delivery

17  process that the Oversight Board used here.

18       But also -- and I want to focus on the 1.5 percent of

19  par that the Plan in 3.3 says is paid pro rata, simply based

20  on the amount of bond holdings, that goes to institutions

21  holding about two-thirds of the bonds, but not retail

22  investors like me.  The 1.5 percent is pure and simple, pro

23  rata payment.  All bondholders should receive the 1.5 percent.

24  If one is one of the major investors who are part of the PSA,

25  per the Plan, 3.3, holding on February 22 is literally the

1   only additional requirement to get the 1.5 percent.  It's

2   called consummation cost, but there's no requirement that they

3   hold to consummation.  One could sell the next day on February

4   23 and still get the 1.5 percent, and many did sell.  There

5   were two and a half billion dollars of bonds sold by PSA

6   signatories in the five to six months that followed February

7   22.

8          There's also no requirement that anyone incur any

9   expense or document any expense.  The supposed restriction was

10  in name only.  In fact, PSA signatories could sell to anyone

11  who was part of the PSA, or anyone who was not part of the

12  PSA, but would join it.  There is no claim here that any of

13  the PSA signatories put up additional new cash, or even

14  backstopped some financing to raise new cash, the type of

15  thing that justifies additional payments in other cases, but

16  not here.

17         The Oversight Board argues, well, the parties getting

18  the one and a half percent provided value by agreeing to

19  support and vote for the Plan, but the United States Supreme

20  Court in the *American United* case that I cite in my objection

21  reversed, reversed confirmation of the municipal debtor's

22  plan, and admonished against unfair discrimination where one

23  creditor obtains special favor or inducement not given to

24  others.

25         The Supreme Court reversed confirmation, even though

1    the vast majority voted to accept the plan in that case, as

2    the Court notes.  Even if payment for Plan support and vote

3    would ever be okay, and I dispute that, the same opportunity

4    to also get the one and a half percent was not offered to

5    everyone here.

6         Now, Your Honor may recall that the Oversight Board,

7    in the face of my motion to appoint a retail investor

8    committee, did post on EMMA at the end of July an offer to let

9    people tender bonds and receive the extra 1.321 percent, but

10   that was never done for the 1.5 percent.  There was never an

11   offer made to bondholders to allow them to opt for the 1.5

12   percent.

13        Now, the Board does not argue that Puerto Rico cannot

14   afford to pay the one and a half percent to bondholders, nor

15   could they.  I showed that for about 65 million dollars more,

16   one could, in fact, treat all bondholders equally.  All could

17   get the one and a half percent.  And even if someone  didn't

18   navigate the ATOP delivery process, they could still get the

19   1.321 percent.  The Oversight Board does not dispute my

20   numbers.

21        Now, contrast the 65 million to treat all bondholders

22   equally with, for example, the cost that Puerto Rico has

23   incurred in its efforts to avoid paying debt.  As I've shown,

24   when you total it up, Puerto Rico is on track to spend two and

25   a half billion dollars in an effort to avoid paying its debt,

 1      or compared to the cost of Puerto Rico incurring a 1.9 billion

 2      dollars expense that it will now incur because, in the last

 3      two weeks, the Oversight Board agreed there would not be one

 4      penny of pension reduction, not even for the most highly

 5      compensated public employee pension recipients, or contrast to

 6      the 100 billion dollars over the next five years that --

 7      because in the last two weeks the Oversight Board agreed to

 8      pay unionized public sector employees, and an additional

 9      guaranteed 2,000 dollar cash bonus, on top of the 1,000 dollar

10      instant cash bonuses each was already getting under the Plan

11      from last July.

12            And these are just bonuses.  These are not payments

13      to someone who's actually owed money, like bondholders are

14      owed money.  These are just payments to public employees,

15      3,000 dollars in cash, because they're public employees.  And

16      this is on top of the 475 million in Christmas bonuses paid to

17      public employees since Puerto Rico stopped paying its debt

18      service.

19            As a further comparison on the Oversight Board's own

20      projections, as I've detailed in my papers, public employees

21      are also likely to receive literally billions of dollars of

22      so-called additional up-side performance bonuses, which if

23      there are billions of more dollars that are of excess cash

24      flow, it ought to go to the bondholders who have the first

25      priority under the Constitution, but right now, it's going to

1    public employees.

2         And there's more.  I've detailed how when you look at

3    Puerto Rico's contract registry, there have been thousands of

4    contracts issued for advertising, representation, and artistic

5    services, over 300 million in expense for that; and thousands

6    more contracts for consulting services, over 2.3 billion in

7    expense for that.  So I would submit, Your Honor, when you

8    look at these other expenditures, 65 million dollars to treat

9    all bondholders, including individuals equally is quite

10   reasonable.

11        A second equal treatment issue is the fact that

12   Puerto Rico investors can elect one single 2041 maturity bond

13   paying five percent, whereas investors in the continental U.S.

14   receive fragments of literally 12 different bonds, two of

15   which pay no interest, and five of which have lower four

16   percent coupons.  The Oversight Board seeks to justify this on

17   the theory that Puerto Rico investors will take taxable bonds,

18   but we know what happened in the COFINA situation where the

19   same argument was made.  And then shortly after the effective

20   date, it was announced that, oh, after all, all bonds can be

21   issued tax free, apparently because the principal on the new

22   bonds was less than the principal amount of the old tax exempt

23   bonds, which is apparently the case here as well.

24        Last summer, in the context of Disclosure Statement

25   objections, I raised the need for a clear disclosure of tax

1  status, as 11 U.S.C. 1125(a) requires.  We still do not have

2  an answer.  We should not have a repeat of the bait and switch

3  that occurred in COFINA, where Puerto Rico investors get one

4  marketable security and a high interest rate, and then it

5  turns out, as I suspect was known all the time, all bonds can

6  be tax exempt after all.  The tax status ought to be resolved

7  and disclosed before, not after confirmation.

8      Now, let me now turn to the next requirement, PROMESA

9  314(b)(3).  The Oversight Board must prove that Puerto Rico is

10  not prohibited by law from taking any action to carry out the

11  Plan.  The debtor has now enacted legislation which expressly

12  speaks to authorizing actions to carry out the Plan.  That's

13  in the Bill.  And that authorizes officials to issue the new

14  bonds, but also specifically cancel and extinguish the

15  existing bonds.

16      But this abrogates the right of GO and PBA

17  bondholders under Puerto Rico's Constitution to first payment

18  of interest and principal for any other expenditures that are

19  paid.  Article VI, Section 8 is explicit:  Interest and

20  amortization on the public debt shall be paid first.  That's

21  Puerto Rico's Constitution.

22      Bondholders have received no interest payments for

23  five years, and, under the Plan, are not getting full

24  principal owed to them either.  I take my GO bond bought in

25  December 2009, for which there has never, never been any issue

 1  about validity raised.  I am owed 100,000 principal, 33,000 in

 2  interest, a total of 133,000, but I recover only 58 percent of

 3  that, just barely over half.

 4        Not only does the new bond legislation provide the

 5  cancellation and extinguishment of my existing bonds without

 6  the priority of payment I'm entitled to under the Puerto Rico

 7  Constitution, but the legislation also mandates that there be

 8  zero cuts to pensions, which do not have priority under the

 9  Constitution; provides that new bond authorization is

10  conditional on zero cuts to pensions; and through its

11  conditionality, effectively puts pensions in front of even the

12  new bonds in right of payment, notwithstanding Article VI,

13  Section 8 of the Puerto Rico Constitution.

14        THE COURT:  Mr. Hein --

15        MR. HEIN:  So the plan -- yes.

16        THE COURT:  I'd like to ask you a question.

17        MR. HEIN:  Sure.

18        THE COURT:  How do you respond to the debtors'

19  argument that because the class of which you are a member has

20  voted to support the Plan, the grounds on which you can object

21  are limited, and specifically that your priority arguments and

22  other arguments for litigating legal points that have been

23  settled as to the class ought not to be entertained?

24        MR. HEIN:  I think, Your Honor, that the requirements

25  for confirmation exist, irrespective of the vote of any

1    particular class.  I think that is clear.  314(b) sets forth

2    requirements of confirmation.  The fact that a class votes to

3    accept does not alter the need for the Court to determine

4    whether the Oversight Board has proved that.

5        The Oversight Board argues, because the classes in

6    which I hold claims is approved, that means, as Your Honor has

7    indicated, that I'm affected by that in some way, but they're

8    putting the cart before the horse.  The statute they rely on,

9    944(a)(3), simply states the provisions of a confirmed -- a

10   confirmed plan bind a creditor, whether or not the creditor

11   has accepted a plan.  But that does not obviate the

12   requirement that 314(b)(3) or the other requirements be met.

13       If the requirements under 314(b)(3) -- or the

14   requirements are not met, one never gets a confirmed plan,

15   and, thus, 944(a)(3) is never operable.  And I should, I

16   think, also address another argument that the Oversight has

17   been -- Oversight Board has been making, which they're

18   arguing, well, PROMESA preempts the Constitution of Puerto

19   Rico, but as I point out in my sur-reply, PROMESA 314(b)(3)

20   itself, itself requires the Oversight Board to prove that

21   debtor is not prohibited by law from taking any action to

22   carry out the Plan.

23       So PROMESA clearly does not preempt itself.  It's

24   PROMESA that imposes the 314(b)(3) requirement.  And,

25   furthermore, even if someone argued that the Puerto Rico

1  Constitution somehow is not law for purposes of 314(b)(3), we

2  would still have the United States Supreme Court Constitution,

3  and among other things, the Takings Clause that I've presented

4  in my sur-reply and objections.

5  I should turn to another requirement under 314, which

6  is 314(b)(6).  And the fact that the Puerto Rico Constitution

7  provides this clear right of first payment for GO bondholders

8  also shows that 314(b)(6) cannot be proven.  314(b)(6) says

9  that the Oversight Board, as the proponent of the Plan, must

10  prove the Plan is in the best interest of creditors, requiring

11  the Court to consider whether available remedies under the

12  nonbankruptcy -- nonbankruptcy laws and the Constitution of

13  Puerto Rico would result in a greater recovery of the

14  creditors than is provided in the Plan.

15  And, importantly, this language is different than the

16  best interest test under 943(b)(7) to the Bankruptcy Code.  As

17  I've showed in my sur-reply, the Oversight Board's argument

18  basically boils down to that you should read 314(b)(6)

19  identical to 943(b)(7), but the language is markedly different

20  in 314(b)(6).  Congress was well aware that Puerto Rico's

21  Constitution and other laws establish priorities of payment,

22  and Congress specifically required 314(b)(6), that those

23  priorities factor into the best interest test that the

24  Oversight Board must prove to have the Plan confirmed here.

25  So for the Oversight Board to prove that it has met

1   314(b)(3) and 314(b)(6) requirements, in essence, they must

2   prove it's permissible for Puerto Rico to pay lower priority

3   creditors before bondholders, who under Puerto Rico's

4   Constitution have the first right of payment.  And they must

5   prove that bondholders would not get a greater recovery under

6   Puerto Rico's nonbankruptcy law and Constitution.

7        Now, Puerto Rico plainly does have money to pay the

8   debt that is its first priority to pay under its Constitution,

9   and I've submitted documents that demonstrate this.  Today,

10  and it's from Puerto Rico's own documents, Puerto Rico has

11  literally 25 billion dollars in the bank.  Literally, over

12  12.5 billion of that is either dedicated to payment of GO

13  bonds, but hasn't been paid yet on the GO bonds, or is

14  unrestricted and could be used to pay the GO bonds.

15       Now, the last audited financial statements are over

16  three years old.  That's for the year that ended June 30,

17  2018.  But when Puerto Rico finally issued those audited

18  three-year-old financial statements, the auditors required a

19  note be included that provides an up-to-date number for how

20  much is owed on the GO and PBA debt service.  And the answer

21  is that as of May 31, 2021, the total past due debt service

22  for the five years or so of nonpayment was only 6.8 billion,

23  which -- and you add another six months of interest, today

24  that would be roughly 7.4 billion.

25       So Puerto Rico could pay off all of the past due GO

1   and PBA debt today and still have over 17.5 billion in the

2   bank, of which more than 5 billion would be unrestricted.  The

3   cash has accumulated because, in addition to not paying a

4   penny on its constitutional first priority GO and PBA bond

5   obligations, Puerto Rico has actually been running large

6   surpluses, despite paying on a PayGo basis two billion plus

7   per year in pensions.

8           In the last fiscal year ending June 30, 2021, despite

9   paying out two billion dollars PayGo for pensions, Puerto Rico

10  still had almost four billion dollars in net cash flow; four

11  billion of revenues in excess of expenses, even after paying

12  pensions.

13          The four billion dollars in cash flow for fiscal 2021

14  was three times the 1.3 billion annual prepetition debt

15  service for GO and PBA bonds.  All pensions were paid in

16  fiscal 2021, but zero interest was paid on the first priority

17  constitutional bond obligation.

18          Now, one might wonder how can a government that has

19  25 billion in the bank, that had a 4 billion dollar surplus in

20  the last fiscal year, and has 12.5 billion in cash that can be

21  used to pay its first priority GO bonds, how can they be

22  asking for a discharge in bankruptcy?  And the answer is, is

23  that unlike Chapter 9, PROMESA is being construed here not to

24  require proof of insolvency.

25          I've objected that PROMESA is a nonuniform bankruptcy

1    law that was tailored to Puerto Rico.  In fact, PROMESA was so

2    tailored to Puerto Rico, it's in the name itself.  PROMESA

3    stands for Puerto Rico Oversight Management and Economic

4    Stability Act.

5           Article I, Section 8, Clause 4 of the United States

6    Constitution gives Congress the power to enact, quote, uniform

7    laws on the subject of bankruptcies throughout the United

8    States.  Puerto Rico sold bonds throughout the United States

9    to individuals, including me.

10          Congress had no authority under the Constitution to

11   enact a special Puerto Rico bankruptcy statute that let's

12   Puerto Rico proceed in bankruptcy without proof of insolvency.

13   Every other municipal debtor throughout the nation has to

14   prove insolvency.  Puerto Rico, it's claimed, does not.  And

15   that's why we're here today, despite the cash on hand.  And I

16   might add that the Territory Clause, Article IV, Section 3,

17   does not supplant other specific constitutional provisions, as

18   the U.S. Supreme Court made clear recently in the *Aurelius*

19   case.

20          Now, I also want to emphasize that the Oversight

21   Board seeks to cut off bondholder rights to payment for all

22   time, not based on a current lack of cash to pay all GO and

23   PBA debt service, but rather based on the Oversight Board's

24   forecast for the future.  The Oversight Board is forecasting a

25   decline in Puerto Rico's fortunes, at least if one assumes

1   that the Puerto Rico Government continues to refuse to adopt

2   basic reforms.

3        The Oversight Board's own expert, Andrew Wolfe, has

4   submitted a report that expressly states, quote, the

5   Commonwealth Government has largely failed to implement the

6   structural reforms recommended by the Board, meaning the

7   Oversight Board.  But as Wolfe also notes, if Puerto Rico does

8   implement the structural reforms recommended by the Board,

9   Puerto Rico has the capacity to turn the negative growth trend

10  around.

11       Moreover, the Oversight Board's forecasts are not

12  infallible.  Before the last fiscal year began, the Oversight

13  Board forecast a 440 million surplus for fiscal 2021.  The

14  surplus turned out to be nine times greater, four billion

15  dollars, the four billion surplus I mentioned.

16       The Oversight Board's projections make assumptions

17  about population that are significantly lower than the actual

18  U.S. Census count, the census count at 8.4 percent more in

19  Puerto Rico than the Oversight Board is assuming in its

20  projections.  And this morning Mr. Bienenstock himself said

21  that the current Puerto Rico population is 2.928 million.

22  Well, the census count, the census actually counted people and

23  found 3.285 million, and that's in docket 18759-3, where I put

24  the census record.

25       Likewise, while everybody here believes that Medicaid

1   funding is going to continue, indeed increase, the Oversight

2   Board is projecting that the Medicaid expense will continue

3   and increase, but the Oversight Board projects that federal

4   funding to cover that Medicaid expense, which has been coming

5   in for the past ten years and is actually provided for and

6   increases are provided for in pending legislation, the

7   Oversight Board says because legislation hasn't actually been

8   enacted yet, well, we're going to assume it's all going to

9   just dry up. So we project that the federal funding for

10  Medicaid will drop by 80 percent, from 2.46 billion in fiscal

11  2021, to about one half, 500 million, in future years.

12  They're projecting an 80 percent drop.

13         No one believes that that is going to happen. Even

14  accepting the Oversight Board's own forecast, the 1.3 billion

15  prepetition GO and PBA debt service would drain from about 6

16  percent to 6.4 percent of revenues in each of the years

17  depicted in the Oversight Board's detailed projections in

18  Chapter 24 of the April 2021 Certified Fiscal Plan.

19         So since Puerto Rico can pay all currently due GO and

20  PBA debt, indeed, as I said, the surplus last year covered it

21  by three times, and since there is now going to be no

22  adjustment whatsoever, and a much greater annual expense for

23  monthly pension payments, there's no justification for

24  cutting off the GO and PBA bondholders now who have the right

25  of first payment. And if, in fact, there is this potential

1    for excess cash flow, and it's going to generate billions of

2    dollars, at the very least, that excess cash flow should go to

3    the bondholders who have the constitutional priority, not

4    additional bonuses to public employees.

5          And there's a broader issue here, Your Honor, which

6    is the inappropriateness of cutting off the rights of

7    bondholders who have this first claim under the Constitution,

8    and it's really brought home when you look at the expenditures

9    not protected by the Constitution that the Plan locks in for

10    the future, the Plan's fundamentally being used to reverse the

11    priorities under Puerto Rico's Constitution that were used to

12    sell the bonds.  And this is, as I've mentioned, prohibited by

13    314(b)(3) and (b)(6).

14          And it's even more troubling that bowing to the

15    political pressures in Puerto Rico, the Oversight Board has

16    repeatedly backed away from making adjustments to public

17    employee pension obligations, which itself had previously said

18    were essential.  So the first Plan, in February 2020, there

19    was a minor 8.5 percent decrease for pension benefits in

20    excess of 1,200 a month.  The Oversight Board said at that

21    time, in the Disclosure Statement, that was, quote, essential.

22    And then the Oversight Board backed off.

23          So in July of this year, there was going to be that

24    8.5 percent adjustment only of the pensions to the extent they

25    exceeded 1,500 a month.  And, again, the Oversight Board said

1    firmly in the Disclosure Statement this was essential.  Now
2    we're being told that, oh, no matter, the Plan is going to
3    provide -- there'll be no reduction whatsoever of monthly
4    benefits, no matter how highly compensated the particular
5    employee is, and no matter that the pension payments do not
6    have priority over the GO bondholders and PBA bondholders
7    under the Constitution.

8         And just as further examples of how constitutional
9    priorities are being reversed, I refer again to the fact that
10   public employees who aren't even owed money are being given
11   3,000 dollar bonuses, and also the up-side performance
12   bonuses, potentially billions in more bonuses to public
13   employees.  And then you look at the recent legislation, Act
14   53-2021.  And read through it, and you'll see that there's a
15   host, a litany of additional expenditures, however worthwhile,
16   that are being called for by that legislation, again in
17   priority over what should be the constitutional first priority
18   obligation.

19        The spending added under the new bond legislation is
20   just the latest example of why outlays in Puerto Rico have
21   increased 29 percent from fiscal '18 to fiscal '21, 29 percent
22   increase in outlays.  And there's also a significant issue
23   with tax incentives.  My objection details how Puerto Rico's
24   tax burden is just a fraction of that of developed OECD
25   countries.  And even the Oversight Board in the latest Fiscal

1   Plan has complained about how Puerto Rico has more than 300

2   tax incentives, with foregone revenues in excess of 21 billion

3   dollars, far more than any state as a share of the economy or

4   tax collections.

5         The Oversight Board's own bar chart shows that the

6   size of Puerto Rico's tax expenditures is literally off the

7   charts compared to any state, like 30 percent of GNP or 20

8   percent of GDP versus New York, for example, is 2.5 percent.

9   So Puerto Rico's tax expenditures are ten fold greater.  Yet,

10  in Act 257 of 2018, Puerto Rico reduced a number of taxes.

11  There have been three additional bills that I've put in as

12  exhibits where they further reduce taxes or added tax

13  incentive.

14        And, indeed, I would point out under this Plan, the

15  Plan proposes to pay two billion cash of tax credit claims in

16  full.  I identified three specific claimants who are getting

17  full payment, unimpaired, of among just the three claimants,

18  835 million of tax incentives.  And I would submit, Your

19  Honor, that that is not appropriate to pay out those claimants

20  in preference to the people with the constitutional priority.

21        Let me turn to the reference to votes.  A vote does

22  not excuse the Oversight Board from proving that it complied

23  with the requirements for confirmation.  No information has

24  been supplied concerning the number of individual investors in

25  each class.  When I asked the Oversight Board in an

1    interrogatory, the Oversight responded to my interrogatory by

2    saying that it did not --

3         (Sound played.)

4         MR. HEIN:  -- have access to information regarding

5    the identities of individual holders of bonds or the amounts

6    of the holdings.

7         And as I mentioned, the Supreme Court in the *American*

8    *United* case made the point that even though the vast majority

9    of the security holders there voted to accept the Plan, that

10   did not matter.  The Supreme Court reversed confirmation.  So

11   in addition to the fact that individuals aren't counted, if

12   they couldn't negate the ATOP delivery process here, even for

13   those individuals who could navigate that process, the vote

14   was inherently coercive.  Bondholders were told that only if

15   their class accepts do they get their share of the 1.321

16   percent.

17        I don't think you can read into the Plan or into the

18   vote, a vote of approval for the Plan by individual investors

19   when, A, you don't know actually how many individuals there

20   are out there.  We just couldn't navigate the process.  And,

21   secondly, when for those who could navigate the process, they

22   were basically told, if you want extra money, you have to vote

23   "accept".

24        Your Honor, to approve anything less than full

25   payment of the first priority obligation under Puerto Rico's

1    Constitution at this time, when Puerto Rico has the money to

2    pay in full, but just prefers to spend it for other purposes,

3    is setting -- I respectfully submit, we're setting Puerto Rico

4    up to become a serial defaulter.  The approach taken by the

5    Oversight Board and Puerto Rico officials reflects an

6    extraordinary short term mind-set.

7            The one premise of PROMESA was that Puerto Rico's

8    access to the credit markets at reasonable interest rates

9    should be restored, but if Puerto Rico just walks away from

10   its constitutional first priority, paying literally everything

11   else under the sun but the bonds --

12           (Sound played.)

13           MR. HEIN:  Can I just finish the thought, Your Honor?

14           THE COURT:  Yes, you may.

15           MR. HEIN:  Thank you.

16           So if Puerto Rico can just walk away from its

17   constitutional priority, paying all of these other expenses

18   I've referred to and more, and the Oversight Board actually

19   allows that to happen, and embraces the Plan that dramatically

20   cuts debt, even though, by the admission of their own expert,

21   reforms have not been made, even though they backed off twice

22   now and now are paying pensions in full, even as they're now

23   paying added cash bonuses to employees who weren't even owed

24   money, who would ever buy Puerto Rico bonds again at anything

25   like a normal interest rate?

1          So I'm arguing here as an individual bondholder in my

2    own self-interest, but, honestly, I think that time will show

3    that paying the obligations, like Hamilton -- we heard from

4    Mr. Bienenstock about Hamilton, but let me quote Hamilton.

5    Mr. Alexander Hamilton in 1790 said, states, like individuals,

6    who observe their engagements are respected and trusted, while

7    the reverse is the fate of those who pursue an opposite

8    conduct.

9          And I would respectfully submit, Your Honor, that

10   it's in Puerto Rico's long-term interest to do what Alexander

11   Hamilton recommended the state do in 1790, which is pay their

12   obligations.  Thank you, Your Honor.

13         THE COURT:  Thank you, Mr. Hein.

14         Our next speaker is Mr. Cuprill for Sucesión Pastor

15   Mandry Mercado.

16         Mr. Cuprill, are you there, or Cuprill?

17         MR. CUPRILL:  Yes, Your Honor.

18         THE COURT:  Good afternoon.

19         MR. CUPRILL:  Good afternoon.

20         THE COURT:  I'm allocating you ten minutes.

21         MR. CUPRILL:  My names is Charles -- I'm sorry, Your

22   Honor.

23         THE COURT:  I'm just confirming that you have ten

24   minutes, rather than eight.

25         MR. CUPRILL:  Thank you, Your Honor.

1      My name is Charles A. Cuprill, and I represent

2  Sucesión Pastor Mandry Mercado, who has an inverse

3  condemnation claim in the amount of 70 million plus dollars,

4  interest and attorney's fees as awarded by the Court of First

5  Instance of Puerto Rico, and affirmed by the Court of Appeals.

6      Your Honor, we basically have stated our position,

7  both in our objection to the confirmation and the Plan -- of

8  the Plan, and the reply that we recently filed last Friday.

9  So I'm not going to repeat the arguments that we raised in

10  those two documents, and -- just to make reference to the main

11  issue in reference to our objection.  And it's basically the

12  nonclassification, or otherwise improper classification of

13  Sucesión's claim.  And that the claim, as finally allowed, and

14  its nondischargeable nature, calls for full payment thereof

15  under the provisions of the Plan.

16      When I say that the claim is not classified under the

17  definition of eminent domain claim in the Plan, and also

18  assuming that the intention of the Plan is for it to be

19  classified as a general unsecured claim, if that would be the

20  case, it will be a discriminatory treatment to Sucesión's

21  claim, which is rooted as well as the regular condemnation

22  proceedings under the laws of the Commonwealth of Puerto Rico,

23  on the Takings Clause of the Constitution of the United States

24  of America.

25      Section 01 of PROMESA cannot discriminate in the

1    classification of an eminent domain claim against the claim of

2    Sucesión, since on -- the fact that Sucesión, different from

3    the claims defined under eminent domain claims, have received

4    the compensation as a result of the taking that was effected

5    in their cases, and the deposit that was made before the Court

6    of First Instance.

7           In the case of Sucesión, no payment whatsoever --

8    assuming that the argument of the Commonwealth would be to the

9    effect that in the case of the other condemnation claims, what

10   was deposited with the Court of First Instance is tantamount

11   to compensation under the Takings Clause, we submit that the

12   claim of Sucesión is not a matter of dischargeability as

13   decided in the case of *City of Detroit*.  Not a matter of its

14   unsecured nature, but its right to be paid in full under the

15   Plan, just as priority and administrative claims are.

16          And the claim arises under the Takings Clause.  We

17   cannot be overridden by PROMESA, particularly taking into

18   consideration the specific nature of PROMESA, which is not a

19   uniform bankruptcy law, but a law that was tailored to the

20   specific needs of the Commonwealth of Puerto Rico.

21          The case of *Knick* that we cited in our writings,

22   decided after the *City* -- after the *City of Detroit*,

23   recognizes the applicability of the Takings Clause to inverse

24   condemnation proceedings, categorically stating that a

25   property owner has an actionable Takings Clause claim when

1   property is taken without paying for it.  The Fifth Amendment

2   right to full compensation arises at the time of the taking,

3   which cannot be affected by PROMESA, and must be paid in full

4   under the Plan.

5           That's our argument -- our opening argument for

6   today, Your Honor.

7           THE COURT:  Thank you, Mr. Cuprill.

8           MR. CUPRILL:  You're welcome, Your Honor.

9           THE COURT:  Next I call on Mr. Rafael Gonzalez

10  Valiente for Suiza Dairy.

11          MR. GONZALEZ VALIENTE:  Good morning, Your Honor.

12          THE COURT:  Good afternoon.

13          MR. GONZALEZ VALIENTE:  I hope that you can hear me

14  fine.

15          THE COURT:  Yes.  I can hear you well, and I can see

16  you.

17          MR. GONZALEZ VALIENTE:  Okay.  Perfect.  Thank you,

18  Your Honor.

19          Good afternoon.  My name is Rafael Gonzalez Valiente

20  from Godreau & González Law, in representation of Suiza Dairy,

21  Inc.  As a preliminary matter, we want to point out that the

22  Eighth Amended Plan of Adjustment addressed part of our

23  objection, the one that was dealing with the incorrect amount

24  owed on Suiza's claim.  Therefore, we withdraw that part of

25  our objection, but maintain the rest of the objection as to

1    the confirmation, and restate the same for the Eighth Amended

2    Plan of Adjustment.

3         This might be a -- I'm not sure if this is the

4    correct time, but in order to not affect the presentation of

5    evidence later on, we would like to ask the Court to admit

6    into evidence our exhibits, which are submitted in accordance

7    with the Court's Order, and can be found in docket 18887.  No

8    objections were raised to those exhibits, and since they are

9    judgments by the Federal District Court of Puerto Rico, the

10   Court may take judicial notice of them.

11        THE COURT:  Well, rather than at this point dealing

12   with the admission of evidence, it is a bit irregular --

13        MR. GONZALEZ VALIENTE:  That's fine, Your Honor.

14        THE COURT:  Yes.  I would do it in sequence once the

15   FOMB has put in its evidence, and then the objectors put in

16   their evidence, and you would tender those exhibits and --

17   yes, so let's do it that way.  Sorry.

18        MR. GONZALEZ VALIENTE:  No.  That's okay, Your Honor.

19   I understand.  It's your prerogative.  I was just trying to be

20   efficient.

21        THE COURT:  Yes.

22        MR. GONZALEZ VALIENTE:  The importance of those

23   exhibits, Your Honor, is that they show the constitutional

24   nature of Suiza's claim as a regulatory taking by the

25   Commonwealth of Puerto Rico through one of its

1    instrumentalities, ORIL, or the instrumentality that controls

2    the price of milk in Puerto Rico.  Actually, it controls the

3    whole industry, the whole milk industry.

4         This is important, because the FOMB would have the

5    Court believe that Suiza's claim stems from a settlement

6    agreement of a contract.  This is incorrect.  As explained in

7    detail in our objection, Suiza's claim is based on a judgment

8    reached after years of litigation and weeks of trial, in which

9    the District Court clearly ruled that the Commonwealth of

10   Puerto Rico had taken Suiza's properties through the

11   regulation by which it fixed the price of raw and fresh milk.

12   Suiza's claim is simply the constitutional requirement of just

13   compensation on account of said taking.

14        Our objection to the Plan is simple.  The Plan seeks

15   to impair and discharge part of Suiza's just compensation, but

16   this claim is protected by the Takings Clause of the U.S.

17   Constitution, which undeniably applies to the Commonwealth of

18   Puerto Rico.  The Supreme Court's consistent rulings on the

19   matter clearly support this conclusion.

20        It is undisputed that PROMESA is a bankruptcy statute

21   that was specifically drafted to allow the Commonwealth of

22   Puerto Rico to restructure its debts.  And I repeat myself,

23   because this is an important part of the analysis.  PROMESA is

24   a statute, a law.  Given that fact, Justice Thomas' statement

25   in the recent case of *Knick v. Township of Scott* is not only

1   illustrating, but should end the discussion right there.  To

2   paraphrase Justice Thomas, if the requirement of enforcing the

3   Takings Clause makes some regulatory programs unworkable in

4   practice, so be it.

5         Your Honor, the constitutional right of just

6   compensation is self-executing, and may not be impaired in any

7   way, by a law or regulatory program, which is exactly what

8   PROMESA is.  That does not mean that PROMESA has to be

9   discarded.  The Plan of Adjustment can be confirmed, and the

10  case does not have to be dismissed.  We understand the

11  importance of confirming the Plan for the people of Puerto

12  Rico and the parties before you, but the Constitution

13  imperative, to provide just compensation, may not be a victim

14  of the restructuring.

15        The FOMB simply needs to amend the Plan to make

16  Suiza's claim nondischargeable, or the Board can follow the

17  Detroit Court's example and accept the claims from discharge

18  pursuant to Section 944(c)(1) of the Bankruptcy Code, which is

19  made applicable to PROMESA through its Section 301(a).

20        The Plan proponents argue that the constitutional

21  claims may somehow be impaired, because they state that they

22  are "unsecured."  Even if they are unsecured, which is not

23  admitted, they may not be impaired or discharged just because

24  they're unsecured.

25        There are numerous examples of other unsecured claims

1    that may not be discharged, such as priority claims, Section

2    -- those claims found in Section 2164 of PROMESA, and those

3    listed in Section 523 of the Bankruptcy Code, which we do know

4    do not apply to PROMESA, but they're an example of unsecured

5    claims that may not be discharged.

6         So the FOMB's argument that just because they are

7    unsecured they may be discharged is incorrect.  The Court in

8    the reorganization of the City of Detroit correctly exempted

9    the claims of the objecting taking creditors -- claimants from

10   discharge using the powers under Section 944.  That is exactly

11   what Suiza requests.  This would allow the Plan of Adjustment

12   to be confirmed, and still comply with the Constitution of the

13   United States.

14        As explained in more detail in our Sur-reply of

15   docket 19087, the cases cited by the FOMB in its Omnibus

16   Objection simply do not support their complaints.  In fact,

17   one of the cases cited by the FOMB, the case of *AmeriCredit*,

18   even goes so far as to hold, and I quote, bankruptcy laws,

19   which is what PROMESA is, are subject to the Fifth Amendment's

20   prohibition against taking property without just compensation.

21   That is exactly the opposite of what the FOMB is alleging.

22        The FOMB also relies heavily on the case of *In re*

23   *Stockton*, but --

24        THE COURT:  I'm sorry, sir.  I'm going to ask you to

25   spell the names of those case to make sure --

1              MR. GONZALEZ VALIENTE:  Oh, I'm sorry.

2              THE COURT:  -- that the court reporter gets them.

3              MR. GONZALEZ VALIENTE:  They're cited in our motions,

4    but *AmeriCredit* is 440 F.3d 850.

5              THE COURT:  Thank you.  The earlier case relied on by

6    the Oversight Board that you mentioned?

7              MR. GONZALEZ VALIENTE:  I'm sorry.  That was the one

8    that I mentioned.  The other case I was talking about is *Knick*

9    *v. Township of Scott*.

10             THE COURT:  You talked about *Knick v. Township of*

11   *Scott*.  You talked about *City of Detroit*.

12             MR. GONZALEZ VALIENTE:  Yes, which is -- and

13   *AmeriCredit* --

14             THE COURT:  You said -- and *AmeriCredit*.  Thank you.

15             MR. GONZALEZ VALIENTE:  -- which says bankruptcy laws

16   are subject to the Fifth Amendment.

17             THE COURT:  Thank you.

18             MR. GONZALEZ VALIENTE:  And, finally, the FOMB relies

19   heavily on *In re Stockton*, which is 909 F.3d 1256, but

20   *Stockton* was dismissed on equitable mootness grounds.  The

21   rest of the rulings are *res dicta*.

22             As we discussed in our reply, *Stockton* is also easily

23   distinguishable from the instant case on numerous matters.

24   The majority in that case ruled that the appellant was

25   requested that the Plan that had already been confirmed and

1    executed be rolled back, affecting third -- innocent third

2    parties.  This is not what we're asking.  We're just asking

3    for our claim to be found to be nondischargeable.

4          And there are also others, other distinguishable

5    features of which we discussed in more detail in our reply.

6    And it also should be noted that *Stockton* has a very strong

7    and very well thought out dissent that supports the

8    conclusions reached by the Detroit Court and our own

9    arguments.

10         The Supreme Court has consistently held that there

11   can be only one outcome once the taking has occurred.  The

12   government has to provide just compensation.  The FOMB

13   contends that the holdings in *Knick v. Township of Scott*

14   supports his arguments, while it really supports the opposite

15   conclusion.

16         For example, *Knick* specifically holds that the right

17   to just compensation is born as soon as the government takes

18   private property, and said right is, and I quote, irrevocable.

19   I repeat, irrevocable.  The Court did not say revocable unless

20   there is a bankruptcy.

21         The Court goes further, saying, and I again quote --

22         (Sound played.)

23         MR. GONZALEZ VALIENTE:  -- no subsequent action by

24   the government can relieve it of the duty to provide just

25   compensation.

1          With all due respect, *Knick* undermines the FOMB

2     arguments and some of the findings in *Stockton*, which is one

3     of the cases that the FOMB heavily relies on.  *Knick* also

4     stresses that just compensation must be awarded once the

5     taking occurs.  Any support that the FOMB hopes to find in

6     that case is misplaced.

7          Finally, the FOMB argues that claims for damages

8     arising out of the Civil Rights Act in Section 1983 may be

9     discharged, so by analogy, takings claims may also be impaired

10    and discharged.  With all due respect to the FOMB, that is

11    also incorrect.  We agree that Section 1983 claims may be

12    discharged.  That is because those monetary damages stem from

13    the law, the Civil Rights Act, not the Constitution.  On the

14    other hand, takings claims may not be impaired, because the

15    Constitution itself requires that the government provides just

16    compensation.

17         If you have any questions, Your Honor, I'd be happy

18    to answer them.  If not, I am done.

19         THE COURT:  Thank you, sir.  I have no questions for

20    you at this time.

21         So the next speaker will be Mr. Capdevila for Finca

22    Matilde.

23         MR. CAPDEVILA DIAZ:  Good morning, Your Honor.  Good

24    afternoon, Your Honor.  Can you hear me well?

25         THE COURT:  Yes, I can.  Good afternoon.

1    MR. CAPDEVILA DIAZ:  For the record, Eduardo

2    Capdevila from Fullana-Fraticelli & Associates on behalf of

3    Finca Matilde, Inc.

4        We filed an objection to the confirmation of the

5    Seventh Amended Plan of Adjustment, and we submit this

6    argument in support of our objection, which is just as

7    applicable to the recently filed Eighth Modified Plan.

8        The Constitution, which is our basic social contract,

9    or the fundamental law in Alexander Hamilton's words, as has

10   been quoted a lot this morning, establishes the judicial

11   branch as the forum in which actions of the political branches

12   are tested against the Constitution, plans, and limitations of

13   authority.

14       Although the Bill of Rights was not included in the

15   1789 Constitution, the first ten Amendments, which are the

16   Bill of Rights to the Constitution, had been drafted and

17   ratified by 1791.  The content and ratification of this Bill

18   of Rights reflects a deep-rooted concern about the protection

19   of civil liberties against government intrusion.

20       The content of the Bill of Rights shows that the

21   framers meant to incorporate their revolutionary tradition

22   that there are certain powers of the sovereign that must yield

23   to the people, or as Alex -- Sir Edward Coke puts it, there

24   are rights against which even the powers of the king must bow.

25   Among those fundamental rights is the people's right to that

1   which is their own, the use and enjoyment of private property.

2        With this in mind, it is of no surprise that a

3   century after the ratification of the Bill of Rights, Supreme

4   Court Justice Brewer held that "it is the duty of courts to be

5   watchful of the constitutional rights of citizens, and against

6   any stealthy encroachments thereon."  Today, these words are

7   as relevant as they were back then, because the Board seeks to

8   impair and discharge the government's obligation to pay just

9   compensation for the property it took.

10       So you see, Your Honor, the questions before the

11  Court are very straight forward.  Can the government be

12  relieved of its constitutional obligation to pay just

13  compensation?  Can the Oversight Board do, through a Plan of

14  Adjustment, that which the sovereign cannot?  The answer to

15  these questions, Your Honor, is no, the Board cannot.

16       Much has been argued in briefs and during today's

17  hearing that -- whether the *Detroit* Opinion should be followed

18  or whether the *Cobb* case of the Court of Appeals should be

19  followed, but, Your Honor, at the end of the day, none of

20  those cases bind this Court.  And while we vehemently submit

21  that the *Detroit* Opinion is the correct one, and that the

22  Court does not need to look to those cases to rule on the

23  matter, even though the Supreme Court has not expressed itself

24  on the subject matter, a glance at the Fifth Amendment and its

25  case law leads to no other conclusion than no matter how great

1   the government's needs, it cannot take property without paying

2   just compensation.

3         The Fifth Amendment states the exact limitation on

4   the power of the government, and that is to pay just

5   compensation regardless of whether the taking was prepetition.

6   As the Supreme Court held over a century ago, the right to

7   just compensation is inseparably connected to the government's

8   power to take property.

9         In fact, as recent as June 2019, the Supreme Court in

10  the *Knick* case characterizes such right to just compensation

11  as an irrevocable right.  Thus, this right cannot be changed,

12  it cannot be modified or otherwise discharged, as the Board

13  seeks.

14        Now, the Plan proponent wants the Court to infer that

15  the Bankruptcy Clause and the Contract Clause of the

16  Constitution allow for the impairment and discharge of the

17  government's obligation to pay that just compensation.  Yet,

18  the Bankruptcy Clause only provides that Congress may enact

19  uniform laws on the subject of bankruptcy throughout the

20  United States.

21        Such language, it does not create an exception to the

22  enforcement of the Bill of Rights.  It certainly does not

23  provide for Congress or the Plan proponent to discharge the

24  government's obligation to pay just compensation, no matter

25  how many supporters of the Plan they have.  On the contrary,

1  Supreme Justice Fuller held a century ago in the *Hanover*
2  *National Bank* case that "Congress may prescribe any
3  regulations concerning discharge in bankruptcy that are not so
4  grossly unreasonable as to be incompatible with fundamental
5  law."
6          Thus, the Plan of Adjustment cannot be incompatible
7  with something so fundamental as the Fifth Amendment.  The
8  Plan of Adjustment before this Court cannot do that which not
9  even Congress can do.
10         Earlier this morning, we heard counsel for the Board
11 arguing in favor of the legality of the Plan because of the
12 Contract Clause, but eminent domain claimants did not enter
13 into a contract with the Commonwealth of Puerto Rico.  My
14 client's claim against the Commonwealth is certainly not
15 voluntary.  My client's claim against the debtor arose out of
16 the government's exercise of its sovereign power over the
17 people, precisely the power which the framers of the Fifth
18 Amendment sought to limit.
19         The Plan of Adjustment cannot be used as a back door
20 to override this constitutional limitation.  It cannot be used
21 as a back door to encroach the people's right to receive just
22 compensation for the property the Commonwealth took.  To
23 confirm a Plan of Adjustment that discharges this
24 constitutional obligation would bring us back to the era of
25 King George the III, where the people feared their government,

1   feared that they would lose something so fundamental as

2   private property.

3           The framers of the Fifth Amendment sought to

4   eradicate this fear, to shelter the people from the

5   government's power to take their property.  On this matter,

6   Your Honor, T.S. Elliot once wrote that the debt tree gives no

7   shelter.  Just like that tree, if the Board is allowed to pull

8   its twigs, if the Board is allowed to pull its branches, if it

9   is allowed to drill holes in its trunk, the Fifth Amendment

10  will no longer be the shelter the framers envisioned, because

11  this will not just be a case about Puerto Rico.  A

12  determination on this matter will have an effect on other

13  municipality bankruptcy cases across the United States and

14  across other territories to which PROMESA applies to, because

15  despite its title, PROMESA does not just apply to Puerto Rico.

16          That is why we move the Court to deny confirmation.

17  No Plan of Adjustment can be confirmed unless it pays eminent

18  domain claimants in full through the Plan of Adjustment.  The

19  Constitution, Your Honor, is supreme, and it is the duty of

20  the branch to say what the law is.  The United States

21  Constitution, which is nonbankruptcy law --

22          (Sound played.)

23          MR. CAPDEVILA DIAZ:  -- pursuant to Section 314 of

24  PROMESA, mandates that my client be paid in full just

25  compensation for the property the government took.  It is not

1  only right, it is what the Constitution mandates.  And that,

2  Your Honor, is why we request that the Plan -- that the Court

3  denies confirmation of the Plan.

4        We also join in with Counsel Cuprill and Gonzalez

5  Valiente's words.  However, we must qualify that we understand

6  that a determination of nondischargeability would be an empty

7  victory for the eminent domain claimants, because unlike the

8  *Detroit* case, here there is a board, an Oversight Board that

9  may survive the Plan.

10       So if the Board can handle the fiscal plan outside of

11  the boundaries of this Court, then eminent domain claimants

12  will not be able to collect, will not have a forum to collect,

13  because their only forum under state law is that it be

14  included in the fiscal plans, which the Board controls.

15       Thank you, Your Honor.

16       THE COURT:  Thank you, Mr. Capdevila.

17       The next speaker is Mr. DeChiara.  I'm sorry.  Did

18  someone else -- Mr. Capdevila, did you want to say something

19  else?

20       MR. CAPDEVILA DIAZ:  (Nodding head up and down.)

21       THE COURT:  Please, go on.

22       MR. CAPDEVILA DIAZ:  No.  It was more of a question.

23       Would the Court like me also to state the cases I

24  quoted in my argument, the citations or --

25       THE COURT:  That might be -- let me just check with

1   the court reporter.

2             Did the court reporter get the case names?

3             COURT REPORTER:  Yes, Your Honor.

4             THE COURT:  The court reporter has caught up with

5   you, so thank you.

6             MR. CAPDEVILA DIAZ:  Okay.  Thank you.

7             THE COURT:  All right.  So now we'll turn to

8   Mr. DeChiara for SEIU and UAW.

9             MR. DECHIARA:  Yes.  Good afternoon, Your Honor.

10  Peter DeChiara from the law firm of Cohen, Weiss & Simon, LLP,

11  and we represent two clients in these proceedings, the United

12  Auto Workers Union and the Service Employees International

13  Union.  Both of my clients are labor unions that represent

14  Commonwealth employees.

15            Let me begin with the position of SEIU.  It is SEIU's

16  position that the proposed Plan of Adjustment is far too

17  generous to bondholder creditors.  Indeed, the bondholders'

18  enthusiastic support for the Plan, as noted in the vote tally,

19  reflects that.

20            SEIU believes that the undue generosity -- that that

21  undo generosity would leave Puerto Rico with unaffordable

22  debt -- an unaffordable debt burden.  Puerto Rico is far

23  poorer on a per capita basis than all of the U.S. states.  In

24  her remarks this morning, counsel for the Retiree Committee

25  detailed how deep and pervasive that poverty is, and I won't

1  repeat those figures again.

2  The proposed Plan of Adjustment would leave Puerto

3  Rico with more debt per capita than the vast majority of U.S.

4  states.  If it were a state, Puerto Rico would be among the

5  most indebted, even after the debt reduction in the proposed

6  Plan of Adjustment.

7  It is SEIU's view that to meet the pressing human

8  needs on the island, deeper cuts are required of financial

9  creditors, and for that reason, SEIU objects to the Plan of

10  Adjustment.  In addition, SEIU intends to object by the

11  November 12th deadline to the Oversight Board's proposed

12  findings regarding Act 53, and it reserves all of its rights

13  regarding that objection.

14  Let me now turn to the position of the UAW.  On

15  October 19th, the UAW filed objections to Plan confirmation

16  and to certain provisions of the then proposed Confirmation

17  Order.  The UAW's objections were, like those of the

18  Government of Puerto Rico, filed before the government's

19  enactment of Act 53, the "Act to end Puerto Rico's

20  bankruptcy," and in certain respects, parallel to those of the

21  government.

22  The UAW is currently reviewing the Modified Eighth

23  Amended Plan of Adjustment and the latest proposed

24  Confirmation Order, both filed yesterday.  The UAW is also

25  reviewing the Oversight Board's Act 53 Urgent Motion, the

1    response date to which is November 12th.

2         In addition, as Mr. Rapisardi acknowledged to the

3    Court this morning, the government is currently in dialogue

4    with the Oversight Board regarding certain concerns it may

5    have as to last night's filing, and has promised to update the

6    Court on those discussions by November 10th.

7         The UAW expects that paragraph 62 of the proposed

8    Confirmation Order entitled Maintenance of Pension System, may

9    be among the subjects of those discussions, given that that

10   paragraph was again changed in last evening's latest iteration

11   of the proposed Confirmation Order.  As a result of the

12   foregoing, the UAW intends to review those of its outstanding

13   objections that parallel the government's pre-Act 53

14   objections, and to do so in light of last evening's filings

15   and the government's upcoming November 10th date.  Based on

16   that review, the UAW will determine whether to maintain,

17   modify, or withdraw such objections.

18        If the Oversight Board is willing, the UAW also seeks

19   to meet and confer with the Oversight Board counsel concerning

20   those other portions of its objections that are UAW-specific

21   and concern union grievance processing and enforcement

22   matters.  The UAW hopes to resolve those matters consensually.

23        The UAW reserves the right to promptly respond to the

24   latest and any further filings in writing, and to make a

25   presentation at the time of closing argument as to any UAW

1     objections which might then remain outstanding.

2             Thank you, Your Honor.

3             THE COURT:  Thank you, Mr. DeChiara.

4             The next speaker is Mr. Almeida for the credit

5     unions.

6             Good afternoon, sir.

7             MR. ALMEIDA BERNAL:  Yes.  Good afternoon, Your

8     Honor.  Can you hear me well?

9             THE COURT:  Yes, I can.  Thank you.

10            MR. ALMEIDA BERNAL:  Okay.  Yes.  Good afternoon,

11    Your Honor, court staff, counsel for other parties, and all

12    the people present in this video conference.  I am attorney

13    Enrique Almeida on behalf of Cooperativa de Ahorro y Credito

14    Abraham Rosa, Cooperativa de Ahorro y Credito de Ciales,

15    Cooperative de Ahorro y Credito de Rincon, Cooperativa de

16    Ahorro y Credito de Vega Alta, Cooperativa de Ahorro y Credito

17    Dr. Manuel Zeno Gandia, and Cooperativa de Ahorro y Credito de

18    Juana Dias.  These are all state-chartered credit unions who

19    are claimants of the Commonwealth in the instant case.  I am

20    here to present arguments and the position to the confirmation

21    of the Commonwealth's Plan of Adjustment on behalf of these

22    credit unions.

23            The objectors herein are several state-chartered

24    credit unions who are part of the financial cooperative system

25    in Puerto Rico comprised of 116 cooperatives, and encompassing

1   around 1.2 million members and depositors, the majority of who

2   are vulnerable populations comprised of middle and low income

3   seniors and elderly persons.

4           State-chartered cooperatives, the credit unions

5   herein have a special nature tinged with a high public

6   interest.  On the one hand, they are regulated, supervised,

7   and insured by COSSEC, a public corporation created by the

8   Commonwealth law.  On the other hand, they are the primary

9   institutions, primary lenders, and providers of cost effective

10  financial services to a multitude of people on the island.

11          The credit unions' claims against the Commonwealth

12  are based on the U.S. Constitution, particularly on the

13  Takings Clause of the Fifth Amendment.  The Commonwealth and

14  several of its instrumentalities incurred in the direct taking

15  of the credit unions' assets without just compensation.  The

16  Commonwealth, together with the GDB and COSSEC's concerted

17  efforts in a fraudulent scheme to offer and actually place

18  upon the credit unions excessive amounts of unsound Puerto

19  Rico debt securities issued by the Commonwealth, COFINA, and

20  other related issuers to fund the GDB.

21          As a result of this scheme, the Commonwealth and the

22  GDB took material portions of the credit unions' cash and

23  liquid assets without providing adequate compensation for

24  them.  In essence, the Commonwealth appropriated the monies of

25  the credit unions to finance the government's operation,

1    knowing that it was financially insolvent, which constitutes a

2    direct and regulatory taking.  In exchange, the credit unions

3    were provided with government papers which did not constitute

4    just compensation.

5          These claims were included in detail in the causes of

6    action of two adversary proceedings pending adjudication from

7    the Court.  These are adversary proceeding 18-28 and 19-389.

8    The claims were also included in each of the credit unions'

9    Proof of Claims that were filed in the Commonwealth's case.

10         The credit unions' grounds for objection to the Plan

11   of Adjustment are all included in the joint objection to the

12   Seventh Plan of Adjustment filed at docket 18594.  These

13   objections are hereby restated as their objection to the

14   Eighth Amended Plan of Adjustment recently filed and modified.

15         First, like several of the preceding appearing

16   parties, the credit unions' claims are based on the

17   enforcement of their constitutional rights for the

18   government's taking of their property without just

19   compensation.  The credit unions herein respectfully submit

20   that their claims are not subject to impairment or reduction

21   as proposed by the treatment in the Plan of Adjustment.

22         These are constitutionally protected by the Fifth and

23   14th Amendments of the Constitution of the U.S. that prohibit

24   the taking of property without just compensation, and, thus,

25   cannot be affected by Congress bankruptcy powers pursuant to

1   which PROMESA was enacted.  The Commonwealth must propose

2   payment in full to the credit unions, regardless of what

3   reductions and compromise that it seeks in the Plan of

4   Adjustment.

5            As Your Honor knows, a state may not transfer private

6   monies into public property without just compensation.  The

7   confirmation of a plan of adjustment in the U.S. Bankruptcy

8   Codes and PROMESA's content that does not pay in full

9   creditors' claims for taking their private property will also

10  constitute a public taking of private property and denial of

11  just compensations for that taking.

12           Although Congress may authorize the Commonwealth

13  under PROMESA to impair contractual and other claims pursuant

14  to its bankruptcy powers, it may not authorize the taking of

15  private property without just compensation in violation of the

16  Fifth Amendment.  The credit unions' objection to the

17  confirmation in this regard is a constitutional challenge to

18  PROMESA and to the Bankruptcy Code, which this Honorable Court

19  has already certified to the Attorney General as it transpired

20  from the Order entered at docket 18620.

21           The Plan of Adjustment does not list the credit

22  unions' claims in a separate class providing for full payment

23  of their claims, but under impaired classes where they will

24  not receive payment in full of their claims, and in some

25  instances, nothing.  In light of the above, the Plan, as it is

1   currently drafted, cannot be confirmed, because it is in

2   contravention of the Constitution. In the alternative, the

3   credit unions submit that their claims be excepted from

4   discharge in the others confirming the Plan pursuant to 11

5   U.S.C. 944(c).

6          Now, the credit unions also submit that the

7   exculpations proposed to be granted to the government parties

8   in this Plan of Adjustment are broad since -- are

9   impermissibly broad since they extend to release to additional

10  parties and related persons of the debtors, as well as to any

11  entity considered government parties.

12         Due process of law warrants and requires adjudication

13  on the merits of the factual and legal issues presented in the

14  pending adversary proceedings previously mentioned.  The

15  credit unions also should be preserved pursuant to the public

16  interest as these claims pertain to the protection of the

17  capital and resources of depository institutions.  The

18  adversary proceedings were on file actually by the credit

19  unions to comply with their fiduciary duties to protect the

20  interests of their members and depositors.

21         Moreover, the Commonwealth and other related parties

22  should not be granted a discharge due to their lack of honesty

23  and their fraudulent behavior as to the credit unions.

24  Essentially, the Plan of Adjustment is being used as a means

25  to whitewash the government's misconduct beyond constitutional

1  taking, and the action and reckless disregard to their

2  statutory and fiduciary duties to safeguard and ensure the

3  cooperative financial system.

4      It is a well-settled legal maxim in bankruptcy law

5  that discharge of debts is only granted to honest debtors.

6  Instead of receiving releases and exculpations when the Plan

7  of Adjustment is confirmed, debtor and its instrumentalities,

8  including COSSEC, should not receive a discharge from the

9  credit unions' claims.  Discharge, and its legal principles

10  and factual surroundings are equivocal in nature.  In this

11  case where the Commonwealth defrauded the credits unions

12  herein, the powers of Section 105 of the Bankruptcy Code

13  should carry out the general and equitable principles of

14  bankruptcy law to disallow a discharge order.

15      The Bankruptcy Code does not foster dishonesty or

16  fraud, neither does PROMESA or this Honorable Court's

17  determinations.  Provisions of the law and this Honorable

18  Court's findings and conclusions as an Article III court

19  should not be construed to be able to reward a dishonest

20  debtor with the discharge of the credit unions' claims, and

21  the release and exculpations of the debtor from these claims.

22      In light of the above, the credit unions also move

23  for denial of confirmation, or, in the alternative, for an

24  exception of discharge of our claims.  This will be my

25  presentation.  Thank you.

 1            THE COURT:  Thank you, Mr. Almeida.

 2            The next speaker will be Mr. Sanchez Girona for

 3   MAPFRE Praico Insurance.

 4            MR. SANCHEZ GIRONA:  Good morning, Your Honor.  For

 5   the record, Jose Sanchez Girona on behalf of MAPFRE Praico

 6   Insurance Company.  MAPFRE Insurance Company is an insurance

 7   company that issues surety bonds to guarantee the performance

 8   of contractors in construction projects.

 9            In this case, MAPFRE filed two objections to the

10   confirmation of the Plan.  One of them was in the Public

11   Buildings Authority case, and the other in the Commonwealth

12   case.  Basically, MAPFRE -- in the Public Buildings Authority

13   case, MAPFRE filed a Proof of Claim No. 2 in the secured

14   amount of $688,471.05.  In that project, MAPFRE issued a bond

15   to secure the principal's performance of the project, which is

16   Synergy, Synergy Construction Company.  And under that bond,

17   MAPFRE incurred a loss of $9,245,213.  And under the contract

18   that was guaranteed by MAPFRE, it provided that the owner of

19   the project, which was the Public Buildings Authority, was to

20   retain 10 percent of the amounts paid, earned by the

21   contractor, for -- as retainage.

22            On August 2, 2006, the Public Buildings Authority

23   declared the contractor, Synergy, in default of its obligation

24   of the bonded contract, and asked MAPFRE to complete the

25   project.  MAPFRE completed the project, expended over nine

1    million dollars, as I already expressed, and today there

2    remains retainage of $698,471.05.

3            Basically, in the other project, in the -- in the

4    Commonwealth case, MAPFRE issued four payments on performance

5    bonds for four projects of the Commonwealth of Puerto Rico.

6    In those, the principal bond under those projects was Juritec

7    Engineering.

8            All four projects were completed, but MAPFRE incurred

9    a loss in payments to labor and materials for those projects,

10   amounting to a total of $5,299,331.89.  In those four

11   projects, as of today, there's a -- all the contracts provided

12   for a ten percent retainage of all the payments made to the

13   contractor.  And as of today, there's a retainage of

14   $2,392,463.36.  So, basically, the contention of MAPFRE is

15   that the amounts that have been retained by the PBA and by the

16   Commonwealth, pursuant to the well settled law, juris prudence

17   for the past at least 40 years in the First Circuit, those

18   amounts are not property of the government.

19           There are two cases upon which MAPFRE bases its

20   contention.  We filed an objection in each of the cases, and

21   we laid down all our arguments there.  Basically, in the case

22   of *Perlman v. Reliance*, the Supreme Court of the United States

23   basically found that when the -- that the owner has the right

24   to use the retainage to complete the projects in case that the

25   contractor defaults its obligations under the contract.  But

1   when the surety makes the payments to complete -- either

2   completes the project under the performance bond or makes the

3   payments to the suppliers of labor and materials, the surety

4   subrogates to the rights of the owner under the construction

5   contract against the contractor.

6        Under the construction contract, the owner has the

7   right to use the funds retained in the public works to finish

8   the project.  If the surety pays or completes the project, it

9   subrogates over the rights of the owner, and those funds

10  become its property.

11       In the case of *Perlman v. Reliance*, the facts were

12  similar to this case.  In that case, a surety -- the bonded

13  principal defaulted its obligation of payments to the

14  suppliers of labor and materials, and the surety stepped in

15  and made payments that were in excess to the amounts that were

16  retained by the owner.  And the Supreme Court decided that the

17  funds -- that by paying to those suppliers in labor and

18  materials, a surety subrogated to the rights of the owner, and

19  those funds became the property of the surety.  The Supreme

20  Court also decided that since those payments had been made

21  before the contractor filed for bankruptcy, they were not

22  property of the estate.

23       In this case, as I already explained, MAPFRE -- the

24  payments made by MAPFRE exceed the amounts retained in all the

25  projects that corresponded, so our contention is -- and those

1  payments were made well before the Commonwealth or the PBA

2  filed their bankruptcies.  So our contention is that those

3  funds do not belong to either the PBA or the Commonwealth, and

4  they belong to MAPFRE.  And they cannot be distributed among

5  the PBA's or the Commonwealth's creditors.

6          In the year 2018, this is what the Court of Appeals

7  for the First Circuit said regarding the decision of the

8  Supreme Court in the *Perlman* case, I quote, the Perlman Court

9  held that the surety owned the funds.  Importantly, for our

10  purposes, the Court's holding was based on its conclusion that

11  the project owner had a right to use the retainages to satisfy

12  the defaulting contractor's debts to its laborers.

13          Once the surety stepped into the owner's shoes and

14  fulfilled its obligation to cover the subcontractor's debts,

15  the surety became subrogated to the owners' right to the

16  funds, to the extent necessary to reimburse it for its cost.

17  Since the surety had paid out more than the amount of the

18  withheld funds, it had a right to all of it.  That's what the

19  First Circuit said regarding the *Perlman* decision in the year

20  2018, in the case of *Insite Corporation v. Walsh Construction*

21  *Company*, 906 F.3d 138.

22          The Court of Appeals for the First Circuit also

23  discussed the case of *Segovia*, which was decided by the First

24  Circuit in 1980.  Regarding the *Segovia* decision, the Court of

25  Appeals for the First Circuit stated as follows:  It says, we

1   subsequently established that Puerto Rico law will burden the

2   ownership of withheld funds, aligns with the *Perlman* doctrine,

3   see *Segovia Development Cooperation v. Constructora Maza.*

4          In *Segovia Development*, the contractor had defaulted

5   and filed for bankruptcy.  And a surety stepped in and

6   expended funds greatly in excess of the 423,630 withheld by

7   the project owner.  We explained that under the law of Puerto

8   Rico, the surety was subrogated to any rights which the owner

9   has against the contractor, including the owner's rights to

10  apply the withheld funds to its cure and completion costs.

11         In other words, once the surety pays, the surety

12  subrogates to the rights of the owner to use the retainage to

13  reimburse itself to cure the defaults of the contractor.  So

14  automatically, once the surety pays, it becomes the owner of

15  those funds.  And in this case, that happened well before

16  either the PBA or the Commonwealth filed for bankruptcy.

17         So our contention is that those funds that are being

18  withheld by the PBA and by the Commonwealth are property of

19  MAPFRE, and the Oversight Board is not entitled to distribute

20  those funds to either the PBA or the Commonwealth's creditors,

21  because those funds, when they filed for bankruptcy, they were

22  not property of either the PBA or the Commonwealth, and they

23  were the property of MAPFRE, the surety.

24         With respect to that, in the *Perlman* decision, the

25  Supreme Court of the United States said that the bankruptcy

1   act simply does not authorize a trustee to distribute other

2   people's property among a bankrupt's creditors.  That's why

3   the question before the Court, before the *Perlman* Court --

4        (Sound played.)

5        MR. SANCHEZ GIRONA:  Before the *Perlman* Court and

6   before this Court also is not if the surety is entitled to

7   priority of distributions under PROMESA or the Bankruptcy

8   Code.  The question before this Court is whether, when PBA or

9   the Commonwealth filed for bankruptcy, those funds were their

10  property.  The answer to that question is no, they were not.

11  Therefore, the Oversight Board is not entitled to distribute

12  MAPFRE's funds to its creditors, Your Honor.

13       That's our contention.

14       THE COURT:  Thank you very much, Mr. Sanchez Girona.

15       At this time, we will take our afternoon break, and

16  we will resume at 3:55 Puerto Rico time, which is 2:55 New

17  York time.

18       We are adjourned.

19       (At 3:38 PM, recess taken.)

20       (At 3:54 PM, proceedings reconvened.)

21       THE COURT:  Good afternoon again.  We will resume

22  with the opening arguments, and the next speaker is Mr. Steel

23  for the Underwriter defendants, who has 12 minutes.

24       MR. STEEL:  Thank you, Your Honor.  Good afternoon,

25  Your Honor.  Howard Steel of Goodwin Procter on behalf of

1    Goldman and Citi.  I'll be presenting for the Underwriter

2    defendants this afternoon.  With me in the virtual courtroom

3    is also counsel from Merrill Lynch, Carrie Hardman of Winston

4    & Strawn.

5            Judge, we heard and appreciated Mr. Bienenstock's

6    opening statement that the Plan does not contain third-party

7    releases, and that the debtors do not intend for the

8    Underwriter defendants to lose their defensive rights as a

9    result of the Plan discharge, and that they will make any

10   necessary changes to accomplish that.  I really hope so.  And

11   we welcome discussions offline with the debtors.  But to date,

12   Judge, there's been no engagement, and additional language has

13   been inserted into the Plan and the Confirmation Order

14   unilaterally that impairs the Underwriter defendants'

15   defensive rights.

16           So as of now, we're pressing our objection.

17           As to Mr. Berezin's opening, with all due respect,

18   he's conflating claims with defenses.  We're seeking to

19   preserve defenses, not assertion of claims for affirmative

20   monetary recoveries.  Likewise, we're not seeking significant

21   revisions of the Plan documents.  We're seeking simple clarity

22   on this point.

23           If anything, from Mr. Berezin's comments, it seems to

24   me that he's seeking a back door third-party release

25   benefiting the monolines in contravention to the debtors'

1   statement repeatedly that there's no third-party release under

2   this Plan.

3        So with that preparatory statement, I want to give

4   Your Honor a little bit of context.  The Underwriter

5   defendants are certain banks, underwriters, and other

6   professionals involved in the issuance, in underwriting of

7   certain Puerto Rico bonds.

8        The Underwriter defendants have been named in several

9   third-party, nondebtor litigations by the monolines, and also

10  a complaint by the Special Claims Committee, which has stayed

11  in this Court, but is expected to continue post confirmation.

12       As to the Special Claims Committee's litigation

13  central to the plaintiffs' claims there against the

14  Underwriter defendants is the allegation that the Puerto Rico

15  Government Development Bank breached its fiduciary duties to

16  the Commonwealth in connection with the issuance of bonds that

17  the plaintiffs assert are invalid, because they violated

18  constitutional debt limits.

19       However, the Special Claims Committee is barred from

20  recovering any damages from GDB, as they've been released

21  pursuant to GDB's PROMESA Title VI modification.  So the

22  Special Claims Committee seeks to recover against other

23  parties, including certain of the Underwriter defendants,

24  alleging that they aided and abetted GDB's alleged breaches.

25       In turn, the monoline actions seek recoveries from

1  certain Underwriter defendants based on the theory that those

2  defendants fraudulently induced them based on allegedly false

3  representations, and offering documents into ensuring certain

4  Puerto Rico bonds.  The monolines' actions were brought in the

5  Commonwealth courts, so these litigations are not before Your

6  Honor today, of course, but the Underwriter defendants'

7  defenses must be left intact so the validity of those defenses

8  can be tested later in the context of the litigations, and

9  liability and judgment, if any, can be reduced or allocated as

10  appropriate.  We're seeking to preserve that, but the Plan

11  seemingly strips the Underwriter defendants of their defensive

12  rights, and inexplicably grants a third-party release to

13  monolines.

14        And how this evolved, it occurred in the last minute.

15  It seems that the monolines and the debtors improperly

16  inserted language into the Eighth Amended Plan and the

17  proposed Confirmation Order that appears to impair the

18  Underwriter defendants' assertion of defenses in the

19  litigation.  And thus, Your Honor, the Plan is not confirmable

20  if it impairs the Underwriter defendants' defensive rights.

21        Again, I think it's really, really important, because

22  I've read the replies and heard some of the monolines'

23  statements today.  Let me be crystal clear.  Contrary to the

24  monolines' hyperbole, the Underwriter defendants are not

25  seeking affirmative monetary recovery from the debtors.  We're

1   not seeking a right to seize Commonwealth property down the

2   road.  We're only seeking to preserve the defenses which

3   survive discharge or confirmation of a Plan.

4        For example, like any other defendant in litigation,

5   the Underwriter defendants may seek a reduction in judgment or

6   a reduction in liability based on principles of allocation of

7   fault.  Under the evidence to be submitted to Your Honor, and

8   pursuant to controlling case law, the Plan cannot and should

9   not impair defensive rights.

10       Frankly, Judge, we're buoyed by Mr. Bienenstock's

11  comments, but we're kind of surprised to be here.  Prior to

12  the Disclosure Statement hearing, we negotiated language with

13  the debtors in the Seventh Amended Plan.  It's still Section

14  92.2(f), they've carried over, but we had a negotiation where

15  we thought we were very close to fully preserving defensive

16  rights.  And in their supplemental reply in support of the

17  Disclosure Statement, the debtor stated the Plan does not, and

18  the debtors do not intend to limit the defensive rights of the

19  Underwriter defendants in the litigations.  We heard it again

20  this morning.  And as Alexander Hamilton I think once said, a

21  promise shall never being broken.  I think he said that.

22       At the Disclosure Statement stage, we had some

23  noncontroversial clarifying comments.  We wanted to plug some

24  gaps in the language.  I think Mr. Rosen called me stubbornly

25  diligent, or something to that effect, at the Disclosure

1  Statement hearing.  So we pressed an objection at the

2  Disclosure Statement to seek to plug certain gaps in the

3  defensive rights language, and our objections were overruled,

4  as I believe the Court found them more properly confirmation

5  objections.

6          So thereafter, we went back to try and engage the

7  debtors to fix what we're calling the gap issue or the

8  plumbing issue.  And as Mr. Despins acknowledged at the

9  pretrial conference, sometimes it's hard to get a phone call

10  back in this case.  We understand that.  But we never did.

11  And we kept trying and kept trying to resolve our gap issue in

12  advance of confirmation, but then the proposed Confirmation

13  Order hit.  We didn't get a preview.  And to our surprise, the

14  language we negotiated with the debtors in the Plan was indeed

15  in the proposed Confirmation Order.  But then, Judge, there's

16  a stream of "provided however that" clauses, which may

17  completely eviscerate the defensive rights language we agreed

18  upon.

19          So we're here today at this moment with a gap

20  plumbing issue and what looks like a bullet hole issue.  We

21  were undeterred.  We again rolled up our sleeves and proposed

22  the language to the debtors to button up the holes in the

23  gaps, and to date, there hasn't been any engagement, so we're

24  pressing our objection.

25          So our objection, Judge, is a couple things.  We

1    think the Plan is not confirmable as to the Underwriter

2    defendants for at least four reasons:  One, the Plan

3    improperly seeks to eliminate defenses that must survive a

4    bankruptcy discharge; two, the Plan seeks to impermissibly bar

5    the Underwriter defendants from asserting setoff or recoupment

6    rights; three, the nonconsensual third-party releases of

7    defensive rights fails to meet the standard required for

8    approval of nonconsensual third-party releases; and four,

9    impairment of the defensive rights causes the Plan to fail the

10    best interest test.

11        A little color, our gap issue relates to the

12    preservation of Underwriter defendants' defensive rights in

13    future underwriter actions.  Inexplicably, the Plan does not

14    provide for the preservation of defensive rights in future

15    actions.

16        There's no basis for such an extreme limitation on

17    defensive rights.  The Underwriter defendants should have

18    their repose of knowing that their defenses are preserved in

19    future actions by other monolines, or anyone else for that

20    matter.

21        The evidence and legal argument will not show any

22    good reason for such a prejudicial limitation, and it would

23    effectuate an improper nonconsensual third-party release.  The

24    Court should instruct the debtors to include language in the

25    Plan and Confirmation Order that preserves the Underwriter

1    defendants' defensive rights and future underwriter actions no

2    matter who brings them.

3         Second are bullet hole issues, and these are oriented

4    around Section 92.2(f) of the Plan, and Section 56(f) of the

5    proposed Confirmation Order.  These sections, Your Honor,

6    impair the preservation of defensive rights, and would have

7    several prejudicial consequences.  First, as it relates to the

8    Special Claims Committee litigation, it presumably impairs the

9    assertion of defensive rights, notwithstanding the debtors'

10   repeated statements that defensive rights shall not be

11   impaired.

12        Second, to the extent the monolines are asserting

13   direct claims against the underwriters, the language could

14   impair or limit the ability of the underwriters to seek a

15   judgment reduction or allocation of liability for the actions

16   of the GDB.  And third, Your Honor, to the extent the

17   monolines' claims are derivative in nature, the Underwriter

18   defendants need to be able to assert defenses necessary to

19   potentially reduce liability the same as if the debtors were

20   the named plaintiff.

21        So the monolines, Judge, claim that the language in

22   paragraph 56 is sufficient.  So it starts with, preserving the

23   Underwriter defendants' defenses.  It does read, Judge, that

24   the release does not limit the plaintiffs and defendants from

25   asserting their respective rights, claims, causes of action,

1  and defenses in the underwriter actions; but then it contains

2  several "provided however" clauses that can be read to

3  eviscerate the preservation of defenses, stating things like

4  setoff, recoupment, indemnification, and similar theories are

5  barred.

6       So the language is, at best, largely ambiguous, and

7  the Underwriter defendants deserve clarity and repose that

8  their defenses are fully preserved.  The Plan and the

9  Confirmation Order should not contradict itself within the

10  same sentence, and prejudice the Underwriter defendants'

11  defensive rights.  It's improper as a matter of law, because a

12  Plan cannot eliminate defenses that survive a bankruptcy

13  discharge.  We'll talk about that at closing.

14       There's no evidence that can be presented to smash

15  this bedrock principle of law.  Indeed, the debtors expressly

16  stated several times that the Plan wasn't intended to limit

17  defensive rights, and doing so would -- any erosion of the

18  defensive rights would enact or is akin to a third-party

19  release.  And we heard the debtor separately and explicitly

20  say this in their reply in support of the Plan, of

21  confirmation, again this morning that there are no third-party

22  releases under the Plan.  The Court should hold them to that.

23       The monolines kind of hedge a little bit here and say

24  that, well, the Underwriter defendants don't have claims

25  against the monolines, and that any release from the monolines

1    is justified by their settlement with the debtors.

2           Well, Judge, the evidence will show that any release

3    of the Underwriter defendants' defensive rights is not

4    integral to this Plan, and any nonconsensual third-party

5    release fails to meet the standards required for approval of

6    nonconsensual third-party releases under this district.

7    Further, as I said before, any elimination of defensive rights

8    would cause the Plan to fail the best interest test by putting

9    the Underwriter defendants in a worse position than they would

10    be absent confirmation of the Plan.  The evidence would not

11    show otherwise.

12           Judge, in our confirmation objection, we attached

13    exhibits with the Underwriter defendants' proposed language to

14    address the potential future underwriter actions, and changes

15    to the Plan and Confirmation Order to preserve the defensive

16    rights.  In advance of the confirmation hearing, we proposed

17    additional language to the debtors that kept the concepts of

18    their (1) and (2) of paragraph 49(f) to try to cue to some

19    consistency for the language that they put out there, but

20    fully preserve the Underwriter defendants' defensive rights.

21    We haven't had engagement.

22           We're hopeful, given today's comments, that we'll get

23    some engagement, but at the bottom, these modifications are

24    necessary and appropriate to render the Plan confirmable.  In

25    short of an agreement, Your Honor should instruct the debtors

1     to include them.

2          In sum, preserving defensive rights under the Plan

3     and the Confirmation Order is fair and appropriate.  It's a

4     common feature in Chapter 11 plans.  Most recently, if you

5     look to the Purdue plan, the Marla Kraut plan, and many others

6     that have post-confirmation litigation, the preservation of

7     defensive rights is front and center and very clear.  Here,

8     the evidence and controlling case law will show that there's

9     no basis to discriminate against the Underwriter defendants,

10    and unless modified, the Plan cannot be confirmed.

11         Unless Your Honor has any questions for me, that's

12    our opening statement.

13         THE COURT:  Thank you, Mr. Steel.

14         MR. STEEL:  Thank you, Your Honor.

15         THE COURT:  The next speaker is Mr. Samdovitz.

16         MR. SAMDOVITZ:  Yes.  Can you hear me?

17         THE COURT:  Yes.  I can't see you yet.  I saw you for

18    a moment there, and I see you now, so you can go on.  Good

19    afternoon, sir.

20         MR. SAMDOVITZ:  Okay.  Thank you.

21         I own 200,000 of the 2014 GO bonds, and want to talk

22    first about the vote tallies for the Plan.  I suspect that

23    they're not correct.  Docket 19056, which purports to be the

24    official vote tally for each class, does not accurately

25    reflect the decisions of the bondholders, at least in retail

1   2014 GO bonds, Class 47, which I'm a member of.

2           This tally lists only 27 votes, all voting yes to the

3   Plan.  There must have been many more bondholders than 27 in

4   this class, so the consent process has not reached a

5   sufficient number of bondholders to be reflective of the

6   class.

7           For example, I signed the letter of authorization

8   twice that I received from my bond broker which stated, please

9   use this as my authorization to opt out of the Puerto Rico

10  restructuring/exchange offer for the following bonds, and then

11  it lists the bonds that I owned.  Apparently my bond broker

12  did not understand the proper procedure to register my "no"

13  vote based on the letter of authorization or other verbal

14  instructions from me, but that appears to be a widespread

15  problem, judging from the very low number of votes that were

16  recorded.  Also, I do not think the ballots were sent out for

17  direct voting.  I did not receive one.

18          Therefore, I ask the Court to order the FOMB or the

19  AAFAF to request from the bond brokers copies of all the

20  opt-out forms that they received from their clients, and then

21  have the opt-out forms counted as "no" votes.  That is the

22  bondholders' will and right, and should not be undermined by a

23  confusing process in how to register "no" votes.

24  Alternatively, I ask the Court to order the FOMB or the AAFAF

25  to send out regular ballots to all the bondholders in the Plan

1    who have not yet had their vote counted.

2           And, next, I object to the restructuring of the 2014

3    GO Bonds as not being in the best interest of the bondholders

4    under 314(b)(6).  This is because the FOMB's challenge to the

5    validity of these bonds are meritless, and settlement of this

6    challenge was a justification for the restructuring.  And

7    also, Puerto Rico has sufficient revenue to pay all GO Bonds

8    in full, as Peter Hein and other objectors have already

9    explained.

10          In FOMB's Docket 4784, the FOMB challenged the

11   validity of the 2004 GO Bonds as exceeding 50 percent debt

12   service limit established by Article XI, Section 2 of the

13   Puerto Rico Constitution, and the settlement of this challenge

14   was cited in the Disclosure Statement.  The FOMB contended

15   that use of the interest capitalization of the 2014 GO Bonds

16   and the calculation of the total debt service was improper.

17   And without the interest capitalization, the total debt

18   service was 15.1 percent in fiscal year 2016.

19          Let me explain what interest capitalization means in

20   this case.  When the 2014 bonds were issued, approximately 420

21   million dollars of the proceeds were withheld to subsidize the

22   interest due on the 2014 GO Bonds in fiscal years 2014 to

23   2016.  And for -- and for the purpose of determining

24   compliance with Article VI, Section 2, the debt service was

25   calculated without including the subsidy from the interest

1    capitalization.

2         The rationale for interest capitalization is that the

3    interest subsidy will not burden Puerto Rico, because it does

4    not require new revenue to pay it.  The total interest due on

5    the 2014 GO Bonds in fiscal year 2016, which incidentally was

6    the year of maximum debt service, was 280 million dollars,

7    which is simply eight percent times 3.5 billion, which was the

8    total issuance.

9         However, the interest subsidy under the interest

10   capitalization for fiscal year 2016 was 75 million.  So only

11   the difference, 205 million, was included in the debt service

12   calculation in the offering statement.  With this interest

13   capitalization/interest subsidy, the total debt service in

14   fiscal year 2066 (sic), including the other outstanding bonds,

15   was 14.2 percent as calculated in the offering statement for

16   the 2014 GO Bonds.  However, without the interest

17   capitalization, that is, if all 280 million dollars of

18   interest was included in the debt service calculation, then

19   the debt service would have been 15.1 percent in fiscal year

20   2016, assuming all the other debt service numbers were

21   correct.  And that would have exceeded the constitutional

22   limit.

23        However, as I will explain later, even if the

24   interest capitalization is not used in the calculations of the

25   debt service, as urged by the FOMB, the actual debt service in

1    fiscal year 2016 still did not exceed the 15 percent debt

2    service limit, because debt service on other variable rate

3    bonds was overestimated in the offering statement published in

4    fiscal year 2014.

5        Now, please note that this calculation of actual debt

6    service on the variable rate bonds is based on information

7    that I recently obtained from the AAFAF through discovery as

8    contained in Exhibits A and B of my objection.  And then also

9    note that at the discovery hearing with Judge Dein, the AAFAF

10   stated that -- well, it objected to the discovery.  And at the

11   discovery hearing, the AAFAF stated that it did not know if

12   these documents still existed or could be found.

13       So presumably these documents were not previously

14   available for the defense of the GO bonds in court cases.

15   They were not available to the settling 2014 GO bondholders,

16   or to other GO bondholders who voted in favor of the Plan.  So

17   this is new evidence, new information.  Just one second.

18   Okay.

19       I ask the Court now to open docket 18433, if that's

20   possible, which is my objection to the Plan, because it would

21   be a visual aid to my more detailed presentation of the debt

22   service.  It shows a key table from the offering statement for

23   the 2014 GO Bonds, and also Exhibits A and B that came from

24   the AAFAF that I will discuss.  Again, it's docket 18433, if

25   it's possible for the Court to open that now.

1          I am pro se.  I was not aware that I should have

2     filed them again for this hearing as formal exhibits.

3     However, I can and will proceed without this visual aid for

4     the Court.

5          THE COURT:  Well, if you give me a moment, I will see

6     if I can.  I am not sure that I have it at hand.

7          MR. SAMDOVITZ:  Okay.  I'll wait.

8          THE COURT:  Why don't you just proceed.

9          MR. SAMDOVITZ:  Okay.  Okay.  Well, if you have

10    docket 18433, please open it and scroll down to page 6, which

11    is a key debt service table from the offering statement for

12    the 2014 bonds.

13         THE COURT:  Actually, I am opening it now.  You said

14    page 6?  Okay.  I'm on page 6.

15         MR. SAMDOVITZ:  That's okay.  And there should be a

16    table there.

17         THE COURT:  Yes.

18         MR. SAMDOVITZ:  Okay.  So this table lists debt

19    service components, and then the total debt service, which is

20    subject to the 15 percent limit for each fiscal year beginning

21    in fiscal year 2014.  So the first column obviously are the

22    different fiscal years.  Column 2 is labeled, outstanding

23    bonds debt service subject to the 15 percent debt service

24    limit aside from the 2014 GO Bonds.  So column 2 is all of the

25    debt service from bonds subject to the 15 percent debt service

1    limit, except for the 2014 GO Bonds.

2         Column 3 lists the return of principal, if any, of

3    what are called the bonds.  That refers to the 2014 GO Bonds

4    in each fiscal year.  Column 4, this is interest for the

5    bonds, but -- again, that's the interest for the 2014 GO

6    Bonds, but after the subsidy is subtracted.  So the entry for

7    the interest on the 2014 GO Bonds in fiscal year 2016 in the

8    table is shown as 205 million dollars, so that will be the

9    next to last column, instead of the full 280 million, because

10   of the 75 million dollar interest subsidy.

11        And then column 5 is the total debt service for both

12   the outstanding bonds, which do not include the 2014 bonds,

13   and then the bonds which are the 2014 bonds.  And you can see

14   that in fiscal year 2016, we have the highest debt service,

15   just slightly larger than 2017.  It's 1,161,777,697, et

16   cetera.

17        Okay.  So with the reduction of the interest in

18   fiscal year 2016 by the interest subsidy of 75 million, the

19   offering statement calculated the maximum debt service as 14.2

20   percent of the applicable Puerto Rico revenue in '15 -- or

21   14.2 percent, in fiscal year 2016, of the applicable Puerto

22   Rico revenue based on the constitutional calculation, which I

23   think is the average of the two years prior, 2014.

24        However, the FOMB later challenged the use of the

25   interest capitalization in the debt service calculation,

1    arguing that all subsidized and nonsubsidized interest, i.e.,

2    280 million due on the 2014 bonds in fiscal year 2066 should

3    be considered in the debt service calculation for purposes of

4    compliance with the Puerto Rico Constitution.

5         Now, following their line of argument, if all the

6    interest due in the 2014 bonds was considered in the debt

7    service calculation --

8         (Sound played.)

9         MR. SAMDOVITZ:  -- and if all other debt service

10   considered in the offering statement for the outstanding bonds

11   was correct, the total debt service in fiscal year 2066 --

12   2016, would be 15.1 percent, as explained earlier.  However,

13   the debt service for the outstanding bonds in fiscal year 2016

14   included interest due on 126.7 million of four variable rate

15   GO bonds, and the projected interest for them used in the

16   calculation of the debt service was projected at the maximum

17   rate allowed by Puerto Rico law, that is, 12 percent.

18        So in the projection for the fiscal year 2066, they

19   estimated or they projected 15 million, 15.2 million dollars

20   of interest on the variable rate bonds.  However, based on the

21   information I obtained from AAFAF, the actual interest rate

22   for 2016 was anywhere from 0.3 percent to 1.5 percent.  So the

23   total actual interest on the variable rate bonds in 2016 was

24   only 2.2 million dollars.

25        That means that the projection for the interest on

1    the variable rate bonds was overestimated by 13 million

2    dollars.  And if you subtract that from the debt service,

3    without the interest capitalization, it brings the total debt

4    service in fiscal year 2016 down to 14.9.4 percent.

5          So even if the FOMB gets what they want, and that is

6    to not use the interest capitalization, once you consider the

7    overestimate of the debt service on the variable rate bonds,

8    you're still below the 15 percent threshold of the Puerto Rico

9    Constitution.  So the FOMB's challenge to the debt -- to the

10   debt service, the 2014 GO Bonds, as exceeding the

11   constitutional limit is completely without merit.

12          And let me now, to --

13          (Sound played.)

14          MR. SAMDOVITZ:  In its recent reply brief, the FOMB

15   did not respond to the foregoing calculation, and proved that

16   the debt service was not exceeded in fiscal year 2016, even

17   without interest capitalization.

18          THE COURT:  Thank you, Mr. Samdovitz.

19          MR. SAMDOVITZ:  I believe my time --

20          THE COURT:  You've run out of time.  Thank you.

21          MR. SAMDOVITZ:  Thank you.

22          THE COURT:  The next speaker is Mr. Barrios Ramos for

23   AMPR.

24          MR. BARRIOS RAMOS:  Your Honor, I'm trying to -- I

25   think the video is allowed now.

1           THE COURT:  Pardon?  I hear your voice.  Oh, there.

2    I think I see you now.  Yes.  Mr. Barrios.

3           MR. BARRIOS RAMOS:  Good afternoon, Your Honor.  Good

4    afternoon.  Your Honor, good afternoon, and to all

5    participants and people linked in.  For the record, Attorney

6    Jose Luis Barrios in representation of Asociación de Maestros

7    de Puerto Rico, and Asociación de Maestros de Puerto

8    Rico-Local Sindical, herein after collectively AMPR.

9           THE COURT:  Good afternoon.

10          MR. BARRIOS:  Your Honor, good afternoon.  I would

11   like to commence our opening statement with one undisputed

12   fact.  That is that teachers are essential workers providing

13   an essential service to Puerto Rico, education to its youth, a

14   right that is constitutionally guaranteed.  And with that, we

15   also want to put -- you know, offer the Court the perspective

16   of the impairment that is being offered in this Plan to the

17   modest salaries and pensions of teachers.

18          For example, Your Honor, the average teacher's salary

19   in Puerto Rico is 1,750 a month.  That is before deductions.

20   If a teacher is able to accrue its 30 years of service, that

21   teacher under the current law is allowed to retire with 75

22   percent of their pension -- of their salary, I'm sorry, which

23   is an average of 1,500 dollars, Your Honor.  And that, Your

24   Honor, as all the participants have mentioned, and is also in

25   the Disclosure Statement and Plan, it's about the limit of the

1   federal poverty threshold.

2          Make no mistake, Your Honor, for many teachers, the

3   so-called freeze, which is nothing else but a cut and a delay

4   in retirement, would place them in the future, when they do

5   retire or simply can no longer work, under the federal poverty

6   level.  And this is without accounting for the immense

7   inflation we are experiencing currently.

8          An example that is very problematic for everybody to

9   understand is a teacher that has 24 years of experience, or

10  service at the Department of Education, and at least about 45,

11  47 years old, upon implementation of the so-called freeze,

12  would have now to work at least 18 additional years, Your

13  Honor, to just not be financially insecure and probably food

14  insecure.  This is no reward for a career of public service.

15         And why would this teacher be required to work 18

16  additional years?  Well, Your Honor, teachers do not have

17  Social Security.  They rely on their pension under their

18  retirement.  Upon implementation of the freeze, this teacher

19  may opt to get Social Security, and will have to work ten to

20  12 years to be eligible under Social Security for a modest

21  payout.

22         In addition, since the so-called freeze implements a

23  delay.  This teacher will not receive any income from the

24  accruals frozen upon the effective date of the Plan until this

25  teacher is 63 years old.

1        Furthermore, Your Honor, this teacher will be

2   enrolled in the Law 106 defined contribution plan, but this

3   teacher would only contribute around six percent of their

4   salary to this.  The normal retirement age in teachers, Your

5   Honor, in Puerto Rico is about 55 years, since teachers enter

6   the work force around the age of 20 to 22 years.  At that

7   time, they have already worked 30 years, and they wish to

8   retire, because although the teaching profession may be, at

9   some times, rewarding, it also takes a toll on many teachers.

10       But that will no longer be the case for these

11  teachers, Your Honor, because he will not be able to sustain

12  his family with the six percent contribution that he started

13  to place when he was 47 years old.  So this teacher faces many

14  challenges, and this perspective we wanted to provide to the

15  Court before we entered to address the arguments that the

16  Board has proposed for this cut.

17       Mr. Bienenstock referred earlier to the declaration

18  of this Sheva Levy, that the savings of the TRS cut would be

19  5.6 billion.  That is not so, and the declaration does not

20  support that conclusion.  In fact, the declaration of Ms. Levy

21  mentions that the 5.6 billion or so would be both freezes,

22  JRS and TRS.  But more so, she mentions to -- that saving will

23  have to reduce the 1.7 billion that would be the cost of

24  Social Security.

25       But that doesn't take into account that her

declaration and her report based these calculations on 36,000

TRS active participants, not in the current 24 to 26,000

active participants.  So that is 10,000 participants less, or

the equivalent of a 33 percent less reduction of the alleged

savings.

Also, Your Honor, Mr. Bienenstock referred to

precedent that the Supreme Court issued in 2014.  The case of

*Asociación de Maestros v. The Retirement System of Teachers*.

And in doing so, he failed to mention that one of the reasons

for why the Court decided that the freeze or cut imposed on

Law 160 was not reasonable was because the cut would, in fact,

not save the retirement, but accelerate its demise, since many

experts concluded that at least 5,000 of the lower side

teachers would resign immediately upon application of the law.

Currently, there are 6,000 teachers eligible to

retire today.  If they were to do it, or a significant amount

of teachers were to retire, those savings would be reduced as

well, because the freeze projects these teachers to remain in

the classrooms for many years more.

So the total savings could be as little as 2.6

billion, without accounting for the additional services the

Commonwealth would need to provide to these teachers, because

they will no longer be able to afford medical plans, the food,

and other services, which brings us to why the Board claims

that this freeze or cut is so indispensable for the Plan.

1   Money is fungible, Your Honor.  The savings are in nominal

2   dollars, not in cash dollars.  So those savings could have

3   been achieved by the Board by reducing the consummation fees

4   with some of the Plan Support Agreement parties, or by

5   continuing the challenge of some of the bondholders' claims,

6   which the Board, as the prior participant mentioned, had

7   challenged under legality.  They chose not to do so, and chose

8   to implement this cut on teachers.

9        At this point, we also want to highlight that since

10  the teachers voted against the alternative proposition for the

11  freeze, teachers under this Plan will now receive far better

12  treatment, which I believe is in Disclosure Statement Exhibit

13  F-1.  Your Honor, we were very confused as to how the Board

14  was going to, in fact, implement this cut, as the Disclosure

15  Statement did and the Plan didn't provide it.  It wasn't until

16  they responded to our objection that they clarified that it's

17  intended to be as a rejection under section 365.

18       And they do admit that that rejection will cause a

19  claim.  However, in the Disclosure Statement, buried in a

20  footnote, they admit that the recovery for teachers under the

21  class for active participants of TRS does not take into

22  account that damages claim that will be resolved after

23  rejection, which brings us to the point and the inquiry that

24  you made to Mr. Bienenstock earlier this morning about our

25  claim, that any rejection claim would trigger an

1    administrative claim, and what would be the better treatment

2    for the teachers.

3         We disagree with Mr. Bienenstock's position that the

4    accrual of benefits after the filing of the petition up to the

5    point of rejection or effective date of the Plan would be a

6    better treatment or that would compensate any compensation for

7    the rejection or satisfaction of an administrative claim --

8         (Sound played.)

9         MR. BARRIOS RAMOS:  -- because it would be paid in

10   the future.  First and foremost, that contribution in that

11   accrual is, in part, with monies of the teachers themselves.

12   And secondly, Your Honor, our position on the administrative

13   claim is that Law 106 was enacted after the filing of the

14   Title III.  The Board certified that law, didn't object to it,

15   and that law codified, again, that teachers were entitled to a

16   defined benefit and a pension.  Therefore, Your Honor, that

17   alone would make it a post petition -- a claim and an

18   administrative claim, in our view.

19        But, moreover, Your Honor, before Law 106 was

20   enacted, TRS as an entity, separate entity created by law was

21   the payee of the pensions' obligations.  Currently, it's the

22   Commonwealth itself.

23        The Board argues in their response that this does not

24   constitute a novation of the obligation.  It does so to avoid

25   the consequence, again, Your Honor, that the obligation was

1   novated to the point that it constituted a new obligation and,

2   therefore, a post petition obligation, which may be entitled

3   to administrative claim.

4        But even assuming, Your Honor, that this is not an

5   administrative claim, which we deny, we believe it is, the

6   rejection of the teachers' pension will nevertheless provide

7   for a damage claim, which is not provided for in any of the

8   mechanisms of the Plan, and that, Your Honor, itself will

9   require a revision of this plan --

10        (Sound played.)

11        THE COURT:  You can sum up.

12        MR. BARRIOS RAMOS:  Your Honor, in closing, teachers

13   are worse off in this Plan than without it.  And, Your Honor,

14   we're asking -- or the Board is asking this Court to confirm a

15   Plan that does not provide a percentage of recovery on a

16   damage clam to the teachers, and which purports to save the

17   Commonwealth billions of dollars that are not there.

18        THE COURT:  Thank you, Mr. Barrios.

19        MR. BARRIOS RAMOS:  Thank you, Your Honor.

20        THE COURT:  Thank you.

21        The final speaker is counsel for Quest for four

22   minutes.

23        MR. FALLON:  Good afternoon, Your Honor.  Brett

24   Fallon of  Faegre, Drinker, Biddle & Reath for Quest

25   Diagnostics of Puerto Rico.  I'm here today with my local

1    counsel, Mariani Muniz Lara of DLA Piper.

2         Your Honor, Quest Diagnostics of Puerto Rico is a

3    named defendant in an adversary proceeding whereby the Special

4    Claims Committee and the Committee seek to avoid and recover

5    from Quest 4.7 million dollars.  Their theories are that these

6    were allegedly fraudulent transfers under Bankruptcy Code, or,

7    alternatively, allegedly unauthorized or fraudulent transfers

8    under Puerto Rico law, or, in the alternative, they seek

9    rescission of the transfers from the Commonwealth to Quest

10   Diagnostics.

11        Quest does not generally oppose confirmation of a

12   plan that provides for the maximization of recovery for

13   creditors.  However, we have two points of limited objection,

14   and these were filed at docket no. 18560.  That's docket no.

15   18560.  First, the Plan and the initial proposed Confirmation

16   Order may be interpreted to eliminate or purport to eliminate

17   certain of Quest's defenses in the adversary proceedings, such

18   as defensive setoff, a recoupment, which is a classic defense,

19   and other affirmative defenses.

20        We have a statute of limitations defense with respect

21   to the rescission claim.  We have a defense that we would be

22   able to be -- if, in fact, they do want rescission, we would

23   be able to be put back in the position we are in status quo

24   ante, i.e., before the contract, and seek repayment of the

25   services we provided.  Of course, they won't be able to return

1   the services, but that's all in the nature of a defense.  And

2   it's not seeking an affirmative recovery.  It's merely a

3   defense to the action.  We are -- the law is clear that

4   defenses are not claims, and a plan cannot compare or

5   eliminate parties' defenses.

6          Your Honor, the second point of our objection is

7   preservation of the 502(h) --

8          (Sound played.)

9          MR. FALLON:  -- and Bankruptcy Rule 3002(c)(3) claim

10  that an avoidance defendant would have, if such defendant were

11  to return some or all of the transfers.  And so, Your Honor,

12  these claims, what the debtors are seeking to do in the

13  avoidance action is clawback transfers that they made to Quest

14  Diagnostics prepetition.

15         If they had not made those, if the debtor had not

16  made those transfers, then Quest would have -- as any other

17  creditor, would have been able to make a claim for those

18  unpaid amounts.  So the 502(h) claim and the Rule 3002(3)(c)

19  claim are really intended to put the parties back at the

20  position they would have been if the Court decides that the

21  transfers should be clawed back, or if there is a voluntary

22  settlement.

23         We're not aware of any basis to eliminate a 502(h)

24  claim, which is part of the Bankruptcy Code, and a Bankruptcy

25  Rule 3002(3)(c) claim, any such claim should be preserved

1   under the Plan, though of course we understand that such claim

2   would be entitled to general unsecured status, as it should.

3        We don't think any of these are controversial items.

4   Some of them are the same items that were put forward by the

5   Underwriter defendants.  We are hopeful that they can be

6   resolved.  We have entered into and are continuing discussions

7   with the Plan proponent about these issues, but to date, they

8   are not resolved.  And we are, therefore, continuing to press

9   those objections at this time, and if we are not able to

10  resolve those issues, then we will ask the Court to either

11  deny confirmation or allow confirmation only if we are able to

12  preserve our defensive rights and any 502(h) claim.

13       (Sound played.)

14       MR. FALLON:  Your Honor, thank you for your time this

15  afternoon.  And if the Court has no further questions, that

16  completes my opening statement.

17       THE COURT:  Thank you, Mr. Fallon.

18       So that concludes the presentation of opening

19  statements.  Mr. Rosen, did you wish to tender the

20  declarations of Ms. Pullo?

21       MR. ROSEN:  Your Honor, thank you very much.  Brian

22  Rosen.  I just made my way over to the witness room.  Yes, we

23  would like to tender the declarations of Ms. Pullo.  They are

24  at ECF Nos. 19056 and 19115.  They were also listed as

25  exhibits.

1          Can you hear me, Your Honor?

2          THE COURT:  Yes, I can.

3          MR. ROSEN:  Okay.  They were also listed as exhibits,

4    Exhibit 142 and 145 respectively, Your Honor.

5          At the same time, Your Honor, we would also like to

6    tender several additional exhibits:  Debtors' Exhibit 138,

7    which was the Affidavit of Service for the solicitation

8    mailing and exhibits.  That was at ECF Nos. 19101-1 through

9    19107-7.  Debtors' Exhibit 139, which was an Affidavit of

10   Service for supplemental solicitation mailing.  That was ECF

11   No. 19107-8.  And Debtors' Exhibit 140, which was an Affidavit

12   of Service for supplemental solicitation mailing at 19107-9,

13   ECF number.  And, lastly, Debtors' Exhibit 141, which was the

14   Affidavit of Publication and radio advertisements and exhibits

15   at 19108-1 and 19108-4, Your Honor.

16         So, in total, there would be six exhibits that we

17   would tender in connection with Ms. Pullo's testimony.

18         THE COURT:  If there's any objection, please raise

19   the hand at this point.

20         There is an objection from Mr. Hein.  Mr. Hein.

21         MR. HEIN:  Yes, Your Honor.  I'm trying to -- oh, I

22   now have the prompt to start my video.

23         Your Honor, you know, my issue is that we -- I

24   received this exhibit list last night.  I saw that it did list

25   Exhibits 142 and 145.  I have maybe simply two questions, but

1  certainly very, very brief cross.

2       I understand the Oversight Board is taking the

3  position that I'm not entitled to cross Ms. Pullo on the

4  declarations, because I didn't identify her as a witness for

5  cross back on October 27th.  When I submitted my informative

6  motion on October 27th, I had gone through the declarations

7  then on file.  I identified the declarants I wished to

8  cross-examine.

9       I did not list Ms. Pullo, because there was no

10  declaration at that time, and I did not understand Your

11  Honor's Order to be requiring that someone list someone for

12  cross with respect to a direct declaration where the direct

13  declaration had not been served.  And then last night, late in

14  the evening, I received this exhibit list, and saw that

15  Exhibits 142 and 145 were Ms. Pullo's declarations.

16       They were being offered --

17       THE COURT:  Mr. Hein?  Mr. Hein dropped out, so we

18  have to wait for Mr. Hein to dial back in.

19       MR. HEIN:  Your Honor, can you hear me?

20       THE COURT:  Yes.

21       MR. HEIN:  There was an interruption.

22       THE COURT:  Yes.  Mr. Hein, you're back with us.

23       MR. HEIN:  Thank you.  I'm not quite sure where I got

24  cut off, but I think I was making the point that one

25  declaration was also served late last night, the other was

1     just a few minutes before midnight on November 3.

2          And, again, I have very brief questioning, but I

3     don't think I should be precluded because I didn't list for

4     cross someone on October 27 when I didn't have any direct to

5     cross at that time.  And I did not understand Your Honor's

6     procedures to require listing people for cross where we didn't

7     have direct.

8          THE COURT:  I understand your argument.

9          Mr. Rosen, why is it that you believe Mr. Hein should

10    be precluded from some brief cross where he did not identify a

11    need for cross prior to seeing the direct testimony

12    declaration?

13         MR. ROSEN:  Your Honor, this is Brian Rosen.  With me

14    is Ms. Julia Alonzo.  I will let her address that question.

15         THE COURT:  Thank you, Ms. Alonzo.  Good afternoon.

16         MS. ALONZO:  Thank you.  Good afternoon, Your Honor.

17    Julia Alonzo for the debtors.

18         In response to Mr. Hein's argument, as Mr. Rosen

19    stated earlier this morning, we do object to his belated

20    request to cross-examine her.  Ms. Pullo has been identified

21    as a witness for the Oversight Board since August 3rd.  The

22    subject of her testimony, including that she would testify to

23    the procedures employed in soliciting and tabulating votes,

24    was in our witness lists that were filed starting on August

25    3rd, and in all subsequent amended and final witness lists

1   that we filed.  And the topics of her testimony have not

2   changed.

3           Her declaration was not due until November 3rd.  That

4   is correct.  That was pursuant to the extension of the voting

5   deadline that the Court entered.  All parties had notice when

6   the voting tabulation declaration would be due.

7           Notwithstanding the fact that her declarations were

8   not filed by the time that the pretrial informative motions

9   were due before this Court, there were multiple opportunities

10  for Mr. Hein to express his intent to examine Ms. Pullo.  He

11  could have put her on his -- as a cross-examination witness on

12  his pretrial informative motion, because, as all parties

13  understood, her declaration would be coming.

14          But even subsequent to that, when we filed her

15  declaration on last -- her initial declaration last Wednesday,

16  on November 3rd, Mr. Hein did not respond.  We then filed two

17  motions on Friday to inform the Court that Ms. Pullo would be

18  testifying today on the first day of the confirmation hearing,

19  and Mr. Hein did not provide us with any indication that he

20  wanted to cross-examine Ms. Pullo until 7:30 this morning, one

21  hour before the confirmation hearing was set to begin.

22          Mr. Hein is in the same situation as -- is actually

23  providing us even less notice than AMPR, who had made their

24  request last week.  And, Your Honor, you denied their request

25  to cross-examine witnesses, noting that their general

1    reference to a reservation of a right to cross-examine

2    witnesses is prejudicial to the Oversight Board.  It's even

3    more prejudicial here.

4         The fact that the supplemental declaration was filed

5    last night is also irrelevant to Mr. Hein's request to

6    cross-examine.  As Mr. Rosen explained this morning,

7    Ms. Pullo's supplemental declaration is very limited in scope.

8    It only involves three changes to Exhibit 8 to that

9    declaration, providing clarification regarding some nonvoting

10   classes, changing the votes from DRA parties, and taking into

11   account the Act 53.

12        None of those affect Mr. Hein or any of his claims,

13   so we would request that Mr. Hein's request to cross-examine

14   Ms. Pullo be denied.

15        THE COURT:  Thank you.  The objection to the

16   cross-examination is sustained, given the delay in asserting a

17   desire to cross-examine this witness between the filing last

18   week of the principal declaration and 7:30 this morning.

19   Therefore, as I said, the request by Mr. Hein is denied.

20        MS. ALONZO:  Thank you, Your Honor.

21        THE COURT:  This concludes our proceedings for today,

22   I believe, unless there is --

23        MR. ROSEN:  Your Honor, if I could just ask --

24        THE COURT:  Yes, Mr. Rosen.

25        MR. ROSEN:  -- for the Court's admission of those

1  exhibits into evidence.

2         THE COURT:  Thank you.  I'm sorry.  Mr. Hein's

3  objection, if it was one, to the admission of the exhibits is

4  also overruled.  And so Pullo Declarations filed at 19056 and

5  19115 are admitted as Ms. Pullo's testimony.  Those are also

6  denominated as Exhibits 142 and 145.

7         Is that correct, Mr. Rosen?

8         MR. ROSEN:  It is, Your Honor.

9         THE COURT:  And in addition, the tender of Exhibits

10 138, 139, 140 -- 140 and 141 are also accepted in evidence.

11 And the record will reflect the ECF numbers of those exhibits

12 as Mr. Rosen recited them on the record.

13        (At 4:49 PM, the Declarations of Ms. Pullo, Exhibits

14 138, 139, 140 and 141 admitted into evidence.)

15        MR. ROSEN:  Thank you very much, Your Honor.

16        THE COURT:  Thank you.

17        So at this point, in a moment, we will adjourn until

18 tomorrow.  Tomorrow's business will consist of hearing the

19 statements of members of the public who have been randomly

20 selected by lottery from the hundreds of individuals who

21 expressed an interest in providing their views concerning the

22 Plan of Adjustment to the Court and the parties in interest.

23        The Court has randomly selected 25 of these members

24 of the public in accordance with the time slots allotted, and

25 so we will be hearing from government employees, at least one

 1  bondholder, and pension beneficiaries, and others who identify

 2  themselves as residents of Puerto Rico, who will be allotted

 3  ten minutes each, including time for interpretation by the

 4  interpreter, who will be provided here.

 5          I thank the Court staff, and I thank counsel and all

 6  of the participants in today's proceeding.  We will recommence

 7  tomorrow morning at 9:30 Atlantic Standard Time, which is 8:30

 8  Eastern Time.  Counsel are requested to log into Zoom by, is

 9  it -- pardon me a moment.  I have to consult with someone

10  here.

11          Is it nine o'clock or what time?

12          COURTROOM DEPUTY:  Nine o'clock.

13          THE COURT:  Okay.  Counsel are requested to log into

14  Zoom by nine o'clock.  That is one half hour before the stated

15  start time.  That would be 8:00 in New York, 9:00 Atlantic

16  Standard Time.

17          Stay safe and keep well everyone.  We were adjourned.

18          (At 4:51 p.m., proceedings adjourned.)

19                          *       *       *

20

21

22

23

24

25

1  U.S. DISTRICT COURT    )

2  DISTRICT OF PUERTO RICO)

3

4      I certify that this transcript consisting of 201 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Laura Taylor Swain, and the

8  Honorable United States Magistrate Judge Judith Gail Dein on

9  November 8, 2021.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25