```
1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF PUERTO RICO

3
       In Re:                    )        Docket No. 3:17-BK-3283(LTS)
4                                )
                                 )        PROMESA Title III
5      The Financial Oversight and )
       Management Board for      )
6      Puerto Rico,              )        (Jointly Administered)
                                 )
7      as representative of      )
                                 )
8      The Commonwealth of       )
       Puerto Rico, et al.       )        November 10, 2021
9                                )
                    Debtors,     )
10

11     _____

12     In Re:                    )        Docket No. 3:17-BK-3566(LTS)
                                 )
13                               )        PROMESA Title III
       The Financial Oversight and )
14     Management Board for      )
       Puerto Rico,              )        (Jointly Administered)
15                               )
       as representative of      )
16                               )
       The Employees Retirement  )
17     System of the Government  )
       of the Commonwealth of    )
18     Puerto Rico,              )
                                 )
19                  Debtors,     )

20     _____

21

22

23

24

25
```

```
 1  _____

 2

 3  In Re:                          )    Docket No. 3:19-BK-5523(LTS)
                                     )
 4                                   )    PROMESA Title III
    The Financial Oversight and )
 5  Management Board for             )
    Puerto Rico,                     )    (Jointly Administered)
 6                                   )
    as representative of             )
 7                                   )
    The Puerto Rico Public           )
 8  Buildings Authority,             )
                                     )
 9              Debtors,             )

10  _____

11              CONFIRMATION HEARING - DAY THREE

12   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

13              UNITED STATES DISTRICT COURT JUDGE

14    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

15              UNITED STATES DISTRICT COURT JUDGE

16  _____

17
    APPEARANCES:
18
    ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY
19
    For The Commonwealth
20  of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                             Mr. Brian S. Rosen, PHV
21                           Mr. Michael A. Firestein, PHV
                             Mr. Michael T. Mervis, PHV
22                           Mr. Paul V. Possinger, PHV

23  For Puerto Rico Fiscal
    Agency and Financial
24  Advisory Authority and
    the Governor of
25  Puerto Rico:             Mr. Peter Friedman, PHV
```

```
 1 │ APPEARANCES, Continued:
   │
 2 │ For The Lawful
   │ Constitutional Debt
 3 │ Coalition:              Mr. Susheel Kirpalani, PHV
   │
 4 │ For Cantor-Katz
   │ Collateral Monitor, LLC: Mr. Douglas Mintz, PHV
 5 │
   │ For Peter C. Hein:      Mr. Peter C. Hein, Pro Se
 6 │
   │ For the Official
 7 │ Committee of Unsecured
   │ Creditors:              Mr. Luc A. Despins, PHV
 8 │
   │ For Assured Guaranty
 9 │ Corp. and Assured
   │ Guaranty Municipal Corp: Mr. William J. Natbony, PHV
10 │
   │
11 │
   │
12 │
   │
13 │
   │
14 │
   │
15 │
   │
16 │
   │
17 │
   │
18 │
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │ Proceedings recorded by stenography.  Transcript produced by
   │ CAT.
25 │
```

```
1  ║                    I N D E X

2  ║ WITNESSES:                                   PAGE

3  ║      The Declarations of Natalie Jaresko
   ║         submitted into evidence              44
4  ║
   ║      NATALIE JARESKO
5  ║      Cross-examination by Mr. Hein           46
   ║      Redirect examination by Mr. Firestein   62
6  ║
   ║      The Declaration of David Skeel
7  ║         submitted into evidence              68

8  ║      DAVID SKEEL
   ║         Witness called but not questioned.
9  ║
   ║      The Declarations of Steven Zelin
10 ║         submitted into evidence              71

11 ║      STEVEN ZELIN
   ║      Cross-examination by Mr. Hein           72
12 ║      Redirect examination by Mr. Firestein   89
   ║      Recross-examination by Mr. Hein         92
13 ║
   ║      The Declarations of Sheva Levy
14 ║         submitted into evidence              97

15 ║      SHEVA LEVY
   ║      Cross-examination by Mr. Hein           98
16 ║
   ║      The Declarations of Guarav Malhotra
17 ║         submitted into evidence              107

18 ║      GUARAV MALHOTRA
   ║      cross-examination by Mr. Hein           108
19 ║
   ║      The Declarations of Mr. Ojas Shah
20 ║         submitted into evidence              122

21 ║      OJAS SHAH
   ║      Cross-examination by Mr. Hein           123
22 ║      Redirect examination by Mr. Mervis      141
   ║      Recross-examination by Mr. Hein         144
23 ║

24 ║

25 ║
```

```
 1                           INDEX (Continued)

 2
     EXHIBITS:                                    PAGE
 3
          Debtors' Exhibit Nos. 1 through 56       16
 4        Debtors' Exhibit Nos. 111 through 117    17
          Debtors' Exhibit Nos. 122 through 132    18
 5        Debtors' Exhibit Nos. 135 through 137    20
          Debtors' Exhibit Nos. 143 through 146    21
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              San Juan, Puerto Rico

 2                              November 10, 2021

 3                              At or about 9:30 AM

 4                   *    *    *

 5        THE COURT:  Buenos dias.  Would the clerk of court

 6   please call the case.

 7        COURTROOM DEPUTY:  Good morning, Your Honor.  The

 8   United States District Court for the District of Puerto Rico

 9   is now in session.  The Honorable Laura Taylor Swain

10   presiding.  Also sitting, the Honorable Magistrate Judge

11   Judith Gail Dein.  God save the United States of America and

12   this Honorable Court.

13        In re: The Financial Oversight and Management Board

14   for Puerto Rico, as representative of the Commonwealth of

15   Puerto Rico, et al., Bankruptcy cases 2017-3283, 2017-3566,

16   and 2019-5523, for Confirmation Hearing.

17        THE COURT:  Thank you.

18        Again, good morning.  Would the video participants

19   please turn your cameras on for the introductory remarks and

20   the usual instructions, but, as always, keep your microphones

21   muted.

22        Welcome back, counsel, parties in interest and

23   members of the public and press who are observing today's

24   proceedings by Zoom video connection or are listening by

25   telephone.  Today's hearing is a continuation of the
```

1  Confirmation Hearing for the Modified Eighth Amended Plan of
2  Adjustment for the Commonwealth of Puerto Rico, et al.
3        To ensure the orderly operation of today's virtual
4  hearing, all parties appearing by Zoom must mute their
5  microphones when they're not speaking, and after these initial
6  announcements, turn off their video cameras if they are not
7  directly involved in the presentation or argument.  When you
8  need to speak, turn your camera on and unmute your microphone
9  on the Zoom screen.
10        I again remind everyone who is listening or observing
11  that consistent with court and judicial conference policies,
12  and the orders that have been issued, no recording or
13  retransmission of the hearing is permitted by anyone,
14  including but not limited to the parties, members of the
15  public, and the press.  Violations of this rule may be
16  punished with sanctions.
17        The Oversight Board has filed an Informative Motion
18  providing the sequence of witnesses whose declarations it
19  intends to offer into evidence as direct testimony.  That
20  document was filed as docket entry no. 19141 in case no.
21  17-3283, and is available to the public at no cost on Prime
22  Clerk for those who are interested.
23        The informative motion also includes the amount of
24  cross-examination time that Mr. Hein has requested with
25  respect to each of the witnesses.  The Court will be keeping

1 | track of time allocations, and will do a one-beep alert when

2 | two minutes are remaining, and a two-beep alert for when time

3 | is up.  Here's a reminder of the beep sound.

4 |        (Sound played.)

5 |        THE COURT:  I will, as usual, be calling on the

6 | relevant participants in the course of the proceeding.  If you

7 | wish to be heard at any point, when you've not been called on,

8 | please use the "raise hand" feature at the appropriate time in

9 | the toolbar at the bottom of the Zoom screen.  It's in the

10 | reactions icon portion of the Zoom screen.  When I call on

11 | you, turn your camera on, and unmute yourself, and identify

12 | yourself by name for clarity of the record.

13 |        As usual, I ask that we not interrupt each other, and

14 | I again apologize, because I may do that if I have questions

15 | or you go beyond your allotted time.  Use the "raise hand"

16 | feature if you have problems hearing me or any other

17 | participant.

18 |        Today we will have a ten-minute break at about 11:15,

19 | and we will break for lunch at 12:50 Atlantic Standard Time,

20 | which is 11:50 Eastern Time, and the break will be at about

21 | 10:15 Eastern Time.

22 |        I see that the Creditors Committee counsel, I assume

23 | that's Mr. Despins, has a hand up.

24 |        MR. DESPINS:  Yes, Your Honor.

25 |        THE COURT:  Good morning, Mr. Despins.

1           MR. DESPINS:  Good morning, Your Honor.

2           I apologize for disrupting the flow of the hearing,

3     but I need to raise this, because I don't want to be in a

4     position where later somebody would say you sat on this and

5     didn't raise an issue.

6           At the hearing on Monday, there was an announcement

7     made that there was a settlement of the UBS objection, but the

8     terms were not disclosed.  And since then, I've sent at least

9     three e-mails asking the Board to tell us what are the terms

10    of that settlement, because I may not care about them at all

11    or I may care about them a lot, depending on what they are.

12          So I think that it's very important for the hearing,

13    from a process point of view, to know not every detail, but at

14    least the headlines of this settlement -- sorry.  It's U.S.

15    Bank, not UBS.  I apologize.  And that's why I raised my hand

16    at this time, to raise that issue, Your Honor.

17          THE COURT:  Thank you.

18          I'll ask that counsel for the Oversight Board respond

19    as to status and intentions with respect to disclosure.

20          MR. ROSEN:  Thank you very much, Your Honor.  This is

21    Brian Rosen, Proskauer Rose.

22          Yes, Mr. Despins did reach out to us yesterday, and

23    we unfortunately were a little bit busy, not only watching the

24    proceedings, but trying to get ready for today.  Your Honor,

25    the reason that there was a lack of disclosure at this point

1   is because things still do require Board approval by not only

2   the Oversight Board, but also the AAFAF Board, and the PFC

3   Board.  And we also did not want to effect any trading in

4   these bonds, because public disclosure of this before the

5   approval may cause a little market change.

6           But we will reach out to Mr. Despins.  I will

7   represent to him that it will have no effect on the

8   Commonwealth, however, and his clients.

9           MR. DESPINS:  Happy to hear that, Your Honor.  Thank

10  you.  And sorry for the interruption.

11          THE COURT:  Thank you.

12          So if anything changes by way of the settlement

13  itself, or the perception of the need to explore any issues

14  with respect to it in the course of the trial, counsel will

15  let me know, and then we'll address that at that time.

16          MR. ROSEN:  Yes.  Yes, Your Honor.

17          THE COURT:  Thank you.

18          So now all but Mr. Rosen can turn their cameras off.

19  The paragraph five of the Informative Motion indicates that

20  the Oversight Board intends to seek the admission of its

21  documentary exhibits into evidence as the first Agenda item

22  this morning.

23          MR. ROSEN:  Yes, Your Honor.  Thank you very much.

24  Again, it is Brian Rosen, Proskauer Rose, on behalf of the

25  Oversight Board.

1          Your Honor, with me this morning is also my partner,

2     Mr. Michael Firestein, and I will, if Your Honor permits, cede

3     the podium over to Mr. Firestein to address that issue.

4          THE COURT:  Thank you.

5          Good morning, Mr. Firestein.

6          MR. FIRESTEIN:  Good morning, Your Honor.  As is the

7     usual morning greeting, can you hear me?

8          THE COURT:  I can hear you.  Can you hear me?

9          MR. FIRESTEIN:  Thank you very much.  Yes.

10          THE COURT:  Good.

11          MR. FIRESTEIN:  Yes.  I can hear the Court well.

12     Thank you very much.

13          Your Honor, as you correctly noted yesterday in

14     connection with the Informative Motion that we placed on file,

15     we advised that our intention was to seek admission of our

16     documentary evidence.  Over the evening, we were able to

17     communicate with Mr. Hein, who's currently the only interested

18     party relative to that, and as we had previously advised the

19     Court, there had been no objections raised with respect to

20     these exhibits, subject to the reservation of rights that was

21     read into the record at the pretrial and was submitted in

22     connection with a separate informative motion.

23          As I noted over the evening, Mr. Hein has agreed, and

24     he can certainly represent for himself, that he's no longer

25     considering or asserting any objection of relevance with

1   respect to any of the exhibits that we intend to introduce as

2   evidence.  So that disposes of everything with the exception

3   of the other reservations that he made, but to this time,

4   we've not seen any particular exhibit to which that

5   reservation is to be asserted, or any particular sentence or

6   paragraph of any declaration to which it is addressed.

7           So I'm happy to handle this in any way that the Court

8   wishes.  We had hoped that we were going to be able to move in

9   all of our exhibits to have a smooth introduction of evidence,

10  given the jostling around of witnesses and moving back and

11  forth, but if the Court's preference is to do it witness by

12  witness, we can do that.  Or we can simply find out from

13  Mr. Hein what the particular exhibits are to which he has

14  those specific objections, and then move the rest of them in,

15  and deal with it in what I expect will be a brief discussion

16  concerning testimony from Ms. Jaresko.

17          THE COURT:  Well, why don't you make a proffer of all

18  of the exhibits by exhibit number that you are seeking to have

19  admitted, and then I can query whether there are objections to

20  any particular exhibits.

21          MR. FIRESTEIN:  I'll be happy to do that, Your Honor.

22  And I will include ones that are withdrawn, so that the

23  Court's record is complete for the clerk's handling of the

24  exhibits.  Exhibit 1 through 56, Debtors' 1 through 56, we

25  would move to admit.

1      THE COURT:  Are there any objections to the admission

2 of any of the exhibits, 1 through 56, of the debtors?

3      Mr. Hein.  Mr. Hein, you need to be unmuted.

4      MR. HEIN:  Sorry, Your Honor.

5      THE COURT:  Thank you.

6      MR. HEIN:  Can you hear me now?

7      THE COURT:  Yes.  Good morning.

8      MR. HEIN:  Thank you.  Good morning.

9      I did communicate by e-mail that I was not going to

10 be asserting any relevancy objections.  I recognize this is a

11 bench trial.  And I also indicated that I hope that the

12 Oversight Board would be similarly appropriate in their

13 approach on relevancy, given that this is a bench trial.

14      There were, in the October 27th letter that has been

15 filed with the Court, certain additional reservations, and

16 those, I think, still pertain.  For example, in agreeing to

17 the admissibility of the document, no party is admitting or

18 acknowledging or accepting as true statements in the document,

19 and all parties reserve the right to dispute matters in the

20 document and/or offer contrary evidence, and/or dispute the

21 weight to be given to the document.

22      And that would apply to virtually everything any

23 party is -- being offered.  I think it goes without saying

24 that that would be the case.  So that is a reservation or

25 clarification, but it's not an objection as such to the

1   admission.  It's just that in accepting that something is

2   offered, even if offered for the truth, I'm not acknowledging

3   it's true.  I'm just acknowledging that it comes into

4   evidence.

5         And, likewise, one of the statements in the October

6   27th letter that I think is still equally applicable:   In

7   addition, the Oversight Board agrees that Mr. Hein reserves

8   and does not waive any objections based on the position that

9   documents pertaining to settlement negotiations or mediation

10  may not be offered, because other documents on that subject

11  have been withheld, and/or the position that predecisional or

12  deliberative communications or documents may not be offered

13  because other predecisional or deliberative communications or

14  documents have been withheld, and/or, alternatively, that the

15  disclosure of such withheld documents should be ordered.

16        And again, Your Honor, I want to be clear that that's

17  my position.  This also affects some of the declarations.  I

18  recognize this is a bench trial, but I just don't want to be

19  acknowledging or waiving those positions.

20        THE COURT:  Well, I'd still need a bit of

21  clarification from you, because the way the reservation is

22  phrased is that documents of the types that you have just

23  mentioned may not be offered.  On the other hand, I believe I

24  hear you saying you are not objecting to the admission of the

25  documents into evidence.  I am not sure I understand how you

1  reconcile those two positions as a technical evidentiary

2  matter.

3         MR. HEIN:  I think -- Your Honor, I want to be clear

4  what my position is.  You know, this is perhaps best

5  illustrated when we get to the Jaresko Declaration, where

6  there are items being proffered in the declaration that I

7  certainly object to.  We can discuss those specifically when

8  we get to that.  You know, I just want to be clear that that's

9  my position.

10        On the other hand, you know, I'm not saying that the

11  Court, you know, can't have these documents in evidence.  And

12  much of it, on 1 through I believe it was 50 --

13        THE COURT:  6.

14        MR. HEIN:  -- 6, yes, that was mentioned were just

15  talking about things like the Plan documents, certified fiscal

16  plans, you know, and things of that nature.  So that type of

17  document would not implicate that issue.  Certainly some of

18  the materials, in particular some of the declarations do

19  implicate that issue, so I just wanted to put that on the

20  table, Your Honor.

21        THE COURT:  Thank you.

22        MR. HEIN:  And I think it may be more clear when we

23  talk about Jaresko.  I can be very specific what my concerns

24  are there.

25        THE COURT:  All right.  Thank you.

1        So we're dealing with the documents first, and what I

2   hear is that there is no objection to the admission in

3   evidence of Exhibits 1 through 56.  Accordingly, those

4   exhibits are admitted in evidence.  That is, Debtors' 1

5   through 56.

6        (At 9:44 AM, Debtors' Exhibit Nos. 1 through 56

7   admitted into evidence.)

8        THE COURT:  Mr. Firestein.

9        MR. FIRESTEIN:  May I move on, Your Honor?

10       THE COURT:  Yes, please.

11       MR. FIRESTEIN:  Exhibits 57 through 110 are merely

12  statutes, and they are set forth for identification purposes,

13  and for the Court's convenience, so that the Court had them.

14  We're not seeking to admit statutes into evidence.

15       THE COURT:  And those remain marked for

16  identification purposes only, and are not tendered or admitted

17  into evidence.

18       MR. FIRESTEIN:  Correct, Your Honor.

19       THE COURT:  Thank you.

20       MR. FIRESTEIN:  Exhibits 111 through 117, we would

21  seek to admit on the same grounds and bases that have already

22  been expressed in connection with our earlier discussion.

23       MR. HEIN:  And, Your Honor, may I just speak to this?

24       THE COURT:  Yes.

25       MR. HEIN:  Yes.  And just as one example, that

1   includes two reports from the debtors' experts.  It includes

2   certain materials that the experts used, including articles of

3   that nature that are being offered but not for the truth.

4           Again, I don't object to that coming in as such, but

5   obviously would dispute and reserve the right to dispute, you

6   know, various of the statements in that material.

7           THE COURT:  So, subject to that reservation of

8   rights, there is no objection to the admission in evidence of

9   Debtors' Exhibits 111 through 117, and those exhibits are now

10  admitted in evidence.

11          (At 9:45 AM, Debtors' Exhibit Nos. 111 through 117

12  admitted into evidence.)

13          MR. FIRESTEIN:  May I continue, Your Honor?

14          THE COURT:  Yes, please.

15          MR. FIRESTEIN:  Exhibit 118 is another statute, which

16  again is only set forth for purposes of identification, and is

17  not being formally offered into evidence.  And I accept the

18  Court's comments as before, and if appropriate, I'll simply

19  move on.

20          THE COURT:  Yes.  I will just make clear that 118 is

21  marked for identification only, and is not tendered or

22  admitted into evidence.

23          The next group, please?

24          MR. FIRESTEIN:  Yes, Your Honor.  Exhibits 119

25  through 121 are withdrawn in light of certain settlements that

1    have already been reported on the record.

2            THE COURT:  Very well.  So the tender of 119 to 121

3    is withdrawn, and so they are not and will not be in evidence.

4            MR. FIRESTEIN:  Thank you, Your Honor.

5            Exhibits 122 through 132, we would seek to admit and

6    incorporate the discussion that we've had previously relative

7    to that.  If the Court wishes further explanation on that, I'm

8    happy to do so.

9            THE COURT:  Mr. Hein, is there any objection to the

10   admission of 122 to 132, subject to the reservations and

11   principles that we've discussed already?

12           MR. HEIN:  With those reservations, there's no

13   objection.  Again, it includes the best interest test reports

14   and amended best interest test reports, which clearly I

15   dispute and contest, but I don't quarrel with the fact they

16   should be in evidence for Your Honor to consider.

17           THE COURT:  Thank you.

18           Debtors' 122 to 132 are admitted into evidence.

19           (At 9:46 AM, Debtors' Exhibit Nos. 122 through 132

20   admitted into evidence.)

21           THE COURT:  You may go on, Mr. Firestein.

22           MR. FIRESTEIN:  Thank you, Your Honor.  Exhibit 133

23   is withdrawn per agreement between -- or per request by AAFAF

24   and agreement by the Oversight Board.

25           THE COURT:  So Exhibit 133 is neither tendered nor

1    admitted into evidence.

2            MR. FIRESTEIN:  Thank you, Your Honor.

3            134 is another statute I believe, and that's Act 53,

4    which is again identified just for identification purposes

5    only.

6            THE COURT:  Exhibit 134 is for identification

7    purposes only, and not in evidence.

8            MR. FIRESTEIN:  Thank you, Your Honor.

9            Exhibits 135 through 137, we seek to move to admit

10   them as evidence pursuant to the same discussion presumably as

11   we've been having with the other exhibits, Your Honor.

12           THE COURT:  They are marked admitted "but not for the

13   truth" in the column on the evidence summary list; is that

14   correct?

15           MR. FIRESTEIN:  That's fine, Your Honor, although,

16   technically speaking, I have no hesitation in moving them for

17   admission without restrictions; but however the Court wishes

18   to handle that under the circumstances is acceptable to the

19   Oversight Board.

20           THE COURT:  All right.  It's not clear to me whose

21   notations or reservations are in that column, so I didn't know

22   if it was yours or whatever; but, Mr. Hein, there is a full

23   proffer of these Exhibits 135 to 137, subject, of course, to

24   your right to dispute the facts, and their weight, and the

25   other objections that you have, the other principles that you

20

1    have articulated.

2           So subject to our earlier discussions, do you have

3    any objection to the admission of 135 to 137?

4           MR. HEIN:  No, with those qualifications.  And just

5    for clarity, Your Honor, the annotations I think in the right

6    column of the chart that I'm looking at, and I assume your

7    Honor's looking at --

8           THE COURT:  Yes.

9           MR. HEIN:  -- are by the Oversight Board.

10          THE COURT:  Thank you.

11          So just to be clear, you are, Mr. Firestein, not

12   tendering subject to the "but not for the truth" qualification

13   in that right-hand column corresponding to these three

14   exhibits?

15          MR. FIRESTEIN:  That's correct.  And as I understood

16   what Mr. Hein said, he, subject to the qualifications, had no

17   objection.

18          THE COURT:  Yes.  That is how I heard Mr. Hein as

19   well.

20          So Exhibits 135 to 137 are admitted for all purposes

21   subject to the reservations and, of course, the ability of

22   Mr. Hein to dispute the matters that are set forth in those

23   exhibits.

24          (Whereupon, Debtors' Exhibit Nos. 135 through 137

25   admitted into evidence.)

1          MR. FIRESTEIN:  Two more groups.

2          THE COURT:  Yes.

3          MR. FIRESTEIN:  Exhibits 138 to 142 I believe were

4   admitted yesterday in connection with Ms. Pullo's testimony,

5   so with that understanding, I'm happy to skip over those.

6          THE COURT:  That is my understanding as well.

7          MR. FIRESTEIN:  And lastly, Your Honor, Exhibits 143

8   through 146, we would move for full admission consistent with

9   the understanding that we have been discussing on the record

10  to this point.

11         THE COURT:  So, Mr. Hein, again, subject to the

12  principles that we have already discussed, do you have any

13  objection to the admission of 143 to 146?

14         MR. HEIN:  No, Your Honor.

15         THE COURT:  Debtors' Exhibits 143 to 146 are admitted

16  in evidence.

17         (Whereupon, Debtors' Exhibit Nos. 143 through 146

18  admitted into evidence.)

19         MR. FIRESTEIN:  That's it, Your Honor.  Thank you

20  very much.

21         THE COURT:  Thank you.

22         So now we will go on to the tender of the first

23  witness' direct testimony in the form of the declaration --

24  actually multiple --

25         MR. ROSEN:  Yes.

1          THE COURT:  -- declarations that have been filed.

2     Mr. Rosen.

3          MR. ROSEN:  Yes, Your Honor.  Thank you very much.

4     Brian Rosen, Proskauer Rose.

5          Your Honor, there are actually three declarations

6     that were originally -- that were filed with respect to

7     Ms. Jaresko.  There was the original declaration at ECF 18729,

8     and as the Court will recall, that was subsequently amended to

9     include the exhibit references.  And that amended declaration,

10    Your Honor, was at 19054.04. And then, Your Honor, there was

11    the supplemental declaration that was filed on November 3rd

12    with respect to Ms. Jaresko, and that was 19058.

13         At this time, Your Honor, we would move for the

14    admission of those three declarations.

15         THE COURT:  All three of the original, the amended,

16    and the supplemental?

17         MR. ROSEN:  Yes, Your Honor.

18         THE COURT:  As to the amended, you referred to the

19    ECF number as 19054.04.  Did you mean a dash?

20         MR. ROSEN:  I have it as point, but let me just

21    clarify that, Your Honor.  I'll be one second.

22         Dash 4, yes, Your Honor.  I apologize.  19054-4.

23         THE COURT:  All right.  Just one moment.  I dropped

24    something.  There.

25         So, Mr. Hein, do you have any objections to the

1   admission of the declarations?

2          MR. HEIN:  Yes, I do, Your Honor, and I can be

3   specific if Your Honor would permit.

4          THE COURT:  Yes, please.

5          MR. HEIN:  So first, just for clarity, I am referring

6   to the most recently filed principal declaration, which is at

7   19054-4.  And Your Honor should just be aware that the

8   pagination is slightly different than the original

9   declaration, because when the Oversight Board added the cites

10  to the trial exhibits, quite understandably, it affected the

11  pagination.  That's a technical point.  But when I refer to

12  specific pages, I think if Your Honor has 19054-4, it may be

13  more clear.

14         THE COURT:  Yes.  I have 19 --

15         MR. HEIN:  -- because both --

16         THE COURT:  I have 19054-4 in front of me here.

17         MR. HEIN:  Correct.  So there are several objections

18  that I would raise.  First, the declaration is replete with

19  legal conclusions.  This starts on page 3, paragraph 5, which

20  kind of previews the conclusions to come.  But then if one

21  jumps ahead to page 21, beginning -- I was turning my pages.

22  So page 21, I'm referring now to the pages at the bottom.

23  It's docket 19054-4, page 22 of 102.

24         This fundamentally reads like a brief.  "II, The Plan

25  Complies with The Factual Requirements in PROMESA Section

```
 1   314(b)."  (A) --
 2              THE COURT:  Mr. Hein.
 3              MR. HEIN:  PROMESA --
 4              THE COURT:  Mr. Hein, I'm going to interrupt you,
 5   because I think that somehow we're not literally on the same
 6   page.  I have the document that is ECF no. 19054-4 filed on
 7   November 3rd -- oh, so are you talking about the numbers --
 8   the word processed numbers at the bottom of the pages, or are
 9   you talking about the ECF pagination at the top of the page?
10              MR. HEIN:  I was using the word processing numbers at
11   the bottom.  I could use either, if Your Honor has a
12   preference.
13              THE COURT:  Actually, neither of them seems to
14   correspond to me to what you're talking about.  On word
15   processed page number -- just one moment.
16              So which paragraph of the declaration are you talking
17   about on page 21?
18              MR. HEIN:  So it's -- II is the header, so it's
19   referring first to the header II.
20              THE COURT:  All right.
21              MR. HEIN:  Which is followed by paragraph 45.
22              THE COURT:  Thank you.  Now I see where you are.  I
23   apologize.
24              MR. HEIN:  Sure.
25              THE COURT:  Yes.  I'm with you now.
```

```
1              MR. HEIN:  Okay.  Thank you.  May I proceed?

2              THE COURT:  Yes, please.

3              MR. HEIN:  So as I was saying, it's replete with

4    legal conclusions, fundamentally reads like, in essence, a

5    brief.  And so you have these point headers, point -- "II, The

6    Plan Complies with the Factual Requirements of PROMESA Section

7    314(b)."  Then "(A), PROMESA § 314(b)(1): The Plan Fully

8    Complies with the Provisions of the Bankruptcy Code Made

9    Applicable by PROMESA Section 301."

10             And then it goes on with, you know, similar structure

11   and headings through page -- I'm referring now to the word

12   processing page 55, basically tracking section by section

13   provisions of Title II of PROMESA.  This, you know, really has

14   every appearance, in essence, as a brief.  And I just don't

15   think it's appropriate to be offering legal conclusions as

16   factual testimony.

17             Secondly, there is testimony in the declaration where

18   Ms. Jaresko is, in essence, stating evaluations of legal

19   claims.  She's not, to my knowledge, an attorney, and doesn't

20   profess to have expertise on U.S. bankruptcy law.  And even if

21   she did, there would probably be a question as to whether

22   that's appropriate to offer from a fact witness.

23             So beginning -- and again, I'm referring to the word

24   processing pages.  Beginning page 55 -- and this is docket 56

25   of 102, there's a section heading that -- III, the Plan
```

1    Settlement Agreements, and goes on to basically chronicle at

2    length various legal claims and proceedings; and then

3    culminates on page 85, again, the word processing pages, with

4    header H on page 85, that's docket 86 of 102, "The Plan

5    Settlement Agreements are Reasonable and Fair."

6           And then we have a section on preemption, and there's

7    a preview of this in paragraph 5 on page 3, the word processed

8    3; but it becomes most apparent when one turns to word

9    processed page 94 -- actually, it's word processed page 96.

10   So this is docket 97 of 102.  And you have a section called

11   Preemption Pursuant to the Plan.

12          And then Ms. Jaresko goes on to basically opine about

13   how a list of the statutes annexed as Exhibit K to the Plan

14   are all preempted by PROMESA.  She talks about having reviewed

15   Exhibit K, you know, the statutes, you know, on Exhibit K, and

16   basically, you know, opines as to their being preempted by

17   PROMESA.

18          She even goes on, and I think this is page 98,

19   paragraph 231, the second sentence.  Quote, any PROMESA --

20   excuse me.  Quote, any Puerto Rico statute or other law

21   requiring the Commonwealth to pay those claims in full is

22   inconsistent with Title III of PROMESA as manifested by the

23   restructuring contained in the Plan.

24          So she's basically opining not only that 57, at least

25   statutes in Exhibit K to the Plan are preempted by PROMESA.

1    She's also opining as to some group of even unidentified

2    statutes being preempted by PROMESA.  There's no showing as to

3    qualifications to opine about this, and in any event, even if

4    she had the qualifications, it would be legal conclusions for

5    the Court, not for a fact witness.

6         And then, finally, I object to Ms. Jaresko testifying

7    to characterizing the settlement discussions and processes as

8    to which mediation privilege was claimed and discovery

9    refused.  And I have this in my Objection, 18575, pages 276 to

10   277, 283 to 285 of 303.  I have a statement of these objection

11   principles at docket 18575, pages 31 to 32.  But in essence

12   what you have is a situation where Your Honor, of course, had

13   orders that made clear that the mediation settlement process

14   was to be confidential, that it should be maintained separate

15   from the litigation.

16        In addition, I sought discovery with respect to what

17   transpired in the mediation.  The Oversight Board filed

18   objections or served objections objecting to providing any

19   discovery whatsoever as to those matters.  Those objections

20   are in the record at 18575, pages 283 to 285, 299.

21        And so having both, you know, the Court's orders on

22   these matters, and then having the Oversight Board refuse to

23   provide any discovery, we basically have a sword-shield

24   problem where the Oversight Board is seeking to offer, in

25   effect, the conclusion of the mediation process -- one of

1   their witnesses even has characterizations of the process as

2   robust, et cetera -- use that as a sword to establish, in

3   their view, reasonableness and fairness of the settlement.

4          But they use the mediation privilege, and objections

5   to discovery is based on the mediation privilege in the

6   Court's Order as a shield to prevent any discovery into the

7   matters.  And just as, you know, specific examples, again,

8   using the word processing versions, there's a specific

9   reference in Jaresko on page word processing 56, paragraph

10  107, and then at word processing 85, paragraph 201, where she

11  talks about, you know, the extensive good faith and

12  arm's-length negotiations led by the mediation team, et

13  cetera, et cetera.

14         And again, Your Honor, having had Court orders that,

15  you know, required confidentiality, also required that the

16  mediation be kept totally separate from the litigation, after

17  I asked in discovery for information about what transpired,

18  and, you know, they assert mediation privilege, settlement

19  privilege, won't disclose what transpired, to then be

20  affirmatively offering this with, in essence,

21  characterizations -- you know, here Ms. Jaresko is saying,

22  extensive good faith, arm's-length negotiations.  Mr. Zelin

23  talks about robust discussions.  It's just, I think, not

24  appropriate to have this used as a sword when they shielded

25  the specifics from discovery.

1          THE COURT:  Did you make any motion to compel the

2    discovery or ask for any preclusion sanctions during the

3    discovery period?

4          MR. HEIN:  I did not, Your Honor.  But you know my

5    position as set forth in my objections, and, frankly, in prior

6    papers in this case, has been very, very clear.  And to make a

7    motion to compel would be, you know -- in other words, they

8    may well have a valid argument that they're protected by

9    mediation privilege.  It's a little bit like attorney-client

10   privilege.  Someone asserts attorney-client privilege, one is

11   not necessarily going to move to compel the disclosure of

12   attorney-client communications.

13         But because you accept that there may be an

14   applicable privilege, and don't press to the mat for

15   disclosure through motions to compel, that doesn't mean

16   someone can use the attorney-client privilege as both a sword

17   and the shield.  It's the same problem that we have here.

18         So this is -- you know, you can accept that they have

19   a valid mediation settlement privilege claim, particularly in

20   light of Your Honor's confidentiality orders, Your Honor's

21   orders that the mediation and settlement be kept separate from

22   the litigation.  You can accept that they had no obligation to

23   make a disclosure.  But having not made the disclosure, what

24   I'm objecting is they are now trying to use this as a sword.

25         THE COURT:  Thank you.

1          Mr. Rosen -- I'm sorry.  Mr. Firestein, would you

2    like to respond?

3          MR. FIRESTEIN:  I would, Your Honor.

4          As I understand it, Mr. Hein has presented four

5    arguments.  I don't know that I'll take them in the order in

6    which he presented them, but I will address all four.  And let

7    me take the last one first, which has to do with the

8    characterization of the settlement process that he referenced.

9          The Court is correct that he did not make any motion

10   to compel with respect to that, but even without that, I

11   submit, Your Honor, that the objection should be overruled.

12   As noted in the informative motion that we filed, the

13   testimony generally describes the mediation process, including

14   the protocols that were directed by the mediation team.

15   Merely commenting upon vigorous debate is hardly the stuff of

16   mediation confidentiality.

17         It is the most basic of foundational background, and

18   no different than the mediation team's required reporting of

19   -- good faith nature of the negotiations that I think, as

20   recently as a couple of weeks ago, that Judge Houser submitted

21   in connection with the discussions that concern the

22   legislation and the Act 53 matters.

23         There is no point-counterpoint discussed by any of

24   these witnesses, only the notion of an exchange of ideas and

25   legal positions without specification.  It's the nature of the

 1    beast as to what happens in mediation.  It's almost

 2    tautological that to the extent the mediation occurs, that

 3    that is what takes place.  That is not the basis of some

 4    notion of confidentiality, much less a sword or a shield.

 5           And, in fact, it is almost in those words that those

 6    matters are contained in the declarations, without discussing

 7    the subject matters of those legal positions.  Indeed, at

 8    least one of the witnesses, and I know Mr. Hein referenced

 9    him, Mr. Zelin, specifically noted in his declaration that he

10    wasn't going to disclose the matters that were confidential,

11    and there was considerable care taken in the drafting of the

12    declarations to avoid doing that.

13           There is no discussion anywhere of who said what to

14    whom, how much was offered or demanded by whom, how that

15    changed over time, the dynamics of the exchanges, the input of

16    the mediation team.  In fact, the only things that are noted

17    by the witnesses in the declarations are the ultimate terms of

18    the PSAs themselves, or, in two instances, proposals that

19    were -- I think this is in Mr. Zelin's declaration, proposals

20    that were made public for all to consume and review pursuant

21    to what has come to be known as a publicly disclosed blowout.

22    So the disclosure of that was something that was already in

23    the public domain.

24           Again, merely discussing a state of mind that

25    Ms. Jaresko or any of the other witnesses had as to the

1   perception of the vigorous nature of the debate is not a

2   disclosure of the specifics of what took place.  I submit,

3   Your Honor, that that is the epitome of a nonconfidential

4   disclosure.  Mr. Hein's equating this to something that he was

5   denied discovery about is like mixing apples and oranges, and

6   additionally is untrue.

7        I just submit, Your Honor, that this type of

8   discussion as to what took place -- and I know the depositions

9   have been withdrawn, but she was asked about these types of

10  things at her deposition, to which I believe Mr. Hein

11  attended, and she responded to those questions.  But I don't

12  think that you need to look at the deposition for the Court to

13  come to the same conclusion.

14       There's nothing specific about this set of issues

15  that comes close to the disclosure of a confidential piece of

16  information, and I submit that objection should be overruled.

17       Unless the Court has questions on that, I'd like to

18  move to a second of Mr. Hein's claims.

19       THE COURT:  You may go on.

20       MR. FIRESTEIN:  Thank you, Your Honor.

21       Mr. Hein comments upon the legal evaluation of

22  claims.  Again, until today, we were unaware of any specific

23  paragraphs or sentences which form the basis of that

24  objection.  And of course it's difficult to respond to that

25  form of improper general objection until we've now arrived

1    here today, but no matter, even with Mr. Hein's discussion of

2    this, it's not well taken and should be overruled.

3            To be clear, and this is, frankly, the case with

4    respect to all three of the remaining categories, but I'll

5    take them in turn.  Ms. Jaresko simply presents her

6    understanding of the well-known public nature of the disputes.

7    It was hardly a secret, and there is little debate that the

8    nature of the GO-PBA dispute related to the generic issue of

9    validity or priority, among other things.

10           Similarly, the HTA, CCDA and PRIFA revenue bond

11   proceedings were well-publicized with many articles written

12   about them as relating to historically allocated revenues now

13   retained by the Commonwealth.  The other disputes described

14   are equally well-known on the docket and otherwise.  And

15   Ms. Jaresko comments in her declaration that she has read

16   pleadings in many instances, and the nature of those disputes

17   is contained in the public document.  And she goes no farther

18   than to provide a generic description of the nature of those

19   disputes.

20           It is true she goes beyond that in describing the

21   terms of the resolution and the risk, time, and expense that

22   is associated with continuing to litigate rather than

23   compromise these issues and reach a settlement; but I think

24   that as a foundational matter, her general understanding of

25   the nature of the dispute is entirely admissible, and is based

1    upon her business assessment of what is out there and how it

2    is that the parties came to a conclusion to resolve their

3    differences.

4         Even a reference that Ms. Jaresko might have said

5    that her belief is that the Oversight Board should prevail in

6    connection with litigation is no different than what any

7    vigorously advocating party would believe.  But nonetheless,

8    as to her state of mind, it does not go to the recitation of

9    any form of legal conclusion, and is instead merely a

10   contributing effect of what her business assessment is on

11   those matters.

12        On balance, this is nowhere close to describing an

13   evaluation of legal claims.  There is no recitation of these

14   people are wrong, or this group is wrong for this reason, or

15   we are right for that reason.  It is the prototype example of

16   someone explaining why.  And in the case of an Oversight -- in

17   the case of the Oversight Board, acted in a certain way to

18   resolve the matters.

19        As I noted, Your Honor, to the extent that the

20   objection is directed to the terms of the deals themselves,

21   Ms. Jaresko, of course, negotiated, often signed the very

22   deals in question, and she has indeed the personal knowledge

23   necessary to say exactly what she is saying.  Under any

24   analysis, this is admissible testimony.

25        Unless the Court has any questions, I'll move on to

1    the issue of preemption.

2         THE COURT:  Well, I think that Mr. Hein made a

3    broader point on this legal opinion argument regarding the

4    section beginning on page 21 with paragraph 45, where

5    Ms. Jaresko talks about -- well, she talks about bond claims,

6    and then she talks -- he had cited pages 21 through -- just

7    one moment -- through 55, which includes statements that

8    particular provisions of the Bankruptcy Code and PROMESA are

9    satisfied.

10        MR. FIRESTEIN:  Yes.

11        THE COURT:  He characterized those as legal

12   opinions.

13        MR. FIRESTEIN:  I actually, Your Honor, was intending

14   to take that as a separate bucket.

15        THE COURT:  Oh, all right.

16        MR. FIRESTEIN:  And I will address that section

17   independently.  I wanted to first deal with the claimed

18   legal -- so-called legal objections to an evaluation of the

19   claims which give rise to the settlements that are baked into

20   the Plan, but I will get to those issues in short order.

21        THE COURT:  Very well.  Please go on then.

22        MR. FIRESTEIN:  Thank you, Your Honor.

23        On the issue of preemption, it is true that

24   Ms. Jaresko uses the term preemption, but in no way in her

25   discussion in her declaration is she articulating what the

1   basis or nature of the preemption is.  She uses the term in

2   its generic sense for the sole and exclusive purpose to

3   represent that if, in fact, the revenues allocated by the

4   various statutes in question were compelled to be appropriated

5   in the manner set forth in those statutes, her assessment,

6   business assessment of that is that it would be difficult, if

7   not impossible, for the Oversight Board to do its job and

8   carry out the mandate of PROMESA to achieve fiscal

9   responsibility for Puerto Rico.

10          There have been many arguments in this courtroom

11  about the impact of preemption and whether preemption should

12  apply, and many opinions by this Court about the issue of

13  preemption, not necessarily resolving it, but certainly

14  discussing the legal implications of it.  That is not in any

15  way, stretch, or form what Ms. Jaresko is intending to

16  communicate about that, merely what the effect is of the

17  necessity of potentially appropriating those revenues and the

18  impact that that would have on the potential restructuring of

19  the Commonwealth, which is exactly what the Oversight Board's

20  directive is, and is precisely what -- the charge that

21  Ms. Jaresko had.

22          Unless the Court has questions on the preemption

23  point, I'll move on to the final point, which are these

24  Bankruptcy Code provisions and other sections of PROMESA.

25          THE COURT:  You may go on.

1                   MR. FIRESTEIN:   Thank you, Your Honor.

2              Once again, the Court, and of course Mr. Hein is

3    correct in identifying the pages in Ms. Jaresko's declarations

4    in which she discusses various Bankruptcy Code provisions, but

5    this Court will ultimately make a determination as a matter of

6    law as to whether those provisions are indeed complied with

7    pursuant to the behavior and testimony of the witnesses

8    involved and the Plan that has been proposed to the Court for

9    confirmation.

10             To be clear on this point, Ms. Jaresko is not

11   discussing the legal requirements of them, but again, much

12   like the PROMESA -- excuse me, much like the preemption issue,

13   is simply reciting her factual understanding of how it is that

14   the English words contained in these particular statutes are

15   ones -- in her layman's sense, are addressed.

16             There are many instances in which the requirements of

17   the Bankruptcy Code -- and we don't have to necessarily go

18   through them.  This Court knows them far better than I do --

19   where you have to identify where claims are impaired or where

20   claims are unimpaired.  And Ms. Jaresko, who is, of course, a

21   serious advocate and proponent of the Plan, and who has a

22   pretty good working understanding of the construct of the

23   Plan, and who is getting what pursuant to it -- how those

24   claims are impaired or whether they're unimpaired, and those

25   are simply in the generic sense of getting less than what

1  they're actually owed under the circumstances.

2          It is not a legal conclusion for her to identify

3  those provisions at the end of the day, nor is it a legal

4  conclusion for her to say that, to her lay understanding, the

5  issues of compliance are satisfied.  And, indeed, if this were

6  the only discussion of this particular point, that would be

7  one thing.  But, of course, there is substantial briefing that

8  addresses evidence on these issues.

9          There is the Plan itself, and argument that people

10  made at length on Monday as to whether certain things are

11  compliant with or not compliant with, depending on your

12  perspective, elements of PROMESA or the Bankruptcy Code; but

13  from an advocate and proponent of the Plan, and particularly

14  from the Oversight Board's perspective, we thought it

15  important for Ms. Jaresko to put forth her lay understanding.

16          And to the extent that this goes to the weight of

17  what -- the Court places on the nature of that testimony, that

18  is always the Court's prerogative, and we would expect that

19  that is how the Court will view her lay understanding.  And

20  the Court will make its own legal determinations based upon

21  the Court's evaluation of the requirements under the Code.

22          Unless the Court has further questions on that, I'll

23  submit on the point.

24          THE COURT:  Thank you.

25          Mr. Hein, anything further?

1          MR. HEIN:  Yes, just a few points.

2          THE COURT:  Mr. Hein, you're breaking up a bit.  Mr.

3     Hein.

4          MR. HEIN:  Can you hear me now?

5          THE COURT:  It's still breaking up a bit.

6          MR. HEIN:  Can you hear me now?

7          THE COURT:  Now it's better.

8          MR. HEIN:  Thank you.  So on the issue of the

9     mediation being used as a sword and a shield, Mr. Firestein

10    mentioned something which I think kind of illustrates the

11    problem, which is if they are taking so-called blowouts where

12    they have some mediation proposals that were exchanged, and

13    they are making a disclosure of them, and that is something

14    where they are, in effect, taking and trying to selectively

15    offer that these things were said or exchanged in mediation,

16    but they're blocking disclosure of the rest of what was said

17    or discussed in mediation, that -- if you think of it again in

18    terms of an analogy to attorney-client privilege, you just

19    can't be offering part and blocking the rest.

20         So Mr. Zelin, when we get to him, even has these

21    characterizations as robust; he was personally involved in the

22    conversations; there were robust discussions.  Again, you just

23    can't have a situation where someone offers part and then

24    blocks the entirety.  They -- it's either got to be nothing,

25    or they have to make full disclosure.

1          They chose, I understand, in light of Your Honor's

2     orders that made it clear mediation would be separate, to have

3     nothing, and they should not be able to now offer parts of

4     what occurred in mediation at this stage in the proceedings.

5     And I have been raising this point in court papers for the

6     last two years, frankly.

7          Secondly, on the preemption point, when you read what

8     is said on preemption in Ms. Jaresko's declaration, it is

9     replete with her legal characterization.  She is looking at a

10    list of statutes, saying this list of statutes are all

11    preempted.  She is saying that even unidentified statutes are

12    preempted.  She goes way beyond just, you know, facts, and I

13    think, therefore, it's inappropriate.

14         And then finally, if, in fact -- on the pleadings,

15    yes, the pleadings are a matter of record, but the fact that a

16    fact witness reads pleadings and then submits an almost

17    hundred-page declaration summarizing pleadings -- the

18    pleadings are in the record.  It's just not appropriate for a

19    fact witness to be offering her summary or take of pleadings

20    based on the fact that she read them and now has a

21    hundred-page declaration.  It's just not appropriate for a

22    fact witness.

23         Thank you, Your Honor.

24         MR. FIRESTEIN:  Your Honor, if I might have 60

25    seconds?

 1              THE COURT:  Yes, Mr. Firestein.

 2              MR. FIRESTEIN:  Thank you.

 3              Three points:  One, for Mr. Hein to equate the

 4    disclosures as the equivalent of a subject matter waiver, I

 5    think is beyond the pale.  The disclosures that were made of

 6    the two particular proposals, if he wanted to use other ones

 7    that were public, I mean, they were certainly out in the

 8    public and disclosed for other legal reasons.  And once

 9    they're in the public, they're no longer protected, and I

10    don't think that that specifically contributes to the issue he

11    raises.

12              Secondly, on the preemption point, what Ms. Jaresko

13    speaks to is the three buckets of statutes:  Good faith in

14    credit, appropriations by the government, and pensions.  That

15    does not take a legal conclusion or a legal analysis to be

16    able to identify it, and I've already stated what she goes on

17    to speak to relative to that.

18              And as to his last point about the state of the

19    pleadings, yes, they're a matter of record, but I think it's

20    important for this Court to understand Ms. Jaresko's state of

21    mind when appreciating the notion of reasonableness as it

22    relates to the settlements that were ultimately reached.

23              And on that, Your Honor, I will submit.

24              THE COURT:  Thank you.

25              I have carefully considered the arguments here and

1   rule as follows:   All of Mr. Hein's objections are overruled

2   with respect to portions of the Jaresko Declaration, and there

3   were references to others in a similar theme that describe the

4   fact of mediation and characterize the process.   There is

5   nothing here that is proffered by way of otherwise nonpublic

6   information regarding the conduct of the mediation.

7           This fact witness, and these witnesses who testify to

8   personal knowledge of or participation in the mediation can

9   testify as to their impressions of the dynamics and the

10  process of mediation in aid of offering their personal

11  impressions of the vigor and the reliability of the process in

12  aid of their personal business conclusions that the mediation

13  led to results that are reasonable.   That doesn't implicate or

14  invade the particulars of offers or exchanges within the

15  mediation privilege or the mediation confidentiality mandate

16  that was denied to Mr. Hein, and this is not a situation in

17  which the particular events within mediation are being used as

18  a sword and a shield, even if that were an appropriate

19  analogy.   So I find that the mediation-related information in

20  the declaration is admissible.

21          With respect to what has been characterized as legal

22  evaluations of risk, the Oversight Board, in determining

23  whether to propose this plan, needed, along with its lawyers,

24  with the help of its lawyers, and by reading pleadings and

25  public documents to have an understanding of what the disputes

1    were that were being compromised.  This declaration does not

2    offer legal analysis of the particulars of disputes, but

3    rather demonstrates this witness' proffer as her understanding

4    of the nature of the disputes, and ultimately the role of that

5    understanding in a business determination as to whether it was

6    appropriate or reasonable to resolve the issues that were in

7    dispute in the manner in which they're resolved in the Plan.

8            That is not improper legal opinion, and that is

9    not -- it is not a brief.  It is the discussion of a decision

10   maker as to the understanding of the underlying issues and the

11   reason for the resolution.

12           The preemption discussion in the declaration, it does

13   use the term "preemption"; but that is tied in the declaration

14   to testimony as to the factual impact of the types of

15   statutory mandates that are discussed in the declaration, and

16   the representation that, financially, the continuation of

17   those mandates would be inconsistent with the Board's

18   understanding of its mission and mandate under PROMESA, and

19   the structures that the Board is proposing to have put in

20   place by way of a Plan of Adjustment, and making the largely

21   factual representation that those statutory mandates would be

22   inconsistent with the Board's understanding of its mission

23   under PROMESA and the Board's interpretation of PROMESA.

24           That is the factual proffer that underlies the

25   reference to preemption, rather than it being a legal analysis

1   or argument regarding preemption.  So with that type of

2   presentation, there is no improper legal opining by this

3   witness, and that element of the objection is overruled.

4           As to the sections regarding PROMESA and Code

5   compliance with respect to particular provisions of PROMESA

6   and the Code, the declaration again marshals facts and factual

7   observations regarding the provisions of the Plan, and does

8   not engage in inappropriate legal opinions or legal analysis

9   by the fact witness.  Accordingly, the objection is overruled

10  in its entirety.

11          So the three Jaresko declarations, the original one,

12  the amended one, and the supplemental, as enumerated earlier

13  on the record by Mr. Firestein, are admitted in evidence.

14          (At 10:31 AM, the Jaresko Declarations are admitted

15  into evidence.)

16          MR. FIRESTEIN:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          Now, I understand that Mr. Hein wishes to

19  cross-examine Ms. Jaresko.  He has requested 20 minutes for

20  that cross-examination.  Is Ms. Jaresko available?

21          MR. FIRESTEIN:  She is, Your Honor.

22          THE COURT:  Thank you.

23          So let us turn --

24          MR. HEIN:  Your Honor.

25          THE COURT:  I'm sorry.  Mr. Hein?

```
 1              MR. HEIN:  Yes.  When I had made my request -- I'm
 2   going to be brief.  I don't think substantially more than 10
 3   to 20 minutes; but DRA was seeking several hours, and I was
 4   trying to be, you know, respectful of the overall time
 5   situation.  I would hope Your Honor would give me a little bit
 6   of latitude, but again, I'm going to be I think concise in my
 7   questioning.
 8              THE COURT:  I won't stop you mid sentence.  I suspect
 9   that the preparations in anticipation of this
10   cross-examination had in mind something concise, so what I
11   will do is run the timer.  You'll hear the beeps.  When we get
12   to the beeps, you'll tell me what, if anything, more you wish
13   to do by way of time in cross-examination, and we'll see if
14   there's any objection to that.
15              MR. HEIN:  Thank you, Your Honor.
16              THE COURT:  Thank you.
17              MR. HEIN:  That's fine.
18              THE COURT:  So, Ms. Jaresko, I see you there.  Good
19   morning.
20              MS. JARESKO:  Good morning, Your Honor.
21              THE COURT:  The clerk of court will administer the
22   oath to you now.
23              COURTROOM DEPUTY:  Please raise your right hand.
24              MS. JARESKO:  I can't hear the clerk.
25              THE COURT:  So, Ms. Tacoronte, would you --
```

46

1           COURTROOM DEPUTY:  Can you hear me now, ma'am?

2           MS. JARESKO:  Yes, I can.  Thank you.

3           COURTROOM DEPUTY:  Please raise your right hand.

4           Do you solemnly swear that all the testimony you are

5    about to give will be the truth, the whole truth, and nothing

6    but the truth?

7           THE WITNESS:  I do.

8           COURTROOM DEPUTY:  So help you God.

9           THE WITNESS:  So help me God.

10          THE COURT:  Thank you.

11          Mr. Hein, you may inquire.

12          MR. HEIN:  Yes.  Thank you, Your Honor.

13               N A T A L I E   J A R E S K O,

14       called as a witness by the Debtors, having been sworn,

15       testified as follows:

16                        CROSS-EXAMINATION

17   BY MR. HEIN:

18   Q.   Good morning, Ms. Jaresko.  Ms. Jaresko, your

19   supplemental declaration discusses changes to monthly pension

20   benefits, contributions to the pension trust, and bonuses to

21   public unionized employees that are now part of the Modified

22   Eighth Plan, correct?

23   A.   Yes.

24   Q.   The April 23, 2021, fiscal plan and its projections and

25   forecasts do not include the elimination of the modification

1  of the monthly benefit, the increased contributions to the

2  pension trust, or the guarantee of a minimum of 2,000 of

3  upside performance bonus to each AFSCME represented employee,

4  correct?

5  A.   That's correct, although several of those issues would

6  not be in the fiscal plan at this time regardless.

7  Q.   But, for example, the monetary effect of having the

8  original proposal to reduce monthly pension benefits, that

9  monetary effect was factored into the fiscal plan, but is not

10  in the current Plan of Adjustment, correct?

11  A.   The elimination of the monthly benefit modification is in

12  the Plan of Adjustment, but is not reflected in the April 2021

13  fiscal plan.

14  Q.   Thank you.  I'm going to now turn to the labor

15  agreements, and specifically those referred to in AFSCME PSA.

16  Is there a written quantification of the net dollar value of

17  the labor savings under the AFSCME PSA or the agreements that

18  are called for by that PSA?

19        MR. FIRESTEIN:  Your Honor, I just want to put on the

20  record an objection under 402 for relevance to the extent that

21  this is directed towards a claim of unfair discrimination.  We

22  haven't gotten to the end of the line of questioning, but it's

23  seemingly apparent as to where it's going.  And I think it's

24  important to get the Court's guidance on this issue right now,

25  which was raised during Mr. Hein's opening argument.

1          I don't mean to make a speaking objection, but I just

2     don't want to have a running objection relative to this in the

3     absence of an understanding on that point.  I'm happy to argue

4     its lack of relevance here.

5          THE COURT:  I need a bit more information from you by

6     way of context.

7          MR. FIRESTEIN:  Yes.  Happy to do that, Your Honor.

8     My sense as to where with Mr. Hein is going is that additional

9     money is being -- or consideration is being afforded to other

10    creditors as opposed to his class of creditors, and that would

11    be suggestive of a classic unfair discrimination claim.

12          However, because his class or classes of -- under the

13    Plan have voted to approve the Plan, there is considerable

14    case law that merely a disapproving creditor who is within a

15    class that has otherwise approved cannot claim unfair

16    discrimination.  And I believe that that is what the intent is

17    of these questions.

18          If it is intent in a different question, then

19    understanding what the Court's guidance is on this issue would

20    be helpful throughout the cross-examination, and we'll be

21    guided accordingly.

22          THE COURT:  Mr. Hein, where are you going with this?

23          MR. HEIN:  Yes.  I have three specific questions, and

24    I'm simply seeking to know whether there's a written

25    quantification of the net dollar value of the labor savings.

1   If so, who prepared it, and what is the quantification, and

2   whether that quantification reflects in that number.

3           I mean, this is a specific question.  I think it goes

4   to the, you know, basic host of issues concerning best

5   interests as -- and I realize there are legal arguments.  It

6   goes to feasibility, and I think it's, you know, very -- we

7   probably could have answered the questions in less time than

8   it's taking to deal with the objection.

9           THE COURT:  I will --

10          MR. FIRESTEIN:  Your Honor -- go ahead.

11          THE COURT:  I will permit limited questioning as

12  Mr. Hein has described, and I will ultimately make

13  determinations in this bench trial as to whether such issues

14  are properly considered in connection with Mr. Hein's

15  objections, given the vote of his class.

16          MR. FIRESTEIN:  Thank you, Your Honor.

17          THE COURT:  You may continue, Mr. Hein.

18          MR. HEIN:  Thank you, Your Honor.

19  BY MR. HEIN:

20  Q.   Ms. Jaresko, is there a written quantification of the net

21  dollar value labor savings to be achieved as a result of the

22  AFSCME PSA?

23  A.   I don't recall a calculation resulting from that specific

24  PSA.  There are multiple financial benefits that were

25  achieved.  One, by having the Collective Bargaining Agreement

1   rejected and having agreement to abide by the fiscal plan with

2   regard to both wage freezes, no incremental hiring, and then a

3   limitation on the employer contribution towards health care of

4   170 million -- 70 million dollars -- 170 dollars per month per

5   employee.

6          So all those were taken together, financial

7   contributions to the fiscal plan, but no, I do not recall a

8   particular calculation based on the PSA of those -- of those

9   specific mathematical savings.

10         MR. HEIN:  And Your Honor, just for the record, I

11  would move to strike the non-responsive portions of the

12  answer.  I realize it's a bench trial, but Ms. Jaresko --

13         THE COURT:  So you are moving to strike the answer

14  after her statement that she doesn't recall a calculation

15  specific to that PSA?  Is that what you're asking me to do?

16         MR. HEIN:  Correct, Your Honor.

17         THE COURT:  That motion to strike is granted.  You

18  may ask your next question.

19  BY MR. HEIN:

20  Q.   Was there a written calculation of a dollar value

21  reflecting a net number where someone took the value of labor

22  savings as a result of the PSA and subtracted all of the costs

23  in terms of extra payments, bonuses, and the like that were

24  also part of the PSA?

25  A.   No.  I do not recall such a calculation.

1    Q.    Thank you.

2            Let me turn to the subject of the PSA fees.  Has the

3    Oversight Board been provided in written form the amounts of

4    the fees and expenses actually incurred by initial GO-PBA PSA

5    creditors who are entitled to their pro rata share of 1.5

6    percent par in consummation costs?

7    A.    No.  We were not -- we have not requested it, and I have

8    not seen it.

9    Q.    Has the Oversight Board received and reviewed fee and

10   expense documentation from the initial GO-PBA PSA creditors

11   who are entitled to their pro rata share, or pro rata 1.5

12   percent of par in consummation costs?

13   A.    No.  That was not required from them.  And it was based

14   on the judgment of the Board that expenses have been accruing

15   at -- very rapidly, and they've been very substantial, and

16   this was a reasonable and yet very minor portion of costs

17   allocated to this transaction.

18           MR. HEIN:  And again, Your Honor, I would move to

19   strike the answer after the initial phrase of the answer as

20   non-responsive.

21           THE COURT:  The motion is granted as to the portion

22   of the answer that follows the statements, "no" and "it was

23   not required."

24           MR. HEIN:  Thank you.

25   BY MR. HEIN:

1   Q.   Ms. Jaresko, turning to the subject of the excess cash

2   flow computation, are you aware of any estimate or projection

3   made of what the future excess cash flow amounts may be?

4   A.   No.  There are -- there are no projections of that excess

5   cash flow.  That is part of the unknown portion of the

6   projections.

7   Q.   Are you aware of any estimate or projection in the amount

8   or range of amounts of the upside performance bonuses that may

9   be due to public employees in future years?

10  A.   I am aware of the percentage of the excess cash surplus

11  that is awarded under the PSA, as well as the percentage

12  that's awarded of the excess cash surplus to the restoration

13  of pensions in the previous plan version, as well as the fact

14  that a portion of excess performance will be awarded through

15  the two CVIs that have been given to bondholders.

16  Q.   Let me be more specific then.  Are you aware of any

17  estimate or projections of a dollar amount, range of dollar

18  amounts --

19       THE COURT:  Mr. Hein.  Mr. Hein.  We're having

20  trouble with your transmission again, so would you start your

21  question again, and we'll see if we can hear you this time.

22       MR. HEIN:  Sure.  Thank you, Your Honor.

23  BY MR. HEIN:

24  Q.   Are you aware of any estimate or projection of the dollar

25  amount or range of dollar amounts of upside performance

1  bonuses that may be due under the Plan to public employees in

2  future years?

3  A.   I am aware of the floor that was established under the

4  PSA for the AFSCME/SPU union employees, which is 2,000 dollars

5  per employee, which can be calculated at approximately less

6  than 20 million dollars per year for each of the five years.

7  That money is not, though, incremental to the extent that an

8  excess cash surplus exists.

9  Q.   Are you aware of any estimate or projection of the

10  maximum dollar amount or a range of dollar amounts in excess

11  of that minimum of upside performance bonuses that may be due

12  to public employees in future years?

13  A.   No.

14  Q.   Are you aware of any data concerning the portion of

15  Commonwealth GO debt that had been purchased in the years

16  prior to and including 2012 by retail investors?

17  A.   No, I am not.

18  Q.   Has the Oversight Board or anyone acting on its behalf

19  compiled or sought to compile information on what portion of

20  the purchasers of Puerto Rico GO debt prior to 2013 were --

21  who were individuals?

22  A.   I don't recall such information.

23  Q.   The Oversight Board established a requirement called

24  requirement 2(g), that the Commonwealth prepare monthly

25  attendance reports for government employees, correct?

```
 1   A.    Yes.
 2   Q.    When did the Oversight Board institute this requirement
 3   for monthly attendance reports?
 4   A.    I generally believe that to be after Hurricane Maria.
 5   Q.    And what was to be included in these monthly attendance
 6   reports?
 7   A.    The reports were to show the number of people at work,
 8   working, and the number of people that were either on holiday,
 9   vacation, or otherwise absent.
10   Q.    Am I correct that no requirement -- 2(g) attendance
11   reports have been issued since October of 2020, over a year
12   ago?
13   A.    I believe that --
14          MR. FIRESTEIN:  Objection, relevance.
15          THE COURT:  Mr. Hein, what is your proffer as to
16   relevance?
17          MR. HEIN:  Yes.  Your Honor, and it's a very discrete
18   and specific question, but there have been arguments made
19   about the importance of these additional benefits to public
20   employees.  And I simply want to state, as a matter of record,
21   that at least as far as I can tell, there have not been any of
22   these attendance reports issued for now over a year.
23          It's really -- I have that question and one specific
24   follow-up question.  It's a very discrete line of inquiry.
25          MR. FIRESTEIN:  Your Honor, the number of questions
```

1   does not trigger relevance.  Whether there were attendance

2   reports has nothing to do with the Plan, the construct of the

3   Plan, or the terms of the Plan.

4           THE COURT:  The objection is sustained.

5           MR. HEIN:  Thank you.

6   BY MR. HEIN:

7   Q.   Let me turn to what is a final area I wish to ask you

8   about, Ms. Jaresko, that relates to preemption.

9           Your declaration contains a discussion of statutes in

10  Exhibit K to the Plan that is entitled List of Main Statutes

11  Preempted by PROMESA.  Do you recall covering that in your

12  declaration?

13  A.   Yes, I do.

14  Q.   The Disclosure Statement that debtor has submitted last

15  summer states that the CW Bond claim's recovery will be

16  distributed each fiscal year from first the 1.03 percentage

17  side property tax levy pursuant to Act 83-1991, correct?

18  A.   Yes.

19  Q.   And Act 83-1991 is the Puerto Rico Statute that provides

20  for the 1.03 percent property tax, and that it's to be used to

21  pay principal and interest on the GO debt, correct?

22  A.   I don't recall which statute.

23  Q.   Have you personally read Act 83-1991?

24  A.   Not in its full text, no.

25  Q.   Am I correct that although the Disclosure Statement says

1   that the 1.03 percent property tax levy pursuant to Act

2   83-1991 is to be the first source of payment of the new bonds,

3   the Oversight Board is proposing that -- the plan to preempt

4   the statutes that establish, provide for that 1.03 percent

5   property tax, correct?

6   A.   It's not correct in the sense that the 1.03 percent

7   property tax is still included in the Plan as a source -- the

8   first source, as you described, of payment of the GO bonds.

9   Q.   But the portion of the statute that provides that this

10  1.03 percent of property tax that is the first source of

11  payment to the new bonds, that portion -- that statute that so

12  provides for that, and provides that it's going to first be

13  used for payment to principal and interest on the GO debt that

14  the Oversight Board seeks to preempt, correct?

15  A.   That is on the list of preemptions.  However, the 1.03

16  percent property tax continues to be, in the Plan, a source of

17  payment for the GOs regardless.

18  Q.   The Disclosure Statement states that the CW Bond claims'

19  recovery will be distributed each fiscal year, second, from

20  monies arising from the operation of Article VI, Section 8 of

21  the Puerto Rico Constitution, correct?

22  A.   Yes.

23  Q.   But your declaration states that a comprehensive list of

24  statutes the Oversight Board has identified as inconsistent

25  with and preempted by PROMESA will be submitted in advance of

57

1    the hearing, and, quote, will likely also include certain

2    sections of the Puerto Rico Constitution, including certain

3    sections of Article VI thereof, correct?

4    A.   Correct.

5    Q.   Has the Oversight Board identified Article VI, Section 8

6    of the Puerto Rico Constitution as inconsistent with and

7    preempted by PROMESA?

8    A.   To the extent that it's listed, yes.

9    Q.   So the Disclosure Statement represents that the new GO

10   bonds will be secured by a statutory first lien and pledge of

11   amounts on deposit to the Debt Service Fund, and a pledge of

12   the Commonwealth's full faith, credit, and taxing power in

13   accordance with Article VI, Section 2 of the Commonwealth

14   Constitution and applicable laws of the Commonwealth as of the

15   effective date, correct?

16   A.   Correct.

17   Q.   Has the Oversight Board identified Article VI, Section 2

18   of the Puerto Rico Constitution as inconsistent with and

19   preempted by PROMESA?

20   A.   I don't recall whether it's that specific section or not.

21   Q.   Can you tell us if the Oversight Board has a position as

22   to whether Article VI, Section 2 of the Puerto Rico

23   Constitution is inconsistent with and preempted by PROMESA?

24   A.   I only recall that certain parts of Article VI.  I cannot

25   tell you with regard to that specific section or not.  I don't

1    recall section by section.

2    Q.   And that would apply to Section 8 as well, that you can't

3    tell me whether Article VI, Section 8 of the Puerto Rico

4    Constitution is something that the Oversight Board claims to

5    be inconsistent with and preempted by PROMESA?

6    A.   I can't tell you section by section of an article of the

7    Constitution.   What I can tell you is that --

8            THE COURT:   Ms. Jaresko --

9            THE WITNESS:   -- a series of the laws that would

10   require preemption --

11           THE COURT:   Ms. Jaresko, you froze for a minute

12   there, and so would you repeat your answer?

13           THE WITNESS:   Thank you, Your Honor.

14           I cannot tell you section by section of an article,

15   or article -- of each individual article of the Constitution.

16   I don't recall that level of detail.   What I do know is that

17   there are certain parts of the Constitution, as well as

18   certain laws that we've identified, that we believe require

19   preemption in order to enable this plan to be feasible in

20   order to enable the Board to --

21           (Sound played.)

22           THE WITNESS:   -- achieve its mandate, its objectives

23   of fiscal sustainability.

24   BY MR. HEIN:

25   Q.   Is one of those laws Act 33, approved December 7, 1942?

1   A.   I could look at Exhibit K, which I believe they're listed

2   on, but I can't tell you off the top of my head unfortunately,

3   you know, each individual law by name or number.

4   Q.   Did you read the different laws that are listed on

5   Exhibit K to the Plan?

6   A.   Not all of them in their totality, no.  Sections of them,

7   to the extent they were relevant, yes.

8   Q.   Are you aware of -- it's now codified as 13 L.P.R.A. §

9   41, which comes from that Act 33 of 1942.  I believe it was

10  section 7 of that Act that provides "the good faith of the

11  Commonwealth of Puerto Rico has hereby irrevocably pledged for

12  the payment of the principal of and interest on bonds or

13  certificates of indebtedness of the Commonwealth Government."

14  Are you aware of that section?

15  A.   I am aware of it, yes.

16  Q.   And is that one of the sections or provisions of law that

17  the Oversight Board has identified as inconsistent with and

18  preempted by PROMESA?

19  A.   Again, I think that's a question for my legal advisors at

20  this point.  I'm not a lawyer who can advise on specifically

21  which sections of each law that you're reading out to me are

22  being preempted.  As a business person, I can tell you that

23  there were a variety of these laws, and that taken together,

24  we required the preemption of them in order to enable this

25  plan.

1          However, Act 53, which was recently passed by the

2     legislature, enables and issues those bonds in the manner that

3     you're describing, with full faith.

4     Q.   Is there any --

5          MR. HEIN:  And, Your Honor, respectfully, I would

6     move to strike the last part of the answer.  It's

7     nonresponsive.

8          (Sound played.)

9          THE COURT:  The motion to strike is granted.  So the

10    answer that she defers to lawyers remains, and the remainder

11    of the answer is stricken.

12         MR. HEIN:  Your Honor, I'm almost done.  Your Honor,

13    with your indulgence, I'd like to just complete.

14         THE COURT:  Yes, you may.

15    BY MR. HEIN:

16    Q.   Ms. Jaresko, is there any plain language disclosure in

17    the materials used to solicit votes on the Plan, in the

18    Disclosure Statement or otherwise, that told bondholders in

19    clear language that it was the Oversight Board's position that

20    the provisions of the Puerto Rico Constitution and statutes

21    providing the first and second source of payment for the new

22    bonds were preempted by PROMESA?

23    A.   I'm not aware that there was any language like that in

24    the Disclosure Statement, no.

25    Q.   You relied on the Oversight Board's legal advisors for

1   the information in your declaration on legal topics such as

2   preemption and the requirements of different sections of the

3   Bankruptcy Code, correct?

4   A.   As well as on my own experience, business judgment, my

5   other advisors, and the necessity to have those laws preempted

6   to enable the objectives of PROMESA.

7   Q.   You are not a United States bankruptcy attorney, correct?

8   A.   No, I am not.

9   Q.   You are not an attorney at all, correct?

10  A.   That's correct.

11  Q.   Have you ever before served as an executive of an U.S.

12  Government -- excuse me, of an United States Municipal

13  Government entity in bankruptcy?

14  A.   No, I have not.

15  Q.   And just so my question is clear, have you ever before

16  served as an executive of a territorial, state, or a municipal

17  government entity in bankruptcy?

18  A.   Not in the United States, no.

19  Q.   For the discussion with -- I think I've covered that.

20       MR. HEIN:  So I've completed my questions, Your

21  Honor.  Thank you very much.

22       THE COURT:  Thank you, Mr. Hein.

23       Mr. Firestein, any redirect?

24       MR. FIRESTEIN:  Just very briefly, Your Honor.  Thank

25  you.

```
 1              REDIRECT EXAMINATION

 2   BY MR. FIRESTEIN:

 3   Q.    Ms. Jaresko, do you recall Mr. Hein asking you questions

 4   concerning the labor union, or AFSCME, A-F-S-C-M-E, PSA?

 5   A.    Yes, I do.

 6   Q.    And did you, in your understanding of that agreement,

 7   believe that there were benefits to the Oversight Board and

 8   the Commonwealth in that settlement arrangement?

 9   A.    Yes, I have believe there are benefits.  The benefits --

10   Q.    Could you just explain to the Court what your

11   understanding are -- or is of those benefits?

12   A.    I think it was extremely important for the Board and for

13   this Plan of Adjustment to obtain the support of a current and

14   powerful union that represents civil service employees who are

15   a part of the stakeholders of this case.

16        I think it was incredibly important to have the

17   agreement that we reached with them to reject their previous

18   Collective Bargaining Agreement to bring them on board in

19   support of this agreement, in support of that implementation

20   of the fiscal plan, and the elements of the fiscal plan that

21   bring savings, whether it's the wage freeze or whether it's

22   the reduction in employer contribution to health care.  And I

23   thought that it was valuable to have their support in also

24   achieving efficiency going forward in government.

25        They only receive that excess cash surplus bonus if
```

1   the government outperforms, whether it's on collection of

2   revenues or reducing costs above and beyond the fiscal plan.

3   So they are incentivized to ensure the government is most

4   efficient in order to receive any bonus.

5   Q.   Moving on to a discussion that you might recall with

6   Mr. Hein concerning fees and expenses that are paid to some of

7   the GO-PBA creditors in connection with the Plan of

8   Adjustment.  Do you remember that discussion?

9   A.   I do.

10   Q.   And do you have -- do you recall his question where he

11   asks you whether you had seen any information specifying the

12   amounts of money that had been incurred by any of those

13   particular creditors?

14   A.   I do.

15   Q.   Do you have an understanding as you sit here as to what

16   the fees and expenses that are being paid to those creditors

17   include?

18          MR. HEIN:  Objection, Your Honor.  That's lacking

19   foundation.  The foundation hasn't been laid for the basis of

20   knowledge.

21          THE COURT:  Well, he's asked her whether she has an

22   understanding.  That's what's pending now.  So that objection

23   is overruled as to that question.

24          THE WITNESS:  Yes, I have an understanding that these

25   fees have nothing to do with the -- on account of the claims

1  whatsoever.  These fees are being paid to reimburse certain

2  expenses, legal, financial and other, of the advisors that

3  contributed to the development of and the framework under

4  which we reached the PSA agreement, and which is enabling the

5  recovery and the Plan to move forward today.

6  BY MR. FIRESTEIN:

7  Q.  Lastly, Ms. Jaresko, do you have an understanding as to

8  whether the Plan of Adjustment, in your business sense,

9  resolves the issues that arise as a consequence of statutes

10  that require the appropriation or delivery of monies to

11  creditors or agencies under the preemption point?

12  A.  I'm sorry.  Could you restate the question?

13  Q.  Does the Plan of Adjustment, to your understanding,

14  resolve the issues raised by the statutes that you describe in

15  your declaration as involving the concept of preemption?

16  A.  Yes.  The PSAs and the agreements reached under the Plan

17  of Adjustment settle all of these issues, and ensure the

18  framework that enables payments to be made, notwithstanding

19  those preemptions.  And we have shown that it is feasible

20  under the fiscal plan, consistent with the fiscal plans, to

21  make those payments affordable under the fiscal plan.

22        MR. FIRESTEIN:  Nothing further, Your Honor.  Thank

23  you.

24        THE COURT:  Thank you.

25        Anything further, Mr. Hein?

```
 1          MR. HEIN:  I would just be repeating my cross, so no,
 2   Your Honor.
 3          THE COURT:  Thank you very much, Ms. Jaresko.  Your
 4   testimony is concluded.
 5          (At 11:03 AM, witness excused.)
 6          THE COURT:  At this point it is -- Mr. Rosen, did you
 7   wish to speak now?  I was going to call our afternoon break,
 8   but if there's something we should take -- not afternoon,
 9   morning break.  If we should take something up before the
10   break, please speak.
11          MR. ROSEN:  No, Your Honor.  I was just going to say,
12   if we had a minute to shuttle in and out witnesses, but during
13   the break we will do that.
14          Thank you, Your Honor.
15          THE COURT:  Okay.  Very well.  We will resume at
16   11:20 AM Atlantic Standard, which is 10:20 Eastern Standard.
17   Have a good break everyone.
18          We are adjourned briefly.
19          (At 11:03 AM, recess taken.)
20          (At 11:18 AM, proceedings reconvened.)
21          THE COURT:  Good morning again, and welcome back.  I
22   believe we are ready for the tender of the next witness
23   declaration.
24          MR. BIENENSTOCK:  Your Honor, Martin Bienenstock,
25   Proskauer Rose, for the Oversight Board, as the Title III
```

1   representative of the Debtors.  May I proceed to proffer the

2   declarations into evidence?

3           THE COURT:  Yes, you may.

4           MR. BIENENSTOCK:  Thank you, Your Honor.

5           The Board proffers Professor David Skeel and chairman

6   of the Oversight Board's original declaration at ECF no.

7   18731, and amended declaration, ECF no. 19054-09.

8           THE COURT:  Is there any objection?

9           MR. HEIN:  Yes, Your Honor.  Your Honor?

10          THE COURT:  Mr. Hein?

11          MR. HEIN:  Yes.  I just -- I realize we discussed

12  this in connection with Ms. Jaresko.  If I just may very

13  briefly --

14          THE COURT:  Mr. Hein, would you turn your camera on,

15  please?

16          MR. HEIN:  Sure.  Yes.  If I may just very briefly

17  state my objection for the record.  And I do realize we

18  discussed this and Your Honor has ruled.  Would that be

19  permitted?

20          THE COURT:  Yes, you may.

21          MR. HEIN:  So I just want to reiterate an objection

22  to Mr. Skeel testifying to or characterizing the settlement

23  discussions and processes as to which mediation privilege and

24  settlement privilege is claimed, and as to which discovery was

25  refused.

1          Just very, very briefly, Mr. Skeel begins at

2     paragraph 17, I believe it's page seven, referencing extensive

3     mediation sessions that he participated in.  He then goes on

4     to opine that the Plan Settlement Agreement's reasonable,

5     fair, in a section that begins on page 13, paragraph 32, which

6     includes the references to things like, quote, extensive,

7     adversarial arms-length negotiation among sophisticated

8     parties.

9          I won't repeat the points I made before, but I just

10    wanted to put that objection on the record.  Thank you, Your

11    Honor.

12         THE COURT:  All right.  Mr. Bienenstock or

13    Mr. Firestein, do you wish to respond?

14         MR. FIRESTEIN:  Yes, Your Honor.  I also, for the

15    Court's convenience, and to avoid taking undue time, if it's

16    acceptable to the Court, I'll merely incorporate the remarks

17    that I made earlier in recognition of the Court's ruling on

18    it.  I think the objection that Mr. Hein is making is the same

19    to this declaration as it was to Ms. Jaresko's, and as I

20    understood the Court's ruling earlier today, I believe the

21    Court indicated that the ruling would be applicable to the

22    similar objections that were being made to other declarations

23    that Mr. Hein had raised those issues regarding.

24         Unless the Court wishes to hear further on this, I'll

25    submit on that.

68

 1          THE COURT:  I don't need anything further.  The

 2    objection is overruled for the reasons that -- the relevant

 3    reasons that I stated in connection with the Jaresko

 4    Declaration.

 5          I had understood our earlier discussion as being a

 6    broader conceptual discussion of these objections, as well as

 7    a discussion of particular points that were illustrative in

 8    Ms. Jaresko's declaration, but for clarity, I would invite

 9    Mr. Hein, if he wants to renew these objections, to say "I

10    object for substantially the reasons that I stated in

11    connection with the Jaresko deposition."  Mr. Firestein can

12    oppose for substantially the reasons earlier stated, and I

13    will make a ruling that, you know, if we're still in the same

14    territory, will not surprise anyone.  I will adopt my earlier

15    remarks.

16          Is that acceptable as a procedure, Mr. Hein?

17          MR. HEIN:  Yes.  That certainly is, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Firestein as well?

20          MR. FIRESTEIN:  Of course, Your Honor.  Thank you.

21          THE COURT:  Thank you.

22          All right.  So Mr. Skeel's declarations at ECF nos.

23    18731 and 19054-09 are admitted into evidence.

24          (Whereupon the Skeel Declarations are admitted into

25    evidence.)

1          THE COURT:  Now, I have been informed that there was

2    no cross-examination of Mr. Skeel.  Is --

3          MR. HEIN:  That's correct, Your Honor.

4          THE COURT:  Thank you.

5          So I have no questions for Mr. Skeel.  I greet him

6    and thank him for coming to virtual court, or Professor Skeel,

7    but I do not have questions for this witness.

8          MR. SKEEL:  Thank you, Your Honor.

9          THE COURT:  Thank you.  So you're excused, Professor

10   Skeel.

11         (At 11:24 AM, witness excused.)

12         MR. FIRESTEIN:  Your Honor, may I be heard on one

13   process point?  It's just simple logistics.

14         THE COURT:  Yes.

15         MR. FIRESTEIN:  We're going to excuse Mr. Skeel, if I

16   understand the Court correctly, and if I could have a moment,

17   we need to sort of transfer in the next witness, who is

18   Mr. Zelin.  But there are some document transfers in the

19   virtual courtroom we need to address.  It could take us a

20   moment or so, one minute or so.

21         THE COURT:  That's fine.

22         MR. FIRESTEIN:  Thank you very much, Your Honor.

23         THE COURT:  Thank you.

24         MR. ROSEN:  Thank you, Your Honor.

25         THE COURT:  Thank you.  Welcome back.

1          MR. ROSEN:  Thank you.  May I proceed?

2          THE COURT:  Yes, you may.

3          MR. ROSEN:  Thank you very much.

4          Your Honor, at this point in time, we would like to

5    present as a witness Mr. Steven Zelin.  We have filed with the

6    Court an original and an amended declaration of Mr. Zelin.

7    The original declaration is at ECF no. 18734, and the amended

8    declaration, which was filed purely for annotation purposes,

9    is ECF no. 19054-10.  We would like to tender those

10   declarations, Your Honor, into evidence at this time.

11         THE COURT:  Thank you.

12         Is there any objection?  Mr. Hein, you need to

13   unmute.

14         MR. HEIN:  Your Honor, I would make substantially the

15   same objection we already discussed, and just, as examples,

16   refer to paragraph 20, paragraph 23, paragraph 24.  We

17   discussed this subject, with respect to my objection to

18   Mr. Zelin characterizing the settlement discussions as robust,

19   et cetera.  And I realize Your Honor's ruled, but I'm just

20   making that for the record.

21         THE COURT:  Thank you.

22         Mr. Firestein?

23         MR. FIRESTEIN:  Your Honor, for substantially the

24   same reasons as the Oversight Board argued in the past in an

25   earlier session, I respectfully request the Court to overrule

 1    the objection, as it has for the other two witnesses.

 2         THE COURT:  Thank you.

 3              For substantially the reasons stated in connection

 4    with this point as to the Jaresko Declaration, the objection

 5    is overruled, and the two declarations, that being the

 6    original at 18734 and the amended at 19054-10, are admitted in

 7    evidence.

 8              (At 11:30 AM, the declarations of Mr. Zelin are

 9    admitted into evidence.)

10         MR. ROSEN:  Thank you very much, Your Honor.

11         THE COURT:  Thank you.

12              Mr. Hein did request 30 minutes for cross-examination

13    of Mr. Zelin, so can Mr. Zelin be brought up, please?  The

14    camera is off on the witness feed.

15         THE COURT:  Good morning, Mr. Zelin.

16         MR. ZELIN:  Good morning, Your Honor.

17         THE COURT:  I will ask the courtroom deputy to

18    administer the oath.

19         COURTROOM DEPUTY:  Please raise your right hand.

20              Do you solemnly swear that all the testimony you are

21    about to give will be the truth, the whole truth, and nothing

22    but the truth?

23         THE WITNESS:  I do.

24         COURTROOM DEPUTY:  So help you God.

25         THE WITNESS:  So help me God.

1          THE COURT:  Thank you.

2          Mr. Hein, you may inquire.

3          MR. HEIN:  Thank you.

4                    S T E V E N   Z E L I N,

5      called as a witness by the Debtors, having been sworn,

6      testified as follows:

7                          CROSS-EXAMINATION

8  BY MR. HEIN:

9  Q.   Good morning, Mr. Zelin.

10         Mr. Zelin, did you make any calculations of whether

11 the Commonwealth had sufficient available resources to pay the

12 prepetition fractional debt service on the GO-PBA bonds if

13 that debt service was paid before other expenses?

14 A.   I did not do such calculations.

15 Q.   Please turn to the subject of the fees under the PSA.

16 Under the Plan as negotiated, an initial GO-PBA PSA creditor

17 has applied PM on February 22, 2021, who had received its pro

18 rata share of cash equal to 1.5 percent of the aggregate

19 amount of the PBA's, Commonwealth -- and Commonwealth

20 guaranteed bond claims it held, correct?

21 A.   If they're a PSA creditor, the answer to that is correct.

22 Yes.

23 Q.   A GO-PBA PSA creditor who sold bonds the next day,

24 February 23, would still be entitled to the 1.5 percent pro

25 rata with respect to the bonds that it held the day before,

1    February 22, but now it no longer owned, correct?

2    A.    In reimbursement of costs that that GO-PBA creditor had

3    incurred, it would still be entitled to receive that fee,

4    because that creditor does still have the obligation to make

5    payment and be reimbursed for costs it incurred up until that

6    point.

7          MR. HEIN:   I respectfully move to strike the answer,

8    or significant portions of the answer as non-responsive.

9          MR. FIRESTEIN:   Your Honor, may I be heard on that?

10   I actually think that that answer was completely responsive to

11   the question.

12         THE COURT:   The request to strike is denied.

13         MR. HEIN:   May I proceed, Your Honor?

14         THE COURT:   Yes, you may.

15         MR. HEIN:   Thank you.

16   BY MR. HEIN:

17   Q.    Mr. Zelin, let me just refocus the question.   There is no

18   stated requirement in the Plan that in order for the PSA --

19   that in order to receive the pro rata 1.5 percent, that a

20   particular party in the GO-PBA PSA agreement must incur any

21   particular expenses, correct?

22   A.    There is no agreement as to whether they must incur.   The

23   provision of that reimbursement was based upon the knowledge

24   that they were incurring expenses.

25         MR. HEIN:   And again, Your Honor, respectfully, I'd

1    move to strike the second part of the answer as

2    non-responsive.

3            MR. FIRESTEIN:  Again, Your Honor, I think it is

4    fully responsive to the question in order to put the

5    information in context.

6            THE COURT:  The request to strike is denied.

7    BY MR. HEIN:

8    Q.   Mr. Zelin, there is no stated requirement of the Plan

9    that -- withdraw that.

10           The 1.5 percent is paid pro rata based on bond claims

11   held, irrespective of the amount of fees or expenses incurred

12   by a given party, correct?

13   A.   That is correct.

14   Q.   There's no requirement under the Plan that any particular

15   party submit documentation or proof of particular fees or

16   expenses, correct?

17   A.   That requirement does not exist under the Plan.  Correct.

18   Q.   There is no requirement under the Plan that the party

19   specify the specific amount of fees or expenses it incurred,

20   correct?

21   A.   There is no requirement.  We have some understanding of

22   the expenses parties have incurred, but there is no

23   requirement.

24   Q.   Is that understanding in writing?

25   A.   In e-mail, yes.

1    Q.   A GO-PBA PSA creditor who held bond claims on February 22

2    will still receive the 1.5 percent, even if they played no

3    role in the prosecution of the approval of the Disclosure

4    Statement in confirmation of the Plan, correct?

5    A.   I think that is correct.

6    Q.   There is nothing in section 3.3 or elsewhere in the Plan

7    that requires that an initial GO-PBA PSA creditor play any

8    particular role in prosecution of the approval of the

9    Disclosure Statement and confirmation of the Plan, correct?

10   A.   I'd have to go back to the PSA document itself, but I do

11   believe that, as part of entering into the PSA, those

12   creditors were required to support the Plan and see it through

13   to its consummation and prosecution, whether that be the party

14   who signed the PSA or a party who acquired that paper subject

15   to the PSA.

16           And there were some I believe obligations in the

17   documents as to their -- the requirement to support the

18   prosecution of the Plan.  That is part of the benefit of the

19   bargain that the Commonwealth received in entering into the

20   PSA.

21   Q.   They were required to support and vote for the Plan; is

22   that correct?

23   A.   It's the truth.  The PSA does stand for Plan Support

24   Agreement, correct.

25   Q.   And with respect to documentation or specification of

1  amounts of fees or expenses, was that received in writing from

2  each initial PSA creditor?

3  A.   It may have been received from all.  I can only recollect

4  seeing estimates from two of the groups.  And just for the

5  record, the PSA creditors formed groups and worked, you know,

6  with respective lawyers and bankers.  And those groups, or

7  those lawyers and bankers did submit on request an estimate of

8  the fees that they were incurring as part of the Plan.

9         I only recall seeing it for two of the groups.  I

10  don't know if others had submitted their estimates.

11  Q.   There was no requirement stated under the Plan itself

12  that the creditor submit such an estimate in order to receive

13  the 1.5 percent, correct?

14  A.   I think I answered that.  There was no requirement, but

15  the willingness to provide it was based upon personal

16  understanding that the creditors that we were negotiating with

17  for years were incurring significant expense.  And the Board's

18  willingness to provide that reimbursement, that fee, was with

19  that knowledge.

20  Q.   Did the GO-PBA PSA provide that any initial GO-PBA

21  creditor would make a new investment of money in Puerto Rico

22  debt?

23  A.   I don't believe so.

24  Q.   Did the GO-PBA PSA require initial GO-PBA creditors to

25  backstop or guarantee funding of new loans to the

1    Commonwealth?

2    A.    Well, to the extent that the take-back paper in the Plan

3    is a form of new loan, they're converting their old

4    obligations to new obligations, but that's not for new money.

5    That's on account of existing obligations.

6    Q.    So with respect to new money, there was nothing that

7    required the GO-PBA creditors to backstop or guarantee funding

8    of new loans to the Commonwealth, correct?

9    A.    Not that I recall, no.  You are correct.

10   Q.    Retail investors were not initially eligible to join the

11   GO-PBA PSA, correct?

12   A.    I don't recall.  I know we opened up participation to

13   other parties.  I don't recall whether retail.  They

14   eventually joined on at some later point in time.  I don't

15   recall what the original PSA said with respect to looking to

16   expand support, whether retail creditors could join.  That I

17   don't recall.

18   Q.    Did any individual retail investors participate in the

19   negotiation of the Plan that you participated in?

20   A.    I know there were discussions with -- I know, for

21   example, you, Mr. Hein, had had some discussions with the

22   mediator during the course of the last, you know, two years.

23   I don't know how frequent, how often.  So there were -- the

24   doors were open for discussions with all creditors, including

25   retail creditors.  So as a general matter, the Board did not

1    turn away discussions with any party who wanted to have a

2    discussion.

3            MR. HEIN:  Your Honor, I respectfully would raise an

4    issue with respect to again this use of mediation as sword and

5    shield.  I'm constrained by Your Honor's confidentiality

6    rulings.  I would be more than happy to provide very specific

7    information with regard to myself.  I'm constrained by Your

8    Honor's rulings for doing that, and it -- I don't think, Your

9    Honor, it's appropriate to get into specifics of mediation

10   without having the whole thing come in.

11           MR. FIRESTEIN:  Your Honor, may I be heard on that

12   briefly?

13           THE COURT:  Yes.  Mr. Firestein.

14           MR. FIRESTEIN:  Mr. Hein opened the door.  He asked

15   the question that specifically requested the information that

16   he got in response, so I don't believe that his objection is

17   -- or however this would be characterized, is well taken.  And

18   I think the answer stands on its own.

19           THE COURT:  You anticipated my ruling.  The objection

20   is overruled for those reasons.  Thank you.

21           MR. FIRESTEIN:  Thank you, Your Honor.

22           MR. HEIN:  Okay.  Your Honor, just for the record, I

23   would state that I had asked a question about participation in

24   the negotiation of the terms of the Plan, and I just would

25   note my objection at this time.

1   BY MR. HEIN:

2   Q.    Mr. Zelin, do you have personal knowledge of any

3   particular individual retail investor being a participant in

4   the actual negotiations of the Plan, where you were personally

5   involved and in personal contact with that individual?

6   A.    I'm not sure I understand the question.  I don't -- when

7   you say -- if you can just define what you mean by

8   "negotiation of the plan".

9   Q.    Yes.  Where someone is involved in negotiating terms of a

10  plan, and where you have actual personal knowledge of it.

11  A.    In the negotiations I personally have had, I do not

12  believe I had discussions with any particular retail

13  investors.  However, I do know retail investors had the

14  opportunity to contact the Oversight Board and the mediator

15  during the process over which the mediation was ongoing, but I

16  did not have personal conversations with any retail investor

17  regarding the terms of the Plan.

18  Q.    And did you have personal involvement in any extending of

19  opportunity, as you describe it, to retail investors?

20  A.    I did not.

21  Q.    Am I correct that any information that you have on the

22  topic of retail investors and whether or not they were

23  involved in negotiating the terms of the Plan is secondhand

24  from others?

25  A.    In that contact was made to people other than myself who

1    then relayed that contact was made, if that's secondhand, that

2    is correct.

3    Q.   Thank you.

4         Are you aware that areas of the bondholder groups

5    who negotiated the PSAs had expressly disclaimed any fiduciary

6    due to all bondholders, including retail investors?

7    A.   I am not aware of that.

8    Q.   Do you know whether any of the bondholder groups who

9    negotiated the PSAs had a fiduciary duty to retail investors?

10   A.   I did not --

11        MR. FIRESTEIN:  Calls for a legal conclusion, Your

12   Honor.

13        THE COURT:  Sustained.

14   BY MR. HEIN:

15   Q.   Do you know whether any of the bondholder groups who

16   negotiated the PSAs expressed that they had duties or

17   fiduciary duties to retail investors?

18        MR. FIRESTEIN:  Other than the word "express", it's

19   the same objection, Your Honor.

20        THE COURT:  Well, I'll take this as a question as to

21   whether he's aware of any of the groups stating -- making a

22   statement that they had fiduciary duties, and in that sense I

23   will allow it.

24        So you may answer, Mr. Zelin.

25        THE WITNESS:  Thank you, Your Honor.

1          I am not -- I don't have any recollection of any of

2     the holders stating that.  What I do know is that the holders

3     were representing people who were similarly situated, and the

4     treatments that were being afforded were meant to be afforded

5     to what would be classes in the Plan of holders of debt,

6     whether they were retail or nonretail.  That is my general

7     understanding of the overall negotiations.

8          MR. HEIN:  Your Honor, respectfully, I'd move to

9     strike the second part of the answer.

10         THE COURT:  Motion to strike is granted.

11    BY MR. HEIN:

12    Q.   Was there ever the dissemination of an offer to retail

13    investors who held GO or PBA bonds of an offer whereby they

14    would be permitted --

15         THE COURT:  Mr. Hein.

16         MR. HEIN:  Yes.

17         THE COURT:  I'm sorry.  You froze again in the middle

18    of the statement, so would you repeat the question?

19         MR. HEIN:  Sure.

20    BY MR. HEIN:

21    Q.   Was there ever a dissemination of an offer to retail

22    investors who held GO or PBA bonds, of an offer whereby they

23    would be permitted to receive their pro rata share of the 1.5

24    percent consummation cost?

25    A.   Given that the 1.5 percent cost was meant to be a

1   reimbursement of costs incurred by parties who were in the

2   negotiations with the Oversight Board, including as part of

3   the mediation, and I'm not aware of any retail investors that

4   were in the mediation, that -- those costs were not incurred

5   by retail investors.  So the 1.5 percent was meant to cover

6   costs incurred by those who we were in negotiation with as

7   part of the mediation, and prior to the mediation.

8   Q.    And that did not included retail investors to your

9   knowledge; is that correct?

10  A.    To my knowledge, that is correct.

11  Q.    One aspect of the documentation that the initial GO-PBA

12  creditors negotiated was that, except for Puerto Rico

13  investors, there would be 12 separate coupons or zero coupon

14  securities that would be issued for every existing bond

15  someone held, correct?

16  A.    Can you repeat the question again?  I'm sorry.

17  Q.    As part of the Plan that the initial GO-PBA creditors

18  negotiated, except for a special provision for Puerto Rico

19  investors, 12 separate coupon or zero coupon securities would

20  be issued for every existing bond someone held, correct?

21  A.    I don't recall that -- I haven't counted and reminded

22  myself there were 12, but there were a number of bonds that

23  were issued.  It may very well be 12.  I would just refer back

24  to my Affidavit for the count, the specific count.

25  Q.    Does 12 sound right?

1    A.    It doesn't sound wrong.

2    Q.    If a particular individual held a 100,000 par position,

3    under the terms of the documents negotiated by the GO-PBA

4    creditors, that individual will now get, assuming you're

5    correct that it's 12 securities, will get 12 separate

6    securities with varying principal amounts, correct?

7    A.    I believe that to be the case, yes.

8    Q.    And if an individual held five CUSIPs, either different

9    series of bonds, or even simply different coupons and

10   maturities within the same series, but separate CUSIPs, that

11   individual would get a total of 60 different coupons, or zero

12   coupon securities, 12 for each zero bond coupon CUSIP they

13   originally held, correct?

14   A.    I believe that is correct.

15   Q.    Is there any written analysis of the impact on individual

16   bondholders of the fact that holders will receive 12 separate

17   coupons or zero coupon securities for each existing bond, and

18   the impact on retail investors?

19   A.    I'm not too sure -- when you say written analysis, can

20   you be more specific?

21   Q.    Is there any analysis of the impact on individual retail

22   bondholders of the fact that these individuals will receive 12

23   separate coupons, or zero coupon securities for each existing

24   bond that they -- bond CUSIP that that retail investor,

25   individual currently has.

1    A.    I mean, there's plenty written about what the Plan

2    structure is.  A holder of debt will receive its strip of new

3    debt to be issued pursuant to the Plan.  That debt was meant

4    to be structured to give a return to the holders of that

5    paper.  And so to the extent recoveries in the Plan are meant

6    to apply to GO-PBA holders and there are retail investors

7    amongst those groups, the recoveries in the Plan are meant to

8    reflect what the recoveries would be to the groups as a whole.

9    Q.    Let me be more specific, Mr. Zelin.  Was there any

10   analysis of the specific impact on individuals who had modest

11   holdings of the fact that they'd be receiving 12 separate

12   coupon, or zero coupon securities, for each existing bond

13   CUSIP in terms of marketability, in terms of just the

14   mechanics to the individual receiving this proliferation of

15   securities?

16   A.    I don't recall seeing such an analysis.  I'm not aware

17   that there's an impact, but I don't recall seeing such an

18   analysis.

19   Q.    Is a mandatory Sinking Fund amortization a device that

20   can be used by municipal issuers to reduce the principal due

21   during the term of a bond?

22   A.    It can be, yes.

23   Q.    Yes.  And the basic concept is that one term bond is

24   issued, and that over the course of the term of that bond, a

25   Sinking Fund is used to amortize the principal, so that the

1    principal can be amortized but the investor just has one term

2    security, correct?

3    A.    I'm not a muni structuring banker, but what you describe

4    is generally an understanding that I have.

5    Q.    Have you had specific experience with the use of

6    contingent value instruments or CVIs with tax exempt municipal

7    issuers?

8    A.    With tax exempt issuers?

9    Q.    Correct.

10   A.    No.

11   Q.    Were you given any instructions concerning whether to

12   assume that payments to holders of CVIs would be tax exempt or

13   not?

14   A.    The structuring -- beyond the economic structure, the

15   actual muni structure of those bonds was handled by

16   colleagues, including lawyers, and my friends at Citibank with

17   particular expertise.

18   Q.    Is the answer to my question then no?

19   A.    If you could repeat the question?

20   Q.    Yes.   Were you given any instructions concerning whether

21   to assume that payments to holders of CVIs would be tax exempt

22   or not?

23   A.    I was not given any instruction.

24   Q.    Do you have an understanding with respect to whether

25   income or distributions from the CVIs will be tax exempt to

1    the holder?

2    A.    The only understanding I have is that the CVIs are

3    intended to be structured in the most efficient way possible,

4    and if they can be tax exempt, that would be the goal if

5    possible.

6    Q.    Do you know whether that's been achieved such that the

7    income or distributions from the CVIs will be tax exempt to

8    the holder?

9          MR. FIRESTEIN:  Your Honor, I'm going to object on

10   the ground it is beyond the scope.  There's a witness that is

11   intending to testify on this subject, and it is not this one.

12   I just put that out there, because I think this is treading on

13   an area that is to be handled by Mr. Brownstein more

14   specifically.

15         THE COURT:  Is it your representation, since I have

16   not memorialized the declaration, that the tax impact or

17   treatment of the various securities is not a subject covered

18   in the declaration?

19         MR. FIRESTEIN:  I have no problem with the witness

20   responding to that question.  My understanding is that that is

21   correct, Your Honor, and that Mr. Brownstein will speak to the

22   tax impact, and the efforts to achieve tax exempt bond status

23   for what is to be issued upon the effective date.

24         THE COURT:  All right.  So you're saying you're not

25   objecting to this question, but going forward, anything more

87

1   detailed regarding the tax issues, you do object to as beyond

2   the scope of the direct as set forth in the declaration?

3          MR. FIRESTEIN:  That's correct, Your Honor.

4          THE COURT:  All right.  Mr. Hein, you are forewarned,

5   and so please proceed.

6   BY MR. HEIN:

7   Q.   Do you recall the question, Mr. Zelin?

8   A.   It would be helpful, if you don't mind, if it's not too

9   much trouble, just to repeat --

10  Q.   Sure.

11         THE COURT:  I'm sorry.  I thought he'd answered the

12  question.  I'm sorry.  So repeat the question, please.

13         MR. HEIN:  Yes.

14  BY MR. HEIN:

15  Q.   What is your understanding with respect to whether income

16  or distributions to the CVIs will be tax exempt to the

17  holder?

18  A.   I don't have a specific recollection. I just know there's

19  work being done to structure it so that they're as efficient

20  as they can be to the holders.

21  Q.   Are you -- and I'm going to move on in light of the

22  colloquy that you're not the most knowledgeable on this topic.

23         Are you aware of any estimate or projection of what

24  future excess cash flow amounts may be?

25         MR. FIRESTEIN:  Objection, vague, Your Honor.

1  BY MR. HEIN:

2  Q.   Let me just be more specific.  You're aware that under

3  the Plan, there's a provision for an excess surplus cash flow,

4  correct?

5  A.   The Plan projects surplus cash flow.  When you say "a

6  provision for an excess," I'm not sure what that means.

7  Q.   Sure.  Let me just be very specific in terms of the

8  terminology, just to have a clear record.  Are you aware of

9  the concept of excess cash surplus?

10  A.   Yes.

11  Q.   Yes.  And that this excess cash surplus is then used to

12  calculate what the upside performance bonuses to go to public

13  employees will be?

14  A.   I am not focused personally on the employee payments for

15  payments that can be made pursuant to the Plan.  I know it as

16  a general concept, but it's not something that I have

17  personally focused on myself.

18  Q.   Are you aware of any estimate or projection that's been

19  made of what the future excess cash surplus amounts may be in

20  terms of dollars?

21  A.   I know such projections have been made, but I'm not

22  personally familiar with them.

23  Q.   And who has that information?

24  A.   There were members of the Oversight Board advisory team

25  that spent their time focused on those calculations.  I think

1    that would likely be my colleagues at Ernst & Young if I

2    remember correctly.

3           Others may know as well.  I don't mean to limit it

4    to Ernst, but that would be the party that I know focused most

5    heavily on the pension.

6    Q.   Sure.  So just one follow-up question then.  Are you

7    aware of any estimates or projections of the dollar amounts or

8    range of dollar amounts of upside performance bonuses that may

9    go to public employees as a result of the excess cash flow

10   calculation?

11   A.   I know the concept, but I am not aware of the numbers or

12   the calculations.

13   Q.   One final subject.  Are you aware of any data concerning

14   the portion of Commonwealth GO debt that has been purchased in

15   the years prior to or including 2012 by retail investors?

16   A.   I do not have information dating back that far.  I'm not

17   personally aware of it.

18   Q.   Okay.  Thank you.  That's all the questioning that I

19   have.

20           THE COURT:  Thank you, Mr. Hein.

21           Mr. Firestein, any redirect?

22           MR. FIRESTEIN:  Very briefly, Your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. FIRESTEIN:

25   Q.   Mr. Zelin, you indicated in response to Mr. Hein's

1    questions earlier that you had seen some written e-mails

2    concerning fees or costs incurred as submitted by some number

3    of GO-PBA creditors.  Did I understand your testimony

4    correctly?

5    A.   Yes.  That is correct.

6    Q.   How many such creditors did you see that information

7    from?

8    A.   I can't tell you the creditors, but there were lawyers

9    and bankers for two of the groups of creditors.  I don't

10   recall exactly how many creditors made up the groups, but it

11   was among -- it was for two of the groups.

12   Q.   Based on what -- strike that.

13             And you are aware, are you not, that -- of the 1.5

14   percent consummation cost figure that Mr. Hein was speaking of

15   in his examination of you?  Did you hear me, sir?

16   A.   You cut out on the screen, so if you could repeat the

17   question, that would be helpful.

18   Q.   Yes.  Yes.

19             MR. FIRESTEIN:  Your Honor, I'm having a little

20   difficulty with my transmission.  I don't have more than a

21   couple more questions, but let me see if I can get this out.

22   BY MR. FIRESTEIN:

23   Q.   You recall Mr. Hein asking you about the 1.5 percent

24   reimbursement figure within the construct of the Plan?

25   A.   Yes.

1  Q.   And what did you understand that 1.5 percent related to,

2  just generally speaking?

3  A.   It related to reimbursing those stakeholders who were

4  active participants in the negotiation for the costs that they

5  incurred for hiring financial advisors, investment banks, and

6  lawyers to assist them in those negotiations, perform all the

7  diligence, so that coming to negotiation, they could have the

8  facts and information they require for that negotiation to be

9  arms length and fair.

10  Q.   And are those the two groups of bondholders for which you

11  identified that you had received some written communication?

12  Is that the fees and costs that those related to, to your

13  understanding?

14  A.   For those two groups.  There were other groups that I do

15  not have estimates for, I have not seen estimates for, but for

16  two of the groups, that's what I have seen.

17  Q.   And based on what you saw, did you form a belief as to

18  whether the 1.5 percent consummation cost reimbursement as

19  provided for in the Plan was reasonable?

20  A.   I had that belief before I actually saw the estimates,

21  because we agreed to that before seeing the estimates; but

22  based upon the dollars that the 1.5 percent represents, and

23  the estimates for two of what is at least five or six or seven

24  groups that I saw, I believe our decision -- or our assumption

25  that the 1.5 percent was reasonable was more than validated.

92

```
1   Q.   One more subject matter.   In the context of the two
2   groups that you did have -- that you've identified, or even
3   with respect to others that you know of, did you have an
4   understanding as to whether any retail investors were part of
5   the PSA groups in the GO-PBA deal?
6   A.   I don't have a recollection that the retail creditors
7   were part of those groups.   I don't have any such
8   recollection.
9   Q.   Have you ever heard of Rick Engman?
10  A.   Yes.
11  Q.   Do you understand what Mr. Engman constitutes a retail
12  investor?
13  A.   I know he represented one particular institution, Mason
14  Capital.   I do not recall whether Rick was a retail investor.
15            MR. FIRESTEIN:   No further questions, Your Honor.
16  Thank you.
17            THE COURT:   Thank you.
18            Anything further, Mr. Hein?
19            MR. HEIN:   Yes.   Just to follow up on the 1.5
20  percent.
21                      RECROSS-EXAMINATION
22  BY MR. HEIN:
23  Q.   The 1.5 percent was not something that was calculated in
24  reference to any fees or expenses, but rather simply applied
25  pro rata based on bond holdings; is that correct?
```

1   A.   Can you repeat the question again?

2   Q.   Sure.  If a particular investor did not submit an

3   estimate of fees or expenses, they would still get their 1.5

4   percent, correct?

5   A.   We had received estimates from two of the groups, not

6   from all of the groups, but all the groups that signed the PSA

7   would be entitled to the 1.5, their pro rata share, whatever

8   the 1.5 percent calculates to, whether we received estimates

9   or not, if that's your question.

10  Q.   And the pro rata share is pro rata based on their bond

11  holdings as of February 22, not the specific amounts of

12  estimated fees or expenses, correct?

13  A.   That's correct.

14  Q.   Thank you.

15  A.   It's meant to be a proxy for that, but it's not specific

16  to that.

17          THE COURT:  Mr. Hein, is there anything further?

18          MR. HEIN:  No.  That's it, Your Honor.  Thank you.

19          THE COURT:  Thank you.

20          Mr. Firestein, anything further?

21          MR. FIRESTEIN:  No, Your Honor.

22          THE COURT:  Thank you, Mr. Zelin.  Your testimony is

23  concluded.  You are excused.

24          THE WITNESS:  Thank you very much, Your Honor.  Thank

25  you very much.

1          (At 12:03 PM, witness excused.)

2          MR. FIRESTEIN:  Your Honor, as Mr. Zelin disconnects,

3    if I might, there was, in connection with the next witness,

4    who just for purposes of explanation is someone for whom I am

5    not going to sit in this chair, there -- the next witness is

6    Ms. Sheva Levy.  There was a little bit of a glitch in the

7    reporting.  The correct order was identified in ECF 19085, in

8    which Ms. Levy was intended to be the witness that followed

9    Mr. Zelin.  We inadvertently flipped some of the order when

10   the ECF 19141 was filed.

11         The only reason why I'm raising this is, for personal

12   reasons, Ms. Levy is not in attendance in our sort of virtual

13   space, and so we have a second space that is set up to

14   accommodate Ms. Levy.  And an attorney from our offices is

15   going to be present there, but it might take a few minutes to

16   adjust logistics in order to be able to address that,

17   something more than simply having Mr. Zelin leave and a new

18   person come in.

19         So with the Court's indulgence, and I realize that

20   it's only ten after 11:00 in New York, either I would request,

21   respectfully, the opportunity for a few moments here so we can

22   log out of Zoom here and do what's necessary at the remote

23   location, or take a slightly longer break, if not the lunch,

24   for purposes of ensuring that there is a seamless transition.

25         I don't really expect it will take more than a few

1    moments, but it will take something longer than what we have

2    done in virtual witnesses here.  And Ms. Levy is the only one

3    with that circumstance.

4            THE COURT:  Would a five-minute break be sufficient

5    or a ten-minute break?

6            MR. FIRESTEIN:  My tech counsel here is advising that

7    ten minutes should be sufficient to accomplish it, and of

8    course we'll work as expeditiously as possible.

9            THE COURT:  Very well.  We will take a break until

10   12:20 Atlantic Standard, which is 11:20 in New York.  Thank

11   you.

12           MR. FIRESTEIN:  Thank you very much. Your Honor.

13           (At 12:05 PM, recess taken.)

14           (At 12:17 PM, proceedings reconvened.)

15           THE COURT:  Good morning again.  Are we ready to

16   proceed?  Let's see.  Is there anyone from Proskauer?

17   Mr. Possinger.

18           MR. MERVIS:  Your Honor, it's --

19           THE COURT:  Okay.  Whoever that is has a bad

20   connection.

21           MR. MERVIS:  Your Honor, it's Michael Mervis of

22   Proskauer Rose.  Can you hear me?

23           THE COURT:  Yes.  I didn't hear your name.

24           MR. POSSINGER:  Your Honor, can I --

25           MR. MERVIS:  Is this any better?

 1              THE COURT:  No.

 2              MR. POSSINGER:  Try --

 3              THE COURT:  Now it's --

 4              MR. MERVIS:  I'm going to switch.  Your Honor, let me

 5    do this.  I'm going to switch computers.

 6              MR. POSSINGER:  You'll be here.

 7              THE COURT:  Okay.  I'm seeing Mr. Possinger and

 8    hearing him whisper.  Mr. Mervis.

 9              MR. POSSINGER:  Good afternoon, Your Honor.  Can you

10    hear me?

11              THE COURT:  Yes, I can hear you.

12              MR. POSSINGER:  Okay.  Then you should -- Mike Mervis

13    is going to take my seat.  He'll show up as Paul Possinger,

14    but it's Mike Mervis, Proskauer, on behalf of the Oversight

15    Board.

16              THE COURT:  Very well.  Thank you.

17              MR. MERVIS:  Your Honor, I apologize for these

18    difficulties.

19              THE COURT:  No worries.

20              MR. MERVIS:  Michael Mervis, Proskauer Rose, for the

21    Oversight Board.  Our witness is Sheva Levy, and I would like

22    to tender for admission her declarations at this time.

23              THE COURT:  Yes.  Please proceed.

24              MR. MERVIS:  Thank you, Your Honor.  So we'll be

25    tendering the three declarations, her original declaration,

1  which is at docket 18737; the amended declaration, which is at

2  docket 19054-05; and the supplemental declaration, which is at

3  docket 19059.

4          THE COURT:  Is there any objection?

5          MR. HEIN:  Your Honor, this is Peter Hein.  Can you

6  hear me?

7          THE COURT:  I can hear you.  Thank you.

8          MR. HEIN:  Yes.  There's no objection to the

9  admissibility, subject to cross and disputing.

10         THE COURT:  Thank you.

11         The declarations of Ms. Levy filed at 18737, 19054-05

12  and 19059 are admitted in evidence.

13         (Whereupon the Levy Declarations admitted into

14  evidence.)

15         THE COURT:  Mr. Hein has requested 20 minutes for

16  cross-examination of the witness.

17         Mr. Hein, you may inquire.

18         MR. HEIN:  Thank you.

19         MR. MERVIS:  Your Honor, just -- sorry.  Before we

20  begin, respectfully, Ms. Levy would like to be affirmed as

21  opposed to sworn, so if the Court could accommodate that

22  request, then I think Mr. Hein could inquire.

23         THE COURT:  Thank you, and thank you for reminding me

24  that I skipped a step there.

25         MR. MERVIS:  No problem.

1          THE COURT:  So would the courtroom deputy please

2  administer the affirmation?

3          COURTROOM DEPUTY:  Absolutely, Your Honor.

4          Please raise your right hand.

5          Do you solemnly affirm that all the testimony you are

6  about to give will be the truth, the whole truth, and nothing

7  but the truth?

8          THE WITNESS:  I affirm.

9          THE COURT:  Thank you.

10         COURTROOM DEPUTY:  Thank you.

11         THE COURT:  Thank you.  You can put your hand down.

12         Now, Mr. Hein, you may inquire.

13         MR. HEIN:  Thank you.

14                   S H E V A   L E V Y,

15     called by the Debtors, having affirmed, testified as

16     follows:

17                      CROSS-EXAMINATION

18  BY MR. HEIN:

19  Q.   Good morning, Ms. Levy.

20         Are the monthly retirement benefits for participants

21  in the Commonwealth pension plans, the ERS, and the JRS, and

22  the TRS, for those participants who reside in Puerto Rico, are

23  they monthly benefits subject to Federal Income Tax?

24  A.   I do not know the answer to that question.

25  Q.   For the pension recipients in these three Commonwealth

1  plans that I identified who reside in Puerto Rico, are they

2  subject to Puerto Rico Income Tax on their benefit payments

3  that they receive every month?

4  A.   I do not know the answer to that question.

5  Q.   Do you know how many of the pension recipients who are

6  now retired public employees live outside of Puerto Rico?

7  A.   No, I do not.

8  Q.   Did you look at how high the monthly benefits for

9  individuals under the Commonwealth pension plans ranged?

10  A.   Meaning what the range was, the highest dollar amounts by

11  participants?  Is that the question?

12  Q.   Let me be very specific.  Do you know what the highest

13  monthly benefit amounts for any individuals under any of the

14  three plans are?

15  A.   Not off the top of my head, no.

16  Q.   Can you approximate that?

17  A.   I know that in some plans there are participants that

18  receive benefits as high as $4,000 a month, but I don't know

19  more specifically than that.

20  Q.   So Exhibit Two to your declaration, and I'm referring for

21  the record to 19054-5, and this is page 23 of 23.  I don't

22  know if you have that available to you, Ms. Levy?

23            MR. MERVIS:  Just one moment.

24            THE COURT:  Yes.  I'm also -- I need to pull that

25  up.  This is to the original declaration?

1           MR. HEIN:  This is actually in the declaration

2     that's restated to include the citations to the trial

3     exhibits.  It's 19054-5, and I'm referring to the last page,

4     which is page 23 of 23.

5           It's Exhibit Two to the declaration.

6           THE COURT:  Thank you.  I have it in front of me.

7           MR. MERVIS:  We have it, Your Honor.

8           MR. HEIN:  Thank you.

9           THE COURT:  And so --

10    BY MR. HEIN:

11    Q.  Ms. Levy --

12          THE COURT:  You may proceed, Mr. Hein.

13          MR. HEIN:  Thank you.

14    BY MR. HEIN:

15    Q.  Ms. Levy, if you look at retired JRS participants above

16    the threshold, the average monthly total retirement benefit is

17    $5,124 per month, correct?

18    A.  That is correct.

19    Q.  And because it's an average, what you did is you took

20    that group of retired JRS participants, whose benefits

21    exceeded the threshold, and what threshold were you using at

22    that time?

23    A.  This was the threshold at $1,500, and this was looking,

24    you are correct, at the data that was provided based on the

25    footnotes in that exhibit as of that snapshot date.  And that

1    was an arithmetic average.

2    Q.   Okay.  And by definition, because it's --

3         THE COURT:  I believe the -- pardon me.  Does the

4    court reporter need something repeated?

5         COURT REPORTER:  Yes, Your Honor.  I'm sorry.  That

6    was a something average -- the word before "average".

7         THE COURT:  Ms. Levy, what word did you --

8         THE WITNESS:  Arithmetic.

9         THE COURT:  Thank you.

10        And so you can go on to the next question again,

11   Mr. Hein.

12        MR. HEIN:  Thank you, Your Honor.

13   BY MR. HEIN:

14   Q.   Ms. Levy, the fact this is an arithmetic average means

15   that, among the people who had benefits that exceeded $1,500 a

16   month, some were higher than $5,124 a month, correct?

17   A.   Correct.

18   Q.   And you don't know how much higher, correct?

19   A.   Not off the top of my head, no.

20   Q.   The initial plan that was announced in February 2020

21   provided for an 8.5 percent reduction in monthly benefits for

22   pension recipients receiving more than $1,200 a month,

23   correct?

24   A.   Yes.  That is my understanding.

25   Q.   And you put in a supplemental declaration the last week

1    or so in these proceedings where you look at the impact in

2    dollar costs of eliminating any reduction in the monthly

3    benefit for the -- compared to a different number, which is --

4    let me restate the question just to be more clear.

5              When you put in your supplemental declaration and you

6    provided an incremental cost of eliminating any reduction in

7    monthly benefit, you were looking at the incremental cost of

8    eliminating an 8.5 percent reduction in monthly benefit for

9    the benefits in excess of $1,500 a month, correct?

10   A.    I was looking at, as compared with the fiscal plan, the

11   impact on the fiscal plan for the employees that are -- that

12   were related to employers that roll up to the fiscal plan

13   PayGo.  I looked at the impact for those individuals based on

14   the data available, and projected an estimated impact on the

15   fiscal plan based on that over $1,500.

16   Q.    Right.  So in other words, the fiscal plan, the current

17   fiscal plan, which is that April 23, 2021, fiscal plan is

18   based on the 8.5 percent reduction for monthly benefits in

19   excess of $1,500 a month, correct?

20   A.    That is my understanding, yes.  It's somehow nuanced how

21   the formula works, but that's a general explanation.

22   Q.    Right.  And now the Modified Eighth Amended Plan of

23   Adjustment, that is different.  It has no monthly benefit

24   reduction; is that correct?

25   A.    That is my understanding, yes.

1   Q.   And so in your supplemental declaration, you were looking

2   at how much more it would cost to eliminate any reduction and

3   not have a reduction for people whose benefit is more than

4   $1,500 a month, correct?

5   A.   Would you repeat the question, please?

6   Q.   Sure.

7            So you are -- in your supplemental declaration, the

8   one you just did in the past week, you're looking at how much

9   more it will cost as compared to the cost scenario where there

10  was an 8.5 percent reduction for benefits in excess of 1,500 a

11  month, correct?

12  A.   The 2021 --

13           THE COURT:  We can't hear Ms. Levy.

14           THE WITNESS:  The 2021 fiscal plan has that

15  benefit --  okay.  I'll start over.

16           The fiscal 2021 -- the fiscal year 2021 fiscal plan

17  has the monthly benefit modification as you described it,

18  Mr. Hein; and then, yes, the second declaration -- the

19  supplemental declaration describes the estimated impact on the

20  fiscal plan of eliminating that monthly benefit reduction.

21  BY MR. HEIN:

22  Q.   Then what is not quantified in dollar terms in your

23  declarations is what the added cost is of eliminating any

24  reduction in pension payments for the band between 1,200 a

25  month and 1,500 a month, correct?

1   A.    If I'm understanding you right, since the fiscal plan

2   itself did a reduction for those individuals, then, yes, this

3   incremental change would not capture any incremental effects

4   for those individuals.

5   Q.    And you know what the incremental cost is of having

6   eliminated the reduction that originally was proposed for

7   people with a benefit of greater than 1,200 a month up through

8   1,500 a month.  So for that increment, do you understand what

9   the dollar cost is?

10  A.    Not off the top of my head.

11  Q.    Were any amounts paid to retirees in the form of pensions

12  reduced following the filing of this Title III proceeding in

13  May of 2017, or have benefits continued to be paid in full?

14  A.    I'm not familiar with the detailed plan administration by

15  the Retirement Board, but I'm not aware of any reductions to

16  the benefit amounts.

17  Q.    Under the current proposed Modified Eighth Plan of

18  Adjustment, will benefits a current employee has accrued

19  between May of 2017, when this proceeding was filed, and the

20  effective date of the Plan, will that accrual during that

21  period be modified in any way under the proposed Plan of

22  Adjustment, if you know?

23  A.    Because of the modified -- because the monthly benefit

24  modification was eliminated, and, as I understand it, the

25  current proposed plan would not impact those benefits in

1   that -- earned in that period.  Is that what you're asking?

2   Q.   I think that answers my question.  Thank you.  And that

3   completes my questioning.  Thank you very much.

4           THE COURT:  Thank you, Mr. Hein.

5           Mr. Mervis, do you wish to inquire?

6           MR. MERVIS:  No, Your Honor.  I have no questions.

7           THE COURT:  Thank you.

8           So thank you, Ms. Levy.  Your testimony is concluded,

9   and you are excused.

10          (At 12:33 PM, witness excused.)

11          THE COURT:  So we have ten minutes until the lunch

12  break.  Shall we have the tender of the declaration as to the

13  next witness before we break?

14          MR. MERVIS:  Your Honor, we can do that.  I will have

15  to cede the podium to one of my partners who's back in the

16  main room and hopefully is signed in.

17          Great.  Thank you.

18          THE COURT:  I see Mr. Rosen's doing his hand signals,

19  so hello there, Mr. Rosen.

20          MR. ROSEN:  Good morning -- or good afternoon, Your

21  Honor.  Yes, we can tender the declaration.  We will go into

22  the other witness room, Your Honor, if you give us one moment

23  to do so, and we'll be ready to tender the declaration of

24  Mr. Malhotra.  One minute, please.

25          THE COURT:  Thank you.

1          Good afternoon, Mr. Bienenstock.

2          MR. BIENENSTOCK:  Good afternoon, Judge Swain.

3    Martin Bienenstock of Proskauer Rose, LLP, for the Oversight

4    Board, as Title III representative.

5          Your Honor, the Board's next witness would be

6    Mr. Gaurav Malhotra of Ernst & Young.  We tender his three

7    documents, Your Honor.  The first is his original declaration,

8    ECF no. 18738.  The second is the amended declaration with the

9    cite references, and that's number 19054-06.  And the third

10   document is the supplemental declaration at ECF no. 19057.

11         THE COURT:  Is there any objection to the admission

12   of these declarations?

13         MR. HEIN:  Your Honor, there is no objection, subject

14   to cross.

15         I do want to just raise, and it doesn't really matter

16   to me, that I guess maybe there's just been a change in the

17   order, and this may just be the inconsistent order issue.  I

18   thought that Mr. Malhotra was last, but it does not matter to

19   me whether Shaw goes before him or he goes before Shaw.

20         THE COURT:  All right.  Since it doesn't matter to

21   you, and they are preparing to cue up Mr. Malhotra, and you

22   have no objection to the receipt of the declarations in

23   evidence, the Malhotra Declarations at 18738, 19054-06, and

24   19057 are admitted in evidence.

25         (At 12:37 PM, the Malhotra Declarations admitted into

1   evidence.)

2        THE COURT:  Is there anything else that we should

3   discuss before we break?  We'll swear the witness and commence

4   the cross-examination after the lunch break.

5        So seeing nothing further, we will commence our lunch

6   break.  I'm going to just confirm we will reconvene at -- we

7   can reconvene at 2:00, since it is 20 minutes before 1:00 now.

8   So we'll reconvene at 2:00 Atlantic Standard Time, which is

9   1:00 Eastern Standard Time.

10       Have a good lunch, everyone.  We were adjourned.

11            (At 12:38 PM, recess taken.)

12            (At 1:57 PM, proceedings reconvened.)

13       THE COURT:  Good afternoon, everyone.  Welcome back.

14   Just before lunch I admitted the declarations of Mr. Malhotra,

15   and we were to begin this afternoon's session with Mr. Hein's

16   cross-examination of Mr. Malhotra.

17       Is there anything that we need to take up before we

18   turn to the cross-examination?  Seeing no hands -- oh,

19   Ms. Dale, if you're speaking, you're muted.

20       MS. DALE:  Apologies, Your Honor.  It's Margaret

21   Dale.

22       THE COURT:  Good afternoon.  Yes.

23       MS. DALE:  Good afternoon.  There is nothing that we

24   need to take up at this time, Your Honor, other than swearing

25   the witness.

1            THE COURT:  Very good.

2            So, Ms. Tacoronte, will you please administer the

3    oath?

4            COURTROOM DEPUTY:  Please raise your right hand.

5            Do you solemnly swear that all the testimony you are

6    about to give will be the truth, the whole truth, and nothing

7    but the truth?

8            THE WITNESS:  I do.

9            COURTROOM DEPUTY:  So help you God.

10           THE COURT:  Do you swear by God?  If you do, repeat

11   the "so help me God."

12           THE WITNESS:  So help me God, yes.

13           THE COURT:  Thank you.  Good afternoon,

14   Mr. Malhotra.

15           THE WITNESS:  Good afternoon.

16           THE COURT:  Thank you.

17           Mr. Hein, you may inquire.

18           MR. HEIN:  Thank you.

19              G U A R A V   M A L H O T R A,

20       called as a witness by the Debtors, having been sworn,

21         testified as follows:

22                     CROSS-EXAMINATION

23   BY MR. HEIN:

24   Q.   Was it part of your assignment or work for the Oversight

25   Board to evaluate the Commonwealth's ability to pay the

1    prepetition contractual debt service on its GO and

2    GO-Commonwealth guaranteed debt?

3    A.    No, it was not.

4    Q.    Was it part of your assignment or work for the Oversight

5    Board to quantify the amount of the prepetition contractual

6    debt service on the GO and Commonwealth guaranteed debt?

7    A.    Mr. Hein, could you please repeat your question?

8    Q.    Sure.  As part of your work for the Oversight Board, was

9    it part of your work to quantify the amount of the

10   Commonwealth's prepetition contractual debt service on the GO

11   and Commonwealth guaranteed debt?  In other words, how much?

12   A.    It was not.

13   Q.    Do you know how much the annual prepetition debt service

14   payment is on an annual basis for the GO and PBA debt?

15   A.    I have an estimate, yes.

16   Q.    And what is that estimate?

17   A.    My recollection is that it is approximately one and a

18   half to two million dollars annually.

19   Q.    And what about the interest component only?  Do you have

20   that?

21   A.    I do not.

22   Q.    And does the one and a half to two billion include

23   amortization of principal?

24   A.    I assume it does.  I am not sure.

25   Q.    Are you sure that it's one and a half to two billion as

1    opposed to 1.3 billion?

2    A.    I am not sure.

3    Q.    Thank you.

4            Did you evaluate as part of your work whether, if

5    priority were to be given to the GO and Commonwealth

6    guaranteed debt, the Commonwealth has and would have

7    sufficient resources to pay the past due principal and

8    interest on the GO and Commonwealth guaranteed debt?

9    A.    No.

10   Q.    Did you evaluate whether, if priority were to be given to

11   the GO and Commonwealth guaranteed debt, the Commonwealth has

12   and would have sufficient resources to pay the prepetition

13   contractual debt service on an ongoing basis on the GO and

14   Commonwealth guaranteed bonds?

15   A.    No.

16   Q.    Your declaration addresses the subject of Commonwealth

17   obligations under the Plan to pay upside performance bonuses

18   or upside bonuses to or for the benefit of the AFSCME

19   affiliated unions and other nonunion rank-in-file employees,

20   correct?

21   A.    That is correct.

22   Q.    And can we call that "upside bonus" for this purpose?

23   A.    Yes.

24   Q.    The upside bonus amount is calculated as 25 percent of

25   what's called excess cash surplus, correct?

1   A.   That is correct.

2   Q.   And that's a term defined in the Plan, correct?

3   A.   That is correct.

4   Q.   And the Plan defines excess cash surplus as the amount of

5   actual cash surplus above and beyond the projected fiscal plan

6   surplus contained in the Fiscal Plan for the Commonwealth,

7   certified by the Oversight Board, and being in effect on the

8   effective date of the Plan, correct?

9   A.   That is my recollection, yes.

10  Q.   Does your declaration quantify an estimate or forecast of

11  the range or potential range of upside bonus dollar amounts

12  for future years?

13  A.   No.

14  Q.   Is there any quantification of an estimate of a forecast

15  of the amounts or range of amounts in dollars of potential

16  upside bonus amounts for future years?

17  A.   Not other than the ones that are already identified in

18  terms of the 2,000-dollar-per-year floor for AFSCME employees.

19  Q.   So the 2,000 is a minimum, correct?

20  A.   That is correct.

21  Q.   Do you have any information whatsoever as to what the

22  maximum may be?

23  A.   I do not.

24  Q.   To your knowledge, has anyone working on behalf of the

25  Oversight Board made any attempt to calculate or estimate what

1   the maximum dollar amount may be paid out per public employee

2   under this upside bonus provision?

3   A.    No.

4   Q.    Now, we've been talking about dollars per person, but let

5   me just focus the questions on aggregate dollar amounts.  And

6   just -- I want to make sure that the record is clear on this.

7   Are you aware of any quantification by anyone of an estimate

8   or forecast of aggregate dollar amounts or ranges of aggregate

9   dollar amounts of potential upside bonus amounts for future

10  years?

11  A.    We have illustrations of what aggregate upside amounts in

12  terms of -- on a per person basis could be based on

13  illustrations for what we have seen.

14  Q.    Okay.  And who prepared these illustrations?

15  A.    It would have been my team.

16  Q.    And have those illustrations been provided to the

17  Oversight Board?

18  A.    The -- those illustrations are ranges, and the output of

19  it would have been provided to the Oversight Board as

20  illustrations.

21  Q.    And what is the high end of those illustrations per

22  person?

23  A.    I do not recall.

24  Q.    And did anyone prepare illustrations to show what the

25  aggregate dollar amount would be?

1    A.    An illustration is an amount that you use, so it is

2    essentially a 100 million dollar illustration yields 25

3    million.  Anything -- 200 million dollars yields 50 million.

4    That's what the illustration would show.

5    Q.    And was that done?

6    A.    Yes.

7    Q.    And did anyone take a forecast that the Oversight Board

8    has in its fiscal plan, the April 23, 2021, fiscal plan, the

9    current fiscal plan, did anyone take the forecast in that

10   fiscal plan for fiscal years '22 through '26, and compute what

11   the upside bonus aggregate dollar amount would be using the 25

12   percent as you described?

13   A.    No, because it would likely be zero based on what the

14   fiscal plan were to be.  So we do not have what an upside

15   would necessarily be today to the fiscal plan to calculate the

16   amount of an upside bonus.

17   Q.    Okay.  We don't know what fiscal plan there may be in the

18   future.  All we have is the April 23, 2021 fiscal plan,

19   correct?

20   A.    That is correct.

21   Q.    And there's no fiscal plan that specifically shows how

22   much may be paid in upside bonuses based on the Modified

23   Eighth Amended Plan, correct?

24   A.    That is correct.

25   Q.    So one method one could take potentially would be to look

1    at what's in the current fiscal plan, the April 23, 2021,

2    fiscal plan, use the forecast the Oversight Board has made

3    there, and compute what the upside performance amounts are

4    mathematically.  You agree that could be done?

5    A.   The upside bonus is calculated based on the fiscal plan

6    as of the effective date.  There has to be over performance,

7    over and above a particular fiscal plan.  Just performing in

8    line with the fiscal plan does not create an upside bonus.

9    Q.   Is it your testimony that without an actual fiscal plan

10   that mirrors the Modified Eighth Amended Plan of Adjustment,

11   one cannot be more specific in quantifying the upside bonus

12   amounts?

13   A.   Could you repeat that question, please?

14   Q.   Sure.  I'm just trying to understand.  Is what you're

15   saying that without a fiscal plan that mirrors the Eighth

16   Amended Plan of Adjustment, you're saying that one can't

17   arrive at a specific quantification of the upside bonuses in

18   aggregate dollar terms?

19   A.   No, I am not saying that.

20   Q.   So how can one calculate the aggregate dollar amount of

21   the upside bonuses based on the information we currently have,

22   which is the current April 23, 2021, fiscal plan?

23   A.   Based on the existing fiscal plan, even after

24   incorporating the adjustments for the amendments in the eighth

25   fiscal plan -- or the Eighth Plan, other than the amounts that

1   have been already quantified for AFSCME, as in the

2   $2,000-per-person floor, there would be no other upside bonus.

3   Q.   And why is that?

4   A.   Because there would have to be outperformance, whatever

5   that outperformance ends up being, over and above the fiscal

6   plan in order for the upside bonus to come into effect.

7   Q.   Let me just wrap up this line with this question.  Are

8   you telling me that until we have a fiscal plan in effect on

9   the effective date of the Plan, if there's a plan other than

10  the current April 23, 2021, plan, you simply can't quantify

11  the aggregate dollar amount of upside bonuses?

12  A.   No, I'm not saying that.

13  Q.   If the Plan became effective today, and today was the

14  effective date of the Plan, we'd be using the April 23, 2021,

15  fiscal plan, correct?  Because that would be what's in effect

16  on the effective date?

17  A.   I can use that as an assumption.

18  Q.   Thank you.  The excess cash surplus calculation factors

19  in all revenues from all sources, including both Commonwealth

20  revenues and any federal funds, correct?

21  A.   That is correct.

22  Q.   The April 23, 2021, certified plan projects surpluses

23  post measures for fiscal 2022 through 2026, correct?

24  A.   That is correct.

25  Q.   The CVIs that bondholders receive factor in only over

1  performance of the 5.5 percent SUT revenues, correct?

2  A.   Yes.  For the GOs, yes.

3  Q.   And what, in approximate percentage terms, are the 5.5

4  percent SUT revenues in comparison to the aggregate

5  Commonwealth revenues from all sources, including federal

6  funds and Commonwealth revenues from all sources?

7  A.   I do not have that handy.

8  Q.   Would it be correct that the Oversight Board, in its

9  fiscal plan, April 23, 2021, fiscal plan, is projecting

10  approximately 21 billion in overall revenues?

11  A.   That sounds correct.

12  Q.   And am I correct that roughly the 5.5 percent of the SUT

13  is 1.3 billion?

14  A.   That sounds about right.

15  Q.   And would you agree that the base on which one factors

16  and calculates excess cash surplus is about 16 times larger

17  than the baseline on which one calculates the share of the 5.5

18  percent SUT that goes through the CVI mechanism?

19  A.   No.

20  Q.   So you've agreed that the base where the excess cash

21  surplus is the overall revenues, the 21 billion approximately,

22  and that the number used to calculate the CVIs is

23  approximately 1.3 billion as a base, correct?

24  A.   The base cash that -- the excess cash surplus, while all

25  of the revenues are one of the components of the input, you

1   also have to calculate all of the expenses.  It is a net

2   surplus calculation in that excess cash surplus that is being

3   driven.  It's a net number versus a one-sided revenue number

4   only.

5   Q.   Your -- to the extent there's added revenue from whatever

6   source, it will increase the amount that potentially may be

7   excess cash surplus, and, thus, 25 percent of which will be

8   paid in upside bonuses, correct?

9   A.   No.

10  Q.   Assume that expenses remain the same.  All things equal,

11  if there's additional revenues from whatever source, and

12  expenses remain the same, all things equal, there will be

13  added excess cash surplus, correct?

14  A.   In a hypothetical world, you keep an expense flat and you

15  increase more revenue, in that hypothetical, that could be a

16  reasonable estimated calculation.

17  Q.   Now, you agree there's a reasonable potential for the

18  Federal Government Medicaid funding to continue at levels at

19  least as high as the Medicaid funding has been in recent

20  years, correct?

21  A.   I cannot say that with any sort of assurance.

22  Q.   I'm not asking for an assurance.  I'm asking whether you

23  believe there's a reasonable potential for that to be the

24  case.

25  A.   It is a potential, but it also has other sort of impacts

1    associated with whether there is a net pick up or not in terms

2    of available resources.

3    Q.   So you had identified in your declaration the potential

4    for Federal Government Medicaid funding to remain the same or

5    even increase as a potential upside, correct?

6              (Sound played.)

7              THE WITNESS:   I have listed it as a potential

8    upside.   That is correct.

9    BY MR. HEIN:

10   Q.   And if there was no change in the Medicaid expense, but

11   you simply had more federal funding for Medicaid come in, you

12   would agree then that that provides an increase in the amount

13   of potential excess cash surplus?

14   A.   Potential excess cash surplus, if we were referring to

15   the original union excess cash surplus, is only triggered

16   based on outperformance over a fiscal plan.

17   Q.   Okay.  What we have now is the current fiscal plan, and

18   the current fiscal plan shows that Medicaid funding in fiscal

19   2021 is approximately two and a half billion, correct?

20   A.   In aggregate, that sounds correct.

21   Q.   And the fiscal plan shows Medicaid funding dropping to

22   about 500 million in fiscal 2023 to 2026, correct?

23   A.   That approximation sounds correct.

24   Q.   So if we just took a snapshot today and said, the current

25   fiscal plan is the fiscal plan, and expenses are on this

1   hypothetical assumed to be the same, you would have

2   potentially two billion or more of additional Medicaid

3   funding, if, instead of dropping by 80 percent, Medicaid

4   funding just remained the same at two and a half billion,

5   correct?

6   A.   Not necessarily.

7   Q.   I'm asking you to assume hypothetically expense --

8           (Sound played.)

9   BY MR. HEIN:

10  Q.   -- Medicaid expense remains the same, and that what you

11  have is the additional Medicaid funding coming in at current

12  levels through 2023 to 2026.

13  A.   If the expenses were not to increase, there is still the

14  other potential assumption of maintenance of effort that might

15  be required by the Federal Government in order to provide

16  additional funding.  So it still remains a hypothetical,

17  whether the Commonwealth would be eligible to receive that

18  particular funding.

19          MR. HEIN:  Let me just ask a few other questions

20  briefly on a different topic, with the Court's indulgence, if

21  I may, Your Honor.

22          THE COURT:  Yes.  You understand that your original

23  reserve time has run out, so you're proposing a few brief

24  additional questions?

25          MR. HEIN:  That's correct, Your Honor.

1          THE COURT:  You may proceed.

2    BY MR. HEIN:

3    Q.    Your declaration compares Puerto Rico debt service levels

4    with those of states, correct?

5    A.    I reference that, yes.

6    Q.    And for the most part, Puerto Rico residents do not pay

7    Federal Income Tax, correct?

8    A.    I am unsure about that.

9    Q.    Okay.  Did you do an analysis that added the federal debt

10   burden for states where residents pay Federal Income Tax to

11   the debt service levels for the states and then compare it to

12   Puerto Rico?

13   A.    I have not gone through that detail.

14   Q.    You state that -- in paragraph 29, that by the time

15   projected deficits emerge in 2035, the amount of Commonwealth

16   GO debt outstanding will be only 2.1 billion, correct?

17   A.    That is correct.

18   Q.    And that statement in your declaration assumes that the

19   Commonwealth will not be issuing and selling new GO debt over

20   the next 15 years, correct?

21   A.    That is correct.

22   Q.    You're a financial professional based in Chicago,

23   Illinois, correct?

24   A.    Yes.

25   Q.    Your opinion concerning the fact that confirmation is not

1    likely to be followed by the need for further unanticipated

2    financial reorganization is based on your financial analysis,

3    correct?

4    A.   That is correct.

5    Q.   You are not opining or attesting to the willingness to

6    pay of future political officials in Puerto Rico, correct?

7    A.   That is correct.

8             MR. HEIN:  Thank you.

9             THE COURT:  Thank you.

10            MR. HEIN:  That's all I have, Your Honor.

11            THE COURT:  Thank you, Mr. Hein.

12            Ms. Dale, did you wish to inquire?

13            MS. DALE:  No questions, Your Honor.

14            THE COURT:  Thank you, Mr. Malhotra.  Your testimony

15   is concluded, and you are excused.

16            THE WITNESS:  Thank you.

17            (At 2:22 PM, witness excused.)

18            MS. DALE:  Your Honor, with your indulgence, if we

19   could just have a moment to switch out for the next witness?

20            THE COURT:  Yes.  That will be Mr. Shah?

21            MS. DALE:  That will be.

22            THE COURT:  Thank you.

23            Well, Mr. Bienenstock, are we ready to proceed?

24            MR. BIENENSTOCK:  Yes.  Yes, we are, Your Honor.

25   Good afternoon.  Martin Bienenstock of Proskauer Rose, LLP,

1    for the Oversight Board, as Title III representative of the

2    debtors.

3           Your Honor, our next witness is Ojas Shah of the

4    McKinsey Company, and I proffer into evidence Mr. Shah's

5    original declaration at ECF no. 18730 and the amended

6    declaration at ECF no. 19054-08.

7           THE COURT:  Is there any objection to admission of

8    these two declarations, the original and the amended?

9           MR. HEIN:  No objection, Your Honor, subject to

10   crossing and to my disputing the declaration.

11          THE COURT:  Very well.  The Shah Declarations at

12   18730 and 19054-08 are admitted into evidence.

13          (At 2:26 PM, the Shaw Declarations admitted into

14   evidence.)

15          THE COURT:  Mr. Shah, the courtroom deputy will be

16   administering the oath.

17          COURTROOM DEPUTY:  Please raise your right hand.

18          Do you solemnly swear that all the testimony you are

19   about to give will be the truth, the whole truth, and nothing

20   but the truth?

21          THE WITNESS:  I do.

22          COURTROOM DEPUTY:  So help you God?

23          THE WITNESS:  So help me God.

24          THE COURT:  Mr. Hein, would you wait just one moment,

25   please?

1               MR. HEIN:  Good afternoon.  Sure.  Sure.  Of course.

2               THE COURT:  Thank you.

3          I just had to have something fixed on my display.

4     Thank you.  We can go forward.  Mr. Hein, you may inquire.

5               MR. HEIN:  Thank you, Your Honor.

6                         O J A S   S H A W,

7          called as a witness by the Debtors, having been sworn,

8          testified as follows:

9                         CROSS-EXAMINATION

10    BY MR. HEIN:

11    Q.   Mr. Shah, various McKinsey entities, including the one

12    that you work for, have been working for the Oversight Board

13    for the past five years, correct?

14    A.   That is correct.

15    Q.   You are the person who led the team at McKinsey who

16    prepared the best interest test reports in this case; is that

17    correct?

18    A.   That's correct.

19    Q.   The best interest test analysis your team prepared refers

20    to certain obligations as being pari passu with the GO debt,

21    is that correct?

22    A.   That is correct.

23    Q.   The pari passu obligations are other obligations that the

24    Commonwealth has guaranteed, such as the PBA bonds, correct?

25    A.   That's correct.

1   Q.   Was the best interest test analysis done on the

2   assumption that one looks at the best interests of all

3   creditors as a whole, including unsecured creditors or others

4   that don't have the Commonwealth guarantee or the GO status,

5   or was the best interest test analysis done by you on the

6   assumption that one looks to the best interest of those

7   particular creditors who have a priority position due to their

8   GO and pari passu Commonwealth guaranteed status?

9   A.   Can you repeat the question?  I just want to make sure I

10  understand it fully.

11  Q.   Sure.  I'm posing two options.  I'm just asking which it

12  is.  Option one would be that the best interest test analysis

13  looks at the best interest of all creditors as a whole in the

14  case, including those with unsecured claims, including those

15  who -- you know, whatever position they may be in.  The

16  other --

17         MR. MERVIS:  Your Honor -- go ahead.  Sorry.

18  BY MR. HEIN:

19  Q.   The other possibility would be that you do the best

20  interest test on the assumption that one looks to the best

21  interest of the particular creditors who have the GO or pari

22  passu Commonwealth guaranteed status.  And I'm simply asking

23  which of those two it is.

24         MR. MERVIS:  Your Honor, I object to the form of that

25  question, because it assumes that it's one or the other, and

1   that hasn't been established.

2           THE COURT:  The objection is sustained.

3           Would you please rephrase, Mr. Hein?

4           MR. HEIN:  Sure.

5   BY MR. HEIN:

6   Q.  Let me just break it up and ask two questions.

7           Was the best interest test analysis done on the

8   assumption that one looks at the best interest of all

9   creditors as a whole?

10          MR. MERVIS:  Your Honor, it's the same objection.

11          THE COURT:  Well, that one is a yes or no question,

12  and so I will permit the witness to answer that if he can.

13          THE WITNESS:  Sure, Your Honor.  So the analysis that

14  was done that's encapsulated in the reports looked at the

15  recovery available to creditors absent a Title III, and the

16  analysis outlines both total recovery, as well as recoveries

17  for, you know, the major categories of indebtedness, the GOs,

18  the pari passu, and other creditors.

19  BY MR. HEIN:

20  Q.  Did that include unsecured creditors?

21  A.  Yes.  The report includes unsecured creditors.

22  Q.  So in assessing whether or not the best interest test

23  analysis is done, it does look to all creditors, including

24  unsecured?

25  A.  Well, the report and the analysis looks at the recoveries

1   available to all creditors, correct.

2   Q.   And that was based on legal instructions you were given

3   by the Oversight Board's counsel?

4   A.   Again, can you be more specific?

5   Q.   You were given instructions or assumptions by the

6   Oversight Board's counsel, correct?

7   A.   There were legal assumptions provided with respect to the

8   analysis.

9   Q.   Indeed, those are annexed as Appendix 5 to the report,

10   correct?

11   A.   That's correct.

12   Q.   It's about 70 pages long, correct?

13   A.   That is correct.

14   Q.   The best interest test analysis was prepared on the basis

15   of those legal assumptions you were given by the Oversight

16   Board's counsel, correct?

17   A.   That's correct.  The analysis was prepared incorporating

18   the legal assumptions.

19   Q.   And I'm going to ask three specific questions, and just

20   ask you yes or no questions.  If you don't know the answer,

21   then it would be you don't know.

22        Did the best interest test analysis assume, pursuant

23   to Article VI, Section 8 of Puerto Rico's Constitution, I'm

24   now quoting, in the case of available revenues, including

25   surplus for any fiscal year, are insufficient to meet the

1   appropriations made for the year, interest on the public debt

2   and amortization thereof shall first be paid, and other

3   disbursements shall thereafter be made in accordance with the

4   order of priorities established by law.

5        Was that an assumption for your best interest test

6   analysis?

7   A.   I'm -- I can't say for sure.

8   Q.   Then the second question:  Did the best interest test

9   analysis you and your team prepared assume that pursuant to

10  Article VI, Section 2, paragraph 3 of Puerto Rico's

11  Constitution, and again I'll quote, the Secretary of the

12  Treasury may be required to apply the available revenues,

13  including surplus, to the payment of interest on the public

14  debt and the amortization thereof in any case provided for by

15  Section 8 of this Article VI, at the suit of any holder of

16  bonds or notes issued in evidence thereof?

17  A.   I don't know specifically.

18  Q.   The third question:  Did the best interest test you and

19  your team prepared specifically consider whether available

20  remedies under the nonbankruptcy laws and Constitution of the

21  territory would result in a greater recovery for the creditors

22  than is provided by the Plan?

23  A.   So, yes, as outlined in my declaration, we looked at the

24  recoveries estimated in the analysis that we prepared relative

25  to the recoveries available under the Plan.

1    Q.    Pursuant to the instructions in Appendix 5?

2    A.    Pursuant to incorporating the legal assumptions that were

3    outlined in Appendix 5.

4    Q.    You and your team accepted as true, accurate, and

5    appropriate all of the legal and financial information and

6    assumptions provided by the Oversight Board's legal advisors,

7    other Oversight Board advisors, and the Government of Puerto

8    Rico and its advisors, correct?

9    A.    That's correct.

10   Q.    You and your team did not independently verify any of the

11   information or assumptions in the Oversight Board's fiscal

12   plans, correct?

13   A.    That's correct.  We did not independently verify the

14   assumptions.

15   Q.    No one -- thank you.  No one at McKinsey independently

16   verified any of the legal or financial assumptions you were

17   given, correct?

18   A.    That is -- well, can you restate the question?  I want to

19   make sure --

20   Q.    Sure.  And I'm just -- I'm referring to the first page of

21   the best interest test.  It's Debtor Exhibit 130 --

22   A.    Yes.

23   Q.    -- if you want to look at it.

24          My question is, no one at McKinsey independently

25   verified any of the legal or financial assumptions you were

1 | given, correct?

2 | A.    Correct.  The legal and financial assumptions or data

3 | provided by other advisors was not independently verified.

4 | Q.    No one at McKinsey, including you, takes any position

5 | with respect to the information and assumptions you have

6 | relied upon in preparing the best interest reports, correct?

7 | A.    I don't believe that's correct.

8 | Q.    So let me refer you to your report.  It's page one of the

9 | text, paragraph four of the last clause.

10 |         MR. MERVIS:  Your Honor, can we just have a moment?

11 | Perhaps Mr. Hein could identify the exhibit that he's looking

12 | at.

13 |         MR. HEIN:  Sure.  It's Debtors' Exhibit 130.

14 |         MR. MERVIS:  And what page, please?

15 |         MR. HEIN:  It's the third physical page in the

16 | exhibit as docketed.  It's the first page of text.

17 |         MR. MERVIS:  Thank you.

18 |         THE COURT:  Please give me a moment as well.  For

19 | some reason, I don't have it right in front of me; but I've

20 | made a note of your reference, and I will look at it

21 | afterward.

22 | BY MR. HEIN:

23 | Q.    Mr. Shah, the specific question references --

24 | A.    I'm sorry.  Go ahead.

25 | Q.    Sure.  The specific question references the last phrase,

1    paragraph four of the page, which says -- it starts out

2    saying, McKinsey & Company has independently verified that, et

3    cetera, and then it goes on to say, nor does it take any

4    independent position with respect to this information and

5    these assumptions; is that correct?

6    A.    That's correct.  With respect to that information, that

7    is correct.

8    Q.    So, for example, on the question of what the population

9    of Puerto Rico is, if the Oversight Board states the

10   population was 2,928,000, but the U.S. Census actual count was

11   3,285,874, McKinsey would use the number from the Oversight

12   Board, the lower 2,928,000 number, correct?

13         MR. MERVIS:  Your Honor, I object to the form of the

14   question to the extent it assumes a fact that's not in

15   evidence, and specifically what Mr. Hein refers to as the

16   actual census count.

17         THE COURT:  Sustained.  Please rephrase or

18   restructure.

19         MR. HEIN:  Sure.  And I have included the document

20   with the census in my exhibits, and I guess, Your Honor, I

21   would propose that the question be stated with a link-up to my

22   exhibit subsequently, if that would be permitted by Your

23   Honor.

24         THE COURT:  So is the exhibit available to the

25   witness now?  I'm just trying to understand what you're

1    proposing.

2            MR. HEIN:  I mean, it's in the record.  It's attached

3    to my declaration.  Perhaps I should frame the question as a

4    hypothetical, if that would be acceptable.

5            I'm not asking the witness to attest to particular

6    documents or information.  I just am trying to make a point.

7    I can do it with a hypothetical.

8            THE COURT:  Please proceed.

9    BY MR. HEIN:

10   Q.   Assume for my hypothetical that the United States Census

11   actual count, the population in Puerto Rico is 3,285,874.

12   Assume that the number the Oversight Board uses in its fiscal

13   plan is 2,928,000, a lower number.  Am I correct that

14   McKinsey, based on using the assumptions you were given, would

15   be using the lower population number provided by the Oversight

16   Board in its fiscal plan?

17   A.   Correct.  We would have used the fiscal plan assumptions.

18   Q.   If the Oversight Board forecasts in its fiscal plan that

19   Medicaid expenses will increase from two billion in fiscal '21

20   to three billion in fiscal '26, and I'm using rough -- round

21   numbers, but Federal Medicaid funding would drop 80 percent,

22   from two and a half billion of federal funding in fiscal 2021

23   to just 500 million in federal funding in fiscal 2026,

24   McKinsey would use, and did use, those Oversight Board

25   numbers, and, therefore, assume in its analysis that net

1   Commonwealth Medicaid expense would go from essentially zero

2   in fiscal '21, to two and a half billion expense to be paid

3   out of Commonwealth revenues in fiscal '26; is that correct?

4   A.   I don't know if those numbers are accurate.

5   Q.   Well, assume they are, and they will be linked up by the

6   documents.  I'm not -- just illustratively assuming

7   hypothetically my numbers are correct, or approximately

8   correct from the fiscal plan document, that's what McKinsey

9   would use, correct?

10  A.   We would have used the fiscal plan numbers for the

11  purpose of our analysis.

12  Q.   No one at McKinsey would have gone out to independently

13  investigate what public statements by members of both parties

14  and Congress are saying, correct?

15          MR. MERVIS:  I object to --

16          THE WITNESS:  Yes.

17          MR. MERVIS:  -- the form of the question, Your Honor.

18  It's vague.

19          THE COURT:  Sustained.  Please rephrase.

20  BY MR. HEIN:

21  Q.   No one at McKinsey would dig into what, on the subject of

22  future funding for Puerto Rico in terms of Federal Medicaid

23  funding, members of Congress in both parties were speaking

24  about, correct?

25  A.   That's not --

1  Q.   You'd be using what's in the fiscal plan?

2  A.   That's not correct.

3  Q.   Did McKinsey independently go out to look at what

4  proposals have been made in Congress on Federal Medicaid

5  funding for purposes of its best interest test analysis?

6  A.   For the purposes of the best interest test analysis, no.

7  Q.   For purposes of the best interest test analysis, did

8  anyone at McKinsey independently go out to look at what the

9  U.S. Budget says on the subject of Medicaid funding?

10  A.   For the purpose of the best interest analysis, no.

11  Q.   If the Oversight Board Fiscal Plan states that Puerto

12  Rico has more than 300 tax incentives, with total foregone

13  revenue in excess of 21 billion, for purposes of the best

14  interest test analysis, McKinsey just assumed that's how it's

15  going to be, and that there would be 20 billion in foregone

16  revenue, correct?

17  A.   I'm sorry.  Could you repeat that?

18  Q.   Sure.  So I'm representing to you, and you can assume

19  from my question, that the Oversight Board Fiscal Plan states

20  that Puerto Rico has more than 300 different tax incentives

21  with foregone revenue in excess of 21 billion.

22       My question is, for purposes of the best interest

23  test, McKinsey would simply assume that there's going to be

24  foregone revenue of 21 billion as opposed to McKinsey

25  independently looking at whether there are things that could

1    be done to reduce that foregone revenue?

2    A.    Correct.  We would have relied on the assumptions

3    included in the fiscal plan.

4    Q.    If the fiscal plan assumes a particular level of

5    operating expenses, and a particular level of pension PayGo

6    expenses, your team did not, for purposes of the best interest

7    test analysis, independently scrutinize those operating

8    expenses to independently assess whether they were all

9    essential or not, you just used what the Oversight Board had,

10   correct?

11   A.    That's correct.  We relied on the fiscal plan.

12   Q.    So if there was tens or hundreds of millions of dollars

13   in contracts for advertising representation or artistic

14   services, or hundreds of millions in contracts for consulting

15   services, McKinsey, if it was part of the fiscal plan, would

16   simply use that and would not be making some independent

17   evaluation of whether these expenses were really necessary or

18   essential, correct?

19   A.    We do not make any independent assessment of expenses.

20   Q.    One of the assumptions that you were given was to assume

21   that all operating expenses must be satisfied in each year,

22   including pension payments, prior to the payment of the debt

23   service.  That was something you were told to assume?

24   A.    That's correct.  That was one of the assumptions.

25   Q.    And that's what you did, correct?

1   A.   That's correct.

2   Q.   You are aware of this Act 53-2021 that was recently

3   enacted?

4   A.   I am aware that Act 53 exists.

5   Q.   And you are aware that it contemplates certain additional

6   expenditures for the University of Puerto Rico and various

7   other purposes?

8   A.   I'm -- I have a -- I have a cursory knowledge of what's

9   in 53.

10  Q.   That is not something incorporated in your best interest

11  test report, because it's just very recent, correct?

12  A.   Well, it is very recent, but the primary focus of 53 I

13  believe are, you know, with respect to the pension cuts, which

14  were, you know, assumed to take effect with a plan in our

15  analysis, as it's described in both the report and I believe

16  in my declaration.  In a nonPOA or, you know, in a situation

17  where the Title III is dismissed, we don't assume that cuts

18  were -- that cuts would take place, and therefore, I believe

19  the outcome of 53 is -- you know, has no impact on the

20  analysis that we did.

21  Q.   So in that assumption that no cuts would take place is --

22  again, you were instructed by the Oversight Board's legal

23  advisors, correct?  That's part of the assumption?

24  A.   It is part of the assumptions, and it was because the

25  enact -- you know, our understanding was the enactment of

1   those cuts was dependant on the confirmation of a plan, which

2   wouldn't occur in a case where the Title III was dismissed.

3   Q.   Are you aware that on June 30th of this year, the

4   Commonwealth issued financial statements for the year ended

5   three years earlier, June 30th, 2018?

6   A.   I believe that's true.

7   Q.   Are you aware that there's a note to those financial

8   statements that says as of May 31, 2021, the total principal

9   and interest on GO and PBA bonds was 6.79 billion?

10  A.   I have not seen that.

11  Q.   Let me just -- you haven't looked for that number; is

12  that correct?

13  A.   I have not read those financial statements.

14  Q.   And you have not calculated what the annual debt service

15  on the GO and PBA bonds prepetition, contractual debt service

16  is?

17  A.   No.   We did do the calculation of what -- the outstanding

18  amounts of both principal and interest as of June 30th, 2021,

19  for the purposes of our analysis.

20  Q.   And did you do that calculation by looking at what the

21  annual debt service cost on the GO and PBA bonds would be?

22  A.   That's correct.   We were provided maturity schedules for

23  the various obligations to do that calculation.

24  Q.   And do you recall what the annual interest expense on the

25  GO and PBA bonds was prepetition?

1   A.   Yeah, I don't recall off the top of my head.

2   Q.   And do you recall what the annual debt service on the GO

3   and PBA bonds is on an annual basis?

4   A.   I don't recall the specific annual figures.

5   Q.   Does the number of 1.3 billion sound approximately

6   correct?

7   A.   I don't know.

8   Q.   Are you familiar with the TSA weekly cash flow reports?

9   A.   Yes.

10  Q.   And you're familiar with the summary of bank account

11  balance reports, correct?

12  A.   That's correct.

13  Q.   And that summary of bank accounts balance reports

14  includes a schedule of amounts that are restricted to only

15  paying GO debt, correct?

16  A.   In terms of the amounts only to pay GO debt, I'm not sure

17  if it's characterized that way, but I know the report that

18  you're referencing.

19  Q.   If those reports show cash on hand that was either

20  restricted or dedicated to paying GO debt, and that the amount

21  be either unrestricted or dedicated to paying GO debt was over

22  12.5 billion, would you accept that as correct?

23         MR. MERVIS:  Your Honor, I object.  There's no

24  foundation for that question.

25         THE COURT:  Sustained.

1  BY MR. HEIN:

2  Q.   Did anyone on your team do a calculation where you took

3  the total value due or the total amount due on the GO and PBA

4  debt through the current time, and then add up the

5  unrestricted cash and the cash that's dedicated to payment of

6  GO debt, and looked at whether there's enough cash currently

7  to pay the debt service that would be due through the present

8  time on the GO and PBA debt?

9  A.   Yes, that was, you know, a component of the analysis, and

10  is also outlined in, you know, the waterfall of funds in the

11  analysis we presented.

12  Q.   Okay.  Your waterfall of funds is making this assumption

13  you were instructed on that operating expenses and pension

14  expenses get paid before the debt service, correct?

15  A.   That's correct.

16  Q.   Assume hypothetically that, in fact, the debt service

17  gets paid first.

18  A.   Okay.

19  Q.   Am I correct there is enough unrestricted cash on hand,

20  plus cash that's restricted to paying GO debt, that Puerto

21  Rico could pay all of its GO and PBA debt that is due to date

22  with the cash on hand and still have plenty left over?

23  A.   I don't know.  I didn't do the analysis.

24  Q.   The fiscal plan shows -- withdraw that.

25        You're familiar with an actual year-to-date net

```
 1    operating cash flow report that is included in the TSA cash
 2    flow reports that Puerto Rico publishes?
 3    A.    I believe I know what you're referencing.
 4    Q.    And am I correct that approximately 4 billion dollars,
 5    the exact number is 3.97, of net operating cash flow was
 6    produced in 2021?
 7    A.    I don't know.
 8    Q.    Did anyone on your team do a calculation where you looked
 9    at the net operating cash flow for 2021 from the reports
10    issued by the Puerto Rico government, and then subtract the
11    prepetition annual contractual debt service on the GO and PBA
12    debt to see whether there were more in the operating -- net
13    operating cash flow for fiscal 2021 than there was actual
14    prepetition contractual debt service obligation?
15    A.    I'm sorry, Mr. Hein.  You froze, at least on my screen,
16    so I lost part of that in the middle.
17          Could you repeat?
18    Q.    Sure.  Of course.
19          Did anyone on your team at McKinsey look for what the
20    year-to-date net operating cash flow for fiscal '21 was
21    through June 30th, 2021, or for Puerto Rico Government
22    reports, and then looked at what the prepetition annual debt
23    service amount would be on the GO and PBA debt, and look at
24    whether there was --
25          (Sound played.)
```

1  BY MR. HEIN:

2  Q.    -- more than enough cash flow last year to pay off the GO

3  and PBA debt?

4  A.    We did not specifically do that analysis.

5           MR. HEIN:  Your Honor, just two additional questions.

6  I don't know if that was the first buzz or the second.

7           THE COURT:  That was only the first buzz.

8           MR. HEIN:  Thank you.

9           THE COURT:  Please go on.

10  BY MR. HEIN:

11  Q.    There are various different McKinsey firm related

12  entities involved in the work for the Oversight Board that's

13  been going on for the past five years, correct?

14  A.    That's correct.

15  Q.    Can you give us your best estimate of the amount or range

16  of amounts of the aggregate that the various McKinsey entities

17  have billed for services for Puerto Rico during this past five

18  years?

19  A.    Over the past five years, I believe our fees are, in

20  total, a little over about 150 million dollars.

21           MR. HEIN:  Thank you.  I have no further questions.

22           THE COURT:  Thank you, Mr. Hein.

23           MR. MERVIS:  Your Honor, I do have some, if I could

24  proceed.

25           THE COURT:  Yes.

 1          MR. MERVIS:  Thank you.

 2                      REDIRECT EXAMINATION

 3    BY MR. MERVIS:

 4    Q.   Mr. Shah, at the outset of Mr. Hein's examination, there

 5    was some questions about which -- whether you shared

 6    recoveries for creditors as a whole or as groups, and you gave

 7    some testimony about that.  Going to Exhibit 130, which I

 8    think you should have in the binder that's in front of you,

 9    which is your -- which is McKinsey's best interest test report

10    that you were responsible for, does -- are there exhibits

11    within the body of the report that actually show the

12    recoveries of different types of creditors under different

13    scenarios?

14    A.   Yes, there is.

15    Q.   And it may take a moment, but just if the Court wanted to

16    know where to look, could you identify those exhibits for us?

17    A.   Yes.

18    Q.   Okay.  Please do.

19    A.   So Exhibit 5, 6, 7, 8, 9, and 10, and 11 look at

20    recoveries by the three major categories of creditors, GOs,

21    the pari passu creditors, and the other creditors, which

22    include the unsecureds, across a variety of scenarios.

23    Q.   And is there an exhibit that shows the aggregate recovery

24    analysis?

25    A.   The aggregate overall recovery is in Exhibit Four.

1    Q.   Okay.  And to be clear, these exhibits are not -- they're

2    interspersed in the text of your BIT report?

3    A.   That's correct.

4    Q.   Okay.  You were asked some questions about the legal

5    assumptions, and I think there were a couple of questions

6    about whether the assumptions, legal assumptions included

7    reference to or the text of a couple of constitutional

8    provisions.  Do you remember those questions?

9    A.   Yes.

10   Q.   And I think you -- my notes anyway say that you said, I

11   can't say for sure.  Do you recall giving an answer like that?

12   A.   Yes.

13   Q.   Again, if the Court wanted to know exactly which legal

14   assumptions were used in your analysis, is there somewhere in

15   Exhibit 130 that you could point the Court to?

16   A.   Yes.  There is a -- let me -- there's an appendix of

17   legal assumptions.  Let me -- it would be Appendix 5 of 130.

18   Q.   Okay.  I guess one final piece.  Do you -- I think you

19   should have your declaration in that binder.  It should be the

20   first, hopefully, exhibit.

21           MR. MERVIS:  And, Your Honor, I just want to make

22   sure that you have it, so we can look at it together.

23           THE COURT:  Right now I'm looking at the amended

24   declaration.  Do you want me to look at the --

25           MR. MERVIS:  Yes.

1          THE COURT:  Okay.  I have the --

2          MR. MERVIS:  Let me see.  That should work.  Let me

3  make sure I have the right one.  I believe that's right.

4          THE COURT:  I have 19054-8.  If you want me to pull

5  the other one up --

6          MR. MERVIS:  No.  That is exactly the right one, Your

7  Honor.  Thank you.

8  BY MR. MERVIS:

9  Q.   Mr. Shah, you were asked a bunch of questions about legal

10  and financial assumptions that McKinsey was given.  Do you

11  recall that?

12  A.   Yes.

13  Q.   And you were asked some questions about whether -- or

14  those assumptions were independently vetted or checked by

15  McKinsey.  Do you recall that?

16  A.   Yes.

17          I want to focus you on an assumption or at least a

18  component of your analysis that Mr. Hein didn't call out

19  specifically, which is at paragraph 12 of your declaration.

20          MR. MERVIS:  And, Your Honor, that is page 5.

21          THE COURT:  Yes.  I have it in front of me.

22          MR. MERVIS:  Thank you.

23  BY MR. MERVIS:

24  Q.   And, Mr. Shah, there's a sentence toward the bottom of

25  that page that says -- it begins with the words "absent a

1   mechanism to restructure the debtors' outstanding debt and

2   pension liabilities," and then it goes on.  Can you just read

3   that sentence to yourself over to page six, and let me know

4   when you're finished?

5   A.    Okay.

6   Q.    Was that an assumption that McKinsey was given, Mr. Shah,

7   or was that McKinsey's assumption or opinion?

8   A.    That was McKinsey's assumption.

9         MR. MERVIS:  I have no further questions, Your

10  Honor.

11        THE COURT:  Thank you.

12        Anything further, Mr. Hein?

13        MR. HEIN:  Yes, just very briefly.

14                      RECROSS-EXAMINATION

15  BY MR. HEIN:

16  Q.    Mr. Shah, you were directed to the various, and you

17  referred to the various exhibits interspersed in the best

18  interest test analysis.  I'm correct that all of those

19  exhibits are based on the assumptions in Appendix 5 that you

20  were given, correct?

21  A.    That's correct.

22  Q.    And all of those exhibits are based on the assumption

23  that one is paying all operating expenses and pension expense

24  before any GO or PBA debt service, correct?

25  A.    Well, with the exception of two scenarios that look at a

1  situation where there may be a Court-mandated cut.

2  Q.   All right.  And you're assuming like a five or ten

3  percent cut?

4  A.   Correct.  That's correct.

5  Q.   And that would be just a cut in pension, not a cut of

6  other operating expenses, correct?

7  A.   That is correct.

8  Q.   There is no exhibit in your best interest test report

9  that looks at the situation from the point of view of what are

10 the revenues and what is the prepetition contractual debt

11 service of the GO and PBA bonds, and looks at paying that

12 first; is that correct?

13 A.   Correct.  There is no scenario which you just outlined.

14         MR. HEIN:  Thank you.

15         THE COURT:  Anything further, Mr. Mervis?

16         MR. MERVIS:  No, Your Honor.

17         THE COURT:  Thank you, Mr. Shah.  Your testimony is

18 concluded, and you are excused.

19         (At 3:03 PM, witness excused.)

20         MR. MERVIS:  Your Honor, at this time, I believe

21 Mr. Shah was our last witness for the day, and I believe that

22 I will be ceding the podium to one of my partners in a

23 different room.  So if that's okay -- I hope my belief is

24 right, but if that's okay, perhaps that individual could turn

25 on his or her camera.

```
 1              MR. ROSEN:  Your Honor.

 2              THE COURT:  Hello, Mr. Rosen.

 3              MR. ROSEN:  Good afternoon, Your Honor.  Brian Rosen,

 4    Proskauer Rose, for the Oversight Board.

 5              Your Honor, unless there is anyone else with a hand

 6    up, which I don't see at this time, that does, in accordance

 7    with the terms of --

 8              THE COURT:  Mr. Friedman -- Mr. Friedman has just put

 9    his hand up.  Do you want me to hear from Mr. Friedman first?

10              MR. ROSEN:  That would be fine, Your Honor.

11              MR. FRIEDMAN:  Good afternoon.

12              THE COURT:  Good afternoon, Mr. Friedman.

13              MR. FRIEDMAN:  Good afternoon, Your Honor.  Peter

14    Friedman of O'Melveny & Myers on behalf of AAFAF.

15              I wanted to alert the Court to two things.  In our

16    withdrawal on -- filed over the weekend, we did note that

17    there are some issues outstanding from our perspective, and I

18    just wanted to give the Court an update as to where we are

19    right now.

20              First, I want to alert the Court to the fact that

21    we're working cooperatively with the Oversight Board to ensure

22    that the Plan and Confirmation Order don't inadvertently

23    reject executory contracts or leases that are necessary for or

24    beneficial to governmental operations.  And we're working with

25    the Board on additions to the Confirmation Order or Plan
```

1    Supplement to address this as soon as possible and prior to

2    the entry of any order confirming the Plan.

3              The second issue, Your Honor, that we are still

4    working through on our end with respect to the operational and

5    policy implications is a change to Section 1.119 of the Plan

6    that was announced last week in last week's filing.  We are in

7    substantial communication with the Board about trying to relay

8    our policy concerns, as well as our legal concerns.

9              Certainly there are -- putting aside any legal

10   objection to the Plan, the government has some policy concerns

11   about the way that's being handled.  I know that's technically

12   not your sphere.  It is something we are working with the

13   Board on.

14             We will meet and confer with the Board after the

15   close of hearing today about where we go substantively and, if

16   we do believe we need to file an objection, how to do that

17   most expeditiously, and in the fewest number of pages

18   possible.  It's possible we wouldn't a file an objection.  We

19   might just file an informative motion to let the Court know

20   what our policy issues are, and I'm sure the Board would want

21   to respond to that.  But I didn't think it was appropriate to

22   let the day conclude without giving the Court the update that

23   we said we would promise when we filed -- provide when we

24   filed our notice of withdrawal.

25             THE COURT:  I appreciate the update.  And so if there

1   is going to be such a filing, should I assume that I would see

2   it before we reconvene?

3          MR. FRIEDMAN:  We will work with the Board as to

4   whether, you know, Friday morning or perhaps, you know, I

5   know -- as to what time works.  I guess if the Court's

6   directive is it will be Friday morning, then it will be Friday

7   morning if that's what the Court is telling me.

8          THE COURT:  Well, the Court would appreciate that,

9   let me put it that way.

10         MR. FRIEDMAN:  Well, understood, Your Honor.

11         THE COURT:  Okay.  Thank you.  Is there anything

12  further that you can or wish to tell me now by way of update

13  or anything else?

14         MR. FRIEDMAN:  That's all from AAFAF's perspective,

15  Your Honor.

16         THE COURT:  Okay.  Thank you, Mr. Friedman.

17         MR. FRIEDMAN:  Thank you.

18         THE COURT:  Mr. Rosen.

19         MR. ROSEN:  Thank you very much, Your Honor.

20         Your Honor, in accordance with the informative motion

21  that we filed, that would conclude the witnesses that we have

22  scheduled for today.  I apologize that we're finished slightly

23  earlier than the calendar was, but we knew that there were

24  some issues that had to be taken care of with the Court with

25  respect to, first, the declarations and the admissibility of

1    things, and we did not know how long that would take, Your

2    Honor.

3              Likewise, we had the issue associated with the

4    admissibility of the exhibits, and we were unsure about how

5    long that would take as well.  So we did not want to promise

6    there would be other witnesses available, and have people

7    prepare for them if, in fact, they were never going to reach

8    the witness stand today, Your Honor.

9              So what we have for the balance of the Oversight

10   Board's case are six witnesses, Your Honor, and they are as

11   follows and in the following order.  They would be Mr. Andrew

12   Wolfe, Mr. Adam Chepenik, Mr. Juan Santambrogio, Ms. Marti

13   Murray --

14             THE COURT:  Would you --

15             MR. ROSEN:  -- Mr. David Brownstein, and Mr. Jay

16   Herriman.

17             THE COURT:  Would you speak just a little slower?

18   Because I'm actually taking notes.

19             MR. ROSEN:  I'm sorry, Your Honor.  I'll repeat them,

20   Your Honor, and what I'll do also at the same time is say how

21   much time Mr. Hein has requested for cross-examination of

22   those witnesses.

23             THE COURT:  Okay.  Very good.  So going back to

24   Mr. Wolfe.

25             MR. ROSEN:  I'm sorry.  The first witness is

1    Mr. Andrew Wolfe, and Mr. Hein has asked for 30 minutes.  The

2    second is Mr. Adam Chepenik, and Mr. Hein has asked for 15

3    minutes.  The third is Juan Santambrogio, and Mr. Hein has

4    asked for 20 minutes.

5              THE COURT:  Twenty-five you said, or 20?

6              MR. ROSEN:  Twenty, Your Honor.  Sorry.

7              THE COURT:  Twenty.  Thank you.

8              MR. ROSEN:  Twenty minutes.  The fourth is Ms. Marti

9    Murray, and Mr. Hein has asked for 45 minutes.  The fifth is

10   Mr. David Brownstein, and Mr. Hein has asked for 30 minutes.

11   The sixth is Mr. Jay Herriman, and Mr. Hein has not requested

12   any cross-examination.  So that would be, Your Honor, 140

13   minutes of total cross-examination time, or two hours and 20

14   minutes.

15         Your Honor, I would also note that the Retiree

16   Committee will also be presenting the report of Simon Johnson,

17   and as far as I know, Your Honor, there is no

18   cross-examination requested of Mr. Johnson.  So, Your Honor,

19   based upon the requested cross-examination times, the

20   Oversight Board is comfortable that all testimony can be

21   concluded on Friday based upon the limited amount available.

22         But as a matter of housekeeping, Your Honor, I would

23   like to point out that a while back, on October 27th, Mr. Hein

24   filed an informative motion, which can be found at ECF no.

25   18861, and on page 6 of that informative motion, Mr. Hein

1    noted that he would be unavailable on Friday after 11:00 AM.

2    And, Your Honor, we do not know whether this is 11:00 AM

3    Atlantic, 11:00 AM Eastern, or, based upon the Court's

4    calendaring of the Confirmation Hearing, whether Mr. Hein

5    remains unavailable, or he has worked out his schedule.  And

6    if so, Your Honor --

7         THE COURT:  Mr. Hein has his -- sorry.  Mr. Hein has

8    his hand up, so perhaps he can clarify things for us now.

9         Mr. Hein.

10        MR. HEIN:  Yes.  I've been able to resolve the issue,

11   so I can be available Friday.

12        THE COURT:  So you can be available on Friday?

13        MR. HEIN:  Yes.  Correct.

14        THE COURT:  Thank you.

15        MR. HEIN:  Thank you.

16        And thank you, Mr. Rosen, for having the courtesy to

17   raise that.

18        MR. ROSEN:  Thank you.

19        So with that, Your Honor, we believe that we will be

20   able to accomplish the entire portion of our presentation on

21   Friday.  We will have all witnesses available here with us in

22   New York.

23        THE COURT:  Thank you.

24        MR. ROSEN:  And if the Court permits, that's all I

25   have to say, unless the Court has any questions for me.

1      THE COURT:  Well, some of the objectors have

2  proffered exhibits.  There was a question about that during

3  openings.  I don't know that any objectors other than DRA and

4  Mr. Hein, with respect to the declarations that I've ruled on,

5  had offered any declarations, but do you have a sense at this

6  point of other evidentiary tenders that are outstanding?

7      MR. ROSEN:  Your Honor, the only issue that we had

8  with the submission of any of the exhibits was with respect to

9  the Elliott Declarations, which were annexed to Mr. Hein's

10  submissions, and we believe that the Court has already ruled

11  upon those.  As far as the other exhibits, we have no

12  objection, Your Honor.

13      THE COURT:  All right.  Well, perhaps between now and

14  Friday, do you think it's possible you can get a stipulation

15  that lists those exhibits together that I can then accept, and

16  accept exhibits --

17      MR. ROSEN:  We will do that, Your Honor.

18      THE COURT:  All right.  Mr. Natbony has his hand up.

19      MR. NATBONY:  Thank you, Your Honor.

20      I just wanted, since you raised the issue, to

21  indicate that the monolines had very limited exhibits.  We

22  originally had something like 53, which we reduced down to

23  five, and we would proffer those at the appropriate time when

24  you're dealing with other exhibits.

25      THE COURT:  Very good.  So maybe that can be

 1   incorporated into the stipulation that we spoke about, and

 2   otherwise, I'll hear your proffer of those exhibits.

 3          MR. NATBONY:  Thank you, Your Honor.

 4          MR. ROSEN:  Your Honor, if I may, I have one

 5   additional issue.

 6          THE COURT:  Yes.

 7          MR. ROSEN:  And it is again along the lines of

 8   housekeeping.  Pursuant to the Court's Order, we do have -- or

 9   parties do have until Friday afternoon with respect to the

10   filing of any objection with respect to the rulings that we

11   suggested, and the Oversight Board has the opportunity to then

12   file a response up to and including Monday, Your Honor.

13          I bring this up only for purposes of, again,

14   calendaring when you would like to move forward with closing

15   arguments, only because we are required to submit an

16   informative motion beforehand.  So it might be sometime over

17   the weekend, if that's what you would like.

18          So, Your Honor, if you have an idea at this point

19   what your schedule might be, it would be helpful to know.

20   Otherwise, we can hold off until Friday.

21          THE COURT:  Well, I don't have a precise proposal for

22   you.  I was going to be thinking about that tomorrow.  To the

23   extent there are objections on Law 53, I will want to hear

24   oral argument on the Law 53 issues, and there may also be

25   other legal issues on which I want to hear oral argument,

1    rather than simply having closings.

2         I need some time to reflect on that, and so that

3    would be at least one day in addition to oral arguments, or in

4    advance of oral arguments.  Then next week we have Monday,

5    Tuesday, Wednesday, and Thursday scheduled, since Friday is a

6    holiday here in Puerto Rico.  So I will -- and then we also

7    will have the PRIFA and CCDA Title VI hearings.

8         MR. ROSEN:  If I could, Your Honor, I could give you

9    an estimate as to how long I believe those will take, if it

10   will help.

11        THE COURT:  Yes, please.

12        MR. ROSEN:  Your Honor, I believe introductory

13   comments would be perhaps ten minutes, and the actual motions

14   for approval of those would probably equally be ten minutes,

15   but no more.  So for a total of 30 minutes for both of those,

16   Your Honor.  There are no objections.  There were two

17   reservation of rights that were submitted.  Both of those have

18   been resolved, Your Honor.  And it's merely taking recognition

19   of the pleadings and declarations that have already been

20   filed, similar to the way that the Court approached the GDB

21   Title VI proceedings.

22        THE COURT:  Well, that was in line with my

23   expectations, so thank you for confirming that.  So just

24   thinking out, my expectation is that I probably will not rule

25   on the record immediately after closings, given the complexity

1    of this confirmation motion; and so I would hear the 30

2    minutes of the presentation of the Title VI motions, and

3    reserve decision on both confirmation and Title VI.

4         I am being specific about that since your Title VI

5    motions said, only going forward if I grant confirmation, and

6    of course that would mean we'd have to come back for another

7    half hour.  So I think it's most efficient for me to take

8    everything under advisement.

9         MR. ROSEN:  That is exactly what we would want, Your

10   Honor, yes.

11        THE COURT:  Well, good.  So we'll need to wait until

12   Friday for me to let you know what I would also want in terms

13   of oral argument.  Do you recall when the reply to any

14   opposition to the Law 53 application is due?

15        MR. ROSEN:  I believe our replies are due at 5:00 on

16   Monday AST.

17        THE COURT:  So that means we won't have papers in

18   hand early in the day on Monday, so it is certainly

19   appropriate for you all to start thinking about the lengths of

20   your closings, and whether that will take more than a day.  If

21   you can give me at least a preliminary idea of that on Friday

22   when we reconvene, that will be helpful in terms of

23   determining whether we should have any session on Monday, and

24   when the arguments should take place, both the legal arguments

25   and the closing arguments.

1            MR. ROSEN:  We will, Your Honor.  Thank you.

2            THE COURT:  Thank you.  I appreciate it.

3            If there's anyone else who has anything to be

4    addressed this afternoon, please raise your hand.

5            I do not see any other hands raised, and so -- I'm

6    sorry.  Mr. Despins is on the screen.  There.  Now your hand

7    is on the screen.

8            MR. DESPINS:  I apologize, Your Honor.

9            THE COURT:  Thank you.

10            MR. DESPINS:  So very briefly, just a reminder that

11    we still have what I describe as plumbing issues that we will

12    try to resolve with the Board tomorrow, but I -- and I don't

13    want to be presumptuous, but to the extent Your Honor were

14    inclined eventually to confirm the Plan, I assume you would

15    have -- you would take us through the usual, where you give us

16    your comments to the Order.

17            And it's that -- in that context you would hear any

18    remaining disputes regarding language or provisions of the

19    Order or documents that are related -- relating to that Order,

20    or -- I just want to get some guidance.

21            THE COURT:  I think it would make sense to address

22    the specifics of the Order, to the extent those don't include

23    issues that are fundamental to the question as to whether to

24    confirm that won't have been addressed in the arguments to

25    take up the issues regarding the Order after the decision on

1    confirmation, if that's what you're asking.  Is that what

2    you're asking?

3        MR. DESPINS:  Yes.  It's just we want to make sure

4    that there will be a place for us to be heard regarding

5    language issues or terms of the Confirmation Order, to the

6    extent we have not been able to reach agreement with the

7    Oversight Board before then, which we hope we will.

8        THE COURT:  So the answer to that is yes.

9        MR. DESPINS:  Okay.

10       THE COURT:  We will define that appropriate place as

11   needed, but it will be after decision as to whether to

12   confirm.

13       There were also, Mr. Rosen, some parties who had

14   issues with the -- well, I guess these are Order type issues

15   as well, but, also, no issues with respect to the text of the

16   Plan regarding exculpation and third parties, and at the time

17   of opening, as of that time, they believed those had not been

18   resolved.  So where do things stand with those issues, and

19   will I need to hear people further on those issues?

20       MR. ROSEN:  There are two that I can report upon,

21   Your Honor.  First, Mr. Steel, on behalf of the Underwriters,

22   had raised certain concerns about the definition of

23   Underwriter actions, as well as a provision, 92.2(f) of the

24   Plan, and the corresponding Confirmation Order paragraph.

25       We have discussed those issues with National.  That

1  is the primary party with whom Mr. Steel had some issues.  We

2  do have some language that has been agreed upon with National,

3  and I will be working that out hopefully with Mr. Steel upon

4  conclusion of today or tomorrow.  And I believe that that will

5  be resolved.

6      Likewise, Your Honor, Mr. Sanchez, on behalf of

7  MAPFRE, which is one of the sureties, he had some concerns.  I

8  did speak with him, and I pointed to the language of the

9  Confirmation Order that I think if he had had an opportunity

10  to see it prior to his argument, that might have obviated the

11  need for him to make any comments on the record.

12      We did speak yesterday, though.  We are looking at

13  his Proofs of Claim that he filed, and I believe that we will

14  be able to resolve his concerns as well.

15      The balance, Your Honor, it's my understanding, are

16  mostly takings claims arguments, or Contracts Clause

17  arguments.  Those will be more legal in nature, and not really

18  something that will be susceptible to our ability to resolve

19  them, although I will reach out at least to one of those

20  claimants who made -- so I can point out where I think he's

21  already covered.

22      But the balance of those, Your Honor, I think will

23  remain probably towards confirmation, as far as I can tell;

24  but to the extent possible -- I will do my best, Your Honor.

25      THE COURT:  Thank you.

1          Counsel for Cantor-Katz has his hand up.

2          MR. MINTZ:  Yes, Your Honor.  Good afternoon.  Doug

3    Mintz from Schulte Roth on behalf of Cantor-Katz, one of the

4    DRA parties.

5          Following up on Mr. Despins' comments, I was

6    inquiring as to if and when there would be any revised

7    Confirmation Order and/or findings of fact.  If Mr. Rosen had

8    any further information on that that he could share with the

9    Court or off-line, that would be very helpful.

10         MR. ROSEN:  Your Honor, we --

11         THE COURT:  I was going to say, if you would share

12   with the Court, that would be helpful, too.

13         MR. ROSEN:  Your Honor, we continue to tinker with

14   the form of the Confirmation Order to try and address some of

15   these, like I indicated with respect to Mr. Steel, because

16   that will require changes to the Confirmation Order.  We are

17   happy, though, to share those with Mr. Mintz.  And I was

18   hoping, Your Honor, that actually we would file it again with

19   the Court with a blackline copy, so people could see it.

20         My guess is, Your Honor, if I can do what I need to

21   do probably tomorrow, we would file that probably upon the

22   close of the day on Friday.

23         THE COURT:  Thank you.

24         MR. ROSEN:  Your Honor, I would like to point out one

25   other thing that was brought to my attention.  I apologize.  I

1   said earlier that I thought our reply was due I think at 5:00

2   AST on Monday.  It is 11:59 PM that it is due AST on Monday,

3   so at the end of the day on Monday.  So 11 -- 10:59 PM New

4   York.

5           THE COURT:  So 11:00 PM on Monday, New York time?

6           MR. ROSEN:  Yes.  Yes, Your Honor.

7           THE COURT:  Thank you.

8           Mr. Kirpalani.

9           MR. KIRPALANI:  Thank you, Your Honor.  Susheel

10  Kirpalani from Quinn Emmanuel on behalf of the Lawful

11  Constitutional Debt Coalition.

12          I already mentioned at the opening statements that we

13  would reserve time and the right to contribute to the closing

14  arguments, specifically with respect to any findings or

15  proposed findings or conclusions of law in the Order that

16  respects the preemption issue.  The way it's currently drafted

17  is fine, but just to the extent it changes.

18          And then secondly, and perhaps more importantly to

19  the Court, on Act 53, we would keep our comments brief as we

20  always try to.

21          THE COURT:  Thank you.

22          Once I've identified the issues on which I would like

23  oral argument, I'm going to ask counsel to give me a lineup

24  and proposed time allocation.  So you can start working on

25  that with respect to Act 53 as soon as we know whether there's

1   opposition to Act 53.  In any event, since I don't have a

2   brief on Act 53, I would want some more fleshed out legal

3   presentation, even if the request appears to be, and is on the

4   record, unopposed.  So that is something that you should start

5   thinking about and working on.

6           MR. KIRPALANI:  Thank you, Your Honor.

7           THE COURT:  Thank you.

8           Mr. Rosen, anything further?

9           MR. ROSEN:  No, Your Honor.  I think that concludes

10  the day.

11          THE COURT:  All right.  Thank you all.  We will

12  reconvene on Friday morning at 9:30 Atlantic Standard, 8:30

13  Eastern Time.  Work well, and I will try to do so, too, and

14  stay well.  We'll see you Friday.

15          MR. ROSEN:  Thank you, Your Honor.

16          THE COURT:  We are adjourned.

17          MR. ROSEN:  Have a good day.

18          THE COURT:  Thank you.

19          (At 3:28 PM, proceedings adjourned.)

20                      *     *     *

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 162 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   November 10, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```