# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                 Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF FILING OF REVISED PROPOSED ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PLEASE TAKE NOTICE** that, on November 7, 2021, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth and ERS, the "Debtors"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations)

("PROMESA"),[2] filed the proposed *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Second Revised Proposed Order") [ECF No. 19118].

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit A** is the proposed *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Third Revised Proposed Order"), which reflects revisions in response to objections and informal comments from various parties.

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit B** is a redline comparison of the Third Revised Proposed Order against the Second Revised Proposed Order.

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.primeclerk.com/puertorico or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

*[Remainder of Page Left Intentionally Blank]*

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

Dated: November 12, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

**<u>Exhibit A</u>**

Third Revised Proposed Order

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## ORDER AND JUDGMENT CONFIRMING
## MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF
## ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | Confirmation of the Plan | 5 |
| 2. | Objections | 6 |
| 3. | Findings/Conclusions | 6 |
| 4. | Litigation Resolution | 10 |
| 5. | Plan Settlements Approved | 11 |
| 6. | Dismissal of Med Center Litigation | 12 |
| 7. | Dismissal of ERS Litigation | 13 |
| 8. | Dismissal of GO/Clawback Litigation | 14 |
| 9. | Dismissal of PRIFA BANs Litigation. | 14 |
| 10. | Dismissal of the PBA Litigation | 14 |
| 11. | Implementation of the Plan | 15 |
| 12. | Enforceability of New Debt Instruments | 16 |
| 13. | Authorization of New GO Bonds and CVIs and Injunction | 16 |
| 14. | Purchase and Sale of Certain ERS Assets | 16 |
| 15. | Monthly Deposits of Interest and Principal | 17 |
| 16. | Comprehensive Cap on All Net Tax-Supported Debt | 18 |
| 17. | Adoption and Maintenance of a Debt Management Policy | 19 |
| 18. | Creation of Avoidance Actions Trust | 19 |
| 19. | Avoidance Actions Trust Assets | 19 |
| 20. | Funding, Costs and Expenses of the Avoidance Actions Trust | 20 |
| 21. | Indemnification of Avoidance Actions Trustee and Board | 20 |
| 22. | Creation of Pension Reserve Trust | 21 |
| 23. | Funding of the Pension Reserve Trust | 21 |
| 24. | No Action | 22 |
| 25. | Government Action | 23 |
| 26. | Oversight Board Consent Pursuant to PROMESA Section 305 | 24 |
| 27. | Binding Effect | 24 |
| 28. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 25 |
| 29. | Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases. | 26 |

i

| | | |
|---|---|---|
| 30. | Insurance Policies | 28 |
| 31. | Rejection Damages Claims | 28 |
| 32. | Payment of Cure Amounts | 28 |
| 33. | Setoff | 29 |
| 34. | Delivery of Distributions | 29 |
| (f) | Delivery of Distributions with Respect to Clawback Recoveries | 36 |
| 35. | Disbursing Agent | 37 |
| 36. | Payment of Trustee Fees and Expenses | 37 |
| 37. | Securities Laws Exemption | 38 |
| 38. | Acceleration of Insured Bonds | 39 |
| 39. | Disputed Claims Reconciliation.  In accordance with the terms and provisions  of Section 82.1(b) of the Plan and the Committee Agreement: | 40 |
| 40. | Disputed Claims Holdback | 42 |
| 41. | National Action Claims | 42 |
| 42. | No Amendments to Proofs of Claim | 44 |
| 43. | Conditions to Effective Date | 45 |
| 44. | Administrative Claim Bar Date | 45 |
| 45. | Professional Compensation and Reimbursement Claims | 45 |
| 46. | GO/PBA Consummation Costs | 46 |
| 47. | AFSCME Professional Fees | 47 |
| 48. | GO/PBA PSA Restriction Fee | 47 |
| 49. | ERS Restriction Fee | 49 |
| 50. | CCDA Consummation Costs | 49 |
| 51. | CCDA Restriction Fee | 50 |
| 52. | HTA Bond Claims | 52 |
| 53. | System 2000 Obligations | 52 |
| 54. | HTA/CCDA Clawback Structuring Fees | 52 |
| 55. | Active JRS Participants and Active TRS Participants | 53 |
| 56. | Discharge and Release of Claims and Causes of Action | 55 |
| 57. | Releases by the Debtors and Reorganized Debtors | 61 |
| 58. | Release and Exculpation Provisions | 61 |
| 59. | **Injunction on Claims** | 62 |
| 60. | **Injunction Related to Releases** | 63 |

61.   Exculpation ................................................................................................64

62.   Maintenance of Pension System...............................................................69

63.   Appointments Related Litigation ..............................................................70

64.   **Bar Order** ..................................................................................................70

65.   **Supplemental Injunction** ........................................................................71

66.   Term of Existing Injunctions or Stays ......................................................72

67.   Prosecution of Claims................................................................................73

68.   Indemnification and Reimbursement Obligations .....................................73

69.   Compliance with Tax Requirements..........................................................73

70.   Documents and Instruments.......................................................................74

71.   Fiscal Plan .................................................................................................75

72.   Claims ........................................................................................................75

73.   GUC Reserve .............................................................................................75

74.   PROMESA 407 Claims ..............................................................................76

75.   Dairy Producer Claims ..............................................................................76

76.   Oversight Board Termination and Post-Confirmation Powers ...................76

77.   Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion............................................................................................77

78.   Government Post-Confirmation Powers and Duties ...................................77

79.   Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated .........77

80.   Non-Impairment of CVIs, SUT ..................................................................78

81.   Reversal/Stay/Modification/Vacatur of Order ...........................................78

82.   Retention of Jurisdiction ...........................................................................79

83.   Conflicts Among Documents ......................................................................79

84.   PBA Leases ................................................................................................80

85.   Modifications .............................................................................................80

86.   Asserted Surety Claims ..............................................................................80

87.   Provisions of Plan and Order Nonseverable and Mutually Dependent ...........81

88.   Governing Law ...........................................................................................81

89.   PFC Reservation ........................................................................................81

90.   Applicable Nonbankruptcy Law .................................................................81

91.   Waiver of Filings .......................................................................................82

92.   Notice of Order ..........................................................................................82

93.    No Waiver ................................................................................................................83

Exhibit A Plan ........................................................................................................... A-1

Exhibit B Form of Notice...........................................................................................B-1

Exhibit C Preempted Laws..........................................................................................C-1

The Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>"), and the Puerto Rico Public Buildings Authority ("<u>PBA</u>" and, collectively with the Commonwealth and ERS, the "<u>Debtors</u>"), by and through the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>"), as Title III representative of the Debtors under PROMESA Section 315(b), having proposed and filed with the United States District Court for the District of Puerto Rico (the "<u>Court</u>") the *Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated November 12, 2021 (Docket Entry No. 19184 in Case No. 17-3283)[1] (as amended, supplemented, or modified prior, at, or subsequent to the Confirmation Hearing as set forth in this Order through the date hereof, including the Plan Supplement, and as may be amended, supplemented, or modified pursuant to Section 313 of PROMESA, the "<u>Plan</u>" through the date hereof), including, without limitation, pursuant to that certain *Modifications to Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.,* dated November 12, 2021 (Docket Entry No. 19183) (collectively, the "<u>Modifications</u>");[2] and the Court having entered, pursuant to, *inter alia*, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "<u>Disclosure Statement Order</u>"), (i) approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, (iii) approving the forms of ballots, master ballots,

---

[1]  All docket entry references are to entries in Case No. 17-3283 unless otherwise indicated.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined herein), or the *Findings of Fact and Conclusions of Law Regarding Confirmation of Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "<u>Findings of Fact and Conclusions of Law</u>"), (Docket Entry No. _____), as applicable. A composite copy of the Plan is annexed hereto as <u>Exhibit A</u>.

and election notices used in connection therewith, and (iv) approving the form of notice of the Confirmation Hearing; and the Court having entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640); and the following documents having been filed by the Debtors or the PSA Creditors in support of or in connection with confirmation of the Plan:

(a) Plan Supplement (Docket Entry No. 18470);

(b) *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9) (the "Mailing Affidavit");

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4) (the "Publication & Radio Affidavit", and together with the Mailing Affidavit, the "Service Affidavits");

(d) Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment (Docket Entry No. 18874) (the "Omnibus Reply");

(e) *Memorandum of Law in Support of Debtors' Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18869) (the "Confirmation Brief"); and

(f) *Declaration of Natalie A. Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18729);

(g) *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico et al.* (Docket Entry No. 18726);

(h) *Declaration of David A. Skeel, Jr. in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18731);

(i) *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18734);

(j) *Declaration of Ojas Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18730);

(k) *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18738);

(l) *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18736);

(m) *Declaration of Adam Chepenik in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18735);

(n) *Declaration of Sheva Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18737);

(o) *Declaration of Jay Herriman in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18732);

(p) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 19056, 19144);

(q) *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725);

(r) *Declaration of Marti Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

(s) *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057);

(t) *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058);

(u) *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19059);

(v)   *Supplemental Declaration of Juan Santambrogia in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19060);  and

(w)  *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115)

and objections to confirmation of the Plan having been interposed by certain parties, as reflected on the docket of the Title III Cases and/or on the record of the Confirmation Hearing; and each of the objections having been resolved, overruled, or withdrawn at, prior to, or subsequent to the Confirmation Hearing;[3] and the Court having held the Confirmation Hearing commencing on November 8, 2021; and the appearances of all interested parties, including members of the public selected by the Court, having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, including, without limitation, motions, applications and orders in each of such cases, the foregoing documents, and the evidence admitted and arguments of counsel presented at the Confirmation Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

1.      <u>Confirmation of the Plan</u>. The Plan and each of its provisions shall be, and hereby are, CONFIRMED pursuant to Section 314(b) of PROMESA. The documents contained in the

---

[3]   All opposition submissions are also listed as part of the Court's Findings of Fact and Conclusions of Law.

Plan Supplement are authorized and approved. The terms of the Plan, as amended, supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation Hearing, as set forth in this Order as well as in the revised composite copy attached hereto as <u>Exhibit A</u>, include the Plan Supplement, as amended, supplemented, or modified on or prior to the date hereof, and are incorporated by reference into and are an integral part of this Order.

2.      <u>Objections</u>.  All objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are, OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn with prejudice.

3.      <u>Findings/Conclusions</u>.  The findings of fact and conclusions of law set forth in the Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in full.  Notwithstanding such incorporation, the following summarizes certain of the Court's determinations:

(A)     Pursuant to PROMESA, on May 3, 2017, May 21, 2017, and September 27, 2019, the Commonwealth, ERS, and PBA, respectively, each commenced a case before the Court in accordance with the requirements of Title III of PROMESA.  The commencement of these cases vested the Court with exclusive jurisdiction over the cases and all respective property of the Commonwealth, ERS, and PBA, wherever located.  As a result of the consensual agreement among the Debtors and their respective creditor representatives, the Debtors formulated, duly solicited, and now seek confirmation of a plan of adjustment in accordance with federal law.

(B)     This Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law.  Confirmation of the Plan constitutes a judicial determination, pursuant to Section 4 of PROMESA, that all laws, rules, and regulations giving rise to obligations of the Debtors discharged by the Plan and this Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations.  Pursuant to PROMESA Section 4, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, have been preempted.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that provide for

transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws shall not be enforceable for any purpose, as well as all laws enacted from and after the commencement of the Title III Cases to the extent inconsistent with the transactions contemplated by the Plan. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on Exhibit C hereto and (b) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit C hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal. To avoid the future re-creation of the debts and claims discharged herein, each of the preempted laws is preempted permanently.

(C)     The Court shall retain jurisdiction to enforce the terms hereof and of the Plan, the New GO Bonds, the GO CVIs, and the Clawback CVIs in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

(D)     At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVIs a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [___] DAY OF [_____], 2021.

(E)     The New GO Bond Legislation and the CVI Legislation are incorporated into Act No. 53-2021, which has been validly enacted by the Commonwealth and is valid and effective in accordance with its terms.

(F)     Pursuant to PROMESA, including Section 4 thereof, as well as sections 944[4] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation

---

[4] Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). *See generally In re City of Stockton, Cal.*, 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws,

Order and the Plan, the Court determines that the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law.

(G)     The New GO Bonds and the CVIs are bonds or notes within the meaning of Section 2 of Article VI of the Commonwealth Constitution to which the

---

including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (*citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.)*, 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; *Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.)*, 432 B.R. 262, 268-70 (E.D. Cal. 2010) (additional citations omitted)). As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier On Bankruptcy § 944.03[1][b] (16th ed. 2013). *See, e.g.*, Amended Order and Judgment Confirming Third Amended Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019, and *Amended Memorandum of Findings of Face and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation,* dated February 5, 2019, ¶174 ("Confirmation of the Plan constitutes a judicial determination and, pursuant to section 4 of PROMESA and sections 944, 1123, and 1125 of the Bankruptcy Code as incorporated by section 301 of PROMESA, the terms of these Findings of Fact and Conclusions of Law shall prevail over any general or specific provision of territory law, State law or regulation that is inconsistent therewith and be full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law"); Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . ."); Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit, dated November 12, 2014, ¶ 86 ("[I]n accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . . ."); Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama, dated November 6, 2013, ¶ 37, ("Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.").

Commonwealth may legally pledge its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest.

(H)    Pursuant to the New GO Bond Legislation and the CVI Legislation, the Commonwealth has validly pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest with respect to the New GO Bonds and payment with respect to the CVIs.

(I)    Subject to the occurrence of the Effective Date and as of the date of issuance of the New GO Bonds and CVIs, the Commonwealth is in compliance with any applicable debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Commonwealth Constitution.

(J)    Pursuant to the New GO Bonds Legislation and other applicable law, upon the issuance of the New GO Bonds, the New GO Bonds shall be secured by a first priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over the funds deposited in the Debt Service Fund, including any revenues generated therefrom, which statutory first lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person, and shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms.

(K)    The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights in the Plan and in the Confirmation Order).

(L)    The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, creates the valid pledge and the valid lien upon the right, title and interest of the Commonwealth in such funds in favor of the Trustee (for the benefit of the holders of the New GO Bonds) which it purports to create, subject only to the provisions of the New GO Bonds Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the New GO Bonds Indenture and each applicable supplemental indenture.

(M)    The Commonwealth has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) with

respect to monies on deposit in the Debt Service Fund as of the
commencement thereof.

(N)     In light of the enactment of the New GO Bond Legislation and the CVI
        Legislation, upon execution by all parties thereto, the New GO Bonds
        Indenture and the CVI Indenture shall (i) have been duly and lawfully
        authorized by the Commonwealth, and (ii) be in full force and effect and valid
        and binding upon the Commonwealth and enforceable in accordance with
        their terms, except that enforceability of rights and remedies may be limited
        by bankruptcy, insolvency, reorganization, moratorium or other laws affecting
        creditors' rights generally or as to the availability of any particular remedy.

(O)     For purposes of Section 209 of PROMESA, the discharge of debt to occur as
        of the Effective Date pursuant to the Plan and the Confirmation Order is
        necessary for the Oversight Board to certify that expenditures do not exceed
        revenues for the Commonwealth, as determined in accordance with modified
        accrual accounting standards.

(P)     The Court's *Opinion and Order Granting Defendants' Motion to Dismiss the
        Complaint*, Adv. Proc. No. 21-00068-LTS, Dkt. No 83 (October 29, 2021),
        including, without limitation, that the GDB HTA Loans are subject to
        subordination to the HTA 68 Bonds and the HTA 98 Bonds qualifies as the
        "GDB Loan Priority Determination" for purposes of the Plan.

4.     Litigation Resolution.  For the reasons stated herein and in the Findings of Fact and

Conclusions of Law, the provisions of the Plan constitute a good faith, reasonable, fair, and

equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan,

including, without limitation, the compromise and settlement of asserted and unasserted disputes

concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond

Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims,

CW/PRIFA Rum Tax Claims, and PRIFA BANs, and disputes (a) set forth in the Debt Related

Objections challenging, among other things, the validity, priority, secured status and related rights

of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond

Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond

Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions,

(c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW

Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, MBA and PRIFA, as applicable, and subject to "clawback" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation, (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation, each as incorporated into the Plan, and the entry of this Order constitutes, if required, approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code. Pursuant to this Order, and to the extent provided in the Plan, on the Effective Date, such compromises and settlements shall be binding upon the Debtors, all Creditors of the Debtors, and all other Entities and, to the fullest extent permitted by applicable law, shall not be subject to collateral attack or other challenge (other than appeals) in any other court or forum.

5.      Plan Settlements Approved. The Court hereby approves the compromises and settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan, authorizes and directs the consummation thereof.

6.    <u>Dismissal of Med Center Litigation</u>.   On the Effective Date, the Med Center Litigation,  except the Med DC Action, shall be deemed dismissed, with prejudice, and each of the Commonwealth  and the respective Med Centers shall take such action as is  necessary to notify  the applicable court of such dismissal, including,  without limitation,  within ten (10) Business Days of the Effective Date, filing  notices with the clerk of such court setting forth the resolution  of the Med Center Litigation  and the dismissal thereof (except the Med DC Action), with prejudice;  <u>provided</u>, <u>however</u>, that all appeals taken from the Med DC Action shall be dismissed, with prejudice, and each of the Commonwealth  and the Med Centers party to such appeals shall take such action as is necessary to notify such appellate courts of appeal of such dismissal, with prejudice; and, <u>provided</u>, <u>further</u>, that the Commonwealth  and the Med Centers shall file a notice with the clerk of the court in connection  with the Med DC Action that (a) all actions in connection  with the Med DC Action shall be stayed, and (b) in the event that, from and after July 1, 2022, the Commonwealth  defaults on its obligations  arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb),  such stay shall be lifted and the Med Centers may pursue relief and the Commonwealth  may present any and all defenses with respect to such alleged future defaults, with all existing  defaults as of the date hereof having  been waived by the Med Centers.  Without in any way limiting  the foregoing, from and after the earlier to occur of (y) July 1, 2022 and (z) the Effective Date (the "<u>Med Center Outside Date</u>"), and until  otherwise ordered or agreed upon,  the parties shall continue  to adhere to and comply  with the terms and provisions  of that certain Stipulation  Modifying  the Automatic Stay Between the Commonwealth  and Atlantic  Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar  Dr. Julio Palmierri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. De Serv Médicos,  Primarios y Prevención de Hatillo,  Inc., Costa Salud, Inc., Centro de Salud de Patillos,  Inc., and Hospital  General Caostañer, Inc., dated July 12, 2019 (the "<u>Med Center</u>

Stipulation"), including, without limitation, the making of quarterly payments to certain Med Centers in accordance therewith. Payments made by the Commonwealth, either directly or indirectly through contractors or subcontractors, to any Med Center prior to modification of the Med Center Stipulation or such other agreement between the applicable Med Centers and the Commonwealth shall not be subject to setoff or recoupment on account of any claims or causes of action arising during the period up to and including the Effective Date; provided, however, that, in the event that the Commonwealth or any Med Center determines that any payments made pursuant to the Med Center Stipulation from and after the Med Center Outside Date constitute an overpayment or an underpayment, as the case may be, based upon services provided by the Med Centers from and after the Med Center Outside Date, the Commonwealth or such Med Center shall submit such issue for a determination in connection with the Med DC Action, with all parties reserving all rights, defenses, and counterclaims with respect to such overpayments or underpayments, as the case may be, notwithstanding the imposition of any stay.

7.     Dismissal of ERS Litigation.  On the Effective Date, (a) the ERS Litigation and the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, the Creditors Committee, and the ERS Bondholders (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions, with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.

8.     <u>Dismissal of GO/Clawback Litigation</u>.   On the Effective Date, (a) to the extent extant, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Lift Stay Motions, the Clawback Actions, and the Section 926 Motion shall be dismissed and/or denied, with prejudice, (b) the Oversight Board, by itself or through its committees, the Creditors Committee, the Monolines and the PSA Creditors (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings in the Title III Court, the United States Court of Appeals for the First Circuit and the courts of the Commonwealth of Puerto Rico, as applicable, to effectuate the dismissal of the aforementioned litigations and motions, with prejudice.

9.     <u>Dismissal of PRIFA BANs Litigation</u>.   On the Effective Date, (a) the PRIFA BANs Litigation and the PRIFA BANs Takings Litigation shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the PRIFA BANs Litigation, with prejudice, and (ii) in the United States Court of Federal Claims to effectuate the dismissal and/or denial of the PRIFA BANs Takings Litigation, with prejudice.

10.     <u>Dismissal of the PBA Litigation</u>.   On the Effective Date, (a) the PBA Litigation shall be dismissed, with prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action necessary, including, without

14

limitation, filing such notices, stipulations or other pleadings in the Title III Court to effectuate such dismissal and/or denial of the PBA Litigation, with prejudice.

11.    <u>Implementation of the Plan</u>.  On and after the Effective Date, the Debtors, the Reorganized Debtors, and each of their respective authorized agents and representatives are authorized and directed to (a) execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, including, without limitation, those contained in the Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, (c) take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan, including, among other things, all such actions delineated in Article LXXXIX of the Plan, and (d) direct or instruct The Depository Trust Company, or such other person or entity necessary to implement or effectuate the terms of the (i) any custodial trust, escrow arrangement, or similar structure established pursuant to Section 75.5(b) of the Plan and facilitated by Ambac (an "<u>Ambac Trust</u>"), (ii) the FGIC Trust, (iii) the Syncora Trust, (iv) any custodial trust, escrow arrangement, or similar structure established pursuant to Section 75.1(b)(ii) of the Plan (an "<u>Assured Trust</u>"), and (v) the Avoidance Actions Trust (collectively, the "<u>Trusts</u>"), and (vi) the related Trust documentation.  Without in any way limiting the foregoing, on the Effective Date, the appropriate officers or representatives of the Debtors and Reorganized Debtors, as the case may be, and members of the boards of directors of the same, as applicable, are authorized, empowered, and directed to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the Plan, and make, or cause to be made, any and all distributions and transfers contemplated

pursuant to, and as provided for in, the Plan and the Plan Supplement, in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable.

12. <u>Enforceability of New Debt Instruments</u>. Pursuant to each of Bankruptcy Code section 944(b)(3), the New GO Bonds Legislation, the CVI Legislation, and all debt instruments to be issued pursuant to the Plan will constitute, upon distribution thereof, valid legal obligations of the Debtor or the Reorganized Debtor, as the case may be, that issues them, and any provision made to pay or secure payment of such obligation is valid.

13. <u>Authorization of New GO Bonds and CVIs and Injunction</u>. The debt authorization in Act 53-2021 is conditioned only on the Plan's cancellation of the Monthly Benefit Modification provided for in the proposed *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "<u>Seventh Amended Plan</u>"), and does not require satisfaction of any other conditions including cancellation of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of defined benefits under the Teachers Retirement System or the Judiciary Retirement System from and after the Effective Date. The Plan cancels and eliminates the Monthly Benefit Modification previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in Act 53-2021 for its debt authorization. The Commonwealth government shall not repeal such debt authorization prior to all such indebtedness issued pursuant to the Plan being satisfied in accordance with the terms thereof. For avoidance of debt, the Plan does not modify benefits comprised of the "Monthly Base Pension", "Christmas Bonus", "Summer Bonus", "Medicine Bonus", and "Medical Insurance Benefit", each as defined in the Seventh Amended Plan.

14. <u>Purchase and Sale of Certain ERS Assets</u>. On the Effective Date, (a) the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey to the

Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without limitation, such Assets subject to a valid and perfected lien or security interest (other than liens or claims discharged pursuant to the Plan and this Order) for an aggregate purchase price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and (b) in accordance with the terms and provisions of Section 69.2 of the Plan, (i) the Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option, pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

15.    <u>Monthly Deposits of Interest and Principal</u>.   Pursuant to the New GO Bonds Legislation and the New GO Bonds Indenture, from and after the Effective Date, until the New GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's then annual obligation with respect to the payment of principal (or accreted value) on the New GO Bonds. On the Effective Date, the Reorganized

Commonwealth shall deposit into the Debt Service Fund such additional amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

16.    <u>Comprehensive Cap on All Net Tax-Supported Debt</u>.  During the Debt Policy Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt of Article IV of the Debt Responsibility Act, which cap shall be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date. Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs to be issued pursuant to the Plan or other contingent value instruments that may be issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date.

The Secretary of Treasury's certification of compliance with the Debt limit pursuant to Section 74.4 of the Plan shall be conclusive and binding absent manifest error; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

17.     Adoption and Maintenance of a Debt Management Policy.  During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated.  The Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board (to the extent exercising authority in accordance with the provisions of PROMESA), at all times include the principles and limitations provided in Section 74.5 of the Plan.

18.     Creation of Avoidance Actions Trust.  Upon the execution of the Avoidance Actions Trust Agreement pursuant to Section 78.1 of the Plan, the Avoidance Actions Trust shall be established and validly created pursuant to the terms of the Avoidance Actions Trust Agreement, with no further authorization or legislative action being required, and the Avoidance Actions Trustee shall be selected in accordance with the terms and provisions of the Avoidance Actions Trust Agreement.  This Court shall retain jurisdiction to enforce the terms and provisions of the Avoidance Actions Trust Agreement.

19.     Avoidance Actions Trust Assets.  The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right,

19

authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions, including, without limitation, those set forth on Exhibits "A" and "B" of the Plan, as of the Effective Date. The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, including, without limitation, all counterclaims and defenses to any such Avoidance Actions Trust Assets, as provided in the Plan or the Avoidance Actions Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors, the Reorganized Debtors, and their predecessors, successors and assigns, and each other Entity released pursuant to Section 88.2 of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

20.  Funding, Costs and Expenses of the Avoidance Actions Trust. On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing. The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

21.  Indemnification of Avoidance Actions Trustee and Board. The Avoidance Actions Trustee, the Trust Advisory Board (as defined in the Avoidance Actions Trust Agreement), and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and

20

agents, and any of such Person's successors and assigns (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries (as defined in the Avoidance Actions Trust Agreement) for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except those acts arising from their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence. Any indemnification claim of an Indemnified Party pursuant to Section 7.5 of the Avoidance Actions Trust Agreement shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom. The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

22.  **Creation of Pension Reserve Trust**. Upon the execution of the Pension Reserve Deed of Trust pursuant to Section 83.1 of the Plan, the Pension Reserve Trust shall be established and validly created pursuant to the terms of the Pension Reserve Deed of Trust, with no further authorization or legislative action being required, and shall not be subject to taxation by the Commonwealth. This Court's retention of jurisdiction includes jurisdiction over actions to enforce the terms and provisions of the Pension Reserve Deed of Trust.

23.  **Funding of the Pension Reserve Trust**. On the Effective Date, the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars ($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve

Trust, of which One Million Dollars ($1,000,000.00) shall be deposited into the Pension Reserve

Board's general account, Two Million Five Hundred Thousand Dollars ($2,500,000.00) shall be

deposited into the Pension Benefits Council's administrative and operating account, and One

Million Five Hundred Thousand Dollars ($1,500,000.00) shall be deposited into the Pension

Reserve Board's administrative and operating account. From and after the FY in which the

Effective Date occurs up to and including the conclusion of the seventh (7th) FY following the FY

in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be

made, annual (but in no event later than October 1st following the conclusion of each FY)

contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b)

such additional amount calculated as the lower of the actual primary surplus for such FY and the

projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution for

such FY, plus (ii) the Commonwealth debt service obligation pursuant to the Fiscal Plan for such

FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in all

instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to

applicable laws, including, without limitation, Titles I and II of PROMESA, such additional

amounts as the Reorganized Commonwealth may deposit into the Pension Reserve Trust. The

Pension Reserve Trust shall be managed by an independent entity whose members shall meet the

independence, professionalism, experience and qualification standards set forth in the Pension

Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts

of interest laws and regulations.

24.    No Action. Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors are

directed to, and no further action of the directors or officers of the Debtors shall be required to

authorize the Debtors, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or

effectuate, as the case may be, the Plan, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including, without limitation, the Plan Supplement.

25.    <u>Government Action</u>.  From the Effective Date up to and including the satisfaction of the New GO Bonds and the CVIs in accordance with their respective terms, (a) pursuant to Bankruptcy Code section 1142(b), the Government of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to consummate the transactions contemplated by the Plan, (b) the Puerto Rico Department of Treasury and AAFAF, as applicable, are authorized and directed, notwithstanding any requirements of Puerto Rico law, to execute any and all agreements necessary for the implementation of the Plan and to make any payments required thereunder, and (c) pursuant to PROMESA Section 108(a)(2), no party, individual, official, or officer (elected or appointed), agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i) impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan, including, but not limited to, those contemplated pursuant to the New GO Bonds Indenture and the CVI Indenture, or (ii) creates any inconsistency in any manner, amount or event between the terms and provisions of the Plan or a Fiscal Plan certified by the Oversight Board, each of which actions has been determined by the Oversight Board to impair or defeat the purposes of PROMESA. To the maximum extent permitted by law, the Government of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, is directed to take any and all actions necessary to consummate the transactions contemplated by the Plan. Without in any way limiting the foregoing, on the earlier to occur of (y) the Effective Date and (z) within forty-five (45) days from and after the date hereof, the agencies and instrumentalities

set forth on Exhibit "D" hereto are directed to transfer the funds and the proceeds of liquid securities held on account and set forth on Exhibit "D" hereto to the Puerto Rico Treasury Single Account; provided, however, that Exhibit "D" hereto may be amended during the period up to and thirty (30) days from the date hereof upon the agreement of the Oversight Board and AAFAF and, to the extent amended, the Oversight Board shall file an informative motion with the Title III Court with respect thereto.

26.    <u>Oversight Board Consent Pursuant to PROMESA Section 305</u>.   Pursuant to PROMESA Section 305, with the consent of the Oversight Board and consistent with the Plan, using all their political and governmental powers, the Governor and Legislature are directed to take all acts necessary to carry out and satisfy all obligations and distributions set forth in the Plan, including, without limitation, enacting any enabling legislation required by, and solely to the extent set forth in, the Plan.

27.    <u>Binding Effect</u>.   This is a full, final, and complete Order intended to be conclusive and binding on all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in this Court and appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired

pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements set forth in the Plan and this Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

28. <u>Cancellation of Notes, Instruments, Certificates, and Other Documents</u>. Pursuant to Section 77.6 of the Plan, and except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 76.1 of the Plan), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtors without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained in the Plan or herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto,

(ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) to allow any trustee, fiscal agent, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan, and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow a Monoline to exercise the redemption or call rights assigned to such Monoline pursuant to the provisions of Article LXXV of the Plan, (vi) to allow the applicable trustee or fiscal agent, as the case may be, to appear in any proceeding in which such trustee or fiscal agent is or becomes a party with respect to clauses (i) through (iv) above, or (vii) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtors or Reorganized Debtors, as the case may be.

29.    <u>Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases</u>. Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Sections 76.5 and 76.7 of the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and

which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed

rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired

Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court

entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be

assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of

the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the

Comptroller of Puerto Rico pursuant to 2 L.P.R.A. §97 and regulations promulgated pursuant

thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court,

unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United

States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is

an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum

producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any

Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or

instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtors

reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory

Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease

thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be,

as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.

The Debtors shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed

or assumed and assigned through the operation of Section 76.1 of the Plan, by including a schedule

of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and

Unexpired Lease to be rejected through the operation of Section 76.1 of the Plan, by serving a

separate notice to the relevant counterparties to such agreements. To the extent there are any

27

amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.

30.     <u>Insurance Policies</u>.  Subject to the terms and provisions of Section 76.7 of the Plan, each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan; <u>provided</u>, <u>however</u>, that, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

31.     <u>Rejection Damages Claims</u>.   If the rejection of an Executory Contract and Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

32.     <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment with respect to each prepetition executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the

28

cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases and the Debtor otherwise agree.

33.     Setoffs.  Except as otherwise provided in the Plan or in this Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided, further, that nothing in this decretal paragraph or Section 77.11 of the Plan shall affect the releases and injunctions provided in Article XCII of the Plan or this Order.

34.     Delivery of Distributions.

(a)     Delivery of Distributions Generally.  Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Plan or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change

29

of address; provided, however, that, except as otherwise provided herein, distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the respective governing documents for such obligations; and, provided, further, that, except as otherwise provided herein, the Disbursing Agent may make distributions of PSA Restriction Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The trustee or fiscal agent for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents. Each trustee or fiscal agent may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to the delivery of distributions in accordance with the terms and provisions of the Plan, including the contra-CUSIP positions and escrow positions established by the Debtors or their agents with The Depository Trust Company, and each trustee or fiscal agent shall close and terminate the original CUSIPs after making distributions in accordance with the terms and provisions of the Plan and shall have no further distribution obligations thereunder. No Trustee or fiscal agent shall be required to post any bond or surety or other security for the performance of its duties, unless otherwise ordered or directed by the Title III Court. Subject to any agreements to the contrary, each trustee or fiscal agent shall only be required to make the distributions and deliveries described in this decretal paragraph and the Plan and in accordance with the terms of this Order, the Plan and such other governing document, and shall have no liability for actions reasonably taken in accordance with the terms of this Order, the Plan and such other governing document, or in reasonable reliance upon information provided to such trustee or fiscal agent by the Debtors or their agents in accordance with the terms of this Order, the Plan or in connection

with distributions to be made hereunder or thereunder, except for liabilities resulting from the gross negligence or willful misconduct of such trustee or fiscal agent. The New GO Bonds and the CVIs shall be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

(b)  Delivery of Distributions with Respect to Assured Insured Bonds. Notwithstanding any other provision of the Plan or of this Order, (i) to the extent an Assured Insured Bondholder holding the Assured Insured Bond with CUSIP number 74514LD46 validly elects (or is deemed to elect) Assured Bondholder Election 2, the Disbursing Agent will deposit the Assured New Securities and Cash allocable to such Assured Insured Bondholder in the applicable Assured Trust in accordance with the applicable trust agreement; (ii) to the extent an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LGL5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745145XZ0, the custody receipt with CUSIP number 745235UX7 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235YJ4 or 745235UX7 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235YZ8 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SC6, or the custody receipt with CUSIP number 745235YV7 or 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SC6 validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts into the applicable Assured

Trust; the trustee (the "Assured Trustee") of the Assured Trusts (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies as provided in the applicable trust agreement, without any further action on the part of the existing custodian, provided, however, that the existing custodian is also hereby authorized and ordered to take any further actions that may be necessary to confirm the collapse of the existing custodial arrangement as provided herein; and the Disbursing Agent will transfer the Assured New Securities and Cash allocable to such Assured Insured Bondholder to the Assured Trustee for deposit in the applicable Assured Trust on account of such custody receipts and Assured Insured Bonds in accordance with the applicable trust agreement; (iii) to the extent an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LWE3 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745145R53 or holding the custody receipt with CUSIP number 74514LUW5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 74514LNG8 validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts into the applicable Assured Trust; the Assured Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies as provided in the applicable trust agreement, without any further action on the part of the existing custodian, provided, however, that the existing custodian is also hereby authorized and ordered to take any further actions that may be necessary to confirm the collapse of the existing custodial arrangement

as provided herein, and, without prejudice to the ability of the Assured Trustee to draw on the applicable Assured Insurance Policy, the Assured Trustee shall be deemed to have deposited such Assured Insured Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to Section 75.4(a) of the Plan; and the trustee for the Assured Trust related to such Assured Insured Bonds shall be deemed to have received its Pro Rata Share of the FGIC Plan Consideration, and shall receive the FGIC Certificates allocable to such Assured Insured Bondholder on account of the custody receipts referred to in this subsection (iii) above and Assured Insured Bonds (which also qualify as FGIC Insured Bonds) referred to in this subsection (iii) above for deposit in the relevant Assured Trust in accordance with the applicable trust agreement, (iv) pursuant to Section 75.1(a) of the Plan, Assured is hereby deemed to have exercised the Assured Acceleration Price Payment Option with respect to all Assured Insured Bonds with respect to which Assured has exercised the Assured Election, and the Disbursing Agent shall disburse the Assured New Securities and Cash on account of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election or with respect to which an Assured Insured Bondholder has validly elected Assured Bondholder Election 1 to Assured in a manner mutually agreed upon between the Disbursing Agent and Assured; and (v) on or prior to the Effective Date, the Disbursing Agent and the Debtors shall disclose to Assured the Acceleration Price to be paid with respect to any Assured Insured Bonds with respect to which Assured has exercised the Assured Election or with respect to which an Assured Insured Bondholder has validly elected Assured Bondholder Election 1, and on the Effective Date (1) with respect to such Assured Insured Bonds insured in the primary market, the paying agent for the GO Bonds or the fiscal agent for the PBA Bonds, as applicable, shall draw down on the applicable Assured Insurance Policies to pay the

applicable Assured Acceleration Price to the beneficial holders of such Assured Insured Bonds insured in the primary market in accordance with Sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable, and (2) with respect to such Assured Insured Bonds insured in the secondary market, Assured shall, or shall cause the applicable custodian of custody receipts evidencing the beneficial ownership interest of the holders thereof in such Assured Insured Bonds and the related Assured Insurance Policies to draw on the applicable Assured Insurance Policies in order to pay the applicable Assured Acceleration Price to the beneficial holders of such Assured Insured Bonds insured in the secondary market in accordance with Sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable; provided, however, that, for the avoidance of doubt, Assured shall not in any circumstance be required to pay itself an Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise.

(c)     Delivery of Distributions with Respect to National Insured Bonds. Notwithstanding any other provision of the Plan or of this Order, on the Effective Date, National shall receive, and the Disbursing Agent shall disburse to National in a manner mutually agreed upon by the Disbursing Agent and National, the National Plan Consideration that would otherwise be allocable to holders of Allowed National Insured Bond Claims that elected to receive the National Non-Commutation Treatment by electing such treatment in accordance with the Election Notice for National Bond Holders with Claims in Classes 3 and 25 (Docket Entry No. 17639-30) or the Election Notice for National Bond Holders with Claims in Class18 (Docket Entry No. 17639-31); provided, however, that, for the avoidance of doubt, National shall not in any circumstance be required to pay itself the National Acceleration Price with respect to any National Insured Bonds owned by National, by subrogation or otherwise.

(d)     Delivery of Distributions to FGIC. Notwithstanding any other provision

34

of the Plan or of this Order, on the Effective Date, the Disbursing Agent shall distribute to FGIC

FGIC's share of the Vintage CW Bond Recovery, the Vintage CW Guarantee Bond Recovery,

and the Vintage PBA Bond Recovery in accordance with the terms and provisions of Section

75.4(b) of the Plan in a manner mutually agreed upon between the Disbursing Agent and FGIC.

        (e)      Delivery of Distributions with Respect to Ambac Insured Bonds.

Notwithstanding any other provision of the Plan or of this Order, (i) to the extent a holder of any

Ambac Insured Bonds with CUSIP numbers 745235D32, 745235D40, or 745235B75 validly

elects to receive the Ambac Non-Commutation Treatment, the Disbursing Agent shall, on the

Effective Date or as soon as reasonably practicable thereafter, distribute to Ambac the Ambac

Plan Consideration payable to such holder on account of its Allowed Claims in Classes 4 and 26;

(ii) to the extent a holder of any Ambac Insured Bonds with CUSIP numbers 745235D32,

745235D40, or 745235B75 validly elects to receive the Ambac Commutation Treatment or

otherwise fails to validly elect to receive the Ambac Non-Commutation Treatment (including

submitting an election for less than all of its Claims in Classes 4 or 26), on the Effective Date or

as soon as reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac

Commutation Consideration payable on account of its Allowed Claims in Class 4 and/or 26 under

the Plan to the applicable indenture trustee, which shall in turn distribute such consideration to

the applicable bondholders, except that Ambac may direct the applicable indenture trustee to

reduce the distribution to any holder to account for any payments that Ambac has made, or for

any other consideration that Ambac has made available or will make available, to such holder

(collectively, the "Prior Payments"), and the applicable indenture trustee shall then pay the

portion of the Ambac Commutation Consideration equal to the applicable Prior Payment to

Ambac; (iii) to the extent a holder of any Ambac Insured Bonds with CUSIP number 745145AX0

validly elects to receive the Ambac Non-Commutation Treatment, on the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall distribute to Ambac the Ambac Plan Consideration payable to such holder on account of its Allowed Claims in Class 19; (iv) to the extent a holder of any Ambac Insured Bonds with CUSIP number 745145AX0 fails to validly elect to receive the Ambac Non-Commutation Treatment (including by submitting an election for less than all of its Claims), on the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Commutation Consideration payable on account of its Allowed Claims in Class 19 under the Plan to the applicable indenture trustee, which shall in turn distribute such consideration to the applicable bondholders, except that Ambac may direct the applicable indenture trustee to reduce the distribution to any holder to account for any Prior Payments that Ambac has made, or for any other consideration that Ambac has made available or will make available, to such holder and the applicable indenture trustee shall then pay the portion of the Ambac Commutation Consideration equal to the applicable Prior Payment to Ambac; and (v) with respect to Ambac Insured Bonds with CUSIP numbers 745145GB2, 745145A3, 745145YY2, 745235KT7, 745235TH4, 745235TJ0, 745235TK7, 745235TL5, which are fully matured, on the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Plan Consideration distributable on account of Allowed Claims in Classes 4, 19, or 26 to Ambac.

(f)   Delivery of Distributions with Respect to Clawback Recoveries. Notwithstanding any other provision of the Plan or of this Order, (i) on the Effective Date, or, in the event the HTA Distribution Conditions have not been satisfied as of the Effective Date, upon satisfaction of the HTA Distribution Conditions, the Disbursing Agent shall distribute to each applicable Monoline its share of the CW/HTA Clawback Recovery in accordance with the terms

and provisions of Section 63.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; (ii) on the Effective Date, the Disbursing Agent shall distribute to each applicable Monoline its share of the CW/Convention Center Clawback Recovery in accordance with the terms and provisions of Section 64.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; and (iii) on the Effective Date, or, in the event the PRIFA Distribution Conditions have not been satisfied as of the Effective Date, upon satisfaction of the PRIFA Distribution Conditions, the Disbursing Agent shall distribute to each applicable Monoline its share of the CW/PRIFA Rum Tax Recovery in accordance with the terms and provision of Section 65.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline and (iv) on the later to occur of (A) the Effective Date and (B) satisfaction of the HTA Distribution Conditions, the Disbursing Agent shall distribute to National National's share of the CW/HTA Clawback Recovery in accordance with the terms and provisions of Section 63.2 of the Plan in a manner mutually agreed upon by the Disbursing Agent and National. Upon satisfaction of the HTA Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to Allowed CWHTA Claims set forth in Exhibit "J" to the Plan.

35.     <u>Disbursing Agent</u>.  Pursuant to Section 1.203 of the Plan, the Disbursing Agent shall be, as applicable, such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions in accordance with the provisions of the Plan and this Order.

36.     <u>Payment of Trustee Fees and Expenses</u>.  The distributions to be made pursuant to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses

allegedly due and owing by the Commonwealth, ERS and PBA with respect to amounts discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights of each Trustee/Fiscal Agent to payment of such amounts (a) from the distributions to be made hereunder, including, without limitation, the imposition of any valid Charging Lien, or (b) pursuant to a contractual fee agreement entered into by the Debtors, or on their behalf, during the period from and after the Commonwealth Petition Date, including, without limitation, that certain Settlement Agreement and Invoice Instructions (the "Settlement Agreement"), dated as of December 21, 2018, by and between, among others, AAFAF, U.S. Bank Trust National Association, and U.S. Bank National Association (collectively, the "USB Entities"); provided, however, that (a) with respect to PBA, the Effective Date, and (b) with respect to PRIFA, the later of (i) the Effective Date and (ii) effectiveness of the PRIFA Qualified Modification pursuant to Title VI of PROMESA, in the event that, following application of fees and expenses in accordance with the terms and provisions of the Settlement Agreement, the USB Entities retain any monies deposited by PBA or PRIFA, as the case may be, pursuant to the terms thereof, the USB Entities shall remit such excess funds to PBA or PRIFA, as the case may be, or such other Entity as may be designated by PBA or PRIFA, as the case may be, within five (5) Business Days of such event by wire transfer of immediately available funds.

37.     Securities Laws Exemption.   Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New GO Bonds, the CVIs, and interests in the ERS Trust pursuant to the terms of the Plan and this Order (and any subsequent offering of such securities, including, without limitation, pursuant to a case under Title VI of PROMESA), or the custodial trusts created in accordance with Articles LXIII, LXIV, LXV, and LXXV of the Plan shall be exempt from registration under the Securities Act

and any state or local law requiring registration for the offer, issuance or distribution of securities,

including, but not limited to, the registration requirements of Section 5 of the Securities Act and

any other applicable state or federal law requiring registration and/or prospectus delivery or

qualification prior to the offering, issuance, distribution, or sale of securities, and, pursuant to

Section 2(b) of the Investment Company Act of 1940, as amended (the "Investment Company

Act"), such custodial trusts, securities and interests shall be exempt from the provisions of the

Investment Company Act.

       38.    Acceleration of Insured Bonds. Notwithstanding any other provision of the Plan or

this Order:

    (a)    Assured Insured Bonds: To the extent there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

    (b)    National Insured Bonds: To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

    (c)    Syncora Insured Bonds: To the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

    (d)    FGIC Insured Bonds: Notwithstanding the terms and conditions of the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be

accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(e)    <u>Ambac Insured Bonds</u>:  To the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date. Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (Sections 75.5(b)(i)-(iv) of the Plan) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds. For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

39.    <u>Disputed Claims Reconciliation</u>.   In accordance with the terms and provisions of Section 82.1(b) of the Plan and the Committee Agreement:

(a)    The two (2) Creditors Committee appointees to the Avoidance Actions Trust Board (collectively, the "<u>Creditor Appointees</u>") shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, Eminent Domain Claims, an ERS General Unsecured Claims, and Convenience Claims, regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five

Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. To facilitate the exercise of the settlement review process, the Oversight Board or AAFAF, as the case may be, shall inform the Creditor Appointees, in writing, five (5) days prior to making or accepting a settlement proposal for the resolution of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim where the proposed allowed amount exceeds Five Hundred Thousand Dollars ($500,000.00).

(b)     With respect to the obligations and responsibilities set forth in this decretal paragraph 39, the Creditor Appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), inclusive of reimbursement of their reasonable out-of-pocket expenses incurred in furtherance of discharging such obligations and responsibilities, which amounts shall be funded from the GUC Reserve. All such compensation and reimbursements shall be paid by the Entity selected pursuant to Section 1.285 of the Plan to hold the GUC Reserve within thirty (30) days of such Entity's receipt of a request for such payment. To the extent the Oversight Board or, in the event the Oversight Board terminates, AAFAF, disputes the validity or amount of any reimbursement request, it shall inform such Entity and, in the event the parties are unable to resolve such dispute, the Title III Court shall retain jurisdiction to resolve any such dispute.

(c)     Without limiting the foregoing, (i) within sixty (60) days after the Effective Date, the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide the Creditor Appointees with a report (the "Initial Claims Report") containing (1) a register setting forth all CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims that have not been reconciled and which are being evaluated for possible objection, (2) the status of any pending objections to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, and (3) information illustrating which Claims are subject to the ACR Procedures and are to be excluded from CW General Unsecured Claims pursuant to Section 82.7 of the Plan, and (ii) within ten (10) days of the end of each month (the "Monthly Claims Report"), the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide a report containing material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Oversight Board or AAFAF, as the case may be, through its advisors, shall, upon reasonable request, periodically supply the Creditor Appointees with any other information the Creditor Appointees may reasonably request related to the claims reconciliation process.

(d)    In connection with the foregoing, the Creditor Appointees, together with their counsel and advisors in such capacity, shall not be liable to any Person for actions taken or omitted in connection with the exercise of their rights hereunder except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement from the GUC Reserve for fees and expenses in defending any and all actions or inaction in their capacity as Creditor Appointees, except for any actions or inactions involving willful misconduct or gross negligence. The foregoing indemnity in respect of any Creditor Appointee shall survive and termination of such Creditor Appointee from the capacity for which they are indemnified.

40.    <u>Disputed Claims Holdback</u>. From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors or the Disbursing Agent, as applicable, shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims have been estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized Debtors; <u>provided</u>, <u>however</u>, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above. To the extent the Disbursing Agent or any of the Reorganized Debtors, as the case may be, retains any New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or CVIs are distributed, the Disbursing Agent or such Reorganized Debtors, as the case may be, shall exercise voting or consent rights with respect to such obligations.

41.    <u>National Action Claims</u>. Notwithstanding anything contained herein, in the GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary,

National may continue to litigate to final judgment or settlement all claims and causes of action asserted in the National Action;  provided,  however, that, in the event that notwithstanding the application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the defendants and, to the extent named, third-party defendants in the National Action assert against the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth (collectively, the "CW Entities") claims or counterclaims for indemnification, contribution, reimbursement, set-off or similar theories of recovery based on, arising from or related to the National Action (collectively, the "CW Entities' Claims"), (i) the CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including, without limitation, invoking the Bar Date Orders and discharge provisions set forth in Article XCII of the Plan and this Order, objecting to any proof of claim, and prosecuting available appeals, based upon, arising from or related to the National Action, (B) to allow National, at its option, to participate in or undertake such defense to such action in its sole discretion, and (C) not to settle any CW Entities' Claims without National's written consent, which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and hold the CW Entities harmless to the extent of the CW Entities' liability for the payment of monies or the delivery of property, pursuant to a Final Order or settlement as a result of the National Action, and (B) reimburse the relevant CW Entities for all documented fees and expenses incurred in connection with the defense against such CW Entities' Claims, including, without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A) and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement exceed any recovery realized by National in connection with the National Action; provided, however, that National shall have no obligation pursuant to this Order, the Plan or otherwise to indemnify and hold the CW Entities harmless for any claims based upon, arising from

or related to the Underwriter Actions that are not based upon, arising from or related to the National Action or in which National is not involved.  For the avoidance of doubt, CW Entities' Claims shall not constitute CW General Unsecured Claims.

42.    No Amendments to Proofs of Claim/Objections to Claims.    As of the commencement of the Confirmation Hearing, a proof of Claim may not be amended without the approval of the Title III Court.  With the exception of proofs of Claim timely filed hereafter in respect of executory contracts and unexpired leases rejected pursuant to this Order, any proof of Claim filed on or after the commencement of the Confirmation Hearing is hereby barred, and the Clerk of the Court and the Debtors' Claims Agent are authorized to remove such proofs of Claims from the claims registry in the Title III Cases. Notwithstanding the provisions of Section 82.1 of the Plan, in the event that (a) a Claim that has been transferred pursuant to the terms and provisions of either the ACR Order or the ADR Order is subsequently transferred back to the claims registry for determination by the Title III Court, the period in which the Reorganized Debtors, by and through the Oversight Board, or AAFAF, as the case may be, shall be extended up to and including one hundred eighty (180) days from and after the date of such notice transferring any such Claim back to the claims registry, and (b) within thirty (30) days of the date hereof, in accordance with Section 204 of PROMESA, the Government of the Commonwealth of Puerto Rico shall deliver, or cause applicable agencies, instrumentalities or Commonwealth of Puerto Rico public corporations to deliver, to the Oversight Board a copy of all files, documents, instruments and, to the extent applicable, pleadings requested by the Oversight Board in connection with the reconciliation of Claims, including, without limitation, Disputed Cliams.

43.     <u>Conditions to Effective Date</u>. The Plan shall not become effective unless and until the conditions set forth in Section 86.1 of the Plan have been satisfied or waived in accordance with the provisions set forth in Section 86.2 of the Plan.

44.     <u>Administrative Claim Bar Date</u>. The last day to file proof of Administrative Expense Claims shall be ninety (90) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto; <u>provided</u>, <u>however</u>, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, or (e) is the subject of a pending motion seeking allowance of an administrative expense pursuant to Bankruptcy Code section 503(b) as of the entry of this Order; and, <u>provided</u>, <u>further</u>, that any such proof of Administrative Expense Claim by a governmental unit shall remain subject to the rights and interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in interest to interpose an objection or other defense to the allowance or payment thereof.

45.     <u>Professional Compensation and Reimbursement Claims</u>. All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including, without

limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the Title III Court, (a) no later than the tenth (10th) calendar day (or the first Business Day to occur thereafter) after the later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order, or (b) upon such other terms no more favorable to the claimant as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein or the Plan, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date. The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred from and after the Effective Date in the ordinary course and without the need for Title III Court approval.

46.     GO/PBA Consummation Costs. Notwithstanding anything contained in the Plan or this Order to the contrary, to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, and in consideration of (a) the negotiation, execution and delivery of the GO/PBA Plan Support Agreement by each Initial GO/PBA PSA Creditor and (b) the obligations and covenants contained in the GO/PBA Plan Support Agreement, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora and

National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (EST) on February 22, 2021.

47.    <u>AFSCME Professional Fees</u>. Notwithstanding anything contained in the Plan or this Order to the contrary, on the Effective Date, AFSCME shall be reimbursed its reasonable professional fees and expenses incurred to compensate AFSCME for the cost of negotiation, confirmation and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions.

48.    <u>GO/PBA PSA Restriction Fee</u>. Notwithstanding anything contained in the Plan or this Order to the contrary, in exchange for (a) executing and delivering the GO/PBA Plan Support Agreement or (b) if applicable, tendering and exchanging GO Bonds or PBA Bonds in accordance with the terms and conditions of the GO/PBA Plan Support Agreement and notices posted on EMMA, and agreeing to all of its terms and conditions, including support of the Plan and the "lock-up" of GO Bonds and PBA Bonds in accordance with the terms of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors (including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-insured GO Bond or PBA Bond insured by Ambac, Assured, FGIC, Syncora or National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC, Syncora and National, to the extent Ambac, Assured, FGIC, Syncora or National, as the case may be, is authorized to vote such Claims in accordance with Section 301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, the GO/PBA PSA

Restriction Fee, in the form of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (without duplication and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac, Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims, CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) for which it would have been entitled to receive the GO/PBA PSA Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, the GO/PBA PSA Restriction Fee on account thereof; and, provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated pursuant to the terms of Sections 7.1(b)(iii) (subject to the extension provided for in Section 7.1(b) thereof), (c)(i) or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan Support Agreement for any reason other than a breach of the GO/PBA Plan Support Agreement by a non-Government Party, the aggregate GO/PBA PSA Restriction Fee and Consummation Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in Cash, as an allowed administrative expense claim under a plan of adjustment for the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and, provided, further, that, in all other

48

circumstances, upon termination of the GO/PBA Plan Support Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

49.     ERS Restriction Fee. Notwithstanding anything contained in the Plan or this Order to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

50.     CCDA Consummation Costs. Notwithstanding anything contained in the Plan or this Order to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent

(1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

51. CCDA Restriction Fee. Notwithstanding anything contained in the Plan or this Order to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, or FGIC, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, and FGIC, to the extent Ambac, Assured, or FGIC, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; provided, however, that each CCDA Restriction Fee Creditor who

acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided, further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Section

7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

52.    <u>HTA Bond Claims</u>.    In consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims.

53.    <u>System 2000 Obligations</u>.    Pursuant to the terms and provisions of Section 55.10 of the Plan, the Commonwealth shall satisfy all obligations associated with Allowed System 2000 Participant Claims in the timeframes set forth therein.

54.    <u>HTA/CCDA Clawback Structuring Fees</u>.    In consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days following such date, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine

Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred

Thousand Dollars ($19,300,000.00), respectively.

55.     <u>Active JRS Participants and Active TRS Participants</u>.  In connection with the

treatment of Active JRS Participant Claims and Active TRS Participant Claims pursuant to

Sections 55.8 and 55.9 of the Plan:

(a)     <u>Act 106 Defined Contribution Accounts</u>.  Notwithstanding any provision of Act

106 to the contrary (including, without limitation, Sections 1.4, 1.6, 2.1, 2.6, and 3.1 thereof), on

or prior to the Effective Date, the Commonwealth shall establish defined contribution accounts

(the "<u>Defined Contribution Accounts</u>") pursuant to Chapter 3 of Act 106 for all holders of such

Active JRS Participant Claims and Active TRS Participant Claims who do not have such accounts

as the Effective Date and who, prior to the Effective Date, were making contributions to JRS in

accordance with the provisions of Act No. 12 of October 19, 1954, as amended, known as the

"Judiciary Retirement Act", or to TRS in accordance with the provisions of Act No. 91-2004, as

amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement System Act", as

applicable.  Without in any way limiting the foregoing, in connection with the modification of the

Commonwealth's obligations under any laws establishing or enabling TRS or JRS, the

Commonwealth shall enroll teachers, judges, and all other employees that would have otherwise

been enrolled in TRS, hired from and after the Effective Date in the Act 106 Defined Contribution

Plan and establish Defined Contribution Accounts for such individuals.

(b)     <u>Eligibility for and Enrollment in Federal Social Security</u>.  From and after the

Effective Date, and notwithstanding any provision of Act 106 to the contrary (including, without

limitation, Section 3.4 thereof), every (i) Active JRS Participant, (ii) teacher who is an Active TRS

Participant, and (iii) teacher and judge hired from and after the Effective Date shall mandatorily

make contributions to his or her Defined Contribution Account at a minimum rate of two and three-tenths percent (2.3%) of his or her monthly compensation, up to the limit established in section 1081.01(d) (7) of Act 1-2011; provided, however, that each teacher and judge who is forty-five (45) years of age or older as of the Effective Date shall contribute to his or her Defined Contribution Account at a minimum rate of eight and one-half percent (8.5%) of his or her monthly compensation, up to the limited established in section 1081.01(d) (7) of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico", or any successor law thereof, and, therefore, fail to be eligible to contribute to the Federal Social Security system, unless any such teacher or judge shall have irrevocably elected within sixty (60) days of the Effective Date to reduce their contributions to a minimum of two and three-tenths percent (2.3%) and be enrolled in the Federal Social Security system. For teachers who are Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date who contribute two and three-tenths percent (2.3%) of their monthly compensation as set forth above, including those aged 45 and older who have elected to do so, the Employer, in coordination with the Retirement Board and/or Secretary of Treasury, shall withhold the minimum amount of six and two-tenths percent (6.2%) of their applicable monthly compensation and remit such amount to the appropriate authority as required by the applicable provisions of the Federal Social Security Act and other applicable Federal law to enable the inclusion of the Participant in the Federal Social Security System. Teachers who are Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date may voluntarily contribute to their Defined Contribution Accounts additional amounts to those established as allowed under section 1081.01 of Act No. 1-2011, provided, however, that in no case may those increased contribution rates and additional amounts exceed the applicable limits to be eligible, and affect the eligibility of these

Participants, for coverage under the Federal Social Security system, unless such Participants are aged 45 and older and do not participate in the Federal Social Security System. In accordance with the foregoing, the Government of the Commonwealth of Puerto Rico, including, without limitation any Entity or Person acting for or on behalf thereof, shall implement all reasonably necessary or advisable policies, procedures, or mechanisms to provide for all payroll deduction or transmittal required by federal law to ensure eligibility for and enrollment of Participants in the Federal Social Security System and effectuating the Federal Insurance Contributions Act remittances.

56.    <u>Discharge and Release of Claims and Causes of Action</u>.

(a)    Except as expressly provided in the Plan or herein, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of each of the Claims or Causes of Action; <u>provided</u>, <u>however</u>, that, without prejudice to the exculpation rights set forth in Section 92.7 of the Plan and decretal paragraph 60 hereof, nothing contained in the Plan or this Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and each of their respective Related Persons by any Creditors of the Debtors. Upon the Effective Date and independent of the distributions provided for under the Plan, the Debtors and Reorganized Debtors shall be discharged and released from any and all Claims, Causes of Action

55

and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained in the Plan or herein shall release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

(b)      Except as expressly provided in the Plan or herein, all Entities shall be precluded from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their respective employees, officials, Assets, property, rights, remedies, Claims or Causes of Action of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets and property, including any and all interest accrued on such Claims, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of each of the Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or herein, this Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or

against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability.   As of the Effective Date, and in consideration for the distributions or other value provided pursuant to the Plan, each holder of a Claim in any Class under the Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property, all such Claims.

(c)     Notwithstanding any other provisions of decretal paragraph 56 of this Order or Section 92.2 of the Plan, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by decretal paragraph 56 of this Order and Section 92.2 of the Plan.

(d)     SEC Limitation.  Notwithstanding anything contained herein or in the Plan to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e)     <u>United States Limitation</u>.   Notwithstanding  anything contained herein or in the Plan

to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents,

or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be, from

compliance  with federal laws or territorial laws and requirements implementing  a federally

authorized  or federally delegated program protecting  the health, safety, and environment  of

persons in such territory, (ii) expand the scope of any discharge, release, or injunction  to which

the Debtors or the Reorganized Debtors are entitled  under Title III, and (iii) discharge, release,

enjoin,  or otherwise bar (A) any liability  of the Debtors or the Reorganized Debtors to the United

States arising  from and after the Effective Date, (B) any liability  to the United States that is not a

Claim, (C) any affirmative  defense or any right of setoff or recoupment of the United States, the

Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and recoupment

of such parties are expressly preserved, (D) the continued  validity  of the obligations  of the United

States, the Debtors or the Reorganized Debtors, as the case may be, under any United States grant

or cooperative  assistance  agreement, (E) the Debtors' or the Reorganized Debtors' obligations

arising under federal police  or regulatory  laws, including,  but not limited  to, laws relating  to the

environment,  public  health or safety, or territorial laws implementing  such federal legal provisions,

including,  but not limited  to, compliance  obligations,  requirements  under consent decrees or

judicial  orders, and obligations  to pay associated administrative,  civil,  or other penalties,  and (F)

any liability  to the United States on the part of any non-debtor.  Without  limiting  the foregoing,

nothing  contained herein or in the Plan shall be deemed (i) to determine the tax liability  of any

Entity,  including,  but not limited  to, the Debtors and the Reorganized Debtors and any obligation

of the Debtors to pay postpetition  interest on any such tax liability,  (ii) to be binding  on the IRS

with regard to the federal tax liabilities,  tax status, or tax filing  and withholding  obligations  of any

58

entity, including, but not limited to, the Debtors and the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any relief to any Entity that the Court is prohibited from granting by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f)      Underwriter Actions.  Notwithstanding anything contained herein or in the Plan to the contrary, including, without limitation, Sections 92.2, 92.3 and 92.11 of the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Defensive Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third party defendant by any of the CW Entities in connection with an Underwriter Action; and, provided, further, that, no party in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that

59

otherwise is barred or discharged pursuant to the Bar Date Orders, the Plan, and/or Confirmation Order; and/or (ii) against any of the CW Entities any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, for indemnification, contribution, reimbursement, set-off or similar theories to the extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be deemed disallowed, barred, released and discharged in accordance with the terms and provisions of the Plan and the Confirmation Order; and provided, further, that, for the avoidance of doubt, nothing in this decretal paragraph 56(f) is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or limiting the amount of any liability or judgment in any Underwriter Action.   The parties in the Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting against any of the CW Entities any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, indemnification, contribution, reimbursement, set-off or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery, based upon, arising from or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum, or in any other manner.

(g)      Quest Litigation.   Notwithstanding anything contained herein or in the Plan to the contrary, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the right of the Quest Diagnostics of Puerto Rico, Inc. ("Quest") (1) from asserting its respective rights, claims, causes of action and defenses

in the avoidance action brought against it, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment, or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment (the "Quest Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Quest Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property by any of the Debtors to Quest in connection with the merits of its avoidance action, or to file a claim pursuant to section 502(h) of the Bankruptcy Code as set forth in the following sentence, and (2) to file and receive payment on any Claim it has pursuant to section 502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3); provided, however, that any such Claims would constitute a CW General Unsecured Claim and be treated in accordance with the terms and provisions of Article LXII of the Plan.

57.   <u>Releases by the Debtors and Reorganized Debtors</u>.  Except as otherwise expressly provided in the Plan or this Order, on the Effective Date, and for good and valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims.

58.   <u>Release and Exculpation Provisions</u>.  Except as otherwise provided in this Order, all release and exculpation provisions, including, but not limited to, those contained in Article

XCII of the Plan, are approved and shall be effective and binding on all Entities, to the extent provided therein.

59.     **Injunction on Claims**.  **Except as otherwise expressly provided in Section 92.11 of the Plan, this Order or such other Final Order of the Title III Court that is applicable, all Entities who have held, hold or in the future hold Claims or any other debt or liability that is discharged or released pursuant to Section 92.2 of the Plan or who have held, hold, or in the future hold Claims or any other debt or liability discharged or released pursuant to Section 92.2 of the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability discharged pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim**

or other debt or liability discharged pursuant to the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

60.  **Injunction Related to Releases**.  As of the Effective Date, all Entities that hold, have held, or in the future hold a Released Claim released pursuant to Section 92.5 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims:   (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum;  (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under decretal paragraph 57 of this Order and Section 92.5 of the Plan; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or this Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of this Order: the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order* (Docket Entry No. 15854), as amended; and the *Fourth Amended Stipulation and Consent Order Between*

*Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations* (**Docket Entry No. 17394**), **as amended.**

61.     Exculpation.

(a)     Government Parties: The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this subparagraph (a) or Section 92.7 of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct. Nothing in this subparagraph (a) or Section 92.7(a) of the Plan shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

(b)     PSA Creditors: Each of the PSA Creditors solely in its capacity as a party to the GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, and/or the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the Petition Date up to

64

and including the Effective Date and each of their respective Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this subparagraph (b) and Section 92.7(b) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)     Retiree Committee: Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree

Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided, however, that, the foregoing provisions of this subparagraph (c) and Section 92.7(c) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)     Creditors' Committee:  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the Petition Date up to and including the Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided, however, that, the foregoing provisions of this subparagraph (d) and Section 92.7(d) of the Plan shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)      AFSCME: Each of AFSCME solely in its capacity as a party to the AFSCME Plan

Support Agreement and a Creditor, as applicable, from the Petition Date up to and including the

Effective Date and each of their respective Related Persons shall not have or incur through the

Effective Date any liability to any Entity for any act taken or omitted to be taken in connection

with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation

or approval of the Plan or any compromises or settlements contained therein, the Disclosure

Statement, the AFSCME Plan Support Agreement, or any contract, instrument, release or other

agreement or document provided for or contemplated in connection with the consummation of the

transaction set forth in the Plan and the AFSCME Plan Support Agreement; provided, however,

that, the foregoing provisions of this subparagraph (e) and Section 92.7(e) of the Plan shall not

affect the liability of any Entity that otherwise would result from any such act or omission to the

extent that such act or omission is determined in a Final Order to have constituted intentional fraud

or willful misconduct.

(f)      Monoline Insurers: Ambac, Assured, FGIC, National, Syncora, and their Related

Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken

consistent with the Plan or in connection with the formulation, preparation, dissemination,

implementation, acceptance, confirmation or approval of the Plan, including, without limitation,

in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims,

FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the

voting procedures, the election procedures, and any release of obligations under the applicable

Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National

Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding

anything contained in this Order or the Plan to the contrary, the terms and provisions of the Plan

and this Order shall not, and shall not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Commutation Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as applicable); provided, however, that the foregoing provisions of this subparagraph (f) and Section 92.7(f) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined, pursuant to a Final Order, to have constituted intentional fraud or willful misconduct.

(g)     The DRA Parties:     Each of the GDB Debt Recovery Authority ("DRA"), AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for Wilmington Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and including the Effective Date and each of the DRA Parties Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Stipulation in Connection with DRA Related Disputes, dated as of November 5,

2021, by and among the Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral Monitor (Docket Entry No. 19100, Ex. A), or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, the foregoing provisions of this subparagraph (g) of the Plan shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

62.    Maintenance of Pension System.    Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accurals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans that ended up creating nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both

prudent and required; and, <u>provided</u>, <u>however</u>, that, prior to the termination of the Oversight Board,
the Oversight Board shall not reduce any defined benefit pension payment or obligation to current
or future retirees from the benefits provided by the Plan.

63.     Appointments Related Litigation/Uniformity Litigation.   Notwithstanding anything
contained herein or the Plan to the contrary, in the event that a Final Order is entered in connection
with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of this
Order, in consideration of the distributions made, to be made, or deemed to be made in accordance
with the terms and provisions of the Plan and documents and instruments related hereto, and all
Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or
as a result of the Plan or this Order having consented and agreed, such Final Order shall not in any
way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan and
this Order, including, without limitation, the compromise and settlement of the Commonwealth-
COFINA Dispute and the releases, exculpations and injunctions provided pursuant to Article XCII
of the Plan and herein; provided, however, that, to the extent that a plaintiff in the Appointments
Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA Plan Support
Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement, or the
ERS Stipulation, within five (5) Business Days of the Effective Date, such plaintiff shall take any
and all actions to dismiss, with prejudice, or, in the event other plaintiffs are party to such
litigations, withdraw from, with prejudice, such Appointments Related Litigation or Uniformity
Litigation, as the case may be, including, without limitation, filing notices with the clerk of the
court having jurisdiction thereof.

64.     **Bar Order**.  **To the limited extent provided in the Plan, each and every Entity
is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or**

70

litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the GO/PBA Plan Support Agreement, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

65.     **Supplemental Injunction**.   Notwithstanding anything contained herein or in the Plan to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, or may control by enacting legislation, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title

71

III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action including enacting legislation against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims for themselves or other entities, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)     Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the Plan or this Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;

(e)     Enacting or adopting any statute, law, rule, resolution, or policy to cause, directly or indirectly, any Released Party to have liability for any Released Claims; and

(f)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Order; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

66.     Term of Existing Injunctions or Stays. Unless otherwise provided in the Plan or this Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation

Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full

force and effect through the Effective Date, except that each injunction imposed by a Court order

shall remain in effect permanently unless the order specifies a termination date or event, in which

case, the specification set forth in such order shall govern. All injunctions or stays contained in

the Plan or this Order shall remain in full force and effect in accordance with their terms.

   67. <u>Prosecution of Claims</u>. Except as settled and released herein, from and after the

Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a)

litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance

Actions, upon approval of the Bankruptcy Court. The net proceeds of any such litigation or

settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be

transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the

Avoidance Actions Trust Agreement.

   68. <u>Indemnification and Reimbursement Obligations</u>. For purposes of the Plan, (i) to

the extent executory in nature, the obligations of the Debtors, including, without limitation,

directors and officers insurance policies, to indemnify and reimburse its directors or officers that

were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS

Petition Date, or the PBA Petition Date, as applicable, shall be deemed assumed as of the Effective

Date and (ii) indemnification obligations of the Debtors arising from conduct of officers and

directors during the period from and after the Commonwealth Petition Date, the ERS Petition Date,

or the PBA Petition Date, as applicable, shall be Administrative Expense Claims.

   69. <u>Compliance with Tax Requirements</u>. Any party issuing any instrument or making

any distribution under the Plan shall comply with all applicable withholding and reporting

requirements imposed by any United States federal, state or local tax law or Tax Authority, and all

73

distributions under the Plan shall be subject to any such withholding or reporting requirements; provided, however, that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions. Except as provided above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent or the trustee of the applicable Trust may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

70.   Documents and Instruments. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments

necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

71.   <u>Fiscal Plan</u>. For so long as the Oversight Board is in existence, the Oversight Board shall cause the Fiscal Plan in effect on the Effective Date, and any post-Effective Date Fiscal Plan certified by the Oversight Board to include provisions requiring the certified budget to provide for the payment in each FY of (a) principal and interest payable on the New GO Bonds, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

72.   <u>Claims Against the Commonwealth Based on Debt Issued by HTA, CCDA, PRIFA and MBA</u>. The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.

73.   <u>GUC Reserve</u>. On and after the Effective Date, the Debtors' and Reorganized Debtors' liability to holders of Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims shall be limited to funding the GUC Reserve in accordance with Section 62.3 of the Plan as follows: subject to the reductions provided therein, (a) Two Hundred Million Dollars ($200,000,000.00) on the later of December 31, 2021 and the Effective Date; (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2022; (c) One Hundred Million Dollars ($100,000,000,00) on or prior to December 31, 2023; (d) One Hundred Million Dollars

($100,000,000.00) on or prior to December 31, 2024; and (e) Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025. Upon the GUC Reserve being funded by the Commonwealth in accordance with Section 62.3 of the Plan, the Debtors and Reorganized Debtors shall have no further liability on account of such Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims.

74.     PROMESA 407 Claims. All Claims reserved by holders of bonds issued by HTA, CCDA, PRIFA, or MBA under that certain *Findings of Fact, Conclusions of Law, and Order Approving the Qualifying Modification for the Government Development Bank for Puerto Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act*, including, without limitation, any claim under PROMESA Section 407, shall be automatically released on the Effective Date with no further notice or action.

75.     Dairy Producer Claims. Notwithstanding anything contained in the Plan or this Order to the contrary, (a) nothing contained herein shall adjust, enlarge, compromise discharge or otherwise affect the respective parties' rights or obligations pursuant to the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory approval accrual set forth decretal paragraph 14 of the Dairy Producer Settlement shall be treated and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy Produce Claim from any other source, and (c) the Plan shall not affect the regulatory accrual charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer Settlement.

76.     Oversight Board Termination and Post-Confirmation Powers. Neither the Plan nor this Order shall change the duration of the Oversight Board's existence set forth in PROMESA Section 209, and neither the Plan nor this Order shall alter any of the Oversight Board's powers

and duties under each title of PROMESA. Until termination of the Oversight Board pursuant to PROMESA Section 209, the Oversight Board may enforce the Plan. At all times, each party in interest may enforce Plan provisions directly affecting the party in interest.

77.   Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion. Nothing in the Plan and nothing in this Order (a) alters the powers of the Oversight Board granted by Titles I and II of PROMESA, including its rights in its sole discretion, to amend the certified Fiscal Plan and budget in effect on the Effective Date and to develop and certify new fiscal plans and budgets at any times, (b) grants the government of Puerto Rico any entitlement to any provisions in certified fiscal plans and budgets, and (c) grants the government of Puerto Rico any rights and powers barred by PROMESA section 108(a).

78.   Government Post-Confirmation Powers and Duties. Upon termination of the Oversight Board pursuant to PROMESA Section 209, the Governor shall enforce the Plan. If the Governor fails to enforce a Plan provision directly or indirectly impacting a party in interest after being requested to do so by a party in interest, each party in interest that would reasonably be prejudiced or injured by lack of enforcement may enforce the Plan provision. At no time prior or subsequent to the termination of the Oversight Board shall the Governor or Legislature enact, implement, or enforce any statute, resolution, policy, or rule reasonably likely, directly or indirectly, to impair the carrying out of the Plan's payment provisions, covenants, and other obligations. Pursuant to Bankruptcy Code section 1142(b), the Governor shall cause the executive branch of the Commonwealth government to take all acts necessary for the consummation of the Plan.

79.   Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated. The Government of Puerto Rico, including without limitation, any Entity or Person acting for or

on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal, change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt issued pursuant to the Plan.

80.     <u>Non-Impairment of CVIs, SUT.</u>  Until all obligations with respect to the CVIs have been paid or otherwise satisfied in accordance with their terms, the Commonwealth, or any Entity or Person acting for or on behalf thereof, shall take no action that would: (a) limit or alter the rights vested in the Commonwealth in accordance with the Plan and this Order to fulfill the terms of any agreements with the holders of CVIs; (b) impair the rights and remedies of the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the payment of the CVIs in accordance with the terms and provisions of the Plan and as set forth in the CVI Indenture; <u>provided</u>, <u>however</u>, that the foregoing shall not preclude the Commonwealth from exercising its power, through a valid change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture.

81.     <u>Reversal/Stay/Modification/Vacatur of Order</u>.  Except as otherwise provided in this Order or a subsequent order issued by this Court or a higher court having jurisdiction over an appeal of this Order or over a *certiorari* proceeding in respect of this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors or the Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.   Notwithstanding any such reversal, stay,

modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respect by the provisions of this Order and the Plan. To the extent not specifically reversed, modified, vacated, or stayed by an order of this Court or an appellate court, all existing orders entered in the Title III Cases remain in full force and effect.

82.     Retention of Jurisdiction.  Notwithstanding the entry of this Order or the occurrence of the Effective Date, subject to the terms and provisions of Article XCI of the Plan, and except as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in Article XCI of the Plan.

83.     Conflicts Among Documents.  The provisions of the Plan and this Order shall be construed in a manner consistent with each other so as to effect the purpose of each; provided, however, that, in the event of any inconsistency between (a) the Plan or this Order and (b) the New GO Bond Legislation, the CVI Legislation, or any other legislation implementing the Plan or otherwise in any manner, the terms and provisions of the Plan or this Order, as applicable, shall prevail; and, provided, further, that, in the event of any irreconcilable inconsistency between the Plan and this Order, the documents shall control in the following order of priority: (i) this Order, and (ii) the Plan; and, provided, further, that, in the event of any inconsistency between this Order and any other order in the Commonwealth Title III Case, the ERS Title III Case, the PBA Title III

79

Case:17-03283-LTS   Doc#:19188   Filed:11/12/21   Entered:11/12/21 20:53:18   Desc: Main
Document       Page 89 of 207

Case, the terms and provisions of this Order shall control; and, provided, further, that nothing contained herein is intended, nor shall be construed, to modify the economic terms of the Plan.

84.    PBA Leases.  On or prior to the Effective Date, the Commonwealth and PBA shall enter into a master lease agreement, for a term of one (1) year, unless otherwise reduced or extended by the parties thereto, in writing, providing for the lease of properties subject to the leases being rejected by the Commonwealth and PBA pursuant to the Plan and this Order, and on terms directly related to the market value of such properties and the costs and expenses associated with the maintenance thereof.

85.    Modifications.  The modifications to the Seventh Amended Plan, as set forth in the Plan, including, without limitation, the Modifications, do not adversely change the treatment of the Claim of any Creditor that accepted the Seventh Amended Plan and all such Creditors shall be deemed to have accepted the Plan.  Before substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after entry of this Order, subject to any limitations set forth in the Plan (including consent rights) and any stipulation approved by this Court in connection with the Plan; provided, however, that the circumstances warrant such modification and the Court, after notice and a hearing, confirms such modified plan under the applicable legal requirements. For the avoidance of doubt, the Plan shall not be modified except in accordance with Bankruptcy Code section 942 and the terms of this Order.

86.    Asserted Surety Claims.  Notwithstanding anything contained in the Plan to the contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a secured claim and allowed in whole or in part, by Final Order, such Claim shall be paid in full, in Cash; provided, however, that, in the event some or all of any such Claim is determined to be an

unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in accordance with the provisions of Section 17.1, 62.1 or 70.1 of the Plan, as the case may be.

87.    Provisions of Plan and Order Nonseverable and Mutually Dependent.    The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

88.    Governing Law. Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

89.    PFC Reservation.    Neither the Plan nor this Order determine, affect or limit any claims or rights U.S. Bank Trust National Association and U.S. Bank National Association, as Trustee for bonds issued by PFC, may have against GDB, DRA or the GDB/PET, including, without limitation, claims and rights in respect of letters of credit.

90.    Applicable Nonbankruptcy Law. Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the Title III Cases pursuant to PROMESA Section 301(a), the provisions of this Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law. The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Order and the Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including, without limitation, the New GO Bonds, the New GO Bonds Indenture,

81

the GO CVIs, the GO CVI Indenture, the Clawback CVIs, the Clawback CVI Indenture, and the Avoidance Actions Trust Agreement, provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code, and, as of the occurrence of the Effective Date, shall constitute legal, valid, and binding obligations of the Debtors, as applicable, and valid provisions to pay and to secure payment of the New GO Bonds, the GO CVIs, and the Clawback CVIs, as applicable, pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in accordance with their terms.

91.   <u>Waiver of Filings</u>.  Any requirement pursuant to Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee is hereby waived as to any such list, schedule, or statement not filed as of the Effective Date.

92.   <u>Notice of Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order and the occurrence of the Effective Date, substantially in the form attached as <u>Exhibit B</u> hereto, to all parties who hold a Claim in the Commonwealth Title III Case, the ERS Title III Case, the HTA Title III Case, and the PBA Title III Case, as well as the Creditors' Committee, the Retiree Committee, the U.S. Trustee, any party filing a notice pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal Revenue Service, and the United States Attorney for the District of Puerto Rico.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Order.

93.    <u>No Waiver</u>.  The failure to specifically include any particular provision of the Plan in this Order shall not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

Dated: _____
       San Juan, Puerto Rico

                                               _____

                                               Laura Taylor Swain
                                               United States District Court Judge

# Exhibit A

**Plan**

**<u>Exhibit B</u>**

**Form of Notice**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**NOTICE OF (A) ENTRY OF ORDER CONFIRMING
MODIFIED EIGHTH AMENDED TITLE III PLAN OF ADJUSTMENT OF
THE COMMONWEALTH OF PUERTO RICO, ET AL. PURSUANT TO
TITLE III OF PROMESA AND (B) OCCURRENCE OF THE EFFECTIVE DATE**

**TO CREDITORS AND OTHER PARTIES IN INTEREST:**

        PLEASE TAKE NOTICE that, pursuant to an order, dated _____ [ECF No.
_____] (the "Confirmation Order"), the *Modified Eighth Amended Title III Plan of Adjustment of
the Commonwealth of Puerto Rico, et al.* (as amended, supplemented, or modified, the "Plan") was
confirmed by the United States District Court for the District of Puerto Rico (the "Court"). Unless
otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to
them in the Plan and the Confirmation Order.

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number
    and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are
    the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four
    Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA")
    (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii)
    Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-
    3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of
    the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-
    3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power
    Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal
    Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No.
    19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed
    as Bankruptcy Case numbers due to software limitations).

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Plan occurred on _____ and the Plan was substantially consummated.

PLEASE TAKE FURTHER NOTICE that any party in interest wishing to obtain copies of the Confirmation Order, the Plan, and related documents should contact Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com, or may view such documents by accessing either https://cases.primeclerk.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/. Please note that a Public Access to Court Electronic Records ("PACER") (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 45 of the Confirmation Order, the deadline for filing proofs of or requests for payment of Administrative Expense Claims ("Administrative Expense Requests") is [_____], 2022; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, or (c) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable; and, provided, further, that any such proof of Administrative Expense Claim by a governmental unit shall remain subject to the rights and interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in interest to interpose an objection or other defense to the allowance or payment thereof.

PLEASE TAKE FURTHER NOTICE that, all Administrative Expense Requests should be sent to the following:

[_____]

Administrative Expense Requests will be deemed timely filed only if **actually received** by Prime Clerk by **5:00 p.m. (prevailing Atlantic Time)** on [____], 2022 (the "Administrative Deadline"). The Administrative Expense Requests may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**PLEASE TAKE FURTHER NOTICE that, if you are required to file an Administrative Expense Request pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 45 of the Confirmation Order and fail to do so by the Administrative Deadline, you will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim (and from filing an Administrative Expense Request with respect to such Administrative Expense Claim) against the Debtors and their property, and the Debtors and Reorganized Debtors will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim.**

2

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 76.6 of the Plan and decretal paragraph 32 of the Confirmation Order, if the rejection of an Executory Contract and Unexpired Lease by the Debtors results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors, unless a proof of Claim is filed with the Court on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order is full, final, and complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements set forth in the Plan and this Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

Dated: _____          /s/_____
          San Juan, Puerto Rico

                                  Martin J. Bienenstock (*pro hac vice*)
                                  Brian S. Rosen (*pro hac vice*)
                                  **PROSKAUER ROSE LLP**
                                  Eleven Times Square
                                  New York, NY 10036
                                  Tel: (212) 969-3000
                                  Fax: (212) 969-2900

                                  *Attorneys for the Financial Oversight and*
                                  *Management Board as representative for the*
                                  *Debtors*

                                  /s/_____

                                  Hermann D. Bauer
                                  USDC No. 215205

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

**<u>Exhibit C</u>**

**Preempted Laws**

## List of Main Statutes Preempted by PROMESA[7]

I.   **Commonwealth good faith and credit pledge statutes**
   A. General Obligation Bonds
      1. Act 2 approved October 10, 1985.
      2. Act 1 approved June 26, 1987, as amended.
      3. Act 34 approved March 4, 2014.
      4. Act 79 approved June 1, 2011.
      5. Act 243 approved August 9, 2008.
      6. Act 43 approved August 1, 2005, as amended.
      7. Act 216 approved August 19, 2004.
      8. Act 100 approved July 12, 2002, as amended.
      9. Act 161 approved July 5, 2003.
      10. Act 149 approved August 9, 2002, as amended.
      11. Joint Resolution No. 57 approved July 12, 1993.
      12. Act 54 approved July 6, 2001.
      13. Act 118 approved July 13, 2000.
      14. Act 153 approved July 16, 1999.
      15. Act 219 approved August 9, 1998.
      16. Act 81 approved August 14, 1997.
      17. Act 119 approved August 9, 1995.
      18. Act 46 approved July 28, 1994.
      19. Act 39 approved May 13, 1976, as amended
      20. Act 83 approved August 30, 1991.


   B. General Obligation Loans
      1. GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
      2. GDB Loans to the Commonwealth
         1. Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
         2. Joint Resolution No. 96 approved November 27, 2013. [$30 million line of credit].

   C. Commonwealth Guaranty – Public Buildings Authority Bonds
      1. Act 17 approved April 11, 1968, as amended.

   D. Commonwealth Guaranty – APLA
      1. Act 409 approved September 22, 2004.

   E. Commonwealth Guaranty – PRIFA-BANs
      1. Act 1 approved January 1, 2015.

---

[7] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.

    F.  [Commonwealth Guaranty – PRASA
        1.  Act 45 approved July 28, 1994.]


II.    **Statutes appropriating Commonwealth revenues**
    A.  HTA
        1.  Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021; 9 L.P.R.A. § 5681
            [motor vehicle license fees]
        2.  13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
        3.  13 L.P.R.A. § 31751(a)(3). [cigarette tax]
    B.  PRIFA
        1.  Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum
            cover over]
    C.  PRIFA BANs
        1.  Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum
            products]
    D.  MBA
        1.  13 L.P.R.A. § 31751(a)(4). [cigarette tax]
    E.  PRITA
        1.  13 L.P.R.A. § 31751(a)(5). [cigarette tax]

    F.  CCDA
        1.  13 L.P.R.A. § 2271v(a). [hotel room tax]
    G.  Act 147 enacted June 18, 1980, as amended
        1.23 L.P.R.A. § 104.[8] [judiciary appropriation]
    H.  UPR
        1.18 L.P.R.A. § 621-1.[9]
    I.  Act 83 approved August 30, 1991, as amended
        1.21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[10]
    J.  Act 221 approved May 15, 1948, as amended
        1.15 L.P.R.A. § 74(d).[11]
    K.  Act 18 approved January 24, 2014, as amended
        1.21 L.P.R.A. § 6742.[12]

---

[8] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.

[9] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.

[10] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted. In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

[11] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.

[12] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

L.  Act 214 approved August 18, 2004, as amended
      1.23 L.P.R.A. § 695

M. Act 41 approved July 22, 2011, as amended
      1.12 L.P.R.A. §8105

N.  Act 1 approved January 31, 2011, as amended
      1.13 L.P.R.A. § 33231(l)

**III.**    **TRS and JRS Statutes**
A.  Act 106 approved August 23, 2017
B.  Act 160 approved December 24, 2013
C.  Act 91 of March 24, 2004
D.  Act 12 approved October 19, 1954
E.  Act 162 approved December 24, 2013

**IV.**    **Statute Relating to Issuance of New Securities**
A.  Act 42 approved September 16, 2021

**<u>Exhibit D</u>**

**List of Agencies and Amounts to be Transferred**

## Exhibit B

Redline

**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY,<br><br>                           Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**ORDER AND JUDGMENT CONFIRMING**
**MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF**
**ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.**

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

**Page**

1.   Confirmation of the Plan ............................................................................. 5

2.   Objections ................................................................................................... 6

3.   Findings/Conclusions .................................................................................. 6

4.   Litigation Resolution ................................................................................. 10

5.   Plan Settlements Approved ....................................................................... 11

6.   Dismissal of Med Center Litigation .......................................................... 12

7.   Dismissal of ERS Litigation ..................................................................... 13

8.   Dismissal of GO/Clawback Litigation ...................................................... 14

9.   Dismissal of PRIFA BANs Litigation ....................................................... 14

10.   Dismissal of the PBA Litigation ............................................................... 14

11.   Implementation of the Plan ....................................................................... 15

12.   Enforceability of New Debt Instruments .................................................. 16

13.   Authorization of New GO Bonds and ~~CVI's~~CVIs and Injunction .............. 16

14.   Purchase and Sale of Certain ERS Assets ................................................ 16

15.   Monthly Deposits of Interest and Principal ............................................... 17

16.   Comprehensive Cap on All Net Tax-Supported Debt ................................ 18

17.   Adoption and Maintenance of a Debt Management Policy ........................ 19

18.   Creation of Avoidance Actions Trust ........................................................ 19

19.   Avoidance Actions Trust Assets ............................................................... 19

20.   Funding, Costs and Expenses of the Avoidance Actions Trust .................. 20

21.   Indemnification of Avoidance Actions Trustee and Board ........................ 20

22.   Creation of Pension Reserve Trust ........................................................... 21

23.   Funding of the Pension Reserve Trust ...................................................... 21

24.   No Action ................................................................................................. 22

25.   Government Action ................................................................................... ~~22~~23

26.   Oversight Board Consent Pursuant to PROMESA Section 305 ................. ~~23~~24

27.   Binding Effect .......................................................................................... 24

28.   Cancellation of Notes, Instruments, Certificates, and Other Documents ... ~~24~~25

29.   Rejection or Assumption of Remaining Executory Contracts and Unexpired
Leases ...................................................................................................... 26

30.   Insurance Policies ................................................................... 2728

31.   Rejection Damages Claims ..................................................... 2728

32.   Payment of Cure Amounts ...................................................... 28

33.   Setoff ...................................................................................... 2829

34.   Delivery of Distributions ........................................................ 29

(f)   Delivery of Distributions with Respect to Clawback Recoveries ......... 36

35.   Disbursing Agent .................................................................... 37

36.   Payment of Trustee Fees and Expenses ................................. 37

37.   Securities Laws Exemption .................................................... 38

38.   Acceleration of Insured Bonds .............................................. 3839

39.   Disputed Claims Reconciliation39.   In accordance with the terms and provisions of Section 82.1(b) of the

40.   Disputed Claims Holdback ..................................................... 4142

41.   National Action Claims .......................................................... 42

42.   No Amendments to Proofs of Claim ...................................... 4344

43.   Conditions to Effective Date .................................................. 4345

44.   Administrative Claim Bar Date .............................................. 4345

45.   Professional Compensation and Reimbursement Claims ....... 4445

46.   GO/PBA Consummation Costs ............................................... 4546

47.   AFSCME Professional Fees ................................................... 4547

48.   GO/PBA PSA Restriction Fee ................................................ 4547

49.   ERS Restriction Fee ............................................................... 4749

50.   CCDA Consummation Costs ................................................... 4849

51.   CCDA Restriction Fee ............................................................ 4850

52.   HTA Bond Claims ................................................................... 5052

53.   System 2000 Obligations ....................................................... 5152

54.   HTA/CCDA Clawback Structuring Fees ................................ 5152

55.   Active JRS Participants and Active TRS Participants ............ 5153

56.   Discharge and Release of Claims and Causes of Action ........ 5355

57.   Releases by the Debtors and Reorganized Debtors ................ 5861

58.   Release and Exculpation Provisions ....................................... 5961

59.   **Injunction on Claims** ............................................................. 5962

60.   **Injunction Related to Releases** ............................................ 6063

ii

61.     Exculpation ......................................................................................................... 6164

62.     Maintenance of Pension System ......................................................................... 66 69

63.     Appointments Related Litigation ........................................................................ 6770

64.     **Bar Order** ............................................................................................................ 6870

65.     **Supplemental Injunction** ................................................................................... 6871

66.     Term of Existing Injunctions or Stays ................................................................ 7072

67.     Prosecution of Claims ......................................................................................... 7073

68.     Indemnification and Reimbursement Obligations ............................................... 7073

69.     Compliance with Tax Requirements .................................................................... 7173

70.     Documents and Instruments ................................................................................ 7274

71.     Fiscal Plan ........................................................................................................... 7275

72.     Claims .................................................................................................................. 7275

73.     GUC Reserve ....................................................................................................... 7275

74.     PROMESA 407 Claims ....................................................................................... 7376

75.     Dairy Producer Claims ........................................................................................ 7376

76.     Oversight Board Termination and Post-Confirmation Powers ........................... 7476

77.     Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's
        Sole Discretion .................................................................................................... 7477

78.     Government Post-Confirmation Powers and Duties ............................................ 7477

79.     Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated .. 7577

80.     Non-Impairment of CVIs, SUT ........................................................................... 7578

81.     Reversal/Stay/Modification/Vacatur of Order .................................................... 7578

82.     Retention of Jurisdiction ..................................................................................... 7679

83.     Conflicts Among Documents ............................................................................... 7679

84.     PBA Leases .......................................................................................................... 7780

85.     Modifications ....................................................................................................... 7780

86.     Asserted Surety Claims ....................................................................................... 7880

87.     Provisions of Plan and Order Nonseverable and Mutually Dependent ............... 7881

88.     Governing Law ..................................................................................................... 7881

89.     PFC Reservation ..................................................................................................... 81

90.     Applicable Nonbankruptcy Law .......................................................................... 7881

90. 91.  Waiver of Filings ................................................................................................. 7982

91. 92.  Notice of Order .................................................................................................... 7982

92 93.  No Waiver ................................................................................................ 80 83

Exhibit A Plan ................................................................................................. A-1

Exhibit B Form of Notice ................................................................................ B-1

Exhibit C Preempted Laws ............................................................................. C-1

The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth and ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as Title III representative of the Debtors under PROMESA Section 315(b), having proposed and filed with the United States District Court for the District of Puerto Rico (the "Court") the *Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated November 7,12, 2021 (Docket Entry No. ——19184 in Case No. 17-3283)[1] (as amended, supplemented, or modified prior, at, or subsequent to the Confirmation Hearing as set forth in this Order through the date hereof, including the Plan Supplement, and as may be amended, supplemented, or modified pursuant to Section 313 of PROMESA, the "Plan" through the date hereof), including, without limitation, pursuant to that certain *Modifications to Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.,* dated November 7,12, 2021 (Docket Entry No. ——19183) (collectively, the "Modifications");[2] and the Court having entered, pursuant to, *inter alia*, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), (i) approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, (iii) approving the forms of ballots, master ballots, and election notices used in connection therewith,

---

[1]    All docket entry references are to entries in Case No. 17-3283 unless otherwise indicated.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined herein), or the *Findings of Fact and Conclusions of Law Regarding Confirmation of Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Findings of Fact and Conclusions of Law"), (Docket Entry No. _____), as applicable. A composite copy of the Plan is annexed hereto as Exhibit A.

1

and (iv) approving the form of notice of the Confirmation Hearing; and the Court having entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640); and the following documents having been filed by the Debtors or the PSA Creditors in support of or in connection with confirmation of the Plan:

    (a) Plan Supplement (Docket Entry No. 18470);

    (b) *Certificate of Service of Solicitation Materials* (Docket Entry ~~No.~~ Nos. 19107-1 through 19107-9) (the "Mailing Affidavit")~~;~~);

    (c) *~~Certificate~~Affidavit of Publication and Radio Advertisements* (Docket Entry ~~No.~~ Nos. 19108-1 through 19108-4) (the "Publication ~~Affidavit");(d) Certificate of Service (Docket Entry No. ____) (the "~~& Radio Affidavit", and together with the Mailing Affidavit ~~and Publication Affidavit~~, the "Service Affidavits");

    (d) ~~(e)~~ Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment (Docket Entry No. 18874) (the "Omnibus Reply");

    (e) ~~(f)~~ *Memorandum of Law in Support of Debtors' Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18869) (the "Confirmation Brief"); and

    (f) ~~(g)~~ *Declaration of Natalie A. Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18729);

(g) (h) *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico et al.* (Docket Entry No. 18726);

(h) (i) *Declaration of David A. Skeel, Jr. in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18731);

(i) (j) *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18734);

(j) (k) *Declaration of Ojas Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18730);

(k) (l) *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18738);

(l) (m) *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18736);

(m)(n) *Declaration of Adam Chepenik in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18735);

(n) (o) *Declaration of Sheva Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18737);

(o) (p) *Declaration of Jay Herriman in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18732);

(p) (q) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. Nos. 19056, 19144);

(q) (r) *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725);

(r) (s) *Declaration of Marti Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

(s) (t) *Supplemental Declaration of Gaurav Malhotra of Ernst &Young LLP in Respect of Confirmation of Eighth Amended Title III Joint of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057);

(t) (u) *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058);

(u) (v) *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19059);

(v) (w) *Supplemental Declaration of Juan Santambrogia in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19060); and

(w) (x) *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115)

and objections to confirmation of the Plan having been interposed by certain parties, as reflected on the docket of the Title III Cases and/or on the record of the Confirmation Hearing; and each of the objections having been resolved, overruled, or withdrawn at, prior to, or subsequent to the Confirmation Hearing;[3] and the Court having held the Confirmation Hearing commencing on November 8, 2021; and the appearances of all interested parties, including members of the public selected by the Court, having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, including, without limitation, motions, applications and orders in each of such cases, the foregoing documents, and the evidence admitted and arguments of counsel presented at the Confirmation Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

---

[3]   All opposition submissions are also listed as part of the Court's Findings of Fact and Conclusions of Law.

1.    Confirmation of the Plan.  The Plan and each of its provisions shall be, and hereby are, CONFIRMED pursuant to Section 314(b) of PROMESA.  The documents contained in the Plan Supplement are authorized and approved.  The terms of the Plan, as amended, supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation Hearing, as set forth in this Order as well as in the revised composite copy attached hereto as Exhibit A, include the Plan Supplement, as amended, supplemented, or modified on or prior to the date hereof, and are incorporated by reference into and are an integral part of this Order.

2.    Objections.  All objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are, OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn with prejudice.

3.    Findings/Conclusions.  The findings of fact and conclusions of law set forth in the Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in full.  Notwithstanding such incorporation, the following summarizes certain of the Court's determinations:

> (A)   Pursuant to PROMESA, on May 3, 2017, May 21, 2017, and September 27, 2019, the Commonwealth, ERS, and PBA, respectively, each commenced a case before the Court in accordance with the requirements of Title III of PROMESA.  The commencement of these cases vested the Court with exclusive jurisdiction over the cases and all respective property of the Commonwealth, ERS, and PBA, wherever located.  As a result of the consensual agreement among the Debtors and their respective creditor representatives, the Debtors formulated, duly solicited, and now seek confirmation of a plan of adjustment in accordance with federal law.

> (B)   This Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law.  Confirmation of the Plan constitutes a judicial determination, pursuant to Section 4 of PROMESA, that all laws, rules, and regulations giving rise to obligations of the Debtors discharged by the Plan and this Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations.  Pursuant to PROMESA Section 4, to the extent not previously ruled preempted pursuant to an order of

6

the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, have been preempted.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws shall not be enforceable for any purpose, as well as all laws enacted from and after the commencement of the Title III Cases to the extent inconsistent with the transactions contemplated by the Plan.  Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on Exhibit C hereto and (b) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit C hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.  To avoid the future re-creation of the debts and claims discharged herein, each of the preempted laws is preempted permanently.

(C)    The Court shall retain jurisdiction to enforce the terms hereof and of the Plan, the New GO Bonds, the GO CVIs, and the Clawback CVIs in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

(D)    At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVIs a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [___] DAY OF [_____], 2021.

(E)    The New GO Bond Legislation and the CVI Legislation are incorporated into Act No. 53-2021, which has been validly enacted by the Commonwealth and is valid and effective in accordance with its terms.

(F)     Pursuant to PROMESA, including Section 4 thereof, as well as sections 944[4]
and 1123 of the Bankruptcy Code, and in accordance with the Confirmation
Order and the Plan, the Court determines that the New GO Bonds and the
CVIs, and the covenants by the Commonwealth, for the benefit of the holders
of the New GO Bonds, and the CVIs as provided in the New GO Bonds

---

[4]   Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine
the validity of obligations imposed under a plan of the debtor and of any provision made to pay
or secure payment of such obligations. 11 U.S.C. § 944(b)(3). *See generally In re City of
Stockton, Cal.*, 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state
relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. .
. . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws,
including state constitutional provisions, that are inconsistent with the exercise by Congress of
its exclusive power to enact uniform bankruptcy laws" (*citing Ass'n of Retired Emps. of the
City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.)*, 478 B.R. 8, 14-16
(Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; *Int'l Bhd. of Elec. Workers, Local 2376 v.
City of Vallejo, Cal. (In re City of Vallejo, Cal.)*, 432 B.R. 262, 268-70 (E.D. Cal. 2010)
(additional citations omitted)). As set forth in the leading bankruptcy treatise, "[t]he
requirement of a court determination of validity is extra assurance for those who might be
skittish about the nature of the bonds being issued . . . . It has the added feature of removing
any doubt concerning the matter, because the determination of the court on that issue should be
binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier On Bankruptcy §
944.03[1][b] (16th ed. 2013). *See, e.g.*, Amended Order and Judgment Confirming Third
Amended Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation, dated
February 5, 2019, and *Amended Memorandum of Findings of Face and Conclusions of Law in
Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto
Rico Sales Tax Financing Corporation,* dated February 5, 2019, ¶174 ("Confirmation of the
Plan constitutes a judicial determination and, pursuant to section 4 of PROMESA and sections
944, 1123, and 1125 of the Bankruptcy Code as incorporated by section 301 of PROMESA, the
terms of these Findings of Fact and Conclusions of Law shall prevail over any general or
specific provision of territory law, State law or regulation that is inconsistent therewith and be
full, final, complete, conclusive, and binding and shall not be subject to collateral attack or
other challenge in any court or other forum, except as permitted under applicable law"); Order
Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino,
California, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with
Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the
Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . .");
Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit,
dated November 12, 2014, ¶ 86 ("[I]n accordance with section 944(a) of the Bankruptcy Code
and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date,
the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . . .");
Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for
Jefferson County, Alabama, dated November 6, 2013, ¶ 37, ("Pursuant to Bankruptcy Code
sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the
provisions of this Confirmation Order, the Plan, and related documents or any amendments or
modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable
nonbankruptcy law.").

Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI
Indenture or the Confirmation Order, as applicable, constitute valid, binding,
legal and enforceable obligations of the Commonwealth, under Puerto Rico,
New York, and federal law.

(G)     The New GO Bonds and the CVIs are bonds or notes within the meaning of
Section 2 of Article VI of the Commonwealth Constitution to which the
Commonwealth may legally pledge its full faith, credit and taxing power
under the Commonwealth Constitution and applicable Puerto Rico law for the
payment of principal and interest.

(H)     Pursuant to the New GO Bond Legislation and the CVI Legislation, the
Commonwealth has validly pledged its full faith, credit and taxing power
under the Commonwealth Constitution and applicable Puerto Rico law for the
payment of principal and interest with respect to the New GO Bonds and
payment with respect to the CVIs.

(I)      Subject to the occurrence of the Effective Date and as of the date of issuance
of the New GO Bonds and CVIs, the Commonwealth is in compliance with
any applicable debt limits, including the Comprehensive Cap and any
applicable debt limit (if any) contained in the Commonwealth Constitution.

(J)      Pursuant to the New GO Bonds Legislation and other applicable law, upon the
issuance of the New GO Bonds, the New GO Bonds shall be secured by a first
priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53))
over the funds deposited in the Debt Service Fund, including any revenues
generated therefrom, which statutory first lien shall occur automatically and
shall automatically attach and be perfected, valid and binding from and after
the Effective Date, without any further act or agreement by any Person, and
shall remain in full force and effect until the New GO Bonds have been paid
or satisfied in full in accordance with their terms.

(K)     The statutory first lien on funds deposited into the Debt Service Fund, as
provided for in the New GO Bonds Legislation, and all other provisions to pay
the New GO Bonds are valid, binding, legal and enforceable, including,
without limitation, covenants not to impair such property, maintain available
tax exemption and provide for the conditions regarding substitution of
collateral (including, without limitation, the statutory lien thereon as adequate
protection for the property rights in the Plan and in the Confirmation Order).

(L)     The statutory first lien on funds deposited into the Debt Service Fund, as
provided for in the New GO Bonds Legislation, creates the valid pledge and
the valid lien upon the right, title and interest of the Commonwealth in such
funds in favor of the Trustee (for the benefit of the holders of the New GO
Bonds) which it purports to create, subject only to the provisions of the New
GO Bonds Indenture permitting the withdrawal, payment, setting apart or
appropriation thereof for the purposes and on the terms and conditions set

9

forth in the New GO Bonds Indenture and each applicable supplemental indenture.

(M)     The Commonwealth has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

(N)     In light of the enactment of the New GO Bond Legislation and the CVI Legislation, upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

(O)     For purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

(P)     The Court's *Opinion and Order Granting Defendants' Motion to Dismiss the Complaint*, Adv. Proc. No. 21-00068-LTS, Dkt. No 83 (October 29, 2021), including, without limitation, that the GDB HTA Loans are subject to subordination to the HTA 68 Bonds and the HTA 98 Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.

4.     <u>Litigation Resolution</u>.  For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the Plan constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the compromise and settlement of asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, and disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the

2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the

2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the

Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of

CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive

revenues historically conditionally appropriated to CCDA, HTA, MBA and PRIFA, as

applicable, and subject to "clawback" by the Commonwealth pursuant to the provisions of the

Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights

attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions,

and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without

limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the

PBA Litigation, (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the

ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA

may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth

in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center

Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the

PRIFA BANs Litigation, each as incorporated into the Plan, and the entry of this Order

constitutes, if required, approval of all such compromises and settlements pursuant to Bankruptcy

Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code.  Pursuant to this Order,

and to the extent provided in the Plan, on the Effective Date, such compromises and settlements

shall be binding upon the Debtors, all Creditors of the Debtors, and all other Entities and, to the

fullest extent permitted by applicable law, shall not be subject to collateral attack or other

challenge (other than appeals) in any other court or forum.

5.      Plan Settlements Approved.  The Court hereby approves the compromises and settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan, authorizes and directs the consummation thereof.

6.      Dismissal of Med Center Litigation.  On the Effective Date, the Med Center Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of the Commonwealth and the respective Med Centers shall take such action as is necessary to notify the applicable court of such dismissal, including, without limitation, within ten (10) Business Days of the Effective Date, filing notices with the clerk of such court setting forth the resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action), with prejudice; provided, however, that all appeals taken from the Med DC Action shall be dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such appeals shall take such action as is necessary to notify such appellate courts of appeal of such dismissal, with prejudice; and, provided, further, that the Commonwealth and the Med Centers shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all actions in connection with the Med DC Action shall be stayed, and (b) in the event that, from and after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb), such stay shall be lifted and the Med Centers may pursue relief and the Commonwealth may present any and all defenses with respect to such alleged future defaults, with all existing defaults as of the date hereof having been waived by the Med Centers.  Without in any way limiting the foregoing, from and after the earlier to occur of (y) July 1, 2022 and (z) the Effective Date (the "Med Center Outside Date"), and until otherwise ordered or agreed upon, the parties shall continue to adhere to and comply with the terms and provisions of that certain Stipulation Modifying the Automatic Stay Between the Commonwealth and

Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmicrri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. De Serv Médicos, Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Patillos, Inc., and Hospital General Caostañer, Inc., dated July 12, 2019 (the "Med Center Stipulation"), including, without limitation, the making of quarterly payments to certain Med Centers in accordance therewith.   Payments made by the Commonwealth, either directly or indirectly through contractors or subcontractors, to any Med Center prior to modification of the Med Center Stipulation or such other agreement between the applicable Med Centers and the Commonwealth shall not be subject to setoff or recoupment on account of any claims or causes of action arising during the period up to and including the Effective Date; provided, however, that, in the event that the Commonwealth or any Med Center determines that any payments made pursuant to the Med Center Stipulation from and after the Med Center Outside Date constitute an overpayment or an underpayment, as the case may be, based upon services provided by the Med Centers from and after the Med Center Outside Date, the Commonwealth or such Med Center shall submit such issue for a determination in connection with the Med DC Action, with all parties reserving all rights, defenses, and counterclaims with respect to such overpayments or underpayments, as the case may be, notwithstanding the imposition of any stay.

7.     Dismissal of ERS Litigation.  On the Effective Date, (a) the ERS Litigation and the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, the Creditors Committee, and the ERS Bondholders (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to

13

effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions, with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.

8.    Dismissal of GO/Clawback Litigation.  On the Effective Date, (a) to the extent extant, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Lift Stay Motions, the Clawback Actions, and the Section 926 Motion shall be dismissed and/or denied, with prejudice, (b) the Oversight Board, by itself or through its committees, the Creditors Committee, the Monolines and the PSA Creditors (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings in the Title III Court, the United States Court of Appeals for the First Circuit and the courts of the Commonwealth of Puerto Rico, as applicable, to effectuate the dismissal of the aforementioned litigations and motions, with prejudice.

9.    Dismissal of PRIFA BANs Litigation.  On the Effective Date, (a) the PRIFA BANs Litigation and the PRIFA BANs Takings Litigation shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the PRIFA BANs Litigation, with prejudice, and (ii) in the United States Court of Federal Claims to effectuate the dismissal and/or denial of the PRIFA BANs Takings Litigation, with prejudice.

10.    <u>Dismissal of the PBA Litigation</u>.  On the Effective Date, (a) the PBA Litigation

shall be dismissed, with prejudice, and (b) the Oversight Board, by itself or through its

committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related

funds or accounts managed by affiliates) shall take any and all action necessary, including,

without limitation, filing such notices, stipulations or other pleadings in the Title III Court to

effectuate such dismissal and/or denial of the PBA Litigation, with prejudice.

11.    <u>Implementation of the Plan</u>.  On and after the Effective Date, the Debtors, the

Reorganized Debtors, and each of their respective authorized agents and representatives are

authorized and directed to (a) execute, deliver, file, or record such documents, contracts,

instruments, releases, and other agreements, including, without limitation, those contained in the

Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and

as provided for in, the Plan and the Plan Supplement, (c) take such other actions as may be

necessary to effectuate, implement, and further evidence the terms and conditions of the Plan,

including, among other things, all such actions delineated in Article LXXXIX of the Plan, and (d)

direct or instruct The Depository Trust Company, or such other person or entity necessary to

implement or effectuate the terms of the (i) any custodial trust, escrow arrangement, or similar

structure established pursuant to Section 75.5(b) of the Plan and facilitated by Ambac (an

"<u>Ambac Trust</u>"), (ii) the FGIC Trust, (iii) the Syncora Trust, (iv) any custodial trust, escrow

arrangement, or similar structure established pursuant to Section 75.1(b)(ii) of the Plan (an

"<u>Assured Trust</u>"), and (v) the Avoidance Actions Trust (collectively, the "<u>Trusts</u>"), and (vi) the

related Trust documentation.  Without in any way limiting the foregoing, on the Effective Date,

the appropriate officers or representatives of the Debtors and Reorganized Debtors, as the case

may be, and members of the boards of directors of the same, as applicable, are authorized,

empowered, and directed to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the Plan, and make, or cause to be made, any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable.

12.    Enforceability of New Debt Instruments.  Pursuant to each of Bankruptcy Code section 944(b)(3), the New GO Bonds Legislation, the CVI Legislation, and all debt instruments to be issued pursuant to the Plan will constitute, upon distribution thereof, valid legal obligations of the Debtor or the Reorganized Debtor, as the case may be, that issues them, and any provision made to pay or secure payment of such obligation is valid.

13.    Authorization of New GO Bonds and ~~CVI's~~CVIs and Injunction.  The debt authorization in Act 53-2021 is conditioned only on the Plan's cancellation of the Monthly Benefit Modification provided for in the proposed *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "Seventh Amended Plan"), and does not require satisfaction of any other conditions including cancellation of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of defined benefits under the Teachers Retirement System or the Judiciary Retirement System from and after the  Effective Date.  The Plan cancels and eliminates the Monthly Benefit Modification previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in Act 53-2021 for its debt authorization.  The Commonwealth government shall not repeal such debt authorization prior to all such indebtedness issued pursuant to the Plan being satisfied in accordance with the terms thereof.  For avoidance of debt, the Plan does not modify benefits

comprised of the "Monthly Base Pension", "Christmas Bonus", "Summer Bonus", "Medicine Bonus", and "Medical Insurance Benefit", each as defined in the Seventh Amended Plan.

14.     <u>Purchase and Sale of Certain ERS Assets</u>.   On the Effective Date, (a) the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey to the Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without limitation, such Assets subject to a valid and perfected lien or security interest (other than liens or claims discharged pursuant to the Plan and this Order) for an aggregate purchase price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and (b) in accordance with the terms and provisions of Section 69.2 of the Plan, (i) the Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option, pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

15.     <u>Monthly Deposits of Interest and Principal</u>.   Pursuant to the New GO Bonds Legislation and the New GO Bonds Indenture, from and after the Effective Date, until the New GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i)

one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's then annual obligation with respect to the payment of principal (or accreted value) on the New GO Bonds.  On the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

16.    Comprehensive Cap on All Net Tax-Supported Debt.  During the Debt Policy Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt of Article IV of the Debt Responsibility Act, which cap shall be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date.  Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs to be issued pursuant to the Plan or other contingent value instruments that may be issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the

Comprehensive Cap.  For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date.  The Secretary of Treasury's certification of compliance with the Debt limit pursuant to Section 74.4 of the Plan shall be conclusive and binding absent manifest error; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

17.    Adoption and Maintenance of a Debt Management Policy

.  During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated.  The Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board (to the extent exercising authority in accordance with the provisions of PROMESA), at all times include the principles and limitations provided in Section 74.5 of the Plan.

18.    Creation of Avoidance Actions Trust.  Upon the execution of the Avoidance Actions Trust Agreement pursuant to Section 78.1 of the Plan, the Avoidance Actions Trust shall be established and validly created pursuant to the terms of the Avoidance Actions Trust Agreement, with no further authorization or legislative action being required, and the Avoidance Actions Trustee shall be selected in accordance with the terms and provisions of the Avoidance

Actions Trust Agreement.  This Court shall retain jurisdiction to enforce the terms and provisions of the Avoidance Actions Trust Agreement.

19.    <u>Avoidance Actions Trust Assets</u>.  The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right, authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions, including, without limitation, those set forth on Exhibits "A" and "B" of the Plan, as of the Effective Date.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, including, without limitation, all counterclaims and defenses to any such Avoidance Actions Trust Assets, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors, the Reorganized Debtors, and their predecessors, successors and assigns, and each other Entity released pursuant to Section 88.2 of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

20.    <u>Funding, Costs and Expenses of the Avoidance Actions Trust</u>.  On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing.  The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses

incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

21.  <u>Indemnification of Avoidance Actions Trustee and Board</u>.  The Avoidance Actions Trustee, the Trust Advisory Board (as defined in the Avoidance Actions Trust Agreement), and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries (as defined in the Avoidance Actions Trust Agreement) for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except those acts arising from their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence. Any indemnification claim of an Indemnified Party pursuant to Section 7.5 of the Avoidance Actions Trust Agreement shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom.  The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.   The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

22.  <u>Creation of Pension Reserve Trust</u>.  Upon the execution of the Pension Reserve Deed of Trust pursuant to Section 83.1 of the Plan, the Pension Reserve Trust shall be

established and validly created pursuant to the terms of the Pension Reserve Deed of Trust, with
no further authorization or legislative action being required, and shall not be subject to taxation
by the Commonwealth.  This Court's retention of jurisdiction includes jurisdiction over actions
to enforce the terms and provisions of the Pension Reserve Deed of Trust.

23.    _Funding of the Pension Reserve Trust_.  On the Effective Date, the Commonwealth
shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars
($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve
Trust, of which One Million Dollars ($1,000,000.00) shall be deposited into the Pension Reserve
Board's general account, Two Million Five Hundred Thousand Dollars ($2,500,000.00) shall be
deposited into the Pension Benefits Council's administrative and operating account, and One
Million Five Hundred Thousand Dollars ($1,500,000.00) shall be deposited into the Pension
Reserve Board's administrative and operating account.  From and after the FY in which the
Effective Date occurs up to and including the conclusion of the seventh (7th) FY following the
FY in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to
be made, annual (but in no event later than October 1st following the conclusion of each FY)
contributions to the Pension Reserve Trust in an amount equal to  (a) the Base Contribution, (b)
such additional amount calculated as the lower of the actual primary surplus for such FY and the
projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution for
such FY, plus (ii) the  Commonwealth debt service obligation pursuant to the Fiscal Plan for
such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in
all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to
applicable laws, including, without limitation, Titles I and II of PROMESA, such additional
amounts as the Reorganized Commonwealth may deposit into the Pension Reserve Trust.  The

Pension Reserve Trust shall be managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations.

24.    <u>No Action</u>.  Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors are directed to, and no further action of the directors or officers of the Debtors shall be required to authorize the Debtors, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including, without limitation, the Plan Supplement.

25.    <u>Government Action</u>.  From the Effective Date up to and including the satisfaction of the New GO Bonds and the CVIs in accordance with their respective terms, (a) pursuant to Bankruptcy Code section 1142(b), the Government of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to consummate the transactions contemplated by the Plan, (b) the Puerto Rico Department of Treasury and AAFAF, as applicable, are authorized and directed, notwithstanding any requirements of Puerto Rico law, to execute any and all agreements necessary for the implementation of the Plan and to make any payments required thereunder,  and (c) pursuant to PROMESA Section 108(a)(2), no party, individual, official, or  officer (elected or appointed), agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i) impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan, including, but not limited to, those contemplated pursuant to the New GO Bonds Indenture and the CVI Indenture, or (ii) creates any inconsistency in any manner,

amount or event between the terms and provisions of the Plan or a Fiscal Plan certified by the Oversight Board, each of which actions has been determined by the Oversight Board to impair or defeat the purposes of PROMESA.  To the maximum extent permitted by law, the Government of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, is directed to take any and all actions necessary to consummate the transactions contemplated by the Plan.  Without in any way limiting the foregoing, on the earlier to occur of (y) the Effective Date and (z) within forty-five (5) Business Days of45) days from and after the date hereof, the agencies and instrumentalities set forth on Exhibit "—D" hereto are directed to transfer the funds and the proceeds of liquid securities held on account and set forth on Exhibit "—D" hereto to the Puerto Rico Treasury Single Account.; provided, however, that Exhibit "D" hereto may be amended during the period up to and thirty (30) days from the date hereof upon the agreement of the Oversight Board and AAFAF and, to the extent amended, the Oversight Board shall file an informative motion with the Title III Court with respect thereto.

26.   <u>Oversight Board Consent Pursuant to PROMESA Section 305</u>.   Pursuant to PROMESA Section 305, with the consent of the Oversight Board and consistent with the Plan, using all their political and governmental powers, the Governor and Legislature are directed to take all acts necessary to carry out and satisfy all obligations and distributions set forth in the Plan, including, without limitation, enacting any enabling legislation required by, and solely to the extent set forth in, the Plan.

27.   <u>Binding Effect</u>.  This is a full, final, and complete Order intended to be conclusive and binding on all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in this Court and appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence,

by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements set forth in the Plan and this Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

28.     Cancellation of Notes, Instruments, Certificates, and Other Documents.  Pursuant to Section 77.6 of the Plan, and except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 76.1 of the Plan), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtors without any further act or action under any

applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee,

paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and

responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under

the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto

shall be discharged; provided, however, that, notwithstanding anything contained in the Plan or

herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments

and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any

distributions as set forth in the Plan and to perform such other necessary administrative or other

functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed

Insured Bond Claims to receive distributions in accordance with the terms and provisions of the

Plan, (iii) to allow any trustee, fiscal agent, agent, contract administrator or similar entity under

all instruments and documents related thereto, to perform necessary functions, including making

distributions, in accordance with the Plan, and to have the benefit of all the rights and protections

and other provisions of such instruments and documents, as applicable, and all other related

agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and

instruments other than the Debtors, (v) to allow a Monoline to exercise the redemption or call

rights assigned to such Monoline pursuant to the provisions of Article LXXV of the Plan, (vi) to

allow the applicable trustee or fiscal agent, as the case may be, to appear in any proceeding in

which such trustee or fiscal agent is or becomes a party with respect to clauses (i) through (iv)

above, or (vii) as may be necessary to preserve any claims under the respective insurance policies

and related documents issued by a Monoline and the Oversight Board shall request that the

Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP

numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such

other reasonable steps as may be necessary to preserve and effectuate such Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtors or Reorganized Debtors, as the case may be.

29.    <u>Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases</u>.  Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Sections 76.5 and 76.7 of the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed ~~or assumed and assigned~~ on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico ~~or~~, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. §97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (~~d~~f) with the United States, or any of its agencies, departments or agents or ~~under~~pursuant to any federal program, ~~or (e~~(g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); <u>provided</u>, <u>however</u>, that the Debtors

reserve the right to amend, on or prior to the ~~Confirmation~~Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.   The Debtors shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of Section 76.1 of the Plan, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of Section 76.1 of the Plan, by serving a separate notice to the relevant counterparties to such agreements.   To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.

30.     <u>Insurance Policies</u>.   Subject to the terms and provisions of Section 76.7 of the Plan, each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan; <u>provided</u>, <u>however</u>, that, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

31.     <u>Rejection Damages Claims</u>.   If the rejection of an Executory Contract and Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of

Claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

32.    <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment with respect to each prepetition executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases and the Debtor otherwise agree.

33.    <u>Setoffs</u>.  Except as otherwise provided in the Plan or in this Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors possess against such holder; and, <u>provided</u>, <u>further</u>, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, <u>provided</u>, <u>further</u>, that nothing in

29

this decretal paragraph or Section 77.11 of the Plan shall affect the releases and injunctions provided in Article XCII of the Plan or this Order.

       34.   <u>Delivery of Distributions</u>.

       (a)   <u>Delivery of Distributions Generally</u>.  Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Plan or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; <u>provided</u>, <u>however</u>, that, except as otherwise provided herein, distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the respective governing documents for such obligations; and, <u>provided</u>, <u>further</u>, that, except as otherwise provided herein, the Disbursing Agent may make distributions of PSA Restriction Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent.  The trustee or fiscal agent for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents.  Each trustee or fiscal agent may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to the delivery of distributions in accordance with the terms and provisions of the Plan, including the contra-CUSIP positions and escrow positions established by the Debtors or their agents with The Depository Trust Company, and each trustee or fiscal agent shall close and terminate the original CUSIPs after making

distributions in accordance with the terms and provisions of the Plan and shall have no further

distribution obligations thereunder.  No Trustee or fiscal agent shall be required to post any bond

or surety or other security for the performance of its duties, unless otherwise ordered or directed

by the Title III Court.  Subject to any agreements to the contrary, each trustee or fiscal agent shall

only be required to make the distributions and deliveries described in this decretal paragraph and

the Plan and in accordance with the terms of this Order, the Plan and such other governing

document, and shall have no liability for actions reasonably taken in accordance with the terms of

this Order, the Plan and such other governing document, or in reasonable reliance upon

information provided to such trustee or fiscal agent by the Debtors or their agents in accordance

with the terms of this Order, the Plan or in connection with distributions to be made hereunder or

thereunder, except for liabilities resulting from the gross negligence or willful misconduct of

such trustee or fiscal agent.  The New GO Bonds and the CVIs shall be transferable and

recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture

and the CVI Indenture, respectively.

(b)   Delivery of Distributions with Respect to Assured Insured Bonds.

Notwithstanding any other provision of the Plan or of this Order, (i) to the extent an Assured

Insured Bondholder holding the Assured Insured Bond with CUSIP number 74514LD46

validly elects (or is deemed to elect) Assured Bondholder Election 2, the Disbursing Agent will

deposit the Assured New Securities and Cash allocable to such Assured Insured Bondholder in

the applicable Assured Trust in accordance with the applicable trust agreement; (ii) to the extent

an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LGL5

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745145XZ0, the custody receipt with CUSIP number 745235UX7 evidencing a beneficial

ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235YJ4 or 745235UX7 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235YZ8 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SC6, or the custody receipt with CUSIP number 745235YV7 or 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SC6 validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts into the applicable Assured Trust; the trustee (the "Assured Trustee") of the Assured Trusts (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies as provided in the applicable trust agreement, without any further action on the part of the existing custodian, provided, however, that the existing custodian is also hereby authorized and ordered to take any further actions that may be necessary to confirm the collapse of the existing custodial arrangement as provided herein; and the Disbursing Agent will transfer the Assured New Securities and Cash allocable to such Assured Insured Bondholder to the Assured Trustee for deposit in the applicable Assured Trust on account of such custody receipts and Assured Insured Bonds in accordance with the applicable trust agreement; (iii) to the extent an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LWE3 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745145R53 or

holding the custody receipt with CUSIP number 74514LUW5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 74514LNG8 validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts into the applicable Assured Trust; the Assured Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies as provided in the applicable trust agreement, without any further action on the part of the existing custodian, provided, however, that the existing custodian is also hereby authorized and ordered to take any further actions that may be necessary to confirm the collapse of the existing custodial arrangement as provided herein, and, without prejudice to the ability of the Assured Trustee to draw on the applicable Assured Insurance Policy, the Assured Trustee shall be deemed to have deposited such Assured Insured Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to Section 75.4(a) of the Plan; and the trustee for the Assured Trust related to such Assured Insured Bonds shall be deemed to have received its Pro Rata Share of the FGIC Plan Consideration, and shall receive the FGIC Certificates allocable to such Assured Insured Bondholder on account of the custody receipts referred to in this subsection (iii) above and Assured Insured Bonds (which also qualify as FGIC Insured Bonds) referred to in this subsection (iii) above for deposit in the relevant Assured Trust in accordance with the applicable trust agreement, (iv) pursuant to Section 75.1(a) of the Plan, Assured is hereby deemed to have exercised the Assured Acceleration Price Payment Option with respect to all Assured Insured Bonds with respect to which Assured has

exercised the Assured Election, and the Disbursing Agent shall disburse the Assured New
Securities and Cash on account of any Assured Insured Bonds with respect to which Assured
has exercised the Assured Election or with respect to which an Assured Insured Bondholder has
validly elected Assured Bondholder Election 1 to Assured in a manner mutually agreed upon
between the Disbursing Agent and Assured; and (v) on or prior to the Effective Date, the
Disbursing Agent and the Debtors shall disclose to Assured the Acceleration Price to be paid
with respect to any Assured Insured Bonds with respect to which Assured has exercised the
Assured Election or with respect to which an Assured Insured Bondholder has validly elected
Assured Bondholder Election 1, and on the Effective Date (1) with respect to such Assured
Insured Bonds insured in the primary market, the paying agent for the GO Bonds or the fiscal
agent for the PBA Bonds, as applicable, shall draw down on the applicable Assured Insurance
Policies to pay the applicable Assured Acceleration Price to the beneficial holders of such
Assured Insured Bonds insured in the primary market in accordance with Sections 75.1(a) and
75.1(b)(i) of the Plan, as applicable, and (2) with respect to such Assured Insured Bonds insured
in the secondary market, Assured shall, or shall cause the applicable custodian of custody
receipts evidencing the beneficial ownership interest of the holders thereof in such Assured
Insured Bonds and the related Assured Insurance Policies to draw on the applicable Assured
Insurance Policies in order to pay the applicable Assured Acceleration Price to the beneficial
holders of such Assured Insured Bonds insured in the secondary market in accordance with
Sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable; provided, however, that, for the
avoidance of doubt, Assured shall not in any circumstance be required to pay itself an
Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by
subrogation or otherwise.

(c)     _Delivery of Distributions with Respect to National Insured Bonds_.
Notwithstanding any other provision of the Plan or of this Order, on the Effective Date,
National shall receive, and the Disbursing Agent shall disburse to National in a manner
mutually agreed upon by the Disbursing Agent and National, the National Plan Consideration
that would otherwise be allocable to holders of Allowed National Insured Bond Claims that
elected to receive the National Non-Commutation Treatment by electing such treatment in
accordance with the Election Notice for National Bond Holders with Claims in Classes 3 and 25
(Docket Entry No. 17639-30) or the Election Notice for National Bond Holders with Claims in
Class18 (Docket Entry No. 17639-31); _provided_, _however_, that, for the avoidance of doubt,
National shall not in any circumstance be required to pay itself the National Acceleration Price
with respect to any National Insured Bonds owned by National, by subrogation or otherwise.

(d)     _Delivery of Distributions to FGIC_.  Notwithstanding any other provision
of the Plan or of this Order, on the Effective Date, the Disbursing Agent shall distribute to FGIC
FGIC's share of the Vintage CW Bond Recovery, the Vintage CW Guarantee Bond Recovery,
and the Vintage PBA Bond Recovery in accordance with the terms and provisions of Section
75.4(b) of the Plan in a manner mutually agreed upon between the Disbursing Agent and FGIC.

(e)     _Delivery of Distributions with Respect to Ambac Insured Bonds_.
Notwithstanding any other provision of the Plan or of this Order, (i) to the extent a holder of
any Ambac Insured Bonds with CUSIP numbers 745235D32,745235D40, or 745235B75
validly elects to receive the Ambac Non-Commutation Treatment, the Disbursing Agent shall,
on the Effective Date or as soon as reasonably practicable thereafter, distribute to Ambac the
Ambac Plan Consideration payable to such holder on account of its Allowed Claims in Classes
4 and 26; (ii) to the extent a holder of any Ambac Insured Bonds with CUSIP numbers

35

745235D32, 745235D40, or 745235B75 validly elects to receive the Ambac Commutation
Treatment or otherwise fails to validly elect to receive the Ambac Non-Commutation Treatment
(including submitting an election for less than all of its Claims in Classes 4 or 26), on the
Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall
distribute the Ambac Commutation Consideration payable on account of its Allowed Claims in
Class 4 and/or 26 under the Plan to the applicable indenture trustee, which shall in turn
distribute such consideration to the applicable bondholders, except that Ambac may direct the
applicable indenture trustee to reduce the distribution to any holder to account for any payments
that Ambac has made, or for any other consideration that Ambac has made available or will
make available, to such holder (collectively, the "Prior Payments"), and the applicable indenture
trustee shall then pay the portion of the Ambac Commutation Consideration equal to the
applicable Prior Payment to Ambac; (iii) to the extent a holder of any Ambac Insured Bonds
with CUSIP number 745145AX0 validly elects to receive the Ambac Non-Commutation
Treatment, on the Effective Date or as soon as reasonably practicable thereafter, the Disbursing
Agent shall distribute to Ambac the Ambac Plan Consideration payable to such holder on
account of its Allowed Claims in Class 19; (iv) to the extent a holder of any Ambac Insured
Bonds with CUSIP number 745145AX0 fails to validly elect to receive the Ambac
Non-Commutation Treatment (including by submitting an election for less than all of its
Claims), on the Effective Date or as soon as reasonably practicable thereafter, the Disbursing
Agent shall distribute the Ambac Commutation Consideration payable on account of its
Allowed Claims in Class 19 under the Plan to the applicable indenture trustee, which shall in
turn distribute such consideration to the applicable bondholders, except that Ambac may direct
the applicable indenture trustee to reduce the distribution to any holder to account for any Prior

Payments that Ambac has made, or for any other consideration that Ambac has made available or will make available, to such holder and the applicable indenture trustee shall then pay the portion of the Ambac Commutation Consideration equal to the applicable Prior Payment to Ambac; and (v) with respect to Ambac Insured Bonds with CUSIP numbers 745145GB2, 745145A3, 745145YY2, 745235KT7, 745235TH4, 745235TJ0, 745235TK7, 745235TL5, which are fully matured, on the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Plan Consideration distributable on account of Allowed Claims in Classes 4, 19, or 26 to Ambac.

(f)     Delivery of Distributions with Respect to Clawback Recoveries. Notwithstanding any other provision of the Plan or of this Order, (i) on the Effective Date, or, in the event the HTA Distribution Conditions have not been satisfied as of the Effective Date, upon satisfaction of the HTA Distribution Conditions, the Disbursing Agent shall distribute to each applicable Monoline its share of the CW/HTA Clawback Recovery in accordance with the terms and provisions of Section 63.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; (ii) on the Effective Date, the Disbursing Agent shall distribute to each applicable Monoline its share of the CW/Convention Center Clawback Recovery in accordance with the terms and provisions of Section 64.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; and (iii) on the Effective Date, or, in the event the PRIFA Distribution Conditions have not been satisfied as of the Effective Date, upon satisfaction of the PRIFA Distribution Conditions, the Disbursing Agent shall distribute to each applicable Monoline its share of the CW/PRIFA Rum Tax Recovery in accordance with the terms and provision of Section 65.1 of the Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline and (iv) on the later to occur of (A) the

37

Effective Date and (B) satisfaction of the HTA Distribution Conditions, the Disbursing Agent shall distribute to National National's share of the CW/HTA Clawback Recovery in accordance with the terms and provisions of Section 63.2 of the Plan in a manner mutually agreed upon by the Disbursing Agent and National.  Upon satisfaction of the HTA Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to Allowed CWHTA Claims set forth in Exhibit "J" to the Plan.

35.    Disbursing Agent.  Pursuant to Section 1.203 of the Plan, the Disbursing Agent shall be, as applicable, such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions in accordance with the provisions of the Plan and this Order.

36.    Payment of Trustee Fees and Expenses.  The distributions to be made pursuant to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses allegedly due and owing by the Commonwealth, ERS and PBA with respect to amounts discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights of each Trustee/Fiscal Agent to payment of such amounts (a) from the distributions to be made hereunder, including, without limitation, the imposition of any valid Charging Lien, or (b) pursuant to a contractual fee agreement entered into by the Debtors, or on their behalf, during the period from and after the Commonwealth Petition Date, including, without limitation, that certain Settlement Agreement and Invoice Instructions (the "Settlement Agreement"), dated as of December 21, 2018, by and between, among others, AAFAF, U.S. Bank Trust National Association, U.S. Bank National Association, and Hogan Lovells (US) LLPand U.S. Bank National Association (collectively, the "USB Entities"); provided, however, that (a) with respect

to PBA, the Effective Date, and (b) with respect to PRIFA, the later of (i) the Effective Date and (ii) effectiveness of the PRIFA Qualified Modification pursuant to Title VI of PROMESA, in the event that, following application of fees and expenses in accordance with the terms and provisions of the Settlement Agreement, and the USB Entities retain any monies deposited by the Commonwealth, PBA or PRIFA, as the case may be, pursuant to the terms thereof, the USB Entities shall remit such excess funds to PBA or PRIFA, as the case may be, or such other Entity as may be designated by PBA or PRIFA, as the case may be, within five (5) Business Days of such event, the USB Entities shall return such funds, by wire transfer of immediately available funds, to the Commonwealth, PBA or PRIFA, as the case may be.

37.     _Securities Laws Exemption._  Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New GO Bonds, the CVIs, and interests in the ERS Trust pursuant to the terms of the Plan and this Order (and any subsequent offering of such securities, including, without limitation, pursuant to a case under Title VI of PROMESA), or the custodial trusts created in accordance with Articles LXIII, LXIV, LXV, and LXXV of the Plan shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities, and, pursuant to Section 2(b) of the Investment Company Act of 1940, as amended (the "_Investment Company Act_"), such custodial trusts, securities and interests shall be exempt from the provisions of the Investment Company Act.

38.   <u>Acceleration of Insured Bonds</u>.  Notwithstanding any other provision of the Plan or this Order:

(a)   <u>Assured Insured Bonds</u>: To the extent there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(b)   <u>National Insured Bonds</u>:  To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(c)   <u>Syncora Insured Bonds</u>:   To the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d)   <u>FGIC Insured Bonds</u>:  Notwithstanding the terms and conditions of the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; <u>provided</u>, <u>however</u>, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(e)   <u>Ambac Insured Bonds</u>:   To the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the

Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date.  Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (Sections 75.5(b)(i)-(iv) of the Plan) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds.   For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

39.     <u>Disputed Claims Reconciliation</u>.  In accordance with the terms and provisions of Section 82.1(b) of the Plan and the Committee Agreement:

(a)     The two (2) Creditors Committee appointees to the Avoidance Actions Trust Board (collectively, the "<u>Creditor Appointees</u>") shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, Eminent Domain Claims, an ERS General Unsecured Claims, and Convenience Claims, regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019.   To facilitate the exercise of the settlement review process, the Oversight Board or AAFAF, as the case may be, shall inform the Creditor Appointees, in writing, ~~three~~five (~~3~~5) days prior to making or accepting a settlement proposal for the resolution of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim where the proposed allowed amount exceeds Five Hundred Thousand Dollars ($500,000.00).

41

(b)    With respect to the obligations and responsibilities set forth in this decretal paragraph 39, the Creditor Appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), inclusive of reimbursement of their reasonable out-of-pocket expenses incurred in furtherance of discharging such obligations and responsibilities, which amounts shall be funded from the GUC Reserve.  All such compensation and reimbursements shall be paid by the Entity selected pursuant to Section 1.285 of the Plan to hold the GUC Reserve within thirty (30) days of such Entity's receipt of a request for such payment.  To the extent such Entitythe Oversight Board or, in the event the Oversight Board terminates, AAFAF, disputes the validity or amount of any reimbursement request, andit shall inform such Entity and, in the event the parties are unable to resolve such dispute, the Title III Court shall retain jurisdiction to resolve any such dispute.

(c)    Without limiting the foregoing, (i) within sixty (60) Business Daysdays after the Effective Date, the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide the Creditor Appointees with a report (the "Initial Claims Report") containing (1) a register setting forth all CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims that have not been reconciled and which are being evaluated for possible objection, (2) the status of any pending objections to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, and (3) information illustrating which Claims are subject to the ACR Procedures and are to be excluded from CW General Unsecured Claims pursuant to Section 82.7 of the Plan, and (ii) within ten (10) Business Daysdays of the end of each month (the "Monthly Claims Report"), the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide a report containing material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports.  In addition, the Oversight Board or AAFAF, as the case may be, through its advisors, shall, upon reasonable request, periodically supply the Creditor Appointees with any other information the Creditor Appointees may reasonably request related to the claims reconciliation process.

(d)    In connection with the foregoing, the Creditor Appointees, together with their counsel and advisors in such capacity, shall not be liable to any Person for actions taken or omitted in connection with the exercise of their rights hereunder except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement from the GUC Reserve for fees and expenses in defending any and all actions or inaction in their capacity as Creditor Appointees, except for any actions or inactions involving willful misconduct or gross negligence.  The foregoing indemnity in respect of any Creditor Appointee shall survive and termination of such Creditor Appointee from the capacity for which they are indemnified.

40.    <u>Disputed Claims Holdback</u>.  From and after the Effective Date, and until such

time as each Disputed Claim has been compromised and settled, estimated by the Title III Court

in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the

Title III Court, Reorganized Debtors or the Disbursing Agent, as applicable, shall retain, for the

benefit of each holder of a Disputed Claim, the distributions that would have been made to such

holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount

set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the

Disputed Claims have been estimated by the Title III Court pursuant to section 502 of the

Bankruptcy Code constitutes and represents the maximum amount in which such Claim may

ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the

holder of such Disputed Claim and Reorganized Debtors; <u>provided</u>, <u>however</u>, that the recovery

by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above.  To the

extent the Disbursing Agent or any of the Reorganized Debtors, as the case may be, retains any

New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or

CVIs are distributed, the Disbursing Agent or such Reorganized Debtors, as the case may be,

shall exercise voting or consent rights with respect to such obligations.

41.    <u>National Action Claims</u>.  Notwithstanding anything contained herein, in the

GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary,

National may continue to litigate to final judgment or settlement all claims and causes of action

asserted in the National Action;  <u>provided</u>, <u>however</u>, that, in the event that notwithstanding the

application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the

defendants and, to the extent named, third-party  defendants in the National Action assert against

the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of

the Commonwealth (collectively, the "CW Entities") claims or counterclaims for indemnification, contribution, reimbursement, set-off or similar theories of recovery based on, arising from or related to the National Action (collectively, the "CW Entities' Claims"), (i) the CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including, without limitation, invoking the Bar Date Orders and discharge provisions set forth in Article XCII of the Plan and this Order, objecting to any proof of claim, and prosecuting available appeals, based upon, arising from or related to the National Action, (B) to allow National, at its option, to participate in or undertake such defense to such action in its sole discretion, and (C) not to settle any CW Entities' Claims without National's written consent, which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and hold the CW Entities harmless to the extent of the CW Entities' liability for the payment of monies or the delivery of property, pursuant to a Final Order or settlement as a result of the National Action, and (B) reimburse the relevant CW Entities for all documented fees and expenses incurred in connection with the defense against such CW Entities' Claims, including, without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A) and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement exceed any recovery realized by National in connection with the National Action; provided, however, that National shall have no obligation pursuant to this Order, the Plan or otherwise to indemnify and hold the CW Entities harmless for any claims based upon, arising from or related to the Underwriter Actions that are not based upon, arising from or related to the National Action or in which National is not involved. For the avoidance of doubt, CW Entities' Claims shall not constitute CW General Unsecured Claims.

44

42.   <u>No Amendments to Proofs of Claim/Objections to Claims</u>.   As of the commencement of the Confirmation Hearing, a proof of Claim may not be amended without the approval of the Title III Court.  With the exception of proofs of Claim timely filed hereafter in respect of executory contracts and unexpired leases rejected pursuant to this Order, any proof of Claim filed on or after the commencement of the Confirmation Hearing is hereby barred, and the Clerk of the Court and the Debtors' Claims Agent are authorized to remove such proofs of Claims from the claims registry in the Title III ~~Case.~~Cases.  Notwithstanding the provisions of Section 82.1 of the Plan, in the event that (a) a Claim that has been transferred pursuant to the terms and provisions of either the ACR Order or the ADR Order is subsequently transferred back to the claims registry for determination by the Title III Court, the period in which the Reorganized Debtors, by and through the Oversight Board, or AAFAF, as the case may be, shall be extended up to and including one hundred eighty (180) days from and after the date of such notice transferring any such Claim back to the claims registry, and (b) within thirty (30) days of the date hereof, in accordance with Section 204 of PROMESA, the Government of the Commonwealth of Puerto Rico shall deliver, or cause applicable agencies, instrumentalities or Commonwealth of Puerto Rico public corporations to deliver, to the Oversight Board a copy of all files, documents, instruments and, to the extent applicable, pleadings requested by the Oversight Board in connection with the reconciliation of Claims, including, without limitation, Disputed Cliams.

43.   <u>Conditions to Effective Date</u>.  The Plan shall not become effective unless and until the conditions set forth in Section 86.1 of the Plan have been satisfied or waived in accordance with the provisions set forth in Section 86.2 of the Plan.

44.    <u>Administrative Claim Bar Date</u>.  The last day to file proof of Administrative
Expense Claims shall be ninety (90) days after the Effective Date, after which date, any
Administrative Expense Claim, proof of which has not been filed, shall be deemed forever
barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto;
<u>provided</u>, <u>however</u>, that no proof of Administrative Expense Claim shall be required to be filed if
such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order
of the Court or (ii) with the written consent of the applicable Government Parties expressly
granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an
intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of
taxes incurred by any of the Debtors during the period from and after the Commonwealth
Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, or (e) is the subject
of a pending motion seeking allowance of an administrative expense pursuant to Bankruptcy
Code section 503(b) as of the entry of this Order; and, <u>provided</u>, <u>further</u>, that any such proof of
Administrative Expense Claim by a governmental unit shall remain subject to the rights and
interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in
interest to interpose an objection or other defense to the allowance or payment thereof.

45.    <u>Professional Compensation and Reimbursement Claims</u>.  All Entities awarded
compensation, including, without limitation, to the fullest extent provided in respective letters of
engagement or similar instruments or agreements, or reimbursement of expenses by the Title III
Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including,
without limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the
Title III Court, (a) no later than the tenth (10th) calendar day (or the first Business Day to occur
thereafter) after the later to occur of (i) the Effective Date and (ii) the date upon which the Title

III Court order allowing such Claims is deemed to be a Final Order, or (b) upon such other terms no more favorable to the claimant as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein or the Plan, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date.   The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred from and after the Effective Date in the ordinary course and without the need for Title III Court approval.

46.   GO/PBA Consummation Costs.   Notwithstanding anything contained in the Plan or this Order to the contrary, to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, and in consideration of (a) the negotiation, execution and delivery of the GO/PBA Plan Support Agreement by each Initial GO/PBA PSA Creditor and (b) the obligations and covenants contained in the GO/PBA Plan Support Agreement, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (EST) on February 22, 2021.

47.     AFSCME Professional Fees.  Notwithstanding anything contained in the Plan or this Order to the contrary, on the Effective Date, AFSCME shall be reimbursed its reasonable professional fees and expenses incurred to compensate AFSCME for the cost of negotiation, confirmation and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions.

48.     GO/PBA PSA Restriction Fee.  Notwithstanding anything contained in the Plan or this Order to the contrary, in exchange for (a) executing and delivering the GO/PBA Plan Support Agreement or (b) if applicable, tendering and exchanging GO Bonds or PBA Bonds in accordance with the terms and conditions of the GO/PBA Plan Support Agreement and notices posted on EMMA, and agreeing to all of its terms and conditions, including support of the Plan and  the "lock-up" of GO Bonds and PBA Bonds in accordance with the terms of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors (including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-insured GO Bond or PBA Bond insured by Ambac, Assured, FGIC, Syncora or National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC, Syncora and National, to the extent Ambac, Assured, FGIC, Syncora or National, as the case may be, is authorized to vote such Claims in accordance with Section 301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, the GO/PBA PSA Restriction Fee, in the form of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of the Plan equal

to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (without duplication and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac, Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims, CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) for which it would have been entitled to receive the GO/PBA PSA Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, the GO/PBA PSA Restriction Fee on account thereof; and, provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated pursuant to the terms of Sections 7.1(b)(iii) (subject to the extension provided for in Section 7.1(b) thereof), (c)(i) or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan Support Agreement for any reason other than a breach of the GO/PBA Plan Support Agreement by a non-Government Party, the aggregate GO/PBA PSA Restriction Fee and Consummation Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in Cash, as an allowed administrative expense claim under a plan of adjustment for the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support

Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

49.     <u>ERS Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this Order to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

50.     <u>CCDA Consummation Costs</u>.  Notwithstanding anything contained in the Plan or this Order to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA Creditor's CCDA

50

Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

51.    <u>CCDA Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this Order to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, or FGIC, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, and FGIC, to the extent Ambac, Assured, or FGIC, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; <u>provided</u>, <u>however</u>, that each CCDA Restriction Fee Creditor who acquires any CCDA

Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided, further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Section 7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be

due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

52.    <u>HTA Bond Claims</u>.    In consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims.

53.    <u>System 2000 Obligations</u>.    Pursuant to the terms and provisions of Section 55.10 of the Plan, the Commonwealth shall satisfy all obligations associated with Allowed System 2000 Participant Claims in the timeframes set forth therein.

54.     HTA/CCDA Clawback Structuring Fees.  In consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days following such date, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

55.     Active JRS Participants and Active TRS Participants.  In connection with the treatment of Active JRS Participant Claims and Active TRS Participant Claims pursuant to Sections 55.8 and 55.9 of the Plan:

(a)     Act 106 Defined Contribution Accounts.  Notwithstanding any provision of Act 106 to the contrary (including, without limitation, Sections 1.4, 1.6, 2.1, 2.6, and 3.1 thereof), on or prior to the Effective Date, the Commonwealth shall establish defined contribution accounts (the "Defined Contribution Accounts") pursuant to Chapter 3 of Act 106 for all holders of such Active JRS Participant Claims and Active TRS Participant Claims who do not have such accounts as the Effective Date and who, prior to the Effective Date, were making contributions to JRS  in accordance with the provisions of Act No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act", or to TRS in accordance with the provisions of Act No. 91-2004, as amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement System Act", as applicable.  Without in any way limiting the foregoing, in connection with the

54

modification of the Commonwealth's obligations under any laws establishing or enabling TRS or JRS, the Commonwealth shall enroll teachers, judges, and all other employees that would have otherwise been enrolled in TRS, hired from and after the Effective Date in the Act 106 Defined Contribution Plan and establish Defined Contribution Accounts for such individuals.

(b)    <u>Eligibility for and Enrollment in Federal Social Security</u>.   From and after the Effective Date, and notwithstanding any provision of Act 106 to the contrary (including, without limitation, Section 3.4 thereof), every (i) Active JRS Participant, (ii) teacher who is an Active TRS Participant, and (iii) teacher and judge hired from and after the Effective Date shall mandatorily make contributions to his or her Defined Contribution Account at a minimum rate of two and three-tenths percent (2.3%) of his or her monthly compensation, up to the limit established in section 1081.01(d) (7) of Act 1-2011; <u>provided</u>, <u>however</u>, that each teacher and judge who is forty-five (45) years of age or older as of the Effective Date shall contribute to his or her Defined Contribution Account at a minimum rate of eight and one-half percent (8.5%) of his or her monthly compensation, up to the limited established in section 1081.01(d) (7) of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico", or any successor law thereof, and, therefore, fail to be eligible to contribute to the Federal Social Security system, unless any such teacher or judge shall have irrevocably elected within sixty (60) days of the Effective Date to reduce their contributions to a minimum of two and three-tenths percent (2.3%) and be enrolled in the Federal Social Security system.   For teachers who are Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date who contribute two and three-tenths percent (2.3%) of their monthly compensation as set forth above, including those aged 45 and older who have elected to do so, the Employer, in coordination with the Retirement Board and/or Secretary of Treasury, shall

withhold the minimum amount of six and two-tenths percent (6.2%) of their applicable monthly compensation and remit such amount to the appropriate authority as required by the applicable provisions of the Federal Social Security Act and other applicable Federal law to enable the inclusion of the Participant in the Federal Social Security System.  Teachers who are Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date may voluntarily contribute to their Defined Contribution Accounts additional amounts to those established as allowed under section 1081.01 of Act No. 1-2011, provided, however, that in no case may those increased contribution rates and additional amounts exceed the applicable limits to be eligible, and affect the eligibility of these Participants, for coverage under the Federal Social Security system, unless such Participants are aged 45 and older and do not participate in the Federal Social Security System.  In accordance with the foregoing, the Government of the Commonwealth of Puerto Rico, including, without limitation any Entity or Person acting for or on behalf thereof, shall implement all reasonably necessary or advisable policies, procedures, or mechanisms to provide for all payroll deduction or transmittal required by federal law to ensure eligibility for and enrollment of Participants in the Federal Social Security System and effectuating the Federal Insurance Contributions Act remittances.

56.    Discharge and Release of Claims and Causes of Action.

(a)    Except as expressly provided in the Plan or herein, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such

56

Claims from and after the Petition Date, and regardless of whether any property will have been
distributed or retained pursuant to the Plan on account of each of the Claims or Causes of Action;
provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 of
the Plan and decretal paragraph 60 hereof, nothing contained in the Plan or this Order is
intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the
PSA Creditors, AFSCME, and each of their respective Related Persons by any Creditors of the
Debtors.  Upon the Effective Date and independent of the distributions provided for under the
Plan,  the Debtors and Reorganized Debtors shall be discharged and released from any and all
Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the
Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections
502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a)
a proof of claim based upon such Claim is filed or deemed filed under section 501 of the
Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and
PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such
debt voted to accept the Plan.  For the avoidance of doubt, nothing contained in the Plan or
herein shall release, discharge or enjoin any claims or causes of action against PREPA arising
from or related to PREPA-issued bonds, including, without limitation, Monoline-issued
insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against
any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to
PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's
Title III case, including, without limitation, any plan of adjustment therein.

(b)      Except as expressly provided in the Plan or herein, all Entities shall be precluded
from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their

respective employees, officials, Assets, property, rights, remedies, Claims or Causes of Action of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets and property, including any and all interest accrued on such Claims, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of each of the Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or herein, this Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  As of the Effective Date, and in consideration for the distributions or other value provided pursuant to the Plan, each holder of a Claim in any Class under the Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property, all such Claims.

(c)     Notwithstanding any other provisions of decretal paragraph 56 of this Order or Section 92.2 of the Plan, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government

Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by decretal paragraph 56 of this Order and Section 92.2 of the Plan.

(d)     SEC Limitation.  Notwithstanding anything contained herein or in the Plan to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e)     United States Limitation.  Notwithstanding anything contained herein or in the Plan to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United States arising from and after the Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtors or the Reorganized Debtors, as the case may be, under any

59

United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized

Debtors' obligations arising under federal police or regulatory laws, including, but not limited to,

laws relating to the environment, public health or safety, or territorial laws implementing such

federal legal provisions, including, but not limited to, compliance obligations, requirements

under consent decrees or judicial orders, and obligations to pay associated administrative, civil,

or other penalties, and (F) any liability to the United States on the part of any non-debtor.

Without limiting the foregoing, nothing contained herein or in the Plan shall be deemed (i) to

determine the tax liability of any Entity, including, but not limited to, the Debtors and the

Reorganized Debtors and any obligation of the Debtors to pay postpetition interest on any such

tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or

tax filing and withholding obligations of any entity, including, but not limited to, the Debtors and

the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim

of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to

grant any relief to any Entity that the Court is prohibited from granting by the Declaratory

Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

      (f)    <u>Underwriter Actions</u>.  Notwithstanding anything contained herein or in the Plan to

the contrary, including, without limitation, Sections 92.2, 92.3 and 92.11 of the Plan, except as

may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the

Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended,

nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release,

reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation,

the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of

action and defenses in the Underwriter Actions, including, but not limited to, any Claims,

defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive Rights"); provided, however, that, notwithstanding the foregoing for the avoidance of doubt, in no event shall any Defensive Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third party defendant by any of the CW Entities in connection with an Underwriter Action; and, provided, further, that, no party in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the Plan, and/or Confirmation Order; and/or (ii) against the Debtors, the Reorganized Debtors, PREPA, HTA, or any other party in the Underwriter Actions any of the CW Entities any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, for indemnification, contribution, reimbursement, set-off or similar theories of to the extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be deemed disallowed, barred, released and discharged in accordance with the terms and provisions of the Plan and the Confirmation Order; and provided, further, that, for the avoidance of doubt, nothing in this decretal paragraph 56(f) is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or limiting the amount of any liability or judgment in any Underwriter Action.   The parties in the Underwriter Actions shall be

permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting against the Debtors, the Reorganized Debtors, PREPA, and HTAany of the CW Entities any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, indemnification, contribution, reimbursement, set-off or similar theories of, to the extent asserted for purposes of obtaining an affirmative monetary recovery, based upon, arising from or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum, or in any other manner.

(g)     Quest Litigation.  Notwithstanding anything contained herein or in the Plan to the contrary, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the right of the Quest Diagnostics of Puerto Rico, Inc. ("Quest") (1) from asserting its respective rights, claims, causes of action and defenses in the avoidance action brought against it, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment, or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment (the "Quest Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Quest Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property by any of the Debtors to Quest in connection with the merits of its avoidance action, or to file a claim pursuant to section 502(h) of the Bankruptcy Code as set forth in the following sentence, and (2) to file and receive payment on any Claim it has pursuant to section 502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3); provided, however, that any such Claims would constitute a CW General Unsecured Claim and be treated in accordance with the terms and provisions of Article LXII of the Plan.

57.  <u>Releases by the Debtors and Reorganized Debtors</u>.  Except as otherwise expressly provided in the Plan or this Order, on the Effective Date, and for good and valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims.

58.  <u>Release and Exculpation Provisions</u>.  Except as otherwise provided in this Order, all release and exculpation provisions, including, but not limited to, those contained in Article XCII of the Plan, are approved and shall be effective and binding on all Entities, to the extent provided therein.

59.  **Injunction on Claims**.  **Except as otherwise expressly provided in Section 92.11 of the Plan, this Order or such other Final Order of the Title III Court that is applicable, all Entities who have held, hold or in the future hold Claims or any other debt or liability that is discharged or released pursuant to Section 92.2 of the Plan or who have held, hold, or in the future hold Claims or any other debt or liability discharged or released pursuant to Section 92.2 of the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or**

property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability discharged pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability discharged pursuant to the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

60.  **Injunction Related to Releases**.  As of the Effective Date, all Entities that hold, have held, or in the future hold a Released Claim released pursuant to Section 92.5 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order;

64

(iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under decretal paragraph 57 of this Order and Section 92.5 of the Plan; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or this Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of this Order: the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order* (Docket Entry No. 15854), as amended; and the *Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations* (Docket Entry No. 17394), as amended.

61.   <u>Exculpation</u>.

(a)   <u>Government Parties</u>:  The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection

with the consummation of the transactions set forth in the Plan; provided, however, that the

foregoing provisions of this subparagraph (a) or Section 92.7 of the Plan shall not affect the

liability of any Entity that otherwise would result from any such act or omission to the extent that

such act or omission is determined in a Final Order to have constituted intentional fraud or

willful misconduct.   Nothing in this subparagraph (a) or Section 92.7(a) of the Plan shall

prejudice the right of any of the Government Parties, and the Government Parties' officers and

directors serving at any time up to and including the Effective Date, and each of their respective

professionals to assert reliance upon advice of counsel as a defense with respect to their duties

and responsibilities under the Plan.

(b)     PSA Creditors:  Each of the PSA Creditors solely in its capacity as a party to the

GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, and/or the HTA/CCDA

Plan Support Agreement and a Creditor and/or insurer, as applicable, from the Petition Date up

to and including the Effective Date and each of their respective Related Persons shall not have or

incur through the Effective Date any liability to any Entity for any act taken or omitted to be

taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation,

dissemination, implementation, acceptance, confirmation or approval of the Plan or any

compromises or settlements contained therein, the Disclosure Statement, the GO/PBA Plan

Support Agreement, the PRIFA Plan Support Agreement, the HTA/CCDA Plan Support

Agreement, the Definitive Documents, or any other contract, instrument, release or other

agreement or document provided for or contemplated in connection with the consummation of

the transactions set forth in the Plan; provided, however, that the foregoing provisions of this

subparagraph (b) and Section 92.7(b) of the Plan shall not affect the liability of any Entity that

otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)    Retiree Committee:  Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided, however, that, the foregoing provisions of this subparagraph (c) and Section 92.7(c) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)    Creditors' Committee:  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the Petition Date up to and including the Effective Date and each of the Creditors' Committee's

Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided, however, that, the foregoing provisions of this subparagraph (d) and Section 92.7(d) of the Plan shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)    AFSCME:  Each of AFSCME solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement;

provided, however, that, the foregoing provisions of this subparagraph (e) and Section 92.7(e) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(f)      Monoline Insurers:  Ambac, Assured, FGIC, National, Syncora, and their Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding anything contained in this Order or the Plan to the contrary, the terms and provisions of the Plan and this Order shall not, and shall not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Commutation Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, National's or Syncora's applicable

obligations under the Ambac Insurance Policies, Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as applicable); provided, however, that the foregoing provisions of this subparagraph (f) and Section 92.7(f) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined, pursuant to a Final Order, to have constituted intentional fraud or willful misconduct.

(g)    The DRA Parties:    Each of the GDB Debt Recovery ~~Authorized~~Authority ("DRA"), AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for Wilmington Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and including the Effective Date and each of the DRA Parties Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral Monitor (Docket Entry No. 19100, Ex. A), or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, the foregoing provisions of this subparagraph (g) of the Plan shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

70

62.   <u>Maintenance of Pension System</u>.   Before the tenth (10th) anniversary of the
Effective Date, the Government of the Commonwealth of Puerto Rico, including, without
limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement
existing legislation or enact new legislation to create or increase any defined benefit pension
payment or obligation to current or future retirees from or related to any defined benefit plans
over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or
part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for
government employees; <u>provided</u>, <u>however</u>, that the Governor and Legislature, subsequent to
termination of the Oversight Board, may apply to the Title III Court for relief from this provision
upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons
why the requested changes will not create a risk of the financial distress caused by the
Commonwealth's prior defined benefit plans that ended up creating nearly $55 billion of
unfunded pension obligations, (iv) the means of funding the requested changes and reasons why
there is little risk of such funding not being carried out, (v) the reasons why the requested
changes will not create a material risk of defaults on any of the then outstanding obligations
pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and
defined benefit plans are both prudent and required; and, <u>provided</u>, <u>however</u>, that, prior to the
termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit
pension payment or obligation to current or future retirees from the benefits provided by the Plan.

63.   <u>Appointments Related Litigation/Uniformity Litigation</u>.   Notwithstanding
anything contained herein or the Plan to the contrary, in the event that a Final Order is entered in
connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to
entry of this Order, in consideration of the distributions made, to be made, or deemed to be made

71

in accordance with the terms and provisions of the Plan and documents and instruments related hereto, and all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan or this Order having consented and agreed, such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan and this Order, including, without limitation, the compromise and settlement of the Commonwealth-COFINA Dispute and the releases, exculpations and injunctions provided pursuant to Article XCII of the Plan and herein; provided, however, that, to the extent that a plaintiff in the Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement, or the ERS Stipulation, within five (5) Business Days of the Effective Date, such plaintiff shall take any and all actions to dismiss, with prejudice, or, in the event other plaintiffs are party to such litigations, withdraw from, with prejudice, such Appointments Related Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing notices with the clerk of the court having jurisdiction thereof.

64.  **Bar Order**.  **To the limited extent provided in the Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the GO/PBA Plan Support Agreement, HTA/CCDA Plan Support Agreement, PRIFA Plan**

72

Support Agreement, AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

65.   **Supplemental Injunction**.  Notwithstanding anything contained herein or in the Plan to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, or may control by enacting legislation, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action including enacting legislation against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with

73

respect to any Released Claims for themselves or other entities, arising prior to the

Effective Date (including prior to the Petition Date), including, but not limited to:

(a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)     Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the Plan or this Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;

(e)     Enacting or adopting any statute, law, rule, resolution, or policy to cause, directly or indirectly, any Released Party to have liability for any Released Claims; and

(f)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Order; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

66.     Term of Existing Injunctions or Stays.  Unless otherwise provided in the Plan or

this Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362,

or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the

Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall

remain in full force and effect through the Effective Date, except that each injunction imposed by

a Court order shall remain in effect permanently unless the order specifies a termination date or

event, in which case, the specification set forth in such order shall govern.  All injunctions or

stays contained in the Plan or this Order shall remain in full force and effect in accordance with

their terms.

67.     <u>Prosecution of Claims</u>.  Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Bankruptcy Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

68.     <u>Indemnification and Reimbursement Obligations</u>.  For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, shall be Administrative Expense Claims.

69.     <u>Compliance with Tax Requirements</u>.  Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements; <u>provided</u>, <u>however</u>, that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without

limitation, the twenty-nine (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.  Except as provided above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent or the trustee of the applicable Trust may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

70.   <u>Documents and Instruments</u>.  Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

71.   <u>Fiscal Plan</u>.  For so long as the Oversight Board is in existence, the Oversight Board shall cause the Fiscal Plan in effect on the Effective Date, and any post-Effective Date Fiscal Plan certified by the Oversight Board to include provisions requiring the certified budget to provide for the payment in each FY of (a) principal and interest payable on the New GO

Bonds, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

72.    Claims Against the Commonwealth Based on Debt Issued by HTA, CCDA, PRIFA and MBA.  The  Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.

73.    GUC Reserve.  On and after the Effective Date, the Debtors' and Reorganized Debtors' liability to holders of Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims shall be limited to funding the GUC Reserve in accordance with Section 62.3 of the Plan as follows: subject to the reductions provided therein, (a) Two Hundred Million Dollars ($200,000,000.00) on the later of December 31, 2021 and the Effective Date; (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2022; (c) One Hundred Million Dollars ($100,000,000,00) on or prior to December 31, 2023; (d) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024; and (e) Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025.  Upon the GUC Reserve being funded by the Commonwealth in accordance with Section 62.3 of the Plan, the Debtors and Reorganized Debtors shall have no further liability on account of such Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims.

77

74. <u>PROMESA 407 Claims</u>. All Claims reserved by holders of bonds issued by HTA, CCDA, PRIFA, or MBA under that certain *Findings of Fact, Conclusions of Law, and Order Approving the Qualifying Modification for the Government Development Bank for Puerto Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act*, including, without limitation, any claim under PROMESA Section 407, shall be automatically released on the Effective Date with no further notice or action.

75. <u>Dairy Producer Claims</u>. Notwithstanding anything contained in the Plan or this Order to the contrary, (a) nothing contained herein shall adjust, enlarge, compromise discharge or otherwise affect the respective parties' rights or obligations pursuant to the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory approval accrual set forth decretal paragraph 14 of the Dairy Producer Settlement shall be treated and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy Produce Claim from any other source, and (c) the Plan shall not affect the regulatory accrual charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer Settlement.

76. <u>Oversight Board Termination and Post-Confirmation Powers</u>. Neither the Plan nor this Order shall change the duration of the Oversight Board's existence set forth in PROMESA Section 209, and neither the Plan nor this Order shall alter any of the Oversight Board's powers and duties under each title of PROMESA. Until termination of the Oversight Board pursuant to PROMESA Section 209, the Oversight Board may enforce the Plan. At all times, each party in interest may enforce Plan provisions directly affecting the party in interest.

77. <u>Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion</u>. Nothing in the Plan and nothing in this Order (a) alters the powers of the

Oversight Board granted by Titles I and II of PROMESA, including its rights in its sole discretion, to amend the certified Fiscal Plan and budget in effect on the Effective Date and to develop and certify new fiscal plans and budgets at any times, (b) grants the government of Puerto Rico any entitlement to any provisions in certified fiscal plans and budgets, and (c) grants the government of Puerto Rico any rights and powers barred by PROMESA section 108(a).

78.   <u>Government Post-Confirmation Powers and Duties</u>.   Upon termination of the Oversight Board pursuant to PROMESA Section 209, the Governor shall enforce the Plan.  If the Governor fails to enforce a Plan provision directly or indirectly impacting a party in interest after being requested to do so by a party in interest, each party in interest that would reasonably be prejudiced or injured by lack of enforcement may enforce the Plan provision.  At no time prior or subsequent to the termination of the Oversight Board shall the Governor or Legislature enact, implement, or enforce any statute, resolution, policy, or rule reasonably likely, directly or indirectly, to impair the carrying out of the Plan's payment provisions, covenants, and other obligations.  Pursuant to Bankruptcy Code section 1142(b), the Governor shall cause the executive branch of the Commonwealth government to take all acts necessary for the consummation of the Plan.

79.   <u>Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated</u>. The Government of Puerto Rico, including without limitation, any Entity or Person acting for or on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal, change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt issued pursuant to the Plan.

80.   <u>Non-Impairment of CVIs, SUT.</u>  Until all obligations with respect to the CVIs have been paid or otherwise satisfied in accordance with their terms, the Commonwealth, or any Entity or Person acting for or on behalf thereof, shall take no action that would: (a) limit or alter the rights vested in the Commonwealth in accordance with the Plan and this Order to fulfill the terms of any agreements with the holders of CVIs; (b) impair the rights and remedies of the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the payment of the CVIs in accordance with the terms and provisions of the Plan and as set forth in the CVI Indenture; <u>provided</u>, <u>however</u>, that the foregoing shall not preclude the Commonwealth from exercising its power, through a valid change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture.

81.   <u>Reversal/Stay/Modification/Vacatur of Order</u>.  Except as otherwise provided in this Order or a subsequent order issued by this Court or a higher court having jurisdiction over an appeal of this Order or over a *certiorari* proceeding in respect of this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors or the Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respect by the provisions of this Order and the Plan.  To the

extent not specifically reversed, modified, vacated, or stayed by an order of this Court or an appellate court, all existing orders entered in the Title III Cases remain in full force and effect.

82.   <u>Retention of Jurisdiction</u>.   Notwithstanding the entry of this Order or the occurrence of the Effective Date, subject to the terms and provisions of Article XCI of the Plan, and except as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in Article XCI of the Plan.

83.   <u>Conflicts Among Documents</u>.   The provisions of the Plan and this Order shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided</u>, <u>however</u>, that, in the event of any inconsistency between (a) the Plan or this Order and (b) the New GO Bond Legislation, the CVI Legislation, or any other legislation implementing the Plan or otherwise in any manner, the terms and provisions of the Plan or this Order, as applicable, shall prevail; and, <u>provided</u>, <u>further</u>, that, in the event of any irreconcilable inconsistency between the Plan and this Order, the documents shall control in the following order of priority: (i) this Order, and (ii) the Plan; and, <u>provided</u>, <u>further</u>, that, in the event of any inconsistency between this Order and any other order in the Commonwealth Title III Case, the ERS Title III Case, the PBA Title III Case, the terms and provisions of this Order shall control; and, <u>provided</u>, <u>further</u>, that nothing contained herein is intended, nor shall be construed, to modify the economic terms of the Plan.

81

84.     PBA Leases.   On or prior to the Effective Date, the Commonwealth and PBA shall enter into a master lease agreement, for a term of one (1) year, unless otherwise reduced or extended by the parties thereto, in writing, providing for the lease of properties subject to the leases being rejected by the Commonwealth and PBA pursuant to the Plan and this Order, and on terms directly related to the market value of such properties and the costs and expenses associated with the maintenance thereof.

85.     Modifications.   The modifications to the Seventh Amended Plan, as set forth in the Plan, including, without limitation, the Modifications, do not adversely change the treatment of the Claim of any Creditor that accepted the Seventh Amended Plan and all such Creditors shall be deemed to have accepted the Plan.   Before substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after entry of this Order, subject to any limitations set forth in the Plan (including consent rights) and any stipulation approved by this Court in connection with the Plan; provided, however, that the circumstances warrant such modification and the Court, after notice and a hearing, confirms such modified plan under the applicable legal requirements.   For the avoidance of doubt, the Plan shall not be modified except in accordance with Bankruptcy Code section 942 and the terms of this Order.

86.     Asserted Surety Claims.   Notwithstanding anything contained in the Plan to the contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a secured claim and allowed in whole or in part, by Final Order, such Claim shall be paid in full, in Cash; provided, however, that, in the event some or all of any such Claim is determined to be an unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in accordance with the provisions of Section 17.1, 62.1 or 70.1 of the Plan, as the case may be.

87. <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>. The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

88. <u>Governing Law</u>. Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

89. <u>PFC Reservation</u>. Neither the Plan nor this Order determine, affect or limit any claims or rights U.S. Bank Trust National Association and U.S. Bank National Association, as Trustee for bonds issued by PFC, may have against GDB, DRA or the GDB/PET, including, without limitation, claims and rights in respect of letters of credit.

90. ~~89.~~ <u>Applicable Nonbankruptcy Law</u>. Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the Title III Cases pursuant to PROMESA Section 301(a), the provisions of this Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law. The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Order and the Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including, without limitation, the New GO Bonds, the New GO Bonds Indenture, the GO CVIs, the GO CVI Indenture, the Clawback CVIs, the Clawback CVI Indenture, and the Avoidance Actions Trust Agreement, provide adequate means

for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code, and, as of

the occurrence of the Effective Date, shall constitute legal, valid, and binding obligations of the

Debtors, as applicable, and valid provisions to pay and to secure payment of the New GO Bonds,

the GO CVIs, and the Clawback CVIs, as applicable, pursuant to section 944(b)(3) of the

Bankruptcy Code, and be enforceable in accordance with their terms.

91.   90.  Waiver of Filings.   Any requirement pursuant to Bankruptcy Rule 1007

obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the

U.S. Trustee  is hereby waived as to any such list, schedule, or statement not filed as of the

Effective Date.

92.   91.  Notice of Order.   In accordance with Bankruptcy Rules 2002 and 3020(c), as

soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry

of this Order and the occurrence of the Effective Date, substantially in the form attached as

Exhibit B hereto, to all parties who hold a Claim in the Commonwealth Title III Case, the ERS

Title III Case, the HTA Title III Case, and the PBA Title III Case, as well as the Creditors'

Committee, the Retiree Committee, the U.S. Trustee, any party filing a notice pursuant to

Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal Revenue Service,

and the United States Attorney for the District of Puerto Rico.  Such notice is hereby approved in

all respects and shall be deemed good and sufficient notice of entry of this Order.

93.    ~~92.~~ No Waiver.  The failure to specifically include any particular provision of the Plan in this Order shall not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

Dated: _____
                San Juan, Puerto Rico

                                        _____
                                        Laura Taylor Swain
                                        United States District Court Judge

**Exhibit A**

**Plan**

**<u>Exhibit B</u>**

**Form of Notice**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                       Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**NOTICE OF (A) ENTRY OF ORDER CONFIRMING**
**MODIFIED EIGHTH AMENDED TITLE III PLAN OF ADJUSTMENT OF**
**THE COMMONWEALTH OF PUERTO RICO, ET AL. PURSUANT TO**
**TITLE III OF PROMESA AND (B) OCCURRENCE OF THE EFFECTIVE DATE**

**TO CREDITORS AND OTHER PARTIES IN INTEREST:**

     PLEASE TAKE NOTICE that, pursuant to an order, dated _____ [ECF No. ____] (the "Confirmation Order"), the *Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (as amended, supplemented, or modified, the "Plan") was confirmed by the United States District Court for the District of Puerto Rico (the "Court"). Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the Plan and the Confirmation Order.

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Plan occurred on _____ and the Plan was substantially consummated.

PLEASE TAKE FURTHER NOTICE that any party in interest wishing to obtain copies of the Confirmation Order, the Plan, and related documents should contact Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com, or may view such documents by accessing either https://cases.primeclerk.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/. Please note that a Public Access to Court Electronic Records ("PACER") (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 45 of the Confirmation Order, the deadline for filing proofs of or requests for payment of Administrative Expense Claims ("Administrative Expense Requests") is [_____], 2022; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, or (c) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable; and, provided, further, that any such proof of Administrative Expense Claim by a governmental unit shall remain subject to the rights and interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in interest to interpose an objection or other defense to the allowance or payment thereof.

PLEASE TAKE FURTHER NOTICE that, all Administrative Expense Requests should be sent to the following:

[_____]

Administrative Expense Requests will be deemed timely filed only if **actually received** by Prime Clerk by **5:00 p.m. (prevailing Atlantic Time)** on [_____], 2022 (the "Administrative Deadline"). The Administrative Expense Requests may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**PLEASE TAKE FURTHER NOTICE that, if you are required to file an Administrative Expense Request pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 45 of the Confirmation Order and fail to do so by the Administrative Deadline, you will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim (and from filing an Administrative Expense Request with respect to such Administrative Expense Claim) against the Debtors and their property, and the Debtors and Reorganized Debtors will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim.**

2

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 76.6 of the Plan and decretal paragraph 32 of the Confirmation Order, if the rejection of an Executory Contract and Unexpired Lease by the Debtors results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors, unless a proof of Claim is filed with the Court on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order is full, final, and complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements set forth in the Plan and this Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

Dated: _____          /s/ _____

      San Juan, Puerto Rico

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

/s/ _____

Hermann D. Bauer

3

USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

**Exhibit C**

**Preempted Laws**

# List of Main Statutes Preempted by PROMESA[1]

I.  **Commonwealth good faith and credit pledge statutes**
    A.  General Obligation Bonds
        1. ~~Act 33 approved December 7, 1942.~~
        1. ~~2.~~ Act 2 approved October 10, 1985.
        2. ~~3.~~ Act 1 approved June 26, 1987, as amended.
        ~~4.  Act 47 approved June 30, 2013.~~
        ~~5.  Act 242 approved December 13, 2011.~~
        ~~6.  Act 45 approved June 30, 2013.~~
        3. ~~7.~~ Act 34 approved March 4, 2014.
        4. ~~8.~~ Act 79 approved June 1, 2011.
        5. ~~9.~~ Act 243 approved August 9, 2008.
        ~~10. Act 74 approved July 23, 2007, as amended.~~
        6. ~~11.~~ Act 43 approved August 1, 2005, as amended.
        7. ~~12.~~ Act 216 approved August 19, 2004.
        8. ~~13.~~ Act 100 approved July 12, 2002, as amended.
        9. ~~14.~~ Act 161 approved July 5, 2003.
        10. ~~15.~~ Act 149 approved August 9, 2002, as amended.
        11. ~~16.~~ Joint Resolution No. 57 approved July 12, 1993.
        12. ~~17.~~ Act 54 approved July 6, 2001.
        13. ~~18.~~ Act 118 approved July 13, 2000.
        14. ~~19.~~ Act 153 approved July 16, 1999.
        15. ~~20.~~ Act 219 approved August 9, 1998.
        16. ~~21.~~ Act 81 approved August 14, 1997.
        17. ~~22.~~ Act 119 approved August 9, 1995.
        18. ~~23.~~ Act 46 approved July 28, 1994.
        19. ~~24.~~ Act 39 approved May 13, 1976, as amended
        20. ~~25.~~ Act 83 approved August 30, 1991.

    B.  General Obligation Loans
        1.  GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
        2.  GDB Loans to the Commonwealth
            1. ~~Act 33 approved December 7, 1942.~~
            2. ~~Act 47 approved June 30, 2013.~~
            3. ~~Act 242 approved December 13, 2011.~~
            4. ~~Act 45 approved June 30, 2013. [$245 million loan for the Fiscal Reconstruction Fund.]~~
            1. ~~5.~~ Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
            2. ~~6.~~ Joint Resolution No. 96 approved November 27, 2013.  [$30 million line of credit].

---

[1] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.

    C.  Commonwealth Guaranty – Public Buildings Authority Bonds
        1.  Act 17 approved April 11, 1968, as amended.

    D.  Commonwealth Guaranty – APLA
        1.       Act 409 approved September 22, 2004.

    E.  Commonwealth Guaranty – PRIFA-BANs
        1.       Act 1 approved January 1, 2015.

    F.  [Commonwealth Guaranty – PRASA
        1.       Act 45 approved July 28, 1994.]


**II.**    **Statutes appropriating Commonwealth revenues**
    A.  HTA
        1.       Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021; 9 L.P.R.A. § 5681 [motor vehicle license fees]
        2.       13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
        3.       13 L.P.R.A. § 31751(a)(3). [cigarette tax]
    B.  PRIFA
        1.       Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]
    C.  PRIFA BANs
        1.       Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]
    D.  MBA
        1.       13 L.P.R.A. § 31751(a)(4). [cigarette tax]
    E.  PRITA
        1.       13 L.P.R.A. § 31751(a)(5). [cigarette tax]

    F.  CCDA
        1.       13 L.P.R.A. § 2271v(a). [hotel room tax]
    G.  Act 147 enacted June 18, 1980, as amended
        1.       23 L.P.R.A. § 104.[2] [judiciary appropriation]
    H.  UPR
        1.       18 L.P.R.A. § 621-1.[3]
    I.  Act 83 approved August 30, 1991, as amended
        1.       21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[4]
    J.  Act 221 approved May 15, 1948, as amended

---

[2] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.
[3] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if preempted.
[4] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted.  In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

1.       15 L.P.R.A. § 74(d).[5]
K.  Act 18 approved January 24, 2014, as amended
1.       21 L.P.R.A. § 6742.[6]
L.  Act 214 approved August 18, 2004, as amended
1.       23 L.P.R.A. § 695
M.  Act 41 approved July 22, 2011, as amended
1.       12 L.P.R.A. §8105
N.  Act 1 approved January 31, 2011, as amended
1.       13 L.P.R.A. § 33231(l)

**III.   TRS and JRS Statutes**
  A.  Act 106 approved August 23, 2017
  B.  Act 160 approved December 24, 2013
  C.  Act 91 of March 24, 2004
  D.  Act 12 approved October 19, 1954
  E.  Act 162 approved December 24, 2013

**IV.   Statute Relating to Issuance of New Securities**
  A.  Act 42 approved September 16, 2021

---

[5] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.
[6] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

3

**<u>Exhibit D</u>**

**<u>List of Agencies and Amounts to be Transferred</u>**

4

Document comparison by Workshare 9.5 on Friday, November 12, 2021 7:17:22 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\na.proskauer.com\firm\Home\CH1\10109\Desktop\Plan 11.7.21\Proposed Confirmation Order 11.7.21 (As Filed).DOCX |
| Description | Proposed Confirmation Order 11.7.21 (As Filed) |
| Document 2 ID | C:\Users\local_10109\Temp\19Workshare\tmpB90B\Proposed Confirmation Order 11.12.DOCX |
| Description | C:\Users\local_10109\Temp\19Workshare\tmpB90B\Proposed Confirmation Order 11.12.DOCX |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 185 |
| Deletions | 163 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |

| Total changes | 352 |
|---|---|