```
 1                     UNITED STATES DISTRICT COURT

 2                     DISTRICT OF PUERTO RICO

 3
     In Re:                    )        Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )        PROMESA Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,              )        (Jointly Administered)
                               )
 7   as representative of      )
                               )
 8   The Commonwealth of       )
     Puerto Rico, et al.       )        November 12, 2021
 9                             )
                  Debtors,     )
10

11   _____

12   In Re:                    )        Docket No. 3:17-BK-3566(LTS)
                               )
13                             )        PROMESA Title III
     The Financial Oversight and )
14   Management Board for       )
     Puerto Rico,              )        (Jointly Administered)
15                             )
     as representative of      )
16                             )
     The Employees Retirement  )
17   System of the Government  )
     of the Commonwealth of    )
18   Puerto Rico,              )
                               )
19                  Debtors,   )

20   _____

21

22

23

24

25
```

```
 1  _____

 2

 3  In Re:                      )        Docket No. 3:19-BK-5523(LTS)
                                )
 4                              )        PROMESA Title III
    The Financial Oversight and )
 5  Management Board for        )
    Puerto Rico,                )        (Jointly Administered)
 6                              )
    as representative of        )
 7                              )
    The Puerto Rico Public      )
 8  Buildings Authority,        )
                                )
 9              Debtors,        )

10  _____

11                 CONFIRMATION HEARING - DAY FOUR

12   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

13               UNITED STATES DISTRICT COURT JUDGE

14    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

15               UNITED STATES DISTRICT COURT JUDGE

16  _____

17
    APPEARANCES:
18
    ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY
19
    For The Commonwealth
20  of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                             Mr. Brian S. Rosen, PHV
21                           Mr. Michael A. Firestein, PHV
                             Mr. Michael T. Mervis, PHV
22                           Mr. Paul V. Possinger, PHV
                             Ms. Laura Stafford, PHV
23                           Ms. Margaret A. Dale, PHV
                             Mr. Scott P. Cooper, PHV

24

25
```

```
 1   APPEARANCES, Continued:

 2   For Puerto Rico Fiscal
     Agency and Financial
 3   Advisory Authority and
     the Governor of
 4   Puerto Rico:            Mr. Peter Friedman, PHV

 5   For Peter C. Hein:      Mr. Peter C. Hein, Pro Se

 6   For Assured Guaranty
     Corp. and Assured
 7   Guaranty Municipal Corp: Mr. William J. Natbony, PHV

 8   For Ambac Assurance
     Corporation:            Ms. Atara Miller, PHV
 9
     For The Official
10   Committee of Retired
     Employees:              Ms. Catherine L. Steege, PHV
11
     For AmeriNational
12   Community Services, LLC: Mr. Nayuan Zouairabani Trinidad, Esq.

13   For Suiza Dairy Corp.:   Mr. Rafael A. Gonzalez Valiente, Esq.

14   For National Public
     Finance Guarantee
15   Corporation:            Mr. Robert S. Berezin, PHV

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.
```

4

```
 1                         I N D E X

 2    WITNESSES:                                    PAGE

 3         The Declarations of Andrew Wolfe
              submitted into evidence               22
 4
      ANDREW WOLFE
 5    Cross-examination by Mr. Hein                  23

 6         The Declaration of Adam Chepenik
              submitted into evidence               34
 7
      ADAM CHEPENIK
 8    Cross-examination by Mr. Hein                  35
      Direct examination by Mr. Mervis              47
 9    Recross-examination by Mr. Hein               50

10         The Declarations of Juan Santambrogio
              submitted into evidence               52
11
      JUAN SANTAMBROGIO
12    Cross-examination by Mr. Hein                  53

13         The Declarations of Marti Murray
              submitted into evidence               70
14
      MARTI P. MURRAY
15    Cross-examination by Mr. Hein                  71
      Direct examination by Ms. Dale                93
16    Recross-examination by Mr. Hein               94

17         The Declarations of David Brownstein
              submitted into evidence               96
18
      DAVID BROWNSTEIN
19    Cross-examination by Mr. Hein                  97
      Redirect examination by Mr. Firestein        121
20    Recross-examination by Mr. Hein              123

21         The Declarations of Mr. Jay Herriman
              submitted into evidence              128
22
      JAY HERRIMAN
23    Witness called but not questioned.

24         The Declarations of Mr. Simon Johnson
              submitted into evidence              130
25
```

```
 1                          I N D E X (Continued)

 2     WITNESSES:                                        PAGE

 3          SIMON JOHNSON
            Witness called but not questioned.
 4
            The Declaration of Mr. Hein submitted
 5             into evidence                             135

 6
       EXHIBITS:                                         PAGE
 7
            Monolines Exhibit Nos. 45, 52, and 53         20
 8          Retiree Committee Exhibit No. One            130

 9
       OTHER ITEMS:
10
            Stipulation No. One, and the referenced
11             exhibits and declarations, to the
               extent Stipulation No. One so provides    135
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                                San Juan, Puerto Rico

 2                                November 12, 2021

 3                                At or about 9:30 AM

 4                         *      *      *

 5          THE COURT:  Good morning.  Would the video

 6   participants please turn their cameras on for the introductory

 7   remarks, as usual?

 8          Welcome back, counsel, parties in interest, and

 9   members of the public, and press who are observing today's

10   proceedings by Zoom video or listening by telephone.  Today's

11   hearing is a continuation of the Confirmation Hearing for the

12   Modified Eighth Amended Plan of Adjustment for the

13   Commonwealth of Puerto Rico, et al.

14          I remind everyone that, consistent with court and

15   judicial conference policies, and the orders that have been

16   issued, no recording or retransmission of the hearing is

17   permitted by anyone, including but not limited to the parties,

18   members of the public, and the press.  Violations of this rule

19   may be punished with sanctions.

20          The Oversight Board has filed an Informative Motion

21   providing the sequence of witnesses whose declarations the

22   Oversight Board and the Retiree Committee intend to offer into

23   evidence as direct testimony.  That document was filed as

24   docket entry no. 19163 in case no. 17-3283, and it is

25   available to the public at no cost on Prime Clerk for those

```
 1   who are interested.

 2          I jumped ahead of myself in opening this proceeding,

 3   and at this point I would ask the clerk of court to make the

 4   proclamation and call the case.

 5          COURTROOM DEPUTY:  Thank you, Your Honor.

 6          The United States District Court for the District of

 7   Puerto Rico is now in session.  The Honorable Laura Taylor

 8   Swain presiding.  Also sitting, the Honorable Magistrate Judge

 9   Judith Gail Dein.  God save the United States of America and

10   this Honorable Court.

11          In re: The Financial Oversight and Management Board

12   for Puerto Rico, as representative of the Commonwealth of

13   Puerto Rico, et al., Bankruptcy Case Nos. 2017-3283,

14   2017-3566, and 2019-5523, for Further Confirmation Hearing.

15          THE COURT:  Thank you.

16          For the record, court was opened nunc pro tunc.  The

17   Informative Motion that the Oversight Board filed also

18   includes the amount of cross-examination time that has been

19   requested by Mr. Hein with respect to the particular

20   witnesses.

21          I'll be calling on each participant during the

22   hearing.  If you wish to be heard at any point when I have not

23   called on you, please use the "raise hand" feature of Zoom,

24   which is in the reactions section of the toolbar at the bottom

25   of the screen, at the appropriate time.
```

1      This morning's session will go until 12:50, that is,

2 ten minutes to 1:00 Atlantic Standard Time, that's ten minutes

3 to 12:00 Eastern Time, with a ten-minute break at about 11:15

4 AM Atlantic Standard, which is about 10:15 AM Eastern

5 Standard.  If necessary, we will resume at ten past 2:00

6 Atlantic Standard, which would be ten past 1:00 Eastern

7 Standard.

8      Please note that I have entered an Order this morning

9 at docket entry no. 19171 setting oral argument for next

10 Monday and Wednesday on certain issues; setting deadlines for

11 the filing of the revised proposed Confirmation Order and

12 objections thereto; and requiring the filing of revised

13 proposed findings of fact and conclusions of law after the

14 conclusion of the closing arguments.

15      I plan to amend this Order later today to provide a

16 deadline for filing objections to the proposed findings and

17 conclusions, and to deal with any other matters that may be

18 brought up in relation to this Order.  We can discuss it at

19 the end of this session or before we adjourn this afternoon,

20 depending on how quickly our proceedings go today.

21      Are there any matters that need to be discussed

22 before we turn to the evidentiary presentations?

23      Mr. Rosen.

24      MR. ROSEN:  Good morning, Your Honor.  Thank you.

25      I did see the Order that was entered this morning,

1   and I appreciate you filling my dance card for the weekend, so

2   thank you.

3          THE COURT:  Well, we all need to be kept busy.

4          MR. ROSEN:  Thank you, Your Honor.

5          Your Honor, at the Court's Order the other day with

6   respect to the submission of a joint stipulation for the

7   admission of exhibits, we have filed something this morning.

8   There is a -- we would like to update the Court with respect

9   to that, and if I could, I'd like to turn the podium over to

10  Ms. Laura Stafford, who you know from many of our prior

11  hearings.

12         THE COURT:  Yes.  Thank you, Mr. Rosen.

13         MR. ROSEN:  Thank you.

14         THE COURT:  Good morning, Ms. Stafford.

15         MS. STAFFORD:  Good morning, Your Honor.  Laura

16  Stafford of Proskauer Rose for the Financial Oversight Board,

17  for the record.

18         As Mr. Rosen noted, we wanted to provide you an

19  update regarding the status of the parties' discussions

20  regarding the exhibits.  As the Court directed on Wednesday,

21  the parties have worked diligently to address any remaining

22  issues with respect to the admissibility of the various

23  exhibits proffered by the parties.

24         This morning we filed a stipulation at ECF no. 19172

25  in which the parties agreed to the admissibility of virtually

1    all of the exhibits that have been proffered by the parties to

2    date.  There is one outstanding issue that the DRA Servicer

3    intends to raise regarding three exhibits proffered by the

4    Monolines, and we propose that the Court take that up prior to

5    the presentation of witnesses today, as we understand that

6    after that issue is resolved, all of the exhibit issues should

7    be resolved, and the admissibility of all exhibits should be

8    determined.

9         And with that, I cede the floor to the DRA Servicer,

10   in the event the Court wishes to take this up at this time.

11        THE COURT:  Very well.  We can proceed in that

12   fashion.

13        Good morning, Mr. Zouairabani.

14        MR. ZOUAIRABANI TRINIDAD:  Good morning, Your Honor.

15   Attorney Nayuan Zouairabani for AmeriNational Services, LLC,

16   as Servicer of the GDB-DRA from the law firm of McConnell

17   Valdes.

18        Your Honor, as Ms. Stafford mentioned, we have a

19   relevance objection with regard to three exhibits that were

20   identified by the Monolines, and I'm referring to their

21   Exhibits 45, 52, and 53, which were identified in the

22   Attachment 1 of the stipulation that was filed today, which is

23   docket 19172-1.

24        And, Your Honor, in a nutshell, the reason why we

25   want to raise this is we have certain concerns.  And just for

1    Your Honor's benefit, the Monolines have proffered to present

2    few documents.  Three of those documents -- I believe,

3    actually, it's four of them, consist of resolutions.  We don't

4    have an objection to those.

5          The ones that we do have objections to relate to a

6    loan agreement corresponding to one of the HTA loans; the

7    security and assignment agreement of the GDB, which now it's

8    for the DRA; and the UCC-1 financing statement corresponding

9    to that financing -- to that assignment agreement, security

10   agreement, Your Honor.

11         So the situation that we have is as follows:  As you

12   may recall, at Exhibit One of the stipulation that the DRA

13   parties entered with the FOMB, this is docket 19100 on Exhibit

14   A, paragraph 3 --

15         THE COURT:  Hold on.  I'm sorry.

16         MR. ZOUAIRABANI TRINIDAD:  Yes.

17         THE COURT:  Okay.  Are we still in 19172, the

18   document -- the 48-page exhibit document that was filed this

19   morning?

20         MR. ZOUAIRABANI TRINIDAD:  Yes, this relates to that.

21   Yes, Your Honor.

22         THE COURT:  Are you referring to a page where these

23   disputed exhibits are listed?

24         MR. ZOUAIRABANI TRINIDAD:  Yes.  Bear with me, Your

25   Honor.  I'll -- it's in docket 19172-1.

```
 1            THE COURT:  Okay.
 2            MR. ZOUAIRABANI TRINIDAD:  Which is the Attachment
 3    1.
 4            THE COURT:  Yes.
 5            MR. ZOUAIRABANI TRINIDAD:  The first document that
 6    the DRA Servicer has an objection to is Exhibit 45.  That's at
 7    page five --
 8            THE COURT:  Thank you.
 9            MR. ZOUAIRABANI TRINIDAD:  -- of that document.
10            THE COURT:  Let me turn back to that.
11            MR. ZOUAIRABANI TRINIDAD:  Sure.
12            THE COURT:  I was flipping through to try to find it
13    as you were speaking, and that got a little difficult, so this
14    is helpful.
15            All right.  So now I'm on page 5 of 35 of document
16    19172-1, and the first document that we're talking about is
17    Exhibit 45, which is described as August 28, 2013, loan
18    agreement and amendments; is that correct?
19            MR. ZOUAIRABANI TRINIDAD:  That is correct, Your
20    Honor.
21            THE COURT:  Okay.
22            MR. ZOUAIRABANI TRINIDAD:  The second document --
23    actually, the remaining two are on the same page.  It's
24    Exhibit 52.
25            THE COURT:  Just one minute.  Okay.  52 is described
```

1   as GDB assignment and security agreement and amendments.

2            MR. ZOUAIRABANI TRINIDAD:  Correct.

3            THE COURT:  All right.

4            MR. ZOUAIRABANI TRINIDAD:  And the last one is

5   Exhibit 53.

6            THE COURT:  And that is described as UCC-1 financing

7   statement filed by HTA, August 2013, and financing statement

8   amendment.

9            MR. ZOUAIRABANI TRINIDAD:  (Nodding head up and

10  down.)

11           THE COURT:  Thank you.

12           MR. ZOUAIRABANI TRINIDAD:  Yes, Your Honor.

13           THE COURT:  So you may proceed.

14           MR. ZOUAIRABANI TRINIDAD:  Thank you, Your Honor.

15           So, Your Honor, at the stipulation the DRA parties

16  entered with the Oversight Board on November 5, that's Exhibit

17  One -- Exhibit A, I'm sorry, of docket 19100, for your

18  benefit, Your Honor, paragraph 3, which talks about plan

19  agreements.  In (f), as in Freddy, there is a stipulation

20  there that the Order dismissing the Adversary Complaint -- for

21  your benefit, Your Honor, we're talking about -- this is ECF

22  no. 83 in Adversary 21-0068.

23           So it says that that Order dismissing the Adversary

24  Complaint, including, without limitation, that the GDB-HTA

25  loans are subject to subordination to the HTA 68 Bonds and the

1    HTA 98 Bonds qualifies as the "GDB Loan Priority

2    Determination," which is a defined term in the Plan of

3    Adjustment for purposes of the Plan.

4            Okay.  So the reason why this background is relevant

5    as it relates to the three exhibits that we just mentioned is

6    as follows:  The position from the DRA Servicer is that Your

7    Honor's decision in the adversary constitutes the GDB loan

8    priority determination.  As Your Honor may know, Class 59 in

9    the Plan, which contains a waterfall for certain CW/HTA

10   claims, organizes those creditors based on an understanding

11   with regard to priorities.

12           One of the conditions for distribution under the Plan

13   was that there be an adjudication in the GDB loan priority

14   determination.  The DRA position -- the DRA Servicer's

15   position is that Your Honor's position in the adversary

16   already considered that.  So if the GDB loan priority

17   determination is no longer an issue for purposes of

18   confirmation of the Plan, these three exhibits that are being

19   proffered by the Monolines do not make confirmation of this

20   plan more or less probable or likely.  They are not relevant,

21   and they are not material under Rules 401 and 402 of Evidence,

22   Federal Rules of Evidence.  And the DRA parties had reserved

23   the right to raise any relevancy issues with regard to these

24   documents.

25           We sustain, in light of the course of how these cases

1    have gone, this relevancy issue has been brought further to

2    light, and it is our position that we believe it should not be

3    presented for Plan purposes, as this particular item, I mean

4    the GDB loan priority determination, has already been

5    resolved.

6              THE COURT:  Thank you.

7              Does anyone else from your DRA constituency wish to

8    be heard on this before I turn to counsel for the Monolines?

9    I see that Mr. Natbony has his hand up.  No one else has their

10   hand up.  So, Mr. Natbony.

11             MR. NATBONY:  Thank you, Your Honor.  William Natbony

12   for Cadwalader Wickersham & Taft on behalf of Assured.

13             And I'll start, Your Honor, I don't know whether my

14   colleagues may have something to add at the end, but simply

15   put, Your Honor, the Plan being reviewed in this confirmation

16   proceeding sets forth a Class 59 distribution based on the

17   Board's review and understanding of the GDB loan documents and

18   other documents demonstrating the subordination of the GDB

19   loans, and any lien on Act 30-31 revenues.

20             The documents that we are seeking to enter are the

21   same documents that the Court specifically relied upon in its

22   October 29, '21, decision finding subordination, and the same

23   documents that the DRA parties used in their adversary

24   complaint.  This Court has recognized consistently the

25   important interrelationship between the confirmation

1   proceedings involving this Plan and the issue of the GDB loan

2   subordination.

3         Our position, Your Honor, is that, as participating

4   parties and supporters of the Plan, the Monolines should be

5   permitted to admit the documents on that issue that the

6   Monolines believe establishes support for the Plan, and the

7   various priorities set forth in the Plan, as well as support

8   Your Honor's decision, considering the documents were

9   specifically relied upon by Your Honor.

10        The DRA Servicer -- and by the way, I should point

11  out that there are no other objections to these documents,

12  including the DRA Collateral Monitor does not oppose these

13  three documents.  The DRA Servicer asserts, because the Court

14  issued its decision on subordination, the actual loan

15  documents upon which the October 29 decision is based somehow

16  become irrelevant.  However, the DRA Servicer and its

17  decisions on settlement, or whatever exhibits it wants to put

18  in the record, should not be able to dictate what proof the

19  Monolines can offer.

20        As separate participants and Plan supporters, the

21  Monolines properly offer these few exhibits to make sure that

22  the record here, and on any appeal, is complete to justify the

23  Plan priorities and the Court's October 29 decision, which, if

24  this Plan is confirmed, will be an important part of the

25  Court's Confirmation Order and incorporated findings of fact

1   and conclusions of law.

2        That's our position, Your Honor.  I don't know

3   whether any of my colleagues have anything to add or if the

4   Court has any questions.  Other than that, I'll conclude my

5   argument.

6        THE COURT:  Thank you.

7        Mr. Berezin has his hand up.  So Mr. Berezin next.

8        MR. BEREZIN:  Thank you, Your Honor.  I join the

9   points raised by Mr. Natbony, and also would just add that the

10  stipulation between the Board and the DRA parties certainly is

11  binding between them, but it obviously does not represent --

12  the DRA parties do not represent all possible parties in

13  interest who could raise an objection.

14       The stipulation between those two parties simply does

15  not dispose of the issue for relevance purposes in a

16  proceeding of this magnitude, with this many potential parties

17  who could raise an issue, whether now or later in the

18  proceedings.  So we would just add that the documents remain

19  relevant, and that they should be admitted.

20       THE COURT:  Thank you.

21       Mr. Zouairabani.

22       MR. ZOUAIRABANI TRINIDAD: Yes.  Thank you, Your

23  Honor.  I'd like to briefly respond.

24       Your Honor, with regard to the position that some of

25  the Monolines have just raised, the concern that we have -- we

1    certainly are not contesting, and we've agreed as part of the

2    stipulation that there would be no appeals, there would be no

3    challenge from the DRA parties with regard to Your Honor's

4    decision on the adversary proceeding, in which Your Honor

5    relied on these documents in issuing that decision.

6          So under the terms of the stipulation, we have agreed

7    that that decision would be binding moving forward.  That is

8    case of the law (sic), Your Honor.  The concern that we have

9    with reasserting these documents in the Plan proceedings -- as

10   part of Plan confirmation is that that issue has already been

11   adjudicated; that issue has already been put to bed.

12         Not only is it just duplicative, but the truth of the

13   matter is the concern we have, especially based on the

14   comments that Mr. Natbony just mentioned, to preserve the

15   record on possible appeal, is the issue with regard to the GDB

16   loan priority determination should not be relitigated as part

17   of the Plan confirmation.  I don't believe anyone else has

18   raised it.  The Monolines have not challenged it specifically.

19   No other objectors to the Plan have challenged it.

20         So if the issue is case of the law, and the party who

21   would have most likely appealed it, which would have been the

22   DRA parties, are not going to do it, we believe this issue

23   should not be relitigated as part of this Plan confirmation.

24   That is why we sustain that Your Honor's decision, which

25   already considered these documents, and we've agreed that it

1    will be final and binding here, should stand.

2         These documents are duplicative and relevant under

3    the Rules of Evidence, and that's why we sustain that the

4    documents should not be presented -- they should not be

5    admitted.  I'm sorry.

6         THE COURT:  Thank you.

7         Mr. Natbony, briefly.

8         MR. NATBONY:  Yes, very briefly, Your Honor.

9         I would only reiterate Mr. Berezin's comments about

10   the stipulation only being for the DRA parties.  And I would

11   also point out to the Court, in light of the stipulation or

12   settlement entered into by the DRA parties, I would seriously

13   question whether they even have standing to raise the

14   objection that they're doing so today.

15        Thank you.

16        THE COURT:  Thank you.

17        I've listened carefully to the remarks.  The

18   objection is overruled.  The documents upon which I've made

19   the determination are relevant in the broad sense to the

20   propriety of the provisions of the Plan, and treatment of the

21   respective claims of the parties who've asserted interest in

22   the HTA-related funds, and, as Mr. Natbony and Mr. Berezin

23   have indicated, are appropriate parts of the record as support

24   for the ultimate determination, if such is made, that the Plan

25   is confirmable.  Therefore, the objection is overruled, and

1  the three contested exhibits, those being 45, 52, and 53, will

2  be admitted as part of the record.  Thank you.

3            (Whereupon Monolines' Exhibit Nos. 45, 52, and 53

4  admitted into evidence.)

5            THE COURT:  Let's see.  Now there is a hand up from

6  the Oversight Board.  Mr. Rosen.

7            MR. ROSEN:  Yes, Your Honor.  Thank you very much for

8  the ruling.  If there is nothing further preliminarily, Your

9  Honor, I would then hand this over to Mr. Bienenstock, and the

10  presentation of our first witness of the day.

11            THE COURT:  So the rest of the exhibit list will

12  be -- the stipulation and exhibit list will be tendered as a

13  whole after the conclusion of the Oversight Board's case; is

14  that correct?

15            MR. ROSEN:  That's fine, Your Honor.  Yes.

16            THE COURT:  Okay.  That's fine.

17            I see that Peter Hein has his hand up, so Mr. Hein --

18            MR. HEIN:  Yes, Your Honor.  I think I put my hand up

19  just to make sure that I was able to inquire, but it sounds to

20  me like the actual tender of the exhibits and declarations

21  will be at the end of the witness examinations, which is fine.

22  I just wanted to inquire as to when I should speak up.

23            THE COURT:  That's fine.  I think it's appropriate

24  for it to come after the conclusion of the Oversight Board's

25  case by way of wrapping up the remainder of the record as to

1    the other parties.  So we will come back to that after the

2    conclusion of the presentation of the declarations and

3    cross-examination.

4         So now we will turn to the tender of the next

5    witness, the declaration of Andrew Wolfe.

6         MR. BIENENSTOCK:    Thank you, Your Honor.  This is

7    Martin Bienenstock of Proskauer Rose, LLP, for the Oversight

8    Board, as the Title III representative of the debtors.

9         Our next witness, as Your Honor mentioned, is Dr.

10   Andrew Wolfe.  Dr. Wolfe is a macroeconomist, whose expert

11   qualifications and experience are detailed in his expert

12   declaration, ECF no. 18725.

13        Dr. Wolfe is offered as an expert to opine on the

14   issue of whether there are actions that can be taken by the

15   Government of Puerto Rico, which, if implemented, would

16   produce sufficient resources to allow for the full repayment

17   of the Commonwealth's restructured post-confirmation debt

18   service, principal and interest, as provided for in the Plan

19   of Adjustment.

20        No motion or objection has been received, either

21   disputing Dr. Wolfe's qualifications or objecting to his

22   testimony.  We ask that Dr. Wolfe be accepted by the Court as

23   an expert qualified to testify on the subject addressed in his

24   declaration.

25        THE COURT:  No objections have been filed.  Does

1   anyone else wish to be heard on this?

2           Seeing no hands, the Court accepts the tender of Dr.

3   Wolfe as an expert, and admits the declaration, which is at

4   ECF no. 18725.

5           (At 9:54 AM, the Wolfe Declaration admitted into

6   evidence.)

7           THE COURT:  Mr. Hein has requested 30 minutes for

8   cross-examination.  Unless, Mr. Bienenstock, you have anything

9   further to say before we turn to Dr. Wolfe, I'd ask that Dr.

10  Wolfe be put on camera.

11          MR. BIENENSTOCK:  I have nothing more, Your Honor.

12          THE COURT:  Thank you.

13          So, Dr. Wolfe, are you there?

14          THE WITNESS:  Yes, I am, Your Honor.

15          THE COURT:  Good morning, Dr. Wolfe.  The courtroom

16  deputy will administer the oath.

17          COURTROOM DEPUTY:  Raise your right hand.

18          Do you solemnly swear that all the testimony you are

19  about to give will be the truth, the whole truth, and nothing

20  but the truth?

21          THE WITNESS:  I do.

22          COURTROOM DEPUTY:  So help you God.

23          THE WITNESS:  I do.

24          THE COURT:  Thank you.  You may put your hand down.

25          Mr. Hein, you may inquire.

1      MR. COOPER:  Your Honor, I don't mean to interrupt,

2   but I just wanted to note for the record, this is Scott Cooper

3   of Proskauer Rose on behalf of the Oversight Board, and I'll

4   be representing the witness during the testimony.

5      THE COURT:  Thank you for making that clear,

6   Mr. Cooper.  Good morning.

7      MR. COOPER:  Good morning, Your Honor.

8      MR. HEIN:  May I proceed, Your Honor?

9      THE COURT:  Yes, you may.

10      MR. HEIN:  Great.  Thank you.

11                  A N D R E W   W O L F E,

12      called as a witness by the Debtors, having been sworn,

13      testified as follows:

14                     CROSS-EXAMINATION

15   BY MR. HEIN:

16   Q.   Dr. Wolfe, you've been involved with Puerto Rico since

17   late 2014 when you were retained by the Government Development

18   Bank of Puerto Rico, correct?

19   A.   Yes.

20   Q.   And during that time, you and two colleagues, Dr. Krueger

21   and Dr. Teja, co-authored a report entitled Puerto Rico, A Way

22   Forward, correct?

23   A.   Yes.

24   Q.   And many of the structural reforms, to lay a foundation,

25   for private sector activity and to raise productivity and

1   growth that you propose in that 2015 report, or that you

2   propose in this case, were initially proposed by you and

3   others going back to 2015, correct?

4   A.   Some, yes.

5   Q.   And most of the reforms that you and Dr. Krueger and

6   others were proposing back in 2015 never got adopted, correct?

7   A.   Correct.

8   Q.   And then the Oversight Board was installed in 2016,

9   correct?

10  A.   Yes.

11  Q.   And you began working with the Oversight Board, correct?

12  A.   Yes.  Later than when it first was installed.

13  Q.   And the Oversight Board, with the benefit of input from

14  you and others, has also repeatedly recommended structural

15  reforms to lay the foundation for private sector investments,

16  which in turn would increase productivity and growth in Puerto

17  Rico, correct?

18  A.   Yes.

19  Q.   The Oversight Board has been urging the Commonwealth

20  Government to carry out these structural reforms since 2017,

21  correct?

22  A.   Correct.

23  Q.   The necessary structural and other reforms have been

24  spelled out in each of the Oversight Board certified fiscal

25  plans, correct?

1          MR. COOPER:  Object to the form, vague.

2          THE COURT:  Please rephrase.

3     BY MR. HEIN:

4     Q.   Necessary structural and other reforms have been

5     identified and described in the Oversight Board's certified

6     fiscal plans from the time the first fiscal plan was issued up

7     through the last fiscal plan in April of this year, correct?

8     A.   Yes.  Every fiscal plan has had structural reform

9     sections.

10    Q.   And there are chapters in the most recent fiscal plan,

11    from April of 2021, that spell out reforms, like human capital

12    and welfare reform, correct?

13    A.   Yes.

14    Q.   K-2 (sic) education reform, correct?

15    A.   Yes.

16    Q.   Ease of doing business reform, correct?

17    A.   Yes.

18    Q.   Cultivating a high performing public workforce, correct?

19    A.   Yes.

20    Q.   Agency efficiency measures, correct?

21    A.   Those are characterized as just fiscal measures.

22    Q.   Municipal services reforms, correct?

23    A.   Again, they're more fiscal policy reform than structural

24    reforms.

25    Q.   Okay.  Now, whether to adopt structural reforms to

1  enhance economic growth and prosperity in Puerto Rico has been

2  within the control of the Commonwealth Government going back

3  to 2015, correct?

4  A.   Yes.

5  Q.   But to date, the Commonwealth Government has still

6  largely failed (inaudible) going back to 2017?

7          THE COURT:  Mr. Hein, from our end, you froze, and so

8  if you would go back and ask the question again, we didn't

9  hear it all.

10         MR. HEIN:  Okay.  The one beginning "but" -- I just

11  want to make sure that --

12         THE COURT:  Something like, "but of many of" or

13  something --

14         MR. HEIN:  Yes.  Yes.

15  BY MR. HEIN:

16  Q.   But to date, the Commonwealth Government has still

17  largely failed to implement the structural reforms recommended

18  by the Oversight Board going back to 2017, correct?

19  A.   Not really.  Partially.  They've implemented a few

20  reforms, but not all the reforms.

21  Q.   Your report in this case in paragraph 12, in the first

22  sentence reads "to date, the Commonwealth Government has

23  largely failed to implement the structural reforms recommended

24  by the Board."

25         That's what you said in your report, page 4,

1   paragraph 12, correct?

2   A.   Yes.  But your question didn't include the word

3   "largely".

4   Q.   (Inaudible) adhered to what you said in that sentence of

5   your report, correct?

6   A.   Is it possible to repeat?

7   Q.   Let me --

8   A.   Yes.  I kind of lost --

9   Q.   Sure.

10       So my question is simply that you remain in agreement

11  with what you said in your report in this case that was filed

12  in September, that to date, the Commonwealth Government has

13  largely failed to implement the structural reforms recommended

14  by the Board.  That's your report, that's your testimony,

15  correct?

16  A.   Yes.

17  Q.   Among these structural reforms that you and others have

18  advocated going back to 2015, were reforms of the (inaudible)

19  markets, correct?

20       THE COURT:  Mr. Hein, you broke up again.  Please

21  state that last question again.

22       MR. HEIN:  Sure.  Thank you, Your Honor.

23  BY MR. HEIN:

24  Q.   Among the structural reforms that you and others

25  advocated going back to 2015, were reforms of the labor

1  markets, correct?

2  A.    Correct.

3  Q.    Among the structural reforms that you and others

4  recommended were reforms to ease doing business, correct?

5  A.    Correct.

6  Q.    And among the structural reforms you and others

7  recommended were reforms relative to taxation, correct?

8  A.    Yes.

9  Q.    In the area of labor markets, what is the labor

10  participation rate, and why is that significant?

11         MR. COOPER:  Object to the form.  Vague.

12         THE COURT:  Please rephrase, Mr. Hein.

13  BY MR. HEIN:

14  Q.    You're familiar with the term "labor participation rate",

15  correct?

16  A.    Yes.

17  Q.    And you used it in your report, correct?

18  A.    Yes.

19  Q.    And why is labor participation rate something that you

20  look at?

21  A.    Well, the labor parti -- the amount of labor in any

22  economic system, multiplied by the average productivity of

23  that system, will give you an estimate of GNP and output and,

24  implicitly, growth.

25  Q.    And why is -- the current Puerto Rico labor market

1    participation rate is in the area of 40 percent, correct?

2    A.    Yes.

3    Q.    And why is the fact that the current Puerto Rico labor

4    participation rate is only in the area of 40 percent something

5    that suggests that structural reforms of the labor market are

6    needed?

7    A.    That's an extremely low rate.  If you look at the lowest

8    rate, for instance, of a mainland state, it's in the upper 50

9    percent range.  I think it's West Virginia.  And so there is a

10   missing amount of labor that's being employed in the formal

11   sector that can generate growth, revenue, and, importantly,

12   taxable revenue.

13   Q.    In the continental United States, you mentioned West

14   Virginia, which has the lowest labor participation rate of any

15   state, and that's in the mid 50s, correct?

16   A.    Yeah.  I think it's like 57 percent.

17   Q.    But the average throughout the continental United States,

18   what is the average labor participation rate currently?

19   A.    I don't know the exact number offhand.

20   Q.    It's around 62 percent, correct?

21   A.    That sounds correct.

22   Q.    So the gap we're talking about is a gap between 62

23   percent and approximately 40 percent, correct?

24   A.    Not necessarily.  Not necessarily.

25   Q.    There's -- you would agree there's a very large gap

1    between the states in the continental U.S. and Puerto Rico?

2    A.    Yes.

3    Q.    And there is data on the World Bank website, among other

4    places, where one can look up labor force participation rate

5    in other Caribbean islands, correct?

6    A.    Correct.

7    Q.    And you've looked at labor participation rates in other

8    Caribbean islands, correct?

9    A.    Not recently, no.

10   Q.    The Puerto Rico labor participation rate is also lower

11   than that in many of the other Caribbean islands, correct?

12   A.    Correct, the last time I looked.

13   Q.    Am I correct that the labor force participation rate in

14   Puerto Rico has been consistently lower than many other

15   Caribbean economies?

16   A.    Yes.

17   Q.    You reference -- on the subject of ease of doing

18   business, you reference the World Bank ease of doing business

19   report rankings as something that underscores the need for

20   structural reforms to enhance and improve the private sector

21   labor market in Puerto Rico, correct?

22   A.    Yes.

23   Q.    And you actually even cite to one of the World Bank ease

24   of doing business rankings, correct?

25   A.    Yes.

```
 1   Q.   And in fact, Puerto Rico's rankings in the World Bank
 2   ease of doing business rankings has actually gotten worse
 3   since 2017, correct?
 4   A.   I don't recall the exact differential offhand.  I don't
 5   think they've changed very much.
 6   Q.   To find that out, you would look at, say, the 2017 World
 7   Bank ease of doing business report and compare it to, say, the
 8   2020, correct?
 9   A.   Yes, by type of reform area.
10   Q.   A third area you mentioned is taxation, correct?
11   A.   Yes.
12   Q.   And one concern that's stated in the current -- the
13   current Oversight Board Fiscal Plan from April 2021 is that
14   Puerto Rico issues more than 300 tax incentives, with total
15   foregone revenue in excess of 21 billion, correct?
16            MR. COOPER:  Objection, form, vague.
17            THE COURT:  Please rephrase.
18   BY MR. HEIN:
19   Q.   You're familiar with the Oversight Board's chapter in the
20   current fiscal plan on the subject of taxation, correct?
21   A.   I've looked at it in the past, yes.
22   Q.   And that chapter makes the statement that Puerto Rico
23   issues more than 300 tax incentives, with total foregone
24   revenue in excess of 21 billion, correct?
25   A.   I'd have to look back at the report, but I don't remember
```

1   that exact line.

2   Q.   Whether or not you recall --

3   A.   Yeah.

4   Q.   -- that exact statement, there is an issue in Puerto Rico

5   with tax incentives being excessive and with substantial

6   foregone revenue losses, correct?

7   A.   Yes.

8   Q.   When you worked with Dr. Krueger and Dr. Teja on the

9   Krueger Report, did the three of you conclude that it would

10  bolster Puerto Rico's economy if Puerto Rico maintained the

11  existing defined benefit pensions for public employees

12  unchanged?  Did you -- the three of you conclude this would be

13  good for Puerto Rico's economy?

14  A.   I don't -- I don't recall us opining on that at all.

15  Q.   Would you agree that an important step Puerto Rico could

16  take for the benefit of its residents, including those who

17  work in the private sector, is to finally enact the structural

18  reforms that you and others have been recommending for the

19  past six years?

20  A.   I believe Puerto Rico needs to enact -- it's in their

21  interest to enact those reforms.

22  Q.   And, indeed, you've concluded that if Puerto Rico were to

23  adopt the structural reforms that you've recommended, Puerto

24  Rico could build surpluses that total over 30 billion dollars

25  in the years to come, correct?

1  A.   Yes.  That's what's in my report.

2         MR. HEIN:  Thank you very much.  I have no further

3  questions.

4         THE COURT:  Thank you, Mr. Hein.

5         Mr. Cooper, any redirect?

6         MR. COOPER:  No, Your Honor.

7         THE COURT:  Then thank you, Dr. Wolfe.  Your

8  testimony has concluded.  You are excused.

9         THE WITNESS:  Thank you, Your Honor.

10         (At 10:09 AM, witness excused.)

11         THE COURT:  The next listed witness is Mr. Chepenik.

12         MR. COOPER:  Your Honor.

13         THE COURT:  Yes, Mr. Cooper.

14         MR. COOPER:  While we change witnesses, I've been

15  asked by my colleagues to make sure that the record is clear

16  that Dr. Wolfe's declaration, which is ECF no. 18725, has been

17  admitted into evidence.  I believe I heard you say it was, but

18  I've been asked to confirm that on the record.

19         THE COURT:  Yes.  I think I did say that before, but

20  for the avoidance of doubt, Dr. Wolfe's declaration at ECF no.

21  18725 is admitted in evidence.

22         MR. COOPER:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24         MR. BIENENSTOCK:  Your Honor, this is Martin

25  Bienenstock.  Is it okay to proceed with our next witness?

1          THE COURT:  Yes, please.

2          MR. MARTINEZ:  Thank you, Your Honor.  Martin

3  Bienenstock for Proskauer Rose, for the Oversight Board, as

4  Title III representative.

5          The Oversight Board's next witness is Mr. Adam

6  Chepenik of Ernst & Young.  I move his original declaration,

7  ECF no. 18735, dated October 25, 2021, into evidence, and his

8  amended declaration at ECF no. 19054-02, dated November 3,

9  2021, into evidence, Your Honor.

10          THE COURT:  If there's any objection, please raise

11  your hand.

12          Seeing no hands raised, and no objection having been

13  filed, the original declaration of Mr. Chepenik filed at ECF

14  no. 18735, and the amended declaration of Mr. Chepenik filed

15  at ECF no. 19054-02 are admitted in evidence.

16          (10:14 AM, the Chepenik Declarations admitted

17  into evidence.)

18          MR. BIENENSTOCK:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. BIENENSTOCK:  I'm going to turn things over now

21  from the Oversight Board's perspective to my partner, Mike

22  Mervis.

23          THE COURT:  Very well.  Thank you.

24          Mr. Chepenik, the courtroom deputy will now

25  administer the oath to you.

 1          COURTROOM DEPUTY:  Please raise your right hand.

 2          Do you solemnly swear that all the testimony you are

 3  about to give will be the truth, the whole truth, and nothing

 4  but the truth?

 5          THE WITNESS:  I do.

 6          COURTROOM DEPUTY:  So help you God.

 7          THE WITNESS:  So help me God.

 8          THE COURT:  Thank you.

 9          Mr. Hein, you may inquire.  Mr. Hein --

10          MR. MERVIS:  I believe Mr. Hein's muted.

11          THE COURT:  -- you have to unmute yourself.  Thank

12  you.

13          You've reserved 15 minutes for the cross-examination.

14          MR. HEIN:  Can you hear me now, Your Honor?

15          THE COURT:  Yes.  Thank you.

16          MR. HEIN:  Thank you, and good morning.

17              A D A M   C H E P E N I K,

18       called as a witness by the Debtors, having been sworn,

19       testified as follows:

20                         CROSS-EXAMINATION

21  BY MR. HEIN:

22  Q.   I want to start with your declaration's discussion of

23  proposed reserve funds that you say are within accepted

24  limits.  Your term is "accepted limits," correct?

25  A.   Correct.

1  Q.   And your proposed first reserve fund is a budget

2  stabilization fund, sometimes referred to as a rainy day fund,

3  correct?

4  A.   Correct.

5  Q.   And an example of a rainy day for budget purposes would

6  be recession or other economic downturn, correct?

7  A.   That could be one of many uses of a rainy day fund.

8  Q.   And others might be a pandemic, or a natural disaster,

9  something that disrupts economic activity, disrupts revenues

10  and cash flow, correct?

11  A.   I do not agree with that, no.

12  Q.   You would agree that, for budget purposes, something that

13  disrupts the economic flow of revenue to the government would

14  be loosely characterized as a rainy day, and requiring some

15  fund to tie one over, correct?

16       MR. MERVIS:  Your Honor, I object to the form.  It's

17  vague.

18       THE COURT:  Sustained.  Please rephrase.

19  BY MR. HEIN:

20  Q.   The purpose of a budget stabilization fund, or rainy day

21  fund is to ensure if there's some reduction in revenues, that

22  the government has money to help get it through the period,

23  correct?

24  A.   Generally, that's correct.

25  Q.   And you think it's within accepted bounds for the

1    proposed rainy day fund that is proposed in your declaration

2    to contain 1.2 billion to 1.7 billion, correct?

3    A.   That is a reasonable range, correct.

4    Q.   And you discussed in your declaration various benchmarks

5    for deciding how much is appropriate for the budget

6    stabilization fund, or rainy day fund, and they range from 1.1

7    billion, which is the cut-off after which the Federal

8    Government said it would not permit the Commonwealth to access

9    community disaster loan funding, correct?

10   A.   I wouldn't use the word "benchmark," but various

11   approaches, that's generally correct.

12   Q.   Sure.  And Detroit bankruptcy was 753 million, correct?

13   A.   Correct.

14   Q.   Following an approach suggested by the National

15   Association of State Budget Officers, 500 million to a

16   billion, correct?

17   A.   Correct.

18   Q.   Following an approach suggested by Government Finance

19   Officers Association, 1.65 billion, correct?

20   A.   Correct.

21   Q.   Suggestions by the Pew Trust would suggest 1.24 billion,

22   correct?

23   A.   Correct.

24   Q.   Groups like the National Association of State Budget

25   Officers or Government Finance Officers Association are, by

38

1    their nature, going to urge typically greater reserves,

2    correct?

3    A.   I don't know that to be true.

4    Q.   These are not groups that want to cut it close to the

5    line?  They do want reserves, correct?

6    A.   Generally correct, yes.

7    Q.   And, on the other hand, having too much cash just sitting

8    in the bank could actually pose an issue potentially, as it

9    did for the Commonwealth several years ago with access to

10   federal funds, correct?

11   A.   I apologize.  I don't quite understand the question and

12   the context of problems with federal funds and having too much

13   money.

14   Q.   You recall that the Federal Government was unwilling to

15   advance funds pursuant to the community disaster loan funding

16   if Puerto Rico's balances were above 1.1 billion, correct?

17   A.   I recall the Federal Government making public statements

18   that below 1.1 billion would be a critically low level, at

19   which the Commonwealth would certainly need additional

20   liquidity support.

21   Q.   You say that the range presented to the Oversight Board

22   for a budget stabilization fund was 1.2 billion to 1.7

23   billion, correct?

24   A.   Correct.

25   Q.   And the upper end of that range, 1.7 billion, exceeds all

1   five of the comparative measures you discuss in your

2   declaration, correct?

3   A.   I'm sorry.  You were breaking up on the question.

4   Q.   The upper end of the range proposed, the 1.7 billion,

5   exceeds the amount of all five of the different comparatives

6   you've looked to as potential benchmarks, correct?

7   A.   You did not mention the sixth approach, which was the

8   government's request for a balance which exceeded that 1.7

9   billion dollar number.

10  Q.   But in terms of things other than the Puerto Rico

11  Government, the 1.7 exceeds the different benchmarks you

12  discussed, correct?

13  A.   It is slightly higher, correct.

14  Q.   And you proposed going beyond just a budget stabilization

15  fund.  You're also proposing a disaster aid revolving fund of

16  750 million, and an emergency reserve of 1.3 billion, which

17  would be additional on top of 1.2 to 1.7 billion, correct?

18  A.   That is a recommendation, correct.

19  Q.   And the total of the three reserves would then be in the

20  area of 3.25 billion to 3.75 billion, correct?

21       MR. MERVIS:  Objection to the form, Your Honor.  I

22  don't think there's been a -- I don't think we've heard about

23  the third reserve yet, if it is a reserve.

24       THE COURT:  Sustained.  Please rephrase.

25  BY MR. HEIN:

1  Q.   You have your rainy day fund, 1.2 to 1.7 billion,

2  disaster aid revolving fund is 750 million, and emergency

3  reserve proposed at 1.3 billion, correct?

4  A.   That was the recommended allocations for different

5  purposes, correct.

6  Q.   And when you add that up together, you have reserves that

7  total 3.25 billion to 3.75 billion, correct?

8  A.   Eventually, although those amounts are not currently

9  funded in their entirety.

10  Q.   On the proposal for reserve funds, the amount ultimately

11  at least withheld or retained by the Commonwealth as reserves

12  would range from 27.8 percent of General Fund revenues

13  projected in fiscal 2022, to 32.3 percent of General Fund

14  revenues projected for 2022, correct?

15  A.   Again, the third reserve, the emergency reserve is not

16  fully funded at the moment, and so at the moment, that

17  percentage is not accurate.

18  Q.   But when it is fully funded, those percentages would be

19  accurate, correct?

20  A.   Potentially, that was the recommended range.  Although, I

21  would also say that first, minimum cash balance ultimately

22  decided upon by the Oversight Board in their judgment was

23  different than the 1.2 to 1.7 billion dollar recommended

24  range.

25  Q.   Do you identify in your report any jurisdiction that

1  holds in cash reserves anything on the order of 28 to 32

2  percent of its General Fund revenues?

3  A.    Yes.

4  Q.    And which do you identify?

5  A.    So there are a number of jurisdictions, both domestically

6  large and small cities, as well as foreign sovereigns that

7  maintain balances in the approximate range of what's being

8  proposed.

9         In a sovereign context, you can take a country like

10  Trinidad and Tobago, also in the Caribbean region, that

11  maintains approximately 25 percent of its both import cover

12  reserves to maintain currency stability, as well as maintains

13  more than 11 percent solely for the purpose of emergency

14  reserve purposes for hurricanes and other disasters.

15         Domestically, you can look at jurisdictions like San

16  Francisco, which maintains a considerable amount of its

17  reserves, both for rainy day purposes, and separately they

18  have 12 different reserves, including emergency reserves, to

19  maintain for other purposes.

20         Other cities like Colorado Springs maintain 25

21  percent of its allocation of General Fund reserves, both split

22  evenly 12 and a half percent for rainy day purposes and 12 and

23  a half percent for emergency purposes.

24  Q.    And there are others that don't, correct?

25  A.    I can't speak to all jurisdictions, but there is a range

42

1   of how much cities reserve, and I've disclosed that, I

2   believe, in paragraphs 15 and 19 of my declaration.

3   Q.   And, indeed, would it be fair to say that preponderantly,

4   jurisdiction states, for example, would not have reserves at

5   the level that you are suggesting here?

6   A.   I don't believe I can conclude -- say that that is

7   accurate.  If you look at -- you know, if you look at the

8   ranges, there's more than 20 states that maintain reserves in

9   excess of ten percent.

10  Q.   So there are 30 states who have reserves lower than ten

11  percent, correct?

12  A.   For rainy day fund purposes.

13  Q.   Thank you.  Now, you also referred to various restricted

14  accounts in the second part of your declaration, correct?

15  A.   Correct.  You mean the cash balance --

16  Q.   Yes.

17  A.   -- analysis?

18  Q.   Yes.

19  A.   (Nodding head up and down.)

20  Q.   And there's certain restricted accounts that can only be

21  used to pay GO debt or are available only to pay GO debt,

22  correct?

23  A.   In my analysis, I've identified -- or we have identified

24  one account that has a balance, I believe, that meets the

25  description you're asking about.

1  Q.   And what is that account called?

2  A.   I have my declaration, if I can refer -- if I can refer

3  to my declaration, I just --

4  Q.   Sure.  Please.

5  A.   The one account I was thinking about is in paragraph

6  57(d), like David, and it has approximately, I believe, 34

7  million dollars in it.

8  Q.   Are you familiar with the GO Redemption Fund account?

9  A.   Generally, but not with a high degree of specificity.

10 Q.   That's an account that holds money from the 1.03 percent

11 property tax to be applied to pay GO debt service, correct?

12 A.   I'm not overly familiar with the account.  I'm familiar

13 with the 1.03 percent, but not where -- not which account that

14 money rests in.

15 Q.   And that account that I've referred to, the GO Redemption

16 Fund account, currently has a balance of approximately 600

17 million, correct?

18 A.   I'm not aware.  I don't know.

19 Q.   And it's not --

20 A.   I don't recall.

21 Q.   It's not in your declaration, or list attached to your

22 declaration, correct?

23       MR. MERVIS:  Your Honor, can I just -- I'd like to

24 interpose an objection to this line.  I've held back, but if I

25 could just have a moment to explain the basis of the

1    objection, Your Honor.

2         THE COURT:  Yes.  Go on.

3         MR. MERVIS:  As the Court will recall, the parties

4    were required to submit pretrial informative motions in which

5    they would identify which witnesses they wished to

6    cross-examine, how much -- on which topics, and Mr. Hein's

7    informative motion is at docket 18861.

8         I'll give Your Honor a moment if you want to call

9    that up.

10        THE COURT:  That would not be easy for me.

11   Actually --

12        MR. MERVIS:  Well, I appreciate that, Your Honor.  I

13   will read you what it says, and I believe I will read it

14   accurately.

15        THE COURT:  All right.

16        MR. MERVIS:  So for Mr. Chepenik it says "practices

17   with respect to budget stabilization, rainy day, emergency and

18   revolving funds, and levels of such funds proposed for the

19   Commonwealth."  That's it.

20        And for the last minute or two, we've been talking

21   about a completely different fund or two different funds that

22   apparently are for funding of GO debt.

23        (Sound played.)

24        MR. MERVIS:  But it's not any of the ones that

25   Mr. Hein identified, and, therefore, we didn't prepare the

1   witness to address these kind of questions.  So that's our

2   objection.

3            THE COURT:  Mr. Hein?

4            MR. HEIN:  Yes.  The reason I'm asking, Your Honor,

5   is that the declaration addresses various funds.  There's

6   exhibits attached that list various funds.  These funds are,

7   as best I can tell, not listed.

8            And it's a very brief line of inquiry, but I just

9   wanted to determine if they were listed here and I missed it,

10  or if it's that they aren't listed.  That's really where I'm

11  going, Your Honor.  It's that brief.

12           THE COURT:  Well, you may ask whether they are listed

13  in the testimony, but not for details of them or their

14  operation or treatment.  We will put another two minutes on

15  the clock for you.

16           MR. HEIN:  Thank you, Your Honor.

17  BY MR. HEIN:

18  Q.  So with respect to the GO Redemption Fund account that I

19  referred to, is it listed in the exhibits to your declaration

20  or in your declaration?

21  A.  I do not recall.

22  Q.  And there's the secondary restricted account called the

23  clawback account, which contains revenues retained by the

24  government, which can be used for the payment of GO debt.  Do

25  you know if that is listed in the exhibits to your

1    declaration?

2    A.   I do not recall if they're embedded in one of those first

3    three accounts, the large Department of Treasury accounts that

4    we commonly refer as the TSA balance.

5    Q.   Talking about the TSA cash report, the last cash report

6    came out on November 10th, earlier this week, and shows about

7    12.164 billion unrestricted cash.  Does that sound about

8    right?

9         MR. MERVIS:  Your Honor, it's the same objection.

10   He's way beyond the topics that were identified in his

11   informative motion.

12        THE COURT:  Sustained.

13        MR. HEIN:  Well, respectfully, I'm trying to lay a

14   foundation for my next question, which ties it in, Your Honor.

15        THE COURT:  Subject to connection, you may ask.

16        (Sound played.)

17        MR. HEIN:  Thank you.

18        MR. MERVIS:  Can I ask that the question be restated

19   for the witness, Your Honor?

20        MR. HEIN:  Sure.

21   BY MR. HEIN:

22   Q.   The last TSA cash report from November 10 shows

23   approximately 12.164 billion unrestricted cash in the TSA

24   account as of October 29.  Does that -- is that approximately

25   correct?

1   A.   That sounds approximately correct.

2   Q.   So if you take the cash on that latest TSA unrestricted

3   cash report, and if you take additional money that may be

4   available for payment only of GO debt, and you subtract the

5   3.75 billion for the three reserve accounts you propose, am I

6   correct that even after establishing reserves in the level of

7   3.25 billion to 3.75 billion, the Commonwealth will still have

8   over 9 billion dollars in unrestricted cash that, under

9   Commonwealth law, could be used to pay GO and government

10  guaranteed debt?

11        MR. MERVIS:  Object to the form, Your Honor.  First,

12  it assumes facts not in evidence.  Second, it calls for a

13  legal conclusion.  Third, it is outside the scope of the

14  topics identified by Mr. Hein in his informative motion.

15        THE COURT:  Sustained.

16        MR. HEIN:  I then have no other questions, Your

17  Honor.

18        THE COURT:  Thank you, Mr. Hein.

19        Mr. Mervis, do you have any questions?

20        MR. MERVIS:  I do, Your Honor, very, very briefly.

21                    REDIRECT EXAMINATION

22  BY MR. MERVIS:

23  Q.   Mr. Chepenik, one of the three funds that Mr. Hein

24  referred to as the reserve is a $750,000 disaster aid

25  revolver; is that right?

1    A.    750 million.

2    Q.    Sorry.  Yes, million.  Sometimes I lose those zeros.

3              And to your understanding, under the Eighth Amended

4    Plan of Adjustment, is there a point in time when that

5    revolver will cease to exist?

6    A.    There is, yes.

7    Q.    And to your understanding, what happens with the funds

8    under the Eighth Amended Plan of Adjustment, what happens to

9    the funds in that revolver at that point in time?

10   A.    So the full 750 million dollars at that point in time

11   will be distributed to creditors as part of the Eighth Amended

12   Plan.

13   Q.    Mr. Chepenik, do you have Exhibit 31 handy?  I can pass

14   you mine, if need be.

15   A.    Yes.  Just one moment.

16              MR. MERVIS:  And Your Honor --

17              THE WITNESS:  Oh, actually -- yes, it's not in

18   here.

19   BY MR. MERVIS:

20   Q.    Yes.  I'll pass mine.

21              MR. MERVIS:  But, Your Honor, this is Debtors'

22   Exhibit 31, if you need a moment to pull it up.

23              THE COURT:  I need a moment to pull it up.

24              MR. MERVIS:  This was identified by Mr. Hein as a

25   cross-exhibit last night.

```
 1              THE COURT:  All right.  Just give me a moment.
 2              I have it now.
 3              MR. MERVIS:  Thank you.
 4    BY MR. MERVIS:
 5    Q.   And if you could turn to page 18 or slide 18 of the -- of
 6    that document.  First of all, before we get there,
 7    Mr. Chepenik, what is Exhibit 31?
 8    A.   Exhibit 31 is a presentation that executive director
 9    Natalie Jaresko presented to the Oversight Board describing
10    the different components of the Plan of Adjustment on, I
11    believe, September 17.
12    Q.   Okay.  Now, directing your attention to slide 18.
13              MR. MERVIS:  And, Your Honor, have you been able to
14    get there?
15              THE COURT:  Well, I am on a page that seems to be
16    page 18 of a PowerPoint presentation.  The top line says "Six,
17    government retains significant cash."
18              Is that the page I'm supposed to be on?  It's page 19
19    of the PDF.
20              MR. MERVIS:  I believe so, Your Honor.  I passed my
21    only copy to the witness, but yes, that is the one.
22              THE COURT:  Thank you.
23    BY MR. MERVIS:
24    Q.   Mr. Chepenik, if you could look at the lower right-hand
25    corner of the exhibit, there's a box that has a number of
```

1    figures.  Do you see that?

2    A.   I do, yes.

3    Q.   And you mentioned this in response to Mr. Hein's

4    questions about the minimum -- the range of the 1.2 to 1.7

5    billion dollar minimum cash reserve.

6         Is there a line in that box that represents the

7    Oversight Board's current thinking or current setting of that

8    minimum cash reserve?

9    A.   Yes, there is.

10   Q.   And which line is that?

11   A.   I believe it's the fourth line down.  The Oversight Board

12   ultimately determined in their judgment that one billion

13   dollars would be sufficient minimum cash.

14   Q.   Thank you.

15        MR. MERVIS:  Your Honor, I have nothing further.

16        THE COURT:  Thank you.

17        Mr. Hein.

18        MR. HEIN:  May I just -- yes.

19                    RECROSS-EXAMINATION

20   BY MR. HEIN:

21   Q.   Let me just clarify, Mr. Chepenik.  So instead of the 1.2

22   to 1.7 billion that's referred to for a rainy day fund in your

23   declaration, the Oversight Board is actually simply looking

24   for one billion dollars?  Am I understanding that correctly?

25   A.   So the amount that was presented to the Oversight Board,

1    based on those six comparable approaches in my declaration,

2    resulted in a recommended range of 1.2 to 1.7 billion dollars.

3    The Oversight Board considered that and subsequently

4    determined that one billion dollars was the appropriate and

5    adequate amount.  And that is what is considered.

6    Q.   Thank you.

7            MR. HEIN:   I have nothing else, Your Honor.

8            THE COURT:   Thank you.

9            Anything further, Mr. Mervis?

10           MR. MERVIS:   No, Your Honor.

11           THE COURT:   Thank you, Mr. Chepenik.   Your testimony

12   is concluded.  You are excused.

13           (At 10:37 AM, witness excused.)

14           MR. MERVIS:   I'm sorry, Your Honor.  I turned off

15   prematurely.  If, again, we could just have a few moments to

16   shuffle personnel and bring our next witness on, it would be

17   appreciated.

18           THE COURT:  Yes.  We'll wait.

19           MR. MERVIS:   Thank you.

20           THE COURT:   Thank you.

21           MS. DALE:   Good morning, Your Honor.  It's Margaret

22   Dale from Proskauer Rose for the Oversight Board, and we are

23   ready to proceed.

24           THE COURT:   Thank you.  Good morning, Ms. Dale.

25   Please proceed.

 1              MS. DALE:  Thank you.  We're calling our next

 2    witness, Your Honor, which is Juan Santambrogio.  And Your

 3    Honor, before we swear the witness, we would move the

 4    admission of Mr. Santambrogio's declarations.  His original

 5    declaration is at ECF no. 18736; the amended declaration is

 6    found at ECF no. 19054-07; and his supplemental declaration,

 7    Your Honor, was filed at ECF no. 19060.

 8              We are unaware of any objections to the admission

 9    into evidence of these declarations, and we would move them in

10    now.

11              THE COURT:  Thank you.

12              If there is any objection, please raise your hand

13    now.

14              Having seen no hands raised, and no objections having

15    been filed, Mr. Santambrogio's declarations at 18736,

16    19054-07, and 19060 are admitted into evidence.

17              (Whereupon the Santambrogio Declarations admitted

18    into evidence.)

19              THE COURT:  Good morning, Mr. Santambrogio.

20              THE WITNESS:  Good morning, Your Honor.

21              THE COURT:  Would the courtroom deputy please

22    administer the oath?

23              COURTROOM DEPUTY:  Please raise your right hand.

24              Do you solemnly swear that all the testimony you are

25    about to give will be the truth, the whole truth, and nothing

1     but the truth?

2             THE WITNESS:  I do.

3             COURTROOM DEPUTY:  So help you God.

4             THE WITNESS:  So help me God.

5             THE COURT:  Thank you.

6             Mr. Hein, you may inquire.

7             MR. HEIN:  Thank you.

8             J U A N   S A N T A M B R O G I O,

9        called as a witness by the Debtors, having been sworn,

10         testified as follows:

11                          CROSS-EXAMINATION

12    BY MR. HEIN:

13    Q.   I would like to start with questions about the AFSCME PSA

14    that's discussed in your original declaration, so just

15    focusing you on that period.

16             The AFSCME PSA was agreed in June of 2019; is that

17    correct?

18    A.   Yes.

19    Q.   And it contemplated additional payments and benefits to

20    public employees, as well as revisions of the Collective

21    Bargaining Agreement with AFSCME, correct?

22    A.   Yes.

23    Q.   And in June of 2019, the Oversight Board agreed to the

24    original 500 dollars per public employee signing bonus,

25    correct?

1   A.   Yes.

2   Q.   And a five million dollar payment to AFSCME, which was to

3   be disbursed as additional cash bonuses amounting to

4   approximately 500 dollars per public employee in addition,

5   correct?

6   A.   Yes.

7   Q.   And there is also five million dollars in addition to

8   compensation AFSCME for its expenses, correct?

9   A.   That is correct.  It was to be contributed to a health

10  care fund.

11  Q.   And there was also then a payment of 2,600 per public

12  employee into defined contribution accounts, correct?

13  A.   That was -- there is a 2,600 dollar per participant that

14  was employees hired before 2000, into their defined

15  contribution accounts.

16  Q.   And there was also provision for upside performance

17  bonuses of 25 percent of the amount by which excess cash

18  surplus exceeded 100 million dollars above the level in the

19  fiscal plan in effect as of the effective date of the Plan,

20  correct?

21  A.   Yes.

22  Q.   After you submitted your October 25 declaration, your

23  first declaration, the Oversight Board has now, in the past

24  two weeks or so, agreed to a -- 2,000 dollars per public

25  employee per year for each of five years minimum of the upside

1   performance bonus, correct?

2   A.   Yes.

3   Q.   And so that would be for every public employee, there

4   would be these payments of a minimum of 10,000 dollars over

5   the next five years, correct?

6   A.   For every AFSCME represented employee, there would be a

7   2,000 dollar per year for five years.

8   Q.   And certain other public employees will also receive the

9   same?

10  A.   No.   That's not correct.

11  Q.   Correct?

12  A.   No.

13  Q.   Only AFSCME?

14  A.   Yes.

15  Q.   The upside performance bonus amounts where excess cash

16  surplus exceeds 100 million, those go to all public employees,

17  correct?

18  A.   No.

19  Q.   Only AFSCME, that's your testimony?

20  A.   No.   It's AFSCME and other eligible public employees,

21  mostly nonrepresented employees, excluding certain trust

22  employees.

23  Q.   But a much larger number than simply the AFSCME

24  workforce?

25  A.   It's a larger number.

1    Q.    And other benefits to public employees under the AFSCME

2    PSA included additional contributions to cover basic medical

3    coverage, correct?

4    A.    Yes.

5    Q.    The ability to have an exclusive representative negotiate

6    health and medical benefits and vote on health plan options,

7    correct?

8    A.    Yes.

9    Q.    Expanded vacation and sick leave accruals, correct?

10   A.    No.   So the sick leave accruals were maintained.   The

11   vacation accruals were reduced for the most part, and the

12   holidays were reduced as well.

13   Q.    So in your declaration, you do refer to expanded vacation

14   and sick leave accruals, correct?

15   A.    I don't recall the exact wording I used, but it was --

16   the vacation, yes, were modified and they were mostly

17   reduced.

18   Q.    Do you stand by what's in your declaration?

19   A.    Yes.

20   Q.    Let me ask it -- excuse me?

21   A.    Yes.

22   Q.    And there has not been any reduction since you agreed to

23   your declaration October 25, 2021, correct?

24   A.    No.

25   Q.    That's going to be ambiguous.   I asked you if it's

1    correct that there's been no reduction after you signed your

2    declaration on October 25.

3              MS. DALE:  Objection to the form of the question.

4              THE COURT:  Ms. Dale, you are muted.

5              MS. DALE:  Apologies, Your Honor.  Objection to the

6    form of the question.  It's vague.  No reductions of what?

7              THE COURT:  Sustained.  Please rephrase.

8              MR. HEIN:  Sure.

9    BY MR. HEIN:

10   Q.   With respect to the subject we are discussing, vacation

11   and sick leave accruals, there's been no reduction in those

12   accruals since you signed your declaration on October 25,

13   correct?

14   A.   Correct.

15   Q.   And the PSA agreed to in June of 2019 confirmed that

16   employees would still get all 15 paid holidays each year,

17   correct?

18   A.   Correct.

19   Q.   So what we've gone through are costs to Puerto Rico,

20   correct?

21             MS. DALE:  Objection to the form of the question.

22   It's vague.

23             THE COURT:  Sustained.

24   BY MR. HEIN:

25   Q.   The different elements of bonuses and different benefits

1   that we've discussed are things that the government bears an

2   economic cost to provide, correct?

3   A.   Yes, for the most part.

4   Q.   Has anyone gone through and aggregated what the total

5   dollar amount of these costs are that are incurred as a result

6   of the June 2019 PSA with AFSCME, and the subsequent agreement

7   to provide the minimum of 2,000 in added bonuses per year for

8   five years?

9   A.   There were estimates for the individual components.  I'm

10  not aware of an aggregate amount.

11  Q.   Has anyone, to your knowledge, calculated an estimate of

12  the dollar amount or range of dollar amounts of potential

13  upside performance bonuses above the 2,000 minimum that could

14  be paid out at different levels of cash surplus greater than

15  100 million dollars?

16  A.   There were some illustrations that were prepared to

17  quantify in a hypothetical situation what those payouts would

18  be.

19  Q.   And what was the highest hypothetical that was used?

20  A.   I don't recall what the highest was.

21  Q.   When pension restorations were part of the Plan, because

22  there was still going to be a reduction in monthly pension

23  benefits for retirees who had pensions above a certain level,

24  was there a calculation or estimate of the potential benefit

25  restoration amounts that would come from the ten percent of

1   excess cash surplus over 100 million?

2   A.   No.

3   Q.   That was never calculated or estimated?

4   A.   Well, to be able to estimate it, you would need to have

5   actual results, because the formula calls for a comparison

6   between projected results and actual results.  So since we

7   don't have any actual results, we can't -- we can't estimate

8   those payments.

9   Q.   You could make different hypothetical assumptions as to

10  what the actual might be, and then figure out what the cost is

11  based on the hypothetical assumptions, correct?

12  A.   Yes.

13  Q.   That has not been done, correct?

14  A.   Not to my knowledge.

15  Q.   There were also modifications made to the collective

16  bargaining agreements that the Oversight Board hopes will

17  potentially save money, correct?

18  A.   Correct.

19  Q.   And the modifications that may save money are principally

20  suspensions or modifications of provisions that make it

21  difficult to lay off or terminate redundant employees,

22  correct?

23  A.   Correct.

24  Q.   Did you or anyone else calculate the estimated or

25  approximate fiscal savings to the Commonwealth under the new

1   collective bargaining agreements to be entered into as a

2   result of the AFSCME PSA?

3   A.   The fiscal plan includes fiscal measures, including

4   agency right-sizing, and payroll freezes that are calculated

5   or estimated for the entire workforce of the government.  The

6   fiscal plan does not have it detailed by union or by labor

7   organization.  So there are estimates of the overall savings

8   to be achieved by the overall government through agency

9   right-sizing and payroll freeze.

10  Q.   And what are those estimates?  What is the dollar amount

11  of those estimates?

12  A.   So those were prepared in 2019 with a base year of 2018.

13  So comparing 2018 through fiscal '23, which is five years,

14  those estimates are around a billion dollars.

15  Q.   And what portion of the workforce does AFSCME's employees

16  represent?

17  A.   AFSCME representatives are spread throughout different

18  agencies.  I believe it's between ten and 15 agencies.  Some

19  of the ones that come to mind are the Department of Education,

20  some administrative employees there; the Department of

21  Corrections, correctional officers, for example; the

22  Department of the Family; the Department of Transportation,

23  are some of the examples.

24  Q.   And has this order of magnitude estimate of potential

25  savings that was done back in 2019, has that been updated in

1    the past two or two and a half years?

2    A.   Well, the fiscal plan has been updated, so those fiscal

3    measures in the fiscal plan would have reflected updates to

4    those estimates.

5    Q.   And can you put a number on it, based on the current

6    fiscal plan?

7    A.   I don't recall what the number is in the current fiscal

8    plan.

9    Q.   So is it realistic to think that one can hand out bonuses

10   to AFSCME employees who are interspersed in these different

11   agencies and not provide the same bonus to the worker whose

12   desk is next door to someone who's getting a bonus?  Has that

13   been discussed?

14   A.   Not to my knowledge.

15   Q.   And, indeed, the bonuses have, at least some of them,

16   been expanded to at least some other public employees,

17   correct?

18        MS. DALE:  Objection to the form of the question.

19   It's vague.

20        THE COURT:  Sustained.  Please rephrase.

21   BY MR. HEIN:

22   Q.   Some of the bonus components that we've gone over in your

23   testimony have been extended to people who are not in the

24   AFSCME union, correct?

25   A.   If you're referring to the upside bonus, yes, that's

1   correct.

2   Q.   Approximately what portion of the savings under the CBA

3   with AFSCME were assumed from the 8.5 percent reduction in

4   pension benefits above 1,200 dollars a month that was

5   contemplated back in June of 2019, but has now been

6   eliminated?

7   A.   I don't know that number.

8   Q.   On the subject of pensions, as part of your work, did you

9   look at the levels of monthly pension benefits of individuals,

10  groups of individuals, in particular, employee groups?

11         MS. DALE:  Excuse me, Your Honor, and Mr. Hein.  You

12  broke up, Mr. Hein, during asking that question.  Could you

13  say it again, please?

14         MR. HEIN:  Sure.

15  BY MR. HEIN:

16  Q.   Did you look, as part of your work, at the level of

17  monthly pension benefits of individuals in different employee

18  groups?

19  A.   I've seen -- I have seen those levels of benefits.

20  Q.   And what are the highest levels of monthly pension

21  benefits you've seen?

22  A.   I don't recall what the maximum levels are.

23  Q.   Can you put any order of magnitude on it, the maximum

24  above 5,000?

25  A.   I'm not sure.  I know that there are -- there are

1  benefits above 4,000, but I'm not -- I'm not sure about 5,000.

2  Q.   Are the pension benefits to Puerto Rican residents

3  subject to Federal Income Tax?

4  A.   My understanding is that they are not --

5  Q.   Are they --

6  A.   -- if they reside in Puerto Rico.

7  Q.   Are the pension benefits to Puerto Rico residents subject

8  to Puerto Rico income tax, if they reside in Puerto Rico?

9  A.   I'm not sure.

10  Q.   What portion of the pension recipients do not currently

11  reside in Puerto Rico?

12  A.   I do not -- do not know that number.

13  Q.   There is a proposed additional contributions to a pension

14  reserve trust.  My question is, if you combine altogether all

15  of the agreed increases in funding to the pension trust, both

16  discussed in your declaration of October 25, as well as those

17  discussed in your supplemental declaration, what is the bottom

18  line in terms of the ultimate dollar amount of contributions

19  that will be made over the years to build up the pension

20  trust?

21  A.   Based on the fiscal plan projections, based on the

22  Certified Fiscal Plan projections, the amount before the

23  changes in the Eight Amended Plan was estimated to be 2.1

24  billion, and after the Eighth Amended Plan, 2.4 billion.

25  Q.   One last area that I wanted to ask you about.  The PSA

1  signed with AFSCME in June of 2019 contemplated benefit

2  reductions, pension benefit reductions of approximately 8.5

3  percent for benefits above 1,200 dollars per month, correct?

4  A.   Correct.

5  Q.   And did anyone calculate what the savings would have been

6  under that original agreement with AFSCME under which pensions

7  would be reduced by 8.5 percent for benefits in excess of

8  1,200 per month?

9  A.   Can you be more specific?

10  Q.   Yes.   I'm just asking whether anyone made a calculation

11  or estimation of the savings of those reductions to the Puerto

12  Rico government?

13  A.   Yes.

14  Q.   And what was the savings that was contemplated from the

15  pension benefit reductions in June of 2019?

16  A.   So overall for the Commonwealth, those savings were

17  estimated to be, over 30 years, around 2.7 billion.

18  Q.   And they're after the threshold for reduction was

19  increased to $1,500, correct?

20  A.   Correct.

21  Q.   And thereafter, any reduction was eliminated, correct?

22  A.   Correct.

23  Q.   And, therefore, that 2.7 billion will not be saved,

24  correct?

25  A.   Correct.

1          MR. HEIN:  Okay.  Thank you.  I have no other

2  questions, Your Honor.

3          THE COURT:  Thank you, Mr. Hein.

4          Ms. Dale, do you have any questions?

5          MS. DALE:  I do not, Your Honor.

6          THE COURT:  Thank you, Mr. Santambrogio.  Your

7  testimony is concluded, and you are excused.

8          THE WITNESS:  Thank you.

9          (At 10:59 AM, witness excused.)

10         MS. DALE:  Your Honor, may we have just a moment now

11 to switch out for our next witness?

12         THE COURT:  Well, I also see that your next witness

13 has a scheduled cross-examination of 45 minutes, so what I

14 propose is that we do the switching out during the break.  So

15 let's reconvene at 11:20.  We'll take a 15-minute break.

16         MS. DALE:  Thank you.

17         THE COURT:  We are adjourned.

18         (At 10:59 AM, recess taken.)

19         (At 11:22 AM, proceedings reconvened.)

20         THE COURT:  Good morning, everyone.  We're back.

21         Is the Oversight Board ready with the next witness?

22 Good morning, Ms. Dale.

23         MR. BIENENSTOCK:  Must have stopped my video.

24         MS. DALE:  Good morning, Your Honor.  One moment, and

25 we're just going to --

1          MR. BIENENSTOCK:  It says the host --

2          MS. DALE:  So we're asking if the Court can open

3    Mr. Bienenstock's video.  We're getting a -- there it is.

4    Wait.  It was there, and then it was gone.  There it goes.

5          THE COURT:  No.  It keeps flipping back.

6          MS. DALE:  Hold on one moment, Your Honor.

7          THE COURT:  Okay.  Mr. Bienenstock is there and

8    holding steady.  Good morning, Mr. Bienenstock.

9          MR. BIENENSTOCK:  Thank you, Your Honor.  Good

10   morning again.

11         The Oversight Board's next witness is Ms. Marti

12   Murray.  Ms. Murray is a bankruptcy and restructuring

13   professional and financial advisor, whose expert

14   qualifications and experience are detailed in her expert

15   report, which is attached to her declaration.  The expert

16   report is ECF no. 18803-22.  It's Debtors' Exhibit 112.  The

17   declaration and report are at ECF no. 18724-1.  And the report

18   has been admitted into evidence as Debtors' Exhibit 112.

19         Ms. Murray is offered as an expert to opine on the

20   following issues:  Whether implementation of the key financial

21   elements of the Plan of Adjustment is consistent with the

22   Fiscal Plan for Puerto Rico dated April 23, 2021, as certified

23   by the Oversight Board; two, whether the proposed treatment of

24   pension liabilities will not negatively impact Puerto Rico's

25   ability to achieve the Fiscal Plan; three, whether

1  implementation of the Plan and achievement of the Fiscal Plan

2  is dependant on new borrowings; and, four, whether certain

3  settlements reached in connection with the Plan are

4  reasonable.

5          The Court already has overruled certain objections

6  that had been raised by the DRA parties to Ms. Murray's report

7  and opinions.  No other party, that is until last night, had

8  raised any objection to Ms. Murray's qualifications or

9  objection to her testimony.

10         Yesterday, however, Mr. Hein e-mailed his objection

11  to Ms. Murray's opinion number four, where he stated he will

12  object to its proffer on substantially the same grounds raised

13  on November 10.  Namely, he contends it's inappropriate for

14  the Oversight Board to use affirmatively the alleged robust

15  nature of the mediation and settlement process,

16  notwithstanding that the Board has objected to any discovery

17  of what transpired in that process; that there's no

18  contemporaneous record of what transpired in that process; and

19  that Mr. Hein was restricted from responding factually with

20  respect to what occurred in that process by virtue of the

21  confidentiality orders that the Court entered.

22         Mr. Hein acknowledged that he realizes the Court on

23  December 10 rejected substantially the same objection, but he

24  wants to reiterate it for the record.  Also, he wants to

25  object to the lack of foundation for Ms. Murray to comment on

1  the purported robust negotiation process.  Mr. Hein did advise

2  us that he does not object to Ms. Murray being tendered as an

3  expert by the Oversight Board.

4        We submit, Your Honor, that Mr. Hein's objection to

5  Ms. Murray's testimony should be overruled on at least two

6  grounds.  First, the objection is late.  Mr. Hein did not

7  provide his objection in his pretrial informative motion, ECF

8  no. 18861, as required by the Court's Procedures Order, which

9  is clear, because he did include his objection to the

10  testimony of Mr. Jaresko and Messrs. Skeel and Zelin in that

11  filing.

12        Second, the objection should be overruled for

13  essentially the same reasons the Court overruled the same

14  objection that Mr. Hein made to the testimony of Ms. Jaresko

15  and Messrs. Skeel and Zelin on this point.  In short,

16  Ms. Murray is merely commenting on the negotiation process

17  disclosed publicly, including with respect to the

18  sophistication of the parties involved, who were assisted by

19  lawyers and financial professionals.  Ms. Murray was not even

20  involved in the negotiations themselves and the mediation,

21  and, therefore, cannot have confidential information of her

22  personal knowledge that she's testifying to, and is not

23  attempting to disclose any of it that she might have heard

24  from other sources.

25        So, therefore, we think the objection should be

1    overruled.  I'm sure Mr. Hein wants to speak for himself on

2    this issue.

3         THE COURT:  Thank you.

4         Mr. Hein.

5         MR. HEIN:  I think Mr. Bienenstock accurately read

6    the e-mail I sent, and I want to just make the objection for

7    the record.  I realize Your Honor ruled beginning with --

8    before Ms. Jaresko's testimony.  I think at that time Your

9    Honor said that, for future witnesses, to raise it and put it

10   in a brief way, referencing the prior discussion we had before

11   Ms. Jaresko.  I've been making this point, you know,

12   repeatedly, and also had made it as a reservation with respect

13   to the exhibit offer.

14        So I acknowledge Your Honor has addressed this.  I

15   just want to have my objection on the record.

16        THE COURT:  Thank you.

17        As Mr. Bienenstock pointed out, this is a

18   procedurally late objection, properly overruled for that

19   reason, and also on the merits, for substantially the reasons

20   stated in connection with the Jaresko and other declarations

21   that were presented on November 10th, I believe, so my ruling

22   was articulated on November 10th.  Thank you.

23        MR. BIENENSTOCK:  Thank you, Your Honor.

24        The Oversight Board offers Ms. Murray's declaration,

25   ECF no. 18724, as her direct testimony, and asks that it be

1  admitted into evidence.

2          THE COURT:  Ms. Murray's declaration at 18724-1 is

3  admitted into evidence.

4          (At 11:29 AM, the Murray Declaration admitted into

5  evidence.)

6          MR. BIENENSTOCK:   Thank you, Your Honor.  I'll be

7  turning things over now to my partner, Margaret Dale.

8          THE COURT:  Thank you.

9          Ms. Dale, is there anything further to discuss before

10  I ask the courtroom deputy to administer the oath?

11          MS. DALE:  No, Your Honor, there is not.

12          THE COURT:  Would the courtroom deputy kindly

13  administer the oath to Ms. Murray?

14          COURTROOM DEPUTY:  Please raise your right hand.

15          Do you solemnly swear that all the testimony you are

16  about to give will be the truth, the whole truth, and nothing

17  but the truth?

18          THE WITNESS:  I do.

19          COURTROOM DEPUTY:  So help you God.

20          THE WITNESS:  So help me God.

21          THE COURT:  Thank you.  You can put your hand down,

22  and good morning.

23          THE WITNESS:  Good morning, Your Honor.

24          THE COURT:  Mr. Hein, you may inquire.

25          MR. HEIN:  Thank you very much, Your Honor.

```
  1                    M A R T I   P.   M U R R A Y,

  2          called as a witness by the Debtors, having been sworn,

  3          testified as follows:

  4                           CROSS-EXAMINATION

  5      BY MR. HEIN:

  6      Q.   Ms. Murray, your Opinion No. 1 one is based on

  7      consistency of the 7th Amended Plan of Adjustment that was

  8      proposed at the time you prepared your September 13th expert

  9      report, and submitted your October 25th declaration that

 10      attaches your expert report, correct?

 11      A.   Correct.

 12      Q.   And that's also true of your Opinion No. 2?

 13      A.   Correct.

 14      Q.   And your Opinion No. 1, concerning consistency with the

 15      2021 Fiscal Plan, is specific to two particular topics,

 16      namely, up front cash needs, and sustainable debt service

 17      levels, correct?

 18      A.   Correct.  Subtopics included.

 19      Q.   Yes.  And your report relies on the April 23, 2021,

 20      fiscal plan, including the various data, including population

 21      data therein, correct?

 22      A.   It relies on the April 2021 certified fiscal plan.

 23      Q.   And your report discusses a time period extending through

 24      2051, correct?

 25      A.   Yes.  That's correct.
```

1   Q.   Did you do calculations of what the service would be on

2   the new bonds in the period fiscal 2022 through fiscal 2046,

3   basically the next 25 years?

4   A.   I'm sorry.  Can you repeat that question?

5   Q.   Did you receive and review projections or forecasts of

6   what debt service would be on the new bonds during the period

7   fiscal 2022 through fiscal 2046, particularly the next 25

8   years?

9   A.   I reviewed information about the current interest bonds

10  and the capital appreciation bonds.

11  Q.   And that information provided what the debt service would

12  be on those instruments?

13  A.   Correct.

14  Q.   In concluding that implementation of the Seventh Amended

15  Plan of Adjustment will result in a level of future

16  non-contingent debt service consistent with sustainable debt

17  levels, you assume there will be no new debt issued by Puerto

18  Rico during the period of time discussed in your expert

19  report, correct?

20  A.   Correct.

21  Q.   As part of your work, you also analyzed prepetition debt

22  service, correct?

23  A.   I evaluated the prepetition debt service as part of the

24  report.

25  Q.   And the debt service amounts in Tables 3 and 4 of your

1  report include both amortization of principal and of interest,

2  not just interest, correct?

3  A.   May I refer to my report?

4  Q.   Of course.

5  A.   Could you repeat the question, please?

6  Q.   Sure.  The debt service amounts that you reference in

7  Tables 3 and 4 of your report include, in the debt service,

8  both amortization of principal and interest, not only

9  interest, correct?

10  A.   That's my understanding, yes.

11  Q.   And you can tell that because the amortization of

12  principal over the period of time that the bonds are

13  outstanding trails off to virtually nothing in 2051, correct?

14  A.   The prepetition debt service trails off.

15  Q.   Correct.  And the concept of amortization of principal of

16  a bond is one where because the debt amortizes, the principal

17  amortizes over the period that's outstanding, by the time you

18  get to the end, the principal's amortized, there's nothing

19  left to pay back, correct?

20  A.   Yes, that's generally correct.

21  Q.   The prepetition debt service referenced in your report

22  includes not only PBA and GO bonds, but other debt that does

23  not have the constitutional priority the GO Commonwealth

24  guaranteed debt and the GO debt itself have, correct?

25       MS. DALE:  Objection, calls for a legal conclusion.

1            THE COURT:  Sustained.

2            MR. HEIN:  Let me rephrase.

3  BY MR. HEIN:

4  Q.    You're aware of the classes of debt, including GO debt,

5  General Obligation debt?  You are aware of that, correct?

6  A.    Yes.

7  Q.    And you're aware of the PBA, or Public Building Authority

8  debt, correct?

9  A.    Yes.

10  Q.    And I'm not asking you to get into the legal arena, but

11  there is other debt beyond the GO debt and the PBA debt that

12  does not have assigned to it the same claim or priority that

13  holders of GO and PBA debt claim.  And, again, I'm not asking

14  you to opine on the legal issue.  I'm just trying to clarify

15  that there are different types of debt than -- GO and PBA are

16  one type, and there are other types as well.

17  A.    There were other types of prepetition debt, yes.

18  Q.    And the prepetition debt service that you reference in

19  Tables 3 and 4 also appears in the Fiscal Plan, an exhibit to

20  the Fiscal Plan itself, correct?

21  A.    That's my recollection.

22  Q.    And a note to that exhibit to the Fiscal Plan states that

23  the debt service amounts include debt service not only for the

24  GO and PBA, but the Fiscal Plan amounts and, therefore, the

25  amounts in your Tables 3 and 4 also include debt service on

1   CCDA, PRIFA, PFC, and ERS, correct?

2   A.   I'm sorry.  I'm not sure I understand your question.

3   Could you rephrase it?

4   Q.   Sure.  The discussion of the debt service in the Fiscal

5   Plan has a note to the table that explains that the debt

6   service line that they have in the Fiscal Plan that you've

7   also used in your Tables 3 and 4, that that debt service line

8   includes not just debt service on the GO and PBA bonds, but

9   also debt service on the CCDA, the PRIFA, PFC, and the ERS

10  bonds, correct?

11  A.   If you're asking me what a footnote in the Fiscal Plan

12  says, I would want to refer to the Fiscal Plan.

13  Q.   You should have with you a Debtors' Exhibit 10, which is

14  the most current fiscal plan, and I can direct you to the

15  specific page.

16        THE COURT:  Mr. Hein, as you ask questions about

17  tables in particular documents, would you please be specific

18  as to the document you're referring to, the ECF number, and

19  the page?

20        MR. HEIN:  Sure.

21        THE COURT:  Thank you.

22  BY MR. HEIN:

23  Q.   This is Debtors' Exhibit 10.  It's at ECF 18785-10.  And

24  the table is chapter 24, financial projections; 24.1, detailed

25  financial projections.  The page number at the bottom of the

1   page is 301, and the docket reference is page 302 of 307.

2          THE COURT:  Thank you.  302 of 309?

3          MR. HEIN:  I'm sorry.  You're correct, Your Honor.

4          THE COURT:  Thank you.

5          MR. HEIN:  It's 302 of 309.

6          THE COURT:  Thank you.

7          MR. HEIN:  Thank you for pointing that out.

8          THE COURT:  Thank you.

9          THE WITNESS:  The exhibit has just been put before

10  me.  Can you please refer me again to the page?

11  BY MR. HEIN:

12  Q.   Sure.  So if you use the page numbers at the top, just

13  flip to page 302 of 309.  So it's at -- very close to the end.

14  And you see footnote 2 there?

15  A.   Yes.

16  Q.   So they have the contractual debt service line there,

17  correct?

18  A.   Correct.

19  Q.   And they're using the same numbers that you have in your

20  Table 3, correct?

21  A.   It looks to be that the contractual debt service payments

22  line in Exhibit 154, which starts with the number 1749 in

23  2022, matches my Table 3, prepetition debt service, which is

24  line 2 under fiscal year 2022.

25  Q.   And hoping your vision is better than mine, are you able

1   to read, or read into the record perhaps for the benefit of

2   everybody, the first sentence of note 2?

3   A.   Yes.  "Debt service based on prepetition contractual debt

4   obligations."

5   Q.   And then I guess you need to go on to read the next

6   sentence.

7   A.   "Presented for illustrative purposes only, and does not

8   represent anticipated future payments on restructured debt."

9   Q.   Then the next sentence?

10  A.   "Includes GO, PBA, CCDA, PRIFA, PFC, ERS."

11  Q.   Thank you.

12          THE COURT:  So, Mr. Hein, before we go on, the Table

13  3 that has been referred to in Ms. Murray's report, which page

14  of which ECF numbered document is that on, again, for clarity

15  of the record?

16          MR. HEIN:  Sure.  It's docket -- I'm using docket

17  18724, and it's page 31 of the report in the lower right-hand

18  corner.  Unfortunately, my copy is one where the docket

19  numbers at the top of the page were kind of overwritten by a

20  second set of the document numbers, which sometimes happens

21  when one takes a document existing on file and refiles it.

22  And so I can't really make out with certainty what the ECF

23  page number is at the top of the page, but it's page 31 at the

24  lower right-hand corner of the report.

25          THE COURT:  Thank you.  That's helpful.  People can

1   compare the documents, but there are many Tables 3 and 4, and

2   Figures 1 and 2 throughout the report.  So, again, just please

3   be as specific as possible for purposes of the record, even if

4   you and Ms. Murray know that you're talking about the same

5   thing.

6            MR. HEIN:   Thank you, Your Honor.

7   BY MR. HEIN:

8   Q.   Did you obtain information on what the current debt

9   service on the -- prepetition contractual debt service, where

10  the GO and PBA Bonds in particular is, as distinct from the

11  debt service number that includes the CCDA, PRIFA, PFC, and

12  ERS as well?

13  A.   I don't recall doing that.

14  Q.   Did you ask anyone for that information?

15  A.   I can't recall.

16  Q.   Would it be fair to say that for the next ten years,

17  prepetition debt service on the GO and PBA bonds will average

18  approximately 1.3 billion per year?

19  A.   I couldn't answer that question without further analysis.

20  Q.   Let me direct you to Debtors' Exhibit 31, which hopefully

21  you have available.  And this is Docket 18797-1.  And I'm

22  referring specifically to -- and again, there's an override of

23  the docket numbers, but it's page 9 in the lower right corner.

24  It's a table called, Overall Debt Drastically Reduced and Made

25  More Affordable.  It's in an Oversight Board presentation.

1          THE COURT:  So is that page 9 in the right-hand

2    corner, or page nine in the middle of the bottom, if that

3    makes a difference?

4          MR. HEIN:  I think you're correct, Your Honor.  At

5    least there's a page 9 at the bottom of the page, and I think

6    there's also one in the lower right corner.

7          THE COURT:  Thank you.

8          MR. HEIN:  And they seem to be, fortunately,

9    consistent.

10          THE COURT:  And that seems to be -- for me, it's a

11    document that has the number 18797-1 on the top, and the

12    headline on it is, Overall Debt Drastically Reduced and Made

13    More Affordable.

14          Is that what we're to be looking at?

15          MR. HEIN:  Yes, that's exactly correct.

16          THE COURT:  Thank you.

17    BY MR. HEIN:

18    Q.   So, Ms. Murray, do you have the page in front of you?

19    A.   Yes, I do.  I note that this document was published after

20    I filed my report.

21    Q.   Okay.  But do you see in the average debt service column,

22    pre-PROMESA for the GO and PBA, it has 1.332 billion?  Do you

23    see that?

24    A.   Yes, I do.

25    Q.   And does that refresh your memory in any way that, as

1   part of your work, you learned that the GO-PBA debt service

2   was -- at least the average for the first ten years was 1.332

3   billion?

4           MS. DALE:  Objection to the form.  I don't think she

5   testified to a failed recollection.

6           THE COURT:  Please rephrase.

7   BY MR. HEIN:

8   Q.   Looking at the 1.332 billion number for average debt

9   service for the first ten years that appears on the document

10  that has previously been identified, does that -- is that

11  information you had or were provided as part of your work, the

12  1.332 billion?

13  A.   As I mentioned, this particular document was dated after

14  I issued my report, so I did not have this particular document

15  at the time I issued my report.

16  Q.   Did you have a number for debt service for the GO and PBA

17  bond specifically when you did issue your report?  Is that

18  something you received or obtained?

19  A.   I don't recall one way or the other.

20  Q.   Now, if you go back to your Table 4 -- and I'm going back

21  now to ECF 18724, your declaration and attached report, and

22  Table 4 is on the page numbered in the lower right corner page

23  31 -- am I correct that the prepetition contractual debt

24  service trails off to very modest amounts by the time one gets

25  to 2042, and then trails off even further by 2051?

1   A.   I don't know what you characterize as very modest

2   amounts.   The numbers decline.

3   Q.   Thank you.

4        Let me focus on your Opinion No. 3.   Your opinion

5   number three assumes no new borrowings by the Commonwealth

6   through 2051, correct?

7   A.   I'm sorry.   Can you repeat the question?

8   Q.   Sure.   I'm referring now to opinion three in your report,

9   and my question is whether your Opinion No. 3, that borrowing

10  lien restrictions incorporated into the Seventh Plan of

11  Adjustment should not impede debtors' ability to achieve the

12  2021 Certified Plan results, whether, for purposes of your

13  Opinion No. 3, you are assuming no new borrowings during the

14  period covered by your report through 2051?

15  A.   Well, in reviewing the 2021 Certified Fiscal Plan, I note

16  that that fiscal plan does not show a need for incremental

17  borrowing.

18  Q.   Is the answer to my question your opinion assumes there

19  won't be new borrowings during the period?

20  A.   My opinion reflects the fact that the Certified Fiscal

21  Plan does not show a need for borrowing.

22  Q.   And stated otherwise, you are not making any assumption

23  that does include new borrowings for the period covered by

24  your report, correct?

25        MS. DALE:   Your Honor, it's Margaret, Margaret Dale.

1   I'm just going to object.  Mr. Hein did not identify Opinion

2   No. 3 as an area that he would inquire on on cross.  He has

3   asked a few questions, and we've let -- I've let him ask a few

4   questions on this area, but I did want to let the Court know

5   that he has not included that opinion as something for cross.

6   And we did not prepare the witness on that area for cross.

7           MR. HEIN:  Your Honor, this was the only question I

8   had --

9           THE COURT:  So this line of questioning is completed,

10  Mr. Hein?

11          MR. HEIN:  Yes.  I just ask the witness to answer the

12  question, but this was the end of that line of questioning.

13          THE COURT:  All right.  So will you restate your

14  final question of this line, and I will permit the witness to

15  answer, to respond to the question.

16          MR. HEIN:  Thank you, Your Honor.

17  BY MR. HEIN:

18  Q.   Your Opinion No. 3 does not make the assumption that

19  there will be new borrowings during the period covered by your

20  report, correct?

21  A.   I'm sorry.  I'm not understanding the question.  If you

22  could rephrase it for me, please.

23  Q.   In your Opinion No. 3, you are not making an assumption

24  that there will be new borrowings, correct?

25  A.   I'm not making an assumption.  I'm reviewing the

1    Certified Fiscal Plan to evaluate whether the Certified Fiscal

2    Plan calls for any new borrowings.

3    Q.   Thank you.

4    A.   And I am noting that it does not.

5    Q.   Thank you.  Let me turn to opinion four.

6         Your Opinion No. 4 regarding the settlements and the

7    settlement process is based on your review of materials in the

8    public record, correct?

9    A.   Correct.

10   Q.   You did not personally observe any portion of the

11   mediation or settlement negotiations, correct?

12   A.   Correct.

13   Q.   You did not personally attend any sessions, correct?

14   A.   No, I did not.

15   Q.   You understood that the settlement and mediation process

16   was subject to court confidentiality orders, correct?

17   A.   That's my understanding.

18   Q.   Because of the court confidentiality records or orders,

19   you were not able to review any contemporaneous record of what

20   transpired, if there was such a record, correct?

21   A.   There were reports filed by the mediation team that I was

22   able to review.

23   Q.   Apart from the reports filed by the mediation team, in

24   terms of the particulars of the back and forth that occurred

25   between the parties, you were not able to review any record of

1  that, correct?

2  A.    I did not review any record of that apart from the

3  reports from the mediation team.

4  Q.    You were not able to interview participants to ask them

5  what happened and what the back and forth was, correct?

6  A.    I did not do so.

7  Q.    Your report refers to recoveries under the Plan resulting

8  from a robust negotiation process.  You do not have any basis,

9  in terms of your personal knowledge, for commenting one way or

10  the other on whether the settlement discussions were robust,

11  because you weren't there and haven't reviewed the back and

12  forth that occurred, correct?

13  A.    I don't agree with that.

14  Q.    You did not know what the motivations of the different

15  participants in the process were, correct?

16  A.    I don't know that I can agree with that.

17  Q.    Is there any party whose motivations you know out of

18  personal knowledge, because you talked to them or they

19  provided that information to you as to what their motivation

20  or strategy in the discussions was?

21  A.    Well, I think there's information about the motivations

22  of the mediation team described in the reports that the

23  mediation team filed with the Court.

24  Q.    Apart from that.

25  A.    Can you repeat the question, please?

1  Q.   Sure.  Apart from reading the written reports filed by

2  the mediation team that are in the Court's docket, you never

3  spoke to any of the mediators, correct?

4  A.   Correct.

5  Q.   And apart from simply reading those reports that are on

6  file, you don't know what any of the particular participants

7  negotiating or participating in that process were motivated

8  by, correct?

9  A.   I'm sorry.  You froze towards the end of that question.

10 Q.   Sure.  Can you hear me better now?

11 A.   I can hear you, yes.

12 Q.   Great.  Apart from reviewing what is filed in the public

13 court record, the mediation reports, you don't have personal

14 knowledge of what particular parties were thinking or

15 proposing or responding during that process, correct?

16 A.   Well, I have industry experience with respect to parties'

17 desires to optimize their outcomes in such situations.

18         MR. HEIN:  Respectfully, I'd move to strike that as

19 non-responsive.

20 BY MR. HEIN:

21 Q.   My question wasn't addressed to industry experience.

22 I'll get to that in a minute.  I just want a direct answer to

23 my question about whether you had personal knowledge.

24         THE COURT:  So the question was personal knowledge of

25 what particular parties were thinking.  The motion to strike

1   is granted.  So you can ask the question again.

2           MR. HEIN:  Sure.  I'll repeat it again.

3   BY MR. HEIN:

4   Q.   Do you have personal knowledge of what the particular

5   parties in this case, participating in the settlement

6   mediation process, were strategizing or their motivations or

7   what the back and forth was?

8   A.   No.

9   Q.   Now, let's turn to other situations.

10          Have you personally participated in mediations in

11  other cases?  And, again, I'm focusing on whether you

12  personally participated.

13  A.   Yes.

14  Q.   And how many other cases?

15  A.   Sitting here today, I can recall at least one.

16  Q.   Can you identify that?

17  A.   Yes.  It was a matter involving Exide Corporation.

18  Q.   Sorry.  I didn't catch the name.

19  A.   Exide Corporation.

20  Q.   And in what capacity did you personally participate?

21  A.   My investment management firm, Murray Capital Management,

22  was a plaintiff in a litigation against Exide.

23  Q.   And was this a bankruptcy situation or was it simply a

24  litigation?

25  A.   It was a litigation.

```
 1   Q.   And were there multiple parties, just -- or just your
 2   company and the defendant?
 3   A.   I can't recall.
 4   Q.   Have we now exhausted your recollection of mediations
 5   that you've personally participated in, this one that you've
 6   described?
 7   A.   Can you be more specific with respect to your use of the
 8   term "mediation"?
 9   Q.   Let me just give you what I would view as a thumbnail.
10   Court process, such as we're engaged in now, all of the
11   parties are present, (inaudible) a judge who makes decisions.
12   There's an arbitration process that (inaudible) typically --
13          THE COURT:   Mr. Hein.   Mr. Hein, I need you to back
14   up to the beginning of that thumbnail, because you froze in
15   the middle of it.
16          MR. HEIN:   Can you hear me now, Your Honor?
17          THE COURT:   Yes, I can.   Thank you.
18   BY MR. HEIN:
19   Q.   So -- and just to try to clarify and focus my question, I
20   guess, with the Court's indulgence, I will provide a thumbnail
21   of judicial court proceedings, arbitration, and mediation just
22   to help illustrate the contrast that I am assuming for
23   purposes of my question.
24          Court proceedings, all of the parties to the case are
25   present, are entitled to be present.   A judge presides and
```

1    makes decisions that bind the parties.  In arbitration,

2    typically it's like a court proceeding, where all of the

3    parties are present, an arbitrator or a panel of arbitrators

4    makes decisions that typically bind the parties.

5           Mediation is different.  Mediation is a voluntary

6    process where the parties will meet with the mediator, and

7    aren't bound by any decisions by the mediator.  The mediator

8    doesn't typically make decisions.  And unlike a court process

9    or an arbitration process, in a mediation, the mediator can

10   speak privately to the different parties.

11          Does that help you?

12   A.   Yes.  Thank you.

13   Q.   So with that clarification, are there any -- let me first

14   ask you of the case you described, where your company was the

15   plaintiff, and Excide was the defendant.  Was that a case

16   where you were dealing with the mediator who kind of shuttled

17   between the parties, and was not making binding decisions, but

18   simply trying to help the parties reach a settlement among

19   themselves?

20   A.   Yes.  It's Exide, E-x-i-d-e.

21   Q.   Okay.  Thank you.

22          So with that clarification, are there any other

23   mediations that you recall personally participating in?

24   A.   Yes.

25   Q.   And what are those?

1    A.    I participated in a mediation for an entity referred to

2    as SW Boston.

3    Q.    In what capacity did you participate?

4    A.    I participated in the capacity of financial advisor to

5    one of the parties in a bankruptcy.

6    Q.    Did you attend actual mediation sessions?

7    A.    Yes.

8    Q.    And how many approximately?

9    A.    As I recall, there was one.

10   Q.    And was this a case with a number of different parties,

11   or just a small number of parties?

12   A.    I don't know what you mean.

13   Q.    How many parties were there involved in this particular

14   mediation matter with SW Boston?

15   A.    Directly in the mediation, there were two parties.

16   Q.    So have we now exhausted your recollection of personal

17   participation in mediation?

18   A.    Those are the two I recall sitting here today.  There may

19   be others.

20   Q.    So specifically, just to follow up, have you had the

21   experience of participating in mediation in the context of a

22   large municipal or other governmental entity in bankruptcy?

23   A.    No.

24   Q.    Have you had the personal experience of participating in

25   mediation in the context of a large corporate bankruptcy?

1   A.   Yes.

2   Q.   And was that the SW Boston?

3   A.   Yes.

4   Q.   Other than SW Boston, have you had the personal

5   experience of participating in mediation in the context of a

6   large corporate bankruptcy?

7   A.   I can't recall with specificity sitting here today.

8   There may have been others.

9   Q.   Thank you.

10          In the two mediation experiences that you handled --

11   withdraw that.

12          You have identified two mediation experiences.

13   You've described them, and I believe you said that in each

14   case, there were two parties, correct?

15   A.   That's my recollection.   There may have been more.

16   Q.   So in those cases, the two cases you personally had

17   experience with, did the mediator meet privately with

18   different parties during the course of the day, or during the

19   course of the session?

20   A.   Yes.

21   Q.   And so the mediator could spend more time with one party

22   than another, correct?

23   A.   I can't recall.

24   Q.   Was there any -- withdraw that.

25          In particular, when -- with respect to your

1    involvement in the mediation, there were times when you would

2    be in a room, perhaps with lawyers or others, where the

3    mediator was often in a different room with the other party,

4    correct?

5    A.   Yes.

6    Q.   And so in the course of even your personal experience,

7    these two mediations, each of which involved two parties,

8    things were going on in other rooms where you didn't know what

9    was happening, correct?

10   A.   I didn't know what was being discussed with any

11   specificity, correct.

12   Q.   So let me now turn to the question of commercial

13   reasonableness.  You offer an opinion that you see no

14   commercially reasonable basis to upset the balance reached as

15   part of the mediation settlement process, correct?  That's

16   your offered opinion?

17   A.   Can you direct me to the paragraph in my report to which

18   you're referring?

19   Q.   Well, I have reference to page 73, paragraph 136, but I

20   don't mean to put words in your mouth.  And if that's not your

21   opinion, or you don't recall that as an opinion, I respect

22   that, and don't want to -- I'm not trying to put words in your

23   mouth.

24   A.   Well, I just wanted to refer to where you were looking in

25   my report.  And what my report says is that, I would see no

1  commercially reasonable basis to upset the balance that has

2  been reached when the parties representing the economic

3  interests at stake have agreed to the compromises incorporated

4  into the terms of the plan.

5  Q.   Okay.  And you're now referring to page 73 in the lower

6  right-hand corner of your report, which is included in docket

7  18724, and you're specifically -- you read the last sentence

8  of paragraph 136, correct?

9  A.   Correct.

10 Q.   Thank you.

11       You are not opining here on the legal

12 appropriateness of the settlement, correct?

13 A.   No.  I'm not offering a legal opinion.

14 Q.   And you are not opining here based on what actually

15 occurred in the mediation that you were not at, correct?

16 A.   I'm opining on the outcome, the holistic outcome of the

17 mediation.

18 Q.   Thank you.

19       Final topic.  You attached Dr. Wolfe's report to your

20 report, correct?

21 A.   Could you direct me to that, please?

22 Q.   You know, it may be that I just erred in my review of

23 what was in the docket and thought the two were connected.

24       Let me just ask you, without any representation, did

25 you attach Dr. Wolfe's report to your report?

1   A.   No.

2   Q.   Okay.  Then that's fine.  That was my mechanical

3   misinterpretation.

4            So thank you very much.  I have no further

5   questions.

6            THE COURT:  Thank you, Mr. Hein.

7            Ms. Dale, do you have any questions for Ms. Murray?

8            MS. DALE:  I do, Your Honor.  Very short.

9                         REDIRECT EXAMINATION

10   BY MS. DALE:

11   Q.   Ms. Murray, if I could direct you to your report,

12   paragraph 114, which is on page 61 in the bottom right-hand

13   corner of the report.

14            Ms. Murray, are you there?  I can't see you.

15   A.   Yes, I am.

16   Q.   Okay.  Thank you very much.

17            Ms. Murray, what is your basis for the statement in

18   the first sentence of paragraph 114 that says "the relative

19   recoveries under the Plan resulted from a robust negotiation

20   process that also reflected risks associated with certain

21   litigations between and among the stakeholders?"

22   A.   That -- the basis for that opinion is my experience as an

23   industry practitioner in bankruptcy and restructuring, and my

24   observation about the process by which the negotiations

25   proceeded.

1          This case has been ongoing for four and a half years.

2     It has involved highly sophisticated parties, represented by

3     very experienced lawyers, and financial advisors.

4          There has been court-appointed mediation.  There had

5     been reports that had been issued by the mediation team that

6     reflect substantive negotiations between the parties.  There

7     are multiple legal issues that had to be addressed in this

8     case.  And there were many, many parties that had to be

9     brought on board.  And the fact that all of these parties have

10    agreed to move forward with this particular plan, in my

11    opinion, in and of itself is evidence of a robust negotiation

12    process.

13          MS. DALE:  Thank you.  I have no other questions.

14          THE COURT:  Thank you.

15          Mr. Hein, any further questions?

16          MR. HEIN:  Just a brief follow-up.

17                        RECROSS-EXAMINATION

18    BY MR. HEIN:

19    Q.   Do you know, in terms of your personal knowledge, whether

20    every creditor was personally involved in active negotiation

21    of the Plan?

22    A.   I do not.

23          MR. HEIN:  Thank you.  No other questions.

24          THE COURT:  Thank you, Mr. Hein.

25          Anything further, Ms. Dale?

1          MS. DALE:  No, Your Honor.

2          THE COURT:  Thank you, Ms. Murray.  Your testimony is

3    concluded, and you are excused.

4          THE WITNESS:  Thank you, Your Honor.

5          (At 12:12 PM, witness excused.)

6          THE COURT:  So, Ms. Dale, we have a transition to the

7    next witness?

8          MS. DALE:  Yes, Your Honor.  If you could just give

9    us one minute.  Thank you very much.

10          THE COURT:  Sure.  Let us know when you're ready.

11          MS. DALE:  Yes, ma'am.

12          MR. ROSEN:  Good morning, Your Honor.  Brian Rosen.

13    I think we're ready to proceed.

14          THE COURT:  Very well.  Good morning, Mr. Rosen.

15          MR. ROSEN:  Good morning, Your Honor.

16          At this time, Your Honor, we would like to present

17    Mr. David Brownstein as our next witness.  We have submitted

18    two declarations on behalf of Mr. Brownstein, an original

19    declaration and an amended declaration.  The amended, of

20    course, was only with respect to the inclusion of certain

21    exhibits.  The ECF numbers for these, the original declaration

22    was 18726, and the amended declaration was ECF no. 19054-01.

23          At this time, Your Honor, we would like to offer

24    those two declarations into evidence.

25          THE COURT:  Is there any objection?  If so, raise

1  your hand.

2          Seeing no objections and none having been filed, the

3  two declarations at 18726 and 19054-01 are admitted in

4  evidence.

5          (Whereupon the Brownstein Declarations admitted into

6  evidence.)

7          MR. ROSEN:  Thank you very much, Your Honor.  At this

8  time, I would like to pass the microphone over to my

9  colleague, Mr. Firestein, and present the witness,

10 Mr. Brownstein, to you.

11         THE COURT:  Thank you.

12         Good morning, Mr. Brownstein.

13         THE WITNESS:  Good morning, Your Honor.

14         THE COURT:  Actually, it's afternoon where I am, so

15 I'll say good afternoon to you as well.

16         THE WITNESS:  Buenas tardes.

17         THE COURT:  Buenas tardes.

18         I will ask the courtroom deputy to administer the

19 oath.

20         COURTROOM DEPUTY:  Please raise your right hand.

21         Do you solemnly swear that all the testimony you are

22 about to give will be the truth, the whole truth, and nothing

23 but the truth?

24         THE WITNESS:  I do.

25         COURTROOM DEPUTY:  So help you God.

1          THE WITNESS:  So help me God.

2          THE COURT:  Thank you, Mr. Brownstein.  You can put

3    your hand down.

4          Mr. Hein, you may inquire.

5          MR. HEIN:  Thank you, Your Honor.

6               D A V I D   B R O W N S T E I N,

7       called as a witness by the Debtors, having been sworn,

8       testified as follows:

9                         CROSS-EXAMINATION

10   BY MR. HEIN:

11   Q.   Mr. Brownstein, you state that a request for the IRS to

12   issue a private letter ruling or closing agreement related to

13   the tax exempt status of the new GO bonds has been prepared,

14   correct?

15   A.   Yes.  To be clear, or a closing agreement, right?  I

16   just -- I didn't hear you.  You froze for a moment there.

17   Q.   Sure.  Yes.  It would be either a request for a private

18   letter ruling or a closing agreement?

19   A.   Correct.

20   Q.   Thank you.

21          And when did the work to prepare that request begin?

22   A.   I can't tell you an exact date.  I wouldn't recall.  But

23   it's been going on for some time now.

24   Q.   And who are the people principally involved in this

25   effort?

1   A.   The tax attorneys representing both AAFAF and the Board

2   who've been involved.

3   Q.   And are there any parties other than those associated

4   with the Oversight Board and AAFAF who have participated or

5   whose attorneys have participated?  For example, (inaudible)

6   receiving drafts of communications --

7           THE COURT:  Mr. Hein, you'll have to repeat that

8   question again from the beginning, because the signal broke

9   up.

10          MR. HEIN:  Sure.  Thank you.

11  BY MR. HEIN:

12  Q.   Apart from the Oversight Board, and AAFAF, and their

13  legal advisors, and financial advisors, have there been

14  communications with other parties about the preparation of

15  this request for a private letter ruling or closing agreement?

16  A.   Other than with me, Mr. Hein, no, not that I'm aware of.

17  Q.   Okay.  And then speaking in terms of communications

18  you've had, who have you had communications with on the

19  subject other than AAFAF, and the Oversight Board, and their

20  legal and other advisors?

21  A.   My communications have only been with them, sir.

22  Q.   Okay.  And are you aware of anyone else having

23  communications with other parties on this subject?

24  A.   No, I am not.

25  Q.   Thank you.

1    Is the request to the IRS for the private letter

2  ruling or closing agreement relating to tax exempt status

3  substantially complete?

4  A.   My understanding is it has been filed.

5  Q.   And do you recall when it was filed?

6  A.   I don't know the exact date, no.

7  Q.   Approximately?

8  A.   I don't know the exact date.  I don't know approximately

9  when either.  Just that it has been filed.

10 Q.   Does the request to the IRS to seek tax exempt status

11 seek tax exempt status for all of the new GO bonds?

12 A.   Can you repeat and restate your question?  I'm not sure I

13 understand what you mean by all GO bonds.

14 Q.   So there are new GO bonds that are proposed to be issued

15 here, correct?

16 A.   Yes.  There are several different GO bonds to be issued

17 here.

18 Q.   And is the request to the IRS to issue a private letter

19 ruling or closing agreement a request that seeks tax exempt

20 status for all the new GO bonds to be issued?

21 A.   No, it does not.

22 Q.   What bonds does it not seek that status with respect to?

23 A.   For the contingent value instruments.

24 Q.   So let me exclude for this line of questioning the

25 contingent value instruments, focus you on the coupon bonds

1   and the capital appreciation bonds.

2          With respect to the coupon and capital appreciation

3   bonds, does the request for tax exempt status apply to all of

4   the new GO bonds that are contemplated?

5   A.   Yes.

6   Q.   Does the request to the IRS set forth that the principal

7   amount of the new bonds will be less than the principal amount

8   of existing and outstanding GO and PBA bonds that were

9   previously issued as federally taxable?

10  A.   I'm sorry.  I don't understand at all your question.  Can

11  you rephrase it for me?

12  Q.   So you have previously issued and still outstanding bonds

13  issued by GO -- issued by the Commonwealth or the PBA, some of

14  which, some small portion of which were federally taxable; is

15  that correct?

16  A.   I believe approximately 13 percent of the outstanding

17  debt is federally taxable.

18  Q.   And, as you understand it, is one of the points made in

19  the request that all of the new GO bonds be tax exempt, that

20  the new principal amount for the new bonds will be less than

21  the principal amount of existing and outstanding GO bonds and

22  PBA bonds that are tax exempt, i.e., the 87 percent?

23  A.   I'm still -- I'm not understanding your question, sir.

24  Q.   Okay.  So in terms of the existing and outstanding bonds,

25  approximately 13 percent of the existing and outstanding GO

1    and PBA bonds were federally taxable when they were issued,

2    correct?

3            THE COURT:  Mr. Hein, you'll need to repeat that

4    because the signal broke up again.

5    BY MR. HEIN:

6    Q.   In terms of the existing and outstanding GO and PBA

7    bonds, approximately 13 percent of them were issued originally

8    as federally taxable, correct?

9    A.   That is correct.

10   Q.   And that means that 87 percent of the currently

11   outstanding GO and PBA bonds were originally issued as tax

12   exempt, correct?

13   A.   That is correct.

14   Q.   And what is the approximate principal amount of that 87

15   percent?

16   A.   I don't have that number with me.

17   Q.   Is one of the points made to the IRS that the principal

18   amount of the new GO bonds will be less than the aggregate

19   principal amount of that 87 percent?

20   A.   That is one of the arguments used as to why the IRS

21   should be willing to provide guidance on tax exemption for the

22   new issue, correct.

23   Q.   And, indeed, that same argument was made in the COFINA

24   case and was successful, correct?

25   A.   That is correct.

1  Q.    Are there additional alternative grounds advanced for why

2  the new bonds should be tax exempt?

3  A.    The letter request tells all of the facts of the existing

4  debt that are known at this time.

5  Q.    You were personally involved in the efforts to obtain tax

6  exempt status for COFINA bonds, correct?

7  A.    Yes, sir.

8  Q.    And so you have the benefit of that experience and your

9  views as to the current request, correct?

10 A.    I know the facts of the COFINA transaction and what the

11 service ultimately said, yes.

12 Q.    And in the *COFINA* case, likewise, the request was that

13 all bonds be tax exempt, and that was granted, correct?

14 A.    Correct.  It was granted.

15 Q.    And the current request of the IRS with respect to the

16 new GO bonds is, in essence, following that same template,

17 correct?

18 A.    Generally correct.

19 Q.    Was there any consideration given here to simply doing an

20 exchange, whereby those holders who held bonds that were

21 issued as taxable would get new bonds that were taxable, and

22 those holders who held bonds, the originally issued bonds that

23 were tax exempt would receive new bonds that were tax exempt?

24 A.    Everyone has an alike claim, whether they own a short

25 bond, long bond, taxable bond, or tax exempt bond, so no.

1   Q.   Now, my question I think was whether that was considered

2   or discussed.  Was it considered or discussed?

3   A.   No.

4   Q.   Some of the parties who participated in the negotiation

5   of the structure of the new bonds hold taxable bonds, correct?

6   A.   It's possible they do, yes.  I don't know for a fact.

7   Q.   If one holds taxable bonds, one receives a benefit if one

8   is able to exchange those taxable bonds for tax exempt bonds

9   on the same basis that someone who holds tax exempt bonds can

10  make their exchange, correct?

11  A.   Again, their claim is a like claim.  Based on that, yes.

12  Q.   Let me turn to -- withdraw that.

13       From the point of view of current holders of taxable

14  bonds, the proposed structure offers them the opportunity, if

15  you're successful, as you were, or the Oversight Board was in

16  the *COFINA* case in getting all bonds tax exempt, it offers the

17  alternative or the opportunity for holders of taxable bonds

18  today to end up with taxable bonds after the exchange,

19  correct?

20  A.   You mean -- I believe what you meant to say was to end up

21  with tax exempt bonds.

22  Q.   Let me restate the question.  If I misspoke, my

23  apologies.

24       The proposed structure that is seeking tax exempt

25  status for all of the new bonds, as was successful in the

1  *COFINA* case, will offer someone who currently holds taxable

2  bonds the added benefit of receiving, in exchange, new bonds

3  that are tax exempt, correct?

4  A.   I -- no.   That -- I'm sorry.   Your question doesn't make

5  any sense to me.

6  Q.   Okay.   Someone who currently holds taxable bonds,

7  assuming the Oversight Board is successful in its request to

8  have all new bonds be tax exempt, as was the case in the

9  COFINA situation, that current holder of originally issued

10 taxable bonds will end up in the exchange with tax exempt

11 bonds, correct?

12 A.   No.   Every -- again, as I stated before, everyone has a

13 like claim, so everyone will be receiving both taxable and tax

14 exempt bonds, whether today they own tax exempt or taxable

15 bonds, so that in the end here everyone will be the

16 beneficiary of the ruling, if we get one from the service.

17 Q.   And let me just perhaps be more clear.   My question was

18 premised on your being successful in getting a ruling that all

19 new GO bonds can be tax exempt.   Do you follow me?   Can you

20 accept that premise for my question?

21 A.   No, because the first part of your question states it

22 very differently, that someone isn't entitled to a pro rata

23 share today of tax exempt bonds either -- whether we get the

24 ruling or not.

25 Q.   So I'm not intending in the question any judgment or the

1    like.  I'm just trying to factually understand.  If the ruling

2    is that all new bonds are tax exempt -- you're with me for

3    that part of the question, correct?

4    A.    Yes.

5    Q.    If all new GO bonds are tax exempt, everybody who

6    currently holds bonds, whether they're taxable or not taxable,

7    will be receiving all tax exempt bonds, correct?

8    A.    If the ruling were to state that all of the refunding

9    bonds were tax exempt, the answer would be yes.

10   Q.    Yes.  Thank you.

11          Now let me turn to a different subject.  One option

12   for the newly issued bonds would be to issue term bonds with a

13   sinking fund, so that principal could be amortized if the

14   number of individual CUSIPs issued could be reduced or kept to

15   a minimum, correct?

16   A.    While that wouldn't be in the interest of any bondholder,

17   that would be an option, correct.

18   Q.    Were there benefits to some of the funds with major

19   holdings who negotiated the Plan to have a multiplicity of new

20   CUSIPs issued in exchange for each existing CUSIP?

21   A.    The structure was created by Citi, as representative of

22   the Board, to provide all holders with as significant a

23   recovery as we could, within the boundaries of what the Board

24   was comfortable as annual debt service being.  So while there

25   were discussions with the participants in mediation as to the

1    structure that Citi was proposing, that proposal was driven by

2    what was in the best interest of all bondholders in getting

3    them the highest recovery possible within the boundaries of

4    the municipal market.

5    Q.   Were there benefits to the Commonwealth of issuing a

6    multiplicity of different CUSIPs in exchange for each existing

7    CUSIP?

8    A.   Not that I can think of.

9    Q.   For individual retail investors with modest-sized

10   holdings, whether it's someone with a CUSIP that's 100,000

11   par, or in some cases individuals may have as little as 5,000

12   par of a particular CUSIP, correct?

13   A.   Yes.

14   Q.   For an individual with a CUSIP that is 100,000, or

15   25,000, or 10,000, or 5,000, they are going to be receiving 12

16   separate CUSIPs for each existing CUSIP, correct?

17   A.   Well, I want to correct you.  They will be receiving in

18   total 13 CUSIPs to replace their existing holdings that are

19   all in one account.  So if an individual has an account solely

20   in their name, all of their bonds will be exchanged in for new

21   bonds that will have 13 CUSIPs.  No more.

22   Q.   So if someone hypothetically has an account with broker

23   A, and with broker A they have four different CUSIPs, some

24   PBA, some GO, are they going to get 13 times four, or are they

25   going to get just 13?

1   A.    You froze there.

2   Q.    Okay.  Yes.  Mr. Brownstein, can you hear me now?

3   A.    Yes.

4   Q.    Let me just back up for the sake of clarity.

5           In the *COFINA* case, someone who had four CUSIPs, and

6   they could be simply different maturities in the same series,

7   or different series, someone with four CUSIPs, even at the

8   same broker, would end up with four times 14, or whatever the

9   number of CUSIPs were there -- I believe it was 14 -- is that

10  correct?

11  A.    I don't believe so, no.  Their custodian would have

12  received back a portfolio that included all 14 CUSIPs; and

13  would have pulled out of that account the four CUSIPs they

14  owned, and put into that individual account the 14 replacement

15  CUSIPs.  Not four times.  I wouldn't -- that wouldn't -- that

16  just doesn't fit within how the market works.

17  Q.    So if -- let me ask you hypothetically, if hypothetically

18  I could show you that that's what happened at at least two

19  different brokerage firms, where one got 14 CUSIPs for every

20  existing CUSIP, you would say that that was not the way it was

21  supposed to work?

22  A.    Again, if you have an account, to be clear, Mr. Hein,

23  that what is -- let's say you have an account with one CUSIP

24  in it, just start there, at UBS, your broker, you will receive

25  back 13 CUSIPs to replace that one CUSIP.

1          If you have two accounts at UBS that are different

2    account numbers, because one's in your and your wife's name,

3    as an example, that will receive separately 13 CUSIPs as an

4    exchange for its existing portfolio.  There are only 13

5    CUSIPs, or in the case of COFINA, as you noted, 14.  So once

6    they're in your portfolio, there are only 14 CUSIPs.

7          They can't give you four times 14.  They just gave

8    you -- instead of a 5,000 bond in one CUSIP, they gave you

9    20,000 in that single CUSIP.  There are no additional CUSIPs

10   above the 14, so, theoretically, it's impossible, but I'm

11   happy to evaluate that with you.

12   Q.   Take your situation where someone -- let's say someone

13   has 100,000 par, one CUSIP.

14   A.   Yes.

15   Q.   And they're going to get 13 different CUSIPs, one being

16   the CVI, correct?

17   A.   I believe the 13 I'm talking about, but I can't recall,

18   exclude the CVI, but I'll have to check on that.

19   Q.   Whether it's 13, or 13 plus the CVI, would you agree

20   that, from the point of view of the retail investor, there's a

21   reduction in their liquidity on a practical level in terms of

22   their ability to sell bits or pieces of these different 13

23   CUSIPs that they've received?

24   A.   No.  I disagree with that statement.

25   Q.   And why do you disagree?

1    A.   So the purpose of going from your question on a term bond

2    to 13 serials is to take advantage of the fact that the

3    municipal market has an upward sloping yield curve, and what

4    that means is if we gave you one term bond, which is priced to

5    maturity of the bond, and doesn't take into account the yield

6    curve, because we don't price in the municipal market to

7    average life, we price to maturity or call, what that means is

8    the principal amount of bonds that you would have received day

9    one, whether you owned 100,000 -- take 700,000 as an example,

10    where you will be receiving back 300,000 in bonds, plus cash.

11    So let's take that 300,000, where now you're receiving 23,000

12    of each of the 13 maturities, or 300,000 of one term bond.

13    The amount of proceeds we were able to generate for you

14    through the serial fracture increased your recovery by two and

15    a half percent of par.

16        The question is whether, if you sold each of your

17    bonds day one, which is not what I solved for -- I solved for

18    giving you the most amount of proceeds, right?  If you sold

19    them all, what I assure you is that the liquidity charge

20    versus the 23,413 versus the 300,000 as one maturity, would be

21    significantly lower.

22        So, in other words, the total amount of value you

23    would receive would still be significantly greater.  That is

24    what the Board charged us to solve for, which is what we

25    solved for.  So your base premise is wrong.

1  Q.   Let me just clarify.  So what you're saying is you

2  believe the value of the structure that you have proposed, and

3  the Plan proposes, provides an additional two and a half

4  percent of par in value, correct?

5  A.   I believe I said two and a quarter, but yes.

6  Q.   Yeah.  And you believe that two and a quarter percent of

7  par is significant?

8  A.   Is significantly greater than the lack -- the

9  differential in liquidity in -- and if you went to sell all of

10 those bonds day one, then the liquidity you would be charged

11 because of having a smaller par amount.  So yes, net, you come

12 out ahead, no matter whether you own one bond or more.

13 Q.   And just, can you tell us, in general terms, what the

14 liquidity charge would be under those circumstances?

15 A.   Well, each retail brokerage firm charges different

16 liquidity charges, but as I think you are aware, they now bid

17 out of all of those holdings to other market participants.

18 And I can never give you, on any given day, what that is per

19 bond, but what I would tell you, in this instant, today I

20 believe the differential is less than half a percent of par,

21 versus the two and a quarter percent in gain we provided you

22 in structure.

23 Q.   So what you're saying is that basically there'd be a net

24 gain of one and a half to one and three-quarters of one

25 percent; is that correct?

1   A.    Today, correct.

2   Q.    And you view that as significant?

3   A.    I view that as significant, because we're talking about

4   trying to increase your recovery in any way we can, so yes.

5   Q.    Thank you.  Let me just turn briefly to a couple other

6   subjects that I want to cover.

7   A.    Of course.

8   Q.    There's a taxable election for Puerto Rico investors.

9   You're familiar with that feature?

10  A.    Yes, I am.

11  Q.    Is it contemplated that if the IRS concludes all bonds

12  can be tax exempt, the Puerto Rican investors will still get

13  the single maturity 2041 with the five percent coupon, and

14  then have a tax exempt bond with those attributes?

15  A.    To the extent we get a ruling that covers all the bonds,

16  and we get it prior to settlement, yes, that would potentially

17  be the case.

18  Q.    And by that, what do you mean?  That the --

19  A.    Let's talk through the reason we did this, so you

20  understand.  The fact is that for every bond that you get

21  that's tax exempt instead of taxable, if you're a mainland IRS

22  taxpayer -- all right.  So let's take an example.  If you

23  have -- there were 49 million in bonds that were taken by the

24  on-island investors in -- as taxable bonds, and that results

25  in gains --

1              (Sound played.)

2    A.    -- if you will, for those investors of about five percent

3    of par in cash flow over the life, because they're getting a

4    higher coupon.

5              Having said that, what you as an U.S. investor gains

6    by having them take that bond, assuming you are a taxpayer --

7    so assume you are a taxpayer in the 35 percent tax bracket.

8    Clearly, if you're a taxpayer who pays state and local taxes,

9    you're higher than that, but in a 35 percent tax bracket, you,

10   as an U.S. holder, mainland holder of these bonds, for the 49

11   million in bonds that the local on-island holders took taxable

12   instead of you, you have a 14 percent after-tax gain.  That is

13   what was provided to you by giving the on-island investors the

14   right to elect taxable bonds, which meant that your portfolio

15   would have a higher amount of tax exempt bonds.

16   Q.    Am I correct that one way to avoid an issue of whether

17   one is preferencing one group of investors over another would

18   be to simply wait until you get the IRS determination, and if

19   all bonds can be tax exempt, everyone would get the same?

20   A.    So let me make a couple of quick points.  First of all,

21   the holders in Puerto Rico, as I just said, gave you a very

22   significant gain on an after-tax basis, but most importantly,

23   what I need to make sure you understand is there is no time in

24   which the IRS is obligated to respond.  What happened in

25   COFINA, as you are aware --

```
 1           (Sound played.)
 2   A.   -- is that the Federal Government closed, and, therefore,
 3   we didn't receive an answer from the IRS in time for
 4   consummation of the COFINA Plan.  Because the IRS does not
 5   give you a timeframe in which you will receive an answer, it
 6   is not in anyone's interest to wait, because we could be
 7   waiting for a very long time before we get an answer, whether
 8   that answer is yes or no, from the IRS.
 9   Q.   Do you know whether an effort has been made to engage the
10   IRS on the subject of timing to increase the possibility of
11   having their determination before the effective date?
12   A.   I know that the service has been told that we are under a
13   time constraint and we'd appreciate a quick answer from them;
14   but, again, look at what happened in COFINA.  The Federal
15   Government closed.
16           There are loads of things that could happen here,
17   and, by the way, one that could happen would be that they say
18   no, in which case you wouldn't want -- have not wanted to take
19   advantage of local investors on island being willing to
20   purchase taxable bonds, given that they don't pay Federal
21   Income Taxes usually on their holdings of Puerto Rico bonds.
22   Q.   Let me just take two questions, please, specific
23   questions as to this.
24   A.   Of course.
25   Q.   If the IRS rules that all bonds can be tax exempt before
```

1  the effective date, will the Puerto Rico investors still get

2  the higher five percent coupon and the single 2041 maturity?

3  A.    I don't have an answer for that.  I don't know.

4  Q.    Let me quickly ask you about the CVIs.

5         THE COURT:  So, Mr. Hein, is this your last topic,

6  since you have gone past your time?

7         MR. HEIN:  I apologize, Your Honor.  I actually had

8  several other topics.  I guess I did bring the other witnesses

9  in much less than my estimate, and with your indulgence, Your

10  Honor, I'd like to try to complete the questions, if I may.

11         THE COURT:  All right.  You may proceed.

12         MR. HEIN:  Thank you.

13  BY MR. HEIN:

14  Q.    On the CVIs, you state that no single individual person

15  can provide the requisite expert opinion and report, correct?

16  A.    None of the consultants for the Oversight Board in that

17  case, correct.

18  Q.    And is there any issue with respect -- or any discussion

19  of bringing in someone new who can cover the waterfront, or,

20  alternatively, have an existing expert rely upon the work of

21  others, do more work themselves to be in the position to

22  render the necessary opinion?

23  A.    Well, it's not simply rendering an opinion, but what I'd

24  say to you is we've had numerous dialogues with both the

25  government's counsel -- who will be the ones providing the

1   opinions on the bonds, not the Board's counsel -- and the

2   Board's counsel, as well as AAFAF's counsel, in discussing

3   what the alternative mechanisms are to try and get to an

4   answer of yes.  We will continue to use our reasonable best

5   efforts to try and find a yes answer.

6        As I think you're aware, there's only been one CVI

7   issued by a municipal government in the United States, and

8   that was not tax exempt.  The question really is, is there a

9   reasonable expectation that the bonds will pay.  That needs to

10  be determined in order for it to be deemed, first, debt, and

11  then potentially tax exempt.

12  Q.   Thank you.

13       Let me turn to a different topic.  I'm now referring

14  to the question of available information on the number of

15  individual holders of GOs or PBA who could qualify, based on

16  the level of their holdings, as retail investors.  Is that

17  something that the Commonwealth or the Oversight Board or

18  their advisors know what the number of individuals who could

19  qualify as retail holders are in each class?

20  A.   I don't know.

21       THE COURT:  So, Mr. Hein, we are ten minutes past

22  where we were going to break for lunch, and so how much more

23  time do you have with your -- how many more additional topics

24  do you have?

25       MR. HEIN:  I think I can complete in ten minutes.  I

1    don't think these topics -- these are going to be topics that

2    I think involve less explanation from the witness.

3            THE COURT:  All right.  I suspect there will be some

4    redirect, so what we'll do is break now for the lunch break,

5    and resume at ten past 2:00 New York time, which is ten

6    past -- I'm sorry, ten past 2:00 San Juan time, which is ten

7    past 1:00 New York time.

8            So, Mr. Firestein, did you want to say something?

9            MR. FIRESTEIN:  The only thing, I just want to make

10   sure that -- I want to not tread on issues that are things

11   that are of concern to the Court.  First of all, my redirect

12   at current is probably 90 seconds, so if that influences the

13   Court's decision as to directionally where to go, I just put

14   that out there for the Court's consideration before I even get

15   to what my second issue might be.

16           THE COURT:  Why don't you tell me what the second

17   issue is, if it also has to do with time.

18           MR. FIRESTEIN:  The second issue is I don't know

19   whether you're going to impose an admonition, Your Honor, as

20   we've often seen.  I don't want to tread to a place where we

21   wouldn't otherwise tread, and I also don't want to have a foot

22   fault on an issue that the Court might be thinking is simply

23   assumed.

24           THE COURT:  Am I being asked for an admonition, Mr.

25   Hein?

1        MR. HEIN:  I think, Your Honor, it would be

2   appropriate that the counsel not speak with the witness during

3   the break.  That would be my request.

4        THE COURT:  Well, I will instruct the witness not to

5   discuss with counsel, or anyone else, any topics on which he

6   has been or can reasonably be expected to be examined.

7        So, Mr. Firestein, does that --

8        MR. FIRESTEIN:  That addresses the second issue, Your

9   Honor.  I don't know whether on the 90 second point, whether

10  we'll still break for lunch or what you wish to do, but we're

11  happy to accommodate.

12       THE COURT:  All right.  Well, on the 90 second -- I

13  was thinking in terms of what all we have left in the day, but

14  I suppose if it's ten minutes and 90 seconds, and

15  Mr. Brownstein would be able to go about his happy way, even

16  if the rest of us have to come back -- I see that's where

17  you're going with the 90 seconds.

18       MR. FIRESTEIN:  That is directionally where I'm

19  going, and I will tell you, Your Honor, we have one further

20  witness for whom there has been no designated

21  cross-examination time.

22       THE COURT:  Yes.  Then there's one of the Retirees

23  Committee.

24       MR. FIRESTEIN:  Correct.

25       THE COURT:  All right.  We'll go for another 15

1  minutes, and see if we can finish up Mr. Brownstein, so that

2  he can go on his happy way.  Then I think we will take perhaps

3  a shorter lunch break.

4         MR. FIRESTEIN:   Thank you, Your Honor.   That was my

5  point.

6         THE COURT:   Thank you.

7         MR. HEIN:   Thank you, Your Honor.   May I resume?

8         THE COURT:   Yes, you may.

9         MR. HEIN:   Thank you.

10 BY MR. HEIN:

11 Q.   Mr. Brownstein, are you familiar with what are called

12 separately managed accounts?

13 A.   Yes.

14 Q.   If an individual investor had a separate managed account

15 arrangement with a broker or trust company or bank, and that

16 individual investor had less than one million par of GO and

17 PBA bonds, did that individual qualify as a retail investor,

18 even though their bonds were managed and directed by the bank

19 or trust company?

20 A.   I don't know.

21 Q.   Is there any current expectation that the new GO bonds

22 will be rated by any of the major rating agencies?

23 A.   That would be the responsibility of the government to

24 determine, but I do not believe day one they will be rated.

25 Q.   Has there been any analysis of how the market yields and

1   secondary trading of the new GO bonds are likely to compare

2   with market yields on similar maturity or similarly structured

3   but investment grade municipal bonds?

4   A.   Not by Citi, so I don't know.

5   Q.   Are you aware of any study or analysis of what portion of

6   Puerto Rico's GO or PBA bonds had, at the time the bonds were

7   issued up through 2012, been held by individual retail

8   investors, either directly or through separately managed

9   accounts?

10  A.   I would not know that.

11  Q.   Were you personally involved in the discussions or

12  meetings, if any, in the mediation or settlement process

13  concerning the issues involving tax exempt status?

14  A.   Yes.

15  Q.   And with respect to the discussions you were personally

16  participating in and personally involved in -- and I want to

17  focus you on what you personally know as opposed to what you

18  were told by others -- were there individual retail investors

19  who were part of those discussions, other than people that

20  might be managers of the fund, but incidentally also have

21  their own holdings?

22        MR. FIRESTEIN:  Your Honor, before the witness

23  answers that question, and I'm not going to object to that

24  question, but I do want to make clear that we not cross over

25  the line into things that were undertaken in mediation, but I

1    am not objecting to this particular question.  I just merely

2    raise this as an issue.

3          So I apologize for that, but I want to make sure that

4    we are clear on the Board's direction here.

5          THE COURT:  So, Mr. Hein, do you want to restate that

6    question, which is not being -- I mean repeat the question,

7    which is not being objected to?

8          MR. HEIN:  Sure.  Thank you.

9    BY MR. HEIN:

10   Q.   I'm now focused on discussions that you were personally

11   participating in on the subject of tax exempt status for the

12   new bonds.  Was there any individual investors, who could

13   qualify as retail investors, who participated in those

14   discussions, apart from someone who may have been a fund

15   manager or acted with one of the funds and incidentally also

16   was personally an investor?

17   A.   Without in any way jeopardizing mediation privilege, what

18   I will say is there was one investor who was serving as a

19   fiduciary to what included retail investors.

20   Q.   And can you identify that person?

21   A.   I'm sorry.  You froze, if you were about to ask a

22   question.

23   Q.   Can you identify that person?

24   A.   No, I will not.

25   Q.   And let me ask you, with respect to the topics of the

1   number of separate CUSIPs or securities that would be issued,

2   was that something that was discussed in meetings or

3   conversations as part of the settlement and mediation

4   process?

5           MR. FIRESTEIN:  Your Honor, that actually I think

6   does invade the contents more particularly of the mediation,

7   and I am obliged, to avoid any sense of waiver and to maintain

8   an element of consistency, to object on those grounds.

9           THE COURT:  The objection is sustained.

10          MR. HEIN:  Your Honor, in that case, I have no

11  further questions.  Thank you very much.

12  BY MR. HEIN:

13  Q.   Thank you, Mr. Brownstein.

14  A.   Thank you.

15          THE COURT:  Thank you, Mr. Hein.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  Mr. Firestein.

18          MR. FIRESTEIN:  Thank you, Your Honor.  Let me try to

19  hold to my 90 seconds.

20                    REDIRECT EXAMINATION

21  BY MR. FIRESTEIN:

22  Q.   Mr. Brownstein, do you recall Mr. Hein inquiring of you

23  about the notion of potentially waiting for an IRS ruling

24  before distributing the new GO bonds?

25  A.   Yes.

1  Q.   And do you recall your testimony in which you indicated

2  that the IRS has no specific time by which it must render its

3  decision in connection with the pending application?

4  A.   Yes.

5  Q.   Separate and apart from that, sir, are you aware of any

6  conditions or terms that exist within the GO-PBA PSA that

7  might dictate a need not to wait?

8  A.   Well, there is -- we have two deadlines.  First, we must

9  have concluded that at delivery of the bonds -- it's not a

10  deadline.  We will deliver a minimum of 87 percent of the

11  bonds on a tax exempt basis.  That is a process that requires

12  diligence.  It's in the works.  But most importantly, there

13  are deadlines built into the PSA where the PSA creditors have

14  the right to terminate.  So --

15  Q.   Go ahead, sir.

16  A.   No.  That's it.

17  Q.   And what is the date that you have in mind relative to

18  that later subject, if you can recall?

19  A.   I believe it's January 15th.

20  Q.   Okay.  Does January 31st sound like a date that might be

21  more consistent with that?

22  A.   Sorry.  Yes.  That is the correct date.  Apologies.

23  Q.   Thank you.

24       MR. FIRESTEIN:  No further questions, Your Honor.

25  Thank you.

1          THE COURT:  Thank you.

2          Mr. Hein, anything further?

3          MR. HEIN:  Yes.  I'd like to just follow up briefly

4    on that.

5                    RECROSS-EXAMINATION

6    BY MR. HEIN:

7    Q.   Mr. Brownstein, are you aware of anything that would

8    prevent the PSA creditors from agreeing to extend the

9    deadline, if that meant being able to have the bonds ruled tax

10   exempt in their entirety or not before the actual issuance

11   occurred?

12         MR. FIRESTEIN:  Objection, Your Honor.  Lacks

13   foundation, calls for speculation.

14         THE COURT:  Overruled.  He can say whether he's aware

15   or not.

16         THE WITNESS:  I am not aware.

17         MR. HEIN:  Thank you.

18         THE COURT:  Nothing further, Mr. Hein?

19         MR. HEIN:  Correct.

20         THE COURT:  Anything further, Mr. Firestein?

21         MR. FIRESTEIN:  No, Your Honor.  Thank you very much

22   for the indulgence.

23         THE COURT:  Thank you.

24         Thank you, Mr. Brownstein.

25         THE WITNESS:  Thank you, Your Honor.

1              THE COURT:  Your testimony is concluded, and you are

2    excused.

3              (At 1:05 PM, witness excused.)

4              THE COURT:  So I just want to look at a time estimate

5    for the remainder of our business today.  I understand that we

6    have a declaration to be tendered by the Oversight Board

7    without cross-examination, and a declaration to be tendered by

8    the Retiree Committee without cross-examination, a return to

9    the stipulation, and admission of exhibits.

10             I was going to ask AAFAF about its policy issues

11   statement.  I see something was filed by AAFAF in the course

12   of the morning that I haven't had a chance to read yet, so I

13   suppose I need to know whether I should just read it or

14   whether there's anything more that AAFAF would want to say.

15             Then, finally, if anyone has issues with respect to

16   the Order that I filed this morning and intend to amend, I

17   suppose I'd like to see a little show of hands on that, so

18   that I can figure out whether we're here for another ten

19   minutes or here for another half hour.

20             MR. FRIEDMAN:  Your Honor.

21             THE COURT:  Yes.  Mr. Friedman.

22             MR. FRIEDMAN:  It's Peter Friedman from O'Melveny &

23   Myers on behalf of AAFAF.

24             No, Your Honor, we're not raising an objection to the

25   Plan.  We don't have an objection.  We simply wanted the

1   government's position to be on the record, so we don't ask for

2   any more of your time or to interpose an objection on the

3   issue.

4          THE COURT:   Thank you.   You don't have any issues

5   with respect to the argument schedule that I set up this

6   morning?

7          MR. FRIEDMAN:   I did have a question, Your Honor.

8   The argument schedule makes sense obviously, and to the extent

9   we have anything to say on those issues, we will ask the Board

10  if they will permit us to speak, but will there be -- but is

11  this in lieu of closing arguments, or are these the closing

12  arguments in their entirety?

13         THE COURT:   No.   It is in advance of closing

14  arguments, so this is intended to address particular legal

15  issues, and then closing arguments, marshaling evidence, and,

16  you know, bringing home points and all that would follow the

17  legal arguments.

18         MR. FRIEDMAN:   Thank you, Your Honor.   Nothing

19  further from AAFAF.

20         THE COURT:   Thank you.

21         Mr. Hein has his hand up.

22         MR. HEIN:   Yes, Your Honor.   I just wanted to say

23  that -- I just wanted to say that I apologize.   I have not

24  reviewed the Court's Order that was filed this morning.   I

25  looked at the docket late last night, and had not seen the

1  Order this morning.  So that's just -- I'm just noting that.

2         THE COURT:  All right.  Thank you.

3         Ms. Miller has a hand up.  You have to unmute,

4  Ms. Miller.  You still have to unmute, Ms. Miller.

5         MS. MILLER:  Okay.  All right.  I think I'm

6  unmuted.

7         THE COURT:  You are unmuted.

8         MS. MILLER:  Okay.

9         THE COURT:  Good afternoon, Ms. Miller.

10        MS. MILLER:  Apologies.  Atara Miller from Milbank on

11 behalf of Ambac, for the record.

12        Just briefly with respect to the Order, I noticed

13 that it identified time allocations for debtors and then

14 objectors.  There may be certain discrete issues, like

15 third-party releases or others, that I would expect supporting

16 parties would want to be heard on.  I just want to make sure

17 that your Court's Order and allocation of time wasn't

18 precluding hearing from third parties or supporters of the

19 Plan as part of the debtors' time.

20        THE COURT:  No.  I did not mean to preclude that.  So

21 perhaps one should have said supporters and opponents, rather

22 than debtor and objectors, but I did not mean to exclude

23 supporters who wish to argue any of the points.

24        MS. MILLER:  Thank you, Your Honor.

25        THE COURT:  So I think that then we can return to

1    Mr. Rosen or Mr. Firestein for the proffer of the remainder of

2    the Oversight Board's case.

3         MR. ROSEN:  Yes, Your Honor.  This is Brian Rosen.

4    If we could just have Mr. Herriman join us in this room, it

5    will take 30 seconds.

6         THE COURT:  Very well.

7         MR. ROSEN:  Just stay there.  He's going to be in.

8    Thanks.

9         Laura, can you get someone to close the door?

10        THE COURT:  We can hear you.

11        MR. ROSEN:  Sorry.  Thank you, Judge.

12        MR. FIRESTEIN:  I had tried to tell him.

13        MR. ROSEN:  Your Honor, we do have Mr. Herriman in

14   the room with me at this time.  At this time, Your Honor, I

15   would like to present the declarations of Mr. Jay Herriman.

16   Like the others, Your Honor, we have submitted two

17   declarations, an original declaration and an amended one, the

18   amended one including any exhibit references.  The original

19   declaration, Your Honor, is at ECF no. 18732, and the amended

20   declaration is at ECF no. 19054-03.

21        Your Honor, at this time, we would like to tender

22   those declarations into evidence.

23        THE COURT:  Raise your hand if there's any objection.

24        Seeing no hands, and there having been filed no

25   objections, the declarations of Mr. Jay Herriman, which are at

1  18732 and 19054-03 on the ECF system are admitted in evidence.

2          (At 1:12 PM, the Herriman Declarations admitted into

3  evidence.)

4          MR. ROSEN:  Thank you very much, Your Honor.

5          I would like to note, as you said earlier, there has

6  been no request for cross-examination of Mr. Herriman.

7          THE COURT:  Thank you.  I have no questions for

8  Mr. Herriman.

9          So thank you, Mr. Herriman, for being prepared to

10  testify today, and your testimonial experience in this hearing

11  is concluded.

12          THE WITNESS:  Thank you, Your Honor.  I appreciate

13  it.

14          (At 1:12 PM, witness excused.)

15          MR. ROSEN:  Thank you, Your Honor.

16          With that, Your Honor, I think Ms. Steege would be

17  next.

18          THE COURT:  Well, first let me just ask a question.

19  Yesterday, or some day earlier this week, we admitted all of

20  the exhibits that I understand the Oversight Board intended to

21  tender as such, and so does the Oversight Board rest on its

22  principal case?

23          MR. FIRESTEIN:  Yes, Your Honor.  We've sought

24  admission and have received admission for all of the exhibits,

25  and we have presented all of the witnesses for whom we sought

1 │ to introduce evidence.

2 │        THE COURT:  Thank you.

3 │        So now we'll turn to Ms. Steege.

4 │        MR. FIRESTEIN:  Excuse me, Your Honor.  One other

5 │ thing.  The only thing is, of course, we also seek to and no

6 │ doubt intend to rely on the evidence that -- for which

7 │ admission was sought and received by the Court by other

8 │ parties, and that will also include some of the things that we

9 │ discussed in the context of argument.  But as far as our

10 │ seeking admission of exhibits and testimonial evidence, we are

11 │ complete.

12 │        THE COURT:  Thank you.

13 │        So, Ms. Steege?

14 │        MS. STEEGE:   Good afternoon, Your Honor.  Catherine

15 │ Steege on behalf of the Retiree Committee.

16 │        I believe that Professor Johnson is in the waiting

17 │ room, and what we would like -- so he is available for

18 │ questions for Your Honor, if you have any.  We would tender

19 │ docket 19014, which is his expert declaration.  Attached to

20 │ that is Retiree Committee Exhibit No. One, which is his expert

21 │ report, and we would ask that that be admitted into evidence.

22 │        I'm not aware of any objections, or that anyone

23 │ wishes to cross-examine Professor Johnson.

24 │        THE COURT:  Thank you.

25 │        Would anyone who objects to this tendered evidence

1   raise your hand?

2          Seeing no hands, and no objections having been filed,

3   the declaration at 19014, and Retiree Committee Exhibit No.

4   One are admitted in evidence.

5          (At 1:14 PM, the Johnson Declaration and Retiree

6   Committee Exhibit No. One admitted into evidence.)

7          THE COURT:  The Court has no questions for Simon

8   Johnson, and since he's in the waiting room, he can't hear me,

9   so you can thank him for me for being prepared to appear.

10         MS. STEEGE:  Thank you, Your Honor.

11         THE COURT:  Thank you.

12         I don't believe -- well, anyway, are there any other

13  parties who seek to tender declarations that we've not already

14  dealt with?

15         Mr. Hein's declarations have been admitted subject to

16  the Court's ruling on redactions, and so -- Mr. Firestein.

17         MR. FIRESTEIN:  If I might, Your Honor --

18         THE COURT:  Yes.

19         MR. FIRESTEIN:  -- speak to that precise issue.  I

20  realize I didn't raise my hand.  But the Court raised the

21  issue, and I think we can salt this one away quickly.

22         THE COURT:  That's fine.  Mr. Hein has his hand

23  raised, too, but we'll start with you, Mr. Firestein, since

24  you're talking.

25         MR. FIRESTEIN:  Very quickly, Your Honor, we did

1    engage with Mr. Hein on the redactions, and I believe, if I'm

2    not mistaken, in this morning's informative motion that we

3    filed, we attached the redacted versions of the two Mark

4    Elliott Declarations consistent with the Court's rulings on

5    that.  And to the extent that Mr. Hein seeks to move to admit

6    those redacted versions, consistent with the Court's rulings,

7    into evidence, we would have no further objection to them

8    being admitted.

9            THE COURT:  Very good.

10           Mr. Hein.

11           MR. HEIN:  Yes.  I just really wanted, out of an

12   excess of caution, to make sure that I don't have to do

13   something further to get the exhibits I offered admitted into

14   evidence.  The Oversight Board attached the initial exhibit

15   list, plus two supplemental lists from me, and if it's

16   necessary for me to move those into evidence, I hereby move.

17   But they're a part of the packet that you received from the

18   Oversight Board.

19           In addition, if I need to do anything, I would move

20   to admit the two redacted Elliott Declarations.  And then,

21   third, there is a declaration that I had listed on my list of

22   declarations as part of my original October 22 Exhibit List,

23   Witness List, and Identification of Previously Filed

24   Declarations.  And this was reiterated in the October 25

25   Amended Exhibit List, Witness List, and Identification of

1   Previously Filed Declarations.

2           And then when Your Honor asked for annotated

3   declarations to reflect trial exhibit numbers, I annotated it

4   and refiled it.  It's a declaration of mine.  It's docket

5   19047.  And, again, I would like to offer that into evidence

6   as well.

7           THE COURT:  Mr. Firestein?

8           MR. FIRESTEIN:  Yes, Your Honor.  Thank you.

9           If he's referring to his declaration, the declaration

10  of Mr. Hein, I believe that that's fine.  I think it was

11  referenced in his exhibit list, or however he chose to

12  characterize it, and we did not raise any objections to that

13  submission.

14          MR. HEIN:  Thank you.

15          THE COURT:  All right.  So it is your declaration at

16  19047 that you're tendering now.  You mentioned one other one,

17  or no?

18          MR. HEIN:  The Elliott Declarations have been covered

19  I think.

20          THE COURT:  Yes.  The Elliott Declarations have been

21  covered.

22          So Mr. Natbony has his hand up.

23          MR. NATBONY:  Thank you, Your Honor.  I just wanted

24  to make sure, because my notes were a little unclear, that the

25  exhibits that were offered through the stipulation this

1    morning, for which there were no objections, have been

2    actually entered as opposed to just deferred to later in the

3    day.

4         THE COURT:  They haven't been entered yet.  I've been

5    waiting to get to the stipulation and all of its attachments,

6    but we've been having these colloquies, some of which are

7    about elements of that stipulation.

8         So, Mr. Hein, to the extent you were wondering when

9    your Elliott Declarations and other exhibits will be

10   officially, fully, and finally admitted, it will be once I've

11   confirmed that the joint stipulation covers everybody's

12   position as to every exhibit and remaining declaration, and

13   then I would admit them.

14        MR. NATBONY:  Thank you for the clarification, Your

15   Honor.  I just wanted to make sure.

16        THE COURT:  Very well.  Thank you.  It's always good

17   to be careful.

18        So is there any other commentary or colloquy

19   regarding the joint stipulation, which is at 19172, that was

20   filed this morning, which appears to me to list every exhibit

21   that has been tendered, with annotations as to whether the

22   exhibit has been withdrawn, whether the parties intend for it

23   to be admitted, and whether there are any limitations on the

24   exhibit?  So it seems to me it's meant to be a comprehensive

25   catalog of everything, with clear annotations as to those that

1   the parties have agreed would be admitted.

2           Have I accurately characterized the stipulation,

3   Mr. Firestein?  You have to unmute, please.

4           MR. FIRESTEIN:  Your Honor -- thank you, Your Honor.

5   Michael Firestein of Proskauer on behalf of the Board.

6           About 95 percent correct.  It's not a 100 percent

7   catalog, because as I think was noted earlier, the Board's

8   exhibits have already been admitted.  I think it's referenced

9   in the stipulation, but I'm not sure, that the exhibit list is

10  attached to the back.  But other than that, you are on

11  point.

12          THE COURT:  Very well.  So since you've still got the

13  microphone, would you move the stipulation and its attachments

14  referenced -- and the underlying exhibits referenced into

15  evidence?

16          MR. FIRESTEIN:  Yes.  I'd be happy to, Your Honor.  I

17  move the stipulation and its attachments into evidence.  The

18  one caveat is I don't know how it was resolved with respect to

19  the exchange between the Monolines and DRA earlier today.  If

20  they were allowed in, then the stipulation in its entirety

21  should come in, and I'll so move.

22          THE COURT:  All right.  I believe I allowed them in.

23  So is there any objection to my granting the motion?

24          I see no hands.  The stipulation and its attachments

25  referencing exhibits -- I'm just getting a note here.

1    So we are going to refer to this as Stipulation No.

2    One.  So Stipulation No. One, including the list of exhibits

3    attached, and representing the admission status of the --

4    those exhibits as reflected in Stipulation No. One, is itself

5    admitted, and the referenced exhibits and declarations are

6    admitted to the extent Stipulation No. One so provides.

7    Stipulation No. One, again, can be found at ECF no. 19172.  So

8    I think I've covered the bases I need to cover with respect to

9    that.

10    Mr. Hein.  Oh, also, Mr. Hein's declaration at 19047

11    is admitted in evidence.

12    (At 1:23 PM, Stipulation No. One, and the referenced

13    exhibits and declarations, to the extent Stipulation No. One

14    so provides, admitted into evidence.)

15    (At 1:23 PM, the Hein Declaration admitted into

16    evidence.)

17    THE COURT:  Mr. Hein's hand went down, so I think I

18    did that housekeeping properly.  So it seems to me then that

19    all of the evidence intended to be offered by any party in

20    this confirmation proceeding has been ruled upon and entered

21    as appropriate.  So any party in interest that does not intend

22    at this point to rest on its entire case should have a

23    representative raise the hand now.

24    No hands have been raised, and so the Court

25    understands that -- oh, I'm sorry.  Suiza Dairy's counsel has

1  raised his hand.

2          Mr. Gonzalez, you have to unmute, please.  You still

3  have to unmute.

4          MR. GONZALEZ VALIENTE:  Okay.  I think I got it now.

5  Thank you.

6          THE COURT:  Yes.

7          MR. GONZALEZ VALIENTE:  Yes.  I just want to make

8  sure that our exhibits will be admitted as part of the

9  stipulation, and that obviously is an important part of our --

10 of our case and presentation.  And that's my only concern,

11 question, or just to make sure that --

12         THE COURT:  Are they included in the stipulation?

13         MR. GONZALEZ VALIENTE:  -- I was -- yes, I understand

14 that it was, Your Honor, that they were.

15         THE COURT:  Yes.  It is on page -- there are three

16 exhibits listed on page 13 --

17         MR. GONZALEZ VALIENTE:  Yes.

18         THE COURT:  -- of Exhibit One to Stipulation No. One.

19 So yes, they have been admitted.

20         MR. GONZALEZ VALIENTE:  Thank you very much, Your

21 Honor.

22         THE COURT:  Thank you.

23         So all parties in interest have rested on their

24 entire cases.  All right.  As I indicated, I filed the

25 argument Order this morning.  I will file an amended version

1    of that this afternoon that simply adds a deadline for the

2    filing of any objections to the revised proposed findings of

3    fact and conclusions of law.

4            Were there any other comments, questions, or requests

5    with respect to the argument Order, which also includes a few

6    other deadlines for filing certain pleadings?

7            MR. ROSEN:  Your Honor, Brian Rosen.

8            THE COURT:  Yes, Mr. Rosen.

9            MR. ROSEN:  I just want to say that we will obviously

10   comply with the Court's Order for the filing of the amended

11   proposed -- or, excuse me, a revised proposed order and

12   judgment with respect to confirmation.  I know that there is

13   another timeframe, I believe it's Monday, with respect to

14   comments to that or objections to that.

15           To the extent necessary, Your Honor, we'll continue

16   to discuss with parties, not only before and after, the filing

17   of that, and to the extent necessary, we will obviously want

18   to file something subsequent, to the extent we can resolve any

19   additional comments to that proposed order.

20           THE COURT:  Thank you.  I know there have been a lot

21   of discussions of changes, and moving targets have to come to

22   rest at some point, so that I know what I'm being asked to

23   rule on.  So that is why I've imposed some deadlines, and some

24   deadlines for coming forward with any remaining objections, so

25   that there can be appropriate discussions or raising of issues

1    for the Court.

2            Mr. Hein has his hand up.

3            MR. ROSEN:  We will file the most up-to-date one

4    by --

5            THE COURT:  By the deadline, yes?

6            MR. ROSEN:  Yes.

7            THE COURT:  Okay.

8            MR. ROSEN:  Yes.

9            THE COURT:  Thank you, Mr. Rosen.

10           Now, Mr. Hein.

11           MR. HEIN:  I'm just -- I tried to call up and

12   multi-task to look at the Order, and it looks like there's a

13   deadline for parties objecting to the proposed -- revised

14   proposed order Monday at noon, which creates a logistical

15   issue given that there'll be argument as well.  And I guess

16   what I'll respectfully request is that the deadline be

17   deferred to the end of the day, so there's some opportunity to

18   make a filing after the day concludes on Monday.

19           THE COURT:  That is a fair point, and so if there's

20   no objection to that request -- I'm actually just looking for

21   that, the right paragraph in this Order.

22           MR. ROSEN:  I believe it's on the third page at the

23   bottom, Your Honor, or perhaps the fourth at the top.

24           THE COURT:  No, I don't think so.  Just one minute.

25           MR. ROSEN:  I don't have it here.

1           THE COURT:  Just bear with me.  Oh, it's on page

2  three, in numbered paragraph three.  So I would change the

3  12:00 Atlantic Standard Time deadline to 6:00 PM Atlantic

4  Standard Time, which would be 5:00 PM New York time.

5           Is that sufficient for you, Mr. Hein?

6           MR. HEIN:  I, you know, would hope so, depending on

7  how long court goes on Monday.  I guess I just, you know, will

8  try to file as soon as possible after court is done on Monday.

9           THE COURT:  All right.  Well, I'll state it as 7:00

10  PM Atlantic Standard, and my understanding is that you are

11  undertaking to file as quickly as you can.  I recognize that,

12  unlike many of the other parties here, you don't have somebody

13  who might be working on it while you're doing your argument,

14  and so I do understand the need.  If you go a little beyond

15  that, nothing terrible will happen.

16           My effort in making an early deadline would be to

17  provide as much time as possible for it to be understood

18  whether and to what extent there are objections that may need

19  to be addressed in discussions.

20           MR. HEIN:  And, Your Honor, if I may raise one other

21  question.  Again, I just scanned the Order quickly, just in

22  the last few minutes, but I would assume that if one basically

23  is just reiterating the same objections, at least in part,

24  because there haven't been changes, that one can rely on what

25  one has already filed?

1          THE COURT:  I think as clear a cross-reference as

2   possible would be helpful to everyone, but in principle,

3   yes.

4          MR. HEIN:  Thank you.  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          So is there anyone else who wishes to speak to this

7   issue?

8          I see no hands, and no one's unmuted, so the amended

9   copy will have those two changes.

10          This concludes the hearing Agenda for today.  We will

11   continue on Monday, beginning at 9:30 Atlantic Standard, which

12   is 8:30 Eastern Standard -- I'm sorry.  Mr. Rosen?

13          MR. ROSEN:  No, Your Honor.

14          THE COURT:  Okay.  I thought I heard someone

15   speaking.

16          Monday we are starting at 8:30 Eastern Standard with

17   oral argument on the legal issues enumerated in the Order that

18   was filed and that will be amended.  Counsel who've registered

19   their e-mail addresses for this hearing pursuant to the

20   Confirmation Hearing Procedures Order will already have

21   received an invitation to register for Zoom access for Monday,

22   Tuesday, and Wednesday.

23          The deadline to register for Monday's hearing is

24   Sunday, the 14th, by 5:00 Atlantic Standard Time.  So if

25   you'll want to be seen and heard, remember to do your

1  registration.

2        As always, I thank the court staff here in Puerto

3  Rico, staff in New York, and in Boston for their work in

4  connection with today's proceedings, and their outstanding

5  ongoing work.  With that, I say stay safe and keep well,

6  everyone.  I will see you from New York on Monday morning.

7        We are adjourned.

8        MR. ROSEN:  Thank you.

9        (At 1:32 PM, proceedings concluded.)

10                    *    *    *

11        .

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    U.S. DISTRICT COURT    )

2    DISTRICT OF PUERTO RICO)

3

4        I certify that this transcript consisting of 142 pages is

5    a true and accurate transcription to the best of my ability of

6    the proceedings in this case before the Honorable United

7    States District Court Judge Laura Taylor Swain, and the

8    Honorable United States Magistrate Judge Judith Gail Dein on

9    November 12, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25