IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUBLIC BUILDINGS AUTHORITY<br><br>*Debtors¹* | PROMESA<br>Title III<br><br>Case No. 17 BK 3283 – LTS<br>(Jointly Administered) |

**CREDIT UNIONS' JOINT OBJECTION TO THE REVISED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT AND TO THE REVISED PROPOSED ORDER AND JUDGMENT CONFIRMING THE MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT**

---

[1] The Debtors in these Title III Cases, along with each debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of federal Tax ID: 3481); (ii) Puerto Rico Sales tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

I. Procedural Background .................................................................................................... 2
II. Objections due to Credit Unions' Takings Claims .......................................................... 4
III. Additional Arguments ................................................................................................... 12
    A. Preemption .............................................................................................................. 12
    B. Exculpations .......................................................................................................... 13
    C. The Protection of Essential Government Services and Feasibility of the Plan .............. 15
IV. Conclusion ..................................................................................................................... 16
V. Reservation of Rights .................................................................................................... 16

# TABLE OF AUTHORITIES

Cases

A&D Auto Sales, Inc. v. U.S., 748 F.3d 1142 (Fed. Cir. 2014) ................................................... 8
Able Sheet Metal, Inc. v. First Bank and Trust of Jonesboro, 15 B.R. 878 (Bnkptcy Ct., E.D. Arkansas, 1981) ......................................................................................................................... 9
Dimare Fresh Inc. v. U.S., 808 F.3d 1301, 1307 (Fed. Cir. 2015) ............................................ 5-8
In re Carroll, 11 B.R. 45, 48 (Bnkptcy Ct., E.D.N.Y. 1981) ........................................................ 9
In re City of Stockton, California, 909 F. 3d 1256 (9th Cir. 2018) ....................................... 11, 12
In re Garland Corp., 6 B.R. 456 (Bnkptcy App. Panel, 1st Cir., 1980) ......................................... 9
In re Pillow, 8 B.R. 404 (Bnkptcy Ct., D. Utah, 1981) ................................................................. 9
Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589 (1935) ..................................... 9
Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 153 (1st Cir. 2012) .......................... 6
Matter of Gifford, 688 F. 2d 447, 458 (7th Cir. 1982) .................................................................. 9
Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978) .............................. 5-7, 10

Statutes

U.S. Const. Amend. I ................................................................................................................. 13
11 U.S.C. §105 .............................................................................................................................. 4
11 U.S.C. §944(c)(1) ............................................................................................................ 2, 4, 17

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUBLIC BUILDINGS AUTHORITY<br><br>*Debtors*[2] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283 – LTS<br>(Jointly Administered) |

**CREDIT UNION'S JOINT OBJECTION TO THE REVISED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT AND TO THE REVISED PROPOSED ORDER AND JUDGMENT CONFIRMING THE MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT**

**TO THE HONORABLE COURT**:

COME NOW, Cooperativa de Ahorro y Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperativa de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Vega Alta, Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía, and Cooperativa de Ahorro y Crédito de Juana Díaz, through the undersigned attorneys, (hereinafter, "the Objectors", "the Credit Unions" or "the Cooperatives") and hereby file this joint objection (the "Objection") to the

---

[2] The Debtors in these Title III Cases, along with each debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of federal Tax ID: 3481); (ii) Puerto Rico Sales tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

1

Revised Eighth Amended Title III Joint Plan of Adjustment and to the Revised Proposed Order and Judgment Confirming the Modified Eighth Amended Title III Joint Plan of Adjustment. (Dkt. 19053 and Dkt. 19118) (hereinafter, "the Plan of Adjustment" and "Proposed Order") as submitted by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") as representative of the Commonwealth of Puerto Rico.

**I.       Procedural Background**

1.      On October 19, 2021, the Credit Unions filed a Joint Objection to the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico *et.al.*, in request from this Honorable Court to deny confirmation of the Seventh Plan of Adjustment filed by the Oversight Board at docket #17627. In the alternative that this Honorable Court intends to enter an Order for the Confirmation of the Plan of Adjustment, the Credit Unions herein respectfully requested that said Proposed Order Confirming Plan expressly except their claims from discharge pursuant to section 11 U.S.C. 944 (c) (1) applicable under PROMESA and preserves their claims and causes of actions, including those asserted in Adversary Proceedings 18-00028 and 19-00389, as well as any claims and causes of action they have against non/Debtor entities, particularly COSSEC, AAFAF, GDB and GDB-DRA.

2.      In the referenced motion the Credit Unions reserved their right to supplement and amend their objections and introduce evidence at any hearing relating thereto without in any way limiting any other rights that they may have. The Credit Unions also reserved their right to object to the confirmation of the Plan of Adjustment or any other subsequent amended plan or supplement thereto on these same grounds or any additional grounds, as may be appropriate.

3.      On November 3rd, 2021, the Financial Oversight Management Board ("FOMB"), as representative of the Commonwealth of Puerto Rico, filed an Eighth Amended Title III Joint

2

Plan of Adjustment and on November 7, 2021, the FOMB filed a Notice of Filing of Revised Proposed Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment.

4. On November 12, 2021, this Honorable Court issued an Order Directing Supplemental Briefing and Oral argument on Issues Pertaining to the Confirmation Hearing, to allow the FOMB until Friday November 12, 2021, at 11:59 p.m., to file an amended proposed order and judgment confirming the Plan. Parties shall file objections (if any) to the Revised Proposed Order by Monday November 15, 2021, at 7:00 p.m. Pursuant to this Order, the FOMB filed a Modified Eighth Amended Title III Joint Plan of Adjustment and a second Revised Proposed Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment.

5. In view of the above, the Credit Unions respectfully file this objection to the Modified Eighth Amended Title III Joint Plan of Adjustment and to the Revised Proposed Order and Judgment Confirming the Modified Eighth Amended Title III Joint Plan of Adjustment. As argued in detail hereinbelow, the Revised Eighth Amended Title III Joint Plan of Adjustment and the Revised Proposed Order fail to address the issues raised in our previous Motion of October 19, 2021, in objection to the Seventh Plan, specially so regarding the constitutional violations and claims of the appearing credit unions. The constitutional nature of the claims filed by the Credit Unions in cases 18-00028 and 19-00389 makes such claims not subject to discharge, reduction or compromise under a Plan of Adjustment, especially so considering that the legal and factual issues presented in cases 18-00028 and 19-00389 have not been adjudicated yet by this Court.

3

**II.     Objections due to Credit Unions' Takings Claims**

6.     Adversary proceeding No. 18-00028 seeks, *inter alia*, a determination of exception from discharge of the Cooperatives' claims based on their constitutional claims for Debtor's taking of their private property without just and right compensation, and to obtain a determination of non-dischargeability pursuant to 11 U.S.C. §105 and 11 U.S.C. §944(c)(1), and pursuant to provisions of PROMESA.

7.     Adversary Proceeding identified as Case No. 19-00389 (against the Commonwealth of Puerto Rico, COSSEC, and the Oversight Board) seeks, among other things, that the Commonwealth comply with statutory requirements to adequately fund the governmental insurance that covers the shares and deposits of credit unions.  While the shares and deposit insurance is provided through COSSEC (a public corporation which is not a Debtor under Title III), the Commonwealth has contingent obligations to ensure that COSSEC is adequately funded to comply with its obligations.  Failure to comply with these statutory funding mechanisms renders the government's insurance contract ineffective, thus depriving the Objectors of property in violation of their constitutional rights.

8.     The specific arguments made under AP18-00028 and AP19-00389 and those presented in our motion of October 19, 2021, especially those regarding the Takings and Contracts Constitutional Clauses are hereby incorporated by reference into this objection. *See* the Credit Unions' filings under AP18-00028 and AP19-00389 and docket 18594.

9.     A substantial amount of the case law regarding the interaction between the Takings Clause and bankruptcy proceedings address the proposition **that the bankruptcy proceeding itself constitutes a taking that generates the obligation to offer some form of just compensation**. That is conceptually different from the prosecution of a Takings Claim **against a**

4

**governmental entity that, <u>after</u> consummating a taking against a private party without providing just compensation, avails itself of a bankruptcy proceeding**. This is the gist of the takings claim of the Credit Unions, wherein the challenged governmental action– the regulatory compulsion over the credit unions of value impaired investments that were knowingly issued in insolvency - was, **in itself**, a Taking that cannot be erased or discharged in a bankruptcy proceeding. In other words, the claimed taking is not the resulting loss of value due to the bankruptcy procedure, **but that the claim itself was the result of a previous consummated taking by the government that was not accompanied by just compensation**.

10. The same applies to the claim regarding the Commonwealth's failure to adequately fund COSSEC. Here, the claim is that the Commonwealth's failure to comply with its statutory obligations that, in turn, directly affect the plaintiffs' investment-backed expectations, constitutes a Taking. This also constitutes a Taking that happened **before** the government availed itself of the bankruptcy process.

11. Current Takings Clause doctrine distinguishes between two forms of takings: (1) classic takings of property and (2) so-called regulatory takings. <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393 (1922). The first occurs when there is a "direct appropriation of property." <u>Dimare Fresh Inc. v. U.S.</u>, 808 F.3d 1301, 1307 (Fed. Cir. 2015). This is also known as a ***per se* or physical taking**. The other instance occurs when "a restriction on the use of property…went too far." <u>Id</u>, c.f. <u>Pennsylvania Coal Co.</u>, *supra*, at 415 ("if a regulation goes too far it will be recognized as a taking"). Whether a particular action constitutes a direct *per se* taking or a regulatory taking will impact the applicable level of scrutiny. <u>Maine Educ. Ass'n Benefits Trust v. Cioppa</u>, 695 F.3d 145, 153 (1st Cir. 2012).

5

12. Two types of takings activate the strictest requirements regarding just compensation: (1) *per se* physical takings and (2) categorical regulatory takings. The existence of either one will trigger the categorical approach. Maine Educ. Ass'n Benefits Trust, *supra*, at 153.

13. The third type of taking, *i.e.* the n**on-categorical** regulatory taking, is analyzed on an *ad hoc*, case by case manner subject to evaluation of three factors: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the government action. Dimare, *supra*, at 1307, c.f. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). Regulatory takings therefore, are ones where no physical taking actually takes places, but the impact of a particular regulation destroys (categorical) or substantially diminishes (non-categorical) the value of a property right. It should be stressed that all takings involve regulatory action as a result of the exercise of the police power or some regulatory scheme.

14. The facts and discussion in the Dimare case are relevant to the Credit Union claims. In Dimare, the plaintiffs alleged that FDA press releases warning consumers about possible links between the plaintiffs' products and salmonella constituted a taking. Because the government had not physically taken the plaintiffs' property (tomatoes), the issue was analyzed under the regulatory takings doctrine.

15. In that case, the government argued that there was no regulatory taking because the FDA press releases had no "legal effect." The Court of Appeals **rejected** that argument (there is no categorical need for the government action to "have a 'legal effect' on the property interest") Id, at 1307.[3]

---

[3] As we will see, regulatory takings don't only exist through statutes or legislative regulations. Other, less formal uses of the regulatory authority of the government can still qualify as a taking. Under the Credit Unions' claims, COSSEC incurred in a direct, physical taking of the credit unions' funds by compelling them to purchase bonds that it and the Commonwealth knew were issued in insolvency.

6

16. The Court in Dimare stated that "[i]n urging courts to consider the 'character of the government action' [third factor], the Supreme Court in Penn Central recognized that government action may impact property in myriad ways and what is important is the nature or substance of the government's action, as opposed to the precise form it may take." Dimare, *supra*, at 1307, c.f. Penn Cent. Transp. Co., *supra*, at 124. In other words, the use of the regulatory power that can trigger a Takings Claim need not be formally exercised. The mechanism by which the government uses that power can come in many different shapes and sizes.

17. The Court ultimately rejected the plaintiffs' takings claim because the FDA's press releases did not have a **direct impact** on the plaintiffs' property interest. At most, the press releases had an impact on consumers and the market. But the Court signaled that (1) the press releases could be enough to trigger a Takings Clause, if (2) they produce a **direct effect** on the plaintiff's property interests.

18. In A&D Auto Sales, Inc. v. U.S., 748 F.3d 1142 (Fed. Cir. 2014) a group of franchise owners sued the federal government because the latter had required a private party to, through a bankruptcy process, release its obligations to said franchise owners as a condition of its continued financial assistance to the private party. The franchise owners filed a Takings Claim. The Court stated that "[t]he question here is whether the government is liable for a taking where it offers financing to a third party as a way of inducing or requiring action that affects or eliminates the property rights of the plaintiff. We conclude that such actions **may** give rise to takings liability depending on the circumstances." (Emphasis added) Id, at 1153.

19. While in the above case the coercion was exercised by the government on a third party to, in turn, destroy the plaintiffs' property interests, the principle remains: when the government uses its regulatory power to **coerce** a private party out of its property interests, a

7

Taking has taken place (contrary to a proper use of the regulatory power that incidentally or collaterally has a mere negative effect on said property interest. Id, at 1153). In these circumstances, **the key factor was whether the government used <u>coercion</u> or merely <u>persuasion</u>**. Id, at 1154.

20. As discussed in Adversary Proceeding 18-0028, the Debtors coerced the Credit Unions to hand over their cash in exchange for bonds that they knew were issued in insolvency and, therefore, had substantially less value. By doing so, the government effectively took direct and physical possession of the credit unions' property without just compensation and did so through the exercise of regulatory power. Only government action that is **devoid** of coercion, legal threat, regulatory restriction, or any binding obligation does not constitute a regulatory taking. <u>Dimare</u>, *supra*, at 1311.

21. The Supreme Court of the United States has stated that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment. <u>Louisville Joint Stock Land Bank v. Radford</u>, 295 U.S. 555, 589 (1935). This is particularly so when is involves "the taking of substantive rights in specific property acquired by the [creditor] prior to the act [in reference to a federal bankruptcy statute]". Id, at 590.

22. As an example of the interaction between "just compensation" and bankruptcy law, a Bankruptcy Court in Utah held that "[h]istorically, lien rights have entitled their holders to the value of collateral and no more in bankruptcy." <u>In re Pillow</u>, 8 B.R. 404 (Bkptcy Ct., D. Utah, 1981), quoted in <u>Matter of Gifford</u>, 688 F. 2d 447, 458 (7th Cir. 1982). *See also* <u>In re Carroll</u>, 11 B.R. 45, 48 (Bkptcy Ct., E.D.N.Y. 1981).

23. In <u>In re Garland Corp.</u>, 6 B.R. 456 (Bkptcy App. Panel, 1st Cir., 1980), the Court stated that "no taking of private property, in reorganization proceedings or otherwise, can be countenanced by the court in contravention of the 'just compensation' clause." In <u>Able Sheet Metal</u>,

8

Inc. v. First Bank and Trust of Jonesboro, 15 B.R. 878, 882-883 (Bkptcy Ct., E.D. Arkansas, 1981), the Court explained that "[i]t is settled that a Bankruptcy Court cannot destroy or permit the destruction of the security interest of a secured creditor in collateral. This concept is grounded on the theory that the bankruptcy power of Congress is subject to the Fifth Amendment injunction against depriving an owner of property rights without just compensation - for example, taking property rights from one creditor and transferring them without just compensation to another creditor.

24. As asserted in full detail in Adversary Proceeding 18-0028, COSSEC exerted regulatory coercive authority to implement a direct, physical taking of the credit unions' funds by compelling them to deliver their liquid assets for bonds that it and the Commonwealth knew were issued in insolvency. Debtors' actions had the direct effect of depriving the Credit Unions property, which clearly requires now a just compensation.

25. A similar conclusion will be reached in the case of a non-categorical regulatory taking under the three factors identified in Penn Central, *supra*.

    a. First, the economic impact of the regulation on the claimant was total: it deprived the credit unions of their liquid funds.[4] It was not an incidental impact on their property interests.

    b. Second, the regulation has interfered with distinct investment-backed expectations, again, by depriving the credit unions of their funds.

    c. And finally, the character of the government action was not an adequate exercise of its regulatory powers as part of its mission to protect the health, safety and morals of the community. On the contrary, it was a direct assault on the credit unions' coffers by the government to finance its own mismanagement and lack of transparency.

---

[4] Even if the Objectors were to recover a portion of their funds, a substantial and material portion was destroyed by governmental action.

9

26. Furthermore, COSSEC's use of the premiums paid by the credit unions, the insurance fund's lack of adequate capital, and the Commonwealth's failure to adequately fund COSSEC, as prescribed by law, also constitute an additional non-categorical regulatory taking. Once more, applying the three factors of Penn Central:

a. First, the economic impact on the credit unions is considerable: a lack of adequate capital and funding of COSSEC's insurance fund leaves the credit unions severely exposed.

b. Second, the regulation severely interferes with distinct investment-backed expectations: the credit unions carry out their business with the belief that the investments made by members in the credit unions are duly insured by COSSEC. Their payment of premiums as the first source of liquidity furthers this belief, since they assume that the government acts as a source of liquidity of last resort. The government's failure to do so has generated severe risk to the credit unions.

c. And finally, the character of the government action is unsupportable, since it's the direct result of the government's failure to obey an applicable statute (Act 114-2001).

27. The Board has banked much of its position to takings claims on the Ninth Circuit's holding in In re City of Stockton, California, 909 F. 3d 1256 (9th Cir. 2018). A careful analysis shows that the Board's position is not correct.

28. First, City of Stockton should not be read as establishing any general or universal rule ("[Plaintiff's] underlying theory - that the Takings Clause exempts his unsecured claim from reorganization - is not viable **on this record**.") (Emphasis added) Id, at 1206. A look at the facts of this case demonstrates that the plaintiff's failure was due to his lack of diligence in the prosecution of his property rights.

10

29. Second, "[t]he Takings Clause is only implied in bankruptcy if the creditor had actually property rights", as opposed to "just a contractual or statutorily right for monetary relief" where "the debt can be adjusted in bankruptcy". Id. This merely reaffirms the important difference in the context of a Takings Claim between property interests and monetary claims, even if they are of a constitutional nature.

30. The Court exemplified this difference comparing a Takings Claim from a 1983 action. Id, at 1268. Both have constitutional roots, but the latter can be adjusted in a bankruptcy proceeding; the former cannot. As such, the key element will be if the creditor's claim regards a Taking in the context of property or an ordinary monetary claim ("unsecured monetary claim") Id. In City of Stockton, the Court held that the plaintiff "had **relinquished his property interest** in the land more than 15 years before the bankruptcy was filed." Id, at 1266. That is factually different from the case of the appearing Objectors, all of which have diligently asserted their claims, which are based on governmental takings that occurred before the Title III petition.

31. Moreover, the Objectors' have a right to a proper judicial adjudication of the constitutional claims posed in AP18-00028 and AP19-00389. In the absence of a judicial consideration of these controversies, the Plan of Adjustment and its confirmation do not and cannot constitute a substitute for the due judicial adjudication of claimants' rights and of defendants' defenses regarding the factual and legal controversies at hand, which are not under evaluation in the confirmation process under way. The right to the judicial adjudication of un-renounced and non-released claims and rights asserted in active ongoing litigation is a fundamental one. The Supreme Court has recognized as much when construing the Petition Clause of the First Amendment, which provides, in pertinent part, the First Amendment provides that "Congress shall

11

make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." U.S. Const. Amend. I.

32. The Credit Unions herein respectfully reaffirm that their claims are not subject to impairment or reduction inasmuch as these are constitutionally protected by the Fifth and Fourteenth Amendments of the Constitution of the United States, that prohibit the taking of property without just compensation, and thus cannot be affected by the Congress' bankruptcy powers, pursuant to which PROMESA was enacted. The Commonwealth must pay the Credit Unions' claims in full regardless of what reduction and compromises it seeks in the Plan of Adjustment.

### III.    Additional Arguments

####    A.    Preemption

33. The Proposed Order seeks to collaterally and surreptitiously obtain a summary adjudication of AP18-00028 and AP19-00389 by asking this Court to broadly swipe away Commonwealth laws through an excessively broad and premature finding of preemption. See Section 3(B) of the Proposed Order. The all-encompassing and anticipatory preemption finding sought by the Oversight Board in such section of the Proposed Order is improper for the following reasons:

   a. The proposed finding is inconsistent with well-established doctrine that balances federal mandates with the due respect to state laws. We hereby restate the credit unions' arguments against preemption of valid Commonwealth laws, raised in Adv. Proc. 19-00389, which still pending before this Court. See docket # 66 in Adv. Proc. 19-00389.

   b. The proposed finding is contrary to PROMESA's acknowledgement of the Commonwealth's power to control, by legislation or otherwise, the territory or any territorial

12

instrumentality thereof in the exercise of the political or governmental powers of the territory or territorial instrumentality, including expenditures for such exercise. See section 303. Through the proposed finding of preemption, the FOMB seeks a blanket power to repeal valid laws, which is a legislative power that it lacks under PROMESA.

      c. The proposed finding is premature, unripe and non-justiciable as it pertains to preemption controversies that are not presently before this Court.

      d. With respect to the claims and controversies asserted in AP18-00028 and AP19-00389, the proposed finding is not supported by any specific judicial determinations of fact and findings of law directly pertaining to the factual and legal controversies of said cases. Let us remember that these active cases are not mere actions for the collection of money, but which specifically assert the non-dischargeability of claims for violations of constitutional rights, claims for intentional fraud and willful misconduct, as well as for compliance and implementation of valid non preempted Commonwealth laws that are necessary for the protection of the 1.3 million residents of Puerto Rico that are members and depositors insured by the government.

    **B.**    **Exculpations**

34. We hereby reaffirm the arguments asserted in our Objections of October 19, 2021(Dkt. 18594) regarding the excessive nature of the releases and exculpations provided in the Plan. Now, the amended Proposed Order and judgment confirming the Plan grants to the GDB Debt Recovery Authorized ("GDB-DRA") the following exculpation:

> …(g) The DRA Parties: Each of the GDB Debt Recovery Authority ("DRA"), AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for Wilmington Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and including the Effective Date and each of the DRA Parties

13

> Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral Monitor (Docket Entry No. 19100, Ex. A), or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, the foregoing provisions of this subparagraph (g) of the Plan shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

35. As affirmed in our previous objection, even when this exculpation carves out negligence and willful misconduct, it does so only to the extent that the actions or omissions for such causes of action are previously recognized in a Final Order. Under said terms, the Proposed Order would constitute another unconstitutional taking of property of the Objectors, including their contractual rights to a duly funded insurance for which they have dutifully paid applicable premiums. Bear in mind that the insurer in question is not a Debtor under Title III.

36. In consonance with our previous objections, the newly granted exculpation to the GDB-DRA needs to be expressly limited to their actions directly related to the Plan, so that it is not used as a shield for their actions and omissions related to the GDB and its Title VI restructuring, which are all outside of the purview of the Title III cases. This is especially important regarding the claims of Objectors against GDB and GDB-DRA in the still pending Adversary Proceeding 18-00028.

37. The Credit Unions reaffirm that instead of receiving overly broad releases and exculpations when the Plan of Adjustment is confirmed, Debtor and its instrumentalities, including COSSEC and the GDB-DRA must not receive a discharge nor release from the Credit Unions'

14

claims, since said claims are not limited to debtor's breach under the bonds' obligations and their defaults, but pertain to violations of constitutional rights and to intentional fraud and/or willful misconduct.

### C. The Protection of Essential Government Services and Feasibility of the Plan

38. Preservation of the Credit Unions' claims is also required pursuant to the public interest, as it pertains to the protection of the capital and resources of depository institutions. In this sense, the protection of the credit unions and of their members and depositors is aligned with the policy objectives of a Plan of Adjustment of a municipality, which is the higher aim of ensuring the governmental function of protecting and serving the municipality's citizens. Failure to protect the credit unions and their members and depositors defeats that purpose by affecting that same constituency. Based on data published by COSSEC as of June 2021, the Plaintiffs in Adversary Proceeding 18-00028 had around 180,000 members and depositors. (Members and depositors in the whole system exceed 1.3 million.)

39. Preservation of Credit Unions' rights and claims under AP18-00028 and AP19-00389 does not impede formulation of a feasible Plan of Adjustment and any financial contingency resulting from that preservation does not adversely affect third parties, as the Objectors' claims are not material amounts as compared to the Adjusted debts under the Plan, not even reaching seven tenths of one percent **(0.658%)** of the restructured debt.

40. Adversary Proceedings 18-00028 and 19-00389 were filed by the Credit Unions in compliance with their fiduciary duties of protecting the interests of their members and depositors, a matter of public interest that is a long-standing statutory policy of the Commonwealth, the scope of which has been acknowledged by the FOMB in its Fiscal Plans for COSSEC. Clearly, the protection of the credit unions and of their members and depositors is aligned with the policy

15

objectives of a Plan of Adjustment of a municipality, which is the higher aim of ensuring the governmental function of protecting and serving the municipality's citizens. Failure to protect the credit unions and their members and depositors defeats that purpose by affecting that same constituency.

## IV. Conclusion

41. In view of the above, the appearing Credit Unions respectfully incorporate by reference every general objection set forth in their motion of October 19, 2021(Dkt. 18594) into this objection and hereby request from this Honorable Court to deny confirmation of the Plan of Adjustment filed by the Oversight Board at docket #19053. In the alternative that this Honorable Court intends to enter an Order for the Confirmation of the Plan of Adjustment, the Credit Unions herein respectfully request that Order Confirming Plan expressly except their claims from discharge pursuant to section 11 U.S.C. 944(c)(1) applicable under PROMESA, and that their claims and causes of actions be preserved, including those asserted in Adversary Proceedings 18-00028 and 19-00389, as well as any claims and causes of action they have against non/Debtor entities, particularly COSSEC, AAFAF, GDB and GDB-DRA.

## V. Reservation of Rights

The Credit Unions objecting herein expressly reserve their right to supplement and amend this objection and introduce evidence at any hearing relating to this objection without in any way limiting any other rights that it may have. The Credit Unions also reserve their right to object to confirmation of the Plan of Adjustment or any other subsequent amended plan or supplement or any other proposed Order and Judgment Confirming the Plan on these same grounds or any additional grounds, as may be appropriate.

**WHEREFORE,** the appearing Credit Unions respectfully request that the Confirmation of the Title III Revised Eighth Amended Plan of Adjustment and the amended proposed Order and Judgment submitted by the Financial Oversight Board as representative of the Commonwealth of Puerto Rico, be denied. In the alternative, it is respectfully requested that in its discretion under section 944(c)(1) of the Code that this Honorable Court except from discharge the Credit Unions' claims in the order confirming the Plan.

Respectfully submitted, in San Juan, Puerto Rico this 15th day of November, 2021.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY, in accordance with Fed. R. Bankr. P. 9014(b), Fed. R. Bankr. P. 7004(b), and the Court's Fifteenth Amended Notice, Case Management and Administrative Procedures Order [ECF#17127 ] (the "CMP Order"), that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the parties appearing in said system including the US Trustee and to all those parties registered to receive notice within the electronic notification service.



*Attorneys for Credit Unions*
*PO Box 191757*
*San Juan, PR 00919-1757*

*/s/ Enrique M. Almeida, Esq.*
**Enrique M. Almeida, Esq.**
*USDC-PR 217701*
*enrique.almeida@almeidadavila.com*