# EXHIBIT 1

177 D.P.R. 121, 2009 WL 3326645 (P.R.), 2009
TSPR 154

RAFAEL HERNÁNDEZ COLÓN, peticionario,
v.
POLICÍA DE PUERTO RICO, recurrida; CARLOS
ROMERO BARCELÓ, peticionario, v. POLICÍA
DE PUERTO RICO, recurrido.

En El Tribunal Supremo De Puerto Rico.
*Números:* CC-2007-347 CC-2007-356

**Synopsis**

PETICIÓN DE *CERTIORARI* para solicitar la revocación
de una SENTENCIA de *Emmalind García García,
Adelaida Varona Méndez* y *Carlos Cabán Cabán*, Js. del
Tribunal de Apelaciones, que dictaminó que la acción
administrativa de la Policía de Puerto Rico no era
revisable judicialmente porque la actuación del
Superintendente de la Policía de eliminar la protección
mediante escoltas a los ex gobernadores es discrecional.
*Se revoca la sentencia emitida por el Tribunal de
Apelaciones. La actuación del entonces Superintendente
de la Policía no era discrecional. Esto porque se afecta
directa y sustancialmente un derecho adquirido que se
encontraba ya en el patrimonio de los peticionarios y, por
ende, está protegido por nuestro ordenamiento jurídico
constitucional.*

*Demetrio Fernández Quiñones*, abogado de Rafael
Hernández Colón, peticionario; *Virgilio Ramos González*,
abogado de **\*127** Carlos Romero Barceló, peticionario;
*Salvador J. Antonetti Stutts*, procurador general, parte
recurrida.

EL JUEZ ASOCIADO SEÑOR RIVERA PÉREZ emitió
la opinión del Tribunal.

El Lcdo. Rafael Hernández Colón y el Lcdo. Carlos
Romero Barceló, ambos ex gobernadores de Puerto Rico,
nos solicitan que revisemos la sentencia emitida por el
Tribunal de Apelaciones. El foro apelativo intermedio
dictaminó que la acción administrativa de la Policía de
Puerto Rico no era revisable judicialmente. Ello, por
entender que la actuación del Superintendente de la
Policía de eliminar la protección mediante escoltas a los
ex gobernadores es discrecional.

Analicemos los hechos y el trámite procesal que

originaron la presente controversia.

**I**

Las escoltas policiacas para los ex gobernadores de Puerto
Rico se originaron en el 1965, cuando el Sr. Luis Muñoz
Marín dejó de ser el Primer Ejecutivo de Puerto Rico.
Debido al cese de sus funciones como Gobernador, la
Policía de Puerto Rico entendió necesario otorgarle una
escolta para proteger su seguridad y vida. La decisión de
proveerle protección mediante el uso de escoltas al ex
Gobernador, señor Muñoz Marín, surgió de unos análisis
periciales y de la interpretación realizada por la Policía de
Puerto Rico al Art. 3 de la Ley Núm. 77 de 22 de junio de
1956, mejor conocida como la Ley de la Policía.[1] Desde
entonces se sentó el precedente de conceder protección
mediante escoltas policiacas a los posteriores ex
gobernadores de Puerto Rico. **\*128**

El 17 de mayo de 2006, sin realizarse un estudio pericial
sobre el gasto del erario público o de algún otro asunto
relacionado al servicio de escoltas de los ex gobernadores,
el Gobernador de turno, Lcdo. Aníbal Acevedo Vilá,
envió una misiva al entonces Superintendente de la
Policía, el Lcdo. Pedro Toledo Dávila, para que
suspendiera el servicio de protección ofrecido hasta ese
entonces a los ex gobernadores. Recibida la directriz, el
Superintendente de la Policía, licenciado Toledo Dávila,
acató la orden del entonces primer mandatario y retiró las
escoltas que proveían seguridad personal a todos los ex
gobernadores de Puerto Rico. *La decisión de eliminar las
escoltas de los ex gobernadores no contaba con el aval de
la Legislatura de turno; por ello, el entonces Gobernador,
licenciado Acevedo Vilá, fundamentó su decisión en los
poderes inherentes del cargo de Primer Ejecutivo y en su
facultad para emitir órdenes ejecutivas.*

Antes de eliminar la protección brindada por las escoltas a
los ex gobernadores, la Legislatura de Puerto Rico nunca
se pronunció contra el uso de éstas. La Legislatura de
Puerto Rico continuó avalando la interpretación impartida
al Art. 3 de la Ley de la Policía.[2] Desde el 1956 nunca se
realizó enmienda alguna a tal disposición que afectara la
protección mediante escoltas a los ex gobernadores. El
Art. 3 de la Ley de la Policía de 1956, *supra*, estatuía lo
siguiente:

> Se crea en el Estado Libre Asociado de Puerto Rico un
> organismo civil de orden público que se denominará
> "Policía de Puerto Rico" y cuya obligación será
> proteger a las personas y a la propiedad, mantener y
> conservar el orden público, prevenir, descubrir y

perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a éstas se promulguen.

Cuando se aprobó la Ley de la Policía de 1974, el Art. 3 disponía lo siguiente: **\*129**

> Se crea en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará "Policía de Puerto Rico" y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a ésta se promulguen. Los miembros del Cuerpo de Policía estarán comprendidos en el Servicio de Carrera.[3]

La única enmienda que se realizó al Art. 3 de la Ley de la Policía de 1974, *supra*, fue la inclusión de lo siguiente: "observar y procurar la más absoluta protección de los derechos civiles del ciudadano .... Los miembros del Cuerpo de Policía estarán comprendidos en el Servicio de Carrera." Cuando se aprobó la Ley de la Policía de 1996, el Art. 3, *supra*, tampoco sufrió enmienda material alguna y su redacción permaneció prácticamente igual a la Ley de la Policía de 1974, excepto que se añadió el verbo *investigar* precedido por el verbo *descubrir*.[4]

El 9 de noviembre de 2006 la Asamblea Legislativa aprobó el Proyecto del Senado Núm. 121 con el propósito de enmendar el Art. 30 de la Ley Orgánica de la Policía, 25 L.P.R.A. sec. 3129. El propósito de tal proyecto de ley era estatuir explícitamente el derecho de los ex gobernadores de recibir protección y seguridad mediante escoltas policiacas. El proyecto de ley fue vetado por el entonces Gobernador, licenciado Acevedo Vilá, sin expresar motivo o razón alguna a la Legislatura de Puerto Rico. **\*130**

Sobre este proyecto es importante reseñar que el 19 de octubre de 2006, la Comisión de lo Jurídico de la Cámara de Representantes emitió un informe cuyas conclusiones son pertinentes a la controversia de autos. El informe reafirma que la protección mediante escoltas policiacas al señor Muñoz Marín surgió de la interpretación del Art. 3 de la Ley de la Policía de 1956, *supra*. Por la importancia del contenido del referido informe citamos literalmente de

éste lo siguiente:

> La Ley de la Policía de 1956 se derogó en 1974, mediante la Ley Núm. 26 aprobada el 22 de agosto de 1974. *Al aprobar esta Ley, la Legislatura estaba consciente de que la Policía proveía protección y seguridad a estos ex-Gobernadores. La Ley de 1974 no proveyó disposición alguna sobre esta protección, la cual se continuó brindando por la Policía de Puerto Rico bajo el Artículo 3* que delegaba en al [sic] Policía la obligación de protección a las personas y a la propiedad.

> ........

> La Ley de la Policía de 1974 fue derogada en 1996 por la Ley Núm. 53 de 10 de junio de ese año. *Al aprobarse esta ley la Legislatura estaba plenamente consciente de la práctica que se había establecido por la Policía de Puerto Rico de proveer protección y seguridad a los ex-Gobernadores bajo el artículo 3 que disponía la delegación del poder de protección a personas y propiedades de la policía.*

> ........

> Esta práctica de la Policía de brindar protección sin límite de tiempo a los ex-Gobernadores era una práctica pública y notoria por cuanto todos los desplazamientos de los ex-Gobernadores a cualquier lugar del país se llevaban a cabo con su correspondiente escolta.

> Al día de hoy todos los ex-Gobernadores disfrutan de la protección y seguridad que les fue brindada desde el momento de su retiro .... *Incluso, aún cuando no se desprende claramente de la Ley que los ex-Gobernadores tendrán derecho a escoltas, el propio Superintendente de la Policía de Puerto Rico reconoce que esta escolta es un derecho adquirido por estos ex-funcionarios ....* (Énfasis suplido.) Apéndice de la Petición de *certiorari*, pág. 392.

Ante la decisión del entonces Gobernador, licenciado Acevedo Vilá, de vetar el Proyecto del Senado 121 y de ordenar la eliminación del servicio de escoltas a todos los **\*131** ex gobernadores efectivo el 31 de diciembre de 2006, el 8 de diciembre de 2006, el ex Gobernador, licenciado Hernández Colón, presentó una solicitud de revisión sobre la decisión administrativa de suspender las escoltas a los ex gobernadores. El 15 de diciembre de 2006 el licenciado Hernández Colón presentó ante el Tribunal de Apelaciones una moción en auxilio de jurisdicción para que se paralizara la determinación del Superintendente de la Policía hasta que se determinara si como ex Gobernador tenía un derecho adquirido a

protección mediante escoltas.

El 20 de diciembre de 2006 el licenciado Romero Barceló presentó una Petición de Revisión de Decisión Administrativa ante el Tribunal de Apelaciones. Para esa misma fecha y ante ese mismo foro, también, presentó una moción en auxilio de jurisdicción para que se dejara sin efecto la decisión administrativa tomada por la Policía de Puerto Rico hasta que se determinara si la protección brindada por las escoltas era o no un derecho adquirido. El mismo día, el licenciado Romero Barceló presentó una solicitud para que se consolidara su caso con el del también ex Gobernador, licenciado Hernández Colón, que trata sobre idéntica controversia. El 20 de diciembre de 2006 el Tribunal de Apelaciones dictó resolución consolidando ambos recursos y requiriéndole al peticionario, licenciado Romero Barceló, que evidenciara la notificación de los recursos y escritos presentados por su representación legal. Por otro lado, le concedió un término fijo al Procurador General para que se expresara sobre las referidas solicitudes en auxilio de jurisdicción así como la de consolidación de los recursos.

Los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, basan su reclamo en que se enteraron informalmente de la directriz emitida por el entonces Gobernador, licenciado Acevedo Vilá. *Arguyen que les enviaron comunicaciones escritas al Superintendente de la Policía, licenciado Toledo Dávila, para que éste dejara sin efecto la suspensión de las escoltas o, en la alternativa, que *132 se les garantizara su derecho a un debido proceso de ley para dilucidar la posible existencia de un derecho adquirido.* Tal pedido fue rechazado por el Superintendente de la Policía, el licenciado Toledo Dávila. El peticionario, licenciado Romero Barceló añadió que cuando decidió postularse para el cargo de gobernador de Puerto Rico consideró que éste y su familia contarían con la protección de las escoltas policiacas una vez cesara en el cargo.

Por otra parte, *el argumento principal del Procurador General es la falta de jurisdicción del Tribunal de Apelaciones para atender el recurso de revisión presentado por los peticionarios. Apoya tal argumento en que las órdenes ejecutivas no son revisables según la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico* (la L.P.A.U.).[5] *En la alternativa, que no estamos ante una actuación administrativa de carácter adjudicativo por lo que dicha actuación no está sujeta a revisión judicial según la L.P.A.U.*

El 26 de diciembre de 2006 el Procurador General presentó una solicitud urgente de prórroga para la presentación de su réplica, así como para que se le

concediera autorización para presentar un escrito en exceso de las páginas reglamentarias. El mismo día el licenciado Romero Barceló presentó una moción aclaratoria sobre el alcance de las resoluciones emitidas por el Tribunal de Apelaciones, en la cual solicitó que no se le concediera una prórroga al Procurador General para expresarse. Ello, para que se atendiera con premura su solicitud en auxilio de jurisdicción. El licenciado Hernández Colón realizó un pedido similar.

También, el 26 de diciembre de 2006 el Procurador General presentó una Moción de Desestimación y en Oposición a Moción Solicitando Orden en Auxilio de Jurisdicción. Alegó que los peticionarios no habían establecido las condiciones necesarias para que se les concedieran sus mociones en *133 auxilio de jurisdicción. Nuevamente, arguyó que el Tribunal de Apelaciones carecía de jurisdicción. El 27 de diciembre de 2006 el Tribunal de Apelaciones emitió una resolución en la cual declaró "NO HA LUGAR" a las mociones en auxilio de jurisdicción y le concedió a las partes hasta el 16 de enero de 2007 para que presentaran sus respectivos alegatos así como cualquier alegato suplementario sobre los méritos del recurso y sobre la jurisdicción del foro apelativo intermedio para atender la controversia de autos.

El 16 de enero de 2007 los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, presentaron mociones en oposición a la moción de desestimación por falta de jurisdicción presentada por el Procurador General, expresándose sobre los méritos del recurso y sobre la jurisdicción del Tribunal de Apelaciones. Refutaron los argumentos presentados por el Procurador General para solicitar la desestimación del caso. El 18 de enero de 2007 el Procurador General presentó una moción de autorización para replicar a los escritos presentados por los peticionarios en oposición a la moción de desestimación. El 19 de enero de 2007 el Tribunal de Apelaciones emitió una resolución concediéndole tiempo adicional al Procurador General para replicar a los escritos suplementarios presentados por los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, e igualmente les extendió el término a éstos para que reaccionaran de entenderlo necesario. El 22 de enero de 2007, el peticionario, licenciado Romero Barceló, presentó una Moción de Reserva de Derechos expresando que sometió una solicitud de "injunction" sobre la controversia de autos ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico.[6]

El 23 de enero de 2007 el Procurador General presentó su Réplica a Oposiciones a Moción de Desestimación. El 26 *134 de enero de 2007, el peticionario, licenciado Romero Barceló, replicó a la moción del Procurador General. En idéntica fecha, el peticionario, licenciado

Hernández Colón, presentó su Oposición a la Réplica del Procurador.

Para el 26 de febrero de 2007, el Tribunal de Apelaciones emitió sentencia declarándose sin jurisdicción para atender el asunto. El foro apelativo intermedio entendió que no existía disposición estatutaria alguna que le otorgara el derecho a los ex gobernadores a recibir seguridad y protección mediante escoltas policiacas. Por ello, dictaminó que la eliminación de las escoltas a los ex gobernadores reside sobre el poder discrecional del Superintendente de la Policía. El 2 de abril de 2007 el peticionario, licenciado Romero Barceló, presentó una moción de reconsideración y el 13 de abril de 2007 el Tribunal de Apelaciones emitió una resolución declarándola "NO HA LUGAR".

Inconformes con el dictamen emitido por el Tribunal de Apelaciones, los ex gobernadores y aquí peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, acuden ante nos y en esencia nos hacen los señalamientos de error siguientes:

Erró el Tribunal de Apelaciones al desestimar el recurso incoado, denegando la petición del Recurrente para que se honre su derecho adquirido al servicio de la seguridad y protección policiaca, en su carácter de ex-gobernador. Caso Núm. CC-2007-356, Alegato, pág. 8.

Erró el Tribunal de Apelaciones al concluir que la decisión de la Policía no era revisable porque [los recurrentes] no había[n] adquirido un derecho a recibir protección bajo la interpretación que hizo la Policía del artículo 3 de su Ley Orgánica, sancionada por la Legislatura, en virtud de la cual la Policía siguió, por 41 años, la práctica de proveer protección de por vida a los ex Gobernadores.

Erró el Tribunal de Apelaciones al concluir que la decisión de la Policía no era revisable porque los [recurrentes] no adquiri[eron] un derecho a protección bajo el artículo 7 del Código Civil que establece la equidad ... como fuente de derecho, debido a que los principios generales del derecho no amparan cuando implican una erogación de fondos públicos.

Erró el Tribunal de Apelaciones al concluir que la decisión de *135 la Policía no era revisable porque el Superintendente no tenía que seguir el procedimiento establecido en la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) para adjudicar el planteamiento de [los recurrentes] y concluir que el debido proceso no requería que se siguiera ese procedimiento.

Erró el Tribunal de Apelaciones al concluir que la decisión del Superintendente no era revisable judicialmente por tratarse de un asunto que caía dentro de la discreción administrativa. Caso Núm. CC-2007-347, Petición de *certiorari*, pág. 13.

Por estar los señalamientos de error íntimamente relacionados entre sí procederemos a discutirlos en conjunto.

## II

[1–2] Todo tribunal tiene la ineludible tarea de auscultar su jurisdicción para atender y resolver el asunto ante su consideración, así como revisar la jurisdicción de los foros de donde proviene el recurso en cuestión.[7] Como expusimos en la parte I, los peticionarios presentaron solicitudes por escrito ante el Superintendente de la Policía. Tales peticiones, según el licenciado Hernández Colón y el licenciado Romero Barceló, tenían el propósito de solicitar que se dilucidara la determinación de la Policía de Puerto Rico de eliminar la protección de escoltas a los ex gobernadores y aquí peticionarios. Ante tal argumento, resulta procedente examinar la Sec. 2152 de la L.P.A.U., la cual dispone lo siguiente:

Excepto cuando por ley se establezca de otro modo el procedimiento adjudicativo ante una agencia *podrá iniciarse* por la propia agencia, o *con la presentación de una* querella, *solicitud o petición, ya sea personalmente o mediante comunicación por escrito*, en el término que establezca la ley o el reglamento, en relación a un asunto que esté bajo la jurisdicción de la agencia. (Énfasis suplido.)[8] *136

El Superintendente de la Policía denegó el pedido de los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, sin tomar en cuenta la posibilidad real e inminente de estar interviniendo con un derecho propietario protegido constitucionalmente. El Superintendente de la Policía aprobó la Resolución Núm. OS-1-16-330 donde dispuso de los recursos de los peticionarios. *Por lo tanto, los peticionarios, licenciado Romero Barceló y el licenciado Hernández Colón, agotaron los recursos administrativos disponibles ante dicha agencia administrativa.*

[3] El propósito de la doctrina de agotamiento de remedios o recursos administrativos es determinar el momento en que se puede solicitar la intervención de los tribunales. La norma pretende evitar que una parte presente un recurso ante los tribunales de justicia sin que la agencia administrativa haya tomado una determinación final en el asunto.[9] La L.P.A.U. dispone en su Sec. 2172

lo siguiente:

> *Una parte adversamente afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia* o por el organismo administrativo apelativo correspondiente *podrá presentar una solicitud de revisión ante el Tribunal de Apelaciones*, dentro de un término de treinta (30) días contados a partir de la fecha del archivo en autos de la copia de la notificación de la orden o resolución final de la agencia. ...

> ........

> *La revisión judicia l aquí dispuesta será el recurso exclusivo para revisar los méritos de una decisión administrativa, sea ésta de naturaleza adjudicativa o de naturaleza informal, emitida al amparo de este capítulo.* (Énfasis suplido.)[10]

**[4]** Hemos expresado que una orden o resolución final es aquella que dispone de la controversia ante la agencia y **\*137** *tiene efectos adjudicativos y dispositivos sobre las partes.*[11] Lo determinante no es el nombre que la agencia le dé a su actuación, sino considerar el estado de derecho vigente al momento del procedimiento administrativo y si la determinación que se pretende revisar es final.[12]

**[5]** En Puerto Rico, así como en la jurisdicción federal, existe el recurso de revisión judicial para revisar las resoluciones u órdenes finales de una agencia administrativa.[13] Los tribunales de justicia son los llamados a interpretar la Constitución así como la legislación vigente. En el caso de autos no encontramos ninguna limitación establecida por la Legislatura en cuanto a la revisión judicial de las resoluciones emitidas por la Policía de Puerto Rico. Hemos expresado que en la práctica casi todo es revisable por los tribunales y como resultado de esa postura, se ha favorecido la revisión judicial.

El Procurador General alega que por tratarse de una orden ejecutiva ésta no es revisable judicialmente por disposición de la L.P.A.U. Ante tal alegación, los peticionarios arguyen que la carta enviada por el entonces Gobernador al entonces Superintendente de la Policía no cumple con los requisitos de una orden ejecutiva al no tener estampado el sello oficial del Estado Libre Asociado de Puerto Rico (E.L.A.), así como por no publicarse de acuerdo con el procedimiento seguido por el Departamento de Estado.[14]

**[6]** Si bien es cierto que el uso y costumbre cuando se emite una orden ejecutiva es ponerle el sello del E.L.A. y darle publicidad en el Departamento de Estado, no es menos cierto que hay un vacío estatutario en cuanto a los **\*138** requisitos que se deben cumplir al emitir una orden

ejecutiva. Una orden ejecutiva no puede intervenir con derechos constitucionalmente protegidos. Sólo se permitiría tal acción en casos de extrema emergencia y por tiempo limitado.[15] Permitir tal actuación constituiría un abuso de poder por parte de la Rama Ejecutiva.[16] Además, tal abrogación de poder podría resultar inconstitucional por lesionar el sistema de pesos y contrapesos establecidos en la Constitución del Estado Libre Asociado de Puerto Rico.

**[7]** Una orden ejecutiva encuentra su base legal en la obligación general del primer ejecutivo de cumplir y hacer cumplir las leyes, vigilar y supervisar la conducta oficial de todos los funcionarios y agencias del poder ejecutivo. Una orden ejecutiva es un mandato dirigido a uno de los brazos auxiliares del poder ejecutivo, conforme a nuestra Constitución y el ordenamiento jurídico estatutario. Pese a lo anterior, el poder del Gobernador para emitir órdenes ejecutivas no puede ejercerse de forma contraria o tener un efecto adverso a lo dispuesto por ley.[17] *Una orden ejecutiva promulgada de acuerdo con la autoridad conferida al Gobernador, ya sea por la Constitución o por la Legislatura, tiene efecto de ley. No obstante, una orden ejecutiva promulgada en ausencia de autorización concedida por la Constitución o por estatuto no tiene efecto de ley.*[18]

*Es imprescindible mencionar que lo que hoy revisamos no es la llamada "orden ejecutiva" emitida por el entonces Gobernador, licenciado Acevedo Vilá, sino la Orden Núm. OS-1-16-330 promulgada por el entonces Superintendente de la Policía, licenciado Toledo Dávila. Ello se debe a que la referida orden adjudicó todas las reclamaciones presentadas por los peticionarios, licenciado Hernández Colón y el licenciado* **\*139** *Romero Barceló. De tal orden éstos recurrieron al Tribunal de Apelaciones mediante un recurso de revisión judicial de decisión administrativa y ante nos mediante recurso de "certiorari".*

*La acción de la agencia administrativa intervino con un derecho adquirido y constitucionalmente protegido de los peticionarios, por ende, no reside dentro del poder discrecional del Superintendente de la Policía y ha de ser revisable judicialmente. Concluimos que la orden emitida por la Policía de Puerto Rico le puso fin al trámite administrativo. La llamada "Orden Ejecutiva" por el Procurador General no podía obviar o ignorar la interpretación de una legislación vigente por la agencia que la administra, avalada por la Legislatura, que produjo un derecho adquirido constitucionalmente protegido. El único recurso disponible de los peticionarios frente a la decisión del Superintendente de la Policía era acudir mediante revisión judicial ante el*

*Tribunal de Apelaciones, como correctamente hicieron.*

### III

[8] En el caso de marras, los peticionarios alegan que la Policía de Puerto Rico violentó su derecho a un debido proceso de ley por haber intervenido injusta e inequitativamente con un derecho adquirido por ellos. El debido proceso de ley aplica ante una privación de un derecho, ya sea propietario, de libertad o vida. El derecho a un debido proceso de ley surge por imperativo constitucional. Tanto la Constitución del Estado Libre Asociado de Puerto Rico como la de Estados Unidos de América señalan, respectivamente, lo siguiente:

Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. ... Ninguna persona será privada de su libertad o propiedad sin **140** el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.[19]

No State shall make or enforce any law which shall ... deprive a person of life, liberty, or property, without due process of the law. ...[20]

No obstante, en los procedimientos administrativos el debido proceso de ley es de carácter flexible. Por ello, existen excepciones que niegan el derecho de ser oído y ello no significa que no se haya cumplido con el debido proceso de ley.

Desde principios del siglo veinte el Tribunal Supremo de Estados Unidos determinó que en los procesos de reglamentación se puede negar no solo el derecho de ser oído, sino también, el de presentar evidencia, argumentar y contrainterrogar. Ello, por razones que limitarían el buen funcionamiento y la razón de ser de la función reglamentadora de algunas agencias administrativas. Lo anterior, surge cuando el proceso de reglamentación se vería afectado por concederle el derecho de ser oído a todo interesado.[21] Por otro lado, el Alto Foro federal puntualizó que aún en los procedimientos de reglamentación existe un derecho a ser oído cuando el reglamento va a afectar a una sola persona o a un pequeño grupo. Ello, por no obstaculizar los procedimientos administrativos, sino que los favorece porque complementan el expediente administrativo y los procedimientos no se ven dilatados de forma perjudicial.[22]

[9] Para determinar si se ha violentado el debido proceso de ley los tribunales deben auscultar si la persona que reclama tiene un derecho de libertad, propiedad o vida que se ve afectado, y si el procedimiento administrativo seguido por la agencia es un sustituto constitucional **141** adecuado para cumplir con el debido proceso de ley,

haciéndolo justo y equitativo.[23]

¿Violó la Policía de Puerto Rico el debido proceso de ley de los peticionarios al intervenir con su derecho propietario adquirido, constitucionalmente protegido? Por estar en controversia la existencia de un derecho propietario, constitucionalmente protegido, nos vemos forzados a contestar tal interrogante en la afirmativa. Veamos.

La decisión del entonces Superintendente de la Policía, licenciado Toledo Dávila, afectó a los peticionarios por existir la posibilidad de un daño real y patente a un derecho adquirido constitucionalmente, protegido en virtud del cese de sus funciones como gobernadores de Puerto Rico. *Por ello, nos encontramos ante la situación de que los peticionarios sufrieran un daño real, claro y palpable sin haber tenido la oportunidad de disfrutar de su derecho a un debido proceso de ley.*

### IV

[10] El Tribunal de Apelaciones entendió que el Art. 7 del Código Civil,[24] no aplica cuando hay una erogación de fondos públicos. Tal percepción es errónea. Hemos determinado que, "[e]n nuestra jurisdicción es aceptable la norma de que, bajo ciertas circunstancias apropiadas, un demandante pueda invocar contra el Estado la doctrina de los actos propios, impedimento en equidad y de la buena fe".[25] Lo que sí hemos expresado es que no son aplicables tales principios cuando se realiza una erogación ilegítima de fondos públicos.[26] Concluimos que en el caso de marras **142** no se violentó ninguna disposición legal sobre desembolso de fondos públicos. Veamos.

[11] Como señaláramos previamente, la protección mediante escoltas policiacas a los ex gobernadores surgió de la interpretación que la Policía de Puerto Rico le ha dado al Art. 3 de la Ley de la Policía, *supra*, el cual dispone, en la actualidad, lo siguiente:

Se crea en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará "Policía de Puerto Rico" y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir, *investigar* y

perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a estas se promulguen. Los miembros de la Policía estarán incluidos en el servicio de carrera.[27]

**[12]** En el Derecho Administrativo la doctrina del "re-enactment" se fundamenta en la creación de un estado de derecho que se sostiene sobre la validez impartida por la Legislatura a la interpretación dada a un estatuto por la agencia administrativa llamada a administrar su cumplimiento. Se entiende que ocurre el "re-enactment" cuando la Asamblea Legislativa revisa y enmienda alguna ley pero deja intactas o no realiza cambios materiales en algunas de sus disposiciones, interpretadas por la agencia llamada a su cumplimiento. Avala la interpretación impartida a dicha disposición estatutaria por la agencia administrativa correspondiente. A base de ello, los tribunales deberán determinar que la decisión de la Asamblea Legislativa fue de preservar y validar la interpretación brindada por la agencia correspondiente a tal disposición, como parte del estado de derecho vigente.[28] **\*143**

**[13]** Cuando la Legislatura enmienda una disposición estatutaria, conociendo la interpretación realizada por la agencia administrativa, y cambia el contenido de ésta de forma sustancial que afecta tal interpretación, los tribunales no pueden aplicar la doctrina del "re-enactment".[29] Cuando la Legislatura, con conocimiento de la interpretación que realiza una agencia administrativa sobre cierta disposición estatutaria llamada a interpretarla, enmienda el estatuto pero mantiene intacta la parte del estatuto interpretada por la agencia, entonces sí aplica la referida doctrina.[30]

**[14]** La doctrina del "re-enactment" puede ser invocada efectivamente frente al Gobierno cuando una agencia administrativa realiza una interpretación a una disposición estatutaria bajo su autoridad y la Legislatura, con conocimiento de ello, enmienda o revisa el estatuto y no realiza ningún cambio material a tal disposición.[31] En esa situación la agencia administrativa se ve impedida posteriormente de cambiar su propia interpretación.[32] El "re-enactment" no solo permite que los tribunales avalen la interpretación administrativa concedida, sino que limita la discreción de la agencia administrativa para cambiar su interpretación luego de que el estatuto es revisado judicialmente.

**[15]** La doctrina del "re-enactment" no puede invocarse

exitosamente cuando la Legislatura enmienda un estatuto y deja intacta o sin cambio sustancial una disposición estatutaria pero no conoce la interpretación brindada a tal **\*144** disposición por el ente administrativo correspondiente. Para invocar la doctrina exitosamente contra el Gobierno se tiene que evidenciar ante el tribunal el conocimiento legislativo de la interpretación de la agencia correspondiente a tal disposición de ley. El Tribunal Supremo de Estados Unidos concluyó sobre este asunto de igual forma.[33]

**[16]** La aplicación de la doctrina de "re-enactment" exige de los tribunales deferencia a la interpretación de la agencia administrativa según las circunstancias antes descritas. Se sostiene sobre la voluntad e intención del legislador.[34] Lo anterior, es compatible con nuestras reiteradas expresiones sobre la deferencia judicial hacia las determinaciones administrativas y legislativas.[35]

**[17]** En *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 690 (1966), expresamos lo siguiente:

Asumiendo que estuviéramos ante un estatuto de dudoso texto que demandara interpretación, hay un punto adicional. Ha sido norma de derecho generalmente aceptada que la aplicación e interpretación administrativa de un estatuto por aquellos organismos particularmente encargados de ponerlo en vigor y velar porque sus fines se cumplan de ordinario debe merecerle un gran peso a los tribunales ....

Es significativo el hecho que con posterioridad al 1947 y durante tantos años que ha estado en vigor la Sec. 2 el Legislador ha legislado en relación a la Ley Núm. 469 y en momento alguno ha alterado o repudiado la interpretación administrativa de dicha disposición o la aplicación de la misma hecha por los organismos administrativos. *Debe presumirse que ha sancionado dicha interpretación.* (Énfasis suplido.)

**[18]** Hemos reconocido que es un principio de hermenéutica que el legislador conoce la interpretación que este Tribunal ha hecho de las leyes. Cuando el legislador, conociendo **\*145** la existencia de una opinión de este Tribunal que interpreta un estatuto, enmienda parte de éste pero mantiene inalterado el texto interpretado por este Tribunal, se avala la normativa jurisprudencial sentada.[36] El Tribunal Supremo de Estados Unidos ha determinado que cuando el Congreso enmienda algún estatuto al cual una agencia administrativa le ha impartido una determinada interpretación a algunas de sus partes y el Congreso no intenta modificar esa parte del referido estatuto, la interpretación administrativa adquiere rango de norma vigente.[37]

En la jurisdicción federal se ha resuelto que cuando el Presidente de Estados Unidos veta un proyecto de ley, ello no limita o impide a los tribunales acudir al historial legislativo del proyecto para determinar la intención del Congreso sobre cierta disposición estatutaria que no iba a sufrir ningún cambio material.[38]

## V

¿Poseen los ex gobernadores y peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló, un derecho adquirido constitucionalmente protegido de seguridad mediante escoltas, o por el contrario, sólo poseían una mera expectativa de tal beneficio? Concluimos que estos poseen un derecho adquirido constitucionalmente protegido de seguridad mediante escoltas.

[19] F. Gómez de Liaño, define el derecho adquirido como "[e]l que se encuentra definitivamente incorporado al patrimonio de una persona y que como regla general han de *146 ser respetados por las nuevas leyes".[39] La contrapartida de los derechos adquiridos es la expectativa. La esperanza no constituye un derecho. Esta corresponde más a situaciones de hecho que a situaciones jurídicas. Es un interés que no posee ningún grado de protección jurídica. Es una simple expectativa que no autoriza a la persona a realizar actos conservatorios, los cuales no pueden ser transmisibles y pueden ser obviados por una nueva legislación. En síntesis, los derechos adquiridos son las facultades legales regularmente ejercidas y las expectativas, aquellas facultades no ejercidas al momento del cambio de legislación.

[20] Los derechos adquiridos son intangibles. Por ello, ni la Legislatura al promulgar una nueva ley, ni el Gobernador mediante una orden ejecutiva, los puede lesionar o ignorar. No sucede lo mismo con las expectativas, pues estas son probabilidades o esperanzas que se tienen y, por ello, pueden modificarse razonablemente. Un derecho adquirido se incorpora dentro del patrimonio del titular del derecho y está protegido constitucionalmente frente a cualquier gestión gubernamental que pretenda intervenirlo.

[21] El Art. 3 del Código Civil dispone que "[l]as leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario [y, e]n ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior".[40] En *Vázquez v. Morales*, 114 D.P.R. 822 (1983), expresamos que el Art. 3 del Código Civil está básicamente inspirado en la doctrina de los derechos adquiridos, sin descartar los hechos consumados.

[22] *Es imperativo mencionar que los derechos adquiridos, sin importar su procedencia, ya sea mediante legislación, por contrato o por "derecho común" gozan de la misma* *147 *protección que todo derecho constitucional.*[41] Recientemente expresamos que los derechos adquiridos protegidos pueden concebirse como "consecuencia de un hecho idóneo, al producirlos en virtud de una ley vigente en el tiempo en que el hecho ha sido realizado, y que se han incorporado a una persona".[42] Expresamos, además, lo siguiente:

> En este sentido, el derecho adquirido no puede ser el conjunto de facultades que la ley anterior permitía que los ciudadanos ejerciesen, ya que esto sería el estado de derecho objetivo que la nueva ley intenta cambiar. *El derecho adquirido, en cambio, es una situación consumada, en la que las partes afectadas descansaban en el estado de derecho que regía al amparo de la ley anterior. Así, los tratadistas distinguen entre la mera expectativa del derecho y los derechos adquiridos que ya entraron en el patrimonio de los sujetos involucrados.* (Énfasis suplido.)[43]

[23] La agencia administrativa tiene la obligación de salvaguardar cualquier derecho adquirido que haya sido reconocido por ésta, al hacer cumplir la ley que administra. *La importancia de la teoría de los derechos adquiridos tiene que ver principalmente con la aplicación del estado de derecho vigente en el tiempo, pero también con la seguridad jurídica de las personas naturales o jurídicas frente al ejercicio de las potestades unilaterales del Gobierno.*

[24] Cuando una agencia administrativa crea o modifica una relación jurídica existente de carácter particular y concreto o reconoce un derecho de igual categoría, éste no podrá ser revocado sin el consentimiento expreso y preferiblemente escrito del respectivo titular. En suma, se permite la renuncia de un derecho adquirido como se permite la renuncia de cualquier otro derecho siempre que la renuncia sea consciente, informada, voluntaria y libre de coacción. *148

[25] Al poseerse un derecho adquirido protegido constitucionalmente la aplicación de una orden ejecutiva o un estatuto, en determinados casos, no puede aplicarse retroactivamente. Este Tribunal ha sido consecuente en reconocer su aplicación prospectiva debido a que no se pueden ver afectados los derechos adquiridos protegidos con anterioridad al cambio propuesto.[44]

Los aquí peticionarios no poseían una mera expectativa sobre el derecho de protección, sino que éstos poseen un

derecho adquirido en virtud de sus respectivos retiros como primeros ejecutivos del país, al amparo de un estado de derecho específico. Es pertinente destacar que *el Superintendente de la Policía en una vista pública ante la Asamblea Legislativa expresó en su ponencia lo siguiente: "estos ex funcionarios tienen unos derechos adquiridos, es necesario que esta pieza legislativa se atempere y contenga disposiciones similares a la Ley Federal para que establezca que el beneficio de la escolta limitada a un término fijo de tiempo será aplicable al próximo gobernador electo."*[45]

La ley federal dispone, en parte, lo siguiente:

(a) Under the direction of the Secretary of the Treasury, the United States Secret Service is authorized to protect the following persons:

(1) The President, the Vice-President (or other officer next in the order of successions to the Office of President), the President-elect, and the Vice President-elect.

(2) The immediate families of those individuals listed in paragraph (1).
(3) *Former Presidents* and their spouses *for their lifetimes,* except that protection of a spouse shall terminate in the event of remarriage *unless the former President did not serve as President prior to January 1, 1997, in which case, former Presidents* and their spouses *for a period of not more than ten years from the date a former President leaves office ....*[46]

Como puede apreciarse en la jurisdicción federal se les **\*149** reconoció un derecho de protección y seguridad mediante escoltas de manera vitalicia a los ex presidentes que cesaron funciones antes del 1 de enero de 1997. Los salientes presidentes, electos luego de la referida fecha, sólo obtendrán el derecho de protección durante un término no mayor de diez años. El Congreso de Estados Unidos reconoció que la legislación promulgada por estos tenía que tener carácter prospectivo debido a que los ex presidentes para la fecha de aprobación del referido estatuto poseían un derecho adquirido ilimitado sobre protección mediante escoltas provistas por el Servicio Secreto de Estados Unidos.

## VI

El Superintendente de la Policía expresamente reconoció que los aquí peticionarios tienen un derecho adquirido protegido, el cual no puede verse afectado por una aplicación retroactiva de una orden ejecutiva. *El entonces Superintendente, licenciado Toledo Dávila, igualmente, reconoció que el gasto por el uso de escoltas era mínimo y su eliminación no representaría una economía significativa en las arcas públicas.*[47]

La protección policiaca a los ex gobernadores ha sido plasmada y reforzada por numerosas acciones legislativas. Estas acciones datan desde el 1956 como resultado de la interpretación del Art. 3 de la Ley de la Policía, *supra.* Tal interpretación fue realizada durante el curso de muchos años por la Policía de Puerto Rico y avalada por la Legislatura de Puerto Rico. La Orden General Núm. 77-2 emitida el 15 de abril de 1977 por el entonces Superintendente de la Policía, Sr. Roberto Torres González, reconoció expresamente el derecho a la seguridad y protección mediante escoltas policiacas a los ex gobernadores. En dicha orden, el entonces Superintendente de la Policía uniformó el derecho **\*150** a las escoltas estableciendo las normas y procedimientos aplicables a éstas. Tal acción tuvo el efecto de reactivar la interpretación impartida por la agencia al Art. 3 de la Ley de la Policía, *supra,* reconociendo el derecho de protección de los ex gobernadores mediante el uso de las escoltas policiacas.

El 22 de diciembre de 1992, se emitió la Orden General Núm. 88-6, en donde la Policía de Puerto Rico nuevamente tomó acción en relación con las escoltas de los ex gobernadores. La referida Orden General enmendó la Núm. 77-2, regulando el derecho de los ex gobernadores a recibir protección mediante escoltas policiacas. La Orden General Núm. 88-6 expresamente reconoció que la Policía de Puerto Rico tiene la obligación de proveerles protección y seguridad a los ex gobernadores de Puerto Rico. Tal orden, al igual que la anterior, señaló como base legal al Art. 3 de la Ley de la Policía, *supra,* para otorgar la protección mediante escoltas policiacas a los ex gobernadores de Puerto Rico. *La Orden General Núm. 88-6, en nada alteró el carácter vitalicio del derecho al uso de escoltas policiacas en beneficio de la seguridad de los ex gobernadores.*

Para el 1 de septiembre de 1998 el entonces Superintendente de la Policía aprobó la Orden General Núm. 98-13, la cual estableció las "Normas y Procedimientos para los Servicios de Protección y Seguridad del Gobernador y ex Gobernadores de Puerto Rico; al Superintendente de la Policía de Puerto Rico y otros Funcionarios, Jefes de Estado y Primeros Ministros de otros Países". Tal orden no establece discreción administrativa alguna, ni el límite de tiempo en que se concederá la protección a los referidos funcionarios. La orden básicamente se limita a establecer la estructura orgánica y el personal encargado de proveer el servicio de

protección y seguridad a los ex gobernadores.

Luego, el 7 de enero de 2004 el Superintendente de la Policía aprobó la Orden General Núm. 2003-9. La referida Orden derogó la Núm. 98-13 y creó la Oficina de Seguridad **151** y Protección. Bajo esta Oficina se ubicó la protección y seguridad de los gobernadores y ex gobernadores. Dicha oficina responde directamente al Superintendente de la Policía. Nuevamente, la referida orden general no estableció el límite de tiempo para la protección mediante escoltas a los ex gobernadores, así como tampoco pautó discreción alguna del Superintendente de la Policía sobre la protección y seguridad de estos ex funcionarios.

La Ley de la Policía de 1996 derogó la Ley de 1974.[48] *Tal derogación no cambió la redacción del Art. 3, supra, fuente de donde emana el derecho y el deber de la Policía de ofrecer seguridad mediante escoltas a los ex gobernadores. La Legislatura de Puerto Rico tenía pleno conocimiento sobre la interpretación que se le había brindado históricamente al Art. 3 de dicha Ley, supra, y que tal práctica se llevaba a cabo desde el 1965.*

*La Legislatura durante más de cuarenta años no ha efectuado ningún tipo de enmienda, eliminación o alteración al Art. 3 de la Ley de la Policía, supra, que afectara el derecho adquirido de los ex gobernadores incluyendo a los peticionarios, licenciado Hernández Colón y el licenciado Romero Barceló.* Lo que es más, en cuarenta y una ocasiones la Legislatura de Puerto Rico aprobó el presupuesto anual del gobierno, según dispone nuestra Constitución, y en todos ellos aprobó una partida para sufragar la protección a los ex gobernadores mediante el uso de las escoltas policiacas. La Asamblea Legislativa de Puerto Rico reconoció que la seguridad de los ex gobernadores de Puerto Rico es un asunto de alto interés público.

Hay que mencionar que la Ley de la Policía tuvo una enmienda el 1 de junio de 1996. La enmienda fue en el Art. 30, el cual dispone lo siguiente:

> (a) La Policía de Puerto Rico tendrá la responsabilidad de **152** proveer seguridad y protección al Gobernador de Puerto Rico y a su familia.
> (b) Además, tendrá la responsabilidad de proveer seguridad y protección al Superintendente y a su familia, durante el término de su incumbencia. Dicho servicio continuará, *una vez éste cese* en sus funciones por cuatro (4) años adicionales y podrá ser extendido previa solicitud y aprobación del Superintendente que lo sustituya. (Énfasis suplido.)[49]

El legislador estableció la protección mediante escoltas a

los ex superintendentes de la Policía. De igual manera, incluyó el procedimiento para solicitar una extensión a esa protección, siempre y cuando, demuestre justa causa y el Superintendente de turno se lo conceda. *Si el legislador hubiera tenido la intención de eliminar la protección de las escoltas a los ex gobernadores lo habría incluido, lo que no ocurrió.* La Asamblea Legislativa no entendió necesario limitarlo, así como tampoco incluirlo porque conocía y avaló la referida interpretación del Art. 3 de la misma ley, *supra.* Se limitó a expresar que el derecho de escoltas se posee dentro de la jurisdicción territorial de Puerto Rico.

En la jurisdicción federal se ha resuelto que en situaciones como la de autos se puede acudir al historial legislativo sobre proyectos de ley aunque éstos hayan sido vetados por el Presidente.[50] *En el caso ante nos, el historial legislativo del Proyecto del Senado 121 evidencia con más peso del necesario que la intención legislativa al promulgar las leyes de la Policía en el 1974 y 1996, supra, fue de continuar brindándole protección y seguridad mediante el uso de escoltas policiacas a los ex gobernadores.* Como mencionamos anteriormente, el Proyecto fue vetado por el entonces Gobernador, licenciado Acevedo Vilá, pero del historial legislativo se desprende, claramente, la deferencia a la interpretación de la agencia al Art. 3 de la Ley de la Policía, *supra,* de parte de la Asamblea Legislativa. **153**

*Por lo expuesto, nos es forzoso concluir que la Legislatura de Puerto Rico reconoció el derecho de los peticionarios a recibir el servicio de escoltas policiacas para garantizar su seguridad.*

Concluimos que la doctrina del "re-enactment" es aplicable a la presente controversia. Se le solicitó a la Legislatura de Puerto Rico revisar la práctica de proveerles seguridad mediante escoltas a los ex gobernadores cuando ésta consideró y enmendó la Ley de la Policía en el 1996 y volvió a avalar el Art. 3, *supra,* sin alterarlo de forma tal que afectara la interpretación que la Policía de Puerto Rico había realizado hasta ese momento sobre tal disposición estatutaria.[51]

Nos encontramos frente a un cuadro fáctico que permite la aplicación de la doctrina del "re-enactment"; el conocimiento legislativo sobre la protección y seguridad de los ex gobernadores de parte de la Policía de Puerto Rico mediante escoltas al promulgar las leyes de la Policía de 1974 y 1996; que tal protección fue concedida mediante la interpretación que realizó el Departamento de Policía del Art. 3 de la Ley de la Policía de 1956, *supra;* y que ésta ha sido avalada por el referido Poder Legislativo consecuentemente durante más de cuatro décadas.[52]

El Tribunal de Apelaciones entendió que no existe derecho de escoltas para la protección y seguridad de los ex gobernadores. Acudió a la Ley Núm. 2 de 26 de marzo

de **\*154** 1965.[53] El que este estatuto no dispusiera expresamente sobre el servicio de protección y seguridad mediante escoltas para los ex gobernadores no es razón para creer que la intención legislativa fue rechazar tal servicio ofrecido por la Policía de Puerto Rico. Cuando se aprobó la Ley Núm. 2 el ex Gobernador de Puerto Rico, señor Muñoz Marín, ya disfrutaba de tal derecho. No existía una necesidad de legislar para proveer protección y seguridad a los ex gobernadores. La Legislatura avaló por espacio de cuatro décadas lo actuado por la Policía de Puerto Rico sobre tal asunto.

La doctrina del "re-enactment" es compatible con nuestras expresiones en *Román v. Superintendente de la Policía*, supra. Por ello y por todo lo expuesto, la referida doctrina aplica al presente caso.

*Nada de lo aquí pautado limita el poder de la Legislatura de Puerto Rico para regular el referido derecho protegido o eliminar el derecho de seguridad y protección de los futuros ex gobernadores de manera prospectiva.* De igual forma, cualquier ex gobernador que entienda que la protección brindada mediante escoltas le es innecesaria puede renunciar voluntaria y expresamente a tal derecho. Finalmente, por encontrarnos ante un asunto *normativo* y de alto interés público, aprovechamos la ocasión para distinguir la presente controversia de lo pautado en *Crespo Quiñones v. Santiago Velázquez*, 176 D.P.R. 408 (2009). En el presente caso, al igual que en *Suárez Cáceres v. Com. Estatal Elecciones*, 176 D.P.R. 31 (2009), tenemos toda la controversia ante nos, tanto sustantiva como procesal. Por ello, al resolver la controversia de marras y disponer lo que en Derecho procede, no alteramos en forma alguna la normativa establecida en *Crespo Quiñones v. Santiago Velázquez*, supra. En éste la controversia trataba sobre un asunto estrictamente procesal de carácter jurisdiccional, a diferencia del presente **\*155** recurso, el cual trata sobre cuestiones procesales así como sustantivas. En *Crespo Quiñones v. Santiago Velázquez*, supra, el Tribunal de Apelaciones se limitó a reseñar la falta de jurisdicción por cuestiones procesales.[54] En el caso ante nos no ocurrió lo mismo. A pesar de que el foro apelativo intermedio determinó en su sentencia que no tenía jurisdicción para resolver el asunto, entró a discutir los méritos del recurso, tanto sustantivos como procesales y el expediente del caso por estar completo nos permite resolver la controversia, a diferencia de lo ocurrido en *Crespo Quiñones v. Santiago Velázquez*, supra.[55] Como hemos expresado previamente, este Tribunal entiende que el Tribunal de Apelaciones tenía jurisdicción en la presente controversia. No obstante, las partes nos han puesto en posición de resolver el asunto planteado a diferencia **\*156** del caso *Crespo Quiñones v. Santiago*

*Velázquez*, supra.[56]

*No existe duda alguna que en Crespo Quiñones v. Santiago Velázquez*, supra, *la controversia estaba revestida de un alto interés público, como lo es el bienestar de los menores de edad. A diferencia de la presente controversia, en Crespo Quiñones v. Santiago Velázquez*, supra, *no nos encontrábamos en condiciones de pautar norma.* Es conocido dentro de nuestro ordenamiento jurídico que en controversias donde estén involucrados menores de edad los tribunales de justicia deben de procurar salvaguardar los mejores intereses de éstos. La referida norma fue pautada hace décadas y tiene un fuerte arraigo dentro de nuestro sistema de justicia. La normativa hoy pautada no atenta, en forma alguna contra los intereses de los menores.

## VII

Por todo lo expuesto, *revocamos la sentencia emitida por el Tribunal de Apelaciones. Concluimos que la actuación del entonces Superintendente de la Policía no era discrecional. Ello es así porque afecta directa y sustancialmente un derecho adquirido que se encontraba ya en el patrimonio de los peticionarios y, por ende, protegido por nuestro ordenamiento jurídico constitucional.*
*Se dictará sentencia de conformidad.* **\*157**

El Juez Asociado Señor Kolthoff Caraballo emitió una opinión de conformidad. El Juez Presidente Señor Hernández Denton emitió una opinión disidente, a la cual se unió la Jueza Asociada Señora Fiol Matta. La Juez Asociada Señora Rodríguez Rodríguez se inhibió.

## --O--

Opinión de conformidad emitida por el Juez Asociado Señor Kolthoff Caraballo.

Endoso en su totalidad la opinión que emite la mayoría de este Tribunal en el día de hoy. Aun así, me veo precisado a emitir este conciso voto de conformidad porque discierno que el resultado que en este día arroja nuestra decisión satisface, además del derecho y la justicia, una necesidad que emana de nuestro sentido de responsabilidad ante la realidad que implica nuestra idiosincrasia como Pueblo.

Como en todo país realmente democrático, nuestros gobernantes, pasados y presentes, han sido o continúan

siendo nuestros líderes políticos. Personas que, en mayor o menor grado, representan una ideología política o que son emblemáticos de alguno de los partidos que ostenta o ha ostentado una franquicia electoral. Aunque Puerto Rico, gracias a Dios, no es un Pueblo inmanentemente violento, la realidad es que *sí somos un pueblo extremadamente apasionado en lo referente a nuestros ideales políticos o la política partidista. En muchas ocasiones tal pasión se excita o despabila, a favor o contra, en función de la mera mención, imagen o presencia de aquellos que son los líderes o iconos de las distintas fórmulas de estatus o facciones partidistas.* Entre tales líderes, como ya mencioné, se encuentran principalmente nuestros pasados gobernantes.

Obviar esta realidad es negar lo innegable, desconocer nuestra idiosincrasia como Pueblo o, simplemente, no haber experimentado lo que es el ambiente en un año electoral *158 en nuestra Isla, así como lo que han sido nuestras campañas o procesos políticos en los últimos cincuenta años. *Y pensar que tal pasión, frustración o descontento por cualquier pasada actuación de nuestros ex gobernantes, no sería capaz de manifestarse en la forma de una agresión física por parte de cualquier paisano, sería sin duda confundir lo poco probable con lo imposible.*

Ahora bien, ante la realidad de un Pueblo no violento como el nuestro, ciertamente cabe pensar que es poco probable que ocurra un atentado contra la vida o la seguridad de alguno de nuestros ex gobernadores o la ex gobernadora. Pero, entonces, cabe también preguntarnos: ¿si se realizaran hoy los mismos análisis periciales que se realizaron en el año 1965 y que reflejaron la necesidad de escolta para el ex gobernador Luis Muñoz Marín, éstos reflejarían que hay menos probabilidad de que en la actualidad uno de nuestros ex gobernantes sufra un atentado contra su vida o su seguridad?

No sabemos con certeza la contestación a tal interrogante.[1] Sin embargo, los que vivimos en el Puerto Rico de hoy, juzguemos si la atmósfera política y la forma en que socializamos es menos violenta que la que vivimos o vivieron nuestros padres en la década de los años sesenta. *Mas, si así fuera, si concluyéramos que un atentado criminal contra la vida de uno de nuestros ex gobernantes es hoy menos probable, tal premisa, de por sí, admite de todos modos la variable de lo posible.*

Lo *posible*, según lo define el diccionario de la Real Academia Española, es algo "que puede suceder, que se puede ejecutar".[2] De manera que, según definimos los conceptos, un atentado contra la vida o la seguridad de uno de nuestros ex gobernantes "puede suceder", "se puede *159 ejecutar". Entonces la pregunta que huelga es:

¿debemos aspirar a reducir tal riesgo? Y más aún, ¿entendemos las consecuencias que acarrea para la psiquis colectiva de nuestro Pueblo la pérdida violenta, a causa de un atentado criminal, de cualquiera de nuestros ex gobernantes?

Como señala la opinión mayoritaria, nuestras Asambleas Legislativas han reconocido que la seguridad de los ex gobernadores de Puerto Rico es un asunto de alto interés público, aprobando una partida para sufragar la protección de éstos, en cada presupuesto, por más de cuarenta años. Por otro lado y como también señala la opinión mayoritaria, el pasado Superintendente de la Policía, Lcdo. Pedro Toledo Dávila, reconoció que el gasto por el uso de escoltas era mínimo y su eliminación no representaría una economía significativa en las arcas públicas.

La realidad del gasto relativamente mínimo al erario que presupone el mantenimiento de esas escoltas, *vis-à-vis* la reducción del riesgo de posibles daños a la persona de uno de estos líderes, nos debe guiar a preguntarnos, sin hesitación alguna: ¿vale la pena el gasto? O, visto de otra forma y ante lo mucho que está en riesgo: ¿tenemos realmente otra opción? Me parece que no.

## --O--

Opinión disidente emitida por el Juez Presidente Señor Hernández Denton, a la cual se une la Jueza Asociada Señora Fiol Matta.

El reclamo sobre el derecho a escoltas policiacas instado por los ex gobernadores Rafael Hernández Colón y Carlos Romero Barceló, quienes por años ocuparon el más alto cargo en el servicio público de nuestro país, es, sin duda, uno que debe dilucidarse en los tribunales. Ello no supone, sin embargo, que la intervención judicial pueda hacerse a base de un lacónico expediente ni, mucho menos, mediante *160 un recurso de revisión administrativa ante el Tribunal de Apelaciones o ante este Tribunal, contra una prohibición clara de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.) que expresamente excluye a las órdenes ejecutivas y a la Oficina del Gobernador del alcance de sus disposiciones sobre revisión judicial.

Como la opinión que hoy emite una mayoría de este Tribunal hace precisamente eso, nos vemos obligados a disentir. Contrario al razonamiento de la mayoría, entendemos que la acción que realmente afectó a los ex

Gobernadores fue la orden ejecutiva emitida por el entonces gobernador Aníbal Acevedo Vilá, la cual por mandato expreso de la L.P.A.U. está excluida de las disposiciones de dicho estatuto.

Aún así, la acción que impugnan los ex Gobernadores no puede estar inmune a la revisión judicial, pues ello equivaldría a otorgarle nuestro aval a un régimen de gobierno por decreto y a privar de un remedio a los ciudadanos que se vean afectados por éste. Por lo tanto, resolveríamos que el procedimiento jurídicamente correcto para dirimir la disputa objeto de este caso es el mecanismo de sentencia declaratoria, no el recurso de revisión administrativa, y remitiríamos el asunto al Tribunal de Primera Instancia.

# I

La controversia del presente caso se originó el 17 de mayo de 2006, cuando el entonces gobernador Aníbal Acevedo Vilá súbitamente cursó una misiva al Superintendente de la Policía, Lcdo. Pedro Toledo Dávila, para ordenar la reducción y eventual suspensión del servicio de escoltas que se le proveía a los ex Gobernadores. En su decreto, el gobernador Acevedo Vilá expresó lo siguiente:

> En el caso de los ex-Gobernadores, deberá quedar reducido a la mitad el personal que presta servicio de escolta para ellos **\*161** efectivo el 31 de agosto de 2006, y suspendido en su totalidad para el 31 de diciembre de 2006. No obstante, quedará coordinado un plan de rondas preventivas con la Policía de Puerto Rico que provea seguridad a las residencias y oficinas de estos ex funcionarios que han brindado el más alto servicio público a nuestro País. Apéndice de la Petición de *certiorari*, Caso Núm. 07-347, pág. 135.

Tras enterarse de que el servicio de protección de escoltas les sería suspendido, los ex gobernadores Hernández Colón y Romero Barceló enviaron sendas comunicaciones escritas al Superintendente para cuestionarle dicha determinación, pues, a su juicio, tenían un derecho

adquirido sobre el referido servicio. Específicamente, el representante legal del ex gobernador Hernández Colón cursó una carta al licenciado Toledo Dávila en la cual le solicitó que dejara sin efecto "*la Orden para privar de la seguridad y protección que le brinda la Policía de Puerto Rico a los ex Gobernadores*". (Énfasis suplido.) Apéndice de la Petición de *certiorari*, Caso Núm. CC-07-347, pág. 137. En la alternativa, solicitó que se le proveyera una audiencia y que no se redujera el servicio de escoltas hasta tanto se cumplieran con las garantías del debido proceso de ley.

En respuesta a dicha comunicación, el licenciado Toledo Dávila suscribió una carta en la que indicó que el servicio de escolta al ex gobernador Hernández Colón sería suspendido en su totalidad efectivo el 31 de diciembre de 2006. Ello, señaló el Superintendente, "a tenor con el Memorando emitido el diecisiete (17) de mayo de 2006, mediante el cual el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Aníbal Acevedo Vilá, *ordenó que a dicha fecha debe quedar suspendido el servicio de escolta a todos los ex Gobernadores ...*". (Énfasis suplido.) Aparte de esa aseveración, la única expresión adicional del Superintendente en la referida carta fue hacer constar los periodos de tiempo en que el ex gobernador Hernández Colón disfrutó del servicio de escoltas, conforme a una solicitud que el **\*162** representante legal del ex mandatario le hizo a tales efectos.[1]

Por otra parte, el representante legal del ex gobernador Romero Barceló envió una comunicación al Superintendente, en la cual solicitó remedios iguales a los que había requerido el ex gobernador Hernández Colón. Entre éstos, pidió que se dejara sin efecto "*la Orden emitida mediante comunicación del 17 de mayo de 2006*". (Énfasis suplido.) Apéndice de la Solicitud de *certiorari*, Caso Núm. CC-07-356, pág. 119. A esta petición, el licenciado Toledo Dávila respondió: "Sobre el particular, *me circunscribo a informarle lo siguiente: que efectivo el treinta y uno (31) de diciembre de 2006, le será suspendido en su totalidad, el servicio de escolta.*" (Énfasis suplido.) *Íd.*, pág. 121. Al igual que en la carta dirigida al ex Gobernador Hernández Colón, el Superintendente *expuso que ello respondía a la directriz de 17 de mayo de 2006 del entonces Gobernador.*

Ante esta negativa a celebrar una vista, los ex mandatarios acudieron al Tribunal de Apelaciones mediante sendos recursos de revisión administrativa. En esencia, ambos alegaron que el Superintendente erró al negarles su petición para que se les continuara brindando el servicio de escoltas y al no reconocer que tenían un derecho adquirido sobre dicha protección. En sus respectivos recursos de revisión, ambos ex Gobernadores señalaron que el licenciado Toledo Dávila ordenó a la Unidad de

Seguridad y Protección de la Policía el cese del servicio de escoltas en las fechas y maneras indicadas por el gobernador Acevedo Vilá. *Reconocieron, además, que la actuación del Superintendente se hizo al amparo y en ejecución de una orden de* **\*163** *Primer Ejecutivo, y adujeron que ésta les privó de un derecho adquirido sin cumplir con el debido proceso de ley.*

Por su parte, el Procurador General presentó una moción de desestimación en la que alegó que el tribunal apelativo carecía de jurisdicción pues, según expuso, la decisión del Superintendente no se basó en el ejercicio de sus facultades administrativas, *sino en el cumplimiento de una orden ejecutiva del Gobernador.* Ambos ex Gobernadores se opusieron a la moción del Procurador General y adujeron que la directriz del gobernador Acevedo Vilá no constituyó una orden ejecutiva debido a que no se cumplió con las formalidades y el procedimiento que de costumbre se sigue para aprobar dichas órdenes.

Entretanto, en diciembre de 2006, el gobernador Acevedo Vilá vetó el Proyecto del Senado 121 de 2 de enero de 2005 (P. del S. 121), cuyo objetivo era, precisamente, enmendar el Art. 30 de la Ley de la Policía, 25 L.P.R.A. sec. 3129, para regular lo concerniente al servicio de escoltas de los ex Gobernadores.[2] En lo pertinente, dicho proyecto establecía que todo Gobernador que hubiese juramentado a su cargo luego del 2 de enero de 2009 tendría derecho a servicios de seguridad y protección durante los diez años siguientes al término de su incumbencia. Transcurrido ese **\*164** periodo, el servicio de escolta se proveería previa solicitud al Gobernador, quien debía contar con una recomendación del Superintendente sobre si se justificaba la concesión de la referida protección.

Sin embargo, respecto a aquellos ex Gobernadores que hubiesen ocupado el cargo antes del 1 de enero de 2009, el proyecto establecía que éstos continuarían recibiendo el servicio de escolta por un término vitalicio. Según se desprende de la exposición de motivos del proyecto, ello respondía a que dichos ex Gobernadores tenían "un derecho por uso y costumbre", por lo que "[e]l negarle esos servicios de seguridad y protección que desde el primer gobernador electo se les ha brindado a todos, equivaldría a despojar a los ex Gobernadores de un derecho adquirido". Exposición de Motivos, P. del S. 121, pág. 2. Cabe señalar que de la referida exposición de motivos surge que se tomó en cuenta, además, que "la eliminación o reducción de las escoltas no generaría los ahorros que originalmente se habían contemplado ...". Íd. No obstante, dicha medida nunca se convirtió en ley.

Luego de otros trámites, el Tribunal de Apelaciones desestimó ambos recursos de revisión por falta de jurisdicción, tras concluir que la acción administrativa no fue producto de un procedimiento adjudicativo. Específicamente, dicho foro entendió que la acción del Superintendente está enmarcada en la discreción de la Policía, *por lo que no es revisable judicialmente.*

Ambos ex Gobernadores acudieron ante nos mediante sendas peticiones de *certiorari.* El ex gobernador Romero Barceló alegó que el foro apelativo erró al desestimar su recurso, mientras que el ex mandatario Hernández Colón esbozó varios señalamientos de error, entre ellos que el tribunal apelativo erró al resolver que la decisión del Superintendente era discrecional y no podía ser revisada por los tribunales. Por otro lado, el Procurador General ha reiterado en su alegato ante este Foro su argumento de que la **\*165** controversia no es revisable mediante el recurso de revisión administrativa.

En este contexto, hoy una mayoría del Tribunal resuelve que el recurso de revisión administrativa era el único que los peticionarios tenían disponible para esgrimir sus planteamientos. Al así proceder, *la mayoría pasa por alto que la acción que los ex mandatarios realmente cuestionan es la orden del entonces gobernador Acevedo Vilá, lo que, como veremos, excede los parámetros claros de revisión judicial preceptuados en la L.P.A.U.*

## II

Al evaluar el caso ante nuestra consideración, reconocemos que la reclamación de los ex gobernadores Hernández Colón y Romero Barceló, quienes luego de culminar sus funciones como Primeros Ejecutivos han permanecido activos en el quehacer público de nuestro país, y quienes tras concluir sus términos han recibido el servicio de escoltas, es de interés público, por lo que debe dilucidarse con premura por el Foro Judicial. No obstante, la letra clara de las disposiciones aplicables de la L.P.A.U. nos obliga a discrepar del curso de acción seguido por la mayoría del Tribunal.

La Sec. 4.2 de la L.P.A.U., que regula lo referente a la revisión judicial de las decisiones administrativas, limita dicha revisión a las órdenes o resoluciones finales de las agencias. 3 L.P.R.A. sec. 2172. Véase, además, el Art. 4.006 de la Ley de la Judicatura, 4 L.P.R.A. sec. 24y(c). Para determinar si un asunto es revisable por la vía administrativa debemos acudir entonces a la Sec. 1.3 del estatuto, la cual define "orden o resolución" como "cualquier decisión o acción agencial de aplicación particular que adjudique derechos u obligaciones de una o más personas específicas, o que imponga penalidades o sanciones administrativas[,] **\*166** *excluyendo órdenes*

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)
2009 TSPR 154

*ejecutivas emitidas por el Gobernador*". (Énfasis suplido.) 3 L.P.R.A. sec. 2102(f). De esta forma, *es evidente que conforme a la letra clara de la L.P.A.U. no procede la revisión administrativa de una orden ejecutiva del Gobernador.*

Esta conclusión encuentra apoyo adicional en el inciso (a) de la Sec. 1.3 del estatuto, la cual excluye del ámbito de aplicación de la L.P.A.U. a la "Oficina del Gobernador y todas sus oficinas adscritas exceptuando aquéllas en donde se haya expresado literalmente la aplicación de las disposiciones de [la L.P.A.U.]". 3 L.P.R.A. sec. 2102(a)(3). El texto actual de dicha exclusión respondió a una enmienda introducida por la Ley Núm. 190 de 17 de agosto de 2002, ya que la versión original de la L.P.A.U. sólo contemplaba como excepción la "Oficina Propia del Gobernador". Así, el legislador quiso dejar claro el alcance de la referida excepción, tomando en cuenta que algunas de las oficinas adscritas a la Oficina del Gobernador son establecidas para ser entes facilitadores de la política pública. Véase Exposición de Motivos de la Ley Núm. 190 de 17 de agosto de 2002, (Parte 1) Leyes de Puerto Rico 825.

En el caso de autos, la acción que se pretende cuestionar fue, exactamente, una directriz del ex gobernador Acevedo Vilá, en la cual éste le ordenó al entonces Superintendente que redujera y, eventualmente, suspendiera en su totalidad las escoltas provistas a los ex Gobernadores, lo que incluyó a los peticionarios. En las misivas cursadas al licenciado Toledo Dávila, los ex gobernadores Romero Barceló y Hernández Colón solicitaron que se dejara sin efecto dicha orden. Además, en los recursos de revisión administrativa presentados por los ex mandatarios ante el Tribunal de Apelaciones éstos reconocieron que la actuación del Superintendente obedeció a la orden del Gobernador. En efecto, en sus respectivas respuestas a las cartas enviadas por los representantes legales de los ex Gobernadores, el **\*167** licenciado Toledo Dávila se limitó a expresar que la cancelación del servicio de escoltas respondía a la orden del Primer Ejecutivo.

Lo anterior apunta a que el decreto impugnado constituyó una orden ejecutiva que, como hemos indicado, *se encuentra fuera del alcance de la L.P.A.U.* Si bien no existen parámetros constitucionales o estatutarios que regulen específicamente el poder del Gobernador para emitir órdenes ejecutivas, éstas se han definido como un "mandato que el primer ejecutivo da a los componentes de la rama ejecutiva". W. Vázquez Irizarry, *Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 (Núm. 4) Rev. Jur. U.P.R. 951, 953 (2007). Usualmente, la orden ejecutiva se dirige a la persona, agencia o entidad concernida para que proceda conforme

con la directriz expresada en ésta. G. Igartúa de la Rosa, *Aspectos legales: Promulgaciones de órdenes ejecutivas y proclamas por el Gobernador de Puerto Rico*, 21 Rev. Der. P.R. 271, 273 (1982); Op. Sec. Just. Núm. 5 de 27 de febrero de 1985; Op. Sec. Just. Núm. 2 de 6 de febrero de 1968.

Se trata de un mecanismo cuyo origen, al igual que en la jurisdicción federal, lo encontramos en la práctica. J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pág. 257. Éste es consustancial con las facultades del Gobernador como autoridad máxima del Poder Ejecutivo. Claro está, dichas órdenes no pueden ser contrarias a la Constitución ni a las leyes. *Soto v. Adm. Inst. Juveniles*, 148 D.P.R. 810, 826 (1999).

Conforme a lo anterior, aunque de ordinario las órdenes ejecutivas se emiten a través de un documento formal, ello no constituye un requisito de ley. Vázquez Irizarry, *supra*, págs. 953 y 1020. En este sentido, las formalidades y atributos propios de las órdenes ejecutivas son producto de un uso y costumbre, plasmado precisamente en una orden ejecutiva **\*168** promulgada el 29 de enero de 1990.[3] Íd., págs. 953 y 1022–1023. De ahí que sea la naturaleza o sustancia de la directriz, no su forma, lo determinante al considerar si nos encontramos ante un mandato del Primer Ejecutivo. Íd., pág. 1020. Véase, además, *Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order, Memorandum for the Counsel to the President*, en www.usdoj.gov/olc/predirective.htm (visitado por última ocasión el 28 de septiembre de 2009).

En el caso de autos, el gobernador Acevedo Vilá impartió una instrucción de naturaleza obligatoria al jefe de uno de los componentes de la Rama Ejecutiva, el Superintendente de la Policía. La directriz emitida por el ex Gobernador constituyó un mandato que el entonces Superintendente, como subalterno, estaba obligado a acatar. Así se desprende de las cartas que el licenciado Toledo Dávila cursó a los representantes legales de los ex mandatarios, en las cuales expresó que la suspensión del servicio de escoltas obedeció a la directriz del Primer Ejecutivo. Tratándose de una orden a un subordinado, su incumplimiento hubiese acarreado consecuencias disciplinarias. Véanse: *Shapp v. Butera*, 348 A.2d 910, 913 (1975); Nota, *Gubernatorial Executive Orders as Devices for Administrative Direction and Control*, 50 (Núm. 1) Iowa L. Rev. 78 (1964). Ello cobra particular importancia en el caso del Superintendente, pues la propia Ley de la Policía preceptúa que el Gobernador ejercerá la "autoridad suprema" sobre dicho organismo. 25 L.P.R.A. sec. 3103.

Ante tales circunstancias, consideramos que le asiste la

razón al Procurador General. *Por mandato expreso de la L.P.A.U., no procede la revisión administrativa de la determinación del ex Gobernador.*

*No obstante, dicha conclusión categórica no coloca la actuación* **\*169** *del ex gobernador Acevedo Vilá fuera del alcance de los foros judiciales.* Por tratarse de un proceder unilateral de parte del entonces Primer Ejecutivo, que tuvo un efecto real y palpable sobre los peticionarios que, según alegan, podría colocar en riesgo sus vidas, su orden no puede escapar de la revisión judicial. Lo contrario implicaría avalar un régimen de gobierno por decreto ejecutivo que se podría prestar para actuaciones arbitrarias, en detrimento de los intereses y derechos de los ciudadanos.

Conforme a lo anterior, entendemos que el procedimiento jurídicamente correcto para dilucidar la controversia ante nos es el mecanismo de sentencia declaratoria. Éste le permite al foro de instancia declarar "derechos, estados y otras relaciones jurídicas". 32 L.P.R.A. Ap. III, R. 59.1.L.P.R.A. Ap. III, R. 59.1. Hemos resuelto que el referido vehículo procesal es adecuado para determinar el alcance e interpretación de un estatuto y para dirimir una controversia en la que se presenten planteamientos constitucionales. *Asoc. de Periodistas v. González*, 127 D.P.R. 704, 723–724 (1991); *P.P.D. v. Gobernador*, 111 D.P.R. 8, 13 (1981).

El procedimiento de sentencia declaratoria ofrece a las partes amplias garantías y oportunidades para que presenten prueba en apoyo de sus posiciones. *Moscoso v. Rivera*, 76 D.P.R. 481, 495 (1954). Véase 32 L.P.R.A. Ap. III, R. 59.5.L.P.R.A. Ap. III, R. 59.5. En el caso de autos, precisamente, entendemos que era necesario remitir el asunto al foro de instancia para que se le proveyera dicha oportunidad a los peticionarios, de manera que pudieran sustentar su alegación de que tienen un derecho adquirido sobre el servicio de protección de escoltas policíacas por el transcurso del tiempo, o de acuerdo con lo dispuesto en el Art. 30 de la Ley de la Policía, *supra*. Además, podrían demostrar las circunstancias particulares de cada uno para justificar la necesidad de la protección policíaca que solicitan. Por no haberse hecho así, el expediente ante nuestra consideración está desprovisto de elementos que le permitan a este Tribunal formular **\*170** un juicio adecuado sobre la controversia.[4] En este sentido, el Tribunal de Apelaciones debió remitir el caso al foro de instancia para que ambas partes presentaran prueba que tienda a demostrar la existencia o inexistencia del alegado derecho adquirido.

Desafortunadamente, la decisión que hoy toma la mayoría del Tribunal no toma estos asuntos en consideración. De hecho, los peticionarios nunca tuvieron la oportunidad de probar que las actuaciones del entonces Superintendente y de sus predecesores crearon un estado de derecho más allá del privilegio a recibir protección mediante las escoltas. Incluso, el Tribunal resuelve que cada una de las misivas cursadas por el Superintendente a los representantes legales de los ex Gobernadores constituye una orden o resolución final revisable ante el Tribunal de Apelaciones. Sin embargo, dichas cartas no contienen determinaciones de hechos y conclusiones de derecho, ni advierten sobre la disponibilidad de algún recurso de reconsideración o revisión. Tampoco son producto de un procedimiento adjudicativo. 3 L.P.R.A. sec. 2164.

### III

Por otro lado, quisiéramos hacer constar una razón adicional que nos lleva a discrepar de la metodología que emplea la opinión del Tribunal para atender la controversia del caso de autos. El fundamento principal en que se ampara la mayoría del Tribunal para concluir que los ex gobernadores Hernández Colón y Romero Barceló tienen derecho a las escoltas policíacas es la llamada doctrina del **\*171** "re-enactment", la cual es de dudosa aplicación a las circunstancias de este caso.

Específicamente, el razonamiento de la mayoría consiste en que: primero, por décadas la Policía le ha ofrecido a los ex Gobernadores el servicio de escoltas a base de su interpretación del Art. 3 de la Ley de la Policía, 25 L.P.R.A. sec. 3102; segundo, que el legislador siempre ha conocido la práctica de la Policía, y tercero, que el legislador, aunque ha enmendado la Ley de la Policía, no ha prohibido dicha práctica, por lo que debemos entender que ha consentido a ésta. *En otras palabras, la mayoría parte de una premisa fundamental, pero inarticulada, que no debe pasar desapercibida: el silencio del legislador es fuente de Derecho en nuestro país.*

Esta teoría, como poco, nos parece un contrasentido. No vemos cómo el dejar de legislar puede implicar precisamente lo contrario, es decir, que se ha legislado. Peor aún, si descifrar la intención del Poder Legislativo ha sido en ocasiones un ejercicio complejo en casos en que esa rama de gobierno ha ejercido su facultad constitucional, resultaría imposible e impermisible interpretar dicha intención cuando no lo ha hecho. Véase L.H. Tribe, *Constitutional Choices*, Cambridge y Londres, Harvard University Press, 1985, pág. 31.

En este caso, la mayoría se ampara en un pasaje de *Román v. Superintendente de la Policía*, 93 D.P.R. 685 (1966), para sugerir que la doctrina del "re-enactment" ha sido adoptada por este Tribunal. No obstante, basta con

examinar la opinión del Tribunal emitida en esa ocasión para concluir que el texto citado en la decisión que hoy avala la mayoría constituye un mero *dictum*. En *Román v. Superintendente de la Policía*, supra, este Foro resolvió que conforme a la *letra clara* de la ley allí en controversia procedía otorgar cierto beneficio a los veteranos. Aunque lo anterior era suficiente para disponer del caso, el Tribunal expresó que *en el supuesto* de que "estuviéramos ante un **\*172** estatuto de dudoso texto que demandara interpretación", como el legislador al enmendarlo no había alterado o repudiado la interpretación administrativa de la disposición específica, debía entenderse que la había sancionado. Íd., pág. 690. Adviértase que en ese caso el fundamento que llevó al Tribunal a resolver la controversia fue la letra clara de la ley. No creemos que las expresiones del Tribunal a modo de *obiter dictum*, que no constituyeron el fundamento de este Foro para disponer del caso en aquella ocasión, sean suficientes para concluir que anteriormente hemos avalado la doctrina del "re-enactment".

Por otra parte, nos parece desatinada la conclusión de la mayoría a los efectos de que el historial legislativo del P. del S. 121, el cual fue vetado por el Primer Ejecutivo, revela que el legislador estatuyó, con su consentimiento implícito a una práctica administrativa que se llevó a cabo por décadas, un derecho vitalicio a escoltas para los ex Gobernadores. Tal ejercicio de interpretación, además de constituir un análisis de la intención legislativa de un proyecto que nunca se convirtió en ley, nos parece un intento fútil de adivinar lo que hubo en la mente de los miembros de la Asamblea Legislativa. Realmente, no tenemos manera de interpretar el silencio legislativo en este caso.

Muestra clara de lo anterior es que actualmente hay un Proyecto del Senado — el P. del S. 329 de 2 de febrero de 2009— que parece ir en dirección opuesta a la intención legislativa del P. del S. 121 y a lo que hoy resuelve la mayoría del Tribunal. El P. del S. 329, al igual que el P. del S. 121, fue presentado por la Hon. Senadora Norma Burgos Andújar y persigue enmendar el Art. 30 de la Ley de la Policía, *supra*, para establecer la naturaleza y extensión del servicio de escolta. Sin embargo, a diferencia del P. del S. 121, el proyecto actual no reconoce expresamente a los ex Gobernadores como acreedores del servicio de escoltas. Más bien, parece agrupar a todos los ex funcionarios en un solo artículo que requiere previa autorización del Gobernador, **\*173** en consideración a una recomendación del Superintendente, para proveer el referido servicio.

Según surge de la exposición de motivos del P. del S. 329, lo que lo motivó fue "el uso de cifras millonarias para servicios de escolta y la falta de normas más específicas y

prudentes que rijan su uso". Exposición de Motivos, P. del S. 329, pág. 2. Evidentemente, lo anterior contradice gravemente el aparente consentimiento implícito legislativo en el que descansa la mayoría del Tribunal y pone en tela de juicio la aplicación de la teoría de "re-enactment" al caso de autos.

Esta práctica también resulta nociva a nuestro sistema democrático de gobierno en la medida en que despoja a la ciudadanía de la confiabilidad y certeza que ofrece un estado de derecho plasmado en las leyes aprobadas por los otros poderes del Estado. En este sentido, resultan muy significativas las palabras del profesor Tribe:

> Cuando el conjunto de poderes del Ejecutivo, de la Rama Judicial o de los estados respecto a determinado asunto sólo puede ser transformado por aprobación o desaprobación del Congreso, entonces es esencial que esa aprobación o desaprobación tome la forma de legislación hecha a través de los procedimientos formales de votación bicameral y presentación al Presidente, conforme al Artículo I [de la Constitución de los Estados Unidos]. *Dado que el Congreso no puede legislar mediante la movida informal de dejar señales y pistas, los tribunales no deben tratar esas señales y pistas como si expresaran la intención del Congreso o como si constituyeran la ley; hacerlo es rehuir responsabilidad, en vez de asumirla, distorsionando nuestro sistema constitucional para la aprobación de las leyes.* (Cita omitida, y traducción y énfasis nuestros.) L.H. Tribe, *American Constitutional Law*, 3ra ed., Nueva York, Ed. Foundation Press, 2000, Vol. 1, pág. 205.

En fin, discrepamos de la teoría adoptada por la mayoría del Tribunal al conferirle autoridad interpretativa al silencio del legislador. Más aún cuando en este caso el legislador se ha expresado sobre el asunto al aprobar el Art. 30 de la Ley de la Policía, *supra*. A nuestro juicio, una de las controversias que debió dilucidarse mediante el procedimiento **\*174** de sentencia declaratoria es,

justamente, si conforme a dicha disposición los peticionarios tenían derecho al servicio de escoltas o si éste ha sido más bien un privilegio concedido a los peticionarios.

## IV

A modo de epílogo, debemos llamar la atención a un asunto procesal que surge a raíz del reciente precedente de *Crespo Quiñones v. Santiago Velázquez, 176 D.P.R. 408 (2009)*. En esa ocasión, la Sra. Arlene Santiago Velázquez, quien tenía la custodia de sus hijas luego de su divorcio del Dr. Oscar Crespo Quiñones, fue demandada por su ex esposo mediante un procedimiento de desahucio. Paralelamente, la señora Santiago Velázquez presentó ante el foro de instancia una petición de hogar seguro sobre el mismo bien inmueble involucrado en la acción de desahucio. Tras apelar la sentencia del tribunal de instancia que ordenó su lanzamiento y pendiente aún la petición de hogar seguro, el Tribunal de Apelaciones desestimó el recurso de la señora Santiago Velázquez porque ésta no prestó la fianza requerida por ley para su apelación. La señora Santiago Velázquez recurrió ante nos y, entre otras cosas, cuestionó la improcedencia del procedimiento sumario de desahucio en vista de su petición de hogar seguro. Ello, a nuestro juicio, requería que este Tribunal se expresara sobre la incompatibilidad del procedimiento sumario de una acción de desahucio con una reclamación paralela de hogar seguro sobre el mismo bien inmueble.

Ante esos hechos, sin embargo, una mayoría de este Tribunal se negó a atender los méritos de la referida controversia. Más bien, de acuerdo con un presunto mandato legislativo, pautó de forma diáfana que "[c]uando determinemos que el Tribunal de Apelaciones *sí tenía jurisdicción para atender el recurso, procede devolverlo a ese foro intermedio para que resuelva los méritos de la controversia* **\*175** *entre las partes*". (Énfasis suplido.) *Crespo Quiñones v. Santiago Velázquez*, supra, pág. 411. Precisamente, en el presente caso, el foro apelativo desestimó los recursos tras determinar que carecía de jurisdicción, ya que a su juicio el asunto correspondía a la discreción del Superintendente. No obstante, contrario a la norma pautada en *Crespo Quiñones*, la Opinión del Tribunal concluye que el Tribunal de Apelaciones tenía jurisdicción sobre el caso pero, en vez de devolver a dicho foro —como se hizo en el referido precedente— opta por resolverlo en sus méritos.

Enfrentada a esa realidad, la mayoría se ha visto obligada a intentar distinguir lo resuelto en dicho precedente del caso de autos. En ese intento, expone que en este caso, a diferencia de *Crespo Quiñones*, estamos ante un "asunto normativo y de alto interés público". Sin embargo, como hemos indicado, en *Crespo Quiñones* este Foro tuvo ante sí la controversia sobre la incompatibilidad entre un procedimiento sumario de desahucio —que afectaría a las hijas menores de edad del propio demandante— y una reclamación de hogar seguro, cuestión que evidentemente entrañaba consideraciones de interés público y ameritaba nuestra intervención. Por ello, la "distinción" que se esboza en la Opinión del Tribunal no resulta a todas luces improcedente y, sobre todo, preocupante, pues parece sugerir que lo "normativo" y el "interés público" son conceptos en extremo maleables, cuya aplicación dependerá de los casos particulares que estén ante la consideración del Tribunal.

Por otro lado, la mayoría sostiene que en el caso de autos, a diferencia de *Crespo Quiñones*, el foro apelativo atendió los méritos de la controversia a pesar de que se declaró sin jurisdicción. En virtud de lo anterior, existe ahora una excepción a la norma pautada hace apenas dos meses: si el Tribunal de Apelaciones resuelve que no tiene jurisdicción, pero de todos modos se pronuncia sobre los méritos de la controversia, entonces este Tribunal puede atender el asunto. En otras palabras, en estos casos la autoridad decisoria **\*176** de este Foro entra en vigor en virtud de los pronunciamientos emitidos sin jurisdicción por el foro apelativo, o sea, en virtud de dictámenes ineficaces.

No cabe duda, a nuestro juicio, de que en su afán por preservar la norma pautada en *Crespo Quiñones*, la mayoría ha comenzado a diseñar excepciones que modifican las reglas básicas sobre jurisdicción que rigen en nuestro ordenamiento y que crean confusión entre la comunidad jurídica.

## V

En vista de todo lo anterior, disentimos del curso de acción que sigue la mayoría del Tribunal en el caso de autos. Conforme a la letra clara de la L.P.A.U., el asunto no es revisable por la vía de un recurso de revisión administrativa ante el Tribunal de Apelaciones ni ante esta Curia. Por ello, contrario al criterio mayoritario, revocaríamos al Tribunal de Apelaciones pero remitiríamos el asunto al tribunal de instancia para que dilucidara con carácter prioritario los méritos de la controversia, conforme al mecanismo de la sentencia declaratoria. De esta manera, los peticionarios hubiesen tenido la oportunidad de tener su día en corte para probar que tienen un derecho a continuar recibiendo el servicio

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

de escolta de la Policía, que han tenido desde que cesaron
en sus funciones, y que fueron privados de dicho interés
sin oportunidad de ser oídos.

**Footnotes**

1       25 L.P.R.A. sec. 221b (ed. 1964).

2       25 L.P.R.A. sec. 3102.

3       25 L.P.R.A. sec. 1003 (ed. 1979).

4       En la actualidad el Art. 3 de la Ley de Policía, *supra*, dispone lo siguiente:
        "Se crea en el Estado Libre Asociado de Puerto Rico un organismo civil de orden público que se denominará 'Policía
        de Puerto Rico' y cuya obligación será proteger a las personas y a la propiedad, mantener y conservar el orden
        público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir,
        investigar y perseguir el delito y, dentro de la esfera de sus atribuciones, compeler obediencia a las leyes y
        ordenanzas municipales, y reglamentos que conforme a estas se promulguen. Los miembros de la Policía estarán
        incluidos en el servicio de carrera."

5       3 L.P.R.A. sec. 2102(f).

6       El Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico paralizó el procedimiento ante su
        consideración hasta que este Tribunal se expresara.

7       *Pagán v. Alcalde Mun. de Cataño*, 143 D.P.R. 314 (1997); *Vázquez v. A.R.PE.*, 128 D.P.R. 513 (1991); *López Rivera v.
        Autoridad Fuentes Fluviales*, 89 D.P.R. 414 (1963).

8       3 L.P.R.A. sec. 2152.

9       *Constructora Celta, Inc. v. A.P.*, 155 D.P.R. 820 (2001); *Rivera Ortiz v. Mun. de Guaynabo*, 141 D.P.R. 257 (1996).

10      3 L.P.R.A. sec. 2172.

11      *Depto. Educ. v. Sindicato Puertorriqueño*, 168 D.P.R. 527 (2006).

12      Íd.

13      *Rivera v. Dir. Adm. Trib.*, 144 D.P.R. 808 (1998).

14      *Por los argumentos que expondremos a continuación no es necesario adentrarnos en el análisis sobre si la misiva
        enviada por el entonces Gobernador, licenciado Acevedo Vilá, al entonces Superintendente de la Policía, licenciado
        Toledo Dávila, cumple con los requisitos requeridos en una orden ejecutiva.*

15      3 L.P.R.A. secs. 1940–1942.

16      *Otero de Ramos v. Srio. de Hacienda*, 156 D.P.R. 876 (2002).

17      Íd.

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)
2009 TSPR 154

[18]   Op. Sec. Just. Núm. 1985-5 de 27 de febrero de 1985.

[19]   Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2009, pág. 296.

[20]   U.S.C.A. Const. Amend. XIV, Sec. 1.

[21]   *Bi-Metallic Co. v. Colorado*, 239 U.S. 441 (1915).

[22]   *United States v. Florida East Coast R. Co.*, 410 U.S. 224 (1973).

[23]   *U. Ind. Emp. A.E.P. v. A.E.P.*, 146 D.P.R. 611 (1998); *Rivera Rodríguez Co. v. Lee Stowell, etc.*, 133 D.P.R. 881 (1993).

[24]   31 L.P.R.A. sec. 7.

[25]   *Berríos v. U.P.R.*, 116 D.P.R. 88, 98 (1985).

[26]   *Sepúlveda v. Depto. de Salud*, 145 D.P.R. 560 (1998); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001 (1994).

[27]   La palabra en bastardilla fue el único cambio realizado por la Legislatura al Art. 3 de la Ley de la Policía de 1996, *supra*.

[28]   *Lorillard v. Pons*, 434 U.S. 575 (1978).

[29]   Véanse: *Solid Waste Agency of Nothern Cook Cty. v. Army Corps of Engineers*, 531 U.S. 159, 169–170 (2001); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985); *Aaron v. SEC*, 446 U.S. 680, 694 esc. 11 (1980).

[30]   Véase escs. 28–29.

[31]   *Wieslander v. Iowa Dept. of Transportation*, 596 N.W.2d 516 (Iowa 1999); *Commissioner v. Acker*, 361 U.S. 87, 93 (1959); *Bear Lake Irrigation Co. v. Garland*, 164 U.S. 1 (1896).

[32]   Véase *Bell Federal Sav. and Loan Ass'n v. C.I.R.*, 40 F.3d 224, 229 (7mo Cir. 1994).

[33]   Véase escs. 28–29.

[34]   *Alonso García v. S.L.G.*, 155 D.P.R. 91 (2001); *Martínez v. Ofic. del Gobernador*, 152 D.P.R. 586 (2000); *Pueblo v. Zayas Rodríguez*, 147 D.P.R. 530 (1999).

[35]   *Vélez v. A.R. PE.*, 167 D.P.R. 684 (2006); *Martínez v. Rosado*, 165 D.P.R. 582 (2005); *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908 (1998).

[36]   *Mun. Trujillo Alto v. Cable TV*, 132 D.P.R. 1008, 1021 (1993).

[37]   *Hartley v. Commissioner*, 295 U.S. 216 (1935); *Brewster v. Gage*, 280 U.S. 327 (1930). Para más información sobre la doctrina de "re-enactment", véanse: *Barnhart v. Walton*, 535 U.S. 212 (2002); *Young v. Community*

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

---

*Nutrition Institute*, 476 U.S. 974 (1986); *Labor Board v. Gullet Gin Co.*, 340 U.S. 361 (1951).

38    Véase *Clifton v. Heckler*, 755 F.2d. 1138 (5to Cir. 1985); *Feldpaush v. Heckler*, 763 F.2d. 229, 233 (6to Cir. 1985) (en donde el Tribunal expresó lo siguiente: "Regardless of the President's veto ... we find its legislative history instructive").

39    F. Gómez de Liaño, *Diccionario Jurídico*, Salamanca, Gráficas Cervantes, 1979, pág. 113.

40    31 L.P.R.A. sec. 3.

41    16B Am. Jur. 2d. Secs. 670–720.

42    *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101 (2006).

43    Íd., citando a M. Albaladejo, *Derecho Civil*, 11ma ed., Barcelona, Ed. Bosch, 1989, T. I, Vol. 1, pág. 204.

44    Véase esc. 43.

45    Cámara de Representantes, Segundo Informe Positivo sobre el P. del S. 121.

46    18 U.S.C.A. sec. 3056.

47    Véase esc. 46.

48    Véase escs. 2–3.

49    25 L.P.R.A. sec. 3129.

50    Véase esc. 38.

51    El entonces Senador, Sr. Miguel Hernández Agosto, en la discusión del Proyecto para la Ley de Policía de 1996, expresó su intención de discutir la partida de fondos previsiblemente necesaria para proveer el servicio de seguridad y protección policiaca. *Aunque su petición no fue avalada ni discutida, sus expresiones, nuevamente, ponen de manifiesto que la Legislatura ha tenido y tiene el conocimiento de la práctica del Departamento de Policía de proveerle escoltas a los ex gobernadores a base de su interpretación al Art. 3 de la referida ley*, supra.

52    Este Tribunal no pretende, de forma alguna, limitar el poder discrecional del Superintendente de la Policía respecto a la cantidad de efectivos asignados como escoltas a los ex gobernadores, sin considerar la situación presupuestaria que vive el país. Su limitación reside en no desnaturalizar el derecho de seguridad y protección que los ex gobernadores adquirieron a base de la interpretación del Art. 3 de la Ley de la Policía, *supra*, que realizó la Policía y que fue avalada por la Legislatura y hoy reconocido por este Tribunal.

53    3 L.P.R.A. sec. 21 *et seq.*

54    En *Crespo Quiñones v. Santiago Velázquez*, supra, determinamos que el Tribunal de Apelaciones sí tenía jurisdicción para atender la controversia. Por ello, lo procedente era devolverlo al referido foro judicial para que entrara a resolver los méritos de la controversia entre las partes. *Enfatizamos y destacamos que en aquella ocasión el único asunto que la señora Santiago presentó en su recurso se limitó a solicitar la revisión de la determinación del Tribunal de Apelaciones en la cual se desestimó el recurso de apelación por falta de jurisdicción.* Lo anterior ha sido el proceder de este Tribunal en situaciones análogas. Véanse: *Fraya v. A.C.T.*, 162 D.P.R. 182 (2004); *Pellot v. Avon*, 160

---

D.P.R. 125 (2003); *Román et als. v. Román et als.*, 158 D.P.R. 163 (2002); *Martínez v. Depto. del Trabajo*, 145 D.P.R. 588 (1988). En *Crespo Quiñones v. Santiago Velázquez*, supra, *puntualizamos que la situación es distinta cuando toda la controversia está ante nos y las partes la han argumentado.*

[55]   En *Crespo Quiñones v. Santiago Velázquez*, supra, el Tribunal de Apelaciones no discutió los méritos de la controversia de desahucio porque desestimó el recurso ante la ausencia de un requisito de umbral, la fianza, y lo que es más, las partes no argumentaron los méritos de la demanda de desahucio. Por ello, expresamos lo siguiente: "[E]l único asunto que la señora Santiago Velázquez presentó en este recurso se limita a revisar la determinación del foro apelativo en la que se desestimó el recurso de apelación por falta de jurisdicción. Según surge del expediente, los escritos de las partes se circunscriben a discutir únicamente el asunto jurisdiccional. ...
........
"[N]uestra decisión de hoy es totalmente compatible con lo resuelto en *Suárez Cáceres v. Com. Estatal de Elecciones* .... Allí teníamos ante nos toda la controversia y la resolvimos luego de que las partes la argumentaran. En cambio, en el recurso que ahora nos ocupa ... no está ante nos y las partes no han argumentado los méritos de ninguna de las ... acciones ...." *Íd.*, págs. 418-419.
Contrario a *Crespo Quiñones v. Santiago Velázquez*, supra, en el caso ante nos, tanto el Tribunal de Apelaciones como las partes sí argumentaron los méritos de umbral de la controversia de marras.

[56]   En suma, en *Crespo Quiñones v. Santiago Velázquez*, supra, devolvimos el caso al Tribunal de Apelaciones por entender que el referido foro tenía jurisdicción. En esa ocasión no entramos a resolver los méritos del caso, ello, debido a que la totalidad de la controversia no estaba ante nos y las partes no argumentaron los méritos de la acción. Solamente se limitaron a reseñar la jurisdicción del Tribunal de Apelaciones. Por ello, aclaramos que en situaciones como la de autos, donde la controversia ante nos está completa, sustantiva y procesalmente, y las partes la han argumentado, el curso a seguir es distinto a lo resuelto en *Crespo Quiñones v. Santiago Velázquez*, supra. *Esto no equivale a un dictamen sin jurisdicción, sino el reconocer nuestra facultad de resolver una controversia que está madura y completa ante este Tribunal.*

[1]   Y como bien señala la opinión mayoritaria, aparentemente tal base de datos empíricos tampoco se tuvo al tomar la decisión de eliminar las escoltas en cuestión.

[2]   *Diccionario de la Lengua Española*, Real Academia Española, 22da ed., Madrid, Ed. Espasa-Calpe, T. II, pág. 1810.

[1]   Cabe señalar que en respuesta a la comunicación del Superintendente, el ex gobernador Hernández Colón le requirió que le informara los periodos en que se brindó el servicio de escoltas al resto de los ex gobernadores y, además, le solicitó una afirmación de que "en virtud del memorando del Honorable Señor Gobernador, usted no puede acceder a mi petición para continuar el servicio de escolta más allá del 31 de diciembre de 2006". Apéndice de Petición de *certiorari*, Caso Núm. CC-07-347, pág. 139. El Superintendente no contestó estos requerimientos.

[2]   El Art. 30 de la Ley de la Policía, *supra*, dispone:
"(a) La Policía de Puerto Rico tendrá la responsabilidad de proveer seguridad y protección al Gobernador de Puerto Rico y a su familia.
"(b) Además, tendrá la responsabilidad de proveer seguridad y protección al Superintendente y a su familia, durante el término de su incumbencia. Dicho servicio continuará, una vez éste cese en funciones por cuatro (4) años adicionales y podrá ser extendido previa solicitud y aprobación del Superintendente que lo sustituya.
"La naturaleza del servicio de protección al ex Superintendente será similar a la ofrecida durante su incumbencia como Superintendente.
"(c) Aquellos funcionarios o ex funcionarios a quienes la Policía les provea servicio de escolta, seguridad y protección sólo tendrán derecho a recibirlo en la jurisdicción o territorio de Puerto Rico, con excepción del Gobernador de Puerto Rico. En aquellos casos excepcionales o meritorios en los cuales se solicite servicio de escolta, seguridad y protección fuera de la jurisdicción de Puerto Rico, el mismo será otorgado con la previa aprobación del Superintendente y el Gobernador. En caso de que la solicitud de escolta surja de algún funcionario, los gastos

2009 TSPR 154

correspondientes a dietas, horas extras, transportación y alojamiento serán pagados por la agencia o dependencia que representa el funcionario que solicita el servicio." 25 L.P.R.A. sec. 3129.

[3]   Véase Boletín Administrativo Núm. 5550. Esta orden ejecutiva indica los requisitos en el formato de las referidas órdenes, así como los pasos a seguir en la preparación y registro del documento.

[4]   Entre otras cosas, no tenemos certeza sobre los criterios de la Policía para la asignación de personal a los ex Gobernadores, la cantidad de agentes que habían sido designados para dicha encomienda desde que cada uno cumplió su término, el tipo de seguridad provista, el gasto que conllevaba dicho servicio, los lugares en que se ofrecía, si alguna vez el servicio fue suspendido o reducido, o si los peticionarios han recibido alguna amenaza o han estado expuestos a algún peligro durante estos años.

---

**End of Document**                                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---