```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF PUERTO RICO

 3
      In Re:                    )        Docket No. 3:17-BK-3283(LTS)
 4                              )
                                )        PROMESA Title III
 5    The Financial Oversight and )
      Management Board for       )
 6    Puerto Rico,               )        (Jointly Administered)
                                )
 7    as representative of       )
                                )
 8    The Commonwealth of        )
      Puerto Rico, et al.        )        November 15, 2021
 9                              )
                   Debtors,     )
10

11    _____

12    In Re:                    )        Docket No. 3:17-BK-3566(LTS)
                                )
13                              )        PROMESA Title III
      The Financial Oversight and )
14    Management Board for       )
      Puerto Rico,               )        (Jointly Administered)
15                              )
      as representative of       )
16                              )
      The Employees Retirement   )
17    System of the Government   )
      of the Commonwealth of     )
18    Puerto Rico,               )
                                )
19                   Debtors,    )

20    _____

21

22

23

24

25
```

```
 1
 2   _____
 3   In Re:                      )      Docket No. 3:19-BK-5523(LTS)
                                 )
 4                               )      PROMESA Title III
     The Financial Oversight and )
 5   Management Board for        )
     Puerto Rico,                )      (Jointly Administered)
 6                               )
     as representative of        )
 7                               )
     The Puerto Rico Public      )
 8   Buildings Authority,        )
                                 )
 9                    Debtors,   )

10   _____

11

12                  CONFIRMATION HEARING - DAY FIVE

13    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14              UNITED STATES DISTRICT COURT JUDGE

15    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

16              UNITED STATES DISTRICT COURT JUDGE

17   _____

18
     APPEARANCES:
19
     ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY
20
     For The Commonwealth
21   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
22

23   For The Lawful
     Constitutional Debt
24   Coalition:              Mr. Susheel Kirpalani, PHV

25
```

```
 1   APPEARANCES, Continued:

 2   For Ambac Assurance
     Corporation:              Ms. Atara Miller, PHV
 3

 4   For Peter C. Hein:        Mr. Peter C. Hein, Pro Se

 5   For Suiza Dairy Corp.:    Mr. Rafael A. Gonzalez Valiente, Esq.

 6   For Finca Matilde, Inc.:  Mr. Eduardo J. Capdevila Diaz, Esq.

 7   For the Official
     Committee of Unsecured
 8   Creditors:               Mr. Luc A. Despins, PHV

 9   For Assured Guaranty
     Corp. and Assured
10   Guaranty Municipal Corp: Mr. William J. Natbony, PHV

11   For Sucesion Pastor
     Mandry Mercado:          Mr. Charles A. Cuprill, Esq.
12
     For Service Employees
13   International Union and
     International Union,
14   United Automobile,
     Aerospace and
15   Agricultural Implement
     Workers of America:      Mr. Peter D. DeChiara, PHV
16
     For Credit Unions:       Mr. Enrique M. Almeida, Esq.
17
     For Underwriter
18   Defendants:              Mr. Howard Steel, PHV

19   For Arthur Samdovitz:    Mr. Arthur Samdovitz, Pro Se

20   For Asociacion de
     Maestros de Puerto Rico
21   and Asociacion de
     Maestros de Puerto
22   Rico-Local Sindical:     Mr. Jose Luis Barrios Ramos, Esq.

23   For PFZ Properties,
     Inc.:                    Mr. David Carrion Baralt, Esq.
24

25
```

1   APPEARANCES, Continued:

2   For Maruz:                Mr. Alexis Fuentes, Esq.

3   For the Special Claims
    Committee:                Mr. Tristan Axelrod, PHV

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by stenography.  Transcript produced by
25  CAT.

1                          I N D E X

2   WITNESSES:                                    PAGE

3        None offered.

4

5

    EXHIBITS:                                     PAGE
6
         None offered.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                                    San Juan, Puerto Rico

2                                    November 15, 2021

3                                    At or about 9:28 AM

4                          *     *     *

5          THE COURT:  Good morning.  Would the video

6     participants please turn your cameras on, but keep your

7     microphones muted.

8          Ms. Tacoronte, would you please call the case?

9     Courtroom deputy, please call the case.

10         COURTROOM DEPUTY:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         COURTROOM DEPUTY:  The United States District Court

13    for the District of Puerto Rico is now in session.  The

14    Honorable Laura Taylor Swain presiding.  Also sitting, the

15    Honorable Magistrate Judge Judith Dein.  God save the United

16    States of America and this Honorable Court.

17         *In re: The Financial Oversight and Management Board*

18    *for Puerto Rico, as representative of the Commonwealth of*

19    *Puerto Rico, et al.*, PROMESA Title III, Case Nos.

20    2017-BK-3283, 2017-BK-3566, and 2019-BK-5523, for Further

21    Confirmation Hearing.

22         THE COURT:  Thank you.

23         Welcome back, counsel, parties in interest, members

24    of the public, and press who are observing today's proceedings

25    by Zoom video connection, or are listening by telephone.

1    Today is a continuation of the Confirmation Hearing for the

2    Modified Eighth Amended Plan of Adjustment for the

3    Commonwealth of Puerto Rico, et al.  The Court will be hearing

4    oral argument concerning a number of legal issues implicated

5    by the Motion to Confirm the Modified Eighth Amended Plan.

6        To ensure the orderly operation of today's virtual

7    hearing, all parties appearing by Zoom must mute their

8    microphones when they are not speaking, and turn off their

9    videocameras if they are not directly involved in the

10   particular presentation or argument once we reach the Agenda.

11   When you need to speak, you must turn your camera on, and

12   unmute your microphone on the Zoom screen.

13        I remind everyone that, consistent with court and

14   judicial conference policies, and the orders that have been

15   issued, no recording or retransmission of the hearing is

16   permitted by anyone, including but not limited to the parties,

17   the members of the public, and the press.  Violations of this

18   rule may be punished with sanctions.

19        The Agenda, which was filed as Docket Entry No. 19194

20   in Case No. 17-3283, is available to the public at no cost on

21   Prime Clerk for those who are interested.  I encourage each

22   speaker to keep track of his or her own time.  The Court will

23   also be keeping track of the time, and will alert each speaker

24   when there are two minutes remaining with one beep, and when

25   time is up, with two beeps.  Here is an example of the beep

1    sound.

2           (Sound played.)

3           THE COURT:  If your allocation is two minutes or

4    less, you'll just hear the final beeps.

5           I will be calling on each participant during the

6    hearing.  If you wish to be heard at a time when I haven't

7    called on you, please use the "raise hand" feature at the

8    appropriate time.  The "raise hand" feature can be accessed by

9    selecting the reactions icon in the toolbar located at the

10   bottom of your Zoom screen.  After you've finished speaking,

11   you should select the "lower hand" feature.

12          Please don't interrupt each other or me during the

13   hearing.  If we interrupt each other, it's difficult to create

14   an accurate transcript, but having said that, and as usual, I

15   apologize in advance for breaking this rule, because I may

16   interrupt if I have questions or if you go beyond your

17   allotted time.  If anyone has difficulty hearing me or another

18   participant, please use the "raise hand" feature.

19          This morning's session will go until 12:50, that is

20   ten to 1:00 Atlantic Standard Time, which means that our lunch

21   break will be at 11:50.  That is, ten minutes before 12:00

22   Eastern Standard Time.  We will have a ten-minute break at

23   about 11:15 Atlantic Standard Time, which is 10:15 Eastern

24   Time.  After the lunch break, we will resume, beginning at

25   2:10 Atlantic Standard Time, which is 1:10 Eastern Time, and

1   we'll have a ten-minute break in the afternoon as well.

2          So please turn your cameras off now, and when we

3   reach your Agenda item, you can turn them back on or turn them

4   back on if I call on you.  Is there anything that we need to

5   address before we begin the arguments?  If anyone has such an

6   item, raise your hand.

7          Seeing no hands raised, we will turn to the first

8   subject of argument, which is Item I.1 on the Agenda, and that

9   is the matter of the parties' arguments concerning preemption,

10  to which a total of 40 minutes have been allocated.  We will

11  begin with supporting parties, and the first supporting

12  speaker is Mr. Bienenstock for the Oversight Board for eight

13  minutes.

14         Good morning, Mr. Bienenstock.

15         MR. BIENENSTOCK:  Good morning, Judge Swain.  Martin

16  Bienenstock of Proskauer Rose, LLP, attorneys for the

17  Oversight Board, as Title III representative of the three

18  debtors.

19         Your Honor, first, I want to address the specific

20  topics Your Honor wrote into the Order for this morning.  And

21  as far as the comprehensive list of the statutes referred to

22  in Ms. Jaresko's declaration, actually, the plans on file have

23  always contained as comprehensive a list as we could put

24  together, and my understanding is, a few days ago, we actually

25  deleted some statutes from that list.

1           And we will be filing, I think today, if not filed

2    last night, a plan with some technical modifications, and the

3    list will have one addition, which simply is a clarification.

4    The prior list of statutes we contend are preempted going

5    forward did not mention the Puerto Rico Constitution, and what

6    we explain in what has either just been filed or will be filed

7    is that the Plan settles the contentions about preemption of

8    Article VI of the Puerto Rico Constitution.  And the Plan is

9    not taking a position going forward on whether that preemption

10   is enforceable or not if, God forbid, there's another distress

11   situation down the road.

12          So the bottom line response to Your Honor's query is

13   that the list has been on file at all times, and it's -- we

14   did not hold back a bunch of statutes or anything like that

15   that we were going to add.

16          THE COURT:  So may I just ask you --

17          MR. BIENENSTOCK:  Sure.

18          THE COURT:  -- to be clear, Exhibit K is intended to

19   be the definitive list identifying all of the statutes and, as

20   you say, the Constitution?

21          MR. BIENENSTOCK:  Yes, Your Honor.  And I do want to

22   point out that it's phrased as including the preempted

23   statutes, because if we missed one or more, we're not saying

24   they're not preempted, but we will not have the benefit of any

25   judgment Your Honor might render determining, specifically,

1    that statute not on the list is preempted.  So it would have

2    to be argued perhaps in the future.  But Exhibit K lists

3    everything we, with our local counsel, were able to identify.

4         THE COURT:  You've used the language that the

5    statutes are preempted to the extent -- or that all laws are

6    preempted that are inconsistent with PROMESA.  How does one

7    identify the elements that the Oversight Board deems

8    inconsistent with PROMESA?

9         MR. BIENENSTOCK:  Well, I'm going to actually go over

10   that right now, Your Honor.

11        THE COURT:  Very good.

12        MR. BIENENSTOCK:  And I'm not -- again, I don't think

13   this is susceptible to a finite, discrete list, but certainly

14   the predominant factors that we contend would lead to a

15   judgment of inconsistency are clear.  In effect, the statutes

16   on our list are in approximately four categories:

17   Appropriations that are in the form of statutes; requirements

18   to pay money, such as the defined benefit plan that the

19   teachers assert is not preempted, and I'll get back to that in

20   a few moments; the requirements to pay debt, and that's

21   basically -- oh, and the authorization of the government to

22   issue new debt.

23        We think it's clear that, for instance, if under the

24   Plan, the Plan of Adjustment, we discharge debt,

25   appropriations designed to supply money to pay that debt are

12

1    obviously inconsistent with it.  It will be paid in accordance

2    with the Plan, not in accordance with statutes providing for

3    appropriations.

4         The only debt that's issued is being issued under the

5    Plan, so any other statutes authorizing debt, usually it's

6    refinancing debt, that would be authorized in advance, are

7    preempted, because that would be inconsistent --

8         (Sound played.)

9         MR. BIENENSTOCK:  -- with what the Plan says will

10   happen to the existing debt on the books.

11        Appropriations also indicate that the preemption is

12   really due to several sources, Title II and Title III.

13   Appropriation statutes are preempted, because while the Board

14   is in existence, the Board has power over appropriations, both

15   in the fiscal plan and budget.  The budget really,

16   specifically.  But beyond that, Title III would actually

17   preempt many of those same statutes, because they require the

18   payment of money, sometimes from one entity to another, and

19   often it's for the purpose of enabling the payment of

20   prepetition debt.  And that would be inconsistent with how

21   Title III treats that debt.

22        So those are the main factors, Your Honor, and I

23   think by themselves they're not even the subject of too much

24   controversy here.  Now, I realize, after the supporters sit

25   down --

```
1               (Sound played.)

2               MR. BIENENSTOCK:  -- AMPR and Mr. Hein are going to

3      provide what controversy there is.  And it sounds like I just

4      have two minutes, so I will hurry up and get to it.

5               As I explained in the opening, AMPR is relying on the

6      2014 Puerto Rico Supreme Court decision that struck revisions

7      of the teachers' defined benefit plan, and that doesn't work,

8      because that decision was purely based on the Contracts

9      Clause.  It's true that the territory cannot impair contracts,

10     but the Federal Government can.

11              And AMPR also argues that there's no specific

12     provision that preempts the defined benefit plan that their

13     members benefit from.  But, starting with Section 4 of PROMESA

14     on supremacy, it says, the act shall prevail over any general

15     or specific provisions of territory law, state law, or

16     regulation that is inconsistent with PROMESA.  There is

17     nothing requiring anything as express, more at -- more express

18     than it is that AMPR contends is needed.

19              Now, Mr. Hein raises, frankly, the same issue he

20     raised in COFINA.  He doesn't like the settlement that the GO

21     creditors reached, and he wants to contend that he's entitled

22     to the priorities in Article VI, Section 6 and 8 of the Puerto

23     Rico Constitution.  He is bound by the vote of his class.

24              The answer he gave Your Honor at the opening, that

25     the binding language only exists after the Court confirms the
```

1    Plan, so he's not bound to it now, is not a good answer.  And

2    the reason it's not a good answer is --

3              (Sound played.)

4              MR. BIENENSTOCK:   May I finish this sentence, Your

5    Honor?

6              THE COURT:  Yes.  You may finish your point.

7              MR. BIENENSTOCK:  Thank you.

8              The reason it's not a good answer is in section 1129,

9    listing the confirmation requirements, it speaks in terms of

10   acceptance of a class, and section 1123 of the Bankruptcy Code

11   made applicable to PROMESA requires the same treatment of

12   every claim in the class.  So there are only certain aspects

13   of confirmation requirements that an individual claimant can

14   contest after its class has rejected, and given that the

15   class, all of which had the benefit of the arguments that the

16   GO Bonds are secured, and that they have an -- effectively, a

17   super priority to all available resources, those arguments

18   were made.  The class settled them.

19             As a matter of common sense, if Mr. Hein were right,

20   one could never settle, because the settling parties would

21   just be given an option.  They either get their settlement or

22   they get some better outcome that one claimant in their class

23   decides to try to litigate for.  So you could never settle.

24             THE COURT:  Thank you, Mr. Bienenstock.

25             MR. BIENENSTOCK:  Thank you, Your Honor.

1          THE COURT:  Next we have Mr. Kirpalani for the LCDC

2     for six minutes.

3          MR. KIRPALANI:  Good morning, Your Honor.  Susheel

4     Kirpalani of Quinn, Emanuel, Urquhart & Sullivan on behalf of

5     the Lawful Constitutional Debt Coalition.

6          THE COURT:  Good morning.

7          MR. KIRPALANI:  The Board argues that PROMESA

8     preempts Commonwealth law.  We agree, but not in a sweeping

9     way.  Rather, PROMESA is a federal law with specified goals

10    and criteria to be used by the Oversight Board in its capacity

11    as agent of the sovereign.  If Commonwealth statutes exist

12    that actually conflict or oppose obstacles to carrying out

13    PROMESA's requirements, then they are preempted.

14         The scope of the preemption ruling requested is an

15    important issue for holders of constitutional debt, because

16    the Plan itself distributes new constitutional debt as part of

17    the currency.  The Plan represents a global compromise of many

18    intertwined issues, including whether the first priority of

19    constitutional debt is preempted or preserved in PROMESA.

20         The Plan fully and finally settles those intertwined

21    issues, including how the constitutional priority should be

22    handled for purposes of these cases.  And the Plan, at section

23    86.1(b), the proposed Confirmation Order at paragraph 27, the

24    binding effect made clear that the compromise here, while a

25    cornerstone of this plan, is not creating a precedent.

1  Mr. Bienenstock mentioned the same point.

2          In this regard, it's important to note that neither

3  Exhibit K to the Plan, nor the proposed conclusions of law,

4  nor the Confirmation Order as proposed contains any statement

5  that the GO constitutional priority or pledge is preempted by

6  PROMESA.  This is embedded in the structure of the Plan, which

7  classifies GO and GO guaranteed creditors separately from

8  creditors who do not have that priority or pledge, and

9  provides different distributions to creditors based on the

10  settlement between the Oversight Board on the one hand, and

11  different vintages of GO debt on the other.

12          In reviewing the settlements embedded in the Plan,

13  the Court is asked not to rule on which side is right, but,

14  rather, to canvas the legal issues, and determine whether the

15  settlement falls in a range of reasonable outcomes.  From the

16  perspective of holders of constitutional debt, we and others

17  have argued that PROMESA does not preempt the constitutional

18  pledge.

19          The Supreme Court has explained, when it comes to

20  preemption, the purpose of Congress is the ultimate

21  touchstone.  Your Honor is familiar with the cases *Wyeth v.*

22  *Levine, Hawaiian Airlines v. Norris, Jones v. Rath Packing*,

23  and others.  We would note that implied preemption occurs only

24  when the scope of a statute indicates that Congress intended

25  federal law to occupy a field exclusively, or when state law

1    is in actual conflict with federal law.  For that we'd cite

2    *Freightliner Corp. v. Myrick*, 514 U.S. 280, at page 288.

3          And even in the event of a direct conflict between

4    federal and territorial law, the latter is only preempted to

5    the extent of the conflict, because a Federal Court should not

6    extend its invalidation of a statute further than necessary to

7    dispose of the case before it.  To get to the settlement, GO

8    bondholders asserted several arguments against preemption of

9    their priority.

10         Your Honor is familiar with Section 201(b)(1)(N), and

11   what it mandates for purposes of Title II.  We believe this

12   provision protects creditors, and GO debtholders in

13   particular, by ensuring that the Commonwealth Constitution and

14   laws regarding creditor priorities are respected.  While there

15   can be debates about what respect means, we think, at a

16   minimum, it doesn't mean preempt, and we argued that to get to

17   the settlement.

18         We argued, in addition, that the respect for lawful

19   priorities under a certified fiscal plan is incorporated into

20   Title III, and to support that we urge, as part of the

21   negotiations, that section 305 of Title III incorporates any

22   limitations set forth in Title II.  And we would argue section

23   201(b)(1) is such a limitation.

24         And as the Court recently held on October 26, in

25   connection with the denial of the Oversight Board's --

1           (Sound played.)

2           MR. KIRPALANI:  -- motion in limine, the Court has an

3    independent function at this point in the Title III case to

4    determine whether the Plan of Adjustment is, in fact,

5    consistent with the applicable fiscal plan.  The Court has

6    been provided hundreds of pages of testimony, and Your Honor

7    has heard from live witnesses in order to make that

8    determination.

9           We would also point out, for purposes of how we got

10   to the settlement, that the House report accompanying PROMESA

11   assured creditors that their priority would be respected in

12   any debt restructuring; and, finally, that section 301(e) of

13   PROMESA shows an intent to preserve state law priorities for

14   purposes of classification of claims.  And that's different

15   from the Federal Bankruptcy Code.  That does not contain such

16   a provision.

17          As part of the compromise, paragraph 44 of the

18   proposed findings of fact and conclusions of law reflects that

19   classification based on the differences in priority is proper,

20   and in pushing for the settlement embodied by the Plan,

21   constitutional debtholders argued that Congress' intent was

22   clear, at least to preserve the pre-existing priorities of

23   creditors under Commonwealth law, vis-a-vis each other.

24          And while we agree some degree of preemption is

25   necessary to implement the Plan, PROMESA's preemption

```
 1    provision applies only to laws or regulations that are

 2    inconsistent with the federal statute.  That's section 4 of

 3    PROMESA.  Therefore, preemption is appropriate only -- to the

 4    extent that PROMESA's actual conflict with state law, state or

 5    territorial law, and for that reason, we support the extent of

 6    preemption set forth in Exhibit K to the Plan, the proposed

 7    Confirmation Order, and the proposed findings of fact and

 8    conclusions of law, but no more.

 9          Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Kirpalani.

11          Next we will hear from Ms. Miller for Ambac for three

12    minutes.

13          MS. MILLER:  Good morning, Your Honor.  Atara

14    Miller --

15          THE COURT:  Good morning.

16          MS. MILLER:  Atara Miller from Milbank on behalf of

17    Ambac Assurance Corporation.

18          As Your Honor I'm sure recalls, we've engaged with

19    this Court numerous times in the past on issues of preemption,

20    usually on the other side.  We, therefore, thought it would be

21    helpful to highlight the key differences between the

22    preemption question that the Court is being asked to rule on

23    in connection with confirmation, and the preemption issue as

24    it was previously presented in the revenue bond related

25    litigation.
```

1          In the past, the Board was arguing for three forms of

2    preemption:  Title I preemption, fiscal plan Title II

3    preemption, and Bankruptcy Code Title III preemption.  We

4    heard a lot this morning from Mr. Bienenstock about Title I

5    preemption, as well as from Mr. Kirpalani, and a little touch

6    on Title III preemption.  The Board in those instances and at

7    that time was advancing preemption as the legal basis to

8    eliminate obligations, asserted property interests, and state

9    law priorities.

10         We argued strenuously that such an application of

11   preemption was improper.  Kirpalani seems to agree, and,

12   thankfully, this Court, based on the settlements that both

13   Mr. Bienenstock and Mr. Kirpalani described, will not have to

14   opine on that issue.

15         (Sound played.)

16         MS. MILLER:  There's disputes that are being settled

17   in agreements incorporated in the Plan.  Disputes related to

18   the use of monies already allegedly diverted or improperly

19   clawed back are similarly settled.  The preemption is best now

20   only being used as a means to preempt statutory allocations of

21   money, and sort of empty rights to align with the financial

22   obligations and the realities of the new debt to the Plan.

23   This is what we would describe as plain vanilla, garden

24   variety Bankruptcy Code preemption.

25         Section 1123(a)(5), which is incorporated into

1    PROMESA by section 301, Mr. Bienenstock mentioned, has long

2    been understood to preempt state laws to allow the debtor to,

3    quote, provide adequate means for the Plan's implementation.

4    Identifying the domain expressly preempted by 1123(a)(5) has

5    presented more challenging, with courts interpreting it

6    differently.

7          The First Circuit back in *In re: Irving Tanning*, 496

8    B.R. 644 (B.A.P. 1st Cir. 2013) adopted an expansive view of

9    preemption, noting that while not boundless, and constrained

10   on those in particular by property interest, it is one of

11   considerable breadth and flexibility.

12         The Nine Circuit, in contrast, adopted a more narrow

13   view, stating that the Bankruptcy Code preempts only state

14   laws relating to the financial condition of the debtor.  And

15   that's *PG&E*, 360 F.3d 932, (9th Cir. 2003).  But, thankfully,

16   the Court again will not have to wade into this debate either,

17   because the statutes being preempted fall within even the most

18   narrow view of the scope of 1123(a)(5).

19         We have long argued, and I'm primarily focused on --

20         (Sound played.)

21         The COURT:  Thank you.  You can finish that sentence,

22   that point, if you wish.

23         MS. MILLER:  Thank you, Your Honor.

24         So we've long said that the statutes both create

25   property rights and accomplish the technical budgetary

1    appropriation.  Because of the settlements embedded in the

2    Plan, the preemption has the effect of only addressing the

3    technical appropriation, which we think is appropriate.

4             Thank you, Your Honor.

5             THE COURT:  Thank you, Ms. Miller.

6             Now we will hear from objecting parties, beginning

7    with Mr. Barrios Ramos for AMPR.  He has been allotted six

8    minutes.

9             MR. BARRIOS RAMOS:  Good morning, Your Honor.

10            THE COURT:  Good morning, Mr. Barrios.

11            MR. BARRIOS RAMOS:  And good morning to all present

12   through this Zoom hearing.

13            Your Honor, on the subject of preemption that we

14   raise over the lack of specific applicability of preemption to

15   the TRS system freezes, the comment that the Board proposes --

16   one of our arguments is that although Law 106 is listed in

17   Exhibit K, there are no specific provisions of Law 106 that

18   are listed.  Therefore, there is no specificity as to what

19   sections are preempted, and what sections are not, and the

20   rationale for those preemptions.

21            And we do agree with the statement that Mr. Kirpalani

22   said, that preemption should not be applied in that sweeping

23   way, but specifically, and to the point that it actually

24   conflicts with the territorial law, Your Honor, which brings

25   us to the point on preemption that we want to stress to the

1   Court, which is that, in application, to mechanically obtain

2   or be able to freeze or cut the accrual of future benefits of

3   teachers throughout the Plan, since the Board seems to argue

4   in the alternative that either preemption will force the

5   freeze and/or if the Court does not rule that way, then

6   rejection under 365 would, which we'll readdress in further

7   oral arguments, but as to this point, Your Honor, preemption

8   alone, it is our position, will not be able to allow the Board

9   to confirm this Plan and freeze the teachers' right to accrue

10  benefit, because even if they could preempt that section of

11  Law 106, they would fail to meet PROMESA's requirement of

12  adequate funding to pensions.

13        And inasmuch the teachers would no longer accrue

14  under a replacement qualified Plan, but will not have either

15  Social Security or a defined contribution benefit upon

16  effective date, inasmuch as your Court, Your Honor, already

17  ruled, the Board cannot legislate.  And for teachers to obtain

18  a defined contribution benefit plan, Law 106 will need to be

19  amended by the local legislature, which has not happened, and

20  which we are not certain that it would.

21        Also, since the Government of Puerto Rico has an

22  agreement with Social Security to not provide Social Security

23  to teachers, because they have a replacement qualified benefit

24  plan, the government will have to legislate out of that

25  agreement as well.  And even if it is forced by law to provide

1   Social Security, as the Board readily admits in its Disclosure

2   Statement and Plan, although it understands that Puerto Rico

3   would provide Social Security, there is no time line for that

4   provision.

5          So teachers would be left without any accrual of

6   pension benefits upon the effective date if preemption is the

7   mechanism that the Court -- that the Board pushes forward to

8   obtain the freeze by preempting the provision of Law 106 that

9   codifies the right of teachers to continue to accrue defined

10  benefits, Your Honor.  Which brings us to the point of

11  feasibility, Your Honor, and whether that Plan would comply

12  with the feasibility requirements, as well as with the PROMESA

13  requirements of adequate funding.

14         If the Court has any questions for me, Your Honor?

15         THE COURT:  Not at this point.  Thank you.

16         Actually, I do.  I'd just like you to return to this

17  question of there being no provisions for teachers if 106's

18  defined benefit obligations are preempted and there's no

19  replacement statute.  Are you saying that there is no defined

20  contribution-type provision for teachers available at this

21  point?

22         MR. BARRIOS RAMOS:  Your Honor, in addressing your

23  question, teachers hired prior to 2014, under the Supreme

24  Court decision, retained their defined benefits.  So when Law

25  106 was enacted post petition in the year 2017, teachers hired

1  prior to 2014 were recognized, in codifying that law, their

2  right to continue to accrue benefits.  Teachers that were

3  hired after 2014 were, pursuant to the law, transferred from

4  their -- some kind of hybrid system that they had at that

5  moment to the new defined contribution benefit plan of the

6  government, Your Honor, but that did not happen with teachers

7  that are under defined benefit.  In fact, they don't

8  contribute to the defined benefit, because they already

9  contribute to a replacement qualified plan.  And to do so,

10  they will have to increase their contributions and so on.

11         So right now there is no legislation creating a

12  mechanism to transfer those teachers to that system, nor to

13  provide them with Social Security, Your Honor.  And the Plan

14  does not legislate one and cannot, as Your Honor has already

15  ruled.

16         THE COURT:  Thank you, Mr. Barrios.

17         Now we will turn to Mr. Hein, who has been allocated

18  14 minutes.

19         MR. HEIN:  Thank you, Your Honor.  Can you hear me?

20         THE COURT:  Yes, I can.

21         MR. HEIN:  Thank you.

22         Let me first address the point Mr. Bienenstock made

23  to the effect that I'm precluded here, because others, not me,

24  settled my claims.  You may recall that Your Honor had asked

25  me about this in the openings.  The Oversight Board cited

1   944(a)(3) in its brief.  I made the point in response to Your

2   Honor's questions that by its terms, 944(a) speaks to the

3   effect of the provisions of a confirmed plan, and that because

4   the Oversight Board's plan is not yet confirmed, it has to

5   meet all of the PROMESA 314(b) requirements.  Someone else's

6   settlement has no impact on my ability to argue that they have

7   not proven the 314(b) requirements.

8        Now, Mr. Bienenstock this morning said, well, what

9   about Title II provisions, 1123(a)(4) and 1129(a)(8) and (B),

10  I think, is what he was referring to.  Putting aside whether

11  there's any merit to his argument even as to that, that would

12  deal with 314(b)(1).  It would not in any way affect my

13  ability to argue against confirmation that the Oversight Board

14  has not proven they met the requirements of 314(b)(3), (6) and

15  (7), as I have.

16       Secondly, let me turn to the arguments that the

17  Oversight Board made in its brief on the subject of preemption

18  addressing my points.  They say, well, I argue that the Puerto

19  Rico Constitution requires that GO debt be paid in full, and

20  thus they argue it would defeat the point of adjusting the

21  debts if Puerto Rico law requiring payment in full was not

22  preempted.  But the fallacy of their argument, Your Honor, is

23  that the Puerto Rico Constitution actually says that the GO

24  debt is to be paid first.  It's entitled to first payment over

25  any other claims.  And the priority of payment given to the GO

1    debt in the Puerto Rico Constitution is reinforced in PROMESA,

2    not preempted.  It's reinforced.

3            314(b)(6), as discussed in my sur-reply, requires the

4    Court to consider whether available remedies under the

5    nonbankruptcy -- nonbankruptcy laws and Constitution of Puerto

6    Rico would result in greater recovery for creditors. Section

7    201(b)(1)(N) of PROMESA expressly requires that the Oversight

8    Board's fiscal plans respect the lawful priorities of lawful

9    liens in the Constitution and laws of Puerto Rico.  So

10   whatever debates there might be about the exact effect of

11   these provisions, they certainly dispel any argument that it's

12   impossible to comply with both federal and Puerto Rico law, or

13   that Puerto Rico laws providing priority to GO debt are

14   somehow an obstacle to federal law.

15           Congress was well aware of the priorities under

16   Puerto Rico Constitution and laws.  Congress expressly

17   provided in PROMESA that such priority should be considered

18   and respected.  Section 4, the preemptive provision of

19   PROMESA, does not provide some sweeping, across the board

20   preemption of all of Puerto Rico's Constitution and laws.

21           Section 4 says that PROMESA shall prevail over any

22   general or specific provisions of territory law inconsistent

23   with PROMESA.  It doesn't say inconsistent with whatever the

24   Oversight Board decides it wants to do.  It says inconsistent

25   with PROMESA.  And since PROMESA, by its terms, looks to the

1   Puerto Rico Constitution and laws to assess whether they would

2   provide greater recovery or to ensure that priorities under

3   Puerto Rico law are respected, there cannot be any preemption.

4   PROMESA does not preempt itself.

5       A third point:  The overreach of the Oversight

6   Board's preemption claims is actually stunning in its scope.

7   It really is a pig in the poke, to use the phrase.

8       Your Honor's Agenda setting order asked about the

9   scope of preemption arising from 89.3 and Exhibit K to the

10  Plan.  Mr. Bienenstock attempted to address that, but let me

11  just emphasize that the first sentence of 89.3 starts out

12  saying all laws other than certified budgets inconsistent with

13  PROMESA are preempted.

14      And it goes on with sweeping language, "without

15  limitation," without in any way limiting, very, very sweeping

16  language making clear that the long list of Puerto Rico

17  statutes is just the tip of the iceberg of some unknown size.

18  The notion that they're kind of casually adding in now Article

19  VI of the Constitution, you know, underscores that the exhibit

20  may just be the tip of a very big, unknown iceberg.

21      It's instructive that when, on cross-examination, I

22  asked Ms. Jaresko, the executive director of the Oversight

23  Board, questions bearing on the reach and effect of

24  preemption, and I noted that, per the Disclosure Statement in

25  the Plan, the first and second sources of payment of the new

1    bonds are based on statutory schemes, Act 83 of 1991 relating

2    to the 1.03 percent property tax, and the Puerto Rico

3    Constitution implementing statutes providing for payment of

4    priority of GO bonds, such as Act 33 of 1942, when I asked

5    those questions, it, I think, brought home that there is no

6    plausible answer to the question of how one can hold out to

7    bondholders that you will get new bonds, and these new bonds

8    are going to be paid from revenue sources, two revenue sources

9    established by Puerto Rico law.

10         But at the same time, there is -- at, you know, the

11   time I asked the questions, there was a position by the

12   Oversight Board that both laws were being preempted.  And this

13   Disclosure Statement certainly did not make clear in any

14   direct way to bondholders voting on the Plan that they were

15   going to be paid from two specific sources.  But, and this is

16   the "but", that wasn't made clear, that the laws providing

17   those sources were, per the Oversight Board, being preempted.

18         Now, perhaps there are -- my questioning of

19   Ms. Jaresko had some impact, because Friday night we got a

20   revised plan and revised proposed order and judgment.  They

21   still sought in that Friday night addition to preempt Act 83

22   relating to 1.03 percent property tax, but they actually

23   dropped -- they dropped Act 33 of 1942 from the list Friday

24   night.

25         Now, today, I'm totally confused, but we're told,

1  well, they're adding back in the Puerto Rico Constitution,

2  Article VI.  And then, as I heard Mr. Bienenstock, something

3  to the effect of, well, as to the past, preemption is settled.

4  There's no position as to the future.

5       So what are they asking Your Honor to do?  Enter an

6  order that declares that the law is that -- you know, it's not

7  known or unsettled -- I'm totally confused.  But even just

8  dropping Act 33 from the claim as to what is preempted is a

9  critical concession that I would submit precludes

10  confirmation, because Act 33 provides that the good faith of

11  the Commonwealth of Puerto Rico is hereby irrevocably pledged

12  for the payment of GO bonds, which shall be paid with any

13  available funds in the Commonwealth Treasury, which funds are

14  appropriated as continuous appropriations, without it being

15  necessary to make new appropriations for said purpose.

16       So when looking at whether the Oversight Board can

17  prove the 314(b)(6) requirement for confirmation is met, a

18  requirement that has language that Congress specifically added

19  to the best interest test that is in Title II, there's now, in

20  PROMESA, specific language Congress added to say that one must

21  consider, under -- one must consider whether under the

22  nonbankruptcy laws, including, of course, Act 33, now conceded

23  not to be preempted, whether available remedies would result

24  in a greater recovery for creditors.

25       So Congress is specifically requiring the Court to

1    look at statutes such as Act 33, that the Oversight Board now

2    concedes are not preempted, and in light of the force of Act

3    33, and I would argue, of course, Puerto Rico Constitution

4    Article VI as well, the Oversight Board cannot prove that the

5    (b)(6) requirement is met.

6         The McKinsey Report, you know, based on assumptions

7    by the Oversight Board's counsel, including the assumption

8    that all operating expenses, regardless of importance, must be

9    paid before debt service on the GO Bond, clearly does not meet

10   the (b)(6) burden.  The assumption that all operating expenses

11   get paid before any debt service gets paid is conceivably

12   contrary, or I would certainly argue is contrary to Act 33,

13   which now is concededly not preempted.

14        I would submit, Your Honor, that it also follows that

15   the requirement in (b)(3) that the debtor is not prohibited by

16   law from taking any action necessary to carry out the Plan

17   requires the Court to look at whether there are prohibitions

18   under Puerto Rico law.  Congress, as I've -- as I've said, was

19   well aware that there were these provisions in the Puerto Rico

20   Constitution and statutes providing for priority for GO debt

21   payment.  And Congress did not qualify the term "law" in

22   section (b)(3).  Congress could have said federal law, if

23   that's what they meant.  They did not.  And so with full

24   awareness of the fact that Puerto Rico law provided priorities

25   to certain creditors, Congress simply used the term "law".

1   And I've addressed (b)(3) in my sur-reply as well.

2            So in short, Your Honor, I think the responses to

3   questions from Ms. Jaresko last week, Mr. Bienenstock's

4   comments today, the shifting sands of the Exhibit K or Exhibit

5   C, depending on whether you're looking at the Plan or the

6   Order of Judgment, this should be extremely concerning, I

7   think, for Your Honor as to exactly what they are asking Your

8   Honor to do.

9            Respectfully, I think it is an overreach.  I think

10  it's going to create total confusion for the future.  I think

11  it really is imperiling the security of the new bonds being

12  issued in ways that have not been candidly disclosed in the

13  Disclosure Statement.  And I would submit, Your Honor, that

14  this provides -- it's just further force for why the Plan

15  should not be confirmed.

16           Thank you, Your Honor.

17           THE COURT:  Thank you, Mr. Hein.

18           Now we'll return to Mr. Bienenstock for three

19  minutes.

20           MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

21  Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

22  as Title III representative.

23           Going in reverse, Your Honor, Mr. Hein's Act 33

24  argument totally fails for a very simple reason:  The Puerto

25  Rico legislature repealed it back in we believe September, and

1   we think the reason it repealed it was that was the act that

2   authorized refinancing debt that they didn't want the

3   Oversight Board to be able to use for purposes of its

4   settlement of the GO debt.  But for whatever reason, Act 33

5   was repealed.  That's why it was taken off of Exhibit K of the

6   preempted statute list.

7          All jurisdictions have laws requiring payment of

8   debt.  Mr. Hein asked this Court to say, well, only look at

9   his law.  The law he wants in Article VI of the Puerto Rico

10  Constitution, that he gets paid first.  Well, once the Court

11  does that, what's the reason for not looking at the other laws

12  requiring that the other debts be paid?  Puerto Rico has lots

13  of them.  And all of that is inconsistent --

14          (Sound played.)

15          MR. BIENENSTOCK:  -- not only with Title III, but

16  with Title II's grant to the Oversight Board of power over

17  appropriations of all available resources in the budget.

18          There's a mismatch between Mr. Hein's reference to

19  his right to prosecute objections under 314(b)(3), (6), and

20  (7), and what his objections are.  The only one that really

21  comes close is (b)(3), which says that the debtor should not

22  be prohibited by -- is not prohibited by law from carrying out

23  the Plan.  If that reference to "by law" refers to anything

24  other than nonpreemptive law, then no Plan could ever be

25  performed unless it pays in full all debts, and that's not the

1    case.  So that's why (b)(3) doesn't apply.

2           In terms of the best interest test, and Mr. Hein, it

3    says that he doesn't like our assumption that operating costs

4    would -- are paid before debt service.  Well, one might argue,

5    although I don't think there's any good argument why you don't

6    pay teachers, firemen, police, nurses, et cetera before debt

7    service, but that was the assumption in the best interest

8    test.  Mr. Hein proposed no alternate test.

9           Moving on to AMPR, Your Honor.  The answers to

10   Mr. Barrios' contentions about the defined contribution plan

11   and Social Security are, very simply, that the Plan of

12   Adjustment puts the teachers into the defined contribution

13   plan, and it reduces the amount they currently pay by a couple

14   percent, which is significant.  It's almost 20 to 30 percent

15   of their current contributions.  They will pay lesser

16   contributions.

17          (Sound played.)

18          MR. BIENENSTOCK:  And the same for Social Security,

19   Your Honor.

20          THE COURT:  Thank you, Mr. Bienenstock.

21          MR. BIENENSTOCK:  Thank you.

22          THE COURT:  The next Agenda item is the deemed

23   rejection of the -- I'm sorry.  There is a hand.  So counsel

24   for Finca Matilde has the hand up.

25          MR. CAPDEVILA DIAZ:  Good morning, Your Honor.

1    Briefly, I know we are in the Agenda.  I am at the eminent

2    domain's part.  However, I believe that the issue of the

3    preemption overlaps with Your Honor's first questions on the

4    eminent domain part of the Agenda, so I just wanted to state

5    it for the record that I will be discussing how it overlaps in

6    my part.

7           I just wanted to raise the issue now in case the

8    Court wants me to do it now, or as scheduled, because both

9    issues overlap.

10          THE COURT:  Thank you, Mr. Capdevila.  We will do it

11   as scheduled.

12          MR. CAPDEVILA DIAZ:  Very well.  Thank you.

13          THE COURT:  Thank you.

14          So the next issue is the deemed rejection of the

15   Commonwealth's contractual obligations to accrue pension

16   benefits, and we have a total of 30 minutes allotted to that

17   overall topic.  And the first speaker is Mr. Bienenstock for

18   12 minutes.

19          MR. BIENENSTOCK:   Thank you, Your Honor.  Martin

20   Bienenstock, Proskauer Rose, LLP, for the Oversight Board, as

21   Title III representative of the debtors.

22          Your Honor, the statutes that create the defined

23   benefit pension plan are essentially options.  They don't

24   promise anyone employment.  They say that if you are employed,

25   for instance, as a teacher, you get a certain defined benefit

1    plan, and you make certain contributions.  And other

2    contributions are made, other obligations are undertaken by

3    the Commonwealth to provide the defined benefits upon your

4    retirement.

5        The reason we have referred to it often as "deemed

6    rejection" is that even though there is no obligation on

7    behalf of anyone to undertake that work as a teacher, et

8    cetera, the jurisprudence says that options are considered

9    executory contracts.  So if they're considered executory

10   contracts, they have to be assumed, rejected, or they pass

11   through the case.

12       So, in order to take no chances here, because the

13   defined benefit plan was, as the Court knows, in the Oversight

14   Board's view, one of the dominant causes of financial distress

15   of the Commonwealth, creating a 55 billion, totally unfunded

16   obligation, we could take no chances, and we rejected the

17   defined benefit plan that is on the books.  When we rejected

18   that, the rejoinder has been that, therefore, they must have a

19   damage claim.

20       So how does the damage claim get paid?  And the

21   answer is very simple.  The Plan provides a treatment for the

22   teachers.  The treatment is that they go into the defined

23   contribution plan, and they get -- the Commonwealth matches

24   their Social Security contributions.  And then they get their

25   defined contribution -- not defined contribution, but their

1  direct contribution benefits and Social Security when they're

2  of retirement age.

3      And the retirement age was not extended for anyone

4  already eligible for retirement.  So it's not going to lead,

5  we don't believe, to any mass exodus of teachers.  We're not

6  really aware of any rejoinder, although I may hear it in a few

7  moments, by AMPR as to why we can't do that.  Their effective

8  arguments I think we've heard in the last segment.  They said

9  that we need legislation in order for them to be put in the

10 defined contribution plan and in Social Security.

11     The answer to that, that is the error we contend they

12 are making.  Under a Federal Plan of Adjustment, no one -- and

13 no one here needs Puerto Rico to legislate, you know, what we

14 can provide the teachers in payment of their claims; and the

15 Plan provides that they will have the benefit of direct

16 contribution plans and Social Security with -- as I said, with

17 their contributions being matched by the Commonwealth, and we

18 don't need the Commonwealth to approve that.

19     Those are the terms of the Plan.  They may well pass

20 legislation in order to provide for themselves procedures, et

21 cetera, but it's certainly not necessary for us to pay their

22 claims under the Plan.  That's just what the Plan provides as

23 treatment of their claims.  And as I think has been well-known

24 from the outset here, their -- the retirees, people retired

25 already, and to the extent active workers have accrued

1  benefits under the defined benefit plan, they are receiving

2  the best returns and treatment in this entire case.

3        So it's not even close that -- a close question that

4  the treatment we provide them under the Plan is more than

5  sufficient to account for all of their rights, including

6  whatever rejection damages they might contend they have for

7  our rejection of the defined benefit provisions in Act 106.

8        And, again, going back to the basics, because Act 106

9  does not promise employment or guarantee employment, it's

10 unclear they would have any claim, but to the extent they have

11 one, as I said, they're being treated the best in this case,

12 along with the other retirees.  So we don't think they really

13 have a meritorious objection to confirmation.

14        Unless the Court has questions, that's all I had,

15 Your Honor.

16        THE COURT:  Give me just one moment, please.

17        Once again, to confirm that I get the bottom line of

18 your argument, you are saying that the provisions that are

19 made in the Plan for the change in benefit platforms and the

20 value of that benefit is sufficient to cover the value of any

21 claim that might exist by way of rejection damages?

22        MR. BIENENSTOCK:   Yes.  Yes, Your Honor.  And to be

23 clear, the damages we're talking about, as I confirmed to Your

24 Honor in the opening statement, they are allowed to accrue

25 benefits under the defined benefit plan up to the effective

 1    date of the Plan of Adjustment.  So they are being -- they

 2    will be paid dollar-for-dollar a hundred percent of everything

 3    they have accrued.  What -- if they have a damages claim at

 4    all, it's for things that they have not accrued, and they

 5    don't have to.  If they don't want to work further and accrue

 6    more, they don't have to.

 7         So it's unclear to us that there is a damage claim,

 8    but if there is, the benefits we're giving them in matching

 9    Social Security, in paying in full their accrued benefits to

10    the effective date, is the treatment of whatever damage claim

11    they have.

12         THE COURT:  Thank you, Mr. Bienenstock.

13         We will now turn to Mr. Barrios Ramos for AMPR, who's

14    been allotted 15 minutes.

15         MR. BARRIOS RAMOS:  Thank you, Your Honor.  Attorney

16    Jose Luis Barrios for AMPR.

17         Your Honor, to the point that Mr. Bienenstock just

18    made regarding the alleged treatment of this damage claim,

19    that, unlike Mr. Bienenstock asserted, the TRS has not been

20    rejected, it could be rejected if allowed under the Plan and

21    upon the effective date.  So it's a future rejection damages

22    claim.

23         Your Honor, of importance, Social Security would not

24    be a treatment, and it cannot be a treatment, nor the DC

25    accounts.  First and foremost, we dispute Mr. Bienenstock's

1   arguments that there is no need for legislation on this issue

2   of moving teachers to DC and to Social Security, because they

3   clearly stated that it does in the disclosure plan --

4   Disclosure Statement and Plan.  But, furthermore, the DC is

5   the money of the teachers, so that provides no treatment

6   whatsoever.

7          And even if they are allowed to reject, which we

8   understand they cannot, which position they cannot, Social

9   Security is a law, Your Honor.  Every private employer has to

10  pay it.  So matching Social Security, which is a requirement

11  of federal law, cannot be deemed a treatment of a damages

12  claim.

13         It's simply the teachers would no longer have a

14  qualified plan of retirement, and that if the reduction of

15  their contribution, as Mr. Bienenstock stated, is reduced

16  under a certain threshold, Social Security immediately

17  applies.  So none of those treatments could be a treatment of

18  the damages claim, Your Honor.

19         Furthermore, the record in this case is closed, Your

20  Honor.  All evidentiary hearings in these proceedings have

21  concluded, and at no time has any witness, nor in any

22  declaration, have declared or put forth evidence about the

23  estimation of this damages claim, about the treatment of this

24  damages claim, if there is one.

25         So, therefore, the Board cannot now try to claim new

```
 1   treatments or provide new treatments under this Plan.  In
 2   fact, this Plan, as we have mentioned and indicated before,
 3   provides no treatment whatsoever for the damages claim, if the
 4   Board can reject its contract.
 5        Mr. Bienenstock deems the defined benefit as an
 6   option, an add-on to the contract, the labor contract, and
 7   that's why he claims that, under 365, he can reject that
 8   option without rejecting the employment contract of the
 9   teachers.  Your Honor, that is contrary to the basic
10   understanding and contract provisions of the teacher's salary.
11   There is a pact between teachers and the Commonwealth, which
12   teachers have always had a modest salary, but they were
13   rewarded by a pension that would last them their lifetime.  So
14   this option that Mr. Bienenstock refers to is integral to
15   their contract of employment.
16        Your Honor, furthermore, to the point of --
17             THE COURT:  Mr. Barrios.
18             MR. BARRIOS RAMOS:  Yes.
19             THE COURT:  May I ask you two questions at this
20   point?  Are you saying that there is an actual written
21   contract, a bargaining agreement, or some other contract that
22   does guarantee the pension element of compensation for
23   teachers?
24             MR. BARRIOS RAMOS:  No, Your Honor.  No, Your Honor.
25   The CBA has no economic provisions, so it's not part of this,
```

1    and there is no written contract between teachers and the

2    Commonwealth regarding the benefit, defined benefit as always

3    being provided by statute, Your Honor.

4         The contract that we referred to is the exchange of a

5    modest salary for lifetime pension.  That is the covenant that

6    every teacher got into with the Commonwealth when they

7    accepted a modest salary in exchange for a lifetime pension.

8    It's an implied covenant, Your Honor, is our proposition.

9         THE COURT:  So you are characterizing as the covenant

10   the historical combination and expectation of teachers that

11   the salary is relatively low, but the benefits are of a

12   certain type?

13        MR. BARRIOS RAMOS:  Correct, Your Honor.  That's

14   always been the implied covenant in this process.  So yeah,

15   there is no written contract.  The pensions are provided by

16   statute, Your Honor.

17        THE COURT:  Then going back to the Social Security

18   and defined contribution elements, do the Plan and the

19   Disclosure Statement describe those as the arrangements for

20   the teachers going forward upon elimination of defined benefit

21   plan accruals?

22        MR. BARRIOS RAMOS:  I believe that the Plan proposes

23   that teachers would get Social Security, disclosing that it

24   understands that the Commonwealth will pay it, but does not

25   put it into a certainty, and also provides that -- or the

1   proposed freeze provides that they will get a DC.  Again, the

2   DC, Your Honor, is funded solely by the monies of the

3   teachers.  The Commonwealth will not put any cent in the DC.

4        And furthermore, Your Honor, as to the treatment on

5   the Social Security, as the Board puts in Exhibit F-1 of the

6   Plan, Your Honor, not every teacher will get Social Security,

7   because teachers over 45, Your Honor, for them at this point,

8   even the Board recognizes it might not be convenient to start

9   for the first time Social Security, because they may not

10  accrue the 40 quarters that they need to obtain a benefit.

11       So that cannot be a treatment, because it would be --

12  it would disadvantage some teachers against others that would

13  be, by the proposition, enrolled automatically.  The mechanics

14  of that, Your Honor, we don't understand them.  And the Board

15  has provided no evidence in these hearings as to how they

16  would make that happen, what would be the mechanics for those

17  things.  And they seem to not have them or -- and the record

18  is closed.  And, therefore, they haven't explained to this

19  Court how would that come about.  They wish that it come

20  about.  They don't explain the mechanics, and they haven't

21  provided anything on the mechanics in here.

22       THE COURT:  Have the teachers put into evidence any

23  valuation, or analysis of negative discrepancies between the

24  arrangements that are described in the Plan and the defined

25  benefit arrangements in support of your argument that there

1 should be rejection damages based on future accruals that will

2 not occur under the defined benefit plan?

3 MR. BARRIOS RAMOS: Your Honor, if I correctly

4 understood, your question is whether the teachers have

5 proffered evidence during these proceedings regarding the

6 valuation of the damages claim. Am I understanding it?

7 THE COURT: Yes.

8 MR. BARRIOS RAMOS: Well, Your Honor, inasmuch as the

9 rejection has not been effectuated, we would then provide it

10 in accordance with the Plan, have an allocation of time to

11 file a proof of claim with the required actuarial evidence

12 regarding what would be the claim valuation, Your Honor. That

13 would be our position as to that. If the Board can pick and

14 choose and reject this side of the contractual agreement, of

15 the employment agreement, but not reject the rest of the

16 employment contract of teachers --

17 THE COURT: When you say the rest of the employment

18 contract with teachers, precisely what are you referring to?

19 MR. BARRIOS RAMOS: Well, Your Honor, as many

20 teachers are -- all teachers basically are employees of the

21 Commonwealth. An employment contract is not only the contract

22 between the employer and the employee to provide services, but

23 also some of the benefits that they have. One of our

24 arguments is that rejection cannot be partial.

25 Mr. Bienenstock again describes this pension benefit

 1   as an option.  We, on the other hand, argue that this has been

 2   always an express covenant, and it's part -- integral to the

 3   employment contract.  That's why the Supreme Court in the case

 4   in 2014 went striking down as unconstitutional the impairment

 5   of the defined benefits for new teachers hired after 2014.

 6   Then there is no more implied covenant, there is no more

 7   impairment, because they will be hired under a different set

 8   of agreements with the Commonwealth.

 9          For those who have been there before, and were

10   accruing, then that impairment would be unreasonable and

11   unconstitutional.

12          THE COURT:  That is the case that focused on the

13   Contract Clause of the Puerto Rico Constitution; is that

14   correct?

15          MR. BARRIOS RAMOS:  Yes, Your Honor.  The Supreme

16   Court said that teachers' right to accrue under their defined

17   benefit is of a proprietary interest of contractual nature.

18   That is correct, Your Honor.

19          THE COURT:  Thank you.  You may go on and complete

20   anything further in your argument.

21          MR. BARRIOS RAMOS:  Well, Your Honor, in conclusion,

22   what we will stress to the Court is that they haven't shown

23   with any evidence, Your Honor, no declarations -- the

24   declaration of Ms. Levy, the declaration of Ms. Jaresko do not

25   put forth what is the recovery for teachers.  Social Security,

1  as we argue, cannot be the treatment, because some teachers

2  impacted by the freeze will get them, while others don't.  And

3  now the Board cannot just put proffered evidence after the

4  record has been closed as to this treatment.

5       Therefore, Your Honor, our position would be that

6  having the Board fail to provide evidence as to how they would

7  intend to treat what could be a significant, significant

8  claim, which we also argue is in the nature of the

9  administrative claim as Law 106, is an assumption of a

10 post-petition obligation by the Commonwealth, since before the

11 obligation was of TRS, an independent entity, much like the

12 ERS, which filed its own Title III proceedings, Your Honor.

13      Now, that novation, that change, which we completely

14 disagree -- with a different source of funding, we agree it

15 should be treated just like ERS, like a different debtor, Your

16 Honor.  So the Commonwealth assumed this obligation.  It

17 stopped being the employer, and contributed, and became the

18 plan manager and sole funder of the teachers' pension, did

19 cause a novation that changed the obligation.  And this would

20 be an administrative claim.

21      But if it wasn't, Your Honor, we still have our

22 argument and our position that the common -- that the Board

23 failed to provide any evidence of the treatment, and,

24 therefore, this Plan provides no treatment whatsoever for the

25 damages claim upon rejection that they seek.

1              THE COURT:  Thank you, Mr. Barrios.

2              MR. BARRIOS RAMOS:  Thank you, Your Honor.

3              THE COURT:  Mr. Bienenstock.  Sorry.  There was a

4     hand raise before we go to Mr. Bienenstock.

5              Mr. Despins.  Mr. Despins, did you wish to be heard?

6              MR. DESPINS:  Yes, Your Honor.  I apologize for the

7     technical problem.

8              This is not our issue, so you might say why am I

9     intervening with it, because we have not been a party to all

10    the negotiations and all that, and I want to be clear, the

11    unions are -- the Teachers Union are on the committee.  We

12    have a very good relationship with them.

13             The concern I have is that I wouldn't want this to

14    head in a direction where -- and I don't think the Teachers

15    Union or the Board are taking that position, but that, hey,

16    there's a place where we could place these claims, which is in

17    Class 58.  And the reason I'm raising this is this Class 58 is

18    our class, and expressly excludes any active and retired

19    employee benefits.

20             So we're not taking a position on the merits of this

21    debate.  I'm just raising it so that Your Honor might, you

22    know, think, oh, maybe we can put that deemed rejection claim,

23    to the extent there's any, into that class; but I want to make

24    sure Your Honor knows there's an express exclusion in our

25    class for these claims.

1            That's it, Your Honor.  Thank you.

2            THE COURT:  Thank you, Mr. Despins.

3            Now, Mr. Bienenstock.

4            MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

5    Bienenstock of Proskauer Rose for the Oversight Board, as

6    Title III representative.

7            First, Your Honor, in respect of the argument that

8    we're not providing anything by paying matching Social

9    Security benefits, because it's the law, that's not really

10   accurate.  The teachers would not be eligible for Social

11   Security benefits if we did not lower the contribution

12   requirement for the defined contribution plan below the

13   qualified plan threshold.  We are lowering it to make them

14   eligible, and that, in turn, causes us to make matching Social

15   Security contributions.

16           I think Your Honor asked the key question in terms of

17   is there a contract with the teachers governing pension

18   benefits, and the candid answer was no.  Additionally, Your

19   Honor, given that the defined benefits were in the statute, it

20   wasn't -- Puerto Rico didn't even set up a situation where you

21   could negotiate with the union to change the collective

22   bargaining agreement's --

23           (Sound played.)

24           MR. BIENENSTOCK:  -- pension provisions, which had

25   none, because you were talking about the union on the one

1    hand, and the legislature and Governor on the other hand.

2         The final contention, as I understand it, from AMPR

3    is they want to know the nitty-gritty, what are the

4    regulations for how the defined contribution plan will be

5    implemented.  And I'm sure the Commonwealth will be providing

6    that, but we don't think that goes at all to the

7    confirmability of the Plan.

8         The Plan provides that they will have that defined

9    contribution plan and benefits at a lower contribution than

10   they're currently making, and they'll have Social Security.

11   And that's all that's necessary, as far as the Plan is

12   concerned.

13        That's all I had, unless Your Honor has questions.

14        THE COURT:  Now, Mr. Barrios spoke in terms of the

15   ability to make a rejection damages claim if the Plan is

16   confirmed.  What is your position as to that procedurally, and

17   to the extent you want to speak about it economically?

18        MR. BIENENSTOCK:  Sure.  The Plan calls for the

19   rejection of the claim which, as Mr. Barrios conceded, the

20   Puerto Rico Supreme Court refers to as a contract claim, and

21   that's why we went to the concept of rejection.  So when a

22   Plan rejects an executory contract, typically there is a

23   damage claim that arises from it, and as I explained earlier,

24   we think we've already provided for that damage claim, if

25   there is one --

1              (Sound played.)

2              MR. BIENENSTOCK:  -- and by everything we're

3    promising the teachers in terms of retirement benefits.

4              THE COURT:  So to the extent the teachers were to

5    make a rejection damages claim after this deemed rejection of

6    the contract becomes effective, you're saying your response to

7    that will be that there are no damages, because of the

8    mechanics and economic value of the provisions that are made

9    for the teachers in the Plan?  Am I understanding that

10   correctly?

11             MR. BIENENSTOCK:  Well, I'm saying that it's very

12   likely there are no damages, because there's no promise of

13   employment; but even if there is a damage claim, however it's

14   quantified, the treatment that we are providing the teachers

15   for their retirements is what they get for that damage claim,

16   as well as all their other -- all their other retirement

17   rights.  It's a package deal.

18             THE COURT:  So this is just what I'm trying to

19   understand here.  Procedurally, are you saying that you meet

20   their post-confirmation executory contract rejection damages

21   claim with an answer that says it's -- you know, A, it wasn't

22   worth anything, because there was no guarantee or promise of

23   future employment; B, even if it is worth something, this

24   value has been given so that there is no incremental value to

25   it; or, on the other hand, are you saying that asserting such

1   a claim at all would be precluded by confirmation of the Plan?

2           MR. BIENENSTOCK:  No, I'm not -- we're not saying the

3   latter, Your Honor.  We're saying that to the extent they

4   would have an allowable rejection damage claim, its treatment

5   is the current Plan treatment of the defined contribution, and

6   the Social Security benefits, and matching contribution of the

7   Commonwealth.

8           THE COURT:  Thank you for clarifying that for me.

9           So that concludes the arguments on Agenda Item II.

10  Now, Agenda Item III.3 is the arguments concerning the Takings

11  Clause of the Constitution, and what I would propose to do is

12  hear Mr. Bienenstock's argument and Mr. Kirpalani's argument,

13  and then take our morning break.

14          Mr. Bienenstock, are you in a position to go through

15  your argument before our morning break?  I mean, the morning

16  break would give you your full 45 minutes.  I would take it

17  later.

18          MR. BIENENSTOCK:  If that's the Court's preference,

19  the answer is yes.

20          THE COURT:  Thank you, Mr. Bienenstock.  That is my

21  preference.

22          MR. BIENENSTOCK:  Okay.  Good morning again.  Martin

23  Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

24  as Title III representative.

25          I'm going to try to go in the order of issues in Your

1   Honor's Order.  I apologize in advance if I stray at some

2   point, but I'm going to try to keep to that order.  So the

3   first issue was whether and to what extent the exercise of

4   discretion by the Court under 11 U.S.C. 944(c)(1) to exempt

5   some or all takings claims from discharge would render the

6   Plan unfeasible.

7        Your Honor, there's something in that question that

8   I'm going to come back to in terms of the exercise of

9   discretion, but first I want to answer the question.  In terms

10  of just the numbers, the eminent domain claims approximate 400

11  million dollars, and could be paid by reducing amounts that

12  would otherwise go into the pension trust, other reserve

13  accounts, and elsewhere.

14       By itself, the Oversight Board does not believe that

15  would cause the Oversight Board to withdraw the Plan on

16  feasibility grounds, although it would obviously make the

17  numbers tighter, with less margin for error.  If, however,

18  Mr. Hein's takings claims for his bonds were allowed and

19  deemed nondischargeable, but on the assumption that ruling

20  would apply to all similar bonds, the system would be hit with

21  billions of dollars in additional debt obligations, and the

22  Plan would no longer be feasible.

23       As Your Honor knows, as a practical matter there,

24  these takings claims are coming in a lot of different flavors

25  in this case, and so it's -- I want to be clear in addressing

1   them that the eminent domain and the inverse condemnation

2   claims are sort of one segment.  Mr. Hein's takings claims are

3   another, and would be much, much larger in magnitude.

4        Now, Your Honor's question seems to dovetail in large

5   part with the *City of Detroit* case, where bankruptcy Judge

6   Rhodes concluded takings claims were nondischargeable, and

7   ordered them nondischargeable pursuant to section 944(c)(1).

8   Takings claims are not nondischargeable.  We submit there is

9   no discretion to order them nondischargeable.

10       Therefore, as a threshold matter, I want -- and a

11  really important one, I want to explain why Judge Rhodes was

12  dead wrong that takings claims are nondischargeable.  The

13  precise point at which Judge Rhodes erred was at 524 B.R., at

14  page 270, where he responded to the argument takings claims

15  are nondischargeable when the bankruptcy statute does the

16  taking, but not when the taking occurred prepetition by

17  ruling, quote, all that matters under the Fifth Amendment is

18  that the owner of private property must be justly compensated

19  if that property was taken for public use, whenever and

20  however that taking occurred.

21       The error in that sentence is Judge Rhodes'

22  application of the just compensation requirement to

23  prepetition takings, regardless of whether the owner still has

24  a property interest at the time of bankruptcy.  The authority

25  showing that was error, with a capital E, are a host of

1   Supreme Court decisions, some of which Judge Rhodes primarily

2   relied on, but failed to discern how they distinguished

3   between contract rights and property rights.

4        Most poignantly, his main authority was *Louisville*

5   *Joint Stock Land Bank v. Radford*, which provides, at pages 589

6   and 590, quote, under the bankruptcy power, Congress may

7   discharge the debtors' personal obligation, because, unlike

8   the states, it is not prohibited from impairing the

9   obligations of contracts. But the effect of the act here

10  complained of is not the discharge of Radford's personal

11  obligation.  It is the taking of substantive rights and

12  specific property acquired by the bank prior to the act.

13       I can't emphasize that enough, Your Honor.  In

14  *Radford*, you had a bank holding real property, a mortgage and

15  real property owned by the debtor.  That gave the bank

16  property interests.  That was separate from the contract, the

17  loan contract between the bank and the debtor, which gave the

18  bank contract interest.

19       (Sound played.)

20       MR. BIENENSTOCK:  And *Radford* itself, which is the

21  *City of Detroit's* primary authority, distinguished between

22  discharging obligations under the contract and discharging

23  obligations under the mortgage.

24       Then, in *U.S. v. Security Industrial Bank*, which

25  Judge Rhodes also relied on, the Supreme Court was confronted

1    with a then new Bankruptcy Code, which avoided liens against

2    the debtors' exempt property.  The Supreme Court at 459 U.S.,

3    at page 75, wrote, "however, bankruptcy principles may speak

4    to this question, our case recognized, as did the common law,

5    that the contractual right of a secured creditor to obtain

6    repayment of this debt may be quite different in legal

7    contemplation from the property right of the same creditor in

8    the collateral.  Compare *Hanover National Bank v. Moyses* with

9    *Louisville Joint Stock Land Bank v. Radford*, et cetera."

10        In *Hanover National Bank v. Moyses*, the Supreme Court

11   upheld the constitutionality of preventing the bankrupt

12   creditors from sharing in the bankrupt's exempt property.  In

13   doing so, the Supreme Court ruled at 186 U.S., at page 188,

14   that the, quote, subject of bankruptcies includes the power to

15   discharge the debtor from his contracts and legal liabilities.

16        And at page 192, the Supreme Court ruled, quote,

17   Congress, I emphasize Congress, may prescribe any regulations

18   concerning discharge in bankruptcy that are not so grossly

19   unreasonable as to being kept incompatible with fundamental

20   law.  And we cannot find anything in this act on that subject

21   which would justify us in overthrowing its action.

22        So, Your Honor, here, Congress did not act

23   unreasonably by failing to exclude unsecured takings claims

24   from discharge in Title III under PROMESA.  Let's see what

25   Congress did in Title III.  It incorporated Bankruptcy Code

1  section 944, providing all debts are discharged other than

2  debts excepted from discharge in the Plan or Confirmation

3  Order, and debts of entities lacking knowledge and notice of

4  the case.

5          As I mentioned earlier, nothing in Title III grants

6  the power to make a debt nondischargeable unless it is

7  nondischargeable.  Several Title III provisions show Congress

8  did not make the contractual or unsecured aspects of

9  prepetition takings claims nondischargeable.  First, there is

10  no language saying that it does.  Second, since the very first

11  municipal bankruptcy statute was held constitutional in 1938

12  in the Supreme Court's *Bekins* decision, none of them,

13  including PROMESA Title III, has ever provided for payment in

14  full of eminent domain or similar claims.

15          Bankruptcy Code Chapter 9, section 901(a) makes

16  Bankruptcy Code section 507(a)(2) applicable to the Chapter 9

17  cases, the same as PROMESA section 301(1) makes it applicable

18  to Title III cases.  Section 507(a)(2) grants priority to

19  three types of claims:  Administrative expenses, certain

20  Federal Reserve Bank claims, and certain fees under Title 28

21  of the United States Code.  Prepetition takings claims do not

22  fit within any of the three types of priority claims that

23  Congress recognized.

24          Congress does make sure it complies with the Fifth

25  Amendment by requiring prepetition secured claims to be paid

1     in full of municipal Chapter 9 cases by incorporating the

2     cramdown provisions of Bankruptcy Code section 1129(b).  That

3     Congress has done nothing for over 80 years to pay prepetition

4     takings claims in full -- and it's not as if the issue never

5     surfaced before.  The Board's confirmation reply brief cites

6     Circuit Court decisions holding prepetition takings claims are

7     just general unsecured claims.  That was in the Ninth

8     Circuit's *Stockton* decision, and in an Eighth Circuit

9     decision.

10          It is highly implausible that Congress simply forgot

11    about takings claims, eminent domain claims under the U.S.

12    Constitution, and didn't fix it over the last 80 years if it

13    meant to make sure takings claims are paid in full.  As I

14    mentioned earlier, in *Security National Bank*, the Supreme

15    Court said it's Congress that can determine what claims are

16    nondischargeable, as long as it's not grossly unreasonable.

17          Now I want to look at the same issue, but from a

18    common sense perspective.  If a municipality's police

19    accidentally crashed into someone's car or home, the

20    municipality has a tort liability for property damage.  That

21    is dischargeable in Title III, and we are discharging them for

22    payments of ten to 30 cents on the dollar in this very Title

23    III case.  There is no rhyme or reason why a different result

24    occurs if the municipality takes the property for public good,

25    as opposed to tortious conduct.

```
 1              Let's assume a municipality is a school district or
 2    irrigation district, and it took property by eminent domain,
 3    and then went into Title III or Chapter 9, because it couldn't
 4    pay its liability for taking.  Are the schools or water
 5    facilities supposed to close because a municipality has more
 6    liabilities than it can pay, and can't repay the takings
 7    claims, because it's nondischargeable?  That makes no sense,
 8    and Congress didn't do it.  That turns the whole fresh start
 9    purpose of the bankruptcy power on its head.  The takings
10    claims are either dischargeable or not.  The answer cannot
11    depend on the debtors' financial condition.
12              The second issue, Your Honor --
13              THE COURT:  I'm sorry, Mr. Bienenstock.  Will you go
14    back to that last point?  I'm not quite sure I followed you.
15    You say the takings claims can't --
16              MR. BIENENSTOCK:   Right.
17              THE COURT:   -- depend on the debtors' financial
18    condition?
19              MR. BIENENSTOCK:  The dischargeability of the takings
20    claims, Your Honor, I'm saying either they're dischargeable or
21    they're not dischargeable.  The answer doesn't change with the
22    debtors' financial condition.  How much the debtor can pay
23    those claims will obviously change based on the debtors'
24    financial condition, but the dischargeability of the eminent
25    domain claims cannot change depending on whether the debtor
```

1    is a -- can pay 80 cents on the dollar, or 40 cents on the

2    dollar, or ten, or a hundred.  It's either dischargeable or

3    it's not dischargeable.

4         And our point is Congress has made very clear it is

5    dischargeable, because it addressed what's not dischargeable

6    and that's not included.  And it also addressed priority

7    claims that have to be paid in full, and that's not included.

8    And if you take, you know, my examples of the school district,

9    it would make no sense if those claims are nondischargeable.

10   You'd have to close the schools.  The bankruptcy law just

11   can't work if claims for taking property for public use are

12   nondischargeable.

13        And, again, it conforms to what the Supreme Court

14   wrote in *Radford* and *Security National Bank,* and all the

15   Circuit Courts have followed.  You look at two things:  The

16   contract and the property interest.  Contract rights are

17   dischargeable.  Property interests have to be paid what

18   they're paid, which I'm about to get to.

19        Here, there's no -- and no one contends there's any

20   security interest for the takings claims.  What seems to

21   create the notion to argue that they're nondischargeable is

22   the word "Constitution".  If it arises under the U.S.

23   Constitution, then somehow you can't be touched.  No, it can

24   be touched.  It has to be touched to comply with the national

25   policies underlying reorganization, and to -- and it seems

1   like the Supreme Court has been consistent all along.  You

2   look for the contracts claims, they are dischargeable;

3   property claims, not as dischargeable.  I mean, they're

4   dischargeable, but you have to pay them more.

5           THE COURT:  Well, here, we certainly have arguments

6   that pick up on language in *Knick,* and opponents argue that

7   this right is a right that is in the Constitution.  It's not

8   merely the word "Constitution", but the Constitution says that

9   property shall not be taken without just compensation,

10  prescribing that just compensation remedy.  So it's

11  distinguished in that way from damages that might be

12  calculated for a tort, or for even a constitutional tort, such

13  as excessive force, where there is some determination of

14  whether and to what extent a remedy is necessary and

15  appropriate.

16          Here, you have a Constitution that says that if

17  property is taken, just compensation must be paid, and *Knick*

18  is saying that that cause of action actually accrues at the

19  time of the taking.  Why is it then that a person whose

20  property has been taken, that has to go through a court

21  process and receive a judgment to substantiate the right to

22  collect in that process, loses the right to collect in the

23  case of bankruptcy?

24          Is that saying that just compensation then is a

25  judgment that might be worth something, might be worth

1   nothing, because it's unsecured, and that's sufficient to

2   satisfy the constitutional obligation?

3           MR. BIENENSTOCK:  Your Honor, I'm glad you asked the

4   question, and the answer is as follows.  And *Knick* is a

5   helpful case for us, because it puts the timing of the taking

6   at the time it occurred, which in this case is all

7   prepetition.  And the answer to Your Honor's question as to

8   why a different result, based upon the passage of time to

9   process the lawsuit, is the exact same reason why some claims

10  are prepetition general unsecured claims, and other claims

11  under the *Redding v. Brown* doctrine are postpetition

12  administrative claims, timing makes a difference.  It's as

13  simple as that.

14          Prepetition claims are dischargeable as general

15  unsecured claims.  Postpetition claims that are -- qualify as

16  administrative claims are paid in full.  So the prepetition

17  eminent domain claims are prepetition claims.  They're general

18  unsecured, except -- and we provide for this in our Plan, Your

19  Honor.

20          And this gets to a subsequent issue Your Honor is

21  asking about.  Puerto Rico frequently put money in escrow for

22  the initial value, or at least the value that Puerto Rico

23  contended the property had that it took.  And where that has

24  happened, then our Plan says that the creditors who have the

25  benefit of those escrows will be treated as secured to the

1    extent of those escrows.  So they will get all that money.

2    But to the extent they have a further claim over and above

3    that for which there's no collateral, that's a general

4    unsecured prepetition claim.

5         Timing does make a difference is the answer to Your

6    Honor's question, and there's nothing in the Constitution that

7    changes that, to our knowledge, where that's been even hinted

8    at by any of the Supreme Court decisions that any of the

9    parties have cited.

10        THE COURT:  Thank you.

11        MR. BIENENSTOCK:  The next question Your Honor raised

12   was arguments concerning the meaning of just compensation in

13   the context of bankruptcy law.  The jurisprudence makes clear

14   that in municipal bankruptcy situations, just compensation

15   does not mean full market value of the taken property.

16        In *United States v. Commodities Trading Corp.*, 339

17   U.S. 121, the Supreme Court said when -- it's referring to

18   market value -- would result in manifest injustice to owner or

19   public, courts have fashioned and applied other standards.

20   The dominant consideration always remains the same:  What

21   compensation is just, both to an owner whose property is

22   taken, and to the public that must pay the bill.

23        I won't go through all of the authorities we've

24   cited, but the bottom line is just compensation does not have

25   to reach actual market value, at least in some situations.  In

1   our view, since they're all prepetition unsecured claims, it

2   won't be a dispositive issue as to the feasibility of the

3   Plan.

4         The Court also raised arguments concerning the

5   Oversight Board's proposed distinction between takings claims

6   that are secured, and those that are unsecured.  I actually

7   just explained that, Your Honor.  Wherever the Commonwealth

8   created an escrow for an entity or person whose property was

9   taken, that's what we're referring to as the secured claim.

10  And then the unsecured claim will be treated the same as the

11  other general unsecured claims in the case.

12        Your Honor also asked whether the reduction of a

13  Takings Clause claim to a judgment or a settlement agreement

14  affects whether it is still subject to the Takings Clause.

15  All of these, Your Honor, as Your Honor probably knows better

16  than I do, that they all trail back to the Court's initial

17  question as to discretion to designate these as

18  nondischargeable in the Confirmation Order, because, from the

19  Oversight Board's perspective as the Title III representative,

20  all of the takings claims start out as prepetition general

21  unsecured claims that are completely dischargeable.  So

22  whether they're reduced to judgment, or settlement agreement,

23  or are still disputed makes absolutely no difference.

24        If, however, one were to say that before judgment or

25  settlement agreement -- or maybe not before judgment, but

1    before a settlement agreement -- maybe a settlement agreement

2    would somehow convert a nondischargeable takings claim into a

3    garden variety contract claim.  Then the contract claim would

4    be dischargeable.  But, Your Honor, we're not really going in

5    that direction, unless and until Your Honor rules that that's

6    what we need to.  We think they're all prepetition general

7    unsecured claims except to the extent of any escrows that the

8    Commonwealth provided.

9         Your Honor also asked how the three factors

10   identified in *Penn Central Transportation v. City of New York*

11   apply to takings claims that are not, per se, takings claims.

12   Certain creditors, such as Mr. Hein, have argued that the

13   Plan's discharge of contractual rights to payment were for

14   taking without just compensation.  This is simply wrong.

15        Every case to ever decide the issue has held that

16   unsecured contractual rights to payment can be discharged in

17   bankruptcy without implicating the takings clause.  There is

18   no taking arising by the Plan's discharge of such unsecured

19   claims.

20        There's actually a very good line or paragraph in

21   *Penn Central Transportation v. City of New York*, Your Honor,

22   where Justice Brennan, in trying to define what a taking is,

23   said, well, obviously taxation does not create takings.  And

24   that is a great example.  If you want an example of the

25   government taking your money, none of us have to look any

1  further than federal taxes.  And it would be great, sort of,

2  if we could all get them back under the Takings Clause, but

3  obviously when money is taken from a wide universe of persons

4  and entities all for public use, no taking occurs.

5      The same rationale applies to Mr. Hein.  The

6  discharge in bankruptcy is most definitely for the good of the

7  public, both in the Commonwealth case, the public in Puerto

8  Rico, and even the public outside of Puerto Rico, and the rest

9  of the United States, because of the debt that is held across

10 the United States that stems from Puerto Rico, and because

11 it's an integral component to the United States.  It's to

12 everyone's benefit that it flourish going forward.  But that's

13 not a taking.

14     And Mr. Hein raised that same objection in *COFINA,*

15 because he contended his COFINA bonds were secured, and the

16 settlement, in his view, deprived him of the collateral

17 security for those bonds.  So he said he had suffered a

18 taking, and this Court disagreed.  And this harks back to the

19 problem Mr. Hein has, because his class has accepted the Plan.

20 It also harks back to the problem that Mr. Hein has not made a

21 case why the settlement was unreasonable.

22     To be sure, Mr. Hein has asserted his arguments that

23 he has good priorities and liens on certain property tax

24 revenues.  He's said what his contentions are, but he's made

25 no effort to show how the class' resolution of those

1  contentions in a settlement that gives them substantially more

2  than the other general unsecured claim holders that

3  Mr. Despins' committee represents.  He's shown nothing why the

4  Court should treat that as a settlement that doesn't come

5  within the lowest range of reasonableness.

6        Also, and what Mr. Hein is trying to do here is to

7  litigate what's been settled.  There would be no purpose in

8  settling anything.  In fact, you wouldn't be able to settle

9  anything if one or more hold-outs could say, well, you might

10 settle, but I'm going to litigate the issue in the case.  The

11 normal bankruptcy reorganization process contemplated by Title

12 III and the rest of the Bankruptcy Code could not work if

13 those settlements were not binding on everyone in the class.

14        Under the *Penn Central* test, the courts consider

15 three factors, and those are:  The economic impact of the

16 regulation on the claimant, the extent to which the regulation

17 interferes with the claimant's reasonable investment-backed

18 expectations, and the character of governmental action.  Your

19 Honor, I think these three factors will definitely impact

20 whether some of the inverse condemnation claims, and perhaps

21 Suiza's claim, should be considered takings.

22        And as Your Honor's questions made clear, that will

23 be very significant if the Court ends up concluding that

24 takings claims are nondischargeable.  It won't have any

25 significance if the Court agrees with our contention that they

1  are dischargeable, because they'll just be claims, no matter

2  whether you call them takings claims or not.

3        The Court used -- as the Court knows, it used the

4  three-factor test in *COFINA*, and concluded, you know, no

5  taking existed, at least in that context where Mr. Hein was

6  intending that his rights to the collateral in COFINA were

7  being taken.  Here, he's claiming again the collateral, that

8  he contends is the 1.03 percent property tax, and he's

9  alluding to the priority under the Puerto Rico Constitution,

10  that he be paid first.

11        I think it's basically a distinction without a

12  difference between the *COFINA* case and this case.  His claims

13  don't qualify his takings under the three-factor test in

14  either case.

15        It's also, I think, important to point out that the

16  action here is a necessary step to address the Commonwealth's

17  fiscal crisis.  The Title III Plan, as I alluded to before,

18  provides a benefit to the entire Commonwealth, and indirectly

19  to the United States, so those are not the types of things

20  where the Supreme Court has found takings.

21        It also looks at who is being targeted, and here it's

22  not Mr. Hein who's individually being targeted.  It's the

23  entire universe of GO and GO guaranteed bondholders who have

24  made this -- entered into this settlement.

25        Mr. Hein does argue that the Plan's discharge of

1   contractual rights to payment were the taking without just

2   compensation.  It's not a lot different than arguing that

3   paying taxes is a taking by the government without just

4   compensation.  As I've explained, it's for a general public

5   use.  It's aimed at a large universe of people, and,

6   therefore, it doesn't qualify as a taking.

7          Your Honor, that concludes my takings remarks,

8   subject to any questions Your Honor has.

9          THE COURT:  I do have a couple of questions.  Aside

10  from the *Cobb v. City of Stockton* case, can you point to any

11  decisions that make the secured/unsecured distinction in the

12  takings context?

13         MR. BIENENSTOCK:  Sure, Your Honor.  As I mentioned,

14  *Radford* does and *Security National Bank* does.  *Security*

15  *National Bank* actually -- let me see if I can find the page

16  quickly.  Yes.  At page -- at page 75 of the *Security National*

17  *Bank* decision, which is found in 459 U.S. 70, is the beginning

18  of the decision.  At page 75, Your Honor will find the

19  following quotation:  However bankruptcy principles may speak

20  to this question, our case recognized, as did the

21  Commonwealth, that the contractual right of a secured creditor

22  to obtain repayment of his debt may be quite different in

23  legal contemplation from the property right of the same

24  creditor in the collateral.  Compare *Hanover National Bank v.*

25  *Moyses*, supra, with *Louisville Joint Stock Land Bank v.*

 1   *Radford*, and *Kaiser Aetna v. The United States*, 44 U.S. 164

 2   (1979).

 3         Those cases, Your Honor, are making the exact -- I

 4   mean, it's no accident I'm copying them.  They say, look at is

 5   there a contract; are there contract rights you want to

 6   discharge; is there a property interest; are there property

 7   interests you want to discharge.  What *City of Detroit* does is

 8   it goes a further step.  It says, without a property interest,

 9   we're going to take the obligation created in the United

10   States Constitution to pay just compensation, and treat it as

11   if it were a property interest.  And we'll make it

12   nondischargeable.

13         That is a quantum leap that we urge this Court not to

14   take, because it's wrong.  And it's wrong not only as a legal

15   matter, because all of the Supreme Court's jurisprudence

16   separately deal with property interest and contract interest,

17   but it's wrong as a practical matter.

18         Please, take a school district.  If it committed a

19   taking and is forced into bankruptcy, you can't say we're

20   going to hold this taking claim nondischargeable and you're

21   going to have to close down.  It just makes no sense in the

22   national policy underlying bankruptcy law, which the United

23   States Constitution does assign to Congress to enact.

24         And as the Supreme Court points out, on the subject

25   of bankruptcies, it's very broad.  And the Supreme Court has

1 frequently said, and some of the litigants here have pointed

2 out that the bankruptcy power, the bankruptcy statutes are

3 subject to the Fifth Amendment.  We could not agree more.  But

4 that doesn't change all of the jurisprudence that separates

5 general unsecured claims and property claims, because -- look

6 at it this way:  A contract is property.  In the abstract

7 legal sense, a contract is property.  A contract right is

8 property.  It's intangible, but a contract right is property.

9        Bankruptcy law discharges contract rights, regardless

10 that it's property.  That's the key point.  You need a real

11 property interest, like a lien, to have something where you do

12 better than a general prepetition unsecured claim.

13        THE COURT:  So in this analogy to contract rights,

14 the municipality or the government takes the property, so

15 there's no longer any title in the original owner of the

16 property, and then the constitutional right to just

17 compensation is of the character of a contract right or a

18 promise, even though it is an obligation imposed by the

19 Constitution.  So by analogy to the position of someone who

20 has an unsecured contract claim, it's dischargeable if it

21 occurred prepetition?

22        MR. BIENENSTOCK:  Yes, Your Honor.  And the key thing

23 is it works perfectly outside of bankruptcy.  The requirement

24 to pay just compensation works when the obligee or the obligor

25 is not in bankruptcy, but to then make the quantum leap to

1   say, well, even if the obligor can't afford to pay, we're

2   going to trounce all of the policies about reorganization, and

3   going concern, and maintaining the municipality for the good

4   of the people, and we're going to say, no, you must pay this

5   in full; we're not discharging it.  Well, that's just against

6   every principle we have in the Constitution and elsewhere.

7        So, yes, it makes a difference if the entity that

8   becomes obligated for a taking under the Fifth Amendment goes

9   into bankruptcy.  Those claims have to be dealt with like all

10  other claims.

11       THE COURT:  So a municipality that felt itself

12  failing and also felt that it would be able to revive more

13  effectively with recreational lands, or a new site for

14  something that will attract business to the municipality

15  could take properties, and then not too long thereafter, file

16  for Chapter 9 and keep those properties, treating the just

17  compensation obligation as a dischargeable unsecured

18  obligation?

19       MR. BIENENSTOCK:  No, Your Honor.

20       THE COURT:  For a reverse incentive --

21       MR. BIENENSTOCK:   No.  It certainly would be, Your

22  Honor, and I'm going to tell you why that wouldn't happen.

23  Because if it did happen -- and I want to be clear, even

24  though it's to state the obvious, no one's suggesting those

25  are the facts here, and there are no facts in the record

1    suggesting --

2            THE COURT:  It was a hypothetical.

3            MR. BIENENSTOCK:  I know.  Right.  It was a

4    hypothetical.  And the reason it would not happen, as Your

5    Honor set out, is that the takings victims would be in your

6    court immediately arguing that the petition is not filed in

7    good faith and, therefore, must be dismissed.  And the

8    Bankruptcy Code and Title III provide Your Honor all the

9    ammunition you need to deal with that bad actor situation.

10           THE COURT:  Thank you, Mr. Bienenstock.

11           MR. BIENENSTOCK:  Thank you.

12           THE COURT:  I have no further questions for you on

13   this.

14           So the next speaker is Mr. Kirpalani, who's been

15   allotted five minutes.

16           MR. KIRPALANI:  Thank you, Your Honor.  For the

17   record, Susheel Kirpalani of Quinn, Emanuel, Urquhart &

18   Sullivan on behalf of the Lawful Constitutional Debt

19   Coalition.

20           Your Honor, I'll be briefer than five minutes I

21   think.  I'm not going to try to tackle some of the issues that

22   Your Honor was discussing with Mr. Bienenstock.  I'm going to

23   try to stay in my lane, which is the GO and GO guaranteed debt

24   treatment.

25           We respectfully refer the Court to paragraphs 86 to

1  110 of the Oversight Board's Memorandum of Law in support of

2  confirmation in the Commonwealth's Title III case, 17-03283,

3  at docket 18869, for a thorough summary of the arguments made

4  by GO and GO guaranteed bondholders, including the LCDC, which

5  demanded payment in accordance with the constitutional pledge,

6  and the constitutional priority, including the assertion of

7  statutory liens.

8        The status of GO and GO guaranteed constitutional

9  debt has been secured by liens, and the extent of those liens

10  is part and parcel of the overall settlement under the Plan.

11  To the extent that individual GO bondholders are here before

12  you asserting violations of the Takings Clause, we think that

13  assertion misses the mark for much of the same reason that we

14  saw in the COFINA Title III case.

15        The problem with the arguments asserted by the

16  individual GO bondholders is they assume the answer.  They

17  assume that they are secured, and then they take the position

18  that the Plan is taking from them and not providing just

19  compensation.  But for a purported secured creditor to argue a

20  Takings Clause violation, when the status of the creditor's

21  lien is the subject of a dispute, simply doesn't work.  The

22  status of GO and GO guaranteed bondholders is at the center of

23  the inextricably intertwined settlements that are embodied in

24  the Plan, and as in *COFINA*, every class of purportedly secured

25  bond debt has accepted the Plan.

1          And we don't believe there's anything more to say

2    about it than that.  The members of each class are bound by

3    that vote.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. Kirpalani.

6          We will now take our morning break, and resume at

7    10:45 Eastern Time, which is 11:45 Atlantic Standard Time.

8              (At 11:28 AM, recess taken.)

9              (At 11:37 AM, proceedings reconvened.)

10          THE COURT:  Good morning, everyone.  My apologies for

11   the slight delay and the technical difficulties.  We will now

12   continue with the oral arguments on the Takings Clause issues.

13   The next speaker is Mr. Gonzalez Valiente for Suiza Dairy, for

14   seven and a half minutes.

15          Hello, Mr. Gonzalez Valiente.  You need to unmute

16   yourself, please.

17          MR. GONZALEZ VALIENTE:  Sorry, Your Honor.

18          THE COURT:  I think you're unmuted now.

19          MR. GONZALEZ VALIENTE:  Yes.  Thank you.  Good

20   morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. GONZALEZ VALIENTE:  Rafael Gonzalez Valiente from

23   Godreau & Gonzalez Law, in representation of Suiza Dairy.  I

24   will be as brief as possible with the limited time available,

25   but I would like to start with a quote from Justice Brandeis

1   in *Luisville Joint Stock Land Bank v. Radford*.  No matter how

2   great the nation's need, private property shall not be thus

3   taken, even for wholly public use, without just compensation.

4   Your Honor, we have to keep that in mind for the rest of the

5   arguments.

6        As to your first question, I believe there's really

7   no evidence on the record that suggests that the Plan is not

8   feasible.  Even if it has to pay for claims, for takings

9   claims, the FOMB itself states that the finances will be

10  tighter, but still feasible.  But to paraphrase Justice

11  Thomas, in *Knick v. Township of Scott*, if observing the

12  Takings Clause makes the Plan unfeasible, then, sadly, the

13  Plan may not be confirmed.

14       Finally, and if I may be so bold, I would like to

15  suggest what I think could be a better alternative than

16  resorting to section 944.  The Court could require the Board

17  to amend the Plan to provide full payment to takings

18  claimants.  Instead of, quote, a nondischargeablility ruling,

19  the Plan would then provided for an orderly and logical

20  payment schedule that is compatible with the Plan.

21       As to your second question, the Takings Claus

22  requires payment in full of affected property rights.  In *Penn*

23  *Central v. New York,* the Court held that the term "property"

24  encompasses the group of rights inherent in a citizen's

25  relation to a claim.  The Court then elaborates with regard to

1    the Fifth Amendment, and I quote "the constitutional provision

2    is addressed to every sort of interest the citizen may

3    possess."

4          In *Logan v. Zimmerman Brush*, 455 U.S. 422, the

5    Supreme Court held that the type of interests protected as

6    property are varied, and as often as not, intangible relating

7    to the whole domain of social and economic facts.  Given the

8    broad definition of property, the Supreme Court's holding in

9    *Security Industrial Park* provides the answer to Your Honor's

10    question.  The bankruptcy power is subject to the Fifth

11    Amendment against taking private property without

12    compensation.

13          The FOMB would like the Court to equate taxation with

14    takings, but this has already been resolved by *Louisville v.*

15    *Radford* and *Security Industrial Bank*.  For this I quote

16    Justice Brandies in *Radford*.  If the public interest requires

17    and permits the taking of public property for -- of private

18    property of individual mortgagees in order to relieve the

19    necessities of individual mortgagors, resort must be had to

20    proceedings by eminent domain, so that through taxation,

21    through taxation the burden of relief is afforded -- afforded

22    in the public interest may be borne by the public.  In other

23    words, the cost of paying for public needs should be

24    distributed equally to all citizens, and not be charged to

25    individual holders of property.  In other words, taxation is

1    necessary in order to pay for takings.

2         To address Mr. Bienenstock's example of the school

3    district, my response is this is exactly why the Fifth

4    Amendment was created.  Again, no matter however great the

5    nation's need, no taking without just compensation.

6         The decision reached here can have far flung

7    consequences in future state and municipal bankruptcies.  If

8    you allow takings claims to be discharged, it sets a precedent

9    where a state, city, or school district may take private

10   property from its citizens, maybe even from political

11   opponents, as has been done since ancient times, and then file

12   for bankruptcy without providing compensation.  Thus, the

13   state would have righted its finances at the expense of its

14   innocent citizens, and not the public at large.  That is

15   exactly why the Fifth Amendment may not being effected by a

16   bankruptcy statute such as PROMESA.

17        As to your third question, the Supreme Court's

18   holdings in *Penn Central*, *Security Industrial Bank*, and *Knick*

19   showed that there is absolutely no difference between any type

20   of taking.  In *Security Industrial Bank*, in response to the

21   U.S. Government's attempts to distinguish a classic taking

22   from a regulatory taking, which is exactly what the FOMB is

23   attempting, the Court specifically held that takings analysis

24   is not necessarily limited to outright acquisitions by the

25   government itself.  That is in *Security Industrial Bank*, 459

1   U.S. 70, at pages 77 and 78.

2         The *Knick* court reached a similar conclusion, holding

3   that no matter the means, whether formal condemnation

4   proceedings, occupancy, physical invasion, or regulation, a

5   citizen has already suffered a constitutional violation.  In

6   sum, all takings are essentially the same.  It is immaterial

7   whether the government deposited money or not.  All property

8   rights are secured in as much as they have the same

9   irrevocable constitutional right to just compensation.

10         As to your fourth question, *Knick* held that a citizen

11   has a Fifth Amendment entitlement to compensation as soon as

12   the government takes its property.  And this is the important

13   part, Your Honor.  The Court continues:  No action by the

14   government can relieve it of the duty to provide compensation.

15         (Sound played.)

16         MR. GONZALEZ VALIENTE:  The Board's contention that

17   Suiza's constitutional right is any different, less powerful,

18   or somehow contractual in nature just because it is a

19   regulatory taking is simply wrong.  As opposed to a classic

20   taking, a regulatory taking requires a judicial proceeding

21   that culminates in a judgment.  It would be contrary to the

22   nature of the proceedings, the Constitution, and the case law

23   if the judgment were then denominated a simple collection

24   action.

25         No, Your Honor, a judgment, or even a settlement in a

1    takings action simply evidences and quantifies the

2    constitutional right to just compensation.  Said compensation

3    has to be provided, or else the constitutional violation is

4    not remedied.  The Constitution is the fundamental law of the

5    land, and the Courts in *First English* and *Knick* make clear

6    that the compensation remedy is required by the Takings Clause

7    of the Constitution itself.

8          Taking without providing compensation is equivalent

9    to a citizen being imprisoned without due process.  The

10   constitutional violation in that scenario is not remedied

11   until the citizen is released.  Here the constitutional

12   violation is the taking, and it is not remedied until

13   compensation is provided.  And no bankruptcy, or any other

14   method may exempt the government from providing said

15   compensation.

16         Justice Kagan, in summarizing the majority holding in

17   *Knick*, perfectly states, a government violates a Constitution

18   whenever it takes property without advance compensation, no

19   matter how good its commitment to pay.  Imagine how bad the

20   violation is when the commitment is not to pay.

21         As to your final question, Your Honor, it really does

22   not apply to Suiza, and let me explain that.  A Federal

23   District Court already ruled there was a regulatory taking.

24   In other words, a court already analyzed the *Penn Central*

25   factors and issued a judgment stating that --

1       (Sound played.)

2       MR. GONZALEZ VALIENTE:  -- violation and a need for

3  just compensation.

4       If Your Honor has any questions --

5       COURT REPORTER:  I'm sorry, Your Honor.  This is the

6  court reporter.  If counsel could repeat his last sentence --

7  the buzzer cut him off.

8       MR. GONZALEZ VALIENTE:  Of course, Your Honor.  In

9  other words, a court already analyzed the issue, and applied

10  all the required factors, and established the need for just

11  compensation.

12       THE COURT:  Thank you.

13       MR. GONZALEZ VALIENTE:  Do you have any questions,

14  Your Honor?

15       THE COURT:  Just one.  So just to follow-up on your

16  last point, your argument in that regard is that there was a

17  determination that there was a taking, and the just

18  compensation is precisely defined by the order that the

19  District Court made by way of remedy, and that the character

20  of that as a constitutional remedy is not changed by the fact

21  that there was a settlement that embodied an ongoing

22  obligation?

23       MR. GONZALEZ VALIENTE:  That's exactly right.  And to

24  be honest, in the case of Suiza, the settlement only

25  established the way that the payments were going to be made.

1   There was already a judgment stating that Suiza had to be

2   compensated, because there had been a regulatory taking by

3   ORIL.

4           THE COURT:  Thank you, sir.

5           MR. GONZALEZ VALIENTE:  You're welcome, Your Honor.

6   Thank you.

7           THE COURT:  We will now turn to Mr. Hein for seven

8   and a half minutes.

9           Mr. Hein, would you say something, because I'm not

10  sure I can hear you.  No, I'm not hearing you yet.  We'll try

11  to unmute you from this side.  Would you say testing, one,

12  two, three?

13          We're thinking now the problem is on your end, so

14  would you try muting and unmuting again?  We are still not

15  hearing you, sir.  Would you say something again?  No.  Still

16  not hearing you.  Now you're showing as muted.

17          It might be your headphones.  Would you try

18  decoupling your headphones and speaking without them?  No.

19  That's still not working.  Let's see.

20          Oh, I think I'm hearing you now.  Would you say

21  something?

22          MR. HEIN:  Yes.  Can you hear me now?

23          THE COURT:  I can hear you now.  Thank you for

24  whatever you did.

25          MR. HEIN:  Yes.  I'm not sure I did anything.  Would

1    you mind if I just plug the headphones back in, because -- are

2    you able to hear me now, Your Honor?

3              THE COURT:  Yes, I am.

4              MR. HEIN:  Yes.  So I'm not quite sure -- I got a

5    message about another participant.  I think there might have

6    been some cross signal in the technology, but, in any event,

7    thank you, Your Honor.  May I begin?

8              THE COURT:  Yes, you may.  Thank you.

9              MR. HEIN:  Thank you.  Your Honor, I'd like to start

10   with question number three in Your Honor's list of questions,

11   and I discussed this in my objection.  Secured claims are not

12   the only claims protected by the Takings Clause.  The Takings

13   Clause, as Your Honor knows, provides that private property

14   shall not be taken for public use without just compensation.

15             *Lynch*, for example, in the takings context, stated

16   expressly, quote, valid contracts are property whether the

17   obligor be a private individual, municipality, a state, or the

18   United States.  And that decision in *Lynch* is cited by

19   approval in the *United States Trust* case, which of course

20   dealt with municipal bonds.

21             Now I realize *United States Trust* itself was a

22   contract case, but -- Contract Clause case, but I think it's

23   nevertheless significant that it recognizes the principle of

24   *Lynch*, that contracts are property under the Takings Clause.

25             My sur-reply also outlines the numerous Supreme Court

1    cases that recognize that all manner of intangibles, including

2    contracts and contract rights, can be property for Takings

3    Clause purposes.  For example, the *Kuhn* case recognized that a

4    bank account or money could be property, and that was, again,

5    a takings case.  The fact that something is a contract right

6    does not mean it's not also property for purposes of the Fifth

7    Amendment.

8         In any event, as Mr. Bienenstock noted, my Proof of

9    Claim has asserted that the interests I have with respect to

10   the PBA Bonds and GO Bonds are, in fact, secured.  There's

11   been no adjudication here to the contrary.  I won't repeat

12   what I already said about how a settlement by others cannot

13   preclude me from opposing confirmation.

14        *Security Industrial* has already been mentioned,

15   making clear that the bankruptcy power is subject to the Fifth

16   Amendment.  I would note, though, that -- Your Honor, that in

17   the typical corporate bankruptcy case, one is dividing up

18   corporate assets among creditors, the government is not taking

19   the property for itself.  Here, the government is taking the

20   property for itself.

21        The Oversight Board is basically saying, disregard

22   the property rights, and reverse the priority rights of GO

23   bondholders who have, under the Constitution of Puerto Rico, a

24   right of first payment, in addition to what I would allege to

25   be a property interest.  And the Oversight Board is saying it

1    wants to do that, to put the GO bondholders and PBA

2    bondholders back behind other claimants, because they think

3    it's more important that, for example, $11,000 in bonuses be

4    paid to each public union employee with AFSCME.  They think

5    that's more important than honoring Puerto Rico's

6    Constitution.

7         I would submit this is not only a Contract Clause

8    violation.  It is also a Takings Clause violation.  It

9    requires just compensation.

10        Turning to the question of just compensation, which

11   was Your Honor's question two, where there's a property right

12   in the right of payment, that is what one is entitled to

13   compensation for.  The Oversight Board says, well, bondholders

14   are getting what they call "commensurate value", which they

15   say is equal to the current value of my bonds.  Well, that's

16   not logical, because the Oversight Board by its own acts has

17   driven down the value of my bonds, and that of others, by

18   refusing to pay interest for over five and a half years.

19   They've further driven down the value of the bonds by the very

20   plan they've proposed, that, in my calculation, gives me 58

21   cents on the dollar.

22        They cannot look to the value of my property as

23   impaired by the taking and say, well, that's just

24   compensation.  The Takings Clause would be a dead letter if

25   government could use the value, as impaired by the taking, to

1    measure the just compensation.  Just compensation under the

2    Supreme Court case law is, quote, full compensation, nothing

3    less.

4            On Your Honor's question five --

5            THE COURT:  I'm sorry.  Mr. Hein, before you go on,

6    as I think Mr. Kirpalani pointed out, the question of a taking

7    is one that has not been adjudicated, and if adjudicated, I

8    will add this to what he said, would likely be in dispute for

9    quite some time.  There is a proposed plan here.  There are

10   the circumstances of the past few years.  And these are

11   securities that do trade on the market.  So why is it so

12   illogical that, in light of uncertainties, the value of the

13   security is something less than its par value, and if, as you

14   say, the taking is as of the time of the cancellation of the

15   instrument, or the confirmation of the Plan, why shouldn't one

16   look to what a willing buyer would pay for this instrument

17   with all of the contingencies and uncertainties, as of the

18   present time, for just compensation?

19           (Sound played.)

20           MR. HEIN:  Sure.  I think, Your Honor, the answer is

21   simply that you're then allowing the Oversight Board, through

22   its own acts, to impair the value, and then point to that

23   value as impaired by its own acts in the taking, to in effect

24   justify that, well, you know, we paid the value as we impaired

25   it.

1          Your Honor, they have cited no case law that says

2     that you look to the value as impaired by the taking.  That I

3     think would just double the wrong of the taking in the first

4     place.

5          If I might, Your Honor, briefly, on the subject of

6     *Penn Central*, the point I want to make here is that the

7     Supreme Court in the *Cedar Point* case from earlier this year

8     decided that a requirement that union organizers be simply

9     allowed on a property for an hour before work, an hour after

10    work, and at lunch time, the Supreme Court said that was a per

11    se taking.

12         I would point to the other cases that I've cited as

13    well.  I think, Your Honor, a fortiori here, taking the GO

14    Bonds or the PBA Bonds is a per se taking.  When you look at

15    how the Supreme Court has looked at the taking analysis over

16    the past several years, it's I think very clear that *Penn*

17    *Central* has no application here at all.

18         I would argue that I would meet the *Penn Central*

19    factors.  Obviously, investment-backed expectations are being

20    interfered with.  But this case I think clearly, under recent

21    Supreme Court jurisprudence, including *Cedar Point*, has to be

22    analyzed as a per se taking, and I'd ask Your Honor to take

23    another look at that issue.

24         I realize you've used *Penn Central* in the *COFINA*

25    decision, but I do think that the Supreme Court case law since

1    then should alter Your Honor's thinking.

2              (Sound played.)

3              MR. HEIN:  I think I'm at the end of my time.  If

4    Your Honor has other questions, I'd be happy to answer them.

5              THE COURT:  Thank you, Mr. Hein.  I have no other

6    questions.

7              MR. HEIN:  Thank you.

8              THE COURT:  Next is Mr. Enrique Almeida for the

9    Credit Unions, for seven and a half minutes.

10             MR. ALMEIDA BERNAL:  Good afternoon, Your Honor.

11   This is Attorney Enrique Almeida on behalf of the Cooperativa

12   de Ahorro y Credito Abraham Rosa, Cooperativa de Ahorro y

13   Credito de Ciales, Cooperative de Ahorro y Credito de Rincon,

14   Cooperativa de Ahorro y Credito de Vega Alta, Cooperativa de

15   Ahorro y Credito Dr. Manuel Zeno Gandia, and Cooperativa de

16   Ahorro y Credito de Juana Dias.  Also, I will center my

17   argument particularly on the nature of the Credit Unions

18   takings claim, and why this should not be discharged in the

19   instant proceeding.

20             The Credit Unions claims against the Commonwealth are

21   based on the U.S. Constitution, particularly on the Takings

22   Clause of the Fifth Amendment.  These claims were included in

23   detail in the causes of action of Adversary Proceedings 18-28

24   and 19-389, which are pending adjudication from the Court.

25             In these adversary proceedings, which support the

1   proof of claims, the Credit Unions are prosecuting takings

2   claims against the Commonwealth, who after consummating a

3   taking against them without providing just compensation, is

4   availing itself of the instant restructure proceeding to

5   discharge these claims.  In other words, the takings claim of

6   the Credit Unions are not the result loss of value to the

7   bankruptcy procedure, but that the claims themselves are the

8   result of a previously consummated taking by the government.

9        These constitutional claims should not be discharged

10  through a confirmation process in the instant case.  The

11  Credit Unions are entitled to due process of law.

12       In essence, the Takings Clause claims of the Credit

13  Unions are based on the following.  First, the Commonwealth,

14  together with the GDB and COSSEC, which is the regulatory

15  public corporation that insures credit unions, they establish

16  a policy of steering credit unions' liquid resources towards

17  Puerto Rico debt instruments, which the Commonwealth knew were

18  unsafe, unsustainable, and that lacked adequate sources of

19  repayment.

20       This regulatory policy was implemented through the

21  issuance of circular letters that were coercive, and selective

22  examinations, and the threat to the credit unions for

23  retaliatory legislative initiatives.  As a result of this

24  scheme, the Commonwealth and the GDB took material portions of

25  the Credit Union's cash and liquid assets without providing

1    adequate compensation for them.  This course of action, we

2    submit that it's a direct appropriation of the property of the

3    Credit Unions, a per se or physical taking of funds from the

4    Credit Unions' account that is subject to just compensation as

5    required by the Fifth Amendment.

6         The Credit Unions then submit that the factors in

7    *Penn Central* are not applicable to this particular takings

8    claim as we're dealing with a direct or physical taking, or at

9    least to a regulatory categorical taking, in as much as the

10   government used its regulatory power to coerce them out of the

11   property interest.  In the instant case, COSSEC used its own

12   circular letters to compel the Credit Unions to hand over

13   their cash in exchange for bonds that it knew had

14   substantially less value.  Thus, just compensation is

15   warranted for a taking in this situation.

16        But even if we were to conclude that we're dealing

17   with a noncategorical taking, an analysis of the three factors

18   identified in *Penn Central* can lead us to the same conclusion

19   that a taking has been made and that just compensation should

20   follow.  First, the economic impact of the regulation on the

21   claimant was total.  It deprived the Credit Unions of their

22   liquid funds.  It was not an incidental impact of their

23   property interest.

24        Second, the regulation has interfered with business

25   -- investment-backed expectations, again, by depriving the

1   Credit Unions of their funds.  And, third, the character of

2   the government action was not an adequate exercise of its

3   regulatory powers as part of its mission to protect the

4   health, safety, and morals of the community.  On the contrary,

5   it was a direct assault on the Credit Unions' coffers to

6   finance its operation when it was insolvent or on the verge of

7   insolvency.

8        Now in addition to the partial taking, the Credit

9   Unions have claimed an additional takings clause claim against

10  the Commonwealth and the regulatory and insurance entity,

11  which is COSSEC.  This is Adversary Proceeding 19-389.

12  COSSEC's use of the premiums money destined to insure the

13  Credit Unions, the lack of liquidity of the insurance funds,

14  and the Commonwealth's failure to adequately fund COSSEC is a

15  contravention of Act 114 of 2001.  These constitute a

16  noncategorical regulatory taking.  But when applying the three

17  factors identified in *Penn Central*, we must also conclude that

18  a taking occurred, and that just compensation is warranted.

19       First, the economic impact on the Credit Unions is

20  considerable.  A lack of liquidity in COSSEC's insurance funds

21  leave the Credit Unions severely exposed.

22       Second, the regulations severely interfere with the

23  investment-backed expectations.  The Credit Unions carry out

24  their business with the belief that these investments made by

25  the member credit unions are duly insured by COSSEC.  Their

1    payment of premiums, as the first source of liquidity,

2    furthers this belief, since they assume that the government

3    acts as a last-minute source of liquidity.  The government's

4    failure to do so has generated severe risk to the Credit

5    Unions.  And, finally, the character of the evidenced

6    government action is untenable, since it is the direct result

7    of the government's failure to obey an applicable statute.

8         As to the inquiry of the Court in regards to the

9    proposed distinction between takings claims that are secured

10   from those that are unsecured, our position is as follows.

11   The Oversight Board tries to argue --

12        (Sound played.)

13        MR. ALMEIDA BERNAL:  -- or is arguing that only

14   secured takings claims are duly compensated in bankruptcy to

15   the extent of their value if there was some prepetition

16   compensation, and that unsecured takings claims are subject to

17   discharge in bankruptcy.  However, we submit that there is no

18   difference between a secured takings claim and an unsecured

19   takings claim.

20        The Fifth Amendment of the Constitution of the U.S.

21   establishes that private property may only be taken by the

22   government for public use when it is accompanied by just

23   compensation.  There is no distinction as to the fact that

24   such taking is or was guaranteed with collateral at some

25   point.  As much as the Plan tries to establish a takings claim

1  without just compensation, being secured or unsecured, it

2  cannot be confirmed, because it would be contrary to the U.S.

3  Constitution's Fifth Amendment.

4       This is our argument, Your Honor.  Unless you have

5  any other questions, that will be it.

6       THE COURT:  Thank you, Mr. Almeida.

7       We will now turn to Charles Cuprill for Sucesion

8  Pastor Mandry Mercado.  You need to unmute yourself, sir.

9  There.

10      MR. CUPRILL:  On behalf of Sucesion Pastor Mandry,

11  Your Honor, when Mr. Bienenstock was addressing the Court, you

12  asked a question of great importance to us:  Which other

13  cases, besides *Stockton*, did he have available to argue in

14  reference to takings under the Fifth Amendment, in reference

15  to property, and the reference was made particularly to

16  contractual cases.

17      Our case, the case of Sucesion Pastor Mandry, is a

18  case that is rooted on the inverse condemnation proceedings,

19  and a judgment both by the Court of First Instance of Puerto

20  Rico, as well as its confirmation by the Court of Appeals,

21  Proof of Claim No. 6272, for over 30 million dollars, plus

22  interest and costs, which as of today has not been objected to

23  in any way, shape, or form by the Oversight Board.

24      As to *Stockton*, *Stockton* is a case that was decided

25  on its soft facts, particularly, the decision was premised on

1    equitable mootness.  The other items that were discussed in

2    reference to the Takings Clause, we considered them to be

3    dicta, as particularly criticized by Judge Friedland in his

4    very vigorous dissent.

5         The reply by the Oversight Board that the Takings

6    Clause are discharged -- that the claims based on the Takings

7    Clause are dischargeable pursuant to the Plan, and that the

8    objections to the Plan premised thereon should be overruled is

9    not the issue of our objection.  The same is centered on the

10   dischargeability of the claim, which must be paid upon

11   confirmation of the Plan.

12        We make reference to the case of *Louisville Joint*

13   *Stock Land Bank,* where Justice Brandies specifically stressed

14   the importance of preserving the Fifth Amendment, despite

15   times of hardship, holding that the Fifth Amendment commands

16   that however great the Nation's need, private property should

17   not be thus taken, even for a wholly public use, without just

18   compensation.

19        We believe that the case of *Knick*, which is to us the

20   most important case as to the issues that are before the

21   Court, categorically holds that there's no distinction

22   whatsoever from direct eminent domain actions or inverse

23   compensation (sic).  The distinction that is attempted to be

24   made as to those claims that are of a secure nature vis-a-vis

25   those that are unsecure under the Takings Clause does not lie,

1    particularly in reference to the claim of Sucesion Pastor

2    Mandry, because otherwise it would be discriminatory

3    treatment, which is provided thereto under the provisions of

4    the Plan, in as much there has been no deposit whatsoever

5    before any court in reference to Sucecion Pastor Mandry's

6    claim.

7         This is not a claim for additional compensation.  It

8    is a claim for just compensation under the Takings Clause, as

9    determined by the Court of First Instance and confirmed by the

10   Court of Appeals.  For this reason alone, the Commonwealth's

11   arguments in support of its contention as to impairment and

12   dischargeability of eminent domain claims fail.

13        Moreover, in making reference to *Knick*, criticizing

14   *Williamson*, that a violation of the Takings Clause arises as

15   soon as the government, as here, condemns the properties for

16   public use without paying, therefore, so the claim of Sucesion

17   Pastor Mandry arose upon the taking that was effected by the

18   Commonwealth.  And pursuant to the provisions of the Takings

19   Clause of the Fifth Amendment, we submit that it is

20   non-dischargeable, and must be paid pursuant to the provisions

21   of the Plan.

22        And that is our argument, not to be repetitive as to

23   other arguments that have already arisen making reference to

24   case law which are just -- applicable as to our case.  And

25   that concludes our argument, Your Honor.  I don't know if

1  you're hearing me.

2          THE COURT:  I am hearing you.  Thank you,

3  Mr. Cuprill.  I wasn't sure whether you were going to go on to

4  another subject or not.  So thank you.

5          The next speaker is Alexis Fuentes for Maruz.

6          MR. FUENTES:  Good morning.  Can you hear me?  Or

7  good afternoon.  Can you hear me, Your Honor?

8          THE COURT:  Good morning.  I can hear you, sir.

9          MR. FUENTES:  Your Honor, I will try to be brief.

10 And I'm going to go through the five points that Your Honor

11 listed in the Order, but first I must say that even though I

12 am appearing now on behalf of Maruz, who has a Proof of Claim

13 and a judgment that is final and unappealable for 2,244,000, I

14 also filed proof of claims with similar issues, meaning

15 takings claims, for Sucesion Frank Torres for 20 million and

16 Lortu-ta Ltd. for 73 million.  However, those two do not have

17 a judgment yet that are final and unappealable.  And we'll go

18 over that, because I believe that's one of the questions that

19 Your Honor posed in the Order.

20         So now I will go through the issues or the questions.

21 The first basically is as to the feasibility.  I think that

22 the debtor -- Counsel already testified that regarding the

23 takings or the inverse condemnation claims like Maruz has,

24 will not render the Plan unfeasible.  We've heard in prior

25 hearings, also, that there are available funds to make

1  additional payments, but, more importantly, our position is

2  that these takings claims shall be paid in full.  But we're

3  not saying that they have to be paid in full on the effective

4  date, so they can be paid over time with interest, which

5  obviously that gives leeway for the debtor to have a feasible

6  plan, as long as they pay the constitutional Takings Clause in

7  full.

8          The second one, the second issue was as to the

9  meaning of just compensation in the context of bankruptcy law.

10 Our position is that in the dissenting opinion of the *City of*

11 *Stockton* case, the judge basically said that the analysis of

12 what just compensation entails must take place under the Fifth

13 Amendment, rather than in the Bankruptcy Code.  So that's an

14 issue for the local courts basically to decide, and that issue

15 in particular, when there's -- like in my client's, Maruz'

16 case, when there's already a judgment, that's when the local

17 court's already decided that the taking took place, and what

18 is the just compensation for that taking, which basically is

19 the difference between having a judgment and not having a

20 judgment.

21         It is basically to quantify what it is, that just

22 compensation, but the claim, as such, is rooted in the

23 Constitution.  And the Bankruptcy Code does not trump the

24 Constitution, and cannot go over it.

25         So we understand that in the only instance where --

1    when the Bankruptcy Court could decide what it is, a just

2    compensation, would be if there was an estimation of the

3    claim, which, in this particular case, the debtor basically

4    bypassed that, because what they did is, for the takings claim

5    that did not have a judgment, then they gave a value of one

6    dollar, you know, for confirmation purposes.  So, therefore,

7    the Bankruptcy Court does not have to enter into what it is,

8    the just compensation.  That would be a matter for the local

9    courts to decide.

10        The third point that Your Honor made, basically, or

11   the question is as to the distinction as to secured and

12   unsecured that the debtor is proposing.  Well, our position is

13   that that is incorrect, in the sense that it is not a

14   collateral, it is not, basically, an escrow, like they said.

15   That's money that was consigned in court, and pursuant to the

16   Civil Code of Puerto Rico, once that money is consigned, it

17   doesn't belong to the debtor.  It doesn't belong to the

18   Commonwealth of Puerto Rico.  It is inured to the favor of the

19   injured party that can take it out at any point.

20        What they can do is, basically, fight for more or

21   additional monies if they understand that the property is

22   worth more, which is exactly what happened in the case of

23   _Stockton_, which is one of the cases that they basically are --

24   or their main case for their proposal.  In that case in

25   particular, that claimant took the money out of court that was

1    consigned.  However, in the other -- or at least, I believe,

2    if not all the majority of the inverse condemnation claimants

3    right here in court, the ones that are objecting to the Plan,

4    we don't have any monies that have been paid to us.

5         Mr. Cuprill just said that his client has not been

6    paid anything, and I know that all of the other ones that will

7    come in will say the same thing.  Maruz will say the same

8    thing.  Why?  Because since it is an adverse condemnation

9    claim, the government did not have to deposit that money in

10   court, or, you know, pay that money.  However, the Supreme

11   Court has already said, that doesn't mean that a taking did

12   not take place, and it's a matter for the court to adjudicate

13   --

14         (Sound played.)

15         MR. FUENTES:  -- and for the local court to

16   adjudicate.

17         I will try to be as fast -- then the next issue will

18   be as to the judgment.  I think we already said that, that the

19   judgment, what it does basically is to quantify that just

20   compensation, but they still are, both of them, the ones that

21   have judgments and the ones that don't have judgments, they

22   still have that constitutional -- what we understand makes

23   them non-dischargeable, because the Constitution goes -- you

24   know, it cannot be through a plan of reorganization in

25   bankruptcy.  You cannot go against the Constitution.

1          And then, lastly, as to the *Penn* factors in *Penn*

2    *Central*, it is our position that that's, again, for the local

3    courts to decide, and we understand that that doesn't apply to

4    us in particular.  We understand that that question was more

5    for that -- the other objectors, but if it is -- if it does

6    apply to us, because the government has not taken physical

7    possession of the property, again, the local courts then

8    should apply those factors, and then decide if there was a

9    taking or not.

10          So if you have any questions, Your Honor?

11          THE COURT:  No, Mr. Fuentes.  Thank you very much.

12          MR. FUENTES:  Thank you.

13          THE COURT:  The next speaker is Maria Figueroa y

14   Morgade for Amador.

15          MS. FIGUEROA Y MORGADE:  Good afternoon, Your Honor.

16   Can you hear me?

17          THE COURT:  Yes.  Good afternoon.

18          MS. FIGUEROA Y MORGADE:  Good afternoon to all.

19          Yes, Your Honor.  Just two brief comments, so I am

20   not repeating what other counsel have included in their

21   discussions before the Court today.

22          Amador joined the objections filed by PFZ, I'm sorry,

23   and also joined the objection filed by Sucesion Mandry.

24   Amador is a reverse condemnation claimant that has a judgment,

25   a firm, final, and appealable judgment, and is pending the

1  results of the state court on the just compensation.  We just

2  echo what has been discussed by counsel for Maruz and by

3  Mr. Cuprill, counsel for Mandry.

4       And we yield the remaining portion of our allotment

5  to Finca Matilde and PFZ.

6       THE COURT:  Thank you very much.

7       So the next speaker will be Mr. Capdevila for Finca

8  Matilde.

9       MR. CAPDEVILA DIAZ:  Good morning, Your Honor.

10      THE COURT:  Good morning.

11      MR. CAPDEVILA DIAZ:  Or good afternoon for the ones

12  in Puerto Rico.

13      First, I would like -- before addressing the five

14  points the Court wanted us to address, I would like to open

15  with a statement quoting from the Supreme Court's recent

16  decision in the *Cedar Point Nursery v. Hassid* case, which was

17  fresh from the oven, decided June 23, 2021.  For the court

18  reporter, that is 141 S.Ct. 2063.  And it quotes, "the

19  Founders recognized that the protection of private property is

20  indispensable to the promotion of individual freedom.  As John

21  Adams tersely put it, 'property must be secured, or liberty

22  cannot exist.'"

23      Your Honor, the Takings Clause in the Fifth Amendment

24  seeks to protect individuals from the sovereign.  My client,

25  Finca Matilde, as well as the other eminent domain claimants,

1 | do not have claims against the government as a contractor.

2 | They do not have claims against the government as a

3 | tortfeasor. They have a claim against their government for

4 | the actions they took as their sovereign.

5 |  Therefore, we understand that the argumentation made

6 | by the Board this morning as to whether it can be impaired or

7 | discharged as any other claim, contractual claim or torts

8 | claim, is untenable, because we are not -- my client did not

9 | contract with the government. Neither this is a matter of

10 | tort. This is a matter of what the sovereign did against its

11 | citizens.

12 |  With that being said, we will go on to the first

13 | question, whether the -- how the feasibility is affected by

14 | the -- if the Court uses its discretion. Your Honor, we

15 | submit that that question has two angles. Two angles. First,

16 | a determination of nondischargeability affects the feasibility

17 | of the Plan to the extent that it affects the debtors' fresh

18 | start. If the Court determines that eminent domain claimants

19 | are nondischargeable, upon confirmation, every eminent domain

20 | creditor, including inverse condemnations, will be able to

21 | execute their judgments and garnish funds from the government.

22 |  It does not require a big leap of faith to believe

23 | that that will affect the prosecution or the execution of the

24 | confirmed plan, if it is confirmed, because the credit --

25 | because once the garnishment is made, it takes whatever money

1    is available, not just any earmarked for this.  There is no

2    part of the Plan that has money earmarked for nondischargeable

3    claims.

4         Now, that leads us to the other angle of the

5    question, which is if the Court's exercise of discretion would

6    be a moot exercise, and I explain myself.  It is black letter

7    law that a judicial determination needs to have a practical

8    effect between parties in a case or a controversy.  Without a

9    practical effect, the Court's determination, whether

10   discretional or unlawful, would be moot, and, thus, an

11   unconstitutional advisory opinion.  And this is where the --

12   this angle overlaps with the preemption issue.

13        Exhibit K of the Modified Eighth Amended Plan

14   contains a footnote that states that, "any statute providing

15   for an appropriation not included in the budget certified by

16   the FOMB is preempted."  That is at page 292 of the ECF

17   pagination of the Eighth Amended Plan.

18        Under this broad language, state courts will not be

19   able to garnish anything, because a garnishment is an

20   appropriation of funds.  So even if the Court exercises its

21   discretion under 944(c), if this pre -- if this comprehensive

22   or overencompassing list of the preempted statutes is amended,

23   a determination would be moot.  That is why we understand that

24   the Plan needs to be modified to include a class of creditors,

25   eminent domain, which will be paid in full through the Plan.

1          Now, the second point, just compensation, our

2     position is that just compensation is just compensation in any

3     context.  As some legal authors have stated.  In the Fifth

4     Amendment, the Takings Clause is center stage, and to that

5     end, I must direct the Court's attention to the Supreme

6     Court's ruling in the *Monongahela Navigation Company v. United*

7     *States*, in which the Court, in describing just compensation,

8     said there can be -- I'm sorry, there can be, in view of the

9     combination of these two words, no doubt that the compensation

10    must be a full and perfect equivalent for the property taken,

11    and this just compensation, it will be noticed, is for the

12    property, not the owner.  Therefore, it is not a claim for

13    damages.  It is a claim for the property that was taken.

14         As for the Court's -- the distinction between secured

15    and unsecured, we would like to point out that it is not --

16    the amount in direct condemnation proceedings, the amount

17    deposited is not a security.

18         (Sound played.)

19         MR CAPDEVILA DIAZ:  Security implies that two parties

20    have interest in that, the ones that make the deposit, and the

21    one that may receive it.  Once the deposit is made, the

22    government loses an interest.  That is their institutional

23    position as to what the just compensation should be.  No more.

24         The government has no right to claim it back, so it

25    is not a security interest.  It is deposited so that the

1  people being -- whose property is being taken dispute among

2  themselves what belongs to who, how much is for the secure --

3  for the mortgage that encumbers the lien, that encumbers the

4  property, how much is for the order -- or for the holders of

5  any other easements.  So our position is that it's not a

6  security.

7          As for the issue that it is a money judgment, which

8  is the fourth issue in the Court's Order, the judicial branch

9  exists to test the actions of the other two political

10  branches, as we stated in our opening statements.  The

11  judgment is merely the Court's ruling on the controversy, that

12  the taking occurred, and what is the final compensation for

13  that.

14          A creditor or a land owner goes to court to protect

15  itself from the other two branches of the government.  It

16  makes no sense that an eminent domain claimant be in a worse

17  position on account of obtaining a judgment that declared that

18  the government's actions were a taking under the Constitution

19  of the United States.  In fact, an inverse condemnation

20  proceeding is a deter -- the claimant seeks that the courts

21  determine that it is a -- that the conversation -- that the

22  Government overstepped in its constitutional obligation, and

23  they demand compensation.

24          As per the five -- the requirements of the *Penn*

25  *Central* factors, we understand that that opens the door for an

1   objection to claim proceedings --

2         (Sound played.)

3         MR. CAPDEVILA DIAZ:  -- which has been filed.  If I

4   could briefly finish that?

5         THE COURT:  Yes.

6         MR. CAPDEVILA DIAZ:  It's going to be short.

7         THE COURT:  I believe that the preceding speaker

8   ceded some time to you, so you can take some time to finish up

9   your point.

10        MR. CAPDEVILA DIAZ:  Thank you, Your Honor.

11        Your Honor, my client already went to state court

12   with proper jurisdiction to litigate these -- that the factors

13   were met.  My client obtained, as well as other parties

14   obtained judgments.  If the Board wants to open the door as to

15   whether it should be market value or should -- or that the

16   parties need to determine what they already determined in

17   state court, that would open a door that the Rooker-Feldman

18   doctrine seeks that it remains shut.

19        The Rooker-Feldman doctrine is a jurisdictional issue

20   that does not allow parties to use the Federal Forum as an

21   appellate forum.  My client already established that it was --

22   that the government overstepped in its regulatory powers, that

23   its actions constituted a taking, and already determined what

24   the just compensation is.  To require that my client

25   establishes those factors again would, in fact, be asking that

1  this Court serves as an appellate forum to the state court.

2  That is -- we understand that, unless the Court is interested

3  that we establish why those factors -- or at least from Finca

4  Matilde's perspective were met, we could happily do so, but we

5  understand that there is a jurisdictional barrier to that.

6          THE COURT:  Thank you.

7          MR. CAPDEVILA DIAZ:  Unless the Court has any other

8  questions?

9          THE COURT:  I have no further questions, and I don't

10  need you to do the *Penn Central* analysis with respect to a

11  liability for which there is a judgment.  So thank you very

12  much.

13          MR. CAPDEVILA DIAZ:  Thank you, Your Honor.

14          THE COURT:  So now we will turn to counsel for PFZ.

15          MR. CARRION BARALT:  Good afternoon, Your Honor.  Can

16  you hear me?

17          THE COURT:  Yes, I can.  Good afternoon Mr. Carrion

18  Baralt.

19          MR. CARRION BARALT:  May I proceed?

20          THE COURT:  Yes.

21          MR. CARRION BARALT:  Good morning again.  David

22  Carrion Baralt on behalf of PFZ.

23          Your Honor, PFZ's position on the matters and

24  questions being addressed at today's hearing are the ones that

25  have been stated in PFZ's previous briefings, which are

1    already listed in today's Agenda.  PFZ's claim is not based on

2    a contract.  Let's start with that.

3         The government physically took the property, and did

4    so under the Puerto Rico quick take law.  All takings --

5    binding precedent dictates that any quick take statute must

6    contain a provision guaranteeing the full payment of the just

7    compensation.  Otherwise, that statute would be contrary to

8    the Takings Clause and facially unconstitutional.  The quick

9    take process simply substitutes the claimant's property rights

10   over his land for a constitutionally guaranteed property right

11   to receive just compensation.

12        We respectfully reaffirm the reasons and legal

13   authority cited in our briefs, which pretty much -- warrant

14   the relief that we ask for, which is, essentially, that the

15   provisions of the Bankruptcy Code on which the Plan relies,

16   for the treatment of PFZ's claim, are unconstitutional as

17   applied to PFZ's claim, or, in the alternative, the Plan as

18   written warrants the discretion of the Court to except PFZ

19   from discharge -- PFZ's claim from discharge in the order

20   approving the Plan, and to declare that PFZ's constitutional

21   claim may not be discharged, impaired, reduced, or adjusted.

22        We'll go now one by one to the different points that

23   the Court asked to address in your Order.  The first one, I

24   believe that debtor has already admitted that if the Court

25   decides to exercise the powers under 11 U.S. Code 944, the

1   Plan will not be unconfirmable, which is consistent with what

2   the Board had said at docket 17187 on the 29th of June of this

3   year, where they unequivocally anticipated and committed to

4   such a result, if it would come to be.

5           As to the second question, the meaning of just

6   compensation, PFZ has found no distinction concerning the

7   meaning of what constitutes just compensation in the context

8   of bankruptcy law vis-a-vis any other law.  In *U.S. v.*

9   *Security Industrial Bank*, the Supreme Court, citing *Radford,*

10  summarized the following.  The bankruptcy power is subject to

11  the Fifth Amendment prohibition against private -- against

12  taking private property without compensation.  There is no

13  factual or legal dispute that PFZ's claim is a classic taking

14  claim by means of a judicial quick-take procedure.

15          In takings actions, both the right and the remedy

16  were carved into the Constitution.  The obligation to pay just

17  compensation is not optional.  It is a mandate of the Takings

18  Clause, as held in *Tahoe-Sierra*, cited in the Supreme Court

19  opinion of *Cedar Point Nursery*, which says when the government

20  physically acquires private property for public use, the

21  Takings Clause imposes a clear and categorical obligation to

22  provide the owner with just compensation.

23          The definition of what is just compensation has been

24  explained by the U.S. Supreme Court.  Its mandate can be

25  succinctly stated as follows.  A property owner found to have

1   a valid takings claim is entitled to compensation as if it had

2   been paid contemporaneously with a taking.  That is, the

3   compensation must generally consist of the total value of the

4   property when taken, plus interest from that time.  See also

5   *Knick* regarding that, and the case of *Olson,* where it says

6   that the owner is entitled to be put in as good a condition

7   pecuniarily as if his property had not been taken.  The taking

8   of property entails a constitutional obligation under the

9   Takings Clause, and no subsequent action of the government can

10  relieve it of the duty to provide just compensation, also from

11  *Knicks*.

12         The Constitutionality of the bankruptcy legislation

13  vis-a-vis the Takings Clause was called into question in the

14  case of *Detroit*.  Therein, the DOJ appeared and agreed that

15  any impairment or discharge of a takings claim would pose a

16  constitutional question, and opted to suggest to the Court to

17  declare the takings claim's not dischargeable.

18         There is no reason to believe that the DOJ's position

19  with regard to PFZ's constitutional challenge, which is

20  presently pending, will be substantially different, but if the

21  Court is inclined to act different than *Detroit*, it should

22  hold such ruling in abeyance pending the DOJ's response.

23         Regarding the third question, the arguments

24  concerning the Oversight Board's proposed distinction between

25  takings claims that are secure and those that are unsecured,

1   we propose that --

2        (Sound played.)

3        MR. CARRION BARALT:  -- this distinction has no basis

4   in the law of any -- or in any judicial decision.  This is the

5   debtors own creation.  There is no such thing as an unsecured

6   takings claim.

7        When the government physically acquires private

8   property for a public use, the Takings Clause imposes a clear

9   and categorical obligation to provide the owner with just

10  compensation.  Again, *Tahoe-Sierra*, cited in *Cedar Point*.

11  Debtors' assertion to the contrary is plainly wrong and wholly

12  lacking any valid legal basis.  On the contrary, as stated by

13  the U.S. Supreme Court, the Court's physical taking

14  jurisprudence is as old as the Republic.

15       Regarding the fourth question, whether the reduction

16  of a taking's claim or to a judgment or a settlement agreement

17  affects whether it is still subject to the Takings Clause, we

18  contend that it is not.  It has been established that even

19  though the government may take private property for public use

20  prior to paying full compensation to the owner, as it

21  generally happens in quick take situations like PFZ's bedrock

22  constitutional precedence dictates that adequate means must be

23  provided for prompt ascertainment and payment of such

24  compensation.  See also, *Joslyn Manufacturing*, holding that it

25  has long been settled that the taking of property for public

1  use by a state need not be accompanied or preceded by payment,

2  but that the requirement of just compensation is satisfied

3  when the public's faith and credit are pledged to a reasonably

4  prompt ascertainment and payment there -- and there is

5  adequate provision for enforcing the pledge.

6          The Takings Clause is of self-executing character

7  with respect to compensation.  That is the holding reiterated

8  at *Knick*, citing *First English Evangelical*.  There is no doubt

9  that PFZ is constitutionally guaranteed to receive full

10  compensation.

11          (Sound played.)

12          MR. CARRION BARALT:  May I complete, Your Honor?

13          THE COURT:  Yes, you may.

14          MR. CARRION BARALT:  PFZ is constitutionally

15  guaranteed to receive full payment of its just compensation,

16  plus interest, the instant its claim is reduced to a final

17  judgment without an impairment or discharge.

18          And regarding the fifth question, we believe it

19  doesn't apply to PFZ, given that what we have here is a

20  physical taking.

21          That, subject to Your Honor's questions, is our

22  presentation.

23          THE COURT:  Thank you, Mr. Carrion Baralt.  I don't

24  have any questions for you.

25          So we will return to Mr. Bienenstock.

1          MR. BIENENSTOCK:  Thank you, Your Honor.  Still good

2     morning.  Martin Bienenstock of Proskauer Rose, LLP.

3          THE COURT:  Sorry.  There is a hand raised.  I didn't

4     realize that.  Mr. Kirpalani.

5          MR. KIRPALANI:  Yes, Your Honor.  If it would be okay

6     -- and it may make more sense for Mr. Bienenstock to be the

7     last one on this issue.  I didn't use all of my five minutes,

8     and I just wanted to respond to a couple of the things that

9     Mr. Hein said.

10         THE COURT:  Very well.  Do you remember how much time

11    you had left?

12         MR. KIRPALANI:  I don't think I'm going to take more

13    than a minute here, Your Honor.

14         THE COURT:  All right.  Please proceed.

15         MR. KIRPALANI:  Okay.  Mr. Hein raised an issue --

16    for the record, Susheel Kirpalani from Quinn, Emanuel on

17    behalf of the LCDC.

18         Mr. Hein raised an issue that I didn't anticipate

19    when I gave my arguments earlier when he talked about the

20    value or the taking of securities and the condemnation by the

21    government, and he mentioned as well that when the government

22    itself is responsible for the deterioration of value, then

23    they can't ignore that and say, well, the value of the

24    property or the security that they took from is already

25    depressed.

1         The problem with this, and we've looked at this issue

2    extensively on behalf of our clients in this case, and as well

3    as in the *COFINA* case, and the case -- the law that he's

4    stating is correct.  The problem here is the failure of

5    evidence.

6         First, the law, just for the record, is *U.S. v.*

7    *Virginia Electric & Power,* 365 U.S. 624, specifically page

8    635.  It's a 1961 case.  Here, and the record is closed, there

9    was no evidence introduced of which bonds were worth how much

10   that were held by Mr. Hein at the time of the bankruptcy, or

11   whenever he believed there was an "onslaught of the

12   affirmative value depressing acts."  That's a phrase from the

13   New York Court of Appeals, *City of Buffalo v. Clement*, 28

14   N.Y.2d 241 (1971), for the same proposition.

15        And most importantly, it is incumbent on --

16        (Sound played.)

17        MR. KIRPALANI:  -- the party that's asserting the

18   taking and the precondemnation conduct to introduce evidence

19   of the value before, the act complained of, and the value

20   after.  There is no evidence in the record as to what the

21   value before was, what the conduct was, and most importantly,

22   what the value of the package of cash and new securities that

23   all GO bondholders are getting is, because I think that's

24   strategic, Your Honor.

25        If Mr. Hein would do that, I think he would be very

1    clear, even if he's right that there's a taking, and even if

2    he's right that the taking of securities requires just

3    compensation, in the alternative, there's been no showing that

4    there's actually been anything but just compensation.

5         Thank you, Your Honor.

6         THE COURT:  Thank you.

7         Now Mr. Bienenstock.

8         MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

9    Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

10   as Title III representative of the debtors.

11        Your Honor, we've all listened to a lot of smart

12   people make impassioned pleas and arguments, and I hope and

13   think I can simplify the process to get into the right answer.

14   The essential argument being made is that, based on Justice

15   Brandeis' concluding sentence in the *Radford* decision, no

16   matter how great the Nation's need, just compensation must be

17   paid.

18        Of course that decision was not a decision about an

19   entity, a municipality in bankruptcy.  It was a -- it was a --

20        THE COURT:  I'm sorry.  We have to stop.  We have to

21   pause.  There is a fire alarm in Puerto Rico.  So just give me

22   a second to figure out whether we need to essentially take our

23   lunch break, or whether it's something that can be cleared

24   quickly.  So let's just all sit quietly.

25        So thank you all for your patience.  I understand

1    that the alarm situation has been cleared in Puerto Rico, and

2    so I am going to ask that Mr. Bienenstock come back on.  We

3    will reset his ten minutes, and ask that he resume from the

4    beginning of his argument, because the court reporter may have

5    been distracted just before we had to stop.

6            Mr. Bienenstock, I'm not hearing you.

7            MR. BIENENSTOCK  Okay.

8            THE COURT:  Now I hear you.

9            MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

10   Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

11   as the debtors' Title III representative.

12           I'm hopeful that while the question is important, and

13   it's been argued by a lot of smart people making impassioned

14   pleas, that I can lead the Court to a solution fairly simply.

15   And let's look at the facts of *Louisville Joint Stock Land*

16   *Bank v. Radford*.  It was-- as the title implies, it was the

17   bank against Radford.  There was a debtor.  The United States

18   Congress had passed a bankruptcy law giving relief to victims

19   of the Great Depression, and specifically enabling especially

20   farmers to stay their mortgages and to restructure their debts

21   in a particular way.

22           And in that context, the Supreme Court applied the

23   Fifth Amendment, and the provisions of the Fifth Amendment

24   requiring just compensation.  What did that lead to?  Well, it

25   lead to ultimately the *Wright* decision.  By *Wright*, I mean

 1   W-r-i-g-h-t, which pared back on what rights were considered

 2   the property rights that had to be protected, but it lead to,

 3   basically, the rest of the bankruptcy statutes as we know

 4   them, from the Great Depression to the current day.

 5          And what are those statutes?  That if you have a

 6   secured claim, you get the value of your collateral under

 7   section 1129(b) of the Bankruptcy Code.  That's also

 8   applicable in PROMESA.  And if you have an unsecured claim,

 9   you get what is entitled to be paid to unsecured claims in the

10   case based on the best interest test or otherwise.

11          In no sense has Congress, or the legal analysis, law

12   professors, bankruptcy judges, anyone else, except for *City of*

13   *Detroit*, in no sense has anyone ever, before the *City of*

14   *Detroit* decision, taken the *Radford* decision and said, oh, and

15   by the way, if it's eminent domain, even though they are

16   applying the same Fifth Amendment language of just

17   compensation, let's make it nondischargeable.

18          Your Honor, that comes out of nowhere, and if that

19   were the law, then in all Chapter 11 cases, in all Chapter 9

20   cases, anyone with a secured claim would have a

21   nondischargeable claim.  And according to my adversaries here,

22   those with unsecured claims would have nondischargeable

23   claims.  They're -- all of the treatment in the jurisprudence

24   at the Supreme Court, and all lower levels, and in the legal

25   articles, it's based on the same Fifth Amendment language to

1   pay just compensation when there's a taking for public use.

2        And in *Radford*, the real stretch was to take a

3   private dispute between a bank and its borrower, and say that

4   even that, because it's being done under a public bankruptcy

5   law, is a taking for public use, I guess, the policy of

6   carrying out reorganization in the United States.

7        I really submit that that ends the inquiry.  It's the

8   same Fifth Amendment language, whether you're talking about a

9   secured creditor and its debtor, or you're talking about a

10  municipality taking.  It's the same Fifth Amendment language.

11  It cannot be that in one instance it's nondischargeable, and

12  in all the other instances it's dischargeable.  It's the same

13  language.  It's got to be the same.  Have we all gotten it

14  wrong for the last 80 years?  I submit no.

15       Now, as for additional authority, Your Honor, I want

16  to point the Court to the case called *Pointsett Lumber v.*

17  *Drainage District,* 119 F.2d 270, at page 272.  There the Court

18  says at 272, quote, in brief, the first contention is that

19  appellant's claim for damages as invested in -- with the

20  constitutional sanctity beyond other forms of liabilities,

21  such as indebtedness for bonds and similar claims, that it is

22  entitled under the Constitution of Arkansas and the

23  Constitution of the United States for just compensation for

24  its injury.  That its claim is not subject to be adjusted in a

25  composition proceeding under the act, and that it is entitled

1   of right to payment, dollar for dollar, for the damage it has

2   sustained for the taking of its land.  Although appellant was

3   not a party to the record in the case in *Lehrman v. Drainage*

4   *District No. 7 of Pointsett County Arkansas*, the point was

5   therein determined at pages 702 and 703 of the reporter,

6   adversely to its present contention.  We are satisfied with

7   our conclusion in that case, and will not extend this opinion

8   to repeat the reasons there stated.  The *Lehrman* decision was

9   at 104 F.2d 96, and cert. was denied.  So there is other

10  Circuit Court authority.

11          Your Honor, in connection with the Suiza objection, I

12  think counsel might have said that his takings claim had been

13  reduced to judgment.  That would be inaccurate.  His own

14  objection at ECF document no. 18593, they admit that what they

15  had was a preliminary injunction, and then they settled it.

16  So there was no final ruling on a taking having existed.

17          As for Mr. Hein's contentions, if he's right, then I

18  ought to retire now, because I don't know how I'm going to

19  drive any reorganization if, when I haircut for creditors or

20  for the debtor, when I agree to a restructuring of bond debt,

21  there are takings claims where I have to pay everything that

22  was supposed to be forgiven in discharge.

23          In so far as the Credit Unions, Your Honor, that is

24  the classic tort claim.  They're angry at the Commonwealth,

25  the Government Development Bank, and COSSEC for, in their

1  words, steering, steering them to buy Commonwealth debt, and

2  want to make that into a takings claim. And of course it

3  would have no consequence if takings claims are as the Board

4  contends they are, they're just prepetition general unsecured

5  claims; but it has a gigantic consequences if they're truly

6  nondischargeable.

7         In connection with the argument -- I think it was

8  Finca Matilde that argued that just because their inverse

9  condemnation claim is reduced to a judgment, they shouldn't

10 lose the effect of it, and we agree. It was a general

11 prepetition secured claim -- unsecured claim at the start, and

12 it continued to be one in the judgment. But there again, you

13 know, that goes to Your Honor's ultimate ruling on the

14 fundamental question.

15        (Sound played.)

16        MR. BIENENSTOCK: Your Honor, that's actually the

17 conclusion of my remarks, unless the Court has any questions.

18        THE COURT: Give me just a moment, please.

19        Is there an element of arbitrariness associated with

20 your secured-unsecured theory, to the extent that deposits

21 under a quick take statute are treated as security, and not

22 every jurisdiction and not every situation has a quick take

23 statute that would be triggered by an eminent domain taking,

24 and certainly not by an inverse condemnation proceeding. So

25 is the ability to realize on a Fifth Amendment claim subject,

1    in your reading of the law under bankruptcy, to the

2    vicissitudes of local procedural laws, in so far as they may

3    or may not require the placement of some up front money in a

4    fund?

5           MR. BIENENSTOCK:  Your Honor, what I am saying is the

6    same as in *Hanover National Bank v. Moyses*, where the Supreme

7    Court was asked whether it should enforce a bankruptcy law

8    where creditors in some states could go after all the debtor's

9    assets --

10          (Sound played.)

11          MR. BIENENSTOCK:  May I finish?

12          THE COURT:  Please go on.  Yes.  You're answering my

13   question.

14          MR. BIENENSTOCK:  And creditors in other states,

15   still in Federal Bankruptcy, but creditors in other states

16   could not go after all the debtor's assets, because there were

17   different exemptions.  It was the happenstance of the

18   difference in exemption law through the states.  The Supreme

19   Court said, that's perfectly fine.  That's what creditors

20   expect, because they know what the exemption laws are.

21          Similarly, Your Honor, property owners in the

22   different states know what the condemnation procedures are,

23   and I would also add that, personally, because this is what I

24   do for a living -- it's like surgeons don't get sick to their

25   stomach when they see blood, because they see it every day.

1    Well, as bankruptcy lawyers, we deal with discharge and these

2    type of issues every day.  To most of the world, you know,

3    just compensation is something that's done outside of

4    bankruptcy, and the law doesn't purport to say what happens if

5    someone can't carry out their obligations.  That's a whole

6    different field.

7         So, Your Honor, the answer is, to be sure,

8    jurisdictions with I think what Your Honor called quick take

9    procedures for eminent domain would yield better treatment

10   when there's going to be a subsequent bankruptcy than other

11   jurisdictions that don't, but that's endemic in the bankruptcy

12   practice.  There's something negative about the term

13   arbitrary, Your Honor.  I would just say there are differences

14   between the states that lead to different creditors' rights.

15   And the Supreme Court has confronted this time after time, and

16   each time it's found it's just fine.

17        THE COURT:  Thank you Mr. Bienenstock.

18        MR. BIENENSTOCK:  Thank you, Your Honor.

19        THE COURT:  At this point, we will take our lunch

20   break.  We will resume at 1:35 Eastern Standard Time, which

21   will be 12:35 Atlantic Standard Time.  I want to thank all of

22   the counsel who have argued this morning for engaging with my

23   questions, both preannounced and oral.  This is very helpful

24   to me.

25        So we'll break now.  We'll see you at either 1:35 or

1    12:35, depending on where you are.

2              Just one moment.  There is a hand up.  Mr. Capdevila.

3              MR. CAPDEVILA DIAZ:  Yes, Eduardo Capdevila, for the

4    record.  Atlantic Time, it would be 2:35, not 12:00.

5              THE COURT:  Oh, I'm sorry.  I'm used to being in

6    Puerto Rico and counting backwards.  Now I have to add.  So

7    2:35 Atlantic Standard Time.  I apologize for the confusion

8    there.

9              Thank you, Mr. Capdevila.

10             Now we are adjourned.

11             (At 1:13 PM, recess taken.)

12             (At 2:31 PM, proceedings reconvened.)

13             THE COURT:  Good afternoon, and welcome back.  I just

14   remind everyone that there is no recording or retransmission

15   of any of these proceedings.  I'm assuming that everyone's got

16   the Zoom camera on and off and muting and unmuting down pat.

17   It worked pretty well this morning.

18             So we will proceed with the oral arguments that are

19   scheduled for today.  The next Agenda Item is no. IV, which is

20   the third-party release exculpation and injunction provision

21   item.  I have scheduled to speak first, for the supporting

22   parties, Mr. Rosen for the Oversight Board.

23             MR. ROSEN:  Good afternoon, Your Honor.  Brian Rosen,

24   Proskauer Rose, on behalf of the Oversight Board.

25             THE COURT:  Good afternoon.

1           MR. ROSEN:  Good afternoon.

2           Your Honor, there are two givens that one can say

3    about the releases and the exculpation provisions in the Plan

4    and the Confirmation Order.  First, Your Honor, as noted in

5    Section 2.3 of the Plan, those provisions, which are contained

6    in Article 92 of the Plan, are integral to obtaining the value

7    provided pursuant to the Plan and the Plan Support Agreements

8    that were reached.

9           They were heavily negotiated, and they constituted an

10   essential component of the compromises and settlements

11   reached, and are not severable from the other provisions of

12   the Plan.  As such, without them, Your Honor, parties may not

13   have been willing to join those Plan Support Agreements.

14          Second, and as we have stated repeatedly, both orally

15   and in writing, there is no intention to provide a

16   nonconsensual third-party release pursuant to the Plan.  The

17   Oversight Board has done everything possible to ensure that a

18   nonconsensual release -- nonconsensual third-party release is

19   not being given or ordered by the Court.  And if the parties

20   still believe that is being done, please point it out to us

21   and it will be corrected.

22          Your Honor, when we started the confirmation

23   objection process, there were objections interposed by several

24   parties concerning various other aspects of the release

25   language.  Specifically, Your Honor, the DRA parties, the

1    Underwriters, Quest Diagnostic, and U.S. Bank have stated

2    various positions.  As the Court knows, all issues involving

3    the DRA parties have been resolved.  Their objections and all

4    other confirmation materials tendered by DRA have been

5    withdrawn, and they have voted in favor of the Plan.

6         The Underwriters and Quest both expressed concerns

7    about their respective defensive rights, and language has been

8    inserted in the Plan and in the proposed Confirmation Order,

9    or both, and such parties are satisfied that such defensive

10   rights have been preserved.  And they no longer oppose

11   confirmation of the Plan, and the entry of a proposed

12   Confirmation Order.

13        U.S. Bank, Your Honor, filed two objections to the

14   Plan.  One was an extremely limited objection regarding their

15   concerns about being a fiscal agent, and making distributions

16   pursuant to the Plan and releases in that regard; and the

17   other was with respect to concerns they had with -- as to PFC,

18   which was a nondebtor instrumentality of the Commonwealth.

19        Your Honor, with respect to the first, those concerns

20   have been allayed, and the provisions have been inserted in

21   both the Plan and the Confirmation Order to take care of that

22   concern about future distributions.  As I indicated at the

23   outset of the hearing, Your Honor, with respect to the other

24   issue, that, with respect to PFC, that an agreement has been

25   reached pursuant to which the Oversight Board has approved it,

1    the terms of that understanding, and that awaits still

2    approval of both AAFAF and PFC.  And hopefully, Your Honor, by

3    the conclusion of this Confirmation Hearing, we'll be able to

4    announce the terms of that understanding.

5         Your Honor, that leaves I believe two, perhaps three

6    parties who might have expressed concerns about the releases.

7    Specifically, Your Honor, that is with respect to the Credit

8    Unions, which Mr. Bienenstock discussed at length earlier

9    today about the release and discharge provisions, and how what

10   they're really trying to do is preserve or create

11   nondischargeability with respect to the adversary proceedings,

12   Your Honor.

13        And I would point out, Your Honor, as this Court

14   recognized in connection with *COFINA*, a discharge is the

15   fundamental component of the Plan and of restructuring

16   proceedings in general.  The Court went on to state in *COFINA*

17   that excepting those claims from discharge would be contrary

18   to the purposes of PROMESA and the Bankruptcy Code to provide

19   a fresh start.

20        Your Honor, I would also point out that the

21   Bankruptcy Code section 523's limited exceptions to discharge

22   were not incorporated into PROMESA.  The only exception to

23   discharge applicable in PROMESA is section 944(c) of the

24   Bankruptcy Code, and as the Court knows, they are either the

25   Plan does not provide for a discharge, or the party seeking

1    the exception to the discharge had no notice or knowledge of

2    the existence of the case.  And as the Court knows, Your

3    Honor, that is not the situation here, especially because our

4    friends from the Credit Unions are in attendance.

5           That would leave us with Mr. Hein, Your Honor.  So he

6    asserts that the scope of the -- excuse me.  He asserts scope

7    issues and concerns that the releases may be given before he

8    exhausts all of his appellate rights.  As to the latter, Your

9    Honor, the Confirmation Order preserves all appellate rights,

10   including the ability to address any provisions that an

11   appellate court --

12           (Sound played.)

13           MR. ROSEN:  -- deems inappropriate.  As to the

14   former, and as I have said, all efforts have been undertaken,

15   Your Honor, to remove any issue associated with third-party

16   releases and excess of scope, including, by extension,

17   granting of releases to extension or attenuated relationships

18   of entities and, therefore, going beyond what is intended,

19   Your Honor.

20           I would note, Your Honor, that a lot of this came up

21   in the context of definitions, the related persons definition

22   or the released claims definition.  And, Your Honor, we have

23   made expressly clear that the related persons are limited to

24   the Debtors, the Creditors Committee, the Retirees; and one

25   that we failed to include, Your Honor, and I would like to

1   note that would be placed back into the Plan, is the related

2   entities associated with the PSA creditors, including the

3   Monolines who are party to it.  But that is solely, Your

4   Honor, with respect to the claims that the debtors have

5   against those entities, and not with respect to any entity

6   that may have a claim against those entities.

7        The sections of the Plan have been called back to be

8   sure that the only claims that are being released are the

9   claims of the debtors, and the reorganized debtors, and their

10  related entities against other parties.  No claims of

11  creditors against any third parties or their related persons

12  are being released pursuant to the Plan.

13       Your Honor, I believe that addresses the release and

14  discharge provisions that the Court had a concern about, and I

15  would reserve my time for rebuttal.

16       THE COURT:  Thank you.

17       The next speaker is for the Monolines, Ms. Miller or

18  Mr. Natbony, for one minute.

19       MR. NATBONY:  Thank you, Your Honor.  Can you see me?

20       THE COURT:  I can't see you yet.

21       MR. NATBONY:  There we go.

22       THE COURT:  I saw you for a second, so keep talking.

23  Let me see if I see you again.  It looks like your camera is

24  off.  Can you put it back on?

25       MR. NATBONY:  I am trying, Your Honor.  Didn't have a

1  problem before.

2            THE COURT:  There you are.

3            MR. NATBONY:  There we go.  Thank you, Your Honor.

4  Sorry for the trouble.

5            So in my one minute, I just wanted to briefly address

6  the exculpation for the Monoline insurers, which is primarily

7  in section 92.7(f) of the Plan.  It is our understanding there

8  are no outstanding objections to that section, so the

9  provisions should be approved.

10            It is substantially identical to the similar

11  exculpation that was included in the COFINA Plan and Order, so

12  there's clearly precedent for it.  And I'd address -- point

13  Your Honor to ECF no. 5055 and 5055-1.  Those were the COFINA

14  Order and the COFINA Plan.  It's paragraph 35 of the Order,

15  and section 30.7 of that Plan.

16            As Mr. Rosen said, this was a necessary provision in

17  order to maintain and obtain the Monoline support.  It is

18  integral to the Plan.

19            And last but not least, Your Honor, I would just

20  point out that we've debriefed the appropriateness of the

21  provision in our reply to the DRA Parties' confirmation

22  objection.

23            (Sound played.)

24            MR. NATBONY:  That reply is at ECF 18873, and we

25  would refer you to paragraphs 15 and 16 therein.

1            Thank you, Your Honor.

2            THE COURT:  Thank you, Mr. Natbony.

3            The next speaker is Mr. Almeida, for the Credit

4    Unions, in opposition -- oh, sorry.  There was a hand raised

5    first.  Counsel for the Underwriter defendants.

6            MR. STEEL:  Good afternoon, Your Honor.  Howard

7    Steel, Goodwin Procter, on behalf of the Underwriter

8    defendants.  Just real briefly, if I may, Your Honor.

9            THE COURT:  Yes.

10            MR. STEEL:  Mr. Rosen is entirely correct, we've

11    reached agreement on updated language for the Plan and

12    Confirmation Order, preserving the Underwriter defendants'

13    defensive rights.  We thank him and the debtor for the work

14    and effort on that.

15            Your Honor, the language is in the currently filed

16    proposed Confirmation Order under section 56(f).  The Plan

17    does need two conforming changes that we've agreed upon with

18    the debtor, and I think per Mr. Bienenstock's comments this

19    morning, it will be filed later today (inaudible).

20            THE COURT:  Thank you, Mr. Steel.

21            Now we'll turn to counsel for the Credit Unions, Mr.

22    Almeida.

23            MR. ALMEIDA:  Yes.  Good afternoon, Your Honor.  Can

24    you hear me well?

25            COURT REPORTER:  Your Honor.

1      THE COURT:  Yes, I can.  Thank you.  Maybe someone

2  else can't hear you well.

3      COURT REPORTER:  I'm sorry, Your Honor.  This is the

4  court reporter.  We were muted.  I tried to ask Mr. Steel to

5  repeat his last sentence, because the audio broke up.

6      THE COURT:  All right.  Mr. Steel, would you come

7  back and repeat your last sentence, please?

8      MR. STEEL:  Sure, Your Honor.  Howard Steel, Goodwin

9  Procter, on behalf of the Underwriter defendants.

10      We just noted for the record that the Plan needs two

11  conforming changes, which we've agreed upon with the debtors,

12  and per Mr. Bienenstock's comments this morning, I think that

13  revised plans will be filed later today.  And we look forward

14  to confirming and seeing that language in the Plan.

15      Thank you very much.

16      THE COURT:  Thank you, Mr. Steel.

17      Now Mr. Almeida.

18      MR. ALMEIDA:  Yes.  Good afternoon, Your Honor.  This

19  is attorney Enrique Almeida on behalf of certain Credit

20  Unions.  We appeared earlier this morning.  I'm hear to

21  present argument in regards to the releases, exculpations, and

22  injunctions provided for in the Plan of Adjustment on behalf

23  of the Credit Unions.

24      THE COURT:  Would you speak just a little bit slower,

25  please, sir?

1          MR. ALMEIDA:  Yes.  Sorry.

2          THE COURT:  Thank you.

3          MR. ALMEIDA:  I'm presenting arguments in regards to

4   the releases, exculpations, and injunctions provided for in

5   the Plan.  These arguments support the Credit Unions'

6   opposition to the confirmation of the Plan of Adjustment as it

7   is currently drafted.

8          We submit, respectfully, that the Plan cannot be

9   confirmed, because the releases and exculpations discharge

10  their constitutional takings claims, as expounded earlier in

11  the previous argument that we made in the morning, and because

12  they are impermissibly broad.

13         As stated earlier, these claims were included in

14  detail in causes of action of two adversary proceedings that

15  are pending adjudication by the Court, which are Adversaries

16  18-28 and 19-389.  Adversary 18-28 seeks a determination of

17  exception from discharge of the Credit Unions' claims based on

18  their constitutional claims for debtors' taking of the private

19  property without just compensation, and to obtain a

20  determination of nondischargeability pursuant to 11 U.S.C.

21  944(c)(1) and 11 U.S.C. 105.

22         Meanwhile, Adversary Proceeding 19-389, filed against

23  the Commonwealth and COSSEC, seeks that the Commonwealth

24  comply with statutory requirements to adequately fund the

25  governmental insurance that covers the shares, and because of

1    the cooperatives -- failure to comply with this statutory

2    funding mechanism renders the government's insurance contract

3    ineffective.   Thus, it's also depriving the Credit Unions of

4    the property, all in violation of the constitutional rights.

5         We submit that the exculpations the government

6    parties provided for in the Plan of Adjustment are

7    impermissibly broad.   They extend the releases to additional

8    parties and related persons of debtors, as well as to entities

9    considered government parties.

10        As stated in our opening argument, and to reply to

11   brother counsel Rosen, due process of law warrants and

12   requires adjudication of the merits of the factual and legal

13   issues which are fact intensive, and which are presented in

14   the pending adversary proceedings previously mentioned within

15   their judicial procedures, and not collaterally through

16   exculpation and release provisions in a confirmation process.

17        The Credit Unions should be preserved -- the Credit

18   Unions' claims should be preserved pursuant to the public

19   interest, as these claims pertain to the protection of the

20   capital and resources of depository institutions.   The Credit

21   Unions' claims have a right to judicial adjudication of

22   unrenounced and nonreleased claims and rights asserted in

23   active, ongoing litigation, just as acknowledging the Plan of

24   Adjustment with regard to claims against CCDA, HTA, MBA, PFC,

25   PRASA, PRIDCO, PRIFA, the UPR, and PREPA.

1          This same acknowledgment is warranted with respect to

2     the pending claims of the Credit Unions in Adversary

3     Proceedings 18-28 and 19-389.

4          (Sound played.)

5          MR. ALMEIDA:  The Credit Unions reaffirm that instead

6     of receiving overly broad releases and exculpations when the

7     Plan of Adjustment is confirmed, the debtor and its

8     instrumentalities, particularly including COSSEC, must not

9     receive a discharge, nor a release from the Credit Unions'

10    claims, especially since the objecting Credit Unions are not

11    limited to debtors' breach under the bond obligations and

12    damages for the results, but pertain to violations of

13    constitutional rights and intentional, willful misconduct.

14         As affirmed at Credit Unions' objection filed at

15    docket 18594, even when the exculpations in the Plan carve out

16    negligence and willful misconduct, it does so only to the

17    extent that the actions or omissions for such causes of action

18    are previously recognized in the final order.  Under said

19    terms, the proposed exculpations, and an order to enforce it,

20    would constitute another unconstitutional taking of property

21    of the Credit Unions, including their contractual rights to a

22    duly funded insurance for which they have dutifully paid

23    applicable permits.  Your Honor should bear in mind that the

24    insuring question in this situation is not a debtor under

25    Title III, but a public corporation created by Commonwealth

1   law.

2          In light of the above, our request would be to move

3   for denial of confirmation or, in the alterative, for an

4   exception of discharge of their claims in adversary

5   proceedings previously mentioned.  That will be all.

6          THE COURT:  Thank you, Mr. Almeida.

7          The next speaker is Mr. Hein.

8          MR. HEIN:  Thank you, Your Honor.  Can you hear me?

9          THE COURT:  Not very well.  Can you turn your volume

10  up a bit perhaps?

11         MR. HEIN:  I'm using the same volume that I had

12  before.  I'm not sure.

13         Is this any better?

14         THE COURT:  Yes.

15         MR. HEIN:  Okay.  Thank you.

16         THE COURT:  It's considerably better.

17         MR. HEIN:  Great.  Thank you.

18         So, Your Honor, my comments are directed to the

19  Modified Eighth Amended Plan that was filed on Friday evening.

20  If something more has been filed this morning, I have not

21  looked at it.  The original releases that I addressed in my

22  objections I think were way overly broad, indeed potentially

23  releasing claims on COFINA bonds.  I appreciate very much that

24  the Oversight Board has dramatically truncated the releases.

25         And I think, as truncated, I'm fine with the basic

1   release provision in 92.2(a), the basic bar order provision at

2   92.2(d).  There are two different injunction provisions at

3   92.3 and 92.6 that I'm confused why there are two, but I'm

4   okay with them.  There are, I think -- there still remains

5   over breadth, going beyond nondebtors in the bar order

6   provision.  There's a third one in 92.9, and a third

7   injunction provision in 92.11.  Given the spirit of

8   Mr. Rosen's comments, I'd be happy to speak with him to

9   address that.

10       Also, although the debtor did drop the elimination of

11  the Rule 3020(e) stay from the Order and Judgment confirming

12  the Plan, they still retain, in section 92.20 of the Plan, a

13  provision for immediate binding effect, notwithstanding the

14  3020(e) stay.  So what they say they've done to address my

15  concern in the Order basically is taken away if you keep 92.20

16  in the Plan, because the Order, of course, confirms the Plan.

17  Now, maybe that's inadvertent, and that's something Mr. Rosen

18  will either take a look at or discuss with me.

19       And then on the exculpation provisions, I also have a

20  concern there, which they cover a host of parties, beginning

21  with fairly broadly defined government parties.  My comments

22  are not in any way directed at the Monolines, but, you know,

23  my basic conceptual concern with the exculpation provisions is

24  to say a party has no liability, in essence, is another way of

25  saying they're released.

1          Again, I'd be happy to discuss the concerns there

2   with Mr. Rosen, but I think just conceptually, if the releases

3   are limited to nondebtors, to say that you're going to

4   exculpate people beyond that, in essence, that becomes a

5   release.  And, on the other hand, I am willing to discuss it.

6          Finally, you know, it goes without saying that I

7   object generally to a release of the debtors.  I don't think

8   that's what Your Honor had in mind for the topic here, though.

9          THE COURT:  Thank you, Mr. Hein.

10         Mr. Rosen.

11         MR. ROSEN:  Yes, Your Honor.  Thank you very much.

12         With respect to the Credit Unions, as I indicated

13  earlier, this is more of the same.  It's the same that we

14  heard in 2019 with respect to COFINA.  It's the same as we

15  heard this morning, that Mr. Bienenstock very skillfully

16  addressed.

17         Your Honor, the exculpation provisions that I chose

18  not to waste the Court's time with earlier, they are extremely

19  narrow.  They relate specifically to the formulation, the

20  dissemination, implementation, confirmation of the Disclosure

21  Statement and Plan, and for activities associated with the

22  Title III cases.  They don't go --

23         (Sound played.)

24         MR. ROSEN:  They don't go later.  So, Your Honor, I

25  don't see the concern that has been espoused by Mr. Almeida

1    and the Credit Unions.

2         The issue that he talked about with due process of

3    law warrants this, warrants that, Your Honor, that was

4    expressly addressed by the Court in *COFINA*.  We talked about

5    it at length in our reply chart, Your Honor, and I won't go

6    through it again with the Court.

7         I appreciate the comments by Mr. Hein with respect to

8    what we have done to alleviate some of his concerns.  I would

9    point out that 92.20, which he expressed some concern about

10   the immediate effect, the clause just before he started

11   reading immediate effect says, "upon the occurrence of the

12   effective date."  So, Your Honor, there is no concern, because

13   until we get to the effective date, there is no binding

14   effect.  I am happy to sit down with Mr. Hein, however, and go

15   over 92.9 or 92.11, which are two other sections that he

16   expressed a concern about.

17        And unless the Court has any additional questions,

18   Your Honor, that is all I have to present at this time.

19        THE COURT:  I do have one question.  The Credit

20   Unions' counsel specifically complained of a release of COSSEC

21   as a nondebtor, and would you please speak to that?

22        MR. ROSEN:  Your Honor, COSSEC is a -- if it is, in

23   fact, a nondebtor instrumentality, and I believe that it is, I

24   believe that we would be prepared to include it along with all

25   the other instrumentalities that have not or will not be

1   receiving the benefit of any release, or not be included as

2   related persons, Your Honor.

3         THE COURT:  Thank you.  So you'll look at that and --

4         MR. ROSEN:  I will.  I will, Your Honor.

5         THE COURT:  Okay.  Thank you.

6         The next Agenda item is the improper solicitation

7   objection and request for designation that Mr. Hein had raised

8   in his papers, and Mr. Samodovitz had argued as well.  The

9   first advocate we have on this for the supporting parties is

10  Mr. Rosen for 17 and a half minutes.

11        MR. ROSEN:  Thank you very much, Your Honor.  Again,

12  Brian Rosen, Proskauer Rose.

13        Your Honor, you asked that two questions be

14  addressed.  The first one of the votes of retail investors

15  were improperly solicited in violation of section 1125(b) of

16  the Bankruptcy Code, and whether designation of any votes is

17  required pursuant to section 1126(e) of the Bankruptcy Code.

18  In a word, in answering both questions at the same time, Your

19  Honor, no.

20        With respect to the question regarding solicitation

21  of the retail investors, as prompted by Mr. Hein, everything

22  was done according to the books, and in that regard, the

23  Bankruptcy Code.

24        If you don't mind, Your Honor, I would like to take

25  you back to July of this year, in the Disclosure Statement

1    hearing, including the multiple dates that we had for those

2    hearings.  Your Honor, on July 29 of 2021, the Court held a

3    continued Disclosure Statement Hearing, and starting on page

4    46 of that transcript, you and I had a conversation regarding

5    the tender and exchange process that was needed to be

6    undertaken in order to appropriately track bonds that would be

7    entitled to receive the restriction fee pursuant to the Plan

8    Support Agreement and the Plan.

9         And in lines 17 through 23, Your Honor, I said to

10   you, "the need to do the tender and exchange is because we

11   need to be able to create an alternative CUSIP number that can

12   be tracked, and that we can actually understand who is going

13   to be the recipient of a PSA restriction fee.  By including

14   retail investors, which is something that Mr. Hein asked for,

15   we're providing for them the opportunity to do that as well.

16        Then on page 47 of that transcript in lines 11

17   through 18, Your Honor, you said, "the Plan that was filed on

18   Tuesday morning still includes the opportunity for those

19   retail investors to receive the PSA restriction fee, in the

20   event the retail investor class votes to accept the Plan.  In

21   the event that they do not, then the amount of PSA restriction

22   fees that otherwise would be allocable to that retail investor

23   class will revert to the initial PSA creditors."

24        Following that, Your Honor, on lines 4 through 15 of

25   page 48, I said, "we're doing this because we need to deal

1   with the tender and exchange, and the creation of the

2   alternate CUSIPs, and have that done in a time frame so that

3   we can then continue the actual solicitation of votes pursuant

4   to the Commonwealth Plan of Adjustment, Your Honor.  Because

5   until you do that, you cannot actually send out the

6   solicitation materials.  So we had to stagger and have the

7   tender and exchange done first, and that will be done by

8   August 13.  And I think the settlement date is then August 17,

9   and then the Plan solicitation materials will be sent out by

10  Prime Clerk subsequent to that settlement date."

11         In response to your question about Mr. Hein's

12  argument that the tender and exchange forced holders to vote

13  early on pages 48 and 49 -- excuse me, I said -- on page 49

14  and 50, Your Honor.  Let me rephrase it, Your Honor.

15         You said to me, the solicitation that will go out

16  under the new CUSIP will still require the filing of a ballot

17  by someone who tenders for the new CUSIP.  So there will be a

18  separate vote.  If they vote negatively, they won't get this

19  additional fee; is that correct?"

20         And I responded to you, Your Honor, "that is correct,

21  Your Honor.  We will know because we -- if they have tendered

22  an exchange pursuant to the notice that is out there on EMMA,

23  and they are receiving it through DTC, we will be able to

24  track that CUSIP.  We will know, in fact, they continued to

25  comply, and if they don't, then their vote won't count, and

1    they will not be entitled to the restriction fee."

2          And you responded, all right.  So they still have the

3    opportunity to vote against the Plan, but they wouldn't be

4    getting the restriction fee, because they're not supporting

5    the Plan, question mark.

6          Yes, Your Honor.  Yes.

7          Your Honor, I would point out that when the tender

8    and exchange was done, any party that had not joined the PSA

9    prior to that was expressly informed that by undertaking the

10   tender and exchange, they would effectively be joining the

11   PSA.  And they, in fact, were given a copy of the PSA, and

12   section 5.2 of the PSA.

13         And that reads, Your Honor, notwithstanding anything

14   contained in this Article V, or elsewhere in this agreement to

15   the contrary, this agreement is not and shall not be deemed to

16   be a solicitation of acceptance of the Plan.  Each of the

17   parties, severally and not jointly, acknowledges and agrees

18   that, A, the votes on the Plan will not be solicited until the

19   Title III Court has approved the Disclosure Statement and

20   related solicitation materials, and such Disclosure Statement

21   and solicitation materials have been transmitted to parties

22   entitled to receive same; and, B, this agreement does not

23   constitute an offer to issue or sell securities to any person

24   or entity for the solicitation of an offer to acquire or buy

25   securities in any jurisdiction where such offer or

1    solicitation would be unlawful.

2           Indeed, Your Honor, the Court's concerns were

3    validated in the tender and exchange, and the subsequent

4    solicitation of acceptances worked as planned.  The

5    solicitation materials, as approved by the Court, were

6    distributed by Prime Clerk, and affidavits of service,

7    publication, and broadcast have been filed, and are actually

8    part of the record of these proceedings.

9           And the solicitation period, Your Honor, ran for

10   approximately seven weeks, and notwithstanding that, scores of

11   persons that tendered and exchanged their bonds, so that we

12   could track the fee entitlement, certain retail investors,

13   actually 66 in total, Your Honor, that had tendered and

14   actually exchanged their bonds voted no.

15          That is important, Your Honor, because it followed

16   the process that you were most concerned about:  Would they

17   have an opportunity, notwithstanding the tender and exchange,

18   to vote.  And yes, some of them did vote no, notwithstanding

19   the tender and exchange.  Even so, Your Honor, it must be

20   noted that all retail investor classes voted to accept the

21   Plan overwhelmingly, with no class being less than a 90

22   percent acceptance rate.

23          So based upon such acceptance, Your Honor, all

24   members of the retail classes, including Mr. Hein, shall

25   receive the restrictions fee.

1           With that, Your Honor, I'll turn, unless the Court

2   has any questions, to the question of designation of the

3   votes.

4           THE COURT:  Just for extreme clarity, and you went

5   over the provision of -- the portion of the transcript from

6   July that addressed this as well, but was it possible for

7   anyone to vote for the Plan before the Disclosure Statement

8   and ballot solicitation materials were sent out?

9           MR. ROSEN:  No, Your Honor.  They were not permitted

10  to vote to the Plan until, at the earliest, I believe it would

11  have been August 30, which would have been -- as I mentioned

12  before, the closing date for the tender and exchange was

13  August 17th.  So approximately two weeks prior to.

14          THE COURT:  Thank you.

15          You may go on to the next topic.

16          MR. ROSEN:  Thank you, Your Honor.

17          As to the designation of acceptances, Your Honor,

18  section 1126(e) permits the Court to designate any entity

19  whose acceptance or rejection of such plan was not in good

20  faith, or was not solicited or procured in good faith, or in

21  accordance with the provisions of that title.  And a party

22  seeking to designate any such entity carries an extremely

23  heavy burden, Your Honor.  And I believe we might have already

24  cited those cases, and I won't belabor that with the Court

25  right now.

1        And as the Court knows, a lack of good faith for

2   these purposes means a creditor cast the vote for an improper

3   purpose or ulterior motive.  Mere pursuit of an economic gain

4   does not in and of itself illustrate bad faith.

5        In claiming that there should be a designation, Your

6   Honor, and, therefore, a lack of good faith of the parties,

7   Mr. Hein is taking his best shot at the mediation program that

8   this Court instituted, and the reports that have been

9   submitted by the mediation team as directed by the Court.

10        In 2020, Your Honor, the mediation team filed a

11   statement discussing the mediation process and the merits --

12   excuse me, and the months of difficult negotiations that went

13   on.  On page 8, Your Honor, the mediation team notes, after

14   months of mediated negotiations, an agreement in principle was

15   reached; and then it goes on and on to discuss the process

16   that unfolded, and what should be taken.  As far as I'm

17   concerned Your Honor, that discussion by the mediation team

18   oozes good faith.

19        More importantly, Your Honor, and directly on point,

20   on June 16, 2021, this Court held an Omnibus Hearing, and as

21   reflected, Your Honor, on page 9 of the transcript, the Court

22   said, therefore, before any approval and dissemination of a

23   Disclosure Statement for a plan that is not substantially

24   consensual, it is essential that the Court be assured that all

25   of the parties have used their best efforts in good faith to

1    consider every potential point of the compromise, and to

2    fairly assess that whatever firm positions are taken are

3    sufficiently essential that they are worth risking failure to

4    achieve a confirmable Plan of Adjustment.

5        Therefore, I am advising all parties that I plan to

6    rely on Judge Houser, as mediation team leader, for

7    confirmation of her belief that such good faith, best efforts

8    have been made.  In this context, I will take the term 'good

9    faith best efforts' to mean that those parties that she

10   directs to engage with each other between now and the date of

11   any approval of the Disclosure Statement, and -- made

12   proposals that have moved closer to each other and would show

13   meaningful progress towards a more consensual plan.

14       I will ask her to so confirm in writing on or before

15   the July 13, 2021, Disclosure Statement hearing date.  If she

16   cannot confirm that good faith best efforts have been

17   undertaken under her supervision by July 13, 2021, it is

18   possible that I will not permit the mailing of the Disclosure

19   Statement, even if I have approved it as containing adequate

20   information, until she can so confirm.

21       Your Honor, at ECF no. 17314, the statement of the

22   mediation team, in paragraph 2, states very, very succinctly

23   "by this statement, the mediation team confirms that all

24   parties, if directed to engage with each other between the

25   Omnibus Hearing and the filing of this statement made 'good

1   faith best efforts' as the Court used that term during the

2   Omnibus Hearing."

3        Your Honor, we believe that there is no way that

4   anyone could ever argue that, after two and a half years of

5   negotiations led by the mediation team, that all parties have

6   not utilized not only their good efforts, but their best

7   efforts to try and reach a consensual resolution.  And we

8   believe that the solicitation results as set forth in the

9   Pullo Declaration and the Supplemental Declaration bear this

10  out, Your Honor.

11       So for all the reasons, we believe that there should

12  not be any designation of any of the votes of any of the

13  entities that submitted in support of the Plan of Adjustment.

14  Your Honor, that would conclude my remarks, unless the Court

15  has any questions.

16       THE COURT:  I may be wrong, and Mr. Hein will correct

17  me when he comes on if I am, but I thought that there was an

18  element of his reference to designation that posited the

19  designation or invalidation of the accepting votes of his

20  retail class as improperly solicited.  You have spent a great

21  deal of time explaining why it's the Oversight Board's

22  position that there was no improper solicitation, but if the

23  Court were to find improper solicitation, would designation of

24  the affirmative votes within the retail class that was offered

25  the payment be a permissible remedy under 1126?

1         If so, what would be the consequence for those

2    bondholders, and for the Court's analytical process under the

3    Plan as currently constructed?

4         MR. ROSEN:  Your Honor, first, I would go back to the

5    first thing that we talked about, which was, was the vote

6    undertaken with respect to the retail classes proper.  And,

7    Your Honor, as I said, the tender and exchange was not a

8    solicitation of the votes.  Everything that was done was

9    pursuant to the Disclosure Statement itself.  And the votes

10   that were received, Your Honor, were those that were done in

11   direct response to the solicitation materials that the Court

12   approved and sent out.

13        But, Your Honor, if the Court were to take the

14   position that all of the retail investors classes were not to

15   be able to be voting, I think the effect would be that none of

16   those parties would be entitled to the restriction fee,

17   because their classes would not have voted in favor and,

18   therefore, that money which would otherwise be applicable to

19   retail investors would refer to the initial PSA holders

20   possibly -- but, Your Honor, I don't think that's a result

21   that certainly the Oversight Board wants, and I can't imagine

22   it's a result that Mr. Hein would want for his fellow retail

23   investors.

24        THE COURT:  As nonaccepting classes, the Court's

25   analysis of the validity of the Plan as to them would have to

1   change as well, correct?

2          MR. ROSEN:  Your Honor, I don't think it affects the

3   overall confirmation of the Plan, because there are more than

4   sufficient numbers of impaired accepting classes, and the fact

5   that they, like perhaps the general unsecured creditors, voted

6   no is of no great moment in connection with satisfaction of

7   the confirmation requirements.

8          THE COURT:  So the Court's findings as to feasibility

9   in the 314(b) issues would be the same as with any other

10  nonaccepting impaired class?

11         MR. ROSEN:  Yes, Your Honor.

12         THE COURT:  Thank you.

13         So I will turn now to Mr. Hein -- I'm sorry.  No.

14  Mr. Samodovitz is first for seven and a half minutes.

15         Mr. Samodovitz, are you there?  Would you turn on

16  your camera and unmute, please?

17         MR. SAMODOVITZ:  Yes.  Can the Court hear me?

18         THE COURT:  Yes.  I can hear you now.  I can see you

19  as well.

20         MR. SAMODOVITZ:  Okay.  Docket 19056, which is the

21  affidavit of Ms. Pullo, contains the official vote tally for

22  each class.  It lists only 27 votes for retail class 47 for

23  the 2014 GO Bonds which I own.  There must be many more

24  bondholders in this class, so the voting process was

25  unsatisfactory.

1          For example, I signed a letter of authorization that

2     I received from my bond broker which stated, please use this

3     as my authorization to opt out of the Puerto Rico

4     restructuring/exchange offer on the following bonds.  My bond

5     broker was confused or intimidated by the voting process, and

6     did not register my "no" vote.

7          This appears to be a widespread problem, and --

8     judging from the very low number of official votes.  The FOMB

9     did this voting process.  At -- docket 19056 states that in

10    order for a bondholder to vote, his or her broker had to

11    tender the bondholders' bonds to DTC.  In addition, the

12    bondholder had to pay a 30 dollar fee per bond to tender it.

13    Both requirements were unreasonable and a deterrent to the

14    bondholder voting.

15         It is also likely that the brokers did not want to be

16    responsible for any mistake in the handling of the bonds when

17    tendered to DTC, so they resist the participation as well,

18    possibly in my case.  The 30 dollar fee per bond is similar in

19    the concept in -- upon context to a poll tax, political

20    elections, which is unconstitutional even when the poll tax is

21    a nominal dollar.  See *Gonzalez v. Arizona*, 677 F.3d 383.

22         The requirement to tender bonds is even more onerous,

23    because of the magnitude of the bonds and the possibility for

24    mishandling your loss of the bonds.  The requirement to tender

25    bonds also discriminates against bondholders who oppose the

1    Plan, because they may want to sell their bonds before the new

2    bonds are issued, instead of tendering the bonds and voting

3    no.

4            Therefore, the voting period should be reopened, and

5    simple ballots without any requirement to tender bonds or pay

6    any fee should be sent to the bondholders of all classes to

7    allow them to vote freely now.

8            And in FOMB's docket 4784, which was publicly

9    available on Prime Clerk as to January 14, 2019, the FOMB

10   challenged the validity of the 2014 GO Bonds as exceeding the

11   15 percent debt service limit established by Article VI,

12   Section 2 of the Puerto Rico Constitution.  Docket 4784

13   provided detailed mathematical calculations that purportedly

14   proved this.  With these calculations, the FOMB contended the

15   use of interest capitalization for the 2014 GO Bonds --

16           THE COURT:  Mr. Samodovitz --

17           MR. SAMODOVITZ:  -- calculation of the total debt

18   service --

19           THE COURT:  Mr. Samodovitz.  Mr. Samodovitz.

20           MR. SAMODOVITZ:  Yes.

21           THE COURT:  You froze for a minute, and I couldn't

22   hear what you were saying.  So would you please go back three

23   sentences and repeat from there?

24           MR. SAMODOVITZ:  Can you hear me now?

25           THE COURT:  You're still breaking up.  Would you say

 1   testing, one, two, three?  I can't hear you.

 2          MR. SAMODOVITZ:  Can you --

 3          THE COURT:  Only very intermittently.

 4          MR. SAMODOVITZ:  Testing, one, two -- let me -- okay.

 5   I'm going to go to a different WIFI source.  Sorry for the

 6   problem.

 7          THE COURT:  All right.

 8          MR. SAMODOVITZ:  One second.  All right.  One second.

 9   Sorry for the delay.  I'm going to switch.

10          Can you hear me now?

11          THE COURT:  Yes, I can.  So if you would go back

12   three sentences from wherever you stopped, that would be

13   helpful.

14          MR. SAMODOVITZ:  Okay.  I'm not sure exactly where --

15   I cited *Gonzalez v. Arizona*, was that the -- 677 F.3d 383?

16          THE COURT:  Ms. court reporter, do you have that --

17   so yes, from there, we got there.

18          MR. SAMODOVITZ:  The requirement to tender bonds is

19   even more onerous, because of the magnitude of the bonds and

20   the possibility for mishandling or loss of the bonds.  The

21   requirement to tender bonds also discriminates against

22   bondholders who oppose the Plan, because they may want to sell

23   their bonds before the new bonds are issued, instead of

24   tendering the bonds and voting no.

25          Therefore, the voting period should be reopened, and

1    simple ballots, without any requirement to tender bonds or pay

2    any fee, should be sent to the bondholders of all classes to

3    allow them to vote freely now.

4         In FOMB's docket 4784, which was publicly available

5    on Prime Clerk as of January 14, 2019, the FOMB challenged the

6    validity of the 2014 GO bonds as exceeding the 15 percent debt

7    service limit established by Article VI, Section 2 of the

8    Puerto Rico Constitution.  Docket 4784 provided detailed

9    mathematical calculations that purportedly prove this.

10        For these calculations, the FOMB contended that use

11   of interest capitalization for the 2014 GO Bonds in the

12   calculation of the total debt service was improper, and

13   without the interest capitalization, the total debt service

14   was 15.1 percent in fiscal year 2016.  However, the projected

15   debt service included interest on other variable rate bonds at

16   12 percent, which was the maximum amount allowed under Puerto

17   Rico law.

18        At 12 percent, the projected interest under variable

19   rate bonds was 15.2 million in fiscal year 2016.  However, the

20   actual average interest on the variable rate bonds in fiscal

21   year 2016 was only 1.7 percent, which translated to 2.2

22   million dollars of interest.  So the projection of debt

23   service was 13 million dollars too high.  If the 13 million is

24   subtracted from a total debt service in fiscal year 2016, the

25   total actual debt service was only 14.94 percent, even if the

1   interest capitalization is not used in the debt service

2   calculation.

3        The Disclosure Statement stated that the Plan settled

4   challenges to the validity of the 2014 GO Bonds.  This implies

5   that the foregoing issue was still unresolved before the

6   settlement in the Plan when it was not.  This may have

7   influenced the 27 votes in Class 47 to vote yes to the Plan to

8   avoid the purported risk of invalidity.

9        Now, the FOMB had documents indicating a projected

10  and actual debt service of the variable rate GO Bonds.  These

11  were Exhibits A and B in my objection, docket 18433.  The

12  documents were clear and concise, and it was a simple matter

13  to calculate the total actual debt service using the actual

14  debt service of the variable rate GO Bonds instead of the

15  projected debt service.  The FOMB did not do so.

16       Even if this was an innocent mistake or an innocent

17  oversight by the FOMB, that is no excuse for the FOMB not

18  conducting the simple, good faith investigation of the actual

19  debt service of the variable rate GO Bonds in view of the

20  tip-off in the offering statement that the debt service for

21  the variable rate GOs was projected at the maximum interest

22  rate --

23       (Sound played.)

24       MR. SAMODOVITZ:  -- of 12 percent allowed by Puerto

25  Rico law, and was not an estimate of the actual interest.

1          Instead of me challenging the 27 votes on record

2    based on this, I request that new ballots be sent to all the

3    bondholders in all classes, and at least the bondholders in

4    Class 47, and the voting period reopened.  If any of the 27 do

5    not vote again, then their original vote can be used.

6          And before the new ballots are sent out, the

7    Disclosure Statement and any summary accompanying the ballot

8    should be updated based on the new information about the

9    actual debt service on the variable rate GO Bonds, and its

10   impact on the challenge to the validity of the 2014 bonds.

11         That's my presentation.  If there's any questions --

12         THE COURT:  Thank you, Mr. Samodovitz.  I don't have

13   questions for you.

14         I do see that counsel for the Special Claims

15   Committee has raised the hand, and so I will call on counsel

16   for the Special Claims Committee.

17         MR. AXELROD:  Thank you, Your Honor.  Tristan

18   Axelrod, Brown Rudnick, for the Special Claims Committee.  Can

19   you hear me clearly?

20         THE COURT:  Yes, I can.  Good afternoon,

21   Mr. Axelrod.

22         MR. AXELROD:  Thank you.

23         The Special Claims Committee has no interest in this

24   particular argument over solicitation.  However, there was

25   just an allegation of an oversight or impropriety, and so I'd

1   just like to make a brief statement.

2          Act 39 of 2005 provides that, in calculating

3   compliance with the Puerto Rico debt limit, Puerto Rico

4   calculates the debt limit as of the time of issuance.  Part of

5   that means that where variable rate bonds have been issued,

6   Puerto Rico has the obligation to count those bonds at the

7   maximum possible interest rate.

8          And so we looked at -- the Special Claims Committee

9   looked at, in the calculations that Mr. Samodovitz refers to,

10  are the interest rate calculations at the maximum rate, 12

11  percent.  There is ample precedent to the effect that if bonds

12  are issued in an invalid manner, if they are void for any

13  reason, they cannot be validated by ratification, or estoppel,

14  or any other ex post facto cause, such as a change in interest

15  rates.

16         That is all I'd like to say, Your Honor, unless you

17  have further questions.

18         THE COURT:  No, I don't.  Thank you, Mr. Axelrod.

19         Now we will return to Mr. -- well, we will go to

20  Mr. Hein for his argument on this topic.

21         MR. HEIN:  Thank you, Your Honor.  Can you hear me?

22         THE COURT:  Yes, I can.  Thank you.

23         MR. HEIN:  Thank you.  So there I think is one set of

24  issues, of concerns, concerning problems, and then a second

25  set of issues concerning remedies.  And I realize the remedies

1   may be different than the problems.

2          Problem one is the CUSIP exchange offer soliciting

3   subscriptions to the PSA, including a commitment in the PSA to

4   support and vote for the Plan launched on July 27 before the

5   Disclosure Statement was even approved, long before the

6   solicitation packages in any form actually got mailed.  I

7   spelled this out in my objection.

8          And section 1125(b) I think is clear that acceptance

9   or rejection may not be solicited until, at the time of or

10  before such solicitation, a Court-approved Disclosure

11  Statement is circulated.  Nothing required the Oversight Board

12  to rush to launch the exchange offer before the Court approved

13  the Disclosure Statement.

14         The Oversight Board cites cases like *Indianapolis*

15  *Downs*, but that case and others involve sophisticated parties,

16  and does not excuse a solicitation before the approval of a

17  Disclosure Statement or individual retail investors.  The

18  Oversight Board, I think realizes this, and that's probably

19  why they set up the separate set of retail classes to begin

20  with, recognizing concerns about their doing a direct coercive

21  PSA solicitation of individuals before there is a Disclosure

22  Statement.

23         And one can't avoid the issue in terms of

24  noncompliance with 1125 by self-serving recitals that this is

25  not a solicitation.  I think that's putting form over

1  substance.

2      I think, therefore, 1126(e) would support designation

3  since the solicitation was not done pursuant to section 1125's

4  requirements, or, alternatively, the solicitation was not in

5  good faith, in particular because it was clearly known the

6  Disclosure Statement had not been approved when the

7  solicitation began.

8      Problem two is the coercive solicitation of retail

9  investors through the Disclosure Statement.  The basic message

10 given was major holders have signed on.  If you want 1.321

11 percent, you need to vote to accept.  You vote to reject, you

12 risk not -- you risk getting less.  It's going to happen

13 anyway.

14     The specific materials sent out through brokerage

15 firms were even more direct.  This is one of the exhibits in

16 the record at docket 18761-4, a September 24, 2021, notice

17 communicated via Merrill.  Page six, paragraph one, sentence

18 three expressly states, for the avoidance of doubt, if you do

19 meet the definition of retail investor and do not vote to

20 accept the Plan, you risk not receiving your pro rata portion

21 of the retail support fee.

22     I don't think you can look at this any other way.

23 The substance here is payment was offered for a vote.

24 Mr. Brownstein's testimony last Friday that net had --

25 consideration in the area of one and a half percent is so

1    significant that it's worth the mind numbing complexity of 12

2    separate CUSIPs for one existing position, if -- you know,

3    underscores that 1.321 percent is significant additional

4    consideration being offered in exchange for the votes.

5          And I would submit, Your Honor, it's no surprise

6    under the circumstances that there was a very large yes vote.

7    People basically were voting for something that's going to

8    happen anyway, that they get the added consideration they

9    otherwise would not get.  Soliciting individual investors,

10   telling them that, you know, a vote to accept will likely get

11   them a fee, a reject vote risks that the same deal happens,

12   but they don't get the fee, I think also triggers the standard

13   for designation under 1126(e).

14         The Oversight Board in their brief argues that

15   so-called toggle or death trap provisions are routine, and

16   they cite several cases.  One of the cases, the *M. Corp.*

17   *Financial* actually rejects such a provision and states, "there

18   is no authority in the Bankruptcy Code for discriminating

19   against classes who vote against a plan of reorganization."

20         And then a second case, the *Affordable Auto Repair*

21   case, that case questioned whether it would be appropriate to

22   offer individual class members more consideration for their

23   affirmative vote.  You're creating the section 1123(a)

24   problem, because people in the same class get different

25   consideration.  And what Mr. Rosen said about the exchange

1    offer, if, in fact, people who tendered into that exchange

2    offer last July, who did not vote yes, then had their 1.321

3    percent taken away, that exactly creates the discrimination

4    problem where they are not receiving the same consideration as

5    other people in their class.

6         And, fundamentally, in response to the cases the

7    Oversight Board cites, one has to remember these are cases in

8    corporate bankruptcies where you have, you know, major parties

9    on both sides.  I did not see any case that remotely presents

10   the situation we have here.  Here, we've got a municipal

11   issuer that for years, while it enjoyed investment grade

12   status, so literally billions of dollars of bonds around the

13   country, actively marketed to retail investors around the

14   country.  There were two separate motions that I made to

15   appoint a committee to act as fiduciary to represent either

16   bondholders generally or individual bondholders.  Both were

17   detained.  Thus, there were no fiduciaries appointed on a

18   committee to represent the individual bondholders here.

19        The Plan terms negotiated by major institutional

20   groups were groups that had filed expressly disclaiming any

21   fiduciary duty to other bondholders.  There were then eight

22   separate retail classes established, and then this extremely

23   complex solicitation process, where if you were simply

24   confused or befuddled by the process, whether you're a broker

25   or individual investor, and you don't vote, simply not voting

 1    as a retail -- potential retail class member, if you don't

 2    vote, you don't get the 1.321 percent.

 3          And to vote, this is not just the normal type of vote

 4    that I'm accustomed to.  This is, for me at least, a

 5    completely new process, where the broker has to tender into

 6    this ATOP facility at DTC, and has to tender into an accept

 7    bucket or a reject budget.

 8          And, fundamentally, the way this is -- what's

 9    happened here is people in the retail classes who managed to

10    navigate this process and got their votes into an accept or

11    reject bucket, they're going to get more consideration than

12    other people in the class who were not able to navigate that

13    process.

14          Likewise, for the other classes, you have people who

15    accepted the tender, exchanged CUSIPs to join the PSA last

16    July to get the 1.321 percent, and we're now hearing that some

17    of those people who are members of other classes, not the

18    retail classes, because they accepted the PSA, they're members

19    of other classes, you now have for really all of the classes

20    of bondholders, you have an 1123(a) problem, where people who

21    did not vote will not get the same consideration as those who

22    did vote.  And that's just, I think, violation of 1123(a)(4).

23          You should not have your consideration as an

24    individual voting member of a class turn on whether you vote

25    yes or no.  And so, fundamentally, I think that, you know,

1    perhaps a judge in a corporate bankruptcy case with a handful

2    of big players on each side, you know, maybe will say, well,

3    look, these people, let them work it out.  But I submit, Your

4    Honor, respectfully, hardball tactics such as used here have

5    no place in a proceeding where you have thousands of

6    unrepresented individual investors in a situation where the

7    issuer had sold its bonds throughout the country, actively

8    marketed as investment grade bonds to individual investors

9    around this country.

10        A part three, or problem three, is the complexity of

11   the process here.  And it's compounded by the fact that the

12   materials, and I've documented this in my motion seeking an

13   extension of time that Your Honor is aware of, but

14   fundamentally, the materials arrived in a -- belatedly, at the

15   end of September, and basically were just telling people, call

16   your broker.

17        And, again, my motions are in the record, 18237,

18   18306, also 18247, and 18439.  I won't belabor that.

19        Mr. Elliott's declaration is heavily redacted due to

20   evidentiary ruling, but points still come out.  First,

21   multiplicity of CUSIPs here, like 700 CUSIPs; the paucity of

22   written information; the "just call your broker" notice; and

23   Exhibit 187 and 61-5 illustrates this.  He makes a point about

24   the fact he never got a call back from Prime Clerk.

25        The 30 dollar fee, I think Mr. Samodovitz mentioned

1    this as well.  If you are an individual retail investor,

2    unless you have the clout to get your broker to waive that

3    fee, you are charged 30 dollars for voting.  There is a charge

4    for voting under the way this was done.

5         Mr. Samodovitz commented about the difficulties his

6    broker had, and that speaks for itself.  So, you know, maybe

7    individual retail investors who were in what's called a

8    separate managed account, who had professional management,

9    even though they hold the bonds directly as individuals, you

10   know, maybe their managers were able to navigate this process.

11   Maybe some sophisticated people, you know, were able to do so.

12        I hope I did.  I have not been able to actually

13   confirm that my brokers actually, you know, dotted their Is

14   and crossed their Ts.  I hope I did.  But for the average

15   individual investor here, this was way too complex.

16        And what's notable about the Pullo Declarations is

17   they do not show how many individual retail investors are out

18   there, so the Pullo Declarations just show the numbers who

19   navigated this complex process.  The Pullo Declarations tell

20   you nothing about what -- the universe of individuals who did

21   not navigate the process and now are not going to get the same

22   consideration as other people in their classes.

23        The Oversight Board, in a discovery response, their

24   interrogatory response here, this is at 19164-2, page 13 of

25   18, admitted, quote, the Commonwealth does not have access to

1   information regarding the identities of individual holders of

2   bonds for the amounts of their holding.  So they admit they

3   have no idea of how many individuals that -- are out there who

4   weren't able to navigate this process and vote, and thus will

5   not get the same consideration as others.  And, you know, as I

6   said, it creates the 1123(a)(4) discrimination problem really

7   in all of the bondholder classes.

8         So then the question is what remedies will make this

9   better?  I outlined several alternatives in my objection.  One

10  would be to deny confirmation.  A second would be to designate

11  votes of those who accepted the July CUSIP exchange offer.  A

12  third would be to deem -- and let me be very careful in saying

13  this.  My papers say, deem the retail classes to have

14  rejected --

15        (Sound played.)

16        MR. HEIN:  -- but only for purposes of section

17  1129(a)(8) and (b) analysis.

18        I recognize, as Mr. Rosen pointed out, that we don't

19  want to have a situation where the retail classes lose the

20  fee.  I'm not in any way, shape, or form suggesting that.

21        Another remedy, which I think the Court honestly

22  should look at, is to deal with the problem with the untold

23  number of individuals who are not getting the same

24  consideration.  There's a simple way to do that, and that's to

25  simply say, regardless of how you voted, regardless of whether

1    you voted, you will get the same 1.321 percent.  I think

2    that's the least that the Oversight Board can do here.

3         They will -- they know who navigated the process,

4    because they've got it in the ATOP bucket, or they've got the

5    new CUSIP, so they don't need to know who the people are to

6    make sure everybody gets the 1.321 percent.  And I think, just

7    as a matter of basic fairness, that would be appropriate.

8         As I said, I hope my brokers successfully navigated

9    the process.  I don't know that for sure.  So, you know, this

10   might be a failsafe for me, but I'm honestly also very

11   concerned about hundreds or thousands out there who are losing

12   the equal consideration just because of the complexity of the

13   process.

14        So that, Your Honor, concludes my comments.

15        THE COURT:  Thank you, Mr. Hein.

16        Now we'll return to Mr. Rosen.

17        MR. ROSEN:  Thank you very much, Your Honor.  Brian

18   Rosen, again, for Proskauer Rose, for the Oversight Board.

19        First, with respect to Mr. Samodovitz, Mr. Samodovitz

20   talks at length about being a 2014 retail bondholder.  Your

21   Honor, because of the situation attendant to the 2014

22   issuance, the issuance or the purchase of those bonds was

23   limited to people in 100,000 dollar or greater increments.  So

24   I would like to note that out of the 2014 issuance, and this

25   is all set forth in the Pullo Declarations, with respect to

1    the nonretail class of holders, in excess of 3.3 billion

2    dollars worth of claims were voted in favor of the Plan.

3         And with respect to the retail class, the 27 votes,

4    6.65 million dollars voted in favor.  Your Honor, that's 95

5    percent of the bond issuance for that particular 2014 group.

6         So if Mr. Samodovitz is looking for some other people

7    to be there, they would have to be more than 27 retail holders

8    holding in excess of 3.3 million of bonds who would actually

9    vote no, Your Honor.  I submit, Your Honor, that that class

10   was thoroughly solicited, and the votes came in appropriately.

11        With respect to whether or not there was a fee

12   charge, and I believe this was answered by Ms. Pullo during

13   the cross-examination, Prime Clerk did not solicit a fee, did

14   not incur a fee, did not charge a fee in connection with any

15   votes that were tendered.  If that was done, it was not done

16   by the Commonwealth, the debtors, or Prime Clerk, Your Honor.

17   So with respect to the poll tax reference, we're really -- it

18   has no bearing at all with respect to the solicitation process

19   itself.

20        Your Honor, Mr. Hein is wrong.  He is wrong on so

21   many levels, but I just want to address one.  He keeps talking

22   about people who did not vote are not going to get the fee.

23   He's wrong.  Those people are within the retail class.

24   Whether or not they voted, because the class voted in favor,

25   all people within that class are entitled to the fee.

1        So I don't know whether Mr. Hein voted yea or nay,

2   but to me, Your Honor, it's irrelevant.  And I don't know

3   whether his broker got it right or got it wrong.  It's

4   irrelevant.  Because the classes in which he is a member voted

5   to accept the Plan, not only does Mr. Hein get the fee, but

6   all those people who either voted no, voted yes, or did not

7   vote at all get the fee within those classes, Your Honor.  I

8   don't think anything more could say the point.

9        Your Honor, he goes on to say that Ms. Pullo reported

10  what she reported, but she didn't say how many more people are

11  out there.  Well, that's correct, because she's only supposed

12  to report what she's required to report, Your Honor, in

13  accordance with the terms of the Bankruptcy Code and by

14  PROMESA.

15       (Sound played.)

16       MR. ROSEN:  So again, Your Honor, back to my original

17  point, it doesn't matter how many more people are out there,

18  it doesn't matter whether they voted or not, they're still

19  entitled to the restriction fee, because over 90 percent of

20  each retail class voted in favor of the Plan.

21       Your Honor, and I have to say this, and it's

22  unfortunate that I do, Mr. Hein brings up Mr. Elliott yet

23  again, and he says he never got a call back.  Well, Your

24  Honor, in order to get a call back, you have to leave a

25  message, and that wasn't done.

1          I have nothing further to add, Your Honor.

2          THE COURT:  Thank you, Mr. Rosen.

3          We will now take a ten-minute break before -- I'm

4    sorry.  There's a hand raised.  Mr. Samodovitz.

5          MR. SAMODOVITZ:  I'm sorry.  Can you hear me now?

6          THE COURT:  I can hear you.  I can't see you.

7          MR. SAMODOVITZ:  Okay.  I wanted to --

8          THE COURT:  Now I can see you and hear you.

9          MR. SAMODOVITZ:  I'm not complaining about the use of

10   the 12 percent interest rate for the variable rate bonds when

11   the projection was done in 2014, but when the FOMB challenged

12   the bonds as exceeding the debt service limit in 2019, that

13   was after 2016, after they had the actual data in.

14         That's all I have to say.

15         THE COURT:  Thank you, Mr. Samodovitz.

16         All right.  Then we will now take a break of ten

17   minutes, and so we will reconvene at 2:55 Eastern Time, which

18   will be 3:55 Atlantic Standard Time.

19         Thank you.

20         (At 3:40 PM, recess taken.)

21         (At 3:55 PM, proceedings reconvened.)

22         THE COURT:  Good afternoon.  We are back for the

23   final Agenda item, which is the objection of the UAW and SEIU

24   to a provision of the second revised Confirmation Order.  That

25   objection is at docket entry no. 19162.

1          There is a hand raised by counsel for the Oversight

2    Board.  Mr. Rosen.

3          MR. ROSEN:  Yes, Your Honor.  Thank you very much.  I

4    want to apologize.  I misspoke at the end there with a comment

5    when I said that something had been said during a

6    cross-examination.  I forgot, in fact, that there never was a

7    cross-examination of Ms. Pullo.  Rather, it was when we were

8    discussing with her ahead of time this concern that several

9    objectors had made with respect to this fee.  We discussed the

10   fact that no fee was charged by Prime Clerk.

11         So that stood out in my mind, so I wanted to just

12   reference that to the Court, that I did misspeak.  There was

13   no cross-examination.  But, again, it doesn't change the fact

14   that there was no fee charged by Prime Clerk.

15         THE COURT:  Well, but is there any evidence in the

16   record that there was no fee charged by Prime Clerk, since you

17   said this is something you discussed with her in preparation

18   for a cross that did not occur?

19         MR. ROSEN:  There is no evidence of that, Your Honor,

20   and there is no evidence that there was a fee charged.

21         THE COURT:  Thank you.

22         So now we will go to counsel for the objectors.

23   Mr. DeChiara.

24         MR. DECHIARA:  Yes, Your Honor.  Good afternoon, Your

25   Honor.  Peter DeChiara of the law firm of Cohen, Weiss &

1    Simon, LLP, for the United Auto Workers International Union

2    and the Service Employees International Union.

3         UAW and SEIU were labor unions that represent

4    employees of the Commonwealth.  Many of their members

5    participate in the Commonwealth's Employees Retirement System,

6    or ERS.

7         UAW and SEIU object to paragraph 62 of the proposed

8    Confirmation Order, to the extent that that language would

9    restrict the Commonwealth from increasing defined benefit

10   pension payments to ERS participants for the next ten years,

11   other than via cost-of-living adjustments.  We object on three

12   grounds.  First, the restriction does not appear in the

13   proposed Plan of Adjustment, yet it adds a material and

14   adverse new term to the treatment of ERS participants.

15   Second, PROMESA provides no basis for such a restriction that

16   does not appear --

17        THE COURT:  Mr. DeChiara, you're breaking up, so

18   would you go back to your second point?

19        MR. DECHIARA:  Yes.  Can you hear me?

20        THE COURT:  I can hear you now.

21        MR. DECHIARA:  Okay.

22        PROMESA provides -- the second point is PROMESA

23   provides no basis for such a restriction that does not appear

24   in the Plan of Adjustment.  Third, inclusion of the

25   restriction in the Confirmation Order violates the due process

1 rights of ERS participants, because they received no notice of

2 it and have had no chance to object to it.

3       And let me get some relevant background.  Retirees or

4 employees who have participated in ERS since January 1, 2000,

5 participate in a defined benefit, or DB program.  Under the DB

6 program, a formula, based on years of service and pay level,

7 determines the pension benefit payable to the participant.

8       Prior versions of the Plan of Adjustment would have

9 cut pension benefits for those above the 1,500 dollar monthly

10 threshold, and that cut was called the monthly benefit

11 modification.  As we all know, the Oversight Board later

12 agreed to eliminate those cuts.

13       The current version of the Plan, the Modified Eighth

14 Amended Plan filed November 12th, thus guarantees that ERS

15 participants will receive no less on their pension claims than

16 they are currently entitled to receive under Puerto Rico law.

17 In other words, for ERS participants, the Plan sets a floor.

18       The relevant Plan language setting the treatment of

19 ERS participants appears in sections 55.1, .4 and .7 of the

20 Plan.  (A) in each of those sections states that ERS

21 participants "shall be entitled to receive" on account of

22 their claim "his or her benefits without an adjustment for any

23 monthly benefit modification."

24       In addition to setting a floor, the Plan's treatment

25 of ERS participants sets one, and only one prohibition on

1    future increases to their benefits.  It prohibits the

2    Commonwealth from increasing benefits through cost-of-living

3    adjustments, or COLAs.  (A) of sections 55.1, .4 and .7 states

4    that ERS participants shall be entitled to receive their

5    benefits, "subject to the elimination of any cost-of-living

6    adjustment from and after the effective date."

7            That COLA language tells us that, apart from COLAs,

8    the Plan's treatment of ERS participants sets only a floor,

9    not a floor and a ceiling.  In other words, if the language in

10   (A) meant that ERS participants would in the future get only

11   their benefits, no less and no more, there would have been no

12   need to specify that their benefits can't be increased by

13   COLAs.

14           Indeed, if the Oversight Board intended to set a

15   general ceiling, it would have been easy enough to draft that

16   language, and including only one specific prohibition on

17   future benefit increases, namely COLAs, the Plan's treatment

18   of ERS participants clearly indicates that other types of

19   future increases are not prohibited by the Plan.

20           For example, the Plan does not prohibit increases via

21   adjustments to the defined benefit pay formula.  To be clear,

22   UAW and SEIU have not objected to the treatment of ERS

23   participants in the Plan of Adjustment.  What we object to is

24   to the paragraph 62 restriction language that was not included

25   in the Plan, but that first appeared in the November 7th

1    version of the proposed Confirmation Order.

2           That language prohibits the Commonwealth, absent

3    judicial relief, for ten years after the Plan's effective date

4    to, implement existing legislation or enact new legislation to

5    create or increase any defined benefit pension payment.  We

6    object to that Confirmation Order language, because it goes

7    beyond the Plan and imposes a new and additional term

8    materially adverse to ERS participants.

9           Treatment of creditors is supposed to be contained in

10   the Plan, not the Confirmation Order.  The Confirmation Order

11   is only supposed to approve, implement, and effectuate the

12   Plan.  Indeed, a Plan's treatment of creditors is subject to

13   review under the criteria in section 314 of PROMESA.

14   Treatment terms that appear only in the Confirmation Order

15   escape such section 314 review.

16          Now, the Oversight Board might argue that the Plan

17   already sets a ceiling on ERS benefits, and section -- and

18   paragraph 62 adds nothing new, but if that were true, why was

19   paragraph 62 added?  Clearly the Oversight Board added it to

20   achieve something, because the restriction on future DB

21   payment increases other than by COLA constitutes an additional

22   material term in the treatment of ERS participants.  And

23   because it does not appear in the Plan, it should be stricken

24   from the proposed Confirmation Order.

25          Nothing in PROMESA permits the Court to restrict the

1   Commonwealth's use of legislation to increase DB benefit

2   payments when such restriction is not contained in the Plan of

3   Adjustment.  Now, PROMESA does provide certain specific

4   mechanisms for blocking implementation of Commonwealth

5   legislation.

6        In an appropriate situation, the Oversight Board can

7   bring a case against Commonwealth legislation under PROMESA

8   section 108, 204(a)(5), or 204(c)(2); but the Oversight Board

9   does not rely on those sections of PROMESA to justify the

10  confirmation language in paragraph 62, and it makes none of

11  the requisite showings under those sections.

12       The Oversight Board may argue that PROMESA preempts

13  any legislation that the Commonwealth might rely on to

14  increase DB pension payments to ERS participants.  In fact,

15  (B) of sections 55.1, .4 and .7 of the Plan bears the heading

16  "preemption", and states that PROMESA preempts any

17  Commonwealth law "to the extent inconsistent with" the Plan's

18  treatment of ERS participants.

19       However, as I explained, because the Plan sets a

20  floor and not a ceiling for ERS participants, using

21  Commonwealth law to increase their DB benefits would not be

22  "inconsistent with" the Plan's treatment of them, so long as

23  that increase was not via a COLA.

24       In sum, no authority exists for restricting the

25  Commonwealth in the future from using existing or future

1    legislation to increase DB payments for ERS participants than

2    for COLAs.  Paragraph 62 is simply an unauthorized overreach

3    by the Oversight Board.

4         We also object to inclusion of this language in the

5    Confirmation Order, because its inclusion violates the due

6    process rights of ERS participants.  There can be no real

7    dispute that the restriction on future increases to their DB

8    benefits is both material and adverse to ERS participants.  It

9    may prevent an increase in their pension payments that the

10   Commonwealth might otherwise grant them.

11        The restriction language in paragraph 62 does contain

12   a proviso that allows the Commonwealth to seek judicial relief

13   leave from the restriction, but that proviso only kicks in

14   after the Oversight Board has disbanded, and who knows when

15   that will be.  And it only allows for a DB pension increase if

16   the Commonwealth satisfies six separate vaguely defined

17   criteria.

18        Clearly, the uncertain possibility of judicial relief

19   from the restriction cannot change the fact that the

20   restriction is material and adverse to ERS participants.  The

21   ERS participants are creditors in this case.  Due process

22   requires notice to them of this material and adverse change in

23   their treatment, and an opportunity for them to object to it.

24        Since the language only first appeared on November 7,

25   long after the Disclosure Statement issued to creditors, and

1    long after the October 19 deadline for Plan objections, ERS

2    participants have been denied both notice and a chance to

3    object.  UAW and SEIU's objection to the restriction language

4    does not cure the due process violation.  UAW and SEIU do not

5    and cannot speak for all ERS participants.  UAW and SEIU do

6    not represent any retirees in this case, and the only active

7    ERS participants we represent are the subset who are UAW or

8    SEIU members.

9          In any event, ERS participants are themselves each

10   creditors in this case, and are entitled to receive their own

11   notice, and to have a right to be heard on matters that

12   adversely affect them.  This due process violation constitutes

13   an additional and separate reason for striking the language at

14   issue.

15         Now, I suspect the Oversight Board may argue that

16   regardless of the legal niceties, the Court should approve the

17   restriction language in paragraph 62 because, as a practical

18   matter, it is needed to prevent the Commonwealth from

19   recklessly increasing pension benefits in the future, and,

20   thus, jeopardizing Puerto Rico's finances.

21         We have two responses to that.  First, whatever the

22   procedural necessity for the language, for all the reasons

23   I've already explained, it can't be implemented through the

24   back door in the form of an 11th hour change to the

25   Confirmation Order.  In any event, the language is not

1    necessary.  If the Commonwealth tries to increase benefits in

2    a manner that the Oversight Board deems to be fiscally

3    reckless, the Board has ample tools to address that.  Tools it

4    has successfully used in this case on various occasions when

5    it deemed the Commonwealth to be acting imprudently.

6         Specifically, if the Commonwealth insists on DB

7    pension increases over the Board's objection, the Board can

8    bring an adversary proceeding under the PROMESA sections I

9    mentioned earlier, claiming the increase is inconsistent with

10   the fiscal plan or Commonwealth's budget.  Thus, more than

11   adequate guardrails already exist to protect against pension

12   increases that the Board might deem ill-advised.

13        For all these reasons, the Court should strike from

14   the Confirmation Order the language in paragraph 62 that would

15   restrict the Commonwealth for the next ten years from

16   increasing DB benefits for participants other than by use of

17   COLAs, and that concludes my opening remarks on this issue.

18   And I've reserved rebuttal time.

19        And, Your Honor, I would note the UAW and SEIU have

20   other objections to the proposed Confirmation Order, but I

21   will address those in Wednesday's oral argument.  Thank you.

22        THE COURT:  Thank you, Mr. DeChiara.

23        Mr. Bienenstock, for the Oversight Board.

24        MR. BIENENSTOCK:  Thank you.  Good afternoon, Your

25   Honor.  Martin Bienenstock of Proskauer Rose, LLP, for the

1    Oversight Board, as the Title III representative of the

2    debtors.

3        Your Honor, I think, first, the background of

4    paragraph 62, which is a public document on ECF, needs to be

5    stated, although I think everyone here knows it, and that is

6    that in order to get the legislature to provide the language,

7    the debt authorization that was necessary for the General

8    Obligation bondholder deal, the Oversight Board agreed to

9    eliminate the monthly benefit modification, as long as the

10   freeze and the elimination of COLAs would remain in effect

11   as -- or remain in the Plan, as they had been previously in

12   all the proposed plans.

13       The Oversight Board has learned, as have all the

14   parties in interest here, and the Court, how much the

15   legislature can do by way of legislation.  And without

16   judging, I mean, the fact is we have learned from such acts as

17   Act 7 and Act 46 that the legislature is willing -- and I'm

18   sure, in its view, it's all for the benefit of the people it

19   represents, but sometimes the Oversight Board has different

20   views as to what's in their best interest.  It has enacted a

21   lot of legislation.  We'd have to go to this Court to nullify

22   or enjoin or seek similar relief.

23       Now, here, the Oversight Board had determined that

24   the defined benefit plan in Puerto Rico was a major cause of

25   its financial distress, and the need for PROMESA and Title III

1    in the first place.  It created a 55 billion dollar zero

2    funded pension plan, which the Commonwealth could not sustain.

3           What the UAW and SEIU are now complaining about is

4    that we've put a provision in the proposed Confirmation Order

5    that provides that the legislature shall not reimplement the

6    defined benefit plan, that the Plan of Adjustment that's

7    proposed eliminates for -- the COLAs, absent going to court

8    and proving the elements of a -- what I call a safety valve.

9           Now, what is the safety valve?  And it took -- it

10   took counsel, I think, two-thirds or more of the way through

11   his presentation before they acknowledged that it even exists.

12   The safety valve is that if you want to recreate a defined

13   benefit plan, as opposed to a defined contribution plan, there

14   has to be a showing that there's a need, it's affordable, the

15   reasons it will not create a risk of the same financial

16   distress that the previous one caused, the means of funding

17   it, the reasons why there's low risk of the funding not being

18   carried out, the reasons why the requested changes will not

19   create a material risk of defaults on any of the then

20   outstanding obligations under the Plan, the reasons why the

21   defined contribution plans are insufficient, and defined

22   benefit plans are both prudent and required.

23          And the SEIU and UAW also did not point out that the

24   Oversight Board, at the government's request, added another

25   provision:  That it would not reduce any defined benefit

1  pension payment that's already accrued that's being paid under

2  the Plan.

3        From the Oversight Board's point of view, this is

4  just simple prudence, and as -- in terms of due process,

5  there's plenty of opportunity for people to object and to

6  state their views.  And the Bankruptcy Code in both sections

7  1123(b)(6) and 1142(b) -- or 1142(a) provides expressly that

8  the Court can issue any order, necessary, desirable to carry

9  out the Plan.  And that's what this is.

10        Let's look at it a different way.  We've just made a

11 very material, important change to our Plan, where we

12 eliminated monthly benefit modifications, but are keeping --

13 and this is all, of course, subject to the Court's rulings

14 after Wednesday's hearing, but are keeping the freeze and the

15 elimination of COLAs.

16        I don't think anyone could seriously contend that if

17 the legislature the next day says, well, thank you very much;

18 we got what we wanted; now we're going to reimpose the defined

19 benefit plan, I don't think anyone could seriously argue that

20 that is in good faith, or consistent with the Plan, or is even

21 allowed by it.  All we are doing is nailing down what the Plan

22 basically provides with a safety valve.

23        Now, for four years, for four balanced budget years,

24 the Board remains in effect, and, as counsel noted, it can

25 object and probably bar any new defined benefit plan that the

1    legislature recreates in form or substance -- in substance, no

2    matter what the form of it.  But the Plan, the Plan of

3    Adjustment and the obligations it creates and it pays go for a

4    lot more than four years, and any plan proponent prudently

5    tries to safeguard its plan for its term.

6         The fact that the Oversight Board may not be here for

7    more than four years -- and for all we know, I mean, things

8    can be amended.  It could be less or more, probably less if

9    there's a change made.  There's still a duty to safeguard the

10   Plan going forward, otherwise, it doesn't work.

11        We've said on several occasions, without the freeze,

12   without the elimination of COLAs in combination with the

13   freeze, the Oversight Board doesn't regard the Plan as

14   feasible.  So we are trying to make sure that the Plan remains

15   feasible, and that's really the totality of it.  And we've

16   learned from history, it's not as if we haven't seen by

17   example what can be done through legislation to change --

18   contrary to people's expectations, including the Oversight

19   Board's expectations.

20        As far as counsel's comment that paragraph 62 is

21   material and adverse to the UAW and SEIU members or the ERS

22   members, that's incorrect.  The material and adverse standard

23   relates to whether the treatment of claims under the Plan are

24   affected materially and adversely.  There is absolutely

25   nothing in section 62 that treats the material -- that changes

1   materially or changes adversely the treatment of the claims.

2          What it protects is the feasibility of the Plan going

3   forward.  It doesn't reduce anyone's payment by one penny,

4   and, in fact, it commits the -- it orders the Oversight Board

5   not to try to reduce it.

6          THE COURT:  Mr. Bienenstock.

7          MR. BIENENSTOCK:  Yes.

8          THE COURT:  Even if it isn't changing the treatment

9   of the particular claim, if, as you contend, this is something

10  that is necessary for the Plan to work, why isn't it required

11  to be in the Plan?  It seems to me your argument that one can

12  put all sorts of new and different restrictions into an order,

13  in order to make the Plan better or make the Plan more

14  protected, if you will, has no immediately discernible limits

15  to that principle.

16         MR. BIENENSTOCK:  Your Honor, thank you for raising

17  that issue.  In a normal plan, and from the background of

18  certainly the Oversight Board and its advisors, when one

19  proposes a plan, the last thing one expects is that the debtor

20  proponent the day after is going to say, well, thank you very

21  much for the plan; now we are increasing all the payments.

22  That's a very unexpected outcome.  Here, unfortunately, we've

23  learned that could happen.

24         And the Bankruptcy Code in section 1142(b) expressly

25  provides for orders to carry out the Plan.  There's no rule

1    that says everything designed to try to make sure the Plan

2    works and is not rendered unfeasible has to be in the Plan

3    itself.  There'd be no reason for section 1142(b) if that were

4    the case.

5         So we've learned from history.  This all occurred, as

6    Your Honor knows, after the voting was done.  I mean, this was

7    in the final days before the Confirmation Hearing was supposed

8    to commence.  So it happened then, and we realized, well, we

9    need some more protection, because if the freeze is unfrozen,

10   or the COLAs come back, the Plan won't be feasible.

11        We had to act in realtime, and section 1142(b) allows

12   us to do that, Your Honor.  This was an unusual circumstance,

13   and we acknowledge that, but it's expressly provided for under

14   section 1142(a) and (b) of the Bankruptcy Code.

15        THE COURT:  Thank you.  You can continue.

16        MR. BIENENSTOCK:  Your Honor, that concludes my

17   remarks, unless the Court has more questions.

18        THE COURT:  Give me just a moment.

19        All right.  I've asked my questions, and so we can go

20   back to Mr. DeChiara.

21        MR. DECHIARA:  Thank you, Your Honor.

22        First, let me just correct an inaccuracy in

23   Mr. Bienenstock's statements.  He said the Plan of Adjustment

24   eliminates the defined benefit plan.  That's incorrect.  ERS

25   participants who were on the payroll prior to January 1, 2000,

1   will continue to have defined benefit pensions.  The Plan does

2   not eliminate that, and the Plan does not say those benefits

3   cannot be increased.  It's only this 11th hour change to the

4   Confirmation Order that would say that those increases cannot

5   be implemented.

6          Essentially what I hear Mr. Bienenstock say to

7   justify this language is that he said it was "simple

8   prudence".  So, in other words, this was an afterthought that

9   the Oversight Board had.  It felt that, based on past

10  experience, it just can't trust the Commonwealth not to raise

11  benefits, and so it stuck this language into the Confirmation

12  Order to, as he said, nail that down.  The problem is the

13  Oversight Board does not have free-floating authority to put

14  whatever it wants into a Confirmation Order to fend off

15  whatever worries it may have about how the Commonwealth may

16  act.

17         This is undoubtedly a material change, an adverse

18  change to a defined benefit to ERS participants.  Whether it's

19  material in the technical sense of a change to a claim, it's

20  material and adverse in the very real sense that this may

21  preclude ERS participants from getting a benefit they might

22  otherwise get.  That's how it's material and adverse.  And

23  because of that, a Court order should not issue without them,

24  namely the ERS participants, having a chance to know about it

25  and to object to it, if they object to it.

1          Now, I think at the heart of what Mr. Bienenstock was

2    arguing was that, well, how do we know that the day after the

3    effective date the Commonwealth won't raise defined benefit

4    payments for ERS participants?  First of all, I have no

5    indication -- I have no reason to believe that that is what

6    the Commonwealth is planning on doing, so I don't think that's

7    a realistic fear.

8          But let's say, hypothetically, that's what the

9    Commonwealth did.  If the Oversight Board wanted to preclude

10   that, it should have written that into the Plan, and it should

11   have given notice of that restriction to the affected

12   individuals, namely, the ERS participants.  But its failure to

13   do so means that inclusion of this language would violate the

14   due process rights of the ERS participants, and it goes beyond

15   the Plan treatment.

16         And, Your Honor, unless you have questions, that

17   concludes my presentation on this issue.

18         THE COURT:  Thank you, Mr. DeChiara.  I do not have

19   further questions.

20         Is there anyone else who wishes to be heard today?

21   Mr. Hein.

22         MR. HEIN:  Yes.  Your Honor, can you hear me?

23         THE COURT:  Yes, I can.

24         MR. HEIN:  Great.  Thank you.  With Your Honor's

25   indulgence, I'd like to just very briefly respond to the

1   supplemental comments on the factual points that Mr. Rosen

2   made, and, you know, I'm happy to discuss this with Mr. Rosen.

3   May I just --

4           THE COURT:  Yes.

5           MR. HEIN:  -- very briefly?  So I'm referring now to

6   exhibit in the record 18761-4, my Exhibit BBB.  And the reason

7   I said what I did about the fact that if someone did not vote

8   either to accept or reject, they will not get the 1.321

9   percent is because what I received from my broker, who I

10  assume was just forwarding the materials they were given by

11  the Oversight Board's agent, under the header default it says,

12  holders who do not elect will be treated as not a retail

13  investor and not a Puerto Rico investor.  If the Court

14  confirms the Plan, beneficial holders who do not elect into

15  one of the options will receive the distribution otherwise

16  going to Class 36.

17          That is not a retail class.  The retail class for

18  this series is 38, not 36.  So what this clearly tells me, and

19  I'm happy to discuss this with Mr. Rosen -- obviously I am

20  reading what I got in writing.  Maybe what I got in writing is

21  wrong, but I do fear, Your Honor, there is a problem here,

22  where people who did not vote accept or reject and did not

23  navigate the process aren't going to get the 1.321 percent.

24          The Oversight Board believes it's intended they get

25  it.  I think it's particularly important that we get this

1    clarified, so they do get it.

2           And then on the issue of fee, at least I was not

3    referring to Prime Clerk charging a fee.  I was referring to

4    the broker.  And that's on the same exhibit, on page 7,

5    paragraph 1 of 18761-4, the 30 dollar fee that the broker,

6    not -- I never said Prime Clerk -- that the broker charges.

7           Thank you, Your Honor.  I appreciate your indulgence.

8           THE COURT:  Thank you.

9           Mr. Rosen.

10          MR. ROSEN:  Yes, Your Honor.  I was not going to

11   address what Mr. Hein said.  Rather, I was going to address

12   housekeeping to go forward.

13          THE COURT:  All right.  Before you go on to

14   housekeeping going forward, will you consult off-line with

15   Mr. Hein and file a supplemental joint statement as to whether

16   there is a dispute as to the way the Plan operates with

17   respect to the nonvoting or "voting against" people?

18          MR. ROSEN:  We will, Your Honor.

19          THE COURT:  Thank you.

20          I will just say that that needs to be done promptly.

21   We have a lot of deadlines, so do it as promptly as you can.

22          MR. ROSEN:  Yes.

23          So speaking of deadlines, Your Honor, that gets to

24   the housekeeping.  We do have a deadline to submit something,

25   I think as early as tomorrow morning, 7:00 AM tomorrow morning

1   I am told.  So we're just trying to get a sense, Your Honor,

2   of what is the Court's thinking with respect to closing

3   arguments above and beyond the Act 53 arguments, or the

4   Confirmation Order discussions that the Court wants to have on

5   Wednesday?

6           The other point I want to raise, Your Honor, and

7   whatever the Court prefers on this latter one, we obviously

8   will do.  As Your Honor knows, the evidence, or the record was

9   closed on Friday, and subsequent to that, Your Honor, we filed

10  a modification to the Plan of Adjustment in a proposed

11  Confirmation Order on Friday evening.  And no doubt, Your

12  Honor, to address some of the things that came up with

13  Mr. Steel over the weekend that he referred to, as well as

14  something that may emanate out of today's deadline for the

15  submission of responses to the Confirmation Order, we might

16  need to make a tweak to the Plan of Adjustment to address

17  those.

18          Your Honor, in -- each and every time that the

19  Oversight Board has filed a Plan of Adjustment, in compliance

20  with the provisions of PROMESA, the Oversight Board has passed

21  a resolution and a certification of the compliance with the

22  fiscal plan, and all of those resolutions, Your Honor, have

23  been in the record.  So what is not in the record at this

24  point is a version that was done by the Oversight Board on

25  Friday evening, or late Friday, as well as one that might or

1   will be done, Your Honor, in order to accommodate any

2   remaining changes that would require to be done either to

3   address any comments by individuals, objectors, or even any

4   comments that the Court may have.

5          So, Your Honor, we would merely ask that the record

6   be allowed to be reopened solely for the purpose of submission

7   of those certifications, so that they would be in the record.

8          THE COURT:  That is granted.

9          MR. ROSEN:  Thank you, Your Honor.

10         THE COURT:  Now, with respect to closings, the

11  Court's ability to form a preference will depend on how much

12  time is expected to be needed for the -- well, I've allocated

13  up to four hours for Act 53, and any objections to the revised

14  proposed Order, so that's four hours of the day.  Wednesday is

15  a day on which we are going to have to have an unusually long

16  break in the middle of the day, which will be about two hours

17  and 20 minutes, because of a scheduling conflict that I have,

18  and so that means that even with maximum efficiency, we have

19  about six hours of Wednesday already blocked out for other

20  activities.

21         Have you, in your consultations, begun to develop an

22  idea of how long the closings will take, whether they will

23  take an entire day, more than one day, less than one day,

24  given that we will have argued all of these legal issues

25  beforehand?

1          MR. ROSEN:  Your Honor, I take today and Wednesday --

2     it will be like spring training for the closing arguments.  I

3     believe a lot of those issues are already going to be taken

4     up, and I would hope that parties would take that into account

5     and not regurgitate all of their arguments as part of a

6     closing.

7          We have begun to receive certain allocations or

8     requested allocations from certain people, but we do not have

9     a total at this point in time.  I don't think, Your Honor,

10    based upon that, we could squeeze it in on Wednesday.  Even if

11    we had truncated versions of those closings, I would believe,

12    Your Honor, it would be Thursday at the earliest, or with us

13    having an off day, keeping into my sports analogies, an

14    off-day on Friday, it would be Monday then after that.

15         THE COURT:  Yes.  That sounds logical, and would be

16    consistent with my expectation that unless you expected that

17    arguments with respect to the proposed order were going to be

18    very, very short indeed, that we would start the closings on

19    Thursday morning.  So then, depending on how much time is

20    requested for the closings, they may continue on Monday, since

21    we're not sitting on Friday.

22         MR. ROSEN:  (Nodding head up and down.)

23         THE COURT:  So is that a sufficient response to your

24    question?

25         MR. ROSEN:  I think it is, Your Honor.  We will

1  continue to -- sorry to use the word -- solicit the time frame

2  from different people, Your Honor, and we will aggregate that

3  and let the Court know as soon as possible what the total

4  amount of allocated time would be.

5  　　　　　　THE COURT:  Thank you, Mr. Rosen.

6  　　　　　　MR. ROSEN:  Thank you, Your Honor.

7  　　　　　　THE COURT:  Does anyone else wish to be heard before

8  we adjourn this afternoon?

9  　　　　　　I see no hands, and so we will continue on Wednesday,

10  beginning at 9:30 -- oh, there is another hand now.  So

11  counsel for Suiza, Mr. Gonzalez or Ms. -- anyway, Counsel for

12  Suiza, Mr. Gonzalez.

13  　　　　　　MR. GONZALEZ VALIENTE:  Hi.  Can you hear me?

14  　　　　　　THE COURT:  Yes.

15  　　　　　　MR. GONZALEZ VALIENTE:  Hi.  Good afternoon, Your

16  Honor.

17  　　　　　　THE COURT:  Good afternoon.

18  　　　　　　MR. GONZALEZ VALIENTE:  And sorry to interrupt.  My

19  only comment is that it's going to be a bit difficult for us

20  to craft our closing arguments if we do not know how much or

21  how long we will be allowed to speak.  And obviously I don't

22  mean to impose, but if we don't know before Wednesday, to

23  expect us to have a closing argument by Thursday morning

24  without having yet had the benefit of knowing how long we will

25  be allowed to speak is going to be a little bit difficult to

1    craft those, those closing arguments.

2         So we would ask, if it's at all possible, that we

3    would have some sort of guidance from the Court, maybe

4    tomorrow or, if not, then if we could, sorry, postpone that

5    maybe for Monday, as I believe that Friday is not going to be

6    a day that we're having hearings, Your Honor.  And --

7         THE COURT:  Let me ask Mr. Rosen what his anticipated

8    process was going to be for collating requests and proposing

9    allocations.

10        MR. ROSEN:  Your Honor, I guess two things:  One

11   would be if we could get -- as counsel just said, if we could

12   get your guidance as to the overall amount of time that you

13   would like for closing arguments.  Of course, it's like

14   expenses rise to meet income.  The more time you give us, I

15   assume the more extensive the allotments will be.

16        So, Your Honor, if -- I don't personally believe

17   that, from the Oversight Board's perspective, not counting the

18   supporting folks, that we would need more than one hour,

19   two -- I'm getting the hand signal over there.  Two hours for

20   the Oversight Board.  And I assume, therefore, the supporting

21   folks might need an additional hour.  So maybe it's safe to

22   say, Your Honor, a three and three kind of proposal, and then

23   we could allocate accordingly.

24        THE COURT:  Yes.  Six hours in total, split half

25   between supporters and opponents.

1          MR. ROSEN:  And the other hand signal I got, Your

2     Honor, was please, please, please can we make this Monday, not

3     Thursday, but I leave that to Your Honor.

4          MR. GONZALEZ VALIENTE:  If I may, Your Honor, I would

5     join brother counsel for Monday also, please, please.

6          THE COURT:  All right.  Monday.  Actually, hold on a

7     minute.  I have to check my hand signals here.  One minute.

8          We'll do it on Monday.

9          MR. ROSEN:  Thank you, Your Honor.

10         MR. GONZALEZ VALIENTE:  Thank you, Your Honor.

11         MR. ROSEN:  Thank you, Your Honor.  So with that, I

12    assume Thursday will be an off day as well?

13         THE COURT:  Yes.  Thursday and Friday will be off

14    days, and closings will begin 9:30 Atlantic Standard, 8:30

15    Eastern Standard on Monday, and will be completed on Monday.

16         MR. ROSEN:  Your Honor, if I could add one other

17    point then.  With six hours allocated, I still think that

18    there would be time on Monday for the CCDA and PRIFA Title VI

19    matters, which, as I indicated, I think would take no more

20    than 30 minutes.  And there are no objections to those.  There

21    were reservation of rights, but we have taken care of those

22    issues.

23         THE COURT:  Yes, so include those on the Agenda.

24         MR. ROSEN:  Thank you, Your Honor.

25         MR. GONZALEZ VALIENTE:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          I see no further hands, and so we will adjourn to

3   Wednesday, 9:30 Atlantic Standard, 8:30 Eastern Standard, for

4   the arguments on Law 53 and the proposed Order.

5          I thank the court staff, as always, and wish you all

6   safety and good health.  We are adjourned to Wednesday

7   morning.

8          (At 4:33 PM, proceedings concluded.)

9                          *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 194 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   November 15, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```