(Official Translation)          Exhibit A

IN THE SUPREME COURT OF PUERTO RICO

Teachers Association of Puerto Rico *et al.*,

    Petitioners

                    CT-2014-2          Intrajurisdictional
        v.            CT-2014-3          Certification

Puerto Rico Teachers Retirement System *et al.*,

    Respondents

---

Educadores/as por la Democracia, Unidad,
Cambio, Militancia y Organización Sindical, Inc.,
individually and on behalf of its members, *et al.*,

    Petitioners

        v.

Puerto Rico Teachers Retirement System *et al.*,

    Respondents

JUSTICE MARTÍNEZ TORRES delivered the opinion of the Court.

San Juan, Puerto Rico, April 11, 2014

> *[The constitutional clause that bars the impairment of contractual obligations is a] classic [principle] in the law of liberal states . . . that reaffirms and consolidates the validity of contractual commitments.*
>
> 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico* [Journal of Proceedings of the Constitutional Convention of Puerto Rico] 2567, Orford, Ed. Equity (1961).

Here we must examine the constitutionality of Act No. 160 of 2013, known as the Commonwealth of Puerto Rico Teachers Retirement Act, which reformed the Puerto Rico Teachers Retirement System (TRS).

We are well aware of the impact of our decision today. Teachers shape the knowledge of all members of our society. They are the cornerstone of our educational system. In view of this fact, we have the obligation to carefully examine the issue raised here in light of the prevailing law, taking into account not only the interests of the teachers, but also the precarious fiscal situation faced by the Government of Puerto Rico.

On the grounds set forth below, we hold that under the constitutional clause that bars the impairment of contractual obligations, P.R. Const. art. II, §7, L.P.R.A., vol. 1,

CT-2014-2; CT-2014-3

2

(Official Translation)

Act No. 160 of 2013 is unreasonable and, consequently, any part of said statute that alters plaintiffs-petitioners' contractual rights to their retirement pensions is unconstitutional pursuant to Act No. 91 of 2004 (18 L.P.R.A. § 391 *et seq.*).

However, we hold that sec. 2 of Act No. 160 of 2013—which repealed the special laws that granted additional benefits not considered as part of the pension—and sec. 4.9 of that same statute—which eliminated certain benefits to TRS members who retire as of August 1, 2014—are constitutional.

Lastly, we hold that those participants who entered the TRS after the passage of Act No. 160 of 2013 are only entitled to the pension established by that law. That group did not suffer any impairment of their contractual right that would trigger the protection afforded by Art. II, Sec. 7 of the Puerto Rico Constitution. Consequently, that part of the statute does not violate the Constitution.

I

In this case we have the benefit of the report submitted by the Special Master, the Hon. Superior Court Judge Ángel Pagán Ocasio, who was appointed by this Court to draw some findings of fact based on the evidence presented by the parties. Having examined this report, we adopt the Special Master's findings. For a better understanding of the events that gave rise to this controversy, let us summarize the relevant facts.

On June 30, 2012, Milliman actuaries Glenn D. Bowen and Katherine A. Warren prepared an Actuarial Valuation Report for the TRS. The Milliman Company has been submitting actuarial valuation reports for the TRS since 2007.

According to this actuarial report, the TRS had $2,099,563,000 in assets and $12,350,836,000 in accrued liability, and the value of benefits amounted to $15,416,000,000. These figures led to an accrued actuarial liability of $10,251,273,000 as of June 30, 2012. Accordingly, the annual required contribution needed to cover the plan's normal outlays and the amortization payment of the actuarial deficit was calculated at $736.6 million, spread over a 25-year amortization period at an interest rate of 5.95%. The net cash flow, in turn, reflects a $334.5 million deficit as of June 30, 2013.

The actuarial report also showed that all TRS assets will be exhausted by 2020, and that there will be no more funds to cover pension payments if appropriate corrective measures are not taken. Absent these changes, the General Fund of the Puerto Rico Treasury would have to assume the TRS deficit. The projected deficit for fiscal year 2021-2022 would be $317,881,000; for fiscal year 2022-2023, the deficit would be $340,675,000; and for fiscal year 2023-2024, the deficit would add up to $363,168,000. These sums would be additional to the employer contributions for those years, assuming that the estimated annual payroll will grow by 3.5% starting on fiscal year 2013-2014.

Moreover, the actuarial report reveals that the percentage of inactive members has increased and, consequently, the TRS has matured even further. This means that the percentage of inactive members has increased in comparison with active members. In other words, for 1999, the number of active members in the system was 48,122, while the

CT-2014-2; CT-2014-3                                          (Official Translation)

number of inactive members reached 22,969 (32%). However, in 2012, the number of active members went down to 42,707, and the number of inactive members grew to 37,243 (47%).

When assets are equal to or greater than accrued liabilities, the retirement system is considered to be financially sustainable and feasible. Contrariwise, when assets are lower than accrued liabilities—as the actuarial report showed in this case—the plan is deemed unsustainable and unfeasible. It was estimated that if the TRS continued in this same trend, the assets would continue to diminish until 2020, when they would be completely exhausted and there would be no funds to pay the pensions. It was on the basis of these facts that the decision was taken to modify the TRS and convert it into a defined contribution plan.

On October 11, 2013, the Governor of Puerto Rico met with the Frente Amplio en Defensa del Retiro para Maestros [Broad Front in Defense of the Teachers Retirement System] (FADSRM [by its Spanish acronym]), among whose members are the plaintiffs in this case: the Teachers Association of Puerto Rico (Association) and Educadores por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc. [Educators for Democracy, Unity, Change, Militancy and Union Organizing Inc.] (EDUCAMOS [by its Spanish acronym]), which is an entity comprised of active and former teachers of the Puerto Rico Department of Education who contribute to or are pensioners under the TRS. Three additional meetings were held in November 2013, during which FADSRM submitted ten proposals to the Governor to reform the TRS, and the Governor submitted his proposals to the leaders of the teachers unions. The proposals submitted by FADSRM to the Governor were the following:

(1)   Reduce TRS administrative expenses by 10%. This measure is estimated to produce $2.5million annually.

(2)   Reduce by 10% the administrative expenses of the Department of Education, excluding payroll expenses, but including unnecessary contracts. This measure is estimated to produce $52 million annually.

(3)   Have the Department of Education immediately pay the $24 million owed to the TRS and continue forwarding all pertinent contributions under Act No. 114 of 2011.

(4)   Eliminate "privileged pensions."

(5)   Fill the vacancies required in the schools so that more teachers contribute to the TRS.

(6)   Impose a 1% tax hike on foreign businesses and allocate it to the TRS.

(7)   Allocate unclaimed Electronic Lottery winnings to the TRS.

(8)   Levy an additional surcharge on cigarettes, alcoholic beverages, and fast food.

(9)   Impose up to 10% in surcharges on gambling winnings surpassing $1,000.

(10)   Impose a $3,500 monthly cap on pensions. This cap would be revised every two years.

CT-2014-2; CT-2014-3

4

(Official Translation)

On December 18, 2013, the Governor convened an extraordinary session to consider new legislation. On December 19, 2013, at 1:47 a.m. a 93-page bill was sent to the Legislative Assembly; this bill became H.B. 1589. Another bill that was also sent and that, in turn, would become H.B. 1594, sought to raise the teachers' basic salary by $25 monthly. A legislative session was held on that same day. At the time, the Milliman 2012 actuarial valuation report was the most recent report available.

A public hearing on H.B. 1589 was held on December 20, 2013. On the following day, December 21, 2013, the bill was passed by the House. The Senate, in turn, passed the bill on December 23, 2013. On December 24, 2013, the Governor signed the bill, which became Act No. 160 of 2013, and which became effective immediately. He also signed H.B. 1594, which became Act No. 161 of 2013. The legislative process for both laws lasted six days.

Act No. 160 of 2013 made the following changes in the TRS:

(1) Raised the minimum retirement age for those who retire as of August 1, 2014, from 47 with 25 years of credited service to 55 with 30 years of credited service or, in the alternative, to 60 with five years of credited service. See sec. 3.9 of Act No. 160 of 2013.

(2) Raised to 62 the minimum retirement age for newly-recruited teachers. See sec. 3.9 of Act No. 160 of 2013.

(3) Increased the teacher's individual contribution from 9% of the gross salary to 10% in 2014, to 13.12% in fiscal year 2017-2018, and to 14.02% in fiscal year 2020-2021. See secs. 5.5 and 4.3 of Act No. 160 of 2013.

(4) Eliminated the summer bonus ($100 per year) for all participants. See sec. 2 of Act No. 160 of 2013.

(5) Eliminated the health insurance plan contribution (up to $100 monthly), the medications bonus ($100 per year), and the Christmas bonus ($600 per year) for those who retire as of August 1, 2014. See sec. 4.9 of Act No. 160 of 2013.

(6) Reduced the Christmas bonus from $600 to 200 for those who had retired before August 1, 2014. See sec. 4.9 of Act No. 160 of 2013.

(7) Imposed a cap on disability pensions equivalent to 33% of the monthly salary, averaged over five years for all active participants prior to August 1, 2014. See sec. 4.6 of Act No. 160 of 2013.

(8) Established a minimum pension of $1,625 for all teachers who are active as of July 31, 2014, cannot retire on that date with a pension equal to or higher than 65% of the average salary defined by the statute, and request retirement when they reach 30 years of service and 55 years of age. See sec. 3.11 of Act No. 160 of 2013.

(9) Excluded all currently active teachers who retire with less than 30 years of service as of August 1, 2014, from the right to a minimum pension. Those who under Act No. 91 of 2004 would have been eligible to retire with 30 years of service as of June 30, 2016, and who do not choose to retire before August 2014, were also excluded. See sec. 3.11 of Act No. 160 of 2013.

5

CT-2014-2; CT-2014-3                                           (Official Translation)

(10) Barred all participants with five years or more of service and $10,000 or more of contributions to the TRS from requesting reimbursement of their contributions as of August 1, 2014. See sec. 5.10 of Act No. 160 of 2013.

(11) Created an incentivized retirement window for participants who reach 30 years of service between August 1, 2014, and June 30, 2016. Participants who retire under this window will be entitled to a pension amounting to 70% of their salary, provided that they accept it by March 31, 2014, and retire by July 31, 2014. However, if those who accept this option have not reached age 55, they will have to pay their corresponding individual contributions until they reach that age. See sec. 4.4(a) 10 of Act No. 160 of 2013.

The following table shows other changes introduced by Act No. 160 of 2013 to Act No. 91 of 2004:

| Act No. 91 of 2004 | Act No. 160 of 2013 |
|---|---|
| Those who have completed 30 or more years of service and reached age 50 are entitled to a lifetime annual pension of 75% of the average of the highest salaries earned in three years. | Those who have completed more than 30 years of service and reached at least age 50 are entitled to the pension accumulated up to July 31, 2014, equivalent to 75% of the average salaries earned in three years up to July 31, 2014, in addition to the pension accumulated for the period worked as of August 1, 2014. |
| Those who have more than 25 but less than 30 years of service and have reached age 50 are entitled to a lifetime annual pension equivalent to 1.8% of the average of the highest salaries earned in three years, multiplied by the number of years of services rendered. | Those who have more than 25 but less than 30 years of service and have reached age 50 are entitled to the pension accumulated up to July 31, 2014, just as established in Act No. 91 of 2004, in addition to the pension for the period worked as of August 1, 2014. |
| Those who completed 30 or more years of service and have not reached age 50 are entitled to a lifetime annual pension of 65% of the average of the highest salaries earned in three years. | Those who completed 30 or more years of service and have not reached age 50 are entitled to the pension accumulated up to July 31, 2014, just as established in Act No. 91 of 2004, in addition to the pension for the period worked as of August 1, 2014. |
| Those who reached age 47 but are less than 50 and have 25 years of service but less than 30 are entitled to 95% of the lifetime annuity to which they would be entitled if they retire at age 50. | Those who have reached age 47 but are less than 50 and have 25 years of service but less than 30 are entitled to the pension accumulated up to July 31, 2014, just as established in Act No. 91 of 2004, in addition to the pension for the period worked as of August 1, 2014. |
| Those who resign before reaching age 60 and have completed at least 10 to 25 years of credited service will be entitled to a lifetime annuity for deferred retirement that they will begin to receive when they reach age 60. | Those who resign before reaching age 60 and have completed at least 10 to 25 years of credited service will be entitled to the pension accumulated up to July 31, 2014, just as established in Act No. 91 of 2004, in addition to the pension for the period worked as of August 1, 2014. |

6

CT-2014-2; CT-2014-3                                                    (Official Translation)

On January 8, 2014, the Association and several teachers covered by Act No. 91 of 2004 moved for preliminary injunction and declaratory judgment in the Court of First Instance, San Juan Part, Case No. K PE2014-0017 (907), asking the court to declare Act No. 160 of 2013 unconstitutional and to stay its effects immediately. The Organización de Directores y Administradores Escolares de Puerto Rico [Organization of School Directors and Administrators of Puerto Rico] (ODAE [by its Spanish acronym]), Educadores Puertorriqueños en Acción, Inc. [Puerto Rican Educators in Action, Inc.] (EPA [by its Spanish acronym]), and several aggrieved members of these organizations subsequently filed motions to intervene.

While these proceedings were pending in the Court of First Instance, the Association resorted to this Court seeking intrajurisdictional certification. By Resolution of January 14, 2014, we accepted the petition for certification, stayed the effects of Act No. 160 of 2013, and appointed the Hon. Superior Court Judge Ángel Pagán Ocasio as special master to draw the pertinent findings of fact.

On January 21, 2014, EDUCAMOS and several teachers covered by Act No. 91 of 2004 filed a similar action in the Court of First Instance, Case No. K PE2014-0059 (907). On the following day, they filed a petition for certification and a motion to consolidate the cases in this Court. On January 27, 2014, we consolidated the cases.

Plaintiffs-petitioners essentially allege that Act No. 160 of 2013 unconstitutionally impairs the State's contractual obligations to the TRS. Moreover, they assert that said law violates substantive due process, the Equal Protection Clause, and the delegation of powers doctrine. They also allege that the government's actions constitute a taking, unjust enrichment, and a violation of their fundamental rights.

On motion of defendants-respondents, we took judicial notice of the reports issued by credit rating agencies Standard & Poor's, Fitch, and Moody's, which downgraded the general obligations credit ratings of the Commonwealth of Puerto Rico, among others. On motion of plaintiffs, we also took judicial notice of the Report of the Dialogue and Negotiation Committee composed of high officials of the Executive Branch, teacher representatives, and other professionals.[1] The report examined several tax measures that would ensure a pension equivalent to 75% of a teacher's average salary. Some of these measures were:

    (1)  impose a tax of less than one percent (.75%) on foreign corporations starting in 2017;

    (2)  impose a 10% tax on winnings from adult entertainment machines;

    (3)  include private school teachers as TRS participants;

---

[1] Specifically, the Committee was constituted by: San Juan Catholic Archbishop Monsignor Roberto González Nieves; Secretary of Labor Vance Thomas Rider; San Juan Mayor Carmen Yulín Cruz Soto; Secretary of State David Bernier Rivera; Professor Aida Luz Díaz Rivera, Atty. Alejandro Torres Rivera; Professor Jorge Soto Díaz; Toa Baja Mayor Aníbal Vega Borges; the Reverend Ángel Luis Rivera Agosto; Professor Justina Ocasio Landrón; Professor Emilio Nieves Torres; Professor María Elena Lara Fontánez; Professor Domingo Madera Ruiz, and Professor Eva Ayala Reyes.

7

CT-2014-2; CT-2014-3                                              (Official Translation)

 (4) reduce TRS operational expenses between 10% and 20%;

 (5) impose an additional tax on cigarettes and alcoholic beverages;

 (6) declare a moratorium on TRS loans; and

 (7) create an incentive for active teachers who are about to retire to remain working for two or three more years.

After several proceedings, an evidentiary hearing was held on January 29, 2014, and the parties presented their stipulations of facts. On February 7, 2014, the Special Master submitted his report with his findings. The parties had the opportunity to make their comments and raise their objections to the Special Master's report, and to present their respective pleadings.

On March 26, 2014, we held an oral hearing and the parties stated their positions. As we can see, although this case was expedited, the parties had ample opportunity to state their case.

## II

We must first discuss the issue of our jurisdiction to resolve the petition for certification, inasmuch as this is a threshold issue that we may address motu proprio. *S.L.G. Solá-Moreno v. Bengoa Becerra*, 182 D.P.R. 675, 682 [82 P.R. Offic. Trans. __, __] (2011).

Act No. 18 of 2013 amended sec. 3.002 of Act No. 201 of 2003, known as the Judiciary Act of 2003 (4 L.P.R.A. § 24s), in order to limit the circumstances in which this Court could issue writs of intrajurisdictional certification. Specifically, Act No. 18 of 2013 required the consent of "both parties" to the action for this Court to enforce its jurisdiction and issue the writ of certification in cases originating in the Court of First Instance. This act also limited this Court's jurisdiction to issue writs of certiorari regarding interlocutory decisions of the Court of Appeals. In *Alvarado Pacheco y otros v. ELA*, 188 D.P.R. 594 [88 P.R. Offic. Trans. __] (2013), this Court held in its resolution that secs. 1 and 2 of Act No. 18 of 2013 were unconstitutional insofar as they alter subsecs. (d) and (e) of the original text of sec. 3.002 of the Judiciary Act of 2003 (4 L.P.R.A. § 24s) and Civil Procedure Rule 52.2(d) (32 L.P.R.A. App. V).

In *Alvarado Pacheco y otros* we issued our decision by resolution because when we examined the petition for certification on the merits we refused to issue the writ. On the other hand, in *Brau, Linares v. E.L.A.*, 189 D.P.R. __ [89 P.R. Offic Trans. __] (2013), we issued a writ of certification by resolution in order to address in the first instance the controversy raised there, and we cited *Alvarado Pacheco y otros* with approval. The case before us, however, allows us to set down in an opinion what we held in *Alvarado Pacheco y otros*. We adopt all the grounds outlined in the resolution issued in that case and reiterate that secs. 1 and 2 of Act No. 18 of 2013 are unconstitutional insofar as they alter subsecs. (d) and (e) of the original text of sec. 3.002 of the Judiciary Act of 2003 and Civil Procedure Rule 52.2(d). Consequently, we have jurisdiction to pass on the instant case.

CT-2014-2; CT-2014-3

8
(Official Translation)

### III

[1] The Puerto Rico Constitution provides: "No laws impairing the obligation of contracts shall be enacted." P.R. Const. art. II, § 7, L.P.R.A., vol. 1, at 281 (2008 ed.). This same provision is contained in Art. I, Sec. 10 of the United States Constitution, L.P.R.A., vol. 1. This clause limits government interference with contractual obligations between private parties and with those incurred by the State. *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. 1, 80 [78 P.R. Offic. Trans. __, __] (2010), *cert. denied, Domínguez Castro v. Puerto Rico*, 131 S.Ct. 152 (Mem) (2010). See also *Energy Reserves Group v. Kansas Power & Light,* 459 U.S. 400 (1983); *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977). Its purpose is "to guarantee the stability of contractual relations." *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. 828, 834 [88 P.R. Offic. Trans. __, __] (2013).

However, this protection is not absolute. This is because this constitutional guarantee "must be construed in harmony with the State's police power in furtherance of the public interest." *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 834 [88 P.R. Offic. Trans. at ___]. See also *United States Trust Co. v. New Jersey*, 431 U.S. at 21; *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 394 [1 P.R. Offic. Trans. 527, 550] (1973). For that reason we have repeatedly held "that not every contractual impairment is unconstitutional." *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 834 [88 P.R. Offic. Trans. at __]; *Bayrón Toro v. Serra,* 119 D.P.R. 605, 619 [19 P.R. Offic. Trans. 646, 661] (1987). See also *United States Trust Co. v. New Jersey*, 431 U.S. at 16. Nonetheless, caselaw has made it clear that the clause that bars the impairment of contractual obligations is a *substantive limitation* on the State's sphere of action. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978); Paul M. Secunda, *Constitutional Contracts Clause Challenges in Public Pension Litigation*, 28 Hofstra Lab. & Emp. L. J. 263, 287 (2011).

[2] The analysis to be employed under this clause depends on whether the modification occurs in a contract to which the State is a party or in one between private parties. *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 80 [78 P.R. Offic. Trans. at __]. In the case of private contracts, the first thing to be determined is whether there is a contractual relationship and whether the modification constitutes a substantial or a severe impairment. *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 834 [88 P.R. Offic. Trans. at __]; *Domínguez Castro et al. v. ELA I*, 178 D.P.R. at 80 [78 P.R. Offic. Trans. at __]; *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. at 395 [1 P.R. Offic. Trans. at 550-551]. If it is determined that there is a severe impairment, we then must examine "if the government's interference furthers a legitimate interest and if it is rationally related to the pursuit of said purpose." *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 834-835 [88 P.R. Offic. Trans. at __]. See also *Domínguez Castro et al. v. E.L.A. I,* 178 D.P.R. at 81 [78 P.R. Offic. Trans. at __]; *Warner Lambert Co. v. Tribunal Superior.* This is a reasonableness test that takes into account the substantiality of the public interest to be furthered and the extent of the contractual impairment. *Domínguez*

9

CT-2014-2; CT-2014-3                                    (Official Translation)

*Castro et al. v. E.L.A. I*, 178 D.P.R. at 81 [78 P.R. Offic. Trans. at __]; *Home Bldg. & L. Ass'n v. Blaisdell*, 290 U.S. 398 (1934).

On the other hand, when a state obligation is modified, a stricter scrutiny must be applied because the State, being a party to the contract, could act in its own benefit. *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 835 [88 P.R. Offic. Trans. at __]; *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 81 [78 P.R. Offic. Trans. at __]; *Bayrón Toro v. Serra*, 119 D.P.R. at 620 [19 P.R. Offic. Trans. at 662]; *Warner Lambert Co. v. Tribunal Superior*. Thus, the contractual impairment, "aside from being reasonable, must be necessary to advance an important governmental purpose." *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 835 [88 P.R. Offic. Trans. at __]; *Bayrón Toro v. Serra*, 119 D.P.R. at 619 [19 P.R. Offic. Trans. at 661]; *United States Trust Co. v. New Jersey*, 431 U.S at 29.

[3]   We have held that in assessing the necessity and reasonableness of a statute under the clause that bars the impairment of contractual obligations, some deference to the legislature's judgment is called for. *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 835 [88 P.R. Offic. Trans. at__]; *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 84 [78 P.R. Offic. Trans. at__]. In this task, it is not incumbent upon this Court "to make a de novo finding on the existence of other alternatives to solve the problem." *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 89 [78 P.R. Offic. Trans. at__].

It bears noting that according to United States Supreme Court caselaw, the higher the degree of severity of the impairment, the stricter the court must be in its scrutiny of the contested statute. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 245.

[4]   In *Bayrón Toro v. Serra*, 119 D.P.R. at 607-608 [19 P.R. Offic. Trans. at 649], this Court stated: "[A] beneficiary of a retirement plan has a property interest of a contractual nature protected by the constitutional guarantee against impairment of contractual obligations."[2] In that case, the interest in protecting the rights of retirement plan participants clashed with the interest in allowing the State to make changes to foster the stability and solvency of the system. *Id.* at 618 [19 P.R. Offic. Trans. at 660]; thus, we held that both interests should be harmonized and, consequently, "before an employee retires, the State may amend the terms of the retirement system, provided that such amendments are reasonable and further the actuarial solvency of the system." *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 836 [88 P.R. Offic. Trans. at __] (in reference to *Bayrón Toro v. Serra*, 119 D.P.R. at 618 [19 P.R. Offic. Trans. at 660]).

[5]   In *Trinidad Hernández et al.* we reiterated, in turn, our decision in *Bayrón Toro* in the context of Act No. 3 of 2013, which reformed the Employees Retirement System of the Government of Puerto Rico and its Instrumentalities. In other words, we insisted that the reform of a government retirement system will be constitutional if it is

---

[2] Contrariwise, in the federal jurisdiction it is presumed that the State is bound by no contractual obligation with regard to pension plans. *National R. Passenger Corp. v. A.T. & S.F.R. Co.*, 470 U.S. 451, 466 (1985); John Beermann, *The Public Pension Crisis*, 70 Wash. & Lee L. Rev. 3, 49-50 (2013).

CT-2014-2; CT-2014-3

reasonable and necessary *to further its actuarial solvency* and there are no less burdensome measures to achieve that end. *Trinidad Hernández et al. v. ELA et al.*

Lastly, in *Trinidad Hernández et al.*, at 838 [88 P.R. Offic. Trans. at ___], we recognized that the plaintiff must bear the burden of proving that the challenged measure is unreasonable and unnecessary. See also *United Auto., Aerospace, Agr. v. Fortuño*, 633 F.3d 37, 45 (1st. Cir. 2011).

IV

[6]   The parties stipulated that the plaintiff teachers have a valid contract with the Government of Puerto Rico with respect to their retirement. It was also stipulated that the State substantially impaired said retirement contract. In light of these facts, our analysis is focused on determining whether the substantial impairment is reasonable and necessary under our caselaw. *Trinidad Hernández et al. v. ELA et al.; Bayrón Toro v. Serra*. After a careful examination of the evidence presented, we must inevitably conclude that Act No. 160 of 2013 is unreasonable and, consequently, unconstitutional under the constitutional clause that bars the impairment of contractual obligations insofar as it alters plaintiffs-petitioners' contractual right to their retirement pension under Act No. 91 of 2004.

In their pleadings, plaintiffs-petitioners allege that when the Legislature passed Act No. 160 of 2013, it failed to consider the impact that a massive retirement of teachers would have on the solvency of the TRS. They likewise argue that this advanced retirement of thousands of teachers would worsen the precarious situation of the TRS. In support of these conclusions, plaintiffs-petitioners submitted several reports prepared by economists and actuaries. This expert evidence, together with the evidence presented by the State, shows that plaintiffs-petitioners are right. Act No. 160 of 2013 does not foster the actuarial solvency of the TRS.

First, the Report of the Association's expert economists, José I. Alameda Lozada and Alfredo González Martínez, raised a red flag about the unforeseen consequences of having 7,000 teachers suddenly retire en masse. *Moción en torno a Prueba de la Parte Peticionaria Asociación de Maestros de Puerto* Rico [Motion on Evidence Presented by Petitioner Teachers Association of Puerto Rico], Appendix, at 1181, Case No. CT-2014-0002, vol. 4. The opinion of these experts is that the retirement en masse "would provoke a significant expense of [TRS] funds in face of an increase in the pension payroll and the cancellation of short-term investments. The cancellation of short-term investments will reduce the returns that the Fund would receive therefrom." *Id.*

Second, ODAE presented as expert evidence the report of Actuary Jose M. Pérez Díaz. The report examines several scenarios to show the impact of the retirement en masse of TRS members as a result of the passage of Act No. 160 of 2013. Actuary Pérez Díaz states that the sudden retirement of 5,000 teachers would exhaust TRS assets by 2022. José M. Pérez Díaz, *Opinión actuarial sobre la nueva Ley 160-2013 - Sistema de Retiro de Maestros de Puerto Rico* [Actuarial Opinion on the New Act No. 160 of 2013 - Puerto Rico Teachers Retirement System] 12, Case No. CT-2014-0002, vol. 1. If the

CT-2014-2; CT-2014-3

11
(Official Translation)

number of suddenly retired teachers were to increase to 10,000, the TRS assets would be exhausted by 2018. *Id.* Finally, the actuary concluded that if 15,000 teachers retired, the assets would be exhausted as soon as 2016. *Id.* These numbers may be compared with the Milliman 2012 valuation report, which states that if the TRS is not reformed, its assets would be exhausted by 2020.

The State, in turn, argues that "Act No. 160 of 2013 would head off the System's structural deficit and provide for the System's recovery in the coming years." Respondents' Brief at 29, Case No. CT-2014-0002, vol. 6. In support of its conclusion, the State presented, insofar as it is pertinent here: (1) Milliman's Actuarial Valuation Report of 2012, and (2) that company's report of January 27, 2014. A rigorous examination of that evidence shows that the State could not rebut the evidence brought by the teachers. Instead of aiding its cause, the State's evidence only shows how correct plaintiffs-petitioners were in arguing that Act No. 160 of 2013 is unreasonable under the constitutional clause that bars the impairment of contractual obligations. P.R. Const. art. II, § 7.

First, we note that the Milliman 2012 report, at 40, Case No. CT-2014-0002, vol. 2, has a table that details the number of TRS contributing members who were active as of June 30, 2012. The information on the table is quite revealing and shows that Act No. 160 of 2013 will probably cause a retirement en masse of teachers that will exhaust the TRS assets sooner than foreseen.

According to this table, some 7,089 TRS participants were entitled to retire under Act No. 91 of 2004, as amended. This number is broken down into the following groups:

    (1)  88 persons aged 60 or older with 40 or more years of service;

    (2)  1,260 persons aged 60 or older with 10 to 24 years of service;

    (3)  176 persons aged 55 or older with 35 to 39 years of service;

    (4)  1,226 persons aged 50 or older with 30 to 34 years of service, and

    (5)  4,339 persons aged 50 or older with 25 to 29 years of service.

The Milliman 2012 valuation report also shows that there are 7,646 TRS participants who, as of June 30, 2012, had only one to five years of service left to be entitled to retire under the terms of Act No. 91 of 2004. We must bear in mind that according to sec. 40 of Act No. 91 (18 L.P.R.A. § 392a), any TRS participant who had reached at least age 47 and had completed 25 years of service, or who had reached age 60 and completed ten years of service, is eligible for retirement. This group of 7,646 participants is broken down as follows:

    (1)  8 persons aged 45-49 with 30-34 years of service;

    (2)  447 persons aged 45-49 with 25-29 years of service;

    (3)  3,671 persons aged 50-59 with 20-24 years of service;

    (4)  3,520 persons aged 45-49 with 20-24 years of service.

CT-2014-2; CT-2014-3

12
(Official Translation)

Second, the Milliman valuation report of January 27, 2014, was limited almost exclusively to describing the actuarial deficiencies of the TRS according to the 2012 actuarial report. Although at the end of the report there is an explanation of some of the changes made to the TRS by Act No. 160 of 2013, nowhere in the report is there an analysis of the number of teachers who would retire straightaway or of how this would affect the TRS's solvency.

Moreover, we must point out that the purpose of the "annual additional contribution," which seeks to prevent the value of gross assets from falling below $300 million as of 2018, and the "teachers justice uniform contribution," which creates an annual contribution of $30 million for fiscal years 2016-2017 and 2017-2018, and of $60 million as of fiscal years 2018-2019, is not to remedy the exodus en masse of teachers mentioned by plaintiffs-petitioners. See sec.1.1 of Act No. 160 of 2013. On the contrary, sec. 7.1 of Act No. 160 of 2013 states quite clearly that the purpose of those contributions is to "make up [for] the System's cash flow deficit" pinpointed by the Milliman 2012 report. Nowhere does the law or that report mention the real scenario: that thousands of entitled teachers may retire.

The evidence admitted also reveals that Acting TRS Executive Director Wanda G. Santiago López stated that some 10,000 active participants have sought guidance and information regarding their retirement benefits after Act No. 160 of 2013 was passed. Sworn Statement of Wanda G. Santiago López, at 5, Case No. CT-2014-0003, vol. 1. In turn, TRS counsel Rafael Escalera Rodríguez stated during the oral hearing of March 26, 2014, that at present some 7,340 TRS members can retire. Recording of Oral Hearing of March 26, 2014, at 1:09:04. He also said that approximately 4,100 retirement applications had been received from persons so entitled. *Id.* at 1:09:10. Likewise, the TRS counsel stated that 2,300 persons qualify for the Retirement Window. See sec. 4.4(a) of Act No. 160 of 2013. Lastly, he stated that 1,300 applications had been received for that window. *Id.* at 1:09:20.

We believe that the retirement en masse of teachers to which plaintiffs-petitioners refer is foreseeable. It must be noted that the TRS counsel admitted during the oral hearing that 4,100 retirement applications had already been received from qualified persons. Moreover, sec. 4.4(a) of Act No. 160 of 2013 clearly creates an early retirement window for those participants who, regardless of age, reach 30 years of service between August 1, 2014, and June 30, 2016. Likewise, sec. 4.9 of Act No. 160 of 2013 eliminates the health plan contribution, the medications bonus, and the Christmas bonus for those retiring as of August 1, 2014. Consequently, *only those who retire before that date* will be entitled to those additional benefits. This becomes an incentive for early retirement for those participants who meet the age and years of service requirements in order to avoid losing the employer health plan contribution and other benefits.

On the other hand, it is clear that in the legislative hurry to pass the law before Christmas Eve, the Legislature failed to inquire how many teachers would retire as a

CT-2014-2; CT-2014-3

13
(Official Translation)

result of Act No. 160 of 2013, or how this would impact the TRS's solvency. It was crucial for the Legislature to have studied this issue. It must be noted that with the passage of Act No. 160, it was only natural that over 5,000 active employees who earn the highest wages because of their many years of service would become pensioners and enter the TRS payroll. On this point, Actuary Pérez Díaz stated that "the sudden retirement of active members would accelerate the collapse of the system, practically bringing it to the present." Actuarial Opinion of José M. Pérez Díaz, *supra*, at 12. In other words, the exodus of thousands of teachers would eliminate their contributions to the TRS and generate new obligations with no source of income to cover them.

Our position is also influenced by the Milliman 2012 Report, which states on page 5 that in the year examined (fiscal 2011-2012), the TSR suffered great losses amounting to $90 million on account of the 1,400 active members who retired. *What would be the loss if the approximately 7,000 teachers entitled to retirement chose to do so?* This only adds to the conclusion that the Legislature had the duty to weigh this matter carefully, taking into account the early retirement of thousands of teachers; however, it failed to do so.

[7]   As one can infer, plaintiffs here brought evidence to show that the adopted measures do not ensure the economic solvency of the TRS, which is a threshold requirement pursuant to our caselaw. *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 839 [88 P.R. Offic. Trans. at __]; *Bayrón Toro v. Serra,* 119 D.P.R. at 623 [19 P.R. Offic. Trans. at 664]. The State failed to present evidence to rebut this conclusion. Consequently, we hold that Act No. 160 of 2013 does not further the important state interest required by our constitutional system in the case of retirement system reforms: *to guarantee the very solvency of the system. Id.* Plaintiffs-petitioners showed that Act No. 160 of 2013, instead of securing the TRS's solvency, places it in an even more precarious state. The expert evidence brought by plaintiffs-petitioners showed that Act No. 160 of 2013 would exhaust the assets before or around 2020, which was the projected date given the difficult situation faced by the TRS at present. This means that Act No. 160 of 2013 is unreasonable and, therefore, unconstitutional.

[8]   In light of the above, we must conclude that Act No. 160 of 2013, specifically its secs. 3.6, 3.9, 3.11, 4.3(a), 4.4, 4.6(a), (b), and (c), and 5.1 to 5.5 are unconstitutional insofar as they substantially impair the contractual rights of plaintiffs-petitioners to their retirement plan under the terms of Act No. 91 of 2004.

We are well aware that the prevailing public policy in our jurisdiction is established by the Legislature and not by this Court. *AAR, Ex parte,* 187 D.P.R. 835 [87 P.R. Offic. Trans. __] (2013) ; *Lozada Sánchez et al. v. JCA,* 184 D.P.R. 898, 923-924 [84 P.R. Offic. Trans. __, __] (2012); *Delgado, Ex parte,* 165 D.P.R. 170, 192-193 [65 P.R. Offic. Trans. __, __] (2005); *Caquías v. Asoc. Res. Mansiones Río Piedras,* 134 D.P.R. 181, 189 [34 P.R. Offic. Trans. __, __] (1993). We also take into account the doctrine of judicial self-restraint, which provides that when the validity of an act is drawn in question, even if serious doubts about its constitutionality are raised, the Judicial Power will first ascertain

Case:17-03283-LTS   Doc#:19285-1   Filed:11/17/21   Entered:11/17/21 15:53:15   Desc:
Exhibit Official Translation of TRS Pension Case   Page 14 of 80

14
(Official Translation)

CT-2014-2; CT-2014-3

whether a reasonable interpretation of the statute is possible by which the constitutionality question may be avoided. *Brau, Linares v. ELA et al.,* 190 D.P.R. __ [90 P.R. Offic. Trans. __] (2014); *Commonwealth v. Aguayo,* 80 P.R.R. 534, 576-577 (1958). This deference, however, ends when it is shown that the State violated the Constitution in passing a law. This is the situation here. The fact that deference must be accorded to legislated public policy does not mean that we must abdicate our constitutional duty to defend the civil rights of those validly claiming redress of a grievance.

In face of the inescapable fact that the State severely impaired the contractual rights of thousands of teachers without even making certain that this would advance the interest of ensuring the solvency of the TRS, it is our constitutional duty to guarantee the right of the teachers affected by the statute to prevent the State from substantially impairing their contractual rights by failing to adhere to the applicable standards.

Having concluded that Act No. 160 of 2013 is unreasonable under Art. II, Sec. 7 of the Puerto Rico Constitution, we need not discuss whether the measures proposed in the Report of the Dialogue Committee signed by high Executive Branch officials (Secretary of State David Bernier Rivera and Secretary of Labor Vance Thomas Rider) are less burdensome. In view of our decision, neither need we discuss the other constitutional arguments raised by plaintiffs-petitioners in their briefs.

V

[9]   We should now stress the scope of our pronouncements. Act No. 160 of 2013 eliminates the health plan contribution (up to $100 monthly), the medications bonus ($100 per year), and the Christmas bonus ($600 per year) of those who retire as of August 1, 2014. Likewise, it eliminates the summer bonus ($100) for all participants. It also reduces the Christmas bonus from $600 to $200 for those who had retired prior to August 1, 2014. In *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 839 [88 P.R. Offic. Trans. at__] n.2, this Court stated that "the benefits granted through special laws being eliminated by the Retirement System Reform are not part of their pensions." See also *Domínguez Castro et al. v. E.L.A. I,* 178 D.P.R. at 67-70 [78 P.R. Offic. Trans. at __]. On the contrary, we concluded that they were legislative gifts that do not create a property interest. Moreover, if we compare sec.1-101 of Act No. 447 of May 15, 1951, as amended, known as the Employees Retirement System of the Government of Puerto Rico and its Instrumentalities Act (3 L.P.R.A. § 761), with sec. 3 of Act No. 91 of 2004 (18 L.P.R.A. § 391a), we notice that the TRS enabling act is clear in establishing that those additional benefits are not part of the pension. Consequently, in the case under our consideration we must conclude that sec. 2 of Act No. 160 of 2013 (which repealed the special laws that granted those legislative gifts that are not part of the pension), and sec. 4.9 of that same act (which eliminated certain additional benefits for those retiring as of August 1, 2014), are constitutional.

[10]   Furthermore, it is important to stress that the participants who began contributing to the TRS after Act No. 160 of 2013 was passed are only entitled to the

CT-2014-2; CT-2014-3

15
(Official Translation)

pension established by said statute. This was the contractual obligation that the State assumed with that group of employees. That group did not suffer an impairment of their contractual rights that may trigger the protection established under Art. II, Sec. 7 of the Puerto Rico Constitution.

### VI

For the foregoing reasons, *we hold that Act No. 160 of 2013, specifically its secs. 3.6, 3.9, 3.11, 4.3(a), 4.4, 4.6(a), (b), (c), and 5.1 to 5.5, are unconstitutional insofar as they substantially and unreasonably impair the contractual rights of plaintiffs-petitioners to their retirement plan under the terms of Act No. 91 of 2004.*

Before the State substantially impairs the contractual obligations it assumes, it must make sure that the law enacted to that end furthers the important state interest required by our constitutional system in cases such as this one: to guarantee the solvency of the retirement system.

On the other hand, *we hold that sec. 2 of Act No. 160 of 2013, which repealed the special laws that granted those legislative gifts that are not part of the pension, and sec. 4.9 of that same act, which eliminated certain additional benefits for those retiring as of August 1, 2014, are constitutional.*

Lastly, *we hold that the participants who began contributing to the TRS after Act No. 160 of 2013 was passed are entitled only to the pension established in that statute. This was the contractual obligation assumed by the State with that group of employees.*

*Judgment will be rendered accordingly.*

Justice Pabón Charneco, with whom Justice Estrella Martínez joined, issued a concurring opinion. Justice Kolthoff Caraballo issued a concurring opinion. Justice Rivera García issued a concurring opinion. Justice Estrella Martínez issued a concurring opinion. Justice Fiol Matta, with whom Chief Justice Hernández Denton joined, issued a dissenting opinion. Justice Rodríguez Rodríguez, with whom Chief Justice Hernández Denton joined, issued a dissenting opinion. Justice Feliberti Cintrón disqualified himself.

JMS/mal

(Official Translation)

IN THE SUPREME COURT OF PUERTO RICO

Teachers Association of Puerto Rico *et al.*,

    Petitioners

|  |  |  |
|---|---|---|
| v. | CT-2014-2 | Intrajurisdictional |
|  | CT-2014-3 | Certification |

Puerto Rico Teachers Retirement System *et al.*,

    Respondents

JUSTICE PABÓN CHARNECO, with whom JUSTICE ESTRELLA MARTÍNEZ joins, concurring.

San Juan, Puerto Rico, April 11, 2014

      Our teachers, who with tremendous sacrifice and devotion share the bread of learning in the hope of building the Puerto Rico we all dream of, deserve more than being steamrolled by clearly unreasonable laws. The path to our socioeconomic progress cannot be paved at the expense of our teachers. Our teachers deserve to know that the trust they placed in the institutions that constitute the very pillars of our democracy has not been futile. More importantly, they deserve to know that this Court will never abdicate its constitutional duty to ensure that the principles of our Constitution are not betrayed.

      Since I believe that Act No. 160 of 2013 is unreasonable and, therefore, unconstitutional under the clause of our Constitution that bars the impairment of contractual obligations,[1] I concur with the Opinion issued today by a Majority of this Court. Despite the fact that on more than one occasion—and this would be the third time—I have expressed my views on retirement system reforms, I cannot allow today's decision to go down in the pages of our constitutional history without first making some brief statements. See *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828, 842 [88 P.R. Offic. Trans. ___, ___] (2013) (Pabón Charneco, J., dissenting), and *Trinidad Hernández v. ELA et al.*, 189 D.P.R. __ [89 P.R. Offic. Trans. __] (2013) (Pabón Charneco, J., separate dissenting opinion). My conscience obliges me and our teachers undoubtedly deserve it.

I

      Today a Majority of this Court discharges its constitutional duty to ensure that the State will not substantially impair the obligations it has assumed without meeting the standards required by our laws and caselaw. This, in turn, will bring tranquility to thousands of distressed teachers who were in a state of unrest and uncertainty about their economic future in light of the changes triggered by Act No. 160 of 2013. As the foregoing

---

[1] P.R. Const. art. II, § 7, L.P.R.A., vol. 1.

CT-2014-2; CT-2014-3                                                      2
Justice Pabón Charneco, concurring                      (Official Translation)

Opinion well states, for a retirement system reform to be deemed constitutional, our legal system requires that it be reasonable and necessary to advance *its actuarial solvency*. *Bayrón Toro v. Serra*, 119 D.P.R. 605, 618 [19 P.R. Offic. Trans. 646, 660] (1987). In the instant case, the parties stipulated: (1) that the plaintiff teachers entered into a valid retirement contract with the Government of Puerto Rico; and (2) that the State substantially impaired that contract. Accordingly, our analysis is solely focused on whether that substantial impairment pursues an important interest that furthers the general welfare and on whether Act No. 160 of 2013 is reasonable and necessary to advance said interest. *Id.*

We do not need to look too hard to see that Act No. 160 of 2013 does not meet the cited requirements. The evidence brought by the plaintiff teachers reveals that far from securing the Teachers Retirement System's solvency, Act No. 160 of 2013 places it in a more precarious state. The expert evidence presented by the plaintiff teachers and discussed *in extenso* in the foregoing Opinion leads us to conclude that the challenged law is not reasonable. It is difficult to argue that a law that was designed to solve the structural deficit of a Retirement System, but that instead aggravates its situation, should be considered reasonable.

As the Majority Opinion shows, the plaintiff teachers were able to prove with strong and cogent expert evidence that the implementation of Act No. 160 of 2013 opens up the real possibility of a retirement en masse of teachers that would exhaust the System's assets sooner than expected.[2] The Milliman 2012 Actuarial Valuation Report, which the State used to support the feasibility of Act No. 160 of 2013, states that if the Teachers Retirement System is not reformed, its assets would be exhausted by 2020. According to Actuary José M. Pérez Díaz, if 5,000 teachers decided to retire, the System would exhaust its assets by 2022.

On the other hand, if a higher number of teachers were to retire, the assets would be exhausted before that date. In other words, the State deemed that it was reasonable and necessary to impair the rights of our teachers to their retirement in order to extend the System's actuarial life by two years. This nightmarish option is clearly unreasonable.

If the legislative history of Act No. 160 of 2013 lacks an actuarial study that would show its effects and support its feasibility, *how can we be sure that this legislative piece would "actually" guarantee the System's solvency*? What the history of this law does reveal is that during this hurried legislative process, no well-pondered study was conducted on the number of teachers who would suddenly seek retirement as a result of the law or on the effect of this massive exodus on the very solvency of the System. If Act

---

[2] According to Wanda G. Santiago López, Acting Executive Director of the Teachers Retirement System, after Act No. 160 of 2013 was passed, some 10,000 active participants have sought orientation on their retirement benefits. Sworn Statement of Wanda G. Santiago López, at 5, Case No. CT-2014-0003, vol. 1. On the other hand, Atty. Rafael Escalera Rodríguez, counsel for the Teachers Retirement System, stated at the oral hearing of March 26, 2014, that approximately 7,340 members of the Teachers Retirement System qualified for retirement. Recording of Oral Hearing of March 26, 2014, at 1:09:04.

CT-2014-2; CT-2014-3                                                                    3
Justice Pabón Charneco, concurring                                    (Official Translation)

No. 160 of 2013 were held constitutional, the havoc this could wreak on our education system is such that its unreasonableness would simply become self-evident.

Finally, the plaintiff teachers proved that the measures adopted in Act No. 160 of 2013 do not guarantee the System's actuarial solvency and, consequently, do not advance any important interest as required by our laws and caselaw in government retirement system cases. *Bayrón Toro v. Serra*. Quite to the contrary, they proved that under this law the System's actuarial situation would deteriorate even more sooner than expected. In light of these circumstances, I concur, *inter alia*, with the view that Act No. 160 of 2013 is unconstitutional because it constitutes a substantial impairment of plaintiffs' expectations regarding their retirement pensions and because said impairment is unreasonable and does not advance the important interest that gave rise to this legislative piece.

II

It is for those reasons that I reiterate my concurrence with the foregoing Opinion. In its eagerness to avoid a credit downgrade for Puerto Rico at all costs,[3] the Legislature embarked on a haphazard process to pass a law that does not advance the important state interest required by our law and caselaw in retirement system reform cases: to guarantee the System's solvency. It did, in fact, just the opposite: it enacted legislation that worsened and destabilized the System. If this is not unreasonable, I do not know what is.

On this occasion, the Legislature forgot that our deference to its power to enact economic legislation is not synonymous with submission. Today we bravely reiterate that the function of this Court is to ensure that the legislative bodies, in the exercise of their powers, do not stray beyond the confines of such powers. This time, the steamroller lost its breaks and threatened to run over our public servants. The Opinion issued today by this Court averts that unfortunate scenario.

JMS/mal

---

[3] I reiterate my position that the threat of a credit downgrade is outside the scope of the Law and should not have any bearing on the adjudication process of this Court. See *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828, 842 [88 P.R. Offic. Trans. ___, __] (2013) (Pabón Charneco, J., dissenting).

(Official Translation)

IN THE SUPREME COURT OF PUERTO RICO

Teachers Association of Puerto Rico *et al.,*

     Petitioners

          v.

Puerto Rico Teachers Retirement System *et al.,*

     Respondents

Organización de Directores y Administradores
Escolares de Puerto Rico, Inc. (ODAE);
Educadores Puertorriqueños en Acción, Inc. (EPA),

     Intervenors           CT-2014-2
                               CT-2014-3

---

Educadores/as por la Democracia, Unidad,
Cambio, Militancia y Organización Sindical, Inc., *et al.,*

     Petitioners

          v.

Puerto Rico Teachers Retirement System *et al.,*

     Respondents

JUSTICE KOLTHOFF CARABALLO, concurring.

San Juan, Puerto Rico, April 11, 2014

> *As a result of this plan to save money, a strike was launched. The flames of hate rose. That was what Segundo preached: hate the rich. The pay was certainly poor; besides, I, spurred on by Don Oscar, was forced to abuse others, to commit the same abuse for which I blamed Don Flor. I was fully aware of the injustice, yet I kept encouraging it just to stay on "the good side" of Don Oscar and "secure" my future. I tried to excuse myself by thinking that the circumstances justified my actions. The Plantation had to be saved from ruin at any cost. After all, the workers should be thankful for the job they were given at a time when so many were jobless. That's how I chose to stifle the cries of my conscience.*[1]

---

[1] Enrique A. Laguerre, *La llamarada* 158, San Juan, Ed. Cultural (rev. 31st ed.) This text from one of the great works of Puerto Rican literature reminds me of the passion my Spanish teacher, Mrs. Corchado, brought to the classroom at the Free Music School in Hato Rey. It was with her that I embarked on this journey of appreciation for our literature.

CT-2014-2; CT-2014-3                                                    2
Justice Kolthoff Caraballo, concurring                    (Official Translation)

Only in ancient monarchies did the King confiscate the lands and crops of his subjects and leave them in the most abject misery. From a pragmatic standpoint, something similar is happening with Act No. 160 of 2013, whose very essence poses a constitutional problem: its profound unreasonableness and unfairness.

One thing—sad as it may be—is the dismissal of a worker by the State, but another quite different thing is the State's deprivation of that worker's right to reap and enjoy what he or she planted for the final years of his or her life. In the case of a dismissal, the worker, sooner or later, with some effort and with the help of God, will see his or her misfortune end when he or she finds another job; another harvest will bear, to his or her relief, the fruits of his or her labor. But when the time comes to harvest the fruits of his or her productive life, if what he or she planted with patience for the "dead season" is "confiscated," certainly that person will not have the time to plant new seed or the strength to till the fields once again and reap a new harvest. That is why I enthusiastically concur with the decision of this Court.

Here the Court has concluded that through Act No. 160 of 2013, the State has substantially and unreasonably impaired its contractual obligations with the country's public school teachers. Consequently, I concur with the Court majority and reaffirm my position in *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828 [88 P.R. Offic. Trans. __] (2013), because, among other reasons, *the State evidently has not met—as the majority Opinion holds—the requirement of reasonableness in failing to show that the law passed effectively addresses its purpose* as it cuts back on the pensions of public school teachers to levels that make it practically impossible for them to retire,[2] while increasing, at the same time, their contribution to the Retirement System (System).

I

*The burden of proof*

As the Majority Opinion rightly states, our Constitution bars the State from enacting laws that impair contractual obligations.[3] The test applicable to the actions of the political branches of government under the clause that bars the impairment of contractual obligations depends on the nature of the contract, whether it is public or private.[4] Thus, in cases such as the one under our consideration, when the impairment involves a public contract, *the judicial scrutiny must be stricter* because the State's own interest may be involved.[5]

Of course, we should not believe that just because the State is a party to the contract there is an absolute prohibition against the exercise by the State of its police power to

---

[2] According to the evidence presented, in several cases pensions have been cut back to approximately 40% of the person's salary at the end of 30 years of service.

[3] P.R. Const. art. II, § 7, L.P.R.A., vol. 1.

[4] *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. 1, 80 [78 P.R. Offic. Trans. 1, __] (2010).

[5] *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828, 835 [88 P.R. Offic. Trans. __, __] (2013); *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 81 [78 P.R. Offic. Trans. at __]; *Bayrón Toro v. Serra*, 119 D.P.R. 605, 620 [19 P.R. Offic. Trans. 646, 662] (1987); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 (1977).

CT-2014-2; CT-2014-3                                                          3
Justice Kolthoff Caraballo, concurring                          (Official Translation)

further a public interest.[6] Consequently, our role as a Court in evaluating the validity of a
law under the impairment of contractual obligations clause in these circumstances is to
weigh and strike a balance between the State's duty to protect the welfare and security of
the people and the interest in protecting the stability of contractual relations.[7]

In view of the above, this Court has held than in cases involving public contracts,
the claimant must first show that a contractual obligation exists and that the modification
of the obligation has caused a substantial or severe impairment of his or her expectations,
inasmuch as the constitutional guarantee against the impairment of contractual obligations
is triggered when the essential terms or conditions of the contract are adversely affected and,
consequently, the modification defeats the reasonable expectations of one of the parties.[8]

It is for these reasons that the burden of proof rests initially with the party that
claims a violation of his or her constitutional protection. However, once the claimant
shows that a contractual relationship existed and that the modification of that relationship
by the State has caused a substantial or severe impairment, the State must justify the
reasons for its actions.

Although it is true that not all courts agree on this matter, several federal and state
courts concur in this respect.[9] In fact, in a case involving a claim on this issue, the United
States Supreme Court held:

> In the instant case *the State has failed to demonstrate* that repeal of the
> 1962 covenant was similarly necessary . . . . We also cannot conclude that
> repeal of the covenant was reasonable in light of the surrounding
> circumstances.[10] [Emphasis added.]

As we can see, the United States Supreme Court held in that case that *the State had
failed to show that its actions were necessary and reasonable.* Although we cannot affirm
that said Court has expressly established that the burden of proof in cases such as the one
before us rests with the State, I believe that such pronouncements and their context leave
no doubt that the State does have the burden of proof.

More so when we cannot responsibly deny that although laws such as the one at
issue here are deemed of a socioeconomic nature, the statute challenged in the present

---

[6] *Trinidad Hernández et al. v. E.L.A. et al.*, 188 D.P.R. at 834 [88 P.R. Offic. Trans. at
__]; *Bayrón Toro v. Serra*, 119 D.P.R. at 619 [19 P.R. Offic. Trans. at 661]. See also *United
States Trust Co. v. New Jersey*, 431 U.S. at 16.

[7] *United States Trust Co. v. New Jersey*, 431 U.S. at 21.

[8] *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 83 [78 P.R. Offic. Trans. at __];
*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245-246 (1978); *City of El Paso v.
Simmons*, 379 U.S. 497 (1965).

[9] *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 894 (9th Cir. 2003);
*Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998); *Massachusetts
Community Coll. Council v. Com. of Mass.*, 649 N.E. 2d 708, 712-713 (1995); *State of Nev.
Employees Ass'n, Inc. v. Keating*, 903 F.2d 1223, 1228 (9th Cir. 1990).

[10] *United States Trust Co. v. New Jersey*, 431 U.S. at 31.

CT-2014-2; CT-2014-3                                                      4
Justice Kolthoff Caraballo, concurring                        (Official Translation)

case has a strong labor-related impact on the affected parties, in contrast to other types of cases involving a *substantial impairment under the constitutional clause.* Thus, in light of the prima facie evidence of *substantial impairment* presented by the affected workers, why should we relieve *the employer* from the burden of proving first that its actions were legitimate, simply because the State is the employer? Why should we deny public servants access to a procedural and evidentiary tool that is available to private employees in cases such as wrongful discharge actions?

*In the absence of guidelines on this aspect of the law at issue here, should our interpretation of the law not be more liberal in order to benefit the worker, thus bringing it more in line with our standards under our Labor Law? In any event, those who have truth and reason on their side only need to have the appropriate resources to prove their case. Is it not the State the one that has the best resources to prove that its action is reasonable?*[11]

This makes all the more sense when we consider that it was the State, through its actions, who interfered with the stability of the contractual relation, and it is the State who, in turn, must justify its actions as necessary and reasonable. It bears repeating that it is the State who has the resources to show what *its* motives were for interfering with the fulfillment of contractual obligations.

Here the parties stipulated that at the time Act No. 160 of 2013 was passed, there was a contractual relationship between the parties and that, in turn, the impairment caused by the enactment of this law is substantial. Therefore, the State, in order to uphold the validity of Act No. 160 of 2013, must justify the impairment as necessary and reasonable.

The State has established for certain that the System requires adjustments in the coming months to ensure its solvency. Likewise, the State has shown that it passed Act No. 160 of 2013 to address the System's fiscal crisis. However, the State has failed to show that said law actually guarantees the System's economic solvency and, consequently, that the impairment caused by the enactment of said statute was necessary and reasonable. This is despite the fact that plaintiffs have presented evidence that shows not only that the enacted law is deficient and fails to address the situation, but also that said statute could worsen the System's finances and accelerate its collapse.

The Government has not presented evidence to justify its actions as necessary and reasonable. Plaintiffs, in turn, have shown not only that there are less burdensome measures available—most of which were studied and endorsed by a Dialogue and Negotiation Committee in which the Executive Branch was represented—but also that the measure is unreasonable because it fails to adequately address the System's fiscal problems.

---

[11] My position in this respect is circumscribed to claims under the constitutional clause that bars the impairment of contractual obligations, and in actions of a strong labor-related nature in which the employee has made a prima facie showing of substantial impairment.

CT-2014-2; CT-2014-3                                        5
Justice Kolthoff Caraballo, concurring              (Official Translation)

## II

*Impairment under the reasonableness test*

The Constitution of the Commonwealth of Puerto Rico expressly provides: "No laws impairing the obligation of contracts shall be enacted."[12] A simple reading of this clause, which bars the impairment of contractual obligations, may give the impression that this prohibition is absolute when it refers to the State. However, the interpretation given to this clause of our Constitution, as well as to its counterpart in the United States Constitution, has made it clear that said protection is triggered only in the face of a substantial or severe impairment.[13] Thus, the impairment that would trigger the constitutional protection is that which substantially or severely modifies the expectation of the parties to the contractual relationship. This should not be understood as solely limited to state actions that totally destroy a party's expectations.[14] Now, this first step in determining whether the impairment was substantial or severe is prior to and independent from the necessity and reasonableness test required to uphold its validity.

In the analysis of what reasonableness implies as a test in the context of public contracts, as is the case here, the degree of impairment plays an extremely important role. In all these cases, the reasonableness of the statute is determined by taking into account the strength and importance of the public interest it seeks to advance.[15] Consequently, the greater the impairment, the higher the public interest involved must be in order to uphold the validity of the law.

With regard to the reasonableness and necessity test, it bears noting that the United States Supreme Court has held that the State is not completely free to consider impairing its contractual obligations on a par with other public policy measures.[16] Likewise, the State cannot impose a more drastic impairment than is necessary to address a compelling public interest.[17] In that respect, a law that imposes a more drastic impairment when a more moderate course would resolve the issue equally well cannot be upheld.[18]

That is why this Court has previously held that the validity of the impairment of the State's contractual obligations will not be upheld if there are alternative measures that

---

[12] P.R. Const. art. II, § 7, L.P.R.A., vol. 1, at 281 (2008 ed.).

[13] *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 834 [88 P.R. Offic. Trans. at __]; *Domínguez Castro et al. v. E.L.A. I,* 178 D.P.R. at 80 [78 P.R. Offic. Trans. at __].

[14] *United States Trust Co. v. New Jersey,* 431 U.S. at 26.

[15] *Warner Lambert Co. v. Tribunal Superior,* 101 D.P.R. 378 [1 P.R. Offic. Trans. 527] (1973); *Home Bldg. & Loan Assn v. Blaisdell,* 290 U.S. 398 (1934); Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L. Rev. 692, 701 (1960).

[16] *United States Trust Co. v. New Jersey,* 431 U.S. at 30-31.

[17] *Id.* at 31.

[18] *Id.*

CT-2014-2; CT-2014-3                                                    6
Justice Kolthoff Caraballo, concurring                      (Official Translation)

prove less drastic or severe than the one taken by the State to achieve its objective.[19] Thus, when we examine the reasonableness and necessity of the measure in the context of public contracts, contrary to cases involving private contracts, it is not appropriate to show complete deference to the legislative determination on the necessity or reasonableness of the law. Insofar as is pertinent here, the United States Supreme Court has stated:

> As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure . . . [but, as to public contracts] complete deference to a legislative assessment of reasonableness and necessity is not appropriate . . . .[20] [Emphasis added.]

We must also stress that this does not mean that just because the State is a party we should not accord any deference to the assessment of necessity or reasonableness of the measure. What we mean by not deferring completely to the Legislature is that we must examine whether it considered impairing its contractual obligations on a par with other alternatives; whether the State substantially impaired its obligations when a less drastic impairment would have achieved the objective sought; and, lastly, whether the state action is unreasonable in light of the surrounding circumstances.

We must reiterate that the extent of the impairment is a threshold issue when determining the reasonableness of a statute. Consequently, when we assess the validity of a law based on its reasonableness, we must examine, among other things, if the law effectively advances a compelling state interest. As we pointed out above, the validity of a statute that causes a severe impairment cannot be upheld, especially considering that it does not even solve the totality of the problem that gave rise to its enactment.

This Court is constitutionally barred from dictating the manner in which the other branches of government should address their public policy issues. This means that we certainly cannot pass on public policy matters from the bench. However, one of our constitutional functions is precisely to examine if in the process of implementing the country's public policy, the other branches of government have overstepped their constitutional limits. In other words, we cannot determine how they should discharge their duties, but rather how they cannot act in the discharge of such duties.

As was clearly evidenced at the oral hearing held in this case, the Court minority wrongly understood that we were overstepping our constitutional powers in examining if there were less burdensome alternatives. On the other hand, however, that minority intends to validate the retirement pension cuts, which are blatantly unreasonable, stating that plaintiffs have failed to establish the existence of less burdensome measures. It would seem nonsensical, on the one hand, to require the presentation of less burdensome

---

[19] *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 838 [88 P.R. Offic. Trans. at__]; *Domínguez Castro et al. v. E.L.A. I,* 178 D.P.R. 84 [78 P.R. Offic. Trans. at__]; *United States Trust Co. v. New Jersey,* 431 U.S. at 29-31.

[20] *Id.* at 22-23 and 26.

CT-2014-2; CT-2014-3                                                7
Justice Kolthoff Caraballo, concurring                    (Official Translation)

measures in support of petitioners' arguments and, on the other hand, to argue that this Court cannot consider the existence of such alternatives.

Certainly this Court is not the appropriate forum for examining the suitability of such measures, since that task is left to the lawmaker's discretion. What is incumbent upon this Court is simply to determine whether other measures exist and whether they were considered by the Legislative Branch before it approved the substantial impairment. It bears noting that in the Executive Branch, Secretary of State David Enrique Bernier Rivera and Secretary of Labor Vance E. Thomas Rider suggested, after the passage of Act No. 160 of 2013, that there could be other less burdensome measures, and therefore formed a Dialogue and Negotiation Committee to examine those alternatives. According to the facts set forth in the majority Opinion, that Committee subsequently rendered a report recommending several less burdensome measures.

III

*The type of scrutiny required in cases involving the impairment of contractual obligations when the State is a party to the contract is different from the substantive due process test.*

Once again some members of this Court confuse our position in *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. 1 [78 P.R. Offic. Trans. 1] (2010), with the facts of the instant case. That case primarily concerned the issue whether the petitioners' constitutional substantive due process rights had been protected. As we pointed out, the scrutiny to be applied in cases that challenge state actions as violating substantive due process is different and much more lenient than the standard required in cases involving an impairment of contractual obligations. The scrutiny to be employed in substantive due process cases is the reasonableness (rational basis) test, which was amply discussed in *Domínguez Castro et al. v. E.L.A. I.*

In that case, the contract clause violation issue was minimal and limited to the fact that some public employees were covered by collective bargaining agreements that regulated the manner of dispensing with their services. Act No. 7 of 2009 modified the collective bargaining agreement for a defined term, temporarily changing the process by which the services rendered by these employees could be dispensed with and putting them on the same footing as thousands of other public employees not covered by the collective bargaining agreement. It bears pointing out that this study was conducted and this Court upheld the impairment as reasonable because it was temporary and sought to place all public employees on the same footing.

When I cast my vote in *Domínguez Castro et al. v. E.L.A. I*, I had the difficult task of weighing the adverse effect caused to a sector of our society in order to save the finances of all of Puerto Rico. I am aware that many people were affected and suffered the effects of losing their jobs. It is the same sensation we suddenly feel when the lights go out without warning. Certainly Act No. 7 of 2009 left a substantial number of public employees without jobs, which for many families meant the loss of their only source of

CT-2014-2; CT-2014-3                                                      8
Justice Kolthoff Caraballo, concurring                    (Official Translation)

income. However, said law provided for several options to aid those so affected in their effort to advance an important purpose for the entire country.

Let there be no doubt: this is a very different measure. Although four years after Act No. 7 of 2009 was passed many of those affected by that statute have not yet recovered completely from its effects, for many the lights came back on. There are many Puerto Ricans who have embarked on new lives and have not only overcome adversity, but have also made the best of their situation and currently are much better off than before. Many of these citizens have started with great effort new businesses, precisely aided by the benefits provided in Act No. 7 of 2009. Others, in turn, entered the private sector and now are able again to support their families. It was not easy for anyone, simply because it is never easy to feel the ground shake beneath our feet and see our immediate reality change so suddenly, regardless of the economic crisis that may justify it.

Nonetheless, I am completely convinced that the issue before us now is very different. Thousands of these teachers may see many years go by, they could change jobs or even take precautions, but had it not been for our decision today, they would have seen their retirement pensions disappear forever.

The workers substantially affected by Act No. 160 of 2013, described by the statute as "*an essential component of education, are the professionals entrusted with the most significant task in the lives of their students and their influence is everlasting. Teachers hold the key to the success of the whole country.*"[21] [*] However, it is precisely that sector which the State intends, "as a token of appreciation," to condemn to poverty.

Today, as I did in *Trinidad Hernández et al.*, I have to reiterate that "I believe that if the ship is taking on water and there is a real danger of sinking, we should first cast overboard the nonessential; then, if need be, the important things; and then, as a last resort, what is most valuable. *To any worker, the pension for which he or she has worked all his or her life constitutes his or her security and most valuable possession.* Consequently—although I am barred from naming them—I clearly see many 'fiscal nonessentials' and 'important things' that should be cast overboard before even touching the valuable pensions of tens of thousands of our public employees."

This Court is certainly barred from dictating the form and manner in which the branches of government should resolve a public policy issue. Nonetheless, as the Court majority holds today, we have to bar any action of the political branches that seeks to unreasonably impair its contractual obligations to sectors of this society. For the foregoing reasons, I concur.

JMS/mal

---

[21] Statement of Motives of Act No. 160 of 2013. (Emphasis added.)

[*] [Translator's note: Citations to the English version of Act No. 160 of 2013 were obtained from a translation of said act certified by Juan Luis Martínez Martínez and found on the Teachers Retirement System webpage at http://www.srm.pr.gov/Pdf/Ley_160_2013_en_inglés.pdf. No official English translation was found on the Office of Legislative Services webpage.]

(Official Translation)

IN THE SUPREME COURT OF PUERTO RICO

Teachers Association of Puerto Rico *et al.,*

    Petitioners

                        CT-2014-2           Intrajurisdictional
        v.                CT-2014-3           Certification

Puerto Rico Teachers Retirement System *et al.,*

    Respondents

———————————————————

Educadores/as por la Democracia, Unidad,
Cambio, Militancia y Organización Sindical, Inc.,
individually and on behalf of its members, *et al.,*

    Petitioners

                  v.

Puerto Rico Teachers Retirement System *et al.,*

    Respondents

JUSTICE RIVERA GARCÍA, concurring.

San Juan, Puerto Rico, April 11, 2014

        Once again the actions of the political branches of the Puerto Rico Government have threatened to offend the dignity of thousands of public employees. This time it was our teachers, with whom the State intended to change its contractual relationship in a desperate act of self-preservation, with ulterior motives that are not in line with the welfare of our teachers. In view of this reality, I concur with the decision reached by this Court in the foregoing opinion. Acting otherwise would be tantamount to endorsing a patently unconstitutional action and, consequently, to abandoning our teachers to a future of economic uncertainty in the twilight of their productive life.

        The factual and procedural background, as well as the applicable law, is correctly set forth in the Court's opinion. Nonetheless, I feel compelled to make some brief expressions on the present controversy for the sole purpose of reaffirming some of the principles that have governed my judicial conscience since I assumed my position as a member of this Court.

I

        First, I deem it convenient to point out that the problem the State attempted to solve by way of Act No. 160 of 2013 was foreseeable from the very moment it entered into its contractual relationship with our teachers. It was the State who designed a system

CT-2014-2; CT-2014-3                                                    2
Justice Rivera García, concurring                          (Official Translation)

of low contributions in comparison to the benefits granted. This was recognized by the
Legislature in the Statement of Motives of Act No. 160 of 2013:

> *Since its beginning,* by virtue of Act No. 218 of May 6, 1951, which
> created the Teacher's Retirement Board (which was later substituted for
> the present System), *it did not receive adequate contributions to maintain
> a healthy solvency level.* The System was designed as a defined benefit
> system whose pensions were fixed by law and did not depend on the
> amount of contributions made by the Commonwealth, as the employer, or
> by the employees.   *The law that created the System established a
> contribution level that was not proportional to the benefits to be paid* by
> the System nor did it adjust to the economic or actuarial changes that
> affected the level of benefits. [Emphasis added.][1][*]

It was in those circumstances—however adequate or inadequate—that the State
first assumed its obligation to our teachers. Consequently, the insolvency that the
Teachers Retirement System (Retirement System or System) faces today should not
surprise anyone. Of course, as the years went by, the System's financial situation only
worsened, but this represented only a change in the degree or magnitude of the problem,
not in the type of problem. In other words, the problem with the System was in the
beginning, and still is, financial in nature, but now to a much greater degree.

Now then, the foreseeability of the problem should not be taken as an invitation to
inaction. Nothing bars the Legislative and Executive branches from taking steps to
reform this situation. However, in that endeavor, the first option should not be the
impairment of the contracted obligation; more so when the State has known for years the
root of the Retirement System's solvency problem and, despite this fact, has chosen to
assume a languishing attitude and sleep the "sleep of the just."

Neither the concurring vote I issue today nor these brief statements should be seen
as questioning the constitutional prerogatives of the two sister branches of government.
The Legislature undoubtedly has the power to pass and amend whatever law it may deem
pertinent, including the law that established the Teachers Retirement System of the
Commonwealth of Puerto Rico. Likewise, I recognize the Governor's authority to
implement and enforce said laws and the public policy behind them.

However, both the Legislative Power and the Executive Power have the obligation
to act within the bounds of the constitutional framework of our legal system, especially in
times of "crisis" or "emergency." It is precisely in these types of scenario that the two
political branches must show greater care and the courts must be more rigorous in their
evaluation. The presence of a "crisis" or "emergency" should not be used as a pretext to
act outside the bounds of our Constitution. Thus, these situations should not be back

---

[1] See Statement of Motives of Act No. 160 of 2013, 17th Leg., 2d Spec. Sess., at 7 (2013).

[*] [Translator's note: The page numbers cited here correspond to those of the English
translation of Act No. 160 of 2013, certified by Juan Luis Martínez Martínez and found on the
Teachers Retirement System webpage at http://www.srm.pr.gov/Pdf/Ley_160_2013_en_inglés.pdf.
No official English translation was found on the Office of Legislative Services webpage.]

CT-2014-2; CT-2014-3                                                    3
Justice Rivera García, concurring                         (Official Translation)

doors that allow the disruption of the most basic principles that have governed our country for decades.

   In a recent case that involved a similar "crisis," I categorically rejected the changes made to the Employees Retirement System of the Government of Puerto Rico. See *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828, 859 [88 P.R. Offic. Trans. __, __] (2013) (Rivera García, J., dissenting). Since the record of that case lacked evidence that may support the parties' positions, I stated that the reforms made to that system by way of Act No. 3 of 2013 were unreasonable and raised strong concerns of unconstitutionality. *Id.* at 894-895 [88 P.R. Offic. Trans. at__].

   Today, consistent with that position and as custodian of the Puerto Rico Constitution, I reiterate my concurrence with the decision reached by a majority of this Court. Therefore, I concur in declaring unconstitutional any part of Act No. 160 of 2013 that would modify petitioners' contractual right to their retirement pension. Likewise, I concur with the majority position upholding the constitutionality of the repeal of the special laws that granted our teachers benefits that are not part of their pensions. I also agree with the majority determination that participants who joined the System after the enactment of Act No. 160 of 2013 will only be entitled to the pension established in said law.

   In this regard, I deem it proper to stress that our analysis in this case was based on two important factors. *First*, on the State's stipulations: (1) teachers have a valid contract with the Puerto Rico Government; and (2) the reform introduced in their retirement system constituted a substantial impairment of said contract. *Second*, on the fact that, as we have recognized in the past, the adoption of measures aimed at ensuring the economic solvency of a retirement system constitutes an important state interest. See *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 837 [88 P.R. Offic. Trans. at__]; *Bayrón Toro v. Serra*, 119 D.P.R. 605 [19 P.R. Offic. Trans. 646] (1987). In light of these two factors, this Court's evaluation was initially limited to examining whether the evidence brought by plaintiffs-petitioners showed that the reforms adopted were unreasonable and unnecessary.[2]

   With this purpose in mind, we examined each of the documents presented by plaintiffs, especially the report of the expert economists supplied by the Teachers Association and the report rendered by Actuary José M. Pérez Díaz and submitted by the Organización de Directores Escolares de Puerto Rico [Organization of School Directors of Puerto Rico]. As the majority opinion correctly states, both reports show the negative impact that the sudden retirement of thousands of teachers would have on the solvency of

---

   [2] This examination was made in keeping with the standard adopted by the majority of this Court in *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828, 838 [88 P.R. Offic. Trans. __, __] (2013), in which the Court held that the plaintiffs had the burden of proving that the challenged measure is unreasonable and unnecessary. Although I disagree on this point because I believe that in face of a substantial impairment it is the State who must bear the burden of proving that the challenged measures are reasonable and necessary (see *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 859 [88 P.R. Offic. Trans. at __] (Rivera García, J., dissenting)), I acknowledge that at present the decision in *Trinidad Hernández et al.* is controlling in these cases. Therefore, I accept as correct the analysis made in the majority opinion because it is the prevailing rule.

CT-2014-2; CT-2014-3                                              4
Justice Rivera García, concurring                    (Official Translation)

the Retirement System in light of the unquestionable fact that there would be an increase in the pension payroll and a reduction in contributions. Consequently, the measures adopted in the law, instead of ensuring the solvency of the Retirement System, only place it in a more vulnerable position. The record of the case has not one single piece of evidence to the contrary.

Under no circumstances do we intend to make a de novo determination on the feasibility of other alternatives that could address the Retirement System's solvency issues and that, in turn, would guarantee that the State will honor its contractual accords. What the Court's opinion holds today is that the alternative chosen by the State does not accomplish its purpose, as shown by plaintiffs-petitioners and as established even by the evidence presented by the State and by the testimony of its legal representatives during the oral hearing. Insofar as the statute adopted does not fulfill its purpose, and since the parties have stipulated the substantial impairment of the contractual obligations of plaintiffs-petitioners, the law becomes unreasonable; consequently, we need not examine its necessity. Moreover, it goes without saying that the imminent and sudden retirement of thousands of teachers would affect the constitutional right of our children to education. See P.R. Const. art. II, § 5 (L.P.R.A., vol. 1). Accordingly, I concur with the decision of this Court to declare Act No. 160 of 2013 unconstitutional on the grounds set forth in the foregoing opinion.

Thus, I strongly reaffirm today that judges are arbiters who must call them as they see them, not as others would like them to see them. Therefore, we must always be attentive to the arguments raised by the parties in a case and decide all cases with complete intellectual honesty and according to law and justice. The success of economic measures sought to be implemented for the common good must never be a pretext to abuse people and much less to offend their dignity.

JMS/mal.

(Official Translation)

## IN THE SUPREME COURT OF PUERTO RICO

| | | |
|---|---|---|
| Teachers Association of Puerto Rico *et al.*, | | |
| Petitioners | | Intrajurisdictional |
| v. | CT-2014-2 | Certification |
| Puerto Rico Teachers Retirement System *et al.*, | | |
| Respondents | | |

| | | |
|---|---|---|
| Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., individually and on behalf of its members, *et al.*, | Consol. with | |
| Petitioners | | |
| v. | | |
| Puerto Rico Teachers Retirement System *et al.*, | CT-2014-3 | |
| Respondents | | |

JUSTICE ESTRELLA MARTÍNEZ, concurring.

San Juan, Puerto Rico, April 11, 2014

> *Speak, speak your truth, TEACHER,*
> *And do not let them humble your life, your presence;*
> *If you've proven to be a hero without a crown,*
> *Also show them that your voice is science.*
>
> Fidencio Escamilla Cervantes, *A ti, maestro*
> *[To You, Teacher]*[*]

The State intended to extend its rope to the teachers—public employees who do not qualify for Social Security benefits and who face a precarious job situation. The State sought to degrade the teachers' situation even more in order to avoid downgrading itself. In that selfish act, the State ended up entangled in its own rope by the credit rating agencies. It could not avoid the inevitable, much less at the expense of the most humble. The time has come for the State to make good on its word, to adopt the more reasonable and effective measures on the table, and to truly reform what must be reformed. Otherwise, the State's selfishness will always be groundless at law.

[*] [Translation supplied by the Bureau of Translations of the Supreme Court of Puerto Rico.]

Since I believe that Act No. 160 of 2013 is plagued with drastic changes to the Teachers Retirement System that contravene the Constitution of Puerto Rico, I concur with the decision reached by this Court.

In a previous case, I examined the law applicable to state actions of this type that are detrimental to the public employees of this country. I did not hesitate to find unconstitutional the State's actions in passing Act No. 160 of 2013. See *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828 [88 P.R. Offic. Trans. __] (2013) (Estrella Martínez, J., dissenting). The principles outlined therein are likewise applicable to the teachers who shape public education in our country. I firmly reiterate this position.

I

As is well known, Act No. 160, passed on December 24, 2013, established the Commonwealth of Puerto Rico Teachers Retirement Act and repealed Act No. 91 of 2004.

Aggrieved by the process and the reform established in the statute, the Puerto Rico Teachers Association, individually and on behalf of several of its members, filed an Action for Preliminary and Permanent Injunction and Petition for Declaratory Judgment in the Court of First Instance, seeking the stay of the implementation of Act No. 160 of 2013 and asking the court to declare it void, illegal, and unconstitutional. The Teachers Association subsequently resorted to this Court by way of a Petition for Intrajurisdictional Certification filed on January 14, 2014.

As a result, this Court, by resolution of January 14, 2014, granted the petition and appointed the Hon. Ángel R. Pagán Ocasio Special Master to draw the corresponding findings of fact. On January 22, 2014, Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc. [Educators for Democracy, Unity, Change, Militancy and Union Organizing, Inc.] (EDUCAMOS [by its Spanish acronym]), individually and on behalf of its members, filed a Petition for Certification, also asking the Court to declare the statute unconstitutional and to stay its effects. We consolidated the actions.

Petitioners essentially contend that Act No. 160 of 2013 violates their constitutional rights by impairing contractual relations without there being any link between the prohibitions and restrictions made and their purpose. Moreover, they argue that the State did not consider less burdensome alternatives and that its actions do not serve a legitimate interest authorized by the applicable law, since they actually release the State from any economic liability with respect to the Teachers Retirement System (System). Petitioners also allege that the impairment is permanent and that the hike in their contributions and the reduction in benefits illegally and unconstitutionally affect their financial situation. Finally, they allege that the measures adopted bear no relation to the purposes of Act No. 160 of 2013.

The State, in turn, alleges that the serious financial situation faced by the country bars it from providing the necessary funds to address the System's actuarial deficit. It also claims that failure to address the System's situation would result in a lack of funds needed to pay the pensions and, as a result, its credit rating would be downgraded. The

CT-2014-2; CT-2014-3                                                           3
Justice Estrella Martínez, concurring                              (Official Translation)

State further argues that Act No. 160 of 2013 addresses the System's economic situation by establishing a defined contribution system with a guaranteed minimum pension, increasing the retirement age for future teachers, increasing individual and employer contributions, repealing the special laws that grant additional benefits, and providing for a uniform contribution system and an additional annual contribution, while ensuring the benefits accrued by allowing pensions equivalent to an annuity resulting from the benefits accrued up to July 31, 2014, plus the annuity computed on the basis of the new defined contribution system that would become effective on August 1, 2014. Likewise, participants are entitled to retire at age 55 with 30 years of service or at age 60 with five years of service. On the other hand, the State alleges that proposals were adopted that would not strain the general fund and that, even if all proposals were adopted, these measures would be insufficient to reduce the actuarial deficit.

On January 30, 2014, the parties submitted the Stipulations of Fact by the Parties in Accordance with the Order of the Special Master. On February 7, 2014, we received the Special Master's Report, which lists the stipulations reached and the documents presented in evidence, and which draws, insofar as it is pertinent here, the following findings of fact: (1) the System was underfunded from its inception; (2) the State, administration after administration, has defaulted on its financing commitment and has implemented a restructuring plan to extend the System's life; (3) the System has a cash flow deficit of $334.5 million as of June 30, 2013, which would decrease annually until 2020, when the deficit would be $316.8 million, to rise again in 2023 to $363.2 million; (4) the situation is so critical that warrants immediate attention; (5) the credit rating agencies have warned that to avoid a downgrade, the System needed to be reformed without significantly impacting the general fund; and (6) the downgrade to "junk" status was not bigger because of the reductions in operational deficits and the reform of the government retirement systems that can substantially contribute to fiscal stability.

Finally, the parties' briefs in the above-captioned cases were received and thoroughly examined, and the case was submitted to this Court for decision.

II

A. It is a deeply rooted principle of our Constitution that "[n]o laws impairing the obligation of contracts shall be enacted." P.R. Const. art. II, § 7, L.P.R.A., vol. 1, at 281 (2008 ed.). The United States Constitution has an analogous provision that bars states from enacting laws that will impair contractual relations. U.S. Const. art. I, § 10, L.P.R.A., vol. 1. See also *United States Trust Co. v. New Jersey*, 431 U.S. 1, 14-15 (1977); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 8.3.1, at 645 (4th ed. 2011).

These constitutional provisions promote contractual stability that prevents state and local governments from alleviating their obligations to a contracting party or making enforcement of a contract unreasonably difficult. See *United States Trust Co. v. New Jersey*, 431 U.S. at 15; 2 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 15.8(b), at 879 (5th ed. 2012).

CT-2014-2; CT-2014-3                                                    4
Justice Estrella Martínez, concurring                          (Official Translation)

As I explained in my dissent in *Trinidad Hernández et al.*, in order to determine whether there has been an impairment of a contractual obligation, we must determine whether the statute passed substantially harms said obligation. The reason for this is that the protection against the impairment of contractual obligations is not absolute. *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 394 [1 P.R. Offic. Trans. 527, 550] (1973); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934). Now then, we must bear in mind that once the parties' rights and obligations are established, these are binding under the law and the parties place their trust in those rights. See *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992); *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 411 (1984); *United States Trust Co. v. New Jersey*, 431 U.S. at 17; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244-245 (1978). Consequently, if the commitments made are substantially affected, we may face a possible violation of the contract impairment clause. *El Paso v. Simmons*, 379 U.S. 497, 508 (1965); *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. at 430.

Therefore, it should not be understood that the State is barred from modifying its obligations in furtherance of a public interest (such as public health, public safety, or the general welfare), but rather that such modification cannot be substantial. *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. at 394 [1 P.R. Offic. Trans. at 550]; *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. at 410; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 240-241.

The role of the courts is to examine the governmental action in order to reconcile the State's interest in implementing its public policy with the interest of the contracting parties in suffering no substantial harm. *United States Trust Co. v. New Jersey*, 431 U.S. at 21. In so doing, courts must never lose sight of the fact that the mere existence of an important public interest does not always justify a contractual impairment. *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 505 (1987).

The applicable test will depend on whether the relationship potentially affected by the government action is private or public in nature. In the first case—private contracts—the courts must defer to the State's determination on the reasonableness and necessity of the law. *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. 1, 22-23 [78 P.R. Offic. Trans. 1, __] (2010). In cases in which contracts between private parties are affected, the protected public interest must be legitimate and significant and may not unreasonably or unnecessarily harm the rights and obligations of the contracting parties. *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. at 411-412; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 244 and 247; *United States Trust Co. v. New Jersey*, 431 U.S. at 22; *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 84 [78 P.R. Offic. Trans. at __].

However, when the affected contractual relationship is public and the State is one of the parties, the constitutional scrutiny is much stricter for the State. *United States Trust Co. v. New Jersey*, 431 U.S. at 23; *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 81 [78 P.R. Offic. Trans. at __]. Consequently, when we examine the impairment of

contractual obligations in which the State is one of the contracting parties, we must forcibly examine if the State surrendered powers that unduly bind future and successive legislatures. *United States Trust Co. v. New Jersey*, 431 U.S. at 23. Likewise, we cannot ignore the fact that once the State assumes an obligation it is bound to fulfill it. *Id.* at 24. It is purely and simply impermissible to allow the State to evade its obligation under the cloak of its own power. This reality calls for a much stricter scrutiny of the government action that resulted in the contractual impairment. Such action will survive scrutiny only if it is reasonable and necessary. *Id.* at 25-26. Under this analysis, the Court must be aware that the State will protect its own interests; therefore, we need not defer to the legislative judgment as to the necessity and reasonableness of a measure. *Id.* at 26; *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. at 505; *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. at 412.

It is important to establish that for a measure to be reasonable, it cannot aim to mitigate a situation foreseen or intended by the State when it assumed its contractual obligation. *United States Trust Co. v. New Jersey*, 431 U.S. at 31. The measure will be deemed necessary when no less drastic alternatives exist to achieve the State's interest. *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 84 [78 P.R. Offic. Trans. at __]; *United States Trust Co. v. New Jersey*, 431 U.S. at 29-31. This analysis is equivalent to a strict scrutiny. Chemerinsky, *supra*, § 8.3, at 655. It is for this reason that in order to validate a government action in these cases it is indispensable to inquire if the measure is temporary and intended to address a public social or economic emergency. *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 85 [78 P.R. Offic. Trans. at __]. Absent these two requirements, the balance tips in favor of protecting the impaired contractual relationship. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 250.

B. The cited caselaw applies to retirement plans, especially when these have been recognized by this Court as a "property interest of a contractual nature protected by the constitutional guarantee against impairment of contractual obligations." *Bayrón Toro v. Serra*, 119 D.P.R. 605, 607-608 [19 P.R. Offic. Trans. 646, 649] (1987). Retirement plans such as the one under our consideration are public contracts that bind the State and the employee from the date of their execution. *Id.* at 618 [19 P.R. Offic. Trans. at 660]. For the employee, retirement plans are an essential part of his or her employment contract and a very important benefit that in most cases becomes the only source of future income that would provide a reasonable degree of economic security. *Id.* at 616-617 [19 P.R. Offic. Trans. at 658]. Retirement plans become a moral obligation of the State. *Id.* at 615 [19 P.R. Offic. Trans. at 656] (citing *Rivera v. Rodríguez*, 93 P.R.R. 20, 23 (1966)).

The State, however, has the power to amend the retirement plan it has offered. In that respect, this Court has held that the Retirement System may be amended if the participant has not retired yet. We also pointed out that these amendments can be upheld only if they are reasonable and advance the System's actuarial solvency. *Bayrón Toro v. Serra*, 119 D.P.R. at 618 [19 P.R. Offic. Trans. at 660]. Consequently, we stated:

CT-2014-2; CT-2014-3                                                            6
Justice Estrella Martínez, concurring                            (Official Translation)

"Changing conditions and requirements, such as years of service, contributions to the fund, and retirement age, are essential to preserve the solvency of the fund." *Id.* at 623 [19 P.R. Offic. Trans. at 664]. This, however, does not mean that the State can play a wild card that allows it to act as it sees fit. Its actions shall be subject to the strict scrutiny mentioned above. In other words, the amendments must be necessary and reasonable to advance an important public interest; this means that there were no alternative measures to avoid the impairment and that what is being mitigated was unforeseen or unintended by the State or only benefits the State. We should not leave out of this analysis the rule that "laws that create pension rights must be construed liberally in favor of the beneficiary in order to achieve the remedial purpose for which they were passed." *Calderón v. Adm. Sistemas de Retiro*, 129 D.P.R. 1020, 1032 [29 P.R. Offic. Trans. __, __] (1992).

This is the legal standard that this Court is obliged to apply to the facts under our consideration. As we did previously, we must understand what the Teachers Retirement System is in order to determine whether the changes introduced by Act No. 160 of 2013 violate the constitutional clause against the impairment of contractual obligations.

III

A. The System we know today has its origins in 1917, when the Teachers' Pension Fund was created through Act No. 62 of December 5, 1917. This law created a system of pensions and annuities for teachers. The System underwent its last change through Act No. 91 of 2004, as amended, known as the Commonwealth of Puerto Rico Teacher's Retirement System, 18 L.P.R.A. § 391 *et seq.* This act provided that System members, their dependents and beneficiaries would receive disability and retirement annuities, death annuities, and other benefits. The System is funded by employer and individual member contributions and by the return on its assets.

The System created through Act No. 91 of 2004 provides that its members would contribute 9% of their salary and the State 8.5% of its salary payroll to fund the System.[1] This granted members the right to a lifetime pension that may be received in the following manner: (1) those who reach age 60 and have ten years of credited service would be entitled to a lifetime pension equivalent to 1.8% of their highest average salary for any 36-month period (that is, of the average compensation for the years of credited service); (2) those who reach age 50 and have 30 years of credited service would receive a lifetime pension equivalent to 75% of the average compensation; (3) those under age 50 with 30 years of credited service would receive a lifetime pension equivalent to 65% of the average compensation; (4) those who reach age 50 and have more than 25 but less than 30 years of credited service would receive a lifetime pension equivalent to 1.8% of the average compensation for the years of credited service; and (5) those under age 50 but

---

[1] Originally, the employer contribution was 6% in 1951; it rose in 1960 to 7%, in 1961 to 7.70%; in 1962 to 8.40%, and in 1967 to 8.5%. There was no other increase until 2011. See Act No. 114 of 2011 (18 L.P.R.A. §391*l*). In turn, the original contributions were 7% and reached 9% in 2000.

CT-2014-2; CT-2014-3                                                    7
Justice Estrella Martínez, concurring                          (Official Translation)

over age 47 who have more than 25 but less than 30 years of service would receive 95%
of the 1.8% of the average compensation for the years of credited service. However, all
active members who retire before reaching age 55 and without 30 years of credited
service would have to contribute 9% of their average compensation for five years to the
Fund. In turn, Act No. 91 of 2004 recognizes death benefits before and after retirement,
as well as benefits for occupational and non-occupational disability.[2]

Thus the System sought to ensure the teachers' economic security by guaranteeing
a dignified pension upon their retirement; for that reason, the System was given authority
to manage portfolios of loans, investments, and other instruments. A safeguard was also
established so that any investment would be carried out with foresight, care, and
reasonableness, not for speculative purposes, and striking a balance between yield and
risk expectation. See sec. 43 of Act No. 91 of 2004 (18 L.P.R.A. § 392h). Likewise, and
in order to preserve the System, it was provided that any change in its benefits structure
would be backed by prior actuarial studies that determine the cost and sources of
financing. See sec. 3 of Act No. 91 of 2004 (18 L.P.R.A. § 391a).

The System currently has 42,707 active members who earn an average annual salary
of $30,275; a total of 31,370 retired members who receive an average monthly benefit of
$1,371; a total of 2,171 disabled members, and about 2,964 additional beneficiaries. For the
coming fiscal year, the System needs $736,590,722 to meet the so-called basic benefits and
those adopted through special laws.[3] In other words, the contributions of its members and of
the State, as employer, are not sufficient to cover the cash flow needed to meet its
obligations. Thus, it is estimated that aside from the contributions, the System would need
$331 million for 2014. This sum could reach $363 million for 2023. Of course, this does not
include the return on the assets, which is calculated at 5.95%.[4]

Given this scenario, it is calculated that the Retirement System has an actuarial
deficit of $10,251,272,526, with a 17.9% solvency percentage.[5] See Milliman's Puerto

---

[2] When the System was created, the retirement age was 60 with a minimum of ten years
of service. However, the merit system described above was created in 1973.

[3] The Annual Required Contribution (ARC) comprises the normal cost of the plan plus an
amortization payment toward the unfunded liability. Since 1999, the contributions made by the
State have not been sufficient to cover this cost. See the expert report of Actuary Glenn Bowen of
January 27, 2014, at 3, contained in Motion of Respondents in Compliance with Order, Case No.
CT-2014-0002, vol. 2.

[4] The System would require a lesser amount if the investment return assumption of 5.95%
is met. However, that level of return is not expected after 2021 because if no changes are made to
the retirement system model, its assets will be exhausted by 2020. See Milliman's Puerto Rico
Teachers Retirement System June 30, 2012 Actuarial Valuation Report (Milliman Report) at 20,
Case No. CT-2014-0003, vol. 2; Report on the Application of Governmental Accounting
Standards Board Statement No. 25 on the Teachers Retirement System, App. XXVII, presented
by the Puerto Rico Teachers Association, Case No. CT-2014-003, vol. 3; Statement of Motives of
Act No. 160 of 2013; expert report of Actuary Glenn Bowen, supra, at 1.

[5] The actuarial valuation determined that as of June 30, 2004, the System had a
capitalization level of 51%; in 2007 said level was 43.8%. See Parissi, P.S.C., Puerto Rico System
of Annuities and Pensions for Teachers 7, at http://www.cepsr.pr.gov/data/library/publ/InfAct/

CT-2014-2; CT-2014-3                                                          8
Justice Estrella Martínez, concurring                          (Official Translation)

Rico Teachers Retirement System June 30, 2012 Actuarial Valuation Report (Milliman Report) at 19, 20, and 26, Case No. CT-2014-0003, vol. 2. An actuarial deficit arises when the benefits granted surpass the System's assets; thus, the deficit rises when: (1) there is a lack of recurring contributions; (2) the obligations increase as a result of a higher number of beneficiaries not originally contemplated in its implementation; and (3) there is an inadequate return on its assets.

Instead of facing these facts and implementing measures that would guarantee the rights of System members, the State allowed it to be bled dry and placed it in a vulnerable position, and now it wants to solve the matter at the expense of those affected.[6] Among the factors that weakened the Retirement System are: (1) insufficient contributions; (2) early retirement programs; (3) changes in life expectancy of participants; and (4) the impact of the special laws.[7] See Statement of Motives of Act No. 160 of 2013.

Specifically, the State contributed to the so-called "crisis" by ignoring the need to timely increase contributions and provide a much-needed cash flow injection, and because of poor management. The State was not unaware of the realities that beset the System from its very beginnings. It had been warned by the actuaries. In fact, it had been forewarned that the System's asset growth rate would be too low while the obligations would rise significantly. On this point, it bears noting that the assumed investment return was lowered from 8% to 5.95%.[8] In fact, the System lacked and still lacks adequate

---

VARRETM2006.pdf. This is consistent with the facts set forth in the Morningstar Pension Report of November 20, 2013, which was included in the *Actuarial Report on the New Act No. 160 of 2013 - Puerto Rico Teachers Retirement System,* by Actuary José M. Pérez Díaz, at 9, Case No. CT-2014-0002, vol. 1, which shows that the Teachers Retirement System had a funded ratio of 40.8% in 2007; of 24% in 2009; of 23.9% in 2010; of 20.8% in 2011; and of 17.0% in 2012. http://www.noticel.com/uploads/gallery/documents/Commonwealth_of_Puerto_Rico_PensionReport1.pdf. See also Milliman's Puerto Rico Teachers Retirement System June 30, 2007 Actuarial Valuation Report, at 9, at http://www.cepsr.pr.gov./data/library/pub1/InfAct/VARRETM2007.pdf.

In comparison with the States, it has been shown that in aggregate, pension plans have a funded ratio of 66.4%, and the source of operational financing is, in most cases, the general fund. See Morningstar, *The State of City Pension Plans 2013: A Deep Dive Into Shortfalls and Surpluses,* at http://global.morningstar.com/CityPensions2013/Excerpt_State ofCityPensions2013.pdf.

[6] It must be noted that the State reports the Teachers Retirement System as a net pension obligation totaling $2,462,232,000, which is equivalent to less than 4% of the debt of the General Fund, municipalities, public corporations and agencies. See the Commonwealth of Puerto Rico Comprehensive Annual Financial Report, Year Ended June 30, 2012, at 35, 82, 209, and 212.

[7] Originally, the State agreed to pay these benefits out of the general fund. However, there is information suggesting that the Government did not keep its promise. In that respect, it was reported that the Government ended up owing the Teachers Retirement System $1.5 billion in 2005; $5.968 billion in 2006; $4.655 billion in 2007; and $1.340 billion in 2008. See *Informe preliminar de la Asociación de Maestros de Puerto Rico sobre los sistemas de retiro* [Preliminary Report of the Puerto Rico Teachers Association on the Retirement Systems], issued in compliance with Executive Order OE-2010-10 (March 12, 2010), available at http://www.amprnet.org/articles_files/documents/Informe%20Preliminar%20AMPR%20Comision%20Sistemas%20de%20Retiro%20ago%202010.pdf (last visited February 4, 2014).

[8] See JLDV Estudios Económicos, Inc., *Evaluación económica de posibles fuentes de recaudos y el impacto de estos sobre la situación económica del Sistema de Retiro de Maestros* [Economic Assessment of Possible Sources of Income and Their Impact on the Economic Situation of the Teachers Retirement System] 4 (January 30, 2014), App. XXVII to the Motion on

CT-2014-2; CT-2014-3                                                          9
Justice Estrella Martínez, concurring                          (Official Translation)

contributions to be solvent. The reason for this is that the defined benefit scheme created by the System does not depend on the amount of contributions received, and neither was it adjusted to the actuarial or economic changes that have affected the level of benefits from its creation.[9] However, it was not until 2011 that the State decided to raise its employer contribution in a limited fashion by enacting a law that raised the employer contribution only by 1% for four years and by 1.25% for subsequent years up to July 1, 2021.[10] Worse yet, state contributions only amounted to a fraction of what was needed; this forced the System to use its resources to pay for what the State should have financed.[11] The State simply turned a deaf ear to all the recommendations to increase employer contributions. See the Statement of Motives of Act No. 160 of 2013.

As if this was not enough, the State initiated early retirement programs, introduced changes in retirement requirements, and even allowed the purchase of years of service at an interest rate that did not cover the actuarial cost of this action.[12] Consequently, this heightened the problem, since these windows reduced the System's cash flow and increased disbursements, and the State ceased to make employer contributions for employees who took advantage of early retirement.[13] Moreover, the State put its word on the line in a desperate need for recognition. Thus, it passed a hike in minimum pensions,[14] disability pensions and death benefits,[15] and a 3% increase in retirement pensions.[16] Likewise, with no feasible financing source, the State also granted greater benefits to teachers through medical plan contributions as high as $100, to be paid from the general fund; a $600 Christmas bonus,[17] a $100 summer

Evidence by Petitioner Puerto Rico Teachers Association, Case No. CT-2014-0003, vol. 3; Expert Report of Actuary Glenn Bowen, *supra*, at 4.

[9] Financing for this type of plan consists in that the contributions plus the income derived therefrom (actuarial assets) would contribute to the paid benefits and administrative expenses of the System (actuarial accrued liability). When the latter is greater than the actuarial assets, we have an unfunded actuarial accrued liability.

[10] Act No. 114 of 2011 (18 L.P.R.A. § 391*l*).

[11] See Morningstar Pension Report of November 20, 2013, at http://www.noticel.com/uploads/gallery/documents/Commonwealth_of_Puerto_Rico_PensionReport1.pdf.

[12] Act No. 33 of 2001; Act No. 358 of 2000; Act No. 45 of 2000; Act No. 44 of 2000. See also the Expert Report of Actuary Glenn Bowen, *supra*, at 2-3.

[13] In that respect, the employer contributions not made reached $23,395,051 as of September 30, 2013. See House of Representatives, *Informe Positivo de la Comisión de Asuntos Laborales y Sistemas de Retiro del Servicio Público* [Positive Report of the Labor Affairs and Public Service Retirement Systems Committee] of October 21, 2013, on H.B. 1335, 17th Assembly, 2nd Ord. Sess., at 4.

[14] Act No. 38 of 2007.

[15] Act No. 272 of 2004.

[16] See Act No. 38 of 2007; Act No. 171 of 2003; Act No. 39 of 2001; Act No. 160 of 1999; Act No. 226 of 1998; Act No. 207 of 1995; Act No. 62 of 1992.

[17] See Act No. 144 of 2005; Act No. 170 of 2003; Act No. 109 of 1997.

CT-2014-2; CT-2014-3                                                    10
Justice Estrella Martínez, concurring                          (Official Translation)

bonus,[18] and a $100 medications bonus.[19] The State brazenly accepts that the special benefits were supposed to be covered by the general fund, "but this has not been the case." See Statement of Motives of Act No. 160 of 2013, at 9.[*] As a matter of fact, the State stopped financing the legislated benefits and the System had to resort to its assets.[20] Likewise, the State also failed to address the problem that arose with the change in life expectancy, which had risen from 1950 to the present. Consequently, the change in life expectancy forced the System to defray pension costs longer than anticipated.

B. All these actions and omissions by the State contributed to the System's downfall. Now, in a hasty process, the State passed Act No. 160 alleging that it was "imperative to take immediate action to improve and assure the fiscal solvency of the System, in order to close the gap between the net assets and those required to continue paying the pensions of our retired teachers and future retirees." Statement of Motives of Act No. 160, at 10. Thus the State intends to justify its passage of Act No. 160 of 2013, and although it accepts that the statute constitutes an impairment of its contractual obligations by adversely affecting the teachers' retirement expectations, it argues that there were no other reasonable alternatives. See Stipulations 84 and 85 of the Stipulations of Fact by the Parties in Accordance with the Order of the Special Master, Case No. CT-2014-0002, vol. 1.

We must, consequently, set forth the alternative measures that were submitted by the principal teacher representatives prior to the passage of Act No. 160 of 2013: (1) reducing by 10% the administrative expenses of the Department of Education and the System;[21] (2) fully paying the $24 million owed in unpaid employer contributions for those who opted for early retirement; (3) paying employer contributions for those who opted for early retirement; (4) eliminating privileged pensions; (5) imposing a $3,500 pension cap; (6) appointing personnel to available required positions in order to increase contributions to the System; (7) increasing by 1% the tax on foreign companies to allocate the resulting funds to the System;[22] (8) allocating unclaimed Electronic Lottery funds to the System; (9) imposing an additional consumer tax on cigarettes, alcoholic

---

[18] Act No. 38 of 2001.

[19] Act No. 162 of 2003.

[*] [Translator's note: The page numbers cited here correspond to those of the English translation of Act No. 160 of 2013, certified by Juan Luis Martínez Martínez and found on the Teachers Retirement System webpage at http://www.srm.pr.gov/Pdf/Ley_160_2013_en_inglés.pdf. No official English translation was found on the Office of Legislative Services webpage.]

[20] For instance, the actuarial report of June 30, 2012, reveals that the State owed the System $58,451,038 in unpaid medical plan contributions from 2008 to 2013. See Milliman's *Puerto Rico Teachers Retirement System June 30, 2012 Actuarial Valuation Report, supra,* at 34.

[21] This would be equivalent to a cash flow increase of $54.4 million annually for the System. See Statement of Motives of Act No. 160 of 2013; JLDV Estudios Económicos, Inc., *Evaluación económica de posibles fuentes de recaudos y el impacto de estos sobre la situación económica del Sistema de Retiro de Maestros, supra,* at 7.

[22] The annual revenues from the proposed 1% tax hike on these companies were estimated at $489 million.

CT-2014-2; CT-2014-3                                              11
Justice Estrella Martínez, concurring                    (Official Translation)

beverages, and fast foods; (10) imposing a fee of up to 10% on gambling winnings of
more than $1,000; (11) recovering $3 billion in uncollected income tax and sales and use
tax; (12) funding the system through the collection of utilities bills owed by municipalities,
agencies and public corporations; (13) eliminating private contracts for services that
could be rendered by public employees; (14) paying contributions owed to the System;
and (15) investigating bond issuance transactions made by the System.

  The State adopted some of these measures: (1) the 10% reduction in Department
of Education and System expenses; (2) the payment of $24 million owed in employer
contributions for early retirement;[23] (3) the prospective elimination of privileged pensions;
and (4) the appointment of personnel to positions required in the schools. The State,
however, refused to tax foreign corporations, stating that this could result in a tax credit
loss. As for the surcharge on cigarettes and alcoholic beverages, the State indicated that
this would not have a significant impact on the System's situation. In its assessment of
the proposal to allocate unclaimed lottery winnings to the System and to impose a fee of
up to 10% on winnings higher than $1,000, the State only indicated that this could affect
the cash flow of the general fund and, consequently, worsen the fiscal deficit.

  Now then, to place in a proper perspective the State's options prior to the passage of
Act No. 160 of 2013, I will make specific reference to the legislative pieces proposed by
the House and the Senate. Some of these bills were: (1) S.B. 859 of December 19, 2013, to
reassign the funds of the Special Scholarship Fund for the University of Puerto Rico to the
System in order to reduce the actuarial deficit; this would transfer $30 million annually in
monthly deposits of the net revenues of the Additional Lottery; (2) S.B. 848 of December
13, 2013, which proposed to allocate one half of the 1% excise tax imposed by Act No.
154 of 2010, as amended, to the System's fund; this would represent close to $244.5 million
annually;[24] (3) S. J. Res. 281 of November 1, 2013, to transfer unclaimed cash prizes of the
IVU Lotto Lottery;[25] and (4) H.B. 1335 of August 22, 2013, to clarify that the Department
of Education was obliged to pay employer contributions corresponding to those teachers
who opted for early retirement in order to cover the actuarial impact involved.

  Likewise, several proposals were made available to the State in order to address
the situation of the Public Employees Retirement System: (1) H.B. 926 of March 12,
2013, which proposed eliminating the tax exemption on distilled spirits or other alcoholic
beverages; this would yield $180 million annually;[26] (2) H.B. 868, which would [amend]
the Games of Chance Act for the purpose of transferring funds from the gross revenues

---

[23] The State has never accepted that it owes this amount.

[24] Act No. 154 of 2010 was amended by Act No. 2 of 2013, which approved a fixed 4%
excise tax from 2013 to 2017.

[25] As of October 2012, that amount was calculated at $2,723,000.

[26] It bears noting that the unions had suggested a tax on alcoholic beverages and
cigarettes, but the State discarded their proposal because it believed that the revenues collected
would not be significant.

generated by slot machines; this sum was estimated at $180 million; (3) H.B. 917, which sought to transfer a specified percent from the Tentative Minimum Tax to the System; this initiative could translate into $150 million annually; (4) H.B. 922, which sought to earmark and transfer 1% of the taxes on the acquisition of some personal property and services to the System; (5) H.B. 997, which proposed a special tax on savings and credit unions, its subsidiaries and affiliates, to be remitted to the teachers retirement fund; (6) H.B. 1045, to deduct certain remittances owed to the System; this would result in an immediate injection of $60,542,036; (7) S.B. 23, which recommended the creation of a *Pega Dominical* [Sunday Lotto], whose funds would be used to bolster the System's finances; (8) S.B. 219, which sought to amend the Compulsory Motor Vehicle Liability Insurance Act in order to provide that $4 of the premium paid in compulsory insurance would be transferred to the System; based on an estimate of 3,045,000 motor vehicles, the bill would bring in $12,180,000 annually in funds; (9) S.B. 428, to amend the Compulsory Motor Vehicle Liability Insurance Act, in order to add 84 cents monthly to the initial uniform premium of the compulsory liability insurance and transfer that sum to the System; this would bring in $2,557,000 annually; (10) S.B. 431, which would provide for the transfer of 2% of the money retained by all banking and financing institutions in our jurisdiction as floating money on the payroll deposits of System pensioners and of the public employee payroll;[27] and (11) S.B. 474, which would transfer to the System the amount in excess of $6,500,000 in funds transferred by the Joint Underwriting Association stemming from the "Funds Retained by the Insurer Belonging to Others" after these become property of the Puerto Rico Government and pass on to the general fund.

In addition to these bills, and after Act No. 160 of 2013 was passed, Governor Alejandro García Padilla announced that he had agreed to the creation of a Dialogue Committee that would seek other alternatives for the System that would protect the teachers' retirement plan. During this process, the teachers raised countless proposals to inject recurring funds into the System.[28] Among these was a tax on the winnings from games of chance and adult entertainment machines,[29] a $5 hotel stay surcharge, identifying the State's debts to the System, making changes in the actuarial bases of the debt, a loan moratorium, a 20% increase in cuts made in the System's administrative expenses, the inclusion of the 11,000 teachers who work in private schools, the imposition of an entry and departure tax on nonresident aliens,[30] and requiring savings and credit unions, as well as insurance companies in their notarial operations, to pay stamps, vouchers and fees. The measures

---

[27] This refers to money deposited but not credited to the recipient's account. That money earns interest for banks during this process.

[28] It was even found that the measures incorporated by Act No. 160 would generate $95.5 million in funds for the System.

[29] It was pointed out that the adult entertainment machines generated $1.8 billion annually, of which 60% is distributed among players tax free; thus, the imposition of a 10% tax on this sum would bring in $108 million annually.

[30] This tax could allocate $20 million to the System annually.

CT-2014-2; CT-2014-3                                                          13
Justice Estrella Martínez, concurring                          (Official Translation)

submitted would generate $450 million that would serve to address the System's operational deficit.[31] Finally, these measures were collected in a Final Report issued on February 6, 2014, which stated that those measures could address the System's operational and fiscal deficit.[32]

In light of these facts, it is quite clear that Act No. 160 of 2013 is not the only alternative that the State should have considered to address the cash flow deficit that has influenced the increase in the System's actuarial deficit.

IV

Here the State has acknowledged and stipulated that Act No. 160 of 2013 constitutes an impairment of contractual obligations because it adversely affects the System participants' retirement. Nonetheless, it is imperative to underline some of the implications of implementing Act No. 160 of 2013. This will allow us to objectively see if this is the most reasonable governmental action.

To that end, I will focus on the changes that Act No. 160 of 2013 will impose on petitioners (that is, on active participants who currently are contributing System members). First, sec. 3.9(c) of Act No. 160 of 2013 both limits and increases the retirement age to 55 with 30 years of service or to 60 years of age with five years of service for active participants who are not entitled to retire under Act No. 91 of 2004. Consequently, these employees are now denied the opportunity to retire under the different stages established by Act No. 91 of 2004, under which they have contributed, and forces them to work longer than expected; what is worse, they will not have the right to receive the pensions to which they once were entitled. They will not even have the 75% average retribution granted to teachers under Act No. 91 of 2004. Moreover, the sworn statements examined show that the changes brought by Act No. 160 of 2013 will cause a drop in the retirement pension ranging from 17% to 37%.

The reason for this is that Act No. 91 of 2004 provided for a lifetime pension upon retirement that was established through a formula based on average salary and years of service. Thus, the System participant knew what his or her pension would be at the time he or she needed it most. However, Act No. 160 of 2013 acknowledges this defined benefit up to the time of its passage, plus the accumulated contributions of the employee and the returns thereof. Under this present scheme, the participant does not really know how much will be actually available at the time of retiring. This is because sec. 5.10(c) of Act No. 160 of 2013 provides that the accumulated pension will be calculated at the time of retirement on the basis of the accumulated balance of the participant's contributions to the Defined Contribution Account divided by a factor established by the Board in consultation with its actuaries and to be determined on the basis on the actuarial life expectancy of the participant and a specific

---

[31] See Eva Laureano, *Consenso irresoluto del Comité de Diálogo de maestros*, Noticel (February 6, 2014), at http://www.noticel.com/noticia/155425/consenso-irresoluto-del-comite-de-dialogo-de maestros.html.

[32] See Final Report of the Dialogue and Negotiation Committee on the Teachers Retirement (February 6, 2014, at http://ampmet.org/articles_files/documents/Informe%20Final%20Comite%20de%20Dialogo%20y%20Negociacion%20SRM%20FADSRM.pdf.

CT-2014-2; CT-2014-3                                                        14
Justice Estrella Martínez, concurring                          (Official Translation)

interest rate. Therefore, there are three factors out of the participant's control. On the basis of those factors, the teacher's pension could be reduced if the actuary determines that the life expectancy could rise. Consequently, the participant cannot plan his or her retirement because he or she cannot count on a defined amount with which he or she may adequately plan his or her retirement. In addition, these employees will receive no Summer Bonus ($100), no Medications Bonus ($100), and no Christmas Bonus ($600).[33] But more important is the fact that they are not entitled to receive Social Security or Medicare benefits. Therefore, they lack the protection afforded by complementary benefits to address their needs.

To justify the pension change, the State provided in sec. 4.4 of Act No. 160 of 2013 a clause that allows those who complete 30 years of credited service between August 1, 2014, and July 30, 2016, to retire with a pension equivalent to 70% of the average salary. However, participants who have not reached age 55 must continue to make individual contributions until they reach that age. Moreover, participants who choose this option must retire before July 31, 2014; this would imply a drop in their monthly earnings, since the retirement pension is lower than their salary. These participants are incentivized to retire on or before July 31, 2014, in order to receive the Medications Bonus, Christmas Bonus, and a contribution to the health plans.[34]

The State intends to protect the change effected in the formula by arguing that Act No. 160 of 2013 guarantees a minimum pension of $1,625; but a closer look at sec. 3.11(a) of the statute reveals that this minimum pension is not available to all participants. In fact, it applies only to those participants who join the System as of August 1, 2014, and reach the retirement age of 62 with five years of service, and to those who were active prior to that date, but were not eligible for retirement when Act No. 160 of 2013 was passed and plan to retire when they reach the newly established retirement age of 55 with 30 years of service.[35] Therefore, this does not apply to employees who met retirement requirements when the act was passed. It rewards those who enter the System as of August 1, 2014, since with only five years of service and a minimum contribution of $10,000, they would have a guaranteed minimum pension of $1,625. However, most active participants lack this protection.

On the other hand, Act No. 160 of 2013 increases the participants' individual contribution from 9% to 14.02% in less than six years, but increases the employer's contribution after 2021 only from 19.75% to 20.525%; that is, by less than 1%.[36] This, far from benefitting teachers, demoralizes and marginalizes this working class even more. Teachers who go to the classroom to educate others, and who oftentimes use their own money to do so, are thus injured by a salary drop with no foreseeable retirement cushion.

[33] See sec. 2 of Act No. 160 of 2013.

[34] See sec. 4.9 of Act No. 160 of 2013.

[35] See Stipulation No. 81 of the Special Master's Report, Case No. CT-2014-0003, vol. 4.

[36] See sec. 4.3(b) of Act No. 160 of 2013.

In turn, Act No. 160 of 2013 modifies the requirements for a disability pension by requiring in its sec. 4.6 at least five years of service to be eligible for this benefit and by imposing a pension cap of 33% of the participant's average salary. This represents an unreasonable change in the terms of the participant's appointment.[37]

Moreover, the $100 allotment to increase the minimum pension of those who retire on or before July 31, 2014,[38] is actually reduced because it absorbs the impact of the loss or drop in some of the benefits granted through special laws, as would be the reduction in the Summer Bonus and the $400 drop in the Christmas Bonus.[39] Likewise, although Act No. 160 of 2013 provides that those participants who meet retirement requirements under Act No. 91 of 2004 could enjoy those benefits in addition to what they accumulate through their defined contributions, this is unlikely to occur, since the statute provides that in these cases the contributions made before August 1, 2014, will be used to pay for those pensions.[40]

And as if this was not enough, Act No. 160 of 2013 raises the interest paid for the recognition of uncredited services, limits the power to return and transfer contributions, and modifies death benefits.

V

In view of these modifications, teachers unanimously argue that the passage of Act No. 160 of 2013 substantially and unreasonably impairs their retirement rights; that there are less burdensome alternatives that the State discarded without due consideration; and that no studies were made to show the real effects of Act No. 160 of 2013.

In the instant case, it was stipulated that the reform imposed by Act No. 160 of 2013 substantially impairs the State's obligations because it adversely affects the teachers' retirement expectations.

In view of this reality, our role demands that we examine if the changes brought about by Act No. 160 of 2013 pursue an important interest in furtherance of the general welfare and if they are reasonable and necessary to advance that interest. However, the existence of an important public interest alone does not always justify a severe contractual impairment. Therefore, we must determine whether the State's commitments are substantially affected. In doing so, it is crucial to seek the true reason behind the modification. We must bear in mind that the deference accorded to the State's action is diminished because the State always protects its own interests. Thus, the measure will be upheld if it is deemed reasonable and necessary.

The provision will be deemed reasonable if it mitigates circumstances unforeseen or unintended by the State and will be upheld if deemed necessary; that is, if there is no less radical or severe alternative to advance the State's purpose.

---

[37] See sec. 4.6(b) of Act No. 160 of 2013.

[38] See sec. 3.11(b) of Act No. 160 of 2013.

[39] See sec. 4.9 of Act No. 160 of 2013.

[40] See sec. 5.4(b) of Act No. 160 of 2013.

CT-2014-2; CT-2014-3                                             16
Justice Estrella Martínez, concurring                   (Official Translation)

Although the State was aware of the System's precarious situation, it failed to implement measures to address the crisis and contributed to deepening said crisis. Thus, the State, among other things, continued to create retirement windows, failed to raise the amount of necessary contributions, failed to allocate and disburse funds to cover the additional benefits granted, turned a blind eye to the changes in the life expectancy of System participants, and even breached its duty to provide sufficient funding as an employer to cover those who opted for an early retirement.

All these actions show that the State was not unaware of the System's situation. On the contrary, the situation was foreseeable and intended. The State knew that the retirement structure for the teachers was not sustainable, but failed to make the necessary modifications and made the situation worse by not providing the necessary funding. Consequently, the System began to decline because of the "bad management of the contributions needed to support the [S]ystem in order to obtain the maximum return on the investments." See José M. Pérez Díaz, *Opinión actuarial sobre la nueva Ley 160-2013 - Sistema de Retiro de Maestros de Puerto Rico* [Actuarial Opinion on the New Act No. 160 of 2013 - Puerto Rico Teachers Retirement System], at 6, Case No. CT-2014-0002, vol. 1; Morningstar Pension Report of November 20, 2013, at http://www.noticel.com/uploads/gallery/documents/Commonwealth_of_Puerto_Rico_PensionReport1.pdf.

On the other hand, the only grounds on which the act intends to rest is the June 30, 2012, Actuarial Valuation Report, which does not contain, and neither was it drafted for the purpose of analyzing, studying, and presenting different alternatives to change the System. Said report is merely a fiscal accounting status report; consequently, the passage of Act No. 160 of 2013 lacks an evaluation of its deliberate or unforeseen implications. Neither is there an actuarial study in support of its feasibility. See the Motion on Evidence by Petitioner Puerto Rico Teachers Association, App. XXVII, Expert Report of Jaime L. Del Valle Caballero, Appendix: José I. Alameda Lozada and Alfredo González Martínez, *Análisis de los fundamentos económicos asociados a la Ley de Reforma del Sistema de Retiro de los Maestros de Puerto Rico* [Analysis of the Economic Grounds for the Reform Act of the Puerto Rico Teachers Retirement System] 3, 11-12, and 14; Case No. CT-2014-0003, Part 3; Expert Report of Fernando J. Troncoso, App. II to the Motion to Submit Expert Reports and Sworn Statements by Intervenor ODAE, Case No. CT-2014-0003, vol. 2.

On this point, for instance, we do not know what effect the retirement en masse of teachers may have because of the passage of Act No. 160 of 2013. In that sense, there is concern that a retirement en masse would directly affect the System by increasing its maturity, since inactive members would outnumber active members, and this would entail a drop in contributions to the System.[41] Likewise, the immediate impact would be

_____

[41] It is estimated that some 7,000 teachers may opt for retirement upon the passage of Act No. 160 of 2013. It must be noted that the System informed 10,000 participants about the effects of Act No. 160 of 2013. See the Sworn Statement of Wanda G. Santiago López, the System's Acting Executive Director para. 20, at 5, Case No. CT-2014-0003, vol. 1. According to Milliman's Puerto Rico Teachers Retirement System June 30, 2012 Valuation Report, Section VII, Item B.,

CT-2014-2; CT-2014-3                                    17
Justice Estrella Martínez, concurring              (Official Translation)

on the System's assets, which would then have to be used to solve the situation. From an actuarial standpoint, if 5,000 employees should retire under Act No. 160 of 2013, the assets would be wiped out by 2022; if it were 10,000 employees, this would happen in 2018; and if 15,000 were to retire, the assets would be exhausted in 2016. See Actuarial Opinion of José M. Pérez Díaz, *supra*, at 12. It is not known whether the existing contributions suffice to cover that part of the pension that falls under Act No. 91 of 2004, and whether the contributions under the new defined system would suffice to guarantee a minimum pension of $1,625 to those eligible.

As petitioners well argued, it is not an indispensable requirement to cover 100% of the future obligations of pension plans. In fact, the median in the States of the Union is 68.4%. Thus, a reasonable coverage—about 65% of the fund's obligations—has the effect of considerably reducing the annual amortization needed, since the actuarial deficit would be $6.6 billion. See the Expert Report of Jaime L. Del Valle Caballero, *supra*, at 6 and 11. However, if we examine the statute, it is clear that it also fails to achieve the public purpose sought: to prevent the erosion of the System's funds in order to close the gap between the net assets and those needed to continue paying pensions. Much less does the statute guarantee that the State will not have to put in money to save the System in the long run. This was made clear when it was found that the main effect would be to extend the amount of the System's assets to 2038.[42] Actuarial Opinion of José M. Pérez Díaz, *supra*, at 11. Likewise, the measures adopted to inject funds into the System would only result in a recurring annual increase of $54.5 million, plus the increase in individual contributions,[43] which is insufficient to cover the stipulated $322 million deficit for the next fiscal year. See the Expert Report of Jaime L. Del Valle Caballero, *supra*, at 7. The State, in turn, does not immediately inject cash flow into the System. We see that it is not until fiscal year 2016-2017 that the State will commit itself to make the $30 million Teachers Justice Uniform Contribution.[44] This sounds like a paradox, considering that the

---

at 40, there are 1,490 teachers who qualify for a pension of 75% of the highest average salary because they have 30 years or more of service and 50 years of age; 4,339 teachers who have at least 25 years but less than 30 years of service and are 50 years old and, thus, qualify for a pension of 1.8% of the average compensation multiplied by the number of credited years; 8 teachers with 30 years of service and less than 50 years of age; 447 teachers with at least 25 years but less than 30 years of service, who are older than 47 but younger than 50, and who therefore qualify for 95% of the 1.8% of the average compensation multiplied by the years of credited years; and 1,260 active members who are at least 60 years old and have at least 10 but less than 25 years of service. It is important to point out that according to the cited actuarial report, 1,400 active members who retired after the last valuation represented $90 million in lost contributions. *Id.* at 5. It bears noting that even if all the vacancies were filled, there would be a drop in the payroll that directly impacts the contribution to the System.

[42] Of course, this is assuming that the law would not trigger a retirement en masse.

[43] According to the Milliman Puerto Rico Teachers Retirement System June 30, 2012 Actuarial Valuation Report, *supra*, at 20, we calculated the individual contribution increase at $13,882,290 ($1,338,229,000 x .01).

[44] Pursuant to sec. 7.1 of Act No. 160 of 2013, this contribution would increase to $60 million as of fiscal year 2018-2019 and until fiscal year 2041-2042.

State, in rejecting the options proposed by the teachers unions, stated that their suggestions "are not enough to reduce the current actuarial and cash flow deficit of the System." See Statement of Motives of Act No. 160 of 2013, at 16.[45]

In conclusion, the bill passed substantially impairs the contract of active System members without having conducted an evaluation of the benefits and socio-economic costs, the feasibility of the proposed new System, or the alternative measures submitted. Worse yet, the evaluation of the measures included in Act No. 160 of 2013 projects an erosion of the System's fiscal status and represents a misstep regarding the interest sought to be advanced.

This analysis shows that the governmental action in passing Act No. 160 of 2013 is not reasonable because it does not involve a situation unforeseen by the State. Neither can we conclude that the action was necessary. Based on the State's own actions, there are less drastic measures that could have been taken to protect the pension rights of active System members.

### VI

Against this legal backdrop, it is unquestionable that Act No. 160 of 2013 is unconstitutional because it was passed without adequate analysis and, what is even more important, because it substantially impairs the State's contractual obligations with the teachers in an unnecessary and unreasonable manner without achieving the purposes for which it was passed.

Adopting the State's position would be tantamount to strangling the System's solvency before 2020 and accelerating the demise it sought to avoid. Therefore, we must perforce conclude that Act No. 160 of 2013 is unconstitutional insofar as it affects active System participants from the moment of its implementation, and because it modifies the benefits granted to participants under Act No. 91 of 2004.[46] Consequently, I concur with the decision of this Court.

JMS/mal

---

[45] It must be noted that the credit rating agencies have stated that unfunded pension liabilities are still very high. See: *Moody's Downgrades Puerto Rico GO and Related Bonds to Ba2, Notched Bonds to Ba3 and COFINA Bonds to Baa1, Baa2: Outlook Negative (February 7, 2014),* at https://www.moodys.com/research/Moodys-downgrades-Puerto-Rico-GO-and-related-bonds-to-Ba2--PR 202399; *Fitch Downgrades Puerto Rico GO and Released Bet Rating to 'BB'; Outlook Negative (February 11, 2014),* at http://www.businesswire.com/news/home/20140211006233/en/Fitch-Downgrades-Puerto-Rico-Related-Debt-Ratings.

[46] The collegial process ordinarily requires reaching a consensus in which some members of the majority not always are fully satisfied with the totality of the remedies granted in the Opinion of the Court. This situation becomes more patently clear at this historic juncture where any justice done to teachers requires, pursuant to the Puerto Rico Constitution, a minimum of five votes to decree the unconstitutionality of the statute. That is why I concurred with the opinion of this Court, because it unravels the principal evils engendered by Act No. 160 of 2013. Now, the courtesy inherent to a collegial process does not force me to shy away from my pronouncements in *Cruz et al. v. ELA,* 189 D.P.R. __ [89 P.R. Offic. Trans. __] (2013), with regard to the benefits granted through special laws.

(Official Translation)

IN THE SUPREME COURT OF PUERTO RICO

Teachers Association of Puerto Rico *et al.*,

    Petitioners

           v.              CT-2014-2

Puerto Rico Teachers Retirement
System *et al.*,

    Respondents

---

| Educadores/as por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., individually and on behalf of its members, *et al.*, | Consol. with | Intrajurisdictional Certification |
|---|---|---|

    Petitioners

           v.

Puerto Rico Teachers Retirement
System *et al.*,           CT-2014-3

    Respondents

JUSTICE FIOL MATTA, with whom CHIEF JUSTICE HERNÁNDEZ DENTON joins, dissenting.

San Juan, Puerto Rico, April 11, 2014

       The case under our consideration requires that we strike a balance between two very important interests. On the one hand, there is the public interest of the State in guaranteeing the fulfillment of its obligations through legislative measures that prove economically feasible and in making sure that it has the budget it needs to provide all citizens with basic health, education, and public safety services. On the other hand, there is the interest of public school teachers in having the State meet the retirement conditions that were in effect at the time of contracting. Both the State and the teachers argue that their prime motivation is to secure a dignified retirement for teachers. This dissent is also in response to that concern.

       We must examine the constitutionality of Act No. 160 of 2013, the Commonwealth of Puerto Rico Teachers Retirement System Act, passed on December 24, 2013, to reform the Puerto Rico Teachers Retirement System (Retirement System) created through Act No. 91 of 2004 (18 L.P.R.A. § 391 *et seq.*). Among the changes made to the Retirement System is its transformation from a defined benefits plan to a defined contribution

CT-2014-2; CT-2014-3                                                  2
Justice Fiol Matta, dissenting                        (Official Translation)

system. The act also raises retirement age and individual and employer contributions. It also eliminates additional benefits created through special laws.

The report submitted by the Hon. Ángel Pagán Ocasio, who was appointed Special Master to collect the evidence presented by the parties,[1] depicts a moribund retirement system that has been affected by the State's fiscal and financing default and that has failed to achieve sustainability and self-sufficiency.[2] The report further states that the System's assets are less than its debts and, consequently, that in view of the insufficient income from contributions or investment returns, it has been necessary to sell its non-liquid assets to raise cash flow in order to cover benefit payments.[3] As of June 30, 2013, this has created an actuarial deficit of $10,251,273,000[4] and a cash flow deficit of $334.5 million.[5] The report reveals that the fiscal situation of the Retirement System is critical and warrants immediate attention and that, because of the governmental crisis faced by Puerto Rico, its reformulation must be quickly addressed.

Plaintiffs and defendants stipulated before the Special Master that the Retirement System Reform constitutes an impairment of the State's obligations because it adversely affects the teachers' retirement expectations.[6] They also acknowledged that according to the Milliman Actuarial Valuation Report, the System's assets would be exhausted by fiscal year 2019-2020 if the government does not inject more funds than those it must provide under the law.[7] If a change is not made, the Government's General Fund would have to assume the deficiency between the System's income and the cost of pension payments and administrative expenses.[8]

The System's financial crisis led the Legislature to enact a bill to reform the Teachers Retirement System. The State alleges that it intended to secure the payment of teacher pensions. The teachers, in turn, argue that the retroactive application of the new retirement system violates the constitutional clause against the impairment of contractual obligations.[9]

---

[1] AMPR et als. v. Sist. Retiro Maestros I, 190 D.P.R. __[90 P.R. Offic. Trans. __] (2014). On February 7, 2014, the Special Master submitted his report, indicating that the parties had submitted the case on the sworn statements of the testifying witnesses and on documentary evidence consisting mostly of expert reports by different professionals. In his report, the Special Master indicated that he was not able to observe the demeanor of neither the witnesses nor the experts who testified and, thus, could not assess the credibility of their testimony. As the majority opinion did, I accept the Master's findings of fact.

[2] Finding of Fact No. 102, Special Master's Report at 35, Case No. CT-2014-0003, vol. 4.

[3] Finding of Fact No. 103, at 35.

[4] Finding of Fact No. 105, at 35-36.

[5] Finding of Fact No. 106, at 36.

[6] Finding of Fact No. 84, at 32.

[7] Finding of Fact No. 86, at 32.

[8] Finding of Fact No. 90, at 33.

[9] P.R. Const. art. II, § 7 (L.P.R.A., vol. 1). This clause stems from sec. 2 of the Jones Act of 1917. 3 José Trías Monge, Historia constitucional de Puerto Rico 187, Río Piedras, Ed. U.P.R. (1982).

CT-2014-2; CT-2014-3                                                          3
Justice Fiol Matta, dissenting                              (Official Translation)

    The main purpose of that constitutional limitation is to ensure the stability of legal transactions and promote the certainty of contractual relations.[10] However, the constitutional protection against the impairment of contractual obligations is not absolute and may be balanced against the State's police power.[11] This is because in our legal system, the State has the power to regulate and advance measures for the common good. Accordingly, not every contractual impairment is unconstitutional; its validity must be examined in light of the legal standards established therefor.[12]

    On previous occasions we have faced the need to strike that balance; thus, we have developed some tests for determining the constitutionality of a law under the clause against the impairment of contractual obligations when the State is a party to the contract. In gist, the change under examination must be, aside from reasonable, necessary to advance an important governmental purpose.[13] In fact, we have had the opportunity to address this matter in fact situations that were very similar to those of the case at bar when we considered the constitutionality of other public employee retirement system reforms.[14]

    As far back as 1987, in *Bayrón Toro v. Serra*, 119 D.P.R. 605 [19 P.R. Offic. Trans. 646] (1987), this Court distanced itself from the idea that government retirement system pensions were state gratuities.[15] There, we held that participants in a Government Retirement System have a property interest of a contractual nature.[16] This interest arose from the moment the employee joined the system and was protected by the constitutional guarantee against the impairment of contractual obligations. Accordingly, "prior to the employee's retirement, the Government may amend the terms and conditions of the retirement, if such amendments are reasonable and seek to further the actuarial solvency of the system."[17] However, we did explain that once the employee retires, his or her pension cannot be changed.

    In that case we had the opportunity to examine the constitutionality of the amendments made to the Regulations of the University of Puerto Rico Retirement System. Among the amendments we examined there was a rise in the age at which system participants with at least 30 years of service could retire and receive 75% of their average

---

    [10] *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828, 834 [88 P.R. Offic. Trans. __, __] (2013); *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 395 [1 P.R. Offic. Trans. 527, 550-551] (1973).

    [11] *Trinidad Hernández et al. v. ELA et al.; Bayrón Toro v. Serra*, 119 D.P.R. 605, 619-620 [19 P.R. Offic. Trans. 646, 661-662] (1987); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977).

    [12] *Bayrón Toro v. Serra*, 119 D.P.R. at 619 [19 P.R. Offic. Trans. at 661]; *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 834 [88 P.R. Offic. Trans. at __].

    [13] *Bayrón Toro v. Serra*, 119 D.P.R. at 620 [19 P.R. Offic. Trans. at 662].

    [14] *Bayrón Toro v. Serra; Trinidad Hernández et al. v. ELA et al.*

    [15] *Bayrón Toro v. Serra*, 119 D.P.R. at 618 [19 P.R. Offic. Trans. at 660].

    [16] *Id.* at 607-608 [19 P.R. Offic. Trans. at 649].

    [17] *Id.* at 618 [19 P.R. Offic. Trans. at 660]; *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 835 [88 P.R. Offic. Trans. __].

CT-2014-2; CT-2014-3                                                           4
Justice Fiol Matta, dissenting                                    (Official Translation)

compensation. Another amendment limited the eligibility criteria for receiving a retirement
annuity for years of service and increased individual contributions to the system fund. We
took into account the fact that the University's retirement system was in such a "serious
actuarial crisis that it ran the risk of having to liquidate its assets."[18] The changes were
therefore "essential to preserve the solvency of the fund."[19] Given the interest in preserving
the system's solvency, this Court held that the State should have flexibility to make
reasonable modifications that are necessary to strengthen the foundations of the system,
and we concluded that the acknowledgement of this power was indispensable to the
system's success. Thus, we held that those modifications were reasonable and necessary
and sought to preserve the system's actuarial solvency.

    In a more recent case, *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. 828 [88
P.R. Offic. Trans. at __] (2013), this Court examined a delicate issue: a claim of
unconstitutional impairment of contractual obligations raised by hundreds of public
employees affected by Act No. 3 of 2013, which reformed the Employees Retirement
System of the Government of Puerto Rico and its Instrumentalities. The reform essentially
froze the accumulation of benefits and raised retirement age in a staggered fashion for
participants who were close to said age, in a manner similar to the so-called retirement
"window" established by the statute under our consideration here. Act No. 3 of 2013 also
increased individual contributions, moved active public employees to a defined
contribution plan, and modified the benefits granted through special laws in order to
employ the savings to create funding for the system. After finding that said reform
substantially impaired the obligations of the State and of the employees, we examined the
changes to determine whether those modifications advanced an important interest in
furtherance of the general welfare by ensuring the system's actuarial solvency.

    Our analysis took into account the fact that by fiscal year 2018-2019, the public
employee retirement system would be left without sufficient funds to cover pension
payments. Moreover, we noted that the magnitude of the deficit in the Public Employee
System and the Teachers Retirement System was equivalent to more than four times the
annual General Fund revenues.[20] On those grounds, we deemed that the reform established
by Act No. 3 of 2013 was reasonable and necessary because it guaranteed the system's
solvency.[21] Finally, we reaffirmed that the Legislature's determination on the enacted
bills constituted an exercise of public policy that deserved judicial deference under our
separation of power system.[22] We concluded that Act No. 3 of 2013 was an exercise of

---

[18] *Bayrón Toro v. Serra*, 119 D.P.R. at 621-622 [19 P.R. Offic. Trans. at 664].

[19] *Id.* at 623 [19 P.R. Offic. Trans. at 664].

[20] *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 837 [88 P.R. Offic. Trans. at __].

[21] *Id.*

[22] *Id.* at 838 [88 P. R. Offic. Trans. at __];   *Domínguez Castro et al. v. E.L.A. I*, 178
D.P.R. 1, 45 [78 P.R. Offic. Trans. ___, ___] (2010).

CT-2014-2; CT-2014-3                                                    5
Justice Fiol Matta, dissenting                         (Official Translation)

the legislative prerogative to adopt measures that would prevent the collapse of the public employee retirement system. [23] We also held that the statement of motives of the law supported the conclusion that the statute was reasonable and necessary to address the financial crisis that jeopardized the solvency of said system.

Today, however, faced with a law that practically has the same consequences for teachers that Act No. 3 of 2013 had for public employees, and which pursues the same aim of ensuring the solvency of the system, a majority of this Court applies the same standard of review, yet arrives at a different conclusion. The Opinion of the Court holds that under the constitutional prohibition against the impairment of contractual obligations, "Act No. 160 of 2013 is unreasonable and, consequently, unconstitutional . . . insofar as it alters plaintiffs-petitioners' contractual right to their retirement pension under Act No. 91 of 2004." [24]

Among the provisions of the law that the Opinion of the Court does not endorse are: the increase in minimum age for those retiring as of August 1, 2013; [25] the increase to 62 as the new minimum age of retirement for new teachers;[26] the increase in individual teacher contributions,[27] and the imposition of a cap on disability pensions equivalent to 33% of the salary averaged over five years.[28] Moreover, the provision that establishes a minimum pension of $1,625 for teachers who are active as of July 31, 2014, and who cannot retire on that date with a pension benefit equal to or higher than 65% of the average salary,[29] is repealed, as well as the provision that excludes from the minimum pension those active teachers who retire with less than 30 years of service as of August 1, 2014.[30] Furthermore, the provision that bars some participants from applying for reimbursement of their contributions[31] and the one that creates an early retirement window incentive[32] are declared unconstitutional.

The majority specifically applies the reasonableness text and concludes that the State did not take into account the impact of a retirement en masse of teachers incentivized by the early retirement window created by sec. 4.4(a) of the law and by the elimination of the benefits granted through special laws for participants who retire as of August 1, 2014. On this point, the majority concludes that a retirement en masse would

---

[23] *Trinidad Hernández et al. v. ELA et al.,*188 D.P.R. at 836 [88 P.R. Offic. Trans. at ___].

[24] Majority opinion at ___.

[25] Sec. 3.9 of Act No. 160 of 2013.

[26] *Id.*

[27] Secs. 4.3 and 5.5 of Act No. 160 of 2013.

[28] Sec. 4.6 of Act No. 160 of 2013.

[29] Sec. 3.11 of Act No. 160 of 2013.

[30] *Id.*

[31] Sec. 5.10 of Act No. 160 of 2013.

[32] Sec. 4.4(a) of Act No. 160 of 2013.

CT-2014-2; CT-2014-3                                                              6
Justice Fiol Matta, dissenting                                  (Official Translation)

place the system on even shakier grounds, exhausting its assets before 2020. The Majority understands that the State failed to rebut the plaintiffs' allegations and concludes that "Act No. 160 of 2013 does not further the important state interest required by our constitutional system in the case of retirement system reforms: to guarantee the very solvency of the system." (Emphasis suppressed.)[33]

To reach this conclusion, the majority resorts primarily to two expert reports submitted by the Puerto Rico Teachers Association and the Organización de Directores y Administradores Escolares de Puerto Rico [Organization of School Directors and Administrators of Puerto Rico] (ODAE [by its Spanish acronym]). It bears noting that no evidentiary hearing was held during the proceedings before the Special Master; rather, the parties agreed to submit their case on sworn statements and expert documentary evidence. Consequently, since there was no finding as to the credibility of the witnesses and experts, the probative value to be assigned to the expert reports will depend exclusively on how well grounded their arguments (and especially their conclusions) are.

The ODAE expert, Actuary José M. Pérez Díaz, points out that his report does not represent an actuarial valuation of the Retirement System and admits that the Milliman valuations meet the Actuarial Standards of Practice requirements for the actuarial profession in the United States.[34] He states that he used the data, results and conclusions of the Milliman report for his study, and that he developed a "quite complex financial model" to predict the impact of Act No. 160 of 2013 on the Retirement System as of 2013.

The report does not describe the model he developed or the grounds and methods he employed. It tersely states that "the principal effect of the law would be to extend the amount of the System's assets until 2038, the same year on which the system would begin with the same amount of assets with which it commenced in 2013. In other words, the system practically would not develop assets from 2013 to 2038 because of the overwhelming pension benefits it must pay. The assets would then be completely exhausted by 2057." (Emphasis suppressed.)[35] The actuary then concludes that the sudden retirement of thousands of participants would accelerate the collapse of the system even before 2020. However, he does not explain how he reached this conclusion or what was factored into his analysis. It seems to me that this report does not deserve the credibility accorded to it by the majority in declaring the measure unreasonable.

The report of economists Alameda and González Martínez has the same deficiency.[36] The citation mentioned in the majority opinion also lacks a satisfactory

---

[33] Majority opinion at ____.

[34] José Pérez Díaz, *Opinión actuarial sobre la Nueva Ley 160-2013 - Sistema de Retiro de Maestros de Puerto Rico* [Actuarial Report on the New Act No. 160 of 2013 - Puerto Rico Teachers Retirement System] 2, Case No. CT-2014-0002, vol. 1.

[35] *Id.* at 11.

[36] We note that this report, *Análisis de los fundamentos económicos asociados a la ley de reforma del Sistema de Retiro de los Maestros de Puerto Rico* [Analysis of the Economic

CT-2014-2; CT-2014-3                                                                    7
Justice Fiol Matta, dissenting                                    (Official Translation)

explanation of the model used to reach the conclusion that the retirement of 7,000, 10,000, or 12,000 teachers would trigger a significant erosion of the System's funds. Although it is obvious that an increase in the number of pensioners would be a major burden on the System, none of the reports considers whether the structural reform of the System and other measures that could provide additional contributions would offset the effect of a retirement en masse of teachers. The evidence presented is insufficient to conclude that the System reform approved by the Legislature would worsen the Systems' solvency.

On the other hand, the legislative history of the bill shows that the Acting Executive Director of the Teachers Retirement System, Wanda Santiago López, mentioned the importance of observing how many teachers would retire, since this would dictate that the system would have to assume more obligations.[37] Santiago López recommended an evaluation of the possibility of advancing the commencement date of the Additional Annual Contribution and of the Teachers Justice Uniform Contribution. In her sworn statement, the Director also pointed out that "even counting the impact of the window created by Act No. 160 of 2013, the contributions from the General Fund necessary for the System's solvency are way below the approximate additional $562 million that would be needed in annual contributions from the General Fund for the System to survive without the Reform."[38]

The Court majority deems that Act No. 160 of 2013 is unreasonable because it does not advance the important governmental interest required by caselaw for this type of situation: ensuring the solvency of the Retirement System. Its conclusion is based on a premise that, though possible, is speculative. The majority believes that the law could trigger a retirement en masse of teachers. Based on this sole assumption, it jumps to the conclusion that the retirement en masse would cause the System's collapse.

However, the legislative history reveals that the Legislature did consider the potential negative impact that the retirement en masse of teachers would cause on the System's cash flow as a result of the reform, and it identified at least one alternative

---

Grounds for the Reform Act of the Puerto Rico Teachers Retirement System] is cited as reference by one of the experts of the Teachers Association, Jamie L. Del Valle Caballero, in his report *Evaluación económica de posibles fuentes de recaudos y el impacto de estos sobre la situación económica del Sistema de Retiro de Maestros* [Economic Assessment of Possible Sources of Income and their Impact on the Economic Situation of the Teachers Retirement System] (January 30, 2014), Case No. CT-2014-0003, vol. 3. It must be noted that Del Valle Caballero does not cite in his report the conclusion reached by the economists that the retirement en masse would significantly erode the Retirement System's funds.

[37] See *Informe Conjunto de las Comisiones de Asuntos Laborales y Sistemas de Retiro del Servicio Público y la Comisión de Hacienda y Presupuesto de la Cámara de Representantes* [Joint Report of the House Labor Affairs and Public Service Retirement Systems Committee and the Treasury And Budget Committee] (December 21, 2013); *Informe Positivo sobre el P. de la C. 1589 de la Comisión de Hacienda y Finanzas Públicas del Senado* [Positive Report of the Senate Treasury and Public Finances Committee on H.B. 1589] (December 21, 2013); and *Segundo Informe Positivo sobre el P. de la C. 1589 de la Comisión de Hacienda y Finanzas Públicas del Senado* [Second Positive Report of the Senate Treasury and Public Finances Committee on H.B. 1589] (December 23, 2013).

[38] Sworn Statement of Wanda G. Santiago López at 4-5, Case No. CT-2014-0003, vol. 1.

CT-2014-2; CT-2014-3                                                    8
Justice Fiol Matta, dissenting                              (Official Translation)

should this occur. It was also found that should this problem arise, it would take *much less* to face it than what it would take to ensure the solvency of the existing system. Thus, the lawmaker considered the issue, examined it, and determined that it was neither necessary nor convenient to do anything until its true impact was determined; that is, until such a time that speculation would yield to reality.

Therefore, the majority decision constitutes an interference with the prerogatives of the Legislature that is repugnant to the deference required in our separation of powers system. We cannot undermine the efforts of the political branches to address the serious economic problems that the country faces today. This is a very complex issue that is tied to the precarious fiscal situation of the Central Government. The State has stressed that this is not an isolated measure but part of the restructuring of all public retirement systems, as well as of the expenses of the Central Government. The evaluation of this measure cannot be based merely on the possibility that a particular situation could arise that may produce an undesired effect. Such a highly important legislative decision should not be cast aside because of speculations based on groundless conclusions.

In view of the above, and because I believe that the Legislature acted in furtherance of the higher interest of ensuring that the teachers will be paid their pensions in the near future, I dissent.

JMS/mal

(Official Translation)

IN THE SUPREME COURT OF PUERTO RICO

Teachers Association of Puerto Rico *et al.*,

    Petitioners

              v.               CT-2014-2

Puerto Rico Teachers Retirement System *et al.*,

    Respondents

Intrajurisdictional
Certification

Educadores/as por la Democracia, Unidad,
Cambio, Militancia y Organización Sindical, Inc.,
individually and on behalf of its members, *et al.*,

    Petitioners

              v.               CT-2014-3

Puerto Rico Teachers Retirement System *et al.*,

    Respondents

JUSTICE RODRÍGUEZ RODRÍGUEZ, dissenting.

San Juan, Puerto Rico, April 11, 2014

> *[T]he lawless science of our law,—*
> *That codeless myriad of precedent,*
> *That wilderness of single instances . . . .*
>
> Alfred, Lord Tennyson, *Aylmer's Field*

For reasons beyond comprehension and the scope of the Law, a majority of this Court today announces to the country that the Commonwealth of Puerto Rico Teachers Retirement System Act, Act No. 160 of December 24, 2013, does not pass the constitutional test that we recently applied to uphold the constitutionality of the Reform of the Commonwealth of Puerto Rico Employees Retirement System, Act No. 3 of April 4, 2013.

The majority reaches this result by carrying out, without a twinge of embarrassment, two unexpected acts: distorting and ignoring, to a great extent, the contract impairment analysis made by this Court scarcely months ago to uphold the validity of the Act to Reform the Commonwealth of Puerto Rico Employees Retirement System. As the country well knows, both laws are practically identical and both intended to address the actuarial precariousness of both retirement systems through very similar mechanisms that were aimed at solving such precariousness. There is no *legal justification* for upholding the constitutionality of that law, but not of this one.

CT-2014-2; CT-2014-3
Justice Rodríguez Rodríguez, dissenting

2

(Official Translation)

The majority has also banished from its discourse the old mantra about the deference owed to the Legislative Power, which it used in the last electoral term to validate countless pronouncements and opinions in which it refused to scrutinize statutes passed by the former Legislative Assembly. It suffices to remember, for instance, *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. 1 [78 P.R. Offic. Trans. 1] (2010), in which the majority, faced with a similar argument about the impairment of contractual obligations, validated the Special Act Declaring a State of Fiscal Emergency and Establishing a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico, Act No. 7 of March 9, 2009 (Act No. 7), which ordered the dismissal of thousands of public employees, after merely reading its statement of motives.

No one should be deceived. The "victory" that some will claim today is just an illusion that makes us recall, above all else, the victory of Pyrrhus, King of Epirus, over the Romans. *The Teachers Retirement System is bankrupt and needs a profound restructuring.* Today's decision merely postpones that stern measure to the detriment of the teachers themselves, and when this decision is finally taken, it will be through a law even more drastic that the one rejected today, since by then the Teachers Retirement System (TRS) will be more insolvent because of the continuous disbursement of its assets to cover its obligations. When that time comes, if there is a change of administration, it will be those who now deliver an extraordinary panegyric on the rights of teachers who will recover their memory and retake the old discourse on the deference owed to the Legislative Assembly.

I dissent because I believe that the measures adopted through Act No. 160 of December 24, 2013, like those adopted in Act No. 3 of April 4, 2013, are necessary and reasonable to ensure the actuarial solvency of the Teachers Retirement System, and that plaintiffs failed to show that there were less burdensome measures to achieve that purpose. In consideration of the deference that we have constantly accorded the Legislature in similar circumstances, this Court should have recognized the constitutionality of the Teachers Retirement System Reform instead of becoming a *superlegislature* and casting aside the most basic principles of our republican form of government and the separation of powers doctrine.

I

I shall now summarize the facts that gave rise to this controversy.

On December 24, 2013, the Legislature passed the Commonwealth of Puerto Rico Teachers Retirement System Act, Act No. 160 of December 24, 2013 (Act No. 160). On January 8, 2014, the Puerto Rico Teachers Association (Association), individually and on behalf of its members, moved for preliminary and permanent injunction and declaratory judgment in the Court of First Instance against the Commonwealth of Puerto Rico and the Puerto Rico Teachers Retirement System (TRS), asking that court to declare Act No. 160 unconstitutional. The Court of First Instance summoned the parties to a hearing on January 27, 2014, to address the tenability of the preliminary injunction. The organization

CT-2014-2; CT-2014-3                                                      3
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

Educadores Puertorriqueños en Acción, Inc. [Puerto Rican Educators In Action, Inc.] and
the Organización de Directores y Administradores Escolares de Puerto Rico [Organization
of School Directors and Administrators of Puerto Rico] (ODAE [by its Spanish
acronym]) subsequently moved to intervene.

On January 14, 2014, the Association filed a Petition for Intrajurisdictional
Certification in the Supreme Court of Puerto Rico, seeking our direct and immediate
intervention in the case pending in the Court of First Instance because said case presents
a novel question of law and is vested with great public interest. The Association also filed
a Motion in Aid of Jurisdiction, asking us to stay the effects of Act No. 160 until their
claims were examined on the merits.

By resolution issued on that same date, this Court "granted" both requests.
Moreover, by virtue of Rule 51 of the Rules of the Supreme Court, 4 L.P.R.A. App. XXI-B,
we appointed the Hon. Ángel Pagán Ocasio as Special Master to receive the parties'
evidence and draw the corresponding findings of fact in a special report that would be
rendered not later than February 7, 2014.

On January 17, 2014, the State and the TRS filed an Urgent Motion for
Reconsideration asking this Court to set aside our Resolution of January 14, 2014, which
had ordered the stay of the effects of Act No. 160. They reasoned that the relief granted
by this Court did not meet the requirements for granting preliminary injunction because
no evidentiary hearing had been held before granting the injunction.

In turn, the group Educadores por la Democracia, Unidad, Cambio, Militancia y
Organización Sindical, Inc. [Educators for Democracy, Unity, Change, Militancy and
Union Organizing, Inc.] (EDUCAMOS [by its Spanish acronym]) filed on January 21,
2014, a motion for preliminary and permanent injunction and declaratory judgment in the
Court of First Instance, challenging the constitutionality of Act No. 160. The following
day, January 22, 2014, EDUCAMOS filed in the Supreme Court a Petition for Certification
and an Urgent Motion for Consolidation, asking us to certify their action in the Court of
First Instance and to consolidate it with the Association's action.

On January 23, 2014, while a conference prior to the evidentiary hearing called by
the Special Master was in process, the Association and the intervenors filed with this
Court a motion to extend the date of submission of the Special Master's Report. They
grounded their request on the fact that the complexity of the controversy and the time it
would take to prepare the actuarial valuations would make it impossible for them to
prepare adequately for the case. Nonetheless, while this Court was examining the
Association's motion, the parties agreed during the hearing before the Special Master to
stipulate all the material facts of the case and to present only documentary evidence,
since the controversy involved in the case was essentially an issue of law and, therefore,
it would not be necessary to hold an evidentiary hearing. Special Master's Report at 2,
Case No. CT-2014-0003, vol. 4. The Special Master accepted the parties' agreement and
scheduled the continuation of the evidentiary hearing for January 29, 2014.

CT-2014-2; CT-2014-3                                    4
Justice Rodríguez Rodríguez, dissenting              (Official Translation)

On January 27, 2014, and while the proceedings before the Special Master were under way, this Court issued a resolution granting the motion for consolidation filed by EDUCAMOS and denying the motion for reconsideration filed by the State and the TRS. On the other hand, the Court asked the Special Master to inform how much additional time he needed to complete his task.

By way of a Special Appearance filed on January 30, 2014, the Special Master informed us that he needed no additional time to prepare the report. During the January 29 hearing, the parties agreed to present a stipulation of facts, which would render the evidentiary hearing unnecessary. Finally, the Special Master submitted his report on February 7, 2014.

After the parties filed several briefs regarding the time they would have to object to the Special Master's Report and to file their respective pleadings, we issued a Resolution on February 11, 2014, to establish a schedule. We gave the parties until February 21, 2014, to present their comments and objections to the Report, and until March 3, 2014, to file their briefs simultaneously.

On March 6, 2014, after receiving the objections and comments to the Special Master's Report, as well as the parties' briefs, this Court, on its own motion, issued a Resolution ordering an oral hearing for March 26, 2014. This hearing was held as ordered.

In gist, the plaintiffs allege in their respective briefs that Act No. 160 is unconstitutional because it violates the constitutional prohibition against the impairment of contractual obligations, inasmuch as the State failed to show that the legislated contractual impairments were reasonable and necessary to achieve the TRS's solvency, and it also failed to consider less burdensome alternatives. The parties likewise allege that Act No. 160 violates the due process and equal protection clauses (P.R. Const. art. II, § 7, L.P.R.A., vol. 1), the separation of powers doctrine, the dignity of the human being (P.R. Const. art. II, § 1, L.P.R.A., vol. 1), and Art. VI, Sec. 10 of the Puerto Rico Constitution, L.P.R.A., vol. 1. Lastly, they argue that the State's action constituted a taking and an act of unjust enrichment.

The Commonwealth and the TRS, in turn, contend that the measures adopted in Act No. 160 are reasonable and necessary to advance the public interest in ensuring the solvency of the Puerto Rico Teachers Retirement System and averting the fiscal crisis faced by Puerto Rico.

Finally, more than three months after the initial action was filed in the Court of First Instance, and after a highly ineffective proceeding for a collegial court such as ours, five Justices of this Court resolved this controversy.

II

Before examining the merits of this controversy, I must make some comments.

The threshold issue that the majority addresses in its decision today is striking. It lays bare the error of substantive law committed by the majority when it declared unconstitutional, by way of a resolution, several sections of Act No. 18 of May 15, 2013

(Act No. 18), which amended the Rules of Civil Procedure to limit our jurisdiction to entertain petitions for intrajurisdictional certification, among other motions.

I then advised the majority that its action was clearly improper. As I held in my dissent, a declaration of unconstitutionality by way of a resolution is clearly untenable. We warned of the inevitable: a resolution of this Court does not establish a precedent and is binding only upon the parties to the case in which it is issued. *Alvarado Pacheco y otros v. ELA*, 188 D.P.R. 594 [88 P.R. Offic. Trans. __] (2013) (separate dissenting opinion of Rodríguez Rodríguez, J.). In that case, I stressed the fact that it was the first time in our constitutional history that a decision of that nature was reached in such manner. *Id.* at 689 [88 P.R. Offic. Trans. at __].

Today the majority, aware of the manifest error committed in that case, a bit ironically, and amplifying its legal anomaly, adopts the pronouncements it made incorrectly in the past by way of that resolution and, through the decision announced today, attempts to vest it with the legally binding nature that characterizes the opinions of this Court.

On the other hand, as I have stated, the questionable procedure followed by the majority to handle this case raises—to say the least—serious suspicions, especially in view of the consequences this case may have on the country's fiscal and political situation. We may compare, for instance, the procedure followed in this case with the procedure followed by this Court in *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. 828, 832-833 [88 P.R. Offic. Trans. __, __] (2013), and in *Brau, Linares v. ELA et al.,* 190 D.P.R. __, __ [90 P.R. Offic. Trans. __, __] (2014). How may such different approaches be justified?

Having said this, let us now examine the law applicable to the controversy under our consideration.

### III

The Puerto Rico Constitution establishes that no laws impairing the obligation of contracts shall be enacted. P.R. Const. art. II, § 7, L.P.R.A., vol. 1. Like its federal counterpart, U.S. Const. art. I, § 10, this clause seeks to guarantee the stability of contractual relations. *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 834 [88 P.R. Offic. Trans. at __]; *Domínguez Castro et al. v. E.L.A. I,* 178 D.P.R. at 81 [78 P.R. Offic. Trans. at ___]; *Warner Lambert Co. v. Tribunal Superior,* 101 D.P.R. 378, 395 [1 P.R. Offic. Trans. 527, 550] (1973). We have, nonetheless, held in the past that this prohibition is not absolute and that, therefore, not every contractual impairment is unconstitutional. *Bayrón Toro v. Serra,* 119 D.P.R. 605, 619 [19 P.R. Offic. Trans. 646, 661] (1987). The constitutional prohibition against the impairment of contractual obligations should be construed in harmony with the State's police power, which allows the State to legislate and regulate in furtherance of the public interest. *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 834 [88 P.R. Offic. Trans. at __] (citing *United States Trust Co. v. New*

CT-2014-2; CT-2014-3                                          6
Justice Rodríguez Rodríguez, dissenting            (Official Translation)

*Jersey*, 431 U.S. 1, 21 (1977) and *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R.
at 394 [1 P.R. Offic. Trans. at 550]).

In considering the validity of a statute in light of this constitutional clause, courts
must apply the test of reasonableness. *Warner Lambert Co. v. Tribunal Superior*, 101
D.P.R. at 395 [1 P.R. Offic. Trans. at 551]. Since this clause protects the contractual
obligations between private parties as well as those contracted by the State with
individuals, when the State intends to impair its own contractual obligations, the applicable
scrutiny must be much stricter to prevent the State from acting solely for its own benefit.
*Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 835 [88 P.R. Offic. Trans. at ___];
*Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 80 [78 P.R. Offic. Trans. at ___];
*Bayrón Toro v. Serra*, 119 D.P.R. at 620 [19 P.R. Offic. Trans. at 661]; *United States
Trust Co. v. New Jersey*, 431 U.S. at 25-26.

When passing on the validity of an impairment of the State's own contractual
obligations, the court must strike a reasonable balance between the legislative intent of
promoting the common good and the constitutional protection of contractual obligations
against the arbitrary and unreasonable application of the laws. *Warner Lambert Co. v.
Tribunal Superior*, 101 D.P.R. at 395 [1 P.R. Offic. Trans. at 551]. Consequently, this
Court has adopted a scrutiny that seeks to strike a balance between the public interest
pursued by said laws and the trust that individuals have placed in the contractual
obligations contracted with the State. *Id.*

At the first stage of the scrutiny, the court must determine whether a contractual
obligation exists, whether the challenged statute impairs that obligation, and what is the
magnitude or extent of that impairment. *Trinidad Hernández et al. v. E.L.A. et al.*, 188
D.P.R. at 834 [88 P.R. Offic. Trans. at ___]. Consequently, the court must examine
whether a contractual obligation actually exists between the private individuals and the
State. *Id.; Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 80 [78 P.R. Offic. Trans. at
___]; *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. at 395 [1 P.R. Offic. Trans.
at 551]. The court should then examine if the challenged law modifies the obligations to
such an extent that it actually constitutes an impairment of the contractual obligation.
*Bayrón Toro v. Serra*, 119 D.P.R. at 620-621 [19 P.R. Offic. Trans. at 662]. Finally, the
court must examine whether the impairment is severe or substantial. *Domínguez Castro
et al. v. E.L.A. I*, 178 D.P.R. at 80 [78 P.R. Offic. Trans. at ___]; *Bayrón Toro v. Serra*,
119 D.P.R. at 621 [19 P.R. Offic. Trans. at 662]; *Warner Lambert Co. v. Tribunal
Superior*, 101 D.P.R. at 395 [1 P.R. Offic. Trans. at 551].

A contractual impairment is considered substantial when it adversely affects the
expectations of one of the parties. *Trinidad Hernández et al. v. ELA et al.; United States
Trust Co. v. New Jersey; Warner Lambert Co. v. Tribunal Superior*. This occurs when the
challenged statute "adversely [modifies or] affects the essential terms or conditions of the
contract that led the parties to contract in the first place and, consequently, disrupts the

CT-2014-2; CT-2014-3                                                      7
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

parties' reasonable expectations." *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 83
[78 P.R. Offic. Trans. at ___].

      Once it is determined that the challenged statute substantially impairs a contractual
obligation, such impairment will be held valid if the modification is reasonable and
necessary to advance the public interest it pursues. *Id.* at 84 [78 P.R. Offic. Trans. at ___].
"In sum, if the impairment results from a reasonable and necessary modification aimed at
furthering a public interest, its validity shall be upheld." *Trinidad Hernández et al. v. ELA
et al.*, 188 D.P.R. at 835 [88 P.R. Offic. Trans. at __] (citing *United States Trust Co. v.
New Jersey*, 431 U.S. at 29).

      We have specifically held that the modification is deemed reasonable "if the
government's interference furthers a legitimate interest and if it is rationally related to the
pursuit of said purpose." *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 834-835
[88 P.R. Offic. Trans. at __] (citing *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 80
[78 P.R. Offic. Trans. at ___]); *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. at
395 [1 P.R. Offic. Trans. at 551]. In other words, for the modification to be deemed
reasonable, the legislated impairment must bear some rational connection to the purpose
sought. Nonetheless, aside from being reasonable, the measures taken must be necessary
to advance an important governmental purpose. *Domínguez Castro et al. v. E.L.A. I*, 178
D.P.R. at 84 [78 P.R. Offic. Trans. at ___] (citing *Bayrón Toro v. Serra*, 119 D.P.R. at
620 [19 P.R. Offic. Trans. at 661], and *United States Trust Co. v. New Jersey*, 431 U.S. at
29). The modifications will be deemed necessary if no less drastic modifications and no
less burdensome alternatives exist to achieve the same goal. *United States Trust Co. v.
New Jersey*, 431 U.S. at 29-30.

      In line with our republican system of government, in which the three branches are
obliged to respect each other's functions (P.R. Const. art. I, § 2, L.P.R.A.. vol. 1; *Trinidad
Hernández et al. v. ELA et al.*, 188 D.P.R. at 838 [88 P.R. Offic. Trans. at __]), this Court
has consistently accorded some deference to the Legislature's determination on the
reasonableness and necessity of its legislated impairments. *Trinidad Hernández et al. v.
ELA et al.*, 188 D.P.R. at 838 [88 P.R. Offic. Trans. at __]; *Domínguez Castro et al. v.
E.L.A. I*, 178 D.P.R. at 85 [78 P.R. Offic. Trans. at ___]. "The Legislature's
determination regarding the [reasonableness and necessity of the] enacted bills is a public
policy determination that deserves deference under our separation of powers system."
*Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 838 [88 P.R. Offic. Trans. at __].
However, this deference is in no manner absolute. *Trinidad Hernández et al. v. ELA et
al.*, 188 D.P.R. at 836 [88 P.R. Offic. Trans. at __] (citing *Domínguez Castro et al. v.
E.L.A. I*, 178 D.P.R. at 85 [78 P.R. Offic. Trans. at ___], and *United States Trust Co. v.
New Jersey*, 431 U.S. at 25-26).

      That fact that *some* deference—instead of *absolute* deference—should be afforded
to the legislative determination of reasonableness and necessity of the measures adopted
does not imply that the courts will make a *de novo* determination on whether other

CT-2014-2; CT-2014-3
Justice Rodríguez Rodríguez, dissenting

8

(Official Translation)

available alternatives would better serve the public interest pursued by the statute. *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 838 [88 P.R. Offic. Trans. at __]; *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 85 [78 P.R. Offic. Trans. at __]; *Buffalo Teachers Federation v. Tobe*, 464 F. 3d 362, 370 (2d Cir. 2006). The contract impairment clause does not require courts to sit as *superlegislatures*, determining on their own which of the alternatives available to the Legislature was the most appropriate. *Baltimore Tchrs. Un. v. Mayor, Etc., of Baltimore*, 6 F. 3d 1012, 1021–1022 (1993) (cited with approval in *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 85 [78 P.R. Offic. Trans. at __]). Our responsibility as a Court is not to examine whether the Legislature *could* have adopted other measures such as diverting funds from essential government services or raising taxes. Our responsibility is to examine whether the measures adopted can pass the scrutiny applicable to the impairment of the State's own contractual obligations. We can thus make sure that the State does not abuse its power and consider impairing its own contracts on a par with other public policy alternatives, or impose a more drastic impairment than necessary to achieve the same purpose. *Baltimore Tchrs. Un. v. Mayor, Etc., of Baltimore*, 6 F.3d at 1019-1020 (citing *United States Trust Co. v. New Jersey*, 431 U.S. at 30-31).

In keeping with the deference we must afford to the legislative determination of reasonableness and necessity, the validity of a contractual impairment will not be upheld if the plaintiff can show that there are less burdensome alternatives than the one chosen by the lawmaker to achieve the public purpose intended by the statute. *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 837 [88 P.R. Offic. Trans. at __]; *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 84 [78 P.R. Offic. Trans. at __]. It does not suffice that the plaintiff should merely allege in general terms that there are less burdensome alternatives: the plaintiff must explain in detail how these alternatives could be implemented and how they could achieve the same purpose intended by the challenged law. *Trinidad Hernández et al. v. ELA et al.*, 188 D.P.R. at 837-838 [88 P.R. Offic. Trans. at __]. The plaintiff must specifically present sufficient evidence to persuade the court that these alternatives are feasible and less burdensome. *Id.* at 838 [88 P.R. Offic. Trans. at __].

In *Bayrón Toro v. Serra*, this Court had the opportunity to examine the reasonableness of some changes made to the University of Puerto Rico Employees Retirement System that were approved by the Council on Higher Education. The amendments changed the conditions and requirements for participation in the UPR Retirement System: the years of service required for retirement, member contributions to the fund, and the minimum age for retirement. An analysis of the changes showed that these amendments impaired the State's contractual obligations to the participants because:

> [M]embers of a government retirement system have a vested contractual right that begins when the employee joins the system . . . . When the employee retires, once he has met all requirement conditions, his pension is not subject to changes or reductions . . . . However, prior to the employee's retirement, the Government may amend the terms and

conditions of the retirement, if such amendments are reasonable and seek
to further the actuarial solvency of the system.

*Id.* at 618 [19 P.R. Offic. Trans. at 660]. (Citation omitted.)

Since the terms and conditions of the retirement plan are an essential part of the
employment contract accepted by the employees when entering the public service, the
changes made to the retirement system that we examined in *Bayrón Toro* defeated the
plaintiffs' expectations and constituted a substantial impairment of the State's own
contractual obligations. *Id.* at 617 [19 P.R. Offic. Trans. at 659]. However, in light of the
circumstances of that case, we upheld the validity of the changes because these were
reasonable and necessary to guarantee the actuarial solvency of the Retirement System.
*Id.* at 623 [19 P.R. Offic. Trans. at 664]. When the amendments were adopted, the
Retirement System:

> [Was] in such a serious actuarial crisis that it ran the risk of having to
> liquidate its assets . . . . An actuarial report indicated that the fund's
> expenditures had increased at a faster pace than its income and that the
> main cause for this was the early retirement of its members.

*Id.* at 622 [19 P.R. Offic. Trans. at 663-664]. (Citation omitted.)

Consequently, we recognized:

> [The] Government should have the capacity and flexibility to make such
> reasonable changes and amendments as may be necessary to further the
> interests of the Retirement System and to strengthen its foundations and
> structure. Changing conditions and requirements, such as years of service,
> contributions to the fund, and retirement age, are essential to preserve the
> solvency of the fund. This flexibility is vital to allow the Retirement
> System to face unforeseen situations and to keep abreast of developments
> in the field of actuarial sciences. Recognizing the Government's power to
> modify retirement systems within the parameters mentioned here is
> essential for the successful operation of these plans.

*Id.* at 623 [19 P.R. Offic. Trans. at 664-665].

In sum, we concluded that there was no undue impairment of contractual
obligations because, under the circumstances of the case, the contractual impairments
were reasonable and necessary to preserve the very solvency of the retirement system. *Id.*
at 623 [19 P.R. Offic. Trans. at 665].

Recently, in *Trinidad Hernández et al.* we upheld the validity of the act that
reformed the Employees Retirement System of the Government of Puerto Rico and its
Instrumentalities, Act No. 3 of April 4, 2013. This act not only impaired the conditions
and requirements for participation in the System, but also froze the benefits accrued
under a defined benefit plan and moved the employees to a defined contribution plan. *Id.*
at 832 [88 P.R. Offic. Trans. at ___]. Unlike the modifications examined in *Bayrón Toro*,
where the changes only impacted the requirements and conditions for retirement, the

CT-2014-2; CT-2014-3                                              10
Justice Rodríguez Rodríguez, dissenting                (Official Translation)

changes examined in *Trinidad Hernández et al.* affected the pension benefits themselves.
We examined these modifications in light of the reasonableness standard applicable
when the State attempts to impair its own contractual obligations and found that
according to the Statement of Motives of the Retirement System Reform:

> [T]he measures adopted [were] necessary and reasonable to adequately
> address the financial crisis that jeopardizes the actuarial solvency of the
> System. This certainly constitutes an important public interest; by
> guaranteeing the System's economic solvency, all participants are
> benefited and the fiscal crisis faced by the country is also partially
> addressed, thus protecting the welfare of all Puerto Ricans.

*Id.* at 837 [88 P.R. Offic. Trans. at __].

In line with our decision in *Domínguez Castro et al.,* in *Trinidad Hernández et
al.,* at 836 [88 P.R. Offic. Trans. at __], we accorded some "deference to the legislative
assessment of reasonableness and necessity of the statute." In sum, we upheld the validity
of the amendments because, as evidenced by the Statement of Motives of Act No. 3, the
State established their reasonableness and necessity, while plaintiffs were not able to show
that there were less drastic or severe alternatives than those chosen by the lawmaker to
ensure the solvency of the Retirement System. Plaintiffs simply alleged in a general manner
that there were less burdensome alternatives, but failed to state in detail how these would
be implemented and how they would guarantee the solvency of the system. *Trinidad
Hernández et al. v. ELA et al.,* 188 D.P.R. at 837-838 [88 P.R. Offic. Trans. at __].

IV

Here the parties have stipulated that there is a contractual obligation between
plaintiffs and the State and that it is being substantially impaired by Act No. 160 because
said law adversely affects the retirement expectations of at least one of the plaintiffs.
Special Master's Report at 32, Case No. CT-2014-0003, vol. 4. Thus, in keeping with
the analysis explained earlier, we must only determine whether the impairment legislated
through Act No. 160 is reasonable and necessary in light of the public interest pursued: to
guarantee the subsistence and solvency of the TRS and the country's economic well-being.
Statement of Motives of Act No. 160 of December 24, 2013, at 26.[*] To do so, we must
first consider the context of the TRS and the deficiencies that this law seeks to remedy.

A reading of the report rendered by the Special Master appointed by a majority of
this Court shows that we are facing a "moribund" TRS (Special Master's Report at 35),
that "warrants immediate attention." *Id.* at 37. This system "is undergoing a fiscal crisis
that threatens to leave it without sufficient funds to meet its present and future obligations
to [all its members]." Statement of Motives of Act No. 160, at 2.

---

[*] [Translator's note: The page numbers of Act No. 160 of 2013 cited here correspond to
those of the English translation of said act certified by Juan Luis Martínez Martínez and found on
the Teachers Retirement System webpage at http://www.srm.pr.gov/Pdf/Ley_160_2013_en_
inglés.pdf. No official English translation was found on the Office of Legislative Services webpage.]

CT-2014-2; CT-2014-3                                          11
Justice Rodríguez Rodríguez, dissenting                (Official Translation)

Currently the TRS has an actuarial deficit of over $10 billion ($10,251,273,000). Special Master's Report at 36. This represents a funded ratio of a mere 17%. Sworn Statement of the Hon. Melba Acosta Febo at 4, Case No. CT-2014-0003, vol. 1. In other words, for each dollar that the TRS has to disburse, it has only 17 cents to cover that disbursement. *Id.* The average funded ratio in comparable state plans is around 70%, and the lowest funded state retirement plan is that of Illinois, with a funded ratio of 34% or, in other words, double the TRS ratio. Statement of Motives of Act No. 160, at 2-3. See also Respondents' Motion in Compliance with Order, Expert Report of Actuary Glen Bowen, at 1, Case No. CT-2014-0002, vol. 2.

It is projected that for fiscal year 2013-2014, the TRS will have a cash flow deficit of $322 million. Special Master's Report at 33. This annual deficit is projected to fluctuate between $317 million and $362 million between 2015 and 2023. *Id.* In order to cover this deficit and meet its obligations to its members, the TRS would have to sell its assets to compensate for its actuarial deficit and cover all its obligations. *Id.* at 35. This has already occurred, since the TRS had to sell its assets in 2013 to cover quarterly obligations. Sworn Statement of Melba Acosta Febo at 6. If this trend continues, it is estimated that by 2020, the Teachers Retirement System will have exhausted all its assets and will not have sufficient funds to meet its obligations, including the payment of retired teacher pensions. Special Master's Report at 35; Sworn Statement of Melba Acosta Febo at 6; Statement of Motives of Act No. 160, at 11.

Once the TRS has no more assets to sell, between 2021 and 2023 the Commonwealth would have to inject between $317 million and $363 million annually into the system in addition to what it already contributes to the TRS as employer. Special Master's Report at 32. As of 2020, the General Fund of Puerto Rico will have to contribute an average of $562 million annually to the TRS, which is a sizable portion of the projected deficit of $820 million for fiscal year 2013-2014. Sworn Statement of Melba Acosta Febo at 7. This impact on the Puerto Rican treasury is equivalent to the impact that the Employees Retirement System of the Government of Puerto Rico would have suffered if the Act No. 3 reform had not been adopted. Sworn Statement of Melba Acosta Febo at 8. "This would clearly affect government operations and would have dire consequences, such as dismissals and cuts in the workday." *Id.* at 4. This situation would demand "drastic cuts in government safety, health, and education services, including additional reductions of personnel, and any necessary adjustments to reduce the $820 million deficit that still burdens the General Fund." Statement of Motives of Act No. 160, at 11.

In the face of this bleak picture, the Legislature passed the Teachers Retirement Act of the Commonwealth of Puerto Rico, Act No. 160 of December 24, 2013. As its Statement of Motives indicates, this statute is "a comprehensive reform plan to address the actuarial crisis of the System." Statement of Motives of Act No. 160, at 18. The amendments made to the TRS seek to significantly reduce "the actuarial deficit of the

CT-2014-2; CT-2014-3                                                        12
Justice Rodríguez Rodríguez, dissenting                          (Official Translation)

System, as well as the cash flow deficit that the same suffers and threatens to deplete the System's assets in the near future . . . ." *Id.* at 19.

As the parties have clearly stipulated, in order to address the System's structural crisis, this measure has substantially impaired the parties' contractual obligations. Special Master's Report at 32. Now, to determine which scrutiny should be applied, we must first define the impairment involved in order to examine its reasonableness and necessity.

Act No. 160 proposed the following measures to ensure the solvency of the TRS and the payment of pensions to retired and active participants:

> (1) freezing benefits accrued by active participants under Act No. 91, by eliminating the accumulation of new benefits under the present defined benefit plan, yet honoring any benefit accrued by said participants to the present; (2) transferring active members under Act No. 91 to a defined contribution plan with a minimum benefit guaranteed for active participants as of July 31, 2014; (3) prospectively eliminating the merit pensions; (4) raising the retirement age for future teachers; (5) increasing the contribution of System participants; (6) increasing employer contributions, in addition to the increase previously legislated through Act No. 114-2011; (7) modifying the benefits granted by Special Laws to retired participants and eliminating said benefits prospectively; and (8) modifying the benefits for disability and for participant beneficiaries.

Statement of Motives of Act No. 160, at 18.

In other words, Act No. 160 impairs the State's obligations insofar as it changes the standards and requirements for participation in the TRS, modifies unaccrued pension benefits, and eliminates the benefits granted under special laws. All this is alongside the additional disbursements from the Puerto Rico General Fund through the Teachers Justice Uniform Contribution and an Annual Additional Contribution. These contributions represent an increase in what the Commonwealth Government currently contributes to the TRS as an employer. Statement of Motives of Act No. 160, at 19.

Having defined just what is the impairment that we must examine, let us now evaluate its reasonableness and necessity. According to the Statement of Motives of Act No. 160, the Legislature deemed it necessary and reasonable to adopt these measures to achieve the solvency of the TRS. Specifically, the Legislature stated:

> [T]hese measures are necessary and reasonable to solve the Teacher's System deficit, within our legal and constitutional framework. They are the least onerous alternatives available to achieve the compelling public purpose of: (1) preventing the Teacher's System from being left without any money to pay the pensions of our retired teachers; (2) honoring the benefits accumulated by retired teachers and by those that continue to work everyday educating our children and youth; (3) significantly reducing the projected impact of the annual deficit of the System on the General Fund, which would otherwise affect the rendering of essential public services to the citizenry; and (4) preventing the socioeconomic and fiscal catastrophe that would ensue upon the downgrading of Puerto Rico's credit to "junk" status.

Statement of Motives of Act No. 160, at 24-25.

CT-2014-2; CT-2014-3                                                      13
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

The Hon. Melba Acosta Febo, Secretary of the Treasury of the Commonwealth of Puerto Rico, who also presides over the Teachers Retirement System Board, stated that through Act No. 160:

> [A] solution was presented to significantly reduce the TRS's cash flow needs, thus lessening pressure on the General Fund, which has now a budget deficit, while ensuring the stability and actuarial solvency of the system (that is, the payment of teacher pensions in the coming years) . . . .

Sworn Statement of the Hon. Melba Acosta Febo at 9.

An analysis of each of the impairments shows that these seek to directly address the TRS's structural problems and its cash flow deficit in order to thus ensure its solvency. Accordingly, the legislated impairments—changes in eligibility requirements and conditions, changes in pension benefits, and the elimination of benefits granted under special laws—are reasonable because they have a rational connection with the purpose of securing the TRS's solvency.

Consequently, we must still determine whether plaintiffs have shown that there were less drastic or severe alternatives than those chosen by the lawmaker to achieve the purpose sought. *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 837 [88 P.R. Offic. Trans. at ___] (citing *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 84 [78 P.R. Offic. Trans. at ___]); *United States Trust Co. v. New Jersey,* 431 U.S. at 29-31. Unlike the situation in *Trinidad Hernández et al.*, plaintiffs in this case have presented several alternatives to the measures adopted by the Legislature and have brought evidence to show how these could be implemented and the impact they would have on the TRS's actuarial solvency. However, "they failed to show that they have evidence to persuade the court at a trial that these alternatives are feasible and less burdensome." *Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 838 [88 P.R. Offic. Trans. at ___].

Some of the measures proposed by plaintiffs are precisely alternatives that have already been included in Act No. 160 after they were received and studied at meetings held with teachers unions: reducing by 10% the administrative expenses of the Department of Education and of the TRS; paying the $24 million debt that, as plaintiffs allege, the Department of Education owes the TRS as an employer; eliminating privileged pensions; and filling teacher vacancies. Statement of Motives of Act No. 160, at 15-16.

As for the other alternatives proposed by plaintiffs, the State considered and discarded them when passing Act No. 160 because they were deemed insufficient to achieve the actuarial solvency of the TRS or because they were not feasible. *Id.* at 12. Moreover, the Secretary of the Treasury stated the following under oath:

> [U]nfortunately, given the magnitude of the problem, we believe that there is no other manner in which the TRS can retain the pension rights that exist today, and the only possible way to guarantee the TRS's solvency is through the reform established in Act No. 160 of 2013.
>
>       . . . .

CT-2014-2; CT-2014-3                                                    14
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

      As part of the process of passing Act No. 160 of 2013, several meetings were held with teachers associations to try to bring proposals to the table that would avoid the system reform. I received and was consulted on the proposals presented by these groups. None of them solves the system's $10 billion problem. They are either unfeasible or simply fall shy. One can say the same with regard to different bills that have been submitted but did not prosper because they are not feasible and/or would not attain the actuarial solvency of the TRS.

Sworn Statement of the Hon. Melba Acosta Febo at 12-13.

      The words of the Secretary of the Treasury show that the State did examine the different alternatives available, including those proposed by plaintiffs, and after studying them concluded that they were not feasible or sufficient to achieve the purpose sought by Act No. 160: to guarantee the actuarial solvency of the TRS and to address, at the same time, the country's fiscal crisis. We can clearly conclude that plaintiffs have failed to show that there are less burdensome alternatives to attain the TRS's solvency; therefore, we cannot depart from our caselaw doctrine and dispense with the deference that on similar occasions we have accorded the Legislature. For the above reasons, Act No. 160 constitutes a permissible contractual impairment because it is a necessary and reasonable measure to ensure the solvency of the TRS.

      But much to the contrary, the Court majority today encroaches upon the legislative function in arguing that the public policy measures adopted by the Legislative Power to address the Teachers Retirement System's actuarial crisis are unreasonable because they fail to solve the system's actuarial crisis, but rather place the System in an even worse position. Said decision is inconsistent with our previous pronouncements on the contract impairment clause in the context of public employee retirement plans.

      The majority Opinion, at 24, concludes that "[a]fter a careful examination of the evidence presented, we must inevitably conclude that Act No. 160 of 2013 is unreasonable and, consequently, unconstitutional under the constitutional clause that bars the impairment of contractual obligations . . . ." Majority opinion at __. This conclusion is grounded on the fact that "plaintiffs here brought evidence to show that the adopted measures do not ensure the economic solvency of TRS, which is a threshold requirement pursuant to our caselaw . . . . The State failed to present evidence to rebut this conclusion." *Id.* at __. (Citations omitted.) Without delving into why we should not accord in this case the same deference we accorded to the legislative determination on the reasonableness and necessity of the measures adopted in *Trinidad Hernández et al.* and *Domínguez Castro et al.*, the majority opinion simply cast aside the legislative determination in that regard.

      The majority concludes that the State "could not rebut the evidence brought by the teachers" on how the alleged retirement en masse that could be triggered by Act No. 160 would have a devastating effect on the TRS's solvency. Majority Opinion at ___. Thus, the majority opinion places on the State the burden of showing the reasonableness and necessity of the measures it has adopted, applying an inarticulate and unintelligible

CT-2014-2; CT-2014-3                                                  15
Justice Rodríguez Rodríguez, dissenting            (Official Translation)

evidentiary standard and reversing without further ado this Court's decision in *Trinidad Hernández et al.*, *Domínguez Castro et al.*, and *Bayrón Toro*.

The Court majority argues that the expert evidence brought by plaintiffs showed that Act No. 160 does not advance the TRS's solvency. I do not agree with disregarding the deference we should accord the Legislature in light of this expert evidence, since it has scarce or no probative value. First, the majority grounds its conclusions on these reports without any pronouncements on their admissibility and relevance. We must bear in mind that, contrary to the procedure required by Rule 51 of this Court, the Special Master drew no findings on the admissibility of the documentary evidence brought by the parties:

> The parties stipulated that they would present the testimony of the witnesses, [*sic*] through sworn statements. This, according to what was stipulated, means that if said witnesses were to take the stand, the content of their sworn statement is what in effect they would have testified; *this without prejudice to the objections and to the admissibility and relevance that each party may have.*

Special Master's Report at 38 n.12. (Emphasis added.)

The Special Master further indicates:

> [I]t is important to point out that the Special Master did not have the opportunity to examine the demeanor of the witnesses or of the experts on the stand, or to weigh their credibility as they testified, given the stipulation reached by all counsel that the case would be submitted on sworn statements.

Special Master's Report at 34 n.7.

Second, the majority rests on the expert reports of the Association's economists, José I. Alameda Lozada and Alfredo González Martínez, and on the report of Actuary José M. Pérez Díaz, the ODAE expert, without questioning the scientific grounds or the methods employed to arrive at the opinions they set forth in their reports, since they do not reveal this information. The reports submitted by Alameda Lozada and González Martínez show that they believe that the fact that 7,000 teachers would opt for an early retirement is an unforeseen consequence of Act No. 160. But they also state that it could be some 10,000 or 12,000 additional teachers who may opt for this, although they cite no source whatsoever in support of these projections.[1]

In turn, Actuary Pérez Díaz only states the following in his actuarial opinion:

> The impact of Act No. 160 of 2013 on the system can be summed up as follows:
>
>     . . . .

---

[1] Motion on Evidence by Petitioner Puerto Rico Teachers Association, Appendix XXVII, Expert Report of Jaime L. Del Valle Caballero, Appendix: J.I. Alameda Lozada y A. González Martínez, *Análisis de los fundamentos económicos asociados a la ley de reforma del Sistema de Retiro de los Maestros de Puerto Rico* [Analysis of Economic Grounds for the Act that Reforms the Puerto Rico Teachers Retirement System]14 (Jan. 30, 2014), Case No. CT-2014-0003, vol. 3.

CT-2014-2; CT-2014-3                                                    16
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

*2. According to our model, the principal effect would be to extend the
amount of system assets to 2038, the same year on which the system would
begin with the same amount of assets it started out with in 2013.* In other
words, the system practically would not develop any assets from 2013 to
2038 given the great need to pay pension benefits. Afterwards, the assets
would be exhausted by 2057.

. . . .

4. The fact is that this law adds too much insolvency risk to the system
because many negative events could take place between 2013 and 2038 to
speed up the system's insolvency.

In the event of a scenario in which there would suddenly be 5,000,
10,000, and 15,000 new retirees, the following would happen under Act
No. 160 of 2013:

Table IV

| Number of pensioners | Fiscal year on which the system's assets would be exhausted |
|---|---|
| 5,000 | 2022 |
| 10,000 | 2018 |
| 15,000 | 2016 |

According to the numbers in Table IV, the sudden retirement of
active members would accelerate the system's collapse, bringing it
practically to the present. This behavior seems logical because according
to our numbers, the pensioners would end up receiving much more
benefits in comparison to what they contribute to the system on an annual
basis. Consequently, when a group of 5,000, 10,000, or 15,000 active
members suddenly retire, the use of pension benefits will skyrocket
accordingly.

José M. Pérez Díaz, *Opinión actuarial sobre la nueva Ley 160-2013, Sistema de Retiro
de Maestros de Puerto Rico* [Actuarial Opinion on the New Act No. 160 of 2013, Puerto
Rico Teachers Retirement System] 11-12, Case No. CT-2014-0002, vol. 1.

The figures on which the majority Opinion rests were calculated by Actuary
Pérez Díaz using "a very complex financial model [which he developed] that can predict
the impact of Act No. 16[0] of 2013 . . . ." *Id.* at 11. He does not describe in detail what
said "financial model" consists of. In fact, of the 12 double-spaced pages of his actuarial
opinion, only the paragraphs cited above make reference to the alleged impact of the
speculative retirement en masse of teachers.

I believe that the cited actuarial opinion has scarce probative value because it fails
to detail the empirical and factual data on which his conclusions are based. Evidence Rule
702 (32 L.P.R.A. App. VI, R. 702). Moreover, the actuarial opinion is contradictory
because it recognizes that Act No. 160 prolongs the life of the system's assets until 2057,
but makes reference later on to the "many negative events" that could trigger its insolvency
by 2016, 2018, or 2022. However, it fails to address or evaluate what is the actual
probability of occurrence of those "many negative events"; therefore, the findings of the
actuarial opinion in this regard do not deserve to be given any probative value.

CT-2014-2; CT-2014-3                                                        17
Justice Rodríguez Rodríguez, dissenting                     (Official Translation)

The majority does not explain why the opinions of these experts deserve more credibility than the evidence presented by the Legislature to the extent of dispensing with the deference that we have accorded the Legislature when applying this scrutiny. I believe that the ungrounded statements made in Actuary Pérez Díaz's actuarial opinion do not suffice to rebut the presumption of constitutionality of the challenged statute. We do not even know what factors the expert considered, whether he took into consideration the other provisions of Act No. 160 or if he examined the impact of that speculative retirement en masse as an isolated event.

Contrary to the allegations of Actuary Pérez Díaz and plaintiffs, the record shows that the Legislature did have the necessary information to determine how many participants would seek retirement in the coming years. The Milliman actuarial valuation report of June 30, 2012, includes several tables and schedules that detail the characteristics of active and retired members of the Teachers Retirement System, including the age and years of service. Milliman Actuarial Valuation Report at 38-44, Case No. CT-2014-0003, vol. 2. The fact that the lawmakers had that information when exercising their legislative prerogative is evidenced in several provisions of Act No. 160. Now, we do not know whether these provisions were examined by Dr. Pérez Díaz in his actuarial opinion or by plaintiffs when they allege that the retirement of 7,000 teachers would worsen the actuarial crisis of the Teachers Retirement System.

Section 3.9 of Act No. 160 does contemplate the different scenarios that could arise with regard to the retirement age and years of service requirements. Specifically, it provides:

(a) Any participant who, as of the effective date of this Act, is entitled to retire and receive any kind of pension under Act No. 91-2004, as amended, for having met the corresponding years of service and age requirements, may retire at any time after the effective date of this Act.

(b) Any participant who, as of July 31, 2014, is entitled to retire and receive any kind of pension under Act No. 91-2004, as amended, or under the provisions of this Act for having met the corresponding years of service and age requirements, may retire at any time after August 1, 2014.

(c) As of August 1, 2014, any participant who is active as of July 31, 2014, may retire when said participant:

(1) reaches fifty-five (55) years of age and completes at least thirty (30) years of service; or

(2) reaches sixty (60) years of age and completes at least five (5) years of service.

(d) Any participant in active service that has enrolled in the System after August 1, 2014, may retire when said participant:

(1) reaches sixty-two (62) years of age and completes at least five (5) five years of service; and

(2) has accumulated individual contributions amounting to ten thousand dollars ($10,000) or more.

Act No. 160, sec. 3.9, at 48-49.

CT-2014-2; CT-2014-3                                                      18
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

As we can see, this section acknowledges different retirement scenarios in accordance with the participants' compliance with the applicable requirements on the different dates set forth in the statute. First, it respects the right acquired by those participants who, as of December 24, 2013 (the effective date of the law), already complied with the requirements for retiring with some type of pension under Act No. 91 of March 29, 2004 (18 L.P.R.A. § 391 *et seq.*) (Act No. 91). This section even provides that these participants may retire at any time after the effective date of the law without seeing their pensions affected. If that were the case, then the assertion that Act No. 160 encourages the sudden and early retirement of these participants out of fear of being left in a worse situation would be totally unfounded. After all, they could decide to retire and receive the pension to which they are entitled under Act No. 91.

Second, subsec. (b) of this section recognizes and respects the acquired right of participants who as of July 31, 2014, are entitled to retire and receive some type of pension under Act No. 91 or Act No. 160. And as in the previous section, the law allows them to retire at any future date. Consequently, the assertion that Act No. 160 encourages the sudden and early retirement of these participants would likewise be baseless.

Third, subsec. (c) of the cited section addresses the case of those participants who as of July 31, 2014, do not qualify for retirement. Of course, we cannot affirm that the contested Reform would cause these participants to seek an early retirement because they would not qualify. Under Act No. 160, these participants could retire when they reach 55 years of age and complete at least 30 years of service, or when they reach 60 years of age and complete at least five years of service.

The fourth and last scenario contemplated in sec. 3.9 is the case of participants who enter the Teachers Retirement System as of August 1, 2014, and who may seek retirement when they reach age 62 and complete five years of service, and have made individual contributions totaling $10,000. Naturally, these cannot retire suddenly either.

Finally, sec. 4.4(a), entitled "Grandfather Provision," is the only provision that allows for early retirement under the following conditions:

Should this Act had not been passed, any participant who would have been entitled to retire with a pension under Articles 40(b)(1) and (b)(2) of Act No. 91-2004, as amended, for having completed thirty (30) years of credited service between August 1, 2014 and June 30, 2016, may do so under the following conditions:

(a) Any participant who would have completed thirty (30) years of credited service or more during such period, but has not reached the age of fifty-five (55) or more on or before the effective date of this Act, shall be granted seventy percent (70%) of the average salary of such participant as of the effective date of this Act. To benefit from this provision, participants shall be required to retire effective on July 31, 2014, and continue making individual contributions to the System as provided in Article 4.4(d) of this Act, until they reach the age of fifty-five (55). Likewise, employers shall continue to make contributions to the System as established in Article 4.4 (d) of this Act, until the participant reaches the age of fifty-five (55).

CT-2014-2; CT-2014-3                                                      19
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

> (b) Any participant who has completed thirty (30) years of credited service or more during such period and reached the age of fifty-five (55) or more on or before the effective date of this Act, shall be granted seventy percent (70%) of the average salary of such participant on the effective date of this Act. To benefit from this provision, the participant shall be required to retire effective on July 31, 2014.
>
> Participants in active service who meet the requirements to receive a pension under this Article and wish to avail themselves of the provisions of this Article, shall be required to notify their resignation, final and binding, to the Department of Education and send a copy thereof to the Teacher's Retirement System on or before March 31, 2014.

Act No. 160, sec. 4.4(a), at 57-58.

Although this provision of Act No. 160 does encourage a group of teachers to retire up to two years earlier, we must also reiterate that the lawmaker relied on the Milliman actuarial valuation report, which easily shows how many participants would qualify for such early retirement. In fact, the majority Opinion itself could state how many participants would retire thanks to the information provided in the tables and charts included in this report and made available to the lawmakers when they passed the Reform in question. We have no reason to infer that the Legislature did not take the impact of this provision into consideration.

It also bears noting that Act No. 160 has no retroactive effect on the pension of those participants who as of July 31, 2014, would be eligible for some type of pension under Act No. 91. Those who decide to remain as teachers and postpone their retirement will retain the pension acquired under the previous law. This is clearly stated in sec. 4.4 on Pension for Age and Years of Service, which states: "The rights of participants in active service who, as of July 31, 2014, meet the requirements of this Article shall be deemed to be vested. It is hereby provided that until July 31, 2014, participants shall accumulate the years of service and the Average Salary applicable as of that date." Act No. 160, sec. 4.4(a), at 54. Section 4.4 further provides that that any participant who as of July 31, 2014, could have retired but chose to continue teaching would retain the pension to which he or she was entitled under Act No. 91, in addition to the pension accumulated after August 1, 2014, as provided in Chapter 5 of Act No. 160. Therefore, it cannot be argued that Act No. 160 encourages these participants to retire this summer so that the rights they acquired under Act No. 91 will not be unconstitutionally affected.

As for the other participants who do not qualify for retirement next summer under the former law or the Grandfather Provision, it is illogical to argue that they will suddenly retire en masse because they have not met the requirements. These participants would in fact have two options: (1) to resign, subject to the Act No. 160 requirements, in order to withdraw their contributions to the Teachers Retirement System;[2] or (2) to

---

[2] Section 3.4 of Act No. 160, at 39, provides:

> "(a) As of August 1, 2014, any System participant who is no longer eligible as a participant and (i) has less than five (5) years of credited service, or

CT-2014-2; CT-2014-3                                              20
Justice Rodríguez Rodríguez, dissenting            (Official Translation)

remain teaching, in which case they would receive the minimum pension established in
sec. 3.11 of Act No. 160.[3] Pursuant to subsec. (c) of that section, the Teachers Retirement
System would request an actuarial valuation every four years to examine the increase in
said minimum pension. If the valuation is favorable, the System's Board of Trustees will
be required to increase the pension.

On the other hand, the Milliman 2012 actuarial valuation report depicted the
TRS's fiscal health under Act No. 91, which was repealed by Act No. 160. Those
teachers who choose to retire under the window provided in Act No. 160 would retire
*under the same conditions and with the same benefits* of those who retired with the
benefits examined by this actuarial valuation report. Act No. 160, sec. 4.4. Moreover,
during the public hearings on the bill that would later become Act No. 160, the Teachers
Association, other teacher organizations, and the TRS voiced their concern that Act No.
160 would encourage a retirement en masse and its possible impact on the TRS's
finances. Positive Report of the House of Representatives (December 21, 2013).
Consequently, and in light of the deference owed to the lawmaker, there is no reason to
assume that the Legislature did not take into account the retirement of participants under
Act No. 160. It is clear that the Legislature was well aware of the concerns raised over

---

(ii) has contributed less than ten thousand dollars ($10,000) shall be entitled to
have the total amount of the contributions made reimbursed, plus compound
interests until he/she receives the reimbursement of contributions or up to six (6)
months after the date of separation from service, whichever occurs first. Any debt
that the participant may have with the System shall be deducted from such
contributions.

"(b) As of August 1, 2014, participants who have five (5) years or more
of credited service and have contributed ten thousand dollars ($10,000) or more
to the System, may not withdraw their individual contributions upon separation
from service, but shall be entitled to the corresponding pension when they reach
the retirement age established in this Act."

[3] Section 3.11 of Act No. 160 of 2013 provides:

"(a) Any participant who is active as of July 31, 2014, and was not
eligible for retirement on such date with a pension benefit equal to or over sixty-
five percent (65%) of the Average Salary and who, subsequently, applies for
retirement when completing thirty (30) years of service and reaching the age of
fifty-five (55) shall be entitled to a minimum pension of one thousand six
hundred twenty-five dollars ($1,625) per month. The minimum pension of one
thousand six hundred twenty-five dollars ($1,625) shall be guaranteed to teachers
who enroll in the system as of August 1, 2014, and meet the years of service and
age requirements provided in Article 3.9(d).

"(b) A minimum pension of five hundred dollars ($500) per month is
hereby fixed for those participants who retired on or before July 31, 2014. Every
pensioner receiving a pension of less than five hundred dollars ($500) per month
shall receive, as of August 1, 2014, the corresponding raise so that his/her
pension amounts to five hundred dollars ($500) per month.

"(c) Every four (4) years, the System shall request an actuarial study to
evaluate the impact of increasing the minimum pension herein established. In the
event that the actuarial study recommends an increase to the minimum pension,
the System's Board of Trustees shall be required to adopt such increase at the
beginning of the following fiscal year."

Act No. 160, at 49-50.

the retirement window, that it had relevant information in that respect, and it exercised its legislative prerogatives as it should be done in a republican system of government.

By granting a retirement window, the Legislature made a public policy decision to grant a benefit to those teachers who would be most affected by the impairments caused by Act No. 160. Accordingly, the Legislature assumed more responsibility for the TRS's fiscal health: it increased employer contribution to 20.53%, established a Teachers Justice Uniform Contribution starting at $30 million and reaching up to $60 million, created an Annual Additional Contribution in which it would allocate the necessary funds to prevent the System's projected gross assets from falling below $300 million, and established an additional contribution from the General Fund of $1,675 per pensioner, regardless of when the person retired. Act No. 160, sec. 4.9., at 63. As the Secretary of the Treasury, the Hon. Melba Acosta Febo, said:

> We must bear in mind that despite the system changes proposed by Act No. 160 of 2013, an additional contribution will be required from the General Fund, starting at $30 million and later increasing to $60 million annually. This means that despite all the changes, the general Fund has to allocate more money to this system in order to solve the deficit. However, we are not talking about the $562 million that would be needed if we do nothing and that the General Fund cannot assume, in which case the assets would be exhausted.

Sworn Statement of Melba Acosta Febo at 12.

After assessing the credibility of these expert reports, it would be clearly speculative to calculate how many teachers would seek retirement as a consequence of this statute. It would be equally speculative to ascribe greater credibility to these expert opinions than to the evidence presented by the Legislature and the testimony of the State's economic officials, especially that of the Secretary of the Treasury herself.

On other occasions, the members of this Court who now endorse the misguided analysis of the majority Opinion have recognized the danger of ignoring the deference owed to the Legislature's public policy decisions on socioeconomic legislation. By way of example, in *Trinidad Hernández et al.* this Court held:

> In sum, if the impairment results from a reasonable and necessary modification aimed at furthering a public interest, its validity shall be upheld. *Id.* In that respect, in *Domínguez Castro et al.* . . . . we held that the courts should accord deference to the legislative determination of necessity and reasonableness of the measure.

*Trinidad Hernández et al. v. ELA et al.,* 188 D.P.R. at 835 [88 P.R. Offic. Trans. at __]. (Citations omitted.)

Likewise, some of the Justices who concurred with the majority Opinion in *Domínguez Castro et al.* agreed with the following pronouncements:

> This, however, does not mean that the court should not accord some deference to the legislative assessment of necessity and reasonableness in

the exercise of its constitutional prerogative, especially when it involves socioeconomic regulations.

For illustrative purposes, we should refer to interpretations made by the circuit courts of appeals regarding the degree of deference due to legislative assessments on necessity and reasonableness. In *Local Div. 589, etc. v. Comm. of Mass.*, 666 F.2d at 643, the United States Court of Appeals for the First Circuit pointed out:

> [D]etermining the "reasonableness and necessity" of a particular statute is a task far better suited to legislators than to judges. Thus, in the case before us, where economic or social legislation is at issue, some deference to the legislature's judgment is surely called for.

Likewise, the Court of Appeals for the Second Circuit stated the following in *Buffalo Teachers Federation v. Tobe*, 464 F.3d at 370:

> We hasten to point out that less deference does not imply no deference . . . . Relatedly, we agree with the First Circuit that *U.S. Trust Co.* does not require courts to reexamine all of the factors underlying the legislation at issue and to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem.

> In short, when posing on the challenge of a statute under the contract clause as applied to state contracts, we must accord some deference to the legislative assessment on the necessity and reasonableness of a measure.

*Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. at 85-86 [78 P.R. Offic. Trans. at ___] (Justice Kolthoff Caraballo).

Later on, in the sequel to *Domínguez Castro et al.*, some members of the majority expressed their concurrence with the following pronouncements in the separate opinion of Justice Rivera Pérez:

> In their lengthy statement of motives of Act No. 7, the lawmakers justified the reasonableness and necessity of the alternative measures that the Executive Branch has taken to urgently address the crisis affecting us. These are not mere allegations. It is the public policy established by law. It was only after this analysis that we decided to accord the lawmaker's determination of necessity and reasonableness the degree of deference that it deserved in a state of fiscal emergency declared by the Legislature in a republican system of government. In our constitutional system, it is not permissible for a judge to hold a trial de novo to review the necessity and wisdom of a fiscal statute.
> . . . .
> The rule in [*United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977)] only requires that the State show the reasonableness and necessity of the measure, deferring to the lawmaker's decision by imperative of the principle and doctrine of the separation of powers. This does not mean that the federal doctrine demands that an evidentiary hearing be held as the only mechanism by which the State may show the reasonableness and necessity of the measure. In the instant case, the State showed through the facts and information contained in the Statement of Motives of Act No. 7 that the challenged measures were reasonable and necessary. That was the

CT-2014-2; CT-2014-3                                                    23
Justice Rodríguez Rodríguez, dissenting                    (Official Translation)

manner in which, as a matter of law, the issue of the unconstitutionality of the cited statute was addressed.

We are not abdicating our constitutional role by showing such deference. On the contrary. We cannot, as the dissenting Justices intend, "abdicate our judicial function" of protecting the constitutional mandate for a separation of powers in order to become a SUPER GOVERNMENT. This is barred by our Constitution.

*Domínguez Castro et al. v. E.L.A. II*, 178 D.P.R. 375, 427-429 [78 P.R. Offic. Trans. __, __] (2010) (Separate Opinion of Rivera Pérez, J., with whom Justices Martínez Torres, Kolthoff Caraballo, and Pabón Charneco join). (Emphasis suppressed.)

Finally, in *AAR, Ex parte*, 187 D.P.R. 835, 855 [87 P.R. Offic. Trans. __, __] (2013), a majority of this Court expressed the following with regard to the separation of powers doctrine:

> [I]t is unquestionable that the Separation of Powers Doctrine is essential to the government system we have adopted as a political community. As a Court of last resort, we cannot succumb to the temptation of ignoring this sacred principle or of using it lightly as a legal catchphrase. We must always be aware of the delicate constitutional limits between the three branches of government. It is our duty to watch over the role of the Judiciary in order to avoid upsetting the principles of separation of powers and wiping out the basic understanding of those who conceived this branch as the least dangerous of the three. We must be aware that the Judiciary, like the other branches, is not exempt from violations of the principles of separation of powers. [Emphasis suppressed.]

We cannot understand how the majority can reconcile its previous pronouncements on the deference owed to legislative public policy decisions with what it determines in the instant case. This inconsistency leads some members of the Court today to assume the role of a *superlegislature* for which our legal and constitutional system has no room.

Act No. 3 of April 4, 2013, whose constitutionality we upheld in *Trinidad Hernández et al.*, had provisions identical to the ones that today the Court majority uses as a shield to justify its determination. Act No. 3 eliminated additional pension benefits for public employees who did not retire before the law's effective date. In light of this, I cannot understand how the members of this majority distinguish one case from the other.

In *Trinidad Hernández et al.* and *Domínguez Castro et al.*, this Court held that the legislated contractual impairments were reasonable and necessary based on the deference we should give to the determination made by the Legislature and evidenced by *the statement of motives of both statutes*. But now a majority of this Court holds that the statement of motives is not sufficient to deserve such deference, but that the Legislature has the burden of proving the reasonableness and necessity of the impairment through additional evidentiary mechanisms additional to those available in the case: the statement of motives of the law, actuarial valuations, legislative committee reports, and the testimony of public official with sufficient expertise to lead the country's fiscal and economic activity.

CT-2014-2; CT-2014-3                                                24
Justice Rodríguez Rodríguez, dissenting                  (Official Translation)

In sum, this dismantling of the analysis of the majority's arguments shows that the grounds for finding this law unconstitutional, in comparison with the reasons espoused for declaring of Act No. 3 constitutional, beyond the logic of law. The awkward handling of this case only strengthens this conclusion. The new adjudicative standards that would apply now in this type of controversy are still unintelligible to me.

V

For the foregoing reasons, I dissent. I would instead recognize the constitutionality of Act No. 160 because I believe that it constitutes a reasonable and necessary impairment of the State's contractual obligations with the Teachers Retirement System members and that plaintiffs failed to show that there are less burdensome measures to ensure the solvency of the Teachers Retirement System.

JMS/mal



I CERTIFY that this is an Official Translation made by the Bureau of Translations of the Supreme Court of Puerto Rico.

In San Juan, Puerto Rico:

Juan E. Dávila Rivera
Clerk of the Supreme Court