```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF PUERTO RICO

3
    In Re:                    )        Docket No. 3:17-BK-3283(LTS)
4                             )
                              )        PROMESA Title III
5   The Financial Oversight and )
    Management Board for      )
6   Puerto Rico,              )        (Jointly Administered)
                              )
7   as representative of      )
                              )
8   The Commonwealth of       )
    Puerto Rico, et al.       )        November 17, 2021
9                             )
              Debtors,        )
10

11  _____

12  In Re:                    )        Docket No. 3:17-BK-3566(LTS)
                              )
13                            )        PROMESA Title III
    The Financial Oversight and )
14  Management Board for      )
    Puerto Rico,              )        (Jointly Administered)
15                            )
    as representative of      )
16                            )
    The Employees Retirement  )
17  System of the Government  )
    of the Commonwealth of    )
18  Puerto Rico,              )
                              )
19            Debtors,        )

20  _____

21

22

23

24

25
```

```
 1   _____

 2

 3   In Re:                      )     Docket No. 3:19-BK-5523(LTS)
                                 )
 4                               )     PROMESA Title III
     The Financial Oversight and )
 5   Management Board for        )
     Puerto Rico,                )     (Jointly Administered)
 6                               )
     as representative of        )
 7                               )
     The Puerto Rico Public      )
 8   Buildings Authority,        )
                                 )
 9               Debtors,        )

10   _____

11

12                CONFIRMATION HEARING - DAY SIX

13   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14               UNITED STATES DISTRICT COURT JUDGE

15    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

16               UNITED STATES DISTRICT COURT JUDGE

17   _____

18
     APPEARANCES:
19
     ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY
20
     For The Commonwealth
21   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
22                            Mr. Timothy W. Mungovan, PHV

23
     For The Lawful
24   Constitutional Debt
     Coalition:              Mr. Susheel Kirpalani, PHV
25                           Mr. Daniel Salinas-Serrano, PHV
```

```
1   APPEARANCES, Continued:

2   For Puerto Rico Fiscal
    Agency and Financial
3   Advisory Authority and
    the Governor of
4   Puerto Rico:                 Ms. Maria J. DiConza, PHV

5   For Peter C. Hein:          Mr. Peter C. Hein, Pro Se

6   For Finca Matilde, Inc.:    Mr. Eduardo J. Capdevila-Diaz, Esq.

7   For the Official
8   Committee of Unsecured
    Creditors:                  Mr. Luc A. Despins, PHV

9   For Assured Guaranty
10  Corp. and Assured
    Guaranty Municipal Corp:    Mr. William J. Natbony, PHV

11  For The Official
12  Committee of Retired
    Employees:                  Mr. Robert D. Gordon, PHV

13  For Service Employees
14  International Union and
    International Union,
15  United Automobile,
    Aerospace and
16  Agricultural Implement
    Workers of America:         Mr. Peter D. DeChiara, PHV

17  For Credit Unions:          Mr. Enrique M. Almeida, Esq.

18  For U.S. Bank Trust
19  National Association
    and U.S. Bank National
20  Association:                Mr. Ronald J. Silverman, PHV

21  Asociacion
    Puertorriquenona de
22  la Judicatura, Inc.:        Mr. David C. Indiano, Esq.

23  For Asociacion de
    Jubilados de la
24  Judicatura de
    Puerto Rico:                Mr. Enrique J. Mendoza-Mendez, Esq.

25
```

```
 1   APPEARANCES, Continued:

 2
     For Asociacion de
 3   Maestros de Puerto Rico
     and Asociacion de
 4   Maestros de Puerto
     Rico-Local Sindical:      Mr. Jose Luis Barrios-Ramos, Esq.
 5
     For Federacion de
 6   Maestros de Puerto Rico,
     EDUCAMOS, and UNETE:      Ms. Jessica Mendez-Colberg, Esq.
 7
     For PFZ Properties,
 8   Inc.:                     Mr. David Carrion-Baralt, Esq.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Proceedings recorded by stenography.  Transcript produced by
24   CAT.

25
```

```
 1                           I N D E X

 2   WITNESSES:                                    PAGE

 3        None offered.

 4

 5

 6
     EXHIBITS:                                      PAGE
 7
          None offered.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                           San Juan, Puerto Rico

2                                           November 17, 2021

3                                           At or about 9:30 AM

4                              *      *      *

5          THE COURT:  Good morning.  Would the courtroom deputy

6     please call the case?

7          COURTROOM DEPUTY:  Good morning.

8          The United States District Court for the District of

9     Puerto Rico is now in session.  The Honorable Laura Taylor

10    Swain presiding.  Also present, the Honorable Magistrate Judge

11    Judith Gail Dein.  God save the United States of America and

12    this Honorable Court.

13         *In re: The Financial Oversight and Management Board*

14    *for Puerto Rico as representative of the Commonwealth of*

15    *Puerto Rico, et al.*, PROMESA, Title III, Case No.

16    2017-BK-3283, 2017-BK-3566, and 2019-BK-5523, for further

17    confirmation hearing.

18         THE COURT:  Thank you.

19         Again, good morning.  Would the video participants

20    please turn your cameras on for these introductory remarks and

21    instructions?

22         Welcome back, counsel, parties in interest, and

23    members of the public, and press who are observing today's

24    proceedings by Zoom video connection, or are listening by

25    telephone.  Today is a continuation of the Confirmation

1    Hearing for the Modified Eighth Amended Plan of Adjustment for

2    the Commonwealth of Puerto Rico, et al.

3         The Court will be hearing oral argument concerning

4    certain legal issues implicated by the motion to confirm the

5    Plan, and specifically on rulings that have been requested,

6    and a form of proposed Order.  To ensure the orderly operation

7    of today's virtual hearing, all parties appearing by Zoom must

8    mute their microphones when they are not speaking, and turn

9    off their video cameras if they are not directly involved in

10   the presentation or argument.  When you need to speak, you

11   must turn your camera on, and unmute your microphone on the

12   Zoom screen.

13        I remind everyone that, consistent with court and

14   judicial conference policies, and the Orders that have been

15   issued, no recording or retransmission of the hearing is

16   permitted by anyone, including but not limited to the parties,

17   members of the public, and members of the press.  Violations

18   of this rule may be punished with sanctions.

19        The Agenda for today, which was filed as Docket Entry

20   No. 19260 in Case No. 17-3283, is available to the public at

21   no cost on Prime Clerk from those who are interested.  I

22   encourage each speaker to keep track of his or her own time

23   during the arguments.  The Court will also be keeping track of

24   the time, and will alert each speaker when there are two

25   minutes remaining with one beep, and when time is up, with two

 1   beeps.  Here is an example of the beep sound.

 2        (Sound played.)

 3        THE COURT:  If your allocation is two minutes or

 4   less, you will just hear the final beeps.

 5        I will be calling on each participant during the

 6   hearing.  If you wish to be heard when I haven't called on

 7   you, please use the "raise hand" feature at the appropriate

 8   time.  That feature of Zoom can be accessed by selecting the

 9   reactions icon in the tool bar located at the bottom of the

10   Zoom screen.  After you finish speaking, you should select the

11   "lower hand" feature.

12        As always, I ask that we don't interrupt each other,

13   that you don't interrupt each other or me, because that makes

14   it difficult to create an accurate transcript, and, as always,

15   I apologize in advance for breaking the rule, because I may

16   interrupt if I have questions, or if you go beyond your

17   allotted time.  If you have difficulty hearing me or another

18   participant, please use the "raise hand" feature, so that we

19   can attend to that.

20        This morning's session will go to 12:50 PM Atlantic

21   Standard Time, and then we will take a lunch break.  That

22   lunch break will, therefore, be at 11:50, or ten minutes to

23   12:00 Eastern Time.  We will also take a ten-minute break at

24   about 11:30 AM Atlantic Standard Time, which will be 10:30 AM

25   Eastern Time.  We will resume, as necessary, at 3:10 PM

1    Atlantic Standard Time, which would be 2:10 PM Eastern Time.

2    Unfortunately, we do need to take a long midday break today,

3    because of some scheduling conflicts.

4         I would ask that you turn your cameras off now, and

5    turn your camera back on when I reach your Agenda item.  Is

6    there anyone who needs to raise anything before we begin the

7    arguments that are on the Agenda?  If so, raise your hand.

8         I don't see any hands raised, and so we will turn to

9    the first Agenda item, which is the Oversight Board's request

10   for rulings regarding Act 53-2021.  Counsel, I have reviewed

11   the submissions, and I would ask that, in your arguments, you

12   focus on issues regarding the interpretation of the statute

13   with regard to the requested rulings, as opposed to general

14   objections to the provisions of the Plan.

15        The first speaker is Mr. -- well, it's the

16   representative of the Oversight Board for 35 minutes.

17   Mr. Bienenstock and/or Mr. Mungovan?

18        MR. MUNGOVAN:  Good morning, Your Honor.  Timothy

19   Mungovan.

20        THE COURT:  Good morning.

21        MR. MUNGOVAN:  May it please the Court.  I'm

22   appearing on behalf of the Financial Oversight and Management

23   Board, as the sole Title III representative of the debtors in

24   this proceeding.

25        The Court should enter the rulings requested by the

1    Board in its notice, Your Honor.  Specifically, that the debt

2    authorization in Act 53 is conditioned only on the Plan's

3    cancellation of the monthly benefit modification, as set forth

4    in the Plan, and nothing in Act 53 requires cancellation of

5    the freeze and the elimination of the COLA.

6           The Court should enter those rulings based on three

7    basic things:  Number one, the plain language of Act 53, and,

8    if needed, the extrinsic evidence confirms the Plan satisfies

9    Act 53.  As to JRS, the freeze and the elimination of the COLA

10   do not violate constitutional principles, and they are not

11   otherwise wrongful.  I understand, from the Court's guidance,

12   that you do not want to hear argument on that.  And then,

13   third, as set forth in our brief, no enabling legislation is

14   required to implement the freeze.  I understand as well from

15   your instruction that you do not wish to hear argument on that

16   as well.

17          THE COURT:  Thank you.

18          Mr. Mungovan, is it possible for you to turn up your

19   volume on your end?  Would you just -- or it might be on my

20   end, but I'm having a little difficulty hearing you.

21          MR. MUNGOVAN:  Let me try again, Your Honor.  Can you

22   hear me now?

23          THE COURT:  Yes.  Thank you.  I could hear you

24   before, but I can hear you better now.

25          MR. MUNGOVAN:  Okay.  Thank you.

1          So as a road map, Your Honor, we were going to divide

2     the arguments between Mr. Bienenstock and myself.  I think

3     what I would propose is, subject to your guidance, that I'm

4     going to cover the statutory interpretation arguments that the

5     Court has indicated that it wants to hear argument on; and

6     Mr. Bienenstock I believe is going to cover the supplemental,

7     or filing by -- the limited response of the UAW and SEIU with

8     respect to the scope of the proposed rulings as set forth in

9     paragraph 33 of the Board's response brief filed on Monday

10    night, and specifically with respect to the application of

11    paragraph 62 of the proposed Confirmation Order.

12          THE COURT:  Very well then.  Please proceed.

13          MR. MUNGOVAN:  I will argue for 35 minutes,

14    Mr. Bienenstock will argue for ten, and we'll reserve the

15    remaining 15 minutes for rebuttal.

16          THE COURT:  All right.  So Mr. Kirpalani will not be

17    arguing?

18          MR. MUNGOVAN:  I apologize, Your Honor.  I will argue

19    for 25 minutes, Mr. Bienenstock will argue for ten, and

20    Mr. Kirpalani will be happy to hear that he has his ten

21    minutes restored at the end.

22          THE COURT:  Very well.  Thank you.

23          MR. MUNGOVAN:  Thank you.  I apologize.

24          While the Board contends that the statutory language

25    of Act 53 is clear and unambiguous on its face, I would like

1    to provide some factual context for the freeze, the COLA, and

2    the monthly benefit modification, who they affect, and how

3    they fit within the Plan of Adjustment, and the overall

4    ability of the Commonwealth to meet its pension obligations,

5    both the current retirees and to currently active employees.

6         This factual context we believe substantiates the

7    conclusion that the imposition of the freeze and the

8    elimination of the COLA in the Plan do not violate Act 53.  I

9    will not repeat our brief, but I will try to synthesize and

10   distill some key points in it.

11        For the first point of context, I'll start with the

12   people and their pensions.  There are three systems at issue,

13   pension systems at issue:  The JRS, the TRS, and the ERS.

14   There are retired employees, and currently active employees

15   who are participants in those three defined benefit plans; but

16   not every government employee, teacher, or judge is a

17   participant in those three defined benefit plans.  The more

18   recent hires are not participants in those plans.

19        For the second point of context, I will summarize

20   briefly the components of the Plan that are at issue:  The

21   monthly benefit modification, the freeze, and the elimination

22   of the COLA.  For the monthly benefit modification, it was a

23   cut to pensions that were already earned, full stop.  It was

24   contained in the Seventh Amended Plan, and provided for the

25   reduction of up to 8.5 percent of monthly pension payments in

1    excess of $1,500.  It applied to all three defined benefit

2    plans, and to both retired employees and currently active

3    employees who had accrued benefits under those defined benefit

4    plans subject to the $1,500 threshold, monthly threshold.

5         The monthly benefit modification has been removed

6    from the Eighth Amended Plan, and I respectfully refer the

7    Court to ECF no. 19053, and specifically section 1.337 of the

8    Plan, at page 70 of 295 in that ECF.  The pension freeze --

9    certain current employees in TRS and JRS are participants in

10   defined benefit plans, and they are continuing to accrue

11   benefits under those plans without any limit, as wage levels

12   increase, and they continue to work and earn time and service

13   in those plans.

14        The freeze stops the continued accrual of those

15   benefits under those defined plans for both TRS and JRS.  The

16   ERS plan has already been frozen since 2013, and, therefore,

17   is not implicated in the freeze as set forth in the Plan of

18   Adjustment.  The freeze, importantly, only applies to current

19   employees of TRS and JRS who are participants in those defined

20   plans.  For example, teachers hired before August 1, 2014,

21   are impacted by the freeze.  Teachers hired after that date

22   are not impacted by the freeze.

23        The participants in those defined benefit plans will

24   retain whatever benefits they have accrued up to the effective

25   date of the Plan, according to the freeze.  Again, they will

1   retain whatever they have earned and accrued up to the

2   effective date of the Plan.

3           The Plan provides for the freeze of defined benefit

4   plans in place for Class 51-H, which are active employees

5   participating in TRS, and 51-I, which are active employees

6   participating in JRS.  And that's in Plan sections 55.8 and

7   55.9.  And for JRS, that section is on page 122 of 295, at ECF

8   19053.  I would also respectfully direct the Court to Exhibit

9   E to the Plan at ECF page 209 of 295; and then separately, for

10  TRS, the applicable section is 59.9(b), and it is on pages 122

11  and 123 of 295, again, at ECF 19053.

12          The Plan works, and the freeze in the Plan works

13  towards leveling the playing field, and establishing fair and

14  uniform retirement benefits for all Commonwealth employees,

15  both current and retired.  The elimination of the COLA -- JRS

16  participants currently receive an increase to their pension

17  payments through COLAs every three years.  COLAs were

18  eliminated for all ERS and TRS participants in 2008 or

19  earlier.  The Plan eliminates all COLAs going forward for all

20  classes.  That's sections 55.1 through 55.9 in the Plan, and

21  that's ECF page 119 through 123, again at ECF 19053.

22          As a result of the elimination of the COLA, the

23  amount of monthly pension benefits will be fixed at the

24  current amount as of the effective date.  As with the freeze,

25  the elimination of the COLAs in the Plan work to level the

1   playing field for everyone, all Commonwealth employees, both

2   current and retired.

3       The third point of context is how the freeze and the

4   elimination of COLAs fit within the Plan of Adjustment.

5   Simply put, they are essential to the confirmation of the

6   Plan.  They relate to the Commonwealth's accrual of future

7   obligations, and, thus, Puerto Rico's ability to achieve

8   fiscal responsibility and access to the capital markets.

9       The Certified Fiscal Plan requires the freeze and the

10  elimination of COLA.  Let me state that again.  The fiscal

11  plan certified in April of 2021 requires the imposition of the

12  freeze and the elimination of the COLA.  The fiscal plans from

13  2019 and from 2020 also required the imposition of the freeze

14  and the elimination of the COLA.

15      And as the Fiscal Plan observes, these measures are

16  essential to put an end to the practice of making promises the

17  government cannot keep, while making sure the Commonwealth has

18  the ability to adequately fund its remaining pension system,

19  i.e., the PayGo system established under Act 106, and to pay

20  in full all of the benefits that have accrued through those

21  plans, through the effective date of the Plan of Adjustment.

22  Because the Fiscal Plan requires the freeze, and the

23  elimination of the COLA, the Plan of Adjustment must also

24  include the freeze and the elimination of the COLA to be

25  consistent with the Fiscal Plan, as required under PROMESA

1    section 314(b)(7).

2           If Act 53's authorization of new debt were deemed to

3    require the Plan to be modified to remove both the freeze and

4    the provisions eliminating the COLAs, the Plan would no longer

5    be consistent with the Fiscal Plan, and would not be

6    confirmable.  Accordingly, the Plan itself requires both the

7    freeze and the elimination of the COLA.

8           Separately and independently, the freeze -- if the

9    freeze and the elimination of COLA are not implemented, the

10   Oversight Board has determined that the Plan of Adjustment

11   will not be feasible.  The impact of eliminating the freeze

12   and reinstating the COLAs is approximately 4.7 billion

13   dollars, and that's set forth in the supplemental declaration

14   of Sheva Levy.  That's document no. ECF 19059, at paragraph

15   14.

16          With that context, Your Honor, the plain and

17   unambiguous language of Act 53 establishes that the

18   cancellation of the monthly benefit modification is the sole

19   condition for Act 53.  Articles 104 and 605 of Act 53 are the

20   operative provisions of the act.  Article 104 provides in full

21   -- and I'm going to read it, because I think it's a key part

22   of the argument, so give me a moment to have a drink.

23          Article 104 provides in full, the Government of the

24   Commonwealth of Puerto Rico hereby declares that it is the

25   public policy of the highest priority to protect the accrued

1    pensions of its public servants, who are one of the most

2    important groups in our society.  As an essential part of this

3    public policy, the protection of the pensions of all our

4    retirees is an important and unwavering commitment.

5         Therefore, with regard to the accrued pensions of

6    government employees, it is hereby provided as follows.  The

7    legislative assembly authorizes the issuance of the General

8    Obligation Bonds and CVIs subject to the FOMB filing an

9    amended plan for confirmation by the Title III Court that

10   eliminates the monthly benefit modification.  Article 104 sets

11   forth that the government's policy is to protect accrued

12   pensions, not future benefits that may accrue, or upward

13   adjustments to those benefits through COLAs.

14        By following this policy declaration with the phrase,

15   "therefore, it is hereby provided as follows," Article 104

16   shows the policy is made operative through and fulfilled by

17   the following sentence phrase:  The FOMB filing an amended

18   plan for confirmation by the Title III Court that eliminates

19   the monthly benefit modification.  That is the operation of

20   the policy.  Nothing more is required to achieve this policy,

21   and it would be inappropriate to read any additional

22   conditions into the policy.

23        Article 605 of Act 53 provides that, quote, the

24   effectiveness of this law is conditioned to the FOMB filing an

25   amended plan for confirmation by the Title III Court that

1    eliminates the monthly benefit modification as defined in the

2    Plan.  That's in Article 605.  Monthly benefit modification is

3    in turn a defined term, as defined so as to have the meaning

4    ascribed to such term in the Plan, and that's in Article

5    102(qq).

6         Nothing in the Plan refers to a pension freeze or

7    cost-of-living adjustment as part of the monthly benefit

8    modification, both of which were provided for separately in

9    the Plan of Adjustment.  Act 53 does not contain the words

10   "freeze", or "COLA", or "cost-of-living adjustment", or

11   anything remotely close to either of those terms, even though

12   the Plan of Adjustment contains and contained previously both

13   of those words, and the fiscal plan has contained both of

14   those concepts for several years.

15        The objectors effectively concede that point by

16   arguing in so many words that the language zero cuts to

17   pensions in Act 53 somehow encompasses the freeze and the

18   elimination of COLA in the Plan of Adjustment.  That argument

19   makes little sense in the context of Act 53.

20        The Teachers Associations focused on the first two

21   sentences of Article 104, which, quote, declare the public

22   policy of the Puerto Rico legislature to, quote, protect the

23   accrued pensions of its public servants and the, quote,

24   pensions of all our retirees, close quote.

25        The Teachers Associations' argument fails.  First,

1    they ignore the policy's express limitation to the word

2    "accrued" in both the first and third sentences of Article

3    104.  The word "accrued" means what has already been earned,

4    not future benefits that will be earned through continued

5    service and work into the future.

6           The freeze and the elimination of the COLA only

7    affect future accruals.  They do not affect already accrued

8    benefits.  Let me repeat that point, because I think it's

9    critical to the interpretation of the act itself.  The freeze

10   and the elimination of COLA affect only future accruals.  They

11   do not affect already accrued benefits.

12          Second, the Teachers Associations ignore the

13   provision in Article 104 tying the fulfillment of the policy

14   of protecting accrued pensions to an express and limited

15   condition on the issuance of the bonds, and that is to

16   eliminate the monthly benefit modification in the Plan.

17          Next, the Teachers Assocations focus on the last two

18   sentences of Article 605, but those sentences must be read in

19   the context of 605 as a whole, and in the context of Act 53.

20   In doing so, the Board contends that those two sentences

21   confirm what the Board contends is the plain meaning of the

22   act, which is a cut to the monthly payment to which active

23   employees and retired employees are currently entitled.  The

24   sentences do not encompass the freeze or the elimination of

25   the COLA.

1    I will read 605 to frame the context for the next

2    argument.  It provides as follows:  This law will take effect

3    immediately after its enactment, except for chapter five of

4    this law, which will take effect on the date of effectiveness.

5    The effectiveness of this law is conditioned to the FOMB

6    filing an amended plan for confirmation by the Title III Court

7    that eliminates the monthly benefit modification as defined in

8    the Plan.  For the sake of clarity, this act shall immediately

9    cease to be in effect, and any transactions undertaken

10   pursuant to it, if reductions to the pensions of government

11   employees are decreed or implemented under the debt adjustment

12   plan, or the restructuring of the debt.  The continued effect

13   of this act is contingent upon zero cuts to pensions.

14   The Teachers Associations focuses on the last two

15   sentences, but ignores the prepositional phrase at the

16   beginning of the third sentence, which is, for the sake of

17   clarity, which prefaces the final two sentences.  That

18   preceding -- that prepositional phrase, for the sake of

19   clarity, refers back to the preceding sentence, meaning the

20   second sentence of section -- of 605, and which is the subject

21   of -- and that is the subject of the clarification in the

22   prepositional phrase.

23   And that preceding sentence, the second sentence of

24   605, is explicitly limited to the elimination of the monthly

25   benefit modification.  All that follows the phrase "for the

1  sake of clarity" in the last two sentences simply clarifies

2  and restates what came before, and does not add any new or

3  additional conditions.  And in our brief, we cite to the

4  *Activision Blizzard* case from the Delaware Chancery Court in

5  2015.

6          To read the final sentences of 605 as adding

7  additional conditions, as the Teachers Associations suggest,

8  would directly contradict the preceding sentence in the

9  statutory text, which is limited by it's very nature to the

10  elimination of the monthly benefit modification.  Nothing in

11  Article 605 suggests the Plan must also eliminate the freeze

12  or the COLA modifications.

13          The Board's interpretation reflects the commonplace

14  statutory construction that the specific governs the general.

15  This principle of statutory construction, and we cite cases

16  supporting it in our brief, has tightened applicability here

17  in this context where the legislature has in the statute,

18  quote, deliberately targeted specific problems with specific

19  solutions, and we've cited to the *RadLAX* case from the United

20  States Supreme Court.  And we're given a general provision

21  that maximum possible breadth would render this specific

22  provision here superfluous.

23          If references in Act 53 to zero cuts to pensions were

24  given the construction advocated by the objectors to preclude

25  any conceivable alteration or limitation of all pension

1    benefits, the specific provisions of Act 53 expressly

2    prohibiting the monthly benefit modification, would be

3    rendered superfluous, because such a prohibition would already

4    be contained in the all-encompassing prohibition on any cut to

5    pensions.

6         This reading, meaning the Board's reading of Article

7    605 and Article 104, are consistent with the doctrine that

8    statutes must be read as a whole.  Here, Article 605 begins by

9    identifying as the sole condition for the act's effectiveness

10   that the, quote, FOMB filing an amended plan for confirmation

11   by the Title III Court that eliminates the monthly benefit

12   modification.  The ensuing language later in 605 of "zero cuts

13   to pensions," therefore, must mean simply no reduction of

14   accrued pensions of the type that would be effectuated by the

15   monthly benefit modification.

16        Indeed, each time the operative sections of Act 53

17   mention the policy goal of protecting government pensions, it

18   is accompanied by a reference to Article 104, or the term

19   "monthly benefit modification".  In other words, Article 104

20   and Article 605 are fully harmonized, in the Board's

21   interpretation of those acts, as applying only to the monthly

22   benefit modification, and having no impact whatsoever on the

23   freeze or the elimination of the Cola.

24        The Teachers Associations also point to the

25   severability provision in Article 603.  As a preliminary

1    matter, Article 603 merely provides that the conditions of

2    Articles 605 and 104 are nonseverable, and that if they were

3    found to be invalid, the whole statute would be without

4    effect.

5         Severability is not an issue here, however, as

6    Article 603 is not even implicated at all.  In any event, the

7    language in Article 603 confirms that, quote, the suspensive

8    condition to avoid any cut of pensions, close quote, is

9    embodied by Article 104, which explained already is limited to

10   the elimination of the monthly benefit modification.

11        One last point on plain meaning, Your Honor.  To the

12   extent that the objectors point to the very last sentence of

13   the law to argue that it encompasses and prohibits the freeze

14   and elimination of COLA, we would submit that, respectfully,

15   that makes no sense.  That sentence is on page 110 of 231 of

16   ECF 19249, and it states in its entirety, the continued effect

17   of this act is conditioned upon zero -- excuse me, the

18   sentence -- I'll start again.  The continued effect of this

19   act is contingent upon zero cuts to pensions.

20        The legislature was well aware of the freeze and the

21   elimination of the COLA in the Plan and in the fiscal plan.

22   The freeze and the elimination of the COLA involved literally

23   billions of dollars.  As the Supreme Court has stated, and as

24   we said in our brief, Congress does not hide elephants in

25   mouse holes.  This would be the proverbial hiding of the

1    elephant in a mouse hole if that one sentence was interpreted

2    to mean that the Plan -- the Plan of Adjustment must be

3    changed to eliminate the freeze, and the elimination of the

4    COLA.

5         And with that, Your Honor, unless the Court has

6    questions on the interpretation, I'll stand on our brief for

7    the remainder of the arguments, and cede remaining time to

8    Mr. Bienenstock.

9         THE COURT:  Thank you, Mr. Mungovan.

10        Mr. Bienenstock?

11        MR. BIENENSTOCK:  Good morning, Your Honor.

12        THE COURT:  Good morning.

13        MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

14   Rose, LLP, for the Oversight Board, as Title III

15   representative of the debtors.

16        Given Your Honor's remarks at the outset, I will only

17   address the filing that I first saw last evening from SEIU and

18   the UAW.  It's at document no. 19278, and I think it was filed

19   about 9:03, or something like that.  But the point of the

20   pleading is their contention that the request for the Court to

21   enter the Confirmation Order, inclusive of paragraph 62 that

22   we inserted, should be rejected, because paragraph 62 was not

23   among the express requested rulings that we included in the

24   notice of the relief we were going to seek interpreting

25   paragraph -- or Act 53.

1         There are several reasons, Your Honor, why we contend

2    the SEIU and UAW are wrong.  First, as a practical matter,

3    PROMESA section 313, headed Modification of Plan, provides

4    that the Oversight Board, after the issuance of a

5    certification pursuant to section 104(j) of this act, may

6    modify the plan at any time before confirmation, but may not

7    modify the plan so that the plan, as modified, fails to meet

8    the requirements of this title, and it goes on.

9         So regardless of Act 53, Your Honor, and our motion

10   that brings us here today, the Oversight Board has every right

11   to amend the Plan and the Confirmation Order, obviously that

12   goes with the Plan, as long as it's not -- doesn't make it

13   unconfirmable.  And the bankruptcy case, the Title III case,

14   and the Confirmation Hearing have been well noticed many times

15   to all parties in interest.  Probably one of the most famous

16   confirmation hearings ever.

17        In terms of the UAW and SEIU's objection the other

18   day, they raise the "material and adverse" concept, and I want

19   to explain why that's inapplicable.  There's a provision in

20   both the Bankruptcy Code and in PROMESA, as I said, where

21   plans can be modified, and Bankruptcy Rule 3019, which is

22   incorporated into PROMESA, provides that if a plan has been

23   accepted and then the plan proponent amends it adversely, then

24   classes that have accepted that are adversely effected cannot

25   be deemed to accept.  If they are not adversely effected by

1  the modification, they are deemed to accept the modified plan.

2          In this case, Your Honor, the ERS classes that we are

3  talking about rejected the Plan, so we are not contending that

4  they accepted and they're bound to accept again with our

5  modification.  We are accepting the fact that they rejected.

6  And the only way the Plan can be confirmed is if,

7  notwithstanding their rejection, the Court determines under

8  section 1129(b) that it can still be confirmed, which is what

9  we are contending.  So the adverse and material standard that

10  they raised has nothing to do with this case, and under

11  PROMESA section 313, we have every right to make the amendment

12  before confirmation, regardless of whether it's related to Act

13  53 or anything else.

14          Now, as a practical matter, the section -- or

15  paragraph 62 that the Board is asking for is very restrictive.

16  It doesn't say -- first, it's a restriction on the government,

17  not employees.  Now, we totally understand that the employees

18  are effected by what the government does, but all people are

19  effected by actions of the government.  But as far as standing

20  to take umbrage about paragraph 62, it's the government that's

21  being restricted directly, and the restriction is not all

22  encompassing in terms of wanting to improve the lot of

23  retirees.

24          As Your Honor may recall from previous pleadings and

25  arguments, there is a hope and aspiration that things will get

1    better, and retirees, active employees may end up with better

2    benefits than this plan contemplates, and that would be

3    wonderful.  And creditors may end up with more, too, under the

4    CVIs, and that would also be wonderful.

5            Paragraph 62 doesn't prevent any of that, except in

6    one narrow respect.  It says that without coming to the Court

7    and showing that it won't be an undue risk of default, that

8    there's funding, and other prudent, normal, business, common

9    sense requirements, that the government should not reestablish

10   a defined benefit plan or it's equivalent.

11           So that doesn't -- if they have extra money and they

12   just want to make an extra payment, it may or may not be

13   consistent with the fiscal plan and other things, but if it

14   is, that's not effected at all by paragraph 62.  Paragraph 62

15   only attempts to secure, for the ten-year period, the lack of

16   a new defined benefit regime, because that's what was perhaps

17   the primary cause of the financial distress we happened

18   into.

19           And as I mentioned the other day, we are dealing now

20   with laws -- for instance, Law 80 is already on the books in

21   Puerto Rico.  We have an agreement with AAFAF and the Governor

22   that it won't be implemented, but it actually creates a

23   defined benefit plan, Your Honor, so we're learning from

24   experience.  The desire to have these plans is apparently

25   forever, and we need to stop them, at least subject to the

1    tests embodied in paragraph 62, for the ten-year period, so as

2    to assure the fiscal responsibility that is the Board's

3    mandate.

4            So bottom line, we think procedurally the SEIU and

5    UAW's pleading of last night fails, because there is no

6    restriction that we can only -- that we can't modify the Plan

7    or Confirmation Order.  And in terms of linking it to Act 53,

8    well, it's obviously related, and we disclosed it.  And this

9    was a good vehicle, but even without that, the Board would

10   want it, and would go forward with the modification.

11           Unless the Court has questions, that's all I have,

12   Your Honor.

13           THE COURT:  Thank you, Mr. Bienenstock.  I don't have

14   questions.

15           So now we'll turn to Mr. Kirpalani.

16           MR. KIRPALANI:  Good morning, Your Honor.  Susheel

17   Kirpalani from Quinn, Emanuel, Urquhart & Sullivan on behalf

18   of the Lawful Constitutional Debt Coalition.

19           THE COURT:  Just one moment.  There is a hand raised,

20   which I actually don't see on my list.  Let me ask my deputy

21   here.

22           Let's see.  Counsel for SEIU and the UAW.  I'm sorry.

23   Mr. DeChiara, you have to unmute.

24           MR. DECHIARA:  Yes, Your Honor.  Peter DeChiara from

25   the law firm of Cohen, Weiss & Simon, LLP, for the UAW and

1 SEIU.

2            I apologize for interrupting, Your Honor, but in

3 light of Mr. Bienenstock's remarks, my clients would

4 respectfully request time to respond.  And we would be happy

5 to do that at the end of the presentations by the other

6 parties who are being heard in opposition to the Act 53

7 motion.

8            I don't think I would need long, maybe -- certainly

9 less than ten minutes.

10           THE COURT:  All right.  I will grant you ten minutes,

11 and I will call on you after Mr. Mendoza-Mendez, who will

12 speak for the AJJPR.

13           MR. DECHIARA:  Thank you very much, Your Honor.

14           THE COURT:  Thank you.

15           So, Mr. Kirpalani, we return to you.

16           MR. KIRPALANI:  Thank you, Your Honor.  And,

17 actually, just -- I would like to ask my partner, Danny

18 Salinas, from San Juan to handle this argument relating to the

19 Puerto Rico statute and its meaning.

20           THE COURT:  Very well.  Good morning, Mr. Salinas.

21           MR. SALINAS-SERRANO:  Good morning, Your Honor.  Can

22 you hear and see me?

23           THE COURT:  Yes, I can.

24           MR. SALINAS-SERRANO:  Thank you very much.  And may

25 it please the Court, Daniel Salinas Serrano, of Quinn,

30

1    Emanuel, Urquhart & Sullivan, on behalf of the Lawful

2    Constitutional Debt Coalition.  May I proceed, Your Honor?

3            THE COURT:  Yes, you may.

4            MR. SALINAS-SERRANO:  Thank you.  Your Honor, given

5    Mr. Mungovan's great job taking the Court through the language

6    of Act 53, I'd like to use my time to provide a bit more

7    context, not because I think Act 53 is ambiguous or requires

8    that the Court delve into the legislative intent to interpret

9    it.  It is not and does not.  But because that context I think

10   underscores the fallacy of the objectors' arguments.

11           Now, the treatment of public employee pensions has

12   featured prominently, both in and outside this courtroom, for

13   well over two years, Your Honor.  The Oversight Board has

14   consistently and publicly required benefit reductions, while

15   the Commonwealth Government has resolutely and just as

16   publicly opposed any alteration of those benefits.

17           This debate, Your Honor, has not been theoretical.

18   Beginning in the first Plan of Adjustment filed in this case

19   in September, 2019, at ECF 8765, the Oversight Board

20   consistently sought to, one, cut the existing accrued monthly

21   pension payments of all public employees above a certain

22   threshold, or what the Plan has always called the monthly

23   benefit modification that you heard Mr. Mungovan speak about;

24   two, freeze monthly pension payments of teachers and judges at

25   current levels, so as to prohibit any future potential

1   increases in those monthly pension payments; and, three,

2   suspend any future cost-of-living adjustments, or COLAs, for

3   judges' pensions.

4          None of this, Your Honor, was secret.  All of it was

5   the subject of vigorous public debate, and even more vigorous

6   private wrangling.  On July 30th, 2021, almost two years

7   later, the Oversight Board filed its Seventh Amended Plan of

8   Adjustment at ECF 17627, which imposed the same three measures

9   with respect to pensions that the Board had maintained in the

10  preceding six versions of the Plan:  The monthly benefit

11  modification, the freeze, and the COLA suspension.

12         That, Your Honor, the Seventh Amended Plan, was the

13  operative version of the Plan when legislators, the Governor,

14  and the Oversight Board were negotiating the language of what

15  would later become Act 53.  Everyone then knew what the levers

16  were, because the levers had never changed:  The monthly

17  benefit modification, the freeze, and the COLA suspension.

18         On October 25th, Your Honor, the Governor, the Senate

19  President, and the Speaker of the House of Representatives

20  appeared before the Court.  Each of them expressed his

21  confidence that the legislation they were putting the final

22  touches on would satisfy the PSA and implement the Plan.  It

23  was obvious that each of them also understood the enormity of

24  the stakes if they failed; but, Your Honor, these leaders

25  chose compromise over failure, and enacted Act 53.

1           If I may share my screen briefly, Your Honor?

2           THE COURT:  Yes, you may.  I think we have to let you

3    do that, so hold on a moment.

4           All right.  So we've given you the ability to share

5    your screen.

6           MR. SALINAS-SERRANO:  And can you see my screen, Your

7    Honor?

8           THE COURT:  Yes.

9           MR. SALINAS-SERRANO:  You should be seeing Article

10   104 of Act 53.

11          THE COURT:  Yes.  I can see your screen now.

12          MR. SALINAS-SERRANO:  Thank you, Your Honor.  And I

13   show you this because, as Mr. Mungovan explained, it really is

14   the key provision of the act with respect to the interplay

15   between pension treatments and the authorizations granted

16   under the act for the issuance of the GO bonds and the CVIs.

17          Now, fully aware that the Seventh Amended Plan

18   impaired both accrued pension benefits through the monthly

19   benefit modification and unaccrued pension benefits, as

20   Mr. Mungovan explained, through the freeze and the COLA

21   suspension, Act 53 conditioned the authorization of the GO

22   Bonds and CVIs only on the unimpairment of accrued benefits.

23   That is clear from the plain text of Article 104, Your Honor.

24          Legislators undoubtedly would have preferred to block

25   both impairments of accrued and unaccrued pension benefits,

1    and, Your Honor, they could have easily done so.  Just as the

2    legislator's conditioned their authorization of the GO Bonds

3    and CVIs on the elimination of one of the three pension

4    impairments in the Plan, the monthly benefit modification,

5    which, as you can see highlighted in green at the end, they

6    plucked directly from the Plan.  They could have done the same

7    with the freeze and the COLA suspension, but they didn't,

8    because the legislators and the government compromised.

9         In fact, as Mr. Mungovan noted, the Court will not

10   find any mention of freezes or COLAs anywhere in Act 53.  Not

11   a single mention, Your Honor.  As the Oversight Board has

12   explained in its submission, however, the Senate actually

13   passed a version of the bill prior to Act 53 that did

14   condition effectiveness on the removal of any freeze from the

15   Plan.  So the legislature clearly was aware that the Plan

16   imposed a freeze, and clearly knew how to oppose that freeze,

17   or require that -- the elimination of that freeze to be a

18   condition.  But that language did not make it into Act 53,

19   Your Honor, because, again, the government compromised.

20        Now, the objectors' reliance on the phrase "zero

21   cuts" and other general references like "no reductions to

22   pensions" in Act 53, changes absolutely nothing.  Their

23   reading runs counter to not only Act 53's plain text, as

24   Mr. Mungovan explained, but also to the act's statement of

25   motives, which is the very best and clearest expression of

1     legislative intent.

2           And if I may, can I -- let me stop sharing and share

3     again, Your Honor.  Apologies.

4           THE COURT:  Thank you.  So you're going to share a

5     different screenshot?

6           MR. SALINAS-SERRANO:  I am.  I apologize.

7           THE COURT:  That's fine.  So we'll leave you with the

8     sharing rights.  Okay.

9           MR. SALINAS-SERRANO:  Thank you, Your Honor.  Can you

10    see it now, Your Honor?

11          THE COURT:  I see something that says you've started

12    screen sharing, but I don't see your screen -- now I see it,

13    the statement of motives.

14          MR. SALINAS-SERRANO:  Thank you, Your Honor.

15          Now, these are excerpts from Act 53's statement of

16    motives, and as you can see from the first excerpt, which is

17    taken from ECF 19249 at page 79, you can see that like Article

18    104 of the statement of motives clarifies that the provisions

19    of Act 53 that seek to protect pensions are aimed at, quote,

20    current accrued benefits, future contingent benefits, like the

21    increases and COLAs, are neither current nor accrued, and,

22    therefore, are not included in Act 53's reference to zero

23    cuts.

24          Further down, taken from act -- 19249, at 82, the

25    legislative assembly also explained that it was motivated by

1   the fact that retirees, quote, have already suffered cuts in

2   their pensions as a result of the enactment of statutes that

3   reduced pension benefits, increased the amount of employee

4   contributions, and raised the retirement age.

5        The legislature did not include freezes as examples

6   of prior cuts.  It could have, however, because in 2013, under

7   Act 3 of that year, the government reformed the ERS pension

8   system by, among other things, freezing future monthly benefit

9   increases.  Now, by omitting this freeze from its description

10  of cuts that retirees suffered in the past, the legislature

11  again confirmed that its conception of pension cuts is limited

12  to reductions or elimination of actual accrued monthly

13  benefits.

14        And the last sentence of that same excerpt, Your

15  Honor, makes clear that the legislature decided to exclude any

16  freeze of future unaccrued benefit increases or COLAs as the

17  plain text already makes clear.  Now, the legislature drew a

18  line between accrued and unaccrued pension benefits.  That

19  line drawing exercise is consistent with and makes sense in

20  light of a line of Puerto Rico Supreme Court cases that

21  discuss what the Court calls acquired rights.

22        Now, the Puerto Rico Supreme Court has discussed --

23  has defined acquired rights as those that are, quote,

24  definitively incorporated into the patrimony of a person.  And

25  we cite Hernandez Colon v. Policia de Puerto Rico, 177 D.P.R.

1    121.  It's a 2009 case.

2         According to the Supreme Court, the opposite of an

3    required right is a mere expectation.  Now --

4         (Sound played.)

5         MR. SALINAS-SERRANO:  May I finish, Your Honor?

6         THE COURT:  You can sum up this point, yes.

7         MR. SALINAS-SERRANO:  Now, acquired rights are legal

8    faculties that are regularly exercised, while expectations are

9    mere probabilities or hopes.  The Puerto Rico Supreme Court's

10   distinction between acquired rights and mere expectations

11   mirrors what the legislature did in Act 53, because the

12   payments that retirees already receive, and that would have

13   been effected by the modified -- by the monthly benefit

14   modification, were acquired in that the retirees already

15   receive it, and it enters into their patrimony.  Whereas

16   future potential increases and cost-of-living adjustments are

17   mere probabilities or hopes that, according to the Supreme

18   Court, can be effected and modified by a change in law.

19        THE COURT:  Thank you.

20        MR. SALINAS-SERRANO:  Now, Your Honor, in light of

21   these arguments, and those detailed in our joinder, we

22   respectfully request that the Court discard the strained

23   reading of Act 53 urged by the objectors, and that, through

24   the findings and conclusions requested by the Oversight Board,

25   it give effect to the hard fought compromises that all

1    stakeholders achieved, including those embodied in Act 53.

2            THE COURT:  Thank you, Mr. Salinas.

3            MR. SALINAS-SERRANO:  Thank you, Your Honor.

4            THE COURT:  Next, for the Teachers Associations,

5    Ms. Mendez-Colberg.

6            MS. MENDEZ-COLBERG:  Good morning, Your Honor.  Can

7    you see me and hear me?

8            THE COURT:  Yes, I can.  Good morning.

9            MS. MENDEZ-COLBERG:  Good morning.  Thank you.  May I

10   proceed?

11           THE COURT:  Yes, you may.

12           MS. MENDEZ-COLBERG:  Thank you.

13           Good morning.  My name is Jessica Mendez-Colberg, on

14   behalf of Federacion de Maestros de Puerto Rico, EDUCAMOS, and

15   UNETE, for their Spanish acronyms.  And I will be referring to

16   them collectively as the Teachers Associations.

17           Your Honor, the Oversight Board stated in its reply

18   that the operative sections of Act 53 are clear and

19   unambiguous, and that the only condition to Act 53's

20   effectiveness is the removal of the monthly benefit

21   modification from the Plan.

22           First of all, if Act 53 is so clear and unambiguous,

23   as the Oversight Board portrays, then the Board would not be

24   requesting this Court for a ruling on the meaning of Act 53,

25   or anticipating future challenges to the act.  Sure, when it

1    comes to statutory interpretation, if the law is unambiguous,

2    the Court should look at the plain text of the statute, but,

3    still, the statute must be analyzed as a whole.

4         When we look at Articles 105 and 605, in which the

5    Board mainly focuses, we see ambiguity within the act.  What

6    did the legislature intend to protect?  What is the public

7    policy?

8         Yes, Article 104 speaks in terms of accrued pensions,

9    but it also speaks about the protection of pensions of all our

10   retirees and an important unwavering commitment.  Does that

11   mean active TRS participants will have future benefits

12   accruing?  Does that mean retired TRS participants?  Does that

13   mean all of them?

14        Now, Article 605, on the other hand, conditions the

15   effectiveness of the act to the Oversight Board's filing an

16   amended plan of adjustment that eliminates the monthly benefit

17   modification, and that's the part that the Oversight Board

18   stresses the most.  But Article 605 also states that the

19   continued effect of this act is contingent on zero cuts to

20   pensions.  It doesn't say accrued pensions.  And as we stated

21   in our objection, zero means zero.

22        That same article goes further to say, and it states,

23   and I quote, "for the sake of clarity," that the law shall

24   immediately cease to be in effect if reductions to the

25   pensions, stated in general terms, of government employees are

1   decreed or implemented under the Plan or the restructuring of

2   the debt.  It says "or".  It could be either option.

3          And that particular wording was not in the original

4   version of the House Bill 1003.  That last sentence that

5   specifically states "for the sake of clarity," was added

6   through the amendments of the -- of the act.  Why would the

7   legislative assembly feel the need to add "for the sake of

8   clarity," and then speak in terms of pensions in general

9   terms?

10         Now, precisely the wording of Articles 104 and 605 is

11  ambiguous, because the Court can turn to extrinsic evidence to

12  interpret the legislative intent.  And with respect to

13  extrinsic evidence, the Oversight Board turns in the reply

14  brief to the different versions of the Bill 1003 to put out

15  that these previous versions specifically mentioned the freeze

16  and the COLAs, and that such references were eliminated in the

17  version of House Bill 1003 that ultimately was enacted as Act

18  53.

19         And we can actually agree on that point.  Act 53 does

20  not specifically mention the freeze and the elimination of the

21  COLAs right now as it was enacted, but the interesting part is

22  House Bill 1003, particularly the version of October 19,

23  stated in Article 104, that counsel read the entire article,

24  Counsel for the Oversight Board, but that original version of

25  Article 103 stated that the legislative assembly authorized

1    the issuance of the General Obligation Bonds conditioned to

2    the Oversight Board amending the Plan of Adjustments to remove

3    the monthly benefit modification, but it also, at the end,

4    added that this condition does not affect the freezing, or

5    future accrual, or the elimination of future adjustments for

6    increases in the cost of living.  And that part was eliminated

7    from Article 104.

8         In other words, the bill used to clarify that the

9    condition to eliminate the monthly modification was not

10   effected by the freeze, and that was eliminated.  That's what

11   the Oversight Board is looking for, that the -- that the

12   condition is only subject to the monthly benefit modification.

13   But the fact that the legislature eliminated that language and

14   instead -- the fact that the legislature eliminated that

15   language, and we were left with general provisions throughout

16   the act, referring to any cuts, zero cuts in such general

17   terms means that the legislative assembly had the opportunity

18   to specifically state it in that way.

19        Now the irony of the Board's argument is that the

20   Board thinks that because Act 53 does not address the freeze

21   and the COLAs right now, then that it is authorized to

22   implement them.  On the contrary, the total absence of

23   legislation regarding such reforms to the retirement system

24   does not mean that the Board is then authorized to implement

25   such provisions through the Plan of Adjustment.

1          And we submit that the Board needs the enabling

2     legislation to implement such reforms.  And that was actually

3     agreed when Governor Pierluisi -- the Board actually agreed

4     with Governor Pierluisi's assessment of Act 53 when he stated

5     that this is an issue separate from Act 53.  And he

6     reiterated, to be clear, Act 53 does not implement the freeze,

7     nor prevents a freeze from occurring.

8          So when analyzing the statutory text as a whole, we

9     can turn to Article 603, which the -- my friends on the other

10    side hadn't mentioned.  Article 603 mandates that the

11    restructuring transactions authorized in the act cannot be

12    enforced if the suspensive condition to avoid any cuts of

13    pensions in the Plan of Adjustment or Article 104 are left

14    without effect, because the logical interpretation of the

15    statute is that the legislative assembly expressly intended

16    for no cuts whatsoever to the pensions, including the monthly

17    benefit modification as it is stated clearly in Article 104,

18    but, also, any cuts of pensions, zero cuts to the government

19    employees, as stated in Articles 603 and 605.

20         And, again, the wording on Article 603 that refers to

21    any cuts was present -- was not present in the early versions

22    of Bill 1003; but the legislature made sure to incorporate it,

23    and, with it, Act 53 was enacted.  With such wording, this

24    Court cannot grant the Oversight Board's request for an

25    interpretation of the statute that falls far from the text of

1    the law.  It would be illogical to interpret that the act --

2    to interpret the act as if the legislative assembly only

3    intended to condition the issuance of new debt to the

4    elimination of the monthly benefit modification, and still

5    allow the Oversight Board to implement a Plan of Adjustment

6    that imposes other cuts and freezes to pensions when the

7    public policy, and I quote, of the highest priority, is to

8    protect the pensions.

9         Now, the public policy of zero cuts means zero,

10   nothing at all.  Now, if we would agree that the only

11   condition for the issuance of the new bonds is the elimination

12   of the monthly benefit modification, then the ruling of this

13   Court needs -- then the ruling of this Court should end there,

14   but the Board wants to go further, so that the ruling of this

15   Court allows it to implement the freeze and the elimination of

16   the COLAs through the Plan of Adjustment, even when the act

17   does not expressly allow it.  And there is no enabling

18   legislation, as required by section 314(b)(5) of PROMESA.

19   Thus, the Plan is not confirmable, and no pension system

20   reform can be implemented without legislation to that effect.

21        The Oversight Board states that no applicable law

22   requires authorization of the freeze and the elimination of

23   the COLAs, but the Board only cites the part of section

24   314(b)(5) that says that the legislation is required when it

25   is necessary under applicable law.  And the Board asserts that

1    there is no applicable law.

2         But section 314 also calls for the legislation

3    necessary to carry out the provisions of the Plan, and in that

4    sense, the Board does not have authorization from the

5    legislative assembly to carry out the provisions of the Plan

6    that implicate any freezes, the elimination of the COLAs, or

7    reforms to the TRS.

8         THE COURT:  So, Ms. Mendez-Colberg, doesn't that

9    present the issue for the Court of a legal determination of

10   whether legislation is necessary?  The Oversight Board argues

11   that the legislation is not necessary, because of the

12   provisions of PROMESA, and the incorporated provisions of the

13   Bankruptcy Code, and you assert that it is.  So that's

14   something that I have to determine, correct?

15        MS. MENDEZ-COLBERG:  Yes, Your Honor.  That's

16   correct.  The Court would need to determine if the Oversight

17   Board can implement the Plan of Adjustment without the

18   enabling legislation to carry out the provisions of the Plan.

19   That is what we're saying.

20        And particularly important here in the context of the

21   Title III, Your Honor, where, unlike the Chapter Nine cases,

22   here it is not the debtor, it is the representative of the

23   debtor, the one that's making the decisions that -- the one

24   that formulates the Plan of Adjustment and implements it.  So

25   it's all part of the awkward power sharing agreement that this

1    Court has recognized that presents in the context of PROMESA.

2         Now, as for the preemption, this cannot be invoked to

3    override the exclusive prerogative that PROMESA grants to the

4    legislature.  Preemption displaces local legislation, but

5    there is still a need to enact new legislation that

6    establishes the provisions necessary to carry out the

7    provisions of the Plan of Adjustment.  And that includes those

8    provisions that attempt to modify in any way the TRS.

9         The Plan of Adjustment and the Fiscal Plan in and of

10   themselves cannot serve as the legislation required to confirm

11   the Plan. And section 314(b)(5) only grants the power to enact

12   enabling legislation to the Government of Puerto Rico, as this

13   Court has already recognized with the awkward power sharing

14   agreement.  And the Oversight cannot bypass the required

15   legislation that section 314 mandates through the Confirmation

16   Order or the preemption doctrine.

17        The Plan of Adjustment only states a summary of the

18   modifications with respect to the freezes of the pensions, and

19   such modification -- and that such modifications altered the

20   benefits provided by the TRS.  But, again, this is not the

21   legislation that is necessary to implement the Plan.

22        Now, for the sake of the argument, if it is conceded

23   that the provisions of the Plan of Adjustment caused several

24   laws to be preempted by PROMESA, the Plan itself is not, as I

25   mentioned, the enabling legislation, even if the Plan is

1   amended to be more specific.

2           Now, the Oversight pointed out in their motion that

3   one of the objectives to request this ruling from the Court,

4   in interpreting Act 53, is to prevent the Puerto Rico

5   Government from circumventing the terms of the Plan through

6   subsequent legislation.  First, it has been previously

7   discussed, the importance of respecting the legislative

8   process, and that was what the representatives of the

9   legislative assembly and the Governor stated to this Court in

10  the urgent status conference of October 25th.

11          The Oversight cannot -- the Oversight Board cannot

12  use this Court's ruling to act to -- ruling on Act 53 to

13  prevent or restrict the Commonwealth from enacting legislation

14  that might be used to implement any type of reform or increase

15  of benefits of the TRS participants at some point in the

16  future.  The Over -- for that, the Oversight Board has

17  alternative -- has the mechanisms through PROMESA sections 108

18  and 204 that provide for the mechanisms to block

19  implementation or enforcement of laws that have been enacted,

20  but the Board cannot prevent the Government of Puerto Rico

21  from enacting legislation as of this point.

22          Finally, Your Honor, the Board also states that there

23  is no need for the enabling legislation, because section 365

24  of PROMESA allows the reinjection of future obligations to

25  teachers, but here the issue is whether the Plan of Adjustment

1   meets the enabling legislation to implement the provisions of

2   the Plan.

3           Finally, Your Honor, we would like to state for the

4   record that it is bad enough that the Oversight Board is an

5   undemocratic entity that is calling all the shots upon the

6   people of Puerto Rico's future.  It is worse to give in to the

7   Oversight Board's interpretation of this act that aims to

8   protect pensions of government employees and allow the Board

9   to overextend its powers to still impose further cuts over the

10  legislature's intent.

11          The teachers deserve better.  The people of Puerto

12  Rico deserve better.  As such, we respectfully request the

13  Court to deny the Oversight Board's urgent motion.  Thank you,

14  Your Honor.

15          THE COURT:  Thank you, Ms. Mendez-Colberg.

16          The next speaker is Mr. Barrios-Ramos for the AMPR

17  for 15 minutes.

18          MR. BARRIOS-RAMOS:  Good morning Your Honor.

19          THE COURT:  Good morning.

20          MR. BARRIOS-RAMOS:  For the record, Attorney Jose

21  Luis Barrios in representation of Asociacion de Maestros de

22  Puerto Rico, and its Local Sindical, the exclusive

23  representative of teachers in Puerto Rico.

24          Your Honor, we want to make the distinction in an

25  abundance of caution since the prior speaker --

1             MR. SEGUI:  You hear us, Your Honor?

2             THE COURT:  Yes, I hear you now.

3             MR. SEGUI:  Okay.  Amy, where did you left --

4             COURT REPORTER:  Good morning, Your Honor.  We froze

5    right after Counsel Barrios introduced himself.

6             THE COURT:  All right.  So I'll ask him to restart

7    entirely.  Thank you.

8             Mr. Barrios, can you --

9             MR. BARRIOS-RAMOS:  Good morning.

10            THE COURT:  Very good.  Welcome back.  You may have

11   heard, the court reporter was unable to hear you from the time

12   you introduced yourself, so we're restarting your clock, and

13   would you restart your argument, please.

14            MR. BARRIOS-RAMOS:  Yes, Your Honor.  For the record,

15   again, Attorney Jose Luis Barrios on behalf of Asociacion de

16   Maestros de Puerto Rico, and its Local Sindical, the exclusive

17   representative of teachers.

18            Your Honor, we'd like to start our argument with a

19   quote taken from the TRS decision in the case of *Asociacion de*

20   *Maestros v. Sistema Retiro de los Maestros*.  At that time, the

21   Court, and speaking on behalf of Justice Charneco stated,

22   teachers who, with tremendous sacrifice and devotion, share

23   the breadth of learning in the hope of building the Puerto

24   Rico we all dream of deserve more than being steamrolled by

25   clearly unreasonable laws.  The path to our socioeconomic

1    progress cannot be paved at the expense of our teachers.

2           Your Honor, at that time, the Supreme Court of Puerto

3    Rico was asked to rule on a very similar matter as the Board

4    is proposing in these rulings of Act 53, and on the Plan of

5    Adjustment.  And the question was simple, was whether a cut,

6    or how the Board calls it, a freeze, was constitutional or

7    not.

8           AMPR wants to highlight that neither the Board, nor

9    the supporters, the debt constitutional holders, want to

10   acknowledge the ruling of the Supreme Court in that case when

11   it defined what is a teacher's pension, and what it

12   encompasses, and what a cut does to that pension, or what a

13   cut is to that pension.

14          I want to bring to the Court's attention, at page two

15   of the official translation of that ruling, the following

16   quote.  We hold that section two of Act 160 of 2013, which

17   repeals the special laws that granted additional benefits, not

18   consider, as part of the pension, and section 4.9 of that same

19   statute, which eliminated certain benefits to TRS members who

20   retired as of August 2014, are unconstitutional -- are

21   constitutional.  I'm sorry, Your Honor.

22          Those words were used by the Supreme Court to declare

23   Law 160 unconstitutional, as to what meant a cut to their

24   teacher's pension.  As we express in our objection, Your

25   Honor, a teacher's pension is not only what the teacher has

1    accrued at the point -- at a certain point, but is the

2    combination of that accrual and the continued right of that

3    teacher to accrue years of service until that teacher reaches

4    an eligibility under the statute to then receive a perpetual

5    monthly benefit.

6         THE COURT:  Mr. Barrios, what is the ECF number where

7    the English translation of the case is filed?

8         MR. BARRIOS-RAMOS:  Your Honor, I will have to -- and

9    please, I apologize, I don't have the ECF document with me,

10   and I --

11        THE COURT:  Thank you.  So if you'll just

12   supplementally file an informative motion that points me to

13   the ECF filing, so that I am sure I am looking at the official

14   translation that you are referring me to.

15        MR. BARRIOS-RAMOS:  Yes, Your Honor.

16        THE COURT:  Thank you.

17        MR. BARRIOS-RAMOS:  I'm certain we have mentioned it,

18   and I will verify if our pleading does attach the full

19   translation, Your Honor.

20        THE COURT:  Thank you so much.

21        MR. BARRIOS-RAMOS:  Otherwise I will --

22        THE COURT:  I appreciate that help.  There are so

23   many filings here.

24        MR. BARRIOS-RAMOS:  Yes, Your Honor.

25             And, Your Honor, taking back the argument, in doing

1   so, the Puerto Rico Supreme Court declared, with no

2   uncertainty, that the right to continue to accrue years of

3   service is a right intrinsically attached to the teacher's

4   pension.

5           In fact, the Court made no distinction between

6   accrued and the right to future accrued pensions.  The only

7   distinction the Court made at that time was for those teachers

8   that were not hired prior to enactment of Law 1060 (sic), and

9   it was clear, since they had not been hired when the statute

10  was enacted, then they didn't have a right to that defined

11  benefit plan that the teachers hired before 2014 enjoyed.

12          But unlike the many arguments that we have heard

13  today, there is no distinction by the highest court of Puerto

14  Rico on whether a pension for a teacher is comprised of

15  accrued or unaccrued.  A defined benefit plan encompasses

16  both, and any impairment to that right, whether accrued or to

17  accrue in the future is a cut to their pension.

18          And that takes us to --

19          THE COURT:  Before you go to the next point, the

20  legislature here did use the specific term "accrued benefit"

21  in conditioning what the Oversight Board can do, and, as I

22  recall, that specific Puerto Rico Supreme Court case was in

23  the context of a challenge under the Contract Clause of the

24  Puerto Rico Constitution, which is not at issue in this

25  proceeding, in this ruling request.

1           So is there no significance at all to the

2    legislature's repeated use of the term "accrued benefit" in

3    the statute?

4           MR. BARRIOS-RAMOS:  Your Honor, our position is that

5    the use of the accrued benefit in light of the mentioning on

6    the statement of motives, does not -- is not mutually

7    exclusive of the section of Act 53 that merely refers to zero

8    cuts to pensions.  There is, in Article 605, an express

9    provision that merely referenced zero cuts to pensions without

10   the attachment or the language that has been referred to as

11   the accrued of the current active employees, Your Honor.

12          THE COURT:  Thank you.

13          MR. BARRIOS-RAMOS:  And that was one of the points

14   that we brought in our objection, Your Honor.

15          So in order to define whether this Act 53, on that

16   language, in fact prohibits the application to the Plan of

17   Adjustment of the freeze, and, therefore, the nullification of

18   that statute, there is a need to define what a teacher's

19   pension is, and what it entails, and what would -- a cut to

20   that pension also would entail.  That's why we reference, Your

21   Honor, the Supreme Court case, and the definition of -- that

22   the Court rendered in that case regarding what is a pension

23   for a teacher, and what a cut to that pension refers to.

24          The Board mentions that the right to accrue is merely

25   an expectancy, that it's not -- and tries to also -- another

1    of the support is mentioned, the acquired rights, Your Honor,

2    but the Supreme Court did not distinguish those two rights or

3    separate them in issuing this ruling, which is specific to

4    TRS, Your Honor.

5            Your Honor, we'd also like to clarify a point that

6    the Board raised yet again in its reply briefing relating to

7    Act 53, regarding the teachers' contractual right to define

8    pension benefits.  In its reply, at page six, the Board notes

9    that because under Puerto Rico law, the Pension System

10   Enabling Act and other legislation merely create contractual

11   rights, not property rights, the Plan properly uses Bankruptcy

12   Code section 365 to reject to -- contractual rights of

13   participants to accrue pensions in the future until their

14   retirement.

15           I believe the Court may have been left with a

16   misimpression from Monday's argument regarding the teachers'

17   right to defined pension benefits.  The Court asked whether

18   those rights are contractual, and they are.  The Board says so

19   as well, and we agree.  These rights are not a gift.  They're

20   not implied.  And unlike the Board argues, they're not

21   optional, which Mr. Bienenstock seems to argue on Monday.

22           This contractual right, however, is not contained in

23   a collective bargaining agreement, as we advanced, or other

24   reading agreement.  It's statutory, law 106, and provided by

25   the Puerto Rico Constitution.  The Supreme Court decision in

1    *AMPR* made that perfectly clear.  Again, the Board knows this,

2    and it says so in its reply.

3         Accordingly, because this contractual right is

4    statutory, it is entirely appropriate for the legislature to

5    protect this right by statute, which we contend it did through

6    Act 53.  As set forth in the objection, the legislation in

7    Article 605 speaks to no cuts to pensions.  It doesn't specify

8    accrue, and, thus, it cannot be said with certainty that the

9    legislation is not predicated on no freeze.

10        Further, in the versions of the bill which the Board

11   advocated, some of them which are attached to its reply brief,

12   there are specific statements to the effect that the

13   legislation was not conditioned on there not being a freeze.

14   And the government specifically removed that language before

15   enactment.

16        Thus, the Board should not be trying to achieve

17   through the judiciary in the Confirmation Order or in this

18   ruling what it could not do by lobbying to the legislature.

19   It is not the role of the judiciary to legislate, as the Board

20   is asking here.

21        In all the discussions surrounding the enabling

22   legislation over the past several months and years, the

23   political leaders have been adamant that they would protect

24   the teachers' defined benefit rights, and never agree to a

25   freeze.  Teachers voted against this specific alternative

1    under the Plan not once, but twice, based upon those repeated

2    assurances by the political figures in the government, and

3    those expressed by the organization which preceded me speaking

4    right here today.

5         Unfortunately, Your Honor, it is the teachers who are

6    caught in the crossfire between the political promises, who

7    have been less than straight forward, and the Board, whose

8    counsel told the Court on Monday that the teachers were

9    getting the best treatment under the Plan, when in fact

10   they're getting nothing, absolutely nothing, Your Honor, for

11   their most sacred contractual right, the right to a perpetual

12   pension.

13        And it is the teachers, Your Honor, who are at once

14   Puerto Rico's most vulnerable, given their modest income, and

15   the most critical to its future, as they hold the breadth of

16   education of tomorrow's leaders, who are being singled out in

17   this plan, who are the only public employees besides judges

18   being impacted, Your Honor, and called upon to fund this

19   restructuring.

20        Once again, in its reply to the objection raised by

21   AMPR and the other objectors, the Board speaks to how critical

22   the freeze is to the feasibility of the Plan.  We again

23   question that, Your Honor.  Those estimates are nominal

24   dollars that we mentioned before, are over 30 years, and they

25   represent --

1          (Sound played.)

2          MR. BARRIOS-RAMOS:  -- a mere one percent of the

3     budgets of the Commonwealth for 30 years.

4          The only -- so we question, it's really the only way

5     that Puerto Rico can emerge from these proceedings, if

6     teachers, a subset of government employees, who in turn make

7     only a subset of the island's obligations, sacrifice their

8     only financial means of survival, so other bondholders and

9     stakeholders can thrive?  For us, Your Honor, AMPR, that

10    defies reason.

11         Political leaders and the Board need to look to the

12    good of Puerto Rico, not their own interests and those of

13    stakeholders.  And we call upon the Board and the political

14    leaders to find a solution to avoid this freeze.

15         Your Honor, in summary, and in conclusion, we have

16    also an opposition to the argument that the Board -- that the

17    legislature does not legislate by omission, as the Board

18    argues, since if we did in Act 53, it would have repealed

19    section 2.6 of the Act 106, which ratifies the right of

20    teachers and judges to continue to accrue benefits into the

21    future.

22         If the Court has any other questions, Your Honor, I

23    will be more than pleased to address them at this time.

24         THE COURT:  Thank you.  I have no further questions

25    for you, Mr. Barrios.  Thank you.

 1              MR. BARRIOS-RAMOS:  Thank you.

 2              THE COURT:  The next speaker is Mr. Indiano for the

 3    APJ.

 4              MR. INDIANO:  Good morning, Your Honor.  Can you hear

 5    me okay?

 6              THE COURT:  Yes.  Good morning, Mr. Indiano.

 7              MR. INDIANO:  I am here this morning on behalf of the

 8    active judges through the APJ to discuss judicial

 9    independence, and why no compensation regarding the judges

10    should be diminished in any way, be it by lowering their

11    monthly benefits, COLA, or the freeze.

12              We join what the teachers have said previously

13    regarding Law 53, and I will not address that here.  I do see

14    issues for the Court to --

15              THE COURT:  Mr. --

16              MR. INDIANO:  Yes.

17              THE COURT:  Remember, as I said, this argument today

18    is about the interpretation of Law 53, not about more general

19    fundamental objections to the Plan provisions changing

20    benefits.  I'm interested here in interpreting Law 53, whether

21    it supports the rulings that the Oversight Board has

22    requested.

23              MR. INDIANO:  Well, Your Honor --

24              THE COURT:  I need to be clear --

25              MR. INDIANO:  -- I heard what you mentioned at the

1  beginning of the hearing, but we filed an objection

2  specifically addressing the issue of judicial independence and

3  how regardless of how --

4        THE COURT:  That objection was not responsive to the

5  call for oral argument on the rulings --

6        MR. INDIANO:  Well, I knew that --

7        THE COURT:  -- so --

8        MR. INDIANO:  -- the Board did address our position,

9  and misinterpreted it, so I don't see how we can't be heard on

10 those issues at this time, Your Honor.  I understand you want

11 to hear Law 53.  I don't have anything to add to what the

12 teachers' groups have already said, so if you're going to deny

13 our ability to speak on behalf of the judges with respect to

14 judicial independence and how Law 53, regardless of how the

15 Court interprets it, will not be decisive as to whether they

16 should be cut, the COLAs, and freeze, I have to respect what

17 Your Honor tells me to do.

18       But we are here, ready, and able to speak to that

19 issue, because that issue is critical to what's going to

20 happen going forward.  And this issue has been in front of the

21 Court before on various occasions, and I would like to address

22 it in my time.  But if Your Honor is going to deny that now, I

23 have to respect what Your Honor says.

24       THE COURT:  Well, as you say, the issue has been

25 raised before the Court on many occasions.  The issue wasn't

1  framed in an objection to the Plan, which were due some time

2  ago.  I will permit you to address the Court as concisely as

3  you deem prudent, focusing on what you contend is a

4  mischaracterization of your position in the response of the

5  Oversight Board.

6        MR. INDIANO:  Now, briefly, just to set the stage,

7  and then I'll go right to where I think is the

8  mischaracterization, if the Court will permit me to do that.

9        THE COURT:  Yes.

10        MR. INDIANO:  And there's a long series of -- not

11  long, but a series of arguments that we've already put forth

12  as to the source of judicial independence coming from the

13  United States Constitution, coming from the history of how

14  judicial independence became critical to Founding Fathers as

15  they established the Constitution.

16        Then I do have to just briefly go to the point that

17  the Congress, acting through Law 600, in 1950, created a

18  Government in Puerto Rico that required a Republican form of

19  government.  That implicitly demands that judicial

20  independence be part of it.

21        That is the source, Your Honor, of our objection, and

22  judicial independence.  The mischaracterization, I want to go

23  right to that, by the Board in I think paragraphs 60 and 61,

24  or in the vicinity, of their midnight filing from Monday, goes

25  to the --

1              THE COURT:  Mr. Indiano.

2              MR. INDIANO:  -- are saying that we are --

3              THE COURT:  Mr. Indiano, there was a glitch in the

4    transmission.

5              MR. INDIANO:  Yes.

6              THE COURT:  So if you would go back to your sentence

7    that began, the mischaracterization of the Board in its

8    filing, and continue again from there, that would be

9    helpful.

10             MR. INDIANO:  No problem.  No problem.  I'll go

11   directly to what I consider a mischaracterization, and what

12   the Court has said in their midnight filing of Monday in I

13   think paragraphs 60, 61 --

14             THE COURT:  We have --

15             MR. INDIANO:  -- at least in that area of --

16             THE COURT:  I'm sorry.  We lost transmission again.

17             MR. INDIANO:  -- the brief --

18             THE COURT:  Please pause for just a moment, and we're

19   pausing your clock as well.

20             Puerto Rico, are you having an issue again with

21   transmissions?

22             COURT REPORTER:  Your Honor, your transmission is

23   fine, but counsel's transmission was breaking up where it was

24   also breaking up for you.

25             THE COURT:  It was breaking up for me and also

1   breaking up for you.

2       So we will ask counsel to go back to that portion of

3   his argument again, and hope that the transmission works

4   better.  So, Mr. Indiano --

5       MR. INDIANO:  Should I try again?

6       THE COURT:  Yes, please.

7       MR. INDIANO:  Okay.  And this is reminiscent of the

8   stay hearing, Your Honor.  I don't know if you remember, but

9   we had several technical difficulties trying to get through

10  that one.  But beyond this, let me get back to what I believe

11  is a mischaracterization of what our argument has always been

12  from the beginning.

13      The Board has suggested, in paragraphs I think 60 and

14  61, or in that area of their brief, that we are saying that

15  PROMESA can preempt the Constitution of Puerto Rico, that's

16  the source of our power for judicial independence.  It is not.

17  That is somewhat of a downstream argument I would suggest,

18  Your Honor, that they are talking about or characterizing our

19  argument as one that finds the power of judicial independence

20  in the Puerto Rico Constitution.  That's not what we're

21  talking about.

22      Judicial independence come from the Federal

23  Government.  There's only one a sovereign here under *Sanchez*

24  *Valle*.  That's the Federal Government.  The Federal

25  Government, through Law 600, in 1950, created Puerto Rico, and

 1   required that there be a Republican form of government, which

 2   necessarily implicated judicial independence.

 3           We are not saying that the source of the judicial

 4   independence comes from the Puerto Rico Cons --

 5           -- the structure of the government and the

 6   requirements of judicial independence that comes from --

 7           COURT REPORTER:  Your Honor, I'm sorry, can you hear

 8   me?  This is the court reporter.

 9           THE COURT:  Yes, we can hear you, Ms. Reporter.

10           COURT REPORTER:  It froze again.  The last I heard

11   was "required that there be a Republican form of government,

12   which necessarily implicated" -- and then we froze until the

13   last couple words that counsel said.

14           THE COURT:  So, Mr. Indiano, I believe that was your

15   sentence which said, the Republican form of government, which

16   necessarily implicates judicial independence.  Can you please

17   go back and restart from that point?

18           MR. INDIANO:  I'll try, but I'm not reading from a

19   text.  I'm responding specifically, Your Honor.  So let me ask

20   the question, Your Honor, have you been hearing me, just so I

21   know?

22           THE COURT:  Yes, I have been hearing you --

23           MR. INDIANO:  Okay.

24           THE COURT:  -- and I let you know when I don't hear

25   you.

1          MR. INDIANO:  Okay.

2          THE COURT:  But it's also important that we have a

3    coherent transcript.

4          MR. INDIANO:  I agree with that.

5          The problem with the argument that they set up is

6    they're setting up a straw man, because every time they talk

7    about us, the Judge is saying that if the Puerto Rico

8    Constitution is the source of judicial independence, then they

9    say, well, if that was true, we have to throw out everything

10   that PROMESA is trying to do in the restructuring.  And that

11   is not what we're doing.

12         The, argument as I was saying, is an upstream

13   argument that stems from Law 600, a federal law that was

14   created to create a Republican form of government in Puerto

15   Rico that implicates judicial independence.  And that is the

16   source from which we derive our argument for judicial

17   independence for Puerto Rico.

18         The Board also keeps trying to take our discussion of

19   the *Brau* case to suggest that we are saying that the *Brau* case

20   is the source of judicial independence for the Court to decide

21   this issue.  It is not.  It's merely illustrative of how the

22   Puerto Rico court, Supreme Court, handled that issue when it

23   came before it.  But once again, the source of judicial

24   independence is not the Federal -- is not the Puerto Rico

25   Constitution, is not derived from *Brau*, but is from Law 600.

1   And there's nothing in PROMESA, as powerful as it is, as

2   widespread as it is that was ever designed to overturn,

3   repeal, modify the basic tenant of Puerto Rico's Government,

4   which is a Republican form of government, with judicial

5   independence clearly embedded in that, as you can see from the

6   history of the United States Constitution, the kind of

7   judicial cases, and 200 years of case law.

8         I have to mention, Your Honor, one thing, and this

9   will not endear me to the teachers' group I'm sure, but I want

10  to at least set it out.  There are declarations I know that

11  set forth the Plan will be ineffective if the freeze, and the

12  COLA for both the TRS and the JRS are not implemented.

13        The JRS, we're talking about with the active judges,

14  a little bit more than 300 active judges, and a dwindling

15  number of course of retired judges.  By attrition, it will be

16  eliminated over time.  We are such a small group of people

17  that I don't see how any declarant can set forth something

18  that would show that this plan is unable to be successful if

19  the JRS is segregated out based on judicial independence.

20        And I have met with Mr. Bienenstock before, and

21  members of his firm, and we have discussed this.  And I do not

22  pretend to speak for them at all, but I think that most legal

23  observers, and legal historians, I think in their heart of

24  hearts they cannot conceive that Puerto Rico does have

25  judicial independence in its courts.  I think the problem has

1  always been that the Board has been reluctant to try to

2  segregate out the judges to make them look like they're

3  something special and being treated differently, or that the

4  judges are some kind of group of prima donnas, or untouchable,

5  but that's both wholly unfair and unappreciative of the role

6  of the judiciary as an independent branch of the government,

7  with judicial independence for all the reasons that the

8  framers set forth.

9          Finally, Judge, Your Honor, I would just say that

10  it's probably -- I know it's been difficult for me to get into

11  this argument given the ruling of the Court, and I do

12  appreciate your patience in at least hearing the judges.  You

13  know, it's been a privilege for me to represent them.  They

14  cannot speak for themselves.  They never really can when

15  they're attacked, disparaged, or economically effected, as

16  this plan will do.

17          I hope that you will consider their plights and their

18  rights to a truly independent judiciary, because that is one

19  judiciary that Puerto Rico badly needs in order to succeed in

20  going forward under whatever plan is eventually confirmed by

21  this Court.

22          Thank you, Your Honor.

23          THE COURT:  Thank you, Mr. Indiano.

24          The next speaker is Mr. Mendoza-Mendez for the

25  AJJPR.

1              Good morning, Mr. Mendoza-Mendez.  I will again say

2    that my primary focus this morning is on interpretation of Act

3    53, which was the subject of the motion, and so I would urge

4    you to be as pertinent as possible to that focus in your

5    remarks.

6              MR. MENDOZA-MENDEZ:  May it please the Court.  Good

7    morning, Your Honor.

8              THE COURT:  Good morning.  Is it possible for you to

9    speak a bit louder, or get closer to your microphone?  Your

10   voice is very low.

11             MR. MENDOZA-MENDEZ:  How about now, Your Honor?

12             THE COURT:  That is a little better.  Just, you know,

13   pretend you're at the opera, so that we can all hear you

14   clearly.  Thank you.

15             MR. MENDOZA-MENDEZ:  Thank you, Your Honor.

16             Good morning.  My name is Enrique Jose

17   Mendoza-Mendez.  I represent the Asociacion de Jubilados de la

18   Judicatura de Puerto Rico, and the Honorable -- and the

19   Honorable Hector Urgell-Cuebas, retired appellate judge of the

20   Courts of Appeal of Puerto Rico.  We thank the Court for the

21   opportunity to address it on this issue.

22              I don't want to repeat myself, and I should not.  And

23   I will go straight to our point concerning the matter on the

24   Agenda concerning essentially Act 53.  Section 104 of Act 53,

25   in pertinent part, provides that the legislative assembly

1    authorizes the issuance of General Obligation Bonds subject to

2    the Board filing an amended plan for confirmation by the

3    Court.

4          Certainly there will be no cuts to current pay of

5    retirees.  The Oversight Board submits that the language in

6    Act 53 does not mean the elimination of the cancellation of

7    the cost of living allowance, and that point has been argued

8    by both sides.  This morning we will not repeat ourself.  The

9    Board's interpretation might or might not be.  The Court will

10   rule on that.  Our position is very limited, very, very

11   limited.  And it is that it cannot be, it cannot be, as to the

12   retired judges are concerned.  And my argument is similar to

13   Mr. Indiano's argument, but bear with me, because we will

14   frame it in a different form.  Form and substance is the

15   same.

16         Law 600 establishes a Republican form of government

17   for Puerto Rico, and creates three branches of government.

18   One of them, the judicial branch.  That law was approved by

19   Congress.  That law was approved by the President.  A

20   Constitution for Puerto Rico was enacted as to it, and was

21   accepted by the Federal Government.  Meaning that certainly

22   the judges, as members of the judicial branch, have a special

23   place, and they have a special place not because they are the

24   privileged ones.  They have a special place, because they

25   represent a branch of government that has a special place.

1          Then we come to PROMESA, and we posit that PROMESA

2    does not trump Law 600.  So we posit that the Court has to

3    harmonize both laws.  It has to harmonize the judicial

4    independence; it has to harmonize the rights of the judges;

5    and it has to harmonize getting Puerto Rico out of its

6    bankruptcy.  And the way to do that is to preserve the vested

7    rights that the retired judges have.

8          We represent judges who are already in retirement,

9    and the cost-of-living allowance is part and parcel of that

10   constitutional guaranteed pension rights that was given to

11   them, that was -- that enticed them to select a judicial

12   career, and that was approved by the Federal Government.  So

13   bottom line, plain and simple, the retired judges, at around

14   400, it is a class that, by law of nature, diminishes in time.

15   And plain and simple, plain and simple, to allow the cost of

16   living allowance moving forward as part and parcel of their

17   pension rights does not make this plan unconfirmable.  Plain

18   and simple, Your Honor.

19         The task to harmonize Law 600 with PROMESA, and the

20   byproduct of that process, is why we move the Court to

21   construe that Law 53, as it refers to the retired judges,

22   should include and should not be banned from future

23   cost-of-living allowances.

24         Your Honor, I was plain and simple, as I promised.

25   If the Court has any questions, we will gladly address them.

1          THE COURT:  Thank you, Mr. Mendoza-Mendez.  You were

2     quite clear.  Thank you for being concise as well.

3          I will now turn to Mr. DeChiara for the SEIU and

4     UAW.

5          MR. DECHIARA:  Thank you, Your Honor.  Peter

6     DeChiara, from the law firm of Cohen, Weiss & Simon, LLC, for

7     the UAW and SEIU.

8          The UAW and SEIU did not object to the Oversight

9     Board's requested rulings regarding Act 53, as those requested

10    rulings were defined in the Court's November 2nd notice at

11    docket entry no. 19017-1.  Those requested rulings sought to

12    nail down what conditions Act 53 placed on the authorization

13    of new Commonwealth bond debt.  However, the rulings the

14    Oversight Board requested in its November 15th Omnibus Reply

15    went beyond simply determining those Act 53 conditions.

16          In particular, of concern to UAW and SEIU, the

17    Oversight Board requested a ruling approving paragraph 62 of

18    the proposed Confirmation Order.  As Your Honor may recall,

19    during Monday's oral argument, I explained that SEIU and UAW

20    object to paragraph 62 to the extent it would restrict the

21    Commonwealth for ten years from increasing defined benefit

22    pension payments for ERS participants, other than through a

23    COLA.

24          The Oversight Board now, in the guise of seeking

25    rulings on Act 53, asked the Court to approve paragraph 62.

1    Without saying so in their Act 53 papers, the Oversight Board

2    is in effect asking the Court to overrule the UAW-SEIU

3    paragraph 62 objection.  The Court should not do so.

4         The Act 53 requested rulings, as defined by the

5    Court's November 2nd notice, had nothing to do with future

6    increases to defined benefit pension payments for ERS

7    participants other than via COLAs, and Mr. Bienenstock in his

8    remarks this morning made no serious argument that they did.

9    In fact, ERS participants received no notice that the

10   Oversight Board, through its Act 53 requested rulings, would

11   seek to restrict increases to their defined benefit pension

12   payments by means other than elimination of COLA.

13        Thus, if the Court grants the Oversight Board's

14   urgent motion on Act 53, it should make clear that it is only

15   granting the requested rulings defined in the Court's November

16   2nd notice, and it is not approving paragraph 62, at least to

17   the extent that paragraph 62 would restrict future increases

18   to defined benefit pension payments to ERS participants by

19   means other than through COLAs.

20        THE COURT:  Mr. DeChiara, just to be clear, so you

21   are particularly concerned about this in the event that I were

22   to rule separately on the Act 53 issues, as opposed to

23   incorporating rulings regarding the Act 53 issues with my

24   other confirmation rulings that, you know, would of course

25   evaluate and take into account the question of whether

1    paragraph 62 should be in the final order or not?

2            MR. DECHIARA:  That's correct, Your Honor.  We don't

3    want the Court to sweep into the Act 53 rulings the paragraph

4    62 issue.

5            THE COURT:  Thank you.

6            MR. DECHIARA:  Mr. Bienenstock really used his

7    remarks today not to seriously defend the Oversight Board's

8    use of its Act 53 requested rulings as a vehicle to obtain

9    Court approval of paragraph 62, but, rather, as an opportunity

10   for another bite at the apple following his remarks at

11   Monday's oral argument opposing UAW and SEIU's challenge to

12   paragraph 62.  And his remarks today were no more successful

13   than they were on Monday.

14           First, Mr. Bienenstock asserted that PROMESA allows

15   the Oversight Board to modify the Plan of Adjustment at any

16   time.  We dispute that assertion, but even if it were

17   accurate, it's irrelevant.

18           First, whether it has the right to do so or not, the

19   Oversight Board has not amended the Plan of Adjustment

20   regarding the treatment of ERS participants.  Second, UAW and

21   SEIU do not oppose the treatment of ERS participants in the

22   Plan.  Indeed, we object to paragraph 62 precisely because it

23   is set forth -- it sets forth a restriction that is not in the

24   Plan, but was added to the Confirmation Order.  And only added

25   at the 11th hour.

1        Next, Mr. Bienenstock points out that ERS classes

2   voted against the Plan of Adjustment, so it doesn't matter if

3   they are adversely and materially affected by paragraph 62.

4   This assertion too is irrelevant.  The Plan of Adjustment, the

5   treatment of ERS participants hasn't been changed.  So we

6   don't argue, we don't contend that the ERS participants were

7   denied a right to vote on any such change.

8        When UAW and SEIU argue that ERS participants will be

9   adversely and materially affected by paragraph 62's

10   restriction on future increases to their DB benefits, we're

11   not concerned about how they voted on the Plan.  We're

12   concerned that ERS participants received no notice of

13   paragraph 62, and, thus, had no chance to object to it in

14   court.

15        Due process demands that a Court give a party

16   adversely affected by a court order notice and a chance to

17   object before the court order issues.  Paragraph 62 was added

18   well after the Disclosure Statement went out, and long after

19   the objection deadline had passed.  And its inclusion now

20   would be a due process violation.

21        Mr. Bienenstock notes that paragraph 62 only

22   restricts the government, but he admits, as he must, that the

23   restriction on future increases to their DB benefits affects

24   ERS participants, and they're not effected in some amorphous

25   or abstract way.  Paragraph 62 restricts their chance of

1    getting an increase to their modest pensions.  That affects

2    people's real lives in a real way.

3          Mr. Bienenstock also suggested that perhaps ERS

4    participants would lack standing to object to paragraph 62.

5    Now, this is obviously incorrect.  ERS participants would

6    certainly have standing, as creditors, as parties in interest,

7    or they would have had standing to object to paragraph 62 if

8    they had received notice of it, but they did not receive

9    notice of it.

10         Finally, Mr. Bienenstock tries to play down paragraph

11   62, suggesting it's not really a restriction, because the

12   Commonwealth can seek judicial relief from the restriction.

13   But a restriction is still a restriction, even if there's a

14   possibility of judicial relief from it.  If I'm sent to jail,

15   I'm adversely effected even if I have a right to appeal my

16   jail sentence.

17         In any event, Mr. Bienenstock on Monday called the

18   safety valve in paragraph 62 -- it's not much of a safety

19   valve.  It only kicks in after the Oversight Board terminates,

20   and who knows when that will be, and only if the Commonwealth

21   meets every one of six separate, vaguely defined criteria.

22   That any relief would ever be available under this so-called

23   safety valve is highly uncertain.

24         As I explained on Monday, PROMESA already gives the

25   Oversight Board the means to challenge Commonwealth action

1  that it deems contrary to the fiscal plan and the budget.  It

2  doesn't need paragraph 62.

3          In sum, the Court should strike paragraph 62 to the

4  extent it would restrict the Commonwealth for ten years from

5  increasing defined benefit payments for ERS participants

6  except via COLAs.  Thank you very much for giving me the

7  opportunity to make these remarks, Your Honor.

8          THE COURT:  Thank you, Mr. DeChiara.

9          So now we will return to the Oversight Board's

10  counsel for the 15-minute reply argument.

11          MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

12  Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

13  as Title III representative.

14          If possible, I'm going to leave some time for

15  Mr. Mungovan, because I'm going to try also to be as succinct

16  as possible on the issues that do not go directly to the

17  statutory interpretation issue, which we believe was the

18  Court's intent to be the subject of this morning's oral

19  argument.

20          The teachers argued that legislation is necessary.

21  Your Honor, the shortest response I can give to that is this

22  goes to a law of nature.  When a debtor, whether it be an

23  individual, a municipality, or any other debtor is in distress

24  and has insufficient funds, I think it jumps off the page that

25  it doesn't need permission to default.  It has to default.

1   And the Bankruptcy Code and PROMESA recognize that when you

2   don't have enough money, you default, and it deals with the

3   consequences of that default.

4        So for the teachers, or any of the other litigants

5   here to argue that we need legislative permission locally to

6   default on defined benefit plans and COLAs is simply contrary

7   to PROMESA, the Bankruptcy Code, and, most importantly, the

8   law of nature.  If you don't have the money, you can't do it.

9        The argument that the Oversight Board cannot go

10  beyond its tenure in protecting the Commonwealth is simply

11  wrong.  The Oversight Board's tenure ends after four years of

12  balanced budgets, which presumably and hopefully will occur

13  after confirmations of the relevant debtors.

14       But any plan proponent has to provide for the

15  feasibility of the plan throughout the plan's term.  And here

16  the Oversight Board is the plan proponent, and can't look at

17  its tenure, which might be only four years longer.  It has to

18  look at the term of the Plan, which goes for decades, because

19  of the lives of the retirees, and the time it will take to pay

20  off the general obligation and other debt.

21       In terms of -- we understand the teachers' point when

22  they say the Board is unelected.  We all know what PROMESA is

23  and how we got here.  But, ironically, the teachers' position

24  is if they're insisting on the defined benefit plan, then

25  their position is they don't want a plan right now.  The

1   Commonwealth stays under a cloud of debt, and the timeline on

2   the Board's four years of balanced budgets doesn't even start

3   to run, so the Board would be here longer.

4          Mr. Barrios Ramos started by saying the economic

5   problems can't be solved at the expense of the teachers.  I

6   want to emphasize, in response to the teachers, Mr. Ramos, and

7   everyone else who's spoken before me this morning, Your Honor,

8   the Board accepts the sincerity and the depth of what they are

9   saying.  There is no joy in allocating losses.  And even

10  though retirees are being allocated lesser losses than anyone

11  else in this case, there is no joy in doing it.

12         And it doesn't help decide the case, but it's just a

13  fact.  And it stems from the law of nature I mentioned.  When

14  you don't have enough resources, you have to allocate them,

15  and that means a sharing of losses.

16         Your Honor mentioned earlier that the 2014 Puerto

17  Rico Supreme Court case turned on the Contract Clause, so I

18  won't get into that.

19         There was a statement that the teachers are getting

20  nothing under the Plan, and I just can't leave that

21  unanswered, Your Honor.  They're getting their full accrued

22  pensions, which makes them the best off under the Plan of

23  anyone.

24         Mr. Indiano and I, as Mr. Indiano mentioned, go way

25  back, a lot of sincere conversations.  I will only say that

1    his point this morning, that it's Law 600 that they're

2    concerned about in creating a Republican form of government

3    and judicial independence is not connected to the object of

4    this morning.

5           One cannot make the argument, and they certainly

6    haven't made it or explained it, that Republican form of

7    government and judicial independence is a function of whether

8    judges get cost-of-living adjustments that no one else is

9    getting.  They just don't connect.

10          That said, here again, the objection of Mr. Indiano

11   was sincere.  There is no joy, there's a lot of sorrow in

12   allocating losses to everyone, most especially the judges, but

13   the argument doesn't add up in terms of Republican form of

14   government and independence being a function of cost-of-living

15   adjustments.

16          In terms of the SEIU and UAW responses, Your Honor,

17   as I understand what they're saying, initially they're saying

18   the elimination of the defined benefit plan is fine with them.

19   They just don't want any provision in the Confirmation Order

20   enforcing it.  I think that their position refutes itself.

21   This was -- as I think everyone even agrees to and does not

22   dispute, the key element in allowing the Board to prosecute

23   this plan was legislative authorization of the debt, without

24   requiring an elimination of the freeze of the defined benefit

25   plans.  To suggest that that could be the most important thing

1     in the world, but we have to have an order that allows the

2     defined benefit plan to be reenacted the next day after the

3     effective date of confirmation is nonsense.  We have to

4     protect the feasibility of our plan.

5          And I think this morning the SEIU and UAW conceded

6     that what -- they don't like the linkage of paragraph 62 to

7     the rulings on Act 53, but as I explained earlier, paragraph

8     62 stands on its own.  I would also say that in terms of -- in

9     terms of the statutory interpretation of Act 53, it should be

10    noted that the legislature is not here arguing that the

11    Oversight Board is wrong, and they are certainly not bashful.

12         The UAW and SEIU further argue that there's a lack of

13    due process, et cetera, and that just has to be put to rest,

14    Your Honor.  The case, the confirmation hearing, the Plan, the

15    subject matter has been noticed to all parties in interest

16    electronically, by mail where possible, and through

17    publication.  Plans are modified throughout confirmation

18    hearings.  Courts usually want those modifications, because

19    they often symbolize new agreements being forged.  And this

20    was a new agreement with the legislature.  Everyone is on

21    notice of this.  There's no lack of due process.

22         The Court has the absolute right to modify the Plan,

23    which leads to modifying the Confirmation Order, and if what

24    the SEIU and UAW are saying is we can put paragraph 62 in the

25    Plan and then it will be a plan modification, fine.  We're

1    happy to do that for them.  We'll also keep it in our proposed

2    Confirmation Order.

3          As far as the attempt by the SEIU and UAW to say our

4    safety valve isn't really a safety valve, Your Honor, the

5    provisions only require that they convince the Court that a

6    new defined benefit plan is needed, affordable, and won't

7    create risks of default on the other plan modifications.

8    That's hardly something that is impossible to meet.  It's

9    common sense.  It's reasonable.  It's good business sense.

10   And that's what the Board is supposed to assure, that the day

11   after confirmation, or four years after confirmation of a plan

12   that lasts 40 years, that things won't happen to jeopardize

13   all the work that has gone into righting the ship, creating

14   fiscal responsibility, by all parties, the government, unions,

15   employees, creditors, and the Oversight Board.  That's all the

16   Oversight Board wants to do, is carry out its mandate to

17   afford fiscal responsibility and market access.

18         Your Honor, if my partner Mr. Mungovan might make the

19   remaining points, I think we have a few more minutes.

20         THE COURT:  Yes.  Thank you, Mr. Bienenstock.

21         MR. BIENENSTOCK:    Thank you.

22         MR. MUNGOVAN:  Good morning again, Your Honor.

23   Timothy Mungovan, Proskauer Rose, on behalf of the Oversight

24   Board.  I believe that I have just under five minutes

25   remaining.  I'll try to come right under that time allotment.

1          I'd like to make two basic points, Your Honor, both

2    with respect to comments by Ms. Mendez-Colberg I believe,

3    opening counsel for one of the teachers' associations.  She

4    specifically invoked the statutory history or the legislative

5    history of Act 53, and suggested that it supported the

6    objectors' interpretation of Act 53.

7          I would suggest, as an overview, the legislative

8    history is laid out in the Board's response papers filed on

9    Monday night, easily and substantially establishes the ruling

10   that the Board is seeking in that the act does not prohibit

11   the imposition of the freeze and the elimination of the COLA

12   under Act 53.

13         Two basic points in that regard.  First, counsel,

14   sister counsel invoked a clarifying parenthetical in HB-1003,

15   which was the bill that preceded the enactment of Act 53.

16   That parenthetical actually came from a letter that the Board

17   had sent to the legislature, and the Court has that letter.

18   It was submitted as Exhibit A to the Board's informative

19   motion to the Court on October 22, which feels like a long

20   time ago.  And it appears at document no. 18681.  18681.  And

21   I'm specifically looking at page three of four, using the ECF

22   tracking.

23         And the first sentence, the first numbered sentence

24   in the Board's letter that's on that page three of four in the

25   ECF count actually found its way into Act 53.  A portion of it

1    did.  And what the Board indicated is that the Board would not

2    oppose legislation that, quote, requires that the Plan

3    submitted for confirmation be amended to provide for no cuts

4    to the accrued pensions of retired public employees and

5    current employees of the Commonwealth, unless required by the

6    U.S. District Court for the District of Puerto Rico.

7            And then here's the parenthetical that's at issue,

8    (but to be clear, this requirement does not extend to the

9    Plan's freeze of the TRS and JRS pensions, or the elimination

10   of any remaining cost-of-living adjustments.)

11           Ms. Mendez-Colberg suggests that the elimination of

12   that parenthetical suggests that in some way the "no cuts to

13   pensions" language somehow encompasses both the freeze and the

14   COLA.  Logically, that can't be the case, because all that the

15   parenthetical is doing is indicating that the language where

16   the Board has indicated that it's willing to eliminate cuts to

17   pensions doesn't include the freeze or the COLAs.  The

18   legislature knew this.

19           The second point that I'd like to make in my

20   remaining minute and a half relates to the prior legislative

21   history that sister counsel did not mention, but is included

22   in our brief and referenced.  And that's specifically at

23   Exhibit D to the Board's response of Monday night, and Exhibit

24   B is document no. 19249.  And that's HB-1003, dated October 6,

25   2021.  And I'd just like to point the Court to some language

1    which, if enacted, would certainly have encompassed the freeze
2    and the elimination of the COLA.
3             The first example appears on page 115 of 231, at
4    document 19249.  That's 115 of 231.  And it provides in
5    pertinent part, it is extremely clear that the public policy
6    of this legislature is zero cuts to the retirees.  The public
7    policy of the legislature is to recognize as a debt of the
8    Government of the Commonwealth that pensions -- according to
9    the rule of law at the time this law is enacted.  Therefore,
10   there will be no cut, reduction, or alteration to the pensions
11   that the retirees receive from the retirement system of the
12   public employees and the judiciary.
13            The second example, and it's substantially broader
14   than the language that appears in the current act of Act 53,
15   appears on page 143 of 231.  Again, this is document no.
16   19249.  It provides as follows:  Provided, however, that the
17   severability of this article will not be applicable to Article
18   605, it is the express and unequivocal will of this
19   legislature that the courts not enforce the restructuring
20   transactions, and their respective authorizations in Articles
21   104, 201, and 301, if the suspensive condition is left without
22   effect, invalidated, or declared unconstitutional, to avoid
23   any cut or freeze of pensions to government employees in the
24   Adjustment Plan or --
25            (Sound played.)

1          MR. MUNGOVAN:  -- provisions of Article 102 or 105 of

2    this law.

3          I'm out of time, Your Honor, but may I make a final

4    statement with respect to that provision?

5          THE COURT:  Yes, you may.

6          MR. MUNGOVAN:  Thank you.

7          The point of that legislative history, Your Honor, is

8    if that law, if that bill was the law that was enacted, and

9    that language referencing the freeze was included in the law,

10   of course Act 53 would have prohibited the imposition of the

11   freeze.  That language was known to the legislature.  It could

12   have included that language, and it chose not to.  And it

13   chose not to because the Board had made clear at the emergency

14   status conference on October 25 that it could not accept such

15   language, and that was consistent with the position that the

16   Board placed in its letter dated October 14, 2021, which I

17   read to the Court a few minutes ago.

18         And for that reason, Your Honor, the objection should

19   be rejected, the Board's requested rulings should be granted,

20   and entered in the record of the case.  Thank you.

21         THE COURT:  Thank you, Mr. Mungovan.

22         We will take our morning break in just a moment, but

23   I would also like to say to those who will be coming up to

24   argue objections to the third revised proposed Order, I have

25   reviewed the submissions, and I ask you to focus on any issues

1    that are specific to the language of the Order, rather than

2    mere preservation of objections to plan provisions that are

3    reflected in the Order, since objections to plan provisions

4    have already been briefed and argued.

5        So to put it another way, if there is something in

6    the Order that you believe is inconsistent with, or not in the

7    plan, or something in the wording of the Order, I would like

8    you to focus, and to focus me on that issue.

9        I also would like the Oversight Board, in its

10   remarks, to explain the scope of the third sentence of

11   paragraph 3(B) of the Order, having to do with preemption.  It

12   is the sentence that reads, quote, pursuant to PROMESA section

13   four, to the extent not previously ruled preempted pursuant to

14   an Order of the Title III Court, all laws (or such portions

15   thereof) of the Commonwealth of Puerto Rico, other than

16   budgets certified by the Oversight Board inconsistent with

17   PROMESA, have been preempted.

18       And I am particularly interested in the Board's

19   explanation of what the antecedent of the parenthetical

20   reference to such portions is, and whether the Board can or

21   will give any more content to the notion of inconsistency with

22   PROMESA, which is a definitional element of the universe of

23   laws that, as I understand it, are referred to in that

24   particular sentence.  So you have fair warning.

25       Thank you all.  We will resume at 11:00 AM Eastern

1   Time, which is 12:00 Atlantic Standard Time.

2              (At 11:43 AM, recess taken.)

3              (At 11:55 AM, proceedings reconvened.)

4              THE COURT:  Good morning.  We're back in session.

5              So now I'm ready to hear arguments with respect to

6   objections to the third revised proposed Order confirming the

7   Plan, and the first speaker is Mr. Rosen for the Oversight

8   Board, who's been allotted 30 minutes.

9              MR. ROSEN:  Thank you very much, Your Honor.  Brian

10  Rosen, Proskauer Rose, on behalf of the Oversight Board.

11             Your Honor, you stole a great deal of my thunder with

12  your comments just before the break, because I was going to

13  note, and I'll say it again, that many of the objections that

14  were filed primarily reiterated many of their comments with

15  respect to the overall confirmation of the Plan of Adjustment.

16  Most notably, with respect to the takings claim and the

17  nondischargeability objections that have been interposed.

18             But, Your Honor, just for the sake of completeness,

19  what I'd like to do is just briefly go through all of them.

20  I'll note those, and we can just move on very quickly.  Your

21  Honor, and I'll do them in the chronological order in which

22  they were filed.

23             The first was filed by unions, the UAW and the SEIU,

24  and they likewise incorporated their prior objections to the

25  Plan and the earlier proposed Confirmation Order, but they

1   also raised two distinct points.  The first, Your Honor, was

2   with respect to the collective bargaining agreements, and,

3   notably, what they focused on, the fact was that the Plan

4   contained in it a provision regarding collective bargaining

5   agreements and how they would run through, if you will -- they

6   would not be assumed, nor would they be rejected.  And they

7   asked specifically for an inclusion in the Plan for a

8   corresponding provision.

9         So, Your Honor, we have included a similar provision

10  in the Plan with respect to that.  I just wanted to --

11  specifically, Your Honor, in paragraph 29, we have included

12  language that mirrors the identical language that is in the

13  Plan.  For the record, except as provided in Articles 50 and

14  51 of the Plan, none of the debtors' collective bargaining

15  agreements shall be treated as executory contracts, and none

16  shall be assumed or rejected or otherwise treated pursuant to

17  the Plan, but shall remain in effect, subject in all instances

18  to Puerto Rico law and Articles 50 and 51 of the Plan

19  regarding the payment and ongoing treatment of pension and

20  related claims obligations.

21        They also had another comment, Your Honor.

22  Essentially, it's beating the same drum that's been beaten so

23  many times throughout the case.  Specifically, it goes back to

24  the ACR Order and the grievance claims.  And notably, Your

25  Honor, the question was are the -- would you please state once

1   and for all in the Plan that the ACR Order will remain in

2   effect, notwithstanding that it says that in the Plan, and

3   would you say that the grievance claims which will be subject

4   to the ACR Order will be included and will ride through, and,

5   once recognized, will be treated in the ordinary course.

6          Your Honor, in paragraph 42 of the proposed

7   Confirmation Order, we will add language which expressly

8   states that, and saying, without in any way limiting the

9   foregoing, or the terms and provisions of the Plan, or the ACR

10  Order to the extent the claims subject to the terms and

11  provisions of the ACR Order, including without limitation the

12  grievance claims subject to the provisions of collective

13  bargaining agreements, remain subject to the ACR Order, upon

14  resolution thereof such claims shall be satisfied by the

15  debtors in the ordinary course.

16         Your Honor, the next two objections that were filed

17  were by PFZ Properties and Finca Matilde.  Those two, Your

18  Honor, dealt exclusively with the takings claims arguments,

19  and there's nothing to respond to there.

20         The fourth pleading that was filed was by Assured

21  Guaranty, Your Honor.  That was merely a reservation of

22  rights, and no suggestions with respect to changes in the

23  Confirmation Order were made.

24         The fifth was filed by Mr. Peter Hein.  Your Honor,

25  as you have requested, Mr. Hein and I spent a considerable

1    amount of time on the phone yesterday going through his

2    concerns about not only the Plan, but also the Confirmation

3    Order.  And of course while Mr. Hein preserves all of his

4    respective arguments to confirmation of the Plan, we did talk

5    about two that he had expressed specifically to the Court and

6    to me on Monday.

7          First, Your Honor, they were with respect to sections

8    92.9 and 92.11 of the Plan dealing with the Bar Order and with

9    respect to a supplemental injunction.  And so, Your Honor, I

10    understand Mr. Hein's concern, although I don't really believe

11    it's necessary, because so many other times in the Plan we had

12    referenced that there would not be any third-party,

13    nonconsensual releases, but notwithstanding that, Your Honor,

14    we will be adding to the Plan in those two sections, as well

15    as to paragraphs 59, 60, 64, and 65 of the proposed Order,

16    language along the lines of, without prejudice to the

17    exculpation rights set forth in section 92.7 of the Plan and

18    the Confirmation Order, nothing contained in the Plan or this

19    Order is intended, nor shall it be construed to be a

20    nonconsensual third-party release of the PSA creditors,

21    AFSCME, and other respective related persons by creditors of

22    the debtors.

23          This is already in the Plan, Your Honor.  We're just

24    repeating it in the various other sections, because Mr. Hein

25    had expressed a new concern that there might have been an

1 | opening for someone to argue it there.

2 | Mr. Hein also asked, and it's not a plan provision,

3 | Your Honor, but I will note it -- he expressed a concern in

4 | 92.20.  This was the provision of the Plan that refers to the

5 | immediate binding effect.  And if Your Honor will recall, and

6 | Mr. Hein acknowledged the other day that we had removed from

7 | the proposed Confirmation Order the waiver of the 14-day stay

8 | that's set forth in Bankruptcy Rule 3020, but he was concerned

9 | about some introductory language in 92.20 of the Plan about

10 | that.  And if you recall, Your Honor, I mentioned that

11 | immediate binding effect was only going to be upon the

12 | occurrence of the effective date.

13 | Nevertheless, Your Honor, after speaking with

14 | Mr. Hein, and hearing his concern yet again, we have agreed

15 | that in the Plan we will remove that introductory language, so

16 | that there is no question that, in fact, there would not be a

17 | waiver of the 14-day stay.  As I said, Your Honor, the balance

18 | of Mr. Hein's objections go to the Plan, and I will not

19 | address those.

20 | Your Honor, the credit unions, which was the sixth

21 | pleading filed, they substantially reassert the general

22 | takings claim and nondischargeability arguments to the Plan

23 | that they have spoken about so much before.  The one point

24 | that they did make the other day, Your Honor, and I promised

25 | the Court I would look into this, was with respect to COSSEC,

1    C-O-S-S-E-C, which is a public corporation regarding the

2    supervision and insurance of cooperatives.

3         And specifically, Your Honor, Counsel, I believe it

4    was Mr. Almeida, had asked that we would include COSSEC as one

5    of those instrumentalities that would be expressly carved out

6    from any sort of release.  We have discussed this issue with

7    the Oversight Board.  We agree that it is a separate

8    instrumentality, Your Honor, and we will include that in one

9    of the carved out parties, so that to the extent that there is

10   something left for the cooperativas to pursue against COSSEC,

11   they may be free to do so.

12        The seventh pleading that was filed, Your Honor, was

13   by the Unsecured Creditors Committee.  That was merely a

14   reservation of rights, and it was noted in there that there

15   were some ongoing documentation issues that had to be

16   finalized.  I can report that, in fact, those documentation

17   issues have been resolved, and we will be filing, as part of

18   the updated plan supplement, a revised avoidance actions trust

19   agreement that takes into account that lingering issue.

20        The eighth pleading that was filed, Your Honor, was

21   by Amador.  That was, again, a takings claim,

22   nondischargeability pleading, and we will leave that based

23   upon the arguments that have already been raised.

24        The next pleading, the ninth, was by the Retiree

25   Committee, Your Honor, and that was a reservation of rights as

1  well.  And the Retiree Committee noted that they thought that

2  the pension reserve trust guidelines had been finalized, and

3  they were wondering why it had not been filed with the Court.

4       Your Honor, with the passage of Act 53, and the

5  removal of the monthly benefit modifications from the Plan,

6  the guidelines on which the parties have previously reached

7  agreement, specifically the Oversight Board, the Retiree

8  Committee, AFSCME, and AAFAF, they had to be revised to

9  eliminate the oversight or the pension cuts, and the benefit

10  restoration, as well as concepts that were no longer

11  relevant.

12       The parties have been passing back and forth a markup

13  of those guidelines, Your Honor.  I understand there will be

14  further discussions today regarding that, and hopefully that

15  will be done so that can be included in the plan supplement

16  that I referred to previously, Your Honor.  So that would take

17  care of, I believe, the comments by the Retiree Committee.

18       There was a 10th pleading filed, Your Honor, last

19  night, about 24 hours after the Court-imposed deadline for

20  filing comments with respect to the Confirmation Order, but

21  this was by Suiza, Your Honor, one of the dairy producers.

22  But it actually provides nothing with respect to the

23  Confirmation Order.  It merely, again, takes up the issues

24  associated with the takings claims.

25       Your Honor, those are all of the formal pleadings

1    that were filed, but I would like to note, Your Honor, that

2    notwithstanding that, we've been having many conversations

3    with many parties informally, and to get their comments to the

4    Plan.  And if you don't mind, Your Honor, I just would like to

5    run through those as well, because some of the parties have

6    asked us to make the representations on the record.  So I will

7    do that now.

8              Specifically, paragraph 23, that is just a note that

9    we had to correct and conform the provision of that with

10   respect to the pension reserve trust funding.  There was, in

11   the Plan itself, an Article 83 of the Plan that referenced to

12   the ninth year.  Unfortunately, the proposed Order had not

13   caught up to that, so there was a change to the funding there,

14   that it will go on for nine years -- or ten years, actually,

15   Your Honor, rather than just the eight years that were

16   previously noted.

17             With respect to paragraph 35, Your Honor, that is

18   just something referring to the disbursing agent, and based

19   upon conversations that the Oversight Board and AAFAF have

20   been having, as required pursuant to the Plan, the parties

21   have agreed that the disbursing agent, if, in fact, the terms

22   of the retention agreement can be ironed out, will be Prime

23   Clerk.  They will be primarily responsible for the

24   distributions to be made to the creditors pursuant to the

25   Plan.

1      We've included or will include in the proposed Order

2  to be filed, Your Honor, that upon that designation being

3  completed, we'll file an informative motion with the Court, so

4  the Court is aware that it will be Prime Clerk serving as

5  disbursing agent.

6      With respect to paragraph 36 of the proposed order,

7  Your Honor, we have been including there language with respect

8  to U.S. Bank.  And there is a reference, Your Honor, to a

9  settlement agreement that was entered into on a postpetition

10 basis between AAFAF and U.S. Bank regarding the payment of

11 certain postpetition fees by U.S. Bank in connection with PBA

12 and PRIFA.  We just have ironed out some additional language

13 as to the timing for U.S. Bank to return excess funds to

14 either PBA or PRIFA, as the case may be.

15     Your Honor, 56(g) of the Confirmation Order is the

16 Plan provisions or the Confirmation Order provisions that had

17 been requested by Quest Diagnostic.  And as I reported to the

18 Court, Your Honor, on Monday, we hadn't worked out the

19 language for Quest.  They had actually subsequently asked to

20 delete one clause that we had initially included.  We will

21 make that deletion.  And therefore, Your Honor, Quest is

22 firmly in support of the Plan at this time.

23     Lastly, Your Honor, there was -- excuse me.  Two

24 more.  One was by the DRA parties.  There was a stray

25 reference in paragraph 61(g) of the Plan, which is the

1  exculpation language for the DRA parties.  The reference

2  followed the reference -- the statement in the Order to (g),

3  and it sets up (g) of this plan, it was meant to be just in

4  that (g).  They've asked us to delete those of this plan, and

5  make that statement on the record, so I'm doing that now, Your

6  Honor.

7          Lastly, Your Honor, with AAFAF, we have been working

8  on some concerns associated with the PBA leases, and we are

9  working out specific language with respect to the rights of

10 those PBA leases to continue for a period of time as PBA and

11 the Commonwealth continue to work out either the assumption or

12 the rejection of those leases, or whether or not there will be

13 a mass release entered into between the parties on a

14 going-forward basis.

15         What we have done, Your Honor, is we've worked out a

16 mechanism, so that the leases will continue, and we will

17 provide notice to the Court as to the treatment of those prior

18 to the effective date.  But in any event, they will all be

19 worked out by no later than June 30th of 2022.

20         The one other change to the Confirmation Order

21 relates to Exhibit C, which actually relates back to your

22 comment to me, or to us, just prior to the break, Your Honor.

23 Exhibit K is the list of statutes that the Oversight Board has

24 been reviewing as -- for purposes of preemption.  And, first,

25 I would like to note, Your Honor, that we had included, or we

1  intended to include three additional statutes, which were Acts

2  80, 81, and 82, which were approved and enacted by the

3  Governor on August 3 of 2020.

4          And we had also wanted to include something that had

5  been requested by certain parties with respect to Article VI

6  of the Puerto Rico Constitution.  And, specifically, the

7  language in that regard, Your Honor, will be, whether the

8  rights provided by Article VI, Sections 6 and 8 of the Puerto

9  Rico Constitution, the General Obligation Bonds, and

10  Commonwealth guaranteed bonds or indebtedness, restructured

11  pursuant to the Plan are preempted by PROMESA is settled by

12  the treatment of such bonds and indebtedness pursuant to the

13  provisions of the Plan.  Nothing in the Plan affects or

14  determines whether Article VI, Section 6 and 8 of the Puerto

15  Rico Constitution, is preempted for any future purpose.

16          Going back to the sentence that you expressed and

17  noted, however, Your Honor -- again, it's on page six of the

18  proposed Confirmation Order, paragraph 3(B).  Your Honor, the

19  inclusion of that sentence was because, while the Oversight

20  Board continues to do its analysis of all of the statutes that

21  may be out there, there are portions of statutes which provide

22  for the payment or the creation of certain payment

23  obligations, which may be inconsistent with PROMESA.

24          That's why of course, Your Honor, there is a

25  reference to "or such portions thereof," because there are

1   certain acts, Your Honor, which are not inconsistent with

2   PROMESA in any manner, and we are not looking to preempt those

3   provisions.

4         Your Honor, as we continue this analysis, though,

5   Your Honor, we wanted to be sure that we had the opportunity

6   to alert the Court as to what statutes might be inconsistent

7   with PROMESA, and if we determined any to be so, that we would

8   certainly file an informative motion with the Court prior to

9   the effective date, and allow parties to weigh in with respect

10   to that if, in fact, they deem that preemption to be

11   inappropriate, Your Honor.

12         So it's our effort to make sure that there is nothing

13   inconsistent, and, at the same time, Your Honor, acknowledging

14   that there might be something out there that we're unaware of,

15   and that we're continuing the process to make sure that we

16   capture all of those particular statutes.

17         THE COURT:  Well, is the comprehensive process one

18   that you envision culminating before the effective date with a

19   definitive list that will be in Exhibit K, and so that the

20   "include but without limitation" language in the following

21   sentence can be eliminated?

22         Will this ever be a definitive universe of existing

23   statutes?

24         MR. ROSEN:  Your Honor, I know Mr. Bienenstock wants

25   to speak on this issue.

1              MR. BIENENSTOCK:  Would that be okay, Your Honor,

2    just briefly?

3              THE COURT:  Yes.  Of course.  Good morning.

4              MR. BIENENSTOCK:  Good morning again.  So this was

5    our thinking and intent and request.  To the extent that

6    Exhibit K, as it is amended, lists statutes, where --

7    specifying those that we're asking the Court to rule are

8    preempted, there's no way to know if we're going to find every

9    single one.  And so the sentence Your Honor identified was

10   intended to serve only one purpose, to signify that just

11   because a statute is not listed in Exhibit K doesn't mean it's

12   not preempted.  But if someone, and it may be someone other

13   than the Oversight Board, determines it is preempted, they'll

14   be able to come to the Title III Court, or whatever court has

15   subject matter jurisdiction at the time, to argue that,

16   because the wording of section four in PROMESA is that

17   inconsistent laws are preempted.

18              So even if we said nothing, they're still preempted,

19   but we wanted to identify the ones that the Board contends are

20   definitely preempted, and reserve for the Board, or for other

21   interested parties, the right to argue that others are

22   preempted when and if those situations arise.

23              THE COURT:  Thank you.  I understand --

24              MR. BIENENSTOCK:  Thank you, Your Honor.

25              THE COURT:  -- the rationale.

1           MR. ROSEN:  Your Honor, unless the Court has any

2    additional questions, I believe that is all I have to address

3    the objections that were raised to the Confirmation Order.

4           THE COURT:  Thank you, Mr. Rosen.  I have no other

5    questions at this time.

6           So I'll now turn to Mr. Hein.

7           MR. HEIN:  Can you hear me, Your Honor?

8           THE COURT:  Yes, I can.  Good morning, Mr. Hein.

9           MR. HEIN:  Good morning.

10          With Your Honor's permission, I, in my objection, in

11   addition to making more global points, tried to zero in on

12   specific paragraphs, and I'd like to address those.  But I'd

13   like to start with the specific paragraphs that Mr. Rosen made

14   reference to, just while we have that in mind, concerning the

15   releases, the bar orders, the injunctions, and exculpation.

16          Mr. Rosen is correct that we did discuss those

17   issues.  I, you know, welcome seeing it in writing, the

18   specific language that Mr. Rosen is suggesting, but I think

19   from what I heard, as to the general release, the bar order,

20   and the injunction provisions, I think that language is

21   certainly going to help address, if not totally address, the

22   issue.  The language, you know, as I heard it, and just to

23   kind of sum up my understanding, is basically, just to be

24   explicit in words of one syllable, that nothing here is a

25   nonconsensual, third-party release of nondebtors.

1          You know, whether you call it a release, or a bar

2    order, or an injunction it's not going to affect rights as

3    against nondebtors.  The principle, though, I think while

4    conceded, also has to be applied to the exculpation provisions

5    in -- it's 92.7 of the Plan, and there are exculpation

6    references.  I think it's paragraph 58 of the Order, which is

7    a more general reference, and, more specifically, in paragraph

8    61 of the Order.  And these exculpation provisions expressly

9    state that the third parties shall not have or incur any

10   liability to any entity.

11         So to say someone has no liability to others is just

12   a release in different words.  And I realize the scope as to

13   which there is no liability is narrower than the broader scope

14   of the releases in 92.2(a), but the principle is the same.

15   The exculpation provisions relieved parties of liability.

16         And specifically here we have a situation where,

17   among the parties being relieved of liability, even though

18   they are not debtors or reorganized debtors, are the very

19   parties who participated in what, from my point of view, is

20   the unequal treatment under the Plan of some bondholders who

21   are not among the people that negotiated the deal.

22         And I would submit that it's completely unreasonable

23   to say that particular parties are entitled to, in effect,

24   impose unequal treatment on me and other individual

25   bondholders, to say we don't get the same pro rata 1.5

1    percent, or, for that matter, that individuals need to go

2    through hoops for many to navigate to get the 1.321 percent.

3    And just as an aside, that's -- I'm mindful and Mr. Rosen is

4    mindful of Your Honor's request that we submit a joint

5    statement on that point. And we've discussed that, and I hope

6    we can get to the point to have a joint statement.

7            But it's not reasonable to say that parties can

8    impose this unequal treatment, and then, in addition, after

9    saying that we get less pro rata than they do, that they

10   should be exculpated with a provision saying that they will

11   not have liability. And that, too, gets imposed on

12   nonconsenting bondholders. It's just they can't have it both

13   ways, and insist on unequal treatment, and then demand a

14   nonconsensual release for that action.

15           The issue I'm raising could and, frankly, should be

16   pretty simply resolved by simply according equal treatment to

17   all, that every bondholder gets the same 1.5 percent and 1.321

18   percent, whether or not they could navigate the ATOP delivery

19   process here. By simply giving equal treatment to every

20   bondholder, we resolve this issue. But we can't have unequal

21   treatment, and then expect that there's going to be a

22   nonconsensual release.

23           So that's my, you know, comment specifically

24   responsive to what we dis -- what Mr. Rosen discussed, but I

25   would like to, with Your Honor's permission, address several

```
 1   other specific provisions.  And starting with the preemption
 2   provision that Your Honor asked about, paragraph 3(B) on page
 3   six, and just, you know, first, hearing the comments that were
 4   made, and in particular the comments about the -- how the
 5   constitutional provision is going to be handled, I'm just --
 6   you know, I'm not -- first, I don't know that -- how one can
 7   wait until after Your Honor rules and then have something done
 8   just before the effective date.  I think clarity is required,
 9   but clarity is required before Your Honor rules.
10           Secondly, what I heard about the constitutional
11   provision, it just struck me as almost bewildering that
12   preemption of the Constitution is settled for the past, but
13   nothing addresses preemption of the Constitution in the
14   future.  As someone who is supposed to get new bonds that rely
15   upon the constitutional provision, and the Disclosure
16   Statement said that they -- you know, that was the source of
17   payment, the constitutional provision, and the implementing
18   statutes, I'm not very happy with the notion that this is
19   unsettled.  I think this is the time to settle that, simply
20   put.
21           And just to put a finer point on it, and this deals
22   with and I think further illustrates the problem here, this
23   deals with comments Mr. Bienenstock made in replying on
24   Monday.  And Your Honor may recall that I had made the point
25   that the Disclosure Statement describes, as the first and
```

1   second sources of payment to the new bond statutes, as well as

2   the Constitution and implementing statutes, yet as to certain

3   of those statutes, it was proposed that they be preempted.

4   And one of those statutes was Act 33 of 1942.

5         And the Oversight Board's response from

6   Mr. Bienenstock was not, oh, well, you know, of course if

7   that's going to be part of what provides the authorization for

8   General Obligation Bonds going forward, you know, surely we're

9   not going to be preempting that.  That's what I would have

10   expected him to have said.  But instead he said, well, the

11   legislature actually repealed Act 33 back in September.  And

12   to put it mildly, I was just shocked.

13         On November 3, Act 33 was listed on the exhibit,

14   Exhibit C to the proposed Order and Judgment, the prior

15   version.  That's at docket 19061, page 94.  And the statute is

16   clear in its language, quote, the good faith of the

17   Commonwealth of Puerto Rico is hereby irrevocably pledged for

18   the payment of the GO Bond.  Irrevocable means irrevocable.

19   There was no Court authorization to repeal this statute.

20         And, you know, this statute was specifically

21   discussed in the Disclosure Statement last summer, where the

22   Disclosure Statement, that people relied upon when they voted,

23   you know, spoke about the fact that GO Bonds are issued under

24   specific authorizing legislation, or Act No. 33 of December 7,

25   1942.  That obviously -- statement in the Disclosure Statement

1  is no longer operative.

2        The Disclosure Statement even represented that if the

3  Puerto Rico Legislature did not authorize the issuance of new

4  bonds and CVIs, they could be issued pursuant to Act 33,

5  another representation that's no longer operative.  And what

6  replaces Act 33?  Is it Act 53 of 2021, which Your Honor heard

7  discussed this morning?

8        You know, and obviously there is clearly an issue as

9  to the conditionality of that, so it just -- to me, it

10 underscores that this is not something that we can just treat

11 as, you know, kind of broad brush.  This is something where

12 one has to get into the nitty gritty details, statute by

13 statute, section by section, and, you know, almost line by

14 line to know what's in, what's out, what their position is.

15       Let me turn to a different specific, and that's in

16 3(O) on page ten of the proposed Order.  Paragraph 3(O)

17 asserts that, for purposes of PROMESA 209, the discharge of

18 debt is necessary for the Oversight Board to certify that

19 expenditures do not exceed revenues for the Commonwealth, as

20 determined in accordance with modified accrual accounting

21 standards.

22       Now, section -- or PROMESA, it would be the section

23 of PROMESA that paragraph 3(O) refers to, this PROMESA 209,

24 provides that the Oversight Board shall terminate, upon the

25 certification by the Oversight Board, among other things, that

1    for at least four consecutive years expenditures did not

2    exceed revenues, and here's the key language, as determined in

3    accordance with modified accrual accounting standards.

4    Modified accrual accounting standards, in terms, are defined

5    in PROMESA section five, subdivision 16, as recognizing

6    revenues as they become available and measurable, and

7    recognizing expenditures when liabilities are incurred, in

8    each case as defined by the Government Accounting Standard

9    Board, in accordance with Generally Accepted Accounting

10   Principles.

11          Now, paragraph 3(O) is not -- there's nothing in this

12   proposed Order that references any specifics in the record to

13   show this.  Certainly not with respect to the GO and PB -- or

14   PBA Bonds.  And certainly there's nothing prepared in

15   accordance with Generally Accepted Accounting Principles in

16   the records that support this, because as Your Honor knows,

17   the last certified financials are over -- you know, for a

18   period over three years old.  So the last certified financials

19   refer to a period ending June 30, 2018, so there's just

20   nothing in the record with respect to -- in accordance with

21   GAAP.

22          Now, by contrast, I have submitted in my objection

23   and in the evidence I have submitted here multiple references

24   that would certainly contest and I would submit refute

25   paragraph 3(O), as to which the Oversight Board has the burden

1   of proof.  And just as one example, and I'm not going to

2   belabor this, you know, the fact that Puerto Rico had a four

3   billion dollar cash surplus in the last fiscal year, and that

4   that is three times the current GO and PBA debt service, it's

5   Exhibits 18759-2, 18759-4, and then that they have 25 billion

6   in cash, 13 billion cash on hand available to pay GO and PBA

7   debt, that's in Exhibit 18758-7, 19164-1, 18758-6, and my

8   declaration summarizes it, 19047, page six of 27.  So, you

9   know, I provided evidence.  I've seen nothing to support 3(O)

10  in the record.

11        Then turning to paragraphs four and five in the

12  proposed Order that deal with litigation resolution and plan

13  settlements, you know, we've covered this in the arguments,

14  where I made the point regarding 944(a), that I'm not bound by

15  the settlements of others.  They still have to prove the

16  requirements for confirmation.  But I just want to make one

17  point here in specific response to including paragraphs four

18  and five in the Order.

19        It's one thing to say that the Court is going to look

20  at a settlement presented consensually by two or more parties

21  where all have agreed and agree to the settlement, and say,

22  you know, I, the Court looked at this and I think it's within

23  this broad range of reasonableness; but that's not what's

24  occurring here.

25        They are asking you to look at the settlement that is

1    not agreed by all parties, and that I think is a very, very

2    different inquiry here, to assess the reasonableness of the

3    settlement that is disputed and that is contested by parties

4    who are not parties to it.  And among other -- and it's no

5    answer to say, oh, the bondholders voted for this.  That gets

6    into the question of what the bondholders were told when they

7    voted.

8            And just as one example to start, they were most

9    certainly not told, when they were asked to vote, and the

10   Disclosure Statement does not tell them this, that Puerto Rico

11   had a four billion dollar surplus in the past year, three

12   times the amount required to pay GO and PBA debt service, nor

13   were other specific imperative disclosures I had asked for

14   made.  But just think of it.  If you're a bondholder, you get

15   something in the mail that says they have three times the

16   amount required to pay debt service in their, you know,

17   revenues over expenses in the past year, now give up, you

18   know, 42 percent of your consideration in your bonds.  I think

19   the vote might be a little bit different, and particularly if

20   you weren't also tying the vote to the offer of cash for vote.

21           Then, let me turn to three provisions relating to the

22   1.321 percent and 1.5 percent.  This is paragraphs 34(a), 46,

23   and 48.  You know, on the 1.321 percent, we have the issue

24   that we discussed Monday that Mr. Rosen and I hopefully will

25   include discussions on -- on the 1.5 percent, we have the

1   issue that, you know, has been discussed, I just alluded to,

2   over whether pro rata consideration can be paid to some, but

3   not others, notwithstanding, among other things, 1123(a)(4).

4   So that's an issue on the merits I just wanted to flag, that I

5   specifically contest those paragraphs.

6          Then I'd like to turn to paragraph 69, which deals

7   with tax requirements, and paragraph 69 provides that payments

8   or redemptions with respect to the CVIs should not be subject

9   to Commonwealth tax withholding.  It would seem to me the same

10  principles should apply to no tax withholding under the new GO

11  Bonds, and I think that ought to be modified.

12         Then let me turn to paragraph 81, and this deals with

13  section 92.2 of the Plan that Mr. Rosen referred to, and that

14  I have had discussions with him about.  I will look at his

15  language, but my thought was, just being clear, and words of

16  one syllable, tracking the language of 3020(e), the Order

17  confirming the Plan is stayed until the expiration of 14 days

18  after the entry of the Order, unless the Court orders

19  otherwise.  And this is key, the Plan shall not become

20  effective until after the 14-day period expires, subject to

21  any further relief the Court may grant.

22         And the reason we need to say that the Plan will not

23  become effective until the 14-day period expires is otherwise

24  we could have an argument that the releases and cancellation

25  and extinguishment of existing bonds took place immediately,

1  and, gee, that can't be reversed or modified now that the Plan

2  is effective.  That's my concern.

3        On paragraph 85, this deals with modifications, and I

4  want to highlight in particular my objection to the first

5  sentence in paragraph 85.  What this deals with, it states

6  that the eliminating, the reduction in pensions, and the

7  providing of significant cash bonuses to public employees and

8  the like that have been done to modify the Plan, it states

9  that does not adversely impair the interests of other

10  creditors, such as GO holders.

11        And I submit that the changes between the Seventh

12  Amended Plan --

13        (Sound played.)

14        MR. HEIN:  -- from last summer, and the fiscal plan

15  from April of 2021 that remains in effect, the changes in this

16  Modified Eighth Plan that basically eliminates any reduction

17  in monthly pension benefits, provides significant cash

18  bonuses, like 11,000 apiece to members of one particular

19  union, even though they're not owed any money, that absolutely

20  adversely affects the interests of me and other GO holders

21  who, you know, risk not getting paid if the money goes out the

22  door first.

23        Final point deals with my request to stay

24  consummation until there's a determination by the IRS as to

25  tax exempt status.  Your Honor, I've detailed, and two years

1    ago detailed, just the utter chaos that occurred in the COFINA

2    situation, where taxable securities were issued even to

3    investors in the 50 states.  Shortly thereafter, it turned out

4    the bonds could be tax exempt after all, but then Puerto Rico

5    took advantage of the situation, because the status had not

6    been determined before the effectiveness of the Plan.  And

7    they basically took the position, well, if you want tax exempt

8    bonds, you have to give up 25 basis points of the interest

9    rate that you were promised under the Plan.

10        So we had to accept a lower rate of interest than

11   provided for in the Plan.  And many individuals, also

12   individual retail investors, had to pay these 30 dollar fees

13   to their brokers just to get the tax exempt bonds they were

14   entitled to all along.

15        And then the paperwork was just extraordinary with

16   all of this back and forth.  I had one COFINA bond at one of

17   my brokers, and I counted over a hundred transactions within a

18   two-month period relating to that one bond.  I start with one

19   bond, somehow end up with over a hundred transactions.

20        No one has provided any --

21        (Sound played.)

22        MR. HEIN:  May I finish the thought, Your Honor?

23        THE COURT:  Yes, you may.

24        MR. HEIN:  No one has identified any good reason we

25   need to put me and other retail investors through this again.

1    We can avoid the problem by simply getting the tax exempt

2    status resolved before, not after this becomes effective and

3    bonds are distributed.

4            Thank you, Your Honor.

5            THE COURT:  Thank you, Mr. Hein.

6            The next speaker is Mr. DeChiara.

7            MR. DECHIARA:  Thank you, Your Honor.  Peter

8    DeChiara, from the law firm of Cohen, Weiss & Simon, LLP, for

9    the United Auto Workers International Union and Service

10   Employees International Union.

11           I've already addressed UAW and SEIU's objection to

12   paragraph 62 of the proposed Confirmation Order.  I'll now

13   address other objections that UAW and SEIU have to the

14   proposed Confirmation Order.

15           First let me say we appreciate Mr. Rosen's comments

16   concerning amendments to the Order that were made in response

17   to certain of our objections, but, unfortunately, we only

18   learned of those amendments minutes ago, while Mr. Rosen was

19   speaking.  So obviously we need to review them, and we reserve

20   all rights concerning those amendments.

21           And, moreover, even though a couple of our objections

22   may have been resolved, I'd like to briefly note our position

23   on them on the record.  Our first objection concerns union

24   grievance claims, which are claims that the Commonwealth, in

25   its role as employer, violated either a collective bargaining

1    agreement or a Puerto Rico unemployment law statute.  We seek

2    that the proposed Order be amended to make clear that the Plan

3    does not discharge such claims.

4            The Court's March 12th, 2020, ACR Order, docket entry

5    12274, at paragraph six, specifically names UAW and SEIU,

6    along with two other unions, and expressly provides that the

7    grievance claims of those named unions would be processed and

8    paid "in the ordinary course."

9            We seek clarification that if the Confirmation Order

10   does not change, the treatment of UAW and SEIU grievance

11   claims set out under the ACR Order -- it appears, based on

12   Mr. Rosen's representations this morning, that this issue has

13   been resolved, so I won't say anything more on that subject

14   now.

15           Next we request clarification that the administrative

16   claims bar date in paragraph 44 of the proposed Order, which

17   sets a bar date of 90 days after the Plan's effective date,

18   does not apply to union grievance claims.  The Oversight Board

19   takes the position in its Omnibus Reply to the plan objections

20   that union grievance claims are not administrative claims.  So

21   we assume that the Board would agree that the administrative

22   claims bar date does not apply to union grievance claims.  So

23   this should not be a matter of dispute, but Mr. Rosen did not

24   mention any clarification to the Order on this point.

25           Because the ACR Order provides that UAW and SEIU

1    grievance claims are to be paid in the ordinary course, they

2    should not be subject to any bar date, administrative or

3    otherwise.  Moreover, just as a practical matter, given the

4    extremely slow pace at which Commonwealth agencies resolve

5    union grievance claims, it would be impossible for the UAW and

6    SEIU to comply with administrative bar date.

7         It typically takes years after a union files a

8    grievance to get a resolution.  There is no way the UAW and

9    SEIU could file an administrative expense claim for all of our

10   grievances by 90 days of the Plan's effective date.

11        So for those reasons, we request that the Court

12   clarify that the Confirmation Order -- or clarify the

13   Confirmation Order to provide that the administrative claims

14   bar date in paragraph 44 does not apply to union grievance

15   claims.

16        Our next objection concerns paragraph 29 of the

17   proposed Confirmation Order.  That paragraph provides that

18   executory contracts are deemed rejected.  It lists certain

19   exceptions, but the list of exceptions does not include

20   collective bargaining agreements.

21        The Plan, at section 76.10, expressly provides that

22   the Commonwealth's collective bargaining agreements will

23   remain in effect and not be rejected.  To avoid any doubt, and

24   because of the obvious importance of this issue, we seek an

25   amendment to paragraph 29 that adds collective bargaining

1    agreements to the list of contracts that will remain in effect

2    and not be rejected.  Mr. Rosen's remarks suggest that this

3    issue has now been resolved, so I won't say anything more on

4    that issue at this point.

5         And then, finally, we object to paragraph 26 of the

6    proposed Confirmation Order, to the extent that it directs the

7    Governor and legislature to enact enabling legislation

8    required by the Plan.  Such indirection is neither necessary

9    nor authorized.  If, as the Oversight Board contends, Act 53

10   constitutes the enabling legislation required by the Plan,

11   then the enabling legislation already exists.  The

12   Confirmation Order does not need language mandating

13   legislation that already exists.

14        In any event, the language requiring the Commonwealth

15   to enact enabling legislation is also unauthorized.  Certainly

16   the Oversight Board does not have authority to mandate

17   Commonwealth legislation.  The Board is not a control board.

18   PROMESA created a power sharing arrangement between the

19   Oversight Board and the Commonwealth.

20        PROMESA section 314(b)(5) makes clear that enabling

21   legislation is something that the Board would have to obtain

22   from the Commonwealth, and as the Court has explained, if the

23   Oversight Board wants something, or wants to obtain something

24   from the Commonwealth, it has to get the Commonwealth's

25   buy-in.  That language occurs at 330 F. Supp. 3d, at 701.

1          Nor does the Court have authority to order the

2   Commonwealth to enact legislation.  A Court may strike down

3   existing legislation.  A Court may order a government agency

4   to comply with existing legislation.  But a Court has no power

5   to order a government to create new legislation.  Legislation

6   by judicial edict simply does not exist in this country.

7          In our democratic system of government, legislators

8   are free to vote or not vote for whatever legislation they

9   choose.  A Court may not order a legislator to vote for a

10  bill.  Similarly, the executive is free to sign or veto

11  proposed legislation based on what he or she thinks best.

12  Because it is both unnecessary and unauthorized, the Court

13  should strike the language in paragraph 26 requiring the

14  Commonwealth to enact enabling legislation.

15          And I would note that this is not a moot issue.  It

16  is a live controversy, so long as the language remains in the

17  proposed order, and so long as --

18          (Whereupon the videoconference connection froze.)

19          THE COURT:  Thank you all for your arguments this

20  morning, and I will look forward to seeing you at 2:10 or 3:10

21  --

22          COURT REPORTER:  Your Honor.

23          THE COURT: -- depending where you are.

24          COURT REPORTER:  Your Honor, can you hear me?

25          THE COURT:  Yes.

1            COURT REPORTER:  I'm so sorry.  We froze again, in

2     Puerto Rico.  It was just for a couple seconds, but it was --

3     the last I heard was counsel saying, "I would note that this

4     is not a moot issue.  It is a live controversy, so long as the

5     language remains in the proposed Order, and so long as --" and

6     then we froze.

7            THE COURT:  All right.  Mr. DeChiara, would you come

8     back and repeat your concluding sentence or sentences?

9            MR. DECHIARA:  Yes.  I said, "and so long as UAW and

10    SEIU object to it, which we do."

11           THE COURT:  Thank you.

12           Mr. Gordon has his hand up.

13           MR. GORDON:  Yes.  Thank you, Your Honor.  May I

14    speak?

15           THE COURT:  Yes.

16           MR. GORDON:  Thank you.  I just wanted to clarify,

17    the remaining objecting parties, as listed as such in the

18    Agenda, will we be then heard when we resume this afternoon?

19    Is that the idea?

20           THE COURT:  Yes.  So I have listed as further

21    objecting speakers the Credit Unions, the Retiree Committee,

22    the UCC, Assured, PFZ, and Finca Matilde, and then we'll have

23    the reply remarks by the Oversight Board.

24           MR. GORDON:  Thank you, Your Honor.

25           THE COURT:  Thank you.  We are now adjourned.

1          (At 12:45 PM, recess taken.)

2          (At 3:09 PM, proceedings reconvened.)

3          THE COURT:  Good afternoon, everyone.  We are back to

4   resume the oral argument regarding objections to the third

5   revised proposed Order confirming the Plan, and I remind all

6   of our Zoom participants and telephone listeners that there's

7   to be no recording or retransmission of any part of the

8   proceedings.

9          I now call on counsel for the Credit Unions,

10  Mr. Almeida, who is allotted four minutes.

11         MR. ALMEIDA:  Yes.  Good afternoon, Your Honor, court

12  staff, and people present in this videoconference.  This is

13  Attorney Enrique Almeida, on behalf of the Credit Unions.

14         On November 15, 2021, at docket 19221, the Credit

15  Unions filed a joint objection to the modified proposed Order

16  and Judgment Confirming the Plan.  In essence, the Credit

17  Unions objected to the proposed Order and Judgment Confirming

18  the Plan in as much as it is not in alignment with the

19  requests made in their objections to the Plan of Adjustment as

20  amended or modified.  Thus, the Credit Unions restated their

21  arguments in objection to the Plan of Adjustment at docket

22  18594.

23         The findings and conclusions in the proposed Order

24  and Judgment Confirming the Plan of Adjustment deny all

25  objections to the Plan and discards an Order of Confirmation

1    wherein this Honorable Court would, under section 944(c)(1),

2    except from discharge the constitutional takings of the Credit

3    Unions as expounded in their objection and claim in the

4    Adversary Proceeding 18-28.

5        In particular, the proposed finding concerning

6    discharge and releases of claims and causes of actions at

7    paragraph 56 discharges all of the Credit Unions claims, even

8    though this Honorable Court has not determined the

9    dischargeabilty or nondischargeability of their claims as

10   requested in Adversary Proceeding 18-28, and as requested in

11   their objection to the Plan.

12       Therefore, the Credit Unions object to the proposed

13   finding in paragraph 56 of the proposed Order, and request

14   that it be amended to provide for the exception of discharge

15   of the Credit Unions' claims.  We just wanted the record to be

16   clear on this objection, as to the fact that the Credit Unions

17   do not accept the language proposed by the Oversight Board in

18   such paragraphs.

19       Now, as to the proposed finding regarding preemption

20   that was addressed in our objection at page 12 of docket

21   19221, we respectfully submitted that the proposed Order and

22   Judgment seeks to broadly eliminate and swipe away

23   Commonwealth laws through an excessively broad and premature

24   finding of preemption at paragraph 3(B).

25       The preemption finding is improper and inconsistent

1    with legal doctrine that balances federal mandates with due

2    respect to state law.  The preemption finding is contrary to

3    PROMESA --

4           (Sound played.)

5           MR. ALMEIDA: -- section 303 as to the Commonwealth

6    power to control, by legislation or otherwise, the territory

7    or any territorial instrumentality in exercise of the

8    political governmental powers, including expenditures for such

9    exercise.

10          We respectfully submit that the proposed finding at

11   paragraph 3(B) is improper and excessive, as it would serve as

12   a blanket power to the Oversight Board to repeal valid loss,

13   which is a legislative power which it does not have under

14   PROMESA.  Therefore, we submit that it should be modified or

15   stricken as it is currently drafted.

16          In order to be brief, with regards to the rest of our

17   position as to the proposed findings of fact and conclusions

18   in the proposed Order, we will rely and restate the Credit

19   Unions' arguments as stated in the objections filed at docket

20   19221 and 18594.  Thank you.

21          THE COURT:  Thank you, Mr. Almeida.

22          Next we have Mr. Gordon for the Retiree Committee for

23   five minutes.

24          MR. GORDON:  Thank you, Your Honor.  Can you hear me?

25          THE COURT:  Yes, I can.  Good afternoon.

1          MR. GORDON:  Thank you so much.  Again, for the

2     record, Robert Gordon of Jenner & Block on behalf of the

3     Retiree Committee.

4          Your Honor, the Retiree Committee filed a reservation

5     of rights at docket number 19248.  And Mr. Rosen is correct

6     that the Oversight Board, the Retiree Committee, and other

7     parties are now in the process of discussing and hopefully

8     progressing these matters in the near term.

9          However, I believe it is important to make a brief

10    record here of the concern, and our reservation of rights.

11    And I will indeed be brief in this regard.  As described in

12    our reservation of rights, the Plan Support Agreement dated

13    June 7, 2019, by and between the Oversight Board and the

14    Retiree Committee, contemplated, among other things, the

15    creation of a pension reserve trust for the benefit of

16    retirees, an entity to provide professional management of the

17    funds to be held by the pension reserve trust, and an

18    independent entity to monitor the funding of the pension

19    reserve, and the withdrawal of funds from the reserve by the

20    Commonwealth.

21         The Plan Support Agreement envisioned the creation of

22    a guidelines document to provide these things, and that the

23    guidelines document would be a definitive document.  That's a

24    defined term in the Plan Support of Agreement.  A definitive

25    document incorporated in the Plan of Adjustment.  To that end,

1    the Retiree Committee negotiated extensively with the

2    Oversight Board professionals over the span of the last two

3    and a half years, interrupted at various points by

4    earthquakes, pandemic, and other events to be sure, to develop

5    those guidelines.

6          While certain details of the guidelines are still

7    being negotiated, Your Honor, the guidelines document is a

8    robust document that provides a detailed structure for, among

9    other things, the creation and governance of the trust, a

10   pension reserve board to professionally manage the assets and

11   invest the funds held in the trust, and a pension benefits

12   counsel comprising retirees and active employees as a majority

13   of the counsel members, as well as designees from the

14   Oversight Board and the Commonwealth to oversee the funding of

15   and withdrawals from the trust by the Commonwealth for the

16   benefit of retirees.

17         The draft guidelines clearly articulate and

18   circumscribe the responsibilities of the pension reserve board

19   and the pension benefits counsel; the composition of those

20   entities; the professional qualifications of the Pension

21   Reserve Board members; the method of appointing members to the

22   Board, and counsel, as of the effective date of the Plan; and

23   the process of conducting elections of retiring members to the

24   Pension Benefits Counsel during a transition period after the

25   effective date, and thereafter; the general contents of each

1   entity's bylaws, and of the deed of public trust that will

2   establish the pension trust, which bylaws and deed of trust

3   will include, among other things, ethics policies. The

4   guidelines also provide for investment policies and procedures

5   that are appropriate for the pension trust, and a highly

6   detailed formula for withdrawals from the trust that ensure

7   that the Commonwealth doesn't try to use the trust as a piggy

8   bank of first resort, but rather as the rainy day fund for the

9   support of pensioners that is intended to be.

10          (Sound played.)

11          MR. GORDON: All of this, and much, much more is

12   provided in the guidelines document, and none of it is

13   provided for in the Plan or the Confirmation Order. The

14   guidelines document is a relatively mature document in the

15   final stages of negotiation, but, to date, not even a draft of

16   it has been filed with the Court as a place holder, Plan

17   support, Plan supplement document. And to be clear, I'm not

18   -- I'm stating that merely factually, not as a matter of

19   criticism. But as such, the guidelines have not been put

20   before the Court and are not encompassed by the proposed

21   Confirmation Order at this time.

22          As we've indicated in our reservation of rights, we

23   certainly understand that the Oversight Board has been

24   juggling numerous matters as it prepared for and has been

25   conducting these confirmation hearings, and we are hopeful

1    that we will complete the negotiation of the guidelines

2    shortly.  Indeed, substantive discussions are resuming in the

3    near term.

4         However, in light of the posture of the case and the

5    deadline for objecting to the current proposed Confirmation

6    Order, we felt compelled to file a reservation of rights and

7    create a place holder to address these issues, if necessary,

8    before completion of these hearings in order to preserve the

9    benefits of the Retiree Committee's Plan Support Agreement and

10   our retiree constituents.

11        Your Honor, one other housekeeping matter.  I noticed

12   last night, and I have communicated with counsel for the

13   Oversight Board, I noticed that in section 83.2 of the

14   Modified Eighth Amended Plan, the provision is there for a

15   ten-year funding period for the pension reserve trust.

16   However, paragraph 23 of the current form of the Confirmation

17   Order still reflects an eight-year funding period.  I have

18   been told that that is being fixed.  I just wanted to make

19   that a part of the record as well.

20        With that, Your Honor, thank you so much.

21        THE COURT:  Just for clarity, I think Mr. Rosen

22   referred to nine years, rather than eight years, and you're

23   saying ten.  Is there --

24        MR. GORDON:  Yes.  No.  I'm sorry, Your Honor.  It is

25   the current year, from the effective date, plus nine fiscal

1  years thereafter, so it ends up being ten years.

2          (Sound played.)

3          THE COURT:  Thank you for clarifying that.  I

4  interrupted you in your final statement, so did you have

5  anything further?

6          MR. GORDON:  No, Your Honor.  I was just thanking you

7  and indicating that, unless the Court has any questions for

8  me, that concludes my remarks for today.

9          THE COURT:  Thank you, Mr. Gordon.

10          MR. GORDON:  Thank you.

11          THE COURT:  Next we have Mr. Despins, for the

12  Unsecured Creditors Committee, for three minutes.

13          MR. DESPINS:  Good afternoon, Your Honor.  And,

14  actually, I will not need to use that time, because Mr. Rosen

15  accurately described where we are, which is that the last

16  issue was resolved yesterday evening, so there's no need to

17  raise any issues with the Court at this time.

18          Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Despins.

20          Next is Mr. Natbony for Assured for five minutes.

21          MR. NATBONY:  Thank you, Your Honor.  William Natbony

22  of Cadwalader, Wickersham & Taft on behalf of Assured.

23          Your Honor, Assured is not an objector to the

24  proposed Order and Judgment, but merely served a reservation

25  of rights in case language changes were made since the last

1   draft that Assured needed to address.  So Assured has no

2   issues with the Order and Judgment as currently drafted.

3            However, I do need to briefly address a comment made

4   earlier this morning by Mr. Hein.  Mr. Hein in his comments

5   today suggested changes to various exculpation provisions.  I

6   did not hear Mr. Rosen to suggest earlier that there would be

7   changes to the exculpation provisions as related to the

8   Monolines, for instance, in paragraph 61(f) of the proposed

9   Order, and our expectation is that there will be no such

10  changes.

11           In any event, Mr. Hein's comments from this morning

12  do not, in our view, support any changes to the Monolines'

13  exculpation provisions.  First, Your Honor, Mr. Hein's

14  objection to the proposed Order and Judgment that was filed,

15  that's ECF 19218, merely refers to the objections that

16  Mr. Hein raised in the Plan of Confirmation, which were filed

17  at ECF 18575.

18           And that filing does not challenge and makes no

19  objections to the exculpation provisions.  It just deals with

20  the release provisions.  So it is our view that there is no

21  objection to the exculpation provision from Mr. Hein relating

22  to the Monolines before the Court.

23           I would also note that this past Monday, during the

24  arguments, during Mr. Hein's argument in particular, he did

25  talk about exculpation, and this is at pages 135 and 136 of

1    the transcript.  He made the specific point that his comments

2    were, quote, not in any way directed to the Monolines.  And

3    again, that's at pages 135 and 36.

4           In addition, Your Honor, I would just note that, as I

5    said on Monday, the exculpation provisions are appropriate as

6    to the Monolines as originally drafted.  They were part of

7    this consideration.  Indeed, the integral consideration that

8    was appropriate in view of the Monolines' substantial

9    contribution to the restructuring of the Commonwealth, as well

10   as the other Monolines, and was consistent with the

11   exculpation language that was approved in *COFINA*.

12          That's all I have to say, Your Honor.

13          THE COURT:  Thank you, Mr. Natbony.

14          MR. NATBONY:  Thank you, Your Honor.

15          THE COURT:  Next we have Mr. Carrion-Baralt for PFZ

16   for three minutes.

17          MR. CARRION-BARALT:  Good afternoon, Your Honor.

18   David Carrion-Baralt on behalf of PFZ Properties.  May I

19   proceed?

20          THE COURT:  Yes, you may.

21          MR. CARRION-BARALT:  As our position has been briefed

22   in writing, we will only state that unless the Plan and the

23   proposed Order are amended to address the issues presented by

24   PFZ, or PFZ's eminent domain claim is excluded from the Plan

25   under 11 U.S. Code 944, we believe both the Plan and the

1   proposed Order are unconstitutional.

2          We have filed notice of a constitutional challenge to

3   a statute.  Your Honor certified the issue to the Attorney

4   General.  The Attorney General just filed an appearance, and

5   requested an extension of time.  And our request to the Court

6   now would be to allow us a reasonable time to react to the

7   AG's brief if the United States decides to do so.  We also

8   reserve the right to supplement the objection if the proposed

9   Order is modified.

10          Subject to your questions, that would be our remarks.

11          THE COURT:  Thank you, Mr. Carrion-Baralt.

12          MR. CARRION-BARALT:  Whatever time is left, I yield

13   to Mr. Capdevila, who comes after me.

14          THE COURT:  Thank you.  Next is Mr. Capdevila, for

15   Finca Matilde.

16          MR. CARRION-BARALT:  Thank you, Your Honor.

17          MR. CAPDEVILA-DIAZ:  Good morning, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. CAPDEVILA-DIAZ:  Good afternoon.  Sorry.

20          THE COURT:  Or good day.  How's that?

21          MR. CAPDEVILA-DIAZ:  I'll be brief.  I originally

22   requested ten minutes, but I had yielded six minutes to

23   Mr. Hein, which were not reflected in the Agenda, so just to

24   say that I'll be brief.

25          THE COURT:  Thank you.

1          MR. CAPDEVILA-DIAZ:  Okay.  Well, Your Honor, the

2     proposed Order before the Court is just that, a proposed

3     order.  It is the Board's idea of what the Confirmation Order

4     should be.  And to that extent, that is their position, but

5     that does not mean that it is correct.

6          Our objection, and minding the Court's comments

7     before the recess this morning, it's not just a reservation of

8     rights, that -- because we already objected to the

9     dischargeability of the debt, of our client's debt for eminent

10    domain, but also because the proposed Order does not take into

11    account the Court's discretion pursuant to section 944(c)(1)

12    of the Bankruptcy Code as applicable to PROMESA.

13         In fact, Monday morning the Board argued that it does

14    not apply, and, well, Your Honor, the rules of statutory

15    construction direct the Court to presume that Congress knows

16    how -- does not act in futility.  Congress knows how to

17    legislate, thus, the statute says what it states and means

18    what it says.

19         Section 941(c)(1) (sic) grants the Court the power to

20    exempt debts from discharge, to argue that the Court lacks

21    authority to determine that eminent domain claimants, whether

22    direct, or regulatory, or indirect takings are

23    nondischargeable, would render section 944(c)(1) purposeless.

24    And that is why, Your Honor, we request that on the proposed

25    Order, paragraphs 56 and 65, that reflect -- or of course in

1   the scenario where the Court grants our objection, that those

2   paragraphs, both paragraphs need to be modified.

3        And I would like to clarify for the record, Your

4   Honor, our objection to the proposed Order is at docket 19214,

5   and by mistake we stated that the paragraph that needs

6   modification is 49, but that was a typo, and I'm sorry.

7        THE COURT:  Understood.

8        MR. CAPDEVILA-DIAZ:  Thank you very much, Your Honor,

9   for the time.

10       THE COURT:  Thank you very much, Mr. Capdevilla.

11       So now we will return to Mr. Rosen for reply

12   remarks.

13       MR. ROSEN:  Thank you very much, Your Honor.  Brian

14   Rosen, Proskauer Rose, on behalf of the Oversight Board.

15       Your Honor, notwithstanding your comments earlier, a

16  lot of the folks still decided to revisit some of their

17  objections.  Most notably Mr. Hein, who, despite saying he

18  wasn't going to be doing that, he launched a collateral attack

19  on the very process, not only the Plan, but the mediation

20  process as well.  And he did that in the context of his

21  argument that there shouldn't be any exculpation provided for

22  the people who were involved in the Plan negotiation process

23  that the Court put in place and that was lead by Judge Houser.

24       Your Honor, the negotiations that took place as part

25  of the mediation, that fostered the ultimate resolution of

1    these Title III cases.  It developed a process, it developed a

2    mechanism, and as I said before, it built the building upon

3    which this Plan of Adjustment rests.

4         Your Honor, no party -- if they did not -- if they

5    were not granted the rights of exculpation that is customary,

6    no party would ever engage in a negotiation.  It just wouldn't

7    happen.  And the efforts that this Court undertook to have the

8    negotiation take place just would not have occurred.  No one

9    would have come.  No one would have spoken honestly.  Nobody

10   would have reached a resolution.

11        Your Honor, Mr. Hein somehow believes that unless he

12   agrees to everything, this Court shouldn't do anything, and

13   that's just not the way a collective action process like a

14   Title III Plan, like a Chapter 11 Plan works.  This Court

15   engaged all the parties to negotiate in good faith.  As the

16   mediator stated, everybody did do just that.  There were good

17   faith negotiations.  It result in a resolution, and it

18   resulted in a Plan of Adjustment that has been overwhelmingly

19   endorsed, including by the classes in which Mr. Hein claims to

20   be a party.  So, Your Honor, there is no doubt that the

21   exculpation provisions of the Plan, of the Confirmation Order,

22   need to remain.

23        As Mr. Natbony said, you know, Mr. Hein is taking

24   shots at people for engaging, but those shots, Your Honor,

25   should miss the mark completely.  And this Court should grant

1    the exculpation that is included in the Plan and in the

2    proposed Confirmation Order.

3          Mr. Hein also brought up the 1.321 fee, Your Honor,

4    and we went back and we reviewed the situation again

5    subsequent to our Monday hearings, and the Oversight Board

6    would like to propose something that would benefit all of the

7    people that Mr. Hein purports to represent, the retail

8    classes.  There are many people who did not vote in favor,

9    Your Honor, and there are many people who may have

10   misunderstood, which we don't know why, but they may have.

11   So, Your Honor, we would like to try one more time to provide

12   all of those folks the opportunity to get the benefit of that

13   1.321 pro rata share.  And the way to do that, Your Honor, is

14   for these people to certify that they are indeed retail

15   investors.  In the absence of that, we don't know who they

16   might be.

17         So, Your Honor, what we would like to do, in the

18   event that this Court confirms the Plan of Adjustment, is to

19   engage DTC, or through Prime Clerk and DTC, to go out one more

20   time, to all of these people, to certify that they do hold

21   less than one -- one million dollars or less of retail -- of

22   bonds, therefore, making them a retail investor.  And if they

23   so certify, Your Honor, they will get the 1.321 fee that

24   Mr. Hein is so concerned that they may have missed out on.

25         So that is something that we would like to do in the

1  event that this Court confirms the Plan of Adjustment, Your

2  Honor.

3          THE COURT:  So are you saying that that is a

4  provision that you would add to the Plan and Order before I

5  make my confirmation determination, or that that is a step

6  that you would introduce formally, and document, and seek to

7  pursue if and only if I confirm the Plan?

8          MR. ROSEN:  Your Honor, my suggestion would be that

9  we include it into the Confirmation Order itself, and it would

10  be self executing in the event that the Court enters that

11  Confirmation Order.

12          THE COURT:  At this point, without that, and

13  notwithstanding the broad discussion we had of who gets the

14  fee and who doesn't get the fee on Monday, if someone didn't

15  respond at all, didn't vote at all in a way that would

16  indicate they were a retail investor, as things stand now,

17  they would not get the fee?

18          MR. ROSEN:  It would be impossible for us to know if,

19  in fact, they were a retail investor if they failed to certify

20  it, Your Honor, because, as we said in the declarations, we

21  cannot look through DTC, so, therefore, we need them to be

22  responsive, complete the certification, so that we know who

23  they are, and then they will get the fee, Your Honor.

24          THE COURT:  Thank you for making that clear.

25          MR. ROSEN:  Yes, Your Honor.

1      Your Honor, Mr. DeChiara, and I apologize if I

2  mispronounce that, Your Honor, he did raise four points:  Two

3  of which he was in agreement to what I said earlier, and two

4  additional points.  One was the administrative bar date, and,

5  Your Honor, we have no problem making clear that the grievance

6  claims would roll through like he is suggesting, because that

7  was the game plan all along, Your Honor.  They would be in the

8  ordinary course.  Therefore, they would not need to be filed

9  as administrative bar date claims.

10      The other comment he had was, at paragraph 26, he was

11  specifically upset about the -- including about limitation

12  enacting any enabling legislation required by, and solely to

13  the extent set forth in the Plan -- Your Honor, we'll delete

14  that language.  That is fine with us as well.

15      With respect to Mr. Gordon, Your Honor, the Plan

16  Supplement is what it is, and as soon as he finishes his work,

17  we will file that document.  The Confirmation Order provides

18  that all plan supplement documents are to be approved, just

19  like the Court did in the context of the COFINA Plan of

20  Adjustment, so we will do the same thing.  As they are done,

21  and there are versions going back and forth, not only of that

22  document, but the new GO bond indenture and the CVI indenture,

23  they will be refiled with the Court, Your Honor.  And that

24  will be part of the formal record, just like you did in the

25  context of *COFINA*.

1          Your Honor, I believe the remaining comments were

2     with respect to the eminent domain and nondischargeablility,

3     so there would be nothing further for me to add there.  Excuse

4     me one second, Your Honor.

5          Your Honor, if I might, Mr. Bienenstock has asked to

6     just address one point with the time I have left.

7          THE COURT:  I actually have a couple of questions for

8     you, and we'll continue to run the time.

9          MR. ROSEN:  Okay.

10         THE COURT:  Meaning I'll allow time for

11    Mr. Bienenstock to speak.

12         So in paragraph four, there is language that says

13    that the compromises and settlements shall be binding upon the

14    debtors, all creditors of the debtors, and all other entities.

15    Is that simply saying that creditors can't challenge the deals

16    between the Commonwealth and the PSA creditors, or is it

17    affirmatively seeking to bind nonaccepting creditors to the

18    legal compromises in the PSAs?

19         MR. ROSEN:  Your Honor, it would be the latter, as

20    you just stated it.  It would be that all creditors involved

21    in the cases, whether or not they are a signatory to those,

22    would be bound to the terms of all of those settlements.

23         THE COURT:  Where specifically does the authority for

24    that come from?  It seems to me that 1129(b) provides that the

25    accepting vote of the class forecloses, for instance, unfair

1   discrimination arguments, or that it is not fair and equitable

2   with respect to an impaired class, but what other arguments

3   are foreclosed and on what specific legal basis?

4           (Sound played.)

5           THE COURT:  You can continue speaking.

6           MR. ROSEN:  I apologize, Your Honor.  I don't

7   understand the question.

8           These are settlements that were -- and if I state it

9   incorrectly, I would ask you to try again for me.  Your Honor,

10  these are the settlements that were reached.  They are part

11  and parcel or integral to the formation of the distributions

12  that are set forth in the Plan, and they have been voted on by

13  all of the creditors involved in this case to the extent that

14  they submitted a vote.  And they have -- as I indicated

15  several times over, they have been approved or overwhelmingly

16  accepted by those creditors.

17          I'm not sure I understood the question otherwise.

18          THE COURT:  I'm trying to think of how to state it

19  more clearly.  The treatments in these accepting classes that

20  we're talking about are reflective of settlement agreements

21  that were negotiated by certain parties that set the terms of

22  the treatment of the class, and as accepting classes, certain

23  Bankruptcy Code arguments are foreclosed to dissenting members

24  of that class.  For instance, unfair discrimination.

25          Are you saying that, in effect, the acceptance by the

1    class makes the dissenters parties to the settlement

2    agreement, so that they are foreclosed from attacking the --

3    from raising issues as to the terms of the class treatment by

4    the acceptance of the class?  I'm not sure that was any

5    clearer, but I tried.

6           MR. ROSEN:  I got it that time, and the answer is

7    absolutely, yes, Your Honor.  That's the argument that we've

8    been making as -- when Mr. Hein raises some of these points,

9    what we've tried to focus on -- the fact is that his classes

10   have in fact supported the Plan, endorsed the Plan, accepted

11   the Plan, and, therefore, the arguments that he chooses to

12   make are not available to him.

13          THE COURT:  That is because of 1129(b)?

14          MR. ROSEN:  Yes.

15          THE COURT:  Thank you.

16          MR. ROSEN:  I apologize for making you go through

17   that.

18          THE COURT:  I just wanted to have the record as clear

19   as possible.  I have no further questions for you at this

20   time.

21          MR. ROSEN:  Thank you very much, Your Honor.

22          THE COURT:  So Mr. Bienenstock can come up.

23          MR. ROSEN:  Thank you.

24          THE COURT:  Thank you.

25          MR. BIENENSTOCK:   Thank you, Your Honor.  Martin

1    Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

2    as Title III representative.

3         On this very last point, this might be stating the

4    obvious, but we are not saying that Mr. Hein cannot try to

5    show that the settlement should not be approved, but what we

6    are saying is he can't attack it, because he doesn't like it,

7    unless -- if the Court approves the settlement, he's bound by

8    its terms.

9         The point I rose to -- I just wanted to provide some

10   clarity, because I think the last objector before Mr. Rosen

11   spoke took issue with what I said about 944(c)(1), and I just

12   wanted to clarify what I did say and what I didn't say.  The

13   Bankruptcy Code provision that's incorporated into PROMESA

14   provides the only claims nondischargeable are the claims that

15   are in the Confirmation Order or Plan as not being discharged

16   or are held by entities that lack knowledge and notice of the

17   case, and the confirmation -- and the Plan.

18        And the point that I had made the other day was this:

19   The fact that the Confirmation Order can contain claims that

20   are not discharged does not mean the Court has a free wheeling

21   equity power to go through every claim and say, well, this one

22   I think I'll make nondischargeable, and this one I won't.

23        I don't mean to suggest that this Court or any Court

24   would be arbitrary about it, but I just want to get across the

25   point that the statute does not grant any power to do that.

1    And so what the Oversight Board is saying is if a claim is

2    nondischargeable, the Court can put it in the Order as

3    nondischargeable.  If a claim is not nondischargeable, the

4    Court cannot make it nondischargeable just by putting it

5    there.  That was the only point I was making.

6              THE COURT:  Thank you.

7              MR. BIENENSTOCK:  Thank you.

8              THE COURT:  Mr. Rosen.

9              MR. ROSEN:  Your Honor, I just wanted to come back

10   and state one other item, and then we can get to housekeeping

11   yet again.  Your Honor, I had indicated previously that the

12   Oversight Board had reached an understanding with U.S. Bank,

13   not only as fiscal agent, but also representing a majority of

14   the holders of PFC, with respect to a treatment not only

15   pursuant to a plan, but an overall treatment with respect to

16   PFC Bonds.  I also indicated that the Oversight Board had

17   authorized and approved that resolution.

18              I believe Ms. DiConza might be on the phone.  We were

19   awaiting, Your Honor, if you recall, approval by AAFAF and PFC

20   with respect to that.  And I believe she could at least update

21   us with respect to that.  And if so, Your Honor, we would be

22   looking to move forward on that as soon as possible.

23   Obviously not realtime, this week, next week, but we would be

24   preparing a Title VI proceeding with respect to PFC.

25              With that, I would turn it over to Ms. DiConza, if

1    the Court will permit.

2            THE COURT:  Thank you.

3            Ms. DiConza.

4            MS. DICONZA:  Good afternoon, Your Honor.  Maria

5    DiConza, from O'Melveny, on behalf of AAFAF.

6            Yes, I can confirm what Mr. Rosen said, that there is

7    an agreement in principle with the PFC Bond Trustee that now,

8    as Mr. Rosen represented, the Oversight Board has approved.

9    That transaction is subject to the approval of the AAFAF Board

10   and the PFC Board, but AAFAF management does support the

11   transaction, and will be submitting it to the AAFAF Board and

12   the PFC Board for formal approval.

13           We did want to make it clear on the record that that

14   process is in place, and we do expect it to move forward

15   expeditiously.

16           THE COURT:  Thank you.  Then the PFC Board would have

17   to approve as well, and then you contemplate it culminating

18   and being accomplished through a Title VI?

19           MS. DICONZA:  That's correct, Your Honor.  So we

20   would proceed with solicitation materials and the Title VI

21   proceeding, as we have with the other Title VI cases.

22           THE COURT:  Thank you.

23           So, Mr. Rosen.

24           MR. ROSEN:  Yes, Your Honor.

25           THE COURT:  I'm sorry.  There is a hand raised.

1   Counsel for U.S. Bank, Mr. Silverman.

2           MR. SILVERMAN:  Good afternoon, Your Honor.  For the

3   record, Ronald Silverman, counsel to U.S. Bank, as the PFC

4   Trustee.  Are you able to hear me well?

5           THE COURT:  Yes, I can hear you.  Thank you.

6           MR. SILVERMAN:  Thank you.

7           I just wanted to reiterate and confirm the statements

8   made by Mr. Rosen and Ms. DiConza, that there has been an

9   agreement on a term sheet for the settlement and resolution of

10  the PFC Trustee's objection to this Plan.  And I'm pleased to

11  hear them say that they have both approved that, again, for

12  AAFAF, subject to their ultimate board approval, and to be

13  implemented, just for a little clarity, pursuant to a Title VI

14  for PFC.  And the parties have agreed to move promptly to do

15  that.

16          To the extent that we get to the closing arguments, I

17  think it would be helpful if we could provide some of the high

18  level details of the settlement as well.  It does involve PFC

19  Bonds, so it is intended to be resolved through a PFC Title VI

20  and that mechanism.  But I just wanted to thank Mr. Rosen,

21  thank Ms. DiConza for those confirmations, so that we can move

22  forward collectively and together.

23          Thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Silverman.

25          So now I'll return to Mr. Rosen.

1           MR. ROSEN:  Thank you, Your Honor.

2           Your Honor, this -- I say it's housekeeping, but it's

3     really in order to -- it's a comment to try and be helpful for

4     the Court, as well as helpful for not only the Oversight

5     Board's presentation, but the presentation of all of the

6     people.

7           Your Honor, the sessions that we have held this week,

8     both Monday and today, the presentation of the oral argument

9     have been truly informative, not only for all of us, but I

10    would hope for you as well.  And the question that I have

11    then, as a result of that is what do you think would be more

12    helpful for your consideration as part of the closings that

13    you are looking for on Monday?  Because -- rather than

14    restating many of the things that have been done Monday and

15    today, what exactly you would be looking for, so we can make

16    sure that we are instructive to you?

17          THE COURT:  Well, these legal arguments have been

18    very helpful to me, and so they certainly don't need all to be

19    reiterated in the closings.  Closings, in more typical,

20    general, commercial, and criminal litigation marshal the

21    factual record for the benefit of the Court in the context of

22    the legal positions of the parties.

23          Right now I have admitted a few hundred exhibits, and

24    so to the extent that there is material in the exhibits that

25    the parties believe is material to a determination either for

1    or against confirmation, I would expect those to be identified

2    in an efficient and accessible way for the Court, so that I

3    don't have to go searching through the haystack to find

4    corroborating material.

5          Having said that, I have set a deadline for revised

6    proposed findings, and conclusions, and I believe objections

7    thereto.  So the granular detail I would expect to find in the

8    proposed findings and conclusions, but an overall conceptual

9    marshaling of the arguments and the record in the context of

10   the closing arguments will be helpful to the Court.

11         MR. ROSEN:  Thank you.

12         THE COURT:  Does that make sense?

13         MR. ROSEN:  It does, Your Honor.  That's what we

14   assumed that you would want.  We just wanted to make sure, so

15   that we didn't misstep, or we didn't leave something out that

16   you were looking for.

17         THE COURT:  Thank you.  I'm glad we're on the same

18   page about that.

19         So we set the time parameters, and the start time,

20   that being 9:30 Monday morning Atlantic Standard, 8:30 Monday

21   morning Eastern Standard, for the closing arguments.  I will

22   say that today we have received the Attorney General's

23   statement and request concerning the certification of the

24   constitutional challenges, and we are entering a very rapid

25   scheduling order for any objections to the extension request.

1          That scheduling order says that I will take that

2     matter under advisement.  If I need argument on that, I will

3     file another order in that regard, but I wanted to take this

4     opportunity to let people know that that order is being filed,

5     and it requires objections I think by 5:00 -- hold on.  I'm

6     just consulting with my colleague here.

7          Is that 5:00 today or tomorrow?  That's what I

8     thought.  Okay.  Fine.

9          Pardon me talking sort of off camera here, but the

10    deadline for responses or objections is 5:00 Atlantic Standard

11    tomorrow, Thursday, and the reply deadline is 5:00 Atlantic

12    Standard, Friday.

13         I think that is all that I have by way of

14    housekeeping from this end today.  Do you have anything

15    further, Mr. Rosen?

16         MR. ROSEN:  No.  Thank you, Your Honor.  That is all.

17         THE COURT:  Thank you.

18         I don't see any hands raised, so I again thank

19    everyone for their focus, and attention, and their

20    responsiveness to my request for oral argument here.  These

21    two days have been very helpful to me, and I wish you further

22    progress in all that you have to do over the next few days,

23    until we reconvene for oral argument.  I'll look forward to

24    the various submissions between now and then.

25         Keep safe, and stay well.  I thank everyone on the

1   court end of things who have so gracefully and effectively

2   administered these proceedings.

3           So we are adjourned.  Take care, everyone.

4           (At 3:51 PM, proceedings concluded.)

5                           *     *     *

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 143 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   November 17, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```