# EXHIBIT 1

177 D.P.R. 121, 2009 WL 3326645 (P.R.), 2009
TSPR 154

RAFAEL HERNÁNDEZ COLÓN, petitioner,
v.
POLICÍA DE PUERTO RICO, respondent;
CARLOS ROMERO BARCELÓ, petitioner, v.
POLICÍA DE PUERTO RICO, respondent.

In the Supreme Court of Puerto Rico.
*Numbers:* CC-2007-347 CC-2007-356

**Synopsis**

*CERTIORARI* PETITION to request reversal of a
JUDGMENT issued by *Emmalind García García,
Adelaida Varona Méndez* and *Carlos Cabán Cabán*,
Judges of the Court of Appeals, which held that the
administrative action of the Puerto Rico Police
Department was not judicially reviewable because the
decision of the Police Superintendent to eliminate escort
protection from former governors was discretionary. *The
judgment issued by the Court of Appeals is reversed. The
actions of then–Police Superintendent were not
discretionary. This is because it directly and substantially
affects an acquired right that already belonged to
petitioners and, therefore, is protected by our
constitutional law.*

*Demetrio Fernández Quiñones*, attorney for Rafael
Hernández Colón, petitioner; *Virgilio Ramos González*,
attorney for **\*127** Carlos Romero Barceló, petitioner;
*Salvador J. Antonetti Stutts*, attorney general, respondent.

ASSOCIATE JUDGE RIVERA PÉREZ issued the
Opinion of the Court.

Mr. Rafael Hernández Colón and Mr. Carlos Romero
Barceló, both former governors of Puerto Rico, have
requested that we review the Decision issued by the Court
of Appeals. The intermediate appellate court ruled that the
administrative action by the Puerto Rico Police
Department was not judicially reviewable, since in its
opinion the action taken by the Superintendent of Police
in eliminating the protection of former governors by
police escorts is within the scope of his discretion.

Below we shall analyze the facts and proceedings
resulting in this dispute.

**I**

Police escorts for Puerto Rico's ex-governors began in
1965, when Mr. Luis Muñoz Marín stopped being Puerto
Rico's Chief Executive. Due to the finalization of his
duties as Governor, the Puerto Rico Police Department
believed that it was necessary to provide him with escorts
to protect his safety and life. The decision to provide the
ex–governor, Mr. Muñoz Marín, with protection by using
escorts resulted from expert analyses and the
interpretation of the Puerto Rico Police Department of
Article 3 of Law Number 77 enacted on June 22, 1956,
better known as the Police Act.[1] From then on, a
precedent was established to provide protection through
police escorts to the subsequent ex-governors of Puerto
Rico. **\*128**

On May 17, 2006, without performing an expert study
regarding the expense to the treasury or any other matter
related to the escort service provided to former governors,
then Governor, Mr. Aníbal Acevedo Vilá, sent a letter to
then Superintendent of Police, Mr. Pedro Toledo Dávila,
ordering the suspension of the protection service offered
until then to former governors. Upon receiving said order,
the Superintendent of Police, Mr. Toledo Dávila, did as
asked by the chief executive and eliminated the escorts
that provided personal security to all of Puerto Rico's
former governors. *The decision to eliminate the escorts of
former governors did not have the support of the
Legislature; therefore, then Governor, Mr. Acevedo Vilá,
based his decision on the inherent powers of the Chief
Executive position and on his authority to issue executive
orders.*

Before eliminating the protection provided by escorts to
former governors, the Puerto Rico Legislature had never
made any statements against the use of escorts as security
for former governors of Puerto Rico. The Puerto Rico
Legislature continued to support the interpretation of
Article 3 of the Police Act.[2] From 1956, no amendment
was made to said provision affecting the protection of
former governors by escorts. Article 3 of the Police Act of
1956, *supra*, provided the following:

A civil law enforcement agency is hereby created in the
Commonwealth of Puerto Rico, to be called the "Puerto
Rico Police Department," the obligation of which shall
be to protect people and property, maintain and
preserve the public order, prevent, discover and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

pursue crime, and, within the scope of its powers, enforce observance of the laws, municipal ordinances, and regulations enacted in accordance therewith.

Article 3 provided the following when the Police Act of 1974 was approved: *129

> A civil law enforcement agency is hereby created in the Commonwealth of Puerto Rico, to be called the "Puerto Rico Police Department," the obligation of which shall be to protect people and property, maintain and preserve the public order, observe and ensure the fullest protection of the civil rights of citizens, prevent, discover and pursue crime, and, within the scope of its powers, enforce observance of the laws, municipal ordinances, and regulations enacted in accordance therewith. The members of the Police Department shall be included under Career Service.[3]

The only amendment that was made to Article 3 of the Police Act of 1974, *supra*, was the inclusion of the following: ". . .observe and ensure the fullest protection of the civil rights of citizens. . . The members of the Police Department shall be included under Career Service." Similarly, when the Police Act of 1996 was approved, Article 3, *supra*, did not suffer any material amendment and its wording remained practically the same as in the Police Act of 1974, *supra*, except for the addition of the verb *investigate* preceded by the verb *discover*.[4]

On November 9, 2006, the Legislative Assembly passed Senate Bill Number 121 in order to amend Article 30 of the Enabling Act of the Police Department, 25 L.P.R.A. sec. 3129. The purpose of said Bill was to specifically establish the right of former governors to receive protection and security by police escorts. The Bill was vetoed by then Governor, Mr. Acevedo Vilá, without stating any motive or reason to the Puerto Rico Legislature. *130

Regarding this Bill, it is important to point out that on October 19, 2006, the Legal Affairs Committee of the House of Representatives issued a report the conclusions of which are relevant to the instant dispute. The report reaffirms that the protection by police escorts provided to Mr. Muñoz Marín resulted from the interpretation of Article 3 of the Police Act of 1956, *supra*. Due to the importance of the contents of said report, we cite the following verbatim from the same:

The Police Act of 1956 was repealed in 1974 by virtue of Law No. 26, enacted on August 22, 1974. *When it passed this Law, the Legislature was aware that the Police provided protection and security to these former Governors. The 1974 Act did not contain any provision regarding this protection, which continued to be provided by the Puerto Rico Police Department under Article 3* which delegated to the Police the obligation to protect persons and property.

........

The Police Act of 1974 was repealed in 1996 by Law No. 53 enacted on June 10 of that year. *When it passed this Law, the Legislature had full knowledge of the practice established by the Puerto Rico Police Department of providing protection and security to former Governors under article 3, which established the delegation of the police's power to protect persons and property.*

........

This practice by the Police of providing protection for an unlimited term to former Governors was a public and well-known practice, as all movements by former Governors to any part of the island were carried out with their corresponding escorts.

At present, all former Governors enjoy the protection and security that started being provided to them from the moment of their retirement .... *Moreover, even though the Law does not clearly establish that former Governors shall have the right to escorts, the Superintendent of the Puerto Rico Police Department has himself acknowledged that having escorts is a right acquired by these former officers* .... (Emphasis added.) *Certiorari* Petition Appendix, p. 392.

Given the decision of then-Governor, Mr. Acevedo Vilá, to veto Senate Bill 121 and order the elimination of the escort service provided to *131 former governors effective starting December 31, 2006, on December 8, 2006, former Governor, Mr. Hernández Colón, filed a request for review of the administrative decision to suspend the escorts of former governors. On December 15, 2006, Mr. Hernández Colón filed a motion for interlocutory appeal before the Court of Appeals requesting that the decision by the Superintendent of Police be stayed until it was decided whether as a former Governor he had an acquired right to

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

protection by escorts.

On December 20, 2006, Mr. Romero Barceló filed a Request for Review of Administrative Decision in the Court of Appeals. On that same date and in the same court, he also filed a motion for interlocutory appeal to set aside the administrative decision taken by the Puerto Rico Police Department until a determination was made regarding whether or not the protection provided by escorts was an acquired right. On that same day, Mr. Romero Barceló filed a request to consolidate his case with the case of the former governor, Mr. Hernández Colón, which presented the same controversy. On December 20, 2006, the Court of Appeals issued a Resolution consolidating both cases and requiring that the petitioner, Mr. Romero Barceló, provide evidence of notice of the motions and requests filed by his legal counsel. Furthermore, it granted a period of time to the Attorney General to file replies to the above-referenced motions for interlocutory appeal and to the motion for consolidation of the cases.

Petitioners, Mr. Hernández Colón and Mr. Romero Barceló, base their claim on the fact that they informally found out about the order issued by then-Governor, Mr. Acevedo Vilá. *They argue that they sent written communications to the Superintendent of Police, Mr. Toledo Dávila, asking him to set aside the elimination of escorts, or, in the alternative, *132 to be guaranteed their right to due process to consider the potential existence of an acquired right.* Said request was rejected by the Superintendent of Police, Mr. Toledo Dávila. Petitioner, Mr. Romero Barceló, added that when he decided to run for governor of Puerto Rico he took into consideration the fact that the he and his family would be protected by Police escorts once he retired from the position.

Furthermore, *the main argument of the Attorney General is the lack of jurisdiction of the Court of Appeals to adjudicate the request for review filed by the petitioners. The Attorney General has based said argument on the fact that executive orders are not reviewable according to the Uniform Administrative Procedure Act* (L.P.A.U, acronym in Spanish).[5] *In the alternative, that an adjudicative administrative action is not involved; therefore, said action is not subject to judicial review under L.P.A.U.*

On December 26, 2006, the Attorney General filed an urgent request for extension to file his answer, as well as

to be granted authorization to file a motion in excess of the regulatory pages. On that same day, Mr. Romero Barceló filed an explanatory motion regarding the scope of the decisions issued by the Court of Appeals, in which he requested that the Attorney General not be granted an extension to answer, so that his motion for interlocutory appeal be considered promptly. Mr. Hernández Colón filed a similar request.

Also, on December 26, 2006, the Attorney General filed a "Motion to Dismiss and to Oppose Motion Requesting Order for Interlocutory Appeal." He alleged that the petitioners had not established the necessary conditions for their motions *133 for interlocutory appeal to be granted. Once again, he argued that the Court of Appeals lacked jurisdiction. On December 27, 2006, the Court of Appeals issued a Decision in which it DENIED the motions for interlocutory appeal and gave the parties until January 16, 2007 to file their respective briefs, as well as any other supplementary briefs regarding the merits of the motion and regarding the jurisdiction of the intermediate appellate court to consider the instant dispute.

On January 16, 2007, the petitioners, Mr. Hernández Colón and Mr. Romero Barceló, filed motions to oppose the motion to dismiss for lack of jurisdiction filed by the Attorney General, stating their positions regarding the merits of the case and regarding the jurisdiction of the Court of Appeals. They refuted the arguments made by the Attorney General to request dismissal of the case. On January 18, 2007, the Attorney General filed a motion requesting authorization to file a reply to the motions filed by the petitioners opposing the motion to dismiss. On January 19, 2007, the Court of Appeals issued a Resolution granting additional time to the Attorney General to reply to the supplementary motions filed by the petitioners, Mr. Hernández Colón and Mr. Romero Barceló, and also extending the term of the latter to file their own answers if deemed necessary. On January 22, 2007, the petitioner, Mr. Romero Barceló, filed a Motion to Reserve Rights stating that he had filed a request for injunction regarding the instant dispute in the United States District Court for the District of Puerto Rico.[6]

On January 23, 2007, the Attorney General filed his "Answer to Oppositions to Motion to Dismiss". On January 26, *134 2007, petitioner Mr. Romero Barceló, filed his reply to the motion of the Attorney General. On that same date, petitioner Mr.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Hernandez, Romero v. Pol. de P.R.*, 177 D.P.R. 121 (2009)

2009 TSPR 154

Hernández Colón, filed his Opposition to Answer of the Attorney General.

On February 26, 2007, the Court of Appeals issued a Judgment ruling that it lacked jurisdiction to consider the matter. The intermediate appellate court believed that no statutory provision granted the right to former governors to receive security and protection by police escorts. Therefore, it ruled that eliminating the escorts of former governors was within the discretionary authority of the Police Superintendent. On April 2, 2007, petitioner Mr. Romero Barceló, filed a motion for reconsideration and, on April 13, 2007, the Court of Appeals issued a Decision DENYING said motion.

Former governors and herein petitioners, Mr. Hernández Colón and Mr. Romero Barceló appeal before us the decision issued by the Court of Appeals, with the following assignment of errors:

The Court of Appeals erred in dismissing the motion filed before it, denying the Petitioner's request that his acquired right as former governor to police protection and security be honored. Case No. CC-2007-356, Brief, p. 8.

The Court of Appeals erred in concluding that the decision by the Police Department was not reviewable because [petitioners] had not acquired the right to receive protection under the interpretation given by the Police Department to article 3 of its Enabling Act, endorsed by the legislature, by virtue of which, for 41 years, the Police Department continued the practice of providing protection to former governors for life.

The Court of Appeals erred by concluding that the decision by the Police Department was not reviewable because [petitioners] had not acquired a right to protection under article 7 of the Civil Code establishing equity as a source of law, since general legal principles did not apply when they implied an expenditure of public funds.

The Court of Appeals erred in concluding that the decision by **\*135** the Police Department was not reviewable because the Superintendent did not have to follow the procedure established in the Uniform Administrative Procedure Act to adjudicate the matter filed by the appellants and by concluding that due process did not require said process to be followed.

The Court of Appeals erred in concluding that the

Superintendent's decision was not judicially reviewable since the matter fell within his administrative discretion. Case No. CC-2007-347, *Certiorari* petition, p. 13.

Since the errors assigned are closely related to one another, we shall discuss them together.

## II

**[1–2]** All courts have the unshirkable duty to consider their jurisdiction to hear and adjudicate the matter before them, as well as to consider the jurisdiction of the courts in which the matter in question originated.[7] As we indicated in part I, petitioners filed written requests with the Superintendent of Police. Said requests, according to Mr. Hernández Colón and Mr. Romero Barceló, sought an analysis of the decision by the Puerto Rico Police Department to eliminate the protection by escorts of the former governors and herein petitioners. Given said arguments, we must examine Section 2152 of L.P.A.U., which provides the following:

Except as otherwise established by law, administrative proceedings before an agency *may be initiated* by the agency itself, or *by filing a* complaint, *request or petition, either in person or in writing,* within the period established by law or regulation with regards to an issue that is within the agency's jurisdiction. (Emphasis added.)[8] **\*136**

The Police Superintendent denied the request of petitioners, Mr. Hernández Colón and Mr. Romero Barceló, without taking into consideration the real and imminent possibility that he could be interfering with a property right protected by the Constitution. The Police Superintendent approved Resolution OS-1-16-330, where he dealt with petitioners' requests. *Therefore, petitioners, Mr. Romero Barceló and Mr. Hernández Colón, exhausted the administrative resources available before said administrative agency.*

**[3]** The purpose of the exhaustion of administrative remedies or resources doctrine is to determine the moment at which intervention by the courts may be requested. The rule is intended to prevent a party from filing a motion in a court of law before the administrative agency makes a final determination regarding the matter.[9] Section 2171 of L.P.A.U. provides the following:



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

*A party adversely affected by the final resolution or order of an agency and which has exhausted all of the administrative resources provided by the agency* or by the corresponding administrative appellate entity, *may file a request for review before the Court of Appeals*, within a period of thirty (30) days from the date of filing in the case files of a copy of the notice of the final resolution or order of the agency. ...

........

*The judicial review mentioned herein shall be the exclusive means to review of the merits of an adjudicative or informal administrative decision issued under this chapter.* (Emphasis added.)[10]

[4] We have stated that a final resolution or order is one which has settled the matter before the agency and **\*137** *has adjudicative and dispositive effects on the parties.*[11] The determining factor is not the name that the agency may give to the action, rather the state of the law at the time of the administrative proceedings must be considered and whether the determination to be reviewed is final.[12]

[5] In Puerto Rico, as well as in the federal jurisdiction, judicial review is a way to review the final orders or resolutions of administrative agencies.[13] Courts of law have been assigned the duty to interpret the Constitution and current legislation. In the case at bar, we did not find any limitation established by the Legislature with regards to judicial review of resolutions issued by the Puerto Rico Police Department. We have stated that, in practice, almost everything is reviewable by courts and, as a result of said position, judicial review has been favored.

The Attorney General alleges that, since we are dealing with an executive order, it is not reviewable according to the provisions of L.P.A.U. In response, petitioners argue that the letter sent by then-Governor to then-Police Superintendent does not comply with the requirements of an executive order since it was not stamped with the official seal of the Commonwealth of Puerto Rico (E.L.A., acronym in Spanish), and since it was not published in accordance with the procedure followed by the Department of State.[14]

[6] Even though custom and usage following issuance of executive orders has resulted in executive orders being stamped with the seal of E.L.A. and published in the Department of State, there is a statutory void with regards to the **\*138** requirements that must be met following issuance of an executive order. An executive order cannot interfere with

constitutionally protected rights. Such an action shall only be allowed in extremely urgent cases and for a limited period.[15] Allowing said action would constitute an abuse of power by the Executive Branch.[16] Also, such abrogation of power could be unconstitutional since it could harm the system of weights and balances established by the Constitution of Puerto Rico.

[7] An executive order has its legal basis in the general obligation of the chief executive to comply with and enforce the law, monitor and supervise the official conduct of all employees and agencies of the executive branch. An executive order is an order issued to one of the auxiliary entities of the executive branch, in accordance with our Constitution and legal statutory system. Notwithstanding the above, the power of the Governor to issue executive orders cannot be exercised in a manner that would be contrary to, or have an adverse effect on, the provisions of the law.[17] *An executive order enacted in accordance with the authority conferred on the Governor, whether by the Constitution or by the Legislature, has the force of law. However, an executive order promulgated without the authorization granted by the Constitution, or by a statute, does not have the force of law.*[18]

*It must be noted that what we are reviewing today is not the so-called "executive order" issued by then-Governor, Mr. Acevedo Vilá, but Order OS-1-16-330 enacted by then-Police Superintendent, Mr. Toledo Dávila, since the above-referenced Order adjudicated all of the claims submitted by petitioners, Mr. Hernández Colón and Mr.* **\*139** *Romero Barceló. They appealed said Order in the Court of Appeals through a judicial request for review of an administrative decision and in this Court through a request for writ of certiorari.*

*The action by the administrative agency interfered with an acquired and constitutionally protected right of petitioners; therefore, it is not within the discretion of the Police Superintendent and may be judicially reviewed. We concluded that the order issued by the Puerto Rico Police Department put an end to the administrative proceedings. The so-called "Executive Order" by the Attorney General could not avoid and ignore the interpretation of current legislation by the agency that administers it, which is endorsed by the Legislature, which produced a constitutionally-protected acquired right. The only recourse available to petitioners following the decision of the Superintendent of Police was to file a request for judicial review in the Court of Appeals, as they correctly did.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

### III

**[8]** In the case at bar, petitioners allege that the Puerto Rico Police Department violated their right to due process of law when it unfairly and inequitably interfered with their acquired right. Due process of law applies in cases of deprivation of a right to property, liberty or life. The right to a due process of law has been established by constitutional mandate. Both the Constitution of Puerto Rico and the Constitution of the United States of America respectively state the following:

The right to life, liberty and the enjoyment of property has been recognized as a fundamental right. No person shall be deprived of his or her liberty or property without **\*140** due process of law, nor will any person in Puerto Rico be denied the equal protection of the law.[19]

No State shall make or enforce any law which shall ... deprive a person of life, liberty, or property, without due process of the law. ...[20]

From the beginning of the twentieth (20th) century, the Supreme Court of the United States ruled that regulatory processes can deny not only the right to be heard, but also the right to present evidence, argue and cross-examine, based on the fact that they would hinder the proper operations and purpose of the regulatory duties of some administrative agencies. The above takes place in cases where the regulatory process would be affected if all interested parties were granted the right to be heard.[21] Furthermore, the Supreme Court noted that even in regulatory proceedings the right to be heard will exist when the regulations will affect one sole person or a small group, since this would not hinder the administrative proceedings, but would actually aid them by supplementing the administrative record, and the proceedings would not be delayed in a manner that would adversely affect them.[22]

**[9]** In order to determine whether due process of law has been violated, courts must examine whether the claimant has a right to liberty, property or life that would be affected and whether the administrative procedure followed by the agency is a constitutionally **\*141** adequate substitute to comply with due process of law, making it fair and equitable.[23]

Did the Puerto Rico Police Department violate the due process of law of the petitioners when it intervened with their acquired and constitutionally protected property right? As we will discuss below, since the existence of an acquired and constitutionally protected right is at issue, we must answer said question in the affirmative.

The decision by then-Police Superintendent, Mr. Toledo Dávila, affected petitioners due to the existence of the possibility of real and palpable damage to a constitutionally acquired right, that was protected based on the end of their duties as governors of Puerto Rico. *Therefore, in this case, the petitioners suffered a real, clear and palpable harm and did not have the opportunity to exercise their due process rights.*

### IV

**[10]** The Court of Appeals believed that Article 7 of the Civil Code,[24] does not apply in cases of use of public of funds. Said opinion is incorrect. We have ruled that, "[i]n our jurisdiction it is acceptable to apply the rule that states that, under certain appropriate circumstances, a plaintiff may invoke against the State the doctrines of unclean hands, estoppel in equity, and good faith."[25] What we have actually stated is that said principles are not applicable in cases of improper use of public funds.[26] As we shall discuss below, we conclude that in the instant case **\*142** there was no violation of any legal provision regarding disbursement of public funds.

**[11]** As previously stated, police escort protection provided to former governors arose from the interpretation that the Puerto Rico Police Department has given to Article 3 of the Police Act, *supra*, which currently provides the following:

A civil law enforcement agency is hereby created in the Commonwealth of Puerto Rico, to be called the "Puerto Rico Police Department," the obligation of which shall be to protect people and property, maintain and preserve the public order, observe and ensure the fullest protection of the civil rights of citizens, prevent, discover, *investigate* and pursue crime, and, within the scope of its

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                                  6

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

powers, enforce compliance with the laws, municipal ordinances, and regulations enacted in accordance therewith. The members of the Police Department shall be included under career service.[27]

**[12]** In Administrative Law, the re-enactment doctrine is based on the creation of a state of law that relies on the validity imparted by the Legislature on the interpretation given to a statute by the administrative agency designated to enforce compliance with said statute. Re-enactment occurs when the Legislative Assembly reviews and/or amends a law, but does not in any way modify or make material changes to its provisions, which are interpreted by the agency enforcing compliance therewith. It endorses the interpretation given to said statutory provision by the corresponding administrative agency. Based on that, courts must rule that the decision of the Legislative Assembly was to preserve and validate the interpretation given by the corresponding agency to said provision, as part of the current state of the law.[28] **\*143**

**[13]** When the Legislature amends a statutory provision, knowing the interpretation given by the administrative agency, and changes the content of the same substantially affecting said interpretation, courts cannot apply the re-enactment doctrine.[29] When the Legislature, aware of the interpretation given by an administrative agency to a statutory provision which it must interpret, amends the statute, but in no way changes the part of the statute interpreted by the agency, then the above-referenced doctrine does apply.[30]

**[14]** The re-enactment doctrine may be effectively cited against the Government when an administrative agency interprets a statutory provision under its authority and the Legislature, knowing this, amends or reviews the statute and does not make any material change to said provision.[31] In that situation, the administrative agency cannot subsequently change its own interpretation.[32] The re-enactment does not only allow courts to endorse the given administrative interpretation, but also limits the discretion of the administrative agency to change its own interpretation after the statute is judicially reviewed.

**[15]** The re-enactment doctrine cannot be successfully invoked when the Legislature amends a statute and does

not make any modification or substantial change to a statutory provision, but does not have knowledge of the interpretation given to said **\*144** provision by the corresponding administrative entity. In order to successfully cite the doctrine against the government, evidence must be provided in court of the fact that the Legislature had knowledge of the interpretation given by the corresponding administrative agency to the statutory provision. The United States Supreme Court has reached the same conclusion regarding this matter.[33]

**[16]** Application of the re-enactment doctrine requires that courts give deference to the interpretation of the administrative agency under the above-described circumstances. It is supported by the will and intention of the legislator.[34] The above is consistent with our repeated statements regarding judicial deference to administrative and legislative determinations.[35]

**[17]** In *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 690 (1966), we stated the following:

Assuming that we were considering a statute containing doubtful text requiring interpretation, there is an additional point. A generally accepted rule of law states that the administrative interpretation and application of a statute by the agencies in charge of putting them into effect, and enforcing compliance with their goals, in general must be assigned great weight by the courts....

It should be noted that after 1947, and during all of the long years through which Sec. 2 has been in effect, the Legislature has legislated in relation to Law No. 469 and has never altered or repudiated the administrative interpretation of said provision or the application of the same by administrative agencies. *It must be assumed that it has endorsed said interpretation.* (Emphasis added.)

**[18]** We have acknowledged as a principle of interpretation that legislators know the interpretation that this Court has given to the law. When a legislator, knowing **\*145** of the existence of an Opinion of this Court interpreting a statute, amends part of said statute, but does not change the text interpreted by this Court, the law established in said case is endorsed.[36] The Supreme Court of the United States has ruled that, when Congress amends a statute which has been interpreted by an administrative agency, and Congress does not try to modify the part of said statute interpreted by the agency, the administrative interpretation becomes the current rule.[37]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

In the federal jurisdiction, it has been held that, when a United States President vetoes a bill, this does not limit or prevent courts from referring to the legislative record of the bill to determine the intention of Congress regarding a statutory provision that was not going to suffer any material change.[38]

## V

Do former governors and petitioners, Mr. Hernández Colón and Mr. Romero Barceló, have an acquired constitutionally protected right to security protection by escorts, or did they merely have an expectation of said benefit? We conclude that they have an acquired constitutionally protected right to security protection by escorts.

[19] F. Gómez de Liaño, defines an acquired right as "[o]ne that becomes a definite part of a person's assets, which in general *146 must be respected by new laws."[39] Acquired rights are contrasted against expectations. Hope does not constitute a right. It is more related to factual situations than to legal situations. It is an interest without any degree of legal protection. It is a mere expectation that does not authorize a person to perform preservative acts, which may not be transferred and may be ignored by new legislation. In short, acquired rights are regularly-exercised legal powers, and expectations are powers that are not exercised when a law is changed.

[20] Acquired rights are intangible. Therefore, neither the Legislature when enacting a new law, nor the Governor through an executive order, may harm or ignore them. The same does not happen in the case of expectations, since the latter are probabilities or hopes that someone may have. Therefore, they may be reasonably modified. An acquired right is part of the assets of the holder of the right and is constitutionally protected against any government action intending to intervene with the same.

[21] Article 3 of the Civil Code provides that, "laws shall not have a retroactive effect, unless they specifically state otherwise, and in no case shall the retroactive effect of a law affect rights acquired under prior legislation."[40] In *Vázquez v. Morales*, 114 D.P.R. 822 (1983), we stated that Article 3 of the Civil Code is basically based on the acquired rights doctrine, without ruling out events that have already taken place.

[22] *It must be noted that acquired rights, regardless of their origin, whether by legislation, contract, or common law, enjoy the same* *147 *protection as all other constitutional rights.*[41] We recently stated that protected acquired rights may be considered the "consequence of an ideal event, when they are produced by virtue of a law that is in effect when the event takes place, and which have been assigned to a person."[42] We also stated the following:

> In this sense, the acquired right cannot be the sum of all of the powers which the prior law allowed citizens to exercise, since this would constitute the objective legal state that new law intends to change. *The acquired right, in turn, is a situation that has already taken place, in which the affected parties relied on the governing legal state under the prior law. So, legal writers distinguish between the mere expectation of a right and the acquired rights that have already become part of the assets of the parties in question.* (Emphasis added.)[43]

[23] The administrative agency has the obligation to safeguard any acquired right recognized by the same, when enforcing compliance with the law which it administers. *The importance of the theory of acquired rights revolves mainly around the application of the state of the law in effect at the time, but it also involves the legal protection of natural or legal persons against the unilateral exercise of power by the Government.*

[24] When an administrative agency creates or modifies an existing legal relationship of a particular and concrete nature, or recognizes a right of the same category, it may not be revoked without the express, and preferably written, consent of the corresponding right holder. In short, acquired right may be waived in the same manner that any other right may be waived, as long as it is done in a manner that is conscious, informed, voluntary, and free from coercion. *148

[25] Where an acquired constitutionally protected right exists, the application of an executive order or of a statute, in certain cases, cannot be applied retroactively. This Court has been consistent in recognizing their prospective application since acquired rights protected before the proposed change cannot be affected.[44]

Petitioners herein did not have a mere expectation regarding the right to protection; they have a right acquired by virtue of their respective retirements

---


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

as the governors of the country, under a specific state of the law. It should be noted that *the Police Superintendent stated the following during a public hearing before the Legislative Assembly: "these former officials have acquired certain rights, it is necessary for this piece of legislation to be harmonized with and contain provisions similar to the ones in the Federal Act in order to establish that the benefit of escorts limited to a specific term shall apply to the next elected governor."*[45]

The federal statute provides the following, as relevant:

(a) Under the direction of the Secretary of the Treasury, the United States Secret Service is authorized to protect the following persons:

(1) The President, the Vice-President (or other officer next in the order of successions to the Office of President), the President-elect, and the Vice President-elect.

(2) The immediate families of those individuals listed in paragraph (1).
(3) *Former Presidents* and their spouses *for their lifetimes*, except that protection of a spouse shall terminate in the event of remarriage *unless the former President did not serve as President prior to January 1, 1997, in which case, former Presidents* and their spouses *for a period of not more than ten years from the date a former President leaves office ....*[46]

As can be noted, in the federal jurisdiction, former presidents who left office before January 1, 1997 **\*149** were afforded the right to protection and security by escorts for life. Presidents elected after the above-referenced date who leave office will acquire the right to protection for a period not to exceed ten (10) years. The United States Congress recognized that the legislation enacted by it had to be prospective since as of the date of enactment of the above-referenced statute former presidents had an acquired unlimited right to protection by escorts provided by the United States Secret Service.

**VI**

The Police Superintendent expressly acknowledged that petitioners herein have an acquired protected right which cannot be affected by the retroactive application of an executive order. *Then-Superintendent,*

*Mr. Toledo Dávila, also recognized that the expense for the use of escorts was minimal and that their elimination would not represent a significant saving for the public treasury.*[47]

Police protection for former governors has been established and reinforced by numerous legislative actions. Said actions date back to 1956 as the result of the interpretation of Article 3 of the Police Act, *supra*. Said interpretation was given during the course of many years by the Puerto Rico Police Department and enforced by the Puerto Rico Legislature. General Order number 77-2, issued on April 15, 1977 by then-Police of Police, Mr. Roberto Torres González, specifically recognized the right to security and protection by police escorts of former governors. In said Order, then-Police Superintendent standardized the right **\*150** to escorts by establishing rules and procedures applicable to these. This had the effect of reactivating the interpretation given by the agency to Article 3 of the Police Act, *supra*, recognizing the right to protection of former governors by using police escorts.

On December 22, 1992, General Order number 88-6 was issued, in which the Puerto Rico Police Department once again took action with regards to the escorts of former governors. The above-referenced General Order amended General Order number 77-2, regulating the right of former governors to receive protection by police escorts. General Order 88-6 expressly acknowledged that the Puerto Rico Police Department has the obligation to provide protection and security to former governors of Puerto Rico. Said Order, like the prior one, stated as its legal basis Article 3 of the Police Act, *supra*, to grant protection by police escorts to Puerto Rico's former governors. *General Order 88-6 in no way modified the life-term nature of the right to use police escorts to provide security to former governors.*

On September 1, 1998, then-Police Superintendent enacted General Order 98-13, which established the "Rules and Procedures for the Protection and Security Services to the Governor and former governors of Puerto Rico, to the Superintendent of the Puerto Rico Police Department, and Other Officers, Heads of State, and Prime Ministers of Other Countries." Said Order does not establish any administrative discretion or time restriction in relation to the granting of the protection to the above-referenced officials. The Order basically establishes the organic structure and personnel in charge of providing the protection and security service to former governors.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

Then on January 7, 2004, the Superintendent of Police enacted General Order 2003-9. Said Order repealed Order 98-13 and created the Office of Security **151** and Protection. The protection and security of governors and former governors was assigned to said Office. Said Office directly reports to the Superintendent of Police. Once again, the above-referenced General Order did not establish a limited term for the protection by escorts provided to former governors, nor did it establish any discretion of the Superintendent of Police regarding the protection and security of these former officers.

The Police Act of 1996, *supra*, repealed the 1974 Act.[48] *Said repeal did not change the language of Article 3, supra, the source of the right and duty of the Police to offer security by escorts to former governors. The Puerto Rico Legislature had full knowledge of the interpretation that had been historically given to Article 3 of said Act,* supra*, and that said practice began in 1965.*

*The Legislature has not made any type of amendment, change or modification to Article 3 of the Police Act, supra, which would affect the acquired right of former governors, including petitioners, Mr. Hernández Colón and Mr. Romero Barceló in over forty years.* Moreover, on forty-one occasions, the Puerto Rico Legislature approved the annual government budget, as provided by our Constitution, approving in all of them an item to pay for the protection of former governors by using police escorts. The Puerto Rico Legislative Assembly recognized that the safety of the former governors of Puerto Rico is a matter of great public interest.

It should be noted that, on June 1, 1996, an amendment was made to the Police Act, *supra*. The amendment was made in Article 30, which states the following:

(a) The Puerto Rico Police Department shall have the responsibility **152** to provide security and protection to the Governor of Puerto Rico and his or her family.
(b) Also, it shall have the responsibility to provide security and protection to the Superintendent and to his or her family, during his or her term of office. Said service shall continue, *once he or she ceases* his or her duties for four (4) additional years, and may be extended upon request and approval by the Superintendent substituting him or her. (Emphasis added.)[49]

The legislature established protection by escorts of former Police superintendents. It also included the procedure to request an extension

of said protection, as long as just cause is shown and then-Superintendent approves it. *If the legislature had intended to eliminate the protection by escorts to former governors, it would have included it, and it did not do so.* The Legislative Assembly did not deem it necessary to limit it, or to include it, since it knew and endorsed the above-referenced interpretation of Article 3 of said Law, *supra*. It limited itself to stating that the right to escorts is possessed within the territorial jurisdiction of Puerto Rico.

In the federal jurisdiction, it has been ruled that, in situations such as the one in the case at bar, one may refer to the legislative record of bills even when they have been vetoed by the President.[50] *In this case, the legislative record of Senate Bill 121 provides more than sufficient evidence of the fact that the legislative intention when enacting the Police Acts in 1974 and 1996, supra, was to continue providing protection and security to former governors by using police escorts.* As mentioned above, the Bill was vetoed by then-Governor, Mr. Acevedo Vilá, but the legislative record clearly reveals the deference given to the interpretation of the agency of Article 3 of the Police Act, *supra*, by the Legislative Assembly. **153**

*Based on the foregoing, we must conclude that the Puerto Rico Legislature recognized the right of the petitioners to receive the service by police escorts to guarantee their safety.*
We have concluded that the re-enactment doctrine applies to the present controversy. The Puerto Rico Legislature was requested to review the practice of providing security by escorts to former governors, when it considered and amended the Police Act in 1996, *supra*, and it once again endorsed Article 3, *supra*, without modifying it in any way that would affect the interpretation given by the Puerto Rico Police Department up to that moment to said statutory provision.[51]
In this case, the facts allow for the application of the re-enactment doctrine; the legislative knowledge of the protection and security provided to former governors by the Puerto Rico Police Department through escorts when enacting the Police Acts of 1974 and 1996; the fact that said protection was granted by virtue of the interpretation of the Police Department of Article 3 of the Police Act of 1956, *supra*; and the fact that it has been endorsed by the Legislative Branch consistently for more than four (4) decades.[52]

The Court of Appeals believed that there is no right to escorts for the protection and security of former governors. It referred to Law Number 2, enacted on March 26,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

**\*154** 1965.[53] The fact that said statute did not include specific provisions regarding the protection and security service by escorts provided to former governors does not constitute reason to believe that the Legislative intention was to deny the service offered by the Puerto Rico Police Department. When Law No. 2 was approved, the former Governor of Puerto Rico, Mr. Muñoz Marín, was already enjoying said right. There was no need to legislate in order to provide protection and security to former governors. The Legislature endorsed, for four (4) decades, the actions of the Puerto Rico Police Department regarding this matter.

The re-enactment doctrine is compatible with our statements in *Román v. Superintendente de la Policía*, supra. Based on this and on all of the foregoing, the above-referenced doctrine applies to the present case.

*Nothing herein stipulated limits the power of the Puerto Rico Legislature to regulate the above-referenced right or to eliminate the right to security and protection of future former* governors in a prospective manner. Likewise, any former governor who believes that the protection provided to the same by escorts is unnecessary may specifically and voluntarily waive said right.

Lastly, due to the *regulatory* nature of, and high public interest in, this matter, we take this opportunity to distinguish the present controversy from the decision in  *Crespo Quiñones v. Santiago Velázquez*, 176 D.P.R. 408 (2009). In this case, as in *Suárez Cáceres v. Com. Estatal Elecciones*, 176 D.P.R. 31 (2009), we are considering the entire controversy, both substantive and procedural. Therefore, by solving the controversy in this case and providing as legally appropriate, we in no way modify the rules established by this Court in *Crespo Quiñones v. Santiago Velázquez*, supra. In the latter controversy strictly dealt with a procedural matter of a jurisdictional nature, as opposed to in this **\*155** case, which deals with procedural and substantive matters. In *Crespo Quiñones v. Santiago Velázquez*, supra, the Court of Appeals limited itself to pointing out the lack of jurisdiction for procedural matters.[54] In the case before us, a different thing happened. Even though the intermediate appellate court stated in its Judgment that it did not have jurisdiction to adjudicate the matter, it discussed both the procedural and substantive merits of the case; therefore, since the case file is complete, we may adjudicate the controversy, as opposed to what took place in *Crespo Quiñones v. Santiago Velázquez*, supra.[55]

As we previously stated, this Court believes that the Court of Appeals had jurisdiction in the present controversy. However, the parties have put us in a position from which we may adjudicate the stated matter as opposed to **\*156** in

*Crespo Quiñones v. Santiago Velázquez*, supra.[56]

There is no doubt that in *Crespo Quiñones v. Santiago Velázquez*, supra, *the controversy was imbued with a high public interest, such as the well-being of minors. As opposed to in the present controversy, in Crespo Quiñones v. Santiago Velázquez*, supra, *we were not in a position from which we could issue a ruling*. It is well-known within our legal system that in controversies involving minors the courts must safeguard the best interests of the same. The aforementioned rule was established decades ago and is deeply rooted in our legal system. The ruling established today in no way affects the interests of minors.

### VII

Based on the foregoing, *we hereby revoke the Judgment issued by the Court of Appeals. We conclude that the action of then-Superintendent of Police was not within the scope of his discretion, since it directly and substantially affected an acquired right that was already a prerogative of the petitioners, and, therefore, protected under our Constitution.*

*Judgment shall be entered in accordance thereto.* **\*157**

Associate Judge Kolthoff Caraballo issued a concurring opinion. Chief Justice Hernández Denton issued a dissenting opinion, joined by Associate Judge Fiol Matta. Associate Judge Rodríguez Rodríguez recused herself.

### --O--

Concurring opinion issued by Associate Judge Kolthoff Caraballo.

I fully endorse the Opinion issued by the majority of this Court on this day. However, I feel the need to issue this concise concurring opinion because I believe that the result of our decision on this day not only satisfies law and justice, but also a need arising from our sense of responsibility given the reality of our idiosyncrasy as a People.

As in all democratic countries, our past and present governors have been or continue

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

to be our political leaders. Persons who, to a greater or lesser degree, represent a political ideology or are representatives of one of the parties having or which has had an electoral franchise. Even though Puerto Rico, thank God, is not an immanently violent Country, the reality is that *we are extremely passionate people when it comes to our political ideas or political party politics. On many occasions, said passion becomes excited or awakens, in favor or against, by the mere mention, image, or presence of the leaders or representatives of the different status formulas or political parties*. Among said leaders, as I already mentioned, are mainly our former governors.

Ignoring this reality is to deny what is undeniable, not have knowledge of our idiosyncrasy, as a People, or simply, not have experienced the environment during an electoral year **\*158** on our Island, as well as our campaigns or political procedures during the last fifty years. *And to think that said passion, frustration, or dissatisfaction, for any past act of our former governors, cannot possibly turn into a physical assault by a compatriot, would certainly be to confuse the unlikely with the impossible.*

However, since our People are not violent, one could certainly think it unlikely that an attempt against the life or safety of any of our former governors could take place. But then, we should also ask ourselves: if the same expert analyses that were performed in 1965, and which revealed the need for escorts for former governor Luis Muñoz Marín, were performed today, would they reveal that currently there is a lower probability of one of our former governors suffering an attempt on his or her life or security?

We do not know with certainty the answer to that question.[1] However, the ones who live in the Puerto Rico of today, should judge whether the political atmosphere and the manner in which we socialize is less violent than the one that we lived or our parents lived in the decade of the sixties. *However, if this were the case, if we concluded that a criminal attempt against the life of one of our former governors is less likely today, said premise, by itself, admits, in any case, the variable of what is possible.*

What is *possible*, as defined by the dictionary of the Royal Spanish Academy, is something "that can happen, that may be carried out."[2] Therefore, according to the definition of the concepts, an attempt against the life or security of one of our former governors "can happen," "it may be **\*159** carried out." So then the question is: should we aspire to reduce the risk? And moreover, do we understand the consequences that the violent death caused

by a criminal attempt, on any of our former governors, would have on the collective psyche of our People?

As pointed out in the majority opinion, our Legislative Assembly has recognized that the security of the former governors of Puerto Rico is a matter of high public interest, approving an item to pay for their protection in each budget, for more than forty years. Furthermore, and as also stated in the Opinion of the majority, the last Superintendent of Police, Mr. Pedro Toledo Dávila, recognized that the cost of using escorts was minimal and its elimination would not represent a significant saving to the public treasury.

The reality of the relatively minimal expense to the treasury resulting from maintaining said escorts *vis-à-vis* the reduction of the risk of possible harm on the person of one of our leaders, should make us ask ourselves, without hesitation: is the expense worth it? Or, looking at it from another perspective, and given how much is at risk: do we really have any other option? I do not think so.

--O--

Dissenting Opinion issued by Chief Judge Hernández Denton, joined by Associate Judge Fiol Matta.

The claim regarding a right to police escort filed by former governors Rafael Hernandez Colon and Carlos Romero Barcelo, who for years occupied the highest position in public service in our country is, without a doubt, one that should be considered in court. However, this does not entail that judicial interference may be made based on a laconic file or, much less, through **\*160** a request for administrative review in the Court of Appeals or in this Court, thus going against a clear prohibition of the Uniform Administrative Procedure Act (L.P.A.U.) which expressly excludes executive orders and the Office of the Governor from the scope of its provisions regarding judicial review.

Since the Opinion issued by the majority of this Court does just that, we are forced to dissent. Contrary to the majority's reasoning, we believe that the act that actually affected the former

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

Governors was the executive order issued by then Governor Anibal Acevedo Vilá, which under the express mandate of the L.P.A.U. is excluded from the provisions of said statute.

Even so, the act challenged by the former governors cannot be immune from judicial review, since this would be the same as granting our approval of a government regimen by decree and depriving citizens affected thereby of a remedy. Therefore, we would decide that the legally correct procedure to attend the dispute which is the subject of this case is the mechanism of declaratory judgment, not the administrative review request, and we would remand the issue to the Court of First Instance.

# I

The controversy in this case originated on May 17, 2006, when then-Governor, Anibal Acevedo Vila, suddenly sent a letter to the Police Superintendent, Mr. Pedro Toledo Davila, to order the reduction and eventual termination of the police escort service provided to former governors. In his decree, Governor Acevedo Vila expressed the following:

> Regarding former Governors, personnel that provides police escort service to them should be reduced to half of the staff **\*161** starting August 31, 2006, and should be fully terminated by December 31, 2006. However, a preventive surveillance plan shall be coordinated with the Puerto Rico Police Department to provide security to the residences and offices of these former employees who have provided the highest public service to our Country. Appendix to the *Certiorari* Petition, Case No. 07-347, p. 135.

Upon learning that the police escort protection service would be terminated, former governors Hernandez Colon and Romero Barcelo sent written communications to the Superintendent questioning said decision, since, in their opinion, they had a vested right regarding the above-referenced service. Specifically, the legal representative of former governor Hernandez Colon sent a letter to Mr.

Toledo Davila in which he requested that "*the Order to deprive the former governors of the security and protection granted to them by the Puerto Rico Police Department*" be invalidated. (Emphasis added.) Appendix to *Certiorari* Petition, Case No. CC-07-347, p. 137. In the alternative, he requested that a hearing be held and that the police escort service not be reduced until the guarantees of due process of law were complied with.

In response to said letter, Mr. Toledo Davila sent a letter in which he indicated that former governor Hernandez Colon's police escort service would be suspended in full starting December 31, 2006. The Superintendent stated that this was "in accordance with the Memorandum issued on May seventeen (17), 2006, through which the Governor of the Commonwealth of Puerto Rico, Hon. Anibal Acevedo Vila, *ordered that the police escort service of all former governors should be terminated as of said date...*" (Emphasis added). Aside from that statement, the only additional statement of the Superintendent in said letter was to state the periods of time in which former governor Hernandez Colon received the police escort service in accordance with a request that the **\*162** legal representative of the former head of state made to that end.[1]

The legal representative of former governor Romero Barcelo, on the other hand, sent a letter to the Superintendent in which he requested the same remedies requested by former governor Hernandez Colon. Among these, he requested that "*the Order issued through letter dated May 17, 2006*" be invalidated. (Emphasis added.) Appendix to the *Certiorari* Petition, Case No. CC-07-356, p. 119. Mr. Toledo Davila responded the following to said request: "*I limit myself to informing you of the following: starting December 31, 2006, the police escort service provided to you shall be fully terminated.*" (Emphasis added.) Id., p. 121. Like in the letter addressed to former governor Hernandez Colon, the Superintendent *stated that that was based on the order from May 17, 2006 of the then–Governor.*

In light of this refusal to hold a hearing, the former heads of state appealed to the Court of Appeals through an administrative review process. In essence, they both alleged that the Superintendent erred when he denied their petition to continue receiving police escort service and when he did not acknowledge that they had a vested right to said protection. In their respective requests for review, both former governors indicated that Mr. Toledo Davila ordered the Security and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

Protection Unit of the Police Department to stop providing the police escort service on the dates and in the manners indicated by Governor Acevedo Vila. *Furthermore, they acknowledged that the Superintendent's acts were carried out under and in execution of an order from the* **\*163** *Head of State, and alleged that they deprived them of a vested right without complying with due process of law.*

The Attorney General, on the other hand, filed a motion to dismiss in which he alleged that the court of appeals lacked jurisdiction since, as he indicated, the Superintendent's decision was not based on the exercise of his administrative powers, *rather it was in compliance with an executive order of the Governor*. Both former governors opposed the Attorney General's motion and alleged that Governor Acevedo Vila's directive was not an executive order since the formalities and procedures customarily employed to approve of said orders was not followed.

Meanwhile, in December 2006, Governor Acevedo Vila vetoed Senate Bill 121 enacted on January 2, 2005 (S. B. 121), the purpose of which was, in fact, to amend Article 30 of the Police Act, 25 L.P.R.A. sec. 3129, to regulate police escort service provided to former governors.[2] In relevant parts, said bill established that every Governor who took office after January 2, 2009 would be entitled to security and protection during the ten years following the end of their term.  After this **\*164** period, the police escort service would be provided upon request to the Governor, who would require a recommendation from the Superintendent as to whether the, in fact, the granting of said protection was justified.

However, as to former governors who occupied their position before January 1, 2009, the bill established that they would continue receiving escort service for a lifelong term.  As indicated in the statement of purpose of the bill, this was based on the fact that said former governors had a "custom and usage right" and therefore "denying these services of security and protection which, starting with the first elected governor, all governors have received, would be tantamount to depriving former governors of a vested right." (Statement of Purpose, Senate Bill 121, page 2).  It should be indicated that the above-referenced statement of purpose states that "the elimination or reduction of police escorts would not generate the savings that had originally been contemplated…" Id. Nevertheless, said measure never became law.

After other procedures, the Court of Appeals dismissed both requests for review for lack of jurisdiction, upon concluding that the administrative action was not a product of adjudicative proceedings.  Specifically, said court believed that the Superintendent's action was framed in the discretion of the Police Department, *wherefore it was not judicially reviewable.*

Both former governors came before us through their respective *certiorari* petitions.  Former governor Romero Barceló alleged that the court of appeals erred when it dismissed his request, while former head of state Hernandez Colon alleged several errors, including that the court of appeals erred when it decided that the Superintendent's decision was discretional and could not be reviewed by the courts. On the other hand, the Attorney General reiterated in his brief to this Court his argument that the **\*165** controversy may not be reviewed by a request for administrative review.

In this context, today, a majority of the Court decides that the request for administrative review was the only one that petitioners had available to make their arguments.  In so doing, *the majority ignores the fact that what the former governors are actually questioning is the order of then-Governor Acevedo Vila, which, as we shall see, falls outside of the clear parameters of judicial review included in the L.P.A.U.*

## II

When evaluating the present case, we acknowledge that the claim of former governors Hernandez Colon and Romero Barcelo, who after finishing their duties as Chief Executives have remained active in public work in our island, and who after the end of their terms received police escort service, is one of public interest, and should therefore be promptly analyzed by the Court. Nevertheless, the clear letter of the applicable provisions of the L.P.A.U. force us to disagree with the course of action followed by the majority of the Court.

Section 4.2 of the L.P.A.U., which regulates everything related to judicial review of administrative decisions, limits said review to final agency orders or resolutions. 3 L.P.R.A. sec. 2172. See, also, Art. 4.006 of the Judiciary Act, 4 L.P.R.A. sec. 24y(c). In order to determine whether a matter is administratively reviewable we must turn to Section 1.3 of the statute, which defines "order or resolution" as "any agency decision or action that is specifically applied which adjudicates rights or obligations of one or more specific persons, or which imposes administrative penalties or sanctions[,] **\*166** *excluding executive*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

*orders issued by the Governor.*" (Emphasis added.) 3 L.P.R.A. sec. 2102(f). Therefore, *it is clear that in accordance with the clear letter of the L.P.A.U. administrative review of an executive order of the Governor is not appropriate.*

This conclusion finds additional support in paragraph (a) of Section 1.3 of the statute, which excludes from the scope of application of the L.P.A.U. the "Office of the Governor and all of its attached offices, except for those where the application of the provisions of [the L.P.A.U.] is literally stated." 3 L.P.R.A. sec. 2102(a)(3). The current text of said exclusion was a response to an amendment introduced by Law No. 190 enacted on August 17, 2002, since the original version of the L.P.A.U. only had as an exception the "Governor's Office itself." Thus, the legislator wished to make the scope of said exception clear, taking into account the fact that the offices attached to the Governor's Office are established between entities that facilitate public policy. See Statement of Purpose, Law No. 190 enacted on August 17, 2002, (Part 1) Laws of Puerto Rico 825.

In the case before us, the action that is being questioned is, exactly, an order from former governor Acevedo Vila in which he ordered then-Superintendent to reduce, and eventually fully terminate the police escorts provided to former governors, which included petitioners. In the letters sent to Mr. Toledo Davila, former governors Romero Barcelo and Hernandez Colon requested that said order be invalidated. Additionally, in the requests for administrative review filed by the former heads of state in the Court of Appeals, they acknowledged that the acts of the Superintendent were following the Governor's orders. In effect, in his respective answers to the letters sent by the legal representatives of the former governors, **\*167** Mr. Toledo Davila limited himself to stating that the cancellation of the police escort service was in response to the order of the Chief Executive.

The above indicates that the challenged decree was an executive order which, as we have stated, is *outside of the range of the L.P.A.U.* Although there are no constitutional or statutory parameters that specifically regulate the power of the Governor to issue executive orders, these have been defined as a "mandate that the executive gives to the components of the executive branch." W. Vazquez Irizarry, *The Powers of the Governor of Puerto Rico and the Use of Executive Orders*, 76 (No. 4) Rev. Jur. UPR 951, 953 (2007). Usually, the executive order is addressed to the person, agency or entity involved in order for it to proceed in accordance with the directive expressed therein. G. Igartúa de la Rosa, *Legal Aspects: Enactments of Executive Orders and Proclamations of the Governor*

*of Puerto Rico*, 21 Rev. Der. PR 271, 273 (1982); Op. Sec. Just. No. 5 enacted on February 27, 1985; Op. Sec. Just. No. 2 enacted on February 6, 1968.

This is a mechanism the origin of which is, just as in federal jurisdiction, found in practice. J.J. Alvarez Gonzalez, *Constitutional Law of Puerto Rico and Constitutional Relations with the United States*, Bogota, Temis Publishing, 2009, page 257. This is inherent to the powers of the Governor as maximum authority of the Executive Power. Of course, said orders may not be contrary to the Constitution or laws. *Soto v. Adm. Inst. Juveniles*, 148 D.P.R. 810, 826 (1999).

In accordance with the above, although usually executive orders are issued in a formal document, this is not a legal requirement. Vázquez Irizarry, *supra*, pp. 953 and 1020. In this sense, the formalities and attributes of executive orders are a product of custom and usage, rooted precisely in an executive order **\*168** enacted on January 29, 1990.[3] Id., pp. 953 and 1022–1023. Hence, the nature or substance of the directive, not its format, is decisive in considering whether we are dealing with an order of the Chief Executive. Id., p. 1020. See, also, *Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order, Memorandum for the Counsel to the President*, in www.usdoj.gov/olc/predirective.htm (last visited on September 28, 2009).

In this case, Governor Acevedo Vila gave an obligatory instruction to the head of one of the components of the Executive Branch, the Police Superintendent. The directive given by the former governor constitutes a mandate that the then-Superintendent, as a subordinate, was obligated to follow. This can be seen in the letters that Mr. Toledo Davila sent the legal representatives of the former heads of state, in which he stated that the termination of the police escort service responded to the Chief Executive's directive. Since it was an order to a subordinate, failure to follow it would have entailed disciplinary consequences. See: *Shapp v. Butera*, 348 A.2d 910, 913 (1975); Note, *Gubernatorial Executive Orders as Devices for Administrative Direction and Control*, 50 (No. 1) Iowa L. Rev. 78 (1964). This takes special importance in the case of the Superintendent, since the Police Act itself stipulates that the Governor shall exercise "supreme authority" over said entity. 25 L.P.R.A. sec. 3103.

In light of said circumstances, we believe that the


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Hernandez, Romero v. Pol. de P.R.*, 177 D.P.R. 121 (2009)

2009 TSPR 154

Attorney General is correct. *Based on the express mandate of the L.P.A.U., administrative review of the former governor's decision is not appropriate.*

*Nevertheless, said categorical conclusion does not place* **\*169** *former governor Acevedo Vila's acts outside of the scope of the courts*. Since it is a unilateral act by the then-First Executive, which had a real and palpable effect on petitioners which, according to their allegations, could place their lives at risk, his order cannot escape judicial review. The contrary would entail validating a government regime by executive decree which could lend itself to arbitrary acts, to the detriment of the interests and rights of citizens.

In accordance with the above, we believe the legally correct procedure to decide the controversy before us is the declaratory judgment mechanism. It allows the first instance court to declare "rights, statuses and other legal relations." 32 L.P.R.A. App. III, R. 59.1.L.P.R.A. Ap. III, R. 59.1. We have decided that the above-referenced procedural mechanism is appropriate to determine the scope and interpretation of a statute and to decide a controversy in which constitutional arguments are raised. *Asoc. de Periodistas v. González*, 127 D.P.R. 704, 723–724 (1991); *P.P.D. v. Gobernador*, 111 D.P.R. 8, 13 (1981).

The declaratory judgment procedure offers the parties broad guarantees and opportunities to submit evidence in support of their positions. *Moscoso v. Rivera*, 76 D.P.R. 481, 495 (1954). See 32 L.P.R.A. App. III, R. 59.5.L.P.R.A. Ap. III, R. 59.5. In precisely the case before us we believe that it was necessary to remand the matter to the court of first instance to provide said opportunity to the petitioners in such a way that they could support their allegation that they have a vested right to the police escort service based on the passing of time or in light of the provisions of Article 30 of the Police Act, *supra*. Additionally, they could prove the specific circumstances of each of them which would justify the need for police protection requested by them. Since this is not the way it was done, the file under our review is barren of elements to allow this Court to formulate **\*170** an adequate judgment regarding the controversy.[4] In this sense, the Court of Appeals should have remanded the case to the court of first instance for both parties to submit evidence tending to demonstrate the existence or inexistence of the alleged vested right.

Unfortunately, the decision that the majority of the court takes today does not take these matters into account. In fact, the petitioners never had the opportunity to prove that the acts of then-Superintendent and his predecessors

created a legal status that went beyond the privilege to receive protection from police escorts. In effect, the Court decides that each of the letters sent by the Superintendent to the legal representatives of the former governors are a final order or resolution reviewable in the Court of Appeals. However, said letters do not contain determinations of facts and conclusions of law, nor do they advise regarding the availability of any mechanism of reconsideration or review. They are also not the product of an adjudicative process. 3 L.P.R.A. sec. 2164.

### III

Additionally, we would like to state another reason that makes us disagree with the methodology employed by the Opinion of the Court to deal with the controversy presented by this case. The main grounds upon which the majority of the Court bases its conclusion that former governors Hernandez Colon and Romero Barcelo have a right to police escort is the so-called **\*171** reenactment doctrine, which we doubt applies to the circumstances of this case.

Specifically, the majority's reasoning consists of the following: first, the Police Department has offered police escort service to former governors for decades based on its interpretation of Article 3 of the Police Act, 25 L.P.R.A. sec. 3102; second, the legislature has always known of the practice of the Police Department; and third, the legislature, although it has amended the Police Act, has not prohibited said practice, and therefore we should understand that it has consented to it. *In other words, the majority bases its reasoning on a fundamental but unarticulated premise which should not be ignored: the legislature's silence is a source of Law in our country.*

This theory, at the very least, does not make sense to us. We cannot understand how failure to legislate can imply exactly the opposite, that is, that it has legislated. Even worse, if deciphering the intention of the Legislative Power has been on occasions a complex exercise in cases in which that branch of government has exercised its constitutional authority, it would be impossible and impermissible to interpret said intention when it has not done so. See L.H. Tribe, *Constitutional Choices*, Cambridge and Londres, Harvard University Press, 1985, p. 31.

In this case, the majority rests on a citation from *Román v. Superintendente de la Policía*, 93 D.P.R. 685 (1966), to suggest that the reenactment doctrine has been adopted by this Court. However, when we



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)**

2009 TSPR 154

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

examine the opinion of the Court issued on that occasion, we conclude that the text cited in the decision that the majority endorses today is mere *dictum.* In *Román v. Superintendente de la Policía*, supra, this Court decided that in accordance with the *clear letter* of the law that was under scrutiny, it was appropriate to grant a certain benefit to veterans. Although the above was enough to decide the case, the Court expressed that *in the event* that "we were faced with a **\*172** statute the text of which was unclear and required interpretation," since the legislator when amending it had not altered or repudiated the administrative interpretation of the specific provision, it should be understood that he approved of it. Id., p. 690. It should be noted that in that case, the grounds that brought the court to decide the controversy was the clear letter of the law. We do not believe that the expressions of the court in *obiter dictum*, which were not the basis for this Court to decide the case on that occasion, are enough to conclude that we have previously endorsed the reenactment doctrine.

Furthermore, we believe the majority's conclusion that the legislative background of Senate Bill 121, which was vetoed by the Governor, reveals that the legislature established, with implicit consent to an administrative practice that was carried out for decades, a lifetime right to police escort for former governors. Said interpretation, besides being an analysis of legislative intent of a bill that never became law, seems to us to be a futile attempt to guess what the members of the Legislative Assembly were thinking. We really do not have any way to interpret legislative silence in this case.

A clear example of the above is that currently there is a Senate Bill - S. B. 329 from February 2, 2009- that appears to go in the opposite direction of the legislative intent of S.B. 121, and of what the majority of the Court now decides. S. B. 329, like S.B. 121, was submitted by Hon. Senator Norma Burgos Andujar, and seeks to amend Article 30 of the Police Act, *supra*, to establish the nature and scope of the police escort service. However, unlike S.B. 121, the current bill does not expressly acknowledge that former Governors should receive the police escort service. In fact, it seems to group together former employees in just one article that requires prior authorization from the Governor, **\*173** in consideration of a recommendation of the Superintendent to provide the above-referenced service.

As seen in the statement of purpose of S.B. 329, what motivated it was the "spending of millions of dollars for police escort services and the lack of more specific and prudent rules to govern its usage." Statement of Purpose, S.B. 329, p. 2. Clearly, the above gravely contradicts the apparent implicit legislative consent in which the majority of the Court rests and calls into question the application of the reenactment theory to this case.

This practice is also contrary to our democratic system of government, to the extent that it deprives citizens of the dependability and certainty offered by a rule of law that is based on laws approved by other powers of the State. In this sense, the words of Professor Tribe are very important:

> When the set of powers of the Executive, the Judiciary or the states as to a given matter can only be transformed by approval or disapproval of Congress, then it is essential that said approval or disapproval take the shape of legislation created through formal procedures of bicameral legislation and submission to the President, in accordance with Article I [of the United States Constitution]. *Since Congress cannot legislate through the informal means of leaving signs and clues, courts should not treat those signs and clues as if they expressed Congress' intent, or as if they were law; doing so would escape responsibility, rather than assuming it, distorting our constitutional system of passing laws.* (Citation omitted and emphasis added.)[Translator's note: translated back into English from the Court's translation into Spanish.] L.H. Tribe, *American Constitutional Law*, 3rd ed., New York, Foundation Press, 2000, Vol. 1, p. 205.

In short, we disagree with the theory adopted by the majority of the Court when it granted interpretative authority to the legislature's silence. Particularly when in this case the legislature has expressed itself as to the issue by passing Article 30 of the Police Act, *supra*. In our opinion, one of the controversies that should have been decided through the declaratory judgment process **\*174** is,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

precisely, whether according to said provision petitioners were entitled to police escort service or whether it was more like a privilege that had been afforded to them.

## IV

As an epilogue, we should mention a procedural matter than arises out of a recent precedent of *Crespo Quiñones v. Santiago Velázquez*, 176 D.P.R. 408 (2009). In this case, Ms. Arlene Santiago Velazquez, who had custody of her daughters after divorcing Dr. Oscar Crespo Quiñones, was sued by her ex-husband in eviction proceedings. At the same time, Ms. Santiago Velazquez filed in the court of first instance a safe haven petition regarding the immovable property involved in the eviction proceedings. After appealing the decision of the court of first instance which ordered her eviction and while the safe haven petition was still pending, the Court of Appeals dismissed Ms. Santiago Velazquez's request because she did not post the bond required by law for her appeal. Ms. Santiago Velazquez appealed to our court and, among other things, challenged the appropriateness of the summary eviction proceedings in light of her safe haven petition. This, in our opinion, required that this Court express itself regarding the incompatibility of the summary eviction proceedings with a parallel safe haven claim regarding the same immovable property.

In light of these facts, however, a majority of this Court refused to consider the merits of the above-referenced controversy. Instead, in light of a presumed legislative mandate, it unequivocally stated that: *"[w]hen we decide that the Court of Appeals did have jurisdiction to hear a case, the appropriate course is to remand it to that intermediate court for it to decide the merits of the controversies *175 between the parties."* (Emphasis added.) *Crespo Quiñones v. Santiago Velázquez*, supra, p. 411. Precisely in our case the court of appeals dismissed the requests after it decided that it lacked jurisdiction since, in its opinion, the matter involved the discretion of the Superintendent. However, contrary to the rule established in *Crespo Quiñones*, the Opinion of the Court concludes that the Court of Appeals had jurisdiction over the case, but instead of remanding it to said court, as was done in said precedent, it opted to rule on the merits.

Faced with said reality, the majority has been forced to try to distinguish what was decided in said precedent from this case. That attempt states that in this case, unlike in *Crespo Quiñones*, we are dealing with a "regulatory matter imbued with high public interest." However, as we

have indicated, in *Crespo Quiñones* this Court considered the controversy regarding incompatibility between summary eviction proceedings- which would affect the minor daughters of the plaintiff himself- and a safe haven claim, a matter that clearly entailed public interest considerations and merited our intervention. Therefore, the "distinction" indicated in the Court's opinion seems inappropriate in every way and moreover, worrisome, since it seems to suggest that "regulatory" and "public interest" are concepts that are extremely malleable, the application of which shall depend on specific cases that are being reviewed by the Court.

Moreover, the majority holds that in this case, unlike in *Crespo Quiñones*, the Court of Appeals reviewed the merits of the controversy despite stating that it had no jurisdiction. In light of the above, there is now an exception to the rule established a mere two months ago: if the Court of Appeals states that it has no jurisdiction, but considers the merits of the controversy regardless, then this Court can review the matter. In other words, in those cases this Court's authority *176 to decide comes into effect by virtue of pronouncements made without jurisdiction by the court of appeals, in other words, by virtue of void rulings.

In our opinion there is no doubt that, in its zeal to preserve the rule set forth in *Crespo Quiñones*, the majority has started designing exceptions that modify the basic rules of jurisdiction that govern in our legal system and cause confusion in the legal community.

## V

In light of the foregoing, we dissent from the course of action that the majority of the Court follows in this case. In accordance with the clear letter of the L.P.A.U., the matter may not be reviewed by a request for administrative review in the Court of Appeals or in this Court. Therefore, contrary to the majority opinion, we would reverse the Court of Appeals, but we would remand the matter to the court of first instance to hear the merits of the controversy on a priority basis, in accordance with the declaratory judgment mechanism. This way, petitioners would have had the opportunity to have their day in court to prove whether they have a right to continue receiving the Police escort

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)**

2009 TSPR 154

service, which they have had since they ended their term,
and which they were deprived of without having the
opportunity to be heard.

### Footnotes

[1]     25 L.P.R.A. sec. 221b (1964 ed.).

[2]     25 L.P.R.A. sec. 3102.

[3]     25 L.P.R.A. sec. 1003 (1979 ed.).

[4]     Currently, Article 3 of the Police Act, *supra*, provides the following:
"A civil law enforcement agency is hereby created in the Commonwealth of Puerto Rico, to be called the 'Puerto Rico Police Department,' the obligation of which shall be to protect people and property, maintain and preserve the public order, observe and ensure the fullest protection of the civil rights of citizens, prevent, discover, investigate and pursue crime, and, within the scope of its powers, enforce observance of the laws, municipal ordinances, and regulations enacted in accordance therewith. The members of the Police Department shall be included under career service."

[5]     3 L.P.R.A. sec. 2102(f).

[6]     The United States District Court for the District of Puerto Rico stayed the proceedings held before it pending a decision by this Court.

[7]     *Pagán v. Alcalde Mun. de Cataño*, 143 D.P.R. 314 (1997); *Vázquez v. A.R.PE.*, 128 D.P.R. 513 (1991); *López Rivera v. Autoridad Fuentes Fluviales*, 89 D.P.R. 414 (1963).

[8]     3 L.P.R.A. sec. 2152.

[9]     *Constructora Celta, Inc. v. A.P.*, 155 D.P.R. 820 (2001); *Rivera Ortiz v. Mun. de Guaynabo*, 141 D.P.R. 257 (1996).

[10]    3 L.P.R.A. sec. 2172.

[11]    *Depto. Educ. v. Sindicato Puertorriqueño*, 168 D.P.R. 527 (2006).

[12]    Id.

[13]    *Rivera v. Dir. Adm. Trib.*, 144 D.P.R. 808 (1998).

[14]    *Based on the arguments stated below, it is unnecessary for this Court to analyze whether the letter sent by then-Governor Mr. Acevedo Vila to then-Police Superintendent Mr. Toledo Dávila complies with the requirements of an executive order.*

[15]    3 L.P.R.A. secs. 1940–1942.

[16]    *Otero de Ramos v. Srio. de Hacienda*, 156 D.P.R. 876 (2002).

[17]    Id.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)**

2009 TSPR 154

---

[18]   Op. Sec. Just. No. 1985-5 from February 27, 1985.

[19]   Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Volume 1, ed. 2009, p. 296.

[20]   U.S.C.A. Const. Amend. XIV, Sec. 1.

[21]   *Bi-Metallic Co. v. Colorado*, 239 U.S. 441 (1915).

[22]   *United States v. Florida East Coast R. Co.*, 410 U.S. 224 (1973).

[23]   *U. Ind. Emp. A.E.P. v. A.E.P.*, 146 D.P.R. 611 (1998); *Rivera Rodríguez Co. v. Lee Stowell, etc.*, 133 D.P.R. 881 (1993).

[24]   31 L.P.R.A. sec. 7.

[25]   *Berríos v. U.P.R.*, 116 D.P.R. 88, 98 (1985).

[26]   *Sepúlveda v. Depto. de Salud*, 145 D.P.R. 560 (1998); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001 (1994).

[27]   The word in italics is the only change made by the Legislature to Article 3 of the Police Act of 1996, supra.

[28]   *Lorillard v. Pons*, 434 U.S. 575 (1978).

[29]   See: *Solid Waste Agency of Nothern Cook Cty. v. Army Corps of Engineers*, 531 U.S. 159, 169–170 (2001); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985); *Aaron v. SEC*, 446 U.S. 680, 694 n. 11 (1980).

[30]   See escs. 28–29.

[31]   *Wieslander v. Iowa Dept. of Transportation*, 596 N.W.2d 516 (Iowa 1999); *Commissioner v. Acker*, 361 U.S. 87, 93 (1959); *Bear Lake Irrigation Co. v. Garland*, 164 U.S. 1 (1896).

[32]   See *Bell Federal Sav. and Loan Ass'n v. C.I.R.*, 40 F.3d 224, 229 (7th Cir. 1994).

[33]   See notes 28–29.

[34]   *Alonso García v. S.L.G.*, 155 D.P.R. 91 (2001); *Martínez v. Ofic. del Gobernador*, 152 D.P.R. 586 (2000); *Pueblo v. Zayas Rodríguez*, 147 D.P.R. 530 (1999).

[35]   *Vélez v. A.R. PE.*, 167 D.P.R. 684 (2006); *Martínez v. Rosado*, 165 D.P.R. 582 (2005); *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908 (1998).

[36]   *Mun. Trujillo Alto v. Cable TV*, 132 D.P.R. 1008, 1021 (1993).

---

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    21

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

[37] *Hartley v. Commissioner*, 295 U.S. 216 (1935); *Brewster v. Gage*, 280 U.S. 327 (1930). For more information regarding the re-enactment doctrine, see: *Barnhart v. Walton*, 535 U.S. 212 (2002); *Young v. Community Nutrition Institute*, 476 U.S. 974 (1986); *Labor Board v. Gullet Gin Co.*, 340 U.S. 361 (1951).

[38] See *Clifton v. Heckler*, 755 F.2d. 1138 (5th Cir. 1985); *Feldpaush v. Heckler*, 763 F.2d. 229, 233 (6th Cir. 1985) (where the Court stated the following: "Regardless of the President's veto. . .we find its legislative history instructive.")

[39] F. Gómez de Liaño, *Diccionario Jurídico*, Salamanca, Gráficas Cervantes, 1979, p 113.

[40] 31 L.P.R.A. sec. 3.

[41] 16B Am. Jur. 2d. Secs. 670–720.

[42] *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101 (2006).

[43] Id., citing M. Albaladejo, *Derecho Civil*, 11th ed., Barcelona, Ed. Bosch, 1989, B. I, Vol. 1, p. 204.

[44] See n. 43.

[45] House of Representatives, Second Positive Report as to S.B.. 121.

[46] 18 U.S.C.A. sec. 3056.

[47] See n. 46.

[48] See notes. 2–3.

[49] 25 L.P.R.A. sec. 3129.

[50] See n. 38.

[51] Then-Senator, Mr. Miguel Hernández Agosto, during the discussion regarding the Bill for the Police Act of 1996, stated his intention of discussing the item for necessary foreseeable funds to provide the police protection and security service. *Even though his request was neither endorsed nor discussed, his statements once again reveal that the Legislature has had and has knowledge of the practice of the Police Department of providing escorts to former governors based on its interpretation of Article 3 of the above-referenced Law*, supra.

[52] This Court in no way intends to limit the discretionary power of the Superintendent of Police regarding the number of officers assigned as escorts for former governors, without considering the budgetary situation of the country. Its limitation resides in preventing the elimination of the right to security and protection acquired by former governors based on the interpretation of Article 3 of the Police Act, *supra*, given by the Police Department, and endorsed by the Legislature, and recognized on this day by the Court.

[53] 3 L.P.R.A. sec. 21 *et seq.*


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)

2009 TSPR 154

---

[54]   In *Crespo Quiñones v. Santiago Velázquez*, supra, we ruled that the Court of Appeals did have jurisdiction to hear the controversy. Therefore, what was appropriate was to return it to the above-referenced court to adjudicate the merits of the controversy between the parties. *We emphasized and noted that on that occasion the only matter that Ms. Santiago included in her motion was the request for review of the decision of the Court of Appeals in which the appeal was dismissed due to lack of jurisdiction*. The foregoing has been the manner in which this Court has acted in analogous situations. See: *Fraya v. A.C.T.*, 162 D.P.R. 182 (2004); *Pellot v. Avon*, 160 D.P.R. 125 (2003); *Román et als. v. Román et als.*, 158 D.P.R. 163 (2002); *Martínez v. Depto. del Trabajo*, 145 D.P.R. 588 (1988). In *Crespo Quiñones v. Santiago Velázquez*, supra, *we stated that the situation is different when all of the controversy is before us and the parties have argued the same*.

[55]   In *Crespo Quiñones v. Santiago Velázquez*, supra, the Court of Appeals did not discuss the merits of the eviction controversy, since it dismissed the motion given the absence of a material requirement, a deposit, and, moreover, the parties did not argue the merits of the eviction complaint. Therefore, we stated the following:
"[T]he only matter that Ms. Santiago Velázquez included in her motion was the request for review of the decision of the appeals court in which her appeal was dismissed due to lack of jurisdiction. As revealed by the file, the motions of the parties only discuss the jurisdictional matter. ...
........
"[Our] decision on this day is completely consistent with the ruling in *Suárez Cáceres v. Com. Estatal de Elecciones* ....
In said case, we were considering the entire controversy and issued our ruling regarding the same after the parties made their arguments. In turn, in the case we are considering today. . . it is not before us and the parties have not argued the merits of any of the. . . actions ...." Id., pp. 418-419.
As opposed to in *Crespo Quiñones v. Santiago Velázquez*, supra, in the case before us, both the Court of Appeals and the parties argued the merits of the controversy in question.

[56]   In short, in *Crespo Quiñones v. Santiago Velázquez*, supra, we returned the case to the Court of Appeals because we believed that the same had jurisdiction. On that case we did not adjudicate the merits of the case, since we did not have the entire controversy before us and the parties did not argue the merits of the action. They only pointed out the jurisdiction of the Court of Appeals. Therefore, we hereby clarify that in situations such as this one, where the controversy is completely before us, substantively and procedurally, and the parties have argued the same, the action to be taken is different from the ruling in *Crespo Quiñones v. Santiago Velázquez*, supra. *This is not equivalent to a decision without jurisdiction, but the recognition of our power to adjudicate a controversy before this Court when it is ripe and complete.*

[1]   And as pointed out in the opinion of the majority, such empirical data was not available at the time that the decision to eliminate the escorts in question was made.

[2]   *Diccionario de la Lengua Española*, Real Academia Española, 22da ed., Madrid, Ed. Espasa-Calpe, T. II, p. 1810.

[1]   It should be indicated that in response to a letter from the Superintendent, former governor Hernandez Colon requested that he be informed of the periods in which police escort service was given to the other former governors and, additionally, requested a statement that "based on the memorandum by the Honorable Governor, you may not grant my request to continue police escort service beyond December 31, 2006." Appendix to *Certiorari* Petition, Case No. CC-07-347, p. 139. The Superintendent did not respond to these requests.

[2]   Article 30 of the Police Act, *supra*, states the following:
"(a) The Puerto Rico Police Department shall be responsible for providing security and protection to the Governor of

---

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Hernandez, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009)**

2009 TSPR 154

Puerto Rico and his or her family.

"(b) Additionally, it shall be responsible for providing security and protection to the Superintendent and his or her family, during his or her term.  Said service shall continue, once he or she ends his or her term for four (4) additional years, and may be extended upon request and approval of the Superintendent that replaces him or her.

"The nature of the protection service provided to the former Superintendent shall be similar to the service provided during their term as Superintendent.

"(c) Any employees or former employees to whom the Police Department provides police escort, security, and protection service shall only be entitled to receive it within the jurisdiction or territory of Puerto Rico, except for the Governor of Puerto Rico.  In any exceptional or merit-worthy cases in which a police escort, security and protection is requested outside of the jurisdiction of Puerto Rico, it shall be granted upon approval of the Superintendent and the Governor.  In the event that the request for a police escort is made by an employee, the expenses corresponding to expenses, overtime, transportation and lodging shall be paid by the agency or department that the employee who requests the service represents." 25 L.P.R.A. sec. 3129.

[3]    See Administrative Bulletin No. 5550. This executive order indicates the format requirements of the above-referenced orders, as well as the steps to be taken in preparation and registration of the document.

[4]    Among other things, we do not have any certainty regarding the criteria of the Police Department for assigning personnel to former governors, the number of agents that had been assigned for said task since each one ended their term, the type of security provided, the expense that said service entailed, the places where it was offered, whether the service was ever terminated or reduced, or whether petitioners have been threatened or whether they have been exposed to any danger during these years.

---

**End of Document**                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.