# EXHIBIT H



FINANCIAL OVERSIGHT & MANAGEMENT BOARD
FOR PUERTO RICO

Members
Ana J. Matosantos
Andrew G. Biggs
Justin Peterson

David A. Skeel, Jr.
Chair

Natalie A. Jaresko
Executive Director

**BY ELECTRONIC MAIL**

October 21, 2020

Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and
Financial Advisory Authority

Dear Mr. Marrero Díaz:

I write in response to your October 15, 2020 letter regarding Acts 80-2020, 81-2020, and 82-2020 (the "Acts").

As you know, the Acts provide for substantially enhanced retirement benefits for large categories of public employees. In your October 15, 2020 letter, you state that "today the Employees Retirement System (ERS) and the Office of Management and Budget (OMB) will begin implementing Act 80-2020[] and 82-2020." Doing so without any realistic plan to pay for their increased costs raises serious concerns and, as you are aware from our prior correspondence, violates PROMESA.

In our prior correspondence, we have explained that the Government has not complied with PROMESA with respect to these laws. For example, the Government initially submitted untimely certifications lacking any substantive financial estimates of the cost of the new laws, in violation of PROMESA section 204(a). Given these failures, the Oversight Board conducted its own analysis. The Oversight Board has determined these Acts in the aggregate will increase the Government's costs by as much as $8.3 billion over the next 30 years by enhancing existing retirement benefits for thousands of public employees in retirement systems that are already insolvent, in one case frozen, and in "pay as you go" status. As a result, the Oversight Board has concluded that each Act is significantly inconsistent with the Commonwealth Fiscal Plan and the Government's enactment and implementation of the Acts violates PROMESA.

Nevertheless, to the extent the Government is committed to increasing pension benefits despite the Oversight Board's repeated notifications of its concerns about costs, the Oversight Board requires the Government to provide fiscally responsible and realistic approaches that would permit the

implementation of the Acts (in whole or in part) in a manner consistent with the certified fiscal plans.

To be clear, the Oversight Board does not consent to the implementation of any of the Acts until and unless the Commonwealth certifies the implementation of a plausible plan for achieving the necessary savings based on the guidance below and the Oversight Board notifies you that it finds the plan plausible. Should the Government commence or continue to implement measures under these Acts inconsistent with the Fiscal Plan and PROMESA, the Oversight Board reserves the right to take such actions as it considers necessary, consistent with its powers under PROMESA, to prevent further harm to the Commonwealth's financial future.

* * * * *

**Act 80**

Act 80 seeks to create an Incentivized Retirement Program (the "IRP"), offering qualifying employees a "lifetime retirement pension equivalent to fifty percent (50%) of the compensation equivalent to the highest annual gross compensation accrued in any of the last three (3) years prior to the moment they availed themselves of this Program," as well as an employer health insurance contribution. To pay for the new benefits, Act 80 would freeze all positions vacated by retirees with the possible exception of "vacant positions that are determined to provide essential services for the operation of the agency."[1]

The Government's revised analysis, after revising several Integrum actuarial reports that did not actually analyze Act 80, determined the Act would save the Commonwealth $2.6 billion over the next thirty to fifty years. In conducting its own analysis, the Oversight Board determined both sets of Integrum reports substantially overstated Act 80's savings. In total, the Oversight Board estimates the law could potentially cost as much as $4.2 billion. The Oversight Board estimates the incremental cost on the Commonwealth's certified Fiscal Plan alone could be as much as $2.2 billion. The Oversight Board's analysis shows the law will result in an overall cost increase <u>unless the Government makes significant and permanent reductions in headcount and compensation for its workforce – above and beyond those required by the Commonwealth's certified Fiscal Plan</u>.

The various certified fiscal plans currently assume headcount reductions as a result of attrition in all forms, including retirement. For example, the Commonwealth's certified Fiscal Plan already assumes a 6.2% headcount reduction over the next 2 years. This equates to approximately 3,215 in personnel reductions, excluding teachers and police who are not eligible for Act 80 benefits. Total payroll is already adjusted, in part, to reflect these reductions. Therefore, increasing the cost of the retirements beyond those in the currently frozen Employment Retirement System (ERS) pension plan as reflected in the certified fiscal plans requires incremental savings to those in the certified fiscal plans. To achieve long-term fiscal plan cost-neutrality through headcount reductions, the Commonwealth agencies alone must eliminate nearly 1,500 positions above and beyond (i) the personnel right-sizing reductions already included in the Commonwealth's Certified Fiscal Plan and (ii) future reductions in headcount contemplated by additional fiscal plans by the

[1] Act 80, § 9(b).

impacted agencies. Therefore, to achieve the savings necessary to pay for the incremental and unbudgeted retirement benefits outlined in Act 80 for the Commonwealth alone, over 4,700 positions must be permanently eliminated – the equivalent of 9.0% of a total of 51,949 jobs. Similar further reductions would be required to offset the costs for each of the non-fiscal plan entities with employees eligible under Act 80.

These headcount reductions seem highly improbable and impossible to achieve without negatively impacting the Government's ability to provide essential services. The Government may therefore have to replace some retired workers to ensure essential services are provided, depending on the actual take-rate (*i.e.,* the number of employees who decide to retire based on Act 80). Act 80 and the associated circular letter clearly state that agencies can unilaterally determine that positions eliminated are essential, and therefore add personnel back to fill those vacated positions. This alone has the potential to add considerable cost to the implementation of Act 80, as opposed to the net savings projected by the Government.

Accordingly, if the Government wishes to proceed with implementation of Act 80 it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 80 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services.

**Act 81**

Act 81 amends existing pension regimes to allow certain public employees (the "Public Emergency Employees") to retire early with 45 to 55 percent of their final salaries as pension benefits as well as a $100 per month medical contribution from their employer. These increased benefits are incremental to the retirement costs already assumed in the Commonwealth's Certified Fiscal Plan.

The Governor's certification, which relies on outdated actuarial reports, determines Act 81 will save $589 million in payroll expenditures over a period of 30-40 years. Such savings purportedly result from hiring reduced numbers of police and by lowering the rookie pay scale. When the Government provided updated information in September 2020, some but not all of the prior reports' errors were remedied. We look forward to receiving an updated section 204(a) certification for Act 81 shortly, as promised in your October 15, 2020 letter.

The Oversight Board's own independent analysis found not only that Act 81 achieves no savings, but also that the additional cost of providing Act 81's enhanced benefits is significant, and thus inconsistent with the Commonwealth's certified Fiscal Plan. The costs of providing enhanced benefits to the approximately 8,640 participants expected to meet Act 81's eligibility requirements at retirement is $2.4 billion. The Oversight Board estimates that the reductions needed to offset this cost would be approximately 1,360 employees *above and beyond* what is currently contemplated in the Fiscal Plan, if positions are eliminated immediately. These additional reductions, beyond the Fiscal Plan, amount to 5.9% of a total of 22,913 Public Emergency Employee jobs. If instead the positions are eliminated at the end of the 5-year fiscal plan horizon, the number of positions that need to be eliminated is 1,600. Under this scenario, this would mean that for every ten Public Emergency employees who retire under Act 81, the Government would

be limited to refilling the positions of just 8, reducing the number of employees by 20% of those departing under the Act. In the police department in particular, headcounts were only expected to be reduced over 2 years by FY 23 from 13,388 to 13,366, and the additional reductions required to implement Act 81 would reduce police staffing to 12,279.

Over the past several years, agencies responsible for public safety of the Commonwealth have already experienced significant workforce declines, reaching the point beyond which their ability to provide essential services effectively and efficiently is tenuous. Act 81's required terminations would come after 2,556 public safety employees have already left the public safety sector over the past five years. For three years, the Commonwealth's certified Fiscal Plan has paved a route for the Government to improve the compensation of police in order to, among other things, reverse the high level of attrition and ensure public safety on the Island. Implementing the reductions necessary to ensure Law 81 is consistent with the Fiscal Plan are contrary to these efforts. The Oversight Board does not believe the drastic cuts to police headcount required to pay for Act 81 would be consistent with providing essential public services, or even possible to achieve.

Accordingly, if the Government wishes to proceed with implementation of Act 81 it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 81 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services.

**Act 82**

Act 82 enables participants of the Teachers Retirement System ("TRS") to apply unused sick leave towards their retirement eligibility and pension benefit level. The enhanced pension benefits as well as the likely and unplanned acceleration in the timing of teacher retirements generate costs and staffing gaps not contemplated by the Fiscal Plan.

The Government's certification for Act 82 is not supported by any financial analysis or formal estimate. Instead, the certification grounds its determinations on the belief that, because employees cannot liquidate their unused sick time, there will be no immediate costs associated with the law. When the Government later provided ERS's internal analysis, it became clear that its internal service purchase mechanism would permit a TRS participant with 108 unused sick days to "purchase" 60 months (*i.e.,* five years) of service credit. As such, the Oversight Board's independent analysis showed that implementing Act 82 will cost the Commonwealth between $635 million and $1.57 billion over the next thirty years, assuming that as a result TRS participants receive between two and five years of additional service credit.

These costs associated with Act 82 will always be incremental to the Fiscal Plan as teachers do not currently have the ability to use accumulated sick days to increase pension benefits. The Government has yet to identify how the cost of providing these benefits will be offset to retain neutrality with the Fiscal Plan. Therefore, the Oversight Board has determined that Act 82 is significantly inconsistent with the Fiscal Plan.

With this background, if the Government remains committed to implementing Act 82, it must first explain specifically how it intends to achieve the savings necessary to make Act 82 revenue neutral. Unless and until the Government provides this information and commits to achieving the requisite targets, any implementation of Act 82 will be in violation of PROMESA and should not take place.

* * * * *

We believe the discrepancies highlighted above as well as the Governor's conduct demonstrate that all three Acts violate numerous sections of PROMESA, including 204, 207, and 108(a)(2). As we have seen no realistic plan by which these Acts may be implemented within the bounds of the Fiscal Plan or PROMESA, the Government should reverse its decision and immediately cease any implementation of the Acts.

However, if the Government remains committed to implementing these Acts notwithstanding their costs, upon receipt from the Government of a certification of implementation of a plausible plan, including headcount reduction and a process for tracking incurred costs vs. positions eliminated[2] on an agency-by-agency basis, that the Oversight Board determines will reduce costs as needed without sacrificing the level of public services required by the Commonwealth Fiscal Plan, the Oversight Board will incorporate such reductions into certified fiscal plans, as well as reduced payroll in certified budgets. The Oversight Board does not consent to any implementation unless and until it notifies you that it finds plausible the savings plans described above.

Please provide the information requested in this letter – including any substantive cost-savings plans for the Acts – by October 28, 2020. Given your stated intent to implement Acts 80 and 82, we also seek your confirmation that implementation of these measures has ceased by 5:00 PM on October 22, 2020.

Should the Governor continue with her plan to implement Acts 80 and 82, the Oversight Board reserves the right to take such actions as it considers necessary, consistent with PROMESA sections 204, 207, and 108(a)(2), including preventing the enforcement or implementation of the Acts. We hope that will be unnecessary.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

[2] This would include information by agency identifying: how many people elect the window, whether their position was deemed essential such that they could continue to work for a short period of time after applying, confirmation that their position was frozen, and what is their benefit amount with and without the window.

Exhibit Exhibit H Page 7 of 7

Mr. Marrero Díaz
October 21, 2020
Page 6 of 6

CC: Hon. Wanda Vázquez Garced
Hon. Thomas Rivera Schatz
Hon. Carlos J. Méndez Núñez

PO Box 192018 San Juan, PR 00919-2018; www.oversightboard.pr.gov; comments@promesa.gov