

# Confirmation
# of Title III Plan of Adjustment
# for the Commonwealth of Puerto Rico,
# Puerto Rico Public Buildings Authority,
# and Employees Retirement System of
# the Government of the Commonwealth
# of Puerto Rico

CLOSING ARGUMENT
November 22, 2021

## Part 1 – Brian Rosen

a) The Puerto Rico Debt Crisis

b) PROMESA Enacted and Title III Cases

c) Multiple Litigations Ensue

d) The Plan Support Agreements Were the Result of Robust, Good-Faith Negotiations

e) Key Settlement Terms

f) The Settlements are Fair and Reasonable

g) Equal Treatment of Claims

h) Releases and Exculpation

i) Voting and Solicitation

## Part 2 – Michael Mervis

a) Best Interest Test Satisfied

## Part 3 – Martin Bienenstock

a) Cramdown of Rejecting Classes

b) Preemption of Statues

c) Consistency  of Fiscal Plans

d) Feasibility of the Plan of Adjustment

# Part 1

**Part 1:**
## A) The Puerto Rico Debt Crisis

- Years of borrowings and the incurrence of liabilities led to, in 2016, in aggregate:

**$74 billion** of indebtedness

**$55.2 billion** of estimated pension liabilities

**Part 1:**
**B) PROMESA Enacted and Title III Cases**

- PROMESA was signed into law on June 30, 2016 and on August 31, 2016, President Obama appointed the original seven voting members to the Oversight Board

- The Oversight Board immediately:

  – Announced a process for developing and certifying Fiscal Plans for the Commonwealth and all covered entities

  – Designated 63 entities as covered entities

  – Requested financial information from the Commonwealth to improve the Government's fiscal governance and accountability

  – Began developing strategy for the implementation of critical energy and infrastructure projects

Jaresko Declaration [ECF No. 19054-4] ¶¶ 7, 8, 15

## Part 1:
## B) PROMESA Enacted and Title III Cases

• The Oversight Board filed Title III cases on behalf of the Debtors:

| Commonwealth: | ERS: |
|:---:|:---:|
| **May 3, 2017** | **May 21, 2017** |

# Part 1:
## B) PROMESA Enacted and Title III Cases

- While the Title III cases were pending, devastation, turmoil and a pandemic hit the island:

  - Hurricanes Irma and Maria hit the Island in September 2017

  - Significant political turmoil on the Island in 2019, culminating in the resignation of the governor

  - Earthquakes hit in late 2019 and early 2020

  - Covid 19 takes hold in March 2020





Jaresko Declaration [ECF No. 19054-4] ¶¶ 20, 22, 23, 27
https://abc7ny.com/puerto-rico-earthquake-damage/5563253/
https://news.harvard.edu/gazette/story/newsplus/chan-school-study-estimates-significant-death-toll-in-
puerto-rico-following-hurricane-maria/

7

## Part 1:
## B) PROMESA Enacted and Title III Cases

- In the face of these disasters, the Oversight Board certified numerous fiscal plans for the Commonwealth setting forth initiatives and reforms the Commonwealth and its agencies and instrumentalities must adapt to enable fiscal responsibility, to reduce Commonwealth spending while ensuring more efficient government services for the residents of the Island, to promote economic growth, and set Puerto Rico back on the path to prosperity.

# Part 1:
## D) Multiple Litigations Ensue

**Shortly after the commencement of the Title III cases, litigation commenced on multiple fronts and with multiple groups.  These included:**

OVERSIGHT
BOARD

VARIOUS
CREDITOR
GROUPS

### GO/PBA LITIGATION

- Commonwealth Debt Related Objections
- Commonwealth Invalidity Actions
- PRIFA BANS Litigation
- Commonwealth Lien Challenge Actions
- PBA Lease Litigation
- PRIFA BANS Takings Litigation

Jaresko Declaration [ECF No. 19054-4] ¶¶ 114-134

## Part 1:
## D) Multiple Litigations Ensue

**OVERSIGHT
BOARD**

**ERS
BONDHOLDERS**

### ERS RELATED LITIGATION

- Ultra Vires Actions
- Lien Scope
  Adversary Proceedings
- Federal Circuit Action

- Administrative Expense and
  Prepetition Claims Action
- PayGo Challenge Actions

Jaresko Declaration [ECF No. 19054-4] ¶¶ 136-149

**Part 1:**
## D) Multiple Litigations Ensue

**OVERSIGHT
BOARD**

**MONOLINES**

### REVENUE BOND LITIGATION

- Commonwealth/HTA Revenue Bond Litigation
- HTA Revenue Bond Litigation
- PRIFA Revenue Bond Litigation
- CCDA Revenue Bond Litigation
- Lift Stay Actions

Jaresko Declaration [ECF No. 19054-4] ¶¶ 157, 159, 161, 165, 184, 187

# Mediation Team Appointed – Immediate Results

- In the midst of the litigation, pursuant to an order, dated June 23, 2017, the Court appointed a five person Mediation Team led by Chief Judge Barbara Houser, United States Bankruptcy Court for the Northern District of Texas.

  – The Mediation Team first tackled existing COFINA – Commonwealth disputes that led to a confirmed plan of adjustment which went effective on February 12, 2019.

  – Shortly thereafter, the Mediation Team guided the Oversight Board and certain GO/PBA creditors to an initial plan support agreement in May 2019, which led to the filing of a plan of adjustment and the commencement of PBA's Title III case on September 27, 2019.

<div align="center">

PBA:
**Sep. 27, 2019**

</div>

  – In an effort to broaden support, the Mediation Team led further discussions with late-vintage GO bondholders, and parties agree to a new plan support agreement. Plan of adjustment and disclosure statement are filed in February 2020.

  – Pandemic hits, and the world and the plan of adjustment hit "Pause" to determine effect.

Case No. 17-03284, ECF No. 561; Zelin Declaration [ECF No. 19054-10] ¶¶ 15-17

12

# Part 1:
## D) February 2021, GO/PBA Plan Support Agreement

- GO/PBA litigation and existing PSA in effect on hold, while pandemic ramifications quantified

- Additional mediation and informal sessions lead to execution of a new plan support agreement in February 2021, with two members – Assured and National – joining on a contingent basis

| OVERSIGHT BOARD | GO/PBA BONDHOLDERS, SYNCORA, ASSURED, NATIONAL |
|---|---|

### GO/PBA LITIGATION

- Commonwealth Debt Related Objections
- Commonwealth Invalidity Actions
- Commonwealth Lien Challenge Actions
- PBA Lease Litigation

Zelin Declaration [ECF No. 19054-10] ¶¶ 17-24

13

# Part 1:
## D) February 2021, GO/PBA Plan Support Agreement

- Other parties invited to join and support swells to over $10 billion of GO/PBA Bondholders

- With its execution, GO/PBA litigation with such parties is compromised and settled subject to confirmation of a plan of adjustment

**OVERSIGHT BOARD**

**GO/PBA BONDHOLDERS, SYNCORA, ASSURED, NATIONAL**

SETTLEMENT

*GO/PBA PSA*

Zelin Declaration [ECF No. 19054-10] ¶¶ 17-22; Jaresko Declaration [ECF No. 19054-4] ¶ 33; Debtors' Ex. 16

## Part 1:
## D) Multiple Litigations Ensue

- **Similar to the February 2020 plan support agreement, included in the February 2021 plan support agreement was the resolution of the PRIFA BANS Litigation and the PRIFA BANS Takings Litigation**

**OVERSIGHT
BOARD**

**PRIFA BANS
BONDHOLDERS**

### LITIGATION

 PRIFA BANS Litigation

 PRIFA BANS Takings Litigation

Jaresko Declaration [ECF No. 19054-4] ¶¶ 129-135

# Part 1:
## D) Multiple Litigations Ensue

- The PRIFA BANS litigation and the PRIFA BANS Takings Litigation are compromised and settled subject to confirmation and effectiveness of a plan of adjustment

**OVERSIGHT BOARD**

**PRIFA BANS BONDHOLDERS**

### SETTLEMENT

*PRIFA BANS Stipulation*

Jaresko Declaration [ECF No. 19054-4] ¶ 135; Debtors' Ex. 22

16

# Part 1:
## D) Multiple Litigations Ensue

- **Starting in 2016, ERS Bondholders engaged in litigation covering many topics, including the existence, validity and scope of liens and security interests, the validity of the ERS bonds, and challenges to PROMESA**

**OVERSIGHT
BOARD**

**ERS
BONDHOLDERS**

| LITIGATION | |
|---|---|
| ERS Ultra Vires Actions | PayGo Challenge Actions |
| ERS Lien Scope Adversary Proceedings | ERS Bondholders' Federal Circuit Action against the US Government |
| ERS Bondholders' Administrative Expense and Prepetition Claims | |

Jaresko Declaration [ECF No. 19054-4] ¶¶ 136-149

17

## Part 1:
## D) Multiple Litigations Ensue

- **Mediation Team leads discussions in March and April 2021, which result in the execution of ERS Stipulation, and the compromise and settlement of all litigation pending confirmation and consummation of plan of adjustment**

**OVERSIGHT
BOARD**                                                                      **ERS
BONDHOLDERS**

| SETTLEMENT |
|---|

*ERS STIPULATION*

Jaresko Declaration [ECF No. 19054-4] ¶ 150; Debtors' Ex. 19

## Part 1:
## D) Multiple Litigations Ensue

- **Assured and National participation in GO/PBA Plan Support Agreement was contingent on several issues, including addressing Revenue Bond Litigation for HTA and CCDA**

**OVERSIGHT
BOARD**

**ASSURED
AND NATIONAL**

### LITIGATION

- Commonwealth-HTA Revenue Bond Litigation
- HTA Revenue Bond Litigation
- CCDA Revenue Bond Litigation

- HTA Lift Stay Motion
- CCDA Lift Stay Motion
- HTA Section 926 Motion

Jaresko Declaration [ECF No. 19054-4] ¶¶ 154-173

19

## Part 1:
## D) Multiple Litigations Ensue

- May 2021 Plan Support Agreement cements Assured and National to GO/PBA Plan Support Agreement, and resolves Revenue Bond Litigation as it develops structure for all clawback recoveries

OVERSIGHT
BOARD

ASSURED
AND NATIONAL

SETTLEMENT

HTA/CCDA PSA

Jaresko Declaration [ECF No. 19054-4] ¶ 174; Debtors' Ex. 17

# Part 1:
## D) Multiple Litigations Ensue

- **Oversight Board and remaining Monolines, led by Mediation Team, discuss "accelerator" for recoveries based upon rum tax "cover over"**

**OVERSIGHT
BOARD**

**AMBAC
and FGIC**

### LITIGATION

 PRIFA Revenue Bond Litigation       PRIFA Lift Stay Motion

Jaresko Declaration [ECF No. 19054-4] ¶¶ 183-190

21

**Part 1:**
## D) Multiple Litigations Ensue

- On eve of July Disclosure Statement, parties reach understanding leading to plan support agreement and cessation of litigation pending confirmation and consummation of plan of adjustment

- AMBAC and FGIC execute joinders to GO/PBA and HTA/CCDA Plan Support Agreements

OVERSIGHT BOARD

AMBAC and FGIC

SETTLEMENT

*PRIFA PSA*

Jareski Declaration [ECF No. 19054-4] ¶¶ 174, 191; Debtors' Ex. 18

22

## Part 1:
## D) Multiple Litigations Ensue

- UCC monitors claims reconciliation process undertaken by Oversight Board and reduction of $43 trillion in filed proofs of claim

- UCC actively participates in litigation to generate additional recoveries

OVERSIGHT
BOARD

UNSECURED
CREDITORS
COMMITTEE

### LITIGATION

Disputes about proposed recoveries for classes of GUCs

Disputes regarding the classification of unsecured claims, including retiree claims, Dairy Producer Claims, and Med Center claims

# Part 1:
## D) Multiple Litigations Ensue

- Oversight Board and UCC execute agreement providing for GUC Recovery pool and ongoing role in claims reconciliation and affirmative recoveries

- UCC supports the plan of adjustment

**OVERSIGHT BOARD**

**UNSECURED CREDITORS COMMITTEE**

**SETTLEMENT**

*Agreement with the UCC*

Jaresko Declaration [ECF No. 19054-4] ¶ 41; Debtors' Ex. 23

## Part 1:
## D) Multiple Litigations Ensue

- **Independently, during the Title III cases, the Oversight Board and the Retiree Committee discuss treatment of ERS, JRS, and TRS retiree benefits**

**OVERSIGHT
BOARD**

**RETIREE
COMMITEE**

### DISPUTED ISSUES

 Disputes about treatment of ERS, JRS and TRS benefits

# Part 1:
## D) Multiple Litigations Ensue

- In June 2019, the parties reach agreement on the structuring of claim recoveries that takes into account levels of monthly benefit distributions

OVERSIGHT
BOARD

RETIREE
COMMITEE

SETTLEMENT

*RETIREE COMMITTEE PSA*

Jaresko Declaration [ECF No. 19054-4] ¶ 31; Debtors' Ex. 20

26

# Part 1:
## D) Multiple Litigations Ensue

- **Similarly, during the Title III cases, the Oversight Board and AFSCME discuss the treatment of its members' ERS benefits and the entry into a new collective bargaining agreement**

**OVERSIGHT
BOARD**

**AFSCME**

### DISPUTED ISSUES

 Disputes concerning ERS pensions, benefits and CBA

Jaresko Declaration [ECF No. 19054-4] ¶ 31

# Part 1:
# D) Multiple Litigations Ensue

- In June 2019, the parties reach agreement on employee contributions under the System 2000 plan and modifications to a collective bargaining agreement

**OVERSIGHT
BOARD**                                                                    **AFSCME**

| SETTLEMENT |
| :---: |
| *AFSCME PSA* |

# Part 1:
## D) Multiple Litigations Ensue

- DRA Parties, the successor in interest to certain GDB assets, intervened in multiple litigations or commenced their own in connection with asserted entitlements, including HTA loan exposure
- October 29, 2021 decisions crystallized parties' positions, including subordination of DRA Parties' HTA related claims

**OVERSIGHT BOARD**                                                                **DRA PARTIES**

### LITIGATION

- DRA Parties' Lift Stay Motion
- DRA Parties' Administrative Expense Motion
- DRA Adversary Proceeding
- DRA PBA Adversary Proceeding
- CW-HTA Revenue Bond Litigation (as to DRA)

**Part 1:**
## D) Multiple Litigations Ensue

- **Oversight Board and DRA Parties reach agreement resolving all litigation subject to confirmation and consummation of an HTA plan of adjustment**

**OVERSIGHT
BOARD**

**DRA
PARTIES**

SETTLEMENT

*DRA STIPULATION*

Debtors' Ex. 146

## Part 1:
## D) The Plan Support Agreements Were the Result of Robust, Good-Faith Negotiations

For example, Mr. Zelin testified, with respect to the negotiations leading to the GO/PBA PSA

20.     The negotiation sessions in which I participated between the Oversight Board and 2020 PSA Creditors included representatives of the various stakeholder parties, as well as the parties' respective legal and financial advisors.  During the many mediation sessions that occurred between August 2020 and February 2021, I observed robust discussion among all in attendance concerning the disputed issues, the parties' respective legal and economic positions, and potential means to achieve a consensual debt restructuring.

Zelin Declaration [ECF No. 19054-10] ¶ 20

31

**Part 1:**
## D) The Plan Support Agreements Were the Result of Robust, Good-Faith Negotiations

- Mr. Zelin provided similar testimony describing the ERS Stipulation, the HTA/CCDA PSA, and the PRIFA PSA. Zelin Declaration [ECF No. 19054-10] ¶¶ 22, 26, 28, 32, 40, 41

- Ms. Jaresko and Mr. Skeel also testified regarding the extensive negotiations leading to each of the PSAs. Jaresko Declaration [ECF No. 19054-4] generally and ¶ 201; Skeel Declaration [ECF No. 19054-9] ¶¶ 14-24, 26, 28-33

32

## Part 1:
## D) The Plan Support Agreements Were the Result of Robust, Good-Faith Negotiations

Retail investors were not excluded from the mediation process nor inadequately represented (Mr. Hein objection).

Q.   Did any individual retail investors participate in the negotiation of the Plan that you participated in?

A.   I know there were discussions with -- I know, for example, you, Mr. Hein, had had some discussions with the mediator during the course of the last, you know, two years. I don't know how frequent, how often.  So there were -- the doors were open for discussions with all creditors, including retail creditors.  So as a general matter, the Board did not turn away discussions with any party who wanted to have a discussion.

Zelin Testimony, 11.10.21 Tr. 77:18-78:2

# Part 1:
## E) Key Settlement Terms

### GO/PBA PSA
(Debtors' Ex. 16 [ECF No. 18791-6])

a) $6.624B cash  ($1.073B allowed as admin expense claim for PBA Bondholders)

b) GO CVI (5.5% SUT); allocated in specific percentages to different CW bond classes; subject to annual ($200M) and lifetime ($3.5B) caps

c) $7.414B New GO Bonds

d) Consummation Costs: 1.5% of aggregate GO and PBA bond claims to initial GO/PBA PSA Creditors

e) Restriction Fee: 1.321% of outstanding principal of GO Bonds and PBA Bonds to GO/PBA Creditors

f) Retail Support Fee: 1.321% fee for Retail Investors whose class has accepted the plan of adjustment

# Part 1:
## E) Key Settlement Terms

### PRIFA BANs Stipulation
(Debtors' Ex. 22 [ECF No. 18794-2])

a) $12.657M cash

b) Claim in Class 49 of $83.589M



# Part 1:
## E) Key Settlement Terms

### ERS Stipulation
(Debtors' Ex. 19 [ECF No. 18791-9])

a) $373M cash

b) Proceeds of sale of ERS Private Equity Portfolio if CW purchases it -- at least $70.750M

c) Restriction Fee: $75M for bondholder parties to the ERS Stipulation



# Part 1:
## E) Key Settlement Terms

### HTA/CCDA PSA
(Debtors' Ex. 17 [ECF No. 18791-7])

a) Holders of Allowed CW/HTA Claims

  i. 68.6% of Clawback CVI (5% SUT); annual (aggregate) and lifetime ($3.698B) caps

    1. For the first 22 years, the Clawback CVI, on aggregate basis, is subject to a cumulative annual cap of the lesser of (i) the sum of $175 million and any unused amounts from previous years, and (ii) $350 million. For the final 8 years, the Clawback CVI, on aggregate basis, is subject to a cumulative annual cap of the lesser of (i) the sum of $375 million and any unused amounts from previous years, and (ii) $750 million.

  ii. $184.8M cash for 68 Bondholders and $79.2M cash for 98 Bondholders (payable by HTA on satisfaction of certain conditions)

  iii. $1.245B New HTA Bonds

  iv. Restriction Fee and Consummation Costs up to aggregate of $125M, payable by HTA

    1. Consummation Costs: Initial HTA/CCDA PSA Creditors get 1% of their respective bond claims, payable by HTA on satisfaction of certain conditions

    2. Restriction Fee: fee percentage multiplied by the aggregate amount of 68 Bonds and 98 Bonds held by the Initial HTA/CCDA PSA Creditor, payable by HTA on satisfaction of certain conditions

b) Holders of Allowed CW/Convention Claims

  i. 4% of Clawback CVI; annual, on aggregate basis (see above) and lifetime ($217M) caps.

  ii. $97M cash, distributable pursuant to CCDA Title VI qualifying modification

  iii. Consummation Costs and Restriction Fees costs up to aggregate of $15M

    1. Consummation Costs: Initial HTA/CCDA PSA Creditors get 1% of their respective bond claims

    2. Restriction Fees: fee percentage multiplied by the aggregate amount of CCDA Bond Claims held by the Initial HTA/CCDA PSA Creditor

c) Structuring Fees: Assured $39.3M cash; National $19.3M cash



37

# Part 1:
## E) Key Settlement Terms

### PRIFA PSA
(Debtors' Ex. 18 [ECF No. 18791-8])

a) PRIFA CVI (payable from 27% of Clawback CVI and/or Rum Tax CVI); annual ($30M) and lifetime ($1.302B) caps

b) $193.5M cash, distributable pursuant to PRIFA Title VI qualifying modification

c) Restriction Fee: fee percentage multiplied by the aggregate amount of PRIFA Bonds held or insured, up to aggregate of $10M, payable on effective date of PRIFA qualifying modification

d) Structuring Fees: Ambac $34.75M; FGIC $21.75M, payable on effective date of PRIFA qualifying modification



38

# Part 1:
## E) Key Settlement Terms

### DRA Stipulation
(Debtors' Ex. 146 [ECF No. 19139-1])

a) GO/PBA cash, GO CVI, New GO Bonds

b) Clawback CVI for Allowed CW/HTA Claims

c) Restriction Fee: $15M, payable by HTA on HTA plan effective date



39

# Part 1:
## E) Key Settlement Terms



### AFSCME PSA
(Debtors' Ex. Ex. 21 [ECF No. 18794-1]).

a) AFSCME union members: (i) a uniform healthcare plan and increased employer contributions of $170 per month; (ii) a one-time signing bonus of $500; (iii) full repayment of the amount of principal contributions made under the System 2000 retirement plan from 2000 through 2017 (paid to all System 2000 participants); (iv)  payment of $2600 to each ERS pension plan participant on account of lost interest accrual under the Act 3-2013 retirement plan from the petition  date through the date of each participant's retirement; and (v) an upside participation bonus (with a floor of $2000), shared with other public rank-and-file employees not represented by any union, but only if there is excess surplus above respective projections for any given year and as long as such excess surplus in any given year is more than $100 million.

b) AFSCME: (i) a one-time support fee of $5 million, in recognition of AFSCME's efforts as lead negotiator of the new CBAs; (ii) an additional $5 million one-time payment, for the efforts undertaken by AFSCME to fulfill its obligations under the new CBAs; and (iii) reimbursement of AFSCME's reasonable professional fees and expenses incurred in connection with negotiation and implementation of the new CBAs and issues relating to the retirement plans.

## Part 1:
## F) The Settlements are Fair and Reasonable



A settlement should generally be approved unless it "falls below the lowest point in the range of reasonableness."

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC*
*(In re Am. Cartage, Inc.)*, 656 F.3d 82, 91 (1st Cir. 2011)

**Part 1:**
**F) The Settlements are Fair and Reasonable**

- Each of the settlements is above the lowest point in the range of reasonableness, taking into account, among other things, the complexity of the litigation, the time and expense associated with the litigation, and the risk of a catastrophic outcome if decided adversely to the Debtors.

## Part 1:
## F) The Settlements are Fair and Reasonable

- With respect to the GO/PBA PSA, for example, Mr. Zelin testified

> The GO/PBA PSA avoids the time, expense and uncertainty of continued litigation, as well as the risk of an all-or-nothing outcome for both sides, which would have the potential of thwarting the restructuring efforts.

Zelin Declaration [ECF No. 19054-10] ¶ 23

# Part 1:
## F) The Settlements are Fair and Reasonable

- Ms. Jaresko participated in the Oversight Board's discussions and negotiations and agreements reached with respect to each of the Plan Settlement Agreements.  She testified:

> In executing each of these Plan Settlement Agreements, and agreeing to their terms and conditions, the Oversight Board considered, among other things, (i) the extensive, good faith and arm's-length negotiations (led by the Mediation Team) among representatives of the Oversight Board, its consultants, and representatives of certain claim holders, (ii) the risks and expenses (and time commitment) relating to the substantial litigation remaining in the GO/PBA PSA Litigation, PRIFA BANs Stipulation Litigation, ERS Stipulation Litigation, HTA/CCDA PSA Litigation, PRIFA PSA Litigation (collectively, the "Plan Litigation"), all of which are resolved by the Plan Settlement Agreements, (iii) the potential for litigation and attendant risks and costs associated with the labor-related disputes ("Labor Disputes"), and (iv) the central components of each of the Plan Settlement Agreements.

Jaresko Declaration [ECF No. 19054-4] ¶ 201

44

# Part 1:
## F) The Settlements are Fair and Reasonable

• Mr. Skeel similarly testified:

> 34.     The Plan Litigation resolved by the PSAs involves extraordinarily complex, high-stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal issues.  Collectively, billions of dollars were at stake.  From the Oversight Board's perspective, the consequence of the GO Bondholders prevailing on their priority argument, or the HTA, PRIFA, or CCDA bondholders prevailing on their property interest contentions, would have inflicted grave harm on the Commonwealth and its residents because the Commonwealth, in either situation, would have lost control of billions of dollars of revenues needed to sustain the Commonwealth, Instead, the revenues would have been payable to the GO Bondholders and/or the HTA, PRIFA, and CCDA bondholders.  This would have prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory mission.

Skeel Declaration [ECF No. 19054-9] ¶ 34

## Part 1:
## F) The Settlements are Fair and Reasonable

- Marti Murray, the Oversight Board's financial expert, opined:

  – The settlements underpinning the plan are consistent with what would be expected in deal negotiations between sophisticated parties undertaken as a part of a complex debt restructuring.
  Murray Report [ECF No. 18097-1] ¶¶ 103 – 136: Opinion 4.

  – The settlements are within the range of possible recoveries.
  Murray Report [ECF No. 18097-1] ¶¶ 119-132.

  – There is no commercially reasonable basis to upset the settlements.
  Murray Report [ECF No. 18097-1] ¶¶ 133-136; Murray Testimony, 11.12.21 Tr. 91:24-92:4.

**Part 1:**
**F) The Settlements are Fair and Reasonable**

- Mr. Hein claims that, as he did not sign a plan support agreement, the settlements contained in the Plan of Adjustment are not binding on him.

- The GO/PBA Settlement is binding on Mr. Hein.

  – The Classes in which Mr. Hein is a member have voted to accept the Plan of Adjustment. Mr. Hein is bound by the settlement if the Plan is confirmed.

  – "In Chapter 9, dissenting creditors in an accepting class are bound by the accepting vote of the other members."  *In re City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 690 (Bankr. D. Col. 1995).

47

## Part 1:
## F) The Settlements are Fair and Reasonable

- Payment of Consummation Costs and Restriction Fees Is Fair and Reasonable
  - Consummation Costs are provided in consideration of the fees and expenses incurred by holders or insurers of settled claims in connection with the negotiation and execution of their applicable PSA and, among other things, the prosecution of the approval of the Disclosure Statement and confirmation of the Plan.  Zelin Declaration [ECF No. 19054-10] ¶ 88.
  - Restriction Fees compensate signatories to the PSAs for, among other things, executing the applicable PSA and agreeing to all its terms and conditions, including the agreement to support the Plan and "lock-up" their respective bonds in accordance with the terms of the PSA.  Zelin Declaration [ECF No. 19054-10] ¶ 89.
  - Without PSA Fees, building consensus and encouraging parties to engage in negotiations would have been significantly more difficult, diminishing chances of consensual resolution, or substantially prolonging the cases. Zelin Declaration [ECF No. 19054-10] ¶ 90.
  - Fees and costs similar to the PSA Fees are a customary component of settlements in large, complex restructurings. The PSA Fees are fair and reasonable in light of the global resolution achieved by the settlements culminating in the Plan.  Zelin Declaration [ECF No. 19054-10] ¶ 93.
  - The Court approved similar fees and expenses in connection with confirmation of the COFINA Plan of Adjustment.  Case No. 17-03284 [ECF No. 561] ¶ 28.

48

## Part 1:
## F) The Settlements are Fair and Reasonable

- Objections to the PSA Fees should be rejected
  - Consummation Costs are not on account of claims asserted by claimholders.
    - "These fees are being paid to reimburse certain expenses, legal, financial and other, of the advisors that contributed to the development of and the framework under which we reached the PSA agreement, and which is enabling the recovery and the Plan to move forward today."
      Jaresko Testimony, 11.10.21 Tr. 63:24-64:5.
    - A GO/PBA PSA creditor who sold their bonds would still get the fees because it is reimbursement of expenses already incurred.  Zelin Testimony, 11.10.21 Tr. 72:23-73:6.
    - The Oversight Board is aware of estimates of fees and costs incurred from some PSA creditor groups. Zelin Testimony, 11.10.21 Tr. 75:25-76:19, 89:25-90:11, 90:23-91:25.
    - Based on the estimates received, Mr. Zelin believes 1.5% as a reasonable proxy for the costs incurred is "more than validated." Zelin Testimony, 11.10.21 Tr . 91:17-25.
  - Parties, including any transferees, receiving Restriction Fees are in fact restricted.
    GO/PBA PSA (Debtors' Ex. 16).

# G) Equal Treatment of Claims



A claim may be classified in a particular class
if it is substantially similar to the other claims
or interests in such class.

Bankruptcy Code § 1122(a)

50

# G) Equal Treatment of Claims, Settlement Claims (Classes 1-50)

- Claims arising from GO and PBA Bonds are separately classified based on:

    1. The year / period in which the bonds were issued

        – Accounts for differences in risk profile associated with each issuance potentially having violated the Constitutional Debt Limit, with the treatment of Classes varying based on how much risk of disallowance of the Claims existed for each Class

    2. Whether the bonds are insured and, if so, the insurer

        – The insurance agreements provide bondholders different rights

    3. Whether the bondholder is a Retail Investor

        – Retail Investors are classified separately due the level of bonds held

    4. Whether the bonds are held by a Puerto Rico Investor

        – Provides opportunity to accept taxable bonds which support recoveries for mainland investors

Jaresko Declaration [ECF No. 19054-4] ¶¶ 48-49

## G) Equal Treatment of Claims, Pension Claims (Classes 51A-51L)

- Active and retired employees holding Pension Claims are separately classified because the employees are integral to the basic provision of government services, and the Oversight Board determined it would be in the best interests of the Commonwealth to ensure they receive a minimum monthly benefit to keep them above federal poverty guidelines and maintain an ability to support themselves without requiring additional future support from the Commonwealth.

  – Pension claims are further classified separately based on whether the employees
    1. are retired or active,
    2. participate in ERS, JRS, TRS, System 2000, or a voluntary termination program, because of different funding sources and liabilities, and
    3. receive a monthly retirement benefit above or below a certain threshold.
  – Threshold levels become irrelevant post-solicitation with the passage of Act 53-2021 and the subsequent removal of the Monthly Benefit Modification.

Jaresko Declaration [ECF No. 19054-4] ¶¶ 50-51

52

## G) Equal Treatment of Claims, AFSCME Claims (Class 52)

- AFSCME Claims are separately classified from general unsecured claims because treatment of these claims is the adoption of a new CBA, inapplicable to other classes of unsecured claims. The amended CBA aligns incentives of the Commonwealth and its workforce going forward by providing public employees with an opportunity to share in the Commonwealth's Excess Cash Surplus in the future.

Jaresko Declaration [ECF No. 19054-4] ¶ 52

## G) Equal Treatment of Claims, Dairy Claims (Class 53)

- Separate classification is reasonable for claims held by the Commonwealth's primary producers and source of dairy for the population.  The dairy industry is essential to the Commonwealth, which supports the enhanced 50% recovery for claimholders.

Jaresko Declaration [ECF No. 19054-4] ¶ 53

## G) Equal Treatment of Claims, Eminent Domain Claims (Class 54)

- Classified separately because, as a requirement under Puerto Rico law, the Government is required to consign amounts to the Puerto Rico court when the Government initiates a condemnation action.  The Plan provides that claimants in this Class are entitled to receive such amounts consigned to the Puerto Rico court to secure their claim and, in accordance with Puerto Rico law, 32 L.P.R.A. § 2907, to the extent it is determined their claim is in excess of the consigned amount, such claimants would have a general unsecured claim treated in Class 58 to the extent there is any such deficiency.

Jaresko Declaration [ECF No. 19054-4] ¶ 54

## G) Equal Treatment of Claims, Energy Incentive Claims (Class 55)

- Separate classification is justified because such claims are not paid in cash, but rather, satisfied through deductions in tax revenues pursuant to Puerto Rico's Energy Incentive Act.  Honoring such tax incentives benefits the Commonwealth and promotes a reasonable governmental purpose to address climate change.

Jaresko Declaration [ECF No. 19054-4] ¶ 55

## G) Equal Treatment of Claims, Med Center Claims (Class 56)

- Separate classification and enhanced 50% recovery for certain federally qualified health centers arising from or relating to the Medicaid Act are reasonable because the Claims are held by entities which provide critical medical treatment to Commonwealth residents, particularly while in the midst of a global pandemic, and are payable through Medicare/Medicaid funds from the federal government which are earmarked for the payment of such claims and not available to other general unsecured claimholders.

Jaresko Declaration [ECF No. 19054-4] ¶ 56

# G) Equal Treatment of Claims, Tax Credit Class (Class 57)

- Class 57 consists of Claims (other than Energy Incentive Claims) relating to refunds or credits for the payment of certain income tax credits, deductions, or carryforwards.  Separate classification is appropriate because these claims are not paid in cash but are satisfied through reductions in tax revenue.

Jaresko Declaration [ECF No. 19054-4] ¶ 57

## G) Equal Treatment of Claims, CW Appropriations Class (Class 63)

- Separate classification is appropriate for Claims arising from or related to indebtedness only payable from Commonwealth appropriations because these claimants hold only contingent rights to payment and have significantly lesser rights than holders of CW General Unsecured Claims.

Jaresko Declaration [ECF No. 19054-4] ¶ 58

# G) Equal Treatment of Claims,
## Section 510(b) Subordinated Claims Class (Class 64)

- Claims subject to Section 510(b) are subordinated to other general unsecured claims.  Because they have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and treatment. Jaresko Declaration [ECF No. 19054-4] ¶ 59

- ACR Order provides separate treatment for individual creditors and any such claims are not even treated pursuant to the plan of adjustment.  [ECF No. 12274]

# ALL MEMBERS OF A CLASS RECEIVE THE SAME TREATMENT

# G) Equal Treatment of Claims



> "a disapproving creditor within a class that approves a plan [such as Hein] cannot claim unfair discrimination."

*In re Nuverra Envtl. Sols., Inc.,* 834 F. App'x 729, 734-35 (3d Cir. 2021)

# G) Equal Treatment of Claims

- The provision of PSA Fees to GO/PBA PSA Creditors does not constitute unfair treatment.

  – Consummation Costs not provided on account of claims, but for fees and expenses incurred in negotiating and developing the PSA. Zelin Declaration [ECF No. 19054-10] ¶ 88; Jaresko Declaration [ECF No. 19054-4] ¶ 216; Jaresko Testimony, 11.10.21 Tr. 63:24-64:5.

  – No evidence that Mr. Hein, nor any other retail investor, incurred such costs.

  – No evidence PSA Fees were paid to buy votes or were undisclosed.  Mr. Hein's reliance on *American United* is inapposite.

    – The Supreme Court held the plan should not have been confirmed where the Bankruptcy Court had not looked into the undisclosed fees of the fiscal agent for the debtor-city's bonds, who solicited votes.  *American United Mut. Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 144-145 (1940).

  – Providing different treatment depending on whether a class votes for a plan is consistent with policy of fostering consensual plans. *See, e.g., In re MPM Silicones, LLC*, No. 14-22503, 2014 WL 4637175, at *3 (S.D.N.Y. Sept. 17, 2014) ("Such fish-or-cut-bait, death-trap, or toggle provisions have long been customary in Chapter 11 plans").

  – However, the 1.321% Retail Support Fee available to Retail Investors who certify their status as a Retail Investor.

# G) Equal Treatment of Claims

- Mr. Brownstein roundly refuted Mr. Hein's contention that the Commonwealth should issue term bonds with a sinking fund and minimize the number of CUSIPs.

> Q.   Yes.  Thank you.
>
>      Now let me turn to a different subject.  One option for the newly issued bonds would be to issue term bonds with a sinking fund, so that principal could be amortized if the number of individual CUSIPs issued could be reduced or kept to a minimum, correct?
>
> A.   While that wouldn't be in the interest of any bondholder, that would be an option, correct.

Brownstein Testimony, 11.12.21 Tr. 105:10-17

# G) Equal Treatment of Claims

• Mr. Brownstein further explained:

Q. Whether it's 13, or 13 plus the CVI, would you agree that, from the point of view of the retail investor, there's a reduction in their liquidity on a practical level in terms of their ability to sell bits or pieces of these different 13 CUSIPs that they've received?

A. No. I disagree with that statement.

Q. And why do you disagree?

A. So the purpose of going from your question on a term bond to 13 serials is to take advantage of the fact that the municipal market has an upward sloping yield curve, and what that means is if we gave you one term bond, which is priced to maturity of the bond, and doesn't take into account the yield curve, because we don't price in the municipal market to average life, we price to maturity or call, what that means is the principal amount of bonds that you would

have received day one, whether you owned 100,000 -- take 700,000 as an example, where you will be receiving back 300,000 in bonds, plus cash. So let's take that 300,000, where now you're receiving 23,000 of each of the 13 maturities, or 300,000 of one term bond. The amount of proceeds we were able to generate for you through the serial fracture increased your recovery by two and a half percent of par.

The question is whether, if you sold each of your bonds day one, which is not what I solved for -- I solved for giving you the most amount of proceeds, right? If you sold them all, what I assure you is that the liquidity charge versus the 23,413 versus the 300,000 as one maturity, would be significantly lower.

So, in other words, the total amount of value you would receive would still be significantly

greater. That is what the Board charged us to solve for, which is what we solved for. So your base premise is wrong.

Q. Let me just clarify. So what you're saying is you believe the value of the structure that you have proposed, and the Plan proposes, provides an additional two and a half percent of par in value, correct?

A. I believe I said two and a quarter, but yes.

Q. Yeah. And you believe that two and a quarter percent of par is significant?

A. Is significantly greater than the lack – the differential in liquidity in -- and if you went to sell all of those bonds day one, then the liquidity you would be charged because of having a smaller par amount. So yes, net, you come out ahead, no matter whether you own one bond or more.

Brownstein Testimony, 11.12.21 Tr. 108:19-110:12

# G) Equal Treatment of Claims

- The taxable election for On-Island investors actually benefits mainland investors like Mr. Hein

> Clearly, if you're a taxpayer who pays state and local taxes,
> you're higher than that, but in a 35 percent tax bracket, you,
> as an U.S. holder, mainland holder of these bonds, for the 49
> million in bonds that the local on-island holders took taxable
> instead of you, you have a 14 percent after-tax gain.  That is
> what was provided to you by giving the on-island investors the
> right to elect taxable bonds, which meant that your portfolio
> would have a higher amount of tax exempt bonds.

Brownstein Testimony, 11.12.21 Tr. 112:8-15

66

# G) Equal Treatment of Claims

- Elimination of the Monthly Benefit Reduction does not affect treatment of Mr. Hein and other GO Bondholders—they receive every dollar they would have received prior to the modification, and the evidence is that Plan remains feasible.

Jaresko Supp. Declaration [ECF No. 19058] ¶¶ 8-12; Malhotra Supp. Declaration [ECF No. 19057] ¶¶ 9-15.

# h) Releases and Exculpation

- The releases contemplated by the Plan are appropriate and essential to the Debtors' successful reorganization.

  – The releases were necessary to incentivize the PSA Creditors to give releases to the Debtors and to support the Plan.

  – The releases are a product of the same robust, mediator supervised negotiations that led to the PSAs.

  – Debtor releases are customary and would be expected by the parties to any complex restructuring transaction.

Jaresko Declaration [ECF No. 19054-5] ¶¶ 218, 219, 222; Zelin Declaration [ECF No. 19054-10] ¶¶ 96, 99-106

# h) Releases and Exculpation

- Objections to the release provisions have been addressed.

  1. The language of the Plan [ECF No. 19323] and Proposed Confirmation Order [ECF No. 19325] are clear that no non-consensual third party (including COFINA) releases are being granted.

     a) Section 92.2(a) makes clear the discharge and release is limited to "all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever..."

     b) Section 92.2(a) includes a provision to make clear that, subject to exculpation included in 92.7, no non-consensual third-party releases are being granted to PSA Creditors, AFSCME, and their respective Related Persons by Creditors of the Debtors.

     c) Section 92.5 has been modified to specify the Debtors' and Reorganized Debtors' releases are of "Released Claims" by striking the last clause in the Seventh Amended Plan beginning with "or otherwise . . ."

     d) "Related Persons" definition (new section 1.420) eliminates language, with respect to the Debtors, that could be construed to apply to instrumentalities.  It also excludes instrumentalities listed therein, such as COFINA.

     e) "Released Claims" definition (new section 1.421) does not include claims "by creditors." Released Claims explicitly excludes claims against instrumentalities listed therein, and has been modified to explicitly exclude AFICA, COFINA, and MFA in addition to the several entities previously listed.

     f) Relevant modifications are also in the Proposed Confirmation Order ¶¶ 56(a), 59, 64, 65.

# h) Releases and Exculpation

- Objections to the release provisions have been addressed.

  2. Proposed Order ¶ 56(f) explicitly preserves Underwriter Defendants' defenses while also making clear that does not include actions to obtain payment or property.

  3. Proposed Order ¶ 56(g) explicitly preserves Quest's defenses while also making clear that does not include actions to obtain payment or property.

  4. Proposed Order ¶ 89 explicitly states the Plan and Order will not affect US Bank's claims against entities they requested be preserved.

# h) Releases and Exculpation

- The exculpations contemplated by the Plan are appropriate and essential to the Debtors' successful reorganization.

  – Exculpation provisions are appropriate for parties' acts or omissions in connection with or related to the the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence.  *See, e.g., In re Montreal Me. & Atl. Ry.*, No. 13-10670, 2015 Bankr. LEXIS 3737, at *24, 26 (Bankr. D. Me. Oct. 9, 2015).

  a. Section 92.7 of the Plan provides for exculpation of the Government Parties, PSA Creditors, Retiree Committee, Creditors' Committee, AFSCME, and the Monolines and DRA Parties for, among other things, any act taken consistent with the Plan or in connection with the formation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan.

  b. Section 92.7 further provides it shall not affect the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.

  c. The Court approved similar exculpation in connection with confirmation of the COFINA Plan of Adjustment. Case No. 17-03284, ECF No. 561 ¶ 31.

# h) Releases and Exculpation

- Mr. Hein's objection—that exculpation of parties who negotiated the GO/PBA PSA is inappropriate because they may be liable to Retail Investors for negotiating and receiving Consummation Cost—should be rejected.

  – The Plan's exculpation provision is customary, and negotiated in conjunction with the PSAs. Without exculpation, it would be impossible to achieve consensual restructuring.  Jaresko Declaration [ECF No. 19054-4] ¶ 225; Zelin Declaration [ECF No. 19054-10] ¶ 111

  – Mr. Hein's objection to exculpation is a collateral attack on the Plan and an attempt by a dissenting creditor to change the outcome of the Court-ordered and facilitated mediation process.

# I) Voting and Solicitation, Solicitation Process



A class of claims has accepted a plan if it is accepted by at least 2/3 in amount and more than ½ in number of allowed claims in such class that have voted on the plan

Bankruptcy Code § 1126(c)

# I) Voting and Solicitation, Solicitation Process

- Process and contents of solicitation package were established by the Disclosure Statement Order

> I.  The procedures set forth below regarding notice to all parties in interest of the
> time, date, and place of the hearing to consider confirmation of the Plan (the "Confirmation
> Hearing"), filing of objections or responses to the proposed confirmation of, or proposed
> modifications to, the Plan ("Confirmation Objections") and the distribution and contents of the
> solicitation packages (the "Solicitation Packages") provide a fair and equitable notice and voting
> process and comply with Bankruptcy Rules 2002, 3017, and 3018 and constitute sufficient notice
> to all interested parties of the Voting Record Date, the Voting Deadline, the Election Deadline,
> the Confirmation Objection Deadline, the Confirmation Hearing, and all related matters.

Disclosure Statement Order ¶ I [ECF No. 17639]

# I) Voting and Solicitation, Solicitation Process

• Prime Clerk retained to carry out Disclosure Statement Order's procedures

> 4.    Pursuant to the *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures,* dated August 2, 2021 [Docket No. 17639] (the "Disclosure Statement Order"), the Title III Court established procedures to solicit votes from, and tabulate Ballots submitted by, holders of claims entitled to vote on the Plan (the "Solicitation Procedures"). Prime Clerk adhered to the Solicitation Procedures outlined in the Disclosure Statement Order and, among other things, distributed (or caused to be distributed) Solicitation Packages (including Ballots or Notices of Voting and Election Instructions (as applicable)) to parties entitled to vote on the Plan. I supervised the solicitation and tabulation performed by Prime Clerk's employees.

Pullo Declaration (Debtors' Exhibit 142) ¶ 4

# I) Voting and Solicitation, Solicitation Process

- Prime Clerk retained to carry out Disclosure Statement Order's procedures

  – Determine which creditors were entitled to vote on the Plan

  – Applying multiple voting record dates (April 1, 2021 for Class 51 and 52, July 13, 2021 for all other non-bond classes).

Pullo Declaration (Debtors' Ex. 142) ¶ 5

# I) Voting and Solicitation, **Solicitation Process**

- Prime Clerk retained to carry out Disclosure Statement Order's procedures

  - Coordinated distribution of Solicitation Packages to holders entitled to vote



6.      In accordance with the Solicitation Procedures, Prime Clerk worked closely with the Debtors' advisors to identify holders entitled to vote in the Voting Classes as of the Voting Record Date, and to coordinate the distribution of Solicitation Packages to these holders, including Solicitation Packages to holders of Bonds through the customary methods of soliciting Plan votes from holders of publicly-traded securities. A detailed description of Prime Clerk's distribution of Solicitation Packages is set forth in Prime Clerk's *Affidavit of Service of Solicitation Materials*, which was filed with this Court on October 21, 2021 [Docket No. 18635]; *Affidavit of Service of Solicitation Materials*, which was filed with this Court on October 23, 2021 [Docket No. 18689]; and *Affidavit of Service of Solicitation Materials*, which was filed with this Court on October 23, 2021 [Docket No. 18690].

Pullo Declaration (Debtors' Exhibit 142) ¶ 6

# I) Voting and Solicitation, Solicitation Process

- Prime Clerk retained to carry out Disclosure Statement Order's procedures

  - Coordinated distribution of Solicitation Packages to holders entitled to vote





Affidavit of Service of Solicitation Materials (Debtors' Exhibit 138) [ECF No. 18635],
Affidavit of Service of Solicitation Materials [ECF No. 18689],
Affidavit of Service of Solicitation Materials [ECF No. 18690

# I) Voting and Solicitation, Solicitation Process

- Coordinated publication of confirmation hearing notices



Affidavit of Publication and Radio
Advertisements [ECF No. 18688]









79

# I) Voting and Solicitation, Solicitation Process

- Claimholders entitled to vote on the Plan submitted ballots to Prime Clerk



8.    In accordance with the Solicitation Procedures, Prime Clerk received, reviewed, determined the validity of, and tabulated the Ballots submitted to vote on the Plan. Each Ballot submitted to Prime Clerk was date-stamped, scanned, assigned a ballot number, entered into Prime Clerk's voting database and processed in accordance with the Solicitation Procedures.  To be included in the tabulation results as valid, a Ballot must have been (a) properly completed pursuant to the Solicitation Procedures, (b) executed by the relevant holder entitled to vote on the Plan (or such holder's authorized representative), (c) returned to Prime Clerk via an approved method of delivery set forth in the Solicitation Procedures, and (d) received by Prime Clerk by 5:00 p.m. (Atlantic Time) on October 18, 2021 (the "Voting Deadline").[4]

Pullo Declaration (Debtors' Exhibit 142) ¶ 8

# I) Voting and Solicitation, Solicitation Process

• Prime Clerk worked with DTC to identify nominees of bondholders and count votes from Bond Classes tendered through DTC's Automated Tender Offer Program (ATOP)

> 9.      The solicitation and voting of the beneficial owners of the Claims in the Bond Classes (and the collection of any associated distribution elections) was conducted electronically through DTC's ATOP platform.[5]  To cast a vote or election (as applicable), holders of Claims in the Bond Classes were required to instruct the bank, broker, or other financial institution that holds their Bonds at DTC "in street name" (each, a "Nominee") to electronically deliver (or "tender") their bonds into the ATOP option that corresponded to their vote, distribution election, and/or certification of any applicable underlying status.  Upon tendering into an ATOP option, the Bonds were frozen from any further trading and labeled with a unique reference number that permits Prime Clerk to identify that particular tender, the amount of bonds tendered, and the corresponding vote, distribution election, and/or certification.  The ATOP voting and distribution election event for holders of the Bonds concluded promptly on the Voting Deadline, and holders of the Bonds were not able to tender into ATOP after the Voting Deadline.

Pullo Declaration (Debtors' Exhibit 142) ¶ 9





# I) Voting and Solicitation, Voting Process

- Prime Clerk worked with DTC to identify nominees of bondholders and count votes from Bond Classes tendered through DTC's ATOP program

  – DTC's role in this process was approved by the Court.

> 9.      Cede & Company and The Depository Trust Company ("DTC") shall provide the Debtors within seven (7) Business Days of the date of this Order, or as soon as possible thereafter, a listing of the names and addresses of all Nominees that as of the Voting Record Date held, directly or indirectly, any of the Existing Bonds.

Disclosure Statement Order [ECF No. 17639] ¶ 9

# I) Voting and Solicitation, **Voting Process**

- Prime Clerk worked with DTC to identify nominees of bondholders and count votes from Bond Classes tendered through DTC's ATOP program

  - This was **_not_** an improper solicitation

82.    However, following the initial entry into the GO/PBA PSA, the Initial GO/PBA PSA parties amended the original agreement to expand the number of creditors eligible to receive the fee and consequently facilitate an exchange to provide an alternate CUSIP identifier for the PSA bonds. Debtors' Ex. 16 [ECF No. 18791-6]. With that revised agreement, retail creditors were provided the option to either (i) participate in the exchange with all other bondholders, thereby receiving the same PSA fee as other Restriction Fee parties, or (ii) as originally contemplated, receive the Retail Support Fee if the creditor identifies as a retail investor and the retail class votes to accept the Plan. Id.



Zelin Declaration [ECF No. 19054-10] ¶ 82

85

# I) Voting and Solicitation, Voting Process

- Prime Clerk worked with DTC to identify nominees of bondholders and count votes from Bond Classes tendered through DTC's ATOP program

  – This was **_not_** an improper solicitation

---

**Rationale for Assignment of Alternative Identifying CUSIPs**

As noted above, Uninsured Bonds tendered prior to the Participation Deadline are entitled to the PSA Restriction Fee, subject to the terms and conditions of the PSA, including, without limitation, court approval thereof. The right to the PSA Restriction Fee Claim "travels" with the Uninsured Bond and any subsequent beneficial owner thereof is deemed under the PSA and the Title III Plan to be an Uninsured Supporting Holder. Accordingly, in order to separately identify the Uninsured Bonds that fall into this category, the PSA provides for the assignment of alternative identifying CUSIPs to track beneficial interests in Uninsured Bonds that become subject to the PSA from time to time, including on or prior to August 13, 2021. Although referred to in the below procedures as an "exchange", the assignment of such alternative identifying CUSIPs does not change or cause a reissuance of the Uninsured Bonds or change the prepetition nature of claims arising from the Uninsured Bonds in any way. The terms of your Uninsured Bond remain the same regardless of your support for the PSA, but Uninsured Supporting Holders thereof become subject to the terms, conditions, settlements, covenants and agreements of the PSA, including the covenant to support the Plan. The new CUSIP merely provides an administrative mechanism for tracking the beneficial interests of existing Uninsured Bonds that became subject to the PSA prior to the Participation Deadline. There are no tax consequences resulting from the administrative change of CUSIP in respect of your Uninsured Bond.

EMMA Notice (Hein Ex. FFF), page 3

# I) Voting and Solicitation, Voting Process

- Prime Clerk worked with DTC to identify nominees of bondholders and count votes from Bond Classes tendered through DTC's ATOP program

  – This was **_not_** an improper solicitation

    – vote to accept or reject the Plan, PSA parties had to instruct their nominees or broker to tender their bonds to the appropriate folder on ATOP.

> 32.    Each Ballot must be executed, completed, and delivered to the Balloting Agent (i) by U.S. first-class mail, in the return envelope provided with each Ballot (or otherwise by first-class mail); (ii) by overnight courier; (iii) by hand delivery, or (iv) Prime Clerk's e-balloting platform (where permitted), so that executed and completed Ballots are received by Prime Clerk, the Balloting Agent, by no later than **5:00 p.m. (Atlantic Standard Time) on October 4, 2021**, unless such time is extended (the "Voting Deadline").[1] Holders of Claims in the Bond Classes must deliver their voting instructions to the Nominee according to the instructions in the applicable Notice in sufficient time for the Nominee to receive and effectuate the creditor's vote through ATOP in accordance with the procedures of DTC by the Voting Deadline; provided,

Disclosure
Statement
Order ¶ 32
[ECF No. 17639]

# I) Voting and Solicitation, **Voting Process**

- Prime Clerk worked with DTC to identify nominees of bondholders and count votes from Bond Classes tendered through DTC's ATOP program
  - This was _**not**_ an improper solicitation

<div style="border:1px solid #000; padding:1em;">

**How to Submit a Valid Election or Vote**

_Retail Investors:_

If you are a Retail Investor and wish to:

    (a) make the Vintage CW Guarantee Taxable Bond Distribution Election and be deemed to accept the Plan in **Class 7** and **Class 29**,

    (b) <u>not</u> make the Vintage CW Guarantee Taxable Bond Distribution Election, but vote to <u>accept</u> the Plan in **Class 7** and **Class 23**, or

    (c) <u>not</u> make the Vintage CW Guarantee Taxable Bond Distribution Election, and vote to <u>reject</u> the Plan in **Class 7** and **Class 23**,

you must instruct your broker or nominee (each, a "**Nominee**") to electronically deliver your Bonds via the Automated Tender Offer Program ("**ATOP**") at The Depository Trust Company ("**DTC**") in accordance with your desire to instruct on one of (a), (b), or (c) set forth above.

</div>

Debtors' Exhibit 140, page 63

88

# I) Voting and Solicitation, Voting Process

- Prime Clerk worked with DTC to identify nominees of bondholders and count votes from Bond Classes tendered through DTC's ATOP program

  – The solicitation procedures' treatment of the Retail Support Fee was not coercive, because all bondholders were sufficiently informed of the existence of the fee and who could or could not receive it.



89

# I) Voting and Solicitation, Voting Process

- Retail Support Fee
  - The Bankruptcy Code and PROMESA allow payment of fees such as the Retail Support Fee.
    - "One justification for such disparate treatment is that, if the class accepts, the Plan proponent is saved the expense and uncertainty of a cramdown fight. This is in keeping with the Bankruptcy Code's overall policy of fostering consensual plans of reorganization and does not violate the fair and equitable requirement of section 1129(b)." *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999).
    - "Additionally, it is in keeping with the Bankruptcy Code's overall policy of fostering consensual plans of reorganization and does not violate the fair and equitable requirement of 11 U.S.C. § 1129(b) . . . . [s]tated somewhat differently, there is a valid and legitimate business purpose for the disparate treatment."  *In re Affordable Auto Repair, Inc.*, No. 6:19-bk-18367, 2020 WL 6991012 (Bankr. C.D. Cal. Sept. 2, 2020).

  - *American United Mut. Life Ins. Co. v. Avon Park*, 311 U.S. 138 (1940), which Mr. Hein cites, is **<u>not on point</u>**.

90

# I) Voting and Solicitation, Voting Process

- Retail Support Fee / *American United*

  - In *American United*:

    - It was alleged the debtor agreed to pay a fiscal agent, who was also a bondholder, $40 per $1,000 of bonds that the fiscal agent convinced to vote in favor of the plan.

    - The fiscal agent purchased a significant number of bonds, and purported to act as a bondholder or representative of bondholders to convince other bondholders to vote in favor of the plan.

    - The fiscal agent's role, and financial stake, in soliciting acceptances of the plan was **<u>not</u>** disclosed.

  - The Supreme Court held that the plan should not have been confirmed because:

    - The bankruptcy court could not have determined whether the fiscal agent's fees were reasonable when it was never disclosed during the plan confirmation process.

    - The bankruptcy court could not have determined whether votes were obtained properly and in good faith when the fiscal agent's payments and potential breaches of fiduciary duty had not been explored.

# I) Voting and Solicitation, Voting Process

- Retail Support Fee / *American United*
  - Here, the payment of the Retail Support Fee was **fully disclosed**.



> 6.    Retail Support Fee
>
> If a Class of Retail Investors (Classes 7, 9, 11, 16, 31, 38, 41, and 47) votes to accept the Plan, the members of such Class will be entitled to receive their pro rata share of such Class's allocable share of the aggregate Retail Support Fee of up to $50,000,000.00 in the amount equal to: the Restriction Fee Percentage <u>times</u> the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims without duplication, and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents, and applicable law, held by such accepting Class of Retail investors, as the case may be, as of the date the Title III Court enters the Confirmation Order.
>
> If the entire $50,000,000.00 of the Retail Support Fee is not fully allocated, the balance of the Retail Support Fee will be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and those Retail Investors that are members of Classes that voted to accept the Plan based upon the aggregate amount of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication) held by such Initial GO/PBA PSA Restriction Fee Creditor and Retail Investor as of the date the Title III Court enters the Confirmation Order.
>
> The Retail Support Fee allocated to any Class of Retail Investors that fails to vote to accept the Plan shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan.

Disclosure Statement [ECF No. 17628] at 406-07

92

# I) Voting and Solicitation, Voting Process

- No evidence of deficiencies by Prime Clerk in the solicitation process

  – Only evidence in the record is Peter Hein's declarations from Mark Elliott (Hein Exhibits JJ and AAA)

  – Admissible evidence from Mark Elliott's declarations does not show any voting process deficiencies









Hein Exhibits JJ and AAA

# I) Voting and Solicitation, **Voting Process**

- No evidence of deficiencies by Prime Clerk in the solicitation process
  - Prime Clerk informed callers that it would call back within 3 days if they left a message

> ██████████████ As I have previously stated, the PrimeClerk
> number provided by the notices is nothing but an answering machine message
> offering to "try" to call back within three business days.  After almost 2 weeks I
> *did <u>not</u> receive a call back*. ████████████████████

Hein Exhibit JJ, page 3

  - There is no evidence that Mr. Elliott left a message

94

# I) Voting and Solicitation, Voting Process

- No evidence of deficiencies by Prime Clerk in the solicitation process

  – Prime Clerk gave voting instructions/notices to nominees

  > **How to Submit a Valid Election or Vote**
  >
  > ***Retail Investors:***
  >
  > If you are a Retail Investor and wish to:
  >
  > (a)  make the Vintage CW Guarantee Taxable Bond Distribution Election and be deemed to accept the Plan in **Class 7** and **Class 29**,
  >
  > (b)  <u>not</u> make the Vintage CW Guarantee Taxable Bond Distribution Election, but vote to <u>accept</u> the Plan in **Class 7** and **Class 23**, or
  >
  > (c)  <u>not</u> make the Vintage CW Guarantee Taxable Bond Distribution Election, and vote to <u>reject</u> the Plan in **Class 7** and **Class 23**,
  >
  > you must instruct your broker or nominee (each, a "**Nominee**") to electronically deliver your Bonds via the Automated Tender Offer Program ("**ATOP**") at The Depository Trust Company ("**DTC**") in accordance with your desire to instruct on one of (a), (b), or (c) set forth above.

Debtors'
Exhibit 140
page 63

95

# I) Voting and Solicitation, Voting Process

- No evidence of deficiencies by Prime Clerk in the solicitation process
  - Individual brokers' procedures were outside of Prime Clerk's control.

[3] Holders of claims in the Bond Classes were required to submit their vote and/or distribution election through the Automated Tender Offer Program ("ATOP") at the Depository Trust Company ("DTC") pursuant to paragraphs 32 and 33 of the Disclosure Statement Order.

Pullo Declaration (Debtors' Exhibit 142) ¶ 5, n.3

# I) Voting and Solicitation, Voting Tabulation

- Prime Clerk tabulated ballots received by the October 18 voting deadline

- Prime Clerk updated tabulation to account for

  1. changing votes cast by DRA in Classes 12, 14, 40 and 59 from reject to accept,

  2. rendering Classes 51A, 51C, 51D, 51F, 51J, 51K, and 51L unimpaired following enactment of Act 53.

  > b. Changes the votes cast by the GDB Debt Recovery Authority (the "DRA") in Classes 12, 14, 40, and 59 to acceptance of the Plan to reflect that certain *Stipulation in Connection with DRA Related Disputes*, dated as of November 5, 2021, among the Oversight Board, AmeriNational Community Services, LLC, as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC, as collateral monitor for Wilmington Trust, N.A., which changes remain subject to the Court's approval [ECF No. 19100]; and
  >
  > c. Reflects the effect of modifications to the treatment of certain Claims in light of the enactment of Act 53-2021 since the filing of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627], which modifications provide, pursuant to Section 84.2 of the Plan, Classes 51A, 51C, 51D, 51F, 51J, 51K, and 51L are unimpaired and deemed to have accepted the Plan.

  Pullo Supplemental Declaration (Debtors' Ex. 145) page 2 paragraphs 2b and 2c

- No evidence the vote tabulations are incorrect. No evidence that Mr. Samodovitz **_properly_** instructed his broker to vote.

  - No evidence of an "opt out" form.

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|------------------|-----------------|-----------------|-----------------|-----------------|---------------------|
| 1 | Vintage PBA Bond Claims | 1097 | 7 | $920,005,278.99 | $1,214,494.86 | Accept |
| | | 99.37% | 0.63% | 99.87% | 0.13% | |
| 2 | Vintage PBA Bond Claims (Assured) | 1 | 0 | $97,171,262.34 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 3 | Vintage PBA Bond Claims (National) | 1 | 0 | $104,028,546.10 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 4 | Vintage PBA Bond Claims (Ambac) | 1 | 0 | $92,985,116.06 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 5 | Vintage PBA Bond Claims (FGIC) | 40 | 2 | $2,114,542.08 | $25,419.66 | Accept |
| | | 95.24% | 4.76% | 98.81% | 1.19% | |
| 6 | Vintage PBA Bond Claims (Syncora) | 1 | 0 | $11,902,049.67 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 7 | Retail Vintage PBA Bond Claims | 377 | 30 | $5,620,569.25 | $584,652.18 | Accept |
| | | 92.63% | 7.37% | 90.58% | 9.42% | |
| 8 | 2011 PBA Bond Claims | 389 | 12 | $602,196,827.91 | $7,213,534.61 | Accept |
| | | 97.01% | 2.99% | 98.82% | 1.18% | |
| 9 | Retail 2011 PBA Bond Claims | 57 | 2 | $2,409,218.88 | $5,648.81 | Accept |
| | | 96.61% | 3.39% | 99.77% | 0.23% | |

Page 1 of 9

Pullo
Supplemental
Declaration
(Debtors' Ex. 145)
Exhibit A

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|
| 10 | 2012 PBA Bond Claims | 378 | 6 | $297,130,404.51 | $203,357.28 | Accept |
| | | 98.44% | 1.56% | 99.93% | 0.07% | |
| 11 | Retail 2012 PBA Bond Claims | 114 | 13 | $2,541,965.99 | $138,395.93 | Accept |
| | | 89.76% | 10.24% | 94.84% | 5.16% | |
| 12 | PBA/DRA Secured Claim* | 1 | 0 | $207,332,233.40 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 13 | PBA General Unsecured Claims | 17 | 43 | $67,417.00 | $2,414,054.38 | Reject |
| | | 28.33% | 71.67% | 2.72% | 97.28% | |
| 14 | PBA/DRA Unsecured Claim* | 1 | 0 | $207,332,233.40 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 15 | Vintage CW Bond Claims | 2385 | 15 | $2,735,189,000.00 | $4,080,000.00 | Accept |
| | | 99.37% | 0.63% | 99.85% | 0.15% | |
| 16 | Retail Vintage CW Bond Claims | 973 | 95 | $27,350,000.00 | $2,525,000.00 | Accept |
| | | 91.10% | 8.90% | 91.55% | 8.45% | |
| 17 | Vintage CW Bond Claims (Assured) | 1 | 0 | $1,054,975,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 18 | Vintage CW Bond Claims (National) | 1 | 0 | $842,755,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |

*Reflects the change of the Ballot(s) cast on behalf of the GDB Debt Recovery Authority to an "acceptance", which remains subject to Court approval of such change.

Pullo
Supplemental
Declaration
(Debtors' Ex. 145)
Exhibit A

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|
| 19 | Vintage CW Bond Claims (Ambac) | 1 | 0 | $56,005,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 20 | Vintage CW Bond Claims (FGIC) | 149 | 36 | $258,557,575.00 | $8,215,000.00 | Accept |
| | | 80.54% | 19.46% | 96.92% | 3.08% | |
| 21 | Vintage CW Bond Claims (Syncora) | 1 | 0 | $25,585,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 22 | Vintage CW Bond Claims (Taxable Election) | 346 | 0 | $18,270,000.00 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |
| 23 | Vintage CW Guarantee Bond Claims | 1389 | 37 | $710,350,805.85 | $1,385,852.96 | Accept |
| | | 97% | 3% | 100% | 0% | |
| 24 | Vintage CW Guarantee Bond Claims (Assured) | 1 | 0 | $74,849,402.60 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 25 | Vintage CW Guarantee Bond Claims (National) | 1 | 0 | $80,131,453.90 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 26 | Vintage CW Guarantee Bond Claims (Ambac) | 1 | 0 | $71,624,883.94 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 27 | Vintage CW Guarantee Bond Claims (FGIC) | 40 | 2 | $1,628,796.50 | $19,580.34 | Accept |
| | | 95.24% | 4.76% | 98.81% | 1.19% | |

Page 3 of 9

Pullo
Supplemental
Declaration
(Debtors' Ex. 145)
Exhibit A

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|------------------|-----------|-----------|-----------|-----------|--------------------|
| 28 | Vintage CW Guarantee Bond Claims (Syncora) | 1 | 0 | $9,167,950.33 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 29 | Vintage CW Guarantee Bond Claims (Taxable Election) | 85 | 0 | $2,643,345.91 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |
| 30 | 2011 CW Bond Claims | 184 | 2 | $208,395,000.00 | $75,000.00 | Accept |
| | | 98.92% | 1.08% | 99.96% | 0.04% | |
| 31 | Retail 2011 CW Bond Claims | 54 | 2 | $2,060,000.00 | $115,000.00 | Accept |
| | | 96.43% | 3.57% | 94.71% | 5.29% | |
| 32 | 2011 CW Bond Claims (Assured) | 1 | 0 | $210,000,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 33 | 2011 CW Bond Claims (Taxable Election) | 14 | 0 | $1,090,000.00 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |
| 34 | 2011 CW Guarantee Bond Claims | 352 | 14 | $455,134,126.73 | $5,560,816.58 | Accept |
| | | 96.17% | 3.83% | 98.79% | 1.21% | |
| 35 | 2011 CW Guarantee Bond Claims (Taxable Election) | 94 | 0 | $10,583,826.48 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |
| 36 | 2011 CW Series D/E/PIB Bond Claims | 407 | 1 | $506,765,000.00 | $135,000.00 | Accept |
| | | 99.75% | 0.25% | 99.97% | 0.03% | |

Page 4 of 9

Pullo
Supplemental
Declaration
(Debtors' Ex. 145)
Exhibit A

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|
| 37 | 2011 CW Series D/E/PIB Bond Claims (Assured) | 1 | 0 | $10,400,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 38 | Retail 2011 CW Series D/E/PIB Bond Claims | 91 | 8 | $2,645,000.00 | $300,000.00 | Accept |
| | | 91.92% | 8.08% | 89.81% | 10.19% | |
| 39 | 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | 34 | 0 | $1,775,000.00 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |
| 40 | 2012 CW Bond Claims* | 1256 | 21 | $2,082,022,644.76 | $1,690,000.00 | Accept |
| | | 98.36% | 1.64% | 99.92% | 0.08% | |
| 41 | Retail 2012 CW Bond Claims | 403 | 28 | $16,195,000.00 | $1,100,000.00 | Accept |
| | | 93.50% | 6.50% | 93.64% | 6.36% | |
| 42 | 2012 CW Bond Claims (Assured) | 1 | 0 | $369,445,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 43 | 2012 CW Bond Claims (Taxable Election) | 168 | 0 | $11,975,000.00 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |
| 44 | 2012 CW Guarantee Bond Claims | 476 | 19 | $230,286,555.04 | $263,246.79 | Accept |
| | | 96.16% | 3.84% | 99.89% | 0.11% | |
| 45 | 2012 CW Guarantee Bond Claims (Taxable Election) | 16 | 0 | $546,073.93 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |

*Reflects the change of the Ballot(s) cast on behalf of the GDB Debt Recovery Authority to an "acceptance", which remains subject to Court approval of such change.

Pullo Supplemental Declaration (Debtors' Ex. 145) Exhibit A

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|---|---|---|---|---|---|---|
| | | % | % | % | % | |
| 46 | 2014 CW Bond Claims | 314 | 0 | $3,318,280,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 47 | Retail 2014 CW Bond Claims | 27 | 0 | $6,650,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 48 | 2014 CW Bond Claims (Taxable Election) | 3 | 0 | $850,000.00 | $0.00 | Deemed to Accept |
| | | 100% | 0% | 100% | 0% | |
| 49 | 2014 CW Guarantee Bond Claims | 20 | 0 | $276,620,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 50 | 2014 CW Guarantee Bond Claims (Taxable Election) | No creditors elected into this class. At the direction of the Debtors, this class is deemed to accept the Plan. | | | | Deemed to Accept |
| 51A* | Retired ERS Participant Below-Threshold Claims | Deemed to Accept | | | | |
| 51B | Retired JRS Participant Below-Threshold Claims | 7 | 4 | $7,820.87 | $4,936.13 | Reject |
| | | 63.64% | 36.36% | 61.31% | 38.69% | |
| 51C* | Retired TRS Participant Below-Threshold Claims | Deemed to Accept | | | | |
| 51D* | Retired ERS Participant Above-Threshold Claims | 2358 | 1689 | $5,480,453.28 | $4,348,160.33 | Reject |
| | | 58.27% | 41.73% | 55.76% | 44.24% | |

*Pursuant to Section 84.2 of the Plan, this Class is unimpaired and deemed to have accepted the Plan.

Pullo Supplemental Declaration (Debtors' Ex. 145) Exhibit A

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|------------------|--------------------|---------------------|--------------------|---------------------|---------------------|
| 51E | Retired JRS Participant Above-Threshold Claims | 114 | 52 | $612,484.78 | $235,765.83 | Accept |
|  |  | 68.67% | 31.33% | 72.21% | 27.79% |  |
| 51F* | Retired TRS Participant Above-Threshold Claims | 920 | 2659 | $1,979,849.76 | $5,888,958.66 | Reject |
|  |  | 25.71% | 74.29% | 25.16% | 74.84% |  |
| 51G | Active ERS Participant Claims | 799 | 789 | $799.00 | $789.00 | Reject |
|  |  | 50.31% | 49.69% | 50.31% | 49.69% |  |
| 51H | Active JRS Participant Claims | 15 | 25 | $15.00 | $25.00 | Reject |
|  |  | 37.50% | 62.50% | 37.50% | 62.50% |  |
| 51I | Active TRS Participant Claims | 264 | 1020 | $264.00 | $1,020.00 | Reject |
|  |  | 20.56% | 79.44% | 20.56% | 79.44% |  |
| 51J* | System 2000 Participant Claims | Deemed to Accept |  |  |  |  |
| 51K* | VTP Payroll Participant Below-Threshold Claims | Deemed to Accept |  |  |  |  |
| 51L* | VTP Payroll Participant Above-Threshold Claims | 175 | 190 | $346,825.32 | $430,412.93 | Reject |
|  |  | 47.95% | 52.05% | 44.62% | 55.38% |  |
| 52 | AFSCME Claims | 1 | 0 | $106,146,942.34 | $0.00 | Accept |
|  |  | 100% | 0% | 100% | 0% |  |

*Pursuant to Section 84.2 of the Plan, this Class is unimpaired and deemed to have accepted the Plan.

Page 7 of 9

Pullo
Supplemental
Declaration
(Debtors' Ex. 145)
Exhibit A

# I) Voting and Solicitation, **Results**

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|
| 53 | Dairy Producer Claims | 1 | 1 | $17,167,799.72 | $44,832,199.28 | Reject |
| | | 50.00% | 50.00% | 27.69% | 72.31% | |
| 54 | Eminent Domain Claims | 0 | 1 | $0.00 | $1.00 | Reject |
| | | 0% | 100% | 0% | 100% | |
| 55 | Energy Incentive Claims | Deemed to Accept | | | | |
| 56 | Med Center Claims | 18 | 0 | $73,000,420.36 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 57 | Tax Credit Claims | Deemed to Accept | | | | |
| 58 | CW General Unsecured Claims | 47 | 551 | $8,393,181.36 | $93,463,937.95 | Reject |
| | | 7.86% | 92.14% | 8.24% | 91.76% | |
| 58A | GDB/PET Claim | Deemed to Reject | | | | |
| 59 | CW/HTA Claims* | 1716 | 79 | $5,281,795,499.20 | $3,220,000.00 | Accept |
| | | 95.60% | 4.40% | 99.94% | 0.06% | |
| 60 | CW/Convention Center Claims | 3 | 0 | $386,415,000.00 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |

*Reflects the change of the Ballot(s) cast on behalf of the GDB Debt Recovery Authority to an "acceptance", which remains subject to Court approval of such change.

Pullo
Supplemental
Declaration
(Debtors' Ex. 145)
Exhibit A

# I) Voting and Solicitation, Results

**Commonwealth of Puerto Rico**
**Exhibit A - Tabulation Summary**

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|---|---|---|---|---|---|---|
| | | % | % | % | % | |
| 61 | CW/PRIFA Rum Tax Claims | 1171 | 114 | $1,846,605,000.00 | $4,685,000.00 | Accept |
| | | 91.13% | 8.87% | 99.75% | 0.25% | |
| 62 | CW/MBA Claims | 1 | 0 | $30,106,786.87 | $0.00 | Accept |
| | | 100% | 0% | 100% | 0% | |
| 63 | CW Appropriations Claims | Deemed to Reject | | | | |
| 64 | Section 510(b) Subordinated Claims | Deemed to Reject | | | | |
| 65 | ERS Bond Claims | 593 | 328 | $3,363,980,000.00 | $31,170,000.00 | Accept |
| | | 64.39% | 35.61% | 99.08% | 0.92% | |
| 66 | ERS General Unsecured Claims | 0 | 1 | $0.00 | $1.00 | Reject |
| | | 0% | 100% | 0% | 100% | |
| 67 | Gracia Gracis Claims | Deemed to Accept | | | | |
| 68 | Convenience Claims | Deemed to Accept | | | | |
| 69 | Federal Claims | No ballots were returned by a holder entitled to vote in this class. Pursuant to section I(37)(p) of the disclosure statement order, this class is deemed to accept the Plan. | | | | Accept |

Page 9 of 9

Pullo
Supplemental
Declaration
(Debtors' Ex. 145)
Exhibit A

# I) Voting and Solicitation, Second Bite for Retail Investors

- Plan Section 77.1(a) and (b) provide that:

   ". . . distribution of the Retail Support Fee, if any, to a holder of an [Allowed PBA Bond Claim & Allowed CW Bond Claim] is subject to the delivery, on or prior to the Ballot Date . . . , of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor."

- Despite assertions by Mr. Hein and Mr. Samodovitz that Retail Investors were unable to participate in the solicitation, there is no evidence to support such assertions.

- Nonetheless, in an effort to address such concerns, revisions to the proposed Confirmation Order will provide a **_second_** opportunity for "Retail Investors" who did <u>not</u> participate in the vote to accept or reject the Plan to identify themselves and certify they were "Retail Investors" as of the Voting Deadline (Oct. 18).

   – Only those who abstained from voting will be eligible to participate.

   – Beneficial holders who <u>did</u> vote, but did <u>not</u> certify that they are a "Retail Investor" will not be eligible to participate in this second opportunity.



Commenced 7/27/21
ECF No. 18761-8
Ended 8/13/21
ECF No. 18761-8
Commenced 8/30/21
ECF No. 19107-1 to 9
Did you tender and exchange your bonds to join the GO/PBA PSA?
Yes
No
You receive a new CUSIP
You keep your existing CUSIP
No option to certify as Retail Investor pursuant to Plan section 1.438
May certify as a Retail Investor
Abstain from Voting
Vote on Plan
Accept
Reject
Not Entitled to PSA Restriction Fee
Receive PSA Restriction Fee
Not Entitled to PSA Restriction Fee
Vote on Plan
Accept and certify as Retail Investor
Reject and certify as Retail Investor
Accept but no certification
Reject but no certification
In Retail Class and Receive Retail Support Fee
Not in Retail Class and no Retail Support Fee
Abstain from Voting
Not Eligible
Certify as Retail Investor
In Retail Class and Receive Retail Support Fee
Abstain from Certification
Not in Retail Class and no Retail Support Fee
GO/PBA PSA Joinder – Tender & Exchange
Plan Solicitation
Second Opportunity to Identify as Retail Investor

# Part 2

# Best Interest Test Satisfied

"The Court shall confirm the plan if . . . the plan is feasible and in the best interests of creditors, which shall require the court **to consider** whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan"

PROMESA § 314(b)(6) (emphasis added)

- Thus, unlike the chapter 11 standard, Section 314(b)(6) is not a "floor" or "litmus test" – the Court need only "**consider**" the recovery for creditors in a world where there is no Title III case

# Consideration of Collective Recovery



> The best interests test in chapter 9 -- and in PROMESA -- is a collective test:  "We conclude that the 'best interests' test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors."

*In re City of Stockton,* 542 B.R. 261, 286 (B.A.P. 9th Cir. 2015)

# Consideration of Collective Recovery

| CHAPTER 9 | CHAPTER 11 | PROMESA |
|---|---|---|
| (943(b)(7)) – The Court shall confirm the plan if— the Plan is in the best interests of creditor**s** and is feasible | (1129(a)(7)) – With respect to **each impaired class of claims or interests—(A) each holder** of a claim or interest of such class—(i) has accepted the plan; or (ii) will receive or retain under the plan **on account of such claim or interest property** of a value, as of the effective date of the plan, that is not less than the amount that **such holder** would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date | (314(b)(6)) – The Court shall confirm the plan if . . . the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater **recovery for the** creditor**s** than is provided by such plan |

# Key Assumptions in Best Interests Test Model (Shah Declaration, ECF No. 18730)

- The Oversight Board remains in place, and Titles I and II continue to apply.  Commonwealth Report (Debtors' Ex. 130), Assumptions Chart, Question 1.

- In each fiscal year, operating expenses will be paid first in accordance with the Fiscal Plan.  Then, GO Bonds and pari passu obligations will be paid in full, and then other creditors, until the Commonwealth is out of money.  Shah Declaration [ECF No. 19054-8] ¶ 33.

- Pensions will be paid without impairment as part of operating expenses to the extent the Commonwealth is able to satisfy all operating expenses in full.  Shah Declaration ¶ 33; see also Commonwealth Report (Debtors' Ex. 130).

- Revenues in the Fiscal Plan are projected downward, and expenses are projected upward, to reflect an inability to fully implement contemplated structural reforms and fiscal measures.  Shah Declaration [ECF No. 19054-8] ¶ 25.

- Varying assumptions are made with respect to the validity of GO Bonds and pari passu obligations (e.g., an assumption that all GO bonds issued after 2012, or after March 2011, are invalid) to determine which obligations would need to be paid outside of Title III.  Commonwealth Report (Debtors' Ex. 130), Assumptions Chart, Question 16.

- The ERS Stipulation remains in effect, and the remaining funds at ERS are transferred to the Commonwealth.  Shah Declaration [ECF No. 19054-8] ¶ 26.

# The Landscape Outside Title III

- "In general, the Plan for each of the Debtors will result in recoveries for creditors in the aggregate that are within the range or greater than the recoveries that they would receive outside Title III based on data available as of the filing date of the Reports. ***Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and be subject to significant litigation.*** The Reports posit that within this environment, the government will face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms. As described in the 2021 Certified Fiscal Plan for the Commonwealth, structural reforms are a key component driving future economic growth on the island. Without the benefit of the uptick in growth from these reforms, overall economic growth and tax revenue will be lower, reducing the amounts available to pay all creditors."  Shah Declaration [ECF No. 19054-8] ¶ 12.

- "In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds.  Clearly, such a result is chaos . . . ."  6 Collier on Bankruptcy p. 943.03 (16th ed. 2021)

# The Results of the Best Interests Test Model

- "The Commonwealth Report and PBA Report establish that creditors in the aggregate will receive a percentage recovery on their claims under the Plan that is within the range or greater than projected recoveries in the Reports. The Report for ERS establishes that creditors in the aggregate will receive a percentage recovery on their claims under the Plan that is greater than projected recoveries in the Report (though ERS creditors do better outside of the Plan if they prevail in litigation that their security interest attaches to PayGo Payments (which FOMB views as unlikely))."  Shah Declaration [ECF No. 19054-8] ¶ 13

| Title III Debtor | Aggregate Plan Recoveries (% and $ billion) | Aggregate Recoveries in the Reports (% and $ billion) |
|---|---|---|
| Commonwealth | 69% / $15.7 | 34%–62% / $9.3–15.3 |
| ERS | 14% / $0.4 | 5%–100% / $0.2-3.7 |
| PBA | 21% / $1.1 | 5% / $0.3 |

[Shah Declaration [ECF No. 19054-8] ¶ 35]

# The Results of the Best Interests Test Model

*Exhibit 8: Estimated likely range of recoveries to Commonwealth creditors by debt class and scenario*

**Estimated likely range of recoveries available to creditors by debt class and scenario[1,2]**

PV of total payment in USD billion, % recovery, breakdown by scenario

| | Base case: GO bonds and *pari passu* debt issued in or after 2012 is deemed invalid | | Scenario 1: GO bonds and *pari passu* debt issued in or after March 2011 is deemed invalid | | Scenario 2: All outstanding claims are deemed valid | |
|---|---|---|---|---|---|---|
| | Lower end of range | Higher end of range | Lower end of range | Higher end of range | Lower end of range | Higher end of range |
| **GO Bonds** | $6.2 *89%* | $6.6 *95%* | $5.8 *98%* | $6.0 *100%* | $10.1 *75%* | $11.3 *84%* |
| **Claims pari passu with GO bonds** | $2.8 *66%* | $3.3 *76%* | $2.1 *70%* | $2.2 *75%* | $2.8 *54%* | $3.3 *63%* |
| **Other eligible claims** | $0.7 *12%* | $1.2 *20%* | $1.5 *24%* | $2.0 *33%* | $0 *0%* | $0 *0%* |
| **Total** | $9.7 *56%* | $11.0 *64%* | $9.3 *63%* | $10.3 *69%* | $12.9 *52%* | $14.6 *59%* |

1 Recoveries on this exhibit do not include pension recoveries, which are assumed to be paid in full as part of Fiscal Plan adjustments, and ERS recoveries, which are assumed to be paid according to agreement with ERS creditors
2 These recoveries are reflective of adjustments made to the Resource Envelope given implementation risks discussed in this analysis

# The Assumption that Operating Expenses will be Paid Before GO Debt Pursuant to Police Power

- Titles I and II apply outside of Title III – thus, Oversight Board's power to certify fiscal plans and budgets will continue

- The Puerto Rico Constitution recognizes the Commonwealth's police power.

  – Section 18 of Article II of the Constitution, which grants the right to organize and bargain collectively, subordinates such right to the state's police power:  "[n]othing herein contained shall impair the authority of the Legislative Assembly to enact laws to deal with grave emergencies that clearly imperil the public health or safety or essential public services."

  – Section 19 of Article II of the Constitution expressly recognizes the police power of the Commonwealth: "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively."

  – And the Puerto Rico Supreme Court has also defined the Commonwealth's police power as an "inherent power" to legislate for the protection of the general welfare.
  *Domínguez Castro v. E.L.A.*, 178 D.P.R. 1, 36 (2010).

117

# Part 3

# A) Cramdown

- Rejecting Classes are:

| | | |
|---|---|---|
| **Class 13:**<br>PBA General Unsecured Claims | **Class 51H:**<br>Active JRS Participant Claims | **Class 58:**<br>CW General Unsecured Claims |
| **Class 51B:**<br>Retired JRS Participant<br>Below-Threshold Claims | **Class 51I:**<br>Active TRS Participant Claims | **Class 58A:**<br>GDB/PET Claim<br>(deemed to reject) |
| **Class 51D:**<br>Retired ERS Participant<br>Above-Threshold Claims | **Class 51L:**<br>VTP Payroll Participant<br>Above-Threshold Claims | **Class 63:**<br>CW Appropriation Claims<br>(deemed to reject) |
| **Class 51F:**<br>Retired TRS Participant<br>Above-Threshold Claims | **Class 53:**<br>Dairy Producer Claims | **Class 64:**<br>Section 510(b) Subordinated Claims<br>(deemed to reject) |
| **Class 51G:**<br>Active ERS Participant Claims | **Class 54:**<br>Eminent Domain Claims | **Class 66:**<br>ERS General Unsecured Claims |

119

# A) Cramdown



Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Bankruptcy Code § 1129(b)(1)

# A) Cramdown



…(B)With respect to a class of unsecured claims—

i.   the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

ii.  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

Bankruptcy Code § 1129(b)(2)

# A) Cramdown

- The Plan satisfies 1129(b)(2)(B) as to all the rejecting classes.
  - Class 64 (subordinated section 510(b) claims) receives nothing.
  - No junior class receives any distribution.

---

**ARTICLE LXVIII**

**PROVISIONS FOR TREATMENT OF**
**SECTION 510(b) SUBORDINATED CLAIMS (CLASS 64)**

68.1     **Treatment of Section 510(b) Subordinated Claims:** Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan with respect to such Section 510(b) Subordinated Claims.

---

Modified Eighth Amended Plan [ECF No. 19323]  § 68.1

# A) Cramdown

- TRS Participant Claims INCLUDE Rejection Damage Claims.

- No junior class receives any distribution.

1.487   **TRS Participant Claim:**   A Claim on account of being or having been a Participant in TRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in TRS from and after the Effective Date.

Modified Eighth Amended Plan [ECF No. 19323], § 1.487

# A) Cramdown

- Treatment of TRS Participant Claims includes 3 components:

55.3 **Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C)**:

(a) Treatment. Each holder of an Allowed Retired TRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

**1**

55.9 **Treatment of Active TRS Participant Claims (Class 51I)**:

(a) Treatment.

(i) Each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (i) his or her, as applicable, benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification, as applicable, and the terms set forth on Exhibit "F-1" hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, and (ii) such additional benefits for service on or after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the Effective Date as set forth on the term sheet attached as Exhibit "F-1" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein; provided, however, that, notwithstanding the foregoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

**2**

**3**

Modified Eighth Amended Plan [ECF No. 19323] §§ 55.3, 55.9

124

# A) Cramdown

- Treatment of TRS Participant Claims includes 3 components:

  – PayGo payments from the Commonwealth budget to pay the defined benefits they will earn up to the effective date of the Plan;

  – Their tax deferred Defined Contribution account balance; and

  – Social Security if they opt in, for which the Commonwealth must make matching contributions to social security.

  – Therefore, the argument they are not getting anything is wrong.  The PayGo payments and the matching social security payments come from the Commonwealth and not from their earnings.

# A) Cramdown

- Classes 51B, G, H, and I: Various Pension Classes

  - Various pensioners asserted that the Plan unfairly discriminates against pensioners.

    - *See*, *e.g.*, Objection of Miguel Luna De Jesus [ECF No. 18485]; Objection of Mildred Batista De Leon [ECF No. 18505].  They largely object to the discount of accrued pensions, which discount has been eliminated.

  - Pensioners in these classes receive 100% of their accrued pensions as of the Effective Date.  Active workers are subject to the freeze,  which impacts prospective pension benefits not yet accrued, and the elimination of COLAs.

    - The Freeze and elimination of COLAs are essential to confirmation of the Plan, as they relate to the Commonwealth's accrual of future obligations, and thus Puerto Rico's ability to achieve fiscal responsibility and access to capital markets.  *See* [ECF No. 19058] Jaresko Supp. Decl. [ECF No. 19058] ¶ 13; Malhotra Supp. Decl. [ECF No. 19057]¶¶ 16–21.

    - As demonstrated in the Shah Declaration, holders of claims against the Commonwealth receive an estimated recovery of $9.3 billion to $14.6 billion. Thus, recoveries under the Plan, which are projected to be 69%, are within range or exceed the recoveries outside of Title III in all Scenarios. *Id*.  Moreover, the pensioners receive the highest recoveries.  Therefore, there can be no unfair discrimination against them.

  - The Plan's treatment of the Pension Classes is consistent with treatment levels approved as "fair" in Chapter 9 cases.  *See, e.g., In re City of Detroit*, 524 B.R. at 257 (confirming the City of Detroit's 60% treatment of pension claims and general unsecured creditors, at approximately 13% recoveries).

126

# A) Cramdown

- Class 53 Dairy Producer Claims

  – Suiza Dairy, Inc. argues the Plan is not fair and equitable with respect to its claim because it does not provide for full payment of its Takings claim.  [ECF No. 18593] at 24.

  – The Oversight Board believes Suiza Dairy has nothing more than a general unsecured claim arising from breach of a settlement agreement by the Commonwealth.

  – Due to the importance of the dairy industry to Puerto Rico, the claims in Class 53 receive recoveries of 50% of its claim.  *See* Jaresko Declaration [ECF No. 19054-4] ¶ 53.

  – If the Court determines Suiza Dairy holds a Takings Claim entitled to better treatment, the Debtors can afford to pay it.

# A) Cramdown

- Class 54 Eminent Domain Claims

  – Various objectors argue the Plan may not classify claimant's Takings claim in the same class as general unsecured claims because the claim cannot be discharged.

  – Eminent Domain Claims are unsecured claims that are not protected from impairment and discharge by the U.S. Constitution.
    – *Cobb v. City of Stockton*, 909 F.3d 1256 (9th Cir. 2018); *Poinsett Lumber & Mfg. Co. v. Drainage Dist.*, 119 F.2d 70 (8th Cir. 1941).

  – This is further demonstrated by Congress' ability to constitutionally eliminate eminent domain claims that are not filed within the limitations period Congress legislates.
    – *Block v. North Dakota*, 461 U.S. 273, 292 (1983) ("A constitutional claim can become time-barred just as any other claim can . . . Nothing in the Constitution requires otherwise."); *Stone Container Corp. v. U.S.*, 229 F.3d 1345, 1350 (Fed. Cir. 2000) ("Both the Supreme Court and this court have repeatedly held that the federal government may apply statutes of limitations to just compensation claims.").

  – If Congress can eliminate eminent domain claims, it can certainly use the bankruptcy power granted to it by the Constitution to limit payments to prepetition eminent domain claims.

# A) Cramdown

- Best Interest Test supports cramdown

12. In general, the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) for each of the Debtors will result in recoveries for creditors in the aggregate that are within the range or greater than the recoveries that they would receive outside Title III based on data available as of the filing date of the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]).  Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and be subject to significant litigation.  The Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) posit that within this environment, the government will face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.  As described in the 2021 Certified Fiscal Plan for the Commonwealth (Debtors' Ex. 10 [ECF No. 18785-10]) (the "Fiscal Plan"), structural reforms are a key component driving future economic growth on the island.  Without the benefit of the uptick in growth from these reforms, overall economic growth and tax revenue will be lower, reducing the amounts available to pay all creditors.

13. The Commonwealth Report (Debtors' Ex. 130 [ECF No. 18807-8]) and PBA Report (Debtors' Ex. 131 [ECF No. 18807-9]) establish that creditors in the aggregate will receive a percentage recovery on their claims under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) that is within the range or greater than projected recoveries in the Reports (Debtors' Exs. 130 and 131 [ECF Nos. 18807-8, 18807-9]) for such creditors in all Scenarios and using alternative assumptions identified below.  The Report for ERS (Debtors' Ex. 130 [ECF No. 18807-8]) establishes that creditors in the aggregate will receive a percentage recovery on their claims under the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) that is greater than projected recoveries in the Report for such creditors in utilizing the Main Assumptions for ERS, and that ERS creditors do better outside of the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) only if they prevail in their assertions that they have a security interest in PayGo Payments (defined below).

Shah Declaration [ECF No. 19054-8] ¶¶ 12-13

# B) Preemption

- GO and Guaranteed Loan Statutes – Statutes that authorize payment in full of general obligation bonds and guaranteed loans

| | | |
|---|---|---|
| **Act 2:** approved October 10, 1985 13 L.P.R.A. § 141-141m | **Act 149:** approved August 9, 2002, as amended | **Act 39:** approved May 13, 1976, as amended |
| **Act 1:** approved June 26, 1987, as amended 13 L.P.R.A. § 63-63h | **Joint Resolution No. 57:** approved July 12, 1993 | **Joint Resolution No. 99-2013:** approved December 9, 2013 |
| **Act 34:** approved March 4, 2014 | **Act 54: appr**oved July 6, 2001 | **Act 242:** approved December 13, 2011 |
| **Act 79:** approved June 1, 2011 | **Act 118:** approved July 13, 2000 | **Joint Resolution No. 104:** approved December 13, 2013 |
| **Act 243:** approved August 9, 2008 | **Act 153:** approved July 16, 1999 | **Joint Resolution No. 96:** approved November 27, 2013 |
| **Act 43:** approved August 1, 2005, as amended | **Act 219:** approved August 9, 1998 | **Act 17:** approved April 11, 1968 |
| **Act 216:** approved August 19, 2004 | **Act 81:** approved August 14, 1997 | **Act 409:** approved September 22, 2004 |
| **Act 100:** approved July 12, 2002, as amended | **Act 119:** approved August 9, 1995 | **Act 1:** approved January 1, 2015 |
| **Act 161:** approved July 5, 2003 | **Act 46:** approved July 28, 1994 | **Act 45:** approved July 28, 1994 |

# B) Preemption

- GO and Guaranteed Loan Statutes – Statutes that authorize payment in full of general obligation bonds and guaranteed loans

  - Paying in full all scheduled debt service on outstanding general obligation bonds for FY 2022 would be more than $1.7 billion.

> 63.    The statutes identified in Section I of Exhibit "K" generally require the Commonwealth to use its revenues to repay its general obligation and guaranteed debt in full. I reviewed the pre-petition debt service amounts in Exhibit 156 of the 2021 Fiscal Plan associated with outstanding general obligation bonds to determine the amount of debt service the Commonwealth would owe in FY 2022 in respect of each of the outstanding General Obligation Bonds. The amount of Commonwealth revenues that would be needed to pay in full all scheduled debt service on outstanding general obligation bonds for FY 2022 would be more than $1.7 billion, if permitted by a certified budget of the Oversight Board.

Malhotra Declaration [ECF No. 19054-6] ¶ 63

# B) Preemption

- GO and Guaranteed Loan Statutes – Statutes that authorize payment in full of general obligation bonds and guaranteed loans

  – The statutes are inconsistent with PROMESA because they require payment in full of claims the Plan proposes to reduce.

> 231.    By way of example, I reviewed Articles V-XV and XIX-LIV of the Plan, which propose to pay GO Bonds and other Commonwealth guaranteed debt less than one hundred percent (100%) of the presented amount of their claims. Any Puerto Rico statute or other law requiring the Commonwealth to pay those claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Moreover, the continued application of such statutes would significantly hamper the Oversight Board's mission to return Puerto Rico to fiscal responsibility and access to capital markets because those laws would effectively nullify the Plan's restructuring of GO Bonds and other Commonwealth guaranteed debt and significantly weaken the Oversight Board's ability to control Commonwealth spending.

Jaresko Declaration [ECF No. 19054-4] ¶ 231

132

# B) Preemption

- GO and Guaranteed Loan Statutes – Statutes that authorize payment in full of general obligation bonds and guaranteed loans

  – The statutes would allow the Commonwealth to incur debt without Oversight Board approval.

232.   Similarly, the statutes listed in Section I to Exhibit K authorize the Commonwealth to issue debt without obtaining Oversight Board approval.  As noted above, I believe continued operation of these statutes would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets.

Jaresko Declaration [ECF No. 19054-4] ¶ 232

133

# B) Preemption

- GO and Guaranteed Loan Statutes – Statutes that authorize payment in full of general obligation bonds and guaranteed loans

  – The statutes require the Governor's approval of any debt issued by the Commonwealth, even if PROMESA or the Plan authorizes the issuance of debt, and therefore would undermine the restructuring of Commonwealth debt contemplated in the Plan.

> 233.   I further understand the statutes listed in Section I of Exhibit K require the Governor to approve any debt the Commonwealth issues, regardless of whether that debt issuance is authorized under PROMESA or the Plan. If these statutes have to be complied with, I believe they would undermine the restructuring of Commonwealth debt contemplated in the Plan. For example,

Jaresko Declaration [ECF No. 19054-4] ¶ 233

134

# B) Preemption

- Statutes Requiring Appropriations

| | | |
|---|---|---|
| **Act 9:** approved August 12, 1982, codified in part at 9 L.P.R.A. § 2021 | **13 L.P.R.A. § 2271v(a)** | **12 L.P.R.A. §8105** |
| **Act 43:** approved June 21, 1971; 13 L.P.R.A. § 31751(a)(1) | **Act 147:** enacted June 18, 1980, as amended, 23 L.P.R.A. § 104 | **Act 41:** Act 41 approved July 22, 2011, as codified in part at 3 L.P.R.A. § 1023 |
| **13 L.P.R.A. § 31751(a)(3)** | **18 L.P.R.A. § 621-1** | **Act 1:** Act 1 approved January 31, 2011, as amended and codified in part at 13 L.P.R.A. § 33231(l) |
| **Act 44:** approved June 21, 1988, as amended; 3 L.P.R.A. § 1914 | **Act 83:** approved August 30, 1991, as amended, 21 L.P.R.A. §§ 5002, 5004, 5006, 5815. | **9 L.P.R.A. § 5681** |
| **Act 1:** approved January 1, 2015; 13 L.P.R.A. § 31751a(a) | **Act 221:** approved May 15, 1948, as amended, 15 L.P.R.A. § 74(d) | **Act 15:** approved February 28, 2017 |
| **13 L.P.R.A. § 31751(a)(4)** | **Act 18:** approved January 24, 2014, codified in part at 21 L.P.R.A. §§ 6741, 6742 | |
| **13 L.P.R.A. § 31751(a)(5)** | **Act 214:** approved August 18, 2004, as Amended and in relevant part, 23 L.P.R.A. § 695d | |

135

# B) Preemption

- Statutes Requiring Appropriations

  – These statutes would require the transfer of over $3.0 billion in FY22.

> 64.    The statutes identified in Section II of Exhibit "K" generally require the
> Commonwealth to transfer certain revenues to numerous other entities to spend on various
> purposes.  These statutes contain formulas explaining the amount of revenues to be transferred.  I
> used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases
> applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The
> amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by
> a certified budget of the Oversight Board, is more than $3.0 billion.[18]

Malhotra Declaration [ECF No. 19054-6] ¶ 64

# B) Preemption

- Statutes Requiring Appropriations

  – These statutes would require payment in full of claims that the Plan proposes to reduce, and are therefore inconsistent with the certified Commonwealth budget, fiscal plan and Plan.

> 234.    It is my understanding that the statutes listed in Section II of Exhibit K generally require the Commonwealth to transfer its money to numerous other entities to spend on various purposes, outside the Oversight Board's certified budget, fiscal plan and Plan. Here, too, I believe these statutes are inconsistent with PROMESA's provisions, purposes and goals and, if they remain enforceable, would undermine the restructuring and limited allowance of claims contemplated by the Oversight Board's proposed Plan. Among other things, Articles LXIII–LXVII of the Plan propose to pay claims arising from obligations described in some of these statutes at less than one hundred percent (100%) of the claimed amounts. Just like the statutes listed in Section I of Exhibit K, I believe the continued application of the statutes listed in Section II would significantly hamper the Oversight Board's purpose to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, because they provide for spending which is inconsistent with the certified Commonwealth budget, fiscal plan and the Plan.

Jaresko Declaration [ECF No. 19054-4] ¶ 234

137

# B) Preemption

- TRS and JRS Statutes

| | |
|---|---|
| **Act 106:** approved August 23, 2017 3 L.P.R.A. § 9531-9590 | **Act 12:** approved October 19, 1954 4 L.P.R.A. § 233-246 |
| **Act 160:** approved December 24, 2013 18 L.P.R.A. § 393-399d | **Act 7-2021** |
| **Act 91:** of March 24, 2004 **Repealed:** 18 L.P.R.A. § 391-392w | **Act 162:** approved on December 24, 2013 |

# B) Preemption

- TRS and JRS Statutes

  - These statutes would require the Commonwealth to spend $984 million on TRS and JRS pension benefits in FY22 alone.

  other benefits calculated in the 2021 Fiscal Plan that would be paid to the Commonwealth's retirees in FY 2022. The amount of Commonwealth revenues that would need to be spent on TRS and JRS pension benefit payments and other benefits or payments in FY 2022, if permitted by a certified budget of the Oversight Board, is $984 million.

  Malhotra Declaration [ECF No. 19054-6] ¶ 65

# B) Preemption

- TRS and JRS Statutes
  - These statutes would require the Commonwealth to spend $984 million on TRS and JRS pension benefits in FY22 alone.

235.   Lastly, it is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which proposes to pay certain retiree claims in amounts less than what those statutes would otherwise require. For example, Article LV of the present Plan would pay certain claims arising from these statutes less than in full and modify certain pension and other benefits to lower levels on a go-forward basis, and eliminate future accruals of pension benefits altogether. Once again, any Puerto Rico statute or other law requiring the Commonwealth to pay the over $55 billion of pension-related claims in full and to continue to accrue defined benefit obligations for teachers and judges is inconsistent with the restructuring contained in the present Plan and would nullify the present Plan's restructuring of retiree claims. As a result, if such laws continued to operate, I believe the Oversight Board's mission to provide for Puerto Rico to achieve fiscal responsibility and access to capital markets would be undermined and the present Plan might be rendered not feasible. As noted above, in making these statements, I recognize there are ongoing discussions concerning matters regarding the Plan, and, in particular, treatment of the Pension Claims. To the extent it becomes necessary, I will supplement this Declaration to reflect the results of those discussions.

Jaresko Declaration [ECF No. 19054-4] ¶ 235

140

# B) Preemption

- Statutes Relating to Issuance of New Securities

| **Act 42:**  approved on September 16, 2021 |
| --- |

- For the same reasons identified with respect to the other statutes, to the extent this law would require approval of the Commonwealth government for refinancing or other issuance of new debt under the Plan, or would give bonds priority not otherwise provided for in PROMESA, any such provisions are preempted.

# B) Preemption

- In total, if the statutes were not preempted, the Oversight Board would not be able to control 43% of the total certified Commonwealth budget (excluding federal funds).

> 66.    The certified budget, excluding federal funds, for the Commonwealth of Puerto Rico for FY 2022 appropriated approximately $13.6 billion. Accordingly, if all Commonwealth appropriations described herein were required to be transferred, the Oversight Board would be unable to control approximately 43% of the total certified Commonwealth budget, excluding federal funds.

Malhotra Declaration [ECF No. 19054-6] ¶ 66

**Acts 80, 81 and 82 reestablish defined benefit plans by compelling enhanced benefits over and above pension payments payable pursuant to the Plan**

# Act 80

- AAFAF admits that Act 80 substantially increases pension benefits, over and above the pension benefits to which employees and retirees would be entitled under the Plan.

  – "Specifically, Act 80 allows Government employees that began their public service when Act 447-1951 or Act 1-1990 were in place to retire early with greater benefits than those currently in place. Among other things, Act 80 provides eligible employees with (i) a pension equal to 50% of their highest salary during their last three prior to retirement; (ii) a monthly employer contribution of $100 to the health insurance plan of their choosing until they reach age 62, and (iii) payment for unused sick leave and vacation time, subject to statutory caps."

AAFAF Objection [ECF No. 19319] ¶ 10

# Act 80

- Article 3: Creates the Incentivized Retirement Program ("IRP").

  – "Through this Law, the Incentivized Retirement Program is created to offer an opportunity for early retirement and do justice to the employees of the Government of Puerto Rico who entered the System under Law No. 447 of May 15, 1951, as amended, prior to April 1, 1990, or that having started to work for the Government of Puerto Rico as a temporary or irregular employee prior to said, they were unable to contribute to the System due to their employment status and after April 1, 1990, they were appointed to career service, plus they asked to pay for those prior services on or before June 30, 2013, to pay into years of service retroactively to a date prior to April 1, 1990; they have not chosen to participate in the Retirement Savings Account Program; and they have a minimum of twenty (20) years of service paid into the System as of June 30, 2017."

Law 80 (formerly SB 1616), at 7

# Act 80

- Article 4: States the agencies that can participate in IRP.

  – "(a) Participants of Law 447 of May 15, 1951, as amended, and of Law No. 1 of April 16, 1990, as amended, of all of the agencies that form part of the System will be eligible for the Incentivized Retirement Program."

  – "(b) For the Incentivized Retirement Program for participants of Law No. 1 of April 16, 1990, as amended, the following will be considered eligible: (1) those agencies that participate in an alliance contract, as defined in Law 29-2009, as amended, known as the "Public-Private Alliances Act," an operation and maintenance contract with a private operator that does not constitute a public-private alliance contract, or any legal business analogous to those established in Law 29-2009, as amended; (2) those agencies, including all of their components, subdivisions, dependencies, ascribed or affiliated entities, that have been the subject of a reorganization plan in accordance with the provisions of Law 122-2017, known as the "New Government of Puerto Rico Act": and (3) public corporations and municipalities. Other agencies that comply with these parameters in the future must submit an application to the Administrator who must approve or reject the same taking into consideration the fiscal reality and need for services of the entity."

Law 80 (formerly SB 1616), at 7-8

# Act 80

- Article 5: States the employees eligible to participate in IRP.

- Article 7: Lists the increased pension benefits that participants are entitled to:

  - (a)(1) and (b)(1): "[a] lifetime retirement pension equivalent to fifty percent (50%) of the compensation equivalent" to the highest annual gross compensation "accrued in any of the last three (3) years prior to the moment" they availed themselves of the IRP.
    - This raises benefits from a range of 29-40% to 50% (all numbers are dependent on when a participant entered ERS and their age at retirement)

  - (a)(2) and (b)(2): "[a]n employer contribution of one hundred dollars ($100) per month to the health insurance plan chosen by the participant" until the participant reaches sixty-two years old.

Law 80 (formerly SB 1616), at 10

# Act 80

- Article 9: Does not require agencies to eliminate the positions necessary to make Act 80 revenue-neutral

    - (a) "The positions that remain vacant in the agencies as a result of the implementation of the Program will be frozen, unless the OGP or the Judiciary, as the case may be, authorizes otherwise by express order to that effect. Positions appointed by the Governor will not be eliminated."

    - (b): "those vacant positions that are determined to provide essential services for the operation of the agency may be filled."

    - (c): "Each agency will establish through an internal procedure in their Retirement Plan the criteria for defining what are considered essential public services for the purposes of this Law."

Law 80 (formerly SB 1616), at 12

# Act 81

- AAFAF admits that Act 81 also increases retirement benefits: Lists the increased pension benefits that participants are entitled to:

  - "11. Act 81 ensures a dignified retirement for Puerto Rico's police officers, firefighters, and correctional officers. When these individuals began serving the public, they were promised a pension equal to 75% of their salaries upon turning 55 years old, provided they served for 30 years. See Act 81, Statement of Motives at 1–3. Over the years, police officers, firefighters, and correctional officers saw their pension benefits decrease to 30% of their salary upon reaching retirement age. See id., Statement of Motives at 3."

  - "12. To address these inequities, Act 81-2020 allows police officers, firefighters, and correctional officers that have worked for at 30 years the option to retire: (i) at 55 with a pension equal to 50% of their salary at retirement; or (ii) at 58 with a pension equal to 55% of their salary at retirement. See id. § 2.5 Moreover, Act 81-2020 provides retirees with a lifetime monthly employer contribution of $100 to the health insurance plan of their choosing. See id. § 2(v); Statement of Motives at 4."

AAFAF Objection [ECF No. 19319] page 6

149

# Act 81

- **Section 2:** Increases benefits for public emergency employees (Police, Firefighters, Corrections officers, EMTs)
  - Raises pensions from a range of 29-40% to 45-55% (all numbers are dependent on when a participant entered ERS and their age at retirement)
    - "(i) In the case of the members of the Police, the members of the Firefighters Corps Bureau, the members of the Custodial Officers Corps, and the Emergency Medical Technicians, commonly known as paramedics, of the Medical Emergencies Corps Bureau, and of the Municipal Medical Emergencies System, including those ascribed to the Offices for Emergency Management who have reached the age of fifty-five (55), who entered the System prior to April 1, 1990, they will be entitled to receive a pension equal to fifty percent (50%) of the salary earned by the police [sic] at the time of their retirement."
    - "(ii) In the case of the members of the Police, the members of the Firefighters Corps Bureau, the members of the Custodial Officers Corps, and the Emergency Medical Technicians, commonly known as paramedics, of the Medical Emergencies Corps Bureau, and of the Municipal Medical Emergencies System, including those ascribed to the Offices for Emergency Management who remain in service until they have reached the age of fifty-eight (58), who entered the System prior to April 1, 1990, they will be entitled to receive a pension equal to fifty-five percent (55%) of the salary earned at the time of their retirement.
    - (iii) In the case of the members of the Police, the members of the Firefighters Corps Bureau, the members of the Custodial Officers Corps, and the Emergency Medical Technicians, commonly known as paramedics, of the Medical Emergencies Corps Bureau, and of the Municipal Medical Emergencies System, including those ascribed to the Offices for Emergency Management who have reached the age of fifty-five (55), who entered the System between April 1, 1990, and December 31, 1999, they will be entitled to receive a pension equal to forty-five percent (45%) of the salary earned at the time of their retirement.
    - (iv) In the case of the members of the Police, the members of the Firefighters Corps Bureau, the members of the Custodial Officers Corps, and the Emergency Medical Technicians, commonly known as paramedics, of the Medical Emergencies Corps Bureau, and of the Municipal Medical Emergencies System, including those ascribed to the Offices for Emergency Management who remain in service until they have reached the age of fifty-eight (58), who entered the System between April 1, 1990, and December 31, 1999, they will be entitled to receive a pension equal to fifty percent (50%) of the salary earned at the time of their retirement."

Law 81 (formerly SB 1623), at 4-5

150

# Act 81

- **Section 2:** Increases benefits for public emergency employees (Police, Firefighters, Corrections officers, EMTs)
  - Participants also receive a lifetime employer contribution of $100 per month to their chosen health-insurance plan
    - "(v) Any members of the Police, the members of the Firefighters Corps Bureau, the members of the Custodial Officers Corps, and the Emergency Medical Technicians, commonly known as paramedics, of the Medical Emergencies Corps Bureau, and of the Municipal Medical Emergencies System, including those ascribed to the Offices for Emergency Management who retire under the provisions of this subsection, will be entitled to a lifetime employer contribution of one hundred dollars ($100) per month to the health insurance plan chosen by the participant pursuant to Law No. 95 of June 29, 1963, as amended, known as the "Public Employees Health Benefits Act" or any other Law that is created in the future to those ends."

Law 81 (formerly SB 1623), at 5-6

# Act 81

- Section 4:

  – "The funds necessary to comply with this Law will come from the General Fund from the payroll savings generated pursuant to the enactment hereof."

  – It is not established that the payroll savings will be enough to cover the increased benefits and the law has no contingency for that scenario

  Law 81 (formerly SB 1623), at 6

# Act 82

- AAFAF also admits that Act 82 increases teachers' retirement benefits:

  - "Act 26-2017, as amended, implemented several measures that affected teachers who were close to retiring, such as eliminating payment on account of unused accrued sick leave in excess of statutory limits. See Act 82, Statement of Motives at 1. In order to remedy this benefit reduction and avoid incremental welfare program costs, Act 82 allows teachers to have their unused sick leave and vacation time credited as time worked for retirement age purposes. See id. § 2.11."

  AAFAF Objection [ECF No. 19319] at 6-7

# Act 82

- ## Section 1:

  – "To amend Article 2.11 of Law 26-2017, as amended, known as the "Compliance with the Fiscal Plan Act," to read as follows:

  – "Article 2.11.- Final liquidation of vacation leave and/or sick leave accrued in the event of the employee's separation from public service:

  – As of the effective date of this Law, any public employee, whether unionized or not, will only be entitled to the payment of a final liquidation of the days that he/she has available for vacation leave at the time of cessation of services, which may never be more than sixty (60) days. The employee may authorize having said balance and/or excess that pre-exists the enactment of this Law be destined to the Retirement System so that it is taken into account as time worked. In the case of employees participants in the Teachers' Retirement System, they may authorize that the pre-existing balance and/or excess sick leave be taken into account as time worked, after having used the totality of the available balance of vacation leave for these purposes.""

  Law 82 (formerly SB 1432), at 2

# C) Consistency



PROMESA § 314(b)(7) requires the Plan be "consistent" with the Fiscal Plan

- "Consistent" does not mean identical. It means:

103.   Section 314(b)(7) of PROMESA requires a plan of adjustment to be consistent with the applicable fiscal plan as certified by the Oversight Board pursuant to Title II.  Upon review of both the Plan (Debtors' Ex. 1 [ECF No. 18785-1]) and the 2021 Commonwealth Fiscal Plan (Debtors' Ex. 10 [ECF No. 18785-10]), I believe that the Plan is consistent with the 2021 Commonwealth Fiscal Plan. Nothing contained in the Plan would violate or otherwise interfere with the 2021 Commonwealth Fiscal Plan.  An objector has asserted the Plan is inconsistent with

Jaresko Declaration [ECF No. 19054-4] ¶ 103

62.   In this context, consistency means that there are no material provisions in the Plan relating to the three categories of focus that conflict with the 2021 CFP, and vice versa.  It does not mean that all provisions in the Plan and the 2021 CFP are necessarily identical.  Provisions may not be identical, among other reasons, because there are timing differences relating to when the 2021 CFP and the Plan were each finalized.[96]  In addition, negotiations with stakeholders have been ongoing, and the results of all negotiations were not necessarily known as of the time the 2021 CFP was certified.  For instance the results of negotiations relating to collective bargaining agreements were not known as of the date of certification.  I have been asked by counsel to assume that a modified fiscal plan will be issued that will address the results of these later negotiations.

Report of M. Murray [Debtors' Ex. 112, ECF No. 18803-22] ¶ 62

155

# C) Consistency

- The Plan is consistent with the Fiscal Plan because the debt service in the Plan is within the bounds of the debt range set by the Fiscal Plan's Debt Sustainability Analysis.

- The DSA provides a framework for assessing the long-term capacity for the Commonwealth to pay debt service and to ensure that debt levels post-restructuring are sustainable.

  – The 2021 Certified Fiscal Plan's Debt Sustainability Analysis provides an assessment of what debt levels are sustainable in light of long-term projections and other general resources, net of obligations that are self-supporting.

EXHIBIT 35: IMPLIED DEBT CAPACITY BASED ON RANGE OF INTEREST RATES AND RISK FACTORS

Implied debt capacity based on range of interest rates and contingency, $M

Sensitivity Analysis:  Implied Debt Capacity at 20% contingency

| Illustrative Cash Flow Available | | $200 | $400 | $600 | $800 |
|---|---|---|---|---|---|
| Sensitivity Analysis: PV Rates % | 4.0% | $2,500 | $4,999 | $7,499 | $9,998 |
| | 5.0% | 2,255 | 4,510 | 6,765 | 9,020 |
| | 6.0% | 2,045 | 4,091 | 6,136 | 8,181 |

Sensitivity Analysis:  Implied Debt Capacity at 5% PV Rate

| Illustrative Cash Flow Available | | $200 | $400 | $600 | $800 |
|---|---|---|---|---|---|
| Sensitivity Analysis: % Contingency | 10.0% | $2,537 | $5,074 | $7,611 | $10,148 |
| | 20.0% | 2,255 | 4,510 | 6,765 | 9,020 |
| | 30.0% | 1,973 | 3,946 | 5,919 | 7,893 |

2021 Certified Fiscal Plan (Debtors' Exhibit 10), page 70

156

# C) Consistency

- The aggregate original principal amount and total debt service falls within the bounds of the debt range implied by the DSA.

> 57.    I have reviewed the Commonwealth's Fiscal Plans, including the most recent Fiscal
> Plan certified by the Oversight Board on April 23, 2021 (the "2021 Fiscal Plan"). Debtors' Ex. 10
> [ECF No. 18785-10].  It is my understanding based on this review that the 2021 Fiscal Plan
> provides a blue print for the Commonwealth to achieve, among other things, fiscal responsibility
> and access to capital markets. *See id.* The 2021 Fiscal Plan contains a debt sustainability analysis
> ("DSA"), which creates a range established by the Oversight Board as the amount of debt and
> long-term capacity of the Government to pay debt service on its debt. *Id.* Per my understanding
> of the 2021 Fiscal Plan, which contains the DSA, the aggregate original principal amount and Total
> Debt Service of the New GO Debt and COFINA debt falls within the bounds of the debt range
> implied by the DSA.

Zelin Declaration [ECF No. 19054-10] ¶ 57

# C) Consistency

- Marti Murray's report also demonstrated that the Plan's debt levels were consistent with the Fiscal Plan.

81. The Plan includes a schedule of annual debt service payments that are applicable post-restructuring.[121]  I considered the debt service schedules provided for under the Plan and evaluated the resulting debt service in light of the metrics contained in the DSA.  I have compared Puerto Rico's metrics to the table contained in Exhibit 30 of the 2021 CFP, which shows key debt ratios for U.S. states as ranked by Moody's.[122]  As indicated in the tables below, based upon the Commonwealth's restructured post-confirmation debt as provided in the Plan, Puerto Rico's debt sustainability metrics will be more in line with, or even compare favorably to, U.S. states that currently are rated Investment Grade ("Investment Grade") by three major credit ratings agencies.[123]

**TABLE 7: MOODY'S KEY DEBT RATIOS FOR U.S. STATES – RANKING OF DEBT SERVICE AS A PERCENT OF OWN-SOURCE REVENUES FOR U.S. STATES AS SHOWN IN THE DSA**

|  | | Debt Service, % of Own-Source Revenues [A] | Fitch [B] | Moody's [C] | S&P [D] |
|---|---|---|---|---|---|
| 1 | Connecticut | 14.7% | AA- | Aa3 | A+ |
| 2 | Massachusetts | 10.5% | AA+ | Aa1 | AA |
| 3 | Hawaii | 9.8% | AA | Aa2 | AA+ |
| 4 | New Jersey | 9.6% | A- | A3 | BBB+ |
| 5 | Kentucky | 9.3% | AA- | Aa3 | A |
| 6 | Illinois | 9.0% | BBB- | Baa3 | BBB |
| 7 | New York | 7.5% | AA+ | Aa2 | AA+ |
| 8 | Washington | 7.3% | AA+ | Aaa | AA+ |
| 9 | Maryland | 6.8% | AAA | Aaa | AAA |
| 10 | Mississippi | 6.4% | AA | Aa2 | AA |
| | ... | | | | |
| **16** | **Puerto Rico under Plan*** | **4.9%** | | | |
| | | | | | |
| | Average of Lowest 10 States | 0.9% | | | |
| | Average of Lowest 25 States | 2.1% | | | |
| | Average of All States | 4.3% | | | |
| | Average of Highest 25 States | 6.5% | | | |
| | Average of Highest 10 States | 9.2% | | | |
| | **Puerto Rico without Plan**** | **10.6%** | | | |

Report of M. Murray (Debtors' Ex. 112) [ECF No. 18803-22] ¶ 81, Table 7

# C) Consistency

- The Plan is also consistent with the Fiscal Plan because it leaves Debtors "with a level of cash that is consistent with the cash necessary to implement undertakings referenced in the 2021 Certified Fiscal Plan."

Report of M. Murray (Debtors' Ex. 112) [ECF No. 18803-22] ¶ 65
*See also* Report of M. Murray (Debtors' Ex. 112) [ECF No. 18803-22] ¶¶ 64, 66-68
(the Sources and Uses of Funds Analysis $1.2 billion payment for System 2000 participants and $390 million emergency reserve, both of which are consistent with the Certified Fiscal Plan).

# C) Consistency

- As explained in Juan Santambrogio's Supplemental Declaration [ECF No. 19060], this is true even after the implementation of Act 53 and elimination of the Monthly Benefit Modification¶ 11.

### Revised funding mechanism for Pension Reserve Trust

> 10. Based on the current Fiscal Plan's projections (Debtors' Exhibit 10) [ECF No. 18785-10], the Commonwealth contributions to the Pension Reserve Trust are estimated to total approximately $2.4 billion during the ten years of funding, all of which will be paid during the time period in which the current Fiscal Plan projects the Commonwealth to have primary surpluses. Fiscal Plan, Exh. 25 at 59 (Debtors' Exhibit 10) [ECF No. 18785-10]. Based on the Oversight Board's assumed annual return on investment for the Pension Reserve Trust of 4.5%, the Oversight Board estimates that the balance of the Pension Reserve Trust will total approximately $3.1 billion by the end of Fiscal Year 2031. The Pension Reserve Trust is designed to protect future pension benefits regardless of the future economic or political circumstances of the Commonwealth. These circumstances include the deficits currently projected under the Fiscal Plan.

### Modification of AFSCME settlement to include $2,000 Upside Participation Bonus "would only have an incremental cost."

> 11. Finally, the Plan modifies the Seventh Amended Plan to provide the Upside Participation Bonus under the AFSCME settlement described in Exhibit G to the Plan will be a minimum of $2,000 for each AFSCME-represented employee during the five-year term of the new AFSCME CBA. The Oversight Board estimates the additional cost of this modification to be approximately $18.3 million per year for five years beginning in FY2022. This modification would only have an incremental cost as compared to the Upside Participation Bonus contemplated in the Seventh Amended Plan if the Excess Cash Surplus formula for the payment of the Upside Participation Bonus does not result in a bonus at this amount or higher in any given year. *See* Plan at p. G-16.

Santambrogio Supplemental Declaration [ECF No. 19060] ¶¶ 10-11

# C) Consistency

- The Plan's treatment of pensions is consistent with the Fiscal Plan – notwithstanding the enactment of Act 53.

  - Elimination of the monthly benefit modification does not render the Plan inconsistent with the Fiscal Plan.

  - Increased funding of the Pension Reserve Trust to pay for the increased pension expenditures arising due to elimination of Monthly Benefit Modification.

> 12.    Over the past several years, the Oversight Board has certified fiscal plans setting forth initiatives and reforms the Commonwealth and its agencies and instrumentalities must adopt to enable fiscal responsibility, to reduce Commonwealth spending while ensuring more efficient government services for the residents of the Island, to promote economic growth, and set Puerto Rico back on the path to prosperity.  No solution to the Commonwealth's financial condition would be complete without addressing Puerto Rico's unsustainable debt burden.  Accordingly, in 2017, the Oversight Board commenced Title III cases for the Commonwealth (the "Commonwealth Title III Case"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), ERS (the "ERS Title III Case"), the Puerto Rico Highways and Transportation Authority ("HTA" and the "HTA Title III Case"), and the Puerto Rico Electric Power Authority ("PREPA"), and in 2019, for PBA (the "PBA Title III Case," and together with the Commonwealth Title III Case and the ERS Title III Case, the "Debtors' Title III Cases").

Jaresko Declaration [ECF No. 19054-4] ¶ 12

161

# C) Consistency

- The Plan maintains the Pension Freeze and the elimination of COLAs – if it had not, then they would not be consistent.

> "If the Plan were modified to remove the (i) Pension Freeze and (ii) the elimination of COLAs, the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze and the elimination of COLAs."

Jaresko Supplemental Declaration [ECF No. 19058]  ¶ 13

# C) Consistency

- Mr. Hein's objection that the Plan is inconsistent with the Fiscal Plan because the Fiscal Plan does not account for elimination or increased funding of the Pension Reserve Trust is mistaken, because the Pension Reserve Trust is largely paid for in surpluses.

  - Jaresko Declaration [ECF No. 19054-4] ¶ 103 – The Pension Reserve Trust does not add additional obligations to the Commonwealth, because it merely provides a source of payment of pension obligations to be funded with surpluses projected under the Fiscal Plan.

  - Jaresko Supplemental Declaration [ECF No. 19058] ¶ 9 – The Oversight Board determined "that it is necessary and fiscally responsible to set aside additional funds in the Pension Reserve Trust, if surplus projections enable them, to ensure there is adequate funding to cover these increased costs [from the elimination of the monthly benefit modification]."

# C) Consistency

- Other aspects of treatment of pensions are consistent with Fiscal Plan. For example:

  – Expanded social security benefits for certain TRS and JRS members, which are accounted for in the 2021 Certified Fiscal Plan. Murray Report (Debtors' Ex. 112) [ECF No. 18803-22]

# D) Feasibility



The Court must, in the course of determining feasibility, evaluate whether it is probable that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality.

*In re Mount Carbon Metro. Dist.*,
242 B.R. 18, 34-35 (Bankr. D. Colo. 1999).

165

# D) Feasibility

- The Plan significantly reduces outstanding debt.

> 31.    After confirmation, the Commonwealth's general obligation and guaranteed debt
> will be approximately $7.4 billion, considerably lower than $30.5 billion pre-restructuring.  The
> Plan also resolves claims against the Commonwealth from holders of HTA, PRIFA, and CCDA
> claims (although HTA's debt will be restructured according to a separate plan of adjustment for
> HTA, which has not yet been filed).  ERS debt will be completely eliminated, and all pre-petition
> general unsecured claims will be paid.  Post confirmation, debt service is significantly lower than

Malhotra Declaration [ECF No. 19054-6] ¶ 31

166

# The CW will have sufficient surplus to meet its obligations.

- With the elimination of the Monthly Benefit Mitigation and the cost of Act 53, deficits are projected in FY23, 24, and 25, but those deficits are surmountable out of current expected surplus.



Debtors' Ex. 30, page 3



Malhotra Supplemental Declaration
[ECF No. 19057] Ex. 1

167

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – The Plan and Fiscal Plan are designed to mitigate against potential Commonwealth underperformance.

  – **Pension Reserve Trust:** The Pension Reserve Trust is funded in early years, with an increase in contributions after elimination of the Monthly Benefit Modification to ensure adequate funding.  As a result, the Pension Reserve Trust is projected to have a balance of $3.1 billion through the end of FY31

    – "the Commonwealth will make annual contributions to the Pension Reserve Trust from the Commonwealth General Fund for ten (10) Fiscal Years beginning in the Fiscal Year in which the Effective Date occurs, in an amount no less than $175 million per year (the "Base Contribution")," and in higher amounts if surplus exceeds a certain threshold;   Malhotra Supp. Declaration [ECF No. 19057] ¶ 12

    – "Based on the Oversight Board's assumed annual return on investment for the Pension Reserve Trust of 4.5%, the Oversight Board estimates that the balance of the Pension Reserve Trust will total approximately $3.1 billion through the end of fiscal year 2031."  Malhotra Supp. Declaration [ECF No. 19057] ¶ 14

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – The Plan and Fiscal Plan are designed to mitigate against potential Commonwealth underperformance.

  – **CVI:** The CVIs are designed to try to protect the Commonwealth from the need to make substantial payments in years of underperformance.

    – "Structuring the CVIs in this manner is designed to protect the Commonwealth from having to make substantial CVI payouts when, for example, it experiences one year of outperformance after experiencing several years of underperformance." Malhotra Declaration [ECF No. 19054-6] ¶ 37

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – The Plan and Fiscal Plan are designed to mitigate against potential Commonwealth underperformance.

  – **Debt Management Policy:** The Plan incorporates a Debt Management Policy and a Comprehensive Cap on Net Tax-Supported Debt, both of which are designed to reduce the risk of future default.

    – "The Comprehensive Cap therefore limits the Commonwealth's future ability to borrow, which is designed to reduce risk by ensuring debt service is affordable in relation to revenue levels, while providing some flexibility for potential future debt issuances. . . . The Plan also requires the Commonwealth to "maintain and comply with a Debt Management Policy designed to ensure that certain past debt issuance practices of the Commonwealth are not repeated. . . . Together, the Comprehensive Cap and the Debt Management Policy are designed to limit the Commonwealth's ability to engage in financial practices such as "scoop and toss" borrowing, even in the event projected deficits materialize.")
    Malhotra Declaration [ECF No. 19054-6] ¶ 38

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – The Plan and Fiscal Plan are designed to mitigate against potential Commonwealth underperformance.

  – The Commonwealth will retain an unrestricted minimum cash balance of $1 billion.

    Q.  And you mentioned this in response to Mr. Hein's questions about the minimum - - the range of the 1.2 to 1.7 billion dollar minimum cash reserve.  Is there a line in that box that represents the Oversight Board's current thinking or current setting of that minimum cash reserve?

    A.  Yes, there is.

    Q.  And which line is that?

    A.  I believe it's the fourth line down. The Oversight Board ultimately determined in their judgment that one billion dollars would be sufficient minimum cash."

Chepenik Testimony, 11.12.21 Tr. 50:3-13

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – The Plan and Fiscal Plan are designed to mitigate against potential Commonwealth underperformance.

  – The Commonwealth will also fund an emergency reserve.

    – "In line with International Monetary Fund guidance, the Oversight Board's yearly certified fiscal plans for the Commonwealth (starting in 2018) provide the Commonwealth will set aside $130 million annually for a period of ten years into an Emergency Reserve until the reserve balance reaches $1.3 billion, or 2% of Puerto Rico's fiscal year 2018 Gross National Product."
    Malhotra Declaration [ECF No. 19054-6] ¶ 51

    – Section 74.5 of the Plan provides for the "adoption and maintenance of a debt management policy 'designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated.'"
    Jaresko Declaration [ECF No. 19054-4] ¶ 67(d)

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – Structural reforms available could generate $32.4B in cumulative surpluses for FY22-FY46.

  – "As shown in Appendix 6, if the three areas of Category 2 and 3 reforms described above are adopted by the Commonwealth, then for every year addressed in the Plan there would be ample surpluses to cover debt service. Cumulatively, the Commonwealth will build surpluses that total $32.4 billion over the period FY2022-FY2046, well above the cumulative debt service over that same period of $10.9 billion as provided for in the Plan. Such buffers provide protection in the event that some of the reforms are implemented with a delay or not at all. Each individual structural reform proposal has an important impact, but as can be seen in Appendix 7, Table 3, the impact of any one reform is less than the cumulative surplus after debt service." Wolfe Report (Debtors' Exhibit 111) ¶ 27

  – "Based on Dr. Wolfe's analysis, then, implementation of the Category 2 and 3 reforms described in his report would not only reverse the Commonwealth's projected deficits, but would provide sufficient cumulative surpluses to enable the Commonwealth to pay the debt service contemplated by the Plan." Malhotra Declaration [ECF No. 19054-6] ¶ 43

173

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – Elimination of the Monthly Benefit Modification does not materially affect this analysis, because it increases costs by a known amount, and about half of those costs will be incurred when there are surpluses.

  – "Over the thirty-year period of the Fiscal Plan projections, the aggregate cost of eliminating the Monthly Benefit Modification is approximately $1.9 billion, see Levy Declaration [ECF No. 18737] ¶ 54, with an overall average annual cost increase of approximately $66 million over the 29 years in which the Monthly Benefit Modification was reflected in the Fiscal Plan. Therefore, the cost of eliminating the Monthly Benefit Modification is known and about half of the cost will be incurred during a period of primary surpluses."
  Malhotra Supp. Declaration [ECF No. 19057] ¶ 9

## The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.
  - While elimination of the Monthly Benefit Modification may accelerate deficits projected in the Fiscal Plan to occur in FY2035, the Commonwealth has tools at its disposal to mitigate those deficits.

  - "The elimination of the Monthly Benefit Modification could have the effect of accelerating projected deficits in the later years. That effect can be mitigated if incremental structural reforms are adopted by the Commonwealth government."
    Malhotra Supp. Declaration [ECF No. 19057] ¶ 9

# The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  - Additional federal Medicaid funding could be made available for Puerto Rico.

  - "However, this additional federal funding, if it materializes, could increase available cumulative surplus starting in FY 2022."
    Malhotra Declaration [ECF No. 19054-6] ¶ 47

## The CW will have sufficient surplus to meet its obligations.

- Although deficits are projected to reemerge in outyears, those deficits are also likely surmountable.

  – The *Vaello Madero* case currently pending before the Supreme Court could result in additional SSI funding for Puerto Rico.

  – "However, if Congress were obligated to provide Supplemental Security Income to residents of Puerto Rico, that additional federal funding could further increase the Commonwealth's economic activity."
  Malhotra Declaration [ECF No. 19054-6] ¶ 48

# The CW will have sufficient surplus to meet its obligations.

- Marti Murray's opinion corroborates the Plan's feasibility.  She concluded the Plan is feasible because it accounts for the Debtors' up-front cash need, will not require new borrowings, and provides sustainable debt levels.

- The Commonwealth will have cash sufficient to implement its undertakings in the Plan.
  - "The sources and uses of funds analysis prepared in connection with the Debtors' planned emergence from the Title III cases (the 'Sources and Uses of Funds Analysis') indicates that the Debtors will emerge with a level of cash that is consistent with the cash necessary to implement undertakings referenced in the 2021 Certified Fiscal Plan, including the System 2000 settlement, and the provision in the 2021 CFP requiring that funds be set aside for an emergency reserve." Murray Report (Debtors' Ex. 112) ¶ 65

# The CW will have sufficient surplus to meet its obligations.

- Marti Murray's opinion corroborates the Plan's feasibility.  She concluded the Plan is feasible because it accounts for the Debtors' up-front cash need, will not require new borrowings, and provides sustainable debt levels.

- The debt to be issued under the Plan is consistent with the Oversight Board's debt sustainability analysis.

  - "I have evaluated whether the debt proposed to be issued under the Plan is consistent with the DSA incorporated into the 2021 CFP. I conclude that it is. This conclusion is based upon my review of both the amount and terms of the to-be issued debt, as compared to the Debt Sustainability Analysis incorporated into the 2021 CFP."
    Murray Report (Debtors' Exhibit 112) ¶ 72

# The CW will have sufficient surplus to meet its obligations.

- Marti Murray's opinion corroborates the Plan's feasibility.  She concluded the Plan is feasible because it accounts for the Debtors' up-front cash need, will not require new borrowings, and provides sustainable debt levels.

  - "The 2021 CFP does not show a need for any additional borrowings. After incorporating noncontingent Plan debt service, the 2021 CFP also shows no deficit after debt service until 2034. In the meantime, under the Plan the Commonwealth is permitted to refinance existing debt as long as it does not result in higher principal and interest payments, with the exception of debt issued in response to natural disasters, in which case the annual debt service due can increase by up to 10% in any given year. Therefore, the Commonwealth does not need to incur additional debt in order to carry out the 2021 CFP, and the Plan borrowing restrictions will thus not interfere with implementation of the 2021 CFP."
  Murray Report (Debtors' Exhibit 112) ¶ 102

# Elimination of the COLA and the freeze, however, could render the Plan infeasible.

17.     The financial impact associated with eliminating the Pension Freeze and reinstating COLAs adds risk to the Commonwealth's long-term fiscal stability.   Specifically, the PayGo

* * *

that fiscal plan model by approximately $240 million over 30 years. Unlike the elimination of the Monthly Benefit Modification, the incremental cost of which decreases as the Commonwealth approaches the deficits projected by the Fiscal Plan, the incremental costs associated with eliminating the Pension Freeze and reinstating any COLAs are projected to grow larger as the Commonwealth approaches the deficits projected by the Fiscal Plan, thus running the risk that the Plan may not be feasible.

Malhotra Supp. Declaration [ECF No. 19057] ¶ 17

13.     Unlike the elimination of the Monthly Benefit Modification, if the Plan were modified to remove the (i) Pension Freeze and (ii) the elimination of COLAs, the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze and the elimination of COLAs, and in my view, the Plan would be at risk of not being feasible or capable of being implemented. To avoid creating unsustainable future pension liabilities and to ensure adequate

Jaresko Supp. Declaration [ECF No. 19058] ¶ 13

# The Plan is feasible as to ERS because ERS will no longer have any ongoing obligations or expenditures.

- ERS's assets are being sold in exchange for $373 million and the agreement to backstop the purchase of the ERS Private Equity Portfolio for $70,750,000. Jaresko Declaration [ECF No. 19054-4] ¶ 98

- ERS's obligations include distributing the $373 million in cash received from the Commonwealth to the holders of Allowed ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in a de minimis amount. Jaresko Declaration [ECF No. 19054-4] ¶ 98

- Because ERS will have "no material obligations after the Effective Date," the risk of ERS needing further restructuring is "nil."
  Jaresko Declaration [ECF No. 19054-4] ¶ 99

Jaresko Amended Decl. ¶ ¶ 98-99

# The Plan is feasible as to ERS because ERS will no longer have any ongoing obligations or expenditures.

- PBA's cash will be sufficient to cover all of its debts to creditors under the Plan including the Claims on account of loans made by GDB to PBA (the "DRA Loan Claims"). Jaresko Declaration [ECF No. 19054-4] ¶ 100

- Furthermore, I understand the Plan will be amended to provide for the rejection, as of the Effective Date, of all leases and subleases of PBA's properties to departments, agencies,  instrumentalities, authorities, public corporations, and municipalities of the Commonwealth (the "PBA Leases"), subject to the execution of a master lease with the Commonwealth which shall provide for lease payments in exchange for the use and occupancy of leased premises in an amount necessary to satisfy its obligations on a going-forward basis. Jaresko Declaration [ECF No. 19054-4] ¶ 100



# Confirmation
# of Title III Plan of Adjustment
# for the Commonwealth of Puerto Rico,
# Puerto Rico Public Buildings Authority,
# and Employees Retirement System of
# the Government of the Commonwealth
# of Puerto Rico

CLOSING ARGUMENT
November 22, 2021