# United States Court of Appeals
## For the First Circuit

───────────────

No. 07-2240

VAQUERÍA TRES MONJITAS, INC.; SUIZA DAIRY, INC.,
Plaintiffs, Appellees,

v.

CYNDIA E. IRIZARRY, in her official capacity as
Administrator of the Office of the Milk Industry Regulatory
Administration for the Commonwealth of Puerto Rico,
Defendant, Appellant,

JOSÉ O. FABRE-LABOY, in his official capacity as Secretary
of the Department of Agriculture of the Commonwealth of
Puerto Rico; INDUSTRIA LECHERA DE PUERTO RICO, INC. (INDULAC),
PUERTO RICO DAIRY FARMERS ASSOCIATION,
Defendants.

───────────────

No. 07-2369

VAQUERÍA TRES MONJITAS, INC.; SUIZA DAIRY, INC.,
Plaintiffs, Appellees,

v.

JAIME RIVERA-AQUINO, in his official capacity as Secretary
of the Department of Agriculture of the Commonwealth of
Puerto Rico;
Defendant, Appellant,

INDUSTRIA LECHERA DE PUERTO RICO, INC. (INDULAC);
PUERTO RICO DAIRY FARMERS ASSOCIATION; CYNDIA E. IRIZARRY,
in her official capacity as Administrator of the Office
of the Milk Industry Regulatory Administration for the
Commonwealth of Puerto Rico,
Defendants.

───────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Daniel R. Domínguez, U.S. District Judge]

---

Before

Torruella, Lipez, and Howard,
Circuit Judges.

---

    Edward W. Hill-Tollinche, with whom Quiñones & Sánchez, P.S.C., Yassmin González-Vélez, and Juan Carlos Ramírez-Ramos, were on brief for appellants.
    Rafael Escalera-Rodríguez, with whom Reichard & Escalera, Carmen Alfonso-Rodríguez, and Amelia Caicedo-Santiago, were on brief for appellee Suiza Dairy, Inc.
    José R. Lázaro-Paoli, José R. Lázaro-Paoli Law Offices, Enrique Nassar-Rizek, Maxine M. Brown-Vázquez, and ENR & Associates, on brief for appellee Vaquería Tres Monjitas, Inc.

---

November 23, 2009

---

**TORRUELLA**, <u>**Circuit Judge**</u>.   This is an appeal from a preliminary injunction issued by the United States District Court for the District of Puerto Rico against the Milk Industry Regulation Administration for the Commonwealth of Puerto Rico ("ORIL" by its Spanish acronym), a sub-entity of the Department of Agriculture charged with regulating Puerto Rico's milk industry, and the Commissioners thereof.  Plaintiffs, fresh milk processors in the Commonwealth, filed suit in federal court under 42 U.S.C. § 1983 and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, alleging that ORIL's regulatory scheme governing milk prices violates the Due Process, Equal Protection, Takings, and dormant Commerce Clauses, and seeking an order pursuant to Fed. R. Civ. P. 65(a) enjoining the Administrator of ORIL from continuing to implement the challenged regulatory provisions.  Finding a likelihood of success on the merits of plaintiffs' constitutional claims, the district court preliminarily enjoined the regulatory scheme.

On appeal, in addition to challenging the merits of the district court's preliminary injunction ruling, Defendants-Appellants argue that the district court's actions were barred by the <u>Burford</u> Abstention doctrine, the Eleventh Amendment, and by various equitable defenses.

After careful consideration, we affirm.

-3-

## I. **Background**

### A. **Factual Background**[1]

#### 1. **Parties**

Plaintiffs-Appellees Vaquería Tres Monjitas ("Tres Monjitas") and Suiza Dairy, Inc. ("Suiza") are fresh milk processors in the Commonwealth of Puerto Rico (collectively "the processors"). Their business consists of purchasing raw milk from local dairy farmers and converting it into drinkable fresh milk, which they then sell to consumers. Plaintiffs are the only fresh milk processors in Puerto Rico. Tres Monjitas holds a market share of 34.7%, and Suiza holds a 65.3% share. As milk processors, plaintiffs fall under Puerto Rico's regulatory structure for milk and milk products.

Defendant-Appellant Cyndia E. Irizarry[2] ("Administrator") is being sued in her official capacity as the current Administrator of ORIL, which is the entity responsible for creating and

---

[1]  These facts are drawn from the findings made by the district court as set forth in its amended opinion and order granting preliminary injunction after fifty-one days of hearings between February 2005 and August 2006. Defendants do not challenge the district court's factual determinations on appeal. Vaquería Tres Monjitas, Inc. v. Fabre Laboy, No. 04-1840, slip op. at 7-44 (D.P.R. July 13, 2007).

[2]  Previous pleadings refer to Juan R. Pedro-Gordian, who was the Administrator at the time when they were filed. "[W]hen officials sued in [their official] capacity in federal court die or leave office, their successors automatically assume roles in the litigation." Hafer v. Melo, 502 U.S. 21, 25 (1991); see Fed. R. Civ. P. 25(d)(1).

-4-

administering the Commonwealth's milk regulatory structure.  ORIL
is a subdivision of the Commonwealth's Department of Agriculture,
whose current Secretary, Jaime Rivera-Aquino,[3] is also a named
defendant in his official capacity.

Defendant Industria Lechera de Puerto Rico, Inc.
("Indulac") was joined to the litigation after its inception.
Indulac is owned and operated by Fondo de Fomento de la Industrial
Lechera ("FFIL" or "the Fund"), an entity created pursuant to the
Milk Industry Regulation Act, Act No. 34 of June 11, 1957 ("Act
34") to promote Puerto Rico's milk industry.  5 P.R. Laws Ann.
§§ 1092-1125 (2005 & Supp. 2008).  Indulac is the sole entity in
Puerto Rico authorized to process ultra high temperature milk ("UHT
milk"), a type of milk that does not require refrigeration prior to
opening and competes directly with the fresh milk produced by Tres
Monjitas and Suiza.

The Administrator of ORIL, who is statutorily empowered
to regulate the milk market, is also chairman of the board of FFIL,
the government entity which owns Indulac.  5 P.R. Laws Ann. § 1099
(e) (2005 & Supp. 2008).  Until the milk processors filed this
suit, then-serving ORIL Administrator Pedro-Gordian also chaired
the Indulac board.  The CEOs of ORIL and FFIL are both former dairy
farmers, as is the Secretary of Agriculture.  Not only does the

---

[3]  Previous pleadings refer to José O. Fabre-Laboy, who was the
Secretary at the time when they were filed.

leadership of ORIL, FFIL, and Indulac overlap, but the three
entities also operate out of the same facility.

Also joined as a defendant was the Puerto Rico Dairy
Farmers Association ("PRDFA"), which represents 300 dairy farmers,
who are the producers of the raw milk processed by Tres Monjitas,
Suiza, and Indulac.

## 2. Background of this Litigation

This litigation arises out of a history of feuding
between dairy farmers and milk processors in Puerto Rico.  Milk
production in the Commonwealth is seasonal and heavily dependent
upon the changing temperature, leading to instability in the
seasonal yield of milk and, consequently, waste during months of
higher production. The strained relations between farmers and
processors and the difficulty of maintaining a consistent supply
led to a chaotic situation in an industry essential to the local
economy and well-being of the population.  To ease tensions between
the farmers and processors and to stabilize the disparity between
months of lean and fat milk production, Act 34, which was passed
June 11, 1957, created ORIL as a regulatory agency to oversee the
milk industry.  5 P.R. Laws Ann. § 1093 (2005 & Supp. 2008).  From
its creation, ORIL set both a maximum price for the sale of milk to
consumers and a minimum price for the purchase of raw milk from
dairy farmers by milk processors.  See 5 P.R. Laws Ann. §§ 1096(a),
1107(d) (2005 & Supp. 2008).  This means that ORIL regulated both

the cost at which milk processors Tres Monjitas and Suiza obtained their raw milk and the price at which they could sell the milk once they processed it into fresh milk.  The result of this regulatory structure was such that the price of fresh milk was kept low to make it affordable for consumers.  The price of the raw milk, however, was kept high, based on ORIL's determinations regarding the farmers' costs of production and their reasonable expectations of profits.

While processors were required to purchase all of the dairy farmers' milk, Indulac purchased from the processors any raw milk left over after the market demand for fresh milk was met (referred to as "surplus milk"), in order to avoid waste.  Under ORIL's pricing system, Indulac purchased this surplus raw milk from the processors at a price significantly below the price that the processors paid the dairy farmers for their non-surplus raw milk.[4] At first, Indulac processed the surplus raw milk that it purchased from the processors to make butter, cream, cheese, and other dairy products that did not directly compete with the fresh milk produced by plaintiffs.

---

[4] At first, Indulac paid 10 cents per quart of surplus raw milk, though it would, when it saw fit, contribute more directly to farmers.  Vaquería Tres Monjitas, No. 04-1840, at *19. In February 2006, ORIL changed this price to 32 cents.  Id. at *27.  The same order set the price milk processors paid for the raw milk at 66 cents per quart.  Id. at *30.

Trouble began around 1985, however, when Indulac began to produce UHT milk, a non-refrigerated milk substitute, which competes directly with plaintiffs' fresh milk. Essentially, by mandating that plaintiffs pay a high price for raw milk and then requiring them to sell the surplus of that same milk to Indulac at a substantially lower price, ORIL created a scheme in which Tres Monjitas and Suiza were forced to subsidize Indulac, their competitor. The district court found that, but for this ORIL-imposed subsidy from the processors, Indulac would not be able to compete with UHT milk imported into Puerto Rico from the continental United States. Thus, Indulac became dependent on this scheme. And, as the only processor authorized to produce UHT milk in Puerto Rico,[5] Indulac amassed 70% of the UHT milk market, with the other portion coming from out-of-state sources.

Moreover, unlike the other milk processors, the price at which Indulac may sell its milk to consumers is not regulated. This lack of regulation as to Indulac's retail price for milk, coupled with the relatively low price at which it could purchase surplus raw milk from plaintiffs, allowed Indulac's profit margin to soar, while the processors struggled. And, since Indulac was able to purchase its raw milk at a deflated price, UHT milk became significantly less expensive than fresh milk -- a phenomenon unique

---

[5]  Plaintiff Suiza applied for, and was denied, a license to process UHT milk itself.

-8-

to Puerto Rico -- causing Indulac's UHT milk to begin to dominate
the Puerto Rican milk market.

Aside from enjoying a near-monopoly on UHT milk, Indulac
also has broad influence over ORIL's regulatory decisions.  When,
in 2002, Indulac began to guarantee supplemental minimum payments
to farmers for raw milk, it was the Board of Indulac, and not ORIL,
which determined what were the dairy farmers' costs and what
constituted reasonable profits.[6]  And, since the Board of Indulac
consisted entirely of dairy farmers,[7] they were essentially setting
their own cost of production and margin. Even as late as February
2006, during the course of this litigation, when ORIL raised the

---

[6]  Indulac's payments to farmers became necessary to remedy the
decrease in the farmers' compensation that resulted from the
decline of the fresh milk market.  The district court explains:

When the demand for fresh milk falls, less fresh milk is
retained and less milk at the higher price went
originally into the weighted average calculation . . .
from which the farmer is paid for its raw milk. Stated
differently, a decrease in the demand of fresh milk (made
from retained milk) and an increase in the demand for UHT
(made from surplus) affected negatively the farmer's
average and now the possibility of paying the farmer at
the established level.

Vaquería Tres Monjitas, No. 04-1840, at *23.

[7]  While, initially, the Board of Indulac consisted of a mixture of
dairy farmers and milk processors, the farmers increasingly
dominated the Board until December of 2002, when its bylaws were
officially amended to exclude milk processors altogether. During
this time, ORIL's regulations were also amended to dilute the power
of milk processors on its Administrative Board.  Vaquería Tres
Monjitas, No. 04-1840, at *24-25; Act of Dec. 19, 2002, No. 278, 5
P.R. Laws Ann. 1099(e) (2005 & Supp. 2008).

price to be paid by Indulac for surplus raw milk to 32 cents per quart from 10 cents per quart, it did so using figures provided by Indulac itself. ORIL held no hearings of any kind, nor did the Administrator conduct any examination into Indulac's operations.

In addition to being forced to subsidize Indulac, Tres Monjitas and Suiza found their financial situation changing from year to year with no forewarning. The district court extensively cataloged these regulatory shifts, of which we highlight but a few. Act 34 requires ORIL to reassess its price structure on a yearly basis and to make necessary adjustments based on the cost of milk production and market demand for milk products. See 5 P.R. Laws Ann. §§ 1107(e) (2005 & Supp. 2008). Yet, ORIL employed no set standards to judge the profit margins of milk processors, nor did it publish its rules of cost analysis. ORIL failed, for instance, to adopt a consistent and scientific measurement of shrinkage, which represents the volume of milk regularly lost in the processing stage and is required for an accurate measurement of total production. Additionally, in calculating plaintiffs' profits, ORIL neglected to follow a consistent standard in determining whether to allow income reductions for returns of product, a common variable. The same was true for discounts to agents and promotions, and for the costs and fees of professional experts utilized by plaintiffs to enable compliance with

regulations.[8]  And, in April of 2007, ORIL, for the first time in its history, began to take plaintiffs' profits from non-milk products into account in its income assessment.[9]

To make matters worse, some of ORIL's estimates have been based on clearly outdated economic figures.  For instance, the raw milk rate for fresh milk processors effective in May 2005 used cost numbers from 2003.  These calculations failed to account for the tremendous increase in prices of essential production elements such as fuel, electricity, and resin that took place in 2004.  Likewise, for its 2005 price order, ORIL used the milk production numbers from 2003, even though 2004's figures demonstrated a significant decline, evidencing a consistent trend of reduced production, which ORIL inexplicably failed to take into account.

Such determinations as to plaintiffs' production costs, the price of raw milk, and the price at which they could sell fresh milk to consumers, allowed ORIL to control the milk processors' rates of return.  ORIL chose that this rate should be 10%,[10] taking

---

[8]  Such reductions were routinely permitted for Indulac.

[9]  In contrast to ORIL's consideration of plaintiffs' non-milk profits, Indulac's non-milk profits were not taken into consideration.

[10]  This is merely ORIL's estimated figure.  In fact, evidence before the district court showed that plaintiffs never achieved a 10% rate of return, and even suffered heavy losses. In the fiscal year 2001, Tres Monjitas and Suiza jointly sustained loses of six million eight hundred and ninety six thousand dollars ($6,896,000.00). In 2002, their losses totaled eight million three hundred and sixty four thousand dollars ($8,364,000.00); and in

-11-

that figure from a 1997 average rate of return for milk processors in the United States.  Not only was this figure outdated, but it also failed to account for the economic particularities of the Puerto Rican milk industry.  In fact, the district court found that ORIL never conducted any reasonable economic study on this matter.

The district court further found that, while defendants' goals were to maintain stable milk production and pricing, their regulatory and market practices had the effect of creating a dire and unsustainable situation in Puerto Rico's milk industry.  The low price of Indulac's UHT milk allowed it to dominate the market, even though FFIL acknowledges that fresh milk consumption is preferable for health reasons.  And, though the demand for fresh milk was dwindling, Tres Monjitas and Suiza were required to purchase all raw milk produced by dairy farmers at an inflated price, and to sell the ever-increasing surplus to Indulac at a deflated price.  Plaintiffs claim that continued regulation in this manner would render them insolvent, leading to the collapse of Puerto Rico's milk industry, as they are the only two entities currently collecting raw milk from the dairy farmers, and are the only entities processing fresh milk for consumers.

---

2003, they lost ten million dollars ($10,000,000.00).  See Motion Requesting Injunctive Relief Under Fed. R. Civ. P. 65(a), Docket No. 2, p.12.

Case: 07-2307 Case: 07-2283 Document: 00116936105 Document: 519385105 Filed: 11/24/21 Date Filed: 11/29/2006 Entry ID: 6395333 Page: 13

Exhibit 1   Page 13 of 52

### B. Procedural History

On August 13, 2004, Tres Monjitas and Suiza filed a complaint in the United States District Court for the District of Puerto Rico. They sought a declaration under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., that the decisions, acts and orders issued by the Administrator are unconstitutional. They also sought to enjoin ORIL's regulatory scheme pursuant to Fed. R. Civ. P. 65(a).

Specifically, plaintiffs alleged that ORIL's regulatory structure, which precluded them from making a reasonable profit in their milk business, constituted a confiscation of property in violation of the Takings Clause. See U.S. Const. amend. V. ("No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation."). In addition, they claimed that defendants violated their Fourteenth Amendment due process and equal protection rights by acting in an arbitrary and discriminatory fashion in guaranteeing Indulac a subsidized price to produce UHT milk, and favoring Indulac's interests over those of other milk processors. Plaintiffs' final constitutional claim alleged that defendants' regulatory practices violated the dormant Commerce Clause by unduly restraining interstate commerce in milk. U.S. Const. art. 1, § 8, cl. 3. In addition to their constitutional claims, plaintiffs alleged that defendants violated Puerto Rico

-13-

state law, because their actions contravened the legislative intent
of Act 34.

Pursuant to these claims, on August 20, 2004, plaintiffs
moved for a preliminary injunction to preclude the Administrator of
ORIL from continuing to implement the complained-of regulatory
practices and orders. Plaintiffs claimed that irreparable injury
would result if this scheme were kept in place much longer, as they
would soon face insolvency. Their insolvency, plaintiffs argued,
would have drastic consequences for the people of Puerto Rico, as
Tres Monjitas and Suiza alone have the capacity to process the
quantity of fresh milk required to supply the Commonwealth. They
contrasted their dire outlooks with evidence of Indulac's high
profitability, arguing that preliminary injunctive relief would not
harm defendants as much as its absence would harm plaintiffs.

After conducting 51 intensive evidentiary hearings over
the course of one-and-a-half years, on July 13, 2007, the district
court granted the preliminary injunction, ordering that (1) all
milk processors pay the same amount for raw milk, (2) that the
Administrator of ORIL develop and implement rational, non-
discriminatory parameters for price regulation, and (3) that the
Administrator adopt a temporary mechanism to allow plaintiffs to
recover a fair rate of return from the year 2003[11] until the

---

[11] The district court found that plaintiffs "have suffered for the
periods from 2003 to 2007 a Due Process and Equal Protection
violation reaching levels of a 'taking.'"

-14-

implementation of the new regulatory regime (this mechanism is referred to as "regulatory accrual").

Defendants timely appealed, arguing that (a) the district court should have abstained from hearing the case pursuant to the <u>Burford</u> abstention doctrine; (b) the portion of the district court's injunction order requiring ORIL, a state entity, to establish a regulatory accrual account constituted issuance of retroactive compensatory relief, in violation of defendant's sovereign immunity; (c) the district court erred in denying defendants' equitable defenses, namely the clean hands doctrine, laches, and estoppel; and (d) the district court erred in applying the standard for issuance of a preliminary injunction.[12]

## II. <u>Discussion</u>

### A. Abstention

Defendants argue that the district court should have abstained from hearing this case under the doctrine set forth in <u>Burford</u> v. <u>Sun Oil Co.</u>, 319 U.S. 315 (1943).  The district court declined to do so, stating that <u>Burford</u> does not apply "when the effect of an entire regulatory scheme is challenged as unconstitutional."  <u>Vaquería Tres Monjitas</u>, No. 04-1840, at *56 (quoting <u>Tenoco Oil Co.</u> v. <u>Dep't. of Consumer Affairs</u>, 876 F.2d 1013, 1029 n.23 (1st Cir. 1989)).  We agree.

---

[12]  Defendants Indulac and PRDFA also filed motions to stay the injunction pending appeal, which were dismissed voluntarily.

### 1. Applicable Law

In Burford, the Supreme Court upheld a federal court's decision to abstain from reviewing an order of the Texas Railroad Commission granting Burford a permit to drill oil wells in east Texas. Plaintiff, Sun Oil, had brought suit not to determine the constitutional validity of the state regulation, which had been settled in prior litigation, but to challenge whether the order was reasonable under a state statute. Burford, 319 U.S. at 328, 332. While the plaintiffs in Burford did allege that the commission order violated their right to due process, resolving the issues on appeal required interpreting state, not constitutional, law. Id. at 331. Since the constitutional validity of the commission's complex procedures was not at issue, the Supreme Court recognized that the federal court was simply being called upon to review the state agency's determination in light of the policy outlined by state law. Id. at 320-21, 331. On these facts, the Court held that, despite the existence of federal subject matter jurisdiction, abstention was proper to maintain the balance between state control over its own regulatory policies and federal oversight. Id. at 327, 332.

Later, in New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI), the Supreme Court clarified that a federal court should abstain from hearing a case that involved "difficult questions of state law bearing on policy problems of substantial

-16-

public import," or where federal intrusion may prove "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."[13]  491 U.S. 350, 361 (1989) (citation omitted).  We have observed that NOPSI's "reformulation" of Burford, "can be read expansively or narrowly and is ultimately ambiguous."  Pub. Serv. Co. of New Hampshire v. Patch, 167 F.3d 15, 27 (1st Cir. 1998).

We believe that an expansive reading of NOPSI -- one that would require federal courts to abstain from hearing any case involving important state regulatory policies -- is not consistent with Supreme Court precedent or with our own.  Indeed, it would fly in the face of the Supreme Court's repeated admonitions that Burford abstention be "the exception, not the rule." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 14 (1983) (internal quotations and citation omitted).  Moreover, cases since NOPSI have not treated Burford as severely curtailing federal courts' jurisdiction.  See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728 (1996) (stating that "Burford represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.") (internal quotations omitted).  While Burford recognizes that states should

---

[13]  In NOPSI, the Court held that a federal court did not need to abstain from deciding whether the Federal Energy Regulatory Commission's decision that a utility's participation in a nuclear power plant venture was reasonable preempts a state agency's determination of reasonableness of the same issue.

-17-

be given leeway to pursue their prerogatives through their own agencies and courts without federal interference, binding precedent makes clear that a federal court need not abstain from hearing a case involving state regulatory administration "merely because resolution of a federal question may result in the overturning of a state policy." Zablocki v. Redhail, 434 U.S. 374, 379 n.5 (1978).

A narrow reading of NOPSI, on the other hand, best comports with not only Supreme Court, but also this Circuit's precedent. In Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n, we recognized that Burford abstention must only apply in "unusual circumstances," when federal review risks having the district court become the "regulatory decision-making center." 853 F.2d 1007, 1012-13 (1st Cir. 1988). Thus, when a federal court's interference would effectively create a dual review structure for adjudicating a state's specific regulatory actions, abstention under Burford may be appropriate. Id. We observed in Patch that "[t]he fundamental concern in Burford [was] to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution." 167 F.3d at 24 (citing NOPSI, 491 U.S. at 361-64; Bath, 853 F.2d at 1014-15). Abstention is not warranted, however, when a claim requires the federal court to

decide "predominating federal issues that do not require resolution of doubtful questions of local law and policy." Id.

With this background in mind, we review the district court's decision not to abstain from hearing plaintiffs' claims. The district court's findings of law regarding the requirements of abstention doctrine in the abstract are reviewed de novo, while the application of particular facts to that law is reviewed for abuse of discretion.  Sevigny v. Employers Ins. of Wausau, 411 F.3d 24, 26-27 (1st Cir. 2005).

## 2. Analysis

We believe that the district court properly declined to abstain from hearing plaintiffs' claims, as (1) the district court's participation does not disrupt ORIL's role as the regulatory decision-maker or interfere with the agency's ability to apply its expertise to local facts in establishing a coherent state policy; and (2) the heart of plaintiffs' action lies in the constitutional challenge to ORIL's decision-making process as a whole, and not to the reasonableness of their particular determinations.

Defendants argue that plaintiffs' claims require the district court to conduct an inquiry into the specifics of ORIL's orders, pursuant to its own construction of state law and policy, which is precisely the type of intrusion abstention doctrine seeks to avoid.  We disagree.

-19-

While Tres Monjitas and Suiza certainly allege that
ORIL's orders were erroneous in substance, the district court was
not required -- and specifically declined -- to rule on their
merits, opting instead to focus on ORIL's decision-making <u>process</u>,
which it found to be arbitrary on the whole. <u>Vaquería Tres
Monjitas</u>, No. 04-1840, at *62-67.  In discussing the rates of
return set by ORIL, for example, the district court expressed the
narrowness of its finding:

> The court does not question the established
> fee per se; the error is in not performing a
> reasonable, timely economic study setting the
> reasonable rate and the continuing usage of
> stale data as to rate of return (1997), and
> further not considering currently doing
> business in the Puerto Rican market under
> current economic realities. <u>The court does not
> hint at any figure as to reasonable rate of
> return.</u> This rate belongs to the setting by
> the Administrator, not the court.

<u>Id.</u> at *37 (emphasis added).  We do not believe that the decisions
in the <u>Burford</u> line of cases prevent federal courts from
undertaking such inquiries.

Furthermore, we refuse to treat, as defendants assert,
the district court's review of the facts surrounding the dispute as
evidencing the need for abstention.  In <u>Bath</u>, we voiced our concern
about having federal courts "conduct highly individualized review
of particular, firm-specific regulatory decisions." 853 F.2d at
1014 (interpreting the Supreme Court's reasoning in <u>Burford</u>).  Yet,
the fact that the district court peered into the substance of

ORIL's determinations does not run afoul of our warning in <u>Bath</u>. The district court did not examine ORIL's decisions to gauge the wisdom of their outcomes, but rather to determine whether or not they were arbitrary and discriminatory, pursuant to the constitutional questions posed by plaintiffs.

Defendants next argue that, to survive <u>Burford</u> abstention, plaintiffs' suit should have taken the form of a facial challenge to Act 34, and not an attack upon ORIL's orders, which it had full authority to promulgate. We believe this argument is based upon a misconstruction of <u>Burford</u>, the subsequent case law, and the case at hand.

In <u>Burford</u>, plaintiffs' challenge centered on the reasonableness of a particular administrative order. Since they did not attack either the authority of the Texas Railroad Commission or its adjudicative methods, the constitutional issue was merely a gloss upon the challenge to the administrative decision, the wisdom of which was truly at the heart of the matter. See <u>Burford</u>, 319 U.S. at 328 n.24; see also <u>Ala. Pub. Serv. Comm'n</u> v. <u>S. Ry. Co.</u>, 341 U.S. 341, 343 (1951) (holding that abstention was proper when the plaintiff's claim consisted of a challenge to an administrative decision born out of a scheme already held constitutional by the Supreme Court).

That is plainly not the case here. Plaintiffs do not claim that ORIL violated their rights to due process, for instance,

-21-

by issuing an order contrary to state policy.  Rather, they claim that the entire system by which ORIL renders its decisions is unconstitutional.  As we stated in Bath, "abstention in the Burford line of cases rest[s] upon the threat to the proper administration of a constitutional state regulatory system." 853 F.2d at 1013.  In Tenoco Oil, we stated even more plainly: "Burford abstention does not apply . . . when the effect of an entire state regulatory scheme is challenged as unconstitutional."  876 F.2d at 1028 n.23.

Defendants further contend that, since Bath dealt with facial challenges to a state law, and given that Bath forms the basis for the above statement in Tenoco Oil, neither case applies to the case at hand.  This is so, they argue, because plaintiffs do not challenge Act 34 on its face, but rather as it is applied.  We believe such a construction to be unduly restrictive.

A federal court need not abstain from hearing a constitutional claim against an administrative scheme simply because the constitutionality of its originating statute is not contested.  In Planned Parenthood League of Massachusetts v. Bellotti (Bellotti II), for instance, we held that it was irrelevant for the Burford abstention analysis that plaintiffs mounted an "as-applied" challenge to a statute, as opposed to a facial one.  868 F.2d 459 (1st Cir. 1989).  Bellotti II dealt with a challenge to a Massachusetts statute requiring a minor seeking an abortion to obtain either parental consent or have the restriction

-22-

waived by a court order.  Plaintiffs initially sued to enjoin state officials from enforcing the statute, based on a facial challenge to the law under Articles I, II, X, and XVI of the Massachusetts Declaration of Rights.  Injunctive relief was denied, and plaintiffs amended their complaint to include an as applied challenge.  Id. at 461.  The district court dismissed the action, however, out of concern that comity required a federal court to abstain from meddling in the state's internal operations.  Id. at 462-63; Planned Parenthood League of Mass. v. Bellotti (Bellotti I), 608 F. Supp. 800, 803-05 (D. Mass. 1985).  We reversed, holding that abstention was not appropriate, as "what will occur is not an ongoing intermeddling with the state judiciary but a prohibition of an unconstitutional process."  Bellotti II, 868 F.2d at 465 (emphasis added).  We stated that, rather than focusing on either party's characterization of the case, a federal judge must perform an independent evaluation and "assess the essential nature of the litigation to see whether its proper objectives could be attained without the intrusion into internal operations of the state judiciary."  Id. at 466 (emphasis added).  We then held that the case was not a proper one for abstention, as plaintiffs' main objective was to enjoin an unconstitutional state process.  Id. at 465-66.

Like Bellotti II, the case at hand involves a challenge to a regulatory process, which places it squarely within the line

-23-

of cases disfavoring abstention, and it is no impediment that
plaintiffs do not mount a facial challenge to Act 34.   While
federal courts should refrain from entering into the technicalities
of states' regulatory apparatuses, they should not decline to hear
cases that challenge the whole of those regulatory schemes under
the United States Constitution.   Plaintiffs do not seek federal
review of a price order, nor are they asking the Court to interpret
local law.   Rather, they seek to have ORIL's current decision-
making process invalidated as contrary to the guarantees of due
process and equal protection.   Theirs is a broad challenge to a
regulatory scheme, which plaintiffs contend has no set standards
and affords the Administrator unbridled discretion over rate-
making.   In other words, Tres Monjitas and Suiza do not seek to
overturn an administrative decision, but to fundamentally alter the
way in which ORIL issues its orders. See, e.g., id., 868 F.2d at
466 ("What PPLM seeks here is not for the federal court to tinker
with Massachusetts' scheme of regulating minors' abortions, but for
the court to dismantle it.").   Abstention is not proper in such
circumstances.

Finally, the nature of the injunctive order issued
demonstrates that the question presented to the district court was
not one as to which the court was required to abstain.   The order
does not second-guess the Administrator's determinations, nor does
it set a new regulatory standard.   While the order does set the

price to be paid by all processors for raw milk at 55 cents per quart, this figure was not the product of the court's own calculation.  Rather, it represents the cost plus fair return rate of the dairy farmers that was last established by ORIL in 2006.  In adopting the 55 cent figure, the district court's order establishes parity among the processors at the level that ORIL itself calculated.  Thus, in deferring to ORIL's own findings, the district court does not engage in the sort of fact-specific technical inquiry Burford prohibits.  Overall, the order requires that ORIL develop and implement reasonable, intelligible standards for future determinations.[14]  ORIL remains free to continue to apply its expertise to distinctively local regulatory facts.[15]  But, it must do so in a way that protects the Due Process and Equal Protection rights of those subject to its regulations.[16]

---

[14]  "In a period of no more than thirty (30) days, the Administrator will put into effect nondiscriminatory, rational and scientific regulatory standards that will allow him to determine costs and fair profits return for all the participants in the Puerto Rico regulated milk market."  Vaquería Tres Monjitas, No. 04-1840, at *94.

[15]  "The Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular 'fit' of Puerto Rico into any economic model which may be used from other jurisdictions."  Vaquería Tres Monjitas, No. 04-1840, at *94.

[16]  "When the Administrator eventually determines to change the price to be paid to said dairy farmers, all market participants using raw milk to process fluid milk will pay the same amount for the milk."  Vaquería Tres Monjitas, No. 04-1840, at *94.

-25-

Thus, we hold that the district court properly declined defendants' invitation to abstain from entertaining this action.

**B. Eleventh Amendment**

As part of the preliminary injunction granted by the district court, ORIL was ordered to develop and implement a mechanism to compensate Plaintiffs for the deficient rate of return that was mandated by ORIL from the year 2003 until the date of the district court's decision:

> The Administrator is ordered to adopt a temporary mechanism that will allow the processors to recover the new rate of return they are entitled to (whatever that may be) for the year 2003 (base cost year of the present structure) and up to the day when they begin to recover said rate based on the new regulatory standards and corresponding order. The Administrator may so act through regulatory accruals, special temporary rates of return or any other available mechanism of his choosing.

Vaquería Tres Monjitas, No. 04-1840, at 95-96. The mechanism developed by the parties involved a small surcharge[17] to be applied to every quart of milk sold in the Commonwealth, which would then be placed into an accrual account for the benefit of Tres Monjitas and Suiza.

On appeal, defendants contend that this order calls for retroactive compensatory relief, which is barred by the Eleventh Amendment. Plaintiffs respond that such relief is allowed, even if

---

[17]   As it stands, the surcharge is 1.5 cents per quart.

the regulatory accrual were to be characterized as retroactive, as it would be derived from milk consumers only, and not from the coffers of the Commonwealth.  We agree that the Eleventh Amendment is not implicated.

## 1. Applicable Law

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has held that the doctrine of sovereign immunity reaches beyond the words of the Eleventh Amendment, extending immunity to state governments in suits not only by citizens of another state, but by its own citizens as well.  Alden v. Maine, 527 U.S. 706 (1999).  An administrative arm of the state is treated as the state itself for the purposes of the Eleventh Amendment, and it thus shares the same immunity.  See Hafer v. Melo, 502 U.S. 21, 25 (1991); see also Pastrana-Torres v. Corporación de P.R., 460 F.3d 124, 126 (1st Cir. 2006) ("[Eleventh Amendment] immunity applies only to the states themselves and entities that are determined to be arms of a state.").

While a state may not be sued directly absent its own consent, the Ex Parte Young doctrine permits suits to proceed against state officers in their official capacities to compel them

-27-

to comply with federal law.  Ex Parte Young, 209 U.S. 123 (1908).
This stems from the notion -- some say fiction -- that, since a
state could not authorize an official to violate federal law, by
doing so, a state official is stripped of her authority and thus a
suit against her does not implicate the state's sovereign immunity.
Id. at 159-60; see also Pennhurst State School and Hospital v.
Halderman, 465 U.S. 89, 102-03, 105 (1984) (discussing the "fiction
of Young").   Such suits, however, may only seek prospective
injunctive or declaratory relief; they may not seek retroactive
monetary damages or equitable restitution.  Edelman v. Jordan, 415
U.S. 651, 664-65 (1974).  If the court were to order a state
official in her official capacity to dispense compensatory relief,
the monies would be drawn from the state treasury and run afoul of
the Eleventh Amendment.  Id. at 664.  We have observed that "[t]he
line drawn by the Court represents a compromise between the impulse
to preserve state autonomy and the need to enforce federal law.
Injunctions are necessary to assure the supremacy of national law;
damage awards are not."  Santiago v. Corporación de Renovación
Urbana y Vivienda de P.R., 554 F.2d 1210, 1212 (1st Cir. 1977).

## 2. Analysis

        The  issue here is whether or not the manner of relief
ordered  by  the  district  court  runs  afoul  of  the  Eleventh
Amendment's prohibition against retroactive damages that reach the
state treasury.  Since the harm to be remedied by the district

-28-

court's regulatory accrual order was the deficient rate of return imposed upon Tres Monjitas and Suiza since 2003, defendants argue that it is necessarily backward-looking, and thus barred by Supreme Court and First Circuit precedent.

Plaintiffs urge this court to reject these arguments on either of two possible grounds.  First, plaintiffs maintain that the regulatory accrual is not meant to compensate Tres Monjitas and Suiza for the revenue lost under ORIL's scheme, but rather to rebuild their capital bases, which are, collectively, $5 million in the red.  They claim that, even if the price of milk were raised to allow a reasonable rate of return, the processors could not make any profit until they rebuild their capital bases, meaning that the regulatory accrual is a necessary component of any prospective relief awarded.  Plaintiffs alternatively argue that, even if the form of relief is deemed retroactive, sovereign immunity should present no bar, as none of the compensation would come from the state treasury.

We decline to rule on plaintiffs characterization of the regulatory accrual as prospective, as we believe that their second argument sufficiently supports their position.

Defendants argue that it is irrelevant whether or not the remedy ultimately is derived from the state treasury, citing Edelman for the proposition that prospective relief is available even if compliance therewith requires expenditures from the state

-29-

treasury, but retrospective relief is always prohibited.  Edelman,
415 U.S. at 667-68.  We are not so convinced.

Defendants provide no support for their contention that
retrospective relief that does not reach the state treasury is
barred by sovereign immunity.  Rather, the cases cited by
defendants, including Edelman, involve requests for retroactive
compensation that would invariably come out of state treasuries.
See, e.g., id., at 667 ("[Relief sought] requires payment of state
funds, not as a necessary consequence of compliance in the future
with a substantive federal-question determination, but as a form of
compensation . . . .");  Papasan v. Allain, 478 U.S. 265, 279 (1986)
(plaintiffs sought funds directly from the state to fund school
districts).

In fact, both the Supreme Court and this Circuit have
consistently considered the source of relief as being of paramount
importance to Eleventh Amendment considerations.  In Hess v. Port
Authority Trans-Hudson Corp., the Supreme Court noted that "the
impetus for the Eleventh Amendment [is] the prevention of
federal-court judgments that must be paid out of a State's
treasury." 513 U.S. 30, 48 (1994).  In even stronger terms, the
Court later added, "[i]n sum . . . the vast majority of Circuits
. . . have concluded that the state treasury factor is the most
important factor to be considered . . . and, in practice, have
generally accorded this factor dispositive weight." Id. at 49

(emphasis added) (internal quotations and citations omitted).  This Circuit has followed this mandate.   In Libby v. Marshall, we stated:

> The damage the Eleventh Amendment seeks to forestall is that of the state's fisc being subjected to a judgment for compensatory relief. Only if the state is forced to use funds from the state treasury to satisfy a compensatory judgment do the adverse consequences that the Eleventh Amendment prohibits occur.

833 F.2d 402, 406 (1st Cir. 1987).

Here, the money in question would come directly from consumers of milk in Puerto Rico.   Unlike a tax, it would be neither collected by government entities nor retained in the Commonwealth's treasury.   Apart from the initial price order, no state action is required to implement this remedial scheme, which would, in no way, reach the coffers of the Commonwealth.   Thus, because no state funds are implicated by the district court's order, we hold that the Eleventh Amendment's prohibition against retrospective relief does not apply.

Defendants alternatively argue that the regulatory accrual is impermissible by attempting to frame the relief as, in essence, ordering the payment of monetary damages in just compensation for a regulatory taking.  They then argue that several circuits have dismissed Takings Clause actions against state officials in their official capacities, as the Eleventh Amendment bars a federal court from issuing just compensation relief against

a state entity.   For this proposition, they cite <u>Seven Up Pete</u>
<u>Venture</u> v. <u>Brian Schweitzer</u>, 523 F.3d 948 (9th Cir. 2008), and <u>DLX</u>
v. <u>Kentucky</u>, 381 F.3d 511 (6th Cir. 2004).   Defendants also point
to this Circuit's precedent, including <u>Ortiz de Arroyo</u> v. <u>Romero</u>
<u>Barceló</u>, 765 F.2d 275, 280 (1st Cir. 1985), which states that, in
a case involving governmental deprivation of property in violation
of the Fifth and Fourteenth Amendments, "the court may not award
the value of the diminished property right; it may issue only
declaratory or injunctive relief." <u>See also</u> <u>Culebra Enter. Corp.</u>
v. <u>Rivera Ríos</u>, 813 F.2d 506, 512 (1st Cir. 1987); <u>Citadel Corp.</u> v.
<u>P.R. Highway Auth.</u>, 695 F.2d 31, 33 (1st Cir. 1982); <u>Pamel Corp.</u> v.
<u>P.R. Highway Auth.</u>, 621 F.2d 33, 36 (1st Cir. 1980).

     We are not persuaded, however, that the present situation
should be analyzed under defendants' characterization.   Unlike any
of the cases relied upon by defendants, here there has been no
award of damages that the state must pay.   That an equitable remedy
results in the payment of monies to plaintiff does not, in itself,
render the relief monetary compensation for a taking.   The district
court's order does not require ORIL or the Department of
Agriculture to provide just compensation, or any monetary award for
that matter.   As we have stated above, no measure of relief
fashioned by the district court would come from the state treasury.
Defendants have argued that this scheme is no different from a
federal court ordering the levying of a tax to pay equitable

restitution, which they contend no federal court has done.  Yet, whether Puerto Rico could levy a special tax to compensate Tres Monjitas and Suiza is not the issue before this Court.  Unlike a tax, the milk surcharge of 1.5 cents per quart does not rely on the state as an intermediary.  Instead, the regulatory accrual operates as any other regulation that raises by a small fraction the price of milk for consumers, based on ORIL's determinations regarding milk processors' costs, revenues, and rates of return.

For the foregoing reasons, we hold that the Eleventh Amendment does not bar the form of relief granted by the district court in its preliminary injunction.

## C. Equitable Defenses

Defendants contend that the district court erred in rejecting their equitable defenses of unclean hands, laches, and estoppel.  We review the lower court's ruling for abuse of discretion.  School Union No. 37 v. Ms. C., 518 F.3d 31, 35 (1st Cir. 2008); Ansin v. River Oaks Furniture, Inc., 105 F.3d 745, 757 (1st Cir. 1997).

### 1. Unclean Hands

Our courts have long held the view that "[h]e who comes into equity must come with clean hands." Dr. José S. Belaval, Inc. v. Pérez-Perdomo, 488 F.3d 11, 15 (1st Cir. 2007) (quoting Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 241 (1933)).  This is to say that we are skeptical of those who seek equitable relief

-33-

when they themselves have engaged in misconduct.  For the defense
to apply, we have also routinely stated that the misconduct must be
"directly related to the merits of the controversy between the
parties." Id. (internal quotations omitted).

Defendants seek to invoke this defense, arguing that
"plaintiffs directly participated and approved the decision to
aggressively market Indulac's UHT milk and benefitted from the
results thereof."  Whether or not this were true, this allegation
does not implicate the unclean hands defense, as defendants fail to
show -- or even explain -- how such actions constitute "misconduct"
on the part of the plaintiffs.

As the district court could have reasonably concluded
from the facts that plaintiffs were not complicit in any wrongdoing
related to the merits of this controversy, we hold that it did not
abuse its discretion in rejecting defendants' unclean hands
defense.

### 2. Laches

The doctrine of laches may bar a claim that was raised
after an inexcusable delay. "In order for laches to apply, the
district court must examine whether plaintiff's delay in bringing
suit was unreasonable and whether defendant was prejudiced by the
delay." Puerto Rican-American Ins. Co. v. Benjamin Shipping Co.
Ltd., 829 F.2d 281, 283 (1st Cir. 1987) (citing Costello v. United
States, 365 U.S. 265, 282 (1961)).

-34-

According to defendants, Tres Monjitas and Suiza began experiencing losses as early as 1998, but waited until 2004 to bring any claims.  Such "slumber," they argue, voided their claims for equitable relief.

Defendants, however, have not presented any evidence indicating that the delay was either unreasonable or prejudicial, nor have they made more than a half-hearted attempt to do so.  As a result, their argument fails.  First, as the district court found, "before the filing of this complaint, plaintiffs and the Administrator were still meeting to try to reach a solution . . . ."  Vaquería Tres Monjitas, No. 04-1840, at *11.  It would be unwise and inequitable to punish Tres Monjitas and Suiza for attempting to settle their grievances through administrative remedies and negotiations.  Second, nowhere in their brief to this court do defendants even allude to the issue of prejudice. They do not allege that they have been in any way injured by the lapse of time, nor have they shown that the passage of time has eroded "the memory and life of witnesses, the muniments of evidence, and other means of proof."  Costello, 365 U.S. at 282 (quoting Brown v. Buena Vista County, 95 U.S. 157, 161 (1877)) (internal quotation marks omitted).

Considering that defendants have failed to satisfy the standard for the application of the laches doctrine, we hold that

the district court did not abuse its discretion in failing to dismiss the action on that basis.

### 3. Estoppel

Under 28 U.S.C. § 1738, federal courts must give "full faith and credit" to the judgments arising out of state courts and give them the same preclusive effect as would a court of that state. Thus, a decision in state court collaterally estops relitigation in a later action in federal court. Allen v. McCurry, 449 U.S. 90, 104-05 (1980) (preventing relitigation of habeas corpus claim already decided in state court).

Defendants contend that, under Puerto Rican law, "an administrative decision not reviewed by the party adversely affected becomes final and firm as a commonwealth judgment." Acevedo v. Western Digital Caribe, Inc., 140 P.R. Dec. 452, 465-66 (P.R. 1996) (internal citation omitted). They then argue that, as the facts found in the orders issued by ORIL from 1998 to 2002 were never challenged, they are "final and firm" and hold the same preclusive effect as the decisions of a court of Puerto Rico, rendering them unassailable in subsequent court actions. Pastor-Ginorio v. R & G Mortg. Corp., Inc., 371 F. Supp. 2d 89, 92 (D.P.R. 2005).

This argument strains credibility. Under Puerto Rican law, a claim may be precluded under the doctrine of res judicata if there exists "the most perfect identity between the things, causes,

-36-

and persons of the litigants, and their capacity as such." 31 P.R. Laws Ann. § 3343.  Res judicata cannot apply here to bar Tres Monjitas' and Suiza's claims, as there has not been a prior court decision on these issues, in an action between these same parties in interest.  In addition, res judicata will present no obstacle "when the litigant was denied a 'full and fair opportunity to litigate' his claims in the earlier proceeding; in this situation, application of res judicata would violate due process of law." Arecibo Radio Corp. v. Com. of P.R., 825 F.2d 589, 592 (1st Cir. 1987) (quoting Allen, 449 U.S. at 101).

Tres Monjitas and Suiza frequently received inadequate notice and opportunity to challenge ORIL's regulatory decisions. For example, a 2007 order for the first time took into consideration plaintiff's income from unregulated non-milk products.  This new parameter was imposed upon plaintiffs without prior notice or opportunity to be heard.  ORIL similarly held no hearings of any sort when it readjusted the percentage of plaintiffs' participation in school lunch programs, decreasing Suiza's share by 5.06% and giving it to Tres Monjitas.  Time and time again, ORIL set and reset regulations relating to the measurement of the processors' milk production and income without giving plaintiffs an explanation or a reasonable opportunity to challenge the decisions.

-37-

Also, since defendants have clearly stated that they do not wish to challenge the district court's findings of fact, we do not see how their invocation of <u>Pastor-Ginorio</u> serves their argument. Even if the Administrator's determinations of facts are to be given preclusive effect, the orders issued did not contain any adjudicatory decisions or rulings of law that are immune from review.

Overall, defendants' argument assumes too much. Their construction of the law would have us hold that the decisions of ORIL's Administrator become unreviewable simply by his say-so. This we cannot do. We hold that the district court did not abuse its discretion in rejecting defendants estoppel defense.

### D. Preliminary Injunction

The district court granted the preliminary injunction after finding that the plaintiffs' claims met the traditional four-part test, which requires consideration of (1) the likelihood that the moving party will succeed on the merits; (2) the possibility that, without an injunction, the moving party will suffer irreparable harm; (3) the balance of relevant hardships as between the parties; and (4) the effect of the court's ruling on the public interest. <u>Waldron</u> v. <u>George Weston Bakeries Inc.</u>, 570 F.3d 5, 9 (1st Cir. 2009).

On appeal, defendants contend that the court erred in its application of the four-part preliminary injunction standard. In

addition, they argue that the court's order improperly changed the status quo by transforming Puerto Rico's milk regulatory scheme, whereas the specific purpose of a preliminary injunction is to maintain current conditions until the dispute is decided on the merits.

We review the district court's grant of the preliminary injunction for abuse of discretion. Waldron, 570 F.3d at 9. We will set aside the ruling "only if [we are] persuaded that the lower court mistook the law, clearly erred in its factual assessments, or otherwise abused its discretion in granting the interim relief." McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001). Within this assessment, findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo, while "[j]udgment calls and issues that demand the balancing of conflicting factors are reviewed deferentially." Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005) (internal citations omitted).

### 1. Likelihood of Success

After extensively analyzing the factual record and the claims put forth, the district court found that there existed a likelihood that Tres Monjitas and Suiza would succeed on the merits of their claims. In particular, the court found:

> [V]iolations of Due Process, Equal Protection and the Takings Clause, a pattern of lack of standards, change in standards with unfettered discretion, use of stale figures, and lack of

-39-

an appropriate standard as to fair rate of
return in the regulations set by the regulator
all pointing to a taking "pursuant" to
Duquesne Light Co. [v. Barasch, 488 U.S. 299,
307 (1989)] and Tenoco Oil, 876 F.2d at 1026-
1027.

Vaquería Tres Monjitas, No. 04-1840, at *91. Defendants challenge

this determination as to plaintiffs' Takings Clause, Due Process,

and Equal Protection Claims.

However, we need only find that one of the district

court's bases for granting injunctive relief is proper to affirm

the grant of the preliminary injunction. We believe that

sufficient evidence exists in the record to support the district

court's determination that Tres Monjitas and Suiza have a

likelihood of success on the merits of their Due Process claims.[18]

Plaintiffs' Due Process challenge arises out of their

assertion that the regulatory structure of the Puerto Rican milk

industry was beholden to the whims of the Administrator. In

addition, they claim that the use of unscientific, stale, and

clearly erroneous figures regarding production costs and rates of

return nearly drove them out of business. These circumstances,

plaintiffs argue, were made possible by the lack of operating

standards, which gave the Administrator unchecked power to issue

_____

[18] Since the Due Process Clause violation is sufficient for the
district court's grant of injunctive relief, we see no need to
reach the Court's determinations regarding the likelihood of
success on the Equal Protection and Takings Clause claims. That we
refrain from reaching these issues should not be regarded as a
commentary on their relative merits.

arbitrary determinations.   They cite as evidence numerous
instances, recounted above, in which the standards ORIL utilized to
calculate their income, milk production, or profits changed without
warning or rationale.

Defendants argue that allowing Indulac to process surplus
milk into UHT and other milk by-products was a reasonable way to
support dairy farmers year-round, quell disputes between the
farmers and processors, and avoid waste.   They cite the difficulty
of producing a reliable supply of milk in Puerto Rico as dictating
a need for regulation and for the role played by Indulac in
stabilizing milk production.   Thus, they argue, since these
regulations are rationally related to a legitimate government
purpose, they meet the requirements of due process, and the
district court therefore erred in finding that plaintiffs had a
likelihood of success on the merits of their claims.

The Supreme Court has cautioned that courts should
refrain from substituting their regulatory wisdom for that of the
legislature, explaining that a court's Due Process inquiry should
be satisfied "[i]f the laws passed are seen to have a reasonable
relation to a proper legislative purpose, and are neither arbitrary
nor discriminatory." Nebbia v. New York, 291 U.S. 502, 537 (1934).
Likewise, in Tenoco Oil, we recognized that this inquiry should
focus on "whether a program's procedures are inadequate or whether,
overall, a program is arbitrary, discriminatory or irrelevant to a

-41-

legitimate legislative goal." 876 F.2d at 1021 (citing Pennell v. City of San Jose, 485 U.S. 1, 11 (1988)). Based on these standards, we have no trouble finding that the district court did not abuse its discretion in finding that plaintiffs had a likelihood of success on their Due Process claims.

First, while the district court agreed with defendants that Puerto Rico has a legitimate state interest in stabilizing milk production and protecting the livelihoods of dairy farmers, it found there was no rational nexus between the regulatory scheme established by ORIL and these goals. Vaquería Tres Monjitas, No. 04-1840, at *59-60. The regulations clearly benefit Indulac, a processor of UHT milk, to the detriment of Tres Monjitas and Suiza, the only fresh milk processors in Puerto Rico. As a result of plaintiffs' forced subsidy, Indulac's market dominance depleted the fresh milk market and injured key components of the milk industry, the processors, to the point of near-insolvency. While the Administrator could have rationally decided that Indulac's operation would provide a stabilizing effect, the measures that it took appear to have been specifically engineered to achieve the opposite result - the benefit of Indulac to the detriment of the milk processors and, ultimately, the milk market. Thus, the district court reasonably concluded that the scheme created by ORIL cannot satisfy rational basis review, as "the elimination of one of the components of the industry is 'demonstrably irrelevant to the

-42-

policy the Legislature is free to adopt.'" <u>Vaquería Tres Monjitas</u>,
No. 04-1840, at *71 (quoting <u>Tenoco Oil</u>, 876 F.2d at 1024).

Second, the district court found that the means used to
achieve ORIL's goals did not pass constitutional muster.  The
record is replete with examples of regulatory practices employed by
ORIL that support the district court's finding that the regulatory
scheme was arbitrary, and thus violated due process.  <u>See</u> <u>Nebbia</u>,
291 U.S. at 537.  The Administrator repeatedly altered -- without
notice or explanation -- the standards for calculating plaintiffs'
incomes and production figures.  Essential parameters for the
adjustment of gross income based on customer returns and discounts
to distributors, for instance, were capriciously applied or
ignored.  The shrinkage factor, a measurement of the fraction of
milk lost in the processing phase, seems to have been set and
adjusted at random.  In fact, in many instances, the district court
found that the Administrator had not performed any inquiries,
studies, or anything resembling the diligent research one would
expect from a rate-making agency before issuing orders.
Accordingly, the court reasonably concluded that the standards and
regulations set forth by ORIL, taken as a whole, likely violated
plaintiffs' due process.

Ultimately, the district court concluded that the record
reasonably supported a finding that defendants failed to meet the
standards for rate-making as set out by the Supreme Court and this

-43-

Circuit.  Given the ample evidence of arbitrary and discriminatory regulation, we see no abuse of discretion in the court's determination that plaintiffs have demonstrated a likelihood of success on the claim that defendants' actions constituted a regulatory taking of their property without due process.

### 2. Irreparable Harm

The district court found that a denial of plaintiffs' request for a preliminary injunction could lead to irreparable harm to Tres Monjitas and Suiza.  More specifically, it stated that defendants' actions, absent injunctive relief, "point to permanent loss in market and long-standing violations of constitutional rights for extensive protracted periods of time." <u>Vaquería Tres Monjitas</u>, No. 04-1840, at *91.

Defendants argue that the alleged harm the district court ruled irreparable was, in fact, economic harm, which can be remedied through money damages, and thus does not warrant injunctive relief.  The matter is a close one, but ultimately, we defer to the district court's decision.

While certain constitutional violations are more likely to bring about irreparable harm, we have generally reserved this status for "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." <u>Pub. Serv. Co. of New Hampshire</u> v. <u>West Newbury</u>, 835 F.2d

-44-

380, 382 (1st Cir. 1987).  So, it cannot be said that violations of
plaintiffs' rights to due process and equal protection
<u>automatically</u> result in irreparable harm.

        Also, it has long been held that traditional economic
damages can be remedied by compensatory awards, and thus do not
rise to the level of being irreparable.  <u>Puerto Rico Hosp. Supply,
Inc.</u> v. <u>Boston Scientific Corp.</u>, 426 F.3d 503, 507 (1st Cir. 2005).
Yet, it has also been recognized that some economic losses can be
deemed irreparable.  For instance, "an exception exists where the
potential economic loss is so great as to threaten the existence of
the movant's business."  <u>Performance Unlimited, Inc.</u> v. <u>Questar
Publishers</u>, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995) (citing <u>Doran</u>
v. <u>Salem Inn, Inc.</u>, 422 U.S. 922, 932 (1975) (finding no abuse of
discretion in determination that "absent preliminary relief
[movants] would suffer a substantial loss of business and perhaps
even bankruptcy")); <u>see also</u> <u>Nat'l Screen Serv. Corp.</u> v. <u>Poster
Exchange, Inc.</u>, 305 F.2d 647 (5th Cir. 1962) (affirming grant of
preliminary injunction where denial of injunctive relief would
result in the destruction of movant's business).

        In addition, we have held that the irreparable harm
requirement may be met upon a showing that "absent a restraining
order, [a party] would lose incalculable revenues and sustain harm
to its goodwill."  <u>Ross-Simons of Warwick, Inc.</u> v. <u>Baccarat, Inc.</u>,
102 F.3d 12, 19 (1st Cir. 1996).  In addition, in <u>Automatic Radio</u>

-45-

Mfg. Co. v. Ford Motor Co., we suggested that the inability to supply a full line of products may irreparably harm a merchant by shifting purchasers to other suppliers. 390 F.2d 113, 116-17 (1st Cir. 1968).

Moreover, the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits. See Ross-Simons, 102 F.3d at 19 ("[A]n attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem."); see also EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996)("[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief."); Gately v. Massachusetts, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[I]rreparable harm is subject to a sliding scale analysis . . . .").

Finally, we are mindful of the narrowness of our charge, recognizing that considerable deference is owed to the district court in evaluating this prong of the preliminary injunction standard. "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." K-Mart Corp. v. Oriental

-46-

Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989) (internal quotations omitted).

With the guidance of precedent, we look to the district court's finding and do not see any abuse of discretion in applying the facts to the legal standard. Clearly, plaintiffs have suffered economic harm. But, that is not the full extent of their injury. As found by the district court, Tres Monjitas and Suiza have continued to subsidize Indulac's production of UHT milk, undercutting their own goodwill by propping up their competitors. As a result, they have suffered a steady decline in the market for fresh milk and are on the verge of losing their businesses. After suffering years of losses, their capital bases have been depleted by five million dollars, and the district court found both companies to be on the brink of insolvency.

Taking into account the rapidly eroding state of the Puerto Rican milk industry, the need for immediate relief, and the likelihood of plaintiffs' success on the merits of their claims, we do not believe the district court abused its discretion in finding that the gravity of these dire circumstances, if allowed to run their course, would constitute irreparable harm, and that their imminence called for preliminary injunctive relief.

### 3. Balance of Equities

The district court found, in considering the balance of equities between plaintiffs and defendants, that "[t]he matter is

-47-

not close." <u>Vaquería Tres Monjitas</u>, No. 04-1840, at *92.  In
balancing the harm likely caused to the milk processors without the
injunction with the harm its grant would cause defendants, the
Court stated that "[t]he constitutional rights of plaintiff[s]
override, with [their] consequential permanent loss of market and
potential fire sale of its plants, the rights of defendant to
continue with a preferential purchase price of raw milk which is
prima facie discriminatory." <u>Id.</u>

        On appeal, defendants entreat us to overturn the district
court's determination, arguing that the hardships caused by the
preliminary injunction outweigh the alleged harm to Tres Monjitas
and Suiza absent the order.  In particular, they allude to the
injury that will come to Indulac, the dairy farmers and their
cattle, the stability of the milk supply, and the existing
regulatory structure.

        In reviewing the district court's judgment of this issue,
we must refrain from second-guessing the district court's
assessment, unless we find that the court abused its discretion.
<u>See</u> <u>George Weston Bakeries</u>, 570 F.3d at 8 ("[W]e afford
considerable deference to the trial court's balancing of
equities."); <u>see also</u> <u>Wine & Spirits Retailers</u>, 418 F.3d at 46
("[J]udgment calls and issues that demand the balancing of
conflicting factors are reviewed deferentially.").

We find in the record no reason to second-guess the district court's finding, arrived at in the course of over a year of hearings and testimony, that the balance of equities at play with this injunction favors the plaintiffs. The district court viewed Tres Monjitas' and Suiza's situations as desperate -- both having negative capital bases and facing insolvency. Furthermore, we see no reason why ORIL cannot stabilize milk production and protect dairy farmers, while setting rational regulations based on non-arbitrary and non-discriminatory standards. So, while we are sympathetic to defendants' claims of hardship, this is a situation of their own doing, and further, we do not believe the district court erred in according greater weight to plaintiffs' hardships in the event that injunctive relief were not granted.

### 4. Public interest

The district court found that the "public interest lies in the granting of the injunctive relief." <u>Vaquería Tres Monjitas</u>, No. 04-1840, at *92. It noted that the current situation is unsustainable for the Puerto Rican milk industry as a whole. The dominance of artificially underpriced UHT milk in the market has diminished the market for processors' fresh milk to the point where Indulac's "surplus" has grown beyond its capacity. Ever-decreasing revenues from Tres Monjitas and Suiza mean lower subsidies to Indulac and FFIL, causing depletion of the Fund, which in turn is threatening the dairy farmers' livelihoods. <u>Id.</u> at 39-41. In

-49-

light of these facts, the district court concluded that "[w]ithout the injunctive relief, the plants are close to being sold at very low prices, an important independent element of the industry is about to be lost and the industry is then close to being monopolized by one party of the milk industry." Id. at 92.

Again, we must give deference to the district court's assessment of the situation. We find ample support in the factual record for its determination, and hold that it did not abuse its discretion in finding that the granting preliminary injunctive relief was in the public interest.

### 5. Scope of Relief

Lastly, defendants challenge the scope of the relief granted by the district court. They contend that the Court "erred in issuing injunctive relief that forever changed the status quo -- contrary to the purposes of the preliminary injunctive relief." We disagree.

We first note that "[i]njunctions must be tailored to the specific harm to be prevented." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 14 (1st Cir. 2000). Since the district court is in the best position to tailor the scope of injunctive relief to the its factual findings, our review is for abuse of discretion only. Id.

The district court found that ORIL had subjected plaintiffs to ongoing constitutional violations as part of an

-50-

arbitrary and discriminatory regulatory process. In requiring ORIL
to develop a scheme that conformed to constitutional principles,
the preliminary injunction cut to the heart of the violations.
And, by leaving decisions regarding specific pricing figures to the
agency, the Court ensured that the preliminary injunction would
prove "no more burdensome to the defendant than necessary to
provide complete relief." Tamko Roofing Products, Inc. v. Ideal
Roofing Co., Ltd., 282 F.3d 23, 40 (1st Cir. 2002) (quoting
Califano v. Yamasaki, 442 U.S. 682, 702 (1979)). Indeed, it is
difficult to see how the district court overstepped its bounds,
when it left the essential parameters of the relief largely in the
hands of the defendants.

        As to defendants' argument, it cannot be said that the
only purpose of a preliminary injunction is to preserve current
conditions pending adjudication. That is not to say that
defendants' position lacks support. See CMM Cable Rep., Inc. v.
Ocean Coast Properties, Inc., 48 F.3d 618, 620 (1st Cir. 1995)
("The court's interim injunctive decree attempts to prevent further
injury by maintaining the status quo."). But, taking steps
necessary to assure the continued operations of the moving party is
appropriate, if the non-moving party's actions threaten its
destruction. Thus, in its injunctive order, the district court did
not act improperly in requiring ORIL to take steps necessary to
ensure the survival of Tres Monjitas and Suiza during the

litigation.   Contrary to defendant's baffling assertion that the relief "forever changed the status quo," the aim of the order was to establish parity among the milk processors pending outcome of the litigation.

Finally, the potential for a moving party's likelihood of success and showing of irreparable harm can guide the scope of preliminary injunctive relief.   Having already found that Tres Monjitas and Suiza had a likelihood of success on the merits of their constitutional claims, the district court was well within its discretion and power to require ORIL to establish non-arbitrary and non-discriminatory regulations to preserve the solvency of the milk processors, which it found to be in imminent jeopardy.

### III. <u>Conclusion</u>

In summation, we hold that the district court did not err in rejecting defendants' <u>Burford</u> abstention and Eleventh Amendment immunity arguments, or in rejecting their equitable defenses.   We also hold that the district court did not abuse its discretion in granting plaintiffs' motion for a preliminary injunction.   The order of the district court is affirmed.

**<u>Affirmed</u>**.   Costs are assessed against appellants.