UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

VAQUERIA TRES MONJITAS, INC., and
SUIZA DAIRY, INC.,

Plaintiffs,

JAVIER RIVERA AQUINO, in his official
capacity as Secretary of Agriculture of the
Commonwealth of Puerto Rico, and
CYNDIA E. IRIZARRY, in her official
capacity as Administrator of the Milk
Industry Regulatory Office of the
Commonwealth of Puerto Rico,

Defendants.

Civil No. 04-1840 (DRD)

## OPINION AND ORDER

Pending before the court are several motions: (a) *Defendants' Motion for Reconsideration, Alteration or Amendment of Opinion and Order* ("ORIL's motion for reconsideration"), Docket No. 1715; (b) *Motion for Partial Reconsideration of Order, Dkt. No. 1697, Amended by Dkt. No. 1699* filed by Suiza Dairy, Inc. ("Suiza's motion for partial reconsideration"), Docket No. 1706; (c) *Defendants' Motion for a Stay of Enforcement of the Amended Opinion and Order* ("ORIL's motion to stay"), Docket No. 1777, and the oppositions thereto.

I. BACKGROUND

On July 13, 2007, the court entered an Amended Opinion and Order, Docket No. 480, after holding "fifty-one intensive hearings,"[1] relating to constitutional deficiencies in the management

---

[1]     As described by the United States Court of Appeals for the First Circuit ("First Circuit Court of Appeals") at Vaquería Tres Monjitas et al. v. Irizarry, 587 F. 3d 463, 472 (1st Cir. 2009).

of the regulation of the milk industry in Puerto Rico by the former Administrator of the Puerto Rico

Milk Industry Regulatory Office, in his official capacity. The local milk regulation office in the

Island is known in Spanish as "ORIL." The District Court found due process and equal protection

violations as to the establishment by the Administrator of a reasonable rate of return charged by

the milk processors to the public through an infirm process, reaching a level of a "taking." "We

think, therefore, that the issue of inadequacy of the rates here is best addressed under the

Takings Clause." Tenoco Oil, 876 F.2d at 1022. The court shall not once again enumerate all

the factors which lead to its conclusion. Amongst others, however, the court found lack of

parameters being used, changes in parameters without any reasoning, elimination of parameters

without notice, lack of equal treatment in the application of parameters, the application of new

parameters at a whim, the sudden elimination of traditional parameters and the reiterated use of

stale outdated parameters.[2]

Further, the court found probable cause to conclude at a preliminary injunctive stage "a

Taking under Due Process and Equal Protection Clause and under the Fifth Amendment of the

U.S. Constitution" as to the price of raw milk being paid by the milk processors to the dairy

farmers, as set forth by the Administrator.[3] The industrial milk processors were being obligated

by the Administrator to pay an amount for the raw milk to the farmers larger than cost justified

---

[2]   The First Court of Appeals found "proper" at Vaquería Tres Monjitas, Inc., 587 F.3d at 482, the legal foundations of the District Court: "Violations of Due Process, Equal Protection and the Takings Clause, a pattern of lack of standards, change in standards with unfettered discretion, use of state figures, and lack of an appropriate standard as to fair rate of return in the regulations set by the regulator all pointing to a taking 'pursuant' to Duquesne Light Co. v. Barasch, 488 U.S. 299, 307(1989) and Tenoco Oil Co., Inc. v. Department of Consumer Affairs, 876 F. 2d 1013, 1026-1027 (1st Cir. 1984)."

[3]   The Supreme Court has found that an inadequacy of rates in state regulated business as "violative of" the takings clause rather than the due process clause. Tenoco Oil, 876 F. 2d at 1022 citing Duquesne Light Co., 488 U.S. at 306-309, and Pennell v. City of San Jose, 485 U.S. 1, 6-19 (1988).

enabling the balancing plant, Indulac, to pay a much lower cost. The final result of the scheme, the District Court found, caused that the balancing plant Indulac through its principal product UHT milk, was slowly but surely taking the market of the fresh milk processing plants. Thus, the balancing plant, Indulac, created by law to purchase the excess of milk production produced by the farmers, was slowly but surely running out of business the milk processors.[4]

Further, when establishing the price of UHT milk, the Administrator authorized Indulac, as reasonable costs, expenses which were disallowed to the milk processors.  Further, the Administrator allowed Indulac but rejected it to the milk processors, certain marketing tools, such as, price discounts.  Moreover, when establishing the milk prices rates of the milk processors, the Administrator improperly used profits totally unrelated to milk, such as, the manufacture of juices.[5] The main violation of due process consisted on the use of stale parameters, suddenly and unexpectedly used or at whim eliminated without any notice whatsoever.

The court made several dozen determinations based on factual findings based on the record and ordered to the Administrator to comply within a period of thirty days.  The First Circuit Court of Appeals found, at Tenoco Oil, 876 F.2d at 1022, that both violations, as to a reasonable rate of return and as to the price of raw milk set by ORIL, constitute a takings violation under Duquesne Light Co., 488 U.S. at 307.

---

[4]     The Court of Appeals found that "ORIL created a scheme in which Tres Monjitas and Suiza were forced to subsidize Indulac, their competitor." Further, "since Indulac was able to purchase its raw milk at a deflated price milk became significantly less expensive than fresh milk – a phenomenon unique to Puerto Rico – causing Indulac's UHT milk to begin to dominate the Puerto Rican milk market." Vaqueria Tres Monjitas et al, 857 F. 3d at 469-470.

[5]     One of the practices being carried on by the Administrator had also been previously prohibited by a state court, no decision having been later rendered by any appellate court reversing said decision.  The court refers to the inclusion of economic gains, as an offset achieved in a non regulated business, the production by the milk processors of fresh juices.

The First Circuit Court of Appeals unanimously affirmed the opinion of the court at Vaquería Tres Monjitas, Inc. v. Irizarry et al., 587 F. 3d 464. There is currently a *certiorari* pending in the Supreme Court as to a limited retroactive remedy involving a limited period of time prior to the filing of the complaint based on the Takings Clause finding of the court at the preliminary injunctive remedy, Docket No. 480. The court found that the Administrator had incurred in a potential violation of the Takings Clause relating to the price structuring of the milk purchased by plaintiffs, all pursuant to Duquesne Light Co. v. Barasch, 408 U.S. at 307 and Tenoco Oil, 876 F. 2d at 1026-1027.

The court, however, clarifies that, as expressed in Tenoco Oil Co., 876 F. 2d at 1024-1025, citing Williamson County Regional Planning Com'n v. Hamilton Bank, 473 U.S. 172, 186 (1985), that retroactivity under the Takings clause "is not ripe until the government entity charged with implementing the regulation has reached a **final decision** regarding the application of the regulations to the property at issue." (Emphasis ours.) ORIL, at this time, is not near a final decision as to the remedy relating to the regulatory accrual nor as to a fair return of equity contemplated under injunctive prospective equitable principles.

Following the *Injunctive Order*, the court has held various hearings in order to achieve compliance. However, as of this date, the court has not found compliance with our Preliminary Injunctive Relief, notwithstanding that the First Circuit Court of Appeals affirmed as to a reasonable rate of return of milk sold to the consumer, and as to a Takings Clause violation relating to the rate for price of milk paid to the farmers.

Hence, the court held compliance hearings as to the Preliminary Injunctive Relief on August 25 and 26, 2008, that is more than one year after the Preliminary Injunctive Relief, which had not

4

been stayed by the District or the First Circuit Court of Appeals. The court stresses that a reasonable rate of return is now been sought for at least the years 2004-2008 in an economic atmosphere that has been found defective as to a reasonable rate of return, regarding the price of milk to the consumer and as to the price imposed by the Administrator to the milk processors to be paid to the farmers, which in turn benefitted a competitor, Indulac, who paid less for the same raw milk due to the excess paid by the milk processors.

On the second day of hearings, as the first day was continued, notwithstanding the Administrator's new administrative price order effective on July 22, 2008, *see* Docket No. 938-3, the parties were attempting to reach an agreement and, in fact, reached an agreement on August 26, 2008, as to the method of calculation of the Regulatory Accrual and Return of Equity of the milk processing plants. The parties reached an agreement signed by the Economic Experts of the parties including the Administrator's expert, on the second day, Docket No. 1003.[6]   The Regulatory Accrual was to be performed "until December 31, 2007 and 2008 would be discussed later." As to the initial calculation of the "Regulatory Accrual . . .  [t]he initial equity for the calculation is that of December 31, 2002." (Docket No. 1003.) As to the "Return of Equity," the "ROE," the experts agreed that "the method to calculate the ROE could either be the Capital Asset Pricing Model (CAPM) as described in Regulation #12 [the alluded new price order of ORIL issued by the defendant on July 22, 2008, *see* Docket No. 938, Ex. 1, cited at Docket No. 1004], plus a measure of Puerto Rico Risk or the method used in the report by Jonathan Lessor plus a measure of Puerto Rico Risk." The *Experts' Agreement* signed and stipulated by the experts was ordered

---

[6]        The court notes that this is not the first time that counsel for all parties have reached an agreement as to the milk prices.  *See Interlocutory Agreement On Prices* of October 25, 2007, Docket No. No. 649-2.  This agreement was signed by Messrs. Rafael Escalera Rodríguez (Suiza), José R. Lázaro Paoli (VTM), Edilberto Berríos Pérez (PRDFA), Edward W. Hill (ORIL), Kermit Ortiz (Secretary of Agriculture).

filed by the court after all counsels present that day examined the same. *See* Docket No. 1002, Minutes of August 26, 2008.

On September 22, 2010, the court issued an *Amended Opinion and Order*, Docket No. 1697, as ORIL, in the process of determining the Return of Equity (ROE), was attempting to disengage from the formula agreed by all experts as to the method to be used in calculating the ROE. ORIL had chosen of the two methods to be used in determining the Return of Equity, the Capital Asset Price Model (CAPM). However, ORIL unilaterally insisted in extricating itself from the phrase "plus a measure of Puerto Rico risk," which was to also be present in the alternate ROE method, the Jonathan Lessor method. *See* Docket No. 1003, signed *Experts' Agreement*.

The court in its Amended Opinion and Order of September 22, 2010, denied the request of ORIL to "extricate" itself unilaterally from a clear stipulation of its own experts as to the procedure to calculate the ROE of the two fresh milk processors unless "it becomes apparent that it may inflict a manifest injustice upon the contracting parties." Chao v. Hotel Oasis, Inc., 493 F.3d 26, 31-32 (1st Cir. 2007) citing Marshall v. Emersons Ltd., 593 F.2d 565, 569 (4th Cir. 1979). The district court also cited the then recent case of the Supreme Court of Christian Legal Soc. Chapter of the University of California et al., ___U.S.___, 130 S.Ct. 2971, 2983 (2010) standing for the proposition that "the burden is on the party seeking to recover to show his or her right from the facts actually stated . . . " Further, "[f]actual stipulations are 'formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."

In the instant case the litigated matter referred to an economic controversy relating to an alleged method to be used by ORIL to determine the return of equity, ROE. The matter was stipulated by the economic experts, examined by counsel and ordered filed by the court. Further, the court clarified that the ROE was a matter that at the time of the signature by the experts,

6

August 26, 2008, was fully justified by the regional economy as an "unsystematic risk" considering the regional economy, as compared to the poorest states in the nation. See *Order* of September 23, 2009 at Docket No. 1699, amending Footnote #6 of Docket No. 1697 and Footnote #7 of the same order. The court had also clarified that the denomination of "measure of Puerto Rico Risk" was ill denominated by the Experts of ORIL and the milk processors and did not constitute a coinage by the court **nor a permanent fixture** as the unsystematic risk could vary potentially from by scientific data from year to year. However, the court also stressed that at the time of the signature, August 26, 2008, the economic regional scenario fully justified the stipulation of "a measure of risk," which does not mean "no risk," as defendant ORIL now seeks to be interpreted. The court was not then impressed with ORIL's argument that "there is no need to add an additional premium to the reasonable rate of return in order to compensate fresh milk processors." Expressions by ORIL at Docket No. 1676, p. 1. ORIL, however, failed to even mention or reach the threshold of "manifest injustice" expressed in Chao, 493 F. 3d at 31-32 nor could ORIL challenge the economic data which totally justified the *Experts' Agreement*, as to "plus a measure of Puerto Rico risk." However, the economic scenario on a year to year basis going backward to potentially "2002," (in at least the "regulatory accrual" section of the stipulation), as agreed by the experts, or going forward can be either the same risk, improved, worsened or non-existent at all for a given year.  But there was "a measure of Puerto Rico Risk" stipulated into the CAPM formula for the first calculation, as the parties agreed within the prevalent economic scenario of August 26, 2008 to include "a measure of Puerto Rico risk."  The court stresses that the agreement did not state "with no risk measure," as defendant now wishes to interpret the document. That is, another economic matter, but not the matter stipulated on August 26, 2008

considering then the regional economic scenario.

The court also tackled another controversy which was impeding compliance with the court's prospective equitable relief. Both VTM and Suiza challenged within the Beta coefficient of the CAPM formula, the inclusion of Dean Foods "being incorporated as part of the Beta coefficient companies to be examined within the CAPM-ROE formula." See VTM's objection at Docket No. 1192, p.p. 6-9 and Suiza's position at Docket No. 1194, p. 2-4. The District Court had warned on several occasions that the court would not allow economic models or economic parameters from other jurisdictions to be imposed without any reasonable, rational justification to Puerto Rico. The parties accepted the CAPM method. However, within the CAPM method as to the Beta coefficient, Suiza and VTM vehemently opposed the inclusion of a large humongous corporation that was at least forty-five times the economic size of the sum of both VTM and Suiza, as part of the beta factor.  Further, the market in Puerto Rico is small compared to the market served by Dean Foods. Above all Puerto Rico is in the Caribbean Sea, a calid temperature market.  Further, it is extremely expensive to transport into the Island, for all members of the milk industry, the industrial machinery, as well as the needs of producing, manufacturing, as the necessary equipment and ingredients must arrive using United States' flag ships under the United States cabotage laws and/or be shipped via air transport.[7]

The First Circuit Court of Appeals at <u>Tenoco</u>, 876 F.2d 1024 has recognized that a regulatory parameter cannot be imposed merely because it was used in Continental United States. In 1981, the United States, using current nationwide economic data for the year 1981

---

[7]   The court concluded in its injunctive relief pursuant to expert testimony that "the production of raw milk in Puerto Rico is more expensive that anywhere else in the United States. . ." based on the record testimony, (Transcript of hearing held on June 6, 2006, p.. 77 lines 6-9.)  This fact has not in any way or form been challenged by any party.

within then a regulated gasoline market, determined a gross 8.6 cents margin for a gallon of

gasoline for the year 1981. That figure was a national reasonable figure for the nation in 1981.

The local Department of Consumer Affairs ("DACO"), however, attempted to use the economic

data for the year 1981 for the economic national figure in Puerto Rico in 1986. The First Circuit

Court of Appeals found the imposition of said figure not only stale but also not necessarily fit in

"*Puerto Rico alone*," as the state regulated market was then only Puerto Rico.

> The above [inclusion into Puerto Rico of a past federal parameter]
> strikes us as a weak basis for a state agency to adopt the most critical
> figure in its arsenal for regulating a vital industry. By 1986, the 8.6¢
> figure, last used by federal authorities in 1981, was five years old. The
> federal regulators had regularly used then current nationwide
> economic data to update their margins, the 8.6¢ figure in 1981 being
> the most recent product of such efforts. That a figure devised in 1981
> for regulating gasoline wholesaler prices throughout the United States
> and Puerto Rico (taken as a whole) would still be the right one for
> regulating prices in 1986 in *Puerto Rico alone* is by no means
> obvious. One would have expected the agency to be able to support
> such an essential figure by specific economic data projecting the
> wholesalers' reasonable operating costs and a fair return on
> investment for the year in question, 1986. DACO made no
> presentation of such data, arguing that it was up to the companies to
> prove the reasonableness of their purported costs given the fact that
> the 8.6¢ figure had stood up in 1981 and was still, allegedly, valid on
> the mainland." Tenoco, 876 F. 2d at 1024. (Emphasis of italics on
> *"Puerto Rico alone"* in the original).

Hence, the importations into a regulated Puerto Rican market of economic data must be

not only contemporary, as opposed to stale, but also reasonable as to "*Puerto Rico alone*." That

is, it must have a fit to this region of the world.

Defendant attempts to use a beta coefficient using a company that not only is forty-five

times in total volume and size than VTM and Suiza, but also does not do business in the relatively

small Puerto Rican market. As in Tenoco Oil, it is not up to the regulated companies to prove that

Dean Foods is comparable, it is ORIL that has the burden of proof to show that such company somehow is a reasonable, rational, economic beta coefficient parameter to be used in Puerto Rico.  The economic market of Dean Foods is not necessarily per se the same market as Puerto Rico. The inclusion of said company representing 96.3% within the total beta coefficient, *see* Docket No. 1194, p. 3, the court found it to be irrational and unreasonable raising artificially the beta coefficient, *see* the *Amended Opinion and Order* of September 22, 2010, Docket No. 1697, as clarified at Docket No. 1699.  The court originally ordered the exclusion of Dean Foods and the use of another surrogate company, *see* Docket No. 1699, p.p. 15-17.

II.

LACK OF COMPLIANCE WITH INJUNCTION ORDER OF JULY 13, 2007

The determinations of the court of September 22, 2010 were made within compliance hearings. Notwithstanding defendants failed to comply. They merely filed motions for reconsideration, yet another additional delay and lack of compliance and a potential contempt with a confirmed injunctive order. The court's July 13, 2007 Injunction Order, more than three years later, has remained without full compliance as to critical equitable remedies for more than three years.[8]

---

[8]    The court is seriously considering the appointment of a monitor to verify compliance and to act as a liason between all parties to assure a more efficient compliance with the *Injunction Order*.  The court prefers the initial use of a monitor rather than the imposition of a fine.  But further delay by the now current Administrator to fully comply with the *Injunction Order* may force the court to impose both remedies.

10

III.

THE MOTION FOR RECONSIDERATION

THE STANDARD

The standard for a motion of reconsideration under Rule 59(e) as specifically alleged by

co-defendant ORIL is the following:

> Motions for reconsideration are generally considered either under Rule 59 or 60 of the
> Federal Rules of Civil Procedure, depending on the time when such motion is served.
> See Pérez-Pérez v. Popular Leasing Rental, Inc., 993 F. 2d 281, 284 (1st Cir. 1993.) It
> is settled that "[a] motion for reconsideration does not provide a vehicle for a party to
> undo its own procedural defects and it certainly does not allow a party to introduce new
> evidence or advance new arguments that could or should have been presented to the
> district court prior to judgment." Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek,
> Inc., 455 F. 3d 7, 15-16 (1st Cir. 2006). Thus, a motion for reconsideration cannot be
> used as a vehicle to re-litigate matters already litigated and decided by the Court. See
> Standard Química de Venezuela v. Central Hispano Int'l, Inc., 189 F.R.D. 202, fn. 4.
> (D.P.R. 1999). These motions are entertained by courts if they seek to correct manifest
> errors of law, present newly discovered evidence, or when there is an intervening
> change in law. See Prescott v. Higgins, 538 F. 3d 32, 45 (1st Cir. 2008); see also
> Rivera Surillo & Co. V. Falconer Glass Indus., Inc., 37 F. 3d 25, 29 (1st Cir. 1994) (citing
> F.D.I.C. v. World University, Inc., 978 F. 2d 10, 16 (1st Cir. 1992)). A motion for
> reconsideration is unavailable if said request simply brings a point of disagreement
> between the court and the litigant, or reargues matters already properly disposed of by
> the Court. See e.g. Waye v. First Citizen's National Bank, 846 F. Supp. 310, 314 n. 3.
> See generally López Quiñones v. Puerto Rico National Guard, 715 F. Supp. 2d 233,
> 248 (D.P.R. 2010).

Since the Preliminary Injunctive Relief was issued on July 13, 2007, Docket No. 480,

the court has held eleven (11) compliance hearings.[9]

---

[9]     The compliance hearings were held on February 12, 2009 (Docket No. 1168), February
13, 2009 (Docket No. 1169), February 16, 2009 (Docket No. 1170), February 17, 2009
(Docket No. 1171, February 18, 2009 (Docket No. 1172), July 13, 2009 (Docket No.
1275), July 14, 2009 (Docket No. 1283), September 16, 2009 (Docket No. 1363),
September 17, 2009 (Docket No. 1367), September 18, 2009 (Docket No. 1369),
September 21, 2009 (Docket No. 1377). Some of the last hearings were related to
imposition of sanctions to defendant under Rule 11 of the Federal Rules of Civil
Procedure ("Fed.R.Civ.P.") relating to expert testimony, which the court entered against

11

The court resolved the compliance hearing matters on September 22, 2010 (Docket No. 1697), which mainly involved the matter as to the *Experts' Agreement*, ROE determination under the CAPM Model, and the "unsystematic risk," ill denominated by the experts, as "plus a measure of Puerto Rico Risk." The court did not authorize ORIL to extricate itself from the *Experts' Agreement* not only because it failed to prove "manifest injustice" as required under Chao, 493 F. 2d at 31-32, but also because the stipulation was made by the experts on August 26, 2008, and the years to be examined were 2004 to 2008, a time when the economic picture in the region was considerably worse than the poorest state of the nation. (See Amended Order of September 23, 2009, Docket No. 1699). The court also tackled the disagreement amongst the parties as to the inclusion of Dean Foods being incorporated as part of the Beta coefficient within the CAPM-ROE formula. The court, as explained infra, expressly rejected ORIL's determination to include Dean Foods as a surrogate company, as no reasonable, rational analysis had been made by ORIL to include said company within the local Caribbean Puerto Rican market. Further, said company was forty-five times larger in volume of business than the sum of the two milk processing companies doing business in the local market, and constituted 96.3% of the total beta coefficient.  The District Court stated, based on Tenoco Oil, 876 F. 2d at 1024, as quoted above (at page 9 of this Opinion and Order), that an imported parameter (even the inclusion of a past federal parameter) had to have a reasonable rational fit "in Puerto Rico alone," that is, in the Puerto Rican market. No such "fit" in 'Puerto Rico alone' was justified by ORIL as to Dean Foods."

Defendants in its Post Compliance Hearing Memorandum of Law, Docket No. 1193,  as to the inclusion of Dean Foods in the surrogate group being examined for adjusting the Beta factor

_____

defendants.

12

stated the following argument:

> The surrogate group used by the Morningstar SIC 202 included Dean Foods, Lifeway Foods, Galaxy Foods, Yocream and Tofutti. *See* Exhibit E, p. 20, its Appendix C, or Exhibit 10. Plaintiffs' experts propose adjusting the *beta* by dropping Dean Foods from the calculation, thereby resulting in a higher *beta*. *See* Exhibits 14, 15, 16, 17 and 18. According to Doctor Cotterill's expert opinion, dropping Dean Foods because of its size is incorrect because such adjustment is subjective instead of allowing an independent third party company to estimates *beta*; because Dean Foods is a fluid milk processor representative of the industry; and because it does proxy measure the kinds of cost and the kinds of demand conditions generally for fluid milk in the United States. (*See* C.H.T., Feb. 17, 2009, p. 50, l. 2-25).

*See* Docket No. 1193, §10, p. 7.

No argument attempting to rationally justify Dean Foods being used as a coefficient factor in the small local Puerto Rican market was made by defendant nor the inclusion of said company, being forty-five times the volume of business of the sum of the two local companies, was rationally explained by ORIL. The burden is on ORIL not on plaintiffs. Tenoco Oil, 876 F.2d 1024.  No "fit" as to "Puerto Rico alone," pursuant to Tenoco Oil, 876 F.2d at 1024, was whatsover mentioned.

As to the "unsystematic risk" incorporated into the *Experts' Agreement* relating to the "measure of risk," the argument made by ORIL is purely conclusive in nature:

> 20. "It is Doctor Cotterill's expert opinion that an industry risk premium is not added to the CAPM. (*See* C.H.T., Feb. 17, 2009, p.127, l.3-25; 21).

> 22. It is Doctor Cotterill's expert opinion that there is no regulatory risk prospectively because there is a regulatory accrual line and such provides a true-up, which means that the profit stream is more controlled than the surrogates used to calculate the rate of return." Docket No. 1193, p. 11 § 20-22.[10]

---

[10]    Dr. Cotterill forgets that "true ups" established on July 22, 2008 are purely prospective in the regulation as to certain limited recurrent costs. True ups are not retroactive to determine a reasonable rate of return based on equity from 2004 to 2010 nor to determine regulatory accrual as accepted by Dr. Cotterill during his recent testimony at Docket No. 1779.

There was no "manifest injustice" even alleged by ORIL. Defendant's expert claimed a prospective inclusion of a "true up," an immediate automatic credit acknowledgment of certain line costs of the regulated parties contained in the Regulation No. 12 of July 22, 2008 reproduced at Docket No. 938-4.[11] Said "true ups" as of this date have not been implemented, notwithstanding that more than two years have elapsed. Further said regulation is only prospective in nature, and hence, does nothing to calculate a reasonable rate of return in a retroactive form from July 22, 2008 until the date of filing the complaint in 2004, as clearly admitted by Dr. Cotterill at the hearings on November 22, 2008, Docket No. 1779, pp. 112-113; 120-121,[12] ("going back prior to 2008 there was no true up. . . going backward we do not have true up but we have the fixed raw milk price." *See* Docket No. 1779, p. 122. But, the problem was not mitigated by ORIL's fixed price of raw milk since said price to Indulac was determined to be seriously constitutionally deficient, since the "fixed price" was marked up by the Administrator in order to authorize Indulac to purchase raw milk at much cheaper prices to produce UHT milk, which not only competed with fresh milk, but also slowly but surely usurped the market from fresh milk. Vaqueria Tres Monjitas et al. v. Cyndia E. Irizarry, 587 F.3d at 469, 470 ("Indulac purchased the surplus raw milk from the processors at a price significantly below the price that the processors paid for their non-surplus raw milk . . . unlike the other milk processors, the price at which Indulac may sell its milk to consumers is not regulated. This lack of regulation as to Indulac's retail price for milk, coupled with the relatively low price at which it could purchase surplus raw milk from plaintiffs, allowed Indulac's

---

[11]    The court orders ORIL to translate Regulation 12 of July 22, 2008 and its order relating thereto which are annexed to Docket No. 938.

[12]    Regulation 12 was signed on July 22, 2008 and is not effective until thirty days elapse from filing at State Department and publication pursuant to local law is complied. The court is not aware of the last date of publication and hence does not know with certainty the exact effective date.

14

profit margin to soar, while the processors struggled. And, since Indulac was able to purchase its raw milk at a deflated price, UHT milk became significantly less expensive than fresh milk- a phenomenon unique to Puerto Rico- causing Indulac's UHT milk to begin to dominate the Puerto Rican milk market." Therefore, the price of milk set forth by ORIL was not a mitigating factor for the years 2002 until months after the *Injunction Order* in July 2007.  Further, the price of raw milk constituted an aggravating factor to the milk processor who had to compete with Indulac, also enjoining the benefit of cheap raw milk.  Hence, Indulac competed favorably with both milk processors to the extreme that it "beg[an] to dominate the Puerto Rican milk market." Vaqueria Tres Monjitas, 587 F.3d at 470.  The price of raw milk reached in fact the threshold of a "taking." Vaqueria Tres Monjitas, 587 F. 3d at 483.

The court is of the opinion that defendant ORIL et al.  cannot now shift gears and allege new reasons as to the inclusion of Dean Foods in the Beta factor nor allege new reasons than those previously alleged in its Compliance Memorandum, Docket No. 1193, as reconsideration standards under Fed. R. Civ. P. 59(e) in the First Circuit eschews the parties on reconsideration to "advance new arguments that could or should been presented prior to [the District Court's resolution] judgment." Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek, Inc., 455 F. 3d at 15-16. Hence, defendant is barred from continuance of bringing new arguments merely "to re-litigate matters already litigated and decided by the court." Standard Química de Venezuela v. Central Hispano Int'l, Inc., 189 F.R.D. 2002, fn. 4. Defendant is limited on reconsideration as to a Resolution under Rule 59(e) to "manifest errors of law, newly discovered evidence" or "intervening changes in law." Prescott v. Higgins, 538 F. 3d at 45.

15

IV

ORIL'S RECONSIDERATION

On October 4, 2010, the defendants filed a *Motion for Reconsideration, Alteration or Amendment of Opinion and Order* , Docket No. 1715 ("ORIL's Motion for Reconsideration").  In a nutshell, ORIL moves for reconsideration of the *Amended Opinion and Order*, Docket No. 1697, on the following grounds:

(1)    "[T]he *Experts' Agreement* is neither final, binding contractual agreement nor a joint stipulation of facts between the parties as to any particular measure of risk. ....  But the parties here did not agree on the existence, term, or measure of risk premium."  *See* Docket No. 1715, p.p. 2-3.

(2)    "[T]he Order substitutes its own assessment of what constitutes an economically and quantitatively sound measure for *beta* and for the Risk Factor, assessments that should rightfully be made by the Administrator after input from interested persons in the rule making process. . . .  The Court's decision to become involved in the details of the *beta* determination - specifically, to strike Dean Foods because it is too big - is unsupported by economic theory, and beyond the limitations of this Court's authority.  And Defendants, after economic analysis and deliberation, have determined that the appropriate measure of a milk industry Risk Factor is zero; Defendants should not be precluded from promulgating its own regulations in accordance with that conclusion."  *See* Docket No. 1715, p. 3.

(3)    "Defendants are concerned about the possibility that the Court's Order might be read to have determined, as a matter of economic fact, that there exists a non-zero

16

risk premium in contexts outside of and beyond the present dispute.  In light of the tremendous consequences such an impression may create for Puerto Rico, Defendants respectfully request that, in the alternative, this Court amend its Order so as to clarify that it has not concluded that there exists a non-zero risk premium as a matter of general economic fact; and that the Order's discussion of a risk premium is limited to the circumstances of the milk industry presented by the specific question at issue in this particular case."  *See* Docket No. 1715, p.p. 3-4.

For procedural reasons, the court herein below also summarizes the oppositions filed by VTM and Suiza to the defendants' motion for reconsideration followed by ORIL's Reply.

The record shows that Suiza and VTM objected to ORIL's motion for reconsideration, Docket No. 1715.  Suiza's objection, Docket No. 1737, alleges that ORIL's arguments are merely a rehash of prior arguments, and the same should be denied as the motion for reconsideration fails to meet the well known First Circuit Court standard of Fed.R.Civ.P. 59(e) that is no new argument may be developed, as well as rehashings are banned.  Only manifest errors of law, newly discovered evidence, or intervening changes in law are authorized pursuant to Fed.R.Civ.P. 59(e).  As to ORIL's **new argument** regarding the non-existence of the *Experts' Agreement*, Suiza argues that the same is late, as the agreement was executed on August 26, 2008 and ORIL had more than ample time to bring this argument earlier.  (The District Court clarifies that the argument of non-existence of the *Experts' Agreement* was not even developed during the compliance hearings nor at the post-compliance memorandum of law at Docket No. 1193).  Suiza further alleges that the court has authority to demand from defendants full compliance with the terms and conditions of the *Injunction Order*, Docket No. 480, as defendants

17

are "obligated to provide a regulation method to calculate the fresh milk processors' constitutionally mandated reasonable rate of return." *See* Docket No. 1737, p. 6.  Suiza emphasizes that defendants are yet to comply with the terms of the *Injunction Order*, as the formula adopted in Regulation No. 12, that is, the Capital Asset Pricing Model ("CAPM"), is "insufficient and unreasonable." *See* Docket No. 1737, p.p. 6-7.  Lastly, Suiza argues that "there is no support for Defendants' claim that the inclusion of an unsystematic risk factor in a CAPM formula applicable exclusively to the fresh milk processors operating within the regulated milk market of Puerto Rico will have implications for Puerto Rico's investments in general." *See* Docket No. 1737, P. 13.

VTM also duly opposed defendants' motion for reconsideration. *See* Docket No. 1738. VTM did not object to the alternative remedy requested by the defendants, that is, that the court amends its *Amended Opinion and Order*, Docket No. 1697, "to clarify that (a) the Order does not conclude that there is a positive non-zero Puerto Rico Risk Factor as a matter of general economic fact; and (b) the conclusions of the Order be limited to the particular circumstances of this particular dispute within this particular industry." *See* Docket No. 1738, p.p. 1-2.[13] VTM conditioned its position as to the alternative remedy requested by defendants in part (b), provided that the "Honorable Court limit its conclusions to the particular circumstances and dispute in this case." *See* Docket No. 1738, p. 2.

---

[13]        The court herein, infra, clarifies that the "unsystematic risk" agreed does not constitute "that there is a positive non-zero Puerto Rico Risk Factor, as a matter of general economic fact, as a permanent or definite conclusion."  Further, the holding is only applicable to "this particular circumstance of this particular dispute within this particular industry," as this is the only industry handled by the court in the instant case.  Moreover, the court has held in the past that the unsystematic risk was a risk agreed to for a limited period to be evaluated retroactively and prospectively on a yearly basis by using rational, reasonable and scientific parameters.

18

As to the new argument raised by the defendants regarding the non-existence of the *Experts' Agreement*, VTM alleges that "[t]he fact that the *Experts' Agreement* allowed for additional information **to be calculated following specific procedures and criteria** for its implementation does not change its nature and the factual stipulations therein stated and agreed upon." *See* Docket No. 1738, p. 3 (Emphasis in the original).

VTM also rejects defendants' interpretation and application to the Puerto Rico contract law provisions of the Civil Code, as "[t]o 'agree' cannot have a contrary meaning requiring testimony to establish that the Experts had the 'intention' not to agree." *See* Docket No. 1738, p.p. 3-4. "The fact that the *Experts' Agreement* provides for the measure to be determined following certain agreed procedure does not mean that there is no agreement as to the fact that a measure must be determined." *See* Docket No. 1738, p. 4.

As to the exclusion of Dean Foods for the sole purpose of the calculation of the Beta factor, VTM agrees with the court, that Dean Foods cannot be used as a comparable surrogated to determine the Beta factor, simply because the size and production of Dean Foods does not conform to the economic reality of the milk processors in Puerto Rico.  That is, using the District Court analysis, that in order to use Dean Foods as a surrogate, ORIL had to prove that Dean Foods was appropriate to be used "in Puerto Rico," as cited by the First Circuit Court of Appeals in <u>Tenoco</u>, 876 F. 2d at 1024.  VTM concludes its opposition expressing that since "Defendants have not presented any factual nor legal arguments, which in any way whatsoever justify, as a matter of law, that this Honorable Court alter its clear and specific conclusions and orders addressed to Defendants, including Defendants' obligations to incorporate the amendments to Regulation No. 12, specifically enumerated by this Honorable Court," defendants' reconsideration

19

should be denied by the court.

Defendants' filed a reply to plaintiffs' opposition at Docket No. 1748.   In a nutshell, defendants allege that their motion for reconsideration meets the standard of Fed.R.Civ.P. 59(e), and is appropriate, as "[i]t challenges the Court's interpretation of the *Experts' Agreement*, which is a question of law."   *See* Docket No. 1748, p. 2.  Defendants further alleges that the argument as to the *Experts' Agreement* "could not have been made earlier."  *See* Docket No. 1748, p. 2. [14]

Defendants further allege that "the Order treated the *Experts' Agreement*, Docket No. 1003, a working agreement reached by the experts *in media res*, as though it were a final, binding *stipulation* of economic fact as to the appropriate formula for Return on Equity - a stipulation operating as a judicial admission that is conclusive of important issues in the case."  *See* Docket No. 1748, p. 2.  "That possibility was not briefed or argued by Defendants because it was wholly unforeseen."  *See* Docket No. 1748, p. 2.  It is important to make reference to defendants' Docket No. 1748, p. 2, n. 2:1:

> Defendants have never argued, and do not argue here, that there was no agreement at all among the experts.  Suiza's contrary contention, *see* Suiza Opp. at 5, is without foundation.  **The question is not *whether* the *Experts' Agreement* was an agreement (it clearly is), but rather whether it was a *factual stipulation* (or its equivalent) operating as a final and binding determination of economic fact conclusive as to the Administrator**.  (Emphasis ours).

Defendants allege that plaintiffs' oppositions failed to response to "defendants' argument concerning the intended meaning of the *Experts' Agreement*."   *See* Docket No. 1748, p. 3.

---

[14]    The District Court strongly disagrees. As the court stated throughout the compliance hearings and in its Amended Order of 9/22/10, Docket No. 1697, its position as to the *Experts' Agreement*. Hence, defendant had at least the court's opinion stated since September 2010 to allege that the *Experts' Agreement* was merely in media res.

Moreover, plaintiffs' oppositions "do not discuss, and leave uncontroverted, Defendants' record evidence establishing that the *Experts' Agreement* was not intended to bind all parties to a non-zero Risk Factor value." *See* Docket No. 1748, p. 3. Defendants further alleges that the court itself never considered the *Experts' Agreement* as a final and binding stipulation of facts. *See generally*, Docket No. 1748, p.p. 3-4. Defendants reminded the court that the Administrator is bound by the Puerto Rico laws and regulations when any changes are proposed to the current rules. "[I]n formulating the final rule, the Administrator is obligated to take account of the agency's own experience, technical competence, expertise, discretion and judgment." P.R. Laws Ann. Tit. 3 § 2124." *See* Docket No. 1748, p. 5. Defendants further argue:

> The Court's reading of the *Experts' Agreement* effectively imputes to the Administrator an intention to ignore all these considerations. But there is no evidence to support the notion that Defendants intended to stipulate conclusively to the inclusion and value of a component of the ratemaking formula before the public portion of the administrative process had begun. Furthermore, there is no reason to think that Defendants intended to stipulate to such before their own experts had completed their own analysis of the subject in advance of that public process. It would be extraordinary, and extraordinarily implausible, for Defendants to stipulate away this important point at so early a time, and in so oblique manner.

Defendants also argue that Suiza failed to explain why "in a federal question case, the court must apply federal contract law." *See* Docket No. 1748, p. 5.[15] In any event, according to

---

[15]   The court interprets the *Experts' Agreement* pursuant to Puerto Rican Law, not federal contract law. Local law dictates that when the language is clear, as was the case as to the parties' experts agreeing to an unsystematic risk. The court does not have to enter into the intent of the parties in order to interpret the *Experts' Agreement*. *See* 31 L.P.R.A. § 3471: "If the terms of the contract are clear and leave no doubt as to the intentions of the contracting parties, **the literal sense of its stipulations shall be observed**." (Emphasis ours). Notwithstanding, the instant case constitutes a federal question of law case as to whether there is a due process, equal protection or a taking violation resulting from the regulation, which the First Circuit Court of Appeals has undoubtedly found "proper" and "not an abuse of discretion of the district court," as affirmed. *See* Vaquería

the defendants, even if federal contract law were to apply and govern the *Experts' Agreement*,

"that point is not effective to rebut Defendants' arguments."  *See* Docket No. 1748, p. 6.  Lastly,

defendants allege that Suiza failed to state any conflict between federal contract law as opposed

to Puerto Rico contract law.  Hence, "Suiza's argument is meritless."  *See* Docket No. 1748, p. 7.

As to Suiza's argument that the defendants "may not be excused from the effects of the *Experts'*

*Agreement* because there is no 'manifest injustice' in the court's determination," the defendants

argue that the defendants "are under no obligation to establish good cause (in the form of

manifest injustice or otherwise) as precondition for relief here."  *See* Docket No. 1748, p. 7.

> Second, even if the *Experts' Agreement* were such a stipulation, there is ample cause to find that it created the kind of "manifest injustice" that could relieve the Administrator of its burdens. As noted above, the effect of the Court's determination is to require a non-zero value for the Risk Factor.  That requirement ties the hands of the Administrator in a fundamental and critical way.  Although the First Circuit said that it had left "ORIL ... free to continue to apply its expertise to distinctively local facts," Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 476 (1st Cir. 2009), the September 22 Order eliminates that freedom entirely by "engag[ing] in the sort of fact-specific technical inquiry" prohibited by the Burford [Burford v. Sun Oil Co., 319 U.S. 315 (1943)], case and by established principles of comity.  Id.  The Court's withdrawal of the freedom frustrates the Administrator's ability to litigate the issue fully before the Court and forecloses her ability to exercise administrative duties in the fact-sensitive context of the statutory ratemaking process.  These effects constitute "good cause" for relieving Defendants from the stipulation, especially in view of the First Circuit's instruction that the necessary "good cause" is present in the case of a misunderstanding by the parties.  See Chao v. Hotel Oasis, Inc., 493 F.3d 26, 31-32 (1st Cir. 2007) (citing T.I. Fed. Credit Union, 72 F.3d [921] at 928 [1st Cir. 1995] and Brast v. Winding Gulf Colliery Co., 94 F.2d 179, 181

---

Tres Monjitas v. Cyndia E. Irizarry et al., 587 F.3d at 469, 483 (describing the price of raw milk established by the former Administrator, favoring Indulac, as discriminatory, and constituting a "taking" as to the fresh milk processors, further finding that the fair rate of return had not been established as to the milk processors, because of due process and equal treatment violations.

(4th Cir. 1938)).  Plaintiffs have not disputed Defendants' abundant evidence that a misunderstanding existed here.

*See* Docket No. 1748, p. p. 7-8.[16]

Lastly, defendants argue that the court's directive of excluding Dean Foods from the list of comparable companies to determine the Puerto Rico "fit" is contrariwise to the court's position of not getting involved in local regulatory matters.  It is defendants' position that the "Court exceeded its power by substituting its own views for the Administrator's 'expertise [on] distinctively local regulatory facts.'  Vaquería Tres Monjitas, 587 F.3d at 476."  *See* Docket No. 1748, p. 9.

The record shows that Suiza filed a *Sur-Reply to Defendants'* [sic] *Dkt. No. 1748*.  *See* Docket No. 1751.  The arguments presented by Suiza are not new, as the same are within the spectrum of Suiza's prior opposition to defendants' reconsideration request, but correctly emphasizes making specific references to the record that ORIL's Reconsideration constitutes a rehashing or a banned new argument not to be considered under reconsideration standards of the First Circuit Court of Appeals.

The court tackles defendant's reconsideration in *seriatim* fashion.

(1) The *Expert's Agreement* recognition of an unsystematic risk.

The issue as to the *Experts' Agreement* is simply limited to an interpretation in the document as to the parties agreeing within the *Experts' Agreement* to the following: "the method to calculate the ROE could be either the Capital Asset Model as described in Regulation 12 plus

---

[16]     But defendant omits that <u>Tenoco</u> at 876 F.2d 1024 held that it is the regulator who has the burden to prove that outside parameters be rationally and reasonably analyzed to "*Puerto Rico alone.*" (Phrase placed in italics by the First Circuit Court of Appeals.)

a measure of Puerto Rico Risk or . . . the Jonathan lessor measure plus a measure of P.R. Risk."
(The Administrator chose the Capital Asset Model, the CAPM method).

The court has previously set forth that the *Experts' Agreement* does not constitute a "*per
secula seculorum*" type of agreement in terms of time frame going retroactively to 2004 (or 2002)
or forward prospectively from August 26, 2008.  But, the phrase "**plus a measure of Puerto
Rican Risk**" does not mean "**no measure**" of Puerto Rican Risk. (Emphasis ours).  The specific
number within the "measure of risk" is to be determined by the Administrator considering P.R.
economic factors then present on August 26, 2008. The court has interpreted that the
unsystematic risk factor, future or past, does not constitute a permanent feature, as the original
number could be going retroactively or forward, increased, decreased or disappear.  But the
Administrator does not enjoy unbridled discretion, as the matter of unsystematic risk must be
rational, reasonable, and based on scientific data.  The court understands that the *Experts'
Agreement* on an original "measure of unsystematic risk as the economic factors included in our
clarification *Order*, Docket No. 1699 at footnotes no. 6 and 7, certainly warranted the *Experts'
Agreement* to agree on "a measure of Puerto Rican Risk." The court does not interpret the
measure as a permanent fixture in the formula as the economic conditions in prior years, 2004-
2008, could warrant either an increase or a decrease or even an elimination; the same analysis
applies going prospectively from August 26, 2008 forward. The court is of the opinion that at least
covering the first initial computation, the parties agreed to a risk factor (for example, on the
consideration of the Regulatory Accrual, the first period of analysis was set "to be performed until
December 31, 2007, and 2008 is to be discussed later").  *See Experts' Agreement*, Docket
No. 1003, at ¶ 1(b).  From the original date prospectively and retrospectively, the determination

24

could depend on a rational, scientific method to increase, decrease, or eliminate the unsystematic risk.  The court interprets the original date to be as to the ROE from December 31, 2007 to December 31, 2008.  *See* analysis, infra.

The court emphasizes as to the unsystematic risk within the *Experts' Agreement* that the experts stated within the agreement other matters that were agreed, and further stated what was not agreed, and what constituted a mere delegation to a person for information without a commitment whatsoever as to any party. Hence, the *Experts' Agreement* at Docket No. 1003 to the court meant "a measure" of unsystematic risk from the period from December 31, 2007 to August-December 2008 outside those times limits the matter was subject to pure rational, scientific methods of increase, decrease, or elimination of the unsystematic risk factor.[17]

The court is not persuaded by ORIL's expert theory, one different from that of ORIL's counsel, that there is no measure of risk, because Regulation No. 12 "true ups" disposition eliminates the risk as Regulation No. 12 signed on July 22, 2008, and effective sometime thereafter, (after publication by the State Department of Puerto Rico pursuant to law), is not retroactive in nature. Regulation No. 12 of July 22, 2008 is purely prospective, hence, could not be applied to the ROE (Reasonable Rate of Return or to the Regulatory Accrual also expressly contemplated by the *Experts' Agreement*).  Dr. Cotterill, after being cross-examined by counsel

---

[17]     The courts' interpretation of the agreement period is the least intrusive interpretation of the *Experts' Agreement*, as this court very well interpret that the unsystematic risk was agreed from filing date 2004 "until December 31, 2007," and 2008 would be"discussed later," as was agreed as to the initial calculation of the regulatory accrual.  But the time period for the regulatory period was not repeated at the reasonable rate of return sections of the *Experts' Agreement*.  Hence, the court deems that a one year period from December 31, 2007 is the most reasonable interpretation, as the parties agreed on August 26, 2008 to a systematic risk factor, and the court deems that the period should be the period covered by the yearly reviews of the milk price for all the industry, *see* The Milk Industry Act of June 11, 1957 ("Law No. 34"), 5 L.P.R.A. § 1092, *et seq.*  All modifications, thereafter, for retroactive and prospective dates depend on reasonable, rational, scientific data.

and asked by the court as to the potential retroactivity of Regulation No. 12, then, as a fall back position, claimed that there was no risk retroactively and prospectively, because the major and most recurring cost expense of Suiza and VTM was the price of raw milk, which was set by law. *See* Docket No. 1799, pp. 112-121, wherein Dr. Cotterill described the milk price as a "constant". Dr. Cotterill forgets that both the District Court at the *Injunction Order*, Docket No. 480, and then First Circuit Court of Appeals at Vaquería Tres Monjitas et al., 587 F.3d 469-470, 483, thoroughly found "proper" that precisely the price of raw milk paid by the industrial milk processors was both discriminatory, and anti-competitive in nature, reaching a taking under Duquesne Light Co., 488 U.S. 299. VTM and Suiza paid an elevated non-cost justified price for raw milk designed to allow Indulac to purchase raw milk at below cost price to produce UHT milk at lower prices, and eventually enabling Indulac to "dominate the Puerto Rican milk market." Vaquería Tres Monjitas, 587 F.3d at 470. Further, the raw milk price constituted a "taking" banned by the United States Constitution. Vaquería Tres Monjitas, 587 F.3d at 484. "Given the ample evidence of arbitrary and discriminatory regulation, we see no abuse of discretion in the court's determination that plaintiffs have demonstrated a likelihood of success on the claim that defendants' actions constituted a regulatory taking of their property without due process." *Id.* (Referring to a reasonable rate of return through the rate to the consumer). But the First Circuit Court of Appeals at Vaquería Tres Monjitas had also found equally infirm the "subsidy of Indulac" to the degree of "elimination of one of the components to the industry [being] demonstrably irrelevant to the policy of the Legislature." Vaquería Tres Monjitas, 587 F.3d 483-484, finding reasonable the analysis of the District Court following Tenoco Oil, 876 F.2d at 1024. Hence, the price of raw milk paid by the milk processors did not constitute a mitigating measure of risk but on the contrary, constituted

26

an aggravating factor.  It is the court's opinion that the price of milk paid by the milk processors was precisely one of the most severe constitutional deficiencies established by the predecessor Administrator.

The court rejects as out-off bounds, and being tardy, the claim that the *Experts' Agreement* was no agreement as a recent vintage argument being made after the holding of eleven compliance hearings, wherein the court stated that the agreement would be enforced.  *See* Docket No. 1737, p. 5.  Further, the defendants' lack of agreement argument comes only after the court's determination of September 22, 2010, Docket No. 1697, enforcing the agreement, on the needs of ORIL's expert being cross-examined by counsel for Suiza, as to the retroactivity of Regulation No. 12.  Hence, pursuant to clear the First Circuit Court of Appeals' reconsideration standards "new arguments" are banned pursuant to Pérez v. Popular Leasing, 993 F.2d at 284, Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek, Inc., 455 F.3d at 15-16, and Prescott v. Higgins, 538 F.3d at 45. The argument of no agreement could and should have been made during the compliance hearings or at Defendant's Post Compliance Hearings Memorandum at Docket No. 1193 dated March 27, 2009, and not now on Reconsideration at Docket No. 1715.

Notwithstanding, the court has addressed on the merits the allegations of defendant ORIL as stated infra and rejected the claims of a "no agreement" as to the unsystematic risk.

2. Dean Foods inclusion as a surrogate company of the Beta component as to ROE.

As to the inclusion of Dean Foods as a surrogate company of the Beta component to be considered under the CAPM method, the court reiterates its holding stated above.  ORIL, pursuant to express findings of the Tenoco Oil, 876 F. 2d at 1024, has the burden to prove by reasonable and rational analysis the inclusion of said company, as a Beta coefficient by Mandate

of the First Circuit Court of Appeals to "*Puerto Rico alone*."  There is no rational, reasonable nor

any analysis whatsoever fitting Dean Foods to the regional calid temperature milk and expensive

market of Puerto Rico nor by including such a large company (forty-five times the seize in volume

of business of the sum of VTM and Suiza), into the Puerto Rican market. Contrary to ORIL's

argument the court is not improperly substituting ORIL's discretion of an economic standard. In

Tenoco, *supra*, as stated above, the court  struck a state federal economic standard not only as

stale but also because the standard could not rationally be applied to "Puerto Rico alone." On

September 22, 2010, the court ordered that another comparable company be added or Dean

Foods would be stricken, and the Beta component would then be limited to the other four

surrogate companies.  The court reiterates the reasoning and the orders of September 22, 2010

and September 23, 2010, Docket entries No. 1697 and 1699.

V.

SUIZA'S PARTIAL RECONSIDERATION

Suiza filed a *Motion for Partial Reconsideration of Order, Dkt. No. 1697, Amended by*

*Dkt. No. 1699*.  *See* Docket No. 1706.  The record shows that VTM opposed Suiza's

reconsideration, Docket No. 1717, followed by Suiza's reply, Docket No. 1729.  In a nutshell,

Suiza's reconsideration is triggered by the court's finding that since the issues of the School

Luncheon Program and the collection of raw milk are not pled in the *Complaint*, and were not

considered by the court in the *Injunction Order*, Docket No. 480, the court will entertain these

issues at the permanent injunction hearing.[18]  *See Amended Opinion and Order*, Docket No. 1697,

---

[18]    But the court did in fact make a finding as to the decision by ORIL having been made by
ORIL without known parameters. See Docket No. 480, pp. 14-15.  The First Circuit Court
of Appeals also considered the matter at 587 F.3d at 481-482.

28

p. 5.  For the reasons set forth below, Suiza's motion for partial reconsideration, Docket No. 1706, is denied without prejudice with a caveat.

The record is clear that on January 22, 2007, Suiza sent a letter to ORIL wherein Suiza voluntarily surrendered certain routes corresponding to the pick-up of raw milk produced by the farmers due to Suiza's temporary "extremely precarious financial situation."  *See* Docket No. 1339-2. (Suiza and VTM are in charge of making the pick-up of the farmers' raw milk production).  Moreover, Suiza specifically requested that these routes be assigned to VTM.

> During the year 2006, Suiza Dairy incurred in $940,815 in expenses above what it was reimbursed.  This situation is untenable.  It is for this reason that we will be suspending approximately 700,000 liters per week in milk pick-ups.  Before suspending this pick-up, we would notify you the routes affected so that you can assign them to Vaquería Tres Monjitas, if you deem that appropriate.  The process of selecting the cattleranchers whose pick-up will be suspended has begun.  We cannot guarantee that this number will not have to be increased later.

*Id.*

In June 7, 2007, Suiza sent another letter to ORIL regarding the "School Lunchrooms," wherein Suiza submits a list of schools that Suiza may be transferring to VTM.  "[W]e are submitting the list of the schools that we might be able to transfer to Vaquería Tres Monjitas, Inc., without its causing the closure of fresh milk service routes.  The list has a total of 205 schools located around the Island, with a total of 1,601,232 liters."  *See* Docket No. 1535-2.  Other letters were also sent by Suiza to ORIL regarding the list of schools, and the collection of raw milk.  ORIL then proceeded by Administrative Orders to amend the list of VTM's routes for collection of raw milk, as well as the service to schools under the School Luncheon Program. *See* Administrative Order of February 7, 2007, Docket No. 1545-2; Administrative Order of February 22, 2007, Docket

No. 1545-2; Administrative Order of March 27, 2007, Docket No. 1545-2; Administrative Order of April 5, 2007, Docket No. 1321-11.  VTM accepted the routes assigned to them by ORIL.  *See* VTM's letter to ORIL regarding the total amount of assigned schools, Docket No. 1545-2. Consequently, the percentage of schools under the luncheon program assigned by ORIL to VTM increased, as opposed to the decreased percentage assigned to Suiza.  The record, however, must be clear that this re-assignment of routes and schools responded to an immediate action taken by ORIL due to the unexpected and sudden voluntary surrender of Suiza's routes triggered by Suiza's "extremely precarious financial situation."  *See* Docket No. 1339-2.

In sum, it is not reasonable for Suiza to expect that ORIL design an immediate parameter regarding the service of the collection of raw milk luncheon school participation, when Suiza had voluntarily and suddenly abandoned the service of these routes and schools, all of which had to be serviced immediately on a continuing basis, the pick-ups of the raw milk, as well as the fresh milk service to be provided to the school children under the lunch program.

At this stage of the proceedings, the court can only examine whether the administrative action taken by ORIL was rational, reasonable, with a scientific basis basis in a non-discriminatory and non-retaliatory fashion.  Regardless of whether or not there is a proprietary federal right that will entitle Suiza to participate in the School Luncheon Program, this issue will be entertained by the court based on supplemental jurisdiction, 28 U.S.C. § 1367, at the final injunction hearing, wherein the court will determine whether ORIL made a rational, reasonable, scientific administrative determination under Puerto Rican law, if not under federal law.

Finally, the issues of the collection of raw milk and the routes of the School Luncheon Program are not related to the core in this case, which is to determine the reasonable rate of

return to the milk processors and regulatory accrual owed to the milk processors at least starting with the date of filing of the instant complaint in 2004.

For the reasons set forth above, Suiza's motion for partial reconsideration, Docket No. 1706, is denied without prejudice, to be entertained at the permanent injunction hearing.

VI.

ORIL'S MOTION TO STAY

ORIL filed a *Motion for a Stay of Enforcement of the Amended Opinion and Order* ("ORIL's motion to stay").  *See* Docket No. 1777.  ORIL's motion to stay was opposed by Suiza, Docket No. 1780, and VTM, Docket No. 1781.  For the reasons set forth below, ORIL's motion to stay is denied as premature, at this stage of the proceedings.

In a nutshell, ORIL moved the court to: (a) stay the enforcement of the *Amended Opinion and Order*, Docket No. 1697, pending the court's ruling on ORIL's motion for reconsideration, Docket No. 1715; and (b) in the event that ORIL's motion for reconsideration is denied in whole or in part, then the order of the court denying the reconsideration will become immediately appealable as the *Amended Opinion and Order* modifies the *Injunction Order*, in which case ORIL will "seek a stay of further proceedings in the District Court pending appeal."  *See* Docket No. 1777, p. 2.  The court finds that ORIL's request to stay is premature, at this stage of the proceedings, as ORIL's motion for reconsideration was still pending the court's consideration when the motion to stay was filed.  The court cannot anticipate the reasons for ORIL's motion to stay until it receives the court's resolution.  Moreover, ORIL's general statement that the *Amended Opinion and Order*, Docket No. 1697, modifies the *Injunction Order*, Docket No. 480, in a conclusory and underdeveloped fashion, fails to persuade the court to consider the stay requested

31

by the defendants, at this stage of the proceedings.

The court is not persuaded by ORIL's additional arguments, as the court has already determined that the stay request is premature at this stage of the proceedings. ORIL may renew its stay request at the appropriate time, if necessary.

Finally, this court has waited patiently for compliance with its *Injunction Order*, which is over three years old, with the aggravating factor that the *Injunction Order* was not in any way or fashion been altered by the First Circuit Court of Appeals. Hence, the court is not to be lenient to further delays triggered by defendant ORIL without even knowing the court's determination or the court's reasoning.

CONCLUSION

The Amended Opinion and Order of September 22, 2010, Docket No. 1697, as amended on September 23, 2010, Docket No. 1699, remains unaltered except as herein clarified. The court once again orders immediate compliance, as to all compliance mandates, pursuant to the Amended Opinion and Order of September 22, 2010, as clarified on September 23, 2010, Docket entries No. 1697, 1699.

A hearing to establish a final due date for ORIL to comply with its obligation to produce the final figures as to the return of equity (ROE), and the regulatory accrual from the date of filing to December 31, 2009 is set for **January 19, 2011 at 5:00 p.m.**

In view of the foregoing, ORIL's motion for reconsideration, Docket No. 1715, is denied; Suiza Dairy's motion for partial reconsideration, Docket No. 1706, is denied without prejudice, as this matter will be entertained by the court in the permanent injunction hearing, and ORIL's motion

32

to stay, Docket No. 1777, is denied without prejudice, as being premature at this stage of the proceedings.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 3rd day of January, 2011.

s/Daniel R. Domínguez

DANIEL R. DOMINGUEZ
U.S. District Judge