```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF PUERTO RICO

 3
    In Re:                    )    Docket No. 3:17-BK-3283(LTS)
 4                            )
                              )    PROMESA Title III
 5  The Financial Oversight and )
    Management Board for       )
 6  Puerto Rico,              )    (Jointly Administered)
                              )
 7  as representative of      )
                              )
 8  The Commonwealth of       )
    Puerto Rico, et al.       )    November 22, 2021
 9                            )
            Debtors,          )
10

11  _____

12  In Re:                    )    Docket No. 3:17-BK-3566(LTS)
                              )
13                            )    PROMESA Title III
    The Financial Oversight and )
14  Management Board for       )
    Puerto Rico,              )    (Jointly Administered)
15                            )
    as representative of      )
16                            )
    The Employees Retirement  )
17  System of the Government  )
    of the Commonwealth of    )
18  Puerto Rico,              )
                              )
19          Debtors,          )

20  _____

21

22

23

24

25
```

```
 1   _____

 2

 3   In Re:                      )        Docket No. 3:19-BK-5523(LTS)
                                 )
 4                               )        PROMESA Title III
     The Financial Oversight and )
 5   Management Board for        )
     Puerto Rico,                )        (Jointly Administered)
 6                               )
     as representative of        )
 7                               )
     The Puerto Rico Public      )
 8   Buildings Authority,        )
                                 )
 9                     Debtors,  )

10   _____

11             CONFIRMATION HEARING - DAY SEVEN

12   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

13            UNITED STATES DISTRICT COURT JUDGE

14   AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

15            UNITED STATES DISTRICT COURT JUDGE

16   _____

17
     APPEARANCES:
18
     ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY
19
     For The Commonwealth
20   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
21                            Mr. Michael T. Mervis, PHV

22   For Puerto Rico Fiscal
     Agency and Financial
23   Advisory Authority and
     the Governor of
24   Puerto Rico:            Mr. Peter Friedman, PHV
                             Ms. Maria DiConza, PHV
25
```

```
 1   APPEARANCES, Continued:

 2   For The Lawful
     Constitutional Debt
 3   Coalition:              Mr. Susheel Kirpalani, PHV

 4
     For Ambac Assurance
 5   Corporation:            Mr. Dennis F. Dunne, PHV
                             Ms. Atara Miller, PHV
 6
     For Financial Guaranty
 7   Insurance Company:      Mr. Martin A. Sosland, PHV

 8   For National Public
     Finance Guarantee
 9   Corporation:            Ms. Kelly DiBlasi, PHV

10   For The Official
     Committee of Retired
11   Employees:              Mr. Robert Gordon, PHV

12   For Cantor-Katz
     Collateral Monitor,LLC: Mr. Douglas Mintz, PHV
13
     For AmeriNational
14   Community Services, LLC: Mr. Nayuan Zouairabani Trinidad, Esq.

15   For Peter C. Hein:      Mr. Peter C. Hein, Pro Se

16   For Suiza Dairy Corp.:  Mr. Rafael A. Gonzalez-Valiente, Esq.

17   For Finca Matilde, Inc.: Mr. Eduardo J. Capdevila-Diaz, Esq.

18   For Vaqueria Tres
     Monjitas:               Mr. Gerardo A. Carlo-Altieri, Esq.
19
     For Maruz Real Estate:  Mr. Alexis Fuentes-Hernandez, Esq.
20
     For the Official
21   Committee of Unsecured
     Creditors:              Mr. Luc A. Despins, PHV
22
     For PFZ Properties,
23   Inc.:                   Mr. David Carrion-Baralt, Esq.

24   For Assured Guaranty
     Corp. and Assured
25   Guaranty Municipal Corp: Mr. Mark C. Ellenberg, PHV
```

```
 1   APPEARANCES, Continued:

 2   For Sucesion Pastor
     Mandry Mercado:          Mr. Alexis Fuentes-Hernandez, Esq.,
 3                               for Mr. Charles A. Cuprill, Esq.
     For U.S. Bank Trust
 4   National Association
     and U.S. Bank National
 5   Association:             Mr. Ronald J. Silverman, PHV

 6   For Service Employees
     International Union and
 7   International Union,
     United Automobile,
 8   Aerospace and
     Agricultural Implement
 9   Workers of America:      Mr. Peter D. DeChiara, PHV

10   For Credit Unions:       Mr. Enrique M. Almeida, Esq.

11   For Mapfre PRAICO
     Insurance Company:       Mr. Jose Sanchez-Girona, Esq.
12
     For Underwriter
13   Defendants:              Mr. Howard Steel, PHV

14   For Arthur Samodovitz:   Mr. Arthur Samodovitz, Pro Se

15   For Asociacion de
     Maestros de Puerto Rico
16   and Asociacion de
     Maestros de Puerto
17   Rico-Local Sindical:     Mr. Jose Luis Barrios-Ramos, Esq.

18   For the Ad Hoc Group
     of Constitutional
19   Debtholders:             Mr. Andrew Kissner, PHV

20   For American Federation
     of State, City, and
21   Municipal Employees:     Mr. Kenneth Pasquale, PHV
                              Ms. Sherry J. Millman, PHV
22
     For Quest Diagnostics:   Mr. Brett Fallon, PHV
23
     For Amador:              Ms. Maria Mercedes Figueroa
24                              y Morgade, Esq.

25   Proceedings recorded by stenography.  Transcript produced by
     CAT.
```

```
 1                            I N D E X

 2    WITNESSES:                                      PAGE

 3         The Declaration of Jay Herriman
                submitted into evidence.              16
 4

 5

 6    EXHIBITS:                                       PAGE

 7
           Debtors' Exhibit Nos. 147, 148 and 149     27
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    November 22, 2021

 3                                    At or about 9:30 AM

 4                          *      *      *

 5            THE COURT:  Buenos dias.  Would the video

 6   participants please turn your cameras on, and would the

 7   courtroom deputy please call the case?

 8            COURTROOM DEPUTY:  Good morning.

 9        The United States District Court for the District of

10   Puerto Rico is now in session.  The Honorable Laura Taylor

11   Swain presiding.  Also sitting, the Honorable Magistrate Judge

12   Judith Dein.  God save the United States of America and this

13   Honorable Court.

14        In re: The Financial Oversight & Management Board for

15   Puerto Rico, as representative of the Commonwealth of Puerto

16   Rico, et al., Case No. 2017-BK-3283, PROMESA Title III,

17   2017-BK-3566, and 2019-BK-5523, for Further Confirmation

18   Hearing.

19            THE COURT:  Thank you.

20        Again, good morning.  Welcome back, counsel, parties

21   in interest, and members of the public, and press who are

22   observing today's proceedings by Zoom video connection or are

23   listening by telephone.

24        Today we will hear the parties' closing arguments in

25   connection with the motion of the Oversight Board as
```

1   representative of the Title III debtors for confirmation of

2   the Modified Eighth Amended Plan of Adjustment for the

3   Commonwealth of Puerto Rico, the Public Buildings Authority,

4   and the Employees Retirement System.  After those arguments,

5   we will proceed to a hearing on the application, pursuant to

6   Title VI of PROMESA, for approval of the proposed Qualifying

7   Modification of bonds issued by CCDA; and then to a hearing on

8   the application, pursuant to Title VI of PROMESA, for approval

9   of the proposed Qualifying Modification of bonds issued by

10  PRIFA.

11       To ensure the orderly operation of today's virtual

12  hearing, once we turn to our Agenda items, all parties

13  appearing by Zoom must mute their microphones when they are

14  not speaking, and turn off their video cameras if they are not

15  directly involved in the presentation or argument.  When you

16  need to speak, you must turn your camera on and unmute your

17  microphone on the Zoom screen.

18       I again remind everyone that, consistent with court

19  and judicial conference policies and the Orders that have been

20  issued, no recording or retransmission of the hearing is

21  permitted by anyone, including but not limited to the parties,

22  members of the public, and the press.  Violations of this rule

23  may be punished with sanctions.

24       The joint informative motion setting out the sequence

25  of speakers for today's closing arguments concerning the

1  proposed Plan of Adjustment was filed as docket entry no.

2  19309 in case no. 17-3283, and it is available to the public

3  at no cost on Prime Clerk for those interested.

4       I encourage each speaker to keep track of his or her

5  own time.  The Court will also be keeping track of the time,

6  and will alert each speaker when there are two minutes

7  remaining with one buzz, and when time is up, with two buzzes.

8  Here is an example of the buzz sound.

9       (Sound played.)

10      THE COURT:  If your allocation is two minutes or

11  less, you will just hear the final buzzes.

12      I'll be calling on each participant during the

13  hearing.  If you wish to be heard when I haven't called on

14  you, please use the "raise hand" feature at the appropriate

15  time.  The "raise hand" feature can be accessed by selecting

16  the reactions icon in the tool bar located at the bottom of

17  your Zoom screen.  After you have finished speaking, you

18  should select the "lower hand" feature.

19      Please don't interrupt each other or me during the

20  hearing.  If we interrupt each other, it's difficult to create

21  an accurate transcript, but having said that, and as usual, I

22  apologize in advance for breaking this rule, as I may

23  interrupt if I have questions, or if you go beyond your

24  allotted time.  If anyone has any difficulty hearing me or

25  another participant, please use the "raise hand" feature

1    immediately.

2          This morning's session will go until 12:50 Atlantic

3    Standard Time, which means we will break at 11:50, or ten

4    minutes to 12:00 Eastern Standard Time, and we will have a

5    ten-minute break at approximately 11:15 AM Atlantic Standard

6    Time, which is 10:15 AM Eastern Standard Time.  Then we will

7    resume from 2:10 PM Atlantic Standard Time, which is 1:10 PM

8    Eastern Standard Time, and have an afternoon break as well.

9          Would everyone except the representative of the

10   Oversight Board please turn their cameras off now, and when we

11   reach your argument item, or I call on you, you'll turn the

12   camera back on.  Thank you all so much.

13         On Friday, the Court issued an Order concerning

14   specific issues to be addressed at the Confirmation Hearing.

15   That was docket entry no. 19308 in case no. 17-3283.  It

16   directed the Oversight Board to address three issues that have

17   a bearing on the Court's analysis of the factual and legal

18   issues it is tasked to resolve in this case, including two

19   questions posed in connection with the potential for a ruling

20   that Takings Clause claims are not dischargeable, except for

21   those arising out of the purchase, sale, or holding of bonds.

22   I did so in the interest of the time sensitive nature of these

23   proceedings, and the need for the Oversight Board to be

24   prepared to respond to possible adverse rulings on such

25   issues.

1          At this point, the Court's preliminary view is that

2     there are potentially meritorious, nondischargeable Takings

3     Clause claims that the Plan currently treats as unsecured

4     eminent domain and inverse condemnation claims.  At this

5     point, and I've not reached a final decision on anything, but

6     at this point I'm not persuaded that any of the other Takings

7     Clause claims raised in the objections to the Plan are likely

8     to be determined to be both allowable and nondischargeable.

9          I am looking forward to the responses of the

10    Oversight Board, and the comments of the other interested

11    parties on the issues identified.  I note that late last night

12    the Oversight Board filed a supplemental declaration of

13    Mr. Herriman, and also some demonstratives labeled "Responses

14    to the Court's Inquiries."  At this point, I'd ask the

15    Oversight Board's counsel to elaborate on that, and,

16    particularly, to explain whether they are tendering the

17    additional declaration and/or Mr. Herriman at this point.

18         Good morning, Mr. Bienenstock.

19         MR. BIENENSTOCK:  Good morning, Your Honor.  Martin

20    Bienenstock of Proskauer Rose, LLP, for the Oversight Board,

21    as the Title III debtors' representative.

22         Your Honor, for the closing this morning, my partners

23    Brian Rosen, Michael Mervis, and I will handle it.  And I

24    actually am going last, except for we wanted at the outset to

25    respond to the Court's inquiries.

1           Your Honor, is this on the clock, so I can turn on my

2    own stopwatch, or can I answer your inquiries before --

3           THE COURT:  You're not on the clock yet.

4           MR. BIENENSTOCK:  Thank you, Your Honor.

5           So the responses to the Court's inquiries are as

6    follows.  First, in respect of the requested findings of fact

7    and conclusions of law -- and conclusion of law at paragraph

8    41 at docket entry no. 18739, the Oversight Board withdraws

9    that request, so that is moot.

10          THE COURT:  Thank you.

11          MR. BIENENSTOCK:  That referred to prior plans.

12          The Court's second inquiry was whether the inverse

13   condemnations claims are included in Class 54, and, if so,

14   what document provides for the classification and treatment of

15   inverse condemnation claims within Class 54.  Your Honor, the

16   one section 1.213 of our proposed Plan defines eminent domain

17   proceedings as a proceeding commenced by the Commonwealth or

18   one of its agencies.  Only eminent domain claims qualify

19   within that definition.  Inverse condemnation claims would be

20   in our general unsecured class.

21          Now, that's not to say that they all agree with that.

22   I think there's some inverse condemnation claims that claim

23   they're eminent domain claims, et cetera.  But as far as our

24   classification, the eminent domain claims are Class 54, and

25   the inverse condemnation claims are within Class 58 for all

1    general unsecured claims.

2         In terms of Mr. Herriman's declaration, we do request

3    that it be admitted into evidence.  What it shows, Your Honor,

4    is that the pure eminent domain claims may be as small --

5    based on his review of the proofs of claims docket, may be as

6    small as approximately 50 million dollars, but if expanded to

7    include all of the inverse condemnation, other claims, it

8    could go as high as almost 400 million dollars.  His

9    declaration is at ECF no. 19329.

10        If I may have share screen privileges, Your Honor, we

11   want to now go to Your Honor's question about whether the Plan

12   would still be feasible if Your Honor determines that some or

13   all of the eminent domain and inverse condemnation claims are

14   nondischargeable.

15        THE COURT:  So are you moving the Herriman

16   Declaration into evidence now, or do you want to do that after

17   you do your demonstrative?

18        MR. BIENENSTOCK:  Now, Your Honor.

19        THE COURT:  All right.  So before we go to your

20   sharing of screen, are there any objections to the receipt of

21   the Herriman Declaration?  If you object, please raise your

22   hand.

23        I see an objection from counsel for the Creditors

24   Committee.  That's Mr. Despins I believe.  Or a "hand

25   raise".

1       MR. DESPINS:  Yes, Your Honor.  Good morning.

2       I apologize.  It's not an objection.  There is just a

3  clarification I think in paragraph ten of that declaration,

4  because there's use of -- I don't want to be critical, but of

5  loose language saying that the Suiza claims would be general

6  unsecured claims.  It doesn't say which class.  We just want

7  to make sure that they're not in our class, they're not in 58.

8  So it's not an objection to the declaration.

9       Maybe Mr. Bienenstock can clarify that, because it

10  doesn't say which -- that they're not in 58.  So that's the

11  only issue we have, is that we don't want, by our silence, a

12  finding that the Suiza claims are in Class 58.  Thank you,

13  Your Honor.

14       THE COURT:  Thank you.

15       Mr. Bienenstock, would you like to respond?

16       MR. BIENENSTOCK:  Yes, Your Honor.

17       That's a fair point, and Mr. Despins is correct.

18  It's not in the general unsecured claim.  It's in the dairy

19  producer class.

20       THE COURT:  All right.  So, on the record, you are

21  not tendering that factual reference to the Suiza claim as

22  being in Class 58, and, rather, acknowledging that it is in

23  the dairy producer class, correct?

24       MR. BIENENSTOCK:  Yes, Your Honor.  Exactly, Your

25  Honor.

1          THE COURT:  Okay.  So now there is another hand

2   raised of Mr. Carrion for PFZ.

3          MR. CARRION-BARALT:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. CARRION-BARALT:  David Carrion on behalf of PFZ

6   Properties.

7          We are looking at the document that was submitted

8   this morning, 19329, and, unfortunately, we have to object to

9   that document, because even though it identifies a number of

10  claims, they do not show where or how they got to that number.

11  Our contention is that, you know, we don't know if they are

12  using the one dollar value for -- that they use for voting

13  purposes or what, but our claim alone is 75 million dollars.

14  And there's no way that I can identify that being either one

15  of the two paragraphs, either paragraph eight or nine.

16         THE COURT:  Mr. Bienenstock?

17         MR. BIENENSTOCK:   As a practical matter, Your Honor,

18  it's in nine.  And Mr. Herriman is here to testify and be

19  cross-examined, but I think -- I think that claim is covered

20  in our numbers.

21         THE COURT:  All right.  Well --

22         MR. CARRION-BARALT:  With that clarification, we take

23  away our objection, Your Honor.

24         THE COURT:  Thank you.

25         Let's see, was there another hand?  No.

1        Very well then.  The objections having been

2   withdrawn, with the information having been clarified, the

3   supplemental declaration of Mr. Herriman, which is filed at

4   docket entry no. 19329 is admitted into the record as evidence

5   for the Oversight Board.

6        (Whereupon the Herriman Declaration admitted into

7   evidence.)

8        MR. BIENENSTOCK:  Thank you, Your Honor.

9        THE COURT:  Thank you.  Now you can proceed,

10  Mr. Bienenstock.

11       MR. BIENENSTOCK:  Okay.  Just before we share

12  screen, Your Honor, I want to give the big picture quickly.

13  Based on Mr. Herriman's declaration, but also based on the

14  estimate of Class 54 claims in the Disclosure Statement, the

15  claims are no higher than 400 million.  Even if they are

16  unsecured, as we believe they are, all of them, the Plan

17  provides for payments of somewhere between 20 and 40 cents,

18  depending on the amount of allowable claims at the end of the

19  day for those claims.

20       So if they're paid just 20 cents, 20 cents of 400 is

21  80, so that would be a maximum whole of 320 million dollars

22  that we would cover.  And that's if they're all allowable, and

23  we have the minimum distribution to unsecured claimholders.

24       And what I'd like to do now, Your Honor, quickly, is

25  show Your Honor evidence already in the record to show that we

1   can handle that from a feasibility point of view.  And I see

2   that --

3            THE COURT:  I'm sorry.  Just so that I'm clear, are

4   you saying that you -- if they were allowed as unsecured

5   claims, the value would be approximately 20 percent of 400

6   million, or are you saying that the value would be 400 million

7   if they were -- if the takings characterization and the

8   argument of these claimants that the claims are

9   nondischargeable were upheld?

10           MR. BIENENSTOCK:  Your Honor, what I'm saying is if

11  the claims were unsecured, the Plan already provides for a

12  payment to them of at least 20 cents, which would be 80

13  million, leaving a whole of 320 million if Your Honor ruled

14  that all of them were nondischargeable.  So I just wanted to

15  show the maximum gap that we'd have to cover for feasibility

16  purposes, and that's about 320 million dollars.

17           THE COURT:  Thank you.

18           MR. BIENENSTOCK:  If I could --

19           THE COURT:  You're sharing now.

20           MR. BIENENSTOCK:  Yes.  I'm trying to click to move

21  to the first slide, and it -- oh, there we go.

22           Your Honor, what the screen shows now is Debtors'

23  Exhibit 30, which shows remaining cash, after making all

24  effective date Plan distributions, there would be remaining

25  cash of 532 million dollars.

1          The next screen, Your Honor, shows that in the first

2    year -- this is Exhibit One to Gaurav Malhotra's Supplemental

3    Declaration.  This shows that in the first year there is an

4    annual surplus projected of 200 million dollars.  Between the

5    532 million and the 200 million, we would be able to cover the

6    320 million, which would be the maximum whole if all 400

7    million dollars were ruled as nondischargeable.

8          Now, that's not to say that we otherwise wouldn't use

9    that money for other important purposes, whether it's

10   increased contributions to the pension trust, or otherwise,

11   but we have the excess available money to handle it.  And

12   that's why we think the existing record does show the Plan

13   would continue to be feasible, notwithstanding a ruling that

14   all 400 million of the claims are nondischargeable.

15         Additionally, Your Honor, Mr. Malhotra is available

16   today and tomorrow should the Court think that, you know, the

17   record should be enhanced further on that feasibility issue,

18   but the debtor does contend that the evidence I've just showed

19   shows that the Plan would continue to be feasible even if the

20   Court ruled the 400 million were nondischargeable.

21         On the subject of feasibility -- I'm sorry, Your

22   Honor.  Okay.  There are two other issues that go to

23   feasibility that were raised.  One was raised last week in

24   argument, Your Honor, and one is more recent even than that.

25         Your Honor will recall that there was an argument on

1   behalf of the teachers that there is no treatment of their

2   rejection damage claim for the freeze imposed by the Plan, and

3   Your Honor was also told that what they do get is nothing but

4   a return of their own money.  What the slide up now, which is

5   1.487 of the Plan, shows is that --

6          THE COURT:  Why aren't you covering this point in

7   your closing?

8          MR. BIENENSTOCK:  Oh, I can do that.  I was only

9   doing it now, because Your Honor raised feasibility issues,

10  but I can cover this in the closing, Your Honor.

11         THE COURT:  Yes.  I'd prefer that you come back to

12  this one in closing, since it's not an issue that I

13  specifically --

14         MR. BIENENSTOCK:  Okay.  That's fine, Your Honor.  In

15  that case, then, if it's okay, I will turn things over to my

16  partner, Brian Rosen, to start our closing argument.

17         THE COURT:  Not quite yet, because I have another

18  off-the-clock question for you and for AAFAF.

19         MR. BIENENSTOCK:  Sure.

20         THE COURT:  So late last week, AAFAF filed two

21  pleadings.  One is 19319, in which AAFAF objects to the

22  inclusion of Acts 80, 81, and 82 to the list of statutes to be

23  preempted in Exhibit K of the Plan.  So unless you are

24  planning to cover this in your closings, would you explain

25  your position, the Oversight Board's position as to the legal

1    propriety of adding 80, 81, and 82 to that list at this stage?

2             MR. BIENENSTOCK:  Your Honor, I am most definitely

3    planning on covering that in the closing --

4             THE COURT:  Okay.

5             MR. BIENENSTOCK:  -- in terms of why those statutes

6    must be deemed preempted.  I can give the legal propriety of

7    including them now, and --

8             THE COURT:  No.  I'll wait for the closing on that.

9             I see that Mr. Capdevila has his hand up, and so,

10   Mr. Capdevila --

11            MR. CAPDEVILA-DIAZ:  Good morning, Your Honor.  For

12   the record, Eduardo Capdevila on behalf of Finca Matilde, Inc.

13            Yes, with respect to Mr. Bienenstock's -- the

14   document he shared on screen, I don't think the question was

15   answered as to -- I understood that there is enough money to

16   make the Plan feasible if the Court determines that the whole,

17   entire amount is nondischargeable, but I don't think it was

18   clear if it would be at the effective date, or deferred cash

19   payments, or within the Plan, or outside the Plan.

20            THE COURT:  Mr. Bienenstock, did you mean to be

21   specific about that?

22            MR. BIENENSTOCK:  Well, first, the excess cash of 532

23   million shows that we have the cash on hand at the outset on

24   the effective date.  As a practical matter, Your Honor, these

25   claims, almost all are disputed.  And we don't anticipate that

1  there would be a cash need on the effective date for all of

2  them, but we have it just in case.

3         THE COURT:  Thank you.  So you are not making a

4  proposal to pay them in full.  You are showing that you would

5  be able to pay them in full, but anticipating litigation

6  challenging the allowability of the claims on the merits; is

7  that correct?

8         MR. BIENENSTOCK:  Yes, Your Honor.

9         THE COURT:  Thank you.

10         Does that answer your question at this point,

11  Mr. Capdevila?

12         MR. CAPDEVILA-DIAZ:  Yes, Your Honor.  Thank you.

13         THE COURT:  Thank you.

14         Mr. Friedman for AAFAF also has his hand raised.

15         MR. FRIEDMAN:  Yes, Your Honor.  It's Peter Friedman

16  from O'Melveny & Myers on behalf of AAFAF.

17         Your Honor, we did file the objection on Saturday.

18  That was before, technically, the Board had submitted its

19  amended list of statutes that was filed last night, but we

20  didn't want to wait until it was actually filed.

21         I was also going to address some components of our

22  position with respect to that during my closing argument,

23  which is largely in support of the Plan, except for this

24  last-minute inclusion.  Would you like me to make those

25  remarks now, or would you prefer that I include those as part

1    of my closing, which is scheduled for I think after

2    Mr. Kirpalani speaks?

3              THE COURT:  I would prefer for you to include them in

4    your closing, but I would also ask you whether you are

5    planning to cover in your closing some clarification as to

6    whether you are asking the Court to strike the modified

7    pension reserve funding mechanism in the current version of

8    the Plan and/or the ten-year defined benefit restoration

9    prohibition provision in the proposed Order accompanying the

10   current version of the Plan?  Are you going to be dealing with

11   those issues in your closing as well?

12             MR. FRIEDMAN:  So, Your Honor, I think with respect

13   to the defined benefit plan issue, we don't object to the

14   substance of it.  We are unhappy with -- the government is

15   unhappy -- well, we object to it I think as a policy matter,

16   but we are not objecting to its inclusion in the Plan.

17             With respect to the other issue, which I believe is

18   the one that the unions objected to last week, we are

19   sympathetic to the points they raised.  We negotiated certain

20   language with the Board which, from our perspective, was the

21   least bad of solutions to the extent that it winds up being

22   kept in.  We obviously wanted those provisions for which we

23   negotiated.

24             So, obviously, if the Court concludes that the union

25   objection should be overheld, that would be fine with us --

1          THE COURT:  Thank you.

2          MR. FRIEDMAN:  -- should be upheld, not overheld.

3    Sorry about that.

4          THE COURT:  Overruled you meant?

5          MR. FRIEDMAN:  Yes -- if it's sustained, if their

6    objection is sustained, that's fine with us.

7          THE COURT:  Thank you.  Now I've caught up with

8    you.

9          MR. FRIEDMAN:  Yes.  Thank you.

10         THE COURT:  Thank you, Mr. Friedman.  So we will look

11   to hear from you further during your closing arguments.

12         So at this point I am ready to turn to the closing

13   arguments, and I thank counsel for those responses to my

14   questions in advance of closing argument.  So the first

15   speaker will be a speaker for the Oversight Board.  We have a

16   total of 65 minutes allocated for the Oversight Board's

17   closing argument.

18         Mr. Rosen.

19         MR. ROSEN:  Yes, Your Honor.  Good morning.

20         THE COURT:  Good morning.

21         MR. ROSEN:  It's 65 minutes -- I thought we actually

22   have 90 minutes, spread across openings and rebuttals.

23         THE COURT:  Yes.  So what I have here that we took

24   from the Agenda was 65 minutes for the initial, and then

25   another 25 for the rebuttal.  So is that how you meant to

1    split it?

2         MR. ROSEN:  Yes, Your Honor.  Thank you.

3         THE COURT:  Okay.

4         MR. ROSEN:  Your Honor, good morning.  Brian Rosen,

5    Proskauer Rose, on behalf of the Oversight Board.

6         Your Honor, I want to thank the Court for the

7    opportunity to address the Court this morning, and despite the

8    plethora of declarations, memoranda, and prior oral arguments,

9    it is our goal here to attempt to bring it all together for

10   you.  And hopefully my effort, and those of Messrs. Mervis and

11   Bienenstock, will assist the Court in the determination

12   regarding confirmation of the proposed Plan of Adjustment.

13        Before I begin, Your Honor, I just want to go back a

14   little bit in time to last evening.  And I know the Court

15   already referenced a few things, but as the Court is aware, we

16   filed last evening a modified Eighth Amended Plan, which

17   incorporated the changes that I had stated on the record last

18   Wednesday, and Monday before that.

19        Likewise, we filed a proposed -- an amended proposed

20   Confirmation Order, which similarly contained the

21   representations that I put on the record on Wednesday.  And I

22   would also say, Your Honor, that we filed an amended or

23   updated Plan Supplement, and as noted, Your Honor, in that

24   Plan Supplement, while it does contain the latest forms of the

25   documents that would be needed for the effective date

1    consummation of the Plan, we do note, Your Honor, that those

2    are just the latest drafts.

3         There are conversations still ongoing.  I

4    participated in one lengthy one yesterday.  And we are sure,

5    just like what happened, Your Honor, in the context of the

6    COFINA confirmation, that we will need to file an amended Plan

7    Supplement with updated forms of those documents.

8         Additionally, Your Honor, you'll recall that last

9    week when we spoke I requested that we keep the evidence open,

10   so that we could provide the Court with two certifications by

11   the Board in connection with the filing of the Plans of

12   Adjustment, the one that was on November 12th, Your Honor, and

13   the one of last evening.

14        And, Your Honor, we have, in fact, filed those with

15   the Court, and the Plan as well.  And those are marked as

16   Exhibits 147, 148, and 149.  And we have provided those, Your

17   Honor, with copies to all of the parties.  And I would like

18   the Court at this time to accept those three exhibits into

19   evidence.

20        THE COURT:  Are there any objections to the tender of

21   new Exhibits 147, 148, and 149?  If you object, raise your

22   hand.

23        I see a hand raised by Mr. Hein.  Mr. Hein.

24        MR. HEIN:  Yes.  If these are the three Plan

25   documents that were filed last night, I don't object as such,

 1   but I would just note, though I was able to pull them up last

 2   night, there certainly hasn't been much time to review them.

 3          THE COURT:  I gather from Mr. Rosen that these are

 4   certifications relating to the Plan documents, rather than the

 5   Plan documents themselves, but I'll let Mr. Rosen speak for

 6   himself on that one.

 7          MR. ROSEN:  Your Honor, yes.  One is the Modified

 8   Eighth Amended Plan itself that was filed.  The two others

 9   were merely the certifications by the Oversight Board which

10   authorize the filing of those, and they are consistent with,

11   and almost verbatim, Your Honor, similar to the prior

12   certifications that we filed each and every time that the

13   Oversight Board authorized the filing of an amended plan.

14   Those, of course, are already in the record.

15          THE COURT:  And so you are tendering them for --

16          MR. ROSEN:  In compliance, Your Honor, with 314.

17          THE COURT:  For compliance, and for the record now,

18   and that does not preclude someone from later disputing the

19   substance, or making some other complaint about the

20   particulars of their contents; is that correct?

21          MR. ROSEN:  Yes, Your Honor.

22          THE COURT:  So, Mr. Hein, with those clarifications,

23   do you object to my receiving 147, 148, and 149 in evidence?

24          MR. HEIN:  That's fine, Your Honor.  I just wanted to

25   be clear that I, and probably others, have not seen them.

1   Thank you.

2           THE COURT:  Yes.  Thank you.

3           If there is anyone else who wishes to object, raise

4   your hand.

5           I see no other hands raised, and so Debtors' Exhibits

6   147, 148, and 149 are admitted in evidence.

7           (At 10:03 AM, Debtors' Exhibit Nos. 147, 148 and 149

8   admitted into evidence.)

9           MR. ROSEN:  Thank you, Your Honor.

10          Last evening, Your Honor, we filed with the Court at

11  ECF no. 19328, and served on all the parties, a demonstrative

12  to be used in connection with this closing presentation.  And

13  I would like to, excuse me, share that with the Court on the

14  screen at this time.

15          Hopefully, Your Honor, this will help the Court and

16  others to follow along today.  The presentation is broken into

17  three portions, Your Honor, and while some of the portions

18  that I have, which is part one, will be treated in depth,

19  others, Your Honor, will be included just for reference points

20  for the Court and the parties.

21          In our efforts, and as requested by the Court last

22  Wednesday, Your Honor, we have attempted to marshal the

23  evidence and the law to establish that the requirements for

24  confirmation of the Plan of Adjustment have been satisfied.

25  We have cited portions of the record, and to the extent

1    necessary, applicable law.

2           Of course, Your Honor, all of this should be viewed

3    in connection with the Omnibus Reply and memorandum of points

4    and authorities that the Oversight Board has filed in support

5    of Confirmation of the Plan.

6           Your Honor, so, how did -- I'm sorry.  Are we able to

7    share at this time?

8           THE COURT:  You've just gotten permission to share.

9           MR. ROSEN:  Thank you, Your Honor.

10          So, Your Honor, how did we get here?  Your Honor,

11   years of borrowing and the incurrence of the liabilities lead

12   in 2016 to 74 billion of debt, and approximately 55.2 billion

13   of indebtedness.  And of course, Your Honor, this lead to the

14   passage of PROMESA -- the passage of PROMESA and the

15   appointment of the Oversight Board.

16          And upon its appointment, Your Honor, the Oversight

17   Board immediately took the task, announced the process for

18   developing and certifying fiscal plans, designated entities as

19   covered entities, requested financial information, and began

20   to develop an overall strategy for the implementation of

21   critical energy and infrastructure projects.

22          And, Your Honor, approximately eight months later,

23   the Oversight Board, with the concurrence of the Governor,

24   filed Title III cases for two of the three debtors which are

25   the subject of the Plan of Adjustment:  The Commonwealth on

1    May 3, and ERS on May 21 of 2017.  And of course, Your Honor,

2    you're well aware that, during these Title III cases, there

3    was devastation, turmoil, and a pandemic that hit the island.

4    Specifically, Your Honor, we had the hurricanes in September

5    of 2017, the political turmoil leading to the resignation of

6    the Governor, earthquakes that hit in 2019 and 2020, and then

7    of course the pandemic that took hold of the island in March

8    of 2020.

9           In the face of this, Your Honor, however, the

10   Oversight Board continued doing its tasks, certifying fiscal

11   plans, working with the government to address issues that

12   would lead to more efficient government services for the

13   island residents, and to promote economic growth, and to put

14   Puerto Rico back on the path to prosperity.  But, Your Honor,

15   a lot of this took place amidst the backdrop of the various

16   litigations that were commenced by various creditor groups,

17   and, to a certain extent, Your Honor, also by the

18   Commonwealth, and by the Creditors Committee by its side.

19          Your Honor, these are listed on this particular page,

20   and I don't really need to go through them, because I know the

21   Court is extremely well aware of each and every one of them.

22   These are the ones, however, Your Honor, that were specific to

23   the GO-PBA creditor groups, and inclusive of those, Your

24   Honor, are those related to the PRIFA BANs.  There was

25   similar, Your Honor, litigation that had been commenced

1    actually in 2017, and in 2017 and beyond by the ERS

2    bondholders, and by the Oversight Board, including whether or

3    not the bonds were issued in an ultra vires fashion context

4    with respect to liens and security interests, whether or not

5    the ERS bondholders were entitled to an administrative expense

6    claim, challenges to PayGo itself, and then a challenge

7    against the Federal Government, Your Honor, that was filed in

8    the Federal Circuit Court.

9            Similarly, Your Honor, there were a multitude of

10   litigations that were commenced, and we refer to these

11   casually as the Revenue Bond litigation.  And as Your Honor

12   knows, these go to, most notably, the clawback claims that

13   were started in connection with HTA, CCDA, and PRIFA, and

14   these were the tussles that took place between the Monolines

15   and the Oversight Board, Your Honor.

16           As part of all of this, Your Honor, however, during

17   the Title III cases, the Court appointed a mediation team lead

18   by Chief Judge Barbara Houser, and while the Chief Judge and

19   the mediation team first tackled the COFINA-Commonwealth

20   dispute, and that lead to the confirmed Plan of Adjustment

21   which became effective in February of 2019, shortly after

22   that, Your Honor, the mediation team got together with the

23   Oversight Board -- got together with the Oversight Board and

24   GO-PBA creditors.  And we were able to enter into a plan

25   support agreement in May of 2019, and this then lead to the

1  filing of PBA on September 27 of 2019, a Plan of Adjustment,

2  and a corresponding Disclosure Statement.

3         However, Your Honor, the mediation team was not done

4  at this point in time, and as I said during my opening

5  statement, the mediation team lead further discussions with

6  the Late Vintage GO bondholders.  If the Court might recall,

7  the initial plan provided that it was really going to be left

8  to future litigation, what would happen with the Late Vintage

9  bondholders.  But this of course would lead to numerous pieces

10  of litigation, and the mediation team thought it best to try

11  and develop a broader base of support.

12         And that lead to more mediation sessions, Your Honor,

13  a plan of adjustment, and disclosure statement, and a new plan

14  support agreement in February of 2020.  But of course, Your

15  Honor, at this point in time, the pandemic hit, and while the

16  Court had already established a time period for consideration

17  of the Disclosure Statement, everything was put on pause in

18  the beginning of March of 2020.

19         This lead, Your Honor, to more mediation between the

20  parties, between March of 2020, because -- and the Court, in

21  fact, Ordered the parties back to the mediation table.  And

22  over the course of the next year, Your Honor, this lead to

23  formal and informal discussions, and ultimately to a February

24  21 Plan Support Agreement that was reached by the Oversight

25  Board with the same GO-PBA bondholders, Syncora, one of the

1  monolines, and Assured and National, two additional monolines.

2  They did join on a contingent basis, however, Your

3  Honor, and as part of that, Your Honor, it provided for a stay

4  of all of the litigation.  And as I like to do on the next

5  slide, Your Honor, all of that liti -- excuse me, Your Honor.

6  All of that litigation -- let me keep going past here, Your

7  Honor.  I apologize.

8  Can you go to slide 13, please?   Thank you.

9  All of that litigation goes away, Your Honor, as part

10  of the GO-PBA settlement that was reached in February of 2021.

11  At the same time, Your Honor, the litigation that had been

12  outstanding in connection with the PRIFA BANs, and also the

13  PRIFA BANs taking litigation that was commenced in another

14  Federal Court went away as part of the February 21 Plan

15  Support Agreement.

16  Similarly, Your Honor, starting, as I noted before,

17  in 2016, there was all of the litigation -- excuse me, Your

18  Honor.  We're having a problem with the court allowing more

19  people in and interrupting this.  I don't know if we could

20  stop that?

21  THE COURT:  Apparently the issue is that if we give

22  you "share screen", as you requested, we don't have a way to

23  keep chat from your group showing up in the public display,

24  and so maybe you all can communicate with each other by text

25  or some other vehicle, rather than using the chat function

1    among yourselves in Zoom.

2           Let me just make sure that I haven't overstepped my

3    technical competence.

4           I'm told that that is the problem, so text each

5    other, please.

6           MR. ROSEN:  Your Honor, we're told that it's the

7    cohost.  It's not our side.  We'll keep trying, Your Honor.

8           THE COURT:  Okay.  Hold on just one second.

9           So for you to be able to share, you had to be made a

10   cohost.  Therefore, I guess you are seeing any messages that

11   are directed to the host, which is us, but we can't give

12   hosting over to you entirely.  So I'll just ask that people

13   who are inclined to try to write us notes from the waiting

14   room, email the PROMESA registration e-mail address rather

15   than putting it in the chat, so that we can have the least

16   disruption.

17          We will put another three minutes on the Oversight

18   Board's time, because we used it to address these technical

19   difficulties.

20          MR. ROSEN:  Thank you, Your Honor.  If I may

21   continue?

22          THE COURT:  Yes, please.

23          MR. ROSEN:  So, Your Honor, as I noted before, there

24   was a lot of litigation that had been started in connection

25   with ERS bondholders, both up and down the spectrum from your

1    court, to the First Circuit, even an effort to go to the

2    Supreme Court at one particular point in time.

3         Your Honor, in March and April of this year, the

4    mediation team again got the parties back together, and that

5    resulted in a stipulation entered into with the ERS

6    bondholders that provided for all of that litigation to go by

7    the by, of course subject to confirmation and consummation of

8    the Plan of Adjustment.

9         Your Honor, as I noted before, also, the contingent

10   aspect of the February 21 Plan Support Agreement, Your Honor,

11   was with respect to Assured and National; and immediately upon

12   the execution of that, Your Honor, the mediation team and the

13   Oversight Board got together with Assured and National to try

14   and address some of their remaining issues.

15        THE COURT:  Let's hold on a minute.

16        Okay.  We made that phone line go away.

17        MR. ROSEN:  Thank you, Your Honor.

18        So, Your Honor, as part of that process, we engaged

19   with Assured and National to try and reach closure with them,

20   remove the contingent aspect of it, and of course, Your Honor,

21   this lead to the HTA-CCDA Plan Support Agreement.  And as part

22   of that, all of the litigation to which Assured and National

23   were a party was removed.

24        Your Honor, that left, as the Court knows, as the

25   remaining monolines still in dispute, Ambac and FGIC.  And

1   while the HTA-CCDA Plan Support Agreement -- and I will get to

2   this in a little bit -- set the pathway for the clawback

3   claims recoveries pursuant to all of the clawback entities,

4   the discussion that then ensued with the benefit of the

5   mediation team and with the development I would say by Ambac

6   and FGIC, was with respect to an accelerator for the recovery

7   with respect to the clawback CVI that would be dedicated

8   towards PRIFA.  And this, of course, was focused on the Rum

9   Tax cover over.

10       The parties, on the eve of the Disclosure Statement,

11  Your Honor, did reach an agreement.  It was announced to the

12  Court, and, in fact, the Court adjourned the Disclosure

13  Statement hearing for two weeks to allow us to paper that.

14  And the Plan Support Agreement was entered into, Your Honor.

15  Ambac and FGIC executed joinders to the prior plan support

16  agreements.  And the remaining litigation that was there with

17  respect to the revenue bonds was put on hold, and would go

18  away, Your Honor, as part of confirmation and consummation of

19  the Plan of Adjustment.

20       Your Honor, during the course of these Title III

21  cases, and as I noted before, the Unsecured Creditors

22  Committee has been a party to multitudes of the litigations

23  with the Oversight Board, on the one hand, and the GO-PBA

24  creditors and other parties.  Each time they have come in

25  either as an intervener, or with respect to -- as a

1    co-plaintiff, as they were in the context of the PBA

2    litigation.

3            And although the UCC was such a party, it always

4    acknowledged that the Oversight Board had the opportunity to

5    compromise and settle these things, as it did in the context

6    of the Plan Support Agreements, subject to the rights of the

7    Unsecured Committee to object if it so thought was

8    appropriate.  And of course that did not occur, and has not

9    occurred.

10           Similarly though, Your Honor, the UCC has been

11   involved in the resolution of or reconciliation of general

12   unsecured claims, and as part of that process, they've also

13   been actively engaged in trying to bring about additional

14   recoveries for creditors.  As part of the Plan process, Your

15   Honor, there was a significant negotiation, though, as to the

16   overall amount of funds that would be available to general

17   unsecured creditors, and of course the classification of

18   general unsecured claims that would be outside, or should be

19   outside the purview of the general unsecured claim recovery.

20   Those negotiations lead to the Committee agreement, Your

21   Honor, and as part of that, there was an agreement reached

22   with the Unsecured Committee and an overall support of the

23   Plan.

24           Your Honor, I did note in my opening arguments, also,

25   that there had been agreements with the Retiree Committee, and

1    with respect to the resolution of those claims.  And,

2    likewise, there had been an agreement with AFSCME that had

3    been reached, Your Honor, in connection with pension payments

4    and a new collective bargaining agreement.  Those, of course,

5    were resolved, and they have no objections with respect to the

6    Plan.

7          That lead us of course, Your Honor, to the retire --

8    excuse me, to the DRA parties, and with the benefit of the

9    Court's decisions that had been rendered in October, October

10   29th, Your Honor, we were able to reach an accord with the DRA

11   parties.  And all of the litigation that you see referenced

12   here goes away, Your Honor.  They now support the Plan of

13   Adjustment.  They have stated that support on the record, and

14   the recoveries that they will be receiving will be as -- that

15   they are entitled to pursuant to either the Title III Plan of

16   Adjustment that is already before the Court, and pursuant to

17   the HTA Plan.

18         Your Honor, that was a lot to talk about, what we've

19   done, but these were not easy.  They were not quick

20   resolutions.  They were not easy negotiations.  And I would

21   say that the mediation team and the Oversight Board put a lot

22   of time and effort into reaching these, and these were the

23   result of robust, good faith negotiations.

24         As Mr. Zelin testified, Your Honor, and this is

25   included in his declaration at paragraph 20, "the negotiation

1    sessions in which I participated between the Oversight Board

2    and the 2020 PSA creditors included representatives of the

3    various stakeholder parties, as well as the parties'

4    respective legal and financial advisors.  During the many

5    mediation sessions that occurred between August 2020 and

6    February '21, I observed robust discussion among all in

7    attendance concerning the disputed issues, the parties'

8    respective legal and economic positions, and potential means

9    to achieve a consensual debt restructuring."

10        He provided further testimony, Your Honor.  These are

11   included in his declaration, at paragraphs that are

12   referenced.  Likewise, Your Honor, Ms. Jaresko and

13   Mr. Steel -- Mr. Skeel, excuse me, also testified regarding

14   the extensive negotiations that lead to each of the Plan

15   Support Agreements, and these are referenced in their

16   respective declarations and the paragraphs that are set forth

17   there, Your Honor.

18        Despite Mr. Hein's comment, Your Honor, retail

19   investors were not excluded from the mediation process, nor

20   were they inadequately represented.  In fact, Your Honor,

21   there was a question put to Mr. Zelin by Mr. Hein.  He said

22   "did any individual retail investors participate in the

23   negotiation of the Plan that you participated in?"

24        Mr. Zelin, "I know there were discussions with -- I

25   know, for example, you, Mr. Hein.  I had some discussions with

1  the mediator during the course of the last, you know, two

2  years.  I don't know how frequent, how often.  So there

3  were -- the doors were open for discussions with all

4  creditors, including retail creditors.  So as a general

5  matter, the Board did not turn away discussions with any party

6  who wanted to have a discussion."

7          But, Your Honor, what were the terms of these

8  settlements, and were they fair and reasonable?  As set forth

9  on the next series of slides, Your Honor, we tried to set

10  forth what are in the respective Plan Support Agreements, and

11  of course which found their way into the Title III Plan of

12  Adjustment.

13          At Debtors' Exhibit 16, Your Honor, and we have here

14  the GO-PBA Plan Support Agreement; at Exhibit 22, Your Honor,

15  we have the PRIFA BANs stipulation, and the consideration

16  being given there; at Exhibit 19, Your Honor, the ERS

17  stipulation and the respective distributions that are going to

18  be made as part of that stipulation; at Exhibit 17, Your

19  Honor, this is the HTA-CCDA Plan Support Agreement terms; and

20  of course, Your Honor, you will note that there is a portion

21  of this that will be done pursuant to the Title -- the CCDA

22  Title VI Qualifying Modification, which will be heard later on

23  today.

24          And if you didn't note, Your Honor, as we've been

25  going along, you can see my building being built off to the

1   side.  I think I'm already up to the fourth level.  And as I

2   get to the next one, we have the PRIFA Plan Support Agreement,

3   and this is Exhibit 18, Your Honor, and the respective terms

4   there.  And, again, you'll note that some of this will be

5   satisfied or be done in the context of the PRIFA Plan

6   Qualifying Modification to be heard later today.

7        Your Honor, then we get to the DRA Stipulation, and

8   this is Debtors' Exhibit 146.  And here you have the

9   consideration that DRA will be receiving as part of its

10  allowed claims under the Title III Plan of Adjustment, as well

11  as a fee that it will receive in the context of the HTA Plan

12  of Adjustment.

13       Lastly, Your Honor, this is the AFSCME Plan Support

14  Agreement terms.  This is Debtors' Exhibit 21.  And as you can

15  see, our lighthouse is now complete, and the light is shining

16  for what we hope to be the Commonwealth of Puerto Rico.

17       Your Honor, we would like to say that the settlements

18  are fair and reasonable, and we believe this is easy to say,

19  because the standard, which says that a settlement should

20  generally be approved unless it falls below the lowest point

21  in the range of reasonableness, is not even closely to be

22  touched.  And, in fact, Your Honor, each of the settlements is

23  way above the lowest point in the range of reasonableness,

24  taking into account, among other things, the complexity of the

25  litigation, the time and expense associated with it, the risk

1     of catastrophic outcome if decided adversely to the debtors.

2           Mr. Zelin, he testified to this in paragraph 23 of

3     his declaration, Your Honor, and we have some additional

4     declaration points that we would point out.  But I would also

5     like to say, Your Honor, that Ms. Jaresko, in her declaration,

6     she testified -- excuse me.  Here it is -- "moreover, and I

7     understand that an adverse result in the lien challenge

8     actions would have set a precedent for approximately 11.5

9     billion in remaining GO Bonds, PBA Bonds, and other bonds

10    guaranteed by the Commonwealth."  That is referenced, Your

11    Honor, I believe in paragraph 206 of her declaration.

12          She further testified, Your Honor, that -- in

13    paragraph 215 of her declaration, that these plan settlement

14    agreements resolve billions of dollars of claims against the

15    Commonwealth, PBA, and ERS; avoid time-consuming litigation;

16    and provide a reasonable solution to extraordinarily complex

17    disputes that are in the best interest of the Commonwealth and

18    its stakeholders.

19          Your Honor, I'm going to jump ahead, Your Honor,

20    because I know that we have a limited time here, and I would

21    like to go all the way to what I think is going to be an

22    important issue, which is the --

23          And if we could turn very quickly to the solicitation

24    process, slide 76.

25          Thank you, Your Honor.  Your Honor, as you know,

1   pursuant to the solicitation procedures, Prime Clerk was

2   retained to carry out the respective procedures.  And there's

3   been some allegations here by Mr. Hein that this was not in

4   fact done according to the terms of the procedures themselves,

5   but, Your Honor, I would like to note that we have Affidavits

6   of Service, which are in the record.  These are the various

7   publications, solicitation, and mailings that were done.  And

8   as you can see by this Affidavit of Publication, Your Honor,

9   there were publications done in the Times, Bond Buyer, they

10  were done on radio, and they were done in various Caribbean

11  periodicals.

12         Your Honor, the question that has arisen, most

13  notably by Mr. Hein, has been with respect to whether or not

14  retail investors had an opportunity to participate, whether or

15  not it was done pursuant to -- pursuant to the tender and

16  exchange, whether or not it was in fact an inappropriate

17  solicitation.

18         As we have stated, Your Honor, the tender and

19  exchange process was done for purposes of determining who to

20  tender the ballots to, and with this flow chart, Your Honor,

21  we would like to show you the process that was undertaken.  So

22  the first question, Your Honor, on the left is, did you tender

23  and exchange your bonds to join.  If yes, you received a new

24  CUSIP.  If no, you kept your existing CUSIP.

25         If yes, Your Honor, you then went into what was

1    referred to as the larger plan -- excuse me, bond classes, and

2    you did not have the option to certify as a retail investor.

3    If you did, however, not tender, you did have the option to

4    certify as a retail investor.  And, Your Honor, most

5    importantly, and the question that we addressed in opening

6    statements, and I even addressed at the Disclosure Statement,

7    is you had the opportunity to vote on the Plan in either

8    situation.

9         So looking at that again, if you were then in the

10   larger bond class, you had the opportunity to accept or reject

11   the Plan.  If you accepted the Plan, you received the PSA

12   restriction fee.  If you did not, if you rejected it, you were

13   not entitled to the PSA restriction fee.

14        If you never tendered an exchange, and you had the

15   right to certify as a retail investor, again, you had the

16   right to vote on the Plan.  You could accept the Plan, and

17   certify as a retail investor; you could reject the Plan, and

18   certify as a retail investor; or you could accept the Plan,

19   but fail to certify; or you could reject, but fail to certify.

20   And in that particular instance, Your Honor, if you failed to

21   certify, you would not be included in the retail class,

22   because we would have no basis to know that you were a retail

23   investor, and, instead, you would be in the larger bond

24   classes.

25        Your Honor, we would submit that everything that was

1  done was done in accordance with the terms and provisions of

2  the Solicitation Procedures Order, and not in any way violated

3  the terms of --

4          Your Honor, I don't know what --

5          COURT REPORTER:  I'm sorry, Your Honor.  This is the

6  court reporter.  Mr. Rosen's last few words were cut off.

7          THE COURT:  So, Mr. Rosen, can you go back a couple

8  sentences, please?

9          MR. ROSEN:  I'll try, Your Honor.

10         In the event that someone did not certify whether or

11 not they were a retail investor, we would have no way of

12 knowing that they were a retail investor; and, therefore, they

13 would have been included in the larger bond classes associated

14 with the respective vintages.

15         Your Honor, I would like to at this point just jump

16 to a final point to make, and I would leave the demonstrative

17 for the Court's benefit with all of the references that we

18 have to the law and to the facts that have already been

19 included.  I want to go, Your Honor, to the issue which is

20 what we offered to the Court and to Mr. Hein at the end of my

21 presentation I believe it was on Wednesday, and I'm getting

22 there.  Here it is, Your Honor.

23         Your Honor, and this is -- it's slide 108, Your

24 Honor.

25         THE COURT:  Thank you.

1          MR. ROSEN:  What we've tried to do, Your Honor, was

2     to give retail investors another opportunity to do what they

3     didn't do the first time around.  So again, Your Honor, if you

4     look to the left:  Did you tender an exchange?  And this runs

5     through, again, the yes and the nos, and it took us to the

6     green slides, however, Your Honor.  And it got to the whole

7     discussion of whether or not we could tell whether or not you

8     were a retail investor or not a retail investor.

9          But if you totally abstained from voting, which is

10    the people that I think we need to focus on, because if they

11    did vote, we know that in fact they were either a retail or

12    they chose not to certify, but if they chose not to, and these

13    are the people we've said along, Your Honor, we want to

14    provide them with the opportunity to get that additional fee,

15    we want to give them that second opportunity to certify as a

16    retail investor.

17         So if, in fact, they do certify, they will be in the

18    retail class, the appropriate retail class, and they would

19    receive that retail support fee.  And if they abstain from

20    recertification, they will not be in the retail class, and

21    they will not be entitled to the retail support fee, Your

22    Honor.

23         So this is the provision that we said we would

24    include, Your Honor, in the proposed Confirmation Order, and,

25    in fact, we did yesterday.  I believe it's included at

 1   paragraph 88 or 87 of the proposed Confirmation Order.  I do

 2   not have it in front of me.  But we set forth in there, Your

 3   Honor, the mechanism to try to provide these would be retail

 4   investors that opportunity.

 5        I would note, Your Honor, that there may not be many

 6   retail investors out there, like Mr. Hein or like

 7   Mr. Samodovitz believes, because a lot of these people had

 8   traded out of their bond holdings way, way earlier; a lot of

 9   these people may already be included in the larger class, and

10   they did not certify.  So there might actually be a very, very

11   small group of people who would be included in the retail

12   investor class that we don't know of at this particular point

13   in time.

14        Your Honor, I know that I'm at my 30 minutes at this

15   point in time, so with that, Your Honor, unless the Court has

16   any questions, I would leave part one of the demonstrative to

17   the Court for the Court's review.  And otherwise, Your Honor,

18   with no questions, I will turn the podium over to Mr. Mervis

19   to handle part two.

20        THE COURT:  Thank you, Mr. Rosen.

21        MR. ROSEN:  Thank you, Your Honor.

22        MR. MERVIS:  Good morning, Your Honor.  Michael

23   Mervis of Proskauer Rose for the Oversight Board.

24        THE COURT:  Good morning.

25        MR. MERVIS:  Your Honor, in part because I think

1  Mr. Rosen took my clicker, I'm going to ask -- that's okay.

2  I'm going to ask Mr. Helt, our crack technician, to advance

3  the slides for me, so I don't have to grapple with the

4  technological challenge of pushing a button.

5       So, Mr. Helt, if you could turn to slide 110, please.

6       So, Your Honor, I'm going to talk briefly about the

7  best interest test, and why we think we've satisfied it here.

8  And of course a logical place to start is with the language of

9  the statute, which is PROMESA 314(b)(6).  The Court is well

10  familiar with it, but I wanted to focus on two particular

11  words at the outset, which is the words "to consider".

12       This is an unusual formulation.  It's different than

13  the Chapter 11 test.  It's different than the Chapter 9 test.

14  And we submit that what those words mean is that unlike in the

15  Chapter 11 test, where there is clearly a floor and a

16  numerical comparison that has to be done, that is not the case

17  with 314(b)(6).  And I'll explain that in a little bit as to

18  why that matters.

19       So Mr. Hein has raised an issue, and the issue is

20  whether, under 314(b)(6), the best interest test should be

21  viewed in accordance with the collective recovery of

22  creditors, as opposed to the individual recovery of classes of

23  creditors, or on a creditor type by creditor type basis.

24  So -- and, Your Honor, I'm going to focus on Mr. Hein's

25  objections here, because although there are some other

1    objections, they're all premised on the idea that 314(b)(6)

2    requires a class-by-class or claimant-by-claimant analysis,

3    and it doesn't.

4        So let's start with Chapter 9.  We're all familiar

5    with this.  Chapter 9 is a collective test.  And it's

6    important, I think, Your Honor, in thinking about the best

7    interest of creditors in this case, that the class that

8    Mr. Hein is focused on, the GO class, overwhelmingly accepted

9    the provisions of this Plan of Adjustment.  It wasn't even

10   close.  Every single class, including Mr. Hein's, accepted.

11       Your Honor, I think it's useful to compare the

12   language of Chapters 9, 11, and 314(b) to explain why

13   unequivocally 314(b) is a collective test.  And the key words

14   -- and I'm focusing, Your Honor, now on the right-hand column.

15   The key words are, shall require the Court to consider whether

16   available remedies under nonbankruptcy law and the

17   Constitution of the territory would result in, and here's the

18   key words, a greater recovery for the creditors.

19       Now, what does that not say?  It doesn't say a

20   greater -- it doesn't say greater recoveries for the

21   creditors.  It doesn't say a greater recovery for each class

22   or each type of creditors.  It uses the pleural, creditors,

23   just as, as you can see, Your Honor, on the left-hand side of

24   the column, Chapter 9 uses the pleural, creditors.

25       So what is Mr. Hein focused on?  He focuses on the

```
1   words "available remedies under nonbankruptcy law," and he

2   suggests that that is an implicit recognition that the

3   remedies are different, and that, therefore, implicitly

4   there's a class-by-class test.  I submit, Your Honor, there's

5   nothing in those words that conveys that message, and I submit

6   further that Congress knows how to write a best interest test

7   statute that deals with class-by-class or

8   claimholder-by-claimholder recoveries, and that's the Chapter

9   11 statute.  And 314(b) isn't even remotely like that.

10          I would say this.  Mr. Hein in his sur-reply brief at

11  page seven, that's docket 10 -- 19093 posits this hypothetical

12  where GO creditors could recover zero under a plan, and yet

13  the plan could meet the best interest test.  Well,

14  theoretically that's true, but what Mr. Hein ignores is that

15  if he's right about GO priority, then every single GO class

16  would reject the Plan.  And they would have a multitude of

17  defenses to defeat the Plan.

18          So the fact that in theory -- and I'm not even sure,

19  frankly, the math works, because we're talking about 18.8

20  billion dollars in GO and pari passu debt, but even if the

21  math worked, it doesn't make a difference.  The hypothetical

22  Mr. Hein talks about will never come to pass.

23          Your Honor, briefly, there are a number of

24  assumptions in Mr. Shah's best interest test, and you heard

25  from Mr. Shah, and you heard the cross-examination of him.
```

 1    And that's not surprising, because this was a very complicated

 2    restructuring, and no one really knows better than Your Honor

 3    that there were a lot of litigation possibilities here.  There

 4    were actual litigations, there were litigations that could

 5    have been asserted but hadn't yet been asserted, and a

 6    multitude of potential outcomes.

 7           And so it made essential, it made perfect sense to

 8    try to capture all those variables in the assumptions that --

 9    the legal assumptions that Mr. Shah and his team was given.

10    And Mr. Hein in his cross of Mr. Shah implied that Mr. Shah

11    sort of overrelied on the Commonwealth's -- or the Board's

12    counsels' assumptions, but what's missing from that criticism

13    is the failure to challenge all but one of the assumptions.

14    The only assumption that Mr. Hein clearly challenges is the

15    payment priority, and I'll get to that in a moment.  But if

16    the assumptions aren't challenges, and if the assumptions are

17    good, then there's nothing wrong with a witness relying on the

18    assumptions.

19           The other thing I will say, Your Honor, is that each

20    of these assumptions -- not each of them, but many of these

21    assumptions had alternate assumptions, where alternate

22    scenarios were run.  And the results were relatively uniform

23    across the spectrum.

24           Not to get lost in this discussion, Your Honor, what

25    would the landscape look like outside of Title III, and the

1    first bullet point on this slide is Mr. Shah's declaration at

2    paragraph 12.  And I highlighted a sentence, absent a

3    mechanism to restructure the debtors' outstanding debt and

4    pension liabilities, the Commonwealth would face great

5    uncertainty, financial and political instability, and be

6    subject to significant litigation.

7         So what did -- and that, as Mr. Shah testified, was a

8    McKinsey assumption.  It wasn't given to him by lawyers.

9         What was done in the prior slide, Your Honor, you

10   will have noticed a bulletpoint.  What McKinsey did was lower,

11   to some extent, the revenue forecasts in the fiscal plan, and,

12   in some cases, increase the expense assumptions in the fiscal

13   plan to apply in non-Title -- in the -- outside of the Title

14   III world.

15        One could argue, and it may be just the nature of the

16   prose, that this is an understatement.  And I, frankly, prefer

17   the quote from Collier that is at the bottom of the page,

18   which says I think very clearly that, in a non-Title III

19   world, or in that case, in a non-Article IX world, the result

20   is chaos.

21        Your Honor, it's often said that Courts don't have to

22   check their common sense at the door.  Your Honor obviously

23   will come to your own conclusions about what the non-Title III

24   world would look like, but I don't believe that chaos is an

25   understatement.

1    So what were the results on the aggregate basis?  And

2    this, again, is coming from Mr. Shah's declaration at

3    paragraph 13, where he describes what the results are, and

4    then at paragraph 35, he's providing a comparison between

5    aggregate plan recoveries and the aggregate recoveries in his

6    BIT reports.  And as you can see, for the Commonwealth,

7    numerically, the recovery is much better, on an aggregate

8    basis, and the same for PBA.

9    I want to spend just a minute on the ERS point,

10   because you'll see there's sort of an eye popping number on

11   the right-hand side, right-hand column of five to a hundred

12   percent.  And a hundred percent obviously is a hundred

13   percent, but it's important for the Court to understand the

14   basis of that particular scenario.

15   That particular scenario assumed that ERS bondholders

16   would prevail in an argument that they had liens in PayGo

17   payments, and although Your Honor never, I think, squarely

18   addressed that issue, the First Circuit in its 2020 ERS

19   decision, was very clear.  And I'll just quote the relevant

20   language.  What -- and this is at 948 F.3d 457, at 680 --

21   sorry, 468 to 469.  Importantly, the bond resolutions

22   explicitly state that the legislation of the Commonwealth

23   might reduce or, by implication, eliminate employers'

24   contributions, and so adversely affect the bondholders.

25   That's a pretty big clue of how this would have come

1    out had it been litigated up to the First Circuit, but suffice

2    it to say that the 100 percent recovery is something the

3    Oversight Board and I think, objectively, is very, very

4    unlikely.  I submit, Your Honor, that we could stop right at

5    this slide, because this is the aggregate recovery, but let's

6    just take a look at the recovery by classes.

7         So, Your Honor, this comes again from Mr. Shah's

8    declaration, and in particular his best interest test, which

9    is Exhibit 130.  This is Exhibit Eight.  So what we see here

10   are three different scenarios.  On the left, you have a

11   scenario where all GO debt after 2012 is deemed invalid.  In

12   the center, it's all GO debt after March 2021 (sic).  And on

13   the right, it's everything is valid.

14        So let's, for a moment, look at the GO bonds in the

15   left and the center.  So you'll see very high percentage

16   recoveries there, but there's two important things to

17   remember.  One, these scenarios assume that a substantial

18   portion of the GO bonds are held invalid, and so those

19   bondholders receive nothing; but, two, the percentages are

20   skewed, because the denominator is not apples to oranges with

21   the plan denominator.  The denominator only includes the GO

22   debt amounts that are deemed valid.

23        And you can see the difference.  If you look on the

24   right-hand side, the numbers are much larger, 10.1 billion to

25   11.3 billion.  Now, if you go to the right-hand side under the

1    GO Bonds, you'll see the recovery range of 75 percent, 84

2    percent, is, as a range, higher than the Plan recoveries.  The

3    Plan recoveries, and this is in the Disclosure Statement, Your

4    Honor, which is docket 17628, at word processing pages 19 to

5    22, the range, depending on vintages, is 67.8 percent to 77.6

6    percent.  But, an important thing about that, that does not

7    include CVI recoveries.  In other words, it doesn't include

8    the potential upside.

9        And I submit, Your Honor, that given the level of

10   uncertainty around this entire exercise, and the words in the

11   statute, to consider, these numerical differences are not

12   material.  And that, again, even assumes that the proper test

13   is to look at the GO bonds individually, which as I've already

14   said, is not the proper test.

15       Your Honor, just a few more points, and then I'll

16   wrap up.  And this really goes to Mr. Hein's argument that GO

17   debt should be paid first, even before operating expenses.  So

18   two reasons why that's not so.  First, there is an assumption,

19   I don't believe challenged by Mr. Hein, that even outside of

20   Title III, the Board would still exist, and Titles I and II

21   would continue, and the Board would continue to certify fiscal

22   plans and budgets.

23       But even putting that aside, there is the police

24   power, and on this slide, we have indicated where in the

25   Constitution there are references to the police power, and a

1  Supreme Court case acknowledging that the Constitution does

2  indeed include the police power.

3       Now, the first of the articles, article -- section 18

4  of Article II talks about an emergency, and Mr. Hein will no

5  doubt tell you that there is no longer an emergency, because

6  there is all this cash on hand.  But that's wrong.  The reason

7  that there's cash on hand is because debt service hasn't been

8  paid in four years, and although it is correct that GOs would,

9  as an initial matter, because they are first in the waterfall

10 under Mr. Shah's BIT analysis behind operating expenses, they

11 will get more money up front, because that money is there, but

12 not necessarily in the long run.  And it's the long run that

13 matters, because GO debt cannot be accelerated, which leads

14 me, Your Honor, to my final point, which is what does the

15 world look like with the police power.

16       So if GO creditors were to argue, hey, I want any

17 surplus paid to me, and if the Secretary of the Treasury said,

18 no, thank you, that's not what we're going to do, someone

19 would have to go to Commonwealth Court, presumably it would be

20 Commonwealth Court.  And a Commonwealth Court judge would have

21 to be asked whether GO bondholders, and Mr. Hein in

22 particular, living in New York City, should be paid before

23 firemen, teachers, policemen, and other critical public

24 servants.  They'd also -- that same judge would be asked

25 whether social safety net spending should be eliminated.

1          Now, Mr. Hein says, but, in the fiscal plan budget,

2     there's all this nonessential spending.  And he talks about

3     consulting fees and advertising fees and fees for the arts.

4     Well, even if you assume that that type of spending wouldn't

5     be found to be within the police power by a Commonwealth

6     Court, it's important to recognize that the Commonwealth is

7     not some sort of static financial statement.  It's a living,

8     breathing organism.  It's a living, breathing society with

9     human beings who react in the way that human beings react.

10          So if you cut advertising spending, for example, and

11     if that advertising spending is for tourism, what's going to

12     happen to the level of tourism on the island?  If you cut the

13     arts, or recreation, how attractive will that make Puerto Rico

14     as a place to live?  The Fiscal Plan is replete with a

15     discussion of outmigration, and the risk of outmigration, and

16     the point is that you cannot assume that a cut in spending

17     won't have a relative impact on spending on the island and

18     revenues.  And Mr. Hein does not discuss that.

19          It is, in fact, discussed in Dr. Simon Johnson's

20     report, Your Honor, at -- and this is docket 9060, in section

21     five.  And he notes that, in the Board's Fiscal Plan, the

22     Board has a fiscal multiplier of 1.34, which basically means

23     that for every dollar of spending that's cut, 1.34 dollars

24     less money will be spent in the Commonwealth.  And Dr. Simon

25     (sic) suggests that perhaps that's a conservative number.  But

1   it doesn't work the way Mr. Hein says.

2          And I'll close on this, Your Honor.  Perhaps most

3   importantly, Mr. Hein criticizes and makes arguments, but he

4   did not offer any counteranalysis.  He has no best interest

5   test analysis, and on that basis alone, Your Honor can

6   overrule his objections.

7          Now let me cede the podium to my partner,

8   Mr. Bienenstock.

9          THE COURT:  Thank you, Mr. Mervis.

10         MR. BIENENSTOCK:  Good morning again, Your Honor.  By

11  our stopwatch, I think I have another 14 minutes.  Does that

12  conform to Your Honor's clock?

13         THE COURT:  Sixteen.

14         MR. BIENENSTOCK:  Okay.

15         THE COURT:  I think we added a little back.

16         MR. BIENENSTOCK:  Thank you, Your Honor.  Much

17  appreciated.

18         Okay.  This starts at slide 119.  I'm going to cover

19  cramdown first.  So these are the rejecting classes.

20  Interestingly, Your Honor, very, very few of the confirmation

21  objections go particularly to cramdown issues.  Almost all of

22  the objections of claimholders in these classes go to -- they

23  don't like the treatment of their claim, whether the class had

24  accepted or not, because of eminent domain reasons or, in the

25  case of pensions, because they didn't think they should have

1    any cut.  And, of course, after they voted, the monthly

2    benefit modification was eliminated, so the only cuts now were

3    to the classes that -- where the defined benefit plans had not

4    already been eliminated, and are being frozen along with the

5    COLAs.

6         The standard for confirming a plan over the rejection

7    of a class is that the plan not discriminate unfairly, and

8    it's fair and equitable.  And fair and equitable means that if

9    there's a junior class, that class will get nothing unless the

10   rejecting class is paid in full.

11        Your Honor, we have a junior class in our plan, and

12   that is the Class 64, which is subordination, because the

13   claims are for the purchase or sale of securities, and that

14   class gets nothing.  So we have satisfied the -- we have

15   satisfied the requirement for cramdown on fair and equitable.

16        As far as unfair discrimination, as I mentioned

17   earlier, no one has compared their treatment to another class'

18   treatment.  Rather, they've made the objections I've

19   mentioned, that they don't want to have any cut, et cetera.

20        Now, in the case of all of the pension classes, those

21   classes are favored humongously compared to any other class.

22   They get their full defined benefit earned as of the effective

23   date of the Plan.  The only hits to those classes are in the

24   case of the teachers, they can't -- future work, if they

25   choose to work in the future, will not increase their

1    benefits. And for the judges, they lose the cost-of-living

2    adjustments in the future.

3         I want to focus now on the TRS, the teachers' class,

4    for two reasons. One is last week, Your Honor, the Court was

5    told a lot of things that we submit do not track to the facts.

6    The Court was told, for instance, that there are rejection

7    damage claims with no class to deal with them, and they're

8    being paid from their own money. The second reason I'm

9    dealing with this, Your Honor, is that if the Court were to

10    side with those arguments, which in a minute I'm going to try

11    to show are completely wrong and based on bad facts, but if

12    the Court were to side with those arguments, the TRS class

13    presents a real feasibility issue, because it creates a

14    liability of so many billions of dollars, and the Oversight

15    Board would not be able to say the Plan is feasible if it

16    cannot have the freeze of those pensions.

17         Now, this slide that's up now, slide 123, shows that

18    the TRS participant claim is defined to include both the

19    retiree benefits as of May 3, 2017, and any right to accrue

20    additional retiree benefits in TRS from and after the

21    effective date of the Plan. Right there you have the

22    rejection damages. They're losing the right to accrue

23    additional benefits from and after the effective date of the

24    Plan. So that has been put into the TRS class, which is 51C.

25         And the slide up now, 124, shows the treatment of

1   that class, and contrary to what the Court heard about they're

2   getting nothing for those claims, and they're being paid from

3   their own money, actually, they're getting paid three

4   different things.  They're getting paid through PayGo for

5   their defined benefits up through the effective date of the

6   Plan; they're getting back their defined contributions; and

7   they're getting Social Security matching payments from the

8   Commonwealth.

9        So they are being paid not from their own money, from

10  Commonwealth money, and they're being paid for all of their

11  damage claims.  And we hope that puts to rest the factual

12  inaccuracies that were stated last week.

13       Various pensioners, as I mentioned, have asserted

14  that the Plan unfairly discriminates against them.  Two

15  examples are ECF no. 18485 and 18505.  Each of those, they're

16  one-page objections, but we take them seriously.  They are

17  from real people who are arguing that they should not have a

18  cut.  And hopefully those people feel -- they may not feel

19  good, but hopefully they feel better today than when they --

20  at the time they voted, because the monthly benefit

21  modification was eliminated from the Plan.

22       The dairy producers' claims are really not an

23  impediment to confirmation.  They're in a class now where they

24  get 50 cents, which is better than the average general

25  unsecured claimholder gets of -- we estimate from 20 to 40

1   cents.  And if they're right about eminent domain, we don't

2   think Suiza Dairy is right, but if they are right and Your

3   Honor rules its nondischargeable, then they'd have to be paid

4   in full as a nondischargeable claim.

5       We're not going to repeat the arguments Your Honor

6   heard last week.  I just marshaled the authorities we

7   mentioned, the *Stockton case,* and the *Poinsett Lumber* case.

8   Also, there was the *Luehrmann* case in the Eighth Circuit, on

9   which *Poinsett Lumber* is based.

10      We did want to bring to the Court's attention one

11  other argument we did not mention last week based on the

12  Supreme Court decision in *Block v. North Dakota*, on this slide

13  128 -- or 126 -- or 128, Your Honor.  What that case says is

14  that the Supreme Court held that Congress does have the power

15  to eliminate eminent domain claims through the statute of

16  limitations, and while the Court might believe -- it's obvious

17  that, you know, there has to be a statute of limitations.

18      The fact is that there are cases on the books, the

19  *Soriano* case and other cases in the Supreme Court, where it

20  has worked to eliminate eminent domain claims.  And the

21  argument is, that if Congress has the power to eliminate in

22  total eminent domain claims even outside of bankruptcy, then

23  it surely has the power, given that it was granted the

24  bankruptcy power in Article I, Section 8, Clause 4 of the

25  Constitution, to limit payment of eminent domain claims.

1         Your Honor, my partner went through the best interest

2    test, but we think this further supports, Mr. Shah's findings

3    further supports that the treatment of all of the rejecting

4    classes is not unfair discrimination.  On the whole, they're

5    getting in the range, sometimes better, sometimes maybe a bit

6    worse, but they're getting in the same range at least as they

7    would get outside of Title III.

8         On the subject of preemption, Your Honor, to our

9    knowledge, this is not really being challenged, except for

10   Acts 80 through 82, which I'm anxious to get to; but as a

11   matter of necessity, we've asked, as part of the Plan, for the

12   Court to rule these statutes are preempted, because they do

13   things like authorize debt.  And our evidence shows that, you

14   know, some of these statutes would cost, as Mr. Malhotra is

15   saying here in his declaration, 1.7 billion dollars paying of

16   old debt that's being discharged under the Plan.

17        The statutes do things like authorize full payment of

18   General Obligation Bonds.  They authorize and require

19   appropriations.  Your Honor is well familiar with that from

20   the litigation.  Clearly, there's no point in appropriating

21   money to HTA or PRIFA to pay debt that's being discharged, and

22   on, and on.  Largely, we believe the statutes that we've

23   listed as being preempted are noncontroversial as far as we

24   know in the context of this confirmation.

25        Now, the TRS and JRS statutes that are the defined

1   benefit plans that we are freezing, here in Mr. Malhotra's

2   declaration, and slide 139, he shows that just for fiscal year

3   2022, this would cost 984 million dollars if we don't do it.

4   So it's a significant hit, and threatens feasibility of the

5   Plan.

6           I mentioned statutes relating to the issuance of new

7   securities.  For securities under the Plan, Act 53 has largely

8   made this academic, but to the extent there's other debt under

9   the Plan that someone says is a security, we submit that in a

10  federal bankruptcy situation, you don't need local

11  authorization to issue debt.

12          Your Honor, I'm going to jump to 80 to 82 now.  This

13  is critical.  Last summer -- two summers ago, Your Honor, at

14  this point, the legislature passed Acts 80 to 82, which

15  effectively create defined benefits in excess of their level

16  going into the Title III case, and they did it under the

17  concept that they'll work some early retirements, which will

18  create savings to offset the increased defined benefits they

19  were offering, but the -- in the Oversight Board's view, two

20  things were wrong with that.

21          First of all, they are now saying that they will

22  determine the treatment of pension claims that preceded the

23  Title III petition; and, second, that they will do it in a way

24  that, in our view, does not save money, because the positions

25  that would be retired can be replaced.  And they decide what's

1    essential service that can be replaced, and you can replace

2    any position appointed by the Governor, et cetera, et cetera.

3         So the Oversight Board views those three acts

4    together as creating up to five billion dollars of debt not

5    accounted for by the Plan and its finances.  Now, the reason

6    Your Honor has not heard about this earlier is that the

7    Governor -- it was passed under a different governor, but that

8    governor and the current governor agreed not to implement any

9    of these statutes while it worked with the Oversight Board to

10   see if we could come up with something to create some early

11   retirement trade offs that would be at least revenue neutral

12   and the like.

13        Suddenly, after this Confirmation Hearing started,

14   the legislature on November 11 passed S.J.R. 171, compelling

15   the Governor immediately to implement Acts 80 through 82.

16   Now, the objection that AAFAF filed the other night admits

17   time and again that these acts increase the defined benefits

18   over what they were, that is an increase over what the Plan

19   would otherwise pay.

20        So, Your Honor, we think it just jumps off the page

21   that the local legislature cannot decide during a Confirmation

22   Hearing that it's nice that for four and a half years the

23   Board worked on getting rid of defined benefits going forward,

24   because that was a large part of the problem; worked on what

25   retirees would be paid; and say to the Oversight Board and

1   everyone else, well, thank you very much for your four and a

2   half years of work, but here's how we're going to treat

3   retirees, and we're going to increase benefits up to five

4   billion dollars, if the --

5          (Sound played.)

6          MR. BIENENSTOCK:   -- Oversight Board's calculations

7   are approximately correct.

8          So in these slides, Your Honor, we highlight the

9   sections of the statutes, the increased benefits; we highlight

10  AAFAF's admissions in the objection it filed that it did

11  increase benefits in three areas; and while it says that we

12  should have acted earlier, they passed S.J.R. 171 on November

13  11, Your Honor.  And we promptly told the Court, and that's

14  what AAFAF was reacting to, that we would have to put these

15  statutes on the list of preempted statutes, because, quite

16  possibly, the Plan wouldn't be feasible if these statutes were

17  ever enforced.

18         And my final point, Your Honor, is this.  AAFAF

19  argues in its objection -- which we will respond to today in

20  writing, but in large part the Court is hearing it now -- it

21  says, well, even if we're right, we have to go through a

22  section 204(a) process, or a 108(a)(2) process.  No.  AAFAF

23  has it all wrong.  We could do what it's suggesting, but if a

24  statute is preempted, it's preempted.  We don't have to use

25  204(a) or 108(a)(2).

1          These statutes where the legislature and Governor

2     would be telling the Board we will decide what retirees get,

3     largely for prior services, and a little for future services

4     that the employees would have to provide, that is directly

5     contrary to the Board's exclusive right to propose a plan that

6     determines treatment of prepetition claims.  It jumps off the

7     page.  And we don't think we can confirm without a

8     determination to that effect, because we might not have the

9     money to do it.  We'd be putting the Commonwealth back in the

10    position that we attempted to rescue it from.

11         Your Honor, I'm going to stop now, and I think that

12    concludes our opening, unless the Court has questions.

13         THE COURT:  I have no questions at this time.  Thank

14    you, Mr. Bienenstock.

15         MR. BIENENSTOCK:  Thank you, Your Honor.

16         THE COURT:  It is now 10:15 New York time, 11:15

17    Atlantic Standard Time, and so we will take our ten-minute

18    morning break now, resuming at 10:25, or 11:25, depending on

19    where you are.  Mr. Kirpalani will be the next speaker.  Thank

20    you.

21         (At 11:09 AM, recess taken.)

22         (At 11:20 AM, proceedings reconvened.)

23         THE COURT:  Good morning.  We're back again

24    continuing with the closings argument on the matter of the

25    Confirmation Motion.  The next speaker is Mr. Kirpalani, for

1    the LCDC.

2         You've been allotted 20 minutes, Mr. Kirpalani.

3         MR. KIRPALANI:  Thank you, Your Honor.  Good morning.

4    Susheel Kirpalani of Quinn, Emanuel, Urquhart & Sullivan, on

5    behalf of the Lawful Constitutional Debt Coalition.

6         Your Honor, I'm going to address three subjects in

7    support of confirmation, with particular focus on the

8    treatment of constitutional debt in the Plan.

9         Judge, can I share my screen?

10         THE COURT:  Yes, you may.

11         MR. KIRPALANI:  Just one second.

12         THE COURT:  You should be able to do it.  We have you

13   set up for it.

14         MR. KIRPALANI:  Do you see my slide there?

15         THE COURT:  Not yet.  Did you press the "share

16   screen" at the bottom?

17         MR. KIRPALANI:  Yes.  Let me try it again.  There we

18   go.  No.  Two seconds.  Okay.  Now you should be able to see

19   it.

20         THE COURT:  Yes.

21         MR. KIRPALANI:  Okay.  Thank you so much.  Sorry

22   about that.  Our demonstratives were filed a little while ago.

23   Just for the record, it's at docket 19332.

24         Judge, I'm going to cover three subjects.  Topic one

25   is the evidence supporting good faith, arms-length

1    negotiations underlying the settlements that are embodied in

2    the Plan.  Topic two is going to be the reasonableness of the

3    PSA fees.  And topic three would be the best interest of

4    creditors where we diverge a little bit with the Oversight

5    Board as to how that test should be conducted.  And we think,

6    as an alternative to the Court, if the Court were to accept

7    the arguments that the Contract Clause must be evaluated, and

8    that best interests must be looked at from the perspective of

9    each constitutional debtholder, we submit that the evidence

10   will show -- does show that the best interest test is met

11   anyway.

12          Before we review the evidence, though, Judge, Your

13   Honor had a colloquy with Mr. Rosen at the end of the last

14   hearing on Wednesday, November 17th.  The transcript was at

15   page 132, line 23.

16          The Court's question was "what's the source of law

17   that supports paragraph four of the Confirmation Order?

18   Namely, what is the legal justification for binding a

19   dissenting creditor within an accepting class to the terms of

20   the Plan?"

21          I think the Court was just looking for the tie back

22   to the Bankruptcy Code of what is a central feature of any

23   plan, binding holdouts.  We touched on this in our statement

24   of position with respect to the United States Attorney

25   General's request for enlargement of time on why a dissenting

1  retail bondholder objector's constitutional challenges are

2  resolved by the class' vote.  Our filing last week was at

3  docket no. 19300, and the relevant sections of that filing, at

4  paragraphs seven and eight.

5       For completeness of the closing argument record, the

6  source of law is not a section within Chapter 11, but rather

7  section 944(a)(3) of the Bankruptcy Code, which is

8  incorporated through section 301(a) of PROMESA.  So not a lot

9  of cases interpreting, a straight forward statute, but Your

10 Honor could find discussion of it in the seminal Chapter 9

11 case of *In re County of Orange*, 219 B.R. 543, 558.  That's a

12 bankruptcy decision from the Central District of California in

13 1947.  And there the Judge, citing the Collier's Bankruptcy

14 Treatise, the Court held, "the important principle of Chapter

15 9 embodied in section 944(a), is that once a plan has been

16 accepted by the requisite majority, all creditors are bound by

17 the Plan."

18      Another seminal case which predates the Bankruptcy

19 Code and makes the same point is *Getz v. Edinburg Consolidated*

20 *Independent School District*, 101 F.2d 734, 736 (5th Cir.

21 1939).  The analog in Chapter 11, is section 1141(a).  Both

22 statutes answer the same question of what is the effect of

23 confirming a plan on those who may have voted against the

24 plan, or not voted at all.

25      To be clear, the proponents of the Plan are not

1    invoking section 1129(b), which is the cramdown statute, to

2    deal with dissenting minorities within a class.  Cramdown will

3    be necessary only to impose the treatment on the classes that

4    rejected the plan, like the General Unsecured creditors for

5    example, but not for any of the constitutional debt classes,

6    because they all overwhelmingly voted in favor.  The issue of

7    the majority binding the minority on all aspects of the Plan

8    was addressed by the Oversight Board's brief in support of

9    confirmation at paragraphs 165 and 297.  That's at docket no.

10   18869.

11        So jumping to the evidence, Your Honor, with that

12   framework in mind, it is still the plan proponent's burden to

13   prove the elements of confirmation in order to make the Plan

14   binding, and the vote is just part of it.  I'd like to focus

15   on the evidence supporting the good faith negotiations that

16   lead to the terms of the Plan.  That is section 1129(a)(3).

17        As we can see here, this is my slide three,

18   Ms. Natalie Jaresko, the executive director of the Oversight

19   Board testified by declaration.  The relevant paragraphs are

20   paragraphs 29, 201, and 202.  She testified that she was

21   directly or indirectly, through her advisors, engaged in

22   extensive mediation sessions under the guidance and direction

23   of the mediation team.  And that she and other representatives

24   of the Board participated in good faith, and all of the

25   negotiations were at arm's length with the various creditors,

1   which of course includes the LCDC.

2         Professor Skeel also testified in his declaration, in

3   paragraphs 17 and 33, that the Oversight Board engaged in

4   extensive mediation through the mediation efforts overseen by

5   Chief Judge Barbara J. Houser of the United States Bankruptcy

6   Court for the Northern District of Texas, and continued to

7   negotiate directly with various constituencies, all in an

8   effort to build support for the restructuring of Commonwealth

9   debt.

10         Professor Skeel participated himself, as he

11   testified, and based on his participation in the negotiation

12   leading to the PSAs, he testified, and it was uncontroverted,

13   that the negotiations were conducted at arm's length and in

14   good faith.

15         THE COURT:  Mr. Kirpalani.

16         MR. KIRPALANI:  Yes.

17         THE COURT:  I see a red symbol up at the top of your

18   screen --

19         MR. KIRPALANI:  Yes.

20         THE COURT:  -- with a white circle in the middle of

21   it.

22         MR. KIRPALANI:  Uh-huh.

23         THE COURT:  Is that meaning you're recording?

24         MR. KIRPALANI:  I don't believe so.  I think it means

25   I'm broadcasting, but let me touch it and take a look.  It's

 1 | just the broadcasting.  It means I'm sharing my screen.

 2 | THE COURT:  Okay.  Thank you very much.  I just

 3 | wanted to make sure.

 4 | MR. KIRPALANI:  Of course, Your Honor.

 5 | So Mr. Zelin testified, in his declaration, at

 6 | paragraphs 13 and 23, that he personally participated in the

 7 | vast majority of the negotiations and discussions concerning

 8 | the settlements, that the negotiations leading to the

 9 | execution of the GO-PBA PSA were at arm's length, and in good

10 | faith, and lead to a compromise of contested positions between

11 | the parties to the GO-PBA PSA.

12 | The next subject, Your Honor, is the reasonableness

13 | of the PSA fees.  So, first of all, in terms of the legal

14 | standard, as a technical matter, section 1129(a)(4) is the

15 | statute that ordinarily requires the Court to approve the

16 | reasonableness of any payments made by the debtor for services

17 | or for costs and expenses incident to the case.  That section

18 | of Chapter 11 was not incorporated into PROMESA.  It is not in

19 | Chapter 9 either.

20 | Presumably, under the theory that a sovereign

21 | ordinarily can use its property to pay fees for services or

22 | reimburse costs as it deems appropriate, but why is it

23 | relevant still?  It's relevant to the Commonwealth's Title III

24 | case, because the allegation has been made by at least one

25 | retail bondholder that the payment of PSA fees, including the

1    consummation costs, is an unequal treatment of constitutional

2    debt claims, and that would violate section 1123(a)(4) if it

3    were true.  Of course it isn't true.  Let's see what the

4    evidence actually says.

5         If we look at Ms. Jaresko's testimony in her

6    declaration at paragraph 216, she says, specifically, in

7    consideration for their efforts in assisting in the

8    formulation of the Plan, and to compensate the PSA creditors

9    for fees and expenses incurred in connection with the

10   negotiation and execution of the GO-PBA PSA, the Oversight

11   Board determined that it is fair and reasonable for the PSA

12   creditors to be paid the consummation costs.

13        Additionally, in exchange for agreeing to support the

14   Plan, and to lockup the parties' bonds in accordance with each

15   of the GO-PBA PSA, and other PSAs, the Oversight Board

16   determined it is fair and reasonable to make PSA restriction

17   fees available to such consummation cost parties.  That's the

18   testimony, and it's uncontroverted.

19        Mr. Zelin, the lead banker who negotiated the Plan

20   for the Board, also testified that the PSA fees were not on

21   account of the claims.  So it's not part of the treatment,

22   but, rather, it's for legitimate and prudent purposes made in

23   the business judgment of the debtor.

24        At paragraph 88, he testified that they were

25   bargained for, they were part and parcel of the overall

1   compromise, and they were -- the fees were paid, in paragraph

2   88, he testified, as consideration for their efforts, meaning

3   the creditors' efforts, in assisting in the formulation of the

4   Plan, which has garnered significant creditor support,

5   continuing to assist in the finalization of definitive

6   agreements and ancillary documents, and the costs incurred in

7   those and other efforts; that it was in that context the

8   Oversight Board determined it was fair and reasonable for the

9   recipients to be paid consummation costs.

10          I would note, Your Honor, even as recently as this

11  weekend, the ongoing negotiations and discussions over the

12  final forms of critical bond documents that are essential to

13  implementing the Plan continues between the Board and the PSA

14  creditors.

15          Even under cross-examination, Your Honor, Mr. Zelin

16  testified that the willingness of the Board to provide the

17  consummation costs and the fees was based upon a personal

18  understanding that the creditors that they were negotiating

19  with for years were incurring significant expense, and the

20  Board's willingness to provide that reimbursement, that fee,

21  was with that knowledge.

22          Just a second, Your Honor.  I'm getting my timer back

23  up.

24          So the testimony on cross-examination by Mr. Zelin

25  was that the consummation costs related to reimbursing those

1    stakeholders who are active participants in the negotiation

2    for the costs that they incurred, so that coming to

3    negotiation, they could have the facts and information they

4    require for that negotiation to be arm's length and fair.

5         And, finally, he testified that, based upon the

6    dollars that the 1.5 percent -- that's the consummation costs

7    component -- represents, and the estimates for two of what

8    were at least five or six or seven groups that I saw, I

9    believe our decision or our assumption that the 1.5 percent

10   was reasonable was more than validated.

11        So, as I mentioned in our opening statement, Your

12   Honor, the GO-PBA PSA in particular enabled the Board to keep

13   its senior-most creditors locked in and locked up for over two

14   years while it accumulated additional revenues and made

15   additional judgments to deal, to cut deals with other groups

16   of creditors.  No one could credibly say that paying the PSA

17   fees to restrict constitutional debtholders was -- did not

18   work out well for the Board and provide a benefit to Puerto

19   Rico.

20        The last topic I'd like to address, Your Honor, is

21   the best interest of creditors.  As the Court knows, we cut

22   our deal with the Oversight Board in the second quarter of

23   2019.  We stand by our deal as a fair compromise, but the

24   Court still must make an independent finding that the best

25   interest of creditors has been satisfied.

1          Some dissenting retail creditors have raised the

2     Contracts Clause.  They also raise the Takings Clause, but

3     given we are dealing with GO debt, that is a disputed secured

4     claim that was compromised and settled, I want to focus on the

5     Contracts Clause, because it's indisputable that

6     constitutional debtholders do have contracts with Puerto Rico.

7          The Oversight Board urges that the Contracts Clause

8     is not at issue, because PROMESA is a federal law, and

9     Congress is not bound by the Contracts Clause.  The Board also

10    says the best interest test should look to aggregate

11    consideration to all creditors, and not to a GO bondholder's

12    right to be paid in accordance with its constitutional

13    priority.

14         Your Honor, we will take the other side of those

15    arguments, because, in the alternative, this is a case of

16    first impression, and we think Your Honor needs to consider

17    "in the alternative" as well.  We can demonstrate why the Plan

18    is nevertheless confirmable.  While we agree that PROMESA is a

19    federal law, the Contracts Clause still plays a role in the

20    analysis.  We think it's incorporated into the analysis over

21    best interests.

22         In the end, it is the Oversight Board, as an agent of

23    the state -- we know from the Supreme Court's decision in the

24    *Aurelius* case that the Board is not acting on behalf of the

25    Federal Government.  It is acting on behalf of Puerto Rico.

1  And it is the judgments and determinations of the Oversight

2  Board that is resulting in a decision to impair the bond debt

3  and by how much.

4          PROMESA would permit unimpairment as much as it

5  permits impairment.  So if the Oversight Board seeks to impair

6  contracts of Puerto Rico, that decision is subject to the

7  Contracts Clause in our view.  Moreover, as at least one of

8  the objectors pointed out, Law 53 is a state law that was

9  passed to implement the Plan, and the passage of that statute,

10  may be subject to the Contracts Clause, too.  But while we

11  agree with the retail objectors that the Contracts Clause is

12  something that the Court needs to consider as part of best

13  interests, the evidence shows the Contracts Clause is

14  satisfied by this plan.

15          Let's look at it.  The Contracts Clause, Your Honor,

16  the text of it says -- I'm sorry.  Before we go there, the

17  text of section 314, the best interests test, says "the Court

18  shall confirm a plan if, (6), the plan is feasible and in the

19  best interest of creditors, which shall require the Court to

20  consider whether available remedies under the nonbankruptcy

21  laws and Constitution of the territory would result in a

22  greater recovery for the creditors than is provided for by

23  such plan."

24          And of course, Your Honor, we know that the U.S.

25  Constitution says "no state shall pass any law impairing the

1    obligation of contracts," but we also know that that language,

2    although it's written in the absolute, it has never been

3    interpreted in the absolute.  The Supreme Court has told us in

4    the *U.S. Trust* case that, legislation adjusting the rights and

5    responsibilities of contracting parties must be based upon

6    reasonable conditions and of a character appropriate to the

7    public purpose justifying its adoption.

8         And we also know from a case that I would encourage

9    Your Honor to reread, the *Faitoute Iron & Steel* case, because

10   of its great similarity to the situation here, the Supreme

11   Court there held that "impairment of an obligation means

12   refusal to pay an honest debt.  It does not mean contriving

13   ways and means for paying it.  The necessity compelled by

14   unexpected financial conditions to modify an original

15   arrangement for discharging a city's debt is implied in every

16   obligation, and for the very reason that, thereby, the

17   obligation is discharged, not impaired."

18        The evidence, Your Honor, supports that there is a

19   necessity of impairment.  We would cite paragraph 12 of the

20   Shah Declaration, paragraph 13 of the Skeel Declaration,

21   paragraph 57 of the Zelin Declaration.

22        And let's turn to the reasonableness of the

23   impairment.  Your Honor can look at what we have here on our

24   slide 13, is a summary of the classification and votes by

25   class.  We thought it would be easier to understand if we just

1   looked at the different vintages.  You can see that the

2   overwhelming acceptance of constitutional debtholders, between

3   92 percent -- I'm sorry, between 80 percent and 100 percent of

4   every single class of constitutional debtholders.  That speaks

5   to the reasonableness of the impairment.

6         And lastly, Your Honor, we need to understand and

7   bring it full circle.  Is the proposed adjustment of

8   constitutional debtholders' rights reasonable and appropriate?

9   And so what we've done here is, based on the evidence, it's

10  all footnoted, we've created a bar graph as a demonstrative to

11  show the amount of existing GO and GO Guaranteed claims is

12  13.5 billion --

13        (Sound played.)

14        MR. KIRPALANI:  -- of GO claims, 4.67 billion of PBA

15  claims, and 577 million of other.  So the total is 18.757

16  billion of claims.

17        And let's look at the proposed treatment, the

18  adjustment, to determine, for Contracts Clause purposes, is it

19  reasonable and appropriate?  And when you stack it up, we've

20  got 6.6 billion of cash, 7.4 billion of new GO Bonds, and an

21  original notional amount of three and a half billion of the GO

22  contingent value instruments, for a total consideration

23  package of 17.538 billion dollars.

24        And when Your Honor rereads the *Faitoute* decision,

25  you'll see that even then where the New Jersey law that

1    governed it did not permit the reduction of any principal, the

2    case really turned on whether the means for discharging the

3    debt was reasonable and appropriate.  And we think that this

4    case is analogous to that, Your Honor.

5         With that, I sincerely want to thank the Court and

6    your staff in both San Juan and New York for putting up with

7    us for all of these years, and for inspiring us back in May of

8    2017 that failure was not an option.  I also want to thank

9    Judge Barbara Houser for her tireless dedication and service

10   in this case.  On behalf of the LCDC, we respectfully urge the

11   Court to confirm the Commonwealth Plan of Adjustment, and pave

12   the way for Puerto Rico to emerge from bankruptcy and focus on

13   creating economic prosperity and greater opportunities for its

14   citizens.

15        Thank you, Your Honor.

16        THE COURT:  Thank you, Mr. Kirpalani.

17        The next speaker is Mr. Friedman for AAFAF, who's

18   been allotted 12 minutes.

19        MR. FRIEDMAN:  Thank you, Your Honor.  It's Peter

20   Friedman from O'Melveny & Myers on behalf of AAFAF.

21        Your Honor, ultimately, AAFAF does support this plan,

22   and I do intend to get to the reasons why we support it, in

23   particular some legal arguments rebutting some of Mr. Hein's

24   arguments.  But it is important for us to address the issues

25   with respect to Acts 80 through 82, as well as the other issue

1  you raised.

2       And one point I want to bring to the fore, Your

3  Honor, is I believe SEIU had objected to paragraph 62 in the

4  Confirmation Order.  I note that that is now in the Plan as of

5  the most recent version of the Plan filed late last night or

6  early this morning, and I assume their objection applies to

7  the provision that's now been imbedded into the Plan with

8  respect to that.

9       THE COURT:  That is the ten-year prohibition on

10  restoration of defined benefits?

11       MR. FRIEDMAN:  Yes, Your Honor.

12       So with respect to Acts 80 to 82, our objection is at

13  this stage really procedural.  AAFAF supports the Plan, but as

14  you've seen, Your Honor, over the last ten days, that the

15  terms of the Plan have changed, particularly as it regards to

16  the government and the government's ability to exercise its

17  policy making powers.

18       And the Board is doing a lot of this under the guise

19  of 314, that purports -- or that says that a plan has to be

20  consistent with a fiscal plan, but we read that as dealing

21  with treatment of creditors, not just a bulldozer to run over

22  any law that the government -- that the Board doesn't like.

23  We think that there are -- obviously, at length, have been

24  procedures over how the Board is to invalidate a law if it is

25  appropriate.  The Court has said on multiple occasions the

1  Board doesn't have a simple, self-effectuating power to say

2  that a statute is invalid.

3  　　　　Now, in the context here, as Mr. Bienenstock

4  acknowledged, Acts 80 through 82 were passed in the summer of

5  -- August 2020.  They've been on the books substantially.  Our

6  brief and objection outlines the back and forth between the

7  government and the Board with respect to the implementation of

8  these statutes that the government does believe and has

9  certified are not significantly inconsistent with the Fiscal

10 Plan, which is the relevant test under 204.

11 　　　　And there -- notably, Your Honor, one of the reasons

12 that I think we have real issues with the last minute

13 inclusion of the statutes, sort of in toto on this preemption

14 list, is Acts 80 and 81 have severability provisions.  And to

15 simply say that in their entirety they're preempted without

16 doing the work as to what each section means and whether it's

17 permissible is procedurally improper.

18 　　　　I would note, similarly, just as Acts 80, 81, and 82

19 are being painted with a very broad brush, so is S.R. 171.

20 S.R. 171 was actually passed by the Senate in August, so not a

21 surprise that this is an issue of heightened importance to the

22 government, and did not pop up at the last minute by any

23 means.  But as S.R. 171 does not require complete

24 implementation with Act -- of Act 80.  Rather, it deals only

25 with specific employees who are nonessential employees, who

1  will not be replaced, and the government firmly believes that

2  that will result in cost savings of the kind that we've been

3  in discussion with the Board for months about.  And I think we

4  reference in our brief that the Board has acknowledged that

5  the government is proceeding with certain phases of Act 80's

6  conditional implementation, and that the Board has

7  acknowledged that that might generate cost savings over and

8  above what's required in the Certified Fiscal Plan.

9       So to simply put these statutes, with a very broad

10  brush, on a list which deems them to be completely preempted,

11  without giving us the opportunity to fully litigation, as is

12  our right is, in our view, abuse of the preemption process.

13  And a list that started in August, where we had the full

14  opportunity to review all of these statutes, and where the

15  Board was required to put in evidence as to a nexus between

16  plan provisions and make legal arguments as to the nexus

17  between the legal basis for preemption, or a factual basis for

18  preemption, and how it interacted with the statute.

19       We're not arguing that the Board is without remedies

20  in the future if it believes that these statutes are

21  significantly inconsistent with the fiscal plan.  We are

22  arguing against this extremely broad use of preemption without

23  notice.  And without notice, Your Honor, one of the points I

24  want to make is, remember, there are multiple suits in state

25  court about these that have been stayed, but there are people

 1   who argue they have rights under Act 80.  Not prepetition

 2   rights, but acts -- rights which have arisen since August of

 3   2020.  And to simply wipe these away and say they're preempted

 4   on two business days' notice, Your Honor, in our view, does

 5   not comport with due process.

 6           I want to move on, Your Honor, from that, which is

 7   our strongly held objection to inclusion of those statutes, to

 8   the reasons we do support the Plan.  We believe the Plan

 9   reflects beneficial economics to the Commonwealth of Puerto

10   Rico.  We have, you know, sympathy to the unions, and the

11   teachers, and the judges in their objection, but as the

12   Governor said when he came to court, the government will abide

13   by whatever the Court's decision is, because it is a

14   government of the rule of law.

15           Now, I want to first talk about pension cuts, and the

16   lack of pension cuts in the Plan, and why that's not an issue.

17   Obviously the Eighth Amended Plan eliminates the monthly

18   benefit modification.  In our view, frankly, there never

19   should have been a monthly benefit modification.  It caused --

20   even the potential inclusion of it caused substantial distress

21   to Puerto Ricans, as this Court heard when you permitted

22   people to be heard two weeks ago.  But the removal of the

23   monthly benefit modification is appropriate factually and

24   legally, and I think it comes against the backdrop of what the

25   First Circuit noted in *COFINA*, which said, courts in municipal

1  bankruptcies have engaged in somewhat a freeform equitable

2  balancing, explicitly allowing municipalities to consider all

3  sorts of policy considerations in devising plans of

4  adjustments. And what could be more appropriate among policy

5  considerations than to respect the pensions of government

6  retirees?

7       And I think that marries up with the backdrop of the

8  Court's analysis of *Granada,* and with respect to

9  classification over the summer, that there are good business

10  justifications for, in the first instance, classifying

11  pensioners separately from other creditors and, ultimately,

12  their treatment.

13       I think we need to remember to not take a myopic

14  focus, I think as Mr. Hein's arguments did, on pension cuts

15  under the Plan versus the reality of pensions and reductions

16  to pensions that Puerto Rico's retirees have suffered over the

17  years. This is laid out in the Disclosure Statement, in the

18  Johnson Declaration, in the Levy Declaration, all of which

19  point out about how -- for example, in the Levy Declaration,

20  Act 3 and Act 106 affected large reductions to pensions. She

21  points out that the Oversight Board Section 211 report states

22  that reductions for exemplar employees range from 44 percent

23  to 82 percent. This is unrebutted evidence. And that's just

24  Act 3, 213 -- and Act 106.

25       Other statutes, Act 160, Act 162, Act 116, all of

1   which are described in the Johnson Declaration and the Levy

2   Declaration, worked reductions on the rights of people of

3   Puerto Rico to their retirement benefits.  The Levy

4   Declaration makes clear at Exhibit Two that the monthly

5   benefit modification would have negatively affected 139,000

6   people in Puerto Rico.  There is good business justification

7   for not doing that.

8           The Johnson report, which I assume Mr. Gordon will

9   discuss in more detail, focuses on the vulnerability of those

10  139,000 people, and why it's so important to avoid damage to

11  those people, why it's justified, and why it is -- and I think

12  if you, for example, look at the *Stockton* decision, why this

13  marries up well, and why it is legally permissible to not have

14  undertaken any cuts to retirees.

15          Your Honor, the next thing I want to address briefly

16  is best interest test.  I actually think that -- and I

17  couldn't tell quite if the Oversight Board was referring to

18  this, but I believe the Court addressed the proper

19  interpretation of best interest in the *COFINA* findings of fact

20  and conclusions of law in paragraph 147 when it said "it's a

21  collective test, not an individual test."  And I think that's

22  important to emphasize.

23          Mr. Hein makes certain arguments that I sort of

24  understand them to be saying, well, Puerto Rico is not using

25  all of its assets to retire its obligations, and, therefore,

1   the Plan can't be confirmed.  That's wrong.  The Court in the

2   *Sanitary & Improvement District of Nebraska*, 98 B.R. 170, said

3   "a debtor may obtain confirmation of a plan over objection,

4   which does not utilize all of the assets of an estate to

5   retire its obligations.  The objecting party suggests that

6   since the value of the property of the estate is equal to or

7   exceeds the amount of bondholder claims, it is the duty of the

8   debtor to levy sufficient taxes to pay the claims as they

9   existed on the date of the petition, plus accruing interest.

10  This Court concludes that such an assertion is erroneous."

11          Your Honor, Mr. Hein, in his best interest analysis,

12  also talks extensively -- or not even analysis, his criticisms

13  about tax abatements, but he didn't provide any evidence that

14  tax abatements, or foregone revenue from tax abatements, is

15  something that GO creditors would have a claim to, nor could

16  the Board have even ordered the removal of tax abatements.  In

17  fact, PROMESA Section 208 strictly limits the Board's power to

18  do anything with respect to the Commonwealth's execution of

19  discretionary tax abatements for similar relief.  So it would

20  have been completely inappropriate to include anything related

21  to tax abatements in a best interest test.

22          Your Honor, the other point I wanted to make is with

23  respect to 314(b)(3), I think Mr. Hein is looking at the

24  statute the wrong way.  I think what that section provides is

25  to confirm a plan, a debtor can't be prohibited by a law from

1    taking actions going forward.  It's not about the retroactive

2    nature of the treatment of claims.  It's about what the

3    debtor's doing going forward.

4         And here we think Act 53 respects Puerto Rico law

5    going forward with respect to the pledge, you know, in Article

6    2, the pledge of good faith, credit and taxing power to the GO

7    Bonds, which will be issued under the Plan.  Article 302

8    provisions of the Confirmation Order all comply with

9    Commonwealth law with respect to the issuance of GO Bonds, and

10   provide them with protection.  And there is no legal or

11   evidentiary basis for the contrary.

12        Your Honor, we've said from the beginning that

13   pension cuts -- we've said it loudly and repetitively, that

14   there is -- pension cuts were wrong, and there were no cuts

15   under this plan.  We have been consistently for a strong voice

16   for the government.  We reiterate that today.  We have spoke

17   loudly to make sure that even though the Board was imposed on

18   Puerto Rico, restructuring is not going to happen to Puerto

19   Rico, but with Puerto Rico as an active participant.

20        Your Honor, we ask that you confirm the Plan.  It is

21   far from perfect.  It reduces debt substantially.  It allows

22   for investment in the future.  And, most importantly, it will

23   definitively mark the beginning of the end of the Oversight

24   Board's tenure in Puerto Rico.  Thank you.

25        THE COURT:  Thank you, Mr. Friedman.

1          The next speaker is Mr. Dunne, for Ambac.  I have

2     Mr. Dunne for four minutes.

3          Mr. Dunne, you need to unmute.

4          MR. DUNNE:  Can you hear me, Your Honor?

5          THE COURT:  Now I can hear you.  Good morning.

6          MR. DUNNE:  Thank you.  Good morning, Your Honor.

7          Dennis Dunne from Milbank on behalf of Ambac

8     Assurance Corporation.  I'm joined in the courtroom by my

9     partner, Atara Miller.  Ms. Miller will address the Court this

10    afternoon when we get to the qualifying modification motions.

11         Before the Court is the Oversight Board's motion to

12    confirm the proposed Plan of Adjustment.  Section 314(b) of

13    PROMESA governs confirmation.  I'd note that that statute

14    reflects the polls between the various conflicting interests

15    at issue in this truly historic case.

16         For instance, the Court's going to need to determine

17    that, you know, the Plan is consistent with the incorporated

18    provisions of the Bankruptcy Code, with the bespoke provisions

19    of PROMESA, that it has the necessary legislative, regulatory,

20    and creditor approval.  It must be feasible.  It must be in

21    the best interest of creditors, and it must also be consistent

22    with the Fiscal Plan.  Each prong there raises a host of legal

23    and factual issues.

24         Prior counsel this morning took the Court through the

25    relevant legal inquiries, and cited to the supporting

 1   evidence.  I think they also addressed Your Honor's written

 2   questions.  So I am going to not focus on that ground.  I

 3   think it was well trod by prior counsel, but I do want to

 4   pause in my minutes today on a few kind of fundamental

 5   touchstones.

 6          One, I think is a risk we all have to guard against,

 7   which is reflexively infusing our views and experience with

 8   Chapter 9 and Chapter 11 cases, and outcomes, into our

 9   interpretation of PROMESA.  As the Court is deeply aware,

10   PROMESA is unique legislation.  Yes, it reflects and

11   incorporates certain elements of the Bankruptcy Code, but at

12   the end of the day, it stands on its own, and is the result of

13   a separate set of pushes and pulls in Congress which birthed

14   this particular insolvency law.  I say that because

15   confirmation should rest or fall solely on PROMESA's statutes,

16   and not on whether parties contend the outcome should have or

17   would have been different under the Bankruptcy Code.

18          One note about the supporting parties, of which Ambac

19   is one, support does not mean the Plan provides optimal

20   returns for us.  A good settlement is one in which everyone is

21   a little --

22          (Sound played.)

23          MR. DUNNE:  -- or a lot unhappy, yet prepared to live

24   with the outcome given the time, the cost, and the risks

25   associated with the alternatives.

 1          And throughout the six days of this Confirmation

 2     Hearing, the Court heard from numerous unhappy parties, and

 3     Ambac, too, is somewhat unhappy.  We continue to believe that

 4     our legal rights would have entitled us to greater recoveries

 5     than provided for under the Plan, but I think the Court can

 6     take comfort from the fact that the stated unhappiness from

 7     the parties on competing sides of various issues, in addition

 8     to the overwhelming support for parties who had staked out,

 9     throughout the past four years, strongly held oppositional

10     positions throughout these cases, is evidence and is probative

11     of the overall fairness of the Plan of Adjustment.

12          Your Honor will recall that, during our opening, we

13     noted the inherent uncertainty present in the Commonwealth's

14     financial projections.  I think we all know that future

15     macroeconomic conditions, political will, legislative actions

16     are impossible to predict, making both sides of the argument

17     about the Commonwealth's future financial condition plausible.

18          The Commonwealth may have additional resources, they

19     may have fewer, but a good example of the known unknowns, to

20     borrow a Rumsfeldian phrase, is what happened last week with

21     the conclusion by the GAO with respect to medicate allotments.

22     This unexpected action could result in a substantial reduction

23     in Puerto Rico's fiscal '22 Medicaid allotment.

24          The question here, Your Honor, is simply whether the

25     Board has presented reasonable assumptions about the future

1  financial wherewithal of the Commonwealth.  They need not, and

2  indeed cannot, guarantee precision and complete accuracy.

3          In sum, we submit that confirmation of the Plan of

4  Adjustment for the Commonwealth is legally warranted.  As the

5  Court knows, and as we have repeatedly said --

6          (Sound played.)

7          MR. DUNNE:  -- our support for this plan is tied,

8  Your Honor, to the PRIFA and CCDA Title VI modifications, but

9  the global resolutions embodied in the Commonwealth Plan, the

10  CCDA and PRIFA Title VI QMs, the HTA PSA, are a testament to

11  the breadth of support and the comprehensive nature of the

12  solutions embedded in this plan.

13          The POA isn't perfect, Your Honor, but it is good

14  enough, it is lawful, and it should be approved.  Thank you.

15          THE COURT:  Thank you, Mr. Dunne.

16          The next speaker is Mr. Sosland for FGIC, who's been

17  allotted five minutes.

18          MR. SOSLAND:  Good morning, Your Honor.  Martin

19  Sosland of Butler Snow, LLP, for Financial Guaranty Insurance

20  Company.

21          Your Honor, I want to speak briefly to the

22  settlements that Your Honor is being asked to approve as part

23  of the Confirmation Hearing.

24          Your Honor, is there a noise interfering with what

25  I'm saying?

1           THE COURT:  I can hear you fine.  There were some

2     little dings, but now they're gone.  I can hear you fine.

3           MR. SOSLAND:  Okay.  Great.  I wanted to make sure

4     that wasn't interfering.  There's a fire drill on the other

5     side of my door.

6           THE COURT:  Ah.  There it goes, but speak on.  I can

7     hear you fine.

8           MR. SOSLAND:  Thank you.  So I won't repeat the

9     repetition of the references to the evidence submitted by

10    counsel for the Oversight Board and by Mr. Kirpalani related

11    to the good faith -- evidence before Your Honor of the good

12    faith negotiations that are an element to the settlements

13    before your court.  But as I prefaced in my opening statement,

14    in addition to the evidence before Your Honor of the good

15    faith negotiations that resulted in the evidence, I wanted to

16    emphasize that Your Honor is uniquely situated, as settlements

17    as part of confirmation hearings go, to make your own

18    determination on the reasonableness of the settlements,

19    because so much of the litigation that's being settled in each

20    of the Plan Support Agreements that is in front of Your Honor

21    has actually been litigated in this Court to various stages

22    prior to the settlement.

23          And, Your Honor, in the Plan itself, there are

24    definitions of the invalidity actions that are being settled

25    at 1.316, and the lien challenge actions at 1.324 of the Plan,

1    to clawback actions defined at 1.137 of the Plan, to the ERS

2    litigation at 1.224, to other actions, as well as to the Lift

3    Stay Motions, to the extent they remain outstanding and are

4    being resolved in the settlements.

5            FGIC, Your Honor, is a party to ten of those -- ten

6    pending actions resolved by the Court if -- resolved and

7    settled, and that will be dismissed by this Confirmation Order

8    if you include one action still in the District of Puerto Rico

9    that was commenced pre-Title III and is stayed, and if you

10   include the DRA litigation on which Your Honor ruled; but

11   pursuant to the DRA settlement, DRA waived its right to appeal

12   the Court's determination.

13           We're also interested in a number of the invalidity

14   actions and lien challenge actions before Your Honor in which

15   we are not ourselves a party, and might have intervened absent

16   the stays that were imposed, and then the settlements the

17   Court is being asked --

18           (Sound played.)

19           MR. SOSLAND:  -- to approve as part of the

20   settlement.

21           Your Honor, we'd ask that you take judicial notice of

22   the pleadings that were filed, and your -- in the adversary

23   proceedings and lift stay motions before you in connection

24   with your determination of the reasonableness of the

25   settlements, because we think, without a doubt, that given the

1    range of outcomes, the outcomes that were reached in each of

2    the settlements is reasonable, reasonable from the perspective

3    of the estate.

4          The other point I would make is that it is

5    uncontested at this point, as part of the DRA settlement, that

6    the Court's rulings constitute the lien priority determination

7    for purposes of the HTA PSA, which is embodied in the Plan,

8    and attached to the Disclosure Statement.

9          Your Honor, I won't otherwise repeat the reasons for

10   confirmation of the Plan that have been laid out by counsel

11   before me, other than to say that FGIC submits that the Plan

12   meets the requirements of section 314 of PROMESA to be

13   confirmed, and the applicable provisions of section 1129 of

14   the Bankruptcy Code.  And we ask that your Court confirm the

15   Plan.

16         One final point.  As Mr. Dunne alluded, this is part

17   of a global settlement, and we will address the PRIFA and CCDA

18   modifications later in the day, but also we'll ask that those

19   be approved.  Thank you.

20         THE COURT:  Thank you, Mr. Sosland.

21         The next party represented by speakers is National,

22   and I have four minutes allocated.

23         MS. DIBLASI:  Good morning, Your Honor.  Kelly

24   DiBlasi of Weil, Gotshal & Manges, on behalf of National

25   Public Finance Guarantee Corporation.

1          Your Honor, I had prepared remarks today, but the

2    arguments that National would offer in support of the Plan

3    have either already been covered, or will be covered by

4    counsel to the Oversight Board and counsel to the other PSA

5    creditors.  Therefore, in the interest of not being

6    repetitive, I will not restate the points that have already

7    been addressed, or will be addressed by others.

8          I'll state merely that National supports these

9    arguments, including arguments in support of approval of the

10   settlements, the exculpation clause, and the payment of fees

11   and costs to be paid to National and the other PSA creditors.

12         On this last point, I'd like to supplement

13   Mr. Kirpalani's remarks, and argue that the same legal

14   arguments and facts he cited support payment of the HTA

15   structuring fees as well.  And there's additional evidence in

16   support of this in Ms. Jaresko's declaration at paragraph 182,

17   and in Mr. Zelin's declaration at paragraphs 84 and 90.

18         National supports the Plan, and appreciates the time

19   and effort of this Court, the mediation team, and the parties

20   in this matter that have allowed us to be here today.

21   National respectfully requests the Court confirm the Plan.

22         Thank you, Your Honor.

23         THE COURT:  Thank you, Ms. DiBlasi.

24         Next I have, for Assured, Mr. Ellenberg.

25         MR. ELLENBERG:  If the Court please, Mark Ellenberg

1    of Cadwalader, Wickersham & Taft, representing Assured.

2         Your Honor, the technical objections to the Plan have

3    been more than adequately addressed by those who have already

4    spoken.  I'm going to use my time instead to address the

5    statements that we heard from private citizens on the second

6    day of this hearing.  Those statements were courageous, and

7    heartfelt, and eloquent, and they deserve to be recognized.

8         Your Honor, bad things have been happening to good

9    people and to good places for a very long time.  The reasons

10   are many, they are varied, they are complex, they're social,

11   they're economic, and of course they're political.

12        Whether in the case of an individual, a corporation,

13   or a municipality, bankruptcy can be a tremendous force for

14   good, but it has its limits.  There is no plan, there is no

15   single order of this Court that can address all of the issues

16   that were so forcefully described on day two of this hearing.

17        Without getting too lost in the weeds, I would note

18   that if repayment of the legacy debt were truly the root cause

19   of issues on the island, not a penny of debt service has been

20   paid for the last five years, yet the conditions described on

21   day two obviously still exist.

22        And, again, without getting too deep in the weeds,

23   every municipality in every state in the union borrows money.

24   Those borrowings are essential to the provision of

25   infrastructure and other services that the population looks to

1   government to provide.  If the legacy debt were simply

2   eviscerated, Puerto Rico's ability to borrow in the future

3   would be severely impaired.  This would lead to a downward

4   spiral that would make things not better, but much worse.

5        And while there are certainly some antidemocratic

6   aspects to the Control Board's existence and operation, it is

7   also undeniable that successive iterations of the

8   Commonwealth's elected leadership made the decisions that

9   created the need for PROMESA and the Oversight Board.

10        You can gain some insight and some hope from prior

11  cases such as *Detroit*.  There, an unpopular bankruptcy process

12  produced an unpopular plan that, nonetheless, became the

13  foundation of an economic revival.  People started moving

14  back.  Businesses opened up and returned.  The Plan sparked a

15  new economic era.  We foresee, there is every reason to hope,

16  indeed to expect that the Plan before the Court can do the

17  same for Puerto Rico.

18        Your Honor, over 40 odd years of practicing law, the

19  one thing I have learned is that you can't always --

20        (Sound played.)

21        MR. ELLENBERG:  -- get what you want, but you can

22  usually get what you need.  That is exactly where we find

23  ourselves in this case, Your Honor.  This is not the plan that

24  anyone wanted, but it is the plan that we all need.

25        The Plan meets the criteria for confirmation as set

1    forth in PROMESA.  We respectfully ask the Court to confirm

2    it.  Thank you.

3          THE COURT:  Thank you, Mr. Ellenberg.

4          The next speaker is Mr. Pasquale, for AFSCME.

5          MR. PASQUALE:  Good morning, Your Honor.  Can you

6    hear me well?

7          THE COURT:  Yes, I can.  Good morning,

8    Mr. Pasquale.

9          MR. PASQUALE:  Good morning.  Kenneth Pasquale of

10   Strook, Strook & Lavan, for AFSCME, American Federation of

11   State, City, and Municipal Employees, on behalf of itself and

12   its two local chapters in Puerto Rico, representing active and

13   retired central government employees.  With me, and

14   representing AFSCME, is Sherry Millman of my firm.

15         AFSCME supports confirmation of the Plan of

16   Adjustment as being in the best interests of the public

17   employees represented by AFSCME, and its local chapters in

18   Puerto Rico, as well as the Commonwealth.  AFSCME represents

19   more than 9,000 employees of the Commonwealth across many

20   diverse occupations.

21         At the commencement of these proceedings, AFSCME

22   vigorously pressed its legal claims to protect its members'

23   pensions, collective bargaining agreements, compensation, and

24   working conditions.  Previous administrations refused to

25   engage in collective bargaining, and health benefits and leave

1    benefits of government employees were reduced.

2              Participants in the System 2000, and those only in

3    Act 3 pension plans, which include all workers hired after

4    January 1st, 2000, and until January 21st, 2017, were left

5    with no funds in their retirement accounts, despite making

6    contributions into the system for years.  In addition, public

7    services performed by members of AFSCME's locals were proposed

8    for outsourcing that could have resulted in substantial

9    layoffs.

10             In that environment, AFSCME negotiated with the

11   Oversight Board to guarantee its members protection from such

12   harms in the future, and was able to reach an agreement that

13   was ratified by AFSCME's members, and is ratified in the Plan

14   of Adjustment and in the Plan Support Agreement between AFSCME

15   and the Oversight Board.

16             There is evidence in the record through Ms. Jaresko's

17   live testimony, and through the Oversight Board declarations

18   concerning the benefits to the Commonwealth from the agreement

19   with AFSCME.  From AFSCME's perspective, there are significant

20   benefits to its members from the agreement.  I want to the

21   just touch on those.

22             AFSCME negotiated terms of a new five-year collective

23   bargaining agreement to provide certainty and security to its

24   members, that protects health benefits, protects jobs from

25   outsourcing, and provides its members with well-deserved cash

1   bonuses.

2        AFSCME negotiated for full payment of System 2000

3   balances for all participants, not only AFSCME's members, and

4   an equitable settlement of the claims of Act 1, and Act 447

5   participants for their contributions into the system under Act

6   3, which was initiated when the former pensions were frozen in

7   2013.

8        The agreement also provides for the sharing with

9   AFSCME members of any excess revenue surplus above and beyond

10  the Certified Fiscal Plan in effect at the time the Plan is

11  approved, based on a formula that provides for the sharing of

12  excess revenue over 100 million dollars.  And each AFSCME

13  member receives no less than 2,000 dollars, should the

14  threshold be met, and more if the formula so provides.

15       This is significant, because in the past, public

16  employees have been hurt when the Commonwealth is struggling

17  financially, but ignored in the better years.  This agreement

18  ensures that will not happen to AFSCME's members over the next

19  five years.

20       AFSCME was also instrumental in negotiating for the

21  establishment of the pension reserve, to be funded by the

22  Commonwealth, as protection for pensioners in the future in

23  the event there is a shortfall from the PayGo system to their

24  pension benefits here for those public employees hired after

25  2000 -- excuse me, before 2000.  The trust will be overseen by

1   representative active government employees, and the funds,

2   therefore, will not be under the control of the government.

3   The guidelines for this trust are still being negotiated

4   between AFSCME, COR, the Board, and AAFAF, and AFSCME reserves

5   all rights in that regard.

6        Puerto Rico's public employees are the heart and soul

7   of the island, and they will be left to carry on and sustain

8   the Commonwealth long after this proceeding is concluded.

9   We've heard Mr. Hein contend during this hearing that AFSCME

10  public employees are receiving too much.  To the contrary,

11  they are not getting nearly enough for all that they do in the

12  circumstances in which they work.

13       The settlement reached by AFSCME with the Board as

14  set forth in the Plan of Adjustment is the first step in what

15  hopefully will be a stronger mutual relationship between

16  AFSCME and the Commonwealth into the future.  AFSCME believes

17  the Plan is feasible and reduces the government's debt service

18  burden to sustainable levels.  This again is especially

19  important --

20       (Sound played.)

21       MR. PASQUALE:  -- because it is the employees who

22  would be among the first to face the consequences of

23  governmental austerity if that is necessitated by higher than

24  sustainable fixed costs.

25       For these reasons, Your Honor, AFSCME respectfully

1   requests that the Plan be confirmed.  Thank you.

2          THE COURT:  Thank you, Mr. Pasquale.

3          The next speaker is Mr. Gordon, for the Retiree

4   Committee, for 17 minutes.

5          MR. GORDON:  Good morning, Your Honor.  Can you hear

6   me?

7          THE COURT:  Yes, I can.  Thank you.

8          MR. GORDON:  Wonderful.  Good morning, Your Honor.

9   Robert Gordon of Jenner & Block, LLP, on behalf of the

10  Official Committee of Retired Employees of Puerto Rico.

11         To avoid unnecessary duplication of remarks, my

12  comments will primarily focus on, A, the application of the

13  unfair discrimination test in the context of this case

14  relative to the treatment of retirees; and, B, the importance

15  of the modified proposed formula for funding the pension

16  reserve trust.

17         I've been allocated 17 minutes, so I will need to

18  speak somewhat briskly, and I apologize to the court reporter

19  for that.

20         Your Honor, in colloquy with Mr. Rosen during the

21  hearings last Wednesday, the Court inquired about the

22  ramifications of Mr. Hein being a claimant only in classes of

23  claims that have accepted the Plan, and, specifically, the

24  impact of that fact on the Court's consideration of the

25  so-called cramdown provisions under Bankruptcy Code section

1129(b), as incorporated in PROMESA.

And the question is a good one, the answer to which, I would submit, must be contextualized for any given case.  On the one hand, section 1129(b) indicates that if any impaired classes of claims reject the plan, the Court must consider the cramdown requirements of section 1129(b) in order to confirm the plan over the dissent of such class.  Those requirements include a showing that the plan, A, does not discrimination unfairly, and, B, is fair and equitable with respect to such dissenting class.

On the other hand, at least from the perspective of the Retiree claims, it should be noted that, A, no dissenting class -- and Mr. Hein is not in a dissenting class -- has actually objected that the Plan unfairly discriminates against it vis-a-vis the Retiree classes of claims, as Mr. Bienenstock mentioned earlier; and, B, the treatment of the Retirees does not create an issue under the fair and equitable test in section 1129(b)(2)(B), because the distribution to Retirees is not a distribution to a class that is junior to any dissenting class, to the best of out knowledge.

Thus, while the Bankruptcy Code and PROMESA may technically require the Court to consider unfair discrimination, and whether the Plan is fair and equitable, such analysis should explicitly recognize the circumstances mentioned here.  However, notwithstanding that no dissenting

1  class has affirmatively raised the issue of fair or unfair

2  discrimination, and that there is no section 1129(b)(2)(B)

3  issue here, we submit that some discussion of these concepts

4  is warranted as a matter of best practices to ensure a fulsome

5  record.

6         The first point I wish to make in this regard, Your

7  Honor, is one of clarification.  In the Oversight Board's

8  Memorandum of Law in Support of Confirmation, docket no.

9  18869, at paragraph 169, the Board correctly asserts that what

10 is fair must be determined on a case-by-case basis.

11 Therefore, comparisons to other cases can be a bit risky.

12        Nonetheless, the Board does provide a comparison to

13 other public sector cases at paragraph 173.  In this regard,

14 we wish to provide one important clarification.  At paragraph

15 173, the Oversight Board indicates that the proposed retiree

16 recoveries in this case are consistent with the retiree

17 recoveries in the *City of Detroit* case, but indicates that the

18 recoveries in the *Detroit* case were approximately 60 percent.

19        This might lead one to wonder if the 100 percent

20 recovery on accrued pension claims proposed in this Plan is

21 truly consistent with the *Detroit* case.  It certainly is

22 consistent with the 100 percent recoveries in the California

23 cases of *Stockton*, *San Bernardino*, and *Vallejo*, which are also

24 cited in said paragraph 173.

25        However, the 60 percent figure used for *Detroit* is

 1   misleading and merits some clarification.  The 60 percent

 2   figure represents the so-called recovery on just the retiree

 3   claims for the unfunded portion of their benefits.  The

 4   retirement system's were underfunded, but not completely

 5   without assets.  But I can assure you, since I played an

 6   essential role in negotiating the retiree settlement in

 7   *Detroit*, that the negotiations did not focus primarily on how

 8   much the recovery should be on the claims for the unfunded

 9   portion of the retiree benefits.  Instead, logically, and just

10   as occurred in the Puerto Rico case, the focus was on the

11   impact of any cut on the overall benefits to be received by a

12   retiree.  That is to say, the actual, real world impact on

13   individual retirees.

14        In that context, the far more relevant figures from

15   the *Detroit* case are as follows:  A 100 percent preservation

16   of the base pension benefit, aside from COLAs, for the police

17   and fire retirement system participants; and a 95.5 percent

18   preservation of the base pension benefit, aside from COLAs,

19   from the general retirement system participants.  And those

20   figures, Your Honor, 100 percent and 95.5 percent preservation

21   of base pension benefits are, indeed, highly consistent with

22   the proposed treatment in this case.

23        Now, as to fair or unfair discrimination, at

24   paragraph 170 of the Oversight Board's memorandum of law, the

25   Board also correctly asserts that what is fair or unfair

1   discrimination, specifically and uniquely in a public sector

2   restructuring, must focus on the needs of the debtor and what

3   is fair to the debtor and its residents.  The Board cites to

4   *In re Richmond Unified School District*, 133 B.R. 221, among

5   other cases.

6        And in this regard, the Court has the testimony of

7   the highly credentialed Professor Simon Johnson, proffered by

8   the Retiree Committee, docket no. 18716-2.  Professor Johnson

9   opines that any cut to the pensions of retired government

10  employees would have a negative impact on Puerto Rico's

11  economy, because retirees comprise a significant component of

12  local demand in Puerto Rico.  In his opinion, which no one has

13  challenged, cutting pensions actually could destabilize Puerto

14  Rico's economic prospects, lead to greater outmigration, and

15  make it harder for Puerto Rico to obtain credit in the future,

16  and that the savings from pension cuts do not justify the

17  damage they would cause to the economy.

18        In sum, Your Honor, Professor Johnson's testimony

19  highlights a unique characteristic of pension debt in a public

20  sector case, that cutting the pension debt obligation actually

21  hurts the debtor in its effort to rehabilitate by causing

22  greater poverty, and, thus, a greater burden on social

23  services, increased outmigration, less local spending, and a

24  contraction of the economy, and, thus, less revenue support

25  for essential services, and an unstable social and economic

1   environment that is not conducive to business.

2        And, Your Honor, there is nothing in the Bankruptcy

3   Code or PROMESA that requires a debtor to take measures that

4   are fundamentally antithetical to the rehabilitation process.

5   From this perspective, fully protecting accrued pensions is

6   not only fair, but also supported by sound economic principles

7   and social policies.

8        Now, early in the case it had been expressed by the

9   Oversight Board that some cuts to pensions may be necessary in

10  the spirit of "shared sacrifice".  However, as the Retiree

11  Committee presented to the Board in our negotiations with the

12  Board that resulted in our Plan Support Agreement, it must be

13  acknowledged that, A, the accrued pensions of retirees in

14  Puerto Rico were already terribly modest as of commencement of

15  the Title III case; and, B, prior to this case, retirees had

16  already sacrificed and suffered the effects of the

17  government's fiscal irresponsibility.  Therefore, any

18  suggestion that retirees must sacrifice further ignores the

19  concessions already made by retirees.

20       I will highlight here just a few data points, as set

21  forth in Professor Johnson's testimony.  First, based upon

22  U.S. Census Bureau data from 2016, the average annual defined

23  benefit, pension benefit of Puerto Rican Government employees

24  was just $13,420, which was less than the average benefit in

25  any U.S. state, and less than half of the U.S. average.

1   That's at docket no. 18716-2, docket page 113 of 161.

2          Second, in 2013, the legislature, pursuant to Act 3

3   of 2013, froze the accrual of benefits of the approximately

4   120,000 participants in the ERS system.  As a result, a sample

5   average Act 447 retiree experienced a 42 percent reduction in

6   benefits.  A sample Act 1 retiree experienced a 31 percent

7   reduction in benefits.  So ERS retirees experienced a very

8   substantial cut to their benefits, and clearly sacrificed

9   prior to the Title III case.  Those facts are in Professor

10  Johnson's testimony at docket pages 103 to 106.

11         Finally, in addition, since 2007, most retirees have

12  not received a cost-of-living adjustment to their benefits.

13  As a result, by 2019, retirees effectively experienced a 19

14  percent reduction in purchasing power.  Professor Johnson's

15  testimony, at docket page 109.

16         Your Honor, these pre-PROMESA concessions by retirees

17  are appropriate for the Court to consider here.  In the *City*

18  *of Stockton* case, for example, Judge Klein noted the

19  significant concessions made by labor prebankruptcy, and

20  considered those concessions in considering that the debtor's

21  plan was fair, and did not unfairly discriminate by protecting

22  100 percent of the pensions.  That's *In re City of Stockton*,

23  526 B.R. 35, 61-62.

24         For these reasons, as well as those articulated in

25  the Oversight Board's memorandum of law, we submit that the

1    Plan satisfies the requirements for confirmation under section

2    1129(b) of the Bankruptcy Code, as incorporated into PROMESA,

3    vis-a-vis the Retiree classes of claims.

4         As to the pension reserve funding, Your Honor, back

5    in the early stages of this case, when the Retiree Committee

6    was negotiating with the Oversight Board regarding the

7    treatment of retiree claims, it was the Retiree Committee that

8    first proposed the concept of a pension reserve trust, because

9    we believed that in addition to minimizing any proposed cuts

10   to pensions, it was also important to provide assurance to

11   retirees that pensions would be paid into the future.

12        There is particularly strong policy in public sector

13   restructurings to try to ensure that there is never again a

14   need for further restructuring, and the pension reserve trust

15   squarely reflects that policy.  The Oversight Board agreed

16   that the pension reserve trust was a good policy, and we

17   jointly incorporated it into the Retiree Committee's Plan

18   Support Agreement.

19        The method or formula for funding the pension reserve

20   has evolved over time, as the Commonwealth's economic

21   trajectory and financial projections changed and evolved.  And

22   various creditor settlements shaped the use and availability

23   of future cash flows.  That said, the funding formula proposed

24   by the Board in the Eighth Amended Plan is faithful to the

25   original intent of the parties to create and meaningfully fund

1    the pension reserve trust to meet its purposes.  So,

2    shockingly, the government has opposed the new funding

3    formula, even though it clearly benefits retirees, claiming,

4    among other things, that it constrains the government's

5    finances unnecessary and infringes on the government's

6    sovereign right to set public policy.

7         On November 19, the Retiree Committee filed a joinder

8    in support of the Oversight Board's position, docket no.

9    19317.  As stated in our joinder, it is both ironic and

10   terribly troubling to see that the government, which has

11   repeatedly declared the paramount importance of retiree

12   pensions, and fought for the right to keep its promise to

13   pensioners, and pay all accrued pension benefits, now seeks to

14   revert to a framework where those benefits are put at risk,

15   because adequate resources may not be allocated to fulfill

16   that promise.

17        Also terribly troubling is the government's continued

18   inability to recognize the scope of fiscal policy that is

19   within the purview of PROMESA and the Oversight Board.  As

20   opposed to matters of pure governmental policy, the funding of

21   a pension reserve trust under the Plan falls squarely within

22   that scope.

23        Section 201(b)(1)(C) of PROMESA requires that a

24   certified fiscal plan, and, by extension, under section

25   314(b)(7) of PROMESA, the Plan of Adjustment itself, "provide

1   adequate funding" of pensions; not provide hollow promises of

2   adequate funding.  Similarly, PROMESA section 201(b)(1)(F)

3   requires that the fiscal plan, and, again, by extension, the

4   Plan of Adjustment "improve fiscal governance, accountability,

5   and internal controls."  And proper fiscal governance,

6   discipline, and accountability is precisely what the Oversight

7   Board's modified funding mechanism for the pension reserve

8   trust is intended to create.

9        The government's track record on managing its pension

10  systems is, to put it plainly, abysmal.  An adequately funded

11  pension reserve trust, Your Honor, is, therefore, an absolute

12  necessity to help ensure the feasibility of the Plan as

13  required by PROMESA section 314(b)(6) with respect to the

14  government meeting its pension obligations under the Plan for

15  the life of the Plan.

16       Accordingly, the Retiree Committee submits that the

17  modified funding mechanism for the pension reserve trust under

18  the Eighth Amended Plan should be approved, and, in sum, the

19  Retiree Committee supports confirmation of the Plan.

20       Finally, Your Honor, if I may, I'd like to express

21  two thank yous.  First, to the Retiree Committee, your

22  professionals thank you and commend you for understanding the

23  importance of being both a zealous advocate for retirees, and

24  a constructive participant in the restructuring process; for

25  having the wisdom to achieve the best deal possible at a

1   critical juncture in this case, and, thus, pave the way for a

2   successful restructuring that will benefit all the people of

3   Puerto Rico; and to not play roulette with the lives and

4   welfare of retirees; and for the courage to stay the course

5   over the past two and a half years, helping to facilitate

6   improvements to our own deal and ultimately achieve full

7   protection and no cuts to pensions under the Plan; and keeping

8   a stiff upper lip; and enduring unfair criticism from various

9   groups who were intent upon spreading misinformation and

10  disinformation about the Retiree Committee and its PSA in

11  order to advance political agendas that had nothing to do with

12  the best interests of retirees.

13          Amidst the machinations of others, the Retiree

14  Committee was always the proverbial honest broker.  You should

15  be proud of your incredibly important work here.

16          Second, Your Honor, at the risk of appearing

17  presumptuous regarding how the Court may rule --

18          (Sound played.)

19          MR. GORDON:   -- on behalf of the Retiree Committee

20  and its professionals, I'd like to thank the Court.

21  Considering the sheer number of novel issues arising in this

22  case under a new and untested PROMESA statute, and the

23  magnitude of the interests effected by each ruling of the

24  Court, this was a case for the ages.  The Court deftly

25  analyzed the issues and the law in each instance, establishing

 1    an impressive body of well-reasoned decisional authority.  And

 2    just as importantly, all the while, the Court managed this

 3    case with a tremendous patience and grace that was so

 4    important here.

 5          We all owe the Court a nondischargeable debt of

 6    gratitude.  Thank you, Your Honor.  Unless the Court has any

 7    questions for me, that concludes my remarks.

 8          THE COURT:  Thank you, Mr. Gordon.

 9          The next speaker is Mr. Despins for the Unsecured

10    Creditors Committee for five minutes.

11          MR. DESPINS:  Good morning, Your Honor, and thank

12    you --

13          THE COURT:  Good morning.

14          MR. DESPINS:  -- for hearing from us.  For the

15    record, Luc Despins, with Paul Hastings, for the Official

16    Committee.

17          As you know, Your Honor, the Committee fully supports

18    confirmation of the Plan, and we do so, because it is the best

19    result that we believe can be achieved under the

20    circumstances.  And we submit that practically, Your Honor,

21    our class should be viewed as supporting confirmation of the

22    Plan.  And I'm saying this not only because, as stated in the

23    opening remarks, we, by our own assessment, believe that about

24    80 percent of the class did not vote, thereby indicating their

25    lack of opposition to the Plan, but more importantly, because

1   you've seen throughout these confirmation hearings that no one

2   in our class is challenging the Plan treatment for the class.

3   To be sure -- what I mean by that is nobody's arguing that the

4   best interest of creditors test is not met, or other

5   Bankruptcy Code standards.  To be sure, some creditors are

6   saying they don't want to be in our class, because they want

7   to get paid in full, and we fully understand that.  But no

8   creditor is taking on the Plan with respect to the treatment

9   of our class.  That's very important.

10          And, finally, I would say that because the Committee

11  is the only fiduciary for the Unsecured Creditors in the case,

12  that should be viewed as practical support for confirmation of

13  this plan with respect to our class under the Plan.

14          I want to address very briefly, Your Honor, some

15  points made by Mr. Hein in his opening and throughout the

16  proceedings, which is his stated point that it is incredibly

17  unfair for him to be bound by agreements that he was not a

18  party to.  And to that -- and I'm going to echo I guess Mr.

19  Dunne in that regard.  I would say, join the club, in the

20  sense that a lot of people around the table are not

21  necessarily completely happy with the outcome.

22          But I want to remind the Court that it's not only

23  because the Committee objected to the priority of the GO Bond

24  that I'm making that point, but also to remind the Court that

25  we were co-plaintiff and sometimes sole plaintiff with -- on

1   the issue of the disallowance of Late Vintage Bonds.  And that

2   we were seeking complete disallowance of those bonds, and not

3   the -- what I would say is a more modest reduction that was

4   negotiated by the PSA parties.  So in that context -- and it's

5   important to remember that there are other parties that are

6   not entirely satisfied with the outcome of these cases from

7   their point of view.

8           And finally, Your Honor, I wanted to thank the Court

9   for your patience throughout the case.  I know this has been a

10  very long case, and you've had to hear from so many parties.

11  And I want to really make sure that we recognize that you've

12  been incredibly patient during these four years.

13          Thank you very much, Your Honor.

14          THE COURT:  Thank you, Mr. Despins.

15          We will now turn to the objecting parties.  I will

16  call on Mr. Hein in a moment.  Our lunch break -- I'm sorry.

17  Have I missed --

18          MR. MINTZ:  Your Honor, Doug Mintz for Cantor-Katz.

19  I believe next on the Agenda should be Cantor-Katz and

20  AmeriNat.

21          THE COURT:  I am so sorry.  For some reason I missed

22  that, so sorry about that.

23          MR. MINTZ:  There's a weird hyphenating -- a space in

24  there, so maybe --

25          THE COURT:  Well, I took notes from notes, so forgive

1    me, and please go on.

2             What is your time allocation?

3             MR. MINTZ:   I believe it's eight minutes for me,

4    followed by four minutes for AmeriNat, Your Honor.

5             THE COURT:   Thank you very much.  Please proceed.

6             MR. MINTZ:   Thank you, Your Honor.  Good morning, or

7    good afternoon in your case.  Doug Mintz from Schulte, Roth &

8    Zabel, appearing on behalf of Cantor-Katz, Collateral Monitor,

9    LLC, as Collateral Monitor for the GDB Debt Recovery Authority

10   Bonds.

11            Before I start, I'll note that we are reviewing the

12   last-minute filings over the weekend, and we've have already

13   flagged one issue for the Oversight Board regarding the DRA

14   parties' exculpation at paragraph 61(g) of the Confirmation

15   Order.  I don't believe we've heard back yet.  We flagged that

16   late last night.

17            When I spoke to you at the start of the month, I told

18   you that the DRA parties reached resolution with the Oversight

19   Board, and were supportive of confirmation of the Plan.  And

20   that remains the case.

21            In the last two weeks, you've heard evidence that all

22   settlements were reasonable, and objecting parties have

23   produced no evidence to the contrary.

24            The DRA parties' decision to settle and support the

25   Plan came after intense litigation and complex but quick

1   negotiations.  The Plan should be approved with respect to the

2   DRA parties' settlements.  These settlements are fair and

3   reasonable, and as Mr. Rosen stated, are the product of

4   extensive negotiations in good faith.

5          Under the Plan, and the agreed settlement

6   stipulation, the DRA will receive a number of recoveries.

7   First, the DRA's direct loan claims against the Commonwealth,

8   which are classified as Class 40, 2012, CW Bond claims,

9   they're in excess of 63 million dollars, and shall be deemed

10  allowed under the Plan.  These claims will be paid in the form

11  of new GO Bonds, GO CVIs, and cash, with a recovery of

12  approximately 72 cents on the dollar before any value from the

13  CVIs.

14         Second, the DRA holds Class 59, CW/HTA claims based

15  on ownership of 200 million dollars of HTA 98 Senior Bond

16  claims.  These are also allowed, and will be paid out of the

17  CW/HTA clawback recovery, the same as any other HTA Senior

18  Bond claims, 98 Senior Bond claims, in that case, second under

19  the distribution waterfall set forth in Exhibit J to the Plan.

20         Third, as you know, the DRA holds Class 59 CW/HTA

21  claims, based on its ownership of more than 1.7 billion

22  dollars principal of the GDB-HTA loans.  Those will also be

23  paid out of the waterfall set forth in Exhibit J to the Plan

24  upon satisfaction of the HTA distribution conditions.  More on

25  that in a moment.

1        Fourth, under the Plan, the DRA's claim at PBA, which

2   the DRA parties assert consists of the Class 12 PBA-DRA

3   secured claim in excess of 66 million dollars, and the Class

4   14 PBA-DRA unsecured claim in excess of 134 million dollars,

5   shall each be paid in cash in an amount equal to ten percent

6   of the allowed amount of the claim.  These claimed amounts

7   have not yet been fixed, but the stipulation provides for an

8   expedited timeline for the Oversight Board to review the

9   asserted amount of these claims, with an eye toward resolving

10  them as quickly as possible.  And this process is underway

11  already.

12        Finally, in consideration for the agreement set forth

13  in the stipulation, including the DRA's agreement to lock up

14  its HTA Senior 98 Bonds and the HTA loans, the DRA shall

15  receive a 15 million dollar restriction fee on the effective

16  date of the HTA Plan in the form of an allowed administrative

17  claim at HTA.

18        As part of the settlement, the Plan, the Confirmation

19  Order, the findings and conclusions, as well as Your Honor's

20  prior ruling, and Mr. Sosland referenced this briefly, all

21  resolve the GDB loan priority determination as well.  As this

22  Court recalls, section 63.2 of the Plan states that upon

23  finalization of the GDB loan priority determination, funds are

24  distributed pursuant to the waterfall under Exhibit J of the

25  Plan.

1          Paragraph 34 of the Confirmation Order further orders

2     that upon satisfaction of the HTA distribution conditions, the

3     DRA shall be entitled to receive its share of the CW/HTA

4     clawback recovery as delineated in that same Exhibit J.  The

5     Plan defines the loan priority determination as the

6     determination in either the Commonwealth Title III, or the HTA

7     Title III with respect to the relative rights of recovery --

8     of finding that, with respect to the relative rights of

9     recovery among the HTA 68 Bonds, the HTA 98 Bonds, and the

10    GDB-HTA loans, or -- and/or a finding that the DRA did not

11    possess an allowable claim with respect to the HTA clawback

12    CVI.

13         The Confirmation Order states at paragraph 3(p) that

14    your ruling granting the HTA bondholders' motion to dismiss

15    with respect to our prior priority adversary proceeding,

16    that's docket no. 83 in adversary 21-00068, qualifies as the

17    GDB loan priority determination for the purposes of the Plan.

18         When you read all this together, Your Honor has

19    determined or hopefully soon will determine that while the

20    GDB-HTA loans are subordinated to the bonds, the DRA now has

21    an entitlement to the provisions of the waterfall in Exhibit

22    J, in satisfaction of the HTA distribution contribution

23    conditions.  And what is that distribution per annex six of

24    Exhibit J, it comes forth, after paying amounts allocated to

25    the bonds, the remaining clawback CVI payments, if any, go to

1   the GDB-HTA loans up to 1.47 billion dollars.

2          This distribution is consistent with your read of the

3   security agreement, which broadly provides that after payment

4   of the HTA Bonds, the GDB-HTA loans receive any surplus

5   remaining from the revenues assigned and the proceeds acquired

6   under the collateral, that is, the Excise Tax revenues.  And

7   so this Court has resolved the GDB loan priority

8   determination, and these issues have been resolved

9   consensually among the parties going further.

10         And as Your Honor has seen from the evidence

11  submitted this month, the evidentiary record supports this

12  position.  And I won't repeat Mr. Rosen's statements, but

13  multiple witnesses, including Ms. Jaresko and Mr. Zelin have

14  testified to the reasonableness of the settlements.  And most

15  importantly, the Plan opponents have introduced zero evidence

16  to the contrary regarding the DRA's settlements.

17         While the Collateral Monitor had a number of concerns

18  about the legal arguments the Oversight Board has made, those

19  concerns have now been resolved economically.  The settlements

20  embodied in the Plan are fair and reasonable, and in the best

21  interest of the many creditors, and, most importantly, its

22  citizens.  No evidence has been presented at trial to show

23  otherwise.

24         Thomas Jefferson is quoted as saying, never put off

25  to tomorrow what you can do today.  Well, after many years of

 1   putting things off, it is now time to act today.  No more

 2   putting things off.

 3          So we hope the Court will move forward with

 4   confirmation, and allow the people of Puerto Rico to move on

 5   from this process to their next chapter.  And, finally, of

 6   course, I will conclude by thanking Your Honor, as well as

 7   Judge Dein, and the Court's various staff for all the hard

 8   work you've put in over the last four years in these Title III

 9   cases, and remaining Title III cases still pending.

10          I have no further comments, unless Your Honor has any

11   questions.

12          THE COURT:  Thank you, Mr. Mintz.

13          MR. MINTZ:  Thank you, Your Honor.

14          THE COURT:  So we will now turn to counsel for

15   AmeriNational.

16          MR. ZOUAIRABANI-TRINIDAD:  Good afternoon, Your

17   Honor.

18          THE COURT:  Mr. Zouairabani, good morning.

19          MR. ZOUAIRABANI-TRINIDAD:  Yes.  Good afternoon over

20   here, Your Honor, and good morning over there.

21          THE COURT:  In New York, it's still morning.

22          MR. ZOUAIRABANI-TRINIDAD:  Yes.  So, Your Honor,

23   Attorney Nayuan Zouairabani, for McConnell Valdes, LLC, on

24   behalf of AmeriNational Community Services, LLC, the GDB DRA

25   Servicer in this case.

1          Your Honor, we are heading into confirmation on an

2   extremely rare and unique happenstance.  Essentially, the

3   stars have aligned in favor of confirmation of the Plan.

4   Whether the objectors like it or not, the current plan is

5   largely consensual, and all material creditors, including the

6   DRA parties, have agreed and settled their claims in order to

7   confirm this plan.

8          As the Court is aware, the DRA parties were among the

9   last significant objectors to the Plan.  Through the

10  stipulation reached on November 5, the DRA settled and

11  resolved the pending disputes with the debtors in relation to

12  the Plan.  And it is important to bear in mind that the DRA

13  had claims and disputes with regards to 2012 GO Bonds, the

14  DRA-PBA secured and DRA unsecured classes, as well as the

15  CW/HTA claims with regard to the Plan.  All of those disputes

16  and all of those issues were settled.  The DRA parties support

17  the Plan.

18         Not only has the Plan garnered support from all

19  material creditors, the Puerto Rico Legislature approved Act

20  53 of 2021, which the Oversight Board believes is satisfactory

21  to consummate the Plan.  It is important to stress, Your

22  Honor, that the fact that a nonhomogeneous legislature in

23  Puerto Rico -- we're not talking about bipartisan.  We're

24  talking about multiple parties -- was able to come together in

25  approving this statute is not something that happens every

1   day.

2          The objectors to the Plan would like to see a, quote,

3   unquote, perfect plan of adjustment that is tailored to their

4   wants and needs.  The chances for a plan to be perfect, in any

5   bankruptcy, especially on a case of this magnitude, which is

6   significantly larger than the *Detroit* Chapter 9 case, is slim.

7   It's very rare.

8          In evaluating confirmation of this Plan, the Court

9   should not lose sight of where the objectors stand in relation

10  to their respective classes.  Many of the objectors'

11  opposition, like Mr. Hein, for example, are being brought in a

12  context --

13          (Sound played.)

14          MR. ZOUAIRABANI TRINIDAD:   -- where the respective

15  classes have already accepted and approved the Plan.

16  Accordingly, the provisions of section 1129(b) of the

17  Bankruptcy Code are not available to these objectors, and the

18  disputes they raise should not preclude confirmation of this

19  plan.

20          Your Honor, the Commonwealth is the closest it's ever

21  been to exit bankruptcy.  It's been a long and difficult road

22  to get where we are today, with a largely consensual plan.  It

23  is uncertain whether this extraordinary set of circumstances

24  could be recreated and achieved again.  Therefore, this

25  opportunity should not be taken for granted.

1       Your Honor, personally, as a Puerto Rican who lives

2   and works in Puerto Rico, and is raising a family on the

3   island, with boots on the ground, Puerto Rico should be

4   allowed the opportunity to finally emerge from bankruptcy.

5   This Plan may not be perfect, but this could very well be the

6   best chance to just do that, to emerge from bankruptcy.

7       Therefore, Your Honor, we join the other supporters

8   in requesting that this Court approve the Plan.  And with

9   that, I have nothing else, unless Your Honor has any

10  questions.

11       THE COURT:  I don't have any further questions.

12  Thank you, Mr. Zouairabani.  I don't know why I'm having

13  trouble with that today.  Zouairabani.  Good afternoon,

14  because it is afternoon where you are.

15       MR. ZOUAIRABANI TRINIDAD:  Thank you, Your Honor.

16       THE COURT:  So is there anyone further who's

17  scheduled to speak in support?  My list was only partial.

18       I don't see any other hands, and so at this point we

19  will break for lunch.  We will resume at 2:10 San Juan time,

20  1:10 New York time.  Thank you all.

21       (At 12:48 PM, recess taken.)

22       (At 2:11 PM, proceedings reconvened.)

23       THE COURT:  Good afternoon.  Welcome back, everyone.

24       There is a raised hand of counsel named Kissner for

25  AHGCD.

1            MR. KISSNER:  That's correct, Your Honor.  Can you

2    hear me?

3            THE COURT:  Yes, I can.  If you'd speak a little

4    louder, that would be great.

5            MR. KISSNER:  Absolutely, Your Honor.  Is that

6    better?

7            THE COURT:  Yes, it is.  Thank you.

8            MR. KISSNER:  Thank you.

9            I tried to raise my hand before we broke for lunch,

10   but was not quick enough on the draw.  So, for the record,

11   Your Honor, Andrew Kissner of Morrison & Foerster, on behalf

12   of the Ad Hoc Group of Constitutional Debtholders, who are PSA

13   creditors, as defined in the Plan.

14           Two things I wanted to raise briefly for the Court

15   this afternoon that are of concern to the four groups that

16   compromise the initial PSA signatories.  First, as

17   Mr. Bienenstock noted this morning, the Board last evening

18   filed revised forms of the Plan and Confirmation Order, with

19   redlines filed at ECF nos. 19324 and 19325, respectfully -- or

20   respectively, rather.

21           And if I could direct the Court's attention to the

22   exculpation provisions in the revised Plan, which is paragraph

23   92.8(b) on PDF page 197 of 306, and this is, again, ECF no.

24   19324.  As folks can see, there has been a change to the

25   exculpation rights for the PSA creditors, which would limit

1    the effect of that exculpation to liability, quote, incurred

2    through the effective date.  And that same language is also

3    included in the Confirmation Order at paragraph 61(b), which

4    is page 74 of 226, on ECF 19325.

5         And I only raise this for the Court because, while we

6    don't dispute that an exculpation provision should only cover

7    acts and omissions taken through the effective date, and the

8    Plan already provides for that, this new language that we saw

9    overnight we think could be construed to limit the exculpation

10   to lawsuits that were commenced and judgments entered prior to

11   the effective date, which clearly isn't the intention.

12        And in that vein, we would note that the analogous

13   provisions for the Unsecured Creditors Committee and Monolines

14   don't contain this error.  We have been in dialogue with the

15   Board's counsel the last couple days with respect to these

16   provisions, and I'm hopeful that this can all be resolved

17   consensually, but we just wanted to flag this for the record

18   before the conclusion of the hearing.

19        The other thing I wanted to note briefly was, as

20   Mr. Kirpalani noted this morning, the parties remain in

21   discussion over the final forms of the trust agreement, so

22   that new GO Bonds and CVIs, and as Mr. Rosen indicated, these

23   documents will need to be included in a revised plan

24   supplement.  We are hopeful and expect that we will reach

25   consensus on those documents, however, there are still open

1 issues, and accordingly, we reserve all rights with respect

2 thereto.

3 Unless Your Honor had any questions, that was all I

4 had, and I had nothing further.

5 THE COURT: Thank you, Mr. Kissner.

6 MR. KISSNER: Thank you very much, Your Honor.

7 THE COURT: So is there anyone else who wants to be

8 heard before we go on to hear from the objecting parties?

9 I don't see any further hands. So at this point, I

10 will call on Mr. Hein, who has been allotted 45 minutes.

11 Good afternoon, Mr. Hein.

12 MR. HEIN: Good afternoon. Can you hear me, Your

13 Honor?

14 THE COURT: Yes, I can. Can you hear me?

15 MR. HEIN: Great. Thank you. Yes, I can. Thank you

16 very much.

17 So just at the outset, I would note that despite the

18 references to section 944(a) and 1129(b), the bottom line here

19 is that no one disputes that I am entitled to press my

20 objections to confirmation, because class acceptance or a

21 settlement agreement entered into by others, despite that, the

22 Oversight Board must still prove the section 314(b)

23 requirements are met, including (b)(3), (b)(6), (b)(7), and

24 (b)(1), to the extent it incorporates Title 11 requirements

25 other than 1129(b).

1       For example, 1123(a) four, the same treatment

2  provision, Title 11, would be encompassed within the (b)(1)

3  requirement for confirmation.

4       THE COURT:  Mr. Hein.

5       MR. HEIN:  Sure.

6       THE COURT:  Mr. Hein, I just want to interrupt you

7  for one moment.  Would you pull the microphone out a little

8  bit further out from your face?  We're getting a percussive

9  sound when you speak.

10       MR. HEIN:  Sure.  Is this better, Your Honor?

11       THE COURT:  Yes, it is.

12       MR. HEIN:  Thank you.

13       On each of these requirements, the Oversight Board

14  has the burden of proof, and the Oversight Board admits that

15  in their papers.

16       So let's start with the 314(b)(6).  Considering first

17  just the initial clause in 314(b)(6), the Oversight Board has

18  the burden to prove the Plan is feasible and in the best

19  interest of creditors.  And that provision is out of 943(b)(7)

20  from Chapter 9.

21       But the PROMESA requirements do not stop there.  They

22  don't stop where Chapter 9 stops.  PROMESA 314(b)(6) goes on

23  in an additional clause to say, which shall require the Court

24  to consider whether available remedies under the nonbankruptcy

25  laws and Constitution of the territory would result in a

1   greater recovery for the creditors than is provided for in

2   such plan.

3           This additional language, which is not part of

4   Chapter 9, has meaning, otherwise it wouldn't be here.

5   Congress was well aware that parties in the Puerto Rico

6   situation asserted both priorities under the Puerto Rico

7   Constitution, as well as secured status, and Congress added

8   requirements to PROMESA for plan confirmation in (b)(6) that

9   specifically require the Court to look at how creditors would

10  fair under the nonbankruptcy laws and Constitution of Puerto

11  Rico.  And this is PROMESA itself requiring this.  There can't

12  be any preemption issue.

13          The Puerto Rico Constitution, as I think Your Honor

14  is aware, provides GO bondholders a first claim priority, and

15  specifically Article VI, Section 8 says, quote, the public

16  debt and amortization shall first be paid.  Shall.  It's not

17  optional.  And this priority is enforceable under Article VI,

18  Section 2, paragraph 3 of the Puerto Rico Constitution.

19          And I might add, these provisions were adopted when

20  the Constitution and amendments were adopted by referendum,

21  referendum of the people of Puerto Rico.  And Commonwealth

22  statutes, such as 23 L.P.R.A. 104(c)(1) follow this Article VI

23  prioritization of payment of GO debt service.

24          The constitutional priority for the payment of GO

25  debt is also reinforced by other Puerto Rico laws, such as Act

1    33 of 1942.  And this is a provision and section that

2    Mr. Bienenstock referred to.  Section 7 of Act 33 provided,

3    quote, the good faith of the Commonwealth of Puerto Rico is

4    hereby irrevocably pledged for the payment of GO bonds.  This

5    irrevocable statutory pledge to pay Puerto Rico's full faith

6    in credit GO debt was backed up in section seven by a

7    commitment that the GO debt would be paid with any available

8    funds at the Commonwealth Treasury, quote, which funds are

9    appropriated as continuous appropriations, without it being

10   necessary to make new appropriations for said purpose.

11          And as an aside, Mr. Bienenstock mentioned that Act

12   33 was apparently repealed two months ago, in September.  If

13   so, this would be a willful violation of the constitutional

14   prohibitions against impairing contracts, both in the United

15   States Constitution, and in Puerto Rico's own Constitution.  A

16   repeal of Act 33 would also constitute a taking, giving rise

17   to a now existent claim for just compensation.

18          Now, the Oversight Board argues that, in essence, one

19   should adopt the approach in Chapter 9 to (b)(6), but the

20   Oversight Board's argument completely ignores the specific

21   Congressional decision to require that the Court consider

22   whether available remedies under the nonbankruptcy laws and

23   Constitutions of Puerto Rico would result in a greater

24   recovery for creditors.

25          Available remedies are creditor specific.  The GO

1  bondholders have a constitutional and statutory priority that

2  other creditors do not have.  And, thus, it has to be

3  addressed, creditor specific, under (b)(6).  And a simplified

4  example shows why I think it makes no sense to read (b)(6) as

5  looking to creditors as a whole.

6       So assume, hypothetically, that you had ten billion

7  of priority first claim GO debt, and ten billion dollars in

8  unsecured claims.  And let's assume, hypothetically,

9  two-thirds of the GO bondholders strike a deal where GO

10 bondholders will get 50 cents on the dollar, and then later a

11 plan is proposed where unsecured creditors get 10 billion, 100

12 percent of their claim.  This is a hypothetical.

13       In this event, the Oversight Board would argue that

14 if 15 billion dollars is the maximum that could be

15 distributed, even if the GO bondholders could recover ten

16 billion, because of their priority position under Puerto Rico

17 law, leaving just five billion for the unsecured,

18 nevertheless, a plan that despite utterly reversing the

19 priorities established by the nonbankruptcy laws and

20 Constitution of Puerto Rico could be perfectly fine, and

21 supposedly comply with (b)(6), regardless of how the

22 creditors -- regardless of how the recovery was racked up

23 among the creditors, simply because the creditors as a whole

24 can't get more than 15 billion.

25       Respectfully, this makes no sense.  The point of

1  (b)(6), looking at Puerto Rico law, is to respect the

2  priorities under Puerto Rico law, not reverse them.

3          And now I'd like to look at the evidence on the

4  record on the best interest point, and I might add the numbers

5  I'm going to mention are based on Puerto Rico's own public

6  reports.  I put them in evidence.  They're summarized and

7  cited in my objection, and in my declaration in evidence.

8  That's 19047.  The objection is 18575.

9          Puerto Rico's own reports show that Puerto Rico is

10  sitting on 25 billion in cash.  Thirteen billion of that 25

11  billion can be used to pay the GO and PBA Bonds.  Indeed, 745

12  million of the 13 billion can only be used to pay GO Bonds.

13  And this cash has accumulated, despite Puerto Rico, for the

14  past five years, contrary to its constitutional priorities,

15  paying all monthly pension benefits and every penny of

16  operating expenses, yet not a penny for GO debt service.

17          In the last four years, fiscal '18 through '21, total

18  outlays have increased over 29 percent.  Yet still not a penny

19  for GO debt service.  And this is shown in my declaration,

20  19047, page 17, paragraph 44, based on exhibits at 18760-15,

21  18760-16.  No proof of necessity of this 29 percent increase

22  in outlays over four years has been presented.

23          And I've also submitted proof from Puerto Rico's own

24  financial records that the total amount of past due interest

25  and principal owed on the GO and PBA bonds is 7.45 billion.

1    You start with the 6.79 billion due on the GO and PBA debt as

2    of May 31, 2021.  That's per note 3(d) in the financial report

3    that was filed three years after the fiscal year ended for

4    fiscal 2018.  But there's a note to reflect subsequent

5    developments.  This is shown on 19047, page six, paragraph

6    ten, based on Exhibit 18760-31.  And then you add in a pro

7    rata share of the annual debt service, which is shown in

8    Debtors' Exhibit 31, page nine, and you get to the 7.45

9    billion.

10         So because there's 13 billion that can be used to pay

11   GO and PBA debt, Puerto Rico could pay off it's entire past

12   due GO and PBA debt today, and still have 5.5 billion in

13   unrestricted cash, and over 17.5 billion in total cash left

14   over.

15         I also submitted Puerto Rico's own report showing

16   that Puerto Rico had a four billion dollar surplus in the last

17   fiscal year.  3.97 billion, to be precise.  This is shown on

18   18759-4, page nine, and refer, Your Honor, to the fiscal year

19   '21, actual year-to-date column.

20         And so I mentioned that the annual debt service is

21   1.3 billion.  In other words, because the surplus was four

22   billion, in the last fiscal year, the surplus was three times

23   what was required to pay GO and PBA debt service.  And that's

24   despite, that's after Puerto Rico paid all pensions, all

25   operating expenses last year.

1          So to apply (b)(6) to the situation at hand,

2     applicable remedies would result in a greater recovery under

3     Puerto Rico law to GO and PBA bondholders.  GO and PBA

4     bondholders would collect all principal and interest due to

5     date, as well as have the ability to collect principal and

6     interest going forward.

7          And I would note, and this is significant, in

8     response to a chart Mr. Kirpalani presented, debtors admit in

9     the best interest report assumptions that, under the

10    nonbankruptcy laws of Puerto Rico, bondholders would be

11    entitled to all accrued interest, including post-petition

12    accrued interest.  I refer Your Honor to Debtor Exhibit 130,

13    which is the best interest test report, page 13, paragraph

14    one; page 39, item nine, assumption (i).  And this point

15    actually appears several times in the best interest report.

16         So it's not just the accrual through the petition

17    date.  Under Puerto Rico law, it would be all accrued interest

18    to the present time, and that is not accounted for in what

19    Mr. Kirpalani showed.  When you account for that, my recovery,

20    even on Vintage Bonds, for which there was never, ever, by

21    anyone, any issue of validity, my recovery is going to be

22    about 58 percent, and on other bonds, even less, like 53

23    percent.

24         So what has the Oversight Board offered to try to

25    meet its burden of proof, and attempt to respond to the Puerto

1    Rico financial documents I've offered?  Basically, they've

2    presented McKinsey, and this best interest test report.  But

3    on cross, respectfully, I think that the presentation just

4    fell apart.  Mr. Shah admitted, as he had to, given what was

5    the language of the report, that the analysis was prepared

6    based on a 70-page appendix of legal assumptions that he had

7    been given by the Oversight Board's attorneys, and that

8    McKinsey did not independently verify any of the information

9    or assumptions he had received from the Oversight Board, or

10   their advisors, or the government Puerto Rico, or their

11   advisors.

12        And I used the question about population to

13   underscore how this just eliminated any element of support in

14   terms of meeting a burden of proof from this best interest

15   test.  And I asked Mr. Shah, well, on the question of Puerto

16   Rico's population, if the Oversight Board stated the

17   population was 2,928,000, but the United States Census actual

18   count is 3,285,874, would McKinsey use the lower 2.9 million

19   number or use the roughly 3.3 million number in the U.S.

20   Census.  And Mr. Shah admitted that McKinsey would use the

21   lower Oversight Board number, that understates Puerto Rico's

22   population by almost ten percent.  And I've placed the U.S.

23   Census number into evidence, that's 18759-3.

24        And, interestingly, the U.S. Census showed that in

25   2020 Puerto Rico's population had increased from their 2019

1    estimate.  In contrast, the Oversight Board not only shows

2    lower population, but shows a steady decline in Puerto Rico's

3    population going into the future forever.

4        McKinsey also just accepting that all operating

5    expenses just have to be paid before any GO or PBA debt could

6    be paid, and that all current tax expenditures, which, per the

7    Oversight Board itself, costs Puerto Rico over 21 billion

8    dollars, all of that just continues unabated.

9        And I set out in my objection specifics, specifics as

10   to expenditures for which there'd been no proof of necessity.

11   And just as examples, you know, the thousands of advertising

12   representation or artistic services contracts, that's 300

13   million over the past four years, thousands of consulting

14   contracts aggregating 2.3 billion in that same time period.

15   There's been no actual evidence shown in the record as to why

16   this is necessary.

17       The 21 billion in tax expenditures, that comes right

18   out of the Oversight Board's own current fiscal report, fiscal

19   plan report.  That's 21 billion in foregone revenue.  The

20   Oversight Board itself admits in its report that Puerto Rico

21   offers far more generous tax incentives than virtually every

22   other jurisdiction.  I mean magnitudes more.  But the McKinsey

23   analysis just assumes all of this will continue.

24       If every operating expense can come before GO debt

25   service, there'd be no reason for Puerto Rico to ever reform.

1   And the current state of affairs, which if it continues, will

2   adversely impact Puerto Rico's ability to pay its obligations,

3   even its obligations on the newly issued debt as part of the

4   Plan, also reflects, as the Oversight Board's own expert, Dr.

5   Wolfe, admitted in his testimony and in his report, that --

6   Dr. Wolfe admitted that the Puerto Rico Government has largely

7   failed to implement recommended structural reforms that could

8   enhance private sector growth, and tax revenues, and that

9   could achieve government economies.  His report is in the

10  record, and the cross is in the record.

11         The Oversight Board here is the representative of the

12  debtor, and just generalized assertions by the Oversight Board

13  cannot justify a discharge from liability when the debtors'

14  own financial records show a present ability to pay all past

15  due debt service and all current debt service on an annual

16  basis.  And even without reforms, it can be paid.

17         The fact that changes in reforms that could actually

18  improve Puerto Rico's financial condition and further enhance

19  its ability to meet all of its obligations have been

20  identified, but per Dr. Wolfe, the Oversight Board's own

21  expert, the Puerto Rico Government has not been willing to act

22  on them, just underscores the lack of proof that all operating

23  expenditures and all of these tax expenditures are actually

24  essential.

25         The Oversight Board's premise is that just as in the

1   Title II budget context, the Oversight Board's fiscal plans,

2   even in this confirmation context under Title III, are

3   effectively immune from challenge, despite admitting that it

4   has the burden of proof under 314(b).  But, Your Honor, in

5   denying the Oversight Board's in limine motion, correctly

6   recognized that the 314(b) requirements are for the Court.

7   The Oversight Board's assertions are not binding.  The Court

8   has to make factual findings, and, thus, to meet its burden of

9   proof, the Oversight Board needs to prove up facts which it

10   has not done.  And the Oversight Board is basically saying

11   that -- let's ignore the financial reports, ignore that today

12   Puerto Rico could pay its debt service, instead, the Oversight

13   Board focused on forecasts about supposedly what will or won't

14   happen in the future.

15       The Oversight Board's May 27, 2020, Fiscal Plan, and

16   this was issued one month before fiscal 2021 began, estimated

17   there would be a surplus in fiscal 2021 of only 440 million.

18   But, in fact, per Puerto Rico's own reports in evidence, and

19   I'll refer Your Honor to 18759-4, page nine, in fact, the

20   surplus for fiscal 2021 turned out to be ten times greater, as

21   I've mentioned, approximately four billion.

22       So per the -- it's one thing to say that under Title

23   II, for budgeting purposes, the Oversight Board's financial

24   plans can't be challenged.  If the Oversight Board turns out

25   to be wrong, it can just be adjusted going forward in the next

1   year.  But in this Title III proceeding, the Oversight Board

2   is seeking to cut off bondholder rights to payment forever.

3   Forever.  They're not saying that if things get better,

4   bondholders are going to get their money back after all.  They

5   are forever trying to cut off bondholder rights, and despite

6   the present ability to pay, and the fact that they had surplus

7   three times what was required to pay debt service just in the

8   past year.

9         The fact that Puerto Rico does have the ability to

10  pay reinforces, I believe, my constitutional takings claims

11  and Uniformity Clause claims, and I'll just take a minute on

12  this.  The issue arose in a session last week, well, what is

13  the record evidence on what was taken, and I submit, Your

14  Honor, the fact that demonstrably, per its own records, Puerto

15  Rico could pay today, and has the ability to pay on an annual

16  basis, is, you know, substantial evidence.  The issue here is

17  not the ability to pay.  The issue is really willingness to

18  pay.

19        And Your Honor remembers Mr. Bienenstock referring to

20  the repeal of Act 33.  I mentioned that a few minutes ago.

21  What the repeal of Act 33 -- you've got an irrevocable pledge

22  in a Puerto Rico statute, and then they just repeal it.  And

23  what this highlights is, the issue here is willingness to pay.

24  Puerto Rico would prefer to keep the money for other uses.

25  And under the *U.S. v. Virginia Electric* case, 365 U.S. 624,

1    631-636, market value is not the exclusive method of valuing

2    for a takings claim, and that no weight can be given to the

3    prospect of government appropriation or a government-caused

4    impairment of value.

5         And then, on the uniformity clause, the fact Puerto

6    Rico has the current ability to pay is relevant, because

7    Chapter 9 that applies throughout the country, except for

8    Puerto Rico, Chapter 9 requires proof of insolvency.  That's

9    11 U.S.C. 109(c)(3).  But in this PROMESA proceeding, proof of

10   insolvency is not being imposed as a requirement for a

11   discharge.

12        The Constitution of the United States states that

13   Congress is authorized to adopt uniform laws on the subject of

14   bankruptcies throughout the United States.  So if a solvent

15   debtor can obtain a discharge under PROMESA, but nowhere else

16   in the country could a solvent debtor obtain a discharge, I

17   submit that this is just plainly not a Uniform Bankruptcy Act.

18   And as per the Supreme Court in the *Aurelius* case, the

19   Territory Clause does not trump other specific provisions of

20   the Constitution.  And I'd submit the Bankruptcy Uniformity

21   Clause is one of those specific provisions.

22        So let me come back to the other requirements for

23   confirmation that I'd like to briefly refer to, and the next

24   is (b)(7), 314(b)(7), the requirement that a plan adjustment

25   be consistent with the applicable fiscal plan.  There's a

1   legal argument that, because under PROMESA 201(b)(1)(N), the

2   Oversight Board is required to respect the relative lawful

3   priorities or lawful liens as may be applicable in the

4   Constitution, other laws, or agreements, because of that

5   requirement for a fiscal plan, that when you come to the

6   confirmation stage, that that respect for the priorities under

7   Puerto Rico law is required under (b)(7), as well as (b)(6),

8   but Your Honor doesn't need to reach that issue for this

9   purpose -- and I briefed it in connection with the in

10  limine -- because here the Oversight Board has failed to prove

11  that the current Modified Eighth Amended Plan of Adjustment is

12  consistent with the current April 23, 2021, fiscal plan.  And

13  when you compare the fiscal plan with the current Plan of

14  Adjustment, it's clear they're not consistent.

15       For example, if you go to the current fiscal plan

16  that's been marked as Debtor Exhibit 10, it's in the docket at

17  18785-10, if one turns to page 276 of 309, there's a section

18  headed 20.2.2 8.5% pension benefit reduction.  In bold type,

19  the Oversight Board states, in the current fiscal plan, that a

20  reduction in pensions with protections for participants close

21  to the poverty level is necessary for the Commonwealth to

22  achieve long-term fiscal stability.  And in the Disclosure

23  Statement that was given to people to vote, the Oversight

24  Board actually used the word "essential", that the pension

25  reductions in the monthly benefit were essential.  That's

1   docket 17628, page 62 of 654.

2        So -- and according to the Oversight Board's own

3   expert, Ms. Levy, had the reductions for people with a benefit

4   over $1,500 per month been implemented, there would have been

5   a savings of 1.9 billion.  There will no longer be, under the

6   current Plan of Adjustment, that 1.9 billion of savings that

7   was part of the fiscal plan.

8        On top of that, as part of the legislation in Act 53,

9   there was a host of additional measures, ranging from a

10   guarantee of 500 million per year for five years for the

11   University of Puerto Rico, that would be a total of 2.5

12   billion guaranteed, to additional funding to municipalities

13   that the Oversight Board agreed to add, that also wasn't on

14   the table at the time of the Fiscal Plan.  The Oversight

15   Board's letter is in the record, 18760-11.  So -- and I might

16   add, before it agreed to this stuff, the Oversight Board had a

17   very stern statement in the record at 18760-12 as to how

18   fiscally irresponsible the legislature's demands were, but

19   then Act 53 happened anyway.

20        Other recent expenditures include this -- it's going

21   to be 11,000 dollars per employee in cash bonuses to the

22   public employees of one union, AFSCME, which happens to be the

23   union that struck the first deal with the Oversight Board in

24   the summer of 2019.  And Mr. Santambrogio's supplemental

25   declaration says that this is going to cost 91.5 million over

1    the next five years.  This, too, is not part of what was on

2    the table at the time of the current fiscal plan.

3            Now, the Oversight Board may argue, well, we're going

4    to have a new fiscal plan, but this is the fiscal plan

5    currently on the table.  It is plainly not consistent with the

6    Plan of Adjustment being proposed.  Thus, the (b)(7)

7    requirement fails.

8            And then coming to (b)(3), the Oversight Board must

9    prove that the debtor is not prohibited by law from taking any

10   actions necessary to carry out the Plan.  I briefed this in my

11   objection at 18575, pages 24, 28 to 31, and 41 to 46 of 303,

12   as well as in my sur-reply, which was 19093.

13           Just several quick points.  PROMESA itself imposes

14   the (b)(3) requirement, so preemption is not an answer.

15   PROMESA does not preempt itself.  And, second, the new bond

16   legislation is a precondition of the effectiveness of the

17   Plan, but the new legislation cancels and extinguishes the GO

18   and PBA Bonds.  That's a violation of Puerto Rico law, and of

19   the U.S. Constitution, including the Takings Clause and

20   Contract Clause.

21           And then, Your Honor, turning to (b)(1), the

22   Oversight Board must prove that the Plan complies with the

23   Title 11 provisions that were specifically made applicable to

24   PROMESA.  And that includes the same treatment requirement of

25   1123(a)(4).  And on the same treatment requirement, I note

1    that on the 1.321 percent, Your Honor had asked Mr. Rosen a

2    question, I think it was on November 15, as to whether a

3    retail investor who did not vote would still get the 1.321

4    percent.  I responded, citing specific language in a

5    communication I received from my broker, which certainly

6    appeared to me to be something that had been supplied to them

7    by an agent for Puerto Rico.

8            And I think, Your Honor probably recognizes this, but

9    in light of the response, which I do appreciate, from

10   Mr. Rosen and the Oversight Board in terms of their now

11   willingness to address this issue, effectively, I think the

12   Oversight Board is acknowledging that I was correct in my

13   concern, and I do appreciate their taking steps to try to at

14   least partially address this, although I think it would be

15   simpler to just pay the 1.321 percent to everybody.

16           But you also have an equal treatment as to the 1.5

17   percent, and per the Plan section 3.3, and this is just on the

18   face of the Plan, it's a pro rata payment.  It's based on the

19   bonds held.  There's no requirement that anyone do any work or

20   incur any expenses.  Pro rata payments I submit need to be

21   paid to all.

22           I'm not saying that the PSA creditors who entered

23   into the initial PSA agreement, that they shouldn't get the

24   1.5 percent.  I'm saying that everybody should get equal, same

25   treatment, and get the 1.5 percent.

1          Mr. Brownstein's testimony underscores that 1.5

2     percent is significant, because Mr. Brownstein explained that

3     while it's worth having these splinter bonds issued, so you

4     may get a proliferation of securities, but that increases the

5     consideration by roughly -- I think he said two and a quarter

6     percent.  And then he said, yeah, there might be a penalty if

7     you try to sell it, because of the lack of liquidity, but that

8     might be roughly one half of one percent or so, so you'll end

9     up with, you know, 1.5, one and three-quarters percent better.

10         Well, per Mr. Brownstein's own testimony, if one and

11    a half percent added consideration is significant enough to

12    put people through the aggravation of this proliferation of

13    splinter bonds, and the associated tax, and just record

14    keeping nightmare for individuals, I submit that 1.5 percent

15    is significant, and ought to be distributed to all, not just

16    two-thirds of the institutional investors who are getting it.

17    Right now roughly two-thirds of the bondholders, the

18    institutional investors are getting the one and a half percent

19    extra.  I submit that everybody, including the retail

20    individual investors are entitled to that one and a half

21    percent as well.

22         Mr. Zelin said, well, this one and a half percent, he

23    knows how hard the people on the other side of the table

24    worked, and one of the groups or two of the groups gave him an

25    e-mail kind of estimating their expenses, but bear in mind the

1 │ Oversight Board has the burden of proof here to prove

2 │ compliance with same treatment.

3 │        They did not even have Mr. Zelin, as I recall, state

4 │ on the record what the amount was, and there wasn't even a

5 │ claim that every party who is getting the one and a half

6 │ percent did the same or, for that matter, did anything in

7 │ particular.

8 │        The Oversight Board has failed to prove that the 1.5

9 │ percent is anything other than a pro rata payment, which if

10 │ it's a pro rata payment, clearly it should go to all.  The

11 │ sheer size of the payment, the aggregate amount, when you

12 │ multiply it against the two-thirds of the bonds that the

13 │ people who get it are getting is over 176 million.  So that,

14 │ too, suggests that this is just added consideration being paid

15 │ pro rata.

16 │        And, again, I'm not suggesting that the parties to

17 │ the initial PSA shouldn't get the one and a half percent.  I'm

18 │ just saying that same treatment under the Bankruptcy Code

19 │ requires that everybody get it.

20 │        I've also estimated in my declaration what the cost

21 │ is of actually providing equal treatment, so that individual

22 │ investors get the same treatment.  The cost of that equal

23 │ treatment is far less than the steps that the Oversight Board

24 │ has taken by way of eliminating the pension modification,

25 │ which is 1.9 billion, you know, paying these additional

1    bonuses to just the public employees associated with one

2    union, which is over 90 million.  The cost of simply providing

3    equal treatment to all bondholders would be, you know,

4    probably just five or six percent of that over two billion of

5    additional costs that just in the last few weeks the Oversight

6    Board was willing to incur.

7           Whatever the courts may accept in the rough and tough

8    world of bankruptcy when you're dealing with corporate

9    bankruptcy, I submit to Your Honor here that rough and tumble,

10   hard-nosed conduct just has no proper role in this case.

11   We're dealing with a municipal issuer that sold bonds that

12   were investment grade rated throughout the United States for

13   years, you know, referencing their Constitutional pledge that

14   the GO Bonds and the PBA Bonds had a first priority of

15   payment.  At the time the bonds were sold throughout the

16   country, there was not even a right of Puerto Rico to seek

17   bankruptcy protection.  And Puerto Rico, in each of the

18   official statements, proudly proclaimed at the time that it

19   had never defaulted, which, unfortunately, they're never going

20   to be able to say again.

21          Your Honor knows that in April of 2019, I moved to

22   appoint a bondholder committee whose members would have been

23   selected by the U.S. Trustee, but being selected by the U.S.

24   Trustee, they would have represented all bondholders, or at

25   least had a fiduciary duty to all bondholders.  And either

1    all, or some, as I proposed, would be individual investors.

2    But the key thing is they would have had fiduciary duty to

3    those who their committee represented.  I submit, Your Honor,

4    respectfully, that had there been a bondholder committee with

5    fiduciary duties, that everybody in fact would be getting

6    equal consideration today.

7          Now, the other issue is this issue of releases, and I

8    recognize that the Oversight Board has substantially narrowed

9    the scope of releases.  The one issue that is open is this

10   issue, they refer to it as exculpation, but it really is just

11   release in another name.  It basically would provide that

12   someone shall not have or incur any liability to an entity.

13         I have a very specific proposal on language, which is

14   simply to take the language that the Oversight Board has used.

15   For example, in Plan section 92.2(a), they have a prefatory

16   clause, without prejudice to the exculpation rights set forth

17   in 92.7, but then they go on to say nothing in the Plan or

18   Order is intended, nor shall be construed to be a plan of a

19   nonconsensual third-party release of the PSA creditors,

20   AFSCME, or each of their respective related persons.

21         And I would submit, Your Honor, that that language,

22   without the "without prejudice to" clause should be added to

23   92.7(b), 92.7(e), and the parallel provisions of the Order.

24   This is taking their own language and just applying it

25   consistently to this additional provision that effectively

1    does provide a release.  And it's something where you just

2    can't escape the fact that the parties who were involved in

3    the negotiation received added consideration, and that no one

4    was there acting as a fiduciary for all bondholders, including

5    individuals.

6         If individuals had received the same treatment, if

7    individuals were also getting the one and a half percent,

8    that's one thing.  And, you know, then maybe they'd have an

9    argument that having this additional release language is

10   appropriate.  I submit that unless everybody's getting equal

11   treatment, it is not.

12        Now, I'm sure Your Honor is concerned about what

13   would happen if the Plan is not confirmed.  I would submit

14   that there's actually the capacity to make payment of past due

15   interest and principal.  The Oversight Board could redouble,

16   which unfortunately have been largely unsuccessful efforts to

17   date, to rein in spending, to make the structural reforms, to

18   put in place financial controls.  Deferring the payment to

19   debt rather than simply refusing to pay what is owed, I'd also

20   submit offers a greater promise of future re-entry to the

21   credit markets.

22        But I think, Your Honor, you can turn the question

23   what would happen if the Plan is not confirmed around, and the

24   question would be, what's going to happen to Puerto Rico if

25   you do confirm?  Because based on this record, I don't think

1    they've proven the feasibility of the Plan.

2            One of the key things that the Oversight Board was

3    supposed to do was to get financial statements, certified,

4    audited, financial statements up-to-date.  That hasn't

5    happened.  The financials -- the certified financials have

6    just gotten later than they were before PROMESA.

7            You also have an issue with controls.  Just last

8    month, the Oversight Board itself sent a letter to Puerto Rico

9    observing that internal control weaknesses identified by the

10   auditor going back over five years to 2016 remained

11   unremedied.  That's 10760-13.

12           I've mentioned before that outlays are up 29 percent

13   in the last four years.  I've mentioned Dr. Wolfe's testimony

14   that structural reforms have been proposed for years, but just

15   have not been adopted.  And I submit that were this plan to go

16   forward, there's been no proof that the necessary reforms are

17   going to be taken, which I think the people of Puerto Rico,

18   including those in the private sector, very much need as well.

19           One of the key aspects of PROMESA also was restoring

20   access to the credit markets.  That is in PROMESA 209.  But

21   then we see this fight with the legislature that the Oversight

22   Board is having over adopting new bond legislation, and we see

23   this fight that we just heard more about today where the

24   legislature just per Mr. Bienenstock on November 11th was

25   trying to push for immediate effectiveness of Acts 80, 81, and

1    82 at a cost of five billion dollars.  And it just -- it's

2    hard to see how Puerto Rico, with this dynamic, if the Plan is

3    confirmed, is going to get access restored to the credit

4    markets.

5          I think it's notable, Your Honor, that the Oversight

6    Board's own experts assume in their reports that no new debt

7    is going to be issued through at least 2051, and I think

8    that's probably an assumption, because without the necessary

9    structural reforms, without actually adopting rigorous fiscal

10   responsibility, fiscal controls, it's very hard to see how

11   Puerto Rico ever reenters the credit markets at reasonable

12   rates.  Puerto Rico will lack the access to credit markets

13   that states and municipalities throughout the country deem so

14   vital to their long-term success, and I think -- this is I

15   think doing a great disservice to the great majority of the

16   people in Puerto Rico, who are not employed by the government,

17   but are part of the private sector.

18         A final note, Your Honor, on the Takings Clause, and

19   that is, I wanted to respond briefly to the question of

20   whether the takings claim of a bondholder could be excepted

21   from discharge.  I'd submit there's no reason why, even if the

22   Plan is confirmed, one could not except from discharge a

23   bondholder takings claim, whether it's based on -- you know,

24   for example, it could be based, among other things, on the

25   repeal of Act 33 that I mentioned, or be based on, you know,

1   adopting the legislation in Act 53 that basically nullifies

2   the current bonds.

3          But there's no reason why that takings claim could

4   not be excepted from discharge.  It doesn't guarantee a

5   recovery on the claim.  It's not speaking to whether the claim

6   has merit.  It's not speaking to what the just compensation

7   would be.  And, clearly, whatever was received under the Plan

8   in terms of value would, you know, offset whatever recovery

9   occurred on the takings claim under the Supreme Court decision

10  in *Security Industrial Bank*.

11         The Bankruptcy Clause cannot override the Fifth

12  Amendment.  I believe all of the Fifth Amendment takings

13  claims should be excepted.

14         And, finally, Your Honor, I want to make a personal

15  note, out of respect for the Court.  I have a commitment today

16  that I just can't break, that I have to leave shortly after

17  4:00 for.  I don't mean to -- and would not suggest holding up

18  these proceedings, but I just wanted to tell Your Honor that

19  if I'm offline, it's not out of disrespect to the Court or

20  other parties.  I'm just not able to alter this commitment.

21         And I thank Your Honor very much for the time.

22         THE COURT:  Thank you, Mr. Hein, and thank you also

23  for giving me notice of your schedule.

24         Next we will hear from Mr. Samodovitz for 16 minutes.

25         MR. SAMODOVITZ:  Yes.  Can you hear me?

1          THE COURT:  Yes.  Good afternoon.

2          MR. SAMODOVITZ:  Okay.  Thank you.  Let me talk about

3     the voting process first.  The affidavit of Ms. Pullo, docket

4     19115, contains the official vote tally for each class.  It

5     lists only 27 votes for Retail Class 47 for the 2014 GO Bonds

6     which I own.  Neither the Pullo Affidavit, nor the FOMB

7     reported how many total bondholders are in Class 47, or the

8     total value of bonds in Class 47.  And, presumably, there were

9     many more bondholders in bonds that were not counted in the

10    vote.

11         The fact that we may now get the 1.3 percent retail

12    support fee is no substitute for the right to vote against

13    larger losses under the Plan.  The present two-step voting

14    process is for bondholder classification, and voting was

15    complex and confusing to both the brokers and bondholders.

16         In July, the FOMB instructed the brokers to ask the

17    bondholders in Retail Class 47 if the bondholders wanted to

18    opt into the Plan, so the bondholder would qualify for an

19    extra 1.3 percent recovery, but the bondholders said no.  If

20    the broker did not tender the bonds, the bondholders remained

21    in Retail Class 47, and did not opt into the Plan, which I

22    think was the case with me.

23         However, this morning the FOMB attorney stated that

24    unless the bondholder was certified as a retail investor, the

25    bondholder's taken out of Class 47.  I am not sure if my

1    broker knew to do this on my behalf.  I was not aware of this

2    requirement, because this requirement was not well known, and,

3    if true, prevented me -- it prevented me, and probably other

4    bondholders, from voting in the retail class, which was my

5    proper class.

6            Next, in September, someone instructed the brokers

7    that the 2014 GO bondholders could then vote to accept or

8    reject the Plan.  Some brokers apparently confused this voting

9    process with the Plan with the previous opt-in process for the

10   PSA, and handled "no" votes in the same way they handled prior

11   bondholder decisions not to opt in.  I.e., by not tendering

12   the bonds to the DTC.

13           For example, in my case, in September my broker sent

14   me the same form as in July, and asked me if I wanted to

15   accept the plan.  And when I said no, the broker did nothing

16   more, assuming that was sufficient to not accept the Plan.

17   But this did not result in a "no" vote to whatever class I was

18   in at the time.  But there was -- it appears there was also a

19   second step between not opting in and voting no, and

20   bondholders such as myself were not counted in the vote.

21           It also discriminated against opponents of the Plan,

22   because brokers knew to opt in or vote yes for the

23   bondholders, the broker had to tender bonds to DTC, but to

24   vote no, some brokers thought no action was sufficient by

25   default to not accept the Plan.  Also, the requirement to

1   tender one's bond to a third party in order to vote was an

2   unreasonable deterrent to voting.  Imagine if a state or

3   municipality required a resident to tender a deed to his or

4   her house to register to vote to ensure the person did not

5   move before election and try to vote in two different states

6   or municipalities.  Certainly that would be an unreasonable

7   deterrent to voting.

8        Also, it is surprising that all 27 official votes

9   from retail class were yes votes, because all of these voters

10  had previously chosen not to opt in to the PSA in July, and

11  consequently risk their qualification for the extra 1.3

12  percent recovery.  Were any of these 27 voters associated with

13  the institutions that negotiated in support of the Plan, and

14  did they buy the bonds and opt out of the PSA in July solely

15  to remain in the Retail Class 47, and later vote the retail

16  class in favor of the Plan?  If all this is true, their motive

17  in acquiring the bond was not proper as required by the law,

18  because of the confusion and the classification and voting

19  process.

20       Before a decision on confirmation is made, the voting

21  period should be reopened, and simple ballots without any

22  requirement to tender bonds should be sent to all the

23  bondholders of all the classes to allow them to vote easily

24  and freely.  This is the common practice in bankruptcy.  And

25  before the new ballots are sent out, the Disclosure Statement,

1    and any summary accompanying the ballots should be updated

2    with new information about the actual debt service on the

3    variable rate GO Bond and its impact on the following

4    challenge to the validity of the 2014 GO bonds.

5           In FOMB's docket 4784, which was publicly available

6    on Prime Clerk as of January 2019, the FOMB challenged the

7    validity of the 2014 GO bond as being issued in excess to the

8    15 percent debt service limit of the Puerto Rico Constitution.

9    The docket 4784 provided mathematical calculations that

10   purportedly prove this.

11          For these calculations, the FOMB contended their

12   total debt service should be calculated without interest

13   capitalization, as used in the offering statement of 2014 GO

14   Bonds.  And without the interest capitalization, the total

15   service was reportedly 15.1 percent in fiscal year 2016.

16          However, to reach the 15.1 percent debt service, the

17   FOMB included in their calculation the debt service and other

18   variable rate GO Bonds at 12 percent interest, which was the

19   maximum interest allowed under the Puerto Rico law, and was

20   used in the offering statement in 2014 as a worst case

21   analysis for future years' interest on the variable rate

22   bonds.

23          At 12 percent, the interest on the variable rate

24   bonds would be 15.2 million dollars.  However, the actual

25   average interest on the variable rate bonds was only 1.7

1  percent, or 2.2 million dollars.  So the worst case analysis

2  calculation in 2014 was 13 million dollars too high, and for

3  fiscal year 2016.  But the 13 million dollars was subtracted

4  from the total debt service in fiscal year 2016.  The total

5  actual debt service was only 14.94 percent.  Even if interest

6  capitalization is not removed in the debt service calculation,

7  the actual debt service could go lower without the listed

8  interest capitalization of the offering statement.

9       The fact that the debt service could have exceeded

10  the constitutional debt service limit in fiscal year '16,

11  based on possible higher interest rates and variable rate GO

12  Bonds, and without interest capitalization, does not change

13  the fact that it did not exceed the constitutional debt

14  service limit for fiscal year 2016, which was determinative of

15  the issue of validity.

16       In docket 4784, the FOMB also challenged the validity

17  of the 2014 GO Bond, as allegedly being used to pay operating

18  expenses of Puerto Rico, allegedly in violation of Puerto

19  Rico's Constitution, because proceeds from the sale of the

20  2014 GO Bond were used to repay other outstanding bonds,

21  allegedly used to pay operating expenses of Puerto Rico.

22  However, the Puerto Rico Constitution does not prohibit use of

23  bond proceeds to pay operating expenses, and, in fact,

24  expressly permits deficit spending under Article II, Section

25  6, which states, the appropriations made for any fiscal year

 1   shall not exceed (Remarks in Spanish), which means total

 2   resources, which is in the translation.  In the process of

 3   drafting the Puerto Rico Constitution, one of the persons

 4   asked about the meaning of (Remarks in Spanish.)  The person

 5   that was drafting responded that the draft intentionally

 6   replaced the term "total revenues" with the broader term

 7   "total resources", to specifically include the resources that

 8   are generated by issuing bonds.  See in the Journal of

 9   Constitutional Convention at page 1090, and there's a

10   certified translation available at docket 475-26.

11        After the official Spanish text was approved, an

12   English translation of the Puerto Rico Constitution

13   incorrectly substituted a narrower term, "total revenues".

14   Therefore, this challenge by the FOMB to the validity of the

15   2014 GO Bonds is frivolous.

16        FOMB docket 474 also challenged the contrary -- also

17   argued that contrary to the offering statements of the PBA

18   Bonds, the PBA Bonds are really GO Bonds in disguise, and

19   their debt service should be added to the debt service

20   calculations to the 2012 Series A and B GO Bonds and the 2014

21   GO Bonds.

22        However, Puerto Rico and its lawyers and accountants

23   certified the offering statement to the PBA Bond as not being

24   general obligations of Puerto Rico, because the PBA Bond --

25   because the PBA owned extensive real estate, and that the PBA

1    would pay its debt service, and Puerto Rico was merely a

2    guarantor of those bonds.

3         Therefore, this challenge by the FOMB to the validity

4    of the 2012 Series A and B Bond, with 2014 GO Bonds is weak.

5    The Disclosure Statement stated that the Plan would settle all

6    challenges to the validity of all the GO Bonds.  Therefore,

7    the amount of reduction of the 2014 GO bonds in the Plan was

8    placed with all the bona fide challenges by the FOMB -- all

9    the challenges submitted by the FOMB to the validity of the

10   2014 GO Bonds, but with the new information about the actual

11   debt service and the variable rate GO Bonds, this challenge to

12   the validity of the 2014 GO Bonds as exceeding the

13   constitutional debt service limit without interest

14   capitalization has been debunked.

15        The 2014 GO bondholders who negotiated the recovery

16   under the Plan, and the yes voters in retail Class 47 and

17   nonretail Class 46 did not have this new information when they

18   negotiated and voted yes.  And with this new information, the

19   associated challenge to the validity of the 2014 GO Bond would

20   have been disregarded.  Not surprising, the Plan would have

21   offered a greater recovery to the 2014 GO Bond, because there

22   would have been one less challenge on the table to the

23   validity of the GO Bond -- 2014 GO Bond.

24        Now, it was the strongest challenge of the three,

25   without the new information about the actual debt service and

1    the variability rate GO bonds in 2016.  Hearing now the

2    ability of Puerto Rico to pay all the GO bonds, and having

3    proven this with established facts and data, and the FOMB has

4    not countered this except with conclusory statements that it

5    cannot pay, and general references to natural disasters, to

6    which the Federal Government provided tens of billions of

7    dollars in relief to Puerto Rico, and the financial result of

8    which is reflected in Peter Hein's facts and data -- the

9    conclusory statement that Puerto Rico cannot stand in the face

10   of these contrary facts as stated.  See *Celotex v. Catrett*,

11   477 U.S. 317.

12        For the foregoing reasons, the Plan is not in the

13   best interest of bondholders as required by PROMESA 314(b)(6),

14   certainly not in the best interest of the 2014 GO bondholders,

15   which are the largest group in dollar amount.  And the Plan

16   should not be confirmed.

17        It is likely that many bondholders voted for the

18   plan, because with the unconscionable four and a half year

19   delay and lack of interest in pendency of the Plan, lack of

20   comparison of recovery under the Plan to greater action of

21   recovery to court action outside of bankruptcy.  If some

22   bondholders of any type of GO bonds still want to settle with

23   the FOMB outside of Title III, there is nothing stopping them

24   from doing so on their own.  So let the rest of the

25   bondholders seek greater recovery under the law, including the

1    possibility that Puerto Rico improperly issued the 2014 GO

2    Bonds while it was considering bankruptcy.

3           I requested that Puerto Rico provide any documents of

4    this type during discovery, but Puerto Rico adamantly refused

5    to comply.  This speaks for itself.

6           I have requested to reserve any remaining time for

7    sur-rebuttal.

8           THE COURT:  If you wish to stop speaking now, you

9    can, and if you wish to apply for permission for sur-rebuttal

10   afterward, I will hear an application then.  Thank you,

11   Mr. Samodovitz.

12          The next scheduled speaker is Mr. Barrios-Ramos for

13   AMPR.

14          MR. BARRIOS-RAMOS:  Good afternoon, Your Honor.

15          THE COURT:  Good afternoon.

16          MR. BARRIOS-RAMOS:  For the record, Attorney Jose

17   Luis Barrios in the representation of Asociacion de Maestros

18   de Puerto Rico and its Local Sindical, the exclusive

19   representative of teachers in Puerto Rico.

20          Your Honor, at the outset of our closing arguments,

21   we would like to address a significant point regarding the

22   active TRS participant claim, and the teachers' damages

23   claims, which are in response to the presentation that the

24   Board made earlier today at its closing arguments, Your Honor.

25          The proposed Plan proposes a freeze of the defined

1   benefit components of the Puerto Rico Teachers Retirement

2   Systems, and it's not only a freeze, but of their defined

3   contribution, Your Honor, as Mr. Bienenstock claimed.  But if

4   we look at the Disclosure Statement, in Exhibit H at page 274,

5   and as Exhibit F-1 of the Plan of Adjustment, it's also a

6   delay in retirement up to three years that all those teachers,

7   upon the effective date, are not eligible to retire.  So the

8   component is not only a freeze to the right to accrue defined

9   benefits, but it's also a modification on the allowance or the

10  time where they will have a right to receive a pension

11  benefit.

12        The Board states in the Disclosure Statement that the

13  freeze will result in significant savings to the Commonwealth,

14  and will play a significant role in restoring long-term

15  adequate funding.  That is, the Disclosure Statement, Exhibit

16  H, at page 275, and the declaration of Ms. Levy, the Board

17  argues, initials some of 4.7 billion, and then with the offset

18  of the Social Security savings, around 3.9 billion over 30

19  years.

20        The Disclosure Statement also includes a recovery

21  analysis for each class of claimant, but, notably, does not

22  include the impact that the freeze will have on the teachers'

23  retirement claims or the teachers' recoveries on the proposed

24  Plan.  That is at the Disclosure Statement, Your Honor, at

25  page 22, footnote 53.

1           The Disclosure Statement in particular -- the Board

2    estimates the following recovery for active teachers.  Active

3    TRS participant claims, Class 51-I, average monthly total

4    retirement benefit of 843 dollars, and the Board claims a

5    recovery of -- 99.5 percent recovery.  But importantly, Your

6    Honor, at footnote 53 of the Disclosure Statement, the Board

7    states, and this hasn't been changed, that the claim estimates

8    do not include the impact of the freeze of the JRS and the TRS

9    pension system or the elimination of any COLA under the Plan.

10          Pursuant to the proposed Plan, active TRS members

11   will receive their pensioning as follows, the monthly benefits

12   upon retirement will no longer be subject to the monthly

13   benefit reduction, and benefits will be frozen as of the

14   effective date, so that teachers will no longer be able to

15   accrue pension benefits after such date.  The right to receive

16   a pension benefit will be delayed to age 63.  And there will

17   be no minimum monthly pension disability benefit or minimum

18   benefit, among other measures exposed by Exhibit F, Your

19   Honor.

20          The treatment that the Board proposes, and the Eighth

21   Modified Proposed Plan of Adjustment states, that teachers'

22   ongoing pension benefits would only accrue through their own

23   contribution to self-funded, individual defined contribution

24   accounts, which have yet to be established for those teachers

25   currently in the defined plan.

1          In addition, pursuant to the proposed Plan, teachers

2     under age 45, and those older, who choose to do so, will be

3     for the first time enrolled in Social Security, although the

4     timeline for when teachers will be able to participate in

5     Social Security is also not yet established.

6          Of particular importance, Your Honor, the freeze is

7     the largest component of the active teachers' claim, which

8     pursuant to the Board, will achieve savings of around 3.9

9     billion dollars.  Assuming those benefits are half

10    contributions by the Commonwealth, and half contributions by

11    the teachers, we're talking about a claim that could be in the

12    size of 1.7 billion dollars.

13         As Mr. Bienenstock referred earlier in their closing

14    arguments, that could affect feasibility of the Plan.  At one

15    point, and why we decided to bring this at the outset of our

16    closing arguments, Your Honor, is that in arguing on the theme

17    of the rejection issue, Mr. Bienenstock advanced in an earlier

18    confirmation hearing for the first time, since that is not in

19    the Plan of Adjustment, the Fiscal Plans, of the Disclosure

20    Statement, that the fact that teachers have no alleged damage

21    claim was because teachers had no promise of employment; and,

22    therefore, it is fair to infer a pension benefit and provide

23    no damage claim recovery.

24         But, Your Honor, that assumption is wrong.  Under

25    Puerto Rico law, most teachers, if not all teachers that have

1     accrued benefits under the TRS pension system, have achieved

2     permanent status within the Department of Education, just like

3     other employees have this permanent status in whatever

4     positions they hold within the Commonwealth.  And the court

5     had stated, Supreme Court of Puerto Rico stated that that

6     permanent status gives teachers a proprietary right over their

7     position.

8             In particular, the Court held in *Pierson Muller I v.*

9     *Feijoo*, 106 D.P.R. 838 (1978), that in Puerto Rico, a public

10    employee has a recognized interest in the retention of its

11    employment when such interest is protected under the law.  And

12    that interest is also protected by an expectancy of

13    continuity.  And I'm translating, Your Honor, from the

14    language, the Spanish language of this case.

15            The case of teachers, Your Honor, it's a proprietary

16    right of teachers upon achieving permanent status as an

17    employee of the Department of Education, codifying Act 312 of

18    May 15 of 1938, 18 L.P.R.A., Section 214, as amended.  Thus,

19    the Board rejection of arguments and denial of an alleged

20    damage claim is based on a wrong assumption that was raised,

21    as I mentioned, for the first time in the Confirmation

22    Hearing.

23            The assumption in question is, under Puerto Rico law,

24    teachers have no expectancy to employment, thus, the damage

25    claim.  That may be true in other jurisdictions, Your Honor,

1   but not in Puerto Rico.  And the Board cannot now at this

2   stage argue that PROMESA preempts this particular law,

3   because, as a matter of fact, it doesn't.

4          Even the Fiscal Plan doesn't contemplate this.  In

5   fact, no laws enacted after the filing of the Title III

6   petition deprived teachers of this proprietary right provided

7   by Act 312.

8          If we look at the latest fiscal plan, it's devoid of

9   any language of layoff of teachers, given the already high

10   attrition rate in the Department of Education and lack of new

11   teachers entering the system.  Therefore, that argument that

12   sometimes we believe is circular, that the Board states that,

13   you know, laws are preempted as long as they're inconsistent

14   with the fiscal plan, would not be applicable here, Your

15   Honor.  That law is also, to the best of our knowledge, not

16   included in Exhibit K.  And, thus, every permanent teacher has

17   not only an expectation, but a proprietary right to its job

18   position, which the case law has held the Commonwealth cannot

19   impair without due process.

20          Under the law, that due process is provided to

21   teachers under administrative proceedings, Your Honor.  I want

22   to make that clear, because that definitely contradicts the

23   statements of no expectation of work, Your Honor.  The Puerto

24   Rico law of the Commonwealth cannot impair that right to a

25   teacher's position without due process, because the right to

1    that position is not only a contractual right, but a

2    proprietary right, and also an acquired right.  That cannot be

3    retroactively impaired.

4         For most teachers under TRS, active teachers, that

5    status of permanent teacher was achieved well before the

6    filing of the Title -- the petition.  Thus, an acquired right

7    was matured before the filing of these proceedings.  And as

8    Your Honor has recognized, and other courts have recognized,

9    there is a clear difference between the impairment of a

10   contractual right under bankruptcy law and impairment of a

11   property right under bankruptcy law.

12        And what are those recoveries for that particular

13   credit?  That was also discussed in another context on the

14   Takings Clause earlier in this hearing.  Thus, since the

15   arguments of no expectation of work is in opposite to Puerto

16   Rico's permanent status of teachers over their positions of

17   employment, or may not be able to push under their argument

18   that there is no damages claim for teachers, because of the

19   expectation of work.  And, if the Board is correct, that this

20   contract is capable of rejection, it still needs to meet the

21   standard to reject.

22        And following such a rejection, the teachers plainly

23   have a legal right to assert a claim for rejection damages.

24   The Plan provides damages in section 76.6, and specifically

25   for teachers, as active TRS participants, in section 55.9(b).

1    The teachers plainly have a right to submit a claim for

2    rejection of damages, as they do have an expectation of

3    employment and a property right over that position.  And the

4    Board's argument of no expectation cannot preclude or disallow

5    such claim under the law.

6         We have also, AMPR has also advanced that since the

7    defined benefit right of teachers was codified under Law 106,

8    a post petition law, teachers would be entitled to an

9    administrative claim on the damages, but even if the Court

10   were to determine that that claim is not administrative in

11   nature, the teachers' rejection damages claim still has to be

12   paid when allowed.  And there is no mechanism in the Plan for

13   doing so.

14        And despite Mr. Bienenstock's comments regarding the

15   Social Security treatment, and the Plan's statements of

16   further consideration as to the defined contribution account,

17   which is solely funded by funds of the teachers, the

18   Commonwealth will not contribute or match any contribution of

19   teachers.  AMPR reiterates its position that teachers are

20   getting nothing under the Plan.  Yes, some teachers may not be

21   eligible for Social Security under Exhibit F-1 proposed

22   treatment after the freeze, but not all, Your Honor.  And even

23   those who are eligible will certainly not be enrolled

24   immediately upon the effective date.

25        The Plan doesn't state how long those teachers have

1  to wait before they are enrolled, and how long teachers will

2  have to wait before they're enrolled even in their defined

3  contribution plan, which is supposed to replace, in part,

4  their current plan.  There is nothing in the Plan to implement

5  this process that Mr. Bienenstock called the nitty gritty,

6  even though the teachers' right will be probably impacted upon

7  the effective date.

8          Which, Your Honor, brings us to our second point,

9  which is a point of contention that AMPR has with the

10  statements of the Board, that ERS are being treated better

11  than other creditors.  We do agree, Your Honor, and we do

12  support the Board's agreement with the Court and the

13  legislature to treat retirees and to provide adequate

14  treatment for them, but that is not the case of active

15  teachers, Your Honor, who will be impacted by this plan.

16          Which brings us to two statements plan supporters

17  made earlier in this hearing, AAFAF and the Retiree Committee,

18  which argued that the Plan may provide better treatment for

19  pensions to other creditors, justifiably so, and we agree with

20  those statements, Your Honor.  The Retiree Committee provided

21  the declaration of Mr. Johnson in support of those statements

22  and treatment under the Plan, and which -- Mr. Johnson

23  testified that when the ERS freeze was imposed, some

24  participants received a 44 percent reduction on their benefit.

25  That particular freeze, Your Honor, although not identical, is

1  very similar to the TRS freeze that is being proposed under

2  Exhibit F-1.

3          So active teachers will likely receive a reduction on

4  their future benefit that would be comparable to 44 percent,

5  Your Honor, and this reduction will be in addition to all the

6  prepetition reductions that teachers have already experienced,

7  and those post petition reductions the teachers experienced as

8  argued by AAFAF at docket 19319, at page 13, in arguing

9  against the proposed preemption of Act 82 by the Oversight

10 Board.  AAFAF argued that pension benefit reductions

11 disproportionately affect Puerto Rico teachers.  Given their

12 low salaries, any additional reductions in pension benefits

13 could render teacher retirees unable to pay for basic life

14 necessities, thereby increasing the future cost of Puerto Rico

15 welfare programs.

16         This, Your Honor, is a reality that I believe has

17 been crystallized in many arguments, not only AMPR.  And AAFAF

18 argues this particular point, and highlights that, as recent

19 as 2017, the legislature enacted Act 26, which implemented

20 several measures that affected teachers who were close to

21 retiring, such as an eliminated payment on account of unused

22 sick leave in excess of statutory limits.

23         AAFAF further argued that such benefit is fair, and

24 specifically, thus, right by teachers who are close to

25 retirement age, and for future years of unused accrued

1    benefits.  So if we take into account the proposed freezing

2    back of approximately 30 to 44 percent, the highlighted impact

3    of Act 26, a post petition measure on teachers, and we take

4    into account all the prepetition reductions, and elimination

5    of benefits, which AMPR lists on its Master Union Claim No.

6    108230, Your Honor, that would closely resemble what

7    Ms. Levy's declaration states, that some employees of the

8    Commonwealth have experienced reductions from 40 to 82 percent

9    of their proposed -- or what would have been their

10   compensation.

11         And, Your Honor, that brings me back to a statement

12   that this Honorable Court issued on May 17, 2017, on the first

13   day's hearing.  At that time, the Court expressed in opening

14   remarks, and we quote, "what we must do here together is work

15   in good faith to identify and implement the changes that are

16   necessary to enable Puerto Rico to emerge as a stronger place

17   than it is today.  One that is providing quality education for

18   its future leaders, retaining talented people who can

19   contribute to Puerto Rico's future, building a vibrant

20   economy, and maintaining public safety; and by doing so,

21   producing economic growth that will provide increasing value

22   for creditors and appropriate support for the retirements of

23   those who have spent their working lives in Puerto Rico's

24   service."  See the transcript of the May 17 hearing, at page

25   7, lines 7 to 16 of the transcript, Your Honor.

1              AMPR cannot agree more with the Court's statements at

2    that time, which are as relevant today as they were on that

3    day, and AMPR presses that to achieve that goal, the TRS

4    freeze must not be included in the POA.  There is no better

5    example of this than considering the plight of Puerto Rico

6    teachers.  The freeze not only harms -- will not only harm the

7    teachers, who will be driven into poverty in retirement --

8    AMPR is not the only one to argue this, Your Honor, before

9    this Court -- but it also affects the students who will no

10   longer have competent educators, as many will leave the

11   system.  And, thus, it does not allow or it will not allow

12   Puerto Rico and its people to continue as a vibrant society.

13             As to whether the POA, as proposed, will further that

14   goal set by the Court on May 17, or proposed by the Court on

15   May 17, Your Honor, you already heard from one teacher at the

16   hearing held on November 9, who said that she could not afford

17   to continue to teach without the defined benefits which have

18   been promised to her.  And when -- she meant promised to her,

19   Your Honor.  Those benefits were truly promised.  There was an

20   inducement to take the position of a teacher, and in exchange,

21   and in consideration for a lower salary, the Commonwealth

22   promised a lifetime pension, a secured, dignified retirement.

23   And many teachers will state --

24             (Sound played.)

25             MR. BARRIOS-RAMOS:  Your Honor, another speaker that

1   same day spoke about her mother, a former teacher now in

2   retirement, who is forced to choose between medicine and food

3   at times.  There is plenty of data, Your Honor, when food

4   insecurity affects a population, we see health issues more

5   recurrent, and shorter life expectancies.

6          Your Honor, we would like to further address and

7   close with a statement from the president of the AMPR.  I will

8   read it in Spanish, and then summarize it in English.  And

9   this message was to the Court and all participants in this

10  case.  (Remarks in Spanish.)

11         (Sound played.)

12         THE COURT:  Can you proceed to the English summary?

13         MR. BARRIOS-RAMOS:  Yes, Your Honor.  I'll best

14  translate.

15         We request for the participants to look at the

16  reality of the teacher, their current situation, how they

17  live, how they have sacrificed, following their vocation,

18  which is to educate this country without taking or being

19  detracted by the many challenges that they have to -- to

20  affront.  We request the parties evaluate the significance of

21  the education for Puerto Rico.  Teachers are the providers of

22  the education.

23         If the Plan is approved as it is, we will be --

24  teachers will be taken to a precarious life, almost to

25  homelessness.  After 30 years of sacrifice, love, commitment,

1    and loyalty to education, teachers will be taking nothing into

2    retirement.  Many of these teachers, when they first began in

3    this profession, what they knew they have secured was their

4    retirement.

5              THE COURT:  Thank you, Mr. Barrios, and thank you for

6    your translation of the statement.

7              MR. BARRIOS-RAMOS:  Thank you, Your Honor.

8              THE COURT:  At this point, we will take the

9    ten-minute afternoon break.  So we will resume at five minutes

10   to 3:00 New York time, which will be five minutes to 4:00

11   Atlantic Standard Time.

12             (At 3:41 PM, recess taken.)

13             (At 3:55 PM, proceedings reconvened.)

14             THE COURT:  Good afternoon again, everyone.  We will

15   now continue with the statements of the objectors.

16             The next speaker is Mr. DeChiara for SEIU and UAW,

17   who's been allotted ten minutes.  Good afternoon, sir.

18             MR. DECHIARA:  Thank you.  Good afternoon, Your

19   Honor.  Peter DeChiara from the lawfirm of Cohen, Weiss &

20   Simon, LLP, for UAW and SEIU.

21             As the Court knows, UAW and SEIU objected to language

22   in paragraph 62 of the proposed Confirmation Order, language

23   that imposed ten years restrictions on the Commonwealth given

24   even modest increases in the defined benefit pension payments

25   for ERS participants.  We argue that inclusion of that

1   language, which first appeared in the Confirmation Order on

2   November 7th, violates the due process rights of ERS

3   participants, because the Oversight Board never served them

4   with a proposed Confirmation Order containing that language or

5   otherwise gave them notice of the language and a chance to

6   object to it.

7       The revised Plan of Adjustment that the Oversight

8   Board filed last night added at section 83.4 of the Plan the

9   same language that we objected to in paragraph 62 of the

10   proposed Confirmation Order.  Since it was only filed last

11   night, UAW and SEIU have not had a chance to prepare a written

12   objection to section 83.4, and we reserve our right to submit

13   one.  But I want to, in this closing, at least outline the

14   basis of our objection.

15       Our core objection is due process, the Oversight

16   Board violated due process rights of ERS participants by

17   seeking Court approval of language in paragraph 62 of the

18   Confirmation Order which would materially and adversely affect

19   them, but without serving them with notice of the proposed

20   language, and, thus, denying an opportunity to object.

21       The Oversight Board cannot cure that due process

22   violation simply by adding the same language to the proposed

23   Plan of Adjustment.  The due process violation remains the

24   same.  The Board is asking the Court approve language adverse

25   to ERS participants, without giving them notice and a chance

1      to object to it.

2           The Supreme Court has held that due process requires

3      that notice be reasonably calculated to afford interested

4      parties an opportunity to object.  And I would cite *Mullane v.*

5      *Central Hanover Bank*, 339 U.S. 306, 314, for that proposition.

6           In the bankruptcy context, the question is what

7      notice the Plan proponents provided the effected parties.  *In*

8      *re Puchi Properties,* 601 B.R. 677, 684.

9           It is irrelevant that ERS participants may have heard

10     that there's a reorganization proceeding going on, or even,

11     more specifically, that they may have heard that a

12     confirmation hearing is taking place.  Parties at interest do

13     not have an affirmative duty to investigate whether their

14     interests may be affected by court proceedings.  The burden

15     rests on the Plan proponent to provide adequate notice, and

16     for that proposition, I again cite the *Puchi* case.

17          The Oversight Board pointed out PROMESA section 313

18     allows it to modify the Plan at any time before confirmation,

19     but that statutory provision does not and cannot trump the

20     constitutional provision for due process.  In other words, the

21     Oversight Board may have a statutory right to revise the Plan,

22     but it would, nonetheless, violate the constitutional right to

23     due process for the Court to approve the revised plan without

24     the effected parties being given notice and a chance to

25     object.

1        Last minute changes to a plan in a reorganization

2   case typically do not raise due process issues, because they

3   are consensual or technical in nature.  The language in

4   section 83.4 is neither.  It is significant, and it is adverse

5   to the ERS participants.  And the Board is trying to slip it

6   through, just as the Confirmation Hearing comes to its close,

7   because inclusion of the language in the Plan and, for that

8   matter, in the Confirmation Order violates due process.  The

9   Court should strike it.

10       So what process would be due ERS participants were

11  the language left in the Plan?  In its motion requesting the

12  Act 53 findings, the Oversight Board took the position that

13  service by publication in newspapers was sufficient for ERS

14  participants, because it claimed the Act 53 findings did not

15  directly affect the ERS participants.  The language at issue

16  here, indisputably affects ERS participants, and, therefore,

17  requires service designed to actually reach them, namely,

18  service by mail, or other direct means.

19       Moreover, as the First Circuit has held in the

20  bankruptcy context, as elsewhere, due process requires "a

21  meaningful opportunity to prepare and be heard."  *In re*

22  *Hoover*, 828 F.3d 5, at page 9.

23       Here, a meaningful opportunity to prepare and be

24  heard means adequate time for ERS participants to consult with

25  and potentially retain counsel, and to have counsel prepare an

1   objection.  That doesn't happen overnight, or even in a few

2   days.  ERS participants are not bankruptcy professionals, but

3   working people and retirees.  They need adequate time to grasp

4   the issues and seek out legal advice.

5        Your Honor, we are not looking to derail the

6   confirmation process.  The best way to avoid this due process

7   problem is for the Board to remove the language, or for the

8   Court to strike it.

9        Now, due process is not the only basis for an

10  objection to this new plan language.  One class of ERS

11  participants, the below threshold ERS retirees in Class 51-A,

12  had no opportunity to vote on the Plan in its earlier

13  iteration.  That class was deemed to accept the Plan, because

14  the monthly benefit modification did not affect them, so they

15  were considered unimpaired.

16       Now, however, the new Plan language added last night

17  restricts their right to a pension increase if the

18  Commonwealth were to decide to grant them one.  That

19  restriction is clearly adverse and material, yet the members

20  of Class 51-A have had no chance to vote on the Plan as

21  modified.

22       I would note UAW and SEIU are not alone objecting to

23  the language that now appears in section 83.4 and paragraph 62

24  of the proposed Confirmation Order.  In docket 19320, filed

25  over the weekend, AAFAF wrote that the paragraph 62 language

1   "impermissibly restricts the Government's sovereignty."

2         We agree the Board is an oversight board, not a

3   control board, and its powers are limited.  It does not have

4   the power to deprive the Commonwealth of the power to

5   legislate.  This is not a question of preemption of existing

6   legislation.  Paragraph 62 would bar legislation that does not

7   yet exist.  Contrary to the Oversight Board's assertion, the

8   paragraph 62 language is not necessary to protect the

9   Commonwealth's finances.  PROMESA already gives the Oversight

10  Board adequate tools to use if the Commonwealth enacts

11  legislation that the Oversight Board believes would authorize

12  spending in excess of that allowed by the fiscal plan or

13  budget, go to PROMESA sections 108 and 204.  The Oversight

14  Board has not been shy in the past about using those

15  mechanisms, and it has used them successfully.  So section

16  83.4/paragraph 62 restrictions is not needed and is an

17  overreach.

18        Before leaving this topic, let me mention that

19  section 83.4/paragraph 62 language is not about "restoring"

20  defined benefit plans.  That's a misnomer.  For pre 2000 ERS

21  participants, those defined pension benefits exist and will

22  continue to exist. The language restricts any increase in

23  those existing benefits, even modest ones.

24        In the newly revised plan filed last night, the

25  Oversight Board added Act 80 to the list of the statutes it

1   deemed preempted.  UAW and SEIU have not had adequate time to

2   study that issue, since it was only added to the Plan last

3   night, so we will simply reserve all of our rights concerning

4   that issue.

5         The revised Confirmation Order filed last night also

6   addresses certain of UAW and SEIU's other objections,

7   including those concerning treatment of union grievances.  I

8   have not had a chance to review it with my client, and we

9   reserve all rights regarding whether they adequately address

10  our concerns.

11        Finally, SEIU continues to object on feasibility

12  grounds, because the Plan is simply too generous to bondholder

13  creditors, and leaves the Commonwealth with too great a debt

14  burden.  And that concludes my closing remarks, unless the

15  Court has questions.  Thank you.

16        THE COURT:  Thank you, Mr. DeChiara.

17        The next speaker is Mr. Fuentes, for Maruz, who has

18  been alotted ten minutes.

19        MR. FUENTES-HERNANDEZ:  Yes.  Good afternoon, Your

20  Honor.

21        THE COURT:  Good afternoon.

22        MR. FUENTES-HERNANDEZ:  Your Honor, before I

23  commence, brother counsel Charles Cuprill, who represents

24  another takings claim, Asociacion Pastor Mandry Mercado, is

25  having a procedure in the Mayo clinic, in the mainland, and he

1    sent me his written position.  He is scheduled to talk later

2    on.  I don't know if you want me to -- because I'm not going

3    to take the full ten minutes that I have, so I don't know if

4    you want me to commence with his position, or whenever his

5    turn is, then you will call me and I will speak on his behalf?

6              THE COURT:  You can do both at this time.

7              MR. FUENTES-HERNANDEZ:  Very well.

8              THE COURT:  So you can start with his if you like.

9              MR. FUENTES-HERNANDEZ:  Very well.

10             THE COURT:  I am very sorry to hear that he is under

11   medical care, and please extend everyone's good wishes for a

12   good outcome and good recovery to him, please.

13             MR. FUENTES-HERNANDEZ:  I will, Your Honor.

14             So, again, this will be the position of Asociacion

15   Pastor Mandry Mercado that Mr. Charles Cuprill, Esq., sent me

16   the position in writing.  So I'm going to read it, Your Honor,

17   as he sent it to me.

18             Sucesion Pastor Mandry Mercado is not challenging the

19   constitutionality of PROMESA or the Bankruptcy Code.  What

20   Sucesion is challenging is the Plan of Adjustment of the

21   Oversight Board, which ignores Sucesion's claim no. 6272, for

22   $30,496,000, plus interest, as of August 9, 2008, until the

23   full payment and costs arising under the Takings Clause for

24   the inverse condemnation of its properties as decided by the

25   Court of First Instance of Puerto Rico, on succession and

1   affirmed by Puerto Rico's Court of Appeals.

2         By classifying direct condemnation proceedings in

3   Class 54 with an improper treatment, the Plan ignores claims

4   arising from inverse condemnation proceedings in violation of

5   section 1122(a) of the Bankruptcy Code.  It must be

6   underscored that Sucesion's claim has not been objected to by

7   the Oversight Board, and consequently is deemed allowed

8   pursuant to section 502(a) of the Bankruptcy Code.

9         There is no basis for separately reclassifying claims

10  arising from inverse condemnation from those arising from

11  direct condemnation, as both are prepetition claims, and the

12  funds deposited as to the later by the Commonwealth belong to

13  the corresponding claimants under Puerto Rico law, and are not

14  part of the Commonwealth's estate.  Therefore, it is a

15  misconception on the part of the Oversight Board to attempt to

16  create a difference between them based on that prepetition

17  payment.

18        Both types of claims arise from condemnation

19  proceedings by the Commonwealth under the Fifth Amendment

20  Takings Clause, and are subject to full compensation, as

21  finally adjudicated by Puerto Rico's judicial system under

22  full faith and credit principles.

23        In the case of Sucesion, the Commonwealth has

24  recently appealed the judgment of the Court of Appeals of

25  Puerto Rico to the Puerto Rico Supreme Court, warranting that

1   until the decision of the Supreme Court, the amount of

2   Sucesion's allowed claim be reserved under the Plan.

3   　　　　Without differentiating between inverse condemnation

4   proceedings and direct condemnation proceedings, the Supreme

5   Court in *Knick* stated "the Fifth Amendment right to full

6   compensation arises at the time of the taking, regardless of

7   the post-taking remedies that may be available to the property

8   owner."  It is Sucesion's position that all eminent domain

9   claims as finally determined must be equally dealt with and

10  paid in full under the Plan.

11  　　　　To argue that, as in *Blanchette*, a case decided in

12  reference to the Rail Act, Sucesion will have a monetary

13  remedy under the Tucker Act before the Federal Court of Claims

14  is ill founded, as Sucesion chose to litigate its claim before

15  the Courts of the Commonwealth.  What *Knick* holds in reference

16  to claims arising under the Takings Clause is that property

17  owners suffering a violation of their Fifth Amendment rights

18  when the government takes their property without just

19  compensation, as in *Knick*, may bring their claims in Federal

20  Court under 48 U.S.C., Section 1983 at that time, without

21  having to first exhaust state remedies and having a state

22  court deny their claims for just compensation, and, as a

23  result, being barred from their federal claims, recognizing

24  that a state court resolution of a claim for just compensation

25  under state law generally has preclusive effect in any

 1   subsequent federal suit under a full faith and credit statute,

 2   28 U.S.C. § 1738.

 3           That is Sucesion Pastor Mandry Mercado's position,

 4   Your Honor.

 5           THE COURT:   Thank you.

 6           MR. FUENTES-HERNANDEZ:   So now I will move to my

 7   client, which is Maruz Real Estate.

 8           THE COURT:   Thank you.

 9           MR. FUENTES-HERNANDEZ:   Your Honor, we will try to be

10   as short as possible, first of all, because after reading the

11   Order that Your Honor issued at docket 19308, we understand

12   that Your Honor is clear as to the issues that are affecting

13   our client, and obvious -- and also because of the comments

14   that Your Honor made this morning.

15           But the three issues that we wanted to discuss, and I

16   think that those were issues that can be ascertained from the

17   ones that Your Honor listed in the Order at docket 19308, are

18   basically that the claims for inverse condemnation are

19   nondischargeable, that they are improper -- they were not

20   classified properly, and that there is a lack of good faith by

21   the debtor in filing this Plan.

22           As to the nondischargeability, Your Honor, and I'm

23   going to be quick, because I think that Your Honor really

24   knows the issue very well, but section three of PROMESA,

25   basically, which is the supremacy clause, clearly states, and

1    obviously it has to be like that, because it cannot be -- it

2    cannot go against the Constitution, it clearly states that a

3    supremacy -- that PROMESA shall prevail over general and

4    specific provisions of territory law, state law, or

5    regulations that are inconsistent with PROMESA.

6         Obviously it does not trump the Constitution.  It

7    cannot go against what the Constitution dictates.  Therefore,

8    as just compensation for either Takings Clause or reverse

9    condemnation, which the Supreme Court in *Knick* has stated it's

10   one in the same, must be paid in full in this Plan.

11        I also want to make a brief -- you know,

12   differentiate the cases that the Board is reliant upon.

13   First, you know, in the case of *Stockton*, that case, that

14   claimant had already received just compensation in a direct

15   takings claim.  What he did is that then, after taking the

16   money out of the court, whereby, based upon the local law

17   there he relinquished any other claim that he had, in order

18   for him to get more money, then he proceeded to file a second

19   and a separate inverse condemnation complaint.

20        In there, and based upon those specific facts, it's

21   that the Court decided that that second lawsuit, then it could

22   be deemed as an unsecured claim, because it was a claim that

23   was filed after he had already took the just compensation that

24   was paid to him under the direct takings case.  So that's

25   completely different from what we have in here, where we have

1  direct inverse condemnation claims, where not a penny has been

2  paid to the claimants.

3  Now, the other case that they are citing now, or at

4  least trying to for this Court to follow, is *Poinsett Lumber*.

5  And in that case, again, that case, it was a particular claim

6  by a particular claimant that said that there was a flooding

7  that caused damages to his property.  In that case in

8  particular, he was not requesting that the Court deem all

9  inverse condemnation claims to be nondischargeable.  He was

10  requesting his claim to be paid in full, and in there, the

11  Court went into that claim in particular and decided, since it

12  wasn't a taking as such, that it was just a damage claim,

13  because he suffered damages because of a flooding.  So that's

14  completely distinguishable from what we have here.

15  Now, the second issue -- so that's as to the

16  nondischargeability.  We understand that, based upon the

17  Constitution, any claims for takings or inverse condemnation

18  has to be paid in full, and it has to say that in the Plan.

19  Then we go as to the improper classification.  Your

20  Honor raised this issue, issue no. two in the Order, docket

21  19308, as to if the inverse condemnation claims are included

22  in Class 54.  The Board stated this morning that, no, that,

23  actually, they included them as a general unsecured.  So,

24  again, our position is that all -- we are not in the same boat

25  as the general unsecured.

1          The inverse condemnation claims have a constitutional

2  right to be paid in full, and that has to be included in a

3  separate class.  If we are included in the same class, which

4  is Class 54, as to the direct takings claims, then the

5  treatment has to also be changed in order for all claims,

6  either direct takings or inverse condemnations, to be paid in

7  full whenever the local courts issue a judgment that is final

8  and unappealable, stating what the just compensation is.

9          So even if, in the direct takings claims, what

10  they're saying is they can only take what is deposited in

11  court, if there's anything, and the rest will be an unsecured

12  claim, that's also wrong.  It has to be just compensation, as

13  decided by the local courts, has to be paid in full for either

14  the direct takings claims or the inverse condemnation.  So the

15  treatment has to change, and obviously the classification of

16  the inverse condemnation has to be either in the same boat as

17  the takings claim or in a claim on its own, but they all must

18  be paid in full.

19          And then the third issue that we would raise was the

20  lack of good faith, and, again, this, we've got to underscore

21  the fact that when Your Honor made inquiries as to, well, what

22  would happen if a municipality or someone starts, you know,

23  doing a lot of takings, or as to a lot of properties, and then

24  files for bankruptcy in order to not pay them in full, and the

25  Board's attorney basically said, well, you know, they will

1    have the bad faith argument in order to dismiss the

2    bankruptcy, well, Title III, section 301 of PROMESA

3    incorporates 1129(a)(3), which is that the Plan has to be

4    submitted in good faith.

5         So the bad faith argument does not only apply when a

6    bankruptcy is filed.  It applies when the Plan is submitted

7    and filed.  So now they are lacking good faith when they are

8    not only including the inverse condemnation in a separate

9    class as to the takings claims, but including that as a

10   general unsecured claim.

11        So we understand, Your Honor, that in order for them

12   to -- and, furthermore, they have never, even though they have

13   said in other -- with other claimants that they have sat down

14   and tried to negotiate, with us there has been no contact

15   whatsoever in order to reach some type of agreement, not even

16   after Your Honor's, you know, issuance of the Order at docket

17   19308.

18        So we understand that the Plan, as submitted, has

19   been submitted in bad faith, and that in order to cure that,

20   the claims be either, as a taking or inverse condemnation, has

21   to be paid in full as soon as any one of them gets a judgment

22   that is final and unappealable.

23        THE COURT:  Does that conclude your remarks,

24   Mr. Fuentes?

25        MR. FUENTES-HERNANDEZ:  It does, unless Your Honor

1    has any other questions.

2         THE COURT:  No.  You were quite clear.  Thank you,

3    Mr. Fuentes.

4         MR. FUENTES-HERNANDEZ:  Thank you.

5         THE COURT:  The next speaker will be

6    Mr. Carrion-Baralt for PFZ Properties.

7         MR. CARRION-BARALT:  Good afternoon, Your Honor.  Can

8    you hear me?

9         THE COURT:  Good afternoon.  Yes, I can.  Thank you.

10        MR. CARRION-BARALT:  David Carrion-Baralt on behalf

11   of PFZ Properties, Inc.

12        In light of Your Honor's remarks this morning, we

13   will only reiterate and adopt by reference the arguments

14   presented in our prior written briefs.  PFZ understands that

15   the Board's surprising new arguments raised today are facially

16   inapplicable to PFZ's claim.

17        The main evidentiary issue, the feasibility of the

18   Plan if certain eminent domain claims were to be deemed

19   nondischargeable, has been solved by the Board's admission

20   that there is money to pay for them.  So subject to Your

21   Honor's questions, those would be my remarks.

22        THE COURT:  Thank you, Mr. Carrion-Baralt.  I don't

23   have questions for you.

24        So now we will hear from counsel for Amador,

25   Ms. Figueroa y Morgade.

1          MS. FIGUEROA Y MORGADE:  Yes, Your Honor.  Can you

2     hear me?

3          THE COURT:  Yes, I can.  Thank you.  I can hear you,

4     but I can't see you.

5          MS. FIGUEROA Y MORGADE:  Let me check my camera.

6          THE COURT:  I see you now.

7          MS. FIGUEROA Y MORGADE:  Okay.  Great.  Thank you.

8          Good afternoon, Your Honor, and to the staff at the

9     Puerto Rico and New York courtrooms.  This is Attorney Maria

10    Mercedes Figueroa y Morgade on behalf of Demetrio Amador, Inc.

11         Amador's arguments this afternoon reinstate its

12    objection to the confirmation of the Eighth Amended Title III

13    Joint Plan of Adjustment, and from here on, we will refer to

14    that Plan as the current proposed Plan.  This current proposed

15    Plan has a fracture.  It has a legal fracture that ignores the

16    Fifth Amendment of the U.S. Constitution, and the

17    corresponding provision of the Puerto Rico Constitution.

18         In order to promote fixing this fracture, Amador will

19    also address the Court on executing its discretionary powers

20    under section 941 -- 944(c)(1) of the Bankruptcy Code, as

21    applicable to PROMESA.  These Title III proceedings are not a

22    panacea that requires creditors under the Takings Clause, as

23    Amador and others, to conform to the Plan proposed by the

24    Board.  Amador has objected to the Plan because, as a Takings

25    Clause claimant, its claim cannot be impaired, nor discharged

1  under the Plan.

2       Amador prays for this Honorable Court to deny

3  confirmation unless the Board amends the Plan to provide a

4  Takings Clause class that is not impaired, that recognizes

5  that Takings Clause claims are not dischargeable, and proposes

6  to pay the claims in full under the Plan.

7       During these past weeks, the Court has heard

8  references to Supreme Court case law, and Article I, Section 1

9  of the U.S. Constitution providing Congress the ability to

10 enact uniform laws on the subject of bankruptcies, but

11 specifically stating that the Fifth Amendment is not abrogated

12 by the Bankruptcy Clause, and that Congress' bankruptcy power

13 is subject to the Fifth Amendment's prohibition against taking

14 private property without just compensation.

15      Article II, Section 9 of the Constitution has the

16 same provision.  No taking of private property unless just

17 compensation is paid.  Therefore, both Takings Clauses create

18 an obligation for the Title III Commonwealth debtor to pay the

19 full amount of the just compensation determined by Puerto Rico

20 courts in eminent domain and inverse condemnation proceedings.

21 The proposed Plan of Adjustment does not propose Amador or any

22 Takings Clause claimants the payment they are entitled to

23 receive under the Fifth Amendment obligation.

24      The Plan seeks to impair, and discharge Amador's

25 claim by failing to provide payment in full of the just

1    compensation it is entitled to receive under the Takings

2    Clause.  Therefore, this Court must decide whether the

3    Commonwealth may impair and discharge a Takings Clause claim

4    to its Plan of Adjustment.  The answer is no.

5          So Amador moves the Court to uphold the Takings Cause

6    claims and deny Plan confirmation unless the Plan is amended.

7    The statutory vehicle to support this request also comes from

8    section 944(c)(1) of the Bankruptcy Code, as applicable to

9    these Title III proceedings, which allows the Court to enter

10   an Order ruling that Takings Clause claims are

11   nondischargeable and cannot be impaired.

12         We have to go to the *Detroit* case, *Detroit* Chapter 9

13   case, where Judge Rhodes decided to follow section 944(c)(1).

14   In that case, the Court faced the same Takings Clause

15   controversy, the impairment, and dischargeability of the

16   Takings Clause claimants, and an unconstitutionality attack --

17   I'm sorry, an unconstitutionality attack on Chapter 9 for

18   various reasons.

19         The *Detroit* Court executed its discretion under

20   944(c)(1), and was persuaded to do so by the Attorney

21   General's Opinion filed in the *Detroit* case.  The Attorney

22   General suggested the Court use its discretion under section

23   944(c)(1) by including the nondischargeability of the Takings

24   Clause claims in the Order of Confirmation, instead of

25   addressing the unconstitutionality issues under Chapter 9.

1              In this case, arguments on the unconstitutionality,

2      I'm sorry, of the provisions of the Bankruptcy Code applicable

3      to PROMESA, the unconstitutionality of the Plan provisions

4      regarding the Takings Clause claimants have been certified to

5      the Attorney General of the United States; but at the end of

6      the day, in this case, after the Attorney General states its

7      position, it will be this Honorable Court, the one to review

8      the unconstitutionality arguments raised in this case.

9      Therefore, Amador moves this Honorable Court to use its

10     discretionary power under section 944(c)(1), and to follow the

11     Supreme Court of the United States' legal maxim on avoiding

12     constitutional questions.

13             The maxim reads as follows:   If a case can be

14     decided on either of two grounds, one involving a

15     constitutional question, the other a question of statutory

16     construction origin law, the Court will decide only on the

17     latter.  Under this maxim, the Court should decide and use

18     section 944(c)(1).

19             The language of section 944(c)(1) is very clear, and

20     its plain language leads us to the fact that the Court has

21     judicial discretion to enter an Order confirming a Plan that

22     provides for the payment in full of Takings Clause claims, and

23     also provides for the nondischargeability of these Takings

24     Clause claims, and, most importantly, that -- the Plan

25     provides that the payments are made through the Plan.

1          Therefore, in order to protect the constitutional

2     obligations of the Commonwealth, to pay just compensation to

3     Takings Clause claimants under the Fifth Amendment and the

4     Puerto Rico Constitution, this Honorable Court should tilt the

5     scales in favor of Amador, a Takings Clause claimant, and the

6     other Takings Clause claimants, deny the confirmation of the

7     Plan with Class 54 and 58, as stated.

8          Amador does not want to delay the confirmation, so if

9     the Court in the execution of its supervising powers regarding

10    the confirmation requirements decides to confirm the Plan,

11    then Amador prays for the Court to enter an Order that will

12    provide for payment in full of these claims, that these claims

13    are nondischargeable, and cannot be impaired.

14          That is the position of Amador, Your Honor.

15          THE COURT:  Thank you, Ms. Figueroa y Morgade.

16          The next speaker is Mr. Capdevila, for Finca Matilde.

17          MR. CAPDEVILA-DIAZ:  Good morning -- good afternoon.

18    I'm sorry.  Do you hear me well?

19          THE COURT:  Yes, I can.  Thank you.

20          MR. CAPDEVILA-DIAZ:  Okay.  For the record, Eduardo

21    Capdevila on behalf of Finca Matilde, Inc.

22          Your Honor, two weeks ago I averred that the

23    questions before this Court were very straightforward:  Can

24    the government be relieved of its constitutional obligation to

25    pay just compensation under the Takings Clause, and can the

1   Oversight do, through a plan of adjustment, that which the

2   sovereign cannot.

3          Two weeks ago we submitted that the answer was no.

4   Today, after the evidence was tendered and admitted, the

5   answer is the same.  For the last two weeks, and even today,

6   we have heard the Plan proponent argue that the Plan is much

7   needed in view of the local economic situation, devastation

8   caused by Hurricane Maria, political turmoil, and the

9   pandemic; but, Your Honor, the Board just appeals to horror,

10  and moves the Court to confirm a plan arguing that

11  confirmation is the only way to avoid chaos.

12         To that end, last week the Oversight Board argued

13  that they took no joy in making cuts to creditors or to

14  pensions, but that cuts were -- and adjustments had to be

15  made, because -- I believe the word Mr. Bienenstock used was,

16  this is the law of nature.  But we are not in a court of

17  nature.  This is a court of law.  Bankruptcy and insolvency

18  law is not about survival of the fittest, and confirmation

19  proceedings are certainly not supposed to be a power struggle

20  between the sovereign and its creditors.

21         The power struggle ended, and it concluded with the

22  Bill of Rights, with adequate protection, our Constitution of

23  the United States of America.  The Constitution sets the

24  supreme boundaries of the government's powers as sovereign

25  against its people.  Those boundaries were established

1  precisely to protect the people from the consequence of a

2  government with unlimited power, or the so-called law of

3  nature.

4      The Takings Clause provides that property cannot be

5  taken without just compensation. This is a court of law that

6  must rule based on the Constitution, the law, and the

7  evidence. It is black letter law that the Plan proponent

8  bears the burden of proof to establish that the Plan meets the

9  requirements for confirmation.

10      Today, the Board and other Plan supporters have gone

11  over what was submitted, and we will not dwell on that.

12  Rather, we should focus on what the Court did not see. With

13  the respect to the classification of the issue of the

14  inverse -- eminent domain claimants, the Oversight Board

15  alleged that classifying inverse condemnation claims as

16  general unsecured, as opposed as -- as direct eminent domain

17  creditors in Class 54 is reasonable and not arbitrary, because

18  direct condemnation claimants have a lien over the cash

19  deposits in state courts. But according to state law, for

20  creditors in Class 54 to have a security interest over that

21  deposit means that the cash deposited is property of the

22  debtor.

23      Now, did the evidence show that such money deposited

24  in state court belonged to the debtor? The answer is no.

25  Neither documental, nor the testimonial evidence before this

1    Court established that such money belonged to the debtor, nor

2    it was taken into consideration in determining whether the

3    Plan complies with the best interest test.  If it is property

4    of the debtor, it should have been considered.

5         The Board wants the Court to infer that such is the

6    case, but arguments are not proof.  And from our review of the

7    evidence presented and admitted, no proof was submitted to the

8    Court to make such inference.  The money deposited in state

9    court for direct condemnation actions belonged to the

10   condemnee and his creditors.  It does not belong to the

11   creditor.

12        As section 2907 of Title 32 of the Puerto Rico Laws

13   Annotated provides, as soon as the deposit is made, title of

14   the property is conveyed to the condemnor.  Therefore, such

15   deposit is not a security interest of the condemnee, but

16   rather the consideration, or just compensation, be it final or

17   partial, for what the government took.

18        Consequently, all condemnation, be it direct or

19   inverse, constitutes a taking under the Fifth Amendment, and

20   the protections therein granted.  There is no legal basis to

21   include inverse condemnation claims as general unsecured

22   claims, that is, separately from direct condemnation claims,

23   and the evidence before this Court does not support the

24   distinction the Board wants to make.  Moreover, the Board did

25   not submit evidence, nor allege, that the eminent domain

1   creditors entered into an agreement that can be impaired under

2   the Contract Clause of the Constitution.

3           With the Takings Clause of the Constitution -- I'm

4   sorry, with respect to the dischargeability issues, bankruptcy

5   was designed by Congress to provide a fresh start for debtors,

6   but bankruptcy was never meant to be the panacea for financial

7   problems, as Attorney Figueroa y Morgade just said.  Yes, we

8   agree with the Board's remarks regarding the hard work and

9   effort this case has been.  I mean, I think everyone here and

10  listening can agree that just keeping track with the docket

11  number and the entries was a full-time job.

12          And, yes, we agree with what Mr. Zouairabani said

13  earlier today, that no plan can be perfect, but neither

14  terror, nor the need for cuts and adjustments are sufficient

15  to confirm a plan.  The Plan does not need to be perfect.  It

16  needs to be legal.  It needs to be constitutional.

17          It is irrelevant whether the Plan has more supporters

18  than objectors.  The relevant question is whether the Plan

19  complies with PROMESA section 314, and whether the Plan is

20  constitutional.  Your Honor, it is not.  Nothing in the

21  Contract Clause or the Bankruptcy Clause of the Constitution

22  allows the government to take property without paying just

23  compensation.

24          Today we heard Mr. Bienenstock argue on behalf of the

25  Board that the case of *Block v. North Dakota* provides

1    additional support for its contention that takings claims can

2    be impaired or dischargeable, but that case, Your Honor, is

3    completely irrelevant to this controversy.  Such case merely

4    upheld that Congress may impose a statute of limitations upon

5    parties asserting claims against the government.  That has

6    never been an issue in this case.  Neither state law, nor the

7    Fifth Amendment imposes a statute of limitations on the

8    condemnees.

9          Additionally, the subject matter of the *Block* case

10   was the constitutionality of a specific statute.  Here, the

11   issue at hand is whether the Board can do that which the

12   sovereign cannot.

13         So I come back to the place where I started, the two

14   questions that were before the Court.  Can the government be

15   relieved of its constitutional obligation to pay just

16   compensation?  No, Your Honor.  The Fifth Amendment states the

17   exact limitation on the power of the government, and that is

18   to pay just compensation.  Neither Puerto Rico, nor the

19   Federal Government can take property without paying just

20   compensation.

21         It follows that the Oversight Board cannot do through

22   a plan of adjustment that which not even the Federal

23   Government can do, take property without paying just

24   compensation.  Therefore, Your Honor, eminent domain creditors

25   --

1          (Sound played.)

2          MR. CAPDEVILA-DIAZ:   -- whether it's direct or

3    inverse condemnation, cannot be impaired, nor discharged, and

4    they must be paid in full through the Plan of Adjustment.

5    Particularly when earlier today we heard the Board admit that

6    paying all condemnation claims in full on the effective date

7    of the Plan will not break the camel's back.  That is, it does

8    not affect feasibility.

9          In as much there is such sufficient funds, the Plan

10   cannot be confirmed as filed, unless the Court determines

11   under the powers granted by section 944(c) that direct and

12   inverse condemnations are nondischargeable, and must be paid

13   in full as of the effective date of the Plan.  Otherwise, the

14   Plan would be unconstitutional.

15         And to finish, Your Honor, to wrap it up, the

16   Constitution is supreme, and each clause in the Bill of Rights

17   serves a purpose.  The Fifth Amendment is a shelter for people

18   against the power of the sovereign.  To confirm a plan that

19   allows for impairment and discharge of the government's

20   obligation to pay just compensation would do that which the

21   framers of the Constitution and the framers of the Fifth

22   Amendment sought to eradicate.  It would pierce a giant hole

23   in that shelter.

24         Again, Your Honor, this is a Court of law, and the

25   Constitution is supreme.  Thank you.

1              THE COURT:  Thank you, Mr. Capdevila.

2              MR. CAPDEVILA-DIAZ:  And since I have a few seconds

3    left --

4              THE COURT:  Yes.

5              MR. CAPDEVILA-DIAZ:  -- the Court Ordered like

6    corroboration docket entries.  I can pinpoint in the reply

7    where the Board made such arguments, which is --

8              THE COURT:  Yes.  Please go ahead.

9              MR. CAPDEVILA-DIAZ:  Docket 11 -- I'm sorry, 11874,

10   at page 63, and at docket 18874-3, at page 13.

11             THE COURT:  Thank you.

12             The next speaker --

13             MR. CAPDEVILA-DIAZ:  Unless the Court --

14             THE COURT:  I'm sorry.

15             MR. CAPDEVILA-DIAZ:  No.  Unless the Court has any

16   questions, that's it, Finca Matilde's account.

17             THE COURT:  Thank you, Mr. Capdevila.

18             So the next speaker is Mr. Carlo-Altieri, from

19   Vaqueria Tres Monjitas.

20             MR. CARLO-ALTIERI:  Yes, Your Honor.  I'm trying to

21   start my video.  I hope that -- can you hear me?

22             THE COURT:  I can hear you, but I don't see you.  Now

23   I see you as well.  Hello.

24             MR. CARLO-ALTIERI:  Thank you, Your Honor.  It's a

25   pleasure to be before you, and an honor.

1        I'm not going to bore you with constitutional

2   discussions.  They've been very well placed by the prior

3   speakers' counsels, and it's too late in my life to start to

4   learn about the Constitution.  But as Your Honor knows,

5   PROMESA is not just about restructuring the debt.  It's much

6   more complicated.  It's really an avant garde piece of

7   legislation, in that it deals not only with financial affairs,

8   but also with socioeconomic issues that occur when an economy

9   like the Puerto Rico economy fails.

10       And I thank you for the opportunity to address the

11  issues that may address even the survival of my client,

12  Vaqueria Tres Monjitas, VTM, as we normally call it.  This is

13  one of only two milk processing plants serving over three

14  million people in Puerto Rico, with strict price controls, and

15  in private hands, local hands.

16       Vaqueria Tres Monjitas is an essential part of and

17  one of the only surviving agricultural operations and

18  businesses that still exists in Puerto Rico.  As you may be

19  aware, Your Honor, 90 or 95 percent of essential food needs,

20  including milk, are being imported from the -- excluding milk,

21  are being imported from the continental U.S. and other

22  countries, and no country can survive without a viable

23  agriculture.  Puerto Rico is not an exception to this, and

24  PROMESA is a survival statute.

25       Hence, it's clear, the essential nature of this

1    industry to Puerto Rico's survival and Puerto Rico's economy.

2    It's an industry, also, that serves over 300 farmers, farms,

3    local farms, and represents -- and also has a direct and

4    indirect employment of about 10,000 local employees, which is

5    a good number.

6                (Sound played.)

7                MR. CARLO-ALTIERI:  At the same time, I want to say

8    that VTM endorses the Eighth Amended Plan, but we want to make

9    sure that if -- because we are in favor of the Plan, we have

10   struck a deal with the Board, but if a special -- if the Plan

11   is changed, to give the eminent domain 100 percent of the

12   claim, we hope and we request that we be treated the same way.

13               Thank you, Your Honor, and have a good day.

14               THE COURT:  Thank you.

15               The next speaker is Mr. Gonzalez-Valiente for Suiza

16   Dairy.

17               MR. GONZALEZ-VALIENTE:  Good afternoon, Your Honor.

18               THE COURT:  Good afternoon.

19               MR. GONZALEZ-VALIENTE:  Rafael Gonzalez-Valiente for

20   Godreau Gonzalez Law, in representation of Suiza Dairy.

21               First, before we start the time, I would ask the

22   Court to indulge me in as much as the Board has raised new

23   arguments today and cited new cases for the first time.  And

24   we would like to address those prior to going into our closing

25   argument.

1          I probably will not go over my time, but if I do, I

2     will ask the Court to indulge me for maybe a minute extra.

3          THE COURT:  Okay.  So I'll start your time, and we'll

4     see where we end up.

5          MR. GONZALEZ-VALIENTE:  That's perfect, Your Honor.

6     Thank you very much.

7          No statute of limitations applies to Suiza Dairy's

8     regulatory claims, so as to that, these are -- the arguments

9     raised today by the FOMB is beyond irrelevant.  But as I think

10    I understand what the FOMB is attempting is to make an

11    analogy, between an alleged statute of limitations, or a

12    takings claim, and bankruptcy claim, this without any support

13    whatsoever and contrary to the specific holdings of the

14    Supreme Court in *Security Industrial Bank v. U.S.*, 459 U.S.

15    70, 77, that holds that the bankruptcy power -- specifically

16    holds that the bankruptcy power is subject to the Fifth

17    Amendment.

18         So this analogy is simply inapplicable, but this

19    argument was also raised for the first time today in closing

20    arguments, so even if it were correct, which it is not, it was

21    waived by the FOMB and may not be raised at this stage.

22         Secondly, there is no statute of limitations on the

23    Takings Clause, and the FOMB does not point to any law that

24    imposes such an alleged time limitation or statute, statute of

25    limitations.  The Board cites *Block v. North Dakota*, 461 U.S.

1   273, but for the proposition that the Takings Clause is

2   subject to a statute of limitations, but this is incorrect.

3   What the Supreme Court held in that case was that the Quiet

4   Title Act and law, not the Fifth Amendment, specifically was

5   subject to a statute of limitations.

6        It specifically stated, and I quote, "the state

7   probably is correct in stating that Congress could not,

8   without making provision for payment of compensation, pass a

9   law depriving the state of land vested in it by the

10   Constitution."  That, and section 2409a(f), the Quiet Title

11   Act, does not support to strip -- does not support to strip

12   any state, or anyone else, for that matter, of any property

13   rights.  So this holding regarding the statute of limitations

14   is not for the Fifth Amendment at all, but for the Quiet Title

15   Act.

16        *Stone*, another case cited by the FOMB, deals with an

17   unconstitutional tax and reimbursement for that tax, not an

18   eminent domain claim.  The same goes for *Davis*, which deals

19   with a tax refund, and a due process allegation, because the

20   claimant for reimbursement -- the claim for reimbursement was

21   time barred, and, thus, the plaintiff did not get his day in

22   court.  So it was a due process allegation, not a Takings

23   Clause allegation, and there's no fundament in any of those

24   cases to support the FOMB analysis.

25        Now, we have briefed the rest of this matter as

1   thoroughly as we have been able, so I would like to take this

2   opportunity just to give a brief history on the Takings

3   Clause, its origin -- and its origin in order to provide

4   perspective and shed additional light on the subject.

5          THE COURT:  May I ask you -- I'm sorry, sir.

6   Mr. Gonzalez-Valiente --

7          MR. GONZALEZ-VALIENTE:  Yes.

8          THE COURT:  -- may I ask you to address a specific

9   question about Suiza Dairy's claim?  Can you point me to any

10  judicial determination in your underlying litigation in Puerto

11  Rico, either at the District Court level, or at the appellate

12  level, that expressly describes the regulatory accrual

13  mechanism as just compensation for a taking, rather than as an

14  equitable remedy?  Because when we looked at the opinions, we

15  saw references to it as an equitable remedy, and an Order and

16  Judgment providing that the Takings Clause claim was dismissed

17  when the Order and Judgment was entered on November 6, 2013.

18          So it seemed I will say unclear that there was an

19  adjudication of a Fifth Amendment violation, and an imposition

20  of the regulatory accrual mechanism as a just compensation

21  mechanism.

22          MR. GONZALEZ-VALIENTE:  Well, for starters, Your

23  Honor, a regulatory accrual is only -- can only be a remedy

24  for a regulatory taking, Your Honor.  But, and I'm looking for

25  it, because I found it -- I was reading over it last week,

1    Your Honor.  There is a specific holding that there was a

2    regulatory taking in docket 480 of case 04-cv-1840, Your

3    Honor.

4           THE COURT:  We had looked at docket entries 2322 and

5    2347 in that case, 04-1840, if that helps you.

6           MR. GONZALEZ-VALIENTE:  No.  There was -- okay.  In

7    page 91 of docket 480, and I'm reading verbatim, the Court

8    finds, as more fully described infra, violations to the Due

9    Process, Equal Protection and the Takings Clause as a pattern

10   of lack of standards, change in standards with the utter --

11   with unfettered discretion, use of stale figures, lack of an

12   appropriate standard as to a fair rate of return in the

13   regulations set by the regulator -- set by the regulator all

14   pointing to a taking "pursuant" to *Duquesne Light Company*, and

15   *Tenoco Oil*.  This Court finds that said criteria has been

16   reached since the two processing plants are losing market and

17   have suffered for the periods from 2003 to 2007 a Due Process

18   and Equal Protection Violation reaching the levels of a

19   "taking".

20          THE COURT:  So what docket entry number was that

21   again?

22          MR. GONZALEZ-VALIENTE:  That's docket entry 480, and

23   I believe it was Exhibit Three of our Objection to the Plan,

24   Your Honor.

25          THE COURT:  That was before the appeal to the First

1     Circuit; is that correct?

2          MR. GONZALEZ-VALIENTE:  That was upheld in the First

3     Circuit.  This was in the initial Opinion and Order issued by

4     Judge Dominguez.

5          THE COURT:  By Judge Dominguez.

6          MR. GONZALEZ-VALIENTE:  Yes.

7          THE COURT:  So I think I looked at the First Circuit

8     Opinion that affirmed, but seemed to affirm in somewhat

9     different, narrower grounds.  Then the other two docket

10    entries that I cited, 2322 and 2347, are after the remand.

11         So I would just ask you to look at those after these

12    arguments, and by Wednesday, submit a letter if your position

13    is any different as to whether there is a judgment that

14    survived the appeal finding a taking.

15         MR. GONZALEZ-VALIENTE:  Just one second, Your Honor.

16    I was just taking notes.  Sorry, Your Honor.

17         THE COURT:  Thank you.

18         MR. GONZALEZ-VALIENTE:  No.  No problem.  If I may go

19    back to --

20         THE COURT:  Yes.

21         MR. GONZALEZ-VALIENTE:  -- argument, and thank you

22    for the opportunity to brief this after.

23         As we have said, we have briefed this matter as

24    thoroughly as we can, and we would like to point to a history

25    of the takings claim and the Takings Clause --

1          THE COURT:  Yes.

2          MR. GONZALEZ-VALIENTE:  -- as taking property from

3    private citizens for the benefit of the state.  Especially in

4    the case of political opponents, and minorities.  This is a

5    practice that takes to ancient times.

6          To give a few famous examples, in the Roman Republic,

7    Lucius Cornelius Sulla, after being appointed dictator by the

8    Senate, conscribed thousands of political opponents and

9    unpopular nobles in order to take their property and rebuild

10   the Republic's treasury.

11         King Philip of France famously combined with then

12   current Avignon Pope and declared the Templars as heretics.  He

13   then had them all summarily executed in order to cripple their

14   political power, avoid paying the substantial loans he owed

15   them, and acquired whatever remaining assets they had.

16         This practice has continued in modern times.  We only

17   need to look to the pogroms of Czarist Russia, the persecution

18   of minorities in Eastern Europe and Nazi Germany.  All

19   followed by the seizure of property for those persecuted, for

20   the presumed benefits of the majority.

21         And this has happened right here in the United

22   States.  During the War of Independence, the English Crown

23   consistently took both real and personal property from the

24   revolutionary colonists.  More pertinent to analysis, the

25   revolutionary government itself took real property from

1   loyalists, in an estimated amount of 20 million dollars at

2   that time, which, to put in context, was about ten percent of

3   the land value of the colonies at the time.  In fact, there

4   were several states which had laws to instutionalize the

5   confiscation of real and personal property of the loyalists.

6          Your Honor can look to *Horne v. Department of*

7   *Agriculture*, 576 U.S. 341, for a brief history and summary of

8   the Fifth Amendment.

9          Justice Thomas there relates that this principle

10  dates back to the magna carta.  He states it was, and I quote,

11  codified in the Takings Clause in part --

12          (Sound played.)

13          MR. GONZALEZ-VALIENTE:   -- because of the property

14  appropriations by both sides during the revolutionary war.

15          James Madison, among others, proposed the Takings

16  Clause in order to make sure that such abuses did not occur in

17  America ever again.  In truth, the Takings Clause, like the

18  Bill of Rights, is an aspiration.  It must live in the hearts

19  of the people, or they will wither.  The Framers obviously

20  believed in this, and private property is essential to

21  liberty.  We must fight to protect the right to possess it, or

22  it is lost.

23          Madison famously stated, where an excess of power

24  prevails, property of no sort is duly respected.  No man is

25  safe in his opinions, his person, his faculties, or his

1  possessions.  Thus, a government is instituted to protect

2  property of every sort.

3       One of the best expressions of the true value of

4  property, respect, and freedom was offered by the escaped

5  slave Frederick Douglass when he wrote, "to understand the

6  emotion that swelled my heart as I grasped this money,

7  realizing I had no master who could take it from me, that it

8  was mine, that my hands were my own and could earn more of the

9  precious coin, I was not only a freeman, but a free-working

10 man, and no master Hugh stood ready at the end of the week to

11 seize my hard earnings."  From The Life and Times of Frederick

12 Douglass, written by Justice Willett of the Supreme Court of

13 Texas in *Patel v. Texas Department of Licensing*, 469 S.W.3d

14 69.  This is an economic relations case -- regulations case.

15 I'm sorry.

16      His follow-up words are also worth considering.

17 "Frederick Douglass's irrepressible joy at exercising his

18 hard-won freedom captures just how fundamental -- and

19 transformative -- economic liberty is.  Self-ownership, the

20 right to put your mind and body to productive enterprise, is

21 not a mere luxury to be enjoyed at the sufferance of

22 governmental grace, but is indispensable to human dignity and

23 prosperity."

24      Your Honor, I know that the --

25      THE COURT:  You asked for a minute or two to

1    continue.  I will give you up to two more minutes --

2            MR. GONZALEZ-VALIENTE:  Okay.  Thank you.

3            THE COURT:  -- if you wish.

4            MR. GONZALEZ-VALIENTE:  Yes.  Yes, please.

5            We contend that the values of Madison's and the

6    Framers are the source behind Justice Brandies' quote in

7    *Louisville Joint Stock Land Bank v. Radford*, that no matter

8    how great the nation's need, private property shall not be

9    taken.

10           The Board would have those words be disregarded by

11   the Court, because they were allegedly relevant only in the

12   historical context of the Great Depression, but those words

13   were quoted verbatim by Justice Brandeis -- by Justice

14   Rehnquist in *U.S. v. Security Industrial Bank*, which was

15   decided in 1982.  And this is the same case in which Justice

16   Rehnquist reaffirmed the earlier rulings in *Radford*, in such

17   that the bankruptcy power is subject to the Fifth Amendment

18   against taking private property without just compensation.

19   The Framers obviously wanted to make sure that Mr.

20   Bienenstock's example of school district did not occur.

21           Quoting Madison once again, it is not a just

22   government, nor is property secure under it where property

23   which a man has in his personal safety and personal liberty,

24   is violated by an arbitrary seizure of one class of citizens

25   at the -- for the service of the rest.

1      It is important to remember that, as opposed to other

2  classes of creditors, takings claimants did not have a

3  previous consensual relationship with the Commonwealth.  They

4  did not provide credit in the form of goods or services, nor

5  did they loan money to the Commonwealth in the form of bonds.

6      Those that willingly entered into a relationship with

7  the Commonwealth can reasonably expect to be effected in the

8  event of a bankruptcy, but in the case of takings claimants,

9  the Commonwealth in one way or another intruded into and

10  affected claimant's property or property rights without their

11  consent.

12      As Justice Roberts stated in *Knick v. Township of*

13  *Scott*, in the event of a taking, the compensation remedy is

14  required by the Constitution.  No action by the government can

15  relieve it from the duty to provide just compensation.

16      Therefore, we ask that the Court exercise its powers

17  under section 944, and deem Suiza's claim as nondischargeable

18  or, in the alternative, require the Board amend the Plan and

19  the treatment in order to protect --

20      (Sound played.)

21      MR. GONZALEZ-VALIENTE: -- Suiza's claims.

22      Thank you, Your Honor.

23      THE COURT:  Thank you, sir.

24      The next speaker is Mr. Sanchez-Girona, for MAPFRE.

25      MR. SANCHEZ-GIRONA:  Thank you, Your Honor.  Can you

1    hear me?

2           THE COURT:  Yes, I can.  I can't see you yet, but I

3    can hear you.

4           MR. SANCHEZ-GIRONA:  Okay.  Can you see me now?

5           THE COURT:  Yes, I can.  Good afternoon.

6           MR. SANCHEZ-GIRONA:  Good afternoon, Your Honor.  On

7    behalf of MAPFRE, Attorney Jose Sanchez-Girona.

8           In this case, MAPFRE filed two objections to the

9    confirmation of the Plan.  The objection under the PBA Plan

10   was based on the fact that MAPFRE incurred losses of over nine

11   million dollars in a project for the police headquarters in

12   Ponce, Puerto Rico, and their surety bond to complete the

13   project.  And in that project, the Public Buildings Authority

14   is holding $698,471 as retainage.

15          The objection under the Commonwealth Plan is that

16   MAPFRE experienced losses of $5,299,331.89 in payments made in

17   four projects, for four construction projects under surety

18   bonds issued for those projects; and in those projects, the

19   Commonwealth is holding $2,164,561.05 in retainages and unpaid

20   progress payments.

21          As we have alleged in our memorandum of law, and in

22   the claim filed by MAPFRE, pursuant to *Pearlman v. Reliance*,

23   that's an opinion of the Supreme Court in 1962, and *Segovia v.*

24   *Constructora Maza*, when the surety paid those amounts, the

25   surety became entitled to those funds that have been retained

 1   by the Commonwealth and by the PBA.  Those funds are not

 2   property of neither the PBA or the Commonwealth.  Therefore,

 3   pursuant to *Pearlman v. Reliance*, the Commonwealth or PBA are

 4   not entitled to distribute among the creditors property that

 5   doesn't belong to either PBA or the Commonwealth.  That

 6   property, those retained funds belong to MAPFRE.

 7          Pursuant to section 1122(a) of the Bankruptcy Code,

 8   the Oversight Board had the burden to prove that MAPFRE's

 9   claim is substantially similar to other general unsecured

10   claims, because it classified MAPFRE's claims in both cases as

11   an unsecured claim.

12          Your Honor, we respectfully submit that the Oversight

13   Board did not meet that burden.  Therefore, the Plan as

14   presented doesn't comply with section 1122(a) of the

15   Bankruptcy Code.  Therefore, it shouldn't be confirmed.

16          The Oversight Board presented a proposed order

17   whereby in paragraph 86 it states that, notwithstanding

18   anything contained in the Plan to the contrary, to the extent

19   that the claimant of and surety against any of the debtors is

20   determined to be a secured claim, and allowed by final order,

21   such claim shall be paid in full in cash.

22          Your Honor, our contention is that the time for the

23   Oversight Board to comply with the Bankruptcy Code is not post

24   confirmation of the Plan.  The plan for them to -- I mean the

25   time for them to comply with the provisions of the Bankruptcy

1   Code is now, is not six months after the effective date of the

2   Order.

3        So we believe that such proposed language would not

4   change the fact -- would not cure the defects of the Plan as

5   presented.  Therefore, our position is that the Plan either

6   cannot be confirmed as submitted, or that the Court should

7   deem as -- the insurers' claim as allowed and Order their

8   payment in full.

9        THE COURT:  Thank you, Mr. Sanchez-Girona.

10       MR. SANCHEZ-GIRONA:  Thank you.

11       THE COURT:  The next speaker is Mr. Almeida, for the

12   Credit Unions.

13       MR. ALMEIDA:  Good afternoon, Your Honor.  Can you

14   hear me well?

15       THE COURT:  Yes, I can.  Thank you.  Good afternoon.

16       MR. ALMEIDA:  Good afternoon.  Once again, this is

17   Attorney Enrique Almeida on behalf of the Credit Unions.  I'm

18   here to present the Credit Unions' argument and remarks in

19   opposition to the confirmation of the Commonwealth's Plan of

20   Adjustment.

21       During the last two weeks, we have heard arguments

22   and evidence in favor and opposition to confirmation of the

23   proposed Plan.  Although we recognize the tremendous efforts

24   of the Oversight Board, the mediation team, and other parties

25   supporting the Plan in trying to attain the Plan's

1    confirmation in this complex case, we firmly submit this:  As

2    it currently stands, it's unconfirmable.

3          In essence, the Plan cannot be confirmed, because it

4    proposes to discharge and reduce the Credit Unions' Takings

5    Clause claims, which are personal takings, as well as

6    regulatory categorical takings obtained by means of coercion

7    against the Credit Unions.  The particular facts and situation

8    giving rise to the Credit Unions' Takings Clause claims were

9    included in detail in the causes of action of Adversary

10   Proceedings 18-28 and 19-389, pending to be adjudicated by the

11   Court, and also in each of the Credit Union's Proofs of Claim

12   that were filed in the *Commonwealth* case, which were not

13   objected and are considered allowed.

14         The facts, these facts, the facts in the causes of

15   action are summarized as follows.  First, the Commonwealth,

16   together with the GDB and COSSEC, adopted and enforced a

17   regulatory policy to coerce the Credit Unions to hand over

18   their cash in exchange for bonds that they knew were issued in

19   insolvency, and, therefore, had substantially less value.  By

20   doing so, the government effectively took direct and physical

21   possession of the Credit Unions' property without just

22   compensation, and did so through the exercise of regulatory

23   power.

24         The Commonwealth and its regulatory power -- used its

25   regulatory power to coerce the Credits Unions.  And here's the

1   most important part, the part that must be stressed and paid

2   attention to.  We're not talking about a voluntary purchase,

3   sale, or possession of funds, nor a voluntary purchase, or

4   transfer of instrument in exchange of money through a mere

5   persuasion.  As alleged in adversary case 18-28, we're dealing

6   with coercion, forced retaliation, coercive regulatory power,

7   and deceit.  We shall not regularly present in the standard

8   purchase and transaction of bonds.  In this respect, the

9   element of coercion in the situation is crucial.

10      Coercion has been recognized as a key factor when

11  determining that a takings claim occurred and warrants

12  compensation.  And in support, we are citing the case of the

13  Federal Circuit in 2014, it's *A&D Auto v. U.S.*, 748 F.3d 1142.

14      Now, in the instant case, the Commonwealth actions

15  when enforcing the regulations to coerce the Credit Unions

16  into obtaining Puerto Rico debt instruments were a direct

17  assault on the Credit Unions' coffers to finance its operation

18  when it was insolvent or on the verge of insolvency.  That is

19  precisely why these Takings Clause claims warrant just

20  compensation and should not be discharged.

21      Second, COSSEC's use of the premiums paid by the

22  Credit Unions, the Insurance Funds lack of adequate capital,

23  and the Commonwealth's failure to adequately fund COSSEC in

24  contravention of Act 14, also constitute a noncategorical

25  regulatory taking that also warrants just compensation.

1          We submit that the Plan of Adjustment provides an

2     unconstitutional treatment to the Credit Unions' claims in as

3     much as it does not pay them in full, and lists them on the

4     impaired class, where they will not receive full payment of

5     their claims.  Although Congress may authorize the

6     Commonwealth under PROMESA to impair contractual and other

7     claims pursuant to its bankruptcy power, it may not authorize

8     the taking of private property without just compensation in

9     violation of the Fifth Amendment.

10          And in the case of the Credit Unions, the claims are

11     not mere contractual claims, but constitutional claims for a

12     taking of their property by the government without just

13     compensation, which occurred prior to the Commonwealth

14     availing itself to the restructure or bankruptcy remedy under

15     PROMESA.

16          So in light of the above, the Credit Unions

17     respectfully submit the Plan of Adjustment cannot discharge

18     the Credit Unions' claims without due process of law and just

19     compensation pursuant to the Fifth Amendment of the

20     Constitution.  On the other hand, the Credit Unions submit

21     that the Plan should not be confirmed, since it has not been

22     proposed in good faith, as required by section 1129(a)(3)

23     requirement applicable to the instant confirmation process by

24     section 301 of PROMESA.

25          First, in as much as the Plan proposes to impair or

1   reduce the Credit Unions' takings claims, doing so in

2   contravention of the Constitution, which is by definition

3   forbidden by law.  Second, when the Plan seeks a determination

4   of exculpability and discharge and instrumentalities from all

5   claims, particularly claims alleged in Adversary Proceedings

6   18-28 and 19-389, it is doing so without good faith and with

7   the knowledge that it intentionally and willfully incurred in

8   a dishonest behavior to the filing of -- prior to the filing

9   of the petition.  And now it's seeking to be forgiven by the

10  restructuring process in PROMESA.

11         It is a well-settled legal and equitable principle in

12  bankruptcy law that the discharge of debts is only granted to

13  honest debtors.  The Commonwealth and other related parties

14  have not been honest with the Credit Unions.  Quite the

15  contrary.  The Commonwealth and other instrumentalities should

16  not be granted the discharge provided for in the Plan due to

17  their lack of honesty and their fraudulent behavior to the

18  Credit Unions.

19         Finally, we submit that the Plan of Adjustment should

20  not be confirmed as it currently stands, because its

21  provisions would further violate other Constitutional rights

22  of the Credit Unions, particularly those regarding the due

23  process of law and the First Amendment right to petition for

24  redress of grievances.

25         The Credit Unions takings claims in Adversary

1 Proceedings 18-28 and 19-329 have not been reduced to

2 judgment. As stated before, these are fact intensive

3 constitutional claims, not mere collections or breach of

4 contract claims. The claims in such cases are pending to be

5 solved in litigation, and subject to the protections of the

6 Takings Clause, and, thus, should not discharged in the

7 instant bankruptcy proceeding.

8 Therefore, instead of the Commonwealth receiving

9 discharge, exculpation, and releases in the Plan, the Court

10 Order confirming the Plan should except from discharge the

11 Credit Unions' claims in order for them to receive the full

12 display of their due process of law. In light of the

13 foregoing, Your Honor, the Credit Unions' move for denial of

14 confirmation, or, in the alternative, for exception of

15 discharge of their claims pursuant to 11 U.S.C. 944(c)(1).

16 And I thank the Court for giving us the opportunity

17 to address these matters.

18 THE COURT: Thank you, Mr. Almeida.

19 The next speaker is Mr. Fallon, for Quest

20 Diagnostics.

21 MR. FALLON: Good afternoon, Your Honor. Brett

22 Fallon --

23 THE COURT: Good afternoon.

24 MR. FALLON: -- of Faegre, Drinker, Biddle & Reath,

25 for Quest Diagnostics of Puerto Rico.

1           Quest Diagnostics is a named defendant in an

2     avoidance action under the theory that there were certain

3     prepetition, allegedly fraudulent transfers under the

4     Bankruptcy Code, or allegedly unauthorized transfers under

5     Puerto Rico law.  We did file a limited objection at docket

6     no. 18560.

7           Our concern was the Plan and initial proposed

8     Confirmation Order could have been interpreted to eliminate or

9     purport to eliminate two things.  One is certain of Quest's

10    defenses in the adversary proceeding, such as defense of set

11    off, recoupment, and other affirmative defenses.  And, two,

12    the 502(h) and Bankruptcy Rule 3002(c)(3) claim that an

13    avoidance defendant would have if such defendant were to

14    return some or all of such transfers.

15          Now, we are pleased to report to the Court that after

16    discussions there is a paragraph 56(g) added to the

17    Confirmation Order that was filed last night that preserves

18    our defenses in the adversary proceeding, and in the event we

19    have to return funds pursuant to a judgment, or we agree to

20    return funds in any settlement, paragraph 56(g) of the

21    Confirmation Order preserves our right to file and receive

22    payment on any 502(h) claim filed pursuant to Bankruptcy Rule

23    3002(c)(3).  So our objection is resolved with the addition of

24    that paragraph.

25          I want to thank the Oversight Board's counsel in

1    working through and resolving that, and for Your Honor's time

2    today.  And I'm happy to cede any of my additional time to any

3    of the other speakers that didn't have an opportunity to

4    finish.

5              THE COURT:  Thank you, Mr. Fallon.

6              The next scheduled speaker is Mr. Silverman, for U.S.

7    Bank.

8              MR. SILVERMAN:  Thank you.  Good afternoon, Your

9    Honor.  Are you able to see me?

10             THE COURT:  Yes, I am.  Good afternoon.

11             MR. SILVERMAN:  Thank you, Your Honor.  Good

12   afternoon.  For the record, it's Ronald Silverman from Hogan

13   Lovells, counsel to U.S. Bank, both U.S. Bank Trust National

14   Association and U.S. Bank National Assocation.

15             Your Honor, we are listed on the schedule of the

16   Agenda for opposing parties.  I am happy to report that we are

17   no longer opposing parties.  Your Honor will remember that

18   U.S. Bank filed two objections to the Plan.  One was a limited

19   objection in respect of its role as PBA Fiscal Agent and PRIFA

20   Trustee.  Upon receipt of the revised Confirmation Order last

21   night, we see that our concerns have been consensually

22   resolved, and that resolves the limited objections.

23             Your Honor, we also filed as PFC Trustee an objection

24   with respect to the Plan.  Your Honor will recall last

25   Wednesday that Mr. Rosen stated to the Court that an agreement

1    had been reached to resolve our objection, and a term sheet

2    for terms of resolution has been approved by the FOMB Board.

3          Last Wednesday Ms. DiConsa, on behalf of AAFAF, also

4    stated on Wednesday that AAFAF management's approval of the

5    terms of the deal and the term sheet had been approved as

6    well.  And the resolution of the objection comes via a Title

7    VI proceeding to be implemented for PFC, as was mentioned last

8    week.

9          Very briefly, the key economic terms of the Title VI

10   resolution involve, first, that PFC can obtain a discharge of

11   PFC's Bonds via a Title VI order and proper proceeding, and,

12   in addition, the PFC Trustee will receive the following:  12.5

13   million dollars in a cash payment.  It will also receive bonds

14   pursuant to the indenture already approved in the GDB

15   Qualifying Modification, in the approximate amount of 47.69

16   million dollars, to give effect to the PFC Trustee's claims to

17   GDB in amounts that are already referenced in the GDB

18   Qualifying Modification.  And, third, that PFC's claim to the

19   PET, in the approximate amount of 28 million dollars, will be

20   allowed and assigned to PFC via the PFC Title VI.

21          (Sound played.)

22          MR. SILVERMAN:  Your Honor, there are other customary

23   and ancillary terms, but the points that I mentioned are the

24   headlines.  And, Your Honor, in terms of process, as agreed by

25   the parties, in order to effectuate the Title VI for PFC, the

1   PFC Trustee and the supporting holders have proposed in

2   writing a modification for PFC under Title VI pursuant to the

3   agreed term sheet.  And we requested that the FOMB certify the

4   modification pursuant to PROMESA 601, as a qualifying

5   modification for PFC.

6          The purpose of this is that the qualifying

7   modification for PFC may move forward either as initial

8   response to a qualifying modification or as a qualifying

9   modification certified by the FOMB as the administrative

10  supervisor under PROMESA.  And a result of this agreement, the

11  PFC Trustee's objection to the Plan is consensually resolved,

12  Your Honor.

13          THE COURT:  Thank you, Mr. Silverman.

14          I see that Mr. Bienenstock has his hand up.

15          MR. ROSEN:  Your Honor, it's actually Brian Rosen.

16          THE COURT:  Masquerading as Mr. Bienenstock.

17          MR. ROSEN:  Hold on.

18          THE COURT:  I'm not going there.

19          MR. ROSEN:  That was too easy, Your Honor.  I'm

20  sorry.

21          Your Honor, I apologize for breaking in, and I

22  appreciate that Mr. Silverman really wanted to put those terms

23  on the record, but as we heard last week, that it had only

24  been approved by AAFAF management.  It had not gone to the PFC

25  Board.  It had not gone to the AAFAF Board.  And the Oversight

1 Board was very reluctant to disclose any of those terms,

2 because there was no approval, and we were concerned about

3 material and nonpublic information being disclosed.

4 Mr. Silverman has done what he has done, Your Honor.

5 We cannot say whether or not those boards will approve this at

6 this time.  So it is what it is, and we just wanted that out

7 there, Your Honor.

8 THE COURT:  Thank you.

9 So now Mr. Steel for the Underwriters is the last

10 scheduled opposition speaker.

11 MR. STEEL:  Thank you, Your Honor.  Good afternoon.

12 Howard Steel of Goodwin Procter, on behalf of the Underwriter

13 defendants.

14 I'll continue the streak, Your Honor.  We have

15 consensually resolved our objection.  The revised Plan and

16 modified Confirmation Order include the agreed language to

17 preserve the Underwriter defendants' rights, though we're

18 pleased to report we're not pressing a confirmation objection.

19 Offline, during the course of this proceeding,

20 Ms. DiBlasi, counsel for National, has requested a further

21 edit that can form the Plan to the language in the

22 Confirmation Order.  There's a slight inconsistency.  And,

23 just for the record, we don't object to that specific edit.

24 And I believe the Debtors --

25 COURT REPORTER:  I'm sorry, Your Honor.

1          THE COURT:  Yes.  Mr. Steel, you're breaking up, and

2    the court reporter couldn't hear you, so can you backtrack by

3    a couple of sentences, please?

4          MR. STEEL:  Sure.  I was saying that Ms. DiBlazi,

5    counsel for National, requested a further edit to conform the

6    Plan to the Confirmation Order.  And we do not object to that

7    specific edit, and believe that it's amenable to the debtors

8    as well.  And I'll let them address it during their rebuttal.

9          With that, Your Honor, our objection is consensually

10   resolved, and I conclude by thanking the Court and the court

11   staff.

12         THE COURT:  Thank you, Mr. Steel.

13         It is now almost 25 past 5:00 Atlantic Standard Time,

14   4:25 New York time, and so it is clear that we will not be

15   able to finish all of the arguments today.  So what we will do

16   is resume with the rebuttal by the Oversight Board tomorrow

17   morning, and then go on to the -- to address the two Title VI

18   proceedings.

19         Mr. Rosen?  You have your hand up.

20         MR. ROSEN:  Yes, Your Honor.  I do, Your Honor, and I

21   apologize again for interrupting.

22         As Your Honor knows, we've arranged for Ms. Pullo to

23   be available.  Ms. Pullo, as the solicitation agent in

24   connection with both the CCDA and the PRIFA Title VI

25   proceedings, she is here in our offices today and available

1    for any questioning that the Court has.  As the Court knows,

2    because I assume that you and your staff have looked at the

3    declarations, both of those solicitations were overwhelmingly

4    approved, 100 percent in the CCDA, and I believe in the high

5    80s or 90s percent with respect to the PRIFA solicitation

6    process.

7        No objections have been interposed at all with

8    respect to those, although there was a reservation of rights.

9    I say this, Your Honor, because Ms. Pullo does have conflicts

10   tomorrow, and may not be available, and certainly on-site not

11   available.  We might be able to do her remotely if that works

12   out, Your Honor.  I don't know what her schedule is.

13       So I just ask the Court's indulgence, and ask you

14   what you would like to do with Ms. Pullo's availability for

15   the two Title VI proceedings.

16       THE COURT:  Well, I do not have questions for

17   Ms. Pullo.  Let me ask now if anyone who is in attendance now,

18   who has an interest in the CCDA or PRIFA Title VI proceedings,

19   who has not given notice of an intention to cross-examine,

20   nonetheless wants to express it at this time, a desire to

21   cross-examine Ms. Pullo, raise your hand.  I'm going to wait

22   30 seconds to see if any hand gets raised.

23       Mr. Samodovitz has raised his hand.  Mr. Samodovitz?

24       MR. SAMODOVITZ:  Yes.  As mentioned, Peter Hein had

25   to leave for another commitment.  I don't know if he has an

1   interest in cross-examining Ms. Pullo, but can you reserve a

2   few minutes for him in case he does?

3          MR. ROSEN:  Your Honor, Mr. Hein is not a creditor of

4   PRIFA.  He owns GO and PBA Bonds only.

5          THE COURT:  That is my understanding as well.  He has

6   not made any filings in connection with PRIFA, and so I deny

7   the request to reserve time for Mr. Hein to cross-examine in

8   connection with the PRIFA Title VI.

9          MR. ROSEN:  Your Honor.

10         THE COURT:  Yes, Mr. -- I'm sorry.  Which one of you

11  is speaking?  I think that was Mr. Rosen.

12         MR. ROSEN:  Yes, Your Honor.  I was just going to say

13  with that as a base, Your Honor, we can either wait until

14  tomorrow to formally offer into evidence the declarations in

15  each of those Title VI proceedings, or we can do it today,

16  whatever the Court prefers.

17         THE COURT:  Let's wait until tomorrow, and do it in

18  order, because I'm going to have a separate section of the

19  transcript begun for the Title VI proceedings.  I can't

20  imagine, based on what we have just done, that there will be a

21  need for Ms. Pullo, but it would be helpful if you had a phone

22  number for her just in case something came up.

23         MR. ROSEN:  We will do so, Your Honor.  Thank you

24  very much.

25         THE COURT:  Thank you.

1          MR. ROSEN:  Thank you.

2          THE COURT:  So we are adjourned to 9:30 tomorrow

3   morning Atlantic Standard Time, 8:30 AM Eastern Standard Time.

4          There's another hand raised.  Okay.  Mr. Capdevila,

5   from Finca Matilde.

6          MR. CAPDEVILA-DIAZ:  Your Honor, since the closing,

7   the rebuttal of the Board is due tomorrow, not today, I have a

8   hearing tomorrow morning, and I would like Finca Matilde to be

9   represented.  But there is another attorney from the same law

10  firm, so I know the scheduling says it is to be me, but I'm

11  telling the Court -- asking if it would be okay for my boss to

12  be present, Isabel Fullana, counsel of record, and she has

13  cosigned all the objections with myself.

14         THE COURT:  Yes.  That is fine.  Would you tell me

15  her name again?

16         MR. CAPDEVILA-DIAZ:  Isabel Fullana, F-u-l-l-a-n.

17         THE COURT:  Fullan.

18         MR. CAPDEVILA-DIAZ:  No, F-u-l-l-a-n-a.

19         THE COURT:  Ah, okay.  Thank you.  Fullana.  Thank

20  you.  That is fine.  So she will come in on your link, is that

21  what you're expecting?

22         MR. CAPDEVILA-DIAZ:  Yes.  Yes, Your Honor.

23         THE COURT:  All right.  So we will know to look for

24  that.  Thank you.

25         MR. CAPDEVILA-DIAZ:  Thank you.

1          THE COURT:  Thank you.

2          So with that, we are adjourned to tomorrow morning.

3   Keep well, everyone.  I look forward to seeing you tomorrow

4   morning.

5          (At 5:24 PM, proceedings concluded.)

6                     *     *     *

1  U.S. DISTRICT COURT    )

2  DISTRICT OF PUERTO RICO)

3

4      I certify that this transcript consisting of 232 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Laura Taylor Swain, and the

8  Honorable United States Magistrate Judge Judith Gail Dein on

9  November 22, 2021.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25