```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF PUERTO RICO

 3
     In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,              )      (Jointly Administered)
                               )
 7   as representative of       )
                               )
 8   The Commonwealth of       )
     Puerto Rico, et al.       )      November 23, 2021
 9                             )
              Debtors,         )
10
     _____
11

12   In Re:                    )      Docket No. 3:17-BK-3566(LTS)
                               )
13                             )      PROMESA Title III
     The Financial Oversight and )
14   Management Board for       )
     Puerto Rico,              )      (Jointly Administered)
15                             )
     as representative of       )
16                             )
     The Employees Retirement   )
17   System of the Government   )
     of the Commonwealth of     )
18   Puerto Rico,              )
                               )
19            Debtors,         )

20   _____

21

22

23

24

25
```

```
 1    _____

 2

 3    In Re:                     )        Docket No. 3:19-BK-5523(LTS)
                                 )
 4                               )        PROMESA Title III
      The Financial Oversight and )
 5    Management Board for        )
      Puerto Rico,                )        (Jointly Administered)
 6                                )
      as representative of         )
 7                                )
      The Puerto Rico Public       )
 8    Buildings Authority,         )
                                   )
 9                Debtors,        )

10    _____

11                  CONFIRMATION HEARING - DAY EIGHT

12     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

13                  UNITED STATES DISTRICT COURT JUDGE

14     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

15                  UNITED STATES DISTRICT COURT JUDGE

16    _____

17    APPEARANCES:

18    ALL PARTIES APPEARING BY VIDEOCONFERENCE AND TELEPHONICALLY

19    For The Commonwealth
      of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
20                             Mr. Brian S. Rosen, PHV
                               Mr. Michael T. Mervis, PHV
21
      For National Public
22    Finance Guarantee
      Corporation:             Mr. Robert S. Berezin, PHV
23
      For PFZ Properties,
24    Inc.:                    Mr. David Carrion-Baralt, Esq.

25    Proceedings recorded by stenography.  Transcript produced by
      CAT.
```

```
 1                            I N D E X

 2   WITNESSES:                                          PAGE

 3        None offered.

 4

 5

 6   EXHIBITS:                                           PAGE

 7        None offered.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              San Juan, Puerto Rico

2              November 23, 2021

3              At or about 9:33 AM

4                    *     *     *

5          THE COURT:  Good morning.  Would the video

6  participants please turn your cameras on for these

7  introductory remarks and instructions?

8          Ms. Tacoronte, would you call the case?

9          COURTROOM DEPUTY:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          COURTROOM DEPUTY:  The United States District Court

12  for the District of Puerto Rico is now in session.  The

13  Honorable Laura Taylor Swain presiding.  Also present,

14  Honorable Magistrate Judge Judith Gail Dein.  God save the

15  United States of America and this Honorable Court.

16          *In re:  The Financial Oversight & Management Board*

17  *for Puerto Rico, as representative of the Commonwealth of*

18  *Puerto Rico, et al.,* Bankruptcy Case No. 2017-BK-3283, PROMESA

19  Title III, 2017-BK-3566, and 2019-BK-5523, for further

20  confirmation hearing.

21          THE COURT:  Again, good morning, and welcome back,

22  counsel, parties in interest, and members of the public and

23  press who are observing today's proceeding by Zoom video

24  connection, or are listening by telephone.  Today we will hear

25  the conclusion of the parties' closing arguments in connection

1    with the motion of the Oversight Board, as representative of

2    the Title III debtors, for confirmation of the Modified Eighth

3    Amended Plan of Adjustment for the Commonwealth of Puerto

4    Rico, the Public Buildings Authority, and the Employees

5    Retirement System.

6         After those arguments, we will proceed to a hearing

7    on the application pursuant to Title VI of PROMESA for

8    approval of the proposed Qualifying Modification of bonds

9    issued by CCDA, and then to the hearing on the application

10   pursuant to Title VI of PROMESA for approval of the proposed

11   Qualifying Modification of bonds issued by PRIFA.  Actually, I

12   understand that the parties intend to present the two

13   applications in tandem, and so we will see how that goes when

14   we get to that portion of the Agenda.

15        To ensure the orderly operation of today's virtual

16   hearing once we turn to our Agenda items, all parties

17   appearing by Zoom must mute their microphones when they are

18   not speaking, and turn off their video cameras if they are not

19   directly involved in the presentation or argument.  When you

20   need to speak, turn your camera on and unmute your microphone

21   on the Zoom screen.

22        I again remind everyone that, consistent with court

23   and judicial conference policies, and the Orders that have

24   been issued, no recording or retransmission of the hearing is

25   permitted by anyone, including but not limited to the parties,

1   members of the public, and the press.  Violations of this rule

2   may be punished with sanctions.

3          The joint informative motion setting out the sequence

4   of speakers for the closing arguments concerning the proposed

5   Plan of Adjustment was filed as docket entry no. 19309 in case

6   no. 17-3283, and is available to the public at no cost on

7   Prime Clerk for those interested.  As usual, I encourage each

8   speaker to keep track of his or her own time.  The Court will

9   also keep track of the time, and will alert each speaker when

10  there are two minutes remaining with one buzz, and when time

11  is up, with two buzzes.  And here is the example of the buzz

12  sound.

13         (Sound played.)

14         THE COURT:  If your allocation is two minutes or

15  less, you'll just hear the final buzzes.

16         I'll be calling on each participant during the

17  proceedings.  If you wish to be heard when I haven't called on

18  you, use the "raise hand" feature of Zoom, which is located in

19  the reactions icon at the tool bar at the bottom of the Zoom

20  screen.  Please don't interrupt each other or me, so that we

21  can create an accurate transcript, and I apologize in advance,

22  because I may interrupt you if I have a question or you go

23  beyond your allotted time.  If anyone has difficulty hearing

24  me or another participant, please use the "raise hand" feature

25  immediately.

1          This morning we are scheduled to go until 12:50

2   Atlantic Standard Time, which is 11:50 Eastern Time.  If we

3   need a morning break, it will happen about 11:15 Atlantic

4   Standard, 10:15 Eastern Standard.

5          You may turn your cameras off now, and we will

6   proceed to the rebuttal argument of the Oversight Board,

7   unless there are any questions or comments before that.  If

8   you have a question or comment, raise your hand.

9          I don't see any hands raised, and so I will call on

10  Mr. Rosen.

11          Good morning, Mr. Rosen.

12          MR. ROSEN:  Good morning, Your Honor.  Brian Rosen,

13  Proskauer Rose, on behalf of the Oversight Board.

14          Your Honor, like the closing arguments yesterday,

15  we're going to do this in three particular pieces.  I will

16  just speak for a few moments, then Mr. Mervis will address a

17  point, and then Mr. Bienenstock will finish up, Your Honor.

18          THE COURT:  Yes.

19          MR. ROSEN:  Your Honor, I am here just to address

20  three minor points that were raised yesterday, the first being

21  the release and exculpation.  And, Your Honor, if we could

22  share the screen at this moment, and not do it as a co-host,

23  because I think we can avoid the issue --

24          THE COURT:  You can share now.  It's enabled.  Thank

25  you.

1        MR. ROSEN:  Thank you, Your Honor.  Thank you.

2        So, Your Honor, this is a slide that we didn't get to

3   yesterday, and I just wanted to briefly go through it, only

4   because it was raised by Mr. Hein again in his comments.  Your

5   Honor, as you can see here, the releases were an integral part

6   of the negotiation process that was put together by the Court

7   and by the mediation team.  And they were needed to

8   incentivize the PSA creditors to give releases to the debtors

9   and to support the Plan.  And they are customary, and they are

10  expected in any of these major, complex restructuring matters.

11       The releases that are being given pursuant to the

12  Plan, Your Honor, despite what has been asserted, are fully

13  consensual.  Those that are being given pursuant to the plan

14  support agreements, they are the give and take of the

15  mediation process, and they are consensual.

16       As we said previously, Your Honor, any nonconsensual,

17  third-party releases that might have been thought to be in the

18  Plan, were certainly not intended to be in the Plan.  And I

19  understand that perhaps Mr. Hein might see a ghost out there

20  still, but we have done everything we possibly could do to

21  remove that ghost.  And we have inserted multiple times within

22  the Plan, and within the Confirmation Order, provisions that

23  expressly say that there are no third-party releases to be

24  given.

25       And, likewise, Your Honor --

1          THE COURT:  Mr. Rosen.

2          MR. ROSEN:  Yes.

3          THE COURT:  As I hear Mr. Hein, he seems to be saying

4    that the exculpation provisions that say there is no liability

5    for this or that would effectively constitute nonconsensual

6    releases, at least as to him, as to things that he might want

7    to litigate.  You are just getting to exculpation now, so I

8    will be quiet and anticipate the response.

9          MR. ROSEN:  Thank you very much, Your Honor.  I

10   appreciate that.

11         Yes, the exculpation provisions, Your Honor, are

12   something that are, likewise, customary in the context of a

13   major restructuring.  They are intended to deal only within

14   the chapter -- excuse me, the Title III process, and the

15   formulation, the negotiation, the documentation, the

16   confirmation, and the consummation of the Title III Plan of

17   Adjustment.  They do not address anything else.

18         To the extent that Mr. Hein is arguing that, because

19   he was not included in the negotiation process, and,

20   therefore, he was not bound by it, and, therefore, he can sue

21   anybody who negotiated that, Your Honor, we believe that is

22   inappropriate, and that should be the proper subject of an

23   exculpation provision.

24         And, Your Honor, as we noted on the following slide,

25   which is item 7 -- on page 72, this really is -- his objection

 1 | or his theory is a collateral attack on the Plan, and it's a
 2 | collateral attack on the mediation process itself.  And we
 3 | believe, Your Honor, that that is inappropriate, and we
 4 | believe that all of the parties who were involved in the
 5 | negotiation of the plan support agreements, and all the
 6 | parties that provided other services in connection with the
 7 | Title III process, like the Retiree Committee, like the
 8 | Creditors' Committee, and even including the DRA parties, Your
 9 | Honor, they should be entitled to the benefits of the
10 | exculpation provisions.  So we disagree with his theory
11 | overall, Your Honor.
12 |         THE COURT:  Thank you for clarifying that.
13 |         MR. ROSEN:  Your Honor, if I could, then, the other
14 | items that I would like to refer to is, one, I believe it was
15 | Mr. Sanchez on behalf of MAPFRE, which was the surety,
16 | unfortunately, Your Honor, his recitation of his position is
17 | inconsistent with the proof of claims that he has filed on
18 | behalf of his clients, the related documentation, and the
19 | state of the overall exposure.
20 |         So Mr. Sanchez takes the position then, so instead of
21 | allowing the claims reconciliation process to proceed, he
22 | wishes to leapfrog everybody.  He wishes to change the
23 | provisions of the Plan, which have been inserted since day
24 | one, since September of 2019, which provided for the 180-day
25 | period in which the claims reconciliation process could

1   unfold, and objections to claims could be filed.  And he is

2   sort of demanding this Court to require the Oversight Board to

3   immediately respond and object to his proofs of claim.

4        Your Honor, we sought to address this very issue two

5   weeks ago when he raised his arguments about retainage,

6   ownership, First Circuit law, et cetera.  And we inserted a

7   provision in the Confirmation Order that expressly said, to

8   the extent that a surety is entitled or has a secured claim to

9   something like a retainage, that amount of money that they

10  claim, and if it's determined by the Court to be theirs, shall

11  be turned over immediately to them, paid in cash.  To the

12  extent otherwise, it would be treated as an unsecured claim.

13       That provision has been in there.  It seems that

14  Mr. Sanchez does not like the fact that there's going to be

15  the claims reconciliation process, but, Your Honor, we believe

16  his objection should be overruled.

17       The last --

18       THE COURT:  I do have a follow-up question about

19  that.

20       MR. ROSEN:  Yes.

21       THE COURT:  So I see at least one of his proofs of --

22  his proof of claim, which is 173926 on the Prime Clerk system,

23  is marked as a secured claim, as I understand it, hasn't been

24  objected to yet, but it is classified as an unsecured claim.

25  Shouldn't there be a classification for it as a secured claim

1    in the Plan, subject to whatever objection may be raised?

2          MR. ROSEN:  Your Honor, we were unaware of this at

3    the time that the Plan was developed and was solicited.  So

4    rather than trying to create a new class at PBA, which I

5    believe is where that one particularly is --

6          THE COURT:  Yes.

7          MR. ROSEN:  -- we chose to try and address that, Your

8    Honor, through a simple means through the Confirmation Order,

9    and merely saying that to the extent it is their's, it will be

10   turned over to them.  We did not feel it would be helpful to

11   add more classes.  I thought 69 or so was already enough, and

12   I didn't want to get into revising that, and even requiring

13   resolicitation, Your Honor.  As I said, we found out about

14   this only subsequent to the solicitation process.

15         THE COURT:  Do you know which paragraph it is in the

16   proposed order?

17         MR. ROSEN:  I want to say 86, Your Honor, but allow

18   me to pick it up.

19         THE COURT:  You've moved away from your microphone.

20         MR. ROSEN:  I'm so sorry.  I went to collect the

21   Confirmation Order.  I think it is 86, I will tell you this

22   moment.  Yes, it is paragraph 86, Your Honor, and it states,

23   "Asserted surety claims.  Notwithstanding anything contained

24   in the Plan to the contrary, to the extent that the claim of a

25   surety against any of the debtors is determined to be a

1    secured claim and allowed, in whole or in part, by final

2    order, such claim shall be paid in full, in cash; provided,

3    however, that in the event some or all of any such claim is

4    determined to be an unsecured claim, and allowed in whole or

5    in part, by final order, such claim shall be treated in

6    accordance with the provisions of Section 17.1, 62.1, or 70.1

7    of the Plan, as the case may be."

8            And those are the provisions, Your Honor, dealing

9    with the payment of unsecured claims.

10           THE COURT:  Thank you.

11           MR. ROSEN:  Your Honor, the last point I wanted to

12   make is addressing the Credit Unions, and Mr. Almeida's

13   ongoing comments about his adversary proceedings.  Your Honor,

14   just for the record, those two adversary proceedings are the

15   subject of fully briefed and submitted motions to dismiss by

16   the parties.  I believe one was in 2020, and the other was in

17   2021.  In one of them, Your Honor, Mr. Almeida does not even

18   assert that there is a takings claim, although he constantly

19   says in his comments to the Court that there is one there.

20           Notwithstanding that, Your Honor, this is very

21   similar to the cooperativas arguments that were made in

22   connection with the COFINA Plan of Adjustment.  And if the

23   Court will recall, at that time, the Court overruled those

24   objections, and did provide that there would be a release for

25   the debtors in connection with those adversary proceedings.

1    Your Honor, we believe that nothing more needs to be

2    done here than the very same, which is to overrule the

3    objection, and to take care of those proceedings, Your Honor,

4    in the adversary proceedings themselves.

5    So on that basis, Your Honor, and I believe also for

6    what the Court stated yesterday, or it might have been even in

7    the Order, I apologize, in connection with the diminution in

8    value with respect to a bond, your views with respect to

9    whether or not a taking's occurred, we believe that

10   Mr. Almeida's objection should be overruled.

11   THE COURT:  Thank you, Mr. Rosen.

12   MR. ROSEN:  Thank you, Your Honor.  I'll now turn the

13   podium over to Mr. Mervis.

14   THE COURT:  Thank you.

15   MR. MERVIS:  Good morning, Your Honor.

16   THE COURT:  Good morning, Mr. Mervis.

17   MR. MERVIS:  Michael Mervis, Proskauer Rose, for the

18   Oversight Board.

19   I'm going to make five points hopefully very quickly

20   in response to Mr. Hein.

21   THE COURT:  I will provide a bit of additional time,

22   because I engaged Mr. Rosen with some specific questions of my

23   own.  So move a pace, but don't panic.

24   MR. MERVIS:  Thank you, Your Honor.  I will not

25   panic.

1          THE COURT:  Oh, good.

2          MR. MERVIS:  I hadn't planned to, but I still won't.

3          So, Your Honor, five points in response to Mr. Hein's

4    comments yesterday regarding the best interest test.  So

5    first, he did repeat his argument about the words "available

6    remedies" in section 314(b)(6) somehow being a signal that the

7    test for the best interest test under PROMESA is a

8    creditor-by-creditor test.  And I will just say two things

9    about that.  One, I'll refer the Court again -- I'm not going

10   to put it up on the screen -- to PowerPoint slide 112.  That

11   was the PowerPoint that showed the text of the Chapter 11 best

12   interest test, and the text of the PROMESA test.  And I think

13   the stark differences between the two easily lead to the

14   conclusion that it is, in fact, a collective test.

15          I also want to thank my friend, Mr. Friedman, for

16   reminding me at least that the Court did address this issue in

17   the *COFINA* case, and specifically at docket 5053 in the *COFINA*

18   case, paragraph 147.

19          Second point, Your Honor, Mr. Hein complained about

20   what he described as wasteful tax incentives, and poor tax

21   enforcement on the island.  And in the Fiscal Plan, Your

22   Honor, which is Debtors' 10 -- and I couldn't provide you with

23   page cites, because there are so many -- the Oversight Board

24   discusses these issues at length, and proposes measures to

25   deal with them.

1          So there's not a disagreement in that respect, but

2    here is where Mr. Hein's argument fails.  Mr. Hein fails to

3    recognize that if this is -- if these systems are going to be

4    reformed under the best interest test, it would have to be

5    outside of Title III.  And to borrow the phrase that I quoted

6    from yesterday from the Collier's transcript, in a world of

7    chaos, there is no reason to think that tax enforcement or tax

8    concessions are going to improve on the island.

9          Third point, Your Honor, Mr. Hein, in discussing

10   Mr. Shah's testimony, I think he used the word that Mr. Shah's

11   analysis fell apart when Mr. Hein pointed out in

12   cross-examination that Mr. Shah relied on a number of legal

13   assumptions.  A few things on that.

14         First, what Mr. Hein did not dispute is that given

15   all the different litigation claims involved, legal

16   assumptions had to be used in order to conduct this test.  He

17   didn't dispute that.  He also didn't dispute that in almost

18   every case, Mr. Shah used alternate assumptions, and showed

19   that, in the main, they made no difference.

20         Thirdly, again, the only real assumption that

21   Mr. Hein criticized was the assumption that GO debt should be

22   paid before operating expenses, and we've dealt with that

23   separately.  I'm not going to reargue it, but I would submit

24   to Your Honor that using legal assumptions is only bad if the

25   assumption are bad.  And Mr. Hein challenged none of them,

1    other than the one I just mentioned.

2         My fourth point, Mr. Hein suggested that there was a

3    problem with the use of projections to project future revenues

4    in Mr. Shah's model, and as Your Honor knows from years on the

5    bench presiding over bankruptcy cases and commercial cases,

6    forward looking projections are used all the time to project

7    future cash flows, or in this case, future revenues.  The

8    issue isn't the use of projections.  The issue is whether the

9    projections are reliable, and on that score, there was no real

10   challenge to the projections.  That's number one.

11        Number two, Mr. Hein did -- he did mention that in

12   the fiscal year that ended on June 30th of '21, there was an

13   unexpected multi-billion dollar surplus.  That's one year,

14   Your Honor.  To suggest from one year's experience during

15   COVID, where one could imagine that all sorts of spending

16   programs were deferred, because people were in their homes,

17   that that somehow renders the rest of the projections

18   unreliable is, Your Honor, not a tenable argument.

19        My fifth and final point, Mr. Hein again complained

20   about what he described as wasteful spending on things like

21   the arts and advertising.  As I pointed out yesterday, if

22   you're going to complain about wasteful spending, you need to

23   account for the effect of cutting spending on revenues, and

24   that's in the context of things like the fiscal multiplier,

25   and the threat of outmigration.  And Mr. Hein had no answer to

1    that.  He had no response to that.

2         Puerto Rico is not a static financial statement.  It

3    is a vibrant island, where American citizens live, work, and

4    raise their families.  And if you're going to complain about

5    expenses and cutting expenses, you better well account for how

6    that will affect on-island revenues, and Mr. Hein did not do

7    that.

8         Your Honor, unless you have any questions, I'll turn

9    the podium over to Mr. Bienenstock.

10        THE COURT:  Thank you, Mr. Mervis.

11        MR. BIENENSTOCK:  Good morning, Judge Swain.  Martin

12   Bienenstock of Proskauer Rose for the Oversight Board, as the

13   Title III representative of the debtors.

14        Your Honor, I'll start with AAFAF's comments about

15   Acts 80 to 82.  Mr. Friedman announced AAFAF's objection to

16   the Board's requested ruling that Acts 80 to 82, if preempted,

17   is procedural.  We agree on that.  In the Board's view, it's a

18   procedurally unacceptable delaying tactic.  It's unacceptable,

19   because the Board cannot take the risk that Acts 80 to 82 may

20   be implemented.  It impacts feasibility.

21        AAFAF contends the Oversight Board lacks power to

22   declare statutes preempted.  We agree.  In PROMESA section 4,

23   Congress already preempted all territorial laws inconsistent

24   with PROMESA, but when there's a dispute, only the Court can

25   resolve it.

1     AAFAF contends Acts 80 to 82 contain provisions not

2 preempted in an attempt to draw this into a lengthy process.

3 Nothing prevents the Court from ruling everything in Acts 80

4 to 82, changing pensions based in whole or in part on

5 pre-effective date services, and everything creating debt to

6 employees or retirees, which debt is not approved by the

7 Oversight Board, is preempted.

8     Notably, prior to PROMESA, the Commonwealth had

9 already eliminated further accruals under defined benefit

10 plans, except for the teachers.  As the teachers'

11 representatives have explained, the Commonwealth tried to

12 eliminate their defined benefit plans, too, but the Puerto

13 Rico Supreme Court ruled it was an unconstitutional impairment

14 of contractual obligations.  Thus, until now, it was

15 unanimously agreed that defined benefit plans had to be

16 eliminated to make the Commonwealth sustainable.  The

17 government's current efforts to undo measures it knows are

18 needed, while simultaneously seizing from the Oversight Board

19 the power to determine treatment of pension claims largely

20 based on pre-effective date services, turns PROMESA inside

21 out, and is diametrically opposite the Board's statutory

22 mission to restore fiscal responsibility.

23     I'm going to move on now to the AMPR confirmation

24 objections, which are in document 18585.  The teachers' TRS

25 pension decision issued in 2014 by the Puerto Rico Supreme

1   Court is based on impairment of contracts, which is

2   inapplicable in a Federal restructuring, and I think that's

3   now uncontroversial here.

4        The AMPR's first confirmation objection is that their

5   statutory entitlement to defined pension benefits cannot be

6   rejected in Title III.  This Court's DRA decision dated

7   October 29, 2021, at document no. 18892 provides at page 19,

8   "although the DRA's claims are based on statutory provisions

9   rather than on a contract, the DRA parties have presented no

10  basis for differentiating obligations arising out of statutes

11  from obligations arising out of nonexecutory contracts."

12       Next, the teachers claim their defined benefit rights

13  are not subject to preemption.  While wrong, that is academic,

14  given that they can be rejected.

15       Next, the teachers argue the Plan does not provide

16  for their rejection damages claim.  As I showed yesterday,

17  their Class 51-I expressly defines its claims as including

18  "any right to accrue additional retiree benefits in TRS from

19  and after the effective date."

20       Yesterday AMPR claimed its rejection damage claim

21  exists, because the teachers do have promised employment under

22  another law.  Although we believe the teachers can be

23  terminated whenever there is insufficient cash, and there can

24  be no dispute here that with all creditors losing nearly five

25  years of post petition interest, and billions of dollars of

1   principal, there is insufficient cash, for argument's sake,

2   let's assume they have a rejection damage claim.

3         Although AMPR again yesterday contended they are

4   getting nothing for the claim, as I showed yesterday, the

5   treatment of Class 51-I provides payment of defined benefits

6   accrued through the effective date of the Plan, return of

7   defined contributions, and matching Social Security payments.

8   That is the treatment of the active teachers' class, and it is

9   clearly not nothing.

10        I also showed yesterday that no junior class receives

11  anything.  That means cramdown under section 1129(b)(2) is

12  allowed.  While we understand the teachers want more, they

13  have no other confirmation objections, and they proffered no

14  evidence to support their objections.

15        AMPR claims the Fiscal Plan is incorporated into the

16  Title III Plan, and fails to provide adequate funding for

17  pensions and essential services.  First, the Plan of

18  Adjustment is consistent with the Fiscal Plan, but the Fiscal

19  Plan is not incorporated into the Plan of Adjustment.  Second,

20  there is no evidence whatever that there is no adequate

21  funding for the pensions being promised.  Confirmation is not

22  a litigation of the Fiscal Plan, and, in any event, AMPR

23  proffered no evidence about feasibility.

24        AMPR also claims the Plan of Adjustment violates the

25  best interest test, because it does not make the teachers

1   better off than their entitlements going into Title III.

2   That, however, is not the best interest test.  If it were,

3   debtors could never restructure if all creditors have to

4   receive more than their prebankruptcy entitlements.

5           In the final analysis, AMPR contends the teachers

6   need more.  That is a sympathetic point, but not a basis to

7   deny confirmation.  During the Title III case, the teachers

8   have been given raises.  As the fiscal plans show, in fiscal

9   year 2019, teachers at the director level received $5,000

10   raises, and other teachers received $1,500 raises.  In fiscal

11   year 2020, teachers received $500 raises.

12           I'm now going to move on to the SEIU confirmation

13   objection, document no. 18511.  They object to the

14   Confirmation Order requiring legislation, but that is now moot

15   due to Act 53.  They also object to the Confirmation Order

16   language providing -- they also object to the lack of language

17   providing the collective bargaining agreements are not subject

18   to rejection, but the Board has not requested rejection of any

19   collective bargaining agreement.  They want the Confirmation

20   Order to provide the grievances will be handled and paid in

21   the ordinary course.  And that is the resolution of that

22   issue, Your Honor.

23           They also object to --

24           (Sound played.)

25           MR. BIENENSTOCK:  Your Honor, am I that close to

1    being out of time?  We thought we had about ten minutes left.

2         THE COURT:  That was the two-minute warning.  Let me

3    just check.

4         Did we start them at 25 minutes?

5         We started you at 25 minutes, but we -- just one

6    minute.

7         Yes, so I will add back six minutes, so that means

8    you have a total of eight.

9         MR. BIENENSTOCK:  Thank you, Your Honor.

10        The SEIU also objects to the debt burden on the

11   ground the Plan leaves Puerto Rico with unsustainable debt

12   level.  There is no evidence that the debt level is

13   unsustainable.  Virtually all the Oversight Board's

14   declarations are to the contrary.

15        They object to paragraph 62 barring reinstatement of

16   defined benefits without first proving they are needed,

17   fundable, and will not jeopardize Plan payments.  While

18   everything the government does and every order it must obey

19   affects the people, the people don't have input on everything

20   the government does except on election day.

21        A restriction in paragraph 62 was a restriction on

22   the government.  If SEIU and the UAW were correct that a new

23   notice need be sent to all union members, no bankruptcy

24   confirmation trial could ever proceed to conclusion without

25   unlimited delays.  Paragraph 62 does not bar the government

1   from paying more to retirees.  Rather, only if it wants to pay

2   more by creating a defined benefit plan, must it first show it

3   is prudent.  While AAFAF does not like the concept, it is not

4   objecting to it.

5          Counsel's analogy to Act 53 does not work.  Act 53

6   was a law passed by the government, and not a plan provision

7   or confirmation order -- or confirmation order provision.  The

8   Oversight Board needed an interpretation that Act 53's debt

9   authorization did not require elimination of the freeze.  It

10  could not afford the risk that, potentially, years from now an

11  employee would claim defined benefits in a territory court,

12  and claim Act 53 prevented the freeze.  So notice was sent to

13  all employees of the request of the interpretation of Act 53

14  that was not part of the Plan, especially when it was

15  distributed.

16         By contrast, here the Plan imposed the freeze at all

17  times, including when it was distributed to employees.

18  Paragraph 62 simply continues what the Plan provided from the

19  outset, namely, the freeze, but it does not impose conditions

20  on other types of pension enhancements.

21         The argument that the Oversight Board can use PROMESA

22  sections 204 and 208 is unavailing.  As the union well knows,

23  the tenure of the Oversight Board is short compared to the

24  number of years the Plan will be paying claims.

25         Now, as to inverse condemnation claims, yesterday it

1    became clear that inverse condemnation claimants sensed the

2    Court may hold eminent domain claims nondischargeable, and

3    they want to be treated the same way.  There are several

4    reasons why inverse condemnation claims should not be treated

5    like eminent domain claims if eminent domain claims will be

6    ruled nondischargeable.

7           First, the statute, Title III, neither assigns a

8    priority to eminent domain and inverse condemnation claims,

9    nor designates them as nondischargeable.  Therefore, the only

10   way either claim could be designated nondischargeable, is if

11   the Court determines the Constitution requires it where

12   Congress in Bankruptcy Code Section 944(c)(1) granted the

13   Court the right to designate any claim as nondischargeable.

14          If Congress did that, the next question becomes what

15   criteria the Court must use to decide to make a claim

16   nondischargeable.  We submit it is not a matter of discretion,

17   either a claim is nondischargeable or not.  The jurisprudence

18   is clear that just because a claim arises out of the

19   Constitution, the claim does not become nondischargeable.  At

20   a minimum, either some property interest is required, or the

21   just compensation requirement in the Fifth Amendment must be

22   interpreted to require it.

23          For eminent domain claims, once the Commonwealth

24   takes property, the former owner has no interest in the

25   property and no secured claim against it.  So the property

1   interest doesn't work.  None of the eminent domain claimants

2   here assert the property is still in their names.  If they

3   have no property interest, their only other argument is the

4   Fifth Amendment of the Constitution, which the creditors have

5   logically been touting.  Therefore, there must be something --

6   therefore, there would have to be something about the

7   constitutional command to pay just compensation that makes it

8   nondischargeable, notwithstanding that the Constitution grants

9   Congress the bankruptcy power to discharge claims.  And we

10  think this is where the rubber hits the road.

11      The creditors assert cases such as *Radford* and

12  *Security National Bank* command that the bankruptcy power is

13  subject to the Fifth Amendment.  Indeed, they contain those

14  words, but they only say those words in over 200 years of

15  jurisprudence, when the creditor has a secured claim or other

16  unavoidable property interest.  Indeed, the Supreme Court

17  allows Congress to avoid security interests otherwise payable

18  under the Fifth Amendment.  How can that be if the bankruptcy

19  power is always subject to the Fifth Amendment?

20      This Court has exercised that power when it avoided

21  the ERS security interest.  That would be impossible if the

22  bankruptcy power were always subject to the Fifth Amendment.

23  The answer is, and logic dictates, that the bankruptcy power

24  is not always subject to the Fifth Amendment when it comes to

25  discharge and avoidance of property interests.  Logic dictates

1    no different result can apply to the discharge of claims when

2    Congress and the Supreme Court allow the avoidance of property

3    interests.  If you can avoid a property interest under

4    Bankruptcy Code section 544, surely you can discharge an

5    unsecured claim to just compensation under section 944.

6            Mr. Hein apparently believes that his contention that

7    the rough and tumble conduct --

8            (Sound played.)

9            MR. BIENENSTOCK:  -- in Chapter 11 has no place here

10   does not apply to him.  Mr. Hein unabashedly asserts he has

11   first priority, and the Commonwealth's money must be turned

12   over to him before it can be used for operating expenses.

13   That's not rough and tumble.  That's nuclear.

14           Suffice it to say Mr. Hein provided no evidence the

15   Commonwealth could survive under his regimen, and he offered

16   no contrary best interest analysis.  Simple logic shows

17   Mr. Hein's contention that he is not bound to his class of

18   settlement until after confirmation is dead wrong.  If

19   Mr. Hein is entitled to litigate what his class settled, then

20   his class could never settle, because every class member could

21   have two bites at the apple, the settlement, or Mr. Hein's

22   litigation outcome, if better.  As shown by the Supreme

23   Court's decision in *Young v. Higbee*, litigation of a claim of

24   a class in an outcome for a class -- is an outcome for the

25   class, not just the class member.

1           Your Honor, I guess I have to wrap up, so I just want

2      to say the Oversight Board wants to express its gratitude to

3      this Court and Judge Dein for all of the prodigious decisions,

4      researched and formulated in realtime, to enable continuous

5      progress, with a narrowing of the issues, and for the

6      invaluable help of the mediators, whom this Court had the

7      foresight to appoint at the outset.

8           Additionally, we want to recognize that the proposed

9      Plan reflects truly ingenious contributions by the creditors

10     and their legal and financial advisors in San Juan and New

11     York, who are well recognized as the best in the business.

12          Unless the Court has questions, that concludes my

13     remarks, Your Honor.

14          THE COURT:   Thank you, Mr. Bienenstock, for all of

15     your remarks.

16          This concludes the closing arguments concerning the

17     Modified Eighth Amended Plan of Adjustment, and the Court will

18     now turn to the second item on today's -- actually, before,

19     there is a hand raised, and, also, I meant to note that,

20     notwithstanding the conclusion of these arguments, I'm looking

21     forward to the further scheduled submissions and to any

22     further proposed amendments to the operative documents.

23          I take the matter of Plan confirmation under

24     advisement.

25          I see that Mr. Berezin has his hand up.

1            MR. BEREZIN:  Yes, Your Honor.  Thank you.  Robert

2   Berezin of Weil, Gotshal, & Manges, for National Public

3   Finance Guarantee Corporation.

4            Your Honor, as noted yesterday by counsel for certain

5   of the underwriter defendants, section 92.F of the Modified

6   Eighth Amended Plan is inconsistent with section 56(f) of the

7   fourth revised proposed Order.  Specifically, as written,

8   section 92.F of the Plan prevents nondebtors from asserting

9   claims or counterclaims against other nondebtors.  That is, of

10   course, materially inconsistent with the fourth revised

11   proposed Order, the PSA, and the intent of the relevant

12   parties.

13            Although National reserves its rights on this issue,

14   and fully expects that it will be resolved shortly, and we

15   continue to strongly support the Plan of Adjustment, we did

16   want to note this reservation for the record before this

17   portion of the hearing closed.

18            THE COURT:  Thank you.  This is something about which

19   you are in discussion with the Oversight Board, correct?

20            MR. BEREZIN:  That's correct, Your Honor.

21            THE COURT:  Thank you, Mr. Berezin.

22            So now we will turn to the Title VI proceedings, and

23   I understand that the Oversight Board -- I'm sorry.  There is

24   another hand, from Mr. Carrion-Baralt.

25            MR. CARRION-BARALT:  Yes, Your Honor.  David

1   Carrion-Baralt on behalf of PFZ.  PFZ is not a part of the

2   Title VI proceedings that are going to be continuing now.  I

3   request to be excused from the hearing.

4           THE COURT:  You may be excused.  Thank you,

5   Mr. Carrion-Baralt.

6           MR. CARRION-BARALT:  Thank you, Your Honor.

7           THE COURT:  Mr. Rosen has his hand raised.

8           MR. ROSEN:  Yes, Your Honor.  I apologize.  I tried

9   to get my hand up before he left.  I did have a housekeeping

10  matter with respect to the confirmation of the Title III Plan

11  of Adjustment, and it is with respect to the submission of

12  findings of fact.

13          THE COURT:  Yes.

14          MR. ROSEN:  Your Honor, pursuant to your prior Order,

15  the findings of fact are to be filed with the Court within 48

16  hours of conclusion of the Confirmation Hearing, which would

17  make that due probably --

18          THE COURT:  You don't want to file them after

19  Thanksgiving dinner?  What's your problem?

20          MR. ROSEN:  I'm going to be watching the balloons or

21  the floats go down, you know, the --

22          THE COURT:  That's in the morning.

23          MR. ROSEN:  Well, that would be 48 hours, Your Honor,

24  and I'll probably still be watching or cooking or doing

25  whatever.  So, Your Honor, I believe that the time period to

1   respond to those would be three business days afterwards, so

2   what we were hoping for is a little bit of the Court's

3   indulgence, so some of the people, including me, who've been

4   working nonstop could perhaps enjoy some time with our

5   families, and that we file the findings of fact on Sunday,

6   Your Honor.  And that the parties -- the three business days

7   would be at the conclusion of Wednesday, which they would

8   still have that, Your Honor, even if we filed it on Friday.

9           So to give us a little bit of time, we were hoping

10  that the Court would allow us to file those findings on

11  Sunday.

12          THE COURT:  That application is granted, but file

13  them by three o'clock on Sunday afternoon, not midnight on

14  Sunday.

15          MR. ROSEN:  We will do that, Your Honor.  Thank you

16  very much for your indulgence.  I appreciate that.

17          THE COURT:  Thank you.

18          MR. ROSEN:  And my wife thanks you, too, because I'll

19  be cooking.

20          THE COURT:  Pardon?

21          MR. ROSEN:  I said my wife thanks you as well,

22  because I'll be doing the cooking on Thanksgiving.

23          THE COURT:  Oh, do you cater?

24          MR. ROSEN:  I'm a renaissance man, Your Honor.  I'll

25  do everything.

```
 1           THE COURT:  So it would appear.

 2           MR. ROSEN:  Thank you.

 3           THE COURT:  Okay.  So were you about to start talking

 4   about Title VI?

 5           MR. ROSEN:  Whenever you're ready, Your Honor.

 6           THE COURT:  All right.  I am going to have a separate

 7   transcript made for this portion, because they are under

 8   separate case numbers.

 9           (At 10:15 AM, recess taken.)

10           (Remarks resumed following Title VI proceeding.)

11           THE COURT:  Mr. Rosen.

12           MR. ROSEN:  Except for you, Your Honor, I did want

13   the last word here.  I just wanted to thank you, just like

14   everybody else has done, and also Judge Dein, and the

15   mediation team, for your indulgence, your cooperation, your

16   patience, and any other word that could fit in there.  If I

17   had my thesaurus, I would go for it, but I want to thank you

18   for everything that you have done to help us get to this

19   point.

20           I know there's a lot more work to be done, not only

21   here, but in connection with some other matters which we have

22   to file, like HTA, which everybody will be thanking me for

23   saying that, but I want to thank you.  And have a happy

24   holiday.

25           THE COURT:  Thank you, Mr. Rosen, and happy holiday
```

 1   to you, too.

 2        Now I get to make some remarks, which will be short.

 3   This concludes the Agenda for today's proceedings.  I'd like

 4   to extend my thanks to counsel, the parties, their advisors,

 5   and the mediation team, particularly, for all of the time,

 6   effort, and patience that they have displayed through the Plan

 7   Confirmation Hearing, and, more generally, for everyone's

 8   professionalism and hard and creative work throughout the four

 9   and a half years that these Title III cases have been pending.

10        The meticulous attention that everyone has paid to

11   challenging issues and complex negotiations has brought us to

12   where the Court can now take the important question of

13   confirmation of the proposed Plan of Adjustment under

14   advisement.

15        I also thank the people of Puerto Rico, thousands of

16   whom have written to the Court, or shared their views in

17   person.  They have spoken about their lives, and made it known

18   that they are the ones who are most directly effected every

19   day by the Title III cases.  Your voices have been heard by

20   both the Court and by counsel, and as I make my legal

21   decisions, I will always be mindful of the reality of your

22   lives and the future of your homeland.

23        As always, I would like to thank the court staff in

24   Puerto Rico, Boston, and New York for their work in preparing

25   for and conducting this Confirmation Hearing, and their

1    outstanding, ongoing, ceaseless support of the administration

2    of these very complex cases.

3              I thank my colleagues, Judge Dein, Judge Houser, and

4    the mediation team, including Judge Colton.  We are very much

5    a team operation, with two branches, and we do appreciate all

6    of the responsibility that has been given to us, which we take

7    quite seriously, as you all have seen, and the ability to work

8    with candid, forthright, and talented parties, and counsel in

9    doing our work.

10             Stay safe and keep well, everyone.  The next

11   scheduled hearing is the December 15th to 16th, 2021, Omnibus

12   Hearing, which will be conducted by Zoom, and/or by telephone,

13   if there are matters to be heard.  A procedures order will be

14   entered if there are matters to be heard after the motion in

15   opposition deadlines have passed.

16             If anyone has any further comment or question, raise

17   your hand now.

18             Seeing no hands raised, we are adjourned.  Happy

19   Thanksgiving, and happy holidays, everyone.  Thank you.

20             (At 11:15 AM, proceedings concluded.)

21                        *      *      *

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 35 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   November 23, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```