UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

  as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

Debtors.[1]

---------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## CERTIFICATE OF PUBLICATION

I, Nicholas Vass, depose and say that I am employed by Prime Clerk LLC ("**Prime Clerk**"), the solicitation, claims and noticing agent for the Debtors in the above-captioned cases under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA).

This Certificate of Publication includes e-sheets verifying that the *Notice of (I) Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 and (II) Deadline for Objections*, as conformed for publication, was published on November 5, 2021 in (1) the national edition of *The New York Times* as described in **Exhibit A**, and (2) *Primera Hora* as described in **Exhibit B**.

This Certificate of Publication includes e-sheets verifying that the *Notice of (I) Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 and (II) Deadline for Objections*, as conformed for publication, was published on November 8, 2021 in (1) *El Diario NY* as described in **Exhibit C**, (2) *El Nuevo Herald* as described in **Exhibit D**, and (3) *El Vocero de Puerto Rico* as described in **Exhibit E**.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Dated: November 26, 2021

                                              */s/ Nicholas Vass*
                                              Nicholas Vass

State of New York
County of New York

Subscribed and sworn (or affirmed) to me on November 26, 2021, by Nicholas Vass proved to me on the bases of satisfactory evidence to be the person who executed this affidavit.

*/s/ OLEG BITMAN*
Notary Public, State of New York
No. 01BI6339574
Qualified in Queens County
Commission Expires April 4, 2024

**<u>Exhibit A</u>**



# PROOF OF PUBLICATION

Nov-08, 20 21

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

Nov 5, 2021, NYT & Natl, pg B3

Sworn to me this 8th day of November, 2021

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

LITIGATION

# At Holmes Trial, Investors Exposed as Anything but Diligent

FROM FIRST BUSINESS PAGE

cially clear picture of the many ways sophisticated investors can be swept up in the hype of a hot start-up, ignoring red flags that look obvious in hindsight. That behavior still resonates today, as investors compete to pour money into Silicon Valley start-ups, which have been in a frenzied state of record-breaking fund-raising.

With so many new investors flocking to start-ups, due diligence is sometimes so minimal that it is used as a punchline, investors said. An overheated market "definitely creates an environment for people to make more inflated claims" and may even tempt them to lie, said Shirish Nadkarni, a longtime entrepreneur, investor and author.

During its lifetime, Theranos exemplified that dynamic. The company raised $945 million from famous venture capitalists including Tim Draper, Donald Lucas and Dixon Doll; wealthy heirs to the founders of Amway, Walmart and Cox Communications; and powerful tech and media moguls such as Larry Ellison and Rupert Murdoch.

And as investors have testified at Ms. Holmes's trial, a central tension has emerged around due diligence. Could these investors have avoided disaster if they had simply done better research on Theranos? Or were they doomed because their research was based on lies?

Prosecutors have presented a growing list of examples supporting the latter argument. For example, Theranos added pharmaceutical company logos to validation reports indicating the pharmaceutical firms had endorsed its technology when they hadn't, according to evidence and testi-

### 'You understand that's a typical thing to do in investing?'

Lance Wade, a lawyer for Elizabeth Holmes, asking a witness about the concept of due diligence.

mony. Theranos also claimed in late 2014 that it would bring in $140 million in revenue that year when it had none, according to evidence and testimony. The start-up also faked demos of its blood-testing machines to investors, witnesses have testified.

In response, Ms. Holmes's lawyers have needled Theranos's investors for their oversights, aiming to convince the jury that the investors were the ones at fault for not digging into Ms. Holmes' claims.

Her lawyers recently pushed Wade Miquelon, the former chief financial officer of Walgreens, to admit that he didn't know if his company had ever gotten one of Theranos's devices in its offices for testing before entering into a partnership. The lawyers also got Mr. Mosley to concede he never directly asked Ms. Holmes whether a pharmaceutical company had written the validation report.

The strategy has sometimes veered into condescension. That was evident last week when Lance Wade, a lawyer for Ms. Holmes, asked Ms. Peterson, an investment professional, if she was familiar with the concept of due diligence.

"You understand that's a typical thing to do in investing?" he said.

The investors have pushed back, explaining that they were acting on false information supplied by Ms. Holmes.

"You're trying to measure our sophistication as an investor when we weren't given complete information," Ms. Peterson said. Mr. Wade asked the judge to strike the comment from the record.


Elizabeth Holmes, left, the founder of failed blood-testing start-up Theranos, arriving at court with her mother in San Jose, Calif., last week.
JOHN G MABANGLO/EPA, VIA SHUTTERSTOCK

TORU YAMANAKA/AGENCE FRANCE-PRESSE — GETTY IMAGES


The Theranos blood-testing machine at the company's lab before the start-up was shut down. Larry Ellison, left, was one of the investors in the failed company.
CARLOS CHAVARRIA FOR THE NEW YORK TIMES

Still, testimony from pharmaceutical company executives who interacted with Theranos showed it was possible to see through at least some of Ms. Holmes's grandiose claims.

Constance Cullen, a former director at Schering Plough, said this week that she was responsible for evaluating Theranos's technology in 2009. She said she came away "dissatisfied" with Ms. Holmes's answers to her technical questions, calling them "cagey" and indirect. She said she stopped responding to emails from Ms. Holmes.

Shane Weber, a director at Pfizer, looked into Theranos in 2008 and concluded that the company's responses to his technical questions were "oblique, deflective or evasive," according to a memo used as evidence. He recommended Pfizer cease working with Theranos.

But investors were less probing, especially when Ms. Holmes appealed to their egos. Her persona as a visionary, bolstered by magazine cover stories and personal eccentricities, created a sense that backing Theranos was an exclusive and elite opportunity.

In testimony and evidence, Ms. Holmes was shown to have guarded information about the business, calling it a trade secret. She told investors she sought out wealthy families who would not want to see a return on their investment anytime soon, making those that she picked feel special with formal invitations. And she controlled the company tightly with "supervoting" shares worth 100 times the power of other shares.

"She has a firm grasp on the company, let there be no mistake," Christopher Lucas, a Theranos investor, said on a call with other investors that was recorded and played in court. "She would have the right to cast out investors."

Mr. Lucas's firm, Black Diamond Ventures, invested around $7 million into Theranos, despite not getting access to its financial information or examining all of its corporate records. This was unusual, Mr. Lucas testified on Thursday, but Ms. Holmes told him the information was sensitive because a leak could "give competitors a chance to crush the company."

That secrecy extended to due diligence. Ms. Peterson testified that she was scared Ms. Holmes would cut her firm out of the deal if they dug deeper into the details of Theranos's business.

"We were very careful not to circumvent things and upset Elizabeth," she said. "If we did too much, we wouldn't be invited back to invest."

Mr. Nadkarni, the longtime investor, said such behavior sounded familiar. He said he had observed a loosening of diligence in deals he's been involved with over the last year.

It hasn't led to many problems while times were good, he said, but "if something happens to the economy, then everyone is going to be toast."

# Facebook, Accused of Sinking a Start-Up, Faces a New Antitrust Lawsuit

By SHEERA FRENKEL and DAISUKE WAKABAYASHI

SAN FRANCISCO — Mark Zuckerberg, Facebook's chief executive, downloaded a popular new app, Phhhoto, on Aug. 8, 2014, and took a selfie. Other Facebook executives and product managers soon followed suit. The social network then made overtures to integrate Phhhoto.

But the interest of Facebook's top executives in Phhhoto was just a show, according to a lawsuit filed on Thursday in the Eastern District of New York by the start-up, which is now defunct. Instead, Facebook simply wanted to squash the competition, according to the suit, which accused the company of antitrust violations.

In the suit, Phhhoto's founders — Champ Bennett, Omar Elsayed and Russell Armand — claim that after Mr. Zuckerberg and other Facebook executives downloaded their app and approached them about a partnership, no deal materialized. Facebook instead launched a competing product that mirrored Phhhoto's features. Facebook also suppressed Phhhoto's content within its photo-sharing app, Instagram, the suit says.

Phhhoto is represented by Gary L. Reback, a well-known lawyer. In the 1990s, Mr. Reback persuaded the Justice Department to sue Microsoft for violating antitrust laws, a case that Microsoft ultimately settled in 2001. Phhhoto's suit seeks unspecified monetary damages from Facebook.

The lawsuit stands out because of Mr. Zuckerberg's personal involvement, Mr. Reback said in an interview. He called Mr. Zuckerberg "the monopolist's C.E.O." and said the Facebook founder had engaged in "anticompetitive conduct to an extent not seen since Bill Gates," one of the founders of Microsoft.

Facebook did not immediately reply to a request for comment.

The lawsuit is the most recent antitrust challenge to the world's largest tech companies. Facebook, Google and Apple all have faced suits from rivals over the years, accusing them of copying their technology or buying them to squash them.

The lawsuit also adds to the woes for Facebook, which was last week renamed Meta. The Federal Trade Commission has sued the company, accusing it of violating antitrust laws by holding a monopoly on social networking through its acquisitions of Instagram and the messaging app WhatsApp. The social network also has been under intense public scrutiny after Frances Haugen, a former employee, leaked thousands of internal documents detailing how the company's platforms have been used to spread misinformation, hate speech and conspiracies.

Even so, Michael Carrier, a professor at Rutgers University's law school, said the standards for antitrust litigation remain high.

"It's hard to show monopolization," he said. "The tumult across the political landscape isn't necessarily going to be reflected in how the courts rule."

Phhhoto was founded in 2012 and the app was launched in 2014. People used it to edit photos and link images together into looping videos. It became buzzy and was promoted by celebrities such as Beyoncé, Miley Cyrus and Katy Perry.

After Mr. Zuckerberg downloaded the app in 2014, Kevin Systrom, a founder of Instagram, and senior managers at Facebook and


Mark Zuckerberg, Facebook's chief.
PETE MAROVICH FOR THE NEW YORK TIMES

### Phhhoto claims that the social network copied its technology.

Instagram also did so, according to the suit.

In February 2015, Bryan Hurren, then Facebook's strategic partnerships manager, reached out to Phhhoto's founders to discuss a "platform integration opportunity," according to the suit. Mr. Hurren offered to integrate Phhhoto into Facebook's News Feed, the suit says, which was prime real estate on the world's largest social platform.

But "Facebook strung Phhhoto along for months without making meaningful progress on the supposed integration," the suit says. Mr. Hurren told Phhhoto that Facebook was "hung up on some legal conversations," the suit says.

On March 31, 2015, Instagram changed its settings so that Phhhoto users couldn't find their Instagram friends. When Phhhoto reached out to Facebook about the issue, Mr. Hurren told them "that Instagram was apparently upset that Phhhoto was growing in users through its relationship with Instagram," according to the suit.

Phhhoto's founders decided to move forward with an Android version of their app, which had only been available on iPhones. But on Oct. 22, 2015, just hours before Phhhoto was set to launch its Android app, Instagram unveiled a product that was a "slavish clone" of Phhhoto, according to the suit.

Instagram introduced other changes in March 2016 that reduced the visibility of Phhhoto's content, the suit says. Phhhoto's founders discovered the change when one of them posted two videos to Instagram, one through his Phhhoto-linked account and the other through a new Instagram account he had opened. While the second account had a fraction of the followers, the video was viewed and liked more than the identical video posted to the Phhhoto-linked account, according to the suit.

Phhhoto shut down in June 2017, "lacking investment or any other means to remain viable," according to the suit.




Gary L. Reback, a lawyer who is representing Phhhoto, called Mr. Zuckerberg "the monopolist's C.E.O."
ELIZABETH D. HERMAN FOR THE NEW YORK TIMES

**UNITED STATES DISTRICT COURT, DISTRICT OF PUERTO RICO**

In re:
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,
as representative of
THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,
Debtors.[1]

PROMESA
Title III
No. 17 BK 3283-LTS
(Jointly Administered)

**NOTICE OF (I) RULINGS THE OVERSIGHT BOARD REQUESTS AT CONFIRMATION HEARING REGARDING ACT 53-2021 AND (II) DEADLINE FOR OBJECTIONS**

PLEASE TAKE NOTICE that, on July 30, 2021, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA," and, together with the Commonwealth and ERS, the "Debtors") pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), filed the Seventh Amended Joint Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al. [ECF No. 17627] (as amended, supplemented, or modified from time to time, the "Plan").

PLEASE TAKE FURTHER NOTICE that a hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held before the Honorable Judge Laura Taylor Swain, United States District Judge, via video and telephonic hearing, on November 8–10, 12, 15–18, and 22–23, 2021 at 9:30 a.m. (Atlantic Time), to the extent the Confirmation Hearing is not earlier concluded.

PLEASE TAKE FURTHER NOTICE that, on October 26, 2021, the Governor of the Commonwealth of Puerto Rico signed Act 53-2021 into law. PLEASE TAKE FURTHER NOTICE THAT THE OVERSIGHT BOARD WILL SEEK RULINGS AT THE CONFIRMATION HEARING THAT THE DEBT AUTHORIZATION IN ACT 53-2021 IS CONDITIONED ONLY ON THE PLAN'S CANCELLATION OF THE MONTHLY BENEFIT MODIFICATION (AS DEFINED IN THE PLAN), AND DOES NOT REQUIRE CANCELLATION OF (I) THE ELIMINATION OF COST OF LIVING ADJUSTMENTS AND/OR (II) FREEZES OF ACCRUAL OF DEFINED BENEFITS UNDER THE TEACHERS' RETIREMENT SYSTEM OR THE JUDICIARY RETIREMENT SYSTEM FROM AND AFTER THE PLAN'S EFFECTIVE DATE.

PLEASE TAKE FURTHER NOTICE that the Oversight Board's rationale for requesting the rulings set forth above are as follows: (a) Section 104 of Act 53-2021, in pertinent part, provides: "employees, it is hereby provided as follows: "... The Legislative Assembly authorizes the issuance of the General Obligation Bonds and CVIs subject to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification..." (b) Section 605 of Act 53-2021, in pertinent part, provides: "...The effectiveness of this Law is conditioned to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification as defined in the Plan...." (c) Article 102(a) of Act 53-2021 refers to a definition of Monthly Benefit Modification, but Article 102 does not in its definitions refer to or define any of (i) defined benefits, (ii) cost of living adjustments, or (iii) freeze. (d) A search of the English translation of Act 53-2021 did not locate any of the words or phrases defined benefit, cost of living, or freeze. (e) The Statement of Motives in Act 53-2021 includes a sentence providing the law: "includes zero cuts to pensions of current retirees and current accrued benefits of active public employees and a "current accrued benefits of active public employees." The Oversight Board believes the statute very carefully protects current pension levels, but not subsequent levels that are cut off by the freeze of defined benefits. (f) Freezing defined benefits saves billions of dollars during the remaining fiscal plan and it is unlikely the Legislature would require elimination of such large savings without mentioning it by name. By analogy, the United States Supreme Court has observed that Congress does not "hide elephants in mouseholes." (Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). We believe requiring the elimination of defined benefit accruals without mentioning them would be like hiding an elephant in a mousehole. (g) Act 53-2021 includes a sentence in Article 605 providing: "...The continued effect of this act is contingent upon zero cuts to pensions." For all the foregoing reasons, the Oversight Board submits the only possible meaning of "zero cuts to pensions" is the elimination of the Monthly Benefit Modification, and does not mean the freeze of defined benefits or the cancellation of cost of living adjustments must be eliminated.

PLEASE TAKE FURTHER NOTICE that, on November 1, 2021, the Oversight Board filed the Urgent Motion of the Financial Oversight and Management Board for Puerto Rico for Order (i) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 and (ii) Scheduling Objection Deadline [ECF No. 19002] (the "Motion"), seeking Court approval of certain procedures and deadlines in connection with the Oversight Board's requested rulings described above. A copy of Act 53-2021 is attached to the Motion as Exhibit B. On November 2, 2021, the Court entered an order granting the Motion [ECF No. 19017] (the "Order").

PLEASE TAKE FURTHER NOTICE that, pursuant to the Order, any objections or responses to the Oversight Board's requested rulings shall (i) be in writing and signed; (ii) state the name, address, whether the objectant is a past or present employee or retiree of the Government, or any other standing for its objection; (iii) state clearly the rationale for the objection; (iv) be filed with the Court, together with proof of service, and served on the following parties so as to be actually received no later than the Objection Deadline, November 12, 2021, at 5:00 p.m. (Atlantic Time): (a) counsel to the Oversight Board, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: Martin J. Bienenstock and Brian S. Rosen, and (b) counsel to AAFAF, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: John J. Rapisardi, Peter Friedman, and Maria J. DiConza.

PLEASE TAKE FURTHER NOTICE that the deadline for filing replies in support of the Oversight Board's requested rulings is November 15, 2021.

PLEASE TAKE FURTHER NOTICE that copies of the Plan and all other documents filed in these Title III cases may be obtained by visiting the case website maintained by Prime Clerk LLC, https://cases.primeclerk.com/puertorico; by sending a request to Prime Clerk LLC, at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Time) (Spanish available), or by email at puertoricoinfo@primeclerk.com, or, for a fee, from the Court's website, https://www.prd.uscourts.gov. A PACER login and password are required to access documents on the Court's website, and these can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov.

Dated: November 2, 2021, San Juan, Puerto Rico

Respectfully submitted, /s/ Hermann D. Bauer, Hermann D. Bauer, USDC No. 215205, O'NEILL & BORGES LLC, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918-1813, Tel: (787) 764-8181, Fax: (787) 753-8944, Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors -and- /s/ Martin J. Bienenstock, Martin J. Bienenstock, Brian S. Rosen, (Admission Pro Hac Vice), PROSKAUER ROSE LLP, Eleven Times Square, New York, NY 10036, Tel: (212) 969-3000, Fax: (212) 969-2900, Attorneys for the Financial Oversight and Management Board as representative for the Debtors

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] PROMESA is codified at 48 U.S.C. §§ 2102–2241.

[3] Capitalized terms used but not defined herein have the meanings given to them in the Plan.

**<u>Exhibit B</u>**

## TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
## DISTRITO DE PUERTO RICO

En el caso: LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, como representante de EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO

Título III de PROMESA, 17 BK 3283-LTS (Con administración conjunta)

NOTIFICACION DE (I) DECISIONES SOLICITADAS POR LA JUNTA DE SUPERVISIÓN EN LA VISTA DE CONFIRMACIÓN CON RESPECTO A LA LEY 532021 Y (II) FECHA LÍMITE PARA LA PRESENTACIÓN DE OBJECIONES…..

# AFIDAVIT

Yo, Juan C. Jiménez Doblado, habiendo prestado el debido juramento declaro:

Que soy Representante del periódico "PRIMERA HORA" que se publica en Guaynabo, P.R.; que en las ediciones de este periódico correspondientes a los días:

**5 DE SEPTIEMBRE DE 2021**

se dio publicidad al anuncio expedido por

**JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO**

en el caso arriba mencionado y copia del cual se une al presente afidávit para que forme parte del mismo.

Guaynabo, P.R. NOV 0 5 2021 20___.

Afidávit No. 82485 del Registro.

Jurado y reconocido ante mi por Juan C. Jiménez Doblado, vecino de San Juan, mayor de edad, soltero, Representante del periódico "PRIMERA HORA", a quien doy fe de conocer personalmente,

Guaynabo, P.R. NOV 0 5 2021 20___.

NOTARIO

---

**TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS**
**DISTRITO DE PUERTO RICO**

En el caso:
LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,
como representante de
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO,
Deudores.[1]

Título III de PROMESA
Núm. 17 BK 3283-LTS
(Con administración conjunta)

**NOTIFICACIÓN DE (I) DECISIONES SOLICITADAS POR LA JUNTA DE SUPERVISIÓN EN LA VISTA DE CONFIRMACIÓN CON RESPECTO A LA LEY 53‑2021 Y (II) FECHA LÍMITE PARA LA PRESENTACIÓN DE OBJECIONES**

NOTIFÍQUESE que, el 30 de julio de 2021, La Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como representante exclusivo para el Título III del Estado Libre Asociado de Puerto Rico (el "Estado Libre Asociado"), el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE"), y la Autoridad de Edificios Públicos de Puerto Rico ("AEP"), y junto con el Estado Libre Asociado y el SRE, los "Deudores") de conformidad con la Sección 315(b) de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico ("PROMESA"),[2] radicó el *Séptimo Plan de Ajuste Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros*. [ECF Núm. 17627] (con sus enmiendas, complementos o modificaciones periódicas, el "Plan").[3]

NOTIFÍQUESE ASIMISMO que se celebrará una vista para examinar la confirmación del Plan (la "Vista de confirmación") ante la Honorable Juez Laura Taylor Swain, Juez de Distrito de Estados Unidos, mediante comunicación de video y telefónica, el **8–10, 12, 15–18, y el 22–23 de noviembre de 2021 a las 9:30 a.m. (hora del Atlántico)**, en caso de que la Vista de Confirmación no concluya con anterioridad.

NOTIFÍQUESE ASIMISMO que el 26 de octubre de 2021, el Gobernador del Estado Libre Asociado de Puerto Rico promulgó la Ley 53‑2021. **NOTIFÍQUESE QUE LA JUNTA DE SUPERVISIÓN SOLICITARÁ EN LA VISTA DE CONFIRMACIÓN QUE SE EMITA UNA DECISIÓN PARA QUE LA AUTORIZACIÓN DE ENDEUDAMIENTO DE LA LEY 53‑2021 TENGA COMO ÚNICA CONDICIÓN LA CANCELACIÓN EN EL PLAN DE LA MODIFICACIÓN DE LOS BENEFICIOS MENSUALES (TAL COMO SE DEFINEN EN EL PLAN), Y NO REQUIERA LA CANCELACIÓN DE (I) LA ELIMINACIÓN DE LOS AJUSTES POR EL COSTO DE VIDA Y/O (II) LOS CONGELAMIENTOS DEL DEVENGO DE BENEFICIOS DEFINIDOS CONFORME AL SISTEMA DE RETIRO DE MAESTROS O EL SISTEMA DE RETIRO DEL PODER JUDICIAL A PARTIR DE LA FECHA DE ENTRADA EN VIGOR DEL PLAN, INCLUSIVE.**

NOTIFÍQUESE ASIMISMO que los fundamentos para la solicitud de las decisiones antes mencionadas por la Junta de Supervisión son los siguientes: (a) la Sección 104 de la Ley 53‑2021, en la parte pertinente, dice "los empleados, se dispone por el presente lo siguiente: "la Asamblea Legislativa autoriza la emisión de los Bonos de Obligaciones Generales y CVI sujeto a la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual..."; (b) la Sección 605 de la Ley 53‑2021, en su parte pertinente, dispone: "... La vigencia de esta Ley tiene como condición la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual tal como se define en el Plan..."; (c) el Artículo 102(qq) de la Ley 53‑2021 hace referencia a una definición de la Modificación del Beneficio Mensual, pero el Artículo 102 no se refiere en sus definiciones ni define ninguno de los (i) beneficios definidos, (ii) ajustes por el costo de vida, o (iii) congelamientos; (d) Una búsqueda en la traducción al inglés de los Ley 53‑2021 no ha detectado ninguna mención a las frases o palabras "beneficio definido", "costo de vida" o "congelamiento"; (e) la Declaración de Motivos de la Ley 53‑2021 incluye una frase que dispone que la ley "incluye cero recortes a las pensiones de los actuales retirados y los beneficios devengados actuales de empleados públicos en actividad y un deseo de promover el bienestar del pueblo de Puerto Rico". Ante la referencia a cero recortes para los retirados actuales y los "beneficios devengados actuales de empleados públicos en actividad", la Junta de Supervisión considera que la ley protege muy cuidadosamente los niveles actuales de pensiones, pero no los niveles subsiguientes que se ven recortados por el congelamiento de los beneficios definidos; (f) El congelamiento de beneficios definidos ahorra miles de millones de dólares durante el plan fiscal certificado y es improbable que la Legislatura requiera la eliminación de tales grandes ahorros sin mencionarlo específicamente. Por analogía, la Corte Suprema de Estados Unidos ha observado que el Congreso "no oculta elefantes en cuevas de ratones", (*Whitman c. Am. Trucking Ass'ns*, 531 U.S. 457, 458 (2001). Creemos que el requisito de la eliminación del devengo de beneficios definidos sin mencionarlos específicamente sería como ocultar un elefante en una cueva de ratones; (g) la Ley 53‑2021 incluye una oración en el Artículo 605 que dispone "la continuación de la vigencia de esta ley dependerá de cero recortes en las pensiones". Por todas las razones que anteceden, la Junta de Supervisión sostiene que el único significado posible de "cero recortes a las pensiones" es la eliminación de la Modificación de Beneficios Mensuales, y no significa que el congelamiento de beneficios definidos ni la cancelación de los ajustes en el costo de vida deban ser eliminados.

NOTIFÍQUESE ASIMISMO que el 1 de noviembre de 2021, la Junta de Supervisión radicó la *Moción Urgente de la Junta de Supervisión y Administración Financiera para Puerto Rico para una Orden que (i) apruebe la forma de Notificación de Decisiones solicitadas por la Junta de Supervisión en la Vista de Confirmación con respecto a la Ley 53‑2021 y (ii) establezca la Fecha Límite para Presentación de Objeciones* [ECF Núm. 19002] (la "Moción"), que procura obtener la aprobación del Tribunal para ciertos procedimientos y fechas límite en relación con las decisiones solicitadas por la Junta de Supervisión que se describen anteriormente. Se adjunta una copia de la Ley 53‑2021 a la Moción como Anexo B. El 2 de noviembre de 2021, el Tribunal radicó una orden que concede la Moción [ECF Núm. 19017] (la "Orden").

NOTIFÍQUESE ASIMISMO que, de conformidad con la Orden, cualquier objeción o respuesta a las decisiones solicitadas por la Junta de Supervisión deberán (i) estipular por escrito y firmadas; (ii) estipular el nombre, la dirección, si la persona que presenta las objeciones es un empleado actual o ex empleado o retirado del Gobierno, o si tiene alguna otra capacidad legal para presentar su objeción; (iii) formular claramente los fundamentos de la objeción; (iv) radicarse ante el Tribunal, junto con las pruebas de los servicios prestados y notificarse a las siguientes partes de manera tal que se reciba a más tardar en la Fecha Límite para la presentación de objeciones, **12 de noviembre de 2021, a las 5:00 p.m. (hora del Atlántico)**: (a) los abogados de la Junta de Supervisión, Proskauer Rose LLP, Eleven Times Square, Nueva York, NY 10036, Attn: Martin J. Bienenstock y Brian S. Rosen, y (b) los abogados de AAFAF, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, Nueva York, NY 10036, Attn: John J. Rapisardi, Peter Friedman, y Maria J. DiConza.

NOTIFÍQUESE ASIMISMO que la fecha límite para la radicación de respuestas en respaldo de las decisiones solicitadas por la Junta de Supervisión es el **15 de noviembre de 2021**.

NOTIFÍQUESE ASIMISMO que las copias del Plan y todos los demás documentos radicados en estos casos de Título III pueden obtenerse visitando el sitio web del caso mantenido por Prime Clerk LLC, https://cases.primeclerk.com/puertorico; enviando una solicitud a Prime Clerk LLC, llamando al (844) 822-9231 (llamada gratuita en EE.UU. y Puerto Rico) o al (646) 486-7944 (para llamadas internacionales), de 10:00 a.m. a 7:00 p.m. (hora del Atlántico) (puede solicitarse hablar con alguien en español), o enviando un mensaje a puertoricoinfo@primeclerk.com, o, mediante el pago de un arancel, en el sitio web del Tribunal, https://www.prd.uscourts.gov. Se necesita tener un nombre de usuario y contraseña de PACER para acceder a los documentos en el sitio web del Tribunal y estos pueden obtenerse a través del Centro de Servicios de PACER en www.pacer.psc.uscourts.gov.

Fecha: 2 de noviembre de 2021, San Juan, Puerto Rico
Atentamente, /s/ Hermann D. Bauer, Hermann D. Bauer, USDC Núm. 215205, **O'NEILL & BORGES LLC**, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918-1813, Tel: (787) 764- 8181, Fax: (787) 753- 8944, *Coabogados de la Junta de Supervisión y Administración Financiera en representación de los Deudores* and- /s/ Martin J. Bienenstock, Martin J. Bienenstock, Brian. S. Rosen, (Admisión *Pro Hac Vice*), **PROSKAUER ROSE LLP**, Eleven Times Square, Nueva York, NY 10036, Tel: (212) 969-3000, Fax: (212) 969- 2900, *Abogados de la Junta de Supervisión y Administración Financiera como representante de los Deudores*

---

[1] Los Deudores en estos Casos del Título III, junto con el número de caso de Título III respectivo de cada Deudor y los últimos cuatro (4) dígitos del número de identificación fiscal federal de cada Deudor, según corresponda, son (i) el Estado Libre Asociado (ELA) de Puerto Rico (Caso de Quiebra Núm. 17-BK-3283-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3481); (ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17-BK-3284-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 8474); (iii) la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico (Caso de Quiebra Núm. 17-BK-3567-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3808); (iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de Quiebra Núm. 17-BK-3566-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 9686); (iii) la Autoridad de Energía Eléctrica de Puerto Rico ("AEE") (Caso de Quiebra Núm. 17-BK-4780-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3747); y (vi) la Autoridad de Edificios Públicos de Puerto Rico ("AEP") de Puerto Rico (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3801) (Los números de caso de Título III figuran como números de Caso de Quiebra debido a limitaciones del software).

[2] PROMESA se encuentra codificada en 48 U.S.C. §§ 2102–2241.

[3] Los términos en mayúscula que se usan pero que no se definen en el presente tendrán los significados que se les atribuyen en el Plan.

---



**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**Gobierno Municipal de Quebradillas**

**Aviso Público**
**Año Fiscal 2021-2022**

Solicitud de Propuestas (RFP) para diseños de un Plan de Recuperación (proyectos, programas y políticas necesarias para la recuperación). Identificar necesidades de las comunidades para promover el desarrollo comunitario, la revitalización de la ciudad, la recuperación de infraestructura crítica, el desarrollo económico y capitalización de la fuerza laboral.

El Municipio de Quebradillas recibirá propuestas en pliegos cerrados en la Oficina de Secretaría Municipal en el segundo piso del anexo Casa Alcaldía, Calle Socorro Paseo Linares o vía email (secretariamunicipal@quebradillas.pr.gov) de personas naturales y/o jurídicas con experiencia en estos trabajos y que cumplan con todos los requisitos y parámetros de la Ley 107 del Código Municipal de Puerto Rico, según aplique.

Los proponentes deben especificar en sus propuestas los servicios que ofrecen, los interesados deben solicitar los documentos en la oficina de Secretaría Municipal, o copia en CD, o documentos vía email (secretariamunicipal@quebradillas.pr.gov), a partir del 5 de noviembre de 2021.

| Calendario | |
|---|---|
| Disponibilidad de documentos | 5 de noviembre de 2021 |
| Someter preguntas o clarificación | 18 de noviembre de 2021 |
| Respuestas y clarificaciones | 1 de diciembre de 2021 |
| Someter propuesta | 9 de diciembre de 2021 |
| Periodo de evaluación de propuesta | 14 al 17 de diciembre de 2021 |
| Aviso de adjudicación | 20 de diciembre de 2021 |

De igual forma puede optar por enviar las propuestas por correo certificado con acuse de recibo a Secretaría Municipal a la dirección P.O. Box 1544, Quebradillas, PR 00678. De utilizar esta opción deberá identificar claramente en el sobre que se trata de esta solicitud de propuesta para la debida atención al recibo de la misma y tiene que ser recibida en la Oficina de Secretaría antes de la hora y fecha establecida como límite, independientemente de su depósito en el correo. Toda propuesta recibida luego de la hora y el día indicado será rechazada y devuelta al proponente.

La Junta de Subastas del Municipio evaluará las propuestas recibidas y seccionará al proponente que ofrezca los mejores servicios, represente los mejores intereses para la Administración Municipal y cumpla con todas las leyes y reglamentos establecidos por este programa.

| *Criterios de evaluación* | *Puntuación* |
|---|---|
| Requisitos Mandatarios | Cumple/No Cumple |
| Experiencia y enfoque | 45 |
| Cualificaciones | 30 |
| Costo de la Propuesta | 25 |
| Costo total | 100 |
| *Puntuación Adicional* | |
| Preferencia por Sección 3 | 5 |
| Preferencia por M/WBE | 5 |

Al cabo de la evaluación y clasificación de la propuesta, la Junta de Subastas hará una selección al proponente cuya propuesta sea la más ventajosa para el Municipio, según sea establecido en los criterios de evaluación.

La Junta de Subastas del Municipio de Quebradillas se reserva el derecho de rechazar o aceptar cualquier propuesta y de adjudicar el contrato bajo los términos y condiciones más beneficiosos para el Municipio. También de reserva el derecho de cancelar el proceso de propuesta y la adjudicación del contrato en cualquier momento antes de la firma del mismo, sin que ellos impliquen responsabilidad u obligación alguna para el Municipio o para la Junta de Subastas.

Para cualquier duda, pregunta o información adicional puede comunicarse a la Oficina de Programas de Federales (CDBG-DR) al (787)291-0162.

En Quebradillas, Puerto Rico hoy 5 de noviembre de 2021.

Omar Vázquez Nieves
Presidente Junta de Subastas

Aidamaris González González
Secretaria Municipal

Po Box 1544, Quebradillas, Puerto Rico 00678-1544
Teléfono: (787) 895-2840 | Fax: (787) 895-7734
Correo Electrónico: oficinadelalcalde@quebradillas.pr.gov
Página Cibernética: www.quebradillas.pr.gov

Gobierno Municipal de Quebradillas
Municipio Quebradillas

 
PRINTED AND DISTRIBUTED BY PRESSREADER
PressReader.com +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

**<u>Exhibit C</u>**



an impreMedia company

**Affidavit of Publication State of New York County of New York, ss:**
The undersigned, <u>Esperanza Ruiz,</u> is an Account Executive of
**EL DIARIO/LA PRENSA** a company of Impremedia, located at
15 Metro Tech Center, 7th Floor, Brooklyn, NY 11201

This is a daily newspaper published in <u>**New York State.**</u> The legal notice of
<u>**The Commonwealth of Puerto Rico – TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS**</u> was published in said newspaper as set forth below or in the annexed exhibit.

This newspaper has been
designated by the Clerk of New York County for this purpose.

Said Notice was published on:

Monday, November 8, 2021

Subscribed and sworn to before me this

day 10 of Nov 2021

_____
Esperanza Ruiz
Account Executive

_____
Notary Public, New York County, N.Y.

XING YI JOLLY WANG
Notary Public- State of New York
No. 01WA6367075
Qualified in Queens County
My Commission Expires 11/13/2021

15 Metro Tech Center, 7th Fl. Brooklyn, NY 11201   Phone: (212) 807-4763   Fax: (212) 807-4617

LUNES 8 NOVIEMBRE 2021  *El Diario NY* | 9

#Nacional
#Tragedia



**Memorial improvisado a las afueras del sitio de la tragedia.** /GETTY IMAGES

# Houston investiga la muerte de ocho personas en concierto

Redes sociales especulan sobre la posibilidad de que alguien inyectara drogas a los otros espectadores

**EFE**
**WASHINGTON**

Las autoridades de Houston (Texas) están investigando qué fue exactamente lo que provocó una avalancha en medio del concierto el viernes en la noche del rapero Travis Scott, en el que al menos ocho personas murieron y decenas se quedaron atrapadas sin poder moverse ni respirar.

Una de las hipótesis que están barajando las autoridades es la posibilidad de que alguien empezara a inyectar drogas a los otros espectadores, una teoría que ha estado circulando por redes sociales y que mencionó este sábado el jefe de Policía de Houston, Troy Finner, durante una rueda de prensa.

Finner reveló que, en las últimas horas, había recibido información sobre un agente de seguridad que intentó inmovilizar a alguien durante el concierto y recibió un "pinchazo" en el cuello.

Ese agente perdió el conocimiento y, para recobrarlo, tuvo que recibir un fármaco llamado Naloxona y que sirve para revertir rápidamente sobredosis de opioides.

Finner indicó que la investigación tiene carácter criminal y están implicadas las unidades de homicidios y narcóticos del departamento de Policía de Houston.

El suceso se produjo cuando unas 50,000 personas se agolpaban al aire libre para disfrutar de un concierto de Scott, originario de Houston y quien, en 2018, lanzó un álbum llamado Astroworld y fundó el festival de música del mismo nombre.

Sobre las 21.15 hora local se desató el pánico y la multitud empezó a empujar en la dirección del escenario, mientras se producían peleas entre los asistentes y algunos perdían el conocimiento.

Como resultado, 25 personas fueron hospitalizadas, de las que 13 todavía están recibiendo atención médica, incluyendo cinco menores de 18 años, de acuerdo con los datos actualizados que ofreció el sábado Peña.

De hecho, entre los ocho fallecidos hay dos menores, de 14 y 16 años, así como dos personas de 21 años, otras dos de 23 y una de 27, además de otro varón que no ha sido identificado.

Una de las cosas que se están examinando, explicó la funcionaria, son los planes de seguridad que diseñaron los organizadores del festival Astroworld. "Esos planes quizás no eran adecuados o quizás eran buenos pero no se siguieron", aventuró.

Uno de los asistentes fue Madeline Eskins, enfermera de profesión, quien contó cómo la gente empezó a empujar hacia el escenario en cuanto Scott inició su actuación y, en seguida, empezó a sentir cómo su cuerpo se comprimía.

"Sentía una presión constante en mi pecho, una presión constante en mi espalda. En un lado, me estaban aplastando. Intenté levantar los brazos para intentar abrirme espacio, pero no funcionaba", narró.

La presión se incrementó cuando Scott empezó a actuar y Eskins perdió el conocimiento de manera intermitente, de manera que no podía ver qué pasaba pero sí podía sentir a la gente agolpándose.●

---

TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS
DISTRITO DE PUERTO RICO

En el caso:
LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,
    como representante de
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO,
    Deudores.[1]

Título III de PROMESA
Núm. 17 BK 3283-LTS
(Con administración conjunta)

**NOTIFICACIÓN DE (I) DECISIONES SOLICITADAS POR LA JUNTA DE SUPERVISIÓN EN LA VISTA DE CONFIRMACIÓN CON RESPECTO A LA LEY 53 2021 Y (II) FECHA LÍMITE PARA LA PRESENTACIÓN DE OBJECIONES**

**NOTIFÍQUESE** que, el 30 de julio de 2021, La Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como representante exclusivo para el Título III del Estado Libre Asociado de Puerto Rico (el "Estado Libre Asociado"), el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE"), y la Autoridad de Edificios Públicos de Puerto Rico ("AEP"), y, junto con el Estado Libre Asociado y el SRE, los "Deudores") de conformidad con la Sección 315(b) de la *Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radicó el *Séptimo Plan de Ajuste Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros.* [ECF Núm. 17627] (con sus enmiendas, complementos o modificaciones periódicas, el "Plan").[3]

**NOTIFÍQUESE ASIMISMO** que se celebrará una vista para examinar la confirmación del Plan (la "Vista de confirmación") ante la Honorable Juez Laura Taylor Swain, Juez de Distrito de Estados Unidos, mediante comunicación de video y telefónica, el **8–10, 12, 15–18, y el 22–23 de noviembre de 2021 a las 9:30 a.m. (hora del Atlántico)**, en caso de que la Vista de Confirmación no concluya con anterioridad.

**NOTIFÍQUESE ASIMISMO** que el 26 de octubre de 2021, el Gobernador del Estado Libre Asociado de Puerto Rico promulgó la Ley 53-2021. **NOTIFÍQUESE ASIMISMO QUE LA JUNTA DE SUPERVISIÓN SOLICITARÁ EN LA VISTA DE CONFIRMACIÓN QUE SE EMITA UNA DECISIÓN PARA QUE LA AUTORIZACIÓN DE ENDEUDAMIENTO DE LA LEY 53-2021 TENGA COMO ÚNICA CONDICIÓN LA CANCELACIÓN EN EL PLAN DE LA MODIFICACIÓN DE LOS BENEFICIOS MENSUALES (TAL COMO SE DEFINEN EN EL PLAN), Y NO REQUIERA LA CANCELACIÓN DE (I) LA ELIMINACIÓN DE LOS AJUSTES POR EL COSTO DE VIDA Y/O (II) LOS CONGELAMIENTOS DEL DEVENGO DE BENEFICIOS DEFINIDOS CONFORME AL SISTEMA DE RETIRO DE MAESTROS O EL SISTEMA DE RETIRO DEL PODER JUDICIAL A PARTIR DE LA FECHA DE ENTRADA EN VIGOR DEL PLAN, INCLUSIVE.**

**NOTIFÍQUESE ASIMISMO** que los fundamentos para la solicitud de las decisiones antes mencionadas por la Junta de Supervisión son los siguientes: (a) la Sección 104 de la Ley 53-2021, en la parte pertinente, dice "los empleados, se dispone por el presente lo siguiente: "la Asamblea Legislativa autoriza la emisión de los Bonos de Obligaciones Generales y CVI sujeto a la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual…"; (b) la Sección 605 de la Ley 53-2021, en su parte pertinente, dispone: "… La vigencia de esta Ley tiene como condición la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual tal como se define en el Plan…"; (c) el Artículo 102(qq) de la Ley 53-2021 hace referencia a una definición de la Modificación del Beneficio Mensual, pero el Artículo 102 no se refiere en sus definiciones ni define ninguno de los (i) beneficios definidos, (ii) ajustes por el costo de vida, o (iii) congelamientos; (d) Una búsqueda en la traducción al inglés de la Ley 53-2021 no ha detectado ninguna mención a las frases o palabras "beneficio definido", "costo de vida" o "congelamiento"; (e) la Declaración de Motivos de la Ley 53-2021 incluye una frase que dispone que la ley "incluye cero recortes a las pensiones de los actuales retirados y los beneficios devengados actuales de empleados públicos en actividad y un deseo de promover el bienestar del pueblo de Puerto Rico". Ante la referencia a cero recortes a los retirados actuales y los "beneficios devengados actuales de empleados públicos en actividad", la Junta de Supervisión considera que la ley protege muy cuidadosamente los niveles actuales de pensiones, pero no los niveles subsiguientes que se ven recortados por el congelamiento de los beneficios definidos; (f) El congelamiento de beneficios definidos ahorra miles de millones de dólares durante el plan fiscal certificado y es improbable que la Legislatura requiera la eliminación de tales grandes ahorros sin mencionarlos específicamente. Por analogía, la Corte Suprema de Estados Unidos ha observado que el Congreso "no oculta elefantes en cuevas de ratones", (*Whitman c. Am. Trucking Ass'ns*, 531 U.S. 457, 458 (2001). Creemos que el requisito de la eliminación del devengo de beneficios definidos sin mencionarlos específicamente sería como ocultar un elefante en una cueva de ratones; (g) la Ley 53-2021 incluye una oración en el Artículo 605 que dispone "la continuación de la vigencia de esta ley dependerá de cero recortes en las pensiones". Por todas las razones que anteceden, la Junta de Supervisión sostiene que el único significado posible de "cero recortes a las pensiones" es la eliminación de la Modificación de Beneficios Mensuales, y no significa que el congelamiento de beneficios definidos ni la cancelación de los ajustes en el costo de vida deban ser eliminados.

**NOTIFÍQUESE ASIMISMO** que el 1 de noviembre de 2021, la Junta de Supervisión radicó la *Moción Urgente de la Junta de Supervisión y Administración Financiera para Puerto Rico para una Orden que (I) apruebe la forma de Notificación de Decisiones solicitadas por la Junta de Supervisión en la Vista de Confirmación con respecto a la Ley 53-2021 y (II) establezca la Fecha Límite para Presentación de Objeciones* [ECF Núm. 19002] (la "Moción"), que procura obtener la aprobación del Tribunal para ciertos procedimientos y fechas límite en relación con las decisiones solicitadas por la Junta de Supervisión que se describen anteriormente. Se adjunta una copia de la Ley 53-2021 a la Moción como Anexo B. El 2 de noviembre de 2021, el Tribunal radicó una orden que concede la Moción [ECF Núm. 19017] (la "Orden").

**NOTIFÍQUESE ASIMISMO** que, de conformidad con la Orden, cualquier objeción o respuesta a las decisiones solicitadas por la Junta de Supervisión deberán (i) estar por escrito y firmadas; (ii) estipular el nombre, la dirección, la persona que presenta las objeciones es un empleado actual o ex empleado o retirado del Gobierno, o si tiene alguna otra capacidad legal para presentar su objeción; (iii) formular claramente los fundamentos de la objeción; (iv) radicarse ante el Tribunal, junto con las pruebas de los servicios prestados y notificarse a las siguientes partes de manera tal que se reciba a más tardar en la Fecha Límite para la presentación de objeciones, **12 de noviembre de 2021, a las 5:00 p.m. (hora del Atlántico)**: (a) los abogados de la Junta de Supervisión, Proskauer Rose LLP, Eleven Times Square, Nueva York, NY 10036, Atn: Martin J. Bienenstock y Brian S. Rosen, y (b) los abogados de AAFAF, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, Nueva York, NY 10036, Atn: John J. Rapisardi, Peter Friedman, y Maria J. DiConza.

**NOTIFÍQUESE ASIMISMO** que la fecha límite para la radicación de respuestas en respaldo de las decisiones solicitadas por la Junta de Supervisión es el **15 de noviembre de 2021**.

**NOTIFÍQUESE ASIMISMO** que las copias del Plan y todos los demás documentos radicados en estos casos de Título III pueden obtenerse visitando el sitio web del caso mantenido por Prime Clerk LLC, https://cases.primeclerk.com/puertorico; enviando una solicitud a Prime Clerk LLC, llamando al (844) 822-9231 (llamada gratuita en EE.UU. y Puerto Rico) o al (646) 486-7944 (para llamadas internacionales), de 10:00 a.m. a 7:00 p.m. (hora del Atlántico) (puede solicitarse hablar con alguien en español), o enviando un mensaje a puertoricoinfo@primeclerk.com, o, mediante el pago de un arancel, en el sitio web del Tribunal, https://www.prd.uscourts.gov. Se necesita tener un nombre de usuario y contraseña de PACER para acceder a los documentos en el sitio web del Tribunal y estos pueden obtenerse a través del Centro de Servicios de PACER en www.pacer.psc.uscourts.gov.

Fecha:  2 de noviembre de 2021, San Juan, Puerto Rico

Atentamente,  /s/ *Hermann D. Bauer* , Hermann D. Bauer, USDC Núm. 215205, **O'NEILL & BORGES LLC**, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918-1813, Tel: (787) 764- 8181, Fax: (787) 753- 8944, *Coabogados de la Junta de Supervisión y Administración Financiera en representación de los Deudores* -and- /s/ *Martin J. Bienenstock* , Martin J. Bienenstock, Brian. S. Rosen, (Admisión Pro Hac Vice), **PROSKAUER ROSE LLP**, Eleven Times Square, Nueva York, NY 10036, Tel: (212) 969-3000, Fax: (212) 969- 2900, *Abogados de la Junta de Supervisión y Administración Financiera como representante de los Deudores*

[1]  Los Deudores en estos Casos del Título III, junto con el número de caso de Título III respectivo de cada Deudor y los últimos cuatro (4) dígitos del número de identificación fiscal federal de cada Deudor, según corresponda, son: (i) el Estado Libre Asociado (ELA) de Puerto Rico (Caso de Quiebra Núm. 17-BK-3283-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3481); (ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17-BK-3284-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 8474); (iii) la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico (Caso de Quiebra Núm. 17-BK-3567-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3808); (iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de Quiebra Núm. 17-BK-3566-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 9686); (v) la Autoridad de Energía Eléctrica de Puerto Rico ("AEE") (Caso de Quiebra Núm. 17-BK-4780-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3747); y (vi) la Autoridad de Edificios Públicos de Puerto Rico ("AEP") de Puerto Rico (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3801) (Los números de caso de Título III figuran como números de Caso de Quiebra debido a limitaciones del software).

[2]  PROMESA se encuentra codificada en 48 U.S.C. §§ 2102—2241.

[3]  Los términos en mayúscula que se usan pero que no se definen en el presente tendrán los significados que se les atribuyen en el Plan.

971-104247-1

# **Exhibit D**



State of Florida                                                             November 8, 2021
County of Monroe, Dade and Broward

I *Matthew Weisberg* Being Duly Sworn on oath say he is and during all times herein stated has been the publisher's designated agent of the publication known as **EL Nuevo Herald** has full knowledge of the facts herein stated as follows:

The run of paper advertisement (ROP) in the Main section A of EL nuevo Herald for LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, Núm. 17 BK 3283-LTS was distributed to Publishers full circulations (EL Nuevo Herald) On the 8th day of November 2021

By: 

Subscribed and sworn to before me this 8th day of November 2021

**Miami Herald**
MEDIA COMPANY

3511 NW 91 Avenue, Miami, FL 33172 | ********@miamiherald.com | www.miamiherald.com | www.elnuevoherald.com

VIENE DE LA 2A

# SECUELAS

ebria.

Estuvo internada en un centro de rehabilitación durante mes y medio, pero al salir regresó a su círculo de amistades, comenzó de nuevo a beber y se fue de la casa dejando a Anderson y los dos hijos de 14 años y 8 años de edad.

"Fue muy duro porque nosotros venimos de estar muy bien en Venezuela. Si no es gracias a la persecución y a no estar de acuerdo con un gobierno dictatorial, nos hubiéramos quedado. Posiblemente esto no hubiera sucedido. Perdí todo, mi casa, mi comunidad, y más que todo mi familia", expresó a el Nuevo Herald.

El venezolano, que emigró hace tres años, aseguró que estar fuera de su país es muy traumatizante. Ha sufrido insomnio y ansiedad que a su vez lo ha impulsado a comer de manera compulsiva, aumentando de peso. Padeció penurias económicas y sufrió de depresión, pero logró superarla.

Su hijo mayor sufre de depresión y está bajo tratamiento con psicólogos.

"Muchas veces caí en crisis, pero mi hijo me traquilizaba (...) Fue muy duro.Ya hemos aceptado mucho lo de la separación y hemos ido solventando un poco la situación económica", relató.

Jazmín Pereira, odontólogo, dijo que su salida se produjo tanto por la persecución como por la situación económica.

"La crisis me alcanzó, no podía costear la calidad de vida ni para mi, ni para mi familia. También por la persecución política, mi familia siempre ha sido opositora al régimen chavista y en la zona donde vivíamos se ensañaron mucho con los disidentes", dijo a el Nuevo Herald.

Pereira, al igual que Tovar y Anderson, tuvo que "agarrar una maleta y meter lo que me cupiera".

Cuando llegó a Estados Unidos el estrés y la ansiedad la afectaron. Sufrió bulimia durante el primer año de ser emigrante.

"No quería comer, la comida me daba náusea. El primer año de llegar aquí lo padecí y me lo tuvieron que tratar psicológicamente", contó.

## HUIR DE LA REPRESIÓN

Un total de 5,914,519 venezolanos han emigrado por la crisis económica, la inseguridad y la represión gubernamental, de acuerdo con cifras del 22 de octubre de 2021 de la Plataforma de Coordinación Interagencial para Refugiados y Migrantes de Venezuela (R4V) que cuenta con el apoyo de ACNUR y la Organización Internacional para la Migración (IOM).

El éxodo de venezolanos "representa la mayor crisis migratoria en la historia reciente de América Latina," dijo Human Rights Watch (HRW) en su informe mundial sobre derechos humanos de 2021.

HRW señaló que una misión del Consejo de Derechos Humanos de la ONU determinó que autoridades del más alto nivel cometieron flagrantes abusos que constituyen crímenes de lesa humanidad.

"El gobierno de Nicolás Maduro y sus fuerzas de seguridad son responsables de ejecuciones extrajudiciales y desapariciones forzadas por períodos breves y han encarcelado a opositores, juzgado a civiles en tribunales militares, torturado a detenidos y reprimido a manifestantes", pormenorizó.

Un informe de la Alta Comisionada de la ONU para los Derechos Humanos, Michelle Bachelet, divulgado el pasado junio señaló que su oficina continuó recibiendo denuncias creíbles de tortura o tratos o penas crueles, inhumanos o degradantes. Recibió algunos reportes de golpizas, descargas eléctricas, violencia sexual y amenazas de violación.

Mientras que los patrones previamente identificados de desapariciones forzadas y detenciones en incomunicación persistieron. Hubo casos de personas que fueron sometidas a desapariciones forzadas, durante las cuales se las mantuvo incomunicadas y las autoridades se negaron a compartir su paradero con sus defensas o sus familiares.

Dos años antes, Bachelet emitió un aniquilador informe detallando que en la mayoría de los casos se sometió a las personas detenidas a torturas con corriente eléctrica, asfixia con bolsas de plástico, simulacros de ahogamiento, palizas, violencias sexuales, privación de agua y comida, posturas forzadas y exposición a temperaturas extremas.

María Eugenia Tovar no sufrió tortura, pero fue víctima de acoso psicológico y persecución en medio del viacrucis que vivió con la muerte de su hija. Apenas la joven falleció le informaron en la clínica que funcionarios de una comisión especial reclamaban el cuerpo para trasladarlo a Caracas.

Afirma que el régimen quería extraer la bala que mató a su hija para evitar que fuera vinculada con los colectivos que dispararon contra los manifestantes en la protesta antigubernamental donde la joven participó en Valencia.

Mientras, los paramilitares del régimen se apostaban en las afueras de la clínica permanentemente en motos.

Los funcionarios se llevaron el cuerpo en contra de la voluntad de Tovar, pero no lo trasladaron a Caracas. Después ella logró recuperar el cadáver y cuando fue a una agencia policial a buscar el documento que le permitiría retirarlo, la sometieron a un prolongado interrogatorio.

En medio de esta situación, recibía llamadas anónimas a su casa y a su trabajo con la intención de atemorizarla para que no declarara sobre el caso de su hija. Personas con camisas rojas iban a su lugar de empleo y otras al edificio donde vivía a hacer preguntas sobre ella y su familia.

También se enfrentó a la negativa de varias funerarias a realizar el servicio fúnebre por temor a sufrir ataques de los paramilitares.

Dos meses después de la muerte de su hija, Tovar tuvo que huir de Venezuela y cuando llegó con sus tres hijos estuvieron casi un año sin salir del lugar donde vivían. "Estábamos deprimidos, se nos paralizó el mundo", dijo.

Tovar no quería comer, lloraba, no dormía y aún sufre de depresión.

"Cada uno de mis hijos vivía su dolor a su manera y yo vivía muy encerrada en mi. De verdad que fueron unos meses bastante fuertes. La depresión era fuerte", recordó.

La familia recibió asistencia psicológica y en la actualidad sus tres hijos están bien, tienen empleos y parejas.

"En este momento me siento bien, nada que me vaya a ir por el camino de las drogas o por el alcohol. Seguimos lidiando, trabajando en esto porque es algo que no va a pasar nunca, pero aprendemos a vivir con el dolor", dijo y se echó a llorar.

## NECESIDAD DE SERVICIOS PSICOLÓGICOS

Antes de la pandemia del COVID-19 la mayoría de las personas que atendía el Centro para Sobrevivientes de la Tortura de la Florida (FCST) eran venezolanos y muchos de ellos necesitaban tanto servicios psiquiátricos como psicológicos, dijeron directivas de ese centro.

Sabine Balmir-Derenoncourt, coordinadora del FCST, detalló los venezolanos que acuden a ese programa sufren de gran ansiedad, depresión, incapacidad para dormir y tienen muchas pesadillas.

"La mayoría de los clientes que nos han llegado de Venezuela la necesidad primaria que tenían era acudir a servicios psicológicos. Su necesidad era tan grande que teníamos que esperar a que los estabilizaran para que luego pudieran acudir a otros programas como clases de inglés u orientación de trabajo", puntualizó.

Sylvia Acevedo, directora de Servicios para Refugiados y Empleo del FCST, dijo que para recibir asistencia de ese programa las personas tienen que ser víctimas de tortura física o psicológica en su país de origen y que han sido instigados por el gobierno de su nación, por una persona que representa a un gobierno o un paramilitar.

Desde 2000, el FCST ha ayudado a miles de sobrevivientes que han experimentado actos de "tortura indescriptibles", con la obtención de recursos para problemas relacionados con el trastorno de estrés postraumático, la ansiedad y la depresión.

En el periodo fiscal de 2020, el programa asistió a 272 venezolanos y 72.06% de ellos tenían edades entre 18 años y 60 años y el 19.12% de 5 años a 18 años, de acuerdo con cifras del centro.

El programa brinda tratamiento integral y servicios de apoyo gratuitos a las víctimas de tortura política que se han trasladado a las áreas de Tampa Bay y Miami-Dade desde sus países de origen.

Entre los servicios está un tratamiento completo con una evaluación biopsicosocial-espiritual integral de necesidades realizada en el hogar de las personas; servicios médicos, de salud mental, legales y sociales e intérpretes profesionales para acompañar a los clientes a las citas según sea necesario.

*Sonia Osorio:*
*305-376-2219,*
*@soniaosoriog*

VIENE DE LA 3A

# DE LA CAMPA

ció a la Ciudad de Guatemala. Fue a Perú para construir el complejo de la mina y fundición de cobre de Cuajone, que también implicó la construcción de una ciudad circundante. Para la familia real saudita, construyó un aeropuerto en Yeda.

"Perdí la cuenta de todos los proyectos que realizó en todo el mundo, desde Corea hasta Indonesia, pasando por Malasia, la República Dominicana y Venezuela", dijo Villoch.

Su amplia experiencia en construcción le llevó a ser presidente de Rust International y vicepresidente de Fluor Daniel, Kellogg/Rust International y Procon/UOP International.

Además de la navegación y la construcción, la familia era muy importante para De la Campa. Villoch dice que le enseñaba las herramientas de su oficio y la llevaba a las obras, recordándole que podía hacer cualquier cosa.

"Mi padre siempre me decía que todo era posible", dijo Villoch. "Nada estaba fuera de los límites para mí…".

En su vida posterior, tras retirarse de la construcción, De la Campa volvió a navegar de forma más pausada que en sus años de juventud, en los que se dedicaba a las regatas.

Además de Villoch y su yerno César E. Mendoza, le sobreviven su hijo Gabriel de la Campa, así como sus nietas Danielle M. Villoch y Victoria de la Campa, y sus bisnietas Felicity y Bonnie Mendoza.

La misa se celebrará el martes a las 10 a.m. en St. Augustine Catholic Church, 1400 Miller Rd., Coral Gables, seguida de un entierro en el Our Lady of Mercy Cemetery, 11411 NW 25th St.

En lugar de flores, la familia solicita que se hagan donaciones en su memoria al Fondo de Investigación e Innovación de la Baptist Health Foundation/Miami Cancer Institute en honor del doctor Peter Citron.

*Devoun Cetoute:*
*305-376-2026,*
*@devoun_cetoute*

VIENE DE LA 3A

# REPUDIO

Herald.

Berthin dijo que "definitivamente" no son elecciones libres, son básicamente elecciones para "coronar la legitimidad de la dictadura de Ortega y Murillo", debido a que los opositores están encarcelados y debido a la intensificación de la represión hay más de 149 presos políticos.

Una situación que afirmó se ha "venido armando" desde las protestas de 2018 e incluso antes, de manera que consideró que las elecciones y los resultados "que ya lo sabemos" no son legítimos y definitivamente hay seguir presionando para que los nicaragüenses tengan la opción de elegir libremente a sus representantes y los presos políticos sean liberados de inmediato.

Nicaragua en los últimos 15 años ha sido el país donde más se han deteriorado los derechos civiles y políticos después de Venezuela, 33 puntos ha bajado de una puntuación de 100, y se encuentren en posiciones similares a las de otras dictaduras como Bielorrusia, China, Afganistán, entre otros países que son gobernados por líderes autoritarios, de acuerdo a cifras de Freedom House.

*Sonia Osorio:*
*305-376-2219,*
*@soniaosoriog*

---

**TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS**
**DISTRITO DE PUERTO RICO**

En el caso:
LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, como representante de
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO,

Deudores.[1]

Título III de PROMESA
Núm. 17 BK 3283-LTS
(Con administración conjunta)

**NOTIFICACIÓN DE (I) DECISIONES SOLICITADAS POR LA JUNTA DE SUPERVISIÓN EN LA VISTA DE CONFIRMACIÓN CON RESPECTO A LA LEY 532021 Y (II) FECHA LÍMITE PARA LA PRESENTACIÓN DE OBJECIONES**

**NOTIFÍQUESE** que, el 30 de julio de 2021, La Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como representante exclusivo para el Título III del Estado Libre Asociado de Puerto Rico (el "Estado Libre Asociado"), el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE"), y la Autoridad de Edificios Públicos de Puerto Rico ("AEP"), junto con el Estado Libre Asociado y el SRE, los "Deudores") de conformidad con la Sección 315(b) de la *Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radicó el *Séptimo Plan de Ajuste Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros.* [ECF Núm. 17627] (con sus enmiendas, modificaciones o modificaciones periódicas, el "Plan").[3]

**NOTIFÍQUESE ASIMISMO** que se celebrará una vista para examinar la confirmación del Plan (la "Vista de confirmación") ante la Honorable Juez Laura Taylor Swain, Juez de Distrito de Estados Unidos, mediante comunicación de video y telefónica, el **8–10, 12, 15–18, y el 22–23 de noviembre de 2021 a las 9:30 a.m. (hora del Atlántico)**, en caso de que la Vista de Confirmación no concluya con anterioridad.

**NOTIFÍQUESE ASIMISMO** que el 26 de octubre de 2021, el Gobernador del Estado Libre Asociado de Puerto Rico promulgó la Ley 53-2021. **NOTIFÍQUESE ASIMISMO QUE LA JUNTA DE SUPERVISIÓN SOLICITARÁ EN LA VISTA DE CONFIRMACIÓN QUE SE EMITA UNA DECISIÓN PARA QUE LA AUTORIZACIÓN DE ENDEUDAMIENTO DE LA LEY 53-2021 TENGA COMO ÚNICA CONDICIÓN LA CANCELACIÓN EN EL PLAN DE LA MODIFICACIÓN DE LOS BENEFICIOS MENSUALES (TAL COMO SE DEFINEN EN EL PLAN), Y NO REQUERIRÁ LA CANCELACIÓN DE (I) LA ELIMINACIÓN DE LOS AJUSTES POR EL COSTO DE VIDA Y/O (II) LOS CONGELAMIENTOS DEL DEVENGO DE BENEFICIOS DEFINIDOS CONFORME AL SISTEMA DE RETIRO DE MAESTROS O EL SISTEMA DE RETIRO DEL PODER JUDICIAL A PARTIR DE LA FECHA DE ENTRADA EN VIGOR DEL PLAN, INCLUSIVE.**

**NOTIFÍQUESE ASIMISMO** que los fundamentos para la solicitud de las decisiones antes mencionadas por la Junta de Supervisión son los siguientes: (a) la Sección 104 de la Ley 53-2021, en la parte pertinente, dice que "los empleados, se dispone por el presente lo siguiente: "la Asamblea Legislativa autoriza la emisión de los Bonos de Obligaciones Generales y CVI sujeto a la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual…"; (b) la Sección 605 de la Ley 53-2021, en su parte pertinente, dispone: "… La vigencia de esta Ley tiene como condición la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual tal como se definen en el Plan…"; (c) el Artículo 102(oq) de la Ley 53-2021 hace referencia a una definición de la Modificación del Beneficio Mensual, pero el Artículo 102 no se refiere en sus definiciones ni define ninguno de los (i) beneficios definidos, (ii) ajustes por el costo de vida, o (iii) congelamientos; (d) Una búsqueda en la traducción al inglés de la Ley 53-2021 no ha detectado ninguna mención a las frases o palabras "beneficio definido", "costo de vida" o "congelamiento"; (e) la Declaración de Motivos de la Ley 53-2021 incluye una frase que dispone que la ley "incluye cero recortes a las pensiones de los actuales retirados y los beneficios devengados actuales de empleados públicos en actividad y un deseo de promover el bienestar del pueblo de Puerto Rico". Ante la referencia a cero recortes para los retirados actuales y los "beneficios devengados actuales de empleados públicos en actividad", la Junta de Supervisión considera que la ley protege muy cuidadosamente los niveles actuales de pensiones, pero no los niveles subsiguientes que se ven recortados por el congelamiento de los beneficios definidos; (f) El congelamiento de beneficios definidos ahorra miles de millones de dólares durante el plan fiscal certificado y es improbable que la Legislatura requiera la eliminación de tales grandes ahorros sin mencionarlo específicamente. Por analogía, la Corte Suprema de Estados Unidos ha observado que el Congreso "no oculta elefantes en cuevas de ratones", (*Whitman c. Am. Trucking Ass'ns*, 531 U.S. 457, 458 (2001). Creemos que el requisito de la eliminación del devengo de beneficios definidos sin mencionarlos específicamente sería como ocultar un elefante en una cueva de ratones; (g) la Ley 53-2021 incluye una oración en el Artículo 605 que dispone "la continuación de la vigencia de esta ley dependerá de cero recortes en las pensiones". Por todas las razones que anteceden, la Junta de Supervisión sostiene que el único significado posible de "cero recortes a las pensiones" es la eliminación de la Modificación de Beneficios Mensuales, y no significa que el congelamiento de beneficios definidos ni la cancelación de los ajustes en el costo de vida deban ser eliminados.

**NOTIFÍQUESE ASIMISMO** que el 1 de noviembre de 2021, la Junta de Supervisión radicó la *Moción Urgente de la Junta de Supervisión y Administración Financiera para Puerto Rico para una Orden que (I) apruebe la forma de Notificación de Decisiones solicitadas por la Junta de Supervisión en la Vista de Confirmación con respecto a la Ley 53-2021 y (II) establezca la Fecha Límite para Presentación de Objeciones* [ECF Núm. 19002] (la "Moción"), que procura obtener la aprobación del Tribunal para ciertos procedimientos y fechas límite en relación con las decisiones solicitadas por la Junta de Supervisión que se describen anteriormente. Se adjunta una copia de la Ley 53-2021 a la Moción como Anexo B. El 2 de noviembre de 2021, el Tribunal radicó una orden que concede la Moción [ECF Núm. 19017] (la "Orden").

**NOTIFÍQUESE ASIMISMO** que, de conformidad con la Orden, cualquier objeción o respuesta a las decisiones solicitadas por la Junta de Supervisión deberán (i) estar por escrito y firmadas; (ii) estipular el nombre, la dirección, si la persona que presenta las objeciones es un empleado actual o ex empleado o retirado del Gobierno, si es cliente alguna otra capacidad legal para presentar la objeción; (iii) formular claramente los fundamentos de la objeción; (iv) radicarse ante el Tribunal, junto con las pruebas de los servicios prestados y notificarse a las siguientes partes de manera tal que se reciba a más tardar en la Fecha Límite para la presentación de objeciones, **12 de noviembre de 2021, a las 5:00 p.m. (hora del Atlántico)**: (a) los abogados de la Junta de Supervisión, Proskauer Rose LLP, Eleven Times Square, Nueva York, NY 10036, Atn: Martin J. Bienenstock y Brian S. Rosen, y (b) los abogados de AAFAF, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, Nueva York, NY 10036, Atn: John J. Rapisardi, Peter Friedman, y Maria J. DiConza.

**NOTIFÍQUESE ASIMISMO** que la fecha límite para la radicación de respuestas en respaldo de las decisiones solicitadas por la Junta de Supervisión es el **15 de noviembre de 2021**.

**NOTIFÍQUESE ASIMISMO** que las copias del Plan y todos los demás documentos radicados en estos casos de Título III pueden obtenerse visitando el sitio web del caso mantenido por Prime Clerk LLC, https://cases.primeclerk.com/puertorico; enviando una solicitud a Prime Clerk LLC, llamando al (844) 822-9231 (llamada gratuita en EE.UU. y Puerto Rico) o al (646) 486-7944 (para llamadas internacionales), de 10:00 a.m. a 7:00 p.m. (hora del Atlántico) (puede solicitarse hablar con alguien en español), o enviando un mensaje a puertoricoinfo@primeclerk.com, o, mediante el pago de un arancel, en el sitio web del Tribunal, https://www.prd.uscourts.gov. Se necesita tener un nombre de usuario y contraseña de PACER para acceder a los documentos en el sitio web del Tribunal y estos pueden obtenerse a través del Centro de Servicios de PACER en www.pacer.psc.uscourts.gov.

Fecha: 2 de noviembre 2021, San Juan, Puerto Rico

Atentamente, /s/ *Hermann D. Bauer*, Hermann D. Bauer, USDC Núm. 215205, **O'NEILL & BORGES LLC**, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918-1813, Tel: (787) 764- 8181, Fax: (787) 753- 8944, *Coabogados de la Junta de Supervisión y Administración Financiera en representación de los Deudores* -and- /s/ *Martin J. Bienenstock*, Martin J. Bienenstock, Brian S. Rosen, (Admisión *Pro Hac Vice*), **PROSKAUER ROSE LLP**, Eleven Times Square, Nueva York, NY 10036, Tel: (212) 969-3000, Fax: (212) 969- 2900, *Abogados de la Junta de Supervisión y Administración Financiera como representante de los Deudores*

[1] Los Deudores en estos Casos del Título III, junto con el número de caso de Título III respectivo de cada Deudor y los últimos cuatro (4) dígitos del número de identificación fiscal federal de cada Deudor, según corresponda, son (i) el Estado Libre Asociado de Puerto Rico (Caso de Quiebra Núm. 17-BK-3283-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3481); (ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17-BK-3284-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 8474); (iii) la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico (Caso de Quiebra Núm. 17-BK-3567-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3808); (iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de Quiebra Núm. 17-BK-3566-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 9686); (iii) la Autoridad de Energía Eléctrica de Puerto Rico ("AEE") (Caso de Quiebra Núm. 17-BK-4780-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3747); y (vi) la Autoridad de Edificios Públicos de Puerto Rico ("AEP") de Puerto Rico (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3801) (Los números de caso de Título III figuran como números de Caso de Quiebra debido a limitaciones del software).

[2] PROMESA se encuentra codificada en 48 U.S.C. §§ 2102–2241.

[3] Los términos en mayúscula que se usan pero que no se definen en el presente tendrán los significados que se les atribuyen en el Plan.

## EL NUEVO HERALD

### CÓMO CONTACTARNOS

Subscripciones: También en 1 800 843-4372
Anuncios clasificados 1 866 860-6000
Otros anuncios: 305-376-2820
Para la entrega de su periódico: 1 800 843-4372
Horario de servicio al cliente: customerservice@miamiherald.com

### DEPARTAMENTOS DE NOTICIAS:
Mesa de Redacción: 305-376-2285
Galería y entretenimiento: 305-376-2183
Revista Viernes: 305-376-2217
Deportes: 305-376-2147
Fotografía: 305-376-2183
Perspectiva/Opiniones: 305-376-2166
perspectiva@elnuevoherald.com
General: 305-376-3535

### EJECUTIVOS DE LA REDACCIÓN
Nancy A. Meyer, Presidente, 305-376-3355
nmeyer@miamiherald.com

Monica R. Richardson, Directora Ejecutiva, 305-376-3410, mrichardson@miamiherald.com

Alex Mena, Subdirector de el Nuevo Herald, 305-376-3493, amena@miamiherald.com

Andoni Biurrarena, Subdirector Adjunto de el Nuevo Herald, 305-376-2002, abiurrarena@elnuevoherald.com

Maru Antuñano, Editora Jefe de Producción y Secciones Especiales, 305-376-2183, mantunano@elnuevoherald.com

Luisa Yanez, Coordinadora de Opinión, 305-376-4627, lyanez@miamiherald.com

Orlando Mellado, Jefe de Fotografía y video, 305-376-3582, omellado@elnuevoherald.com

Orlando Comas, Vicepresidente de publicidad
305-376-5181, ocomas@miamiherald.com

### AUTORIZACIÓN PARA REIMPRIMIR:
El contenido de información que aparece en el Nuevo Herald está protegido por el Federal Copyright Act (la ley de derechos de autor). No se permiten reproducciones sin permiso por escrito. Para solicitar autorización llame a los siguientes números. Fotos y gráficas: 305-376-3582; ediciones atrasadas: 305-376-3431, email a: backissues@miamiherald.com.

### PRECIOS DE ENTREGA A DOMICILIO POR SEMANA
**En Miami Dade y Broward:**
Precio un solo ejemplar; Diario: $2.50*
Domingo: $3.99* / Ediciones especiales: $5.99*.
Tarifas publicadas por suscripción semanal para formato impreso y digital
Domingo-Viernes, $25.90* / semana

Miércoles/Domingo, $15.50* / semana
Solo domingo, $14.50* / semana
**Tarifas publicadas por suscripción semanal solo para formato impreso**
Domingo-Viernes, $25.70* / semana
Miércoles/Domingo, $15.30* / semana
Solo domingo, $14.30* / semana
**Tarifas publicadas solo para formato digital**
Semanal, $26.80*

\* además de impuesto a la venta aplicable (Pay las tax si aplicable). Su suscripción se renovará automáticamente durante el plazo inicial a la tarifa actual, a menos que pagos de suscripción anticipada. Las cancelaciones entran en vigencia al final de su período de suscripción actual. Todos los pagos de la cuenta de suscripción no son reembolsables. Nuestro contenido llega a usted a través de diferentes medios y formatos. Nos reservamos el derecho de sustituir la entrega y el formato de su suscripción impresa por una eEdition (réplica digital de una edición impresa) en cualquier momento. Las notificaciones de cambio de tarifas se enviarán por correo postal o correo electrónico a la dirección de facturación del suscriptor antes de la fecha efectiva de cambio de tasa. Los precios están sujetos a cambios. Las notificaciones de cambio de tarifas se enviarán por correo o correo electrónico a la dirección de facturación del suscriptor antes de que cambie la tarifa. El precio de su suscripción incluye un cargo de transporte diario de $0.25 de lunes a sábado, y $0.46 los domingos, más el impuesto de ventas aplicable en la Florida. Usted tiene la opción de recoger el periódico en uno de nuestros centros de distribución para evitar el cargo de transporte. Para los suscriptores que decidan pagar la cuenta de suscripción por renovación automática, se aplicará una tarifa de factura mensual de $2.99 por cada período de renovación. Todas las suscripciones incluirán la entrega el día de Acción de Gracias. Se agregará una tarifa adicional de $ 3.99 a todas las suscripciones para cada una de estas suscripciones prem en 2021: 12/19 y en 2022: 10/9, 11/24, 12/25. Usted puede cancelar en cualquier momento poniéndose en contacto con nuestro centro de servicio al cliente llamando al 1-800-The-Herald (843-4372). Su suscripción está sujeta a adicional términos de servicio disponibles en http://www.elnuevoherald.com/servicios/condiciones-de-uso/.

## **Exhibit E**



# AFIDAVIT

## TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS
## DISTRITO DE PUERTO RICO
### Título III de PROMESA
### Núm. 17 BK 3283-LTS

**NOTIFICACIÓN DE (I) DECISIONES SOLICITADAS POR LA JUNTA DE SUPERVISIÓN EN LA VISTA DE CONFIRMACIÓN CON RESPECTO A LA LEY 532021 Y (II) FECHA LÍMITE PARA LA PRESENTACIÓN DE OBJECIONES**

Yo, Noemí Merced Morales habiendo prestado el juramento debido, declaro lo siguiente: Que soy facturadora de Publi-Inversiones para el periódico El Vocero de Puerto Rico el cual se pública en San Juan Puerto Rico y que en las ediciones de este mismo diario correspondientes a los siguientes días:

**8 de noviembre de 2021**

Se dio publicidad al aviso expedido por: **Peticionario: Commonwealth of Puerto Rico.**

Sobre el asunto arriba mencionado, y copia del cual se une al presente affidavit para que forme parte del mismo.

San Juan, Puerto Rico, a __NOV 1 0 2021__

Noemí Merced Morales
Departamento de Finanzas

Affidavit Núm. __121286__ del Registro

Jurado y reconocido ante mí por Noemí Merced Morales, mayor de edad, casada, vecina de San Juan y facturadora del Departamento de Facturación de Publi Inversiones para el periódico El Vocero de Puerto Rico, de esta vecindad, a quien doy fe de conocer personalmente.

San Juan, Puerto Rico, a __NOV 1 0 2021__

NOTARIO PÚBLICO



> LUNES, 8 DE NOVIEMBRE DE 2021    ECONOMÍA >21

# Crece la economía en Lajas

### Mantiene su apuesta como área de interés turístico

**Brenda A. Vázquez**
>bvazquez@elvocero.com

La zona turística y comercial de la Parguera, en Lajas, comenzó a fortalecerse en el segundo trimestre del año y ha continuado en constante crecimiento, luego de enfrentar los terremotos y los desafíos del covid-19 que afectaron las finanzas del sector y el municipio en general.

Así lo aseguró a **EL VOCERO**, Jayson "Jay" Martínez, alcalde de Lajas, tras mencionar, además, algunos de los proyectos en agenda para 2022 y 2023, que mejorarán la experiencia de los visitantes, que han ido en aumento en los pasados meses.

"Vamos a rehabilitar la Playita Rosada con una piscina natural y una inversión de $600,000 y uno de nuestros parques con $800,000. También nos asignaron $8 millones de fondos federales para rehabilitar el vertedero y comprar nuevos terrenos para darle vida al vertedero por 30 años", indicó el ejecutivo municipal.

Sostuvo, que el desarrollo de negocios ha comenzado a extenderse con nuevas propuestas de tiendas al detal y de gastronomía, que le brindarán a los turistas nuevas alternativas que mejoren su experiencia cuando recorran los lugares de interés de La Parguera.

"Ahora se está construyendo una tienda de una marca exclusiva de aquí que estará lista en cinco meses, un nuevo concepto de restaurante de cortes fríos, otro mexicano y una tienda de trajes de baño colombianos, pero de un comerciante local. El desarrollo se está moviendo", aseguró Martínez.

Entre los proyectos en desarrollo también está el mejoramiento de la infraestructura de los predios que componen La Parguera, que, según Delma Rosado Cintrón, presidenta de la Asociación de Comerciantes de la Parguera, fue visitada recientemente por representantes de la Organización de Mercadeo del Destino (DMO) y Compañía de Turismo para evaluar sus necesidades y asignarle fondos cdbg-dr.

"Vinieron a ver en qué condiciones está La Parguera y cómo pueden mejorarla. Están haciendo una evaluación y estamos espe-



Resurge la Parguera como centro de interés turístico. >Suministrada

> "Ahora se está construyendo una tienda de una marca exclusiva de aquí que estará lista en cinco meses, un nuevo concepto de restaurante de cortes fríos, otro mexicano y una tienda de trajes de baño colombianos, pero de un comerciante local. El desarrollo se está moviendo.

**Jayson Martínez**
alcalde de Lajas

rando que nos contesten", explicó Rosado.

Los comerciantes les mostraron los sectores deteriorados y las necesidades apremiantes para recibir, tanto al turista local como al del exterior, de modo que tenga una buena experiencia durante su estadía y recorrido por el concurrido lugar para vacacionar.

"Desde María se dañaron las sombrillas y los techos de la plaza, las áreas de descanso. También hay que arreglar carreteras, alumbrado, pintura, la Playita Rosada, la reserva natural de Los Cayos y la Bahía Bioluminiscente, que es el gancho para que venga el turista americano que es el 95% de los visitantes extranjeros", indicó Rosado.

### Sólida la recuperación del comercio

Los negocios de La Parguera, al igual que muchos otros de los sectores turísticos de Puerto Rico, sufrieron el impacto financiero desde el comienzo de la pandemia, luego de enfrentar la destrucción de los terremotos que paralizaron el comercio en los pueblos más afectados y cercanos al epicentro, situaciones que los dueños de negocios de La Parguera han podido manejar para permanecer en el mercado del comercio turístico.

> **Dato relevante**
> El municipio tiene agendado alrededor de $10 millones en inversión

"Comenzamos a mejorar nuestras ventas desde abril, pero los mejores meses fueron junio, julio y agosto. Las ventas fueron mejor que el 2019, tanto en restaurantes, hoteles y tiendas en general. Los negocios están siendo productivos. Nos reunimos con el alcalde para desarrollar el plan de los eventos de entretenimiento y actividades comunitarias", aseguró la también dueña de La Jamaca Hotel.

La presidenta añadió que "este destino lo tiene todo, gastronomía, hospederías, actividades, playas, deportes acuáticos, operadores turísticos y recursos naturales. También hay nuevos negocios turísticos que están surgiendo", acotó.

El alcalde augura una excelente temporada de invierno para la que tienen varias actividades en agenda con el fin de atraer al turista local y al americano que viene a Puerto Rico en los últimos meses del año huyéndole al frio de los Estados Unidos.

---

**TRIBUNAL DE DISTRITO DE ESTADOS UNIDOS**
**DISTRITO DE PUERTO RICO**

En el caso:
LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, como representante de
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, EL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO,
Deudores.[1]

Título III de PROMESA
Núm. 17 BK 3283-LTS
(Con administración conjunta)

**NOTIFICACIÓN DE (I) DECISIONES SOLICITADAS POR LA JUNTA DE SUPERVISIÓN EN LA VISTA DE CONFIRMACIÓN CON RESPECTO A LA LEY 532021 Y (II) FECHA LÍMITE PARA LA PRESENTACIÓN DE OBJECIONES**

**NOTIFÍQUESE** que, el 30 de julio de 2021, La Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como representante exclusivo para el Título III del Estado Libre Asociado de Puerto Rico (el "Estado Libre Asociado"), el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE"), y la Autoridad de Edificios Públicos de Puerto Rico ("AEP") y, junto con el Estado Libre Asociado y el SRE, los "Deudores") de conformidad con la Sección 315(b) de la *Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radicó el *Séptimo Plan de Ajuste Enmendado de Título III del Estado Libre Asociado de Puerto Rico, y otros.* [ECF Núm. 17627] (con sus enmiendas, complementos o modificaciones periódicas, el "Plan").[3]

**NOTIFÍQUESE ASIMISMO** que se celebrará una vista para examinar la confirmación del Plan (la "Vista de confirmación") ante la Honorable Juez Laura Taylor Swain, Juez de Distrito de Estados Unidos, mediante comunicación de video y telefónica, el **8–10, 12, 15–18, y el 22–23 de noviembre de 2021 a las 9:30 a.m. (hora del Atlántico)**, en caso de que la Vista de Confirmación no concluya con anterioridad.

**NOTIFÍQUESE ASIMISMO** que el 26 de octubre de 2021, el Gobernador del Estado Libre Asociado de Puerto Rico promulgó la Ley 53-2021. **NOTIFÍQUESE ASIMISMO QUE LA JUNTA DE SUPERVISIÓN SOLICITARÁ EN LA VISTA DE CONFIRMACIÓN QUE SE EMITA UNA DECISIÓN PARA QUE LA AUTORIZACIÓN DE ENDEUDAMIENTO DE LA LEY 53-2021 TENGA COMO ÚNICA CONDICIÓN LA CANCELACIÓN EN EL PLAN DE LA MODIFICACIÓN DE LOS BENEFICIOS MENSUALES (TAL COMO SE DEFINEN EN EL PLAN), Y NO REQUIERA LA CANCELACIÓN DE (I) LA ELIMINACIÓN DE LOS AJUSTES POR EL COSTO DE VIDA Y/O (II) LOS CONGELAMIENTOS DEL DEVENGO DE BENEFICIOS DEFINIDOS CONFORME AL SISTEMA DE RETIRO DE MAESTROS O EL SISTEMA DE RETIRO DEL PODER JUDICIAL A PARTIR DE LA FECHA DE ENTRADA EN VIGOR DEL PLAN, INCLUSIVE.**

**NOTIFÍQUESE ASIMISMO** que los fundamentos para la solicitud de las decisiones antes mencionadas por la Junta de Supervisión son los siguientes: (a) la Sección 104 de la Ley 53-2021, en la parte pertinente, dice "los empleados, se dispone por el presente lo siguiente: "la Asamblea Legislativa autoriza la emisión de los Bonos de Obligaciones Generales y CVI sujeto a la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual..."; (b) la Sección 605 de la Ley 53-2021, en su parte pertinente, dispone: "... La vigencia de esta Ley tiene como condición la radicación por parte de la Junta de Supervisión de un Plan enmendado para su confirmación por parte del Tribunal de Título III que elimina la Modificación del Beneficio Mensual tal como se define en el Plan..."; (c) el Artículo 102(qq) de la Ley 53-2021 hace referencia a una definición de la Modificación del Beneficio Mensual, pero el Artículo 102 no se refiere en sus definiciones ni define ninguno de los (i) beneficios definidos, (ii) ajustes por el costo de vida, o (iii) congelamientos; (d) Una búsqueda en la traducción al inglés de la Ley 53-2021 no ha detectado ninguna mención a las frases o palabras "beneficio definido", "costo de vida" o "congelamiento"; (e) la Declaración de Motivos de la Ley 53-2021 incluye una frase que dispone que la ley "incluye cero recortes a las pensiones de los actuales retirados y los beneficios devengados actuales de empleados públicos en actividad y un deseo de promover el bienestar del pueblo de Puerto Rico". Ante la referencia a cero recortes para los retirados actuales y los "beneficios devengados actuales de empleados públicos en actividad", la Junta de Supervisión considera que la ley protege muy cuidadosamente los niveles actuales de pensiones, pero no los niveles subsiguientes que se ven recortados por el congelamiento de los beneficios definidos; (f) El congelamiento de beneficios definidos ahorra miles de millones de dólares durante el plan fiscal certificado y es improbable que la Legislatura requiera la eliminación de tales grandes ahorros sin mencionarlo específicamente. Por analogía, la Corte Suprema de Estados Unidos ha observado que el Congreso "no oculta elefantes en cuevas de ratones", (*Whitman c. Am. Trucking Ass'ns*, 531 U.S. 457, 458 (2001). Creemos que el requisito de la eliminación del devengo de beneficios definidos sin mencionarlos específicamente sería como ocultar un elefante en una cueva de ratones; (g) la Ley 53-2021 incluye una oración en el Artículo 605 que dispone "la continuación de la vigencia de esta ley dependerá de cero recortes en las pensiones". Por todas las razones que anteceden, la Junta de Supervisión sostiene que el único significado posible de "cero recortes a las pensiones" es la eliminación de la Modificación de Beneficios Mensuales, y no significa que el congelamiento de beneficios definidos ni la cancelación de los ajustes en el costo de vida deban ser eliminados.

**NOTIFÍQUESE ASIMISMO** que el 1 de noviembre de 2021, la Junta de Supervisión radicó la *Moción Urgente de la Junta de Supervisión y Administración Financiera para Puerto Rico para una Orden que (I) apruebe la forma de Notificación de Decisiones solicitadas por la Junta de Supervisión en la Vista de Confirmación con respecto a la Ley 53-2021 y (II) establezca la Fecha Límite para Presentación de Objeciones* [ECF Núm. 19002] (la "Moción"), que procura obtener la aprobación del Tribunal para ciertos procedimientos y fechas límite en relación con las decisiones solicitadas por la Junta de Supervisión que se describen anteriormente. Se adjunta una copia de la Ley 53-2021 a la Moción como Anexo B. El 2 de noviembre de 2021, el Tribunal radicó una orden que concede la Moción [ECF Núm. 19017] (la "Orden").

**NOTIFÍQUESE ASIMISMO** que, de conformidad con la Orden, cualquier objeción o respuesta a las decisiones solicitadas por la Junta de Supervisión deberán (i) estar por escrito y firmadas; (ii) estipular el nombre, la dirección, si la persona que presenta las objeciones es un empleado actual o ex empleado o retirado del Gobierno, o si tiene alguna otra capacidad legal para presentar su objeción; (iii) formular claramente los fundamentos de la objeción; (iv) radicarse ante el Tribunal, junto con las pruebas de los servicios prestados y notificarse a las siguientes direcciones de manera tal que se reciba a más tardar en la Fecha Límite para la presentación de objeciones, **12 de noviembre de 2021, a las 5:00 p.m. (hora del Atlántico)**: (a) los abogados de la Junta de Supervisión, Proskauer Rose LLP, Eleven Times Square, Nueva York, NY 10036, Atn: Martin J. Bienenstock y Brian S. Rosen, y (b) los abogados de AAFAF, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, Nueva York, NY 10036, Atn: John J. Rapisardi, Peter Friedman, y Maria J. DiConza.

**NOTIFÍQUESE ASIMISMO** que la fecha límite para la radicación de respuestas en respaldo de las decisiones solicitadas por la Junta de Supervisión es el **15 de noviembre de 2021**.

**NOTIFÍQUESE ASIMISMO** que las copias del Plan y todos los demás documentos radicados en estos casos de Título III pueden obtenerse visitando el sitio web del caso mantenido por Prime Clerk LLC, https://cases.primeclerk.com/puertorico; enviando una solicitud a Prime Clerk LLC, llamando al (844) 822-9231 (llamada gratuita en EE.UU. y Puerto Rico) o al (646) 486-7944 (para llamadas internacionales), de 10:00 a.m. a 7:00 p.m. (hora del Atlántico) (puede solicitarse hablar con alguien en español), o enviando un mensaje a puertoricoinfo@primeclerk.com, o, mediante el pago de un arancel, en el sitio web del Tribunal, https://www.prd.uscourts.gov. Se necesita tener un nombre de usuario y contraseña de PACER para acceder a los documentos en el sitio web del Tribunal y estos pueden obtenerse a través del Centro de Servicios de PACER en www.pacer.psc.uscourts.gov.

Fecha: 2 de noviembre 2021, San Juan, Puerto Rico

Atentamente, /s/ Hermann D. Bauer , Hermann D. Bauer, USDC Núm. 215205, **O'NEILL & BORGES LLC,** 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918-1813, Tel: (787) 764- 8181, Fax: (787) 753- 8944, *Coabogados de la Junta de Supervisión y Administración Financiera en representación de los Deudores* -and- /s/ Martin J. Bienenstock , Martin J. Bienenstock, Brian. S. Rosen, (Admisión *Pro Hac Vice*), **PROSKAUER ROSE LLP,** Eleven Times Square, Nueva York, NY 10036, Tel: (212) 969-3000, Fax: (212) 969- 2900, *Abogados de la Junta de Supervisión y Administración Financiera como representante de los Deudores*

[1] Los Deudores en estos Casos del Título III, junto con el número de caso de Título III respectivo de cada Deudor y los últimos cuatro (4) dígitos del número de identificación fiscal federal de cada Deudor, según corresponda, son (i) el Estado Libre Asociado (ELA) de Puerto Rico (Caso de Quiebra Núm. 17-BK-3283-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3481); (ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17-BK-3284-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 8474); (iii) la Autoridad de Carreteras y Transportación ("ACT") de Puerto Rico (Caso de Quiebra Núm. 17-BK-3567-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3808); (iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de Quiebra Núm. 17-BK-3566-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 9686); (iii) la Autoridad de Energía Eléctrica de Puerto Rico ("AEE") (Caso de Quiebra Núm. 17-BK-4780-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3747); y (vi) la Autoridad de Edificios Públicos de Puerto Rico ("AEP") de Puerto Rico (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos del Número de identificación fiscal federal: 3801) (Los números de caso de Título III figuran como números de Caso de Quiebra debido a limitaciones del software).

[2] PROMESA se encuentra codificada en 48 U.S.C. §§ 2102–2241.

[3] Los términos en mayúscula que se usan pero que no se definen en el presente tendrán los significados que se les atribuyen en el Plan.