# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>    Debtors. | PROMESA<br><br>Title III<br><br>No. 17 BK 3283-LTS |
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>**PUERTO RICO PUBLIC BUILDING AUTHORITY**,<br><br>    Debtor | PROMESA<br><br>Title III<br><br>**No. 19 BK 05523-LTS** |

**OBJECTION TO OVERSIGHT BOARD'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH CONFIRMATION OF MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE PBA**

COMES NOW, Mapfre PRAICO Insurance Company (the "Surety"), creditor of the Puerto Rico Public Buildings Authority (the "PBA") in the PBA's Title III proceedings under the Puerto Rico Oversight Management and Economic Stability Act ("PROMESA"), through the

undersigned counsel and very respectfully objects to the Proposed Findings of Fact and Conclusions of Law in Connection with the Modified Eighth Amended Title III Joint Plan of Adjustment for the PBA filed by the Oversight Board on November 28, 2021, since the amended and modified Plan misclassifies the Surety's claims in complete disregard of the provisions of Section 1122(a) of the Bankruptcy Code and of the case law established by the Court of Appeals for the First Circuit.

**Preliminary Statement**

The Oversight Board proposes to this Court to find that the Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code. Such proposal, is based on its contention that "each Class contains only claims that are either all unsecured Claims or are all secured Claims secured by the same collateral." However, as will be shown below, the Surety's unobjected Proof of Claim clearly establishes that it has a claim in the amount of $698,471.05 against the retainage held by the PBA in the project known as "Comandancia de la Policía, Ponce, Puerto Rico AEP-3563" (the "Bonded Project"). Notwithstanding the foregoing, the Oversight Board incorrectly chose to place its claim in Class 13 of the Plan along with other completely different General Unsecured Claims. Hence, not only the Oversight Board's contention lacks any basis in the facts of the case, but it is crystal clear that the Oversight failed to comply with its basic obligation under Section 1122(a) to avoid commingling dissimilar claims with different legal characteristics into one same class.

At the hearing for rebuttal of Closing Arguments held on November 23, 2021, the Honorable Judge asked the attorney for the Oversight Board why the Oversight Board had not placed the Surety's claim in a separate class as a secured claim as provided in its Proof of Claim. Incredibly, he answered that they had allegedly "not noticed" the claim filed by the Surety and,

thus, "were unaware" of its existence.[1] Even if believed, such omission would be inexcusable and would not constitute a legitimate ground to misclassify a claim to the detriment of one creditor. Afterwards, the Oversight Board modified the Eighth Amended Plan but once again refused to classify the Surety's claim correctly. Accordingly, the Oversight Board's proposed finding should be denied by this Honorable Court.

On May 7, 2020, the Surety timely filed Proof of Claim Number 2 in the secured amount of $698,471.05 (the "Claim") and an unsecured amount of $1,995,362.00 based on its rights as subrogee of the PBA for whom it performed as surety of Synergy Group, S.E. ("Synergy"). By way of subrogation, the remaining retainage amounting to $698,471.05 withheld and unpaid by the PBA in the Bonded Project became the Surety's property many years before the Oversight Board filed a Title III petition on behalf of the PBA to the extent necessary to reimburse the Surety for fulfilling PBA's obligation to pay Synergy's massive debts due to labor, materials, and equipment furnished to PBA's Bonded Project.

On October 15, 2021, the Surety objected to the Plan because the Claim is for earned amounts retained by the PBA from payments made due to labor and materials incorporated into the PBA's Bonded Project but unpaid by the PBA many years before the Oversight Board filed the Title III petition on its behalf, and which never became property of the PBA. The Plan proposes to treat the Claim as a general unsecured claim, thus significantly impairing the same, completely disregarding the Surety's statutory right to be paid the amounts retained by PBA from certified work and materials approved and partially paid by PBA without any kind of reduction or

---

[1] As soon as the transcript of the hearing becomes available, we will supplement this motion with a copy of the transcript.

adjustment under the Plan filed under PROMESA and the Bankruptcy Code provisions incorporated therein.

## Holders of Secured Claims must be placed in a separate class

In addition to any objection raised by creditors, the court has a mandatory independent duty to determine whether the plan meets all of the requirements necessary for confirmation. *In re Wallace,* 61 B.R. 54, 58 (Bankr.W.D.Ark.1986). In providing for classification of claims or interests in a plan, each holder of an allowed claim secured by a security interest in specific property must ordinarily be placed in a separate class. Bankr.Code, 11 U.S.C.A. § 1122. Matter of Moore, 81 B.R. 513 (Bankr. S.D. Iowa 1988). The general rule regarding classification is that "all creditors of equal rank with claims against the same property should be placed in the same class." *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984). Here, the Surety is the only creditor with a claim against the remaining retained fund amounting to $698,471.05 withheld and unpaid by the PBA in the Bonded Project. Hence, pursuant to the First Circuit's opinion in *Granada Wines* to comply with section 1122(a) the Plan proposed by the Oversight Board must place the Surety in a separate class as the only creditor with a claim against such retained fund withheld and unpaid by the PBA in the Bonded Project.

## Background and Description of the Claim

At the request of Synergy, the Surety issued performance and payment bond No. 13014303373 (the "Bond") naming Synergy as Principal and the PBA as Obligee, to guarantee Synergy's compliance of obligations under contract No. C-00031 (2003-2004) (the "Contract") entered into with the PBA on November 24, 2003 for construction of the Bonded Project; and its payment of labor and materials furnished therein. The Contract provided that the PBA would retain

10% of each partial payment earned by Synergy to guarantee the faithful compliance of the Contract.

On August 2, 2006, the PBA declared Synergy in default of its obligations under the Contract. Subsequently, the Surety took over the performance of the remaining work and completed the Bonded Project. By September 27, 2019, ten (10) years had passed since the Surety had incurred a net loss of $9,244,213 to discharge Synergy's obligations to complete the Bonded Project pursuant to its obligations under the Bonds. The Bonded Project was substantially completed by July 2, 2009 and accepted by the PBA on April 9, 2010. On September 10, 2010, the PBA authorized the release of 50% of the retainage amounting to $672,840, which was paid to the Surety. On November 16, 2016, the Surety filed suit against PBA before Puerto Rico's Court of First Instance requesting the payment of the remaining unpaid retainage owed in the Bonded Project and Unabsorbed Extended Overhead costs that Surety had to incur to complete the Bonded Project. On February 11, 2019, Puerto Rico's Court of First Instance entered Partial Judgment ordering the PBA to pay to the Surety the amount of $698,471.05 plus legal interest due to the remaining 50% withheld from payments made due to Surety's performance of Synergy's obligations in the Bonded Project.

As of today, the PBA is withholding as retainage $698,471.05 in the Bonded Project that are property of the Surety. More than ten (10) years have elapsed since the Bonded Project was completed by the Surety, accepted by the PBA, and the Police Headquarters constructed therein have been in use by the Government. However, the PBA has obstinately refused to release the amounts withheld from payments made and owed in its possession to pay for the labor and materials that it took to construct the two massive buildings whose use the Government enjoys today.

**Burden of Proof**

"A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest objects." 11 U.S.C.A. § 502(a). "A proof of claim which comports with the requirements of Bankruptcy Rule 3001(f) constitutes *prima facie* evidence of the validity and amount of the claim. *See* Fed. R. Bankr.P. 3001(f). The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by substantial evidence. *In re Hemingway Transp., Inc.*, 993 F.2d 915, 925 (1st Cir. 1993); In re Hann, 711 F.3d 235, 240 (1st Cir. 2013) ("*a proof of claim is presumptively valid unless countered by an objection supported by substantial evidence, in which case the risk of nonpersuasion returns to the claimant*"); La Trinidad Elderly LP SE (B.A.P. 1st Cir. 2021)("*Absent a viable objection based on substantial evidence, the proof of claim filed by Loíza Ponce constituted prima facie evidence of the validity and amount of that claim*") In re Kittery Point Partners, LLC, 858 F. App'x 386 (1st Cir. 2021)(*a proof of claim is presumptively valid unless countered by an objection supported by substantial evidence and "an objection does not overcome the presumption of prima facie validity of a filed claim unless supported by "substantial evidence"*);  In re Rowlands, No. BAP MB 08-047, 2008 WL 8664766, at 4 (B.A.P. 1st Cir. Dec. 30, 2008)("*a properly executed proof of claim "shall constitute prima facie evidence of the validity and amount of the claim and an objection does not overcome this presumption unless it has substantial merit*"); Nelson v Wells Fargo, N.A., 621 B.R. 542, 559 (B.A.P. 1st Cir. 2020)("*An objection does not overcome the presumption of prima facie validity of a filed claim unless supported by "substantial evidence*"); In re Empresas Omajede Inc. (Bankr. D.P.R. 2015)("*The evidentiary effect of a proof of claim is established in Fed. R. Bankr.P. 3001(f), which provides "[a] proof of claim executed and filed in accordance with these rules shall constitute prima*

*facie evidence of the validity and amount of the claim." Fed. R. Bankr.P. 3001(f)"*). Only if the trustee manages the initial burden of producing substantial evidence, will the ultimate risk of nonpersuasion as to the allowability of the claim shift to the party asserting the claim. *See Bankruptcy Rules,* at 191–92; *see also In re VTN, Inc.,* 69 B.R. 1005, 1006 (Bankr.S.D.Fla.1987)." *In re Hemingway Transp., Inc.*, 993 F.2d 915, 925 (1st Cir. 1993).

Here, the Surety filed its secured Claim using the Official Form provided in this case, which was executed by its Supervisor of the Bonds Department. The same is supported with ten (10) exhibits, including the Judgment entered in its favor on February 11, 2019 against PBA, the bond contract, the Construction Contract, Takeover Agreement, Certificate of Substantial Completion issued by PBA, Certificate of Acceptance of the Project by the PBA, the Certification of Amounts owed issued by PBA, and a spread-sheet itemizing amounts paid by Surety to complete PBA's massive buildings, which have been in use for more than 10 years. Therefore, the Surety's proof of claim comports with the requirements of Bankruptcy Rule 3001(f). Given the foregoing, to impair or reduce the Surety's secured Claim of $698,471.05 in any way, shape, or form not only the Oversight Board was required to file an objection to it; but it was also obligated to support such objection with substantial evidence to prove that the secured Claim was either unmeritorious, invalid, or for a lesser amount than asserted.

**Argument**

The Oversight Board has not filed an objection to the Surety's secured Claim. The Oversight Board has never presented any evidence whatsoever that would establish any grounds upon which this Court could rest to impair or reduce the Surety's Claim in any way. Thus, the Oversight Board has failed to meet its burden to rebut the validity and amount of the Surety's secured Claim, which is presumed correct. Therefore, based on the First Circuit's opinion in *In re*

*Hemingway Transp., Inc.*, supra, as of today the Surety is entitled to be paid by PBA the entire amount of $698,471.05 plus legal interests pursuant to its secured and unobjected Claim.

The Plan aims to adjust and modify the PBA's obligations to creditors whose claims are subject to impairment and reduction. By failing to list the Claim in a separate Class providing for its full secured payment, but in Class 13 PBA General Unsecured Claims as an Impaired Claim, together with a variety of general unsecured claims with different characteristics as to the Claim, scheduled to receive a dividend consisting of a payment in cash in an amount equal to only 10% of the amount owed, the Claim has been dramatically reduced by 90%. Nevertheless, as will be shown below the Claim is not subject to reduction because it is well established by the precedents of the Court of Appeals for the First Circuit that under the law of Puerto Rico, the surety is subrogated to any rights which the owner has against the contractor, including the owner's rights to apply the withheld funds to its cure and completion costs. Also, that by way of subrogation to the owner's rights the amounts withheld by the owner of a construction project, such as PBA, become the surety's property to the extent necessary to reimburse the surety for its payments of the laborers and materialmen and other costs of contract performance. Moreover, the Supreme Court has unequivocally established that when the surety becomes entitled to the retained funds before the bankrupt's filing of bankruptcy, as happened in this case, those retained funds never become property of the bankrupt debtor; are not susceptible to distribution by the bankruptcy trustee to the bankrupt's general creditors; and are payable in their entirety to the Surety.

In *Pearlman v Reliance*, 371 U.S. 132 (1962) the owner had accumulated $87,737 in retainages by the time its contractor defaulted. A surety stepped in and spent over $350,000 to discharge the contractor's debts for labor and materials. The Supreme Court held:

> *"there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country and generally known as the right of subrogation, was relied on by the Court of Appeals in this case. It seems rather plain that at least two prior decisions of this Court have held that there is a security interest in a withheld fund like this to which the surety is subrogated, Those two cases are Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), and Henningsen v. United States Fid. & Guar. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908).*
>
> *In the Prairie Bank case . . . [T]he Court, in a well-reasoned opinion by Mr. Justice White, held that this fund materially tended to protect the surety, that its creation raised an equity in the surety's favor, that the United States was entitled to protect itself out of the fund, and that the surety, by asserting the right of subrogation, could protect itself by resort to the same securities and same remedies which had been available to the United States for its protection against the contractor. 'The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed. And there is great justness in the rule adopted. Equitably, therefore, the sureties in such cases are entitled to have the sum agreed upon held as a fund out of which they may be indemnified, and, if the principal releases it without their consent, it discharges them from their undertaking.*
>
> *The Henningsen case, decided 12 years later in 1908, carried the Prairie Bank case still closer to ours. . . . Henningsen completed the buildings according to contract but failed to pay his laborers and materialmen. The surety paid. This Court applied the equitable principles declared in the Prairie Bank case so as to entitle the surety to the same equitable claim to the retained fund that the surety in the Prairie Bank case was held to have. Thus the same equitable rules as to subrogation and property interests in a retained fund were held to exist whether a surety completes a contract or whether, though not called upon to complete the contract, it pays the laborers and materialmen. These two cases therefore, together with other cases that have followed them, establish the surety's right to subrogation in such a fund whether its bond be for performance or payment.*

Pearlman v. Reliance Ins. Co., 371 U.S. 132, 139, 83 S. Ct. 232, 236, 9 L. Ed. 2d 190 (1962)

Based on the above well-established legal principles, in *Pearlman* the Supreme Court held "that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he

completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 141–42, 83 S. Ct. 232, 237, 9 L. Ed. 2d 190 (1962).

Subsequently, based on *Pearlman*, in *The National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843 (1st Cir. 1969) the Court of Appeals for the First Circuit explained that "Upon the Principal's default the surety is subrogated not only to the right of the government to pay laborers and materialmen from funds retained out of progress payments, but also to the government's right to apply to the cost of completion the earned but unpaid progress payments in its hands at the time of default.

Following *Pearlman* and the governing precedents of the Puerto Rico Supreme Court, in *Segovia v. Constructora Maza*, 628 F.2d 724 (1st Cir. 1980), the Court of Appeals for the First Circuit noted that "[T]he question is whether the Puerto Rico law governing a surety's right vis-à-vis the owner and contractor accords with that "widely applied in this country." Pearlman v. Reliance Ins. Co. 371 U.S. 132."[2] that "*Federal's claim is based on its rights as subrogee of the owner, . . . for whom it performed as Maza's surety*"[3] and; that in *Pearlman* the Supreme Court held that *"the retainages remained the property of **the owner**, **and by way of subrogation, became the surety's property** to the extent necessary to reimburse it for its payments of the laborers and materialmen and other costs of contract performance*."[4] (Our emphasis).

---

[2] See, *Segovia* at page 725.
[3] See, *Segovia* at page 726 where it states, in its pertinent part, "*Federal's claim is based on its rights as subrogee of the owner, . . . for whom it performed as Maza's surety.*"
[4] See,, Segovia at page 726.

In *Segovia*, the First Circuit held that "Puerto Rican law defines by statute the subrogation rights available to sureties and others who provide security in a contractual context. See, e. g., Article 1721, et seq., Civil Code of Puerto Rico, 31 Laws of Puerto Rico Annotated s 4871 et seq. Of particular relevance are Articles 1737, 1738 and 1166, 31 L.P.R.A. ss 4911, 4912, 3250. Pursuant to Article 1737, "(a) surety who pays for a debtor shall be indemnified by the latter." Article 1738 provides that a surety who pays for a debtor is "subrogated in all the rights which the creditor had against the debtor." Article 1166 states that "(s)ubrogation transfers to the subrogated the credit, with the corresponding rights, either against the debtor or against third persons, be they sureties or holders of mortgages." "Under these statutes Federal is subrogated to all the rights of creditors whom it paid under the payment and performance bonds, and, as such, Federal is generally subrogated to Segovia's right to have the project completed, and to all the legal and contractual rights of Maza's subcontractors, laborers and materialmen." Also, that "[T]his analysis of Puerto Rican law shows that it is in agreement with the reasoning and holding of <u>Pearlman</u>." Accordingly, in *Segovia* the First Circuit held that under Puerto Rican law, a surety is subrogated to the owner's rights in contract retainages as a consequence of its performance of the contractual obligations of the contractor. <u>Segovia Dev. Corp. v. Constructora Maza, Inc.</u>, 628 F.2d 724, 730 (1st Cir. 1980).

Subsequently, other federal courts have also held that "*the Pearlman ruling **is applicable to any owner** . . . regardless of whether it is a governmental or a non-governmental entity, because the issue is one of payment to the unpaid laborers and suppliers that have performed under a construction contract. . . . Therefore, since both the government and the non-government owner have the right to pay their suppliers out of the unpaid balance, the performing surety, through*

*subrogation, is entitled to assert that right, and prevail over the secured creditor.*" In re Caribbean Resort Const. & Maint., Inc., 318 B.R. 241, 249-250 (Bankr. D.P.R. 2003).

Recently, the Court of Appeals for the First Circuit explained as follows the legal basis upon which the Supreme Court held in *Pearlman* that the surety owned the funds retained by the owner:

> *"The Pearlman Court held that the surety owned the funds. Importantly for our purposes, the Court's holding was based on its conclusion that the project owner had a right to use the retainages to satisfy the defaulting contractor's debts to its laborers. Id. at 141, 83 S.Ct. 232. Once the surety stepped into the owner's shoes and fulfilled its obligation to cover the subcontractor's debts, the surety became subrogated to the owner's right to the funds "to the extent necessary to reimburse it" for its costs. Id. Since the surety had "paid out more than the amount of the [withheld] fund, it ha[d] a right to all of it," Id. at 141-42, 83 S.Ct. 232."*

See, *Insite Corporation v. Walsh Construction Company*, 906 F.3d 138, 147 (1st Cir. 2018)("Insite Corporation"")

Hence, based on the Supreme Court's opinion in *Pearlman* recently in *Insite Corporation*, supra, the Court of Appeals for the First Circuit reiterated that once the surety satisfies the defaulting contractor's debts to its laborers it steps into the owner's shoes and becomes subrogated to the owner's right to the retained funds "to the extent necessary to reimburse it" for its costs.

Recently, the Court of Appeals for the First Circuit also explained the legal basis upon which it held in *Segovia* that under the law of Puerto Rico the surety becomes the owner of the funds withheld by the owner upon the surety's fulfillment of obligations under the bond as follows:

> *"We subsequently established that Puerto Rico law governing the ownership of withheld funds aligns with the Pearlman doctrine. See Segovia Dev. Corp. v. Constructora Maza, Inc., 628 F.2d 724, 725 (1st Cir. 1980). In Segovia Development, the contractor had defaulted and filed for bankruptcy, and a surety stepped in and "expended funds greatly in excess" of the $423,630 withheld by the project owner. Id. at 726.* **We explained that under the law of Puerto Rico, the**

> surety was "*subrogated to any rights which the owner ... has against [the contractor],*" *including the owner's rights to apply the withheld funds to its cure and completion costs. Id.*" (Our emphasis).

See, *Insite Corporation v. Walsh Construction Company*, supra, at page 148,

Hence, recently the Court of Appeals for the First Circuit reiterated that under the law of Puerto Rico upon the surety's fulfillment of obligations under the bonds to discharge the contractor's debts to suppliers of labor and materials the surety is subrogated to the owner's rights to apply the funds withheld in the project to its costs to cure the contractor's defaults therein to the extent of the surety's payments. Thus, under Puerto Rico subrogation law the surety becomes the owner of the retained amounts upon the surety's payments under the bonds up to amounts paid.

Regarding the inapplicability of the Bankruptcy Code's provisions to retained funds that are already owned by the surety at the time when a bankruptcy petition is filed, the Supreme Court has explained:

> "*One argument against the surety's claim is that this controversy is governed entirely by the Bankruptcy Act and that s 64, 11 U.S.C. s 104, 11 U.S.C.A. s 104, which prescribes priorities for different classes of creditors, gives no priority to a surety's claim for reimbursement. But the present dispute—who has the property interests in the fund, and how much—is not so simply solved.*
>
> *Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankrupt's estate is quite another.*
>
> *Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee.*
>
> *The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.*
>
> *So here if the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund or had an equitable lien or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt.*

> *This Court has recently reaffirmed that such property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.*
>
> *Consequently, our question is not who was entitled to priority in distributions under s 64, but whether the surety had, as it claimed, ownership of, an equitable lien on, or a prior right to this fund before bankruptcy adjudication."*

See, *Pearlman* at pages 234-235.

Hence, the Supreme Court has unequivocally established that when the surety becomes entitled to the retained funds before the bankrupt's filing of bankruptcy those retained funds never become part of the bankrupt's estate; they never become susceptible to distribution by the bankruptcy trustee to the bankrupt's general creditors; the surety's claim to the retained funds is not subject to the scheme of priorities prescribed for different classes of creditors under the Bankruptcy Code. In other words, the surety's claim over the retained funds is not subject to any kind of impairment and, thus, the trustee is obligated to turn the retained funds over **<u>in their entirety</u>** to the surety to the extent of the surety's payments.

In a series of cases based on *Pearlman*, the Court of Appeals for the First Circuit has also made clear that the *Pearlman* doctrine applies regardless of whether the withheld funds are retainages or unpaid progress payments. See *Framingham Trust Co. v. Gould-Nat'l Batteries, Inc.*, 427 F.2d 856 (1st Cir. 1970); *Nat'l Shawmut Bank of Bos. v. New Amsterdam Cas. Co.*, 411 F.2d 843, 844 (1st Cir. 1969); *Am. Fire & Cas. Co. v. First Nat'l City Bank of N.Y.*, 411 F.2d 755, 757 (1st Cir. 1969). The Supreme Court of Puerto Rico has held that the Construction Contract is consensual, bilateral, onerous, and comprised of reciprocal obligations whose main characteristics are the works to be performed by a contractor and its price to be paid by the owner. *Constructora Bauzá v García Lopez*, 129 D.P.R. 579, 592-593 (1991).

Here, many years before the Oversight Board filed a Title III petition on behalf of the PBA the Surety stepped in and spent a total of $9,244,213 to discharge Synergy's and PBA's obligations to pay the suppliers of labor and material and complete the Bonded Project while the PBA accumulated $698,471.05 in retainages earned by the Surety therein.[5] As held in *Pearlman* and *Segovia*, the Surety is subrogated to the PBA's rights to apply the funds withheld in the Bonded Project to cover the costs to cure Synergy's defaults therein to the extent of the Surety's payments. As held in *Pearlman*, those retained funds earned by the Surety never became property of the PBA. PROMESA does not authorize the Oversight Board to distribute other people's property among the PBA's creditors. Therefore, the retained funds never became susceptible to distribution by the Oversight Board to the PBA's general creditors. As held in *Pearlman*, the Surety's claim to the retained funds is not subject to the scheme of priorities prescribed for different classes of creditors under PROMESA or the Bankruptcy Code. Simply put, the Surety's claim over the retained funds is not subject to any kind of reduction and, thus, the Oversight Board is obligated to deliver to the Surety the retained funds **<u>in their entirety</u>** to the extent of the Surety's payments. In *Pearlman*, the Supreme Court held that "since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it." The same holds true in this case.

The Oversight Board is treating the Claim as a general unsecured claim, to be dramatically reduced under the Plan by 90%. The Plan as drafted disregards the fact that the amounts paid by the Surety many years before the PBA's Title III petition was filed to fulfill Synergy's obligations

---

[5] As part of the contract documents attached to and made part of the construction contract entered into between the parties were the "*General Conditions for the Contract for the Construction of Public Works*", which, in their pertinent part, established:

"4.4.1 If the Contractor neglects to carry out the Work in accordance with the Contract Documents or fails to perform any provision of the Contract the owner may, after written notice to the Contractor and Surety and without prejudice to any other remedy he may have, make good such deficiencies. In such case, an appropriate deduction shall be made from the payments then or thereafter due the Contractor of the cost of correcting such deficiencies. If the payments then or thereafter due the Contractor are not sufficient to cover such amount, the Contractor shall pay the difference to the Owner."

in the Bonded Project greatly exceeded the amounts retained by the PBA from payments made due to labor and materials incorporated into the PBA's Bonded Project by the Surety but unpaid by the PBA. Therefore, the Surety is entitled to ALL of them. Notwithstanding that reality, the Plan wrongfully seeks to use the scheme of priorities prescribed for different classes of creditors under PROMESA to distribute most of the Surety's property among the PBA's general creditors and to provide to the Surety a minimal payment of less than ten cents on the dollar, all of which is expressly forbidden under *Pearlman* and its progeny.

Further, Section 1122(a) of the Bankruptcy Code, 11 U.S.C. sec. 1122(a), which is made applicable to this case under section 301 of PROMESA provides, in its pertinent part, that "*a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.*" The First Circuit's mandate is that "all creditors of equal rank with claims against the same property should be placed in the same class." *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, supra. Clearly, the other claims included as General Unsecured Claims under class 13 of the Plan are not secured by a fund in possession of the PBA from which the creditors therein are entitled to be paid. Unlike those claims, the Surety is the only creditor with a claim against the remaining retained fund amounting to $698,471.05 withheld and unpaid by the PBA in the Bonded Project. Notwithstanding that reality, the Oversight Board refuses to correctly classify the Surety's Claim in a separate class as the only creditor with a claim against such retained fund withheld and unpaid by the PBA in the Bonded Project, in willful contravention of the First Circuit's mandate in *Granada Wines*.

**WHEREFORE,** it is respectfully requested from this Honorable Court to enter an order denying the Oversight Board's proposed conclusion to the effect that the Plan somehow complies

with Section 1122(a) of the Bankruptcy Code. Also, directing the Oversight Board to correctly classify the Surety's Claim against the retained fund amounting to $698,471.05 due to work accepted by the PBA in the completed Bonded Project as a secured claim in a separate Class under the Plan providing for full payment thereof, plus the remaining $1,995,362.00 as a general unsecured claim. Otherwise, to deny confirmation of the Plan proposed by the Oversight Board on behalf of the PBA.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 1st day of December 2021.

**I HEREBY CERTIFY:** That on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which will send automatic notification of such filing to all participants and attorneys of record.

**SALDAÑA, CARVAJAL & VÉLEZ-RIVÉ, PSC**
166 Avenida de la Constitución
San Juan, Puerto Rico 00901
Tel.: 787-289-9250
Fax: 787-289-9253

s/ José A. Sánchez Girona
JOSÉ A. SÁNCHEZ GIRONA
USDC-PR No. 222310
E-mail: jsanchez@scvrlaw.com