UNITED STATES DISTRICT COURT DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of THE COMMONWEALTH OF PUERTO RICO, et al., Debtors. | ) PROMESA Title III <br> ) <br> ) 17 BK 3283-LTS <br> ) (Jointly Administered) <br> ) [Related to Docket #17640] |

### Objections to Findings of Fact and Conclusions of Law Proposed by FOMB (by Individual Bondholder Arthur Samodovitz, pro se.)

I object to the Findings of Fact and Conclusions of Law proposed by the FOMB in Docket 19366, as noted below:

<u>FOMB proposal</u> "4. Burden of Proof. The Debtors have the burden of proving the elements of PROMESA Section 314 and, to the extent applicable to consideration of confirmation of the Plan, Rule 9019 of the Bankruptcy Rules, by a preponderance of the evidence. The Debtors have met their burden with respect to each element of PROMESA Section 314 and, to the extent applicable to consideration of confirmation of the Plan, Bankruptcy Rule 9019."

Samodovitz Objection: PROMESA section 314(b)(6) requires that the Plan be in the best interests of creditors, which requires the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan. To support its position on the best interest test, the FOMB contends that PR cannot pay the GO bonds in full and the GO bonds are all invalid as exceeding the debt service limit of Article 2 Section 6 of the Puerto Rico ("PR") Constitution.

However, the FOMB has failed to meet its burden that PR cannot pay all its (original) GO Bonds in full. To the Contrary, Docket 19047, pages 5-11 of Peter Hein and Docket 18575, pages 13-14 of Peter Hein demonstrate that PR can pay all its original GO bonds in full including post-petition debt service and debt service from FY 2022 forward. This need not be repeated here.

**Thus, PR can pay all the debt service on the GO bonds in full based on its current tax structure. Nevertheless, under the non-bankruptcy laws and constitution of the territory, PR would be required to pay the GO bonds in full by raising taxes as needed based on PR's taxing authority or by decreasing other expenditures as required by the "full faith and credit" clause. Alternatively, under the non-bankruptcy laws and constitution of the territory, any unpaid debt service in one year would accumulate to the next until it is finally paid, even if the requisite**

1

**payments extend pas the maturity date of the bonds. This alternative was not considered in Debtor's Exhibit 130 – Docket 18807-8.**

Also, PR has failed to meet its burden that any of the GO Bonds are invalid as exceeding the Constitutional debt service limit. The FOMB incorrectly challenged the validity of the 2014 GO Bonds as follows:

i. FOMB's Docket 4784 challenged the validity of the 2014 GO Bonds as exceeding the 15% debt service limit established by Article VI Section 2 of the PR Constitution. The FOMB contended that use of interest capitalization of the 2014 GO Bonds in the calculation of the total debt service in the Offering Statement ("OS") was improper, and **without** the interest capitalization, the total debt service was 15.1% in FY 2016. **With** "interest capitalization" used in the OS, some of the proceeds from the sale of the 2014 GO Bonds were used to subsidize the interest due on the 2014 GO Bonds in FYs 2014-2016, and the debt service was calculated without including the amount of the subsidy. The total interest due on the 2014 GO Bonds in FY 2016 was $280 Million (i.e., 8% X $3.5 Billion), the interest subsidy was $75 Million, so only the difference, i.e., $205 Million, was included in the debt service calculation in the OS. If the total debt service in FY 2016 included that additional $75 Million, **and if all other items considered in the total debt service were correct,** then the total debt service in FY 2016 would have been 15.1% as asserted by the FOMB. However, the debt service in FY 2016 included interest due on $126.725 Million of four variable rate GO bonds, and the interest considered in the OS was projected at the maximum rate allowed by PR law, i.e., 12%:

> "The … calculation of the Constitutional debt limit after giving effect to the issuance of the Bonds and the refunding of the Refunded Bonds. **The calculation is based on the assumptions that variable rate bonds bear interest at the maximum legal rate of 12% per annum.**" Page 30 of the OS.

12% of $126.725 Million equals $15,207,000, and this was included in the OS as the (projected) debt service in the "Outstanding Bonds Debt Service" column in the Table on page 31 of the OS. (There was no return of principal on the Variable Rate GOs in FYs 2014-2016, just the 12% interest. See Exhibit A which was produced by the AAFAF on October 1, 2021 in response to an order by Judge Dein to show the projected debt service of the variable rate GO bonds used in the OS calculation.) However, according to the OS, the actual interest on the Variable Rate GOs was based on the CPI or LIBOR bond rates:

2

"Variable rate debt shown under the column heading "Other Variable Debt" below consists of bonds that are not subject to optional or mandatory tender, the interest rate on which bonds is tied to various indices (e.g., CPI bonds or LIBOR bonds). … Other Variable Rate Debt - $126,725,000". Page 29 of OS.

In fact, the actual debt service (just interest) in FY 2016 was only $2,162,617 for the variable rate GO bonds. See Exhibit B of Docket 18433; the AAFAF produced Exhibit B on October 1, 2021 in response to the order from Judge Dein. So, the actual debt service (just interest) on the variable rate GO bonds in FY 2016 was over-projected in the OS by **$13,044,413**, i.e., $15,207,000 - $2,162,587. As explained in Docket 18433, if the total debt service in FY 2016 is properly reduced by this $13,044,413, the actual total debt service in FY 2016 was only 14.94% **without interest capitalization as the FOMB contends**. This is less than the 15% debt service limit of the PR Constitution even if the interest capitalization is not used. The FOMB has not contested this calculation of 14.94% as the actual, total debt service in FY 2016. Therefore, this FOMB challenge to the validity of the 2014 GO Bonds is completely without merit.

ii. FOMB's Docket 4784 also contended that the 2014 GO Bonds were issued in excess of the 15% debt service limit if the debt service of the prior issued, outstanding PBA bonds was included in the calculation. However, because Puerto Rico is only a guarantor of these bonds, and there are separate viable and sufficient funding sources for these bonds, their debt service should not be included in the calculation of the debt service limit, and PR and its lawyers and accountants certified this in the respective Offering Statements. For example, in FY 2011, according to the OS for the 2012 Series A GO Bonds, PR was **not required to pay any amount** as the guarantor of any of the PBA bonds. (As explained on page 16 of the OS, the $16.5 Million paid by PR as a guarantor in FY 2011 was for guarantee of Port of the Americas Authority "POA" bonds.) Similarly, in FY 2013, according to the OS for the 2014 GO Bonds, PR was **not required to pay any amount** as the guarantor of any of the PBA bonds. (As explained on page 31 of the OS, the $17.3 Million paid by PR as a guarantor in FY 2013 was for guarantee of Port of the Americas Authority "POA" bonds.) This demonstrates that PBA had sufficient rental income to pay its own debt service. Therefore, this FOMB challenge to the validity of the GO bonds is very weak.

iii. FOMB's Docket 4784 also challenged the validity of the 2014 GO Bonds as allegedly being issued to pay operating expenses of Puerto Rico allegedly in violation of the PR Constitution because proceeds from the sale of the 2014 GO Bonds were used to repay other outstanding bonds that allegedly were used to pay operating expenses of

3

PR. Article II Section 7 of the PR Constitution states, "The appropriations made for any fiscal year shall not exceed the *total resources*, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." This is the correct English translation of the original Spanish language version which uses the Spanish term "recursos totales" meaning "total resources". See pages 42-48 of GO Bondholder Docket 10702, and Journal of Constitutional Convention at 104 (certified translation available at Dkt. No. 452-1 in Adv. Proc. No. 17-257-LTS) (Apr. 18, 2018). Page 43 of Docket 10702 recounts the history of this clause as follows:

> "The original Spanish text of that provision reads: "The appropriations made for any fiscal year shall not exceed the total resources [recursos totales], ...." P.R. Const. art. VI, § 7. During the drafting process, one of the delegates asked (in Spanish) about the meaning of "recursos totales" in the Balanced Budget Clause. Diario de Sesiones Procedimientos y Debates de la Convencion Constituyente de Puerto Rico ("Journal of Constitutional Convention"), at 1090 (certified translation available at Dkt. No. 4785-26). In response, the president of the drafting committee explained (again, in Spanish) that the draft intentionally **replaced** "total revenues" ... with the broader term "total resources... specifically including the "resources that are generated by issuing bonds." Id. After ... the official Spanish text was approved, an English translation ... incorrectly used the narrower term "total revenues"."

Therefore, this FOMB challenge to the validity of the 2014 GO Bonds is frivolous.

In summary, because Puerto Rico can pay all its GO bonds in full, and there is no real challenge to the validity of the 2014 GO Bonds, the Plan is not in the best interest of the 2014 GO Bondholders; they would have a greater available recovery, i.e., the original, callable bonds with 100% principal and the original 8% interest rate, under the non-bankruptcy laws and constitution of PR. Also, based on Promesa section 303, if GO bonds are removed from Title III, the nonconsenting bondholders may be entitled to 4 ½ years of back interest, which for the 2014 GO Bonds would be an additional 36%. This is double the 67% of principal recovery under the Plan (with no back interest).

FOMB proposal "30. On August 2, 2021, the Court entered the Disclosure Statement Order, among other things (a) approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

Samodovitz Objection. The Disclosure Statement failed to disclose that the actual debt service in FY 2016 did not exceed the constitutional debt service limit without interest capitalization.

4

<u>FOMB proposal</u> "50. The classification of Claims set forth in the Plan is reasonable and was not done to control the outcome of voting to accept or reject the Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law. To the extent unsecured Claims are separately classified from the unsecured claims (Class 58),9 it is not to gerrymander an accepting Class, as proven by there being several impaired accepting Classes for each Debtor. Rather, separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims. (Jaresko Decl. ¶ 48)."

Samodovitz Objection: My understanding of the complex classification and voting process is as follows: A bondholder who met the qualifications as a retail investor for Retail Class 47 and was initially classified as a retail investor in Retail Class 47 would be reclassified into nonretail Class 46 if the bondholder did not know to sign or did not sign a Retail Investor Certification or if his/her broker did not send a signed certificate where it needed to go. The FOMB did not show that any of these initial classifications were incorrect and why the certification process was necessary. This certification process caused improper classifications, such as myself, whose broker did not notify the retail investor and the retail investor did not know to sign a Retail investor Certification. So, presumably I was reclassified as a nonretail investor in Class 46 despite my qualifications as a retail investor. Once in nonretail Class 46, any subsequent votes of retail investors who were reclassified from Retail Class 47 would be virtually meaningless in view of the vast holdings of the institutions in nonretail Class 46 who previously signed the PSA with extra recovery and would therefore would vote "Yes" to the Plan. There were only 27 votes in Retail Class 47 for the 2014 GO bondholders, See Affidavit of Ms. Pullo Docket 19115. (There is no information available as to the number of bondholders in Retail Class 47 at the time of the vote, but this is certainly a small fraction of the total number of bondholders who were initially classified as retail investors in Retail Class 47 for a bond issuance of $3.5 Billion.) To make these votes in Retail Class 47, the 27 bondholders had to remain in Retail Class 47 by them and their brokers following the certification process explained above, and then their brokers needed to inform them later of the opportunity to vote and then tender their bonds to the DTC to a mailbox corresponding to their vote. To add to the confusion was another step back in July where a bondholder in Retail Class 47 could "opt in" to the PSA and the broker would tender the bondholder's bonds to the DTC. Presumably this would result in an automatic "Yes" vote for the bondholder. However, it is not clear in what class the bondholder would be classified after opting-in to the PSA. My broker thought that when I instructed him not to "opt-in" for me, that I was electing not to vote, and therefore, my broker did not process the retail investor certification or even mention it to me. The entire process for classification and voting was complex and onerous, and undoubtedly prevented many votes of retail investors even votes from bondholders who remained in Retail Class 47. Presumably, the same complex and onerous process applied to retail investors in other retail classes as well. Also, this process deviated from the industry-standard, one-step process of relying on the initial classifications of the bondholders and simply sending them ballots with which to vote. Therefore, the classification and voting process for the GO Plan was improper and skewed toward acceptance of the Plan.

5

<u>FOMB proposal</u> "90. The Plan is the result of extensive arms' length negotiations among the Government Parties and significant creditor constituencies, including the PSA Creditors, each of which was represented by sophisticated counsel, and the compromises and settlements among the Government Parties and various PSA Creditors form the very foundation of the Plan. In the absence of such compromises and settlements, the Debtors' emergence from Title III would likely be significantly delayed by further litigation and burdened by additional expense, which could impair the Debtors' ability to successfully adjust their debts, thereby prejudicing recovery for all creditors and raising further uncertainties regarding the Debtors' financial condition. (See Jaresko Decl. ¶¶ 81–82, 201–204, 214–215; Skeel Decl. ¶ 43–46)."

Samodovitz Objection: The Plan was not the result of an "arms' length" negotiation because the bondholders were not being paid interest during the years of negotiations and therefore, were pressured to accept the terms of the FOMB. The FOMB could wait forever because every additional day of delay meant more gain by PR and more loss by the bondholders. Also, retail investors were not included in the negotiations.

<u>FOMB proposal</u> "91. Each of the compromises and settlements incorporated into the Plan (a) is made in good faith, furthers the policies and purposes of PROMESA, and is fair, equitable, and reasonable; (b) is in the best interests of the Debtors, their creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law. Further, the Plan will fairly and consensually resolve numerous pending adversary proceedings and appeals, each of which raises difficult and complex issues. The Plan thus incorporates a complex series of compromises and settlements that resolve the most significant potential obstacles to confirmation of a plan of adjustment. (See Skeel Decl. ¶¶ 33–34; Jaresko Decl. ¶¶ 201–205). The settlements resolve billions of dollars of claims against the Debtors. (Skeel Decl. ¶ 46). Each of the settlements is consistent with what would be expected as a result of negotiations in a complex debt restructuring and is reasonable. In addition, the ability to achieve consensus from at least 15 major parties is evidence the settlements are reasonable. (Murray Decl. Ex. A ¶¶ 115–137; Zelin Decl. ¶¶ 24, 29, 36, 43)."

Samodovitz Objection. See Samodovitz Objection to FOMB proposal 4 as to the Plan not being in the best interest of the creditors. Also, FOMB's Docket 4784 stating that the debt service was exceeded in FY without interest capitalization of the 2014 GO Bonds was published on Prime Clerk on January 14, 2019. The Disclosure Statement,

6

PSAs and FOMB's opening brief Docket 17680 all referenced the challenges to the validity of the 2014 GO bonds. The signatories to the PSAs in May 2019, September 2019 and February 2020 did not know that the foregoing challenge to the 2014 Bonds without interest capitalization was meritless because the FOMB, until October 1, 2021, did not disclose the data on the actual debt service of the variable rate GO bonds in 2016. Docket 18433 of Arthur Samodovitz, exposing the data on the low, actual debt service on the variable rate GO bonds in 2016 and its impact on the total debt service on all GOs in FY 2016, was not published until October 7, 2021, which was after the PSAs were signed and the final voting period was closed. Therefore, acceptance of the Plan by owners of the 2014 GO bondholders is not evidence of reasonableness.

Also, undoubtedly years of unpaid interest drove GO Bondholders to accept the Plan.

FOMB proposal "108. The Plan was proposed in good faith with the legitimate purpose to provide a means for the Debtors to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA. (Jaresko Decl. ¶ 81)."

Samodovitz Objection: The Plan was not proposed in good faith because the FOMB did not disclose the data about the actual debt service on the variable rate GO bonds resulting in the total debt service not exceeded the constitutional limit in FY 2016. Also, Promesa lacks sufficient standards to determine what conditions justify Title III for a debtor because there is no requirement of insolvency or other objective standard.

FOMB proposal "117. Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules. (See Pullo Decl. ¶ 8)."

Samodovitz Objection: See Samodovitz Objection to FOMB proposal 50.

FOMB proposal "133. The Court approved the procedures for voting to accept or reject the Plan, including the use of DTC's ATOP process for bondholder votes, in the Disclosure Statement Order. (See Disclosure Statement Order ¶¶ 9, 14, 32). The tabulation of votes, showing approximately eighty percent (80%) of Bond Claims in dollar amount participated in the vote, shows that creditors were able to successfully vote on the Plan. (See Pullo Decl. Ex. A)."

Samodovitz Objection: See Samodovitz Objection to FOMB proposal 50.

FOMB proposal "140. The Plan does not contain any provision violating the Takings Clause of the Constitution of the United States. The proper analytical framework for addressing the Takings Clause is set forth in Penn Central Transportation v. City of New

7

York, 438 U.S. 104, 124 (1978). See Patriot Portfolio v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st Cir. 1999) (applying Penn Central analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the Bankruptcy Code). Pursuant to that test, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action." Id."

Samodovitz Objection: The permanent and complete taking of a portion of a bondholder's bonds or their revenue source is not a mere regulatory action, and is compensable under the Fifth Amendment. See *Campbell v. United States*, 266 U.S. 368, 370 (1924), where the US Supreme Court confirmed the right of a landowner to just compensation for the government taking of the landowner's 1.8 acres from the landowner's total estate of 69 acres (to build a nitrate factory during WWI), stating,

> "Thereupon he became entitled to have the just compensation safeguarded by the Fifth Amendment to the Constitution; that is, the value of **the land taken** and the damages inflicted by the taking — such a sum as would put him in as good a position pecuniarily as he would have been if his property had not been taken. Citing *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304."

<u>FOMB proposal</u> "144. Furthermore, even if the restructuring proposed by the Plan results in a Fifth Amendment "taking" of bondholder property, the Court is satisfied that the value to be received by bondholders pursuant to the Plan constitutes just compensation. Here, creditors will receive consideration that is discounted by settlements that recognize significant litigation risks, the allocation of distributions was determined via a long mediation and settlement process among sophisticated parties, and creditors have ratified the result by voting in favor of the Plan. These characteristics of the settlements and the Plan and the circumstances under which they were developed provide sufficient proof that the consideration to be received by bondholders pursuant to the Plan constitutes just compensation within the meaning of the Takings Clause. The objections to the Plan and Settlement Agreement based upon the Takings Clause of the United States Constitution are therefore overruled

Samodovitz Objection: PR issued the GO bonds as valid with certified OSs. Now, without any new evidence of invalidity, PR contends that they are invalid. Moreover, PR has not explained how the risks of invalidity of the GO bonds match the specific amounts of reductions for the respective bonds under the Plan, because the risks of invalidity have not been quantified. And, the risk of invalidity of the 2014 GO bonds is minimal as explained above.

November 30, 2021

        Respectfully Submitted, /s/ Arthur Samodovitz, pro se.

Arthur Samodovitz

140 Lasa Dr. Apt 204, St. Augustine, Fl 32084

904-878-4026 ArthurSsails@gmail.com

Certificate of Service

I, Arthur Samodovitz, swear under penalty of perjury that I have caused the foregoing "Objection to Confirmation of Plan of Reorganization of the GO Bonds (by Individual Bondholder Arthur Samodovitz)", Exhibit A and Exhibit B to be served by email on each attorney whose email address appears below.

Dated: November 30, 2021

/s/ Arthur Samodovitz, Arthur Samodovitz, deponent

Counsel for FOMB:
PROSKAUER ROSE LLP Eleven Times Square New York, New York 10036-8299 Attn: Martin J. Bienenstock Paul V. Possinger Ehud Barak Maja Zerjal E-Mail:

mbienenstock@proskauer.com  ppossinger@proskauer.com
ebarak@proskauer.com  mzerjal@proskauer.com

O'NEILL & BORGES LLC 250 Muñoz Rivera Ave., Suite 800 San Juan, PR 00918-1813 Attn: Hermann D. Bauer, Esq. E-Mail:
hermann.bauer@oneillborges.com

Counsel for AAFAF:
O'MELVENY & MYERS LLP 7 Times Square New York, NY 10036 Tel: (212) 326-2000 Fax: (212) 326-2061 Attn: John J. Rapisardi Peter Friedman E-Mail:

jrapisardi@omm.com  pfriedman@omm.com

MARINI PIETRANTON MUNIZ LLC 250 Ponce de León Ave. Suite 900 San Juan,

Puerto Rico 00918 Tel: (787) 705-2171 Fax: (787) 936-7494 Attn: Luis C. Marini-Biaggi Carolina Velaz-Rivero E-Mail: lmarini@mpmlawpr.com cvelaz@mpmlawpr.com

Sworn to before me this 5th day of November 30, 2021

_____, Notary Public

STATE OF FLORIDA
COUNTY OF St. Johns
The foregoing instrument was acknowledged before me this 30 day of November 2021
by Arthur Jay Samodovitz
☐ PERSONALLY KNOWN TO ME
☑ PRODUCED AS IDENTIFICATION
FL DL: S531-050-55-223-0
Type of identification
Notary Signature



STEPHANIE TORRES
Commission # GG 284319
Expires December 13, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

9