UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

----------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

       Debtors.

----------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

**[Response to Docket # 19366]**

**OBJECTION TO PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
(THIS OBJECTION IS FILED BY INDIVIDUAL GO AND PBA BONDHOLDER
PETER C. HEIN)**

Dated:  December 1, 2021 [corrected 12-6-2021]

## TABLE OF CONTENTS

**Page**

I.     Response to Introduction and ¶¶ 1-4.................................................................3

II.    Response to ¶¶ 5-15:  The Oversight Board and Title III Cases......................3

III.   Response to ¶¶ 16-31:  The Plan Support Agreements.....................................5

IV.    Response to ¶¶ 32-47:  Compliance with PROMESA Sections 104(j) and
       313.........................................................................................................................6

V.     Response to ¶ 48:  Compliance with PROMESA Section 314(b). ...................6

VI.    Response to ¶¶ 49-68:  Compliance with PROMESA Section 314(b)(1):  11
       U.S.C. 1122(a) and (b)........................................................................................6

VII.   Response to ¶¶ 69-74:  Compliance with PROMESA Section 314(b)(1):  11
       U.S.C. 1123(a)(1), (2) and (3)..........................................................................10

VIII.  Response to ¶¶ 75-78:  Compliance with PROMESA Section 314(b)(1):  11
       U.S.C. 1123(a)(4), the "same treatment" requirement...................................10

       A.     Overview of response to FF/CL ¶¶ 75-78:........................................10

       B.     Paragraph-by-paragraph response to FF/CL ¶¶ 75-78. .....................19

IX.    Response to ¶¶ 79-83:  Compliance with PROMESA Section 314(b)(1):  11
       U.S.C. 1123(a)(5)...............................................................................................19

X.     Response to ¶¶ 84-101:  Compliance with PROMESA Section 314(b)(1):
       11 U.S.C. 1123(b). ............................................................................................20

       A.     Overall response to ¶¶ 84-101: ...........................................................20

       B.     Specific responses to ¶¶ 84-101 ..........................................................21

XI.    Response to ¶¶ 102-103:  Compliance with PROMESA Section 314(b)(1):
       11 U.S.C. 1123(d). ............................................................................................22

XII.   Response to ¶¶ 104-112:  Compliance with PROMESA Section 314(b)(1):
       11 U.S.C. 1129(a)(2), (3), (6). .........................................................................22

XIII.  Response to ¶¶ 113-118:  Compliance with PROMESA Section 314(b)(1):
       11 U.S.C. 1129(a)(8)..........................................................................................24

XIV.   Response to ¶¶ 119:  Compliance with PROMESA Section 314(b)(1):  11
       U.S.C. 1129(a)(10)..............................................................................................24

XV.     Response to ¶¶ 120-128:  Compliance with PROMESA Section 314(b)(1):
        11 U.S.C. 1129(b)(1), (2).................................................................................24

XVI.    Response to ¶¶ 129-134:  Compliance with PROMESA Section 314(b)(2). ...............25

XVII.   Response to ¶¶ 135-147:  Compliance with PROMESA Section 314(b)(3). ...............28

        A.     Overview of response to ¶¶ 135-137. ....................................................28

        B.     Enacted legislation is contrary to Puerto Rico Constitution. ............................29

        C.     Contract Clause. ................................................................................29

        D.     Takings Clause...................................................................................34

        E.     Preemption. .......................................................................................37

XVIII.  Response to ¶¶ 148-150:  Compliance with PROMESA Section 314(b)(4). ...............40

XIX.    Response to ¶¶ 151:  Compliance with PROMESA Section 314(b)(5)..........................40

XX.     Response to ¶¶ 152-183:  Compliance with PROMESA Section 314(b)(6). ...............40

        A.     Overview of response to ¶¶ 152-183. ....................................................40

        B.     Response to ¶¶ 153-174:  Failure to prove feasibility. ......................................40

        C.     Response to ¶¶ 175-183:  Failure to prove the Plan is in the best
               interests of creditors, which requires the court to consider whether
               available remedies under the non-bankruptcy laws and constitution
               of the territory would result in a greater recovery for the creditors
               than is provided by such plan...............................................................44

XXI.    Response to ¶¶ 184-191:  Compliance with PROMESA Section 314(b)(7). ...............46

        A.     Overview of Response to ¶¶ 184-191:  Failure to meet the
               requirements of 48 U.S.C. § 2141(b)(1)(N) and § 2174(b)(7)
               precludes confirmation.........................................................................46

        B.     Paragraph-by-paragraph responses to ¶¶ 184-191. ............................................49

XXII.   Response to ¶¶ 192-195:  Bankruptcy Rule 3019..............................................................49

XXIII.  Response to ¶¶ 196:  Nullification of Laws Conditioning Debt Authorization
        on Elimination of Freeze of Accruing Pension Benefits and Cost of Living
        Adjustments. .......................................................................................50

XXIV.   Response to ¶¶ 197-207:  The Releases, Exculpations, and Injunctions
        Pursuant to the Plan. ..............................................................................50

A.    Overview of response and objection to FF/CL ¶¶ 197-207, Plan §§ 92.2 through 92.11 Release provisions (however denominated) and proposed Order ¶¶ 56-61 and 64-65. ...................................................50

B.    Paragraph-by-paragraph response:  Response to ¶¶ 197-207: ...........................59

XXV.    Response to ¶ 208:  Validity of Bonds and CVIs. .........................................60

XXVI.    Response to ¶ 209-220:  GDB loan priority determination. ...........................................60

XXVII.    Response to ¶¶ 221-229:  Miscellaneous Provision.......................................60

XXVIII.    Conclusion ..........................................................................................61

XXIX.    Other objections:..................................................................................61

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cedar Point* v. *Hassid,*
    141 S.Ct. 2063 (2021) ................................................................................34, 35

*Connolly* v. *Pension Benefit Guaranty Corp.,*
    475 U.S. 211 (1986) ..................................................................................36

*Financial Oversight and Management Board for Puerto Rico ("FOMB")* v.
    *Aurelius Investment, LLC,*
    140 S.Ct. 1649 (2020) ................................................................................30, 34

*Horne* v. *Department of Agriculture,*
    135 S.Ct. 2419 (2015) ................................................................................35, 36

*In re City of Stockton,*
    478 B.R. 8 (Bankr. E.D. Cal. 2012*)* ................................................................*29*

*In re Commercial Western Finance,*
    761 F.2d 1329 (9th Cir. 1985) ................................................................21

*In re Mansaray-Ruffin,*
    530 F.3d 230 (3d Cir. 2008) ................................................................21

*In re Montreal Me. & Atl. Ry.,*
    No. 13-10670, 2015 Bankr. Lexus 3737 (Bankr. D. Me. Oct. 9, 2015) ................................55

*In re PWS Holding Corp.,*
    228 F.3d 224 (3d Cir. 2000) ................................................................53, 54, 55, 58

*In re Washington Mutual, Inc.,*
    442 B.R. 314 (D. Del. 2011) ................................................................53, 55

*Koontz* v. *St. Johns River Water Mgt. Dist.,*
    570 U.S. 595 (2013) ................................................................ 35, 36

*Lynch* v. *United States,*
    292 U.S. 571 (1934) ................................................................31, 36

*Penn Central Transportation Co.* v. *New York City,*
    438 U.S. 104 (1978) ................................................................34, 35

*Pension Benefit Guaranty Corp. ("PBGC")* v. *Gray,*
    467 U.S. 717 (1984) ................................................................30

*Phillips* v. *Washington Legal Foundation*,
    524 U.S. 156 (1998)...............................................................................................36

*Saenz* v. *Roe*,
    526 U.S. 489 (1999)...............................................................................................31

*Security Industrial Bank,(see United States v. Security Industrial Bank)*

*Slattery Co.* v. *United States*,
    231 F.2d 37 (5th Cir. 1956) .............................................................................21, 37

*Sturges* v. *Crowninshield*,
    17 U.S. 122 (1819) ...........................................................................................29, 30

*United Automobile*, *Aerospace, Agricultural Union*  v. *Fortuno*,
    633 F.3d 37 (1st Cir. 2011)...................................................................................34

*United States Trust Co.* v. *New Jersey*,
    431 U.S. 1 (1977)...........................................................................31, 32, 33, 36

*United States.* v. *Contra Costa County Water District*,
    678 F.2d 90 (9th Cir. 1982) ..............................................................................20, 37

*United States* v. *Security Industrial Bank*,
    459 U.S. 70 (1982)................................................................................................35

*Young* v. *Higbee Co.*,
    324 U.S. 204 (1945)........................................................................54, 55, 59, 60

**Constitution – U.S.**

U.S. Const. Art. I, § 8, cl. 4 (Bankruptcy clause) ................................................34, 60

U.S. Const. Art. I, §10, cl. 1 (Contracts clause and prohibition of Bills of Attainder and
    Ex Post Facto laws)........................................................................... 23, 29-34

U.S. Const. Art. IV, §2, cl. 1 (Privileges and Immunities clause)...........................8, 42

U.S. Const. Amendment V (Due Process and Takings clauses)......................21, 34-37

U.S. Const. Amendment XIV, §1 (Privileges and Immunities, Due Process and
    Equal Protection clauses)................................................................... 8, 42

**Statutes – U.S.**

11 U.S.C. § 943(b)(7) ................................................................................................45

11 U.S.C. § 1122(a) ....................................................................................................6

11 U.S.C. § 1122(b) .................................................................................................................6

11 U.S.C. § 1123(a)(1) ...........................................................................................................10

11 U.S.C. § 1123(a)(2) ...........................................................................................................10

11 U.S.C. § 1123(a)(3) ...........................................................................................................10

11 U.S.C. § 1123(a)(4) ......................................................................................10, 12, 13, 18, 40, 55

11 U.S.C. § 1123(a)(5) ...........................................................................................................19

11 U.S.C. § 1123(b) ...............................................................................................................20

11 U.S.C. § 1123(d) ...............................................................................................................22

11 U.S C. § 1125 ...............................................................................................................23, 26

11 U.S.C. § 1125(a) ...............................................................................................................28

11 U.S.C.§ 1125(b) ...............................................................................................................25

 11 U.S C. § 1126 ..................................................................................................................23

11 U.S.C. § 1129(a)(2) ...........................................................................................................22

11 U.S.C. § 1129(a)(3) ...........................................................................................................22

11 U.S.C. § 1129(a)(6) ...........................................................................................................22

11 U.S.C. § 1129(a)(8) ...........................................................................................................24

11 U.S.C. § 1129(a)(8)(A) .......................................................................................................24

11 U.S.C. § 1129(a)(10) .........................................................................................................24

11 U.S.C. § 1129(b)(1) ...........................................................................................................24

11 U.S.C. § 1129(b)(2) ...........................................................................................................24

PROMESA § 4, 48 U.S.C. § 2103 ..........................................................................................5, 38

PROMESA § 104(j), 48 U.S.C. § 2124(j) ..................................................................................6

PROMESA § 201(b)(1)(N), 48 U.S.C. § 2141(b)(1)(N) ..............................31, 38, 39, 46, 47

PROMESA § 206(a)(2)(A), 48 U.S.C. § 2146(a)(2)(A)................................................................4

PROMESA § 303, 48 U.S.C. § 2163 .......................................................................................34

PROMESA § 313, 48 U.S.C. § 2173 ..........................................................................6

PROMESA § 314(b)(1), 48 U.S.C. § 2174(b)(1) ................................6, 10, 19, 20, 22, 24

PROMESA § 314(b)(2), 48 U.S.C. § 2174(b)(2) ...................................................................25

PROMESA § 314(b)(3), 48 U.S.C. § 2174(b)(3) ...........................28, 29, 30, 31, 33, 37

PROMESA § 314(b)(4), 48 U.S.C. § 2174(b)(4) .................................................................40

PROMESA § 314(b)(5), 48 U.S.C. § 2174(b)(5) .................................................................40

PROMESA § 314(b)(6), 48 U.S.C. § 2174(b)(6) ...................31, 38, 40, 44, 45, 46

PROMESA § 314(b)(7), 48 U.S.C. § 2174(b)(7) ..........................................................46, 47

PROMESA § 316, 11 U.S.C. § 2176 ...................................................................................12

PROMESA § 405(l), 48 U.S.C. § 2194 (l) .........................................................................22

PROMESA § 405(m), 48 U.S.C. § 2194 (m) ................................................................3, 45

**Puerto Rico Constitution**

P.R. CONST. Art. VI, § 2 ....................................................................................................29

P.R. CONST. Art. VI, § 6 ....................................................................................................37

P.R. CONST. Art. VI, § 8 ............................................................................................29, 37, 39

**Statutes – Puerto Rico**

13 L.P.R.A. 41 .....................................................................................................................41

Act 33 of 1942 ....................................................................................................................41

Act 53 of 2021 ...............................................................................20, 30, 31, 34, 35, 50

Act 83 of 1991 ..............................................................................................................38, 39

**Rules**

Fed. R. Bankr. P. 7001(2) .................................................................................................21

Fed. R. Evid. 408 .....................................................................................................20, 21, 37

**Legislative History**

H.R.-Report 114-602, to accompany H.R. 5278, "Puerto Rico Oversight,
   Management and EconomicStability Act" (June 3, 2016)................................38, 47

**Other Authorities**

https://www.richter.ca/wp-content/uploads/Insolvency-Cases/fr/M/Montreal-
Maine-and-Atlantic-Canada-Co/Chapter-11---Montreal-Maine-and-Atlantic-
Railway-Ltd/Plan-of-Arrangement/05-DE1534-Revised-first-amended-plan-
liquidation-20150716.pdf.................................................................................................55 n.1

## TABLE OF ABBREVIATIONS AND CITATIONS

| | |
|---|---|
| # | Docket entries are referred to in the form of "#___" |
| "COFINA" | Puerto Rico Sales Tax Financing Corporation |
| "Commonwealth" | Commonwealth of Puerto Rico |
| FF/CL | Debtors' proposed Findings of Fact and Conclusions of Law dated November 28, 2021 (#19366) |
| GO bonds | General obligation bonds issued by the Commonwealth of Puerto Rico for which the full faith credit and taxing power of the Commonwealth is pledged |
| PBA bonds | Bonds issued by Puerto Rico Public Building Authority "secured by a pledge" of certain rentals and "further secured by the guaranty of the Commonwealth" |

[This filing corrects certain typographical or citation errors I noted after filing #19400, and in Section XXI, ¶¶ g-i, modifies the citations and text to reference provisions of the Eighth Amended Plan submitted by FOMB in November (as #19365, #19323, #19184 and #19053), which supersede the Seventh Amended Plan that I had previously cited and discussed in these paragraphs (cites are now to #19365, filed 11-28-2021).  Copies of redlined pages showing corrections are attached following the end of this document.]

Peter C. Hein, a GO and PBA bondholder who purchased in the 2009 through March 2012 time period, at times that Puerto Rico GO and PBA bonds were rated investment grade and years before PROMESA was even in prospect, previously filed an objection to confirmation (#18575), declarations in support of such objection (including #19047), a court-authorized sur-reply to FOMB's 10/27/2021 and 10/28/2021 supporting and reply briefs (#19093), and an objection to the proposed order and judgment confirming the plan (#19218).  I have also submitted exhibits into evidence (*see* #19172 and #19352), presented argument on certain issues on which the Court entertained argument, presented an opening statement and a closing argument, and filed papers in connection with prior proceedings in this Title III case.

Given time constraints in light of the schedule the Court has set for responses to Debtors' proposed Findings of Fact and Conclusions of Law ("FF/CL") (#19179-page-4-of-4, Item 5), I am not able to respond in detail to each and every assertion by Debtors in their FF/CL. However, I continue to maintain my objections, as set forth in the foregoing papers, exhibits and arguments previously filed in, or presented to, the Court.

To assist the Court in identifying my responses to particular paragraphs or sections of Debtors' FF/CL, I largely use Debtors' outline structure in this response, and I address FOMB's FF/CL on a paragraph-by-paragraph basis, to the extent feasible in light of the time constraints applicable to this filing.  In some sections of my below responses, I provide an overview of my objections pertinent to a particular topic first, and then (to the extent not covered in the overview) proceed to respond paragraph-by-paragraph, with appropriate cross references to the

overview, because I believe this approach will be more comprehensible and will avoid the repetition that would occur if I had instead presented my responses only in a paragraph-by-paragraph responsive format.

The numbered paragraphs that follow are numbered to match the paragraph numbers in FOMB's FF/CL to which each paragraph responds.  Accordingly, in some cases paragraph numbers may be skipped if there is no specific response to a particular paragraph in FOMB's FF/CL, beyond the general responses made to the topic in question and my overall objections previously asserted.  In addition, to maintain numbering consistent with Debtors' FF/CL, I will sometimes use paragraph numbers with a '-0' or with lettered subdivisions (*e.g.*, 'a', 'b', etc.).

I.      **Response to Introduction and ¶¶ 1-4**

**Introduction:**  Object and dispute characterizations, including for reasons detailed below
and in my prior objections.  Specifically, object and dispute reference to alleged "good faith,
arm's length negotiations, many of which were facilitated by the Mediation Team appointed by
the Court," including for reasons stated in objection #18575-page-31-to-35-of-303, on the record
in the course of the confirmation hearing, and below in Section X and in response to paragraph
144.

**Paragraph 4:**  Object and dispute.  Debtors have not met their burden of proof, for the
reasons set forth in my above-referenced filings and as further set forth in my responses below.

II.     **Response to ¶¶ 5-15:  The Oversight Board and Title III Cases.**

**Paragraph 5:**  Object and dispute.  a.  The findings referenced in PROMESA §405(m),
48 U.S.C. §2194(m) were made 5 1/2 years ago and in the context of providing "an immediate –
but temporary – stay" "to stabilize the region for the purposes of resolving this territorial crisis."
Congress emphasized that "[t]he stay is limited in nature and narrowly tailored to achieve the
purposes of this chapter, including to ensure all creditors have a fair opportunity to consensually
renegotiate terms of repayment based on accurate financial information that is reviewed by an
independent authority or, at a minimum, receive a recovery from the Government of Puerto Rico
equal to their best possible outcome absent the provisions of this chapter."  PROMESA
§ 405(m)(5).

b.      Since then, the original objectives of PROMESA have fallen by the wayside.
What was supposed to be a "temporary" stay "to stabilize the region" has become a protracted
and extraordinarily unfair 5 1/2 year stay on the payment of even interest to bondholders despite
Puerto Rico having literally over $25 billion in cash (#18758-6 p.4), over $13 billion of which is
available to pay the GO and PBA bonds (#18758-6 pp. 7, 11; #19164-1 p. 5).  *See* #19047-page-
6,9-of-27.  Although a prerequisite to issuing a restructuring certification is a determination by
FOMB that Commonwealth "adopted procedures necessary to deliver timely audited financial

statements" (PROMESA § 206(a)(2)(A), 48 U.S.C. § 2146(a)(2)(A)), Puerto Rico has during the

FOMB's tenure failed to deliver timely audited financial statements.  At the time Puerto Rico

was selling bonds, Puerto Rico's audited financials were generally timely.  Its fiscal 2011 audited

financials were issued 4/27/2012, about 302 days after fiscal year end.  #16908-page-136-of-178.

The fiscal 2013 audited financials were issued within a year (on 6/30/2014).  #16908-page-148-

of-178.  It was after Puerto Rico in 2015 sought to avoid payment of its Constitutional "first

claim" debt, and after PROMESA was enacted in 2016 and the FOMB was installed, that Puerto

Rico became seriously delinquent in issuing its financials.  The "latest" audited financial

statement, for the year ended June 30, 2018, was not issued until June 30, 2021, 1,096 days

(three years) after the fiscal year end.  #17628-14-page-12-of-471.

      c.     Puerto Rico's population is, per U. S. Census Bureau count, actually 8.4% higher

than the 2020 population numbers used by FOMB in its fiscal plan, and per the U. S. Census

Bureau, the actual count as of 4/1/2020 was 2.89 % greater than the Census Bureau's 7/1/2019

estimate, in contrast to FOMB's assumption of continuous decline.  #19047-page-8-to-9-of-27.

      d.     While – years *after* Puerto Rico's then political leadership chose to default –

Puerto Rico has suffered from hurricanes in 2017, earthquakes in early 2020 and the COVID-19

pandemic, Puerto Rico has received billions of dollars of federal assistance and is not alone

among jurisdictions within the United States to suffer from natural disasters and COVID.  By

way of example only, Florida, Louisiana, Mississippi, Texas and North Carolina have suffered

from devastating hurricanes and tropical storms.  California has suffered from both earthquakes

and raging forest fires.  All states and territories have been adversely impacted by the COVID-19

world-wide pandemic.  I understand, including from personal experience in New York during

Sandy, the personal and economic harm natural disasters cause to people and localities.  And I

also understand, again from living in New York, the harm and tragedy COVID and the responses

thereto have caused many people.  But Puerto Rico defaulted *before* the 2017 hurricanes, *before*

the 2020 earthquakes and *before* COVID.  Furthermore, other jurisdictions that have experienced

natural disasters and COVID have not defaulted on their full faith and credit general obligation bonds, much less bonds that, per their Constitution, have a "first claim" priority right of payment (among other sources of security).

     **Paragraph 6:**  Object and dispute.  FOMB mischaracterizes the reach of preemption under PROMESA's § 4, as discussed in response to paragraph 145 below.

**III.**    **Response to ¶¶ 16-31:  The Plan Support Agreements.**

     **Paragraph 16:**  Object and dispute reference to alleged "extensive mediation sessions", including for reasons stated in objection #18575-page-31-to-35-of-303, on the record in the course of the confirmation hearing, and below in Section X and in paragraph 144.

     **Paragraph 17:**  Object and dispute reference to "under the guidance of the Mediation Team", for reasons stated in objection #18575-page-31-to-35-of-303, on the record in the course of the confirmation hearing, and below in Section X and in paragraph 144.

     **Paragraph 18:**  Object and dispute in light of failure to specify and place in evidence the quantified cost savings from the modified terms of collective bargaining agreements, if there were any such savings.

     **Paragraph 22:**  Object and dispute reference to "continue to engage in discussions with the guidance of the Mediation Team," for reasons stated in objection #18575-page-31-to-35-of-303, on the record in the course of the confirmation hearing, and below in Section X and in paragraph 144.

     **Paragraph 24:**  Object and dispute reference to "engage with objecting parties under the guidance of the Mediation Team, for reasons stated in objection #18575-page-31-to-35-of-303, on the record in the course of the confirmation hearing, and below in Section X and in paragraph 144.

**Paragraph 27:** Object and dispute reference to "proposed global resolution of disputes regarding the validity and related rights of GO bonds that may have been issued in violation of the Puerto Rico Constitutional debt limit", *see* Objection #18575-page-20-to-35-of-303.

**Paragraph 31:** Object and dispute.  The problems with the adequacy of the solicitation process, as concerns retail investors, have been described in #18237, #18247, #18306, #18439, #16909, *see* also #17221, #17524 and is discussed in Section XVI below.

IV.    **Response to ¶¶ 32-47:  Compliance with PROMESA Sections 104(j) and 313.**

**Overall response to ¶¶ 32-47:**  Object and dispute, on the grounds that (i) FOMB has not complied with its obligations pursuant to PROMESA Sections 104(j) and 313, and (ii) that the proposed FF/CL do not comply with PROMESA, as set forth in my objections made to date and as further described below.

**Paragraph 32:** Object and dispute FOMB's claimed ability to unilaterally modify the plan.

**Paragraph 33:** Object and dispute that FOMB Board has complied with its obligations pursuant to PROMESA 104(j) and 313.

**Paragraph 47:** Object and dispute, including object and dispute claim that the current proposed Plan meets the requirements of PROMESA and that FOMB has complied with all provisions of PROMESA applicable to the confirmation of the Plan.

V.    **Response to ¶ 48:  Compliance with PROMESA Section 314(b).**

**Paragraph 48:** Object and dispute for reasons set forth below.

VI.    **Response to ¶¶ 49-68:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1122(a) and (b).**

**Paragraph 49 - 52:** Object and dispute, on the grounds that the classification scheme fails to accord GO and PBA bonds the "first claim" priority right of payment to which they are entitled, based on both their right of priority of payment under applicable law and on secured status, as set forth in my objections made to date (including #18575-page-22-to-23-of-303) and

as further described below.  Furthermore, although ¶ 51 states that claims of Retail Investors are separately classified because such Claims are smaller in dollar amount and the holders' rights differ from those of holders of GO bonds and PBA Bonds pursuant to the GO/PBA Plan Support Agreement, it is inappropriate to pay Retail Investors less pro rata consideration than the major funds and other institutional investors who were Initial GO/PBA PSA Creditors, as more fully discussed in Section VIII below and in my objection #18575-16-to-18-of-303.  Notably, in stark contrast to the treatment of the "smaller in dollar amount" unsecured claims – who receive 100 cents on the dollar as members of the "convenience claims" Class LXVIII (Class 68) (in contrast to the lower recoveries of other larger unsecured creditors in Class LV (Class 55), *see* #17628-page-38-of-654) – the proposed plan's treatment of "smaller in dollar amount" bondholder claims gives the bondholders holding "smaller in dollar amount" claims *less* pro rata consideration than the major funds and institutional investors who negotiated bondholder treatment.  Unlike the situation for general unsecured claims, where there was a committee appointed by the U.S. Trustee, whose members owed fiduciary duties to all unsecured creditors, there was no committee appointed by the U.S. Trustee representing bondholders and thus no one with a fiduciary duty to all bondholders, including individual bondholders whose claims are "smaller in dollar amount", and the result has been disparate and unfair treatment of the "smaller in dollar amount" Retail Investor claims in this case.

**Paragraph 53:** Object and dispute.  a.  Mainland U.S. Investors may hold the bonds in accounts not subject to federal income tax, but only Puerto Rico Investors are entitled to elect taxable bonds.  Furthermore, Puerto Rico Investors receive one single 2041 maturity paying 5%, whereas 50-states investors receive bits and pieces of 12 bonds (two of which pay no current interest, and five of which have 4% coupons).  The consideration given to Puerto Rico Investors is more valuable, as explained in my objection #18575-page 39-of 303.  In addition, investors who originally held the approximately 13% of par amount of Puerto Rico GO or PBA bonds that were originally issued as federally taxable receive distributions that either are now largely or

7

completely comprised of tax-exempt bonds or, if eligible for the Puerto Rico investor election, receive the higher coupon single 2041 maturity bonds.  If the taxable New GO Bonds were allocated to those who hold taxable securities, and tax-exempt bonds were allocated to those who hold tax-exempt securities, the spectre of mainland U.S. bondholders who hold tax-exempt bonds receiving instead some portion of taxable bonds would be eliminated.

b.      By providing only Puerto Rico Investors the option to elect one single 2041 maturity paying 5% in interest, whereas 50-states investors receive bits and pieces of 12 bonds (two of which pay no current interest, and five of which have 4% coupons) individual 50-states bondholders are discriminated against based on residence in violation of the cited provisions of the Constitution, statutes and case law discussed in my objection, #18575-page-39-to-40-of-303.

c.      The entire issue of unfair discriminatory benefits to Puerto Rico Investors, and detriments to the U.S. mainland investors, could be eliminated if the IRS determination of whether all bonds will be tax exempt is obtained before the plan is confirmed and becomes effective.  In light of the fact that FOMB has been in place for over five years, the Title III petition with respect to the Commonwealth was filed in early May 2017, over 4 1/2 years ago, and the various iterations of the proposed plan of adjustment began to be announced over two years ago, in 2019, there is simply no reason to rush consummation and the Effective Date before the IRS determination of tax-exempt status is received.  By waiting until the IRS determination is received, one also avoids any spectre of securities initially being issued as taxable, only to then in a short time be exchangeable into tax exempt bonds, but through an exchange process imposing additional tax-related recordkeeping burdens on individuals, and fees charged by individuals' brokerage firms, resulting in added costs and burdens on individual Retail Investors**.**

**Paragraph 54:**  Object and dispute.  a.  As evident from facts discussed in my declaration and exhibits cited therein (#19047-page-18-to-19-of 27), not all current employees are required for, or involved in, the provision of essential governmental services to Commonwealth residents.  FOMB has never delineated which are essential services and which

are not, much less offered evidence to sustain a burden of proof as to which services are essential.  FOMB's failure to demonstrate which employees are actually needed, as opposed to being employed for political or other reasons unrelated to efficient provision of government services, is particularly problematic in light of the fact OATRH attendance reports are no longer produced and made public, which obscures (1)  issues with regard to attendance by public employees, and (2) issues with respect to the size and utilization of the Commonwealth's public employee work force, such as raised by the large number of PREPA employees who have recently been moved over to the Commonwealth payroll.  Underscoring the seriousness of the attendance issue, FOMB had imposed, as a stated requirement in its fiscal plans, the preparation and issuance of attendance reports by OATRH.  #15988-5-page-249-of-272, #17628-8-page-289-of-309.  OATRH had regularly issued these attendance reports "prepared for the FOMB" for years.  However, for reasons never explained, these reports ceased to be made publicly available after October 2020 and FOMB and AAFAF have refused to say why.  *See* #19047-page-18-to-19-of-27 and exhibits cited therein.

b.      As shown in #18760-3, of 114 government agencies, 85% + reported attendance when the OATRH attendance reports began to be issued in 2017.  But by the last week of October 2020, only 8.77% reported attendance.  And even before the pandemic hit, in January 2020, the percentage of "employees working" was as low as 16.73% to 38.55%.  *See* #19047-page-19-¶¶ 50-51-of-27, citing #18760-3.

c.      It is also disputed whether the interests of the Commonwealth and all of its stakeholders are served by the decision – under political pressure – to eliminate any reduction in the monthly benefit payments.  Originally, FOMB had stated that it was "appropriate and necessary" that there be a modest 8.5% reduction in monthly benefit amounts over $1200.  #15988-5-page-236-of-272.  Then FOMB backed off that reduction, and provided for a more limited reduction of 8.5% to the extent monthly pension benefits exceed $1500 per month.  FOMB stated this "reduction in pensions (with protections for participants close to the poverty

9

level) is necessary for the Commonwealth to achieve long-term fiscal stability." #17628-8-page-276-of-309. Now, FOMB has abandoned any reduction in the monthly pension benefits at all, regardless of the size of an individual's benefit and regardless of whether the benefit is wholly or at least substantially tax-exempt. The effect of not reducing monthly benefits for even more highly compensated retirees has been to effectively reverse the payment priorities set by the Puerto Rico Constitution (which had been adopted in a referendum by the people of Puerto Rico), which Constitution provided GO bondholders – not public employees or retired public employees – the "first claim" priority of payment.

**VII.   Response to ¶¶ 69-74:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1123(a)(1), (2) and (3).**

**VIII.  Response to ¶¶ 75-78:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1123(a)(4), the "same treatment" requirement.**

   **A.      Overview of response to FF/CL ¶¶ 75-78:**

75-0  a.  FOMB has failed to prove that the Plan complies with the "same treatment" requirement of 11 U.S.C. § 1123(a)(4) and other applicable law. The § 1123(a)(4) "same treatment" requirement is not complied with because bondholders who own identical bonds nevertheless do not receive the same pro rata consideration. *See* Objection, #18575-page-16-to-18-of-303. The below discussions focus on:

- Violation of the "same treatment" requirement concerning the additional 1.5% of par pro rata payments hedge funds and other institutional parties (who hold approximately 2/3s of the Bond Claims) receive, but that other bondholders, including individual Retail Investors, do not: To "cure" this violation of § 1123(a)(4) and other applicable law, all bondholders must be paid pro rata the same additional 1.5% of par.

- Violation of the "same treatment" requirement concerning the additional 1.321% of par pro rata some but not all bondholders receive: FOMB effectively admits that the 1.321% of par should be paid to all individual

Retail Investors, however, the mechanism used to distribute the 1.321% of par to Retail Investors is so complex and confusing that even FOMB now concedes additional steps need to be taken.

- The additional steps FOMB proposes to take in the version of the proposed order and judgment filed the night of November 21, 2021 (and refiled on November 28 with several additional changes), which additional steps do not adequately resolve the problems that flow from the complex and confusing process FOMB has required that one navigate to get the 1.321%.

1.  **1.5% paid pro rata to selected parties – Overview of response and objection to FF/CL ¶¶ 75-78:**

b.      Selected parties – who were given the opportunity to join the PSA by 2/22/2021 – receive a pro rata 1.5% Consummation Fee, but individual Retail Investors, like me, do not.  *See* Plan §§ 1.267, 1.309, 3.3.  FOMB has failed to prove a legally cognizable justification for this unequal treatment.  FOMB has also failed to prove that individual Retail Investors were ever offered the opportunity to elect to receive this 1.5% pro rata payment.

c.      The terms of the Plan contradict the self-serving rhetoric to the effect that the 1.5% of par was paid "to compensate certain parties for the cost of negotiation, confirmation and consummation":  Under the terms of the Plan, these "fees" are simply pro rata additional payments.  Plan § 3.3 is express that each Consummation Cost recipient gets "a pro rata share" equaling 1.5% of the aggregate amount of its bond claims as of 2/22/2021.  A bondholder who sells on 2/23/2021 still gets the 1.5%, even if they are not around for confirmation or consummation (and many have sold, *see* #18763-3 (Hein Ex. JJJ), #17524-page-9,37-to-41-of-41).  Conversely, a bondholder who signs the PSA on or just before 2/22/2021 receives the 1.5%, irrespective of whether the bondholder establishes that it played any particular role in "negotiations" or that it incurred any expense in connection with "negotiations."

d.      Plan § 3.3 does **not** require any proof of expenses incurred in order to receive the

1.5% fee.  The Plan does not require, for example, that expenses go through the PROMESA

§316 approval process or meet the standards provided for in PROMESA §316.  Payments are

simply 1.5% pro rata based on holdings as of 2/22/2021, irrespective of the nature or amount of

expenses (if any) incurred.  Furthermore, if expenses were incurred, they were incurred by the

party for representing its own interests:  FOMB did not prove that the recipients of the 1.5% pro

rata payments were fiduciaries for the entire body of bondholders, or that they incurred any

expenses while acting as fiduciaries for the benefit of the entire body of bondholders in any or all

of the bond series.  The record in these proceedings is that the recipients of the 1.5% pro rata

payments did **not** act as fiduciary for other bondholders.  *See* #17524-page-8-of-41, #17382-

page-5-of-7, #17296-page-3-of-11, #17397-page-4-to-5-of-11.

e.      The limited evidence in the record from FOMB witnesses does not overcome the

evidentiary force of the fact of pro rata distribution under Plan § 3.3, and thus does not meet

FOMB's burden of proof to demonstrate that the 1.5% pro rata payment is being paid "to

compensate certain parties for the cost of negotiation, confirmation and consummation," much

less that the "same treatment" requirement of § 1123(a)(4) is met.  Zelin testified that (i) he was

provided an email by two of the bondholder groups that showed an estimate of their cost and

expenses (which email estimate was **not** itself offered into evidence) and (ii) he believes that the

bondholder representatives he dealt with worked hard.  But there is no getting around the fact

that under Plan § 3.3 the 1.5% was paid pro rata based on holdings as of February 22, 2021.  As

discussed above, a party that signed-on as late as February 21, 2021 got the same 1.5%.  Indeed,

someone who did no work whatsoever, but was offered the opportunity to serve as an Initial

GO/PBA PSA Creditor, even if offered that opportunity just before February 21, 2021, will,

under Plan § 3.3, receive the full 1.5% pro rata payment.  And a party that sold out on February

23, 2021 still gets the same 1.5% pro rata on bonds held on February 22, 2021.

f.      FOMB did not prove that any recipient of the 1.5% invested new cash in a debtor, and thus could be said to have provided new funding for debtor that warrants payment separate from that creditor's pro rata share of the consideration paid to its class.

g.      Any contention by FOMB that those getting the 1.5% also locked up their support for the plan does not meet FOMB's burden to establish the "same treatment" requirement of § 1123(a)(4) is met.  The "lock-up" rationale does not justify limiting the 1.5% pro rata payment to only selected major institutions, rather than making the 1.5% available to all bondholders. Furthermore, Plan § 3.3 states that the 1.5% is to "compensate certain parties for the cost of negotiation, confirmation and consummation."  Per the Plan, it was the 1.321% Restriction Fee in Plan § 3.5 that was paid to "lock-up" bonds, not the 1.5% pro rata Consummation Costs.  And Retail Investors – to get even the 1.321% – are themselves subject to even more stringent restrictions on transfer, since Retail Investors were required to have their bonds delivered to the ATOP facility in the "accept" or "reject" bucket by October 18, 2021 (or an earlier date set by their broker), at which time they are restricted from transfer until the Effective Date.  #18761-4-page-5-to-6-of-7 (Hein Ex. BBB).

h.      There was also no proof that payment of the 1.5% of par to some but not all bondholders was the only alternative to litigation. (I maintain that even if there had been such proof, that would not have justified the payment of the 1.5% pro rata fee to some, but not all bondholders.)  I repeatedly sought to have a committee appointed to represent individual bondholders who have been excluded from the negotiation of the Plan (*cf.* #17420-page-19-¶34-of-27, FOMB noting that "Retail Investors, such as Hein, … have not worked to negotiate or support the Plan"), or alternatively, all bondholders.  However, FOMB opposed the establishment of such a bondholder committee, and this Court rejected my motions to have such a committee appointed.  #6128, #6487, #6534, #17221, #17524, #17724.  Had such a committee been appointed, there would have been a mechanism in place to negotiate treatment of all bond

claims, so all holders of a particular series of bonds would receive the same consideration.  But there was not.

> **2.    1.321% paid pro rata to selected parties – Overview of response and objection to FF/CL ¶¶ 75-78, proposed Order and Judgment ¶ 87 (#19325-page-202-to-203-of-226) and the proposed Notice of Retail Investor Certification (#19325-page-220-to-224-of-226).**

i.    FOMB's November 21, 2021 proposed Order and Judgment (i) now recognizes – as I had pointed out in the hearings (*citing* #18761-4-page-6-par-1; *see also* #17628-page-35, identifying class 36 as a non-retail class) – that individuals who qualified under the Plan as Retail Investors but who did not have their brokers deliver their bonds to ATOP to vote either accept or reject would not (without a change in the procedures being followed) receive the added 1.321%, and (ii) now provides (through additions to the proposed Order and Judgment) for the opportunity for such individuals to submit a certification of retail status and receive the added 1.321%.

j.    However, I remain concerned about the complexity and confusing nature of the process, and I do not believe the FOMB's new proposal is sufficient to ensure all Retail Investors, including me, receive the added 1.321% they are entitled to under the terms of the Plan.

k.    **First**, as described in the proposed Notice of Retail Investor Certification, the opportunity is only made available "[i]f you are a 'Retail Investor' and did not submit a vote to accept or reject the Plan …." (#19325-page-220-of-226).  However, it is not made clear in the notice how an individual investor (or the investor's broker, for that matter) can verify whether – if they did previously provide timely instructions (*e.g.*, delivery to ATOP option 6 "reject" and certify as Retail Investor) – those instructions were properly implemented by the broker's back office and the party who maintains the ATOP at DTC.  After I had the opportunity to study the material FOMB added in the proposed order and judgment filed the night of November 21, 2021, I asked my broker at Merrill to check with the Merrill back office to be sure my bonds were in fact delivered to the ATOP option 6 "reject" (including the certification of my status as a Retail

Investor), as I had instructed in September and October prior to the October 12 3 p.m. Merrill cut-off time for instructions (#18760-17-page-3-of-7). I was told in response that the Merrill back office is showing that there is a delay on the ATOP/Puerto Rico side, that delivered bonds had not yet been processed and issued new CUSIPS and that there was no time frame for completion.

l.       There needs to be an unambiguous means by which an individual Retail Investor can confirm that their bonds have already been delivered into the ATOP "accept" or "reject" bucket for Retail Investors. This is of specific concern to me personally (as well as a general concern to others) because – despite my attempting to follow these cases as closely as practical, and despite my following up with my broker at Merrill – I am not in a position to verify that in fact my instructions to deliver to ATOP, certify as a Retail Investor and vote to "reject" were in fact followed. Likely other individuals are in the same position. For example, if new CUSIPs are supposed to be issued to those whose bonds were delivered to ATOP, those new CUSIPs should be provided to brokerage firms now and individuals should be provided a chart showing old CUSIPs and the corresponding new CUSIPs that qualify for the 1.321% (and, additionally, which new CUSIPs do not qualify for the 1.321%, if there are such).

m.       I fear I will only find out if my prior instructions were properly implemented with a delivery to ATOP (with a certification as a Retail Investor and a "reject" vote) after the Effective Date, which apparently will be after the internal broker deadlines for action in advance of the January 18, 2022 deadline for submission of the Retail Investor certifications to ATOP at DTC.

n.       Related to the foregoing concern, there needs to be a way investors and brokers can submit a Retail Investor certification out of an abundance of caution to make sure that a prior delivery to ATOP and vote to "accept" or "reject" with respect to their bonds was properly registered.

15

o.     **Second**, there is no plain language explanation of the reason for the "Notice of Retail Investor Certification" that is proposed to be sent to individual investors (#19325-page-220-of-226).  Such a plain language explanation is needed for both brokers (so they can properly consult with their clients) and individual investors (so they can appropriately provide their instructions to their brokers).  Not only is such a plain language explanation necessary for individual investors and their brokers, this is also necessary to ensure the back office personnel at brokerage firms understand the situation.  Otherwise, I (and other individual investors) run the risk that, even though we properly instruct our brokers, and our brokers (hopefully) then understand what the situation is and what needs to be done, back office personnel may be confused and the appropriate delivery to ATOP may not occur.  Thus, I believe the notice should start out with a paragraph – to follow the first paragraph in the current notice – that says in substance:  "Because the Plan has been approved by the Court, all bondholders, including Retail Investors, will be bound by it and will receive the consideration provided for in the Plan.  This notice is alerting Retail Investors to their opportunity (if not previously exercised) to get 1.321% of par additional consideration.  If you did not already have your bonds delivered to ATOP with a Retail Investor certification and vote either "accept" or "reject", and if you now fail to act on this notice, you will not receive the 1.321% of par additional consideration being made available to investors."  [FOMB to insert here a clear explanation of how one can tell if one has properly delivered to ATOP and been recorded as a Retail Investor].  (This language is suggested on the assumption the Court ultimately approves the Plan in some form; I am not hereby waiving any of my objections or positions.)

p.     **Third**, FOMB's re-opened process has a qualification that should be removed.  It appears that FOMB intends that even if a Retail Investor instructed their broker to deliver the bonds to ATOP, certify as a Retail Investor and vote either "accept" or "reject," if the broker (perhaps confused) failed to certify the customer as a Retail Investor, but still "voted" the bonds (perhaps applying some default rule (*e.g.*, 18761-4-page-6; *compare* #19328-2-page-108-of-

16

184)), there is no "second chance".  *See* 19328-2-page-108-of-184.  The complex nature of the

options given to Retail Investors raise the possibility that a broker (or broker's back office), who

were unfamiliar with the ATOP delivery, certify and vote process as applied to municipal bonds,

might not have correctly implemented the instructions of a qualified Retail Investor.  *See*

#18761-4-page-3-to-7-of-7.  And because nothing in the solicitation materials told the individual

Retail Investors how they could confirm that their bonds had been property delivered into the

appropriate "accept" or "reject" bucket as an "accept" or "reject" vote with a certification of

status as a Retail Investor, an investor may not realize the problem until after the Plan goes

Effective and they receive distributions but no 1.321% fee.  Thus, FOMB's qualification should

be removed.  If a broker discovers that a Retail Investor's bonds were not properly tendered into

the appropriate ATOP bucket at DTC, the process should allow that problem to be cured.  Bear

in mind, it is undisputed that whether someone voted "accept" or "reject," they are entitled to the

1.321%.  Someone should not be denied the 1.321% because of confusion – and, in particular,

confusion by their broker – resulting from an overly complex process.

q.     **Fourth**, Retail Investor is inconsistently defined or described.  The Plan defines

Retail Investor as one who holds less than $1 million of GO and PBA bonds.  Plan 1.435.

#19365-page-81-of-296.  The proposed Order and Judgment (in par 87.e, #19368-page-92-of-

231) states a Retail Investor is one with $1 million or less (i.e., holdings of $1 million of GO and

PBA bonds qualifies as a Retail Investor per the proposed Order but not per the Plan).

r.     But whatever the precise qualifying amount, neither Plan 1.435 nor Plan 3.6

requires navigation of the overly complex delivery to ATOP process used here as a pre-condition

to receipt of the 1.321%.  I did a word search of the Plan (both of #17627 and the more recent

#19323 and #19184); there appears to be no mention of "ATOP" anywhere in the Plan.

Allowing errors in the ATOP delivery process to be cured is not only appropriate, it is necessary

to comply with Plan terms that do not condition Retail Investor status on navigating a complex

ATOP delivery process.

s.      **Fifth**, a preferable method of proceeding would be to give all bondholders the
additional 1.321% of par.  This would be simpler, and would ensure all Retail Investors (as well
as all bondholders) receive the 1.321%.  I realize this may mean some non-Retail Investors who
hold more than $1 million par GO and PBA bonds (*e.g.*, perhaps an individual who holds $1.3
million par of GO and PBA bonds) and who did not accept the CUSIP exchange offer abruptly
announced on EMMA last summer – but not mailed to bondholders – will then also get the
1.321%.  However, given the complexity of the processes in this case, and the abrupt and not
well-publicized nature of the CUSIP exchange offer last summer, simply giving all bondholders
the additional 1.321% of par is likely the only way to ensure all Retail Investors get the 1.321.
Moreover, as a legal matter, if all bondholders (Retail Investors or not) do not get the 1.321%,
the Plan does not comply with the "same treatment" requirement of 11 U.S.C. § 1123(a)(4).

t.      Giving all bondholders the 1.321% of par without requiring an individual and
their broker to navigate the ATOP delivery process has the further benefit that individuals whose
brokers may otherwise charge a fee (as illustrated by the $30 fee to the broker reflected in, e.g.,
#18761-4-page-7), because a particular process is deemed "voluntary," will not be charged a fee
because (if everyone gets the 1.321% fee) the distribution will instead be "mandatory".

u.      I am not aware of FOMB – which has the burden of proof – providing evidence
that the delivery to ATOP processes for voting or election has been commonly used in cases
involving municipal bond issues initially sold to large numbers of individual investors.  I have
been investing in municipal bonds for over 40 years and I have never seen any situation that has
involved the complexity of the delivery to ATOP processes for voting or election used in this
case.  If the complexity of the delivery to ATOP process for voting or election has not been
commonly used in cases involving municipal bonds issues sold to individual investors, there is
no reason to think that the average individual investor in municipal bonds or their broker will be
familiar with the delivery to ATOP process for voting or election.  (FOMB has acknowledged
that "Commonwealth does not have access to information regarding the identities of individual

18

holders of bonds or the amount of their holdings". #19164-2-page-13-of-18. Since it appears that individuals who held bonds in a separate managed account with an asset management firm were also treated as Retail Investors (Plan 1.435), one cannot look at the Retail Class vote and conclude from the fact a number of Retail Investors' bonds were delivered via ATOP that the average individual or their broker understood or successfully navigated the process.)

v.       As I noted in closing argument, prior assurances by FOMB in the course of the hearing that all individual Retail Investors would receive the 1.321% – whether or not they navigated the process to have their bonds delivered to ATOP and voted – turned out to be incorrect. Because there is no official committee, appointed by the U.S. Trustee, representing as fiduciaries individual investors who qualify as Retail Investors, that has the resources and "clout" of a committee and the ability to ensure that, even with the new mechanism proposed by the FOMB, all Retail Investors receive the 1.321%, it is particularly important that this Court independently investigate and verify assertions by FOMB. One or two individual investors do not have the capability of obtaining from FOMB satisfactory answers to the issues raised above.

**B.       Paragraph-by-paragraph response to FF/CL ¶¶ 75-78.**

**Paragraph 75:** Object and dispute that the Plan so provides, for the reasons set forth above.

**Paragraph 76**: Object and dispute, for the reasons set forth in the above discussion.

**Paragraph 77**: Object and dispute that the provision for Retail Support Fee suffices to provide "same treatment" to individuals who under the Plan qualify as Retail Investors for the reasons set forth above.

**Paragraph 78**: Object and dispute for the reasons set forth above.

**IX.    Response to ¶¶ 79-83: Compliance with PROMESA Section 314(b)(1): 11 U.S.C. 1123(a)(5)**

**Paragraph 79:** Object and dispute to the extent these matters are addressed and objected to elsewhere.

**Paragraph 80**:  Object and dispute based on failure to prove feasibility, as discussed in Section XX.B.

**Paragraph 81:**  Object and dispute based on inter alia, failure to prove feasibility as discussed in Section XX.B.  Among other things, the restriction for 10 years is insufficient because it does not extend through the maturity of the New GO Bonds.

**Pargagraph 82:**  Object and dispute that Act 53 and a court order confirming the Plan is adequate to protect holders of New GO Bonds in light of the issues presented in Section XX.B concerning willingness to pay.

**Paragraph 83:**  Object and dispute for the reasons noted above.

**X.     Response to ¶¶ 84-101:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1123(b).**

**A.     Overall response to ¶¶ 84-101:**

84-0  Object and dispute.  a.  ***First***, I reiterate my objections to any use of, or reliance upon, the confidential mediation-negotiation process (e.g., #18575-page-31-to-35-of-303).  Among other things, it is inappropriate for FOMB to use affirmatively the alleged "robust" nature of the mediation and settlement process notwithstanding that FOMB has objected to discovery of what transpired in that process (*see* #18760-23-page-5-to-7-of-8 (Hein Ex. KK pp.15-17; #18760-25-page-4-of-8 (Hein Ex. MM p.9), that there is no contemporaneous record of what transpired in that process (e.g., #18575-page-31-to-32-of-303), and that I am restricted from responding factually with respect to what occurred in that process by virtue of the confidentiality orders that the Court has entered (e.g., #1836, #1841, #8686).

b.     ***Second***, I did not agree to have any issues concerning validity, priority or secured status of the GO and PBA bonds resolved through the mediation-negotiation process in lieu of adjudication; rather I objected.  E.g., #9096 (citing prior filings), #9508, #11284.  And under settled legal principles, what settling bondholders agreed to cannot, and should not, be considered for any purpose.  *See*, *e.g.*, F.R. Evid. 408; *U.S.* v. *Contra Costa*, 678 F.2d 90, 92 (9th

Cir. 1982) (citing 408); *Slattery* v. *U.S.*, 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").

      c.     ***Third***, confirmation is not the proper procedure by which to abrogate bondholder property rights.  #18575-page-32-to-33-of-303.  Under Due Process and Bankruptcy Rule 7001(2), an adversary proceeding was required against each bondholder "to determine the validity, priority, or extent of a lien or other interest in property".  *Mansaray-Ruffin*, 530 F.3d 230, 234-43 (3d Cir. 2008); *Commercial Western Finance*, 761 F.2d 1329, 1336-38 (9th Cir. 1985).  Debtors implicitly acknowledged that by filing (but not prosecuting) adversary proceedings to challenge bondholders' liens.  *E.g.*, Adv.Proc. 19-292. However, that adversary was not prosecuted – it was stayed at Debtors' behest (and over my objection).  *E.g.*, Adv.Proc. 19-292-Doc#54 & #54-page-2n.5-of-7; #11284.  No adversary proceeding was brought to contest validity or priority (albeit a claims objection to contest validity was brought, but also was never the subject of a judicial ruling).

      d.     ***Fourth***, use of a confidential mediation-negotiation process – rather than adjudication of the priority, secured status and validity of the GO and PBA bonds – cannot be used to abrogate rights of non-consenting bondholders, for reasons set forth, *e.g.*, in #18575-page-33-to-34-of-303.

    **B.**    **Specific responses to ¶¶ 84-101**

**Paragraph 88:**  Object and dispute for reasons set forth above and on grounds that the incorporated "settlements and compromises" are not by all bondholders and that there has been no adjudication of rights through a successful prosecution to judgment of an adversary proceeding as was required if Debtors sought to alter the validity, priority or secured status of GO and PBA bonds, as discussed in my objection. #18575-page-32-to-33-of-303.

**Paragraph 89:**  Object and dispute, including for reasons set forth above.

**Paragraph 90:**  Object and dispute, including for reasons set forth above.

21

**Paragraph 91:**  Object and dispute, including for reasons set forth above.  Furthermore, the asserted reasonableness of the settlement as to Debtors does not provide a basis for binding creditors who do not consent, which would require a successful prosecution to judgment of an adversary proceeding, as discussed in #18575-page-32-to-33-of-303.

**Paragraph 92:**  Object and dispute, including for reasons set forth above.

**Paragraph 100:**  Object and dispute, including for reasons set forth in Section XXIV.

**Paragraph 101:**  Object and dispute, including for reasons set forth in Section XXIV.

**XI.**   **Response to ¶¶ 102-103:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1123(d).**

**XII.**   **Response to ¶¶ 104-112:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1129(a)(2), (3), (6).**

**A.  Overall response to ¶¶ 104-112:**  Object and dispute, for reasons previously set forth.  In addition, FOMB and Commonwealth have not acted in good faith and have acted by means forbidden by law, in that, among other things, (i) FOMB has refused to pay the GO and PBA debt service that has priority under the Puerto Rico Constitution, despite the fact Puerto Rico has sufficient funds to pay all GO and PBA debt service in full, as I have detailed in my objection (#18575-page-26-to-27-of-303), declaration (#19047-page-6-to-16-of-27), opening statement and closing argument, based on exhibits in the record including #18760-31, #18758-6, #18758-7, #18759-2, #18759-4, and other exhibits cited in #19047; (ii) although Commonwealth with FOMB's consent could have paid interest on an ongoing basis (*cf*. PROMESA 405(l)), Commonwealth and FOMB have refused for 4 years to pay even interest on the GO and PBA debt – even while pension obligations, which do *not* have a "first claim" priority under the Constitution, were paid in full each month to former public employees, and Puerto Rico's outlays were permitted to continue to rise (increasing 29% from FY2018 to FY2021) – This nonpayment even of interest (x) placed downward pressure on bond prices that permitted hedge funds to purchase at steep discounts and then use their positions as leverage to the detriment of individual Retail Investors who had purchased years earlier when Puerto Rico was investment grade and

22

long before PROMESA was proposed, and (y) contributed to the pressures on individual Retail Investors to support the Plan; (iii) Commonwealth's pre-PROMESA repudiation of its obligation to pay debt service on the GO and PBA bonds that were entitled to priority of payment was in violation of the Contract Clause of the U.S. and Puerto Rico Constitutions and also placed downward pressure on bond prices that permitted hedge funds to purchase at steep discounts and then use their positions as leverage to the detriment of individual Retail Investors who had purchased years earlier when Puerto Rico was investment grade and long before PROMESA was even proposed.

**B.  Specific responses to ¶¶ 104-112:**

**Paragraph 104:**  Object and dispute, based on the foregoing and, among other things, noncompliance with requirements of 11 U.S C. § 1125 and 1126.  *See*, *e.g.,* #16908, #16909, #16977, #17536.

**Paragraph 105:**  Object and dispute, for reasons set forth above and including noncompliance with 11 U.S.C. § 1125 and 1126.

**Paragraph 106:**  Object and dispute, including for reasons set forth above.

**Paragraph 107:**  Object and dispute, including for reasons set forth above.

**Paragraph 108:**  Object and dispute, including for reasons set forth above.  Also object and dispute reference to "result of extensive arm's length negotiations among the parties, including through mediation led by Chief Bankruptcy Judge Barbara Houser," including for reasons stated above and in objection #18575-page-31-to-35-of-303, on the record in the course of the confirmation hearing, and in Section X and in ¶ 144.

**Paragraph 109:**  Object and dispute for reasons set forth above and in, *inter alia*, Section II including ¶5.d and Section XVII including ¶139.l.

**Paragraph 110:**  Object and dispute, including for reasons set forth above.

23

**Paragraph 111:**  Object and dispute, including for reasons set forth above.

**XIII.   Response to ¶¶ 113-118:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1129(a)(8).**

**Paragraph 113:**  Object and dispute, including for reasons set forth in Objection #18575-page-35-to-38-of-303.

**Paragraph 114:**  Object and dispute, including for reasons set forth in Objection #18575-page-35-to-38-of-303.

**Paragraph 115:**  Object and dispute, including for reasons set forth in Objection #18575-page-35-to-38-of-303 and #18237, #18247, #18306, #18439.

**Paragraph 116:**  Object and dispute, including for reasons set forth above.

**Paragraph 117:**  Object and dispute, including for reasons set forth above.

**Paragraph 118**: Object and dispute, including for reasons set forth above.

**XIV.   Response to ¶¶ 119:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1129(a)(10).**

**XV.   Response to ¶¶ 120-128:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1129(b)(1), (2).**

**Paragraph 120**: I recognize 11 U.S.C. § 1129(b)(1) and (2) would not apply if a particular class has properly accepted the plan (§ 1129(a)(8)(A)), but I reference (i) my position in Section XVI below and in #18575-page-35-to-38-of-103 that FOMB's improper and coercive solicitation requires denial of confirmation, and (ii) issues raised in #18237, #18247, #18306 and #18439.  To avoid any suggestion that I acquiesce in the proposed findings that appear in this section, I respond below to those proposed findings as well.

**Paragraph 121**:  Object and dispute.  The issue addressed in ¶ 121 concerning retirees with pensions below the federal poverty level was previously addressed by the FOMB determination that the reduction of monthly benefits would only apply, first, to benefits in excess of $1200/month, and then benefits in excess of $1500/month.  *See generally* Section VI, par 54.c. Furthermore, the issues raised in ¶ 121 are not a justification for Puerto Rico failing to pay the

debt that has "first claim" priority under Puerto Rico's Constitution.  Paragraph 121 also fails to address (i) whether and to what extent pension benefits are being paid to individuals who no longer reside in Puerto Rico and (ii) the tax-free nature of the monthly pension benefits paid.

Paragraph 122:  Object and dispute for reasons set forth above.  Furthermore, the illogic of the fiscal multiplier analysis is underscored when one considers that (i) carried to its logical conclusion, the solutions to all of Puerto Rico's financial problems would be to simply continue to ratchet up government spending above and beyond the 29% increase in outlays from fiscal 2018 to fiscal 2021 (but that clearly is not the solution), and (ii) the fiscal multiplier analysis fails to factor in the fact that spending requires taxing or borrowing that takes money out of the economy, and thereby reduces private sector activity that may be more economically productive than the public sector activity the taxes or spending finances.

Paragraph 123:  Object and dispute, including for reasons set forth above.

Paragraph 124:  Object and dispute, including for reasons set forth above.

Paragraph 125:  Object and dispute, including for reasons set forth above.

Paragraph 126:  Object and dispute.  Among other things, FOMB ignores that its own expert, Dr. Wolfe, acknowledges that Commonwealth "has largely failed to implement the structural reforms recommended by" FOMB and others. #18151-1-page-5-of-30.

XVI.   Response to ¶¶ 129-134:  Compliance with PROMESA Section 314(b)(2).

Overall response to ¶ ¶ 129-134:  Object and dispute, including for reasons set forth in objection #18575-page-35-to-38 as well as #16909, #18237, #18247, #18306 and #18439.

Paragraph 132:  Object and dispute.  a.  As set forth in my objection (#18575-page-36-to-37-of-303), Section 1125(b) is express:  "An acceptance or rejection of a plan *may not be solicited … unless, at the time of or before* such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement *approved*, after notice and a hearing, by the court as containing adequate information," (emphasis added).

b.      Rather than wait until the Court approved, and creditors received and studied the 2695 page disclosure statement (with exhibits), Debtors preemptively, without advance Court approval, launched the 7/27/2021 exchange offer in an effort to lock in support – and votes – for the Plan.  #17649-page-2,9-to-29-of-29.  The exchange offer had a stated deadline of August 13, 2021, but as a practical matter Retail Investors were required to notify their brokers by earlier dates (*e.g.*, by August 10).  #17649-page-2,4,6,10-of-29.

c.      The Court did not approve the Disclosure Statement, and authorize solicitation of acceptances and rejections of the Plan, until August 2, 2021 (after the exchange offer had been launched, see #17649), and the solicitation packages were only belatedly mailed weeks thereafter (#17639-page-6-to-of-27-¶¶ 2,9,11,13; #18237; #18247; #18306; #18439).  The 7/27/2021 exchange offer was not compliant with the Court's order approving the disclosure statement and solicitation packages and distribution procedures (#17639).

d.      The exchange offer professed that it was "not … a solicitation … within the meaning of section 1125" (#17649-page-10-of-29).  But the Plan is structured to pay added consideration pro rata to certain favored bondholders.  For individual bondholders excluded from the Plan negotiations, and who had no committee to represent them (#6534, #17724), to be sure to get even part of the added consideration given to negotiating bondholders (*i.e.*, the 1.321% of par "restriction fee") a bondholder had to consent to become a party to the PSA (#17649-page-10-to-14-of-29).

e.      The PSA asserts that a PSA joiner must "support" plan confirmation, "timely vote … to accept the Plan" and not vote for or support any modification or plan FOMB did not propose (#17628-2-page-30,32-to-33,42-to-43-of-135 §§ 4.5(c),4.6(c),5.1(ii), emphasis added).  Adding self-serving language in PSA § 5.2 that "this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan" does not alter the reality that FOMB was offering added consideration for votes.  Indeed, major bondholder groups themselves acknowledge that the PSA "committed" them to "vote to accept."  #18453-page-2-¶2-of-7.

26

  f.  A bondholder who accepted the exchange offer and thus became a party to the PSA was not free to vote their true preference.  FOMB's counsel admitted at the hearing that if a bondholder accepted the exchange offer, and then voted "reject," FOMB would track them down and retract the 1.321% added consideration.

**Paragraph 133:**  Object and dispute.  a.  As set forth in my objection (#18575-page-37-to-38-of-303), the solicitation pursuant to the Disclosure Statement was also improperly coercive.  Retail Investors were expressly told that unless a majority of their class vote "accept," there will be no Retail Support Fee for them.  *E.g.*, #17628-page-27,57,420-to-421-of-654; Plan §§ 1.440, 3.6, 11.1, 13.1, 15.1, 20.1, 35.1, 42.1, 45.1, 51.1.  Only if a Retail class votes "accept" can members of that class even potentially receive even a fraction of the 2.821% of par that the Initial GO/PBA PSA Creditors with 67% of bond claims receive.  Payment of a fee conditioned on a vote does not become OK because the coercive benefit (part of a 1.321% of par fee) is tied to the overall vote of the class, rather than the vote of each individual class member.

  b.  The Retail class vote is also impacted by the fact that the Retail classes included not only individuals who are self-directed purchasing through a broker, but also purchasers for individuals through trust, custodial and separately managed accounts, which effectively are professionally managed, often by major banks.  Plan § 1.435.  While those professional managers may have navigated the process, that does not mean the average self-directed individual who purchased bonds from a broker did.

  c.  FOMB states in paragraph 133 that 80% of bond claims in dollar amount participated in the vote.  That actually undermines FOMB's position.  About 67% of Bond Claims by dollar amount were held by Initial GO/PBA PSA Creditors.  Thus, it appears only a minority of the other Bond Claims (about 40% of the 33% not held by Initial GO/PBA PSA Creditors) were voted.  This suggests widespread confusion and non-participation, particularly by individuals who are investing on their own, as distinct from having a professional manager handle their account.

d.     There are also fundamental issues with disclosure.  We now know that Puerto

Rico had a $4 billion surplus in FY2021, three times what was required to pay GO and PBA debt

service.  #19047-page-9-of-27.  But that was not disclosed in the Disclosure Statement.  *Contrast*

#17628-8-page-44-of-309.  And investors were also not directly told that Puerto Rico had

sufficient cash on hand to pay all past due GO and PBA debt service.  #19047-page-6-of-27.

Furthermore, individual bondholders were not told that there would be absolutely no reduction in

any retiree's monthly pension benefit payment, regardless of that retiree's income and the size of

their pension benefit, such that retirees would be receiving 100% of their claim.  The fact Puerto

Rico could afford to pay 100% to retirees would impact on the thinking of an individual

bondholder in the Retail classes as to why bondholders, with a priority right of payment, were

also not getting 100%, and the added expense to Puerto Rico of providing 100% to retirees also

impacted Puerto Rico's resources to pay the New GO Bonds.

e.     The Court did order FOMB to make a limited number of added disclosures

(#17387).  However, important information identified in my Objections (#16908, #16977,

#17536) was never included in the final disclosure statement.  Notably, there never was an

adequate disclosure – not even in the plan supplement filed 10/11/2021 – of "potential material

Federal tax consequences," which are expressly required to be disclosed under 11 U.S.C.

1125(a).  #16908-page-28-to-29-of-178.  The Disclosure Statement simply asserts "[t]he tax

status of the New GO Bonds has not been determined."  #17628-page-604,612,613-of-654.

f.     In short, the preponderance of "accept" votes does not reflect individual

bondholder preferences based on a fair, informed and un-coerced vote.

**XVII.  Response to ¶¶ 135-147:  Compliance with PROMESA Section 314(b)(3).**

**A.     Overview of response to ¶¶ 135-137.**

**Paragraph 135-137:**  Object and dispute.  a.  FOMB must prove that "debtor is not

prohibited by law from taking any action necessary to carry out the plan," but has not.  This

28

requirement was addressed in #18575-page-24,28-to-31,41-to-46-of-303, #19093, my opening statement and my closing argument.

**B.     Enacted legislation is contrary to Puerto Rico Constitution.**

b.      New GO Bonds and CVI Legislation is a pre-condition to the confirmation and effectiveness of the Plan (*see* Plan §§ 1.171, 1.360, 85.1(b)(viii), 86.1(b)(v), #19323-page-47,72,177-to-179-of-296, and provisions of the GO/PBA PSA that provide for CVI and New Bonds Legislation "to be enacted on or prior to the Effective Date", #17628-2-page-8,10,14-of-135).  However, the enacted legislation is contrary to Puerto Rico's Constitution.  Art. VI, § 8 requires GO and Commonwealth guaranteed debt to be paid "first," and § 2 (last sentence) provides for the enforcement of that Constitutional pledge.  But the New GO Bonds and CVI Legislation provides for the "cancellation and extinguishment" of existing bonds as among the actions "to carry out the Plan and/or a Restructuring Transaction" (defined to include "cancellation and extinguishment" of existing bonds).  #19062-page-688,page-733-Art.-102(pp), page-734-Art.-103-¶1,sent.-1-and ¶2.  Art. 103, ¶1 also purports to override any other provisions of Puerto Rico law.  *Id*.

**C.     Contract Clause.**

**Paragraph 139:**  Object and dispute.  a.  Commonwealth's impairment of the rights of its "first claim" priority (and secured) GO and PBA bondholders violates the Contract Clause, as explained in #18575-page-41-to-46-of-303 and in argument in the course of the confirmation hearings.

b.      FOMB argues that no provision of the Plan requires violation of the Contract Clause because Congress is empowered to impair contractual obligations pursuant to the Bankruptcy Clause.  #19366-page-71-of-113.  As a threshold matter, there is a flaw in FOMB's citation of, and quotation from, *City of Stockton*, 478 B.R. 8, 14-15 (Bankr. E.D. Cal. 2012), which in turn purports to cite and quote from the U.S. Supreme Court's opinion in *Sturges* v. *Crowninshield*, 17 U.S. 122, 191 (1819).  *City of Stockton* actually quotes from *the argument of*

29

*counsel* preceding Chief Justice Marshall's opinion in *Sturges* v. *Crowninshield*, not the opinion of the Court—*compare* 17 U.S. at 191 (in official reporter).

c.        Beyond this, FOMB disregards that, here, PROMESA itself posits as a requirement for confirmation that debtor must prove that "debtor is not prohibited by law from taking any action necessary to carry out the plan" (PROMESA 314(b)(3)).  As discussed in Section XVII.B above, one action "necessary to carry out the plan" is the enactment of Act 53, which provides for the "cancellation and extinguishment" of the existing bonds.  Since the Contract Clause of the U.S. (as well as Puerto Rico) Constitution prohibits the Puerto Rico legislature from cancelling and extinguishing existing bonds, Commonwealth is prohibited by the Contract Clause from taking this "action necessary to carry out the plan."  Moreover, Act 53 essentially reverses the priority of the GO and PBA debt under Puerto Rico's Constitution, by providing for a multitude of expenditures to be made – ranging from eliminating the monthly benefit modification irrespective of the amount of a monthly benefit, to funding for the University of Puerto Rico, to other purposes – even while the GO and PBA debt is impaired (#19062-page-735-to-736-of-756).  Because the statute impairing the contract here is a Commonwealth law, FOMB's citation of *Pension Benefit Guaranty Corp.* v. *Gray*, which dealt with a federal statute, is off-point.  467 U.S. 717, 732 & n.9 (1984).

d.        An alternative ground for finding a Contract Clause violation is based on the acts of FOMB itself, which *Aurelius* ruled "is part of the local Puerto Rican government." #18575-page-41-303.  FOMB does not respond to this alternative ground.

e.        It is no answer to argue that cancelling and extinguishing debt is (supposedly) the whole point of PROMESA.  First, PROMESA itself sets forth the 314(b)(3) requirement, so that requirement must be proven to be met before a plan can be confirmed.  Even if hypothetically one (somehow) read 314(b)(3) to be limited to "federal law" – rather than all "law", as 314(b)(3) states – to then read 314(b)(3) to not even include all federal law, including the Contract Clause, would be to double-down on reading 314(b)(3) out of PROMESA.

30

f.      Second, PROMESA itself – enacted by a Congress well aware of the priority under Puerto Rico's Constitution of its GO debt – has multiple provisions that emphasize the importance of respecting priorities under Puerto Rico's Constitution and other laws.  PROMESA §201(b)(1)(N) requires that a fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016."  PROMESA §314(b)(6) requires that, in determining whether the "feasible and in the best interest of creditors" requirement is met, confirmation of a PROMESA plan – unlike a Chapter 9 plan – "shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."

g.      The provisions of PROMESA itself underscore that cancelling and extinguishing lawful debt with a priority of payment under the Puerto Rico Constitution was most certainly **not** the point of PROMESA.  Yet Act 53 provides for the "cancellation and extinguishment" both of the "vintage" GO and PBA debt – whose lawfulness was never even questioned – and later-issued GO and PBA bonds whose lawfulness was questioned but never adjudicated adverse to the bondholders.  Act 53's provisions for cancellation and extinguishment of GO and PBA debt violate the Contract Clause.

h.      FOMB makes no response to other points in my objection.  Thus, I noted that there is no "Congress-authorized-violation" exception to the Contracts Clause, *citing*, *Saenz* v. *Roe*, 526 U.S. 489, 508 (1999) (Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution.").  #18575-page-41-of-303.  No response.

i.      I discussed *United States Trust*, the controlling case regarding whether a municipal issuer can impair its own bond obligations, which makes the points that "need for money is no excuse for repudiating contractual obligations" (431 U.S. at 26n.25, *citing Lynch*), and that impairment must be both reasonable and necessary (431 U.S. at 25-26,29-32).  #18575-page-42-of-303.  Again, no response.

31

j.      FOMB has the burden of proving that the §314(b)(3) requirement for
confirmation is met.  Nevertheless, I specified in detail in my objection (#18575-page-42-to-45-
of-303), in my opening, and in my closing, specific facts, documented by exhibits in evidence –
most documents issued by FOMB or Commonwealth themselves – that contradict any assertions
that the *United States Trust* standard is met here.  I also made the point that, per Commonwealth
documents, total outflows have increased 29% from FY2018 to FY2021.  #19047-page-17-
par.44-of-27; #18760-15; #18760-16.  Yet FOMB's proposed findings on the Contract Clause do
not so much as cite or discuss one piece of evidence.  *Compare* #19366-page-71-to-72-of-113.

k.      In argument of counsel during the hearings, FOMB tried to counter my showing –
from Commonwealth's own records – that over $300 million had been spent on thousands of
contracts for "advertising, representation or artistic services," and over $2.375 billion had been
spent on thousands of consulting contracts (*e.g.* #18575-page-43-of-303 and documents cited;
#19047-page-17-to-18-of-27; #18760-4 thru #18760-7).  But FOMB's argument of counsel did
not dispute my facts.  Rather, FOMB simply argued that it could be counter-productive to pare
back on expenditures for advertising.  But that is just argument of counsel – no facts were put
forward to show that all of these expenditures were actually reasonable or necessary.  In
addition, FOMB counsel's argument is hardly the stuff of judicial notice.  No facts have been
offered by FOMB to show the content of the advertising, how much is spent on tourism
advertising outside Puerto Rico as distinct from government self-promotion within Puerto Rico,
or why government sponsored generic advertising is somehow more effective than advertising
dollars spent by private tourist businesses or business associations (*e.g.*, hotels or associations of
tourist businesses) in attracting paying customers.  And, aside from advertising, counsel offered
no rationale for why all of the thousands of contracts for "representation", or "artistic services",
or consulting are supposedly "essential."

l.      Elsewhere, FOMB may talk about recitals in PROMESA – now 5 ½ years old –
and hurricanes and COVID – problems that have also afflicted Florida, Louisiana, Mississippi,

Texas, North Carolina, and many other states in recent years, all of whom continue to meet their full faith and credit obligations to bondholders. But none of this contradicts my showing, again with Commonwealth documents, that Puerto Rico could pay all currently due debt service on its GO and PBA bonds and still have over $5.5 billion unrestricted cash, and over $17.5 billion total cash, left over. #18575-page-26-of-303; #19047-page-6-¶¶-10-12-of-27; #18758-6 p.4,7,11; #18760-31; 18797-1-p.9. And that Commonwealth's surplus in the last fiscal year (FY2021) of $3.97 billion was three times more than needed to pay GO and PBA debt service. #18575-page-42-of-303; #19047-page-9-¶¶-19-20-of-27; #18759-4-p.9; #18797-1-p.9.

m. Moreover, nowhere does FOMB confront the implications of the report of FOMB's own expert, Dr. Wolfe, whose report and live testimony on cross sets forth that Commonwealth "has largely failed to implement the structural reforms recommended by" FOMB. #18151-1-page-5-of-30, cited in my objection, #18575-page-42-of-303. While FOMB's failure to prove that 314(b)(3) is met does not require the Court to reach this point, I submit that it is manifestly neither reasonable nor necessary for Commonwealth's government to persist in refusing to adopt structural reforms that FOMB and its own experts have recommended for years now, and then claim that, although it has the funds for every sort of expenditure *other than* debt service, it cannot possibly meet the obligation to pay its GO debt that its Constitution sets as its first priority.

n. In light of FOMB's failure to make a factual showing that would meet its burden of proof that the §314(b)(3) requirement is met, much less a factual showing that would counter the evidence I proffered – this case does not turn on who has the burden of proof on whether an abrogation of bondholder rights is both reasonable and necessary. However, I note that under *United States Trust*, Commonwealth—self-interested in not paying its debt obligations—bears the burden of demonstrating that abrogation of rights of GO and PBA bondholders is both reasonable and necessary. 431 U.S. at 31 ("the State has failed to demonstrate."). The Constitutional violation here follows *a fortiori* from *United States Trust*, where a covenant's

abrogation did not directly jeopardize payments to bondholders.  431 U.S. at 18-19.  The First Circuit's *United Automobile* decision is not to the contrary.  Two judges, concurring in *United Automobile*, stated the Supreme Court suggested that the burden of establishing reasonableness and necessity lies with the government and whether a plaintiff asserting a Contract Clause violation bore the burden of proof was "unsettled"; they emphasized the "outcome of this case need not turn on definitive resolution of the burden issue." 633 F.3d 37, 48-49 (1st Cir. 2011) (Boudin & Howard, JJ., concurring).

o.      Also I dispute that PROMESA is a "uniform" law "on the subject of bankruptcies throughout the United States", as set forth in my objection #18575-page-46-to-47-of-303.

p.      Also, under 48 U.S.C. §2163 territory law – here, Commonwealth legislation, such as Act 53-2021 (#19062-page-688-of-756), to the extent it provides for the "cancellation and extinguishment" of existing bonds – prescribes a method of composition of indebtedness that cannot bind nonconsenting creditors.

**D.      Takings Clause.**

**Paragraph 140:**  Object and dispute.  a.  The Takings Clause bars release of Commonwealth from claims of nonconsenting GO and PBA bondholders who do not receive full compensation for their property, as explained in #18575-page-28-to-30-of-303, in #19093-page-4-to-6-of-11, and in argument in the course of the confirmation hearings.

b.      Contrary to FOMB's position, the taking sought to be achieved by FOMB (which "is part of the local Puerto Rican government," *see FOMB* v. *Aurelius*, 140 S.Ct. 1649, at 1661) and Commonwealth is a per se taking.  The Supreme Court's decisions – most recently this year in *Cedar Point* v. *Hassid*, 141 S.Ct. 2063 (2021) – make clear that the *Penn Central* regulatory takings framework that this Court adopted in COFINA (361 F.Supp.3d 203, at 244) has no application here.  As *Cedar Point* explained, "Government action that physically appropriates property is no less a physical taking because it arises from a regulation."  "Whenever a

34

regulation results in a physical appropriation of property, a per se taking has occurred, and *Penn Central* has no place" (*Id*. at 2072).

c.      *Cedar Point* reinforces the Court's recent decisions in *Horne* (2015) and *Koontz* (2013), which also underscore that a per se taking occurred.  *Horne* ruled that the Takings Clause "protects 'private property' without any distinction between different types" (576 U.S. at 358); "a physical appropriation of property" – including personal property – "[gives] rise to a per se taking, without regard to other factors."  (*Id*. at 360); and partial takings of personal property (*e.g.*, 47% in Horne) are still per se takings.  (*Id*. at 362, 366).  *Koontz* ruled that when "government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account...a 'per se (takings) approach' is the proper mode of analysis." 570 U.S. at 614.

d.      *Patriot Portfolio* is over 20 years old at this point, and does not reflect the Supreme Court's decisions in *Cedar Point* (with its direct admonition that a regulation that results in a physical appropriation is a per se taking "and *Penn Central* has no place"), in *Horne* and in *Koontz*.  In addition, *Patriot*'s citation of *Security Industrial*'s statement that lien avoidance under § 552(f) "fits but awkwardly into the analytic framework employed in Penn Central" (164 F.3d at 685) requires that one look at *Security Industrial*, and *Security Industrial's* ruling that Congress could not retroactively side-step the Takings Clause does not support applying *Penn Central* here.  After its "fits but awkwardly" observation, *Security Industrial* goes on to underscore that the fact the "bundle of rights" accruing to secured parties is smaller than that of fee owners does not alter the status of liens as property.  459 U.S. at 76-78.  Furthermore, the bankruptcy provision in *Patriot* was applied prospectively – not retroactively.  164 F.3d at 685.

e.      Underscoring that *Penn Central* does not provide the proper analytical framework here, in *Penn Central*, the regulation did "not interfere with...Penn Central's primary expectation concerning use" (438 U.S. at 136).  Here, Act 53 provides for the "cancellation and

35

extinguishment" of the existing bonds and essentially reverses the priority of the GO and PBA debt under Puerto Rico's Constitution, by providing for a multitude of expenditures to be made – ranging from eliminating the month benefit modification irrespective of the size of a monthly benefit, to funding for the University of Puerto Rico, to other purposes – even while the GO and PBA debt is impaired (#19062-page-733-sec.201(pp),734-sec.103,735-to-736-of-756).

       f.     Previously in these proceedings FOMB has argued that there is no property interest here, so there can be no taking.  But this argument ignored that *United States Trust*, which involved a municipal bond covenant that protected bondholders, stated "contract rights" "are a form of property" for purposes of the Takings Clause, and cited *Lynch* with approval. #18575-page-28-to-29-of-303.  FOMB had cited *Connolly* v. *PBGC*, a case dealing with federal legislation concerning Multi-Employer Pension Plan Act requirements on withdrawing employers, but (based on a word search of the opinion) that case does not discuss *Lynch*. #18874-page-46-of-94.

       g.     Buttressing *United States Trust* are a host of recent Supreme Court opinions, including *Horne* v. *Department of Agriculture*, 135 S.Ct. 2419, 2425-31 (2015) (an "appropriation" of personal property or intangibles, or a partial interest therein, gives "rise to a per se taking"); *Koontz* v. *St. Johns River Water Mgt. Dist.*, 570 U.S. 595, 614-616 (2013) ("bank account" or "money"); *Phillips* v. *Washington Legal*, 524 U.S. 156, 169-72 (1998) ("interest income").

       h.     This "no property interest" argument does not appear to be pressed in FOMB's proposed conclusions of law.

       **Paragraph 141:**  Object and dispute for reasons discussed above.

       **Paragraph 142:**  Object and dispute for reasons discussed above.

       **Paragraph 143:**  Object and dispute for reasons discussed above.

**Paragraph 144:**  FOMB argues in ¶ 144 that the value to be received by bondholders constitutes just compensation based on the assertion that "creditors will receive consideration that is discounted by settlements that recognize significant litigation risks, the allocation of distributions was determined via a long mediation and settlement process among sophisticated parties."  However, as noted above, under settled legal principles, what settling bondholders agreed to cannot, and should not, be considered for any purpose.  *See, e.g.*, F.R. Evid. 408; *U.S.* v. *Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (citing 408); *Slattery* v. *U.S.*, 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").  I had made this point in my objection (#18575-page-31-to-32-303), and in my sur-reply I made the point that FOMB had offered no response to my citation of F.R.Evid. 408, *Contra Costa* and *Slattery* for the proposition that what settling bondholders agreed to cannot be considered for any purpose. #19093-page-6-of-11.  Tellingly, FOMB still provides no response to these authorities.

### E.   Preemption.

**Paragraph 145:**  a.   FOMB seeks to sidestep its inability to prove that debtor "is not prohibited by law from taking any action necessary to carry out the plan" (as PROMESA §314(b)(3) requires in order for the court to confirm a plan) by simply having the plan provide that dozens of laws, as well as provisions of Puerto Rico's Constitution, "are held preempted". The broad sweep of preempted laws would "include, without limitation, laws enacted prior to June 30, 2016, that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose".  #19366-page-74-of-113 ¶ 145.  Highlighting the extraordinary sweep of preemption being asserted, FOMB purports to preempt "Sections 6 and 8 of Article VI of the Puerto Rico Constitution insofar as they could be applied to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant the Plan, but not for any future purpose".  How provisions of the Puerto

Rico Constitution could be preempted as applied to GO and PBA bonds "but not for any future purpose" is left to the reader's wonderment.

b.      PROMESA § 4 does not provide for the sweeping preemption of Puerto Rico's Constitution and laws that FOMB asserts.  Section 4 simply provides "[t]he provisions of [PROMESA] shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with [PROMESA]".  However, PROMESA, by its terms, in § 314(b)(6) requires the court "to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan" and PROMESA § 201(b)(1)(N) provides that a fiscal plan "shall" "respect the relative lawful priorities or lawful liens, as may be applicable, in the Constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016."  There is, and can be, no inconsistency between PROMESA and the Puerto Rico constitutional and statutory provisions that PROMESA itself repeatedly references and expects to be respected.  Accordingly, PROMESA does not preempt the very constitutional provisions and other laws that PROMESA itself looks to.

c.      The House Report provisions further underscore that Congress was well aware of the Puerto Rico constitutional and statutory provisions according priority to GO and Commonwealth guaranteed debt, as well as the positions of creditors that they had secured interests, and Congress sought to "ensure" the "lawful priorities and liens" provided for in those constitutional and statutory provisions would be respected in the event of a restructuring – not sweep them away as "preempted".  *See* H.R.Rep.page-114-602-regarding-201,314-pp.58,63/115, discussed #18575-page-27-of-303 and reprinted #18575-page-205-to-207-of-303.

d.      Further highlighting the overreaching nature of FOMB's preemption requests is that FOMB seeks to preempt Act 83 of 1991, relating to the 1.03% property tax.  See #19368-page-217-of-231-II.I (& Note 4 referencing amounts); #19365-page-288-of-296-II.I.  As I noted in cross-examining Ms. Jaresko, Act 83 of 1991, relating to the 1.03% property tax, is specified

in the disclosure statement as the "first" source of payment of the New GO Bonds.  #17628-page-56-of-654.

e.     The second source of funds for payment of the New GO Bonds specified in the disclosure statement are "the monies arising from the operation of Article VI, Section 8 of the Puerto Rico Constitution."  #17628-page-56-of-654.  But, per FOMB, that too is to be preempted.  #19368-page-218-of-231-V; #19365-page-289-of-296-V.

f.     Ms. Jaresko on cross found it difficult to answer my questions about how it can be that FOMB represented Act 83 as the first source of payment for the New GO Bonds, and monies arising from the operation of Article VI, Section 8 of the Puerto Rico Constitution as the second source of payment, yet those very same provisions of law are to be held preempted. Respectfully there is no plausible answer.

g.     The distinction between the present and the future for purposes of preemption of Article VI of the Puerto Rico Constitution is not only a conceptual head-spinner, it also cannot be justified under PROMESA.  The distinction that PROMESA makes in § 201(b)(1)(N) is whether the provision of the Constitution or other laws was in effect prior to June 30, 2016 – the fiscal plan "shall" "respect the relative lawful priorities or lawful liens" in those pre-June 30, 2016 constitutional provisions and laws.  Yet it is those very pre-June 30, 2016 laws that FOMB targets for preemption, on the theory that what PROMESA sought to respect is somehow inconsistent with PROMESA.  *See* #19366-page-74-to-75-of-113.

h.     Were the Court to accept FOMB's sweeping preemption claims, so as to preempt Article VI of the Puerto Rico Constitution and Act 83 of 1991 relating to the 1.03% property tax, respectfully, the disclosure statement would need to be revised to reflect the fact that those will no longer be the "first" and "second" sources of payment of the New GO Bonds (or, in the case of Article VI of the Constitution, that there is an active issue as to whether that will be the second source of payment for the New GO Bonds) and bondholders would need to be re-solicited after being told in direct, clear terms of FOMB's position on preemption.

**Paragraph 146:**  Object and dispute for reasons set forth above.  In addition, average annual GO and PBA debt service is approximately $1.3 billion, and scheduled to decline in future years.  *See* Debtor Ex. 31 p.9, #18797-1-page-10.  Also, paragraph 146 fails to distinguish between Puerto Rico constitutional and statutory provisions with respect to the GO and Commonwealth guaranteed debt versus other obligations.

**Paragraph 147:**  Object and dispute, for reasons set forth above.

**XVIII. Response to ¶¶ 148-150:  Compliance with PROMESA Section 314(b)(4).**

**Overall response to ¶¶ 148-150**:  Object and dispute for reasons set forth in Section VIII concerning the "same treatment" requirement of 11 USC § 1123(a)(4).

**XIX.  Response to ¶¶ 151:  Compliance with PROMESA Section 314(b)(5).**

**XX.  Response to ¶¶ 152-183:  Compliance with PROMESA Section 314(b)(6).**

**A.  Overview of response to ¶¶ 152-183.**

**Paragraph 152:**  Object and dispute.  FOMB has failed to prove that the plan is both "feasible" and "in the best interests of creditors," taking into account "whether available remedies under the non-bankruptcy laws and constitution" of Puerto Rico "would result in a greater recovery for the creditors than is provided" by the plan.  This objection has been explained in my objection (#18575-page-25-to-27-of-303), sur-reply (#19093-page-7-to-9-of-11), and in my opening statement and closing argument.

**B.  Response to ¶¶ 153-174:  Failure to prove feasibility.**

**Paragraph 155-174:**  Object and dispute.  a.  Even if FOMB's recitals of numerical financial metrics were to add up (and that is disputed), FOMB has failed to prove the Plan is feasible, and there are fundamental reasons that indicate the Plan is not feasible.

b.  **First**, there is a fundamental issue with Commonwealth's willingness to pay its full faith and credit GO and Commonwealth guaranteed debt.  This started back in 2014, when Puerto Rico enacted a local law that purported to open the door to public utilities restructuring their debt.  It continued with Puerto Rico's then Governor declaring in the summer of 2015 that

40

Puerto Rico would not pay its full faith and credit GO debt.  And recent developments –
including the push to implement Acts 80, 81 and 82, the legislature's efforts to use authorizing
legislation for New GO Bonds as leverage to avoid cuts in monthly pension benefits, and the
repeal of Act 33 of 1942 – show the basic unwillingness to pay remains.

     c.     The fact that (as per FOMB counsel's statements in the hearing) that back in
September 2021 Commonwealth's legislature repealed Act 33 of 1942, including Section 7
thereof (codified as 13 L.P.R.A. 41), is very troubling.  Section 7 of Act 33 of 1942 provided that
"[t]he good faith of the Commonwealth of Puerto Rico is hereby irrevocably pledged for the
payment" of GO bonds, an irrevocable pledge backed up by the commitment that GO bonds
would be "paid … with any available funds in the Commonwealth Treasury, … which funds are
appropriated as continuous appropriations without its being necessary to make new
appropriations for said purpose."  Yet, per FOMB's counsel, the Puerto Rico legislature took it
upon itself to repeal (and thereby revoke) this "irrevocable pledge."

     d.     **Second,** despite having the funds to pay all GO and PBA debt service, the
existing bonds have not been paid and will not be paid in full under the Plan, yet FOMB has now
backed off twice so that monthly benefit reductions (originally proposed for retirees' benefits
over $1200/month, then over $1500/month) will not occur at all.  This has made plain there
simply is no political will to pay bondholders, irrespective of how much cash is on hand or how
large a surplus has been realized.  There will always be expenditures more politically appealing
than paying bondholders.  And this has occurred when an "oversight" board is in place

     e.     **Third**, as noted elsewhere, audited financial statements have only gotten later and
remain late.  And internal control weaknesses, dating back over 5 years to 2016, remain
unresolved.  #18760-13.

     f.     **Fourth**, FOMB's own expert, Dr. Wolfe, testified that for the past 5 years or
more the Puerto Rico Government "has largely failed to implement the structural reforms
recommended by" FOMB and others.  #18151-1-page-5-of-30.  And FOMB put forth Dr. Wolfe

– FOMB thought this helped its case by showing that, despite its projections of deficits beginning in the 2030s, there was some path Puerto Rico could take to generate sufficient tax revenues to pay debt service.  But while Dr. Wolfe identified structural reforms that could be done, there was no proof the Puerto Rico politicians who have resisted these reforms for years would adopt these needed structural reforms.

       g.     **Fifth**, even while not paying GO and PBA bondholders, public unionized employees have been promised signing bonuses and now guaranteed annual bonuses of at least $2000/year, annual Christmas bonuses for public employees– paid every year even while in Title III – will continue, and the Excess Cash Surplus feature of the Plan in effect mortgages Puerto Rico's future to the public employee unions, to the detriment of both bondholders (who should be paid before additional bonuses are distributed) and the many private sector businesses (large and small) and their employees (who do not benefit from this distribution of "upside" bonuses to public employees).

       h.     In addition to generally objecting and disputing, additional specific responses to portions of paragraphs 155 – 174 follow.

     **Paragraph 160:**  Object and dispute for reasons set forth above.  In addition, it is not correct to say that "[a]ll holders" of GO and Commonwealth guaranteed debt will receive 13 CUSIPs, as Puerto Rico investors receive preferential treatment in violation of provisions of the U.S. Constitution and statutes, as discussed in my objection #18575-page-39-to-40-of-303.  Furthermore, Mr. Brownstein's testimony (i) underscores the significance of pro rata payments of 1.5 % of par (in violation of the "same treatment" requirement as discussed in section VIII), and (ii) is premised on the asserted "need to keep annual debt service sustainable;" however, as demonstrated elsewhere in this response, Puerto Rico can pay all GO and PBA debt.  Finally the elimination of the debt service reserve fund undermines any claim of feasibility in light of the willingness to pay issue discussed above.

**Paragraph 161:** Object and dispute, including on the grounds that any "upside" should go first to the "first claim" priority GO and PBA bondholders who have a "first claim" under Puerto Rico's Constitution.

**Paragraph 162:** Object and dispute, including on the grounds that any "upside" should go first to the "first claim" priority GO and PBA bondholders who have a "first claim" under Puerto Rico's Constitution

**Paragraph 163:** Object and dispute, including for reasons set forth above. In addition, elimination of the Monthly Benefit Modification improperly reverses priorities of payment under Puerto Rico's Constitution.

**Paragraph 165:** Object and dispute that ensuring pension-related provisions contained in the Plan will not be undone for 10 years is not sufficient to prove feasibility, particular in light of the willingness to pay issue discussed above.

**Paragraph 166:** Object and dispute, including object to payment of monies in the form of bonuses to public employees even though GO and PBA bondholders are not paid in full.

**Paragraph 170:** Object and dispute the claim that the facts set forth in paragraph 170 establish feasibility and, further, note that the statement that "Commonwealth will have the ability to pay debt service pursuant to the Plan through at least 2034" undermines any claim of feasibility as the New GO Bonds have maturity dates subsequent to 2034.

**Paragraph 172:** The acknowledgement that Puerto Rico is not projected to borrow in the future through 2051 only highlights the plan's failure to establish market access for Puerto Rico.

**Paragraph 173:** The assertions in ¶ 173 only underscore that the fundamental problem is Puerto Rico's failure to date to enact recommended structural reforms. Were those structural reforms enacted, it would be further evident that there is no need to fail to pay GO and Commonwealth guaranteed bondholders in full. Conversely if Puerto Rico's politicians persist

43

(as they have in the past) in refusing to enact necessary structural reforms, the fact that Commonwealth is only projected to have sufficient resources to pay debt service pursuant to the Plan until 2034 underscores the failure to prove feasibility.

**C.    Response to ¶¶ 175-183:  Failure to prove the Plan is in the best interests of creditors, which requires the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan.**

**Paragraph 175-183:**  Object and dispute.  a.  FOMB has failed to prove that PROMESA §314(b)(6)'s requirement for confirmation is met.  Indeed, since as discussed above and in my objection, Puerto Rico has the cash to pay past due GO and PBA debt service, and surpluses are sufficient to continue to pay the GO and PBA debt service (one reason the $25 billion in cash, $13 billion of which is available to pay GO and PBA debt service, has accumulated), it would seem evident that "available remedies under the non-bankruptcy laws and constitution" of Puerto Rico "would result in a greater recovery for the creditors than is provided" by the plan (to quote the language of PROMESA 314(b)(6)).

b.    FOMB's legal arguments do not support its conclusion that this Court can – consistent with PROMESA § 314 – confirm a plan whereby GO and PBA bondholders with a "first claim" priority under Puerto Rico's constitution (which also builds in an enforcement mechanism) receive less pro rata than creditors, such as public employees and public employee retirees who do not have that constitutional priority.  And it is markedly less.  Unlike retirees whose pensions have continued uninterrupted, bondholders have not been paid a dime for years. As FOMB admits, under the non-bankruptcy laws of Puerto Rico bondholders are entitled to be paid all accrued interest – including post-petition interest – as well as all due principal.  #18807-8-page-13,39-of-110 (Debtor Ex. 130 p. 13 par 1, last sentence; p.39 item 9 assumption 'i' – the McKinsey best interest test report).  Thus, for my vintage 6% bond maturing 7/1/2039, CUSIP 74514LWA1, I am owed not only principal, but also interest going back to July 1, 2016 (aggregating $33,000, for a total non-bankruptcy claim of $133,000).  I receive 77.6% under the

plan (#17268-page-34-of-654), but that is not 77.6% of $133,000 but rather 77.6% of principal plus pre-petition interest only, which I estimate to be about $5000, for a bankruptcy claim of $105,000.  $105,000 / $133,000 = approx. 61.2% recovery.  This on a bond that is indisputably valid.  And that Puerto Rico has the cash in the bank to pay full debt service today.  Recoveries on bonds subject to (never adjudicated) claims of invalidity are less.

c.       FOMB argues that the Court only looks at aggregate recoveries of all creditors, and need only "consider" the non-bankruptcy remedies of GO and PBA bondholders.  But FOMB's interpretation effectively reads the added language of §314(b)(6) out of the statute, as I explain in my sur-reply (#19093-page-7-to-9-of-11).  The language added to § 314(b)(6) on its face focuses the inquiry not simply on the remedies available to all creditors, viewing creditors as a whole, but also on the remedies available to particular creditors, since all creditors may not have the same "available remedies under the non-bankruptcy laws and constitution" of a territory.  FOMB's interpretation would fail to give effect to Congress' addition of the language to § 314(b)(6) – referencing "available remedies under the non-bankruptcy laws and constitution of the territory" that "would result in a greater recovery" – that does not appear in § 943(b)(7).

d.       Notably, Congress emphasized that "[t]he stay is limited in nature and narrowly tailored to achieve the purposes of this chapter, including to ensure *all* creditors have a fair opportunity to consensually renegotiate terms of repayment based on accurate financial information that is reviewed by an independent authority *or, at a minimum, receive a recovery from the Government of Puerto Rico equal to their best possible outcome absent the provisions of this chapter*."  PROMESA § 405(m)(5)(emphasis).  This provision confirms that Congress contemplated that the inquiry would be focused on the remedies available to particular creditors.

e.       And while FOMB stresses the word "consider," it ignores that the word consider is preceded by the word "required" – the court is "required" "to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."  Finally, FOMB stresses that the plural

was used – "creditors" – but there are multiple creditors in the bondholder classes.  Use of the
plural does not signify an aggregate analysis was intended.  Fundamentally, FOMB's reading
would construe 314(b)(6) to be the same as 11 U.S.C. 943(b)(7), whereas my reading would give
meaning to the words added in 314(b)(6).

   f.      Notably, FOMB states the aggregate recovery for all claimholders will be 69%.
#19366-page-92-of-113.  But that means that my recovery of 61.2% - even on a vintage bond,
indisputably valid, with a constitutional right to priority of payment – is materially below
average.  This is a clear indication that FOMB's legal framework is wrong and fails to give effect
to the plain meaning of the language Congress added to 314(b)(6).

   g.      And FOMB points to Exhibit 7 in best interests test report (Debtor Ex. 10-page-
21-of-110, #18807-8-page-21-of-110) which supposedly shows a range of recoveries for GO
bondholders if all GO bonds are deemed valid.  The range is 75% to 84%.  But as noted my
recovery on a vintage GO bond that is indisputably valid is only 61.2%.

   h.      The complexity of the McKinsey best interest test is not proof of its validity.  The
analysis is premised on a host of legal and other assumptions, none of which have been
"independently verified" by McKinsey.  And McKinsey does not "take an independent position"
with respect to the information and assumptions it has been provided.  That is admitted on the
first text page of the report, #18807-8-Debtor Ex. 10-page-3-of-110.  This report fails to carry
FOMB's burden of proof.

**XXI.  Response to ¶¶ 184-191:  Compliance with PROMESA Section 314(b)(7).**

   **A.      Overview of Response to ¶¶ 184-191:  Failure to meet the requirements of 48
   U.S.C. § 2141(b)(1)(N) and § 2174(b)(7) precludes confirmation.**

   **Paragraph 184-191:**  Object and dispute.  a.  Protections against unilateral decisions by
FOMB to unfairly treat bondholders who have a first claim priority under Puerto Rico's
Constitution include Section 2141(b)(1)(N), which requires that fiscal plans "shall … respect the
relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or

46

agreements of a covered territory…in effect prior to June 30, 2016" (emphasis added).  Section

2174(b)(7) requires, at confirmation, the plan be "consistent with the applicable fiscal plan."

      b.      The House Report discussion of § 2141 and § 2174 explains:

Fiscal Plans ***ensure the protection of the lawful priorities and liens*** as guaranteed by
the territorial constitution and applicable laws, and prevent unlawful inter-debtor
transfers of funds. …

By incorporating consistency with the fiscal plan into the requirements of confirmation
of a plan of adjustment, the committee has ***ensured lawful priorities and liens***, as
provided for by the territory's constitution, laws, and agreements, ***will be respected*** in
any debt restructuring that occurs.

H.R.Rep.page-114-602-regarding-§ 201,314-pp.58,63/115(emphasis added).  (#18575-

page-205-to-207-of-303)

      c.      The House Report's explanation ("ensured lawful priorities and liens…will be

respected") underscores that, at plan confirmation, courts can (and should) remedy FOMB's

disregard of § 2141(b)(1)(N).

      d.      The Plan does ***not*** respect the "first claim" priority and liens of GO bondholders:

      e.      **First**, energy incentive and tax incentive claims aggregating over $2 billion are

unimpaired.  #17628-page-489-to-491-of-654.  Other classes that do not have Constitutional

priority are also unimpaired (*e.g.*, Classes 51A,51C,51J,51K,55,57,67,68) or receive larger

percentage recoveries, in many cases – since there will no longer be reductions in any monthly

benefits - up to 100% (Classes 51B,51D-to-51I,51L,69).  Cf.  #17628-page-79,464,466-to-

481,489-to-491,504-of-654 (#17628 does not reflect the elimination of the 8.5% reduction in

monthly pensions above $1500/month).  FOMB, as representative of debtor Commonwealth, has

no right to decide it is better for the debtor that FOMB represents to reverse the priorities under

the Puerto Rico Constitution and pay these classes more than nonconsenting GO and PBA

bondholders.

f.     **Second**, yet additional classes that do not have Constitutional priority nevertheless receive non-contingent cash recoveries, including cash payments to public employees and their unions.  *E.g.*, Class 52,53,56,58.  #17628-page-486-to-488,490-to-494-of-654.

g.     Particularly in light of FOMB's own recent experience with projections that understate ultimate actual performance, there is the potential for billions of dollars of "Excess Cash Surplus," resulting in large amounts paid out in Upside Performance Bonuses, in FY22-FY26.  (#19365-page-57(§ 1.235), 59(§ 1.255), 126-to-127 (§ 56.l(a)), 238-to-239,264-to-265-of-296, *superseding*, #17627-page-41(§ 1.118), 57(§ 1.234), 59(§ 1.254), 127(§ 56.l(a)), 234-to-235,258-to-259-of-291; #17628-8-page-44-of-309; #15988-5-page-41-of-272; #18759-4-p.9; Hein ¶¶19-20, #19047-page-9-of-27).  FOMB may argue that it is the fiscal plan in effect on the Effective Date that will be the measuring point for Excess Cash Surplus, but since the current fiscal plan was certified on 4-23-2021 FOMB has agreed to numerous additional "sweeteners" for Puerto Rico politicians and public employees, including dropping any reductions in monthly pension benefits, guaranteeing an additional $10,000 per employee of bonus money (even if there is no Excess Cash Surplus), committing to new minimum funding levels for the University of Puerto Rico and increasing assistance to municipalities.  #18760-11.  Based on FOMB's track record, it is hard to see FOMB modifying the current fiscal plan in a manner that reduced the prospects for multi-billion dollar payouts of Upside Performance Bonuses and other benefits to public employees from Excess Cash Surpluses.

h.     Furthermore, if the Medicaid funding "cliff" is averted, added payments for Upside Performance Bonuses and Pension Reserve contributions will be staggering (Hein ¶65, #19047-page-24-of-27), and if the 5/27/2020 fiscal plan projections are used as the benchmark, the added payments to or for the benefit of public employees and retirees and their unions will be doubly staggering (Hein ¶66, #19047-page-24-of-27).

i.       Because – whatever the base for the calculation – an Excess Cash Surplus number, that results in the potential for huge dollar payments to or for the benefit of public employees and that is computed before debt service (*see* 4/23/2021 fiscal plan p.43 & Ex. 18 (#17628-8-page-44-of-309); #17628-6-page-30-of-35 & n.2; #17628-7-page-42-of-65 & n.2), presents the potential for payouts to public employees and retirees that will jeopardize Puerto Rico's ability to pay debt service even on the New GO Bonds.

**B.       Paragraph-by-paragraph responses to ¶¶ 184-191.**

**Paragraph 184:**  Object and dispute for reasons set forth above.

**Paragraph 186:**  Object and dispute for reasons set forth above, including that elimination of the Monthly Benefit Modification alone makes the plan of adjustment inconsistent with the current fiscal plan.

**Paragraph 188:**  Object and dispute and for the reasons set forth above.  Notably, the notion that any amounts can be spent during currently projected periods of surplus and not jeopardize full payment of the New GO Bonds ignores that, if not spent, projected surplus through 2034 could either be paid out to bondholders ahead of schedule or retained to ensure sufficient funds remain in later years to pay debt service.

**Paragraph 189:**  Object and dispute, including for reasons set forth above.

**Paragraph 190:**  Object and dispute, including for reasons set forth above.

**Paragraph 191:**  Object and dispute, including for reasons set forth above.

**XXII.  Response to ¶¶ 192-195:  Bankruptcy Rule 3019.**

**Overall response to ¶ ¶ 192-195:**  Object and dispute on the grounds that elimination of the Monthly Benefit Modification, which admittedly imposes an added $1.9 billion cost on Puerto Rico (*see*, *e.g.*, proposed finding ¶ 163), as well as other increases in expenditures over those contemplated in the 4/23/2021 fiscal plan (*e.g.*, #18760-11), takes away resources that would otherwise be available to pay debt service on the New GO Bonds.  This is of particular

concern in light of the projection of deficits beginning the mid-2030s and the issues with respect

to willingness to pay discussed in Section XX.

## XXIII. Response to ¶¶ 196:  Nullification of Laws Conditioning Debt Authorization on Elimination of Freeze of Accruing Pension Benefits and Cost of Living Adjustments.

**Note:**  The uncertainties with respect to the conditionality of Act 53 underscore the

inappropriateness of approving a plan that purports to terminate obligations under existing GO

and PBA bonds and substitute New GO Bonds and CVIs that are subject to significant

contingencies and uncertainties, including the conditionality of Act 53.

## XXIV. Response to ¶¶ 197-207:  The Releases, Exculpations, and Injunctions Pursuant to the Plan.

### A.   Overview of response and objection to FF/CL ¶¶ 197-207, Plan §§ 92.2 through 92.11 Release provisions (however denominated) and proposed Order ¶¶ 56-61 and 64-65.

#### 1.   Provisions that no longer appear to be in dispute.

197-0  a.  Article XCII (Art. 92) has multiple provisions providing for releases of claims,

variously denominated release, bar order, injunction and exculpation.  The Plan as proposed in

July 2021 contained overly broad provisions relating to releases of claims (variously

characterised as release, bar order, injunction and exculpation) – so overly broad that those

provisions appeared to even potentially release claims with respect to COFINA bonds as well as

to release numerous non-debtor parties.  *See* #18575-page-14-to-16-of-303.  In response to my

objection, FOMB acknowledged that releases needed to be limited to release of claims against

debtors, and could not extend to release of claims against non-debtor third parties, except to the

extent the releases are consensual.  #18874-3-page-13-of-29.  To that end, FOMB has added, in

various places, new language that includes a statement to the effect that "nothing contained in the

Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-

consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related

Persons by Creditors of the Debtors".  *See, e.g.*, Plan § 92.2(a) as filed 11/28/2021 #19365-page-

188-of-296.  *Compare* #17627-page-186-to-291, the proposed plan as it read at the time

50

objections were filed.  Similar changes have been made to various release provisions, however denominated, in the proposed order and judgment.  This new language, were it to stand alone, would address – for the particular provisions to which this new language is added – my concern.

### 2.  Remaining dispute.

b.      As I noted in closing arguments, an issue remains:  The new language added to plan § 92.2(a) (and in other places) is qualified with the phrase "without prejudice to the exculpation rights set forth in Section 92.7".  In turn, § 92.7(b) and (e) provide, with respect to PSA Creditors (and AFSCME), what are in substance releases, denominated "exculpation," that by their terms provide that PSA Creditors (and AFSCME), "and each of their respective Related Persons," "shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the [Plan Support Agreement] … or any other contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan…".  #19365-page-192,193-of-296.  In substance, this is a release of liability, for acts within the scope referenced, and by its terms this releases the PSA Creditors (and AFSCME) from liability "to any Entity," including non-consenting parties.  Furthermore, in the new version of the Plan filed the night of November 21, the definition of Related Persons was significantly broadened, with an added clause (§ 1.420(c)) that specifically extends the scope of Related Persons for PSA Creditors.  #19324-page-83-of-306.  And then, in a yet further version of the Plan filed the night of November 28, the scope of the § 92.7(b) release (denominated "exculpation") was yet further broadened by omitting the phrase "through the Effective Date."  #19367-page-197-of-306.

c.      As stated I in argument in the hearing, the following changes should be made to the Plan (with corresponding changes in the order and judgment):

- In Plan § 92.2(a), omit the phrase "without prejudice to the exculpation rights set forth in Section 92.7 here of", that currently appears on #19365-page-188-of-296.

- Add to § 92.7(b) and (e) the language currently in 92.2(a) (and in other provisions in Article XCII/Art. 92) that reads: "nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors".

    d.    The releases denominated "exculpation" would continue to operate to release PSA Creditors, AFSCME, and their Related Persons from liability to Debtors, consenting creditors and even the office of the United States Trustee (assuming it has consented to provide such a release, *see* Plan § 1.216). This would thus permit the parties to the agreements, including FOMB, to agree to releases, including releases denominated exculpation, among themselves. Thus, for example, the PSA Creditors would still be able to have Debtor agree to release PSA Creditors from any liability with respect to acts taken or omitted in connection with the Title III cases or the negotiation of the plan. If limited to parties who consent, the exculpation provisions may serve an appropriate purpose. But the extension of releases, denominated exculpation, to nonconsenting third parties is objectionable and inappropriate.

    e.    FOMB concedes the principle (as it must) that nonconsensual releases of non-debtor third parties, however denominated, are not appropriate. *See* #18874-3-page-13-of-29 ("the Plan is not intended to release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor"). But this principle likewise precludes a non-consensual release, even if denominated "exculpation" and however defined in scope, of non-debtors, such as PSA Creditors or AFSCME:

f.      ***First***, no statutory provision of, or incorporated into, PROMESA Title III is cited as authority for a non-consensual release, even if denominated "exculpation" and however defined in scope, of non-debtors.

g.      ***Second***, authorities that FOMB relies upon in its briefs do not support extending an "exculpation" clause as proposed here to bind non-consenting parties.  Thus, the Court of Appeals case FOMB relies on, *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) (discussed #18869-page-172-to-173-of-177), expressly limited the parties who could receive releases of liability to members of an official committee – who are viewed to have "a fiduciary duty to committee constituents" – and professionals who provided services to debtors.  *Id*. at 246-47. The court's reasoning noted that Bankruptcy Code provisions applicable to official committees have been interpreted "to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members".  *Id*. at 246.  Subsequent case law applying *PWS* has recognized that any "exculpation (or release)" of claims with respect to actions taken during the bankruptcy case "must be limited to the fiduciaries who have served during the chapter 11 proceeding:  estate professionals, the Committees and their members, and the Debtors' Directors and Officers".  *In re Washington Mutual, Inc.*, 442 B.R. 314, 350-351 (D. Del. 2011).  The PSA Creditors and AFSCME are, of course, not members of an official committee owing fiduciary duties to all similarly situated creditors.  Indeed, a number of the PSA creditors that took the lead in the negotiations that led to the plan expressly disclaimed any fiduciary duty to other bondholders.  *See, e.g.*, #17524-page-7-to-11-of-41, *citing* (at #17524-page-8-of-41) prior filings by such PSA creditors.

h.      FOMB seeks to skirt over the critical fact that *PWS Holdings* and cases following it limit any "exculpation (or release)" of claims with respect to actions taken during the bankruptcy case "to the fiduciaries who have served during the chapter 11 proceeding" by suggesting that the PSA Creditors or AFSCME served "functions that are similar in nature" to fiduciaries for whom a release characterized as "exculpation" may be permissible.  *See* #18869-

page-172-to-173-of-177.  That, of course, ignores that parties acting in their own interests (indeed, disclaiming any fiduciary responsibility to others) do not, by definition, perform functions "similar in nature" to fiduciaries.

       i.     I had sought to have a committee appointed, as an official committee, to represent either individual bondholders or alternatively all bondholders.  *E.g.*, #6128, 6487.  I reiterated my belief that such an official committee was needed in subsequent filings.  *E.g.*, #7540-page-6,9,-to-11-of-19; #9508-page-13-of-24; #10029-page-8-of-9; #11150-page-3-to-4-of-4; #16387-page-17-of-21; *see also* #8308-page-13-of-17; #7961-page-17-of-19.  I also filed a second motion seeking the appointment of a committee to represent Retail Investors in the eight Retail Investor classes whose members would have had fiduciary duties to creditors in the represented classes of bondholders.  *See, e.g.*, #17221 and #17524.

       j.     The Court declined to order the appointment, by the U.S. Trustee, of an official committee either to represent individual bondholders or, alternatively, to represent all bondholders, including individual bondholders, whose members would have had a fiduciary duty to bondholders.  #6534, #17724.  Had such a committee been appointed, under *PWS Holding*, it would have been plausible to seek releases, denominated exculpation, for the members of such official committee and the professionals acting at their direction.  But had there been an official committee involved in the negotiation process whose members owed fiduciary duties either to individual bondholders, or all bondholders including individual bondholders, my belief is that we would ***not*** now be faced with the current situation in which two-thirds of the bondholders (hedge funds or other institutional creditors) – none of whom have fiduciary duties to all bondholders, including individual bondholders – receive additional pro rata consideration (the additional 1.5%) that all bondholders do not receive.

       k.     ***Third***, other cases FOMB relies upon likewise do not support its position here.  FOMB in its rebuttal closing argument referred to *Young* v. *Higbee Co.*, 324 U.S. 204 (1945).  In that case, stockholders who "temporarily control[ed]" the interests of other stockholders – even

though not formally designated as fiduciaries of such other stockholders – were criticized for seeking to obtain "more than the ratable equivalent of their proportionate part." *Id*. at 211-12.  If anything, *Young* v. *Higbee* underscores my point that particular securities holders may not receive preferential pro rata consideration – the same treatment and consideration must be accorded to all holders of the same securities, as both the principles set forth in *Young* v. *Higbee* and 11 U.S.C. 1123(a)(4) require.  To the extent FOMB – by referencing *Young* v. *Higbee* – suggests, through innuendo, that I am seeking some special payment for myself beyond the same pro rata payments (including both the 1.5% and 1.321%) that I believe all bondholders are entitled to, FOMB ignores that I am the one who, since March 2019, has consistently sought to have established an official bondholder committee, whose members would be appointed by the U.S. Trustee and owe fiduciary duties to the bondholders the committee would represent, and that FOMB has repeatedly opposed the establishment of such a committee whose members the U.S. Trustee would appoint.

l.     The authority featured in FOMB's PowerPoint (#19328-2-page-71-of-184), *In re Montreal Me. & Atl. Ry.*, No. 13-10670, 2015 Bankr. Lexis 3737 (Bankr. D. Me. Oct. 9, 2015), is consistent with the principle set forth in *PWS Holdings* and *Washington Mutual* that (as discussed and quoted above) "exculpation (or release)" of claims with respect to actions taken during a bankruptcy case "must be limited to the fiduciaries who have served during the chapter 11 proceeding:  estate professionals, the Committees and their members, and the Debtors' Directors and Officers."  Thus, the exculpation provision in *Montreal Maine* only covered the Trustee, Creditors' Committee, the Monitor (the foreign representative of the Canadian affiliate, MMA Canada, which was the debtor in a Canadian Companies' Creditors Arrangement Act proceeding), MMA Canada, and the members and professionals of such entities.  *See* 2015 Bankr. Lexis. 3737 at *24-26; Trustee's Revised First Amended Plan of Liquidation dated 7-15-2015, page 1 and sections 1.5, 1.28, 1.32, 1.92, 1.93.[1]  In any event, the citation at

---

[1] Available in Case 13-10670 Doc 1534, entered 7-16-2015 and on the internet at https://www.richter.ca/wp-content/uploads/Insolvency-Cases/fr/M/Montreal-Maine-and-

2015 Bankr. LEXIS 3737 is simply to an order confirming a plan, which order includes no citations to statutes or case law on the subject of the proper scope of a release denominated exculpation.

      m.    Yet other cases FOMB relies upon are mis-described in its brief and – parsed carefully – likewise do not support FOMB's position that this Court can order a non-consensual release (denominated "exculpation") in favor of persons other than Debtors and official committees whose members and professionals owe fiduciary duties to creditors:  [1] *Western Mining*, #18869-page-173-of-177 (at *5, finding party claiming benefit of release, in form of limitation of liability and exculpation, had not met its burden of demonstrating plaintiff had granted releases and was bound by confirmation order); [2] *Genesis Health*, #18869-page-173-of-177 (at 605-609, striking "section 10.6" release (denominated "exculpation") of third-party claims against Senior Lenders); [3] *Quincy Medical*, #18869-page-173-of-177 (at *3-5, while upholding exculpation provisions, as modified in response to U.S. Trustee's objections, court then goes on to state "only consensual releases are permissible" and sums up its rulings by stating that plan would be confirmable "if the plan's third party releases are limited to those who actually submitted ballots accepting the plan"); [4] *National Heritage*, #18869-page-173-of-177 (at 232-234, upheld narrowed exculpation clause that only covered Debtor, Reorganized Debtor, the Committee and its members and representatives, and such parties' officers, directors and employees); [5] *South Edge – Meritage Homes*, #18869-page-173-of-177 (at 414-416, applicable circuit law requires rejection of plan provision that purports to release third parties from liability to nonconsenting creditors; court construed the clause before it not as an improper release of third parties from liability, but rather as merely setting the standard of care for liability; in *South Edge* the clause at issue, 8.10, expressly provided there was no release or exculpation from obligations under the plan, gross negligence or willful misconduct; even if *South Edge* is defensible notwithstanding the circuit rule that third parties may not be released from liability to

---

Atlantic-Canada-Co/Chapter-11---Montreal-Maine-and-Atlantic-Railway-Ltd/Plan-of-Arrangement/05-DE1534-Revised-first-amended-plan-liquidation-20150716.pdf.

non-consenting creditors, the case does not sanction the clauses at issue here, such as 92.7(b), which purport to release non-fiduciary third parties from liability to nonconsenting creditors, with exclusions only for intentional fraud and willful misconduct; a modification of 92.7(b) and (e) would be required here even under *South Edge*).

n.   Including any release (however denominated) that binds nonconsenting bondholders is particularly inappropriate in this case, where the plan provides 1.5% of par pro rata additional consideration (called "Consummation Costs") to parties who negotiated the plan and other major bondholders holding approximately 2/3s (in par amount) of the bonds, yet that 1.5% of par pro rata additional consideration is not paid, or even made equally available, to all other bondholders.  Plan proponents have the burden of proof, but offered no evidence that others, including Retail Investors like me, were ever offered the opportunity to elect to receive that 1.5% "fee."

o.   While the 1.5% pro rata "Consummation Costs" is rationalized as compensation for costs and expenses incurred in negotiating the plan and in participating in confirmation and consummation of the plan, plan proponents bear the burden of proof and no specifics have been placed in evidence.  As noted above, Zelin testified that (i) he was provided an email by two of the bondholder groups with an estimate of their cost and expenses (which email estimate was not itself offered into evidence) and (ii) he believes that the bondholder representatives he dealt with worked hard.  But there is no getting around the fact that, under Plan § 3.3, the 1.5% was paid pro rata based on holdings as of February 22, 2021.  A party that signed-on as late as February 21, 2021 got the same 1.5%.  Indeed, someone who did no work whatsoever, but was offered the opportunity to serve as an Initial GO/PBA PSA Creditor, even if just before February 21, 2021, will, under Plan § 3.3, receive the full 1.5% of par pro rata payment.  And a party who sold out on February 23, 2021 still gets the same 1.5% pro rata on bonds held on February 22, 2021.

p.   FOMB may argue that those getting the 1.5% also locked up their support for the plan.  But the "lock-up" rationale does not justify limiting the 1.5% to only selected major

57

institutions, rather than making the 1.5% available to all bondholders.  Furthermore, Plan §3.3

states that the 1.5% is to "compensate certain parties for the cost of negotiation, confirmation and

consummation."  Per the Plan, it was the Restriction Fee in Plan §3.5 that was paid to "lock-up"

bonds, not the 1.5% Consummation Costs.  And Retail Investors – to get even the 1.321% – are

subject to even more stringent restrictions on transfer than Initial GO/PBA PSA Creditors, since

Retail Investors were required to have their bonds delivered to the ATOP facility, in the "accept"

or "reject" bucket, by October 18, 2021 (or an earlier date set by their broker), at which time they

are restricted from transfer until the Effective Date.  18761-4-page-5-to-6-of-7.

q.      If the parties who negotiated the Plan with FOMB negotiated a Plan whereby all

bondholders, including Retail Investors, would receive the same consideration, including the

additional 1.5% pro rata payments, perhaps they might now argue that cases like *PWS Holding*

should be extended to cover a situation where certain creditors – albeit not members of an

official creditor committee – nevertheless acted as in effect de facto committee fiduciaries, in the

best interests of all bondholders, and thus should get the benefit of exculpation.  While that

argument would ultimately not pass muster, since such Plan negotiators would not in fact have

been official committee members with fiduciary duties to all creditors in the represented classes,

there would at least be a plausible argument to be made.  But here, FOMB and the parties with

whom they negotiated made the choice to provide pro rata compensation in the form of the 1.5%

"fees" to be paid to some, but not all, bondholders.  Indeed, they never even offered the 1.5% to

Retail Investors.  Thus, there is no plausible argument here that parties who chose ***not*** to act as

fiduciaries, should now be treated as if they were fiduciaries, when one turns to the subject of

releases (including those denominated exculpation).

r.      In sum, FOMB asks this Court to impose on non-consenting individual Retail

Investors a "settlement" to which they were not parties, and did not participate in negotiating,

that both (i) gives the parties who did negotiate the agreement added pro rata consideration

(including the 1.5% of par pro rata payments), and (ii) compels a release of any claims held by

those who do not get the same treatment, in favor of those who structured the plan that failed to provide the same treatment to such nonconsenting bondholders. The court should either (i) at the very least, require that the 1.5% pro rata added consideration be provided to all bondholders, or (ii) deny the request for the releases (denominated "exculpation"), in favor of non-debtor third parties, of claims of non-consenting creditors.

**B.     Paragraph-by-paragraph response:  Response to ¶¶ 197-207:**

**Paragraph 197:**  Object and dispute for reasons set forth above.  Also, the assertion that all of the discharge, release, exculpation and injunction provisions in favor of non-debtor third parties are "essential" is conclusory.  FOMB has the burden of proof, but has not presented a non-conclusory showing that it is "essential" to impose on non-consenting bondholders non-consensual release provisions (however denominated) in favor of third parties other than debtors, and even if such a showing of "essential" was made, it would not justify imposing on non-consenting bondholders non-consensual release provisions applicable to non-debtors (however such release provisions are denominated).

**Paragraph 198:**  Object and dispute for reasons set forth above.  Furthermore, the notion that (i) particular parties negotiate a plan in secret mediation and settlement discussions, (ii) provide that certain parties (including those who negotiate the plan) receive additional pro rata consideration that others do not receive, and (iii) also provide that the parties who negotiated the plan receive releases denominated "exculpation" for any claims that may be made against them on account of their having negotiated a plan that provides them with pro rata consideration that others do not receive, directly implicates the *Young* v. *Higbee*, 324 U. S. 204 (1945), issue discussed above.

**Paragraph 200:**  Object and dispute for reasons set forth above.

**Paragraph 201:**  Object and dispute for reasons set forth above.  Also object and dispute reference to "robust, mediator-supervised negotiations" for reasons already described in these responses to FOMB's FF/CL.

**Paragraph 203:**  Object and dispute to the extent described above.

**Paragraph 204:**  Object and dispute, including for the reasons set forth above.  As noted, it hardly justifies the exculpation provisions to say that parties in secret mediation and settlement negotiations, who negotiated a plan under which they receive greater pro rata consideration than others, also negotiated for themselves exculpation provisions.  Rather this implicates the *Young* v. *Higbee* case that FOMB raised in its rebuttal closing argument.

**Paragraphs 205-206:**  The Court is respectfully referred to the above discussion.

**XXV.     Response to ¶ 208:  Validity of Bonds and CVIs.**

**XXVI.     Response to ¶ 209-220:  GDB loan priority determination.**

**XXVII.   Response to ¶¶ 221-229:  Miscellaneous Provision.**

**Paragraph 221:**  Object and dispute, on grounds that extremely limited time was permitted to review the materials contained in the Plan Supplement.

**Paragraph 222:**  Object and dispute based on the foregoing objections and the objections I have previously asserted to the Plan.

**Paragraph 223:**  Object and dispute for the reasons I object to and dispute proposed paragraph 3(O) of the order and judgment (#19368-page-19-of-231), as set forth in detail in my objection to the revised proposed order and judgment at #19218-page-11-to-14-of-21.

**Paragraph 224:**  Object and dispute, including on the grounds set forth in Section XII.

**Paragraph 225:**  Object and dispute, including for the reasons set forth in Section XII.

**Paragraph 229:**  Object and dispute for reasons set forth elsewhere above and in my previously asserted objections.

**XXVIII.  Conclusion**

**XXIX.     Other objections:**

A.  I have asserted other grounds for dismissal of the current Title III and for other relief in my prior objections, including that PROMESA violates the Bankruptcy Uniformity Clause. *See* #18575-page-46-to-47-of-303; Opening Statement; Closing Argument.

B. The Court is respectfully referred to my other grounds for objection to the Plan in my prior filings and argument that are referred to at the outset of this response.

C.  I reiterate my position that the Court should require FOMB to get an answer from the IRS on whether all New GO Bonds will be tax exempt before the Plan is confirmed and becomes effective so that we do not have the same problem that occurred in COFINA, where the IRS ruling that all bonds could be tax-exempt was announced shortly after – rather than shortly before – the Effective Date.

December 1, 2021 [corrected filing 12-6-2021]

Respectfully Submitted,

/s/ Peter C. Hein
Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY  10023
917-539-8487
petercheinsr@gmail.com

Claim 10696 and 174229
GO Bonds:  500,000 par amount, plus
unpaid interest to date
[5 separate CUSIPS:   74514LVX2
                                    74514LWA1
                                    74514LWM5
                                    74514LWZ6
                                    74514LB63]
PBA Bonds:  200,000 par amount, plus
unpaid interest to date
[CUSIP:  745235M24]

### Declaration pursuant to 28 U.S.C. § 1746

I declare under penalty of perjury that the factual statements in the foregoing objection are true
and correct to the best of my knowledge and belief.

Executed on this 1st day of December 2021 [corrected filing 12-6-2021].

/s/ Peter C. Hein
Peter C. Hein

**<u>Certificate of Service</u>**


I, Peter C. Hein, certify that I have caused the foregoing "Objection To Proposed Findings Of

Fact And Conclusions Of Law (This Objection Is Filed By Individual GO And PBA Bondholder

Peter C. Hein)" to be served via the Court's CM/ECF system.


December 1, 2021 [corrected filing served 12-6-2021]


_____/s/ Peter C. Hein_____
Peter C. Hein

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

        Debtors.

-------------------------------------------------------------------x

PROMESA
Title III


No. 17 BK 3283-LTS
(Jointly Administered)


**[Response to Docket # 19366]**

**OBJECTION TO PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
(THIS OBJECTION IS FILED BY INDIVIDUAL GO AND PBA BONDHOLDER
PETER C. HEIN)**


Dated:  December 1, 2021 [corrected 12-6-2021]

XV.      Response to ¶¶ 120-128:  Compliance with PROMESA Section 314(b)(1):
         11 U.S.C. 1129(b)(1), (2)..................................................................................24

XVI.     Response to ¶¶ 129-134:  Compliance with PROMESA Section 314(b)(2)..........25

XVII.    Response to ¶¶ 135-147:  Compliance with PROMESA Section 314(b)(3)..........28

         A.     Overview of response to ¶¶ 135-137...............................................28

         B.     Enacted legislation is contrary to Puerto Rico Constitution............29

         C.     Contract Clause.................................................................................29

         D.     Takings Clause..................................................................................34

         E.     Preemption........................................................................................37

XVIII.   Response to ¶¶ 148-150:  Compliance with PROMESA Section 314(b)(4)..........40

XIX.     Response to ¶¶ 151:  Compliance with PROMESA Section 314(b)(5)..................40

XX.      Response to ¶¶ 152-183:  Compliance with PROMESA Section 314(b)(6)..........40

         A.     Overview of response to ¶¶ 152-183...............................................40

         B.     Response to ¶¶ 153-174:  Failure to prove feasibility.....................40

         C.     Response to ¶¶ 175-183:  Failure to prove the Plan is in the best
                interests of creditors, which requires the court to consider whether
                available remedies under the non-bankruptcy laws and constitution
                of the territory would result in a greater recovery for the creditors
                than is provided by such plan.........................................................44

XXI.     Response to ¶¶ 184-191:  Compliance with PROMESA Section 314(b)(7)..........46

         A.     Overview of Response to ¶¶ 184-191:  Failure to meet the
                requirements of 48 U.S.C. § 2141(b)(1)(N) and § 2174(b)(7)
                precludes confirmation....................................................................46

         B.     Paragraph-by-paragraph responses to ¶¶ 184-191........................49

XXII.    Response to ¶¶ 192-195:  Bankruptcy Rule 3019....................................................49

XXIII.   Response to ¶¶ 196:  Nullification of Laws Conditioning Debt Authorization
         on Elimination of Freeze of Accruing Pension Benefits and Cost of Living
         Adjustments..............................................................................................50

XXIV.    Response to ¶¶ 197-207:  The Releases, Exculpations, and Injunctions
         Pursuant to the Plan..................................................................................50

11 U.S.C. § 1122(b) .................................................................................................... 6

11 U.S.C. § 1123(a)(1) ............................................................................................... 10

11 U.S.C. § 1123(a)(2) ............................................................................................... 10

11 U.S.C. § 1123(a)(3) ............................................................................................... 10

11 U.S.C. § 1123(a)(4) .......................................... 10, 12, 13, 18, ~~39~~40, ~~54~~55

11 U.S.C. § 1123(a)(5) ............................................................................................... 19

11 U.S.C. § 1123(b) .................................................................................................... 20

11 U.S.C. § 1123(d) .................................................................................................... 22

11 U.S.C. § 1125 ................................................................................................... 23, 26

11 U.S.C. § 1125(a) .................................................................................................... 28

11 U.S.C.§ 1125(b) ..................................................................................................... 25

11 U.S C. § 1126 ........................................................................................................ 23

11 U.S.C. § 1129(a)(2) ............................................................................................... 22

11 U.S.C. § 1129(a)(3) ............................................................................................... 22

11 U.S.C. § 1129(a)(6) ............................................................................................... 22

11 U.S.C. § 1129(a)(8) ............................................................................................... 24

11 U.S.C. § 1129(a)(8)(A) ......................................................................................... 24

11 U.S.C. § 1129(a)(10) ............................................................................................. 24

11 U.S.C. § 1129(b)(1) ............................................................................................... 24

11 U.S.C. § 1129(b)(2) ............................................................................................... 24

PROMESA § 4, 48 U.S.C. § 2103 ............................................................... 5, ~~37~~38

PROMESA § 104(j), 48 U.S.C. § 2124(j) .................................................................. 6

PROMESA § 201(b)(~~i~~1)(N), 48 U.S.C. § 2141(b)(1)(N) ........... ~~30~~31, ~~37~~38, 39, 46, 47

PROMESA § 206(a)(2)(A), 48 U.S.C. § 2146(a)(2)(A) ............................................. 4

PROMESA § 303, 48 U.S.C. § 2163 ........................................................................ 34

PROMESA § 313, 48 U.S.C. § 2173 .......................................................................... 6

PROMESA § 314(b)(1), 48 U.S.C. § 2174(b)(1) ................................ 6, 10, 19, 20, 22, 24

PROMESA § 314(b)(2), 48 U.S.C. § 2174(b)(2) .......................................................... 25

PROMESA § 314(b)(3), 48 U.S.C. § 2174(b)(3) ...................... 28, 29, 30, 31, 33, 37

PROMESA § 314(b)(4), 48 U.S.C. § 2174(b)(4) ................................................. ~~39~~40

PROMESA § 314(b)(5), 48 U.S.C. § 2174(b)(5) .......................................................... 40

PROMESA § 314(b)(6), 48 U.S.C. § 2174(b)(6) .......... ~~30~~31, ~~37~~38, ~~39~~40, ~~40~~44, ~~43~~45, ~~44, 45~~46

PROMESA § 314(b)(7), 48 U.S.C. § 2174(b)(7) ................................................. ~~45~~46, 47

PROMESA § 316, 11 U.S.C. § 2176 ........................................................................ 12

PROMESA § 405(l), 48 U.S.C. § 2194 (l) ................................................................. 22

PROMESA § 405(m), 48 U.S.C. § 2194 (m) .......................................................... 3, 45

**Puerto Rico Constitution**

P.R. Const. Art. VI, § 2 ............................................................................................. 29

P.R. Const. Art. VI, § 6 ..................................................................................... 37, ~~39~~

P.R. Const. Art. VI, § 8 ............................................................. ~~28~~29, 37, ~~38,~~ 39

**Statutes – Puerto Rico**

13 L.P.R.A. 41 ............................................................................................... ~~40~~41

Act 33 of 1942 ............................................................................................... ~~40~~41

Act 53 of 2021 ........................................ 20, ~~29~~30, ~~30~~31, ~~31~~34, ~~34~~35, ~~35~~50

Act 83 of 1991 ....................................................................................... 38, 39

**Rules**

Fed. R. Bankr. P. 7001(2) .................................................................................... 21

Fed. R. Evid. 408 ............................................................................. 20, 21, ~~36,~~ 37

[This filing corrects certain typographical or citation errors I noted after filing #19400, and in Section XXI, ¶¶ g-i, modifies the citations and text to reference provisions of the Eighth Amended Plan submitted by FOMB in November (as #19365, #19323, #19184 and #19053), which supersede the Seventh Amended Plan that I had previously cited and discussed in these paragraphs (cites are now to #19365, filed 11-28-2021).  Copies of redlined pages showing corrections are attached following the end of this document.]

Peter C. Hein, a GO and PBA bondholder who purchased in the 2009 through March 2012 time period, at times that Puerto Rico GO and PBA bonds were rated investment grade and years before PROMESA was even in prospect, previously filed an objection to confirmation (#18575), declarations in support of such objection (including #19047), a court-authorized sur-reply to FOMB's 10/27/2021 and 10/28/2021 supporting and reply briefs (#19093), and an objection to the proposed order and judgment confirming the plan (#19218).  I have also submitted exhibits into evidence (*see* #19172 and #19352), presented argument on certain issues on which the Court entertained argument, presented an opening statement and a closing argument, and filed papers in connection with prior proceedings in this Title III case.

Given time constraints in light of the schedule the Court has set for responses to Debtors' proposed Findings of Fact and Conclusions of Law ("FF/CL") (#19179-page-4-of-4, Item 5), I am not able to respond in detail to each and every assertion by Debtors in their FF/CL. However, I continue to maintain my objections, as set forth in the foregoing papers, exhibits and arguments previously filed in, or presented to, the Court.

To assist the Court in identifying my responses to particular paragraphs or sections of Debtors' FF/CL, I largely use Debtors' outline structure in this response, and I address FOMB's FF/CL on a paragraph-by-paragraph basis, to the extent feasible in light of the time constraints applicable to this filing.  In some sections of my below responses, I provide an overview of my objections pertinent to a particular topic first, and then (to the extent not covered in the overview) proceed to respond paragraph-by-paragraph, with appropriate cross references to the

completely ~~comprise~~comprised of  tax-exempt bonds or, if eligible for the Puerto Rico investor

election, receive the higher coupon single 2041 maturity bonds.  If the taxable New GO Bonds

were allocated to those who hold taxable securities, and tax-exempt bonds were allocated to

those who hold tax-exempt securities, the spectre of mainland U.S. bondholders who hold

tax-exempt bonds receiving instead some portion of taxable bonds would be eliminated.

  b. By providing only Puerto Rico Investors the option to elect one single 2041

maturity paying 5% in interest, whereas 50-states investors receive bits and pieces of 12 bonds

(two of which pay no current interest, and five of which have 4% coupons) individual 50-states

bondholders are discriminated against based on residence in violation of the cited provisions of

the Constitution, statutes and case law discussed in my objection, #18575-page-39-to-40-of-303.

  c. The entire issue of unfair discriminatory benefits to Puerto Rico Investors, and

detriments to the U.S. mainland investors, could be eliminated if the IRS determination of

whether all bonds will be tax exempt is obtained before the plan is confirmed and becomes

effective.  In light of the fact that FOMB has been in place for over five years, the Title III

petition with respect to the Commonwealth was filed in early May 2017, over 4 1/2 years ago,

and the various iterations of the proposed plan of adjustment began to be announced over two

years ago, in 2019, there is simply no reason to rush consummation and the Effective Date before

the IRS determination of tax-exempt status is received.  By waiting until the IRS determination is

received, one also avoids any spectre of securities initially being issued as taxable, only to then

in a short time be exchangeable into tax exempt bonds, but through an exchange process

imposing additional tax-related recordkeeping burdens on individuals, and fees charged  by

individuals' brokerage firms, resulting in added costs and burdens on individual Retail Investors**.**

 **Paragraph 54:**  Object and dispute.  a.  As evident from facts discussed in my

declaration and exhibits cited therein (#19047-page-18-to-19-of 27), not all current employees

are required for, or involved in, the provision of essential governmental services to

Commonwealth residents.  FOMB has never delineated which are essential services and which

are not, much less offered evidence to sustain a burden of proof as to which services are essential.  FOMB's failure to demonstrate which employees are actually needed, as opposed to being employed for political or other reasons unrelated to efficient provision of government services, is particularly problematic in light of the fact OATRH attendance reports are no longer produced and made public, which obscures (1)  issues with regard to attendance by public employees, and (2) issues with respect to the size and utilization of the Commonwealth's public employee work force, such as raised by the large number of PREPA employees who have recently been moved over to the Commonwealth payroll.  Underscoring the seriousness of the attendance issue, FOMB had imposed, as a stated requirement in its fiscal plans, the preparation and issuance of attendance reports by OATRH.  #~~18759-1~~15988-5-page-249-of-272, #17628-8-page-289-of-309.  OATRH had regularly issued these attendance reports "prepared for the FOMB" for years.  However, for reasons never explained, these reports ceased to be made publicly available after October 2020 and FOMB and AAFAF have refused to say why.  *See* #19047-page-18-to-19-of-27 and exhibits cited therein.

b.      As shown in #18760-3, of 114 government agencies, 85% + reported attendance when the OATRH attendance reports began to be issued in 2017.  But by the last week of October 2020, only 8.77% reported attendance.  And even before the pandemic hit, in January 2020, the percentage of "employees working" was as low as 16.73% to 38.55%.  *See* #19047-page-19-¶ ¶ 50-51-of-27, citing #18760-3.

c.      It is also disputed whether the interests of the Commonwealth and all of its stakeholders are served by the decision – under political pressure – to eliminate any reduction in the monthly benefit payments.  Originally, FOMB had stated that it was "appropriate and necessary" that there be a modest 8.5% reduction in monthly benefit amounts over $1200.  #15988-5-page-236-of-272.  Then FOMB backed off that reduction, and provided for a more limited reduction of 8.5% to the extent monthly pension benefits exceed $1500 per month.  FOMB stated this "reduction in pensions (with protections for participants close to the poverty

Investor), as I had instructed in September and October prior to the October 12 3 p.m. Merrill cut-off time for instructions (#18760-17-page-~~2~~3-of-7).  I was told in response that the Merrill back office is showing that there is a delay on the ATOP/Puerto Rico side, that delivered bonds had not yet been processed and issued new CUSIPS and that there was no time frame for completion.

l.      There needs to be an unambiguous means by which an individual Retail Investor can confirm that their bonds have already been delivered into the ATOP "accept" or "reject" bucket for Retail Investors.  This is of specific concern to me personally (as well as a general concern to others) because – despite my attempting to follow these cases as closely as practical, and despite my following up with my broker at Merrill – I am not in a position to verify that in fact my instructions to deliver to ATOP, certify as a Retail Investor and vote to "reject" were in fact followed.  Likely other individuals are in the same position.  For example, if new CUSIPs are supposed to be issued to those whose bonds were delivered to ATOP, those new CUSIPs should be provided to brokerage firms now and individuals should be provided a chart showing old CUSIPs and the corresponding new CUSIPs that qualify for the 1.321% (and, additionally, which new CUSIPs do not qualify for the 1.321%, if there are such).

m.      I fear I will only find out if my prior instructions were properly implemented with a delivery to ATOP (with a certification as a Retail Investor and a "reject" vote) after the Effective Date, which apparently will be after the internal broker deadlines for action in advance of the January 18, 2022 deadline for submission of the Retail Investor certifications to ATOP at DTC.

n.      Related to the foregoing concern, there needs to be a way investors and brokers can submit a Retail Investor certification out of an abundance of caution to make sure that a prior delivery to ATOP and vote to "accept" or "reject" with respect to their bonds was properly registered.

15

#19328-2-page-108-of-184)), there is no "second chance". *See* 19328-2-page-108-of-184.  The complex nature of the options given to Retail Investors raise the possibility that a broker (or broker's back office), who were unfamiliar with the ATOP delivery, certify and vote process as applied to municipal bonds, might not have correctly implemented the instructions of a qualified Retail Investor.  *See* #18761-4-page-3-to-7-of-7.  And because nothing in the solicitation materials told the individual Retail Investors how they could confirm that their bonds had been property delivered into the appropriate "accept" or "reject" bucket as an "accept" or "reject" vote with a certification of status as a Retail Investor, an investor may not realize the problem until after the Plan goes Effective and they receive distributions but no 1.321% fee.  Thus, FOMB's qualification should be removed.  If a broker discovers that a Retail Investor's bonds were not properly tendered into the appropriate ATOP bucket at DTC, the process should allow that problem to be cured.  Bear in mind, it is undisputed that whether someone voted "accept" or "reject," they are entitled to the 1.321%.  Someone should not be denied the 1.321% because of confusion – and, in particular, confusion by their broker – resulting from an overly complex process.

q.      **Fourth**, Retail Investor is inconsistently defined or described.  The Plan defines Retail Investor as one who holds less than $1 million of GO and PBA bonds.  Plan 1.435. #~~19323~~19365-page-81-of-296.  The proposed Order and Judgment (in par 87.~~a~~e, #19368-page-92-of-231) states a Retail Investor is one with $1 million or less (i.e., holdings of $1 million of GO and PBA bonds qualifies as a Retail Investor per the proposed Order but not per the Plan).

r.      But whatever the precise qualifying amount, neither Plan 1.435 nor Plan 3.6 requires navigation of the overly complex delivery to ATOP process used here as a pre-condition to receipt of the 1.321%.  I did a word search of the Plan (both of #17627 and the more recent #19323 and #19184); there appears to be no mention of "ATOP" anywhere in the Plan. Allowing errors in the ATOP delivery process to be cured is not only appropriate, it is necessary

17

b.   ***Second***, I did not agree to have any issues concerning validity, priority or secured status of the GO and PBA bonds resolved through the mediation-negotiation process in lieu of adjudication; rather I objected.  E.g., #9096 (citing prior filings), #9508, #11284.  And under settled legal principles, what settling bondholders agreed to cannot, and should not, be considered for any purpose.  *See*, *e.g.*, F.R. Evid. 408; *U.S.* v. *Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (citing 408); *Slattery* v. *U.S.*, 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").

c.   ***Third***, confirmation is not the proper procedure by which to abrogate bondholder property rights.  #18575-page-32-to-33-of-303.  Under Due Process and Bankruptcy Rule 7001(2), an adversary proceeding was required against each bondholder "to determine the validity, priority, or extent of a lien or other interest in property".  *Mansaray-Ruffin*, 530 F.3d 230, 234-43 (3d Cir. 2008); *Commercial Western Finance*, 761 F.2d 1329, 1336-38 (9th Cir. 1985).  Debtors implicitly acknowledged that by filing (but not prosecuting) adversary proceedings to challenge bondholders' liens.  *E.g.*, Adv.Proc. 19-292. However, that adversary was not prosecuted – it was stayed at Debtors' behest (and over my objection).  *E.g.*, Adv.Proc. 19-292-Doc#54 & #54-page-2n.5-of-7; #11284.  No adversary proceeding was brought to contest validity or priority (albeit a claims objection to contest validity was brought, but also was never the subject of a judicial ruling).

d.   ***Fourth***, use of a confidential mediation-negotiation process – rather than adjudication of the priority, secured status and validity of the GO and PBA bonds – cannot be used to abrogate rights of non-consenting bondholders, for reasons set forth, *e.g.*, in #18575-page-33-to-34-of-303.

### B.   Specific responses to ¶¶ 84-101

**Paragraph 88:**  Object and dispute for reasons set forth above and on grounds that the incorporated "settlements and compromises"" are not by all bondholders and that there has been no adjudication of rights through a successful prosecution to judgment of an adversary

proceeding as was required if Debtors sought to alter the validity, priority or secured status of GO and PBA bonds, as discussed in my objection. #18575-page-32-to-33-of-303.

**Paragraph 89:** Object and dispute, including for reasons set forth above.

**Paragraph 90:** Object and dispute, including for reasons set forth above.

**Paragraph 91:** Object and dispute, including for reasons set forth above. Furthermore, the ~~reported~~asserted reasonableness of the settlement as to Debtors does not provide a basis for binding creditors who do not consent, which would require a successful prosecution to judgment of an adversary proceeding, as discussed in #18575-page-32-to-33-of-303.

**Paragraph 92:** Object and dispute, including for reasons set forth above.

**Paragraph 100:** Object and dispute, including for reasons set forth in Section XXIV.

**Paragraph 101:** Object and dispute, including for reasons set forth in Section XXIV.

**XI.   Response to ¶¶ 102-103:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1123(d).**

**XII.   Response to ¶¶ 104-112:  Compliance with PROMESA Section 314(b)(1):  11 U.S.C. 1129(a)(2), (3), (6).**

**A.   Overall response to ¶¶ 104-112:** Object and dispute, for reasons previously set forth. In addition, FOMB and Commonwealth have not acted in good faith and ~~not~~have acted by means forbidden by law, in that, among other things, (i) FOMB has refused to pay the GO and PBA debt service that has priority under the Puerto Rico Constitution, despite the fact Puerto Rico has sufficient funds to pay all GO and PBA debt service in full, as I have detailed in my objection (#18575-page-26-to-27-of-303), declaration (#19047-page-6-to-16-of-27), opening statement and closing argument, based on exhibits in the record including #18760-31, #18758-6, #18758-7, #18759-2, #18759-4, and other exhibits cited in #19047; (ii) although Commonwealth with FOMB's consent could have paid interest on an ongoing basis (*cf.* PROMESA 405(l)), Commonwealth and FOMB have refused for 4 years to pay even interest on the GO and PBA debt – even while pension obligations, which do *not* have a "first claim" priority under the

22

#18439.  To avoid any suggestion that I acquiesce in the proposed findings that appear in this section, I respond below to those proposed findings as well.

Paragraph 121:  Object and dispute.  The issue addressed in ¶ 121 concerning retirees with pensions below the federal poverty level was previously addressed by the FOMB determination that the reduction of monthly benefits would only apply, first, to benefits in excess of $1200/month, and then benefits in excess of $1500/month.  *See generally* Section VI, par 54.c.  Furthermore, the issues raised in ¶ 121 are not a justification for Puerto Rico failing to pay the debt that has "first claim" priority under Puerto Rico's Constitution.  Paragraph 121 also fails to address (i) whether and to what extent pension benefits are being paid to individuals who no longer reside in Puerto Rico and (ii) the tax-free nature of the monthly pension benefits paid.

Paragraph 122:  Object and dispute for reasons set forth above.  Furthermore, the illogic of the fiscal multiplier analysis is underscored when one considers that (i) carried to its logical conclusion, the solutions to all of Puerto Rico's financial problems would be to simply continue to ratchet up government spending above and beyond the 29% increase in outlays from fiscal 2018 to fiscal 2021 (but that clearly is not the solution), and (ii) the fiscal multiplier analysis fails to factor in the fact that spending requires taxing or borrowing that takes money out of the economy, and thereby reduces private sector activity that may be more economically productive than the public sector activity the taxes or spending finances.

Paragraph 123:  Object and dispute, including for reasons set forth above.

Paragraph 124:  Object and dispute, including for reasons set forth above.

Paragraph 125:  Object and dispute, including for reasons set forth above.

Paragraph 126:  Object and dispute.  Among other things, FOMB ignores that its own expert, Dr. Wolfe, acknowledges that Commonwealth ""has largely failed to implement the structural reforms recommended by"" FOMB and others. #18151-1-page-5-of-30.

**XVI.   Response to ¶¶ 129-134:  Compliance with PROMESA Section 314(b)(2).**

**Overall response to ¶ ¶ 129-134**:  Object and dispute, including for reasons set forth in objection #18575-page-35-to-38 as well as #16909, #18237, #18247, #18306 and #18439.

**Paragraph 132:**  Object and dispute.  a.  As set forth in my objection (#18575-page-36-to-37-of-303),  Section 1125(b) is express:  "An acceptance or rejection of a plan *may not be solicited … unless, at the time of or before* such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement *approved*, after notice and a hearing, by the court as containing adequate information," (emphasis added).

b.      Rather than wait until the Court approved, and creditors received and studied the 2695 page disclosure statement (with exhibits), Debtors preemptively, without advance Court approval, launched the 7/27/2021 ex-change offer in an effort to lock in support – and votes – for the Plan.  #17649-page-2,9-to-29-of-29.  The exchange offer had a stated deadline of August 13, 2021, but as a practical matter Retail Investors were required to notify their brokers by earlier dates (*e.g.*, by August 10).  #17649-page-2,4,6,10-of-29.

c.      The Court did not approve the Disclosure Statement, and authorize solicitation of acceptances and rejections of the Plan, until August 2, 2021 (after the exchange offer had been launched, see #17649), and the solicitation packages were only belatedly mailed weeks thereafter (#17639-page-6-to-of-27-¶¶ 2,9,11,13; #18237; #18247; #18306; #18439).  The 7/27/2021 exchange offer was not compliant with the Court's order approving the disclosure statement and solicitation packages and distribution procedures (#17639).

d.      The exchange offer professed that it was "not … a solicitation … within the meaning of section 1125" (#17649-page-10-of-29).  But the Plan is structured to pay added consideration pro rata to certain favored bond-holders.  For individual bondholders excluded from the Plan negotiations, and who had no committee to represent them (#6534, #17724), to be sure to get even part of the added consideration given to negotiating bond-holders (*i.e.*, the

**C.    Contract Clause.**

**Paragraph 139:**  Object and dispute.  a.  Commonwealth's impairment of the rights of its "first claim" priority (and secured) GO and PBA bondholders violates the Contract Clause, as explained in #18575-page-41-to-46-of-303 and in argument in the course of the confirmation hearings.

b.    FOMB argues that no provision of the Plan requires violation of the Contract Clause because Congress is empowered to impair contractual obligations pursuant to the Bankruptcy Clause.  #19366-page-71-of-113.  As a threshold matter, there is a flaw in FOMB's citation of, and quotation from, *City of Stockton*, 478 B.R. 8, 14-15 (Bankr. E.D. Cal. 2012), which in turn purports to cite and quote from the U.S. Supreme Court's opinion in *Sturges* v. *Crowninshield*, 17 U.S. 122, 191 (1819).  *City of Stockton* actually quotes from *the argument of counsel* preceding Chief Justice Marshall's opinion in *Sturges* v. *Crowninshield*, not the opinion of the Court—*compare* 17 U.S. at 191 (in official reporter).

c.    Beyond this, FOMB disregards that, here, PROMESA itself posits as a requirement for confirmation that debtor must prove that "debtor is not prohibited by law from taking any action necessary to carry out the plan" (PROMESA 314(b)(3)).  As discussed in Section XVII.B above, one action "necessary to carry out the plan" is the enactment of Act 53, which provides for the "cancellation and extinguishment" of the existing bonds.  Since the Contract Clause of the U.S. (as well as Puerto Rico) Constitution prohibits the Puerto Rico legislature from cancelling and extinguishing existing bonds, Commonwealth is prohibited by the Contract Clause from taking this "action necessary to carry out the plan."  Moreover, Act 53 essentially reverses the priority of the GO and PBA debt under Puerto Rico's Constitution, by providing for a multitude of expenditures to be made – ranging from eliminating the ~~month~~monthly benefit modification irrespective of the amount of a monthly benefit, to funding for the University of Puerto Rico, to other purposes – even while the GO and PBA debt is impaired (#19062-page-735-to-736-of-756).  Because the statute impairing the contract here is a

30

to the bondholders.  Act 53's provisions for cancellation and extinguishment of GO and PBA debt violate the Contract Clause.

       h.      FOMB makes no response to other points in my objection.  Thus, I noted that there is no "Congress-authorized-violation" exception to the Contracts Clause, *citing*, *Saenz* v. *Roe*, 526 U.S. 489, 508 (1999) (Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution.").  #18575-page-41-of-303.  No response.

       i.      I discussed *United States Trust*, the controlling case regarding whether a municipal issuer can impair its own bond obligations, which makes the points that "need for money is no excuse for repudiating contractual obligations" (431 U.S. at 26n.25, *citing Lynch*), and that impairment must be both reasonable and necessary (431 U.S. at 25-26,29-32). #18575-page-42-of-303.  Again, no response.

       j.      FOMB has the burden of proving that the §314(b)(3) requirement for confirmation is met.  Nevertheless, I specified in detail in my objection (#18575-page-42-to-4445-of-303), in my opening, and in my closing, specific facts, documented by exhibits in evidence – most documents issued by FOMB or Commonwealth themselves – that contradict any assertions that the *United States Trust* standard is met here.  I also made the point that, per Commonwealth documents, total outflows have increased 29% from FY2018 to FY2021.  #19047-page-17-par.44-of-27; #18760-15; #18760-16.  Yet FOMB's proposed findings on the Contract Clause do not so much as cite or discuss one piece of evidence. *Compare* #19366-page-71-to-72-of-113.

       k.      In argument of counsel during the hearings, FOMB tried to counter my showing – from Commonwealth's own records – that over $300 million had been spent on thousands of contracts for "advertising, representation or artistic services," and over $2.375 billion had been spent on thousands of consulting contracts (*e.g.* #18575-page-43-of-303 and documents cited; #19047-page-17-to-18-of-27; #18760-4 thru #18760-7).  But FOMB's argument of counsel did not dispute my facts.  Rather, FOMB simply argued that it could be counter-productive to pare

back on expenditures for advertising.  But that is just argument of counsel – no facts were put
forward to show that all of these expenditures were actually reasonable or necessary.  In addition,
FOMB counsel's argument is hardly the stuff of judicial notice.  No facts have been offered by
FOMB to show the content of the advertising, how much is spent on tourism advertising outside
Puerto Rico as distinct from government self-promotion within Puerto Rico, or why government
sponsored generic advertising is somehow more effective than advertising dollars spent by
private tourist businesses or business associations (*e.g.*, hotels or associations of tourist
businesses) in attracting paying customers.  And, aside from advertising, counsel offered no
rationale for why all of the thousands of contracts for "representation", or "artistic services", or
consulting are supposedly "essential."

l.      Elsewhere, FOMB may talk about recitals in PROMESA – now 5 ½ years old –
and hurricanes and COVID – problems that have also afflicted Florida, Louisiana, Mississippi,
Texas, North Carolina, and many other states in recent years, all of whom continue to meet their
full faith and credit obligations to bondholders.  But none of this contradicts my showing, again
with Commonwealth documents, that Puerto Rico could pay all currently due debt service on its
GO and PBA bonds and still have over $5.5 billion unrestricted cash, and over $17.5 billion total
cash, left over.  #18575-page-26-of-303; #19047-page-6-par¶¶-10-12-of-27; #18758-6 p.4,7,11;
#18760-31; #18797-1-p.9.  And that Commonwealth's surplus in the last fiscal year (FY2021) of
$3.97 billion was three times more than needed to pay GO and PBA debt service.
#18575-page-42-of-303; #19047-page-9-par.¶¶-19-20-of-27; #18759-4-p.9; #18797-1-p.9.

m.      Moreover, nowhere does FOMB confront the implications of the report of
FOMB's own expert, Dr. Wolfe, whose report and live testimony on cross sets forth that
Commonwealth "has largely failed to implement the structural reforms recommended by"
FOMB.  #18151-1-page-5-of-30, cited in my objection, #18575-page-42-of-303.  While FOMB's
failure to prove that 314(b)(3) is met does not require the Court to reach this point, I submit that
it is manifestly neither reasonable nor necessary for Commonwealth's government to persist in

refusing to adopt structural reforms that FOMB and its own experts have recommended for years now, and then claim that, although it has the funds for every sort of expenditure *other than* debt service, it cannot possibly meet the obligation to pay its GO debt that its Constitution sets as its first priority.

n.      In light of FOMB's failure to make a factual showing that would meet its burden of proof that the §314(b)(3) requirement is met, much less a factual showing that would counter the evidence I proffered – this case does not turn on who has the burden of proof on whether an abrogation of bondholder rights is both reasonable and necessary.  However, I note that under *United States Trust*, Commonwealth—self-interested in not paying its debt obligations—bears the burden of demonstrating that abrogation of rights of GO and PBA bondholders is both reasonable and necessary.  431 U.S. at 31 ("the State has failed to demonstrate.").  The Constitutional violation here follows *a fortiori* from *United States Trust*, where a covenant's abrogation did not directly jeopardize payments to bondholders.  431 U.S. at 18-19.  The First Circuit's *United Automobile* decision is not to the contrary.  Two judges, concurring in *United Automobile*, stated the Supreme Court suggested that the burden of establishing reasonableness and necessity lies with the government and whether a plaintiff asserting a Contract Clause violation bore the burden of proof was "unsettled"; they emphasized the "outcome of this case need not turn on definitive resolution of the burden issue." 633 F.3d 37, 48-49 (1st Cir. 2011) (Boudin & Howard, JJ., concurring).

o.      Also I dispute that PROMESA is a "uniform" law "on the subject of bankruptcies throughout the United States", as set forth in my objection #18575-page-46-to-47-of-303.

p.      Also, under 48 U.S.C. §2163 territory law – here, Commonwealth legislation, such as Act 53-2021 (#19062-page-688-of-756), to the extent it provides for the "cancellation and extinguishment" of existing bonds — prescribes a method of composition of indebtedness that cannot bind nonconsenting creditors.

and in *Koontz*.  In addition, *Patriot*'s citation of *Security Industrial*'s statement that lien

avoidance under § 552(f) "fits but awkwardly into the analytic framework employed in Penn

Central' (164 F.3d at 685) requires that one look at *Security Industrial*, and *Security Industrial's*

ruling that Congress could not retroactively side-step the Takings Clause does not support

applying *Penn Central* here.  After its "fits but awkwardly" observation, *Security Industrial* goes

on to underscore that the fact the "bundle of rights" accruing to secured parties is smaller than

that of fee owners does not alter the status of liens as property.  459 U.S. at 76-78.  Furthermore,

the bankruptcy provision in *Patriot* was applied prospectively – not retroactively.  164 F.3d at

685.

     e.     Underscoring that *Penn Central* does not provide the proper analytical framework

here, in *Penn Central*, the regulation did "not interfere with…Penn Central's primary

expectation concerning use" (438 U.S. at 136).  Here, Act 53 provides for the "cancellation and

extinguishment" of the existing bonds and essentially reverses the priority of the GO and PBA

debt under Puerto Rico's Constitution, by providing for a multitude of expenditures to be made –

ranging from eliminating the month benefit modification irrespective of the size of a monthly

benefit, to funding for the University of Puerto Rico, to other purposes – even while the GO and

PBA debt is impaired (#19062-page-733-sec.201(pp),734-sec.103,735-to-736-of-756).

     f.     Previously in these proceedings FOMB has argued that ~~argues~~ there is no property

interest here, so there can be no taking.  But this argument ignored that *United States Trust*,

which involved a municipal bond covenant that protected bondholders, stated "contract rights"

"are a form of property" for purposes of the Takings Clause, and cited *Lynch* with approval.

#18575-page-28-to-29-of-303.  FOMB had cited *Connolly* v. *PBGC*, a case dealing with federal

legislation concerning Multi-Employer Pension Plan Act requirements on withdrawing

employers, but (based on a word search of the opinion) that case does not discuss *Lynch*.

#18874-page-46-of-94.

g.       Buttressing *United States Trust* are a host of recent Supreme Court opinions,

including *Horne* v. *Department of Agriculture*, 135 S.Ct. 2419, 2425-31 (2015) (an

"appropriation" of personal property or intangibles, or a partial interest therein, gives "rise to a

per se taking"); *Koontz* v. *St. Johns River Water Mgt. Dist.*, 570 U.S. 595, 614-616 (2013)

("bank account" or "money"); *Phillips* v. *Washington Legal*, 524 U.S. 156, 169-72 (1998)

("interest income").

h.       This "no property interest" argument does not appear to be pressed in FOMB's

proposed conclusions of law.

**Paragraph 141:**  Object and dispute for reasons discussed above.

**Paragraph 142:**  Object and dispute for reasons discussed above.

**Paragraph 143:**  Object and dispute for reasons discussed above.

**Paragraph 144:**  FOMB argues in ¶ 144 that the value to be received by bondholders

constitutes just compensation based on the assertion that "creditors will receive consideration

that is discounted by settlements that recognize significant litigation risks, the allocation of

distributions was determined via a long mediation and settlement process among sophisticated

parties."  However, as noted above, under settled legal principles, what settling bondholders

agreed to cannot, and should not, be considered for any purpose.  *See, e.g.*, F.R. Evid. 408; *U.S.*

v. *Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (citing 408); *Slattery* v. *U.S.*, 231 F.2d 37, 41

(5th Cir. 1956) ("prices paid in settlement … inadmissible").  I had made this point in my

objection (#18575-page-31-to-32-303), and in my sur-reply I made the point that FOMB had

offered no response to my citation of F.R.Evid. 408, *Contra Costa* and *Slattery* for the

proposition that what settling bondholders agreed to cannot be considered for any purpose.

#19093-page-  6 -of-  11 .  Tellingly, FOMB still provides no response to these authorities.

E.    Preemption.

**Paragraph 145:** a.    FOMB seeks to sidestep its inability to prove that debtor "is not prohibited by law from taking any action necessary to carry out the plan" (as PROMESA §314(b)(3) requires in order for the court to confirm a plan) by simply having the plan provide that dozens of laws, as well as provisions of Puerto Rico's Constitution, "are held preempted". The broad sweep of preempted laws would "include, without limitation, laws enacted prior to June 30, 2016, that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose". #19366-page-74-of-113 ¶ 145.  Highlighting the extraordinary sweep of preemption being asserted, FOMB purports to preempt "Sections 6 and 8 of Article VI of the Puerto Rico Constitution insofar as they could be applied to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant the Plan, but not for any future purpose".  How provisions of the Puerto Rico Constitution could be preempted as applied to GO and PBA bonds "but not for any future purpose" is left to the reader's wonderment.

b.    PROMESA § 4 does not provide for the sweeping preemption of Puerto Rico's Constitution and laws that FOMB asserts.  Section 4 simply provides "[t]he provisions of [PROMESA] shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with [PROMESA]".  However, PROMESA, by its terms, in § 314(b)(6) requires the court "to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan" and PROMESA § 201(b)(1)(N) provides that a fiscal plan "shall" "respect the relative lawful priorities or lawful liens, as may be applicable, in the Constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016."  There is, and can be, no inconsistency between PROMESA and the Puerto Rico constitutional and statutory provisions that PROMESA itself repeatedly references

and expects to be respected.  Accordingly, PROMESA does not preempt the very constitutional

provisions and other laws that PROMESA itself looks to.

c.      The House Report provisions further underscore that Congress was well aware of

the Puerto Rico constitutional and statutory provisions according priority to GO and

Commonwealth guaranteed debt, as well as the positions of creditors that they had secured

interests, and Congress sought to "ensure" the "lawful priorities and liens" provided for in those

constitutional and statutory provisions would be respected in the event of a restructuring – not

sweep them away as "preempted".  *See* H.R.Rep.page-114-602-regarding-201,314-pp.58,63/115,

discussed #18575-27-page-27-of-303 and reprinted 48 U.S.C. #18575-page-205-to-207-of-303.

d.      Further highlighting the overreaching nature of FOMB's preemption requests is

that FOMB seeks to preempt Act 83 of 1991, relating to the 1.03% property tax.  See

#19368-page-217-of-231-II.I (& Note 4 referencing amounts); #19365-page-288-of-296-II.I.  As

I noted in cross-examining Ms. Jaresko, Act 83 of 1991, relating to the 1.03% property tax, is

specified in the disclosure statement as the "first" source of payment of the New GO Bonds.

#17628-page-56-of-654.

e.      The second source of funds for payment of the New GO Bonds specified in the

disclosure statement are "the monies arising from the operation of Article VI, Section 8 of the

Puerto Rico Constitution."  #17628-page-56-of-654.  But, per FOMB, that too is to be

preempted.  #19368-page-218-of-231-V; #19365-page-289-of-296-V.

f.      Ms. Jaresko on cross found it difficult to answer my questions about how it can be

that FOMB represented Act 83 as the first source of payment for the New GO Bonds, and

monies arising from the operation of Article VI, Section 8 of the Puerto Rico Constitution as the

second source of payment, yet those very same provisions of law are to be held preempted.

Respectfully there is no plausible answer.

would be "paid … with any available funds in the Commonwealth Treasury, … which funds are appropriated as continuous appropriations without its being necessary to make new appropriations for said purpose." Yet, per FOMB's counsel, the Puerto Rico legislature took it upon itself to repeal (and thereby revoke) this "irrevocable pledge."

d.     **Second,** despite having the funds to pay all GO and PBA debt service, the existing bonds have not been paid and will not be paid in full under the Plan, yet FOMB has now backed off twice so that monthly benefit reductions (originally proposed for retirees' benefits over $1200/month, then over $1500/month) will not occur at all. This has made plain there simply is no political will to pay bondholders, irrespective of how much cash is on hand or how large a surplus has been realized. There will always be expenditures more politically appealing than paying bondholders. And this has occurred when an "oversight" board is in place

e.     **Third**, as noted elsewhere, audited financial statements have only gotten later and remain late. And internal control weaknesses, dating back over 5 years to 2016, remain unresolved. #18760-13.

f.     **Fourth**, FOMB's own expert, Dr. Wolfe, testified that for the past 5 years or more the Puerto Rico Government "has largely failed to implement the structural reforms recommended by" FOMB and others. #18151-1-page-5-of-30. And FOMB put forth Dr. Wolfe – FOMB thought this helped its case by showing that, despite its projections of deficits beginning in the 2030s, there was some path Puerto Rico could take to generate sufficient tax revenues to pay debt service. But while Dr. Wolfe identified structural reforms that could be done, there was no proof the Puerto Rico politicians who have resisted these reforms for ~~year~~years would adopt these needed structural reforms.

g.     **Fifth**, even while not paying GO and PBA bondholders, public unionized employees have been promised signing bonuses and now guaranteed annual bonuses of at least $2000/year, annual Christmas bonuses for public employees– paid every year even while in Title III – will continue, and the Excess Cash Surplus feature of the Plan in effect mortgages

Puerto Rico's future to the public employee unions, to the detriment of both bondholders (who should be paid before additional bonuses are distributed) and the many private sector businesses (large and small) and their employees (who do not benefit from this distribution of "upside" bonuses to public employees).

h.    In addition to generally objecting and disputing, additional specific responses to portions of paragraphs 155 – 174 follow.

**Paragraph 160:**  Object and dispute for reasons set forth above.  In addition, it is not correct to say that "[a]ll holders" of GO and Commonwealth guaranteed debt will receive 13 CUSIPs, as Puerto Rico investors receive preferential treatment in violation of provisions of the U.S. Constitution and statutes, as discussed in my objection #18575-page-39-to-40-of-303. Furthermore, Mr. Brownstein's testimony (i) underscores the significance of pro rata payments of 1.5 % of par (in violation of the "same treatment" requirement as discussed in section VIII), and (ii) is premised on the asserted "need to keep annual debt service sustainable;" however, as demonstrated else-where in this response, Puerto Rico can pay all GO and PBA debt.  Finally the elimination of the debt service reserve fund undermines any claim of feasibility in light of the willingness to pay issue discussed above.

**Paragraph 161:** Object and dispute, including on the grounds that any "upside" should go first to the "first claim" priority GO and PBA bondholders who have a "first claim" under Puerto Rico's Constitution.

**Paragraph 162:**  Object and dispute, including on the grounds that any "upside" should go first to the "first claim" priority GO and PBA bondholders who have a "first claim" under Puerto Rico's Constitution

**Paragraph 163:**  Object and dispute, including for reasons set forth above.  In addition, elimination of the Monthly Benefit Modification improperly reverses priorities of payment under Puerto Rico's Constitution.

43

$13 billion of which is available to pay GO and PBA debt service, has accumulated), it would

seem evident that "available remedies under the non-bankruptcy laws and constitution" of Puerto

Rico "would result in a greater recovery for the creditors than is provided" by the plan, and thus

(to quote the language of PROMESA 314(b)(6)).

b.      FOMB's legal arguments do not support its conclusion that this Court can –

consistent with PROMESA § 314 – confirm a plan whereby GO and PBA bondholders with a

"first claim" priority under Puerto Rico's constitution (which also builds in an enforcement

mechanism) receive less pro rata than creditors, such as public employees and public employee

retirees who do not have that constitutional priority.  And it is markedly less.  Unlike retirees

whose pensions have continued uninterrupted, bondholders have not been paid a dime for years.

As FOMB admits, under the non-bankruptcy laws of Puerto Rico bondholders are entitled to be

paid all accrued interest – including post-petition interest – as well as all due principal.

#18807-8-page-13,39-of-110 (Debtor Ex. 130 p. 13 par 1, last sentence; p.39 item 9 assumption

'i' – the McKinsey best interest test report).  Thus, for my vintage 6% bond maturing 7/1/2039,

CUSIP 74514LWA1, I am owed not only principal, but also interest going back to July 1, 2016

(aggregating $33,000, for a total non-bankruptcy claim of $133,000).  I receive 77.6% under the

plan (#17268-page-34-of-654), but that is not 77.6% of $133,000 but rather 77.6% of principal

plus pre-petition interest only, which I estimate to be about $5000, for a bankruptcy claim of

$105,000.  $105,000 / $133,000 = approx. 61.2% recovery.  This on a bond that is indisputably

valid.  And that Puerto Rico has the cash in the bank to pay full debt service today.  Recoveries

on bonds subject to (never adjudicated) claims of invalidity are less.

c.      FOMB argues that the Court only looks at aggregate recoveries of all creditors,

and need only "consider" the non-bankruptcy remedies of GO and PBA bondholders.  But

FOMB's interpretation effectively reads the added language of §314(b)(6) out of the statute, as I

explain in my sur-reply (#19093-page-7-to-9-of-11).  The language added to § 314(b)(6) on its

face focuses the inquiry not simply on the remedies available to all creditors, viewing creditors

Case:17-03283-LTS   Doc#:19422   Filed:12/06/21   Entered:12/06/21 11:34:15   Desc: Main
Document    Page 98 of 103

as a whole, but also on the remedies available to particular creditors, since all creditors may not have the same "available remedies under the non-bankruptcy laws and constitution" of a territory. FOMB's interpretation would fail to give effect to Congress' addition of the language to § 314(b)(6) – referencing "available remedies under the non-bankruptcy laws and constitution of the territory" that "would result in a greater recovery" – that does not appear in § 943(b)(7).

d.      Notably, Congress emphasized that "[t]he stay is limited in nature and narrowly tailored to achieve the purposes of this chapter, including to ensure *all* creditors have a fair opportunity to consensually renegotiate terms of repayment based on accurate financial information that is reviewed by an independent authority *or, at a minimum, receive a recovery from the Government of Puerto Rico equal to their best possible outcome absent the provisions of this chapter*." PROMESA § 405(m)(5)(emphasis). This provision confirms that Congress contemplated that the inquiry would be focused on the remedies available to particular creditors.

e.      And while FOMB stresses the word "consider," it ignores that the word consider is preceded by the word "required" – the court is "required" "to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan." Finally, FOMB stresses that the plural was used – "creditors" – but there are multiple creditors in the bondholder classes. Use of the plural does not signify an aggregate analysis was intended. Fundamentally, FOMB's reading would construe 314(b)(6) to be the same as 11 U.S.C. 943(b)(7), whereas my reading would give meaning to the words added in 314(b)(6).

f.      Notably, FOMB states the aggregate recovery for all claimholders will be 69%. #19366-page-92—of-113. But that means that my recovery of 61.2% - even on a vintage bond, indisputably valid, with a constitutional right to priority of payment – is materially below average. This is a clear indication that FOMB's legal framework is wrong and fails to give effect to the plain meaning of the language Congress added to 314(b)(6).

46

g.      And FOMB points to Exhibit 7 in best interests test report (Debtor Ex. 10-page-~~10~~21-of-110, #18807-8-page-21-of-110) which supposedly shows a range of recoveries for GO bondholders if all GO bonds are deemed valid.  The range is 75% to 84%.  But as noted my recovery on a vintage GO bond that is indisputably valid is only 61.2%.

h.      The complexity of the McKinsey best interest test is not proof of its validity.  The analysis is premised on a host of legal and other assumptions, none of which have been "independently verified" by McKinsey.  And McKinsey does not "take an independent position" with respect to the information and assumptions it has been provided.  That is admitted on the first text page of the report, #18807-8-Debtor Ex. 10-page-3-of-110.  This report fails to carry FOMB's burden of proof.

## XXI.   Response to ¶¶ 184-191:  Compliance with PROMESA Section 314(b)(7).

### A.      Overview of Response to ¶¶ 184-191:  Failure to meet the requirements of 48 U.S.C. § 2141(b)(1)(N) and § 2174(b)(7) precludes confirmation.

**Paragraph 184-191:**  Object and dispute.  a.  Protections against unilateral decisions by FOMB to unfairly treat bondholders who have a first claim priority under Puerto Rico's Constitution include Section 2141(b)(1)(N), which requires that fiscal plans "shall … respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory…in effect prior to June 30, 2016" (emphasis added).  Section 2174(b)(7) requires, at confirmation, the plan be "consistent with the applicable fiscal plan."

b.      The House Report discussion of § 2141 and § 2174 explains:

Fiscal Plans ***ensure the protection of the lawful priorities and liens*** as guaranteed by the territorial constitution and applicable laws, and prevent unlawful inter-debtor transfers of funds. …

By incorporating consistency with the fiscal plan into the requirements of confirmation of a plan of adjustment, the committee has ***ensured lawful priorities and liens***, as provided for by the territory's constitution, laws, and agreements, ***will be respected*** in any debt restructuring that occurs.

47

H.R.Rep.page-114-602-regarding-§ 201,314-pp.58,63/115(emphasis added). (#18575-page-205-to-207-of-303)

c.      The House Report's explanation ("ensured lawful priorities and liens…will be respected") underscores that, at plan confirmation, courts can (and should) remedy FOMB's disregard of § 2141(b)(1)(N).

d.      The Plan does **not** respect the "first claim" priority and liens of GO bondholders:

e.      **First**, energy incentive and tax incentive claims aggregating over $2 billion are unimpaired.  #17628-page-489-to-491-of-654.  Other classes that do not have Constitutional priority are also unimpaired (*e.g.*, Classes 51A,51C,51J,51K,55,57,67,68) or receive larger percentage recoveries, in many cases – since there will no longer be reductions in any monthly benefits - up to 100% (Classes 51B,51D-to-51I,51L,69).  Cf. #17628-page-79,464,466-to-481,489-to-491,504-of-654 (#17628 does not reflect the elimination of the 8.5% reduction in monthly pensions above $1500/month).  FOMB, as representative of debtor Commonwealth, has no right to decide it is better for the debtor that FOMB represents to reverse the priorities under the Puerto Rico Constitution and pay these classes more than nonconsenting GO and PBA bondholders.

f.      **Second**, yet additional classes that do not have Constitutional priority nevertheless receive non-contingent cash recoveries, including cash payments to public employees and their unions.  *E.g.*, Class 52,53,56,58. #17628-page-486-to-488,490-to-494-of-654.

g.      ~~Under~~Particularly in light of FOMB's own recent experience with projections~~, over $2.1 billion~~ that understate ultimate actual performance, there is the potential for billions of dollars of "Excess Cash Surplus," ~~may be~~resulting in large amounts paid out ~~for~~in Upside Performance Bonuses ~~($1.551 billion) and Benefit Restoration ($620.6 million),~~ in FY22-FY26. (#19365-page-57(§ 1.235), 59(§ 1.255), 126-to-127 (§ 56.l(a)), 238-to-239,264-to-265-of-296,

48

*superseding,* #17627-page-41(§ 1.118), 57(§ 1.234), 59(§ 1.254), 127(§ 56.l(a)),

234-to-235,258-to-259-of-291; #17628-8-page-44-of-309;

#1690815988-5-page-15 to 16,2041-of-272; #18759-4-p.9; Hein ¶¶19-20,

#19047-page-9-of-17827).   FOMB may argue that it is the fiscal plan in effect on the Effective

Date that will be the measuring point for Excess Cash Surplus, but since the current fiscal plan

was certified on 4-23-2021 FOMB has agreed to numerous additional "sweeteners" for Puerto

Rico politicians and public employees, including dropping any reductions in monthly pension

benefits, guaranteeing an additional $10,000 per employee of bonus money (even if there is no

Excess Cash Surplus), committing to new minimum funding levels for the University of Puerto

Rico and increasing assistance to municipalities.  #18760-11.  Based on FOMB's track record, it

is hard to see FOMB modifying the current fiscal plan in a manner that reduced the prospects for

multi-billion dollar payouts of Upside Performance Bonuses and other benefits to public

employees from projected Excess Cash SurplusSurpluses.

h.      Furthermore, if the Medicaid funding "cliff" is averted, added payments for

Upside Performance Bonuses, Benefit Restoration and Pension Reserve contributions will be

staggering (Hein ¶65, #19047-page-24-of-27), and if the 5/27/2020 fiscal plan projections are

used as the benchmark, the added payments to or for the benefit of public employees and retirees

and their unions will be doubly staggering (Hein ¶66, #19047-page-24-of-27).

i.       Because – whatever the base for the calculation – an Excess Cash Surplus

number, that results in the potential for huge multi-billion dollar payments to or for the benefit of

public employees and that is computed before debt service (*see* 4/23/2021 fiscal plan p.43 & Ex.

18 (#17628-8-page-44-of-309); #17628-6-page-30-of-35 & n.2; #17628-7-page-42-of-65 & n.2),

it is very possible that these multi-billion dollarpresents the potential for payouts to public

employees and retirees that will jeopardize Puerto Rico's ability to pay debt service even on the

New GO Bonds.

December 1, 2021 [corrected filing 12-6-2021]

Respectfully Submitted,


/s/ Peter C. Hein
Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY  10023
917-539-8487
petercheinsr@gmail.com

Claim 10696 and 174229
GO Bonds:  500,000 par amount, plus
unpaid interest to date
[5 separate CUSIPS:   74514LVX2
                                    74514LWA1
                                    74514LWM5
                                    74514LWZ6
                                    74514LB63]
PBA Bonds:  200,000 par amount, plus
unpaid interest to date
[CUSIP:  745235M24]


**Declaration pursuant to 28 U.S.C. § 1746**


I declare under penalty of perjury that the factual statements in the foregoing objection are true
and correct to the best of my knowledge and belief.


Executed on this 1st day of December 2021 [corrected filing 12-6-2021].


          /s/ Peter C. Hein
               Peter C. Hein

### Certificate of Service

I, Peter C. Hein, certify that I have caused the foregoing "Objection To Proposed Findings Of

Fact And Conclusions Of Law (This Objection Is Filed By Individual GO And PBA Bondholder

Peter C. Hein)" to be served via the Court's CM/ECF system.


December 1, 2021 [corrected filing served 12-6-2021]


_____/s/ Peter C. Hein_____

Peter C. Hein